135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

crime that "involve [d] *conduct* that present[ed] a serious potential risk of physical injury to another." 🚩 § 924(e)(2) (B)(ii) (emphasis added). At the very least, it would be a reasonable way to describe the defendant's conviction.

The *Taylor* Court's remaining reasons for adopting the categorical approach cannot justify an interpretation that renders the residual clause unconstitutional. While the *Taylor* Court feared that a conduct-specific approach would unduly burden the courts, experience has shown that application of the categorical approach has not always been easy. Indeed, the Court's main argument for overturning the statute is that this approach is unmanageable in residual clause cases.

As for the notion that the categorical approach is more forgiving to defendants, there is a strong argument that the opposite is true, at least with respect to the residual clause. Consider two criminal laws: Injury occurs in 10% of cases involving the violation of statute A, but in 90% of cases involving the violation of statute B. Under the categorical approach, a truly dangerous crime under statute A might not qualify as a violent felony, while a crime with no measurable risk of harm under statute B would count against the defendant **\*635** . Under a conduct-specific inquiry, on the other hand, a defendant's actual conduct would determine whether ACCA's mandatory penalty applies.

**\*\*2580** It is also significant that the allocation of the burden of proof protects defendants. The prosecution bears the burden of proving that a defendant has convictions that qualify for sentencing under ACCA. If evidentiary deficiencies, poor recordkeeping, or anything else prevents the prosecution from discharging that burden under the conduct-specific approach, a defendant would not receive an ACCA sentence.

Nor would a conduct-specific inquiry raise constitutional problems of its own. It is questionable whether the Sixth Amendment creates a right to a jury trial in this situation. See ⚠️ *Almendarez–Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). But if it does, the issue could be tried to a jury, and the prosecution could bear the burden of proving beyond a reasonable doubt that a defendant's prior crimes involved conduct that presented a serious potential risk of injury to another. I would adopt this alternative interpretation and hold that the residual clause requires an examination of real-world conduct.

The Court's only reason for refusing to consider this interpretation is that "the Government has not asked us to abandon the categorical approach in residual-clause cases." *Ante,* at 2562. But the Court cites no case in which we have suggested that a saving interpretation may be adopted only if it is proposed by one of the parties. Nor does the Court cite any secondary authorities advocating this rule. Cf. Scalia, Reading Law § 38 (stating the canon with no such limitation). On the contrary, we have long recognized that it is "our plain duty to adopt that construction which will save [a] statute from constitutional infirmity," where fairly possible.

🔖 *United States ex rel. Attorney General v. Delaware & Hudson Co.,* 213 U.S. 366, 407, 29 S.Ct. 527, 53 L.Ed. 836 (1909). It would be strange if we could fulfill that "plain duty" only when a party asks us to do so. And the Court's refusal to consider a saving interpretation not advocated by the Government is hard **\*636** to square with the Court's adoption of an argument that petitioner chose not to raise. As noted, Johnson did not ask us to hold that the residual clause is unconstitutionally vague, but the Court interjected that issue into the case, requested supplemental briefing on the question, and heard reargument. The Court's refusal to look beyond the arguments of the parties apparently applies only to arguments that the Court does not want to hear.

E

Even if the categorical approach is used in residual clause cases, however, the clause is still not void for vagueness. "It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined" on an as-applied basis. 🔖 *United States v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975). "Objections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." 🔖 *Maynard v. Cartwright,* 486 U.S. 356, 361, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). Thus, in a due process vagueness case, we will hold that a law is facially invalid "only if the enactment is impermissibly vague in *all* of its applications." 🔖 *Hoffman Estates,* 455 U.S., at 494–495, 102 S.Ct. 1186 (emphasis added); see also 🔖 *Chapman,* 500 U.S., at 467, 111 S.Ct. 1919.[2]

**\*637** In concluding that the residual clause is facially void for vagueness, the Court flatly **\*\*2581** contravenes this rule.

135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

The Court admits "that there will be straightforward cases under the residual clause." *Ante,* at 2560. But rather than exercising the restraint that our vagueness cases prescribe, the Court holds that the residual clause is unconstitutionally vague even when its application is clear.

The Court's treatment of this issue is startling. Its facial invalidation precludes a sentencing court that is applying ACCA from counting convictions for even those specific offenses that this Court previously found to fall within the residual clause. See *James,* 550 U.S., at 203–209, 127 S.Ct. 1586 (attempted burglary); *Sykes,* 564 U.S., at ––– –––, 131 S.Ct., at 2272–2275 (flight from law enforcement in a vehicle). Still worse, the Court holds that vagueness bars the use of the residual clause in other cases in which its applicability can hardly be questioned. Attempted rape is an example. See, *e.g., Dawson v. United States,* 702 F.3d 347, 351–352 (C.A.6 2012). Can there be any doubt that "an idealized ordinary case of th[is] crime" "involves conduct that presents a serious potential risk of physical injury to another"? How about attempted arson,[3] attempted kidnapping,[4] solicitation to commit aggravated assault,[5] possession of a loaded weapon with the intent to use it unlawfully against another person,[6] possession of a weapon in prison,[7] or compelling a person to act as a prostitute?[8] Is there much doubt that those offenses "involve conduct that presents a serious potential risk of physical injury to another"?

**\*638** Transforming vagueness doctrine, the Court claims that we have never actually *held* that a statute may be voided for vagueness only when it is vague in all its applications. But that is simply wrong. In *Hoffman Estates,* we reversed a Seventh Circuit decision that voided an ordinance prohibiting the sale of certain items. See 455 U.S., at 491, 102 S.Ct. 1186. The Seventh Circuit struck down the ordinance because it was "unclear in *some* of its applications," but we reversed and emphasized that a law is void for vagueness "only if [it] is impermissibly vague in all of its applications." *Id.,* at 494–495, 102 S.Ct. 1186; see also *id.,* at 495, n. 7, 102 S.Ct. 1186 (collecting cases). Applying that principle, we held that the "facial challenge [wa]s unavailing" because "at least some of the items sold ... [we]re covered" by the **\*\*2582** ordinance. *Id.,* at 500, 102 S.Ct. 1186. These statements were not dicta. They were the holding of the case. Yet the Court does not even mention this binding precedent.

Instead, the Court says that the facts of two *earlier* cases support a broader application of the vagueness doctrine. See *ante,* at 2560 – 2561. That, too, is incorrect. Neither case remotely suggested that mere overbreadth is enough for facial invalidation under the Fifth Amendment.

In *Coates v. Cincinnati,* 402 U.S. 611, 612, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), we addressed an ordinance that restricted free assembly and association rights by prohibiting "annoying" conduct. Our analysis turned in large part on those First Amendment concerns. In fact, we specifically explained that the "vice of the ordinance lies not alone in its violation of the due process standard of vagueness." *Id.,* at 615, 91 S.Ct. 1686. In the present case, by contrast, no First Amendment rights are at issue. Thus, *Coates* cannot support the Court's rejection of our repeated statements that "vagueness challenges to statutes which *do not involve First Amendment freedoms* must be examined in light of the facts ... at hand." *Mazurie, supra,* at 550, 95 S.Ct. 710 (emphasis added).

Likewise, *L. Cohen Grocery Co.,* 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516, proves precisely the opposite of what the Court claims. In that case, **\*639** we struck down a statute prohibiting " ' unjust or unreasonable rate [s]' " because it provided no "ascertainable standard of guilt" and left open " the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against." *Id.,* at 89, 41 S.Ct. 298. The clear import of this language is that the law at issue was impermissibly vague in all applications. And in the years since, we have never adopted the majority's contradictory interpretation. On the contrary, we have characterized the case as involving a statute that could "not constitutionally be applied to any set of facts." *United States v. Powell,* 423 U.S. 87, 92, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975). Thus, our holdings and our dicta prohibit the Court's expansion of the vagueness doctrine. The Constitution does not allow us to hold a statute void for vagueness unless it is vague in all its applications.

IV

Because I would not strike down ACCA's residual clause, it is necessary for me to address whether Johnson's conviction for

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 3 of 1271

135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

possessing a sawed-off shotgun qualifies as a violent felony. Under either the categorical approach or a conduct-specific inquiry, it does.

A

The categorical approach requires us to determine whether "the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another." *James,* 550 U.S., at 208, 127 S.Ct. 1586. This is an "inherently probabilistic" determination that considers the circumstances and conduct that ordinarily attend the offense. *Id.,* at 207, 127 S.Ct. 1586. The mere fact that a crime *could* be committed without a risk of physical harm does not exclude it from the statute's reach. See *id.,* at 207–208, 127 S.Ct. 1586. Instead, the residual clause speaks of "potential risk[s]," § 924(e)(2)(B)(ii), a term suggesting "that Congress intended to encompass possibilities even more contingent or remote than a simple 'risk,' much less a certainty." *James, supra,* at 207–208, 127 S.Ct. 1586.

**\*640** Under these principles, unlawful possession of a sawed-off shotgun qualifies as a violent felony. As we recognized in *District of Columbia v. Heller,* 554 U.S. 570, 625, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), sawed-off shotguns are "not typically possessed by law-abiding citizens for **\*\*2583** lawful purposes." Instead, they are uniquely attractive to violent criminals. Much easier to conceal than long-barreled shotguns used for hunting and other lawful purposes, short-barreled shotguns can be hidden under a coat, tucked into a bag, or stowed under a car seat. And like a handgun, they can be fired with one hand—except to more lethal effect. These weapons thus combine the deadly characteristics of conventional shotguns with the more convenient handling of handguns. Unlike those common firearms, however, they are not typically possessed for lawful purposes. And when a person illegally possesses a sawed-off shotgun during the commission of a crime, the risk of violence is seriously increased. The ordinary case of unlawful possession of a sawed-off shotgun therefore "presents a serious potential risk of physical injury to another." § 922(e)(2)(B)(ii).

Congress' treatment of sawed-off shotguns confirms this judgment. As the Government's initial brief colorfully recounts, sawed-off shotguns were a weapon of choice for gangsters and bank robbers during the Prohibition Era. See Brief for United States 4.[9] In response, Congress enacted the National Firearms Act of 1934, which required **\*641** individuals possessing certain especially dangerous weapons —including sawed-off shotguns—to register with the Federal Government and pay a special tax. 26 U.S.C. §§ 5845(a)(1)-(2). The Act was passed on the understanding that "while there is justification for permitting the citizen to keep a pistol or revolver for his own protection without any restriction, there is no reason why anyone except a law officer should have a ... sawed-off shotgun." H.R.Rep. No. 1780, 73d Cong., 2d Sess., 1 (1934). As amended, the Act imposes strict registration requirements for any individual wishing to possess a covered shotgun, see, *e.g.,* §§ 5822, 5841(b), and illegal possession of such a weapon is punishable by imprisonment for up to 10 years. See §§ 5861(b)-(d), 5871. It is telling that this penalty exceeds that prescribed by federal law for quintessential violent felonies.[10] It thus seems perfectly clear that Congress has long regarded the illegal possession of a sawed-off shotgun as a crime that poses a serious risk of harm to others.

The majority of States agree. The Government informs the Court, and Johnson does not dispute, that 28 States have followed Congress' lead by making it a crime to possess an unregistered sawed-off shotgun, and 11 other States and the District of Columbia prohibit private possession of sawed-off shotguns entirely. See Brief for United States 8–9 (collecting statutes). Minnesota, where petitioner was convicted, **\*\*2584** has adopted a blanket ban, based on its judgment that "[t]he sawed-off shotgun has no legitimate use in the society whatsoever." **\*642** *State v. Ellenberger,* 543 N.W.2d 673, 676 (Minn.App.1996) (internal quotation marks and citation omitted). Possession of a sawed-off shotgun in Minnesota is thus an inherently criminal act. It is fanciful to assume that a person who chooses to break the law and risk the heavy criminal penalty incurred by possessing a notoriously dangerous weapon is unlikely to use that weapon in violent ways.

B

If we were to abandon the categorical approach, the facts of Johnson's offense would satisfy the residual clause as well. According to the record in this case, Johnson possessed his sawed-off shotgun while dealing drugs. When police

**Johnson v. U.S., 576 U.S. 591 (2015)**
Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 4 of 1271

135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

responded to reports of drug activity in a parking lot, they were told by two people that "Johnson and another individual had approached them and offered to sell drugs." PSR ¶ 45. The police then searched the vehicle where Johnson was seated as a passenger, and they found a sawed-off shotgun and five bags of marijuana. Johnson admitted that the gun was his.

Understood in this context, Johnson's conduct posed an acute risk of physical injury to another. Drugs and guns are never a safe combination. If one of his drug deals had gone bad or if a rival dealer had arrived on the scene, Johnson's deadly weapon was close at hand. The sawed-off nature of the gun elevated the risk of collateral damage beyond any intended targets. And the location of the crime—a public parking lot —significantly increased the chance that innocent bystanders might be caught up in the carnage. This is not a case of "mere possession" as Johnson suggests. Brief for Petitioner i. He was not storing the gun in a safe, nor was it a family heirloom or collector's item. He illegally possessed the weapon in case

he needed to use it during another crime. A judge or jury could thus conclude that Johnson's offense qualified as a violent felony.

There should be no doubt that Samuel Johnson was an armed career criminal. His record includes a number of **\*643** serious felonies. And he has been caught with dangerous weapons on numerous occasions. That this case has led to the residual clause's demise is confounding. I only hope that Congress can take the Court at its word that either amending the list of enumerated offenses or abandoning the categorical approach would solve the problem that the Court perceives.

**All Citations**

576 U.S. 591, 135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800, 2015 Daily Journal D.A.R. 7362, 25 Fla. L. Weekly Fed. S 459

---

## Footnotes

\*      The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1      By "penal," I mean laws "authoriz[ing] criminal punishment" as well as those "authorizing fines or forfeitures ... [that] are enforced through civil rather than criminal process." Cf. C. Nelson, Statutory Interpretation 108 (2011) (discussing definition of "penal" for purposes of rule of lenity). A law requiring termination of employment from public institutions, for instance, is not penal. See *Keyishian,* 385 U.S., at 597–604, 87 S.Ct. 675. Nor is a law creating an "obligation to pay taxes." *Milwaukee County v. M.E. White Co.,* 296 U.S. 268, 271, 56 S.Ct. 229, 80 L.Ed. 220 (1935). Conversely, a law imposing a monetary exaction as a punishment for noncompliance with a regulatory mandate is penal. See *National Federation of Independent Business v. Sebelius,* 567 U.S. ——, —— – ——, 132 S.Ct. 2566, 2650–2656, 183 L.Ed.2d 450 (2012) (SCALIA, KENNEDY, THOMAS, and ALITO, JJ., dissenting).

2      At the time, the ordinary meaning of the word "cattle" was not limited to cows, but instead encompassed all "[b]easts of pasture; not wild nor domestick." 1 S. Johnson, A Dictionary of the English Language (4th ed. 1773). Parliament responded to the judicial refusal to apply the provision to "cattle" by passing "another statute, 15 Geo. II. c. 34, extending the [law] to bulls, cows, oxen, steers, bullocks, heifers, calves, and lambs, by name." 1 Blackstone, Commentaries on the Laws of England, at 88.

3      Early American state courts also sometimes refused to apply a law they found completely unintelligible, even outside of the penal context. In one antebellum decision, the Pennsylvania Supreme Court did not even attempt to apply a statute that gave the Pennsylvania state treasurer " 'as many votes' " in state bank elections as " 'were held by *individuals* ' " without providing guidance as to which individuals it was referring. *Commonwealth v. Bank of Pennsylvania,* 3 Watts & Serg. 173, 177 (1842). Concluding that it had "seldom, if ever, found the language of legislation so devoid of certainty," the court withdrew the case. *Ibid.*; see also

135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

*Drake v. Drake,* 15 N.C. 110, 115 (1833) ("Whether a statute be a public or a private one, if the terms in which it is couched be so vague as to convey no definite meaning to those whose duty it is to execute it, either ministerially or judicially, it is necessarily inoperative"). This practice is distinct from our modern vagueness doctrine, which applies to laws that are intelligible but vague.

4    During this time, the Court would apply its new vagueness doctrine outside of the penal context as well.

In *A.B. Small Co. v. American Sugar Refining Co.,* 267 U.S. 233, 45 S.Ct. 295, 69 L.Ed. 589 (1925), a sugar dealer raised a defense to a breach-of-contract suit that the contracts themselves were unlawful under several provisions of the Lever Act, including one making it " 'unlawful for any person ... to make any unjust or unreasonable ... charge in ... dealing in or with any necessaries,' or to agree with another 'to exact excessive prices for any necessaries,' " *id.,* at 238, 45 S.Ct. 295. Applying *United States v. L. Cohen Grocery Co.,* 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (1921), which had held that provision to be unconstitutionally vague, the Court rejected the dealer's argument. 267 U.S., at 238–239, 45 S.Ct. 295. The Court explained that "[i]t was not the criminal penalty that was held invalid, but the exaction of obedience to a rule or standard which was so vague and indefinite as really to be no rule or standard at all." *Id.,* at 239, 45 S.Ct. 295. That doctrine thus applied to penalties as well as "[a]ny other means of exaction, such as declaring the transaction unlawful or stripping a participant of his rights under it." *Ibid.*

5    Vagueness challenges to laws regulating speech during this period were less successful. Among the laws the Court found to be sufficiently definite included a state law making it a misdemeanor to publish, among other things, materials " 'which shall tend to encourage or advocate disrespect for law or for any court or courts of justice,' " *Fox v. Washington,* 236 U.S. 273, 275–277, 35 S.Ct. 383, 59 L.Ed. 573 (1915), a federal statute criminalizing candidate solicitation of contributions for " 'any political purpose whatever,' " *United States v. Wurzbach,* 280 U.S. 396, 398–399, 50 S.Ct. 167, 74 L.Ed. 508 (1930), and a state prohibition on becoming a member of any organization that advocates using unlawful violence to effect " 'any political change,' " *Whitney v. California,* 274 U.S. 357, 359–360, 368–369, 47 S.Ct. 641, 71 L.Ed. 1095 (1927). But see *Stromberg v. California,* 283 U.S. 359, 369–370, 51 S.Ct. 532, 75 L.Ed. 1117 (1931) (holding state statute punishing the use of any symbol " 'of opposition to organized government' " to be impermissibly vague).

6    All the while, however, the Court has rejected vagueness challenges to laws punishing those on the other side of the abortion debate. When it comes to restricting the speech of abortion opponents, the Court has dismissed concerns about vagueness with the observation that " 'we can never expect mathematical certainty from our language,' " *Hill v. Colorado,* 530 U.S. 703, 733, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000), even though such restrictions are arguably "at least as imprecise as criminal prohibitions on speech the Court has declared void for vagueness in past decades," *id.,* at 774, 120 S.Ct. 2480 (KENNEDY, J., dissenting).

7    As a general matter, we should be cautious about relying on general theories of "fair notice" in our due process jurisprudence, as they have been exploited to achieve particular ends. In *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), for instance, the Court held that the Due Process Clause imposed limits on punitive damages because the Clause guaranteed "that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose," *id.,* at 574, 116 S.Ct. 1589. That was true even though "when the Fourteenth Amendment was adopted, punitive damages were undoubtedly an established part of the American common law of torts," and "no particular procedures were deemed necessary to circumscribe a jury's discretion regarding the award of such damages, or their amount." *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 26–27, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (SCALIA, J., concurring in judgment). Even under the view of the Due Process Clause articulated in *Murray's Lessee,* then, we should not allow nebulous

135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

principles to supplant more specific, historically grounded rules. See 499 U.S., at 37–38, 111 S.Ct. 1032 (opinion of SCALIA, J.).

1    The Court also says that the residual clause's reference to the enumerated offenses is "confusing." *Ante,* at 2561. But this is another argument we rejected in *James v. United States,* 550 U.S. 192, 127 S.Ct. 1586, 167 L.Ed.2d 532 (2007), and *Sykes v. United States,* 564 U.S. 1, 131 S.Ct. 2267, 180 L.Ed.2d 60 (2011), and it is no more persuasive now. Although the risk level varies among the enumerated offenses, all four categories of offenses involve conduct that presents a serious potential risk of harm to others. If the Court's concern is that some of the enumerated offenses do not seem especially risky, all that means is that the statute "sets a low baseline level for risk." *Id.,* at ——, 131 S.Ct., at 2278 (THOMAS, J., concurring in judgment).

2    This rule is simply an application of the broader rule that, except in First Amendment cases, we will hold that a statute is facially unconstitutional only if "no set of circumstances exists under which the Act would be valid." *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). A void-for-vagueness challenge is a facial challenge. See *Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494–495, and nn. 5, 6, 7, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Chicago v. Morales,* 527 U.S. 41, 79, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (SCALIA, J., dissenting). Consequently, there is no reason why the no-set-of-circumstances rule should not apply in this context. I assume that the Court does not mean to abrogate the no-set-of-circumstances rule in its entirety, but the Court provides no justification for its refusal to apply that rule here. Perhaps the Court has concluded, for some undisclosed reason, that void-for-vagueness claims are different from all other facial challenges not based on the First Amendment. Or perhaps the Court has simply created an ACCA exception.

3    *United States v. Rainey,* 362 F.3d 733, 735–736 (C.A.11) (*per curiam* ), cert. denied, 541 U.S. 1081, 124 S.Ct. 2433, 158 L.Ed.2d 996 (2004).

4    *United States v. Kaplansky,* 42 F.3d 320, 323–324 (C.A.6 1994) (en banc).

5    *United States v. Benton,* 639 F.3d 723, 731–732 (C.A.6), cert. denied, 565 U.S. ——, 132 S.Ct. 599, 181 L.Ed.2d 439 (2011).

6    *United States v. Lynch,* 518 F.3d 164, 172–173 (C.A.2 2008), cert. denied, 555 U.S. 1177, 129 S.Ct. 1316, 173 L.Ed.2d 595 (2009).

7    *United States v. Boyce,* 633 F.3d 708, 711–712 (C.A.8 2011), cert. denied, 565 U.S. ——, 132 S.Ct. 1002, 181 L.Ed.2d 744 (2012).

8    *United States v. Brown,* 273 F.3d 747, 749–751 (C.A.7 2001).

9    Al Capone's south-side Chicago henchmen used sawed-off shotguns when they executed their rivals from Bugs Moran's north-side gang during the infamous Saint Valentine's Day Massacre of 1929. See 7 Chicago Gangsters Slain by Firing Squad of Rivals, Some in Police Uniforms, N.Y. Times, Feb. 15, 1929, p. A1. Wild Bill Rooney was gunned down in Chicago by a "sawed-off shotgun [that] was pointed through a rear window" of a passing automobile. Union Boss Slain by Gang in Chicago, N.Y. Times, Mar. 20, 1931, p. 52. And when the infamous outlaws Bonnie and Clyde were killed by the police in 1934, Clyde was found "clutching a sawed-off shotgun in one hand." Barrow and Woman are Slain by Police in Louisiana Trap, N.Y. Times, May 24, 1934, p. A1.

10   See, *e.g.,* 18 U.S.C. § 111(a) (physical assault on federal officer punishable by not more than eight years' imprisonment); § 113(a)(7) (assault within maritime or territorial jurisdiction resulting in substantial bodily injury to an individual under the age of 16 punishable by up to five years' imprisonment); § 117(a) ("assault, sexual abuse, or serious violent felony against a spouse or intimate partner" by a habitual offender within

**Johnson v. U.S., 576 U.S. 591 (2015)**
135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

maritime or territorial jurisdiction punishable by up to five years' imprisonment, except in cases of "substantial bodily injury").

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by Springer v. Willis, 5th Cir.(Tex.), June 24, 2016

132 S.Ct. 1166
Supreme Court of the United States

Akio KAWASHIMA, et ux., Petitioners

v.

Eric H. HOLDER, Jr., Attorney General.

No. 10–577.
|
Argued Nov. 7, 2011.
|
Decided Feb. 21, 2012.

**Synopsis**

**Background:** Aliens, as natives and citizens of Japan and lawful permanent residents of United States, separately petitioned for review of decision of Board of Immigration Appeals (BIA), affirming immigration judge's (IJ) order for aliens' removal, under Immigration and Nationality Act (INA), based on their separate convictions for willfully making and subscribing false tax return and aiding and assisting in preparation of false tax return. Following consolidation, the United States Court of Appeals for the Ninth Circuit, O'Scannlain, Circuit Judge, 615 F.3d 1043, partially granted petitions and remanded in part, denied in part, and dismissed as moot in part. Certiorari was granted in part.

**Holdings:** The United States Supreme Court, Justice Thomas, held that:

[1] aliens' tax crimes qualified under INA as deportable aggravated felonies involving fraud or deceit;

[2] INA tax evasion provision did not render INA fraud or deceit provision inapplicable to tax crimes;

[3] sentencing guidelines did not render INA fraud or deceit provision inapplicable to tax crimes; and

[4] rule of lenity did not apply to construe INA provision in aliens' favor.

Affirmed.

Justice Ginsburg, filed dissenting opinion, in which Justice Breyer and Justice Kagan joined.

West Headnotes (14)

**[1]**    **Aliens, Immigration, and Citizenship**    🔑  Fraud, forgery, and theft offenses

To determine whether an alien's offense involves "fraud or deceit," within the meaning of the Immigration and Nationality Act (INA) provision defining aggravated felonies that constitute deportable offenses, a categorical approach is employed by looking to the statute defining the crime of conviction, rather than to the specific facts underlying the crime; if the elements of the crime of conviction establish that the alien committed a crime involving

fraud or deceit, then the requirement of the INA provision is satisfied. Immigration and Nationality Act, § 101(a)(43)(M)(i), 🚩 8 U.S.C.A. § 1101(a)(43)(M)(i).

23 Cases that cite this headnote

**[2]    Internal Revenue** 🔑 Fraud and false statements

The elements of a violation of the statute prohibiting willfully making and subscribing to a false tax return include that the document in question was false as to a material matter, that the defendant did not believe the document to be true and correct as to every material matter, and that he acted willfully with the specific intent to violate the law. 26 U.S.C.A. § 7206(1).

4 Cases that cite this headnote

**[3]    Aliens, Immigration, and Citizenship** 🔑 Fraud, forgery, and theft offenses

Resident alien's conviction for willfully making and subscribing false tax return in which government's revenue loss exceeded $10,000 qualified as "aggravated felony" involving "fraud or deceit," as defined in Immigration and Nationality Act (INA) provision classifying deportable offenses, even though words "fraud" and "deceit" were neither in text of statute of conviction nor formal elements of crime, since INA provision broadly referred to offenses with elements necessarily entailing fraudulent or deceitful conduct, and alien committed felony that involved deceit by knowingly and willfully submitting tax return that was false as to material matter. Immigration and Nationality Act, § 101(a)(43)(M)(i), 🚩 8 U.S.C.A. § 1101(a)(43)(M)(i); 26 U.S.C.A. § 7206(1).

18 Cases that cite this headnote

**[4]    Aliens, Immigration, and Citizenship** 🔑 Fraud, forgery, and theft offenses

Under the Immigration and Nationality Act (INA) provision, defining deportable aggravated felonies involving fraud or deceit, the scope of the provision is not limited to offenses that include fraud or deceit as formal elements; rather, the provision refers more broadly to offenses that involve fraud or deceit, meaning offenses with elements that necessarily entail fraudulent or deceitful conduct. Immigration and Nationality Act, § 101(a)(43)(M)(i), 🚩 8 U.S.C.A. § 1101(a)(43)(M)(i).

16 Cases that cite this headnote

**[5]    Internal Revenue** 🔑 Aiders and abettors; tax return preparers

The elements of a violation of statute prohibiting aiding and assisting in the preparation of a false tax return include that the document in question was false as to a material matter and that the defendant acted willfully. 26 U.S.C.A. § 7206(2).

3 Cases that cite this headnote

**[6]    Aliens, Immigration, and Citizenship** 🔑 Fraud, forgery, and theft offenses

Resident alien's conviction for willfully aiding and assisting in preparation of false tax return in which government's revenue loss exceeded $10,000 qualified as "aggravated felony" involving "fraud or deceit," as defined in Immigration and Nationality Act (INA) provision classifying deportable offenses, since alien committed felony that involved deceit by knowingly and willfully assisting her husband's filing of materially false tax return. Immigration and Nationality Act, § 101(a)(43)(M)(i), 🚩 8 U.S.C.A. § 1101(a)(43)(M)(i); 26 U.S.C.A. § 7206(2).

132 S.Ct. 1166, 182 L.Ed.2d 1, 80 USLW 4147, 12 Cal. Daily Op. Serv. 2059...

4 Cases that cite this headnote

---

**[7]**    **Aliens, Immigration, and Citizenship**    👉 Fraud, forgery, and theft offenses

Immigration and Nationality Act (INA) provision, defining deportable aggravated felony as offense involving fraud or deceit in which loss to victim exceeded $10,000, did not exclude tax crimes, even though another INA provision defined deportable aggravated felony as offense relating to tax evasion involving revenue loss to government exceeding $10,000, since fraud or deceit provision covered broad class of offenses involving wide range of potential losses and victims, but tax evasion provision was limited to single type of offense that by definition could only cause one type of loss to one type of victim. Immigration and Nationality Act, § 101(a)(43)(M)(i, ii), 🚩 8 U.S.C.A. § 1101(a)(43)(M)(i, ii); 26 U.S.C.A. § 7201.

4 Cases that cite this headnote

---

**[8]**    **Aliens, Immigration, and Citizenship**    👉 Fraud, forgery, and theft offenses

Immigration and Nationality Act (INA) provision, defining deportable aggravated felony as offense relating to tax evasion, was not rendered completely redundant and mere surplusage, in violation of presumption against superfluities, by interpreting another INA provision as including tax crimes within definition of deportable aggravated felony as offense involving fraud or deceit, since elements of crime of tax evasion did not necessarily involve fraud or deceit, so INA's tax evasion provision ensured that specific crime of tax evasion qualified as deportable aggravated felony, but did not implicitly remove all other tax offenses from scope of plain language of INA provision that extended to any offense involving fraud and deceit. Immigration and Nationality Act, § 101(a)(43)(M)(i, ii), 🚩 8 U.S.C.A. § 1101(a)(43)(M)(i, ii); 26 U.S.C.A. § 7201.

19 Cases that cite this headnote

---

**[9]**    **Internal Revenue**    👉 Attempts to evade or defeat tax

Neither fraud nor deceit is among the elements of a tax evasion conviction, which include: (1) willfulness, (2) the existence of a tax deficiency, and (3) an affirmative act constituting an evasion or an attempted evasion of the tax. 26 U.S.C.A. § 7201.

7 Cases that cite this headnote

---

**[10]**    **Aliens, Immigration, and Citizenship**    👉 Fraud, forgery, and theft offenses

A tax evasion conviction only qualifies as an "aggravated felony," within meaning of Immigration and Nationality Act's (INA) provision governing deportable crimes involving fraud or deceit, if a willful, affirmative attempt to evade a tax necessarily entails fraud or deceit. Immigration and Nationality Act, § 101(a)(43)(M)(i), 🚩 8 U.S.C.A. § 1101(a)(43)(M)(i); 26 U.S.C.A. § 7201.

3 Cases that cite this headnote

---

**[11]**    **Internal Revenue**    👉 Attempts to evade or defeat tax

Tax evasion statute includes two offenses: the offense of willfully attempting to evade or defeat the assessment of a tax, as well as the offense of willfully attempting to evade or defeat the payment of a tax. 26 U.S.C.A. § 7201.

5 Cases that cite this headnote

---

132 S.Ct. 1166, 182 L.Ed.2d 1, 80 USLW 4147, 12 Cal. Daily Op. Serv. 2059...

[12]    **Internal Revenue** 🔑 Attempts to evade or defeat tax

Under the tax evasion statute, it is possible to willfully evade or defeat payment of a tax without making any misrepresentation, such as by a taxpayer filing a truthful tax return, but also taking affirmative steps to evade payment by moving his assets beyond the reach of the Internal Revenue Service (IRS). 26 U.S.C.A. § 7201.

6 Cases that cite this headnote

[13]    **Aliens, Immigration, and Citizenship** 🔑 Fraud, forgery, and theft offenses

Sentencing guidelines' prior separate treatment of tax crimes and crimes involving fraud and deceit did not support exclusion of tax crimes from Immigration and Nationality Act (INA) provision, defining deportable aggravated felony as offense involving fraud or deceit, despite another INA provision defining deportable aggravated felony as offense relating specifically to tax evasion, since guidelines referred to all offenses involving taxation, but INA's provision was expressly limited to tax evasion offenses. Immigration and Nationality Act, § 101(a)(43)(M)(i, ii), 8 U.S.C.A. § 1101(a)(43)(M)(i, ii); 26 U.S.C.A. § 7201; U.S.S.G. §§ 2F1.1, 2F1.2, 18 U.S.C.App.(2000 Ed.); U.S.S.G. § 2T1.1 et seq., 18 U.S.C.A.

2 Cases that cite this headnote

[14]    **Aliens, Immigration, and Citizenship** 🔑 Fraud, forgery, and theft offenses

Resident aliens' allegations of ambiguities in Immigration and Nationality Act (INA) provision, defining deportable aggravated felonies as crimes involving fraud or deceit, in one clause that was interpreted to include tax crimes, but also defining deportable aggravated felony in another clause as offense relating to tax evasion, did not require construction of alleged ambiguities in favor of aliens, under rule of lenity, in light of clear application of INA provision. Immigration and Nationality Act, § 101(a)(43)(M)(i), 8 U.S.C.A. § 1101(a)(43)(M)(i, ii).

2 Cases that cite this headnote

**\*\*1168** *Syllabus* [*]

An Immigration Judge ordered the removal of resident aliens Akio and Fusako Kawashima, determining that Mr. Kawashima's conviction for willfully making and subscribing a false tax return, **\*\*1169** 26 U.S.C. § 7206(1), and Mrs. Kawashima's conviction for aiding and assisting in the preparation of a false tax return, § 7206(2), qualified as crimes involving fraud or deceit under 8 U.S.C. § 1101(a)(43)(M)(i) (Clause (i)) and thus were aggravated felonies for which they could be deported under § 1227(a)(2)(A)(iii). The Board of Immigration Appeals affirmed. Holding that convictions under 26 U.S.C. § 7206(1) and (2) in which the Government's revenue loss exceeds $10,000 constitute aggravated felonies under Clause (i), the Ninth Circuit affirmed, but remanded for the Board to determine whether Mrs. Kawashima's conviction had caused a Government loss in excess of $10,000.

*Held:* Convictions under 26 U.S.C. § 7206(1) and (2) in which the Government's revenue loss exceeds $10,000 qualify as aggravated felonies pursuant to Clause (i). Pp. 1171 – 1176.

(a) The Kawashimas' argument that they cannot be deported for the commission of an "aggravated felony" because crimes under § 7206(1) and (2) do not involve the fraud or deceit required by Clause (i) is rejected. This Court looks to the statute

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

132 S.Ct. 1166, 182 L.Ed.2d 1, 80 USLW 4147, 12 Cal. Daily Op. Serv. 2059...

defining the crime of conviction, rather than the specific facts underlying the crime, see *Gonzales v. Duenas–Alvarez,* 549 U.S. 183, 186, 127 S.Ct. 815, 166 L.Ed.2d 683, to determine whether the Kawashimas' offenses involve fraud or deceit within the meaning of Clause (i). Section 7206(1) provides that any person who "[w]illfully makes and subscribes any return ... which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter," shall be guilty of a felony. Although the words "fraud" and "deceit" are absent from § 7206(1) and are not themselves formal elements of the crime, it does not follow that Mr. Kawashima's offense falls outside Clause (i). Clause (i) is not limited to offenses that include fraud or deceit as formal elements. Rather, it refers more broadly to offenses involving fraud or deceit—meaning offenses with elements that necessarily entail fraudulent or deceitful conduct. Mr. Kawashima's conviction under § 7206(1) involved deceitful conduct in that he knowingly and willfully submitted a tax return that was false as to a material matter. Mrs. Kawashima was convicted of violating § 7206(2), which declares that any person who "[w]illfully aids or assists in ... the preparation or presentation ... of a return ... which is fraudulent or is false as to any material matter" has committed a felony. She committed a felony involving deceit by knowingly and willfully assisting her husband's filing of a materially false tax return. Pp. 1171 – 1173.

(b) The Kawashimas' argument that Clause (i), when considered in light of 8 U.S.C. § 1101(a)(43)(M)(ii) (Clause (ii)), must be interpreted as being inapplicable to tax crimes is also rejected. Clause (i) defines "aggravated felony" to mean an offense that "involves fraud or deceit in which the loss to the victim or victims exceeds $10,000." Clause (ii) defines "aggravated felony" as an offense that is "described in section 7201 of title 26 (relating to tax evasion) in which the revenue loss to the Government exceeds $10,000." Contrary to the Kawashimas' claim, the difference in the clauses' language—"revenue loss to the Government" in Clause (ii) compared to "loss to the victim" in Clause (i)—does not establish Congress' intent to remove tax crimes from the scope of Clause (i). By its plain language, Clause (i) covers a broad class of offenses that involve fraud or deceit, and Congress' decision to tailor Clause (ii)'s language to match the sole type of offense it covers does not demonstrate that Congress intended to implicitly **1170 circumscribe Clause (i)'s broad scope. Furthermore, interpreting Clause (i) to include tax crimes does not violate the presumption against superfluities. The specific inclusion of tax evasion in Clause (ii) does not make it redundant to Clause (i) because the inclusion was intended to ensure that tax evasion pursuant to 26 U.S.C. § 7201 was a deportable offense. Pp. 1173 – 1175.

(c) The United States Sentencing Guidelines' separate treatment of tax crimes and crimes involving fraud and deceit does not support the Kawashimas' contention that Congress did not intend to include tax crimes within Clause (i). No evidence suggests that Congress considered the Guidelines when drafting 8 U.S.C. § 1101(a)(43)(M). Moreover, the differences between § 1101(a)(43)(M) and the Guidelines undercut any inference that Congress was incorporating the distinction drawn by the Guidelines into § 1101(a)(43)(M). P. 1175.

(d) Construing § 1101(a)(43)(M) in the Kawashimas' favor under the rule of lenity is not warranted in light of the statute's clear application. Pp. 1175 – 1176.

615 F.3d 1043, affirmed.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C.J., and SCALIA, KENNEDY, ALITO, and SOTOMAYOR, JJ., joined. GINSBURG, J., filed a dissenting opinion, in which BREYER and KAGAN, JJ., joined, *post,* pp. 1176 – 1181.

**Attorneys and Law Firms**

Thomas J. Whalen, Washington, DC, for Petitioners.

Curtis E. Gannon, Washington, DC, for Respondent.

132 S.Ct. 1166, 182 L.Ed.2d 1, 80 USLW 4147, 12 Cal. Daily Op. Serv. 2059...

Edward O.C. Ord, Jenny Lin–Alva, Ord & Norman, San Francisco, CA, Thomas J. Whalen, Counsel of Record, Mark A. Johnston, Nicholas T. Moraites, Eckert Seamans Cherin & Mellott, LLC, Washington, DC, for Petitioners.

Donald B. Verrilli, Jr., Solicitor General, Counsel of Record, Tony West, Assistant Attorney General, Edwin S. Kneedler, Deputy Solicitor General, Curtis E. Gannon, Assistant to the Solicitor General, Donald E. Keener, Bryan S. Beier, Attorneys, Department of Justice, Washington, DC, for Respondent.

**Opinion**

Justice THOMAS delivered the opinion of the Court.

**\*480** This case concerns whether aliens who commit certain federal tax crimes are subject to deportation as aliens who have been convicted of an aggravated felony. We hold that violations of 26 U.S.C. § 7206(1) and (2) are crimes "involv[ing] fraud or deceit" under 8 U.S.C. § 1101(a)(43)(M)(i) and are therefore aggravated felonies as that term is defined in the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.,* when the loss to the Government exceeds $10,000.

I

Petitioners, Akio and Fusako Kawashima, are natives and citizens of Japan who have been lawful permanent residents of the United States since June 21, 1984. In 1997, Mr. Kawashima pleaded guilty to one count of willfully making and subscribing a false tax return in violation of 26 U.S.C. § 7206(1). Mrs. Kawashima pleaded guilty to one count of aiding and assisting in the preparation of a false tax return in violation of 26 U.S.C. § 7206(2).

Following their convictions, the Immigration and Naturalization Service charged the Kawashimas with being deportable **\*\*1171** **\*481** from the United States as aliens who had been convicted of an aggravated felony.[1] See 8 U.S.C. § 1227(a)(2)(A)(iii) ("Any alien who is convicted of an aggravated felony at any time after admission is deportable").[2] In the Immigration and Nationality Act, Congress listed categories of offenses that qualify as "aggravated felonies" for the purpose of deportation. See § 1101(a)(43). Here, the Government charged the Kawashimas with being deportable for committing offenses under subparagraph (M) of § 1101(a)(43). That subparagraph classifies as an aggravated felony an offense that either: "(i) involves fraud or deceit in which the loss to the victim or victims exceeds $10,000; or (ii) is described in section 7201 of title 26 (relating to tax evasion) in which the revenue loss to the Government exceeds $10,000." Hereinafter, we refer to § 1101(a)(43)(M)(i) as "Clause (i)" and to § 1101(a)(43)(M)(ii) as "Clause (ii)."

At their deportation hearing, the Kawashimas argued that their convictions under 26 U.S.C. § 7206 did not qualify as aggravated felonies under subparagraph (M). The Immigration Judge disagreed and ordered removal, concluding that the Kawashimas' convictions qualified as aggravated felonies under Clause (i). The Kawashimas appealed the removal order to the Board of Immigration Appeals (Board), which affirmed the Immigration Judge's decision. After unsuccessfully petitioning the Board to reopen its decision, the Kawashimas filed petitions for review of the Board's decision in the United States Court of Appeals for the Ninth Circuit.

**\*482** The Ninth Circuit held that "convictions for violating § 7206(1) and (2) in which the tax loss to the government exceeds $10,000 constitute aggravated felonies under subsection (M)(i)." 615 F.3d 1043, 1053 (2010). The court concluded that Mr. Kawashima's conviction under § 7206(1) qualified as an aggravated felony within Clause (i)'s definition "because it involved 'fraud or deceit' and because his offense resulted in a loss to the government in excess of $10,000." *Id.,* at 1055. The Ninth Circuit also determined that Mrs. Kawashima's conviction under § 7206(2) "necessarily 'involve[d] fraud or deceit.' " *Id.,* at

132 S.Ct. 1166, 182 L.Ed.2d 1, 80 USLW 4147, 12 Cal. Daily Op. Serv. 2059...

1055. But because Mrs. Kawashima's plea agreement was not in the administrative record, the Ninth Circuit remanded to the Board to determine whether Mrs. Kawashima's conviction had caused a loss to the Government in excess of $10,000. *Id., at 1056–1057.*

We granted the Kawashimas' petition for a writ of certiorari to determine whether their convictions for violations of 26 U.S.C. § 7206(1) and (2) respectively qualify as aggravated felonies under Clause (i). 563 U.S. 1007, 131 S.Ct. 2900, 179 L.Ed.2d 1245 (2011). We now affirm.

II

The Kawashimas argue that they cannot be deported for commission of an "aggravated felony" because crimes under § 7206(1) and (2) do not "involv[e] fraud or deceit" as required by Clause (i). The **1172** Kawashimas also assert that their convictions under § 7206 are not "aggravated felonies" because tax crimes are not included within Clause (i) at all. We address each argument in turn.

A

 **[1]**   The Kawashimas contend that their offenses of conviction do not fall within the scope of Clause (i) because neither "fraud" nor "deceit" is a formal element of a conviction under § 7206(1) or § 7206(2). The Government responds that the Kawashimas' convictions necessarily involved deceit because **483** they required a showing that the Kawashimas willfully made materially false statements. To determine whether the Kawashimas' offenses "involv[e] fraud or deceit" within the meaning of Clause (i), we employ a categorical approach by looking to the statute defining the crime of conviction, rather than to the specific facts underlying the crime. See *Gonzales v. Duenas–Alvarez,* 549 U.S. 183, 186, 127 S.Ct. 815, 166 L.Ed.2d 683 (2007) (applying the approach set forth in *Taylor v. United States,* 495 U.S. 575, 599–600, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990)). If the elements of the offenses establish that the Kawashimas committed crimes involving fraud or deceit, then the first requirement of Clause (i) is satisfied. [3]

 **[2]**   **[3]**   **[4]**   Mr. Kawashima was convicted of violating 26 U.S.C. § 7206(1), which provides that any person who "[w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter," shall be guilty of a felony. Mr. Kawashima does not dispute that the elements of a violation of § 7206(1) include, *inter alia,* that the document in question was false as to a material matter, that the defendant did not believe the document to be true and correct as to every material matter, and that he acted willfully with the specific intent to violate the law. See, *e.g.,* *United States v. Aramony,* 88 F.3d 1369, 1382 (C.A.4 1996); *United States v. Kaiser,* 893 F.2d 1300, 1305 (C.A.11 1990); *United States v. Marabelles,* 724 F.2d 1374, 1380 (C.A.9 1984); *United States v. Whyte,* 699 F.2d 375, 381 (C.A.7 1983). Although the words "fraud" and "deceit" are absent from the text of § 7206(1) and are not themselves formal elements of the crime, it does not follow that his offense falls outside of Clause (i). The scope of that clause is **484** not limited to offenses that include fraud or deceit as formal elements. Rather, Clause (i) refers more broadly to offenses that "involv[e]" fraud or deceit—meaning offenses with elements that necessarily entail fraudulent or deceitful conduct.

When subparagraph (M) was enacted, the term "deceit" meant "the act or practice of deceiving (as by falsification, concealment, or cheating)." Webster's Third New International Dictionary 584 (1993). Mr. Kawashima's conviction under § 7206(1) establishes that he knowingly and willfully submitted a tax return that was false as to a material matter. He therefore committed a felony that involved "deceit."

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 15 of 1271

Kawashima v. Holder, 565 U.S. 478 (2012)

132 S.Ct. 1166, 182 L.Ed.2d 1, 80 USLW 4147, 12 Cal. Daily Op. Serv. 2059...

**[5]**    **[6]**    Turning to Mrs. Kawashima, our analysis follows a similar path. Mrs. Kawashima was convicted of violating 26 U.S.C. § 7206(2), which declares that any person who "[w]illfully aids or assists in  **\*\*1173**  ... the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter," has committed a felony. Mrs. Kawashima does not dispute that the elements of a violation of § 7206(2) include, *inter alia,* that the document in question was false as to a material matter and that the defendant acted willfully. See *Aramony, supra,* at 1382; *United States v. Sassak,* 881 F.2d 276, 278 (C.A.6 1989); *United States v. Hooks,* 848 F.2d 785, 788–789 (C.A.7 1988); *United States v. Dahlstrom,* 713 F.2d 1423, 1426–1427 (C.A.9 1983). We conclude that Mrs. Kawashima's conviction establishes that, by knowingly and willfully assisting her husband's filing of a materially false tax return, Mrs. Kawashima also committed a felony that involved "deceit."

The language of Clause (i) is clear. Anyone who is convicted of an offense that "involves fraud or deceit in which the loss to the victim or victims exceeds $10,000" has committed an aggravated felony and is subject to deportation pursuant to 8 U.S.C. § 1227(a)(2)(A)(iii). The elements of willfully making and subscribing a false corporate tax return, in violation of 26 U.S.C. § 7206(1), and of aiding and assisting in the preparation of a false tax return,  **\*485**  in violation of 26 U.S.C. § 7206(2), establish that those crimes are deportable offenses because they necessarily entail deceit.


B

The Kawashimas' second argument is based on inferences drawn from the interaction of Clause (i) and Clause (ii). The full text of subparagraph (M) reads as follows:

"(43) The term 'aggravated felony' means—

. . . . .

"(M) an offense that—

"(i) involves fraud or deceit in which the loss to the victim or victims exceeds $10,000; or

"(ii) is described in section 7201 of title 26 (relating to tax evasion) in which the revenue loss to the Government exceeds $10,000."

The Kawashimas argue that when Clause (i) is read together with Clause (ii), Clause (i) must be interpreted as being inapplicable to tax crimes. In their view, subparagraph (M), when considered in its entirety, demonstrates that Congress was addressing two mutually exclusive categories of crimes in subparagraph (M)'s two clauses: general, nontax crimes involving fraud or deceit that cause actual losses to real victims in Clause (i), and tax crimes involving revenue losses to the Government in Clause (ii). For the reasons discussed below, this argument cannot overcome the plain language of Clause (i), which encompasses the Kawashimas' offenses of conviction.


1

**[7]**    The Kawashimas contend that textual differences between Clauses (i) and (ii) indicate that Congress intended to exclude tax crimes from Clause (i). Specifically, they note that Clause (i) addresses "loss to the victim," whereas Clause (ii) addresses "revenue loss to the Government."

**\*486**  This difference in language does not establish Congress' intent to remove tax crimes from the scope of Clause (i). Clause (i) covers a broad class of offenses that involve fraud or deceit. Clause (i) thus uses correspondingly broad language to refer to

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 16 of 1271

Kawashima v. Holder, 565 U.S. 478 (2012)
132 S.Ct. 1166, 182 L.Ed.2d 1, 80 USLW 4147, 12 Cal. Daily Op. Serv. 2059...

the wide range of potential losses and victims. Clause (ii), on the other hand, is limited to the single type of offense "described in **1174 section 7201 of title 26 (relating to tax evasion)," which, by definition, can only cause one type of loss (revenue loss) to one type of victim (the Government). Congress' decision to tailor Clause (ii)'s language to match the sole type of offense covered by Clause (ii) does not demonstrate that Congress also intended to implicitly circumscribe the broad scope of Clause (i)'s plain language.

2

[8]    Next, the Kawashimas argue that interpreting Clause (i) to include tax crimes violates the presumption against superfluities by rendering Clause (ii) completely redundant to Clause (i). Clause (ii) explicitly states that convictions for tax evasion pursuant to 26 U.S.C. § 7201 that cause a revenue loss of at least $10,000 to the Government are aggravated felonies. The Kawashimas assert that, if Clause (i) applies to tax crimes, then qualifying convictions for tax evasion under Clause (ii) would also qualify as aggravated felonies under Clause (i), because tax evasion is a crime involving fraud or deceit. To buttress this argument, the Kawashimas point to a body of law providing that a conviction for tax evasion under § 7201 collaterally estops the convicted taxpayer from contesting a civil penalty under 26 U.S.C. § 6663(b) for "underpayment ... attributable to fraud." See, *e.g.,* Gray v. Commissioner, 708 F.2d 243, 246 (C.A.6 1983) ("Numerous federal courts have held that a conviction for federal income tax evasion, either upon a plea of guilty, or upon a jury verdict of guilt, conclusively establishes fraud in a subsequent civil tax fraud proceeding through application of the doctrine of collateral estoppel"). Therefore, according **487 to the Kawashimas, if Clause (i) covers tax offenses, then Clause (ii) is mere surplusage.

We disagree with the Kawashimas' contention that the specific mention of one type of tax crime in Clause (ii) impliedly limits the scope of Clause (i)'s plain language, which extends to any offense that "involves fraud or deceit." We think it more likely that Congress specifically included tax evasion offenses under 26 U.S.C. § 7201 in Clause (ii) to remove any doubt that tax evasion qualifies as an aggravated felony.

[9]    [10]    Several considerations support this conclusion. Like § 7206(1) and (2), § 7201 does not, on its face, mention fraud or deceit. Instead, § 7201 simply provides that "[a]ny person who willfully attempts in any manner to evade or defeat any tax imposed by [the Internal Revenue Code] or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony." Accordingly, neither fraud nor deceit is among the elements of a conviction under § 7201, which include: (1) willfulness; (2) the existence of a tax deficiency; and (3) an affirmative act constituting an evasion or an attempted evasion of the tax. Boulware v. United States, 552 U.S. 421, 424, n. 2, 128 S.Ct. 1168, 170 L.Ed.2d 34 (2008). A conviction under § 7201, therefore, only qualifies as an aggravated felony under Clause (i) if a willful, affirmative attempt to evade a tax necessarily entails fraud or deceit.

This Court's decision in United States v. Scharton, 285 U.S. 518, 52 S.Ct. 416, 76 L.Ed. 917 (1932), gave Congress good reason to doubt that a conviction under § 7201 satisfies that condition. In *Scharton,* the defendant was indicted for attempting to evade income taxes by falsely understating his taxable income. The question before the Court was whether the crime was subject to the 3–year statute of limitations generally applicable to tax crimes, or whether it was instead subject to the 6–year statute of limitations applicable to " 'offenses involving the defrauding or attempting to defraud the United States **1175 or any agency thereof, whether by conspiracy or not, **488 and in any manner.' " Id., at 520, n. 2, 52 S.Ct. 416 (quoting 18 U.S.C. § 585 (1926 ed., Supp. V)). The Government argued that the 6–year statute of limitations applied because "fraud is implicit in the concept of evading or defeating" and because any effort to evade a tax is tantamount to an attempt to defraud the taxing body. 285 U.S., at 520–521, 52 S.Ct. 416. The Court rejected that argument, noting that, in an indictment for evasion, "an averment [of intent to defraud] would be surplusage, for it would be sufficient to plead and prove a willful attempt to evade or defeat." Id., at 521, 52 S.Ct. 416.

132 S.Ct. 1166, 182 L.Ed.2d 1, 80 USLW 4147, 12 Cal. Daily Op. Serv. 2059...

 **[11]**    **[12]**    Moreover, § 7201 includes two offenses: "the offense of willfully attempting to evade or defeat the *assessment* of a tax as well as the offense of willfully attempting to evade or defeat the *payment* of a tax." *Sansone v. United States,* 380 U.S. 343, 354, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965) (emphasis in original). As the Government notes, it is possible to willfully evade or defeat payment of a tax under § 7201 without making any misrepresentation. For example, § 7201 can be violated by a taxpayer who files a truthful tax return, but who also takes affirmative steps to evade payment by moving his assets beyond the reach of the Internal Revenue Service. Although the Government concedes that evasion-of-payment cases will almost invariably involve some affirmative acts of fraud or deceit, it is still true that the elements of tax evasion pursuant to § 7201 do not *necessarily* involve fraud or deceit. Thus, we conclude that the specific inclusion of tax evasion in Clause (ii) was intended to ensure that tax evasion pursuant to § 7201 was a deportable offense. Clause (ii) does not implicitly remove all other tax offenses from the scope of Clause (i)'s plain language.

3

 **[13]**    The Kawashimas also assert that the separate treatment of tax crimes and crimes involving fraud and deceit in the United States Sentencing Guidelines (USSG) supports their contention that Congress did not intend to include tax crimes within Clause (i). They point to the fact that, in 1987, the **\*489** United States Sentencing Commission included within the Guidelines a category of "offenses involving fraud or deceit." USSG §§ 2F1.1 to 2F1.2 (deleted effective Nov. 1, 2001). The Commission simultaneously included "offenses involving taxation" as a separate category. § 2T1.1 *et seq.* (Nov.2011). Although the Kawashimas acknowledge that they have found no evidence that Congress actually considered the Guidelines, they contend that "it is likely that the language of [Clause (i) ] and [Clause (ii) ] was taken from the Sentencing Guidelines" by the sponsors of the bill that expanded the definition of aggravated felony to include subparagraph (M). Brief for Petitioners 29. Therefore, the theory goes, we can infer from the similar language in the Guidelines that Congress did not intend Clause (i) to include tax crimes.

We reject the Kawashimas' reliance on the Guidelines. The Kawashimas' argument is at odds with the fact that, unlike the Guideline that the Kawashimas cite, Clause (ii) does not refer to all offenses "involving taxation." Rather, Clause (ii) is expressly limited to tax evasion offenses under § 7201. That textual difference undercuts any inference that Congress was considering, much less incorporating, the distinction drawn by the Guidelines.

C

 **[14]**    Finally, the Kawashimas argue that subparagraph (M)'s treatment of tax crimes other than tax evasion is ambiguous, **\*\*1176** and that we should therefore construe the statute in their favor. It is true that we have, in the past, construed ambiguities in deportation statutes in the alien's favor. See *INS v. St. Cyr,* 533 U.S. 289, 320, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). We think the application of the present statute clear enough that resort to the rule of lenity is not warranted.

\* \* \*

For the foregoing reasons, we conclude that convictions under 26 U.S.C. § 7206(1) and (2) in which the revenue loss **\*490** to the Government exceeds $10,000 qualify as aggravated felonies pursuant to 8 U.S.C. § 1101(a)(43)(M)(i). Because the Kawashimas are subject to deportation as aliens who have been convicted of aggravated felonies pursuant to 8 U.S.C. § 1227(a)(2)(A)(iii), the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

132 S.Ct. 1166, 182 L.Ed.2d 1, 80 USLW 4147, 12 Cal. Daily Op. Serv. 2059...

Justice GINSBURG, with whom Justice BREYER and Justice KAGAN join, dissenting.

Petitioner Akio Kawashima was convicted of preparing a false corporate tax return in violation of 26 U.S.C. § 7206(1). His wife, petitioner Fusako Kawashima, was convicted under § 7206(2) of assisting her husband in preparing the false return. The question presented is whether a conviction under § 7206 is an "aggravated felony" that renders the Kawashimas deportable from the United States. See 8 U.S.C. § 1227(a)(2)(A)(iii).

Congress has defined "aggravated felony" to include, *inter alia,* offenses that "(i) involv[e] fraud or deceit in which the loss to the victim or victims exceeds $10,000" or "(ii) [are] described in section 7201 of title 26 (relating to tax evasion) in which the revenue loss to the Government exceeds $10,000." § 1101(a)(43)(M). The Kawashimas argue that tax offenses triggering deportation are delineated exclusively in § 1101(a)(43)(M)(ii) (or Clause (ii)), and that § 1101(a)(43)(M)(i) (or Clause (i)) does not encompass tax crimes. The Court rejects this argument, and holds that any tax offense "involv[ing] fraud or deceit," if the loss to the fisc exceeds $10,000, ranks as an "aggravated felony." See *ante,* at 1176. Because the Kawashimas' tax offense involved deceit and meets the monetary threshold, the Court concludes, they have committed an aggravated felony and are therefore deportable.

The Court's construction of the statute is dubious, as I see it. For one thing, it effectively renders Clause (ii) superfluous. **\*491** Further, the Court's reading sweeps a wide variety of federal, state, and local tax offenses—including misdemeanors—into the "aggravated felony" category. In addition, today's decision may discourage aliens from pleading guilty to tax offenses less grave than tax evasion, thereby complicating and delaying enforcement of the internal revenue laws. I conclude that Clause (i) does not address tax offenses, and would therefore hold that making a false statement on a tax return in violation of § 7206 is not an "aggravated felony."

I

Any alien convicted of an "aggravated felony" after admission to the United States is deportable. 8 U.S.C. § 1227(a)(2)(A)(iii). Subparagraph (M) of § 1101(a)(43) includes as an "aggravated felony":

"an offense that—

"(i) involves fraud or deceit in which the loss to the victim or victims exceeds $10,000; or

"(ii) is described in section 7201 of title 26 (relating to tax evasion) in which the revenue loss to the Government exceeds $10,000."

Notably, Clause (i) speaks of "loss to the victim," Clause (ii) of "revenue loss to the **\*\*1177** Government." The Kawashimas contend that Clause (i) covers crimes of fraud or deceit causing losses unrelated to tax revenue. Tax crimes, they argue, are addressed exclusively in Clause (ii), and that clause designates only tax evasion proscribed by 26 U.S.C. § 7201 as an "aggravated felony." Willfully submitting a false statement proscribed by § 7206, the Kawashimas maintain, is not an "aggravated felony" that would render them deportable under 8 U.S.C. § 1227(a)(2)(A)(iii).

The Government contends that Clause (i) covers all tax offenses involving fraud or deceit, and that Congress included Clause (ii) out of caution, to make certain that persons convicted of tax evasion would be subject to deportation. **\*492** Under the Government's construction, because the crime of making a false statement on a tax return involves "fraud" or "deceit," the Kawashimas committed an aggravated felony. See *ante,* at 1172 ("the words 'fraud' and 'deceit' are absent from the text of

Kawashima v. Holder, 565 U.S. 478 (2012)

132 S.Ct. 1166, 182 L.Ed.2d 1, 80 USLW 4147, 12 Cal. Daily Op. Serv. 2059...

§ 7206(1) and are not themselves formal elements of the crime," nonetheless, "[the] elements [of a § 7206 crime] necessarily entail fraudulent or deceitful conduct").

The Court's task is to determine which reading of the statute is correct. If the two proffered constructions of subparagraph (M) are plausible in roughly equal measure, then our precedent directs us to construe the statute in the Kawashimas' favor. See *Fong Haw Tan v. Phelan,* 333 U.S. 6, 10, 68 S.Ct. 374, 92 L.Ed. 433 (1948) ("We resolve the doubts in favor of [the alien] because deportation is a drastic measure...."); *INS v. St. Cyr,* 533 U.S. 289, 320, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (same).

II

A

In interpreting 8 U.S.C. § 1101(a)(43)(M), I would rely upon the familiar canon that statutes should be interpreted to avoid superfluity. See *Corley v. United States,* 556 U.S. 303, 314, 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009) ( "[O]ne of the most basic interpretive canons" is that a " 'statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant....' " (quoting *Hibbs v. Winn,* 542 U.S. 88, 101, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004))). If Clause (i) is construed to apply to tax crimes, then Clause (ii)'s discrete inclusion of tax evasion would add nothing, for tax evasion is itself an offense that, in all actual instances of which the Government is aware, "involves fraud or deceit." See § 1101(a)(M)(i); Tr. of Oral Arg. 30–31.

The elements of tax evasion are the existence of a tax deficiency, willfulness, and "an affirmative act constituting an evasion or attempted evasion of the tax." *Sansone v. United States,* 380 U.S. 343, 351, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965). As this Court's decisions **\*493** indicate, the evasion of taxes involves deceit or fraud upon the Government, achieved by concealing a tax liability or misleading the Government as to the extent of the liability. See, *e.g., Spies v. United States,* 317 U.S. 492, 499, 63 S.Ct. 364, 87 L.Ed. 418 (1943) (an act of tax evasion may be "any conduct, the likely effect of which would be to mislead or to conceal"). Accordingly, courts have determined that tax evasion is a crime of moral turpitude, because it necessarily involves fraud. See, *e.g., Carty v. Ashcroft,* 395 F.3d 1081, 1085, n. 7 (C.A.9 2005) (fraud is "implicit in the nature of the crime" of tax evasion); *Considine v. United States,* 683 F.2d 1285, 1287 (C.A.9 1982) ("The express language of section 7201 requires an intent to avoid tax (a legitimate synonym for fraud).")); *Costello* **\*\*1178** *v. INS,* 311 F.2d 343, 348 (C.A.2 1962) ("There can be no 'wilful'

[tax] evasion without a specific intent to defraud."), rev'd on other grounds, 376 U.S. 120, 84 S.Ct. 580, 11 L.Ed.2d 559 (1964).

Even more to the point, courts have held that a conviction for tax evasion under 26 U.S.C. § 7201 "conclusively establishes fraud in a subsequent civil tax fraud proceeding." *Gray v. Commissioner,* 708 F.2d 243, 246 (C.A.6 1983); see *Klein v. Commissioner,* 880 F.2d 260, 262 (C.A.10 1989) (conviction under § 7201 "collaterally estops a taxpayer from denying fraud [in a] civil tax case involving the same years"). [1] This preclusive effect obtains, courts have explained, because " 'willful' [tax evasion] includes all the elements of 'fraud.' " *Tomlinson v. Lefkowitz,* 334 F.2d 262, 265 (C.A.5 1964); see *Gray,* 708 F.2d, at 246 ("The elements of criminal tax evasion and civil tax fraud are identical."); *Moore v. United States,* 360 F.2d 353, 356 (C.A.4 1965) ("[W]hile the criminal evasion statute does not explicitly require a finding of fraud, the case-by-case process of construction of the civil [fraud] and criminal tax provisions has demonstrated that their constituent elements are identical.").

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

132 S.Ct. 1166, 182 L.Ed.2d 1, 80 USLW 4147, 12 Cal. Daily Op. Serv. 2059...

**\*494**  Tax offenses span a wide range, from failure to file a tax return, 26 U.S.C. § 7203, to the unauthorized use of tax stamps, § 7209. But "the gravest of offenses against the revenues," this Court has said, the "capstone" of tax law violations, is tax evasion. *Spies,* 317 U.S., at 497, 499, 63 S.Ct. 364; see *Boulware v. United States,* 552 U.S. 421, 424, 128 S.Ct. 1168, 170 L.Ed.2d 34 (2008). Tellingly, the Kawashimas pleaded guilty to a crime carrying a maximum prison term of three years, § 7206; for tax evasion, the maximum term is five years, § 7201. It is thus understandable that Congress would single out tax evasion, as it did in Clause (ii), specifically designating it, and no other tax crime, an "aggravated felony" for deportation purposes.

The Court ascribes a different purpose to Clause (ii). Tax evasion, made criminal by § 7201, the Court states, "almost invariably," but "not *necessarily* [,] involve[s] fraud or deceit." *Ante,* at 1175. But see *supra,* at 1177 and this page. Congress likely included Clause (ii), the Court suggests, simply "to remove any doubt that tax evasion qualifies as an aggravated felony." *Ante,* at 1174. In other words, in holding that Clause (i) includes tax offenses, the Court finds Clause (ii) largely, but not totally, redundant.

In support of the notion that tax evasion can occur without fraud or deceit, the Court cites *United States v. Scharton,* 285 U.S. 518, 52 S.Ct. 416, 76 L.Ed. 917 (1932); see *ante,* at 1174 – 1175. In that long-obsolete case, the Court rejected the Government's plea for the application of an extended limitation period to a prosecution for tax evasion. The generally applicable statute of limitations was three years; for tax offenses that involve defrauding the United States, however, the limitation period was six years. An averment of intent to defraud, the Court said in *Scharton,* would be "surplusage," for it would suffice "to plead and prove a wilful attempt to evade or defeat." 285 U.S., at 521, 52 S.Ct. 416.

Courts had limited *Scharton* to its statute of limitations context several decades before Congress enacted § 1101(a)(43)(M) in 1994. See *Tseung Chu v. Cornell,* 247 F.2d 929, 936, n. 6 (C.A.9 1957) (distinguishing *Scharton* and holding **\*495**  that tax evasion is a crime of moral turpitude because it entails fraud); **\*\*1179** *Lefkowitz,* 334 F.2d, at 265 (distinguishing *Scharton* and holding that tax evasion necessarily involves fraud). Moreover, Congress, since 1954, has expressly prescribed a six-year limitation period for tax evasion. See 26 U.S.C. § 6531(2). In short, *Scharton* is a cryptic, thinly reasoned opinion, one that did not influence subsequent federal-court description of the crime of tax evasion. The suggestion that Congress may have worried about *Scharton* when framing legislation over 60 years later is hardly credible.

The Court presents another reason, drawn from the Government's brief, why Congress may have treated tax evasion discretely, while embracing tax crimes generally within the Clause (i) category. Section 7201 covers both evasion of assessment and evasion of payment. Imagine a taxpayer who files a truthful return, then moves her assets to a place "beyond the reach of the Internal Revenue Service." *Ante,* at 1175; see Brief for Respondent 34. The Court acknowledges that evasion-of-payment cases almost always "involve some affirmative acts of fraud or deceit." *Ante,* at 1175. Still, there may be a rare case in which that is not so. Rare, indeed; imaginary would be an apt characterization. The Government conceded that, to its knowledge, there have been no actual instances of indictments for tax evasion unaccompanied by any act of fraud or deceit. Tr. of Oral Arg. 30–31.

The canon that statutes should be interpreted to avoid superfluity cannot be skirted as easily as the Government here urges. We have declined to interpret legislation in a way that "would in practical effect render [a provision] entirely superfluous in all but the most unusual circumstances." *TRW Inc. v. Andrews,* 534 U.S. 19, 29, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001). It is hardly sufficient for the Government to hypothesize a case in which the provision might have some independent role. See *id.,* at 30, 122 S.Ct. 441. Where, as here, "the independent function one could attribute to the [provision] **\*496**  would [rarely] arise," a construction moored to a case "most unlikely" to exist should be rejected. *Id.,* at 31, 122 S.Ct. 441. It is highly improbable that "a proviso accounting for more than half of [the] text" of § 1101(a)(43)(M), *i.e.,* Clause (ii), "would lie dormant in all but the most unlikely situations." See 534 U.S., at 31, 122 S.Ct. 441.

Kawashima v. Holder, 565 U.S. 478 (2012)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 21 of 1271

132 S.Ct. 1166, 182 L.Ed.2d 1, 80 USLW 4147, 12 Cal. Daily Op. Serv. 2059...

Congress' aim in drafting 🚩 § 1101(a)(43) was to determine which crimes are sufficiently serious to warrant the "drastic measure" of deportation, and which are not. See 🏷️ *Fong Haw Tan,* 333 U.S., at 10, 68 S.Ct. 374. It is implausible that Congress, when drafting 🚩 § 1101(a)(43)(M), intended to address, or was even aware of, the Government's scenario: a taxpayer who files a truthful return, then, to thwart collection of the tax due, moves all her assets offshore. Far more likely, Congress did not intend to include tax offenses in § 1101(a)(43)(M)(i), but instead drafted that provision to address fraudulent schemes against private victims, then added 🚩 § 1101(a)(43)(M)(ii) so that the "capstone" tax offense against the Government also qualified as an aggravated felony. See *supra,* at 1178.

### B

The Court's construction of the statute is even less plausible given the numerous offenses it would rank as "aggravated felon[ies]." Many federal tax offenses, like 26 U.S.C. § 7206, involve false statements or misleading conduct. See, *e.g.,* § 7202 (failing to truthfully account for and pay taxes owed). Conviction of any of these offenses, if the Court's construction were correct, would render an alien deportable. So would conviction of state and local tax **\*\*1180** offenses involving false statements. 🚩🔶 *Ferreira v. Ashcroft,* 390 F.3d 1091, 1096–1097 (C.A.9 2004) (state-law offenses qualify as offenses involving fraud or deceit under 🏷️ 8 U.S.C. § 1101(a)(43)(M)); see, *e.g.,* 🏷️ Del.Code Ann., Tit. 30, § 574 (2009) (submitting a tax return false as to any material matter is a criminal offense); D.C.Code § 47–4106 (2001–2005) (same); Ala.Code § 40–29–114 (2003) (same); Va.Code Ann. § 58.1–1815 (Lexis 2009) **\*497** willfully failing to account truthfully for and pay certain taxes is a criminal offense).

Rendering all tax offenses involving false statements "aggravated felon[ies]" that subject an alien to deportation is all the more problematic, for many of these offenses are misdemeanors. Among federal misdemeanors, see, *e.g.,* 🏷️ 26 U.S.C. § 7204 ("furnish[ing] a false" W–2 form to an employee); § 7205 ("suppl[ying] false or fraudulent information" to an employer); § 7207 (filing a return "known ... to be false as to any material matter"). On the state and local level, see, *e.g.,* Cal. Rev. & Tax.Code Ann. § 1610.4 (West 1998) ("Every person who wilfully states anything which he knows to be false in any oral or written statement, not under oath, required or authorized to be made as the basis of an application to reduce any tax or assessment, is guilty of a misdemeanor."); N.D. Cent.Code Ann. 🏷️ § 57–37.1–16 (Lexis 2011) ("Every person who wilfully and knowingly subscribes or makes any false statement of facts [on an estate tax return] ... is guilty of a class A misdemeanor."); Columbus, Ohio City Code §§ 361.31(a)(4), (b), (d) (2009) (any person who "[k]nowingly make[s] and file[s] an incomplete, false or fraudulent [municipal] return" is guilty of a fourth-degree misdemeanor). Nor would the $10,000 threshold set in 🚩 8 U.S.C. § 1101(a)(43)(M) prevent deportation for tax crimes far less serious than willful tax evasion, as many as six years may be included in the amount-of-loss calculation. See 26 U.S.C. § 6531 (setting a six-year statute of limitations for, *inter alia,* tax crimes involving fraud or falsity); Brief for Johnnie M. Walters as *Amicus Curiae* 15–16 (hereinafter Walters Brief). [2]

**\*498** Finally, the Court's decision has adverse consequences for the efficient handling of tax prosecutions. It is often easier for the Government to obtain a conviction under § 7206 (false statements) than under § 7201 (tax evasion). See *United States v. Olgin,* 745 F.2d 263, 272 (C.A.3 1984) (unlike a conviction under § 7201, a conviction under § 7206 does not require proof of a tax deficiency); *Considine,* 683 F.2d, at 1287 (unlike a conviction under § 7201, a conviction under § 7206 does not require proof of an attempt to escape a tax). For this reason, the Government has allowed taxpayers to plead guilty to a § 7206 charge in lieu of going to trial under § 7201 on an evasion charge. See Walters Brief 19–20. Deportation consequences are important to aliens facing criminal charges. See 🏷️ *Padilla v. Kentucky,* 559 U.S. 356, 373, 130 S.Ct. 1473, 1483, 176 L.Ed.2d 284 (2010) ( "[P]reserving the client's right to remain in the United States may be more important to the client than any potential

Kawashima v. Holder, 565 U.S. 478 (2012)
Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 22 of 1271

132 S.Ct. 1166, 182 L.Ed.2d 1, 80 USLW 4147, 12 Cal. Daily Op. Serv. 2059...

jail sentence." (quoting *St. Cyr,* 533 U.S., at 322, 121 S.Ct. 2271)). If a § 7206 charge carries the same prospect of deportation as a § 7201 charge, then an alien's incentive to plead guilty to any tax offense is significantly reduced.

* * *

**1181  For the reasons stated, I would hold that making a material, false statement on a tax return does not qualify as an aggravated felony within the compass of 8 U.S.C. § 1101(a)(43)(M)(i). I would therefore reverse the judgment of the Court of Appeals for the Ninth Circuit.

## All Citations

565 U.S. 478, 132 S.Ct. 1166, 182 L.Ed.2d 1, 80 USLW 4147, 12 Cal. Daily Op. Serv. 2059, 2012 Daily Journal D.A.R. 2235, 23 Fla. L. Weekly Fed. S 121, 63 A.L.R. Fed. 2d 735

## Footnotes

| * | The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499. |
|---|---|
| 1 | On March 1, 2003, most of the functions of the Immigration and Naturalization Service were transferred to the Bureau of Immigration and Customs Enforcement, and the Immigration and Naturalization Service ceased to exist. |
| 2 | Before 1996, there were two procedures for removing aliens from the country: "deportation" of aliens who were already present, and "exclusion" of aliens seeking entry or reentry into the country. Since 1996, the Government has used a unified procedure, known as "removal," for both exclusion and deportation. See 8 U.S.C. §§ 1229, 1229a. We use the terms "deportation" and "removal" interchangeably in this opinion. |
| 3 | We note that the issue whether the Kawashimas' offenses satisfy the second requirement of Clause (i)—that the loss to the victim exceeded $10,000—is not before us. We address only whether their offenses of conviction qualify as crimes "involv[ing] fraud or deceit." |
| 1 | See also, *e.g., Blohm v. Commissioner,* 994 F.2d 1542, 1554 (C.A.11 1993); *Fontneau v. United States,* 654 F.2d 8, 10 (C.A.1 1981) *(per curiam)* ; *Plunkett v. Commissioner,* 465 F.2d 299, 307 (C.A.7 1972). |
| 2 | One might also ask what reason Congress would have for making a tax misdemeanor a deportable offense, while more serious crimes do not jeopardize an alien's residency in the United States. See, *e.g., Leocal v. Ashcroft,* 543 U.S. 1, 11–12, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004) (driving while drunk, causing serious bodily injury to others is not an aggravated felony). |

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

Abrogated by Abebe v. Mukasey, 9th Cir., January 5, 2009

35 F.3d 432
United States Court of Appeals,
Ninth Circuit.

Alexander KOMARENKO, Petitioner,

v.

IMMIGRATION & NATURALIZATION
SERVICE, Respondent.

No. 92–70595.
|
Argued and Submitted Feb. 8, 1994.
|
Decided Sept. 9, 1994.

**Synopsis**

Lawful permanent resident alien who was convicted of assault with deadly weapon and ordered deported sought review of Board of Immigration Appeals' dismissal of his appeal from immigration judge's order that he was ineligible for discretionary relief. The Court of Appeals, Trott, Circuit Judge, held that alien was not denied his constitutional right to equal protection of the law because Immigration and Nationality Act's (INA) deportation provision for aliens convicted of firearms charges and INA's exclusion provision for moral turpitude were not substantially identical.

Petition for review denied.

West Headnotes (5)

**[1]**    **Aliens, Immigration, and Citizenship** ⬦ Crimes of moral turpitude

**Aliens, Immigration, and Citizenship** ⬦ Firearms offenses

**Constitutional Law** ⬦ Discrimination Between Classes of Aliens

Lawful permanent resident alien convicted of assault with deadly weapon and ordered deported was not denied his constitutional right to equal protection of the law when he was denied discretionary relief from deportation; deportation provision for aliens convicted for firearms charges and exclusion provision for moral turpitude were not substantially identical because deportability provision stated that any alien who at any time after entry is convicted under any law of using weapon is deportable while exclusion provision stated that any alien convicted of acts which constitute essential elements of crime involving moral turpitude is excludable and exempted from moral turpitude exclusion aliens convicted of misdemeanor, such that distinction between the two classes was not arbitrary or unreasonable. U.S.C.A. Const.Amend. 14; Immigration and Nationality Act, §§ 212(a)(2)(A)(i)(I), (a)(2)(A)(ii)(II), (c), 241(a)(2)(C), as amended, 8 U.S.C.A. §§ 1182(a)(2)(A)(i)(I), (a)(2)(A)(ii)(II), (c), 1251(a)(2)(C).

19 Cases that cite this headnote

**[2]**    **Constitutional Law** ⬦ Statutes and other written regulations and rules

Fundamental query in equal protection claim that does not involve suspect class is whether classification is reasonable, not arbitrary, and rests upon some ground of difference having fair and substantial relation to object of the legislation so that all persons similarly circumstanced shall be treated alike. U.S.C.A. Const.Amend. 14.

7 Cases that cite this headnote

**[3]**    **Aliens, Immigration, and Citizenship** ⬦ Constitutional questions

**Constitutional Law** ⬦ Immigration and Naturalization

Court of Appeals would decline to adopt factual approach to equal protection analysis in context of deportation and excludability provisions of Immigration and Nationality Act (INA). Immigration and Nationality Act, § 101 et seq., as amended, 8 U.S.C.A. § 1101 et seq.

8 Cases that cite this headnote

**[4]** Administrative Law and Procedure — Arbitrariness and capriciousness; reasonableness

Administrative Law and Procedure — Consistency with statute, statutory scheme, or legislative intent

To be valid, regulation must be consistent with its enabling statute and must be reasonable.

1 Cases that cite this headnote

**[5]** Aliens, Immigration, and Citizenship — Validity

Aliens, Immigration, and Citizenship — Crimes and Related Grounds

Attorney General did not exercise unreasonably the discretion Congress granted in statute, providing that alien may be granted asylum in the discretion of Attorney General, by promulgating regulation denying asylum to aliens convicted of particularly serious crimes; regulation was based on reasonable determination that persons convicted of particularly serious crimes pose danger to the community, Congress itself had elsewhere in Immigration and Nationality Act (INA) made a virtually identical determination and Attorney General still had to exercise individualized discretion in determining whether given offense was particularly serious. Immigration and Nationality Act, §§ 208(a), 243(h)(2)(B), as amended, 8 U.S.C.A. §§ 1158(a), 1253(h)(2)(B); 8 C.F.R. § 208.14(c)(1).

9 Cases that cite this headnote

**Attorneys and Law Firms**

*433 Daniel E. Kritz, Sideman & Bancroft, San Francisco, CA, for petitioner.

Francesco Isgro, Attorney, Office of Immigration Litigation, Civ. Div., U.S. Dept. of Justice, Washington, DC, for respondent.

Petition to Review a Decision and Order of the Board of Immigration Appeals.

Before: FLETCHER, KOZINSKI and TROTT, Circuit Judges.

**Opinion**

TROTT, Circuit Judge:

On March 12, 1990, Alexander Komarenko, a former Soviet citizen and a lawful permanent *434 resident of the United States, was convicted of assault with a deadly weapon in violation of California Penal Code § 245(a)(2) and sentenced to four years of imprisonment. The I.N.S. commenced deportability proceedings against Komarenko under 8 U.S.C. § 1251(a)(2)(C) for being an alien convicted of a firearms charge.

Komarenko concedes he is deportable, but submitted to the I.N.S. applications for asylum, withholding of deportation and waiver of inadmissibility. An Immigration Judge ("IJ") held that Komarenko was: 1) ineligible for asylum under 8 U.S.C. § 1158(a); 2) "statutorily ineligible" for withholding of deportation under 8 U.S.C. § 1253(h)(2)(B); and, 3) "statutorily ineligible" for waiver of inadmissibility under 8 U.S.C. § 1182(c).

Komarenko appealed to the Board of Immigration Appeals ("BIA"), which dismissed his appeal. The BIA concluded: 1) Komarenko was ineligible for waiver of inadmissibility under § 212(c) of the INA, based on the reasoning in Cabasug v. I.N.S., 847 F.2d 1321 (9th Cir.1988); 2) Komarenko had been convicted of a "serious crime" and was therefore ineligible for asylum pursuant to 8 C.F.R. § 208.14(c)(1) and for withholding of deportation pursuant to 8 U.S.C. § 1253(h)(2)(B). Komarenko petitions for review of the BIA's dismissal of his appeal. See 8 U.S.C. § 1105a (1988).

I

**[1]** Komarenko argues the Immigration Judge's "absolute refusal" to allow him access to relief under § 212(c) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(c) (1988), violates his right to equal protection of the law under the Due Process Clause of the Fifth Amendment. "It is well established that all individuals in the United States —citizens and aliens alike—are protected by the Due Process

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Clause of the Constitution. It is equally well established that the Due Process Clause incorporates the guarantees of equal protection." *Garberding v. I.N.S.,* 30 F.3d 1187, 1190 (9th Cir.1994) (citations omitted). "We review de novo the [BIA's] determination of purely legal questions regarding the requirements of the Immigration and Nationality Act." *Abedini v. I.N.S.,* 971 F.2d 188, 190–91 (9th Cir.1992).

We have held that "when the basis upon which the INS seeks deportation *is identical to a statutory ground for exclusion* for which discretionary relief would be available, the equal protection component of the fifth amendment due process guarantee requires that discretionary relief be accorded in the deportation context as well." *Gutierrez v. I.N.S.,* 745 F.2d 548, 550 (9th Cir.1984) (emphasis added); *see also Cabasug,* 847 F.2d at 1325; *Tapia–Acuna v. I.N.S.,* 640 F.2d 223, 224 (9th Cir.1981). This circuit has joined other circuits in reasoning that if a subsection of the exclusion statute is substantially identical to a subsection of the deportation statute, it would be irrational for the I.N.S. to treat differently the class of aliens who have not departed the United States and the class of aliens who have departed and then returned to the United States. *See Cabasug,* 847 F.2d at 1324–25; *Campos v. I.N.S.,* 961 F.2d 309, 315–17 (1st Cir.1992); *Francis v. I.N.S.,* 532 F.2d 268, 272–73 (2d Cir.1976). Such an arbitrary distinction between classes of aliens would amount to a denial of equal protection. *Cabasug,* 847 F.2d at 1324–25.

To extend this reasoning to the instant case, we would have to conclude that the deportation provision for aliens convicted for firearms charges and the exclusion provision for moral turpitude are "substantially identical." *See id. at 1326.* They are not. The deportability provision states: "Any alien who at any time after entry is convicted under *any law* of purchasing, selling, offering for sale, exchanging, using, owning, possessing, or carrying in violation of *any law,* any weapon, part, or accessory which is a firearm or destructive device ... is deportable." 8 U.S.C. § 1251(a) (2)(C) (Supp. III 1992) (emphasis added). The exclusion provision states: "Except as provided in clause (ii), any alien convicted of ... acts which constitute the essential elements of a crime involving moral turpitude ... is excludable." *Id.* § 1182(a)(2)(A)(i)(I). Clause (ii) excludes from the moral

turpitude exclusion aliens convicted of a misdemeanor. *Id.* § 1182(a)(2)(A)(ii)(II).

**\*435** There is more than a technical distinction between these two provisions. First, the exclusion provision does not apply to misdemeanors, while the deportation provision does. *See Cabasug,* 847 F.2d at 1324. More importantly, although Komarenko's conduct could be a crime of moral turpitude, possession of a firearm will not always be a crime of moral turpitude, nor will crimes of moral turpitude necessarily involve firearms. *See Jordan v. De George,* 341 U.S. 223, 227–31 & n. 14, 71 S.Ct. 703, 705–08 & n. 14, 95 L.Ed. 886 (1951).

**[2]** Komarenko argues, however, that the factual basis for his conviction, assault with a deadly weapon, could have rendered him excludable as an alien convicted of a crime involving moral turpitude under § 212(a)(2) of the INA. *See* 8 U.S.C. § 1182(a)(2)(A)(i)(I) (Supp. III 1992). We have not previously employed a factual approach to these types of cases, but have examined the classes of persons created by the excludability and deportation provisions to determine whether they created a "distinction that lacks a rational basis." *Cabasug,* 847 F.2d at 1323–26; *Gutierrez,* 745 F.2d at 550; *Tapia–Acuna,* 640 F.2d at 225. Other circuits also employ this approach. *See Francis,* 532 F.2d at 272 ("distinctions between different classes of persons must be reasonable, not arbitrary"); *Campos,* 961 F.2d at 316.[1] Thus, we must determine whether it is appropriate to change our approach. It is not.

Generally, when courts have found an equal protection violation, the excludability and deportation provisions have been substantially identical. That way, the only distinction between the two classes of persons the statute created was that one class of individuals had traveled abroad and returned, and the other had not. It is this arbitrary distinction that violates equal protection. In the instant case, the provisions are entirely dissimilar, and the distinction between the two classes is not arbitrary or unreasonable. *See Campos,* 961 F.2d at 316 ("We cannot say that it is absurd that for purposes of discretionary deportation review Congress chooses to treat different crimes differently."). For this reason, the linchpin of the equal protection analysis in this context is that the two provisions be "substantially identical."

**[3]** Komarenko claims we must focus on the facts of his individual case and conclude that because he *could have been* excluded under the moral turpitude provision, he has been denied equal protection. We decline to speculate whether the I.N.S. would have applied this broad excludability provision to an alien in Komarenko's position. Were we to do so, we would extend discretionary review to every ground for deportation that could constitute "the essential elements of a crime involving moral turpitude." 8 U.S.C. § 1182(a)(2) (A)(i)(II).[2] Such judicial legislating would vastly overstep our "limited scope of judicial inquiry into immigration legislation," *Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977); *Francis,* 532 F.2d at 272, and would interfere with the broad enforcement powers Congress has delegated to the Attorney General, *see* 8 U.S.C. § 1103(a). We decline to adopt a factual approach to our equal protection analysis in the context of the deportation and excludability provisions of the INA, and we conclude that Komarenko was not denied his constitutional right to equal protection of the law.

## II

**[4]** Komarenko argues 8 C.F.R. § 208.14(c)(1) is invalid as an unreasonable exercise **\*436** of power delegated to the Attorney General. In order to be valid, a regulation must be consistent with its enabling statute and must be reasonable. *Manhattan Gen. Equip. Co. v. Commissioner,* 297 U.S. 129, 134, 56 S.Ct. 397, 399–400, 80 L.Ed. 528 (1935). The enabling statute states:

> The Attorney General shall establish a procedure for an alien physically present in the United States ... to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title.

8 U.S.C. § 1158(a) (1988). This is a broad delegation of power, which restricts the Attorney General's discretion to grant asylum only by requiring the Attorney General to first determine that the asylum applicant is a "refugee" under 8 U.S.C. § 1101(a)(42)(A).

**[5]** Komarenko argues 8 C.F.R. § 208.14(c)(1) is inconsistent with the enabling statute because Congress intended there to be no categories of aliens for whom asylum would be completely unavailable. However, Congress did not expressly declare such an intent in 8 U.S.C. § 1158(a). Because § 1158(a) is silent as to this specific issue, the question is "whether the agency's answer is based on a permissible construction of the statute." *Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2793, 81 L.Ed.2d 694 (1984). The statute merely states that "the alien may be granted asylum in the discretion of the Attorney General." 8 U.S.C. § 1158(a). It, therefore, does not preclude the Attorney General from exercising this discretion by promulgating reasonable regulations applicable to particularly dangerous or undesirable classes of aliens. Here, the Attorney General has promulgated a regulation denying asylum to all aliens who have been convicted of particularly serious crimes. This regulation is based on the reasonable determination that persons convicted of particularly serious crimes pose a danger to the community, *see Urbina–Mauricio v. I.N.S.,* 989 F.2d 1085, 1088 (9th Cir.1993), one that outweighs any equities such persons may have in their favor. Congress itself has elsewhere in the INA made a virtually identical determination, and has with nearly identical language made withholding of deportation unavailable to aliens convicted of particularly serious crimes. 8 U.S.C. § 1253(h)(2)(B). Moreover, the Attorney General must still exercise individualized discretion in determining whether a given offense should be counted as "particularly serious." The BIA in this case, for instance, conducted a considerable factual examination of Komarenko's conviction before deciding it was particularly serious. The Attorney General has not exercised unreasonably the discretion Congress granted in the asylum statute.

We DENY the petition for review and petitioner's request for attorney fees.

**All Citations**

35 F.3d 432

# Footnotes

1    The fundamental query in an equal protection claim that does not involve a suspect class is whether "[a] classification [is] reasonable, not arbitrary, and [rests] upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Stanton v. Stanton,* 421 U.S. 7, 14, 95 S.Ct. 1373, 1377, 43 L.Ed.2d 688 (1975) (internal quotations omitted).

2    We also would create an arbitrary distinction between aliens whose firearms convictions rise to the level of a crime of moral turpitude and those whose convictions do not, and then extend discretionary review only to those with the more serious convictions.

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by Marouf v. Lynch, 6th Cir., January 6, 2016

505 F.3d 534
United States Court of Appeals,
Sixth Circuit.

Nikolai KOULJINSKI, Petitioner,

v.

Peter D. KEISLER,[*] Acting Attorney
General of the United States, Respondent.

No. 06–4016.
|
Argued: Sept. 17, 2007.
|
Decided and Filed: Oct. 16, 2007.

**Synopsis**

**Background:** Applicant, a Jewish citizen of Russia, petitioned for review of decision of Board of Immigration Appeals (BIA) denying asylum, withholding of removal, and relief under Convention Against Torture (CAT).

**Holdings:** The Court of Appeals, Karen Nelson Moore, Circuit Judge, held that:

[1] Immigration Judge (IJ) did not abuse his discretion in basing his discretionary denial of asylum on applicant's three drunk-driving convictions;

[2] IJ did not abuse his discretion in failing to consider presence of applicant's wife and daughter in United States when deciding whether to grant asylum;

[3] applicant failed to show that he was more likely than not to face persecution upon his return to Russia, and he thus was not eligible for withholding of removal;

[4] IJ did not incorrectly focus on applicant's subjective fears in deciding whether he was eligible for relief under CAT; and

[5] applicant failed to show that he was more likely than not to face torture upon his return to Russia, and he thus was not eligible for relief under CAT.

Petition denied.

West Headnotes (10)

**[1]** **Aliens, Immigration, and Citizenship** ⚖ Review of initial decision or administrative review

Because Board of Immigration Appeals (BIA) adopted the Immigration Judge's (IJ) reasoning, Court of appeals would review IJ's decision directly.

3 Cases that cite this headnote

**[2]** **Aliens, Immigration, and Citizenship** ⚖ Crimes and Related Grounds

An Immigration Judge (IJ) may consider an alien's convictions for an offense like driving while under the influence of alcohol, regardless of whether it is a crime of moral turpitude or a particularly serious crime, in deciding whether to grant an asylum application as matter of discretion. Immigration and Nationality Act, § 101(a)(42)(A), 🚩 8 U.S.C.A. § 1101(a)(42)(A).

**[3]** **Aliens, Immigration, and Citizenship** ⚖ Crimes and Related Grounds

Immigration Judge (IJ) did not abuse his discretion in basing his discretionary denial of asylum on applicant's three drunk-driving convictions in United States. Immigration and Nationality Act, § 101(a)(42)(A), 🚩 8 U.S.C.A. § 1101(a)(42)(A).

7 Cases that cite this headnote

**[4]** **Aliens, Immigration, and Citizenship** ⚖ Admissibility

Immigration Judge (IJ) did not abuse his discretion in failing to consider presence of Russian Jewish applicant's wife and daughter in United States when deciding whether to grant him asylum, given that wife and daughter were not legally present in United States. Immigration

and Nationality Act, § 101(a)(42)(A), 🚩 8 U.S.C.A. § 1101(a)(42)(A).

1 Cases that cite this headnote

**[5]**    **Aliens, Immigration, and Citizenship** 🔑 Clear Probability Standard for Withholding of Removal

**Aliens, Immigration, and Citizenship** 🔑 Standard for relief

To prevail on a petition for withholding of removal under the Immigration and Nationality Act (INA), or on a petition for withholding of removal under the Convention Against Torture (CAT), an alien must show that there is a clear probability that she would be subject to persecution, for the INA, or to torture, for the CAT, on the basis of one of the five statutorily protected grounds were she removed from this country.

17 Cases that cite this headnote

**[6]**    **Aliens, Immigration, and Citizenship** 🔑 Reasonable fear of persecution or clear probability standard

**Aliens, Immigration, and Citizenship** 🔑 Standard for relief

The showing of clear probability that an alien would be subject to persecution, for withholding of removal, or to torture, for relief under the Convention Against Torture (CAT) requires more than that needed to demonstrate refugee status for purposes of asylum, which requires only a well-founded fear of persecution. Immigration and Nationality Act, § 101(a)(42)(A), 🚩 8 U.S.C.A. § 1101(a)(42)(A); 🚩 8 C.F.R. § 208.13(b).

16 Cases that cite this headnote

**[7]**    **Aliens, Immigration, and Citizenship** 🔑 Country conditions; official reports

Jewish applicant failed to show that he was more likely than not to face persecution upon his return to Russia, and he thus was not

eligible for withholding of removal, in that Immigration Judge (IJ) reasonably concluded that State Department reports indicated that non-state actors were the source of prejudice, social discrimination, and some acts of violence against Jews in Russia, and that such occurrences thus were likely to be somewhat more sporadic than former persecution by government authorities.

3 Cases that cite this headnote

**[8]**    **Aliens, Immigration, and Citizenship** 🔑 Findings or statement of reasons

Immigration Judge (IJ) did not incorrectly focus on Russian Jewish applicant's subjective fears in deciding whether he was eligible for relief under Convention Against Torture (CAT), even though IJ stated that applicant's fear of persecution related to action by non-state actors and not by government, where IJ also supported his decision by noting that applicant did not complain that he was ever tortured or physically mistreated by government authorities. 🔖 8 C.F.R. § 208.16(c)(3)(i).

3 Cases that cite this headnote

**[9]**    **Aliens, Immigration, and Citizenship** 🔑 Weight and Sufficiency

Jewish applicant failed to show that he was more likely than not to face torture upon his return to Russia, and he thus was not eligible for relief under Convention Against Torture (CAT), despite applicant's contention that Russian government acquiesced in abuse, torture, and murder of Jews, where documents on which he relied demonstrated that Russian government had condemned and worked to stop acts of persecution and violence against Jews. 🔖 8 C.F.R. § 1208.18(a)(1).

4 Cases that cite this headnote

**[10]**    **Aliens, Immigration, and Citizenship** 🔑 Government action or acquiescence

International Law    Punishment, torture, and genocide

Government acquiescence in torture of a group can support relief under the Convention Against Torture (CAT). 8 C.F.R. § 1208.18(a)(1).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*536  ARGUED:** Scott A. Keillor, Ypsilanti, Michigan, for Petitioner. Kristin K. Edison, United States Department of Justice, Washington, D.C., for Respondent. **ON BRIEF:** Scott A. Keillor, Ypsilanti, Michigan, for Petitioner. Kristin K. Edison, United States Department of Justice, Washington, D.C., for Respondent.

Before: MOORE and GRIFFIN, Circuit Judges; GRAHAM, District Judge. **\*\***

## OPINION

KAREN NELSON MOORE, Circuit Judge.

After finding that an alien is eligible for asylum, may an immigration judge consider the alien's three convictions for driving under the influence of alcohol in denying the application for asylum as a matter of discretion? That is the principal question in this appeal, and because we conclude that an immigration judge may properly consider such convictions, we **DENY** Nikolai Kouljinski's petition for review of the decision of the Board of Immigration Appeals denying his application for asylum and withholding of removal.

## I. BACKGROUND

**A. Procedural History**
Petitioner Nikolai Kouljinski ("Kouljinski"), now a fifty-five year-old Russian **\*537** Jew, entered the United States in October 1992 and filed an application for asylum in November 1992 with the former Immigration and Naturalization Service ("INS"). Joint Appendix ("J.A.") at 680–84 (1992 Request for Asylum), 698–708 (2004 Application for Asylum). In June 1995, Kouljinski learned

that his wife had been involved in a serious car accident in Russia, and he returned to Russia after first receiving advance parole, which allowed him to reenter the United States and not abandon his application for asylum. J.A. at 611–13 (Authorization for Parole), 141 (Hr'g Tr. at 74). He returned to the United States on August 11, 1995, and his wife and daughter followed him to the United States on December 11, 1995.

On August 14, 2002, the former INS initiated removal proceedings against Kouljinski, alleging that, pursuant to 8 U.S.C. § 1182(a)(7)(A)(i)(I), he was removable for entering the United States without valid documents. J.A. at 709–10 (Notice to Appear in Immigration Court). On November 26, 2003, at an initial Master Calendar hearing, the immigration judge ("IJ"), noting that Kouljinski had originally applied for asylum in 1992, scheduled a second hearing for February 20, 2004, at which time Kouljinski was to submit an updated application for asylum. J.A. at 163–68 (Transcript of Master Calendar Hearing). Kouljinski submitted an updated application for asylum at a brief hearing on February 20, 2004, at which he was represented by his current counsel. J.A. at 698–708 (Application for Asylum), 158–162 (Transcript of Hearing). Kouljinski sought asylum, withholding of removal under the Immigration and Nationality Act ("INA"), and withholding of removal under the Convention Against Torture ("CAT"). On August 13, 2004, an IJ held a hearing at which Kouljinski's attorney, the Department of Homeland Security's attorney, and the IJ discussed the parties' evidentiary submissions in advance of the asylum hearing. J.A. at 149–57 (Transcript of Hearing). On November 12, 2004, the IJ held a hearing on Kouljinski's asylum application. J.A. at 84–148 (Transcript of Hearing). At this hearing, Kouljinski and his wife, Alla Kouljinski ("Ms.Kouljinski"), testified regarding instances of harassment and intimidation that they experienced in Russia and attributed to anti-Semitism.

The IJ rendered an oral decision at the conclusion of the hearing. J.A. at 10–24 (Transcript of Oral Decision). The IJ denied Kouljinski's applications for asylum, withholding of removal under the INA, and withholding of removal under the CAT. The IJ did so after first finding Kouljinski eligible for asylum—he "conclu[ded] that [Kouljinski], in my view, has established a reasonable possibility of persecution," J.A. at 22 —but the IJ denied Kouljinski asylum because he "reached the conclusion that a favorable exercise of discretion in this case is unwarranted." J.A. at 24. In doing so, the IJ decided that Kouljinski's eligibility for asylum was not "a sufficiently

weighty favorable discretionary factor to outweigh the fact that [he] has three convictions for driving under the influence" of alcohol, noting that Kouljinski's most recent conviction was a felony offense. J.A. at 23.

Kouljinski timely appealed to the BIA, where he argued that the IJ abused his discretion in denying asylum based on Kouljinski's drunk-driving convictions and his lack of family ties to the United States given that his wife and daughter are currently in the United States. Kouljinski also challenged the IJ's findings as to past persecution and as to a likelihood of future persecution and torture, arguing that he had established the higher showing necessary to mandate withholding of removal under the INA and under the CAT.

 **\*538** On June 23, 2006, the BIA adopted and affirmed the IJ's decision and dismissed the appeal. J.A. at 8–9. Kouljinski filed a timely petition for review in this court of the BIA's decision.

## B. The Hearing

At the hearing on November 12, 2004, Kouljinski testified that he was born in Leningrad, Russia, in 1952, that he is Jewish, that he had been married to his wife for over twenty years, and that they have a daughter, then sixteen years old. Kouljinski testified that his employment options in the former Soviet Union were limited because, as a Jew, he could not be a member of the Communist Party. In 1980, when he was working for a restaurant, Kouljinski's application for a managerial position was "not approved by the District Party Committee," and he stated that the District Party Committee "sen[t] documents to me suggesting that I need to quit." J.A. at 102 (Hr'g Tr. at 35). As a result of that pressure, Kouljinski quit; to obtain another position he moved from Leningrad to Kronstadt, a city twenty kilometers from Leningrad. KGB agents then demanded that he report to them while he was working in Kronstadt. While he was working as a bartender in an establishment frequented by military personnel, the KGB arrested him and detained him overnight, demanding that he listen to conversations in the bar and pass along information to the KGB about anyone planning to leave the Soviet Union and seek asylum elsewhere.

After his father died in the late 1980s, Kouljinski learned from some of his father's papers how to manufacture jewelry that resembled Fabergé products; once it became legal to do so, he started his own business. Soon thereafter, Kouljinski faced problems from racketeers, who pressured him to manufacture counterfeit Fabergé products, but he

refused. On his application for asylum, Kouljinski stated that an entity called the "Ost Corporation" began threatening and pressuring him, demanding that he merge his business with theirs because his jewelry-making "was a 'Russian' practice and tradition, part of the Russian culture, and therefore not suitable for Jews." J.A. at 708 (2004 Asylum Application). Ms. Kouljinski testified that they frequently received threatening calls at night and that windows in their house were broken. The racketeers demanded thirty percent of his revenue, and Kouljinski testified that when he attempted to report the extortion to the police, he was laughed at. Ultimately, Kouljinski decided to shut down his production and flee to the United States.

While Kouljinski was in the United States, his wife continued to experience harassment in Russia. Ms. Kouljinski testified that she received threats, with callers telling her that "we know that your husband got out ... and you should leave with him, because you're even worse than him. You married a Jew." J.A. at 136 (Hr'g Tr. at 69). She also claimed that callers directed threats at their daughter. In 1995, Ms. Kouljinski was involved in a serious car accident, and she testified that the other car "collided with my vehicle at a very high speed" and that she spent over two weeks in the hospital due to her injuries. J.A. at 137–38 (Hr'g Tr. at 70–71). Her mother began receiving threats over the phone, with the callers "saying that if your daughter doesn't leave the country with her offspring, then she would lose her life." J.A. at 138 (Hr'g Tr. at 71). At this time, her mother called Kouljinski, who returned to Russia. On his 2004 asylum application, Kouljinski stated that he believed the auto accident "was caused by persons associated with members of the Ost Corp." J.A. at 708 (2004 Asylum Applic.). He admitted on cross-examination at  **\*539** his asylum hearing that he had no personal knowledge regarding the circumstances of the accident.

Ms. Kouljinski filed a lawsuit in Russia against the other driver, and Kouljinski's asylum application stated that "[e]ven though she won in court, the courts have never enforced the judgment." J.A. at 708 (2004 Asylum Applic.). When Ms. Kouljinski testified about the car accident, she said that her suit "never got to the Court." J.A. at 142 (Hr'g Tr. at 75). The government noted that a document submitted in Kouljinski's asylum application stated that a judgment had been granted on her claim in the amount of some three thousand U.S. dollars. J.A. at 142 (Hr'g Tr. at 75), 279 (Letter from Saint Petersburg Attorney German Natus). Ms. Kouljinski replied that they had never received any payment and that her attorney informed her that the other party has twenty years to pay the judgment.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Both Kouljinski and his wife described episodes involving the brief kidnapping of their daughter. Kouljinski testified that when he returned to Russia in 1995, while his daughter was playing outside one day, he received a phone call in which he was told that the caller had his daughter in a car. He stated that the caller wanted the documents regarding his jewelry manufacturing process, and he immediately agreed to hand over the documents. He claimed that "when I got outside, my daughter was already returned to me. It all took not more than 15 minutes." J.A. at 121–22 (Hr'g Tr. at 54–55). Ms. Kouljinski testified that on another occasion, when their daughter was five years old, their daughter disappeared while playing in a park. She stated that she received a phone call in which the caller claimed they had taken her daughter and that "[t]his time we took her only for two hours. Next time, it's going to be forever." J.A. at 137 (Hr'g Tr. at 70). No mention of either incident appeared in the application for asylum that Kouljinski filed in 2004, or in any earlier application or affidavit.

Kouljinski and his wife also both testified that the graves of his family members have been desecrated in recent years. In his asylum application, Kouljinski stated that he heard in 1998 that his father's gravestone was destroyed by anti-Semitic vandals. At his hearing, he also identified photographs sent to him by friends containing images of grave sites with non-Russian names that had been vandalized and "dirtied up." J.A. at 112–13 (Hr'g Tr. at 45–46). Ms. Kouljinski also identified photographs, which her mother's friends had taken, depicting vandalized grave sites, and she stated that the vandalism was "the work of a skinhead organization that exists in St. Petersburg, whose goal is to clear St. Petersburg from all non-Russians." J.A. at 139 (Hr'g Tr. at 72). Ms. Kouljinski also specifically identified photographs of vandalism to the headstones of Kouljinski's aunt and uncle, his niece, and his parents.

Kouljinski testified that since he has been in the United States, he has been convicted three times for driving under the influence of alcohol, in 1994, 1996, and 2001, all in the state of Michigan. J.A. at 409–28 (Michigan State Court Records). Kouljinski asserted that he had not drunk alcohol for three years and that he attends AA meetings when he is able. He also stated that he now has a restricted driver's license: his car must be equipped with a device to check his blood alcohol level before he can start the car, and he is permitted to drive only to and from work and to and from substance-abuse-

support meetings. J.A. at 127–28 (Hr'g Tr. at 60–61), 248–51 (Order, Mich. Dep't of State, Driver License Appeal Div.).

**\*540** Finally, both Kouljinski and the government submitted numerous documents for the IJ to consider, including reports from the U.S. Department of State and Amnesty International.

**C. The IJ's Decision**

The IJ opened his decision by analyzing the testimony that Kouljinski and his wife gave at the hearing. The IJ expressed "concerns about the credibility of the testimony of [Kouljinski] and his wife." J.A. at 13–14. Although their testimony described their daughter being abducted, the IJ highlighted that Kouljinski's application for asylum did not mention these alleged traumatic events. While Ms. Kouljinski attributed the cause of their problems in Russia to his Jewish religion, Kouljinski spoke about racketeers' efforts to extort him and take over his business. The IJ also noted discrepancies between Ms. Kouljinski's testimony about her car accident and lawsuit and the documents that Kouljinski submitted with his asylum application. The IJ did find credible Kouljinski's testimony that he is Jewish and that he left Russia because he was subjected to extortion by racketeers in connection with his jewelry-manufacturing business.

The IJ next announced that he "would not be prepared to find on this record that [Kouljinski] was persecuted in Russia on account of his religion." J.A. at 17. Although Kouljinski mentioned various employment difficulties, the IJ stated that "these appear to have been related to his failure to obtain party membership" and those employment difficulties were not "sufficiently serious enough to rise to the level of persecution." *Id.* Further, those experiences occurred prior to the disintegration of the Soviet Union, and "there obviously have been significant changes in country conditions," particularly relating "to whether membership in the Communist Party would act as a barrier to employment" today. *Id.*

Although the IJ found that Kouljinski had not been persecuted in the past, in light of the testimony and the evidence in the record—particularly the Department of State 2003 Country Report on Human Rights Practices for Russia, J.A. at 18; *see also* J.A. at 494–531 (Dep't of State Report)—the IJ concluded that Kouljinski had demonstrated a well-founded fear of future persecution. J.A. at 18–19. Specifically, the IJ stated that

> given the fact that [Kouljinski] suffered some level of discrimination in the past based on the fact that he is Jewish and the fact that societal anti-Semitism appears to have survived the collapse of the Soviet Union and, unfortunately, that skinhead violence against Jews and other minorities is a persistent problem in Russia, [he] might well reasonably fear that he would be the target of such violence on return to Russia today.

J.A. at 19.

The IJ next discussed Kouljinski's three convictions in the United States for driving while under the influence of alcohol, noting that he had "very serious concerns in this case about whether ... asylum should be granted as a matter of discretion." J.A. at 19. The IJ discussed each of the convictions and Kouljinski's efforts to attend substance-abuse counseling. The IJ also noted that Michigan had not fully restored Kouljinski's driving privileges and that Kouljinski's last conviction was a felony offense.

Before making his final determination as to whether to grant asylum to Kouljinski as a matter of discretion, the IJ next evaluated whether Kouljinski had demonstrated that he was entitled to withholding of removal under the INA or the CAT. Although the IJ concluded that Kouljinski "established a reasonable possibility of persecution," he found that Kouljinski had **\*541** not demonstrated a likelihood of persecution—the standard for withholding of removal—for two reasons: First, because Kouljinski "was not, in my view, actually persecuted in the past," and second, because "the type of harm that [he] fears is not harm which is inflicted by the government" and is instead harm inflicted by non-state actors. J.A. at 22. The IJ stated that such harm is "likely to be somewhat more sporadic than persecution by government authorities." Id. The IJ next found that Kouljinski had not established a likelihood of being tortured on his return to Russia for similar reasons, explaining that Kouljinski did not complain of ever being tortured by government authorities and that his fear of persecution "relates again to action by non-state actors and not by the government." J.A. at 23.

At this point, the IJ returned to balancing the favorable and unfavorable factors regarding the exercise of discretion in Kouljinski's asylum application. The IJ explained that "the question is whether [Kouljinski's] eligibility for asylum is a sufficiently weighty favorable discretionary factor to outweigh the fact that [he] has three convictions for driving under the influence, the most recent conviction ... a felony conviction for that offense." J.A. at 23. Noting the "repetitive" nature of Kouljinski's behavior as an adverse factor, the IJ concluded that "[i]n consideration of these factors, unfortunately, I have reached the conclusion that a favorable exercise of discretion in this case is unwarranted." J.A. at 23–24. Accordingly, the IJ ordered that Kouljinski's petition be denied and that he be removed from the United States to Russia.

## II. ANALYSIS

### A. Asylum

#### 1. Standard of Review

 **[1]**   "The court reviews the factual determination of whether a petitioner qualifies as a refugee under a 'substantial evidence' test." *Gilaj v. Gonzales,* 408 F.3d 275, 283 (6th Cir.2005). "The court may reverse the BIA's determination if the evidence 'not only supports a contrary conclusion, but indeed *compels* it.' " *Id.* (quoting *Ouda v. INS,* 324 F.3d 445, 451 (6th Cir.2003)). Pursuant to 8 U.S.C. § 1252(b)(4)(D), "the Attorney General's discretionary judgment whether to grant relief under section 1158(a) ... shall be conclusive unless manifestly contrary to the law and an abuse of discretion." "An abuse of discretion occurs when the BIA exercises its discretion in a way that is arbitrary, irrational, or contrary to law." *Gilaj,* 408 F.3d at 288. Because the BIA adopted the IJ's reasoning, we review the IJ's decision directly. *Id.* at 282–83.

#### 2. Analysis

"The disposition of an application for asylum involves a two-step inquiry: (1) whether the applicant qualifies as a 'refugee' as defined in 8 U.S.C. § 1101(a)(42)(A), and (2) whether the applicant 'merits a favorable exercise of discretion by the Attorney General.' " *Gilaj,* 408 F.3d at 283 (quoting *Perkovic v. INS,* 33 F.3d 615, 620 (6th

Cir.1994)). At the first step, an applicant for asylum may qualify as a refugee in either of two ways: (A) by establishing that he or she has suffered past persecution on the basis of race, religion, nationality, social group, or political opinion; or (B) by showing that he or she has a well-founded fear of persecution on one of those same bases. 8 C.F.R. § 1208.13(b).

Once an applicant demonstrates his or her eligibility for asylum by establishing refugee status, as Kouljinski did, the applicant progresses to the second step of the inquiry, at which point the BIA has stated **\*542** that the applicant "has the burden of establishing that the favorable exercise of discretion is warranted." In re Pula, 19 I. & N. Dec. 467, 474 (B.I.A.1987). The BIA has also stated that IJs should consider "the totality of the circumstances ... in determining whether a favorable exercise of discretion is warranted," id. at 473, and that "[t]he danger of persecution will outweigh all but the most egregious adverse factors." In re Kasinga, 21 I. & N. Dec. 357, 367 (B.I.A.1996).

Even though the IJ found that Kouljinski succeeded in establishing refugee status by showing a well-founded fear of future persecution, Kouljinski argues extensively in his brief that he is a refugee entitled to asylum because of *both* past persecution and fear of future persecution. *See* Brief for Petitioner ("Pet.Br.") at 17–26. Because both the IJ and the BIA agreed with Kouljinski that he established refugee status via the second route—by showing a reasonable possibility of future persecution—we proceed to the second step and analyze the IJ's discretionary denial of Kouljinski's application for asylum. [1]

Kouljinski argues that the IJ abused his discretion in denying him asylum for two reasons. First, Kouljinski contends that "drunk driving convictions, which are not even crimes involving moral turpitude, should not be a factor to negate the grant of asylum." Pet. Br. at 28. In his brief, Kouljinski provides absolutely no citations or support for his assertions that only crimes involving moral turpitude may be the basis for a discretionary denial of asylum. [2] In fact, several cases appear to rely on such lesser crimes in affirming the exercise of discretion by immigration judges. *See* Barrie v. Gonzales, 228 Fed.Appx. 66, 69 (2d Cir.2007) (denying petition where IJ based her discretionary denial on applicant's multiple convictions for counterfeiting

and disorderly conduct); Huang v. INS, 436 F.3d 89, 98 (2d Cir.2006) (stating that "[a]dverse factors include criminal convictions, as well as significant violations of national immigration laws and the manner of entry into this country"); **\*543** Kazlauskas v. INS, 46 F.3d 902, 906–07 (9th Cir.1995) (holding that "the IJ permissibly found asylum unwarranted as a matter of discretion" where the IJ considered the applicant's "criminal record since he has been in this country"); Dhine v. Slattery, 3 F.3d 613, 619 (2d Cir.1993) ("Seven convictions over seven years—even seven misdemeanors—easily furnish a rational basis for the Attorney General's exercise of discretion."); Purveegiin v. U.S. INS Processing Ctr., 73 F.Supp.2d 411, 418–19 (S.D.N.Y.1999) (stating that the "INS may consider petitioner's criminal history in determining whether he is eligible for asylum" and concluding that six misdemeanor convictions over four years furnished rational basis for the exercise of discretion); *cf.* Ajanel v. Ashcroft, 120 Fed.Appx. 729, 732 (9th Cir.2005) (denying petition, in context of motion to remand for adjustment of status, where the IJ held that applicant did not merit "favorable exercise of discretion because his [single] drunk driving conviction outweighed his recent marriage to a [U.S.] citizen[ ] and the fact that their child was a [U.S.] citizen").

The BIA has stated that IJs should consider "the totality of the circumstances ... in determining whether a favorable exercise of discretion is warranted," In re Pula, 19 I. & N. Dec. at 473, and Kouljinski points to nothing in the INA, relevant regulations, or BIA case law that precludes consideration of convictions for driving under the influence of alcohol. Indeed, governing law provides for a *mandatory* denial of an alien's application for asylum if the alien has "been convicted by a final judgment of a particularly serious crime [and] constitutes a danger to the community of the United States." 8 U.S.C. § 1158(b)(2)(A)(ii); *see also* 8 C.F.R. 1208.13(c)(2)(i). Given that the BIA has held that "[f]actors which fall short of the grounds of mandatory denial may constitute discretionary considerations," In re H—, 21 I. & N. Dec. 337, 347 (B.I.A.1996), we need not determine whether driving under the influence of alcohol is a "particularly serious crime"—which would *require* the denial of Kouljinski's application—to hold that the IJ properly considered Kouljinski's three convictions of that offense in denying his application as a matter of discretion.

**[2]** **[3]** In light of this case law and our view that an IJ may properly consider an alien's convictions for an offense like driving while under the influence of alcohol, regardless of whether it is a crime of moral turpitude or a particularly serious crime, we hold that the IJ did not abuse his discretion in this case by basing his discretionary denial of asylum on Kouljinski's three drunk-driving convictions.

**[4]** Kouljinski's second argument that the IJ abused his discretion concerns the IJ's statement that Kouljinski "does not have family ties in the United States to individuals who are legally present in this country." J.A. at 23. Kouljinski contends that the IJ erred in ignoring his daughter and his wife, who testified at his hearing, Pet. Br. at 28, but BIA case law belies this argument. *In re Pula,* the case that Kouljinski cites regarding the factors that an IJ should consider in exercising discretion, states that "whether the alien has relatives *legally* in the United States ... is another factor to consider." *In re Pula,* 19 I. & N. Dec. at 474 (emphasis added). Kouljinski does not rely on the presence of any relatives legally in the United States, as he only mentions his wife and daughter, who were not legally present. The IJ therefore did not abuse his discretion balancing the factors without considering Kouljinski's wife and daughter.

In sum, Kouljinski has not demonstrated that the IJ abused his discretion in denying Kouljinski's application for asylum.

**\*544 B. Withholding of Removal under the INA and the CAT**

**1. Standard of Review**

**[5]** **[6]** To prevail on a petition for withholding of removal under the INA, or on a petition for withholding of removal under the CAT, an alien must show that there is a "clear probability" that she would be subject to persecution, for the INA, or to torture, for the CAT, on the basis of one of the five statutorily protected grounds were she removed from this country. *Almuhtaseb v. Gonzales,* 453 F.3d 743, 749 (6th Cir.2006). This showing of "clear probability" requires more than that needed to demonstrate refugee status, which requires only a "well-founded fear of persecution." 8 C.F.R. § 208.13(b). *See also Mikhailevitch v. INS,* 146 F.3d 384, 391 (6th Cir.1998) ("An application seeking withholding of deportation faces a more stringent burden of proof than one for asylum."). Further, "administrative findings of fact are conclusive unless any reasonable adjudicator would be

compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

**2. Analysis**

**[7]** Kouljinski contends that the IJ erred in finding that Kouljinski failed to meet the showing required for withholding of removal under the INA because "the country condition reports alone support Mr. Kouljinski's claims that as a Russian Jew, he faces persecution, detention, torture and possibly even death at the hands of anti-Jewish Russians." Pet. Br. at 30. The IJ, however, recognized that such anti-Semitic violence was possible, but concluded that such violence was not likely and relied on the same State Department country conditions report that Kouljinski claims demonstrates his entitlement to relief. J.A. at 18, 22–23. The IJ "noted that Jewish leaders have stated publicly that state-sponsored anti-Semitism of the Soviet era no longer existed." J.A. at 18. The IJ also stated that although "Jews continued to face prejudice, social discrimination and some acts of violence," because non-state actors are the source of such harms, "such occurrences are ... likely to be somewhat more sporadic than persecution by government authorities." J.A. at 18, 22. The IJ and Kouljinski examined the same evidence, the IJ reached a reasonable conclusion, and Kouljinski does not point to any evidence that compels the opposite conclusion.

**[8]** Kouljinski argues that the IJ erred in denying his claim for relief under the CAT because the IJ incorrectly focused on Kouljinski's subjective fears. *See* Pet. Br. at 33 (citing *Camara v. Ashcroft,* 378 F.3d 361 (4th Cir.2004)). Although the IJ did state his belief that Kouljinski's "fear of persecution, in my view, relates again to action by non-state actors and not by the government," the IJ also supported his decision to deny relief under the CAT by noting that Kouljinski "does not complain that he was ever tortured or really in any way physically mistreated by government authorities during the time he lived in the Soviet Union or Russia previously." J.A. at 23. That consideration appears as a factor designated for examination in the relevant regulation. *See* 8 C.F.R. § 208.16(c)(3)(i).

**[9]** **[10]** Kouljinski also argues that the IJ erred in denying his claim for relief under the CAT because the record shows that the "Russian government does not investigate nor prosecute these claims [of torture], thus showing their acquiescence in the abuse, torture and murder of Jews in Russia." Pet. Br. at 34. Kouljinski is correct that a

government's "acquiescence" in the torture of a group *could* support relief under the CAT. *See* **\*545** 8 C.F.R. § 1208.18(a)(1) (defining torture as including severe pain or suffering "inflicted by or ... with the consent or acquiescence of a public official or other person acting in an official capacity"). The IJ, however, observed that the State Department report noted that governmental "[a]uthorities often provided strong words of condemnation" to acts of violence against Jews. J.A. at 19. That report also notes that Russian police have successfully defused bombs wired to anti-Semitic signs. J.A. at 512 (State Dep't Report). As the Second Circuit concluded in *Wang v. Ashcroft,* "while [the asylum applicant's] testimony as well as some of his 'country conditions' documents ... indicate that some prisoners in China have been tortured, [he] has in no way established that someone in his particular alleged circumstances is *more likely than not* to be tortured if imprisoned in China." *Wang v. Ashcroft,* 320 F.3d 130, 144 (2d Cir.2003). Likewise, given that the very documents on which he relies demonstrate that the Russian government has condemned and worked to stop acts of persecution and violence against Jews, Kouljinski

has not demonstrated that the record compels the conclusion that it is more likely than not that he would be subjected to torture in Russia by public officials or with the consent or acquiescence of the Russian government.

## III. CONCLUSION

Because we hold that an IJ may properly consider an alien's convictions for driving under the influence of alcohol in making a discretionary denial of asylum, and because Kouljinski has failed to show that he is "more likely than not" to face persecution or torture were he to return to Russia, we **DENY** Kouljinski's petition for review of the BIA's decision to deny his application for asylum and withholding of removal.

**All Citations**

505 F.3d 534

## Footnotes

\*    Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Acting Attorney General Peter D. Keisler is automatically substituted for former Attorney General Alberto R. Gonzales.

\*\*    The Honorable James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation.

1    We will return to Kouljinski's evidentiary arguments insofar as they relate to his claims that he met the standards required for mandatory relief under the INA and the CAT.

2    At oral argument, counsel for Kouljinski referenced the U.S. Department of State Foreign Affairs Manual in arguing that the IJ should not have considered Kouljinski's drunk-driving convictions because they occurred more than three years before the hearing. The cited section, however, pertains not to asylum applications but to visas. *See* 9 F.A.M. 40.11 N9.5, *available at* http://www.state.gov/documents/organization/86936. pdf. Further, the section discusses the effect of evidence of substance abuse in visa applications, and, far from barring evidence of substance abuse, the manual provides that an alien in remission—which is not something that Kouljinski established—"is not ineligible to receive a visa." 9 F.A.M. 40.11 N9.4. Thus, even the sole source to which Kouljinski points does not bar this evidence and would seem to permit consideration of drunk-driving convictions.

In addition, the manual elsewhere states that an applicant is ineligible for a visa if the applicant "[h]as a physical or mental disorder with associated harmful behavior." 9 F.A.M. 40.11 N.8. The manual further explains that

[w]hile alcoholism constitutes a medical condition ... [a]n alcoholic is *not* ineligible to receive a visa *unless* there is current[,] or a history of, harmful behavior associated with the disorder that has posed or is likely to pose a threat to the property, safety, or welfare of the alien or others. For example, ... a conviction for

driving while under the influence of alcohol would constitute evidence of a medical disorder with associated harmful behavior.

9 F.A.M. 40.11 N8.3. According to the Foreign Affairs Manual, Kouljinski appears ineligible for a visa based on his three convictions for driving under the influence.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Superseded by Statute as Stated in *Osorio-Martinez v. Attorney General United States of America,* 3rd Cir.(Pa.), June 18, 2018

103 S.Ct. 321
Supreme Court of the United States

Michael LANDON, District Director of the Immigration and Naturalization Service, Petitioner

v.

Maria Antonieta PLASENCIA.

No. 81-129.
|
Argued Oct. 5, 1982.
|
Decided Nov. 15, 1982.

**Synopsis**

Alien filed petition for writ of habeas corpus, seeking release from Immigration and Naturalization Service's exclusion order and contending that she was entitled to have the question of her admissibility litigated in a deportation proceeding where she would be entitled to procedural protections and substantive rights not available in exclusion proceedings. The United States District Court for the Central District of California vacated the INS decision, and it appealed. The Court of Appeals, Ninth Circuit, 637 F.2d 1286, affirmed, and certiorari was granted. The Supreme Court, Justice O'Connor, held that the INS had statutory authority to proceed in an exclusion hearing to determine whether respondent, a permanent resident alien who was denied admission to the United States by INS when she returned from a brief visit to Mexico that involved an attempt to smuggle aliens across the border, was attempting to "enter" the United States and whether she was excludable; nothing in the language or history of the Immigration and Nationality Act suggested that respondent's status as a permanent resident entitled her to a suspension of the exclusion hearing or required INS to proceed only through a deportation hearing.

Reversed and remanded.

Justice Marshall filed an opinion concurring in part and dissenting in part.

**Procedural Posture(s):** On Appeal.

West Headnotes (17)

**[1]     Aliens, Immigration, and Citizenship** 🔑 Distinction Between Admissibility and Removal Proceedings

Immigration laws create two types of proceedings in which aliens can be denied the hospitality of the United States, viz., deportation hearings and exclusion hearings; a deportation hearing is the usual means of proceeding against an alien already physically in the United States, and an exclusion hearing is the usual means of proceeding against an alien outside the United States seeking admission.

61 Cases that cite this headnote

**[2]     Aliens, Immigration, and Citizenship** 🔑 Distinction Between Admissibility and Removal Proceedings

An exclusion proceeding is usually held at the port of entry, while a deportation hearing is usually held near the residence of the alien within the United States.

Landon v. Plasencia, 459 U.S. 21 (1982)
103 S.Ct. 321, 74 L.Ed.2d 21

76 Cases that cite this headnote

**[3]    Aliens, Immigration, and Citizenship** 👉 Notice; Order to Show Cause

Regulations of the Attorney General require in most deportation proceedings that the alien be given seven days' notice of the charges against him, while there is no requirement of advance notice of the charges for an alien subject to exclusion proceedings. Immigration and Nationality Act, § 242(b) as amended 🚩 8 U.S.C.A. § 1252(b).

3 Cases that cite this headnote

**[4]    Aliens, Immigration, and Citizenship** 👉 Jurisdiction and Venue

**Habeas Corpus** 👉 Aliens

If the Immigration and Naturalization Service prevails in a deportation proceeding, the alien may appeal directly to the Court of Appeals, while the alien can challenge an exclusion order only by petition for writ of habeas corpus. Immigration and Nationality Act, § 106(a,b) as amended 🏳 8 U.S.C.A. § 1105a(a,b).

7 Cases that cite this headnote

**[5]    Aliens, Immigration, and Citizenship** 👉 Distinction Between Denial of Admission or Exclusion and Removal or Deportation

**Aliens, Immigration, and Citizenship** 👉 Voluntary Departure

**Aliens, Immigration, and Citizenship** 👉 Distinction Between Admissibility and Removal Proceedings

Alien who loses his right to reside in the United States in a deportation hearing has a number of substantive rights not available to the alien who is denied admission in an exclusion proceeding: he can, within certain limits, designate the country of deportation, he may be able to depart voluntarily, thus avoiding both the stigma of deportation and the limitations on his selection of destination, and he can seek suspension of deportation. Immigration and Nationality Act, §§ 212(a)(16, 17), 242(b,e) 243(a) 244(e) as amended 🏳 8 U.S.C.A. §§ 1182(a)(16, 17), 🚩 1252(b,e), 1253(a), 🚩 1254(e).

15 Cases that cite this headnote

**[6]    Aliens, Immigration, and Citizenship** 👉 Voluntary Departure

Voluntary departure for an alien who would otherwise be deported means that he will not be subject to provision of the Immigration and Nationality Act which requires aliens who have once been deported to seek prior approval of the Attorney General before reentering; there is no comparable requirement of prior approval for aliens who have been excluded and later seek again to enter. Immigration and Nationality Act, § 212(a)(16, 17) as amended 🏳 8 U.S.C.A. § 1182(a)(16, 17).

6 Cases that cite this headnote

**[7]    Aliens, Immigration, and Citizenship** 👉 Distinction Between Admissibility and Removal Proceedings

Immigration and Naturalization Service had statutory authority to proceed in an exclusion hearing to determine whether respondent, a permanent resident alien who was denied admission to the United States by INS when she returned from a brief visit to Mexico that involved an attempt to smuggle aliens across the border, was attempting to

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"enter" the United States and whether she was excludable; nothing in the language or history of the Immigration and Nationality Act suggested that respondent's status as a permanent resident entitled her to a suspension of the exclusion hearing or required INS to proceed only through a deportation hearing. Immigration and Nationality Act, § 101 et seq. as amended 🚩 8 U.S.C.A. § 1101 et seq.

123 Cases that cite this headnote

[8]    **Aliens, Immigration, and Citizenship** 🔑 Mode and Effect of Entry or Reentry

Only "entering" aliens are subject to exclusion. Immigration and Nationality Act, § 236(a) as amended 🚩 8 U.S.C.A. § 1226(a).

8 Cases that cite this headnote

[9]    **Aliens, Immigration, and Citizenship** 🔑 Reentry or New Entry

An innocent, casual, and brief excursion by a resident outside this country's borders would not subject him to consequences of an "entry" on his return, but if the purpose of leaving the country is to accomplish some object which is itself contrary to some policy reflected in our immigration laws, it would appear that the interruption of residence thereby occurring would properly be regarded as meaningful. Immigration and Nationality Act, § 101(a) (13) as amended 🚩 8 U.S.C.A. § 1101(a)(13).

14 Cases that cite this headnote

[10]    **Aliens, Immigration, and Citizenship** 🔑 Administrative Procedure

It was not "circular" and "unfair" to allow the Immigration and Naturalization Service to litigate the question of "entry" in exclusion proceedings simply because that question also went to the merits of respondent's admissibility.

3 Cases that cite this headnote

[11]    **Aliens, Immigration, and Citizenship** 🔑 Invalid Reentry of Permanent Residents

Use of exclusion proceedings to litigate the question of "entry" by respondent did not violate either the "scope" or "spirit" of the *Fleuti* decision, in which the Supreme Court held that an "innocent, casual and brief excursion" by a resident alien outside this country's borders would not subject him to the consequences of an "entry" on his return. Immigration and Nationality Act, § 101(a)(13) as amended 🚩 8 U.S.C.A. § 1101(a)(13).

60 Cases that cite this headnote

[12]    **Aliens, Immigration, and Citizenship** 🔑 Remand

Although respondent was entitled to due process in her exclusion hearing, the case would be remanded to the Court of Appeals to consider whether respondent was accorded due process, since the factors relevant to due process analysis had not been adequately presented to permit an assessment of the sufficiency of the hearing. U.S.C.A. Const.Amends. 5, 14.

14 Cases that cite this headnote

[13]    **Aliens, Immigration, and Citizenship** 🔑 Admission as Privilege or Right

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

An alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative.

128 Cases that cite this headnote

[14]    **Aliens, Immigration, and Citizenship**  👈 Status and Classification of Aliens in General

Once an alien gains admission to the United States and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly.

84 Cases that cite this headnote

[15]    **Aliens, Immigration, and Citizenship**  👈 Conduct of Hearing;  Fairness in General

A continuously present resident alien is entitled to a fair hearing when threatened with deportation.

26 Cases that cite this headnote

[16]    **Constitutional Law**  👈 Factors Considered;  Flexibility and Balancing

Constitutional sufficiency of procedures provided in any situation varies with the circumstances, and the courts, in evaluating the procedures in any case, must consider the interest at stake for the individual, the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different procedural safeguards, and the interest of the government in using the current procedures rather than additional or different procedures.

69 Cases that cite this headnote

[17]    **Aliens, Immigration, and Citizenship**  👈 Power to Regulate in General
        **Aliens, Immigration, and Citizenship**  👈 Judicial Review or Intervention
        **Aliens, Immigration, and Citizenship**  👈 Standard and Scope of Review

Control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature; the role of the judiciary is limited to determining whether the procedures meet the essential standard of fairness under the due process clause and does not extend to imposing procedures that merely displace congressional choices of policy. U.S.C.A. Const.Amends. 5, 14.

67 Cases that cite this headnote

**\*\*323**  Syllabus [*]

 **\*21**  Section 235 of the Immigration and Nationality Act of 1952 (Act) permits the Immigration and Naturalization Service (INS) to examine "all aliens" who seek "admission or readmission to" the United States and empowers immigration officers to take evidence concerning the privilege of any persons suspected of being an alien "to enter, reenter, pass through, or reside" in the United States, and to detain for further inquiry "every alien" who does not appear "to be clearly and beyond a doubt entitled to" enter. Under s 236(a), if an alien is so detained, the officer is directed to determine whether the alien "shall be allowed to enter or shall be excluded and deported." Following an exclusion hearing, the INS denied respondent, a permanent resident alien, admission to the United States when she returned from a brief visit to Mexico that involved an attempt to smuggle aliens across the border. Subsequently, respondent filed a petition for a writ of habeas corpus in Federal District Court, seeking release from the

103 S.Ct. 321, 74 L.Ed.2d 21

exclusion order and contending that she was entitled to have the question of her admissibility litigated in a deportation proceeding where she would be entitled to procedural protections and substantive rights not available in exclusion proceedings. The District Court vacated the INS's decision, instructing it to proceed against respondent, if at all, only in deportation proceedings. The Court of Appeals affirmed.

Held:

1. The INS had statutory authority to proceed in an exclusion hearing to determine whether respondent was attempting to "enter" the United States and whether she was excludable. The language and history of the Act both clearly reflect a congressional intent that, whether or not the alien is a permanent resident, admissibility shall be determined in an exclusion hearing. Nothing in the language or history suggests that respondent's status as a permanent resident entitles her to a suspension of the exclusion hearing or requires the INS to proceed only through a deportation hearing. Pp. 325-327.

2. Contrary to the view of the Court of Appeals, it was not "circular" and "unfair" to allow the INS to litigate the question of "entry" in exclusion  *22  proceedings simply because that question also went to the merits of respondent's admissibility. Nor did the use of exclusion proceedings violate either the "scope" or "spirit" of 🚩 Rosenberg v. Fleuti, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000, where the Court held that an "innocent, casual, and brief excursion" by a resident alien outside this country's borders would not subject him to the consequences of an "entry" on his return. Pp. 327-329.

3. Although under the circumstances, respondent is entitled to due process in her exclusion hearing, the case will be remanded  **324  to the Court of Appeals to consider whether she was accorded due process, because the factors relevant to due process analysis have not been adequately presented here to permit an assessment of the sufficiency of the hearing. Pp. 329-332.

🚩 9th Cir., 637 F.2d 1286, reversed and remanded.

**Attorneys and Law Firms**

*Elliott Schulder* argued the cause for petitioner. With him on the briefs were *Solicitor General Lee* and *Deputy Solicitor General Geller.*

*Gary H. Manulkin* argued the cause and filed a brief for respondent.

**Opinion**

Justice O'CONNOR delivered the opinion of the Court.

Following an exclusion hearing, the Immigration and Naturalization Service ("INS") denied the respondent, a permanent resident alien, admission to the United States when she attempted to return from a brief visit abroad. Reviewing the respondent's subsequent petition for a writ of habeas corpus, the Court of Appeals vacated the decision, holding that the question whether the respondent was attempting to "enter" the United States could be litigated only in a deportation hearing and not in an exclusion hearing. Because we conclude that the INS has statutory authority to proceed in an exclusion hearing, we reverse the judgment below. We remand to allow the Court of Appeals to consider whether the respondent, a permanent resident alien, was accorded due process at the exclusion hearing.

*23  I

Respondent Maria Antonieta Plasencia, a citizen of El Salvador, entered the United States as a permanent resident alien in March, 1970. She established a home in Los Angeles with her husband, a United States citizen, and their minor children. On

June 27, 1975, she and her husband travelled to Tijuana, Mexico. During their brief stay in Mexico, they met with several Mexican and Salvadoran nationals and made arrangements to assist their illegal entry into the United States. She agreed to transport the aliens to Los Angeles and furnished some of the aliens with alien registration receipt cards that belonged to her children. When she and her husband attempted to cross the international border at 9:27 on the evening of June 29, 1975, an INS officer at the port of entry found six nonresident aliens in the Plasencias' car. The INS detained the respondent for further inquiry pursuant to s 235(b) of the Immigration and Nationality Act of 1952, 66 Stat. 182, as amended, 8 U.S.C. s 1101 et seq. ("Act"). [1]  In a notice dated June 30, 1975, the INS charged her under s 212(a)(31) of the Act, 8 U.S.C. s 1182(a)(31), which provides for the exclusion of any alien seeking admission "who at any time shall have, knowingly and for gain, encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law," **\*24** and gave notice that it would hold an exclusion hearing at 11:00 a.m. on June 30, 1975. [2]

**\*\*325**  An immigration law judge conducted the scheduled exclusion hearing. After hearing testimony from the respondent, her husband, and three of the aliens found in the Plasencias' car, the judge found "clear, convincing and unequivocal" evidence that the respondent did "knowingly and for gain encourage, induce, assist, abet, or aid nonresident aliens" to enter or try to enter the United States in violation of law. He also found that the respondent's trip to Mexico was a "meaningful departure" from the United States and that her return to this country was therefore an "entry" within the meaning of s 101(a)(13), 8 U.S.C. s 1101(a)(13). [3]  **\*25**  On the basis of these findings, he ordered her "excluded and deported."

After the Board of Immigration Appeals ("BIA") dismissed her administrative appeal and denied her motion to reopen the proceeding, the respondent filed a petition for a writ of habeas corpus in the United States District Court, seeking release from the exclusion and deportation order. The Magistrate initially proposed a finding that, on the basis of evidence adduced at the exclusion hearing, "a meaningful departure did not occur ... and that therefore (the respondent) is entitled to a deportation hearing." After considering the Government's objections, the Magistrate declared that the Government could relitigate the question of "entry" at the deportation hearing. The District Court adopted the Magistrate's final report and recommendation and vacated the decision of the BIA, instructing the INS to proceed against respondent, if at all, only in deportation proceedings.

The Ninth Circuit Court of Appeals affirmed. Plasencia v. Sureck, 637 F.2d 1286 (CA9 1980).

## II

 **[1]    [2]    [3]    [4]    [5]    [6]**    The immigration laws create two types of proceedings in which aliens can be denied the hospitality of the United States: deportation hearings and exclusion hearings. See generally Leng May Ma v. Barber, 357 U.S. 185, 187, 78 S.Ct. 1072, 1073, 2 L.Ed.2d 1246 (1958). The deportation hearing is the usual means of proceeding against an alien already physically in the United States, and the exclusion hearing is the usual means of proceeding against an alien outside the United States seeking admission. The two types of proceedings differ in a number of ways. See generally Maldonado-Sandoval v. United States Immigration and Naturalization Service, 518 F.2d 278, 280 n. 3 (CA9 1975). An exclusion proceeding is usually held at the port of entry, while a deportation hearing is usually held near the residence of the alien within the United **\*26** States, see 1A C. Gordon & H. Rosenfield, Immigration Law and Procedure s 5.6c (1981). The regulations of the Attorney General, issued under the authority of s 242(b), 8 U.S.C. s 1252(b), require in most deportation proceedings that the alien be given seven days' notice of the charges against him, 8 CFR s 242.1(b) (1982), while there is no  **\*\*326**  requirement of advance notice of the charges for an alien subject to exclusion proceedings. Indeed, the BIA has held that, "as long as the applicant is informed of the issues confronting him at some point in the hearing, and he is given a reasonable opportunity to meet them," no further notice is necessary. In re Salazar, 17 I & N Dec. 167, 169 (BIA 1979). Also, if the INS prevails in a deportation proceeding, the alien may appeal directly to the Court of Appeals, s 106(a), 75 Stat. 651, 8 U.S.C. s 1105a(a), while the alien

can challenge an exclusion order only by a petition for a writ of habeas corpus, s 106(b), 75 Stat. 653, 8 U.S.C. s 1105a(b). Finally, the alien who loses his right to reside in the United States in a deportation hearing has a number of substantive rights not available to the alien who is denied admission in an exclusion proceeding: he can, within certain limits, designate the country of deportation, s 243(a), 8 U.S.C. s 1253(a); he may be able to depart voluntarily, s 244(e), 8 U.S.C. s 1254(e), avoiding both the stigma of deportation, s 242(b), 8 U.S.C. s 1252(b), and the limitations on his selection of destination, s 243(a), 8 U.S.C. s 1253(a);[4] or he **27** can seek suspension of deportation, s 242(e), 8 U.S.C. s 1252(e).

The respondent contends that she was entitled to have the question of her admissibility litigated in a deportation hearing, where she would be the beneficiary of the procedural protections and the substantive rights outlined above. Our analysis of whether she is entitled to a deportation rather than an exclusion hearing begins with the language of the Act. Section 235 of the Act, 8 U.S.C. s 1225, permits the INS to examine "(a)ll aliens" who seek "admission or readmission to" the United States and empowers immigration officers to take evidence concerning the privilege of any person suspected of being an alien "to enter, reenter, pass through, or reside" in the United States. Ibid. (emphasis added). Moreover, "every alien" who does not appear "to be clearly and beyond a doubt entitled to land shall be detained" for further inquiry. Ibid. If an alien is so detained, the Act directs the special inquiry officer to determine whether the arriving alien "shall be allowed to enter or shall be excluded and deported." Section 236(a), 8 U.S.C. s 1226(a). The proceeding before that officer, the exclusion hearing, is by statute "the sole and exclusive procedure for determining admissibility of a person to the United States ...." Ibid.

The Act's legislative history also emphasizes the singular role of exclusion hearings in determining whether an alien should be admitted. The reports of both the House and Senate state:

> The special inquiry officer is empowered to determine whether an alien detained for further inquiry shall be excluded and deported or shall be allowed to enter after he has given the alien a hearing. The procedure established in the bill is made the sole and exclusive procedure for determining the admissibility of a person to the **28** United States.

S.Rep. No. 1137, 82d Cong., 2d Sess., 29 (1952); H.R.Rep. No. 1365, 82d Cong., 2d Sess., 56 (1952), U.S.Code Cong. & Admin.News 1952, p. 1653, 1711.

 [7]   The language and history of the Act thus clearly reflect a congressional intent that, whether or not the alien is a permanent resident, admissibility shall be determined in an exclusion hearing. Nothing in **327** the statutory language or the legislative history suggests that the respondent's status as a permanent resident entitles her to a suspension of the exclusion hearing or requires the INS to proceed only through a deportation hearing. Under the terms of the Act, the INS properly proceeded in an exclusion hearing to determine whether respondent was attempting to "enter" the United States[5] and whether she was excludable.

III

To avoid the impact of the statute, the respondent contends, and the Court of Appeals agreed, that unless she was "entering," she was not subject to exclusion proceedings, and that prior decisions of this Court indicate that she is entitled to have the question of "entry" decided in deportation proceedings.

 **[8]**    The parties agree that only "entering" aliens are subject to exclusion. See Brief for Petitioner at 19. That view accords with the language of the statute, which describes the exclusion hearing as one to determine whether the applicant "shall be allowed to enter or shall be excluded and deported." Section 236(a), 8 U.S.C. s 1226(a) (emphasis added). But the respondent's contention that the question of entry can be determined only in deportation proceedings reflects a misconception of our decisions.

 **[9]**    In Rosenberg v. Fleuti, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963), we faced the question whether a resident alien's return from an afternoon **\*29** trip across the border was an "entry" for immigration law purposes. The definition of that term was the same then as it is now: it means "any coming of an alien into the United States ... except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him...." Section 101(a)(13), 8 U.S.C. s 1101(a) (13). We held in Fleuti that the "intent exception" refers to an intent to depart in a "manner which can be regarded as meaningfully interruptive of the alien's permanent residence." 374 U.S. at 462, 83 S.Ct., at 1812. Thus, an "innocent, casual, and brief excursion" by a resident alien outside this country's borders would not subject him to the consequences of an "entry" on his return. Ibid. If, however, "the purpose of leaving the country is to accomplish some object which is itself contrary to some policy reflected in our immigration laws, it would appear that the interruption of residence thereby occurring would properly be regarded as meaningful." Ibid. That distinction both protects resident aliens from "unsuspected risks and unintended consequences of ... a wholly innocent action," ibid., and gives effect to the language of s 101(a)(13).[6]

 **\*30** **\*\*328**  The government has argued in this case that Plasencia violated the immigration laws by attempting to smuggle aliens for gain. Therefore, her departure was "meaningfully interruptive" of her residence, she was attempting an "entry," and she was subject to exclusion proceedings. And, the government urges, under s 212(a)(31), 8 U.S.C. s 1182(a)(31), she was excludable because she had attempted to smuggle aliens for gain. Plasencia, on the other hand, argues that it would "violat(e) both the scope and spirit," Brief for the Respondent at 15, of Fleuti to permit the INS to litigate questions of "entry" in exclusion proceedings.

 **[10]**    The Court of Appeals viewed Fleuti as a deportation case rather than an exclusion case, 637 F.2d, at 1288, and therefore not relevant in deciding whether the question of "entry" could be determined in exclusion proceedings. For guidance on that decision, the Court of Appeals turned to Kwong Hai Chew v. Colding, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576 (1953), which it read to hold that a resident alien returning from a brief trip "could not be **\*31**  excluded without the procedural due process to which he would have been entitled had he never left the country"-i.e., in this case, a deportation proceeding. 637 F.2d, at 1288. The court concluded that Plasencia was entitled to litigate her admissibility in deportation proceedings. It would be "circular" and "unfair," thought the court, to allow the INS to litigate the question of "entry" in exclusion proceedings when that question also went to the merits of the respondent's admissibility. Id., at 1288-1289.

 **[11]**    We disagree. The reasoning of Chew was only that a resident alien returning from a brief trip has a right to due process just as would a continuously present resident alien. It does not create a right to identical treatment for these two differently situated groups of aliens.[7] As the Ninth Circuit seemed to recognize, if the respondent here was making an "entry," she would be subject to exclusion proceedings. It is no more "circular" to allow the immigration judge in the exclusion proceeding to determine whether the alien is making an entry than it is for any court to decide that it has jurisdiction when the facts relevant to the determination of jurisdiction are also relevant to the merits. Thus, in United States v. Sing Tuck, 194 U.S. 161, 24 S.Ct. 621, 48 L.Ed. 917 (1904), this Court held that an immigration inspector could make a determination whether an applicant for admission was an alien or a citizen, although only aliens were subject to exclusion. Cf. Land v. Dollar, 330 U.S. 731, 739, 67 S.Ct. 1009, 1013, 91 L.Ed. 1209 (1947) (district court has jurisdiction to determine its jurisdiction by proceeding to a decision on the merits). Nor is it in any way "unfair" to decide the question of entry in exclusion proceedings as long as those proceedings

themselves are fair. Finally, **329 the use of exclusion proceedings *32 violates neither the "scope" nor the "spirit" of Fleuti. As the Court of Appeals held, that case only defined "entry" and did not designate the forum for deciding questions of entry. The statutory scheme is clear: Congress intended that the determinations of both "entry" and the existence of grounds for exclusion could be made at an exclusion hearing.

## IV

[12]  Our determination that the respondent is not entitled to a deportation proceeding does not, however, resolve this case. In challenging her exclusion in the District Court, Plasencia argued two points: not only that she was entitled to a deportation proceeding but also that she was denied due process in her exclusion hearing. See Joint Appendix 5, at P 9; Record at 19, 20, 23. We agree with Plasencia that under the circumstances of this case, she can invoke the Due Process Clause on returning to this country, although we do not decide the contours of the process that is due or whether the process accorded Plasencia was insufficient.

[13]  [14]  [15]  This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative. See, e.g., United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950); Nishimura Ekiu v. United States, 142 U.S. 651, 659-660, 12 S.Ct. 336, 338, 35 L.Ed. 1146 (1892). Our recent decisions confirm that view. See, e.g., Fiallo v. Bell, 430 U.S. 787, 792, 97 S.Ct. 1473, 1477, 52 L.Ed.2d 50 (1977); Kleindienst v. Mandel, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). As we explained in Johnson v. Eisentrager, 339 U.S. 763, 770, 70 S.Ct. 936, 939, 94 L.Ed. 1255 (1950), however, once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly. Our cases have frequently suggested that a continuously present resident alien is entitled to a fair hearing when threatened with deportation, see, e.g., United States ex rel. Tisi v. Tod, 264 U.S. 131, 133, 134, 44 S.Ct. 260, 261, 68 L.Ed. 590 (1924); *33 Low Wah Suey v. Backus, 225 U.S. 460, 468, 32 S.Ct. 734, 735, 56 L.Ed. 1165 (1912) (hearing may be conclusive "when fairly conducted"); see also Kwong Hai Chew, 344 U.S., at 598 n. 8, 73 S.Ct., at 478 n. 8, and, although we have only rarely held that the procedures provided by the executive were inadequate, we developed the rule that a continuously present permanent resident alien has a right to due process in such a situation. See, e.g., United States ex rel. Vajtauer v. Commissioner of Immigration, 273 U.S. 103, 106, 47 S.Ct. 302, 303, 71 L.Ed. 560 (1927); The Japanese Immigrant Case, 189 U.S. 86, 100-101, 23 S.Ct. 611, 614, 47 L.Ed. 721 (1903); see also Wong Yang Sung v. McGrath, 339 U.S. 33, 49-50, 70 S.Ct. 445, 453-54, 94 L.Ed. 616 (1950); Bridges v. Wixon, 326 U.S. 135, 153-154, 65 S.Ct. 1443, 1452, 89 L.Ed. 2103 (1945).

The question of the procedures due a returning resident alien arose in Kwong Hai Chew v. Colding, supra. There, the regulations permitted the exclusion of an arriving alien without a hearing. We interpreted those regulations not to apply to Chew, a permanent resident alien who was returning from a five-month voyage abroad as a crewman on an American merchant ship. We reasoned that, "For purposes of his constitutional right to due process, we assimilate petitioner's status to that of an alien continuously residing and physically present in the United States." 344 U.S., at 596, 73 S.Ct., at 477. Then, to avoid constitutional problems, we construed the regulation as inapplicable. Although the holding was one of regulatory interpretation, the rationale was one of constitutional law. Any doubts that Chew recognized constitutional rights in the resident alien returning from a brief trip abroad were dispelled by Rosenberg v. Fleuti, supra, where we described Chew as holding "that the returning **330 alien is entitled as a matter of due process to a hearing on the charges underlying any attempt to exclude him." 374 U.S., at 460, 83 S.Ct., at 1811.

If the permanent resident alien's absence is extended, of course, he may lose his entitlement to "assimilat(ion of his) status," Kwong Hai Chew v. Colding, supra, 344 U.S., at 596, 73 S.Ct., at 477, to that of an alien continuously residing and physically

present in the United States. In Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953), this Court rejected the argument *34 of an alien who had left the country for some twenty months that he was entitled to due process in assessing his right to admission on his return. We did not suggest that no returning resident alien has a right to due process, for we explicitly reaffirmed Chew. We need not now decide the scope of Mezei; it does not govern this case, for Plasencia was absent from the country only a few days, and the United States has conceded that she has a right to due process, see Transcript of Oral Argument at 6, 9, 14; Brief for the Petitioner at 9-10, 20-21.

[16]  [17]  The constitutional sufficiency of procedures provided in any situation, of course, varies with the circumstances. See, e.g., Lassiter v. Department of Social Services, 452 U.S. 18, 24-25, 101 S.Ct. 2153, 2158, 68 L.Ed.2d 640 (1981); Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 12, 99 S.Ct. 2100, 2106, 60 L.Ed.2d 668 (1979); Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). In evaluating the procedures in any case, the courts must consider the interest at stake for the individual, the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different procedural safeguards, and the interest of the government in using the current procedures rather than additional or different procedures. See Mathews v. Eldridge, 424 U.S. 319, 334-335, 96 S.Ct. 893, 902-903, 47 L.Ed.2d 18 (1976). Plasencia's interest here is, without question, a weighty one. She stands to lose the right "to stay and live and work in this land of freedom," Bridges v. Wixon, supra, 326 U.S., at 154, 65 S.Ct., at 1452. Further, she may lose the right to rejoin her immediate family, a right that ranks high among the interests of the individual. See, e.g., Moore v. City of East Cleveland, 431 U.S. 494, 499, 503-504, 97 S.Ct. 1932, 1935, 1937-1938, 52 L.Ed.2d 531 (1977) (plurality opinion); Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972). The government's interest in efficient administration of the immigration laws at the border also is weighty. Further, it must weigh heavily in the balance that control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature. See, e.g., Fiallo, supra, 430 U.S., at 792-793, 97 S.Ct., at 1477-1478; Knauff, supra, 338 U.S., at 542-543, 70 S.Ct., at 312; The Japanese Immigrant Case, supra, 189 U.S., at 97, 23 S.Ct., at 613. The role of the judiciary *35 is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause and does not extend to imposing procedures that merely displace congressional choices of policy. Our previous discussion has shown that Congress did not intend to require the use of deportation procedures in cases such as this one. Thus, it would be improper simply to impose deportation procedures here because the reviewing court may find them preferable. Instead, the courts must evaluate the particular circumstances and determine what procedures would satisfy the minimum requirements of due process on the re-entry of a permanent resident alien.

Plasencia questions three aspects of the procedures that the government employed in depriving her of these interests. First, she contends that the immigration law judge placed the burden of proof upon her. In a later proceeding in Chew, the Court of Appeals for the District of Columbia Circuit held, without mention of the Due Process Clause, that, under the law of the case, Chew was entitled to a hearing at **331 which the INS was the moving party and bore the burden of proof. Kwong Hai Chew v. Rogers, 257 F.2d 606 (CADC 1958). The BIA has accepted that decision, and although the Act provides that the burden of proof is on the alien in an exclusion proceeding, s 291, 8 U.S.C. s 1361, the BIA has followed the practice of placing the burden on the government when the alien is a permanent resident alien. See, e.g., In re Salazar, supra, at 169; In re Kane, 15 I & N Dec. 258, 264 (BIA 1975); In re Becerra-Miranda, 12 I & N Dec. 358, 363-364, 366 (BIA 1967). There is no explicit statement of the placement of the burden of proof in the Attorney General's regulations or in the immigration law judge's opinion in this case and no finding on the issue below.

Second, Plasencia contends that the notice provided her was inadequate. She apparently had less than eleven hours' notice of the charges and the hearing. The regulations do not *36 require any advance notice of the charges against the alien in an exclusion hearing, and the BIA has held that it is sufficient that the alien have notice of the charges at the hearing, In re Salazar, supra,

103 S.Ct. 321, 74 L.Ed.2d 21

at 169. The United States has argued to us that Plasencia could have sought a continuance. It concedes, however, that there is no explicit statutory or regulatory authorization for a continuance.

Finally, Plasencia contends that she was allowed to waive her right to representation, s 292, 8 U.S.C. s 1362, [8] without a full understanding of the right or of the consequences of waiving it. Through an interpreter, the immigration law judge informed her at the outset of the hearing, as required by the regulations, of her right to be represented. He did not tell her of the availability of free legal counsel, but at the time of the hearing, there was no administrative requirement that he do so. 8 CFR s 236.2(a) (1975). The Attorney General has since revised the regulations to require that, when qualified free legal services are available, the immigration law judge must inform the alien of their existence and ask whether representation is desired. 44 Fed.Reg. 4654 (Jan. 23, 1979) (codified at 8 CFR s 236.2(a) (1982)). As the United States concedes, the hearing would not comply with the current regulations. See Transcript of Oral Argument at 11.

If the exclusion hearing is to ensure fairness, it must provide Plasencia an opportunity to present her case effectively, though at the same time it cannot impose an undue burden on the government. It would not, however, be appropriate for us to decide now whether the new regulation on the right to notice of free legal services is of constitutional magnitude or whether the remaining procedures provided comport with the Due Process Clause. Before this Court, the parties have devoted their attention to the entitlement to a deportation hearing rather than to the sufficiency of the procedures in the **37** exclusion hearing. [9] Whether the several hours' notice gave Plasencia a realistic opportunity to prepare her case for effective presentation in the circumstances of an exclusion hearing without **332** counsel is a question we are not now in a position to answer. Nor has the government explained the burdens that it might face in providing more elaborate procedures. Thus, although we recognize the gravity of Plasencia's interest, the other factors relevant to due process analysis-the risk of erroneous deprivation, the efficacy of additional procedural safeguards, and the government's interest in providing no further procedures-have not been adequately presented to permit us to assess the sufficiency of the hearing. We remand to the Court of Appeals to allow the parties to explore whether Plasencia was accorded due process under all of the circumstances.

Accordingly, the judgment of the Court of Appeals is

Reversed and remanded.

Justice MARSHALL, concurring in part and dissenting in part.

I agree that the Immigration and Nationality Act permitted the INS to proceed against respondent in an exclusion **38** proceeding. The question then remains whether the exclusion proceeding held in this case satisfied the minimum requirements of the Due Process Clause. While I agree that the Court need not decide the precise contours of the process that would be constitutionally sufficient, I would not hesitate to decide that the process accorded Plasencia was insufficient. [1]

The Court has already set out the standards to be applied in resolving the question. Therefore, rather than just remand, I would first hold that respondent was denied due process because she was not given adequate and timely notice of the charges against her and of her right to retain counsel and to present a defense. [2]

While the type of hearing required by due process depends upon a balancing of the competing interests at stake, due process requires "at a minimum ... that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950). See, e.g., Bell v. Burson, 402 U.S. 535, 542, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90 (1971). Permanent resident aliens who are detained upon reentry into this country clearly are entitled to adequate notice in advance of an exclusion proceeding.

**\*39**  To satisfy due process, notice must "clarify what the charges are" in a manner adequate to apprise the individual of the basis for the government's proposed action. Wolff v. McDonnell, 418 U.S. 539, 564, 94 S.Ct. 2963, 2978, 41 L.Ed.2d 935 (1974). Notice must be provided sufficiently in advance of the hearing to "give the charged party a chance to marshal the facts in his defense." Id., at 563, 564, 94 S.Ct., at 2978 (prisoners charged with disciplinary violations must be given "advance written notice of the claimed violation"). See, e.g., Goldberg v. Kelly, 397 U.S. 254, 267-268, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970) (welfare recipients must be given "timely and adequate notice detailing the reasons for a proposed termination"); **\*\*333** In re Gault, 387 U.S. 1, 33, 87 S.Ct. 1428, 1446, 18 L.Ed.2d 527 (1967) (juvenile must be given notice of "the specific charge or factual allegations" to be considered at delinquency hearing "at the earliest practicable time, and in any event sufficiently in advance of the hearing to permit preparation").

Respondent was not given notice sufficient to afford her a reasonable opportunity to demonstrate that she was not excludable. The immigration judge's decision to exclude respondent was handed down less than 24 hours after she was detained at the border on the night of June 29, 1975. By notice in English dated June 30, 1975, she was informed that a hearing would be conducted at eleven o'clock on the morning of that same day, and that the government would seek to exclude her on the ground that she had "wilfully and knowingly aided and abetted the entry of illegal aliens into the United States in violation of the law and for gain." [3] It was not until the commencement of the hearing that she was given notice in her native language of the charges against her and of her right to retain counsel and to present evidence.

The charges against Plasencia were also inadequately explained at the hearing itself. [4] The immigration judge did not explain to her that she would be entitled to remain in the  **\*40**  country if she could demonstrate that she had not agreed to receive compensation from the aliens whom she had driven across the border. [5] Nor did the judge inform respondent that the meaningfulness of her departure was an issue at the hearing.

These procedures deprived Plasencia of a fair opportunity to show that she was not excludable under the standards set forth in the Immigration and Nationality Act. Because Plasencia was not given adequate notice of the standards for exclusion or of her right to retain counsel and present a defense, she had neither time nor opportunity to prepare a response to  **\*41**  the government's case. The procedures employed here virtually assured that the Government attorney would present his case without factual or legal opposition.

When a permanent resident alien's substantial interest in remaining in this country is at stake, the Due Process Clause forbids the Government to stack the deck in this fashion. Only a compelling need for truly summary action could justify this  **\*\*334**  one-sided proceeding. In fact, the Government's haste in proceeding against Placensia could be explained only by its desire to avoid the minimal administrative and financial burden of providing her adequate notice and an opportunity to prepare for the hearing. Although the various other government interests identified by the Court may be served by the exclusion of those who fail to meet the eligibility requirements set out in the Immigration and Nationality Act, they are not served by procedures that deny a permanent resident alien a fair opportunity to demonstrate that she meets those eligibility requirements.

I would therefore hold that respondent was denied due process.

**All Citations**

459 U.S. 21, 103 S.Ct. 321, 74 L.Ed.2d 21

# Footnotes

\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1 Section 235, 8 U.S.C. s 1225, provides in part:

"(a) The inspection ... of aliens (including alien crewmen) seeking admission or readmission to ... the United States shall be conducted by immigration officers, except as otherwise provided in regard to special inquiry officers. All aliens arriving at ports of the United States shall be examined by one or more immigration officers at the discretion of the Attorney General and under such regulations as he may prescribe....

"(b) Every alien ... who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer."

2 The hearing was authorized by s 236, 8 U.S.C. s 1226, which provides in part:

"(a) A special inquiry officer shall conduct proceedings under this section, administer oaths, present and receive evidence, and interrogate, examine, and cross-examine the alien or witnesses. He shall have authority in any case to determine whether an arriving alien who has been detained for further inquiry under section 1225 of this title shall be allowed to enter or shall be excluded and deported. The determination of such special inquiry officer shall be based only on the evidence produced at the inquiry.... Proceedings before a special inquiry officer under this section shall be conducted in accordance with this section, the applicable provisions of sections 1225 and 1375(b) of this title, and such regulations as the Attorney General shall prescribe, and shall be the sole and exclusive procedure for determining admissibility of a person to the United States under the provisions of this section.... A complete record of the proceedings and of all testimony and evidence produced at such inquiry, shall be kept."

3 Section 101(a)(13), 8 U.S.C. s 1101(a)(13), defines "entry" as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntary or otherwise, except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary: Provided, That no person whose departure from the United States was occasioned by deportation proceedings, extradition, or other legal process shall be held to be entitled to such exception."

4 Voluntary departure for an alien who would otherwise be deported also means that he will not be subject to s 212(a)(17), 8 U.S.C. s 1182(a)(17), which at the time of Plasencia's hearing, required aliens who had once been deported to seek prior approval of the Attorney's General before re-entering. There was no comparable requirement of prior approval for aliens who had been excluded and sought again to enter more than one year later. s 212(a)(16), 8 U.S.C. s 1182(a)(16). The requirement of prior approval for deported aliens now applies only within five years of deportation. 95 Stat. 1612, s 212(a) (17), 8 U.S.C. s 1182(a)(17) (1976 Ed. Supp. V).

5    Apparently the practice of the INS is to determine this question in exclusion proceedings. See In re Leal, 15 I & N Dec. 477, 478-479 (BIA 1975); In re Becerra-Miranda, 12 I & N Dec. 358, 362-363 (BIA 1967).

6    Section 101(a)(13), 8 U.S.C. s 1101(a)(13), which defines "entry," was enacted in 1952 in response to the harsh results visited upon resident aliens by earlier restrictive interpretations of the term. Both the House and Senate reports contained identical explanatory language:

> "Normally an entry occurs when the alien crosses the borders of the United States and makes a physical entry, and the question of whether an entry has been made is susceptible of a precise determination. However, for the purposes of determining the effect of a subsequent entry upon the status of an alien who has previously entered the United States and resided therein, the preciseness of the term "entry" has not been found to be as apparent. Earlier judicial constructions of the term in the immigration laws, as set forth in Volpe v. Smith (289 U.S. 422 (53 S.Ct. 665, 77 L.Ed. 1298) (1933)), generally held that the term "entry" included any coming of an alien from a foreign country to the United States whether such coming be the first or a subsequent one. More recently, the courts have departed from the rigidity of that rule and have recognized that an alien does not make an entry upon his return to the United States from a foreign country where he had no intent to leave the United States (Di Pasquale (sic) v. Karnuth, 158 F.2d 878 (C.C.A.2d 1947)), or did not leave the country voluntarily (Delgadillo v. Carmichael, 332 U.S. 388 (68 S.Ct. 10, 92 L.Ed. 17) (1947)). The bill defines the term "entry" as precisely as practicable, giving due recognition to the judicial precedents. Thus any coming of an alien from a foreign port or place or an outlying possession into the United States is to be considered an entry, whether voluntary or otherwise, unless the Attorney General is satisfied that the departure of the alien, other than a deportee, from this country was unintentional or was not voluntary."

S.Rep. No. 1137, 82d Cong., 2d Sess., 4 (1952); H.R.Rep. No. 1365, 82d Cong., 2d Sess., 32 (1952), U.S. Code Cong. & Admin.News 1952, p. 1683.

In DiPasquale, the court refused to allow a deportation that depended upon an "entry" that occurred after an overnight train on which an alien was a passenger passed through Canada on its way from Buffalo to Detroit. In Delgadillo, the Court refused to define as an "entry" the return of an alien taken to Cuba to recuperate after the merchant ship on which he sailed was torpedoed in the Caribbean during World War II.

7    Indeed, we expressly declined to reach the question whether Chew himself was entitled to a deportation proceeding. We stated: "From a constitutional point of view, he is entitled to due process without regard to whether or not, for immigration purposes, he is to be treated as an entrant alien, and we do not now reach the question whether he is to be so treated." 344 U.S., at 600, 73 S.Ct., at 479.

8    The statute provides a right to representation without expense to the government. Section 292, 8 U.S.C. s 1362. Plasencia has not suggested that she is entitled to free counsel.

9    Thus, the question of Plasencia's entitlement to due process has been briefed and argued, is properly before us, and is sufficiently developed that we are prepared to decide it. Precisely what procedures are due, on the other hand, has not been adequately developed by the briefs or argument. The dissent undertakes to decide these questions, but, to do so, must rely heavily on an argument not raised by Plasencia: to wit, that she was not informed at the hearing that the alleged agreement to receive compensation and the meaningfulness of her departure were critical issues. Also, the dissent fails to discuss the interests that the government may have in employing the procedures that it did. The omission of arguments raised by the parties is quite understandable, for neither Plasencia nor the government has yet discussed what procedures are due. Unlike the dissent, we would allow the parties to explore their respective interests and arguments in the Court of Appeals.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

1    Because the due process question was squarely addressed in the briefs and at oral argument, there is no doubt that the Court may now decide the issue. See Vance v. Terrazas, 444 U.S. 252, 258-259 n. 5, 100 S.Ct. 540, 544-545 n. 5, 62 L.Ed.2d 461 (1980), and cases cited therein. In fact, the Court has reached the threshold of the constitutional question. It has identified the deficiencies in the exclusion hearing afforded Plasencia and it has set forth the standards that it would apply to determine whether the procedures, as described, denied Plasencia due process. I do not see any interest to be served in declining to take the final step of applying these due process standards to the record before us, as the Court of Appeals would otherwise be required to do on remand.

2    Because Plasencia did not receive constitutionally sufficient notice, I find it unnecessary to address the other constitutional deficiencies she asserts.

3    It is unclear from the record whether respondent received the notice prior to the commencement of the hearing.

4    The exclusion hearing was conducted with the aid of an interpreter.

5    The principal issue of fact at the hearing was whether Plasencia had transported the six aliens "for gain." Plasencia, who was called as the Government's first witness, denied repeatedly that any of the aliens had agreed to pay her for driving them into this country. The Government's trial attorney then called three of the six aliens as witnesses. One witness, Jose Alfredo Santillana, stated unequivocally that he was picked up by the Plasencias while hitchhiking and that, without making any mention of money, they agreed to drive him to Los Angeles. A second witness, Luis Polio-Medina, testified that there had not been any talk with Plasencia at any time about payment for transportation to Los Angeles, though there "was kind of an understanding" that "some people in Los Angeles" whom he "was going to look for" would pay her a "normal amount" on his behalf. Only the third witness, Eugenia Linares-Moreno, testified that she had an agreement to pay Plasencia for transportation into the country.

Given the weakness of the Government's evidence, Plasencia may well have been prejudiced by her inability to prepare for the hearing and to obtain counsel. The three aliens who did not testify at the hearing might have supported Plasencia's claim that she did not expect to receive financial compensation. The immigration judge's finding that Plasencia transported the aliens for gain must have depended on his acceptance of the testimony given by Linares-Moreno and Polio-Medina. The motives of these Government witnesses in testifying against Plasencia were open to question, since they were subject to criminal prosecution in this country. The credibility of Linares-Moreno, the Government's key witness, might also have been challenged on the grounds that she had contradicted herself on at least one key question during the course of her examination and that she had concededly lied to an INS officer by giving a false name. Vigorous cross-examination by a competent attorney might well have led the immigration judge to resolve the disputed issue of fact in Plasencia's favor.

---

**End of Document**                                            © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

548 F.2d 233
United States Court of Appeals,
Eighth Circuit.

Ruben LONGORIA-CASTENADA, Petitioner,
v.
IMMIGRATION AND NATURALIZATION
SERVICE, Respondent.

No. 76-1147.
|
Submitted Nov. 10, 1976.
|
Decided Jan. 19, 1977.

**Synopsis**
Petition was brought to review deportation order entered by the Board of Immigration Appeals. The Court of Appeals, Henley, Circuit Judge, held that evidence in the record supported immigration judge's findings that alien knowingly aided and abetted others in commission of misdemeanor offense against United States by illegal entry into country, that resident alien did such for gain and that alien's actions occurred within five years after an entry into United States; thus deportation order was proper.

Affirmed.

Gibson, Chief Judge, filed a dissenting opinion.

West Headnotes (8)

[1]    **Aliens, Immigration, and Citizenship** ⚖ Review of Discretion

**Aliens, Immigration, and Citizenship** ⚖ Constitutional Questions

**Aliens, Immigration, and Citizenship** ⚖ Substantial Evidence in General

Scope of judicial review of deportation order is narrowly restricted; a determination by the Immigration and Naturalization Service can be overturned only where there is an abuse of discretion, lack of procedural due process or where a finding required by applicable statute is unsupported by reasonable, substantial or

probative evidence. Immigration and Nationality Act, §§ 106, 242(b)(4), 🚩 8 U.S.C.A. §§ 1105a, 🚩 1252(b)(4).

1 Cases that cite this headnote

[2]    **Aliens, Immigration, and Citizenship** ⚖ Crime and Related Grounds

Immigration authorities must look to judicial record and may not go behind it to make independent determination of alien's guilt or innocence of charge of violating immigration laws.

5 Cases that cite this headnote

[3]    **Aliens, Immigration, and Citizenship** ⚖ Crimes and Immorality

Court record of alien's conviction of violation of statute prohibiting unlawful aiding and abetting of others in commission of misdemeanor offense against United States by illegal entry into country was sufficient to prove that alien had aided aliens in illegal activities within meaning of statute authorizing deportation of an alien who knowingly and for gain aided and abetted other aliens to enter United States illegally. Immigration and Nationality Act, §§ 241(a)(13), 275, 🚩 8 U.S.C.A. §§ 1251(a)(13), 🚩 1325.

[4]    **Aliens, Immigration, and Citizenship** ⚖ Admissibility

Record of alien's conviction for knowingly and unlawfully aiding and abetting others in commission of misdemeanor offense against United States by illegal entry into country, which record was certified by deputy clerk as being a true copy of original filed in clerk's office, was properly authenticated and thus admissible in deportation proceeding. Immigration and Nationality Act, §§ 241(a)(13), 275, 🚩 8 U.S.C.A. §§ 1251(a)(13), 🚩 1325; Fed.Rules Civ.Proc. rule 44, 28 U.S.C.A.

1 Cases that cite this headnote

**[5]    Aliens, Immigration, and Citizenship** 🔑 Admissibility

Exacting requirements of judicial admissibility are not ordinarily applicable to administrative proceedings such as a deportation hearing except to extent that due process is involved.

1 Cases that cite this headnote

**[6]    Aliens, Immigration, and Citizenship** 🔑 Crimes and Immorality

Evidence including, inter alia, alien's prior sworn statement indicating that he had transported illegal aliens for gain supported immigration judge's finding that alien had transported illegal aliens for gain for purpose of statute authorizing deportation of an alien who knowingly and for gain aided and abetted other aliens to enter United States illegally, despite alien's testimony at deportation proceeding that he had lied about events related in sworn statement. Immigration and Nationality Act, §§ 106, 241(a)(13), 8 U.S.C.A. §§ 1105a, 1251(a)(13).

**[7]    Aliens, Immigration, and Citizenship** 🔑 Crimes and Immorality

Evidence showing, inter alia, that resident alien traveled from his Kansas home to New Mexico to transport illegal aliens to Texas, that alien traveled into Mexico to look for his accomplice and ate lunch, that alien returned to United States and that alien's intent to violate immigration laws was formed before he left country, remained operative during his presence in Mexico and reached fruition upon his return to country supported immigration judge's finding that there was entry by alien into the United States upon which deportation could be predicated under statute authorizing deportation of an alien who within five years after an entry knowingly and for gain aids and abets other aliens to enter United States illegally. Immigration and Nationality Act,

§§ 101(a)(13), 241(a)(13), 8 U.S.C.A. §§ 1101(a)(13), 1251(a)(13).

**[8]    Aliens, Immigration, and Citizenship** 🔑 Time of Crime or Conviction

Where alien within five years after entry into country knowingly and for gain aided and abetted in transportation of illegal aliens, order of deportation of alien was proper. Immigration and Nationality Act, §§ 241(a)(13), 8 U.S.C.A. § 1251(a)(13).

**Attorneys and Law Firms**

**\*234**  Dale K. Irwin, The Legal Aid & Defender Society of Greater Kansas City, Inc., Kansas City, Mo., for petitioner; J. D. Riffel, The Legal Aid & Defender Society of Greater Kansas City, Inc., Kansas City, Mo., on brief.

John E. Harris, Atty., Dept. of Justice, Govt. Regulations & Labor Section, Crim. Div., Washington, D. C., for respondent; Philip Wilens, Chief, Govt. Regulations & Labor Section, Crim. Div., James P. Morris and Robert Kendall, Jr., Attys., Dept. of Justice, Washington, D. C., on brief.

Before GIBSON, Chief Judge, VAN OOSTERHOUT, Senior Circuit Judge, and HENLEY, Circuit Judge.

**Opinion**

**\*235**  HENLEY, Circuit Judge.

Petitioner seeks reversal of an order issued by an Immigration Judge [1] that petitioner be deported from the United States to Mexico for violating the Immigration and Nationality Act, 8 U.S.C. s 1251(a)(13), [2] in that, within five years after an entry into the United States, he knowingly and for gain aided and abetted other aliens to enter the United States illegally. The Board of Immigration Appeals dismissed petitioner's appeal, and he comes before this court pursuant to 8 U.S.C. s 1105a which sets forth the sole and exclusive procedure for judicial review. We affirm the order of deportation.

Petitioner Ruben Longoria-Castenada is a forty-seven year old male citizen of Mexico, duly admitted to the United States for permanent residence on August 14, 1957 at Hidalgo, Texas. He is employed, has eight children living at home, and his wife is a lawful permanent resident alien.

On October 23, 1974 the Immigration and Naturalization Service issued petitioner an order to show cause and notice of hearing charging that he was subject to deportation pursuant to 8 U.S.C. s 1251(a)(13) which requires proof of three elements: that petitioner assisted, aided or abetted other aliens to enter the United States illegally; that he acted for gain; and that he did so within five years after making an entry into the United States. The Service alleged that all of these transpired in March of 1971.

On March 14, 1971 petitioner travelled from his home in Liberal, Kansas to Deming, New Mexico where he was scheduled to have met with one Al Gutierrez to arrange for a rendezvous with some aliens petitioner was to haul from New Mexico to Flomot, Texas. When petitioner did not find Gutierrez on the United States side of the border, he crossed the border into Palomas, Mexico to get something to eat and talk with Gutierrez if he could find him. Failing to locate Gutierrez, petitioner ate a meal and returned to the United States where he finally met with Gutierrez who led petitioner to a house in Columbus, New Mexico where the aliens were waiting. They paid petitioner $25.00 for gas. Petitioner put them in the back of his truck and started out for Texas where a Mr. Clyde was to pay him $100.00 for each alien. After driving about one-half hour, they were apprehended.

On March 15, 1971 petitioner was convicted on his plea of guilty in United States District Court in New Mexico for violation of 8 U.S.C. s 1325, for knowingly and unlawfully aiding and abetting others in the commission of a misdemeanor offense against the United States by illegal entry into this country; he was sentenced to thirty days. On March 16, during his incarceration, a sworn statement reciting the above story was taken from petitioner by United States Border Patrol Agents.

The deportation hearing was held in two parts on January 21 and March 18, 1975. Both the sworn statement as to the events and the Conviction, Judgment and Commitment relating to the s 1325 offense were admitted into evidence. Petitioner was the sole witness, and much of his testimony contradicted the facts related in his previously sworn statement. On the basis of this record, the Immigration Judge determined petitioner to be deportable under s 1251(a) (13), and the Board of Immigration Appeals dismissed his appeal.

[1] In a case such as this, the scope of our judicial review is narrowly restricted. A determination by the Immigration and Naturalization Service can be overturned only where there is an abuse of discretion, lack of procedural due process, or where a *236 finding required by the statute is unsupported by reasonable, substantial or probative evidence. Martin-Mendoza v. I&NS, 499 F.2d 918, 920 (9th Cir. 1974). The standards for review are set by statute which provides that the findings of fact by the immigration judge must be accepted as valid and conclusive if they are supported by reasonable, substantial and probative evidence. 8 U.S.C. s 1105a, s 1252(b)(4).

[2] [3] Petitioner's plea of guilty to the s 1325 offense established the first element required for deportation under s 1251(a)(13), that petitioner knowingly aided and abetted other aliens to enter the United States in violation of law. Cuevas-Cuevas v. I&NS, 523 F.2d 883 (9th Cir. 1975). Petitioner's argument that this element was negated because the persons he aided were never proved to be illegal aliens has no merit. His conviction is a matter of record. Immigration authorities must look to the judicial record, and may not go behind it to make an independent determination of guilt or innocence. Aguilera-Enriquez v. I&NS, 516 F.2d 565, 570 (6th Cir. 1975). The court record of petitioner's Conviction, Judgment and Commitment under s 1325 was sufficient to prove that he had aided aliens in illegal activities within the meaning of the deportation provision.

[4] [5] Similarly, petitioner's contention that the s 1325 conviction was improperly admitted into evidence at the deportation proceeding because it was not authenticated pursuant to Fed.R.Civ.P. 44 borders on the frivolous. A deputy clerk had certified that the record was a true copy of the original filed in the clerk's office. Although Rule 44 sets forth an acceptable standard for authenticating public records, the exacting requirements of judicial admissibility are not ordinarily applicable to administrative proceedings such as a deportation hearing except to the extent that due process is involved, which petitioner has not alleged here. Maroon v. I&NS, 364 F.2d 982, 986 (8th Cir. 1966); United States v. O'Rourke, 211 F.2d 609, 611 (8th Cir. 1954). Furthermore, upon specific questioning by the immigration

AR.05280

judge who pointed out that the conviction record had been certified, counsel for petitioner withdrew his objection to its introduction into evidence and thus in effect abnegated petitioner's basis for appeal.

[6]    The second element necessary for determination of a s 1251(a)(13) deportation, whether petitioner had acted for gain, became a matter of credibility when the petitioner testified that he had lied about the events related in his March 16 sworn statement. The immigration judge believed the evidence in the statement which indicated that petitioner had transported illegal aliens for gain. We accept this finding because it is supported by reasonable, substantial and probative evidence. 8 U.S.C. s 1105a.

[7]    In addition we accept the immigration judge's finding as to the third element required under s 1251(a)(13), that petitioner's return from his brief excursion into Mexico on March 14 constituted an "entry" into the United States upon which deportation could be predicated.

The term "entry" is defined in 8 U.S.C. s 1101(a)(13) and includes a special provision for returning resident aliens based upon the intent of their departure from the United States.[3] This intent exception was construed in Rosenberg v. Fleuti, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963), to mean that only a resident alien with an intent to depart the United States in a *237 manner which can be regarded as "meaningfully interruptive" of his permanent residence will be exposed to the consequences of an "entry" into the country on his return. An innocent, casual, and brief excursion outside this country will not evoke the effects of an "entry" where the resident alien did not intend a departure disruptive of his resident alien status. 374 U.S. at 462, 83 S.Ct. 1804.

The criteria formulated to determine whether departure by a resident alien should be interpreted as a "meaningful interruption" of his resident alien status included, but was not limited to, the length of the absence, the procurement of travel documents and the purpose of the visit. Id. The Court observed that if the resident alien's purpose of leaving the country was to accomplish some object which is itself contrary to a policy reflected in our immigration laws, the interruption of the alien's residence would be properly regarded as "meaningful." Id.

In the case before us, the Immigration and Naturalization Service contends that petitioner's trip to Mexico was "meaningfully interruptive" of his permanent residence because it took place in furtherance of a scheme to assist illegal aliens. We agree.

Petitioner's sworn statement that he went to Mexico "to get something to eat and talk to Gutierrez if I could find him" indicates that petitioner left the United States for the purpose of participating in a meeting to advance a prearranged plan to aid and abet aliens who had entered the country illegally. By travelling to Mexico to speak with Gutierrez, petitioner attempted to expedite the execution of a master plan which provided for him to travel from his home in Kansas to New Mexico where he was scheduled to make contact with Gutierrez prior to transporting illegal aliens to Texas.

Although petitioner's brief crossing into Mexico required no travel documents, and his consumption of a meal while there was perfectly innocent, his intent in departing the United States was to pursue a course of action proscribed by immigration policy so as to convert his trip from a short, casual sojourn to a departure meaningfully disruptive of his resident alien status. Cuevas-Cuevas v. I&NS, supra; Palatian v. I&NS, 502 F.2d 1091 (9th Cir. 1974); Solis-Davila v. I&NS, 456 F.2d 424 (5th Cir. 1972); cf. Vargas-Banuelos v. I&NS, 466 F.2d 1371 (5th Cir. 1972).

The fact that petitioner's meeting with Gutierrez was not actually accomplished while he was in Mexico has little palliative effect. Petitioner's situation is distinguishable from the case he relies upon wherein it was determined there had been no "entry" on the return of a resident alien whose plan for revenge against an enemy in Mexico was aborted so that no offense was committed in either country. Yanez-Jacquez v. I&NS, 440 U.S. 701 (5th Cir. 1971). Here petitioner's intent to act in contravention of our immigration laws was formed before he left this country, remained operative during his presence in Mexico, and in fact reached fruition upon his return to the United States.

The intent that petitioner sustained until the offense which contravened immigration policy was finally committed removed his departure from this country from the "innocent, casual, and brief" ambit of Rosenberg v. Fleuti, supra. In the circumstances petitioner's purpose for going to Mexico made his departure one that was meaningfully disruptive of his resident alien status, and thus his return to this country

properly constituted an "entry" within the meaning of 8 U.S.C. s 1101(a)(13). As a result, the final element necessary for deportation under s 1251(a)(13) was fulfilled.

We observe additionally that the effect of uprooting which would be caused by deportation has been recognized as a fourth relevant factor to be included in the Fleuti criteria for determining whether a departure from this country was intended to be meaningfully disruptive of a resident alien's status. Lozano-Giron v. I&NS, 506 F.2d 1073, 1077 (7th Cir. 1974). Here petitioner will be leaving a resident alien wife and eight children born in the United States *238 where he has legally lived for almost twenty years and has earned well-paying employment. And we note further that petitioner has been duly punished for his assistance to illegal aliens.

[8] While we are unpersuaded on review that it was error to order deportation, we recognize that the sanction of deportation with its attendant hardships, both personal and familial, could be so harsh that petitioner's cause may commend itself for administrative relief. 8 U.S.C. s 1254(a)(1). Thus, while we affirm the order of deportation, we stay our mandate for sixty days to allow petitioner an opportunity to apply for discretionary administrative relief.

GIBSON, Chief Judge, dissenting.

I respectfully dissent. I find the Government's decision to bring deportation proceedings against petitioner to be based upon a hypertechnical interpretation of our immigration laws, which exhibits gross insensitivity to a resident alien of twenty years and to his large family of United States citizens.

In drafting the statute applied to effect petitioner's deportation, Congress expressed the clear intent to ameliorate "the harsh results" which had previously befallen resident aliens. Rosenberg v. Fleuti, 374 U.S. 449, 458, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963). In recognition of this ameliorative intent, the Supreme Court has refused to fossilize the term "entry" as used in 8 U.S.C. s 1101(a)(13) (1970) by rigid definition. Instead, it has preferred a flexible approach, which permits a court faced with a question of interpretation of "entry" under s 1101(a)(13) to consider and balance a variety of relevant factors. "Given that the congressional protection of returning resident aliens in (s 1101(a)(13)) is not to be woodenly construed", the Court declined to reduce these factors to a closed or definitive list

and left the development of other possibly relevant factors to the "gradual process of judicial inclusion and exclusion."

Rosenberg v. Fleuti, 374 U.S. at 460, 462, 83 S.Ct. 1804, 1811, 1812. The most significant factor to be so added since Fleuti has been that of the impact of deportation upon a particular alien. In recent decisions, a consideration of the effect of deportation upon an individual has been deemed integral to a proper implementation of our immigration laws either explicitly, Lozano-Giron v. Immigration and Naturalization Service, 506 F.2d 1073, 1077-78 (7th Cir. 1974), or sub silentio, Vargas-Banuelos v. Immigration and Naturalization Service, 466 F.2d 1371 (5th Cir. 1972); Yanez-Jacquez v. Immigration and Naturalization Service, 440 F.2d 701 (5th Cir. 1971).

The Supreme Court has recognized that "(t)he stakes are indeed high and momentous for the alien who has acquired his residence here", Rosenberg v. Fleuti, 374 U.S. at 458, 83 S.Ct. at 1810, quoting Delgadillo v. Carmichael, 332 U.S. 388, 391, 68 S.Ct. 10, 92 L.Ed. 17 (1947). In light of the legislative history of s 1101(a)(13) and the Supreme Court's interpretation of this provision, I believe that a consideration of the effect of deportation upon a particular alien is a factor that should be considered in determining whether an "entry" has been effected. This is especially imperative where, as here, it was unnecessary to procure travel documents and there is no evidence of any intent to leave the country for more than a brief interlude, such as an hour for lunch, or of a meaningful departure. Concededly there was no intention on petitioner's part to abandon his alien residency of many years when he crossed the Mexican border for lunch.

The potential effect of deportation in the present case is indeed lamentable. In departing from this country, Longoria-Castenada will leave behind him eight children, all United States citizens, a wife who is a lawful permanent resident alien and the employment whereby he has successfully supported this large family. Petitioner committed an offense for which he was duly punished. I am dismayed at the Government's decision to parlay a one hour lunch trip across the border into the basis of the instant deportation proceedings. The instigation of these proceedings epitomizes *239 a mechanical and inhumane application of our immigration laws.

I agree with the majority that the facts of this case pertaining to petitioner's intent are distinguishable from those underlying

other decisions where no "entry" was found. I do not believe, however, that ☐ s 1101(a)(13) requires that petitioner's intent be weighed more heavily than other relevant factors. A balancing of all relevant factors, including the impact of deportation upon petitioner, convinces me that the order of deportation here is inconsonant with both the letter and spirit of our immigration laws.

I would reverse the deportation order.

**All Citations**

548 F.2d 233

# Footnotes

1    Thomas M. Ragno, Immigration Judge.

2    ☐ 8 U.S.C. s 1251(a)(13) provides:

1251. Deportable aliens General classes

(a) Any alien in the United States (including an alien crewman) shall, upon the order of the Attorney General, be deported who

(13) prior to, or at the time of any entry, or at any time within five years after any entry, shall have, knowingly and for gain, encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law . . ..

3    ☐ 8 U.S.C. s 1101(a)(13) provides in pertinent part:

1101. Definitions

(a) As used in this chapter

(13) The term "entry" means any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise, except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary . . ..

---

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Lapaix v. U.S. Atty. Gen., 605 F.3d 1138 (2010)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 59 of 1271

22 Fla. L. Weekly Fed. C 802

605 F.3d 1138
United States Court of Appeals,
Eleventh Circuit.

Michaelle LAPAIX, Petitioner,

v.

U.S. ATTORNEY GENERAL, Respondent.

No. 09–12488.
|
May 12, 2010.

**Synopsis**

**Background:** Alien, a citizen of Haiti, petitioned for review of a decision of the Board of Immigration Appeals (BIA), Agency No. AXXX-XX5-457, affirming an immigration judge's (IJ's) order which denied her applications for asylum and withholding of removal on the basis of her previous conviction of a "particularly serious crime" and determining that she waived her claims for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT).

**Holdings:** The Court of Appeals held that:

[1] the IJ's purported refusal to allow alien to testify at her evidentiary hearing regarding the circumstances of the crime in question did not violate her due process rights, and

[2] the BIA did not abuse its discretion in determining that alien failed to challenge the IJ's denial of her claim for CAT relief.

Petition denied.

West Headnotes (23)

[1]     **Aliens, Immigration, and Citizenship** 🗝️ Crimes and Related Grounds

Conviction of a particularly serious crime renders an alien ineligible for asylum and withholding of removal. Immigration and Nationality Act, §§ 208(b)(2)(A)(ii), 241(b)

(3)(B)(ii),  🔖 8 U.S.C.A. §§ 1158(b)(2)(A)(ii), 1231(b)(3)(B)(ii).

1 Cases that cite this headnote

[2]     **Aliens, Immigration, and Citizenship** 🗝️ Crimes and Related Grounds

Conviction of a particularly serious crime, which renders an alien ineligible for asylum and withholding of removal, necessarily renders one a danger to the community. Immigration and Nationality Act, §§ 208(b)(2)(A)(ii), 241(b)

(3)(B)(ii),  🔖 8 U.S.C.A. §§ 1158(b)(2)(A)(ii), 1231(b)(3)(B)(ii).

[3]     **Aliens, Immigration, and Citizenship** 🗝️ Review of initial decision or administrative review

On petition for review of a decision of the Board of Immigration Appeals (BIA), the Court of Appeals reviews only the BIA's decision, except to the extent that it expressly adopts the immigration judge's (IJ's) opinion.

17 Cases that cite this headnote

[4]     **Federal Courts** 🗝️ Constitutional questions in general

**Federal Courts** 🗝️ Constitutional rights, civil rights, and discrimination in general

Court of Appeals reviews constitutional challenges, including alleged due process violations, *de novo*. U.S.C.A. Const.Amend. 5.

14 Cases that cite this headnote

[5]     **Aliens, Immigration, and Citizenship** 🗝️ Review of discretion

Court of Appeals would review for abuse of discretion the Board of Immigration Appeals' (BIA's) determination that alien failed to raise her United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) claim on appeal.

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 60 of 1271

Lapaix v. U.S. Atty. Gen., 605 F.3d 1138 (2010)

22 Fla. L. Weekly Fed. C 802

2 Cases that cite this headnote

**[6]    Constitutional Law** 👈 Admission and exclusion;  deportation

Fifth Amendment entitles aliens in removal proceedings to due process of the law. U.S.C.A. Const.Amend. 5.

16 Cases that cite this headnote

**[7]    Constitutional Law** 👈 Admission and exclusion;  deportation

Due process requires that aliens be given notice and an opportunity to be heard in their removal proceedings. U.S.C.A. Const.Amend. 5.

17 Cases that cite this headnote

**[8]    Constitutional Law** 👈 Admission and exclusion;  deportation

To establish a due process violation in connection with removal proceedings, an alien must show that she was deprived of liberty without due process of law and that the purported errors caused her substantial prejudice. U.S.C.A. Const.Amend. 5.

41 Cases that cite this headnote

**[9]    Constitutional Law** 👈 Admission and exclusion;  deportation

To show "substantial prejudice," as required to establish a due process violation in connection with removal proceedings, an alien must demonstrate that, in the absence of the alleged violations, the outcome of the proceeding would have been different. U.S.C.A. Const.Amend. 5.

43 Cases that cite this headnote

**[10]    Aliens, Immigration, and Citizenship** 👈 Crimes and Related Grounds

When the offense in question is not a per se particularly serious crime, the Attorney General retains discretion to determine on a case-by-case basis whether the offense constituted a particularly serious crime, as would render an alien ineligible for asylum and withholding of removal. Immigration and Nationality Act, §§ 208(b)(2)(A)(ii), 241(b)(3)(B)(ii), 8 U.S.C.A. §§ 1158(b)(2)(A)(ii), 1231(b)(3)(B)(ii).

10 Cases that cite this headnote

**[11]    Aliens, Immigration, and Citizenship** 👈 Crimes and Related Grounds

Attorney General's discretion to determine, on a case-by-case basis, whether an offense that is not a per se particularly serious crime constituted a particularly serious crime may be delegated to other administrative bodies, including immigration judges (IJs). Immigration and Nationality Act, §§ 208(b)(2)(A)(ii), 241(b)(3)(B)(ii), 8 U.S.C.A. §§ 1158(b)(2)(A)(ii), 1231(b)(3)(B)(ii).

10 Cases that cite this headnote

**[12]    Aliens, Immigration, and Citizenship** 👈 Crimes and Related Grounds

In determining whether an offense that is not a per se particularly serious crime constituted a particularly serious crime under the circumstances, as would render an alien ineligible for asylum or withholding of removal, an immigration judge (IJ) is free to rely solely on the elements of the offense, though IJs generally consider additional evidence and look to such factors as the nature of the conviction, the circumstances of the underlying facts of the conviction, and the type of sentence imposed. Immigration and Nationality Act, §§ 208(b)(2)(A)(ii), 241(b)(3)(B)(ii), 8 U.S.C.A. §§ 1158(b)(2)(A)(ii), 1231(b)(3)(B)(ii).

10 Cases that cite this headnote

**[13]    Aliens, Immigration, and Citizenship** 👈 Admissibility

**Constitutional Law** 👈 Asylum, refugees, and withholding of removal

Lapaix v. U.S. Atty. Gen., 605 F.3d 1138 (2010)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 61 of 1271

22 Fla. L. Weekly Fed. C 802

Immigration judge's (IJ's) purported refusal to allow alien, who had been convicted of aggravated battery with a deadly weapon under Florida law, to testify regarding circumstances of crime, for purposes of determining whether it was a "particularly serious crime" that rendered her ineligible for asylum or withholding of removal, did not violate alien's due process rights; record showed that alien was not denied opportunity to present her case, as IJ, though candid about his opinion, gave alien chance to testify or offer any evidence she or her counsel might have thought could have persuaded IJ otherwise, but nothing new was argued or presented, and alien failed to show how proceedings would have been different had she testified, as IJ acknowledged alien's version of events but noted that, even if alien used table knife to stab victim, table knife was still a deadly weapon, and alien had "a serious felony conviction involving a crime against another person with a weapon." U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, §§ 208(b)(2)(A)(ii), 241(b)(3)(B)(ii), 8 U.S.C.A. §§ 1158(b)(2)(A)(ii), 1231(b)(3)(B)(ii); West's F.S.A. § 784.045.

3 Cases that cite this headnote

[14]    **Aliens, Immigration, and Citizenship**  🔑  Summary dismissal

Board of Immigration Appeals (BIA) has discretion to summarily dismiss claims where the record clearly indicates that the applicant has waived her right to appeal. 8 C.F.R. § 1003.1(d)(2)(i)(G).

[15]    **Aliens, Immigration, and Citizenship**  🔑  Review of discretion

"Abuse of discretion" review of a Board of Immigration Appeals (BIA) decision is limited to determining whether there has been an exercise of administrative discretion and whether the matter of exercise has been arbitrary or capricious.

2 Cases that cite this headnote

[16]    **Aliens, Immigration, and Citizenship**  🔑  Administrative Review

In order to avoid a waiver of appeal, alien's Notice of Appeal or any attachments thereto must specifically identify the findings of fact, the conclusions of law, or both, that are being challenged. 8 C.F.R. § 1003.3(b).

[17]    **Federal Courts**  🔑  Failure to mention or inadequacy of treatment of error in appellate briefs

Generally, when an appellant fails to offer argument on an issue, that issue is deemed abandoned.

7 Cases that cite this headnote

[18]    **Federal Courts**  🔑  Specification of errors; points and arguments

Passing references to issues are insufficient to raise a claim for appeal.

12 Cases that cite this headnote

[19]    **Federal Courts**  🔑  Specification of errors; points and arguments

For purposes of appeal, a claim may remain viable if the core issue is maintained regardless of labels.

1 Cases that cite this headnote

[20]    **Aliens, Immigration, and Citizenship**  🔑  Administrative Review

Board of Immigration Appeals (BIA) did not abuse its discretion in determining that alien failed to challenge immigration judge's (IJ's) denial of her claim for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT); alien, who admittedly confused the IJ's analysis as supporting the denial of asylum instead of CAT relief, only

specifically appealed the IJ's asylum ruling, and alien's actions were not sufficient to provide the BIA notice of her claim and therefore preserve the issue for appeal, as, while alien specifically mentioned her CAT claim in the first page of her brief, she failed to present any further arguments, assertions, law, or statement regarding CAT relief, focusing on the potential "persecution perpetrated by non-governmental forces" required for asylum rather than on the governmental persecution or acquiescence required for CAT relief.

1 Cases that cite this headnote

[21]  **Aliens, Immigration, and Citizenship**  🔑  Standard for relief

Burden of proof for an alien seeking protection under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) is higher than the burden for showing eligibility for asylum.

1 Cases that cite this headnote

[22]  **Aliens, Immigration, and Citizenship**  🔑  Standard for relief

To prevail on a claim for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), an alien must demonstrate it is more likely than not that she will be subjected to pain and suffering at the hands or acquiescence of the government.

6 Cases that cite this headnote

[23]  **Aliens, Immigration, and Citizenship**  🔑  Government action or acquiescence

Government acquiescence is the key distinguishing factor between a claim under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) and an asylum claim.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1141** Kerri Lauren McNulty, White & Case, LLP, Holly R. Skolnick, Edward O. Martos, Greenberg Traurig, Miami, FL, for Lapaix.

Anthony Cardozo Payne, David V. Bernal, Lauren Fascett, Jesse M. Bless, U.S. Dept. of Justice, OIL, Civ. Div., Washington, DC, for U.S. Atty. Gen.

Petition for Review of a Decision of the Board of Immigration Appeals.

Before PRYOR and FAY, Circuit Judges, and QUIST,[*] District Judge.

**Opinion**

PER CURIAM:

Petitioner Michaelle Lapaix seeks review of the Board of Immigration Appeals's ("BIA") decision affirming the Immigration Judge's ("IJ") order denying her applications for asylum and withholding of removal. Lapaix also seeks review of the BIA's decision that she waived her claims for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). We find that Lapaix has not presented any reversible error and deny her petition for review.

I. FACTS AND PROCEEDINGS

Lapaix, a citizen of Haiti, entered the United States in March 1992. In March 1998, she filed an application for asylum and withholding of removal. According to her application, Lapaix was raped and beaten by non-governmental political vigilantes on two separate occasions because of her involvement in political organizations. In February 2005, an IJ granted Lapaix's application for asylum. The IJ found that Lapaix had been persecuted on account of her political opinion, which created the presumption of a well-founded fear of future persecution that the government failed to rebut. Because she was granted asylum, the IJ did not consider her claims for withholding of removal and protection under the CAT.

At the time she was granted asylum, Lapaix was facing a charge of aggravated battery, a second degree felony.[1] The

Lapaix v. U.S. Atty. Gen., 605 F.3d 1138 (2010)

22 Fla. L. Weekly Fed. C 802

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 63 of 1271

charge stemmed from a July 2004 incident in which Lapaix stabbed her landlord in the forearm twice with a kitchen knife, hit her with a closed fist and took the phone away from the victim as she attempted to call 911. Lapaix then fled the scene, stating that she was "going to jail." Lapaix pled no contest in May 2005, and was sentenced to eight years probation and ordered to complete a sixteen week anger management course, stay away from the victim and pay restitution in the amount of $6,697.36.

[1] [2] In February 2006, the Department of Homeland Security moved to reopen Lapaix's asylum case on the basis of her conviction. An IJ reopened the case in March 2006. The issue presented was whether an aggravated battery constituted a "particularly serious crime" under the Immigration and Nationality Act, which would void Lapaix's asylum status. [2]

**\*1142** Lapaix's initial brief stated that, "if it becomes necessary to consider the events as dictated in the police report, Ms. Lapaix would request the opportunity to give testimony, or to provide a sworn statement." At the hearing, Lapaix asserted that there was nothing on the record from her perspective and, although it was inappropriate for counsel to fill in those facts, the situation was more complex than suggested. Lapaix's counsel stated, "it's not as simple as the victim having been strapped [sic] with a knife that [Lapaix] carried on her person. In fact there was a table knife that [Lapaix] was using in her own room when her landlord came into the room."

Lapaix further contended that police reports are unreliable sources of evidence. The IJ agreed, but stated that "even if we take the police report out of it, we're still left with a serious felony conviction involving a crime against another person with a weapon." When Lapaix replied that the weapon was a table knife, the IJ noted that "a table knife is still a deadly weapon." At the conclusion of the proceeding, the IJ asked if either party had anything else to add. Lapaix chose not to offer any additional testimony, evidence or argument.

The IJ took the matter under consideration and issued a written decision in February 2008. The IJ denied Lapaix's application for asylum, withholding of removal and CAT relief. The IJ found Lapaix ineligible for asylum and withholding of removal because she had been convicted by a final judgment of a particularly serious crime. The IJ reasoned that, "due to the nature and the circumstances of the respondent's offense and to the lengthy term of probation

imposed and restitution ordered that the respondent was convicted of a particularly serious crime."

With regard to CAT relief, the IJ noted that Haiti's political conditions had changed since Lapaix left. The IJ stated that, although Lapaix was tortured in the past, "[she] has not demonstrated that she will be singled out and tortured upon her removal to Haiti. There is nothing in the record to indicate that the current government in Haiti would have any inclination to harm [her]." Therefore, the IJ found that the evidence did not support Lapaix's claim for CAT relief.

Lapaix filed a timely notice of appeal with the BIA. The BIA dismissed Lapaix's appeal, finding that her offense constituted a particularly serious crime given its violent nature against a person. The BIA held that there was no reason to remand because the IJ's decision was supported by the record. Additionally, the BIA found that Lapaix did not dispute the IJ's denial of CAT relief and as such, waived any appeal as to that finding.

Lapaix now petitions this court for review of the BIA's decision. Lapaix presents two issues on appeal. First, Lapaix claims that the IJ violated her due process rights by refusing to permit her to testify at her evidentiary hearing regarding the circumstances of the crime in question. Second, Lapaix asserts that the BIA erred in refusing to consider her CAT claim, which she alleges was sufficiently raised in her brief to the BIA.

## II. STANDARD OF REVIEW

[3] [4] This court reviews only the BIA's decision, except to the extent that it expressly adopts the IJ's opinion. *See*
Al **\*1143** *Najjar v. Ashcroft,* 257 F.3d 1262, 1284 (11th Cir.2001). We review constitutional challenges, including alleged due process violations, *de novo. See Lonyem v. U.S. Att'y Gen.,* 352 F.3d 1338, 1341 (11th Cir.2003).

[5] Lapaix's claim that the BIA erred in refusing to consider her CAT claim presents a more complex issue. Under the applicable regulations, in order to avoid summary dismissal, the applicant's Notice of Appeal or any attachments thereto must specifically identify the findings of fact, the conclusions of law, or both, that are being challenged. *See* 8 C.F.R. § 1003.3(b). If not, then the BIA may grant summary dismissal pursuant to 8 C.F.R. § 1003.1(d)(2)(i). Specifically, the

Case 3:20-cv-07721-SI   Document 58-5   Filed 11/10/20   Page 64 of 1271

Lapaix v. U.S. Atty. Gen., 605 F.3d 1138 (2010)

22 Fla. L. Weekly Fed. C 802

code vests discretion in the BIA to summarily dismiss any part of an appeal where there has been an affirmative waiver of the right to appeal that is clear from the record. *See* 🚩 8 C.F.R. § 1003.1(d)(2)(i)(G).

Previously, we reviewed the BIA's summary dismissal of an appeal to determine if the dismissal was "appropriate," without articulating the precise standard of review. *See* 📒 *Bayro v. Reno,* 142 F.3d 1377, 1379 (11th Cir.1998); *Bonne–Annee v. INS,* 810 F.2d 1077, 1078 (11th Cir.1987) (per curiam). However, in 📒 *Esponda v. U.S. Att'y Gen.,* we held that because the regulation indicates the BIA "may" summarily dismiss an appeal, it vests discretion in the BIA. 📒 453 F.3d 1319, 1321 (11th Cir.2006). Because the regulations grant the BIA discretion, *Esponda* determined that the appropriate standard of review for the BIA's application of the regulation to summarily dismiss an appeal is abuse of that discretion. *See* 📒 *id.* Accordingly, we review the BIA's determination that Lapaix failed to raise her CAT claim on appeal for abuse of discretion.

### III. DISCUSSION

*Due Process Violation*

**[6]** **[7]** **[8]** **[9]** It is well-established that the Fifth Amendment entitles petitioners in removal proceedings to due process of the law. *See* 📒 *Frech v. U.S. Att'y Gen.,* 491 F.3d 1277, 1281 (11th Cir.2007). Due process requires that aliens be given notice and an opportunity to be heard in their removal proceedings. *See* 📒 *Tang v. U.S. Att'y Gen.,* 578 F.3d 1270, 1275 (11th Cir.2009). To establish a due process violation, the petitioner must show that she was deprived of liberty without due process of law and that the purported errors caused her substantial prejudice. *See id.* To show substantial prejudice, an alien must demonstrate that, in the absence of the alleged violations, the outcome of the proceeding would have been different. *See Ibrahim v. I.N.S.,* 821 F.2d 1547, 1550 (11th Cir.1987).

**[10]** **[11]** When the offense in question is not a per se particularly serious crime, the Attorney General retains discretion to determine on a case-by-case basis whether the offense constituted a particularly serious crime. *See* 🚩 *In re N–A–M–,* 24 I. & N. Dec. 336, 338 (BIA 2007). That discretion may be delegated to other administrative bodies,

including IJ's. *See* 📒 *Zardui–Quintana v. Richard,* 768 F.2d 1213, 1221 (11th Cir.1985).

**[12]** In making that determination, the IJ is free to rely solely on the elements of the offense. *See* 🚩 *In re N–A–M–,* 24 I. & N. Dec. at 342 ("On some occasions, we have focused exclusively on the elements of the offense, i.e. the nature of the crime."). However, IJ's generally consider additional evidence and look "to such factors as the nature of the conviction, the circumstances of the underlying facts of the conviction, [and] the type of sentence imposed." 🚩 **\*1144** *Matter of Frentescu,* 18 I. & N. Dec. 244, 247 (BIA 1982), *superseded in part by amendment to* 8 U.S.C. § 1253(h)(2), *as recognized in Matter of C–,* 20 I. & N. Dec. 529, 533 (BIA 1992).

**[13]** Lapaix asserts that the IJ violated her due process rights because he considered evidence beyond the mere elements of the offense without hearing her testimony regarding the incident. She contends that the IJ must have considered additional evidence because his opinion referenced the "nature and the circumstances" of the incident. Lapaix alleges that when the IJ considered circumstances beyond the mere elements of the offense, he opened the door to considering all relevant information regarding the charge. In support of her argument, Lapaix quotes 🚩 *In re N–A–M–,* 24 I. & N. Dec. at 344:

> It has been [the BIA's] practice to allow both parties to explain and introduce evidence as to why a crime is particularly serious or not. We see no reason to exclude otherwise reliable information from consideration in an analysis of a particularly serious crime once the nature of the crime, as measured by its elements, brings it within the range of a "particularly serious" offense.

Arguing that her testimony constituted relevant information regarding the charge, Lapaix claims that the IJ's refusal to hear that testimony violated her rights. She further contends that this violation had the potential to affect the outcome of her case, as she would have provided mitigating information

which could have changed the IJ's characterization of the crime.

The government responds that Lapaix has not established that the IJ or the BIA violated her due process rights because she failed to show that she suffered substantial prejudice that would have changed the outcome of the proceedings. The government asserts that, although the IJ considered a proffer by Lapaix's counsel that she had used a table knife against her landlord after the landlord had entered her apartment, the IJ did not find that this information negated the violent and particularly serious nature of her crime. The government references the IJ's oral statement that even without the police report, Lapaix still has a conviction for aggravated battery on her record.

After reviewing the record, we find that Lapaix was not denied an opportunity to present her case. The IJ was candid about his opinion. Lapaix was given the opportunity to testify or offer any evidence she or her counsel might have thought could have persuaded the IJ otherwise. Nothing new was argued or presented to the IJ or to the BIA. The decision of what evidence to present is one to be made by the petitioner with the advice of counsel, when represented by such. At no point did the IJ refuse to hear admissible testimony and the record fully supports the denial of relief.

Additionally, Lapaix has not demonstrated how the proceedings would have been different had she testified. Lapaix's counsel proffered the basic facts of her case, which put the IJ on notice to the content of Lapaix's potential testimony. Counsel noted that the crime took place in Lapaix's home and she used a table knife to stab her victim. The IJ acknowledged counsel's version of events, but noted that a table knife is still a deadly weapon and that Lapaix had "a serious felony conviction involving a crime against another person with a weapon." Lapaix has offered no explanation as to how aggravated battery with a deadly weapon is not a particularly serious crime.

### Waiver of CAT Relief

**[14]** **[15]**  The BIA has discretion to summarily dismiss claims where the record clearly indicates that the applicant has waived her right to appeal. *See* 8 C.F.R. § 1003.1(d)(2)(i)(G); **\*1145** *Esponda,* 453 F.3d at 1321. In *Abdi v. U.S. Att'y Gen.,* we stated that abuse of discretion review "is limited to determining whether there has been an exercise of administrative discretion and whether the matter of

exercise has been arbitrary or capricious." 430 F.3d 1148, 1149 (11th Cir.2005). The BIA exercised its discretion by determining that Lapaix failed to challenge the IJ's denial of her claim for CAT relief. Therefore, the issue before us is whether the BIA acted arbitrarily or capriciously in making that determination.

**[16]** **[17]** **[18]** **[19]**  In order to avoid a waiver of appeal, the applicant's Notice of Appeal or any attachments thereto must specifically identify the findings of fact, the conclusions of law, or both, that are being challenged. *See* 8 C.F.R. § 1003.3(b). Generally, when an appellant fails to offer argument on an issue, that issue is deemed abandoned.

*See* *Sepulveda v. U.S. Att'y Gen.,* 401 F.3d 1226, 1228 n. 2 (11th Cir.2005). Passing references to issues are insufficient to raise a claim for appeal. *See* *Greenbriar, Ltd. v. City of Alabaster,* 881 F.2d 1570, 1573 n. 6 (11th Cir.1989). We recognize, however, that a claim may remain viable if the core issue is maintained regardless of labels. *See* *Montano Cisneros v. U.S. Att'y Gen.,* 514 F.3d 1224, 1228 n. 3 (11th Cir.2008).

**[20]**  Lapaix admits that she confused the IJ's analysis as supporting the denial of asylum instead of CAT relief. As such, she only specifically appealed the IJ's asylum ruling. However, Lapaix argues that her actions were sufficient to provide the BIA notice of her claim and therefore preserve the issue for appeal.

On the first page of her brief to the BIA, Lapaix stated that she was "submitting the following brief in support of her appeal of the decision of the [IJ] denying her application for Asylum and Withholding of Removal and Convention Against Torture." Additionally, Lapaix argues that she implicitly appealed her CAT claim when she challenged the IJ's determination regarding Haiti's current political condition. Lapaix asserts that because the IJ used Haiti's current political condition to determine CAT status, challenge of those facts on appeal should put the government on notice that Lapaix was appealing her CAT claim. Lapaix contends the overlap in facts, coupled with the reference to CAT on the first page of her brief are sufficient to preserve her CAT claim.

**[21]**  While Lapaix specifically mentioned her CAT claim in the first page of her brief, she failed to present any further arguments, assertions, law or statements regarding

Lapaix v. U.S. Atty. Gen., 605 F.3d 1138 (2010)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 66 of 1271

22 Fla. L. Weekly Fed. C 802

CAT relief. The entire brief focused solely on Lapaix's claim for asylum and status as an asylee. Notably, the burden of proof for an alien seeking CAT protection is higher than the burden for showing eligibility for asylum. *See* 🚩 *Al Najjar,* 257 F.3d at 1303. Therefore, an appeal of an IJ's asylum determination does not necessarily appeal his decision regarding CAT relief.

[22] [23] In order to prevail on a claim for CAT relief, an alien must demonstrate it is more likely than not that she will be subjected to pain and suffering at the hands or acquiescence of the government. *See Reyes–Sanchez v. U.S. Att'y Gen.,* 369 F.3d 1239, 1242 (11th Cir.2004). Government acquiescence is the key distinguishing factor between a CAT and asylum claim. *See Rodriguez Morales v. U.S. Att'y Gen.,* 488 F.3d 884, 891 (11th Cir.2007).

In her brief to the BIA, Lapaix focuses solely on the potential "persecution perpetrated by non-governmental forces." There is no allegation of persecution at the hands of the government, nor any allegation of government acquiescence to outside forces. Lapaix's failure to mention the key distinguishing characteristic of a CAT **\*1146** claim undercuts her argument that she maintained the core issues of her claim for CAT relief or put the government on notice as to the content of her claim.

Therefore, we find that the BIA did not abuse its discretion in determining that Lapaix failed to appeal the IJ's ruling regarding CAT relief. Accordingly, Lapaix has presented no reversible error.

IV. CONCLUSION

For the foregoing reasons, Lapaix's petition is denied,

PETITION DENIED.

**All Citations**

605 F.3d 1138, 22 Fla. L. Weekly Fed. C 802

## Footnotes

\*  Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

1  (1)(a) A person commits aggravated battery who, in committing battery: ... 2. Uses a deadly weapon .... (2) Whoever commits aggravated battery shall be guilty of a felony of the second degree. Fla. Stat. § 784.045

2  Particularly serious crimes render aliens ineligible for asylum and withholding of removal. An alien may not receive asylum if she, "having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States." 📙 8 U.S.C. 1158 § (b)(2)(A)(ii). Like asylum, withholding of removal is not available to an alien if she, "having been convicted by a final judgment of a particular serious crime is a danger to the community of the United States." 📙 8 U.S.C. 1231 § (b)(3)(B)(ii). Conviction of a particularly serious crime necessarily renders one a danger to the community. *Zardui–Quintana v. Richard,* 768 F.2d 1213, 1222 (11th Cir.1985).

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

418 F.2d 732
United States Court of Appeals Ninth Circuit.

Gerard Joseph LAVOIE, Petitioner,

v.

IMMIGRATION AND NATURALIZATION
SERVICE, Respondent.

No. 23182.
|
Nov. 21, 1969, Rehearing Denied Jan. 9, 1970.

**Synopsis**

Deportation proceeding. The Court of Appeals, 360 F.2d 27, set aside deportation order, and the Supreme Court, on petition for writ of certiorari, vacated the Court of Appeals' order and remanded the cause, 387 U.S. 572, 87 S.Ct. 2069, 18 L.Ed.2d 965. On remand, the Court of Appeals, J. Warren Madden, J., held that evidence, including evidence that alien before and up to time of entry into United States frequently and regularly engaged in homosexual acts supported finding that alien was 'psychopathic personality' at time of entry within statute authorizing deportation.

Petition denied; order affirmed.

West Headnotes (3)

**[1]**  **Aliens, Immigration, and
Citizenship**  Civil Proceedings in General

Deportation proceedings are civil and not criminal in nature, and rules laid down in Massiah and Escobedo cases requiring presence of counsel during interrogation and other Sixth Amendment safeguards are not applicable to such proceedings. U.S.C.A.Const. Amend. 6.

20 Cases that cite this headnote

**[2]**  **Aliens, Immigration, and
Citizenship**  Admissibility

Alien's statement was admissible against him in deportation proceeding notwithstanding that it was obtained by Immigration and Naturalization Service at time when alien was not represented by counsel nor advised of his right to be so represented.

8 Cases that cite this headnote

**[3]**  **Aliens, Immigration, and
Citizenship**  Inadmissible at Time of Entry,
Reentry, or Adjustment of Status

Evidence, including evidence that alien before and up to time of entry into United States frequently and regularly engaged in homosexual acts supported finding that alien was "psychopathic personality" at time of entry within statute authorizing deportation. Immigration and Nationality Act, § 212(a) (4) as amended 8 U.S.C.A. § 1182(a) (4).

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*733**  Norman Leonard (argued), of Gladstein, Andersen, Leonard & Sibbett, San Francisco, Cal., for appellant.

David R. Urdan (argued), Asst. U.S. Atty., Cecil F. Poole, U.S. Atty., San Francisco, Cal., Stephen M. Suffin, Atty., I & NS, San Francisco, Cal., John N. Mitchell, Atty. Gen. of the U.S.A., Washington D.C., for appellee.

Before MADDEN,[*] Judge of the United States Court of Claims; MERRILL and CARTER, Circuit Judges.

**Opinion**

J. WARREN MADDEN, Judge:

The petitioner, pursuant to Section 106 of the Immigration and Nationality Act, 8 United States Code Section 1105a, seeks review by this court of an order of the Immigration and Naturalization Service, directing petitioner's deportation to Canada. The petitioner is a citizen of Canada who entered the United States for permanent residence on January 26, 1960. On June 2, 1961, he was arrested by a San Francisco policeman and charged with a violation of Section 215 of the San Francisco Municipal Police Code, by being a party to a lewd, obscene and indecent act. He pleaded guilty and was sentenced for the violation.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

The San Francisco incident came to the attention of the United States Immigration and Naturalization Service, hereinafter called the Service. On August 30, 1961, the petitioner made a sworn statement before an investigator employed by the Service, from which statement it appeared that he had engaged in numerous homosexual acts during the years 1945 to 1961.

In January, 1962, the Service issued to the petitioner an Order to Show Cause why he should not be deported. The order alleged that he was a sexual deviate at the time of his entry into the United States, and was subject to deportation under Section 241(a)(1) of the Immigration and Nationality Act, ( 8 U.S.C. Section 1251(a)(1)) in that 'at the time of entry you were within one or more of the classes of aliens excludable by the law existing at the time of such entry, to wit, aliens afflicted with psychopathic personality under Section 212(a)(4) of the Act.' ( 8 U.S.C. Section 1182(a)(4))

A hearing was held before a 'special inquiry officer' of the Service. That officer, in a written decision, held that a person who had engaged in numerous homosexual acts over a period of at least eleven years, as the petitioner had done, is a sexual deviate and is included within the class which Congress intended to cover by the words 'psychopathic personality' in Section 212(a)(4) of the Act. The petitioner appealed from the decision of the special inquiry officer to the Board of Immigration Appeals. The Board ordered the case remanded to the special inquiry officer for purposes not relevant to the instant proceeding. On the remand, the special inquiry officer, after a hearing, in effect made the same decision which he had made before. The petitioner again appealed to the Board. On May 28, 1965, the Board ordered that the appeal be dismissed.

On July 7, 1965, the petitioner filed in this court a petition for review of the deportation order. This court, in Lavoie v. United States Immigration and Naturalization Service, 360 F.2d 27, on *734 April 8, 1966, set aside the deportation order on the ground that the statute on which the order was based was void for vagueness. The Service petitioned the Supreme Court of the United States for a writ of certiorari. The petition was granted on June 5, 1967, 387 U.S. 572, 87 S.Ct. 2069, 18 L.Ed.2d 965, the Court citing Boutilier v. Immigration and Naturalization Service, 387 U.S. 118, 87 S.Ct. 1563, 18 L.Ed.2d 661, May 22, 1967, in which the Court had held that the statute here in question was not void for vagueness, and remanding the case to this court in order that it 'may pass upon the issues in this case not covered by its prior

opinion'. That action of the Supreme Court disposed of the 'void for vagueness problem.' But this court in its decision cited above, had expressly found it unnecessary, in view of its decision that the pertinent statute was void for vagueness, to pass upon other issues presented by the petitioner. An additional issue had been raised in the meantime, by the decision of the Supreme Court in the case of Woodby v. Immigration and Naturalization Service, 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362, December 12, 1966. The Court said, in Woodby, that 'no deportation order may be entered unless it is found by clear, unequivocal, and convincing evidence that the facts alleged as grounds for deportation are true', 385 U.S. 285-286, 87 S.Ct. 488.

Pursuant to the remand to this court from the Supreme Court, this court remanded the case to the Service for reconsideration, in the light of the intervening decision in Woodby, supra, and without limitation upon the authority of the service to consider other issues. The case being again before the Service, the petitioner presented two issues: (1) the claim that a statement obtained by the Service from the petitioner at a time when he was not represented by counsel nor advised of his right to be so represented was not, over timely objections, admissible against him, and (2) the claim that the Service's evidence did not come up to the Woodby standard.

[1] [2] As to the admissibility of the petitioner's statement to the Service's investigator, this court's decision in Ben Huie v. Immigration and Naturalization Service, 349 F.2d 1014 (1965) is controlling. See also MacLeod v. Immigration and Naturalization Service, 327 F.2d 453, (CA 9, 1964); Nason v. Immigration and Naturalization Service, 370 F.2d 865, (CA 2, 1967); and Pang v. Immigration and Naturalization Service, 368 F.2d 637, (CA 3, 1966). The decisions cited above are to the effect that deportation proceedings are civil and not criminal, in nature, and that the rules laid down in Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) requiring the presence of counsel during interrogation, and other Sixth Amendment safeguards, are not applicable to such proceedings. Furthermore, the petitioner's statement to the investigating officer was made when he was not in custody and was not induced by coercion, duress or other improper action of any agent of the Government. Our conclusion is that the petitioner's statement was admissible in evidence at the deportation hearing.

The statement above adverted to was that the petitioner, during a period of some eleven years before and up to the time of his entry into the United States frequently and regularly engaged in homosexual acts. As we have recited above, the special inquiry officer, based upon the petitioner's statement described above, and after hearing the conflicting testimony of two psychiatrists, made findings that the petitioner was, at the time of his entry into the United States, a homosexual and as such was a sexual deviate deportable as a member of the class of aliens afflicted with a psychopathic personality, within the meaning of the deportation statute. The special inquiry officer ordered the petitioner's deportation. The petitioner appealed to the Board of Immigration Appeals, which dismissed his appeal. He again **\*735** sought review by this court, of the deportation order.

[3]   We now consider the petitioner's contention that the evidence upon which the Service based its deportation order did not come up to the standard set by the Supreme Court in Woodby v. Immigration and Naturalization Service, 385 U.S. 276, 285-286, 87 S.Ct. 483, 488, 17 L.Ed.2d 362 (1966), supra, in which the court said 'no deportation order may be entered unless it is found by clear, unequivocal, and convincing evidence that the facts alleged as grounds for deportation are true.'

Since our remand to the Service called for reconsideration in the light of Woodby there can be no question that the Service, on remand, had the proper standard in mind. That standard, applicable to the Service, does not apply to this court on our review of the Service's order. On review, our standard, fixed by 8 U.S.C. Section 1105a(a)(4), is that the agency determination must be supported by reasonable, substantial and probative evidence on the record considered as a whole.

The Service based its deportation order upon the fact that the petitioner, at the time of entry, was a 'homosexual'. If the issue of fact in the case were whether, by scientific psychological standards, the petitioner was properly classified as a 'homosexual,' it would be difficult to say that the evidence met the statutory standard applicable to our review. The petitioner's psychiatrist, Dr. Diamond, having made an extensive examination of the petitioner, testified 'I do not even regard him as a homosexual in any sense of the word,' and gave his reasons for his conclusion. The Service's psychiatrist, Dr. Beittel, in his written report to the Service, had expressed doubt as to whether the petitioner was a

homosexual and, in his oral testimony, he said he would not positively state that the petitioner was a homosexual.

The case of Boutilier v. Immigration and Naturalization Service, supra, 387 U.S. 118, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967), went to the Supreme Court from the United States Court of Appeals for the Second Circuit. The court, in Boutilier v. I.N.S., 363 F.2d 488 (2 Cir. 1966) had reviewed and affirmed the Service's order that Boutilier be deported. In that case the special inquiry office ordered deportation, finding that Boutilier had been a homosexual at the time of entry. He said that the phrase 'psychopathic personality' as used in Section 212(a)(4) of the Immigration and Nationality Act [1] is not a 'medical formulation' but is a legal term of art evincing a Congressional purpose to exclude from this country any alien who is shown to be a homosexual. The Court of Appeals in Boutilier, supra, at pages 492-493, said:

[W]e believe the term 'psychopathic personality', as employed in section 212(a) (4) reflects a Congressional purpose to prevent alien homosexuals from obtaining admission into this country. It was employed as a term of art to be interpreted by what Congress intended as a guide, and not to be left to the vagaries and honest but conflicting theories of psychiatry for determination. The legislative history * * * leaves no room for doubt that Congress intended to exclude homosexuals and would have expressly so provided if the Public Health Service had not advised that the term 'psychopathic personality' alone was sufficient to accomplish this result.

On page 494, the Court said:

Thus, on the basis of this brief survey of the legislative history of section 212(a)(4) it seems fairly clear that Congress utilized the phrase 'psychopathic personality' not as a medical or psychiatric formulation but as a legal term of art designed to preclude **\*736** the admission of homosexual aliens into the United States.

We do not repeat, in this opinion, the legislative history which the Court of Appeals relied upon in Boutilier. That history was recounted in the Boutilier case in the Supreme Court of the United States, supra, 387 U.S. 118, 87 S.Ct. 1563, 18 L.Ed.2d 661. The Court there said:

The legislative history of the Act indicates beyond a shadow of a doubt that the Congress intended the phrase 'psychopathic personality' to include homosexuals such as petitioner.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

and at page 122, 87 S.Ct. at page 1566 the Court said:

We, therefore, conclude that the Congress used the phrase 'psychopathic personality' not in the clinical sense, but to effectuate its purpose to exclude from entry all homosexuals and other sex perverts.

The Boutilier case is controlling in the case before us. In both, the person ordered to be deported had frequently, over a period of years before entry engaged in homosexual acts. Each was a person who, in common opinion, would be regarded as a homosexual. The fact that one or more psychiatrists might regard such a person as having 'character disorder, psychopathic or otherwise' as the petitioner's psychiatrist testified, or that another psychiatrist might regard such a person as not necessarily a homosexual, but as a sexual deviate, as the Service's psychiatrist testified, are both irrelevant, in view of the meaning which the Supreme Court in Boutilier gave to the pertinent statute.

Applying the proper standard to the evidence which was relevant, under the Boutilier interpretation of the statute, the evidence in support of the order was reasonable, substantial and probative. It was, and is, uncontradicted.

The petition for review of the Service's order of deportation is denied, and the order is affirmed.

**All Citations**

418 F.2d 732

## Footnotes

*       Senior Judge, The United States Court of Claims, sitting by designation.

1       8 United States Code Section 1182(a)(4).

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

125 S.Ct. 377, 160 L.Ed.2d 271, 73 USLW 4001, 04 Cal. Daily Op. Serv. 10,025...

KeyCite Yellow Flag - Negative Treatment
Disapproval Recognized by U.S. v. Ledcke, 7th Cir.(Ill.), July 23, 2007

125 S.Ct. 377
Supreme Court of the United States

Josue LEOCAL, Petitioner,

v.

John D. ASHCROFT, Attorney General, et al.

No. 03–583.
|
Argued Oct. 12, 2004.
|
Decided Nov. 9, 2004.

**Synopsis**

**Background:** Alien sought review of the Board of Immigration Appeals' (BIA) order that he be deported because his conviction for driving under the influence of alcohol (DUI) and causing serious bodily injury in an accident, in violation of Florida law, was an aggravated felony. The United States Court of Appeals for the Eleventh Circuit dismissed his petition for review.

**[Holding:]** On grant of petition for writ of certiorari, the United States Supreme Court, Chief Justice Rehnquist, held that abrogating Le v. United States Attorney General, 196 F.3d 1352, alien's conviction for driving under the influence of alcohol (DUI) and causing serious bodily injury in an accident, in violation of Florida law, was not a "crime of violence," and therefore, was not an "aggravated felony" warranting deportation.

Reversed and remanded.

West Headnotes (2)

**[1]**    **Aliens, Immigration, and Citizenship**    Crimes of violence

Alien's conviction for driving under the influence of alcohol (DUI) and causing serious bodily injury in an accident, in violation of Florida law, was not a "crime of violence," and thus was not an "aggravated felony" warranting deportation under the Immigration and Nationalization Act (INA); although Florida's DUI statute required proof of causation, it did not require any proof of mental state and it did not involve the use of physical force against the person or property of another; Le v. United States Attorney General, 196 F.3d 1352. Immigration and Nationality Act, §§ 101(h), 212(a)(2)(E), 8 U.S.C.A. §§ 1101(h), 1182(a)(2)(E); 18 U.S.C.A. § 16(a, b); West's F.S.A. § 316.193(3)(c) 2.

865 Cases that cite this headnote

**[2]**    **Statutes**    Natural, obvious, or accepted meaning

When interpreting a statute, courts must give words their ordinary or natural meaning.

225 Cases that cite this headnote

**377   *1** *Syllabus* *

Petitioner, a lawful permanent resident of the United States, pleaded guilty to two counts of driving under the influence of alcohol (DUI) and causing serious bodily injury in an accident, in violation of Florida law. While he was serving his prison sentence, the Immigration and Naturalization Service initiated removal proceedings pursuant to § 237(a) of the Immigration and Nationality Act (INA), which permits deportation of an alien convicted of "an aggravated felony." INA § 101(a)(43)(F) defines "aggravated felony" to include, *inter alia,* "a crime of violence [as defined in 18 U.S.C. § 16] for which the term of imprisonment [is] at least one year." Title 18 U.S.C. § 16(a), in turn, defines "crime of violence" as "an offense that has as an element the use ... of physical force against the person or property of another," and § 16(b) defines it as "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." An **378** Immigration Judge and the Board of Immigration Appeals ordered petitioner's deportation, and the Eleventh Circuit

125 S.Ct. 377, 160 L.Ed.2d 271, 73 USLW 4001, 04 Cal. Daily Op. Serv. 10,025...

dismissed his petition for review, relying on its precedent that a conviction under Florida's DUI statute is a crime of violence under 🚩 18 U.S.C. § 16.

*Held:* State DUI offenses such as Florida's, which either do not have a *mens rea* component or require only a showing of negligence in the **\*2** operation of a vehicle, are not crimes of violence under 🚩 18 U.S.C. § 16. Pp. 380–384.

(a) 🚩 Section 16 requires this Court to look to the elements and nature of the offense of conviction in determining whether petitioner's conviction falls within its ambit. Florida's DUI statute, like similar statutes in many States, requires proof of causation but not of any mental state; and some other States appear to require only proof that a person acted negligently in operating the vehicle. This Court's analysis begins with 🚩 § 16's language. See 🚩 *Bailey v. United States,* 516 U.S. 137, 144, 116 S.Ct. 501, 133 L.Ed.2d 472. Particularly when interpreting a statute featuring as elastic a word as "use," the Court construes language in its context and in light of the terms surrounding it. See 🟨 *Smith v. United States,* 508 U.S. 223, 229, 113 S.Ct. 2050, 124 L.Ed.2d 138. 🚩 Section 16(a)'s critical aspect is that a crime of violence involves the "use ... of physical force against" another's person or property. That requires active employment. See 🚩 *Bailey, supra,* at 145, 116 S.Ct. 501. While one may, in theory, actively employ *something* in an accidental manner, it is much less natural to say that a person actively employs physical force against another by accident. When interpreting a statute, words must be given their "ordinary or natural" meaning, 🟨 *Smith, supra,* at 228, 113 S.Ct. 2050, and 🚩 § 16(a)'s key phrase most naturally suggests a higher degree of intent than negligent or merely accidental conduct. Petitioner's DUI offense therefore is not a crime of violence under 🚩 § 16(a). Pp. 380–382.

(b) Nor is it a crime of violence under 🚩 § 16(b), which sweeps more broadly than 🚩 § 16(a), but does not thereby encompass all negligent conduct, such as negligent operation of a vehicle. It simply covers offenses that naturally involve a person acting in disregard of the risk that physical force might be used against another in committing an offense. The classic example is burglary, which, by nature, involves a substantial risk that the burglar will use force against a victim in completing the crime. Thus, 🚩 § 16(b) contains the same formulation found to be determinative in 🚩 § 16(a): the use of physical force against another's person or property. Accordingly, 🚩 § 16(b)'s language must be given an identical construction, requiring a higher *mens rea* than the merely accidental or negligent conduct involved in a DUI offense. Pp. 382–383.

(c) The ordinary meaning of the term "crime of violence," which is what this Court is ultimately determining, combined with 🚩 § 16's emphasis on the use of physical force against another (or the risk of having to use such force in committing a crime), suggests a category of violent, active crimes that cannot be said naturally to include DUI offenses. This construction is reinforced by INA § 101(h), which includes as alternative definitions of "serious criminal offense" a "crime of violence, as defined in [ 🚩 § 16]," § 101(h)(2), and a DUI-causing-injury offense, § 101(h)(3). Interpreting 🚩 § 16 to include DUI offenses would leave **\*3** § 101(h)(3) practically void of significance, in contravention of the rule that effect should be given to every word of a statute whenever possible, see 🟨 *Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251. Pp. 383–384.

**\*\*379** (d) This case does not present the question whether an offense requiring proof of the *reckless* use of force against another's person or property qualifies as a crime of violence under 🚩 § 16. P. 384.

Reversed and remanded.

REHNQUIST, C. J., delivered the opinion for a unanimous Court.

## Attorneys and Law Firms

J. Sedwick Sollers III, Patricia L. Maher, Michael J. Ciatti, Jessica S. Champa, Augusta M. Ridley, Philip D. MacWilliams, King & Spalding LLP, Washington, D.C., for petitioner.

Paul D. Clement, Acting Solicitor General, Peter D. Keisler, Assistant Attorney General, Michael R. Dreeben, Edwin S. Kneedler, Deputy Solicitors General, Dan Himmelfarb, Assistant to the Solicitor General, Donald E. Keener, Greg D. Mack, Attorneys Department of Justice, Washington, D.C. for respondents.

125 S.Ct. 377, 160 L.Ed.2d 271, 73 USLW 4001, 04 Cal. Daily Op. Serv. 10,025...

**Opinion**

Chief Justice REHNQUIST delivered the opinion of the Court.

Petitioner Josue Leocal, a Haitian citizen who is a lawful permanent resident of the United States, was convicted in 2000 of driving under the influence of alcohol (DUI) and causing serious bodily injury, in violation of Florida law. See Fla. Stat. § 316.193(3)(c)(2) (2003). Classifying this conviction as a "crime of violence" under 18 U.S.C. § 16, and therefore an "aggravated felony" under the Immigration and Nationality Act (INA), an Immigration Judge and the Board of Immigration Appeals (BIA) ordered that petitioner be deported pursuant to § 237(a) of the INA. The Court of Appeals **\*4** for the Eleventh Circuit agreed, dismissing petitioner's petition for review. We disagree and hold that petitioner's DUI conviction is not a crime of violence under 18 U.S.C. § 16.

Petitioner immigrated to the United States in 1980 and became a lawful permanent resident in 1987. In January 2000, he was charged with two counts of DUI causing serious bodily injury under Fla. Stat. § 316.193(3)(c)(2), after he caused an accident resulting in injury to two people. He pleaded guilty to both counts and was sentenced to 2 ½ years in prison.

In November 2000, while he was serving his sentence, the Immigration and Naturalization Service (INS) initiated removal proceedings against him pursuant to § 237(a) of the INA. Under that provision, "[a]ny alien who is convicted of an aggravated felony ... is deportable" and may be removed upon an order of the Attorney General. 66 Stat. 201, 8 U.S.C. § 1227(a)(2)(A)(iii). Section 101(a)(43) of the INA defines "aggravated felony" to include, *inter alia,* "a crime of violence (as defined in section 16 of title 18, but not including a purely political offense) for which the term of imprisonment [is] at least one year." [1] 8 U.S.C. § 1101(a)(43)(F) (footnote omitted). Title 18 U.S.C. § 16, in turn, defines the term "crime of violence" to mean:

**\*\*380  \*5** "(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

"(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

Here, the INS claimed that petitioner's DUI conviction was a "crime of violence" under § 16, and therefore an "aggravated felony" under the INA. In October 2001, an Immigration Judge found petitioner removable, relying upon the Eleventh Circuit's decision in *Le v. United States Attorney General,* 196 F.3d 1352 (1999) *(per curiam),* which held that a conviction under the Florida DUI statute qualified as a crime of violence. The BIA affirmed. [2] Petitioner completed his sentence and was removed to Haiti in November 2002. In June 2003, the Court of Appeals for the Eleventh Circuit dismissed petitioner's petition for review, relying on its previous ruling in *Le, supra.* [3] App. to **\*6** Pet. for Cert. 5a–7a. We granted certiorari, 540 U.S. 1176, 124 S.Ct. 1405, 158 L.Ed.2d 76 (2004), to resolve a conflict among the Courts of Appeals on the question whether state DUI offenses similar to the one in Florida, which either do not have a *mens rea* component or require only a showing of negligence in the operation of a vehicle, qualify as a crime of violence. Compare *Le, supra, at 1354;* and *Omar v. INS,* 298 F.3d 710, 715–718 (C.A.8 2002), with *United States v. Trinidad–Aquino,* 259 F.3d 1140, 1145–1146 (C.A.9 2001); *Dalton v. Ashcroft,* 257 F.3d 200, 205–206 (C.A.2 2001); *Bazan–Reyes v. INS,* 256 F.3d 600, 609–611 (C.A.7 2001); and *United States v. Chapa–Garza,* 243 F.3d 921, 926–927 (C.A.5), amended, 262 F.3d 479 (C.A.5 2001) *(per curiam);* see also *Ursu v. INS,* 20 Fed.Appx. 702 (C.A.9 2001) (following *Trinidad–Aquino, supra,* and ruling that a violation of the Florida DUI statute at issue here and in *Le* does not count as a "crime of violence"). We now reverse the Eleventh Circuit.

\* \* \*

Title 18 U.S.C. § 16 was enacted as part of the Comprehensive Crime Control **\*\*381** of 1984, which broadly reformed the federal criminal code in such areas as

125 S.Ct. 377, 160 L.Ed.2d 271, 73 USLW 4001, 04 Cal. Daily Op. Serv. 10,025...

sentencing, bail, and drug enforcement, and which added a variety of new violent and nonviolent offenses. § 1001(a), 98 Stat. 2136. Congress employed the term "crime of violence" in numerous places in the Act, such as for defining the elements of particular offenses, see, *e.g.,* 18 U.S.C. § 1959 (prohibiting threats to commit crimes of violence in aid of racketeering activity), or for directing when a hearing is required before a charged individual can be released on bail, see § 3142(f) (requiring a pretrial detention hearing for those alleged to have committed a crime of violence).

Congress therefore provided in § 16 a general definition of the term "crime of violence" to be used throughout the Act. See § 1001(a), **\*7** 98 Stat. 2136. Section 16 has since been incorporated into a variety of statutory provisions, both criminal and noncriminal. [4]

Here, pursuant to § 237(a) of the INA, the Court of Appeals applied § 16 to find that petitioner's DUI conviction rendered him deportable. In determining whether petitioner's conviction falls within the ambit of § 16, the statute directs our focus to the "offense" of conviction. See § 16(a) (defining a crime of violence as "*an offense* that has *as an element* the use ... of physical force against the person or property of another" (emphasis added)); § 16(b) (defining the term as "*any other offense* that is a felony and that, *by its nature,* involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense" (emphasis added)). This language requires us to look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime.

Florida Stat. § 316.193(3)(c)(2) makes it a third-degree felony for a person to operate a vehicle while under the influence and, "by reason of such operation, caus[e] ... [s]erious bodily injury to another." The Florida statute, while it requires proof of causation of injury, does not require proof of any particular mental state. See *State v. Hubbard,* 751 So.2d 552, 562–564 (Fla.1999) (holding, in the context of a DUI manslaughter conviction under § 316.193, that the statute **\*8** does not contain a *mens rea* requirement). Many States have enacted similar statutes, criminalizing DUI causing serious bodily injury or death without requiring proof of any mental state, [5] or, in some States, appearing to **\*\*382** require only proof that the person acted negligently

in operating the vehicle. [6] The question here is whether § 16 can be interpreted to include such offenses.

**[1]** Our analysis begins with the language of the statute. See *Bailey v. United States,* 516 U.S. 137, 144, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). The plain text of § 16(a) states that an offense, to qualify as a crime of violence, must have "as an element the use, attempted use, or threatened use of physical force against the person or property of another." We do not deal here with an *attempted* **\*9** or *threatened* use of force. Petitioner contends that his conviction did not require the "use" of force against another person because the most common employment of the word "use" connotes the *intentional* availment of force, which is not required under the Florida DUI statute. The Government counters that the "use" of force does not incorporate any *mens rea* component, and that petitioner's DUI conviction necessarily includes the use of force. To support its position, the Government dissects the meaning of the word "use," employing dictionaries, legislation, and our own case law in contending that a use of force may be negligent or even inadvertent.

**[2]** Whether or not the word "use" alone supplies a *mens rea* element, the parties' primary focus on that word is too narrow. Particularly when interpreting a statute that features as elastic a word as "use," we construe language in its context and in light of the terms surrounding it. See *Smith v. United States,* 508 U.S. 223, 229, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993); *Bailey, supra,* at 143, 116 S.Ct. 501. The critical aspect of § 16(a) is that a crime of violence is one involving the "use ... of physical force *against the person or property of another.*" (Emphasis added.) As we said in a similar context in *Bailey,* "use" requires active employment. 516 U.S., at 145, 116 S.Ct. 501. While one may, in theory, actively employ *something* in an accidental manner, it is much less natural to say that a person actively employs physical force against another person by accident. Thus, a person would "use ... physical force against" another when pushing him; however, we would not ordinarily say a person "use[s] ... physical force against" another by stumbling and falling into him. When interpreting a statute, we must give words their "ordinary or natural" meaning. *Smith, supra,* at 228, 113 S.Ct. 2050. The key phrase in § 16(a)—the "use ... of physical force against the person or property of another"—most naturally suggests a higher degree of intent than negligent or merely

125 S.Ct. 377, 160 L.Ed.2d 271, 73 USLW 4001, 04 Cal. Daily Op. Serv. 10,025...

accidental conduct. See *United States v. Trinidad–Aquino,* 259 F.3d, at 1145; *Bazan Reyes v. INS,* 256 F.3d, at 609.

**\*10** Petitioner's DUI offense therefore is not a crime of violence under § 16(a).

Neither is petitioner's DUI conviction a crime of violence under § 16(b). Section 16(b) sweeps more broadly than § 16(a), **\*\*383** defining a crime of violence as including "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." But § 16(b) does not thereby encompass all negligent misconduct, such as the negligent operation of a vehicle. It simply covers offenses that naturally involve a person acting in disregard of the risk that physical force might be used against another in committing an offense. The reckless disregard in § 16 relates *not* to the general conduct or to the possibility that harm will result from a person's conduct, but to the risk that the use of physical force against another might be required in committing a crime.[7] The classic example is burglary. A burglary would be covered under § 16(b) *not* because the offense can be committed in a generally reckless way or because someone may be injured, but because burglary, by its nature, involves a substantial risk that the burglar will use force against a victim in completing the crime.

**\*11** Thus, while § 16(b) is broader than § 16(a) in the sense that physical force need not actually be applied, it contains the same formulation we found to be determinative in § 16(a): the use of physical force against the person or property of another. Accordingly, we must give the language in § 16(b) an identical construction, requiring a higher *mens rea* than the merely accidental or negligent conduct involved in a DUI offense. This is particularly true in light of § 16(b)'s requirement that the "substantial risk" be a risk of using physical force against another person "in the course of committing the offense." In no "ordinary or natural" sense can it be said that a person risks having to "use" physical force against another person in the course of operating a vehicle while intoxicated and causing injury.

In construing both parts of § 16, we cannot forget that we ultimately are determining the meaning of the term "crime

of violence." The ordinary meaning of this term, combined with § 16's emphasis on the use of physical force against another person (or the risk of having to use such force in committing a crime), suggests a category of violent, active crimes that cannot be said naturally to include DUI offenses. Cf. *United States v. Doe,* 960 F.2d 221, 225 (C.A.1 1992) (Breyer, C.J.) (observing that the term "violent felony" in 18 U.S.C. § 924(e) (2000 ed. and Supp. II) "calls to mind a tradition of crimes that involve the possibility of more closely related, active violence"). Interpreting § 16 to encompass accidental or negligent conduct would blur the distinction between the "violent" crimes Congress sought to distinguish for heightened punishment and other crimes. See *United States v. Lucio–Lucio,* 347 F.3d 1202, 1205–1206 (C.A.10 2003).

Section 16 therefore cannot be read to include petitioner's conviction for DUI **\*\*384** causing serious bodily injury under Florida law.[8] This construction is reinforced by Congress' use **\*12** of the term "crime of violence" in § 101(h) of the INA, which was enacted in 1990. See Foreign Relations Authorization Act, Fiscal Years 1990 and 1991, § 131, 104 Stat. 31 (hereinafter FRAA). Section 212(a)(2)(E) of the INA renders inadmissible any alien who has previously exercised diplomatic immunity from criminal jurisdiction in the United States after committing a "serious criminal offense." 8 U.S.C. § 1182(a)(2)(E). Section 101(h) defines the term "serious criminal offense" to mean:

"(1) any felony;

"(2) any crime of violence, as defined in section 16 of title 18; *or*

"(3) any crime of reckless driving or of driving while intoxicated or under the influence of alcohol or of prohibited substances if such crime involves personal injury to another." 8 U.S.C. § 1101(h) (emphasis added).

Congress' separate listing of the DUI-causing-injury offense from the definition of "crime of violence" in § 16 is revealing. Interpreting § 16 to include DUI offenses, as the Government urges, would leave § 101(h) (3) practically devoid of significance. As we must give

125 S.Ct. 377, 160 L.Ed.2d 271, 73 USLW 4001, 04 Cal. Daily Op. Serv. 10,025...

effect to every word of a statute wherever possible, see *Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001), the distinct provision for these offenses under § 101(h) bolsters our conclusion that § 16 does not itself encompass DUI offenses. [9]

 **\*13** This case does not present us with the question whether a state or federal offense that requires proof of the *reckless* use of force against a person or property of another qualifies as a crime of violence under 18 U.S.C. § 16. DUI statutes such as Florida's do not require any mental state with respect to the use of force against another person, thus reaching individuals who were negligent or less. Drunk driving is a nationwide problem, as evidenced by the efforts of legislatures to prohibit such conduct and impose appropriate penalties. But this fact does not warrant our shoehorning it into statutory sections where it does not fit. The judgment of the United States Court of Appeals for the Eleventh Circuit is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

## All Citations

543 U.S. 1, 125 S.Ct. 377, 160 L.Ed.2d 271, 73 USLW 4001, 04 Cal. Daily Op. Serv. 10,025, 2004 Daily Journal D.A.R. 13,674, 18 Fla. L. Weekly Fed. S 9

## Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1    Congress first made commission of an aggravated felony grounds for an alien's removal in 1988, and it defined the term to include offenses such as murder, drug trafficking crimes, and firearm trafficking offenses. See Anti–Drug Abuse Act of 1988, §§ 7342, 7344, 102 Stat. 4469, 4470. Since then, Congress has frequently amended the definition of aggravated felony, broadening the scope of offenses which render an alien deportable. See, *e.g.,* Antiterrorism and Effective Death Penalty Act of 1996, § 440(e), 110 Stat. 1277 (adding a number of offenses to § 101(a)(43) of the INA); Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), § 321, 110 Stat. 3009–627 (same). The inclusion of any "crime of violence" as an aggravated felony came in 1990. See Immigration Act of 1990, § 501, 104 Stat. 5048.

2    When petitioner first appealed, the BIA's position was that a violation of DUI statutes similar to Florida's counted as a crime of violence under 18 U.S.C. § 16. See, *e.g., Matter of Puente–Salazar,* 22 I. & N. Dec. 1006, 1012–1013, 1999 WL 770709 (BIA 1999) (en banc). Before petitioner received a decision from his appeal (due to a clerical error not relevant here), the BIA in another case reversed its position from *Puente–Salazar* and held that DUI offenses that do not have a *mens rea* of at least recklessness are not crimes of violence within the meaning of § 16. See *Matter of Ramos,* 23 I. & N. Dec. 336, 346, 2002 WL 1001049 (BIA 2002) (en banc). However, because the BIA held in *Ramos* that it would "follow the law of the circuit in those circuits that have addressed the question whether driving under the influence is a crime of violence," *id.,* at 346–347, and because it found the Eleventh Circuit's ruling in *Le* controlling, it affirmed the Immigration Judge's removal order. See App. to Pet. for Cert. 1a–4a.

3    Pursuant to the IIRIRA, the Eleventh Circuit was without jurisdiction to review the BIA's removal order in this case if petitioner was "removable by reason of having committed" certain criminal offenses, including those covered as an "aggravated felony." See 8 U.S.C. § 1252(a)(2)(C). Because the Eleventh Circuit held that petitioner's conviction was such an offense, it concluded that it had no jurisdiction to consider the removal order.

AR.05301

125 S.Ct. 377, 160 L.Ed.2d 271, 73 USLW 4001, 04 Cal. Daily Op. Serv. 10,025...

4    For instance, a number of statutes criminalize conduct that has as an element the commission of a crime of violence under § 16. See, *e.g.,* 18 U.S.C. § 842(p) (prohibiting the distribution of information relating to explosives, destructive devices, and weapons of mass destruction in relation to a crime of violence). Other statutory provisions make classification of an offense as a crime of violence consequential for purposes of, *inter alia,* extradition and restitution. See §§ 3181(b), 3663A(c). And the term "crime of violence" under § 16 has been incorporated into a number of noncriminal enactments. See, *e.g.,* 8 U.S.C. § 1227(a)(2)(A)(iii) (rendering an alien deportable for committing a crime of violence, as petitioner is charged here).

5    See, *e.g.,* Ala.Code § 13A–6–20(a)(5) (West 1994); Colo.Rev.Stat. § 18–3–205(1)(b)(I) (Lexis 2003); Conn. Gen.Stat. § 53a–60d(a) (2003); Ga.Code Ann. § 40–6–394 (Lexis 2004); Idaho Code § 18–8006(1) (Lexis 2004); Ill. Comp. Stat. Ann., ch. 625, § 5/11–501(d)(1)(C) (West 2002); Ind.Code § 9–30–5–4 (1993); Iowa Code § 707.6A(4) (2003); Ky.Rev.Stat. Ann. §§ 189A.010(1) and (11)(c) (Lexis Supp.2004); Me.Rev.Stat. Ann., Tit. 29–A, § 2411(1–A)(D)(1) (West Supp.2003); Mich. Comp. Laws Ann. § 257.625(5) (West Supp.2004); Neb.Rev.Stat. § 60–6,198(1) (2002 Cum.Supp.); N.H.Rev.Stat. Ann. §§ 265:82–a(I)(b) and (II)(b) (West 2004); N.J. Stat. Ann. § 2C:12–1(c) (West Supp.2003); N.M. Stat. Ann. §§ 66–8–101(B) and (C) (2004); N.D. Cent.Code § 39–09–01.1 (Lexis 1997); Ohio Rev.Code Ann. § 2903.08(A)(1)(a) (Lexis 2003); Okla. Stat. Ann., Tit. 47, § 11–904(B)(1) (West 2001); 75 Pa. Cons.Stat. § 3804(b) (Supp.2003); R.I. Gen. Laws § 31–27–2.6(a) (Lexis 2002); Tex. Penal Code Ann. § 49.07(a)(1) (West 2003); Vt. Stat. Ann., Tit. 23, § 1210(f) (Lexis Supp.2004); Wash. Rev.Code § 46.61.522(1)(b) (1994); Wis. Stat. § 940.25(1) (1999–2000); Wyo. Stat. § 31–5–233(h) (Lexis 2003).

6    See, *e.g.,* Cal. Veh.Code Ann. § 23153 (West 2000); Del.Code Ann., Tit. 11, §§ 628(2), 629 (Lexis 1995); La. Stat. Ann. §§ 14:39.1(A), 14:39.2(A) (West 1997 and Supp.2004); Md.Crim. Law Code Ann. §§ 3–211(c) and (d) (Lexis 2004); Miss.Code Ann. § 63–11–30(5) (Lexis 2004); Mo. Ann. Stat. § 565.060.1(4) (West 2000); Mont.Code Ann. § 45–5–205(1) (2003); Nev.Rev.Stat. § 484.3795(1) (2003); S.C.Code Ann. § 56–5–2945(A)(1) (2003); S.D. Codified Laws § 22–16–42 (West Supp.2003); Utah Code Ann. §§ 41–6–44(3)(a)(ii)(A) and (3)(b) (Lexis Supp.2004); W. Va.Code § 17C–5–2(c) ( Lexis 2004).

7    Thus, § 16(b) plainly does not encompass all offenses which create a "substantial risk" that injury will result from a person's conduct. The "substantial risk" in § 16(b) relates to the use of force, not to the possible effect of a person's conduct. Compare § 16(b) (requiring a "substantial risk that physical force against the person or property of another may be used") with United States Sentencing Commission, Guidelines Manual § 4B1.2(a)(2) (Nov.2003) (in the context of a career-offender sentencing enhancement, defining "crime of violence" as meaning, *inter alia,* "conduct that presents a serious potential risk of physical injury to another"). The risk that an accident may occur when an individual drives while intoxicated is simply not the same thing as the risk that the individual may "use" physical force against another in committing the DUI offense. See, *e.g.,* *United States v. Lucio–Lucio,* 347 F.3d 1202, 1205–1207 (C.A.10 2003); *Bazan–Reyes v. INS,* 256 F.3d 600, 609–610 (C.A.7 2001).

8    Even if § 16 lacked clarity on this point, we would be constrained to interpret any ambiguity in the statute in petitioner's favor. Although here we deal with § 16 in the deportation context, § 16 is a criminal statute, and it has both criminal and noncriminal applications. Because we must interpret the statute consistently,

125 S.Ct. 377, 160 L.Ed.2d 271, 73 USLW 4001, 04 Cal. Daily Op. Serv. 10,025...

whether we encounter its application in a criminal or noncriminal context, the rule of lenity applies. Cf. *United States v. Thompson/Center Arms Co.,* 504 U.S. 505, 517–518, 112 S.Ct. 2102, 119 L.Ed.2d 308 (1992) (plurality opinion) (applying the rule of lenity to a tax statute, in a civil setting, because the statute had criminal applications and thus had to be interpreted consistently with its criminal applications).

9    This point carries significant weight in the particular context of this case. Congress incorporated § 16 as an aggravated felony under § 101(a)(43)(F) of the INA in 1990. See Immigration Act of 1990, § 501, 104 Stat. 5048 (Nov. 29, 1990). Congress enacted § 101(h), with its incorporation of § 16 *and* a separate provision covering DUI-causing-injury offenses, just nine months earlier. See FRAA, § 131, 104 Stat. 31 (Feb. 16, 1990). That Congress distinguished between a crime of violence and DUI-causing-injury offenses (and included both) in § 101(h), but did not do so shortly thereafter in making only a crime of violence an aggravated felony under § 101(a)(43)(F), strongly supports our construction of § 16.

---

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

121 S.Ct. 714, 148 L.Ed.2d 635, 69 USLW 4067, 01 Cal. Daily Op. Serv. 265...

KeyCite Yellow Flag - Negative Treatment
Superseded by Regulation as Stated in *Peck v. Thomas*, D.Or., March 30, 2011

121 S.Ct. 714
Supreme Court of the United States

Christopher A. LOPEZ, Petitioner,
v.
Randy J. DAVIS, Warden, et al.

No. 99–7504.
|
Argued Oct. 30, 2000.
|
Decided Jan. 10, 2001.

**Synopsis**

Federal prisoner convicted of possession with intent to distribute methamphetamine petitioned for writ of habeas corpus, challenging Bureau of Prisons (BOP) regulation categorically denying early release to prisoners, based on completion of drug treatment program, if a prisoner's current offense was a felony attended by the carrying, possession, or use of a firearm. The United States District Court for the District of South Dakota, Lawrence L. Piersol, J., granted petition, but the United States Court of Appeals for the Eighth Circuit, 186 F.3d 1092, reversed. On grant of petition for certiorari, the Supreme Court, Justice Ginsburg, held that BOP had discretion, under governing statute, to promulgate regulation categorically denying early release to prisoners whose felonies involved use a firearm, abrogating *Ward v. Booker, Kilpatrick v. Houston.*

Judgment of the Court of Appeals affirmed.

Justice Stevens filed a dissenting opinion, in which Chief Justice Rehnquist and Justice Kennedy joined.

West Headnotes (7)

**[1]**    **Prisons**    Participation in treatment programs

Statute providing that the period a prisoner convicted of a nonviolent offense remains in custody after successfully completing a drug treatment program may be reduced by the Bureau

of Prisons (BOP) categorically denies early release eligibility to inmates convicted of violent offenses.    18 U.S.C.A. § 3621(e)(2)(B).

639 Cases that cite this headnote

**[2]**    **Prisons**    Participation in treatment programs

Under statute providing that Bureau of Prisons (BOP) "may" reduce sentence of nonviolent offender who has successfully completed drug treatment program, BOP had discretion to promulgate regulation categorically denying early release to prisoners whose current offense was a felony attended by the carrying, possession, or use of a firearm; statute did not limit considerations that BOP could use to guide its decisions, BOP was not required to make only individualized determinations or to consider only postconviction conduct, and BOP reasonably concluded that inmate's prior involvement with firearms, in connection a felony, suggested a readiness to resort to life-endangering violence that was relevant to the early release decision; abrogating *Ward v. Booker,* 202 F.3d 1249, *Kilpatrick v. Houston,* 197 F.3d 1134.    18 U.S.C.A. § 3621(e)(2)(B); 28 C.F.R. § 550.58(a)(1)(vi)(B).

946 Cases that cite this headnote

**[3]**    **Prisons**    Drug and alcohol treatment
**Prisons**    Participation in treatment programs

When an eligible prisoner successfully completes a drug treatment program, the Bureau of Prisons (BOP) has the authority, but not the duty, both to alter the prisoner's conditions of confinement and to reduce his term of imprisonment.    18 U.S.C.A. § 3621(e)(2)(A, B).

209 Cases that cite this headnote

**Lopez v. Davis, 531 U.S. 230 (2001)** Case 3:20-cv-07721-SI   Document 58-5   Filed 11/10/20   Page 80 of 1271

121 S.Ct. 714, 148 L.Ed.2d 635, 69 USLW 4067, 01 Cal. Daily Op. Serv. 265...

**[4]** **Administrative Law and Procedure** ⚷ Permissible or reasonable construction

Where Congress has enacted a law that does not answer the precise question at issue, all the court must decide is whether the agency empowered to administer the statute has filled the statutory gap in a way that is reasonable in light of the legislature's revealed design.

58 Cases that cite this headnote

**[5]** **Administrative Law and Procedure** ⚷ Rulemaking, adjudication, or other mechanism

Even if a statutory scheme requires individualized determinations, the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority.

78 Cases that cite this headnote

**[6]** **Federal Courts** ⚷ Presentation of Questions Below or on Review; Record; Waiver

Supreme Court would decline to address claim urged by amici that Bureau of Prisons (BOP) violated notice and comment requirements of Administrative Procedure Act (APA) when it published regulation categorically denying early release, based on completion of drug treatment program, to prisoners whose current offense involved a firearm, as such claim was not raised or decided below, or presented in the petition for certiorari. 5 U.S.C.A. § 551 et seq.

246 Cases that cite this headnote

**[7]** **Prisons** ⚷ Participation in treatment programs

Rule of lenity did not require Supreme Court to accept prisoner's claim that Bureau of Prisons (BOP) lacked authority to promulgate categorical exclusion from early release program of certain offenders whose current felonies involved a firearm, as governing statute could

not be read to prohibit BOP from exercising its discretion categorically or on the basis of preconviction conduct. 18 U.S.C.A. § 3621(e)(2)(B); 28 C.F.R. § 550.58(a)(1)(vi)(B).

599 Cases that cite this headnote

**\*\*716** *Syllabus* [*]

Under 18 U.S.C. § 3621(e)(2)(B), "[t]he period a [federal] prisoner convicted of a nonviolent offense remains in custody after successfully completing a [substance abuse] treatment program may be reduced by the Bureau of Prisons" (BOP). The BOP therefore ranked ineligible for early release all inmates incarcerated for "crime[s] of violence." Initially, the BOP defined the term "crimes of violence" to include, among other offenses, a drug trafficking conviction under 21 U.S.C. § 841, if the offender received a two-level sentence enhancement under United States Sentencing Commission, Guidelines Manual (USSG) § 2D1.1(b)(1), for possessing a dangerous weapon in connection with the drug offense. The Courts of Appeals thereafter divided over the validity of classifying drug offenses involving firearms possession as crimes of violence. The Circuit division prompted the BOP to issue the regulation now before the Court. That regulation denies early release to several categories of prisoners, including inmates whose current offense is a felony attended by "the carrying, possession, or use of a firearm." 28 CFR § 550.58(a)(1)(vi)(B). The BOP rests this denial not on a definition of "crimes of violence," but on the BOP's asserted discretion to prescribe additional early release criteria.

Petitioner Lopez was convicted of possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841. Finding that Lopez possessed a firearm in connection with his offense, the District Court enhanced his sentence by two levels pursuant to USSG § 2D1.1(b)(1). While incarcerated, Lopez requested substance abuse treatment. The BOP found him qualified for its treatment program, but categorically ineligible, under 28 CFR § 550.58(a)(1)(vi), for early release. Ordering the BOP to reconsider Lopez's eligibility for early release, the District Court held that the BOP may not categorically count out, based upon sentencing

121 S.Ct. 714, 148 L.Ed.2d 635, 69 USLW 4067, 01 Cal. Daily Op. Serv. 265...

factors or weapon possession, inmates whose underlying conviction was for a nonviolent crime. The Eighth Circuit reversed. It reasoned that § 3621(e)(2)(B)'s "*may ... reduc[e]*" formulation allows the BOP discretion to devise a regime based on criteria that can be uniformly applied. To the extent Congress left a gap in § 3621(e)(2)(B) for the BOP to fill, the Court of Appeals stated, deference is owed to BOP's interpretation under *Chevron U.S.A. Inc. v. Natural Resources* **\*231** *Defense Council, Inc.,* 467 U.S. 837, 843–845, 866, 104 S.Ct. 2778, 81 L.Ed.2d 694, so long as the interpretation is a permissible construction of the statute. The BOP's decision to deny early release to drug traffickers who carry firearms, the court concluded, represents a manifestly permissible statutory construction and an appropriate exercise of discretion.

*Held:* The regulation at issue is a permissible exercise of the BOP's discretion under § 3621(e)(2)(B). Pp. 721–724.

(a) Section 3621(e)(2)(B) gives the BOP discretion to grant or deny a sentence reduction, but leaves open the manner in which the discretion is to be exercised. If an inmate meets the two statutory prerequisites for sentence reduction—conviction of a nonviolent offense and successful completion of drug treatment—then § 3621(e)(2)(B) instructs that the BOP "may," not that it must, grant early release. The statute's use of the permissive "may" contrasts with Congress' **\*\*717** use of a mandatory "shall" elsewhere in § 3621 to impose discretionless obligations, *e.g.,* the obligation to provide drug treatment when funds are available, see § 3621(e)(1). Sensibly read, § 3621(e)(2)(B)'s sentence reduction discretion parallels the grant of discretion in § 3621(e)(2)(A) to retain a prisoner who successfully completes drug treatment "under such [custodial] conditions as the [BOP] deems appropriate." The constraints Lopez urges—requiring the BOP to make individualized determinations based only on postconviction conduct—are nowhere to be found in § 3621(e)(2)(B). Beyond instructing that the BOP has discretion to reduce the period of imprisonment for a nonviolent offender who successfully completes drug treatment, Congress has not identified any further circumstance in which the BOP either must grant the reduction, or is forbidden to do so. In this familiar situation, where Congress has enacted a law that does not answer the precise question at issue, all this Court

must decide is whether the BOP, the agency empowered to administer the early release program, has filled the statutory gap in a way that is reasonable in light of the Legislature's revealed design. *E.g., NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 257, 115 S.Ct. 810, 130 L.Ed.2d 740. Pp. 721–723.

(b) The BOP may categorically exclude prisoners from early release eligibility based on their preconviction conduct. The Court rejects Lopez's argument that the BOP may take into account only postconviction conduct. The BOP need not blind itself to preconviction conduct that the agency reasonably views as jeopardizing life and limb. By denying eligibility to violent offenders, the statute manifests congressional concern for preconviction behavior—and for the very conduct leading to conviction. The BOP may reasonably attend to these factors as well. The statute's restriction of early release eligibility to nonviolent offenders **\*232** does not cut short the considerations that may guide the BOP in implementing § 3621(e)(2)(B). See *INS v. Yueh–Shaio Yang,* 519 U.S. 26, 31, 117 S.Ct. 350, 136 L.Ed.2d 288. The Court also rejects Lopez's argument that the BOP must not make categorical exclusions, but may rely only on case-by-case assessments. Even if a statutory scheme requires individualized determinations, which this scheme does not, the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority. *E.g., Heckler v. Campbell,* 461 U.S. 458, 467, 103 S.Ct. 1952, 76 L.Ed.2d 66. The approach pressed by Lopez—case-by-case decisionmaking in thousands of cases each year—could invite favoritism, disunity, and inconsistency. Pp. 723–724.

(c) The regulation excluding Lopez is permissible. The BOP reasonably concluded that an inmate's prior involvement with firearms, in connection with the commission of a felony, suggests his readiness to resort to life-endangering violence and therefore appropriately determines the early release decision. P. 724.

186 F.3d 1092, affirmed.

GINSBURG, J., delivered the opinion of the Court, in which O'CONNOR, SCALIA, SOUTER, THOMAS, and BREYER, JJ., joined. STEVENS, J., filed a dissenting opinion, in which REHNQUIST, C.J., and KENNEDY, J., joined, *post,* p. 724.

121 S.Ct. 714, 148 L.Ed.2d 635, 69 USLW 4067, 01 Cal. Daily Op. Serv. 265...

**Attorneys and Law Firms**

Mark Meierhenry, Sioux Falls, SD, for petitioner.

Beth S. Brinkmann, Washington, DC, for respondents.

**Opinion**

 **\*\*718** Justice GINSBURG delivered the opinion of the Court.

Congress has provided, in 18 U.S.C. § 3621(e)(2) (B), that the Bureau of Prisons (Bureau or BOP) may reduce by up to one year the prison term of an inmate convicted of a nonviolent felony, if the prisoner successfully completes a substance abuse program. The Bureau's implementing regulation categorically **\*233** denies early release to prisoners whose current offense is a felony attended by "the carrying, possession, or use of a firearm." 28 CFR § 550.58(a)(1)(vi)(B) (2000). The validity of the Bureau's regulation is the question presented in this case. We hold, in accord with the Court of Appeals for the Eighth Circuit, that the regulation is a permissible exercise of the Bureau's discretion under 18 U.S.C. § 3621(e)(2)(B).

## I

### A

Title 18 U.S.C. § 3621 governs the imprisonment of persons convicted of federal crimes. In 1990, Congress amended the statute to provide that "[t]he Bureau shall ... make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse." Pub.L. 101–647, § 2903, 104 Stat. 4913. Four years later, Congress again amended § 3621, this time to provide incentives for prisoner participation in BOP drug treatment programs. The incentive provision at issue reads: "The period a prisoner convicted of a nonviolent offense remains in custody after successfully completing a treatment program may be reduced by the Bureau of Prisons, but such reduction may not be more than one year from the term the prisoner must otherwise serve." Pub.L. 103–322, § 32001, 108 Stat. 1897 (codified at 18 U.S.C. § 3621(e)(2) (B)).

In 1995, the Bureau published a rule to implement the early release incentive. 60 Fed.Reg. 27692–27695; 28 CFR § 550.58. Because the statute explicitly confined the incentive to prisoners convicted of "nonviolent offense [s]," 18 U.S.C. § 3621(e)(2)(B), the BOP ranked ineligible for early release all inmates currently incarcerated for "crime[s] of violence," 60 Fed.Reg. 27692. As explained in the Bureau's program statement, the BOP defined "crimes of violence" to include a drug trafficking conviction under 21 U.S.C. § 841, **\*234** if the offender received a two-level sentence enhancement under United States Sentencing Commission, Guidelines Manual (USSG) § 2D1.1(b)(1) (Nov. 2000), for possessing a dangerous weapon during commission of the drug offense. Bureau of Prisons Program Statement No. 5162.02, § 9 (July 24, 1995), reprinted in App. to Brief for Petitioner 17–18.[1] "[E]xercising [its] discretion" in reducing a sentence," the Bureau also excluded from early release eligibility inmates who had a prior conviction "for homicide, forcible rape, robbery, or aggravated assault." 60 Fed.Reg. 27692 (codified at 28 CFR § 550.58 (1995)).

The Courts of Appeals divided over the validity of the Bureau's definition of crimes of violence to include drug offenses that involved possession of a firearm. A majority of Circuits, including the Eighth, held that § 3621(e) (2)(B) required the Bureau to look only to the offense of conviction (drug trafficking), and not to sentencing factors (firearm possession), in determining whether an offender was convicted of a "nonviolent offense," and was therefore eligible under the statute for the early release incentive. **\*\*719** Martin v. Gerlinski, 133 F.3d 1076, 1079 (C.A.8 1998); see also Fristoe v. Thompson, 144 F.3d 627, 631 (C.A.10 1998); Byrd v. Hasty, 142 F.3d 1395, 1398 (C.A.11 1998); Roussos v. Menifee, 122 F.3d 159, 164 (C.A.3 1997); Downey v. Crabtree, 100 F.3d 662, 668 (C.A.9 1996). The Fourth and Fifth Circuits, however, upheld the Bureau's classification of drug offenses attended by firearm possession as violent crimes. **\*235** Pelissero v. Thompson, 170 F.3d 442, 447 (C.A.4 1999); Venegas v. Henman, 126 F.3d 760, 763 (C.A.5 1997).

This split among the Circuits prompted the Bureau in 1997 to publish the regulation now before the Court. See 62 Fed.Reg. 53690–53691. Like the 1995 rule, the current

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 83 of 1271

Lopez v. Davis, 531 U.S. 230 (2001)
121 S.Ct. 714, 148 L.Ed.2d 635, 69 USLW 4067, 01 Cal. Daily Op. Serv. 265...

regulation excludes from early release eligibility offenders who possessed a firearm in connection with their offenses. In contrast to the earlier rule, however, the 1997 regulation does not order this exclusion by defining the statutory term "prisoner convicted of a nonviolent offense" or the cognate term "crimes of violence." Instead, the current regulation relies upon "the discretion allotted to the Director of the Bureau of Prisons in granting a sentence reduction to exclude [enumerated categories of] inmates." *Id., at 53690.* The regulation, designed to achieve consistent administration of the incentive, now provides:

> "(a) *Additional early release criteria.* (1) As an exercise of the discretion vested in the Director of the Federal Bureau of Prisons, the following categories of inmates are not eligible for early release:
>
> . . . . .
>
> "(iv) Inmates who have a prior felony or misdemeanor conviction for homicide, forcible rape, robbery, or aggravated assault, or child sexual abuse offenses;
>
> . . . . .
>
> "(vi) Inmates whose current offense is a felony:
>
> . . . . .
>
> "(B) That involved the carrying, possession, or use of a firearm or other dangerous weapon ...." 28 CFR § 550.58(a) (2000).

In sum, the 1995 rule defined the statutory term "prisoner convicted of a nonviolent offense" to exclude categorically an inmate who possessed a firearm in connection with his offense. The current regulation categorically excludes such an inmate, not because § 3621(e)(2)(B) so mandates, but pursuant *236 to the Bureau's asserted discretion to prescribe additional early release criteria. Drug traffickers who possess firearms when they engage in crimes are no longer characterized as "violent" offenders within the

meaning of the statute. But they are bracketed, for sentence reduction purposes, with persons currently incarcerated for "nonviolent offense[s]" who in the past committed crimes qualifying as violent. The preconviction conduct of both armed offenders and certain recidivists, in the Bureau's view, "suggest [s] that they pose a particular risk to the public." Brief for Respondents 30.

B

In 1997, petitioner Christopher A. Lopez was convicted of possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841. Upon finding that Lopez possessed a firearm in connection with his offense, the District Court enhanced his sentence by two levels pursuant to USSG § 2D1.1(b)(1). Lopez is currently scheduled to be released from prison in June 2002.

While incarcerated, Lopez requested substance abuse treatment. The Bureau found him qualified for its residential drug abuse program,[2] but categorically ineligible, **720 under 28 CFR § 550.58(a)(1)(vi), for early release. App. 3–7.

When notified that he would not be a candidate for early release, Lopez challenged the BOP's determination by filing a petition for a writ of habeas corpus, under 28 U.S.C. § 2241, in the United States District Court for the District of South Dakota. The District Court granted the petition. In that court's view, the Bureau's 1997 regulation did not correct the infirmity the Eighth Circuit saw in the 1995 rule. See App. 17–18, and n. 4 (citing Martin, 133 F.3d, at 1079). "[I]t is true," the District Court recognized, "that the BOP *237 may exercise a great deal of discretion in determining who among the eligible nonviolent offenders may be released." App. 17. But, the District Court held, the BOP may not categorically count out, "based upon sentencing factors or weapon possession," inmates whose underlying conviction was for a nonviolent crime. *Id.,* at 18. Accordingly, the District Court ordered the BOP "to reconsider Lopez's eligibility for early release." *Id.,* at 19.

The Eighth Circuit reversed. *Bellis v. Davis,* 186 F.3d 1092 (1999). Section 3621(e)(2)(B), the Court of Appeals observed, "states only that the prison term of an inmate convicted of a nonviolent offense '*may* be reduced by the

Bureau of Prisons.' " *Id.,* at 1094 (quoting 18 U.S.C. § 3621(e)(2)(B)). This discretionary formulation, the Eighth Circuit reasoned, allows the Bureau to devise a regime based on criteria that can be uniformly applied. The statute grants no entitlement to any inmate or class of inmates, the Court of Appeals noted, and it does not instruct the Bureau to make "individual, rather than categorical, assessments of eligibility for inmates convicted of nonviolent offenses." 186 F.3d, at 1094. The court further reasoned that, to the extent Congress left a gap in § 3621(e)(2)(B) for the Bureau to fill, deference is owed the BOP's interpretation under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–845, 866, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), so long as the interpretation is a permissible construction of the statute. 186 F.3d, at 1095. The Bureau had elected to deny early release to certain categories of prisoners, notably recidivists and firearms carriers, whose "conduct indicates that they pose a serious risk to public safety." *Ibid.* That decision, the Court of Appeals concluded, "represents a manifestly permissible construction of the statute and an appropriate exercise of the BOP's discretion." *Ibid.*

The Eighth Circuit next explained why its earlier decision in *Martin* did not control this case, which trains on the BOP's 1997 regulation: *Martin* addressed only the Bureau's 1995 **\*238** attempt to interpret the statutory term "nonviolent offense"; the court in that case did not address "whether the BOP may, as an exercise of its discretion, ... look to sentencing factors in deciding which individuals among statutorily eligible inmates are appropriate candidates for early release." 186 F.3d, at 1095. Facing that issue, the Court of Appeals held such an exercise of discretion proper. *Ibid.*

The Courts of Appeals have again divided, now over the permissibility of the Bureau's current (1997) regulation. The Tenth and Eleventh Circuits, in line with their prior decisions invalidating the 1995 rule, have concluded that § 3621(e)(2)(B) permits no categorical exclusions of nonviolent offenders based on sentence enhancements. *Ward v. Booker,* 202 F.3d 1249, 1256–1257 (C.A.10 2000); *Kilpatrick v. Houston,* 197 F.3d 1134, 1135 (C.A.11 1999). The Ninth Circuit, on the other hand, has agreed with the Eighth Circuit that precedent invalidating the 1995 rule does

not control and that, in 1997, the BOP permissibly exercised its discretion under § 3621(e)(2)(B) when it categorically excluded from early release consideration inmates who possessed a firearm in connection with their nonviolent offenses. *Bowen v. Hood,* 202 F.3d 1211, 1218–1220 (2000).

**\*\*721** We granted certiorari to resolve this conflict, 529 U.S. 1086, 120 S.Ct. 1717, 146 L.Ed.2d 640 (2000), and now affirm the judgment of the Eighth Circuit.

II

[1] [2] The statute provides: "The period a prisoner convicted of a nonviolent offense remains in custody after successfully completing a treatment program may be reduced by the Bureau of Prisons ...." 18 U.S.C. § 3621(e)(2)(B). The measure thus categorically denies early release eligibility to inmates convicted of violent offenses. The question we address is whether the Bureau has discretion to delineate, as an additional category of ineligible inmates, those whose current offense is a felony involving a firearm. 28 CFR § 550.58(a)(1)(vi)(B) (2000).

**\*239** Lopez urges that the statute is unambiguous. He says that, by identifying a class of inmates ineligible for sentence reductions under § 3621(e)(2)(B), *i.e.,* those convicted of a violent offense, Congress has barred the Bureau from identifying further categories of ineligible inmates. "If Congress wanted the BOP to reduce the categories of inmates eligible for the early release incentive (beyond the one identified by Congress), Congress would have specifically placed this grant of authority in the language of the statute." Brief for Petitioner 23. As to the statutory instruction that the Bureau "may" reduce sentences, Lopez initially suggests it is merely a grant of authority to the BOP to reduce a sentence that, prior to the enactment of § 3621(e)(2)(B), could not be reduced for successful completion of drug treatment: "The power granted was to give reductions not the power to decide who was eligible to receive reductions." *Id.,* at 21. He alternately contends that the Bureau may take into account only "post-conviction conduct," not "pre-conviction conduct." Reply Brief 4–5. Acting on a case-by-case basis, Lopez asserts, the Bureau may "deny early release to those inmates [who] are statutorily eligible, but who do not deserve early release based on their conduct while in prison." *Id.,* at

121 S.Ct. 714, 148 L.Ed.2d 635, 69 USLW 4067, 01 Cal. Daily Op. Serv. 265...

5. Under this reading, the Bureau may exercise discretion in denying early release, but only on an individual basis, taking account solely of postconviction conduct.

In the Bureau's view, § 3621(e)(2)(B) establishes two prerequisites for sentence reduction: conviction of a nonviolent offense and successful completion of drug treatment. Brief for Respondents 18. If those prerequisites are met, the Bureau "may," but also may *not,* grant early release. The BOP opposes Lopez's argument that Congress barred the Bureau from imposing limitations categorically or on the basis of preconviction conduct. According to the Bureau, Congress simply "did not address how the Bureau should exercise its discretion within the class of inmates who satisfy the statutory prerequisites for early release." *Id.,* at 23. Because **\*240** Congress left the question unaddressed, the Bureau maintains, the agency may exclude inmates either categorically or on a case-by-case basis, subject of course to its obligation to interpret the statute reasonably, see *Chevron,* 467 U.S., at 844, 104 S.Ct. 2778, in a manner that is not arbitrary or capricious, see 5 U.S.C. § 706(2)(A). In this instance, the Bureau urges, it has acted reasonably: Its denial of early release to all inmates who possessed a firearm in connection with their current offense rationally reflects the view that such inmates displayed a readiness to endanger another's life; accordingly, in the interest of public safety, they should not be released months in advance of completing their sentences.[3]

**\*\*722** We agree with the Bureau's position. Preliminarily, we note conspicuous anomalies in Lopez's construction. If § 3621(e)(2)(B) functions not as a grant of discretion to determine early release eligibility, but both as an authorization and a command to reduce sentences, then Congress' use of the word "may," rather than "shall," has no significance. And if the BOP does have discretion to deny early release to certain inmates, but only based on individualized assessments of postconviction conduct, then the agency cannot categorically deny early release even to recidivists with prior (perhaps multiple) convictions for "homicide, forcible rape ..., or child sexual abuse offenses." 28 CFR § 550.58(a)(1)(iv) (2000). For that provision, as much as the exclusion of inmates imprisoned for offenses involving a firearm, see *supra,* at 719, entails no individualized determination based on postconviction conduct. Furthermore, **\*241** Lopez's position would confine the BOP's discretion under § 3621(e)(2)(B) to consideration of factors of the kind the Bureau already

may consider in granting credit for "satisfactory behavior." See 18 U.S.C. § 3624(b)(1) ("a prisoner [serving a term of more than one year and less than life] may receive credit toward the service of the prisoner's sentence ... subject to determination by the Bureau of Prisons that, during that year, the prisoner has displayed exemplary compliance with such institutional disciplinary regulations").

[3] We turn now to the Bureau's reading of the statutory text, which instructs that the agency "may" reduce the sentence of a nonviolent offender who has successfully completed a drug treatment program. Congress' use of the permissive "may" in § 3621(e)(2)(B) contrasts with the legislators' use of a mandatory "shall" in the very same section. Elsewhere in § 3621, Congress used "shall" to impose discretionless obligations, including the obligation to provide drug treatment when funds are available. See 18 U.S.C. § 3621(e)(1) ("Bureau of Prisons shall, subject to the availability of appropriations, provide residential substance abuse treatment (and make arrangements for appropriate aftercare)"); see also, *e.g.,* § 3621(b) ("The Bureau shall designate the place of the prisoner's imprisonment.... In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status."). Sensibly read, the grant of discretion in § 3621(e)(2)(B) to decide whether to reduce a sentence parallels the grant of discretion in § 3621(e)(2)(A) to retain a prisoner who successfully completes drug treatment "under such [custodial] conditions as the Bureau deems appropriate." § 3621(e)(2)(A). When an eligible prisoner successfully completes drug treatment, the Bureau thus has the authority, but not the duty, both to alter the prisoner's conditions of confinement and to reduce his term of imprisonment.

[4] The constraints Lopez urges—requiring the BOP to make individualized determinations based only on postconviction **\*242** conduct—are nowhere to be found in § 3621(e)(2)(B). Beyond instructing that the Bureau has discretion to reduce the period of imprisonment for a nonviolent offender who successfully completes drug treatment, Congress has not identified any further circumstance in which the Bureau either must grant the reduction, or is forbidden to do so. In this familiar situation, where Congress has enacted a law that does not answer "the

121 Cal. Rptr. 714, 148 L.Ed.2d 635, 69 USLW 4067, 01 Cal. Daily Op. Serv. 265...

precise question at issue," all we must decide is whether the Bureau, the agency empowered to administer the early release program, has filled the statutory gap "in a way that is reasonable in light of the legislature's revealed design."

*NationsBank of* **723 *N.C., N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 257, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995) (citing *Chevron,* 467 U.S., at 842, 104 S.Ct. 2778); see also *Reno v. Koray,* 515 U.S. 50, 61, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (deferring to BOP's interpretation of statute). We think the agency's interpretation is reasonable both in taking account of preconviction conduct and in making categorical exclusions.

First, as the dissent but not Lopez recognizes, see *post,* at 726, the Bureau need not blind itself to preconviction conduct that the agency reasonably views as jeopardizing life and limb. By denying eligibility to violent offenders, the statute manifests congressional concern for preconviction behavior—and for the very conduct leading to conviction. The Bureau may reasonably attend to these factors as well. Its regulation in this regard is kin to the Attorney General's order upheld in *INS v. Yueh–Shaio Yang,* 519 U.S. 26, 117 S.Ct. 350, 136 L.Ed.2d 288 (1996). That case involved a statute authorizing the Attorney General to waive deportation of aliens deportable for entry fraud. The Attorney General had refused to waive deportation for one alien because of "acts of fraud ... in connection with his entry." *Id.,* at 27, 117 S.Ct. 350. The alien argued that because the statute made aliens who had committed entry fraud eligible for waiver, the Attorney General was precluded from taking such conduct into account "at all" in deciding whether to grant relief. *Id.,* at 30, 117 S.Ct. 350. We rejected this view, stating **243 that the statute "establishes only the alien's *eligibility* for the waiver. Such eligibility in no way limits the considerations that may guide the Attorney General in exercising her discretion to determine who, among those eligible, will be accorded grace." *Id.,* at 31, 117 S.Ct. 350. Similarly in this case, the statute's restriction of early release eligibility to nonviolent offenders does not cut short the considerations that may guide the Bureau. Just as the Attorney General permissibly considered aspects of entry fraud, even though entry fraud was a criterion of statutory eligibility, so the Bureau may consider aspects of the conduct of conviction, even though the conviction is a criterion of statutory eligibility. [4]

[5]  [6]  We also reject Lopez's argument, echoed in part by the dissent, *post,* at 726, that the agency must not make categorical exclusions, but may rely only on case-by-case assessments. [5] "[E]ven if a statutory scheme requires individualized **244 determinations," which this scheme does not, "the decisionmaker has the authority to rely on **724 rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority." *American Hospital Assn. v. NLRB,* 499 U.S. 606, 612, 111 S.Ct. 1539, 113 L.Ed.2d 675 (1991); accord, *Heckler v. Campbell,* 461 U.S. 458, 467, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). The approach pressed by Lopez—case-by-case decisionmaking in thousands of cases each year, see *supra,* at 723, n. 4—could invite favoritism, disunity, and inconsistency. The Bureau is not required continually to revisit "issues that may be established fairly and efficiently in a single rulemaking proceeding." *Heckler,* 461 U.S., at 467, 103 S.Ct. 1952. [6]

[7]  Having decided that the Bureau may categorically exclude prisoners based on their preconviction conduct, we further hold that the regulation excluding Lopez is permissible. The Bureau reasonably concluded that an inmate's prior involvement with firearms, in connection with the commission of a felony, suggests his readiness to resort to life-endangering violence and therefore appropriately determines the early release decision. [7]

*245 For the reasons stated, the judgment of the Court of Appeals for the Eighth Circuit is

*Affirmed.*

Justice STEVENS, with whom THE CHIEF JUSTICE and Justice KENNEDY join, dissenting.

The question at issue in this case is whether all, or merely some, of the federal prisoners who were convicted of nonviolent offenses and who have successfully completed a Bureau of Prisons (BOP or Bureau) drug treatment program are eligible for a sentence reduction pursuant to 18 U.S.C. § 3621(e)(2)(B). For the reasons outlined below, I believe that Congress has answered that precise question. The statute expressly states that the sentence of every prisoner in that category "may be reduced." *Ibid.* The disposition of this case is therefore governed by the first step in the familiar test

121 S.Ct. 714, 148 L.Ed.2d 635, 69 USLW 4067, 01 Cal. Daily Op. Serv. 265...

announced in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842–843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), for "Congress has directly spoken to the precise question at issue." Id., at 842, 104 S.Ct. 2778.

I

In drafting the statute in question, Congress was faced with a difficult policy choice: whether the commission of particular crimes made certain categories of offenders so dangerous that the costs of offering them early release in return for the successful completion of a drug treatment program outweighed the rewards. The initial drafts of the bill answered that question in the negative and made all federal prisoners eligible for a sentence reduction of up to one year if they successfully completed a drug treatment program. See, e.g., H.R.Rep. No. 103–320, p. 2 (1993). However, the inclusion of those convicted of violent offenses within the category of those eligible for the inducement soon became a fulcrum of criticism **725 for the larger crime bill within *246 which the statute was embedded.[1] Perhaps as a result of these criticisms,[2] the statute ultimately adopted limited the inducement to "prisoner[s] convicted of ... nonviolent offense[s]." 18 U.S.C. § 3621(e)(2)(B).

Both the text of the statute and the aforementioned history demonstrate that Congress directly addressed the "precise question" of what offenses ought to disqualify prisoners from eligibility for a sentence reduction, and that its unambiguous answer was "violent offenses." Under the statute as enacted, those who commit crimes of violence are categorically barred from receiving a sentence reduction while those convicted of nonviolent offenses "may" receive such an inducement.

*247 The BOP regulation challenged here operates to redefine the set of prisoners categorically ineligible for a sentence reduction, a set unambiguously defined in the text of the statute. It does so by taking a group of prisoners whose offenses the Bureau acknowledges are "nonviolent" within the meaning of the statute[3] and imposing the same sanction—categorical ineligibility—upon them as the statute imposes upon violent offenders. In so doing, the Bureau ignores Congress' express determination that, when evaluating eligibility for a sentence reduction, the salient distinction is the line between violent and nonviolent

offenses. By moving this line, the BOP exceeded its authority and sought to exercise its discretion on an issue with regard to which it has none. See, e.g., Chevron, 467 U.S., at 842–843, 104 S.Ct. 2778 ("First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress"); United States v. Haggar Apparel Co., 526 U.S. 380, 392, 119 S.Ct. 1392, 143 L.Ed.2d 480 (1999) ("In the process of considering a regulation in relation to specific factual situations, a court may conclude the regulation is inconsistent with the statutory **726 language or is an unreasonable implementation of it. In those instances, the regulation will not control").

*248 II

I fully agree with the majority that federal prisoners do not become entitled to a sentence reduction upon their successful completion of a drug treatment program; the words "may be reduced" do not mean "shall be reduced." Nonetheless, while the statute does not entitle any prisoner to a sentence reduction, it does guarantee nonviolent offenders who successfully complete a drug treatment program consideration for such a reduction.

For every nonviolent offender who participates in a drug treatment program, the BOP may be required to make two individualized determinations: (1) whether he or she has successfully completed that program; and (2), if so, whether his or her preconviction conduct, postconviction conduct, and prospects for rehabilitation justify a sentence reduction. In evaluating whether or not a particular individual is entitled to a sentence reduction, the BOP may give great weight to whichever of these factors it determines to be most relevant. That, however, is a far cry from categorically excluding from consideration prisoners who Congress explicitly intended to obtain such consideration.[4]

The majority's concern about the risks and burdens associated with case-by-case decisionmaking in a large number of cases is understandable yet ultimately misguided. In order to fulfill the statute's requirements, the BOP must already *249 evaluate every prisoner seeking the sentence reduction on an individual basis to determine whether that prisoner "successfully completed" his or her drug treatment program. Individualized consideration of the second salient question

121 S.Ct. 714, 148 L.Ed.2d 635, 69 USLW 4067, 01 Cal. Daily Op. Serv. 265...

involves consideration of many of the same personalized factors that go into determining whether a prisoner's course of drug treatment has been "successful." To the extent that answering the second question requires consideration of additional factors with a concomitant administrative burden, the costs of such a scheme are, in Congress' judgment, outweighed by the benefits of encouraging drug treatment and of carefully distinguishing between those prisoners who have earned an early return to their communities and those who require further incarceration.

The majority's worry that individualized decisionmaking might lead to "favoritism, disunity, and inconsistency" is similarly misplaced. *Ante,* at 724. To suggest that decisionmaking must be individualized is not to imply that it must also be standardless. If the Court today invalidated the regulation in question, its decision would not preclude the BOP from adopting a uniform set of criteria for consideration in evaluating applications for sentence reductions. Nor would it necessarily preclude the Bureau from giving dispositive

weight to certain postconviction criteria or near-dispositive weight to preconviction criteria. Cf. *Heckler v. Campbell, 461 U.S. 458, 467, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983).* The Bureau would remain free to structure its decisionmaking in any way it saw fit as long as in so doing it did not contravene policy decisions explicitly made by the statute's drafters. As Congress has already addressed preincarceration conduct **727 in *§ 3621(e)(2)(B),* the Bureau may not categorically exclude a prisoner not convicted of a violent offense from consideration for early release on the basis of such conduct without exceeding the limits of its discretion.

Accordingly, I respectfully dissent.

**All Citations**

531 U.S. 230, 121 S.Ct. 714, 148 L.Ed.2d 635, 69 USLW 4067, 01 Cal. Daily Op. Serv. 265, 2001 Daily Journal D.A.R. 337, 2001 CJ C.A.R. 330, 14 Fla. L. Weekly Fed. S 43

## Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.*

1    *Title 21 U.S.C. §§ 841(a)(1) and (2)* make it unlawful "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance," or "to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance." *Section 2D1.1(b)(1)* of the Sentencing Guidelines provides for a two-level sentence enhancement if a dangerous weapon was possessed in connection with the commission of a drug offense. See *USSG § 2D1.1(b)(1)* and comment., n. 3 (Nov.2000).

2    To qualify for residential substance abuse treatment, an inmate must be "determined by the Bureau of Prisons to have a substance abuse problem" and be "willing to participate in [the] program." *18 U.S.C. §§ 3621(e) (5)(B)(i), (ii).*

3    The dissent straddles the fence, agreeing with Lopez that the statute addresses his case unambiguously, but disagreeing with him on precisely what the statute says. Lopez reads the statute to exclude Bureau consideration of preconviction conduct, Reply Brief 4–5; the dissent reads the same words to permit BOP consideration of such conduct, *post,* at 726 (opinion of STEVENS, J.). These divergent readings hardly strengthen the dissent's assertion that Congress supplied a definitive answer to the "precise question" at issue. See *post,* at 724.

4    Lopez contends that the Bureau's creation of additional hurdles to receipt of a sentence reduction defeats Congress' purpose of giving inmates an incentive to undergo drug treatment. Brief for Petitioner 24–29. *In INS v. Yueh–Shaio Yang, 519 U.S. 26, 117 S.Ct. 350, 136 L.Ed.2d 288 (1996),* we said that "[i]t could be

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Lopez v. Davis, 531 U.S. 230 (2001)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 89 of 1271

121 S.Ct. 714, 148 L.Ed.2d 635, 69 USLW 4067, 01 Cal. Daily Op. Serv. 265...

argued that if the Attorney General determined that *any* entry fraud or misrepresentation, no matter how minor and no matter what the attendant circumstances, would cause her to withhold waiver, she would not be exercising the conferred discretion at all, but would be making a nullity of the statute." *Id.,* at 31, 117 S.Ct. 350. In this case, it is plain that the Bureau has not rendered § 3621(e)'s incentive a nullity. A total of 6,559 inmates have received sentence reductions under § 3621(e)(2)(B), including 2,633 inmates in Fiscal Year 1999 alone. Bureau of Prisons, Substance Abuse Treatment Programs in the Federal Bureau of Prisons, Report to Congress 8 (Jan.2000). Moreover, inmates who do not qualify for early release, like inmates who do, receive other incentives to participate in substance abuse treatment. See 28 CFR §§ 550.57(a)(1), (3) (2000) ("An inmate may receive incentives for his or her satisfactory involvement in the residential [drug treatment] program," including "[l]imited financial awards" and "[l]ocal institution incentives such as preferred living quarters or special recognition privileges.").

5    The dissent appears to acknowledge that the Bureau may give "near-dispositive weight to preconviction criteria." *Post,* at 726. To the extent the dissent would permit the BOP to accord heavy weight to preconviction conduct, the structured "[i]ndividualized [BOP] consideration" the dissent would allow, *post,* at 726, seems but a shade different from the forthright categorical exclusion the Bureau has adopted.

6    *Amici* urge reversal on the ground that the Bureau violated the notice and comment requirements of the Administrative Procedure Act when it published the 1997 regulation. Brief for National Association of Criminal Defense Lawyers et al. as *Amici Curiae* 18–24. We decline to address this matter, which was not raised or decided below, or presented in the petition for certiorari. *Blessing v. Freestone,* 520 U.S. 329, 340, n. 3, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997).

7    Lopez invokes the rule of lenity in urging us to accede to his interpretation. Because, as discussed above, the statute cannot be read to prohibit the Bureau from exercising its discretion categorically or on the basis of preconviction conduct, his reliance on the rule is unavailing. See *Caron v. United States,* 524 U.S. 308, 316, 118 S.Ct. 2007, 141 L.Ed.2d 303 (1998) ("The rule of lenity is not invoked by a grammatical possibility. It does not apply if the ambiguous reading relied on is an implausible reading of the congressional purpose.").

1    Throughout 1993 and 1994, Republican leaders gave numerous speeches contrasting their proposed crime bill and the administration's. One contrast repeatedly stressed was that the Republican bill set aside more money for prison construction while the Democratic bill allocated greater funds to drug treatment. This difference allegedly reflected differing views as to how society should deal with violent criminals. To this end, Republican leaders repeatedly criticized the inclusion of violent criminals in the sentence reduction provision. See, *e.g.,* 139 Cong. Rec. 27209 (1993) (remarks of Sen. Hatch) ("Their treatment allows all Federal prisoners, including the most violent, to have their sentences reduced, if you will, at the Bureau of Prisons' discretion if they complete a drug treatment program. Boy, I can see where everybody is going to do that. You can imagine the sincerity of that"); 139 Cong. Rec. 27460 (1994) (remarks of Sen. Hatch) ("The Democratic crime bill actually permits the Bureau of Prisons to decrease the sentence of Federal inmates —violent offenders included—who complete drug treatment programs. Their bill also proposes that States be given grant money which can be used to implement home confinement and other alternative sanctions for violent offenders").

2    The House initially approved a version of the bill that would have extended the inducement to all federal prisoners. The Senate, where the criticism of the inclusion of violent offenders was more pronounced, see n. 1, *supra,* limited the provision to nonviolent offenders. The Conference Committee accepted the Senate's limitation. H.R. Conf. Rep. No. 103–711, p. 381 (1994), U.S.Code Cong. & Admin.News 1994 pp. 1801, 1849.

3    The BOP regulation challenged here treats an otherwise nonviolent offense where a gun was carried as a "nonviolent offense" within the meaning of the statute, and the case was argued on that assumption. As the majority notes, *ante,* at 718–719, the BOP initially attempted to classify such crimes as violent offenses, but receded when the Courts of Appeals divided over the validity of such a construction. The question over which the Courts of Appeals initially divided is not before us today. If it were, the arguments raised by both sides

121 S.Ct. 714, 148 L.Ed.2d 635, 69 USLW 4067, 01 Cal. Daily Op. Serv. 265...

would be quite different, with the debate likely focusing on whether "nonviolent offense" is best understood as a term of art or in relation to a more colloquial understanding of violence.

4    This Court's decision in 📑 *INS v. Yueh–Shaio Yang,* 519 U.S. 26, 117 S.Ct. 350, 136 L.Ed.2d 288 (1996), relied upon by the majority, *ante,* at 723, is not to the contrary. *Yueh–Shaio Yang* did not involve an effort by an administrative agency to categorically exclude from consideration for a benefit a particular class of individuals because of a characteristic considered and rejected by Congress as a basis for categorical exclusion. Rather, that case involved the related yet distinct question whether such a characteristic may be given any weight by the agency in making an individualized case-by-case determination whether to grant the benefit to a particular individual. If the issue in this case were whether the BOP could even consider the nature of the offense in determining whether to grant a particular sentence reduction, *Yueh–Shaio Yang* would be relevant to our analysis.

---

**End of Document**                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

948 F.3d 1143
United States Court of Appeals, Ninth Circuit.

Ludwin Israel LOPEZ-AGUILAR, Petitioner,

v.

William P. BARR, Attorney General
of the United States, Respondent.

No. 17-73153
|
Argued and Submitted March
5, 2019 Portland, Oregon
|
Filed January 28, 2020

**Synopsis**
**Background:** Alien, a native and citizen of Guatemala, filed petition for review of a decision of the Board of Immigration Appeals (BIA), finding him removable based on his conviction of aggravated felony under Oregon law, and denying his application for relief under the Convention Against Torture (CAT). The United States Court of Appeals for the Ninth Circuit, John R. Tunheim, Chief District Judge, sitting by designation, 921 F.3d 898, denied the petition and, 935 F.3d 878, panel rehearing was granted.

**[Holding:]** The Court of Appeals, Berzon, Circuit Judge, held that third-degree robbery under Oregon law did not qualify as aggravated felony under the Immigration and Nationality Act.

Petition granted.

Graber, Circuit Judge, filed concurring opinion in which Tunheim, Chief District Judge, sitting by designation, joined.

**Procedural Posture(s):** Review of Administrative Decision.

West Headnotes (13)

**[1]** **Aliens, Immigration, and Citizenship** ⚷ Jurisdiction and venue

The Court of Appeals has jurisdiction to review final orders of removal based on an alien's commission of an aggravated felony, pursuant to the Immigration and Nationality Act, to the extent that the petition raises questions of law. Immigration and Nationality Act, § 101 et seq., 8 U.S.C.A. § 1101(a)(43)(G).

**[2]** **Aliens, Immigration, and Citizenship** ⚷ Law questions

Whether a particular offense is an aggravated felony rendering an alien removable under the Immigration and Nationality Act is a question of law reviewed de novo. Immigration and Nationality Act, § 101 et seq., 8 U.S.C.A. § 1101(a)(43)(G).

**[3]** **Aliens, Immigration, and Citizenship** ⚷ Aggravated felonies in general

Under the categorical approach for determining whether a particular offense is an aggravated felony rendering an alien removable under the Immigration and Nationality Act, courts compare the elements of the statute forming the basis of the defendant's conviction with the elements of the generic crime. Immigration and Nationality Act, § 101 et seq., 8 U.S.C.A. § 1101(a)(43)(G).

1 Cases that cite this headnote

**[4]** **Aliens, Immigration, and Citizenship** ⚷ Aggravated felonies in general

For purposes of determining whether a particular offense is an aggravated felony rendering an alien removable under the Immigration and Nationality Act, there is a categorical match between a particular conviction and a generic offense only if the elements of the statute of conviction are the same as, or narrower than, those of the generic offense. Immigration and Nationality Act, § 101 et seq., 8 U.S.C.A. § 1101(a)(43)(G).

**[5]** **Aliens, Immigration, and Citizenship** ⚷ Aggravated felonies in general

In determining whether a particular offense is an aggravated felony rendering an alien removable under the Immigration and Nationality Act, if the statute of conviction is broader than the generic offense, courts must determine whether the statute is divisible or indivisible; only when an overbroad statute is divisible does the court turn to the modified categorical approach. Immigration and Nationality Act, § 101 et seq.,

🚩 8 U.S.C.A. § 1101(a)(43)(G).

2 Cases that cite this headnote

**[6]    Aliens, Immigration, and Citizenship** 🔑 Aggravated felonies in general

An overbroad and indivisible statute does not constitute a generic crime, for purposes of determining whether a particular offense is an aggravated felony rendering an alien removable under the Immigration and Nationality Act. Immigration and Nationality Act, § 101 et seq.,

🚩 8 U.S.C.A. § 1101(a)(43)(G).

**[7]    Aliens, Immigration, and Citizenship** 🔑 Aggravated felonies in general

A state offense qualifies as a generic offense, and, therefore, an aggravated felony rendering an alien removable under the Immigration and Nationality Act, only if the full range of conduct covered by the state statute falls within the meaning of the generic offense. Immigration and Nationality Act, § 101 et seq., 🚩 8 U.S.C.A. § 1101(a)(43)(G).

1 Cases that cite this headnote

**[8]    Aliens, Immigration, and Citizenship** 🔑 Aggravated felonies in general

There is not a categorical match between a particular conviction and a generic offense, for purposes of determining whether a particular offense is an aggravated felony rendering an alien removable under the Immigration and Nationality Act, if a state statute expressly defines a crime more broadly than the generic

offense. Immigration and Nationality Act, § 101 et seq., 🚩 8 U.S.C.A. § 1101(a)(43)(G).

**[9]    Aliens, Immigration, and Citizenship** 🔑 Aggravated felonies in general

As long as the application of a statute's express text in the nongeneric manner is not a logical impossibility, the relative likelihood of application to nongeneric conduct is immaterial in determining whether a particular offense is an aggravated felony rendering an alien removable under the Immigration and Nationality Act. Immigration and Nationality Act, § 101 et seq.,

🚩 8 U.S.C.A. § 1101(a)(43)(G).

1 Cases that cite this headnote

**[10]    Aliens, Immigration, and Citizenship** 🔑 Aggravated felonies in general

An alien can show that a state statute exceeds the generic definition of an offense, and, thus, does not qualify as an aggravated felony rendering an alien removable under the Immigration and Nationality Act, if the alien can point to at least one case in which the state courts applied the statute in a situation that does not fit under the generic definition. Immigration and Nationality Act, § 101 et seq., 🚩 8 U.S.C.A. § 1101(a)(43)(G).

1 Cases that cite this headnote

**[11]    Aliens, Immigration, and Citizenship** 🔑 Fraud, forgery, and theft offenses

Oregon third-degree robbery statute included conduct outside generic definition of theft offense, and, thus, did not qualify as aggravated felony rendering alien removable under the Immigration and Nationality Act, where it incorporated consensual takings via theft by deception, while generic definition of theft required that the taking be without consent. Immigration and Nationality Act, § 101 et seq.,

20 Cal. Daily Op. Serv. 704, 2020 Daily Journal D.A.R. 660

🚩 8 U.S.C.A. § 1101(a)(43)(G); Or. Rev. Stat. § 164.395.

**[12]    Aliens, Immigration, and Citizenship** 🔑 Fraud, forgery, and theft offenses

A generic "theft," qualifying as an aggravated felony rendering an alien removable under the Immigration and Nationality Act, is defined as the taking of property or an exercise of control over property without consent with the criminal intent to deprive the owner of rights and benefits of ownership, even if such deprivation is less than total or permanent. Immigration and Nationality Act § 101, 🚩 8 U.S.C.A. § 1101(a)(43)(G).

**[13]    Aliens, Immigration, and Citizenship** 🔑 Presentation of questions in brief or petition

Government waived issue of whether Oregon's third-degree robbery statute was divisible, on alien's petition for review of decision of the Board of Immigration Appeals (BIA), finding that third-degree robbery under Oregon law was aggravated felony rendering alien removable under the Immigration and Nationality Act, where government did not argue to Court of Appeals that the statute was divisible. Immigration and Nationality Act, § 101 et seq., 🚩 8 U.S.C.A. § 1101(a)(43)(G); Or. Rev. Stat. § 164.395.

**Attorneys and Law Firms**

**\*1145** Jennifer K. Lesmez (argued), Law Offices of Jennifer Lesmez, Selah, Washington; Jerome Mayer-Cantú, Oakland, California; for Petitioner.

Imran R. Zaidi (argued) and Matthew A. Spurlock, Trial Attorneys; John S. Hogan and John W. Blakeley, Assistant Directors; Joseph H. Hunt, Assistant Attorney General; Office

of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

Kari Hong, Ninth Circuit Appellate Program, Boston College Law School, Newton, Massachusetts, for Amici Curiae American Immigration Lawyers Association, Florence Immigrant & Refugee Rights Project, and Innovation Law Lab.

On Petition for Review of an Order of the Board of Immigration Appeals, Agency No. AXXX-XX4-680

Before: Susan P. Graber and Marsha S. Berzon, Circuit Judges, and John R. Tunheim, [*] Chief District Judge.

Concurrence by Judge Graber

**OPINION**

BERZON, Circuit Judge:

Petitioner Ludwin Israel Lopez-Aguilar, a native and citizen of Guatemala, seeks **\*1146** review of a final order of the Board of Immigration Appeals ("BIA") finding him removable pursuant to § 237(a)(2)(A)(iii) of the Immigration and Nationality Act ("INA"), because of his conviction under Oregon Revised Statutes section 164.395, and denying his application for relief under the Convention Against Torture ("CAT"). We grant Lopez-Aguilar's petition because we conclude that section 164.395 is not a categorical theft offense and, therefore, not an aggravated felony under § 101(a)(43)(G) of the INA. Because we conclude that Lopez-Aguilar is not removable, we do not reach the question whether the record supports the BIA's denial of CAT relief.

**I**

Lopez-Aguilar is a native and citizen of Guatemala. He entered the United States in 1989, when he was three years old, and became a legal permanent resident in March 2001, when his application for suspension of deportation was granted.

In 2014, Lopez-Aguilar was convicted of third-degree robbery in violation of Oregon Revised Statutes section 164.395 and sentenced to 13 months in prison. The government initiated removal proceedings against Lopez-Aguilar based on the robbery conviction.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

An immigration judge ("IJ") found Lopez-Aguilar removable as an alien convicted of an aggravated felony as defined in section 101(a)(43)(G) of the INA, which defines theft offenses for which the term of imprisonment is at least one year. The BIA agreed that the conviction was for a theft offense under section 101(a)(43)(G). [1]

The BIA rejected Lopez-Aguilar's argument that section 164.395 is overbroad because it incorporates theft by deception and thus covers consensual takings. The BIA concluded that the statute requires taking property by force, which negates the consensual nature of theft by deception. The BIA also rejected Lopez-Aguilar's argument that section 164.395 is overbroad because it covers mere unauthorized use of a vehicle, affirmed the denial of Lopez-Aguilar's petition for relief under CAT, and affirmed the order that Lopez-Aguilar be removed to Guatemala.

## II

**[1]  [2]** We have jurisdiction to review final orders of removal based on a petitioner's commission of an aggravated felony to the extent that the petition "raises ... questions of law." *Ngaeth v. Mukasey,* 545 F.3d 796, 800 (9th Cir. 2008) (per curiam) (quoting *Vizcarra-Ayala v. Mukasey,* 514 F.3d 870, 872 (9th Cir. 2008)). Whether a particular offense is an "aggravated felony" under the INA is a question of law that we review de novo. *Id.*

Lopez-Aguilar argues that section 164.395 exceeds the generic definition of a theft offense because it incorporates consensual takings via theft by deception, and the force elements do not impose a requirement that the defendant engage in a nonconsensual taking. We agree.

**[3]  [4]  [5]  [6]** To determine whether a particular conviction is for a generic offense, we use the categorical and modified categorical approaches of *Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), and *Shepard v. United States,* 544 U.S. 13, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005). Under the categorical approach, we "compare the elements of the statute forming the basis of the defendant's **\*1147** conviction"—here, Or. Rev. Stat. section 164.395—"with the elements of the 'generic' crime."

*Descamps v. United States,* 570 U.S. 254, 257, 133 S.Ct. 2276, 186 L.Ed.2d 438 (2013). There is a categorical match "only if the statute's elements are the same as, or narrower than, those of the generic offense." *Id.* If the statute of conviction is broader than the generic offense, we next determine whether the statute is divisible or indivisible. *Medina-Lara v. Holder,* 771 F.3d 1106, 1112 (9th Cir. 2014). Only when an overbroad statute is divisible do we turn to the "modified categorical approach." *Descamps,* 570 U.S. at 263–64, 133 S.Ct. 2276. An overbroad and indivisible statute does not constitute a generic crime. *Id.* at 264–65, 133 S.Ct. 2276; *Medina-Lara,* 771 F.3d at 1112.

### A

**[7]** "A state offense qualifies as a generic offense—and therefore, in this case, as an aggravated felony—only if the full range of conduct covered by [the state statute] falls within the meaning of the generic offense." *United States v. Alvarado-Pineda,* 774 F.3d 1198, 1202 (9th Cir. 2014) (citation and internal quotation marks omitted). *Gonzales v. Duenas-Alvarez* held that a state conviction is not a categorical match for its generic counterpart if there is "a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime." 549 U.S. 183, 193, 127 S.Ct. 815, 166 L.Ed.2d 683 (2007).

**[8]  [9]  [10]** There are two ways to show "a realistic probability" that a state statute exceeds the generic definition. First, there is not a categorical match if a state statute expressly defines a crime more broadly than the generic offense. *United States v. Grisel,* 488 F.3d 844, 850 (9th Cir. 2007) (en banc), *abrogated on other grounds by United States v. Stitt,* — U.S. ——, 139 S. Ct. 399, 202 L.Ed.2d 364 (2018). As long as the application of the statute's express text in the nongeneric manner is not a logical impossibility, the relative likelihood of application to nongeneric conduct is immaterial. *See United States v. Valdivia-Flores,* 876 F.3d 1201, 1208 (9th Cir. 2017). Second, a petitioner can show that a state statute exceeds the generic definition if the petitioner can "point to at least one case in which the state courts applied the statute" in a situation that does not fit under the generic

20 Cal. Daily Op. Serv. 704, 2020 Daily Journal D.A.R. 660

definition. *United States v. Ruiz-Apolonio*, 657 F.3d 907, 914 (9th Cir. 2011) (citing *Duenas-Alvarez*, 549 U.S. at 193, 127 S.Ct. 815).

**[11]** Here, the Oregon robbery statute is facially overbroad because its "greater breadth is evident from its text." *Grisel*, 488 F.3d at 850.

**[12]** Under the INA, a conviction for a generic theft offense that results in a prison term of at least one year is an aggravated felony. 8 U.S.C. § 1101(a)(43)(G). A generic "theft" is defined as the "taking of property or an exercise of control over property *without consent* with the criminal intent to deprive the owner of rights and benefits of ownership, even if such deprivation is less than total or permanent." *Duenas-Alvarez*, 549 U.S. at 189, 127 S.Ct. 815 (emphasis added) (quoting *Penuliar v. Gonzales*, 435 F.3d 961, 969 (9th Cir. 2006)).

The Oregon robbery statute of conviction here provides:

(1) A person commits the crime of robbery in the third degree if in the course of committing or attempting to commit theft or unauthorized use of a vehicle as defined in ORS 164.135 the person uses or threatens the immediate use of physical force **\*1148** upon another person with the intent of:

(a) Preventing or overcoming resistance to the taking of the property or to retention thereof immediately after the taking; or

(b) Compelling the owner of such property or another person to deliver the property or to engage in other conduct which might aid in the commission of the theft or unauthorized use of a vehicle.

Or. Rev. Stat. § 164.395. Section 164.395 incorporates Oregon's definition of theft, which includes "theft by deception." Or. Rev. Stat. §§ 164.015(4), 164.085.

The first requirement of section 164.395 is a theft or attempted theft or unauthorized use of a vehicle. A theft by deception satisfies this element. *See* Or. Rev. Stat. §§ 164.015(4), 164.085. The generic definition of theft requires that the taking be without consent. *Alvarado-Pineda*, 774 F.3d at 1202. We have explained elsewhere that theft statutes which include theft by deception fall outside the generic definition

for theft. *See, e.g.,* *Lopez-Valencia v. Lynch*, 798 F.3d 863, 868 (9th Cir. 2015) (explaining that California's theft statute is overbroad because it includes conduct such as theft by false pretenses, which could be consensual); *United States v. Rivera*, 658 F.3d 1073, 1077 (9th Cir. 2011) (same), *abrogated on other grounds by* *Lopez-Valencia v. Lynch*, 798 F.3d 863 (9th Cir. 2015). Because it is possible to commit theft by deception with the consent of the owner, Oregon's theft statute expressly includes conduct outside of the generic definition.

The additional robbery elements of section 164.395—namely, the use or threat of force to obtain the property—do not limit the reach of the statute to match the generic definition of theft. A force element generally implies a lack of consent—the force can be used, for example, to overcome resistance or otherwise compel behaviors. But the statute here expressly contemplates that such force may be used to "compel[ ]" "another person," rather than the property owner, "to deliver the property or to engage in other conduct which might aid the commission of the theft." Or. Rev. Stat. § 164.395(1)(b).

Consequently, even with the additional robbery elements, the text of the statute expressly includes situations involving consensual takings. Under subsection (b), a defendant could be convicted if she threatened force against a third party to compel that third party to convince a property owner, by deception, to give the property to the defendant consensually. *See* Or. Rev. Stat. § 164.395(1)(b) (covering threatened force used to "compel[ ] ... another person to ... engage in [ ] conduct which might aid in the commission of the theft"). In that scenario, the property would have been taken with the consent of the owner, and the force used would not negate the owner's consent because the force was used against a third party without the owner's knowledge.

Similarly, under subsection (a), a defendant could be convicted if the taking was consensual (although deceptive), but force was used against a third party to prevent that person from retrieving the property right after it was received by the thief. In that case, the thief would use "physical force upon another person with the intent of ... [p]reventing or overcoming resistance ... to retention [of the property] immediately after the taking." *See id.* § 164.395(1)(a).

Although correctly recognizing that the plain text of section 164.395 does not require that the defendant engage in a nonconsensual taking, the BIA reasoned that the force

20 Cal. Daily Op. Serv. 704, 2020 Daily Journal D.A.R. 660

requirement would necessarily **\*1149** nullify consent, because "[t]here is no meaningful difference between a taking of property accomplished against the victim's will and one where his 'consent' to parting with his property is coerced through force, fear, or threats," citing *Matter of Ibarra*, 26 I. & N. Dec. 809, 811 (B.I.A. 2016). But, as we have noted, under the plain text of the statute, it is possible to apply the force needed for a third-degree robbery against a third person while engaging in a taking that is consensual with regard to the victim of the robbery. The state statute at issue in *Matter of Ibarra*, by contrast, explicitly required "the felonious taking of personal property in the possession of another ... against his will." *26 I. & N. Dec. at 810 n.2* (emphasis added) (quoting Cal. Penal Code § 211); *see also id. at 812* ("[T]he jury instructions for section 211 of the California Penal Code require as an element that the defendant take property from another 'against that person's will.' " (citation omitted)).

In short, unlike the generic theft offense, section 164.395 does not require that the defendant engage in a nonconsensual taking. As the Oregon statute expressly includes consensual takings, it is facially overbroad. *See Grisel, 488 F.3d at 850*.

**B**

Because we hold that the statute is overbroad, we move to the next step in the analysis: determining whether the statute is divisible, such that application of the modified categorical approach is appropriate. *See Lopez-Valencia, 798 F.3d at 867–68*.

**[13]** Oregon's third-degree robbery statute is indivisible. In this case, the government did not argue otherwise. "On the merits of the divisibility inquiry, the government did not argue to us that section 164.395 is divisible. We therefore deem the issue waived." *Barbosa v. Barr, 926 F.3d 1053, 1059 (9th Cir. 2019)*. Because the statute of conviction is both overbroad and indivisible, the modified approach "has no role to play in this case" and the inquiry ends. *Descamps, 570 U.S. at 264, 133 S.Ct. 2276*.

**III**

Accordingly, we hold that section 164.395 is facially overbroad and indivisible. As it therefore does not qualify as a categorical theft offense, it does not count as an aggravated felony under section 101(a)(43)(G) of the INA.

Because Lopez-Aguilar's conviction was not for an aggravated felony, he is not removable under 8 U.S.C. § 1227(a)(2)(A)(iii). We therefore grant the petition.

**Petition GRANTED.**

GRABER, Circuit Judge, with whom Judge Tunheim joins, concurring:

I join the majority opinion in full. I write separately to add my voice to the substantial chorus of federal judges pleading for the Supreme Court or Congress to rescue us from the morass of the categorical approach. *See, e.g., United States v. Brown*, 879 F.3d 1043, 1051–52 (9th Cir. 2018) (Owens, J., concurring) (noting that "countless judges" have "urg[ed] an end" to the categorical approach); *United States v. Valdivia-Flores*, 876 F.3d 1201, 1210 (9th Cir. 2017) (O'Scannlain, J., specially concurring) (collecting cases). The categorical approach requires us to perform absurd legal gymnastics, and it produces absurd results.

As the majority opinion explains, Oregon Revised Statutes section 164.395 is not a categorical match for the generic theft offense because it incorporates consensual takings. But I can conceive of very few **\*1150** scenarios in which a defendant could use, or threaten the immediate use of, physical force against a third party while carrying out a taking that was consensual from the property owner's perspective. And in my view those scenarios are unlikely to occur and to be prosecuted under this statute. Regardless of the existence of possible examples of consensual takings under section 164.395, the fundamental problem is that, to escape the consequences of his actions under our immigration laws, Petitioner need not show that *he* carried out a consensual taking. Without a doubt, there are better ways to decide these cases. *See, e.g., Brown*, 879 F.3d at 1051 (advocating for "[a] regime based on the length of previous sentences, rather than on the vagaries of state law").

The categorical approach allows individuals who have been convicted of serious crimes to avoid removal, so long as they are "clever enough to find some space in the state statutory

scheme that lies outside the federal analogue." *Valdivia-Flores*, 876 F.3d at 1211. As my colleagues have noted, we have no discretion in removal cases such as this one to correct absurd results—indeed, we must turn a blind eye even when the defendant's actions underlying his state conviction unquestionably meet the definition of the generic federal offense. *Id.*

It is past time for someone with the power to fix this mess to do so.

**All Citations**

948 F.3d 1143, 20 Cal. Daily Op. Serv. 704, 2020 Daily Journal D.A.R. 660

## Footnotes

\*    The Honorable John R. Tunheim, Chief United States District Judge for the District of Minnesota, sitting by designation.

1    The BIA disagreed with the IJ's alternative conclusion that Lopez-Aguilar's conviction under section 164.395 was for a crime of violence under section 101(a)(43)(F) of the INA.

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

11 Cal. Daily Op. Serv. 2014, 2011 Daily Journal D.A.R. 2443

633 F.3d 1211
United States Court of Appeals,
Ninth Circuit.

Maria LOPEZ–BIRRUETA, Petitioner,

v.

Eric H. HOLDER Jr., Attorney General, Respondent.

No. 10–70128.
|
Argued and Submitted Jan. 13, 2011.
|
Filed Feb. 14, 2011.

**Synopsis**

**Background:** Alien, a native and citizen of Mexico, petitioned for review of an order of the Board of Immigration Appeals (BIA), which denied her request for special–rule cancellation of removal under Violence Against Women Act (VAWA).

**[Holding:]** The Court of Appeals, Graber, Circuit Judge, held that children were subjected to battery by lawful–permanent–resident father.

Petition granted and matter remanded.

West Headnotes (8)

**[1]**   **Aliens, Immigration, and Citizenship** ⚷ Substantial evidence in general

**Aliens, Immigration, and Citizenship** ⚷ Law questions

Court of Appeals reviews legal determinations of the Board of Immigration Appeals (BIA) de novo and its factual findings for substantial evidence.

4 Cases that cite this headnote

**[2]**   **Civil Rights** ⚷ Assault and battery; personal injury and use of force

When interpreting the Violence Against Women Act (VAWA), the courts adhere to the general rule of construction that when the legislature enacts an ameliorative rule designed to forestall harsh results, the rule will be interpreted and applied in an ameliorative fashion.

2 Cases that cite this headnote

**[3]**   **Aliens, Immigration, and Citizenship** ⚷ Cancellation of Removal or Suspension of Deportation in General

In providing that Attorney General may grant suspension of deportation to alien who, inter alia, has been battered or subjected to extreme cruelty in the United States, Violence Against Women Act (VAWA) distinguishes between "battery" and "extreme cruelty," reserving the term "extreme cruelty" for something other than physical assault,

presumably actions in some way involving mental or psychological cruelty. 🚩 8 U.S.C.(1994 Ed.) § 1254(a)(3); 🚩 8 C.F.R. § 204.2(c)(1)(vi), 🚩 (e)(1)(vi).

1 Cases that cite this headnote

**[4]**    **Aliens, Immigration, and Citizenship**  ⚷  Cancellation of Removal or Suspension of Deportation in General

Lawful–permanent–resident father's acts of striking his two– and three–year–old children with stick were regular and arbitrary, and thus constituted "act of physical abuse" or "act of violence" resulting in physical injury under Violence Against Women Act's (VAWA's) definition of "battery" so as to warrant special–rule cancellation of alien mother's removal; father struck children two or three times each week, in front of his "drunken friends" and for non–punishment reasons, causing red welts that required home medical treatment of ointment and ice and causing his children to fear him. 🚩 8 U.S.C.(1994 Ed.) § 1254(a)(3); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 304(a), 🟨 8 U.S.C.A. § 1229b(b)(2)(A); 🚩 8 C.F.R. § 204.2(c)(1)(vi), 🚩 (e)(1)(vi).

1 Cases that cite this headnote

**[5]**    **Aliens, Immigration, and Citizenship**  ⚷  Review of initial decision or administrative review

When the Board of Immigration Appeals (BIA) adopts the immigration judge's (IJ's) decision in a removal proceeding, the Court of Appeals reviews the IJ's decision as if it were the BIA's.

3 Cases that cite this headnote

**[6]**    **Aliens, Immigration, and Citizenship**  ⚷  Cancellation of Removal or Suspension of Deportation in General

Under Violence Against Women Act (VAWA), in providing that Attorney General may grant suspension of deportation to alien who has been battered or subjected to extreme cruelty in the United States, "battery" includes but is not limited to an act of violence resulting in injury; the definition does not require that the violence be heightened or result in injury, though physically injurious acts of violence qualify per se as battery. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 304(a), 🟨 8 U.S.C.A. § 1229b(b)(2)(A); 🚩 8 C.F.R. § 204.2(c)(1)(vi).

1 Cases that cite this headnote

**[7]**    **Aliens, Immigration, and Citizenship**  ⚷  Cancellation of Removal or Suspension of Deportation in General

Violence Against Women Act (VAWA) does not even suggest that the acts required to constitute "battery," so that Attorney General may grant suspension of deportation to alien who has been battered or subjected to extreme cruelty in the United States, depend on state law, given the strong uniformity sought by Congress in the area of immigration law and its remedial purpose in enacting VAWA. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 304(a), 🟨 8 U.S.C.A. § 1229b(b)(2)(A).

1 Cases that cite this headnote

**[8]**    **Aliens, Immigration, and Citizenship**  ⚷  Cancellation of Removal or Suspension of Deportation in General

Violence Against Women Act (VAWA), in providing that Attorney General may grant suspension of deportation to alien who has been battered or subjected to extreme cruelty in the United States, provides protection not only to those

presently experiencing battery, but also to those who experienced battery in the past. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 304(a), 🚩 8 U.S.C.A. § 1229b(b)(2)(A); 🚩 8 C.F.R. § 204.2(c)(1)(vi).

**Attorneys and Law Firms**

**\*1212** Matt Adams, Northwest Immigrant Rights Project, Seattle, WA, Martha H. Rickey, Northwest Immigrant Rights Project, Granger, WA, for the petitioner.

M. Jocelyn Lopez Wright, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the respondent.

Loni A. Mahanta, Crowell & Moring LLP, San Francisco, CA, for the amicus curiae.

On Petition for Review of an Order of the Board of Immigration Appeals. B.I.A. No. AXXX–XX8–289.

Before: SUSAN P. GRABER and MILAN D. SMITH, JR., Circuit Judges, and CHARLES R. BREYER, [*] District Judge.

## OPINION

GRABER, Circuit Judge:

Petitioner Maria Lopez–Birrueta petitions for review of the Board of Immigration Appeals' ("BIA") denial of special-rule **\*1213** cancellation of removal under the Violence Against Women Act of 1994 ("VAWA"). The BIA held that, although Petitioner's children were mistreated by their lawful-permanent-resident father, that mistreatment did not rise to the level of "battery" under 8 U.S.C. § 1229b(b)(2)(A). We disagree. Accordingly, we grant the petition and remand.

## FACTUAL AND PROCEDURAL HISTORY

Petitioner is a native and citizen of Mexico. She entered the United States without inspection in 1994 at the age of 14. In 2002, the government served her with a notice to appear. She conceded removability but applied for special-rule cancellation of removal under 8 U.S.C. § 1229b(b)(2)(A). To qualify, an alien must demonstrate (1) the existence of battery or extreme cruelty, (2) physical presence, (3) good moral character, (4) not being inadmissible for certain specified reasons, and (5) extreme hardship. *Id.* Regarding the first requirement, Petitioner sought to demonstrate that she "is the parent of a child of an alien who is ... a lawful permanent resident and the child has been battered or subjected to extreme cruelty by such permanent resident parent." *Id.* § 1229b(b)(2)(A)(i)(II).

At a merits hearing in 2008, Petitioner testified as follows. After arriving in the United States, and still at the age of 14, Petitioner began a sexual relationship with Gill Campos, who was then 36 years old. Campos is a legal permanent resident of the United States.

Petitioner and Campos had two children together. At age 16, Petitioner gave birth to E—. At age 18, she gave birth to G—. Petitioner and Campos lived together while the children were very young.

During that time, Campos repeatedly threatened Petitioner, insulted her, prohibited her from talking with others, acted aggressively toward her, and threatened to alert immigration officials if Petitioner disobeyed his orders. While they lived together, Campos was not a loving father. He was violent toward his children, yelled at them, and often took them for rides in his car when he was drunk.

Petitioner described one incident in detail. In front of his "drunken friends," Campos struck E—, then 3 years old, three times on the legs with a stick that was 24 inches long and one-half inch in diameter. The strikes caused red welts to appear on E—'s legs, which Petitioner treated with ointment and ice. That same form of beating occurred two to three times a week. Campos subjected G— to the same mistreatment. Asked why, Petitioner responded that Campos "probably want[ed] to control me through the children."

Twice, Petitioner left Campos but, both times, she returned after Campos convinced her that he had changed. Petitioner left for good in 1999 and moved to Yakima, Washington, with her children. Since Petitioner left, the children have visited Campos for one or two months at a time, and once for almost a year. Campos no longer strikes the children.

Both children testified at the hearing. At the time, E— was 12 years old, and G— was 11 years old. E— testified that he has not had any problems with his father in the past few years and that, although he did not love his father when he was younger, he loves him now. He remembers his father striking him, "for no reason," with a tree branch and with his hand. G— testified that he remembers that his father would beat him and E— with a stick, on the legs. When his father came home, G— was scared and hid to "try[ ] to get away." But he no longer feels that way about his father.

In a written decision, an immigration judge ("IJ") denied cancellation of removal. **\*1214** The IJ expressly found Petitioner credible but found that she failed to establish that the children had been "battered" or subjected to "extreme cruelty" under the statute. Because the IJ held that Petitioner did not meet the statutory requirement of battery or extreme cruelty, he did not reach any of the other statutory requirements for relief.

Citing *In re Burbano,* 20 I. & N. Dec. 872, 874 (B.I.A.1994), the BIA adopted and affirmed the IJ's decision. The BIA also added its own summary as to why no battery or extreme cruelty occurred. Petitioner timely petitions for review.

STANDARDS OF REVIEW

[1]  "We review the BIA's legal determinations de novo and its factual findings for substantial evidence." *Kyong Ho Shin v. Holder,* 607 F.3d 1213, 1216 (9th Cir.2010).

DISCUSSION

A. *Sources of Law*

The statute provides several categories of aliens who satisfy the "battery or extreme cruelty" requirement. The alien must demonstrate that:

(I) the alien has been battered or subjected to extreme cruelty by a spouse or parent who is or was a United States citizen (or is the parent of a child of a United States citizen and the child has been battered or subjected to extreme cruelty by such citizen parent);

(II) the alien has been battered or subjected to extreme cruelty by a spouse or parent who is or was a lawful permanent resident (or is the parent of a child of an alien who is or was a lawful permanent resident and the child has been battered or subjected to extreme cruelty by such permanent resident parent); or

(III) the alien has been battered or subjected to extreme cruelty by a United States citizen or lawful permanent resident whom the alien intended to marry, but whose marriage is not legitimate because of that United States citizen's or lawful permanent resident's bigamy[.]

8 U.S.C. § 1229b(b)(2)(A)(i).

Because Petitioner and Campos never married (legally or bigamously), Petitioner cannot claim protection under VAWA for Campos' mistreatment *of her*. Instead, Petitioner sought to demonstrate that she fell within the category protected by the parenthetical in subsection (II), that she "is the parent of a child of an alien who is ... a lawful permanent resident and the child has been battered or subjected to extreme cruelty by such permanent resident parent." *Id.* § 1229b(b)(2)(A)(i)(II). None of the other categories applies.

The statute does not define the phrase "has been battered or subjected to extreme cruelty." But the agency has promulgated a regulation at 8 C.F.R. § 204.2 that pertains to the topic. Although we ultimately agree with the BIA and the parties that the regulation's definitions of "battery or extreme cruelty" apply, some explanation is required.

The first seven subsections of the regulation pertain to a particular type of petitioner. For instance, subsection (a) is entitled "Petition for a spouse" and contains implementing regulations for petitions filed by a spouse of a citizen or legal permanent resident. Relevant here, subsection (c) is entitled "Self-petition by spouse of abusive citizen or lawful permanent resident," and subsection (e) is entitled "Self-petition by child of abusive citizen or lawful permanent resident." Both subsections (c) and (e) describe the requirements for special-rule cancellation of removal under VAWA, and both subsections contain a definition of "battery or extreme cruelty." Except for their respective **\*1215**  final sentences, the two definitions are identical:

> Battery or extreme cruelty. For the purpose of this chapter, the phrase "was battered by or was the subject of extreme cruelty" includes, but is not limited to, being the victim of any act or threatened act of violence, including any forceful detention, which results or threatens to result in physical or mental injury. Psychological or sexual abuse or exploitation, including rape, molestation, incest (if the victim is a minor), or forced prostitution shall be considered acts of violence. Other abusive actions may also be acts of violence under certain circumstances, including acts that, in and of themselves, may not initially appear violent but that are a part of an overall pattern of violence.

8 C.F.R. § 204.2(c)(1)(vi), (e)(1)(vi). The final sentence in the two definitions varies depending on whether the petitioner is a spouse or child. The subsection concerning a petition for a spouse states: "The qualifying abuse must have been committed by the citizen or lawful permanent resident spouse, must have been perpetrated against the self-petitioner or the self-petitioner's child, and must have taken place during the self-petitioner's marriage to the abuser." *Id.* § 204.2(c)(1)(vi). The subsection concerning a petition for a child states: "The qualifying abuse must have been committed by the citizen or lawful permanent resident parent, must have been perpetrated against the self-petitioner, and must have taken place while the self-petitioner was residing with the abuser." *Id.* § 204.2(e)(1)(vi).

We have two difficulties with the regulation's definitions of "battery or extreme cruelty." First, the definitions give the meaning of the phrase "was battered by or was the subject of extreme cruelty." But that phrase appears nowhere in the statute or elsewhere in the regulation. Both the statute and the regulation use the verb form "has been," instead of the definitions' formulation "was." Neither the parties nor we attribute any significance to this difference, though. The agency plainly intended to define the phrase as it appears in the regulation and the statute.

Second, and slightly more troubling, is that the definitions do not cover Petitioner's situation. Petitioner filed neither a petition from an abusive *spouse,* covered by the definition at § 204.2(c)(1)(vi), nor a petition from a *child,* covered by the definition

at § 204.2(e)(1)(vi). Petitioner is the non-married parent of a child abused by the other parent. Even though the *statute* covers Petitioner's situation, it appears that the agency failed to promulgate regulations specifically covering that situation. Both the parties and the BIA assumed that the relevant part of the definitions, block-quoted above, applies to Petitioner's circumstances, even though the definitions on their face do not apply. We agree that the BIA permissibly extended the use of the definitions here. There is no indication in the statute or elsewhere that a different definition of battery or extreme cruelty should apply depending on the marital status of the petitioner.

### B. *Battery Under VAWA*

**[2]**   "Congress's goal in enacting VAWA was to eliminate barriers to women leaving abusive relationships." *Hernandez v. Ashcroft,* 345 F.3d 824, 841 (9th Cir.2003). The statute "was a generous enactment, intended to ameliorate the impact of harsh provisions of immigration law on abused women." [1] *Id.* at 840. Accordingly,  **\*1216**  when interpreting this statute, we have "adhere[d] to the general rule of construction that when the legislature enacts an ameliorative rule designed to forestall harsh results, the rule will be interpreted and applied in an ameliorative fashion." *Id.* (internal quotation marks omitted).

**[3]**   "The text of the statute reveals that Congress distinguished between 'battery' and 'extreme cruelty,' reserving the term extreme cruelty for something other than physical assault, presumably actions in some way involving mental or psychological cruelty." *Id.* at 838. "Under [ 8 C.F.R. § 204.2(c)(1)(vi) ], any act of physical abuse is deemed to constitute domestic violence without further inquiry, while 'extreme cruelty' describes all other manifestations of domestic violence." *Id.* at 840. Relevant here, the regulation states that battery "includes, but is not limited to, ... any act or threatened act of violence, including any forceful detention, which results or threatens to result in physical or mental injury." 8 C.F.R. § 204.2(c)(1)(vi), (e)(1)(vi).

We acknowledge that those sources of law are somewhat open-ended: The regulation defines some conduct that qualifies as battery but leaves open the full scope of what "battery" encompasses and, in *Hernandez,* we did not elaborate on what constitutes an "act of physical abuse." But those sources provide more than adequate definitions for the challenged conduct here.

**[4]**   Campos struck his children with a stick two or three times a week, when they were 2 and 3 years old, in front of his "drunken friends," for no reason at all (that is, not as punishment), causing red welts that required home medical treatment of ointment and ice and causing his children to fear him. We are compelled to conclude that those regular, arbitrary beatings causing injury constituted an "act of physical abuse," *Hernandez,* 345 F.3d at 840, or an "act of violence ... which results ... in physical ... injury," 8 C.F.R. § 204.2(c)(1)(vi), (e)(1)(vi). We therefore hold that the BIA erred in concluding otherwise. [2]

### C. *The BIA's Legal Errors*

**[5]**   The BIA made several errors in its legal analysis. The BIA adopted the IJ's reasoning in full, citing *Burbano*. "When, as here, the BIA adopts the IJ's decision citing *Matter of Burbano,* we review the IJ's decision as if it were the BIA's." *Cortez–Pineda v. Holder,* 610 F.3d 1118, 1121 (9th Cir.2010). The IJ's errors, described below, therefore apply to the BIA's decision as well.

**[6]**   First, the IJ held that "[t]he regulatory definition of 'battery or extreme cruelty' requires a heightened level of violence that 'results or threatens to result in physical or mental injury.' " (Quoting 8 C.F.R. § 204.2(c)(1)(vi).) But the regulation states that battery "*includes, but is not limited to* " an act of violence resulting in injury. 8 C.F.R. § 204.2(c)(1)(vi) (emphasis

added). The definition does not *require* that the violence be "heightened" or result in injury, though physically injurious **\*1217** acts of violence qualify per se as battery.

[7]    Second, and perhaps most egregious, the IJ turned to California's criminal-law definition of "battery" and its definition of "injury" for certain sentencing purposes. From that premise, the IJ held that the term "injury" in the federal regulation "means

'any physical injury which requires professional medical treatment.' " (Quoting Cal.Penal Code § 243(f)(5)). As an initial matter, nothing in the *federal* statute suggests that the acts required to constitute battery depend on *state* law. Given the strong uniformity sought by Congress in the area of immigration law and its remedial purpose in enacting VAWA, we doubt that acts of violence would qualify (or fail to qualify) as battery depending on locale.

In any event, examining the cited definitions in context reveals the fatal flaws of the IJ's analysis here. The definition of "injury"

found in California Penal Code section 243(f)(5) has a very limited application. It applies only if a state criminal defendant

battered certain emergency workers (such as an ambulance driver or lifeguard) such that the battery caused an "injury." *Id.* § 243(c)(1). If the battery caused an "injury," then the defendant is subject to increased criminal penalties. *Id.* It is wholly illogical to reason that Congress intended to import a narrow, specialized state-law sentencing enhancement definition as the proper definition of "injury" in the immigration context. It is completely arbitrary that California chose to use a generic term "injury" in its sentencing-enhancement statute and then provide a definition for that term. The fact that the common term "injury" is used in both the California sentencing-enhancement statute and the federal immigration regulations is happenstance.

[8]    Finally, [3]  the BIA also suggested (as does the government on appeal) that no battery occurred for reasons that, while facially appealing, are in fact irrelevant. For example, it is true that the children now love their father and that he no longer beats them. But Congress chose to provide protection for anyone who "*has been*" battered while residing with the abuser. Petitioner and the amicus point out that, in the context of an abusive relationship, the abuser may re-start the abuse when he or she once again has that opportunity, for instance, if Petitioner is removed and the children move in with their father again and, if they wish to remain in the United States, have no choice but to remain with their father. Congress chose to prevent that opportunity by granting relief to those who *had been* subjected to battery. The BIA's suggestion that no battery occurred *in the past* because of the state of the relationship *today* is irrelevant under the plain text of the statute. [4]

CONCLUSION

We hold that Petitioner demonstrated that her children had been battered by Campos within the meaning of 8 U.S.C. § 1229b(b)(2)(A)(i)(II). We therefore **\*1218**  grant the petition. The BIA also held that Petitioner failed to establish that the children had been subjected to extreme cruelty. Because we grant the petition on other grounds, we do not reach the issue of extreme cruelty.

The BIA did not reach the other four statutory requirements for relief. We remand for consideration of those requirements and any other issues not addressed by this opinion.

**Petition GRANTED; case REMANDED.**

**All Citations**

633 F.3d 1211, 11 Cal. Daily Op. Serv. 2014, 2011 Daily Journal D.A.R. 2443

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

11 Cal. Daily Op. Serv. 2014, 2011 Daily Journal D.A.R. 2443

# Footnotes

\*       The Honorable Charles R. Breyer, United States District Judge for the District of Northern California, sitting by designation.

1       As originally enacted, special-rule cancellation of removal under VAWA was codified at a different section of the United States Code. We agree with the parties that, because there is no relevant difference in this case between the current statute and its predecessor, the discussion in *Hernandez* applies with equal force.

2       There is some uncertainty about the correct standard of review, because we gave arguably conflicting indicators in *Hernandez. See* 345 F.3d at 834 (holding that "battery is clearly a factual determination, readily resolved by the application of a legal standard defining battery to the facts in question"); *id.* at 840–41 (announcing our "hold[ing]" that the petitioner was subject to extreme cruelty, without reference to the "substantial evidence" standard). We need not resolve that uncertainty. Even if we review for substantial evidence the BIA's conclusion that no battery occurred here, substantial evidence does not support the BIA's conclusion.

3       We also note that the IJ improperly looked to an unpublished decision by this court and an unpublished decision by the BIA. This court's decision was issued in 2006 and therefore may not be cited for any reason (other than reasons plainly inapplicable here). 9th Cir. R. 36–3(c). Similarly, the BIA decision states, as the very first line " * * THIS IS AN UNPUBLISHED DECISION THAT CANNOT BE CITED * *."

4       We note that the statute's use of the term "child" might suggest a time limitation on a parent's ability to seek relief under VAWA. The text of the statute suggests that, at the time of application, the petitioner's child must still be a minor. But because Petitioner's children here were minors at the time of application (and are still minors), we have no occasion to consider that issue.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by IN RE: GREGORIO ORDAZ-NATERA, BIA, November 30, 2005

368 F.3d 1206
United States Court of Appeals,
Ninth Circuit.

Javier Ramon LOPEZ-MOLINA, Petitioner,

v.

John ASHCROFT, Attorney General, Respondent.

No. 02-74095.
|
Argued Feb. 11, 2004.
|
Submitted Feb. 25, 2004.
|
Filed June 2, 2004.

**Synopsis**

**Background:** Alien petitioned for review of summary affirmance by Board of Immigration Appeals (BIA) of order of removal entered by immigration judge (IJ).

**Holdings:** The Court of Appeals, Clifton, Circuit Judge, held that:

[1] jurisdiction-stripping provision of Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) applies when alien is removable because immigration official has "reason to believe" alien was involved in drug trafficking, and

[2] IIRIRA applied based on substantial evidence in record to support immigration official's belief and removal order.

Petition dismissed.

Tashima, Circuit Judge, filed dissenting opinion.

West Headnotes (3)

**[1]**  **Aliens, Immigration, and Citizenship**  Jurisdiction and Venue

Court of Appeals has jurisdiction to determine its own jurisdiction to review final order of removal under jurisdiction-stripping provisions of Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA). Immigration and Nationality Act, § 242(a)(2)(C), 8 U.S.C.A. § 1252(a)(2)(C).

5 Cases that cite this headnote

**[2]**  **Aliens, Immigration, and Citizenship**  Jurisdiction and Venue

Jurisdiction-stripping provision of Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), which deprives appellate courts of jurisdiction to review removal orders for aliens "removable by reason of having committed a criminal offense," applied to alien found removable on ground that immigration official had "reason to believe" alien was involved in illicit drug trafficking. Immigration and Nationality Act, §§ 212(a)(2)(C), 242(a)(2)(C), 8 U.S.C.A. §§ 1182(a)(2)(C), 1252(a)(2)(C).

18 Cases that cite this headnote

**[3]**  **Aliens, Immigration, and Citizenship**  Jurisdiction and Venue

Jurisdiction-stripping provision of Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) applied upon determination that there was substantial, probative evidence in record, including alien's attempted escape and subsequent arrest for driving car containing 147 pounds of concealed marijuana, to give immigration official had "reason to believe" alien was involved in illicit drug trafficking and therefore "removable by reason of having committed a criminal offense." Immigration and Nationality Act, §§ 212(a)(2)(C), 242(a)(2)(C), 8 U.S.C.A. §§ 1182(a)(2)(C), 1252(a)(2)(C).

25 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1206** Bertram Polis, Tucson, AZ, for the petitioner.

Genevieve Holm, United States Department of Justice, Office of Immigration Litigation, Washington, DC, for the respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

**\*1207** Before: TASHIMA and CLIFTON, Circuit Judges, and LEIGHTON, District Judge. *

**Opinion**

Opinion by Judge Clifton; Dissent by Judge Tashima

CLIFTON, Circuit Judge:

Javier Ramon Lopez-Molina, a native and citizen of Mexico, petitions for review of a summary affirmance by the Board of Immigration Appeals (BIA) of an order of removal entered by the immigration judge (IJ). Before addressing the merits of his petition, we must determine whether the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) divests this court of jurisdiction to review Lopez-Molina's removal order. More specifically, we must decide whether 8 U.S.C. § 1252(a)(2)(C)-which bars our review of a removal order when the alien "is removable by reason of having committed a criminal offense covered in section 1182(a)(2)"-applies when the alien is removable pursuant to 8 U.S.C. § 1182(a)(2)(C) because an immigration official has "reason to believe" the alien was involved in illicit drug trafficking. Because our decision in *Alarcon-Serrano v. INS*, 220 F.3d 1116 (9th Cir.2000) held that we lacked jurisdiction under nearly identical circumstances, we dismiss Lopez-Molina's petition for review.

**I. BACKGROUND**

In 1990, Arizona law enforcement officers, acting on a tip regarding the transport of a load of marijuana, placed Lopez-Molina and four other suspects under surveillance. After observing several meetings between the suspects, officers attempted to stop the vehicle that Lopez-Molina was driving. Upon seeing the police pursuit, Lopez-Molina exited the vehicle and attempted to escape on foot before he was ultimately captured. Officers then searched the vehicle and found 147 pounds of marijuana concealed in the trunk. While in custody, Lopez-Molina stated that he thought the plastic bags in the trunk contained garbage and denied knowledge of the marijuana. Although he claimed that he and a friend had borrowed the car to "purchase some items," he could not say what store they were going to or what items they were going to purchase. Lopez-Molina then told police that he only ran from the officers because he was afraid that they were immigration officials. For reasons unknown, Lopez-Molina was not immediately prosecuted.

In 1995, Lopez-Molina was admitted into the United States as a non-immigrant visitor. A year later, the federal government charged him with violating 18 U.S.C. § 4 (Misprision of Felony), a charge that arose out of his 1990 drug-related arrest in Tucson, Arizona. According to the Information, Lopez-Molina had knowledge of a "conspiracy to possess marijuana with intent to distribute, [but] concealed and failed ... to make said offense known." Lopez-Molina eventually pleaded guilty to this charge.

In 1997, Lopez-Molina applied for an adjustment of status to that of a permanent resident. This application was denied and soon thereafter, the government filed a Notice to Appear (NTA), charging that Lopez-Molina was subject to removal because he was an inadmissible alien under 8 U.S.C. § 1182(a)(2)(C) at the time of adjustment of status, and thus deportable pursuant to 8 U.S.C. § 1227(a)(1)(A). [1]

**\*1208** At a master calendar hearing before an IJ, Lopez-Molina entered a general denial of the allegations in the NTA. During the subsequent evidentiary hearing, the government offered a set of documents into evidence, including an Arizona Department of Public Safety Report detailing the circumstances of his 1990 drug arrest (DPS Report), the Information to which Lopez-Molina pleaded guilty, and the judgment entered pursuant to his guilty plea. Lopez-Molina responded, through counsel, with a variety of objections. He first objected to the admission of the documents because they were not filed or disclosed prior to the court-imposed deadline. Lopez-Molina then alleged that several documents were "inadmissible hearsay," were not made under oath, were not reliable, and were contradictory as to the amount of marijuana seized from the vehicle that Lopez-Molina was driving. Aside from making these objections, however, Lopez-Molina did not otherwise testify or present any evidence to refute the government's charges.

04 Cal. Daily Op. Serv. 4733, 2004 Daily Journal D.A.R. 6518

The IJ noted that Lopez-Molina offered nothing in the form of rebuttal evidence and concluded that the government had established that "there was sufficient evidence for the consular or Immigration officer to formulate a reason to believe that [Lopez-Molina] is a trafficker in controlled substances." The IJ ordered Lopez-Molina removed and the BIA summarily affirmed the IJ's order of deportation. Lopez-Molina appealed and the removal order has been stayed pending our review.

## II. DISCUSSION

[1]    The permanent rules of IIRIRA govern this case because removal proceedings were initiated after April 1, 1997.

*See* Castro-Baez v. Reno, 217 F.3d 1057, 1058 n. 2 (9th Cir.2000). Under IIRIRA's permanent rules, this court's ability to review a final order of removal is limited by 8 U.S.C. § 1252(a)(2)(C).[2] This court determines for itself whether Lopez-Molina's case falls within the parameters of this jurisdiction-stripping provision. In other words, we have jurisdiction to consider our own jurisdiction. *See* Cedano-Viera v. Ashcroft, 324 F.3d 1062, 1064-65 (9th Cir.2003).

In Alarcon-Serrano v. INS, 220 F.3d 1116 (9th Cir.2000), we held that in order to determine whether we lack jurisdiction to review a final order of removal under IIRIRA,[3] we may consider *only* whether the petitioner is "(i) an alien (ii) who is [removable] (iii) by reason of having committed a criminal offense listed in [ § 1182(a)(2) ]." *Id.* at 1119. Because there is no dispute that Lopez-Molina is an alien, the only viable question in this case is whether he is removable by reason of having "committed a criminal offense" listed in § 1182(a)(2). *Id.*

[2]    Section 1182(a)(2) provides that an alien is *inadmissible,* and thus removable,[4] if he has been convicted of certain **\*1209** crimes, or if he has been convicted multiple times. *See* 8 U.S.C. § 1182(a)(2)(A) and (B). Section 1182(a)(2)(C), however, does not require a conviction in order for the alien to be deemed removable. *See* Alarcon-Serrano, 220 F.3d at 1119. The only requirement under § 1182(a)(2)(C) is that an immigration official has "reason to believe" that the alien is or has been involved in illicit drug trafficking. *See* 8 U.S.C. § 1182(a)(2)(C).[5] Therefore, the question we must decide is whether an alien, who is removable pursuant to § 1182(a)(2)(C) because an immigration official had "*reason to believe* " he was involved in illicit drug trafficking, qualifies as "an alien who is removable by reason of having *committed a criminal offense* covered in *section 1182(a)(2).*" *See* 8 U.S.C. § 1252(a)(2)(C). If we answer this question in the affirmative, then we lack jurisdiction to review Lopez-Molina's order. If we answer in the negative, then we must proceed to review the order on the merits.

We need not look far for our answer. We applied these very provisions in *Alarcon-Serrano,* and did so under virtually identical circumstances, before concluding that we lack jurisdiction to review a final removal order that was premised upon the "reason to believe" standard of § 1182(a)(2)(C). *See* Alarcon-Serrano, 220 F.3d at 1120. The petitioner in that case was a legal alien who had been apprehended while attempting to drive a car carrying 86 pounds of concealed marijuana across the California border. *Id.* at 1117. After his arrest, Alarcon-Serrano consistently denied knowledge of the concealed marijuana and was not convicted of any crime. *Id.* at 1118. Nonetheless, the government initiated removal proceedings against him, alleging that he was removable pursuant to § 1182(a)(2)(C) because immigration officials had "reason to believe" that Alarcon-Serrano was a participant in controlled substance trafficking. *Id.* 1118-19. The IJ found that "circumstances correlate to show that [Alarcon-Serrano] colluded with a known drug trafficker to import in to the United States more than 80 pounds of marijuana." *Id.* The BIA agreed that Alarcon-Serrano's claims of ignorance lacked credibility and affirmed the IJ's removal order. *Id.*

When Alarcon-Serrano appealed the removal order to this court, the government argued-as it does in the case at hand-that because the removal order was premised upon the IJ's "reason to believe" that Alarcon-Serrano had been involved in illegal drug trafficking, Alarcon-Serrano qualified as an alien removable by reason of having "committed a criminal offense" covered in section 1182(a)(2), and thus, this court lacked jurisdiction under IIRIRA to review the removal order. The *Alarcon-Serrano* court ultimately agreed. Recognizing that it must first determine whether the case fell within

04 Cal. Daily Op. Serv. 4733, 2004 Daily Journal D.A.R. 6518

the terms of IIRIRA's jurisdiction-stripping provision, it formulated the following analysis:

> Under [ 8 U.S.C. § 1182(a)(2)(C) ], the only requirement is that an immigration officer 'knows or has reason to believe' that Alarcon-Serrano is an illicit trafficker in controlled substances or that Alarcon-Serrano has knowingly assisted, abetted, conspired with, or colluded with others in such illicit trafficking.
>
> The appropriate way of measuring whether the IJ and BIA had 'reason to believe' that Alarcon-Serrano was participating **\*1210** in drug trafficking is to determine whether substantial evidence supports such a conclusion.... Although to some extent this conflates review of the jurisdictional facts and review of the merits in this case, *this is the correct path to follow.*

*Id.* (citations omitted) (emphasis added). *Alarcon-Serrano* then ruled that substantial evidence did support the IJ's conclusion that the petitioner knew he was participating in drug trafficking and concluded:

> Because an immigration officer had ample reason to believe that Alarcon-Serrano knowingly engaged in drug trafficking, we lack jurisdiction to consider Alarcon-Serrano's petition for review pursuant to [IIRIRA's jurisdiction-stripping provision].

*Id.* at 1120.

The dissent in the current case argues, however, that we are not bound by *Alarcon-Serrano* because it did not "expressly address" the "tension" created between the jurisdiction-stripping provision's requirement that the alien *commit* a criminal offense covered in § 1182(a)(2), and § 1182(a)(2)(C)'s more "lenient" requirement that there need only be *reason to believe* that the alien committed a criminal offense. Instead, the dissent urges us to rely on *Pondoc Hernaez v. INS,* 244 F.3d 752 (9th Cir.2001), and concludes that despite *Alarcon-Serrano's* holding to the contrary, § 1252(a)(2)(C) does not bar our review of orders finding aliens removable pursuant to § 1182(a)(2)(C).

We are unpersuaded by the dissent's arguments for two reasons. First, it is not enough to simply point out that *Alarcon-Serrano* did not "expressly address" what the dissent views as "tension" between the requirements in § 1252(a)(2)(C) and § 1182(a)(2)(C). It is beyond dispute that *Alarcon-Serrano* not only applied these very same standards under identical circumstances, but explicitly outlined how such an analysis should proceed, stating that "this is the correct path to follow." *Alarcon-Serrano,* 220 F.3d at 1119. To refuse to follow these instructions when we are confronted with identical circumstances is the equivalent of overruling *Alarcon-Serrano,* a position that we are unwilling and, more importantly, unable to take. *See Montana v. Johnson,* 738 F.2d 1074, 1077 (9th Cir.1984) (holding that only this court sitting en banc may overrule a prior decision by this court).

Second, *Pondoc Hernaez,* though informative, is hardly controlling. *Pondoc Hernaez* does not address § 1182(a)(2)(C) or its "reason to believe" standard; rather, it was concerned with 8 U.S.C. § 1227(a)(2)(B)(ii), which provides that "[a]ny alien who is ... a drug abuser or addict is deportable." *See Pondoc Hernaez,* 244 F.3d at 756. Not only did *Pondoc Hernaez* analyze the interplay between IIRIRA's jurisdiction-stripping provision and an altogether different statute, but its analysis occurred in a context that is not relevant to the case at hand. In fact, *Pondoc Hernaez* cited *Alarcon-Serrano* with *approval* before stating that it was *not* addressing the issue already decided in *Alarcon-Serrano* and currently before this court:

> Under [IIRIRA's jurisdiction-stripping provision], Petitioner must have committed a 'criminal offense' to divest this court of jurisdiction. As the [government] argues, under *Alarcon-Serrano,* such a criminal offense could be proven without a conviction. But the issue here is the more fundamental question whether drug addiction is actually a 'criminal offense.'

*Id.* at 757.

In sum, *Pondoc Hernaez* never addressed what would or would not constitute sufficient proof that an alien had "committed a criminal offense." Although **\*1211** *Pondoc Hernaez* concluded that this court was not stripped of jurisdiction to review a removal order, it did so because it ruled that drug addiction was not a "criminal offense." Such a holding does not apply to the case at hand and fails to convince us that we may now disregard the explicit analysis demanded by *Alarcon-Serrano*.

[3]    For the foregoing reasons, we hold that in order to decide the case at hand, we are obligated to adhere to the analysis applied by *Alarcon-Serrano* to this identical issue under identical circumstances. Accordingly, we must first determine whether "reasonable, substantial, and probative evidence" supports the IJ's "reason to believe" that Lopez-Molina knew he was participating in illicit drug trafficking. *Id.* at 1119 (citing *Hamid v. INS,* 538 F.2d 1389, 1390-91 (9th Cir.1976)). If substantial evidence does support the IJ's "reason to believe," then Lopez-Molina also qualifies as "an alien who is removable by reason of having committed a criminal offense covered in section 1182(a)(2)." 8 U.S.C. § 1252(a)(2)(C).

Upon a review of the record, we conclude that there is reasonable, substantial, and probative evidence for an immigration official to have "reason to believe" that Lopez-Molina knowingly participated in illicit drug trafficking. The government submitted numerous documents establishing Lopez-Molina's role in transporting a large load of marijuana. These documents included a DPS report describing the police surveillance of Lopez-Molina prior to his 1990 arrest-surveillance which witnessed suspicious meetings between Lopez-Molina and other suspects (several of whom were arrested with several thousand dollars in cash). The DPS report then details Lopez-Molina's attempt to escape when police stopped the vehicle that he was driving, and describes the subsequent discovery of 147 pounds of marijuana inside that vehicle's trunk. In addition, the government submitted Lopez-Molina's guilty plea to a charge that he failed to disclose to authorities his "knowledge" of a conspiracy to distribute marijuana. In the face of this evidence, Lopez-Molina neither testified nor submitted evidence to rebut the facts set out in the DPS report and other documents. Instead, Lopez-Molina's counsel merely objected to the DPS report on numerous evidentiary and constitutional grounds. [6]

*Alarcon-Serrano* held that in light of the evidence that Alarcon-Serrano was arrested with marijuana concealed in his car, his inadmissibility pursuant to § 1182(a)(2)(C) was "undoubtedly supported by substantial probative evidence." *Id.* at 1120. We similarly hold that evidence of Lopez-Molina's attempted escape and subsequent arrest for driving a car containing 147 pounds of concealed marijuana undoubtedly supports a "reason to believe" that he was involved in drug trafficking. Because Lopez-Molina is inadmissible under § 1182(a)(2)(C), he meets § 1252(a)(2)(C)'s definition of "an alien ... removable by reason of having committed a criminal offense covered in section 1182(a)(2)." 8 U.S.C. § 1252(a)(2)(C). *See also Alarcon-Serrano,* 220 F.3d at 1119-20.

**\*1212  III. CONCLUSION**

There is reasonable, substantial, and probative evidence for the IJ to have "reason to believe" that Lopez-Molina knowingly participated in the illicit trafficking of drugs. He is therefore removable pursuant to § 1182(a)(2)(C) and this court is barred from reviewing that removal order pursuant to § 1252(a)(2)(C). Furthermore, because we lack jurisdiction to review this order, we are similarly precluded from direct review of his evidentiary and due process claims. *See e.g.,* *Cedano-Viera v. Ashcroft,* 324 F.3d 1062 (9th Cir.2003) (holding that when we lack jurisdiction to review an alien's removal order, we also lack jurisdiction to review due process and equal protection claims); *Flores-Miramontes v. INS,* 212 F.3d 1133, 1143 (9th Cir.2000) (holding that after petitioner conceded both that he was an alien and that he committed a trafficking crime, we have no further jurisdiction to review petitioner's due process and access to the courts claims).

**PETITION FOR REVIEW DISMISSED.**

TASHIMA, Circuit Judge, dissenting:

The threshold issue we must decide is whether 8 U.S.C. § 1252(a)(2)(C), [1] the jurisdiction-stripping provision of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), which deprives appellate courts of jurisdiction to review orders of removal where the alien is removable by reason of having "committed a criminal offense," applies when the alien is found removable on the ground that an immigration official has "reason to believe" that the alien is

04 Cal. Daily Op. Serv. 4733, 2004 Daily Journal D.A.R. 6518

an illicit drug trafficker. *See* 8 U.S.C. § 1182(a)(2)(C). [2] Because I disagree that the jurisdiction-stripping provision applies in this case, I respectfully dissent.

As a first principle, the Supreme Court has instructed that jurisdiction-stripping legislation is to be strictly construed. *INS v. St. Cyr,* 533 U.S. 289, 298, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (noting the "strong presumption in favor of judicial review of administrative action"). As the majority recognizes, we have jurisdiction to determine whether the jurisdiction-stripping provision of § 1252(a)(2)(C) applies. *Noriega-Lopez v. Ashcroft,* 335 F.3d 874, 879 (9th Cir.2003). In most cases the inquiry is relatively simple. All but two of the statutes referenced in § 1252(a)(2)(C) require that the alien either be convicted of a criminal offense or admit to having committed acts that constitute the essential elements of a criminal offense. *See* 8 U.S.C. §§ 1182(a)(2)(A), (B), 1227(a)(2)(A)(ii), (A)(iii), (B), (C), and (D). Where the alien is ordered removed pursuant to any of those statutes, the court need only determine "whether an alien in fact committed acts sufficient to trigger" the jurisdiction-stripping provision. *See Pazcoguin v. Radcliffe,* 292 F.3d 1209, 1212 (9th Cir.2002). [3]

**\*1213** In order to be removable under § 1182(a)(2)(C), however, the alien need not have committed, or be found to have committed, a criminal offense. *See Hamid v. U.S. INS,* 538 F.2d 1389, 1391 (9th Cir.1976) ("[T]he immigration officer need not know that an individual is or has been a trafficker in order to exclude that person [pursuant to former 8 U.S.C. § 1182(a)(23), the predecessor to § 1182(a)(2)(C) ]. The officer is justified in acting if he has 'reason to believe' that an individual is so engaged."). In this case, the INS alleged that Lopez-Molina was removable pursuant to § 1227(a)(1)(A) because, at the time he applied for adjustment of status, he was inadmissible under § 1182(a)(2)(C) because he had "engaged in unlawful activities related to the sale and trafficking of ... marijuana." The immigration judge ordered him removed because there was "sufficient evidence for the consular or immigration officer to formulate a reason to believe that he is a trafficker in controlled substances."

In *Alarcon-Serrano v. INS,* 220 F.3d 1116 (9th Cir.2000), an alien was ordered removed under § 1182(a)(2)(C) on the ground that there was "reason to believe" that he was an illicit drug trafficker. *Id.* at 1118. In that case, we assumed that IIRIRA § 309(c)(4)(G), [4] which deprived the court of appellate jurisdiction where the alien was "inadmissible or deportable by reason of having committed a criminal offense" covered in § 1182(a)(2), applied to aliens ordered deported pursuant to § 1182(a)(2)(C), so long as substantial evidence supported that there was "reason to believe" that the alien committed a criminal offense. *See id.* at 1119 ("The appropriate way of measuring whether the IJ and BIA had 'reason to believe' that Alarcon-Serrano knew he was participating in drug trafficking is to determine whether substantial evidence supports such a conclusion."). Because the immigration officer had "ample reason" to suspect that the petitioner was a drug trafficker, we concluded that we lacked jurisdiction under IIRIRA § 309(c)(4)(G). *Id.* at 1120. In *Alarcon-Serrano,* however, we did not confront or expressly address the issue created by the tension between the requirement under § 309(c)(4)(G) that the alien *commit* a criminal offense, and the more lenient requirement of § 1182(a)(2)(C) that there need only be *reason to* believe that the alien committed a criminal offense.

In *Hernaez v. INS,* 244 F.3d 752 (9th Cir.2001), however, we addressed a similar issue. In that case, an alien was found deportable on the ground that he was a drug addict. *Id.* at 754; *see* 8 U.S.C. § 1227(a)(2)(B)(ii) ("Any alien who is, or at any time after admission has been, a drug abuser or addict is deportable."). Although IIRIRA § 309(c)(4)(G) specifically references deportation orders issued pursuant to § 1227(a)(2)(B), we held that it did not apply to such deportation orders because the conduct described in § 1227(a)(2)(B)-drug addiction-was not a "criminal offense." *Id.* at 757. We reasoned that the language of the jurisdiction-stripping provision, rather than the list of deportation orders it purported to cover, dictated its scope. *Id.* ("The language of the transition rules that removes this court's jurisdiction is different from the language of the sections of the INA establishing grounds for deportation. Under IIRIRA § 309(c)(4)(G), Petitioner must **\*1214** have committed a 'criminal offense' to divest this court of jurisdiction.").

04 Cal. Daily Op. Serv. 4733, 2004 Daily Journal D.A.R. 6518

*Hernaez* dictates the proper analysis in this case.[5] Whereas *Alarcon-Serrano* assumed that we lacked jurisdiction simply because § 1182(a)(2) was referenced in the jurisdiction-stripping statute, *Hernaez* was faithful to the language of the jurisdiction-stripping statute itself. *See INS v. Cardoza-Fonseca,* 480 U.S. 421, 432 n. 12, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (noting a "strong presumption that Congress expresses its intent through the language it chooses"). *Hernaez's* approach is also consistent with the principle that jurisdiction-stripping provisions should be narrowly construed, *McNary v. Haitian Refugee Ctr.,* 498 U.S. 479, 494, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991), and, accordingly, that courts should not cede jurisdiction to review administrative decisions unless Congress specifically so instructs, *Bowen v. Mich. Acad. of Family Physicians,* 476 U.S. 667, 671, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986); *St. Cyr,* 533 U.S. at 298, 121 S.Ct. 2271.

Applying the reasoning of *Hernaez,* I conclude that § 1252(a)(2)(C), by its express terms, applies only to removal orders in which the alien is ordered removed "by reason of having *committed* a criminal offense."[6] Because § 1182(a)(2)(C) does not require that an alien commit a criminal offense in order to be found inadmissible or removable, § 1252(a)(2)(C) does not bar our review of orders finding aliens removable pursuant to that statute.

Because no finding has been made in this case that Lopez-Molina *committed* a criminal offense, I would conclude that we have jurisdiction and reach the merits of Lopez-Molina's petition. Accordingly, I respectfully dissent from the majority's holding that we lack jurisdiction to review this petition.

**All Citations**

368 F.3d 1206, 04 Cal. Daily Op. Serv. 4733, 2004 Daily Journal D.A.R. 6518

## Footnotes

[*] The Honorable Ronald B. Leighton, United States District Judge for the Western District of Washington, sitting by designation.

[1] According to the NTA, Lopez-Molina was inadmissible under § 1182(a)(2)(C) because he was an alien "who the consular officer or the Attorney General knows or has reason to believe is or has been an illicit trafficker in any controlled substance or is or has been a knowing assister, abettor, conspirator, or colluder with others in the illicit trafficking in any such controlled substance." The government explicitly referenced Lopez-Molina's 1990 arrest and his 1996 conviction for Misprision of Felony.

[2] Section 1252(a)(2)(C) provides in relevant part:
   Notwithstanding any other provision of law, no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of *having committed a criminal offense* covered in [ 8 U.S.C. § 1182(a)(2) ]....
   8 U.S.C. § 1252(a)(2)(C) (emphasis added).

[3] Although *Alarcon-Serrano* involved IIRIRA's transitional rules, it nonetheless controls the case at hand because the jurisdiction-stripping provision of IIRIRA's transitional rules, § 309(c)(4)(G), is essentially identical to § 1252(a)(2)(C).

[4] 8 U.S.C. § 1227(a)(1)(A) provides that an alien who is inadmissible at the time of adjustment of status is deportable.

[5] Any alien who the consular officer or the Attorney General knows or *has reason to believe*-is or has been an illicit trafficker in any controlled substance or in any listed chemical ... or is or has been a knowing aider,

abettor, assister, conspirator, or colluder with others in the illicit trafficking in any such controlled or listed substance or chemical, ... is inadmissible.

8 U.S.C. § 1182(a)(2)(C) (emphasis added).

6   Because Lopez-Molina's additional constitutional and evidentiary claims are also without merit, the position that the dissent advocates makes no practical difference in this case. Under the dissent's analysis, we would retain jurisdiction and proceed to review Lopez-Molina's claim on the merits only to engage in an identical analysis. *See Hamid,* 538 F.2d at 1390-91 (conducting a review on the merits by applying substantial evidence review to an IJ's conclusion that there was reason to believe that alien was an illicit drug trafficker). Therefore, the difference between the analysis formulated by *Alarcon-Serrano* and the approach suggested by the dissent is that the former would require us to dismiss the petition for review, while the latter would have us deny the petition.

1   [N]o court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having *committed* a criminal offense covered in [ 8 U.S.C. § 1182(a)(2) ].

8 U.S.C. § 1252(a)(2)(C) (emphasis added).

2   Any alien who the consular officer or the Attorney General knows or *has reason to believe*-is or has been an illicit trafficker in any controlled substance or in any listed chemical ... or is or has been a knowing aider, abettor, assister, conspirator, or colluder with others in the illicit trafficking in any such controlled or listed substance or chemical, or endeavored to do so ... is inadmissible.

8 U.S.C. § 1182(a)(2)(C) (emphasis added).

3   The other two statutes identified in § 1252(a)(2)(C) are 8 U.S.C. § 1182(a)(2)(C) (the statute under which Lopez-Molina was found inadmissible), and § 1227(a)(2)(B)(ii) ("Any alien who is, or at any time after admission has been, a drug abuser or addict is deportable.").

4   IIRIRA § 309(c)(4)(G), the jurisdiction-stripping provision of IIRIRA's transitional rules, is essentially identical to § 1252(a)(2)(C).

5   The majority's assertion, Maj. op. at 1211, that *Hernaez* "cited *Alarcon-Serrano* with *approval* " is something of an overstatement. In fact, all that *Hernaez* did was to observe that "[*a* ]*s the INS argues,* under *Alarcon-Serrano,* such a criminal offense could be proven without a conviction." *Hernaez,* 244 F.3d at 757 (emphasis added). Stating the government's position is hardly an approval of the same.

6   Neither party has argued that the word "committed," as used in § 1252(a)(2)(C), is ambiguous. *See Coronado-Durazo v. INS,* 123 F.3d 1322, 1324 (9th Cir.1997) ("Where the plain meaning of a provision is unambiguous that meaning is controlling." (quoting *United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989))).

---

**End of Document**              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

05 Cal. Daily Op. Serv. 3798, 2005 Daily Journal D.A.R. 5206

KeyCite Yellow Flag - Negative Treatment
Distinguished by Enying Li v. Holder, 9th Cir., December 31, 2013

405 F.3d 1049
United States Court of Appeals,
Ninth Circuit.

Rosalina LOPEZ–UMANZOR, Petitioner,

v.

Alberto R. GONZALES, *
Attorney General, Respondent.

No. 03–72014.
|
Argued and Submitted Jan. 13, 2005.
|
Filed May 6, 2005.

**Synopsis**
**Background:** Alien petitioned for judicial review of a decision of the Board of Immigration Appeals (BIA), affirming the immigration judge's (IJ) decision, finding her ineligible for cancellation of removal and denying her request for voluntary departure.

**Holdings:** The Court of Appeals, Graber, Circuit Judge, held that:

[1] IJ's refusal to hear testimony from alien's domestic violence experts violated due process, and

[2] alien was prejudiced by the due process violation.

Petition granted; remanded with instructions.

West Headnotes (9)

**[1]** **Aliens, Immigration, and Citizenship** ⬤ Jurisdiction and venue
The Court of Appeals has jurisdiction to review due process challenges to immigration proceedings. U.S.C.A. Const. Amend. 5.

1 Cases that cite this headnote

**[2]** **Aliens, Immigration, and Citizenship** ⬤ Constitutional questions
Claims of due process violations in removal proceedings are reviewed de novo. U.S.C.A. Const. Amend. 5.

2 Cases that cite this headnote

**[3]** **Constitutional Law** ⬤ Admission and exclusion; deportation
Due process principles prohibit an immigration judge (IJ) from declining to hear relevant testimony in a removal proceeding because of a prejudgment about the witness's credibility or the probative value of the testimony. U.S.C.A. Const. Amend. 5.

13 Cases that cite this headnote

**[4]** **Aliens, Immigration, and Citizenship** ⬤ Judicial Review or Intervention
The Court of Appeals will grant a petition for judicial review from a Board of Immigration Appeals (BIA) decision on due process grounds, if the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his or her case. U.S.C.A. Const. Amend. 5.

7 Cases that cite this headnote

**[5]** **Constitutional Law** ⬤ Admission and exclusion; deportation
Whether the immigration judge's (IJ's) actions prevented the introduction of significant testimony is critical to the ultimate due process question of whether the alien had a reasonable opportunity to present evidence in a removal proceeding. U.S.C.A. Const. Amend. 5.

5 Cases that cite this headnote

**[6]** **Aliens, Immigration, and Citizenship** ⬤ Admissibility

05 Cal. Daily Op. Serv. 3798, 2005 Daily Journal D.A.R. 5206

**Constitutional Law** 🔑 **Admission and exclusion; deportation**

Immigration judge's (IJ's) refusal to hear testimony from alien's domestic violence experts, proffered to boost alien's credibility to explain why she repeatedly returned to her abusive husband and other conduct, violated alien's due process rights, in proceeding for cancellation of removal based upon her status as a battered spouse; IJ speculated that experts on patterns of domestic violence could do no more than repeat the alien's testimony, and that evidence of such patterns was not helpful in evaluating alien's credibility. U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, § 240A(b)(2), as amended, 8 U.S.C.A. § 1229b(b)(2).

4 Cases that cite this headnote

[7]   **Aliens, Immigration, and Citizenship** 🔑 **Effect of irregularities; harmless or prejudicial error**

**Constitutional Law** 🔑 **Admission and exclusion; deportation**

Alien seeking cancellation of removal based upon her status as a battered spouse was prejudiced by immigration judge's (IJ's) due process violation, in refusing to allow alien to present testimony from domestic violence experts, proffered to boost alien's credibility to explain why she repeatedly returned to her abusive husband and other conduct questioned by IJ; IJ's adverse credibility determination on issue of domestic violence directly affected his subsequent decision to discredit alien's testimony that she did not engage in drug transaction, and to credit police detective's testimony with regard to alleged drug transaction, which rendered her ineligible for cancellation of removal. U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, §§ 212(a)(2)(C), 240A(b)(2), as amended, 8 U.S.C.A. §§ 1182(a)(2)(C), 1229b(b)(2).

19 Cases that cite this headnote

[8]   **Witnesses** 🔑 **Falsus in Uno, Falsus in Omnibus**

A person who is deemed unbelievable as to one material fact may be disbelieved in all other respects.

12 Cases that cite this headnote

[9]   **Aliens, Immigration, and Citizenship** 🔑 **Controlled substances offenses**

If the Board of Immigration Appeals (BIA) properly concludes that there is reason to believe an alien is a drug trafficker, then the alien is ineligible for cancellation of removal as a battered spouse. Immigration and Nationality Act, §§ 212(a)(2)(C), 240A(b)(2), as amended, 8 U.S.C.A. §§ 1182(a)(2)(C), 1229b(b)(2).

7 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1050** Mara Kimmel, Catholic Social Services, for the petitioner.

James E. Grimes and Thomas K. Ragland, U.S. Department of Justice, Civil Division, Office of Immigration Litigation, Washington, DC, for the respondent.

David R. Fine, Carleton O. Strouss, Kirkpatrick & Lockhart Nicholson Graham LLP, Harrisburg, PA, and Gail L. Pendleton, Associate Director, National Immigration Project of the National Lawyers Guild, Boston, MA, for the amici curiae.

On Petition for Review of an Order of the Board of Immigration Appeals.

Before SCHROEDER, Chief Judge, and GOODWIN and GRABER, Circuit Judges.

**Opinion**

GRABER, Circuit Judge.

Petitioner Rosalina Lopez–Umanzor petitions for review of a decision of the Board of Immigration Appeals ("BIA") finding her ineligible for cancellation of removal and denying

05 Cal. Daily Op. Serv. 3798, 2005 Daily Journal D.A.R. 5206

her request for voluntary departure. An immigration judge ("IJ") had found Petitioner to be ineligible for relief because there was "reason to believe" that she had been involved in drug trafficking, 8 U.S.C. § 1182(a)(2)(C); the IJ disbelieved her testimony to the contrary. On appeal of the IJ's decision, the BIA rejected Petitioner's due process arguments and affirmed the IJ's adverse credibility determination. We grant the petition for review and remand for a new hearing because the IJ refused to allow Petitioner to present relevant expert testimony that bore on Petitioner's credibility, relying instead on his own stereotypical assumptions about domestic violence.

FACTUAL AND PROCEDURAL BACKGROUND

Petitioner is a native and citizen of Honduras who entered the United States without inspection in 1989. Nine years later the government sought her removal. Petitioner conceded removability, but applied for cancellation of removal under 8 U.S.C. § 1229b(b)(2), a provision available to certain victims of domestic violence. [1] The IJ denied her application because he found a "reason to believe" that Petitioner had **\*1051** been involved in drug trafficking and, consequently, that she lacked good moral character; he also concluded that her testimony regarding domestic violence was not credible. The BIA affirmed the IJ's adverse credibility finding and his conclusion that Petitioner was ineligible for cancellation of removal and voluntary departure.

A. *The course of proceedings before the IJ*
In advance of her removal hearing, Petitioner submitted evidence intended to corroborate her allegation that she had suffered domestic violence, including medical records from an emergency room visit and written statements from social service providers and a psychologist who had worked with Petitioner. The government submitted a criminal information, charging Petitioner with Misconduct Involving a Controlled Substance, and a notice that the charge had been dismissed. Petitioner was the sole witness at the removal hearing on April 1, 1999. The government presented no further evidence and no evidence to undermine Petitioner's testimony regarding the abuse that she had endured.

After the April 1 removal hearing (and after missing the deadline to file a post-hearing brief), the government submitted a written statement from a detective regarding the

circumstances surrounding the dismissed criminal charge. The government initially sought, and was granted, a second hearing to present the detective's live testimony. Later, however, the government twice tried to withdraw its request for a second hearing. The IJ denied the withdrawal motions and subpoenaed the detective. After Petitioner's interlocutory appeal to the BIA was denied, the second hearing went forward, with the IJ conducting the direct examination of the detective. Petitioner did not testify at the second hearing, but made an offer of proof and presented one character witness.

B. *Testimony regarding domestic violence*
Petitioner's husband, Luis Calzadillas, is a lawful permanent resident of the United States. Petitioner testified that, on the night she first met Calzadillas, he drugged and raped her, causing her to become pregnant. He assaulted her during that pregnancy and her two others with him, including hitting her and kicking her in the stomach. On one occasion, he caused a miscarriage. Even when Petitioner was not pregnant, Calzadillas regularly hit and beat her, threw her to the ground, and kicked her. He repeatedly threatened to call immigration authorities if she revealed the ongoing abuse.

When Petitioner tried to leave Calzadillas, he twice followed her from Texas, where they had been living, to California, and then he followed her to Alaska. Calzadillas arrived at Petitioner's apartment in Anchorage. He began drinking and attacked Petitioner with a knife, attempting to stab her in the back, but instead hitting her hand as she turned around. She went to an emergency room for treatment, where she told the doctors that she had cut her hand on a broken bottle. Petitioner testified that she lied about the cause of the injury because Calzadillas had threatened to do something worse if she did not report it that way.

After receiving treatment at the emergency room, Petitioner returned to her apartment. She returned there because, she testified, she thought (incorrectly, as it turns out) that Calzadillas had left, and she had nowhere else to go at the time. Later, however, Petitioner and her two youngest daughters sought refuge at a domestic violence shelter in Anchorage, which provided services to her as "a survivor of domestic violence" at the hands of Calzadillas.

**\*1052** The IJ expressed doubt about whether Petitioner was telling the truth about the abuse (a subject that we will discuss in detail below). Nonetheless, when Petitioner offered the live testimony of several expert witnesses who could testify on the

05 Cal. Daily Op. Serv. 3798, 2005 Daily Journal D.A.R. 5206

topic of domestic violence, and perhaps shed light on the IJ's credibility concerns, the IJ refused to allow them to testify.

### C. *Testimony regarding drug trafficking*

While residing in Alaska, Petitioner was arrested and charged with Misconduct Involving a Controlled Substance in the third degree. At the time of the arrest, Petitioner was a passenger in a car belonging to Jose Armando Gomez–Mendoza who, she testified, was the boyfriend of her 23–year–old daughter. Anchorage police stopped the car and arrested both Gomez–Mendoza and Petitioner. The district attorney later dropped the charge against Petitioner.

At the second hearing in this case, Anchorage Detective Bruce Edward Bryant testified that a reliable informant had identified Petitioner as one of several people involved in the distribution of crack cocaine. Detective Bryant had no first-hand knowledge of Petitioner's reported involvement in drug transactions, however, nor did any of the other officers on the case witness a transaction between the informant and Petitioner. On the day of the arrest, according to the informant, Gomez–Mendoza obtained a small package of cocaine from Petitioner, who was holding it in her mouth, and sold the package to the informant. When the car was stopped, half the marked "buy" money was found in Gomez–Mendoza's pocket and half in Petitioner's purse. Documents in her purse showed her address to be the same as the one listed on the car's registration, and telephone records showed several calls from Gomez–Mendoza to Petitioner's number (which also was her daughter's number). Additionally, a storage locker rented in Petitioner's name contained $934, three pagers, five cellular telephones, and identity documents bearing Petitioner's photograph but using other names.

On the other hand, no cocaine was found on Petitioner when she was arrested. Nor, despite a search, were any drugs found in her apartment. At the initial hearing, Petitioner testified unequivocally that she never was involved in drug trafficking. She testified that she was in the car because she had asked Gomez–Mendoza for a ride to a shopping center. Specifically, Petitioner denied having held a package for Gomez–Mendoza, denied having put anything in her mouth, and denied having taken anything out of her mouth to give to anyone.

Following Detective Bryant's testimony, the IJ accepted Petitioner's offer of proof with respect to the facts to which she had testified at the earlier hearing: she relied on Gomez–Mendoza for transportation; she had no involvement in

Gomez Mendoza's drug transactions; and Gomez–Mendoza gave her half of the "buy" money because he owed her money for a radio that he previously had purchased from her. The government specifically waived the opportunity to cross-examine Petitioner.

At the conclusion of the second hearing, a character witness, who had been Petitioner's pastor for three years and who knew her well, testified on Petitioner's behalf as to her good moral character. In the pastor's opinion, Petitioner has never been involved with drugs. After the pastor's testimony, the hearing was adjourned.

## RELEVANT STATUTORY PROVISIONS

To qualify for cancellation of removal under 8 U.S.C. § 1229b(b)(2) ( "Special rule **\*1053** for battered spouse or child"), a provision added as part of the Violence Against Women Act of 1994 ("VAWA"),[2] Petitioner had to demonstrate that she met each of the following five criteria:

> (1) that she had been "battered or subjected to extreme cruelty" by a spouse who is or was a United States citizen or lawful permanent resident;

> (2) that she had lived continuously in the United States for the three years preceding her application;

> (3) that she was a person of "good moral character" during that period;

> (4) that she is not inadmissible or deportable under various other specific immigration laws relating to criminal activity, including 8 U.S.C. § 1182(a)(2); and

> (5) that her removal "would result in extreme hardship" to herself, her children, or her parents.

8 U.S.C. § 1229b(b)(2)(A)(i)-(v). If Petitioner failed to establish *any one* of those criteria, she is not eligible for cancellation of removal under § 1229b(b)(2), *even if* she is a victim of domestic violence.

The central issue in this case is whether Petitioner met the fourth criterion—specifically, whether she demonstrated that she is not inadmissible under 8 U.S.C. § 1182(a)(2)(C),

which relates to involvement in illegal drug trafficking. [3] Under § 1182(a)(2)(C), an alien is inadmissible if

the ... Attorney General knows or has *reason to believe* ... [that the alien] is or has been an illicit trafficker in any controlled substance ... or is or has been a knowing aider, abettor, assister, conspirator, or colluder with others in the illicit trafficking in any such controlled or listed substance or chemical, or endeavored to do so[.]

(Emphasis added.). Section 1182(a)(2)(C) does not require a conviction, but only a "reason to believe" that the alien is or has been involved in drug trafficking. *Lopez–Molina v. Ashcroft,* 368 F.3d 1206, 1209 (9th Cir.2004). If Petitioner is inadmissible under § 1182(a)(2)(C), then she is ineligible for cancellation of removal under 8 U.S.C. § 1229b(b)(2)(A)(iv).

JURISDICTION AND STANDARD OF REVIEW

[1]  [2]  We have jurisdiction to review due process challenges to immigration proceedings. *Reyes–Melendez v. INS,* 342 F.3d 1001, 1006 (9th Cir.2003). Claims of due process violations in removal proceedings are reviewed de novo. *Id.*

DISCUSSION

Petitioner's eligibility for cancellation of removal focused on one question: who was telling the truth about Petitioner's alleged involvement in drug trafficking, Petitioner or Detective Bryant? Had the IJ believed Petitioner's explanation, then she would have met the statutory criteria for relief. Instead, the IJ believed Detective Bryant, thereby rendering Petitioner ineligible for relief.

To answer that question, the IJ had to weigh Petitioner's credibility against the credibility of the detective and the credibility of the absent informant. We rarely **\*1054** disturb the result of that kind of balancing. But here, the IJ's assessment of Petitioner's credibility was skewed by prejudgment, personal speculation, bias, and conjecture; and his refusal to allow Petitioner to challenge those views by presenting expert testimony violated Petitioner's right to due

process. We cannot assume that the IJ would have struck the same balance had the weighing begun on an even plane.

A. *The IJ improperly impugned Petitioner's credibility and prejudged the utility of expert testimony.*

1. *Speculation and bias about Petitioner's credibility*

The IJ stated, in his written decision, that "[e]ven before hearing the testimony of Detective Bryant, the Court had doubts about [Petitioner's] credibility." [4]  Specifically, the IJ repeatedly expressed doubts about Petitioner's account of domestic violence. The IJ's skepticism centered around three key points: he doubted that Petitioner would stay with, or return to, Calzadillas if he were abusive; he doubted that Calzadillas would follow Petitioner if she did leave; and he doubted that Calzadillas could find Petitioner if he did wish to follow her.

The IJ's most intense skepticism was directed at the third point, Calzadillas' ability to find Petitioner. Before Petitioner had even testified to the events in question, the IJ stated: "[I]t's just about impossible, if she didn't tell him. She must have communicated with him, otherwise, how could he have possibly figured out where she went?" The IJ observed that the Immigration and Naturalization Service [5] ("INS") commonly could not locate people against whom there were orders of removal and wondered how, given the INS's ability to lose people, Calzadillas could have tracked Petitioner down. In his written decision, the IJ regarded as "implausible" the "amazing ability of [Petitioner's] tormentors to locate her, though she traveled to the far corners of this country to escape."

The IJ also doubted that Calzadillas would have followed Petitioner in the first place. During a discussion, early in the hearing, of whether Calzadillas, who is originally from Mexico, would follow Petitioner to Honduras, the IJ said:

I mean, it's not very persuasive that he is going to go back to a country, because he is so obsessed by her that he is going to follow her back to her country where ... a foreign country where he doesn't even have a right to be and probably can't get a job, just so, you know, he can be close to her.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

05 Cal. Daily Op. Serv. 3798, 2005 Daily Journal D.A.R. 5206

Finally, the IJ expressed disbelief that Petitioner would stay with an abusive partner. Petitioner explained that, during her time with Calzadillas in Texas (while she was pregnant, and then while she had a newborn daughter), she stayed at home while Calzadillas worked. The IJ asked: "Well, why didn't you escape then?" (She did, when her baby reached the age of six months.) Petitioner also testified that she, along with two of her children, returned to **\*1055** her Anchorage apartment after being treated for stab wounds inflicted by Calzadillas because she thought he had left and because they had nowhere else to go. When she returned, Petitioner asked Calzadillas to leave, but he refused. Later in the hearing, the IJ questioned whether someone who was afraid to tell hospital personnel about her abuse would be likely "to go back to the apartment where this drunk is waiting" or would have the gumption to tell the abuser to leave when she found him there. In his written decision, the IJ found it "implausible" that Petitioner would have returned to her apartment "if there truly had been a chance that a drunken abusive man with a knife was waiting there." He suggested several other destinations, including a park bench, that would have been preferable and concluded that Petitioner's "willingness to return to her apartment so soon after the alleged knifing event seriously detracted from her credibility as to the actual events of that evening."

These areas of skepticism are important for two reasons. First, they reveal the kind of speculation and bias that we have held to be improper bases for an adverse credibility determination.[6] *Cf.* Kaur v. Ashcroft, 379 F.3d 876, 885–87 (9th Cir.2004) (reversing an adverse credibility determination in part because the IJ speculated that India would not have issued a passport with the name printed as "Ran*jit,*" but signed as "Ran*jeet,*" despite the explanation from the petitioner's counsel that the spellings were interchangeable); *Arulampalam v. Ashcroft,* 353 F.3d 679, 687 (9th Cir.2003) (holding that the IJ improperly speculated that experienced soldiers would have been able to prevent the petitioner from bypassing check-points on his way out of his country, as he testified that he did); *Paramasamy v. Ashcroft,* 295 F.3d 1047, 1052 (9th Cir.2002) (rejecting an IJ's speculation about the petitioner's "real" economic motives for wanting to leave her country); *see also* Reyes–Melendez, 342 F.3d at 1006 (holding that a neutral judge is among the most basic of due process protections); Colmenar v. INS, 210 F.3d 967, 971 (9th Cir.2000) (stating that a due process violation occurs when an IJ prejudges a claim and

fails to behave as a neutral fact-finder interested in hearing the petitioner's evidence).

Second, these areas of skepticism are important because they provide a context for the IJ's refusal to hear expert testimony, from professionals who had worked with Petitioner, regarding the dynamics of abusive relationships. *Cf.* Zi Lin Chen v. **\*1056** *Ashcroft,* 362 F.3d 611, 618 (9th Cir.2004) (holding that, when the petitioner had been "denied a reasonable opportunity to explain what the IJ perceived as an inconsistency in her testimony," the "IJ's doubt about the veracity of her story [could not] serve as a basis for the denial of asylum").

### 2. *Doubts about the utility of expert testimony*

The IJ was of the preconceived view that expert testimony could do no more than repeat, uncritically, the victim's consistent—but potentially fabricated—story. ("You know, I mean, she talked to [Petitioner] and believes the story, basically, so you know, it's kind of bootstrapping then.") Indeed, the IJ observed that persons in need of services can be motivated to fabricate stories of domestic violence:

> But ... the more she tells these stories, the more benefit she accrues from all of these agencies that are quite eager to help her in any way they can. And the more they hear, the more they [p]ile on the services. So there's always the possibility of someone embellishing in order to gain the kind of support. I'm not saying I don't believe her. Don't get me wrong.

*Cf.* Sanchez–Cruz v. INS, 255 F.3d 775, 779–80 (9th Cir.2001) (observing that the IJ had focused with disapproval on the fact that the petitioner had received welfare). And, as for the experts' ability to discriminate between actual victims of domestic violence and people whose need flows from other sources, the IJ opined:

> [T]his type of people, they don't throw people out on the street. If someone comes in and says that they have been

abused, if—if everything they observe
in talking to them, hearing their case
history is consistent with their story,
they'll basically believe it.

Petitioner's counsel countered that the experts' live testimony could provide information relevant to the IJ's most critical areas of doubt, such as Calzadillas' desire and ability to follow Petitioner. Counsel also offered to question the experts regarding the intake criteria they use to determine whether someone has, in fact, been abused. She pointed out that none of those issues had been addressed in the written materials previously provided by way of affidavits.

The IJ ultimately refused the live testimony, asserting that time was short: "I don't—I don't believe that I want to hear any testimony from the experts, because—mainly because of the lateness of the hour. If—you know, if we had more time, perhaps, but it is 4:30 and I don't think we could accomplish much in 30 minutes." The IJ assured Petitioner's counsel that he would consider the experts' written materials.

B. *The IJ's refusal to hear testimony from Petitioner's experts violated due process.*

**[3]  [4]  [5]**  Due process principles prohibit an IJ from declining to hear relevant testimony because of a prejudgment about the witness's "credibility or the probative value of[the] testimony." *Kaur v. Ashcroft,* 388 F.3d 734, 737 (9th Cir.2004). "We will grant a petition for review from a BIA decision on due process grounds if the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting [his or her] case." *Reyes–Melendez,* 342 F.3d at 1006 (internal quotation marks omitted).[7] Whether the IJ's actions prevented the introduction of significant testimony is critical to the ultimate **\*1057** question whether the alien had a reasonable opportunity to present evidence. *See, e.g.,* *Sanchez–Cruz,* 255 F.3d at 779 (noting that the IJ "refused to allow the petitioner to introduce evidence that specifically contradicted some of his factual findings"); *Colmenar,* 210 F.3d at 971 (noting that the IJ cut off the alien's testimony regarding the possible political motivations of the attack against him).

In *Kaur,* an asylum seeker attempted to call her son, who had been granted asylum a year earlier, as a witness to the events that had caused her to leave her native country. The IJ refused to hear his testimony because the son had been only 8 or 9 years old at the time of the relevant incidents. 388 F.3d at 736. The IJ then denied asylum, in part because of the absence of corroborative evidence. *Id.* We held that "[t]he IJ was not entitled to prejudge [the son's] credibility or the probative value of his testimony." *Id.* at 737. The testimony, for which there was no substitute, was relevant to corroborate the petitioner's testimony and to bolster her credibility. *Id.*

In the circumstances of this proceeding, the IJ's refusal to hear testimony from Petitioner's experts likewise violated due process. In *Kaur,* of course, there was no substitute for the son's testimony, and the IJ there gave no reason for excluding the testimony other than a prejudgment of its value. *See id.* Here, the IJ gave two facially neutral reasons—efficiency and the superiority of written materials—for refusing the expert testimony. But the latter reason cannot suffice when the proffered testimony was *not* covered in the written materials and when it would have reflected directly on Petitioner's credibility, on specific points as to which the IJ repeatedly had expressed skepticism. And the IJ's claimed interest in efficiency was belied by the substantial amount of time the IJ spent arguing with Petitioner's counsel about *whether* to hear the testimony and by his willingness (indeed, insistence) to call, and to hold an additional hearing to receive testimony from, Detective Bryant.[8]

**[6]**  Petitioner was denied an opportunity to challenge the IJ's preconceived views that experts in the patterns of domestic violence could do no more than repeat, uncritically, the victim's testimony, and that evidence of such patterns was not a helpful supplement to the traditional tools for evaluating credibility. As we wrote in a slightly different context:

[I]n enacting VAWA, Congress recognized that lay understandings of domestic violence are frequently comprised of "myths, misconceptions, and victim blaming attitudes," and that background information regarding domestic violence may be crucial in order to understand its essential characteristics and manifestations.

*Hernandez v. Ashcroft,* 345 F.3d 824, 836 (9th Cir.2003) (quoting H.R.Rep. No. 103–395, at 24 (1993)).[9]  In VAWA, Congress took steps to provide judges with training **\*1058** on the topics of rape and domestic violence. *See* Pub.L. No. 103–322, tit. IV, subtit. D, §§ 40411–40422. In support of that measure, Congress noted that "[a] judge who is confident in

05 Cal. Daily Op. Serv. 3798, 2005 Daily Journal D.A.R. 5206

controlling his or her own life and circumstances ... may find it difficult to understand the circumstances and responses of a battered woman." S.Rep. No. 103–138, at 46 (1993).

> Some judges and court personnel approach domestic violence cases, whether consciously or unconsciously, with assumptions based not on personal experience or the facts of a particular case but on stereotypes and biases. Judges and court personnel may also lack information about the psychological, economic, and social realities of domestic violence victims.

*Id.* Congress, in other words, recognized that information about the dynamics of abusive relationships could help adjudicators evaluate facts more fairly. This recognition supports our conclusion that due process required the IJ to allow Petitioner to confront his overt skepticism with expert testimony on the issue of domestic violence.

C. *Petitioner suffered prejudice as a result of this due process violation and the IJ's improper speculation as to her credibility.*

[7]    For us to grant the petition for review on due process grounds, Petitioner must show prejudice, "which means that the outcome of the proceeding *may have been affected* by the alleged violation." *Reyes–Melendez,* 342 F.3d at 1006 (emphasis added). The government argues that there is no prejudice because substantial evidence supports the IJ's finding that Petitioner was involved in drug trafficking, regardless of any mistakes the IJ may have made in evaluating the credibility of her testimony about domestic violence. That is, even if the IJ's improper assessment of Petitioner's credibility resulted in an incorrect conclusion as to her testimony about *domestic violence,* it did not affect his decision to credit the detective's testimony over Petitioner's with regard to the alleged *drug transaction.* We do not agree.

Petitioner and Detective Bryant presented conflicting testimony with regard to the alleged drug transaction. To review: In the initial hearing, Petitioner testified to her version of the events leading to her arrest, in which she was an innocent bystander. At the second hearing, Detective Bryant presented another version, relayed from an informant, in which Petitioner had held a rock of cocaine in her mouth, passed it to Gomez–Mendoza, and received half of the marked "buy" money in exchange. After Detective Bryant testified, in rebuttal Petitioner's counsel gave a detailed offer of proof to supplement Petitioner's earlier testimony. The offer of proof unequivocally denied any involvement in

drug trafficking; said that Petitioner needed a ride with her daughter's boyfriend because she lacked other transportation; and explained the presence of the money in her purse as payment for a radio, sold earlier to the boyfriend. Her previous testimony had caused denial of specific charges (like holding cocaine in her mouth). The IJ accepted the offer of proof in lieu of Petitioner's live rebuttal testimony, and the government waived the right to cross-examine.

[8]    The IJ's decision to believe Detective Bryant over Petitioner controlled the outcome of the proceeding. Our task is to determine whether the IJ's assessment of Petitioner's credibility regarding domestic violence, and his refusal to admit testimony that would have challenged his preconceived view of her credibility on that point, may have affected his resolution of the drug-related credibility dispute. On this record, we cannot conclude that the two issues were unconnected. The IJ's improper **\*1059** prejudgment on the first issue, which culminated in his refusal to hear testimony that might have bolstered Petitioner's credibility, infected his decision to believe Detective Bryant's testimony over Petitioner's. Our law has long recognized that a person who is deemed unbelievable as to one material fact may be disbelieved in all other respects. *See Hattem v. United States,* 283 F.2d 339, 343 (9th Cir.1960) (approving, as a correct statement of the law, a jury instruction stating that, "[i]f you find that any witness in this trial has wilfully testified falsely as to any material fact in the case, then you are at liberty wholly to disregard all of the testimony of that witness");

*Shelton v. United States,* 169 F.2d 665, 667 (D.C.Cir.1948) (discussing the maxim "falsus in uno, falsus in omnibus"). Petitioner's testimony regarding domestic violence came before the testimony regarding her arrest, and the IJ expressly stated that his credibility concerns began during the former. "Even before hearing the testimony of Detective Bryant," the IJ stated in his decision, he "had doubts about [Petitioner's] credibility."

Of course, we cannot be sure that the IJ would have reached a different conclusion about the drug transaction had he begun with a more neutral view of Petitioner's credibility. But our cases do not require absolute certainty. *See, e.g.,* *Agyeman v. INS,* 296 F.3d 871, 884 (9th Cir.2002) ("Prejudice is shown if the violation *potentially* ... affects the outcome of the proceedings." (internal quotation marks omitted)). In this proceeding, everything came down to resolving a conflict in testimony; and the IJ's earlier-developed, improperly negative view of Petitioner's credibility may have affected

05 Cal. Daily Op. Serv. 3798, 2005 Daily Journal D.A.R. 5206

his later conclusion that it was Petitioner, not the detective (or the informant), who lied about the drug transaction. That conclusion, as we have said, controlled the outcome.

**[9]** Today's decision by no means refutes the self-evident proposition that one can be both a victim of domestic violence and a drug trafficker. If the agency properly concludes that there is reason to believe an alien is a drug trafficker, [10] then the alien is ineligible for cancellation of removal under 8 U.S.C. § 1229b(b)(2), period. But, before reaching that conclusion, the agency must give the alien a fair hearing in front of a neutral decision-maker. Because the IJ's disbelief of Petitioner rested on personal speculation, bias, conjecture, and prejudgment, and because he refused to hear testimony that would have challenged those assumptions, we decline to assume that a fair and neutral balancing of the conflicting testimony occurred or to assume that a fair and neutral balancing necessarily would have yielded the same answer. Thus, we conclude that Petitioner has demonstrated prejudice.

We do not suggest that the agency was or is required to credit Petitioner's version of events uncritically. We merely hold that the IJ was required to hear testimony from Petitioner's experts in the subject of domestic violence, as to matters pertaining to her credibility. Thus, we remand for a new hearing, to ensure that Petitioner has a full and fair opportunity to establish her credibility, *Kaur,* 388 F.3d at 738 (remanding for a new hearing), and we suggest that the new hearing be held before a different immigration judge, *Perez–Lastor v. INS,* 208 F.3d 773, 783 (9th Cir.2000). [11]

**\*1060** PETITION GRANTED; REMANDED with instructions.

**All Citations**

405 F.3d 1049, 05 Cal. Daily Op. Serv. 3798, 2005 Daily Journal D.A.R. 5206

---

## Footnotes

*    Alberto R. Gonzales is substituted for his predecessor, John Ashcroft, as Attorney General of the United States, pursuant to Fed. R.App. P. 43(c)(2).

1    Petitioner was not eligible under the general cancellation of removal provision, 8 U.S.C. § 1229b(b)(1), because she had not been present in the United States for ten years.

2    Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, Tit. IV (VAWA), subtit. G, § 40703, 108 Stat. 1796. After its enactment, the statute was amended to reflect the transition in immigration parlance from "suspension of deportation" to "cancellation of removal."

3    As the IJ and the BIA properly noted, involvement in drug trafficking, and presentation of false testimony regarding such involvement, also would preclude Petitioner from establishing "good moral character" as required by the third criterion, 8 U.S.C. § 1229b(b)(2)(A)(iii). The government does not argue that Petitioner fails to meet the remaining three statutory criteria.

4    His first doubt was that "[h]er demeanor during testimony often sounded more like the recitation of a memorized story than a person actually recalling and reliving traumatic events." We rejected a very similar generalized statement, made by the very same immigration judge, as a basis for an adverse credibility determination in *Arulampalam v. Ashcroft,* 353 F.3d 679, 686 (9th Cir.2003).

5    The INS ceased to exist on March 1, 2003, when its functions were transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub.L. No. 107–296, 116 Stat. 2135. We refer to the agency as the INS because the hearings in this case took place before the transfer.

6    Another area in which personal conjecture determined the course of this proceeding, and influenced the IJ's credibility determination, pertains to Petitioner's relationship with Gomez–Mendoza, who was with Petitioner in the car on the day of her arrest. The IJ doubted that Gomez–Mendoza, a man in his forties, could have been the boyfriend of Petitioner's daughter (who was 23 years old at the time of Petitioner's arrest). Indeed, their

05 Cal. Daily Op. Serv. 3798, 2005 Daily Journal D.A.R. 5206

age difference was the primary reason the IJ gave for calling Detective Bryant to testify after the government tried to withdraw its request:

> There were aspects of [Petitioner's] testimony which the Court found implausible and unpersuasive regarding the arrest, which the detective's testimony might clarify.... Gomez-[Mendoza] is apparently a middle-aged man, closer to the age of the respondent than her daughter, yet she testified that this man was her daughter's boyfriend. Her testimony did not have the ring of truth on this point.... If he is actually [Petitioner's] boyfriend, it would indicate that she lacked credibility, and would affect the merits of her claim as an allegedly abused person.

No evidence, including Detective Bryant's testimony, contradicted Petitioner's assertion that Gomez–Mendoza was her daughter's boyfriend; and their 20–year age difference is not so unusual that the IJ properly could have discounted the accuracy of Petitioner's testimony.

7  As we will discuss in the next section, "[t]he alien must also show prejudice." *Reyes–Melendez,* 342 F.3d at 1006.

8  The IJ's statements suggested that less neutral reasons also influenced his decision. In his discussion with Petitioner's counsel, the IJ appeared to discount the value of information about typical patterns of domestic violence as an aid in resolving inconsistencies and determining credibility in general:

> Well, we can figure that out, you know, that someone has to have an explanation as to why there is something inconsistent in the documentary evidence.... I mean, the type of thinking that you are projecting here would account for someone who nothing ever happened to them being eligible for this kind of relief. Well, it doesn't matter what they told the emergency room[,] they were afraid, you know.

9  In *Hernandez,* we were reviewing the agency's determination that the petitioner had not established the "extreme cruelty" requirement for suspension of deportation. 345 F.3d at 832–33.

10  "The appropriate way of measuring whether the IJ and BIA had 'reason to believe' " that a petitioner is involved in drug trafficking is to assess "whether substantial evidence supports such a conclusion." *Alarcon–Serrano v. INS,* 220 F.3d 1116, 1119 (9th Cir.2000).

11  Because we remand for a new hearing on the ground discussed, we need not and do not reach Petitioner's other arguments about the procedures below.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

920 F.3d 414
United States Court of Appeals, Sixth Circuit.

Carlos Clifford LOWE, Petitioner-Appellant,

v.

UNITED STATES of America, Respondent-Appellee.

No. 17-5490
|
Argued: October 3, 2018
|
Decided and Filed: April 4, 2019
|
Rehearing En Banc Denied June 26, 2019

**Synopsis**
**Background:** Following denial of his first motion to vacate, set aside, or correct sentence, 2011 WL 4500012, federal inmate filed second or successive motion to vacate, set aside, or correct his sentence. The United States District Court for the Eastern District of Tennessee, Nos. 3:05-cr-00022-1; 3:16-cv-00714, Thomas A. Varlan, J., 2017 WL 1366916, denied motion, and inmate appealed.

**Holdings:** The Court of Appeals, Bernice Bouie Donald, Circuit Judge, held that:

[1] inmate's Tennessee conviction for aggravated assault was predicate "violent felony" under Armed Career Criminal Act (ACCA), and

[2] inmate's Tennessee rape conviction did not qualify as predicate "violent felony" under ACCA.

Reversed and remanded.

Thapar, Circuit Judge, concurred and filed opinion.

**Procedural Posture(s):** Appellate Review; Post-Conviction Review.

West Headnotes (5)

[1]    **Sentencing and Punishment**  Particular offenses

Defendant's Tennessee conviction for aggravated assault was predicate "violent felony" under Armed Career Criminal Act (ACCA). 18 U.S.C.A. § 924(e)(1); Tenn. Code Ann. § 39-13-102(a)(1)(B).

3 Cases that cite this headnote

[2]    **Sentencing and Punishment**  Violent or Nonviolent Character of Offense

To determine whether conviction offense is predicate "violent felony" under Armed Career Criminal Act (ACCA), court must apply categorical approach focusing on offense's statutory definition, rather than manner in which offender may have violated statute in particular circumstance. 18 U.S.C.A. § 924(e).

1 Cases that cite this headnote

[3]    **Sentencing and Punishment**  Offenses Usable for Enhancement

Pursuant to categorical approach, if offense's elements do not necessarily involve use, attempted use, or threatened use of physical force against another, crime does not qualify as predicate offense under Armed Career Criminal Act's (ACCA) elements clause. 18 U.S.C.A. § 924(e)(2)(B).

2 Cases that cite this headnote

[4]    **Sentencing and Punishment**  Violent or Nonviolent Character of Offense

To determine whether crime is predicate offense under Armed Career Criminal Act (ACCA) when statute sets out one or more elements of offense in alternative, court must employ modified categorical approach, and first look to statute as a whole to determine whether it

includes crimes that do not necessarily involve use of force, and if it does, determine whether statute is divisible and whether any crime defined by statute may qualify as ACCA predicate offense; if answer is yes, court must look to limited class of documents—for example, indictment, jury instructions, or plea agreement and colloquy—to determine what crime, with what elements, defendant was convicted of, and determine whether that crime necessarily involved use, attempted use, or threatened use of force. 18 U.S.C.A. § 924(e).

1 Cases that cite this headnote

**[5]** **Sentencing and Punishment** Particular offenses

Defendant's Tennessee rape conviction did not qualify as predicate "violent felony" under Armed Career Criminal Act's (ACCA) force clause; statute of conviction defined one crime, that being rape by force or coercion, and rape by coercion could be committed by use of parental authority, which did not require use of force. 18 U.S.C.A. § 924(e)(2)(B); Tenn. Code Ann. §§ 39-2-602(1), 604(a)(1) (1982).

2 Cases that cite this headnote

**\*415** Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville. Nos. 3:05-cr-00022-1; 3:16-cv-00714—Thomas A. Varlan, District Judge.

**Attorneys and Law Firms**

ARGUED: Melissa M. Salinas, Garrett T. Fox, UNIVERSITY OF MICHIGAN LAW SCHOOL, Ann Arbor, Michigan, for Appellant. Luke A. McLaurin, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee. ON BRIEF: Melissa M. Salinas, Garrett T. Fox, UNIVERSITY OF MICHIGAN LAW SCHOOL, Ann Arbor, Michigan, for Appellant. Luke A. McLaurin, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

Before: BATCHELDER, DONALD, and THAPAR, Circuit judges.

DONALD, J., delivered the opinion of the court in which BATCHELDER and THAPAR, JJ., joined. THAPAR, J. (pg. 420), delivered a separate concurring opinion in which BATCHELDER, J., joined.

## OPINION

BERNICE BOUIE DONALD, Circuit Judge.

Petitioner-appellant Carlos Lowe appeals the district court's denial of his successive pro se motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. For the reasons more fully explained below, we **REVERSE** and **REMAND** the case back to the district court.

I.

In 2005, a jury found Lowe guilty of possessing ammunition as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Lowe had previously been convicted of four felonies under Tennessee law. They include: third-degree burglary, aggravated assault, a rape occurring in 1977, and a rape occurring in 1985.

At his sentencing, the district court determined that at least three of those prior felonies qualified Lowe as an armed career criminal under the Armed Career Criminal Act ("ACCA") and sentenced him to 235 months imprisonment. *See* 18 U.S.C. § 924(e)(1). Lowe subsequently appealed his conviction and his sentence, but this court affirmed. *United States v. Lowe*, No. 06-5352 (6th Cir. Apr. 27, 2007) (order). Lowe then filed a motion to vacate his sentence under 28 U.S.C. § 2255, which the district court denied.

After the Supreme Court held that the residual clause of the ACCA is unconstitutionally vague in *Johnson v. United States*, ––– U.S. ––––, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015), Lowe filed a motion for an order authorizing the district court to consider a second or successive motion to vacate, set aside, or correct his sentence under *§ 2255. In re Carlos Clifford Lowe*, 16-6002 (6th Cir. Nov. 14, 2016)

AR.05350

(order). We granted the motion and transferred the case to the district court. *Id.*

Lowe filed his second or successive 🚩 § 2255 motion in the district court, challenging his status as an armed career **\*416** criminal. The district court denied the motion and certified that an appeal would not be taken in good faith, holding that Lowe's convictions for third-degree burglary, aggravated assault, and the 1977 rape still qualify as ACCA predicates. Based on those determinations, the district court did not address Lowe's 1985 rape, for which he was convicted under a different statute than for the 1977 rape.

Lowe timely appealed the district court's denial of his second 🚩 § 2255 motion. This court granted him a certificate of appealability to determine whether his third-degree burglary conviction qualifies as an ACCA predicate. That question, however, was recently answered in 🚩 *Cradler v. United States*, 891 F.3d 659 (6th Cir. 2018). It does not. *See* 🚩 *id.* at 671.

 **[1]**  Undeterred, the Government now argues that Lowe's status as an armed career criminal remains valid because his convictions for aggravated assault and the two rapes qualify as violent felonies under the ACCA. In response, Lowe asserts that the Government has not met its burden of establishing that the 1985 rape qualifies.[1] We now turn to that conviction.

## II.

The validity of Lowe's designation as an Armed Career Criminal hinges entirely on whether his 1985 rape qualifies as an ACCA predicate offense. The district court declined to reach this question once it determined that Lowe's convictions for third-degree burglary, aggravated assault, and the 1977 rape qualified as violent felonies. Nevertheless, we exercise our discretion to consider this issue in the first instance. *See* 🚩 *Singleton v. Wulff*, 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases.").

The ACCA imposes a fifteen year mandatory minimum sentence on a defendant who violates 🚩 § 922(g) after having been convicted of three prior "violent felonies." *See* 🚩 18 U.S.C. § 924(e). A violent felony, as pertinent here, is defined as "any crime punishable by imprisonment for a term exceeding one year, ... that—(i) has as an element the use, attempted use, or threatened use of physical force against the person of another[.]" 🚩 § 924(e)(2)(B), 🚩 (i). This clause has come to be known as the "use-of-force" or the "elements" clause, requiring a finding that an offense involved a level of "force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010).

 **[2]**  **[3]**  "To determine whether a conviction offense is a [violent felony], we apply a categorical approach 'focus[ing] on the statutory definition of the offense, rather than the manner in which the offender may have violated the statute in a particular circumstance.' " *United States v. Gooch*, 850 F.3d 285, 290 (6th Cir. 2017) (quoting *United States v. Rafidi*, 829 F.3d 437, 444 (6th Cir. 2016) ). Pursuant to the **\*417** categorical approach, if an offense's elements do not necessarily involve the use, attempted use, or threatened use of physical force against another, the crime does not qualify as a predicate offense under the ACCA (in the elements-clause context). *See* *United States v. Harris*, 853 F.3d 318, 320 (6th Cir. 2017).

 **[4]**  Where, however, a statute sets out "one or more elements of the offense in the alternative," the statute defines multiple crimes and is considered divisible. *See* 🚩 *Descamps v. United States*, 570 U.S. 254, 257, 133 S.Ct. 2276, 186 L.Ed.2d 438 (2013). In that scenario, we employ a modified categorical approach, which requires a multi-step inquiry. *See* 🚩 *id.* We first look to the statute as a whole to determine whether it includes crimes that do not necessarily involve the use of force. If it does, we determine whether the statute is divisible and whether any crime defined by the statute may qualify as an ACCA predicate offense. If the answer is yes, we "look[ ] to a limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements, a defendant was convicted of." 🚩 *Mathis v. United States*, —— U.S. ——, 136 S.Ct. 2243, 2249, 195 L.Ed.2d 604 (2016) (citing 🚩 *Shepard v. United States*, 544 U.S. 13, 26, 125 S.Ct. 1254,

161 L.Ed.2d 205 (2005) ). Finally, we determine whether that crime necessarily involved the use, attempted use, or threatened use of force.

Under either the categorical or the modified categorical approach, the first step is to look to the statute under which the defendant was convicted. At the time Lowe committed the 1985 rape, the relevant statute read:

(a) Rape is unlawful sexual penetration of another accompanied by any of the following circumstances:

(1) Force or coercion is used to accomplish the act;

(2) The actor knows or has reason to know that the victim is mentally defective, mentally incapacitated, or physically helpless; and

(3) The actor accomplishes sexual penetration by fraud.

(b) Rape is a felony punishable by imprisonment in the penitentiary for a determinate sentence not less than five (5) years nor more than twenty (20) years.

Tenn. Code Ann. § 39-2-604 (1982).

As we have previously held, a conviction for rape where the victim is "physically helpless" does not necessarily require the use of force. *In re Sargent*, 837 F.3d 675, 677-78 (6th Cir. 2016). Thus, for purposes of the ACCA, this statute is overbroad because it is comprised of at least one crime that does not require the use, attempted use, or threatened use of force. The next step is to determine whether the statute is divisible.

We find that it is because it lists elements in the alternative, thereby defining multiple crimes. *See Mathis*, 136 S.Ct. at 2248 (" 'Elements' are the 'constituent parts' of a crime's legal definition—the things the 'prosecution must prove to sustain a conviction.' ") (quoting Black's Law Dictionary 634 (10th ed. 2014)). For instance, a jury may find that a defendant committed rape by force or coercion, as listed in (a)(1), without finding that the defendant committed rape by fraud, as listed in (a)(3). Therefore, § 39-2-604 defines multiple crimes and is divisible. *See Descamps v. United States*, 570 U.S. 254, 257, 133 S.Ct. 2276, 186 L.Ed.2d 438 (2013).

The next question is whether the statute defines at least one crime that would likely qualify as a predicate offense under

the **\*418** ACCA. We find that it likely does. Section (a)(1) criminalizes rape committed by force. Force is defined as "compulsion by the use of physical power or violence and shall be broadly construed to accomplish the purposes of the Sexual Offenses Law[.]" Tenn. Code Ann. § 39-2-602(3) (1982). Therefore, rape by force would almost certainly qualify as a predicate offense under the ACCA.

Because the statute defines the crime of rape in a way that could, but need not, qualify as an ACCA predicate, our next step is to consult the *Shepard* documents to see which offense Lowe committed. In this case, the only *Shepard* document we have is the indictment. It charged Lowe with "feloniously engag[ing] in sexual penetration ... by use of *fear and coercion* in violation of TCA 39-2-604." The parties dispute whether the indictment contains a typo because it used the terms "fear and coercion" rather than (a)(1)'s "force or coercion" or whether, instead, Lowe was charged with only rape by coercion. This distinction is immaterial, though, because it is clear that Lowe was indicted under (a)(1). No other section in the statute criminalizes rape by coercion, and nowhere in the statute is rape by fear criminalized at all. Therefore, the only question before us is whether a violation of (a)(1) necessarily involved the use, attempted use, or threatened use of force.

As described above, rape by "force" would almost certainly qualify as a predicate offense under the ACCA; however, it is not immediately clear whether rape by "coercion" would likewise qualify. Because (a)(1) lists both force and coercion, we must determine whether rape by coercion would qualify on its own as a predicate offense, and further, whether (a)(1) is divisible. If the answer to both questions is no (e.g., rape by coercion is not a predicate offense and (a)(1) is not divisible), then Lowe's conviction does not qualify as a predicate offense. We begin with the definition of coercion.

Tennessee defines "coercion" as a "threat of kidnapping, extortion, force or violence to be performed immediately or in the future or the use of parental, custodial, or official authority over a child less than fifteen (15) years of age[.]" Tenn. Code Ann. § 39-2-602(1). The last clause of this definition, which requires only use of authority over a child, does not satisfy the use of force clause. Therefore, we must determine whether this definition describes various factual means by which a defendant may commit a single element—rape by coercion—or elements in the alternative, thereby listing the constituent parts of four separate crimes. *See Mathis v.*

AR.05352

*United States*, ——— U.S. ———, 136 S.Ct. 2243, 2248, 195 L.Ed.2d 604 (2016). If it is the former (means), then rape by coercion is not a predicate offense because it can be committed without the use, attempted use, or threatened use of force; but if it is the latter (elements), we continue down the modified-categorical-approach pathway. To make the means versus elements determination, we first look to state court decisions addressing the issue. *See Mathis*, 136 S.Ct. at 2256 (opining that the means versus elements question be made easy where "a state court decision definitively answers the question"); *see also United States v. Ritchey*, 840 F.3d 310, 318 (6th Cir. 2016) ("In determining whether statutory alternatives constitute elements or means, the Court clarified that sentencing courts should look first to state law, including judicial interpretations of the criminal statute by state courts."); *Smith v. Sowders*, 848 F.2d 735, 738 (6th Cir. 1988) ("State courts interpret state criminal statutes, and their interpretations are binding on federal courts.").

**\*419** In this instance, Tennessee courts have determined that rape by force or coercion, as listed in (a)(1), is an indivisible crime. Therefore, the definition of coercion simply lists means by which that crime may be committed. Numerous opinions issued by Tennessee appellate courts support this conclusion. *State v. Sontay*, No. M2012-01579-CCA-R3-CD, 2013 WL 3964119, at \*10–\*11, 2013 Tenn. Crim. App. LEXIS 643 at \*29-\*30 (Tenn. Crim. App. July 31, 2013); *State v. Way*, No. E2002-00251-CCA-R3-CD, 2004 WL 234741, at \*10, 2004 Tenn. Crim. App. LEXIS 120 at \*28-\*29 (Tenn. Crim. App. Feb. 9, 2004); *State v. Hilton*, C.C.A. No. 278, 1991 Tenn. Crim. App. LEXIS 738 (Tenn. Crim. App. Sep. 4, 1991); *State v. Watkins*, 754 S.W.2d 95, 98-99 (Tenn. Crim. App. 1988); *State v. Halton*, C.C.A. NO. 23, 1988 WL 105722, at \*2, 1988 Tenn. Crim. App. LEXIS 619, at \*5 (Tenn. Crim. App. Oct. 12, 1988).

The most illustrative state-court case is *State v. Goff*, No. E2002-691, 2003 WL 21788914, at \*8-\*11 (Tenn. Crim. App. Aug. 5, 2003). There, a jury convicted Goff of, among other things, multiple counts of rape by force or coercion. *See id.* at \*2-\*3. On appeal, Goff challenged the sufficiency of the evidence of those rape convictions. *Id.* at \*18-\*19.

The Tennessee Court of Appeals began its analysis by considering how many crimes the rape statute listed. It stated, "Many of our proscriptive statutes set forth alternative modes

for committing crimes. Code section 39-13-503 specifies four different modes of committing rape." *Id.* at \*21.

The statute at issue in *Goff* was Tennessee Code Annotated § 39-13-503, not § 39-2-604, the statute at issue here. However, § 39-13-503 is the successor to § 39-2-604, and (a)(1) in both statutes criminalizes rape by the use of "[f]orce or coercion," and the correlative definitions of coercion are identical. *Compare* Tenn. Code Ann. §§ 39-13-501(1), 503(a)(1), *with* Tenn. Code Ann. §§ 39-2-602(1), 604(a)(1) (1982). The only meaningful difference between the two statutes for purposes of this case is that § 39-13-503(a) contains four subsections whereas § 39-2-604(a) contains only three, which is why the *Goff* court found that § 39-13-503 lists four separate crimes, instead of three. According to the Tennessee Court of Appeals, then, the definition of coercion does not list additional crimes. Rather, it lists means of committing the single crime of rape by coercion.

Delving further into the court's opinion, we find more support for this determination. In analyzing whether the evidence was sufficient to convict Goff of rape by force or coercion, the court began by defining force and coercion. It then opined that "the evidence strikes us as an effort to persuade that the *element* of coercion was supplied via the 'parental authority language....' " *Id.* at \*22 (emphasis added). The court found that there was no evidence in the record that the victim was under fifteen years of age at the time the alleged rapes occurred; thus, there was insufficient evidence to convict Goff of rape by coercion "through the use of parental ... authority over a child less than fifteen (15) years of age." *Id.* at \*22-\*26.

Notably—and dispositive to the question at hand—the court did not stop its analysis there. It continued, stating that

> there are two other avenues by which the sufficiency of the rape convictions might be upheld. Section 39-13-503(1) supplies an alternative definition of coercion as the "threat of kidnapping, extortion, force of violence to be performed immediately or in the future." Also, the rape statute provides that either "force" or "coercion" will suffice.

**\*420** *Id.* at \*26 (internal citations omitted). The court first found that the record could not support a conviction for rape

by force. *Id.* at \*26-\*29. It then went on to analyze each remaining provision in the definition of coercion, finding that there was insufficient evidence to support a finding that Goff committed rape by "threat of kidnapping, extortion, force or violence to be performed immediately or in the future...." *Id.* at \*26-\*32; *see also* § 39-2-604(a)(1).

**[5]** What is clear from the court's opinion is that it would have upheld the jury's conviction for rape by force or coercion if a single definitional provision of force or coercion had been established in the record. This means two things: (1) rape by force or coercion, as enumerated in (a)(1), is an indivisible crime, and (2) the definition of coercion is not a list of elements that defines four separate crimes. *See* *Mathis*, 136 S.Ct. at 2248 (opining that elements are what must be proven by "the prosecution to sustain a conviction[ ]"). As the Tennessee appellate court's analysis makes clear, the jury could have chosen any definitional provision upon which to convict Goff, and its verdict would have been upheld. It necessarily follows, then, that the government did not have to prove the existence of any one specific definitional provision. Therefore, § 39-2-604(a)(1) defines one crime, that being rape by force or coercion. Because rape by coercion can be committed by the use of parental authority—e.g., without any force—the statute is overbroad for purposes of the ACCA.

III

Lowe's previous convictions for third degree burglary and the 1985 rape do not qualify as ACCA predicates. Therefore, his sentence as an armed career criminal cannot stand. Accordingly, we **REVERSE** and **REMAND** the case for resentencing.

CONCURRENCE

THAPAR, Circuit Judge, concurring.

Rape is always violent. Whether a rapist coerces a victim, tricks them, or drugs them, the act of "unlawful sexual penetration" involves violent force. And then there is this case, where Carlos Lowe dragged his victim across a car seat and raped her. No one questions that his act was unlawful, forceful, and violent.

Yet, in the categorical-approach world, we cannot call rape what it is. Instead of analyzing the facts underlying Lowe's crime to determine if it was violent, we must engage in a hypothetical exercise to determine whether the crime's elements could be committed in a non-violent fashion. So, although rape is always violent as a matter of fact, the majority correctly applies our precedent to conclude that Lowe's rape was not violent as a matter of law. But this case demonstrates, once again, that it is time for Congress to revisit the categorical approach so we do not have to live in a fictional world where we call a violent rape non-violent. *See* *United States v. Burris*, 912 F.3d 386, 407–10 (6th Cir. 2019) (en banc) (Thapar, J., concurring); *Ovalles v. United States*, 905 F.3d 1231, 1257–62 (11th Cir. 2018) (en banc) (W. Pryor, J., concurring) (suggesting that Congress adopt a fact-based approach for the Armed Career Criminal Act); *see also* U.S. Sentencing Comm'n, Sentencing Guidelines for United States Courts, 83 Fed. Reg. 65400, 65408 (proposed Dec. 20, 2018) (similar proposal for sentencing guidelines). Since Congress has not yet eliminated the categorical approach, I regrettably concur.

**All Citations**

920 F.3d 414

**Footnotes**

1    Lowe also argues that his conviction for aggravated assault cannot be an ACCA predicate because the Government has not demonstrated that he was convicted for acting intentionally rather than recklessly. Our recent holding in *Davis v. United States*, 900 F.3d 733, 736 (6th Cir. 2018), forecloses this argument, as we held that both reckless and intentional aggravated assault in Tennessee qualify as violent felonies.

*Accord* 📒 *United States v. Harper*, 875 F.3d 329, 330 (6th Cir. 2017) ("[W]e are bound to hold that reckless aggravated assault in violation of 📒 Tenn. Code Ann. § 39-13-102(a)(1)(B) is a crime of violence for purposes of 🚩 U.S.S.G. § 4B1.2(a).")). Lowe, however, does not submit argument concerning the 1977 rape; thus, we do not consider it.

---

**End of Document**                                  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Bare v. Barr, 9th Cir., September 16, 2020

937 F.3d 244
United States Court of Appeals, Third Circuit.

Ayub Juma LUZIGA, Petitioner

v.

ATTORNEY GENERAL UNITED
STATES OF AMERICA, Respondent

No. 17-2444
|
Argued June 17, 2019
|
Filed: September 5, 2019

**Synopsis**
**Background:** Alien, a native of Tanzania, petitioned for
review of order of the Board of Immigration Appeals,
upholding denial of his application for withholding or deferral
of removal by Roxanne C. Hladylowycz, Immigration Judge.

**Holdings:** The Court of Appeals, Fisher, Senior Circuit
Judge, held that:

[1] to determine whether alien's conviction of conspiring to
commit wire fraud was a "particularly serious crime," of
kind rendering him ineligible for withholding of removal,
immigration judge should have first looked at elements of
alien's offense, and

[2] immigration judge's failure to ask alien whether he could
provide further corroborating evidence or, if he could not,
for an explanation necessitated remand for new corroboration
determination.

Petition granted; vacated and remanded.

**Procedural Posture(s):** Review of Administrative Decision.

West Headnotes (21)

**[1]** **Aliens, Immigration, and
Citizenship** Credibility

On petition for review of a final order of
removal, the Court of Appeals, in the absence
of an explicit adverse credibility determination
by immigration judge, may assume that alien
testified credibly.

**[2]** **Aliens, Immigration, and
Citizenship** Review of initial decision or
administrative review

On petition for review of final order of removal,
the Court of Appeals generally reviews opinion
of the Board of Immigration Appeals (BIA)
as agency's "final order"; however, when the
BIA affirms immigration judge's decision and
adds analysis of its own, the Court reviews both
immigration judge's and the BIA's decisions,
referring to the BIA's opinion generally and to
immigration judge's opinion when necessary.

3 Cases that cite this headnote

**[3]** **Aliens, Immigration, and
Citizenship** Presentation and preservation
of questions at administrative level

On petition for review in immigration case,
the Court of Appeals may present an issue
to the Court of Appeals only if he or she
has first raised the issue before the Board
of Immigration Appeals (BIA) or immigration
judge. Immigration and Nationality Act § 242(d)
(1), 8 U.S.C.A. § 1252(d)(1).

**[4]** **Aliens, Immigration, and
Citizenship** Presentation and preservation
of questions at administrative level

While, in order to satisfy administrative
exhaustion requirement, it is preferable that
alien unambiguously articulate his argument
to the Board of Immigration Appeals (BIA)
or immigration judge, the Court of Appeals'
exhaustion policy is liberal, and if alien makes
some effort, however insufficient, that puts
agency on notice of a straightforward issue, then
the Court of Appeals can consider the issue on
alien's petition for review of agency's removal

order. Immigration and Nationality Act § 242(d)
(1), 🚩 8 U.S.C.A. § 1252(d)(1).

**[5]**   **Aliens, Immigration, and**
**Citizenship** 🔑 Jurisdiction and venue

On petition for review of final removal order,
the Court of Appeals has jurisdiction to review
constitutional and legal questions, such as
whether immigration judge applied correct legal
standard. Immigration and Nationality Act §
242(a)(2)(D), 🚩 8 U.S.C.A. § 1252(a)(2)(D).

1 Cases that cite this headnote

**[6]**   **Administrative Law and**
**Procedure** 🔑 Denial of admission; removal

**Aliens, Immigration, and**
**Citizenship** 🔑 Law questions

On petition for review of final removal order,
the Court of Appeals reviews legal questions
and the application of the law to the facts de
novo, with appropriate deference to the Board
of Immigration Appeals' (BIA's) reasonable
interpretation of provisions of the Immigration
and Nationality Act (INA). Immigration and
Nationality Act, § 101 et seq., 🚩 8 U.S.C.A. §
1101 et seq.

**[7]**   **Aliens, Immigration, and**
**Citizenship** 🔑 Remand

If, on review of final order of removal entered
by the Board of Immigration Appeals (BIA),
the Court of Appeals takes issue with agency's
application of the law to case, it will defer to
the authority granted the agency by Congress and
remand for appropriate consideration.

**[8]**   **Aliens, Immigration, and**
**Citizenship** 🔑 Law questions

Court of Appeals owes deference to the Board of
Immigration Appeals (BIA) only when it acts in
exercise of Congressionally-delegated authority
to make rules carrying the force of law.

**[9]**   **Administrative Law and**
**Procedure** 🔑 Aliens, Immigration, and
Citizenship

**Aliens, Immigration, and**
**Citizenship** 🔑 Law questions

Unpublished, single-member decisions of the
Board of Immigration Appeals (BIA) are not
entitled to 🏷 *Chevron* deference.

**[10]**   **Aliens, Immigration, and**
**Citizenship** 🔑 Standard for relief

Noncitizen seeking relief under the Convention
Against Torture (CAT) does not need to connect
the prospect of torture with any protected status,
such as race, religion, or membership in a
particular social group.

**[11]**   **Aliens, Immigration, and**
**Citizenship** 🔑 Law questions

Court of Appeals reviews de novo a
determination by the Board of Immigration
Appeals (BIA) that alien has been convicted
of a "particularly serious crime" and is thus
ineligible for withholding of removal under
the Immigration and Nationality Act (INA) or
under the Convention Against Torture (CAT).
Immigration and Nationality Act § 241(b)(3)(A),
🏷 8 U.S.C.A. § 1231(b)(3)(A); 🏷 8 C.F.R. §
1208.16(c).

1 Cases that cite this headnote

**[12]**   **Aliens, Immigration, and**
**Citizenship** 🔑 Crimes and Related Grounds

To determine whether alien has been convicted
of a "particularly serious crime," of a kind
rendering him ineligible for withholding of
removal either under the Immigration and
Nationality Act (INA) or under the Convention
Against Torture (CAT), adjudicator must first
consider whether the elements of alien's offense
potentially bring the crime into the category
of particularly serious crimes; if not, then the

individual facts and circumstances of alien's offense are of no consequence, and alien will not be barred from obtaining a grant of withholding of removal. Immigration and Nationality Act § 241(b)(3)(A), 🔖 8 U.S.C.A. § 1231(b)(3)(A); 🔖 8 C.F.R. § 1208.16(c).

3 Cases that cite this headnote

[13]  **Aliens, Immigration, and Citizenship** 🔖 Crimes and Related Grounds

If elements of alien's offense potentially bring that offense within ambit of a "particularly serious crime," of kind affecting alien's eligibility for withholding of removal, then the adjudicator may proceed to second step of two-step analysis and make determination as to whether alien has been convicted of "particularly serious crime" by considering all reliable information, including the conviction records and sentencing information, as well as other information outside the confines of record of conviction. Immigration and Nationality Act § 241(b)(3)(A), 🔖 8 U.S.C.A. § 1231(b)(3)(A); 🔖 8 C.F.R. § 1208.16(c).

1 Cases that cite this headnote

[14]  **Aliens, Immigration, and Citizenship** 🔖 Crimes and Related Grounds

To determine whether alien's conviction of conspiring to commit wire fraud was a "particularly serious crime," of a kind rendering alien ineligible for withholding of removal either under the Immigration and Nationality Act (INA) or under the Convention Against Torture (CAT), immigration judge and the Board of Immigration Appeals (BIA) should have first determined whether the elements of alien's offense potentially fell within the ambit of a "particularly serious crime"; only if they found this to be the case could they then proceed to consider the facts and circumstances particular to alien's case to determine whether they were such as to render him ineligible for withholding of removal. Immigration and Nationality Act §

241(b)(3)(A), 🔖 8 U.S.C.A. § 1231(b)(3)(A); 🔖 8 C.F.R. § 1208.16(c).

3 Cases that cite this headnote

[15]  **Aliens, Immigration, and Citizenship** 🔖 Relief Under Treaties Against Torture

Deferral of removal under the Convention Against Torture (CAT) is a last-resort form of relief, which is like an injunction in that, for the time being, it prevents government from removing the alien in question, though it can be revisited if circumstances change.

[16]  **Aliens, Immigration, and Citizenship** 🔖 Government action or acquiescence

Public official does not need to have actual knowledge of the likelihood of torture that alien allegedly faces if he is removed in order for such torture to be with the "acquiescence of a public official," as required to warrant a deferral of removal under the Convention Against Torture (CAT); such "acquiescence" can also be found in situations of willful blindness. 🔖 8 C.F.R. § 1208.18(a)(1).

1 Cases that cite this headnote

[17]  **Aliens, Immigration, and Citizenship** 🔖 Presumptions and Burden of Proof

Noncitizens seeking deferral of removal under the Convention Against Torture (CAT) bear the burden of proof. 🔖 8 C.F.R. § 1208.16(c)(2).

1 Cases that cite this headnote

[18]  **Aliens, Immigration, and Citizenship** 🔖 Weight and Sufficiency

While a noncitizen seeking deferral of removal under the Convention Against Torture (CAT) may satisfy his burden of proof with credible testimony alone, corroborating evidence may be

required when it is reasonable to expect it, such as for facts that are central to the claim and easily verified. 🔖 8 C.F.R. § 208.16(c)(2).

1 Cases that cite this headnote

[19] **Aliens, Immigration, and Citizenship** 🔑 **Weight and Sufficiency**

Before immigration judge can decide that a lack of corroborating evidence undermines alien's application for relief, judge must (1) identify the facts for which it is reasonable to expect corroboration, (2) inquire as to whether alien has provided information corroborating the relevant facts and, if he or she has not, (3) analyze whether the alien has adequately explained his or her failure to do so; this requirement is strictly enforced, and if immigration judge fails to follow these steps while holding the lack of corroboration against alien, then the Court of Appeals will vacate and remand.

1 Cases that cite this headnote

[20] **Aliens, Immigration, and Citizenship** 🔑 **Presentation and preservation of questions at administrative level**

On administrative appeal, simply by questioning correctness of immigration judge's corroboration determination, alien put the Board of Immigration Appeals (BIA) on notice of possible error by immigration judge in failing to conduct three-step 🔖 Abdulai, 239 F.3d 542, inquiry, so as to adequately exhaust the issue and permit judicial review thereof.

1 Cases that cite this headnote

[21] **Aliens, Immigration, and Citizenship** 🔑 **Remand**

Immigration judge's failure to ask alien whether he could provide further corroborating evidence or, if he could not, whether he had some explanation for his inability to do so, prior to denying, based on lack of corroboration, the alien's application for deferral of removal under the Convention

Against Torture (CAT), despite alien's credible testimony of fears of torture at hands of individuals with government connections and credible testimony that Tanzanian officials acquiesced in harm perpetrated by people with government connections, necessitated remand for new corroboration determination. 🔖 8 C.F.R. § 208.16.

1 Cases that cite this headnote

**\*247** On Petition for Review from an Order of the Board of Immigration Appeals (Agency No. AXXX-XX7-666), Immigration Judge: Roxanne C. Hladylowycz

**Attorneys and Law Firms**

Khary Anderson [ARGUED], University of Pennsylvania, School of Law, 3400 Chestnut Street, Philadelphia, PA 19104

Joseph P. Archie, Nicolas A. Novy, Dechert, 2929 Arch Street, 18th Floor, Cira Centre, Philadelphia, PA 19104, Counsel for Petitioner

Jennifer R. Khouri [ARGUED], Tim Ramnitz, Chad A. Readler, Acting Assistant Attorney General, United States Department of Justice, Office of Immigration Litigation, P.O. Box 878, Ben Franklin Station, Washington, DC 20044

Before: AMBRO, RESTREPO and FISHER, Circuit Judges.

OPINION OF THE COURT

FISHER, Circuit Judge.

An Immigration Judge (IJ) decided, and the Board of Immigration Appeals (BIA) agreed, that Petitioner Ayub Luziga is ineligible for withholding of removal under the Immigration and Nationality Act (INA) and the Convention Against Torture (CAT) because he was convicted of a "particularly serious crime," and that he is not entitled to deferral of removal under the CAT because he failed to carry his burden of proof. Luziga requests our review, arguing that the IJ and BIA made two legal errors. First, Luziga argues that the IJ and BIA misapplied the framework for making particularly serious crime determinations, a framework the BIA itself has established in its precedential opinions. Second, Luziga argues that the IJ failed to observe the rule

we articulated in *Abdulai v. Ashcroft*, 239 F.3d 542, 554 (3d Cir. 2001), requiring immigration judges to notify a noncitizen in removal proceedings that he is expected to present corroborating evidence before finding that failure to present such evidence undermines his claim. We agree that the IJ and BIA erred in these respects; therefore, we will grant Luziga's petition for review, vacate the underlying order, and remand. [1]

## I.

Ayub Luziga, a native of Tanzania, was lawfully admitted to the United States as a **\*248** visitor twenty years ago. He later applied and was approved for a student visa but eventually fell out of lawful status. In 2014, he was arrested and indicted for wire fraud in violation of 18 U.S.C. § 1343 and conspiracy to commit the same in violation of 18 U.S.C. § 1349. The Government alleged that from 2007 to 2008, Luziga, his then-wife, Annika Boas, [2] and fellow Tanzanians conspired to "fraudulently secure residential mortgage loans funded by federally-insured financial institutions by causing materially false statements to be made during the loan application and approval process." Certified Administrative Record (C.A.R.) 1026-28.

Luziga pleaded guilty to the conspiracy charge and was sentenced to twenty-one months' imprisonment. His conduct caused losses between $400,000 and $1,000,000, and he personally received checks totaling at least $54,863.11. He was ordered to pay restitution of almost $1,000,000.

Luziga cooperated in the investigation of his co-conspirators and testified against his wife, who was convicted and sentenced to twenty-seven months' imprisonment. While Luziga prepared to testify, prosecutors asked him about the location of Mrisho Nzese, who had been convicted for his role in the conspiracy but fled the country. They also wanted Luziga to ask his stepfather, a police commissioner and the chief of INTERPOL in East Africa, to help return Nzese to the United States. News of the investigation and Luziga's cooperation with prosecutors spread through the Tanzanian community in the United States and abroad.

While Luziga was serving his sentence, the Department of Homeland Security (DHS) ordered him removed by final administrative order. *See* 8 U.S.C. § 1228(b). However,

because Luziga expressed a reasonable fear of returning to Tanzania, DHS referred him to the Executive Office for Immigration Review (EOIR) for removal proceedings, where he requested withholding of removal under the INA and the CAT, and deferral of removal under the CAT. *See* 8 C.F.R. § 208.31. At Luziga's individual hearing, [3] the IJ heard part of his testimony before deciding that his conspiracy conviction was a conviction for a particularly serious crime, making him ineligible for withholding of removal under the INA, 8 U.S.C. § 1231(b)(3)(B)(ii), and the CAT, 8 C.F.R. § 1208.16(d)(2). The IJ allowed the hearing to proceed on the issue of deferral of removal under the CAT.

In support of his request for deferral of removal, Luziga explained that he feared torture and testified that his parents-in-law threatened to "make sure that [he] suffer[s]" in Tanzania and said he "would never even survive a day in Africa." C.A.R. 472-73. Luziga understood this to mean that they would kill him. Nzese, the co-conspirator who had fled the United States, made similar threats. Luziga learned of Nzese's threats from two sources. First, he received a letter from a friend reporting that "the other guy who went [to Tanzania]," who Luziga believed to be Nzese, blamed Luziga for trying to bring him back to the United States. C.A.R. 509-10, 974. Second, a friend of his then-wife who "[hung] out [at] a lot of parties in Tanzania" with Nzese, C.A.R. **\*249** 501, wrote to Luziga warning him of Nzese's threats. Annika's friend also testified telephonically in support of Luziga's request for relief from removal.

Luziga testified that his parents-in-law and Nzese could act on threats with assistance from Tanzanian officials, or at least with impunity. He claimed that Nzese is the nephew of Tanzania's former president. And he believed that his father-in-law, Nicholas Boas, knew "top level" officials through his work. [4] C.A.R. 477. Luziga believed that another co-conspirator's father was a retired general. Luziga testified that, in his experience, connections with Tanzanian officials shield perpetrators of violence from criminal culpability. He described a time when his friend, whose grandfather was a member of parliament, shot a bus driver without any criminal consequence. Luziga feared that his parents-in-law and Nzese could do the same to him. Though his own stepfather occupied a position of prominence, Luziga feared this would not suffice to protect him due to his stepfather's fragile health and waning influence, among other things.

**[1]** The IJ found that Luziga testified in a "forthright and frank fashion," C.A.R. 445, and made no adverse credibility determination. In the absence of an explicit adverse credibility determination, we assume that the noncitizen testified credibly. *Camara v. Att'y Gen.*, 580 F.3d 196, 201 (3d Cir. 2009).

Luziga also presented the testimony of an expert witness, Professor Ned Bertz, an associate professor at the University of Hawaii with expertise in Tanzanian "history ... encompass[ing] politics[,] culture[,] religion[,] ethnicity[,] and current events, as well as issues of crime [and] violence." C.A.R. 521-22. Professor Bertz validated Luziga's fears, testifying that in Tanzania "[p]eople with government contacts have the ability ... to enact violence against other individuals if they so choose." C.A.R. 530. And while Professor Bertz could not verify the alleged connection between Nzese and the former president, he confirmed that the former president was directly involved in the selection of the current president and that Nzese appeared to be an influential member of the same political party.

After the close of evidence and counsel's final remarks, the IJ announced her opinion and decision. She first addressed her particularly serious crime determination, explaining that Luziga's conviction for participation in a fraud scheme that resulted in losses of nearly $1,000,000 constituted a particularly serious crime under Third Circuit precedent and calling Luziga's criminal pre-sentencing report "quite dispositive." C.A.R. 432-33. She accordingly found Luziga ineligible for withholding of removal under the INA and the CAT and pretermitted those applications.

Addressing Luziga's request for deferral of removal, the IJ decided that Luziga had not carried his burden of proof. She accepted that there had been threats against him, but highlighted what she saw as shortcomings in his evidence. She said there was "absolutely no showing whatsoever that either Mrisho Nzese or [Luziga]'s parents-in-law have the capacity somehow to cause [his] torture." C.A.R. 446. She stated there was "no proof" that Luziga's parents-in-law and Nzese had government connections: "[O]ther than one individual so opining, and [Luziga] also opining that [Nzese] is the nephew of the ex-president[,] ... [t]here is no independent **\*250** corroborative information supplied on this issue, and that causes the issue to fail under the burden of proof standard." *Id.* Even assuming Luziga's co-conspirators' government connections, she found that Luziga did not satisfy his burden of proof on the nexus between

torture and government action or culpable inaction because "the suggestion that the ex-president would ... do something unlawful to vindicate [ ] Nzese, is supported by nothing at all on the record other than some opining by [the] expert ... and [Luziga]'s own opinions about that"; and "there is nothing to substantiate" that Luziga's parents-in-law could torture him with the acquiescence of the government. C.A.R. 446-47. Finally, she found that "[t]here is absolutely nothing to substantiate [Luziga]'s contention that his own stepfather ... would be unable to protect [him]." C.A.R. 447. The IJ found these failures of proof dispositive of Luziga's claim.

Luziga appealed to the BIA [5] and argued that the IJ erred in her particularly serious crime determination because, while precedent requires a two-step analysis, the IJ had "skipped the preliminary step to determine whether the elements of federal wire fraud bring 'the crime into a category of particularly serious crimes.' " C.A.R. 28 (citing *In re N-A-M-*, 24 I. & N. Dec. 336, 342 (B.I.A. 2007)). He also argued that the IJ clearly erred in finding that he had failed to present corroborating evidence, erroneously required corroborating evidence when he had credibly testified to the details of his claim, and failed to find that additional corroborating evidence was readily available such that its absence could be held against him.

The BIA agreed with the IJ and dismissed the appeal. To the IJ's particularly serious crime determination, it added that the IJ applied the correct legal standard and that "the nature of [Luziga]'s crime, as measured by the elements of the offense, i.e., participation in a scheme to defraud victims of nearly $1,000,000, brings [his] crime within the range of a particularly serious offense" under BIA and Third Circuit precedent. C.A.R. 2-3. Thus, the BIA held that the IJ "properly considered the nature and scope of [Luziga]'s crime, the sentence imposed, and the circumstances and underlying facts" in making that determination. C.A.R. 3. Luziga timely filed a petition for review with this Court.

## II.

The BIA had jurisdiction under 8 C.F.R. § 1003.1(b)(3). We have jurisdiction to review final orders of removal under 8 U.S.C. § 1252. Noncitizens petition for review "with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings." 8 U.S.C.

§ 1252(b)(2). In this case, the IJ entered her appearance over proceedings in York, Pennsylvania from Arlington, Virginia. A panel of this Court previously noted that venue is proper where an IJ sitting outside our Circuit appears by video conference within our Circuit. *See Angus v. Att'y Gen.*, 675 F. App'x 193, 196 n.4 (3d Cir. 2017) (addressing venue where the IJ conducted a hearing in York by video conference from Arlington and explaining that venue under § 1252(b)(2) is "non-jurisdictional") (quoting *Khouzam v. Att'y Gen.*, 549 F.3d 235, 249 (3d Cir. 2008)). Neither party has challenged venue, which—we now hold—is appropriate in this Court.

**\*251** **[2]** We usually review the BIA's opinion as the agency's "final order." *Zhang v. Gonzales*, 405 F.3d 150, 155 (3d Cir. 2005).[6] However, "[w]hen, as here, the BIA affirms an IJ's decision and adds analysis of its own, we review both the IJ's and the BIA's decisions," *Martinez v. Att'y Gen.*, 693 F.3d 408, 411 (3d Cir. 2012), referring to the BIA's opinion "generally" and to the IJ's opinion "when necessary." *Quao Lin Dong v. Att'y Gen.*, 638 F.3d 223, 229 n.1 (3d Cir. 2011).

**[3]** **[4]** Our review is restricted by statute. Pursuant to the administrative exhaustion requirement, 8 U.S.C. § 1252(d) (1), a petitioner may present an issue to this Court only if he or she has "first raise[d] [it] before the BIA or the IJ." *Joseph v. Att'y Gen.*, 465 F.3d 123, 126 (3d Cir. 2006). While we prefer that a petitioner unambiguously articulates his argument to the agency, our exhaustion policy is liberal: if the petitioner "makes some effort, however insufficient," that puts the agency on notice of a straightforward issue, the requirement is satisfied. *Id.* (quoting *Yan Lan Wu v. Ashcroft*, 393 F.3d 418, 422 (3d Cir. 2005)). We are further limited by the prohibition against review of final removal orders for noncitizens convicted of aggravated felonies, 8 U.S.C. § 1252(a)(2)(C), and the prohibition against review of matters entrusted to the Attorney General's discretion, *id.* § 1252(a)(2)(B)(ii).[7]

**[5]** **[6]** **[7]** **[8]** **[9]** We have jurisdiction to review constitutional and legal questions, *id.* § 1252(a)(2)(D), such as "[w]hether an IJ applied the correct legal standard." *Alaka v. Att'y Gen.*, 456 F.3d 88, 103 (3d Cir. 2006); *see also Nkomo v. Att'y Gen.*, 930 F.3d 129, 135 (3d Cir. 2019) ("We have jurisdiction to review claims that the [BIA] misapplied its precedents."). We review legal questions

and the application of law to fact *de novo* with appropriate deference to the BIA's reasonable interpretation of the INA.

*Yusupov v. Att'y Gen.*, 518 F.3d 185, 197 (3d Cir. 2008)

(citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).[8] If, upon review, we "take issue with the application of law" to the case, "we will defer to the authority granted an agency by Congress and remand ... for the appropriate consideration." *Quao Lin Dong*, 638 F.3d at 228.

### III.

#### A. *Withholding of Removal and Particularly Serious Crime Determinations*

Luziga's first challenge to the agency's final order is that the IJ and BIA erred in deciding that his conviction for conspiracy to commit wire fraud is a conviction for a "particularly serious crime," making him ineligible for withholding of removal.

**[10]** Withholding of removal is a mandatory form of relief that prevents removal of a noncitizen to a country where that **\*252** individual's life or freedom would be threatened because of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1231(b)(3)(A); *Ghebrehiwot v. Att'y Gen.*, 467 F.3d 344, 351 (3d Cir. 2006). Withholding of removal is also available under the CAT for those who establish that it is more likely than not that they will be tortured if removed. 8 C.F.R. § 1208.16(c). A noncitizen seeking relief under the CAT does not need to connect the prospect of torture with "any protected status," such as race, religion, or a particular social group. *Silva-Rengifo v. Att'y Gen.*, 473 F.3d 58, 64 (3d Cir. 2007).

**[11]** Withholding of removal, though generally mandatory for those who meet the criteria, is not available to individuals who have been convicted of a "particularly serious crime." 8 U.S.C. § 1231(b)(3)(B)(ii); 8 C.F.R. § 1208.16(d) (2). An aggravated felony is a particularly serious crime *per se* if it resulted in a "term of imprisonment of at least 5 years." 8 U.S.C. § 1231(b)(3)(B). For other offenses, the Attorney General, or the BIA in its exercise of delegated adjudicatory authority, *Kucana*, 558 U.S. at 239, 130 S.Ct. 827, decides whether an offense is particularly serious. 8 U.S.C. § 1231(b)(3)(B).[9]

Though § 1231(b)(3)(B) directs immigration adjudicators to decide whether an offense is particularly serious, the INA is "silent" about how the determination should be made. *Chong v. INS*, 264 F.3d 378, 387 (3d Cir. 2001). In the BIA's first attempt at filling this gap, it stated that "an exact definition of a 'particularly serious crime' " could not be given. *Matter of Frentescu*, 18 I. & N. Dec. 244, 247 (B.I.A. 1982). However, it provided general guidance: sometimes offenses are or are not "particularly serious crimes" on their face, but most of the time the determination is made on a "case-by-case" basis, taking into consideration "such factors as [1] the nature of the conviction, [2] the circumstances and underlying facts of the conviction, [3] the type of sentence imposed and, most importantly, [4] whether the type and circumstances of the crime indicate that the alien will be a danger to the community." *Id.* Over time, the *Frentescu* factors evolved: the BIA eliminated the "separate determination to address whether the alien is a danger to the community," *In re N-A-M-*, 24 I. & N. Dec. 336, 342 (B.I.A. 2007) (citing *Matter of Carballe*, 19 I. & N. Dec. 357 (B.I.A. 1986)), and moved away from focusing on the sentence imposed as a "dominant factor" in the determination. *Id.* at 343. [10]

**[12]   [13]** Then, in *N-A-M-*, the BIA incorporated the *Frentescu* factors into a two-step analysis and articulated the current legal standard for particularly serious crime determinations. First, adjudicators **\*253** consider whether the elements of an offense "potentially bring the crime into a category of particularly serious crimes." 24 I. & N. Dec. at 342. [11] If not, then "the individual facts and circumstances of the offense are of no consequence, and the alien would not be barred from a grant of withholding of removal." *Id.* at 342. If, however, the elements do "potentially bring the offense within the ambit of a particularly serious crime," then an adjudicator may make the determination by considering "all reliable information[,] ... including the conviction records and sentencing information, as well as other information outside the confines of a record of conviction." *Id.*

Before *N-A-M-*, we deferred to the *Frentescu* analysis because it was reasonable. *Chong*, 264 F.3d at 388 (holding that the BIA's interpretation of § 1231(b)(3)(B)

"guides and channels the Attorney General's discretion[,] ... thereby helping to ensure that the Attorney General does not make [the 'particularly serious crime'] determination in an arbitrary or inconsistent manner") (citing *L-S-*, 22 I. & N. Dec. at 651 (holding "[w]e will ... employ *Frentescu*" for aggravated felonies with a sentence of fewer than five years)). Then, we deferred to the analysis announced in *N-A-M-*. *Denis v. Att'y Gen.*, 633 F.3d 201, 214-16 (3d Cir. 2011) (noting that *N-A-M-* "provided more clarity as to the evidence that may be considered in deciding whether an offense is particularly serious").

**[14]** Luziga, like the noncitizen in *Denis*, committed an aggravated felony that was not a particularly serious crime *per se*. The IJ and BIA therefore had to decide whether he had committed a particularly serious crime. Luziga argues that the IJ and BIA failed to correctly apply the analysis articulated in *N-A-M-*, skipping right over the preliminary consideration of elements. He is correct: the agency should have applied the *N-A-M-* analysis, but from the record it is clear that both the IJ and BIA failed to apply *N-A-M-* correctly.

The BIA began its particularly serious crime analysis by approving of the IJ's application of the "proper legal standard." C.A.R. 2. However, when the IJ made the particularly serious crime determination, she failed to first consider the elements of Luziga's offense. In her preliminary determination, she focused on the loss amount of up to $1,000,000, found our decision in *Kaplun v. Attorney General* controlling, [12] and announced that Luziga would be barred from withholding of removal. When the IJ addressed the particularly serious crime determination for a second time in her opinion, she explained that the case "clearly [fell] under the rubric of [*Kaplun*]," emphasized her reliance on the facts and circumstances in the pre-sentencing report and plea agreement, and found **\*254** that Luziga's participation in the conspiracy involved not only monetary loss, but also identity theft. C.A.R. 432-35. She made no reference to the elements of Luziga's offense, that is "(1) two or more persons entered the unlawful agreement charged in the Superseding Indictment [the conspiracy]; and (2) [Luziga] knowingly and willfully became a member of that conspiracy." C.A.R. 197 (Luziga Plea Agreement). To the extent that the BIA decided that the IJ correctly applied the proper legal standard for the particularly serious crime determination, it erred.

The BIA's added analysis did not fix this error. Though it cited 🚩 *N-A-M-* and even stated that it would consider the "elements" of Luziga's offense, the BIA listed as "elements" specific offense characteristics such as loss amount. C.A.R. 2-3 ("[T]he nature of the applicant's crime, as measured by the elements of the offense, i.e., participation in a scheme to defraud victims of nearly $1,000,000, brings the applicant's crime within the range of a particularly serious offense."). That is, rather than considering the elements of conspiracy to commit wire fraud, the BIA described a hybrid of the elements and facts of Luziga's conviction. The BIA's failure to correctly apply its own precedent for the particularly serious crime determination, to which we have consistently deferred, requires remand for "appropriate consideration." *Quao Lin Dong*, 638 F.3d at 228. On remand, the agency should first determine whether the elements of Luziga's offense potentially fall within the ambit of a particularly serious crime. Only then may it proceed to consider the facts and circumstances particular to Luziga's case.

**B.** *Deferral of Removal and Corroboration Determinations*
Luziga's second challenge to the agency's final order is that the IJ failed to notify him that he was expected to present corroborating evidence regarding the likelihood that he would be tortured in Tanzania before she denied his request for CAT deferral.

**[15]** Deferral of removal under the CAT is a last-resort form of relief that is "like an injunction" in that, "for the time being, it prevents the government from removing the person in question, but it can be revisited if circumstances change." 🔖 *Wanjiru v. Holder*, 705 F.3d 258, 264 (7th Cir. 2013). It does not give a noncitizen any legal status and it can be terminated at any time. 8 C.F.R. § 1208.17. But for removable noncitizens facing a likelihood of torture and no other avenues of relief, it's better than nothing.

**[16]** To demonstrate entitlement to this form of relief, a noncitizen must prove that there is a greater likelihood than not that he will be tortured in the country to which he will be removed, *id.*, "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id.* § 1208.18(a)(1). "Acquiescence" of an official is defined as when a "public official, prior to the activity constituting torture, [has] awareness of such activity and thereafter breach[es] his or her legal responsibility to intervene to prevent such activity." *Id.* § 1208.18(a)(7). It

is not limited to situations where officials have "actual knowledge" of torture but includes "willful blindness." 🔖 *Silva-Rengifo*, 473 F.3d at 65, 68 (citing 🔖 *Zheng v. Ashcroft*, 332 F.3d 1186, 1194 (9th Cir. 2003)).

**[17]  [18]  [19]** As with asylum or withholding of removal, noncitizens seeking deferral of removal bear the burden of proof. 🔖 *Mulanga v. Ashcroft*, 349 F.3d 123, 133 & n.6 (3d Cir. 2003) (citing 🔖 8 C.F.R. § 208.16(c)(2)); *see also* 8 C.F.R. § 1208.17. A noncitizen **\*255** may carry his burden with credible testimony alone. 🔖 8 C.F.R. § 1208.16(c)(2). However, corroborating evidence may be required when it is reasonable to expect it, such as for "facts [that] are central" to a claim and easily verified. 🔖 *Chukwu v. Att'y Gen.*, 484 F.3d 185, 192 (3d Cir. 2007). Before requiring corroborating evidence, i.e., deciding that "failure to corroborate undermines" a claim, an IJ must follow the 🔖 *Abdulai* inquiry. 🔖 *Saravia v. Att'y Gen.*, 905 F.3d 729, 736 (3d Cir. 2018). The inquiry demands that an IJ requiring corroboration first:

> (1) [identify] ... the facts for which 'it is reasonable to expect corroboration;' (2) [inquire] as to whether the applicant has provided information corroborating the relevant facts; and, if he or she has not, (3) [analyze] whether the applicant has adequately explained his or her failure to do so.

🔖 *Id.* (citing 🔖 *Abdulai v. Ashcroft*, 239 F.3d 542, 554 (3d Cir. 2001)). Where an IJ fails to "develop [a noncitizen applicant's testimony] in accord with the 🔖 *Abdulai* steps" and "hold[s] the lack of corroboration against [the] applicant," we vacate and remand. 🔖 *Chukwu*, 484 F.3d at 192. We strictly enforce this rule. For example, in 🔖 *Saravia* we remanded for a new determination where the IJ asked the noncitizen "why he *had not* submitted corroborating evidence," instead of asking "whether he *could* not corroborate his testimony" and providing an opportunity to do so. 🔖 905 F.3d at 738–39.

Luziga argues that he never received notice or an opportunity to provide corroborating evidence before the IJ faulted him for failing to corroborate his CAT deferral claim. [13] Before we address the merits of his argument, we must first address

whether Luziga adequately exhausted the issue to permit our review. *See* 8 U.S.C. § 1252(d)(1).

 **[20]**  Before the BIA, Luziga argued that the IJ failed to find that corroborating evidence beyond what he had provided was "readily available" such that failure to produce it could be held against him. C.A.R. 43. He also questioned the correctness of the IJ's corroboration findings, calling them "clearly erroneous." C.A.R. 39-40. Under our liberal exhaustion policy, *see* *Yan Lan Wu*, 393 F.3d at 422, this is adequate. Luziga was not required to unambiguously raise the IJ's failure to follow the three steps of the *Abdulai* inquiry as long as he "place[d] the Board on notice of a straightforward issue being raised on appeal." *Id.* In questioning the correctness of the IJ's corroboration determination, Luziga put the BIA on notice of an error in that determination.

 **[21]**  The BIA agreed with the IJ's decision on Luziga's CAT deferral claim without adding analysis, so we review the IJ's decision. *Zhang*, 405 F.3d at 155. The record clearly shows that the IJ did not perform the *Abdulai* inquiry before announcing her decision. [14] She never asked Luziga whether he could provide further corroborating evidence of his claim, or, if he could not, whether he had an explanation for his inability to do so. This error **\*256** requires remand for a new corroboration determination, *see* *Toure v. Att'y Gen.*, 443 F.3d 310, 323 (3d Cir. 2006), unless, as the Attorney General argues, "corroboration was not determinative [of] [Luziga's] CAT claim," Respondent's Br. 31.

In her opinion, the IJ held that Luziga failed to carry his burden of proof to demonstrate entitlement to CAT deferral, saying that Luziga had "not met his burden of proof of establishing the elements of his claim." C.A.R. 446. The IJ then pointed to Luziga's failure to provide corroborating evidence, remarking that "[a]s far as Mrisho Nzese is concerned, there is no proof other than one individual so opining, and [Luziga] also opining that he is the nephew of the ex-president[;] [t]here is no *independent corroborative information* supplied on this issue, and that causes the issue to fail under the burden of proof standard." *Id.* (emphasis added). And further, "[w]ith respect to the suggestion that the ex-president would, even if he is related to Mrisho Nzese, do something unlawful to vindicate Mrisho Nzese, is supported by nothing at all on the record other than some opining by this expert ... and [Luziga]'s own opinions about that." *Id.* The IJ

also stated that there was no evidence corroborating Luziga's testimony that his friend shot a bus driver, his stepfather couldn't protect him, and his parents-in-law and Nzese could torture him with the acquiescence of public officials.

The Attorney General argues that, though the IJ discussed corroboration, she ultimately denied Luziga's request for deferral because of his failure to satisfy the "burden of persuasion." [15] The Attorney General asserts that the IJ noted the facts Luziga failed to corroborate, but ultimately accepted those facts for purposes of argument and was nevertheless unpersuaded that Tanzanian officials would acquiesce in Luziga's torture.

We are unconvinced. The IJ emphasized Luziga's failure to corroborate throughout her opinion, and while she indicated that she would assume that Luziga had been threatened and that Nzese is in fact the nephew of the former president, she explained that, even assuming those facts, Luziga had failed to carry his burden of proof on the nexus between the possibility that his feared assailants would torture him and government acquiescence. C.A.R. 447-48 (explaining that CAT relief requires acquiescence of a public official, and deciding "[t]here is absolutely, completely[,] no evidence of this at all"). The rub is that Luziga credibly testified that Tanzanian officials acquiesce in harm perpetrated by people with government connections, particularly when he testified about his friend shooting a bus driver with impunity because his grandfather had been a member of parliament. Moreover, he provided an expert who testified to the same effect based on his study of Tanzanian history and society. *See* C.A.R. 530 ("People with government contacts have the ability, essentially, to enact plans, to enact violence against other individuals if they so choose."). Thus, a failure to prove acquiescence must not have been due to a lack of credible testimony on the issue. And if Luziga's failure on the burden of proof was not due to a lack of credible testimony, the only other possibility is that the IJ found Luziga failed to produce corroborating evidence.

There is nothing inherently wrong with that—IJs may require corroboration of central aspects of a claim that can be easily verified or demand an explanation for the absence of reasonably available **\*257** corroborating evidence. *Chukwu*, 484 F.3d at 192. In fact, we have observed that we "typically" see the *Abdulai* inquiry "come[ ] into play" in just this type of situation: where the "petitioner has testified, apparently credibly, about the facts giving rise to [his] claim,

but the IJ believes it would be 'reasonable' for [him] to have corroboration of one or more facts, such that [the IJ] imposes an obligation on [him] to produce corroboration in order to meet [his] burden." *Quao Lin Dong*, 638 F.3d at 231. The demand is not the problem; what we prohibit is failing to notify the noncitizen of an unspoken expectation and then penalizing him for failing to meet it. The IJ held Luziga's failure to produce corroborating evidence against him without first giving him notice and an opportunity to provide the evidence or explain its absence, as *Abdulai* requires. That is precisely the kind of " 'gotcha' conclusion[ ]" that led this Court to vacate and remand in *Saravia*. 905 F.3d at

738-39. Therefore, we must remand for a new corroboration determination.

IV.

In light of the foregoing errors, we will grant Luziga's petition for review, vacate the underlying order, and remand this case for further proceedings consistent with this opinion.

**All Citations**

937 F.3d 244

## Footnotes

1    The Court wishes to express its gratitude to a recent graduate of the University of Pennsylvania Law School, Khary Anderson, and his supervising lawyers, Joseph Patrick Archie and Christopher J. Mauro of Dechert LLP, for their excellent *pro bono* representation of the Petitioner in this matter.

2    The record indicates that Luziga and Boas were in divorce proceedings in October 2015. Their current marital status is not reflected in the record.

3    The hearing where parties are afforded the opportunity to make opening and closing statements, present and object to evidence, and present and cross-examine witnesses before an IJ is known as the "individual calendar hearing." U.S. Dep't of Justice, Office of the Chief Immigration Judge, Immigration Court Practice Manual, § 4.16 (2019).

4    The exact nature of Luziga's father-in-law's work with the government is unclear. Luziga testified that his father-in-law had a government contract and gave speeches, but he was not aware of the nature of these speeches.

5    Luziga's appeal involved several intermediate steps, which are not relevant to our review of the issues presented in the petition.

6    The "agency" is the EOIR, an agency within the Department of Justice that includes the BIA, 8 C.F.R. § 1003.0(a), and immigration courts, *id.* § 1003.9(a).

7    Section 1252(a)(2)(B)(ii) only prohibits our review of matters specifically delegated to the Attorney General's discretion. *See Kucana v. Holder*, 558 U.S. 233, 251, 130 S.Ct. 827, 175 L.Ed.2d 694 (2010) (explaining the correct interpretation of § 1252(a)(2)(B)(ii) in light of "the presumption favoring judicial review of administrative action"); *see also Yusupov v. Att'y Gen.*, 518 F.3d 185, 195 n.15 (3d Cir. 2008).

8    We owe deference to the BIA only when it acts "in the exercise of congressionally-delegated authority to make rules carrying the force of law," meaning "unpublished, single-member BIA decisions are not entitled to *Chevron* deference." *Mahn v. Att'y Gen.*, 767 F.3d 170, 173 (3d Cir. 2014).

9    Particularly serious crime determinations are not among the matters specifically delegated to the Attorney General's discretion, and therefore we review them *de novo. Denis v. Att'y Gen.*, 633 F.3d 201, 214 n.18 (3d Cir. 2011) (citing *Alaka*, 456 F.3d at 101–02). We had previously held that only aggravated felonies could be particularly serious crimes. *Alaka*, 456 F.3d at 104–05. We recently reconsidered that holding as

a full court. *Bastardo-Vale v. Att'y Gen.*, No. 17-2017, 934 F.3d 255, 2019 WL 3772097 (3d Cir. Aug. 12, 2019) (en banc). Luziga concedes that his conspiracy conviction is an aggravated felony.

10  Though *Frentescu* was rendered inapplicable in many cases when Congress amended the INA in 1990 and linked particularly serious crimes to aggravated felonies, *id.* at 339-40, the BIA eventually "revived the *Frentescu* case-by-case analysis," *Blandino-Medina v. Holder*, 712 F.3d 1338, 1347 (9th Cir. 2013) (citing *In re L-S-*, 22 I. & N. Dec. 645, 649 (B.I.A. 1999) (en banc)), after intervening legislation restored some of the Attorney General's discretion. For a thoughtful review of this history, see *L-S-*, 22 I. & N. Dec. at 649-51.

11  In *N-A-M-*, the BIA also reasserted that adjudicators may make particularly serious crime determinations solely on the elements of a crime. *Id.* at 342-43. Elements-only determinations are outside the scope of this case.

12  In *Kaplun v. Attorney General*, which was decided before we approved of the *N-A-M-* framework, we found no error in the BIA's determination that the noncitizen's securities fraud conviction with losses of almost $900,000 constituted a particularly serious crime. 602 F.3d 260, 267-68 (3d Cir. 2010). The Attorney General argues that, by citing *Kaplun*, the agency performed the first step in *N-A-M-*. However, mere citation to *Kaplun* is insufficient for us to draw that inference, and we are not at liberty to "supply the basis for [an agency] decision where appropriate reasons are not set forth by the administrative agency itself." *Wang v. Att'y Gen.*, 423 F.3d 260, 271 (3d Cir. 2005). Moreover, our decision in *Kaplun* does not dictate that aggravated felony financial crimes must potentially fall within the ambit of particularly serious crimes.

13  Luziga also argues that the IJ overlooked corroborating evidence he did provide. Overlooking corroborating evidence in the record is an error at step two of the *Abdulai* inquiry. Because we will remand for a new corroboration determination, the IJ will have an opportunity to address any corroborating evidence already in the record.

14  DHS counsel asked several questions about corroboration during proceedings. However, it is the adjudicator's duty to address corroboration by going through the *Abdulai* inquiry if she plans to find corroboration determinative. *See Chukwu*, 484 F.3d at 192.

15  Oral Argument at 22:40-23:05, *available at* https://www2.ca3.uscourts.gov/oralargument/audio/172444AyubJumaLuzigav.AttyGenUSA.mp3.

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Rates Technology Inc. v. Broadvox Holding Co., LLC, S.D.N.Y., October 7, 2014

2007 WL 1876502

Only the Westlaw citation is currently available.

United States District Court,

E.D. New York.

Paul LYN and Jamroc Café, Inc., Plaintiffs,

v.

INCORPORATED VILLAGE OF HEMPSTEAD, James A. Garner, Jody Edmondson, Wayne J. Hall, Sr.,
Perry Pettus, Don Ryan, Carol Riddick, James Russo, Sgt. Kearney, Jane and John Does, Defendants.

No. 03–CV–5041 (DRH).
|
June 28, 2007.

**Attorneys and Law Firms**

Diane S. Pollard, Esq., New York, NY, for Plaintiffs.

Laurel R. Kretsing, Esq., Jaspan Schlesinger Hoffman, LLP, Garden City, NY, for Defendants.

*MEMORANDUM and ORDER*

On Defendants' Motion for Summary Judgment

HURLEY, Senior District Judge.

**\*1** Before the Court for its consideration is Defendants' Motion for Summary Judgment, together with supporting papers, and Plaintiffs' Opposition thereto, together with supporting papers. Plaintiffs bring a suit against the Defendants claiming constitutional violations, in particular, violations of the Privileges and Immunities Clause, the Supremacy Clause, the Commerce Clause, the Contracts Clause, and violations of the First, Fourth, Fifth, Eighth, Ninth, Tenth, and Fourteenth Amendments.

As a result, Plaintiffs seek declaratory and injunctive relief; Plaintiffs also ask for damages pursuant to 42 U.S.C. § 1983. Plaintiffs' claims arise from the revocation of their business license to run a night club, the Jamroc Café, Inc. ("Jamroc"), within the borders of the Village of Hempstead ("Village"). The Plaintiffs' claims of constitutional violations focus on the Village's Code of Ordinances, specifically Chapter 86, sections (1) through (13) (hereinafter, the "Code" or "Village Code"). Defendants contend that the Plaintiffs cannot prove that the Code is unconstitutional or that the Village violated Plaintiffs' rights when it revoked Plaintiffs' license to operate the Jamroc within the Village.

For the reasons stated *infra,* the Court grants Defendants' Motion for Summary Judgment.

## I. BACKGROUND

A. *Material Facts*

Having reviewed the Defendants' Statement of Material Facts Pursuant to Local Rule 56.1, together with corresponding affidavits, declarations, and exhibits, and Plaintiffs' Response to Defendants' Statement of Material Facts, together with Lyn's affidavit and attached exhibits, the Court gleans the following material facts. [1]

Jamroc was a night club located at 45 Main Street in Hempstead, New York, adjacent to a Village municipal park lot. Plaintiff Paul Lyn ("Lyn") was the owner and operator of Jamroc. The Jamroc was a multi-level facility with, inter alia, three bars, two dance floors and an outdoor café. Different events were held targeting different age groups. Some events were held for non-drinking-aged teens, while others were held for drinking-aged young adults. One such event was held on Thursday, August 21, 2003; it lasted into the early morning hours of Friday, August 22, 2003, at which time Village police were called to the establishment because of a disturbance in the adjacent Village municipal parking lot. The crowd was large [2] and unruly; the Village police required the assistance of other area police forces to control the crowd. Subsequently, an arrest was made for possession of a firearm; there were also reports of persons being cut or stabbed.

Shortly before the end of business hours on August 22, 2003 (i.e., 5:00 p.m.), Sergeant Kearney ("Kearney") of the Village's Police Department became aware that another music event was scheduled to be held at the Jamroc within the next few days. Given (1) the early Friday morning incident outside the Jamroc, and (2) prior police intervention required at and around the night club during previous musical events, Kearney became concerned for the public's health and safety if the next event were to be held.

 **2** Under the Code, the Village Clerk is designated as the "License Commissioner" and, as such, is authorized, inter alia, "to conduct investigations in relation to the issuance, renewal, amendment, termination, cancellation, revocation and suspension of licenses or permits required by provisions of [the] Code." Code § 86–2. To the extent investigations were required, that function was apparently delegated by the Village Clerk to Kearney. However, the power to suspend a license remained vested in the Village Clerk, subject to the holding of a prompt hearing before the Village Board "concerning the facts and circumstances prompting the suspension," which Board shall then decide whether to "continue suspension for a fixed period of time or reinstate or revoke the license." *Id.* § 86–12.

Because of prior incidents involving the Jamroc and knowing that another event was to be held before the next work week, Kearney had a discussion with one of the deputy clerks (as the Village Clerk was on extended medical leave) about suspending Jamroc's license. (*See* Defs.' Rule 56.1 Statement, ¶ 65). Later on that Friday, viz. August 22, 2003, Kearney caused a "Notice of Suspension" to be hand-delivered to Lyn. The Notice, on Police Department letterhead, was signed by Kearney and read:

> Be advised your license to conduct business at Jam Roc [3] 45 Main St. is suspended immediately. The reason for suspension is Sec: 86–11E of the Village code. The section reads conducting any business activity which is regulated by the provisions of this code or any other law requiring the license in such a manner as to constitute a breach of the peace or to endanger the health, safety or general welfare of the public is grounds for suspension. You have the right to request a hearing before the Village board for reinstatement of your license, which must be done to the Village clerks [*sic*] office in writing within ten days of the suspension. While your license is suspended, pending a hearing you can not be open for business.

(Ex. E, attached to Defs.' Exs. in Supp. Mot. Summ. J.) While this Notice cited the relevant Code section upon which suspension was based, it did not identify the conduct at issue that constituted the alleged breach or endangerment. Yet, Lyn complied with the order and the planned music event did not occur. He also sent a letter, dated August 25, 2003, requesting "a hearing before the Village Board as soon as possible," a lifting of the stay in the interim, and informing the Village of his "intention ... to sell

AR.05369

the building and close Jamroc Night club, which will effectively [produce] the same results as persued [sic] by the Village of Hempstead/Police Department." (*Id.* at Ex. F.)

Also on August 25, 2003, a formal "Notice of Suspension," pursuant to § 86–11(E) of the Code and stamped with the signature of the Village Clerk, was sent to Lyn. Unlike Kearney's Notice, this formal Notice identified the conduct alleged to breach the peace and to endanger the health, safety and general welfare of the public: "There have been numerous instances of which the most recent includes alcoholic consumption by underage individuals which was a possible factor in four people being stabbed on August 21, 2003 'Teen Night' in about [*sic* ] your premises." (Ex. G, attached to Defs. Exs. in Supp. Mot. Summ. J.) The August 25th Notice again ordered that all business at the Jamroc "cease and desist pending a hearing" before the Village Board of Trustees. (*Id.*) A license revocation hearing was conducted on October 7, 2003, before Mayor Garner, Trustee Hall, and Trustee Ryan of the Village Board. Plaintiffs were represented by counsel at the hearing. Testimony and evidence, including numerous police reports and police referral forms, were introduced. Garner, Hall and Ryan voted unanimously to revoke Plaintiffs' business license.

**\*3**  Plaintiffs never applied to run another business at 45 Main Street. In December 2004, Lyn sold 45 Main Street for $2 million.

B. *Procedural History and Summary of the Parties' Arguments*

As stated in the Court's June 25, 2004, Memorandum of Decision and Order in this case:

On August 29, 2003, Plaintiffs moved to enjoin the suspension of Jamroc's license in New York Supreme Court, Nassau County (Phelan, J .). Plaintiffs simultaneously filed a complaint alleging that the Village Code Section 86–11(E) was unconstitutional because it was an unreasonable exercise of police power.

On September 17, 2003, Justice Phelan denied Plaintiffs' motion for injunctive relief, finding that they failed to adequately establish a likelihood of success on the merits. Justice Phelan also dismissed Plaintiffs' complaint because Plaintiffs failed to serve a notice of claim.

Plaintiffs then filed a complaint in this Court, on October 3, 2003, seeking identical relief—an injunction, which the Court denied, and a declaration that the Village Code is unconstitutional. Defendants move[d] to dismiss Plaintiffs' complaint in its entirety, based on the doctrine of issue preclusion, or collateral estoppel. Additionally, the individual defendants James A. Garner, Jody Edmondson, Wayne J. Hall Sr., Perry Pettus, Don Ryan, Carol Riddick, James Russo, Sergeant Kearney, John Doe and Jane Doe argue[d] that they [were] entitled to qualified immunity.

(*Lyn et al. v. Inc. Vill. Hempstead et al.,* No. 03–cv–5041 (DRH)(WDW), slip op. at 2 (E.D.N.Y. June 25, 2004) (internal citations omitted).) Within the framework of a motion to dismiss, though, the Court did not have enough information to determine whether the individual Defendants were entitled to qualified immunity. (*See id.* at 3–4.) As to issue preclusion, the Court found that the issue in question—whether the relevant portions of the Village Code were ovevbroad and/or vague—had not been decided by the state court; there, Plaintiffs argued unconstitutionality of the Village Code because of unnecessary and unreasonable exercise of police power. In any event, the Court found "Plaintiffs have met their burden of establishing they have not previously fully and fairly litigated the claims advanced in their [federal] compliant ... [as] Plaintiffs' state complaint was dismissed at the outset on procedural grounds." (*Id.* at 6.)

Defendants now move for summary judgment dismissing Plaintiffs' action in its entirety arguing that the Village Code does not violate Plaintiffs' constitutional rights.

## II. DISCUSSION

A. *Summary Judgment Standard*

AR.05370

Summary judgment is generally appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Viola v. Philips Med. Sys. of N. Am.,* 42 F.3d 712, 716 (2d Cir.1994) (quoting Fed.R.Civ.P. 56(c)). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and identifying those materials "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

**\*4**  Once the moving party has offered some evidence that no genuine issue of material fact remains to be tried, the burden shifts to the non-moving party to provide similar evidence indicating that a genuine, triable issue remains. *See Anderson v. Liberty Lobby, Inc .,* 477 U.S. 242, 250 (1986); *see also* Fed.R.Civ.P. 56(e). Affidavits submitted in opposition to summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show that the affiant is "competent to testify to the matters stated therein." *Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 219 (2d Cir.2004) (citing Fed.R.Civ.P. 56(e)). When determining whether a genuinely disputed factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability," or "the substantive evidentiary standards that apply to the case." *Anderson,* 477 U.S. at 254–55.

In deciding a summary judgment motion, a court must resolve all factual ambiguities and draw all reasonable inferences in favor of the non-moving party. *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987). That being said, it is well-established that a non-movant cannot defeat summary judgment with nothing more than "unsupported assertions," *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995), or the allegations in its pleadings. *See Cifarelli v. Vill. of Babylon,* 93 F.3d 47, 51 (2d Cir.1996); *see also* Fed.R.Civ.P. 56(e). The Second Circuit has stated: "Claims turning entirely on the constitutional validity or invalidity of a statute are particularly conducive to disposition by summary judgment as they involve purely legal questions." *Connecticut ex rel. Blumenthal v. Crotty,* 346 F.3d 84, 93 (2d Cir.2003).

B. *The Instant Case*

The Court will first address the constitutional violations alleged by Plaintiffs, utilizing the sequential format from Defendants' Memorandum of Law in Support of the Motion for Summary Judgment. (*See* Defs.' Summ. J. Mem. at i ("Table of Contents"), and 2–13.))[4] The Court will then address Defendants' arguments that Plaintiffs' action for damages under 42 U .S.C. § 1983 must be dismissed. (*See id.* at 13–19.) Finally, the Court will turn to Defendants' final points that neither the Village nor any of the individual Defendants are liable under § 1983 because Plaintiffs cannot prove, as a matter of law, a constitutional violation. (*See id.* at 19–20.)

1. *Constitutional Violations*

(a) The Privileges and Immunities Clause

At its core, the Privileges and Immunities Clause requires a diversity of citizenship as it provides "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. Art. IV, § 2(1). "[I]ntended to foster a national economic union, the Privileges and Immunities Clause of Article IV limits a State's power to discriminate *against residents of other States* with respect to the Privileges and Immunities that 'are sufficiently basic to the livelihood of the Nation' and that 'bear[ ] upon the vitality of the Nation as a single entity.' " *Blumenthal,* 346 F.3d at 94 (quoting *Baldwin v. Fish & Game Comm'n of Mont.,* 436 U.S. 371, 388 (1978) (emphasis added) (further citation omitted)). Thus, the threshold inquiry in a Privileges and Immunities Clause challenge is "whether a State has, in fact, discriminated against out-of-staters with regard to the privileges and immunities it accords its own citizens." *Id.* (citing *United Bldg. & Constr. Trades Council*

*v. Mayor & Council of Camden,* 465 U.S. 218, 222 (1984)). Then, a court considers whether there is sufficient justification for such discrimination. *See id.*

 **\*5**  The Court is perplexed by Plaintiffs' claim of a Privileges and Immunities Clause violation in this instance as neither is an "out-of-stater." There is no dispute that Lyn is a resident of New York and Jamroc is a New York corporation. Moreover, by its plain language, the Village Code applies to residents and non-residents alike. As Plaintiffs are not "out-of-staters" and, thus, cannot demonstrate discrimination on that basis, they have no claim under the U.S. Constitution's Privileges and Immunities Clause that the Code is unconstitutional. As a matter of law, therefore, it is proper to grant summary judgment in Defendants' favor as to Plaintiffs' Privileges and Immunities Clause claim.


   (b) The Supremacy Clause

The Supremacy Clause concerns itself with the primacy of federal law as it states that the "Constitution and the Laws of the United States ... shall be the supreme Law of the Land." U.S. Const. Art. VI, cl. 2. "Accordingly, consistent with the Tenth Amendment, Congress may create federal causes of action that state courts are obligated to adjudicate ... [o]r it may enact a federal law that preempts a state-law cause of action, thereby foreclosing state courts from entertaining such a state-law claim." *Freier v. Westinghouse Elec. Corp.,* 303 F.3d 176, 204 (2d Cir.2002) (internal citations omitted). In other words, the Supremacy Clause makes clear that between a federal law and a state law, federal law prevails over conflicting state law. It does not speak of—nor does it concern itself with—the supremacy of allegedly conflicting intra-state laws. *See, e.g.,* N.Y. State Pesticide Coalition, Inc. v. Jorling, 874 F.2d 115, 118 (2d Cir.1989).

While Plaintiffs discuss the early interpretation of the Supremacy Clause by the Supreme Court and the well-accepted "principle that the federal judiciary is supreme in the exposition of the law of the Constitution" (Pls.' Opp'n Mem. at 4–5), it is unclear what purpose this discussion serves. To begin, Plaintiffs' discussion does not elucidate their claim of a violation of the Supremacy Clause. All the Court knows, from reading the Complaint, is that Plaintiffs assert that the Village Code violates the Supremacy Clause "in that the law deprives both the plaintiff [*sic* ] and members of the public of rights they are exercising under the laws of the United States and particularly rights created under the New York State Alcoholic Beverage Control Law and determined by the New York State Liquor Authority, pursuant thereto." (Pls.'s Compl., ¶ 19(B).) That conclusory assertion is, essentially, the extent of Plaintiffs' argument. The particular federal rights said to be impermissibly compromised by the Village Code are not identified and none are apparent to the Court.

Further absent from Plaintiffs' Supremacy Clause discussion is any opposition to Defendants' argument that "[s]ince the New York State Alcoholic Beverage Control Law is a law of the state—not the United States—the Supremacy Clause does not serve to render the Village Code section unconstitutional." (Defs.' Summ. J. Mem. at 4 .) This statement is correct. As the Court has already stated, the focus of the Supremacy Clause is establishing the supremacy of federal law over conflicting state law, not resolving purported conflicts between intra-state laws.

 **\*6**  In short, Plaintiffs' discussion of Supremacy Clause jurisprudence is not an offer of evidence of a genuine, triable issue. Having previously noted that their Rule 56.1 Response rests on their pleadings without offering any probative evidence tending to support their complaint of a Supremacy Clause violation (*see supra* note 1), there is no dispute to resolve. Rather, Defendants are entitled to judgment as a matter of law as to Plaintiffs' claim of a Supremacy Clause violation.


   (c) The Commerce Clause

The Commerce Clause empowers the U.S. Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes." U.S. Const. Art. I, § 8, cl. 3. That subsection dealing with Congress' power to regulate commerce among the several States has come to be known as the "Interstate Commerce Clause" and its purpose is to avoid "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Env't Quality,* 511 U.S. 93, 99 (1994). And, "[w]hile the Commerce Clause is more frequently

invoked as authority for federal legislation, the so-called dormant Commerce Clause limits state legislation that adversely affects interstate commerce." *Grand River Enters. Six Nations v. Pryor,* 425 F.3d 158, 168 (2d Cir.2005) (further citation omitted). "The central rationale for the [dormant Commerce Clause's] rule against discrimination is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent." *C & A Carbone v. Town of Clarkstown, N.Y.,* 511 U.S. 383, 390 (1994).

Defendants argue that the Village Code "is facially neutral and does not discriminate against interstate and out of state interests." (Defs.' Summ. J. Mem. at 4.) Indeed, by its plain language, the Village Code requires *"any* person" engaging in or carrying on any business, trade or calling in the Village to first obtain a license. Village Code § 86–1 (emphasis added). Yet, if Plaintiffs can demonstrate either that a relevant provision of the Code (1) "imposes a burden on interstate commerce incommensurate with the local benefits secured," *Grand River,* 425 F.3d at 168 (quoting *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 216 (2d Cir.2004)), [5] or (2) "has the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question," *id.,* then, Plaintiffs can establish a Commerce Clause violation. Here, although alleging in their Compliant that "[s]aid ordinances are an unreasonable burden upon interstate commerce" (Pls.' Compl., ¶ 19(C))), Plaintiffs have not presented evidence pertaining to either of the two predicates necessary to establish a violation of the Commerce Clause. Thus, presented with no genuine issue of material fact as to the purported Commerce Clause violation, as a matter of law, Defendants are entitled to summary judgment on that claim.

(d) The Contracts Clause

**\*7** Under Article I, Section 10, Clause 1 of the U.S. Constitution, "[N]o State shall ... pass any ... Law impairing the Obligations of contracts." When one asserts a violation of the Contracts Clause, therefore, one is required to show three elements: (1) there is a contractual relationship; (2) there has been a change in law that impairs that relationship; and (3) the impairment is substantial and unjustified. *See General Motors Corp. v. Romein,* 503 U.S. 181, 185–86 (1992); *Coney Islands Resorts, Inc. v. Giuliani,* 103 F.Supp.2d 645, 655 (E.D.N.Y.2000) (Glasser, J.).

While Plaintiffs allege a Contracts Clause violation in their Complaint (*see* Pls.' Compl., ¶ 19(D)), they do not respond to Defendants' argument that Plaintiffs make no claim for relief based on the Contracts Clause. (*See* Defs.' Summ. J. Mem. at 5.) The heart of Defendants' argument is that Plaintiffs freely began their business venture in the Village "with the Village's regulatory scheme already in place." (*Id.* at 6.) The record evinces no dispute that the Village Code—in particular, Chapter 86 of the Code—was enacted in early 1981 (*see* Defs.' Rule 56 Statement), and pre-existed the opening of the Jamroc in 1995 (*see* Pls.' Rule 56.1 Response). Thus, no meaningful claim may be advanced that the enactment of the challenged Code provision unconstitutionally impaired any contractual relationship between Plaintiffs and others. Defendants are correct in their assertion that "when [P]laintiffs chose to operate a business in the Village[,] they did so subject to the Code and all its provisions, including revocation." (Defs.' Summ. J. Mem. at 6.) *See, e.g., U.S. Trust Co. of N.Y. v. New Jersey,* 431 U.S. 1, 33 n. 17 (1977) ("This Court has said that the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms. This principle presumes that contracting parties adopt the terms of their bargain in reliance on the law in effect at the time the agreement is reached.") (citations and internal quotations omitted). In short, as to Plaintiffs' Contracts Clause violation, there is no genuine material fact in dispute requiring resolution; rather, as a matter of law, Defendants are entitled to summary judgment on this cause of action.

(e) Police Power

Plaintiffs allege that the Village Code is "beyond the power of a state to legislate as an attempted regulation of the internal affairs of private business, unwarranted by the exercise of any proper police power of a state under Amendments V and XIV ...." (Pls.' Compl., ¶ 19(E).) "There is a heavy burden of proof imposed upon the party challenging a public safety law because such legislation is entitled to a strong presumption of constitutionality ." *N.Y. City Friends of Ferrets v. City of N.Y.,* 876 F.Supp.

529, 534 (S.D.N.Y.1995) (citing *McGowan v. Maryland,* 366 U.S. 420 (1961)). Indeed, in order to succeed on a police power constitutionality challenge, such as that raised by Plaintiffs, a plaintiff must show that no reasonable basis exists at all for the challenged provision of an ordinance. *See id.* (quoting *Lighthouse Shores, Inc. v. Town of Islip,* 41 N.Y.2d 7 (1976) (further citation omitted)). And, "[t]he party challenging public safety laws must prove by clear and convincing evidence that the law is unconstitutional." *Id.* (citing *In re Winship,* 397 U.S. 358 (1970)). "Th[is] exceedingly strong presumption of constitutionality applies not only to enactments of the Legislature[,] but to ordinances of municipalities as well." *Id.* (quoting *Lighthouse Shores,* 41 N.Y.2d 7).

**\*8** Plaintiffs have failed to meet their burden; they have not presented any evidence showing that no reasonable basis exists for Chapter 86 of the Village's Code. Instead, the evidence in the record is undisputed that the requirements of Chapter 86 of the Code have a rational connection with the promotion and protection of public safety. *See, e.g., Kelley v. Johnson,* 425 U.S. 238, 247 (1976). Thus, as a matter of law, Defendants are entitled to summary judgment on Plaintiffs' Police Power Constitutional violation cause of action.

(f) Vagueness

(i) *Plaintiffs' Vagueness Challenge Calls for an As–Applied, Rather Than a Facial, Evaluation*
Plaintiffs also assert that Chapter 86 of the Code is invalid because it is "unduly vague and uncertain" (Pls.' Compl., ¶ 19(F)) and, therefore, violates the Fourteenth Amendment. In their Complaint, Plaintiffs contend that the Code:

> both *on its face* and *as construed and applied* by defendants ... interfere[s] and suppress[es] the operation of plaintiffs' private business[,] abridges the exercise by plaintiff [sic] and the public of the freedoms of assembly, speech, and the right to live and work and earn a livelihood in any lawful calling or to pursue any lawful trade or avocation ...

(*Id.,* ¶ 18 (emphasis added).) In their opening brief, Defendants argue that Plaintiffs' vagueness claim is "to be evaluated with respect to their own conduct and not with respect to hypothetical situations or with respect to the conduct of other parties." (Defs.' Summ. J. Mem. at 9 (citing *Perez v. Hoblock,* 368 F.3d 166, 175 (2d Cir.2004).) In other words, Defendants frame their argument against Plaintiffs' vagueness claim as if it is an as-applied vagueness claim.

In response, Plaintiffs opine:

This is not an ordinance that "simply regulates business behavior and contains a scienter requirement." *Hoffman Estates v. Flipside, Hofman Estates, Inc.,* 455 U.S. 489, 199 (1982). It is a criminal law that contains no *mens rea* requirement, *Colautti v. Franklin,* 439 U.S. 379, 395 (1979), and infringes on constitutionally protected rights. *Id.,* [sic] at 391.

(Pls.' Opp'n Mem. at 9.) Apparently based on that notion, Plaintiffs maintain that "it is clear that the vagueness of this enactment makes a facial challenge appropriate." (*Id.*)

Plaintiffs do not elaborate on their position that the subject ordinance should be reviewed as criminal in nature. Seemingly, however, it is tethered to the general penalty section of the Village Code, to wit § 1–16,[6] which provides:

whenever in this Code or in any local law of the village any act is prohibited or is made or declared to be unlawful or an offense or whenever in such Code or local law the doing of any act is required or the failure to do any act is declared to be unlawful, *when no specific penalty is provided therefore,* the person, firm or corporation who or which violates the same shall be guilty of a violation and so be subject to punishment [including a fine and/or imprisonment not exceeding 15 days or both].

**\*9**  Village Code, Chapter 1, § 1–16 (emphasis added). Not surprisingly, since Plaintiffs have not endeavored to explain the nature of their argument, no authority is provided for the position implicitly urged, i.e., since some violations of the multi-subject Village Code would constitute violations subject to periods of incarceration, all provisions of the Code should be deemed criminal for the purpose of permitting a void-for-vagueness facial challenge. If the Court has correctly identified the Plaintiffs' position, it is rejected as being without foundation in law or logic. Otherwise, for example, a person charged criminally with larceny could plausibly seek a dismissal of the accusatory instrument on the ground that the assault statute within the same penal law is constitutionally suspect. To have standing to mount a constitutional challenge, even if facial in character, the movant must have some stake in the targeted provision. One who stands accused under a different and distinct section of a statute or, as in the instant case, of a municipal code, does not meet that threshold standard.

The portion of the Village Code that is particularly applicable here is § 86–11(E), which indicates that anyone who operates a licensed business activity subject to the Code "in such a manner as to constitute a breach of peace or to endanger the health, safety or general welfare of the public" is subject to a suspension or revocation of that license.[7] *Id.* § 86–11(E). Which is to say, Plaintiffs were not charged with the type of conduct that could trigger a period of incarceration under the general penalty provisions of § 1–16.[8] Indeed, § 86–11 is entitled "Grounds for suspension and revocation," i.e., it has a self-contained "specific penalty" provision thus rendering the possibility of incarceration inapplicable. *Id.* § 1–16.

In sum, Plaintiffs' loss of license was based on § 86–11 of the Village Code. That section is not penal in nature; rather, it constitutes civil legislation designed to regulate economic activities. As a result, Plaintiffs' first asserted basis for mounting a facial challenge against "Section 86–1 thru 86–13, Article I (Licensing) of the Hempstead Village Code" (Pls.' Compl., WHEREFORE clause, ¶ (C)(I), is unavailing.

The second basis urged for a facial challenge is similarly flawed. Notwithstanding Plaintiffs' protestations to the contrary, § 86–11 does not give rise to First Amendment concerns. (*See, infra,* Part II(B)(1)(h) ("Free Speech and Assembly").) As a result, Plaintiffs' call for a facial review on this alternate ground is also misplaced. *See United States v. Mazurie,* 419 U.S. 544, 550 (1975) ("It is well established that vagueness challenges to statutes which do not invoke First Amendment freedoms must be examined in the light of the facts of the case at hand."); *see also Hersch v. United States,* 685 F.Supp. 325, 327 (E.D.N.Y.1988) (citations deleted) ("The stricter facial invalidity test will only be used when the statute affects first amendment rights, or where a penal statute 'impacts upon important constitutional rights.' ")). Therefore, this Court's analysis of Plaintiffs' vagueness challenge will not be facial but instead will be as applied, i.e., based on the facts at hand.

(ii) *Plaintiffs' As–Applied Vagueness Challenge to § 86–11 Lacks Merit*[9]

**\*10**  In any event, whether a vagueness challenge is facial or as-applied, as the Second Circuit instructs, *"all* vagueness challenges ... require us to answer two separate questions: whether the statute gives adequate notice, and whether it creates a threat of arbitrary enforcement." *Farrell v. Burke,* 449 F.3d 470, 485 (2d Cir.2006) (emphasis added). This is consistent with the Circuit's earlier statement: "The Due Process Clause requires 'that laws be crafted with sufficient clarity to 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited' and to 'provide explicit standards for those who apply then.' " *Perez,* 368 F.3d at 174 (quoting *Gen. Media Commc'ns, Inc. v. Cohen,* 131 F.3d 273, 286 (2d Cir.1997), *cert. denied,* 524 U.S. 951 (1998)). These requirements prevent "trap[ping] the innocent by not providing fair warning" and prevent "impermissibly delegat[ing] basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory applications." *Grayned v. City of Rockford,* 408 U.S. 104, 108–09 (1972) (quoted in *Hoffman Estates,* 455 U.S. at 498).

(A) *Adequate Notice*

The record before the Court states Plaintiffs had adequate advance notice that the alleged events of August 22, 2003, and like incidents said to have occurred prior thereto could result in the suspension, and, ultimately, the revocation of their Village license to do business.

Granted, the terms "breach of the peace" and conducting a business activity in such a manner "as to ... endanger the health safety or general welfare of the public" are broad-based and do not detail each specific prohibited act. However, as the Second Circuit has explained "a statute or regulation is not required to specify every prohibited act." *Perez,* 368 F.3d at 175 (citing *Rock of Ages Corp. v. Sec'y of Labor,* 170 F.3d 148, 156 (2d Cir.1999) ( "[R]egulations need not achieve 'meticulous specificity' and may instead embody 'flexibility and reasonable breadth.' ") (further citation omitted)). Indeed, § 86–11 passes constitutional muster vis-a-vis notice if "it gives a person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Id.* at 174 (internal quotation marks and citations deleted). And, in making that determination in an as-applied context, the business environment in which Plaintiffs operate may be considered. *See, e.g., id.* at 175–76 ("In evaluating Perez's vagueness claim, we must consider the context in which the regulation was enforced, i.e., we must evaluate Perez's underlying conduct by reference to the norms of the racing community."); *see also* the cases cited in *Perez* for the foregoing proposition, including *Rock of Ages Corp.,* 170 F.3d at 156 ("[R]egulations satisfy due process as long as a reasonably prudent person, familiar with conditions the regulations are meant to address and the objectives the regulations are meant to achieve, has fair warning of what the regulations require."); *San Filippo v. Bongiovanni,* 961 F.2d 1125, 1137 (3rd Cir.1992) (rejecting professor's as-applied vagueness challenge to regulation requiring professors engage in "sound scholarship and competent teaching" because a reasonable person in the professor's position would know his conduct violated mores of the academic community), *Cranston v. City of Richmond,* 40 Cal.3d 755, 710 P.2d 845, 851 (1985) (in rejecting police officer's vagueness challenge to a "conduct unbecoming" statute, the Supreme Court of California noted: "[w]hile the language of the statute fails to provide an objective standard by which conduct can be judged, the required specificity may nonetheless be provided by the common knowledge and understanding of members of the particular vocation or profession to which the standard applies.").

**\*11**  It also warrants mention that it is incontestable that (1) acts of violence were common at the Jamroc and the adjacent parking lot (*see* Ex. C, attached to Defs.' Exs. in Supp. of Mot. Summ. J., and Russo Aff., ¶ 2), and (2) that "on at least two occasions" prior to the incident of August 22, 2003, Lyn met with then Mayor Garner and Police Chief Russo about problems associated with the operation of Jamroc, coupled with conversations concerning possible corrective measures. (Russo Aff., ¶ 3) (*see also, infra,* Part II(B)(1)(f)(ii)(B) ("Threats of Arbitrary Enforcement") (discussing incidents prior to August 22, 2003, as well as on that date).) Therefore, to the extent Plaintiffs suggest that the language of § 86–11(E) is not sufficiently detailed to provide advance notice of the type of conduct that could lead to a suspension and or revocation of their license, that claim is belied when viewed in the appropriate business context, *including* prior discussions had with Village officials about problems at the Jamroc site.

In sum, Plaintiffs' claim that § 86–11(E) failed to provide them with adequate prior notice is insufficient as a matter of law.

(B) *Threats of Arbitrary Enforcement*

The second question implicated by Plaintiffs' as-applied vagueness challenge is whether § 86–11(E) contains sufficient guidance to those charged with enforcing its provisions to prevent arbitrary application. *See Farrell v. Burke,* 449 F.3d 470, 492–93 (2d Cir.2006). Plaintiffs' discussion of the subject in their Memorandum of Law in Opposition consists of the following: "The broad sweep of the ordinance also violates 'the requirement that a legislature establish minimal guidelines to govern law enforcement.' " (Pls.' Opp'n Mem. at 9 (citing *Kolender v. Lawson,* 461 U.S. 352, 259 (1983)).) But, even if, *arguendo,* § 86–11(E) provides insufficient general guidance, Plaintiffs' as-applied vagueness challenge is not necessarily on sound ground.

*See* [icons] *Farrell, 449 F.3d at 493; see also Thibodeau v. Portuondo, 486 F.3d 61, 67–70 (2d Cir.2007).* As explained in *Farrell,* "even in the absence of such standards, [a party will not be heard to complain if] the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and fact finders might have in other, hypothetical applications of the statute." *Id.* at 494.

The events which caused the revocation of Plaintiffs' license fall squarely within the core of the legislative purpose underlying § 86–11(E). Those events included numerous danger-fraught breaches of the peace at the Jamroc prior to August 22, 2003. (*See, e.g.,* Tr. of Oct. 7, 2003, Village Board of Trustee Hearing at 3 (unnumbered), attached as Ex. B to Defs.' Exs. in Supp. Mot. Summ. J. (providing testimony of police receiving report in December 2002 of possible gunshot victim; when arrived, initially denied access to the Club; upon belated entry, police "found patrons had left and employees were cleaning up blood"); *id.* at 6–7 (Village Police Lt. McNamara detailing number of Jamroc patrons shot or stabbed in the Club or the adjacent parking lot for the period from April 2002 through and including incident of August 22, 2003); *see also* Exs. B–L and B–M attached to Defs.' Exs. in Supp. Mot. Summ. J. (supporting documents attached to Police Referral Forms to the New York State Liquor Authority).) And, according to a Village police officer at the scene, the events of August 22, 2003 "about 500 patrons from the ages of 17–25 exiting from Jam Rock," and thereupon engaging in protracted mayhem in the adjacent parking lot. (*See* Aug. 22, 2003 Report of P.O. Paul Bell, included as part of Ex. D attached to Defs.' Exs. in Supp. Mot. Summ. J.)

**\*12** In sum, "the conduct at issue falls so squarely in the core of what is prohibited by [§ 86–11(E) ] that there is no substantial concern about arbitrary enforcement because no reasonable enforcing officer [nor a Village Board] could doubt the law's application in the circumstances." [icons] *Farrell, 449 F.3d at 494.* Simply put, Plaintiffs' as-applied challenge to § 86–11(E) falls short of the mark on the arbitrary enforcement prong of the constitutional analysis, as well as on the first prong concerning adequate notice. [10]

For the reasons indicated, Plaintiffs' constitutional vagueness challenge is found to be without merit.

   (iii) *Additional Comments and Conclusions Regarding Plaintiffs' Constitutional Vagueness Claim*
Plaintiffs have not claimed that they were constitutionally entitled to a pre-suspension hearing. However, they seemingly find fault with the fact that Kearney signed the August 22, 2003 Notice of Suspension (rather than the Village Clerk), and allege that they were not afforded "the opportunity of a fair and impartial hearing." (Pls.' Rule 56.1 Response, ¶ 75.)

It may well be that Kearney lacked the authority to issue the initial Notice of Suspension. However, that communique was followed three days later by a procedurally unchallenged Notice to the same effect issued by the Village Clerk. Plaintiffs have not argued, no less established, the existence of a material issue of fact consistent with the requirements of Rule 56(e), concerning financial or other harm that may have materialized during that three day period. As a result, even if the Notice from Kearney was unauthorized, it represents a non-actionable error without constitutional significance.

With respect to Plaintiffs' claim that they were not afforded a fair hearing, it is undisputed that a hearing was held on October 7, 2003, at which Plaintiffs were represented by counsel. Although the legitimacy of that hearing is being called into question, Plaintiffs have not proffered *any* details about the purported shortcomings of the process such as being denied the opportunity to call or cross-examine witnesses or to otherwise fully present their position to the Village Board. Nor do they argue that the post-deprivation judicial review process available to them in New York was inadequate. *See, e.g., Giglio v. Dunn,* 732 F.3d 1133 (2d Cir.1984) (finding that post-deprivation remedies available through N.Y. Civil Practice Law and Rules were adequate to satisfy the requisites of due process).

Finally, as earlier noted, Plaintiffs maintain that the October 7, 2003, hearing before the Village Board failed to afford them not only a "fair" hearing, but also an "impartial" hearing. Here again, the conclusory charge stands without elaboration. Seemingly,

however, Plaintiffs are suggesting that it was improper for the Village Board to hear and determine the charged violation of § 86–11(E) of the Village Code. That conclusion is highly questionable and, in the dearth of concomitant support, is rejected.

**\*13** In sum, none of the additional due process considerations discussed above alters the Court's earlier conclusion that Defendants are entitled to summary judgment on Plaintiffs' constitutional vagueness claim.

(g) Overbreadth

Plaintiffs do not raise an overbreadth cause of action in their Complaint, but inartfully raise it in their Opposition to Defendants' Motion for Summary Judgment. (*See* Pls.' Opp'n Mem. at 8–9, 13–14.) To the extent Plaintiffs raise this as a discrete argument, separate from its vagueness challenge, the Court will briefly address it.

As the Second Circuit instructs, while an overbreadth challenge is a facial challenge (like a vagueness challenge), "[o]verbreadth and vagueness are different doctrines." *Farrell,* 449 F.3d at 498. "The purpose of an overbreadth challenge is to prevent the chilling of constitutionally protected conduct, as prudent citizens will avoid behavior that may fall within the scope of a prohibition, even if they are not entirely sure whether it does." *Id.* at 499. Further, "to prevail on an overbreadth challenge, 'the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.' " *Id.* (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 6155 (1973)).

Plaintiffs argue that they have standing to bring an overbreadth challenge because, by having their business license revoked, they have suffered an injury-in-fact. (*See* Pls.' Opp'n Mem. at 13–14.) The Second Circuit "allow[s] a party to bring an overbreadth challenge where that party 'satisfied the [Article III] requirement of 'injury-in-fact,' and [where] it can be expected satisfactorily to frame the issues in the case.' " *Farrell,* 449 F.3d at 499 (quoting *Sec'y of State, Md. v. Munson,* 467 U.S. 947, 958 (1984)). Since Plaintiffs' business license was suspended and later revoked by the Village, they have satisfied the injury-in-fact requirement; as a result, it will be assumed that they are well-suited to frame satisfactorily the issues regarding overbreadth.

Yet, Plaintiffs' overbreadth challenge must fail. "[T]he analysis of the merits of an overbreadth challenge is essentially the same as the analysis ... in the facial vagueness context." *Farrell,* 449 F.3d at 499. The Court has already discussed that the regulation in this instance is one concerning public safety; as such, the test required to pass constitutional muster is more lenient than if a First Amendment right was implicated. (*See supra* Part II(B)(1)(e).) Under the more tolerant standard applied to public safety regulations, the Code is not constitutionally vague. Similarly, the Plaintiffs have not shown that the Code's claimed overbreadth is both real and substantial in relation to its plainly legitimate sweep. Accordingly, to the extent there is one, the Court rejects Plaintiffs' overbreadth cause of action. In turn, Defendants are entitled to summary judgment as a matter of law on the overbreadth challenge.

(h) Free Speech and Assembly

**\*14** Under sub-paragraph (G) of paragraph 19 of their Complaint, Plaintiffs assert, "The ordinances are unconstitutional as an impairment of the constitutional rights of free speech and assembly under Articles I and XIV of the Amendments of the Constitution of the United States." (Pls.' Compl., ¶ 19(G).) Defendants argue:

> [P]laintiffs have failed to allege that they were engaged in any expressive conduct or explain how the obviously content neutral Code, which applies to all business operated within the Village, infringes on the right of free speech. Plaintiffs are apparently arguing that their conduct in running a night club and associating with its patrons is being impaired.

(Defs.' Summ. J. Mem. at 10.) Relying on the Supreme Court case 📄 *City of Dallas v. Stanglin,* 490 U.S. 19 (1989), Defendants posit that Plaintiffs' free speech and assembly claim is barred because there is no generalized right of "social association." (*Id.* at 10–11 (citing 📄 *Stanglin,* 490 U.S. at 25).)

In *Stanglin,* a dance hall owner challenged a city's age-restriction ordinance that limited admission of patrons to certain dance halls to persons between the ages of 14 and 18, arguing the ordinance violated the First Amendment, as well as "substantive due process and equal protection under the United States and Texas Constitutions." 📄 490 U.S. at 22. While the trial court upheld the ordinance, the state appellate court struck it down, "holding it violated the First Amendment associational rights of minors," *id.,* because the "patrons were engaged in a form of expressive activity that was protected by the First Amendment." 📄 *Id.* at 24. The Supreme Court disagreed, holding the Constitution does not recognize a generalized right of "social association." 📄 *Id.* at 25. Noting that while "[i]t is possible to find some kernel of expression in almost every activity a person undertakes ... such kernel is not sufficient to bring the activity within the protection of the First Amendment." *Id.* Simply put: *Stanglin* instructs that coming together to engage in recreational dancing "qualifies neither as a form of 'intimate association' nor as a form of 'expressive association' " protected by the First Amendment. *Id.*

In their papers in opposition, Plaintiffs, inexplicably fail to address the holding in *Stanglin.* However, citing 📄 *Ward v. Rock Against Racism,* 491 U.S. 781 (1989), they do note that music, as a form of expression and communication, is protected by the First Amendment, and state, through the representation of their counsel in their opposition memorandum, that "hip hop" and "rap" are played at the Jamroc. (Pls.' Opp'n Mem. at 17–18.) Significantly absent from their submissions, though, is a specific argument or authority for the notion that the use of music in a business owner's operation, standing alone, imbues the overall operation with First Amendment protections. Were that the case, such heightened scrutiny would arguably apply, *ipso facto,* to, *e.g.,* roller skating rinks with musical accompaniment and elevators with Muzak.

**\*15** Here, as in *Stanglin,* music was a necessary part of Plaintiffs' overall operation. There is no information before the Court that patrons of Jamroc were meeting for anything other than to engage in recreational or social association. Without any evidence linking such gatherings to a form of intimate association or to a form of expressive association or communication, there is no First Amendment right to be protected. Therefore, as a matter of law, Defendants are entitled to summary judgment on Plaintiffs' First Amendment claim. [11]

(i) Equal Protection

Defendants note that "[P]laintiffs do not include the Equal Protection Clause in their laundry list of Constitutional deficiencies set forth in paragraph 19 of the Complaint," (Defs.' Summ. J. Mem. at 11), but that "paragraph 29 alleges a denial of Equal Protection as constituting a basis for their claim pursuant to 📄 42 U.S.C. § 1983" (*id.*). The Court also notes that Plaintiffs do allege in paragraph 19 that their constitutional rights of free speech and assembly are impaired under the Fourteenth Amendment, as well as under the First Amendment. (*See* Pls.'Compl., ¶ 19(G).) Therefore, the Court will infer that this claim includes one under the Equal Protection Clause.

Plaintiffs do not present any factual support for their Equal Protection claim. The Equal Protection Clause of the Fourteenth Amendment guarantees the right to be free from "invidious discrimination in statutory classifications and other governmental activity." 📄 *Bernheim v. Litt,* 79 F.3d 318, 323 (2d Cir.1996) (quoting ❓ *Harris v. McRae,* 448 U.S. 297, 322 (1980)). "The Equal Protection Clause [thus] requires that the government treat all similarly situated people alike." 📄 *Harlen Assocs. v. Inc. Village of Mineola,* 273 F.3d 494, 499 (2d Cir.2001). There is no allegation in Plaintiffs' Complaint of any "similarly-situated" individuals who were treated differently. While Plaintiffs assert that their customers' and patrons' constitutional rights are threatened (*see, e.g.,* Pls.' Compl., ¶ 27), these groups of people are not "similarly situated" to Plaintiffs as the customers

and patrons are not required to obtain a business license to frequent the Jamroc. In this instance, those who would be "similarly situated" would be other business owners within the Village as they are also required to obtain a business license; yet, the Complaint is void of such an allegation. Nor is there any indication that Plaintiffs' license was revoked based on the racial or ethic composition of their customers which may be different than that of other licensed businesses in the Village. To the extent Plaintiffs may be pleading a "class of one" Equal Protection claim, they fail to mention it in their Complaint. As such, Plaintiffs have failed to state an Equal Protection claim. Accordingly, Defendants' motion for summary judgment on Plaintiffs' Equal Protection claim is granted.

### (j) Just Compensation Clause of Fifth Amendment

**\*16** Insofar as Plaintiffs argue that the Village Code amounts to a taking, this claim is not ripe for adjudication. *See, e.g.,* *Dougherty v. Town of N. Hempstead Bd. of Zoning,* 282 F.3d 83, 90 (2d Cir.2002) ("The purpose of the ripeness requirement is to ensure that a dispute has generated injury significant enough to satisfy the case or controversy requirement of Article III of the U.S. Constitution. The ripeness requirement prevents a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur ...."). According to Supreme Court precedent, before one can claim a takings violation, he must demonstrate that he has been denied just compensation for that taking. *See* *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 195 n. 13 (1985). Here, Defendants state that "[a]s plaintiffs' [sic] acknowledge, there is still a state court [taking] action pending between the parties." (Defs.' Reply at 9 (citing "Lyn Affid. ¶ 23 [presumably the first of the two ¶ s 23 in the Lyn Affidavit and]; Exhibit 10").) Reference to the two items cited is less than illuminating. Yet, Plaintiffs do not contest Defendants' assertion and, thus, the Court assumes it is correct. Accordingly, the Defendants' Motion for Summary Judgment as to Plaintiffs' Just Compensation Clause claim is granted, without prejudice, as prematurely filed.

### (k) *Allegations in Complaint That Defendants' Actions Violated not Only the Constitutional Provisions Already Discussed, but Also the Fourth, Eighth, Ninth, and Tenth Amendments*

Included within the litany of constitutional provisions claimed by Plaintiffs to have been violated by Defendants are the Fourth, Eighth, Ninth and Tenth Amendments to United States Constitution. [12] (Pls.' Compl., ¶¶ 1, 18, 22, and 28.)

In seeking judgment as a mater of law under Rule 56 based on the absence of material issues of fact, Defendants maintain that the Complaint is subject to dismissal, *in toto.* The above referenced constitutional amendments are necessarily embraced within that broad-based attack. Yet, while Plaintiffs devotes considerable effort in their opposing papers to addressing some of the constitutional provisions alleged to have been violated, their submissions are silent as to others, including the four now under discussion. Under such circumstances, a waiver argument certainly could be legitimately advanced. [13] But beyond that, a juxtapositioning of the text of the Amendments with the facts at hand demonstrates that whatever unexplained metaphysical relevance any of those provisions may have—a problematic proposition, at best—is insufficient to affect the outcome of Defendants' Motion for Summary Judgment.

### 2. *§ 1983 Liability*

#### (a) Regarding the Individual Defendants

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities

AR.05380

secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

**\*17** 42 U.S.C. § 1983. Thus, to prevail on a § 1983 claim, a plaintiff must establish (1) that a person acted under color of state law, and (2) in doing so, deprived plaintiff of a federal right. *See* § 1983; *see also Gomez v. Toledo,* 446 U.S. 635, 640 (1980); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). Defendants argue that, since Plaintiffs have not suffered any constitutional violation, the individual Defendants are not liable to the Plaintiffs under 42 U.S.C. § 1983. (*See* Defs.' Summ. J. Mem. at 13.)

Assuming that the individual Defendants were acting under color of state law, the Court has determined, *supra,* that the Village Code does not violate Plaintiffs' constitutional rights: under the Privileges and Immunities Clauses;

• under the Privileges and Immunities Clauses;

• under the Supremacy Clause;

• under the Commerce Clause;

• under the Contracts Clause;

• as beyond the State's Police Power;

• of Free Speech and of Assembly;

• of Equal Protection;

• under the Fourteenth Amendment upon the ground that the challenged Code provisions are void for vagueness; or

• under the Fourth, Eighth, Ninth, and Tenth Amendments.

Therefore, as to these above-listed claims, Defendants are entitled to summary judgment and the Court need not reach the question of qualified immunity. [14] *See Farrell,* 449 F.3d at 499 n. 14 (declining to reach the question of qualified immunity because it found no cognizable violation of plaintiff's rights) (citing *Saucier v. Katz,* 533 U.S. 194, 200–01 (2001)). [15] Additionally, since the Takings Clause claim has been dismissed as prematurely filed, the concomitant immunity issue is deferred to another day should Plaintiffs elect to pursue the matter further.

(b) Regarding the Village

To succeed on a § 1983 claim against the Village, in addition to proving actions taken under color of law that deprived them of their constitutional or statutory rights, Plaintiffs would have to establish that an official policy or custom of the Village caused their constitutional injury. *See Monell v. Dep't of Social Servs. of City of N.Y.,* 436 U.S. 658, 690–91 (1978); *Doe v. City of Waterbury,* 453 F.Supp.2d 537, 542 (D.Conn.2006). It is not enough for a plaintiff to show that a municipal employee or agent committed a tort, *see Bd. of County Comm'rs of Bryan Count, Okla. v. Brown,* 520 U.S. 397, 405 (1997), because "a municipality may not be found liable based on the vicarious liability theory of respondent superior." *Doe,* 453 F.Supp.2d at 543 (citing *Monell,* 436 U.S. at 691). Since Defendants are entitled to judgment as a matter of law as to each of constitutional claims upon which the § 1983 claim against the Village is predicated, this claim, too, is dismissed.

AR.05381

III. CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is granted *in toto.*

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 1876502

## Footnotes

1    The Court notes that Plaintiffs' "Response to Defendants [sic] Statement of Material Facts" (hereafter, "Rule 56.1 Response") attempts to create disputes of material fact where, from the record, none appear to exist. As the opponents to Defendants' Motion for Summary Judgment, Plaintiffs are required to "do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule [i.e., Federal Rule of Civil Procedure 56], the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Reznick v. Aramark Corp.,* No. 97–cv–18977, 1999 WL 287724, at \*6 (E.D.N.Y.1999) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (quoting Fed.R.Civ.P. 56(e))). And, it is well-settled law that "a non-moving party cannot survive a properly supported motion for summary judgment by resting on its pleadings 'without offering 'any significant probative evidence tending to support the complaint.' ' " *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 290 (1968)). Yet, that is precisely what Plaintiffs have attempted to do here; their Rule 56.1 Response is replete with citations to their Complaint and Answer to Defendants' Counterclaim as support for alleged disputes. Noticeably missing from Plaintiffs' Rule 56.1 Response are citations to significant probative evidence. As Second Circuit precedent has consistently made clear, "[c]onclusory allegations, conjecture, and speculation 'are insufficient to create a genuine issue of fact.' " *Id.* (quoting *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) (further citation omitted)); *see also Ying Jing Gan v. City of N.Y .,* 996 F.2d 522, 532 (2d Cir.1993) (stating that a non-moving party may not simply rely upon "conclusory statements").

    Lyn has also filed an "Answering Affidavit to Defendant's [sic] Motion for Summary Judgment" (hereinafter, "Answering Affidavit"). While the Affidavit is made upon Lyn's personal knowledge and is sworn to and notarized, much of the facts attested to and the exhibits attached thereto are irrelevant to the issues at hand. The balance of the attached exhibits do not evidence "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Similarly, Plaintiffs' references to Defendants' submitted exhibits do not demonstrate the existence of material facts in dispute.

    The Court is also unpersuaded by Plaintiffs' objections to the affidavits submitted by the Defendants. (*See* Answering Affidavit, ¶¶ 17–20.) Contrary to Plaintiffs' assertions, the Declaration of Laurel R. Kretzing, and the Affidavits of Wayne J. Hall, Sr., James Russo, and Michael Kearney, all substantially comply with 28 U.S.C. § 1746. *See, e.g., Mugno v. Societe Internationale de Telecommunications,* No. 05–cv–2037, 2007 WL 316573, \*8–\*9 (E.D.N.Y. Jan. 30, 2007) (discussing requirements of declarations). As such, the Declaration and Affidavits shall be considered by the Court in its ruling on Defendants' Motion for Summary Judgment.

In sum, the Court is now presented with Defendants' Motion that is "made and supported as provided" in Rule 56 and Plaintiffs' Opposition that rests upon the mere allegations of their pleadings and a Rule 56.1 Response and an Answering Affidavit that do not properly "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). It is in this context that the Court must determine whether it is appropriate to enter summary judgment against Plaintiffs.

2    Although the number of people in attendance that Friday morning may not be determined from the record, Lyn estimated the average Saturday night crowd in 2003 to be "about eight hundred people." (Lyn Dep. at 107, Ex. K, attached to Defs.' Exs. in Supp. Mot. Summ. J.)

3    As previously defined, the Court shall refer to Defendant Jamroc Café, Inc. as "Jamroc". However, "Jamroc" is spelled in various forms throughout the record; thus, when quoting materials from the record, the Court shall use the spelling presented in the record. It should be understood, however, that the different spelling of "Jamroc" does not indicate a different entity or defendant. Rather, all variations of "Jamroc" indicate the same corporate defendant.

4    The Defendants address Plaintiffs' allegations regarding: (1) violation of the Privileges and Immunities Clauses; (2) violation of the Supremacy Clause; (3) violation of the Commerce Clause; (4) violation of the Contracts Clause; (5) violation of the State's Police Power; (6) Vagueness violations; (7) violations of rights of Free Speech and of Assembly; and (8) Equal Protection violations. (*See* Pls.' Compl., ¶ 19(A)-(G).) There is no particularized discussion of Plaintiffs' claims of constitutional violations under the Fourth, Eighth, Ninth or Tenth Amendments in any of the parties' submissions. (*See id.*, ¶ 22.); *see also* discussion *infra* under the caption "Allegations in Complaint that Defendants' Actions Violated ... the Fourth, Eighth, Ninth and Tenth Amendments."

5    The Second Circuit was referring to the application of the balancing test articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970):

   In *Pike v. Bruce Church, Inc.*, the Supreme Court established the balancing test applicable to nondiscriminatory state legislation affecting interstate commerce:

   Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

   397 U.S. at 142 (internal citation omitted). To apply this balancing test, we consider (1) the nature of the local benefits advanced by the statute; (2) the burden placed on interstate commerce by the statute; and (3) whether the burden is "clearly excessive" when weighed against these local benefits. *Id.*

   *Grand River,* 425 F.3d at 169.

6    (*See* Answering Affidavit, ¶¶ 12, 13.)

7    Section 86–12 is also germane in that it describes certain procedural aspects of a suspension or revocation proceeding for a charged violation of § 86–11.

8    Parenthetically, unlike § 86–11, § 86–1 declares that conducting an *unlicensed* business within the Village is "unlawful," thus implicating the fine and incarceration provisions of § 1–16.

9    The discussion in the text on vagueness focuses on § 86–11. That section, given the Court's rejection of Plaintiffs' argument that the relevant portions of the Code are criminal in character, seems to represent—although their stated position is not a model of clarity—the surviving core of their vagueness claim. (*See* Pls.' Opp'n Mem. at 8–10.)

10   In rejecting Plaintiffs' as-applied challenge as a matter of law, the Court considered that some of the facts underlying the Village Board's revocation decision were then, and now remain in dispute. However, those disputes do not affect the validity or, in this case, lack thereof of Plaintiffs' constitutional claim.

   Plaintiffs have contended throughout that in many instances, including on August 22, 2003, the events in issue occurred outside the Jamroc—to wit, in the adjacent municipal parking lot—and *may* have involved non-Jamroc patrons, or patrons victimized by non-patrons. To the extent that hypothesis dovetails with reality, certainly a formidable argument could be made that Plaintiffs may not be legitimately saddled with the off-premises acts of others over which they had no obligation, nor, seemingly, ability to exert control. However, Plaintiffs have not suggested

AR.05383

16

that the mere fact that the Village Board rejected their arguments at the revocation hearing somehow renders § 86–11(E) void for vagueness as applied, and surely such is not the case.

11   Even if, *arguendo,* the enforcement of § 86–11(E) against Jamroc is deemed to implicate not only the due process clause of the Fourteenth Amendment, but the First Amendment as well, Plaintiffs' void-for-vagueness challenge would still fall short of the mark. No information, consistent with the requirements of Rule 56(e), has been furnished which would permit an inference that the music played influenced the Village's decision to revoke Jamroc's license.

12   Those Amendments read:

> Amendment IV
>
> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
>
> Amendment VIII
>
> Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.
>
> Amendment IX
>
> The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.
>
> Amendment X
>
> The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.
>
> U.S. Const. amends. IV, VII, IX, and X.

13   "Issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived ..." *Vieira v. Wal–Mart Stores, Inc.,* 2001 WL 394898, *7 (D.Conn.2001) (citing *Graham v. United States,* 753 F.Supp. 994, 1000 (D.Me.1990)); *see also Kaltman–Glasel v. Dololey,* 228 F.Supp.2d 101, 110 n. 10 (D.Conn.2002) (warning plaintiff that its "cut-and-paste recitation (word for word)" of its complaint in opposition to defendants' motion for summary judgment "is perilously close to waiver of an issue"); *cf.* *Tolbert v. Queens College,* 242 F.3d 58, 75 (2d Cir.2001) (undeveloped argumentation, are deemed waived) (internal quotations omitted); *Norton v. Sam's Club,* 145 F.3d 114, 117 (2d Cir.1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.").

14   For the same reason stated in the text regarding qualified immunity as to the above-listed constitutional claims, the Court passes on determining whether legislative immunity would be applicable to some of the individual Defendants.

15   Courts perform a two-part inquiry to determine whether an official is entitled to qualified immunity. *See* *Loria v. Gorman,* 306 F.3d 1271, 1281 (2d Cir.2002). First, a court questions whether "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show the officer's conduct violated a constitutional right.' " *Id.* (quoting *Saucier v. Katz,* 533 U.S. 194, 201 (2001)). By answering this question first, "a clear standard against which officers can measure the legality of future conduct" is provided. *Id.* (further citations omitted). "If [a court] determine[s] that the officer's conduct did not violate a constitutional right, [it] proceed[s] no further and hold [s] that the officer is entitled to qualified immunity." *Id.* (internal quotations and citations omitted); *see also Demoret v. Zegarelli,* 451 F.3d 140, 148 (2d Cir.2006) (same); *Farrell,* 449 F.3d at 499 n. 14 (declining to reach the question of qualified immunity because it found no cognizable violation of plaintiff's rights) (citing *Saucier v. Katz,* 533 U.S. 194, 200–01 (2001)).

---

**End of Document**        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Torres v. United States Department of Homeland Security, C.D.Cal., October 24, 2019

171 F.Supp.3d 961
United States District Court, N.D. California.

Audley Barrington LYON, et al., Plaintiffs,

v.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, et al., Defendants.

Case No. 13-cv-05878-EMC
|
Signed March 18, 2016

**Synopsis**

**Background:** Immigration detainees brought class action against, inter alia, United States Immigration and Customs Enforcement (ICE), challenging restrictive telephone communications policies of California facilities where they were detained. Parties cross-moved for summary judgment.

**Holdings:** The District Court, Edward M. Chen, J., held that:

[1] litigants in removal proceedings had no Sixth Amendment right to counsel;

[2] telephone restrictions did not violate detainees' statutory right to counsel;

[3] Immigration and Nationality Act (INA) did not provide detainees a general right to investigate and gather evidence in advance of and in preparation for removal hearing;

[4] detainees who were incarcerated pending removal hearings for three weeks to 36 days failed to establish substantive due process claim based on prolonged detention;

[5] in challenging telephone restrictions as allegedly violative of their procedural due process rights, detainees were not required to show actual injury;

[6] there was sufficient evidence of prejudice to detainees as a result of telephone restrictions to establish a real risk that restrictions may affect outcome of removal proceedings, as required to satisfy injury requirement for procedural due process claim; and

[7] fact issues remained, including whether there was a risk of depriving detainees of their rights to access counsel and to a full and fair hearing as a result of telephone restrictions, precluding summary judgment on detainees' procedural due process and First Amendment claims.

Motions granted in part and denied in part.

**Procedural Posture(s):** Motion for Summary Judgment.

West Headnotes (17)

[1]     **Aliens, Immigration, and
        Citizenship** 🔑 Assistance of counsel

        Because removal proceedings are civil rather than criminal proceedings, litigants in removal proceedings have no Sixth Amendment right to counsel. U.S.C.A. Const.Amend. 6.

[2]     **Aliens, Immigration, and
        Citizenship** 🔑 Assistance of counsel

        **Aliens, Immigration, and
        Citizenship** 🔑 Detention Pending Removal
        Proceeding

        Restrictive telephone communications policies of California facilities, including high rates and fees for paid calls, limits on hours of telephone access, lack of privacy, and inability to receive incoming calls or timely messages, did not violate immigration detainees' statutory right to counsel; there were other available means of communicating with counsel, including by non-private calls, legal mail, in-person meetings, and scheduling private calls, and while those options may limit the effectiveness of communications with counsel, they were not tantamount to an outright denial of counsel. Immigration and Nationality Act §§ 292, 240, 🏷 8 U.S.C.A. §§ 1362, 🏷 1229a(b)(4)(A).

        1 Cases that cite this headnote

**[3]**    **Aliens, Immigration, and Citizenship**   Hearing

     **Aliens, Immigration, and Citizenship**   Detention Pending Removal Proceeding

Immigration and Nationality Act (INA) did not provide immigration detainees a general right to investigate and gather evidence in advance of and in preparation for a removal hearing; statute provided only for the reasonable opportunity to present evidence. 8 U.S.C.A. § 1229a(b)(4)(B).

**[4]**    **Constitutional Law**   Admission and exclusion; deportation

In general, the Fifth Amendment guarantees due process in deportation proceedings; as a result, an alien who faces deportation is entitled to a full and fair hearing of his claims and a reasonable opportunity to present evidence on his behalf. U.S.C.A. Const.Amend. 5.

**[5]**    **Constitutional Law**   Admission and exclusion; deportation

Decision in a deportation proceeding can be reversed on due process grounds if the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case. U.S.C.A. Const.Amend. 5.

**[6]**    **Constitutional Law**   Admission and exclusion; deportation

An alien must show prejudice to prevail on a claim of a due process violation in deportation proceedings, which means that the outcome of the proceeding may have been affected by the alleged violation. U.S.C.A. Const.Amend. 5.

**[7]**    **Aliens, Immigration, and Citizenship**   Time limitations

     **Constitutional Law**   Arrest, detention, supervision, and parole

Immigration detainees who were incarcerated pending removal hearings for three weeks to 36 days, allegedly as a result of restrictive telephone access and being forced to request a continuance to retain counsel and prepare their cases, failed to establish substantive due process claim based on prolonged detention. U.S.C.A. Const.Amend. 5.

**[8]**    **Aliens, Immigration, and Citizenship**   Judicial Review or Intervention

     **Constitutional Law**   Arrest, detention, supervision, and parole

In challenging restrictive telephone communications policies of California facilities as allegedly violative of their procedural due process rights, immigration detainees were not required to show actual injury, but rather, only needed to establish that the outcome of immigration proceedings may have been affected by the alleged violation. U.S.C.A. Const.Amend. 6.

**[9]**    **Aliens, Immigration, and Citizenship**   Detention Pending Removal Proceeding

     **Constitutional Law**   Arrest, detention, supervision, and parole

There was sufficient evidence of prejudice to immigration detainees as a result of telephone restrictions and their potential impact upon detainees' ability to communicate with counsel, relatives, and government agencies to establish a real risk for detainees that restrictions may affect outcome of removal proceedings, as required to satisfy injury requirement for procedural due process claim. U.S.C.A. Const.Amend. 5.

2 Cases that cite this headnote

**[10]**    **Federal Civil Procedure**   Factors, grounds, objections, and considerations in general

Even if some class members have not been injured by the challenged practice, a class may

nevertheless be appropriate. 📖 Fed. R. Civ. P. 23(b)(2).

[11] **Constitutional Law** 👈 Factors considered; flexibility and balancing

Under *Mathews* balancing test in reviewing procedural due process claims, courts consider: (1) the interest at stake for the individual, (2) the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different procedural safeguards, and (3) the interest of the government in using the current procedures rather than additional or different procedures. U.S.C.A. Const.Amend. 5.

[12] **Prisons** 👈 Regulation and supervision in general; role of courts

A prison regulation that impinges on an inmate's constitutional rights is valid if it is reasonably related to legitimate penological interests.

[13] **Prisons** 👈 Regulation and supervision in general; role of courts

In determining the reasonableness of restriction on prison inmate's constitutional rights, court considers: (1) whether there is a valid, rational connection between the restriction and legitimate governmental interest put forward to justify it, (2) whether there are alternative means of exercising the right, (3) whether accommodating asserted constitutional right will have a significant negative impact on prison guards and other inmates, and on the allocation of prison resources generally, and (4) whether there are obvious, easy alternatives to restriction showing that it is an exaggerated response to prison concerns.

[14] **Aliens, Immigration, and Citizenship** 👈 Detention Pending Removal Proceeding

**Constitutional Law** 👈 Arrest, detention, supervision, and parole

In reviewing immigration detainees' claim that telephone restrictions hindered their ability to communicate with counsel and government agencies and pursue their requests for release on bond, appropriate legal framework was to first apply *Mathews* balancing test to determine if the complained of phone restrictions would result in a putative constitutional violation, and if it did, the court would determine whether the phone restrictions which impinged upon due process rights nonetheless could be upheld because they were reasonably related to legitimate penological interests. U.S.C.A. Const.Amend. 5.

[15] **Federal Civil Procedure** 👈 Questions for Jury

When there are factual disputes underlying legal determinations, such questions must be resolved by the factfinder.

[16] **Federal Civil Procedure** 👈 Aliens, actions involving

Genuine issues of material fact as to whether there was a risk of depriving immigration detainees of their rights to access counsel and to a full and fair hearing as a result of restrictive telephone communications policies of California facilities, whether there was any government interest in the policies, and whether the restrictions were reasonably related to penological interests precluded summary judgment on immigration detainees' procedural due process and First Amendment claims. U.S.C.A. Const.Amends. 1, 5.

2 Cases that cite this headnote

[17] **Prisons** 👈 Scope or standard of review

In determining the reasonableness of restriction on prison inmate's constitutional rights, legitimacy of prison officials' asserted penological interests are findings of fact.

**Attorneys and Law Firms**

**\*964** Alexis Jeuk-Ling Yee-Garcia, Christine Melissa Smith, Robert P. Varian, Orrick, Herrington and Sutcliffe LLP, Julia Harumi Mass, Esq., American Civil Liberties Union of Northern California, Inc., Marc Vanderhout, Megan Elaine Sallomi, Van Der Hout, Brigagliano, & Nightingale, LLP, Michael Temple Risher, ACLU Foundation of Northern California, Inc., San Francisco, CA, Angelica H. Salceda, ACLU of Northern California, Fresno, CA, Carl Takei, American Civil Liberties Union, Christopher Joseph Siebens, Orrick Herrington Sutcliffe, Washington, DC, Charles J. Ha, David S. Keenan, Orrick Herrington and Sutcliffe LLP, Seattle, WA, Jaya N. Kasibhatla, Orrick, Herrington, Sutcliffe LLP, New York, NY, for Plaintiffs.

Jennifer A. Bowen, Katherine J. Shinners, Brian Christopher Ward, Katherine Ann Smith, Lauren Crowell Bingham, Ben Franklin Station, U.S. Department of Justice, Civil Divisionoffice of Immigration Litigation, Washington, DC, for Defendants.

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Docket Nos. 120, 139

EDWARD M. CHEN, United States District Judge

## I. INTRODUCTION

The instant action is brought on behalf of a certified class of adult immigration detainees who are or will be held by Defendant United States Immigration and Customs Enforcement (ICE) in Contra Costa County, Kern County, Sacramento County, or Yuba County. Docket No. 99 (First Supplemental Complaint) (Compl.) at ¶ 90.

The Immigration and Nationality Act (INA) grants the Attorney General the discretionary authority, transferred to the Department of Homeland Security (DHS), to detain any alien in removal proceedings pending a final order. 🚩 8 U.S.C. § 1226(a). At issue are conditions at four detention facilities used to hold adult immigration detainees:

Yuba County Jail (Yuba), Rio Cosumnes Correctional Center (RCCC) in Sacramento County, West County Detention Facility (Contra Costa), and Mesa Verde Detention Facility (Mesa Verde) in Bakersfield County (collectively, Facilities). *See* FAC at ¶¶ 31-32. Plaintiffs' cases are venued at the San Francisco Immigration Court; thus, Contra Costa, RCCC, Yuba, and Mesa Verde are respectively 21, 83, 123, and 282 driving miles from San Francisco. *See* Docket No. 100 (Answer) at ¶ 33. Because of this distance, Plaintiffs allege that in-person visits are "impractical at best," making telephone access "critical to Plaintiffs' ability to locate, retain, and seek advice from legal counsel" and "essential to gather the evidence and government documents necessary to defend[ ] against removal charges, locate witnesses, and do other things necessary to represent themselves in complex legal proceedings." [1] FAC at ¶ 3.

**\*965** However, because of restrictions on telephone access, Plaintiffs contend that they are unable to retain or communicate with counsel, or to gather evidence to be presented in removal proceedings or that is otherwise necessary for relief. *Id.* at ¶ 6. Plaintiffs specifically allege the following limitations: (1) high rates and fees for paid calls from Housing Unit Phones; (2) technical barriers and payment restrictions on Housing Unit Phones, such as a "positive acceptance" requirement where the individual being called must accept the call; (3) inadequacies of the free call or pro bono platforms; (4) limits on hours of telephone access; (5) lack of privacy; (6) inability to receive incoming calls or timely messages; and (7) failure to provide notice of calling options for detainees with limited English or Spanish language skills. Plaintiffs Mot. at 6. As a result of these alleged restrictions, Plaintiffs who would be eligible for relief are deported or unnecessarily detained as they seek continuances in order to find counsel and gather evidence. Compl. at ¶¶ 5, 6.

Based on these allegations, Plaintiffs bring three claims for relief: (1) the right to representation of counsel, (2) the right to a full and fair hearing, and (3) the right to petition the government for redress of grievances. *Id.* at ¶¶ 100-112. The Court certified a class of "all current and future immigration detainees who are or will be held by ICE in Contra Costa, Sacramento, and Yuba Counties" in April 2014 under Federal Rule of Civil Procedure 12(b)(2), and expanded the class definition to include detainees who are or will be held in Bakersfield County. *See* Docket Nos. 31, 98.

The parties' cross-motions for summary judgment came on for hearing before the Court on February 11, 2016. *See* Docket Nos. 120 (Plaintiffs Mot.), 139 (Defendants Mot.). For the reasons set forth below, the Court **GRANTS** in part and **DENIES** in part Defendants' motion for summary judgment, and **DENIES** Plaintiffs' motion for summary judgment.

## II. BACKGROUND [2]

A. Undisputed Facts

The Court finds that the following facts are not in dispute.

1. General Matters

1. Many of the detainees were arrested for a crime or are being held by the ICE after serving time for their crimes. *See* Docket No. 139–2 (Shinners Dec.), Exh. 1 (Vaughn Dep.) at 175:25-176:4.

2. Of the individuals held between December 10, 2012 through August 31, 2014, 10.54% were classified low risk, 20.5% were medium-low risk, 35.7% were medium-high risk, and 33.27% were high risk. [3] Shinners Dec., Exh. 32.

3. Each of the Facilities provide access to telephones in or near the common areas of their housing units (Housing Unit Phones). *See* Docket No. 119–5, Exh. A (Berg Report) at 6-11.

4. Since this action was filed, ICE also began offering access to telephones outside of the housing units at Yuba, Contra Costa, and Mesa Verde. *Id.* at 12-15.

**\*966** 5. Detainees at all four facilities also have access to a "Free Call Platform" or "Pro Bono Platform" from the Housing Unit Phones and some Phone Rooms, which allows free direct calls to a pre-programmed set of speed dial numbers. *See* Shinners Dec., Exh. 6 (Landy Dep.) at 159:16-20.

6. Detainees may also request to be transported to the ICE Field Office to make telephone calls. [4] *See* Shinners Dec., Exh. 31 (Butler Dep.) at 87:13-22. Detainees at all facilities also have access to legal mail and attorney visits, although there is some evidence that these services are inadequate substitutes for telephone access due to the delay in responses and distance between the Facilities and where attorneys are located. *See* Docket No. 120–17 (Supp. Vincent Dec.) at ¶ 11.

2. Contra Costa

7. Contra Costa is an open, campus-style facility. Shinners Dec., Exh. 20 (Bonthron Dep.) at 45:19. Because of this open layout, Contra Costa only houses detainees who fall into certain security classifications, and does not house any ICE detainees classified as high risk, have accumulated a significant number of disciplinary incident reports, have medical or mental health needs, or have been violent against other inmates or staff. *Id.* at 45:18-46:14; 118:18-22.

8. Housing Unit Phones are located in dayrooms on each tier of the housing units. Berg Report at 6. They are typically set up in pairs facing each other, and are often located only a few feet from the door of the nearest cell. *Id.* The Housing Unit Phones are also located within auditory range of the common-area tables and televisions. *Id.*; *see also* Docket No. 124–5 (Takei Dec.) at DSC00452, 484, 504, 535. All Housing Unit Phone calls are monitored and recorded. Berg Report at 7.

9. In order to use the Housing Unit Phone, detainees must pay an initiation fee of $2.60-$3.00, and per-minute rates ranging from $.05-$.025. Docket No. 119–10 (Phillips Dec.), Exh T.

10. Housing Unit Phone calls must be paid for by the recipient. Ha Dec., Exh. 35 (Bonthron Dep.) at 165:20-25. Thus, detainees can only call individuals or offices that agree to accept collect calls or have a prepaid account. Berg Report at 7.

11. Housing Unit Phones have a positive acceptance requirement; the phone plays an outgoing message identifying the caller as an "inmate" calling from Contra Costa jail, before prompting the call recipient to affirmatively accept the call by pressing a numbered key on his or her phone. *See* Ha Dec., Exh. 36 (Neria-Garcia Dep.) at 169:22-24; Ha Dec., Exh. 35 (Bonthron Dep.) at 167:8-21.

12. The positive acceptance requirement makes it impossible for detainees to navigate automated telephone systems to dial an extension or leave a voicemail message. Ha Dec., Exh. 35 (Bonthron Dep.) at 167:22-168:4 (explaining that calls which go to voice mail or offices that use a phone tree system will not connect); Berg Report at 7-8, 10.

13. Detainees are not permitted to make three-way calls. [5] Ha Dec., Exh. 31 (Philbin **\*967** Dep.) at 85:9-11 ("Q: So is it your understanding that all facilities do not allow three-way

calls? A: That is my understanding."); Phillips Dec., Exh. D (Contra Costa Detainee Handbook) at 14.

14. Detainees are only permitted to use the Housing Unit Phones during designated free time hours. Ha Dec., Exh. 35 (Bonthron Dep.) at 38:1-13. Free time hours are limited to Monday through Wednesday and Friday between 3:30 p.m. and 5:00 p.m. and 6:30 p.m. to 9:00 p.m., Thursday between 6:30 p.m. and 9:00 p.m., and Saturday and Sunday between 10:30 a.m. and 11:30 a.m., 1:30 p.m. to 2:50 p.m., 3:30 p.m. to 5:00 p.m., to 6:45 p.m. and 10:00 p.m. Ha Dec., Exh. 35 (Bonthron Dep.) at 60:1-8.

15. From the Housing Unit Phones, detainees can access the Talton Free Call Platform, which allows direct calls to a limited set of speed-dial numbers, made up primarily of federal government offices connected with immigration, the immigration court system, foreign consulates, and several free legal services providers. Berg Report at 6; *see also* Takei Dec. at DSC00434, 555. The free call numbers do not include local government offices or local courts. *See* Takei Dec. at DSC00434, 555. The free legal service providers also do not include all offices on Defendants' free legal services list. *Compare id.* with Ha Dec., Exh. 9.

16. The Talton Free Call Platform has a 15-minute automatic cutoff. Contra Costa officials were unable to explain why there is a cutoff. Ha Dec., Exh. 37 (Grant Dep.) at 77:4-18 (stating that she does not know why there is an automatic cutoff and when compared with other telephone calls, "there's no comparison" and "[i]t doesn't make any sense to me.").

17. In addition to the Housing Unit Phones, Contra Costa has —following the filing of this suit—added phone rooms, from which detainees are permitted to make private and free calls to case-related contacts. Ha Dec., Exh. 37 (Grant Dep.) at 64:9-15.

18. Contra Costa maintains a dedicated e-mail address for attorney e-mail messages, while anyone may send e-mail messages through its SmartMail service. Shinners Dec., Exh. 23 at 5; Grant Dep. at 88:15-89:9.

19. Information about the dedicated attorney e-mail system is posted on the housing units to advise detainees that the system is available. Shinners Dec., Exh. 20 (Bonthron Dep.) at 208:14-18.

20. The attorney e-mail system is not confidential; two copies of the e-mail are printed out, with one being logged and the other hand-delivered to the detainee. *Id.* at 208:7-12; Supp. Vincent Dec. at ¶ 10. [6]

### 3. RCCC

21. RCCC houses only male detainees in dormitory-style housing units that contain phones the detainees can access at any time. [7] Shinners Dec., Exh. 31 (Butler Dep.) at 32:12-14, 41:2.

**\*968** 22. The Housing Unit Phones are located within auditory range of the stairwells, and below a television which is kept at a loud volume. Berg Report at 7-8; *see also* Takei Dec. at DSC00329, 290.

23. All Housing Unit Phone calls are monitored and recorded. Berg Report at 8.

24. In order to use the Housing Unit Phones, detainees must pay an initiation fee of $1.75 to $2.40, and per-minute rates ranging from $.175-$.50. Phillips Dec., Exh. B at 52. Phone calls are limited to 20 minutes. Ha Dec., Exh. 32 (Butler Dep.) at 81:17-18.

25. Like Housing Unit Phones at Contra Costa, Housing Unit Phones at RCCC have a positive acceptance requirement, with the phone playing an outgoing message identifying the caller as a "Sacramento County inmate." Ha Dec., Exh. 32 (Butler Dep.) at 118:3. The recipient must then accept the call. Ha Dec., Exh. 32 (Butler Dep.) at 118:15-16.

26. Detainees are not permitted to make three-way calls. Ha Dec., Exh. 31 (Philbin Dep.) at 85:9-11.

27. From the Housing Unit Phones, detainees can access the Talton Free Call Platform. Berg Report at 6; *see also* Takei Dec. at DSC00356. The free call numbers do not include local government offices or local courts, and do not include all offices on Defendants' free legal services list. *Compare id.* with Ha Dec., Exh. 9.

28. The instructions for using the Talton Free Call Platform are confusing and incorrect. Berg Report at 8.

29. Unlike the other Facilities, RCCC does not offer a dedicated phone room for private calls. Instead, RCCC permits detainees to make phone calls from a private phone

in the law library. Shinners Dec., Exh. 31 (Butler Dep.) at 37:16-38:1.

30. The library phone is free, has no time limit and does not require positive acceptance. *See* Shinners Dec., Exh. 31 (Butler Dep.) at 81:18-20.

31. Like Contra Costa, there is an e-mail system for people to communicate with a detainee. Shinners Dec., Exh. 31 (Butler Dep.) at 92:4-10. Each day, the e-mail is pulled off the server and delivered by the night shift to the deputies to be passed out to the detainees. Shinners Dec., Exh. 31 (Butler Dep.) at 92:11-15. The night shift and deputies are permitted to read these messages. Shinners Dec., Exh. 31 (Butler Dep.) at 92:16-23.

### 4. Yuba

32. Yuba provides a mix of housing styles; depending on the housing style, detainees have varying degrees of access to the housing unit phones. Shinners Dec., Exh. 27 (Gil Dep.) at 22:9-23:11. Individuals who are in an administrative segregation tank (individual cells) have access to phones for one hour a day. *Id.* at 22:9-15. Other units with single cells permit access for four hours a day. *Id.* at 22:16-21. Individuals held in dorm style settings have access to phones at all times. *Id.* at 22:21-25.

33. All Housing Unit Phone calls can be monitored and recorded, although such calls are not routinely monitored. *Id.* at 67:15-19.

34. In order to use the Housing Unit Phones, detainees must pay an initiation fee of $3.20, and per-minute rates ranging from $.06-$330. *See* Ha Dec., Exh. 43.

35. Phone calls are limited to twenty minutes. Ha Dec., Exh. 27 (Vaughn Dep.) at 116:6-9.

36. Like Housing Unit Phones at other facilities, the Housing Unit Phones at Yuba have a positive acceptance requirement, with the phone playing an outgoing message identifying the caller as an "inmate at the Yuba County Jail." Berg Report **\*969** at 10. The recipient must then accept the call. *Id.*

37. Detainees are also not permitted to make three-way calls. Ha Dec., Exh. 31 (Philbin Dep.) at 85:9-11.

38. From the Housing Unit Phones, detainees can access the Talton Free Call Platform. Berg Report at 9; *see also* Takei Dec., at DSC00129, 148, 188, 253, 254. The free call numbers do not include local government offices or local courts, and do not include all offices on Defendants' free legal services list. *Compare* Takei Dec. at DSC00129, 188 with Ha Dec., Exh. 9.

39. Yuba provides a phone room that contains two phones for detainees to make free calls. Shinners Dec., Exh. 27 (Gil Dep.) at 24:19-24.

40. The Yuba phone room is generally available for use between 8 a.m. and 4 p.m., and sometimes earlier if a detainee needs to contact someone on the east coast. Shinners Dec., Exh. 27 (Gil Dep.) at 25:19-23.

41. Detainees are limited to one 20-minute legal call per week in order "to provide reasonable and equitable access for all detainees," and it takes about one week to process a request. Ha Dec., Exh. 19; Berg Report at 15 ("As of August 2015, there was a 1 to 2-week backlog in providing these calls at Yuba.").

42. Phones in this room retain the positive acceptance requirement. Berg Report at 13.

43. Finally, the official policy is that the free legal telephone calls are limited to phone calls made directly to a legal representative, preventing detainees from using the phone room to call local agencies, potential witnesses or sponsors, or family members to gather evidence. Ha Dec., Exh. 19; *see also* K.M. Dec. at ¶ 14; Docket No. 120–6 (O.A. Dec. at ¶ 23).

44. Yuba also permits free calls from a phone in the booking area. Shinners Dec., Exh. 27 (Gil Dep.) at 21:22-23.

45. Yuba maintains a system for receiving incoming messages from attorneys. *Id.* at 68:18-20. An attorney can call the facility, and facility staff are to deliver the message to the detainee within hours. *Id.* at 68:22-17. An attorney can also e-mail or fax the facility a message to be delivered to the detainee. *Id.* at 69:18-70:7.

### 5. Mesa Verde

46. Mesa Verde is a medium-security facility that houses only ICE detainees, including those with high classifications. Shinners Dec., Exh. 8 (Murray Dep.) at 40:1-43:23; Berg Report at 10.

47. Mesa Verde has four Units, and each of the Units has ten phones, many of which are placed in large banks of telephone installations immediately adjacent to each other, separated by Plexiglas partitions. Berg Report at 10; *see also* Takei Dec. at DSC00740, 754. The holding cells are also equipped with a single telephone unit on wheels that can be rolled up to the cell door. Berg Report at 10.

48. Housing Unit Phone calls can be monitored and recorded (although such calls are not routinely monitored), except for calls to the Pro Bono Platform or to attorneys registered with the facility and/or the phone provider, which are never recorded or monitored. Shinners Dec., Exh. 10 (Bonnar Dec.) at ¶¶ 16-18.

49. Housing Unit Phones require no initiation fee, and per-minute rates are $.10 for domestic calls and $.15-35 for international calls. Ha Dec., Exh. 44. Phone calls are limited to 180 minutes. Docket No. 144–1 (Yee–Garcia Dec.), Exh. 60 (Talton Dep.) at 155:5-10.

50. Housing Unit Phones have a positive acceptance requirement, with the phone **\*970** playing an outgoing message stating: "This is an Intelmate automated operator with a [PREPAID, FREE, COLLECT] from [RESIDENT'S NAME] at [FACILITY NAME]." Ha Dec., Exh. 7. The recipient is then given the option to accept or deny the call. *Id.*

51. Three-way calls are not permitted and will be blocked. *Id.*

52. Toll free numbers, *i.e.*, calls to 800, 866, 900 area codes, are blocked. Ha Dec., Exh. 40 (Murray Dep.) at 95:3-19.

53. Detainees can access the Talton Free Call Platform from the Housing Unit Phones. Berg Report at 10; *see also* Takei Dec., at DSC00711, 712, 739, 752. The free call numbers do not include local government offices or local courts, and do not include all offices on Defendants' free legal services list. *Compare* Takei Dec. at DSC00616 with Ha Dec., Exh. 9.

54. Mesa Verde has several visitation rooms equipped with direct dial phones. Mesa Verde's stated policy is that free calls are permitted to the immigration court, federal and state courts, consular offices, legal service providers, government offices, and other individuals if there is a personal or family emergency or other compelling need. Shinners Dec., Exh. 17; Exh. 11 (Harvey Dep.) at 37:3-15; *see also* Shinners Dec., Exh. 10 (Bonnar Dec.) at ¶ 22 ("The facility does not limit legal calls from the private room to calls to attorneys or legal

representatives. The facility will allow private legal calls to be made to courts; government agencies; witnesses; and other verifiable, case-related contacts.").

55. Mesa Verde informs detainees of this private phone option via the Mesa Verde detainee handbook. *See* Plaintiffs Mot. at 18 (arguing that access to Phone Rooms at Yuba, Contra Costa, and RCCC's library option are "not made known to Plaintiffs through policy documents or handbooks"); *see also* Docket No. 120–5 (R.K.Dec.) at ¶ 45 ("I read in a handbook or posting somewhere in the facility that detainees can make free, private calls to attorneys.").

56. Mesa Verde also allows callers to leave messages for detainees in two ways. First, voicemails can be left for detainees; the cost of leaving a voicemail message is $1.20 per message. Shinners Dec., Exh. 11 (Bonnar Dec.) at ¶ 31. These voicemail messages are accessible directly by the detainee, without having to be transcribed by a Mesa Verde employee. Ha Dec., Exh. 39 (Harvey Dep.) at 55:19-56:10. Second, legal representatives may also call the facility and leave messages at no cost. *Id.* at ¶ 32. Emergency messages may be left using this latter system at no cost. *Id.* Using this system, messages are written down and delivered no less than three times a day. Ha Dec., Exh. 38 (Andrews Dep.) at 84:10-14. Because they are written down by a staff member, they are not considered private. Ha Dec., Exh. 39 (Harvey Dep.) at 57:2-5.

B. Disputed Facts

The parties dispute a number of facts, primarily related to the availability of private phone calls at each Facility.

- For the Contra Costa phone room, the parties dispute whether detainee calls are limited to attorneys only, and the availability of these phone rooms. Defendants assert that detainee calls have been made to non-attorneys from the phone rooms, and that the phone rooms are available at any time upon request. *See* Shinners Dec., Exh. 20 (Bonthron Dep.) at 38:18-20 (stating that detainees have 24/7 hour access to the private phone line in the phone rooms); Shinners Dec., Exh. 24 (Lyon Dep.) at 66:16-24 (stating that detainees generally cannot use phones during lockdown time, but that he was permitted to make a call because his **\*971** attorney had made a request for a call during that particular time beforehand); Shinners Dec., Exh. 25 (V.V. Dep.) at 94:25-95:4; Shinners Dec., Exh. 37 (phone logs indicating calls with family members). Plaintiffs contend that access is granted at the discretion of individual

AR.05392

deputies, and that many detainees are denied access outside of free-time hours. Ha Dec., Exh. 36 (Neria-Garcia Dep.) at 61:22-62:1 ("In Contra Costa we—we were only allowed to use the phone during our free time, which was an hour per day."); Phillips Dec., Exh. P (Lyon Dep.) at 48:23-49:2 (stating that phone room access was usually limited to "free time, but it depends on the deputy, he can let you use it."). Plaintiffs also present evidence that until at least October 2015, the phone rooms were limited to attorney calls only. Berg Report at 12 ("Detainee interviews confirmed that the phone rooms can only be used to call attorneys and only during free-time hours, with some exceptions based on the discretion of deputies"). For example, Lieutenant Bonthron explained in his August 2015 deposition that Contra Costa expanded its policy to allow phone use not just with attorneys; however, Plaintiffs' expert, Mr. Berg, reported that during his visit to Contra Costa in October 2015, the deputies who demonstrated the phone system informed him that they would disconnect the call if they determined that the call was not to an attorney's office. Shinners Dec., Exh. 20 (Bonthron Dep.) at 123:21-24; Berg Report at 12.

- At RCCC, the parties dispute whether the option to make phone calls from the law library is truly private, as the phone is located on the library officer's desk, close to where the deputy sits, and is within earshot of other detainees using the library. Berg Report at 13; *see also* Takei Dec., at DSC00422, 423, 428. There is also evidence that detainees are not given advance notice of when they may use the library phone, and therefore cannot schedule calls with their attorneys or other individuals. *See* Docket No. 120–8 (M.G.Dec.) at ¶ 24; Docket No. 120–12 (I.P.Dec.) at ¶ 24.

- For the Yuba phone room, the parties dispute whether this phone room is truly private, as there is no barrier between the phones. Berg Report at 13; *see also* Takei Dec., at DSC00190. Furthermore, under normal circumstances, it is expected that both telephones will be used simultaneously, although Yuba's policy states that "[w]hen a detainee specifically requests a private phone call, they may be placed into the room alone." Ha Dec., Exh. 19.

- For the Mesa Verde phone rooms, the parties dispute whether calls to non-attorneys are permitted. Plaintiffs point to policies which explain the policy for obtaining legal calls as submitting a detainee request (kite) to the

shift supervisor with the phone number of the attorney, which will then be verified by onsite staff. Ha Dec., Exh. 16. Plaintiffs also cite to deposition testimony, in which Mesa Verde officials expressed uncertainty as to whether a legal call would include witnesses. *See* Ha Dec., Exh. 40 (Murray Dep.) at 91:5-14 (stating that he did not know if a legal call included calls to witnesses); Yee-Garcia Dec., Exh. 54 (Harvey Dep.) at 74:15-75:20 (stating that she had not scheduled a call to a potential witness for a pro se detainee, but also noting that she had "never had anybody ask that, so I don't really have an understanding of calling a witness.").

**\*972** C. Named Plaintiffs' Experiences

Although the parties' characterizations of these facts may differ, the parties do not dispute the following facts regarding each of named Plaintiffs' experiences.

1. Jose Astorga-Cervantes

57. Named Plaintiff Jose Astorga-Cervantes was detained at RCCC for ninety days beginning on or about November 20, 2013. *See* Docket No. (Astorga–Cervantes Dec.) at ¶ 4; Shinners Dec., Exh. 7 (Astorga-Cervantes Dep.) at 33:16-17.

58. Beyond his thirty-second free phone call, he was unable to speak with his family due to the costs of phone calls, except for once on December 17 when a fellow inmate allowed him to use his phone credit. Astorga-Cervantes Dec. at ¶ 7.

59. With the assistance of his fellow detainees, Mr. Astorga-Cervantes was able to use the Pro Bono Platform on the housing unit phones to contact several legal aid groups, including Catholic Charities and another in Palo Alto. Shinners Dec., Exh. 7 (Astorga-Cervantes Dep.) at 17:20-23. Both Catholic Charities and the group in Palo Alto informed him that they could not pick up any more cases. *Id.* at 19:8-15.

60. Mr. Astorga-Cervantes was able to obtain an attorney for his first immigration hearing on December 18, 2013. *Id.* at 40:3-16.

61. On January 23, 2014, the immigration judge granted Mr. Astorga-Cervantes release on bond, which he paid on February 20, 2014. *Id.* at 60:17-61:10.

2. Nancy Neria-Garcia

62. Named Plaintiff Nancy Neria-Garcia was detained at Yuba from June 26, 2014 to March 26, 2015, at Mesa Verde from March 26, 2015 to June 3, 2015, and at Contra Costa from June 4, 2015 until her release on October 22, 2015. Docket No. 120–7 (Neria–Garcia Dec.) at ¶¶ 7-10; Shinners Dec., Exh. 36 (Neria-Garcia Dep.) at 18:11-15.

63. Ms. Garcia retained immigration counsel, who she was able to meet with in-person and speak to on the phone while being held at Yuba. *See* Shinners Dec., Exh. 36 (Neria-Garcia Dep.) at 27:3-9, 28:8-12.

64. Ms. Neria-Garcia's access to phones varied depending on which housing unit she was at. Neria-Garcia Dec. at ¶¶ 14-17. For example, in one housing unit, Ms. Neria-Garcia was locked down in a cell for 23 hours a day, and could only access the telephone during one hour of "hallway time." *Id.* at ¶ 17.

65. Ms. Neria-Garcia was uncomfortable talking to her attorney about her case on the housing unit phones due to lack of privacy.

66. It was not until October 2014 that she was informed by another detainee that she could make free telephone calls from the phone room, although she had to share the phone room with another detainee. *Id.* at ¶ 20.

67. Ms. Neria-Garcia had problems calling coworkers for assistance in her case due to the positive acceptance requirement on the Housing Unit Phones; coworkers would not pick up her calls because they did not know who was calling them from jail. Shinners Dec., Exh. 36 (Neria-Garcia Dep.) at 54:3-24.

68. While at Mesa Verde, Ms. Neria-Garcia read in the detainee handbook that detainees could make private calls to their attorneys. Neria-Garcia Dec. at ¶ 25.

69. She would write requests to speak to her attorney, to varying degrees of success; for example, one request was granted the next day, one was granted four days later, and one was denied because she had to wait a few days before making another request. *Id.* at ¶ 26.

 *973 70. Ms. Neria-Garcia was able to make between eight and ten short calls to her attorney from the Housing Unit Phones. Shinners Dec., Exh. 36 (Neria-Garcia Dep.) at 141:13-18.

71. Ms. Neria-Garcia was held at Mesa Verde while her case was on appeal, and has admitted that the telephone situation at Mesa Verde did not interfere with her case or her ability to seek release on bond. *Id.* at 125:24-126:9.

72. While at Contra Costa, Ms. Neria-Garcia was able to meet her attorney in-person between seven and ten times, and to speak with him using the phone room at least fifteen times (but never the Housing Unit Phone). *Id.* at 143:23-145:16.

   3. Audley Barrington Lyon, Jr.

73. Named Plaintiff Audley Barrington Lyon, Jr. was detained at Contra Costa from October 22, 2013 to April 23, 2015. Docket No. 120–9 (Lyon Dec.) at ¶ 5; Compl. at ¶ 11; Answer at ¶ 11.

74. Mr. Lyon was able to make phone calls using the Pro Bono Call platform by December 3, 2013. Shinners Dec., Exh. 24 (Lyon Dep.) at 98:11-14.

75. Prior to obtaining representation, Mr. Lyon attempted to gather documents on his own. Lyon Dec. at ¶ 5. During that time, he continued his case three times, for two to three weeks each time, while he tried to gather documentation in support of his U visa application. *Id.* at ¶¶ 5-7.

76. Relying on himself and his wife's assistance, he tried to obtain a police report from the East Palo Alto Police Department and records from the victims services unit of the San Mateo District Attorney's Office. *Id.* at ¶ 7. However, he was unable to call either the police department or the victims services unit, as neither was willing to accept his call. *Id.* at ¶ 8.

77. Mr. Lyon's wife was also unable to obtain the police report because the police department would only release it to Mr. Lyon or Mr. Lyon's legal representative. *Id.* at ¶ 11.

78. Mr. Lyon had difficulty communicating with his wife because she could not afford to pay for telephone calls; instead, they would communicate by writing letters, a process he considered slow and inefficient as a simple question caused a delay of several days. *Id.* at ¶ 9-10.

79. Mr. Lyon was eventually able to retain counsel in early 2014. *Id.* at 28:1-23. After he obtained counsel, Mr. Lyon was able to communicate with his attorney because she would

come to the building so that he did not need to call her. Shinners Dec., Exh. 24 (Lyon Dep.) at 94:2-8.

## III. DISCUSSION

### A. Standard of Review

The Court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See* *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252, 106 S.Ct. 2505. At the same time, "all reasonable inferences must be drawn in favor of the non-movant." *John v. City of El Monte*, 515 F.3d 936, 941 (9th Cir.2008).

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. **\*974** *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party has the ultimate burden of proof, the moving party may prevail on a motion for summary judgment by pointing to the non-moving party's failure "to make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* at 322, 106 S.Ct. 2548.

### B. Immigration and Nationality Act (INA)

First, Plaintiffs allege that their rights to counsel and to present evidence, as articulated by the INA, are violated by the Facilities' phone conditions. Plaintiffs Mot. at 25. The INA itself does not dictate the precise level of telephone access required for detainees. Instead, Plaintiffs rely on 8 U.S.C. § 1229a(b)(4) to establish their rights under the INA. Section 1229a governs removal proceedings generally, while section 1229a(b)(4) delineates an alien's rights in proceedings, which include:

(A) the alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings,

(B) the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government but these rights shall not entitle the alien to examine such national security information as the Government may proffer in opposition to the alien's admission to the United states or to an application by the alien for discretionary relief under this chapter, and [8]

(C) a complete record shall be kept of all testimony and evidence produced at the proceeding.

Plaintiffs argue that a necessary condition of these statutory rights include the ability to retain or consult with counsel under section 1229a(b)(4)(A), and to obtain evidence under section 1229a(b)(4)(B).

### 1. Right to Counsel

**[1]** Because removal proceedings are civil rather than criminal proceedings, "litigants in removal proceedings have no Sixth Amendment right to counsel." *Torres–Chavez v. Holder*, 567 F.3d 1096, 1100 (9th Cir.2009) (citation omitted). However, the Ninth Circuit has also recognized that "[t]he right to counsel in immigration proceedings is rooted in the Due Process Clause and codified at 8 U.S.C. § 1362 and 8 U.S.C. § 1229a(b)(4)(A)." *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir.2005).

Plaintiffs contend that a detainee's statutory rights under the INA should be informed by Sixth Amendment cases concerning the rights of criminal defendants to counsel. Plaintiffs Mot. at 22, 25. In support, Plaintiffs cite *Montes–Lopez v. Holder*, in which the Ninth Circuit found that a petitioner's right to be represented in removal proceedings was violated when the immigration judge (IJ) refused to continue the hearing when the petitioner's attorney failed to appear. 694 F.3d 1085, 1086 (9th Cir.2012). In concluding that an alien need not show prejudice where an alien is denied a statutory right to be represented by counsel, the Ninth Circuit drew in part on the "logic that has guided [its]

interpretation of the Sixth Amendment." *Id.* at 1092–93. However, the Ninth Circuit did not so go far as to suggest that **\*975** courts should import rights due under the Sixth Amendment to the immigration context; instead, the Ninth Circuit acknowledged that "[t]he Sixth Amendment does not apply in the immigration context." *Id.* at 1092.

Other Ninth Circuit decisions have declined to apply rights and standards owed under the Sixth Amendment in the immigration context. For example, the Ninth Circuit has held that "*Miranda* warnings are not required before questioning in the context of a civil deportation hearing...because deportation proceedings are not criminal prosecutions, but are civil in nature." *United States v. Solano–Godines*, 120 F.3d 957, 960 (9th Cir.1997); *see also id.* at 960–61 ("The full panoply of procedural and substantive safeguards which are provided in a criminal proceeding are not required at a deportation hearing") (internal modifications and citation omitted). The Ninth Circuit has also noted that with respect to ineffective assistance of counsel, the Sixth Amendment framework does not apply; instead, "aliens shoulder a heavier burden of proof in establishing ineffective assistance of counsel under the Fifth Amendment than under the Sixth Amendment." [9] *Torres–Chavez v. Holder*, 567 F.3d 1096, 1100 (9th Cir.2009) (citation omitted).

Given that the Ninth Circuit has generally recognized that the Sixth Amendment does not apply to removal hearings because they are civil proceedings, the Court declines to adopt Plaintiffs' suggestion that Sixth Amendment cases should be applied to determine what rights are required to satisfy the INA's right to counsel. *See* Docket No. 141 (Plaintiffs Opp.) at 23. The Ninth Circuit has never so held, and the Court is reluctant to so interpret the INA absent any indication that Congress intended to import full Sixth Amendment standards into the INA. Plaintiffs have not submitted any such indication.

The Court must therefore look to existing precedent. The Ninth Circuit has thus far only found violations of the statutory right to counsel where conditions were "tantamount to denial of counsel." *Biwot*, 403 F.3d at 1099 (finding that IJs should grant reasonable continuances to give an alien sufficient time to locate counsel and permit counsel to prepare for a hearing); *see also Rios–Berrios v. INS*, 776 F.2d 859, 862–63 (9th Cir.1985) (finding that IJ should have

continued the hearing to provide the petitioner reasonable time to locate counsel where petitioner was effectively given only two business days to obtain an attorney, was in custody, spoke only Spanish, had limited education, was unfamiliar with the country and legal procedures, and was 3,000 miles from his only friend in the country).

**[2]** Here, while Plaintiffs present evidence that telephone restrictions result in difficulty locating, retaining, and consulting with counsel, Plaintiffs have not presented evidence that these restrictions were "tantamount to denial of counsel." For example, Plaintiffs acknowledge that many of their witnesses did eventually find counsel after months of searching and with assistance from friends or family. *See* Plaintiffs Opp. at 4, fn. 9. There are also available means of communicating with **\*976** counsel, whether by non-private calls, legal mail, in-person meetings, and scheduling private calls. While these options may limit the effectiveness of communications with counsel, Plaintiffs have not shown that they are tantamount to an outright *denial* of counsel. For this reason on this record, the Court finds that Defendants are entitled to summary judgment on this claim.

2. Right to a Full and Fair Hearing Under Section 1229a(b)(4)(B)

Next, Plaintiffs contend there is a right to a full and fair hearing—which includes a reasonable opportunity to prepare the case, including the gathering of evidence—based on Section 1229a(b)(4)(B) on the INA. Plaintiffs Mot. at 23; Compl. at ¶ 107. Again, section 1229a(b)(4)(B) require that "the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government...." However, none of the cases examining the INA cited by Plaintiffs discuss a general right to gather evidence in preparation for a hearing; instead, they focus primarily on whether an IJ's denial of a continuance of a hearing resulted in the exclusion of evidence. *See Cruz Rendon v. Holder*, 603 F.3d 1104, 1110 (9th Cir.2010) ("When determining whether an IJ has abused her discretion, we consider a number of factors, including: (1) the nature of the evidence excluded as a result of the denial of the continuance...."); *Baires v. INS*, 856 F.2d 89, 92 (9th Cir.1988) (petitioner's statutory right to present evidence was violated where IJ denied request for a continuance and change

of venue, preventing petitioner from presenting the testimony of his expert witness and two other potential witnesses). [10]

Plaintiffs' reliance on 📄 *Dent v. Holder* is misplaced. In 📄 *Dent v. Holder*, the Ninth Circuit found that the ICE was statutorily required to provide documents in the petitioner's A-file which were relevant to the petitioner's citizenship claim. 📄 627 F.3d 365, 369, 374 (9th Cir.2010). *Dent* is distinguishable on two grounds. First, *Dent* was not decided on statutory grounds, but on due process grounds, as the Ninth Circuit found that the failure to provide the A-file documents violated the petitioner's Fifth Amendment right to due process (including the right to a full and fair hearing). [11] **\*977** 📄 *Id.* at 374. Second, the Ninth Circuit's finding that the petitioner was entitled to his A-file was premised on 📄 section 1229a(c)(2)(B), which expressly gives an alien access to his entry document and any other non-confidential records pertaining to the alien's admission or presence in the country. 📄 *Id.* Thus, there was a direct violation of the plaintiff's right to particular evidence as specifically required by statute.

[3] In contrast, Plaintiffs' concern in the instant case is the process of gathering evidence in advance of a hearing, evidence such as that from family members, the community, and other government agencies (such as local police departments); the INA does not expressly address the process of gathering such evidence. Neither the language of the statute (which provides only for the reasonable opportunity to *present* evidence) nor any existing case precedent cited by Plaintiffs supports Plaintiffs' expansive reading of the INA that would provide for a general right to investigate and gather evidence in advance of and in preparation for a removal hearing. [12] Thus, the Court holds that Defendants are also entitled to summary judgment on this statutory claim.

C. Due Process

[4]  [5]  [6] Plaintiffs assert that their rights to counsel and to a full and fair hearing under the due process clause have been violated. In general, "[t]he Fifth Amendment guarantees due process in deportation proceedings. As a result, an alien who faces deportation is entitled to a full and fair hearing of his claims and a reasonable opportunity to present evidence on his behalf." 📄 *Colmenar v. INS*, 210 F.3d

967, 971 (9th Cir.2000) (citations omitted). A decision can be reversed on due process grounds "if the proceeding 'was so fundamentally unfair that the alien was prevented from reasonably presenting his case.'" 📄 *Id.* (quoting 📄 *Platero– Cortez v. INS*, 804 F.2d 1127, 1132 (9th Cir.1986)). The alien must also "show prejudice, which means that the outcome of the proceeding may have been affected by the alleged violation." 📄 *Id.*

1. Substantive Due Process
Plaintiffs contend that their confinement violates substantive due process in two ways: (1) being housed in conditions identical to county prisoners awaiting criminal trials and serving criminal sentences is unconstitutionally punitive, and (2) restrictions and denial of telephone access prolong Plaintiffs' detention without any compelling justification. Plaintiffs Mot. at 44-45.

a. Conditions of Confinement

First, the Court finds that Defendants are correct in that Plaintiffs did not expressly plead a claim regarding the conditions of confinement. Plaintiffs' complaint is focused specifically on the alleged failure to provide adequate phone access; it does not challenge the practice of confining detainees in conditions identical to criminal prisoners. *See* FAC at ¶ 91 (class wide allegation that Defendants have engaged in a common course of conduct of denying and restricting Plaintiffs' telephone access). While Plaintiffs do allege due process violations, which could encompass both procedural and substantive due process violations, Plaintiffs' due process violations are still related to the failure to provide adequate phone access, and the resulting impacts. FAC at ¶¶ 100-109. Because Plaintiffs did not plead any claims or facts challenging their confinement in conditions **\*978** identical to criminal prisoners, no such claim is at issue, and the Court finds that summary judgment in favor of Defendants on this claim is appropriate.

b. Prolonged Imprisonment

Second, the Court finds that Plaintiffs do not have a claim for substantive due process as to prolonged imprisonment. Unlike their challenge to the conditions of confinement, Plaintiffs did make specific allegations of prolonged incarceration. FAC

at ¶¶ 69-70. Specifically, Plaintiffs allege that "Defendants' restriction and denial of telephone access to immigrants held in ICE custody substantially prolongs Plaintiffs' incarceration pending removal hearings [because a] master calendar hearings, Plaintiffs are forced to ask the immigration judge for a continuance to retain counsel, to prepare their cases, or simply to obtain legal advice...." *Id.* at ¶ 69.

In *Zadvydas v. Davis,* the Supreme Court found that a statute which permitted aliens to be detained following a final order of removal did not permit indefinite detention. 533 U.S. 678, 682, 690, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). In so ruling, it recognized a six-month (180 day) period in which an alien can be held, after which "once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* at 701, 121 S.Ct. 2491.

Subsequent decisions have recognized this six-month incarceration period. For example, in *Demore v. Kim,* the Supreme Court rejected a respondent's habeas corpus action, in which the respondent argued that his detention under section 1226(c) violated due process because no determination had been made that he posed either a danger to society or a flight risk. 538 U.S. 510, 514, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003). The Supreme Court distinguished *Zadvydas* in two respects. First, it explained that *Zadvydas* dealt with aliens who challenged their detention following final orders of deportation but "for whom removal was 'no longer practically attainable.'" *Id.* at 527, 123 S.Ct. 1708 (quoting *Zadvydas,* 533 U.S. at 690, 121 S.Ct. 2491). In such cases, the purpose of detention (to hold people in preparation for removal) "no longer bears a reasonable relation to the purpose for which the individual was committed" because for those individuals, removal was not possible. *Id.* (quoting *Zadvydas,* 533 U.S. at 690, 121 S.Ct. 2491). By contrast, *Demore* involved detention of deportable criminal aliens pending their removal proceedings, and "[s]uch detention necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the alien will be successfully removed." *Id.* at 527–28, 123 S.Ct. 1708.

Second, the Supreme Court concluded that *Zadvydas* was "materially different" because it involved an indefinite and potentially permanent duration, whereas *Demore* involved detention "of a much shorter duration." *Id.* at 528, 123 S.Ct. 1708. It noted that in most cases, detention lasted "less than the 90 days we considered presumptively valid in *Zadvydas,*" as in 85% of the cases in which aliens were detained pursuant to section 1226(c), removal proceedings were completed in an average time of 47 days and a median of 30 days. *Id.* at 529, 123 S.Ct. 1708. Even in the remaining 15% of cases, in which the alien appealed, the appeal took an average of four months. *Id.* "In sum, the detention at stake under § 1226(c) lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal." *Id.* at 530, 123 S.Ct. 1708. While the respondent had been detained for six months, the Supreme Court noted that "respondent himself had **\*979** requested a continuance of his removal hearing." *Id.* at 531, 123 S.Ct. 1708. Based on these distinctions, the Supreme Court rejected the respondent's habeas claim.

The Ninth Circuit has also recognized that prolonged incarceration typically requires incarceration of at least 180 days. *See Diouf v. Napolitano,* 634 F.3d 1081, 1091 (9th Cir.2011); *see also Rodriguez v. Robbins,* 715 F.3d 1127, 1138 (9th Cir.2013) ("As a general matter, detention is prolonged when it has lasted six months and is expected to continue more than minimally beyond six months") (quotation omitted). In *Diouf,* at issue were DHS regulations that provided for custody reviews within 90 days, 180 days, and 18 months of confinement. *Id.* at 1089. During the 90-day removal period, DHS was required to detain the alien, after which continued detention was at the discretion of the Attorney General. *Id.* The Ninth Circuit found that there were no serious constitutional concerns with the initial 90-day review period because its focus was "on *prolonged* detention." *Id.* at 1091. As to the time between the 90-day and 180-day review period, the Ninth Circuit found that "[d]etention during this period certainly affects aliens' interests in freedom from confinement, and requires that adequate procedural safeguards be in place to protect

against the erroneous deprivation of liberty. But given the relatively limited period of detention involved, and in view of the *Mathews* factors as a whole, the period afforded by the DHS regulations is adequate." *Id.* However, after the 180-day period, the Ninth Circuit found that the alien's detention could be prolonged an additional year; thus, "[a]t this point, the alien's continuing detention becomes prolonged." *Id.*

**[7]** In the instant case, Plaintiffs cite no cases in which a court found a violation of substantive due process for prolonged incarceration that lasted less than the presumptively valid six-month period in the immigration context. [13] Here, Plaintiffs themselves present evidence that the average time of detention between June 1, 2014 and May 30, 2015 was about 36 days, and the majority of stays (59%) were less than three weeks. Docket No. 119–6, Exh. A (Levy Report) at ¶ 6. While there are a few individuals who have been detained for more than 180 days, including Mr. Lyon (detained October 2013 and April 2015) and Ms. Neria-Garcia (detained between June 2014 and October 2015), Plaintiffs' expert notes that in general, "[m]any detainees are held for very short periods of time, while a few are held for very long periods of time." [14] *Id.*

Here, it cannot be said that the class is subject to a systemic prolongation of detention which applies "generally to the class" which would make injunctive relief "appropriate respecting the class as a whole," as contemplated by *Fed. R. Civ. P. 23(b)(2)*. With the exception of the two named Plaintiffs, Plaintiffs' evidence shows **\*980** that the vast majority of detainees are held for less than three weeks. Based on the evidence in the record, Plaintiffs have failed to show that as a class they have established a substantive due process claim based on systemic prolonged detention. Thus, Defendants are entitled to summary judgment on this claim. [15]

### 2. Procedural Due Process

#### a. Actual Injury Requirement

The parties dispute whether Plaintiffs must show an actual injury in order to assert a procedural due process claim, as was required in *Lewis v. Casey*. In *Lewis*, the Supreme Court found that the actual right at issue was not the right to

a law library and legal assistance programs; instead, access to a law library and legal assistance programs were a "means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *518 U.S. at 351, 116 S.Ct. 2174* (quotation omitted). Thus, to bring a claim, the Supreme Court found that the inmates had to show that they had actually been hindered in pursuing their legal claims, *i.e.*, by demonstrating that an inmate was unable to file a complaint or had a complaint dismissed for failure to observe a technicality. *Id.* As applied in the instant case, Defendants argue that Plaintiffs must show that telephone restrictions "have actually hindered Plaintiffs from pursuing their cases or requests for release on bond." Defendants Mot. at 28.

Plaintiffs in turn argue that *Lewis* is distinguishable because that case concerned sentenced prisoners, whereas here Plaintiffs are civil detainees facing immigration proceedings. Plaintiffs Opp. at 26. The Court agrees. In *Benjamin v. Fraser*, the Second Circuit declined to apply the *Lewis* actual injury requirement to a case challenging conditions affecting attorney visitation, use of restraints, restrictive housing, inmate correspondence, and law libraries. *264 F.3d 175, 179, 185 (2d Cir.2001)*. First, the Second Circuit explained that *Lewis* did not concern a direct constitutional right, but an opportunity to present claimed violations of constitutional rights. The *Benjamin* case, however, concerned conditions which interfered with an individual's ability to consult with counsel, which itself was a constitutional right. *Id.* Second, the Second Circuit reasoned that the interest of a convicted prisoner is distinct from the interest of a pretrial detainee; in short:

> The access claims at issue in *Lewis* concerned the ability of convicted prisoners to attack their sentences, directly or collaterally, and to challenge the conditions of their confinement. By contrast, here we are concerned with the Sixth Amendment right of a pretrial detainee, in a case brought against him by the state to utilize counsel in his defense. It is not clear to us what "actual injury" would

AR.05399

even mean as applied to a pretrial detainee's right to counsel.

*Id.* at 186 (internal quotations and modifications omitted). In other words, "pretrial detainees need access to the courts and counsel is not to present claims to the courts, but to defend against the charges brought against them." *Id.*

 **\*981** Here, Plaintiffs are not seeking phone access in order affirmatively to present constitutional claims, like the prisoners in *Lewis*. Rather, Plaintiffs contend that phone conditions have impaired their right to gather and present evidence in *defending themselves* against the government's effort to deport them. In this context, detainees have a Fifth Amendment guarantee to a full and fair hearing, and this includes access to counsel (of their own choosing). *See Oshodi v. Holder*, 729 F.3d 883, 889 (9th Cir.2013) ("It is well established that the Fifth Amendment guarantees non-citizens due process in removal proceedings. Therefore, every individual in removal proceedings is entitled to a full and fair hearing. A vital hallmark of a full and fair hearing is the opportunity to present evidence and testimony on one's behalf.") (internal quotations omitted); *Rios–Berrios*, 776 F.2d at 862 ("Although a deportation hearing is not a criminal matter and [an alien] had no Sixth Amendment right to appointment of counsel at government expense, due process mandates that [an alien] is entitled to counsel of his own choice at his own expense under the terms of the [INA].") (citation omitted).

Furthermore, like *Benjamin*, Plaintiffs are not convicted inmates but civil detainees who are defending themselves in proceedings brought by the government. Thus, the Court finds *Lewis* does not apply, and thus Plaintiffs are not required to show actual injury or actual hindrance of detainees' ability to pursue their cases in order to assert a procedural due process claim.

Instead, under circumstances outside of *Lewis*, the Ninth Circuit has held that the court looks not to whether the outcome of a hearing was actually affected by an alleged violation, but at whether "the outcome of the proceeding *may* have been affected by the alleged violation." *Colmenar*, 210 F.3d at 971 (emphasis added); *see also Zolotukhin*

*v. Gonzales*, 417 F.3d 1073, 1076 (9th Cir.2005) ("For us to grant the petition for review on due process grounds, Petitioner must show prejudice, which means that the outcome of the proceedings *may have been affected* by the alleged violation.") (internal quotation omitted) (emphasis in original).

In *Walters*, the Ninth Circuit upheld the district court's finding that the INS's procedure for obtaining waivers in document fraud cases violated the plaintiffs' rights to due process of law. *Walters v. Reno*, 145 F.3d 1032, 1036 (9th Cir.1998). There, the plaintiffs brought a class action, alleging that the INS issued complex, confusing forms to aliens charged with violating the INA's document fraud provisions, which failed to adequately inform aliens of the steps they had to take in order to contest the charges brought against them. *Id.* In challenging the district court's finding, the government argued that there was insufficient evidence that the plaintiff class suffered prejudice as a result of the constitutionally deficient proceedings. *Id.* at 1044. The Ninth Circuit found that the issue of prejudice "overlap[ped] with the question whether the plaintiffs suffered actual injury to justify injunctive relief," before explaining that plaintiffs had made the required showing of prejudice. *Id.* at 1044 n. 7. It first reiterated that "[w]hen it is necessary to demonstrate prejudice as a result of a constitutional violation, the alien must show that the inadequate procedures occurred in a manner so as *potentially* to affect the outcome of the proceedings." *Id.* at 1044 (emphasis added) (citations omitted). Thus, "there must be *plausible scenarios* in which the outcome of the proceedings would have been different, absent the constitutional violation." *Id.* (emphasis added).

**[8]** **[9]** Thus, Plaintiffs are not required to show actual injury, as defined by *Lewis*. **\*982** Instead, Plaintiffs need only establish that the outcome of immigration proceedings *may* have been affected by the alleged violation. So defined, the Court finds that there is sufficient evidence of prejudice to the class as a result of telephone restrictions. For example, Mr. Lyon stated in his December 2013 declaration that he was unable to obtain a police report he needed for his U-visa application, as he was unable to call the East Palo Alto Police Department because the police did not take collect calls. Lyon Dec. at ¶ 8. Mr. Lyon's wife, who was assisting him, also could not obtain the police report because the police would only release the report to Mr. Lyon or his legal representative,

which he did not have at the time. *Id.* at ¶¶ 9, 11. It was not until he retained counsel (which at the time of his declaration, he could not afford) that he could obtain the police report.

Similarly, B.M. testified that he was able to retain an attorney, but that he was not able to get through to his attorney from the Housing Unit Phones because his attorney did not accept collect calls. Docket No. 120–16 (B.M.Dec.) at ¶¶ 13, 14. Between June 16, 2014 and August 20, 2014, B.M. was only able to see his attorney once, when his attorney was at Contra Costa to visit another detainee. *Id.* at ¶ 15. At this time, B.M.'s attorney informed him that he had a hearing on August 20, 2014, but they were otherwise unable to speak about what that hearing would entail. *Id.* at ¶¶ 15-17. At the August 20, 2014 hearing, the IJ informed B.M. that he would need to get documents from Kenya and Somalia; when B.M. explained it would be difficult to make those calls from detention, the IJ said his attorney would help. *Id.* at ¶ 18. In September 2014, Contra Costa opened the phone room, permitting free calls that were usually limited only to 5-10 minutes. *Id.* at ¶ 21. B.M. was able to get in contact with his attorney more often, but communication was still difficult because his attorney did not always answer his calls (which were unpredictable due to the limited time and the number of other attorneys who needed to use the phone). *Id.* at ¶ 22. In December 2014, B.M. learned from an ICE officer that the IJ denied asylum, after which B.M.'s attorney informed him that he would not help appeal the decision. *Id.* at ¶ 23. B.M. then began calling free legal service organizations to find another attorney, and learned from a Centro Legal de la Raza attorney that a large part of the reason why his asylum case was denied was because he did not prove his evidence with available evidence. *Id.* at ¶ 24. B.M. states that his attorney did not help him get the evidence to prove his identity (which he could not obtain himself due to phone restrictions), and that B.M. did not realize how ineffective his attorney was because he communicated with his attorney so rarely. *Id.* at ¶ 25. The Centro Legal de la Raza attorney has since helped get B.M. released on bond and filed a motion to reopen the case based on ineffective assistance of counsel. *Id.* at ¶ 26.

Other declarants have discussed the impacts of limited phone access on their ability to gather evidence, although it is less clear what impact that failure to gather evidence had on the outcome of a hearing. *See* O.A. Dec. at ¶ 14 (inability to contact a gang prevention program for documents, likely attributable to the gang prevention program's refusal to accept a call that stated it was from an unspecified "inmate" at Yuba County Jail); Docket No. 120–11 (J.H.Dec.) at ¶ 12

(inability to contact the criminal court and Kern county public defender in order to work on vacating his criminal conviction because the county offices hang up when they hear the recording that the call is from a detention facility); I.P. Dec. at ¶¶ 6, 42-43 (delaying bond hearing by a month because of the delay in gather evidence due to high phone costs; bond was granted at the continued hearing); Docket No. 120–13 (H.S.Dec.) at ¶ 15  **\*983**  (inability to speak freely about his case on Housing Unit phones because his claim for relief is based on sexual orientation, and expressing fear that he would be harassed and physically attacked if his sexual orientation is discovered); Docket No. 120–14 (F.L.Dec.) at ¶ 36 (fear of speaking about his case on Housing Unit Phones because applying for a U-Visa and concerned about being physically attacked if other detainees or county inmates learn that he is cooperating with the police); *see also* Berg Report at 6 (concluding that "the telephone policies and practices challenged in this case significantly limit the ability of detainees to retain and communicate with counsel and gather evidence for their cases"), 17 ("The detainees I interviewed expressed frustration, resignation, and hopelessness related to the difficulty of pursuing their cases with the limited telephone access provided to them. This situation, many times, motivates detainees to simply sign removal papers"); Supp. Vincent Dec. at ¶ 13 (attorney declaration explaining hesitation to take on complex cases for detained immigrants because "telephone access is too unreliable to provide adequate legal representation"); Docket No. 120–18 (Lee Dec.) at ¶ 12 (attorney declaration explaining that in her experience, "[i]n comparison to my non detained clients, detained clients are prevented from playing an active role in their removal proceedings because of the current telephone restrictions"); Docket No. 120–22 (Prasad Dec.) at ¶ 12 (attorney declaration stating "[w]e regularly see detainees not represented by counsel denied bond or discretionary relief who, in my experience, may not have been denied if they had been able to contact family to obtain documents").

This evidence, along with the nature and breadth of the systemic phone restrictions and their potential impact upon detainees' ability to communicate with counsel, relatives, government agencies, etc., are sufficient to establish a real risk for class members that the restrictions "may" or "potentially" affect the outcome of removal proceedings; there are "plausible scenarios" in which outcomes are affected. *Colmenar*, 210 F.3d at 971; *Zolotukhin*, 417 F.3d at 1076; *Walters*, 145 F.3d at 1049.

**[10]** Plaintiffs need not demonstrate every member of the class has suffered from an adverse effect on the outcome of their renewal hearing. The Ninth Circuit has made clear that "[i]t is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole. Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate." *Walters*, 145 F.3d at 1047. This is particularly the case in a Rule 23(b)(2) class action, where the defining feature is whether "the party opposing the class has acted or refused to act on grounds that apply *generally* to the class....," and whether injunctive relief is appropriate respecting the *class as a whole*.[16] Fed. R. Civ. P. 23(b)(2) (emphasis **\*984** added). *See Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir.1988) ("That the claims of individual class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy."); 7AA Charles Alan Wright et al., *Federal Practice and Procedure* § 1775 (3d ed. 1998) ("All the class members need not be aggrieved by or desire to challenge defendant's conduct in order for some of them to seek relief under Rule 23(b)(2).."). As Professor Rubenstein explained:

> The first requirement under Rule 23(b)(2) is that "the party opposing the class has acted or refused to act on grounds that apply generally to the class." While the Rule looks for grounds that "apply generally" to the class, it is well-settled that the defendant's conduct described in the complaint need not be directed or damaging to every member of the class. The framers of the Rule stated that: "Action or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class."
>
> Courts have followed the Advisory Committee's approach, finding that certification of a Rule 23(b)(2) class is proper despite the fact that not all class members may have suffered the injury posed by the class representatives so long as the challenged policy or practice was generally applicable to the class as a whole. The requirement focuses on the defendant and questions whether the defendant has a policy that affects everyone in the proposed class in a similar fashion. That scrutiny ensures

that the class's interests are related in a manner that makes aggregate litigation appropriate—because one class member's litigation will invariably affect everyone in the class—and therefore efficient.

> William B. Rubenstein et al., *Newberg on Class Actions* § 4:28 (5th ed.) (citations omitted).[17]

**\*985** Accordingly, the Court finds that based on the record, there is substantial undisputed evidence of prejudice suffered by the class as a whole based on conduct which applies generally to the class; this is sufficient to satisfy the injury requirement for a procedural due process claim.

#### b. Legal Framework

Finding the injury requirement is satisfied starts but does not end the due process inquiry. The Court must examine the merits of the constitutional claim, viewed in the context of a custodial setting.

**[11] [12] [13]** The parties dispute whether in reviewing Plaintiffs' due process claim, the Court should apply *Mathews v. Eldridge*'s balancing test or *Turner v. Safley*'s four-factor test. *Mathews* requires that the court consider: (1) the interest at stake for the individual, (2) the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different procedural safeguards, and (3) the interest of the government in using the current procedures rather than additional or different procedures. 424 U.S. 319, 324, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In contrast, *Turner* starts with the principle that "[a] prison regulation that impinges on an inmate's constitutional right 'is valid if it is reasonably related to legitimate penological interests.'" *Valdez v. Rosenbaum*, 302 F.3d 1039, 1048 (9th Cir.2002) (quoting *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). In determining reasonableness, the court must consider four factors: (1) whether there is a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) whether accommodation of the asserted constitutional right will have significant impacts on guards, other inmates, and the allocation of prison resources generally; and (4) whether ready alternatives

are absent (or whether obvious, easy alternatives exist).

*Turner*, 482 U.S. at 89–90, 107 S.Ct. 2254.

*Mathews* and *Turner* are not mutually exclusive; the application of one test does not prohibit the use of the other. Instead, the Court finds that in the instant case, application of both *Mathews* and *Turner* is necessary. As a predicate to applying the *Turner* four-factor test, the Court must first find that there is a prison regulation that "*impinges on inmates' constitutional rights.*" *Turner*, 482 U.S. at 89, 107 S.Ct. 2254 (emphasis added). If there is no such impingement, then the Court need not reach the *Turner* four-factor test. The Court must therefore first apply the *Mathews* balancing test in order to determine if Plaintiffs' due process rights have been impinged by the telephone restrictions at issue. If the Court finds that Plaintiffs' constitutional rights have been impinged, the Court will then apply the *Turner* four-factor test.

Plaintiffs contend *Turner* has no application to the case at bar. In *Demery v. Arpaio*, the Ninth Circuit declined to apply *Turner* in an action alleging violations of substantive due process based on the installation of live-streaming webcams in a prison facility used exclusively to house pretrial detainees. 378 F.3d 1020, 1024 (9th Cir.2004). The court found that *Turner* was inapposite because: (1) "*Turner* dealt with convicted prisoners, not pretrial detainees," and (2) "*Turner* involved an Eighth Amendment cruel and unusual punishment challenge, not a claim brought under the Substantive Due Process Clause of the Fourteenth Amendment." *Id.* at 1028–29. However, although the Ninth Circuit has not expressly overruled *Demery*, the Ninth Circuit has since applied the *Turner* four-factor test to pre-trial detainees. *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1209 (9th Cir.2008); *see also* **\*986** *Bull v. City & Cnty. of S.F.*, 595 F.3d 964, 974 n. 10 (9th Cir.2010) (en banc) ("We have never distinguished between pretrial detainees and prisoners in applying the *Turner* test, but have identified the interests of correction facility officials responsible for pretrial detainees as being 'penological' in nature. [Citations] While penological interests

in punishment or rehabilitation may not be applicable outside of a prison setting, the penological interest in security and safety is applicable in all correction facilities."); *United States v. Loughner*, 672 F.3d 731, 751 (9th Cir.2012) ("So long as Loughner is a pretrial detainee, and lawfully held, his rights are limited by the facility's legitimate goals and policies, and his dangerousness to himself or to others may be judged by the same standard as convicted detainees."). The Ninth Circuit has further acknowledged that the Supreme Court has "made quite clear that the standard of review [in *Turner*] applies to all circumstances in which the needs of prison administration implicate constitutional rights.'" *Bull*, 595 F.3d at 974 (quoting *Washington v. Harper*, 494 U.S. 210, 224, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990)); *see also* *Washington*, 494 U.S. at 224, 110 S.Ct. 1028 (principles articulated in *Turner* "apply in all cases in which a prisoner asserts that a prison regulation violates the Constitution, not just those in which the prisoner invokes the First Amendment.").

**[14]** The Court thus finds that the appropriate legal framework is to first apply the *Mathews* balancing test to determine if the complained of phone restrictions would result in a putative constitutional violation. If it does, the Court must apply *Turner* to determine whether the phone restrictions which impinges upon due process rights nonetheless may be upheld because they are "reasonably related to legitimate penological interests." [18] 482 U.S. at 89, 107 S.Ct. 2254.

**\*987** c. Underline{Application}

i. *Mathews* and Constitutional Violation

The threshold question is whether the complained of regulations violate detainees' constitutional rights, in this case their due process right to a full and fair hearing and access to counsel. *See* Compl. at ¶¶ 100-109. Again, *Mathews* requires that the court consider three factors: (1) the interest at stake for the individual, (2) the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different procedural safeguards, and (3) the interest of the government in using

the current procedures rather than additional or different procedures. 424 U.S. at 324, 96 S.Ct. 893.

**[15]** The Ninth Circuit has found that "conclusions regarding the due process...claims present mixed questions of law and fact since they involve a determination of whether factual findings satisfy undisputed rules of law." *Nat'l Ass'n of Radiation Survivors v. Derwinski*, 994 F.2d 583, 587 (1992) (applying *Mathews* to due process claim). In particular, when there are factual disputes underlying legal determinations, such questions must be resolved by the factfinder. *See Wheaton v. Webb–Petett*, 931 F.2d 613, 617 (9th Cir.1991) (remanding plaintiff's due process claim because the plaintiff "has raised genuine factual issues on whether his constitutional right to pretermination process was respected").

#### (a) Plaintiffs' Interests

The parties do not appear to seriously dispute that Plaintiffs have a significant interest in avoiding deportation, the ultimate consequence and hence interest at stake. In applying *Mathews* in the immigration context, the Ninth Circuit has found that "[i]t is clear that the plaintiffs' interests in this case are significant." *Walters*, 145 F.3d at 1043 (citing *Landon v. Plasencia*, 459 U.S. 21, 34, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) (alien's interest in deportation proceedings "is, without question, a weighty one" because "[s]he stands to lose the right to stay and live in this land of freedom [and] may lose the right to rejoin her immediate family, a right that ranks high among the interests of the individual.")). Thus, the Court finds that Plaintiffs have a significant interest.

#### (b) Risk of Erroneous Deprivation of Rights

**[16]** Plaintiffs next argue that the telephone restrictions create a risk of depriving Plaintiffs of their rights because they "effectively den[y] Plaintiffs a means of accessing the counsel and evidence needed to present their cases." Plaintiffs Mot. at 30. However, as to this issue, the Court finds that there are numerous factual disputes that make summary judgment on this issue inappropriate at this time. First, there are outstanding disputes at each of the facilities as to the adequacy of the private phone options at each

of the Facilities. Specifically, the parties dispute whether detainee calls are limited to attorneys only at both Contra Costa and Mesa Verde, the availability of phone rooms at Contra Costa, and whether RCCC and Yuba's private phone options are in fact private. The availability of private phone options can affect detainees in a number of ways; for example, detainees have testified that their inability to communicate with their attorneys was specifically the result of the lack of privacy, especially when the **\*988** case involves sensitive personal information that could lead to physical harm. *E.g.*, Docket No. 120–12 (I.P.Dec.) at ¶¶ 36-38 (RCCC detainee explaining difficulty in communicating with his attorney due to lack of privacy because his case involved sensitive personal information concerning his sexual orientation, and did not want his sexuality known in a jail setting due to fear of harm from other detainees or deputies); H.S. Dec. at ¶ 15 (RCCC detainee explaining difficulty using non-private phones to discuss his case with his attorneys as his claim was based on his sexual orientation, and had previously been harassed and physically attacked because of his sexual orientation). There is also evidence that limiting the private phones to attorney calls only—another factual issue in dispute—can impede individuals from gathering evidence, particularly individuals who have no attorney or when the private phone is the only available phone option without a positive acceptance requirement. *See* Lyon Dec. at ¶ 8 (Contra Costa detainee explaining inability to call the East Palo Alto Police Department to obtain a police report he needed for his U-visa application because the department did not accept collect calls); Docket No. 120–8 (M.G.Dec.) at ¶ 13 (RCCC detainee explaining inability to call extended family members, Fresno Police Department, and corroborating witness to gather evidence for his U-visa case); Docket No. 120–6 (O.A.Dec.) at ¶ 14 (Yuba detainee explaining inability to contact gang prevention program for evidence likely because the program did not want to accept a call from an unspecified inmate at Yuba County Jail); Docket No. 120–5 (R.K.Dec.) at ¶¶ 19-20 (Contra Costa detainee explaining inability to call contacts at the Marin County Probation Department and Health and Human Services Department for support in bond hearing because they would not accept a collect call). These disputes over the actual availability of private phone options may affect the due process analysis.

The Court also finds that the record on notice is not fully developed. For example, during the hearing on this matter, the parties debated whether Plaintiffs had demonstrated any harm based on the ban on three-way calling. Docket No. 157

at 38:20-14. Defendants argued that Plaintiffs had failed to "point[ ] to any facts where the request was made to make a three-way call to use an interpreter for legal purposes," to which Plaintiffs responded that detainees are informed by policies and handbooks that three-way calling is prohibited, and thus would not think that is an available option to request. *Id.*; *see also id.* at 47:4-14 (Defendants argument that there is no evidence detainees asked to use the private phones to connect with counsel who were not on the pro bono platform, to which Plaintiffs responded that many detainees did not even know there was a private phone option until informed by other detainees or an ACLU lawyer). In short, even assuming that these options are available (which was not clear from the record), if detainees are not informed of the availability and are even given legitimate reasons to believe that they are not available (whether by wrong information being stated in detainee handbooks, postings, or staff), it may be difficult for Defendants to argue that there is no evidence of harm simply because no detainee has ever asked for an accommodation that they were explicitly told was prohibited.

Because there are outstanding factual disputes which may materially affect whether there is a risk of erroneous deprivation, the Court finds that summary judgment is not appropriate at this time.

(c) Government Interest

Finally, the Court must consider the government's interest in using the current procedures rather than additional or different **\*989** safeguards. The Supreme Court has recognized that "[t]he government's interest in efficient administration of the immigration laws at the border also is weighty." *Landon, 459 U.S. at 34, 103 S.Ct. 321*. It has also found that "[t]he Government also has legitimate interests that stem from its need to manage the facility in which the individual is detained....For example, the Government must be able to take steps to maintain security and order at the institution and make certain no weapons or illicit drugs reach detainees." *Bell, 441 U.S. at 540, 99 S.Ct. 1861*. Furthermore, "[s]triking a balance between these two strong competing interests cannot be done in the abstract." *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 980 (9th Cir.2012). The Court must "carefully assess the precise 'procedures used' by the government, 'the value of additional safeguards' and 'the burdens of additional procedural requirements.'" *Id.*

The Court finds that there are a number of outstanding disputes with respect to the government's interest. For example, there is an issue regarding the calling rates. Defendants do not appear to provide any justification for the rates, instead arguing that they are irrelevant given the FCC's regulations. Defendants Mot. at 13. Defendants argued that issues regarding cost "will soon be largely irrelevant..." because the Federal Communications Commission ('FCC') has undertaken regulation of inmate and detainee calling, which would impose caps on interstate and intrastate calling rates and eliminate connection fees. Defendants Mot. at 13; FCC, 15-136, Rates for Interstate Inmate Calling Services, at ¶¶ 22, 101, *available at* http://apps.fcc.gov/edocs_public/attachmatch/FCC-15-136A1.pdf (last accessed Feb. 2, 2016); Docket No. 120–24, Exh. A (Wood Report) at 12 (table of rate caps). Plaintiffs' expert, Mr. Wood, agreed that "the recent action by the FCC...represents a useful tool that will help ensure reasonable rates for ICS [Inmate Calling Services]." Wood Report at 12. The rules and requirements governing rates and connection fees were to be made effective on June 20, 2016. Defendants Reply at 7 n.10; FCC, WC Docket No. 12–375, Wireline Competition Bureau Announces the Comment Cycle and Effective Dates for the *Inmate Calling Second Report and Order and Third FNPRM*, at 2, *available at* http://apps.fcc.gov/edocs_public/attachmatch/DA-15-1484A1.pdf (last accessed Feb. 2, 2016). However, given the D.C. Circuit's decision staying implementation of the FCC regulations, this issue will need to be fully developed to determine what, if any, government interest exists for justifying the phone costs. *See* Docket No. 161–1 (order staying FCC, 15-136).

With respect to the automatic cutoffs at Contra Costa, Defendants argue that time limits on call duration promote safety and security by reducing the possibility of fights for telephone access while promoting equitable access to phones. Defendants Mot. at 15. Yet Plaintiffs have presented evidence showing that Contra Costa's officials were unable to explain why there is a cutoff on the Talton Free Call Platform, and stated that the cutoff "doesn't make any sense." Ha Dec., Exh. 37 (Grant Dep.) at 77:4-18. Plaintiffs further argue that short cut-offs are also not applied across-the-board; for example, Mesa Verde has a 180-minute limitation, which is only in place to prevent people from forgetting to hang up the phone. Docket Yee-Garcia Dec., Exh. 60 (Talton Dep.) at 155:11-19 (explaining that the security precaution for the 180-minute limit is so that detainees "can't leave the phone off the hook. You know, after they get on the phone, they just drop the

phone. Let's say they walk away, and the next day, you know, the clock is still ticking, you know. So in other words, the call has to end at some point."). It is unclear whether there is sufficient **\*990** justification where the limitations appear to vary widely. Given that all reasonable inferences must be drawn against the non-moving party, summary judgment is not appropriate.

There is also a dispute as to whether there is any government interest in Contra Costa's requirement that Housing Unit Phones be paid for by the recipient, which has affected the ability of detainees to obtain information if the recipient is not willing (or able) to pay for the call, even if the detainee is willing to pay for the call. Defendants only explain that Contra Costa doesn't have the ability to assign a pin number to the detainees, but is "currently exploring obtaining a new jail management system." Defendants Mot. at 15. It is not clear that this is a legitimate governmental purpose, but Defendants at this juncture is entitled to the benefit of reasonable inferences.

Similarly, it is unclear whether the time restrictions on when detainees can access phones are reasonably related to a government interest, particularly with respect to Contra Costa. Defendants argue they have an interest in limited hours to ensure that violent or unruly individuals are segregated, or to protect individuals from other detainees who may harm them. However, the applicability of this policy to the Facilities raises some questions; as Plaintiffs point out, Contra Costa imposes the greatest time restrictions on detainees use of their Housing Unit Phones (with only 1.5 hours during regular business hours); yet Contra Costa has the lowest percentage of medium-high and high risk prisoners. Plaintiffs Opp. at 14; *see* Shinners Dec., Exh. 32. The record on this point is spare.

Finally, there is an overarching question of whether application of the ICE's 2011 Performance Based National Detention Standards (2011 PBNDS) could be readily implemented, a question which goes to whether the government has an interest in using the current procedures rather than additional or different procedures. *See* U.S. Immigration and Customs Enforcement, Performance-Based National Detention Standards 2011, *available at* https://www.ice.gov/detention-standards/2011 (last accessed Feb. 5, 2016). Currently, RCCC, Yuba, and Contra Costa must comply with ICE's 2000 National Detention Standards (2000 NDS), while Mesa Verde must comply with the 2011 PBNDS. Plaintiffs Mot. at 18; Hackett Report at ¶ 5. Plaintiffs argue that the 2011 PBNDS "require many of the

outcomes Plaintiffs seek in this litigation." *Id.* at 19. This includes reasonably priced telephone calls (2011 PBNDS at § 5.6.V.A.2); providing direct or free calls to offices, including federal and state courts, legal representatives, legal services, and government offices to obtain relevant documents (2011 PBNDS at § 5.6.V.E); providing private legal calls (2011 PBNDS at § 5.6.V.F.2); allowing incoming legal calls and messages (2011 PBNDS at § 5.6.V.J); and providing adequate notice of telephone access opportunities, including in other languages (2011 PBNDS at § 5.6.V.C). Plaintiffs' expert, Mr. Berg, explains that while the 2000 NDS and 2011 PBNDS both "require reasonable and equitable access to telephones and prohibit facilities from unduly limiting a detainee's efforts to obtain legal representation, the newer standards are significantly more detailed, which makes expectations for detention facilities more clear." Berg Report at 20. Thus, the 2011 PBNDS are "generally more rigorous than the 2000 NDS because ICE recognized that there were opportunities for improvement and best practices had evolved since the issuance of the 2000 NDS." *Id.* at 20 (citation omitted).

However, the parties' experts dispute whether the 2011 PBNDS can be readily implemented. For example, Plaintiffs' expert opines that the fiscal and administrative **\*991** costs to adopt better procedures, such as the 2011 PBNDS, and hire additional staff would be minimal. Berg Report at 26-29. Mr. Berg takes the daily income of the RCCC, Contra Costa, and Yuba facilities for housing ICE detainees, and compares it with the average starting annual salary for a correctional officer for these counties. *Id.* at 28. Based on these numbers, Mr. Berg contends that it will take RCCC 4.3 contract days to pay for one correctional officer, Contra Costa 3.6 contract days to pay for one correctional officer, and Yuba 2.7 days to pay for one correctional officer. Defendants' expert, Mr. Hackett, counters that Mr. Berg's calculations ignore the costs of jail operations and employee costs beyond base salary, such as benefits, recruitment, and training. Hackett Report at ¶ 34. Mr. Hackett also argues that implementation of the 2011 PBNDS is affected by factors other than cost, such as facility construction, geographic location, and staffing limitations. *Id.* at ¶ 33.

There are disputes of material fact in the record as to the government's interest. This together with the requirement that all reasonable inferences must be drawn against the moving party where the record is inconclusive requires the summary judgment be denied. Moreover, application of the *Matthews* balancing test is a mixed question of law and fact which is

normally for the trier of fact to decide. *See Nat'l Ass'n of Radiation Survivors*, 994 F.2d at 587.

### ii. *Turner* "Rationally Related to a Legitimate Penological Objective"

**[17]** In addition to the dispute over the application of *Mathews*, there are disputes as to whether Defendants could satisfy the four-factor *Turner* test.[19] Like the *Mathews* balancing test, the Ninth Circuit has found that the *Turner* four factor test is a mixed question of law and fact. *See Friedman v. Arizona*, 912 F.2d 328, 331 (9th Cir.1990), *superseded by statute on other grounds* (finding that whether a particular regulation "impermissibly restricts [the plaintiffs'] first amendment right is a mixed question of law and fact" and applying *Turner*). However, "[t]he legitimacy of prison officials' asserted penological interests are findings of fact." *Henderson v. Terhune*, 379 F.3d 709, 712 (9th Cir.2004); *see also Cal. First Amend. Coal. v. Woodford*, 299 F.3d 868, 880 (9th Cir.2002) (finding that the district court's findings on whether there was a ready alternative to the challenged procedure under *Turner* constituted factual findings).

In *Hrdlicka v. Reniff*, the Ninth Circuit overturned the district court's grant of summary judgment, finding that there were "questions of material facts" as to the district court's application of *Turner*. 631 F.3d 1044, 1046 (9th Cir.2011). There, the publisher of the magazine "Crime, Justice & America" (CJA) brought suit against two county jails that refused to distribute unsolicited copies of CJA to its inmates, alleging First Amendment violations. *Id.* After recognizing the existence of a First Amendment interest, the Ninth Circuit looked at each of the *Turner* factors.

The first *Turner* factor, which requires a "valid, rational connection" between the prison regulation and the government interest, "is a *sine qua non*: If the prison fails to show that the regulation is rationally related to a legitimate penological objective, we do not consider the other factors." *Id.* at 1051 (internal quotation omitted). The Ninth Circuit looked at each of the justifications forwarded by the county

jails. First, the jails asserted that refusing **\*992** to distribute unsolicited copies of CJA promoted jail security by reducing the likelihood of contraband entering the jail and the amount of clutter (thereby reducing the risk of fires and promoting efficient cell searches). While the Ninth Circuit did not question the importance of these goals, it found that the defendant's general statements were "undercut by the specific evidence they offer in an attempt to show the degree to which these purposes are actually served by a refusal to allow the requested distribution of CJA." *Id.* The Ninth Circuit pointed to one of the jail's decision to stop distributing unsolicited copies of newspapers, noting that the decision was based on the monetary cost and not security risks. *Id.* It also found that the other prison had admitted that inmates had access to paper that they could use for improper purpose, and that there was no specific evidence that distribution of CJA would increase the rate of misuse of paper. *Id.* at 1052. Second, the jails asserted that allowing delivery of unsolicited copies of CJA would require additional staff time. The Ninth Circuit rejected this as well, as there was no estimate of how many additional personnel hours would be required for CJA to be delivered. Furthermore, neither jail had suggested that unsolicited publications were more difficult to inspect than solicited publications. *Id.* at 1053. Third, one of the jails argued that accepting unsolicited CJA would create a "slippery slope" that would require the jail to accept other unsolicited publications. *Id.* However, the Ninth Circuit pointed out that this "slippery slope" problem was not a concern when the jail accepted or ceased accepting unsolicited copies of newspapers, and that there had only been three requests to distribute unsolicited publications. *Id.* Finally, one of the jails contended that it had an interest in maintaining control over advertising of bail in the jail, as the jail had an existing contract with an organization to operate bulletin boards on which bail bond agents could post advertisements. *Id.* The Ninth Circuit found that it was not clear how distribution of CJA would be inconsistent with that contract, and that in any case, there was no legitimate penological interest "in protecting a profit made by impinging on inmates' First Amendment rights." *Id.*

The Ninth Circuit then reviewed the second *Turner* factor, which looked at whether other avenues are available for the exercise of the asserted right. *Id.* Although the jails argued that CJA could still be distributed to inmates who request it, "there is a material question of fact whether, as a practical matter, Plaintiffs can effectively reach county jail inmates if they can delivery CJA only upon request." *Id.* at 1054. Specifically, the Ninth Circuit noted that it is difficult to create

broad awareness of CJA when inmate populations turn over quickly, resulting in many inmates having left the jail before they could learn about CJA's existence, request it to be sent, and then receive it. *Id.*

The Ninth Circuit also found "material questions of fact" as to the third ⚑ *Turner* factor, which looks at the impact accommodation of the asserted constitutional right will have on guards and other inmates. *Id.* Specifically, the Ninth Circuit explained that there were questions about "whether, and to what degree, the jails should be forced to expend significant additional resources if CJA was delivered by either of the two methods sought by Plaintiffs." *Id.* For example, the publisher had proposed delivering only one copy of CJA for every ten inmates each week, and offered to either do a general delivery or individually addressed mailings. *Id.* The jails, in turn, had not explained how mail inspectors would distinguish between a copy of CJA that is solicited and that is not, or why a complete ban on unsolicited mail did not consume more prison resources than accepting **\*993** such mail if the jail had to compile subscription lists and compare incoming mail to those lists. *Id.*

Finally, the Ninth Circuit analyzed the fourth ⚑ *Turner* factor, which looked at whether there was the existence of easy and obvious alternatives which would indicate that the challenged regulation is an exaggerated response by prison officials. *Id.* "'This is not a "least restrictive alternative" test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint.'" *Id.* at 1054–55 (quoting ⚑ *Turner,* 482 U.S. at 90–91, 107 S.Ct. 2254). However, an alternative that fully accommodates the asserted rights at *de minimis* cost suggests that the regulation does not satisfy the reasonable relationship standard. *Id.* at 1055. As applied in *Hrdlicka,* the Ninth Circuit found that it was undisputed that CJA was distributed in more than 60 countries throughout 13 states, including 32 California county jails, thus "suggest[ing] that the response of the two jails in this case may be an exaggerated response." *Id.* Further, the "weak, and to some degree contradictory, specific evidence" offered by the jails in support of their cited penological purposes suggested that the challenged policies were an exaggerated response. *Id.* Taken together, the Ninth Circuit concluded that the jails were not entitled to summary judgment.

In the instant case, the parties raise similar questions as to whether the asserted regulations are reasonably related

to the penological purposes being asserted by Defendants. In general, the Supreme Court has recognized that the government has legitimate interests in managing detention facilities, including the maintenance of security and order at the institution. *See* ⚑ *Bell,* 441 U.S. at 540, 99 S.Ct. 1861. There is also evidence that the government has an interest in controlling phone use in particular, including to prevent inmates from making threatening or harmful calls to the community. Shinners Dec., Exh. 33 (Berg Dep.) at 46:23-47:18, 50:14-20, 122:11-17; *see also generally* Shinners Dec., Exh. 34 (Hackett Report).

However, as discussed above, there are several disputes as to specific justifications made by Defendants for various technical limitations, such as whether there is a penological interest in the time limits, Contra Costa's requirement that calls made from Housing Unit Phones be paid for by a recipient, and time restrictions on when detainees can access phones. There is also a significant question as to whether the 2011 PBNDS can be readily implemented, a question which goes to whether Defendants' telephone policies are an "exaggerated response" where there is an obvious alternative. Viewed as a whole, the Court finds that there are disputes of material fact which make summary judgment improper in the instant case, particularly in view of the reasonable inferences that must be drawn in the non-moving party's favor along with the fact that application of ⚑ *Turner* is a mixed question of law and fact.

### D. Right to Petition

Plaintiffs contend that per their right to petition the government for redress of grievances, they have a right to obtain governmental records, benefits, or actions, as well as hire and consult attorneys. Plaintiffs Mot. at 46. Defendants in turn contend that an application for immigrant status is not a lawsuit or airing of a political grievance, but is an affirmative application for a discretionary benefit from the government, which should not be considered a petition for redress of grievances. Defendants Mot. at 36-37. However, the Ninth Circuit has found that "the First Amendment extends to the right to petition an administrative agency...." ⚑ **\*994** *Nat'l Ass'n of Radiation Survivors,* 994 F.2d at 595 (concerning applications for Veterans' Administration benefits based on exposure to ionizing radiation during service). Given the stakes at issue in removal proceedings, the Court sees no reason why the right to petition does not apply here. The Court therefore finds that the petition clause can extend to the

immigration proceedings which Plaintiffs allege are impacted by telephone restrictions.

However, for the same reasons discussed with respect to Plaintiffs' procedural due process clause, the Court finds that summary judgment on Plaintiffs' First Amendment claim is inappropriate at this time. In *National Association of Radiation Survivors*, the Ninth Circuit found that both the due process and First Amendment claims were about "meaningful access to the VA benefits process," such that "the focus of the First Amendment analysis is essentially the same as that under the Due Process Clause." *994 F.2d at 595*. As the Ninth Circuit had already determined that there was no due process violation, it summarily found that there was no First Amendment violation. *Id.* As in *National Association of Radiation Survivors*, the focus of Plaintiffs' First Amendment claim is essentially the same as that under the due process clause, as both claims are related to how telephone restrictions affect detainees' ability to gather evidence to present at their immigration hearing and to contact, retain, and consult with attorneys. *See* Compl. at ¶¶ 103 (due process claim based on Defendants having "violated Plaintiffs' right to representation of counsel by denying and severely restricting Plaintiffs' ability to make telephone calls to locate, consult with, and retain counsel, and Plaintiffs' ability to communicate with retained counsel"); 108 (due process claim based on Defendants having "violated Plaintiffs' right to a full and fair hearing by denying and severely restricting Plaintiffs' ability to make telephone calls to gather information and obtain evidence in support of their immigration cases"); 112 (First Amendment claim based on Defendants having "violated Plaintiffs' right to petition the government by denying and severely restricting the telephone access necessary to seek legal representation and obtain documents and evidence in support of their applications for immigration benefits"). For the reasons the Court denies summary judgment on Plaintiffs' procedural due process claim, it denies summary judgment on the First Amendment claim.

## IV. CONCLUSION

The Court **GRANTS** Defendants' motion for summary judgment with respect to Plaintiffs' INA statutory claims and substantive due process claims. Based on undisputed facts, the Court finds Plaintiffs have satisfied the injury requirement for a procedural due process claim. However, the Court **DENIES** the cross-motions for summary judgment with respect to Plaintiffs' procedural due process and First Amendment claims for the reasons stated above.

Having viewed the record, the Court observes that there do not appear to be many issues of dispute with respect to present conditions in the Facilities. The primary factual disputes under the *Matthews* analysis concern, as the Court noted, the availability of private phone options and how much notice is provided to detainees about the available phone options. As to *Turner*, there are a number of factual disputes and an inclusive record relative to the justification and penological interests asserted by Defendants.

The Court thus **ORDERS** the parties to meet and confer, in order to reach a stipulation to undisputed facts (as found and set forth in this Order) for trial and to determine which specific facts need to be tried. Those areas should be limited in scope as **\*995** indicated herein, and the evidence for trial herein shall be so limited. The Court will also set a Case Management Conference for March 23, 2016 at 10:00 a.m. to delineate the scope and nature of the trial.

This order disposes of Docket Nos. 120 and 139.

**IT IS SO ORDERED**.

**All Citations**

171 F.Supp.3d 961

## Footnotes

1    For example, detainees seeking asylum or withholding or deferral of removal under the United Nations Convention Against Torture often must gather evidence of their identity, conditions in their home country, and other evidence corroborating their claim. *See* Docket No. 120–19 (Realmuto Dec.) at ¶ 28. Similarly,

detainees seeking cancellation of removal need to establish residency and physical presence, the absence of disqualifying criminal convictions, good moral character, and/or hardship to a qualifying relative. *Id.* Finally, detainees who seek a U-visa must obtain a government-issued form certifying that the individual was a victim of a crime and that the individual was helpful to law enforcement. *See* Docket No. 120–22 (Prasad Dec.) at ¶ 16.

2    Defendants make a number of evidentiary objections to the declarations submitted by Plaintiffs in support of their motion for summary judgment. Docket No. 139–1. Many of these objections have merit, and the Court will sustain the objections. However, the objected to statements have no impact on the Court's ruling on the cross-motions for summary judgment.

3    Risk takes into account factors such as flight risk, protective custody factors (*i.e.*, age), and the seriousness or violent nature of criminal convictions. Vaughn Dep. at 199:5-19.

4    This process requires being shackled, and is considered insufficient to comply with ICE detention standards that require telephone access within the detention facility. *See* Docket No. 144–1 (Yee–Garcia Dec.), Exh. 49 (Meyer Dep.) at 132:2-14 (testifying that transportation requires shackles on the hands and a chain around the waist); Exh. 50 (Dozoretz Dep.) at 124:16-126:1 (explaining that detention standards are facility-specific, and that if the facility lacks accessible phones which provide privacy for detainees to discuss legal matters, it will be cited as deficient).

5    Three-way calls are used by attorneys to communicate with detainees who do not share a common language by including an interpreter. *See* Phillips Dec., Exh. Q (Shugall Dep.) at 96:23-97:11.

6    It is unclear how quickly messages are passed onto the detainees; one attorney stated that she would message her clients to call her, but would not receive a call back for several days. Supp. Vincent Dec. at ¶ 10. However, she was unsure if the waiting period was due to phone availability, a delay in clients receiving messages, or both. *Id.*

7    For detainees held in administrative segregation, there is a dispute over how many hours a day these detainees would have access to phones. *See* Ha Dec., Exh. 32 (Butler Dep.) at 63:22-64:25 (stating that they have access "several hours a day"); Docket No. 120–8 (M.G.Dec.) at ¶ 6 (stating that while in restricted housing, he was only let out of his cell one hour a day, during which he had access to showers and telephone calls).

8    8 U.S.C. § 1362 likewise states that: "In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose."

9    While *Torres–Chavez* analyzed the plaintiff's ineffective assistance of counsel claim by applying the Sixth Amendment framework, that was because the Sixth Amendment applied a higher standard; thus, "[i]f an attorney's performance passes muster under *Strickland*, it cannot render an alien's proceeding fundamentally unfair. In other words, there is no violation of the alien's Fifth Amendment right to due process if the alien's counsel was effective for Sixth Amendment purposes." 567 F.3d at 1100. *Torres–Chavez* does not suggest that courts should apply rights due under the Sixth Amendment, as Plaintiffs contend. *See* Plaintiffs Opp. at 23.

10   In *Cruz Rendon* and *Baires*, the evidence was available for the hearing, but could not actually be presented at the hearing because of the IJ's action. *See Cruz Rendon*, 603 F.3d at 1109 (IJ precluded Cruz Rendon from testifying as to any topic that was mentioned in her son's psychological evaluation, including "the life she had created for [her son] in the United States, [her son's] medical and educational needs, and the hardships [her son] would face if forced to relocate to Mexico"); *Baires*, 856 F.2d at 92 (denial of continuance precluded presentment of evidence because "[t]he necessary arrangements for the testimony of these potential witnesses could not be completed by April 15, nor was the expert able to travel to Florence").

AR.05410

The challenged conduct in these cases was more proximate to the presentation of evidence at the hearing than the alleged interference with the investigation and gathering of evidence at issue in the instant case.

11    Plaintiffs' other cases do not rely on the statutory right to present evidence under section 1229a(b)(4)(B), but instead rely on due process grounds, *see* *Ibarra–Flores v. Gonzales*, 439 F.3d 614, 621 (9th Cir.2006) (holding that petitioner's due process rights were violated where IJ refused to order the INS to produce petitioner's voluntary departure form), or the failure to provide a petitioner with a reasonable opportunity to examine the evidence against him in the hearing. *See* *Singh v. Holder*, 405 Fed.Appx. 193, 194 (9th Cir.2010) (holding that petitioner's statutory right to examine the evidence against him was violated where the IJ refused to grant a continuance to allow the petitioner to conduct a forensic analysis of the original letters that the government had failed to provide even though the government knew the petitioner wanted to use the letters in his defense against the government's allegations).

12    To the extent Plaintiffs again rely on *Montes–Lopez* and *Torres–Chavez*, the Court finds for the reasons stated above that neither of these cases stands for the proposition that rights under Sixth Amendment jurisprudence should be applied in the immigration context.

13    Plaintiffs do cite *Zavala v. Ridge*, 310 F.Supp.2d 1071 (N.D.Cal.2004); however, this case was a challenge to a regulation which automatically stayed the IJ's decision to grant bond. *Id.* at 1075. As the district court explained, this automatic stay, "which permits unilateral government detention of individuals without a case-by-case determination after a reasoned finding that they do not pose threat to safety or a risk of flight, violates the Due Process Clause because no special justification exists that outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Id.* at 1077. In short, *Zavala* challenged the *detention* itself, not the length of the detention, which is the issue in this case.

14    Notably, even the Mesa Verde numbers, which Dr. Levy notes "are distorted because of the transfer of long-term detainees from other facilities," note an average stay of 157.4 days, below the 180-day period that the Ninth Circuit found significant.

15    While the Court finds that there is no substantive due process claim, this does not preclude a *procedural* due process claim. *See* *Prieto–Romero v. Clark*, 534 F.3d 1053, 1065 (9th Cir.2008) ("Even if Prieto-Romero's continued detention is permitted by statute, however, due process requires 'adequate procedural protections' to ensure that the government's asserted justification for physical confinement 'outweighs the individual's constitutionally protected interest in avoiding physical restraint.'"). This is particularly so in light of the discussion which follows which concludes the injury requirement to make a procedural due process claims has a degree of flexibility.

16    By way of example, if a prison hospital had a policy of not sterilizing its equipment, resulting in significantly increased risk of infection or spread of a disease (such as HIV), the fact that not every class member or even the named plaintiff contracted the disease would not preclude an injunction. Every person, indeed not even a majority of the class, need not be infected with a life-threatening disease before relief may be granted. The purpose of an injunction under Rule 23(b)(2), after all, is to prevent future injury that may occur as a result of the complained of policy. *See* *Dittimus–Bey v. Taylor*, 244 F.R.D. 284, 291 (D.N.J.2007) (prison-crowding case in which the Court found that "Rule 23 does not require that the representative plaintiff have endured precisely the same injuries that have been sustained by the class members, only that the harm complained of be *common* to the class, and that the named plaintiff demonstrate a personal interest or threat of injury that is real and immediate, not conjectural or hypothetical").

17    Thus, rights of the class under Rule23(b)(2) are not measured solely by the facts and circumstances of the named representatives. For example, in reviewing mental health care provided by the California prison system, the court in *Coleman v. Wilson* did not limit its factual findings to the claims of the named plaintiffs; it considered the testimony of inmate witnesses and declarations of expert witnesses, whose reports were

based in part on interviews with numerous inmates, unnamed members of the class. No. CIV S–90–0520 LKK JFM P, 1994 U.S. Dist. LEXIS 20786, at *9–12, *23 at fn. 15 (E.D.Cal. June 6, 1994), *report and recommendation adopted as modified by* Coleman v. Wilson, 912 F.Supp. 1282, 1324 (E.D.Cal.1995). Similarly, in Plata v. Schwarzenegger, the district court looked at the system as a whole, giving a "few representative examples from the testimonial and documentary evidence" of the effects of inadequate health care in the California prison system; evidence was not confined to the named plaintiffs. Case No. C01– 1351 TEH, 2005 WL 2932253, *6, 2005 U.S. Dist. LEXIS 43796, at *16–19 (N.D.Cal. Oct. 3, 2005); *see also* Orantes–Hernandez v. Meese, 685 F.Supp. 1488, 1507 (C.D.Cal.1988) (reviewing testimony from class members, not just the named plaintiffs, to determine there was a procedural due process violation); *Perez–Funez v. Dist. Dir., I.N.S.*, 619 F.Supp. 656, 657, 661 (C.D.Cal.1985) (reviewing the testimony of both the named plaintiffs and fourteen other class members to determine whether plaintiffs were signing a voluntary departure form without being advised of their rights). *Cf.* Moss v. Lane, 471 F.2d 853, 854–55 (4th Cir.1973) (rejecting trial court's conclusion that because the plaintiff had not proved his discrimination case, the class action also failed because "the subsequent dismissal or mootness of his individual claim...will not operate as a dismissal or render moot the action of the class, or destroy the plaintiff's right to litigate the issues on behalf of the class.").

18    Plaintiffs contend, however, that they are unaware of any cases that have applied Turner deference to detention conditions of civil detainees who alleged that their conditions impacted procedural rights in pending civil proceedings. Docket No. 160 (Plaintiffs Supp.) at 1 fn. 1. As discussed above, the Supreme Court has taken a broad view that Turner should apply to all circumstances in which the needs of prison administration implicate constitutional rights, and that Turner is a recognition of "the need to reconcile our longstanding adherence to the principle that inmates retain at least some constitutional rights despite incarceration with the recognition that prison authorities are best equipped to make difficult decisions regarding prison administration." Washington, 494 U.S. at 223–24, 110 S.Ct. 1028. The Supreme Court has long recognized the government's interest in "manag[ing] the facility in which the individual is detained....For example, the Government must be able to take steps to maintain security and order at the institution and make certain no weapons or illicit drugs reach detainees." Bell v. Wolfish, 441 U.S. 520, 540, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *see also* Turner, 482 U.S. at 84–85, 107 S.Ct. 2254 ("Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of these branches, and separation of powers concerns counsel a policy of judicial restraint."). In order to give the necessary deference to the government's interests in institutional order and security, the Court will apply the Turner four-factor test. *Compare with* Flemings v. Gray, 1:14–cv–01248 LJO DLB PC, 2015 WL 4393016, at *4, 2015 U.S. Dist. LEXIS 93433, at *9 (E.D.Cal. July 17, 2015) (reviewing claim for deprivation of property without procedural due process and finding that "[a]uthorized deprivations of property are permissible if carried out pursuant to a regulation that is reasonably related to a legitimate penological interest"); *Casper v. Baker*, 3:12–cv–00204–LRH–VPC, 2013 U.S. Dist. LEXIS 183058, at *31 (D.Nev. Aug. 23, 2013), *report and recommendation adopted by* Casper v. Baker, 2014 WL 177436, 2014 U.S. Dist. LEXIS 3108 (D.Nev. Jan. 10, 2014) (same); *Patrick v. Bonner Cnty. Sheriff's Dep't*, Case No. 2:11–cv–00113–EJL–REB, 2013 WL 4028201, at *, 2013 U.S. Dist. LEXIS 84027, at * (D.Idaho June 13, 2013) (same); *Dudley v. Cesolini*, No. CV 11–0387–PHK–SMM (LOSA), 2012 U.S. Dist. LEXIS 190818, at *15 (D.Ariz. May 11, 2012) (same).

19    This is unsurprising, given that neither party briefed how Turner would apply in practice to the instant case, as Defendants did not raise the issue until after briefing was completed.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

849 F.3d 187
United States Court of Appeals, Fourth Circuit.

Riaz MAHMOOD, Petitioner,

v.

Jefferson B. SESSIONS III,
Attorney General, Respondent.

No. 16-1438
|
Argued: January 24, 2017
|
Decided: February 22, 2017

**Synopsis**

**Background:** Alien, a native and citizen of Pakistan who was previously granted asylum and was later granted lawful permanent resident status, petitioned for review of order of Board of Immigration Appeals (BIA), which affirmed immigration judge's (IJ) order of removal.

**Holdings:** The Court of Appeals, Niemeyer, Circuit Judge, held that:

[1] alien no longer retained benefits of alien granted asylum once he successfully pursued an adjustment of status to lawful permanent resident and, thus, was subject to removal, and

[2] BIA's determination that alien's successful adjustment of status to that of lawful permanent resident meant that he no longer retained benefits of asylum status and was subject to removal was not arbitrary, capricious or manifestly contrary to law.

Petition denied.

West Headnotes (3)

[1]    **Aliens, Immigration, and
       Citizenship** 🔑 Inadmissible at time of entry,
       reentry, or adjustment of status

       **Aliens, Immigration, and
       Citizenship** 🔑 Change of status

Alien, a native and citizen of Pakistan who was previously granted asylum, no longer retained benefits of alien granted asylum once he successfully pursued an adjustment of status to lawful permanent resident and, thus, was subject to removal for deliberately misrepresenting material facts in order to obtain travel documents and his lawful permanent resident status; alien could be removed without requirement that Attorney General conduct asylum termination proceeding. Immigration and Nationality Act §§ 208, 209, 212, 237, 📖 8 U.S.C.A. §§ 1158(c), 📖 1159(b), 📖 1182(a)(6)(C), 📖 1227(a)(1)(A).

2 Cases that cite this headnote

[2]    **Administrative Law and
       Procedure** 🔑 Plain, literal, or clear meaning;
       ambiguity or silence

       **Administrative Law and
       Procedure** 🔑 Permissible or reasonable
       construction

Under *Chevron*, a reviewing court must follow the plain meaning of a statute where Congress has directly spoken to the precise question at issue; however, if the statute is ambiguous, the court must defer to the agency's permissible construction of that ambiguity made through its published, precedential decisions.

1 Cases that cite this headnote

[3]    **Aliens, Immigration, and
       Citizenship** 🔑 Inadmissible at time of entry,
       reentry, or adjustment of status

       **Aliens, Immigration, and
       Citizenship** 🔑 Change of status

Determination of Board of Immigration Appeals (BIA), in affirming immigration judge's order of removal of alien, a native and citizen of Pakistan who was previously granted asylum, that alien's successful adjustment of status to that of lawful permanent resident meant that he no longer retained benefits of asylum status, and was subject to removal for deliberately misrepresenting material facts in order to obtain travel documents and his lawful permanent

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

resident status, was not arbitrary, capricious or manifestly contrary to law; because alien adjusted his status from alien granted asylum to lawful permanent resident, he no longer had protections based on his original asylum status.

5 U.S.C.A. § 706(2)(A); Immigration and Nationality Act §§ 208, 209, 212, 237, 8 U.S.C.A. §§ 1158(c), 1159(b), 1182(a)(6)(C), 1227(a)(1)(A).

3 Cases that cite this headnote

**\*188** On Petition for Review of an Order of the Board of Immigration Appeals.

**Attorneys and Law Firms**

ARGUED: Bradley Bruce Banias, BARNWELL, WHALEY, PATTERSON, AND HELMS, LLC, Charleston, South Carolina, for Petitioner. Tiffany L. Walters, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. ON BRIEF: Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, Anthony C. Payne, Assistant Director, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

Before NIEMEYER, TRAXLER, and DIAZ, Circuit Judges.

**Opinion**

Petition denied by published opinion. Judge Niemeyer wrote the opinion, in which Judge Traxler and Judge Diaz joined.

NIEMEYER, Circuit Judge:

Riaz Mahmood, a native and citizen of Pakistan who was granted asylum in the United States in 1997, voluntarily applied in 2011 for adjustment of his asylum status to the status of a lawful permanent resident, pursuant to 8 U.S.C. § 1159(b). His application was granted in 2012. The Attorney General thereafter sought to deport Mahmood for having, over the years, obtained several immigration benefits by fraud.

The immigration judge found by clear and convincing evidence that Mahmood deliberately misrepresented material facts in order to obtain travel documents and his lawful permanent resident status and ordered that Mahmood be removed from the United States to Pakistan.

The Board of Immigration Appeals ("BIA") affirmed, rejecting Mahmood's argument that he could not be removed unless his asylum status had first been terminated pursuant to 8 U.S.C. § 1158(c). Mahmood argued that, as an "adjusted asylee," he "retain[ed] the protections of asylum after obtaining [lawful permanent] residency, and therefore [could] not be removed without first having asylum terminated via the procedures outlined in [ § 1158(c)(2) ] and 8 C.F.R. § 1208.24." In rejecting Mahmood's argument, the BIA relied on its precedential decision in *Matter of C-J-H-*, 26 I. & N. Dec. 284 (BIA 2014), which held that aliens who adjust to lawful permanent resident status under § 1159(b) do not retain their asylum status.

On appeal, we conclude that the BIA's interpretation of § 1159(b) is the best interpretation of the statute and that, in any **\*189** event, it deserves deference under *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Accordingly, we affirm the BIA's decision and deny Mahmood's petition for review.

I

Some nine years after Mahmood was granted asylum in the United States, he applied in March 2006 for a refugee travel document in order to leave the country, stating that he sought to travel to Bangkok, Thailand, to visit his wife and children. In his application, Mahmood indicated that, since being granted asylum in 1997, he had neither returned to Pakistan nor "applied for and/or obtained a national passport, passport renewal or entry permit" from Pakistan. As it turned out, however, Mahmood had departed the United States in March 2003 using a Pakistani passport and reentered the United States in July 2005 using a U.S. visa. The Department of Homeland Security ("DHS") was unaware of Mahmood's 2003 trip and granted Mahmood's application for the refugee travel document in July 2006. Mahmood then departed the United States in February 2007 using a Pakistani passport with a number different from that which he had used in 2003

and returned in July 2007 using his U.S.-issued refugee travel document.

In December 2007, Mahmood applied for another refugee travel document, again purportedly to visit his wife and children in Bangkok, and, as in his first application, he denied having returned to Pakistan or having obtained or renewed a Pakistani passport since his grant of asylum. While his application for this second refugee travel document was pending, Mahmood departed the United States using the same Pakistani passport that he had used on his 2007 trip and returned a few months later, using the second refugee travel document that had since been granted.

Mahmood left the United States for a fourth time in March 2009, using a Pakistani passport with yet a third number. Mahmood claims that he traveled to Dubai, where he met his wife and children, and that they subsequently flew to Russia, Cuba, and finally Mexico, where he tried to bring his family across the border with the intent that they would apply for asylum in the United States "because their lives were in danger in Pakistan." He and his family were apprehended after crossing into the United States, and, in August 2009, the DHS charged Mahmood with removability on the ground that he had entered the country without inspection.

While that charge was pending, Mahmood filed a Form I-485 application in August 2011, seeking to adjust his asylee status to that of lawful permanent resident, pursuant to 8 U.S.C. § 1159(b). In his application, Mahmood certified under the penalty of perjury that he had never "by fraud or willful misrepresentation of a material fact, ever sought to procure, or procured, a visa, other documentation, entry into the United States, or any immigration benefit." He further certified that he had never "knowingly encouraged, induced, assisted, abetted, or aided any alien to try to enter the United States illegally." While this application was pending, the DHS dropped the illegal entry charge against him and subsequently, in December 2012, granted his application for adjustment to the status of a lawful permanent resident.

In September 2013, however, the DHS commenced another removal proceeding against Mahmood, alleging that he had sought to procure an immigration benefit by fraud or by willful misrepresentation of a material fact. Specifically, the DHS claimed that Mahmood's alleged misrepresentations **\*190** regarding his unreported travel and possession of Pakistani passports made him inadmissible at the time of his application for adjustment, which in turn rendered

him removable under the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. §§ 1182(a)(6)(C)(i), 1227(a)(1)(A).

An immigration judge held a removal hearing and found that the DHS had proven, by clear and convincing evidence, that Mahmood had obtained his lawful permanent resident status and his two refugee travel documents by fraud. Specifically, the immigration judge found that Mahmood's travel pattern "represented a concerted effort by him to avoid using his authorized travel documents to return to Pakistan, which he denied was his intention when he applied for them," and that his use of three Pakistani passports showed that he made misrepresentations on his application for travel documents. The immigration judge also found that Mahmood was ineligible for a waiver of inadmissibility under 8 U.S.C. § 1159(c). As a result, the judge ordered that Mahmood be removed to Pakistan.

Mahmood appealed the immigration judge's decision to the BIA, at first on the sole ground that the immigration judge had erred in denying his application for waiver of inadmissibility. After Mahmood filed his initial brief, however, the Fifth Circuit issued a decision finding that the INA was ambiguous as to whether an asylee who adjusted his status to lawful permanent resident could be removed without first having his asylum status terminated under § 1158(c) and remanding the case to the BIA to resolve that question in the first instance. *See Ali v. Lynch,* 814 F.3d 306, 312 (5th Cir. 2016). Relying on that decision, Mahmood filed a supplemental brief before the BIA, arguing that because he "retained his asylum status" after his adjustment to lawful permanent resident status, the immigration judge erred in ordering his removal without first conducting an asylum termination proceeding under 8 U.S.C. § 1158(c).

With a one-member decision, the BIA rejected Mahmood's arguments and dismissed his appeal. As relevant here, it held that the immigration judge properly ordered Mahmood's removal without first conducting an asylum termination proceeding. The BIA relied on its precedential decision in *Matter of C-J-H-,* 26 I. & N. Dec. 284, in which it had concluded that "aliens whose status was adjusted from asylee to lawful permanent resident no longer qualify as asylees," *id.* at 285, and it "declined to revisit [that] decision."

From the BIA's order dated March 29, 2016, Mahmood filed this petition for review.

## II

Mahmood contends that even though he applied for and obtained the status of a lawful permanent resident, "he is still an asylee," and, as an asylee, he has "the right to not be returned to a country where [he] would be persecuted, threatened, or harmed." He argues that this treaty-based right is recognized and preserved in 8 U.S.C. § 1158(c), which provides that "in the case of an alien granted asylum ... the Attorney General ... *shall not remove or return* the alien to the alien's country of nationality" unless his asylum status is first terminated. *See also* 8 C.F.R. § 1208.22 (providing that "[a]n alien who has been granted asylum may not be deported or removed unless his or her asylum status is terminated pursuant to procedures set forth in 8 C.F.R. § 1208.24"). Mahmood's argument thus rests on his claimed continuing status as an asylee and the statutory requirement that the Attorney General cannot terminate the status of an asylee without pursuing **\*191** the procedure set forth in § 1158(c) and in the regulations promulgated under it. Because the Attorney General has not pursued those procedures, he argues, he cannot now be deported, and the BIA erred as a matter of law in concluding otherwise.

The government does not dispute Mahmood's recital of law relating to asylees. Rather, it argues, because of Mahmood's voluntary action of changing his status from an alien granted asylum to a lawful permanent resident under § 1159(b), he is no longer an asylee with rights under § 1158. Focusing on the language of § 1159, under which Mahmood obtained an adjustment of status to a lawful permanent resident, the government maintains that "the term 'adjust' necessarily describes a change in status, not the acquisition of an additional status" and that therefore Mahmood "no longer retains asylee status." Under this argument, it reasons, Mahmood, as a lawful permanent resident, may be deported as any other lawful permanent resident under §§ 1227(a)(1)(A) and 1182(a)(6)(C) for procuring an immigration benefit by fraud or willful misrepresentation of a material fact.

It is undisputed that Mahmood, while an asylee, submitted an application in 2011 to the DHS to adjust his status to that of a lawful permanent resident under § 1159(b) and

that the DHS granted his application in 2012. We therefore must focus on the consequence of this adjustment of status. To be sure, if Mahmood remains an asylee, his status cannot be terminated by the Attorney General without following the process afforded by § 1158(c). On the other hand, if Mahmood is no longer an asylee by reason of his adjustment of status to a lawful permanent resident, he no longer enjoys the rights of asylum status. Thus, we must determine whether an asylee who successfully pursues an adjustment of status under § 1159(b) nonetheless retains the benefits of an alien granted asylum.

**[1]** The text of § 1159(b) appears to answer this question. Section 1159(b) provides that "the Secretary of Homeland Security or the Attorney General ... may," upon application of the alien and satisfaction of specified statutory conditions, "adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum." This text thus contemplates two statuses—an "alien granted asylum" and an "alien lawfully admitted for permanent residence." Moreover, it describes a process of "adjustment" from the former "to" the latter. A provision that addresses two statuses and provides for the adjustment from one "to" the other appears clearly to indicate a *change* to and *not an accretion of* the second status. *See* Adams v. Holder, 692 F.3d 91, 97 (2d Cir. 2012) ("[P]lainly, then *adjustment* of status ... references some *change* in that status corresponding to a change in the alien's relationship to this country" (second emphasis added)).

Under this reading, therefore, Mahmood simply no longer holds the status of an "alien granted asylum." Rather, he holds the status to which he was adjusted, *i.e.*, an alien lawfully admitted for permanent residence. In his new status, he is, like every other lawful permanent resident, subject to removal for procuring an immigration benefit by fraud or willful misrepresentation of a material fact. *See* 8 U.S.C. §§ 1227(a)(1)(A), 1182(a)(6)(C).

Mahmood contends, however, that focusing only on § 1159(b) paints an incomplete picture. He argues that because he was an asylee at the time he adjusted his status, we must focus on § 1158(c)(2)'s restrictions on the removal of asylees. As he points out, § 1158(c) allows the Attorney General to terminate asylum status for five listed

AR.05417

reasons, none of which includes an **\*192** adjustment of status under § 1159(b). Mahmood also points to DHS regulations providing that an asylee may not be removed absent termination of his asylum status under provided procedures. *See* 8 C.F.R. §§ 1208.22, 1208.24. And he argues that an adjustment of status under § 1159(b) cannot substitute for a formal termination of his asylum status pursuant to § 1158(c) and the regulations promulgated under that section.

Mahmood's argument, however, is premised on unwritten assumptions. First, it presumes that because the Attorney General cannot terminate an asylee's status except by following the specified procedures of § 1158(c) and its regulations, the alien cannot voluntarily give up the asylee status in favor of another. Second, he equates his *voluntary surrender* of his asylum status through his adjustment under § 1159(b) with the *involuntary loss* of his asylum status through the Attorney General's termination of it under § 1158(c). The two, however, are clearly not the same. The office of § 1158 protects an asylee from having his asylum status terminated against his will by the Attorney General except for the reasons given in § 1158. In contrast, the office of § 1159 authorizes an asylee to voluntarily give up his asylum status in favor of the status of a lawful permanent resident. In this fashion, § 1158 does not appear to limit § 1159, as Mahmood seems to argue. On the contrary, § 1158 and § 1159 can easily be read harmoniously, with the former governing asylees while they retain that status and the latter serving as a bridge to an entirely different status with different rights and responsibilities. Thus, even though an asylee is protected from deportation and removal except as provided in § 1158(c), he can voluntarily seek adjustment of his status under § 1159(b) and thereby withdraw from the protections of asylum status to attain the benefits of being a lawful permanent resident.

Those benefits are different from asylee benefits and are significant. An asylee who adjusts his status under § 1159(b) gains a direct path to naturalized citizenship, 8 U.S.C. § 1427(a); he gives his family a better chance to obtain lawful permanent residency, *id.* § 1153(a)(2); and he

obtains the right to travel outside of the United States without the advance permission of a refugee travel document, *id.* § 1101(a)(13)(C). An asylee who adjusts to lawful permanent resident status also untethers the fate of his immigration status from the tumultuous conditions of his home country, because his status as an asylee may, after all, be terminated if he no longer has "a well-founded fear of persecution." 8 U.S.C. § 1101(a)(42) (defining "refugee"); *see id.* § 1158(c)(2)(A) (allowing for termination if an alien granted asylum no longer meets INA's definition of "refugee"). Thus, Congress, with the enactment of § 1159, can be seen as deciding sensibly that, where an alien voluntarily seeks adjustment under § 1159(b) and gains the advantages of lawful permanent residency, he gives up the absolute right to have the protections of his asylum status adjudicated before removal.

In an effort to diminish the importance of the text of § 1159 and its apparent relationship to § 1158, Mahmood argues that Congress cannot have intended the practical consequences that flow from the BIA's interpretation. For one, he claims that allowing removal of a former asylee without termination will incentivize the government to "manipulate immigration benefits" by liberally granting adjustments to aliens it wishes to deport and then immediately initiating removal proceedings against them. But this argument entirely ignores the fact that the adjustment process is *voluntary* and that, moreover, **\*193** § 1159(b) has its own limitations, such as those that require that the alien be admissible before granting the adjustment or obtain a waiver of inadmissibility. *See* 8 U.S.C. § 1159(b), (c). An alien simply need not apply for adjustment if he wishes to retain the protections of asylum. On the other hand, as we have explained, there are numerous benefits to be gained by forgoing the protections of asylum and seeking the status of a lawful permanent resident.

Moreover, an alien's status as a lawful permanent resident does not leave the alien fully exposed to removal to a dangerous country even if he conducts himself in a manner that gives rise to his removal. "Any alien who is physically present in the United States ... irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1). And, in some circumstances, the INA explicitly prohibits the Attorney General from removing an otherwise removable

alien. *See* 8 U.S.C. § 1231(b)(3)(A) (prohibiting removal to a country where the Attorney General finds that "the alien's life or freedom would be threatened"); 8 C.F.R. § 1208.16(c) (prohibiting removal under the Convention Against Torture if applicant shows that torture in country of removal is "more likely than not").

At bottom, the most reasonable reading of § 1159(b) leads to the conclusion that once an asylee has adjusted his status to that of lawful permanent resident, the alien is then fully considered a lawful permanent resident and not an asylee. And, in his status as a lawful permanent resident, the alien may be removed without a requirement that the Attorney General conduct an asylum termination proceeding under § 1158(c)(2).

Even so, Mahmood urges that we should remand this case to the BIA to resolve the ambiguity existing between § 1158 and § 1159 because neither section explicitly takes the other into account. He maintains that Congress may have intended to grant overarching protections to asylees until the asylee's status is terminated pursuant to § 1158(c), regardless of whether the asylee subsequently adjusts his status to lawful permanent resident. And because § 1158(c) does not list adjustment of status as a ground allowing for termination of asylum status, he argues that his reading of the statute would bar removal in his circumstances. *See Ali, 814 F.3d at 311* (finding the INA ambiguous in this regard). Moreover, Mahmood notes, the BIA in this case construed only § 1159, never addressing the protections given to asylees by § 1158.

While we conclude that Mahmood's reading of the INA is not the best one, it is at least plausible, thus suggesting ambiguity. *See, e.g., Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 410, 417, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993)* (noting that a provision with two plausible meanings is ambiguous for purposes of applying *Chevron* deference).

Under the assumption that § 1159(b) is indeed ambiguous, it then becomes appropriate to defer to the BIA's interpretation of the INA in resolving the issue. As it is well understood, when the question of whether the BIA erred turns on statutory interpretation of the INA, "principles of

*Chevron* deference" apply to our review of the decision because the BIA is responsible for administering the statute. *See Negusie v. Holder, 555 U.S. 511, 516, 129 S.Ct. 1159, 173 L.Ed.2d 20 (2009)* (quoting *INS v. Aguirre-Aguirre, 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999)*).

**[2]** Under *Chevron*, we must follow the plain meaning of the statute where "Congress has directly spoken to the precise question at issue." **\*194** *Chevron, 467 U.S. at 842, 104 S.Ct. 2778*. But if the statute is ambiguous, we must defer to the agency's permissible construction of that ambiguity made through its published, precedential decisions. *See Aguirre-Aguirre, 526 U.S. at 424, 119 S.Ct. 1439; Hernandez v. Holder, 783 F.3d 189, 192 (4th Cir. 2015)*.

**[3]** In this case, the BIA relied on its precedential decision in *Matter of C-J-H-, 26 I. & N. Dec. at 284*, in holding that Mahmood could be removed without an asylum termination proceeding. Thus, even though the BIA's one-member decision in this case was not precedential and therefore not itself entitled to *Chevron* deference, it controls so long as *C-J-H-*, on which its decision rested, permissibly construed an ambiguity in the INA. *See Hernandez, 783 F.3d at 192*. In other words, the BIA's position in *C-J-H-* "prevails if it is a reasonable construction of the statute, whether or not it is the only possible interpretation or even the one a court might think best." *Holder v. Martinez Gutierrez, 566 U.S. 583, 132 S.Ct. 2011, 2014, 182 L.Ed.2d 922 (2012)*.

In *C-J-H-*, as in the case before us, an alien who had been granted asylum subsequently adjusted his status to that of a lawful permanent resident pursuant to § 1159(b). 26 I. & N. Dec. at 284. The alien was then charged with removability after being convicted of conspiracy to traffic in counterfeit goods, a crime involving moral turpitude. *Id.* During his removal proceedings, the alien conceded removability but applied for a readjustment of status under § 1159(b), which, again, allows "any alien granted asylum" to adjust his status. *Id.* at 284-85. The BIA concluded, however, that the alien was not eligible for a readjustment of status. It reasoned that, by its "plain terms" § 1159(b) applied only "to *asylees* seeking to adjust status to that of a lawful permanent resident," and that "*[o]nce [the alien] became a lawful permanent resident, he no longer had the status of an asylee.*" *Id.* at 285 (emphasis added). The BIA based this

conclusion in part on its prior holding that "a refugee admitted as a lawful permanent resident is subject to removability even though his refugee status has not been terminated." *Id.* (citing *Matter of Smriko*, 23 I. & N. Dec. 836, 841 (BIA 2005)).

Mahmood argues that *C-J-H-* does not warrant deference because the BIA there "failed to interpret 🔖 section 1159(b) or 🔖 section 1158(c)(2)" and because, in relying on its prior decisions outside the context of asylum, the BIA improperly "equated refugees and asylees." We do not find these arguments persuasive. For one, *C-J-H-'s* failure to analyze the effect of 🔖 § 1158(c) does not imply that its analysis was insufficient. Rather, it implies that the BIA understood adjustment as a categorical shift from asylum to lawful permanent residency—a shift that left no continued role for the INA's provisions, such as 🔖 § 1158, that apply to asylum status. *C-J-H-*, 26 I. & N. Dec. at 286 ("[A]liens who have adjusted from their status as asylees have no status that would authorize them to readjust under [ 🔖 § 1159(b) ]"). The BIA's analysis perhaps would have been tighter had it made this point expressly, but we are not persuaded that a remand is necessary. With respect to the BIA's discussion of refugee cases in reaching its conclusion, we similarly reject that this fact somehow undercuts *C-J-H-*. The BIA in *C-J-H-* did not rest its holding on the similarities of those two categories but rather on the reasonable conclusion that the language of 🔖 § 1159(b) provides that once an alien adjusts to lawful permanent resident status, he no longer holds the status of an asylee.

On a larger scale, Mahmood's challenge to the BIA's decision in *C-J-H- on the basis of its reasoning* ignores the limited nature of our review under 🔖 *Chevron*. The **\*195** Supreme Court has held that in reviewing an agency's interpretation of a statute, we will not remand solely because the agency engaged in a mode of reasoning other than that which we would have preferred. *See* 🔖 *Aguirre-Aguirre*, 526 U.S. at 431, 119 S.Ct. 1439 (rejecting the Ninth Circuit's conclusion that the BIA was required to address certain factors and, as a result, vacating the court's order of remand). Rather, because we are simply conducting a reasonableness review, we treat the BIA's interpretation as controlling unless it has reached *a conclusion* that is "arbitrary, capricious, or manifestly contrary to the

statute." 🔖 *Amos v. Lynch*, 790 F.3d 512, 518 (4th Cir. 2015) (quoting 🔖 *Chevron*, 467 U.S. at 843-44, 104 S.Ct. 2778). In this case, we cannot conclude that the BIA's conclusion regarding 🔖 § 1159 was arbitrary, capricious, or manifestly contrary to the statute. To the contrary, as we have pointed out, the BIA in *C-J-H-* reached a reasonable conclusion in holding that, with adjustment, the alien relinquished his asylum status. Accepting the BIA's conclusion in *C-J-H-* as reasonable, it then follows that Mahmood is not subject to the protections of 🔖 § 1158(c), which by their terms apply only "[i]n the case of an alien granted asylum."

Of course, strong policies underlie the INA's protection of aliens granted asylum, as Mahmood points out, temporarily prohibiting, except in carefully delineated circumstances, their return to a country where they would be persecuted. But strong policies also underlie the INA's authorization to asylees to change their status and eventually to become naturalized citizens of the United States. These policies serve different purposes, either of which an alien in Mahmood's position may invoke. But the statute does not provide for both statuses to apply simultaneously. Asylum status is a *transient* status that is conditioned on the fear of persecution in the country of origin. Lawful *permanent* resident status, on the other hand, focuses on a future permanent status in the United States. Nonetheless, as we have noted, even in the circumstance where an asylee has adjusted his status to a lawful permanent resident and thereby relinquished his asylum status, the lawful permanent resident can, after obtaining that status, still object to deportation by requesting asylum if the conditions in his country at that time justify such a request.

As it stands, the BIA in this case held simply that because Mahmood adjusted his status from an alien granted asylum to a lawful permanent resident, he no longer has protections based on his *original* asylum status, and we affirm this holding. Accordingly, we deny Mahmood's petition for review.

PETITION DENIED

**All Citations**

849 F.3d 187

---

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Vidinski v. Lynch, 7th Cir., November 1, 2016

610 F.3d 483
United States Court of Appeals,
Seventh Circuit.

Manuela D. MALAVE, Petitioner,

v.

Eric H. HOLDER, Jr., Attorney General of the United States, Respondent.

No. 08–3578.
|
Argued Sept. 22, 2009.
|
Decided June 29, 2010.

**Synopsis**

**Background:** Alien, as citizen of Nicaragua, petitioned for review of order of Board of Immigration Appeals (BIA), dismissing alien's appeal of immigration judge's (IJ) denial of cancellation of removal, under Nicaraguan Adjustment and Central American Relief Act (NACARA).

**[Holding:]** The Court of Appeals, Easterbrook, Chief Judge, held that fair hearing was required to determine alien's entitlement to adjustment of status.

Petition granted.

West Headnotes (4)

**[1]**  **Aliens, Immigration, and Citizenship** 👈 Jurisdiction and venue

Nicaraguan Adjustment and Central American Relief Act (NACARA) provision, forbidding judicial review of a decision denying an alien's motion for adjustment of status, does not bar review of order of removal itself. Nicaraguan Adjustment and Central American Relief Act, § 202, 8 U.S.C.A. § 1255 note.

**[2]**  **Administrative Law and Procedure** 👈 Presumptions as to Reviewability

There is a presumption favoring judicial review of administrative action.

**[3]**  **Aliens, Immigration, and Citizenship** 👈 Findings or statement of reasons

**Constitutional Law** 👈 Admission and exclusion; deportation

Aliens are entitled to due process of law in removal hearings, and administrative decisions must stand on a better footing than speculation. U.S.C.A. Const.Amend. 5.

5 Cases that cite this headnote

**[4]    Aliens, Immigration, and Citizenship** 🔑 Witnesses

Alien applying for cancellation of removal, under Nicaraguan Adjustment and Central American Relief Act (NACARA), after immigration judge (IJ) ordered removal based on alien's allegedly sham marriage to secure immigration benefit that rendered her inadmissible, under Immigration and Nationality Act (INA), and derivatively ineligible under NACARA, was entitled to opportunity for fair hearing to determine whether adjustment of status was warranted based on her allegation that marriage was not sham, since IJ had refused to issue subpoena for alien's spouse so that alien could cross-examine him regarding marriage. Immigration and Nationality Act, §§ 212(a)(6)(C)(i), 240(b)(4)(B), 8 U.S.C.A. §§ 1182(a)(6)(C)(i), 1229a(b)(4)(B); Nicaraguan Adjustment and Central American Relief Act, § 202, 8 U.S.C.A. § 1255 note; 8 C.F.R. § 1240.1(c).

14 Cases that cite this headnote

**Attorneys and Law Firms**

**\*484** Paula S. Kim (argued), Katten Muchin Rosenman, Chicago, IL, for Petitioner.

Rebecca A. Hoffberg (argued), Department Of Justice, Civil Division, Immigration Litigation, Washington, DC, for Respondent.

Before EASTERBROOK, Chief Judge, and BAUER and ROVNER, Circuit Judges.

**Opinion**

EASTERBROOK, Chief Judge.

Manuela Malave, a citizen of Nicaragua, was ordered removed from the United States after an immigration judge concluded that she had paid $1,000 to her ex-husband to enter into a sham marriage for the purpose of securing an immigration benefit. Malave applied for cancellation of removal under § 202 of the Nicaraguan Adjustment and Central American Relief Act, 111 Stat. 2193, as amended by 111 Stat. 2644 (1997). Section 202 of NACARA is reproduced as a note following 8 U.S.C. § 1255. But the IJ's finding of a sham marriage made her inadmissible under § 212(a)(6)(C)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(6)(C)(i), so § 202(a)(1)(B) of NACARA precluded relief. The Board of Immigration **\*485** Appeals dismissed her appeal in a brief order.

**[1]**    Section 202(f) of NACARA forbids judicial review of a decision denying a motion for adjustment of status, and the Attorney General asks us to dismiss Malave's petition. The parties have debated the interesting question whether 🚩 8 U.S.C. § 1252(a)(2)(D), part of the Real ID Act, permits review of legal questions notwithstanding § 202(f) of NACARA, but this is not a subject we need explore. For what § 202(f) says is: "A determination by the Attorney General as to whether the status of any alien should be adjusted under this section is final and shall not be subject to review by any court." This does not bar review of the order of removal itself, as some sections of the Immigration and Nationality Act do. See, e.g., 🚩 8 U.S.C. § 1252(a)(2)(C) ("no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section 1182(a)(2) or 1227(a)(2)(A)(iii), (B), (C), or (D) of this title").

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**[2]**   Malave contends that the order of removal is defective because the IJ did not hold a hearing that complies with 8 U.S.C. § 1229a(b)(4)(B), which directs the agency to afford each alien "a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government". Section 202(e)(2) of NACARA requires the Attorney General to follow § 1229a. A need to give every alien one complete hearing does not impinge on the Attorney General's plenary authority to decide whether, on a properly compiled record, the alien is entitled to adjustment of status. To the extent there is any ambiguity about the way in which § 202(f) of NACARA interacts with the general grant of jurisdiction in § 1252(a), we resolve it by "the presumption favoring judicial review of administrative action". *Kucana v. Holder,* 558U.S. 233, ——, 130 S.Ct. 827, 839, 175 L.Ed.2d 694, —— (2010).

Manuela Gaula married Jose Antonio Malave Cruz on August 8, 1996, and took his family name. Four months later, Jose filed an I–130 petition on her behalf, asking immigration officials to adjust her status to that of permanent resident on the basis of her marriage to a citizen. Manuela filed a corresponding I–485 petition. *Afzal v. Holder,* 559 F.3d 677 (7th Cir.2009), discusses how this process works. In September 1997 Manuela and Jose were interviewed, both jointly and separately, by immigration officials. During the separate portion of this interview, Jose signed a statement that he had been paid $1,000 to marry Manuela. He withdrew his I–130 petition. The interview with Jose was not recorded, and Manuela did not see a copy of Jose's statement until 2002, when she obtained her immigration file under the Freedom of Information Act.

Manuela was taken into custody immediately after the interview with Jose ended but was released that evening. She relates that an agent of the FBI told her that he had investigated, concluded that the marriage had been genuine, and informed immigration officials so. Despite releasing her, the agency commenced removal proceedings and denied her petition for adjustment of status as a citizen's spouse. Manuela says that she has been unable to locate Jose since the day of the interviews.

The removal proceeding was closed later in 1997 after Congress enacted NACARA, which provides for adjustment of status for citizens of Nicaragua who entered the United States before December 1, 1995, have been in this nation continuously since, and are not statutorily ineligible for admission. **\*486**  Manuela applied for the statute's benefits. She next heard from the agency in 2005, when it denied her application on the ground that a fraudulent marriage made her ineligible for admission and derivatively ineligible under NACARA. The agency then reinstituted removal proceedings.

A hearing began in December 2006 and was conducted in stages. During the first, the agency's lawyers offered two versions of Jose's statement. Both were in English, a language that Manuela says Jose does not understand. (She tells us that he was born and raised in Puerto Rico. Many U.S. citizens from that commonwealth understand only Spanish.) The first is handwritten, by a different hand than the signature, and reads:

> Manuela Gaula gave me $1,000 to marry her so she could get her green card. I never lived with her & never slept or had sex with her. I don't even know her address but I do know the street name, Delaware.

The second, which is typed, reads:

> [Manuela] offered me $1,000. She never told me it was illegal and I did not realize it was wrong until after we were married, on August 8, 1996 in Lake County at the courthouse in Waukegan. The[ ] day we married they paid me the $1,000 cash. There was no other person involved in our arrangement and there were no witnesses at the marriage. We never dated or had any romantic involvement. I think she lives with a man she is not married to and I think their address is 1928 Delaware, Waukegan. We came to the Immigration office today for our interview and the officer who interviewed us ... said that it could be

prejudicial to me if I didn't tell the truth about our marriage; so I said I would rather cancel my application for Manuela Gaula, and tell the truth.

Manuela's lawyer objected to the receipt of these statements in evidence, contending that they had not been authenticated or disclosed before the hearing. Manuela also maintained that the details of the statements (such as whether she had lived with and had sexual relations with Jose), could be refuted by admissible evidence. The IJ then recessed the hearing.

When it was resumed in mid-January 2007, Manuela not only presented some evidence to contradict Jose's purported statements but also asked the IJ to issue a subpoena, so that Jose could be compelled to attend and be subjected to cross-examination. The IJ refused, stating that if Manuela had not found Jose during the decade since the 1997 interview, she was never going to find him. The IJ did not consider asking federal agents to enforce the subpoena (nor did the BIA discuss that possibility on appeal). After admitting the two statements into evidence, the IJ again recessed the hearing. The final stage of the hearing came on March 12, 2007, when Manuela testified that she did not pay Jose, that the marriage had been consummated, and that the couple lived together for approximately ten months until she threw him out after finding him in bed with another man. The IJ then rendered an oral opinion stating that he believed the statements attributed to Jose. This led to the finding of fraud, the denial of relief under NACARA, and the order of removal.

Part of Manuela's brief is devoted to the proposition that the IJ violated the due process clause of the fifth amendment by admitting and relying on hearsay evidence. (Jose's statements are hearsay because they are out-of-court declarations used for the truth of the matter stated.) This line of argument is unnecessary. If as Manuela contends the hearsay statements are unreliable, then the agency's decision is  **\*487**  not supported by substantial evidence and may be set aside under standard principles of administrative law without any need for constitutional theorizing.

 **[3]**    No one doubts that aliens are entitled to due process of law in removal hearings, and that administrative decisions must stand on a better footing than speculation. See  *Bridges v. Wixon,* 326 U.S. 135, 156, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945). But statutes such as  8 U.S.C. § 1229a(b)(4)(B), and regulations such as 8 C.F.R. § 1240.1(c), guarantee to aliens notice and an opportunity for a fair hearing. Appeals to "due process" often come at the expense of arguments based on these concrete procedural entitlements. That's one reason why we have advised aliens and their lawyers to omit due-process contentions unless they believe that the statutes and regulations that govern removal hearings are constitutionally deficient. See, e.g., *Rehman v. Gonzales,* 441 F.3d 506, 508–09 (7th Cir.2006).

Perhaps Manuela's lawyers believe that they must make a due-process argument because neither the statute nor any regulation forbids the use of hearsay. But then neither does the due process clause. Hearsay is regularly used in administrative adjudication, and for that matter criminal sentencing. In  *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), the Justices roundly rejected the argument that the due process clause creates for administrative adjudication the same constitutional requirement of live testimony that the confrontation clause establishes for criminal trials. The Court added that hearsay could supply substantial evidence for an administrative decision. See also, e.g.,  *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229–30, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *Duad v. Holder,* 556 F.3d 592, 595–96 (7th Cir.2009).

 **[4]**    *Perales* has a proviso of consequence here. The Court wrote that hearsay "may constitute substantial evidence supportive of a finding by the hearing examiner adverse to the claimant, when the claimant has not exercised his right to subpoena the [declarant] and thereby provide himself with the opportunity for cross-examination".  402 U.S. at 402, 91 S.Ct. 1420. Manuela tried to take advantage of that proviso, but the IJ refused to issue a subpoena for Jose. And that's a big problem, not only under the proviso in *Perales* but also under  § 1229a(b)(4)(B), which entitles aliens to cross-examine adverse witnesses. The bureaucracy can't nullify that right by presenting written declarations rather than live testimony. A declarant is a "witness" when

testimony comes in on paper, no less than when it is offered in person. Cf. *Melendez–Diaz v. Massachusetts,* —— U.S. ——, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009).

Several circuits have concluded that, when an alien wants to cross-examine a witness, the agency not only must issue a subpoena but also must use reasonable efforts to enforce that subpoena (which the alien may lack the resources to do). See *Ocasio v. Ashcroft,* 375 F.3d 105, 107 (1st Cir.2004); *Olabanji v. INS,* 973 F.2d 1232, 1234 (5th Cir.1992); *Dallo v. INS,* 765 F.2d 581, 586 (6th Cir.1985); *Saidane v. INS,* 129 F.3d 1063, 1065 (9th Cir.1997). We need not decide when assistance with enforcement is required—or what kind of assistance is necessary—because here the IJ refused to issue a subpoena in the first place.

The IJ did not find the request untimely. The hearing was just about to recess for two months, so a subpoena would not have occasioned any additional delay. Nor did the IJ rely on 8 C.F.R. § 1003.35(b)(2), which requires an alien to make a "diligent effort" to locate the witness before requesting **\*488** a subpoena. (The Attorney General's brief in this court likewise does not mention § 1003.35(b)(2).) Instead the IJ stated that a subpoena would be futile, because if Manuela had not found Jose in the last ten years, she never would. That's not a good reason. Manuela was not looking for most of that time. Until 2005, when the agency renewed its request for her removal, she had no reason to. And Manuela is not a professional skip tracer. She does not know how to locate people who don't want to be found. That expertise exists in both the government and the private market, however, and a subpoena could have been turned over to a professional with experience in finding people who did not leave forwarding addresses.

A prediction that a person can't be found, or that cross-examination won't be fruitful, is a poor reason to deny a litigant the statutory entitlement to cross-examine adverse witnesses. The best way to find out whether a subpoena will work is to issue one. Jose Malave may be dead or untraceable, and if so the hearing would have proceeded as it did; no harm would have been done (and no delay would have ensued). But he might have turned up.

None of this is to say that Jose's statements are so outré that an agency is forbidden to rely on them. Bogus marriages designed to obtain immigration benefits are regrettably common, and the agents who interview the applicants have every reason to separate the real marriages from the spurious ones. They don't get a bonus for imputing immigration fraud to honest people. Section 202(f) of NACARA insulates from judicial review the decision whether to believe particular evidence of immigration fraud. But before exercising this unreviewable power, the IJ, as the Attorney General's delegate, must furnish the alien with compulsory process to seek the adverse witness's presence, so that the truth of the writings may be tested.

The petition for review is granted, and the matter is remanded to the agency for further proceedings consistent with this opinion.

## All Citations

610 F.3d 483

---

End of Document                                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

422 Fed.Appx. 120
This case was not selected for publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also U.S.Ct. of Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals,
Third Circuit.

Luisa MALDONADO, Petitioner

v.

ATTORNEY GENERAL OF the UNITED STATES of America, Respondent.

No. 10–1855.
|
Submitted Pursuant to Third Circuit
LAR 34.1(a) March 23, 2011.
|
Opinion filed: April 7, 2011.

**Synopsis**
**Background:** Alien petitioned for review of order of the Board of Immigration Appeals (BIA) denying her motion to reopen her immigration proceedings, and government objected to jurisdiction of Court to consider petition.

**Holdings:** The Court of Appeals held that:

[1] while the Court of Appeals had jurisdiction to review legal question of whether the BIA employed incorrect legal standard in failing to focus on whether alien, as opposed to her citizen spouse, had entered into marriage in good faith, alien failed to demonstrate that the BIA had applied improper legal standard, and

[2] alien also failed to show that the BIA had not made individualized determination, in violation of her due process rights.

Petition denied.

West Headnotes (2)

[1]    **Aliens, Immigration, and Citizenship** 🔑 Grounds and Factors Considered

**Aliens, Immigration, and Citizenship** 🔑 Jurisdiction and venue

On petition for review of allegedly discretionary decision of the Board of Immigration Appeals (BIA) that alien had failed to establish her prima facie eligibility for adjustment of status and thus was not entitled to have removal proceedings reopened, while the Court of Appeals had jurisdiction to review legal question of whether the BIA employed incorrect legal standard in failing to focus on whether she, as opposed to her citizen spouse, had entered into marriage in good faith, alien failed to demonstrate that the BIA had applied improper legal standard, especially given the evidence presented in support of motion to reopen, which, as to the bona fides of alien's marriage, primarily consisted of her own statement.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**[2]**    **Aliens, Immigration, and Citizenship**  ☞  Findings, statement of reasons, and determination

**Aliens, Immigration, and Citizenship**  ☞  Jurisdiction and venue

**Constitutional Law**  ☞  Admission and exclusion;  deportation

On petition for review of allegedly discretionary decision of the Board of Immigration Appeals (BIA) that alien had failed to establish her prima facie eligibility for adjustment of status and thus was not entitled to have removal proceedings reopened, while the Court of Appeals had jurisdiction to consider constitutional question of whether alien was deprived of due process based on the BIA's alleged failure to make an individualized determination in alien's case, alien failed to show that the BIA had not made such an individualized determination, where the BIA addressed spousal support order that alien had submitted in support of her motion and explained that the order only established the legality, not the bona fides, of her marriage, and also addressed other evidence presented by alien to extent relevant to her prima facie eligibility for status adjustment. U.S.C.A. Const.Amend. 5.

**\*120**  On Petition for Review of an Order of the Board of Immigration Appeals (Agency No. AXX-XXX-715), Immigration Judge: Honorable Frederic G. Leeds.

**Attorneys and Law Firms**

**\*121**  Carla R. McBeath, Esq., Fort Lee, NJ, for Petitioner.

Dawn S. Conrad, Esq., Timothy Hayes, Esq., Eric H. Holder, Jr., Esq., Thomas W. Hussey, Esq., United States Department of Justice, Washington, DC, for Respondent.

Before: SLOVITER, CHAGARES and WEIS, Circuit Judges.

OPINION

PER CURIAM.

**\*\*1**  Luisa Maldonado, a native and citizen of the Dominican Republic, petitions for review of an order of the Board of Immigration Appeals ("BIA") denying her motion to reopen her immigration proceedings. For the reasons that follow, we will deny the petition for review.

Maldonado came to the United States in 1991 as a visitor. In 2002, she married a United States citizen. The following year, Maldonado adjusted her status to that of a conditional permanent resident based on her marriage. Maldonado and her husband filed a joint petition to remove the conditions on her residence in 2005. The Department of Homeland Security, however, denied the petition and terminated Maldonado's status, having concluded that she and her husband failed to establish that the marriage was entered into in good faith and not to procure her entry to the United States as an immigrant. In 2006, a notice to appear was issued charging that Maldonado was subject to removal from the United States as a result of the termination of her conditional permanent resident status.

After a hearing, an Immigration Judge ("IJ") concluded that the Government met its burden of proof to establish that Maldonado's marriage was not entered into in good faith. The IJ ordered Maldonado's removal to the Dominican Republic. On appeal, the BIA decided that Maldonado's conditional permanent resident status was properly terminated and affirmed the

order of removal. The BIA noted numerous inconsistencies in the evidence, including discrepancies in the couple's tax filings and inconsistencies in their testimony.

Maldonado then filed a motion to reopen her immigration proceedings, asserting that her husband had taken deliberate steps to prevent her from showing that the marriage was entered into in good faith. Maldonado sought reopening in order to apply for adjustment of status under provisions of the Violence Against Women Act of 1994 ("VAWA"), which afford relief to aliens who are victims of domestic abuse at the hands of United States citizen spouses. In support of her motion, Maldonado submitted several documents, including her affidavit, medical notes dated March 7, 2007, and invoices reflecting payments to a psychological center.

In denying the motion to reopen, the BIA decided that Maldonado failed to establish prima facie eligibility for adjustment of status. The BIA explained that Maldonado was required to show, among other things, that her marriage was entered into in good faith, that she and her husband had shared a joint residence, and that her husband had subjected her to battery or extreme cruelty. *See* 8 U.S.C. § 1154(a)(1)(A)(iii); 8 C.F.R. § 204.2(c). The BIA concluded that the evidence of record together with the evidence submitted in support of the motion to reopen failed to make this showing.

The BIA explained that it had previously affirmed the IJ's decision that Maldonado's marriage was not entered into in good faith, that the evidence cast doubt on whether she and her husband had shared a residence, and that Maldonado's new evidence did not offset the evidence of record. **\*122** The BIA also found that Maldonado did not provide any objective evidence supporting her allegations that her husband had subjected her to battery or extreme cruelty and noted that the medical report she had submitted appeared to be inconsistent with the allegations in her affidavit. This petition for review followed.

**\*\*2** We must first address the Government's argument that we lack jurisdiction over the petition for review. The Government contends that we lack jurisdiction because the BIA's decision that Maldonado failed to establish battery or extreme cruelty was a discretionary decision not subject to judicial review, and absent jurisdiction to review this decision, we also lack jurisdiction to review the BIA's other determinations. The Government recognizes that we retain jurisdiction over colorable constitutional claims and questions of law, but argues that Maldonado has presented no such question in connection with the BIA's determination that she failed to establish extreme cruelty.

We conclude that it is unnecessary to decide our jurisdiction to review the BIA's decision that Maldonado failed to establish battery or extreme cruelty for purposes of reopening her proceedings because, as discussed below, her brief presents colorable constitutional claims and questions of law for our review. Although we ultimately conclude that these questions lack merit, they are sufficient to confer jurisdiction over the petition for review. *See* 8 U.S.C. § 1252(a)(2)(D).

**[1]** Maldonado first contends that the BIA applied the wrong legal standard in deciding whether her marriage was entered into in good faith, an element of her prima facie case for adjustment of status. She argues that the statute requires that the marriage was entered into in good faith "by the alien," 8 U.S.C. § 1154(a)(1)(A)(iii)(I)(aa), and that the BIA failed to focus on whether *she* entered into the marriage in good faith, as evidenced by its reliance on its earlier decision denying the joint petition with her husband to remove the conditions on permanent residence.

As noted by the Government, the BIA stated in its decision that Maldonado was required to show that "*her* marriage to her husband, Mr. Maldonado, was in good faith." A.R. at 3 (emphasis added). In addition, the BIA's decision reflects that it did not decide that Maldonado could not make the requisite showing based on the finding in the proceedings on her joint petition. Rather, the BIA considered the documents submitted by Maldonado and concluded that the new evidence did not offset the evidence of record regarding the bona fides of her marriage, which cast doubt on whether she and her husband lived together. In light of the evidence presented in support of the motion to reopen, which as to the bona fides of the marriage primarily consists of Maldonado's statement, Maldonado has not shown that the BIA applied the wrong legal standard.

AR.05428

 **[2]**  Maldonado also argues that she was deprived of due process because the BIA failed to make an individualized determination in her case. Relying on our decision in *Zheng v. Attorney General,* 549 F.3d 260 (3d Cir.2008), Maldonado contends the BIA made conclusory statements about the insufficiency of the evidence and failed to conduct any meaningful analysis of the evidence submitted in support of her motion to reopen. In *Zheng,* we remanded the matter to the BIA because the BIA had failed to discuss most of the evidentiary record in its decision denying reopening. *Id.* at 269.

 **\*\*3**  The BIA's decision reflects that the BIA made an individualized determination in Maldonado's case. On the issue of the **\*123**  bona fides of her marriage, the BIA addressed a spousal support order Maldonado had submitted in support of her motion to reopen and explained that the order only established the legality of her marriage. Although Maldonado faults the BIA for failing to address her statement that her husband lied in the prior proceedings to make it appear that their marriage was a sham, the BIA acknowledged this allegation in its decision. The BIA did not further discuss Maldonado's statement that her husband had lied, but she has not shown that she was prejudiced by any failure by the BIA in this regard. Maldonado's allegations that her husband lied in the prior proceedings are unsupported. In addition, Maldonado's allegations primarily concern the fact that she was unaware of the contents of her husband's tax filings and other actions he had taken, which the BIA found raised questions as to whether Maldonado and her husband lived together.

The BIA also addressed in its decision Maldonado's affidavit and medical notes dated March 7, 2007, which she submitted to support her claim of spousal abuse. The BIA found the documents inconsistent as to when Maldonado claimed she discovered that her husband was unfaithful. The BIA further noted that Maldonado stated that her husband forced her to engage in a certain sexual activity, but the medical notes stated only that she refused to engage that activity with her husband. Contrary to Maldonado's argument, the BIA thus explained why her evidence did not support her claim that she was subject to battery or extreme cruelty.

Maldonado also asserts that the BIA's conclusory statement that she failed to provide objective evidence supporting her claim of battery or extreme cruelty offends due process in light of the evidence of her ongoing psychological treatment. To the extent Maldonado is referring to the invoices reflecting payments to a psychological center, we find no error in the fact that the BIA did not address these invoices, as they do not support the conclusion that Maldonado was subjected to battery or extreme cruelty. [1]

Accordingly, we will deny the petition for review.

**All Citations**

422 Fed.Appx. 120, 2011 WL 1318897

---

**Footnotes**

1    To the extent Maldonado also argues that the BIA erred by failing to cite in its decision any cases addressing the VAWA or involving similar facts and law, Maldonado has not established any error in this regard.

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

786 F.3d 1155
United States Court of Appeals,
Ninth Circuit.

Roberto Curinsita MALDONADO, Petitioner,

v.

Loretta E. LYNCH, Attorney General, Respondent.

No. 09–71491.
|
Argued and Submitted En Banc Sept. 19, 2014.
|
Amended May 18, 2015.
|
Filed May 18, 2015.

**Synopsis**

**Background:** Mexican alien filed petition for review of an order of the Board of Immigration Appeals (BIA) dismissing his appeal of an immigration judge's (IJ) denial of his application for deferral of removal under the Convention Against Torture (CAT).

**Holdings:** In en banc proceeding, on grant of Government's motion to clarify decision, the Court of Appeals, Paez, Circuit Judge, held that:

[1] alien's removal did not render petition for review moot;

[2] alien was not required to prove that internal relocation was impossible, overruling Hasan v. Ashcroft, 380 F.3d 1114, Lemus–Galvan v. Mukasey, 518 F.3d 1081, and Singh v. Gonzales, 439 F.3d 1100; and

[3] regulations governing deferral of removal under CAT do not shift the burden to the government to establish that internal relocation would be reasonable, overruling Perez–Ramirez v. Holder, 648 F.3d 953.

Petition granted; remanded.

Gould, Circuit Judge, filed dissenting opinion in which Clifton, Ikuta, and N.R. Smith, Circuit Judges, joined.

M. Smith, Circuit Judge, filed dissenting opinion in which Clifton, Circuit Judge, joined.

Opinion, 781 F.3d 1107, amended and superseded.

West Headnotes (9)

[1]    **Aliens, Immigration, and Citizenship** ⬌ Review of initial decision or administrative review

Where the Board of Immigration Appeals (BIA) conducted its own review of the evidence and law rather than adopting the immigration judge's (IJ's) decision, appellate review is limited to the BIA's decision.

12 Cases that cite this headnote

[2]    **Federal Courts** ⬌ Want of Actual Controversy;  Mootness and Ripeness

When there are developments in a proceeding that suggest that it may be moot, the Court of Appeals has an obligation to inquire whether a case or controversy under Article III of the Constitution continues to exist. U.S.C.A. Const. Art. 3, § 1 et seq.

3 Cases that cite this headnote

[3]    **Aliens, Immigration, and Citizenship** ⬌ Decisions reviewable

Mexican alien's removal to Mexico did not render moot alien's petition for review of an order of the Board of Immigration Appeals (BIA) dismissing his appeal of an immigration judge's (IJ) denial of his application for deferral of removal under the Convention Against Torture (CAT); there was solid evidence, including recently renewed California driver's license, that alien was currently present in the United States, and obtaining deferral of removal under CAT would allow alien to remain in the United States, giving him a clear personal stake in the outcome of the lawsuit. U.S.C.A. Const. Art. 3, § 1 et seq.

26 Cases that cite this headnote

Maldonado v. Lynch, 786 F.3d 1155 (2015)

2015 Daily Journal D.A.R. 5437

**[4]** **Federal Courts** 👈 Mootness

Mootness is a jurisdictional issue. U.S.C.A. Const. Art. 3, § 1 et seq.

4 Cases that cite this headnote

**[5]** **Federal Courts** 👈 Rights and interests at stake

For a dispute to remain live without being dismissed as moot, the parties must continue to have a personal stake in the outcome of the lawsuit. U.S.C.A. Const. Art. 3, § 1 et seq.

3 Cases that cite this headnote

**[6]** **Criminal Law** 👈 Escape of accused as grounds of dismissal

The fugitive disentitlement doctrine allows the court to dismiss a criminal defendant's appeal if he flees while the appeal is pending.

**[7]** **Aliens, Immigration, and Citizenship** 👈 Right of review or intervention; standing

Fugitive disentitlement doctrine did not support dismissal of Mexican alien's petition for review of an order of the Board of Immigration Appeals (BIA) dismissing his appeal of an immigration judge's (IJ) denial of his application for deferral of removal under the Convention Against Torture (CAT), since alien complied with his deportation order and was removed to Mexico, and was not a fugitive.

21 Cases that cite this headnote

**[8]** **Aliens, Immigration, and Citizenship** 👈 Aliens able to relocate in other part of home country

**Aliens, Immigration, and Citizenship** 👈 Standard for relief

**Aliens, Immigration, and Citizenship** 👈 Presumptions and Burden of Proof

Mexican alien seeking deferral of removal under the Convention Against Torture (CAT) was not required to prove that internal relocation was impossible; overruling 🚩 Hasan v. Ashcroft, 380 F.3d 1114, 🚩 Lemus–Galvan v. Mukasey, 518 F.3d 1081, and 🚩 Singh v. Gonzales, 439 F.3d 1100. 🏷 8 C.F.R. § 1208.16(c)(3).

**[9]** **Aliens, Immigration, and Citizenship** 👈 Presumptions and Burden of Proof

Regulations governing deferral of removal under Convention Against Torture (CAT) do not shift the burden to the government to establish that internal relocation would be reasonable, since the applicant carries the overall burden of proof; overruling 🚩 Perez–Ramirez v. Holder, 648 F.3d 953. 🏷 8 C.F.R. § 1208.16(c)(3).

15 Cases that cite this headnote

**Attorneys and Law Firms**

*1157 Haitham Edward Ballout (argued), and Mairead C. Donahey, Law Offices of Haitham E. Ballout, Burlingame, California, for Petitioner.

Andrew C. MacLachlan (argued), Senior Litigation Counsel, and Ilissa M. Gould, Attorney, United States Department of Justice, Office of Immigration Litigation, Washington D.C., for Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals. Agency No. AXXX–XX3–848.

Before: ALEX KOZINSKI, KIM McLANE WARDLAW, RONALD M. GOULD, RICHARD A. PAEZ, RICHARD R. CLIFTON, MILAN D. SMITH, JR., SANDRA S. IKUTA, N. RANDY SMITH, MORGAN CHRISTEN, PAUL J. WATFORD, and MICHELLE T. FRIEDLAND, Circuit Judges.

AR.05431

Opinion by Judge PAEZ; Dissent by Judge GOULD; Dissent by Judge M. SMITH.

ORDER AND OPINION

## ORDER

The Government's Motion to Clarify Decision is granted as follows. On page 5 of the slip opinion, filed on March 27, 2015, the text of footnote 1 is amended as follows: "Because the IJ deemed Maldonado credible, we take his testimony as true for purposes of this opinion. *See, e.g., Singh v. Holder, 764 F.3d 1153, 1159 (9th Cir.2014).*"

PAEZ, Circuit Judge:

## OPINION

Roberto Curinsita Maldonado ("Maldonado") petitions for review of the Board of Immigration Appeals' ("BIA") decision dismissing his appeal of an immigration judge's ("IJ") denial of his application for deferral of removal under the Convention Against Torture ("CAT"). Although the IJ found that Maldonado testified credibly that he was tortured by corrupt Mexican police officers after he was deported in 2000, the BIA concluded that Maldonado was not "eligible for deferral of removal under [CAT] because he failed to establish that internal relocation within Mexico was impossible."

In this proceeding, Maldonado argues that, although he bears the ultimate burden to prove he would be tortured if returned to Mexico, the BIA's ruling on internal relocation is inconsistent with the plain text of the governing regulation, 8 C.F.R. § 1208.16(c)(3). He also challenges our framework in *Lemus–Galvan v. Mukasey,* 518 F.3d 1081, 1084 (9th Cir.2008), which the BIA cited in support of its ruling. We acknowledge that our case law on internal relocation under CAT departs from the text of § 1208.16(c)(3). We therefore take this opportunity sitting en banc to clarify our case law and to restore the integrity of § 1208.16(c)(3) in the analysis of a claim for deferral of removal under CAT. In light of the BIA's reliance on our interpretation of § 1208.16(c)(3), we grant the petition for review and

remand to the BIA for further proceedings consistent with this opinion.

While this petition for review was pending, Maldonado was removed to Mexico. This development prompted us to question whether this petition is moot. After considering the government's response to our post-argument inquiry, we conclude, as explained below, that this petition is not moot and proceed to the merits.

## I. Background

*Factual Basis for Torture Claim* [1]

Maldonado entered the United States in 1966 as a young child. He obtained lawful **\*1158** permanent resident status through his father. As the result of a first degree burglary conviction in 1991, he was stripped of that status in 1997 and ordered deported to Mexico. [2]

After Maldonado returned to Mexico, he attempted to settle in his family's hometown, Ciudad Hidalgo, in the state of Michoacan. As he passed through inspection at the airport in nearby Morelia, he was detained by what Maldonado described as "Mexican officers" or "Mexican judicial police" [3] who were inspecting individuals arriving after removal from the United States. The officers handcuffed him and took him to a police station. They questioned him about tattoos on his body, which they insisted were proof that he had been in a Mexican prison before relocating to Michoacan. As the police officers questioned Maldonado, they beat him, drove screwdrivers into his legs, and burned him with cigarettes, leaving multiple scars. At other points during his detention, the police officers administered shocks to his testicles and placed a bag filled with water over his head such that he believed he was choking. For approximately one month, the police detained Maldonado in a cell at the station without access to a phone. While in custody, they continued to torture him. Eventually, Maldonado was able to contact his father, who paid $15,000 for his release. The police officers did not release Maldonado to his father. Instead, they moved Maldonado by helicopter to a prison and demanded more money for his release.

After three months of captivity and torture, the police informed Maldonado that they would release him only on the condition that he guide other recent deportees into their hands. When Maldonado refused, they stabbed him in the leg

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

and beat him for two days. Fearing for his life, he agreed to participate. Maldonado's role in the criminal enterprise was to approach recent deportees at the airport, promise to assist them, and guide them to hotels that had been chosen by the police. Maldonado would instruct the deportees to wait for him in the hotel. Instead of returning, Maldonado would notify the police, who would then go to the hotel and take the deportees into custody where, according to Maldonado, they likely suffered a fate similar to his own. Maldonado received modest payments for his assistance. After he had saved enough money, Maldonado fled the enterprise and re-entered the United States illegally.

Between 2000 and 2007, Maldonado returned to the United States and was deported three separate times. Each time he returned to Mexico, he was subjected to further torture and abuse in retaliation for leaving the criminal enterprise. When he returned to Ciudad Hidalgo after his removal in 2007, the enterprise had grown in sophistication and was apprehending deportees from airports across Mexico and taking them to prisons and other locations **\*1159** in Michoacan. The corrupt officers had also expanded the enterprise to include kidnapping elected officials' children. Wanting nothing more to do with the criminal enterprise, Maldonado tried to sever his ties. When he attempted to leave the enterprise, however, he suffered further abuse. He suspected that he was being monitored and followed by the enterprise's operatives.

Maldonado approached his only relative in the area, a cousin, for help. His cousin provided Maldonado with a small amount of money, which he used to travel by bus to Sonora, near the United States–Mexico border. In 2007, Maldonado attempted to enter the United States by foot through the Arizona desert, where he was apprehended.

Maldonado asserts that if he is returned to Mexico, the enterprise will kill him because he "know[s] too much of what they were doing." In particular, Maldonado fears that he would be targeted because he overheard discussions of the enterprise's plans to begin pursuing government officials and their families. Maldonado suspects that photographs of him have been distributed to federal police "all over the place."

*Administrative Proceedings*

On July 23, 2008, the Department of Homeland Security reinstated Maldonado's June 17, 1997, removal order pursuant to 8 U.S.C. § 1231(a)(5) and 8 C.F.R. § 241.8. Because Maldonado feared that he would be tortured

if returned to Mexico, the matter was referred to an asylum officer for a reasonable fear determination. *See* 8 C.F.R. § 241.8(e). An asylum officer interviewed Maldonado, found him credible, and determined that he had a reasonable fear of being tortured by the corrupt "Mexican judicial police" if he were returned to Mexico. Maldonado's matter was next referred to an immigration judge for a hearing on his claim of torture and request for relief under CAT. *See* 8 C.F.R. § 208.31(e). In pursuit of such relief, Maldonado filed a formal application with the IJ, which he supported with a declaration outlining the above facts and other documentary evidence regarding country conditions and official corruption in Mexico.

In considering Maldonado's request for deferral of removal under CAT, the only relief he sought, the IJ credited Maldonado's testimony. The IJ, however, denied his application because Maldonado "has available to him the opportunity to relocate in the country without fear of harm." The IJ acknowledged Maldonado's testimony that the enterprise had expanded its scope by entrapping deportees from across Mexico, but reasoned that, because the enterprise had to transport those deportees to its principal base in Michoacan, its authority did not extend nationwide. The IJ determined that relocation was possible because, although police corruption in Mexico was "rampant," the government was "taking steps to investigate and prosecute those involved in corruption." The IJ thus suggested that Maldonado could trade evidence of the corruption he witnessed for the Mexican government's protection from the enterprise. Maldonado timely appealed to the BIA.

In affirming the IJ's decision, the BIA "agree[d] with the ... finding that the respondent is not eligible for deferral of removal under [CAT] because he failed to establish that internal relocation within Mexico was impossible." The BIA further explained that Maldonado "did not show that the influence of the corrupt police officers in Morelia extended country wide." According to the BIA, Maldonado's evidence that the enterprise was run by federal officers, and not city or state officers, was "speculative and unpersuasive." It reasoned that "even if corrupt federal officers **\*1160** were involved, the respondent has not shown that they could locate him in every area of Mexico." The BIA relied, in part, on documentary evidence that the Mexican government was prosecuting police corruption as further evidence that Maldonado could safely relocate. Thus, Maldonado "failed to

2015 Daily Journal D.A.R. 5437

satisfy the requirements for eligibility for deferral of removal under [CAT]."

*Petition for Review and Removal*

Maldonado filed a timely petition for review. He filed a motion for a stay of removal pending review, which a motions panel of this court denied. At oral argument, after confirming that Maldonado had been removed to Mexico, we raised the question of whether this petition was moot. We ordered the government to submit documentary proof that Maldonado was actually removed from the United States, and allowed the parties to present evidence of Maldonado's current presence in the United States. The government's response included documentation that on October 28, 2009, an immigration officer removed Maldonado to Mexico. The government's response also included documentation from the California Department of Motor Vehicles that Maldonado updated his driver's license in April 2010. Maldonado filed a response, but his counsel was unable to offer any evidence of Maldonado's present whereabouts. Neither the government nor Maldonado argues that the petition is moot.

## II. Standard of Review

**[1]** The BIA agreed with the IJ's decision but did not adopt it. Where, as here, the BIA "conduct[ed] its own review of the evidence and law rather than adopting the IJ's decision, our review is limited to the BIA's decision." *Shrestha v. Holder,* 590 F.3d 1034, 1039 (9th Cir.2010) (quoting *Hosseini v. Gonzales,* 471 F.3d 953, 957 (9th Cir.2006)) (internal quotation marks omitted).

## III. Jurisdiction

We have jurisdiction to review petitions for relief under CAT. 8 U.S.C. § 1252(a)(4).[4] Our jurisdiction encompasses legal and constitutional issues arising from claims for deferral of removal under CAT. 8 U.S.C. § 1252(a)(2)(D).

**[2]** **[3]** When there are developments in a proceeding that suggest that it may be moot, we have an obligation to inquire whether a case or controversy under Article III of the Constitution continues to exist. *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971) (per

curiam). Of concern here is Maldonado's removal to Mexico after he filed his petition for review. After considering the government's response to our concern, we conclude that our review of Maldonado's petition has not been rendered moot by his removal.

**[4]** **[5]** "Mootness is a jurisdictional issue." *Blandino– Medina v. Holder,* 712 F.3d 1338, 1341 (9th Cir.2013). It can be described as "the doctrine of standing set in a time frame." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quoting *Arizonans for Official English v. Arizona,* 520 U.S. 43, 68 n. 22, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997)). For a dispute to remain live without being dismissed as moot, "[t]he parties must continue to have a personal stake in **\*1161** the outcome of the lawsuit." *Lewis v. Cont'l Bank Corp.,* 494 U.S. 472, 478, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990) (internal quotation marks omitted).

Maldonado's petition for review continues to present a case or controversy because there is solid evidence that he is currently present in the United States. According to the government's response, since Maldonado's removal in October 2009, he has updated his California driver's license. Obtaining deferral of removal under CAT would allow Maldonado to remain in the United States, giving him a clear "personal stake in the outcome of the lawsuit." *See Lewis,* 494 U.S. at 478, 110 S.Ct. 1249 (internal quotation marks omitted).[5]

It is highly unlikely that Maldonado left the United States since he renewed his driver's license in 2010. *See Gould dissent 1165.* Maldonado applied for CAT relief because he fears that, if he returns to Mexico, the enterprise will kill him. Indeed, every time he was removed to Mexico since 2000, the enterprise found and tortured him. Maldonado has little reason to return to Mexico.

**[6]** **[7]** We disagree with Judge Gould's dissent that we should invoke the fugitive disentitlement doctrine to dismiss Maldonado's petition. *See Gould dissent 1165–66.* "The fugitive disentitlement doctrine allows us to dismiss a criminal defendant's appeal if he flees while the appeal is pending." *Antonio–Martinez v. INS,* 317 F.3d 1089, 1091 (9th Cir.2003). We have exercised our discretion to apply this equitable doctrine to immigration petitioners, noting the similarity between "[a]n alien subject to a stayed deportation order" and "a criminal defendant on bail pending appeal."

*Id.* at 1093. The alien, like the defendant, "remains subject to the court's authority and must surrender any time the court deems it appropriate." *Id.* Thus, in the immigration context, "we have dismissed petitions for review by aliens *who have fled custody* and cannot be located when their appeals come before this court." *Wenqin Sun v. Mukasey, 555 F.3d 802, 804 (9th Cir.2009)* (emphasis added); *see also Zapon v. U.S. Dep't of Justice, 53 F.3d 283, 285 (9th Cir.1995)* (discussing fugitive status where an alien "fail [ed] to surrender ... despite a lawful order of deportation"). Here, Maldonado is not a fugitive because he did not flee. He complied with his deportation order and was removed to Mexico.

We are thus satisfied that this case is not moot [6] and that it does not otherwise **\*1162** warrant our discretionary dismissal. We proceed to the merits.

### IV. CAT Claim

In 1988, the United States signed the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. 1465 U.N.T.S. 85 (1988). Article 3 of CAT states that a signatory nation must not "expel, return ... or extradite" a person to a country "where there are substantial grounds for believing that he would be in danger of being subjected to torture." *Id.* at 114. In 1998, the United States passed the FARRA, which implemented Article 3 in the United States. *See Khourassany v. I.N.S., 208 F.3d 1096, 1099 (9th Cir.2000).* The FARRA and its implementing regulations allow for relief under CAT. The implementing regulations define torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted ... by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *8 C.F.R. § 1208.18(a)(1).*

One of the available remedies under CAT is deferral of removal. [7] Under the applicable regulations:

> An alien who: has been ordered removed; has been found under *§ 1208.16(c)(3)* to be entitled to protection under [CAT]; and is subject to the provisions for mandatory denial of withholding of removal ... shall be granted

deferral of removal to the country where he or she is more likely than not to be tortured.

*Id.* § 1208.17(a). *Section 1208.16(c)(3)* further explains:

> In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered, including, but not limited to: (i) Evidence of past torture inflicted upon the applicant; (ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured; (iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and (iv) Other relevant information regarding conditions in the country of removal.

*Id.* § 1208.16(c)(3). *Section 1208.16(c)(2)* further explains: "The burden of proof is on the applicant for withholding of removal ... to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Id.* § 1208.16(c)(2).

[8] Although the BIA has not interpreted the internal relocation provision of *§ 1208.16(c)(3)*, we have addressed it on several occasions. In *Hasan v. Ashcroft,* we explained that "in the CAT context, ... **\*1163** the petitioners have the burden of presenting evidence to show that internal relocation is not a possibility." *380 F.3d 1114, 1123 (9th Cir.2004).* Citing this statement, we later denied a petition for review of an IJ decision denying deferral of removal under CAT because the petitioner "failed to establish that internal relocation within Mexico was impossible." *Lemus–Galvan, 518 F.3d at 1084.* Similarly, in *Singh v. Gonzales,* we denied a petition for review of a BIA decision denying withholding of removal under CAT in part because the petitioner did not meet his "burden of proving he 'would

2015 Daily Journal D.A.R. 5437

be unable to live elsewhere in the country safely.' " *439 F.3d 1100, 1113 (9th Cir.2006)* (quoting *Hasan, 380 F.3d at 1123*).

Our interpretation of § 1208.16(c)(3) in *Hasan,* [8] *Lemus–Galvan,* and *Singh* departs from the plain text of the regulation. Although § 1208.16(c)(2) places the burden on the petitioner "to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal," *see also Kamalthas v. I.N.S., 251 F.3d 1279, 1282 (9th Cir.2001),* neither that provision nor § 1208.16(c)(3) requires the petitioner to prove anything as to internal relocation. Rather, § 1208.16(c)(3) provides that, if such evidence is relevant, it must be considered in assessing whether it is more likely than not that the petitioner would be tortured if removed. The text of § 1208.16(c)(3) differs from the standard set forth in *Hasan* and *Lemus–Galvan* because neither that section nor § 1208.16(c)(2) requires an applicant for deferral of removal to prove that internal relocation is "impossible." *See Lemus–Galvan, 518 F.3d at 1084.* Further, *Singh* departs from § 1208.16(c)(3) because the regulation does not specify that the inability to relocate safely is an element of a claim for deferral of removal for which a petitioner bears a "burden of pro[of]." *See Singh, 439 F.3d at 1113.*

[9]    We recently addressed internal relocation under CAT in *Perez–Ramirez v. Holder, 648 F.3d 953 (9th Cir.2011).* In that case, we added a new gloss on the issue of internal relocation in § 1208.16(c)(3). Drawing from the asylum context, we held that "the BIA improperly placed the burden on petitioner to show that he could not relocate within Mexico and failed to apply the presumption of a nationwide threat." *Id.* at 958. In so holding, we relied on the burden-shifting scheme for internal relocation in the context of an asylum claim. *Id.* (citing *Melkonian v. Ashcroft, 320 F.3d 1061, 1070 (9th Cir.2003)*). The regulations governing asylum, however, differ markedly from those governing deferral of removal under CAT; they explicitly shift the burden to the government after the petitioner has established a well-founded fear of persecution:

> In cases in which the persecutor is a government or is government-sponsored, or the applicant has established persecution in the past, it shall be presumed that internal relocation would not be reasonable, unless the Service establishes by a preponderance of the evidence that, under all the circumstances, it would be reasonable for the applicant to relocate.

8 C.F.R. § 1208.13(b)(3)(ii); *see Henriquez–Rivas v. Holder, 707 F.3d 1081, 1083 (9th Cir.2013)* (en banc). The regulations governing CAT deferral, unlike the asylum regulation, do not call for any burden shifting. **\*1164** As in *Hasan, Lemus–Galvan,* and *Singh,* our interpretation of § 1208.16(c)(3) in *Perez–Ramirez* departs substantially from the text of the regulation.

*Hasan, Lemus–Galvan, Singh,* and *Perez–Ramirez* run afoul of the regulations at issue here. Section 1208.16(c)(2) provides that an applicant for deferral of removal must demonstrate that it is more likely than not that he or she will be tortured if removed. In deciding whether the applicant has satisfied his or her burden, the IJ must consider all relevant evidence, including but not limited to the possibility of relocation within the country of removal. Section 1208.16(c)(2) does not place a burden on an applicant to demonstrate that relocation within the proposed country of removal is impossible because the IJ must consider all relevant evidence; no one factor is determinative. *See* § 1208.16(c)(3)(i)-(iv); *Kamalthas, 251 F.3d at 1282.* Nor do the regulations shift the burden to the government because they state that the applicant carries the overall burden of proof. To the extent that *Hasan, Lemus–Galvan, Singh,* and *Perez–Ramirez* conflict with the plain text of the regulations, they are hereby overruled.

In its supplemental briefs the government argues that there may be certain terms in the regulations that the BIA may ultimately need to clarify, but the government stresses that clarification should be the task of the BIA in the first instance.

We do not admit that principle. Indeed, we have said that "interpretation of BIA regulations is 'a matter that is placed primarily in agency hands.' " *Brezilien v. Holder,* 569 F.3d 403, 413 (9th Cir.2009) (quoting *I.N.S. v. Ventura,* 537 U.S. 12, 16, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) (per curiam) (brackets omitted). If the BIA were to provide a new interpretation of the regulations, we would give that interpretation an appropriate level of deference. *See Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). Indeed, the BIA is not precluded from reading § 1208.16(c)(3) as requiring a CAT petitioner to show that he is unable to safely relocate within the country of removal. *See Long Island Care at Home, Ltd. v. Coke,* 551 U.S. 158, 171, 127 S.Ct. 2339, 168 L.Ed.2d 54 (2007) ("an agency's interpretation of its own regulations is controlling unless plainly erroneous or inconsistent with the regulations being interpreted") (internal quotation marks omitted).

Here, the BIA relied on *Lemus–Galvan* in affirming the denial of CAT relief, reasoning that Maldonado failed to show that internal relocation within Mexico was impossible. Although the BIA performed its own analysis, it ultimately affirmed the IJ's decision precisely because Maldonado failed to prove that relocation within Mexico was impossible. Indeed, according to the BIA, Maldonado's "fail[ure] to show that internal relocation within Mexico is impossible" constituted the very "circumstances" under which the IJ "properly found that the respondent failed to satisfy the requirements for eligibility for deferral of removal under [CAT]." The BIA's conclusion demonstrates that failure to meet the burden stated in *Lemus–Galvan* was the determinative blow to Maldonado's petition. Because *Lemus–Galvan's* interpretation of the CAT regulations is no longer controlling, we grant the petition for review and remand to the BIA for reconsideration of Maldonado's claim for deferral of removal.

**PETITION GRANTED and REMANDED.**

**\*1165** GOULD, Circuit Judge, with whom CLIFTON, IKUTA, and N.R. SMITH, Circuit Judges, join, dissenting: Maldonado for years has not been in touch with the lawyer who advocated before us. In such circumstances I believe that our proceeding to render a decision on the merits is essentially to give an advisory opinion. With the party not before us, we are engaging in what might be called "ghost ship" ruling, with the case careening along unmanned by the party seeking

relief. We thus have the "ghost" of the prior controversy but not a real and actual controversy. The Supreme Court since the early days of our country has made clear that it is not the province of federal courts to give advisory opinions, even in matters of importance to society. *See Flast v. Cohen,* 392 U.S. 83, 96 n. 14, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) ("The rule against advisory opinions was established as early as 1793."); *see generally* William R. Casto, *The Early Supreme Court Justices' Most Significant Opinion,* 29 Ohio N.U. L. Rev. 173 (2002) (detailing the history of the Jay Court's 1793 letter to George Washington declining a request for an advisory opinion).

As the majority correctly recites, mootness is a jurisdictional issue we must address. *See Blandino–Medina v. Holder,* 712 F.3d 1338, 1341 (9th Cir.2013). But I regret that after this recognition, the balance of what the majority says on jurisdiction is not in my view correct. In *Ellis v. Dyson,* the Supreme Court confronted a case in which counsel for petitioners had not had contact with their clients for a year and the petitioners were not informed regarding the progress of the litigation. 421 U.S. 426, 434, 95 S.Ct. 1691, 44 L.Ed.2d 274 (1975). The Court expressed "reservations ... as to whether a case or controversy" existed. *Id.* The Court said that unless the petitioners were found by the time the matter was considered on remand, "it [was] highly doubtful that a case or controversy could be held to exist; it is elemental that there must be parties before there is a case or controversy." *Id.* Although the statement in *Ellis v. Dyson* on which I rely might be argued to be a dictum, we have square precedent stating that we give great respect even to dicta of the United States Supreme Court. *See United States v. Montero–Camargo,* 208 F.3d 1122, 1132 n. 17 (9th Cir.2000) (en banc). Further, what the Court said in *Ellis* is right on the money so far as I am concerned.

The majority argues that there is a clear indication that Maldonado is in the country because he renewed a driver's license after the date of his removal. But even if he was here in 2010, that does not necessarily mean that he remained here to the present day. Because I do not believe our court may properly rule on cases where a party is not present— either in person or through a lawyer who is in reasonable communication with the party—I would dismiss this case as moot for lack of a present justiciable controversy under Article III.

But even if the case is not moot in a constitutional sense, we should dismiss under the doctrine of prudential mootness, which allows a court to dismiss an appeal, even if not technically moot, "if circumstances have changed since the beginning of litigation that forestall any occasion for meaningful relief." *Deutsche Bank Nat'l Trust Co. v. F.D.I.C.,* 744 F.3d 1124, 1135 (9th Cir.2014) (quoting *Hunt v. Imperial Merchant Servs., Inc.,* 560 F.3d 1137, 1142 (9th Cir.2009)); *see also Ali v. Cangemi,* 419 F.3d 722, 723–24 (8th Cir.2005) (dismissing an appeal as prudentially moot where an immigrant's whereabouts were unknown after he failed to notify immigration authorities of his change of address).

**\*1166** We have applied similar prudential reasoning in immigration cases involving the fugitive disentitlement doctrine. For example, in *Antonio–Martinez v. INS* we said:

> Those who disregard their legal and common-sense obligation to stay in touch while their lawyers appeal an outstanding deportation order should be sanctioned. The prospect of disentitlement provides a strong incentive to maintain contact with the INS and counsel, rather than taking one's continued presence in the country for granted.... By failing to report his change of address to either his lawyer or the INS for an extended period of time, [petitioner] has effectively put himself beyond the jurisdiction of the court. Because no one has any clue where [petitioner] is, his petition has the same "heads I win, tails you'll never find me" quality that justifies disentitlement in other contexts.

*317 F.3d 1089, 1093 (9th Cir.2003).* Although it might be argued that Maldonado's compliance with his removal order, even if he later returned to the United States, distinguishes his case from the petitioner's in *Antonio–Martinez,* I think the two cases are fundamentally similar in the most important respects. We cannot give Maldonado an effective remedy, just as none could be given to the petitioner in *Antonio–Martinez.* Had today's majority reached a conclusion that would deny him any relief, Maldonado would remain as unaffected by it as he is by the majority's granting the petition as they do. I think that our prudential mootness doctrine can be adapted here to function like the fugitive disentitlement doctrine.

There are many actual or potential litigants in our system who have not yet been removed and who can petition for review on the merits issues presented in this case. Moreover, there will be others who will return after removal, and who can present the same issues while staying in contact with their counsel.

We don't need to engage in "ghost ship" jurisprudence to give a ruling in a case where there is no one on board the ship of the dispute presented. Instead, we should limit invoking the awesome power of the federal courts to decide important immigration law matters to cases where parties also remain within the effective reach of our court's jurisdiction so that we can give meaningful relief. We should await such a case before deciding the issue that the majority does today. I respectfully dissent.

M. SMITH, Circuit Judge, with whom CLIFTON, Circuit Judge, joins, dissenting:

I agree with Judge Gould that we lack jurisdiction to review Maldonado's claim because his attorney is no longer in contact with him, and there is no evidence that Maldonado is presently in the United States. The only evidence in the record that Maldonado was in the United States subsequent to the date of his removal in 2009 is Maldonado's 2010 application for a driver's license in Palo Alto, California, and it was the government, not Maldonado's counsel, that supplied that evidence. Even if we assume that Maldonado personally submitted such an application in 2010, that act tells us nothing definitive about whether Maldonado has remained in the United States since then. We do know for certain that petitioner's counsel has not heard from his client in some time, and that when petitioner's counsel recently contacted Maldonado's immediate family seeking sworn declarations from them concerning petitioner's location, the family refused to communicate further with him. Thus, there is simply no evidence in the record that Maldonado is currently in the United States, and counsel confirms that he has not been in contact with the petitioner. **\*1167** Under the circumstances, the case is moot.

I write separately from Judge Gould because even if I agreed with the majority that Maldonado's petition for review continues to present a justiciable controversy, which I do not, I would affirm the decision of the BIA denying Maldonado relief under the Convention Against Torture, 1465 U.N.T.S. 85 (1988) (CAT). Article 3 of CAT provides that no country shall "expel, return ... or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." 1465 U.N.T.S. 85 (1988). The INS's regulations implementing CAT state that in determining "[e]ligibility for withholding of removal under the Convention Against Torture[,] ... [t]he burden of proof is on the applicant ... to establish that it is more likely than not that he or she would be tortured if removed to

AR.05438

the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). In making that determination, the immigration judge shall consider

> all evidence relevant to the possibility of future torture ... including, but not limited to: (i) Evidence of past torture inflicted upon the applicant; (ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured; (iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and (iv) Other relevant information regarding conditions in the country of removal.

8 C.F.R. § 1208.16(c)(3).

The petitioner is not required to prove that internal relocation is impossible; rather, that is just one factor the immigration judge must consider in assessing the likelihood of future torture. I agree with the majority that our decision in Perez–Ramirez v. Holder, 648 F.3d 953 (9th Cir.2011), must be overruled because it improperly imported into the CAT context the burden-shifting scheme for asylum claims, which places the burden on the government to show that a previously tortured petitioner can safely relocate within the country of removal. Id. at 958. I also agree that the BIA may have interpreted language in our decision in Lemus–Galvan v. Mukasey, 518 F.3d 1081, 1084 (9th Cir.2008), as setting a standard that a petitioner must "establish that internal relocation ... [is] impossible," although that was not the intent of our opinion. However, I do not agree that our decisions in Hasan v. Ashcroft, 380 F.3d 1114 (9th Cir.2004), Singh v. Gonzales, 439 F.3d 1100 (9th Cir.2006), and the substance of our opinion in Lemus–Galvan, conflict with the governing regulations. In overruling these precedents, the majority throws the baby out with the bath water, and reaches a conclusion that distorts the BIA's carefully reasoned decision in Maldonado's case.

Our decisions in Hasan, Singh, and Lemus–Galvan did not alter the burden of proof set forth in 8 C.F.R. § 1208.16(c)(3). In Hasan, we noted that "the Hasans have not presented substantial grounds for believing that they would be unable to live elsewhere in the country safely," and placed equal emphasis on the fact that "there was no substantial evidence offered that the future persecution the Hasans would experience would rise to the level of torture." 380 F.3d at 1123. Similarly, in Singh, we concluded that "[t]he record evidence does not compel a finding that it is more likely than not that Mr. Singh will be tortured upon returning to India." 439 F.3d at 1113. Moreover, we noted that:

> If Mr. Singh's fear is based on the mistaken belief of police in a certain area, he would presumably be safe in another area of India where the police do not **\*1168** take him for a separatist. The record contains no evidence that simply being an apolitical Sikh would cause police to torture Mr. Singh if they do not believe he is a separatist.

Id. In Lemus–Galvan, the petitioner sought CAT relief, alleging that if he were returned to Mexico, he would be tortured by a drug cartel family because they "had been involved in a violent turf war with members of Lemus–Galvan's extended family in the northern border regions of Mexico." 518 F.3d at 1083. On appeal, we concluded:

> Lemus–Galvan failed to establish that internal relocation within Mexico was impossible. See 8 C.F.R. § 208.16(c)(3)(ii); see also Hasan v. Ashcroft, 380 F.3d 1114, 1123 (9th Cir.2004). Substantial evidence therefore supports the IJ's decision to deny deferral of removal under the CAT. See Zheng v. Ashcroft, 332 F.3d 1186, 1194 (9th Cir.2003).

*Id.* at 1084. "Evidence that the applicant *could* relocate to a part of the country of removal where he or she is not likely to be tortured" is one of four non-exhaustive factors that the immigration judge shall consider in assessing "all evidence relevant to the possibility of future torture." 8 C.F.R. § 1208.16(c)(3) (emphasis added). *Lemus–Galvan* does not stand for the proposition that the ability to relocate is dispositive of a CAT petitioner's claim.

The BIA did not reject Maldonado's claim solely because he failed to prove that internal relocation within Mexico was impossible. The majority overstates the issue when it says that, "[A]ccording to the BIA, Maldonado's 'fail[ure] to show that internal relocation within Mexico is impossible' constituted the very 'circumstances' under which the IJ 'properly found that the respondent failed to satisfy the requirements for eligibility for deferral of removal under [CAT].' " Instead, the BIA cited Maldonado's failure to refute evidence that he could relocate to a different part of Mexico as just one factor supporting the denial of his CAT petition:

> In assessing whether it is more likely than not that the respondent would be tortured in Mexico, all evidence relevant to the possibility of future torture shall be considered, including evidence of past torture inflicted upon the respondent and evidence that the respondent could relocate where torture is unlikely. *See* 8 C.F.R. § 208.16(c)(3)(ii).

The BIA credited Maldonado's testimony that the police in Michoacán had previously tortured him, but concluded that Maldonado "did not show that the influence of the corrupt police officers located in Morelia extended country wide." The BIA went on to analyze the other factors, explaining that "the 2007 Country Report indicates that the Mexican government is aggressively prosecuting those who are involved in police corruption.... Therefore, the Mexican government will provide protection to the respondent from any corrupt police officers." The BIA determined that record evidence of other human rights violations in Mexico was not relevant to Maldonado's CAT claim because these violations were perpetrated against members of organized drug gangs, and Maldonado does not claim to be a member of such an organization. In denying Maldonado's petition, the BIA ultimately concluded: "Given that the respondent has not shown that the corrupt police officers could locate him anywhere in Mexico, and the Mexican government is aggressively prosecuting police corruption, the respondent has failed to show that internal relocation within Mexico is impossible."

A CAT petitioner is not required to conclusively prove that internal relocation is impossible—but the BIA did not hold Maldonado **\*1169** to such a standard here. I would dismiss this case as moot, but were I to reach the merits, I would affirm the decision of the BIA.

I respectfully dissent.

**All Citations**

786 F.3d 1155, 2015 Daily Journal D.A.R. 5437

## Footnotes

1    Because the IJ deemed Maldonado credible, we take his testimony as true for purposes of this opinion. *See, e.g., Singh v. Holder,* 764 F.3d 1153, 1159 (9th Cir.2014).

2    Although Maldonado's declaration in support of his CAT claim states that he was ordered deported "[i]n or around 1998," he testified that he did not leave the United States until 2000. The government, however, clarified that he was ordered removed on June 17, 1997, and was actually removed on November 7, 1998.

3    Maldonado used these English-language terms along with two additional Spanish-language terms, "judiciales" and "policiales," to describe the corrupt Mexican police officers who seized him.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2015 Daily Journal D.A.R. 5437

4    In *Nuru v. Gonzales,* we also explained that we have jurisdiction to review a claim for CAT relief under the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105–277, Div. G, Title XXII, § 2242, 112 Stat. 2681–822 (codified at 🔖 8 U.S.C. § 1231). 🔖 404 F.3d 1207, 1215 (9th Cir.2005).

5    We disagree with Judge Gould's dissent that this case warrants dismissal under the prudential mootness doctrine for several reasons. *See* Gould dissent 1165–66. First, if Maldonado ultimately prevails before the agency, he will obtain meaningful relief—deferral of removal to Mexico. Second, we have not adopted prudential mootness *per se. Hunt v. Imperial Merchant Servs., Inc.,* 560 F.3d 1137, 1142 (9th Cir.2009) (noting that some of our sister circuits have adopted the prudential mootness doctrine and, even assuming we could apply it, declining to do so). Third, we have applied prudential mootness only in the bankruptcy context, when there are no assets left to distribute. *See* 🔖 *Deutsche Bank Nat'l Trust Co. v. F.D.I.C.,* 744 F.3d 1124, 1135 (9th Cir.2014).

6    Although we give great respect to dicta of the United States Supreme Court, *see* 🔖 *United States v. Montero–Camargo,* 208 F.3d 1122, 1132 n. 17 (9th Cir.2000) (en banc), we are not persuaded by Judge Gould's dissent that the Court's statement in *Ellis v. Dyson* warrants a determination of mootness here. 421 U.S. 426, 434, 95 S.Ct. 1691, 44 L.Ed.2d 274 (1975); Gould Dissent 1165. In the context of a civil rights case about the constitutionality of a local loitering statute, the Court "observe[d] in passing" that a case or controversy may not exist on remand for several reasons, including lack of knowledge of the petitioners' whereabouts. *Id.* The Court also noted that "if petitioners no longer frequent Dallas, it is most unlikely that a sufficiently genuine threat of prosecution for possible future violations of the Dallas ordinance could be established." *Id.* In other words, if the petitioners were no longer in Dallas, prevailing would in no way affect them. By contrast, what is at issue here is Maldonado's eligibility for deferral of removal under CAT, and that determination is not affected by his location within the United States.

7    The other remedy is withholding of removal. Determining whether an alien is entitled to either form of protection under CAT requires the same analysis, so we discuss both types of cases as precedents. However, unlike deferral of removal, withholding of removal may not be granted if the alien has been convicted of a "particularly serious crime." 🔖 8 C.F.R. § 1208.16(d)(2). Both parties agree that Maldonado is only eligible for deferral of removal because his 1991 first degree burglary conviction qualifies as such a crime.

8    Hasan cites to the Department of Homeland Security regulations governing CAT claims. 🔖 8 C.F.R. § 208.16. These are the same as the Executive Office for Immigration Review regulations. 🔖 8 C.F.R. § 1208.16.

---

**End of Document**                                                           © 2020 Thomson Reuters. No claim to original U.S. Government Works.

   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Pascual-Juan v. Barr, 9th Cir., August 17, 2020

390 F.3d 1129
United States Court of Appeals,
Ninth Circuit.

Nune MAMOUZIAN, Petitioner,

v.

John ASHCROFT, Attorney General, Respondent.

No. 03–71469.
|
Submitted Sept. 2, 2004. *
|
Filed Dec. 9, 2004.

**Synopsis**
**Background:** Alien, a native and citizen of Armenia, petitioned for review of the decision of the Board of Immigration Appeals (BIA) denying her applications for political asylum, withholding of deportation, and protection under the Convention Against Torture (CAT).

**Holdings:** The Court of Appeals, Reinhardt, Circuit Judge, held that:

[1] applicant established persecution in Armenia based on political opinion;

[2] applicant demonstrated well-founded fear of future persecution;

[3] remand was required so that Attorney General could consider whether to exercise his discretion in granting asylum; and

[4] applicant failed to demonstrate that it was more likely than not that she would be persecuted if returned to home country, thus was not eligible for withholding of removal.

Petition granted in part, remanded in part, and denied in part.

West Headnotes (24)

[1] **Aliens, Immigration, and Citizenship**    Review of initial decision or administrative review

Where the Board of Immigration Appeals (BIA) affirms the decision of the Immigration Judge (IJ) denying asylum without opinion, the Court of Appeals reviews the IJ's decision.

6 Cases that cite this headnote

[2] **Aliens, Immigration, and Citizenship**    Substantial evidence in general

The Court of Appeals must uphold the decision of the Board of Immigration Appeals (BIA) denying asylum if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole.

3 Cases that cite this headnote

[3] **Aliens, Immigration, and Citizenship**    Fact Questions

The Court of Appeals reverses the decision of the Board of Immigration Appeals (BIA) denying asylum if a reasonable factfinder would be compelled to conclude that the requisite persecution or fear has been shown.

6 Cases that cite this headnote

[4] **Aliens, Immigration, and Citizenship**    Well Founded Fear of Future Persecution

A well-founded fear of future persecution as required to support an application for asylum may be established by proving either past persecution or good reason to fear future persecution.

6 Cases that cite this headnote

Mamouzian v. Ashcroft, 390 F.3d 1129 (2004)

04 Cal. Daily Op. Serv. 10,772, 2004 Daily Journal D.A.R. 14,599

**[5]    Aliens, Immigration, and Citizenship**  ⟜  Political opinion in general

Asylum applicant established persecution in Armenia based on her political opinion; applicant was arrested and beaten for participating in anti-government rally, applicant was beaten by government officials on three occasions in retaliation for applicant's political expression, one of the beatings caused applicant to lose consciousness for some time, applicant was threatened and beaten as result of articles she wrote in which she voiced opposition to corruption in ruling party, applicant's life was threatened by government authorities, and applicant's protests were directed towards policies and practices of governing party.

8 Cases that cite this headnote

**[6]    Aliens, Immigration, and Citizenship**  ⟜  Credibility

When an Immigration Judge (IJ) makes no express adverse credibility determination, the Court of Appeals accepts an asylum applicant's testimony as true.

3 Cases that cite this headnote

**[7]    Aliens, Immigration, and Citizenship**  ⟜  Threats, Harassment, and Acts of Violence

When an asylum applicant was physically harmed in home country and harm was inflicted on more than one occasion over a period of years, and where the physical abuse was combined with other incidents, such as detention and threats, the harm is severe enough that no reasonable fact-finder could conclude that it did not rise to the level of persecution.

8 Cases that cite this headnote

**[8]    Aliens, Immigration, and Citizenship**  ⟜  Weight and Sufficiency

An asylum applicant need only produce evidence from which it is reasonable to believe that the physical harm by home country's government

officials was motivated, at least in part, by an actual or implied protected ground.

1 Cases that cite this headnote

**[9]    Aliens, Immigration, and Citizenship**  ⟜  Political opinion in general

Retaliation against an individual who opposes government corruption can constitute persecution on account of political opinion.

8 Cases that cite this headnote

**[10]    Aliens, Immigration, and Citizenship**  ⟜  Political opinion in general

The salient question in determining whether retaliation against an asylum applicant who opposes government corruption can constitute persecution on account of political opinion, is whether the petitioner's opposition to corruption was directed toward a governing institution, or only against individuals whose corruption was aberrational; when the alleged corruption is inextricably intertwined with governmental operation, opposition to such an abuse of public trust is necessarily political.

10 Cases that cite this headnote

**[11]    Aliens, Immigration, and Citizenship**  ⟜  Past persecution

Once an asylum applicant demonstrates past persecution, she is entitled to a presumption of a well-founded fear of future persecution.

20 Cases that cite this headnote

**[12]    Aliens, Immigration, and Citizenship**  ⟜  Subjective and Objective Tests

In order to qualify for asylum on the basis of a fear of future persecution, applicant's fear must be both subjectively genuine and objectively reasonable; the reasonableness of the fear must be determined in the political, social, and cultural milieu of the place where the applicant lived, and even a ten percent chance of persecution may establish a well-founded fear.

04 Cal. Daily Op. Serv. 10,772, 2004 Daily Journal D.A.R. 14,599

2 Cases that cite this headnote

[13]  **Aliens, Immigration, and Citizenship** 🔑 Constitutional and Statutory Provisions

**Aliens, Immigration, and Citizenship** 🔑 Standard and Scope of Review

Just as deportation statutes must be construed in favor of the alien because deportation is a harsh measure all the more replete with danger when the alien makes a claim that he or she will be subject to death or persecution if forced to return to his or her home country, the briefs of aliens seeking refugee status must be reviewed with lenity and any ambiguities must be resolved in their favor.

3 Cases that cite this headnote

[14]  **Aliens, Immigration, and Citizenship** 🔑 Presentation of questions in brief or petition

**Aliens, Immigration, and Citizenship** 🔑 Effect of irregularities; harmless or prejudicial error

Even if asylum applicant does not sufficiently raise the claim of future persecution in her brief, the Court of Appeals retains discretion to decide the merits of the claim on appeal where the government briefed it, and thus suffers no prejudice from the applicant's failure to properly raise the issue.

2 Cases that cite this headnote

[15]  **Federal Courts** 🔑 Briefs

The Court of Appeals may review an issue not presented in an opening brief if a failure to do so would result in a manifest injustice.

[16]  **Aliens, Immigration, and Citizenship** 🔑 Political opinion in general

Asylum applicant demonstrated well-founded fear of future persecution; applicant was arrested, brought to court, and prohibited from leaving home country because she was engaged in anti-government political expression, government authorities threatened that applicant would be jailed, even possibly killed, if she continued speaking out against corruption in ruling party, applicant had endured arrests, beatings, and detention on account of her political expression in home country, and state department home country reports depicted a country rife with political corruption and police abuse.

15 Cases that cite this headnote

[17]  **Aliens, Immigration, and Citizenship** 🔑 Weight and Sufficiency

In general, an asylum applicant satisfies the subjective component of the well-founded fear test by testifying credibly about his fear of future persecution.

4 Cases that cite this headnote

[18]  **Aliens, Immigration, and Citizenship** 🔑 Threats, Harassment, and Acts of Violence

Specific threats can give rise to a well-founded fear of future persecution, even when an asylum applicant has not suffered past persecution.

7 Cases that cite this headnote

[19]  **Aliens, Immigration, and Citizenship** 🔑 Well Founded Fear of Future Persecution

An asylum applicant's ability to escape her persecutors does not undermine her claim of a well-founded fear of future persecution, even when she succeeds in obtaining government documents that permit her to depart.

4 Cases that cite this headnote

[20]  **Aliens, Immigration, and Citizenship** 🔑 Findings or statement of reasons

**Aliens, Immigration, and Citizenship** 🔑 Remand

04 Cal. Daily Op. Serv. 10,772, 2004 Daily Journal D.A.R. 14,599

Immigration Judge (IJ) abused his discretion in failing to balance all of the factors in favor of a discretionary grant of asylum against the factors that he identified as negative, and thus remand was required so that Attorney General could consider whether to exercise his discretion in granting asylum; IJ based his discretionary decision on his erroneous rejection of asylum applicant's underlying persecution claim and Court of Appeals found that applicant had suffered past persecution on account of political opinion and that applicant had well-founded fear of future persecution.

13 Cases that cite this headnote

[21]    **Aliens, Immigration, and Citizenship** 🔗 Eligibility; Refugee Status

In order to secure entry to the United States and to escape their persecutors, genuine refugees may lie to immigration officials and use false documentation.

1 Cases that cite this headnote

[22]    **Aliens, Immigration, and Citizenship** 🔗 Weight and Sufficiency

When an asylum applicant who fears deportation to his country of origin uses false documentation or makes false statements in order to gain entry to a safe haven, that deception does not detract from but supports his claim of fear of persecution.

9 Cases that cite this headnote

[23]    **Aliens, Immigration, and Citizenship** 🔗 Particular cases

Applicant for withholding of removal failed to demonstrate that it was more likely than not that she would be persecuted if returned to home country, and thus was not eligible for withholding of removal. Immigration and Nationality Act, § 241(b)(3), as amended, 🔖 8 U.S.C.A. § 1231(b)(3).

[24]    **Aliens, Immigration, and Citizenship** 🔗 Discretionary or mandatory

While asylum is discretionary, an applicant is entitled to withholding of removal if the evidence demonstrates a clear probability that the applicant would be persecuted were he to be deported to his home country.

1 Cases that cite this headnote

**Attorneys and Law Firms**

*1131 Asbet A. Issakhanian, Glendale, CA, for the petitioner.

Peter D. Keisler, Terri J. Scadron, and Leslie McKay, Washington, D.C., for the respondent.

On Petition for Review of an Order of the Board of Immigration Appeals. Agency No. AXX–XXX–616.

Before REINHARDT, WARDLAW, and PAEZ, Circuit Judges.

**Opinion**

REINHARDT, Circuit Judge.

Nune Mamouzian, a native and citizen of Armenia, petitions for review of a decision of the Board of Immigration Appeals ("BIA"). The BIA affirmed without opinion *1132 the Immigration Judge's ("IJ") denial of her applications for political asylum, withholding of deportation, and protection under the Convention Against Torture ("CAT"). We have jurisdiction over her petition for review pursuant to 🚩 8 U.S.C. § 1252. We conclude that the IJ erred in determining that Mamouzian has not established a well-founded fear of future persecution on account of political opinion. Therefore, we grant Mamouzian's petition for review and remand.

I.

Mamouzian testified to the following at her asylum hearing before the IJ: She worked as an electrical engineer for a state-owned factory from 1989 through the fall of 1995. In September 1995, the director of the factory, a member of

the ruling "HeHeShe" party, [1] asked Mamouzian to help sell the factory's machinery to governments in Iran, Libya, and North Korea. After assisting in a couple of transactions over the course of three months, she told the factory director that she opposed the dismantling of the factory despite the profits such sales would bring to the government because she "did not want the factory to ... stay jobless." The director became very angry with her and called the police. After arresting Mamouzian, the police hit and kicked her until she lost consciousness. She was detained for one week and released only after her family paid a fine. After the arrest, Mamouzian was fired from the factory and was subsequently unable to find another job.

Approximately one year later, Mamouzian participated in a massive anti-government rally, demanding the resignation of the ruling HeHeShe party officials. She and other demonstrators who were holding banners in the front row of the crowd were attacked and arrested by the police. At the police station, Mamouzian explained why she opposed the HeHeShe party, at which point the officers beat her for about twenty minutes. The next day, she was taken to court, where she testified regarding her opposition to the HeHeShe party's policies, including the policy of dismantling and selling off government factories, and her disgust with political corruption. According to Mamouzian, the judge became so upset by her testimony that he accused her of being "an anti-government person" and forbade her to leave the country for two years. Again, the authorities released her only after her family paid a fine.

After Mamouzian's court appearance, government personnel began to follow her and, on several occasions, threatened her life. On June 5, 1997, two government officials searched Mamouzian's home and found articles that she had authored criticizing the ruling party and protesting government corruption. Then, "[t]hey started slapping me on my face and kicked me. I fell down and they said 'we catch you with something similar again, we will jail you.'" Fearing for her safety, Mamouzian fled Armenia for Moscow. In Moscow, she worked with a smuggler (whom she referred to as a "mediator"), to get a visa to Mexico; from Mexico she entered the United States.

In an oral decision issued in September 1999, an IJ denied Mamouzian's applications for asylum, withholding of deportation, and protection under CAT. He concluded that Mamouzian's experiences did not rise to the level of persecution and were not on account of her political opinion.

According to the IJ, opposition to "corruption is not a ground[ ] for a grant of asylum in the United States." Furthermore, **\*1133** the IJ concluded that Mamouzian's ability to leave the country using her own passport undermined her claim that she had a well-founded fear of persecution by Armenian authorities, and he found that her fear was not objectively reasonable in light of the conditions in Armenia. Finally, he concluded that she would not be eligible for asylum as a matter of discretion, even if she were statutorily eligible, because she had used fraudulent documents to enter the United States and had failed to seek asylum in Russia or Mexico. In addition, the IJ denied Mamouzian's CAT claim, asserting that she indicated "nothing more than a gentle description of an alleged beating and mistreatment."

On March 17, 2003, one member of the Board affirmed the decision of the IJ without opinion. This petition for review followed.

## II.

**[1]** **[2]** **[3]** Where, as here, the BIA affirms the IJ's decision without opinion, we review the IJ's decision. *Falcon Carriche v. Ashcroft,* 350 F.3d 845, 849 (9th Cir.2003). We must uphold the decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) (citation omitted). We reverse if a reasonable factfinder would be compelled to conclude that the requisite persecution or fear has been shown. *Id.* at 483–84, 112 S.Ct. 812; *Singh v. INS,* 134 F.3d 962, 966 (9th Cir.1998).

**[4]** To establish eligibility for asylum, Mamouzian must prove that she is unable or unwilling to return to her home country because of a well-founded fear of future persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion ...." 8 U.S.C. § 1101(a)(42)(A); *see INS v. Cardoza–Fonseca,* 480 U.S. 421, 428, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). "A well-founded fear of future persecution may be established by proving either past persecution or 'good reason' to fear 'future persecution.' " *Navas v. INS,* 217 F.3d 646, 654 (9th Cir.2000) (citation omitted).

**[5]** **[6]** According to the IJ, the physical abuse Mamouzian suffered was too "gentle" to rise to the level of persecution. The government on appeal similarly argues that the "physical abuse" was "mild." Yet Mamouzian testified that she was beaten by government officials on three occasions, on two of which she was also kicked. One of the beatings and kickings caused her to lose consciousness for some period. She further testified that she was jailed twice in retaliation for her political expression, and that her life was threatened by government authorities on other occasions as well. Because the IJ made no express adverse credibility determination, we accept her testimony as true. *See* *Lim v. INS,* 224 F.3d 929, 933 (9th Cir.2000). [2]

**\*1134** **[7]** We have consistently found persecution where, as here, the petitioner was physically harmed. *Duarte de Guinac v. INS,* 179 F.3d 1156, 1161 (9th Cir.1999). Where such harm was inflicted on more than one occasion over a period of years, and where the physical abuse was combined with other incidents, such as detention and threats, "the harm is severe enough that no reasonable fact-finder could conclude that it did not rise to the level of persecution ...." *Chand v. INS,* 222 F.3d 1066, 1074 (9th Cir.2000); *see also* *Korablina v. INS,* 158 F.3d 1038, 1044 (9th Cir.1998) (cumulative effect of several instances of violence and harassment compel finding of past persecution). [3] Indeed, we have held that death threats alone can compel a finding of past persecution, especially when those threats occur in conjunction with detention, attacks, or even close confrontations. *See, e.g.,* *Ruano v. Ashcroft,* 301 F.3d 1155, 1159–60 (9th Cir.2002); *Salazar–Paucar v. INS,* 281 F.3d 1069, 1074–75 (9th Cir.2002); *Reyes–Guerrero v. INS,* 192 F.3d 1241, 1245–46 (9th Cir.1999); *Leiva–Montalvo v. INS,* 173 F.3d 749, 751 (9th Cir.1999). Thus, there is no doubt that Mamouzian has made a sufficient showing of persecution. We hold that any reasonable fact-finder would be compelled to conclude that the repeated beatings, arrests, and threats suffered by Mamouzian constitute persecution within the meaning of the asylum statute; the IJ erred in dismissing her experiences as "gentle" beatings.

**[8]** The IJ also erred in concluding that the persecution was not on account of political opinion. The second and third attacks were unquestionably in retaliation for Mamouzian's

political expression: She was arrested and beaten for participating in an anti-government rally, and was threatened and beaten as a result of articles she wrote in which she voiced opposition to corruption in the ruling party. In addition, the first attack, which occurred after Mamouzian voiced her opposition to the sale of state-owned factory equipment, was also at least in part "on account of" political opinion. Mamouzian expressed opposition to the economic policies of the ruling HeHeShe party as implemented in the state-run factory. The consequence was her arrest, beating, and detention. That Mamouzian's supervisor might also have been motivated by personal dislike, as the government contends, does not undermine Mamouzian's claim of persecution. An applicant need only produce evidence from which it is reasonable to believe that the harm was motivated, at least in part, by an actual or implied protected ground. *Borja v. INS,* 175 F.3d 732, 736 (9th Cir.1999) (en banc); *see also* *Agbuya v. INS,* 241 F.3d 1224, 1228 (9th Cir.2001).

**[9]** **[10]** The IJ's conclusion that persecution resulting from opposition to government corruption cannot form the basis for an asylum claim is without support. Indeed, we have repeatedly held that retaliation against an individual who opposes government corruption can constitute persecution on account of political opinion. *See* *Hasan v. Ashcroft,* 380 F.3d 1114, 1120–21 (9th Cir.2004); *Njuguna v. Ashcroft,* 374 F.3d 765, 770–71 (9th Cir.2004); **\*1135** *Grava v. INS,* 205 F.3d 1177, 1181 (9th Cir.2000). The "salient question" is whether the petitioner's opposition to corruption was "directed toward a governing institution, or only against individuals whose corruption was aberrational." *Grava,* 205 F.3d at 1181. "When the alleged corruption is inextricably intertwined with governmental operation," opposition to "such an abuse of public trust is necessarily political." *Id.* In this case, Mamouzian's acts of protest were directed toward the policies and practices of the governing party, and not against "aberrational" corrupt practices of a single individual. Thus, the IJ's conclusion that Mamouzian's persecution was not on account of political opinion is clearly at odds with the record and with circuit law.

In sum, Mamouzian has demonstrated that her experiences rose to the level of persecution, that the persecution was on account of political opinion, and that it was perpetrated by government officials. Accordingly, the record compels a

conclusion that she suffered past persecution. *See* Chand, 222 F.3d at 1073.

### III.

**[11]** Once a petitioner demonstrates past persecution, she is entitled to a presumption of a well-founded fear of future persecution. *See* Korablina v. INS, 158 F.3d 1038, 1043 (9th Cir.1998). The government must then rebut that presumption by demonstrating by a preponderance of the evidence that country conditions have changed or that relocation is possible, so that the petitioner no longer has a well-founded fear that she would be persecuted if she were to return. *See* 8 C.F.R. § 208.13(b)(1). Here, the IJ did not apply the presumption and therefore did not consider whether the government met its rebuttal burden. In such cases, we sometimes remand for the agency to resolve the question of changed conditions in the first instance. *See* INS v. Ventura, 537 U.S. 12, 14, 17–18, 123 S.Ct. 353, 154 L.Ed.2d 272(2002) (per curiam); Lopez v. Ashcroft, 366 F.3d 799, 806–07 (9th Cir.2004). Under some circumstances, however, such as where the government has made no arguments before the IJ or the BIA concerning changed conditions, we do not remand. *See* Baballah v. Ashcroft, 367 F.3d 1067, 1078 n. 11 (9th Cir.2004); Ndom v. Ashcroft, 384 F.3d 743, 756 (9th Cir.2004). Here, we need not decide whether remand for an analysis of changed conditions would be necessary because we conclude that Mamouzian has demonstrated a well-founded fear of future persecution independent of any finding of past persecution and independent of the consequent presumption that such fear exists.

After deciding that Mamouzian had not demonstrated past persecution, the IJ went on to consider whether, even so, she had an objectively well-founded fear of future persecution. He concluded that she had not met her burden in that regard. Because the agency made a full and reasoned determination on the question of well-founded fear, we do not remand for further consideration. Instead, we review the decision to determine whether it was supported by substantial evidence. *See* Khup v. Ashcroft, 376 F.3d 898, 904 (9th Cir.2004) (declining to remand for an analysis of changed country conditions because applicant established a well-founded fear without the benefit of the presumption).

In order to qualify for asylum on the basis of a fear of future persecution, Mamouzian's fear "must be both subjectively [genuine] and objectively reasonable." Hoxha v. Ashcroft, 319 F.3d 1179, 1182 (9th Cir.2003) (alteration in original) (internal citations and quotation marks omitted). "The reasonableness of the fear must be determined in the political, social and cultural milieu of the place where the petitioner lived[,] and even a ten percent chance of persecution may establish a well- **\*1136** founded fear." Khup, 376 F.3d at 904 (alteration in original) (internal citations and quotation marks omitted); *see also* INS v. Cardoza–Fonseca, 480 U.S. 421, 431, 440, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); Al–Harbi v. INS, 242 F.3d 882, 888 (9th Cir.2001).

**[13]** **[14]** **[15]** The government argues that Mamouzian has waived her opportunity to challenge the IJ's decision regarding her fear of future persecution by failing to properly brief the issue. Mamouzian's brief may not be perfectly written, but it is not difficult to discern the point she is trying to make. The brief discusses the grounds upon which a grant of asylum can be made, explains that the basis for Mamouzian's fear is her political opinion, and argues that she "is more than likely to suffer future persecution should [she] return to Armenia." We will not ignore the ultimate objective of Mamouzian's appeal—to demonstrate that she has a well-founded fear of future persecution—by parsing her brief's language in a hyper technical manner. Just as deportation statutes must be construed in favor of the alien because deportation is a "harsh measure ... all the more replete with danger when the alien makes a claim that he or she will be subject to death or persecution if forced to return to his or her home country," Cardoza–Fonseca, 480 U.S. at 449, 107 S.Ct. 1207; *see also* INS v. St. Cyr, 533 U.S. 289, 320, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001); Kwai Fun Wong v. United States, 373 F.3d 952, 962 (9th Cir.2004), the briefs of aliens seeking refugee status must be reviewed with lenity and any ambiguities must be resolved in their favor. *See* Ndom, 384 F.3d at 750–51 (construing an "inartful" brief in petitioner's favor). Thus, Mamouzian's brief is sufficient to raise a claim of a well-founded fear of future persecution. [4]

**[16]** **[17]** We also reject the government's alternative argument, that Mamouzian's fear of political persecution is neither subjectively genuine nor objectively reasonable. In general, an alien satisfies the subjective component of the

well-founded fear test by testifying credibly about her fear of future persecution. *See* Korablina, 158 F.3d at 1044. The government contends that this case is different, because while Mamouzian testified that she fears punishment on account of violating the court order that prohibited her from leaving the country, she does not genuinely fear persecution on account of political opinion. In light of the circumstances surrounding the imposition of the court order, this argument makes little sense. Mamouzian was arrested, brought to court, and prohibited from leaving the country because she engaged in anti-government political expression. Any punishment that occurs as a result of the court proceedings and order necessarily constitutes punishment on account of political opinion. [5]

**\*1137**  **[18]**  **[19]**  The record also compels the conclusion that Mamouzian's fear of future persecution is objectively reasonable. Government authorities threatened that she would be jailed, and even possibly killed, if she continued to speak out against corruption in the ruling party. Specific threats can give rise to a well-founded fear of future persecution, even when a petitioner has not suffered past persecution.

*See, e.g.,* Lim v. INS, 224 F.3d 929, 936 (9th Cir.2000); Mgoian v. INS, 184 F.3d 1029 (9th Cir.1999) (holding that an Armenian woman who was threatened and harassed, but never physically harmed, had a well founded fear of future persecution). Mamouzian had already endured arrests, beatings, and detention on account of her political expression. In light of these experiences, a reasonable fact-finder would be compelled to conclude that her fear of future persecution was objectively reasonable. [6] Contrary to the IJ's assertion, Mamouzian's successful evasion of government authorities and flight from Armenia does not make her fear any less objectively reasonable. A petitioner's ability to escape her persecutors does not undermine her claim of a well-founded fear of future persecution, even when she succeeds in obtaining government documents that permit her to depart. *See* Khup, 376 F.3d at 905 (rejecting argument that petitioner's ability to procure a passport belied his claim of persecution because "there [wa]s no evidence in the record on which to conclude that the ability to renew a passport signifies that a person does not have a genuine fear of future persecution"); Hoxha, 319 F.3d at 1184 ("[T]he fact that Hoxha received a passport does not alter our conclusion that Hoxha has presented evidence that compels a finding that he entertains a well-founded fear of persecution.").

Notwithstanding Mamouzian's testimony, the IJ rejected her claim of a well-founded fear on the grounds that freedom of assembly and political opinion are formally guaranteed by the Armenian constitution, that "political intimidation has remained, for the most part, episodic, rather than systemic," and that "[t]here were no reports of political killings" or "politically motivated disappearances." In so doing, the IJ impermissibly "extrapolat[ed] specific findings regarding an applicant from general information about country conditions reflected in State Department reports," Hoque v. Ashcroft, 367 F.3d 1190, 1197–98 (9th Cir.2004), while simultaneously mischaracterizing the conclusions of the reports. Contrary to the IJ's assertions, the country reports in the record actually bolster Mamouzian's testimony by depicting a country rife with political corruption and police abuse. According to the reports, there have been widespread irregularities in elections, making peaceful political change difficult. *See* U.S. Dept. of State, *Armenia Country Report on Human Rights Practices for 1996* at 1; U.S. Dept. of State, *Armenia Country Report on Human Rights Practices for 1998* at 2. Arbitrary arrests and detentions without warrants are common and "[m]embers of the security forces routinely beat detainees during arrest and interrogation." *1998 Country Report* at 2. The judicial system is not independent and prison conditions are poor. *Id.* at 4. In short, the evidence of country conditions contained in the record demonstrates that the beatings, detention, and threats Mamouzian experienced are not atypical or unusual in Armenia.  **\*1138**  Consequently, the record compels the conclusion that her fear of future persecution is objectively reasonable.

### IV.

**[20]**  Because Mamouzian is statutorily eligible for asylum, the Attorney General must determine whether she is entitled to asylum as a matter of discretion. *See* Kalubi v. Ashcroft, 364 F.3d 1134, 1137 (9th Cir.2004). It is not clear from the IJ's decision whether he has already made a negative discretionary determination, or whether he simply noted that if Mamouzian had been statutorily eligible, her failure to apply for asylum in Russia and her unlawful entrance into the United States might have resulted in a negative ruling. Because the government asserts that the IJ did make such a determination, we will discuss that part of his decision briefly.

Assuming the ruling included a discretionary determination, that part of the IJ's decision must also be reversed. First, the IJ abused his discretion in failing to balance all of

the factors in favor of a discretionary grant against the factors that he identified as negative. *See id.* at 1139, 1140 & n. 6 (explaining that discretionary denials must show that the agency considered and weighed positive factors as well as negative factors). Instead, the IJ based his discretionary decision on his erroneous rejection of Mamouzian's underlying persecution claim. That is, his faulty determination that Mamouzian was not *eligible* for asylum impermissibly colored his discussion of whether or not she was *entitled* to asylum. As a result, he failed to acknowledge and consider the past harm and future danger that qualified Mamouzian for refugee status.

Second, in determining that Mamouzian's stay in Russia should weigh against her for the purposes of his discretionary determination, the IJ relied on *Matter of Pula,* 19 I & N Dec. 467 (BIA 1987), a case that had already been superceded in relevant part by a new regulation. *See Andriasian v. INS,* 180 F.3d 1033, 1043–44 (9th Cir.1999). Stays in third countries are now governed by 8 C.F.R. § 208.15, which specifies how and when an opportunity to reside in a third country justifies a denial of asylum.[7] Indeed, the government implicitly concedes that because of the reliance on *Matter of Pula,* the IJ's discretionary determination cannot stand.

[21]    [22]    Finally, the way in which Mamouzian entered this country is worth little if any weight in the balancing of positive and negative factors. We have recognized that, in order to secure entry to the United States and to escape their persecutors, genuine refugees may lie to immigration officials and use false documentation. *See Akinmade v. INS,* 196 F.3d 951, 955 (9th Cir.1999). When a petitioner who fears deportation to his country of origin uses false documentation or makes false statements in order to gain entry to a safe haven, that deception "does not detract from but supports his claim of fear of persecution." *Id.* (quoting *Turcios v. INS,* 821 F.2d 1396, 1400–01 (9th Cir.1987)). Accordingly, it would be anomalous for an asylum seeker's means of entry to render her ineligible for a favorable exercise of discretion.

**\*1139** We remand so that the Attorney General may consider whether to exercise his discretion in light of our holding

that Mamouzian suffered past persecution on account of political opinion and that she has a well-founded fear of future persecution.

V.

[23]    [24]    While asylum is discretionary, a petitioner is entitled to withholding of removal "if the evidence demonstrates a clear probability that the applicant would be persecuted were he to be deported to his home country." *Gui v. INS,* 280 F.3d 1217, 1230 (9th Cir.2002) (internal quotation marks and citation omitted). If a petitioner meets this high standard, the Attorney General must grant withholding under 8 U.S.C. § 1231(b)(3). Although Mamouzian has demonstrated that she has a reasonable fear of future persecution, we cannot conclude that the record compels a finding that it is *more likely than not* that Mamouzian will be persecuted upon return.

Likewise, the record does not compel the conclusion that it is more likely than not that Mamouzian will be tortured upon return to Armenia. Therefore, we affirm the IJ's denial of her petition for protection under CAT. *See* 8 C.F.R. § 208.16(c) (2002).

VI.

For the foregoing reasons, we grant the petition for review and find Mamouzian statutorily eligible for asylum. We remand solely for an exercise of statutory discretion. However, we affirm the IJ's decision that Mamouzian does not meet the criteria for withholding of removal and protection under CAT and deny the petition as to those forms of relief.

**GRANTED in part; REMANDED in part; DENIED in part.**

**All Citations**

390 F.3d 1129, 04 Cal. Daily Op. Serv. 10,772, 2004 Daily Journal D.A.R. 14,599

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

04 Cal. Daily Op. Serv. 10,772, 2004 Daily Journal D.A.R. 14,599

## Footnotes

\*      This panel unanimously finds this case suitable for decision without oral argument. See Fed. R.App. P. 34(a)(2).

1      While the transcript refers to the ruling party as "Herhersher," Mamouzian's asylum application and the State Department Reports refer to it as "HeHeShe" or the Armenian National Movement ("ANM"). We will use "HeHeShe."

2      On appeal, the government does not assert that the IJ made any adverse credibility determination, nor does it contend that Mamouzian's testimony should be discredited. We take the government's case as it is presented to us.

     In any event, even if the IJ's adverse comments were treated as an adverse credibility determination, such determination would not be supported by substantial evidence and therefore would require reversal. See Gui v. INS, 280 F.3d 1217, 1225 (9th Cir.2002). The IJ provided no "legitimate articulable basis to question the petitioner's credibility," nor did he offer a "specific, cogent reason" for his disbelief, as required by our precedent. See Shah v. INS, 220 F.3d 1062, 1067 (9th Cir.2000) (internal citations and quotation marks omitted). Instead, his comments were based on "impermissible speculation and conjecture" about what "[government] authorities would or would not do under certain circumstances." Ge v. Ashcroft, 367 F.3d 1121, 1124–25 (9th Cir.2004); see also Salaam v. INS, 229 F.3d 1234, 1238 (9th Cir.2000).

3      The government points to Prasad v. INS, 47 F.3d 336, 339 (9th Cir.1995), for the proposition that beatings on account of political activity do not rise to the level of past persecution. However, as we pointed out in Chand, "the beating at issue [in Prasad ] was a single, non-serious incident," that occurred in the immediate aftermath of a coup, and "no one in Fiji had any 'continuing interest' in persecuting Prasad beyond that one event." Chand, 222 F.3d at 1075. Here, Mamouzian was not only detained twice, and beaten on three occasions, but the government continued to engage in surveillance and threats even after her release from her second detention.

4      Even if Mamouzian had not sufficiently raised the claim of future persecution, we retain discretion to decide the merits of her claim " 'because the government briefed it, and thus suffers no prejudice from [the petitioner's] failure to properly raise the issue.' " Ndom, 384 F.3d at 751 (quoting Singh v. Ashcroft, 361 F.3d 1152, 1157 n. 3 (9th Cir.2004)). Furthermore, we may review an issue not presented in an opening brief if a failure to do so would result in a manifest injustice. Koerner v. Grigas, 328 F.3d 1039, 1048–49 (9th Cir.2003).

5      Furthermore, we have held that an alien qualifies for asylum if she can demonstrate that she would be subject to severe penalties for her illegal departure or unauthorized stay abroad and that she left or has remained abroad on account of race, religion, nationality, membership in a social group, or political opinion. Rodriguez–Roman v. INS, 98 F.3d 416, 429 (9th Cir.1996).

6      Were Mamouzian to refrain from political protest in the future, she very well might be able to escape future persecution. However, just as we do not require a petitioner to convert to a government-supported religion in order to avoid persecution, we do not require renunciation of anti-government political beliefs.

7      Mamouzian testified that she stayed in Russia only long enough to arrange travel to the United States and that she was unable to obtain legal status in Russia. She pointed to documentary evidence indicating that popular opposition to the resettlement of Armenians was widespread, resulting in harassment, discrimination, and violence against Armenian refugees. Thus, Mamouzian was not "firmly resettled" in Russia within the meaning of 8 C.F.R. § 208.15, and she remains eligible for asylum in the United States. The government does not contend otherwise.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

04 Cal. Daily Op. Serv. 10,772, 2004 Daily Journal D.A.R. 14,599

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

932 F.3d 650
United States Court of Appeals, Eighth Circuit.

Shuli MARAMBO Petitioner

v.

William P. BARR, Attorney General
of the United States Respondent

No. 18-2331
|
Submitted: March 12, 2019
|
Filed: July 26, 2019

**Synopsis**

**Background:** Alien, a citizen of the Democratic Republic of Congo (DRC), petitioned for review of the affirmance, by the Board of Immigration Appeals (BIA), of the denial of his applications for adjustment of status, asylum, withholding of removal, and relief under the Convention Against Torture (CAT), as well as of an order for his removal.

**Holdings:** The Court of Appeals, Shepherd, Circuit Judge, held that:

[1] Immigration Judge (IJ) and BIA did not impermissibly rely on facts relating to an uncharged crime;

[2] Court lacked jurisdiction to review the denial of alien's request for withholding of removal; and

[3] Court was unable to review claim that BIA should have applied a de novo standard of review when concluding that alien was ineligible for relief under CAT.

Petition denied.

**Procedural Posture(s):** Review of Administrative Decision.

West Headnotes (16)

[1]    **Aliens, Immigration, and Citizenship** 🔑 Jurisdiction and venue

Where the petitioner is removable as a criminal alien, Court of Appeals' jurisdiction is limited to constitutional claims and questions of law.

[2]    **Administrative Law and Procedure** 🔑 Aliens, Immigration, and Citizenship

**Aliens, Immigration, and Citizenship** 🔑 Law questions

Court of Appeals reviews questions of law de novo but accords substantial deference to Board of Immigration Appeals' interpretation of immigration statutes and regulations.

[3]    **Aliens, Immigration, and Citizenship** 🔑 Presentation and preservation of questions at administrative level

Alien failed to exhaust his administrative remedies, and therefore Court of Appeals was unable to review his claim, raised for first time on a petition for review, that Board of Immigration Appeals' (BIA) prior interpretations of the particularly serious crime bar were contrary to law and not entitled to deference; alien was challenging determination that his Minnesota offense of being a prohibited person in possession of a firearm was a particularly serious crime that rendered him ineligible for withholding of removal. Immigration and Nationality Act § 241, 🔖 8 U.S.C.A. § 1231(b)(3)(B)(ii); 🔖 Minn. Stat. Ann. § 624.713.

1 Cases that cite this headnote

[4]    **Aliens, Immigration, and Citizenship** 🔑 Exhaustion of remedies in general

Court of Appeals, on review of the denial of alien's applications for adjustment of status, asylum, withholding of removal, and relief under the Convention Against Torture (CAT), as well as of an order for his removal, would apply the court-imposed doctrine of administrative exhaustion; alien did not dispute that he

was represented or that the proceedings were adversarial.

**[5]**    **Aliens, Immigration, and Citizenship**    Exhaustion of remedies in general

Regardless of whether Court of Appeals is precluded by statute from addressing unexhausted issues in removal proceedings, a court-imposed exhaustion requirement is appropriate where the proceedings before the Immigration Judge (IJ) and the Board of Immigration Appeals (BIA) were adversarial in nature and the petitioner was represented by counsel. Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(d)(1).

**[6]**    **Aliens, Immigration, and Citizenship**    Determination

Board of Immigration Appeals (BIA) can reexamine, and if it wants, overrule, a precedent.

**[7]**    **Administrative Law and Procedure**    Exhaustion of Administrative Remedies

Court of Appeals applies the court-imposed doctrine of administrative exhaustion because it has consistently recognized the preference to allow the agency an opportunity to correct its own mistakes.

1 Cases that cite this headnote

**[8]**    **Aliens, Immigration, and Citizenship**    Crimes and Related Grounds

Immigration Judge (IJ) and Board of Immigration Appeals (BIA) did not impermissibly rely on facts relating to alien's purported commission of an uncharged crime, attempted burglary, to determine that his Minnesota conviction for being a prohibited person in possession of a firearm was a particularly serious crime that rendered him ineligible for withholding of removal; although

IJ acted within his authority by considering facts and circumstances set forth in the criminal complaint, including law enforcement officers' observation of two males attempting to enter a locked building late at night, which provided the factual context in which alien was observed in possession of a firearm and contributed to the probable cause that he committed the offense, IJ did not attempt to determine alien's guilt or innocence as to the uncharged offense. U.S. Const. Amend. 4; Immigration and Nationality Act § 241, 8 U.S.C.A. § 1231(b)(3)(B)(ii); Minn. Stat. Ann. § 624.713.

**[9]**    **Aliens, Immigration, and Citizenship**    Aggravated felonies in general

An alien is not entitled to withholding of removal if the Attorney General decides that the alien, having been convicted by a final judgment of a particularly serious crime, is a danger to the community of the United States; a particularly serious crime includes an aggravated felony for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years, but classification as a particularly serious crime is not limited to aggravated felonies. Immigration and Nationality Act §§ 237, 241, 8 U.S.C.A. §§ 1227(a)(2)(A)(iii), 1231(b)(3)(B)(ii).

**[10]**    **Aliens, Immigration, and Citizenship**    Crimes and Related Grounds

Determination whether a crime is a particularly serious crime, as would render an alien convicted of such an offense ineligible for withholding of removal, requires examination of a variety of factors and consideration of the individual facts and circumstances of the conviction; those factors include nature of the conviction, circumstances and underlying facts of the conviction, type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a danger to the community. Immigration and

Nationality Act § 241, 8 U.S.C.A. § 1231(b)(3)(B)(ii).

**[11]    Aliens, Immigration, and Citizenship** ⚷ **Admissibility**

After determining that the elements of the offense potentially state a particularly serious crime, all reliable information may be considered in making a particularly serious crime determination, including the conviction records and sentencing information, as well as other information outside the confines of a record of conviction. Immigration and Nationality Act § 241, 8 U.S.C.A. § 1231(b)(3)(B)(ii).

**[12]    Aliens, Immigration, and Citizenship** ⚷ **Admissibility**

Immigration Judge (IJ) acts within its authority by considering the facts and circumstances set forth in a criminal complaint to determine whether an alien's conviction makes the alien deportable, particularly where the portions of the complaint were integral to the elements of the crime and not surplusage.

**[13]    Aliens, Immigration, and Citizenship** ⚷ **Jurisdiction and venue**

Court of Appeals lacked jurisdiction to review the denial of alien's request for withholding of removal, to extent alien was challenging the inferences the Immigration Judge (IJ) or Board of Immigration Appeals (BIA) drew from the stipulated facts of his conviction; since alien challenged only how the IJ or BIA weighed the relevant factors to determine whether he committed a particularly serious crime, his allegations amounted to nothing more than challenges to factual determinations. Immigration and Nationality Act §§ 241, 242, 8 U.S.C.A. §§ 1231(b)(3)(B)(ii), 1252(a)(2)(D).

**[14]    Aliens, Immigration, and Citizenship** ⚷ **Presentation and preservation of questions at administrative level**

Alien failed to exhaust his administrative remedies, and therefore Court of Appeals was unable to review his claim that Board of Immigration Appeals (BIA) should have applied a de novo standard of review instead of clear error when concluding that he was ineligible for relief under the Convention Against Torture (CAT) because he failed to show that he would more likely than not be tortured if returned to the Democratic Republic of Congo (DRC); alien argued on appeal that the facts were established and undisputed and required only application of the correct legal framework, but he had not raised that issue before BIA, but only argued that BIA should apply a clear error standard.

2 Cases that cite this headnote

**[15]    Aliens, Immigration, and Citizenship** ⚷ **Presentation of questions in brief or petition**

Court of Appeals lacked jurisdiction to review alien's argument that Board of Immigration Appeals' (BIA) decision to deny him relief under the Convention Against Torture (CAT) was erroneous under either a clear error or de novo standard of review; alien offered no legal argument, but merely challenged factual findings. Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(a)(2)(D).

**[16]    Federal Courts** ⚷ **Decisions Reviewable**

Factual determinations lie outside Court of Appeals' scope of review. Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(a)(2)(D).

**\*653**  Petition for Review of an Order of the Board of Immigration Appeals

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**Attorneys and Law Firms**

Counsel who presented argument on behalf of the petitioner was David Yoshimura, of Des Moines, IA. In addition to Mr. Yoshimura, the following attorney(s) appeared on the petitioner brief – Charles F. Webber and Kevin L. Morrow both of Minneapolis, MN., and Ms. Kathleen Moccio, Linus Chan, and Benjamin Casper Sanchez all of University of Minnesota Law School in Minneapolis, MN.

Counsel who presented argument on behalf of the respondent was Stephanie E. Beckett, of Washington, DC. The following attorney(s) appeared on the respondent brief – Stephanie E. Beckett of Washington, D.C.

Before SHEPHERD, ARNOLD, and KOBES, Circuit Judges.

**Opinion**

SHEPHERD, Circuit Judge.

Shuli Marambo, a native and citizen of the Democratic Republic of Congo (DRC), petitions for review of an order of the Board of Immigration Appeals (BIA) upholding the decision of an immigration judge (IJ) concluding that Marambo was removable; denying his applications for adjustment of status, asylum, withholding of removal, and relief under the Convention Against Torture (CAT); and ordering removal to the DRC. Having jurisdiction under 8 U.S.C. § 1252, we deny the petition.

After fleeing the DRC due to an ongoing war, Marambo was admitted to the United States in 2007 as a refugee, settling with family in Minnesota. In 2013, Marambo pled guilty to two counts of second-degree burglary, in violation of Minn. Stat. § 609.582. In 2014, while he was still serving probation related to his burglary convictions, he was arrested and charged with one count of being a prohibited person in possession of a firearm, in violation of Minn. Stat. § 624.713. He was subsequently found guilty, his probation for the burglary offenses was revoked, and he was sentenced to a total term of imprisonment of 60 months.

Based on Marambo's convictions, the Department of Homeland Security charged Marambo with being removable pursuant to 8 U.S.C. § 1227(a)(2)(A)(ii), as an alien "convicted of two or more crimes involving moral turpitude"; 8 U.S.C. § 1227(a)(2)(A)(iii), as "an alien convicted

of an aggravated felony"; and 8 U.S.C. § 1227(a)(2)(C), as an alien convicted of an offense for unlawfully possessing a firearm. Marambo conceded removability based on two convictions for crimes involving moral turpitude, but challenged the other two bases for removal. Marambo also filed an application for adjustment of ***654** status, asylum, withholding of removal, and relief under CAT.

After a hearing during which the IJ heard testimony from Marambo, his cousin, and his uncle, the IJ determined that Marambo was removable and denied his various requests for relief. The IJ first noted that Marambo had conceded removability based on his convictions for crimes involving moral turpitude before concluding that, while Marambo was not removable pursuant to § 1227(a)(2)(C) for unlawful possession of a firearm, he was additionally removable pursuant to § 1227(a)(2)(A)(iii) because his burglary convictions qualified as aggravated felonies. The IJ then determined that Marambo was not eligible for withholding of removal because his conviction for unlawful possession of a firearm was a "particularly serious crime" under 8 U.S.C. § 1231(b)(3)(B)(ii) and was thus a disqualifying offense. The IJ also denied Marambo's request for relief under CAT, concluding that, despite the credibility of Marambo and his family members, Marambo failed to show that he would more likely than not be tortured if he returned to the DRC. The IJ ordered Marambo removed from the United States to the DRC. Marambo appealed to the BIA. The BIA reversed the IJ's determination with respect to removability under § 1227(a)(2)(A)(iii) (aggravated felony), but because Marambo had conceded removability as an alien with two or more convictions for crimes involving moral turpitude, it found Marambo removable, regardless of its determinations as to the other bases for removal. The BIA affirmed the IJ's determination that Marambo was not entitled to withholding of removal, agreeing that Marambo's conviction for possession of a firearm was a particularly serious crime, rendering him ineligible for withholding of removal and that Marambo failed to show that he would more likely than not be tortured in the DRC if he returned, rendering him ineligible for relief under CAT.

**[1]    [2]** Marambo now petitions this Court for review, asserting that the IJ and BIA erred in concluding that his conviction for unlawful possession of a firearm was a particularly serious crime, and in concluding that he was ineligible for CAT relief because the BIA applied an

improper legal standard and, under either standard, he had shown entitlement to relief. Where, as here, the petitioner "is removable as a 'criminal alien,' our jurisdiction is limited to constitutional claims and questions of law." Constanza v. Holder, 647 F.3d 749, 753 (8th Cir. 2011) (per curiam) (internal quotation marks omitted). "We review questions of law de novo but accord substantial deference to the BIA's interpretation of immigration statutes and regulations." Puc-Ruiz v. Holder, 629 F.3d 771, 777 (8th Cir. 2010).

[3] [4] [5] [6] [7] With respect to the determination that his firearm offense was a particularly serious crime, Marambo challenges, for the first time before this Court, the BIA's prior interpretations of the particularly serious crime bar, 8 U.S.C. § 1231(b)(3)(B)(ii), asserting that the BIA's prior decisions, specifically, In re N-A-M-, 24 I. & N. Dec. 336 (BIA 2007), are contrary to law and are not entitled to deference. However, Marambo's failure to raise this issue before the BIA means he has not exhausted his administrative remedies, and we are unable to review his claim for the first time on a petition for review. Although our prior decisions have been inconsistent as to whether a failure to exhaust is a jurisdictional defect or falls within the doctrine of administrative exhaustion, Zine v. Mukasey, 517 F.3d 535, 539-40 (8th Cir. 2008) (collecting cases), "[r]egardless of whether *655 § 1252(d)(1) precludes us from addressing unexhausted issues, a court-imposed exhaustion requirement is appropriate" where the proceedings before the IJ and the BIA were adversarial in nature and the petitioner was represented by counsel. Frango v. Gonzales, 437 F.3d 726, 728 (8th Cir. 2006). As Marambo does not dispute that he was represented or that the proceedings were adversarial, we apply the court-imposed doctrine of administrative exhaustion. Marambo argues that raising the issue before the BIA would have been futile because the BIA has adhered to the same framework for over 10 years, but we are cognizant that the BIA "can reexamine, and if it wants, overrule, a precedent," Margulis v. Holder, 725 F.3d 785, 788 (7th Cir. 2013), and that our Court has consistently recognized the preference "to allow the agency an opportunity to correct its own mistakes[.]" Agha v. Holder, 743 F.3d 609, 616 (8th Cir. 2014) (alteration in original) (internal quotation marks omitted). Marambo's argument regarding the purported futility of raising the issue to the BIA is unpersuasive.

[8] [9] [10] [11] Marambo also argues that the IJ and BIA impermissibly relied on facts related to Marambo's purported commission of an uncharged crime, attempted burglary, to determine that his possession of a firearm conviction was a particularly serious crime. An alien is not entitled to withholding of removal "if the Attorney General decides that ... the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States[.]" 8 U.S.C. § 1231(b)(3)(B)(ii). A particularly serious crime includes "an aggravated felony ... for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years," id. § 1231(b)(3)(B), but classification as a particularly serious crime is not limited to aggravated felonies. In re N-A-M-, 24 I. & N. Dec. at 338-39. Although there is no more detailed statutory definition of a particularly serious crime, "the BIA has generally examined a variety of factors and found that the consideration of the individual facts and circumstances [of the conviction] is appropriate" to determine whether a conviction is for a particularly serious crime. Tian v. Holder, 576 F.3d 890, 897 (8th Cir. 2009) (internal quotation marks omitted). These factors include "the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and most importantly whether the type and circumstances of the crime indicate that the alien will be a danger to the community." Id. (quoting In re Frentescu, 18 I. & N. Dec. 244, 247 (BIA 1982)). After determining that the elements of the offense potentially state a particularly serious crime, "all reliable information may be considered in making a particularly serious crime determination, including the conviction records and sentencing information, as well as other information outside the confines of a record of conviction." In re N-A-M-, 24 I. & N. Dec. at 342.

[12] Marambo asserts that the IJ erred by considering uncorroborated and unproven conduct in the criminal complaint, which amounted to unreliable information, and compounded the error by extrapolating from the facts in the criminal complaint that Marambo attempted to commit a separate, uncharged crime of burglary before he was found to be unlawfully in possession of a firearm. As to his challenge to the reliability of the criminal complaint, our Court has previously held that an IJ acted within its authority by considering a criminal complaint to determine whether a conviction for aggravated robbery qualified as an offense involving a *656 firearm, making the alien deportable, particularly where the portions of the criminal complaint were integral to the elements of the crime and not surplusage. Vue v. INS, 92 F.3d 696, 700 (8th Cir. 1996). Here, the IJ acted within this same authority by considering the

facts and circumstances set forth in the criminal complaint, including law enforcement officers' observation of two males attempting to enter a locked building late at night, which provided the factual context in which Marambo was observed in possession of a firearm and contributed to the probable cause that he committed the offense. The IJ did not, as Marambo suggests, attempt to determine Marambo's guilt or innocence as to an uncharged offense of attempted burglary. Rather, the IJ relied on the facts and circumstances that were directly related to the unlawful-possession-of-a-firearm charge; the IJ did not rely on Marambo's purported guilt of attempted burglary as the basis to conclude the unlawful possession offense was a particularly serious crime.

[13] Finally, to the extent that Marambo challenges the inferences the IJ or BIA drew from the stipulated facts of his conviction, he challenges only how the IJ or BIA weighed the relevant factors to determine whether Marambo committed a particularly serious crime. "[Marambo]'s allegations ... amount to nothing more than challenges to factual determinations, which we lack jurisdiction to review under 🚩 8 U.S.C. § 1252(a)(2)(D)." Constanza, 647 F.3d at 754; see also Garcia-Aguillon v. Mukasey, 524 F.3d 848, 850 (8th Cir. 2008) ("[Petitioner]'s first argument fails to state a colorable legal claim because it amounts to nothing more than a challenge to the IJ's discretionary and fact-finding exercises cloaked as a question of law."). We thus find no error in the IJ's or BIA's determination that his unlawful-possession-of-a-firearm offense qualified as a particularly serious crime and barred withholding of removal.

[14] With respect to his claims regarding the IJ's and BIA's denials of his request for relief under CAT, Marambo first asserts that the BIA should have applied a de novo standard of review instead of clear error because the facts were established and undisputed and required only application of the correct legal framework. See Njong v. Whitaker, 911 F.3d 919, 923 (8th Cir. 2018) (applying de novo standard of review to question of whether undisputed facts satisfied legal definition). Again, Marambo did not raise this issue before the BIA; instead, Marambo argued that the BIA should apply a clear error standard. Because Marambo did not raise this issue before the BIA, he failed to exhaust his administrative remedies. See Frango, 437 F.3d at 728.

[15]    [16]    Marambo finally asserts that the denial of relief under CAT was erroneous under either a clear error or de novo standard of review. But despite his efforts to case his arguments as legal in nature, Marambo offers no legal argument; he merely challenges factual findings. "Factual determinations lie outside our scope of review and ... we lack the jurisdiction to reweigh the evidence before the BIA." 🚩 Cherichel v. Holder, 591 F.3d 1002, 1017 (8th Cir. 2010). We thus conclude that there was no reviewable error in the denial of Marambo's request for relief pursuant to CAT.

For the foregoing reasons, we deny the petition for review.

### All Citations

932 F.3d 650

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Jian Le Lin v. U.S. Atty. Gen., 11th Cir., May 23, 2012

612 F.3d 591
United States Court of Appeals,
Seventh Circuit.

Jose Concepcion MARIN–RODRIGUEZ, Petitioner,

v.

Eric H. HOLDER, Jr., Attorney General
of the United States, Respondent.

No. 09–3105.
|
Argued April 16, 2010.
|
Decided July 14, 2010.

**Synopsis**

**Background:** Mexican alien petitioned for review of order of the Board of Immigration Appeals (BIA) denying reconsideration of denial of his motion to remand case to immigration judge (IJ), on ground that it lacked jurisdiction after alien had been removed.

**[Holding:]** The Court of Appeals, Easterbrook, Chief Circuit Judge, held that BIA had jurisdiction to reconsider its decision after alien's removal.

Petition granted.

West Headnotes (3)

**[1]    Aliens, Immigration, and
Citizenship** ⚖ Reopening, Reconsideration,
or Remand

Alien's departure from United States does not deprive Board of Immigration Appeals (BIA) of jurisdiction to reconsider or reopen its decision; regulation providing that departure from United States "shall constitute a withdrawal" of motion to reopen or reconsider does not concern subject matter jurisdiction. Immigration and Nationality

Act, § 240(c)(7)(A), 8 U.S.C.A. § 1229a(c)(7)(A); 8 C.F.R. § 1003.2(d).

23 Cases that cite this headnote

**[2]    Administrative Law and
Procedure** ⚖ Rulemaking, adjudication, or
other mechanism

Agency may exercise discretion categorically, by regulation, and is not limited to making discretionary decisions one case at a time under open-ended standards.

2 Cases that cite this headnote

**[3]    Aliens, Immigration, and
Citizenship** ⚖ Remand

Upon determining that Board of Immigration Appeals (BIA) denied alien's motion for reconsideration on improper ground of lack of jurisdiction, *Chenery* principle required that Court of Appeals remand case to BIA, rather than decide issue itself, even if Board of Immigration Appeals (BIA) was rethinking its approach.

11 Cases that cite this headnote

**Attorneys and Law Firms**

**\*591**  Matthew Lorn Hoppock, Attorney (argued), McCrummen Immigration Law Group, North Kansas City, MO, for Petitioner.

Allen W. Hausman, Attorney (argued), OIL, Attorney, Department of Justice, Civil Division, Immigration Litigation, Washington, DC, for Respondent.

Before EASTERBROOK, Chief Judge, FLAUM, Circuit Judge, and HIBBLER, District Judge. †

**Opinion**

EASTERBROOK, Chief Judge.

The Board of Immigration Appeals believes that it lacks jurisdiction to reconsider or reopen any of its decisions after

the alien has left the United States. We must decide whether the Board's understanding is correct.

Jose Concepcion Marin–Rodriguez entered the United States from Mexico by stealth in 1988 and remained undetected **\*592** until 2005, when he was convicted of using fraudulent documents to obtain employment under the pretense of citizenship. 18 U.S.C. § 1546(a). He sought cancellation of removal, contending that a return to Mexico would cause hardship for himself and his family. To be eligible for that relief, an alien usually must submit biometric information that will enable the agency to determine that he is who he claims to be, and to find out whether he has any disqualifying criminal convictions. 8 C.F.R. § 1003.47(d). At a hearing in mid–2006, Marin–Rodriguez was told to submit fingerprints and warned that, if he did not, his application would be denied. When the next hearing occurred 15 months later, Marin–Rodriguez still had not complied. The immigration judge deemed his application for cancellation of removal to have been abandoned, see 8 C.F.R. § 1003.47(c), and ordered him removed because he is a citizen of Mexico without a visa or any other claim of right to be in the United States.

Marin–Rodriguez appealed to the Board of Immigration Appeals. While that appeal was pending, he submitted a set of fingerprints and asked the Board to remand to the IJ for reconsideration. But in September 2008 the Board deemed his motion untimely and dismissed his appeal. Marin–Rodriguez protested the next month, via a motion for reconsideration, that a motion for remand filed while an appeal is pending cannot be untimely. (The *submission* of fingerprints was late, but what the Board said is that the *motion* was untimely.) On April 29, 2009, the Board granted this motion and remanded to the IJ, stating that its decision of September 2008 had been mistaken in deeming untimely the motion for remand.

Before the IJ could act, however, the Department of Homeland Security asked the Board to reconsider. It observed that Marin–Rodriguez had been removed to Mexico on April 10, 2009, after both the Bureau of Immigration and Customs Enforcement and the Board had denied his requests for a stay of removal. The Board granted the Department's motion and withdrew the remand to the IJ. This order states: "As the respondent has been removed, the Board was without jurisdiction to consider the respondent's motion to reconsider. *See* 8 C.F.R. § 1003.2(d)." This is the order that Marin–Rodriguez asks us to set aside.

The Board's belief that it lacks jurisdiction to grant relief to an alien who is no longer in the United States has a pedigree dating to 1954. See *Matter of G- y B-,* 6 I. & N. Dec. 159 (BIA 1954) (discussing the 1952 version of the regulation), reaffirmed in *Matter of Armendarez–Mendez,* 24 I. & N. Dec. 646 (BIA 2008). One court of appeals has held that the Board's refusal to adjudicate these requests conflicts with 8 U.S.C. § 1229a(c)(7)(A). See *William v. Gonzales,* 499 F.3d 329 (4th Cir.2007). Other circuits have held that the Board is entitled to treat an alien's departure as an event that deprives it of jurisdiction. See *Toora v. Holder,* 603 F.3d 282, 285 (5th Cir.2010); *Mendiola v. Holder,* 585 F.3d 1303 (10th Cir.2009); *Pena–Muriel v. Gonzales,* 489 F.3d 438, 441–43 (1st Cir.2007); *Mansour v. Gonzales,* 470 F.3d 1194, 1198 (6th Cir.2006); *Singh v. Gonzales,* 468 F.3d 135, 140 (2d Cir.2006). We were asked to consider this subject in *Munoz De Real v. Holder,* 595 F.3d 747 (7th Cir.2010), but bypassed it, because the alien's request was untimely. We cannot duck here, for the Board itself has concluded that Marin–Rodriguez satisfied its timing requirements.

The fourth circuit's conclusion rests on § 1229a(c)(7)(A), which says that "[a]n alien may file one motion to reopen proceedings under this section". We don't **\*593** agree with the fourth circuit's understanding of this statute, because the statement "a litigant may file motion X" differs from the statement "the opportunity to file motion X cannot be limited." Consider a simple rule: "A motion to reopen must be filed within 90 days of the final decision." That does not detract from the entitlement to file a motion, any more than the time limit for appeal undercuts the right to file one appeal. Cf. *Lantz v. CIR,* 607 F.3d 479 (7th Cir.2010) (the Treasury Department is entitled to set a two-year deadline for seeking innocent-spouse relief in a tax proceeding, even though the statute lacks an outer limit). People have a right to trial by jury, but not if they settle their dispute; criminal defendants have a right to appeal, but they may surrender that right as part of a plea bargain. Cf. *United States v. Wenger,* 58 F.3d 280 (7th Cir.1995). And although an alien is entitled to seek permission to depart voluntarily, someone who applies for judicial review of a removal order gives up that opportunity. *Dada v. Mukasey,* 554 U.S. 1, 128 S.Ct.

2307, 171 L.Ed.2d 178 (2008); 8 C.F.R. § 1240.26(b)(3)(iii), adopted and explained at 73 Fed.Reg. 76927 (Dec. 18, 2008). If the Supreme Court sees no incompatibility between a statutory right to apply for something and an implied-withdrawal approach, it is hard to fault the Board for adopting a similar view. Thus an alien with a right to move for reconsideration may give up that right by a specified act. Whether the particular condition the Board has attached to exercise of this particular entitlement—that the alien be in the United States—is a proper one can't be resolved by pointing to the existence of the right. The validity of the condition must be ascertained on other grounds.

[1] [2] The Board relied on 8 C.F.R. § 1003.2(d), which reads:

> A motion to reopen or a motion to reconsider shall not be made by or on behalf of a person who is the subject of exclusion, deportation, or removal proceedings subsequent to his or her departure from the United States. Any departure from the United States, including the deportation or removal of a person who is the subject of exclusion, deportation, or removal proceedings, occurring after the filing of a motion to reopen or a motion to reconsider, shall constitute a withdrawal of such motion.

Similar language appears in 8 C.F.R. §§ 1003.4 and 1003.23(b). The regulation says that departure from the United States "shall constitute a withdrawal" of the motion. It is strange phraseology as applied to an alien whose departure was beyond his control; it amounts to saying that, by putting an alien on a bus, the agency may "withdraw" its adversary's motion. It is unnatural to speak of one litigant withdrawing another's motion. This led us to wonder whether the regulation —which does not use or allude to the concept of jurisdiction —should be understood as meaning that the Board has decided to exercise its discretion to deny all post-decision motions by aliens who have left the United States. An agency may exercise discretion categorically, by regulation, and is not limited to making discretionary decisions one case at a time

under open-ended standards. See Lopez v. Davis, 531 U.S. 230, 121 S.Ct. 714, 148 L.Ed.2d 635 (2001). But neither the Board nor the regulation describes the dismiss-on-departure rule as a categorical exercise of discretion. Given SEC v. Chenery Corp., 318 U.S. 80, 87–88, 63 S.Ct. 454, 87 L.Ed. 626 (1943), we must confine attention to the Board's stated rationale: lack of jurisdiction.

As a rule about subject-matter jurisdiction, § 1003.2(d) is untenable. The Immigration and Nationality Act authorizes the **594** Board to reconsider or reopen its own decisions. It does not make that step depend on the alien's presence in the United States. Until 1996 deportation proceedings (as they were then called), and judicial review of deportation orders, automatically halted when the alien left this nation. 8 U.S.C. § 1105a(c) (1994). The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 repealed § 1105a(c). Pub.L. 104–208, division C, title III, subtitle A, § 306(b), 110 Stat. 3009–546, 3009–612. One would suppose that this change also pulled the rug out from under Matter of G- y B- and similar decisions, based as they were on the earlier norm that departure ended all legal proceedings in the United States, though the Board nonetheless held in Matter of Armendarez–Mendez that the 1996 repealer did not affect motions to reconsider or reopen.

The fact remains that since 1996 nothing in the statute undergirds a conclusion that the Board lacks "jurisdiction"— which is to say, adjudicatory competence, see Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154, 130 S.Ct. 1237, 1243, 176 L.Ed.2d 17 (2010) (collecting cases)—to issue decisions that affect the legal rights of departed aliens. The Board certainly could have decided Marin–Rodriguez's appeal from the IJ's removal order, notwithstanding his removal, if he had not asked for the remand. And if the Board had the authority to decide his appeal, why did it lose that authority just because it thought that the IJ (rather than the Board itself) should be the first to consider whether to accept Marin–Rodriguez's belatedly submitted fingerprints?

The Supreme Court recently held that an administrative agency is not entitled to contract its own jurisdiction by regulations or by decisions in litigated proceedings. Union Pacific R.R. v. Brotherhood of Locomotive Engineers, 558 U.S. 67, 130 S.Ct. 584, 175 L.Ed.2d 428 (2009). Union Pacific post-dates most decisions in other circuits that have

approved the Board's conclusion that it lacks "jurisdiction" to consider motions filed by aliens who have left the United States, and circuits that have addressed this issue after *Union Pacific* do not mention it. *Union Pacific, Reed Elsevier*, and *Morrison v. National Australia Bank Ltd.,* ––– U.S. ––––, 130 S.Ct. 2869, 2877–78, 177 L.Ed.2d 535 (2010), are just the most recent examples of the Supreme Court's effort during the last decade to draw with greater precision the line between "jurisdictional" and other legal rules. Neither the Board's decision in *Armendarez–Mendez,* nor any other circuit's opinion concerning the "jurisdictional" characterization of 8 C.F.R. § 1003.2(d), mentions the Supreme Court's recent cases observing that legal rules can be mandatory without being jurisdictional and insisting that courts (and agencies) exercise their full jurisdiction. We think that *Union Pacific* is dispositive in favor of the holding in *William*—though on a rationale distinct from the fourth circuit's.

There is another route to the same result. Two courts of appeals have held that § 1003.2(d) and equivalent regulations do not apply when the alien is removed involuntarily—in other words, that it makes sense to treat departure from the United States as the withdrawal of a motion only when the alien could have remained to see the litigation through. *Coyt v. Holder,* 593 F.3d 902, 905–07 (9th Cir.2010); *Madrigal v. Holder,* 572 F.3d 239, 243–45 (6th Cir.2009). The fourth circuit reached the same conclusion using its approach in *William.* See *Sadhvani v. Holder,* 596 F.3d 180, 183 (4th Cir.2009). Three other circuits are to the contrary, though without much discussion. *Paredes v. Attorney General,* 528 F.3d 196, 199 n. 3 (3d Cir.2008); **\*595** *Ugokwe v. Attorney General,* 453 F.3d 1325, 1328 (11th Cir.2006) (dictum); *Ahmad v. Gonzales,* 204 Fed.Appx. 98, 99 (2d Cir.2006) (non-precedential).

The view taken by the sixth and ninth circuits is hard to reconcile with the principle that the judiciary should accept an agency's plausible reading of its own regulations. *Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); see also *Coeur Alaska, Inc. v. Southeast Alaska Conservation Council,* 557 U.S. 261, 129 S.Ct. 2458, 2467–70, 2472–74, 174 L.Ed.2d 193 (2009). The Board understands § 1003.2(d) as equally applicable to voluntary and involuntary departures, and the text of the regulation supports that view notwithstanding the oddity of

applying the word "withdrawal" to the consequence of an involuntary departure. But because the Board also believes that the regulation curtails its jurisdiction—which is *why* it applies to involuntary and voluntary departures alike—we come out in the same place as the sixth and ninth circuits on the basis of *Union Pacific,* without suggesting that the Board has misunderstood the regulation.

The Board may well be entitled to recast its approach as one resting on a categorical exercise of discretion, but it cannot insist that it has elected to foreswear subject-matter jurisdiction that it possesses under a statute. A recent decision suggests that the Board may be in the process of abandoning its "jurisdictional" characterization of the departure rule. *Matter of Bulnes–Nolasco,* 25 I. & N. Dec. 57 (BIA 2009), holds that the Board does possess jurisdiction if a departed alien contends that she did not receive proper notice of proceedings before the immigration judge. It is hard to see how the arguments an alien offers in support of reopening can affect whether the Board has subject-matter jurisdiction —though easy to see how a distinction could be justified as a conclusion that the Board always denies certain kinds of motions as an exercise of discretion, while entertaining others on the merits.

**[3]**　The Board's rationale for denying Marin–Rodriguez's motion was the lack of jurisdiction, so he is entitled to a remand even if the Board is rethinking its approach. Marin–Rodriguez may not have much to gain—his conviction for immigration-related fraud may block adjustment of status even if the IJ decides to accept the untimely fingerprints— but the *Chenery* principle requires us to send this subject to the agency rather than decide for ourselves whether the conviction is for a crime of moral turpitude. See also, e.g., *Gonzales v. Thomas,* 547 U.S. 183, 126 S.Ct. 1613, 164 L.Ed.2d 358 (2006). The IJ thought that § 1546(a) establishes a crime of moral turpitude, and if that's right then adjustment of status is unavailable, but the Board of Immigration Appeals dismissed Marin–Rodriguez's appeal without reaching that issue.

Before we wrap up, a few words are in order about why we have elected to decide this case at all. Three days before the date for oral argument, counsel for the Attorney General filed a motion asking us to remand the proceeding to the Board. Normally motions to remand are granted as a matter of course, see *Ren v. Gonzales,* 440 F.3d 446 (7th Cir.2006), but Marin–Rodriguez opposed this motion and we directed

the parties to come prepared to discuss the subject at oral argument.

The motion did not say what the Board planned to do with the proceeding on remand: entertain the matter on the merits, re-remand to the IJ (as Marin–Rodriguez wants), or just write a different opinion. At oral argument we asked the Attorney General's lawyer whether the Board has changed its mind and now believes that it has jurisdiction to entertain the sort of **\*596** motion that Marin–Rodriguez presented. Counsel said that he did not know—that he spoke only for the Attorney General and not for the Board or the Department of Homeland Security. Yet the Attorney General has not exercised his authority to withdraw this proceeding from the Board and decide it himself. See 8 C.F.R. § 1003.1(h). The motion requested a remand to the Board, not to the Attorney General. What's more, counsel stated that the Department of Justice has not changed the view, expressed in its brief, that the Board is *right* in believing that it lacks jurisdiction.

There is no point in remanding to a body that has already declared the absence of subject-matter jurisdiction, unless it has reconsidered that issue or is prepared to do so. The motion to remand does not moot the controversy. Marin–Rodriguez wants relief different from what the Attorney General is prepared to allow. So we deny the motion to remand.

The petition for review is granted, and the proceeding is remanded to the Board for further consideration consistent with this opinion.

**All Citations**

612 F.3d 591

## Footnotes

†      Of the Northern District of Illinois, sitting by designation.

End of Document      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

04 Cal. Daily Op. Serv. 4626

KeyCite Yellow Flag - Negative Treatment

Distinguished by Tovar-Rodriguez v. Gonzales, 9th Cir., December 8, 2005

370 F.3d 851

United States Court of Appeals,

Ninth Circuit.

Josadac MARISCAL–SANDOVAL, Petitioner,

v.

John ASHCROFT, Attorney General, Respondent.

No. 02–71925.

|

Argued and Submitted March 31, 2004.

|

Filed May 28, 2004.

**Synopsis**

**Background:** Immigration Judge (IJ) found alien excludable from United States for knowingly attempting to transport six undocumented aliens from Mexico into California. Alien appealed. The Board of Immigration Appeals (BIA) affirmed. Alien petitioned for review.

**Holdings:** The Court of Appeals, Tallman, Circuit Judge, held that:

[1] alien did not "enter" into United States, and thus he was subject to exclusion proceedings, rather than deportation proceedings, and

[2] dissolution of stay of removal by Court of Appeals could not occur until mandate was issued, rather than when opinion was filed.

Petition for review denied.

Beezer, Circuit Judge, filed concurring opinion.

West Headnotes (4)

**[1]    Aliens, Immigration, and Citizenship** 🗝 Review of initial decision or administrative review

The Court of Appeals reviews the opinion of the immigration judge (IJ) as the basis for the decision of the Board of Immigration Appeals (BIA) when the BIA adopts the IJ's findings and reasoning in full. Immigration and Nationality Act, § 106, as amended, 8 U.S.C.(1994 Ed.) § 1105a.

3 Cases that cite this headnote

**[2]    Aliens, Immigration, and Citizenship** 🗝 Mode and effect of entry or reentry

Alien did not "enter" into United States, and thus he was subject to exclusion proceedings, rather than deportation proceedings, although Immigration and Naturalization Service (INS) released alien after his arrest, it delayed for over two months before reinstating alien's parole, and only condition on alien's freedom was that he appear for his continued hearing one month later; alien was already in active exclusion proceedings when his alleged "entry" occurred, and he was never inspected and admitted in usual manner by immigration officer, and he did not actually succeed in evading inspection at border. Immigration and Nationality Act, § 101(a)(13), 8 U.S.C.A. § 1101(a)(13); 8 C.F.R. § 212.5(d)(2)(i).

10 Cases that cite this headnote

**[3]    Aliens, Immigration, and Citizenship  🔑  Mode and effect of entry or reentry**

In the immigration context, an entry into the United States requires a crossing into the territorial limits of the United States, i.e., physical presence; (2) inspection and admission by an immigration officer or actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint. Immigration and Nationality Act, § 101, 8 U.S.C.A. § 1101.

2 Cases that cite this headnote

**[4]    Aliens, Immigration, and Citizenship  🔑  Jurisdiction and venue**

Dissolution of stay of removal by Court of Appeals could not occur until mandate was issued, rather than when opinion was filed, since Court of Appeals retained jurisdiction and was capable of modifying or rescinding opinion until mandate issued.

19 Cases that cite this headnote

**Attorneys and Law Firms**

**\*852**  Raul M. Montes, Montes, Montes & Montes, San Diego, CA, for the petitioner.

Theresa M. Healy, Office of Immigration Litigation, Civil Division, Los Angeles, CA, for the respondent.

On Petition for Review of an Order of the Board of Immigration Appeals. Agency No. AXX–XXX–076.

Before HARRY PREGERSON, ROBERT R. BEEZER, and RICHARD C. TALLMAN, Circuit Judges.

**Opinion**

TALLMAN, Circuit Judge.

Josadac Mariscal–Sandoval, a native and citizen of Mexico, petitions for review of a final order of exclusion by the Board of Immigration Appeals ("BIA"). The BIA affirmed without opinion the Immigration Judge's ("IJ") Order, which found Mariscal Sandoval excludable from the United States for knowingly attempting to transport six undocumented aliens from Mexico into California. Mariscal–Sandoval contends that he should have been placed in deportation rather than exclusion proceedings because he had "entered" the United States within the meaning of 8 U.S.C. § 1101(a)(13) (1997).[1] We hold that Mariscal–Sandoval did not make an "entry" into the country when the Immigration and Naturalization Service ("INS")[2] failed to promptly issue him a parole extension. Because he was not entitled to deportation proceedings, we deny the petition for review.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# I

Mariscal–Sandoval obtained lawful permanent resident status in the United States in 1992. The INS's exclusion proceedings against him arose out of an incident that occurred on May 16, 1995, at the Otay Mesa Port of Entry along the United States–Mexico border in California. The INS alleged that Mariscal–Sandoval tried to evade inspection while transporting six undocumented Mexican women into this country in his van, and it issued a notice of excludability that charged him with attempted **\*853** alien smuggling under the Immigration and Nationality Act ("INA") § 212(a)(6)(E)(i), 8 U.S.C. § 1182(a) (6)(E)(i) (1995).

The issue Mariscal–Sandoval presents concerns the effect of his pre-hearing parole status in the nearly two years between his initial detention at Otay Mesa and the completion of all exclusion proceedings. He first applied for and was granted parole on May 17, 1995. From 1995 to 1997, he appeared before an IJ for several master calendar hearings. The INS set his parole to expire on the day of each hearing. After each hearing was concluded, Mariscal–Sandoval received a notice from the Immigration Court that directed him to report to the nearest INS office so the INS could re-parole him into the country: [3]

> If you are under exclusion proceedings, you are present in this country under a special permit called parole. The parole permits are issued only by the [INS] and not by this office. If your parole has expired, and you are now residing in this country, you must apply for an extension at [the local INS office]. You must apply in person and should go to that office at once. You will show the people in that office the notice which indicates your upcoming hearing date.

Following these directions, Mariscal–Sandoval reported to the local INS office after each hearing to be re-paroled. The INS then issued him an I–94 Form [4] that stated how long his parole would last until it next expired. This sequence of events recurred several times without incident during the next two years.

Of particular relevance are the events that occurred after a hearing on February 19, 1997. As he had many times before, Mariscal–Sandoval reported to the INS office after this hearing and asked to be re-paroled. However, this time he did not receive an I–94 Form or any other document. Mariscal–Sandoval alleges that an INS officer on duty told him that he must show up for his next scheduled appearance before the IJ, but that he need not carry any particular documentation to prove that he was on parole. Instead, the officer directed Mariscal–Sandoval to carry the notice for his next hearing with him and to present that notice if stopped by an immigration inspector.

At the next hearing on April 2, 1997, Mariscal–Sandoval moved to terminate the exclusion proceedings. In an affidavit, he recounted his interaction with the INS officer on February 19, 1997. He argued that the INS's failure to provide him with an I–94 Form that day meant that he had effected an "entry" into the United States and that he now should be in deportation proceedings instead of exclusion proceedings. The IJ denied the motion.

Shortly thereafter, on April 23, 1997, the INS sent Mariscal–Sandoval's attorney a notice requesting that Mariscal–Sandoval visit the San Diego office so the agency could "extend [his] I–94 (parole)[.]" The notice also informed Mariscal–Sandoval's attorney that it was the third time the INS had attempted to notify his client of its intent to extend his parole.

On May 5, 1997, the INS finally issued another I–94 Form stating that Mariscal– **\*854** Sandoval's parole was extended until May 14. His parole was again terminated and renewed without incident for hearings that occurred on May 14, September 11, December 11, and December 18. At the conclusion of all proceedings, the IJ issued an order of exclusion.

When Mariscal–Sandoval filed a petition for review in this court on July l, 2002, he also requested a stay of removal. Under Ninth Circuit General Order 6.4(c)(1), this caused a temporary stay to automatically issue. The government filed a notice of

non-opposition to Mariscal–Sandoval's motion. On September 9, 2002, pursuant to our local rules, a staff attorney in our Clerk's office ordered the stay of removal to be continued pending our disposition of his petition for review, or until our further order.

## II

**[1]**    We have jurisdiction pursuant to 8 U.S.C. § 1105a(a). [5]  Because the BIA adopted the IJ's findings and reasoning in full, we review the IJ's opinion as the basis for the agency's decision. *Singh–Kaur v. INS,* 183 F.3d 1147, 1150 (9th Cir.1999).

**[2]**    Under the version of the INA in effect at the time of Mariscal–Sandoval's exclusion proceedings, [6] "excludable" aliens (those seeking admission from outside the United States) were entitled to fewer procedural protections than "deportable" aliens (those who had "entered" the United States). *See Xi v. INS,* 298 F.3d 832, 838 (9th Cir.2002); *see also Landon v. Plasencia,* 459 U.S. 21, 25–27, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982). Once an alien made an "entry" into the United States, lawfully or unlawfully, the relatively greater protections of deportation proceedings were required. *See Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 212, 73 S.Ct. 625, 97 L.Ed. 956 (1953); *see also Landon,* 459 U.S. at 30–32, 103 S.Ct. 321 (holding that the question of whether an alien has made an entry may be decided at either a deportation or exclusion hearing).

**[3]**    The determination of whether Mariscal–Sandoval was properly placed in exclusion proceedings or should have been placed in deportation proceedings thus depends upon whether he made an entry into the United States. In 1997, an entry was defined as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise[.]" INA § 101(a)(13), 8 U.S.C. § 1101(a)(13) (1997). We recently adopted the BIA's more detailed definition, which requires: "(1) a crossing into the territorial limits of the United States, *i.e.,* physical presence; (2)(a) inspection and admission by an immigration officer, or (b) actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint." *See Sidhu v. Ashcroft,* 368 F.3d 1160 (9th Cir.2004); *see also* **\*855** *Matter of Patel,* 20 I. & N. Dec. 368, 370, 1991 WL 353524 (BIA 1991).

As to the third prong of the test, the BIA has held that an alien effects an entry when he comes into the United States "free from actual or constructive restraint." *Matter of Sanchez,* 17 I. & N. Dec. 218, 220 1980 WL 121869 (BIA 1980) (citations omitted). In *Matter of Sanchez*—the main authority upon which Mariscal–Sandoval relies—an alien was arrested at the border and charged with mail fraud. *Id.* at 219. He was brought into this country in INS custody, so at that time no entry was made. *Id.* at 220. However, "when he was released the following day without bond, and only on the condition that he appear for his trial on the mail charges, an entry was made. He was then free from any legal restraints imposed upon him by the immigration laws." *Id.* at 220–21. Because the alien had entered the United States at that point, the BIA held that he should be in deportation proceedings rather than exclusion proceedings.

Mariscal–Sandoval argues that he too should be placed in deportation proceedings because he entered the United States when his parole expired on February 19, 1997, and the INS released him that same day and did not issue him an I–94 Form to extend his parole until May of that year. He contends that at that point he became "free from restraint" because he was released without being re-paroled as required by 8 C.F.R. § 212.5(d)(2)(i) (1997), and the only condition on his freedom was that he appear for his continued hearing a month later. We disagree.

The Supreme Court has held that an alien's parole status was never intended to affect immigration status. *Ma v. Barber,* 357 U.S. 185, 190, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958) (noting that an alien's argument that her parole "placed her legally 'within the United States' is inconsistent with the congressional mandate, the administrative concept of parole, and the decisions of this Court."); *see also Matter of L—Y—Y—,* 9 I. & N. Dec. 70, 1960 WL 12063 (1960) (holding that the plain language of the

exclusion rule, INA § 212(d)(5), renders aliens whose parole has been terminated and who remain in the United States still subject to exclusion proceedings, not deportation proceedings).

Mariscal–Sandoval's situation differs from the alien in *Sanchez* in one key respect: unlike Sanchez, Mariscal–Sandoval was already in active exclusion proceedings when his alleged entry occurred. In contrast, Sanchez was not subject to any pending immigration proceedings, only his upcoming criminal trial on mail fraud charges. In this respect, Mariscal–Sandoval's situation is more closely analogous to our decision in *Luk v. Rosenberg,* 409 F.2d 555, 558 (9th Cir.1969). In *Luk,* an alien was paroled into the country while arrangements were made for his upcoming deportation. *Id.* at 556. A few months later, the INS revoked his parole and told him to appear for departure when notified. *Id.* That notice did not occur until two years later. *Id.*

Like Mariscal–Sandoval, Luk argued that he was no longer subject to exclusion proceedings because he had entered the country by virtue of the INS's failure to take immediate action on his case. *Id.* at 558. We squarely rejected this argument, noting that Congress did not likely intend "the mere fact of delay to improve an alien's status from that of one seeking admission to that of one legally considered within the United States." *Id.* (quoting *Rogers v. Quan,* 357 U.S. 193, 196, 78 S.Ct. 1076, 2 L.Ed.2d 1252 (1958)). In this case, the fact that the INS delayed for over two months before reinstating Mariscal–Sandoval's **\*856** parole likewise does not serve to alter his immigration status.

Finally, we note that the BIA's test for determining whether an alien has made an entry requires all three elements to be met: physical presence, inspection and admission *or* evasion of inspection at the border, and freedom from restraint. *See Patel,* 20 I. & N. Dec. at 370. Mariscal–Sandoval is physically present in this country. Even if we were to hold that he was "free from restraint" under *Sanchez,* he still cannot establish that the second prong has been met. He was never inspected and admitted in the usual manner by an immigration officer, nor did he actually succeed in evading inspection at the border. The IJ properly concluded that Mariscal–Sandoval had not made an entry and that exclusion proceedings were appropriate.

### III

[4]    Finally, we must address our concurring colleague's contention that we should dissolve the stay of removal immediately when this opinion is filed, rather than when the mandate is issued.

Today we deny Mariscal–Sandoval's petition for review. The concurrence reasons that this action means there is no longer a "probability of success on the merits" or any "serious legal questions." We disagree. Although it is true that "[n]othing requires the court to wait until the mandate issues [,]" Concurring Op. at 6835, Mariscal–Sandoval still retains the ability to petition this panel for rehearing, or to petition the court as a whole to review our decision en banc. Until any further petitions to this panel or the entire court are resolved, we cannot say that Mariscal–Sandoval has no probability of success on the merits.

Therefore, we believe that the better course of action is to vacate Mariscal–Sandoval's stay when we no longer have jurisdiction over his case. Until the mandate issues, we retain jurisdiction, *see Sgaraglino v. State Farm Fire & Cas. Co.,* 896 F.2d 420, 421 (9th Cir.1990), and we are capable of modifying or rescinding today's opinion, *see United States v. Foumai,* 910 F.2d 617, 620 (9th Cir.1990). Because we have previously held that "finality of an appellate order hinges on the mandate," *id.,* we order the Clerk to vacate Mariscal–Sandoval's stay of removal when the mandate issues.

**PETITION DENIED.**

BEEZER, Circuit Judge, concurring:
I join the judgment of the court.

04 Cal. Daily Op. Serv. 4626

I write separately with respect to the dissolution of the stay orders entered during the course of this appeal.

## I

Mariscal–Sandoval filed his petition for review on July 1, 2002. At that time he moved for a stay of removal pending our review of his petition. The act of filing Mariscal–Sandoval's stay motion resulted in the automatic issuance of a temporary stay order so that the court could evaluate the merits of petitioner's motion for stay.

This temporary stay procedure is established in our General Order 6.4(c). On September 9, 2002, after the government filed a notice of non-opposition to the stay motion, a staff attorney employed by this court prepared, certified and filed an order granting Mariscal–Sandoval's motion for a stay of removal *pendente lite*. Because our opinion today removes any "likelihood of success on the merits," the petitioner's allegations of fact supporting a stay now are determined to be without merit. There is no legitimate reason not to revoke Mariscal–Sandoval's stay order immediately **\*857** so that the removal or deportation process can proceed as required by statute.

I discuss the application of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 to the process of granting stays in the Ninth Circuit and Congress's intent regarding stays of deportation and removal.

## II

Prior to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, an undocumented alien typically was granted an automatic stay of deportation upon filing a petition for review of a Board of Immigration Appeals ("BIA") decision.[1] 8 U.S.C. § 1105a(a)(3) (1994). Under this earlier statutory scheme, automatic stays were justified in most cases because a deported alien could not procedurally continue with his petition for relief. The court lost jurisdiction to review an alien's petition following his departure from the United States. 8 U.S.C. § 1105a(c) (1994) ("An order of deportation ... shall not be reviewed by any court if the alien has departed from the United States after issuance of the order.").

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 changed this rule. An alien's removal[2] no longer deprives the court of jurisdiction to consider a pending petition. As a result, Congress eliminated automatic stays in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. The statute says: "[S]ervice of the petition for review shall not stay the deportation of an alien pending the court's decision on the petition, unless the court orders otherwise." 8 U.S.C. § 1252(b)(3)(B).

Despite Congress's statutory removal of automatic stays, the court's opinion in *De Leon v. INS,* 115 F.3d 643 (9th Cir.1997), establishes a new found basis in law for automatic *temporary* stays. The opinion says: "The filing of a motion for stay or a request for a stay contained in a petition for review will stay a petitioner's deportation temporarily until the court rules on the stay." This rule is codified in General Order 6.4(c). ("Upon the filing of a motion or request for stay of removal or deportation, the order of removal or deportation is temporarily stayed until further order of the court.") When the government files a notice of non-opposition while temporary stay is in effect, or when the court resolves a disputed motion in the alien's favor, the temporary stay is extended and "shall remain in effect during the pendency of the petition for review or until further order of the court." General Order 6.4(c)(5).

## III

Ninth Circuit opinions and rules of court never have established the standard that governs the granting of temporary stays under *De Leon* and General Order 6.4(c). The temporary stay appears to be automatic. In *Abbassi v. INS,* 143 F.3d 513 (9th Cir.1998), the court discusses the standard under which it evaluates an alien's motion for a stay of removal *after* the temporary stay is granted. The opinion holds that under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996's transitional rules, a request for a **\*858** stay is to be evaluated "under the same standards employed by district courts in evaluating motions for preliminary injunctive relief." *Id. at 514.* Specifically, an alien must show either "a probability of success on the merits and the possibility of irreparable injury, or that serious legal questions are raised and the balance of hardships tips sharply in petitioner's favor." *Id.* (internal citations omitted).

In *Andreiu v. Ashcroft,* 253 F.3d 477 (9th Cir.2001) (en banc), the INS challenges application of the *Abbassi* rule to the permanent rules under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. *Id. at 480.* The INS maintains that an alien's request for a stay is governed by 8 U.S.C. § 1252(f)(2), which states: "Notwithstanding any other provision of law, no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry of execution of such order is prohibited as a matter of law." *Andreiu* holds that § 1252(f)(2)'s use of the term "enjoin" does not refer to stays of removal and, therefore, neither § 1252(f)(2), nor its "clear and convincing evidence" standard, limits this court's power to grant stays of removal. [3] *Id. at 480–82; accord Arevalo v. Ashcroft,* 344 F.3d 1 (1st Cir.2003); *Mohammed v. Reno,* 309 F.3d 95 (2d Cir.2002); *Bejjani v. INS,* 271 F.3d 670 (6th Cir.2001).

A concurring opinion in *Andreiu* questions the court's statutory construction and the resulting application of the injunction standard; the "clear and convincing evidence" standard is urged. *Id. at 485–90* (Beezer, J., concurring); *accord Weng v. Attorney General,* 287 F.3d 1335 (11th Cir.2002) (per curiam) (holding that the "clear and convincing" standard of § 1252(f) (2) applies to motions for stays of removal pending review). *See also Kenyeres v. Ashcroft,* 538 U.S. 1301, 123 S.Ct. 1386, 155 L.Ed.2d 301 (2003) (Kennedy J., in Chambers) (discussing the conflict between the courts of appeals and need for resolution).

Although *Andreiu* does not address temporary stays specifically, the entire panel in that case agrees that a petitioner must meet some substantive standard to be entitled to a stay pending resolution of the claims of error identified in his petition. *Compare id.* at 483, *with id.* at 485. *Andreiu* thus undermines the reasoning in *De Leon.* The importance of this substantive showing requirement should not hinge on the duration of the stay in question. Automatic, standardless stays, even the temporary stays provided for under *De Leon* and by General Order 6.4(c), are contrary to case law and Congress's intent in passing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996.

## IV

The court avoids Congress's intent as well by refusing to apply the "clear and convincing evidence" standard for stays expressly provided for in § 1252(f)(2). As noted above, *Andreiu* holds that the injunction standard is the appropriate standard under which to evaluate requests for **\*859** stays pending review of an alien's petition. *253 F.3d at 483.* The separate opinion discusses the flaws in the court's interpretation of Congress's intent. *Id. at 485–90.*

If the traditional injunction standard is correct, then it must be applied as the law of the circuit. Under the injunction standard, an alien is entitled to a stay only so long as the petitioner can demonstrate that "either a probability of success on the merits

and the possibility of irreparable injury, or that serious legal questions are raised and the balance of hardships tips sharply in petitioners's favor." *Abbassi,* 143 F.3d at 514 (internal quotations omitted).

Once we carefully consider the administrative agency record and the parties' briefs on appeal and after oral argument or submission without argument and when an opinion is filed which denies an alien's petition for review, there necessarily is no longer "a probability of success on the merits" or any "serious legal questions." From the time of filing an opinion and thereafter, the court has no sound basis for further delaying the alien's removal or deportation. Nothing requires the court to wait until the mandate issues. General Order 6.4(c) expressly authorizes a merits panel to terminate a stay order at any time.

The proposition that a court has the authority to alter the effect of an injunction in light of changes in the law or the circumstances is well established. *See, e.g., Pasadena City Bd. of Educ. v. Spangler,* 427 U.S. 424, 437, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976); *System v. Wright,* 364 U.S. 642, 646–47, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961); *United States v. Swift & Co.,* 286 U.S. 106, 114–15, 52 S.Ct. 460, 76 L.Ed. 999 (1932); *Chrysler Corp. v. United States,* 316 U.S. 556, 562, 62 S.Ct. 1146, 86 L.Ed. 1668 (1942); *Pennsylvania v. Wheeling and Belmont Bridge Co.,* 59 U.S. (18 How.) 421, 431–32, 15 L.Ed. 435 (1855). "There is no dispute but that a sound judicial discretion may call for the modification of the terms of an injunction decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen." *System Federation,* 364 U.S. at 647, 81 S.Ct. 368; *see also Donk v. Miller,* 365 F.3d 159, 164–65 (2d Cir.2004) (vacating injunction because the court's determination on the merits removed the factual and legal predicates for the injunction).

## V

General Order 6.4(c) states that stays of deportation or removal remain in effect "until further order of *the court.*" (Emphasis added.) But in this case, as in many others, a Ninth Circuit staff attorney, not an Article III judge, granted petitioner's motion for a stay.

Pursuant to Ninth Circuit rules, judges need not resolve all motions. Rule 27–7, entitled Delegation of Authority to Act on Motions, provides as follows: "The Court may delegate to the Clerk or designated deputy clerks, staff attorneys, appellate commissioner or circuit mediators authority to decide motions filed with the court." Those motions delegated to the Clerk are set forth in our General Orders. General Orders, App. A. The General Orders also grant the Clerk discretion to refer certain motions to "a single judge, an appellate commissioner, a circuit court mediator, an appropriate motions attorney for presentation to a motions panel, or a merits panel." General Order 6.3; App. A.

However, nowhere in our General Orders, Circuit Rules, or anywhere else do we grant authority to the Clerk, let alone a staff attorney, to issue orders granting stays of removal. Even if our court rules could be interpreted to grant such authority, they would be in direct conflict with the language of the statute, which states that **\*860** service of the petition does not stay removal "unless *the court* orders otherwise." 8 U.S.C. § 1252(b)(3)(B) (emphasis added).

In this case, as appears to be the rule rather than the exception, the government filed a notice of non-opposition to Mariscal–Sandoval's request for a stay of removal. The government's practice, whether the result of administrative burdens or otherwise, most often results in stays being granted routinely by staff attorneys without meaningful scrutiny by any member of this court. In addition to being unauthorized, the practice of permitting staff attorneys to grant stays of removal deprives the judges of this court of an important judicial obligation established by Congress for granting due process to an ever increasing number of undocumented aliens who seek to reside in the United States as permanent residents.

04 Cal. Daily Op. Serv. 4626

## VI

The intent of Congress is best served if the effect of stays pending resolution of an appeal is maintained for the minimum necessary period of time. The circumstances, if any, under which this court should continue a stay in effect after decision are limited indeed. When the petitioner has failed to prevail on his asylum or removal claims, the time to depart has arrived and the court should vacate the stay.

**All Citations**

370 F.3d 851, 04 Cal. Daily Op. Serv. 4626

## Footnotes

1    We have addressed Mariscal–Sandoval's other arguments in a concurrently filed memorandum disposition.

2    On March 1, 2003, the Department of Justice transferred the INS's functions to the Bureau of Border Security and the Bureau of Immigration and Citizenship Services. *See* Homeland Security Act of 2002, Pub. L. No. 107–296 § 471, 116 Stat. 2135 (2002). We will refer to the relevant agency as the INS.

3    In 1997, the District Director of the INS had exclusive jurisdiction to parole an alien into the country pursuant to 8 C.F.R. § 212.5(a). *Matter of Matelot,* 18 I. & N. Dec. 334, 336 (BIA 1982). An immigration judge did not have jurisdiction to grant parole. *Id.*

4    An I–94 Form is an alien arrival-departure record that serves as proof of the bearer's current immigration status and the time period during which his stay in this country is authorized. *See* 8 C.F.R. § 229.1 (1997) (prescribing the forms used by the INS).

5    The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") repealed 8 U.S.C. § 1105a and replaced it with new rules for judicial review now codified at 8 U.S.C. § 1252. *See* IIRIRA § 306(c)(1), Pub. L. No. 104–208, 110 Stat. 3009 (Sept. 30, 1996), *as amended by* the Extension of Stay in the United States for Nurses Act, Pub.L. No. 104–302, 110 Stat. 3656 (Oct. 11, 1996). However, this case is governed by IIRIRA's transitional rules and we continue to have jurisdiction pursuant to 8 U.S.C. § 1105(a) because the INS commenced exclusion proceedings against Mariscal–Sandoval prior to April 1, 1997, and the final order of exclusion was entered after October 30, 1996. *See* IIRIRA § 309(c)(1).

6    The IIRIRA merged deportation and exclusion proceedings into the broader category of "removal" proceedings. *See Kalaw v. INS,* 133 F.3d 1147, 1149 n. 2 (9th Cir.1997).

1    We did not automatically issue stays in cases involving an alien being deported because of an aggravated felony conviction. 8 U.S.C. § 1105a(a)(3) (1994).

2    The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 eliminated the previous legal distinction between deportation and removal, merging both into a broader category entitled "removal." *United States v. Lopez–Gonzalez,* 183 F.3d 933, 934–35 (9th Cir.1999).

3    The tortured reading of § 1252(f)(2) has resulted in some semantical oddities. *Andreiu* holds that the definition of "enjoin" includes "to restrain by injunction" but goes on to conclude that a stay of proceedings is "very different" from an injunction and therefore not encompassed by section 1252(f)(2). 253 F.3d at 482–83 ("Put simply, injunctions run against parties; stays run against courts and judgments."). By contrast, *Faruqi v. DHS,* 360 F.3d 985, 988 (9th Cir.2004),

**Mariscal-Sandoval v. Ashcroft, 370 F.3d 851 (2004)**

04 Cal. Daily Op. Serv. 4626

says that enjoin as used in 🚩 § 1252(f)(2) "refers only to permanent injunctive relief and not to temporary relief such as an injunction pending appeal." (Internal quotations omitted.)

---

**End of Document**                                            © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Marmolejo-Campos v. Holder, 558 F.3d 903 (2009)

09 Cal. Daily Op. Serv. 2667, 2009 Daily Journal D.A.R. 3224

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Nunez v. Holder, 9th Cir., February 10, 2010

558 F.3d 903
United States Court of Appeals,
Ninth Circuit.

Armando MARMOLEJO–CAMPOS, aka
Campos Ramos Armando, Petitioner,

v.

Eric H. HOLDER, Jr., Attorney

General, * Respondent.

No. 04–76644.
|
Argued and Submitted June 23, 2008.
|
Filed March 4, 2009.

**Synopsis**

**Background:** Mexican petitioner sought review of an order of the Board of Immigration Appeals (BIA) which affirmed an immigration judge's (IJ) decision to remove him following his violation of Arizona's aggravated DUI (driving under the influence) statute. A divided panel of Court of Appeals, 503 F.3d 922, denied the petition.

**Holdings:** Upon rehearing en banc, the Court of Appeals, O'Scannlain, Circuit Judge, held that:

[1] where BIA determines that certain conduct is morally turpitudinous in a precedential decision, reviewing court applies *Chevron* deference regardless of whether the order under review is the precedential decision itself or a subsequent unpublished order that relies upon it; overruling

Nicanor–Romero, 523 F.3d 992, and Plasencia–Ayala v. Mukasey, 516 F.3d 738, and

[2] violation of Arizona's aggravated DUI statute was a crime of moral turpitude for removal purposes.

Petition denied.

Bybee, Circuit Judge, filed opinion concurring in part and dissenting in part.

Berzon, Circuit Judge, filed dissenting opinion in which Pregerson, Fisher, and Paez, Circuit Judges, joined.

West Headnotes (7)

[1] **Aliens, Immigration, and Citizenship** — Jurisdiction and venue

While court has no jurisdiction to review a final order removing an alien on account of a conviction for a crime involving moral turpitude, court has jurisdiction to review Board of Immigration Appeals' (BIA) determination that alien's convictions were, in fact, "crimes involving moral turpitude" within meaning of Immigration and Nationality Act (INA). Immigration and Nationality Act, § 242(a)(2)(C), 8 U.S.C.A. § 1252(a)(2)(C).

57 Cases that cite this headnote

[2] **Administrative Law and Procedure** — Aliens, Immigration, and Citizenship

**Aliens, Immigration, and Citizenship** — De novo review in general

In reviewing Board of Immigration Appeals' (BIA) determination that alien's convictions were "crimes involving moral turpitude" within meaning of Immigration and Nationality Act (INA), court reviews the BIA's finding regarding the specific act for which the alien was convicted de novo, however, *Chevron* deference is appropriate with respect to BIA's construction of "moral turpitude" through its precedential decisions and *Skidmore* deference should be accorded to the Board's nonprecedential decisions interpreting "moral turpitude." Immigration and Nationality Act, § 237(a)(2)(A), 8 U.S.C.A. § 1227(a)(2)(A).

88 Cases that cite this headnote

[3] **Administrative Law and Procedure** — Aliens, Immigration, and Citizenship

Marmolejo-Campos v. Holder, 558 F.3d 903 (2009)

09 Cal. Daily Op. Serv. 2667, 2009 Daily Journal D.A.R. 3224

**Aliens, Immigration, and Citizenship** 🗝 Law questions

Where Board of Immigration Appeals (BIA) determines that certain conduct is morally turpitudinous in a precedential decision, reviewing court applies *Chevron* deference regardless of whether the order under review is the precedential decision itself or a subsequent unpublished order that relies upon it; overruling *Nicanor–Romero, 523 F.3d 992*, and 🚩 *Plasencia–Ayala v. Mukasey, 516 F.3d 738*.

Immigration and Nationality Act, § 237, 🏳 8 U.S.C.A. § 1227.

44 Cases that cite this headnote

**[4]    Aliens, Immigration, and Citizenship** 🗝 Crimes of moral turpitude in general

Driving under the influence with knowledge that driver is prohibited from driving with a suspended or otherwise restricted license is a crime of moral turpitude for removal purposes. Immigration and Nationality Act, § 237(a)(2)(A), 🏳 8 U.S.C.A. § 1227(a)(2)(A).

2 Cases that cite this headnote

**[5]    Aliens, Immigration, and Citizenship** 🗝 Crimes of moral turpitude in general

Violation of Arizona's aggravated DUI (driving under the influence) statute was a crime of moral turpitude for removal purposes; conviction required proof of driver's knowledge that he was prohibited from driving with a suspended or otherwise restricted license. Immigration and Nationality Act, § 237(a)(2)(A), 🏳 8 U.S.C.A. § 1227(a)(2)(A); A.R.S. § 28–1383(A)(1).

19 Cases that cite this headnote

**[6]    Administrative Law and Procedure** 🗝 Erroneous or unreasonable construction;  conflict with statute

Unexplained inconsistency in an agency's interpretation of its governing statute can be a reason for holding an interpretation to be an arbitrary and capricious change from agency practice; however, such inconsistency provides a basis for rejecting an agency's interpretation only in rare instances, such as when an agency provides no explanation at all for a change in policy, or when its explanation is so unclear or contradictory that court is left in doubt as to the reason for the change in direction.

23 Cases that cite this headnote

**[7]    Aliens, Immigration, and Citizenship** 🗝 Crimes of moral turpitude in general

Board of Immigration Appeals (BIA) did not act irrationally in determining that presence or absence of a mens rea element in the statute of conviction could be essential to a determination of whether a crime involved moral turpitude for removal purposes. Immigration and Nationality Act, § 237(a)(2)(A), 🏳 8 U.S.C.A. § 1227(a)(2)(A).

24 Cases that cite this headnote

---

**Attorneys and Law Firms**

**\*904** Christopher J. Stender, Esq., Stender & Pope, P.C., San Diego, CA, argued the cause, for the petitioner and filed a brief.

Surell Brady, Trial Attorney, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, DC, argued the cause, for the respondent and filed a brief; Bryan S. Beier, Senior Litigation Counsel, Donald E. Keener, Deputy Director, Office of Immigration Litigation, and Jeffrey S. Bucholtz, Acting Assistant Attorney General, Civil Division, were on the brief; Edward C. Durant, Attorney, Office of Immigration Litigation, also filed a brief; Linda S. Wendtland, Assistant Director, Office of Immigration Litigation, and Peter D. Keisler, Assistant Attorney General, Civil Division, were on the brief.

On Petition for Review of an Order of the Board of Immigration Appeals. Agency No. AXX–XXX–204.

**\*905** Before: ALEX KOZINSKI, Chief Judge, HARRY PREGERSON, DIARMUID F. O'SCANNLAIN, ANDREW J. KLEINFELD, BARRY G. SILVERMAN, RAYMOND C. FISHER, RICHARD A. PAEZ, MARSHA S. BERZON, RICHARD C. TALLMAN, RICHARD R. CLIFTON, and JAY S. BYBEE, Circuit Judges.

**Opinion**

Partial Concurrence and Partial Dissent by Judge BYBEE;

O'SCANNLAIN, Circuit Judge:

We are called upon to decide whether an alien may be removed from the United States for having been convicted of a crime involving moral turpitude as determined under federal immigration law.

## I

### A

Petitioner Armando Marmolejo–Campos, a native and citizen of Mexico, entered the United States without inspection near Nogales, Arizona, sometime in 1983. In 1990, he was convicted of felony theft in violation of Arizona Revised Statutes section 13–1802, and was sentenced to two months imprisonment. Years later, Campos was pulled over while driving in Maricopa County, Arizona, and charged with aggravated driving under the influence ("DUI"), in violation of Arizona Revised Statutes section 28–1383(A)(1).[1] Under that statute, a person is guilty of an aggravated DUI if he "driv[es]" or takes "actual physical control" of a vehicle "while under the influence of intoxicating liquor or drugs" *and* "while the person's driver license or privilege to drive is suspended, canceled, revoked or refused or while a restriction is placed on the person's driver license or privilege to drive as a result of [a prior DUI-related conviction]." *Id.*[2]

In 1997, Campos pled guilty to committing such offense and, in so doing, admitted that he was driving on the day in question, that his blood alcohol content upon arrest was .164, and that he did not have a valid driver's license at the time.

Campos was sentenced to four months in prison and three years probation as a result of this conviction.

The Immigration and Naturalization Service ("INS") subsequently placed Campos in removal proceedings, but he successfully petitioned for a waiver of inadmissibility and an adjustment of status to that of a lawful permanent resident, which he received in 2001. One year later, Campos pled guilty to violating Arizona's aggravated DUI statute for a second time, after he was again pulled over in Maricopa County for running a red light while intoxicated. At Campos's plea hearing, he admitted that he ran the red light, that his **\*906** blood alcohol content upon arrest was .233, and that he knew at the time he was driving that his license had been suspended or revoked. Campos was sentenced to two and a half years in prison as a result of this second offense.

### B

After his second aggravated DUI conviction, the Department of Homeland Security ("DHS"), the successor to the INS,[3] reinstituted removal proceedings against Campos, charging that he was removable under the Immigration and Naturalization Act ("INA") as an alien convicted of "a crime involving moral turpitude" within ten years of admission, *see* 8 U.S.C. § 1227(a)(2)(A)(i), and as an alien convicted of "two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct," *see id.* § 1227(a)(2)(A)(ii).

Campos filed a motion to terminate the proceedings, arguing that his aggravated DUI convictions were not crimes of moral turpitude. An Immigration Judge ("IJ") held otherwise and ordered him removed to Mexico.[4]

The Board of Immigration Appeals ("BIA" or the "Board") affirmed the IJ's decision in an unpublished order signed by a single member of the Board. That order relied on the BIA's en banc precedent, *In re Lopez–Meza,* 22 I. & N. Dec. 1188 (B.I.A.1999), which held that a violation of Arizona's aggravated DUI statute is a crime involving moral turpitude. In *Hernandez–Martinez v. Ashcroft,* 329 F.3d 1117 (9th Cir.2003), we considered *Lopez–Meza* and rejected the Board's interpretation of the Arizona statute. Although

09 Cal. Daily Op. Serv. 2667, 2009 Daily Journal D.A.R. 3224

we did not opine on the Board's conclusion that the act of driving under the influence with a suspended or otherwise restricted driver's license is a crime involving moral turpitude, we held that the Board misinterpreted Arizona's aggravated DUI statute by failing to acknowledge that it prohibits more than that act alone. *Id.* at 1118–19. As we explained, section 28–1383(A)(1) can be violated (1) by "driving" while under the influence of intoxicating liquor or drugs with a suspended or otherwise restricted driver's license, *or* (2) by maintaining "actual physical control" of a vehicle under the same conditions. *Id.* When a criminal statute has multiple independent prongs, the Board must determine whether any conduct violative of the statute meets the relevant definition of a deportable offense under the INA. *Id.* at 1118. By failing to assess Arizona's aggravated DUI statute as such, we held that the Board committed an "error of law" and we expressed our doubt that it intended to categorize the second act as a crime of equal severity as the first. *Id.* at 1119. Still, we did not foreclose the possibility that a conviction under section 28–1383(A)(1) could qualify as a crime of moral turpitude if the record of conviction demonstrated that the offender had been driving at the time of the arrest.

Acknowledging *Hernandez–Martinez,* the IJ and the BIA in this case looked beyond the statute to the record of Campos's conviction and determined that the transcripts of his 1997 and 2002 plea hearings sufficiently established that both offenses for which he was convicted involved driving while intoxicated. Relying on *Lopez–Meza,* the BIA concluded that such **\*907** convictions were crimes involving moral turpitude. [5]

### D

Campos timely filed a petition for review. A divided panel of our court denied the petition, upholding the Board's determination that a violation of Arizona's aggravated DUI statute that involves actual driving is a crime involving moral turpitude. *Marmolejo–Campos v. Gonzales,* 503 F.3d 922 (9th Cir.2007), *reh'g en banc granted,* 519 F.3d 907 (9th Cir.2008). We now consider this question en banc.

### II

### A

**[1]** We have no jurisdiction to review a final order removing an alien on account of a conviction for a crime involving moral turpitude. 8 U.S.C. § 1252(a)(2)(C). Nevertheless, we have jurisdiction to review the Board's determination that Campos's convictions are, in fact, "crimes involving moral turpitude" as the INA defines that term. *See Ye v. INS,* 214 F.3d 1128, 1131 (9th Cir.2000).

### B

**[2]** Before examining the Board's decision, we must determine the standard of our review, an issue which has been squarely raised in this case. The BIA's ultimate determination that a petitioner such as Campos has committed a crime involving moral turpitude requires two separate inquiries. First, the BIA must determine what offense the petitioner has been convicted of committing. This requires the agency to interpret the statute under which the petitioner was convicted and, in certain cases, to examine the record of conviction. [6] *See infra* at 911–12. Second, once the Board has identified the petitioner's offense, it must determine whether such conduct is a "crime involving moral turpitude" as defined in the applicable section of the INA. This requires the Board to apply the definition of the term "moral turpitude" and to determine whether the petitioner's conduct meets such definition.

It is well established that we give no deference to the BIA's answer to the first question. The BIA has no special expertise by virtue of its statutory responsibilities in construing state or federal criminal statutes and, thus, has no special administrative competence to interpret the petitioner's statute of conviction. As a consequence, we review the BIA's finding regarding the specific act for which the petitioner was convicted *de novo. See Cuevas–Gaspar v. Gonzales,* 430 F.3d 1013, 1017 (9th Cir.2005); *Goldeshtein* **\*908** *v. INS,* 8 F.3d 645, 647 n. 4 (9th Cir.1993).

The Board's answer to the second question requires a different standard of review. Our precedents, however, have not always been consistent. At times, we have suggested that the BIA's determination that a specific act is a crime of moral turpitude is a finding entitled to deference, although

we have not prescribed the precise nature of such deference. *See* Cerezo v. Mukasey, 512 F.3d 1163, 1166 n. 6 (9th Cir.2008); Hernandez–Martinez, 329 F.3d at 1119. At other times, we have reviewed the determination *de novo. See, e.g.,* Fernandez–Ruiz v. Gonzales, 468 F.3d 1159, 1165 (9th Cir.2006); Cuevas–Gaspar, 430 F.3d at 1018–20; Notash v. Gonzales, 427 F.3d 693, 696 (9th Cir.2005). [7] And in still other cases, we have suggested that while our review might be deferential in theory, it is *de novo* in fact. *See* Nicanor–Romero v. Mukasey, 523 F.3d 992, 997–98 (9th Cir.2008). In light of this uncertainty, we set forth the following principles.

1

When the Board considers whether a certain crime involves "moral turpitude," it must interpret that term through a process of case-by-case adjudication. [8] When reviewing an agency's interpretation of its governing statute, we follow the two-step framework famously set forth in Chevron U.S.A. Inc., v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Initially, we determine whether "the intent of Congress is clear." Id. at 842, 104 S.Ct. 2778. If it is, both the court and the agency "must give effect to the unambiguously expressed intent of Congress." Id. at 842–43, 104 S.Ct. 2778. If the statute is "silent or ambiguous," however, we may not supply the interpretation of the statute we think best (as we would without an agency pronouncement), but must limit ourselves to asking "whether the agency's answer is based on a permissible construction of the statute." Id. at 843, 104 S.Ct. 2778.

Not every agency interpretation of its governing statute is entitled to *Chevron* deference, however. In United States v. Mead Corp., 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), the Supreme Court emphasized that *Chevron* only applies (1) "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law," *and* when (2) "the agency interpretation claiming deference was promulgated in the exercise of that authority." Id. at 226–27, 121 S.Ct. 2164. In other words, before we apply *Chevron,* we must conclude that Congress delegated

authority to the agency to interpret the statute in question and that the agency decision under review was **\*909** made with a "lawmaking pretense." Id. at 233, 121 S.Ct. 2164.

2

The Board's interpretations of the INA made in the course of adjudicating cases before it satisfy the first requirement for *Chevron* deference set forth in Mead: the Board, through the Attorney General's delegation, is authorized to promulgate rules carrying the force of law through a process of case-by-case adjudication and, thus, "should be accorded *Chevron* deference" as it exercises such authority to "give[ ] ambiguous statutory terms 'concrete meaning.' " INS v. Aguirre–Aguirre, 526 U.S. 415, 425, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) (quoting INS v. Cardoza–Fonseca, 480 U.S. 421, 448–49, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)).

Whether the Board's interpretations of the INA satisfy Mead's second requirement depends on the form the Board's decision takes. "Our cases applying *Mead* treat the precedential value of an agency action as *the* essential factor in determining whether *Chevron* deference is appropriate." Alvarado v. Gonzales, 449 F.3d 915, 922 (9th Cir.2006) (collecting cases). Thus, we have held that the Board's precedential orders, which bind third parties, qualify for *Chevron* deference because they are made with a "lawmaking pretense." Id. (internal quotation marks omitted). We have not accorded *Chevron* deference to the Board's unpublished decisions, however, because they do not bind future parties. *See* Garcia–Quintero v. Gonzales, 455 F.3d 1006, 1012–14 (9th Cir.2006). [9]

Nevertheless, *Skidmore* deference remains "intact and applicable" when an agency with rulemaking power interprets its governing statute without invoking such authority. Mead, 533 U.S. at 237, 121 S.Ct. 2164 (discussing Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). Under *Skidmore,* the measure of deference afforded to the agency varies "depend[ing] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to

persuade, if lacking power to control." 323 U.S. at 140, 65 S.Ct. 161. Recognizing that the BIA's interpretations of the INA are entitled to at least this much respect, we have applied *Skidmore* when reviewing its unpublished orders. *See, e.g.,* Ortiz–Magana v. Mukasey, 523 F.3d 1042, 1050 (9th Cir.2008); Estrada–Rodriguez v. Mukasey, 512 F.3d 517, 520 (9th Cir.2007); Ortega–Cervantes v. Gonzales, 501 F.3d 1111, 1113 (9th Cir.2007); Garcia–Quintero, 455 F.3d at 1014.

3

In light of these principles, we consider the extent to which the BIA's interpretations of the term "moral turpitude" are entitled to our deference.

a

The meaning of the term falls well short of clarity. Indeed, as has been noted before, "moral turpitude" is perhaps the quintessential example of an ambiguous phrase. *See* Galeana–Mendoza v. Gonzales, 465 F.3d 1054, 1055 (9th Cir.2006). [10]   **\*910**  In a series of published decisions, the BIA has set forth its general understanding that a "crime involving moral turpitude" involves "conduct that shocks the public conscience as being inherently base, vile, or depraved, contrary to the rules of morality and the duties owed between man and man, either one's fellow man or society in general." In re Perez–Contreras, 20 I. & N. Dec. 615, 618 (B.I.A.1992); *see also* In re Danesh, 19 I. & N. Dec. 669, 670 (B.I.A.1988) (same). In a welcome effort to "establish a uniform framework" for the determination of crimes involving moral turpitude, the Attorney General has recently decreed that "[a] finding of moral turpitude ... requires that a perpetrator have committed [a] reprehensible act with some form of scienter." *In re* Silva–Trevino, 24 I. & N. Dec. 687, 688, 706 (2008).

Despite the principles set forth above, we have been hesitant to defer to such general statements by the Board, and we are not alone in this view. As the Seventh Circuit has explained, the Board's general understanding of the term "moral turpitude" is not the result of "any insights that it might have obtained from adjudicating immigration cases," Mei v. Ashcroft, 393 F.3d 737, 739 (7th Cir.2004), but simply a recitation of the definition found in the criminal law, *see, e.g.,* Benitez v. Dunevant, 198 Ariz. 90, 7 P.3d 99, 104 (2000); In re Craig, 12 Cal.2d 93, 82 P.2d 442, 444 (1938); In re Farina, 94 Wash.App. 441, 972 P.2d 531, 541 (1999). Thus, as we have stated before, because the Board's general definition of "moral turpitude" fails to "particularize" the term in any meaningful way, " 'giving *Chevron* deference ... has no practical significance.' " Galeana–Mendoza, 465 F.3d at 1058 n. 9 (quoting Mei, 393 F.3d at 739).

Consequently, without more specific guidance from the Board, we have relied on our own generalized definition of "moral turpitude," *see* Carty v. Ashcroft, 395 F.3d 1081, 1083 (9th Cir.2005) (explaining that we have traditionally divided crimes involving moral turpitude into two basic types: "those involving fraud and those involving grave acts of baseness or depravity."); *see also* Navarro–Lopez v. Gonzales, 503 F.3d 1063, 1074 (9th Cir.2007) (en banc) (Reinhardt, J., concurring for the majority) (same), although we have noted that our understanding does not differ materially from the Board's, Galeana–Mendoza, 465 F.3d at 1058 n. 9.

b

Orders issued by the BIA contain more than an abstract definition of moral turpitude, however. When the Board adjudicates a case, it must determine whether a petitioner's offense, once established, meets the definition of such term. In so doing, it assesses the character, gravity, and moral significance of the conduct, drawing upon its expertise as the single body charged with adjudicating all federal immigration cases. This is precisely the type of agency action the Supreme Court instructs is entitled to *Chevron* deference. *See* Aguirre–Aguirre, 526 U.S. at 425, 119 S.Ct. 1439. Indeed, we accord *Chevron* deference to the BIA's construction of other ambiguous terms in the INA promulgated through its precedential decisions.  **\*911**  *See, e.g.,* Miguel–Miguel v. Gonzales, 500 F.3d 941, 947–48 (9th Cir.2007) ( "particularly serious crime"); Murillo–Espinoza v. INS, 261 F.3d 771, 774 (9th Cir.2001) ("conviction"); Fisher v. INS, 79 F.3d 955, 961 (9th Cir.1996) (en banc) ("persecution"). Similarly,

we accord *Skidmore* to the Board's nonprecedential decisions interpreting its governing statute. *See supra* at 909–10 (collecting cases). We see no reason to exempt the Board's treatment of "moral turpitude" from these rules.

With this backdrop in mind, we now consider the proper standard of review in this case. The Board affirmed the IJ's order of removal, holding that Campos's 1997 and 2002 aggravated DUI convictions were "crimes involving moral turpitude" under the INA, 8 U.S.C. § 1227(a)(2)(A)(i), (ii). As previously explained, *supra* at 907, we review de novo the Board's interpretation of the Arizona statute under which Campos was convicted. If we uphold such interpretation, we must consider the extent to which we will defer to the Board's decision that the conduct it found the Arizona statute to prohibit—driving under the influence with a suspended or otherwise restricted license—is a crime of moral turpitude.

 [3]    The BIA dismissed Campos's appeal in an unpublished order. That order, however, relied upon *Lopez–Meza,* a precedential decision addressing the dispositive question of statutory interpretation at issue in this case. As the Supreme Court has suggested, we conclude that where, as here, the Board determines that certain conduct is morally turpitudinous in a precedential decision, we apply *Chevron* deference regardless of whether the order under review is the precedential decision itself or a subsequent unpublished order that relies upon it. *See Aguirre–Aguirre,* 526 U.S. at 418, 425, 119 S.Ct. 1439 (applying *Chevron* deference to a nonprecedential BIA order interpreting the phrase "serious nonpolitical crime" that relied on the interpretation of such phrase in an earlier precedential decision); *see also Mead,* 533 U.S. at 230 & n. 12, 121 S.Ct. 2164 (noting *Aguirre–Aguirre*'s application of *Chevron* deference with approval); *Garcia–Quintero,* 455 F.3d at 1014 (suggesting that *Chevron* deference may be appropriate when the BIA relies upon a precedential BIA decision "addressing the precise question at issue" in an unpublished order).

In sum, we conclude that, once the elements of the petitioner's offense are established, our review of the BIA's determination that such offense constitutes a "crime of moral turpitude" is governed by the same traditional principles of administrative deference we apply to the Board's interpretation of other ambiguous terms in the INA. We have sometimes suggested

otherwise in the past. *Nicanor–Romero,* 523 F.3d at 997 (declining to defer to the Board's *generalized* definition of "moral turpitude" but failing to assess the Board's particularized application of that definition to the petitioner's case); *Plasencia–Ayala v. Mukasey,* 516 F.3d 738, 744–45 (9th Cir.2008) (rejecting the argument that "*Chevron* deference should apply to the BIA's interpretation of the 'amorphous phrase' 'crime involving moral turpitude' " even though such interpretation was based on a precedential decision). We now overrule those cases and any others that have impliedly so held. And, in so doing, we join every other court of appeals to have considered the question. *See Ali v. Mukasey,* 521 F.3d 737, 739 (7th Cir.2008); *Wala v. Mukasey,* 511 F.3d 102, 105 (2d Cir.2007); *Knapik v. Ashcroft,* 384 F.3d 84, 87–88 (3d Cir.2004); *Yousefi v. INS,* 260 F.3d 318, 325–26 (4th Cir.2001);  **\*912**  *Hamdan v. INS,* 98 F.3d 183, 185 (5th Cir.1996); *Franklin v. INS,* 72 F.3d 571, 572 (8th Cir.1995); *Cabral v. INS,* 15 F.3d 193, 194 (1st Cir.1994).

III

With our standard of review established, we examine the BIA's decision in this case. We begin with the Board's construction of Campos's aggravated DUI convictions.

A

To determine whether a specific crime meets the definition of a removable offense listed in the INA, our court applies the categorical and modified categorical approaches set forth in *Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). *See Cuevas–Gaspar,* 430 F.3d at 1017. While we first apply the categorical approach, if the statute of conviction is not a "categorical match" for the generic federal crime because it criminalizes both conduct that does involve moral turpitude and other conduct that does not, "we apply a 'modified' categorical approach." *Fernandez-Ruiz,* 468 F.3d at 1163. Under that approach, in the past, we have seen fit to " 'look beyond the language of the statute to a narrow, specified set of documents that are part of the record of conviction, including the indictment, the judgment of conviction, jury instructions, a signed guilty

plea, or the transcript from the plea proceedings.' " *Id.* at 1163–64 (quoting *Tokatly v. Ashcroft,* 371 F.3d 613, 620 (9th Cir.2004)). If these documents establish that the jury found, or the petitioner pled guilty to, elements of a crime involving moral turpitude, he is properly removable. *Cuevas–Gaspar,* 430 F.3d at 1020. [11]

Arizona's aggravated DUI statute contains four elements. The first three elements are immediately apparent: A person must (1) "driv[e] or maintain "actual physical control" over a vehicle, (2) while "under the influence of intoxicating liquor or drugs," (3) while his or her license or privilege to drive is "suspended, canceled, revoked, or refused or while a restriction is placed upon the person's driver license[as a result of a prior DUI-related offense]." Ariz.Rev.Stat. § 28–1383(A)(1); *see supra* 905. As for the fourth element, Arizona courts have held that to sustain a conviction, the text of the statute requires the state to prove that the offender drove with a suspended or otherwise revoked license, and that he knew or should have known of the suspension or revocation. *See State v. Cramer,* 192 Ariz. 150, 962 P.2d 224, 226 (1998) ("To support the conviction for aggravated DUI, the state is required to prove the defendant drove a motor vehicle under the influence of alcohol while his license was revoked and that he *knew or should have known* of the revocation." (emphasis added)); *State v. Superior Court,* 190 Ariz. 203, 945 P.2d 1334, 1337 (1997) (same); *State v. Agee,* 181 Ariz. 58, 887 P.2d 588, 590 (1994) (same); *see also State v. Williams,* 144 Ariz. 487, 698 P.2d 732, 734 (1985) (same). "Should have known" is a negligence standard. *See State v. Hyde,* 186 Ariz. 252, 921 P.2d 655, 678 (1996). The BIA has held that mere negligence cannot support a finding of moral turpitude. *See Perez–Contreras,* 20 I. & N. Dec. at 618–19.

In *Lopez–Meza,* the BIA concluded that a violation of section 28–1383(A)(1) was categorically a crime involving moral turpitude. 22 I. & N. Dec. at 1195–96. As noted, we rejected that conclusion in *Hernandez–Martinez* because the Board failed to acknowledge that section 28–1383(A)(1) independently prohibits both driving *and* physically controlling a vehicle while under **\*913** the influence and with a suspended or otherwise restricted license. *Hernandez–Martinez,* 329 F.3d at 1118. Still, we did not consider whether a violation of section 28–1383(A)(1) could qualify as a crime involving moral turpitude if the petitioner had actually been driving at the time of the arrest.

Acknowledging *Hernandez–Martinez,* the Board in the case before us examined the transcript of Campos's 1997 and 2002 plea hearings and concluded that his testimony in both proceedings plainly demonstrated that both convictions arose out of incidents in which he was actually driving. The Board's reliance on the plea transcripts was an appropriate application of the modified categorical approach. *See Tokatly,* 371 F.3d at 620. Moreover, they adequately show that Campos admitted to driving on both occasions. Accordingly, we agree with the Board that the 1997 and 2002 aggravated DUI convictions both involved actual driving. [12]

The Board then relied on its precedent in *Lopez–Meza* to conclude that such conduct is a crime involving moral turpitude. Thus, the Board's decision in this case must stand if *Lopez–Meza* is based on a permissible construction of the INA.

### B

The BIA has never held that a simple DUI offense is a crime involving moral turpitude, a fact it attributes to "a long historical acceptance." *Lopez–Meza,* 22 I. & N. Dec. at 1194. Although the dangers of drunk driving are well established, the Board's unwillingness to classify it as a crime of moral turpitude is, perhaps, not surprising because statutes that prohibit driving under the influence typically do not require intent, but rather "are, or are most nearly comparable to, crimes that impose strict liability." *Begay v. United States,* 553 U.S. 137, 128 S.Ct. 1581, 1586, 170 L.Ed.2d 490 (2008); *id.* at 1587 ("[T]he conduct for which the drunk driver is convicted (driving under the influence) need not be purposeful or deliberate."); *see Leocal v. Ashcroft,* 543 U.S. 1, 11, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004) (stating that a DUI offense involves "accidental or negligent conduct"). [13]

**\*914** **[4]** **[5]** Yet the Board treats Arizona's prohibition on aggravated DUI differently because it contains an additional "aggravating" element: the offender's knowledge, at the time of the DUI, that the state has denied him the privilege to drive under any circumstances. *See Lopez–Meza,* 22 I. & N. Dec. at 1195 (citing Arizona caselaw interpreting section 28–1383(A)(1) as containing a knowledge requirement); *see supra* at 912–13 (collecting such Arizona cases). Thus,

Marmolejo-Campos v. Holder, 558 F.3d 903 (2009)
09 Cal. Daily Op. Serv. 2667, 2009 Daily Journal D.A.R. 3224

the Board reasoned that "aside from the culpability that is often, but not inherently, present in a simple DUI offense," an individual who commits an aggravated DUI does so "knowing that he or she is *absolutely prohibited* from driving" and, in so doing, commits a morally turpitudinous offense. *Lopez–Meza,* 22 I. & N. Dec. at 1195–96 (emphasis added); *cf.* *Silva–Trevino,* 24 I. & N. Dec. at 706 & n. 5 (noting that a scienter element is a hallmark of a crime involving moral turpitude); *Danesh,* 19 I & N. Dec. at 673 (explaining that violation of the law "exhibits a deliberate disregard for the law, which we consider to be a violation of the accepted rules of morality and the duties owed to society").

### 1

[6]   Campos and the dissent argue that the Board's decision in his case cannot stand because *Lopez–Meza* conflicts with other BIA precedents and, thus, is not based on a permissible construction of the INA. They are correct that "[u]nexplained inconsistency" in an agency's interpretation of its governing statute can be "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 981, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005); Dissent at 919–21. Nevertheless, we are mindful that such inconsistency provides a basis for rejecting an agency's interpretation only in "rare instances, such as when an agency provides no explanation at all for a change in policy, or when its explanation is so unclear or contradictory that we are left in doubt as to the reason for the change in direction." *Morales–Izquierdo v. Gonzales,* 486 F.3d 484, 493 (9th Cir.2007) (en banc); *see also* *Lands Council v. Martin,* 529 F.3d 1219, 1225 (9th Cir.2008) (applying *Morales–Izquierdo* to hold that the Forrest Service provided a "rational explanation" for its change in policy that did not leave the court "in doubt as to the reason for the change in direction" (internal quotation marks and citation omitted)).

Campos's argument is twofold. First, he argues that *Lopez–Meza* cannot be harmonized with a subsequent BIA decision, *In re Torres–Varela,* 23 I. & N. Dec. 78 (B.I.A.2001), and that, as a result, the Board erred in relying on *Lopez–Meza* in his case. In *Torres–Varela,* the Board held that an alien who had violated Arizona's "recidivist DUI" statute, which

punishes those who commit a DUI after already having three or more simple DUI convictions, had not committed a crime involving moral turpitude.[14]   **\*915** 23 I. & N. Dec. at 85–86. Campos contends that if committing three separate DUIs is not morally turpitudinous, driving under the influence with a suspended or otherwise restricted license cannot be said to be more offensive conduct.

Yet the en banc panel of the Board in *Torres–Varela* acknowledged *Lopez–Meza* and reasoned that its holding did not conflict with that precedent. According to *Torres–Varela,* "[t]he aggravating factor rendering the DUI conviction a crime involving moral turpitude in ... *Lopez–Meza* was the *culpable mental state* needed for a conviction under [section 28–1383(A)(1) ]": the "showing that the defendant *knew,* at the time that he was driving while under the influence of alcohol, that his driver's license had been suspended and that he was not permitted to drive." 23 I. & N. Dec. at 85 (emphasis added). The aggravating factor in a recidivist conviction, however, is the fact that the offender has been convicted of simple DUI offenses before. In the Board's view, recidivist DUI "is based on an aggregation of simple DUI convictions" and, since no single simple DUI is a crime of moral turpitude, a collection of DUIs, no matter how many, can never qualify as such. *Id.* at 85–86.

[7]   The Board in *Torres–Varela* offered a rational distinction between recidivist DUI and aggravated DUI offenses. Thus, we cannot accept Campos's argument that the Board should not have applied *Lopez–Meza's* interpretation of the aggravated DUI statute at issue in this case. To reject the Board's distinction as arbitrary and capricious would be to reject its use of the knowledge element in the aggravated DUI statute as a permissible ground for treating an aggravated DUI differently from a recidivist DUI offense. Again, the Attorney General has declared the presence of scienter to be an essential element of a crime involving moral turpitude. *See* *Silva–Trevino,* 24 I. & N. Dec. at 706 & n. 5. Such a distinction consistently has been critical to the BIA's determination of whether violation of a statute constitutes a crime involving moral turpitude. *See, e.g.,* *Perez–Contreras,* 20 I. & N. Dec. at 618 ("Where knowing or intentional conduct is an element of an offense, we have found moral turpitude to be present."); *Danesh,* 19 I. & N. Dec. at 673 (transforming assault into a crime involving moral turpitude because the statute required the offender to "know that the person

09 Cal. Daily Op. Serv. 2667, 2009 Daily Journal D.A.R. 3224

assaulted a peace officer"); *In re McNaughton*, 16 I. & N. Dec. 569, 574 (B.I.A.1978) (stating that "whenever a crime has involved intent to defraud, it has been found to involve moral turpitude"); *In re Abreu–Semino*, 12 I. & N. Dec. 775, 777 (B.I.A.1968) (stating that "moral turpitude normally inheres in the intent"); *In re P-*, 6 I. & N. Dec. 795, 798 (B.I.A.1955) (same); *In re R-*, 6 I. & N. Dec. 772, 773–774 (B.I.A.1955) (stating the rule that "unless the statute under consideration requires knowledge on the part of the receiver that the goods were obtained unlawfully the offense defined does not necessarily involve moral turpitude"); *In re M-*, 2 I. & N. Dec. 721, 723 (B.I.A.1946) (holding that an offense involving a breaking and entering may be deemed to involve moral turpitude only if it is accompanied by the intent to commit a morally turpitudinous act after entry); *In re G-*, 1 I. & N. Dec. 403, 404–06 (B.I.A.1943) (same). While we recognize that Campos's knowledge that he was driving without a license does not exactly add a knowing or intentional component to DUI because the intent involved is different, we cannot conclude that the Board acted irrationally in using intent as a ground to draw a distinction between recidivist DUI and aggravated DUI.

The dissent criticizes our deference to the BIA's conclusion that the presence or absence of a mens rea element in the **\*916** statute of conviction can be essential to a determination of whether a crime involves moral turpitude. The "real question," the dissent asserts, is "what *is* a sufficiently 'culpable mental state?' " Dissent at 926. This stands in stark contrast to the Attorney General's determination that "*some form* of scienter" is all that is required in order to conclude that a crime involves moral turpitude. *Silva–Trevino*, 24 I. & N. Dec. at 706 (emphasis added). Indeed, the dissent asks us to apply a heightened standard of review, a standard of review far beyond the deferential approach mandated by *Chevron*. Because the statutory text is devoid of any provision which requires a particular level of scienter, we must defer to the agency's case-by-case adjudication of the matter so long as its construction of the statute is permissible. *See Aguirre–Aguirre*, 526 U.S. at 424–25, 119 S.Ct. 1439. As the dissent itself admits, the BIA has not seen fit to create a categorical level of scienter for all crimes involving moral turpitude: nor is it required to. Here, after assessing "the statutory definition" and "the nature of the crime," *McNaughton v. INS*, 612 F.2d 457, 459 (9th Cir.1980), the BIA concluded that given the mens rea involved, the crime was one of moral turpitude.

To the extent such a conclusion conflicts with prior BIA precedent, this is not one of those "rare instances" where we should withhold deference. *Morales–Izquierdo*, 486 F.3d at 493; *see also Lands Council*, 529 F.3d at 1225. The agency has not failed to provide an explanation for its action. To the contrary, the BIA explicitly pointed to the significance of the mens rea element, a significance only confirmed by *Silva–Trevino*. *See Lopez–Meza*, 22 I. & N. Dec. at 1195–96; *see also Silva–Trevino*, 24 I. & N. Dec. at 706; *Torres–Varela* 23 I. & N. Dec. at 85. Such explanation is not irrational, and it certainly does not leave us "in doubt as to the reason for the change in direction." *Morales–Izquierdo*, 486 F.3d at 493; *see also Lands Council*, 529 F.3d at 1225. The dissent would have us be persuaded by the reason for the change. Our precedent does not require so much.

### 2

Second, Campos, along with the dissent, argues that the Board's decision in *Lopez–Meza* cannot be reconciled with its prior holding in *In re Short*, 20 I. & N. Dec. 136 (B.I.A.1989). In that case, the Board held that the federal offense "assault with intent to commit any felony" could not be categorized as a crime involving moral turpitude without first considering whether the underlying felony was itself such an offense. *Id.* at 139 (discussing 18 U.S.C. § 113(b) (repealed 1994)). The Board reasoned that because simple assault is not a crime involving moral turpitude, "if ... the felony intended as a result of that assault also does not involve moral turpitude, then the two crimes combined do not involve moral turpitude." *Id.* The Board then stated that "[m]oral turpitude cannot be viewed to arise from some undefined synergism by which two offenses are combined to create a crime involving moral turpitude, where each crime individually does not involve moral turpitude." *Id.*

Campos and the dissent contend that this latter statement from the Board's opinion in *Short* governs this case. Because the Board has never held that simple DUI or driving with a suspended license, standing alone, are crimes of moral turpitude, they argue that committing both offenses at the

Marmolejo-Campos v. Holder, 558 F.3d 903 (2009)
09 Cal. Daily Op. Serv. 2667, 2009 Daily Journal D.A.R. 3224

same time is not a crime involving moral turpitude either. Yet the en banc panel in *Lopez–Meza* considered the same argument and rejected it. As the BIA explained,

> [w]e *did not hold* in [*Short* ] that a combination of acts that are included as elements of a specific offense could *never,* when added together, build to such a **\*917** heightened deviance from accepted moral standards as to reach a level of conduct deemed morally turpitudinous. In fact, additional aggravating elements can often transform an offense that otherwise would not be a crime involving moral turpitude into one that is.

*Lopez–Meza,* 22 I. & N. Dec. at 1196 (emphasis added). In other words, the Board construed *Short* as prohibiting a finding of moral turpitude based on the amalgamation of offenses in *that* case (simple assault with intent to commit a felony of unproven seriousness), but held that *Short* did not prohibit a finding of moral turpitude based on *any* combination of acts proscribed by a single criminal statute that might arise in a future case.

We conclude that the Board provided a reasoned explanation for its resolution of any tension between its holdings in *Lopez–Meza* and *Short. See Brand X,* 545 U.S. at 1000–01, 125 S.Ct. 2688. Moreover, the Board's rejection of the rule Campos seeks is not irrational. It is possible that two separate acts may not be turpitudinous standing alone, but that their commission in tandem rises to the level of an offense so contrary to accepted societal standards as to result in a crime involving moral turpitude. [15]

The Board's en banc decision in *Lopez–Meza* was accompanied by a dissent that would have held that aggravated DUI is not a crime involving moral turpitude. Our decision today is likewise accompanied by a vigorous dissent. The existence of such dissents indicates that the question of whether the offense at issue rises to the level of a crime of a crime involving moral turpitude is one upon which reasonable minds can differ. Yet Congress left the choice between reasonable interpretations of the INA to the Attorney

General and, by his delegation, to the BIA, and " ' desired [that body] (rather than the courts) to possess whatever degree of discretion the ambiguity allows.' " *Brand X,* 545 U.S. at 982, 125 S.Ct. 2688 (quoting *Smiley v. Citibank (S.D.), N.A.,* 517 U.S. 735, 740–41, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996)). We are satisfied that the Board's determination—DUI offenses committed with the knowledge that one's driver's license has been suspended or otherwise restricted are crimes involving moral turpitude—is a reasonable interpretation of the INA. The deferential standard that governs our review requires no more.

IV

Accordingly, Campos's petition for review is

**DENIED.**

BYBEE, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the BIA is entitled to *Chevron* deference when it issues a precedential decision holding that **\*918** particular conduct is morally turpitudinous *and* when it subsequently issues an unpublished order relying upon that precedential decision. As the majority notes, today's decision clarifies an area of confusion in our case law and harmonizes our approach with that of other circuits who have considered this issue. I am therefore pleased to join Parts I and II of the court's opinion.

I dissent, however, from Part III of the court's opinion and from its judgment. As Judge Berzon convincingly demonstrates in her opinion, the BIA's decision in *In re Lopez–Meza,* 22 I. & N. Dec. 1188 (B.I.A.1999), cannot be plausibly reconciled with BIA precedent. The BIA has already determined that even a third recidivist conviction for drunk driving does not constitute a crime involving moral turpitude ("CIMT"), *see Matter of Torres–Varela,* 23 I. & N. Dec. 78 (B.I.A.2001), and the agency has categorically stated that "[m]oral turpitude cannot be viewed to arise from some undefined synergism by which two offenses are combined to create a crime involving moral turpitude." *Matter of Short,* 20 I. & N. Dec. 136, 139 (B.I.A.1989). In light of these decisions—as well as the BIA's consistently

expressed view that regulatory offenses do not involve moral turpitude—the BIA's conclusion that driving under the influence without a valid driver's license constitutes a CIMT cannot be deemed reasonable.

Of course, an agency is not prohibited from reconsidering the wisdom of past decisions in light of changed circumstances and past experience. Thus, I might well have viewed this case differently if the BIA had issued a well-considered opinion formally overruling either *Torres–Varela,* or *Short,* or both. However, here the BIA did not take the opportunity to overrule or formally limit its past decisions. Instead, the agency supported its moral turpitude finding by baldly stating "that a person who drives while under the influence, knowing that he or she is absolutely prohibited from driving," has committed a CIMT. *Lopez–Meza,* 22 I. & N. Dec. at 1196. The agency attempted to distinguish *Short* by noting that *Short* involved only the question whether simple assault with intent to commit a felony constituted a CIMT, but the BIA did not even attempt to explain how its decision in *Lopez–Meza* was consistent with the language in *Short,* quoted above, which broadly precludes the BIA from doing exactly what it did here—combining two non-turpitudinous offenses to create a CIMT. *Id.* An agency has an obligation of consistent dealing and we cannot, even under *Chevron,* affirm an agency decision that offers nothing more than a conclusory and disingenuous attempt to distinguish past decisions that clearly mandate a result contrary to the one the agency has reached.

I thus respectfully dissent from the court's judgment.

BERZON, Circuit Judge, with whom PREGERSON, FISHER, and PAEZ, Circuit Judges, join, dissenting:

I agree with the majority that *Chevron U.S.A. Inc., v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), is the correct framework within which to evaluate whether deference is due to the BIA's holding, in a precedential decision, that a conviction under Arizona Revised Statutes § 28–1383(A)(1) constitutes a "crime involving moral turpitude" ("CIMT") for purposes of 8 U.S.C. § 1227(a)(2)(A)(ii). I agree, further, that when such a precedential holding directly controls the outcome in a subsequent, non-precedential case, we evaluate that holding under the *Chevron* framework as well. [1]

**\*919** I disagree, however, with the majority's conclusion in Part III of its opinion that, under *Chevron,* deference is in fact merited in this case. Although the BIA's precedential decision in *Matter of Lopez–Meza,* 22 I. & N. Dec. 1188 (B.I.A.1999), directly controls Marmolejo–Campos's case, *Lopez–Meza* is the epitome of an unreasonable agency interpretation, to which we need not defer under *Chevron.*

As the majority explains, *Chevron,* at what has come to be known as Step Two, instructs us to defer to an agency's interpretation of ambiguous statutory language so long as that interpretation is "a reasonable policy choice for the agency to make." *Chevron,* 467 U.S. at 845, 104 S.Ct. 2778. I can imagine few starker examples of unreasonable agency action than *Lopez–Meza,* the precedential decision dispositive in this case. Drunk driving is not, by itself, a CIMT; nor is driving on a suspended license; nor is a second (or third) drunk driving conviction. Yet under *Lopez–Meza,* drunk driving only once, while on a suspended license, *is* a CIMT. This holding is utterly illogical. And beyond defying common sense, *Lopez–Meza* makes no attempt to square its holding with prior BIA case law forbidding such "undefined synergism [s]" of individually nonturpitudinous offenses. *Matter of Short,* 20 I. & N. Dec. 136, 139 (B.I.A.1989). I fail to see how we can grant *Chevron* deference to this latest interpretive whim of an agency that continually refuses to state a coherent definition of, or follow a coherent approach to, the vague CIMT statutory term it is charged with applying. I therefore respectfully dissent.

## I.

## Unreasonable Interpretations Under *Chevron*

I begin with some observations concerning the degree of consistent decision-making we demand of an agency before deferring under *Chevron* to that agency's interpretation of its governing statute.

I recognize, first, that an agency's interpretation of an ambiguous statutory term can merit deference even if "the agency has from time to time changed its interpretation of the term." *Chevron,* 467 U.S. at 863, 104 S.Ct. 2778. So, when an agency articulates an interpretation of its governing statute in the type of decision for which *Chevron* deference

09 Cal. Daily Op. Serv. 2667, 2009 Daily Journal D.A.R. 3224

is otherwise appropriate, *see* *United States v. Mead Corp.,* 533 U.S. 218, 230–34, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), that "interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis." *Chevron,* 467 U.S. at 863–64, 104 S.Ct. 2778. We assume that by leaving gaps in a statute, Congress intended to give the agency charged with filling those gaps the flexibility to adapt its reading in light of changing circumstances and policy priorities, and we apply the *Chevron* framework with this flexibility in mind. *Id.* at 843–44, 104 S.Ct. 2778.

At the same time, agencies are *not* free, under *Chevron,* to generate erratic, irreconcilable interpretations of their governing statutes and then seek judicial deference. Consistency over time and across subjects is a relevant factor at *Chevron* Step Two, [2] **\*920** when deciding whether the agency's current interpretation is "reasonable." [2] *See* *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (observing that the Court would not need to defer to the INS's interpretation of the term "well-founded fear" at *Chevron* Step Two because "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view.") (internal quotation marks omitted). [3]

Moreover, when an agency does change its mind, it must provide an adequately reasoned explanation for the change. "Sudden and unexplained change, or change that does not take account of legitimate reliance on prior interpretation, may be arbitrary, capricious [or] an abuse of discretion," and therefore unworthy of deference. *Smiley v. Citibank (S.D.), N.A.,* 517 U.S. 735, 742, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996) (internal quotation marks and citations omitted); *see also* *Brand X,* 545 U.S. at 1000, 125 S.Ct. 2688 ("[T]he Commission is free within the limits of reasoned interpretation to change course if it adequately justifies the change."); *Rust v. Sullivan,* 500 U.S. 173, 186–87, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (deferring to the Secretary of Health and Human Services' interpretation, because "the Secretary amply justified his change of interpretation with a 'reasoned analysis' "). To satisfy this requirement, the agency must provide not only a reasoned explanation for its current position, but also a

reasoned explanation for why the change was warranted or why the new position is preferable.

This last check on agency discretion is particularly important when an agency interprets its governing statute, as the BIA does, primarily through adjudication. The flexibility *Chevron* accords is meant to give agencies room to "inform[ ]" themselves and "[re-]consider" the wisdom of their policies, 467 U.S. at 863–64, 104 S.Ct. 2778—*not* to allow them to proceed entirely ad hoc, capriciously deciding individual cases without any concern for generating a coherent body of interpretation and without pursuing a set of articulable and reconcilable policy goals. That is why, when agencies depart from their prior interpretations, they must offer a reasoned explanation for doing so. This requirement is rooted not only in the APA's prohibition on arbitrary and capricious action, but in the rule of law itself, for "unreasoned decisionmaking ... prevent[s] both consistent application of the [rule] by subordinate agency **\*921** personnel ... and effective review of the [rule] by the courts." *Allentown Mack Sales & Serv., Inc. v. NLRB,* 522 U.S. 359, 375, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998). *See also* *CBS v. FCC,* 454 F.2d 1018, 1025 (D.C.Cir.1971) ("Without such a requirement [as reasoned decisionmaking], effective judicial review would be impractical if not impossible, and administrative litigants and the public generally would be set adrift on a potential sea of unconscious preference and irrelevant prejudice.").

## II.

### *Lopez–Meza* as an Unreasonable Agency Interpretation

Viewed against these bedrock principles, the BIA's *Lopez–Meza* ruling merits no deference from this Court.

Overall, the BIA's precedential case law regarding the meaning of the phrase "crime involving moral turpitude" ("CIMT") is a mess of conflicting authority. To the degree that one is able to extract strands of relative coherence from that disarray, however, *Lopez–Meza* is inconsistent with those strands in two important respects. First, mere knowledge is not a sufficiently culpable mental state to transform a *regulatory* offense, such as driving without a license or simple driving under the influence ("DUI"), into a CIMT. As discussed in Section II.A, below, when the offense

in question is a nonfraud offense, the BIA generally requires some variant of "evil intent" to establish turpitude. When the offense is a mere *regulatory* offense, however, unrelated to a fraud or sex offense, the BIA will not consider it a CIMT *regardless* of what mental state the underlying statute specifies as a requirement for conviction. *Lopez–Meza* breaks with this principle by holding that the "knew or should have known" standard associated with A.R.S. § 28–1383(A)(1) is a sufficiently "evil" mens rea to transform that regulatory offense into a CIMT.

Second, as discussed in Section II.B, the BIA's case law indicates that if two offenses are not in themselves morally turpitudinous, they cannot be "synergis [tically]" combined to create a CIMT. *Matter of Short*, 20 I. & N. Dec. 136, 139 (B.I.A.1989). By combining two non-CIMTs to create a CIMT, *Lopez–Meza* is inconsistent with this strand of the agency's case law as well.

As to neither deviation does *Lopez–Meza* provide an adequately reasoned justification. In a context in which the agency has ventured precious few attempts at enunciating any generally applicable principles, *Lopez–Meza*'s deviation from the few principles that do exist is of special significance in undermining any semblance of reasoned decisionmaking. *Cf.* CBS, 454 F.2d at 1025 (noting that, for due process and public reliance reasons, "judicial vigilance to enforce the rule of law in the administrative process is particularly crucial where, as here, the area under consideration is in a constant state of flux.").

**A. Knowledge or Negligence as a CIMT Mental State**

*1. The relevance of intent in the BIA's case law*

As the majority observes, the BIA has never offered a comprehensive definition of the term "crime involving moral turpitude" to which we could defer under *Chevron*. Slip Op. at 909–10 (quoting Galeana–Mendoza v. Gonzales, 465 F.3d 1054, 1058 n. 9 (9th Cir.2006)). Although the Attorney General recently took a small step toward establishing a general definition in Matter of Silva–Trevino, 24 I. & N. Dec. 687 (2008), by opining that a CIMT "must involve both reprehensible conduct and some degree of scienter," *id.* at 689, the majority rightly treats this definition as ineligible for *Chevron* deference, because it is too vague to be a meaningful

clarification **\*922** of the notoriously ambiguous statutory term. Slip Op. at 910. [4]

In the absence of a meaningful definition of "crimes involving moral turpitude" generally, the *Chevron* framework is applicable only to the BIA's holdings in individual cases that particular offenses are, or are not, CIMTs. For example, the BIA has held fraud, "murder, rape, robbery, kidna[p]ping, voluntary manslaughter, some involuntary manslaughter offenses, [certain] aggravated assaults, mayhem, theft offenses, spousal abuse, child abuse, and incest" to be CIMTs. *Lopez–Meza*, 22 I. & N. Dec. at 1193 (citing no cases); *see also* Matter of Sanudo, 23 I. & N. Dec. 968, 973 (B.I.A.2006) (assault and battery involving the intentional infliction of serious bodily injury on another); Matter of Logan, 17 I. & N. Dec. 367 (B.I.A.1980) (assault with a deadly weapon); Matter of Leyva, 16 I. & N. Dec. 118, 120 (B.I.A.1977) (burglary with intent to commit theft); Matter of Beato, 10 I. & N. Dec. 730, 732 (B.I.A.1964) (rape); Matter of Y-, 3 I. & N. Dec. 544 (1949) (incest). Conversely, the BIA has held that most assaults and batteries, alien smuggling offenses, indecency offenses, and rioting offenses are *not* CIMTs. *See* Matter of S—, 9 I. & N. Dec. 688 (B.I.A.1962) (assault and battery); Matter of Tiwari, 19 I. & N. Dec. 875 (B.I.A.1989) (alien smuggling); Matter of Mueller, 11 I. & N. Dec. 268 (B.I.A.1965) (indecency); Matter of O—, 4 I. & N. Dec. 301 (B.I.A.1951) (rioting).

Despite this relative consistency in outcome, it is hard to say that any articulable principle distinguishes the offenses that are CIMTs from those that are not. Instead, the BIA has issued precedential decisions [5] making seemingly definitive pronouncements on both sides of possible lines of demarcation.

For example, the BIA has described the term "crime involving moral turpitude" as **\*923** a classification aimed primarily at "serious" and "dangerous" crimes. Matter of E-, 2 I. & N. Dec. 134, 139–40 (B.I.A.1944). Yet, it has also cautioned that "[n]either the seriousness of a criminal offense nor the severity of the sentence imposed therefor is determinative of whether a crime involves moral turpitude." Matter of Tran, 21 I. & N. Dec. 291, 293 (B.I.A.1996); *see also* Silva–

09 Cal. Daily Op. Serv. 2667, 2009 Daily Journal D.A.R. 3224

*Trevino,* 24 I. & N. Dec. at 705; *Matter of Serna,* 20 I. & N. Dec. 579 (B.I.A.1992).

Similarly, the BIA has declared that the definition of a CIMT is " 'an act which is per se morally reprehensible and intrinsically wrong, or malum in se, so it is the nature of the act itself and not the statutory prohibition of it which renders a crime one of moral turpitude.' " *Matter of Fualaau,* 21 I. & N. Dec. 475, 477 (B.I.A.1996) (quoting *Matter of Franklin,* 20 I. & N. Dec. 867, 868 (B.I.A.1994)). Yet, the BIA has designated offenses ranging from the knowing possession of child pornography,[6] to the sale of "a number of packages of oleomargarine labeled as butter, in violation of ... the Food, Drug, and Cosmetic Act [and] ... with intent to defraud,"[7] as "morally reprehensible" conduct,[8] without specifying with any clarity what "the nature of th[ose] act[s]" have in common. *Matter of Fualaau,* 21 I. & N. Dec. at 477.

Aside from the severity or baseness of the crime at hand, the BIA also often looks to the mental state involved when distinguishing between CIMTs and non-CIMTs—again, with stark inconsistencies across cases. The BIA has stated definitively that " 'evil intent' is a requisite element for a crime involving moral turpitude," *Matter of Khourn,* 21 I. & N. Dec. 1041, 1046 (B.I.A.1997), and indeed that "evil or malicious intent is ... the essence of moral turpitude." *Matter of Flores,* 17 I. & N. Dec. 225, 227 (B.I.A.1980). Yet, the Board has also held that the "presence or absence of a corrupt or vicious mind is not controlling" in determining whether an offense is a CIMT, *Matter of Medina,* 15 I. & N. Dec. 611, 614 (B.I.A.1976), and even that certain strict liability offenses may qualify as CIMTs. *See Matter of Imber,* 16 I. & N. Dec. 256, 258 (B.I.A.1977) (observing that "statutory rape has repeatedly been held to involve moral turpitude, despite the strict liability nature of the crime."). In fact, at various times and in various contexts, the BIA has held such diverse mental states as "evil intent,"[9] "wil[l]fulness,"[10] "recklessness,"[11] "knowledge," **\*924** [12] and even "forgetfulness"[13] to be necessary or sufficient to support a finding of moral turpitude.

The Attorney General's recent holding in *Silva–Trevino* is no improvement on the existing mess. *Silva–Trevino* holds that "some degree of scienter" is required for a CIMT. 24 I.

& N. Dec. at 689. Yet, the common definition of "scienter" is nothing more than "a degree of knowledge that makes a person legally responsible for the consequences of his or her act or omission." BLACK'S LAW DICTIONARY 1081 (7th ed.2000). So *Silva–Trevino* merely begs the question: *What* "degree of knowledge" is sufficient to indicate moral turpitude? The Attorney General suggests that "specific intent, deliberateness, willfulness, or recklessness," *id.,* may be sufficient—a list he later rounds out by adding "knew, or reasonably should have known," as well. *Id. at 707.* Of course, "reasonably should have known" is not a culpable mental state; it is an objective standard of negligence, disregarding the defendant's actual state of mind. The Attorney General's concept of "some scienter" therefore includes just about every possible mental state and even one imputed mental state, without providing any indication of which one would be sufficient in what circumstances. *Silva–Trevino's* "scienter" standard is thus wholly vacuous.

*Lopez–Meza* takes note of some of the BIA's previous conflicting holdings about the relevance of intent in distinguishing CIMT from non-CIMT offenses, but it does not attempt to synthesize or distinguish those cases. Instead, it glibly summarizes the cases by recognizing that "while crimes involving moral turpitude *often* involve an evil intent, such a specific intent is *not a prerequisite* to finding that a crime involves moral turpitude." *Lopez–Meza,* 22 I. & N. Dec. at 1192 (emphases added). This statement is simply an observation of the obvious, not a reasoned explanation of the BIA's apparent lack of a coherent line of authority.

More than that, the sentence just quoted misleadingly conflates "evil intent" with "specific intent." The BIA has generally understood "evil intent" to mean something more than mere knowledge; in some cases, it has specified that "evil intent" involves a degree of depravity above and beyond the specific intent to violate the law.[14] *Lopez–Meza,* however, uses the terms "evil" and "specific" intent as though they were interchangeable.

 **\*925** Having thus further muddied the already opaque waters, *Lopez–Meza* then concludes that the "knew or should have known" standard associated with the driving-on-a-suspended-license portion of the Arizona aggravated DUI offense renders that entire offense a CIMT—even though "knew or should have known" is clearly a less demanding

09 Cal. Daily Op. Serv. 2667, 2009 Daily Journal D.A.R. 3224

standard from *either* "evil" *or* "specific" intent. Specifically, *Lopez–Meza* reasons that although simple DUI is not a CIMT, aggravated DUI under § 28–1383(A)(1) *is* a CIMT because, unlike simple DUI, a conviction for aggravated DUI requires that at the time of the offense the driver's license was "suspended, canceled, revoked ... [,] refused or [restricted due to a prior DUI offense]." A.R.S. § 28–1383(A)(1). The circumstance of having an already suspended or revoked license implies that the driver knows he "should not be driving under any circumstances." *Lopez–Meza,* 22 I. & N. Dec. at 1196. And because "any circumstances" necessarily includes the circumstance of driving while intoxicated, *Lopez–Meza* reasons, aggravated DUI is a "knowing" violation which carries greater moral opprobrium than simple DUI alone. *Id.* at 1195–96.

This logical chain makes little sense. On *Lopez–Meza*'s theory of imputing knowledge, driving without a license under *any* circumstances, drunk or not, would amount to driving while "knowing" that one "should not be driving." There is thus nothing about the mental state involved in aggravated DUI that differentiates it from mere driving on a suspended license—which is not a CIMT. *Lopez–Meza* nevertheless holds that aggravated DUI is a CIMT "because the aggravated circumstances necessary for a conviction under [A.R.S. § 28–1383(A)(1)] establish a culpable mental state adequate to support a finding of moral turpitude." *Lopez–Meza,* 22 I. & N. Dec. at 1195. In other words, according to the BIA, the mental state associated with aggravated DUI is sufficient because the mental state associated with aggravated DUI is sufficient.

The majority in today's case recognizes that *Lopez–Meza*'s "intent" analysis was mistaken in one respect: The intent standard specified in A.R.S. § 28–1383(A)(1) is divisible, and the "should have known" portion—which Arizona courts understand to be a negligence standard—does not articulate a sufficiently culpable mental state to establish moral turpitude. *See* Maj. Op. at 912 (citing *State v. Hyde,* 186 Ariz. 252, 921 P.2d 655, 678 (1996)). I agree with the majority on this point.

But the majority considers this error to be harmless, because it believes that, with respect to both Campos's 1997 conviction and his 2002 conviction, judicially noticeable documents establish that Campos did in fact *know* he was prohibited from

driving [15]—and it defers to the BIA's holding that knowledge, if not negligence, is a sufficiently **\*926** culpable mental state to constitute moral turpitude. Maj. Op. at 914–15. I cannot agree with this conclusion. As I will show, even if we assume that knowledge, as opposed to negligence, has been established by Campos's conviction, the BIA's own jurisprudence forecloses the conclusion that mere knowledge could support a finding of moral turpitude in this context.

Although *Lopez–Meza* provides no discernible reasons of its own for concluding that knowledge is a sufficiently culpable mental state, and despite the principle that "we may not supply a reasoned basis for the agency's action that the agency itself has not given," *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.,* 477 F.3d 668, 688 (9th Cir.2007) (internal quotation marks omitted), the majority here strives mightily to invent a justification for the BIA's holding. It does so by citing a hodgepodge of CIMT cases which it claims demonstrate that "[t]he presence or absence of an element in the statute of conviction requiring a culpable mental state consistently has been critical to the BIA's determination of whether a violation of such statute constitutes a crime involving moral turpitude." Maj. Op. at 915. That statement, surely, is true, but only by virtue of being contentless. It side-steps the real question—again, what *is* a sufficiently "culpable mental state?" Crucially, none of the cases the majority cites support the precise proposition advanced in *Lopez–Meza:* that *mere knowledge* is a sufficiently culpable mental state to convert a *regulatory offense* into a CIMT. *See* Maj. Op. at 915–16 (citing cases). [16] Having reviewed **\*927** the entire corpus of precedential CIMT decisions issued by the BIA from 1940 to the present, I have found no support for this conclusion.

## 2. Surveying the BIA's case law on "regulatory offenses"

As this Court has consistently explained, CIMTs can be understood as belonging to two basic types: (1) offenses involving "fraud," and (2) offenses involving conduct that is both (a) "inherently base, vile, or depraved" and (b) "contrary to the [accepted] private and social duties man owes to his fellow men or to society in general." *Navarro–Lopez v. Gonzales,* 503 F.3d 1063, 1068 (9th Cir.2007) (en banc) (Pregerson, J., writing for the majority); *accord Galeana– Mendoza,* 465 F.3d at 1058 (9th Cir.2006); *Carty v. Ashcroft,* 395 F.3d 1081, 1083 (9th Cir.2005). The BIA has never rejected this understanding, *see Galeana–Mendoza,*

465 F.3d at 1058 n. 9, and it has adopted *Navarro–Lopez*'s typology in recent non-precedential decisions.

The BIA looks for different levels of mens rea when considering whether offenses in these two categories are CIMTs. For fraud offenses, the mens rea required to establish moral turpitude is more than mere knowledge of the acts committed; it is the specific intent to defraud. [17] For non-fraud offenses involving "base, vile, or depraved" conduct —an ill-defined group which may be further broken down into the subcategories of violent crimes, theft offenses and other crimes against property, sex offenses, drug offenses, and certain offenses against the government—the BIA appears to require a prescribed degree of intent that varies depending upon which subcategory is at issue. As noted above, today's majority relies on language it finds in a smattering of fraud, theft, and violent crime cases to find *Lopez–Meza*'s holding "reasonable." *See supra,* note 16. In doing so, the majority either misunderstands or ignores the fact that the BIA does not follow a single, generally applicable rule as to "intent" across all subcategories of offenses. (Indeed, one could find support for *any* proposition if one's search pool includes all of the BIA's precedential CIMT opinions over the last seven decades.) The better approach, consequently, is to consider what kind of mental state the BIA has required in cases involving the same *type* of offenses.

*Lopez–Meza* does not assert that the Arizona aggravated DUI statute involves a fraud offense. [18] Rather, it views aggravated  **\*928**  DUI as belonging to the second, non-fraud category of offenses *Navarro–Lopez* describes. It holds:

> We find that a person who drives while under the influence, knowing that he or she is absolutely prohibited from driving, commits a crime *so base and so contrary* to the currently accepted *duties that persons owe to one another and to society in general* that it involves moral turpitude.

*Lopez–Meza,* 22 I. & N. Dec. at 1196 (emphases added). This description clearly puts aggravated DUI in the non-fraud category, which encompasses offenses involving "base, vile, or depraved" conduct in violation of "social duties." *See Navarro–Lopez,* 503 F.3d at 1068. Generally speaking, offenses in the "base, vile or depraved" category will constitute CIMTs only if the BIA finds that they either inherently involve or specifically require a showing

of "evil intent." [19] What constitutes "evil intent," in turn, is offense-specific.

Looking in this light at the crime for which Campos was convicted, it is apparent that it involves two component unlawful acts: (1) simple DUI, and (2) driving on a suspended license. Simple DUI, as *Lopez–Meza* acknowledges, is indisputably a "regulatory offense," *Lopez–Meza,* 22 I. & N. Dec. at 1194; *accord Matter of Torres–Varela,* 23 I. & N. Dec. 78 (B.I.A.2001) (en banc), and so lacks any "evil intent" element. Driving without a valid license, too, can only be described as a regulatory offense, for it involves the lack of permission to do something that would otherwise be permissible. [20] My review of the BIA's  **\*929**  precedential case law over the past seven decades shows that the BIA consistently declines to characterize purely regulatory offenses as CIMTs. In its own words, the BIA has "many times held that the violation of a regulatory, or licensing, or revenue provision of a statute is not a crime involving moral turpitude." *Abreu–Semino,* 12 I. & N. Dec. at 776. Evil intent simply is not an essential aspect of such a regulatory violation, even if the violation is a knowing one, and so such violations are not CIMTs.

For example, in *Matter of H-,* 1 I. & N. Dec. 394 (B.I.A.1943), the BIA held that an alien's violation of a federal statute requiring liquor retailers to pay a tax to operate their businesses was not a CIMT:

> The crime consists ... in merely failing to register, pay a tax, and comply with certain regulations of the Internal Revenue Commissioner.... [We know of] [n]o case ... which holds that the violation of a revenue or licensing statute involves moral turpitude. The fact that the thing may be done, providing a tax is paid to the Government, indicates that the act itself does not involve moral turpitude.

*Id.* at 395 (quoting *United States ex rel. Andreacchi v. Curran,* 38 F.2d 498 (S.D.N.Y.1926)) (internal quotation marks omitted). The BIA recognized that the respondent had been convicted of "unlawfully *and knowingly* carrying on

the business of a retail liquor dealer without having paid the special tax as required." *Id.* at 395–96 (emphasis added). Still, the presence of a "knowing[ ]" scienter requirement did not matter to the BIA's analysis; even a knowing failure to conform to a regulatory requirement, apparently, could not demonstrate a sufficiently culpable state of mind to indicate moral turpitude.

Similarly, in *Matter of G-,* 7 I. & N. Dec. 114 (B.I.A.1956), the BIA held that a conviction for the "possession and transportation of distilled spirits without tax stamps affixed thereto" in violation of "licensing and regulating provisions of the Internal Revenue Code" was not a CIMT, because the "violation of statutes which merely license or regulate and impose criminal liability without regard to *evil* intent do not involve moral turpitude." *Id.* at 115, 118 (emphasis added). Even a knowing violation of the tax statute, then, would not be enough to transform a regulatory offense into a CIMT. *Accord Matter of J-,* 2 I. & N. Dec. 99, 104 (B.I.A.1944) (holding that a conviction under a federal statute prohibiting the sale of alcohol to Native Americans was not a CIMT because "[r]egulatory enactments of this nature do not create crimes involving moral turpitude."); *Matter of V-,* 1 I. & N. Dec. 293, 294 (B.I.A.1942) (holding that a conviction under the federal Narcotic Drugs Import and Export Act of 1909, which penalized "knowingly importing or participating in the importation of narcotic drugs," was not a CIMT because the Act "is a regulatory act and that the violation of it is therefore not a crime involving moral turpitude"); *Matter of G-,* 1 I. & N. Dec. 59, 62 (B.I.A.1941) (holding that gambling in violation of New **\*930** York's gaming law was a regulatory offense and so not a CIMT).

The lack of a sufficiently evil intent also played the decisive role in *Goldeshtein v. INS,* 8 F.3d 645 (9th Cir.1993), where this Court held that the regulatory offense of "willfully" structuring financial deposits in order to prevent a bank from filing currency reports in violation of federal law is not a CIMT, because "evil intent"—as opposed to willfulness or knowledge that the conduct is unlawful—is not an element of the crime." *Id.* at 648. The BIA recently adopted *Goldeshtein* as its rule nationwide in *Matter of L–V–C–,* 22 I. & N. Dec. 594, 603 (B.I.A.1999), holding that a violation of the structuring statute involves "no per se morally reprehensible conduct."

In short, in a body of case law riddled with inconsistencies, the rule that regulatory offenses are simply not CIMTs—even if committed "knowingly"—appears to be one of the BIA's more stable principles.

### 3. Lopez–Meza's *departure from the BIA's regulatory offense precedents*

*Lopez–Meza* acknowledges that there exists a "general rule" that regulatory offenses do not constitute CIMTs. *Lopez–Meza,* 22 I. & N. Dec. at 1193. But it departs from this rule, reasoning that

> an individual who drives under the influence in violation of ... [A.R.S.] section 28–1383(A)(1) does so with the knowledge that he or she should not be driving under any circumstances. We find that a person who drives while under the influence, knowing that he or she is absolutely prohibited from driving, commits a crime so base and so contrary to the currently accepted duties that persons owe to one another and to society in general that it involves moral turpitude.

*Id.* at 1195–96.

This purported explanation is a non-explanation—an ipse dixit or "because I said so" edict. One can, perhaps, read into the BIA's non-explanation the implication that certain offenses are *so* "base, vile, or depraved" that an evil intent, even if not an explicit requirement for conviction under the statute, is inherent in the act. But the BIA has never given any particularized content to the phrase "base, vile, or depraved" other than to hold that some offenses *are* and others are *not.* This is why, as the majority explains, we do not defer to the BIA's use of general descriptive phrases like "base, vile, or depraved, [and] contrary to ... the duties owed between man and man"—because deferring to a contentless phrase would "ha[ve] no practical significance." *See* Maj. Op. at 909–10 (quoting *Galeana–Mendoza,* 465 F.3d at 1058 n. 9).

Similarly, *Lopez–Meza's* purported explanation provides no way to figure out when (or by what logic) an offense is *sufficiently* "base, vile, and depraved" that evil intent is implicit in the act.[21] What we do know is that the BIA and this Court have **\*931** in practice limited the concept of "implicitly evil intent" to fraud,[22] sex offenses,[23] and drug trafficking offenses.[24] *Lopez–Meza* provides no reasons why a regulatory DUI offense belongs in the same camp.

Indeed, to the extent *Lopez–Meza* can be read to hold that drunk driving on a suspended license is so base, vile, or depraved that evil intent is somehow inherent in the act, I can find no reasons in the BIA's precedential CIMT cases—or in logic—why that should be so. Certainly, where a nonfraud offense is purely regulatory, it cannot "inherently" exhibit an evil intent. After all, that is the very definition of a crime that is *malum prohibitum:* But for the statutory prohibition, the act would not be wrongful.[25] If any aspect of Campos's conduct could be characterized as morally wrongful, it would be driving while intoxicated—not driving on a suspended license. But the BIA has unequivocally acknowledged that driving while intoxicated is *not* turpitudinous, *see* *Lopez–Meza, 22 I. & N. Dec. at 1194,*[26] and so, necessarily, does not inherently demonstrate an evil state of mind.

**\*932** In fact, the BIA has held that even a *third* conviction for drunk driving—another variety of "aggravated" DUI under the same Arizona statute at issue here—is not a CIMT. *Matter of Torres–Varela, 23 I. & N. Dec. 78 (B.I.A.2001)* (en banc).[27] As Judge Nelson cogently argued in her dissent from the panel decision in this case, "it is patently unreasonable to conclude that driving under the influence only once, even with a suspended license, somehow carries with it greater moral opprobrium than driving drunk repeatedly." *Marmolejo–Campos v. Gonzales, 503 F.3d 922, 929 (9th Cir.2007)* (D. Nelson, J., dissenting).

*Lopez–Meza's* implicit suggestion that the lack of a valid license converts a simple DUI offense, which does not inherently involve an evil intent, into a CIMT that does necessarily involve an evil intent, is simply incoherent. The BIA has identified no basis whatever for treating this variety of aggravated DUI under *A.R.S. § 28–1383(A)(1)* differently from other regulatory offenses which have been designated as nonturpitudinous. "Because I said so" is not good enough.

## B. The BIA's rule against combining two non-CIMT offenses into a CIMT

In addition, treating aggravated DUI under *A.R.S. § 28–1383(A)(1)* as a CIMT runs squarely into a second set of BIA precedents: those cases holding that two crimes that are not themselves CIMTs cannot, when committed together, morph into a CIMT.

As I have already noted, simple DUI is not a CIMT. *See* *Lopez–Meza, 22 I. & N. Dec. at 1194.* The act of driving without a valid license is not a CIMT either. If evil intent does not inhere in either of the component offenses that make up *A.R.S. § 28–1383(A)(1)* individually, then such intent could only be found, if anywhere, in the synergy between those two component offenses when they are committed simultaneously. This appears to be where *Lopez–Meza* ultimately locates it—in bald defiance of the rule it set out in *Matter of Short, 20 I. & N. Dec. 136 (B.I.A.1989).*

In *Matter of Short,* the BIA held that assault with intent to commit a felony is not per se a CIMT. Rather, the assault will only fall within the CIMT category if the felony that the perpetrator intended to commit would itself have been so designated. *Short* explained:

> [I]f a simple assault does not involve moral turpitude and the felony intended as a result of that assault also does not involve moral turpitude, then the two crimes combined do not involve moral turpitude. Moral turpitude cannot be viewed to arise from some undefined synergism by which two offenses are combined to create a crime involving moral turpitude, where each crime individually does not involve moral turpitude. There must be some particular criminal activity with which to evaluate whether the nature of that activity involves moral turpitude.

*Id. at 139.* In other words, evil intent cannot float about in the ether; it must be grounded in one act or another.

The rule of *Short* coheres with the BIA's longstanding insistence that it is the *nature* of the offense that matters when deciding whether the offense is morally turpitudinous, not the circumstances under which the offense occurred or how frequently it has happened. *See, e.g.,* *Goldeshtein,* 8 F.3d at 649; *accord* *933 *L–V–C–,* 22 I. & N. Dec. at 603. Consistent with the rule that the requisite evil intent must inhere in the crime of conviction, the BIA will impute the intent associated with crime A to crime B only if crime B is done with the *purpose* of committing crime A.

For example, burglary offenses "may or may not involve moral turpitude, the determinative factor being whether the crime intended to be committed at the time of entry ... involves moral turpitude." *Matter of M-,* 2 I. & N. Dec. 721, 723 (B.I.A.1946). Likewise, malicious trespass, which is not a CIMT by itself, becomes one when the trespass is committed with the intent to commit larceny, which would itself be 2677 a CIMT. *Matter of Esfandiary,* 16 I. & N. Dec. 659, 661 (B.I.A.1979). *Short* is a reiteration of this general rule.

*Lopez–Meza* runs directly into this line of case law by suggesting that the regulatory offense of driving without a license and the regulatory offense of simple DUI, neither of which (even if committed "knowingly") involves moral turpitude, somehow exhibit moral turpitude when committed at the same time. But the simultaneity of offenses, without more, has never been enough to create moral turpitude out of nothing. As *Short* held, "[t]here must be some particular criminal activity" in which moral turpitude inheres, 20 I. & N. Dec. at 139, or else some purposeful link between an attempted CIMT offense and the perfected non-CIMT offense that justifies imputing the mental state associated with the former to the latter. *Matter of M-,* 2 I. & N. Dec. at 723; *Matter of Esfandiary,* 16 I. & N. Dec. at 661. Turpitude cannot arise simply out of the "synergism" between two non-turpitudinous offenses, even if committed simultaneously. *Matter of Short,* 20 I. & N. Dec. at 139. Yet that is precisely what *Lopez–Meza* does.

*Lopez–Meza* does lamely attempt to distinguish itself from *Short*. First, it notes that

> [t]he relevant discussion in *Matter of Short* ... pertained to a simple

assault with intent to commit a felony of unproven seriousness. We did not hold in that decision that a combination of acts that are included as elements of a specific offense could never, when added together, build to such a heightened deviance from accepted moral standards as to reach a level of conduct deemed morally turpitudinous. In fact, additional aggravating elements can often transform an offense that otherwise would not be a crime involving moral turpitude into one that is.

*Lopez–Meza,* 22 I. & N. Dec. at 1196. Tellingly, the BIA cites *no* authority for its proposition that aggravating elements not themselves demonstrative of evil intent "often" have transformed non-CIMTs into CIMTs. [28]

*Lopez–Meza* then goes on to explain:

> *934 The finding of moral turpitude in the crimes in the present case does not arise simply from an amalgamation of distinct separate offenses; rather, it results from a building together of elements by which the criminalized conduct deviates further and further from the private and social duties that persons owe to one another and to society in general.... [W]hen [simple DUI] is committed by an individual who knows that he or she is prohibited from driving, the offense becomes such a deviance from the accepted rules of contemporary morality that it amounts to a crime involving moral turpitude.

*Id.* But nowhere does the BIA attempt to explain *by what logic* simple DUI, when committed simultaneously with unlicensed driving, "becomes such a deviance" from moral standards that moral turpitude materializes where

09 Cal. Daily Op. Serv. 2667, 2009 Daily Journal D.A.R. 3224

there was none before. The BIA claims that this is not the "amalgamation of distinct separate offenses" but the "building together of elements by which the criminalized conduct deviates further and further" from accepted moral standards—but what is "amalgamation," if not a "building together?" Again, *Lopez–Meza* offers no clue.

Encountering a similarly flimsy explanation in *Bush–Quayle '92 Primary Comm. v. FEC,* 104 F.3d 448, 454 (D.C.Cir.1997), the D.C. Circuit lamented that "[w]ithout adequate elucidation, this court has no way of ascertaining whether cases are indeed distinguishable, whether the [agency] has a principled reason for distinguishing them, or whether the [agency] is refusing to treat like cases alike."

So here. *Lopez–Meza*'s explanation of how it differs from *Short* amounts to "because I said so," yet the majority considers this a "reasoned explanation" worthy of *Chevron* deference. Maj. Op. at 916. The majority explains its position by noting that *Lopez–Meza,* even if "inconsistent" with *Short,* "does not leave us 'in doubt as to the reason for the change in direction.' " *Id.* at 916–17 n. 15 (quoting *Morales–Izquierdo v. Gonzales,* 486 F.3d 484, 493 (9th Cir.2007) (en banc); *see also* Maj. Op. at 915–16. I cannot agree. Unless we understand that new direction to be "any way the Board wants," *Lopez–Meza* provides no explanation for the change in direction, and thus no guidance on how to apply *Short*'s rule to future cases.

As I see *Lopez–Meza,* "the [Board] has changed its view of the [continued validity or scope of *Short* ] without explaining what its new interpretation is." *Cross–Sound Ferry Servs., Inc. v. ICC,* 873 F.2d 395, 398 (D.C.Cir.1989). That "is not a permissible exercise of the [Board's] power under *Chevron,*" *id.,* and it certainly is not a decision to which this Court should defer.

### C. Summary: *Lopez–Meza* as an Unreasonable Interpretation of the INA

In sum, the BIA offers no reasoned explanation in *Lopez–Meza* for its deviations from two modest, relatively consistent principles floating in the miasma that is the BIA's CIMT jurisprudence. We have no "explanation" worthy of the name for why knowledge, rather than evil intent, should be sufficient to transform a regulatory offense into a CIMT. And we have no "explanation" worthy of the name for why the principle that aggregating two non-CIMT offenses cannot yield a CIMT offense, which was enunciated definitively

in *Matter of Short,* does not apply here. Even within an exceptionally tangled field of confused and conflicting case law, *Lopez–Meza* stands apart, ignoring what few guideposts the BIA has staked out.

I note that the BIA's own regulations require that, "through precedent decisions, [the Board] shall provide clear and uniform **\*935** guidance to the Service, the immigration judges, and the general public on the proper interpretation and administration of the Act and its implementing regulations." 8 C.F.R. § 1003.1(d)(1). Yet, the BIA's CIMT precedents are anything *but* "clear and uniform," as I hope I have demonstrated.

The BIA's refusal to abide by its regulatory mandate to provide clear and uniform guidance leaves individual aliens uncertain as to what conduct will put them at risk of deportation—a "drastic sanction," as we noted in *American–Arab Anti–Discrimination Comm. v. Thornburgh,* 970 F.2d 501, 508 n. 4 (9th Cir.1991) (quoting *Gastelum–Quinones v. Kennedy,* 374 U.S. 469, 479, 83 S.Ct. 1819, 10 L.Ed.2d 1013 (1963)). The Supreme Court in *Smiley* specifically provided that an agency's indifference to "legitimate reliance on prior interpretation[s]" could make that agency's new position ineligible for *Chevron* deference. *Smiley v. Citibank (S.D.), N.A.,* 517 U.S. 735, 742, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996) (internal citations and quotation marks omitted); *see also Billeke–Tolosa v. Ashcroft,* 385 F.3d 708, 711 (6th Cir.2004) ("The consistent application of [the BIA's] precedents, like the consistent application of [an agency's] regulations, serves a critical purpose: the provision of fair notice to those subject to the agency's decisions."). [29] The BIA's failure to abide by its own CIMT precedents, in defiance of its duty under 8 C.F.R. § 1003.1(d)(1) to "provide clear and uniform guidance to ... the general public," casually ignores those reliance interests.

Moreover, the BIA's refusal to provide "clear and uniform guidance" makes our task as a reviewing court immeasurably harder. Without any overarching theory to guide the BIA's application of the term "crime involving moral turpitude," how can a court review the Board's determination that a particular offense falls on one side or another of that nonexistent line? Without any stable theory about what role intent plays in defining moral turpitude, how can a court tell whether a particular decision is "consistent" or

"inconsistent" with the agency's past positions, and, thus, whether it is reasonable under *Chevron? See Nicanor–Romero v. Mukasey,* 523 F.3d 992, 997 (9th Cir.2008) (noting that "the BIA has provided little concrete guidance" as to the meaning of moral turpitude); *Mei v. Ashcroft,* 393 F.3d 737, 739 (7th Cir.2004) ("Since Congress did not define 'crime involving moral turpitude' ... it is reasonable to suppose à la *Chevron* that Congress contemplated that the agency charged with administering the statute would define the term, and specifically would tailor the definition to the policies embodied in the immigration statutes. The Board of Immigration Appeals has done neither."). To nonetheless defer to *Lopez–Meza,* as the majority does today, is to acquiesce in the BIA's flouting of its interpretive duty and surrender to its continued frustration of effective judicial review.

I would hold that the BIA's determination in Campos's case —that, based on *Lopez–Meza,* Campos's two aggravated DUI convictions are CIMTs—is not supported by a reasoned explanation, and would remand **\*936** to the agency. I therefore respectfully dissent.

### All Citations

558 F.3d 903, 09 Cal. Daily Op. Serv. 2667, 2009 Daily Journal D.A.R. 3224

## Footnotes

\*  Eric H. Holder, Jr. is substituted for his predecessor, Michael B. Mukasey, as Attorney General. Fed. R.App. P. 43(c)(2).

1  At the time of Campos's conviction, Arizona's aggravated DUI statute was codified at Arizona Revised Statutes section 28–697. Five months later, Arizona redesignated the statute as Arizona Revised Statutes section 28–1383. 1996 Ariz. Sess. Laws, ch. 76, §§ 3, 25, *as amended by* 1997 Ariz. Sess. Laws, ch. 1, § 108 (effective Oct. 1, 1997); 1997 Ariz. Sess. Laws, ch. 220, § 82. For purposes of this opinion, we refer to the aggravated DUI statute by its current designation, section 28–1383.

2  The statute provides in pertinent part:
    A. A person is guilty of aggravated driving or actual physical control while under the influence of intoxicating liquor or drugs if the person does any of the following:
    1. Commits a violation of § 28–1381[ driving under the influence ], § 28–1382 [ (driving under the extreme influence) ] or this section while the person's driver license or privilege to drive is suspended, canceled, revoked or refused or while a restriction is placed on the person's driver license or privilege to drive as a result of violating § 28–1381 or 28–1382 or under § 28–1385[ administrative license suspension for driving under the influence) ].

3  On March 1, 2003, the INS ceased to exist as an agency under the U.S. Department of Justice and its functions were transferred to the Bureau of Immigration and Customs Enforcement within the newly formed DHS.

4  DHS withdrew its charge that Campos was removable under 8 U.S.C. § 1227(a)(2)(A)(i).

5  The BIA also concluded that Campos' theft conviction constituted a crime involving moral turpitude. Campos does not dispute this conclusion on appeal. The only issues preserved on appeal with respect to his removability under 8 U.S.C. § 1227(a)(2)(A)(ii) are: (1) whether aggravated DUI rises to the level of a crime involving moral turpitude and (2) a limited challenge to the adequacy of the administrative record.

6  The Attorney General has recently stated that it may be appropriate for immigration judges to look beyond the record of conviction when applying the modified categorical approach. *See In re Silva–Trevino,* 24 I. & N. Dec. 687, 699 (2008) ("[W]hen the record of conviction fails to show whether the alien was convicted of a crime involving moral turpitude, immigration judges should be permitted to consider evidence beyond that record if

doing so is necessary and appropriate to ensure proper application of the Act's moral turpitude provisions."). As that question is not squarely before us, we reserve judgment as to the validity of that portion of our prior case law which suggests review should be more confined. *See, e.g., Nicanor–Romero v. Mukasey,* 523 F.3d 992, 1007 (9th Cir.2008) (limiting review to particular documents in the alien's record of conviction).

7    Frequently, we have characterized the question presented in these cases as singular, i.e., whether the petitioner's statutory offense is a crime of moral turpitude. As noted, we review the BIA's interpretation of criminal statutes *de novo.* However, many of our prior cases have not acknowledged the second component of the BIA's inquiry, its interpretation of the INA. *See, e.g.,* 🚩 *Cuevas–Gaspar,* 430 F.3d at 1017, 1018–20 (reviewing both components of the BIA's decision but suggesting that the standard of review is singular). One reason for such omission is that once the conduct proscribed by the petitioner's statute of conviction is identified (e.g., fraud), the question whether such conduct involves "moral turpitude" is not in doubt and thus merits little or no analysis from the court.

8    The Attorney General is charged with the "administration and enforcement" of the INA and the "determination and ruling by the Attorney General with respect to all questions of law [are] controlling." 📑 8 U.S.C. § 1103(a) (1). While retaining ultimate authority, the Attorney General has delegated his discretion and authority in interpreting the INA to the BIA to exercise in the course of adjudicating cases before it. 🚩 8 C.F.R. § 1003.1(d) (1).

9    As we explained in *Garcia–Quintero,* the applicable regulations allow the BIA to decide most appeals through brief, nonprecedential orders authored by a single member of the Board. 🚩 8 C.F.R. § 1003.1(e)(5). Only if that member determines that a case presents "[t]he need to establish a precedent construing the meaning of laws, regulations, or procedures" is it transferred to a three-judge panel for decision in a published order. *See* 🚩 8 C.F.R. § 1003.1(e)(6). The Board's internal policies establish "[u]npublished decisions are binding on the parties to the decision but are *not* considered precedent for unrelated cases." BIA Prac. Man., Ch. 1.4(d)(ii) (rev. June 15, 2004).

10   Some have suggested that the imprecision of the term "moral turpitude" demonstrates Congress's intent that its meaning be developed over time through judicial and administrative construction. Others have construed matters less charitably. As Justice Jackson once wrote, "Congress knowingly conceived [the term] in confusion," deliberately ignoring a warning raised by a member of the House that " '[n]o one can really say what is meant by ... a crime involving moral turpitude.' " 📑 *Jordan v. DeGeorge,* 341 U.S. 223, 233–34, 71 S.Ct. 703, 95 L.Ed. 886 (1951) (Jackson, J., dissenting) (quoting *House Committee on Immigration and Naturalization Hearings on H.R.Rep. No. 10384,* 64th Cong., 1st Sess. 8 (1916)).

11   Again, the Attorney General has suggested that a broader scope of review is appropriate. *See supra* note 6.

12   We also recognize that they both involved actual knowledge, not mere negligence. Campos admitted in 1997 that he knew he did not have a valid license, and he admitted in 2002 that he knew his license had been suspended or revoked.

The dissent disagrees with our conclusion as to Campos's 1997 conviction. Dissent at 925–26 n.15. The fact of Campos's conviction is proof that his license had been "suspended, canceled, revoked or refused" in 1997. Ariz.Rev.Stat. § 28–1383(A)(1). With this established, what else could Campos's admission—which indicated he knew he did not possess a valid license—have meant except that he knew his license was "suspended, canceled, revoked or refused"? Moreover, despite the fact that the BIA precedent under which he was deemed removable requires a knowledge scienter, *see* 📑 *Lopez–Meza,* 22 I. & N. Dec. at 1195–96, Campos never contends that he was convicted of anything but a "knowing" violation of section 28–1383. In any case, the record undeniably reflects that Campos *knew* he was "absolutely prohibited from driving." 📑 *Id.* at 1196.

Even if the record of Campos's 1997 DUI conviction does not establish the requisite mens rea, the point is academic. The BIA determined that he was alternatively removable on the basis of his 1990 theft conviction.

Campos did not appeal that portion of the BIA's decision, thus waiving any challenge to its validity. *See Paladin Assocs., Inc. v. Mont. Power Co.,* 328 F.3d 1145, 1164 (9th Cir.2003) (explaining that we "will not consider matters on appeal that are not specifically and distinctly argued in an appellant's opening brief").

13    The Supreme Court has held that simple DUI is not a "violent felony" as defined in the Armed Career Criminal Act, *Begay,* 128 S.Ct. at 1586, or a "crime of violence" under the INA, *Leocal,* 543 U.S. at 8–9, 125 S.Ct. 377. Nevertheless, because those terms contain different elements than a "crime involving moral turpitude," such holdings bear little relation to the question presented here. *See Begay,* 128 S.Ct. at 1586 (explaining that a "violent felony" must include "purposeful, *violent,* and *aggressive* conduct" (emphasis added; internal quotation marks omitted)); *Leocal,* 543 U.S. at 8–9, 125 S.Ct. 377 (stating that a "crime of violence" must have "as an element the use, attempted use, or threatened use of *physical force* against the person or property of another" (emphasis added; internal quotation marks omitted)).

14    The petitioner in *Torres–Varela* was convicted of violating Arizona Revised Statutes section 28–697(A)(2), which has since been redesignated as section 28–1383(A)(2), *see supra* note 1, the subsection adjacent to Arizona's prohibition on aggravated DUI, section 28–1383(A)(1). The term "recidivist DUI" is not used in the Arizona statute, but we employ it here to distinguish § 28–1383(A)(2) from § 28–1383(A)(1).

15    The dissent derides this "lame[ ] attempt" to distinguish *Lopez–Meza* from *Short,* demanding that the BIA explain "by what logic" it can reach the conclusion it sets forth. Dissent at 2678–80. Again, the dissent demands more than is required by *Chevron.* The BIA's distinction is not irrational: *Short* did not purport to establish a categorical rule. It is possible that two non-turpitudinous offenses, committed at the same time could rise to the level of a crime involving moral turpitude. As the Chief Judge mentioned at oral argument, while neither simple DUI nor driving at excessive speeds individually constitute crimes involving moral turpitude, it would not be irrational to conclude that driving at excessive speeds while drunk amounted to "conduct that shocks the public conscience as being inherently base, vile, or depraved." *Perez–Contreras,* 20 I. & N. Dec. at 618.

To the extent *Lopez–Meza* is somehow inconsistent with *Short,* as we stated previously, the agency's explanation for its departure does not leave us "in doubt as to the reason for the change in direction." *Morales–Izquierdo,* 486 F.3d at 493; *see also Lands Council,* 529 F.3d at 1225.

1    The BIA's holding in a prior precedential decision that a conviction under a given criminal statute is a CIMT will be entitled to *Chevron* deference in a subsequent case only if the prior holding *directly* controls the outcome in the subsequent case. We so held in *Garcia–Quintero v. Gonzales,* 455 F.3d 1006, 1014 (9th Cir.2006) ("[T]he BIA has never issued a published decision addressing the precise question at issue. Although the BIA's order cited several published BIA decisions, none of them sets forth a binding interpretation of the question at issue.... Therefore, we do not accord *Chevron* deference to the BIA's decision in this case.").

2    To be clear, inconsistency in agency interpretations does not mean that the *Chevron* framework does not *apply.* Rather, an unexplained inconsistency may be a reason for a court—having found that *Chevron* is the correct framework to apply to the type of agency interpretation in question, having determined that the relevant statutory language is ambiguous at *Chevron* Step One, and moving on to apply *Chevron* Step Two —to find the agency interpretation "unreasonable" and decline to give it deference. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 981, 1001 n. 4, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) [hereinafter "*Brand X* "].

3    *See also Barnhart v. Walton,* 535 U.S. 212, 219–20, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002) (granting *Chevron* deference because "the Agency's regulations reflect the Agency's own longstanding interpretation. And this Court will normally accord particular deference to an agency interpretation of 'longstanding' duration.") (internal citations omitted); *Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 417, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993) ("[T]he consistency of an agency's position is a factor in assessing the weight

that position is due."); *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 698, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991) ("As a general matter, of course, the case for judicial deference is less compelling with respect to agency positions that are inconsistent with previously held views.").

4    Having offered this capacious definition, which he terms a "rearticulat[ion]" of the standard the BIA has "long applied," the Attorney General then states his "belie[f] [that] the definition in existing Board precedent merits judicial deference under controlling Supreme Court decisions." 🚩 *Silva–Trevino,* 24 I. & N. Dec. at 689 n. 1. Issuing a blanket definition at such an elevated level of generality as to retrospectively encompass virtually every BIA decision that has come before or will come afterward cannot create a rule entitled to *Chevron* deference if none existed before—and, as we held in 🚩 *Galeana–Mendoza,* 465 F.3d at 1058, none did.

5    The BIA issues "precedential" (also called "published") and "nonprecedential" (also called "unpublished") decisions. Precedential decisions "serve as precedents in all [future] proceedings involving the same issue or issues," 🚩 8 C.F.R. § 1003.1(g), and, unless "modified or overruled," are "binding on all officers and employees of the Department of Homeland Security or immigration judges in the administration of the immigration laws of the United States." *Id.* Only decisions issued by three-member panels, by the Board sitting en banc, or more rarely, by the Attorney General or the Secretary of Homeland Security, may be designated as precedential. *See* 🚩 *id.* at §§ 1003.1(e)(6)(ii); 1003.1(g); 103.3(c). In contrast, decisions issued by single Board members—which make up the vast majority of BIA dispositions—are by definition non-precedential. All decisions designated to serve as precedent are published in bound volumes of the reporter entitled *Administrative Decisions Under the Immigration & Nationality Laws of the United States* (or "I. & N. Dec."). Separately, the Executive Office of Immigration Review periodically compiles certain unpublished decisions as so-called "indexed decisions," which are meant to serve as useful but non-binding guidance for EOIR staff. *See* BIA PRAC. MAN., Ch. 1.4(d) (rev. July 30, 2004), *available at* http://www.usdoj.gov/eoir/vll/qapracmanual/pracmanual/chap1.pdf. Indexed decisions are, nevertheless, non-precedential. *Id.*

In the discussion that follows, I consider only the BIA's precedential CIMT decisions, as these embody the agency's official interpretations of "the meaning of [the governing] law[ ]." 🚩 8 C.F.R. § 1003.1(e)(6)(ii).

6    *Matter of Olquin–Rufino,* 23 I. & N. Dec. 896, 897 (B.I.A.2006).

7    *Matter of P-,* 6 I. & N. Dec. 795, 796 (B.I.A.1955) (internal quotation marks omitted).

8    *See Matter of Olquin–Rufino,* 23 I. & N. at 898 ("[T]he offense of possession of child pornography is morally reprehensible and intrinsically wrong."); *Matter of P-,* 6 I. & N. Dec. at 798 ("[T]he offenses for which respondent was convicted ... were inherently wrong and morally reprehensible, not merely prohibited by statute of recent origin.").

9    *See* 📗 *Matter of Tiwari,* 19 I. & N. Dec. 875, 882–83 (B.I.A.1989) (holding that an alien smuggling offense is not categorically a CIMT because "[v]iolations of the immigration laws, in the absence of 'fraud or evil intent,' are not ordinarily regarded as involving moral turpitude" and "some persons convicted [of alien smuggling] ... have been motivated by 'love, charity, or kindness,' or by religious principles [rather than].... an '*evil intent*.' ") (internal citations omitted; emphasis added).

10   📗 *Matter of Alfonzo–Bermudez,* 12 I. & N. Dec. 225, 226–27 (B.I.A.1967) (holding that a California conviction for "*will*[*l*]*fully* and unlawfully offer[ing] to commit a lewd or indecent act with another person" is a CIMT) (emphasis added).

11   *See* 📗 *Matter of Fualaau,* 21 I. & N. Dec. 475, 478 (B.I.A.1996) (explaining that the element of a "*reckless* state of mind" is enough to make an assault conviction under Hawaii law a CIMT, but only if "the infliction of serious bodily injury" is also an element under the statute) (emphasis added).

12   *See* 📗 *Matter of Danesh,* 19 I. & N. Dec. 669, 673 (B.I.A.1988) (holding that a Texas conviction for aggravated assault on a peace officer is a CIMT because the statute required both "bodily harm to the victim" and "*knowledge* by the offender that his force is directed to an officer who is performing an official duty") (emphasis added).

13    *See* 🚩 *Matter of Tobar–Lobo,* 24 I. & N. Dec. 143, 145 (B.I.A.2007) (holding that the failure to register as a convicted sex offender under California law is categorically a CIMT, even if California courts allow for convictions for "fail[ure] ... as a result of forgetfulness.").

14    *See, e.g.,* 🚩 *Matter of Solon,* 24 I. & N. Dec. 239, 241 (B.I.A.2007) ("Offenses characterized as 'simple assaults' are generally not considered to be crimes involving moral turpitude.... This is so because they require *general intent only* and may be committed *without the evil intent,* depraved or vicious motive, or corrupt mind associated with moral turpitude.") (internal quotation marks and citation omitted; emphasis added); *Matter of B–M–,* 6 I. & N. Dec. 806, 808–09 (B.I.A.1955) ("In some penal statutes, the word 'wi[l]lful' connotes moral turpitude or evil of mind, but in others it means no more than that the interdicted act is done deliberately and with knowledge. We think th[e latter] clearly is the sense in which the term is used in the statute [here at issue] ... [and] conclude, therefore, that the false statement made by the appellant did not constitute a crime involving moral turpitude.") (internal citation omitted). *Accord* 🚩 *Notash v. Gonzales,* 427 F.3d 693, 698 (9th Cir.2005) (holding that the Immigration Judge erred in "equat[ing] [willfulness] with evil intent. We have stated ... that the word 'wil[l]ful' means no more than that the forbidden act is done deliberately and with knowledge.... [This] does not establish the evil intent required for a crime of moral turpitude.") (internal quotation marks, alterations, and citations omitted).

15    I disagree, however, with the majority's assertion that judicially noticeable documents establish that Campos's 1997 conviction was for a "knowing" violation of A.R.S. § 28–1838(A)(1). The majority states that "Campos admitted in [his plea colloquy] that he knew he did not have a valid license." Maj. Op. at 913 n.12. That is true—at his plea colloquy, in response to the question "And, Mr. Campos, did you have a valid driver's license at that time in Arizona?," Campos responded, "I never had one." But driving under the influence while "kn[owing] he did not have a valid license" is not sufficient for a conviction under A.R.S. § 28–1838(A)(1). The Arizona statute instead requires that the defendant knew or should have known that his license to drive was "suspended, canceled, revoked, or refused or while a restriction is placed upon the person's driver's license [as a result of a prior DUI-related offense]." A.R.S. § 28–1383(A)(1). We cannot infer from the fact of his conviction and his statement in the plea colloquy that Campos *knew* his license was suspended, canceled, revoked, or refused; if anything, the plea colloquy indicates that he did not know that. This point of disagreement does not matter, however, because I would hold that even a knowing violation of the Arizona statute would not constitute a CIMT.

16    Specifically, the majority begins by quoting language concerning "knowing or intentional conduct" from 🏷️ *Matter of Perez–Contreras,* 20 I. & N. Dec. 615, 618 (B.I.A.1992), *see* Maj. Op. at 915, but that language is merely dicta. The assault statute at issue in *Perez–Contreras* lacked a knowledge requirement, 🏷️ *id.* at 619, and so the BIA had no occasion to hold that the offense would have qualified as a CIMT had it required knowledge. In any event, later cases concerning violent crimes confirmed that "knowingly" engaging in prohibited conduct is *not* the test for a finding of moral turpitude. In the violent crimes context, the BIA usually requires more than knowledge—essentially, recklessness plus. *See, e.g.,* *Matter of Fualaau,* 21 I. & N. Dec. 475, 478 (B.I.A.1996) ("In order for an assault ... to be deemed a crime involving moral turpitude, the element of a reckless state of mind must be coupled with an offense involving the infliction of serious bodily injury."). *Matter of McNaughton,* 16 I. & N. Dec. 569, 574 (B.I.A.1978), which the majority cites next, is a fraud case, and is therefore inapposite; a conviction for fraud must require a showing not of knowledge, but of the specific "intent to defraud," in order to constitute a CIMT. *See infra,* note 17. The majority then cites 🏷️ *Matter of R-,* 6 I. & N. Dec. 772, 773–774 (B.I.A.1955), 🏷️ *Matter of M-,* 2 I. & N. Dec. 721, 723 (B.I.A.1946), and 🏷️ *Matter of G-,* 1 I. & N. Dec. 403, 404–06 (B.I.A.1943), *see* Maj. Op. 915, all of which involve theft offenses, for which the requisite mens rea appears to be the specific intent to deprive another permanently of his property. *See* 🏷️ *Matter of Jurado–Delgado,* 24 I. & N. Dec. 29, 33–34 (B.I.A.2006) (conviction for retail theft is

a CIMT where the statute "requires proof that the person took merchandise offered for sale by a store without paying for it and with the intention of depriving the store owner of the goods" and where it can be presumed that "the taking is with the intention of retaining the merchandise permanently."); *Matter of Salvail,* 17 I. & N. Dec. 19, 20 (B.I.A.1979) (possession of stolen property is a CIMT where the statute "specifically requires knowledge of the stolen nature of the goods"). The majority also cites *Matter of Abreu–Semino,* 12 I. & N. Dec. 775, 777 (B.I.A.1968), and *Matter of P-,* 6 I. & N. Dec. 795, 798 (B.I.A.1955), for the proposition that "moral turpitude normally inheres in the intent." Maj. Op. at 915. This statement is unarguably correct, but it says nothing about *what level of intent* is sufficient to establish turpitude in what sorts of cases. Notably, *none* of the cases on which the majority relies involve a regulatory offense—which, as shown below, is the category of offense to which aggravated DUI belongs.

17    *See, e.g.,* *Matter of Balao,* 20 I. & N. Dec. 440, 443 (B.I.A.1992) (conviction for the violation of a statute prohibiting the issuing of worthless checks was not categorically a CIMT, because the statute prohibited only "the 'knowing' issuance of bad checks," rather than "expressly requir[ing] intent to defraud as an element of the crime"); *Matter of Serna,* 20 I. & N. Dec. 579 (B.I.A.1992) (conviction for possession of an altered immigration document with knowledge that it was altered, but without proof of any intent to use it unlawfully, is not a CIMT). *But see* *Matter of Tejwani,* 24 I. & N. Dec. 97, 98–99 (B.I.A.2007) (money laundering is a fraud CIMT even without any showing of specific intent, because "[a] person who deliberately takes affirmative steps to conceal or disguise the proceeds of criminal conduct acts in an inherently deceptive manner ... contrary to accepted moral standards.").

18    Indeed, Campos's offense cannot logically be described as a "fraud" offense, because Campos gave no false information to the motor vehicles authorities to obtain a driver's license—he simply drove without one. In contrast, the BIA's fraud cases normally involve affirmative misrepresentations of material facts made for the purposes of personal gain. *See Matter of P-,* 6 I. & N. Dec. 795, 798 (B.I.A.1955) (making "false or misleading representations in labeling" in violation of the Food, Drug, and Cosmetic Act is a CIMT); *Matter of M-,* 1 I. & N. Dec. 619 (B.I.A.1943) (willfully and knowingly making a false statement on a Selective Service questionnaire for the purpose of evading military service, where that statement is material, is a fraud CIMT). *See also* *Beltran–Tirado v. INS,* 213 F.3d 1179, 1184 (9th Cir.2000) (making false attestations on an employment verification form I–9 and using a false Social Security number are *mala prohibita* but not *mala in se,* and so are not CIMTs).

19    *See, e.g.,* *Matter of Solon,* 24 I. & N. Dec. 239, 241 (B.I.A.2007) ("Offenses characterized as 'simple assaults' are generally not considered to be crimes involving moral turpitude. This is so because they require general intent only and may be committed without the evil intent, depraved or vicious motive, or corrupt mind associated with moral turpitude.") (internal citation omitted); *Matter of Khourn,* 21 I. & N. Dec. 1041, 1045–46 (B.I.A.1997) (possession with the intent to distribute cocaine is a CIMT; the intent to distribute involves "evil intent"); *Matter of B-,* 5 I & N Dec. 538, 540–41 (B.I.A.1953) (a simple assault committed "knowingly" upon a prison guard involved no evil intent and so was not a CIMT); *Matter of S–C–,* 3 I. & N. Dec. 350, 353 (B.I.A.1948) (state misprision of felony offense is not a CIMT because "[t]o constitute this offense there must be mere knowledge of the offense, and not [necessarily] an[y] assent or encouragement.... A conviction could be had[, therefore,] ... without evil intent.... [S]ince the statute does not require an evil or corrupt intent, it is concluded that the crime is not one involving moral turpitude.") (internal quotation marks and citations omitted); *Matter of J-,* 2 I. & N. Dec. 99, 102 (B.I.A.1944) ( "All crimes violate some laws; all deliberate crimes involve the intent to do so. Congress could not have meant to make the willfulness of the act a test; it added as a condition that it must itself be shamefully immoral."). *See also* *Fernandez–Ruiz v. Gonzales,* 468 F.3d 1159, 1165–66 (9th Cir.2006) (discussing the requirement that a crime involve a showing of " 'willfulness' or 'evil intent' " to be classified as a CIMT, as opposed to "general intent" or "reckless[ness]");

*Notash v. Gonzales,* 427 F.3d 693, 698 (9th Cir.2005) (an act done deliberately and with knowledge does not necessarily involve "evil intent" for CIMT purposes); *Goldeshtein v. INS,* 8 F.3d 645, 648 (9th Cir.1993) (rejecting the argument that "evil intent exists if a conviction requires proof that a defendant did a forbidden act 'willfully,' " where "willfully' was defined to mean "deliberately and with knowledge.").

20    Neither *Lopez–Meza* nor any other precedential BIA decision classifies the offense of driving without a valid license as a "regulatory" (or any other kind of) offense. Nor has the BIA ever considered in a precedential decision whether the possession or use of a falsified driver's license is a CIMT. *But see Montero–Ubri v. INS,* 229 F.3d 319, 321 (1st Cir.2000) (affirming BIA's non-precedential decision that "using" a falsified driver's license was a CIMT, because the "attempt at deceit is inherent in this act"); *id.* at 320 (stating incorrectly that "[t]he BIA has held [in *Serna* ] that use of a fraudulent driver's license is a crime of moral turpitude," when in fact, *Serna* involved a falsified immigration document, not a driver's license, and it held that possession of such documents was not a CIMT); *Zaitona v. INS,* 9 F.3d 432 (6th Cir.1993) (affirming BIA's nonprecedential decision that knowingly using a false name and date of birth to obtain a driver's license was a CIMT).

21    The answer to this question cannot depend upon the seriousness of the breach or the severity of the harm caused, for the BIA has held that neither factor can compensate for the lack of mens rea otherwise required to transform an offense into a CIMT. *See Abreu–Semino,* 12 I. & N. Dec. at 777 (holding, in the drug possession context, that "crimes in which evil intent is not an element, no matter how serious the act or harmful the consequences, do not involve moral turpitude."); *Matter of Solon,* 24 I. & N. Dec. 239, 242 (B.I.A.2007) (explaining, in the context of assault crimes, that "as the level of conscious behavior decreases, i.e., from intentional to reckless conduct, more serious resulting harm is required in order to find that the crime involves moral turpitude. [But] where no conscious behavior is required, there can be no finding of moral turpitude, regardless of the resulting harm.").

22    *See Matter of Flores,* 17 I. & N. Dec. 225, 230 (B.I.A.1980) ("[T]he crime of uttering or selling false or counterfeit paper relating to registry of aliens with knowledge of their counterfeit nature inherently involves a deliberate deception of the government and an impairment of its lawful functions. Thus, fraudulent conduct is implicit in the statute."); *accord Notash v. Gonzales,* 427 F.3d 693, 698 (9th Cir.2005) ("[E]ven if intent to defraud is not explicit in the statutory definition, a [fraud] crime nevertheless may involve moral turpitude if such intent is implicit in the nature of the crime.") (internal citations, quotation marks, and alterations omitted).

23    *See Matter of Dingena,* 11 I. & N. Dec. 723, 727–28 (B.I.A.1966) (holding that statutory rape is a CIMT, despite the lack of a scienter requirement); *but see Quintero–Salazar v. Keisler,* 506 F.3d 688, 692 (9th Cir.2007) (holding that statutory rape under Cal.Penal Code § 261.5(d) is not categorically a CIMT). *See also Matter of Tobar–Lobo,* 24 I. & N. Dec. 143, 146–47 (B.I.A.2007) (holding that a convicted sex offender's failure to register in violation of Cal.Penal Code § 290(g)(1) was a CIMT, even if the failure was purely inadvertent, because the failure to abide by the registration requirement is so base and depraved that evil intent is inherent in the act). Although *Tobar–Lobo* involved a regulatory registration requirement, it is best understood as a sex-related offense case, not a regulatory offense case, as it was evidently the underlying sex offense and not the failure to register that the BIA found "reprehensible." *See Plasencia–Ayala v. Mukasey,* 516 F.3d 738, 748–49 (9th Cir.2008). At any rate, *Tobar–Lobo* has been superseded in this Circuit by *Plasencia–Ayala. See id.* at 746–49 (holding that failure to register as a sex offender under Nev.Rev.Stat. § 179D.550 is not a CIMT, because the statute is "regulatory ... in nature" and "lacks the requisite element of willfulness or evil intent"). Most recently, the Attorney General held that "convictions obtained under statutes that limit convictions to defendants who knew, or reasonably should have known, that their intentional sexual acts were directed at children categorically should be treated as convictions for crimes involving moral turpitude." *Silva–Trevino,* 24 I. & N. Dec. at 707.

09 Cal. Daily Op. Serv. 2667, 2009 Daily Journal D.A.R. 3224

24    *See* Matter of Khourn, 21 I. & N. Dec. at 1047 ("an evil intent is inherent in the crime of distribution of a controlled substance under 21 U.S.C. § 841(a)(1).").

25    *See* COOLEY's BLACKSTONE, Vol. I at 54, 58 (4th ed.) (describing crimes *mala in se* as crimes "such as murder, theft, and perjury: which contract no additional turpitude from being declared unlawful by the inferior legislature," whereas crimes *mala prohibita* "enjoin only positive duties, and forbid only such things as are not *mala in se* ... without any intermixture of moral guilt.").

26    *Accord* Knapik v. Ashcroft, 384 F.3d 84, 90 (3d Cir.2004) (noting that drunk driving "almost certainly does not involve moral turpitude"); Murillo–Salmeron v. INS, 327 F.3d 898, 902 (9th Cir.2003) ("[S]imple DUI convictions ... are not crimes of moral turpitude."); Franklin v. INS, 72 F.3d 571, 590 n. 17 (8th Cir.1995) (recognizing that the "violation of regulatory laws such as ... drunk driving" does not involve moral turpitude).

27    *Torres–Varela* involved A.R.S. § 28–697(A)(2), which has since been redesignated as A.R.S. § 28–1383(A)(2)—and which is the neighboring subsection to A.R.S. § 28–1383(A)(1), formerly A.R.S. § 28–697(A)(1), the provision at issue here. *See* Maj. Op. at 905 n.1. Both subsections are categorized as "aggravated driving" offenses.

28    This statement would be supportable, although only qualifiedly so, in the assault context. In assault cases, certain "aggravating factors," like the use of a deadly weapon, may be sufficient to establish turpitude where simple assault by itself would not. *See* Matter of Fualaau, 21 I. & N. Dec. at 478; Matter of Sanudo, 23 I. & N. Dec. at 971. The BIA's case law in this area is particularly confused, probably because the term "assault" encompasses such a wide range of state crimes. Moreover, I have found *no* cases in which an aggravating factor converts a *regulatory* offense to a CIMT; nor does the BIA in *Lopez–Meza* provide any reason why the approach used in its assault cases should be imported to the regulatory offense context when it has not been imported into other contexts. Indeed, the BIA established in *Torres–Varela* that another "aggravating factor" listed under the same Arizona statute at issue here—that is, recidivist DUI, A.R.S. § 28–1383(A)(2)— is not enough to establish moral turpitude. Torres–Varela, 23 I. & N. Dec. at 85–86. And as shown above, in Section II.A, the bulk of the BIA's case law on regulatory offenses holds that *no* mental state can establish sufficient culpability to transform a regulatory offense into a CIMT.

29    *See also* William N. Eskridge, Jr. & Lauren E. Baer, *The Continuum of Deference: Supreme Court Treatment of Agency Statutory Interpretations from* Chevron *to* Hamdan, 96 GEO. L.J. 1083, 1151 (2008) ("An agency interpretation that departs from a previously established agency understanding is more likely to be *arbitrary* in several senses: compared with a longstanding interpretation, a new construction is more likely to unsettle reliance interests ....") (emphasis in original).

---

End of Document                                            © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Not Followed on State Law Grounds M.E.K. v. R.L.K., Fla.App. 5 Dist., February 24, 2006

96 S.Ct. 893
Supreme Court of the United States

F. David MATHEWS, Secretary of Health, Education, and Welfare, Petitioner,

v.

George H. ELDRIDGE.

No. 74-204.
|
Argued Oct. 6, 1975.
|
Decided Feb. 24, 1976.

**Synopsis**

A person whose social security disability benefits had been terminated brought an action challenging the constitutional validity of the administrative procedures established by the Secretary of Health, Education and Welfare for assessing whether there exists a continuing disability. The United States District Court for the Western District of Virginia, 361 F.Supp. 520, determined that the administrative procedures in question were unconstitutional, and the Court of Appeals, 493 F.2d 1230, affirmed. On grant of certiorari, the Supreme Court, Mr. Justice Powell, held that an evidentiary hearing is not required prior to termination of disability benefits, and that the present administrative procedures for such termination fully comport with due process.

Reversed.

Mr. Justice Brennan dissented and filed opinion in which Mr. Justice Marshall concurred.

West Headnotes (11)

[1]    **Social Security**    Exhaustion of other remedies

Despite disability benefit claimant's failure to exhaust administrative remedies under Social Security Act after termination of disability benefits, district court had jurisdiction to entertain his claim that evidentiary hearing was required prior to termination of such benefits where claimant's answers to questionnaire and letter to state agencies specifically presented claim that his benefits should not be terminated because he was still disabled and where claimant's interest in having particular issue promptly resolved was so great that deference to decision of Secretary of Health, Education and Welfare whether to waive exhaustion requirements was inappropriate. Social Security Act, § 205(a, g, h) as amended 42 U.S.C.A. § 405(a, g, h); Fed.Rules Civ.Proc. rules 8(c), 12(h)(1), 28 U.S.C.A.; Social Security Administration Regulations, §§ 404.910, 404.916, 404.940, 42 U.S.C.A. App.; 28 U.S.C.A. §§ 1257, 1291.

1446 Cases that cite this headnote

[2]    **Social Security**    Exhaustion of other remedies

Secretary of Health, Education and Welfare may waive requirement that administrative remedies be exhausted before court review of agency determination is sought if Secretary satisfies himself, at any stage of administrative process,

that no further review is warranted either because internal needs of agency are fulfilled or because relief that is sought is beyond his power to confer. Social Security Act, § 205(g) as amended 🔖 42 U.S.C.A. § 405(g).

682 Cases that cite this headnote

**[3]**    **Constitutional Law** 👈 Social Security

Interest by individual in continued receipt of social security benefits is statutorily-created property interest protected by due process clause of Fifth Amendment. Social Security Act, § 201 et seq. as amended 🔖 42 U.S.C.A. § 401 et seq.; U.S.C.A.Const. Amend. 5.

1032 Cases that cite this headnote

**[4]**    **Constitutional Law** 👈 Notice and Hearing

Fundamental requirement of due process is opportunity to be heard at meaningful time and in meaningful manner. U.S.C.A.Const. Amends. 5, 14.

3656 Cases that cite this headnote

**[5]**    **Constitutional Law** 👈 Factors considered;  flexibility and balancing

Due process is not technical conception with fixed content unrelated to time, place and circumstances; rather, it is flexible and calls for such procedural protections as particular situation demands. U.S.C.A.Const. Amends. 5, 14.

1628 Cases that cite this headnote

**[6]**    **Constitutional Law** 👈 Factors considered;  flexibility and balancing

Identification of specific dictates of due process generally requires consideration of three distinct factors: private interest that will be affected by official action; risk of erroneous deprivation of such interest through procedures used, and probable value, if any, of additional or substitute procedural safeguards; and government's interest, including function involved and fiscal and administrative burdens that additional or substitute procedural requirements would entail. U.S.C.A.Const. Amends. 5, 14.

7120 Cases that cite this headnote

**[7]**    **Constitutional Law** 👈 Disability benefits

Evidentiary hearing is not required prior to termination of social security disability benefits; present administrative procedures for such terminations fully comport with due process. U.S.C.A.Const. Amends. 5, 14; Social Security Act, §§ 201(b), 202(b–d), 204, 204(b), 205(a, g, h), 215, 216(i)(2)(D), 221, 221(b, c), 223, 223(a)(1, 2), (d)(1), (d)(1)(A), (d)(2)(A), (d)(3), 224, 1614(a)(3), 1631(c) as amended 🔖 42 U.S.C.A. §§ 401 et seq., 🔖 401(b), 🔖 402(b–d), 🔖 404, 🔖 404(b) 🔖 405(a, g, h), 🔖 415, 🔖 416(i)(2)(D), 🔖 421, 🔖 421(b, c), 🔖 423, 🔖 423(a)(1, 2), (d)(1), (d)(1)(A), (d)(2)(A), (d)(3), 424a, 🚩 1382c(a)(3), 🔖 1383(c); Social Security Administration Regulations, §§ 404.408, 404.501–404.515, 404.503, 404.504, 404.907, 404.909, 404.910, 404.916, 404.917, 404.927, 404.934, 404.940, 404.945, 404.951, 42 U.S.C.A. App.; 28 U.S.C.A. §§ 1257, 1291, 1361.

335 Cases that cite this headnote

**[8]**    **Constitutional Law** 🖝 Administrative Agencies and Proceedings in General

Degree of potential deprivation that may be created by particular decision is factor to be considered in assessing validity of administrative decision-making process from due process standpoint. U.S.C.A.Const. Amends. 5, 14.

64 Cases that cite this headnote

**[9]**    **Constitutional Law** 🖝 Factors considered; flexibility and balancing

Procedural due process rules are shaped by risk of error inherent in truth-finding process as applied to generality of cases, not rare exceptions. U.S.C.A.Const. Amends. 5, 14.

419 Cases that cite this headnote

**[10]**    **Constitutional Law** 🖝 Administrative Agencies and Proceedings in General

Financial cost alone is not controlling weight in determining whether due process requires particular procedural safeguard prior to some administrative decision; but government's interest, and hence that of public, in conserving scarce fiscal and administrative resources, is factor which must be weighed. U.S.C.A.Const. Amends. 5, 14.

1039 Cases that cite this headnote

**[11]**    **Constitutional Law** 🖝 Notice and Hearing

Essence of due process is requirement that person in jeopardy of serious loss be given notice of case against him and opportunity to meet it; all that is necessary is that procedure be tailored, in light of decision to be made, to capacities and circumstances of those who are to be heard, to insure that they are given meaningful opportunity to present their case. U.S.C.A.Const. Amends. 5, 14.

3074 Cases that cite this headnote

**895    *319** *Syllabus* [*]

In order to establish initial and continued entitlement to disability benefits under the Social Security Act (Act), a worker must demonstrate that, inter alia, he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ." The worker bears the continuing burden of showing, by means of "medically acceptable . . . techniques" that his impairment is of such severity that he cannot perform his previous work or any other kind of gainful work. A state agency makes the continuing assessment of the worker's eligibility for benefits, obtaining information from the worker and his sources of medical treatment. The agency may arrange for an independent medical examination to resolve conflicting information. If the agency's tentative assessment of the beneficiary's condition differs from his own, the beneficiary is informed that his benefits may be terminated, is provided a summary of the evidence, and afforded an opportunity to review the agency's evidence. The state agency then makes a final determination, which is reviewed by the Social Security Administration (SSA). If the SSA accepts the agency determination it gives written notification to the beneficiary of the reasons for the decision and of his right to de novo state agency reconsideration. Upon acceptance by the SSA, benefits are terminated effective two months after the month in which recovery is found to have occurred. If, after reconsideration by the state agency and SSA review, the decision remains adverse to the recipient, he is notified of his right to an evidentiary hearing before an SSA administrative law judge. If an adverse decision results, the recipient may request discretionary review by the SSA Appeals Council, and finally may obtain judicial review. If it is determined after benefits are terminated that the claimant's disability extended beyond the date of cessation initially established, he is entitled to retroactive payments. Retroactive adjustments are also made for

overpayments. A few years after respondent was first awarded disability benefits he received and completed a questionnaire *320 from the monitoring state agency. After considering the information contained therein and obtaining reports from his doctor and an independent medical consultant, the agency wrote respondent that it had tentatively determined that his disability had ceased in May 1972 and advised him that he might request a reasonable time to furnish additional information. In a reply letter respondent disputed one characterization of his medical condition and indicated that the agency had enough evidence to establish his disability. The agency then made its final determination reaffirming its tentative decision. This determination was accepted by the SSA, which notified respondent in July that his benefits would end after that month and that he had a right to state agency reconsideration within six months. Instead of requesting such reconsideration respondent brought this action challenging the constitutionality of the procedures for terminating disability benefits and seeking reinstatement of benefits pending a hearing. The District Court, relying in part on ☐ Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287, held that the termination procedures violated procedural due process and concluded that prior to termination of benefits respondent was entitled to an evidentiary hearing of the type provided welfare beneficiaries under Title IV of the Act. The Court of Appeals affirmed. Petitioner contends, inter alia, that the District Court is barred from considering respondent's action by Weinberger v. Salfi, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522, which held that district courts are precluded from exercising jurisdiction over an action seeking a review of a decision of the Secretary of Health, Education, and Welfare regarding benefits under the Act except **896 as provided in ☐ 42 U.S.C. s 405(g), which grants jurisdiction only to review a "final" decision of the Secretary made after a hearing to which he was a party. Held :

1. The District Court had jurisdiction over respondent's constitutional claim, since the denial of his request for benefits was a final decision with respect to that claim for purposes of ☐ s 405(g) jurisdiction. Pp. 898-902.

(a) The ☐ s 405(g) finality requirement consists of the waivable requirement that the administrative remedies prescribed by the Secretary be exhausted and the nonwaivable requirement that a claim for benefits shall have been presented to the Secretary. Respondent's answers to the questionnaire and his letter to the state agency specifically presented the claim that his benefits should not be terminated because he was still disabled, and thus satisfied the nonwaivable requirement. Pp. 899-901.

*321 (b) Although respondent concededly did not exhaust the Secretary's internal-review procedures and ordinarily only the Secretary has the power to waive exhaustion, this is a case where the claimant's interest in having a particular issue promptly resolved is so great that deference to the Secretary's judgment is inappropriate. The facts that respondent's constitutional challenge was collateral to his substantive claim of entitlement and that (contrary to the situation in Salfi ) he colorably claimed that an erroneous termination would damage him in a way not compensable through retroactive payments warrant the conclusion that the denial of his claim to continued benefits was a sufficiently "final decision" with respect to his constitutional claim to satisfy the statutory exhaustion requirement. Pp. 900-902.

2. An evidentiary hearing is not required prior to the termination of Social Security disability payments and the administrative procedures prescribed under the Act fully comport with due process. Pp. 901-910.

(a) "(D)ue process is flexible and calls for such procedural protections as the particular situation demands," ☐ Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484. Resolution of the issue here involving the constitutional sufficiency of administrative procedures prior to the initial termination of benefits and pending review, requires consideration of three factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and probable value, if any, of additional procedural safeguards; and (3) the Government's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail. Pp. 901-903.

(b) The private interest that will be adversely affected by an erroneous termination of benefits is likely to be less in the case of a disabled worker than in the case of a welfare recipient, like the claimants in Goldberg, supra. Eligibility for disability payments is not based on financial need, and although hardship may be imposed upon the erroneously terminated disability

recipient, his need is likely less than the welfare recipient. In view of other forms of government assistance available to the terminated disability recipient, there is less reason than in Goldberg to depart from the ordinary principle that something less than an evidentiary hearing is sufficient prior to adverse administrative action. Pp. 905-907.

(c) The medical assessment of the worker's condition implicates **\*322** a more sharply focused and easily documented decision than the typical determination of welfare entitlement. The decision whether to discontinue disability benefits will normally turn upon "routine, standard, and unbiased medical reports by physician specialists," Richardson v. Perales, 402 U.S. 389, 404, 91 S.Ct. 1420, 1428-1429, 28 L.Ed.2d 842. In a disability situation the potential value of an evidentiary hearing is thus substantially less than in the welfare context. Pp. 907-908.

(d) Written submissions provide the disability recipient with an effective means of communicating his case to the decision-maker. The detailed questionnaire identifies **\*\*897** with particularity the information relevant to the entitlement decision. Information critical to the decision is derived directly from medical sources. Finally, prior to termination of benefits, the disability recipient or his representative is afforded full access to the information relied on by the state agency, is provided the reasons underlying its tentative assessment, and is given an opportunity to submit additional arguments and evidence. Pp. 907, 908.

(e) Requiring an evidentiary hearing upon demand in all cases prior to the termination of disability benefits would entail fiscal and administrative burdens out of proportion to any countervailing benefits. The judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances, and here where the prescribed procedures not only provide the claimant with an effective process for asserting his claim prior to any administrative action but also assure a right to an evidentiary hearing as well as subsequent judicial review before the denial of his claim becomes final, there is no deprivation of procedural due process. Pp. 909-910.

493 F.2d 1230, reversed.

### Attorneys and Law Firms

**\*323** Donald E. Earls, Norton, Va., for respondent.

### Opinion

Mr. Justice POWELL delivered the opinion of the Court.

The issue in this case is whether the Due Process Clause of the Fifth Amendment requires that prior to the termination of Social Security disability benefit payments the recipient be afforded an opportunity for an evidentiary hearing.

I

Cash benefits are provided to workers during periods in which they are completely disabled under the disability insurance benefits program created by the 1956 amendments to Title II of the Social Security Act. 70 Stat. 815, 42 U.S.C. s 423. [1] Respondent Eldridge was first awarded benefits in June 1968. In March 1972, he received a questionnaire from the state agency charged with monitoring his medical condition. Eldridge completed **\*324** the questionnaire, indicating that his condition had not improved and identifying the medical sources, including physicians, from whom he had received treatment recently. The state agency then obtained reports from his physician and a psychiatric consultant. After considering these reports and other information in his file the agency informed Eldridge by letter that it had made a tentative determination that his disability had ceased in May 1972. The letter included a statement of reasons for the proposed termination of benefits, and advised Eldridge that he might request reasonable time in which to obtain and submit additional information pertaining to his condition.

In his written response, Eldridge disputed one characterization of his medical condition and indicated that the agency already had enough evidence to establish his disability. [2] The state agency then made its final determination that he had ceased to be disabled in May 1972. This determination was accepted by the Social Security Administration **898 (SSA), which notified Eldridge in July that his benefits would terminate after that month. The notification also advised him of his right to seek reconsideration by the state agency of this initial determination within six months.

Instead of requesting reconsideration Eldridge commenced this action challenging the constitutional validity *325 of the administrative procedures established by the Secretary of Health, Education, and Welfare for assessing whether there exists a continuing disability. He sought an immediate reinstatement of benefits pending a hearing on the issue of his disability. [3] 361 F.Supp. 520 (W.D.Va.1973). The Secretary moved to dismiss on the grounds that Eldridge's benefits had been terminated in accordance with valid administrative regulations and procedures and that he had failed to exhaust available remedies. In support of his contention that due process requires a pretermination hearing, Eldridge relied exclusively upon this Court's decision in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), which established a right to an "evidentiary hearing" prior to termination of welfare benefits. [4] The Secretary contended that Goldberg was not controlling since eligibility for disability benefits, unlike eligibility for welfare benefits, is not based on financial need and since issues of credibility and veracity do not play a significant role in the disability entitlement decision, which turns primarily on medical evidence.

The District Court concluded that the administrative procedures pursuant to which the Secretary had terminated Eldridge's benefits abridged his right to procedural *326 due process. The court viewed the interest of the disability recipient in uninterrupted benefits as indistinguishable from that of the welfare recipient in Goldberg. It further noted that decisions subsequent to Goldberg demonstrated that the due process requirement of pretermination hearings is not limited to situations involving the deprivation of vital necessities. See Fuentes v. Shevin, 407 U.S. 67, 88-89, 92 S.Ct. 1983, 1998-1999, 32 L.Ed.2d 556 (1972); Bell v. Burson, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971). Reasoning that disability determinations may involve subjective judgments based on conflicting medical and nonmedical evidence, the District Court held that prior to termination of benefits Eldridge had to be afforded an evidentiary hearing of the type required for welfare beneficiaries under Title IV of the Social Security Act. 361 F.Supp., at 528. [5] Relying entirely upon the District Court's opinion, the Court of Appeals for the Fourth Circuit affirmed the injunction barring termination of Eldridge's benefits prior to an evidentiary hearing. 493 F.2d 1230 (1974). [6] We reverse.

**899 II

[1]    At the outset we are confronted by a question as to whether the District Court had jurisdiction over this suit. The Secretary contends that our decision last Term in Weinberger v. Salfi, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), bars the District Court from considering Eldridge's action. Salfi was an action challenging the Social Security Act's *327 duration-of-relationship eligibility requirements for surviving wives and stepchildren of deceased wage earners. We there held that 42 U.S.C. s 405(h) [7] precludes federal-question jurisdiction in an action challenging denial of claimed benefits. The only avenue for judicial review is 42 U.S.C. s 405(g), which requires exhaustion of the administrative remedies provided under the Act as a jurisdictional prerequisite.

Section 405(g) in part provides:

"Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow." [8]

**\*328** On its face s 405(g) thus bars judicial review of any denial of a claim of disability benefits until after a "final decision" by the Secretary after a "hearing." It is uncontested that Eldridge could have obtained full administrative review of the termination of his benefits, yet failed even to seek reconsideration of the initial determination. Since the Secretary has not "waived" the finality requirement as he had in Salfi, supra, at 767, 95 S.Ct., at 2467-2468, he concludes that Eldridge cannot properly invoke s 405(g) as a basis for jurisdiction. We disagree.

Salfi identified several conditions which must be satisfied in order to obtain judicial review under s 405(g). Of these, the requirement that there be a final decision by the Secretary after a hearing was regarded as "central to the requisite grant of subject-matter jurisdiction . . .." 422 U.S., at 764, 95 S.Ct., at 2466. [9] Implicit in Salfi however, is the principle that this condition consists of two elements, only one of which is purely "jurisdictional" in the sense that it cannot be "waived" by the Secretary in a particular case. The waivable element is the requirement that the administrative remedies prescribed by the Secretary be exhausted. The nonwaivable element is the requirement that a claim for benefits shall have been presented to the Secretary. Absent such a claim there can be no "decision" of any type. And some decision by the Secretary is clearly required by the statute.

**\*329  \*\*900** That this second requirement is an essential and distinct precondition for s 405(g) jurisdiction is evident from the different conclusions that we reached in Salfi with respect to the named appellees and the unnamed members of the class. As to the latter the complaint was found to be jurisdictionally deficient since it "contain(ed) no allegations that they have even filed an application with the Secretary . . . ." 422 U.S., at 764, 95 S.Ct., at 2466. With respect to the named appellees, however, we concluded that the complaint was sufficient since it alleged that they had "fully presented their claims for benefits 'to their district Social Security Office and, upon denial, to the Regional Office for reconsideration.' " Id., at 764-765, 95 S.Ct., at 2466. Eldridge has fulfilled this crucial prerequisite. Through his answers to the state agency questionnaire, and his letter in response to the tentative determination that his disability had ceased, he specifically presented the claim that his benefits should not be terminated because he was still disabled. This claim was denied by the state agency and its decision was accepted by the SSA.

The fact that Eldridge failed to raise with the Secretary his constitutional claim to a pretermination hearing is not controlling. [10] As construed in Salfi, s 405(g) requires only that there be a "final decision" by the Secretary with respect to the claim of entitlement to benefits. Indeed, the named appellees in Salfi did not present their constitutional claim to the Secretary. Weinberger v. Salfi, O.T.1974, No. 74-214, App. 11, 17-21. The situation here is not identical to Salfi, for, while the **\*330** Secretary had no power to amend the statute alleged to be unconstitutional in that case, he does have authority to determine the timing and content of the procedures challenged here. 42 V.S.C. s 405(a). We do not, however, regard this difference as significant. It is unrealistic to expect that the Secretary would consider substantial changes in the current administrative review system at the behest of a single aid recipient raising a constitutional challenge in an adjudicatory context. The Secretary would not be required even to consider such a challenge.

**[2]**  As the nonwaivable jurisdictional element was satisfied, we next consider the waivable element. The question is whether the denial of Eldridge's claim to continued benefits was a sufficiently "final" decision with respect to his constitutional claim to satisfy the statutory exhaustion requirement. Eldridge concedes that he did not exhaust the full set of internal-review procedures provided by the Secretary. See 20 CFR ss 404.910, 404.916, 404.940 (1975). As Salfi recognized, the Secretary may waive the exhaustion requirement if he satisfies himself, at any stage of the administrative process, that no further review is warranted either because the internal needs of the agency are fulfilled or because the relief that is sought is beyond his power to confer.

Salfi suggested that under s 405(g) the power to determine when finality has occurred ordinarily rests with the Secretary since ultimate responsibility for the integrity of the administrative program is his. But cases may arise where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate. This is such a case.

Eldridge's constitutional challenge is entirely collateral to his substantive claim of entitlement. Moreover, there **\*331** is a crucial distinction between the nature of the constitutional claim asserted here and that raised in Salfi. A claim to a predeprivation hearing as a matter of constitutional right rests on the proposition that full relief cannot be obtained at a postdeprivation hearing.

**\*\*901**  See  Regional Rail Reorganization Act Cases, 419 U.S. 102, 156, 95 S.Ct. 335, 365, 42 L.Ed.2d 320 (1974). In light of the Court's prior decisions, see, e. g.,  Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970);  Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), Eldridge has raised at least a colorable claim that because of his physical condition and dependency upon the disability benefits, an erroneous termination would damage him in a way not recompensable through retroactive payments. [11]  Thus, unlike the situation in Salfi, denying Eldridge's substantive **\*332** claim "for other reasons" or upholding it "under other provisions" at the post-termination stage,  422 U.S., at 762, 95 S.Ct., at 2465, would not answer his constitutional challenge.

We conclude that the denial of Eldridge's request for benefits constitutes a final decision for purposes of  s 405(g) jurisdiction over his constitutional claim. We now proceed to the merits of that claim. [12]

III

A

 [3]    Procedural due process imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment. The Secretary does not contend that procedural due process is inapplicable to terminations of Social Security disability benefits. He recognizes, as has been implicit in our prior decisions, e. g.,  Richardson v. Belcher, 404 U.S. 78, 80-81, 92 S.Ct. 254, 256-257, 30 L.Ed.2d 231 (1971);  Richardson v. Perales, 402 U.S. 389, 401-402, 91 S.Ct. 1420, 1427-1428, 28 L.Ed.2d 842 (1971);  Flemming v. Nestor, 363 U.S. 603, 611, 80 S.Ct. 1367, 1372-1373, 4 L.Ed.2d 1435 (1960), that the interest of an individual in continued receipt of these benefits is a statutorily created "property" interest protected by the Fifth Amendment. Cf.  Arnett v. Kennedy, 416 U.S. 134, 166, 94 S.Ct. 1633, 1650, 40 L.Ed.2d 15 (Powell, J., concurring in part) (1974);  Board of Regents v. Roth, 408 U.S. 564, 576-578, 92 S.Ct. 2701, 2708-2710, 33 L.Ed.2d 548 (1972);  Bell v. Burson, 402 U.S., at 539, 91 S.Ct., at 1589;  Goldberg v. Kelly, 397 U.S., at 261-262, 90 S.Ct., at 1016-1017. Rather, the Secretary contends that the existing administrative procedures, detailed below, provide all the process **\*333** that is constitutionally due before a recipient can be deprived of that interest.

**\*\*902**  [4]    This Court consistently has held that some form of hearing is required before an individual is finally deprived of a property interest.  Wolff v. McDonnell, 418 U.S. 539, 557-558, 94 S.Ct. 2963, 2975-2976, 41 L.Ed.2d 935 (1974). See, e. g.  Phillips v. Commissioner of Internal Revenue, 283 U.S. 589, 596-597, 51 S.Ct. 608, 611-612, 75 L.Ed. 1289 (1931). See also  Dent v. West Virginia, 129 U.S. 114, 124-125, 9 S.Ct. 231, 234, 32 L.Ed. 623 (1889). The "right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society."  Joint Anti-Fascist Comm. v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 646, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner."  Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). See  Grannis v. Ordean, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914). Eldridge agrees that the

review procedures available to a claimant before the initial determination of ineligibility becomes final would be adequate if disability benefits were not terminated until after the evidentiary hearing stage of the administrative process. The dispute centers upon what process is due prior to the initial termination of benefits, pending review.

In recent years this Court increasingly has had occasion to consider the extent to which due process requires an evidentiary hearing prior to the deprivation of some type of property interest even if such a hearing is provided thereafter. In only one case, Goldberg v. Kelly, 397 U.S., at 266-271, 90 S.Ct., at 1019-1022, 25 L.Ed.2d 287, has the Court held that a hearing closely approximating a judicial trial is necessary. In other cases requiring some type of pretermination hearing as a matter of constitutional right the Court has spoken sparingly about the requisite procedures. **\*334** SniaDachv. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), involving garnishment of wages, was entirely silent on the matter. In Fuentes v. Shevin, 407 U.S., at 96-97, 92 S.Ct., at 2002-2003, 32 L.Ed.2d 556, the Court said only that in a replevin suit between two private parties the initial determination required something more than an ex parte proceeding before a court clerk. Similarly, Bell v. Burson, supra, at 540, 91 S.Ct., at 1590, 29 L.Ed.2d 90, held, in the context of the revocation of a state-granted driver's license, that due process required only that the prerevocation hearing involve a probable-cause determination as to the fault of the licensee, noting that the hearing "need not take the form of a full adjudication of the question of liability." See also North Georgia Finishing, Inc. v. Di-Chem, Inc., 419 U.S. 601, 607, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975). More recently, in Arnett v. Kennedy, supra, we sustained the validity of procedures by which a federal employee could be dismissed for cause. They included notice of the action sought, a copy of the charge, reasonable time for filing a written response, and an opportunity for an oral appearance. Following dismissal, an evidentiary hearing was provided. 416 U.S., at 142-146, 94 S.Ct., at 1638-1640.

**[5]** **[6]** These decisions underscore the truism that " '(d)ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." Cafeteria Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). "(D)ue process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Accordingly, resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected. Arnett v. Kennedy, supra, 416 U.S., at 167-168, 94 S.Ct., at 1650-1651 (Powell, J., concurring in part); Goldberg v. Kelly, supra, 397 U.S., at 263-266, 90 S.Ct., at 1018-1020; **\*\*903** Cafeteria Workers v. McElroy, supra, 367 U.S., at 895, 81 S.Ct., at 1748-1749. More precisely, our prior decisions **\*335** indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. See, e. g., Goldberg v. Kelly, supra, 397 U.S., at 263-271, 90 S.Ct., at 1018-1022.

We turn first to a description of the procedures for the termination of Social Security disability benefits and thereafter consider the factors bearing upon the constitutional adequacy of these procedures.

B

The disability insurance program is administered jointly by state and federal agencies. State agencies make the initial determination whether a disability exists, when it began, and when it ceased. 42 U.S.C. s 421(a). [13] The standards applied

and the procedures followed are prescribed by the Secretary, see 🔖 s 421(b), who has delegated his responsibilities and powers under the Act to the SSA. See 40 Fed.Reg. 4473 (1975).

**\*336**  In order to establish initial and continued entitlement to disability benefits a worker must demonstrate that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 🔖 42 U.S.C. s 423(d)(1)(A).

To satisfy this test the worker bears a continuing burden of showing, by means of "medically acceptable clinical and laboratory diagnostic techniques," 🔖 s 423(d)(3), that he has a physical or mental impairment of such severity that "he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 🔖 s 423(d)(2)(A). [14]

The principal reasons for benefits terminations are that the worker is no longer disabled or has returned to work. As Eldridge's benefits were terminated because he was determined to be no longer disabled, we consider only the sufficiency of the procedures involved in such cases. [15]

**\*337**  **\*\*904**  The continuing-eligibility investigation is made by a state agency acting through a "team" consisting of a physician and a nonmedical person trained in disability evaluation. The agency periodically communicates with the disabled worker, usually by mail in which case he is sent a detailed questionnaire or by telephone, and requests information concerning his present condition, including current medical restrictions and sources of treatment, and any additional information that he considers relevant to his continued entitlement to benefits. CM s 6705.1; Disability Insurance State Manual (DISM) s 353.3 (TL No. 137, Mar. 5, 1975). [16]

Information regarding the recipient's current condition is also obtained from his sources of medical treatment. DISM s 353.4. If there is a conflict between the information provided by the beneficiary and that obtained from medical sources such as his physician, or between two sources of treatment, the agency may arrange for an examination by an independent consulting physician. [17]  Ibid. Whenever the agency's tentative assessment of the beneficiary's condition differs from his  **\*338**  own assessment, the beneficiary is informed that benefits may be terminated, provided a summary of the evidence upon which the proposed determination to terminate is based, and afforded an opportunity to review the medical reports and other evidence in his case file. [18]  He also may respond in writing and submit additional evidence. Id., s 353.6.

The state agency then makes its final determination, which is reviewed by an examiner in the SSA Bureau of Disability Insurance. 🔖 42 U.S.C. s 421(c); CM ss 6701(b), (c). [19]  If, as is usually the case, the SSA accepts the agency determination it notifies the recipient in writing, informing him of the reasons for the decision, and of his right to seek de novo reconsideration by the state agency. 20 CFR ss 404.907, 404.909 (1975). [20]  Upon acceptance by the SSA, benefits are terminated effective two months after the month in which medical recovery is found to have occurred. 🔖 42 U.S.C. (Supp. III) s 423(a) (1970 ed., Supp. III).

**\*339**  If the recipient seeks reconsideration by the state agency and the determination is adverse, the SSA reviews the reconsideration determination and notifies the recipient of the decision. He then has a right to an evidentiary hearing before an SSA administrative law judge. 20 CFR ss 404.917, 404.927 (1975). The hearing is nonadversary,  **\*\*905**  and the SSA is not represented by counsel. As at all prior and subsequent stages of the administrative process, however, the claimant may be

96 S.Ct. 893, 47 L.Ed.2d 18

represented by counsel or other spokesmen. s 404.934. If this hearing results in an adverse decision, the claimant is entitled to request discretionary review by the SSA Appeals Council, s 404.945, and finally may obtain judicial review. 42 U.S.C. s 405(g); 20 CFR s 404.951 (1975). [21]

Should it be determined at any point after termination of benefits, that the claimant's disability extended beyond the date of cessation initially established, the worker is entitled to retroactive payments. 42 U.S.C. s 404. Cf. s 423(b); 20 CFR ss 404.501, 404.503, 404.504 (1975). If, on the other hand, a beneficiary receives any payments to which he is later determined not to be entitled, the statute authorizes the Secretary to attempt to recoup these funds in specified circumstances. 42 U.S.C. s 404. [22]

C

 **[7]**    Despite the elaborate character of the administrative procedures provided by the Secretary, the courts  ***340**  below held them to be constitutionally inadequate, concluding that due process requires an evidentiary hearing prior to termination. In light of the private and governmental interests at stake here and the nature of the existing procedures, we think this was error.

Since a recipient whose benefits are terminated is awarded full retroactive relief if he ultimately prevails, his sole interest is in the uninterrupted receipt of this source of income pending final administrative decision on his claim. His potential injury is thus similar in nature to that of the welfare recipient in Goldberg, see 397 U.S., at 263-264, 90 S.Ct., at 1018-1019, the nonprobationary federal employee in Arnett, see 416 U.S., at 146, 94 S.Ct., at 1640, 1641, and the wage earner in Sniadach. See 395 U.S., at 341-342, 89 S.Ct., at 1822-1823. [23]

Only in Goldberg has the Court held that due process requires an evidentiary hearing prior to a temporary deprivation. It was emphasized there that welfare assistance is given to persons on the very margin of subsistence:
"The crucial factor in this context a factor not present in the case of . . . virtually anyone else whose governmental entitlements are ended is that termination of aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits." 397 U.S., at 264, 90 S.Ct., at 1018 (emphasis in original).

Eligibility for disability benefits, in contrast, is not based upon financial need. [24] Indeed, it is wholly unrelated to  ***341**  the worker's income or support from many other sources, such as earnings of other family members, workmen's compensation awards, [25] tort claims awards, savings, private  ****906**  insurance, public or private pensions, veterans' benefits, food stamps, public assistance, or the "many other important programs, both public and private, which contain provisions for disability payments affecting a substantial portion of the work force . . . ." Richardson v. Belcher, 404 U.S., at 85-87, 92 S.Ct., at 259 (Douglas, J., dissenting). See Staff of the House Committee on Ways and Means, Report on the Disability Insurance Program, 93d Cong., 2d Sess., 9-10, 419-429 (1974) (hereinafter Staff Report).

 **[8]**    As Goldberg illustrates, the degree of potential deprivation that may be created by a particular decision is a factor to be considered in assessing the validity of any administrative decisionmaking process. Cf. Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The potential deprivation here is generally likely to be less than in Goldberg, although the degree of difference can be overstated. As the District Court emphasized, to remain eligible for benefits a recipient must be "unable to engage in substantial gainful activity." 42 U.S.C. s 423; 361 F.Supp., at 523. Thus, in contrast to the discharged federal employee in Arnett, there is little possibility that the terminated recipient will be able to find even temporary employment to ameliorate the interim loss.

As we recognized last Term in Fusari v. Steinberg, 419 U.S. 379, 389, 95 S.Ct. 533, 540, 42 L.Ed.2d 521 (1975), "the possible length of wrongful deprivation of . . . benefits (also) is an important factor in assessing the impact of official action on the private interests." The Secretary concedes that the delay between **\*342** a request for a hearing before an administrative law judge and a decision on the claim is currently between 10 and 11 months. Since a terminated recipient must first obtain a reconsideration decision as a prerequisite to invoking his right to an evidentiary hearing, the delay between the actual cutoff of benefits and final decision after a hearing exceeds one year.

In view of the torpidity of this administrative review process, cf. id., at 383-384, 386, 95 S.Ct., at 536-537, 538, and the typically modest resources of the family unit of the physically disabled worker,[26] the hardship imposed upon the erroneously terminated disability recipient may be significant. Still, the disabled worker's need is likely to be less than that of a welfare recipient. In addition to the possibility of access to private resources, other forms of government assistance will become available where the termination of disability benefits places a worker or his family below the subsistence level.[27] See **\*343** Arnett v. Kennedy, supra, 416 U.S., at 169, **\*\*907** 94 S.Ct., at 1651-1652 (Powell, J., concurring in part); id., at 201-202, 94 S.Ct., at 1667-1668 (White, J., concurring in part and dissenting in part). In view of these potential sources of temporary income, there is less reason here than in Goldberg to depart from the ordinary principle, established by our decisions, that something less than an evidentiary hearing is sufficient prior to adverse administrative action.

D

An additional factor to be considered here is the fairness and reliability of the existing pretermination procedures, and the probable value, if any, of additional procedural safeguards. Central to the evaluation of any administrative process is the nature of the relevant inquiry. See Mitchell v. W. T. Grant Co., 416 U.S. 600, 617, 94 S.Ct. 1895, 1905, 40 L.Ed.2d 406 (1974); Friendly, Some Kind of Hearing, 123 U.Pa.L.Rev. 1267, 1281 (1975). In order to remain eligible for benefits the disabled worker must demonstrate by means of "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. s 423(d)(3), that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ." s 423(d)(1)(A) (emphasis supplied). In short, a medical assessment of the worker's physical or mental condition is required. This is a more sharply focused and easily documented decision than the typical determination of welfare entitlement. In the latter case, a wide variety of information may be deemed relevant, and issues of witness credibility and **\*344** veracity often are critical to the decisionmaking process. Goldberg noted that in such circumstances "written submissions are a wholly unsatisfactory basis for decision." 397 U.S., at 269, 90 S.Ct., at 1021.

[9]    By contrast, the decision whether to discontinue disability benefits will turn, in most cases, upon "routine, standard, and unbiased medical reports by physician specialists," Richardson v. Perales, 402 U.S., at 404, 91 S.Ct., at 1428, concerning a subject whom they have personally examined.[28] In Richardson the Court recognized the "reliability and probative worth of written medical reports," emphasizing that while there may be "professional disagreement with the medical conclusions" the "specter of questionable credibility and veracity is not present." Id., at 405, 407, 91 S.Ct., at 1428, 1430. To be sure, credibility and veracity may be a factor in the ultimate disability assessment in some cases. But procedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions. The potential value of an evidentiary hearing, or even oral presentation to the decisionmaker, **\*345** is substantially less in this context than in Goldberg.

The decision in Goldberg also was based on the Court's conclusion that written submissions were an inadequate substitute for oral presentation because they did not provide an effective means for the recipient to communicate his case to the decisionmaker. Written submissions were viewed as an unrealistic option, for most recipients lacked the "educational attainment necessary to

96 S.Ct. 893, 47 L.Ed.2d 18

**\*\*908** write effectively" and could not afford professional assistance. In addition, such submissions would not provide the "flexibility of oral presentations" or "permit the recipient to mold his argument to the issues the decision maker appears to regard as important." 397 U.S., at 269, 90 S.Ct., at 1021. In the context of the disability-benefits-entitlement assessment the administrative procedures under review here fully answer these objections.

The detailed questionnaire which the state agency periodically sends the recipient identifies with particularity the information relevant to the entitlement decision, and the recipient is invited to obtain assistance from the local SSA office in completing the questionnaire. More important, the information critical to the entitlement decision usually is derived from medical sources, such as the treating physician. Such sources are likely to be able to communicate more effectively through written documents than are welfare recipients or the lay witnesses supporting their cause. The conclusions of physicians often are supported by X-rays and the results of clinical or laboratory tests, information typically more amenable to written than to oral presentation. Cf. W. Gellhorn & C. Byse, Administrative Law Cases and Comments 860-863 (6th ed. 1974).

A further safeguard against mistake is the policy of allowing the disability recipient's representative full access **\*346** to all information relied upon by the state agency. In addition, prior to the cutoff of benefits the agency informs the recipient of its tentative assessment, the reasons therefor, and provides a summary of the evidence that it considers most relevant. Opportunity is then afforded the recipient to submit additional evidence or arguments, enabling him to challenge directly the accuracy of information in his file as well as the correctness of the agency's tentative conclusions. These procedures, again as contrasted with those before the Court in Goldberg, enable the recipient to "mold" his argument to respond to the precise issues which the decisionmaker regards as crucial.

Despite these carefully structured procedures, amici point to the significant reversal rate for appealed cases as clear evidence that the current process is inadequate. Depending upon the base selected and the line of analysis followed, the relevant reversal rates urged by the contending parties vary from a high of 58.6% For appealed reconsideration decisions to an overall reversal rate of only 3.3%. [29] Bare statistics rarely provide a satisfactory measure of the fairness of a decisionmaking process. Their adequacy is especially suspect here since **\*347** the administrative review system is operated on an open-file basis. A recipient may always submit new evidence, and such submissions may result in additional medical examinations. Such fresh examinations were held in approximately 30% To 40% Of the appealed cases, in fiscal 1973, either at the reconsideration or evidentiary hearing stage of the administrative process. Staff Report 238. In this context, the value of reversal rate statistics as one means of evaluating the adequacy of the pretermination process is diminished. Thus, although we view such information as relevant, it is certainly not controlling in this case.

**\*\*909** E

In striking the appropriate due process balance the final factor to be assessed is the public interest. This includes the administrative burden and other societal costs that would be associated with requiring, as a matter of constitutional right, an evidentiary hearing upon demand in all cases prior to the termination of disability benefits. The most visible burden would be the incremental cost resulting from the increased number of hearings and the expense of providing benefits to ineligible recipients pending decision. No one can predict the extent of the increase, but the fact that full benefits would continue until after such hearings would assure the exhaustion in most cases of this attractive option. Nor would the theoretical right of the Secretary to recover undeserved benefits result, as a practical matter, in any substantial offset to the added outlay of public funds. The parties submit widely varying estimates of the probable additional financial cost. We only need say that experience with the constitutionalizing of government procedures suggests that the ultimate additional cost in terms of money and administrative burden would not be insubstantial.

[10] **\*348** Financial cost alone is not a controlling weight in determining whether due process requires a particular procedural safeguard prior to some administrative decision. But the Government's interest, and hence that of the public, in conserving scarce fiscal and administrative resources is a factor that must be weighed. At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost. Significantly, the cost of protecting those whom the preliminary administrative process has identified

as likely to be found undeserving may in the end come out of the pockets of the deserving since resources available for any particular program of social welfare are not unlimited. See Friendly, supra, 123 U.Pa.L.Rev., at 1276, 1303.

 [11]    But more is implicated in cases of this type than ad hoc weighing of fiscal and administrative burdens against the interests of a particular category of claimants. The ultimate balance involves a determination as to when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness. We reiterate the wise admonishment of Mr. Justice Frankfurter that differences in the origin and function of administrative agencies "preclude wholesale transplantation of the rules of procedure, trial and review which have evolved from the history and experience of courts." FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 143, 60 S.Ct. 437, 441, 84 L.Ed. 656 (1940). The judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances. The essence of due process is the requirement that "a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it."

 *349  Joint Anti-Fascist Comm. v. McGrath, 341 U.S., at 171-172, 71 S.Ct., at 649. (Frankfurter, J., concurring). All that is necessary is that the procedures be tailored, in light of the decision to be made, to "the capacities and circumstances of those who are to be heard," Goldberg v. Kelly, 397 U.S., at 268-269, 90 S.Ct., at 1021 (footnote omitted), to insure that they are given a meaningful opportunity to present their case. In assessing what process is due in this case, substantial weight must be given to the good-faith judgments of the individuals charged by Congress with the administration of social welfare programs that the procedures they have provided assure fair consideration of the entitlement claims of individuals. See Arnett v. Kennedy, 416 U.S., at 202, 94 S.Ct., at 1667-1668 (White, J., concurring in part and dissenting in part). This is especially so where, as here, the prescribed procedures not only provide the claimant with an effective process for  **910  asserting his claim prior to any administrative action, but also assure a right to an evidentiary hearing, as well as to subsequent judicial review, before the denial of his claim becomes final. Cf. Boddie v. Connecticut, 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971).

We conclude that an evidentiary hearing is not required prior to the termination of disability benefits and that the present administrative procedures fully comport with due process.

The judgment of the Court of Appeals is

Reversed.

Mr. Justice STEVENS took no part in the consideration or decision of this case.

Mr. Justice BRENNAN, with whom Mr. Justice MARSHALL concurs, dissenting.

For the reasons stated in my dissenting opinion in Richardson v. Wright, 405 U.S. 208, 212, 92 S.Ct. 788, 791, 31 L.Ed.2d 151 (1972), I agree with the District Court and the Court of Appeals that, prior to termination of benefits, Eldridge must be afforded  *350  an evidentiary hearing of the type required for welfare beneficiaries under Title IV of the Social Security Act, 42 U.S.C. s 601 et seq. See Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). I would add that the Court's consideration that a discontinuance of disability benefits may cause the recipient to suffer only a limited deprivation is no argument. It is speculative. Moreover, the very legislative determination to provide disability benefits, without any prerequisite determination of need in fact, presumes a need by the recipient which is not this Court's function to denigrate. Indeed, in the present case, it is indicated that because disability benefits were terminated there was a foreclosure upon the Eldridge home and the family's furniture was repossessed, forcing Eldridge, his wife, and their children to sleep in one bed. Tr. of Oral Arg. 39, 47-48. Finally, it is also no argument that a worker, who has been placed in the untenable position of having been denied disability benefits, may still seek other forms of public assistance.

George P. McLAUGHLIN, petitioner, v. Douglas VINZANT, Superintendent, Massachusetts Correctional Institution. No. 75-5671.

Former decision, 423 U.S. 1037, 423 U.S. 1037, 96 S.Ct. 573.

Facts and opinion, 1 Cir., 522 F.2d 448.

Jan. 26, 1976. Petition for rehearing denied.

Mr. Justice STEVENS took no part in the consideration or decision of this petition.

**All Citations**

424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18

## Footnotes

\*   The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1   The program is financed by revenues derived from employee and employer payroll taxes. 26 U.S.C. ss 3101(a), 3111(a); 42 U.S.C. s 401(b). It provides monthly benefits to disabled persons who have worked sufficiently long to have an insured status, and who have had substantial work experience in a specified interval directly preceding the onset of disability. 42 U.S.C. ss 423(c)(1)(A) and (B). Benefits also are provided to the worker's dependents under specified circumstances. ss 402(b)- (d). When the recipient reaches age 65 his disability benefits are automatically converted to retirement benefits. ss 416(i)(2)(D), 423(a)(1). In fiscal 1974 approximately 3,700,000 persons received assistance under the program. Social Security Administration, The Year in Review 21 (1974).

2   Eldridge originally was disabled due to chronic anxiety and back strain. He subsequently was found to have diabetes. The tentative determination letter indicated that aid would be terminated because available medical evidence indicated that his diabetes was under control, that there existed no limitations on his back movements which would impose severe functional restrictions, and that he no longer suffered emotional problems that would preclude him from all work for which he was qualified. App. 12-13. In his reply letter he claimed to have arthritis of the spine rather than a strained back.

3   The District Court ordered reinstatement of Eldridge's benefits pending its final disposition on the merits.

4   In Goldberg the Court held that the pretermination hearing must include the following elements: (1) "timely and adequate notice detailing the reasons for a proposed termination"; (2) "an effective opportunity (for the recipient) to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally"; (3) retained counsel, if desired; (4) an "impartial" decisionmaker; (5) a decision resting "solely on the legal rules and evidence adduced at the hearing"; (6) a statement of reasons for the decision and the evidence relied on. 397 U.S., at 266-271, 90 S.Ct., at 1019-1022. In this opinion the term "evidentiary hearing" refers to a hearing generally of the type required in Goldberg.

5   The HEW regulations direct that each state plan under the federal categorical assistance programs must provide for pretermination hearings containing specified procedural safeguards, which include all of the Goldberg requirements. See 45 CFR s 205.10(a) (1975); n. 4, supra.

6    The Court of Appeals for the Fifth Circuit, simply noting that the issue had been correctly decided by the District Court in this case, reached the same conclusion in Williams v. Weinberger, 494 F.2d 1191 (1974), cert. pending, No. 74-205.

7    Title 42 U.S.C. s 405(h) provides in full:

"(h) Finality of Secretary's decision.

"The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 41 of Title 28 to recover on any claim arising under this subchapter."

8    Section 405(g) further provides:

Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the United States District Court for the District of Columbia. . . . The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . . ."

9    The other two conditions are (1) that the civil action be commenced within 60 days after the mailing of notice of such decision, or within such additional time as the Secretary may permit, and (2) that the action be filed in an appropriate district court. These two requirements specify a statute of limitations and appropriate venue, and are waivable by the parties. Salfi, 422 U.S., at 763-764, 95 S.Ct., at 2465-2466. As in Salfi no question as to whether Eldridge satisfied these requirements was timely raised below, see Fed.Rules Civ.Proc. 8(c), 12(h)(1), and they need not be considered here.

10   If Eldridge had exhausted the full set of available administrative review procedures, failure to have raised his constitutional claim would not bar him from asserting it later in a district court. Cf. Flemming v. Nestor, 363 U.S. 603, 607, 80 S.Ct. 1367, 1370-1371, 4 L.Ed.2d 1435 (1960).

11   Decisions in different contexts have emphasized that the nature of the claim being asserted and the consequences of deferment of judicial review are important factors in determining whether a statutory requirement of finality has been satisfied. The role these factors may play is illustrated by the intensely "practical" approach which the Court has adopted, Cohen v. Beneficial Ind. Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 1225-1226, 93 L.Ed. 1528 (1949), when applying the finality requirements of 28 U.S.C. s 1291, which grants jurisdiction to courts of appeals to review all "final decisions" of the district courts, and 28 U.S.C. s 1257, which empowers this Court to review only "final judgments" of state courts. See, e. g., Harris v. Washington, 404 U.S. 55, 92 S.Ct. 183, 30 L.Ed.2d 212 (1971); Construction Laborers v. Curry, 371 U.S. 542, 549-550, 83 S.Ct. 531, 536, 537, 9 L.Ed.2d 514 (1963); Mercantile Nat. Bank v. Langdeau, 371 U.S. 555, 557-558, 83 S.Ct. 520, 521-522 (1963); Cohen v. Beneficial Ind. Loan Corp., supra, 337 U.S., at 545-546, 69 S.Ct., at 1225-1226. To be sure, certain of the policy considerations implicated in ss 1257 and 1291 cases are different from those that are relevant here. Compare Construction Laborers, supra, 371 U.S., at 550, 83 S.Ct., at 536-537; Mercantile Nat. Bank, supra, 371 U.S., at 558, 83 S.Ct., at 522, with McKart v. United States, 395 U.S. 185, 193-195, 89 S.Ct. 1657, 1662-1663, 23 L.Ed.2d 194 (1969); L. Jaffe, Judicial Control of Administrative Action 424-426 (1965). But the core principle that statutorily created finality requirements should, if possible, be construed so as not to cause crucial collateral claims to be lost and potentially irreparable injuries to be suffered remains applicable.

12   Given our conclusion that jurisdiction in the District Court was proper under s 405(g), we find it unnecessary to consider Eldridge's contention that notwithstanding s 405(h) there was jurisdiction over his claim under the mandamus statute, 28 U.S.C. s 1361, or the Administrative Procedure Act, 5 U.S.C. s 701 et seq.

13    In all but six States the state vocational rehabilitation agency charged with administering the state plan under the Vocational Rehabilitation Act of 1920, 41 Stat. 735, as amended, 29 U.S.C. s 701 et seq. (1970 ed., Supp. III), acts as the "state agency" for purposes of the disability insurance program. Staff of the House Comm. on Ways and Means, Report on the Disability Insurance Program, 93d Cong., 2d Sess., 148 (1974). This assignment of responsibility was intended to encourage rehabilitation contacts for disabled workers and to utilize the well-established relationships of the local rehabilitation agencies with the medical profession. H.R.Rep.No.1698, 83d Cong., 2d Sess., 23-24 (1954).

14    Work which "exists in the national economy" is in turn defined as "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." s 423(d)(2)(A).

15    Because the continuing-disability investigation concerning whether a claimant has returned to work is usually done directly by the SSA Bureau of Disability Insurance, without any state agency involvement, the administrative procedures prior to the post-termination evidentiary hearing differ from those involved in cases of possible medical recovery. They are similar, however, in the important respect that the process relies principally on written communications and there is no provision for an evidentiary hearing prior to the cutoff of benefits. Due to the nature of the relevant inquiry in certain types of cases, such as those involving self-employment and agricultural employment, the SSA office nearest the beneficiary conducts an oral interview of the beneficiary as part of the pretermination process. SSA Claims Manual (CM) s 6705.2(c).

16    Information is also requested concerning the recipient's belief as to whether he can return to work, the nature and extent of his employment during the past year, and any vocational services he is receiving.

17    All medical-source evidence used to establish the absence of continuing disability must be in writing, with the source properly identified. DISM s 353.4C.

18    The disability recipient is not permitted personally to examine the medical reports contained in his file. This restriction is not significant since he is entitled to have any representative of his choice, including a lay friend or family member, examine all medical evidence. CM s 7314. See also 20 CFR s 401.3(a)(2) (1975). The Secretary informs us that this curious limitation is currently under review.

19    The SSA may not itself revise the state agency's determination in a manner more favorable to the beneficiary. If, however, it believes that the worker is still disabled, or that the disability lasted longer than determined by the state agency, it may return the file to the agency for further consideration in light of the SSA's views. The agency is free to reaffirm its original assessment.

20    The reconsideration assessment is initially made by the state agency, but usually not by the same persons who considered the case originally. R. Dixon, Social Security Disability and Mass Justice 32 (1973). Both the recipient and the agency may adduce new evidence.

21    Unlike all prior levels of review, which are de novo, the district court is required to treat findings of fact as conclusive if supported by substantial evidence. 42 U.S.C. s 405(g).

22    The Secretary may reduce other payments to which the beneficiary is entitled, or seek the payment of a refund, unless the beneficiary is "without fault" and such adjustment or recovery would defeat the purposes of the Act or be "against equity and good conscience." 42 U.S.C. s 404(b). See generally 20 CFR ss 404.501-404.515 (1975).

23    This, of course, assumes that an employee whose wages are garnisheed erroneously is subsequently able to recover his back wages.

24    The level of benefits is determined by the worker's average monthly earnings during the period prior to disability, his age, and other factors not directly related to financial need, specified in 42 U.S.C. s 415 (1970 ed., Supp. III). See s 423(a)(2).

25    Workmen's compensation benefits are deducted in part in accordance with a statutory formula. 42 U.S.C. s 424a (1970 ed., Supp. III); 20 CFR s 404.408 (1975); see Richardson v. Belcher, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971).

26    Amici cite statistics compiled by the Secretary which indicate that in 1965 the mean income of the family unit of a disabled worker was $3,803, while the median income for the unit was $2,836. The mean liquid assets i. e., cash, stocks,

bonds of these family units was $4,862; the median was $940. These statistics do not take into account the family unit's nonliquid assets i. e., automobile, real estate, and the like. Brief for AFL-CIO et al. as Amici Curiae App. 4a. See n.29, infra.

27    Amici emphasize that because an identical definition of disability is employed in both the Title II Social Security Program and in the companion welfare system for the disabled, Supplemental Security Income (SSI), compare 42 U.S.C. s 423(d)(1) with s 1382c(a)(3) (1970 ed., Supp. III), the terminated disability-benefits recipient will be ineligible for the SSI Program. There exist, however, state and local welfare programs which may supplement the worker's income. In addition, the worker's household unit can qualify for food stamps if it meets the financial need requirements. See 7 U.S.C. ss 2013(c), 2014(b); 7 CFR s 271 (1975). Finally, in 1974, 480,000 of the approximately 2,000,000 disabled workers receiving Social Security benefits also received SSI benefits. Since financial need is a criterion for eligibility under the SSI program, those disabled workers who are most in need will in the majority of cases be receiving SSI benefits when disability insurance aid is terminated. And, under the SSI program, a pretermination evidentiary hearing is provided, if requested. 42 U.S.C. s 1383(c) (1970 ed., Supp. III); 20 CFR s 416.1336(c) (1975); 40 Fed.Reg. 1512 (1975); see Staff Report 346.

28    The decision is not purely a question of the accuracy of a medical diagnosis since the ultimate issue which the state agency must resolve is whether in light of the particular worker's "age, education, and work experience" he cannot "engage in any . . . substantial gainful work which exists in the national economy . . . ." 42 U.S.C. s 423(d)(2)(A). Yet information concerning each of these worker characteristics is amenable to effective written presentation. The value of an evidentiary hearing, or even a limited oral presentation, to an accurate presentation of those factors to the decisionmaker does not appear substantial. Similarly, resolution of the inquiry as to the types of employment opportunities that exist in the national economy for a physically impaired worker with a particular set of skills would not necessarily be advanced by an evidentiary hearing. Cf. K. Davis, Administrative Law Treatise s 7.06, at 429 (1958). The statistical information relevant to this judgment is more amenable to written than to oral presentation.

29    By focusing solely on the reversal rate for appealed reconsideration determinations amici overstate the relevant reversal rate. As we indicated last Term in Fusari v. Steinberg, 419 U.S. 379, 383 n. 6, 95 S.Ct. 533, 536-537, 42 L.Ed.2d 521 (1975), in order fully to assess the reliability and fairness of a system of procedure, one must also consider the overall rate of error for all denials of benefits. Here that overall rate is 12.2%. Moreover, about 75% Of these reversals occur at the reconsideration stage of the administrative process. Since the median period between a request for reconsideration review and decision is only two months, Brief for AFL-CIO et al. as Amici Curiae App. 4a, the deprivation is significantly less than that concomitant to the lengthier delay before an evidentiary hearing. Netting out these reconsideration reversals, the overall reversal rate falls to 3.3%. See Supplemental and Reply Brief for Petitioner 14.

End of Document                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Mathis v. U.S., 136 S.Ct. 2243 (2016)    Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 296 of 1271

195 L.Ed.2d 604, 84 USLW 4412, 14 Cal. Daily Op. Serv. 6517...

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Tendrich v. United States, 11th Cir.(Fla.), October 27, 2020

136 S.Ct. 2243
Supreme Court of the United States

Richard MATHIS, Petitioner
v.
UNITED STATES.

No. 15–6092.
|
Argued April 26, 2016.
|
Decided June 23, 2016.

**Synopsis**

**Background:** Defendant pled guilty in the United States District Court for the Southern District of Iowa, John A. Jarvey, J., to being a felon in possession of a firearm, and he received 15-year mandatory minimum sentence under Armed Career Criminal Act (ACCA). Defendant appealed. The United States Court of Appeals for the Eighth Circuit, Smith, Circuit Judge, 786 F.3d 1068, affirmed. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Kagan, held that:

[1] a prior conviction does not qualify as the generic form of a predicate violent felony offense listed in the ACCA if an element of the crime of conviction is broader than an element of the generic offense because the crime of conviction enumerates various alternative factual means of satisfying a single element, abrogating United States v. Ozier, 796 F.3d 597, and United States v. Trent, 767 F.3d 1046, and

[2] Iowa's burglary statute had a broader locational element than generic burglary.

Reversed.

Justice Kennedy filed a concurring opinion.

Justice Thomas filed a concurring opinion.

Justice Breyer filed a dissenting opinion, in which Justice Ginsburg joined.

Justice Alito filed a dissenting opinion.

West Headnotes (12)

**[1]**  **Sentencing and Punishment** ⚖ Particular offenses

Congress, in listing burglary, arson, or extortion as violent felonies, as predicate offenses for 15-year mandatory minimum sentence under Armed Career Criminal Act (ACCA), referred only to their usual or generic versions, and not to all variants of the offenses. 18 U.S.C.A. § 924(e)(1), (e)(2)(B)(ii).

108 Cases that cite this headnote

**[2]**  **Sentencing and Punishment** ⚖ Particular offenses

"Burglary," as predicate violent felony offense for 15-year mandatory minimum sentence under Armed Career Criminal Act (ACCA), means a crime containing the following elements: an unlawful or unprivileged entry into a building or other structure, with intent to commit a crime. 18 U.S.C.A. § 924(e)(1), (e)(2)(B)(ii).

153 Cases that cite this headnote

**[3]**  **Sentencing and Punishment** ⚖ Particular offenses

To determine whether a prior conviction is for a generic form of burglary, arson, or extortion, as predicate violent felony offenses for 15-year mandatory minimum sentence under Armed Career Criminal Act (ACCA), courts apply a categorical approach, which focuses solely on whether the elements of the crime of conviction sufficiently match the elements of the generic offense, i.e., the elements for the crime of conviction are the same as, or narrower than, those of the generic offense, while ignoring the particular facts of the case, which are real-world

things that are extraneous to the crime's legal requirements. 🚩 18 U.S.C.A. § 924(e)(1), 🚩 (e)(2)(B)(ii).

931 Cases that cite this headnote

**[4]**    **Sentencing and Punishment** 🔑 Particular offenses

"Elements" of an offense are the constituent parts of a crime's legal definition, for purposes of the categorical approach to determining whether a prior conviction is for a generic form of burglary, arson, or extortion, as predicate violent felony offenses for 15-year mandatory minimum sentence under Armed Career Criminal Act (ACCA), which approach focuses solely on whether the elements of the crime of conviction sufficiently match the elements of the generic offense; they are the things the prosecution must prove to sustain a conviction, i.e., at trial, what the jury must find beyond a reasonable doubt to convict the defendant, and at a plea hearing, what the defendant necessarily admits when he pleads guilty. 🚩 18 U.S.C.A. § 924(e)(1), 🚩 (e)(2)(B)(ii).

648 Cases that cite this headnote

**[5]**    **Sentencing and Punishment** 🔑 Particular offenses

Under the modified categorical approach for determining whether a prior conviction is for a generic form of burglary, arson, or extortion, as predicate violent felony offenses for 15-year mandatory minimum sentence under Armed Career Criminal Act (ACCA), which approach is used for statutes having multiple alternative elements, the court looks to a limited class of documents, for example, the indictment, jury instructions, or plea agreement and colloquy, to determine what crime, with what elements, a defendant was convicted of, and the court can then compare that crime, as the categorical approach commands, with the relevant generic offense. 🚩 18 U.S.C.A. § 924(e)(1), 🚩 (e)(2)(B)(ii).

1235 Cases that cite this headnote

**[6]**    **Sentencing and Punishment** 🔑 Particular offenses

A prior conviction does not qualify as the generic form of burglary, arson, or extortion, as predicate violent felony offenses supporting 15-year mandatory minimum sentence under Armed Career Criminal Act (ACCA), if an element of the crime of conviction is broader than an element of the generic offense because the crime of conviction enumerates various alternative factual means of satisfying a single element; abrogating 🚩 *United States v. Ozier*, 796 F.3d 597, and 🚩 *United States v. Trent*, 767 F.3d 1046. 🚩 18 U.S.C.A. § 924(e)(1), 🚩 (e)(2)(B)(ii).

491 Cases that cite this headnote

**[7]**    **Sentencing and Punishment** 🔑 Particular offenses

Iowa's burglary statute, which encompassed entry into any building, structure, or land, water, or air vehicle, set out alternative means of fulfilling its locational element, which were broader than the locational element of generic burglary, i.e., entry into a building or other structure, and thus, defendant's prior Iowa convictions for burglary did not qualify as predicate violent felony offenses for 15-year mandatory minimum sentence under Armed Career Criminal Act (ACCA). 🚩 18 U.S.C.A. § 924(e)(1), 🚩 (e)(2)(B)(ii); I.C.A. § 702.12.

431 Cases that cite this headnote

**[8]**    **Sentencing and Punishment** 🔑 Particular offenses

The label that a State assigns to a crime, whether "burglary," "breaking and entering," or something else entirely, has no relevance to whether that offense is generic burglary, as predicate violent felony offense for 15-year mandatory minimum sentence under Armed

Mathis v. U.S., 136 S.Ct. 2243 (2016)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 298 of 1271

195 L.Ed.2d 604, 84 USLW 4412, 14 Cal. Daily Op. Serv. 6517...

Career Criminal Act (ACCA). 18 U.S.C.A. § 924(e)(1), (e)(2)(B)(ii).

299 Cases that cite this headnote

[9]    **Jury**    Sentencing Matters

Under the Sixth Amendment right to jury trial, only a jury, and not a judge, may find facts that increase a maximum penalty, except for the simple fact of a prior conviction. U.S.C.A. Const.Amend. 6.

52 Cases that cite this headnote

[10]    **Judgment**    Application of general rules of construction

A good rule of thumb for reading Supreme Court decisions is that what they say and what they mean are one and the same.

32 Cases that cite this headnote

[11]    **Burglary**    Description of building

The listed premises in Iowa's burglary statute are alternative methods of committing one offense, so that a jury need not agree whether the burgled location was a building, other structure, or vehicle. I.C.A. § 702.12.

55 Cases that cite this headnote

[12]    **Sentencing and Punishment**    Particular offenses

If state law fails to provide clear answers regarding whether an alternatively phrased statute lists elements of an offense or instead lists means of satisfying an element, federal courts can look at the record of the prior conviction itself, for purposes of the categorical approach to determining whether a prior conviction is for a generic form of burglary, arson, or extortion, as predicate violent felony offenses for 15-year mandatory minimum sentence under Armed Career Criminal Act (ACCA). 18 U.S.C.A. § 924(e)(1), (e)(2)(B)(ii).

429 Cases that cite this headnote

**\*2245** *Syllabus* [*]

The Armed Career Criminal Act (ACCA) imposes a 15–year mandatory minimum sentence on a defendant convicted of being a felon in possession of a firearm who also has three prior state or federal convictions "for a violent felony," including "burglary, arson, or extortion." 18 U.S.C. §§ 924(e)(1), (e)(2)(B)(ii). To determine whether a prior conviction is for one of those listed crimes, courts apply the "categorical approach"—they ask whether the elements of the offense forming the basis for the conviction sufficiently match the elements of the generic (or commonly understood) version of the enumerated crime. See *Taylor v. United States,* 495 U.S. 575, 600–601, 110 S.Ct. 2143, 109 L.Ed.2d 607. "Elements" are the constituent parts of a crime's legal definition, which must be proved beyond a reasonable doubt to sustain a conviction; they are distinct from "facts," which are mere real-world things—extraneous to the crime's legal requirements and thus ignored by the categorical approach.

When a statute defines only a single crime with a single set of elements, application of the categorical approach is straightforward. But when a statute defines multiple crimes by listing multiple, alternative elements, the elements-matching required by the categorical approach is more difficult. To decide whether a conviction under such a statute is for a listed ACCA offense, a sentencing court must discern which of the alternative elements was integral to the defendant's conviction. That determination is made possible by the "modified categorical approach," which permits a court to look at a limited class of documents from the record of a prior conviction to determine what crime, with what elements, a defendant was convicted of before comparing that crime's elements to **\*2246** those of the generic offense. See, *e.g., Shepard v. United States,* 544 U.S. 13, 26, 125 S.Ct. 1254, 161 L.Ed.2d 205. This case involves a different type of alternatively worded statute—one that defines only one crime, with one set of elements, but which lists alternative factual means by which a defendant can satisfy those elements.

195 L.Ed.2d 604, 84 USLW 4412, 14 Cal. Daily Op. Serv. 6517...

Here, petitioner Richard Mathis pleaded guilty to being a felon in possession of a firearm. Because of his five prior Iowa burglary convictions, the Government requested an ACCA sentence enhancement. Under the generic offense, burglary requires unlawful entry into a "building or other structure." *Taylor,* 495 U.S., at 598, 110 S.Ct. 2143. The Iowa statute, however, reaches "any building, structure, [or] land, water, or air vehicle." Iowa Code § 702.12. Under Iowa law, that list of places does not set out alternative elements, but rather alternative means of fulfilling a single locational element.

The District Court applied the modified categorical approach, found that Mathis had burgled structures, and imposed an enhanced sentence. The Eighth Circuit affirmed. Acknowledging that the Iowa statute swept more broadly than the generic statute, the court determined that, even if "structures" and "vehicles" were not separate elements but alternative means of fulfilling a single element, a sentencing court could still invoke the modified categorical approach. Because the record showed that Mathis had burgled structures, the court held, the District Court's treatment of Mathis's prior convictions as ACCA predicates was proper.

*Held* : Because the elements of Iowa's burglary law are broader than those of generic burglary, Mathis's prior convictions cannot give rise to ACCA's sentence enhancement. Pp. 2250 – 2257.

(a) This case is resolved by this Court's precedents, which have repeatedly held, and in no uncertain terms, that a state crime cannot qualify as an ACCA predicate if its elements are broader than those of a listed generic offense. See, *e.g.,* *Taylor,* 495 U.S., at 602, 110 S.Ct. 2143. The "underlying brute facts or means" by which the defendant commits his crime, *Richardson v. United States,* 526 U.S. 813, 817, 119 S.Ct. 1707, 143 L.Ed.2d 985, make no difference; even if the defendant's conduct, in fact, fits within the definition of the generic offense, the mismatch of elements saves him from an ACCA sentence. ACCA requires a sentencing judge to look only to "the elements of the [offense], not to the facts of [the] defendant's conduct." *Taylor,* 495 U.S., at 601, 110 S.Ct. 2143.

This Court's cases establish three basic reasons for adhering to an elements-only inquiry. First, ACCA's text, which asks only about a defendant's "prior convictions," indicates that Congress meant for the sentencing judge to ask only whether "the defendant had been convicted of crimes falling within

certain categories," *id.,* at 600, 110 S.Ct. 2143 not what he had done. Second, construing ACCA to allow a sentencing judge to go any further would raise serious Sixth Amendment concerns because only a jury, not a judge, may find facts that increase the maximum penalty. See *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435. And third, an elements-focus avoids unfairness to defendants, who otherwise might be sentenced based on statements of "non-elemental fact[s]" that are prone to error because their proof is unnecessary to a conviction. *Descamps v. United States,* 570 U.S. ——, ——, 133 S.Ct. 2276, 2289, 186 L.Ed.2d 438.

Those reasons remain as strong as ever when a statute, like Iowa's burglary statute, lists alternative means of fulfilling one (or more) of a crime's elements. **\*2247** ACCA's term "convictions" still supports an elements-based inquiry. The Sixth Amendment problems associated with a court's exploration of means rather than elements do not abate in the face of a statute like Iowa's: Alternative factual scenarios remain just that, and thus off-limits to sentencing judges. Finally, a statute's listing of disjunctive means does nothing to mitigate the possible unfairness of basing an increased penalty on something not legally necessary to a prior conviction. Accordingly, whether means are listed in a statute or not, ACCA does not care about them; rather, its focus, as always, remains on a crime's elements. Pp. 2250 – 2256.

(b) The first task for a court faced with an alternatively phrased statute is thus to determine whether the listed items are elements or means. That threshold inquiry is easy here, where a State Supreme Court ruling answers the question. A state statute on its face could also resolve the issue. And if state law fails to provide clear answers, the record of a prior conviction itself might prove useful to determining whether the listed items are elements of the offense. If such record materials do not speak plainly, a sentencing judge will be unable to satisfy "*Taylor* 's demand for certainty." *Shepard,* 544 U.S., at 21, 125 S.Ct. 1254. But between the record and state law, that kind of indeterminacy should prove more the exception than the rule. Pp. 2256 – 2257.

786 F.3d 1068, reversed.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C.J., and KENNEDY, THOMAS, and

SOTOMAYOR, JJ., joined KENNEDY, J., and THOMAS, J., filed concurring opinions. BREYER, J., filed a dissenting opinion, in which GINSBURG, J., joined. ALITO, J., filed a dissenting opinion.

**Attorneys and Law Firms**

Mark C. Fleming, Boston, MA, for Petitioner.

Nicole A. Saharsky, Washington, DC, for Respondent.

James Whalen, Federal Public Defender's Office, Des Moines, David M. Lehn, Joshua M. Koppel, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, Mark C. Fleming, Eric F. Fletcher, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA, Alan E. Schoenfeld, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, for Petitioner.

Donald B. Verrilli, Jr., Solicitor General, Leslie R. Caldwell, Assistant Attorney General, Michael R. Dreeben, Deputy Solicitor General, Nicole A. Saharsky, Assistant to the Solicitor General, John M. Pelletieri, Attorney, Department of Justice, Washington, DC, for Respondent.

**Opinion**

Justice KAGAN delivered the opinion of the Court.

The Armed Career Criminal Act (ACCA or Act), 18 U.S.C. § 924(e), imposes a 15-year mandatory minimum sentence on certain federal defendants who have three prior convictions for a "violent felony," including "burglary, arson, or extortion." To determine whether a past conviction is for one of those offenses, courts compare the elements of the crime of conviction with the elements of the "generic" version of the listed offense—*i.e.,* the offense as commonly understood. For more than 25 years, our decisions have held that the prior crime qualifies as an ACCA predicate if, but only if, its elements are the same as, or narrower than, those of the generic offense. The question in this case is **\*2248** whether ACCA makes an exception to that rule when a defendant is convicted under a statute that lists multiple, alternative means of satisfying one (or more) of its elements. We decline to find such an exception.

I

**A**

**[1]** **[2]** ACCA prescribes a 15-year mandatory minimum sentence if a defendant is convicted of being a felon in possession of a firearm following three prior convictions for a "violent felony." § 924(e)(1). (Absent that sentence enhancement, the felon-in-possession statute sets a 10-year *maximum* penalty. See § 924(a)(2).) ACCA defines the term "violent felony" to include any felony, whether state or federal, that "is burglary, arson, or extortion." § 924(e)(2)(B)(ii). In listing those crimes, we have held, Congress referred only to their usual or (in our terminology) generic versions—not to all variants of the offenses. See *Taylor v. United States,* 495 U.S. 575, 598, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). That means as to burglary—the offense relevant in this case—that Congress meant a crime "contain[ing] the following elements: an unlawful or unprivileged entry into ... a building or other structure, with intent to commit a crime." *Ibid.*

**[3]** **[4]** To determine whether a prior conviction is for generic burglary (or other listed crime) courts apply what is known as the categorical approach: They focus solely on whether the elements of the crime of conviction sufficiently match the elements of generic burglary, while ignoring the particular facts of the case. See *id.,* at 600–601, 110 S.Ct. 2143. Distinguishing between elements and facts is therefore central to ACCA's operation. "Elements" are the "constituent parts" of a crime's legal definition—the things the "prosecution must prove to sustain a conviction." Black's Law Dictionary 634 (10th ed. 2014). At a trial, they are what the jury must find beyond a reasonable doubt to convict the defendant, see *Richardson v. United States,* 526 U.S. 813, 817, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999); and at a plea hearing, they are what the defendant necessarily admits when he pleads guilty, see *McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969). Facts, by contrast, are mere real-world things—extraneous to the crime's legal requirements. (We have sometimes called them "brute facts" when distinguishing them from elements. *Richardson,* 526 U.S., at 817, 119 S.Ct. 1707.) They are "circumstance[s]" or "event[s]" having no "legal effect [or] consequence": In particular, they need neither be found by a jury nor admitted by a defendant. Black's Law Dictionary 709. And ACCA, as we have always understood it, cares not

Mathis v. U.S., 136 S.Ct. 2243 (2016)

Case 3:20-cv-07721-SI   Document 58-5   Filed 11/10/20   Page 301 of 1271

195 L.Ed.2d 604, 84 USLW 4412, 14 Cal. Daily Op. Serv. 6517...

a whit about them. See, *e.g., Taylor,* 495 U.S., at 599–602, 110 S.Ct. 2143. A crime counts as "burglary" under the Act if its *elements* are the same as, or narrower than, those of the generic offense. But if the crime of conviction covers any more conduct than the generic offense, then it is not an ACCA "burglary"—even if the defendant's actual conduct (*i.e.,* the facts of the crime) fits within the generic offense's boundaries.

The comparison of elements that the categorical approach requires is straightforward when a statute sets out a single (or "indivisible") set of elements to define a single crime. The court then lines up that crime's elements alongside those of the generic offense and sees if they match. So, for example, this Court found that a California statute swept more broadly than generic burglary because it criminalized entering a location (even if lawfully) with the intent to steal, and thus encompassed mere shoplifting. See **\*2249** *id.,* at 591, 110 S.Ct. 2143; *Descamps v. United States,* 570 U.S. ——, ——– ——–, 133 S.Ct. 2276, 2283–2284, 186 L.Ed.2d 438 (2013). Accordingly, no conviction under that law could count as an ACCA predicate, even if the defendant in fact made an illegal entry and so committed burglary in its generic form. See *id.,* at ——– ——–, 133 S.Ct. at 2292–2293.

 **[5]** Some statutes, however, have a more complicated (sometimes called "divisible") structure, making the comparison of elements harder. *Id.,* at ——, 133 S.Ct. at 2283. A single statute may list elements in the alternative, and thereby define multiple crimes. Suppose, for example, that the California law noted above had prohibited "the lawful entry or the unlawful entry" of a premises with intent to steal, so as to create two different offenses, one more serious than the other. If the defendant were convicted of the offense with unlawful entry as an element, then his crime of conviction would match generic burglary and count as an ACCA predicate; but, conversely, the conviction would not qualify if it were for the offense with lawful entry as an element. A sentencing court thus requires a way of figuring out which of the alternative elements listed—lawful entry or unlawful entry —was integral to the defendant's conviction (that is, which was necessarily found or admitted). See *id.,* at ——, 133 S.Ct., at 2283. To address that need, this Court approved the "modified categorical approach" for use with statutes having multiple alternative elements. See, *e.g., Shepard v. United States,* 544 U.S. 13, 26, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005). Under that approach, a sentencing court looks to a

limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements, a defendant was convicted of. See *ibid.; Taylor,* 495 U.S., at 602, 110 S.Ct. 2143. The court can then compare that crime, as the categorical approach commands, with the relevant generic offense.

This case concerns a different kind of alternatively phrased law: not one that lists multiple elements disjunctively, but instead one that enumerates various factual means of committing a single element. See generally *Schad v. Arizona,* 501 U.S. 624, 636, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) (plurality opinion) ("[L]egislatures frequently enumerate alternative means of committing a crime without intending to define separate elements or separate crimes"). To use a hypothetical adapted from two of our prior decisions, suppose a statute requires use of a "deadly weapon" as an element of a crime and further provides that the use of a "knife, gun, bat, or similar weapon" would all qualify. See *Descamps,* 570 U.S., at ——, 133 S.Ct., at 2289; *Richardson,* 526 U.S., at 817, 119 S.Ct. 1707. Because that kind of list merely specifies diverse means of satisfying a single element of a single crime—or otherwise said, spells out various factual ways of committing some component of the offense—a jury need not find (or a defendant admit) any particular item: A jury could convict even if some jurors "conclude[d] that the defendant used a knife" while others "conclude[d] he used a gun," so long as all agreed that the defendant used a "deadly weapon." *Ibid.;* see *Descamps,* 570 U.S., at ——, 133 S.Ct., at 2288 (describing means, for this reason, as "legally extraneous circumstances"). And similarly, to bring the discussion back to burglary, a statute might—indeed, as soon discussed, Iowa's burglary law does —itemize the various places that crime could occur as disjunctive factual scenarios rather than separate elements, so that a jury need not make any specific findings (or a defendant admissions) on that score.

 **\*2250** The issue before us is whether ACCA treats this kind of statute as it does all others, imposing a sentence enhancement only if the state crime's elements correspond to those of a generic offense—or instead whether the Act makes an exception for such a law, so that a sentence can be enhanced when one of the statute's specified means creates a match with the generic offense, even though the broader element would not.

Mathis v. U.S., 136 S.Ct. 2243 (2016)
195 L.Ed.2d 604, 84 USLW 4412, 14 Cal. Daily Op. Serv. 6517...

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 302 of 1271

B

Petitioner Richard Mathis pleaded guilty to being a felon in possession of a firearm. See § 922(g). At sentencing, the Government asked the District Court to impose ACCA's 15–year minimum penalty based on Mathis's five prior convictions for burglary under Iowa law.

Iowa's burglary statute, all parties agree, covers more conduct than generic burglary does. See Brief for Petitioner 36; Brief for United States 44. The generic offense requires unlawful entry into a "building or other structure." *Taylor, 495 U.S., at 598, 110 S.Ct. 2143; supra,* at 2248. Iowa's statute, by contrast, reaches a broader range of places: "any building, structure, *[or] land, water, or air vehicle.*" Iowa Code § 702.12 (2013) (emphasis added). And those listed locations are not alternative elements, going toward the creation of separate crimes. To the contrary, they lay out alternative ways of satisfying a single locational element, as the Iowa Supreme Court has held: Each of the terms serves as an "alternative method of committing [the] single crime" of burglary, so that a jury need not agree on which of the locations was actually involved. *State v. Duncan,* 312 N.W.2d 519, 523 (Iowa 1981); see *State v. Rooney,* 862 N.W.2d 367, 376 (Iowa 2015) (discussing the single "broadly phrased ... element of place" in Iowa's burglary law). In short, the statute defines one crime, with one set of elements, broader than generic burglary —while specifying multiple means of fulfilling its locational element, some but not all of which (*i.e.,* buildings and other structures, but not vehicles) satisfy the generic definition.

The District Court imposed an ACCA enhancement on Mathis after inspecting the records of his prior convictions and determining that he had burgled structures, rather than vehicles. See App. 34–35. The Court of Appeals for the Eighth Circuit affirmed. 786 F.3d 1068 (2015). It acknowledged that Iowa's burglary statute, by covering vehicles in addition to structures, swept more broadly than generic burglary. See *id.,* at 1074. But it noted that if structures and vehicles were separate elements, each part of a different crime, then a sentencing court could invoke the modified categorical approach and look to old record materials to see which of those crimes the defendant had been convicted of. See *id.,* at 1072–1074. And the Court of Appeals thought nothing changed if structures and vehicles were not distinct elements but only alternative means:

"Whether [such locations] amount to alternative elements or merely alternative means to fulfilling an element," the Eighth Circuit held, a sentencing court "must apply the modified categorical approach" and inspect the records of prior cases. *Id.,* at 1075. If the court found from those materials that the defendant had in fact committed the offense in a way that satisfied the definition of generic burglary—here, by burgling a structure rather than a vehicle—then the court should treat the conviction as an ACCA predicate. And that was so, the Court of Appeals stated, even though the elements of the crime of conviction, in encompassing both types of locations, were broader than those of the relevant generic offense. See *id.,* at 1074–1075. In this circumstance, the court **\*2251** thus found, ACCA's usual elements-based inquiry would yield to a facts-based one.

That decision added to a Circuit split over whether ACCA's general rule—that a defendant's crime of conviction can count as a predicate only if its elements match those of a generic offense—gives way when a statute happens to list various means by which a defendant can satisfy an element.[1] We granted certiorari to resolve that division, 577 U.S. ——, 136 S.Ct. 894, 193 L.Ed.2d 788 (2016), and now reverse.

II

A

[6] [7] As just noted, the elements of Mathis's crime of conviction (Iowa burglary) cover a greater swath of conduct than the elements of the relevant ACCA offense (generic burglary). See *supra,* at 2249 – 2250. Under our precedents, that undisputed disparity resolves this case. We have often held, and in no uncertain terms, that a state crime cannot qualify as an ACCA predicate if its elements are broader than those of a listed generic offense. See, *e.g., Taylor,* 495 U.S., at 602, 110 S.Ct. 2143. How a given defendant actually perpetrated the crime—what we have referred to as the "underlying brute facts or means" of commission, *Richardson,* 526 U.S., at 817, 119 S.Ct. 1707—makes no difference; even if his conduct fits within the generic offense, the mismatch of elements saves the defendant from an ACCA sentence. Those longstanding principles, and the reasoning that underlies them, apply regardless of whether a statute omits or instead specifies alternative possible means

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

195 L.Ed.2d 604, 84 USLW 4412, 14 Cal. Daily Op. Serv. 6517...

of commission. The itemized construction gives a sentencing court no special warrant to explore the facts of an offense, rather than to determine the crime's elements and compare them with the generic definition.

**[8]**    *Taylor* set out the essential rule governing ACCA cases more than a quarter century ago. All that counts under the Act, we held then, are "the elements of the statute of conviction." 495 U.S., at 601, 110 S.Ct. 2143. So, for example, the label a State assigns to a crime—whether "burglary," "breaking and entering," or something else entirely—has no relevance to whether that offense is an ACCA predicate. See *id., at 590–592, 110 S.Ct. 2143.* And more to the point here: The same is true of "the particular facts underlying [the prior] convictions"—the means by which the defendant, in real life, committed his crimes. *Id., at 600, 110 S.Ct. 2143.* That rule can seem counterintuitive: In some cases, a sentencing judge knows (or can easily discover) that the defendant carried out a "real" burglary, even though the crime of conviction also extends to other conduct. No matter. Under ACCA, *Taylor* stated, it is impermissible for "a particular crime [to] sometimes count towards enhancement and sometimes not, depending on the facts of the case." *Id., at 601, 110 S.Ct. 2143.* Accordingly, a sentencing judge may look only to "the elements of the [offense], not to the facts of [the] defendant's conduct." *Ibid.*

That simple point became a mantra in our subsequent ACCA decisions. [2] At the **\*2252** risk of repetition (perhaps downright tedium), here are some examples. In *Shepard* : ACCA "refers to predicate offenses in terms not of prior conduct but of prior 'convictions' and the 'element[s]' of crimes." 544 U.S., at 19, 125 S.Ct. 1254 (alteration in original). In *James v. United States* : "[W]e have avoided any inquiry into the underlying facts of [the defendant's] particular offense, and have looked solely to the elements of [burglary] as defined by [state] law." 550 U.S. 192, 214, 127 S.Ct. 1586, 167 L.Ed.2d 532 (2007). In *Sykes v. United States* : "[W]e consider [only] the *elements of the offense* [,] without inquiring into the specific conduct of this particular offender." 564 U.S. 1, 7, 131 S.Ct. 2267, 180 L.Ed.2d 60 (2011) (quoting *James, 550 U.S., at 202, 127 S.Ct. 1586;* emphasis in original). And most recently (and tersely) in *Descamps* : "The key [under ACCA] is elements, not facts." 570 U.S., at ——, 133 S.Ct., at 2283.

Our decisions have given three basic reasons for adhering to an elements-only inquiry. First, ACCA's text favors that approach. By enhancing the sentence of a defendant who has three "previous convictions" for generic burglary, § 924(e)(1)—rather than one who has thrice committed that crime—Congress indicated that the sentencer should ask only about whether "the defendant had been convicted of crimes falling within certain categories," and not about what the defendant had actually done. *Taylor, 495 U.S., at 600, 110 S.Ct. 2143.* Congress well knows how to instruct sentencing judges to look into the facts of prior crimes: In other statutes, using different language, it has done just that. See *United States v. Hayes, 555 U.S. 415, 421, 129 S.Ct. 1079, 172 L.Ed.2d 816 (2009)* (concluding that the phrase "an offense ... committed" charged sentencers with considering non-elemental facts); *Nijhawan v. Holder, 557 U.S. 29, 36, 129 S.Ct. 2294, 174 L.Ed.2d 22 (2009)* (construing an immigration statute to "call[ ] for a 'circumstance-specific,' not a 'categorical' interpretation"). But Congress chose another course in ACCA, focusing on only "the elements of the statute of conviction." *Taylor, 495 U.S., at 601, 110 S.Ct. 2143.*

**[9]**    Second, a construction of ACCA allowing a sentencing judge to go any further would raise serious Sixth Amendment concerns. This Court has held that only a jury, and not a judge, may find facts that increase a maximum penalty, except for the simple fact of a prior conviction. See *Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).* That means a judge cannot go beyond identifying the crime of conviction to explore the manner in which the defendant committed that offense. See *Shepard, 544 U.S., at 25, 125 S.Ct. 1254* (plurality opinion); *id., at 28, 125 S.Ct. 1254* (THOMAS, J., concurring in part and concurring in judgment) (stating that such an approach would amount to "constitutional error"). He is prohibited from conducting such an inquiry himself; and so too he is barred from making a disputed determination about "what the defendant and state judge must have understood as the factual basis of the prior plea" or "what the jury in a prior trial must have accepted as the theory of the crime." See *id., at 25, 125 S.Ct. 1254* (plurality opinion); *Descamps, 570 U.S., at ——, 133 S.Ct., at 2288.* He can do no more, consistent with the Sixth

Mathis v. U.S., 136 S.Ct. 2243 (2016)

195 L.Ed.2d 604, 84 USLW 4412, 14 Cal. Daily Op. Serv. 6517...

Amendment, than determine what crime, with what elements, the defendant was convicted of.

 **\*2253** And third, an elements-focus avoids unfairness to defendants. Statements of "non-elemental fact" in the records of prior convictions are prone to error precisely because their proof is unnecessary. *Id.,* at ——, 133 S.Ct., at 2288–2289. At trial, and still more at plea hearings, a defendant may have no incentive to contest what does not matter under the law; to the contrary, he "may have good reason not to"—or even be precluded from doing so by the court. *Ibid.* When that is true, a prosecutor's or judge's mistake as to means, reflected in the record, is likely to go uncorrected. See *ibid.*[3] Such inaccuracies should not come back to haunt the defendant many years down the road by triggering a lengthy mandatory sentence.

Those three reasons stay as strong as ever when a statute, instead of merely laying out a crime's elements, lists alternative means of fulfilling one (or more) of them. ACCA's use of the term "convictions" still supports an elements-based inquiry; indeed, that language directly refutes an approach that would treat as consequential a statute's reference to factual circumstances *not* essential to any conviction. Similarly, the Sixth Amendment problems associated with a court's exploration of means rather than elements do not abate in the face of a statute like Iowa's: Whether or not mentioned in a statute's text, alternative factual scenarios remain just that—and so remain off-limits to judges imposing ACCA enhancements. And finally, a statute's listing of disjunctive means does nothing to mitigate the possible unfairness of basing an increased penalty on something not legally necessary to a prior conviction. Whatever the statute says, or leaves out, about diverse ways of committing a crime makes no difference to the defendant's incentives (or lack thereof) to contest such matters.

For these reasons, the court below erred in applying the modified categorical approach to determine the means by which Mathis committed his prior crimes. 786 F.3d, at 1075. ACCA, as just explained, treats such facts as irrelevant: Find them or not, by examining the record or anything else, a court still may not use them to enhance a sentence. And indeed, our cases involving the modified categorical approach have already made exactly that point. "[T]he only [use of that approach] we have ever allowed," we stated a few Terms ago, is to determine "which *element[s]* played a part in the defendant's conviction." *Descamps,* 570 U.S.,

at ——, ——, 133 S.Ct., at 2283, 2285 (emphasis added); see *Taylor,* 495 U.S., at 602, 110 S.Ct. 2143 (noting that the modified approach may be employed only to determine whether "a jury necessarily had to find" each element of generic burglary). In other words, the modified approach serves—and serves solely—as a tool to identify the elements of the crime of conviction when a statute's disjunctive phrasing renders one (or more) of them opaque. See **\*2254** *Descamps,* 570 U.S., at ——, 133 S.Ct., at 2285.[4] It is not to be repurposed as a technique for discovering whether a defendant's prior conviction, even though for a too-broad crime, rested on facts (or otherwise said, involved means) that also could have satisfied the elements of a generic offense.

B

The Government and Justice BREYER claim that our longtime and exclusive focus on elements does not resolve this case because (so they say) when we talked about "elements," we did not really mean it. "[T]he Court used 'elements,' " the Government informs us, "not to distinguish between 'means' and 'elements,' " but instead to refer to whatever the statute lists—whether means *or* elements. Brief for United States 8; see *id.,* at 19. In a similar vein, Justice BREYER posits that every time we said the word "element," we "used the word generally, simply to refer to the matter at issue," without "intend[ing] to set forth a generally applicable rule." *Post,* at 2265 (dissenting opinion).

 **[10]** But a good rule of thumb for reading our decisions is that what they say and what they mean are one and the same; and indeed, we have previously insisted on that point with reference to ACCA's elements-only approach. In *Descamps,* the sole dissenting Justice made an argument identical to the one now advanced by the Government and Justice BREYER: that our prior caselaw had not intended to distinguish between statutes listing alternative elements and those setting out "merely alternative means" of commission. 570 U.S., at ——, 133 S.Ct., at 2298 (opinion of ALITO, J.).[5] The Court rejected that contention, stating that "[a]ll those decisions rested on the explicit premise that the laws contain[ed] statutory phrases that cover several different crimes, not several different methods of committing one offense"—in other words, that they listed **\*2255** alternative elements, not alternative means. *Id.,* at ——, n. 2, 133 S.Ct., at 2285, n. 2 (ellipsis and internal quotation marks omitted)*;* see, *e.g.,*

Mathis v. U.S., 136 S.Ct. 2243 (2016)

195 L.Ed.2d 604, 84 USLW 4412, 14 Cal. Daily Op. Serv. 6517...

*Johnson v. United States,* 559 U.S. 133, 144, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010); *Nijhawan,* 557 U.S., at 35, 129 S.Ct. 2294. That premise was important, we explained, because an ACCA penalty may be based only on what a jury "necessarily found" to convict a defendant (or what he necessarily admitted). *Descamps,* 570 U.S., at ——, ——, 133 S.Ct., at 2287, 2290. And elements alone fit that bill; a means, or (as we have called it) "non-elemental fact," is "by definition[ ] *not* necessary to support a conviction." *Id., at* ——, n. 3, ——, 133 S.Ct., at 2286, n. 3, 2288; see *supra,* at 2248. [6] Accordingly, *Descamps* made clear that when the Court had earlier said (and said and said) "elements," it meant just that and nothing else.

For that reason, this Court (including Justice BREYER) recently made clear that a court may not look behind the elements of a generally drafted statute to identify the means by which a defendant committed a crime. See *Descamps,* 570 U.S., at ——, 133 S.Ct., at 2282–2282. Consider if Iowa defined burglary as involving merely an unlawful entry into a "premises"—without any further elaboration of the types of premises that exist in the world (*e.g.,* a house, a building, a car, a boat). Then, all agree, ACCA's elements-focus would apply. No matter that the record of a prior conviction clearly indicated that the defendant burgled a house at 122 Maple Road—and that the jury found as much; because Iowa's (hypothetical) law included an element broader than that of the generic offense, the defendant could not receive an ACCA sentence. Were that not so, this Court stated, "the categorical approach [would be] at an end"; the court would merely be asking "whether a particular set of facts leading to a conviction conforms to a generic ACCA offense." *Id., at* ——, 133 S.Ct., at 2291. That conclusion is common ground, and must serve as the baseline for anything Justice BREYER (or the Government) here argues.

And contrary to his view, that baseline not only begins but also ends the analysis, because nothing material changes if Iowa's law further notes (much as it does) that a "premises" may include "a house, a building, a car, or a boat." That fortuity of legislative drafting affects neither the oddities **\*2256** of applying the categorical approach nor the reasons for doing so. On the one hand, a categorical inquiry can produce the same counter-intuitive consequences however a state law is written. Whether or not the statute lists various means of satisfying the "premises" element, the record of a prior conviction is just as likely to make plain that the defendant burgled that house on Maple Road and the jury knew it. On the other hand (and as already shown), the grounds—constitutional, statutory, and equitable—that we have offered for nonetheless using the categorical approach lose none of their force in the switch from a generally phrased statute (leaving means implicit) to a more particular one (expressly enumerating them). See *supra,* at 2253. In every relevant sense, both functional and legal, the two statutes—one saying just "premises," the other listing structures and vehicles—are the same. And so the same rule must apply: ACCA disregards the means by which the defendant committed his crime, and looks only to that offense's elements.

C

The first task for a sentencing court faced with an alternatively phrased statute is thus to determine whether its listed items are elements or means. If they are elements, the court should do what we have previously approved: review the record materials to discover which of the enumerated alternatives played a part in the defendant's prior conviction, and then compare that element (along with all others) to those of the generic crime. See *ibid.* But if instead they are means, the court has no call to decide which of the statutory alternatives was at issue in the earlier prosecution. Given ACCA's indifference to how a defendant actually committed a prior offense, the court may ask only whether the *elements* of the state crime and generic offense make the requisite match.

[11]    This threshold inquiry—elements or means?—is easy in this case, as it will be in many others. Here, a state court decision definitively answers the question: The listed premises in Iowa's burglary law, the State Supreme Court held, are "alternative method[s]" of committing one offense, so that a jury need not agree whether the burgled location was a building, other structure, or vehicle. See *Duncan,* 312 N.W.2d, at 523; *supra,* at 2250. When a ruling of that kind exists, a sentencing judge need only follow what it says. See *Schad,* 501 U.S., at 636, 111 S.Ct. 2491 (plurality opinion). Likewise, the statute on its face may resolve the issue. If statutory alternatives carry different punishments, then under *Apprendi* they must be elements. See, *e.g.,* Colo.Rev.Stat. § 18–4–203 (2015); Vt. Stat. Ann., Tit. 13, § 1201 (Cum. Supp. 2015); see also 530 U.S., at 490, 120 S.Ct. 2348 (requiring a jury to agree on any circumstance increasing a statutory penalty); *supra,* at 2252. Conversely, if a statutory list is

195 L.Ed.2d 604, 84 USLW 4412, 14 Cal. Daily Op. Serv. 6517...

drafted to offer "illustrative examples," then it includes only a crime's means of commission. *United States v. Howard,* 742 F.3d 1334, 1348 (C.A.11 2014); see *United States v. Cabrera–Umanzor,* 728 F.3d 347, 353 (C.A.4 2013). And a statute may itself identify which things must be charged (and so are elements) and which need not be (and so are means). See, *e.g.,* Cal.Penal Code Ann. § 952 (West 2008). Armed with such authoritative sources of state law, federal sentencing courts can readily determine the nature of an alternatively phrased list.

**[12]**    And if state law fails to provide clear answers, federal judges have another place to look: the record of a prior conviction itself. As Judge Kozinski has explained, such a "peek at the [record] documents" is for "the sole and limited purpose of determining whether [the listed items **\*2257** are] element[s] of the offense." *Rendon v. Holder,* 782 F.3d 466, 473–474 (C.A.9 2015) (opinion dissenting from denial of reh'g en banc). [7]  (Only if the answer is yes can the court make further use of the materials, as previously described, see *supra,* at 2253 – 2254.) Suppose, for example, that one count of an indictment and correlative jury instructions charge a defendant with burgling a "building, structure, or vehicle"—thus reiterating all the terms of Iowa's law. That is as clear an indication as any that each alternative is only a possible means of commission, not an element that the prosecutor must prove to a jury beyond a reasonable doubt. So too if those documents use a single umbrella term like "premises": Once again, the record would then reveal what the prosecutor has to (and does not have to) demonstrate to prevail. See *Descamps,* 570 U.S., at ——, 133 S.Ct., at 2290. Conversely, an indictment and jury instructions could indicate, by referencing one alternative term to the exclusion of all others, that the statute contains a list of elements, each one of which goes toward a separate crime. Of course, such record materials will not in every case speak plainly, and if they do not, a sentencing judge will not be able to satisfy "*Taylor* 's demand for certainty" when determining whether a defendant was convicted of a generic offense. *Shepard,* 544 U.S., at 21, 125 S.Ct. 1254. But between those documents and state law, that kind of indeterminacy should prove more the exception than the rule.

III

Our precedents make this a straightforward case. For more than 25 years, we have repeatedly made clear that application of ACCA involves, and involves only, comparing elements. Courts must ask whether the crime of conviction is the same as, or narrower than, the relevant generic offense. They may not ask whether the defendant's conduct—his particular means of committing the crime—falls within the generic definition. And that rule does not change when a statute happens to list possible alternative means of commission: Whether or not made explicit, they remain what they ever were—just the facts, which ACCA (so we have held, over and over) does not care about.

Some have raised concerns about this line of decisions, and suggested to Congress that it reconsider how ACCA is written. See, *e.g., Chambers v. United States,* 555 U.S. 122, 133, 129 S.Ct. 687, 172 L.Ed.2d 484 (2009) (ALITO, J., concurring in judgment); *Descamps,* 570 U.S., at ——, 133 S.Ct., at 2293–2294 (KENNEDY, J., concurring). But whether for good or for ill, the elements-based approach remains the law. And we will not introduce inconsistency and arbitrariness into our ACCA decisions by here declining to follow its requirements. Everything this Court has ever said about ACCA runs counter to the Government's position. That alone is sufficient reason to reject it: Coherence has a claim on the law.

Because the elements of Iowa's burglary law are broader than those of generic burglary, Mathis's convictions under that law cannot give rise to an ACCA sentence. We accordingly reverse the judgment of the Court of Appeals.

*It is so ordered.*

**\*2258**   Justice KENNEDY, concurring.
The Court's opinion is required by its precedents, and so I join it, with one reservation set forth below.

In no uncertain terms, the Court has held that the word "burglary" in the Armed Career Criminal Act (ACCA) "refers to the elements of the statute of conviction, not to the facts of each defendant's conduct." *Taylor v. United States,* 495 U.S. 575, 601, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). An enhancement is proper, the Court has said, if a defendant is convicted of a crime "having the elements" of generic burglary, "regardless of its exact definition or label" under state law. *Id.,* at 599, 110

Mathis v. U.S., 136 S.Ct. 2243 (2016)

195 L.Ed.2d 604, 84 USLW 4412, 14 Cal. Daily Op. Serv. 6517...

S.Ct. 2143. See also 📑 *Descamps v. United States,* 570 U.S. ——, ——, 133 S.Ct. 2276, 2285, 186 L.Ed.2d 438 (2013) ("[T]he categorical approach's central feature [is] a focus on the elements, rather than the facts, of a crime"). In the instant case, then, the Court is correct to conclude that "an elements-based approach remains the law." *Ante.* at 2255. And it is correct to note further that it would "introduce inconsistency and arbitrariness into our ACCA decisions by here declining to follow its requirements," without reconsidering our precedents as a whole. *Ibid.*

My one reservation to the Court's opinion concerns its reliance on 📑 *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). *Ante* at 2252. In my view, *Apprendi* was incorrect and, in any event, does not compel the elements based approach. That approach is required only by the Court's statutory precedents, which Congress remains free to overturn.

As both dissenting opinions point out, today's decision is a stark illustration of the arbitrary and inequitable results produced by applying an elements based approach to this sentencing scheme. It could not have been Congress' intent for a career offender to escape his statutorily mandated punishment "when the record makes it clear beyond any possible doubt that [he] committed generic burglary." *Post,* at 2270 (opinion of ALITO, J.). Congress also could not have intended vast sentencing disparities for defendants convicted of identical criminal conduct in different jurisdictions.

Congress is capable of amending the ACCA to resolve these concerns. See, *e.g.,* 📑 *Nijhawan v. Holder,* 557 U.S. 29, 38, 129 S.Ct. 2294, 174 L.Ed.2d 22 (2009) (interpreting the language Congress used in 🚩 8 U.S.C. § 1101(a)(43)(M)(i) as requiring a "circumstance-specific" rather than categorical approach). But continued congressional inaction in the face of a system that each year proves more unworkable should require this Court to revisit its precedents in an appropriate case.

Justice THOMAS, concurring.
I join the Court's opinion, which faithfully applies our precedents. The Court holds that the modified categorical approach cannot be used to determine the specific means by which a defendant committed a crime. *Ante,* at 2253 – 2254. By rightly refusing to apply the modified categorical approach, the Court avoids further extending its precedents

that limit a criminal defendant's right to a public trial before a jury of his peers.

In 📑⚠ *Almendarez–Torres v. United States,* 523 U.S. 224, 246–247, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), the Court held that the existence of a prior conviction triggering enhanced penalties for a recidivist is a fact that could be found by a judge, not an element of the crime that must be found by a jury. Two years later, the Court held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum" is an element **\*2259** of a crime and therefore "must be submitted to a jury, and proved beyond a reasonable doubt." 📑 *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); see 📑 *id.,* at 489–490, 120 S.Ct. 2348. But *Apprendi* recognized an exception for the "fact of a prior conviction," instead of overruling 📑 *Almendarez–Torres.* See 530 U.S., at 490, 120 S.Ct. 2348. I continue to believe that the exception in *Apprendi* was wrong, and I have urged that *Almendarez– Torres* be reconsidered. See 📑 *Descamps v. United States,* 570 U.S. ——, ——, 133 S.Ct. 2276, 2294–2295, 186 L.Ed.2d 438 (2013) (THOMAS, J., concurring in judgment).

Consistent with this view, I continue to believe that depending on judge-found facts in Armed Career Criminal Act (ACCA) cases violates the Sixth Amendment and is irreconcilable with *Apprendi.* ACCA improperly "allows the judge to 'mak[e] a finding that raises [a defendant's] sentence beyond the sentence that could have lawfully been imposed by reference to facts found by the jury or admitted by the defendant.' "
📑 *Descamps, supra,* at —— – ——, 133 S.Ct., at 2294– 2295 (opinion of THOMAS, J.) (brackets in original; internal quotation marks omitted). This Sixth Amendment problem persists regardless of whether "a court is determining whether a prior conviction was entered, or attempting to discern what facts were necessary to a prior conviction." 📑 *Id.,* at ——, 133 S.Ct., at 2294 (citation omitted).

Today, the Court "at least limits the situations in which courts make factual determinations about prior convictions." *Ibid.* As the Court explains, the means of committing an offense are nothing more than "various factual ways of committing some component of the offense." *Ante,* at 2249. Permitting judges to determine the means of committing a prior offense would expand *Almendarez–Torres.* Therefore, I join the Court's opinion refusing to allow judges to determine, without a

AR.05532

**Mathis v. U.S., 136 S.Ct. 2243 (2016)**  Case 3:20-cv-07721-SI   Document 58-5   Filed 11/10/20   Page 308 of 1271

195 L.Ed.2d 604, 84 USLW 4412, 14 Cal. Daily Op. Serv. 6517...

jury, which alternative means supported a defendant's prior convictions.

Justice BREYER, with whom Justice GINSBURG joins, dissenting.

The elements/means distinction that the Court draws should not matter for sentencing purposes. I fear that the majority's contrary view will unnecessarily complicate federal sentencing law, often preventing courts from properly applying the sentencing statute that Congress enacted. I consequently dissent.

### I

The federal statute before us imposes a mandatory minimum sentence upon a person convicted of being a felon in possession of a firearm if that person also has three previous convictions for (among several other things) "burglary." 18 U.S.C. § 924(e)(2)(B)(ii). The petitioner here has been convicted of being a felon in possession, and he previously was convicted of three other crimes that qualify him for the federal mandatory minimum if, but only if, those previous convictions count as "burglary." To decide whether he has committed what the federal statute calls a "burglary," we must look to the state statute that he violated.

The relevant state statute, an Iowa statute, says that a person commits a crime if he (1) "enters an occupied structure," (2) "having no right ... to do so," (3) with "the intent to commit a felony." Iowa Code § 713.1 (2013). It then goes on to define "occupied structure" as including any (1) "building," (2) "structure," (3) "land" vehicle, (4) "water" vehicle, or (5) "air vehicle, or similar place." § 702.12. The problem arises because, as we have previously held, see *Taylor v. United* **\*2260** *States,* 495 U.S. 575, 602, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), if the structure that an offender unlawfully entered (with intent to commit a felony) was a "building," the state crime that he committed counts under the federal statute as "burglary." But if the structure that the offender unlawfully entered was a land, water, or air vehicle, the state crime does not count as a "burglary." Thus, a conviction for violating the state statute may, or may not, count as a "burglary," depending upon whether the structure that he entered was, say, a "building" or a "water vehicle."

Here, if we look at the court documents charging Mathis with a violation of the state statute, they tell us that he was charged with entering, for example, a "house and garage." App. 60–73 (charging documents). They say nothing about any other structure, say, a "water vehicle." Thus, to convict him, the jury—which had to find that he unlawfully entered an "occupied structure"—must have found that he entered a "house and garage," which concededly count as "building [s]." So why is that not the end of this matter? Why does the federal statute not apply?

Just to be sure, let us look at how we previously treated an almost identical instance. In *Taylor,* a state statute made criminal the "breaking and entering [of] a building, booth, tent, boat, or railroad car." 495 U.S., at 579, n. 1, 110 S.Ct. 2143. We explained that breaking into a building would amount to "burglary" under the federal statute, but breaking into a railroad car would not. But the conviction document itself said only that the offender had violated the statute; it did not say whether he broke into a building or a railroad car. See *id.,* at 598–602, 110 S.Ct. 2143. We said that in such a case the federal sentencing judge could look at the charging papers and the jury instructions in the state case to try to determine what the state conviction was actually for: building, tent, or railroad car. We wrote that

"in a State whose burglary statutes include entry of an automobile as well as a building, if the indictment or information and jury instructions show that the defendant was charged only with a burglary of a building, and that the jury necessarily had to find an entry of a building to convict, then the Government should be allowed to use the conviction for enhancement." *Id.,* at 602, 110 S.Ct. 2143.

(We later added that where a conviction rests upon an offender's guilty plea, the federal judge can look to the facts that the offender admitted at his plea colloquy for the same purpose. See *Shepard v. United States,* 544 U.S. 13, 20–21, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005).)

So, again, what is the problem? The State's "burglary statut[e] include[s] entry" of a vehicle as well as a "building." *Taylor,* 495 U.S., at 602, 110 S.Ct. 2143. The conviction document might not specify what kind of a structure the defendant entered (*i.e.,* whether a building or an automobile). But the federal sentencing judge can look at the charging documents (or plea colloquy) to see whether "the defendant

Mathis v. U.S., 136 S.Ct. 2243 (2016)

195 L.Ed.2d 604, 84 USLW 4412, 14 Cal. Daily Op. Serv. 6517...

was charged only with a burglary of a building." *Ibid.* And here that was so. In addition, since the charging documents show that the defendant was charged only with illegal entry of a "building"—not a tent or a railroad car—the jury, in order to find (as it did) that the defendant broke into an occupied structure, would "necessarily [have] had to find an entry of a building." *Ibid.* Hence, "the Government should be allowed to use the conviction for enhancement." *Ibid.*

The majority, however, does not agree that the two cases I have described are almost identical. To the contrary, it notes correctly that our precedent often uses the word "element" to describe the relevant **\*2261** facts to which a statute refers when it uses words such as "building," "tent," "boat," or "railroad car." See, *e.g., ante,* at 2251 – 2252. It points out that, here, the Iowa Supreme Court described those words as referring, not to "elements" of a crime, but rather to "means" through which a crime was committed. See *ante,* at 2249 – 2250. And that fact, in the majority's view, makes all the difference. See *ante,* at 2254 – 2256. But why? I, of course, see that there is a distinction between means and elements in the abstract, but—for sentencing purposes—I believe that it is a distinction without a difference.

## II

I begin with a point about terminology. All the relevant words in this case, such as "building," "structure," "water vehicle," and the like, are statutory words. Moreover, the statute uses those words to help describe a crime. Further, the statute always uses those words to designate *facts.* Whether the offender broke into a building is a fact; whether he broke into a water vehicle is a fact. Sometimes, however, a State may treat certain of those facts as elements of a crime. And sometimes a State may treat certain of those facts as means of committing a crime. So far, everyone should agree. See *Richardson v. United States,* 526 U.S. 813, 817, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999) (describing both "elements" and "means" as "facts"). Where we disagree is whether that difference, relevant to the application of state law, should make a difference for federal sentencing purposes.

## III

Whether a State considers the statutory words "boat" or "building" to describe elements of a crime or a means of

committing a crime can make a difference for purposes of applying the State's criminal law, but it should not make a difference in respect to the sentencing question at issue here. The majority, I believe, reasons something like this: Suppose the jury unanimously agreed that the defendant unlawfully entered some kind of structure with felonious intent, but the jury is deadlocked six to six as to whether that structure is (1) a "boat" or (2) a "house." If the statute uses those two words to describe two different elements of two different crimes—*i.e.,* (1) breaking into a boat, and (2) breaking into a house—then the defendant wins, for the jury has not found unanimously each element of either crime. But if the statute uses those two words to describe two different means of committing the same crime—*i.e.,* breaking into an occupied structure that consists of either a house or a boat—then the defendant loses, for (as long as the jury decides unanimously that the defendant broke into an occupied structure of whichever kind) the jury need not decide unanimously which particular means the defendant used to commit the crime. See *ante,* at 2248 – 2250.

I accept that reasoning. But I do not see what it has to do with sentencing. In the majority's view, the label "means" opens up the possibility of a six-to-six jury split, and it believes that fact would prevent us from knowing whether the conviction was for breaking into a "building" or a "boat." See *ante,* at 2249 – 2250. But precisely the same is true were we to use the label "element" to describe the facts set forth in the state statute. The federal sentencing judge may see on the defendant's record a conviction for violating a particular provision of the state criminal code; that code may list in a single sentence both "buildings" and "boats"; the State may interpret the two words as separate elements of two separate crimes; and the federal judge will not know from the simple fact of conviction for violating the statute (without more) which of the **\*2262** two crimes was at issue (that is, was it the one aimed at burglaries of buildings, or the one aimed at burglaries of boats?). That is why the Court said in *Taylor* that in such a case the federal judge may look to the "indictment or information and jury instructions" to determine whether "the jury necessarily had to find an entry of a building," rather than a boat, "to convict." 495 U.S., at 602, 110 S.Ct. 2143. If so, the federal judge may count the conviction as falling within the federal statutory word "burglary" and use it for sentencing.

In my view, precisely the same is true if the state courts label the statute-mentioned facts ("building," "boat," etc.) as "means" rather than "elements." The federal judge should be able to "look ... to" the charging documents and the

Mathis v. U.S., 136 S.Ct. 2243 (2016)
195 L.Ed.2d 604, 84 USLW 4412, 14 Cal. Daily Op. Serv. 6517...

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 310 of 1271

plea agreement to see if "the jury necessarily had to find an entry of a building," rather than a boat, "to convict." *Ibid.* If so, the federal judge should be able to count the conviction as a federal-statute "burglary" conviction and use it for sentencing.

Of course, sometimes the charging documents will not give us the answer to the question. But often they will. If, for example, the charging document accuses Smith of breaking and entering into a house (and does not mention any other structure), then (1) the jury had to find unanimously that he broke into a "house," if "house" is an element, and (2) the jury had to find unanimously that he broke into a "house," if "house" is the only means charged. (Otherwise the jury would not have unanimously found that he broke into an "occupied structure," which is an element of the statutory crime.)

Suppose, for example, that breaking into a "building" is an element of Iowa's burglary crime; and suppose the State charges that Smith broke into a building located in Des Moines (and presents evidence at trial concerning only a Des Moines offense), but the jury returns its verdict on a special-verdict form showing that six jurors voted for guilt on the theory that he broke into a building located in Detroit —not Des Moines. The conviction would fail (at least in Iowa), would it not? See, *e.g., State v. Bratthauer,* 354 N.W.2d 774, 776 (Iowa 1984) ("*If substantial evidence is presented to support each alternative method of committing a single crime,* and the alternatives are not repugnant to each other, *then* unanimity of the jury as to the mode of commission of the crime is not required. At the root of this standard is the principle that the unanimity rule requires jurors to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether the defendant is guilty of the crime charged" (emphasis added; citation, brackets, and internal quotation marks omitted)). Similarly, we would know that—if the charging documents claim only that the defendant broke into a house, and the Government presented proof only of that kind of burglary—the jury had to find unanimously that he broke into a house, not a boat. And that is so whether state law considers the statutory word "house" to be an element or a means. I have not found any nonfanciful example to the contrary.

## IV

Consider the federal statute before us—the statute that contains the word "burglary"—from a more general

sentencing perspective. By way of background, it is important to understand that, as a general matter, any sentencing system must embody a host of compromises between theory and practicality. From the point of view of pure theory, there is much to be said for "real offense" sentencing. Such a system would require a commission or a sentencing judge to determine in some **\*2263** detail "the actual conduct in which the defendant engaged," *i.e.,* what the defendant really did now and in the past. United States Sentencing Commission (USSC), Guidelines Manual ch. 1, pt. A, p. 5 (Nov. 2015). Such a system would produce greater certainty that two offenders who engaged in (and had previously engaged in) the same real conduct would be punished similarly. See *ibid.*

Pure "real offense" sentencing, however, is too complex to work. It requires a sentencing judge (or a sentencing commission) to know all kinds of facts that are difficult to discover as to present conduct and which a present sentencing judge could not possibly know when he or she seeks to determine what conduct underlies a prior conviction. Because of these practical difficulties, the USSC created Guidelines that in part reflect a "charge offense" system, a system based "upon the conduct that constitutes the elements of the offense for which the defendant was charged and of which he was convicted." *Ibid.*

A pure "charge offense" system, however, also has serious problems. It can place great authority to determine a sentence in the hands of the prosecutor, not the judge, creating the very nonuniformity that a commission would hope to minimize. Hence, the actual federal sentencing system retains "a significant number of real offense elements," allowing adjustments based upon the facts of a defendant's case. *Id.,* at 6. And the Commission is currently looking for new ways to create a better compromise. See, *e.g.,* USSC, Amendments to the Sentencing Guidelines, at 24 (Apr. 2016) (effective Nov. 1, 2016) (creating a "sentence-imposed model for determining" whether prior convictions count for sentence-enhancement purposes in the context of certain immigration crimes).

With this background in mind, turn to the federal statute before us. The statute, reflecting the impossibility of knowing in detail the conduct that underlies a prior conviction, uses (in certain cases involving possession of weapons) the fact of certain convictions (including convictions for burglary) as (conclusive) indications that the present defendant has previously engaged in highly undesirable conduct. And, for the general reasons earlier described, it is practical

195 L.Ed.2d 604, 84 USLW 4412, 14 Cal. Daily Op. Serv. 6517...

considerations, not a general theory, that would prevent Congress from listing the specific prior conduct that would warrant a higher present sentence. Practical considerations, particularly of administration, can explain why Congress did not tell the courts precisely how to apply its statutory word "burglary." And similar practical considerations can help explain why this Court, in *Taylor* and later cases, described a modified categorical approach for separating the sheep from the goats. Those cases recognize that sentencing judges have limited time, they have limited information about prior convictions, and—within practical constraints—they must try to determine whether a prior conviction reflects the kind of behavior that Congress intended its proxy (*i.e.,* "burglary") to cover.

The majority's approach, I fear, is not practical. Perhaps the statutes of a few States say whether words like "boat" or "building" stand for an element of a crime or a means to commit a crime. I do not know. I do know, however, that many States have burglary statutes that look very much like the Iowa statute before us today. See, *e.g.,* Colo.Rev.Stat. §§ 18–4–101, 18–4–202, 18–4–203 (2015); Mont.Code Ann. §§ 45–2–101, 45–6–201, 45–6–204 (2015); N.H.Rev.Stat. Ann. § 635:1 (2015); N.D. Cent. Code Ann. §§ 12.1–22–02, 12.1–22–06 (2012); Ohio Rev.Code Ann. §§ 2909.01, 2911.11–2911.13 (Lexis 2014); 18 Pa. Cons.Stat. Ann. §§ 3501, 3502 (2015); S.D. Codified Laws §§ 22–1–2, **2264** 22–32–1, 22–32–3, 22–32–8 (2006); Wyo. Stat. Ann. §§ 6–1–104, 6–3–301 (2015); see also ALI, Model Penal Code §§ 221.0, 221.1 (1980); cf. *Taylor,* 495 U.S., at 598, 110 S.Ct. 2143 ("burglary" in the federal statute should reflect the version of burglary "used in the criminal codes of most States"). I also know that there are very few States where one can find authoritative judicial opinions that decide the means/element question. In fact, the Government told us at oral argument that it had found only "two States" that, in the context of burglary, had answered the means/elements question. Tr. of Oral Arg. 45; see *id.,* at 37.

The lack of information is not surprising. After all, a prosecutor often will charge just one (*e.g.,* a "building") of several statutory alternatives. See *Descamps v. United States,* 570 U.S. ——, ——, 133 S.Ct. 2276, 2283–2284, 186 L.Ed.2d 438 (2013). A jury that convicts, then, would normally have to agree unanimously about the existence of that particular fact. See *Richardson,* 526 U.S., at 818, 119 S.Ct. 1707 ("Our decision [whether something is an element or a means] will make a difference where ... the Government

introduces evidence that the defendant has committed more underlying drug crimes than legally necessary to make up a 'series' "). Hence, it will not matter for that particular case whether the State, as a general matter, would categorize that fact (to which the statute refers) as an "element" or as a "means."

So on the majority's approach, what is a federal sentencing judge to do when facing a state statute that refers to a "building," a "boat," a "car," etc.? The charging documents will not answer the question, for—like the documents at issue here—they will simply charge entry into, say, a "building," without more. But see *ante,* at 2256 – 2257 (suggesting that a defendant's charging documents *will* often answer the question). The parties will have to look to other state cases to decide whether that fact is a "means" or an "element." That research will take time and is likely not to come up with an answer. What was once a simple matter will produce a time-consuming legal tangle. See, *e.g.,* *State v. Peterson,* 168 Wash.2d 763, 769, 230 P.3d 588, 591 (2010) ( " 'There is simply no bright-line rule by which the courts can determine whether the legislature intended to provide alternate means of committing a particular crime. Instead, each case must be evaluated on its own merits' " (brackets omitted)); *State v. Brown,* 295 Kan. 181, 192, 284 P.3d 977, 987 (2012) (the "alternative means" definition is "mind-bending in its application"). That is why lower court judges have criticized the approach the majority now adopts. See, *e.g.,* *Omargharib v. Holder,* 775 F.3d 192, 200 (C.A.4 2014) (Niemeyer, J., concurring) ("Because of the ever-morphing analysis and the increasingly blurred articulation of applicable standards, we are being asked to decide, without clear and workable standards, whether disjunctive phrases in a criminal law define alternative elements of a crime or alternative means of committing it.... I find it especially difficult to comprehend the distinction" (emphasis deleted)).

V

The majority bases its conclusion primarily upon precedent. In my view, precedent does not demand the conclusion that the majority reaches. I agree with the majority that our cases on the subject have all used the word "element" in contexts similar to the present context. But that fact is hardly surprising, for all the cases in which that word appears involved elements—or at least the Court assumed that was

Mathis v. U.S., 136 S.Ct. 2243 (2016)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 312 of 1271

195 L.Ed.2d 604, 84 USLW 4412, 14 Cal. Daily Op. Serv. 6517...

so. See *Descamps,* 570 U.S., at ——, n. 2, 133 S.Ct., at 2285, n. 2. In each of **\*2265** those cases, the Court used the word generally, simply to refer to the matter at issue, without stating or suggesting any view about the subject of the present case. See, *e.g.,* *id.,* at ——, 133 S.Ct., at 2283 ("Sentencing courts may look only to the statutory definitions—*i.e.,* the elements—of a defendant's prior offenses" (internal quotation marks omitted)); *Shepard,* 544 U.S., at 16–17, 125 S.Ct. 1254 (using the terms "statutory definition" and "statutory elements" interchangeably); *Taylor,* 495 U.S., at 602, 110 S.Ct. 2143 ("[A]n offense constitutes 'burglary' for purposes of [the Armed Career Criminal Act] if either its statutory definition substantially corresponds to 'generic' burglary, or the charging paper and jury instructions actually required the jury to find all the elements of generic burglary").

The genius of the common law consists in part in its ability to modify a prior holding in light of new circumstances, particularly where, as Justice Holmes said, a existing principle runs up against a different principle that requires such modification. See Holmes, The Path of the Law, 10 Harv. L. Rev. 457, 469 (1897). *A fortiori,* we should not apply this Court's use of a word in a prior case—a word that was not necessary to the decision of the prior case, and not intended to set forth a generally applicable rule—to a new circumstance that differs significantly in respect to both circumstances and the legal question at issue.

Does *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), require the majority's result here? There we held that any fact ("[o]ther than the fact of a prior conviction") that must be proved in order to increase the defendant's sentence above what would otherwise be the statutory maximum must be proved to a jury beyond a reasonable doubt. *Id.,* at 490, 120 S.Ct. 2348. Where, as here, the State charges only one kind of "occupied structure"—namely, entry into a "garage"—that criterion is met. The State must prove to the jury beyond a reasonable doubt that the defendant unlawfully entered a garage. And that is so, whether the statute uses the term "garage" to refer to a fact that is a means or a fact that is an element. If the charging papers simply said "occupied structure," leaving the jury free to disagree about whether that structure was a "garage" or was, instead, a "boat," then we lack the necessary assurance about jury unanimity; and the sentencing judge consequently cannot use that conviction as a basis for an increased federal sentence. And that is true whether the state statute, when using

the words "garage" and "boat," intends them to refer to a fact that is a means or a fact that is an element.

What about *Descamps* ? The statute there at issue made it a crime to "ente [r] certain locations with intent to commit grand or petit larceny or any felony." 570 U.S., at ——, 133 S.Ct., at 2282 (internal quotation marks omitted). The statute made no distinction between (1) lawful entry (*e.g.,* entering a department store before closing time) and (2) unlawful entry (*e.g.,* breaking into a store after it has closed). See *ibid.* The difference matters because unlawful entry is a critical constituent of the federal statute's version of "burglary." If the entry is lawful, the crime does not fall within the scope of that word.

We held that a conviction under this statute did not count as a "burglary" for federal purposes. We reasoned that the statute required the Government only to prove "entry," that there was no reason to believe that charging documents would say whether the entry was lawful or unlawful, and that, "most important[ly]," even if they did, the jury did not have to decide that **\*2266** the entry was unlawful in order to convict (that is, any description in the charging document that would imply or state that the entry was illegal, say, at 2:00 in the morning, would be coincidental). *Id.,* at ——, 133 S.Ct., at 2290; see *id.,* at ——, 133 S.Ct., at 2288.

Here, by way of contrast, the charging documents must allege entry into an "occupied structure," and that "structure" can consist of one of several statutory alternatives. Iowa Code §§ 713.1, 702.12. The present law thus bears little resemblance to the hypothetical statute the majority describes. That hypothetical statute makes it a crime to break into a "premises" without saying more. *Ante,* at 2255 – 2256. Thus, to apply the federal sentencing statute to such a nonspecific, hypothetical statute would require sentencing judges to "imaginatively transfor[m]" "every element of [the] statute ... so that [the] crime is seen as containing an infinite number of sub-crimes corresponding to 'all the possible ways an individual can commit' " the crime—an impossibly difficult task. *Descamps,* 570 U.S., at —— – ——, 133 S.Ct. at 2291.

But the Iowa statute before us contains explicit (not hypothetical) statutory alternatives, and therefore it is likely (not unlikely) that the charging documents will list one or more of these alternatives. Indeed, that is the case with each of Mathis' charging documents. See App. 60–73. And if the

AR.05537

Mathis v. U.S., 136 S.Ct. 2243 (2016)

195 L.Ed.2d 604, 84 USLW 4412, 14 Cal. Daily Op. Serv. 6517...

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 313 of 1271

charging documents list only one of these alternatives, say, a "building," the jury normally would have to find unanimously that the defendant entered into a building in order to convict. See *Bratthauer,* 354 N.W.2d, at 776. To repeat my central point: In my view, it is well within our precedent to count a state burglary conviction as a "burglary" within the meaning of the federal law where (1) the *statute* at issue lists the alternative means by which a defendant can commit the crime (*e.g.,* burgling a "building" or a "boat") and (2) the *charging documents* make clear that the state alleged (and the jury or trial judge necessarily found) only an alternative that matches the federal version of the crime.

*Descamps* was not that kind of case. It concerned a statute that did not explicitly list alternative means for commission of the crime. And it concerned a fact extraneous to the crime— the fact (whether entry into the burgled structure was lawful or unlawful) was neither a statutory means nor an element. As the Court in that case described it, the fact at issue was, under the state statute, a "legally extraneous circumstance[e]" of the State's case. 570 U.S., at ——, 133 S.Ct., at 2288. But this case concerns a fact necessary to the crime (regardless of whether the Iowa Supreme Court generally considers that fact to be a means or an element).

Precedent, by the way, also includes *Taylor.* And, as I have pointed out, *Taylor* says that the modified categorical approach it sets forth may "permit the sentencing court to go beyond the mere fact of conviction in a narrow range of cases where a jury was actually required to find all the elements of generic burglary." 495 U.S., at 602, 110 S.Ct. 2143. *Taylor* is the precedent that I believe governs here. Because the majority takes a different view, with respect, I dissent.

Justice ALITO, dissenting.

Sabine Moreau lives in Solre–sur–Sambre, a town in Belgium located 38 miles south of Brussels. One day she set out in her car to pick up a friend at the Brussels train station, a trip that should have taken under an hour. She programmed her GPS and headed off. Although the GPS sent her south, not north, she apparently thought nothing of it. She dutifully stayed **2267** on the prescribed course. Nor was she deterred when she saw road signs in German for Cologne, Aachen, and Frankfurt. "I asked myself no questions," she later recounted. "I kept my foot down." [1]

Hours passed. After crossing through Germany, she entered Austria. Twice she stopped to refuel her car. She was involved in a minor traffic accident. When she tired, she pulled over and slept in her car. She crossed the Alps, drove through Slovenia, entered Croatia, and finally arrived in Zagreb—two days and 900 miles after leaving her home. Either she had not properly set her GPS or the device had malfunctioned. But Ms. Moreau apparently refused to entertain that thought until she arrived in the Croatian capital. Only then, she told reporters, did she realize that she had gone off course, and she called home, where the police were investigating her disappearance.

Twenty-six years ago, in *Taylor v. United States,* 495 U.S. 575, 602, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), this Court set out on a journey like Ms. Moreau's. Our task in *Taylor,* like Ms. Moreau's short trip to the train station, might not seem very difficult—determining when a conviction for burglary counts as a prior conviction for burglary under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e). But things have not worked out that way.

Congress enacted ACCA to ensure that violent repeat criminal offenders could be subject to enhanced penalties— that is, longer prison sentences—in a fair and uniform way across States with myriad criminal laws. See *Descamps v. United States,* 570 U.S. ——, —— – ——, 133 S.Ct. 2276, 2301–2302, 186 L.Ed.2d 438 (2013) (ALITO, J., dissenting). ACCA calls for an enhanced sentence when a defendant, who has three or more prior convictions for a "violent felony," is found guilty of possession of a firearm. § 924(e)(1). And ACCA provides that the term "violent felony" means, among other things, "any crime punishable by imprisonment for a term exceeding one year ... that ... is burglary." § 924(e)(2)(B). In other words, "burglary" = "violent felony."

While this language might seem straightforward, *Taylor* introduced two complications. First, *Taylor* held that "burglary" under ACCA means offenses that have the elements of what the Court called "generic" burglary, defined as unlawfully entering or remaining in a building or structure with the intent to commit a crime. 495 U.S., at 598, 110 S.Ct. 2143. This definition is broader than that of the common law but does not include every offense that States have labeled burglary, such as the burglary of a boat or vehicle. Second, *Taylor* and subsequent cases have limited the ability of sentencing judges to examine the record in prior cases for the purpose of determining whether the convictions in

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 314 of 1271

Mathis v. U.S., 136 S.Ct. 2243 (2016)
195 L.Ed.2d 604, 84 USLW 4412, 14 Cal. Daily Op. Serv. 6517...

those cases were for "generic burglary." See, *e.g.,* 🔖 **\*2268**
*Shepard v. United States,* 544 U.S. 13, 26, 125 S.Ct. 1254,
161 L.Ed.2d 205 (2005). We have called this the "modified
categorical approach." 🔖 *Descamps, supra,* at —— – ——,
133 S.Ct., at 2281–2282.

Programmed in this way, the Court set out on a course that
has increasingly led to results that Congress could not have
intended. [2] And finally, the Court arrives at today's decision,
the upshot of which is that all burglary convictions in a
great many States may be disqualified from counting as
predicate offenses under ACCA. This conclusion should set
off a warning bell. Congress indisputably wanted burglary to
count under ACCA; our course has led us to the conclusion
that, in many States, no burglary conviction will count; maybe
we made a wrong turn at some point (or perhaps the Court
is guided by a malfunctioning navigator). But the Court is
unperturbed by its anomalous result. Serenely chanting its
mantra, "Elements," see *ante,* at 2251, the Court keeps its foot
down and drives on.

The Court's approach calls for sentencing judges to delve
into pointless abstract questions. In *Descamps,* the Court gave
sentencing judges the assignment of determining whether a
state statute is "divisible." See 🔖 570 U.S., at ——, 133
S.Ct., at 2293. When I warned that this novel inquiry would
prove to be difficult, the opinion of the Court brushed off
that concern, see 🔖 *id.,* at ——, 133 S.Ct., at 2285, n. 2
("[W]e can see no real-world reason to worry"). But lower
court judges, who must regularly grapple with the modified
categorical approach, struggled to understand *Descamps.*
Compare 🔖 *Rendon v. Holder,* 764 F.3d 1077, 1084–1090
(C.A.9 2014) (panel opinion), with 782 F.3d 466, 466–473
(C.A.9 2015) (eight judges dissenting from denial of reh'g
en banc), and *id.,* at 473–474 (Kozinski, J., dissenting from
denial of reh'g en banc). Now the Court tells them they must
decide whether entering or remaining in a building is an
"element" of committing a crime or merely a "means" of
doing so. I wish them good luck.

The distinction between an "element" and a "means" is
important in a very different context: The requisite number
of jurors (all 12 in most jurisdictions) must agree that a
defendant committed each element of an offense, but the
jurors need not agree on the means by which an element
was committed. So if entering or remaining *in a building* is
an element, the jurors must agree that the defendant entered

or remained in a *building* and not, say, a boat. But if the
element is entering or remaining within one of a list of places
specified in the statute (say, building, boat, vehicle, tent),
then entering or remaining in a building is simply a means.
Jurors do not need to agree on the means by which an offense
is committed, and therefore whether a defendant illegally
entered a building or a boat would not matter for purposes of
obtaining a conviction.

In the real world, there are not many cases in which the state
courts are required to decide whether jurors in a burglary case
must agree on the building vs. boat issue, so the question
whether buildings and boats are elements or means does
not often arise. As a result, state-court **\*2269** cases on the
question are rare. The Government has surveyed all the state
burglary statutes and has found only one—Iowa, the State in
which petitioner was convicted for burglary—in which the
status of the places covered as elements or means is revealed.
See Brief for United States 43, and n. 13. Petitioner's attorneys
have not cited a similar decision from any other State.

How, then, are federal judges sentencing under ACCA to
make the element/means determination? The Court writes:
"This threshold inquiry—elements or means?—is easy in this
case, as it will be in many others." *Ante,* at 2256. Really? [3]
The determination is easy in this case only because the
fortified legal team that took over petitioner's representation
after this Court granted review found an Iowa case on point,
but this discovery does not seem to have been made until the
preparation of the brief filed in this Court. Brief for United
States 43, and n. 13. "Petitioner's belated identification of
a relevant state decision confirms that the task is not an
easy one." *Ibid.* And that is not the worst of it. Although
many States have burglary statutes like Iowa's that apply
to the burglary of places other than a building, neither the
Government nor petitioner has found a single case in any of
these jurisdictions resolving the question whether the place
burglarized is an element or a means.

The Court assures the federal district judges who must apply
ACCA that they do not need such state-court decisions, that
it will be easy for federal judges to predict how state courts
would resolve this question if it was ever presented to them.
*Ante,* at 2256 – 2257. But the Court has not shown how this
can be done. The Government's brief cites numerous state
statutes like Iowa's. Brief for United States 42, n. 12. If this
task is so easy, let the Court pick a few of those States and
give the lower court judges a demonstration.

Mathis v. U.S., 136 S.Ct. 2243 (2016)
195 L.Ed.2d 604, 84 USLW 4412, 14 Cal. Daily Op. Serv. 6517...

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 315 of 1271

Picking up an argument tossed off by Judge Kozinski, the Court argues that a federal sentencing judge can get a sense of whether the places covered by a state burglary statute are separate elements or means by examining the charging document. *Ante,* at 2256 – 2257 (citing *Rendon, supra,* at 473–474 (Kozinski, J., dissenting from denial of reh'g en banc)). If, for example, the charging document alleges that the defendant burglarized a house, that is a clue, according to the Court, that "house" is an element. See *ibid.* I pointed out the problem with this argument in 🔖 *Descamps.* See 570 U.S., at —— – ——, 133 S.Ct., at 2301–2302 (dissenting opinion). State rules and practices regarding the wording of charging documents differ, and just because something is specifically alleged in such a document, it does not follow that this item is an element and not just a means. See *ibid.*

The present case illustrates my point. Petitioner has five prior burglary convictions in Iowa. In Iowa, the places covered are "means." See *ante,* at 2254. Yet the charging documents in all these cases set out the specific places that petitioner burglarized—a "house and garage," a "garage," a "machine shed," and a "storage shed." See Brief for Petitioner 9.

A real-world approach would avoid the mess that today's decision will produce. Allow a sentencing court to take a look at the record in the earlier case to see if the **\*2270** place that was burglarized was a building or something else. If the record is lost or inconclusive, the court could refuse to count the conviction. But where it is perfectly clear that a building was burglarized, count the conviction.

The majority disdains such practicality, and as a result it refuses to allow a burglary conviction to be counted even when the record makes it clear beyond any possible doubt that the defendant committed generic burglary. Consider this hypothetical case. Suppose that a defendant wishes to plead guilty to burglary, and the following occurs in open court on the record at the time of the plea:

PROSECUTOR: I am informed that the defendant wishes to plead guilty to the charge set out in the complaint, namely, "on June 27, 2016, he broke into a house at 10 Main Street with the intent to commit larceny."

DEFENSE COUNSEL: That is correct.

COURT: Mr. Defendant, what did you do?

DEFENDANT: I broke into a house to steal money and jewelry.

COURT: Was that the house at 10 Main St.?

DEFENDANT: That's it.

COURT: Now, are you sure about that? I mean, are you sure that 10 Main St. is a house? Could it have actually been a boat?

DEFENDANT: No, it was a house. I climbed in through a window on the second floor.

COURT: Well, there are yachts that have multiple decks. Are you sure it is not a yacht?

DEFENDANT: It's a little house.

PROSECUTOR: Your Honor, here is a photo of the house.

COURT: Give the defendant the photo. Mr. Defendant, is this the place you burglarized?

DEFENDANT: Yes, like I said.

COURT: Could it once have been a boat? Maybe it was originally a house boat and was later attached to the ground. What about that?

DEFENSE COUNSEL: Your honor, we stipulate that it is not a boat.

COURT: Well, could it be a vehicle?

DEFENDANT: No, like I said, it's a house. It doesn't have any wheels.

COURT: There are trailers that aren't on wheels.

DEFENSE COUNSEL: Your Honor, my client wants to plead guilty to burglarizing the house at 10 Main St.

PROSECUTOR: Your Honor, if necessary I will call the owners, Mr. and Mrs. Landlubbers–Stationary. They have lived there for 40 years. They will testify that it is a building. I also have the town's tax records. The house has been at that location since it was built in 1926. It hasn't moved.

COURT: What do you say, defense counsel? Are those records accurate?

DEFENSE COUNSEL: Yes, we so stipulate. Again, my client wishes to plead guilty to the burglary of a house.

Mathis v. U.S., 136 S.Ct. 2243 (2016)

195 L.Ed.2d 604, 84 USLW 4412, 14 Cal. Daily Op. Serv. 6517...

He wants to take responsibility for what he did, and as to sentencing,....

COURT: We'll get to that later. Mr. Defendant, what do you say? Is 10 Main St. possibly a vehicle?

DEFENDANT: Your Honor, I admit I burglarized a house. It was not a car or truck.

COURT: Well, alright. But could it possibly be a tent?

DEFENDANT: No, it's made of brick. I scraped my knee on the brick climbing up.

COURT: OK, I just want to be sure.

**\*2271** As the Court sees things, none of this would be enough. Real-world facts are irrelevant. For aficionados of pointless formalism, today's decision is a wonder, the veritable *ne plus ultra* of the genre. [4]

Along the way from *Taylor* to the present case, there have been signs that the Court was off course and opportunities to alter its course. Now the Court has reached the legal equivalent of Ms. Moreau's Zagreb. But the Court, unlike Ms. Moreau, is determined to stay the course and continue on, traveling even further away from the intended destination. Who knows when, if ever, the Court will call home.

### All Citations

136 S.Ct. 2243, 195 L.Ed.2d 604, 84 USLW 4412, 14 Cal. Daily Op. Serv. 6517, 2016 Daily Journal D.A.R. 6071, 26 Fla. L. Weekly Fed. S 315

## Footnotes

[*] The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

[1] Compare *786 F.3d 1068 (C.A.8 2015)* (case below) (recognizing such an exception); *United States v. Ozier,* 796 F.3d 597 (C.A.6 2015) (same); *United States v. Trent,* 767 F.3d 1046 (C.A.10 2014) (same), with *Rendon v. Holder,* 764 F.3d 1077 (C.A.9 2014) (rejecting that exception); *Omargharib v. Holder,* 775 F.3d 192 (C.A.4 2014) (same).

[2] So too in our decisions applying the categorical approach outside the ACCA context—most prominently, in immigration cases. See, *e.g., Kawashima v. Holder,* 565 U.S. 478, 482–483, 132 S.Ct. 1166, 182 L.Ed.2d 1 (2012) (stating that a judge must look to the "formal element[s] of a conviction[,] rather than to the specific facts underlying the crime," in deciding whether to deport an alien for committing an "aggravated felony").

[3] To see the point most clearly, consider an example arising in the immigration context: A defendant charged under a statute that criminalizes "intentionally, knowingly, or recklessly" assaulting another—as exists in many States, see, *e.g.,* Tex. Penal Code Ann. § 22.01(a)(1) (West Cum. Supp. 2015)—has no apparent reason to dispute a prosecutor's statement that he committed the crime intentionally (as opposed to recklessly) if those mental states are interchangeable means of satisfying a single *mens rea* element. But such a statement, if treated as reliable, could make a huge difference in a deportation proceeding years in the future, because an intentional assault (unlike a reckless one) qualifies as a "crime involving moral turpitude," and so requires removal from the country. See *In re Gomez–Perez,* No. A200–958–511, p. 2 (BIA 2014).

[4] *Descamps* made the point at some length, adding that the modified categorical approach "retains the categorical approach's central feature: a focus on the elements, rather than the facts, of a crime. And it preserves the categorical approach's basic method: comparing those elements with the generic offense's. All the modified approach adds is a mechanism for making that comparison when a statute lists multiple, alternative elements, and so effectively creates 'several different ... crimes.' If at least one, but not all of those crimes matches the generic version, a court needs a way to find out which the defendant was convicted of.

195 L.Ed.2d 604, 84 USLW 4412, 14 Cal. Daily Op. Serv. 6517...

That is the job, as we have always understood it, of the modified approach: to identify, from among several alternatives, the crime of conviction so that the court can compare it to the generic offense." 570 U.S. at ——, 133 S.Ct., at 2285 (citation omitted).

5    In another solo dissent, Justice ALITO today switches gears, arguing not that our precedent is consistent with his means-based view, but instead that all of our ACCA decisions are misguided because all follow from an initial wrong turn in *Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). See *post,* at 2267 – 2268. To borrow the driving metaphor of his own dissent, Justice ALITO thus locates himself entirely off the map of our caselaw. But that is not surprising; he has harshly criticized the categorical approach (and *Apprendi* too) for many years. See, *e.g., Johnson v. United States,* 576 U.S. ——, —— – ——, 135 S.Ct. 2551, 2577–2580, 192 L.Ed.2d 569 (2015) (ALITO, J., dissenting); *Descamps,* 570 U.S., at —— – ——, 133 S.Ct., at 2296–2297 (ALITO, J., dissenting); *Moncrieffe v. Holder,* 569 U.S. ——, —— – ——, 133 S.Ct. 1678, 1700–1701, 185 L.Ed.2d 727 (2013) (Alito, J., dissenting); *Chambers v. United States,* 555 U.S. 122, 132–134, 129 S.Ct. 687, 172 L.Ed.2d 484 (2009) (ALITO, J., concurring in judgment); see also *Hurst v. Florida,* 577 U.S. ——, ——, 136 S.Ct. 616, 625, 193 L.Ed.2d 504 (2016) (ALITO, J., dissenting); *Alleyne v. United States,* 570 U.S. ——, —— – ——, 133 S.Ct. 2151, 2172–2173, 186 L.Ed.2d 314 (2013) (ALITO, J., dissenting).

6    Justice BREYER's dissent rests on the idea that, contrary to that long-accepted definition, a jury sometimes does "necessarily ha[ve] to find" a means of commission, see *post,* at 2260 (quoting *Taylor,* 495 U.S., at 602, 110 S.Ct. 2143)—but *Descamps* specifically refuted that argument too. In that case, Justice ALITO made the selfsame claim: A jury, he averred, should be treated as having "necessarily found" any fact, even though non-elemental, that a later sentencing court can "infer [ ]" that the jury agreed on "as a practical matter." 570 U.S., at ——, 133 S.Ct., at 2303 (ALITO, J., dissenting). The Court rejected that view, explaining that its ACCA decisions had always deemed a jury necessarily agree *as a legal matter*—which meant on elements and not on means. See *id.,* at 2252, n. 3, 133 S.Ct., at 2286, n. 3. The requirement, from the Court's earliest decisions, was that a judge could impose a 15–year sentence based only on a legal "certainty," not on his inference (however reasonable in a given case) about what a prior factfinder had thought. *Shepard,* 544 U.S., at 23, 125 S.Ct. 1254; see *Taylor,* 495 U.S., at 602, 110 S.Ct. 2143; *supra,* at 2252. Or otherwise said, the relevant question was whether a defendant *was* legally convicted of a certain offense (with a certain set of elements), not whether a sentencing judge believes that the factfinder *would have* convicted him of that offense had it been on the books. See *Carachuri–Rosendo v. Holder,* 560 U.S. 563, 576, 130 S.Ct. 2577, 177 L.Ed.2d 68 (2010) (rejecting such a "hypothetical" approach given a similar statute's directive to "look to the conviction itself").

7    *Descamps* previously recognized just this way of discerning whether a statutory list contains means or elements. See 570 U.S., at ——, n. 2, 133 S.Ct., at 2285, n. 2. The Court there noted that indictments, jury instructions, plea colloquies and plea agreements will often "reflect the crime's elements" and so can reveal—in some cases better than state law itself—whether a statutory list is of elements or means. *Ibid.* Accordingly, when state law does not resolve the means-or-elements question, courts should "resort[ ] to the [record] documents" for help in making that determination. *Ibid.*

1    For accounts of the journey, see, *e.g.,* Waterfield, GPS Failure Leaves Belgian Woman in Zagreb Two Days Later, The Telegraph (Jan. 13, 2013), online at http://www.telegraph.co.uk/news/worldnews/europe/belgium/9798779/GPS-failure-leaves-Belgian-woman-in-Zagreb-two-days-later.html (all Internet materials as last visited June 22, 2016); Grenoble, Sabine Moreau, Belgian Woman, Drives 900 Miles Off 90–Mile Route Because of GPS Error, Huffington Post (Jan. 15, 2013), online at http://www.huffingtonpost.com/2013/01/15/sabine-moreau-gps-belgium-croatia-900-miles_n_2475220.html; Malm, Belgian Woman Blindly Drove 900

195 L.Ed.2d 604, 84 USLW 4412, 14 Cal. Daily Op. Serv. 6517...

Miles Across Europe As She Followed Broken GPS Instead Of 38–Miles To The Station, Daily Mail, (Jan. 14, 2013), online at http://www.dailymail.co.uk/news/article-2262149/Belgian-woman-67-picking-friend-railway-station-ends-Zagreb-900-miles-away-satnav-disaster.html.

2    In *Descamps v. United States,* 570 U.S. ——, 133 S.Ct. 2276, 186 L.Ed.2d 438 (2013), the decision meant that no California burglary conviction counts under ACCA. See *id.,* at ——, 133 S.Ct., at 2302 (ALITO, J., dissenting). In *Moncrieffe v. Holder,* 569 U.S. ——, 133 S.Ct. 1678, 185 L.Ed.2d 727 (2013), where the Court took a similar approach in interpreting a provision of the immigration laws, the Court came to the conclusion that convictions in about half the states for even very large scale marijuana trafficking do not count as "illicit trafficking in a controlled substance" under a provision of the immigration laws. *Id.,* at ——, 133 S.Ct., at 1700 (ALITO, J., dissenting).

3    In *Rendon v. Holder,* 782 F.3d 466, 466–473 (C.A.9 2015) (dissent from denial of rehearing), eight circuit judges addressed the question of the difficulty of this determination. They described it as "a notoriously uncertain inquiry" that will lead to "uncertain results." *Id.,* at 471.

4    The Court claims that there are three good reasons for its holding, but as I explained in *Descamps,* none is substantial. The Court's holding is not required by ACCA's text or by the Sixth Amendment, and the alternative real-world approach would be fair to defendants. See 570 U.S., at ——, —— – ——, 133 S.Ct., at 2296–2297, 2299–2301 (ALITO, J., dissenting).

---

End of Document                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

Abrogated by Grace v. Barr, D.C.Cir., July 17, 2020

27 I. & N. Dec. 316 (U.S.Atty.Gen.), Interim Decision 3929, 2018 WL 3091048

U.S. Department of Justice

Office of the Attorney General

MATTER OF A-B-, RESPONDENT

Decided by Attorney General June 11, 2018

**\*\*1  \*316** (1) *Matter of A-R-C-G-*, 26 I&N Dec. 338 (BIA 2014) is overruled. That decision was wrongly decided and should not have been issued as a precedential decision.

(2) An applicant seeking to establish persecution on account of membership in a "particular social group" must demonstrate: (1) membership in a group, which is composed of members who share a common immutable characteristic, is defined with particularity, and is socially distinct within the society in question; and (2) that membership in the group is a central reason for her persecution. When the alleged persecutor is someone unaffiliated with the government, the applicant must also show that her home government is unwilling or unable to protect her.

(3) An asylum applicant has the burden of showing her eligibility for asylum. The applicant must present facts that establish each element of the standard, and the asylum officer, immigration judge, or the Board has the duty to determine whether those facts satisfy all of those elements.

(4) If an asylum application is fatally flawed in one respect, an immigration judge or the Board need not examine the remaining elements of the asylum claim.

(5) The mere fact that a country may have problems effectively policing certain crimes or that certain populations are more likely to be victims of crime, cannot itself establish an asylum claim.

(6) To be cognizable, a particular social group must exist independently of the harm asserted in an application for asylum.

(7) An applicant seeking to establish persecution based on violent conduct of a private actor must show more than the government's difficulty controlling private behavior. The applicant must show that the government condoned the private actions or demonstrated an inability to protect the victims.

(8) An applicant seeking asylum based on membership in a particular social group must clearly indicate on the record the exact delineation of any proposed particular social group.

(9) The Board, immigration judges, and all asylum officers must consider, consistent with the regulations, whether internal relocation in the alien's home country presents a reasonable alternative before granting asylum.

**\*317**  BEFORE THE ATTORNEY GENERAL

On March 7, 2018, I directed the Board of Immigration Appeals ("Board") to refer for my review its decision in this matter, see 8 C.F.R. § 1003.1(h)(1)(i), and I invited the parties and any interested amici to submit briefs addressing questions relevant to that certification. *Matter of A-B-*, 27 I&N Dec. 227 (A.G. 2018). Specifically, I sought briefing on whether, and under what

circumstances, being a victim of private criminal activity constitutes a cognizable "particular social group" for purposes of an application for asylum or withholding of removal.

**\*\*2** For the reasons set forth in the accompanying opinion, I vacate the Board's December 6, 2016 decision and remand this case to the immigration judge for further proceedings. Consistent with the test developed by the Board over the past several decades, an applicant seeking to establish persecution on account of membership in a "particular social group" must satisfy two requirements. First, the applicant must demonstrate membership in a group, which is composed of members who share a common immutable characteristic, is defined with particularity, and is socially distinct within the society in question. And second, the applicant's membership in that group must be a central reason for her persecution. When, as here, the alleged persecutor is someone unaffiliated with the government, the applicant must show that flight from her country is necessary because her home government is unwilling or unable to protect her.

Although there may be exceptional circumstances when victims of private criminal activity could meet these requirements, they must satisfy established standards when seeking asylum. Such applicants must establish membership in a particular and socially distinct group that exists independently of the alleged underlying harm, demonstrate that their persecutors harmed them on account of their membership in that group rather than for personal reasons, and establish that the government protection from such harm in their home country is so lacking that their persecutors' actions can be attributed to the government. Because *Matter of A-R-C-G-*, 26 I&N Dec. 388 (BIA 2014), recognized a new particular social group without correctly applying these standards, I overrule that case and any other Board precedent to the extent those other decisions are inconsistent with the legal conclusions set forth in this opinion.

OPINION

The Immigration and Nationality Act ("INA") authorizes the Attorney General to grant asylum if an alien is unable or unwilling to return to her country of origin because she has suffered past persecution or has a well- **\*318** founded fear of future persecution on account of "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(a), (b)(i). A recurring question in asylum law is determining whether alleged persecution was based on their membership in a """"particular social group." Over the past thirty years, this question has recurred frequently before the Board and the courts of appeals, and the standard has evolved over time.

The prototypical refugee flees her home country because the government has persecuted her--either directly through its own actions or indirectly by being unwilling or unable to prevent the misconduct of non-government actors--based upon a statutorily protected ground. Where the persecutor is not part of the government, the immigration judge must consider both the reason for the harm inflicted on the asylum applicant and the government's role in sponsoring or enabling such actions. An alien may suffer threats and violence in a foreign country for any number of reasons relating to her social, economic, family, or other personal circumstances. Yet the asylum statute does not provide redress for all misfortune. It applies when persecution arises on account of membership in a protected group and the victim may not find protection except by taking refuge in another country.

**\*\*3** The INA does not define "persecution on account of . . . membership in a particular social group." The Board first addressed the term in *Matter of Acosta*, 19 I&N Dec. 211, 233 (BIA 1985), where it interpreted a "particular social group" in a manner consistent with the other four grounds of persecution identified in section 1101(a)(42)(A)--race, religion, nationality, or political opinion. *Id*. The Board concluded that a "particular social group" required a "group of persons all of whom share a common, immutable characteristic" that "the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Id*. The Board noted that the "shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances, it might be a shared past experience such as former military leadership or land ownership." *Id*.

In *Matter of R-A-*, 22 I&N Dec. 906, 917-23 (BIA 1999) (en banc), the Board considered whether a victim of domestic violence could establish refugee status as a member of a particular social group consisting of similarly situated women. The Board held

that the mere existence of shared circumstances would not turn those possessing such characteristics into a particular social group. *Id.* at 919. Rather, the members of a particular social group must not merely share an immutable characteristic, but must also be recognized as a distinct group in the alien's society, *id.* at 918-19, and the persecution must be motivated by membership in that social group, *id.* at 919-22. Attorney General Reno vacated that decision for reconsideration in **\*319** light of a proposed regulation, *see* 22 I&N Dec. 906, 906 (A.G. 2001), but no final rule ever issued, and the case was eventually resolved in 2009 without further consideration by the Board. Despite the vacatur of *R-A-*, both the Board and the federal courts have continued to treat its analysis as persuasive.

In the years after *Matter of R-A-*, the Board refined the legal standard for particular social groups. By 2014, the Board had clarified that applicants for asylum seeking relief based on "membership in a particular social group" must establish that their purported social group is "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *Matter of M-E-V-G*, 26 I&N Dec. 227, 237 (BIA 2014). Applicants must also show that their membership in the particular social group was a central reason for their persecution. *See* 8 U.S.C. § 1158(b)(1)(B)(i); *Matter of W-G-R-*, 26 I&N Dec. 208, 224 (BIA 2014). Where an asylum applicant claims that the persecution was inflicted by private conduct, she must also establish that the government was unable or unwilling to protect her. *See, e.g., Acosta*, 19 I&N Dec. at 222.

 **\*\*4** Later that year, the Board decided *A-R-C-G-*, which recognized "married women in Guatemala who are unable to leave their relationship" as a particular social group--without performing the rigorous analysis required by the Board's precedents. 26 I&N Dec. at 389; *see id.* at 390-95. Instead, the Board accepted the concessions by the Department of Homeland Security ("DHS") that the respondent suffered harm rising to the level of past persecution, that she was a member of a qualifying particular social group, and that her membership in that group was a central reason for her persecution. *Id.* at 395.

I do not believe *A-R-C-G-* correctly applied the Board's precedents, and I now overrule it. The opinion has caused confusion because it recognized an expansive new category of particular social groups based on private violence. Since that decision, the Board, immigration judges, and asylum officers have relied upon it as an affirmative statement of law, even though the decision assumed its conclusion and did not perform the necessary legal and factual analysis. When confronted with asylum cases based on purported membership in a particular social group, the Board, immigration judges, and asylum officers must analyze the requirements as set forth in this opinion, which restates and where appropriate, elaborates upon, the requirements set forth in *M-E-V-G* and *W-G-R-*.

In this matter, the immigration judge initially denied the respondent's asylum claim, which arises out of allegations of domestic abuse suffered in El Salvador. In reversing the immigration judge's decision, the Board did little more than cite *A-R-C-G-* in finding that she met her burden of **\*320** establishing that she was a member of a particular social group. In addition to failing meaningfully to consider that question or whether the respondent's persecution was on account of her membership in that group, the Board gave insufficient deference to the factual findings of the immigration judge.

For these and other reasons, I vacate the Board's decision and remand for further proceedings before the immigration judge consistent with this opinion. In so doing, I reiterate that an applicant for asylum on account of her membership in a purported particular social group must demonstrate: (1) membership in a particular group, which is composed of members who share a common immutable characteristic, is defined with particularity, and is socially distinct within the society in question; (2) that her membership in that group is a central reason for her persecution; and (3) that the alleged harm is inflicted by the government of her home country or by persons that the government is unwilling or unable to control. *See M-E-V-G-*, 26 I&N Dec. at 234-44; *W-G-R-*, 26 I&N Dec. at 209-18, 223-24 & n.8. Furthermore, when the applicant is the victim of private criminal activity, the analysis must also """""consider whether government protection is available, internal relocation is possible, and persecution exists countrywide." *M-E-V-G-*, 26 I&N Dec. at 243.

 **\*\*5** Generally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not qualify for asylum.[1] While I do not decide that violence inflicted by non-governmental actors may never serve as the basis

for an asylum or withholding application based on membership in a particular social group, in practice such claims are unlikely to satisfy the statutory grounds for proving group persecution that the government is unable or unwilling to address. The mere fact that a country may have problems effectively policing certain crimes--such as domestic violence or gang violence--or that certain populations are more likely to be victims of crime, cannot itself establish an asylum claim.

<div align="center">I.</div>

The respondent, a native and citizen of El Salvador, entered the United States illegally and was apprehended by U.S. Customs and Border Protection agents in July 2014. After being placed in removal proceedings, the respondent filed an application for asylum and withholding of removal under **\*321** the INA, 8 U.S.C. §§ 1158, 1231(b)(3), and for withholding of removal under the regulations implementing the United Nations Convention Against Torture.

The respondent claimed that she was eligible for asylum because she was persecuted on account of her membership in the purported particular social group of "El Salvadoran women who are unable to leave their domestic relationships where they have children in common" with their partners. *Matter of A-B-*, Decision Denying Asylum Application at \*8, (Immig. Ct. Dec. 1, 2015). The respondent asserted that her ex-husband, with whom she shares three children, repeatedly abused her physically, emotionally, and sexually during and after their marriage. *Id*. at \*2-3).

In December 2015, the immigration judge denied all relief and ordered the respondent removed to El Salvador. The immigration judge denied the respondent's asylum claim for four independent reasons: (1) the respondent was not credible; (2) the group in which she claimed membership did not qualify as a "particular social group" within the meaning of 8 U.S.C. § 1101(a)(42)(A); (3) even if it did, the respondent failed to establish that her membership in a social group was a central reason for her persecution; and (4) she failed to show that the El Salvadoran government was unable or unwilling to help her. *Id*. at \*4-15. The respondent appealed the immigration judge's decision to the Board.

In December 2016, the Board reversed and remanded with an order to grant the respondent asylum after the completion of background checks. *Matter of A-B-*, (BIA Dec. 8, 2016). The Board found the immigration judge's adverse credibility determinations clearly erroneous. *Id*. at \*1-2. The Board further concluded that the respondent's particular social group was substantially similar to "married women in Guatemala who are unable to leave their relationship," which the Board had recognized in *Matter of A-R-C-G-, 26 I&N Dec. at 390*. *A-B-* at \*2. Moreover, the Board held that the immigration judge clearly erred in finding that the respondent could leave her ex-husband, and that the respondent established that her ex-husband persecuted her because of her status as a Salvadoran woman unable to leave her domestic relationship. *Id*. at \*2-3. Finally, the Board determined that the El Salvadoran government was unwilling or unable to protect the respondent. *Id*. at \*3-4.

 **\*\*6** In August 2017, the immigration judge issued an order purporting to certify and administratively return the matter to the Board in light of intervening developments in the law. [2] *Matter of A-B-*, Decision and Order **\*322** of Certification, (Immig. Ct. Aug. 18, 2017). The immigration judge observed that several courts of appeals had recently held that domestic-violence victims failed to prove their entitlement to asylum based on membership in particular social groups. *See id*. at \*2-3 (citing *Fuentes-Erazo v. Sessions*, 848 F.3d 847, 853 (8th Cir. 2017); *Cardona v. Sessions*, 848 F.3d 519, 523 (1st Cir. 2017); *Marikasi v. Lynch*, 840 F.3d 281, 291 (6th Cir. 2016); *Vega-Ayala v. Lynch*, 833 F.3d 34, 40 (1st Cir. 2016)). The immigration judge thus believed that the precedents relied upon by the Board in its December 2016 decision were no longer good law. *A-B-* at \*3-4 (Immig. Ct. Aug. 18, 2017).

In particular, the immigration judge cited the Fourth Circuit's opinion in *Velasquez v. Sessions*, 866 F.3d 188 (4th Cir. 2017), which denied the petition for review on the ground that the alien had not established that her alleged persecution was on account of her membership in a particular social group. *A-B-* at \*3-4 (Immig. Ct. Aug. 18, 2017) (citing *Velasquez*, 866 F.3d at 197). Distinguishing *A-R-C-G-* because of DHS's concessions there, 866 F.3d at 195 n.5, the court in *Velasquez* reiterated that "'[e]vidence consistent with acts of private violence or that merely shows that an individual has been the victim of criminal activity does not constitute evidence of persecution on a statutorily protected ground."DDD' *Id*. at 194 (quoting *Sanchez v. U.S.*

*Att'y Gen.*, 392 F.3d 434, 438 (11th Cir. 2004)). The court further noted, "'the asylum statute was not intended as a panacea for the numerous personal altercations that invariably characterize economic and social relationships.'DDD' *Id.* at 195 (quoting *Saldarriaga v. Gonzales*, 402 F.3d 461, 467 (4th Cir. 2005)).

In a concurrence, Judge Wilkinson reiterated that the particular social groups protected from persecution under the asylum statute must be understood in the context of the other grounds for protection, which concern specific segments of the population who are marginalized or subjected to social stigma and prejudice. *Id.* at 198 (Wilkinson, J., concurring). Noting that victims of private violence were "seizing upon the 'particular social group' criterion in asylum applications," Judge Wilkinson considered the example of applicants who claim to be the victims of gang violence. Aliens seeking asylum on that basis "are often not 'exposed to more violence or human rights violations than other segments of society,' and 'not in a substantially different situation from anyone who has crossed the gang, or who is perceived to be a threat to the gang's interests.'DDD' *Id.* at 199 (quoting *Matter of S-E-G-*, 24 I&N Dec. 579, 587 (BIA 2008)). He recognized that the Board "has previously explained that 'victims of gang violence come from all segments of society, and it is difficult to conclude that any "group," **\*323** as actually perceived by the criminal gangs, is much narrower than the general population.'DDD' *Id.* (quoting *M-E-V-G-*, 26 I&N Dec. at 250). The pervasive nature of this violent criminality, in Judge Wilkinson's view, suggested that membership in a purported particular social group "is often not a central reason for the threats received, but rather is secondary to a grander pattern of criminal extortion that pervades petitioners' societies." *Id.*

**\*\*7** On March 7, 2018, pursuant to 8 C.F.R. § 1003.1(h)(1)(i), I directed the Board to refer this matter to me for my review. I invited the parties and any interested amici to submit briefs on the following question:

Whether, and under what circumstances, being a victim of private criminal activity constitutes a cognizable "particular social group" for purposes of an application for asylum or withholding of removal.

*A-B-*, 27 I&N Dec. at 227. After certifying this case, I received party submissions from the respondent and DHS and twelve amicus briefs.

<div align="center">II.</div>

As a threshold matter, I address the respondent's procedural objections concerning my authority to review this case and the certification procedure.

<div align="center">A.</div>

The respondent argues that I lack the authority to certify the Board's decision because it did not reacquire jurisdiction following its remand to the immigration judge. In the respondent's view, the Attorney General's authority to certify and review immigration cases is restricted to cases over which the Board expressly retains jurisdiction, excluding any cases that have been remanded for further proceedings. This restrictive interpretation of my jurisdiction finds no support in the law.

Under the INA, "[t]he Attorney General enjoys broad powers with respect to ""the administration and enforcement of [the INA itself] and all other laws relating to the immigration and naturalization of aliens."DDD' *Blanco de Belbruno v. Ashcroft*, 362 F.3d 272, 279 (4th Cir. 2004) (quoting 8 U.S.C. § 1103(a)(1)); *see also Henderson v. INS*, 157 F.3d 106, 126 (2d Cir. 1998) ("[T]he extraordinary and pervasive role that the Attorney General plays in immigration matters is virtually unique."); *Matter of D-J-*, 23 I&N Dec. 572, 573-74 & n.3 (A.G. 2003) (describing Attorney General's review authority under 8 U.S.C. § 1226(a)). The INA grants the Attorney General the authority to """"review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the **\*324** Attorney General determines to be necessary for carrying out" his duties related to the immigration and naturalization of aliens. 8 U.S.C. § 1103(g)(2). This authority includes the power to refer cases for my review, *see* 8 C.F.R. § 1003.1(h)(1), which the First Circuit has called an "unfettered grant of authority," *Xian Tong Dong v. Holder*, 696 F.3d 121, 124 (1st Cir. 2012). Nothing in the INA or the implementing regulations precludes

the Attorney General from referring a case for review simply because the Board has remanded the case for further proceedings before an immigration judge.

**\*\*8**  It is likewise irrelevant that there has not been a final decision from the Board either granting or denying relief. The relevant federal regulation states: "The Board shall refer to the Attorney General for review of its decision all cases that . . . the Attorney General directs the Board to refer to him." 8 C.F.R § 1003.1(h)(1). Nothing in section 1003.1(h) requires, or even suggests, that the only Board "decisions" the Attorney General can review are *final* decisions that definitively grant or deny relief to a respondent. Nor do the applicable regulations or the INA define "decision" as a "final" decision. *See id*. § 1001.1 (defining terms in the relevant chapter); 8 U.S.C. § 1101 (defining terms under the Act).

<div align="center">B.</div>

Both the respondent and certain amici also raise due process concerns with my certification of this matter. They argue principally that my certification improperly bypassed the Board and deprived it of the opportunity to consider the certified question in the first instance. The Board exercises "only the authority provided by statute or delegated by the Attorney General," *Matter of Castro-Tum*, 27 I&N Dec. 271, 282 (A.G. 2018), and the regulations allow the Attorney General to certify any case that is before the Board or where it has rendered a decision, 8 C.F.R § 1003.1(h). In any event, the respondent has already received full and fair opportunities to present her asylum claim before both the immigration judge and the Board. After those proceedings, both the immigration judge and the Board issued written decisions that analyzed the validity of the respondent's proposed particular social group and whether the respondent qualified for asylum on that ground.

The respondent also argues that the certification violated her due process rights because alleged "irregularities" in the certification "reflect prejudgment of her claim and lack of impartiality, in contravention of her right to a full and fair hearing by a neutral adjudicator."[3] There is no basis  **\*325**  to this claim. The respondent and some amici complain that I have advanced policy views on immigration matters as a U.S. Senator or as Attorney General, but the statements they identify have no bearing upon my ability to faithfully discharge my legal responsibilities in this case. I have made no public statements regarding the facts of respondent's case, and I have no "personal interest in the outcome of the proceedings." *Strivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995).

Nor is there any requirement that an administrator with significant policymaking responsibilities withdraw from "interchange and discussion about important issues." *Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1168 (D.C. Cir. 1979). As the Supreme Court has held, a decision maker need not be "disqualified simply because he has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not 'capable of judging a particular controversy fairly on the basis of its own circumstances.'"DDD *Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 493 (1976) (*quoting United States v. Morgan*, 313 U.S. 409, 421 (1941)). If policy statements about immigration-related issues were a basis for disqualification, then no Attorney General could fulfill his or her statutory obligations to review the decisions of the Board.

<div align="center">III.</div>

**\*\*9**  I turn now to the question of whether, and under what circumstances, being a victim of private criminal activity constitutes persecution on account of membership in a particular social group.[4]

<div align="center">A.</div>

An applicant for asylum bears the burden of establishing that she "is a refugee within the meaning of section 1101(a)(42) (A)" of the INA. 8 U.S.C. § 1158(b)(1)(A), (B)(i). Under that definition, the applicant must demonstrate that she is an alien outside her country of nationality "who is  **\*326**  unable or unwilling to return to, and is unable or unwilling to avail . . . herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id*. § 1101(a)(42)(A). Here, the respondent claims

that she is eligible for asylum because of persecution she suffered on account of her purported membership in a particular social group--"El Salvadoran women who are unable to leave their domestic relationships where they have children in common" with their partners.

As the Board and the federal courts have repeatedly recognized, the phrase "'''''membership in a particular social group" is ambiguous. *Matter of Acosta,* 19 I&N Dec. at 232-33; *Matter of M-E-V-G-,* 26 I&N Dec. at 230; *Matter of W-G-R-,* 26 I&N at 209; *see also,* e.g., *Ngugi v. Lynch,* 826 F.3d 1132, 1138 (8th Cir. 2016); *Gonzalez v. U.S. Att'y Gen.,* 820 F.3d 399, 404 (11th Cir. 2016); *Henriquez-Rivas v. Holder,* 707 F.3d 1081, 1083 (9th Cir. 2013) (en banc); *Mayorga-Vidal v. Holder,* 675 F.3d 9, 17 (1st Cir. 2012); *Valdiviezo-Galdamez v. U.S. Att'y Gen.,* 663 F.3d 582, 612 (3d Cir. 2011). Neither the INA nor the implementing regulations define "particular social group." [5] "The concept is even more elusive because there is no clear evidence of legislative intent." *Valdiviezo-Galdamez,* 663 F.3d at 594. As then-Judge Alito noted for the court, "[r]ead in its broadest literal sense, the phrase is almost completely open-ended. Virtually any set including more than one person could be described as a 'particular social group.' Thus, the statutory language standing alone is not very instructive." *Fatin v. INS,* 12 F.3d 1233, 1238 (3d Cir. 1993) (Alito, J.).

**10  The Attorney General has primary responsibility for construing ambiguous provisions in the immigration laws. *M-E-V-G-,* 26 I&N Dec. at 230; *see also* 8 C.F.R. § 1003.1(g). The INA provides that the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." 8 U.S.C. § 1103(a)(1). The Attorney General's reasonable construction of an ambiguous term in the Act, such as "membership in a particular social group," is entitled to deference. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 980 (2005); *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844 (1984); *see also Negusie v. Holder,* 555 U.S. 511, 516 (2009) *327 ("'''''Consistent with the rule in *Chevron* . . ., the BIA is entitled to deference in interpreting ambiguous provisions of the INA."); *id.* at 525 (Scalia, J., concurring) (citing *Chevron* and agreeing that "the agency is entitled to answer" whether the alien is statutorily barred from receiving asylum); *Aguirre-Aguirre,* 526 U.S. at 425 ("judicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations" (quotations omitted)). Thus, every court of appeals to have considered the issue has recognized that the INA's reference to the term "'particular social group" is inherently ambiguous and has deferred to decisions of the Board interpreting that phrase. [6]

The Supreme Court has "also made clear that administrative agencies are not bound by prior judicial interpretations of ambiguous statutory interpretations, because there is 'a presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows."DDD' *Matter of R-A-,* 24 I&N Dec. 629, 631 (A.G. 2008) (quoting *Brand X,* 545 U.S. at 982 (internal quotation and citations omitted)). "A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Brand X,* 545 U.S. at 982.

B.

**11  In a number of opinions spanning several decades, the Board has articulated and refined the standard for persecution on account of membership in a "particular social group" so that this category is not boundless. The Board first interpreted the term in *Matter of Acosta,* 19 I&N Dec. at 233. Applying the canon of *ejusdem generis,* the Board concluded that the phrase "'''''particular social group" should be construed in a manner consistent with the other grounds for persecution in the statute's definition of refugee: race, religion, nationality, and political opinion. *Id.* Noting that each of these terms describes "a characteristic that either is beyond the power *328 of an individual to change or is so fundamental to individual identity or conscience that it ought not be required to be changed," the Board concluded that persecution on account of membership in a particular social group must similarly mean "persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic." *Id.* The Board stated that this definition "preserve[d] the

concept that refuge is restricted to individuals who are either unable by their own actions, or as a matter of conscience should not be required, to avoid persecution." *Id.* at 234.

In 1999, the Board, sitting *en banc*, considered for the first time "whether the repeated spouse abuse inflicted on the respondent makes her eligible for asylum as an alien who has been persecuted on account of her membership in a particular social group." *R-A-*, 22 I&N Dec. at 907. In a thorough, well-reasoned opinion, the Board first looked to the plain language of the INA to determine whether Congress intended the Act to provide asylum to battered spouses who are leaving marriages to aliens having no ties to the United States. *Id.* at 913-14. Finding no definitive answer in the language of the statute, the Board "look[ed] to the way in which the other grounds in the statute's 'on account of' clause operate." *Id.* at 914. Following that """"significant guidance," the Board concluded that R-A- was not eligible for asylum for two reasons. First, her claimed social group--"Guatemalan women who have been involved intimately with Guatemalan male companions, who believe that women are to live under male domination"--did not qualify as a "particular social group" under the INA. *Id.* at 917-18. And second, even if it did qualify, she failed to show a sufficient nexus between her husband's abuse and her membership in that social group. *Id.* at 923.

**\*\*12** The Board first observed that the purported social group appeared "to have been defined principally, if not exclusively, for purposes of this asylum case, and without regard to the question of whether anyone in Guatemala perceives this group to exist in any form whatsoever." *Id.* at 918. The Board found "little or no relation [of the purported social group] to the way in which Guatemalans might identify subdivisions within their own society or otherwise might perceive individuals either to possess or to lack an important characteristic or trait." *Id.* The Board reasoned that for a social group to be viable for asylum purposes, there must be some showing of how the immutable characteristic shared by the group is understood in the alien's home country so that the Board can "understand that the potential persecutors in fact see persons sharing the characteristic as warranting suppression or the infliction of harm." *Id.*

The Board held that a "particular social group" should be recognized and understood to be a societal faction or a recognized segment of the population **\*329** in the alien's society. *R-A-*, 22 I&N Dec. at 918. The Board found that R-A- had "shown neither that the victims of spouse abuse view themselves as members of this group, nor, most importantly, that their male oppressors see their victimized companions as part of this group." *Id.* Without such a showing, the Board concluded that "if the alleged persecutor is not even aware of the group's existence, it becomes harder to understand how the persecutor may have been motivated by the victim's 'membership' in the group to inflict the harm on the victim." *Id.* at 919.

In addition to holding that R-A-'*s* proposed group did not qualify as a """"""particular social group," the Board also held that she had not shown the persecution was "on account of" her membership in the group. *Id.* at 920; *see* 8 U.S.C. § 1101(a)(42)(A). Even if the Board were to accept the respondent's proposed social group, she "has not established that her husband has targeted and harmed [R-A-] because he perceived her to be a member of this particular social group." *R-A-*, 22 I&N Dec. at 920. R-A-'s husband targeted her "because she was his wife, not because she was a member of some broader collection of women, however defined, whom he believed warranted the infliction of harm." *Id.*

**\*\*13** On January 19, 2001, Attorney General Reno summarily vacated *R-A-* and directed the Board to stay consideration of the case pending final publication of a proposed rule offering guidance on the definitions of "persecution" and """"""membership in a particular social group" and what it means to be "on account of" a protected characteristic. *R-A-*, 22 I&N Dec. at 906; *see also* 65 Fed. Reg. 76,588, 76,588 (Dec. 7, 2000). No final rule ever issued, however. In September 2008, Attorney General Mukasey lifted the stay and directed the Board to reconsider the case in light of intervening Board and judicial decisions. *Matter of R-A-*, 24 I&N Dec. 629, 630 (A.G. 2008). In December 2009, before the Board issued an opinion, R-A- and DHS jointly stipulated that she was eligible for asylum, resolving the case. *See A-R-C-G-*, 26 I&N Dec. at 391-92 n.12.

Despite its vacatur, both the Board and federal courts have continued to rely upon *R-A-*. In 2014, the Board stated that the 1999 opinion's "role in the progression of particular social group claims remains relevant." *M-E-V-G-*, 26 I&N Dec. at 231 n.7. In 2013, the Ninth Circuit recognized that although "*R-A-* was later vacated[,] . . . litigants and other courts have relied heavily

AR.05551

upon its analysis." *Henriquez-Rivas*, 707 F.3d at 1090 n.11. And in 2011, the Third Circuit quoted *R-A-* at length because "*R-A-* is so important to the claim before us here." *Valdiviezo-Galdamez*, 663 F.3d at 596-97 & n.8.

In the years since *R-A-*, the Board has refined its interpretation of "'''''particular social group" on a case-by-case basis. In *Matter of C-A-*, 23 I&N Dec. 951, 959 (BIA 2006), *aff'd sub nom.* **\*330** *Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d 1190 (11th Cir. 2006), the Board held that a cognizable "'''''particular social group" should generally be "easily recognizable and understood by others to constitute social groups." In *S-E-G-*, 24 I&N Dec. at 584, the Board defined the "particularity" requirement as "whether the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons." In *Matter of E-A-G-*, 24 I&N Dec. 591, 594 (BIA 2008), the Board further explained that "the extent to which members of a society perceive those with the characteristic in question as members of a social group--is of particular importance in determining whether an alien is a member of a claimed particular social group."

**\*\*14** In 2014, the Board issued a pair of complementary precedential opinions, *M-E-V-G-* and *W-G-R-*, clarifying what is necessary to establish a particular social group. In those cases, the Board held that an asylum applicant claiming membership in a particular social group must "establish that the group is (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *M-E-V-G-*, 26 I&N Dec. at 234, 237; *see also W-G-R-*, 26 I&N Dec. at 212. The Board explained that those applicants also bear the burden of showing that their membership was a central reason for their persecution, and that their home government was "unable or unwilling to control" the persecutors. *W-G-R-*, 26 I&N Dec. at 224 & n.8.

Again echoing *R-A-*, the Board explained that the requirement that a group be socially distinct "considers whether those with a common immutable characteristic are set apart, or distinct, from other persons within the society in some significant way. In other words, if the common immutable characteristic were known, those with the characteristic in the society in question would be meaningfully distinguished from those who do not have it." *M-E-V-G-*, 26 I&N Dec. at 238. Members of a particular social group will generally understand their own affiliation with that group, as will other people in their country. *Id.* To be socially distinct, a particular social group "must be perceived as a group by society." *Id.* at 240.

*M-E-V-G-* also clarified that "a group's recognition for asylum purposes is determined by the perception of the society in question, rather than by the perception of the persecutor." *Id.* at 242. The Board explained that to do otherwise would create two significant problems. First, it would conflate the inquiry into whether a "particular social group" is cognizable under the INA with the separate and distinct requirement that the persecution be "on account of" membership. *Id.* Second, defining a particular social group from the perspective of the persecutor would contradict the Board's prior holding that a social group may not be defined exclusively by the fact that its members **\*331** have been subjected to harm. *Id.* (citing *Matter of A-M-E- & J-G-U-*, 24 I&N Dec. 69, 74 (BIA 2007)).

Finally, the Board explained that this definition did not abrogate or depart from *Acosta*, 19 I&N Dec. 211, or the Board's other decisions, but rather clarified how the definition of "particular social group" had developed through case-by-case adjudication. *See W-G-R-*, 26 I&N Dec. at 212; *M-E-V-G-*, 26 I&N Dec. at 244-47.

## C.

**\*\*15** Although the Board has articulated a consistent understanding of the term "particular social group," not all of its opinions have properly applied that framework. Shortly after *M-E-V-G-* and *W-G-R-*, the Board decided *A-R-C-G-*, 26 I&N Dec. 388, which held that "married women in Guatemala who are unable to leave their relationship" could constitute a particular social group, *id.* at 392. Importantly, the Board based its decision on DHS's concessions that: (1) A-R-C-G- suffered harm rising to the level of past persecution; (2) A-R-C-G-'s persecution was on account of her membership in a particular social group; and (3) A-R-C-G-'s particular social group was cognizable under the INA. *Id.* at 392-95. In fact, the only legal question not conceded by DHS was whether, under applicable Eighth Circuit law, the Guatemalan government was unwilling or unable to control her husband. *Id.* at 395; *see also Gutierrez-Vidal v. Holder*, 709 F.3d 728, 732 (8th Cir. 2013) (asylum applicant must show that

assaults were either condoned by the government or were committed by private actors that the government was unwilling or unable to control). The Board declined to answer that question, electing instead to remand for further proceedings.

Because of DHS's multiple concessions, the Board performed only a cursory analysis of the three factors required to establish a particular social group. The Board concluded that A-R-C-G-'s purported particular social group was """"""composed of members who share the common immutable characteristic of gender," and that "marital status can be an immutable characteristic where the individual is unable to leave the relationship." *A-R-C-G-*, 26 I&N Dec. at 392-93. With respect to particularity, the Board observed that the terms defining the group--"married," "women," and "unable to leave the relationship"--had commonly accepted definitions within Guatemalan society. *Id.* at 393. And finally, with respect to social distinction, the Board cited evidence that Guatemala has a "culture of machismo and family violence," and that although Guatemala's criminal laws that prohibit domestic violence, """"""enforcement can be problematic because the National Civilian Police often failed to respond to requests for  **\*332**  assistance related to domestic violence." *Id.* at 394 (quotation marks omitted).

Subsequent Board decisions, including the decision certified here, have read *A-R-C-G-* as categorically extending the definition of a "particular social group" to encompass most Central American domestic violence victims. Like *A-R-C-G-*, these ensuing decisions have not performed the detailed analysis required. For instance, the Board's decision in this case offered only the conclusory statement that the respondent's proposed group was "substantially similar to that which we addressed in *Matter of A-R-C-G-*," and that the """"""totality of the evidence, including the 2014 El Salvador Human Rights Report, establishes that the group is sufficiently particular and socially distinct in El Salvadoran Society." *A-B-* at \*2. The Board's entire analysis of the respondent's proposed particular social group consisted of only two sentences. *Id.* Other Board opinions have similarly treated *A-R-C-G-* as establishing a broad new category of cognizable particular social groups. *See, e.g.*, *Matter of D-M-R-* (BIA June 9, 2015); *Matter of E-M-* (BIA Feb. 18, 2015).

 **\*\*16**  By contrast, several courts of appeals have expressed skepticism about *A-R-C-G-*. In *Velasquez v. Sessions*, the Fourth Circuit concluded that the petitioner's asylum claim concerned personal, private conflict rather than persecution on a protected ground. 866 F.3d at 197. The court distinguished *A-R-C-G-* "because, there, the Government conceded that the mistreatment suffered by the alien was, at least for one central reason, on account of her membership in a cognizable particular social group." 866 F.3d at 195 n.5 (quotation marks and alterations omitted). In *Fuentes-Erazo*, the Eighth Circuit declined to approve a particular social group of "Honduran women in domestic relationships who are unable to leave their relationships" after distinguishing *A-R-C-G-* because there "the petitioner's actual membership in the proposed particular social group was undisputed." 848 F.3d at 853. And in *Jeronimo v. U.S. Attorney General*, 678 F. App'x 796 (11th Cir. 2017), the Eleventh Circuit denied the asylum application of a woman who claimed membership in a group of "indigenous women who live with a domestic partner and who suffer abuse and cannot leave safely from that domestic partner relationship." *Id.* at 802-03. The court recognized that in *A-R-C-G-*, "DHS had conceded the petitioner had suffered past persecution and the persecution was because of membership in a particular social group." *Id.* at 802. [7]

**\*333**  IV.

*A-R-C-G-* was wrongly decided and should not have been issued as a precedential decision. DHS conceded almost all of the legal requirements necessary for a victim of private crime to qualify for asylum based on persecution on account of membership in a particular social group. [8]  To the extent that the Board examined the legal questions, its analysis lacked rigor and broke with the Board's own precedents.

A.

The Board should not have issued *A-R-C-G-* as a precedential opinion because DHS conceded most of the relevant legal questions. Precedential opinions of the Board are binding on immigration judges and guide the resolution of future cases. *See* 8 C.F.R. § 1003.1(d)(1) ("[T]he Board, through precedent decisions, shall provide clear and uniform guidance to the Service, the immigration judges, and the general public on the proper interpretation and administration of the [INA] and its implementing

regulations."). Yet the parties in *A-R-C-G-* decided significant legal issues on consent, and such concessions should not set precedential rules. Many of the issues that DHS conceded--such as the "existence of [the proposed] particular social group in Guatemala"--effectively stipulated key legal questions.

 **\*\*17   \*334** But "[p]arties may not stipulate to the legal conclusions to be reached by the court." *TI Fed. Credit Union v. DelBonis*, 72 F.3d 921, 928 (1st Cir. 1995) (internal quotation marks and alterations omitted); *see also Swift & Co. v. Hocking Valley Ry. Co.*, 243 U.S. 281, 289 (1917) ("If the stipulation is to be treated as an agreement concerning the legal effect of admitted facts, it is obviously inoperative; since the court cannot be controlled by agreement of counsel on a subsidiary question of law."). The same principle has long applied before the Board. *Matter of A-*, 4 I&N Dec. 378, 384 (BIA 1951); *see also Sagastume v. Holder*, 490 F. App'x 712, 715-16 (6th Cir. 2012) (holding that immigration judge did not err in denying voluntary departure even though the parties had stipulated that the petitioner would qualify for such relief because "[p]arties cannot stipulate around a statutory requirement"). Given the decision's significant limitations in guiding future decisionmakers, the Board should not have designated *A-R-C-G-* as a precedential decision.

B.

Had the Board properly analyzed the issues, then it would have been clear that the particular social group was not cognizable. The Board's approach in *A-R-C-G-* was contrary to the appropriate way that the Board has in the past, and must in the future, approach such asylum claims. By accepting DHS's concessions as conclusive, the Board in *A-R-C-G-* created a misleading impression concerning the cognizability of similar social groups, and the viability of asylum claims premised upon persecution on account of membership in such groups.

1.

In *A-R-C-G-*, DHS conceded that A-R-C-G- was a member of a "cognizable" social group that was both particular and socially distinct. *Id.* at 392-95. The Board thus avoided considering whether A-R-C-G- could establish the existence of a cognizable particular social group without defining the group by the fact of persecution. *M-E-V-G-*, 26 I&N Dec. at 232; *W-G-R-*, 26 I&N Dec. at 215; *see also Perez-Rabanales v. Sessions*, 881 F.3d 61, 67 (1st Cir. 2018); *Rreshpja v. Gonzales*, 420 F.3d 551, 556 (6th Cir. 2005); *Jonaitiene v. Holder*, 660 F.3d 267, 271 (7th Cir. 2011); *Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d 1190, 1198 (11th Cir. 2006); *Moreno v. Lynch*, 628 Fed. Appx. 862, 865 (4th Cir. 2015).

 **\*\*18**   To be cognizable, a particular social group *must* "exist independently" of the harm asserted in an application for asylum or statutory withholding of removal. *M-E-V-G-*, 26 I&N Dec. at 236 n.11, 243;   **\*335**   *W-G-R-*, 26 I&N Dec. at 215; *Perez-Rabanales*, 881 F.3d at 67; *Lukwago v. Ashcroft*, 329 F.3d 157, 172 (3d Cir. 2003). If a group is defined by the persecution of its members, then the definition of the group moots the need to establish actual persecution. For this reason, "[t]he individuals in the group must share a narrowing characteristic other than their risk of being persecuted." *Rreshpja*, 420 F.3d at 556 ("If the group with which Rreshpja is associated is defined noncircularly--i.e., simply as young attractive Albanian women-- then any young Albanian woman who possesses the subjective criterion of being "'attractive' would be eligible for asylum in the United States."). *A-R-C-G-*never considered that "married women in Guatemala who are unable to leave their relationship" was effectively defined to consist of women in Guatemala who are victims of domestic abuse because the inability "to leave" was created by harm or threatened harm.

In accepting DHS's concession that this proposed particular social group was defined with particularity, the Board limited its analysis to concluding that the terms used to describe the group--"married," "women," and "unable to leave the relationship"-- have commonly accepted definitions within Guatemalan society. *A-R-C-G-*, 26 I&N Dec. at 393. But that misses the point. To say that each term has a commonly understood definition, standing alone, does not establish that these terms have the requisite particularity in identifying a distinct social group as such, or that people who meet all of those criteria constitute a discrete social group. A particular social group must not be "'''''amorphous, overbroad, diffuse, or subjective," and "not every 'immutable characteristic' is sufficiently precise to define a particular social group." *M-E-V-G-*, 26 I&N Dec. at 239. The Board's scant

analysis did not engage with these requirements or show that A-R-C-G-'s proposed group was "defined by characteristics that provide a clear benchmark for determining who falls within the group." *M-E-V-G-*, 26 I&N Dec. at 239.

Social groups defined by their vulnerability to private criminal activity likely lack the particularity required under *M-E-V-G-*, given that broad swaths of society may be susceptible to victimization. For example, groups comprising persons who are "resistant to gang violence" and susceptible to violence from gang members on that basis "are too diffuse to be recognized as a particular social group." *Constanza v. Holder*, 647 F.3d 749, 754 (8th Cir. 2011); *see also, e.g.*, *S-E-G-*, 24 I&N Dec. at 588; *Lizama v. Holder*, 629 F.3d 440, 447 (4th Cir. 2011); *Larios v. Holder*, 608 F.3d 105, 109 (1st Cir. 2010); *Lushaj v. Holder*, 380 F. App'x 41, 43 (2d Cir. 2010); *Barrios v. Holder*, 581 F.3d 849, 855 (9th Cir. 2009). Victims of gang violence often come from all segments of society, and they possess no distinguishing characteristic or concrete trait that would readily identify them as members of such a group.

**19   *336** Particular social group definitions that seek to avoid particularity issues by defining a narrow class--such as "Guatemalan women who are unable to leave their domestic relationships where they have children in common"--will often lack sufficient social distinction to be cognizable as a distinct social group, rather than a description of individuals sharing certain traits or experiences. *See R-A-*, 22 I&N Dec. at 918 (holding that R-A- failed to show that her claimed social group "is a group that is recognized and understood to be a societal faction, or is otherwise a recognized segment of the population, within Guatemala"). A particular social group must avoid, consistent with the evidence, being too broad to have definable boundaries and too narrow to have larger significance in society.

DHS similarly admitted that *A-R-C-G-'s* proposed particular social group was socially distinct by conceding that it was cognizable. *A-R-C-G-*, 26 I&N Dec. at 392. In support of that concession, the Board cited evidence that Guatemala has a "culture of machismo and family violence" and that, although Guatemala has laws in place to prosecute domestic violence crimes, "enforcement can be problematic because the National Civilian Police often failed to respond to requests for assistance related to domestic violence." *Id.* at 394 (quotation marks omitted).[9] The Board provided no explanation for why it believed that that evidence established that Guatemalan society perceives, considers, or recognizes "married women in Guatemala who are unable to leave their relationship" to be a distinct social group. But the key thread running through the particular social group framework is that social groups must be classes recognizable by society at large. *See W-G-R-*, 26 I&N Dec. at 217 ("To have the 'social distinction' necessary to establish a particular social group, there must be evidence showing that society in general perceives, considers, or recognizes persons sharing the particular characteristic to be a group."). Membership in a particular tribe or clan within a society is an instructive example: those distinctions often constitute a "particular social group" because that is a "highly recognizable, immutable characteristic" that makes members recognized in society as a group. *In re H-*, 21 I&N Dec. 337, 342-43 (BIA 1996). By contrast, there is significant room for doubt that Guatemalan society views these women, as horrible as their personal circumstances may be, as members of a distinct group in society, rather than each as a victim of a particular abuser in highly individualized circumstances.

*337   2.

**20   In *A-R-C-G-*, DHS also conceded that the respondent established that she had suffered past persecution. 26 I&N Dec. at 392. It can be especially difficult, however, for victims of private violence to prove persecution because "[p]ersecution is something a *government* does," either directly or indirectly by being unwilling or unable to prevent private misconduct." *Hor v. Gonzales*, 400 F.3d 482, 485 (7th Cir. 2005) (emphasis in original). Persecution under the asylum statute "does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional." *Fatin*, 12 F.3d at 1240.

Board precedents have defined "persecution" as having three specific elements. First, "persecution" involves an intent to target a belief or characteristic. *See Matter of L-E-A-*, 27 I&N Dec. 40, 44 n.2 (BIA 2017) (citing *Acosta*, 19 I&N Dec. at 222). Yet private criminals are motivated more often by greed or vendettas than by an intent to "overcome [the protected] characteristic of the victim." *Matter of Kasinga*, 21 I&N Dec. 357, 365 (BIA 1996). For example, in *R-A-*, R-A-'s husband targeted her "because

she was his wife, not because she was a member of some broader collection of women, however defined, whom he believed warranted the infliction of harm." 22 I&N Dec. at 920.

Second, the level of harm must be "severe." *Matter of T-Z-*, 24 I&N Dec. 163, 172-73 (BIA 2007). Private violence may well satisfy this standard, and I do not question that A-R-C-G-'s claims of repugnant abuse by her ex-husband were sufficiently severe.

Third, the harm or suffering must be "inflicted either by the government of a country or by persons or an organization that the government was unable or unwilling to control." *Acosta*, 19 I&N Dec. at 222. The Board declined to address this prong of the analysis, instead remanding to the immigration judge for further proceedings to determine whether the Guatemalan government was unwilling or unable to control A-R-C-G-'s ex-husband.

An applicant seeking to establish persecution based on violent conduct of a private actor "must show more than 'difficulty . . . controlling' private behavior." *Menjivar v. Gonzales*, 416 F.3d 918, 921 (8th Cir. 2005) (quoting *Matter of McMullen*, 17 I&N Dec. 542, 546 (BIA 1980)). The applicant must show that the government condoned the private actions "or at least demonstrated a complete helplessness to protect the victims." *Galina v. INS*, 213 F.3d 955, 958 (7th Cir. 2000); *see also Hor*, 400 F.3d at 485. The fact that the local police have not acted on a particular report of an individual crime does not necessarily mean that the government is unwilling or unable to control crime, any more than it would in the United States. There may be many reasons why a particular crime is not successfully investigated and **\*338** prosecuted. Applicants must show not just that the crime has gone unpunished, but that the government is unwilling or unable to prevent it.

3.

 **\*\*21** Finally, DHS conceded the nexus requirement by agreeing that persecution suffered by A-R-C-G- "was, for at least one central reason, on account of her membership in a cognizable particular social group." *A-R-C-G-*, 26 I&N Dec. at 392, 395. This conclusion simply does not follow from the facts of that case or similar cases. Establishing the required nexus between past persecution and membership in a particular social group is a critical step for victims of private crime who seek asylum. *See R-A-*, 22 I&N Dec. at 920-23. Yet the Board did not evaluate the conclusion that A-R-C-G- was persecuted "'''''on account of" her status as a married woman in Guatemala who was unable to leave her relationship.

Normally, an alien seeking asylum bears the burden of establishing a nexus between the alleged persecution and one of the five statutory grounds for asylum. *See* 8 U.S.C. § 1158(b)(1)(B)(i); *Tamara-Gomez v. Gonzales*, 447 F.3d 343, 349 (5th Cir. 2006). "If the ill-treatment was motivated by something other than one of these five circumstances, then the applicant cannot be considered a refugee for purpose of asylum." *Zoarab v. Mukasey*, 524 F.3d 777, 780 (6th Cir. 2008). "In analyzing 'particular social group' claims" the Board's decisions "require that the persecution or well-founded fear of persecution be on account of, or, in other words, because of, the alien's membership in that particular social group." *R-A-*, 22 I&N Dec. at 920. The focus in determining whether an alien was persecuted "on account of" her group membership is on "the persecutors' motives"--why the persecutors sought to inflict harm. *INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992). Reasons incidental, tangential, or subordinate to the persecutor's motivation will not suffice. *Matter of J-B-N- & S-M-*, 24 I&N Dec. 208, 214 (BIA 2007).

The nexus requirement is critically important in determining whether an alien established an asylum claim. That requirement is "where the rubber meets the road" because the "importance of the 'on account of' language must not be overlooked." *Cece*, 733 F.3d at 673. "Although the category of protected persons [within a particular group] may be large, the number of those who can demonstrate the required nexus likely is not." *Id*. Indeed, a "safeguard against potentially innumerable asylum claims" may be found "in the stringent statutory requirements for all asylum seekers." *Id*. at 675.

 **\*\*22** When private actors inflict violence based on a personal relationship with a victim, then the victim's membership in a larger group may well not be **\*339** "one central reason" for the abuse. [10] *See, e.g.*, *Zoarab*, 524 F.3d at 781 ("Courts have routinely rejected asylum applications grounded in personal disputes."). A criminal gang may target people because they have money or property within the area where the gang operates, or simply because the gang inflicts violence on those who are nearby.

AR.05556

*See, e.g., Constanza*, 647 F.3d at 754. That does not make the gang's victims persons who have been targeted "on account of" their membership in any social group.

Similarly, in domestic violence cases, like *A-R-C-G-*, the Board cited no evidence that her ex-husband attacked her because he was aware of, and hostile to, "married women in Guatemala who are unable to leave their relationship." Rather, he attacked her because of his preexisting personal relationship with the victim. *See R-A-*, 22 I&N Dec. at 921 ("the record does not reflect that [R-A-'s] husband bore any particular animosity toward women who were intimate with abusive partners, women who had previously suffered abuse, or women who happened to have been born in, or were actually living in, Guatemala"). When """"the alleged persecutor is not even aware of the group's existence, it becomes harder to understand how the persecutor may have been motivated by the victim's 'membership' in the group to inflict the harm on the victim." *Id.* at 919.

4.

In *A-R-C-G-*, the Board recognized that it had a duty to evaluate "any claim regarding the existence of a particular social group in a country . . . in the context of the evidence presented regarding the particular circumstances in the country in question," 26 I&N Dec. at 392, but it did not adequately observe that duty. Although the immigration judge had previously denied A-R-C-G-'s applications, the Board accepted, with little or no analysis, DHS's concessions to the contrary on nearly every legal issue. By doing so, the Board recognized a new category of asylum claims that did not satisfy the requirements set forth by the Board's precedent.

**\*340** Future social group cases must be governed by the analysis set forth in this opinion.

V.

Having overruled *A-R-C-G-*, I must vacate the Board's December 2016 decision in this case as well. The Board's cursory analysis of the respondent's social group consisted of a general citation to *A-R-C-G-* and country condition reports. Neither immigration judges nor the Board may avoid the rigorous analysis required in determining asylum claims, especially where victims of private violence claim persecution based on membership in a particular social group. Such claims must be carefully analyzed under the standards articulated in this opinion and in past Board decisions, such as *M-E-V-G-* and *W-G-R-*.

**\*\*23** An asylum applicant has the burden of showing her eligibility for asylum, 8 C.F.R. § 208.13(a), which includes identifying a cognizable social group and establishing group membership, persecution based on that membership, and that the government was unwilling or unable to protect the respondent. The respondent must present facts that undergird *each* of these elements, and the asylum officer, immigration judge, or the Board has the duty to determine whether those facts satisfy all of the legal requirements for asylum.

Of course, if an alien's asylum application is fatally flawed in one respect--for example, for failure to show membership in a proposed social group, *see Guzman-Alvarez v. Sessions*, 701 F. App'x 54, 56-57 (2d Cir. 2017)--an immigration judge or the Board need not examine the remaining elements of the asylum claim. *See, e.g., Perez-Rabanales*, 881 F.3d at 67 ("That ends this aspect of the matter. The petitioner's failure to satisfy both the particularity and the social distinctiveness requirements defeats her attempt to qualify as a refugee through membership in a particular social group.").

Having subjected the Board's decision to plenary review, I also address several additional errors and outline other general requirements relevant to all asylum applications to provide guidance to the Board and immigration judge on remand.

A.

First, the Board erred in finding several of the immigration judge's factual and credibility determinations to be "clearly erroneous."

Under Department regulations, the Board may not engage in fact-finding on appeals (except for taking administrative notice of commonly known facts). 8 C.F.R. § 1003.1(d)(3)(iv). Furthermore, the Board may "not engage *341 in de novo review of findings of fact determined by an immigration judge," and the immigration judge's factual findings, "including findings as to the credibility of testimony, shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous." Id. § 1003.1(d)(3)(i); see also Turkson v. Holder, 667 F.3d 523, 527 (4th Cir. 2012) (noting that "[t]his rule stems from a sensible understanding of the roles and abilities of the two bodies"). Notably, "where credibility determinations are at issue, . . . 'even greater deference' must be afforded to the [immigration judge]'s factual findings." Rodriguez v. Holder, 683 F.3d 1164, 1171 (9th Cir. 2012) (quoting Anderson, v. Bessemer City, 470 U.S. 564, 575 (1985)). The Board may find an immigration judge's factual findings to be clearly erroneous only if they are "illogical or implausible," or without "support in inferences that may be drawn from the facts in the record." Id. at 1170 (quoting Anderson, 470 U.S. at 577).

**24  Furthermore, the Board "cannot, under a clear error standard of review, override or disregard evidence in the record" or rely "simply on its own interpretation of the facts." Ridore v. Holder, 696 F.3d 907, 917 (9th Cir. 2012). If the Board disagrees with an immigration judge's factual findings, a "conclusory pronouncement" that the findings were erroneous "does not constitute clear error review." Id. While the Board purported to apply the "clear error" standard in this case, I cannot simply "rely on the Board's invocation of the clear error standard." Rodriguez, 683 F.3d at 1170. My task is to determine whether the Board "faithfully employed the clear error standard or engaged in improper de novo review" of the immigration judge's factual findings. Id.

1.

Here, the Board admitted that the immigration judge identified discrepancies and omissions in the respondent's testimony, but discounted the adverse credibility determination on various grounds including that the supportive affidavits were due greater weight, that the respondent sufficiently explained some discrepancies, and that the discrepancies did not ultimately undermine the respondent's account. In so doing, the Board failed to give adequate deference to the credibility determinations and improperly substituted its own assessment of the evidence.

When an asylum applicant makes inconsistent statements, the immigration judge is uniquely advantaged to determine the applicant's credibility, and the Board may not substitute its own view of the evidence on appeal. See Xiao Ji Chen v. U.S. Dep't of Justice, 471 F.3d 315, 334 (2d Cir. 2006) ("[W]here the [immigration judge]'s adverse credibility finding is based on specific examples in the record of inconsistent statements by the *342 asylum applicant about matters material to his claim of persecution, or on contradictory or inherently improbable testimony regarding such matters, a reviewing court will generally not be able to conclude that a reasonable adjudicator was compelled to find otherwise." (quotation omitted)). Under the REAL ID Act, "[t]here is no presumption of credibility" in favor of an asylum applicant. Pub. L. No. 109-13, div. B, §§ 101(a)(3), 119 Stat. 231, 303 (2005) (codified at 8 U.S.C. § 1158(b)(1)(B)(iii)). Furthermore, the identified inconsistencies do not have to be related to an applicant's core asylum claim to support an adverse credibility determination: "Considering the totality of circumstances, and all relevant factors, a trier of fact may base a credibility determination on . . . the consistency between the applicant's or witness's written and oral statements . . ., the internal consistency of each such statement, [and] the consistency of such statements with other evidence of record . . ., without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other factor." Id. (emphasis added). "'''''[O]missions, inconsistent statements, contradictory evidence, and inherently improbable testimony are appropriate bases for making an adverse credibility determination," and the existence of "only a few" such issues can be sufficient to make an adverse credibility determination as to the applicant's entire testimony regarding past persecution. Djadjou v. Holder, 662 F.3d 265, 273-74 (4th Cir. 2011).

2.

**25  The Board further erred in concluding that the immigration judge's factual findings concerning the respondent's ability to leave her relationship and El Salvador's ability to protect her were clearly erroneous. A-B- at *3. In support of his findings, the

immigration judge cited evidence that the respondent was able to divorce and move away from her ex-husband, and that she was able to obtain from the El Salvadoran government multiple protective orders against him.[11]  Although the Board questioned the significance of these facts in light of other evidence, it did not establish that the immigration judge's conclusions were "illogical or implausible," or without support from the record. *See Rodriguez*, 683 F.3d at 1170.

Instead, the Board substituted its view of the evidence for that of the immigration judge, again violating the standard of review applicable to the factual determinations of immigration judges.

**\*343  B.**

The Board also erred when it found that the respondent established the required nexus between the harm she suffered and her group membership. Whether a purported persecutor was motivated by an alien's group affiliation "is a classic factual question," *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 247-48 (4th Cir. 2017) (internal quotation marks omitted), which the Board may overturn only if "clearly erroneous."

The Board stated that "the record indicates that the ex-husband abused [the respondent] from his position of perceived authority, as her ex-husband and the father of her children." *A–B–* at *3. From this, the Board held, in a conclusory fashion, that the "record as a whole supports a finding that the respondent's membership in the particular social group of 'El Salvadoran women who are unable to leave their domestic relationship where they have children in common' is at least one central reason that he ex-husband abused her." *Id.* While citing the standard of review, the Board did not apply it in summarily dismissing the immigration judge's findings. Moreover, the Board's legal analysis was deficient. The Board, required to find "clear error" of a factual finding, pointed to no record evidence that respondent's husband mistreated her in any part "on account of" her membership in the particular social group of "''''''El Salvadoran women who are unable to leave their domestic relationship where they have children in common." The Board cited no evidence that her husband knew any such social group existed, or that he persecuted wife for reasons unrelated to their relationship. There was simply no basis in the Board's summary reasoning for overturning the immigration judge's factual findings, much less finding them clearly erroneous.

**C.**

**\*\*26**  The Board also erred when it overruled the immigration judge's finding that the respondent failed to demonstrate that the government of El Salvador was unable or unwilling to protect her from her ex-husband. This inquiry too involved factual findings to which the Board did not give proper deference. No country provides its citizens with complete security from private criminal activity, and perfect protection is not required. In this case, the respondent not only reached out to police, but received various restraining orders and had him arrested on at least one occasion. *See A–B–* at *14-15 (Immig. Ct. Dec. 1, 2015).

For many reasons, domestic violence is a particularly difficult crime to prevent and prosecute, even in the United States, which dedicates significant  **\*344**  resources to combating domestic violence. *See, e.g.*, Office of Justice Programs, U.S. Dep't of Justice, Extent, Nature, and Consequences of Intimate Partner Violence (2000). The persistence of domestic violence in El Salvador, however, does not establish that El Salvador was unable or unwilling to protect A–B– from her husband, any more than the persistence of domestic violence in the United States means that our government is unwilling or unable to protect victims of domestic violence. In short, the Board erred in finding, contrary to the record and the immigration judge's findings, that El Salvador was unable or unwilling to protect A–B– and that she thus had no choice but to flee the country.

**D.**

The Board, immigration judges, and all asylum officers should consider the following points when evaluating an application for asylum. First, an applicant seeking asylum or withholding of removal based on membership in a particular social group must clearly indicate, on the record and before the immigration judge, the exact delineation of any proposed particular social group. *See Matter of W-Y-C- & H-O-B-*, 27 I&N Dec. 189, 190-91 (BIA 2018); *Matter of A-T-*, 25 I&N Dec. 4, 10 (BIA 2009). The

immigration judge has a responsibility to "ensure that the specific social group being analyzed is included in his or her decision," as it critical to the Board's "appellate review that the proposed social group is clear and that the record is fully developed." *Matter of W-Y-C- & H-O-B-*, 27 I&N Dec. at 191. The Board must also remember that it cannot sustain an asylum applicant's appeal based on a newly articulated social group not presented before or analyzed by the immigration judge. *Id.* at 192; *see also, e.g.*, *Baltti v. Sessions*, 878 F.3d 240, 244-45 (8th Cir. 2017) (finding no jurisdiction to review a newly defined social group because the claim based on "membership in that narrowed social group" had not been raised below); *Duarte-Salagosa v. Holder*, 775 F.3d 841, 845 (7th Cir. 2014) (declining to address a particular social group raised for the first time on appeal).

**27** Furthermore, the Board, immigration judges, and all asylum officers must consider, consistent with the regulations, whether internal relocation in the alien's home country presents a reasonable alternative before granting asylum. Asylum applicants who have "not established past persecution . . . bear the burden of establishing that it would not be reasonable for him or her to relocate, unless the persecution is by a government or government-sponsored." 8 C.F.R. § 1208.13(b)(3)(i). An immigration judge, "in the exercise of his or her discretion, shall deny the asylum application of an alien found to be a refugee on the basis of past persecution" if it is "found by a preponderance of the evidence" that "the applicant could avoid future **345** persecution by relocating to another part of the applicant's country of nationality, . . . and under all the circumstances, it would be reasonable to expect the applicant to do so." *Id.* § 1208.13(b)(1)(i). Beyond the standards that victims of private violence must meet in proving refugee status in the first instance, they face the additional challenge of showing that internal relocation is not an option (or in answering DHS's evidence that relocation is possible). When the applicant has suffered personal harm at the hands of only a few specific individuals, internal relocation would seem more reasonable than if the applicant were persecuted, broadly, by her country's government.

Finally, there are alternative proper and legal channels for seeking admission to the United States other than entering the country illegally and applying for asylum in a removal proceeding. The asylum statute "is but one provision in a larger web of immigration laws designed to address individuals in many different circumstances," and "[t]o expand that statute beyond its obviously intended focus is to distort the entire immigration framework." *Velasquez*, 866 F.3d at 199 (Wilkinson, J., concurring). Aliens seeking a better life in America are welcome to take advantage of existing channels to obtain legal status before entering the country. In this case, A-B- entered the country illegally, and when initially apprehended by Border Patrol agents, she stated that her reason for entering the country was "to find work and reside" in the United States. Aliens seeking an improved quality of life should seek legal work authorization and residency status, instead of illegally entering the United States and claiming asylum. [12]

<div align="center">VI.</div>

**346** In reaching these conclusions, I do not minimize the vile abuse that the respondent reported she suffered at the hands of her ex-husband or the harrowing experiences of many other victims of domestic violence around the world. I understand that many victims of domestic violence may seek to flee from their home countries to extricate themselves from a dire situation or to give themselves the opportunity for a better life. But the "asylum statute is not a general hardship statute." *Velasquez*, 866 F.3d at 199 (Wilkinson, J., concurring). As Judge Wilkinson correctly recognized, the Board's recent treatment of the term "particular social group" is "at risk of lacking rigor." *Id.* at 198. Nothing in the text of the INA supports the suggestion that Congress intended "membership in a particular social group" to be "some omnibus catch-all" for solving every "heart-rending situation." *Id.*

**28** I therefore overrule *Matter of A-R-C-G-*, 26 I&N Dec. 388 (BIA 2014) and all other opinions inconsistent with the analysis in this opinion, vacate the Board's decision, and remand to the immigration judge for further proceedings consistent with this opinion.

# Footnotes

1    Accordingly, few such claims would satisfy the legal standard to determine whether an alien has a credible fear of persecution. *See* 8 U.S.C. § 1225(b)(1)(B)(v) (requiring a "significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 1158 of this title [8 U.S.C. § 1158]").

2    As explained in my order of March 30, *Matter of A-B-*, 27 I&N Dec. 247, 248-49 (A.G. 2018), the immigration judge's *sua sponte* order purporting to certify the matter back to the Board was procedurally defective because the immigration judge had not issued any decision for the Board to review. Neither the immigration judge nor the Board has taken any other actions in this matter since the Board issued its December 2016 decision.

3    The only alleged "irregularity" cited by respondent is the notion that "[g]iven that Respondent's case was not under active consideration by Judge Couch or the Board at the time of the Attorney General's referral order, it is not clear how the Attorney General became aware of Respondent's case." Respondent's Opening Br. at 18 n.5. The Attorney General has the express authority under the INA to review "administrative determinations in immigration proceedings." 8 U.S.C. § 1103(g)(2). The suggestion that there is something """"""irregular" about my exercise of that authority is meritless.

4    The respondent in this case also applied for withholding of removal under 8 U.S.C § 1231(b)(3) and for protection under the United Nations Convention Against Torture ("CAT"), *see* 8 C.F.R. § 1208.16(c). Because the Board sustained the respondent's appeal as to her asylum claim, the Board did not address the immigration judge's denial of her applications for withholding of removal or for CAT protection. *See A-B-* at *4 (BIA). My opinion addresses only respondent's asylum claim. On remand, the immigration judge may consider any other issues remaining in the case.

5    One of Congress's primary purposes in passing the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, was to implement the principles agreed to in the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 (entered into force Oct. 4, 1967; for the United States Nov. 1, 1968), as well as the United Nations Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 (entered into force Apr. 22, 1954)). *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 436-37 (1987). The Protocol offers little insight into the definition of "particular social group," which was added to the Protocol "as an afterthought." *Acosta*, 19 I&N Dec. at 232.

6    *See*, *e.g.*, *Reyes v. Lynch*, 842 F.3d 1125, 1135 (9th Cir. 2016); *Gonzalez*, 820 F.3d at 404; *Zaldana Menjivar v. Lynch*, 812 F.3d 491, 498 (6th Cir. 2015); *Cantarero v. Holder*, 734 F.3d 82, 85 (1st Cir. 2013); *Cece v. Holder*, 733 F.3d 662, 668-69 (7th Cir. 2013) (en banc); *Orellana-Monson v. Holder*, 685 F.3d 511, 520 (5th Cir. 2012); *Lizama v. Holder*, 629 F.3d 440, 446 (4th Cir. 2011); *Ngengwe v. Mukasey*, 543 F.3d 1029, 1033 (8th Cir. 2008); *Niang v. Gonzales*, 422 F.3d 1187, 1199 (10th Cir. 2005); *Ucelo-Gomez v. Mukasey*, 509 F.3d 70, 72 (2d Cir. 2007); *Fatin*, 12 F.3d at 1238-39 (3d Cir. 1993).

7    Other appellate courts have resisted attempts to expand *A-R-C-G-*'s reach. *See*, *e.g.*, *Menjivar-Sibrian v. U.S. Att'y Gen.*, ___ F. App'x. ___, 2018 WL 1415126, at *1 (11th Cir. Mar. 22, 2018) ("women abused by her partner she cannot control" is not a cognizable social group where defining attribute of proposed group is having suffered persecution); *Solorzano-De Maldonado v. Sessions*, ___ F. App'x ___, 2018 WL 1192988, at *1 (5th Cir. Mar. 7, 2018) ("single women living alone targeted by gangs for sexual abuse" does not constitute a socially distinct group in Salvadoran society); *Perez-Rabanales v. Sessions*, 881 F.3d 61, 66 (1st Cir. 2018) (finding that purported social group of "Guatemalan women who try to escape systemic and severe violence but who are unable to receive official protection" lacked particularity and social distinction); *Vega-Ayala*, 833 F.3d at 39 ("Being in an intimate relationship with a partner who views you as property is not an immutable characteristic.").

8    In *Matter of L-E-A-*, 27 I&N Dec. 40 (BIA 2017), the Board similarly used key concessions by DHS to recognize a particular social group that might not have withstood the rigorous legal analysis required by Board precedent. The respondent and DHS "agree[d] that the immediate family unit of the respondent's father qualifies as a particular social group" and "that if family membership is a central reason for persecuting an asylum applicant, nexus may be established." *Id.* at 42. There is reason to doubt that a nuclear family can comprise a particular social group under the statute. *See,*

*e.g.*, *Thomas v. Gonzales*, 409 F.3d 1177, 1192 (9th Cir.) (en banc) (Rymer, J., dissenting), *rev'd*, 547 U.S. 183 (2005). Although the validity of the particular social group analysis in *Matter of L-E-A-* is beyond the scope of this opinion, the case reflects another instance where the Board purported to decide significant legal questions based upon concessions by the parties, rather than the appropriate legal analysis.

9   On this point, I note that conclusory assertions of countrywide negative cultural stereotypes, such as *A-R-C-G-*'s broad charge that Guatemala has a "culture of machismo and family violence" based on an unsourced partial quotation from a news article eight years earlier, neither contribute to an analysis of the particularity requirement nor constitute appropriate evidence to support such asylum determinations.

10  Even if mistreatment is suffered at the hands of a government official, there is no nexus between the purported persecution and one of the grounds for asylum if the dispute is a "purely personal matter." *Matter of Y-G-*, 20 I&N Dec. 794, 799 (BIA 1994); *see also, e.g.*, *Marquez v. INS*, 105 F.3d 374, 380-81 (7th Cir. 1997) (concluding that a commercial dispute with a Philippine military officer was "apolitical"); *Iliev v. INS*, 127 F.3d 638, 642 (7th Cir. 1997) (holding that a dispute with a Bulgarian secret service agent over employment was "personal, not political"). The Board has recognized this principle for decades, including in cases involving threats of domestic violence. *See Matter of Pierre*, 15 I&N Dec. 461, 463 (BIA 1975) (holding that a husband's threats against his wife were "strictly personal," even though he was a Haitian government official, and, thus, she did not establish persecution).

11  The immigration judge's findings that the respondent was able to leave her relationship on the basis of her divorce and her ability to move from the home she shared with her ex-husband, and that she was able to obtain some measure of government protection, are supported by case law considering other particular social group claims. *See, e.g.*, *Menjivar-Sibrian*, 2018 WL 1415126, at *1; *Vega-Ayala*, 833 F.3d at 39.

12  Asylum is a discretionary form of relief from removal, and an applicant bears the burden of proving not only statutory eligibility for asylum but that she also merits asylum as a matter of discretion. 8 U.S.C. §§ 1158(b)(1), 1229a(c)(4)(A)(ii); *see also Romilus v. Ashcroft*, 385 F.3d 1, 8 (1st Cir. 2004). Neither the immigration judge nor the Board addressed the issue of discretion regarding the respondent's asylum application, and I decline to do so in the first instance. Nevertheless, I remind all asylum adjudicators that a favorable exercise of discretion is a discrete requirement for the granting of asylum and should not be presumed or glossed over solely because an applicant otherwise meets the burden of proof for asylum eligibility under the INA. Relevant discretionary factors include, *inter alia*, the circumvention of orderly refugee procedures; whether the alien passed through any other countries or arrived in the United States directly from her country; whether orderly refugee procedures were in fact available to help her in any country she passed through; whether she made any attempts to seek asylum before coming to the United States; the length of time the alien remained in a third country; and her living conditions, safety, and potential for long-term residency there. *See Matter of Pula*, 19 I&N Dec. 467, 473-74 (BIA 1987).

27 I. & N. Dec. 316 (U.S.Atty.Gen.), Interim Decision 3929, 2018 WL 3091048

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Holding Modified by Matter of Gonzalez, BIA, July 27, 1988

19 I. & N. Dec. 357 (BIA), Interim Decision 3007, 1986 WL 67712

United States Department of Justice

Board of Immigration Appeals

MATTER OF CARBALLE

In Exclusion Proceedings

A-22788430

Decided by Board February 13, 1986

**\*\*1  \*357**  (1) An alien is barred from the relief of withholding of deportation if he, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States. See section 243(h)(2)(B) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h)(2)(B) (1982).

(2) Once a finding is made that an alien has been finally convicted of a particularly serious crime, it necessarily follows that the alien is a danger to the community of the United States.

(3) Because the proper focus is on the serious nature of the crime and not on the likelihood of future serious misconduct on the part of the alien, the contention that the statute requires two separate and distinct findings as to 'seriousness of the crime' and 'danger to the community' is rejected.

(4) If an applicant is statutorily ineligible for withholding of deportation because he is a danger to the community of the United States, having been finally convicted of an inherently particularly serious crime, e.g., armed robbery, background evidence including the circumstances of the crime is not relevant to the determination of statutory eligibility.

**EXCLUDABLE:**

Act of 1952—Sec. 212(a)(9) 8 U.S.C. § 1182(a)(9)]—Crime involving moral turpitude

Sec. 212(a)(20) [8 U.S.C. § 1182(a)(20)]—No valid immigrant visa

**ON BEHALF OF APPLICANT:**
Robert L. Boyer, Esquire
623 West Flagler Street
Miami, Florida 33130

**ON BEHALF OF SERVICE:**
David Dixon
Appellate Counsel

BY: Milhollan, Chairman; Maniatis, Dunne, Morris, and Vacca, Board Members

In a decision dated February 6, 1985, the immigration judge found the applicant excludable on the grounds set forth above, denied his applications for asylum and withholding of deportation under sections 208(a) and 243(h) of the Immigration and

Nationality Act, 8 U.S.C. §§ 1158(a) and 1253(h) (1982), and ordered that he **\*358** be excluded and deported from the United States. [1] The applicant appeals the denial of asylum and withholding of deportation. The appeal will be dismissed.

The applicant is a 22-year-old native and citizen of Cuba. After departing Cuba and arriving at Key West, Florida, in April 1980 as part of the Mariel boatlift, the applicant was paroled into the United States.

On February 18, 1983, in the Circuit Court for Dade County, Florida, the applicant was convicted, on his plea of guilty, of (1) robbery with a firearm, to wit, a pistol (two counts), (2) attempted robbery with a firearm, to wit, a pistol (two counts), (3) grand theft second degree, and (4) accessory after the fact, in violation of sections 812.13, 812.014, and 777.03 of the Florida Statutes. The applicant was sentenced to terms of 15 years each on the robbery and attempted robbery counts with the sentences to run concurrently. He also was sentenced to terms of 5 years each on the grand theft and accessory counts with the sentences to run concurrently with the robbery counts. He was incarcerated at the time of the exclusion hearing.

**\*\*2**  At his hearing, the applicant, through counsel, conceded excludability under section 212(a)(20) of the Act, 8 U.S.C. § 1182(a)(20) (1982), and did not contest excludability under section 212(a)(9) of the Act. He requested asylum and withholding of deportation. The applicant submitted that he would be imprisoned and singled out for disparate treatment by Cuban authorities because he was one of the first Cubans to enter the Peruvian Embassy in Havana in 1980. The record includes a 'Safe Conduct Definitive,' issued by the Cuban Government, which essentially authorized the applicant's safe conduct from the Peruvian Embassy to any country that offered him a visa. Also, the applicant stated that he would be persecuted in Cuba because of his robbery convictions in the United States.

The immigration judge denied the applicant's applications for asylum and withholding of deportation without reaching the merits of the claim or submitting any documents to the State Department for an advisory opinion. See 8 C.F.R. § 208.10(b) (1985). In view of the nature of the offenses that had been committed, the immigration **\*359** judge found that the applicant was ineligible for relief under section 243(h) of the Act as one who had been convicted of a particularly serious crime and constituted a danger to the community of the United States. For the same reason, the immigration judge denied asylum.

In pertinent part, section 243(h)(2)(B) of the Act provides that withholding of deportation 'shall not apply to any alien if the Attorney General determines that the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States.'

On appeal, the applicant contends that the immigration judge erred in his interpretation of section 243(h)(2)(B) of the Act. Through counsel, he submits that section 243(h)(2)(B) requires two separate factual findings. First, it must be determined that an applicant has committed a particularly serious crime. Then, there must be a second, distinct finding that the applicant constitutes a danger to the community of the United States. The applicant submits that 'the use of the present tense verb 'constitutes' in section 243(h)(2)(B) indicates that this second question should be appraised in light of present circumstances and the record should therefore be carefully scrutinized for evidence of rehabilitation or other factors indicating that [the] applicant may not now be a danger to the community.'

The Service, however, argues that both the language of section 243(h)(2)(B) of the Act and its legislative history make clear that only one test is required. It is submitted that section 243(h)(2)(B) 'establishes a cause and effect relationship between the two clauses.' If Congress had 'intended to establish two separate criteria,' the Service argues, 'it could have easily done so by its use of the conjunction 'and.' Instead, the grammatical structure shows that a conviction for a particularly serious crime is the sole factor which Congress has made determinative of whether the alien constitutes a danger to the community.'

**\*\*3**  The Service contends that the legislative history of this statutory provision supports the contention that only one finding is required. The present provisions of section 243(h) of the Act were enacted as part of the Refugee Act of 1980. The House Judiciary Committee Report, in reviewing the provisions of section 243(h), noted that an exception to eligibility for such relief included 'aliens . . . who have been convicted of particularly serious crimes <u>which</u> make them a danger to the community of

the United States.' (Emphasis added.) [2] The Service submits that this language reflects the congressional understanding of how section 243(h)(2)(B) **\*360** is properly read. The phrase 'danger to the community' is an aid to defining a 'particularly serious crime,' not a mandate that administrative agencies or the courts determine whether an alien will become a recidivist.

We find section 243(h)(2)(B) of the Act does not require that two separate and distinct factual findings be made in order to render an alien ineligible for withholding of deportation. It must be determined that an applicant for relief constitutes a danger to the community of the United States to come within the purview of section 243(h)(2)(B). However, the statute provides the key for determining whether an alien constitutes such a danger. That is, those aliens who have been finally convicted of particularly serious crimes are presumptively dangers to this country's community. The clauses of section 243(h)(2)(B), nevertheless, are inextricably related. We have noted that the phrase 'particularly serious crime' is not defined in the statute. Matter of Frentescu, 18 I&N Dec. 244, 246 (BIA 1982). In determining whether a conviction is for such a crime, the essential key is whether the nature of the crime is one which indicates that the alien poses a danger to the community. As we noted in Matter of Frentescu, id., there are some crimes that are inherently 'particularly serious' while others clearly are not. There will be cases, however, where the seriousness of a crime will have to be judged by considering the nature of the conviction, the circumstances and underlying facts of the conviction, the sentence imposed, and whether the type and circumstances of the crime indicate the alien will be a danger to the community. The focus here is on the crime that was committed. If it is determined that the crime was a 'particularly serious' one, the question of whether the alien is a danger to the community of the United States is answered in the affirmative. We do not find that there is a statutory requirement for a separate determination of dangerousness focusing on the likelihood of future serious misconduct on the part of the alien. See Crespo—Gomez v. Richard, 780 F.2d 932 (11th Cir. 1986); Zardui—Quintana v. Richard, 768 F.2d 1213 (11th Cir. 1985) (Vance, J., concurring).

Has this applicant been convicted of a particularly serious crime? In addition to two other offenses, the applicant was convicted in the State of Florida, on February 18, 1983, of two counts of armed robbery and two counts of attempted armed robbery. The offenses involved the use of a firearm. They were felonies, as well as offenses against individuals. On their face, they were dangerous.

**\*\*4** Robbery is a grave, serious, aggravated, infamous, and heinous crime. See Matter of Rodriguez—Palma, 17 I&N Dec. 465 (BIA 1980). We have previously found a California conviction for armed robbery **\*361** to be a crime rendering an alien statutorily ineligible for withholding of deportation. See Matter of Rodriguez—Coto, Interim Decision 2985 (BIA 1985). We have little difficulty concluding that the applicant herein has been convicted of a particularly serious crime and, therefore, constitutes a danger to the community of the United States within the meaning of section 243(h)(2)(B) of the Act. Moreover, the same reasons that lead us to conclude this applicant has been finally convicted of such a crime satisfy us that his request for asylum properly warrants denial in the exercise of discretion.

The applicant complains that the immigration judge erred by refusing to admit background information, including the circumstances of the armed robberies, into evidence. We conclude that there has been no error on the part of the immigration judge as the crimes at issue in this case are inherently 'particularly serious.'

In Matter of Saban, 18 I&N Dec. 70 (BIA 1981), we stated that, pursuant to 8 C.F.R. § 208.10(b) (1981), when an applicant files an application for asylum after he has been placed in exclusion proceedings, the immigration judge must adjourn the hearing for the purpose of requesting an advisory opinion from the Bureau of Human Rights and Humanitarian Affairs (BHRHA), Department of State. See 8 C.F.R. § 236.3(a) (1985).

This case is distinguishable from Matter of Saban, supra. In Saban, it did not appear that the alien was statutorily precluded from withholding of deportation; nor was it evident that asylum would be denied in the exercise of discretion.

In these proceedings, on the other hand, it is clear that the applicant is statutorily ineligible for withholding of deportation. Even if we assume that the applicant established the merits of his claim, no purpose would be served by obtaining an advisory opinion if the ultimate result, as here, is to statutorily preclude the applicant from relief. Similarly, the merits of the applicant's asylum

claim need not be addressed. See INS v. Rios—Pineda, —— U.S. ——, 105 S. Ct. 2098 (1985); INS v. Bagamasbad, 429 U.S. 24 (1976). See generally Matter of Reyes, 18 I&N Dec. 249 (BIA 1982). It is evident, based on the applicant's convictions for armed robbery and attempted armed robbery, that asylum would be denied as a matter of discretion. Therefore, no purpose is served by obtaining an advisory opinion when, notwithstanding a favorable recommendation, relief is denied on discretionary grounds.

Accordingly, the appeal will be dismissed.

ORDER: The appeal is dismissed.

### Footnotes

1     In his decision, the immigration judge refers to the applicant as Lazarro Caraballe. Inasmuch as there is no issue regarding the applicant's identity, we find that the reference is an inadvertent error and that the decision does, in fact, relate to the applicant. See Corona—Palomera v. INS, 661 F.2d 814 (9th Cir. 1981); United States v. Rebon—Delgado, 467 F.2d 11 (9th Cir. 1972); Valeros v. INS, 387 F.2d 921 (7th Cir. 1967); Vlisidis v. Holland, 245 F.2d 812 (3d Cir. 1957); Matter of Ramirez—Sanchez, 17 I&N Dec. 503 (BIA 1980).

2     H.R. Rep. No. 608, 96th Cong., 1st Sess. 17 (1979).

19 I. & N. Dec. 357 (BIA), Interim Decision 3007, 1986 WL 67712

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

27 I. & N. Dec. 664 (U.S.Atty.Gen.), Interim Decision 3965, 2019 WL 5546809

U.S. Department of Justice

Office of the Attorney General

MATTER OF CASTILLO-PEREZ, RESPONDENT

Decided by Attorney General October 25, 2019

**\*\*1   \*664** (1) The Immigration and Nationality Act's "good moral character" standard requires adherence to the generally accepted moral conventions of the community, and criminal activity is probative of non-adherence to those conventions.

(2) Evidence of two or more convictions for driving under the influence during the relevant period establishes a presumption that an alien lacks good moral character under INA § 101(f), 8 U.S.C. § 1101(f).

(3) Because only aliens who possessed good moral character for a 10-year period are eligible for cancellation of removal under section 240A(b) of the INA, 8 U.S.C. § 1229b(b), such evidence also presumptively establishes that the alien's application for that discretionary relief should be denied.

BEFORE THE ATTORNEY GENERAL

On December 3, 2018, Acting Attorney General Matthew G. Whitaker directed the Board of Immigration Appeals to refer this case to the Attorney General for review. See 8 C.F.R. § 1003.1(h)(1)(i). Acting Attorney General Whitaker invited the parties and interested amici to submit briefs addressing questions relevant to the disposition of the case. *Matter of Castillo-Perez*, 27 I&N Dec. 495 (A.G. 2018).

For the reasons set forth in the accompanying opinion, I affirm the Board's order vacating the immigration judge's decision to grant the respondent cancellation of removal. I hold that, when assessing an alien's good moral character under section 101(f) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101(f), evidence of two or more convictions for driving under the influence during the relevant period establishes a rebuttable presumption that the alien lacked good moral character during that time. Because only aliens who possessed good moral character for a 10-year period are eligible for cancellation of removal under section 240A(b) of the INA, 8 U.S.C. § 1229b(b), such evidence also presumptively establishes that the alien is not eligible for that relief.

Section 240A(b)(1) of the Immigration and Nationality Act ("INA" or "Act") grants the Attorney General the discretion to cancel the removal and adjust the status of an inadmissible or deportable alien who shows that his removal would result in exceptional and extremely unusual hardship to his **\*665** family and, among other things, that he has been "a person of good moral character" for the 10 years preceding his application. 8 U.S.C. § 1229b(b)(1).

**\*\*2** In this case, the immigration judge granted the respondent's application for cancellation of removal despite the respondent's multiple convictions for driving under the influence ("DUI") and other criminal history. [1] On appeal, the Board of Immigration Appeals ("Board") vacated the immigration judge's decision and ordered the respondent removed to Mexico. Acting Attorney General Matthew G. Whitaker subsequently directed the Board to refer this case to him for review. See 8 C.F.R. § 1003.1(h)(1)(i). He invited the parties and any interested amici to brief relevant points, including the correct standard for assessing good moral character under the INA and the impact of multiple convictions for DUI on whether an alien should be granted cancellation of removal. *Matter of Castillo-Perez*, 27 I&N Dec. 495 (A.G. 2018).

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For the reasons set forth below, I affirm the Board's order. I conclude that, when assessing an alien's good moral character under INA § 101(f), 8 U.S.C. § 1101(f), evidence of two or more DUI convictions during the relevant period establishes a rebuttable presumption that the alien lacked good moral character during that time. Because the Attorney General may only cancel removal of an alien who has been a person of good moral character during a 10-year period, see INA § 240A(b), 8 U.S.C. § 1229b(b), such evidence also presumptively establishes that the alien is not eligible for that relief. Here, because the evidence of the respondent's efforts to rehabilitate himself is insufficient to overcome this presumption, the Board correctly vacated the immigration judge's decision to grant cancellation of removal.

## I.

Section 240A(b)(1) of the INA authorizes the Attorney General to cancel removal and adjust the status of an alien who:

 **\*666**  (A) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application;

(B) has been a person of good moral character during such period;

(C) has not been convicted of an offense under [certain specified sections of the INA]; and

(D) establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.

8 U.S.C. § 1229b(b)(1). The Attorney General's judgment on this matter is discretionary. *See Moncrieffe v. Holder*, 569 U.S. 184, 204 (2013); *Carachuri-Rosendo v. Holder*, 560 U.S. 563, 581 (2010). As with all discretionary forms of relief from removal, the alien bears the burden of proving that he both "satisfies the applicable eligibility requirements" for cancellation of removal and "merits a favorable exercise of discretion." INA § 240(c)(4)(A), 8 U.S.C. § 1229a(c)(4)(A); *see also, e.g., Matter of Gomez-Beltran*, 26 I&N Dec. 765, 766 (BIA 2016); *Matter of C-V-T-*, 22 I&N Dec. 7, 10 (BIA 1998).

 **\*\*3**  In this case, the critical eligibility requirement concerns the Act's ""good moral character" provision. The concept of good moral character has been part of the United States' immigration laws since the earliest days of the Republic. The first federal naturalization statute required that any alien applying for naturalization "mak[e] proof to the satisfaction of [a] court, that he is a person of good character." Act of Mar. 26, 1790, ch. 3, 1 Stat. 103, 103. Congress rephrased the standard as "good moral character" in the second naturalization law, Act of Jan. 29, 1795, ch. 20, § 1, 1 Stat. 414, 414, and it remains a requirement for naturalization to this day, INA § 316(a), 8 U.S.C. § 1427(a). The good moral character standard has proliferated throughout the INA and is now a prerequisite to eligibility for numerous forms of immigration relief. *See, e.g.*, INA § 240B(b)(1)(B), 8 U.S.C. § 1229c(b)(1)(B) (voluntary departure); INA § 245(l)(1)(B), 8 U.S.C. § 1255(l)(1)(B) (adjustment of status for trafficking victims).

Despite the ubiquity of the good moral character standard, the INA "does not specifically define what 'good moral character' is"--but it does "quite explicitly state[] what it is *not*." *United States v. Jean-Baptiste*, 395 F.3d 1190, 1193 (11th Cir. 2005). Section 101(f) of the Act provides that "[n]o  **\*667**  person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established is, or was," a person falling within any of eight listed categories. 8 U.S.C. § 1101(f). Those categories include, among others, "a habitual drunkard," "one who has given false testimony for the purpose of obtaining any benefits under [the INA]," and "one who at any time has been convicted of an aggravated felony." *Id.* § 1101(f)(1), (6), (8). The provision's so-called "catch-all clause" then explains: "The fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character." *Id.* § 1101(f). In other words, an alien may lack good moral character even if he is not within one of those eight enumerated classes.

Long-standing judicial precedent holds that good moral character under the immigration laws requires adherence to, as Judge Learned Hand put it, "the generally accepted moral conventions" of the community. *United States v. Francioso*, 164 F.2d 163, 163 (2d Cir. 1947); *see also* Petition of De Leo, 75 F. Supp. 896, 900 (W.D. Pa. 1948) (good moral character "results from acts and conduct of an individual, and is of such a character as measures up to the standards of average citizens of the community in which the alien resides"); *In re Spenser*, 22 F. Cas. 921, 921 (C.C.D. Or. 1878) (No. 13,234) ("probably the average man of the country is as high as [the standard] can be set"); *Black's Law Dictionary* 808 (10th ed. 2014) (defining good moral character as a ""pattern of behavior that is consistent with the community's current ethical standards and that shows an absence of deceit or morally reprehensible conduct"). Similarly, the regulation governing claims of good moral character for naturalization purposes requires the Department of Homeland Security ("DHS") to consider "the standards of the average citizen in the community of residence" in assessing such claims. 8 C.F.R. § 316.10(a)(2). Although a ""moral conventions" test may sometimes be "difficult" to apply, *Repouille v. United States*, 165 F.2d 152, 153 (2d Cir. 1947) (L. Hand, J.), that does not mean it lacks discernible content.

**\*\*4** An alien's criminal record is highly probative of whether he possesses good moral character. "It is not open to doubt," the Supreme Court has explained, "that the commission of crime . . . has some relation to the question of character." *Hawker v. New York*, 170 U.S. 189, 196 (1898). At the same time, a criminal record is not an absolute prerequisite to concluding that an alien lacks good moral character. Congress has identified "habitual drunkard [s]," for example, as persons who lack good moral character even when they have no criminal convictions. INA § 101(f)(1), 8 U.S.C. § 1101(f)(1).

### \*668  II.

The respondent, a native and national of Mexico, has lived in the United States without admission or parole since 1997. He is married, has three U.S.-citizen children, and works as a mason for a construction company. He also has a criminal record. On two separate occasions in 2001, and again in 2006, he was arrested for assault and battery of his wife. In 2004, he was charged with public drunkenness, and in 2005, he was convicted of negligent driving. Most relevant for present purposes, he was convicted of DUI in 2010 and 2012. *See* Va. Code Ann. § 18.2-266. The respondent admitted in the immigration court that his excessive consumption of alcohol was a major factor in each of these episodes. Immig. Ct. Ex. 3, Tab L, Resp.'s Aff. ¶ 8 ("I have been involved in several incidents that resulted in criminal charges being filed against me. In each case, the excessive consumption of alcohol was a major factor."). The respondent stopped drinking and completed an alcohol-safety program after his last DUI conviction, and he regularly attends Alcoholics Anonymous meetings.

DHS initiated removal proceedings against the respondent in February 2010. He conceded removability and applied for cancellation of removal, which the immigration judge granted in 2016. In a written opinion, the immigration judge concluded that the respondent had shown good moral character. The immigration judge first stated that the respondent was not subject to any "automatic bar" to a finding of good moral character. Then the immigration judge explained that, while he was "troubled by [the respondent's] alcohol-related convictions," they were outweighed by his work history, his support for his family, and especially his "rehabilitation efforts" related to his previous alcohol abuse. The immigration judge further held that the respondent satisfied the other statutory requirements for cancellation of removal and warranted relief as a matter of discretion.

The Board disagreed, holding that the respondent had failed to establish that his removal would result in the requisite "exceptional and extremely unusual hardship" to a qualifying relative. INA § 240A(b)(1)(D), 8 U.S.C. § 1229b(b)(1)(D). More pertinently, it held in the alternative that the respondent had not demonstrated good moral character and did not warrant cancellation of removal as an exercise of the Board's discretion. The Board therefore vacated the immigration judge's ruling and ordered the respondent removed to Mexico. Acting Attorney General Whitaker subsequently directed the Board to refer the case for review.

### \*669  III.

**\*\*5**  Cancellation of removal is a coveted and scarce form of relief. Under the INA, the Attorney General may cancel the removal of only 4,000 aliens per year. INA § 240A(e)(1), 8 U.S.C. § 1229b(e)(1). As the Ninth Circuit has recognized, "[i]n

1997, the first year that the quota was in effect, the limit was reached in the month of February." *Cuevas-Gaspar v. Gonzales*, 430 F.3d 1013, 1029 n.9 (2005), *abrogated on other grounds by Holder v. Martinez Gutierrez*, 566 U.S. 583 (2012). Because immigration judges continued to "reach [] the annual 4,000 limitation early in the fiscal year," they began ""reserving" decisions on many applications until subsequent fiscal years, contributing to backlogs and delays in the immigration adjudication system. Notice of Proposed Rulemaking, *Procedures Further Implementing the Annual Limitation on Suspension of Deportation and Cancellation of Removal*, 81 Fed. Reg. 86,291, 86,294 (Nov. 30, 2016). As a result, according to the Executive Office for Immigration Review, 3,500 cancellation of removal slots have been filled on the first day of each of the last five fiscal years. The other 500 slots are set aside to be granted to detained aliens throughout the year.

With demand for cancellation of removal well outstripping supply, immigration judges should grant such relief, in an evenhanded way, only to the most deserving candidates. *Cf.* Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 115(1), 100 Stat. 3359, 3384 ("the immigration laws of the United States should be enforced vigorously and uniformly"). This case presents an opportunity to promote the uniform and fair enforcement of the immigration laws by clarifying how an alien's DUI convictions affect his eligibility for cancellation of removal.

**A.**

Multiple DUI convictions during the relevant period are strong evidence that an alien lacked good moral character during that time and is thus not eligible for cancellation of removal.

An alien with multiple DUI convictions likely lacks good moral character under the catch-all clause of section 101(f) of the INA. 8 U.S.C. § 1101(f) ("The fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character."). Good moral character requires adherence to the generally accepted moral conventions of the community, and criminal activity is probative of non-adherence to those conventions. *See supra* Part I. This country has spoken clearly on the morality of DUI. All 50 States have **\*670** criminalized it, *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2166 (2016), reflecting a national consensus that drunk and other forms of impaired driving are unacceptable conduct that imposes intolerable harms on society, *see id.* ("Drunk drivers take a grisly toll on the Nation's roads, claiming thousands of lives, injuring many more victims, and inflicting billions of dollars in property damage every year."); *Mitchell v. Wisconsin*, 139 S. Ct. 2525, 2531 (2019) (plurality opinion) (noting "the country's efforts over the years to address the terrible problem of drunk driving"); *Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1047 (9th Cir. 2017) (en banc) ("Driving under the influence is, self-evidently, a public harm."). Multiple DUI convictions represent a repeated failure to meet the community's moral standards, rather than a "single lapse" that would be less probative of moral character. *Matter of B-*, 1 I&N Dec. 611, 612 (BIA 1943). [2]

**\*\*6** Even setting good moral character aside, an alien with multiple DUI convictions would likely be denied cancellation of removal as a purely discretionary matter. *See Moncrieffe*, 569 U.S. at 204 ("The Attorney General may, in his discretion, . . . deny relief if he concludes the negative equities outweigh the positive equities of the noncitizen's case[.]"). Multiple DUI convictions are a serious blemish on a person's record and reflect disregard for the safety of others and for the law. Although "there is no inflexible standard for determining who should be granted discretionary relief," the Board has identified an array of factors that should be considered in deciding whether to grant cancellation of removal and other forms of **\*671** discretionary relief under the Act. *C-V-T-*, 22 I&N Dec. at 11. An alien's criminal record--including its "nature, recency, and seriousness"--is a key factor. *Id.* In that analysis, "[m]ore serious misconduct necessarily weighs more heavily against an exercise of discretion than does less serious misconduct. Therefore, an alien must present 'additional offsetting favorable evidence' to counterbalance an adverse factor such as serious criminal activity." *Matter of Sotelo-Sotelo*, 23 I&N Dec. 201, 203 (BIA 2001) (en banc) (quoting *Matter of Marin*, 16 I&N Dec. 581, 585 (BIA 1978)). Given the reckless and dangerous nature of the crime of DUI and the limited number of aliens who may be granted cancellation of removal each year, aliens with multiple DUI convictions are likely undeserving of such discretionary relief.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Multiple DUI convictions during the relevant period are thus strong evidence that the alien was not a person of good moral character during that time and is ineligible for cancellation of removal. But I do not hold that they are conclusive evidence. There could be an unusual case in which an alien can establish that the multiple convictions were an aberration and can show good moral character. To do so, the respondent must overcome the strong evidence attributable to those multiple convictions by establishing good moral character. See 8 C.F.R. § 1240.8(d). But a respondent may not make this showing merely by demonstrating that he reformed himself after those convictions by, for instance, addressing a problem with substance abuse. The statute requires that good moral character be shown over the "continuous period of not less than 10 years immediately preceding" the application. INA § 240A(b)(1), 8 U.S.C. § 1229b(b)(1). The alien thus must show that he had good moral character even during the period within which he committed the DUI offenses. An alien's efforts to reform or rehabilitate himself after multiple DUI convictions are commendable, but they do not themselves demonstrate good moral character during the period that includes the convictions. Absent substantial relevant and credible contrary evidence, multiple DUI convictions require that the immigration judge deny cancellation of removal.

### B.

**\*\*7** Imposing the foregoing presumption is an appropriate exercise of my authority under the INA. The Attorney General has recognized similar presumptions in the past to channel the discretion of immigration judges and promote the uniform administration of the immigration laws. In *Matter of Jean*, for example, Attorney General Ashcroft established that aliens who have committed violent or dangerous crimes may not be granted discretionary waivers under section 209(c) of the INA, 8 U.S.C. § 1159(c), **\*672** except in "extraordinary circumstances." 23 I&N Dec. 373, 383 (2002); *see also Mejia v. Gonzales,* 499 F.3d 991, 996 (9th Cir. 2007) (upholding a regulation codifying the *Matter of Jean* presumption). Along the same lines, in *Matter of Y-L-*, Attorney General Ashcroft concluded that "aggravated felonies involving unlawful trafficking in controlled substances presumptively constitute "particularly serious crimes"D' for purposes of section 241(b)(3)(B)(ii) of the Act, 8 U.S.C. § 1231(b)(3)(B)(ii), and that "[o]nly under the most extenuating circumstances that are both extraordinary and compelling would departure from this interpretation be warranted or permissible." 23 I&N Dec. 270, 274 (2002).

The Board also regularly employs rebuttable presumptions. *See, e.g., Matter of Valdez,* 27 I&N Dec. 496, 499 (2018) ("an alien's signature on an immigration application establishes a strong presumption that he or she knows the contents of the application and has assented to them"); *Matter of Acosta,* 27 I&N Dec. 420, 432 (2018) ("once the DHS has established that a respondent has a criminal conviction at the trial level and that the time for filing a direct appeal has passed, a presumption arises that the conviction is final for immigration purposes"). Like those decisions, this opinion recognizes a rebuttable presumption that will promote the consistent application of the immigration laws.

### IV.

Under the principles set forth above, the Board's order vacating the immigration judge's decision was correct. The respondent's multiple DUI convictions warrant a presumption that he was not a person of good moral character during the requisite 10-year period and is not eligible for cancellation of removal. Nothing in the record rebuts that presumption. In determining that the respondent's positive attributes outweighed his criminal history, the immigration judge "place[d] particular weight [on] the respondent's rehabilitation efforts." But as noted above, rehabilitative efforts, standing alone, do not overcome the presumption that an alien with multiple DUI convictions is ineligible for cancellation of removal. The Board was right to hold that the respondent's criminal record, along with his ""longstanding alcohol abuse and negative immigration history," foreclosed him from establishing the good moral character required for cancellation of removal. The record shows that the respondent failed to adhere to the community's moral standards during the decade at issue. The respondent's failure to satisfy the good moral character requirement forecloses cancellation of removal, and the Board correctly vacated the immigration judge's decision to grant the respondent relief.

**\*\*8** **\*673** Congress has required a showing of good moral character as a condition of eligibility for cancellation of removal. A person who consumes drugs or alcohol and then repeatedly gets behind the wheel of a vehicle while impaired demonstrates

a character inconsistent with the Nation's moral standards, because he places not only his life but the lives of innocents on the road in grave danger. *See Birchfield*, 136 S. Ct. at 2178. An alien's DUI record is critically important in assessing whether he is eligible for discretionary relief from removal, especially when the alien is seeking to be one of the mere 4,000 aliens who may receive cancellation of removal per year. A record of multiple DUIs should presumptively foreclose this relief.

In accordance with the foregoing, I hold that evidence of two or more DUI convictions during the relevant period establishes a presumption that an alien lacks good moral character under INA § 101(f), 8 U.S.C. § 1101(f). Because only aliens who possessed good moral character for a 10-year period are eligible for cancellation of removal under section 240A(b) of the INA, 8 U.S.C. § 1229b(b), such evidence also presumptively establishes that the alien's application for that discretionary relief should be denied. The DUI convictions of the respondent in this case establish such a presumption that is not overcome by the respondent's subsequent efforts at rehabilitation. The Board correctly held that the respondent is ineligible for cancellation of removal. The Board's decision is therefore affirmed. I decline to address in the first instance the respondent's argument that he is eligible for adjustment of status, without precluding the Board from considering this question on remand in connection with the respondent's pending request to reopen or reconsider. [3]

## Footnotes

[1]  This opinion uses the term "DUI" to mean all state and federal impaired-driving offenses, including "driving while intoxicated," "operating under the influence," and the like, that make it unlawful for an individual to operate a motor vehicle while impaired. This term does not include lesser included offenses, such as negligent driving, that do not require proof of impairment. Although DUIs are the offenses at issue here, nothing in this opinion prevents immigration judges or the Board of Immigration Appeals from taking into account other convictions, such as negligent driving, in determining whether to grant cancellation of removal.

[2]  Multiple DUI convictions that involve alcohol should also prompt an immigration judge to assess whether the alien is or was a "habitual drunkard" categorically lacking good moral character under section 101(f)(1) of the INA, 8 U.S.C. § 1101(f)(1). A habitual drunkard is "a person who regularly drinks alcoholic beverages to excess." *Ledezma-Cosino*, 857 F.3d at 1046. DHS presents uncontroverted, publicly available data showing that DUI arrests account for only a small fraction of all driving-while-impaired episodes, and that the average DUI arrestee drives impaired dozens of times before ever being arrested. DHS Br. 11-14. Other studies further support the conclusion that a typical person with multiple DUI convictions drinks to excess with regularity. *See, e.g.*, Howard J. Shaffer et al., *The Epidemiology of Psychiatric Disorders Among Repeat DUI Offenders Accepting a Treatment-Sentencing Option*, 75 J. Consulting & Clinical Psychol. 795, 802 (2007) ("Almost 100% of our repeat DUI sample qualified for a lifetime diagnosis of alcohol abuse or dependence, and three quarters of the sample met criteria for one of those diagnoses within the past year."); Ralph K. Jones & John H. Lacey, *State of Knowledge of Alcohol-Impaired Driving: Research on Repeat DWI Offenders* 18 (2000) (repeat offenders ""often have alcohol problems" and "commonly suffer from alcohol addiction"); *cf.* Amy Jewett et al., *Alcohol-Impaired Driving Among Adults --United States*, 2012, 64 Morbidity & Mortality Wkly. Rep. 814, 814 (2015) ("the 4% of the adult population who reported binge drinking at least four times per month accounted for 61% of all alcohol-impaired driving episodes").

[3]  I note, however, that adjustment of status is similarly a discretionary benefit that *may* be granted to an applicant who meets general statutory qualifications. *See* INA § 245(a), 8 U.S.C. § 1255(a). Although not specifically at issue here, any decision to grant or deny adjustment of status, or a remand to pursue an application for adjustment of status, should include a careful analysis of whether an applicant with multiple DUI convictions merits such relief as a matter of discretion.

27 I. & N. Dec. 664 (U.S.Atty.Gen.), Interim Decision 3965, 2019 WL 5546809

---

   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

Disagreed With by Barajas-Romero v. Lynch, 9th Cir., January 18, 2017

25 I. & N. Dec. 341 (BIA), Interim Decision 3697, 2010 WL 3632821

U.S. Department of Justice

Executive Office for Immigration Review

Board of Immigration Appeals

MATTER OF C-T-L-, RESPONDENT

Decided September 14, 2010

**1  *341  The "one central reason" standard that applies to asylum applications pursuant to section 208(b)(1)(B)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1158(b)(l)(B)(i) (2006), also applies to applications for withholding of removal under section 241(b)(3)(A) of the Act, 8 U.S.C. § 1231(b)(3)(A) (2006).

**FOR RESPONDENT:**

Jaspreet Kalra Singh, Esquire,

New York, New York [1]

**FOR THE DEPARTMENT OF HOMELAND SECURITY:**

Grace H. Cheung,
Assistant Chief Counsel

**AMICI CURIAE:**

Michael M. Hethmon, Esquire;

Joseph C. Hohenstein, Esquire;

Paul O'Dwyer, Esquire; and

Stephen W. Manning, Esquire,

Washington, D.C. [2]

BEFORE: Board Panel: GRANT, MALPHRUS, and MULLANE, Board Members.
MALPHRUS, Board Member:

In a decision dated October 5, 2006, an Immigration Judge denied the respondent's applications for asylum, withholding of removal, and protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46. 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture"), and ordered him removed from the United States. We dismissed the respondent's appeal from that decision on January 7, 2008. The matter is now before us on remand from the United States Court of Appeals for the Ninth Circuit. Both parties and  *342  amici curiae have filed briefs. [3]  The respondent's appeal will again be dismissed.

I. FACTUAL AND PROCEDURAL HISTORY

The respondent is a native and citizen of Brazil who was admitted to the United States as a nonimmigrant visitor in 1995. He was served with a Notice to Appear (Form I-862) dated January 24, 2006, charging him with marriage fraud under section 237(a)(l)(G)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(l)(G)(i) (2006). At proceedings before the Immigration Judge on June 28, 2006, the respondent conceded removability and applied for asylum, withholding of removal under section

241(b)(3)(A) of the Act, 8 U.S.C. § 1231(b)(3)(A) (2006), and protection under the Convention Against Torture. Accordingly, these proceedings are governed by the provisions of the REAL ID Act of 2005, Division B of Pub. L. No. 109-13, 119 Stat. 302 ("REAL ID Act"). *See Matter of S-B-,* 24 I&N Dec. 42 (BIA 2006).

 **\*\*2**  The respondent sought relief based on three separate incidents. First, he expressed a fear of a former employer, a businessman and politician whom the respondent had criticized during the 1980s for the employer's involvement in the death of an American citizen. Second, after the respondent had relocated during the early to mid-1990s, he was involved in the business of registering automobiles with a government agency and was approached by police officers to participate in a blackmail scheme. The respondent reported the officers' scheme to the authorities, who disciplined and suspended the rogue officers for 2 months, and he later appeared on television to expose the officers' wrongdoings. Third, while in the United States, after being solicited by a drug dealer to engage in illegal activities, the respondent assisted law enforcement authorities in apprehending the dealer.

The Immigration Judge found the respondent to be credible, but she denied his application for asylum because he failed to file for relief within a year after the date of his arrival in the United States, as required by section 208(a)(2)(B) of the Act, 8 U.S.C. § 1158(a)(2)(B) (2006). The respondent demonstrated no changed or extraordinary circumstances to excuse the delay. *See* section 208(a)(2)(D) of the Act; 8 C.F.R. §§ 1208.4(a)(4), (5) (2010). In addition, the Immigration Judge denied the respondent's request for withholding of removal, also referred to as restriction from removal, finding that he did not show that there was a nexus between the harm he fears and one of the protected grounds specified in the Act. Finally, the Immigration Judge  **\*343**  determined that the respondent did not establish that he should be granted protection under the Convention Against Torture.

In dismissing the respondent's appeal, we stated that he was unable to demonstrate that either his political opinion or his membership in a particular social group was a "central reason" for any feared persecution, as required by section 208(b)(l)(B)(i) of the Act. On November 19, 2008, the Ninth Circuit granted the Government's unopposed motion to remand these proceedings to determine whether section 208(b)(l)(B)(i) applies to applications for withholding of removal under section 241(b)(3)(A).

In the motion, the parties acknowledged that although the respondent did not contest the applicability of the REAL ID Act to his request for withholding of removal, there was no developed or meaningful discussion by the parties addressing the applicability of the "one central reason" standard to withholding of removal claims. Thus, the record was remanded for us to "bring [our] expertise to bear upon the matter … through informed discussion and analysis." *INS v. Orlando Ventura,* 537 U.S. 12, 17 (2002).

## II. ANALYSIS

### A. REAL ID Act Amendments

 **\*\*3**  Section 208(b)(1)(A) of the Act provides that a "refugee" is eligible for asylum. That term is defined in section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42) (2006), as including a person who has been persecuted or who has a well-founded fear of persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion." *See also INS v. Cardoza-Fonseca,* 480 U.S. 421, 423 (1987). An alien who demonstrates past persecution or a well-founded fear of future persecution is eligible for asylum, subject to a discretionary determination. *Id.* at 423, 428 nn. 5-6. This standard is a broader one than that used to demonstrate eligibility for withholding of removal. *Id.* at 423-24.

Eligibility for withholding of removal requires a showing that the alien's life or freedom would be threatened "because of … race, religion, nationality, membership in a particular social group, or political opinion." Section 241(b)(3)(A) of the Act. Thus, to establish eligibility for withholding of removal, an alien must show that there is a clear probability of persecution, or stated differently, that it is more likely than not that he or she would be subject to persecution. *INS v. Stevic,* 467 U.S. 407, 424 & n.19 (1984). We view the "clear probability" standard to be equivalent to, and interchangeable with, the "more likely than not" standard for purposes of withholding of removal. *See id.* at 429-30. *See generally* 8 C.F.R. §§ 208.16(b), 1208.16(b) (2010).

**\*344** The REAL ID Act amended section 208(b)(1) of the Act by addressing the required burdens of proof. One of the amendments provides that an asylum applicant must "establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason" for the persecution. Section 208(b)(l)(B)(i) of the Act (emphasis added). We apply this standard in asylum proceedings to so-called "mixed motive" cases. *Matter of J-B-N- & S-M-,* 24 I&N Dec. 208 (BIA 2007). [4]

The REAL ID Act amendments also addressed other burden of proof issues concerning credibility and corroboration. *See* sections 208(b)(l)(B)(ii), (iii) of the Act. Section 241(b)(3)(C) of the Act explicitly states that these amendments apply to applications for withholding of removal:

In determining whether an alien has demonstrated that the alien's life or freedom would be threatened for a reason described in subparagraph (A), the trier of fact shall determine whether the alien has sustained the alien's burden of proof, and shall make credibility determinations, in the manner described in clauses (ii) and (iii) of section 208(b)(1)(B).

**\*\*4** However, the Act does not expressly provide whether the "one central reason" standard in section 208(b)(l)(B)(i) of the Act applies in the context of withholding of removal. Thus, this matter has been remanded for us to determine the appropriate burden of proof standard for withholding of removal applications. *See Negusie v. Holder,* 129 S. Ct. 1159, 1164 (2009).

### B. Statutory Construction and Congressional Intent

In deciding this issue, we employ settled principles of statutory construction. "Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340 (1997). Issues regarding whether the language is plain and unambiguous are "determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* at 341. Thus, we first "look to the particular statutory language at issue." *K-Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291 (1988).

Section 241(b)(3)(C) of the Act specifically addresses "burden of proof" and "credibility determinations" and does so by cross-referencing, and thus incorporating, sections 208(b)(l)(B)(ii) and (iii) of the Act. However, section 241(b)(3)(C) does not expressly cross-reference section 208(b)(l)(B)(i), **\*345** which, as noted above, was also part of the amendments made by the REAL ID Act and set forth the "one central reason" standard. Thus, section 241(b)(3)(C) is silent regarding whether that standard is applicable to withholding of removal claims.

The respondent contends that Congress's failure to expressly make the "one central reason" standard applicable to the withholding of removal provision must mean that it did not intend for that standard to apply. However, in statutory construction, "silence is not conclusive." *Negusie v. Holder,* 129 S. Ct. at 1164. We are instructed not to view the language of statutory provisions in isolation but instead are charged with reading the words "'in their context and with a view to their place in the overall statutory scheme.'" *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133 (2000) (quoting *Davis v. Michigan Dep't of Treasury,* 489 U.S. 803, 809 (1989)); *see also Matter of Moncada,* 24 I&N Dec. 62, 64 (BIA 2007). We are also "guided to a degree by common sense" as we "interpret the statute 'as a symmetrical and coherent regulatory scheme'" and "'fit, if possible, all parts into an harmonious whole.'" *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.,* 529 U.S. at 133 (quoting *Gustafson v. Alloyd Co.,* 513 U.S. 561, 569 (1995), and *FTC v. Mandel Brothers, Inc.,* 359 U.S. 385, 389 (1959)); *see also Matter of Moncada,* 24 I&N Dec. at 65.

**\*\*5** In applying these principles, we begin our analysis by examining the intent and purpose of the REAL ID Act amendments regarding the burden of proof, which were a direct response to inconsistent asylum law in the courts of appeals. Congress recognized that these courts had developed different standards on the "mixed motive" issue. H.R. Rep. No. 109-72, at 163 (2005) (Conf. Rep.), *as reprinted in* 2005 U.S.C.C.A.N. 240, 289, 2005 WL 1848528 (citing *Ambartsoumian v. Ashcroft,* 388 F.3d 85, 91 (3d Cir. 2004) (discussing an applicant's failure to show persecution where police harassment was "mainly because

he had failed to obtain proper legal documents and permissions," not on account of ethnicity); *Useinovic v. INS,* 313 F.3d 1025, 1033 (7th Cir. 2002) (finding no showing of persecution where robbery "was primarily aimed at [the alien] personally" and not at a theft of valuables); and *Girma v. INS,* 283 F.3d 664, 668 (5th Cir. 2002) (affirming the Board's finding of no persecution in a mixed motive case because "the harm suffered was [not] motivated in meaningful part by a protected ground")). In enacting the REAL ID Act amendments, Congress sought to clarify the "mixed motive" standard and provide a "uniform standard for assessing motivation." *Id.* at 163; *see also Matter of J-B-N- & S-M-,* 24 I&N Dec. at 214.

Specifically, Congress set out to address an "anomaly in the law" that it said was "created by the Ninth Circuit." H.R. Rep. No. 109-72, at 163. Congress was critical of the Ninth Circuit's decisions in *Borja v. INS,* 175 F.3d 732 (9th Cir. 1999), and *Briones v. INS,* 175 F.3d 727 (9th Cir. 1999), saying that they "substantially undermined a proper analysis of mixed motive cases" **\*346** by weakening the standard regarding motivation for persecution that the alien was required to show. H.R. Rep. No. 109-72, at 163; *see also Matter of J-B-N- & S-M-,* 24 I&N Dec. at 214 n.9. [5] It also noted that the Ninth Circuit's approach to motivation "improperly favors asylum applicants who claim that they have been accused of engaging in terrorist, militant, or guerilla activity." H.R. Rep. No. 109-72, at 163-64.

Prior to the enactment of the REAL ID Act, we consistently applied the nexus requirement in the same manner to withholding of removal cases as we did in asylum cases. *See, e.g., Matter of A-M-,* 23 I&N Dec. 737, 739 (BIA 2005); *Matter of V-T-S-,* 21 I&N Dec. 792, 796 (BIA 1997); *Matter of T-M-B-,* 21 I&N Dec. 775, 780 (BIA 1997), *rev'd on other grounds, Borja v. INS,* 175 F.3d 732. There is no indication that Congress intended to change this approach that we had traditionally applied when it passed the REAL ID Act. In fact, all indications are that Congress intended to apply the "one central reason" standard uniformly to both asylum and withholding claims, as the Department of Homeland Security and the American Immigration Lawyers Association discuss in their briefs.

**\*\*6** We see no reason to now treat withholding of removal claims differently for cases subject to the REAL ID Act amendments. Applying this standard to withholding claims has two distinct practical advantages. The first is that it will avoid the application of the different standards adopted by the courts of appeals in "mixed motive" cases. Congress envisioned that a single national standard would apply to all applicants regardless of where the proceedings arose.

The second is that the burden of proof standard would be consistent between asylum and withholding of removal claims. There are important distinctions between asylum and withholding of removal. One is the overall burden of proof standard: well-founded fear of persecution for asylum, and clear probability of persecution for withholding of removal. *See INS v. Stevic,* 467 U.S. at 429-30. Other differences include the fact that an asylee can adjust to lawful permanent resident status and sponsor certain other relatives, whereas aliens granted only withholding of removal can remain and work in the United States but cannot adjust status on that basis and cannot extend the status to others. *See, e.g., Gumaneh v. Mukasey,* 535 F.3d 785, 789 (8th Cir. 2008). The existing distinctions are generally straightforward to apply because they involve either basic eligibility criteria or the overarching burden of proof.

**\*347** Applying a different standard in "mixed-motive" cases to asylum and withholding of removal would create inherent difficulties because it would require a bifurcated analysis on a single subissue in the overall case. An application for asylum necessarily includes the similar but lesser form of relief of withholding of removal. 8 C.F.R. §§ 208.3(b), 1208.3(b) (2010); *see also Matter of Castellon,* 17 I&N Dec. 616, 620 (BIA 1981). Given that an asylum application also includes an application for withholding of removal, applying a different standard would make these adjudications more complex, unclear, and uncertain. On the other hand, applying the same standard promotes consistency and predictability, which are important principles in immigration law.

The legislative history of the REAL ID Act is clear that Congress was dissatisfied with the analysis in *Borja* and *Briones* and attempted to address the disparity in the circuits regarding the proper standard for evaluating the persecutor's motive. It does not make sense to resurrect that disparity for withholding of removal claims. We cannot conclude that Congress would have intended to create such an anomaly. Congress's silence regarding the "mixed motive" application to withholding of removal

AR.05576

cases is best understood through the legislative history, which noted a disagreement with cases that arose in the context of asylum, not withholding of removal. Given Congress' criticism of the *Borja* and *Briones* "mixed motive" analysis, we do not attribute its silence on the withholding of removal provision as an intent to preserve the standard applied there in the context of withholding cases. Rather, it appears that, in modifying the asylum standard, Congress believed it had fixed the problem and provided a "uniform standard for assessing motivation" in related forms of relief that generally arise in the same case. H.R. Rep. No. 109-72, at 163. We further note in this regard that section 208(b)(l)(B)(i) of the Act, which codified the "one central reason" standard in the asylum context, refers to the definition of a "refugee" in section 101(a)(42)(A) that an applicant must meet, which is a lesser burden than that required for withholding of removal. Thus it makes sense that, given the different legal standard, section 208(b)(1)(B)(i) would not refer to withholding of removal.

**\*\*7** Moreover, because key language regarding motivation in the relevant statutes has the same meaning, adopting two different standards would be unharmonious and asymmetrical. *See Food and Drug Admin. v. Brown & Williamson Tobacco Corp.,* 529 U.S. at 133; *see also Matter of Moncada,* 24 I&N Dec. at 65. To be eligible for asylum, an alien must qualify as a "refugee," that is, a person who suffered persecution or has a well-founded fear of persecution "*on account of* race, religion, nationality, membership in a particular social group, or political opinion." Section 101(a)(42) of the Act (emphasis added); *see also INS v. Cardoza-Fonseca,* 480 U.S. at 423. An applicant for withholding of removal must demonstrate that **\*348** his or her life or freedom would be threatened "*because of*" one or more of the same five reasons. Section 241(b)(3)(A) of the Act (emphasis added); *see also INS v. Stevic,* 467 U.S. 407. The phrases "on account of" and "because of" are equivalent and have been used interchangeably. *See, e.g., INS v. Elias-Zacarias,* 502 U.S. 478, 481-83 (1992).

Indeed, in applying the REAL ID Act, numerous courts have assumed that the standard applies to withholding of removal claims, or they have determined that if asylum is denied where an applicant fails to meet the "one central reason" standard, then the alien's application for withholding of removal necessarily fails as well. *See, e.g., Shaikh v. Holder,* 588 F.3d 861 (5th Cir. 2009); *Dias Gomes v. Holder,* 566 F.3d 232, 234 (1st Cir. 2009); *Quinteros-Mendoza v. Holder,* 556 F.3d 159, 164-65 (4th Cir. 2009); *Singh v. Mukasey,* 543 F.3d 1, 5-7 (1st Cir. 2008); *Abdel-Rahman v. Gonzales,* 493 F.3d 444, 453 n.12 (4th Cir. 2007); *Wong de Abanto v. U.S. Att'y Gen.,* 367 F.App'x 993, 996 n.5 (11th Cir. 2010); *Tian Ming Huang v. BIA,* 305 F.App'x 722, 723-24 (2d Cir. 2009); *Gutul v. Mukasey,* 290 F.App'x 968, 969 (8th Cir. 2008); *Rios v. Holder,* No. 07-73953, 2010 WL 1474494 (9th Cir. Apr. 14, 2010).

Our determination here expressly adopts what has been implicitly assumed since the enactment of the REAL ID Act. Considering the language and design of the statute, congressional intent to create a uniform standard, and the inherent difficulties in applying different burden of proof standards on the subissue of the persecutor's motive, we conclude that an applicant for withholding of removal must demonstrate that race, religion, nationality, membership in a particular social group, or political opinion was or will be "at least one central reason" for the claimed persecution.

**\*\*8** Furthermore, even if we were unable to discern a clear congressional intent based on the lack of express statutory language making the "one central reason" standard applicable to the withholding of removal provision, we would reach the same result. Our application of the "one central reason" standard to withholding of removal claims represents at a minimum a "reasonable choice within a gap left open by Congress." *Chevron, U.S.A., Inc., v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 866 (1984). Thus, assuming that the statutory language gap makes the statute ambiguous, we would adopt this approach as a matter within our adjudicative authority and administrative judgment. *See id.* at 843-44; *see also Negusie v. Holder,* 129 S. Ct. at 1167; *INS v. Orlando Ventura,* 537 U.S. at 16-17.

<center>C. Application of the REAL ID Act Amendment</center>

At the outset, we note that only withholding of removal is before us. The respondent does not challenge his ineligibility for asylum based on his untimely filing. *See* section 208(a)(2)(B) of the Act. Nor does he assert any **\*349** arguments to convince us that he is entitled to protection under the Convention Against Torture. Rather, the respondent argues that, assuming he must demonstrate that race, religion, nationality, membership in a particular social group, or political opinion will be "at least one

central reason" for future persecution, he has met his burden based on membership in a particular social group, namely, public opponents of police violence and corruption in Brazil, and on his political opinion.

The threats that the respondent received were of a personal or retaliatory nature and were not because of any politically held or imputed opinion or because of his membership in any particular social group. As concerns the three incidents with which the respondent was associated, he is unable to demonstrate that political opinion or his membership in a particular social group is at least one central reason for any feared persecution. It is not necessary to determine whether the respondent's articulated particular social group is valid because the respondent has not shown that any persecution was or would be on account of his membership in that group. The respondent was employed as a driver and confidant by a businessman who was also a politician. When the employer found out about the respondent's casual discussions or, as the Immigration Judge characterized them, his "talking behind his employer's back and criticizing him," the respondent's employment was terminated. He had problems not on account of a protected basis, but because his employer wanted retribution for his comments. The fact that the respondent's employer happened to be a politician is merely incidental in this case. *Molina-Morales* v. *INS,* 237 F.3d 1048, 1052 (9th Cir. 2001).

 **9  Also, the police officers threatened the respondent not because of his political opinion or his membership in a particular social group, but because he had interfered with their private money-making scheme. Similarly, the respondent did not seek to expose police corruption because of any political opinion, but rather to avoid being harmed by the two officers. The record does not demonstrate that the officers were interested in other than personal retribution. Moreover, as previously discussed, the officers were disciplined and suspended. The officers' scheme represents "aberrational" conduct by individuals, not systemic government-sanctioned corruption. *See Baghdasaryan v. Holder,* 592 F.3d 1018, 1024 (9th Cir. 2010). Finally, as we stated in our earlier decision, the respondent's assistance of American law enforcement has no relation to police corruption.

The respondent has not produced "evidence, either direct or circumstantial, from which it is reasonable to believe that [any] harm … would be motivated [even] in part by an actual or imputed protected ground." *Matter of J-B-N- & S-M-,* 24 I&N Dec. at 211 (citing *Matter of S-P-,* 21 I&N Dec. 486, 494 (BIA 1996)). Thus he clearly has not shown that one of the protected grounds was "at least one central reason" for the incidents that he described. Because the remand from the Ninth Circuit was only for the purpose  *350  of addressing the applicability of section 208(b)(l)(B)(i) of the Act to the respondent's claim for withholding of removal, we rely on our earlier decision and will not further address the specifics of this issue.

### III. CONCLUSION

After consideration of the relevant statutory, legal, and legislative references in the proper context, we hold that an applicant for withholding of removal must demonstrate that race, religion, nationality, membership in a particular social group, or political opinion was or will be "at least one central reason" for the claimed persecution. Although the respondent argues that he will be targeted because of political opinion or his membership in a particular social group, he is unable to demonstrate that he engaged in activity that is protected under the Act. Thus, the respondent has not shown that a protected ground would be a reason for his fear of future persecution, let alone at least one central reason. Therefore, he is not entitled to withholding of removal. Accordingly, the respondent's appeal will be dismissed.

**ORDER:** The appeal is dismissed.

### Footnotes

1    Although the respondent's former attorney has been suspended from practice before the Board, the Immigration Court, and the Department of Homeland Security, his suspension was not in effect at the time he filed a brief in April 2009, so we have considered the arguments set forth in that brief.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2    We acknowledge and appreciate the very helpful briefs submitted by the parties and by amici curiae, the American Immigration Lawyers Association and the Federation for American Immigration Reform, Inc.

3    After amici curiae submitted their briefs, the Department of Homeland Security ("DHS") filed a motion to accept its supplemental brief. The DHS's unopposed motion will be granted. We have also accepted the respondent's supplemental brief, which was filed on August 6, 2010.

4    The Ninth Circuit adopted our interpretation of the meaning of "one central reason" in *Parussimova v. Mukasey,* 555 F.3d 734, 741 (9th Cir. 2009).

5    The Ninth Circuit has recognized the effect that the REAL ID Act amendments have had on its earlier precedent, and it has acknowledged the congressional abrogation of some of its case law. *See, e.g., Shrestha v. Holder,* 590 F.3d 1034, 1042 n.3 (9th Cir. 2010); *Aden v. Holder,* 589 F.3d 1040, 1043-45 (9th Cir. 2009); *Parussimova v. Mukasey,* 555 F.3d at 739-40.

25 I. & N. Dec. 341 (BIA), Interim Decision 3697, 2010 WL 3632821

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

27 I. & N. Dec. 575 (BIA), Interim Decision 3958, 2019 WL 3423459

U.S. Department of Justice

Executive Office for Immigration Review

Board of Immigration Appeals

MATTER OF D-A-C-, RESPONDENT

Decided July 26, 2019

**\*\*1  \*575**  Immigration Judges have the authority to deny an application for temporary protected status in the exercise of discretion.

**FOR RESPONDENT:**
Mary Sameera Van Houten Harper, Esquire
Brooklyn, New York

**FOR THE DEPARTMENT OF HOMELAND SECURITY:**
Joshua Lee
Assistant Chief Counsel

BEFORE: Board Panel: MALPHRUS, MULLANE, and CREPPY, Board Members.
MALPHRUS, Board Member:

In a decision dated October 10, 2018, an Immigration Judge found the respondent removable under section 212(a)(6)(A)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(6)(A)(i) (2012), as an alien who is in the United States without permission, and denied his application for temporary protected status ("TPS"). The respondent has appealed from that decision. [1] The appeal will be dismissed.

The respondent is a native and citizen of El Salvador, who entered the United States in April 1997. On January 30, 2018, he pled guilty to attempted endangering the welfare of a child, a class B misdemeanor under sections 110.00 and 260.10(01) of the New York Penal Law, for which he was sentenced to 90 days in prison. An order of protection was also issued against the respondent.

The Immigration Judge found that the respondent is statutorily eligible for TPS under section 244 of the Act, 8 U.S.C. § 1254a (2012). However, he denied the application because the respondent did not establish that a favorable exercise of discretion was warranted. The respondent challenges the denial of his application, arguing that an Immigration Judge does not have  **\*576**  the authority to deny TPS in discretion and, alternatively, that he merits a discretionary grant of TPS. We disagree.

The respondent primarily argues that discretionary determinations should be limited to forms of relief, such as waivers of inadmissibility or cancellation of removal, where the terms "discretion" or "good moral character" have been explicitly incorporated into the framework of the statute. [2] However, it is not necessary for a statute to include this language if it otherwise indicates that it has a discretionary component, as it does here.

The plain language of section 244(a)(1)(A) of the Act provides that the Attorney General "*may* grant an alien" TPS if the alien meets the statutory eligibility requirements in section 244(c). "The word 'may' customarily connotes discretion." [3] *Jama v. ICE*, 543 U.S. 335, 346 (2005). Moreover, in other parts of the TPS statute, Congress used the word "shall," which "generally imposes a nondiscretionary duty." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1354 (2018); *see also, e.g.*, sections 244(a)(1)(A), (B) of the Act (stating that the Attorney General "shall not remove the alien" while TPS status is in effect and "shall authorize

the alien to engage in employment"). The fact that both words are in the same statute further reinforces that a grant of TPS is intended to be discretionary. *See Jama*, 543 U.S. at 346 (emphasizing the "inappropriateness of reading 'may' to mean 'shall,'" particularly where "'may' is used in contraposition to the word 'shall'").

 **\*\*2**  The applicable regulations also provide that an applicant "may in the discretion of the director be granted Temporary Protected Status." 8 C.F.R. §§ 244.2, 1244.2 (2019). Although these regulations refer to "the director," we have held that an alien may renew an application for TPS in removal proceedings before an Immigration Judge, who has de novo review over such applications. *See Matter of Figueroa*, 25 I&N Dec. 596, 598 (BIA 2011).

The respondent notes that section 242(a)(2)(B)(i) of the Act, 8 U.S.C. § 1252(a)(2)(B)(i) (2012), divests the Federal courts of jurisdiction to review "'any judgment regarding the granting of relief under section 212(h), 212(i), 240A, 240B, or 245" of the Act and argues that if Congress had intended TPS to be discretionary, it would have included section 244 in this provision. Section 242(a)(2)(B)(i)'s limitation on the scope of the courts' review  **\*577**  authority does not determine whether TPS can be denied as a matter of discretion. The fact that this ancillary jurisdictional statute lists several other provisions for discretionary forms of relief in the Act does not override the plain language of section 244(a)(1)(A).

The United States Court of Appeals for the Eleventh Circuit has specifically stated that "[t]he ultimate decision of whether to grant TPS to an alien is undisputedly within the discretion of the Secretary" of Homeland Security pursuant to section 244(a)(1)(A) of the Act. *Mejia Rodriguez v. U.S. Dep't of Homeland Sec.*, 562 F.3d 1137, 1143 (11th Cir. 2009) (per curiam). We are unpersuaded that there are any valid reasons to read section 244(a)(1)(A) differently. We therefore conclude that TPS is a discretionary form of relief and that Immigration Judges have the authority to deny TPS in the exercise of discretion. *See Matter of Figueroa*, 25 I&N Dec. at 598.

We must next examine the Immigration Judge's denial of TPS in this case. To be statutorily eligible for TPS, the respondent must prove that he is admissible to the United States and meets certain other requirements, including timely registration and continuous physical presence. Section 244(c)(1)(A) of the Act. In addition, he must establish that he is not barred from relief because he has been convicted of a felony or two or more misdemeanors in the United States or has engaged in other serious conduct specified in the Act. Section 244(c)(2)(B) of the Act.

The Immigration Judge determined that the respondent is statutorily eligible for TPS, finding that his conviction for a single misdemeanor did not bar him from establishing eligibility. The respondent argues that this alone warrants a grant of relief and that the Immigration Judge erred in considering the factual circumstances underlying his conviction. The Supreme Court has made clear, however, that an alien's statutory eligibility for discretionary relief "in no way limits the considerations that may guide [the exercise of] discretion to determine who, among those eligible, will be accorded grace." *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 31 (1996).

 **\*\*3**  It is well established that "there is no inflexible standard for determining who should be granted discretionary relief, and each case must be judged on its own merits." *Matter of C-V-T-*, 22 I&N Dec. 7, 11 (BIA 1998). Although we have not previously decided what factors should be considered in the TPS context, we deem it appropriate to balance the favorable and adverse factors in a manner similar to that which we have long employed in analyzing other forms of discretionary relief.
For example, favorable considerations include such factors as family ties within the United States, residence of long duration in this country (particularly when the inception of residence occurred while at a young age), evidence of hardship to the respondent and his family if deportation occurs, service in this country's armed forces, a history of employment, the existence of property or business ties, evidence  **\*578**  of value and service to the community, proof of genuine rehabilitation if a criminal record exists, and other evidence attesting to a respondent's good character. Among the factors deemed adverse to an alien are the nature and underlying circumstances of the grounds of [removal] that are at issue, the presence of additional significant violations of this country's immigration laws, the existence of a criminal record and, if so, its nature, recency, and seriousness, and the presence of other evidence indicative of a respondent's bad character or undesirability as a permanent resident of this country.

*Id.* (citing *Matter of Marin*, 16 I&N Dec. 581 (BIA 1978)) (setting forth the factors to be applied in exercising discretion under section 240A of the Act).

In addition, since the purpose of TPS is to provide protection based on adverse conditions in an alien's home country, it is important to also consider how those conditions might affect the alien's potential safety if he is removed there. *See Matter of Sosa Ventura*, 25 I&N Dec. 391, 394-95 (BIA 2010). The ultimate consideration when balancing factors in the exercise of discretion is to determine whether a grant of relief, or in this case protection, appears to be in the best interest of the United States. *See Matter of C-V-T-*, 22 I&N Dec. at 11; *see also Matter of Mendez*, 21 I&N Dec. 296, 305 (BIA 1996) (considering the welfare and safety of others in this country in making a discretionary determination).

In some circumstances, meeting the minimum eligibility requirements for relief may be sufficient to warrant a favorable exercise of discretion, especially where, as here, there are restrictive statutory bars to eligibility for criminal conduct and the relief itself is temporary. *See Matter of C-V-T-*, 22 I&N Dec. at 11. However, any adverse factors, including recent criminal activity, must be offset by significant additional equities. *Id.*

 **\*\*4**  The respondent was convicted of attempting to endanger the welfare of a child. The charging document in his case alleged that he grabbed a young girl by the arm and that he forcibly attempted to kiss her on the lips and touch her in an inappropriate manner. However, he testified that he never touched the girl inappropriately and that he inadvertently kissed her lips, instead of her cheek, in an attempt to console her after he pushed her away from a machine he was operating while he was working in the family home.

The Immigration Judge found that the charging document was reliable as to the key facts that formed the basis for the respondent's conviction and persuasive as to his actual conduct. He also determined that the respondent was evasive and withheld important details and that his testimony was not consistent in all respects with a statement he gave to the police. The Immigration Judge considered implausible the respondent's claim that the prosecutor added untrue facts to the charging document to convince him to plead guilty. Stating that he was not satisfied by the respondent's  **\*579**  explanations, the Immigration Judge found that his testimony regarding his conviction was not credible, which the respondent claims was erroneous.

An Immigration Judge "is not required to accept a respondent's assertions, even if plausible, where there are other permissible views of the evidence based on the record." *Matter of D-R-*, 25 I&N Dec. 445, 455 (BIA 2011), *remanded on other grounds*, *Radojkovic v. Holder*, 599 F. App'x 646, 648 (9th Cir. 2015). The Immigration Judge's findings as to the respondent's conduct represent a permissible view of the evidence. There is no clear error in these findings. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

The respondent argues that he was not required to admit all the allegations in the charging document and only pled guilty to the broad language of section 260.10(01), that is, to attempting to act "in a manner likely to be injurious to the physical, mental or moral welfare of a child." In particular, he asserts that he did not admit guilt to the inappropriate physical conduct alleged in the charging document and that the Immigration Judge should not have considered the allegations as true. [4]

In support of his claim, the respondent cites *Padmore v. Holder*, 609 F.3d 62 (2d Cir. 2010) (per curiam), where the Second Circuit found that we impermissibly engaged in fact-finding when we relied on information in an arrest report and a prosecutor's affidavit that was based on a statement by a police officer. The alien disputed factual statements in both documents, and the Immigration Judge made no findings in that regard. The court held that we exceeded our authority by reversing the Immigration Judge's grant of discretionary relief, "*not* on the basis of having found clear error, but instead based on disputed material facts with respect to which the [Immigration Judge] reached no resolution, and which [were] analyzed in such a way as to constitute independent factfinding." *Id.* at 68 (citation omitted).

**\*\*5**  The respondent's reliance on that case is misplaced. Unlike in *Padmore*, the Immigration Judge here found the charging document to be reliable, and he made an adverse credibility finding regarding the respondent's testimony, which we have determined is not clearly erroneous. *Padmore* is distinguishable and, consequently, not controlling in the respondent's case.[5]

 **\*580**  Significantly, the Second Circuit recognized that the Board has "authority to review 'police reports and complaints, even if containing hearsay and not a part of the formal record of conviction' because such documents 'are appropriately admitted for the purposes of considering an application for discretionary relief.'D' *Id.* at 69 (quoting *Carcamo v. U.S. Dep't of Justice, 498 F.3d 94, 98 (2d Cir. 2007)*).

Thus, it was proper for the Immigration Judge to consider any reliable and probative evidence regarding the respondent's actual conduct, including the information in the charging document, to determine the factual circumstances underlying his conviction. *See Matter of Mendez*, 21 I&N Dec. at 303 n.1 (noting that "it is proper to look to probative evidence outside the record of conviction in inquiring as to the circumstances surrounding the commission of the crime in order to determine whether a favorable exercise of discretion is warranted" (citation omitted)); *Matter of Grijalva*, 19 I&N Dec. 713, 722 (BIA 1988) (finding the admission of police reports "especially appropriate in cases involving discretionary relief from deportation, where all relevant factors concerning an arrest and conviction should be considered"); *see also Matter of D-R-*, 25 I&N Dec. at 458 ("Immigration Judges have broad discretion to admit and consider relevant and probative evidence.").

In balancing the various factors in the respondent's case, the Immigration Judge recognized the equities reflected in the record, including the respondent's residence in the United States for many years, his history of gainful employment, and his strong ties to the community. The Immigration Judge also noted the current country conditions in El Salvador in view of the respondent's claimed fear of persecution. However, the respondent has not pursued the persecution claim on appeal or otherwise argued that a grant of TPS is warranted because of adverse country conditions in El Salvador.

Concluding that the serious nature of the respondent's crime and his lack of candor outweighed his equities, the Immigration Judge denied his application for TPS in the exercise of discretion. Based on our consideration of the Immigration Judge's factual findings and our de novo review of his discretionary determination, we agree with the Immigration Judge that denial of the respondent's application for TPS was appropriate. Accordingly, the respondent's appeal will be dismissed.

 **\*\*6  ORDER:** The appeal is dismissed.

### Footnotes

[1]  The Immigration Judge also denied the respondent's applications regarding his claim that he will be persecuted in El Salvador if he is deported because, as a criminal deportee, he would be harmed by gangs or tortured by the Government. However, the respondent states on appeal that he does not contest the denial of these applications, so we deem any issues in that regard waived. *See Matter of Zhang*, 27 I&N Dec. 569, 569 n.2 (BIA 2019).

[2]  Although the respondent implies that good moral character is a matter of discretion, it is clear that an applicant for cancellation of removal or voluntary departure must establish good moral character to be statutorily eligible for relief. *See* sections 240A(b)(1)(B), 240B(b)(1)(B) of the Act, 8 U.S.C. § 1229b(b)(1)(B), 1229c(b)(1)(B) (2012); *Matter of Gomez-Beltran*, 26 I&N Dec. 765, 770 (BIA 2019). Good moral character and discretion are distinct issues that should be evaluated separately.

[3]  Significantly, provisions for other forms of discretionary relief in the Act, including certain waivers of inadmissibility, cancellation of removal, and voluntary departure, state that relief "may" be granted, without including the word "discretion." *See, e.g.*, sections 212(e), 240A(a)-(b)(1), 240B(b)(1) of the Act.

[4]  In analyzing a conviction under the categorical approach, we must assume that the respondent committed the least of the acts criminalized by his statute of conviction. *See Moncrieffe v. Holder*, 569 U.S. 184, 191 (2013). However,

the categorical approach is not applicable in a discretionary determination, where it is proper to consider all probative evidence regarding the factual circumstances surrounding a conviction.

5    Two other cases cited by the respondent are also distinguishable. *Rojas v. Att'y Gen. of U.S.*, 728 F.3d 203, 220 (3d Cir. 2013) (en banc) (rejecting the use of a police criminal complaint to establish the fact of a conviction, except "to the extent it serves as a charging instrument with certain indicia of reliability"); *United States v. Juwa*, 508 F.3d 694, 700 (2d Cir. 2007) (finding that the district court impermissibly enhanced a criminal defendant's sentence "based solely on unproven charges in an indictment").

27 I. & N. Dec. 575 (BIA), Interim Decision 3958, 2019 WL 3423459

---

**End of Document**                         © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.    AR.05584  5

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by IN RE: AROLD LUMA, BIA, November 16, 2005

23 I. & N. Dec. 572 (U.S.Atty.Gen.), Interim Decision 3488, 2003 WL 1953603

U.S. Department of Justice

Office of the Attorney General

IN RE D-J-, RESPONDENT

Decided April 17, 2003

**\*\*1  \*572** (1) The Attorney General has broad discretion in bond proceedings under section 236(a) of the Immigration and Nationality Act, 8 U.S.C. § 1226(a) (2000), to determine whether to release an alien on bond.

(2) Neither section 236(a) of the Act nor the applicable regulations confer on an alien the right to release on bond.

(3) In determining whether to release on bond undocumented migrants who arrive in the United States by sea seeking to evade inspection, it is appropriate to consider national security interests implicated by the encouragement of further unlawful mass migrations and the release of undocumented alien migrants into the United States without adequate screening.

(4) In bond proceedings involving aliens seeking to enter the United States illegally, where the Government offers evidence from sources in the Executive Branch with relevant expertise establishing that significant national security interests are implicated, Immigration Judges and the Board of Immigration Appeals shall consider such interests.

(5) Considering national security grounds applicable to a category of aliens in denying an unadmitted alien's request for release on bond does not violate any due process right to an individualized determination in bond proceedings under section 236(a) of the Act.

(6) The denial of the respondent's release on bond does not violate international law.

(7) Release of the respondent on bond is unwarranted due to considerations of sound immigration policy and national security that would be undercut by the release of the respondent and other similarly situated undocumented alien migrants who unlawfully crossed the borders of the United States on October 29, 2002; further, the respondent failed to demonstrate adequately that he does not present a risk of flight if released and should be denied bond on that basis as well.

IN BOND PROCEEDINGS

The respondent is an undocumented alien from Haiti who was taken into custody and detained by the Immigration and Naturalization Service ("INS") on October 29, 2002, while attempting to evade lawful immigration procedures and enter the United States illegally. He arrived aboard a vessel that sailed into Biscayne Bay, Florida, on that date, carrying 216 undocumented aliens from Haiti and the Dominican Republic. He and other passengers on the vessel were apprehended ashore after the vessel sought to **\*573**  evade coastal interdiction by the United States Coast Guard and after many of the aliens sought to evade law enforcement authorities ashore. *See* INS Brief in Support of Bond Appeal, Exh. A ("INS Brief"). Respondent was placed in removal proceedings and charged as being an inadmissible alien under section 212(a)(6)(A)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(6)(A)(i) (2002) ("INA"). He is now seeking asylum in the United States and has applied for bond, which would allow his release into the community pending disposition on removal or asylum.

**\*\*2**  On November 6, 2002, an Immigration Judge ("IJ") granted respondent's application for release on bond (set at $2,500) over the objections of the INS. The INS argued, inter alia, that the release of respondent, and of other members of the undocumented migrant group of October 29, would stimulate further surges of such illegal migration by sea and threaten important national security interests. The INS then appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). The BIA dismissed the appeal, concluding, inter alia, that the broad national interests invoked by INS were not appropriate considerations for the IJ or the BIA in making the bond determination, "[a]bsent contrary direction from the Attorney General." Decision of the Board of Immigration Appeals, *In re D-J-*, at 2 (March 13, 2003) ("BIA Dec."). Exercising authority transferred to the Department of Homeland Security ("DHS") by the Homeland Security Act of 2002 ("HSA"), and pursuant to the provisions of 8 C.F.R. § 1003.1(h)(1)(iii), the Under Secretary for Border and Transportation Security has now referred the BIA's decision to me for review. [1]  This referral automatically stayed the BIA's order pending my decision. *See* 8 C.F.R. § 1003.19(i)(2).

On February 12, 2003, the IJ denied respondent's application for asylum. His appeal of that decision is pending before the BIA.

Although authority to enforce and administer the INA and other laws related to the immigration and naturalization of aliens has recently been transferred to the Secretary of Homeland Security by the HSA, the Attorney General retains his authority to make controlling determinations with respect  **\*574**  to questions of law arising under those statutes. [2]  This statutory framework is consistent with the Attorney General's traditional role as the primary interpreter of the law within the Executive Branch. *See generally* 28 U.S.C. §§ 511-13 (2000).

Pursuant to the authority and discretion vested in me under the provisions of section 236(a) of the INA, 8 U.S.C. § 1226(a) (2000), [3]  I have determined that the release of respondent on bond was and is unwarranted due to considerations of sound immigration policy and national security that would be undercut by the release of respondent and other undocumented alien migrants who unlawfully crossed the borders of the United States on October 29, 2002. I further determine that respondent has failed to demonstrate adequately that he does not present a risk of flight if released on bond and that he should be denied bond on that basis as well. *See* 8 C.F.R. § 236.1(c)(8) (2002). Accordingly, I order that the BIA's decision and order be vacated, and that respondent be denied bond and detained pending appropriate disposition and proceedings respecting his status under the immigration laws.

**\*575**  I.

**\*\*3**  My review of the BIA's decision in this case is *de novo*; it is not confined to reviewing the decisions of the BIA or the IJ for legal or factual error. *See Deportation Proceedings of Joseph Patrick Thomas Doherty*, 12 Op. O.L.C. 1, 4 (1988) ("[W]hen the Attorney General reviews a case pursuant to 8 C.F.R. § 3.1(h), he retains full authority to receive additional evidence and to make de novo factual determinations."). In making their decisions in this matter, both the IJ and the BIA were exercising limited authority that is dependent upon delegation from the Attorney General. *See id.* at 4. When I undertake review of such decisions pursuant to a referral under 8 C.F.R. § 1003.1(h), the delegated authorities of the IJ and BIA are superseded and I am authorized to make the determination based on my own conclusions on the facts and the law. The recent promulgation of 8 C.F.R. § 1003.1(d)(3), which precludes the BIA from engaging in de novo review of an IJ's findings of fact, does not affect the de novo standard articulated in *Doherty* because that regulation does not govern the authority of the Attorney General to review BIA decisions.

I now turn to the question of whether respondent should have been detained or released on bond under the authority of section 236(a) of the INA.

II.

A.

The law governing the detention or release of aliens such as respondent (i.e., aliens arrested and detained pending a decision on removal) is set forth in section 236(a) of the INA. It provides that the Attorney General may (1) continue to detain the alien; or (2) release the alien on bond or conditional parole. *See* section 236(a) of the INA.[4] Conditional parole is not placed in issue here, so the only question is whether the respondent should be detained or released on bond.

As recognized by the Supreme Court, section 236(a) does not give detained aliens any *right* to release on bond. *See Carlson v. Landon*, 342 U.S. 524, 534 (1952). Rather, the statute merely gives the Attorney General the authority to grant bond *if* he concludes, in the exercise of broad discretion, that the alien's release on bond is warranted. The extensive discretion granted the Attorney General under the statute is confirmed by its further provision that "[t]he Attorney General's discretionary judgment regarding the application of this section shall not be subject to review." Section 236(c) of the INA. Even apart from that provision, the courts have consistently recognized that the Attorney General has extremely broad discretion in **\*576** determining whether or not to release an alien on bond under this and like provisions. *E.g., Carlson*, 342 U.S. at 540; *United States ex rel. Barbour v. District Dir. of INS*, 491 F.2d 573, 577-78 (5th Cir.), *cert. denied*, 419 U.S. 873 (1974). Further, the INA does not limit the discretionary factors that may be considered by the Attorney General in determining whether to detain an alien pending a decision on asylum or removal. *See, e.g., Carlson*, 342 U.S. at 534 (Attorney General's denial of bail to alien is within his lawful discretion as long as it has a "reasonable foundation"); *Barbour*, 491 F.2d at 578 (INS finding that alien was a threat to national security warranted denial of bond, applying "reasonable foundation" standard); *see also Sam Andrews' Sons v. Mitchell*, 457 F.2d 745, 748 (9th Cir. 1972) (Attorney General's exercise of discretionary authorities under the INA must be upheld if they are founded "on considerations rationally related to the statute he is administering").

**\*\*4** Further discretionary authority for the release on bond of aliens such as respondent is found in subpart A, section 236.1 of the INS regulations governing "Detention of Aliens Prior to Order of Removal." *See* 8 C.F.R. § 236.1(c)(8). This regulation provides:

Any officer authorized to issue a warrant of arrest *may, in the officer's discretion*, release an alien not described in section 236(c)(1) of the Act, under the conditions at section 236(a)(2) and (3) of the Act; provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding.

*Id.* (emphasis added). This provision gives the DHS discretionary authority to release a covered alien on bond if, and only if, the alien makes a satisfactory demonstration with respect to the stated criteria. Like section 236(a), it does not establish any right to release on bond.

<div align="center">B.</div>

I will now briefly summarize the pertinent facts and contentions of the parties indicated in the record.

As noted above, respondent arrived off the shores of Florida in an overloaded vessel with 216 undocumented aliens from Haiti and the Dominican Republic on October 29, 2002. After the vessel sought to evade the orders and interdiction efforts of a U.S. Coast Guard ("USCG") vessel, some of the alien passengers jumped from the vessel and swam ashore. After the migrant vessel ran aground, the remaining passengers disembarked and, despite the order of USCG officers to stop, ran ashore and fled from law enforcement officers before they were apprehended. *See* INS Brief, Exh. A (Declaration of Captain Mark J. Kerski, USCG) ("Kerski Declaration"). I find nothing in the record showing that respondent was not among the alien **\*577** migrants who disobeyed the orders of, and sought to evade, USCG or law enforcement officers ashore in an effort to enter the United States unlawfully.

The respondent offered limited evidence and information in the proceedings below in support of his claims that he did not present a danger to the community, a risk of flight, or a threat to national security. Respondent testified that he has not been arrested or convicted of a crime; and that, if released, he would live with an uncle residing in New York, New York, who would

provide him with food, shelter, and transportation while he applied for asylum. Memorandum Decision of the Immigration Judge, *In re D-J-*, at 2 (Dec. 12, 2002) ("IJ Dec.").

Respondent's brief before the BIA asserts that he was "willingly taken into INS custody." Respondent's Brief in Support of the Immigration Judge's Custody Determination at 3 ("Respondent's Brief"). That assertion, however, does not address whether the respondent was among the migrants who sought to evade USCG and other law enforcement officers after coming ashore, as indicated in the USCG's Kerski Declaration. Respondent's brief further asserts that, because he does not speak or understand English, he could not be expected to obey any orders from English-speaking law enforcement officers at the time he came ashore. That assertion, however, does not address the likelihood, indicated by the content of the Kerski Declaration, that the circumstances in which those orders were issued were such that their meaning would have been clear in context, without regard to the particular words uttered by the officers. *See* INS Brief, Exh. A, ¶¶ 4-6.

**\*\*5**  In opposing respondent's contentions, the INS submitted declarations from officers of the Coast Guard, the Department of State, and the Department of Defense ("DOD") as exhibits before the IJ and the BIA.[5]  INS maintains that these declarations show that there are strong concerns of national security requiring the continued detention of the respondent and similarly situated undocumented migrants pending removal proceedings. Two general areas of concern are implicated. First, there is a concern that the release of aliens such as respondent and the other October 29 migrants would tend to encourage further surges of mass migration from Haiti by sea, with attendant strains on national and homeland security resources. Such mass migrations would also place the lives of the aliens at risk. Second, in light of the terrorist attacks of September 11, 2001, there is increased necessity in preventing undocumented aliens from entering the country without the screening of the immigration inspections process.

**\*578**  The first area of national security concern advanced by INS is the threat of further mass migration. INS asserts that reports and rumors of successful entry into the United States by Haitian migrants have fueled recent migration surges and the perception of further successful entries could encourage further mass migration attempts.[6]  In support of this contention, INS has submitted a memorandum issued by the State Department supporting detention of the migrants who landed in Florida on October 29, 2002, in order to prevent further mass migrations. The memorandum states in relevant part:

The disposition of those detained in the October 29 arrival will spur further migration if they are released into the U.S. Such treatment would create a perception in Haiti of an easing in U.S. policy with respect to admission of migrants. For this reason, the Department of State strongly recommends that the 216 migrants (207 Haitians, 9 Dominicans) from the boat which reached Key Biscayne on October 29 be detained while they undergo processing. The migrants should be detained unless and until they demonstrate a well-founded fear of persecution. Those who cannot do so should continue to be held, absent a compelling humanitarian reason for release, until they can be expeditiously repatriated.

INS Brief, Exh. B (State Department Memorandum). The State Department memorandum sets forth extensive and detailed information documenting the relationship between perceptions in Haiti of successful U.S. entry by seagoing migrants and the likelihood of further mass migrations. *Id.*

The declarations submitted from the Coast Guard (*see supra* n.6) and the Defense Department express corroborating statements regarding this concern. The Coast Guard states that "[a]necdotal reporting and operational experience strongly suggests that detaining and swiftly repatriating those who illegally and unsafely attempt to enter the United States by sea is a significant deterrent to surges in illegal immigration and mass migration." INS Brief, Exh. C, ¶ 9 (Declaration of Captain Kenneth A. Ward, USCG). Similarly, the Department of Defense declaration states that "[a]ctual or even *perceived* changes in U.S. immigration policy can trigger mass migration events by encouraging other potential illegal migrants." *See* INS Brief, Exh. F, ¶ 5 (Declaration of Joseph J. Collins, Deputy Assistant Secretary of Defense for Stability Operations).

**\*\*6**  The INS submissions also outline an additional national security implication of encouraging future mass migrations by sea from Haiti. The Coast Guard declaration asserts that continued mass migrations from Haiti have "heavily taxed Coast Guard capacity and capabilities," while "reducing  **\*579**  responsiveness in other mission areas." INS Brief, Exh. C, ¶ 7. The

Department of Defense, which is also involved in efforts to contain such overseas migrations, also asserts that the demands of mass migrations from Haiti "would create a drain on scarce assets that are being used in or supporting operations elsewhere." INS Brief, Exh. F, ¶ 8.

The declarations submitted by INS also substantiate a national security concern raised by the prospect of undocumented aliens from Haiti being released within the United States without adequate verification of their background, associations, and objectives. Thus, the State Department declaration asserts that it has "noticed an increase in third country nations (Pakistanis, Palestinians, etc.) using Haiti as a staging point for attempted migration to the United States. This increases the national security interest in curbing use of this migration route." INS Brief, Exh. B, ¶ 11. Relatedly, the Coast Guard's supplemental declaration asserts that the boatloads of interdicted Haitians have included persons previously deported for drug trafficking and subject to outstanding felony warrants. INS Brief, Exh. E, ¶ 4 (Supplemental Declaration of Captain Kenneth A. Ward, USCG). The Coast Guard further asserts that "because maritime migrants are typically undocumented and carry little or no identification, it is often difficult to ascertain the identity and background of interdicted persons, particularly in large groups, which presents potential threats to officer safety, as well as national security." *Id.*

III.

Having considered the record and the briefs of the parties, and exercising my authority under section 236(a) of the INA, I have determined that the release of respondent on bond is unwarranted.

I conclude that releasing respondent, or similarly situated undocumented seagoing migrants, on bond would give rise to adverse consequences for national security and sound immigration policy. As demonstrated by the declarations of the concerned national security agencies submitted by INS, there is a substantial prospect that the release of such aliens into the United States would come to the attention of others in Haiti and encourage future surges in illegal migration by sea. Encouraging such unlawful mass migrations is inconsistent with sound immigration policy and important national security interests. As substantiated by the government declarations, surges in such illegal migration by sea injure national security by diverting valuable Coast Guard and DOD resources from counterterrorism and homeland security responsibilities. Such national security considerations clearly constitute a "reasonable foundation" for the exercise of my discretion to deny release on bond under section 236(a). *See Carlson*, 342 U.S. at 534; *Barbour*, 491 F.2d at 578.

**\*\*7  \*580**  I have noted the BIA's suggestion that the INS's recent adoption of a policy placing certain aliens (including many undocumented aliens who arrive by sea and are not admitted or paroled) in expedited removal proceedings in which affected aliens, with limited exceptions, would be automatically detained without review by an IJ or the BIA tends to negate the INS's concern regarding the encouragement of migration surges. BIA Dec. at 2 n.3; *see Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68,924*-26 (Nov. 13, 2002). The offsetting effect suggested by the BIA would presumably be due to the prospect that the new expedited removal policy will be so restrictive that potential Haitian migrants would learn of that and be deterred from future migration attempts, regardless of respondent's fate and that of the other October 29 migrants. While the expedited removal policy may reduce the incidence of seagoing Haitian migrants being released on bond pending removal, it hardly provides airtight assurance against future successful entries by such migrants through legal and extra-legal maneuvers, or the encouragement of additional maritime migrations likely to arise from such entries. I note, for example, that the policy's strict detention provision is entirely inapplicable to aliens who are admitted or paroled. In any event, even if the new policy somewhat reduced the expectations of further successful U.S. entries, the release of respondent and hundreds of others from the October 29 migrant group would strongly undercut any resultant deterrent effect arising from the policy. The persistent history of mass migration from Haiti, in the face of concerted statutory and regulatory measures to curtail it, confirms that even sporadic successful entries fuel further attempts. I therefore am not persuaded that the new expedited removal policy negates the migration "surge" consideration.

I further conclude that the release on bond of undocumented seagoing migrant aliens from Haiti without adequate background screening or investigation presents a risk to national security that provides additional grounds for denying respondent's release

AR.05589

on bond. This consideration is fortified by the State Department's assertion that it has observed an increase in aliens from countries such as Pakistan using Haiti as a staging point for migration to the United States. Under the current circumstances of a declared National Emergency, the Government's capacity to promptly undertake an exhaustive factual investigation concerning the individual status of hundreds of undocumented aliens is sharply limited and strained to the limit. Under these circumstances, it is reasonable to make a determination that aliens arriving under the circumstances presented by the October 29 influx should be detained rather than released on bond. There is substantial risk that granting release on bond to such large groups of undocumented aliens may include persons who present a threat to the national security, as well as a **\*581** substantial risk of disappearance into the alien community within the United States.

**\*\*8** I note that the BIA has acknowledged the seriousness of INS's arguments that the detention or release of these aliens implicates important national security interests. *See* BIA Dec. at 2. The BIA determined, however, that such considerations fall "outside the scope of Immigration Judge bond proceedings as such proceedings are currently constituted," except where individual considerations show that the respondent is not likely to appear or presents a danger to the community. The BIA then stated: "Absent contrary direction from the Attorney General, we therefore agree with the Immigration Judge's focus on the respondent's individual likelihood to appear and individual danger to the community." *Id.* This opinion provides the BIA and Immigration Judges with the "contrary direction" to which the BIA referred. In future proceedings involving similarly situated aliens, this opinion constitutes binding precedent, requiring the BIA and IJs to apply the standards set forth herein, including consideration of national security interests. *See generally Iran Air v. Kugelman*, 996 F.2d 1253, 1260 (D.C. Cir. 1993) (administrative judges "are entirely subject to the agency on matters of law"). Further, in all future bond proceedings involving aliens seeking to enter the United States illegally, where the Government offers evidence from sources in the Executive Branch with relevant expertise establishing that significant national security interests are implicated, IJs and the BIA shall consider such interests.

Finally, I conclude that respondent has not individually demonstrated that he satisfies the prerequisites to discretionary release on bond under the provisions of 8 C.F.R. § 236.1(c)(8). INS may (but is not required to) grant release under that provision if the alien demonstrates to its satisfaction that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding. I do not find that respondent has adequately demonstrated that he is likely to appear at future proceedings for purposes of granting release on bond pursuant to section 236(a)(2) of the INA or 8 C.F.R. § 236.1(c)(8). There are strong indications in the record that respondent was among those aliens who sought to evade Coast Guard and law enforcement officers in a determined effort to effect illegal entry into the United States. Because such evasive behavior does not provide reassuring evidence of respondent's likely reliability in appearing for future proceedings, it was incumbent upon respondent to produce substantial countervailing evidence as to that criterion. I conclude that the minimal showing made by respondent on this point was insufficient to demonstrate the likelihood of his appearance for future proceedings. [7]

**\*582** In addition, I note that the respondent was denied asylum by the Immigration Judge on February 12, 2003. The respondent appealed that decision to the BIA on March 14, 2003, and that appeal remains pending. The IJ's denial of the respondent's application for asylum increases the risk that the respondent will flee if released from detention. "A respondent with a greater likelihood of being granted relief from deportation has a greater motivation to appear for a deportation hearing than one who, based on a criminal record or otherwise, has less potential of being granted such relief." *Matter of Andrade*, 19 I&N Dec. 488, 490 (BIA 1987).

IV

**\*\*9** Although neither the IJ nor the BIA chose to address the issue, respondent contends that he is constitutionally entitled on due process grounds to an "individualized determination" of his request for release on bond and that denying bond on broad national security grounds that are generally applicable to the October 29 migrants would somehow violate such a right. Respondent's Brief at 6-8. In that regard, I note that several federal appellate courts have recently held that a *lawful permanent resident alien* has a due process right to an individualized hearing and determination on whether he poses a risk of flight or a danger to the community when subjected to the mandatory detention provisions of section 236(c) of the INA. *See Kim v. Ziglar*,

276 F.3d 523 (9th Cir.), *cert. granted sub nom. Denmore v. Hyung Joon Kim*, 536 U.S. 956 (2002); *Patel v. Zemski*, 275 F.3d 299, 314-15 (3d Cir. 2001); *see also Hoang v. Comfort*, 282 F.3d 1247, 1256 (10th Cir. 2002). Another federal appeals court has reached a contrary conclusion on that issue, *see Parra v. Perryman*, 172 F.3d 954, 958 (7th Cir. 1999), and the Supreme Court has granted the Government's petition for a writ of certiorari and heard oral argument in *Kim*.

I first note that the decisions in *Kim* and *Patel* were specifically addressed to the *mandatory* detention provisions of section 236(c) of the INA and are therefore fundamentally distinguishable from the procedures afforded under section 236(a). Section 236(c) requires nondiscretionary detention as a categorical statutory mandate for those aliens covered by it, whereas section 236(a) affords aliens to whom it applies the opportunity to seek discretionary relief (bond or conditional parole) in a hearing before an Immigration Judge. *See Kim*, 276 F.3d at 533.

More significantly, however, the holdings in *Kim* and *Patel* were premised upon the petitioner's status as a lawful permanent resident alien. *See Kim*, 276 F.3d at 528, 534; *Patel*, 275 F.3d at 307. In contrast, respondent has not **\*583** even been admitted to the United States, let alone acquired the status of a lawful permanent resident alien. Respondent's status is that of an undocumented alien, charged as being inadmissible as an alien present in the United States without having first been admitted or paroled. *See* section 212(a)(6)(A)(i) of the INA. As an alien who has "not yet gained initial admission to the United States," he does not qualify for the limited due process protection extended to "admitted" aliens under the sharply distinguishable circumstances presented in *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001) ("We deal here with aliens who were admitted to the United States but subsequently ordered removed. Aliens who have not yet gained initial admission to this country would present a very different question."). As explained by the court in *Gisbert v. United States Attorney General*, 988 F.2d 1437, 1440 (5th Cir.), *amended on other grounds*, 997 F.2d 1122 (5th Cir. 1993): "Although aliens seeking admission into the United States may physically be allowed within its borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected entry into this country." *Accord United States v. Lopez-Vasquez*, 227 F.3d 476, 484-85 (5th Cir. 2000); *Zheng v. INS*, 207 F.Supp.2d 550, 552 (E.D. La. 2002) ("The detention of aliens who have been denied initial admission into the United States does not implicate the Fifth Amendment, even if such aliens were subsequently paroled or released within the country.").

 **\*\*10** Even if the respondent *were* entitled to an individualized hearing, however, such a conclusion would not support a contention that this respondent's request for release on bond must be determined exclusively on the basis of his individual situation, rather than on the basis of general considerations applicable to a category of migrants, as a matter of constitutional due process. The mere fact that general considerations are introduced does not negate the individual nature of the hearing. The Attorney General is broadly authorized to detain respondent, and deny his request for bond, based on any reasonable consideration, individualized or general, that is consistent with the Attorney General's statutory responsibilities. *See Reno v. Flores*, 507 U.S. 292, 313-14 & n.9 (1993) (rejecting juvenile aliens' demands for an "individualized custody hearing" and upholding INS use of "reasonable presumptions and generic rules" in such cases).

In any event, I have given full consideration to the individual aspects of respondent's claim for bond based on the record in this proceeding. I find nothing in respondent's individual case that warrants granting him release on bond when balanced against the above-described compelling factors that militate against such release in the case of undocumented aliens attempting illegal entry into the United States under the circumstances presented by the October 29 influx.

 **\*584** Finally, I note that respondent argued to the BIA that an INS policy of detaining Haitian migrants in order to deter other Haitians from migrating to the United States seeking asylum violates international law. *See* Respondent's Brief at 8-9. In support of his argument, he invokes the right to asylum protected by Article 14 of the Universal Declaration of Human Rights ("UDHR") and an advisory opinion of the United Nations High Commission for Refugees stating that "asylum seekers should not be detained for purposes of deterrence." *Id.* at 8. The BIA did not address respondent's arguments on this point in its decision.

This argument is without merit. First, the UDHR is merely a nonbinding expression of aspirations and principles, rather than a legally binding treaty. *See Haitian Refugee Center v. Gracey*, 809 F.2d 794, 816 n.17 (D.C. Cir. 1987) (UDHR "is

merely a nonbinding resolution, not a treaty"). In any event, the application of U.S. law to protect the nation's borders against mass migrations by hundreds of undocumented aliens violates no right protected by the UDHR or any other applicable rule of international law. As the Supreme Court has recognized, "'[T]he power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments ….'" *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953)). The authority to expel aliens is meaningless without the authority to detain those who pose a danger or a flight risk during the process of determining whether they should be expelled. The national security interests invoked in this opinion are directed at unlawful and dangerous mass migrations by sea, not the right to seek asylum. Aliens who do arrive in the United States, including the respondent himself, are afforded the right to apply for asylum and have those applications duly considered. [8]

**\*585**  CONCLUSION

**\*\*11**  I have determined that respondent's release on bond under the provisions of section 236(a) of the INA is unwarranted. The BIA's Order of March 13, 2003, is hereby vacated and respondent is to be detained pending decision on removal.

### Footnotes

[1]     On March 1, 2003, the INS was transferred from the Department of Justice to the Department of Homeland Security pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2178. The Executive Office for Immigration Review, however, remains in the Department of Justice. On February 28, 2003, the Attorney General published a technical rule that moved 8 C.F.R. § 3.1(h) (2002) to 8 C.F.R. § 1003.1(h). *See* Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824, 9332 (Feb. 28, 2003) (to be codified at 8 C.F.R. § 1003.1(h)). The authority of the INS Commissioner to refer Board decisions to the Attorney General is now vested in the Secretary of Homeland Security, or in "specific officials of the Department of Homeland Security designated by the Secretary with the concurrence of the Attorney General." 8 C.F.R. § 1003.1(h)(iii).

[2]     *See* section 103(a)(1) of the INA, 8 U.S.C. § 1103(a)(1), *as amended by* Homeland Security Act of 2002 Amendments, Division L of Pub. L. No. 108-7, § 105(a)(1), 117 Stat. 531 (2003), which provides:
        The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however*, That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

[3]     Section 1102 of the HSA, 116 Stat. at 2274, added a new subsection (g) to section 103 of the INA, providing as follows:
        The Attorney General shall have such authorities and functions under this Act and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002.
        The Attorney General's authority to detain, or authorize bond for aliens under section 236(a) of the INA is one of the authorities he retains pursuant to this provision, although this authority is shared with the Secretary of Homeland Security because officials of that department make the initial determination whether an alien will remain in custody during removal proceedings. *See* sections 103(a), (g) of the INA, *as amended*; 8 C.F.R. §§ 236.1(c), (d), 287.3(d) (2002).

[4]     *See supra* n.3.

[5]     The exhibits submitted with the INS brief included: Declaration of Captain Mark J. Kerski, USCG (Exhibit A); Memorandum from the United States Department of State (Exhibit B); Declaration of Captain Kenneth A. Ward, USCG (Exhibit C); Declaration of Johnny Williams (Exhibit D); Supplemental Declaration of Captain Kenneth A. Ward, USCG

(Exhibit E); and Declaration of Joseph J. Collins, Deputy Assistant Secretary of Defense for Stability Operations (Exhibit F).

6   Following the successful landing of more than 200 Haitians on October 29, 2002, on November 7, 2002, and again on November 9, 2002, the USCG successfully interdicted three groups of undocumented Haitian migrants attempting to transit to the United States via the Bahamas. In all, 264 Haitian migrants were interdicted on these dates. Such incidents are "typical of a surge in Haitian migrant departures following similar successful landings and demonstrates the 'pull' factor that successful landing can have." INS Brief, Exh. E, ¶ 3 (Supplemental Declaration of Captain Kenneth A. Ward, USCG).

7   The INS also offered evidence disputing respondent's claim that, individually, he does not pose a danger to the community and is likely to appear in future proceedings. *See* INS Brief at 14-15.

8   I note that a regional official of the United Nations High Commissioner for Refugees ("UNHCR") has sent me a letter volunteering certain comments on this proceeding. Letter for The Honorable John Ashcroft, Attorney General of the United States, from Guenet Guebre-Christos, Regional Representative, United Nations High Commissioner for Refugees, *Re: Matter of D-J-*, *Advisory Opinion on Detention of Asylum Seekers* (March 28, 2003). In brief, the UNHCR letter makes certain arguments invoking purported obligations arising under the 1967 Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577 (Jan. 31, 1967) ("Protocol"), and the 1951 United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (1954), 19 U.S.T. 6259, 6278, T.I.A.S. No. 6577 (1968) ("Convention"). The United States is not a party to the Convention, but it is a party to the Protocol, which incorporates by reference Articles 2 through 34 of the Convention. The Protocol is not self-executing, but Congress has incorporated into the INA, through the Refugee Act of 1980, the appropriate requirements of the Protocol. Consequently, the Protocol does not afford respondent any rights beyond what he is afforded under the federal immigration laws, as applied in this decision. *See Abdelwahed v. INS*, 22 Fed.Appx. 811, 815, 2001 WL 1480651 (9th Cir. 2001) (stating that "the Protocol does not give [the petitioner] any rights beyond what he already enjoys under the immigration statutes"); *Legal Obligations of the United States under Article 33 of the Refugee Convention*, 15 Op. O.L.C. 86, 87 (1991) ("[T]he Protocol by which the United States adhered to the Convention is not self-executing for domestic law purposes. Accordingly, the Protocol itself does not create rights or duties that can be enforced by a court.").

23 I. & N. Dec. 572 (U.S.Atty.Gen.), Interim Decision 3488, 2003 WL 1953603

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

KeyCite Red Flag - Severe Negative Treatment

Criticized by Sharifzadeh-Fahraji v. I.N.S., 9th Cir., April 15, 1994

8 I. & N. Dec. 251 (BIA), Interim Decision 982, 1959 WL 11558

United States Department of Justice

Board of Immigration Appeals

MATTER OF F-----

In VISA PETITION Proceedings

VP 3-I-126943

Decided by Board January 29, 1959

**1 *251 Nonquota status—Spouse of United States citizen—Divorce decree granted by State court not subject to collateral attack in visa petition proceedings.

(1) For the purposes of administering the immigration laws, a divorce decree granted by a State court will not be open to collateral attack on jurisdictional grounds to inquire into questions of residence and domicile, provided one of the parties to the divorce was actually present within the court's jurisdiction.

(2) Visa petition filed by United States citizen wife to confer nonquota status upon alien husband will be approved where the record shows that the beneficiary's divorce from his first wife in Italy was granted by a Florida court before whom the beneficiary was physically present and was followed by a ceremonial marriage in New York to his present spouse.

BEFORE THE BOARD

Discussion: The case comes forward on appeal from the order of the District Director, New York District, dated August 11, 1958, denying the visa petition for the reason that petitioner's marriage to the beneficiary/husband is not legal on the ground that he did not have the necessary residence in the State of Florida before he obtained his divorce there; that consequently his prior marriage had not been legally terminated and the petitioner's present marriage to the beneficiary is invalid.

The petitioner's acquisition of United States citizenship through her father is conceded. She seeks nonquota status on behalf of the beneficiary whom she married at New York on January 25, 1958. This is the first marriage for the petitioner. The beneficiary was previously married on March 6, 1950, and as evidence of the termination of his prior marriage he submitted a final decree of divorce obtained in the Circuit Court of the Eleventh Judicial District in and for Dade County, Miami, Florida, on January 16, 1958. Examination of the divorce decree indicates that a decree pro confesso was entered against the defendant's wife and provided for the payment of $10 per month by the plaintiff-husband for the support of the minor child of the parties, the wife and child then residing in Italy.

*252 A sworn statement was taken from the beneficiary, who is an applicant for preexamination, by a Service officer on May 26, 1958, and May 29, 1958. In the course of the first statement the beneficiary stated that he had lived in Miami Beach, Florida, continually from April 1957 to September 1957, returned to Miami after 15 days in New York, next returned to New York Christmas 1957, back to Miami about the fifteenth of January 1958 to obtain his divorce decree, thereafter returning to New York where he has since resided.

The beneficiary appeared voluntarily for a second statement to reveal that he had not disclosed the whole truth about his Florida residence. He stated that he first went to Florida in April 1957 and remained 4 days in order to sign some papers before a notary public; that he next went to Florida in June or July 1957, also for the purpose of signing papers before a notary public, and returned the same day; that he finally returned to Florida on January 15, 1958, and appeared in court and was granted a divorce the next day. He admitted that he had never actually resided in Florida but had always lived in New York. He did not recall being asked under oath whether he was a resident of Florida and claimed that he did not know the residential requirements for divorce in Florida but simply did what his lawyer told him to do; that the lawyer had told him that he could go back and forth 3 times and that it was the same as if he had resided there. He stated he had been advised by a friend to testify that he had resided in Florida and that he was scared when he appeared before an official of the law for a sworn statement on May 26, 1958. He further testified that he retained a New York lawyer to handle the divorce matter and that the latter referred him to the Florida attorney. He further explained that he and his wife did not actually consummate the marriage and live together until the religious ceremony in April 1958, and that they had lived together since that time. The beneficiary stated that his first wife was never in the United States but that she had been notified of the divorce action by letter.

 **2  In the instant case we have in evidence a marriage certificate showing that the parties married in accordance with all the prescribed formalities of law. In addition, there has been submitted a divorce decree of a State court purporting to dissolve the prior marriage of the beneficiary. There is of course the legal presumption which favors the validity of every ceremonial marriage which is one of the strongest presumptions known to the law and which ordinarily will yield only in the face of the most compelling proof. [1]  In addition, the divorce decree in Florida was rendered by  **253  a legally constituted court. Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself. [2]  That presumption may be overcome and is open to attack where the other spouse in the divorce proceeding had neither appeared nor been served with process in the State. [3]  The burden of undermining the decree of a sister State is a heavy one and is not overcome by a record which contains merely a statement by the court below that the findings do not show that the defendant has appeared or been served with process in the divorce State, where the record does not contain the decree nor any stipulation concerning it. [4]

In the instant case the first wife of the beneficiary had neither appeared nor been served with process in the State. The Service representative has cited a number of Florida cases which indicate that the residence of a plaintiff in a divorce action in Florida may be attacked to show lack of jurisdiction and where jurisdiction is shown to be vulnerable, generally, under such circumstances, a collateral attack may be made on the decree of the court. Here, the beneficiary who was the plaintiff in the court action did make a personal appearance within the jurisdiction of the Florida court. The question we are confronted with is, whether, for immigration purposes, and under circumstances such as are present in this case, in the face of a divorce decree granted by a court of competent jurisdiction, followed by a ceremonial marriage which complies with the formalities of law, and evidence showing that the plaintiff in the court action was present within the jurisdiction of the court, we should inquire into the question of bona fide residence which purported to give the court jurisdiction.

This problem has previously been the subject of administrative scrutiny. [5]  Questions involving the validity and recognition of divorces have concerned the courts for many years and unquestionably will continue to cause difficulty in the future; however, the Service can hardly undertake to become a disputant in the divorce arena since immigration officers are not equipped to adjudicate  **254  troublesome legal questions of this character; and for the purpose of the immigration laws a divorce decree regularly granted by a court in the United States should be accepted at face value and should be deemed to have terminated the prior marriage for immigration purposes. There is no Federal policy which enjoins the nullification of State divorce decrees. On the other hand, a sound policy would require the avoidance, if possible, of a disruption of stable family relationships, and as a Federal administrative agency enforcing Federal statutes there is no justification in disregarding a divorce decree legally granted by a State court.

**\*\*3** The assumption of authority to pass upon the validity of divorce decrees would place an excessive burden upon those charged with administration of the immigration laws. Exploration of the ramifications of divorce law in each case would inevitably lead into labyrinths of jurisdiction, domicile, residence and status with no satisfactory goal and an involvement in complexities utterly foreign to the responsibilities of administering the immigration laws. It would not appear to be sound administrative practice to expect immigration officers to pause in executing their own exacting duties in order to embark upon the collateral inquiry as to whether State divorce decrees were supported by proper jurisdiction and such an inquiry would impede the expeditious administration of the immigration laws. The wisest course would be to accept at face value the marital status regularized in conformity with the laws of the State. In conclusion, for the purpose of the immigration laws, the Service should regard as valid a divorce regularly granted by a State court and a subsequent remarriage formalized in conformity with the laws of that State or of any other State. In adopting this policy the requirements of the law would be adhered to, proper effect would be given to judgments and proceedings of a sovereign State, and reasonable safeguards would thereby be erected to protect a properly solemnized marital relationship. Finally, the adoption of such a policy would unquestionably facilitate the administration of the immigration laws.

These views received endorsement in Matter of B-----, 3 I. & N.Dec. 227, where the residential requirements of jurisdiction of a Mexican divorce obtained by the petitioner were brought into question. It appeared that the petitioner had gone to Mexico for a few days, was granted a divorce, then returned to live in Florida and later remarried the beneficiary. In that case we disapproved as improper the view that immigration authorities must inquire into the validity of every divorce, whether obtained within the United States or elsewhere, and satisfy itself that the petitioner in a divorce action in every instance was domiciled within the jurisdiction of the court granting the decree before a subsequent marriage would be **\*255** recognized. We expressed the view that an administrative agency is going far beyond its legislative sphere when it attempts to inquire into the issue of whether the petitioner for a divorce was domiciled within the jurisdiction of the court granting the divorce and, therefore, whether the decree ought to be recognized. We set forth the principle that inquiry into the jurisdiction of a court should stop when it is ascertained that a party to the proceeding was actually within the court's jurisdiction.

In Matter of B-----, 5 I. & N. Dec. 659, we recognized as valid a marriage in California subsequent to a Mexican divorce obtained by a wife, the wife having made a trip to Mexico to secure the divorce and the defendant-husband having given his written consent to the divorce and having been represented by counsel in the divorce proceedings, applying the principle that the validity of a marriage is governed by the law of the place of celebration.[6] Of course, this type of case differs from the pure Mexican "mail-order" divorce decree where neither party was ever physically present within the jurisdiction of the court or within the jurisdiction of the state. However, if recognition under rules of comity is granted to a Mexican divorce decree in which one of the parties was physically present within the jurisdiction, it would follow that recognition under the full faith and credit clause of the Constitution would present a stronger argument for recognition of a divorce decree granted by a sister State in which one of the parties was actually present within the court's jurisdiction. Under such circumstances, it having been established that one of the parties was physically present within the court's jurisdiction, for immigration purposes the inquiry as to jurisdiction should end.

**\*\*4** In the present case it appears that the beneficiary was actually present within the jurisdiction of the Florida court and appeared in court when he obtained the divorce decree terminating his first marriage. He has presented evidence of a subsequent ceremonial civil marriage, as well as a religious marriage with the petitioner in the State of New York. There is no indication of any attempt by the first wife to contest the Florida divorce decree. Under these circumstances, the visa petition will be approved.

Order: It is ordered that the visa petition be and the same is hereby approved for nonquota status on behalf of the beneficiary.

**Footnotes**

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 372 of 1271

1    Schouler, Marriage, Divorce, Separation and Domestic Relations (6th ed.), vol. II, p. 1477; Wigmore on Evidence (3rd ed.), vol. IX, p. 370.

2    Adam v. Saenger, 303 U.S. 59 (1938).

3    Williams v. North Carolina, 325 U.S. 226 (1945).

4    Cook v. Cook, 342 U.S. 126 (1951).

5    Memorandum of the General Counsel, Immigration and Naturalization Service, File 56013–B (7/2/47), approved by the Commissioner 7/8/47. The General Counsel's memorandum involved a Nevada divorce decree but the arguments would appear to apply with equal cogency to a Florida divorce decree.

6    Matter of P-----, 4 I. & N. Dec. 610.

<div align="center">8 I. & N. Dec. 251 (BIA), Interim Decision 982, 1959 WL 11558</div>

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

Overruled in Part by   Matter of Ozkok,   BIA,   April 26, 1988

19 I. & N. Dec. 270 (BIA), Interim Decision 2995, 1985 WL 56047

United States Department of Justice

Board of Immigration Appeals

MATTER OF GARCIA

In Deportation Proceedings

A-36664307

Decided by Board October 9, 1985

**\*\*1   \*270**  (1) Although Article 42.12, section 3d of the Texas Code of Criminal Procedure is not a first offender statute, a person sentenced to probation under that statute has not been convicted for immigration purposes because adjudication of guilt has been withheld by the trial court.

(2) Where there has been no affirmative showing that the trial judge lacked authority under Texas law to order a new trial and resentence the respondent, the Board will not question the judge's jurisdiction to so act.

**CHARGE:**

Order: Act of 1952—Sec. 241(a)(11) [8 U.S.C. § 1251(a)(11)]—Convicted of marihuana violation

**ON BEHALF OF RESPONDENT:**

Frank S. Triana, Esquire

664 Broadway, Suite G

Chula Vista, California 92010

**ON BEHALF OF SERVICE:**

Penny M. Smith

General Attorney

BY: Milhollan, Chairman; Maniatis, Dunne, Morris, and Vacca, Board Members

In a decision dated April 30, 1984,[1] the immigration judge found the respondent deportable under section 241(a)(11) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(11) (1982), as an alien convicted of possession of marihuana and ordered him deported from the United States. The immigration judge has certified his decision to the Board for review and the respondent has appealed. The respondent's appeal will be sustained and the decision of the immigration judge will be reversed. The proceedings against the respondent will be terminated.

**\*271**  The respondent is a 28-year-old native and citizen of Mexico who was admitted to the United States as a lawful permanent resident on May 12, 1980. The record reflects that he was convicted on December 13, 1982, in the District Court of Brewster County, Texas, 83rd Judicial District, of possession of marihuana for which he was fined $1,000 and sentenced to 10 years of confinement. The imposition of the respondent's prison sentence was suspended, and he was placed on probation for 10 years. He subsequently filed a motion for a new trial, alleging that the trial court had committed a material error in entering a judgment that was contrary to law and evidence. The motion was granted on October 24, 1983, on which date a new order

was issued. Pursuant to that order, the court deferred adjudication of guilt, but again placed the respondent on probation for 10 years and fined him $1,000.

Following issuance of an Order to Show Cause and Notice of Hearing (Form I–221), the respondent requested that his deportation proceedings be terminated on the ground that there was no conviction to support a finding of deportability. He claimed that he was not convicted because he had been placed on probation under Article 42.12, section 3d of the Texas Code of Criminal Procedure. That statute provides for deferral of adjudication of guilt during probation and dismissal of the proceedings without conviction upon expiration of the probationary period.[2]

 **2  *272  The immigration judge rejected the respondent's contention that a conviction did not exist for immigration purposes. He first noted that the respondent had not argued that Article 42.12, section 3d of the Texas Code of Criminal Procedure was the state equivalent of the Federal Youth Corrections Act or the federal first offender statute. The immigration judge further commented on the fact that, following the order for a new trial, the trial judge again found that the evidence substantiated the respondent's guilt, placed him on probation for 10 years, and ordered him to pay a fine of $1,000. The immigration judge concluded that the action of the trial court did not constitute an expunction or vacation of the respondent's conviction since the same penalties had been imposed and the respondent remained subject to arrest and detention upon violation of probation. He therefore determined that the respondent had been convicted of illicit possession of marihuana and that he was consequently deportable under section 241(a)(11) of the Act.

On appeal the respondent argues that he was deprived of a fair hearing because the Service failed to amend the allegations of the Order to Show Cause to reflect the state court's disposition upon new trial. He claims that he was not given an opportunity to request additional time in which to respond to the Service's position on the court's new order, in violation of 8 C.F.R. § 242.16(d) (1984). The respondent further contends that the immigration judge erred in finding him deportable as an alien convicted of a marihuana offense. He asserts that Article 42.12, section 3d of the Texas Code of Criminal Procedure is not an expunction statute but is akin to the Georgia statute analyzed by the Board in Matter of Seda, 17 I&N Dec. 550 (BIA 1980). The respondent therefore asserts that no conviction exists upon which he can be found deportable.

In Matter of Seda we examined the Georgia first offender statute and determined that a person sentenced under a statute which provides for withholding of adjudication of guilt by the court and discharge without conviction upon successful completion of probation is not considered to be 'convicted' for immigration purposes. In so holding, we noted our long-standing position that a conviction  *273  exists for immigration purposes when the following elements are present: (1) There has been a judicial finding of guilt; (2) the court takes action which removes the case from the category of those which are (actually or in theory) pending for consideration by the court—the court orders the defendant fined or incarcerated, or the court suspends sentence; (3) the action of the court is considered a conviction by the state for at least some purpose. See also Matter of Robinson, 16 I&N Dec. 762 (BIA 1979); Matter of Varagianis, 16 I&N Dec. 48 (BIA 1976); Matter of Pikkarainen, 10 I&N Dec. 401 (BIA 1963); Matter of L—R—, 8 I&N Dec. 269 (BIA 1959).

Although Seda involved a first offender statute, we find the rationale of our holding in that case relevant to the statute at issue despite its applicability to all criminal offenders. Prior to the decision in Seda, our inquiry into state laws was limited to determining whether the statute in question was the state counterpart to the federal first offender statute. See Matter of Kaneda, 16 I&N Dec. 677 (BIA 1979); Matter of Haddad, 16 I&N Dec. 253 (BIA 1977); Matter of Werk, 16 I&N Dec. 234 (BIA 1977). Our primary focus was on the fact that, in passing the federal first offender statute, Congress had expressed an intention to eliminate the stigma of a conviction on first offenders in order to give them a second opportunity to live as law-abiding members of society. Applying this policy consideration to an immigration context, we determined that first offenders should also be exempt from deportation despite their conviction for a narcotics offense.[3]

 **3  Upon further examination in Seda of state and federal first offender statutes, we concluded that an offender sentenced under those statutes was never in fact convicted, so no expunction was necessary. Our determination was based on analysis of the terms of the statutes and our established standards for conviction. The decision was one of law, independent of the policy

considerations previously deemed critical in determining whether elimination of a narcotics **\*274** conviction for deportation purposes was appropriate.[4] Consequently, we conclude that the Seda rationale is not limited to first offender statutes. We shall therefore examine the Texas law at issue in the context of that case.

As in the Georgia first offender statute, Article 42.12, section 3d of the Texas Code of Criminal Procedure provides for withholding of adjudication of guilt and deferral of the criminal proceedings during a period of probation. According to the statute, the court dismisses the proceedings and discharges the defendant at the expiration of his probationary period. The statute further specifies that such dismissal and discharge may not be deemed a conviction for the purpose of disabilities imposed by law for conviction of an offense.

Interpreting these provisions, the Court of Criminal Appeals of Texas has determined that a trial judge's action in deferring the proceedings without entering an adjudication of guilt does not constitute a conviction under Texas law because an adjudication of guilt is essential to a conviction. Ex parte Shillings, 641 S.W.2d 538 (Tex. Crim. App. 1982); McNew v. State, 608 S.W.2d 166 (Tex. Crim. App. 1978). This assessment comports with our own standards for conviction which require a judicial finding of guilt. Inasmuch as Texas law clearly precludes a conviction where there is no adjudication of guilt and our decisions are in accord, we find that an alien sentenced to probation under Article 42.12, section 3d of the Texas Code of Criminal Procedure has not been convicted for immigration purposes.

Finally, we note the apparent concern of the immigration judge regarding the propriety of the trial court's grant of a new trial which resulted in the imposition of the same penalties. Inasmuch as there has been no affirmative showing that the trial judge lacked authority under Texas law to order a new trial and place the respondent on probation under Article 42.12, section 3d, we shall not question his jurisdiction to so act. See Matter of Kaneda, supra; Matter of Sirhan, 13 I&N Dec. 592 (BIA 1970); Matter of O'Sullivan, 10 I&N Dec. 320 (BIA 1963).

Although we need not fully address the respondent's other argument on appeal in view of our finding that he was not convicted, **\*275** we find it to be without merit. Accordingly, the respondent's appeal will be sustained and the decision of the immigration judge will be reversed.

ORDER: The appeal is sustained and the decision of the immigration judge is reversed.

**\*\*4** FURTHER ORDER: These deportation proceedings are terminated.

# Footnotes

1    The record reflects that the immigration judge initially rendered a decision on March 26, 1984, which he subsequently amended on April 30, 1984. Since the respondent's appeal was untimely filed, it was not inappropriate for the immigration judge to reopen the proceedings on his own motion to amend his decision.

2    Article 42.12, section 3d of the Texas Code of Criminal Procedure of 1965 Annotated provides as follows:
(a) Except as provided by Subsection (d) of this section, when in its opinion the best interest of society and the defendant will be served, the court may, after receiving a plea of guilty or plea of nolo contendere, hearing the evidence, and finding that it substantiates the defendant's guilt, defer further proceedings without entering an adjudication of guilt, and place the defendant on probation for a period as the court may prescribe, not to exceed 10 years. The court may impose a fine applicable to the offense and require any reasonable terms and conditions of probation, including any of the conditions enumerated in Sections 6 and 6a of this Article. However, upon written motion of the defendant requesting final adjudication filed within 30 days after entering such plea and the deferment of adjudication, the court shall proceed to final adjudication as in all other cases.

(b) On violation of a condition of probation imposed under Subsection (a) of this section, the defendant may be arrested and detained as provided in Section 8 of this Article. The defendant is entitled to a hearing limited to the determination by the court of whether it proceeds with an adjudication of guilt on the original charge. No appeal may be taken from this determination. After an adjudication of guilt, all proceedings, including assessment of punishment, pronouncement of sentence, granting of probation, and defendant's appeal continue as if the adjudication of guilt had not been deferred. (c) On expiration of a probationary period imposed under Subsection (a) of this section, if the court has not proceeded to adjudication of guilt, the court shall dismiss the proceedings against the defendant and discharge him. The court may dismiss the proceedings and discharge the defendant prior to the expiration of the term of probation if in its opinion the best interest of society and the defendant will be served. A dismissal and discharge under this section may not be deemed a conviction for the purposes of disqualifications or disabilities imposed by law for conviction of an offense, except that upon conviction of a subsequent offense, the fact that the defendant had previously received probation shall be admissible before the court or jury to be considered on the issue of penalty.

Tex. Code Crim. Proc. Ann. art. 42.12, sec. 3d (Vernon 1983).

3    We first concluded in Matter of Werk, supra, that an alien sentenced under the federal first offender statute should not be subject to deportation for a narcotics violation. Our decision was based on a Service memorandum in which the first offender statute was equated with the Federal Youth Corrections Act. We had previously determined that expunction of a narcotics conviction pursuant to that act or an equivalent state statute should eliminate the conviction as a basis for deportation. See Matter of Andrade, 14 I&N Dec. 651 (BIA 1974); Matter of Zingis, 14 I&N Dec. 621 (BIA 1974). In reaching that conclusion, we acknowledged the congressional policy to deport narcotics offenders, but found that the desire expressed by Congress to rehabilitate youthful offenders was equal in importance and would be thwarted by deporting alien youth offenders. Matter of Zingis, supra; see also Matter of A—F—, 8 I&N Dec. 429 (A.G. 1959).

4    In subsequent cases where we have found that a narcotics conviction was not eliminated for immigration purposes, we also noted the fact that the statute in question did not limit its applicability to first offenders or youthful offenders. See Matter of Carrillo, Interim Decision 2965 (BIA 1984); Matter of Forstner, 18 I&N Dec. 374 (BIA 1983); Matter of Golshan, 18 I&N Dec. 92 (BIA 1981). We do not find that factor to be controlling here, however, because each of the statutes examined in those cases clearly involved expunction procedures.

19 I. & N. Dec. 270 (BIA), Interim Decision 2995, 1985 WL 56047

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment
Vacated and Remanded by Gomez-Sanchez v. Sessions, 9th Cir., June 12, 2018

26 I. & N. Dec. 339 (BIA), Interim Decision 3806, 2014 WL 3571529

U.S. Department of Justice

Executive Office for Immigration Review

Board of Immigration Appeals

MATTER OF G-G-S-, RESPONDENT

Decided July 17, 2014

**1  *339  An alien's mental health as a factor in a criminal act falls within the province of the criminal courts and is not considered in assessing whether the alien was convicted of a "particularly serious crime" for immigration purposes.

**FOR RESPONDENT:**
Bardis Vakili, Esquire
Santa Ana, California

**FOR THE DEPARTMENT OF HOMELAND SECURITY:**
Kerri Calcador
Senior Attorney

BEFORE: Board Panel: NEAL, Chairman; GREER, Board Member; KENDALL CLARK, Temporary Board Member.

GREER, Board Member:

This case addresses whether an alien's mental illness should be considered when determining if his or her criminal conviction is for a "particularly serious crime" within the meaning of section 241(b)(3)(B) of the Immigration and Nationality Act, 8 U.S.C. § 1231(b)(3)(B) (2012). In a decision dated December 8, 2011, an Immigration Judge determined that the respondent has been convicted of a particularly serious crime and is therefore ineligible for withholding of removal under both section 241(b)(3)(A) of the Act and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture"). The respondent has appealed from the denial of his applications for withholding of removal.

We hold that a person's mental health is not a factor to be considered in a particularly serious crime analysis and that adjudicators are constrained by how mental health issues were addressed as part of the criminal proceedings. Accordingly, because we conclude that the respondent has been convicted of a particularly serious crime pursuant to section 241(b)(3)(B) of the Act and 8 C.F.R. § 1208.16(d)(2) (2013), we will dismiss his appeal.

*340  I. FACTUAL AND PROCEDURAL HISTORY

The respondent is a native and citizen of Mexico who was admitted to the United States as a lawful permanent resident. From an early age, he has suffered from chronic paranoid schizophrenia. The Immigration Judge's finding that the respondent was mentally incompetent for purposes of his removal proceedings is undisputed. In going forward with the respondent's removal proceedings, various procedural safeguards were implemented, which included representation by legal counsel, the appearance of the respondent's mother on his behalf, and the release of the respondent from custody to his family.

The respondent was convicted in 2004 of assault with a deadly weapon in violation of section 245(a)(1) of the California Penal Code, for which he was sentenced to 2 years in prison.[1] The Immigration Judge found that the respondent's offense was a crime of violence aggravated felony under section 101(a)(43)(F) of the Act, 8 U.S.C. § 1101(a)(43)(F) (2006).[2] She further determined that it was a particularly serious crime, which barred the respondent from establishing eligibility for withholding of removal. However, the Immigration Judge found that the respondent is eligible for deferral of removal under the Convention Against Torture and granted his application for that relief.[3]

**\*341** II. ISSUE

**\*\*2** The issue before us is whether an alien's mental health at the time he or she committed a crime should be considered in determining if the alien was convicted of a particularly serious crime for immigration purposes.

III. ANALYSIS

A. Evolution of the Particularly Serious Crime Analysis

The Act does not define the phrase "particularly serious crime." We first articulated the framework for determining whether a crime was particularly serious under former section 243(h)(2)(B) of the Act, 8 U.S.C. § 1253(h)(2)(B) (1982), in *Matter of Frentescu*, 18 I&N Dec. 244 (BIA 1982). At that time, we held that in judging the seriousness of a crime, "we look to such factors as the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a *danger to the community,"* as provided in the statute. *Id.* at 247 (emphasis added). We further found that offenses against persons are more likely to be categorized as particularly serious crimes but recognized that there may be instances where crimes against property will be considered particularly serious. *Id*.

In subsequent decisions, we have held that once an alien is found to have been convicted of a particularly serious crime, there is no need for a separate determination whether he or she is a danger to the community. *See Matter of N-A-M-*, 24 I&N Dec. 336 (BIA 2007), *aff'd*, *N-A-M- v. Holder*, 587 F.3d 1052 (10th Cir. 2009), *cert. denied*, 131 S. Ct. 898 (2011); *Matter of Q-T-M-T-*, 21 I&N Dec. 639, 646-47 (BIA 1996); *Matter of K-*, 20 I&N Dec. 418, 423-24 (BIA 1991); *Matter of Carballe*, 19 I&N Dec. 357, 360 (BIA 1986). Our interpretation has been accepted by the courts that have addressed this issue. *See N-A-M- v. Holder*, 587 F.3d at 1057 (collecting cases); *Ramirez-Ramos v. INS*, 814 F.2d 1394, 1397 (9th Cir. 1987).

Since our decision in *Matter of Frentescu*, the provision that bars aliens with particularly serious crimes from being granted withholding of deportation or removal has been amended three times. Congress first amended former section 243(h)(2) of the Act in 1990, providing that aggravated felonies are to be categorically considered particularly serious crimes and obviating the need for an individualized analysis of the underlying facts of the aggravated felony conviction. Immigration Act of 1990, Pub. L. No. 101-649, § 515(a)(2), 104 Stat. 4978, 5053 (effective Nov. 29, 1990); *Matter of L-S-*, 22 I&N Dec. 645, 650 (BIA 1999). However, in 1996 Congress gave the Attorney General discretionary **\*342** authority to override the categorical bar that designated every aggravated felony as a particularly serious crime. Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 413(f), 110 Stat. 1214, 1269 (effective Apr. 24, 1996) ("AEDPA"). Interpreting the effect of the amended provision in *Matter of Q-T-M-T-*, 21 I&N Dec. at 654, we applied a rebuttable presumption in section 243(h) cases that an aggravated felony was a particularly serious crime.

**\*\*3** Months after the passage of the AEDPA, Congress again revised the ""particularly serious crime" clause, eliminating the categorical bar to withholding of removal for aliens convicted of an aggravated felony and undermining our rationale for applying a rebuttable presumption in *Matter of Q-T-M-T-*. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Div. C of Pub. L. No. 104-208, § 305(a), 110 Stat. 3009-546, 3009-597, 3009-602 (effective Apr. 1, 1997) (amending former section 243(h)(2) and recodifying it as section 241(b)(3)(B) of the Act, 8 U.S.C. § 1231(b)(3)(B) (Supp. II 1996)); *Matter of L-S-*, 22 I&N Dec. at 650-51; *Matter of S-S-*, 22 I&N Dec. 458, 463 (BIA 1999), *overruled in part by Matter of Y-*

*L-, A-G- & R-S-R-*, 23 I&N Dec. 270, 273-74 (A.G. 2002). This last revised version of the particularly serious crime clause remains in effect and applies to the respondent's case.

B. Current Law

The Act currently provides that an alien is ineligible for withholding of removal if "the Attorney General decides that . . . the alien, having been convicted by a final judgment of a particularly serious crime, is a danger to the community of the United States." Section 241(b)(3)(B)(ii) of the Act; *see also* 8 C.F.R. § 1208.16(d)(2) (providing that an "alien who has been convicted of a particularly serious crime shall be considered to constitute a danger to the community"). Section 241(b)(3)(B) further states that "[f]or purposes of [section 241(b)(3)(B)(ii)], an alien who has been convicted of an aggravated felony . . . for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime." However, the Attorney General is not precluded from determining that the alien has been convicted of a particularly serious crime, regardless of the sentence imposed. *Id.* Moreover, an offense need not be an aggravated felony to be a particularly serious crime. *See Delgado v. Holder*, 648 F.3d 1095, 1097 (9th Cir. 2011) (en banc) (deferring to *Matter of N-A-M-*, 24 I&N Dec. at 337).

We have held that for an alien who has not been convicted of an aggravated felony or whose aggravated felony conviction did not result in an aggregate term of imprisonment of 5 years or more, it is necessary to **\*343** examine the nature of the conviction, the type of sentence imposed, and the circumstances and underlying facts of the conviction to determine whether the crime was particularly serious. *Matter of N-A-M-*, 24 I&N Dec. at 342. As the Ninth Circuit has noted, we have identified "'dangerousness,' [as] the pivotal standard by which particularly serious crimes are judged." *Alphonsus v. Holder*, 705 F.3d 1031, 1041 (9th Cir. 2013) (citing *Matter of N-A-M-*, 24 I&N Dec. at 341-43).

**\*\*4** If the elements of an offense are found to potentially bring it within the ambit of a particularly serious crime, all reliable information that is relevant to the determination may be considered. *Matter of N-A-M-*, 24 I&N Dec. at 342. This may include the conviction records and sentencing information, as well as other information outside the confines of a record of conviction. *Id.*; *see also Anaya-Ortiz v. Holder*, 594 F.3d 673, 678-79 (9th Cir. 2010) (deferring to our interpretation of the evidence that may be considered in a particularly serious crime determination).

A particularly serious crime analysis is centered on the crime that was committed. *Matter of Carballe*, 19 I&N Dec. at 360. Consequently, the inquiry does not involve an examination of an alien's personal circumstances and equities, such as family or community ties or any risk of persecution in the country of removal. *Matter of L-S-*, 22 I&N Dec. at 651; *Matter of Q-T-M-T-*, 21 I&N Dec. at 656; *Matter of K-*, 20 I&N Dec. at 418 (stating that a particularly serious crime analysis "relates only to the nature of the crime and does not vary with the nature of the evidence of persecution"); *Matter of Rodriguez-Coto*, 19 I&N Dec. 208, 209-10 (BIA 1985).

The presence or absence of harm to the victim is also a pertinent factor in evaluating whether a crime was particularly serious. *See, e.g., Alphonsus v. Holder*, 705 F.3d at 1043 (recognizing "that harm to persons is the usual requisite danger" relevant in a particularly serious crime analysis); *Matter of R-A-M-*, 25 I&N Dec. 657, 661 (BIA 2012) (finding that possession of child pornography was a particularly serious crime and noting "that the primary victims of the distribution of child pornography are the people who are depicted in the pornographic materials" (citing *United States v. Stevens*, 197 F.3d 1263, 1269 n.6 (9th Cir. 1999))); *Matter of N-A-M-*, 24 I&N Dec. at 343 (finding that felony menacing was a particularly serious crime because it is an offense against a person, and the statute of conviction clearly required a serious threat to others); *cf. Matter of L-S-*, 22 I&N Dec. at 655-56 (finding that an alien smuggling conviction, which resulted in a 3½-month sentence, was not for a particularly serious crime and noting that the statute did not require proof of any endangerment, harm, or intended harm and the smuggled alien suffered no actual harm).

**\*\*5** **\*344** The language of the statute provides the "essential key" to determining whether a crime is particularly serious, which is "whether the nature of the crime is one which indicates that the alien poses a danger to the community." *Matter of*

AR.05604

*Carballe*, 19 I&N Dec. at 360. Once an offense is determined to be particularly serious, no separate determination of danger to the community is required. 8 C.F.R. § 1208.16(d)(2); *see also Anaya-Ortiz v. Holder*, 594 F.3d at 679.

## C. Application to the Respondent

The respondent was convicted of assault with a deadly weapon. Because he was not sentenced to a term of imprisonment of more than 5 years, the respondent is not barred from establishing eligibility for relief under section 241(b)(3)(B) of the Act. We therefore evaluate the nature of the conviction, the type of sentence imposed, and the circumstances and underlying facts of his assault with a deadly weapon conviction to determine whether his crime was particularly serious. *See Anaya-Ortiz v. Holder*, 594 F.3d at 679; *Matter of R-A-M-*, 25 I&N Dec. at 659; *Matter of N-A-M-*, 24 I&N Dec. at 342; *Matter of Frentescu*, 18 I&N Dec. at 247.

As previously noted, we have long recognized that "crimes against persons" are more likely to be categorized as particularly serious crimes. *See, e.g., Matter of R-A-M-*, 25 I&N Dec. at 662; *Matter of N-A-M-*, 24 I&N Dec. at 343; *Matter of L-S-*, 22 I&N Dec. at 649; *Matter of Frentescu*, 18 I&N Dec. at 247; *see also Matter of L-S-J-*, 21 I&N Dec. 973, 974-75 (BIA 1997) (finding robbery with a deadly weapon, a handgun, to be a particularly serious crime).

In considering the circumstances of the respondent's offense, the Immigration Judge relied on sworn testimony given by the respondent's victim during the preliminary criminal hearing. According to the victim, the respondent physically assaulted him by swinging a weightlifting bell and grazing the side of his head, which resulted in a laceration that required stitches. This was a dangerous act capable of causing grave injuries. The gravity of the respondent's offense is also reflected in his 2-year sentence to prison.

We recognize the significance of the respondent's mental health struggles and sympathize with the resulting hardships he has faced. However, based on our assessment of the nature of the respondent's conviction, the prison sentence imposed, and the circumstances of his offense, we concur with the Immigration Judge that the respondent's conviction for assault with a deadly weapon was for a particularly serious crime.

**\*\*6  \*345** The respondent argues on appeal that his mental condition should be a factor in determining whether his offense was a particularly serious crime for purposes of section 241(b)(3)(B) of the Act. He claims that ""his mental illness prevented him from solving a complex social situation such as being aggressively challenged by a stranger" and consequently resulted in his use of violence. We are unpersuaded by this contention and conclude that consideration of an alien's mental health as a factor in the criminal act falls within the province of the criminal courts and is not a factor to be considered in a particularly serious crime analysis.

Whether and to what extent an individual's mental illness or disorder is relevant to his or her commission of an offense and conviction for the crime are issues best resolved in criminal proceedings by the finders of fact. Such fact finders have expertise in the applicable State and Federal criminal law, are informed by the evidence presented by the defendant and the prosecution, and have the benefit of weighing all the factors firsthand. We cannot go behind the decisions of the criminal judge and reassess any ruling on criminal culpability.

Issues concerning a defendant's mental condition at the time a crime was committed can be raised at different phases of the criminal proceedings. For instance, evidence of a defendant's mental condition may give rise to a reason to doubt his or her competency to stand trial. [4] Further, such evidence may be submitted to establish an affirmative defense of not guilty by reason of insanity, to show the absence of specific intent or other mental states required for a conviction, or to be a mitigating factor for sentencing purposes. [5] The defendant's mental condition may also be raised in post-conviction motions, appeals, and petitions.

**\*346** It is fundamental to California's jurisprudence that an individual with a mental condition that renders that person legally "insane" cannot be convicted of acts performed while suffering from that condition. *See People v. Kelly*, 516 P.2d 875, 881-83

(Cal. 1973) (finding that the defendant was not guilty of assault with a deadly weapon by reason of insanity where evidence showed that she was psychotic at the time of the offense and was incapable of understanding that her act was wrong). However, the respondent has not made a claim that he entered a plea of guilty by reason of insanity at his criminal proceedings, nor has he presented any evidence of such a plea. See *People v. Mills*, 286 P.3d 754, 758-61 (Cal. 2012) (explaining California law on the insanity defense and proof of the defendant's mental state). Insanity at the time the offense was committed was a factual question to be decided by the trier of fact during his criminal proceedings. See *People v. Kelly*, 516 P.2d at 881. No such finding of fact was made in the respondent's criminal case.

**\*\*7** The record reflects that the respondent's mental disorder warranted the application of procedural safeguards in removal proceedings to ensure the protection of his right to a fair hearing. See *Matter of M-A-M-*, 25 I&N Dec. 474, 479-81, 483 (BIA 2011). However, his mental condition does not relate to the pivotal issue in a particularly serious crime analysis, which is whether the nature of his conviction, the sentence imposed, and the circumstances and underlying facts indicate that he posed a danger to the community. Section 241(b)(3)(B)(ii) of the Act; *Alphonsus v. Holder*, 705 F.3d at 1041 (citing *Matter of N-A-M-*, 24 I&N Dec. at 341-43; *Matter of Carballe*, 19 I&N Dec. at 360); *Delgado v. Holder*, 648 F.3d at 1107. The respondent's claim that his violent act was a result of his mental illness does not lessen the danger that his actions posed to others and is therefore not relevant to our determination that his offense is a particularly serious crime.

The respondent also asserts that section 245(a)(1) of the California Penal Code "does not necessarily require evil intent or fraud" and contends that as a result of his mental disorder, he "did not act with the requisite intent to render his crime particularly serious." Whether an offense requires evil intent or fraud is often a relevant factor in determining whether a crime involves moral turpitude. See *Matter of Solon*, 24 I&N Dec. 239, 240-41 (BIA 2007); **\*347** *Matter of Torres-Varela*, 23 I&N Dec. 78, 82-84 (BIA 2001). It may also be appropriate to consider whether an alien's conduct was "inherently base, vile, or depraved" in deciding whether a crime is particularly serious. *Matter of Ajami*, 22 I&N Dec. 949, 950 (BIA 1999) (defining moral turpitude). However, since the focus in a particularly serious crime analysis is whether the offense justifies a determination that the respondent "is a danger to the community," an inquiry regarding evil intent or fraud is not necessarily dispositive. Section 241(b)(3)(B)(ii) of the Act; *see also Alphonsus v. Holder*, 705 F.3d at 1041; *Matter of N-A-M-*, 24 I&N Dec. at 341-43; 8 C.F.R. § 1208.16(d)(2).

Assault with a deadly weapon under section 245(a)(1) of the California Penal Code is a general intent crime, which does not require any specific intent to injure another. California courts have nevertheless recognized that the statute's general intent requirement does not diminish the dangerousness of acts committed in violation of this statute. *See, e.g., People v. Aznavoleh*, 148 Cal. Rptr. 3d 901, 908-09 (Cal. Ct. App. 2012) (observing that running a red light while racing another vehicle on a busy city street was inherently dangerous to others); *In re Gavin T.*, 77 Cal. Rptr. 2d 701, 703 (Cal. Ct. App. 1998) (stating that to be found guilty of criminal assault, "one must have a general criminal intent to do an act which is inherently dangerous to human life"). Because the respondent's assault with a deadly weapon is an inherently dangerous offense, his commission of the crime warrants a finding that he is "a danger to the community," even if he did not intend to commit a particularly serious crime. Section 241(b)(3)(B)(ii) of the Act.

## IV. CONCLUSION

**\*\*8** Although we are mindful of the impact mental illness can have on an individual's behavior, we conclude that an alien's mental health is not a factor to be considered in assessing whether he or she has been convicted of a particularly serious crime under section 241(b)(3)(B) of the Act.[6] Upon our de novo review, we conclude that the respondent did not satisfy his burden of establishing that his conviction for assault with a deadly weapon was not for a particularly serious crime. See 8 C.F.R. § 1240.8(d) (2013) **\*348** (providing that an applicant for relief from removal has the burden of proving by a preponderance of the evidence that a ground for mandatory denial of an application does not apply). Because the respondent has been convicted of a particularly serious crime, he is ineligible for withholding of removal under both the Act and the Convention Against Torture. However, he remains eligible for deferral of removal under the Convention Against Torture, and the Immigration Judge's grant of that relief has not been contested on appeal. Accordingly, the respondent's appeal will be dismissed and the record will be remanded solely for the purpose of completing the requisite background checks.

AR.05606

**ORDER:** The respondent's appeal is dismissed.

**FURTHER ORDER:** Pursuant to 8 C.F.R. § 1003.1(d)(6) (2013), the record is remanded to the Immigration Judge for the purpose of giving the Department of Homeland Security the opportunity to complete or update identity, law enforcement, or security investigations or examinations, for further proceedings, if necessary, and for the entry of an order as provided by 8 C.F.R. § 1003.47(h) (2013).

## Footnotes

1    At the time of the respondent's conviction in 2004, section 245(a)(1) of the California Penal Code proscribed "an assault upon the person of another with a deadly weapon or instrument other than a firearm or by any means of force likely to produce great bodily injury." Section 240 of the California Penal Code, in turn, defined an "assault" as an "unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." The term "deadly weapon," as used in section 245(a)(1) of the California Penal Code, means "any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury." *People v. Aguilar*, 945 P.2d 1204, 1207 (Cal. 1997) (quoting *In re Jose D.R.*, 186 Cal. Rptr. 898, 901 (Cal. Ct. App. 1982)) (internal quotation marks omitted).

2    Although the respondent stated without elaboration on the notice of appeal that his conviction was not for an aggravated felony, he did not pursue that argument in his brief. We will therefore not address this issue further. *See Rizk v. Holder*, 629 F.3d 1083, 1091 n.3 (9th Cir. 2011) (finding that issues not raised in a brief are deemed waived); *Martinez-Serrano v. INS*, 94 F.3d 1256, 1259 (9th Cir. 1996) (finding that an issue referred to in an appellant's statement of the case but not discussed in the body of the brief is deemed waived); *see also United States v. Grajeda*, 581 F.3d 1186, 1196-97 (9th Cir. 2009) (holding that "assault with a deadly weapon or by means of force likely to produce great bodily injury under section 245(a)(1) is categorically a crime of violence").

3    This finding has not been challenged by the Department of Homeland Security and is not before us on appeal.

4    As the Supreme Court has noted, it "has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Indiana v. Edwards*, 554 U.S. 164, 169-70 (2008) (emphasis omitted) (quoting *Drope v. Missouri*, 420 U.S. 162, 171 (1975)); *see also Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam) (defining the competency standard as including whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding--and whether he has a rational as well as factual understanding of the proceedings against him" (quoting the Solicitor General) (internal quotation mark omitted)).

5    *See Clark v. Arizona*, 548 U.S. 735, 749-52 (2006) (noting that most States recognize some variant of the insanity defense); *United States v. Christian*, 749 F.3d 806, 813 (9th Cir. 2014) (finding that the trial court erroneously excluded expert testimony that could have "provided some evidentiary basis for inferring" a link between the defendant's mental illness and his defense that he lacked the specific intent required by the charged offense); *Caro v. Woodford*, 280 F.3d 1247, 1254-56 (9th Cir. 2002) (finding ineffective assistance where counsel failed to investigate and present evidence of the defendant's brain damage as a mitigating factor during the penalty phase); *People v. DeHoyos*, 303 P.3d 1, 33 (Cal. 2013) (noting that the California Penal Code "permit[s] introduction of evidence of mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense").

6    An alien who, "having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States" is similarly barred from establishing eligibility for asylum under section 208(b)(2)(A)(ii) of the Act, 8 U.S.C. § 1158(b)(2)(A)(ii) (2012). Our analysis in this case would also apply to aliens who may be eligible for asylum. The respondent is not eligible for asylum because he has been convicted of an aggravated felony. *See* section 208(b)(2)(B)(i) of the Act; 8 C.F.R. § 1208.13(c)(1) (2013).

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 383 of 1271

26 I. & N. Dec. 339 (BIA), Interim Decision 3806, 2014 WL 3571529

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Called into Doubt by Toure v. Barr, 7th Cir., June 7, 2019

24 I. & N. Dec. 785 (BIA), Interim Decision 3640, 2009 WL 1471560

U.S. Department of Justice

Executive Office for Immigration Review

Board of Immigration Appeals

MATTER OF AJMAL HUSSAIN SHAH HASHMI, RESPONDENT

Decided April 22, 2009

**1 *785 (1) An alien's unopposed motion to continue ongoing removal proceedings to await the adjudication of a pending family-based visa petition should generally be granted if approval of the visa petition would render him prima facie eligible for adjustment of status. *Matter of Garcia*, 16 I&N Dec. 653 (BIA 1978), followed.

(2) In determining whether good cause exists to continue such proceedings, a variety of factors may be considered, including, but not limited to: (1) the Department of Homeland Security's response to the motion to continue; (2) whether the underlying visa petition is prima facie approvable; (3) the respondent's statutory eligibility for adjustment of status; (4) whether the respondent's application for adjustment merits a favorable exercise of discretion; and (5) the reason for the continuance and any other relevant procedural factors.

**FOR RESPONDENT:**
Regis Fernandez, Esquire
Newark, New Jersey

**FOR THE DEPARTMENT OF HOMELAND SECURITY:**
Xiomara Davis-Gumbs
Assistant Chief Counsel

BEFORE: Board Panel: OSUNA, Chairman; GREER and MALPHRUS, Board Members.

GREER, Board Member:

On July 7, 2008, in *Hashmi v. Attorney General of U.S.,* 531 F.3d 256 (3d Cir. 2008), the United States Court of Appeals for the Third Circuit granted the respondent's petition for review of our July 31, 2006, decision, vacated our prior order, and remanded the case to us for further proceedings. Upon further review of the respondent's case, we will sustain the respondent's appeal and remand the record to the Immigration Judge for further proceedings.

## I. FACTUAL AND PROCEDURAL HISTORY

The respondent, a native and citizen of Pakistan, entered the United States as a visitor on October 22, 2000. He married a United States citizen in 2001. The respondent was personally served with a Notice to Appear (Form I-862) *786 on July 30, 2003. When he first appeared before the Immigration Judge on September 25, 2003, the respondent, through counsel, admitted the allegations of fact and conceded the charges of removability in the Notice to Appear. He informed the Immigration Judge that he intended to apply for adjustment of status based on his marriage to a United States citizen and the pending Petition for Alien Relative (Form I-130) filed by his wife on his behalf. The Immigration Judge granted the respondent a 4-month continuance to allow time for the United States Citizenship and Immigration Services ("USCIS") of the Department of Homeland Security ("DHS") [1] to adjudicate the visa petition.

When the parties reconvened on February 5, 2004, the respondent reported that the I-130 was still pending. He explained that the USCIS interviewed him on November 25, 2003, and the following month he submitted the additional documentation requested by the USCIS. The DHS attorney [2] advised that he did not have the respondent's file because it was with the Cherry Hill USCIS office where the respondent had been interviewed. The Immigration Judge granted the respondent a second continuance to give the USCIS additional time to adjudicate the I-130.

**2  The parties reconvened on May 24, 2004, and again reported that the I-130 remained pending. This time the DHS attorney had the respondent's file. The Immigration Judge granted a third continuance to wait for the USCIS to adjudicate the I-130. On August 26, 2004, the Immigration Judge continued the proceedings for a fourth time for the same reason.

At the final removal hearing on March 29, 2005, counsel for the respondent reported that the Cherry Hill USCIS office could not adjudicate the I-130 because the DHS attorney had the file. The respondent sought another continuance, which the DHS did not oppose. The Immigration Judge denied the fifth continuance request. He observed that despite numerous continuances over an 18-month period, the I-130 was still pending and unadjudicated. The Immigration Judge explained that he was expected to complete cases in a reasonable period of time by meeting certain "case completion goals" set by the Department of Justice. The Immigration Judge recognized that the case  *787  completion goals are not mandatory, but they are intended to provide case management guidance to Immigration Judges. The respondent appealed.

On July 31, 2006, we adopted and affirmed the Immigration Judge's decision denying the respondent's motion to continue. We agreed with the Immigration Judge that a further continuance was unwarranted in light of the numerous continuances already granted. We also found that the respondent failed to establish that his case was prejudiced because, at the time of our decision, he had yet to proffer an approved I-130. Citing *Matter of Sibrun*, 18 I&N Dec. 354 (BIA 1983), we recognized that an Immigration Judge's discretionary decision denying a continuance will not be reversed on appeal unless the respondent establishes that the denial caused him actual prejudice and harm, and it materially affected the outcome of his case. Moreover, we found that the adjudication of the I-130 was delayed, in part, because of the respondent's failure to disclose a prior marriage, as well as doubts that were cast on the authenticity of his divorce decree.

The respondent filed a petition for review of our decision with the Third Circuit. First, the court found that the Immigration Judge's denial of the respondent's final continuance request was arbitrary and an abuse of discretion because it was "based solely on case-completion goals," rather than the specific facts and circumstances of the case. *Hashmi v. Att'y Gen. of U.S., supra,* at 261. Next, the court concluded that our finding that the respondent contributed to the delay in the I-130 adjudication constituted impermissible fact-finding on appeal. *See* 8 C.F.R. § 1003.1(d)(3)(iv) (2008) ("[T]he Board will not engage in factfinding in the course of deciding appeals."). The case was remanded to us for further proceedings consistent with the court's opinion.

## II. ISSUE

**3  In this case, the respondent sought multiple continuances to afford the USCIS the time and opportunity to adjudicate his I-130, which, if approved, would render him prima facie eligible for adjustment of status. The question presented is what factors should be considered in determining whether the respondent should be allowed to continue ongoing removal proceedings pending the final adjudication of an I-130, which is a prerequisite for adjustment of status. This is a difficult question because of the inherent tension between the conflicting needs to bring finality to the removal proceedings and to give the respondent an opportunity to apply for relief, especially where the respondent may be eligible for lawful permanent resident status through a family-based petition.

*788  III. ANALYSIS

A. Motions for Continuances

The Immigration and Nationality Act does not contain specific statutory authority for the adjudication of motions to continue removal proceedings. Rather, Immigration Judges derive their broad discretionary authority over continuances from the regulations, which state that "[t]he Immigration Judge may grant a motion for continuance for good cause shown." 8 C.F.R. § 1003.29 (2008); *see also* 8 C.F.R. § 1240.6 (2008) (providing that the Immigration Judge may grant a reasonable adjournment either at his or her own instance or, for good cause shown, upon application by the respondent or the DHS).

The regulations do not contain a definition of what constitutes good cause. We have defined the parameters of "good cause" in different ways depending on the facts and circumstances presented. For example, in *Matter of Sibrun*, *supra*, we set a high standard for adjudicating motions to continue to give the respondent more time to prepare and the opportunity to obtain additional evidence. Under *Sibrun*, these motions must be accompanied, at a minimum, by a "reasonable showing that the lack of preparation occurred despite a diligent good faith effort to be ready to proceed and that any additional evidence [the alien] seeks to present is probative, noncumulative, and significantly favorable to the alien." *Id.* at 356; *cf. Matter of Silva-Rodriguez*, 20 I&N Dec. 448 (BIA 1992) (holding that good cause was not shown where the respondent sought a continuance to have more time to establish rehabilitation in furtherance of his application for a waiver of inadmissibility under former section 212(c) of the Act, 8 U.S.C. § 1182(c) (Supp. II 1990)).

Pertinent to the matter before us, in *Matter of Garcia*, 16 I&N Dec. 653 (BIA 1978), *modified on other grounds, Matter of Arthur*, 20 I&N Dec. 475 (BIA 1992), we considered whether a respondent should be granted reopening or a continuance for the adjudication of a pending I-130. We held "that discretion should, as a general rule, be favorably exercised where a prima facie approvable visa petition and adjustment application have been submitted in the course of a deportation hearing or upon a motion to reopen." *Id.* at 657. In *Garcia*, the respondent requested reopening of his deportation proceedings pending adjudication of a visa petition filed by his United States citizen wife simultaneously with his application to pursue adjustment of status before the Immigration Judge, who had jurisdiction over that application.[3] *Garcia* aimed **789** to allow a respondent, as the likely beneficiary of a visa petition conferring immediate eligibility for adjustment of status, an opportunity to await the outcome of the visa petition decision before proceedings concluded. Our decision focused on the likelihood of success of the visa petition on the merits, which would result in "a substantial claim to relief from deportation under section 245 of the Act." *Matter of Garcia, supra*, at 656.

**4** The circuit courts reacted favorably to *Garcia*, supporting its presumption that discretion should be favorably exercised in appropriate cases to await resolution of the ancillary visa petition. The circuit courts also recognized that *Garcia* "did not create an inflexible rule, requiring an [Immigration Judge] to continue deportation proceedings, regardless of the merits of the pending visa petition." *Onyeme v. U.S. INS*, 146 F.3d 227, 233 (4th Cir. 1998); *see also Pedreros v. Keisler*, 503 F.3d 162, 166 (2d Cir. 2007); *Hassan v. INS*, 110 F.3d 490 (7th Cir. 1997); *Oluyemi v. INS*, 902 F.2d 1032, 1034 (1st Cir. 1990).

### B. Motions to Continue for Adjustment of Status

#### 1. Adjustment of Status Process

A two-step process underlies a family-based adjustment of status. First, the United States citizen or lawful permanent resident petitioner files an I-130 with the USCIS on behalf of his or her qualifying family member, who is the beneficiary of the visa petition and later becomes the respondent in removal proceedings. The petitioner must establish his or her own United States citizenship or lawful permanent resident status and the bona fides of the claimed relationship to the beneficiary and must also show that the family relationship meets the statutory requirements. *See* 8 C.F.R. §§ 204.1-204.2 (2008) (providing filing and adjudication procedures for certain family-based immigrant visa petitions).

Once the I-130 is approved and an immigrant visa is immediately available, the respondent may apply for adjustment of status under section 245(a) of the Act, 8 U.S.C. § 1255(a) (2006). The burden is on the respondent to establish his adjustment eligibility. *See* 8 C.F.R. § 1240.8(d) (2008). To establish eligibility for adjustment of status under section 245(a) of the Act, the respondent must demonstrate that he has been inspected and admitted or paroled into the United States; is eligible to receive an immigrant

visa and has a visa immediately available to him; is not statutorily barred from adjustment; and is admissible to the United States within the meaning of section 212(a) of the Act or, if inadmissible, is eligible for a waiver of inadmissibility.

Regarding the requirement that a visa be immediately available, immediate relatives, who are defined as parents, spouses, and children of United States citizens in section 201(b)(2)(A)(i) of the Act, 8 U.S.C. § 1151(b)(2)(A)(i)  *790  (2006), are not subject to numerical limits on immigrant visas, meaning that visa availability is immediate. On the other hand, aliens in the preference categories under section 203(a) of the Act, 8 U.S.C. § 1153(a) (2006) (e.g., the spouse of a lawful permanent resident), are subject to numerical limits on visas. The Department of State tracks visa availability in its monthly Visa Bulletin. A visa is immediately available when the alien's priority date is earlier than the date for the specified preference category shown on the current Visa Bulletin. *See* 8 C.F.R. §§ 245.1(g)(1), 1245.1(g)(1) (2008). The alien's priority date is fixed when the I-130 is filed with the USCIS. *See* 8 C.F.R. §§ 245.1(g)(2), 1245.1(g)(2).

### 2. Appropriate Factors for Consideration of a Motion To Continue for Adjustment of Status

 **5  After evaluating the respondent's place in the adjustment of status process, the Immigration Judge must determine whether to grant a continuance request. This brings us to the precise issue before us, namely, what factors should be considered in determining whether to continue removal proceedings pending final adjudication of an I-130 filed in conjunction with an adjustment application.

Adjudication of a motion to continue should begin with the presumption stated in *Matter of Garcia, supra*, at 657, that discretion should be favorably exercised where a prima facie approvable visa petition and adjustment application have been submitted in the course of an ongoing removal hearing. This presumption is reasonable given the significant interest at stake—the chance to acquire lawful permanent resident status through a family-based visa petition. At the same time, it is well established that *Garcia* does not require the Immigration Judge to grant a continuance in every case where there is a pending visa petition. Although the focus of the inquiry is the likelihood that the adjustment application will be granted, we find that there are a number of factors that may be relevant to evaluate and weigh in deciding whether a continuance is warranted in family-based adjustment scenarios.

In determining whether to continue proceedings to afford the respondent an opportunity to apply for adjustment of status premised on a pending visa petition, a variety of factors may be considered, including, but not limited to: (1) the DHS response to the motion; (2) whether the underlying visa petition is prima facie approvable; (3) the respondent's statutory eligibility for adjustment of status; (4) whether the respondent's application for adjustment merits a favorable exercise of discretion; and (5) the reason for the continuance and other procedural factors. These factors are illustrative, not exhaustive. While all these factors may be relevant in a given case, the focus of the inquiry is the apparent ultimate likelihood of success on the adjustment application.  *791  *See Pede v. Gonzales*, 442 F.3d 570, 571 (7th Cir. 2006) (stating that the denial of a continuance was not an abuse of discretion, given the "ultimate hopelessness" of the adjustment application).

First, the Immigration Judge should consider the DHS's position. If the DHS affirmatively expresses a lack of opposition, the proceedings ordinarily should be continued by the Immigration Judge in the absence of unusual, clearly identified, and supported reasons for not doing so. Government opposition that is reasonable and supported by the record may warrant denial of a continuance. On the other hand, unsupported opposition does not carry much weight. The Immigration Judge should evaluate the Government's objection, considering the totality of the circumstances. *See Badwan v. Gonzales*, 494 F.3d 566, 568 (6th Cir. 2007) (stating that the DHS's lack of opposition "underscores the importance of the [Immigration Judge's] offering a coherent explanation as to why, from the perspective of the immigration courts, the motion should be denied"). [4]

 **6  If the DHS does oppose a continuance or further analysis is warranted, the Immigration Judge may need to evaluate whether the respondent is the beneficiary of a prima facie approvable I-130. It is well established that Immigration Judges do not have jurisdiction to decide visa petitions. *See Matter of Perez Vargas*, 23 I&N Dec. 829, 831 (BIA 2005). However, in the context of deciding a motion to continue for the USCIS to adjudicate the petition, it is useful for the Immigration Judge to evaluate the viability of the underlying I-130. *See, e.g., Afzal v. Holder*, 559 F.3d 677, 679 (7th Cir. 2009) (finding that the denial

of a continuance was not an abuse of discretion where the respondent "could not point to any prospect of success regarding the reinstatement of his visa").

Submission of the visa petition to the Immigration Judge assists in determining the viability of the underlying I-130. If needed, the respondent's request for a continuance should be supported by particularized facts and evidence, including a copy of the I-130 visa petition packet that the respondent filed with the USCIS, along with the USCIS Notice of Action (Form I-797) **\*792** showing the date of receipt. [5] Cf. *Ilic-Lee v. Mukasey*, 507 F.3d 1044, 1048 (6th Cir. 2007) (noting that the respondent failed to provide evidence, such as a copy of the pending I-130 petition).

If other visa petitions filed on the respondent's behalf have been denied, those petitions and the USCIS's determinations could also be presented and considered. These prior filings or other evidence of potential fraud or dilatory tactics may impact the viability of the visa petition underlying the motion. *See, e.g., Pedreros v. Keisler, supra,* at 166 (finding that it was not an abuse of discretion to deny a continuance where there was "no basis to conclude that the denial of the I-130 petition had any likelihood of being overturned on appeal"); *Morgan v. Gonzales,* 445 F.3d 549, 552 (2d Cir. 2006) (finding no abuse of discretion in the denial of a continuance for adjudication of a second visa petition when the first I-130 filed by the same petitioner was denied by the USCIS for failure to establish a bona fide marriage).

Third, the Immigration Judge may evaluate the respondent's statutory eligibility for adjustment of status. We held in *Matter of Garcia, supra,* that a continuance request could be denied based on a determination that the respondent is statutorily ineligible for adjustment. *See also Ilic-Lee v. Mukasey, supra,* at 1048 (finding no obligation to continue where it was unlikely that an adjustment application would be approved); *Pedreros v. Keisler, supra,* at 166 (finding no obligation to continue "when there is a reliable basis to conclude that the visa petition or the adjustment of status will ultimately be denied"); *Oluyemi v. INS, supra,* at 1034 (finding no obligation to continue when the Immigration Judge "believed that the adjustment petition eventually would be denied").

 **\*\*7** To determine the likelihood of success of the adjustment application, the Immigration Judge needs some basis to examine the merits of the application. Therefore, the respondent may be required to submit evidence establishing prima facie eligibility for adjustment, including the Application to Register Permanent Residence or Adjust Status (Form I-485), the required supporting documentation, and the USCIS fee receipts. *See* section 245(a) of the Act (requiring that the alien make an application for such adjustment). If warranted, the respondent should provide evidence establishing his admissibility or his eligibility for a corresponding waiver of inadmissibility. *See* 8 C.F.R. § 1245.1(f) (2008) (providing that an application for a waiver of inadmissibility should be filed concurrently with an adjustment application). If a waiver of inadmissibility is required, the appropriate application for a waiver may also be submitted to the Immigration Judge, along with the **\*793** required supporting documentation. *See Onyeme v. U.S. INS, supra* (finding that a respondent who failed to demonstrate eligibility for a waiver of inadmissibility could not establish a prima facie case for adjustment of status).

Similarly, a respondent who is present in this country without having been inspected and admitted or paroled, or who is barred from adjustment under section 245(c) of the Act, would need to establish eligibility for adjustment of status under section 245 (i) of the Act. This would include proof that a labor certification or visa petition was properly filed on the respondent's behalf on or before April 30, 2001, and was approvable when filed. *See Matter of Jara Riero and Jara Espinol*, 24 I&N Dec. 267 (BIA 2007); 8 C.F.R. § 1245.10(2008).

Fourth, the Immigration Judge may consider whether the respondent warrants adjustment of status in the exercise of discretion. *See Matter of Garcia, supra,* at 657 (stating that a continuance may be denied based on a determination that adjustment is not warranted in the exercise of discretion, notwithstanding the approval of the visa petition); *see also Malik v. Mukasey,* 546 F.3d 890 (7th Cir. 2008) (finding that it is not an abuse of discretion to deny a continuance based on the determination that the alien does not merit adjustment in the exercise of discretion). Factors relevant to determining whether a favorable exercise of discretion is warranted include, but are not limited to, the existence of family ties in the United States; the length of the respondent's residence in the United States; the hardship of traveling abroad; and the respondent's immigration history, including

AR.05613

any preconceived intent to immigrate at the time of entering as a nonimmigrant. *See generally Matter of Blas*, 15 I&N Dec. 626 (BIA 1974; A.G. 1976); *Matter of Arai*, 13 I&N Dec. 494 (BIA 1970); *see also Oluyemi v. INS, supra,* at 1033-34 (stating that an alien must establish that adjustment is warranted as a matter of discretion). A respondent's criminal history is an additional consideration. *See Abu-Khaliel v. Gonzales, 436 F.3d 627, 634 (6th Cir. 2006).*

 **8  Fifth, the Immigration Judge may consider the reasons for the continuance and other relevant procedural factors. In some cases, both parties may require additional time. *See, e.g., Badwan v. Gonzales, supra* (noting that the DHS needed time to complete the required background check and the respondent needed time to prove the validity of his divorce). In other cases, however, a critical inquiry will revolve around which party is most responsible for the delay in the proceedings. In the instant case, the continuance was predicated on the USCIS's delay in processing the I-130. The delay was exacerbated by the movement of the respondent's file back and forth between the offices of the USCIS adjudicator and the DHS trial attorney. Delay that is not attributable to the respondent augurs in favor of a continuance.

The Immigration Judge may also consider any other relevant procedural factors. Compliance with an Immigration Judge's case completion goals,  *794  however, is not a proper factor in deciding a continuance request, and Immigration Judges should not cite such goals in decisions relating to continuances. *See Hashmi v. Att'y Gen. of U.S., supra,* at 261. The number and length of prior continuances are not alone determinative. However, a history of continuances being granted by the Immigration Judge for the adjudication of a pending I-130, coupled with other relevant factors, may support a decision to move forward with the case. *See, e.g., Abu-Khaliel v. Gonzales, supra* (finding that the denial of a continuance was not an abuse of discretion where the Immigration Judge considered the number and length of prior continuances, the recently filed second I-130 by the respondent's second wife, and the respondent's criminal history).

Finally, as with other discretionary determinations, the Immigration Judge should articulate, balance, and explain all these relevant factors, and any others that may be applicable, in deciding whether to grant the respondent a continuance for the USCIS to adjudicate the I-130 or, alternatively, to proceed with the case despite the pendency of the visa petition. *See Subhan v. Ashcroft, 383 F.3d 591 (7th Cir. 2004)* (finding an abuse of discretion where the Immigration Judge offered no reason for denying the continuance).

## IV. CONCLUSION

The record will be remanded to the Immigration Judge so that he can consider the aforementioned factors to determine whether a continuance is warranted in this case. In considering the facts and circumstances of this particular case, he should evaluate the following five factors, as relevant: (1) the DHS's position on the motion to continue; (2) whether the underlying visa petition is prima facie approvable; (3) the respondent's statutory eligibility for adjustment of status; (4) whether the respondent's application for adjustment merits a favorable exercise of discretion; and (5) the reason for the continuance and any other relevant procedural factors. He may also consider any other facts that he deems appropriate. The parties will be afforded the opportunity to satisfy the evidentiary requirements described above.

 **9  ORDER: The respondent's appeal is sustained.

FURTHER ORDER: The record is remanded to the Immigration Judge for further proceedings consistent with the foregoing opinion and for the entry of a new decision.

## Footnotes

1    On March 1, 2003, pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2178, the
     functions of the Immigration and Naturalization Service were transferred to the Department of Homeland Security.
     As a result of this transfer, benefit and enforcement functions were separated. The DHS's United States Citizenship
     and Immigration Services is authorized to provide immigration and naturalization benefits to aliens, including the
     adjudication of visa petitions. The DHS's United States Immigration and Customs Enforcement ("ICE") is authorized
     to enforce the Immigration and Nationality Act and other immigration-related laws. Attorneys from ICE's Office of the
     Principal Legal Advisor represent the DHS in removal proceedings.

2    In this decision, we refer to the ICE attorney as the "DHS attorney."

3    *Matter of Garcia* predates the enactment of time and number limits on motions to reopen under section 240(c)(7) of
     the Act, 8 U.S.C. § 1229a(c)(7) (2006).

4    In appropriate circumstances, such as where there is a pending prima facie approvable visa petition, we urge the DHS
     to consider agreeing to administrative closure of the case. *See generally Matter of Gutierrez*, 21 I&N Dec. 479 (BIA
     1996) (stating that administrative closure is used to temporarily remove the case from the court's docket and that a case
     may not be administratively closed if opposed by either party). Administrative closure is an attractive option in these
     situations, as it will assist in ensuring that only those cases that are likely to be resolved are before the Immigration
     Judge. This will avoid the repeated rescheduling of a case that is clearly not ready to be concluded. Notably, either
     party can move to have the case recalendered once the visa petition has been adjudicated or some other factor has arisen
     indicating that the case is ready for a hearing. *Id.*

5    In this case, the respondent did not submit any evidence of the pending I-130 and did not specify the date it was filed,
     although it appears to have been filed prior to the initiation of his removal proceedings.

24 I. & N. Dec. 785 (BIA), Interim Decision 3640, 2009 WL 1471560

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

25 I. & N. Dec. 845 (BIA), Interim Decision 3759, 2012 WL 2521107

U.S. Department of Justice

Executive Office for Immigration Review

Board of Immigration Appeals

Matter of Ignacio GUZMAN MARTINEZ, Respondent

Decided June 29, 2012

**\*\*1   \*845** Pursuant to section 101(a)(13)(C)(iii) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(13)(C)(iii) (2006), a lawful permanent resident of the United States may be treated as an applicant for admission in removal proceedings if the Department of Homeland Security proves by clear and convincing evidence that the returning resident engaged in "illegal activity" at a United States port of entry.

**FOR RESPONDENT:**
Arnold S. Jaffe, Esquire
Santa Barbara, California

**FOR THE DEPARTMENT OF HOMELAND SECURITY:**
Tasha Gailys
Assistant Chief Counsel

BEFORE: Board Panel: COLE, PAULEY, and GREER, Board Members.

GREER, Board Member:

In a decision dated February 14, 2011, an Immigration Judge terminated removal proceedings against the respondent, concluding that the Department of Homeland Security ("DHS") had improperly charged the respondent with inadmissibility to the United States based on alleged illegal activity discovered at a port of entry. The DHS has appealed from that decision. The appeal will be sustained, the proceedings will be reinstated, and the record will be remanded to the Immigration Judge.

I. FACTUAL AND PROCEDURAL HISTORY

The respondent, a native and citizen of Mexico, has been a lawful permanent resident of the United States since 2004. On July 31, 2005, after visiting Mexico, he presented himself for inspection at the San Ysidro, California, port of entry. During the inspection process, immigration officers concluded that the respondent was attempting to bring an undocumented juvenile alien into the United States in violation of law. Accordingly, the officers paroled the respondent into the United States and initiated removal proceedings by filing a notice to appear, which charged him with **\*846** inadmissibility under section 212(a)(6)(E) (i) of the Act, 8 U.S.C. § 1182(a)(6)(E)(i) (2000), as an alien who "at any time knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law."

After several evidentiary hearings, the Immigration Judge dismissed the charge and terminated the removal proceedings "without prejudice," concluding that the notice to appear had been "improvidently issued" by the DHS. According to the Immigration Judge, the DHS's decision to charge the respondent with inadmissibility was inconsistent with section 101(a)(13) (C) of the Act, 8 U.S.C. § 1101(a)(13)(C) (2006), which establishes a rebuttable presumption that returning lawful permanent residents "shall not be regarded as seeking an admission into the United States for purposes of the immigration laws." On appeal, the DHS counters that the notice to appear was not improvidently issued and that the evidence in this case is sufficient to rebut the statutory presumption against treating a returning lawful permanent resident as an applicant for admission.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## II. ANALYSIS

**\*\*2** As the Immigration Judge determined, section 101(a)(13)(C) of the Act establishes a presumption against treating a returning lawful permanent resident as an applicant for admission in removal proceedings. That presumption may be rebutted, however, if the DHS establishes by clear and convincing evidence that one or more of six statutory exceptions applies. *Matter of Rivens*, 25 I&N Dec. 623 (BIA 2011). Here, the DHS invokes the exception in section 101(a)(13)(C)(iii) of the Act, which authorizes a returning lawful permanent resident to be regarded as an applicant for admission if he "has engaged in illegal activity after having departed the United States."

The term "illegal activity" is not defined in the Act. As a matter of semantics, it is possible to interpret the term broadly to encompass any activity that is "[f]orbidden by law" or "unlawful." *Black's Law Dictionary* 763 (8th ed. 1999) (defining the term "illegal"). On the other hand, we are mindful of the Supreme Court's caveat that "[a] word in a statute may or may not extend to the outer limits of its definitional possibilities. Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). A contextual reading of section 101(a)(13)(C)(iii) suggests **\*847** that Congress understood the term "illegal activity" to mean *criminal* activity, [1] as opposed to other forms of "illegal" activity, such as torts, breaches of contracts, or noncriminal regulatory violations. We need not define the outer limits of the term in this case, however, because there is no serious dispute that the conduct alleged here--knowingly attempting to bring an undocumented alien into the United States--is "illegal activity" under any reasonable construction. *See* sections 212(a)(6)(E)(i), 237(a)(1)(E)(i), 274(a) of the Act, 8 U.S.C. §§ 1182(a)(6)(E)(i), 1227(a)(1)(E)(i), 1324(a) (2006).

The Immigration Judge appeared to acknowledge that attempting to bring an undocumented alien into the United States was "illegal activity," but he nevertheless concluded that section 101(a)(13)(C)(iii) did not apply to the respondent because his illegal activity did not occur after he had "departed the United States," but rather as he "crossed the border" back into it. In other words, the Immigration Judge read section 101(a)(13)(C)(iii) as applying only to illegal activity engaged in abroad or on the high seas, but not to activity committed during the inspection process at a United States port of entry. [2] We disagree with that interpretation.

**\*\*3** There is no dispute that illegal activity committed by a returning lawful permanent resident *after* his lawful reentry into the United States would not trigger application of section 101(a)(13)(C)(iii) because in such a case the offending conduct would have occurred while the lawful permanent resident was "in and admitted" to the United States within the meaning of section 237(a) of the Act, thereby making him subject to the grounds of deportability. *Matter of Alyazji*, 25 I&N Dec. 397, 406 (BIA 2011). But the same cannot **\*848** be said of a returning lawful permanent resident who engages in illegal activity while undergoing inspection at a port of entry. When a lawful permanent resident voluntarily leaves the United States, he remains outside this country for immigration purposes until he completes the inspection process upon return. [3] An alien does not meaningfully "enter" the United States simply by setting foot in a port of entry. *See Matter of Patel*, 20 I&N Dec. 368 (BIA 1991). [4] Furthermore, although the illegal activity alleged here--alien smuggling--may have been *discovered* at a port of entry, that does not mean it *began* there. On the contrary, a single incident of alien smuggling may involve a course of illegal conduct "engaged in" on both sides of the border. Thus, in our view the most natural reading of section 101(a)(13)(C)(iii) is that it covers any alien who engages in illegal activity after departing from the United States but before reentering after inspection. Accordingly, a returning lawful permanent resident who is shown by clear and convincing evidence to have engaged in illegal activity at the port of entry (for example by attempting to bring an undocumented alien into the United States) is in the same position vis-a-vis section 101(a)(13)(C)(iii) as a lawful permanent resident who engaged in illegal activity on foreign soil or the high seas. Both are subject to charges of inadmissibility upon return.

## III. CONCLUSION

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

In conclusion, if the DHS adduces clear and convincing evidence that the respondent was knowingly attempting to bring an undocumented alien into the United States in violation of law at the San Ysidro port of entry on July 31, 2005, it will thereby have established that the respondent is an applicant for admission despite his lawful permanent resident status, in which case a charge of inadmissibility would be appropriate. Because the Immigration Judge incorrectly determined that the respondent could not be treated as an applicant for admission by virtue of conduct committed at the port of entry, he did not decide whether the evidence was sufficient to establish that the respondent did, in fact, engage in "illegal activity." The record will be remanded for further proceedings with respect to that question and for the entry of a new decision.

**4 *849 ORDER:** The appeal of the Department of Homeland Security is sustained, the decision of the Immigration Judge is vacated, and the removal proceedings are reinstated.

**FURTHER ORDER:** The record is remanded to the Immigration Judge for further proceedings consistent with the foregoing opinion and for the entry of a new decision.

## Footnotes

1  Section 101(a)(13)(C)(iii) was enacted pursuant to section 301(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-575, but its language is derived verbatim from the text of an earlier House bill. H.R. 2202, 104th Cong. § 301(a) (1996). The report of the House Judiciary Committee issued in conjunction with H.R. 2202 reflects that the amendment to section 101(a)(13) was intended to "preserve [] a portion of the *Fleuti* doctrine by stating that a returning lawful permanent resident shall not be regarded as seeking admission unless the alien . . . has engaged in *criminal* activity after having left the U.S." H.R. Rep. No. 104-469, pt. 1, at 225 (1996) (emphasis added) (footnote omitted); *see also Rosenberg v. Fleuti*, 374 U.S. 449 (1963).

2  In so concluding, the Immigration Judge found that the notice to appear had been "improvidently issued." On appeal, the DHS contends that the phrase "improvidently issued" applies exclusively to notices to appear that are either cancelled by the Government before jurisdiction vests with the Immigration Judge or dismissed on the Government's motion thereafter. *See* 8 C.F.R §§ 239.2(a)(6), 1239.2(c) (2012). While the DHS raises a valid point, it is nevertheless evident that the Immigration Judge employed the phrase "improvidently issued" to convey nothing more than his own legal judgment that the charge set forth in the notice to appear was incorrect.

3  A lawful permanent resident who departs the United States but evades inspection upon return is treated as an applicant for admission pursuant to section 101(a)(13)(C)(vi) of the Act, without regard to his commission of other "illegal activity."

4  If a lawful permanent resident is permitted to reenter the United States after inspection by an immigration officer but is thereafter determined to have engaged in illegal activity before reentry, the alien may be subject to a charge of deportability under section 237(a)(1)(A) of the Act for having been inadmissible at the time of a prior entry.

25 I. & N. Dec. 845 (BIA), Interim Decision 3759, 2012 WL 2521107

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

20 I. & N. Dec. 738 (BIA), Interim Decision 3211, 1993 WL 494088

United States Department of Justice

Board of Immigration Appeals

MATTER OF JIMENEZ-LOPEZ

In Exclusion Proceedings

A-29279152

*Decided by Board November 3, 1993*

**1  An alien admitted for lawful temporary residence under section 210 of the Immigration and Nationality Act, 8 U.S.C. § 1160 (1988 & Supp. IV 1992), who is paroled into the United States for criminal prosecution under 8 C.F.R. § 212.5(a)(3) (1990) does not subsequently make an "entry" as that term is defined under the immigration laws when the Immigration and Naturalization Service adjusts his status to that of a lawful permanent resident under section 210(a)(2)(B) of the Act, and 8 C.F.R. § 210.5(a)(2) (1990).


**EXCLUDABLE:**
Act of 1952-Sec. 212(a)(23) [8 U.S.C. § 1182(a)(23) ]-Trafficker


**ON BEHALF OF APPLICANT: Pro se**

**ON BEHALF OF SERVICE**
Lee Abbott
General Attorney

BY: Milhollan, Chairman; Dunne, Morris, Vacca, and Heilman, Board Members

At the conclusion of a hearing conducted on March 10, 1993, an immigration judge terminated these exclusion proceedings and certified her decision to us for review pursuant to 8 C.F.R. §§ 3.1(c) and 3.7 (1993). In an order dated April 19, 1993, we remanded the record to the immigration judge for preparation of a transcript of the proceedings and her oral decision and for compliance with the requirements of certification as set forth at 8 C.F.R. § 3.7 (1993). A transcript of the proceedings and the decision of the immigration judge was prepared and forwarded to the applicant and the attorney for the Immigration and Naturalization Service. Both have submitted statements in support of their respective positions and we deem the case ripe for our review. The record will be remanded to the immigration judge for further proceedings.

The facts in this case are not in dispute. The applicant is a 32-year-old native and citizen of Mexico who applied for lawful temporary residence under the special agricultural worker ("SAW") provisions set forth at section 210 of the Immigration and Nationality Act, **739 8 U.S.C. § 1160 (1988 & Supp. IV 1992), on June 2, 1988. That application was approved on November 10, 1989.

On April 8, 1990, the applicant was returning from a trip to Mexico and presented himself for inspection as a returning temporary resident. Because the motor vehicle in which the applicant was traveling was found to contain marijuana, the applicant was arrested and charged with excludability as an alien who the immigration officer had reason to believe was a drug trafficker under section 212(a)(23) of the Act, 8 U.S.C. § 1182(a)(23) (1988). [1] The applicant was apparently then paroled into the United States pursuant to 8 C.F.R. § 212.5(a)(3) (1990) for the purpose of his criminal prosecution.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

On October 1, 1990, the applicant was convicted, in the United States District Court for the Southern District of California, of importation of a controlled substance and possession of a controlled substance with intent to distribute. He was sentenced to a concurrent term of imprisonment of 46 months and is currently serving that sentence.

 **2  On December 1, 1990, the Immigration and Naturalization Service adjusted the applicant's status as a lawful temporary resident to that of a lawful permanent resident pursuant to the provisions of section 210(a)(2)(B) of the Act, 8 U.S.C. § 1160(a)(2)(B) (1988), and 8 C.F.R. § 210.5(a)(2) (1990). No appeal is pending from that adjustment.

The immigration judge, at a hearing conducted on March 10, 1993, terminated the exclusion proceedings on the ground that the Service's adjustment of the applicant's status to that of a lawful permanent resident after the institution of proceedings was the equivalent of admitting the applicant into the United States as a resident alien. The immigration judge added that rescission of the applicant's lawful permanent resident status might be proper, but concluded that the Service could no longer seek to exclude the applicant as a drug trafficker.

On certification, the applicant claims that his case was heard and the proceedings terminated, thus making applicable the doctrine of res judicata. He requests to be notified if the decision is "holding," as he is under the impression that the immigration judge's decision should stand. [2]  The Service, for its part, argues that it is without authority to  *740  rescind the applicant's status after adjustment under section 210(a)(2)(B) of the Act and that such rescission is therefore not a condition precedent to the commencement or continuation of exclusion proceedings. The parties' arguments notwithstanding, we believe that the issue now before us is whether pending exclusion proceedings must be terminated after adjustment of an applicant's status from lawful temporary residency to that of a lawful permanent resident under section 210(a)(2)(B) of the Act. We conclude that they need not.

An alien who is seeking to enter the United States who does not appear to be admissible clearly and beyond a doubt is properly placed in exclusion proceedings by operation of section 235 of the Act, 8 U.S.C. § 1225 (1988 & Supp. IV 1992). Such an alien is not considered to have entered the United States, even if he or she is paroled into this country for humanitarian or other purposes. See section 212(d)(5)(A) of the Act, 8 U.S.C. § 1182(d)(5)(A) (Supp. IV 1992); Leng May Ma v. Barber, 357 U.S. 185 (1958). In addition, it is well established that an alien's status as a lawful permanent resident of the United States does not affect the propriety of exclusion proceedings, although such status may have an impact on the course of the proceedings. See, e.g., Landon v. Plasencia, 459 U.S. 21 (1982) (holding that due process applies in exclusion proceedings when the alien sought to be excluded is a lawful permanent resident); see also Matter of Huang, 19 I & N Dec. 749, 754 (BIA 1988), and cases cited therein (stating that the burden rests on the Service to establish excludability of lawful permanent residents). On the other hand, aliens who have "entered" the United States, by whatever means, must have their right to remain in this country adjudicated in deportation proceedings under section 242 of the Act, 8 U.S.C. § 1252 (1988 & Supp. IV 1992). See Matter of Lin, 18 I & N Dec. 219 (1982) (citing Luk v. Rosenberg, 409 F.2d 555 (9th Cir. 1969)). The question before us therefore is whether, after the applicant's parole into the United States, the Service's adjustment of his status to that of a lawful permanent resident under section 210(a)(2)(B) of the Act caused him to make an entry into this country as a matter of law.

 **3  The term "entry" is defined in part by section 101(a)(13) of the Act, 8 U.S.C. § 1101(a)(13) (1988), as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntary or otherwise." We have further refined this definition to require that the following elements be met before an alien effects an entry into the United States as a matter of law: first,  *741  there must be a crossing into the territorial limits of the United States; second, an alien must be inspected and admitted by an immigration officer, or, in the alternative, actually and intentionally evade such inspection; and, finally, the alien must be free from official restraint. See Matter of Pierre, 14 I & N Dec. 467 (BIA 1973).

In this case, as the applicant has been paroled into this country, there has been a crossing into the territorial limits of the United States. With respect to the second element, the record establishes that the applicant did not evade inspection, but rather presented himself for same. As such, although the applicant has been inspected, he has not been "admitted" since he was merely paroled into the United States for purposes of prosecution. See Matter of Lin, supra.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

It is therefore clear that the applicant was properly subject to exclusion at least up to the time that his status was adjusted to that of a lawful permanent resident of the United States. An alien may, however, "enter" the United States by virtue of circumstances arising subsequent to his initial arrival and inspection. *See, e.g., Matter of Patel,* Interim Decision 3157 (BIA 1991) (clearing customs); *Matter of Pierre, supra; see also Matter of Ching and Chen,* 19 I & N Dec. 203 (BIA 1984) (escaping from Service custody); *Matter of A-,* 9 I & N Dec. 356 (BIA 1961); *Matter of A-T-,* 3 I & N Dec. 178 (BIA 1948). We therefore proceed to the question of whether the Service's adjustment of the applicant's status after his parole into the United States under section 210(a)(2)(B) of the Act constituted such an admission as a matter of law.

"Admission" has been defined as occurring when an inspecting officer communicates to an applicant for admission his or her determination that the applicant is not inadmissible. This communication normally takes place when the inspector allows the alien to pass through the port of entry. *See Matter of Patel, supra; Matter of Areguillin,* 17 I & N Dec. 308 (BIA 1980). This is not, however, the only instance in which an alien's admissibility is determined and that determination communicated to the alien. For example, with respect to adjustment of status under section 245 of the Act, 8 U.S.C. § 1255 (1988 & Supp. IV 1992), it is well established that an applicant for relief under that provision is "assimilated" to the position of an alien seeking entry into this country because a grant of such relief is contingent upon a favorable adjudication of the applicant's admissibility under section 212 of the Act. *Matter of Connelly,* 19 I & N Dec. 156 (BIA 1984). In the case of an alien who otherwise meets the *Pierre* requirements of a territorial crossing and freedom from official restraint, his or her adjustment of status under section 245 would logically provide the final element of "admission" and would thereby  **\*742**  create an entry, effective as of the date of adjustment. *Cf. Matter of Lin, supra.* [3]

 **\*\*4**  Adjustment of status under section 210(a)(2) of the Act involves a different procedure, however. That section adjusts the status of an alien granted lawful temporary status under section 210(a)(1) to that of a lawful permanent resident on the basis of a fixed schedule, without regard for the alien's admissibility at that time. *See Matter of Juarez,* Interim Decision 3154, at 8-9 (BIA 1991). This mechanism is perhaps unique under the immigration laws, since an alien admitted for temporary residence under section 210(a)(1) may apparently adjust his or her status to that of a lawful permanent resident even if physically outside of the United States. [4] Obviously, such an alien cannot be said to make an "entry" until his or her subsequent return to this country.

It is true that section 210(a)(3)(B) of the Act, 8 U.S.C. § 1160(a)(3)(B) (Supp. IV 1992), permits the Attorney General to deny a lawful temporary resident adjustment of status under section 210(a)(2) and terminate temporary resident status upon, *inter alia,* the alien's commission of an act that renders him or her inadmissible under section 212(a) of the Act. However, the language of this provision is permissive in nature only; it does not mandate an examination of a lawful temporary resident's admissibility before adjustment to permanent status, such as is the case with respect to adjustment under section 245.

Turning to the facts of this case, the record reflects that the Service clearly could have proceeded to deny the applicant's adjustment of status under section 210(a)(2) of the Act and to terminate his lawful temporary status, but did not. We do not find this omission, however, to constitute a new determination of the applicant's admissibility to the United States, as the Service was not obliged to make such a  **\*743**  finding before the automatic adjustment of the applicant's status took place on December 1, 1990. We further note in this regard that the applicant's conviction took place 2 months before his status was adjusted under section 210(a)(2) of the Act. It is possible the Service would not have had time to terminate his temporary residence in that time period. Had the applicant's conviction occurred a matter of days before the automatic adjustment of his status, it is clear the Service would have been unable to terminate his temporary status before adjustment to permanent status. The applicant, therefore, cannot be assimilated to the position of an alien seeking entry, as no new inspection took place. It follows that he was accordingly not "admitted" into this country when his status was adjusted on December 1, 1990, and since the applicant has not been admitted to the United States, he has not made an entry as a matter of law. *Matter of Patel, supra; Matter of Pierre, supra.* [5]

The necessary conclusion is that these exclusion proceedings are still proper despite the applicant's adjustment of his status to that of lawful permanent resident under section 210(a)(2) of the Act. [6] / The following orders shall accordingly be entered.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**\*\*5** ORDER: The order of the immigration judge entered on March 10, 1993, terminating these exclusion proceedings, is vacated.

FURTHER ORDER: The record is remanded to the immigration judge for further proceedings.

### Footnotes

1   This section of the Immigration and Nationality Act is cited in its form before the redrafting and redesignation of section 212 by the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978. This later redesignation has no impact on the issues in this case.

2   We note that the immigration judge reserved both parties' right to appeal and granted the Service's request that the case be certified to this Board should neither party perfect an appeal. Although the applicant's statement in his brief would initially lead us to believe that he was misinformed about the procedural posture of this case, our letter to the applicant affording him additional time in which to submit a brief, to which he responded with a second copy of the same, has sufficiently advised him of the issue before this Board and hence the pending nature of these proceedings.

3   We note that the administrative mechanism whereby an alien obtains lawful permanent residence under section 245 has been held not to constitute an entry in and of itself for immigration purposes. *See Matter of Connelly, supra* (finding no "territorial crossing" under *Pierre* test). That case, however, holds only that an alien who has already entered the United States as a matter of law does not again effect an entry on the basis of his or her subsequent adjustment of status. In the case of an alien paroled into the United States, an entry has not yet been made, as he or she has not been "admitted." The communication of the alien's admissibility when later adjusted under section 245 completes the final element necessary to enter this country under the *Pierre* definition. That alien's "entry" date would thus occur at the time his or her status was adjusted and not on the earlier date when the alien physically arrived in this country.

4   In most cases, an alien obtains lawful permanent resident status upon arriving in the United States with a valid immigrant visa. In the context of adjustment of status under other provisions of the Act, such as sections 209, 245, and 245A, 8 U.S.C. §§ 1159, 1255, and 1255a (1988 & Supp. IV 1992), an alien must be physically present in the United States.

5   The record reflects that the applicant was paroled into the United States for purposes of prosecution and is currently incarcerated. It is therefore possible that he is unable to establish that he has been "free from official restraint," the final prong of the *Pierre* test. *See Matter of Patel, supra.* We are unable from a review of the record to determine whether or not this is the case, but, given our holding that the applicant has not been admitted to the United States, we find it unnecessary to remand the record for further findings in this regard.

6   We note in passing that the applicant's status as a lawful permanent resident is not completely without effect in these proceedings. For example, the burden of proof is now on the Service to establish the applicant's inadmissibility, and the full panoply of due process considerations now applies to these exclusion proceedings. *Landon v. Plasencia, supra; Matter of Huang, supra.*

20 I. & N. Dec. 738 (BIA), Interim Decision 3211, 1993 WL 494088

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

20 I. & N. Dec. 418 (BIA), Interim Decision 3163, 1991 WL 353530

United States Department of Justice

Board of Immigration Appeals

MATTER OF K-

In Deportation Proceedings

A-29690266

Decided by Board November 5, 1991

**1  The language of section 515(a)(2) of the Immigration Act of 1990, Pub.L. No. 101–649, 104 Stat. 4978, 5053 (enacted Nov. 29, 1990), amending section 243(h)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h)(2) (1988), expressly states that an alien convicted of an aggravated felony shall be considered to have committed a "particularly serious crime" for purposes of section 243(h)(2)(B), thereby obviating the need for a case-by-case determination of this question, but does not alter the conclusion in Matter of Carballe, 19 I & N Dec. 357 (BIA 1986), modified on other grounds, Matter of Gonzalez, 19 I & N Dec. 682 (BIA 1988), that under section 243(h)(2)(B) all aliens convicted of "particularly serious crimes" necessarily constitute a "danger to the community." Matter of U–M-, Interim Decision 3152 (BIA 1991); Matter of Gonzalez, supra; Matter of Garcia–Garrocho, 19 I & N Dec. 423 (BIA 1986), modified on other grounds, Matter of Gonzalez, supra; and Matter of Carballe, supra, clarified.

**CHARGE:**

Order: Act of 1952—Sec. 241(a)(1) [8 U.S.C. § 1251(a)(1) ]—Excludable at entry under section 212(a)(20) [8 U.S.C. § 1182(a)(20) ]—No valid immigrant visa

Sec. 241(a)(11) [8 U.S.C. § 1251(a)(11) ]—Convicted of controlled substance violation

Sec. 241(a)(4)(B) [8 U.S.C. § 1251(a)(4)(B) ]—Convicted of aggravated felony

**ON BEHALF OF RESPONDENT:**
Margaret Gleason, Esquire
Catholic Legal Immigration Network
1221 Massachusetts Avenue, N.W.
Washington, D.C. 20005

**ON BEHALF OF SERVICE:**
James Reynolds
Acting Appellate Counsel
Janice B. Podolny
District Counsel

BY: Milhollan, Chairman; Dunne, Morris, Vacca, and Heilman, Board Members

On April 26, 1991, the immigration judge found that the respondent, an alien convicted of two aggravated felonies, was barred from applying for asylum under section 208(a) of the Immigration and **419** Nationality Act, 8 U.S.C. § 1158(a) (1988). The immigration judge further concluded that although the respondent was deemed to have committed a "particularly serious crime" for purposes of section 243(h)(2)(B) of the Act, 8 U.S.C. § 1253(h)(2)(B) (1988), as a result of his convictions, he would nevertheless be eligible to pursue withholding of deportation under section 243(h) of the Act if he could show that he does

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

not "constitute[] a danger to the community of the United States" within the meaning of section 243(h)(2)(B) of the Act. The immigration judge set a hearing for May 10, 1991, to determine whether the respondent constitutes a danger to the community. On May 3, 1991, the Board denied a request by the Immigration and Naturalization Service for a stay of the proposed hearing, and the evidentiary hearing was held as scheduled. On June 4, 1991, the immigration judge issued a decision finding that the respondent was no longer a danger to the community within the meaning of section 243(h)(2)(B) of the Act and therefore was entitled to be heard on his application for withholding of deportation to Liberia. The immigration judge scheduled a hearing for July 2, 1991, for adjudication of the merits of the persecution claim. On June 11, 1991, the Service filed this interlocutory appeal of the immigration judge's decision and sought a stay of the proceedings. The Service also filed a motion to reconsider with the immigration judge and requested a stay of the proceedings based on Matter of U–M-, Interim Decision 3152 (BIA 1991), which was issued by the Board on June 5, 1991, the day after the immigration judge's decision. On June 14, 1991, the immigration judge denied the Service's motion for reconsideration and a stay of proceedings. On June 18, 1991, the respondent requested permission to "join" in the Service's interlocutory appeal. On June 28, 1991, the Board granted a stay of the proceedings and subsequently heard oral argument on August 1, 1991. The Service's interlocutory appeal will be considered and sustained, and the record will be remanded to the immigration judge.

**2  In order to avoid the piecemeal review of the many questions which may arise in a deportation proceeding, this Board does not ordinarily entertain interlocutory appeals. See Matter of Ruiz–Campuzano, 17 I & N Dec. 108 (BIA 1979); Matter of Ku, 15 I & N Dec. 712 (BIA 1976); Matter of Sacco, 15 I & N Dec. 109 (BIA 1974). We have on occasion ruled on the merits of interlocutory appeals where we deemed it necessary to address important jurisdictional questions regarding the administration of the immigration laws, or to correct recurring problems in the handling of cases by immigration judges. See Matter of Guevara, Interim Decision 3143 (BIA 1990, 1991); Matter of Garcia–Reyes, 19 I & N Dec. 830 (BIA 1988); Matter of Rosales, 19 I & N Dec. 655 (BIA 1988); Matter of Amico, 19 I & N Dec. 652 (BIA 1988);  *420  Matter of Correa, 19 I & N Dec. 130 (BIA 1984); Matter of Victorino, 18 I & N Dec. 259 (BIA 1982); Matter of Alphonse, 18 I & N Dec. 178 (BIA 1981); Matter of Wadas, 17 I & N Dec. 346 (BIA 1980); Matter of Seren, 15 I & N Dec. 590 (BIA 1976); Matter of Fong, 14 I & N Dec. 670 (BIA 1974). We find the issues presented in this case appropriate for review at this time. [1]

The respondent is a native and citizen of Liberia who entered the United States at New York, New York, in June of 1980. On June 20, 1990, the respondent was convicted in the Circuit Court for Frederick County, Maryland, of distribution of a controlled substance (cocaine) in violation of Article 27, Section 286(a) of the Annotated Code of Maryland. The respondent was also convicted in the Circuit Court for Prince George's County, Maryland, on June 25, 1990, of possession with intent to distribute a controlled substance (cocaine) in violation of Article 27, Section 286(a)(1) of the Annotated Code of Maryland. By an Order to Show Cause, Notice of Hearing, and Warrant for Arrest of Alien filed on November 16, 1990, the respondent was charged with deportability under section 241(a)(4)(B) of the Act, 8 U.S.C. § 1251(a)(4)(B) (1988), [2] for conviction of an aggravated felony; under section 241(a)(11) of the Act [3] for conviction of a controlled substance violation; and under section 241(a)(1) of the Act [4] as an alien excludable at the time of entry as an immigrant not in possession of a valid immigrant visa or other entry document. The respondent does not contest that his convictions are aggravated felonies within the meaning of section 101(a) (43) of the Act, 8 U.S.C. § 1101(a)(43) (1988). The only issue on appeal is whether the respondent's convictions render him ineligible for withholding of deportation to Liberia. [5]

Pursuant to section 515(a)(1) of the Immigration Act of 1990,  *421  Pub.L. No. 101–649, 104 Stat. 4978, 5053 (enacted November 29, 1990), which amended section 208 of the Immigration and Nationality Act, an alien who has been convicted of an aggravated felony "may not apply for or be granted asylum." This bar applies to applications for asylum made on or after November 29, 1990, and, therefore, as found by the immigration judge, renders the respondent in this case ineligible to apply for asylum.

**3  Section 243(h)(2)(B) of the Act states that withholding of deportation "shall not apply to any alien if the Attorney General determines that ... the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States."

Section 515(a)(2) of the Immigration Act of 1990, 104 Stat. at 5053, amended section 243(h)(2) to add the following at the end: "For purposes of subparagraph (B), an alien who has been convicted of an aggravated felony shall be considered to have committed a particularly serious crime." The 1990 Act is silent as to the effective date of section 515(a)(2). In Matter of U–M-, this Board found that in the absence of any statutory instruction to the contrary, the effective date of the amendment was the date of enactment of the 1990 Act, which was November 29, 1990. Matter of U–M-, supra, at 8–9. We therefore apply the amended version of section 243(h)(2) of the Act in reviewing the respondent's eligibility for withholding of deportation. Id.

In Matter of Carballe, 19 I & N Dec. 357 (BIA 1986), modified on other grounds, Matter of Gonzalez, 19 I & N Dec. 682 (BIA 1988), we rejected the contention that section 243(h)(2)(B) requires two separate and distinct findings as to the seriousness of the crime and the danger to the community because we found that the proper focus in section 243(h)(2)(B) of the Act is on the serious nature of the crime and not on the likelihood of future serious misconduct on the part of the alien. As stated in Carballe: If it is determined that the crime was a "particularly serious" one, the question of whether the alien is a danger to the community of the United States is answered in the affirmative. We do not find that there is a statutory requirement for a separate determination of dangerousness focusing on the likelihood of future serious misconduct on the part of the alien.

Matter of Carballe, supra, at 360 (citing Crespo–Gomez v. Richard, 780 F.2d 932 (11th Cir.1986); Zardui–Quintana v. Richard, 768 F.2d 1213 (11th Cir.1985) (Vance, J., concurring); see also Ramirez–Ramos v. INS, 814 F.2d 1394 (9th Cir.1987); Matter of Gonzalez, supra; Matter of Garcia–Garrocho, 19 I & N Dec. 423 (BIA 1986), modified on other grounds, Matter of Gonzalez, supra; cf. Matter of Rodriguez–Coto, 19 I & N Dec. 208 (BIA 1985), modified on other grounds, *422 Matter of Gonzalez, supra; Matter of Frentescu, 18 I & N Dec. 244 (BIA 1982), modified on other grounds, Matter of Gonzalez, supra.

In Matter of U–M-, supra, while not addressing the specific arguments raised in the present appeal, the Board followed the holding of Carballe in applying section 243(h)(2)(B), as amended by the Immigration Act of 1990, in the case of an alien convicted of an aggravated felony. We found there that an alien convicted of an aggravated felony has been convicted of a particularly serious crime for purposes of section 243(h)(2)(B) of the Act and 8 C.F.R. § 208.16(c)(2)(ii) (1991), and, as no separate finding of danger to the community is required under Matter of Carballe, the alien is ineligible for withholding of deportation. Matter of U–M-, supra, at 5, 8. [6]

**4 The immigration judge in the instant case reasoned that, based on the amendments of the Immigration Act of 1990, the Board's decision in Matter of Carballe, supra, is no longer applicable. He determined that while an alien convicted of an aggravated felony is considered to have committed a particularly serious crime, he might not constitute a danger to the community and therefore would not be barred from withholding of deportation under section 243(h)(2)(B). The immigration judge found that if Congress, in enacting the Immigration Act of 1990, intended to render all aggravated felons ineligible for withholding of deportation, it would have done so in clear, unambiguous language as it did for asylum. The immigration judge relied on representations from Carl W. Hampe, Minority Counsel to the Senate Subcommittee on Immigration & Refugee Affairs, to the effect that an alien convicted of an aggravated felony is barred from applying for asylum but may still request withholding of deportation. Hampe, Immigration Enforcement, Exclusions and Deportation Provisions of the Immigration Act of 1990, in The Immigration Act of 1990 212, 216–17 (1990). Alternatively, the immigration judge found that even after Matter of U–M- the Board "continues" to apply only a "presumption" that an alien convicted of a particularly serious crime constitutes a danger to the community. The immigration judge stated that the Board "has neither stated nor implied that this presumption is an irrebuttable presumption; that is, that an individual having been convicted of a particularly serious crime, to now include an aggravated felon, is and always will be a danger to the community of the United States." The immigration judge stressed that it is not logical to find *423 that an aggravated felon "will always" pose a danger to the community and should "forever" be barred from withholding of deportation.

On appeal the Service contends that Matter of Carballe and Matter of U–M-are controlling, and that the immigration judge's decision must therefore be reversed. In his reply brief and at oral argument, the respondent, through counsel, reiterated the

AR.05625

arguments noted by the immigration judge in support of the conclusion that, subsequent to the amendments of the Immigration Act of 1990, a finding that an alien "constitutes a danger to the community of the United States" is separate and distinct from a finding that he has been convicted of a "particularly serious crime." The respondent contends that barring an alien convicted of an aggravated felony from asylum but permitting him to apply for withholding of deportation is not inconsistent with the Act in that asylum is a more generous form of relief than withholding. The respondent further emphasizes the strength of the underlying merits of his claim for withholding of deportation and that his trafficking convictions involved only small amounts of a controlled substance.

We find that the plain language of section 243(h)(2) as amended does not indicate the result reached by the immigration judge. See INS v. Cardoza–Fonseca, 480 U.S. 421, 431 (1987); INS v. Phinpathya, 464 U.S. 183, 189 (1984) (the starting point in cases involving statutory construction must be the language employed by Congress, and it is assumed that the legislative purpose is expressed by the ordinary meaning of the words used). Congress is presumed to know the prior construction of a statute. 1A N. Singer, Sutherland Statutory Construction §§ 22.33, 22.35 (4th ed. 1985); Matter of Castro, 19 I & N Dec. 692, 695 (BIA 1988). Congress did not change the statutory language of section 243(h)(2)(B) in any way to suggest disapproval of the Board's construction of this provision in Matter of Carballe, supra. Through section 515(a)(2) of the Immigration Act of 1990 Congress clarified that all aggravated felonies are to be considered particularly serious crimes for the purpose of section 243(h)(2)(B), [7] but left section 243(h)(2)(B) and our analysis of it undisturbed. While the language of section 515(a)(2) expressly states that an alien convicted of an aggravated felony shall be considered to have committed a particularly serious crime, thereby obviating the need for a case-by-case determination *424 of this question, see Matter of U–M–, supra, at 6–8 (citing Beltran–Zavala v. INS, 912 F.2d 1027 (9th Cir.1990)), it does not alter the conclusion in Carballe that under section 243(h)(2)(B) all aliens convicted of particularly serious crimes necessarily constitute a danger to the community. [8] For Congress to repeat the language concerning "danger to the community" in section 515(a)(2), knowing how the language of section 243(h)(2)(B) has been interpreted, would only have been redundant.

**5 We are not persuaded by the argument that if Congress had intended to absolutely preclude aggravated felons from withholding of deportation, it would have used the same unambiguous language that it did for the asylum preclusion added by section 515(a)(1) of the Immigration Act of 1990. Considering the existing framework of statutory bars in section 243(h)(2) and the fact that there is no formal application for withholding as for asylum, it seems a much simpler answer that Congress did intend to preclude aggravated felons from withholding of deportation and, knowing how section 243(h)(2)(B) has been interpreted, achieved that result by simply clarifying the existing bar to eligibility in section 243(h)(2)(B), rather than adding a wholly independent bar based on conviction for an aggravated felony.

Because we find no ambiguity in the language of section 243(h)(2) as amended, there is no reason to consult legislative history. Moreover, with respect to the comments of Carl W. Hampe, Minority Counsel to the Senate Subcommittee on Immigration & Refugee Affairs, the respondent has advanced no arguments that the comments of a staff member are properly considered legislative history or that any comments which postdate the act to which they refer, as did Mr. Hampe's, are properly considered legislative history of that act.

We are also not convinced by the immigration judge's emphasis that it is not logical to find that an aggravated felon "will always" pose a danger to the community and should "forever" be barred from withholding of deportation. In Matter of Carballe, supra, the Board found that the proper focus of section 243(h)(2)(B) of the Act is on the *425 serious nature of the crime and not on the likelihood of future serious misconduct on the part of the alien. Accordingly, the Board in Carballe rejected the contention that section 243(h) (2)(B) requires two separate and distinct findings as to the seriousness of the crime and the danger to the community. Furthermore, the emphasis of the immigration judge on rehabilitation potential seems even less appropriate in the context of aliens convicted of an aggravated felony, considering the priority given in the Act to streamline procedures directed at the prompt deportation of such aliens. See, e.g., section 242(a)(2) of the Act, 8 U.S.C. § 1252(a)(2) (1988) (mandatory detention for aliens convicted of an aggravated felony who are not lawful permanent residents); section 242(a)(3)(A) of the Act (investigative resources for identifying and tracking alien aggravated felons); section 242A(a) of the

Act, 8 U.S.C. § 1252a(a) (1988) (special deportation proceedings for incarcerated criminal aliens); section 242A(c) of the Act (presumption of deportability for aliens convicted of an aggravated felony).

We note the policy argument raised by the respondent that it would not necessarily be inconsistent for Congress to make "danger to the community" a separate and distinct test in section 243(h)(2)(B), and thereby allow for the possibility of an alien convicted of an aggravated felony to qualify for withholding of deportation, even if asylum is categorically denied to aggravated felons, because a grant of asylum contemplates the adjustment of the alien to lawful permanent resident status in this country and withholding only requires that the alien not be deported to the country of persecution. However, based on the language of section 515 of the Immigration Act of 1990, we find that Congress did not choose to do so. There is no dispute that Congress has taken a strong stance in the Immigration and Nationality Act against aliens who commit aggravated felonies. Removing eligibility for both asylum and withholding of deportation is consistent with this stance and creates a strong incentive for aliens coming to this country not to commit aggravated felonies. For aliens who are established in this country as longtime lawful permanent residents, relief from deportation under section 212(c) of the Act, 8 U.S.C. § 1182(c), may be available notwithstanding the conviction of an aggravated felony.

**6  We conclude that the respondent, as an alien who has been convicted of an aggravated felony, has been convicted of a particularly serious crime, and therefore, constitutes a danger to the community of the United States within the meaning of section 243(h)(2)(B) of the Act. He is ineligible for withholding of deportation. Section 243(h)(2) of the Act; see also 8 C.F.R. § 208.16(c)(2)(ii) (1991); Matter of U–M–, supra; Matter of Carballe, supra. The respondent's emphasis on appeal concerning the underlying merits of his persecution claim and the allegedly small amount of controlled substance involved in his *426 convictions is therefore not relevant. The statutory bar to withholding of deportation based on conviction of a particularly serious crime relates only to the nature of the crime and does not vary with the nature of the evidence of persecution. Ramirez–Ramos v. INS, supra, at 1397–98; Matter of Garcia–Garrocho, supra, at 424–25; Matter of Rodriguez–Coto, supra, at 209–10. Furthermore, the language of section 515(a)(2) of the Immigration Act of 1990, amending section 243(h)(2) of the Act, reflects no distinction based on the relative severity of an aggravated felony.

Accordingly, the interlocutory appeal of the Immigration and Naturalization Service will be sustained.

ORDER: The appeal is sustained, and the record is remanded to the immigration judge for further proceedings consistent with the foregoing decision.

## Footnotes

1    The Service's interlocutory appeal, joined by the respondent, is from the June 4, 1991, decision of the immigration judge. Upon being questioned by the Board at oral argument, both parties requested that the immigration judge's June 14, 1991, decision on the motion for reconsideration also be considered as part of the current joint appeal. We have reviewed both of these orders in reaching our decision.

2    Revised and redesignated as section 241(a)(2)(A)(iii) of the Act by section 602 of the Immigration Act of 1990, Pub.L. No. 101–649, 104 Stat. 4978, 5080 (effective Nov. 29, 1990).

3    Revised and redesignated as section 241(a)(2)(B) of the Act by section 602 of the Immigration Act of 1990, 104 Stat. at 5080.

4    Revised and redesignated as section 241(a)(1)(A) of the Act by section 602 of the Immigration Act of 1990, 104 Stat. at 5077–78.

5    Although the Attorney General has designated Liberia under the Temporary Protected Status Program pursuant to section 244A(b) of the Act, 8 U.S.C. § 1254a(b) (Supp. II 1990), the respondent, by virtue of his conviction for a drug-related

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

aggravated felony, is not eligible for temporary protected status under section 244A(c)(2) of the Act. See 56 Fed.Reg. 12,746 (1991).

6    The regulatory bar to asylum found in 8 C.F.R. § 208.14(c)(1) (1991) for commission of a particularly serious crime is, of course, not at issue in this case, as the respondent is ineligible to apply for asylum, and, absent an application for asylum, the regulation is not called into play. See section 515(a)(1) of the Immigration Act of 1990, 104 Stat. at 5053.

7    The parties and the immigration judge did not address the question whether only aggravated felonies are to be considered particularly serious crimes for the purpose of section 243(a)(2)(B) of the Act as clarified by section 515(a)(2) of the Immigration Act of 1990, or whether certain crimes which are not aggravated felonies may be particularly serious crimes within the meaning of that provision. We find it unnecessary to decide this issue for disposition of this interlocutory appeal.

8    We do not agree with the immigration judge's conclusion that the decision in Matter of Carballe indicates that a finding of particularly serious crime creates only a rebuttable presumption of danger to the community. At one point in Carballe, in noting that the statutory key to determining whether an alien constitutes a danger to the community is whether he has been convicted of a particularly serious crime, we stated that "those aliens who have been finally convicted of particularly serious crimes are presumptively dangers to this country's community." Matter of Carballe, supra, at 360. However, the unqualified conclusion in Carballe is that "[i]f it is determined that the crime was a 'particularly serious' one, the question of whether the alien is a danger to the community of the United States is answered in the affirmative." Id.; see also Ramirez–Ramos v. INS, supra; Matter of Gonzalez, supra; Matter of Garcia–Garrocho, supra.

20 I. & N. Dec. 418 (BIA), Interim Decision 3163, 1991 WL 353530

---

**End of Document**        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Gutierrez Hernandez v. Barr, 9th Cir., October 6, 2020

27 I. & N. Dec. 581 (U.S.Atty.Gen.), Interim Decision 3959, 2019 WL 3492202

U.S. Department of Justice

Office of the Attorney General

MATTER OF L-E-A-, RESPONDENT

Decided by Attorney General July 29, 2019

**1    *581   (1) In *Matter of L-E-A-*, 27 I&N Dec. 40 (BIA 2017), the Board of Immigration Appeals improperly recognized the respondent's father's immediate family as a "particular social group" for purposes of qualifying for asylum under the Immigration and Nationality Act.

(2) All asylum applicants seeking to establish membership in a "particular social group," including groups defined by family or kinship ties, must establish that the group is (1) composed of members who share a common immutable characteristic; (2) defined with particularity; and (3) socially distinct within the society in question.

(3) While the Board has recognized certain clans and subclans as "particular social groups," most nuclear families are not inherently socially distinct and therefore do not qualify as "particular social groups."

(4) The portion of the Board's decision recognizing the respondent's proposed particular social group is overruled. *See Matter of L-E-A-*, 27 I&N Dec. at 42-43 (Part II.A). The rest of the Board's decision, including its analysis of the required nexus between alleged persecution and the alleged protected ground, is affirmed. *See id.* at 43-47 (Part II.B).

BEFORE THE ATTORNEY GENERAL

The Immigration and Nationality Act ("INA") authorizes the Attorney General to grant asylum, in his discretion, if an alien establishes that he is unable or unwilling to return to his country of origin because he has suffered past persecution or has a well-founded fear of future persecution on account of """race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A), (B)(i). This case once again requires interpretation of what it means to suffer persecution on account of "membership in a particular social group," an ambiguous term that has required repeated construction by the Board of Immigration Appeals (the "Board"), the Attorney General, and the U.S. Courts of Appeals.

The respondent contends that he was persecuted by a criminal gang on account of his membership in the "particular social group" defined as the "immediate family of his father," who owned a store targeted by a local drug cartel. Under existing Board precedent, a particular social group must share "a common immutable characteristic" that is defined with particularity and **582   "set apart, or distinct, from other persons within the society in some significant way." *Matter of M-E-V-G-*, 26 I&N Dec. 227, 238 (BIA 2014); *see also Matter of W-G-R-*, 26 I&N Dec. 208, 217 (BIA 2014). The alien bears the burden of showing that his proposed group meets these criteria, *see* 8 U.S.C. § 1158(b)(1)(B)(i), and he will not satisfy that burden solely by showing that his social group has been the target of private criminal activity. The fact that a criminal group--such as a drug cartel, gang, or guerrilla force--targets a group of people does not, standing alone, transform those people into a particular social group. *See, e.g., Matter of S-E-G-*, 24 I&N Dec. 579, 586-87 (BIA 2008) (concluding that respondents who feared harm from their refusal to join MS-13 were not a "particular social group"; they were "not in a substantially different situation from anyone [else] who has crossed the gang, or who is perceived to be a threat to the gang's interests"); *Matter of Acosta*, 19 I&N Dec. 211, 234 (BIA

1985) (working as a taxi driver and "refusing to participate in guerrilla-sponsored work stoppages" at risk to personal safety did not create "particular social group" status).

**\*\*2** At the same time, the Board has recognized that a clan or similar group bound together by common ancestry, cultural ties, or language *may* constitute a "'"particular social group." *Matter of H-*, 21 I&N Dec. 337, 343 (BIA 1996) (describing the relevant "distinct and recognizable clans and subclans in Somalia"); *Acosta*, 19 I&N Dec. at 233 (calling for a case-by-case determination of whether innate characteristics like "sex, color, or kinship ties" qualify as "particular social group" characteristics). But what qualifies certain clans or kinship groups as particular social groups is not merely the genetic ties among the members. Rather, it is that those ties or other salient factors establish the kinship group, on its own terms, as a "recognized component of the society in question." *W-G-R-*, 26 I&N Dec. at 217. In that respect, the large and prominent kinship and clan groups that have been recognized by the Board as cognizable particular social groups stand on a very different footing from an alien's immediate family, which generally will not be distinct on a societal scale, whether or not it attracts the attention of criminals who seek to exploit that family relationship in the service of their crimes.

Consistent with these prior decisions, I conclude that an alien's family-based group will not constitute a particular social group unless it has been shown to be socially distinct in the eyes of its society, not just those of its alleged persecutor. *See M-E-V-G-*, 26 I&N Dec. at 237; *W-G-R-*, 26 I&N Dec. at 215-18. Because the record does not support the determination in this case that the immediate family of the respondent's father constituted a particular social group, I reverse the Board's conclusion to the contrary.

## \*583 I.

In 1998, the respondent, a Mexican citizen, illegally entered the United States. After a criminal conviction for driving under the influence, the Department of Homeland Security ("DHS") initiated removal proceedings. The respondent accepted voluntary departure and returned to Mexico in May 2011. But he did not stay there long. By August 2011, the respondent had again illegally returned to the United States. DHS apprehended him and commenced removal proceedings. The respondent conceded removability, but this time sought asylum based upon a claim of persecution allegedly suffered during his brief return to Mexico.

According to the respondent, upon returning to Mexico, he had gone to live with his parents in Mexico City. His father operated a neighborhood general store there, but he had run afoul of La Familia Michoacana, a Mexican drug cartel. Because his father refused to sell the cartel's drugs out of his store, the drug dealers evidently decided to retaliate against the respondent upon his return. About a week after returning to Mexico City, the respondent was walking a few blocks from his home when he heard gunshots coming out of a black sport-utility vehicle. He dropped down to the ground and was unharmed. Although the respondent did not initially believe that he was the target of the shooting, he later concluded that he was, based upon the cartel's subsequent actions.

**\*\*3** About a week later, four armed cartel members, driving the same black sport-utility vehicle, approached the respondent and asked him to agree to sell the cartel's drugs at his father's store. When the respondent declined, the cartel members threatened him and advised him to reconsider. Shortly thereafter, four masked men, in the same sport-utility vehicle, attempted to kidnap the respondent, but he managed to escape. After that incident, the respondent left Mexico City for Tijuana, where two months later, he illegally crossed back into the United States and was thereafter apprehended.

In his removal proceeding, the respondent claimed persecution in Mexico based on his membership in the particular social group comprising his father's immediate family. The immigration judge denied relief on the ground that the respondent had not shown he was the victim of anything more than criminal activity.

On appeal, the Board found that the respondent's relationship with his father established membership in a particular social group, namely "his father's immediate family." *Matter of L-E-A-*, 27 I&N Dec. 40, 43 (BIA 2017). In reaching that conclusion, the Board relied upon DHS's concession "that the immediate family unit of the respondent's father qualifies as a cognizable social group." *Id.* at 42; *see also* DHS Supplemental Brief at 20 **\*584** ("In this case, the Department stipulates that the immediate

AR.05630

family unit of the respondent's father qualifies as a cognizable particular social group."). The Board recognized that, under the relevant precedents, a family-related group must satisfy the requirements of particularity and social distinction to qualify as a "particular social group" under the INA. *L-E-A-*, 27 I&N Dec. at 42. And the Board noted that such a determination requires "a fact-based inquiry made on a case-by-case basis," and will not be satisfied by "all social groups that involve family members." *Id.* at 42-43. But the Board did not perform such an inquiry; instead, it summarily concluded that "[i]n consideration of the facts of this case *and the agreement of the parties*, we have no difficulty identifying the respondent, a son residing in his father's home, as being a member of the particular social group comprised of his father's immediate family." *Id.* (emphasis added).

Although it approved the claimed social group, the Board denied the respondent's asylum application because of the absence of the necessary nexus between his membership in the group and the persecution. *Id.* at 43-47. The Board explained that "[a] persecution claim cannot be established if there is no proof that the applicant or other members of the family were targeted because of the family relationship." *Id.* at 43. Here, the Board concluded, the respondent was approached by the cartel "because he was in a position to provide access to the store, not because of his family membership." *Id.* at 46. He "was targeted only as a means to achieve the cartel's objective to increase its profits by selling drugs in the store owned by his father," and "'"[a]ny motive to harm the respondent because he was a member of his family was, at most, incidental." *Id.* As the Board noted, "the fact that a persecutor targets a family member simply as a means to an end is not, by itself, sufficient to establish a claim, especially if the end is not connected to another protected ground." *Id.* at 45.

**4** The Board remanded the matter to the immigration judge for consideration of the respondent's additional claim for protection under the U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). *Id.* at 47.

On December 3, 2018, Acting Attorney General Whitaker directed the Board to refer its decision for review, *see* 8 C.F.R. § 1003.1(h)(1)(i), staying the proceedings and inviting briefing on whether, and under what circumstances, an alien may establish persecution on account of membership in a "particular social group" based on the alien's membership in a family unit. *Matter of L-E-A-*, 27 I&N Dec. 494, 494 (A.G. 2018).

## *585 II.

Before turning to the merits, I address several threshold arguments raised by the respondent about my authority to review this case. First, the respondent argues that the Acting Attorney General could not certify this matter for review because the Board had remanded the case to the immigration judge for further proceedings. As *Matter of A-B-* recognized, "[n]othing in the INA or the implementing regulations precludes the Attorney General from referring a case for review simply because the Board has remanded the case for further proceedings before an immigration judge." 27 I&N Dec. 316, 323-24 (A.G. 2018). I therefore reject this argument for the reasons stated in that opinion.

Second, the respondent argues that the Acting Attorney General had no authority to refer this case because he was not properly appointed to his position. But the President's designation of Mr. Whitaker as Acting Attorney General was expressly authorized by the Federal Vacancies Reform Act of 1998, 5 U.S.C. §§ 3345-3349d, and was consistent with the Appointments Clause of the Constitution, U.S. Const. art. II, § 2, cl. 2. *See Designating an Acting Attorney General*, 42 Op. O.L.C. __ (Nov. 14, 2018). In any event, that question is now moot, because the respondent has not argued, and cannot argue, that my appointment as Attorney General is subject to such a challenge. As Attorney General, I have the authority to ratify the initial certification (which I hereby do), and I have decided this case based upon my own independent review of the record. *See Wilkes-Barre Hosp. v. NLRB*, 857 F.3d 364, 371 (D.C. Cir. 2017) ("[R]atification can remedy a defect arising from the decision of 'an improperly appointed official . . . when . . . a properly appointed official has the power to conduct an independent evaluation of the merits and does so.'DD' (quoting *Intercollegiate Broad. Sys., Inc. v Copyright Royalty Bd.*, 796 F.3d 111, 117 (D.C. Cir. 2015))). Therefore, the validity of the Acting Attorney General's appointment is not relevant to my disposition of this case.

**\*\*5**  Third, the respondent contends that my prior statements regarding asylum and immigration issues prevent me from acting as an unbiased adjudicator. But I "have made no public statements regarding the facts of respondent's case, and I have no 'personal interest in the outcome of the proceedings.'"DD' *A-B-*, 27 I&N Dec. at 325 (quoting *Strivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995)); *see also Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1168 (D.C. Cir. 1979) (finding that policymakers do not have to retreat from "interchange and discussion about important issues").

Finally, the respondent argues that I do not have jurisdiction to render a decision because the immigration judge never properly acquired jurisdiction.  **\*586**  The respondent contends that jurisdiction never vested because the charging document lacked all of the information required by the INA and 8 C.F.R. § 1003.15--namely, the notice to appear did not include the time and place of the first hearing in this matter. But the Board has previously ruled that similar notices are adequate to establish jurisdiction, so long as subsequent notices provide that information. *Matter of Bermudez-Cota*, 27 I&N Dec. 441 (BIA 2018); *see also Karingithi v. Whitaker*, 913 F.3d 1158, 1161 (9th Cir. 2019) (holding that *Bermudez-Cota* permissibly interpreted the relevant regulations). Further, neither the INA nor 8 C.F.R. § 1003.15 specifies that the notice to appear must contain such details about the first hearing. *See id.* § 1003.15(b). And the relevant jurisdictional regulation, 8 C.F.R. § 1003.14(a), "does not specify what information must be contained in a 'charging document' at the time it is filed with an Immigration Court, nor does it mandate that the document specify the time and date of the initial hearing before jurisdiction will vest." *Bermudez-Cota*, 27 I&N Dec. at 445. Although that information was not contained in the initial notice to appear, the immigration court subsequently issued a notice of hearing with all the required information. *See Matter of L-E-A-*, Notice of Hearing (Immig. Ct. Aug. 17, 2011). Therefore, this jurisdictional challenge does not block my review.

### III.

Turning now to the merits, I conclude that the Board erred in finding that the respondent's purported social group--the members of his father's immediate family--qualified as a "particular social group" under the INA. All particular social groups must satisfy the criteria set forth in *Matter of M-E-V-G-* and *Matter of W-G-R-*, and a proposed family-based group is no different. An applicant must establish that his specific family group is defined with sufficient particularity and is socially distinct in his society. In the ordinary case, a family group will not meet that standard, because it will not have the kind of identifying characteristics that render the family socially distinct within the society in question. The Board here did not perform the required fact-based inquiry to determine whether the respondent had satisfied his burden of establishing the existence of a particular social group within the legal requirements of the statute. The Board's summary conclusions, based on DHS's stipulation rather than its own legal analysis, must therefore be reversed.

### \*587 A.

**\*\*6**  An applicant for asylum bears the burden of establishing that he "is a refugee, within the meaning of section 1101(a)(42)(A)" of the INA. 8 U.S.C. §§ 1158(b)(1)(A), (B)(i). To meet that definition, the applicant must demonstrate that he is an alien outside his country of nationality "who is unable or unwilling to return to, and is unable or unwilling to avail himself . . . of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, *membership in a particular social group*, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (emphasis added). No statute or regulation defines what constitutes a "particular social group."

The Board first interpreted "persecution on account of membership in a particular social group" in *Acosta*, 19 I&N Dec. at 232-34. Noting that this provision "was added as an afterthought" to the CAT and that "Congress [similarly] did not indicate what it understood this ground of persecution to mean," *id.* at 232, the Board turned to the language itself:
A purely linguistic analysis of this ground of persecution suggests that it may encompass persecution seeking to punish either people in a certain relation, or having a certain degree of similarity, to one another or people of like class or kindred interests, such as shared ethnic, cultural, or linguistic origins, education, family background, or perhaps economic activity.

*Id.* at 232-33. Applying the doctrine of *ejusdem generis*, the Board read """particular social group" in a manner consistent with the other statutory grounds for persecution: race, religion, nationality, and political opinion. *Id.* at 233. Because each of these terms describes "a characteristic that either is beyond the power of an individual to change or is so fundamental to an individual's identity or conscience that it ought not be required to be changed," the Board concluded that "membership in a particular social group" must similarly involve the sharing of a "common, immutable characteristic." *Id.* According to the Board, "[t]he shared characteristic might be an innate one such as sex, color, or kinship ties," and immigration judges should engage in a case-by-case analysis to determine whether a particular innate characteristic would qualify. *Id.* The Board did not clarify whether the sharing of a "common, immutable characteristic" was a sufficient, as opposed to just a necessary, condition for qualifying as a particular social group under the statutory definition of "refugee." *See id.*

**\*\*7** In *Matter of H-*, 21 I&N Dec. 337, 342-43 (BIA 1996), the Board addressed the kind of kinship ties that might constitute membership in a **\*588** particular social group. There, the Board found that the record established credible evidence that the Somali Marehan subclan constituted a """particular social group," because the subclan was "distinct and recognizable" in Somali society with distinguishing "linguistic commonalities." *Id.* at 343. The Board relied on a legal opinion by the General Counsel of the Immigration and Naturalization Service, who stated that Somali "[c]lan membership is a highly recognizable, immutable characteristic;" that Somali clans are "defined by discrete criteria"; and that "membership in a clan is at the essence of a Somali's identity in determining his or her relations to others in and outside of the clan," *Whether Somali Clan Membership May Meet the Definition of Membership in a Particular Social Group under the INA,* Genco Op. No. 93-91 (INS), 1993 WL 1504038, at \*1-\*2 (Dec. 9, 1993). *See H-*, 21 I&N Dec. at 342. The Board also recognized that annual reports issued by the Department of State spoke specifically to the "presence of distinct and recognizable clans and subclans in Somalia and the once-preferred position of the applicant's Marehan subclan," due to its association with former Somali President Siad Barre. *Id.* at 342-43.

Over the decades since, the Board has refined the standard for identifying social groups that qualify for protection under the asylum statute. *See M-E-V-G-*, 26 I&N Dec. at 236-49; *W-G-R-*, 26 I&N Dec. 209-21; *see also Reyes v. Lynch*, 842 F.3d 1125, 1134-35 (9th Cir. 2016) (recognizing the Board's refinement of its "particular social group" framework); *Orellana-Monson v. Holder*, 685 F.3d 511, 521 (5th Cir. 2012) ("The [Board] may make adjustments to its definition of 'particular social group' and often does so in response to the changing claims of applicants. Deference to published [Board] decisions is warranted as [the Board] gives ambiguous statutory terms concrete meaning through a process of case-by-case adjudication." (internal quotation marks and citations omitted)). Specifically, in two complementary opinions issued in 2014, the Board held that an asylum applicant claiming membership in a particular social group must "establish that the group is: (1) composed of members who share a common immutable characteristic; (2) defined with particularity; and (3) socially distinct within the society in question." *M-E-V-G-*, 26 I&N Dec. at 237; *see W-G-R-*, 26 I&N Dec. at 212. The Board explained that this definition was a continuation of its earlier interpretations of "particular social group," *see, e.g., Acosta*, 19 I&N Dec. 211, clarifying how the definition of "particular social group" had been refined through the process of case-by-case adjudication. *See W-G-R-*, 26 I&N Dec. at 212; *M-E-V-G-*, 26 I&N Dec. at 244-47.

**\*\*8** In *Matter of A-B-*, Attorney General Sessions reaffirmed this approach and emphasized the importance of a rigorous application of that legal **\*589** standard. 27 I&N Dec. at 333-36.[1] Respondents must present facts to establish each of the required elements for asylum status, and the asylum officer, immigration judge, or Board must determine whether those facts satisfy the required elements. *See id.* at 340 (citing 8 C.F.R. § 208.13(a)). *Matter of A-B-* reiterated that, "[t]o be cognizable, a particular social group *must* 'exist independently' of the harm asserted." *Id.* at 334 (citing, *inter-alia, M-E-V-G-*, 26 I&N Dec. at 237 n.11, 243). Based upon these immigration decisions, in the ordinary case, a nuclear family will not, without more, constitute a "particular social group" because most nuclear families are not inherently socially distinct.

I recognize that a number of courts of appeals have issued opinions that recognize a family-based social group as a "particular social group" under the asylum statute. In some of these cases, the courts may have been willing (as the Board was in this case) to accept, or assume with little analysis, the existence of a particular social group because the court went on to deny asylum on other grounds. *See, e.g., Cruz-Guzman v. Barr*, 920 F.3d 1033, 1037 (6th Cir. 2019); *Rivas v. Sessions*, 899 F.3d 537, 542 (8th

Cir. 2018); *Bernal-Rendon v. Gonzales*, 419 F.3d 877, 881 (8th Cir. 2005). In other cases, the parties stipulated to the validity of the applicant's particular social group definition and the applicant's membership therein. *See, e.g.*, *K.H. v. Barr*, 920 F.3d 470, 474 (6th Cir. 2019). Consequently, these cases do not reflect the thorough, case-specific analysis of the three *Matter of M-E-V-G-* factors that the Board's precedents generally require. And I do not believe that a cursory analysis of a question that was either uncontested, or not dispositive to the outcome, should be taken to undermine the Board requirement that asylum applicants claiming "membership in a particular social group" must establish that their group shares a common immutable characteristic, is defined with particularity, and is socially distinct. *See M-E-V-G-*, 26 I&N Dec. at 237-38; *see W-G-R-*, 26 I&N Dec. at 212.

I also recognize that certain courts of appeals have considered the requisite elements of a "particular social group" and, despite the requirements set forth in *M-E-V-G-* and *W-G-R-*, have nonetheless suggested that shared family ties alone are sufficient to satisfy the INA's definition of "refugee"--regardless of whether the applicant's specific family is defined with particularity or is socially distinct in his society. For instance, in *Rios v. Lynch*, the Ninth Circuit expressly observed that under the "refined **\*590** framework" of *Matter of M-E-V-G-*, "the family . . . [is] the quintessential particular social group." 807 F.3d 1123, 1128 (9th Cir. 2015). In addition, three other circuits have expressed the same view, but without explicitly evaluating whether that position is consistent with *Matter of M-E-V-G-* and *Matter of W-G-R-*. *See, e.g.*, *Velasquez v. Sessions*, 866 F.3d 188, 194 (4th Cir. 2017) ("We have recognized that an individual's membership in her nuclear family is a particular social group."); *Villalta-Martinez v. Sessions*, 882 F.3d 20, 26 (1st Cir. 2018) ("[I]t is well established that the nuclear family constitutes a recognizable social group . . . ."); *Torres v. Mukasey*, 551 F.3d 616, 629 (7th Cir. 2008) ("Our prior opinions make it clear that we consider family to be a cognizable social group . . . .").

**\*\*9** These decisions do not purport to contradict the Board's "particular social group" framework and, in my view, they have relied upon outdated dicta from the Board's early cases. For example, the First Circuit has long relied on precedent that derives from *Matter of Acosta*'s vague statement that kinship ties "might" be the kind of innate characteristic that could form the basis of a particular social group. *See, e.g.*, *Gebremichael v. INS*, 10 F.3d 28, 36 (1st Cir. 1993) (citing *Acosta* to support broad recognition of particular social groups based on the nuclear family). But the reference to "kinship ties" in *Matter of Acosta* provides no justification for a broad assumption that an applicant's nuclear family will constitute a valid particular social group in his society. The Board there did not define what it meant by "kinship ties," since the respondent had described his relevant social group instead as persons "engaged in the transportation industry" in his country. *See 19 I&N Dec. at 232, 233*.

Similarly, the Seventh Circuit has declined to apply the particularity and social distinction requirements, requiring only that members of particular social groups share a common, immutable characteristic, as recognized in *Matter of Acosta*, 19 I&N Dec. at 233. *See, e.g.*, *Melnik v. Sessions*, 891 F.3d 278, 286 n.22 (7th Cir. 2018) (noting the circuit's rejection of the Board's initial articulations of the particularity and social distinction requirements). The Seventh Circuit's refusal to reconsider its position in light of *Matter of M-E-V-G-* and *Matter of W-G-R-* has left in place circuit precedent dating from the 1990s positing, without analysis, that every family would constitute a cognizable social group under the INA. *See Torres*, 551 F.3d at 629 (citing *Iliev v. INS*, 127 F.3d 638, 642 & n.4 (7th Cir. 1997) (noting that "[o]ur case law has *suggested*, with *some* certainty, that a family constitutes a cognizable 'particular social group' within the meaning of the law," but citing only cases in which the court determined that the alien had failed to establish persecution on account of family ties (emphases added))).

**\*591** Finally, the Fourth Circuit based its conclusion that nuclear families could be particular social groups on a passing suggestion by the Board that "'[s]ocial groups based on innate characteristics such as . . . family relationship are generally easily recognizable and understood by others to constitute social groups.'"DD' *Crespin-Valladares v. Holder*, 632 F.3d 117, 126-27 (4th Cir. 2011) (quoting *Matter of C-A-*, 23 I&N Dec. 951, 959 (BIA 2006)). But *Matter of C-A-* did not concern a family-based social group, and in fact expressly cautioned against broad recognition of family-based social groups, noting that a particular social group must be recognizable as a separate, distinct group within the alien's home country. 23 I&N Dec. at 959. Therefore, the Board's passing suggestion that nuclear families always constitute "particular social group[s]" was subsequently qualified within the text of the opinion itself.

**\*\*10** To the extent, however, that any court of appeals decision is best interpreted as adopting a categorical rule that any nuclear family could constitute a cognizable "particular social group," I believe that such a holding is inconsistent with both the asylum laws and the long-standing precedents of the Board. Since *Matter of Acosta*, the Board has emphasized that a "particular social group" must be particular and socially distinct in the society at question, which itself requires a fact-specific inquiry based on the evidence in a particular case. *Compare Acosta*, 19 I&N Dec. at 233, *and C-A-*, 23 I&N Dec. at 955, *with M-E-V-G-*, 26 I&N Dec. at 231, *and W-G-R-*, 26 I&N Dec at 210; *see also Pirir-Boc v. Holder*, 750 F.3d 1077, 1084 (9th Cir. 2014) ("To determine whether a group is a particular social group for the purposes of an asylum claim, the agency must make a case-by-case determination as to whether the group is recognized by the particular society in question."); *Miranda v. Sessions*, 892 F.3d 940, 943 (8th Cir. 2018) (applicant "did not present evidence that he shared [the defining] characteristic with others or that the characteristic was commonly recognized as defining a particular social group"). The application of contradictory rules by the courts of appeals is inappropriate because whether a specific family group constitutes a "particular social group" should be determined by the immigration courts in the first instance, as an exercise of the Attorney General's delegated authority to interpret the INA. *See Gonzales v. Thomas*, 547 U.S. 183, 185-87 (2006).

The Attorney General has primary responsibility for construing and applying provisions in the immigration laws. *See M-E-V-G-*, 26 I&N Dec. at 230. The INA provides that, within the Executive Branch, the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." 8 U.S.C. § 1103(a)(1). Plainly, the term "particular social group" is ambiguous, and every court of appeals to **\*592** address the proper application of the phrase "particular social group" has deferred to decisions of the Board in the phrase's application. *See A-B-*, 27 I&N Dec. at 327 & n.6 (collecting cases). Congress thus delegated to the Attorney General the discretion to reasonably interpret the meaning of "membership in a particular social group," and such reasonable interpretations are entitled to deference. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). As the Supreme Court has recognized, "'ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion. Filling these gaps . . . involves difficult policy choices that agencies are better equipped to make than courts.'" *Negusie v. Holder*, 555 U.S. 511, 523 (2009) (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005)). This principle holds even in cases where the courts of appeals might have interpreted the phrase differently in the first instance. *See Brand X Internet Servs.*, 545 U.S. at 980. I therefore interpret the ambiguous term "particular social group" in the manner that I believe to be the most faithful to the text, purpose, and policies underlying the asylum statute.

## B.

**\*\*11** The Board has recognized that "kinship ties" may be one of the kinds of common, immutable characteristics that might form the basis for a """"particular social group" under the INA. *Acosta*, 19 I&N Dec. at 233. But the Board has never held that *every* type of family grouping would be cognizable as a particular social group. *Cf. C-A-*, 23 I&N Dec. at 959 ("In considering clan membership in [a prior decision] we did not rule categorically that membership in any clan would suffice."). Here, the respondent argues that the immediate family of his father constitutes a particular social group because a local drug cartel had a dispute with his father, and the cartel chose to take that dispute out upon his family members. But the respondent did not show that anyone, other than perhaps the cartel, viewed the respondent's family to be distinct in Mexican society. If cartels or other criminals created a cognizable family social group every time they victimized someone, then the social-distinction requirement would be effectively eliminated.

Under the *ejusdem generis* canon, the term "particular social group" must be read in conjunction with the terms preceding it, which cabin its reach, *see Acosta*, 19 I&N Dec. at 233, rather than as an "omnibus catch-all" for everyone who does not qualify under one of the other grounds for asylum, *see Velasquez*, 866 F.3d at 198 (Wilkinson, J., concurring). The INA **\*593** expressly grants asylum to spouses and children of aliens who receive asylum if those family members are accompanying or following the original applicant to the United States. 8 U.S.C. § 1158(b)(3)(A). By contrast, the INA does not specify family ties alone as an independent basis for qualifying for asylum relief. *Cf. In re A-K-*, 24 I&N Dec. 275, 278 (BIA 2007) ("Automatically treating harm to a family member as being persecution to others within the family is inconsistent with the derivative asylum provisions, as it would obviate the need for these provisions in many respects.").

AR.05635

Further, as almost every alien is a member of a family of some kind, categorically recognizing families as particular social groups would render virtually every alien a member of a particular social group. There is no evidence that Congress intended the term "particular social group" to cast so wide a net. Moreover, 8 U.S.C. § 1101, within which the definition of """"refugee" appears, uses the term family (or families) ten times in the definitions of other terms. *See, e.g.*, 8 U.S.C. § 1101(a)(15)(A), (G) (including members of "immediate famil[ies]" within eight separate classes of nonimmigrant aliens); *id.* § 1101(a)(27)(I)(iv) (referencing members of an immigrant's "immediate family" within a category of "special immigrant"); *id.* § 1101(b)(1)(E)(i) (referencing "family member[s]" within a definition of the term "child"). If Congress intended for refugee status to turn on one's suffering of persecution "on account of" family membership, Congress would have included family identity as one of the expressly enumerated covered grounds for persecution.

**12 Thus, by the terms of the statutory definition of "refugee," as well as according to long-standing principles set forth in BIA precedent, to qualify as a "particular social group," an applicant must demonstrate that his family group meets each of the immutability, particularity, and social distinction requirements. While many family relationships will be immutable, some family-based group definitions may be too vague or amorphous to meet the particularity requirement--i.e., where an applicant cannot show discernible boundaries to the group. *See, e.g.*, *S-E-G-*, 24 I&N Dec. at 585 (noting that the "proposed group of 'family members,' which could include fathers, mothers, siblings, uncles, aunts, nieces, nephews, grandparents, cousins, and others, is . . . too amorphous a category" to satisfy the particularity requirement). Further, many family-based social groups will have trouble qualifying as "socially distinct," a requirement that contemplates that the applicant's proposed group be "set apart, or distinct, from other persons within the society in some significant way." *M-E-V-G-*, 26 I&N Dec. at 238 ("In other words, if the common immutable characteristic were known, those with the characteristic in the society in question would be meaningfully distinguished from those who do not have it."). """"To have the 'social **594 distinction' necessary to establish a particular social group, there must be evidence showing that society in general perceives, considers, or recognizes persons sharing the particular characteristic to be a group." *W-G-R-*, 26 I&N Dec. at 217.

Asylum applicants generally seek to establish family-based groups as """"particular social groups" by raising one of two principal arguments. First, many applicants assert a specific family unit as their "particular social group." *See, e.g.*, *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949-50 (4th Cir. 2015) (social group defined as appellant's nuclear family); *Rios*, 807 F.3d at 1126 (social group defined as appellant's "family"); *Perecki v. U.S. Att'y Gen.*, 446 F. App'x 236, 239 (11th Cir. 2011) (social group defined as """"Perkeci family, as targets of a blood feud"). But to qualify under the statute and Board precedent, when an applicant proposes a group composed of a specific family unit, he must show that his proposed group has some greater meaning in society. It is not enough that the family be set apart in the eye of the persecutor, because it is the perception of the relevant society-- rather than the perception of the alien's actual or potential persecutors--that matters. *W-G-R-*, 26 I&N Dec. at 217.

**13 In analyzing these claims, adjudicators must be careful to focus on the particular social group *as it is defined* by the applicant and ask whether *that group* is distinct in the society in question. If an applicant claims persecution based on membership in his father's immediate family, then the adjudicator must ask whether *that* specific family is "set apart, or distinct, from other persons within the society in some significant way." *M-E-V-G-*, 26 I&N Dec. at 238. It is not sufficient to observe that the applicant's society (or societies in general) place great significance on the concept of the family. If this were the case, virtually everyone in that society would be a member of a cognizable particular social group. The fact that "nuclear families" or some other widely recognized family unit generally carry societal importance says nothing about whether a *specific* nuclear family would be """"recognizable by society at large." *A-B-*, 27 I&N Dec. at 336; *see also Castellano-Chacon v. INS*, 341 F.3d 533, 548 (6th Cir. 2003) (noting that a country or society's reaction to a group is a factor in establishing whether it is a cognizable particular social group). The average family--even if it would otherwise satisfy the immutability and particularity requirements--is unlikely to be so recognized.

Second, other applicants define the relevant "particular social group" as a collection of familial relatives of persons who have certain shared characteristics. *See, e.g.*, *S.E.R.L. v. Att'y Gen. U.S.A.*, 894 F.3d 535, 541 (3d Cir. 2018) (social group defined as "immediate family members of Honduran women unable to leave a domestic relationship"); *Cordova v.* **595 *Holder*, 759 F.3d

*332, 336 (4th Cir. 2014)* (social group defined as """family members of persons who have been killed by rival gang members"); *Vumi v. Gonzales*, 502 F.3d 150, 152 (2d Cir. 2007) (social group defined as """relatives of assassination suspects"). This is a common approach in asylum cases concerning gang violence. *See, e.g., Orellana-Monson v. Holder*, 685 F.3d 511, 517 (5th Cir. 2012) (social group defined to include families of Salvadoran young adults who were subjected to, and rejected, gang recruitment); *Crespin-Valladares*, 632 F.3d at 120-21 (social group defined as "consisting of family members of those who actively oppose gangs in El Salvador by agreeing to be prosecutorial witnesses"); *Poroj-Mejia v. Holder*, 397 F. App'x 234, 236 (7th Cir. 2010) (social group defined as "members of families who sought police assistance against the Mara 18"). Often, this category of family classifications fails the social distinction requirement because there is little evidence to indicate that families sharing these characteristics are seen in society as cohesive and identifiable groups. *See, e.g., S-E-G-*, 24 I&N Dec. at 585-88 (holding that there was little to distinguish purported social group comprising "family members of Salvadoran youth . . . who have rejected or resisted membership in [MS-13]" from members of Salvadoran society at large, who were also threatened by gang violence). Furthermore, when proposing these kinds of groups, applicants risk impermissibly defining their purported social group in terms of the persecution it has suffered or that it fears. *See M-E-V-G-*, 26 I&N Dec. at 236 n.11 (particular social groups must exist independently of the harm asserted); *see also, e.g., Poroj-Mejia*, 397 F. App'x at 237 (denying asylum claim of applicant whose proposed social group "has no existence independent of" the alleged persecutors); *Rodriguez v. U.S. Att'y Gen.*, 735 F.3d 1302, 1310 (11th Cir. 2013) (concluding that the defining attribute of applicant's proposed family member group was its persecution by the drug-trafficking organization, and the risk of persecution alone can never create a particular social group).

**\*\*14** This opinion does not bar all family-based social groups from qualifying for asylum. To the contrary, in some societies, an applicant may present specific kinship groups or clans that, based on the evidence in the applicant's case, are particular and socially distinct. *See, e.g., Ali v. Ashcroft*, 394 F.3d 780, 785 (9th Cir. 2005) (holding that the "persecution Ali suffered was clearly on account of . . . her membership in a particular social group, her clan"); *H-*, 21 I&N Dec. at 343 (recognizing a Somali subclan as a "particular social group"). But unless an immediate family carries greater societal import, it is unlikely that a proposed family-based group will be """distinct" in the way required by the INA for purposes of asylum. Moreover, adjudicators should be skeptical of social groups that appear to be "defined principally, if **\*596** not exclusively, for the purposes of [litigation] . . . without regard to the question of whether anyone in [a given country] perceives [those] group[s] to exist in any form whatsoever." *In re R-A-*, 22 I&N Dec. 906, 918 (BIA 1999; A.G. 2001), *remanded for recons. in Matter of R-A-*, 24 I&N Dec. 629 (A.G. 2008).[2]

Here, the Board's particular social group analysis merely cited past Board and federal court precedents recognizing family-based groups and then agreed with the parties' stipulations. The Board summarily concluded that "the facts of this case present a valid particular social group," without explaining how the facts supported this finding or satisfied the particularity and social visibility requirements. *L-E-A-*, 27 I&N Dec. at 42-43. This cursory treatment could not, and did not, satisfy the Board's duty to ensure that the respondent satisfied the statutory requirements to qualify for asylum. The Board's conclusion that the respondent's proposed group presents a valid """particular social group" under the INA must be reversed.

### IV.

As Attorney General Sessions previously explained, "[a]n alien may suffer threats and violence in a foreign country for any number of reasons relating to her social, economic, family, or other personal circumstances. Yet, the asylum statute does not provide redress for all misfortune." *A-B-*, 27 I&N Dec. at 318. The term "particular social group" may not receive such an elastic and unbound meaning that it includes all immediate-family units, regardless of whether the applicant's proposed family is particular and socially distinct in his society.

For the reasons stated above, I overru **\*597** le the portion of *Matter of L-E-A-* discussing whether the proposed particular social group is cognizable. 27 I&N Dec. at 42-43 (Part II.A). Furthermore, I abrogate all cases inconsistent with this opinion.

**\*\*15** Although the Board relied on the parties' concessions to find the existence of a particular social group in this case, it ultimately concluded that the respondent failed to establish a nexus between his purported particular social group and the

persecution that he alleged and feared. I leave the Board's analysis of the nexus requirement undisturbed and remand this matter to the immigration judge for further proceedings consistent with this opinion and the remaining portions of the Board's decision below.

## Footnotes

1    The U.S. District Court for the District of Columbia has called into question some aspects of *Matter of A-B-* that are not relevant here. *See Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018). The Department of Justice has appealed that decision, which is the subject of ongoing litigation. *See* Notice of Appeal, *Grace v. Whitaker*, No. 19-5013 (D.C. Cir. Jan. 30, 2019).

2    Some proposed group definitions appear, on their face, to be convoluted and to lack any greater importance in society. *See, e.g., Franco-Reyes v. Sessions*, 740 F. App'x 420, 421 (5th Cir. 2018) (proposed group comprising Salvadoran "nuclear fami[ies] headed by a woman with a partner who is perceived as being absent and who is perceived as having expatriated himself"); *Solomon-Membreno v. Holder*, 578 F. App'x 300, 301 (4th Cir. 2014) (proposed group comprising "young female students who are related to an individual who opposes gang practices and values"); *Rodriguez*, 735 F.3d at 1306-07 (proposed group comprising "Mexican farmers in the State of Michoacán, owning . . . farmland suitable for producing high yields of illegal drug crops (cannabis), who are subject to Drug Trafficking Organizations' (DTOs') extortion tactics on account of their ownership of said farmland and unwillingness to collaborate with the DTOs by refusing to grow and produce illegal drug crops or participate in illegal drug trafficking" (ellipses in original)); *Zavala v. Holder*, 353 F. App'x 631, 633 (2d Cir. 2009) (proposed group comprising "all persons who the Maras have targeted for revenge or recruitment as a form of repayment for that person's family's failure to support the guerrillas during the civil war").

27 I. & N. Dec. 581 (U.S.Atty.Gen.), Interim Decision 3959, 2019 WL 3492202

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.    AR.05638    10

KeyCite Yellow Flag - Negative Treatment

Distinguished by Matter of Z-, BIA, October 5, 1993

20 I. & N. Dec. 368 (BIA), Interim Decision 3157, 1991 WL 353524

United States Department of Justice

Board of Immigration Appeals

MATTER OF PATEL

In Exclusion Proceedings

A-70442716

Decided by Board August 9, 1991

**\*\*1** (1) Aliens seeking admission to the United States who do not appear to an immigration inspector to be clearly and beyond a doubt entitled to enter are placed in exclusion proceedings under section 235(b) of the Immigration and Nationality Act, 8 U.S.C. § 1225(b) (1988).

(2) Aliens who have effected an entry into the United States may only be removed in deportation proceedings under section 242(b) of the Act, 8 U.S.C. § 1252(b) (1988).

(3) "Entry" is defined at section 101(a)(13) of the Act, 8 U.S.C. § 1101(a)(13) (1988), as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession."

(4) The Board of Immigration Appeals has formulated a more precise definition of "entry" which requires (1) a crossing into the territorial limits of the United States, i.e., physical presence; (2)(a) inspection and admission by an immigration officer, or (b) actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint.

(5) An applicant for admission to the United States, whose passport is stamped "Admitted" by an immigration inspector but who is prevented from entering the main terminal of an airport by a customs officer who suspects the passport to be fraudulent, is properly placed in exclusion proceedings because the applicant is not "free from official restraint," as required by Matter of Pierre, 14 I & N Dec. 476 (BIA 1973). Matter of V–Q-, 9 I & N Dec. 78 (BIA 1960), clarified.

**EXCLUDABLE:**

Act of 1952—Sec. 212(a)(19) [8 U.S.C. § 1182(a)(19) ]—Sought to enter by fraud or willful misrepresentation of a material fact

Sec. 212(a)(20) [8 U.S.C. § 1182(a)(20) ]—No valid immigrant visa

**ON BEHALF OF APPLICANT:**
Herbert Gee, Esquire
5847 San Felipe, Suite 2950
Houston, Texas 77057

**ON BEHALF OF SERVICE:**
Kimberly J. Barton
General Attorney

BY: Milhollan, Chairman; Dunne, Morris, and Vacca, Board Members. Dissenting Opinion: Heilman, Board Member.

At the conclusion of an exclusion hearing conducted on November **368** 16, 1990, [1] an immigration judge found the applicant excludable under section 212(a)(19) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(19) (1988), as an alien who had sought to enter the United States by fraud, and under section 212(a)(20) of the Act, as an immigrant not in possession of a valid unexpired immigrant visa. The applicant appealed from the immigration judge's decision and requested oral argument before this Board. [2] The record will be remanded for further proceedings. The applicant's request for oral argument is denied.

While the factual record before us is incomplete, the underlying basis for the immigration judge's determination of excludability is not in dispute. The applicant is a male of indeterminate identity. He arrived in the Houston Intercontinental Airport on September 7, 1990, and presented an Indian passport and an Employment Authorization Card (Form I–688A) to the immigration inspector. The immigration inspector processed the applicant and stamped his passport: "ADMITTED, SEP 07 1990, CLASS: I–688A." The applicant was not referred to secondary inspection and proceeded directly to customs for an inspection of his baggage and personal effects.

**2  In the customs area of the airport, the applicant presented his passport and customs form to the customs officer. Finding the applicant's passport suspicious, the customs officer returned the applicant to the immigration section to verify his documentation. A computer check revealed the applicant's passport to be a fraudulent one, and he was accordingly served with a Notice to Applicant for Admission Detained for Hearing before Immigration Judge (Form I–122) and placed in exclusion proceedings.

At an exclusion hearing conducted on September 28, 1990, the applicant claimed that he had "entered" the United States, as that term is defined for the purposes of the immigration laws, and should therefore have been placed in deportation proceedings. The immigration judge continued the proceedings to allow the parties to submit briefs in support of their respective positions. At the reconvened hearing, the immigration judge determined that the applicant was properly in exclusion rather than deportation proceedings based on Correa v. Thornburgh, 901 F.2d 1166 (2d Cir.1990), a recent decision that arose out of events that took place at the same Houston airport in 1982. In that case, the United States Court of Appeals for the Second **370** Circuit found that an alien who had been inspected and admitted by an immigration officer but was later apprehended with a concealed controlled substance in the customs area of the airport had not "entered" the United States within the contemplation of the immigration laws. The sole issue before us in the present case is whether the applicant is properly in exclusion proceedings.

Aliens seeking admission who do not appear to an immigration officer to be clearly and beyond a doubt entitled to enter the United States are placed in exclusion proceedings under section 235(b) of the Act, 8 U.S.C. § 1225(b) (1988). On the other hand, aliens who have effected an entry into the United States may only be removed in deportation proceedings under section 242(b) of the Act, 8 U.S.C. § 1252(b) (1988). Resolution of this case thus requires a determination of whether the applicant "entered" the United States as that term is defined under the immigration laws.

Section 101(a)(13) of the Act, 8 U.S.C. § 1101(a)(13) (1988), generally defines "entry" as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession." This Board has fashioned a more precise definition of entry, requiring: (1) a crossing into the territorial limits of the United States, i.e., physical presence; (2)(a) inspection and admission by an immigration officer or (b) actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint. Matter of Ching and Chen, 19 I & N Dec. 203, 205 (BIA 1984) (citing Matter of Pierre, 14 I & N Dec. 467, 468 (BIA 1973)); see also Matter of Yam, 16 I & N Dec. 535 (BIA 1978); Matter of Loulos, 16 I & N Dec. 34 (BIA 1976).

In Correa v. Thornburgh, supra, the Second Circuit initially described the inspection and admission procedures at Houston Intercontinental Airport in 1982 as follows:

**\*\*3**  At the Houston airport, all processing at that time of arriving international passengers for customs, agriculture and immigration purposes was conducted in a restricted area closed to the general public commonly referred to as the "Customs Enclosure." ...

Each incoming passenger was initially processed at a primary inspection station by a single Customs or INS inspector, who was cross-designated in order to act for both agencies. After preliminary questioning, the primary inspector would refer the passenger to a "red area" within the "Customs Enclosure" for a more intensive inspection, or to a "green area" still within the "Customs Enclosure." "Green area" referrals were permitted to proceed to the exit control station but were still subject to random selection for the more intensive "red area" inspection. The final stage in the inspection process occurred at the point of exit when the passenger presented the Customs declaration to the exit control officer. The exit control officer could either accept the declaration and permit the passenger to depart the "Customs Enclosure," or direct the passenger to the "red area" for further inspection.

**\*371**  Id. at 1168 (footnote omitted).

The court went on to describe the circumstances following Ms. Correa's arrival at the airport following an international flight. A customs officer, acting that day on a "cross-designated" basis as an immigration inspector at one primary inspection station noticed Ms. Correa, who was standing in line at another primary inspection station, and suspected her of being a drug courier. Although she successfully passed through primary inspection, officers of the United States Department of Agriculture operating in the customs area prevented Ms. Correa from proceeding to the exit control station and referred her to an area designated for "secondary inspection." After an agricultural inspection in that area, the customs officer who initially observed Ms. Correa searched her luggage and discovered a large amount of cocaine. The Immigration and Naturalization Service subsequently sought to exclude her under section 212(a)(23) of the Act, as an alien who an "immigration officer knows or has reason to believe" is or has been an illicit trafficker in controlled substances.

Ms. Correa contended that she had effected an "entry" into the United States when she was permitted to pass through the primary inspection station at the Houston airport and maintained that she consequently was improperly in exclusion proceedings. She cited our decision in Matter of V–Q–, 9 I & N Dec. 78 (BIA 1960), in support of her claim. The alien in that case, after inspection by an immigration official at the Santa Fe Street Bridge inspection station in El Paso, Texas, was told to "go ahead." When the alien had proceeded some 75 feet past the immigration inspection point, a bystander notified the inspecting officer that the alien was a prostitute. The immigration officer then apprehended the alien for further inspection, which this Board held could be conducted only in deportation proceedings.

**\*\*4**  The Second Circuit, however, applying our caselaw as synthesized in Matter of Pierre, supra, found that Ms. Correa had not effected an "entry." The court concluded that it was clear that she had never satisfied the third prong of the Pierre test, i.e., "freedom from official restraint." From her arrival in the United States to the moment of her arrest, she "remained in a restricted area, known as the 'Customs Enclosure', where access and egress were controlled by exit control officers, and by Customs, Immigration, and USDA officers assigned to the area." Correa v. Thornburgh, supra, at 1172 (footnote omitted). If she had attempted to leave, she would have been prevented from doing so. Thus, Ms. Correa was "never free to physically enter the United States or to go at large and mix with the general population." Id. The court distinguished Matter of V–Q–, supra, on the factual ground that the alien in that case, after completing an inspection, had been told to "go ahead" and had proceeded beyond the inspection point. The court **\*372**  noted our conclusion in Matter of V–Q–that, since the inspector had lost custody over the alien, an entry had occurred, necessitating deportation proceedings. In Ms. Correa's case, however, "custody was never lost" and she was never free from official restraint. Correa v. Thornburgh, supra, at 1172.

We have reviewed Matter of V–Q– in light of the applicant's arguments in the instant case and the decision of the Second Circuit in Correa v. Thornburgh. In Matter of V–Q–, supra, at 79, we stated that jurisdiction to hold and exclude the alien terminated because the question of her right to be admitted as a returning resident had been resolved in her favor "and she was no longer in the custody of the immigration officer." We found support for our decision in an unreported case in which an alien had been

placed in deportation proceedings "after he had progressed not more than six or eight feet from the point where an immigrant inspector had 'admitted' him as a United States citizen." Id. Matter of V–Q-, however, also contains the following language: "Admission" occurs when an authorized employee of the Service communicates in a tangible manner to an applicant for admission his determination that the applicant has established that he is not inadmissible under the immigration laws. At the point such communication is made and received by the applicant, "admission" has occurred.... Once "admission" has occurred, our holding is that exclusion proceedings are no longer proper and that expulsion proceedings are required.

Id. at 79–80. This aspect of the decision makes no reference to the alien being "no longer in the custody of the immigration officer." Id. at 79. And, unless read within the factual context of the case, this language differs from the holding in Matter of Pierre, supra, which delineates the threshold between exclusion and deportation proceedings at an alien's "entry" into the United States which in turn requires both "inspection and admission" and "freedom from official restraint." Id. at 468.

**5** If Matter of V–Q- is read as omitting the requirement that an alien be free from official restraint before deportation proceedings are mandated, a disparate outcome obviously could result in certain kinds of cases. For example, in the case of aliens such as the one in Matter of V–Q-, "admission" and "entry" converge: i.e., once the immigration inspector communicates his favorable determination of her "admissibility," the alien is free to proceed into the United States. She therefore effects an "entry" inasmuch as she is "free from official restraint" immediately following inspection. Under the facts in Correa v. Thornburgh, however, a gap separates the immigration inspector's communication of his determination that the alien is "admissible" (by stamping her passport) and the moment the alien is free to exit the restricted area and "enter" the United States. For aliens at this point between the immigration inspection point and the exit control station,  **373**  Matter of Pierre would indicate that exclusion proceedings are required, since such aliens have not effected an "entry" as they are not yet free from official restraint. On the other hand, if we were to apply Matter of V–Q-, as that case is interpreted by the applicant herein, aliens similarly situated would instead find themselves in deportation proceedings, as the boundary would be drawn at the earlier point when their admissibility was favorably determined and that determination was communicated to them by an immigration inspector. [3]

Given the possible contradictory results in the application of these two cases, we note that Matter of Pierre and its progeny were decided after, and thereby supersede, Matter of V–Q-. In any event, we now clarify that Matter of V–Q- should not be read as requiring that an alien who has been inspected and admitted, but who has not yet been freed from official restraint, be placed in deportation rather than exclusion proceedings. [4]  Reading Matter of V–Q-to hold that freedom from official restraint is not an essential element to effecting an entry into the United States would be inconsistent with decades of caselaw on the "entry" issue, including the very cases relied upon in Matter of V–Q-. See United States v. Vasilatos, 209 F.2d 195, 197 (3d Cir.1954); United States ex rel. Patton v. Tod, 297 Fed. 385, 396 (2d Cir.1924); United States v. Lazarescu, 104 F.Supp. 771, 777 (D.C.Md.1952), aff'd,  **374**  199 F.2d 898 (4th Cir.1952). The critical point in such cases is that freedom from official restraint exists, not that such freedom has been exercised. Compare, e.g., United States v. Vasilatos, supra (entry occurred when a crewman was cleared by an immigration officer upon arrival in Philadelphia for a temporary stay in the United States even though the crewman did not exercise this freedom until physically landing at Baltimore), with In Re Dubbiosi, 191 F.Supp. 65, 66 (E.D.Va.1961) (entry did not occur where a crewman was examined and given a landing permit but was not permitted to leave the ship pending the completion of a search for stowaways).

**6** Applying our definition of "entry" as set forth in Matter of Pierre to the facts of the present case, we would find that this applicant has not yet "entered" the United States if the same inspection and admission procedures outlined by the Second Circuit in Correa v. Thornburgh are still in effect at Houston Intercontinental Airport. However, the record before us does not include evidence regarding the present inspection and admission procedures at that airport and there is no clear factual record before us upon which to resolve this issue. Accordingly, we will remand the record to the immigration judge to further consider the "entry" issue after submission of evidence regarding the alien's freedom (or lack thereof) from official restraint. In this respect, we note the following:

"Freedom from official restraint" means that the alien who is attempting entry is no longer under constraint emanating from the government that would otherwise prevent her from physically passing on. Although physical movement may evidence that such

freedom has been acquired, it is not a necessary component as long as the alien is free physically to enter the United States openly or surreptitiously. Such restraint need not be by immigration officers. Edmond v. Nelson, 575 F.Supp. 532, 535 (E.D.La.1983) (aliens seeking entry by sea "restrained" by master of rescuing ship, acting pursuant to government regulations); Matter of Yam, 16 I & N Dec. 535, 536–37 (BIA 1978) (alien found at border and taken under guard by local police to a medical facility).

Correa v. Thornburgh, supra, at 1172 (citations omitted).

ORDER: The record is remanded to the immigration judge for further proceedings.

### DISSENTING OPINION: Michael J. Heilman, Board Member

**\*\*7** I respectfully dissent.

The majority opinion relies very heavily on the issue of "restraint" in arriving at its conclusion. In my estimation, this reliance is incorrect, as this term has attained prominence through an incorrect reading of federal court decisions relating to crewmen. This term was applied to the specific context of prosecution of alien crewmen who had arrived in foreign vessels in United States waters after being **\*375** deported. The term was never used to describe the situation in a United States airport confronting an alien passenger who had disembarked from an aircraft, the situation we are dealing with here. The term "restraint" and the phrase "free from restraint" have no applicability here and should not be employed. I would dismiss the appeal as the applicant was properly in exclusion proceedings.

This Board's leading decision on the concept of "restraint" is Matter of Pierre, 14 I & N Dec. 467 (BIA 1973). There, a number of Haitian nationals had been passengers on a small boat, which had fallen into distress and had been towed into the port of West Palm Beach, Florida, by an American vessel. At that point, the captain of the American vessel kept them on board, as he had determined that they had no entry documents. The aliens contended that they had made an "entry" and so should have been placed in deportation, not exclusion proceedings. The exact argument the aliens made is not set forth in the decision, and it is not clear at what point they claimed they had entered, upon arrival at the port, or subsequently when they were "paroled" into the custody of several ministers of religion. The Board stated that although the aliens had "crossed into the territorial limits of the United States," they "remained on board and waited for the immigration inspectors to come to them." The Board concluded that they had not entered and were correctly in exclusion proceedings. Id. at 469–70.

This conclusion was based on the Board's interpretation of the term "entry," as only aliens who "enter" the United States are properly in deportation proceedings. As the Board stated:
The courts have found it necessary to interpret the term "entry," which is now defined in section 101(a)(13) of the Act as "... any coming of an alien into the United States, from a foreign port or place or from an outlying possession...." A survey of the many cases which have treated this subject over the years leads to the following conclusion: An "entry" involves (1) a crossing into the territorial limits of the United States, i.e. physical presence; plus (2) inspection and admission by an immigration officer, United States v. Vasilatos, 209 F.2d 195 (C.A. 3, 1954); Lazarescu v. United States, 199 F.2d 898, 900 (C.A. 4, 1952); or (3) actual and intentional evasion of inspection at the nearest inspection point, U.S. ex rel. Giacone v. Corsi, 64 F.2d 18 (C.A. 2, 1933); Morini v. United States, 21 F.2d 1004 (C.A. 9, 1927), cert. den. 276 U.S. 623 (1928); Lew Moy v. United States, 237 Fed. 50, 52 (C.A. 8, 1916); Matter of Estrada–Betancourt, 12 I & N Dec. 191, 193–4 (BIA 1967); Matter of Albuerne–Urquiza, A17 334 264, unreported decision (BIA October 12, 1967); coupled with (4) freedom from restraint, United States v. Vasilatos, supra; Lazarescu v. United States, supra. In all of the above cases these conditions were satisfied and an entry was effected.

**\*\*8** Matter of Pierre, supra, at 468.

For our purposes, it is important to note the context of the two decisions cited for the proposition that "freedom from restraint" is a prerequisite to "entry," **\*376** United States v. Vasilatos, 209 F.2d 195 (3d Cir.1954), and Lazarescu v. United States, 199

F.2d 898 (4th Cir.1952). These cases involved criminal prosecutions of previously deported aliens registered on crew lists as crewmen on vessels which had come to the United States from foreign territory. The discussion of "restraint" in those decisions occurred against the backdrop of the particular immigration laws applicable to crewmen and passengers. As the United States Court of Appeals for the Third Circuit stated in Vasilatos:

It must have been apparent, long before the fact was emphasized in the 1952 definition, that in a literal and physical sense a person coming from abroad enters the United States whenever he reaches any land, water or air space within the territorial limits of this nation. But the actual clearance of persons who seek admission in regular course is accomplished at designated stations, many of them located as a matter of convenience some distance inside the national boundary. In these circumstances, those who have come from abroad directly to such a station seeking admission in regular course have not been viewed by the courts as accomplishing an "entry" by crossing the national boundary in transit or even by arrival at a port so long as they are detained there pending formal disposition of their requests for admission. The reasonableness of this concept is emphasized by the fact that the master of an incoming vessel is under a legal duty to restrict passengers and crew members to the ship pending immigration clearance....

... For that presence in the United States which is essential to entry existed when, and even before, the ship arrived in Philadelphia. No landing was necessary to supply that prerequisite. The other essential factor, freedom from restraint, came into existence when an immigration officer in Philadelphia cleared Vasilatos for a temporary stay in the United States.

United States v. Vasilatos, supra, at 197 (emphasis added) (citations omitted).

This interpretation tracked that of Lazarescu, where the Court of Appeals for the Fourth Circuit stated: "The port and harbor of Baltimore is territory of the United States. Entry into that territory even in a vessel amounted to a violation of the act unless appellant was under restraint which prevented his departing from the vessel." Lazarescu v. United States, supra, at 900–01.

It is clear from the analysis provided in these two decisions that the "restaint" the courts were referring to was that imposed by the captains of the vessels. They were "under a legal duty to restrict passengers and crew members to the ship," as the court stated in Vasilatos.

It is clear that the Board understood this to be the "restraint" it found in Matter of Pierre, supra. As the Board correctly noted, the captain "would have been subject to penalties if he had permitted them to land, sections 271 and 273, Immigration and Nationality Act." Id. at 469. Section 271 of the Immigration and Nationality Act, 8 U.S.C. § 1321 (1988), states in part:

**\*9   \*377** (a) It shall be the duty of every person, including the owners, masters, officers, and agents of vessels, aircraft, transportation lines, or international bridges or toll roads, other than transportation lines which may enter into a contract as provided in section 238, bringing an alien to, or providing a means for an alien to come to, the United States (including an alien crewman whose case in not covered by section 254(a)) to prevent the landing of such alien in the United States at a port of entry other than as designated by the Attorney General or at any time or place other than as designated by the immigration officers. Any such person ... shall be liable to a penalty to be imposed by the Attorney General of $1,000 for each such violation.... [1]

This duty to detain on board is also stated in the immigration regulations:

(a) Prior to inspection. All persons arriving at a port in the United States by vessel or aircraft shall be detained aboard the vessel or at the airport of arrival by the master, commanding officer, purser, person in charge, agent, owner, or consignee of such vessel or aircraft until admitted or otherwise permitted to land by an officer of the Service. Notice or order to detain shall not be required. The Service will not be liable for any expenses of a passenger who has not been presented for inspection and for whom a determination has not been made concerning admissability [sic] by a Service officer.

8 C.F.R. § 235.3(a) (1991).

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

The captain of the United States vessel which had towed the Haitian boat into United States territorial waters carried out this duty and did not allow the aliens to leave the ship. This is the "restraint" the Board was referring to, the same "restraint" discussed in Vasilatos and Lazarescu. This is not the "restraint" we are dealing with in this case. If we were considering the "restraint" imposed by the captain of the aircraft which had brought the alien to Houston, we would be correctly applying Matter of Pierre and the cases it surveys.

We are not. What we are considering is the entirely different situation where the captain of the aircraft has delivered the passengers to a designated port of entry, the passengers have been given permission to disembark from the aircraft, and they have left the aircraft and entered the airport proper. We are in fact at this point now considering a different form of "restraint," that exercised by immigration officers within the confines of the airport. Whatever that "restraint" might be, it is not the "restraint" considered to exist when a private party, under legal obligation, prevents the departure of a passenger or crewman from a vessel or aircraft. We are already well past that point in this situation.

The majority's decision simply treats these two different forms of "restraint" as the same issue. The majority wrongly employs prior  *378  court and Board decisions as authority for its interpretation of "entry" in this case.

 **10  The situation that we are dealing with in this instance is covered by the provisions of section 235 of the Act, 8 U.S.C. § 1225 (1988), which governs the immigration inspection of aliens seeking admission to the United States. In pertinent part that section states:
(a) The inspection, other than the physical and mental examination, of aliens (including alien crewmen) seeking admission or readmission to, or the privilege of passing through the United States shall be conducted by immigration officers, except as otherwise provided in regard to special inquiry officers. All aliens arriving at ports of the United States shall be examined by one or more immigration officers at the discretion of the Attorney General and under such regulations as he may prescribe....

(b) Every alien (other than an alien crewman) and except as otherwise provided ... who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer. The decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien, whose privilege to land is so challenged, before a special inquiry officer for further inquiry.

The situation we are considering is that where the passengers have been delivered by the carrier to the inspection station and they are free of carrier restraint. At this point, we are considering the authority of the immigration officer under this section of the Act, not the obligation of the carrier. As an initial matter, it is clear that the term "restraint" does not appear in this provision. There is a simple requirement for "examination" of the arriving alien on such matters as the purpose of the visit, the anticipated length of stay, and if the individual is an alien, "whether he belongs to any of the excluded classes enumerated in section 212" of the Act. Section 235(b) of the Act. If the alien does not "appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land," then the alien "shall be detained for further inquiry to be conducted by a special inquiry officer." Id.

It is in these words that we discover the authority of the immigration officer to "restrain" persons, as the immigration officer is obligated to prevent the alien's admission by detaining him. It is also clear from the language of section 235(b) of the Act that Congress intended this authority to be broadly available to all immigration officers at the port of entry, not just the first immigration officer who may have examined the alien, and who may in fact have decided to admit the alien. This is evident from the language in which Congress stated that even if an examining officer's decision is "favorable to the admission" of the alien, that decision "shall be subject to challenge by  *379  any other immigration officer and such challenge shall operate" to force the alien to appear before a special inquiry officer. Id.

**11** This "challenge" feature of section 235(b) of the Act is also found in section 204(e) of the Act, 8 U.S.C. § 1154(e) (1988), which specifically states that approval of an immigrant visa petition does not entitle an alien to enter the United States if the inspecting immigration officer finds the individual "not to be entitled" to his visa classification. The same situation pertains with an alien who has obtained a nonimmigrant visa from a consular officer. That person is also subject to exclusion at the port of entry by an immigration officer. Section 221(h) of the Act, 8 U.S.C. § 1201(h) (1988).

While it is clear that an alien traveler or immigrant may be sorely inconvenienced by having his entry subject to challenge after having received a visa and having traveled to the United States, it is equally clear that this redundant authority to challenge an alien's entry is a cornerstone of the immigration control process. A person seeking a business visitor's visa at an American consulate may be subjected to a lengthy interview and be required to provide documentary evidence of ties to his native country. After satisfying the consular officer and being granted the visa, he may still be barred from entry upon arrival.

Section 235(b) adds another layer to this authority to challenge entry. In this instance, the authority is given to "any" immigration officer and may be exercised by, in effect, second-guessing a decision to admit, already made by a fellow immigration officer. One imagines that in practical terms this authority to challenge an initial decision to admit is normally carried out by a supervisory immigration inspector, or by an experienced inspector as against a junior or trainee officer. It may operate as simply as an immigration officer pointing out something that may have been overlooked in the initial inspection, even after the alien's passport has been stamped with an admission stamp and the individual has passed the initial inspecting officer. This all seems to be a matter of common sense. International flights disgorge several hundred passengers at a time, and the immigration inspectors are under pressure and instructions to inspect them as quickly as possible. Under these circumstances, judgments as to admissibility are made very quickly, often in less than a minute, while the immigration inspector flips through a passport handed to the inspector by the passenger. In this context there is a premium on speed, but also on not being bound by mistake or misjudgment. That is why a decision to admit is subject to challenge by "any other immigration officer."

As this is so, it appears to me that the only issue in this appeal is whether this "challenge" occurred pursuant to section 235(b) of the Act, when, following the decision of the first inspecting officer to  **380** admit the alien, a customs officer subsequently discovered that the individual's passport had been altered. The customs officer brought this matter to the attention of the Immigration and Naturalization Service, which then placed this individual in exclusion proceedings before an immigration judge. Presumptively, this "challenge" fell within section 235(b) of the Act. This is so because there is nothing to indicate that the customs officer was not authorized to do what he did, examine the passport and bring its fraudulent nature to the attention of the Service. I assume that if this was not an accepted practice, the Service would not have taken any action when the alteration was pointed out.

**12** For purposes of this appeal, I would assume that once this highly material fact was brought to the attention of the immigration inspector, he "challenged" his own decision. Surely, well within the scope of the term "challenge" is the entirely mundane act of pointing out for the inspecting officer's edification and action a piece of crucial information which has been overlooked in the press of business. If this is done by a fellow immigration officer so much the better, but there is no reason it cannot be done by a customs officer or even a fellow passenger who has seen or overheard something suspicious which he brings to the inspecting officer's attention.

To require this "challenge" to occur before the decision to admit is made, and before the passport is stamped, would effectively do away with the "challenge" provisions of section 235(b) of the Act. It would require the would-be challenger to anticipate the decision and leap into action before the admission stamp could touch a page in the passport. This provision authorizes any immigration officer to challenge the "decision" to admit, and this authority is clearly not negated just because the passport has been marked with an admission stamp. The effect of the "challenge" is to nullify the stamp in the passport, not vice versa.

Here, the alien applicant for admission does not assert that the customs officer's action was improper or without authority, as he cannot. He can only argue that the decision of the inspecting immigration officer could not be reversed, even by the officer himself. But this argument runs directly counter to the abundantly clear language of section 235(b) of the Act. Surely,

"challenge" does not mean that a duel with seconds was required before the inspecting officer could consider the information provided to him by the customs officer, come to the entirely reasonable conclusion that he may have made a mistake, and withdraw his decision to admit. Surely, implicit in the word "challenge" is a discussion in civilized discourse which results in a change in the decision. I imagine that in the normal course of events at an inspection station supervisory inspectors often **\*381** "challenge" decisions by subordinates, who change their mind, and that in any event, the supervisor's decision controls, whether the subordinate agrees or not. When an alien is brought before the immigration judge under this provision, the admitting officer and the "challenger" do not argue about their decisions to admit or to bar admission. In every case, as the law makes crystal clear, it is only the adverse decision of an immigration officer, the decision to deny admission, that is considered by the immigration judge.

It is abundantly clear in these circumstances that once the customs officer brought to the inspecting immigration officer the information that the passport was fraudulent, the immigration officer was free under section 235(b) of the Act to withdraw his decision to admit, to override, to "challenge" his own decision, and to detain the applicant for a hearing before an immigration judge. For these reasons, I would find that the applicant was not admitted to the United States when the stamp was placed in his passport, and so he was properly in exclusion proceedings. I would therefore dismiss the appeal.


### Footnotes

1    The record contains the immigration judge's subsequent memorandum decision, dated February 11, 1991, which articulates the basis for his determination.

2    Upon motion of the Immigration and Naturalization Service, which was not opposed by the applicant, the record of proceedings was forwarded to this Board without a transcript for an expedited decision.

3    The Service acknowledged in its brief before the immigration judge that it had in the past followed unspecified "caselaw" and placed aliens who were inspected and admitted by an immigration inspector in deportation proceedings, notwithstanding the fact that such aliens were not permitted to proceed past the customs area. Now, however, based on Correa v. Thornburgh, supra, the Service indicates that it is seeking the exclusion rather than the deportation of such aliens.

4    Our determination finds further support in section 235(b) of the Act, which governs exclusion proceedings. That provision reads:

Every alien ... who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer. The decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien, whose privilege to land is so challenged, before a special inquiry officer for further inquiry. (Emphasis added.)

The statutory language here quoted indicates that Matter of V–Q- may have been wrongly decided in that it held a single immigration inspector's communication of his favorable determination of an alien's admissibility to be sufficient to require that all further adjudication of that issue be conducted in deportation proceedings. Section 235(b) of the Act clearly states that an alien is subject to exclusion proceedings until such time as the initial decision to admit the alien is no longer subject to challenge by another immigration inspector. We believe the requirement that an alien "enter" the United States "free from official restraint" before he or she will be placed in deportation proceedings, as set forth in Matter of Pierre, comports well with this statutory framework.

1    Section 271 of the Act was revised by section 543(a)(8) of the Immigration Act of 1990, Pub.L. No. 101–649, 104 Stat. 4978, 5058, to increase the amount of the penalty imposed for each violation from $1,000 to $3,000.

20 I. & N. Dec. 368 (BIA), Interim Decision 3157, 1991 WL 353524

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

🟨 KeyCite Yellow Flag - Negative Treatment

Disagreement Recognized by Chung v. Reno, M.D.Pa., May 16, 1995

14 I. & N. Dec. 467 (BIA), Interim Decision 2238, 1973 WL 29484

United States Department of Justice

Board of Immigration Appeals

MATTER OF PIERRE ET AL.

In Exclusion Proceedings

A-20182758-763

Decided by Board October 5, 1973

**\*\*1  \*467**  (1) An alien has not effected an entry into the United States unless, while free from actual or constructive restraint, he has crossed into the territorial limits of the United States and has been inspected and admitted by an immigration officer or has actually and intentionally evaded inspection at the nearest inspection point.

(2) Respondents, Haitian refugees, who, upon arrival at the port of West Palm Beach, Florida, remained on board their vessel awaiting inspection by immigration officers but who were not admitted by such officers, did not make an entry into the United States. Consequently, exclusion proceedings are proper in their cases and relief under section 243(h) of the Immigration and Nationality Act, as amended, is, therefore, unavailable to them.

**EXCLUDABLE:**

Act of 1952—Section 212(a)(20) [8 U.S.C. 1182(a)(20) ]—Immigrants—no visas.

**ON BEHALF OF APPLICANTS:**
Donald I. Bierman, Esquire
Bierman & Sonnett, P.A.
600 Roberts Building
28 West Flagler Street
Miami, Florida 33130

**ON BEHALF OF SERVICE:**
Irving A. Appleman
Appellate Trial Attorney

The aliens, hereafter referred to as "applicant," appeal from the May 24, 1973 decision of the immigration judge in which he found them excludable under section 212(a)(20) of the Immigration and Nationality Act, and refused to hear their claims of persecution under section 243(h) of the Act. The appeal will be dismissed.

The principal question to be decided is whether these cases are properly in exclusion rather than deportation proceedings. The applicants are all natives and citizens of Haiti. They left Haiti in a small boat, which fell into distress and was towed into West Palm Beach, Florida, a designated port of entry, 8 CFR 100.4(c)(2) by an American vessel on May 20, 1973. Upon being questioned, they informed the captain of the American vessel that they had no entry documents. Then they waited on board for the arrival of  **\*468**  immigration officers in the hope of being allowed to remain in the United States as political refugees. Because they did not appear to the immigration officers to be clearly and beyond a doubt entitled to land, the matter was referred to the immigration judge for further inquiry in accordance with section 235(b) of the Act. The applicants were held in custody

until June 15, 1973, when they were paroled in the custody of a group of ministers. Their applications for political asylum were denied by the District Director after he had consulted with the Office of Refugee and Migration Affairs of the Department of State.

The applicants contend thay they should be heard in deportation (i.e. expulsion) rather than exclusion proceedings. Therefore, the key question is whether or not an entry was made, since it is clear that they did not effect an "entry" into this country, exclusion proceedings were proper, whereas the proceedings must be in deportation if the aliens made an "entry."

**\*\*2** Section 291 of the Immigration and Nationality Act provides that any person who applies for admission to the United States must establish that he is not subject to exclusion. An alien who has effected an entry is not subject to exclusion, but rather to deportation. Section 291 further provides that in deportation proceedings the respondent must bear the burden of showing the time, place, and manner of his entry into the United States. It follows, therefore, that the responsibility for establishing whether an entry has been made rests on the alien.

The courts have found it necessary to interpret the term "entry," which is now defined in section 101(a)(13) of the Act as "...any coming of an alien into the United States, from a foreign port or place or from an outlying possession. ..." A survey of the many cases which have treated this subject over the years leads to the following conclusion: An "entry" involves (1) a crossing into the territorial limits of the United States, i.e. physical presence; plus (2) inspection and admission by an immigration officer, United States v. Vasilatos, 209 F.2d 195 (C.A. 3, 1954); Lazarescu v. United States, 199 F.2d 898, 900 (C.A. 4, 1952); or (3) actual and intentional evasion of inspection at the nearest inspection point, U.S. ex rel. Giacone v. Corsi, 64 F.2d 18 (C.A. 2, 1933); Morini v. United States, 21 F.2d 1004 (C.A. 9, 1927), cert. den. 276 U.S. 623 (1928); Lew Moy v. United States, 237 Fed. 50, 52 (C.A. 8, 1916); Matter of Estrada–Betancourt, 12 I. & N. Dec. 191, 193–4 (BIA 1967); Matter of Alburne–Urquiza, A17 334 264, unreported decision (BIA October 12, 1967); coupled with (4) freedom from restraint, United States v. Vasilatos, supra; Lazarescu v. United States, supra. In all of the above cases these conditions were satisfied and an entry was effected.

**\*469** In contrast, the courts have held that no entry is made when the alien is taken into custody upon his arrival at an American port (even though he may possess a valid immigrant visa), Klapholz v. Esperdy, 302 F.2d 928, 929 (C.A. 2), cert. den. 371 U.S. 891 (1962). There is no entry when the alien is under official restraint, even after his ship has arrived at port and he has been inspected and given a conditional landing permit, In re Dubbiosi, 191 F.Supp 65, 66 (E.D.Va.1961). The restraint may take the form of surveillance, unbeknownst to the alien; he has still not made an entry despite having crossed the border with the intention of evading inspection, because he lacks the freedom to go at large and mix with the population, Ex parte Chow Chok, 161 Fed. 627, 629–30, 632 (N.D.N.Y.), aff'd 163 Fed. 1021 (C.A. 2, 1908).

Parole is not an admission, section 212(d)(5), Immigration and Nationality Act, and therefore does not constitute an entry, Leng May Ma v. Barber, 357 U.S. 185, 186, 188–90 (1958); Vitale v. INS, 463 F.2d 579, 582 (C.A. 7, 1972); Siu Fung Luk v. Rosenberg, 409 F.2d 555, 558 (C.A. 9), cert. denied 396 U.S. 801 (1969); U.S. ex rel. Tom We Shung v. Murff, 176 F.Supp 253, 256 (S.D.N.Y.1959), aff'd 247 F.2d 667 (C.A. 2, 1960). Moreover, when an alien crosses the border, intends to present himself for inspection, and follows the ordinary path from the international line to the nearest inspection point, he has not effected an entry, Thack v. Zurbrick, 51 F.2d 634, 635–36 (C.A. 6, 1931). A fortiori an entry is not made when an alien merely crosses into the territorial waters of the United States without landing and without evading inspection.

**\*\*3** In the present case, the aliens arrived at port but did not land. Instead, they waited on board their vessel until they could be inspected by immigration officers. While they may have crossed into the territorial limits of the United States, they were not admitted by immigration officers, nor did they intentionally evade inspection. On the contrary, they requested inspection (Tr. P. 12). The captain of the American vessel had no authority to admit them. Indeed, he would have been subject to penalties if he had permitted them to land, sections 271 and 273, Immigration and Nationality Act.

Counsel relies heavily on Matter of Estrada–Betancourt, supra, in which we found that an entry had been made and that, therefore, deportation proceedings rather than exclusion proceedings were proper. The aliens in that case did not arrive at a

"designated port of entry." We stated that they "were required to proceed by the ordinary route to the nearest such port for their inspection," and held that "when they evaded inspection at that place their 'entry' was effected and they were thereafter properly the subject of expulsion proceedings for having 'entered without inspection,'" **470** id. at 194. That the applicants in the present case remained on board and waited for the immigration inspectors to come to them does not alter the fact that they did not evade or seek to evade inspection at the nearest inspection point.

Accordingly, we find that the applicants have not sustained their burden of establishing that an entry was made. In Beauvil v. Ahrens, 333 F.2d 307 (C.A. 5, 1964), on substantially similar facts, the United States Court of Appeals held that exclusion proceedings were proper. [1] Consequently, we agree with the immigration judge that the proceedings are properly in exclusion, not in deportation.

Since these are exclusion proceedings, the immigration judge correctly refused to hear the applicants' claims of persecution under section 243(h) of the Act. That provision by its terms applies to aliens "within the United States" and not to those who, like the applicants, seek admission. Section 243(h) relief is thus unavailable to applicants in exclusion proceedings, Leng May Ma v. Barber, supra at 186; U.S. ex rel. Tom We Shung v. Murff, supra at 260.

Applicants for admission and excluded aliens have the alternative remedy of presenting evidence concerning feared persecution to the District Director and requesting parole pursuant to section 212(d)(5) and 8 CFR 212.5(a). Cf. Glavic v. Beechie, 225 F.Supp 24, 27 (S.D.Tex.1963), aff'd 340 F.2d 91 (C.A. 5, 1964) (where a crewman has the opportunity to seek parole under section 212(d)(5), a hearing under section 243(h) is not required by the Act). The applicants have availed themselves of this opportunity, but the District Director denied their requests for political asylum after consultation with the Office of Refugee and Migration Affairs, Department of State. Neither the immigration judge nor this Board is empowered to grant parole pursuant to section 212(d)(5) of the Act, Matter of Conceiro, Interim Decision No. 2183 (BIA 1973), aff'd Conceiro v. Marks, 360 F.Supp 454 (S.D.N.Y.1973).

**4**  The applicants claim that not to allow them to be heard in deportation proceedings is a violation of due process under the Fifth Amendment of the United States Constitution. Similarly, they assert that it is a violation of their rights to due process and equal protection of the laws under the Fifth and Fourteenth Amendments for the immigration judge to refuse to hear their persecution claims. They insist further that their exclusion and subsequent deportation to Haiti would constitute cruel and unusual punishment, and would violate their rights under the Eighth **471** Amendment of the United States Constitution. These claims were advanced in order to preserve them in the event that appeal to the courts should become necessary. The applicants acknowledge that it is not within the province of this Board to pass upon the constitutionality of the statutes we administer, Matter of L--, 4 I. & N. Dec. 556, 557 (BIA1951).

Congress has provided that a hearing be given to those whose right to enter is in dispute, sections 235(b) and 236, Immigration and Nationality Act. We have determined that the hearing held before the immigration judge in the present case was fairly conducted. We agree with the decision of the immigration judge that the proceedings were properly in exclusion, and that he was therefore without jurisdiction to hear the persecution claims under section 243(h).

Counsel has requested that the case be certified to the Attorney General pursuant to 8 CFR 3.1(h). We see no reason for certification and therefore deny counsel's request.

ORDER: The appeal is dismissed.

## Footnotes

l        The facts in the Beauvil case are fully set forth in the unreported Board decision, Matter of Haitian Refugees, A13 322
         344–57, 59–68 (BIA, December 3, 1963).

14 I. & N. Dec. 467 (BIA), Interim Decision 2238, 1973 WL 29484

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   AR.05651   4

KeyCite Red Flag - Severe Negative Treatment

Superseded by Statute as Stated in East Bay Sanctuary Covenant v. Barr, 9th Cir.(Cal.), July 6, 2020

19 I. & N. Dec. 467 (BIA), Interim Decision 3033, 1987 WL 108948

United States Department of Justice

Board of Immigration Appeals

MATTER OF PULA

In Exclusion Proceedings

A-26873482

Decided by Board September 22, 1987

**\*\*1  \*467**  (1) An alien's manner of entry or attempted entry is a proper and relevant discretionary factor to consider in adjudicating asylum applications.

(2) The circumvention of orderly refugee procedures can be a serious adverse factor in determining whether to grant asylum; however, it should not be considered in such a way that the practical effect is to deny relief in all cases.

(3) The circumvention of the immigration laws is only one of a number of factors which should be balanced in exercising discretion, and the weight accorded to this factor may vary depending on the facts of a particular case.

(4) The circumvention of orderly refugee procedures alone is insufficient to require the most unusual showing of countervailing equities. Matter of Salim, 18 I&N Dec. 311 (BIA 1982), modified.


EXCLUDABLE:

Act of 1952—Sec. 212(a)(19) 8 U.S.C. § 1182(a)(19)]—Seeks to enter by fraud or willful misrepresentation of a material fact

Sec. 212(a)(20) [8 U.S.C. § 1182(a)(20)]—No valid immigrant visa


**ON BEHALF OF APPLICANT:**
Joanna Miller Bukszpan, Esquire
1414 Avenue of the Americas
New York, New York 10019

**ON BEHALF OF SERVICE:**
Janice Podolny
Appellate Counsel
Alan L. Page
General Attorney

BY: Milhollan, Chairman; Dunne, Morris, and Vacca, Board Members. Concurring in Part, Dissenting in Part: Heilman, Board Member

In a decision dated December 1, 1986, the immigration judge found the applicant excludable under sections 212(a)(19) and (20) of the Immigration and Nationality Act, 8 U.S.C. §§ 1182(a)(19) and (20) (1982). He granted the applicant's applications for withholding of deportation to Albania and Yugoslavia under section 243(h) of the Act, 8 U.S.C. § 1253(h) (1982), but he denied

the applicant's application **\*468** for asylum under section 208 of the Act, 8 U.S.C. § 1158 (1982), and ordered that the applicant be excluded and deported from the United States. The applicant has appealed from the denial of his application for asylum. The Immigration and Naturalization Service has appealed from the grant of the application for withholding of deportation to Yugoslavia. The applicant's appeal will be sustained, and the Service's appeal will be dismissed. [1]

The applicant is a 26-year-old married male native of Albania and citizen of Yugoslavia. He arrived in the United States on June 5, 1986, and was placed in exclusion proceedings. The applicant does not contest on appeal his excludability under sections 212(a)(19) and (20) of the Act. We are satisfied from a review of the record that the applicant received a fair hearing and that his excludability has been clearly established. The only issues to be decided by the present appeal are whether the immigration judge's denial of asylum and grant of withholding of deportation to Yugoslavia were proper.

The applicant testified that he was born in Albania and fled to Yugoslavia with his family as a refugee when he was 5 years old. He said that he left Yugoslavia in 1986 to avoid further encounters with police officials who, on numerous occasions since 1979, had detained, interrogated, and physically abused him for hours or days at a time. He stated that the police insisted that he was involved in the political activities of the Albanian minority in Yugoslavia, although he denied the accusation. He said that the police sought information from him about such matters as his contacts with his Albanian family and friends, Albanian anti-government demonstrations, and discussions among local Albanian university students. He also testified that one of the periods of detention occurred in 1982 after he approached Yugoslav authorities to request travel documents to visit his sister in the United States. The applicant explained that the police accused him of planning to go to the United States to participate in anti-Yugoslav demonstrations with Albanians here.

**\*\*2** The applicant further advised that in 1985 Yugoslav authorities did issue him a titre de voyage [2] so he could travel out of the country, but the American Embassy denied his application for a visa. According to the applicant, he was told at the embassy that the titre de voyage did not guarantee his return to Yugoslavia. The applicant **\*469** testified that he subsequently relinquished his refugee status and reluctantly accepted Yugoslav citizenship in order to qualify for a Yugoslav passport. He said that he left Yugoslavia on April 20, 1986, as soon as he managed to obtain the passport. He stated that he took a train to Brussels, Belgium, although he had made application to Yugoslav authorities only for permission to visit Turkey. He testified that he believed that the authorities would have denied him the passport if they had known that he intended to go to the United States. He also said that he was afraid to apply again for a visa at the American Embassy because most of the employees there were Yugoslav nationals who might be agents for the Government of Yugoslavia.

In addition, the applicant testified that he stayed in Brussels for 6 weeks with a man who had been a friend of his family in Albania and Yugoslavia. He said that his friend made a telephone call on his behalf to a refugee organization in Italy to inquire about whether he could obtain residency in an Italian refugee camp. According to the applicant, his friend was informed by the organization that citizens of Yugoslavia were not accepted as refugees in European states. The applicant also said that while he was in Brussels he applied for a tourist visa at the American Embassy, but his application was denied and he was told to go to Yugoslavia to apply for a visa. He testified that he did not ask for asylum at the American Embassy because he did not know that he could do so.

The applicant also stated that one day while he was discussing his situation in an Albanian coffee house in Belgium, a stranger there offered to sell him a titre de voyage for $1,000. He said that he gave the man his photograph and paid him the money 2 days later, when he returned with a tire de voyage issued by the Government of Belgium which had a torist visa to the United States already entered. The applicant advised that the titre de voyage had been issued in the name of someone whom he did not know.

The applicant further testified that on June 5, 1986, he flew with his titre de voyage from Belgium to New York. He said that during a 2- to 3-hour stopover at the airport in Amsterdam, he mailed his Yugoslav passport to a cousin in the United States to avoid having it in his possession when he landed in New York. He explained that his inability to speak English made him concerned that immigration officials might discover the passport and put him on a plane to Yugoslavia before he could tell them about his desire for asylum. The applicant also stated that he did not dispose of the Yugoslav passport altogether because he

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

planned to use it later to corroborate his account of events for his asylum request. In addition, the applicant advised that when he arrived in New York, language **\*470** differences did in fact prevent him and the immigration officer from communicating and, as a result, he did not tell the officer anything or sign any statements.

**\*\*3** The applicant also testified that he chose to flee to the United States because he had relatives here. He stated that he had a sister and two uncles who were lawful permanent residents of the United States, and cousins who were United States citizens. He further advised that his wife, who was still living in Yugoslavia with their daughter, also had an uncle and cousins in the United States. The record reflects that many of the applicant's relatives traveled from such places as upstate New York, Texas, and California on multiple occasions to attend the applicant's hearings in New York City.

In his decision, the immigration judge stated that if the facts as described by the applicant were true, they established without a doubt that the applicant had been persecuted in the past and faced a clear probability of persecution in the future. The immigration judge then made a specific finding that the applicant's testimony was credible, noting that he had observed the applicant testify for approximately 8 hours over a period of 2 days. He accordingly found that the applicant had established his eligibility for withholding of deportation to Yugoslavia and Albania. The immigration judge further found, however, that the applicant was not eligible for asylum as a matter of discretion because the equity of his many relatives legally in the United States did not overcome the adverse factor of his having sought admission to the United States by use of a purchased travel document.

On appeal, the Service contends that the applicant has not established his eligibility for asylum or withholding of deportation to Yugoslavia because his testimony is not credible. It is argued that the applicant's persecution claim rests primarily on his own self-serving statements, that discrepancies exist between his testimony and his written asylum application, and that some of the facts to which he testified, such as his receipt of Yugoslav citizenship and a Yugoslav passport, are inconsistent with a clear probability or a well-founded fear of persecution. In addition, the Service maintains that the immigration judge correctly denied asylum in the exercise of discretion because the applicant sought admission to the United States with a false travel document.

The applicant asserts on appeal that there is no basis to disturb the immigration judge's credibility finding, and that he merits asylum on both statutory and discretionary grounds. He contends that the immigration judge gave undue weight to his manner of attempted entry in denying asylum in the exercise of discretion. He argues that in Matter of Salim, 18 I&N Dec. 311 (BIA 1982), the **\*471** Board of Immigration Appeals failed to consider that section 208(a) of the Act is 'entry-blind.' According to the applicant, the phrase 'irrespective of such alien's status' in section 208(a) implies that Congress did not intend for the manner of entry or attempted entry to be relevant in determining eligibility for asylum. He maintains that while manner of entry may be considered as one of many factors in exercising discretion, it should not be used as the primary and overriding basis for denial.

**\*\*4** The applicant bears the evidentiary burdens of proof and persuasion in any application for withholding of deportation under section 243(h) or asylum under section 208 of the Act. Matter of Acosta, Interim Decision 2986 (BIA 1985); 8 C.F.R. §§ 208.5, 242.17(c) (1987).

To be eligible for withholding of deportation pursuant to section 243(h) of the Act, an alien's facts must show a clear probability of persecution in the country designated for deportation, on account of race, religion, nationality, membership in a particular social group, or political opinion. INS v. Stevic, 467 U.S. 407 (1984). This means that the alien's facts must establish that it is more likely than not he would be subject to persecution for one of the grounds specified. Id.

To be eligible for asylum under section 208 of the Act, an alien must meet the definition of a 'refugee,' which requires him to show persecution or a well-founded fear of persecution in a particular country on account of race, religion, nationality, membership in a particular social group, or political opinion. Section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1982); section 208 of the Act. The burden of proof required to establish eligibility for asylum is lower than that required for withholding of deportation. INS v. Cardoza—Fonseca, —— U.S. ——, 107 S. Ct. 1207 (1987). An applicant for asylum has established a well-founded fear if he shows that a reasonable person in his circumstances would fear persecution for one of the five grounds specified in the Act. Matter of Mogharrabi, Interim Decision 3028 (BIA 1987). Further, asylum, unlike withholding

of deportation, may be denied in the exercise of discretion to an alien who establishes statutory eligibility for the relief. INS v. Cardoza—Fonseca, supra; Matter of Mogharrabi, supra.

We find no merit in the assertion by the Service that the immigration judge erred in assessing the applicant's credibility. The immigration judge found the applicant to be credible after observing his demeanor and listening to his testimony for 8 hours over a period of 2 days. The finding of an immigration judge with respect to the credibility of witnesses appearing before him will ordinarily be given great weight. **\*472** Wing Ding Chan v. INS, 631 F.2d 978 (D.C. Cir. 1980), cert. denied, 450 U.S. 921 (1981); Vasquez—Mondragon v. INS, 560 F.2d 1225 (5th Cir. 1977); Matter of Magana, 17 I&N Dec. 111 (BIA 1979); Matter of Teng, 15 I&N Dec. 516 (BIA 1975); Matter of T—, 7 I&N Dec. 417 (BIA 1957). We have carefully examined the record in this case and conclude that the immigration judge's determination is correct. In view of the detail, consistency, and candor of the applicant's lengthy testimony, we do not find that his credibility is impeached by the minor discrepancies in his written asylum application, which was prepared with the assistance of interpreters.

We further agree with the immigration judge's conclusion that if the applicant's testimony is true, it establishes that the applicant has been persecuted. We have considered the Service's argument that some of the actions of Yugoslav authorities towards the applicant, i.e., granting him citizenship and issuing him a passport, appear inconsistent with an intent to persecute. Yet because the record reflects that those authorities nevertheless have persecuted the applicant, these apparent inconsistencies in treatment provide an insufficient basis, under the facts of this case, for rejecting the applicant's persecution claim. We conclude, therefore, that a reasonable person in the applicant's circumstances would fear persecution if returned to Yugoslavia, and that the applicant has established his statutory eligibility for asylum.

**\*\*5** We turn now to the issue of whether the applicant merits asylum in the exercise of discretion. In Matter of Salim, supra, we denied asylum as a matter of discretion to an alien who was excludable under section 212(a)(19) of the Act and who attempted to circumvent the orderly procedures provided for refugees to immigrate lawfully. We found the fraudulent avoidance of orderly refugee procedures to be an extremely adverse factor which could only be overcome with the most unusual showing of countervailing equities.

The applicant argues that the decision in Matter of Salim, supra, improperly considered the alien's manner of attempted entry, because it overlooked language in section 208(a) of the Act, 'irrespective of such alien's status,' which makes the manner of entry irrelevant to eligibility for asylum. We reject the applicant's argument. Section 208(a) of the Act provides:
The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 101(a)(42)(A).

**\*473** Section 208(a) consists of only one sentence, which contains two independent clauses linked by the conjunction 'and.' A careful reading of the language of this section reveals that the phrase 'irrespective of such alien's status' modifies only the word 'alien' in the first clause of the sentence. The function of that phrase is to ensure that the procedure established by the Attorney General for asylum applications includes provisions for adjudicating applications from any alien present in the United States or at a land or port of entry, 'irrespective of such alien's status.' Cf. Yiu Sing Chun v. Sava, 708 F.2d 869 (2d Cir. 1983), and Matter of Waldei, Interim Decision 2981 (BIA 1984) (discussing whether an alien in the status of a stowaway is entitled under section 208(a) to a hearing before an immigration judge on his application for asylum). The phrase does not apply to the second clause of the sentence, which is independent and separate from the first clause. This second clause contains authorization for the Attorney General to grant asylum applications at his discretion. The only express qualification on the exercise of this discretion is that the alien be a refugee within the meaning of section 101(a)(42)(A). Thus, while section 208(a) provides that an asylum application be accepted from an alien 'irrespective of such alien's status,' no language in that section precludes the consideration of the alien's status in granting or denying the application in the exercise of discretion.

Yet while we find that an alien's manner of entry or attempted entry is a proper and relevant discretionary factor to consider in adjudicating asylum applications, we agree with the applicant that Matter of Salim, supra, places too much emphasis on the

circumvention of orderly refugee procedures. This circumvention can be a serious adverse factor, but it should not be considered in such a way that the practical effect is to deny relief in virtually all cases. This factor is only one of a number of factors which should be balanced in exercising discretion, and the weight accorded to this factor may vary depending on the facts of a particular case. We therefore withdraw from Matter of Salim insofar as it suggests that the circumvention of orderly refugee procedures alone is sufficient to require the most unusual showing of countervailing equities.

**6  Instead of focusing only on the circumvention of orderly refugee procedures, the totality of the circumstances and actions of an alien in his flight from the country where he fears persecution should be examined in determining whether a favorable exercise of discretion is warranted. Among those factors which should be considered are whether the alien passed through any other countries or arrived in the United States directly from his country, whether orderly refugee procedures were in fact available to help him in  *474  any country he passed through, and whether he made any attempts to seek asylum before coming to the United States. In addition, the length of time the alien remained in a third country, and his living conditions, safety, and potential for long-term residency there are also relevant. For example, an alien who is forced to remain in hiding to elude persecutors, or who faces imminent deportation back to the country where he fears persecution, may not have found a safe haven even though he has escaped to another country. Further, whether the alien has relatives legally in the United States or other personal ties to this country which motivated him to seek asylum here rather than elsewhere is another factor to consider. In this regard, the extent of the alien's ties to any other countries where he does not fear persecution should also be examined. Moreover, if the alien engaged in fraud to circumvent orderly refugee procedures, the seriousness of the fraud should be considered. The use of fraudulent documents to escape the country of persecution itself is not a significant adverse factor while, at the other extreme, entry under the assumed identity of a United States citizen with a United States passport, which was fraudulently obtained by the alien from the United States Government; is very serious fraud.

In addition to the circumstances and actions of the alien in his flight from the country where he fears persecution, general humanitarian considerations, such as an alien's tender age or poor health, may also be relevant in a discretionary determination. A situation of particular concern involves an alien who has established his statutory eligibility for asylum but cannot meet the higher burden required for withholding of deportation. Deportation to a country where the alien may be persecuted thus becomes a strong possibility. In such a case, the discretionary factors should be carefully evaluated in light of the unusually harsh consequences which may befall an alien who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors.

Each of the factors mentioned above will not, of course, be found in every case. An applicant for asylum has the burden of establishing that the favorable exercise of discretion is warranted. Matter of Shirdel, Interim Decision 2958 (BIA 1984). Therefore, the alien should present evidence on any relevant factors which he believes support the favorable exercise of discretion in his case. In the absence of any adverse factors, however, asylum should be granted in the exercise of discretion.

**7  In the case before us, the applicant attempted to enter the United States with a fraudulent document. Yet we note that the  *475  applicant had inquired about obtaining refugee status in Europe, only to be informed that the Yugoslav citizenship which he had recently accepted presented an obstacle to his being recognized by European countries as a refugee. Further, the record reflects that the applicant resorted to the purchase of the fraudulent document only after he was unsuccessful in several attempts at acquiring a visa to enter the United States legally to ask for asylum. We find no basis for doubting the applicant's testimony that he failed to request asylum at the American Embassy because he did not know that he could do so. In addition, the applicant remained in Belgium for only 6 weeks and was in the Netherlands for only a few hours; it does not appear that he was entitled to remain permanently in either country. Moreover, he decided to seek asylum in the United States because he had many relatives legally in the United States to whom he could turn for assistance. Although only the applicant's sister would typically be characterized as a 'close' relative, the record reflects that many of his other relatives are also particularly supportive and concerned about him. We note that the applicant seems to have no significant ties to any other countries except for Albania and Yugoslavia, where he fears persecution. Based on the foregoing factors, therefore, we find that asylum should be granted in the exercise of discretion. We further find it unnecessary to decide whether the applicant has also established a clear probability of persecution in Yugoslavia for the purpose of section 243(h) of the Act. See Matter of Mogharrabi, supra.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Accordingly, the applicant's appeal will be sustained and the Service's appeal will be dismissed.

ORDER: The applicant's appeal is sustained and the Service's appeal is dismissed.

FURTHER ORDER: The applicant is granted asylum pursuant to section 208 of the Immigration and Nationality Act, as amended, and the exclusion proceedings are terminated.

CONCURRING IN PART AND DISSENTING IN PART: Michael J. Heilman Board Member

In my view, this decision is headed in the right direction, the rejection of the unfortunate series of decisions starting with Matter of Salim, 18 I&N Dec. 311 (BIA 1982), in which so much emphasis was based on 'circumvention' of the overseas refugee process, and on the manner of entry or attempted entry into the United States. These decisions were unfortunate because they betrayed a basic misunderstanding of the nature of the overseas refugee program  *476  and most essentially, the criteria a person had to meet to even be considered for the program, much less to qualify.

Equally as important, those decisions disregarded the clear language and clear purpose of section 208 of the Immigration and Nationality Act, 8 U.S.C. § 1158. The majority in this decision continues to disregard that language and purpose. Specifically, the phrase 'irrespective of such alien's status' is interpreted by the majority as governing the procedures used to adjudicate asylum applications. I do not follow the logic of this approach. If the purpose of the phrase is as described by the majority, then it is simply surplus, as it adds nothing grammatically to that subsection, which could just as well read a 'procedure for an alien physically present in the United States or at a land border or port of entry, to apply for asylum.'

 **8  In my estimation, that subsection makes more sense if that phrase is read to describe the alien, not the procedure for adjudicating the asylum claim. This is so for two reasons. The first is the fact that there have been different procedures for different aliens to apply for asylum depending on their status and other factors. If this language required a single procedure, then it has never been implemented in that manner.

Secondly, the purpose of the asylum provision would be better served by abandoning the fixation with the manner in which the asylum applicant has arrived in the United States or at a port of entry. The asylum provisions are humanitarian in their essence and indeed recognize that the forces which impel persons to seek reguge may be so overwhelming that the 'normal' immigration laws cannot be applied in their usual manner. This fact was recognized in the United Nations Convention and Protocol Relating to the Status of Refugees, [1] the international agreement which the asylum provisions implement. Not only did the Convention recognize the abnormal situations which give rise to refugee flows, it specifically forbade its signatories in Article 31 from penalizing a person who violated a signatory's borders, if the person presented himself promptly after arrival. Since the United States is a signatory to the Protocol, and purports to apply the asylum and refugee laws consistently with that agreement, there seems little justification for the approach taken by the majority.

 *477  While I concur with the conclusion reached in this appeal, I do not join that part of the decision which interprets the phrase 'irrespective of such alien's status.' Asylum should be denied in the exercise of discretion only in exceptional circumstances.

### Footnotes

1      This decision was originally entered on August 6, 1987. We have reopened on our own motion for the limited purpose of incorporating revisions for publication.

AR.05657

2    A titre de voyage is a travel document issued in lieu of a passport under provisions of the United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150.

1    United Nations Convention Releating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150; United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

19 I. & N. Dec. 467 (BIA), Interim Decision 3033, 1987 WL 108948

---

End of Document    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

25 I. & N. Dec. 657 (BIA), Interim Decision 3736, 2012 WL 31381

U.S. Department of Justice

Executive Office for Immigration Review

Board of Immigration Appeals

MATTER OF R-A-M-, RESPONDENT

Decided January 3, 2012

**\*\*1  \*657**  The respondent's conviction for possession of child pornography is for a particularly serious crime under section 241(b)(3)(B)(ii) of the Immigration and Nationality Act, 8 U.S.C. § 1231(b)(3)(B)(ii) (2006), based on the nature of the offense and the specific facts and circumstances of the crime.


**FOR RESPONDENT:**
Judith A. Marty, Esquire, Fullerton, California

**FOR THE DEPARTMENT OF HOMELAND SECURITY:**
Edward Lepkowitz
Deputy Chief Counsel

BEFORE: Board Panel: GRANT, MALPHRUS, and MULLANE, Board Members.
MALPHRUS, Board Member:

In a decision dated March 8, 2011, an Immigration Judge found the respondent removable on his own admissions under section 212(a)(6)(A)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(6)(A)(i) (2006), as an alien present in the United States without being admitted or paroled, and granted his application for withholding of removal under section 241(b)(3) of the Act, 8 U.S.C. § 1231(b)(3) (2006). The Department of Homeland Security ("DHS") has appealed from that decision. The appeal will be sustained, and the record will be remanded for further proceedings.


I. FACTUAL AND PROCEDURAL HISTORY

The respondent was placed in removal proceedings on July 10, 2008. Based on his claim that he was mistreated in Honduras because of his sexual orientation, he sought asylum, withholding of removal, and protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46. 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture").

**\*658**  While in removal proceedings, the respondent was convicted on August 5, 2010, of possession of child pornography in violation of section 311.11(a) of the California Penal Code, which makes it unlawful to knowingly possess or control any image or film that depicts a person under the age of 18 years engaging in or simulating sexual conduct, as defined in section 311.4(d). [1]  The respondent was convicted of possessing videos and images depicting child pornography on two computers, and he was sentenced to 280 days of imprisonment and 3 years' probation.

At the hearing, the DHS argued that the respondent was ineligible for asylum, in part because his child pornography offense constituted an aggravated felony under section 101(a)(43)(I) of the Act, 8 U.S.C. § 1101(a)(43)(I) (2006). The DHS further claimed that the respondent was ineligible for withholding of removal because his conviction was for a particularly serious crime. The Immigration Judge denied asylum, finding that the respondent's offense was an aggravated felony, but he granted

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

withholding of removal, holding that the respondent had not been convicted of a particularly serious crime. [2] The DHS appealed, arguing that the Immigration Judge erred in finding that the respondent's conviction was not for a particularly serious crime. We review this question of law de novo. 8 C.F.R. § 1003.1(d)(3)(ii) (2011).

## II. ANALYSIS

**\*\*2** We conclude that the respondent's crime is an aggravated felony under section 101(a)(43)(I) of the Act because it is an offense "described in" **\*659** 18 U.S.C. § 2252. *See* 18 U.S.C. § 2252(a)(4) (2006) (punishing the knowing possession of child pornography); *see also Armijo v. Mukasey,* 266 F. App'x 511 (9th Cir. 2008) (holding that a conviction for possession of child pornography under section 311.11(a) of the California Penal Code is for an offense "described in" 18 U.S.C. § 2252(a)(4)(B), which prohibits possession of visual depictions of minors engaging in sexually explicit conduct). Because the respondent was convicted of an aggravated felony, we agree that he is ineligible for asylum. *See* sections 208(b)(2)(A)(ii), (B)(i) of the Act, 8 U.S.C. §§ 1158(b)(2)(A)(ii), (B)(i) (2006).

We next consider the Immigration Judge's conclusion that the respondent was eligible for withholding of removal because he was not convicted of a particularly serious crime. [3] In determining, on a case by case basis, whether an offense is a particularly serious crime, *see Delgado v. Holder,* 648 F.3d 1095, 1106-07 (9th Cir. 2011), "we examine the nature of the conviction, the type of sentence imposed, and the circumstances and underlying facts of the conviction." *Matter of N-A-M-,* 24 I&N Dec. 336, 342 (BIA 2007), *aff'd, N-A-M- v. Holder,* 587 F.3d 1052 (10th Cir. 2009), *cert. denied,* 131 S. Ct. 898 (2011); *see also Matter of L-S-,* 22 I&N Dec. 645, 651 (BIA 1999) (determining that "consideration of the individual facts and circumstances is appropriate"); *Matter of Q-T-M-T-,* 21 I&N Dec. 639 (BIA 1996). "[A]ll reliable information may be considered in making a particularly serious crime determination, including the conviction records and sentencing information, as well as other information outside the confines of a record of conviction." *Matter of N-A-M-,* 24 I&N Dec. at 342; *see also Anaya-Ortiz v. Holder,* 594 F.3d 673, 678-79 (9th Cir. 2010) (holding that it is proper to consider the respondent's testimony in a particularly serious crime determination).

On March 18, 2010, based on information received from the respondent's internet service provider, law enforcement officers executed a search warrant and seized two computers from the respondent's residence containing numerous images and videos of child pornography. During the immigration hearing, the respondent initially testified that he did not know there was child pornography on his computers, explaining that he would download adult movies on different occasions without knowing their content and without viewing most of them. However, upon the DHS's cross-examination with the police report, he later admitted that he had told police he knew that there was child pornography on his computers. He then claimed that a friend must have downloaded it from the internet without his knowledge, although he also said **\*660** that the friend only had access to one of the computers. The respondent further admitted that he pled no contest to possession of child pornography, saying he did so upon his attorney's advice. As a result of his conviction, the respondent was sentenced to 280 days in prison and 3 years of probation, and he was required to register as a sex offender. Additionally, the respondent testified that he has a long-standing alcohol and drug problem.

**\*\*3** As an initial matter, the Immigration Judge was unpersuaded by the respondent's claim that he did not know he had child pornography on his computers. He noted that the respondent's testimony on this issue was part of "a pattern of mitigation" of his offenses, which also included convictions for indecent exposure and disorderly conduct. Relying on the respondent's sometimes inconsistent testimony, the arrest report, and the presentence report, the Immigration Judge properly concluded that the respondent knowingly downloaded, for his own use, pornographic materials depicting children. *See Matter of D-R-,* 25 I&N Dec. 445, 454-55 (BIA 2011) (explaining that an Immigration Judge may make reasonable inferences from direct and circumstantial evidence in the record as a whole and is not required to accept a respondent's account where other plausible views of the evidence are supported by the record); *see also* section 240(c)(4)(C) of the Act, 8 U.S.C. § 1229a(c)(4)(C) (2006).

However, the Immigration Judge determined that the respondent's crime, although serious, was not a particularly serious one. He first noted that the respondent's 280-day sentence was significantly less than what could have been imposed. He emphasized

that the respondent downloaded images to view only for himself and that he was convicted of possession, rather than production, marketing, or distribution of child pornography. The Immigration Judge noted that the children had already been victimized before the respondent downloaded the pornographic materials. He also considered that the respondent was receiving treatment for his drug and alcohol problems and was scheduled for treatment at an inpatient facility upon his release from DHS detention. According to the Immigration Judge, there was no indication that the respondent had been violent in the past or would be violent in the future.

Considering both the nature of the crime and the individual factual circumstances of the conviction, we conclude that the respondent was convicted of a particularly serious crime. Child pornography is an intrinsically serious offense that is directly related to the sexual abuse of children. *See Matter of Olquin,* 23 I&N Dec. 896, 898 (BIA 2006) (holding that "the offense of possession of child pornography is morally reprehensible and intrinsically wrong"). Background materials submitted by the DHS at the hearing discussed the expanding problem of internet child pornography and its harmful effects on perpetrators and especially on the child victims.

We recognize that the respondent's conviction was for possession, and that he was not involved in the production or dissemination of the material. As with many other crimes, possession is not as serious as production or distribution. The fact that the respondent was convicted for possession of child pornography does not make the offense per se a particularly serious crime and does not end our review. We also consider the individual facts and circumstances surrounding the crime. *See Gao v. Holder,* 595 F.3d 549, 557 (4th Cir. 2010) (holding that the Board properly determined that while the respondent's offense was not particularly serious on its face, the respondent's conduct elevated it to that status).

 **\*\*4** Here, despite the respondent's assertions to the contrary, the Immigration Judge found that he repeatedly downloaded numerous images and videos of child pornography for his personal use. We do not agree with the Immigration Judge's determination that the offense is mitigated by the fact that the children depicted in the videos and images had already been victimized before the respondent downloaded the materials. The harm to child victims does not end with production. As we noted in *Matter of Olquin,* 23 I&N Dec. at 897, child pornography is "a permanent record of a child's abuse" and "the circulation of child pornography continues to harm the child's reputation and emotional well-being." The United States Court of Appeals for the Ninth Circuit's has also recognized that the primary victims of the distribution of child pornography are the people who are depicted in the pornographic materials and that those victims continue to suffer long into the future. *See United States v. Stevens,* 197 F.3d 1263, 1269 n.6 (9th Cir. 1999) (stating that "[a]s long as the images are in circulation, the possessors of the images continue to victimize the people depicted, whether they are seven or seventy-seven"); *see also Osborne v. Ohio,* 495 U.S. 103, 111 (1990) ("[M]aterials produced by child pornographers permanently record the victim's abuse. The pornography's continued existence causes the child victims continuing harm by haunting the children in years to come.").

Although we agree with the Immigration Judge that there is no indication that the respondent had ever been violent in the past, the fact that he, personally, has never physically harmed anyone, including children, does not undermine the fact that, because of the nature of the offense, he has contributed to the sexual abuse of children by downloading child pornography for his own use. "[P]ossessing child pornography … fuels the demand for the creation and distribution of child pornography." *United States v. Daniels,* 541 F.3d 915, 924 (9th Cir. 2008); *see also United States v. Yuknavich,* 419 F.3d 1302, 1310 (11th Cir. 2005) ("[P]ossession of child pornography is not a victimless crime. A child somewhere was used to produce the images downloaded by [the defendant], in large part, because individuals like [him] exist to download the images.").

 **\*662** Regarding the length of the respondent's sentence, we recognize that 280 days in prison and 3 years of probation is much less than the respondent could have received. However, as the Immigration Judge also stated, 280 days was "not a light sentence." Moreover, we have explained that "the severity of the crime is not always reflected in the length of the sentence." *See Matter of N-A-M-,* 24 I&N Dec. at 344 n.8. Here, the nature of the respondent's crime is so condemnable that the length of the sentence is less significant to the analysis. Also, as a result of his conviction, the respondent was required to register as a sex offender. *See id.* at 343.

**\*\*5** Further, the Immigration Judge's belief that the respondent would not be violent in the future is not dispositive of whether his conviction is for a particularly serious crime. As we explained in *Matter of N-A-M-, 24 I&N Dec. at 342,* it is not necessary to make a separate determination whether the alien is a danger to the community. The focus "is on the nature of the crime and not the likelihood of future serious misconduct." *Id.; see also Kankamalage v. INS,* 335 F.3d 858, 861 n.2 (9th Cir. 2003) ("Once … a finding [is made] that an offense constitutes a particularly serious crime, a separate determination of danger to the community is not required."). Also, the respondent's potential rehabilitation is not significant to the analysis. *See Matter of S-S-,* 22 I&N Dec. 458, 466 (BIA 1999) (stating that the focus is on the crime of conviction, "not on any equities or other favorable discretionary factors"). Moreover, while an offense is more likely to be considered particularly serious if it is against a person, it does not have to be violent to be a particularly serious crime. *See Matter of N-A-M-,* 24 I&N Dec. at 343; *Matter of Y-L-, A-G-, & R-S-R-,* 23 I&N Dec. 270, 274 (A.G. 2002) (finding that aggravated felonies involving unlawful trafficking in controlled substances presumptively constitute "particularly serious crimes"); *see also Matter of S-V-,* 22 I&N Dec. 1306, 1308 (BIA 2000).

### III. CONCLUSION

Child pornography is, by its nature, a serious offense because it victimizes some of the most vulnerable members of society and can have life-long adverse effects. While the respondent's offense is not per se a particularly serious crime, he downloaded numerous images and videos of child pornography from the internet onto his computers for his personal use. Based on both the nature of the offense and the specific facts and circumstances of the crime, we conclude that the respondent's possession of child pornography constitutes a particularly serious crime.

Since the respondent has been convicted of a particularly serious crime, he is ineligible for withholding of removal under section 241(b)(3)(B)(ii) of the **\*663** Act. *Matter of N-A-M-,* 24 I&N Dec. at 338-39. Accordingly, the DHS's appeal will be sustained. The record will be remanded for consideration of the respondent's application for protection under the Convention Against Torture.

**ORDER:** The appeal of the Department of Homeland Security is sustained.

**FURTHER ORDER:** The record is remanded to the Immigration Judge for further proceedings consistent with the foregoing opinion and for the entry of a new decision.

### Footnotes

1    Section 311.4(d)(1) of the California Penal Code defines "sexual conduct" as
     any of the following, whether actual or simulated: sexual intercourse, oral copulation, anal intercourse, anal oral copulation, masturbation, bestiality, sexual sadism, sexual masochism, penetration of the vagina or rectum by any object in a lewd or lascivious manner, exhibition of the genitals or pubic or rectal area for the purpose of sexual stimulation of the viewer, any lewd or lascivious sexual act as defined in Section 288, or excretory functions performed in a lewd or lascivious manner, whether or not any of the above conduct is performed alone or between members of the same or opposite sex or between humans and animals. An act is simulated when it gives the appearance of being sexual conduct.

2    The respondent was also found ineligible for asylum because his application was not timely filed and he did not demonstrate changed or extraordinary circumstances that would qualify him for an exception to the filing deadline. 8 C.F.R. §§ 1208.4(a)(2), (4), (5) (2011). The respondent did not appeal the Immigration Judge's decision regarding that aspect of his claim, so this issue is waived. *See Marmolejo-Campos v. Holder,* 558 F.3d 903, 913 n.12 (9th Cir. 2009).

3    The respondent does not fall within the categorical bar to withholding of removal since his aggravated felony conviction did not involve a sentence to an aggregate term of imprisonment of at least 5 years. *See* section 241(b)(3)(B) of the Act.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

AR.05662

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

AR.05663

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 439 of 1271

MATTER OF SILVESTRE MENDOZA-HERNANDEZ,..., 27 I. & N. Dec. 520...

KeyCite Red Flag - Severe Negative Treatment

Abrogated by Banuelos v. Barr, 10th Cir., March 25, 2020

27 I. & N. Dec. 520 (BIA), Interim Decision 3951, 2019 WL 1953943

U.S. Department of Justice

Executive Office for Immigration Review

Board of Immigration Appeals

MATTER OF SILVESTRE MENDOZA-HERNANDEZ, RESPONDENT

MATTER OF RUFINA CAPULA-CORTES, RESPONDENT

Decided May 1, 2019

**\*\*1  \*520** A deficient notice to appear that does not include the time and place of an alien's initial removal hearing is perfected by the subsequent service of a notice of hearing specifying that missing information, which satisfies the notice requirements of section 239(a) of the Immigration and Nationality Act, 8 U.S.C. § 1229(a) (2012), and triggers the "stop-time" rule of section 240A(d)(1)(A) of the Act, 8 U.S.C. § 1229b(d)(1)(A) (2012). Pereira v. Sessions, 138 S. Ct. 2105 (2018), distinguished; Matter of Bermudez-Cota, 27 I&N Dec. 441 (BIA 2018), followed.

**FOR RESPONDENTS:**
Terence S. Coonan, Esquire
Tallahassee, Florida

**FOR THE DEPARTMENT OF HOMELAND SECURITY:**
Donald W. Cassidy
Associate Legal Advisor

BEFORE: Board En Banc: NEAL, Chairman; MALPHRUS, WENDTLAND, MULLANE, GREER, MANN, O'CONNOR, LIEBOWITZ, and KELLY, Board Members. Dissenting Opinion: GUENDELSBERGER, joined by ADKINS-BLANCH, Vice Chairman; COLE, GRANT, CREPPY, KENDALL CLARK, Board Members.

GREER, Board Member:

In a decision dated August 14, 2017, an Immigration Judge found the respondents removable under section 212(a)(6)(A)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(6)(A)(i) (2012), as aliens present in the United States without being admitted or paroled. She also denied their applications for cancellation of removal under section 240A(b)(1) of the Act, 8 U.S.C. § 1229b(b)(1) (2012), finding that they lacked the requisite period of continuous physical presence. The respondents have appealed from that decision, arguing that they are not foreclosed from establishing continuous physical presence pursuant to Pereira v. Sessions, 138 S. Ct. 2105 (2018). The record will be remanded to the Immigration Judge for further proceedings.

**\*521**  I. FACTUAL AND PROCEDURAL HISTORY

The respondents, a husband and wife, are both natives and citizens of Mexico. On October 11, 2010, the Department of Homeland Security ("DHS") served the respondents with notices to appear charging them with removability. The notices to appear did not specify the time or place at which the respondents' initial removal hearing would be held. The DHS commenced removal proceedings on November 22, 2010, by filing the notices to appear with the Immigration Court. On December 8, 2010, the Immigration Court mailed notices of hearing to the respondents, which stated that their initial removal hearing was scheduled for 9:00 a.m. on January 6, 2011, in Miami. The respondents appeared at this and several subsequent hearings. Their attorney entered a notice of appearance on March 24, 2011.

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 440 of 1271

MATTER OF SILVESTRE MENDOZA-HERNANDEZ,..., 27 I. & N. Dec. 520...

**\*\*2** The respondents filed applications for cancellation of removal, which the Immigration Judge denied, finding that they did not demonstrate they had been physically present in the United States for a continuous period of 10 years prior to the October 2010 service of the notice to appear, as required by section 240A(b)(1)(A) of the Act and the "stop-time" rule in section 240A(d)(1)(A). [1]  In her decision, the Immigration Judge found that the respondents submitted documentary evidence establishing physical presence since 2005, but she determined that they did not adequately demonstrate presence since October 2000. [2]  On September 5, 2017, the respondents filed a motion to reopen with the Immigration Court, seeking to submit additional evidence relating to their physical presence before 2005. The respondents also filed a notice of appeal with the Board on September 11, 2017. [3]

While their appeal was pending, the respondents filed another motion to remand based on *Pereira*. In that case, the Supreme Court rejected our **\*522**  decision in *Matter of Camarillo*, 25 I&N Dec. 644, 651 (BIA 2011), where we held that "service of a notice to appear triggers the 'stop-time' rule, regardless of whether the date and time of the hearing have been included in the document." Instead, the Court held that a notice to appear that does not specify the time and place of an alien's removal proceedings "is not a 'notice to appear under section [239(a) of the Act, 8 U.S.C. § 1229(a) (2012)]' and therefore does not trigger the stop-time rule." *Pereira*, 138 S. Ct. at 2110 (quoting section 240A(d)(1)(A) of the Act). Citing *Pereira*, the respondents argue that the service of their notices to appear was insufficient to trigger the "stop-time" rule and that the proceedings should be remanded for service of new "legally sufficient" notices to appear.

We requested supplemental briefing from the parties. In response to one of our inquiries, the respondents argue that the Immigration Court's subsequent service of a notice of hearing that conveyed time and place information did not trigger the "stop-time" rule because "jurisdiction has never vested" with the Immigration Court. They further assert that subject matter jurisdiction cannot be waived by their personal appearance before the Immigration Court and that their continuous physical presence will continue to accrue until the DHS issues notices to appear that include the time and place of their removal hearing.

In its supplemental brief, the DHS contends that the respondents' notices to appear, in combination with the notices of hearing specifying the time and place of their proceedings, provided the necessary written notice required by section 239(a)(1) of the Act to trigger the "stop-time" rule. The DHS further argues that the respondents are ineligible for cancellation of removal because they did not establish 10 years of continuous physical presence prior to service of the notices of hearing that contained information regarding the time and place of their initial hearing.

## II. ISSUE

**\*\*3** The issue before us is whether the "stop-time" rule, which provides for termination of continuous residence and physical presence in the United States, is triggered when an alien who was served with a notice to appear that did not specify the time and place of the initial removal hearing is subsequently served with a notice of hearing that includes that essential information.

## **\*523**  III. ANALYSIS

### A. Jurisdiction

As an initial matter, we conclude that the respondents' jurisdictional arguments are foreclosed by *Matter of Bermudez-Cota*, 27 I&N Dec. 441 (BIA 2018). In that case, we held that "a notice to appear that does not specify the time and place of an alien's initial removal hearing vests an Immigration Judge with jurisdiction over the removal proceedings and meets the requirements of section 239(a) of the Act, so long as a notice of hearing specifying this information is later sent to the alien." *Id.* at 447.

To date, the United States Courts of Appeals for the Second, Sixth, and Ninth Circuits have considered and deferred to *Bermudez-Cota* in precedential decisions. *See Banegas Gomez v. Barr*, No. 15-3269, 2019 WL 1768914, at \*6-8 (2d Cir. Apr. 23, 2019) (holding that jurisdiction vests with the Immigration Court when the initial notice to appear does not specify the time and place

MATTER OF SILVESTRE MENDOZA-HERNANDEZ,..., 27 I. & N. Dec. 520...

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 441 of 1271

of the proceedings, but notices of hearing served later include that information); *Karingithi v. Whitaker*, 913 F.3d 1158, 1159-62 (9th Cir. 2019) (same); *Hernandez-Perez v. Whitaker*, 911 F.3d 305, 312-15 (6th Cir. 2018) (same). [4]

Additionally, the Eleventh Circuit, in whose jurisdiction this case arises, recently rejected an alien's argument that she did not receive notice of her removal hearing because the notice to appear did not include the date and time of the hearing. *See Molina-Guillen v. U.S. Att'y Gen.*, 758 F. App'x 893, 898 (11th Cir. 2019) (per curiam). The court held that the deficient notice to appear and the subsequent notice of hearing supplying the missing information ""[t]ogether . . . fulfilled the notice requirements in [section 239(a)(1)]." *Id.* at 898-99. The Eleventh Circuit therefore determined that the Immigration Judge "was authorized to enter the removal order in [the alien's] absence when she failed to appear at the hearing." *Id.* (citing section 240(b)(5)(A) of the Act, 8 U.S.C. § 1229a(b)(5)(A) (2012)). [5]

**\*\*4  \*524**  In this case, the respondents were properly served with notices of hearing providing time and place information, and they attended all their scheduled removal hearings. We therefore find no jurisdictional defect in their proceedings that would warrant termination or remand on this basis. *See Matter of Bermudez-Cota*, 27 I&N Dec. at 447.

B. Case Law Regarding the "Stop-Time" Rule

Prior case law governing this issue is instructive and sheds light on the narrow character of the holding in *Pereira*. Before the Supreme Court decided *Pereira*, several circuit courts and the Board had addressed the question whether the notice requirements of section 239(a)(1) of the Act are satisfied by service of a notice to appear stating that the time and place of a hearing are to be set, followed by service of a separate notice of hearing that specifies that information. [6]

In *Dababneh v. Gonzales*, 471 F.3d 806, 808-09 (7th Cir. 2006), the Seventh Circuit rejected the alien's argument that the Immigration Judge did not have jurisdiction to initiate his removal proceedings because the notice to appear did not specify the date and time of his initial hearing. The court concluded that "[t]he fact that the government fulfilled its obligations under [section] 239(a) in two documents--rather than one--did not deprive the [Immigration Judge] of jurisdiction to initiate removal proceedings." *Id.* at 809. Regarding whether the "defective" notice to appear cut off the alien's accrual of physical presence, the Seventh Circuit held that once the DHS served the notice to appear and the notice of hearing, the alien received notice "that met the [section] 239 requirements through receipt of both" documents, and the ""stop-time" rule cut off his accrual of physical presence. *Id.* at 810. In *Matter of Bermudez-Cota*, 27 I&N Dec. at 446-47, we cited with approval this two-part process, pursuant to which jurisdiction vested and the "stop-time" rule was triggered once the alien received *both* the notice to appear and the notice of hearing.

In *Matter of Camarillo*, 25 I&N Dec. at 645, we addressed the Immigration Judge's ruling that the alien was eligible for cancellation of removal under section 240A(a)(2) of the Act because her continuous **\*525**  residence did not end with the service of a notice to appear that lacked the date and time of her initial removal hearing. [7] According to the Immigration Judge, the alien's residence only terminated when the Immigration Court issued a notice of hearing that included the required information. The DHS appealed, arguing that the alien's residence ended when the notice to appear was served, even though it did not include the date and time of the hearing.

**\*\*5**  We concluded that the relevant statutory language of the "stop-time" rule at section 240A(d)(1)(A) of the Act is ambiguous and found the competing readings of the statute to be "equally plausible." *Id.* at 647, 651. However, we ultimately agreed with the DHS's position that its "service of a notice to appear triggers the 'stop-time' rule, regardless of whether the date and time of the hearing have been included in the document." *Id.* at 651. In this regard, we stated that "[n]o authority . . . supports the contention that a notice of hearing issued by the Immigration Court is a constituent part of a notice to appear, the charging document issued only by the DHS." *Id.* at 648. We further noted that "another reason an Immigration Court's notification of a hearing date does not 'serve' a notice to appear is that neither the Immigration Court nor the Immigration Judge has been delegated the authority to serve a notice to appear." *Id.* at 650 (citations omitted). [8]

MATTER OF SILVESTRE MENDOZA-HERNANDEZ,..., 27 I. & N. Dec. 520...

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 442 of 1271

Shortly after we issued our decision in *Matter of Camarillo*, the Second Circuit decided *Guamanrrigra v. Holder*, 670 F.3d 404 (2d Cir. 2012) (per curiam). In that case, the alien was served with a notice to appear before an Immigration Judge in Boston at a date and time to be set, followed later by a notice of hearing indicating the date and time of his initial removal hearing, which the alien and his counsel received by mail. The alien was ordered removed in absentia. His proceedings were later reopened based on lack of notice, but the Immigration Judge and Board denied the alien's application for cancellation of removal, reasoning that the "stop-time" rule was triggered by the service of the notice to appear.

Adopting the rationale articulated by the Seventh Circuit in *Dababneh* but without mentioning *Matter of Camarillo*, the Second Circuit held that "the stop-time rule is triggered upon service of a Notice to Appear that (*alone or in combination with a subsequent notice*) provides the notice required by [section] 239(a)(1)" of the Act. *Id.* at 409-10 (emphasis added). Because **\*526** service of the notice of hearing "perfected the notice required by section 239(a)(1)," the alien did not accrue the requisite 10 years of continuous physical presence and was ineligible for cancellation of removal. *Id.* at 410-11.

A number of circuit courts subsequently agreed with our decision in *Matter of Camarillo* and concluded that it was entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Moscoso-Castellanos v. Lynch*, 803 F.3d 1079, 1083 (9th Cir. 2015); *O'Garro v. U.S. Att'y Gen.*, 605 F. App'x 951, 953 (11th Cir. 2015) (per curiam); *Guaman-Yuqui v. Lynch*, 786 F.3d 235, 239-40 (2d Cir. 2015) (per curiam); *Gonzalez-Garcia v. Holder*, 770 F.3d 431, 434-35 (6th Cir. 2014); *Yi Di Wang v. Holder*, 759 F.3d 670, 674-75 (7th Cir. 2014); *Urbina v. Holder*, 745 F.3d 736, 740 (4th Cir. 2014). The Third Circuit, however, found no ambiguity in the "stop-time" rule and declined to defer to our decision. *Orozco-Velasquez v. Att'y Gen. U.S.*, 817 F.3d 78, 81-82 (3d Cir. 2016).

**\*\*6** The alien in *Orozco-Velasquez* was served with a notice to appear ordering him to appear before an Immigration Judge in Elizabeth, New Jersey, at a date and time "to be set." *Orozco-Velasquez*, 817 F.3d at 79. Nearly 2 years later, in April 2010, the DHS mailed him "an otherwise identical" notice to appear correcting the address of the Immigration Court and, within a week, he received a notice of hearing containing the date and time of the removal proceedings. The Third Circuit held that "an initial [notice to appear] that fails to satisfy [section 239(a)(1)'s] various requirements will not stop the continuous residency clock until the combination of notices, properly served on the alien charged as removable, conveys the *complete* set of information prescribed by [section 239(a)(1)]." *Id.* at 83. Applying that reasoning, the court further determined that the Government only complied with section 239(a)(1) in April 2010, when the alien received both a notice to appear correcting the address of the Immigration Court and a notice of hearing establishing the date and time of removal proceedings. *Id.* at 84.

The First Circuit then addressed this issue in *Pereira v. Sessions*, 866 F.3d 1 (1st Cir. 2017), *rev'd*, 138 S. Ct. 2105. The alien there was admitted to the United States as a nonimmigrant visitor in 2000. In May 2006, he was served with a notice to appear that did not specify the date and time of his initial removal hearing. More than a year later, in August 2007, the DHS filed the notice to appear with the Immigration Court, which then mailed the alien a notice of hearing setting the date and time for his initial removal hearing. However, it was sent to the wrong address and was returned as undeliverable. The alien did not appear at his hearing and was ordered removed in absentia. In 2013, after he demonstrated that he did not receive the 2007 notice of **\*527** hearing, his removal proceedings were reopened and he applied for cancellation of removal.

In regard to the "stop-time" rule, the alien claimed that he had continued to accrue time until he received a notice of the hearing after his case was reopened in 2013. He agreed that the notice required by section 239(a)(1) of the Act "need not be provided in the same document," and that "two or more documents that together contain" all the information, such as the notice to appear served on him in 2006 and the hearing notice he received in 2013, could, "in combination," trigger the "stop-time" rule. *Id.* at 4. However, the Immigration Judge determined that the 2006 notice to appear alone triggered the "stop-time" rule, so the alien could not satisfy the 10-year continuous physical presence requirement. We agreed and dismissed the alien's appeal.

**\*\*7** The First Circuit concluded that the language in section 240A(d)(1)(A) of the Act is ambiguous, and it gave deference under *Chevron* to our interpretation in *Matter of Camarillo* that the DHS's service of a notice to appear triggers the "stop-time"

MATTER OF SILVESTRE MENDOZA-HERNANDEZ,..., 27 I. & N. Dec. 520...

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 443 of 1271

rule, regardless of whether the date and time of the hearing have been included in the notice. *Id.* at 2, 7-8. It denied the alien's petition for review, and the Supreme Court granted certiorari.

<div align="center">C. *Pereira v. Sessions*</div>

The Supreme Court's analysis in *Pereira* focused on the plain language of the statute, specifically, "the intersection" of the "stop-time" rule in section 240A(d)(1)(A) of the Act, which terminates continuous residence or physical presence "when the alien is served a notice to appear under section 239(a)," and the notice requirements in section 239(a)(1) of the Act, which provides that a notice to appear must specify certain information, including the "time and place at which the proceedings will be held." *Pereira*, 138 S. Ct. at 2110. Based on the "plain text, the statutory context, and common sense," the Court held that a notice to appear that does not specify the time and place of the proceedings does not trigger the "stop-time" rule. *Id.* Because the Court found the language of the "stop-time" rule to be unambiguous, it did not need to consider *Chevron* deference. *Id.* at 2113, 2117. Furthermore, the Court did not address the propriety of the two-part notice process applied by several circuit courts because the alien had accrued the required 10 years of physical presence before he received notice of his hearing in the reopened removal proceedings. *See Pereira*, 138 S. Ct. at 2112 (noting that the proceedings were reopened in 2013).

To summarize the development of the case law on the question before us, the circuit courts initially ruled that if a notice to appear lacks information regarding the time and place of the hearing, the notice requirements of section 239(a)(1) of the Act are only satisfied, and the "stop-time" rule is **\*528** triggered, once the defective notice is perfected by the alien's receipt of a subsequent notice of hearing specifying the hearing's time and place. *See, e.g.*, *Guamanrrigra*, 670 F.3d at 409-10; *Dababneh*, 471 F.3d at 808-10. However, we rejected the application of such a two-step process in *Matter of Camarillo*, holding that the "stop-time" rule is triggered by service of a notice to appear alone, regardless of whether that notice contains time and place information. Several circuits then retreated from the initial trend of recognizing the two-step process and, instead, deferred to our holding in *Matter of Camarillo*.

**\*\*8** This was followed by the Third Circuit's issuance of *Orozco-Velasquez*, which disapproved of *Matter of Camarillo* but did not disagree with the circuit courts that had previously recognized a two-step process. In fact, *Orozco-Velasquez* explicitly stated that the "stop-time" rule is triggered upon the service of the "combination" of the notice to appear and a subsequent notice of hearing that supplies the missing time and place information. *Orozco-Velasquez*, 817 F.3d at 83-84.

According to the Supreme Court's majority opinion in *Pereira*, certiorari was granted to resolve the division regarding the "stop-time" rule between the Third Circuit, which had rejected *Matter of Camarillo* as contrary to the plain language of the statute, and other circuits that had deferred to it. *Pereira*, 138 S. Ct. at 2113. While the Court majority abrogated *Matter of Camarillo* and the circuit court cases deferring to our decision, it did not disturb the Third Circuit's decision. Thus, although the Court was clearly aware of the circuit split, which it resolved in favor of the Third Circuit, it did not reject the portion of the holding in *Orozco-Velasquez* that recognized a two-step process under which a notice of hearing could perfect a notice to appear that had omitted the requisite time and place information.

Furthermore, since the alien in *Pereira* received only a deficient notice to appear, with no subsequent notice of hearing containing the time and place of his initial removal hearing until after he accrued 10 years of physical presence, the Supreme Court had no need to address either how the "stop-time" rule operates once such information has been properly conveyed or at what point the alien's period of continuous physical presence stops accruing. Consequently, we do not read the majority decision in *Pereira* as invalidating the two-step notice process, under which a subsequently issued notice of hearing "cures" or "perfects" a deficient notice to appear.

Thus, no court has adopted the view of our dissenting colleagues in this case that the deficiency in a notice to appear that is missing the time and place of the initial removal proceeding cannot be remedied by a notice of hearing that includes that information. The result of the dissent's approach is that there can be no way to perfect a notice to appear that is insufficient

MATTER OF SILVESTRE MENDOZA-HERNANDEZ,..., 27 I. & N. Dec. 520...

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 444 of 1271

under section 239(a) in order to invoke the "stop-time" rule, which we do not **\*529** find to be persuasive, given the Supreme Court's decision and the circuit court cases issued both before and after it that support a two-step notice process.

### D. Two-Step Process

**\*\*9** We conclude that in cases where a notice to appear does not specify the time or place of an alien's initial removal hearing, the subsequent service of a notice of hearing containing that information perfects the deficient notice to appear, triggers the "stop-time" rule, and ends the alien's period of continuous residence or physical presence in the United States. Therefore, although the notices to appear served on the respondents on October 11, 2010, did not trigger the "stop-time" rule under *Pereira*, 138 S. Ct. at 2110, we hold that their continuous physical presence ended on December 8, 2010, when the Immigration Court sent them notices of hearing that specified the time and place of their initial removal hearing.

This rule is consistent with the Supreme Court's narrow mandate and "common sense" observation that "the Government has to provide noncitizens 'notice' of the information, *i.e.*, the 'time' and 'place,' that would enable them 'to appear' at the removal hearing in the first place." *Id.* at 2115. It is also consistent with the plain language of the statute, *Matter of Bermudez-Cota*, and the circuit court law that, prior to *Pereira*, held that the "stop-time" rule is triggered by a two-part process where an alien is served with a notice to appear in combination with a subsequent notice of hearing that provides the information required by section 239(a)(1) of the Act. [9] *See Orozco-Velasquez*, 817 F.3d at 83; *Guamanrriga*, 670 F.3d at 410; *Dababneh*, 471 F.3d at 810.

As the respondents have argued, *Pereira* can be interpreted more broadly and read in a literal sense to reach a different result, because the opinion includes language stating that a notice lacking the specific time and place of the removal proceedings does not equate to a notice to appear under section **\*530** 239(a)(1) of the Act. *Pereira*, 138 S. Ct. at 2110, 2113-14. But we did not elect that path in *Matter of Bermudez-Cota* and we do not do so here, particularly given the legal landscape underlying the circuit split addressed in *Pereira*. Rather, we understand *Pereira* as directing us to respond to the substantive concerns of fundamental fairness inherent in procedural due process and to applicants' settled expectations about eligibility for relief, which the Supreme Court explained were not met in *Pereira*.

**\*\*10** We disagree with the dissent to the extent it argues that we are ignoring the Supreme Court's broader holding that "based on the plain text of the statute, it is clear that to trigger the stop-time rule, the Government must serve a notice to appear that, at the very least, 'specif[ies]' the 'time and place' of the removal proceedings." *Id.* at 2114. To the contrary, we are applying that holding by concluding that the notices to appear initially served on the respondents did not trigger the "stop-time" rule because they lacked the requisite information about the time and place of the hearing. However, the Court's holding does not preclude a "perfected" notice to appear from stopping time, because that issue was not before the Court in *Pereira*.

Importantly, the Supreme Court repeatedly emphasized in *Pereira* that the question before it was "narrow." *Id.* at 2110, 2113; *see also Banegas Gomez*, 2019 WL 1768914, at *7 (noting "the care taken by the *Pereira* Court to emphasize the narrow scope of its holding"); *Karingithi*, 913 F.3d at 1161 (observing that the Court "emphasiz[ed] multiple times the narrowness of its ruling"); *Hernandez-Perez*, 911 F.3d at 314 (discussing "*Pereira*'s emphatically 'narrow' framing" (quoting *Pereira*, 138 S. Ct. at 2110, 2113)); *see also Matter of Bermudez-Cota*, 27 I&N Dec. at 443 (noting that the Court ""specifically stated multiple times that the issue before it was 'narrow'"D" (quoting *Pereira*, 138 S. Ct. at 2110, 2113)). In this regard, the Court observed that the question presented by the alien--whether service of a "notice to appear" that fails to specify all of "the items listed" in section 239(a)(1) triggers the "stop-time" rule--"sweeps more broadly than necessary to resolve" the case. [10] *Id.* at 2113. The Court further stated that the ""dispositive question" is "much narrower," namely, "Does a 'notice to appear' that does not specify the 'time and place at which the proceedings will be held' . . . trigger the stop-time rule?" *Id.* (quoting section 239(a)(1)(G)(i) of the Act). In a footnote, the Court stated that it left "for another day whether a putative notice to appear that omits any of the other categories of information enumerated in [section 239(a)(1)] triggers the stop-time rule." *Id.* at 2113 n.5.

**\*\*11** **\*531** As we observed in *Matter of Bermudez-Cota*, 27 I&N Dec. at 443, "*Pereira* involved a distinct set of facts." Because the alien in *Pereira* "never received notice of the time and date of his [initial] removal hearing, he failed to appear"

MATTER OF SILVESTRE MENDOZA-HERNANDEZ,..., 27 I. & N. Dec. 520...

Case 3:20-cv-07721-SI Document 58-5 Filed 11/10/20 Page 445 of 1271

and was ordered removed in absentia. *Pereira*, 138 S. Ct. at 2112. The respondents, like the alien in *Matter of Bermudez-Cota*, were properly served with notices to appear, followed by notices of hearing setting forth the time and place of their initial removal hearings. *Matter of Bermudez-Cota*, 27 I&N Dec. at 441, 443. The notices of hearing were served on the respondents in December 2010, approximately 2 months after they were served with their notices to appear. The respondents appeared at their initial removal hearing on January 6, 2011, and at every subsequent hearing. In addition, since they have been represented in these proceedings since March 2011, they had the opportunity to secure counsel and to adequately prepare.

We are also mindful of *Pereira*'s invocation of "common sense" in concluding that a notice that does not specify when and where to appear for removal proceedings is not a "notice to appear" that triggers the "stop-time" rule. *Id.* at 2110, 2115. The Supreme Court explained that

common sense compels the conclusion that a notice that does not specify when and where to appear for a removal proceeding is not a "notice to appear" that triggers the "stop-time" rule. If the three words "notice to appear" mean anything in this context, they must mean that, at a minimum, the Government has to provide noncitizens "notice" of the information, *i.e.*, the " "time" and "place," that would enable them "to appear" at the removal hearing in the first place. Conveying such time and place information to a noncitizen is an essential function of a notice to appear, for without it, the Government cannot reasonably expect the noncitizen to appear for his removal proceedings.

*Id.* at 2115. In short, the Court explained that the fundamental purpose of notice is to convey essential information to the alien, such that the notice creates a reasonable expectation of the alien's appearance at the removal proceeding, which is consistent with the statutory text and the judicial precedent that departed from *Matter of Camarillo*.

This purpose can be satisfied by a combination of documents that jointly provide the notice required by statute. Although the provision in section 239(a)(1) of the Act stating that "a 'notice to appear'"D' must be given to the alien is in the singular, we do not read the statute as requiring that the ""written notice" be in a single document. Rather, it may be provided in one or more documents--in a single or multiple mailings. And it may be served personally, by mail, or by a combination of both, so long as the essential information is conveyed in writing and fairly informs the alien of the time and place of the proceedings.

 **\*\*12  \*532** *Pereira* teaches that the "essential function of a notice to appear" is paramount, not the form of the notice. *Id.* at 2115 (noting that ""a barebones document labelled 'Notice to Appear,' with no mention of the time and place of the removal proceedings . . . would do little if anything to facilitate appearance at those proceedings"). A notice to appear that does not contain the requisite information cannot form the basis of a reasonable expectation of the alien's appearance at the removal hearing.

Moreover, under the regulations, "the [DHS] shall provide in the Notice to Appear, the time, place and date of the initial removal hearing, where practicable." 8 C.F.R. § 1003.18(b) (2018). But if time, place, and date information "is not contained in the Notice to Appear, the Immigration Court shall be responsible for scheduling the initial removal hearing and providing notice to the government and the alien of the time, place, and date of hearing." *Id.* Here, too, the focus is on the contents of the notice and facilitating the alien's appearance, not the title affixed to the document. *See Orozco-Velasquez*, 817 F.3d at 84 (stating that the purpose of a notice to appear "is to provide an alien with notice--of the charges against him and the basic contours of the proceedings to come").

The dissent relies heavily on *Pereira*'s discussion of section 239(a)(2) of the Act, which is entitled, "Notice of Change in Time or Place of Proceedings." In *Pereira*, the Government and the dissent observed that the "stop-time" rule makes "broad reference" to a notice to appear "under section 239(a)," which includes paragraphs (2) and (3), as well as paragraph (1). But the majority of the Court found that "only paragraph (1) bears on the meaning of a "notice to appear.""D [11] *Pereira*, 138 S. Ct. at 2114. The Court further  **\*533**  found that section 239(a)(2) "bolsters" its interpretation of the "stop-time" statute because "[b]y allowing for a 'change or postponement' of the proceedings to a 'new time or place,' paragraph (2) presumes that the Government has already served a 'notice to appear under section [239(a)]' that specified a time and place as required by [section 239(a)(1)(G) (i)]." *Id.* That section 239(a)(2) of the Act "presumes" that the time and place of the proceedings was already specified in a

notice to appear does not preclude the possibility of a two-step process that allows a notice of hearing containing time and place information to perfect, or cure, a deficient notice to appear. The *Pereira* Court was not presented with that question.

**\*\*13**  On this point, we again find *Orozco-Velasquez* instructive. The dissent reads the Third Circuit as having "relied on section 239(a)(2) to permit an Immigration Court's notice of hearing to trigger the 'stop-time' rule" and finds that "its rationale directly conflicts with *Pereira*'s reading of that statutory provision." *Matter of Mendoza-Hernandez & Capula-Cortes*, 27 I&N Dec. 520, 542 (BIA 2019) (Guendelsberger, dissenting). Yet the court explicitly rejected any argument of ambiguity in the "stop-time" rule, concluding that the statute's incorporation of additional provisions, including section 239(a)(2), "does nothing to diminish the clear-cut command" in section 239(a)(1) that notice must specify the time and place at which the proceedings will be held. *Orozco-Velasquez, 817 F.3d at 82-83.*

After concluding that the plain language of the statute states that time stops only when the Government serves a notice to appear in conformance with section 239(a) of the Act, the Third Circuit continued:

Moreover, in requiring that an "alien [be] served a notice to appear under section [239(a)]" to suspend the alien's accrual of continuous residency, [section 240A(d)(1)] simultaneously compels government compliance with each of [section 239(a)(1)'s notice to appear] requirements and accommodates a " "change or postponement in the time and place of [removal] proceedings" when the government provides written notice of such changes the alien. Congress's incorporation of [section 239(a)] in its entirety conveys a clear intent: that the government may freely amend and generally supplement its initial [notice to appear]; but to cut off an alien's  **\*534**  eligibility for cancellation of removal, it must do so within the ten years of continuous residence identified in [section 240A(b)(1)(A)] (one of three cancellation-of-removal provisions the "stop-time" rule exists to explicate). Thus, an initial [notice to appear] that fails to satisfy [section 239(a)(1)'s various requirements will not stop the continuous residency clock until the combination of notices, properly served on the alien charged as removable, conveys the *complete* set of information prescribed by [section 239(a)(1)] within the alien's first ten years of continuous residence.

*Id.* (first and fifth alterations in original). This analysis supports our conclusion that although a notice to appear that omits time and place information does not stop time, a notice to appear perfected by a notice of hearing that does include such information can stop time in accordance with section 240A(d)(1)(A)'s reference to "section 239(a)" of the Act.

Lastly, the dissent concludes that neither the service of the notices to appear nor the subsequent notices of hearing in this case triggered the "stop-time" rule. But it does not provide a clear answer as to how the "stop-time" rules operates in this situation under its interpretation of *Pereira*, absent a break in physical presence or the commission of a disqualifying crime. It simply posits alternative ending points, including service of a new notice to appear specifying the time and place of the hearing or the entry of a final order of removal. *See* sections 240A(d)(1)-(2) of the Act.

## IV. CONCLUSION

**\*\*14**  Until *Matter of Camarillo*, there was an "emerging consensus" among the courts of appeals that "the notice necessary to trigger the stop-time rule found in [section 240A(d)(1)] was not 'perfected' until the immigrant received all the information listed in [section 239(a)(1)]." *Pereira, 138 S. Ct. at 2120* (Kennedy, J., concurring) (quoting *Guamanrriga, 670 F.3d at 410*); *Dababneh, 471 F.3d at 810.* In *Matter of Camarillo*, we rejected that interpretation. After *Matter of Camarillo*, the Third Circuit in turn rejected our conclusion that section 240A(d)(1)(A) of the Act is ambiguous and specified that under the statute's plain language, the "stop-time" rule unambiguously requires service of a notice to appear that meets the requirements of section 239(a)(1). *Orozco-Velasquez, 817 F.3d at 83-84.*

The majority opinion in *Pereira* recognized the split in the circuits and cited this aspect of *Orozco-Velasquez*'s holding without discussing or expressing disapproval of the Third Circuit's further holding that "the combination of notices" conveying all the information prescribed by section 239(a)(1) of the Act triggers the "stop-time" rule. *Orozco-Velasquez, 817 F.3d at 83; see also Pereira, 138 S. Ct. at 2113 n.4.* None of the courts involved in the circuit split had held that service of a subsequent notice of

Case 3:20-cv-07721-SI   Document 58-5   Filed 11/10/20   Page 447 of 1271

MATTER OF SILVESTRE MENDOZA-HERNANDEZ,..., 27 I. & N. Dec. 520...

**\*535** hearing that included time and place information was insufficient to perfect the notice to appear. And the majority in *Pereira* did not indicate it was adopting that approach.

In his concurring opinion, Justice Kennedy criticized the circuits that granted *Chevron* deference to *Matter of Camarillo* after previously ruling that notice was not "perfected" until all the requirements of section 239(a)(1) of the Act were met. *Pereira*, 138 S. Ct. at 2120 (Kennedy, J., concurring). Neither the majority nor the concurrence, however, expressed disagreement with the aspects of those previous rulings that had held that the service of a notice of hearing containing time and place information indeed perfects a notice to appear that had omitted that information, such that the "stop-time" rule is invoked.

Accordingly, in light of the jurisprudence that preceded *Pereira*, which explained that the notice necessary to trigger the "stop-time" rule is ""perfected" when an alien is served with a notice of hearing containing the time and place information required by section 239(a)(1) of the Act, and the Supreme Court's resolution of the circuit court split in favor of a plain language rejection of *Matter of Camarillo*, which we read as consistent with the analysis and holding in *Orozco-Velasquez*, we now adopt the "equally plausible" view advocated by the respondents in *Matter of Camarillo*, 25 I&N Dec. at 647.

**\*\*15** We therefore hold that where a notice to appear does not specify the time and place of an alien's initial removal hearing, the subsequent service of a notice of hearing containing that information "perfects" the deficient notice to appear, satisfies the notice requirements of section 239(a)(1) of the Act, and triggers the "stop-time" rule of section 240A(d)(1)(A) of the Act. *Pereira* did not reach this issue because the alien was not properly served with a notice of hearing providing the time and place information and so did not appear at his initial removal hearing. Because the respondents in this case appeared at their initial removal hearing after they received notices of hearing with proper notice of the time and place of their proceedings, we will deny their motion to remand based on *Pereira*.

We further conclude that the respondents' period of continuous physical presence ended on December 8, 2010, when they were served with notices of hearing scheduling their initial removal hearing on January 6, 2011. Accordingly, it is the respondents' burden to demonstrate 10 years of continuous physical presence in the United States measured backward from service of the notices of hearing. *See* section 240A(b)(1)(A) of the Act.

The record will be remanded for the Immigration Judge to consider whether the aliens have met this burden, upon consideration of the entire record, including testimony and corroborative evidence. The parties may supplement the record with additional evidence relevant to continuous **\*536** physical presence on remand, including the new evidence proffered with the respondents' motion to remand.

**ORDER:** The record is remanded to the Immigration Judge for further proceedings consistent with the foregoing opinion and for the entry of a new decision.

**\*\*16** *DISSENTING OPINION*: John W. Guendelsberger, Board Member, in which Charles K. Adkins-Blanch, Vice Chairman; Patricia A. Cole, Edward R. Grant, Michael J. Creppy, and Molly Kendall Clark, Board Members, joined

We respectfully dissent from the majority's determination that an Immigration Court's service of a notice of the initial hearing date in removal proceedings triggers the "stop-time" rule to end the period of continuous physical presence required for cancellation of removal. [1] The United States Supreme Court's decision in *Pereira v. Sessions*, 138 S. Ct. 2105 (2018), governs this case and compels us to find that the service of a "notice of hearing" by an Immigration Court does not meet the definition of a "notice to appear" under section 239(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1229(a) (2012), and therefore does not trigger the "stop-time" rule when a ""notice to appear" from the Department of Homeland Security ("DHS") fails to specify the time of the initial proceedings.

MATTER OF SILVESTRE MENDOZA-HERNANDEZ,..., 27 I. & N. Dec. 520...

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 448 of 1271

## I. STOP-TIME RULE

To qualify for cancellation of removal under section 240A(b)(1) of the Act, 8 U.S.C. § 1229b(b)(1) (2012), an applicant must demonstrate 10 years of continuous physical presence in the United States. Under the "stop-time" rule in section 240A(d)(1)(A) of the Act, "any period of . . . continuous physical presence" is "deemed to end when the alien is served a notice to appear under section 239(a)." The Supreme Court in *Pereira* directly addressed the statutory text of the "stop-time" rule and the definition of "notice to appear" in section 239(a)(1) of the Act. [2] The Court found that the **\*537** ""plain text, the statutory context, and common sense all lead inescapably and unambiguously" to the conclusion that the time and place of hearing must be designated in a section 239(a)(1) notice to appear to trigger the "stop-time" rule. *Id.* at 2110.

In so finding, the Court overruled the Board's decision in *Matter of Camarillo*, 25 I&N Dec. 644, 648 (BIA 2011), that service of a notice to appear cut off accrual of the time required for cancellation of removal, even if it did not specify the time and place of hearing. The Board reasoned in *Camarillo* that the "stop-time" rule "merely specifies the document the DHS must serve on the alien to trigger the 'stop-time' rule and does not impose substantive requirements for a notice to appear to be effective in order for that trigger to occur." *Id.* at 647. As to the significance of a notice of hearing later issued by an Immigration Court, the Board stated that "[n]o authority . . . supports the contention that a notice of hearing is a constituent part of a notice to appear, the charging document issued only by the DHS." *Id.* at 648.

**\*\*17** The Court in *Pereira* framed the issue before it as whether "a 'notice to appear' that does not specify the 'time and place at which the proceedings will be held,' as required by [section 239(a)(1)(G)(i)], trigger[s] the 'stop-time' rule." *Pereira*, 138 S. Ct. at 2113. The Court found that Congress had provided a "clear and unambiguous" answer to this question, namely, that a "putative notice to appear that fails to designate the specific time or place of the noncitizen's removal proceedings is not a 'notice to appear under section [239(a)],' and so does not trigger the 'stop-time' rule." *Id.* at 2113-14.

In *Pereira*, the DHS failed to specify a time of hearing in the notice to appear, and the notice of the initial hearing date was sent by the Immigration Court after the respondent had accumulated the requisite 10 years of physical presence. In the case now before us, the DHS served a notice to appear that failed to specify a time of hearing, and the Immigration Court later served notice of the initial hearing date before the respondent had accrued 10 years of continuous physical presence. [3]

The legal issue in this case is whether the issuance of a notice of hearing by an Immigration Court triggers the "stop time" rule when the notice to appear issued by the DHS did not specify the time of hearing. The Court in *Pereira* answers this question, stating that "based on the plain text of the statute, it is clear that to trigger the stop-time rule, the Government must **\*538** serve a notice to appear that, at the very least, 'specif[ies]' the 'time and place' of the removal proceedings." *Pereira*, 138 S. Ct. at 2114. Under this holding, and the Court's underlying reasoning, a "notice of hearing" sent by an Immigration Court is not a "notice to appear" under section 239(a)(1) of the Act, as required by the "stop-time" rule.

### A. Plain Language

The reasoning of the Court in *Pereira* indicates that the event that triggers the "stop-time" rule is the service of a "notice to appear" that provides the essential information required by section 239(a)(1), including the time and place at which the hearing will be held. The Government argued in *Pereira* that, because the "stop-time" rule refers to section 239(a) as a whole, the "stop-time" rule was not limited to service of a section 239(a)(1) notice to appear but could be triggered by the service of other documents referenced in section 239(a)(2) that provide the time and place of hearing. *Pereira*, 138 S. Ct. at 2114. The Court rejected this argument, stating that ""the broad reference to [section 239(a)] is of no consequence, because, as even the Government concedes, only paragraph (1) bears on the meaning of a 'notice to appear.'"D' *Id.* The Court reasoned that "[n]owhere else within [section 239(a)] does the statute purport to delineate the requirements of a 'notice to appear.' In fact, the term 'notice to appear' appears only in paragraph (1) of [section 239(a)]." *Id.*

MATTER OF SILVESTRE MENDOZA-HERNANDEZ,..., 27 I. & N. Dec. 520...

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 449 of 1271

**\*\*18**  The Court found that the plain language of section 239(a)(2) ""bolsters" its interpretation of the statute that the notice of the date and time of the hearing must be included in a section 239(a)(1) notice to appear in order to trigger the "stop-time" rule. *Id.* As the Court explained:

Paragraph (2) [of section 239(a)] provides that, "in the case of any change or postponement in the time and place of [removal] proceedings," the Government shall give the noncitizen "written notice . . . specifying . . . the new time or place of the proceedings." [Section 239(a)(2)(A)(i) of the Act.] By allowing for a "change or postponement" of the proceedings to a "new time or place," paragraph (2) presumes that the Government has already served a "notice to appear under [section 239(a)]" that specified a time and place as required by [section 239(a)(1)(G)(i)]. Otherwise, there would be no time or place to "change or postpon[e]." [Section 239(a)(2) of the Act.]

*Id.* (second alteration in original).

Under the Court's reasoning in *Pereira*, Congress provided clear and unambiguous language identifying the event that triggers the "stop-time" rule-- that is, service by the DHS of a "notice to appear" under section 239(a)(1) that specifies the time and place of the hearing as required by  **\*539**  section 239(a)(1)(G), along with other essential information required by sections 239(a)(1)(A) through (G). A subsequent "notice of hearing" generated by the Immigration Court is not a section 239(a)(1) "notice to appear" and, therefore, does not trigger the "stop-time" rule.

A subsequent "notice of hearing" also cannot complete or cure a deficient ""notice to appear." First, neither notice would meet, on its own, the definition of "a notice to appear" under section 239(a)(1). Second, the statute contains no ambiguity or gap that would permit a "combination" approach to trigger the stop time rule under the plain text roadmap provided by the Supreme Court in *Pereira*. The statute refers to a single document, "a notice to appear" issued by the DHS. *Pereira* makes clear that a section 239(a)(1) ""notice to appear" must include the date and time of hearing in order to trigger the "stop-time" rule.

Prior to enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 ("IIRIRA"), the initiation of deportation proceedings involved a two-step process beginning with a charging document known as an "order to show cause" that was served by the former Immigration and Naturalization Service that was then followed up by a notice of hearing date issued by the Immigration Court. *See* former sections 242B(a)(1)(A)-(F) of the Act, 8 U.S.C. § 1252b(a)(1)(A)-(F) (Supp. V 1993) (describing the essential elements of an order to show cause without reference to inclusion of the date and time of hearing). In the IIRIRA, Congress added section 239(a) to the Act in an effort to simplify the process for initiating removal proceedings. H.R. Rep. 104-469(I), 1996 WL 168955, at 159 (1996). In so doing, Congress moved from the two-step process for initiating deportation proceedings to a one-step "notice to appear" that specifies the time and place of hearing as an essential element of a section 239(a)(1) notice to appear.

**\*\*19**  The Supreme Court in *Pereira* found no ambiguity in the statute and concluded its opinion by stating that, "[a]t the end of the day, given the clarity of the plain language, we 'apply the statute as it is written.'" *Id.* at 2119-20 (citation omitted). We must do the same.

### B. A Notice of Hearing Cannot Cure a Defective Notice to Appear

The Court in *Pereira* directly addressed whether the language of section 239(a)(1) "can be understood to define what makes a notice to appear *complete*." *Pereira*, 138 S. Ct. at 2116 (quoting *id.* at 2126, Alito, J., dissenting). The Court responded that [s]ection [239(a)(1)] does not say a "notice to appear" is "complete" when it specifies the time and place of the removal proceedings. Rather, it defines a "notice to appear"  **\*540**  as a "written notice" that "specif [ies]," at a minimum, the time and place of the removal proceedings.

*Id.* (quoting section 239(a)(1)(G) of the Act) (third alteration in original). The Court emphasized that "the omission of time-and-place information is not, as the dissent asserts, some trivial, ministerial defect, akin to an unsigned notice of appeal." *Id.* Rather,

MATTER OF SILVESTRE MENDOZA-HERNANDEZ,..., 27 I. & N. Dec. 520...

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 450 of 1271

such an omission would ""deprive [the notice to appear] of its essential character." *Id.* at 2116-17 (alteration in original) (quoting *id.* at 2127 n.5 (Alito, J., dissenting)). The Court's analysis establishes that the plain text of the "stop-time" rule requires the DHS to include the notice of time and place of hearing in the section 239(a)(1) notice to appear in order to trigger the "stop-time" rule.

Other aspects of the Court's analysis indicate that its holding applies to all cases involving the "stop-time" rule in which the DHS does not include the time or place of hearing in its notice to appear. For example, in response to the Government's concerns that the DHS would have difficulty coordinating scheduling of hearings in the Immigration Courts if required to set initial hearing dates in notices to appear in order to trigger the "stop-time" rule, the Court responded that the DHS had previously established such an arrangement with the courts and that "[g]iven today's advanced software capabilities, it is hard to imagine why DHS and immigration courts could not again work together to schedule hearings before sending notices to appear." *Id.* at 2119.

 **20  The Court also responded to concerns that "[r]equiring the Government to furnish time and place information in a notice to appear" would impede the statute's objective of preventing administrative delays by noting that "once a proper notice to appear is served, the stop-time rule is triggered, and a noncitizen would be unable to manipulate or delay removal proceedings to 'buy time.'"D' *Id.*

Justice Alito's dissenting opinion confirms that the "stop-time rule" is triggered when the DHS "serve[s] a notice to appear that, at the very least, specif[ies] the 'time and place' of the removal proceedings." *Id.* at 2125 (Alito, J., dissenting) (quoting *id.* at 2113 (majority opinion)). In Justice Alito's view, the Court's holding means that, "going forward the Government will be forced to include an arbitrary date and time on every notice to appear that it issues." *Id.* at 2129. Justice Sotomayor, writing for the majority, responds that it trusts the Government will not "engage in [such] 'arbitrary' behavior." *Id.* at 2119.

The reasoning of the Supreme Court in *Pereira*, when considered in its entirety, leaves little room for doubt that the Court's decision requires us to follow the plain language of the Act that the DHS must serve a section 239(a)(1) "notice to appear" that includes the date, time, and place of hearing  *541  in order to trigger the "stop-time" rule. [4]  The Court in *Pereira* repeatedly emphasized the "plain text" of the "stop-time" rule and left no room for agency gap-filling as to whether an Immigration Court can ""complete" or "cure" a putative "notice to appear" by subsequent issuance of a ""notice of hearing" that would trigger the "stop-time" rule on the date of that event. Quite simply, under the Act and implementing regulations designating the DHS as the agency responsible for issuing a "notice to appear," a "notice of hearing" is not a "notice to appear" and, therefore, it does not satisfy the requirement that the DHS serve a section 239(a)(1) "notice to appear" that specifies the date and time of hearing, in order to trigger the "stop-time" rule. *See* 8 C.F.R. § 239.1 (2018) (designating the DHS officials authorized to issue a "notice to appear").

## II. MAJORITY'S APPROACH

The majority decision essentially adopts the approach taken by the United States Court of Appeals for the Third Circuit in *Orozco-Velazquez v. Att'y Gen. U.S.*, 817 F.3d 78 (3d Cir. 2016), to hold that a notice of hearing issued by an Immigration Court may trigger the "stop-time" rule when the DHS has not specified a hearing date in the notice to appear. [5]  In its analysis of the "stop-time" rule, *Orozco-Velazquez* relied on section 239(a)(2) to conclude that "Congress's incorporation of [section 239(a)] in its entirety conveys a clear intent: that the government may freely amend and generally supplement its initial [notice to appear]." *Id.* at 83. Since the decision in *Orozco-Velazquez* was issued prior to *Pereira*, its reasoning does not take into account the Supreme Court's determination that the "stop-time" rule  *542  contains plain and unambiguous language in its description of the event that triggers the "stop-time" rule, namely, the service of a section 239(a)(1) notice to appear. [6]

 **21  To the extent that *Orozco-Velazquez* relied on section 239(a)(2) to permit an Immigration Court's notice of hearing to trigger the "stop-time" rule, its rationale directly conflicts with *Pereira*'s reading of that statutory provision. As discussed above, the Court in *Pereira* explicitly rejected reliance on section 239(a)(2) as the underpinning for an approach that would excuse the DHS from the requirement that it specify the time and place of hearing in its notice to appear in order to trigger the "stop-time" rule. The Court in *Pereira* found that, "[b]y allowing for a 'change or postponement' of the proceedings to a 'new time or

MATTER OF SILVESTRE MENDOZA-HERNANDEZ,..., 27 I. & N. Dec. 520...

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 451 of 1271

place,' paragraph (2) presumes that the Government has already served a 'notice to appear under section [239(a)]' that specified a time and place as required by [section 239(a)(1)(G)(i)]." *Pereira, 138 S. Ct. at 2114.* Otherwise, as the Court explained, there would be no time or place to change or postpone.

In reaching its result, the majority conflates an Immigration Court's service of a "notice of hearing" with the DHS's service of a "notice to appear." The majority essentially amends Congress' plain language description of the triggering event in the "stop-time" rule (DHS service of the "notice to appear") by adding an additional triggering event (Immigration Court service of a "notice of hearing"), so that the "stop-time" rule can be triggered by either event, whichever occurs first. The distinction between a "notice to appear" issued by the DHS and a "notice of hearing" issued by an Immigration Court is well understood. An Immigration Court does not serve a "notice to appear" because neither the Immigration Court nor an Immigration Judge has been delegated such authority. *See 8 C.F.R. § 239.1* (designating the DHS officials authorized to serve a "notice to appear" in accordance with section 239(a) of the Act).

The majority reasons that because a notice of hearing sent by an Immigration Court resolves concerns about adequate notice and also provides a benchmark for stopping accrual of physical presence, the purposes of the "stop-time" rule would be met under their approach. This may be true, but such an approach does not take into account the plain text analysis of the "stop-time" rule outlined by the Supreme Court in *Pereira,* and it ignores the Court's recognition that the "stop-time" rule is triggered by service of a **\*543** section 239(a)(1) ""notice to appear" that specifies the time and place of hearing as an essential part of the charging document. It also ignores the implementing regulations that recognize that only the DHS can issue a "notice to appear" in accordance with section 239(a) of the Act. *8 C.F.R. § 239.1.* Because the Act provides an explicit definition of a section 239(a) (1) "notice to appear" and the "stop-time" rule explicitly refers to that definition, the plain language of the statute controls.

**\*\*22** According to this plain language, an Immigration Court's service of a notice of hearing cannot trigger the "stop-time" rule. However, the Court's decision in *Pereira* does not preclude the DHS from serving a new notice to appear that meets the requirements of the "stop-time" rule. *See, e.g., Moscoso-Castellanos v. Lynch,* 803 F.3d 1079, 1082 (9th Cir. 2015) (noting that when the initial notice to appear did not specify a date of hearing, ""accrual of physical presence did not stop until [the alien] was served a second [notice to appear] that included the missing hearing information" (citing *Garcia-Ramirez v. Gonzalez,* 423 F.3d 935, 937 n.3 (9th Cir. 2005))). [7]

Additionally, proof of 10 years of continuous physical presence is just one among many eligibility requirements for cancellation of removal. The applicant must also demonstrate that (1) removal would cause "exceptional and extremely unusual hardship" to a citizen or lawful permanent resident spouse, child, or parent; (2) the applicant has "good moral character"; (3) the applicant was not inadmissible or removable for specified criminal offenses; and (4) relief from removal should be granted in the exercise of discretion. Sections 240A(b)(1)(B)-(D) of the Act.

Entry of a final order of removal is also relevant to accrual of continuous physical presence. *See, e.g., Matter of Cerna,* 20 I&N Dec. 399, 400-01 (BIA 1991) (holding that the residence requirement for a waiver of deportation under former section 212(c) of the Act, 8 U.S.C. § 1182(c) (1988), ends upon entry of a final order of removal); *Matter of Chang,* 10 I&N Dec. 14, 16 (BIA 1962) (same with regard to the physical presence requirement for suspension of deportation under former section 244(a) of the Act, 8 U.S.C. § 1254(a) (1958)). The entry of an in absentia order of removal after notice of the consequences of failure to appear for removal proceedings also renders an alien ineligible for cancellation of removal for 10 years after the date of the final order of removal. Section 240(b)(7) of the Act, 8 U.S.C. § 1229a(b)(7) (2012).

### **\*544**  III. JURISDICTION

In *Matter of Bermudez-Cota,* 27 I&N Dec. 441 (2018), the Board held that a section 239(a)(1) notice to appear that does not specify the time and place of an alien's initial removal hearing vests an Immigration Judge with jurisdiction over the removal proceedings and meets the requirements of section 239(a) of the Act, so long as a notice of hearing specifying this information is later sent to the alien. In so holding, we distinguished *Pereira,* noting that "the Court did not hold that proceedings initiated by

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 452 of 1271

MATTER OF SILVESTRE MENDOZA-HERNANDEZ,..., 27 I. & N. Dec. 520...

a notice to appear that fails to specify a time, date, and place for the initial hearing should be terminated." *Id.* at 444. Application of the "stop-time" provision affects eligibility for cancellation of removal, a discretionary form of relief, while determination of Immigration Court jurisdiction involves termination of proceedings. Different statutory and regulatory frameworks govern each of these distinct issues.

**23**  The Second, Sixth, and Ninth Circuits, in decisions addressing Immigration Court jurisdiction, have recently approved the Board's reasoning and holding in *Bermudez-Cota*, while emphasizing that the "stop-time" issue addressed in *Pereira* involves a distinct and separate issue. *See Banegas Gomez v. Barr*, No. 15-3269, 2019 WL 1768914, at *6-8 (2d Cir. Apr. 23, 2019); *Karingithi v. Whitaker*, 913 F.3d 1158, 1160-62 (9th Cir. 2019); *Hernandez-Perez v. Whitaker*, 911 F.3d 305, 312-15 (6th Cir. 2018).

As the Sixth Circuit explained, "The issue in *Pereira* required the Court to begin by looking to the plain text of the stop-time statute, which provides that the period of continuous physical presence necessary to qualify for cancellation of removal ends 'when the alien is served a notice to appear under section [239(a)].'" *Hernandez-Perez*, 911 F.3d at 313. The court pointed out that "based on the plain text of the statute, it is clear that to trigger the stop-time rule, the Government must serve a notice to appear that, at the very least, 'specif[ies]' the 'time and place' of the removal proceedings." *Id.* (alteration in original) (quoting *Pereira*, 138 S. Ct. at 2114). The court acknowledged that there is "some common-sense discomfort in adopting the position that a single document labeled 'Notice to Appear' must comply with a certain set of requirements for some purposes, like triggering the stop-time rule, but with a different set of requirements for others, like vesting jurisdiction with the immigration court." *Id.* at 314. However, referring to the breadth of *Pereira*'s holding on the "stop-time" rule, the court noted that the importation of that approach into the jurisdictional context "would have unusually broad implications." *Id.*

**\*545**  In *Karingithi*, the Ninth Circuit noted that "*Pereira* was not in any way concerned with the Immigration Court's jurisdiction." *Karingithi*, 913 F.3d at 1159. Rather, the court emphasized that "*Pereira*'s analysis hinges on 'the intersection' of two statutory provisions: [section 240A(d)(1)'s] stop-time rule and [section 239(a)'s] definition of a notice to appear." *Id.* at 1161 (quoting *Pereira*, 138 S. Ct. at 2110). The court noted that the "stop-time rule is not triggered by *any* 'notice to appear'-- it requires a 'notice to appear *under* section [239(a)].'" *Id.* (quoting section 240A(d)(1) of the Act). The court concluded that "*Pereira* treats this statutory cross-reference as crucial: 'the word "under" provides the glue that bonds the stop-time rule to the substantive time-and-place requirements mandated by [section 239(a)].'" *Id.* (quoting *Pereira*, 138 S. Ct. at 2117); *see also Banegas Gomez*, 2019 WL 1768914, at *7 ("The result in *Pereira* was based on the intersection of *two* statutory provisions, one of which, addressing the stop time rule, is not relevant to [the alien's] proceeding at all.").

## IV. CONCLUSION

**24**  Congress, in section 240A(d)(1)(A) of the Act defined the event that triggers the "stop-time" rule as "service of a notice to appear under section 239(a)." The Court in *Pereira*, 138 S. Ct. at 2114-15, held that Congress' reference to "service of a notice to appear under section 239(a)," means a ""notice to appear" as defined in section 239(a)(1) of the Act. The Court also held that, "[b]ased on the plain language of the statute, it is clear that to trigger the stop-time rule, the Government must serve a notice to appear that, at the very least, 'specif[ies]' the 'time and place' of the removal proceedings." *Id.* at 2114 (alteration in original) (quoting section 239(a)(1) of the Act). As the Court concluded, "At the end of the day, given the clarity of the plain language, we 'apply the statute as it is written.'" *Id.* at 2119-20. The plain language of the Act leaves no room for the majority's conclusion that a subsequent notice of hearing can cure a notice to appear that fails to specify the time and place of the initial removal hearing.

For these reasons, neither the service of the notice to appear nor the subsequent service of a notice of hearing on the respondents triggered the ""stop-time" rule for purposes of cancellation of removal under section 240A of the Act. We therefore respectfully dissent.

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 453 of 1271

MATTER OF SILVESTRE MENDOZA-HERNANDEZ,..., 27 I. & N. Dec. 520...

## Footnotes

1    The "stop-time" rule in section 240A(d)(1)(A) of the Act states, in pertinent part, that "any period of continuous residence or continuous physical presence in the United States shall be deemed to end . . . when the alien is served a notice to appear under section 239(a)." As relevant to this decision, section 239(a)(1) of the Act provides:

In removal proceedings under section 240 [of the Act, 8 U.S.C. § 1229a (2012)], written notice (in this section referred to as a "notice to appear") shall be given in person to the alien (or, if personal service is not practicable, through service by mail to the alien or to the alien's counsel of record, if any) specifying the following:

. . . .

(G)(i) The time and place at which the proceedings will be held.

2    The Immigration Judge determined that the respondents had otherwise established eligibility for relief, which is not in dispute on appeal.

3    Because the respondents filed their notice of appeal before the Immigration Judge issued a decision on the pending motion, jurisdiction over the motion vested with the Board. The motion is now before us as a motion to remand. *See* 8 C.F.R. § 1003.2(c)(4) (2018).

4    The Sixth Circuit recently followed *Hernandez-Perez* and *Karingithi* in holding that an Immigration Judge properly exercised jurisdiction where information regarding the time and place of the hearing, which was missing from the notice to appear, was provided in a notice of hearing that was subsequently issued, notwithstanding the alien's claim that he did not receive the notice of hearing. *See Santos-Santos v. Barr*, 917 F.3d 486, 491-92 (6th Cir. 2019). The court did not mention *Matter of Bermudez-Cota* in its decision.

5    Section 240(b)(5)(A) of the Act provides in pertinent part:

Any alien who, after written notice required under paragraph (1) or (2) of section 239(a) has been provided to the alien or the alien's counsel of record, does not attend a proceeding under this section, shall be ordered removed in absentia if the [DHS] establishes by clear, unequivocal, and convincing evidence that the written notice was so provided and that the alien is removable . . . .

6    We note that some decisions discussing the issue of proper notice refer to the "date and time" of the hearing. However, section 239(a)(1)(G) of the Act requires inclusion of the "time and place" of the hearing in the notice to appear. We will therefore otherwise refer to the required "time and place" in this decision.

7    The "stop-time" rule at section 240A(d)(1)(A) of the Act is also applicable to determine eligibility for relief under section 240A(a)(2), which requires 7 years of *continuous residence* in the United States after having been admitted in any status.

8    We now consider that analysis to be flawed. A notice of hearing is not part of the notice to appear, which is not "served" by the Immigration Courts. Instead, the notice of hearing is a separate notice, served in conjunction with the notice to appear, that satisfies the requirements of section 239(a)(1)(G) of the Act by providing the essential information regarding the time and place of the hearing.

9    Our interpretation is also consistent with the congressional intent behind the "stop-time" rule. As we have stated, "By enacting the rule, Congress intended to prevent aliens from being able 'to "buy time," during which they could acquire a period of continuous presence that would qualify them for forms of relief that were unavailable to them when proceedings were initiated.'"D' *Matter of Camarillo*, 25 I&N Dec. at 649 (quoting *Matter of Cisneros*, 23 I&N Dec. 668, 670 (BIA 2004) (quoting Report of the Committee on the Judiciary, House of Representatives, H.R. Rep. 104-469 (1996))). If a notice of hearing cannot cure or perfect a deficient notice to appear, then the DHS would be required to re-serve a "corrected" notice to appear in proceedings once a cancellation of removal application is filed in order to trigger the "stop-time" rule. In many cases this could be after the alien has appeared at multiple hearings over a number of years. Such an outcome would defeat the reason for enacting the "stop-time" rule in the first place.

10    Section 239(a)(1) of the Act requires that the "written notice" given to an alien must specify several things, only one of which is "[t]he time and place at which the proceedings will be held" in section 239(a)(1)(G)(i). *Pereira*, 138 S. Ct. at 2109-10.

11    Section 239(a)(2) of the Act governs the notice of change in time and place of proceedings, and paragraph (3) provides for a system to record aliens' addresses and phone numbers. The dissent asserts that "[t]he Government argued in *Pereira* that, because the 'stop-time' rule refers to section 239(a) as a whole, the 'stop-time' rule was not limited to service of a section 239(a)(1) notice to appear but could be triggered by the service of other documents referenced in section 239(a)(2) that provide the time and place of hearing." *Matter of Mendoza-Hernandez & Capula-Cortes*, 27 I&N Dec. 520, 538 (BIA 2019) (Guendelsberger, dissenting). More accurately, the Supreme Court noted the point made by the Government and the dissent that the "stop-time" rule makes broad reference to a notice to appear under section 239(a) of the Act, which includes paragraphs (1) through (3). *Pereira*, 138 S. Ct. at 2114.

Justice Alito's dissent asserts that the "stop-time" rule's cross-reference to section 239(a)--without limiting it to paragraph (1)--indicates that "'Congress chose to insert a broader cross-reference, one that refers to the general process of serving notices to appear as a whole." *Id.* at 2123 (Alito, J., dissenting). There is no reference in *Pereira* to an argument by the Government or the dissent that the "stop-time" rule could be triggered by the service of other documents, such as a subsequent notice of hearing. The facts of *Pereira* would not support such an argument being made because the only document that could have stopped time before the alien accrued 10 years of continuous physical presence was the notice to appear, given that the initial hearing notice was sent to an incorrect address. And the dissent in *Pereira* concluded that *Chevron* deference should be given to our interpretation of the "stop-time" rule in *Matter of Camarillo*, where we held that a notice to appear alone triggers the "stop-time" rule, even if it does not include the time and place of the initial hearing. *Id.* at 2122, 2129. Therefore, we disagree with the dissent in this case to the extent it is suggesting that the Supreme Court has already addressed and resolved the question whether the ""stop-time" rule can be triggered by the subsequent service of other documents, such as a notice of hearing, that provide the time and place of hearing.

1    We agree with the majority decision insofar as it denies the respondent's request for termination of proceedings.

2    The provisions for cancellation of removal, including the "stop-time" rule, as well as the "notice to appear" provisions of section 239(a) of the Act were enacted by section 304 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-587 to 3009-597. Cancellation of removal replaced the ""suspension of deportation" provisions in former section 244(a) of the Act, 8 U.S.C. § 1254 (1994). Applicants for suspension of deportation could continue to accrue time to meet the physical presence requirement during the course of deportation proceedings until the entry of a final order of deportation. *See, e.g.*, *Matter of Castro*, 19 I&N Dec. 692, 693-94 (BIA 1988); *Matter of Chang*, 10 I&N Dec. 14, 16 (BIA 1962).

3    The notice to appear issued by the DHS to the alien in *Pereira* did not set a date and time for the initial hearing in removal proceedings. An incorrectly addressed notice of hearing was later mailed by the Immigration Court to the alien. When he failed to appear at his hearing, he was ordered removed in absentia.

4    The Court in *Pereira*, 138 S. Ct. at 2115 n.7, reasoned that
      neither the Government nor the dissent offers any convincing basis, much less one rooted in the statutory text, for treating time-and-place information as any less crucial than charging information for purposes of triggering the "stop-time" rule. . . . At bottom, the Government's self-serving position that a notice to appear must specify charging information, but not the time-and-place information, reveals the arbitrariness inherent in its atextual approach to the "stop-time" rule.

5    The majority reads *Pereira*, which refers to various circuit court decisions, as favorably endorsing *Orozco-Velazquez*. However, the Supreme Court's reference to *Orozco-Velazquez* is limited to a parenthetical explanation of that decision, which describes the case as "holding that the stop-time rule unambiguously requires service of a 'notice to appear' that meets [section 239(a)(1)'s] requirements." *Pereira*, 138 S. Ct. at 2113 n.4. The Court does not refer to or endorse the part of the *Orozco-Velazquez* decision that finds that service of a hearing notice by an Immigration Court can be an event that triggers the stop-time rule.

6    A section 239(a)(1) notice to appear is the charging document issued by the DHS on a Form I-862 (Notice to Appear). The Form I-862 provides all of the information required by section 239(a)(1) of the Act, and it leaves blank space for specification of the charges against the alien and the time and place of the hearing. Under the "stop-time" statute, the DHS may amend and reissue its initial notice to appear, and the DHS's service of a reissued notice to appear specifying the date of hearing may trigger the "stop-time" rule.

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 455 of 1271

MATTER OF SILVESTRE MENDOZA-HERNANDEZ,..., 27 I. & N. Dec. 520...

7    Of course, the Court in *Pereira* abrogated *Moscoso-Castellanos* insofar as the Ninth Circuit deferred to the Board's decision in *Matter of Camarillo*. The Ninth Circuit's approach prior to *Camarillo* presents an aspect of the circuit court conflict referred to in *Pereira*, as well as an approach that is fully consistent with the Court's holding and reasoning there.

27 I. & N. Dec. 520 (BIA), Interim Decision 3951, 2019 WL 1953943

---

**End of Document**        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

27 I. & N. Dec. 674 (U.S.Atty.Gen.), Interim Decision 3966, 2019 WL 5546810

U.S. Department of Justice

Office of the Attorney General

MATTER OF MICHAEL VERNON THOMAS, RESPONDENT

MATTER OF JOSEPH LLOYD THOMPSON, RESPONDENT

Decided by Attorney General October 25, 2019

**\*\*1  \*674** (1) The tests set forth in *Matter of Cota-Vargas, Matter of Song, and Matter of Estrada* will no longer govern the effect of state-court orders that modify, clarify, or otherwise alter a criminal alien's sentence.

(2) Such state-court orders will be given effect for immigration purposes only if based on a procedural or substantive defect in the underlying criminal proceeding; these orders will have no effect for immigration purposes if based on reasons unrelated to the merits of the underlying criminal proceeding, such as rehabilitation or the avoidance of immigration consequences.

BEFORE THE ATTORNEY GENERAL

On May 28, 2019, I directed the Board of Immigration Appeals ("Board") to refer this case for my review and invited the parties and interested amici to submit briefs addressing relevant questions. *Matter of Thomas & Matter of Thompson*, 27 I&N Dec. 556 (A.G. 2019).

For the reasons set forth in the accompanying opinion, I overrule the Board's decisions in *Matter of Cota-Vargas*, 23 I&N Dec. 849 (BIA 2005); *Matter of Song*, 23 I&N Dec. 173 (BIA 2001); and *Matter of Estrada*, 26 I&N Dec. 749 (BIA 2016). The tests described in those cases will no longer govern the effect of state-court orders that modify, clarify, or otherwise alter a criminal alien's sentence. Instead, for reasons similar to those explained in *Matter of Pickering*, 23 I&N Dec. 621 (BIA 2003), *rev'd on other grounds, Pickering v. Gonzales*, 465 F.3d 263 (6th Cir. 2006), such state-court orders will be given effect for immigration purposes only when the orders are based on a procedural or substantive defect in the underlying criminal proceeding. These state-court orders will have no effect for immigration purposes when based on reasons unrelated to the merits of the underlying criminal proceeding, such as rehabilitation or immigration hardship.

Accordingly, I vacate the decisions below and remand these cases to the Board to reassess whether the relevant state-court sentence alterations should be effective for purposes of federal immigration law.

**\*675**  Aliens convicted of crimes in state court may face immigration consequences based on the nature of the conviction and the length of the resulting sentence. To avoid these consequences, some aliens seek state-court orders retroactively vacating the conviction or altering the sentence. At present, the Board of Immigration Appeals ("Board") has adopted three different tests to determine the legal effect of such state-court orders, depending upon how the state court describes its decision.

**\*\*2**  If the order "vacates" an alien's conviction, then the order has legal effect if based on "a procedural or substantive defect in the underlying proceedings," but not if based on reasons "unrelated to the merits" such as "'''rehabilitation or immigration hardships." *Matter of Pickering*, 23 I&N Dec. 621, 624 (BIA 2003), *rev'd on other grounds, Pickering v. Gonzales*, 465 F.3d 263 (6th Cir. 2006). If the order "modifies" an alien's sentence, then the modification is given "full . . . faith and credit" for immigration purposes regardless of the reason. *Matter of Cota-Vargas*, 23 I&N Dec. 849, 850-52 (BIA 2005); *see also Matter of Song*, 23 I&N Dec. 173 (BIA 2001). Finally, if the order "clarifies" an alien's sentence, then an immigration judge assessing the order's effect considers several characteristics of the order, such as whether the original sentencing order contained an obvious

discrepancy and whether the clarifying court had jurisdiction to enter the order. *Matter of Estrada*, 26 I&N Dec. 749, 755-56 (BIA 2016). Adding to the confusion, the classification of a state-court order as a modification or clarification may turn on how the state court itself labels the order, not on any objective distinctions between the two categories.

The tests articulated in *Matter of Cota-Vargas*, *Matter of Song*, and *Matter of Estrada* have no basis in the text of the Immigration and Nationality Act ("INA"), promote inconsistency in the application of the country's immigration laws, and fail to advance Congress's intent to attach immigration consequences to certain convictions and sentences. Accordingly, those cases are overruled. Going forward, immigration courts should apply the test articulated in *Matter of Pickering* in determining the immigration consequence of any change in a state sentence, no matter how the state court describes its order. Such an alteration will have legal effect for immigration purposes when based on a procedural or substantive defect in the underlying criminal proceeding, but not when the change was based on reasons unrelated to the merits, such as the alien's rehabilitation or an interest in avoiding an immigration consequence.

## I.

### A.

**\*676** Congress has provided that an alien's conviction for certain serious crimes, which result in a sentence of imprisonment of sufficient length, shall have consequences for an alien's immigration status. Notably, the INA defines an "aggravated felony" to include a "crime of violence" for which "the term of imprisonment [is] at least one year," *see* 8 U.S.C. § 1101(a)(43)(F), and an alien convicted of an aggravated felony is ineligible for most forms of relief or protection from removal, *see, e.g.*, *id.* § 1227(a)(2)(A)(iii). In many cases, after the Department of Homeland Security ("DHS") commences removal proceedings against a criminal alien, the alien petitions a state court to alter the conviction or resulting sentence. An alien facing removal as an aggravated felon, for example, may ask the state court to vacate the underlying conviction entirely, or to modify, clarify, or otherwise alter the associated sentence so that it falls below the one-year term of imprisonment necessary to qualify as an "aggravated felony." The state court's order may have no actual impact on the alien under state law-- in most cases, the alien has already served the term of imprisonment he seeks to alter. The sole issue then is the impact that the conviction has under the immigration laws.

**\*\*3** Under existing Board precedent, the immigration consequences of such a state-court order depend on the precise form of relief granted by the court. First, if the state court vacates the alien's conviction, then the Board applies the test set forth in *Matter of Pickering*, 23 I&N Dec. 621. In *Pickering*, the Board concluded that there is a "significant distinction" between vacaturs based on a "procedural or substantive defect in the underlying proceedings," and those based on "post-conviction events, such as rehabilitation or immigration hardships." *Id.* at 624. The former circumstance calls into question whether the *original* conviction was valid, but the latter does not. Hence, under *Pickering*, "if a court with jurisdiction vacates a conviction based on a defect in the underlying criminal proceedings, the respondent no longer has a 'conviction' as that term is defined in the INA. If, however, a court vacates a conviction for reasons unrelated to the merits of the underlying criminal proceedings, [then] the respondent remains "'convicted' for immigration purposes." *Id.*

By contrast, if the state court modifies the alien's sentence, rather than vacating the alien's conviction, then the Board follows the rule set forth in *Matter of Song*, 23 I&N Dec. at 173-74, and *Matter of Cota-Vargas*, 23 I&N Dec. at 851-52. Under those decisions, the immigration judge will automatically give full faith and credit to the state court order, regardless of the reason for the modification. In *Matter of Song*, the respondent was originally sentenced to a term of imprisonment of one year, but subsequently **\*677** petitioned a state court to resentence him to a term of imprisonment of 360 days. 23 I&N Dec. at 173-74. Finding the situation analogous to one where a state court had deemed the alien's initial sentence "to have been illegal" and thus regarding it "as void and of no force and effect," *see Matter of Martin*, 18 I&N Dec. 226, 227 (BIA 1982), the Board concluded that ""the offense no longer [fell] within the definition of an 'aggravated felony' in [the INA], and the respondent [was] not removable." *Matter of Song*, 23 I&N Dec. at 174. Elaborating upon that reasoning in *Matter of Cota-Vargas*, the Board, over a

dissent, held that "a modified or reduced sentence is recognized as valid for purposes of the immigration law without regard to the trial court's reasons for effecting the modification or reduction." 23 I&N Dec. at 849.

 **4  Finally, if the state court "clarifies" an alien's sentence, then the Board considers the characteristics of the order discussed in *Matter of Estrada*, 26 I&N Dec. 749. There, the respondent initially had received a twelve-month sentence, but it was not clear whether the sentence was for """"probation" or for a "probated term of imprisonment"--only the latter of which would have counted as a term of imprisonment under the INA. The respondent successfully petitioned the state court to "[c]larify[]" that the sentence was solely for probation. *See id.* at 755. In deciding whether to give effect to the order, the Board considered several characteristics previously identified as relevant by the Eleventh Circuit. *See id.* (citing *Herrera v. U.S. Att'y Gen.*, 811 F.3d 1298 (11th Cir. 2016); *United States v. Garza-Mendez*, 735 F.3d 1284 (11th Cir. 2013)). These characteristics include whether the original sentencing order contained an obvious discrepancy; whether the original judge was the same as the clarifying judge; whether a significant period of time had passed between the original sentencing and the clarification; and whether the clarifying court had jurisdiction to enter the clarification. *Id.* at 755-56. The Board then observed that, in the case before it, the alien's original sentencing order was legitimately unclear and the clarifying order had been issued by the same judge who had initially sentenced the alien. *Id.* For these reasons, the Board gave effect to the order and concluded that the alien was not removable. *Id.* at 756.

Taken together, these Board decisions establish three distinct tests governing the immigration consequences of state-court orders that retroactively alter a criminal conviction or sentence. These tests are inconsistent with each other, and they cause similarly situated aliens to experience disparate outcomes under the immigration laws. The two cases in this matter demonstrate this inconsistency.

## B.

### *678  1.

In *Matter of Michael Vernon Thomas*, the respondent, a citizen of Trinidad and Tobago, had been living in the United States as a lawful permanent resident since 1977. In 2001, a Georgia state court convicted Thomas of family violence battery, *see* Ga. Code Ann. § 16-5-23.1(f), and sentenced him to a term of imprisonment of twelve months. In 2016, DHS charged Thomas as removable as an aggravated felon because he had been convicted of a "crime of violence" for which the "term of imprisonment [was] at least one year." *See* 8 U.S.C. § 1101(a)(43)(F). Thomas conceded before an immigration judge that his conviction constituted grounds for removal, and the immigration judge ordered Thomas removed.

 **5  While Thomas's appeal was pending, he petitioned a Georgia state court to alter his criminal sentence. Thomas did not allege any procedural or substantive defect in the original criminal proceeding, which occurred over fifteen years before, but upon the consent of the prosecution, the state court issued an order stating, "Defendant's sentence in the above matter is hereby clarified to reflect that Defendant was sentenced to a cumulative term of 11 months and 28 days of probation." The Board then remanded for the immigration judge to review the impact of the consent order.

The immigration judge declined to credit the order, and the Board affirmed. Because the order "clarified" Thomas's sentence, the Board considered the characteristics of the order identified as relevant in *Matter of Estrada*. The Board observed that--in contrast to the situation of the alien in that case--Thomas's original sentencing order was clear; a significant period of time (approximately fifteen years) had passed between the original sentence and the clarification; and the state-court judge clarifying the sentence differed from the original sentencing judge. The Board thus declined to credit the """"clarification" of Thomas's sentence, and he was deemed removable.

### 2.

In *Matter of Joseph Lloyd Thompson*, the respondent, a citizen of Jamaica, was lawfully admitted to the United States in 1987. In 2012, a Georgia state court convicted Thompson of family violence battery, *see* Ga. Code Ann. § 16-5-23.1(f), and sentenced him to a term of imprisonment of twelve months. As with Thomas, in 2017, DHS charged Thompson as removable as an aggravated felon, because had had been convicted of a "crime of violence" for which the "term of imprisonment [was] at least one year." *See* 8 U.S.C. § 1101(a)(43)(F).

**\*679**  In March 2018, while the removal charges were pending, Thompson filed a "Motion to Modify Sentence" in Georgia state court seeking to reduce his sentence to eleven months and twenty-seven days. Thompson did not identify any defect in the original criminal proceeding, but the court granted the motion the same day. Before the immigration judge, Thompson admitted that he had been convicted of a crime of violence, yet argued that his modified sentence did not amount to a term of imprisonment of at least one year.

After the immigration judge rejected Thompson's argument, the Board reversed on appeal. The Board acknowledged that there were questions concerning whether the Georgia state court had jurisdiction to issue the order and that the timing of the order suggested that it may have been issued to affect the immigration court proceeding. But under *Matter of Cota-Vargas*, the Board concluded that it must "give full effect" to the modified sentence. Thus, in contrast with *Matter of Thomas*, the Board gave effect to the post-sentencing state-court order and concluded that Thompson was no longer removable.

### 3.

**\*\*6**  Both Thomas and Thompson were convicted of the same state law offense, were charged with removability on the same ground, and petitioned the state courts to alter their sentences without alleging any procedural or substantive defects in the original proceeding. Yet these similarly situated aliens faced markedly divergent consequences. Relying on a semantic distinction between a """clarification" and a "modification," the Board found that Thomas *was* removable but Thompson was *not*. I certified these cases to address these inconsistencies and to clarify the appropriate treatment under the INA. *See* 27 I&N Dec. 556 (A.G. 2019). [1]

### II.

The INA assigns clear immigration consequences to an alien who has been convicted and sentenced for a state crime, yet the Board has adopted multiple tests that permit state courts to change those results well after the **\*680**  fact. Although a state court may alter a state conviction for appropriate reasons under state law, the state court does not have the authority to make immigration-law determinations. In view of these considerations, I conclude that the *Pickering* test should apply to state-court orders that modify, clarify, or otherwise alter the term of imprisonment or sentence associated with a state-court conviction. As a result, such alterations will have legal effect for immigration purposes if they are based on a procedural or substantive defect in the underlying criminal proceeding, but not if they are based on reasons unrelated to the merits, such as rehabilitation or immigration hardship. *Matter of Cota-Vargas*, *Matter of Song*, and *Matter of Estrada* must therefore be overruled.

### A.

### 1.

In considering whether a state-court order that modifies, clarifies, or otherwise alters a "term of imprisonment or a sentence" should change the immigration consequences of the original sentence, we begin with the text of the statute. *E.g.*, Ross v. Blake, 136 S. Ct. 1850, 1856 (2016). The INA defines "conviction" and a "term of imprisonment or a sentence" as follows:

(A) The term "conviction" means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where--

(i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and

(ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

(B) Any reference to a *term of imprisonment or a sentence* with respect to an offense is deemed to include the period of incarceration or confinement ordered by a court of law regardless of any suspension of the imposition or execution of that imprisonment or sentence in whole or in part.

**\*\*7** 8 U.S.C. § 1101(a)(48) (emphasis added). An alien plainly has been convicted under the INA when a court has entered "a formal judgment of **\*681** guilt," and he has received a sentence when the court orders a "period of incarceration or confinement," no matter whether that sentence is executed.

The question then is whether the state court's subsequent alteration of a ""'"conviction" or a "sentence" changes those facts under the INA. Neither the INA nor the associated regulations provide further guidance on this point, but the statute's history helps illuminate the meaning of the phrase. Congress amended the INA to define "conviction" following the Board's decision in *Matter of Ozkok,* 19 I&N Dec. 546 (BIA 1988). There, the Board established a rule that "a conviction will be found for immigration purposes" where:
(1) a judge or jury has found the alien guilty or he has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilty;

(2) the judge has ordered some form of punishment, penalty, or restraint on the person's liberty to be imposed (including but not limited to incarceration, probation, a fine or restitution, or community-based sanctions such as a rehabilitation program, a work-release or study- release program, revocation or suspension of a driver's license, deprivation of nonessential activities or privileges, or community service); and

(3) a judgment or adjudication of guilt may be entered if the person violates the terms of his probation or fails to comply with the requirements of the court's order, without availability of further proceedings regarding the person's guilt or innocence of the original charge.

*Id.* at 551-52. Under *Ozkok*'s definition of "conviction," "it was possible for a defendant to plead nolo contendere, obtain a suspended sentence, or enter a rehabilitation program on probation--so long as the court stopped short of a formal adjudication of guilt--without having the offense be considered a conviction for purposes of immigration laws." *Francis v. Gonzales,* 442 F.3d 131, 140 (2d Cir. 2006). Applying this definition "required an individualized analysis of the particular procedures of different state penal systems to determine whether a person had been 'convicted."DD' *Id.*

Congress rejected the third element of *Ozkok* in enacting 8 U.S.C. § 1101(a)(48) as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). The statute incorporated the first two elements of *Ozkok*'s definition of "conviction," but eliminated the third, which had excluded certain suspended sentences. *See* Pub. L. No. 104-208, **\*682** div. C, § 322, 110 Stat. 3009, 3009-546, 3009-628 (1996); *see also* H.R. Rep. No. 104-828, at 224 (Conf. Rep. 1996) (confirming this textual interpretation by observing that the IIRIRA "broaden[ed] the scope of the definition of 'conviction' beyond that adopted by the Board of Immigration Appeals in *Matter of Ozkok,*" which had not gone "far enough to address situations where a judgment of guilt or imposition of sentence [was] suspended."); *Francis,* 442 F.3d at 141 (collecting cases acknowledging "that in enacting IIRIRA, Congress specifically and deliberately abrogated the *Ozkok* test").

**\*\*8** In enacting section 1101(a)(48), Congress made clear that immigration consequences should flow from the original determination of guilt. In addition, Congress ensured uniformity in the immigration laws by avoiding the need for immigration

judges to examine the post-conviction procedures of each State. *See Saleh v. Gonzales, 495 F.3d 17, 23 (2d Cir. 2007)* ("Interpreting the new definition, the BIA identified two primary aims that it believed Congress sought to accomplish: to focus the conviction inquiry on the "'original determination of guilt' and to 'implement a uniform federal approach."'DD' (quoting *Matter of Roldan-Santoyo*, 22 I&N Dec. 512, 521-22 (BIA 1999)); *Herrera-Inirio v. I.N.S.*, 208 F.3d 299, 306 (1st Cir. 2000) (explaining the "emphasis that Congress placed on the *original* admission of guilt" when enacting the new definition of "conviction" (emphasis in original)); *id.* at 305 (explaining that *Matter of Ozkok* "failed to produce . . . uniformity and Congress stepped in to fill the void"); *see also, e.g., Resendiz-Alcaraz v. U.S. Atty. Gen.*, 383 F.3d 1262, 1270 (11th Cir. 2004).

This statutory history confirms that, under paragraph (A), an alien's *original* adjudication or admission of guilt establishes the fact of his "'"'conviction." The remainder of the definition, paragraph (B), similarly contains language making clear that the length of a "term of imprisonment or a sentence" is calculated "*regardless of any suspension of the imposition or execution of that imprisonment or sentence* in whole or in part." 8 U.S.C. § 1101(a)(48)(B) (emphasis added). The length of a sentence for immigration purposes thus ignores "suspensions" (whether occurring at the time of sentencing or thereafter), suggesting that other post-sentencing events--such as modifications or clarifications--should not be relevant under the immigration laws. Accordingly, the phrase "term of imprisonment or a sentence" in paragraph (B) is best read to concern an alien's *original* criminal sentence, without regard to post-sentencing alterations that, like a suspension, merely alleviate the impact of that sentence.

This reasoning, which supports the *Pickering* test, should likewise extend to all state-court modifications, clarifications, and other alterations of a criminal sentence. If the original sentence was altered because of a legal defect, then the sentence was not legally effective, and there is no valid **\*683** sentence to which immigration consequences can attach. The original sentence-- because of the defect--should not have been entered in the first place. If, in contrast, a state court later alters an earlier sentence for rehabilitative or immigration reasons, then the immigration consequences of that sentence under section 1101(a)(48) remain unchanged because section 1101(a)(48) addresses the alien's original term of imprisonment or sentence. *See Saleh*, 495 F.3d at 24 (explaining that "Congress did not intend to allow an alien to escape [immigration] consequences by means of a state vacatur that was not on the merits").

**\*\*9** Said differently, Congress has determined that an alien who is convicted of a crime that is sufficiently serious to warrant a significant sentence should be subject to removal. Later alterations to that sentence that do not correct legal defects, do not change the underlying gravity of the alien's action. They accordingly do not affect Congress's judgment as to whether that alien should be removed. Such an alteration therefore should have no effect for purposes of the immigration laws. *Cf. id. at 25* ("When a conviction is amended nunc pro tunc solely to enable a defendant to avoid immigration consequences, in contrast to an amendment or vacatur on the merits, there is no reason to conclude that the alien is any less suitable for removal."). Applying the *Pickering* test to all sentence alterations thus ensures that aliens who have committed significant crimes, as identified by Congress, do not later avoid the immigration consequences of those actions.

Furthermore, the application of a single test to state-court sentence alterations promotes uniformity in the law. In the cases currently under review, for example, applying the *Pickering* test should avoid the inconsistent results that apply to the two similarly situated respondents. If neither state court altered the respondent's sentence on the basis of "a procedural or substantive defect in the underlying proceedings," *see Pickering, 23 I&N Dec. at 624*, then the *Pickering* test would dictate the same immigration consequence for both respondents.

In addition, applying the *Pickering* test to all forms of state-court sentence alterations resolves inconsistencies among the states' "crazy quilt of . . . widely disparate state rehabilitative and diversionary arrangements." *Herrera-Inirio, 208 F.3d at 305*; *see also, e.g., Pinho v. Gonzales, 432 F.3d 193, 206 (3d Cir. 2005)* (observing that the Board in the past has been "'"'bedeviled by the diversity of state rehabilitative programs and the resulting difficulty in fashioning a uniform national immigration policy"); *Resendiz-Alcaraz, 383 F.3d at 1269* (noting "the vagaries of state law" related to the alteration of a conviction). The *Pickering* test eliminates the need to assess this broad array of state procedures. If the state court alters the alien's sentence because of a procedural or substantive defect in the **\*684** original proceeding, then the alteration has legal effect--regardless of the label the state court placed on the order. If the state court alters an alien's sentence on the basis of something other than a procedural

or substantive defect, then the alteration has no effect and the immigration judge need inquire no further. Moreover, similarly situated aliens in different states will face similar consequences. Whether one state affords more or less generous mechanisms for altering a sentence for rehabilitative purposes will be irrelevant. Only those alterations based on legal defects will receive effect. The country's immigration system will thereby achieve more uniform results.

**2.**

 **\*\*10**  In reaching this conclusion, I have considered the Board's reasons for adopting the *Cota-Vargas* and *Estrada* tests, but I find them unpersuasive. In *Matter of Song*, the Board offered little analysis before giving full effect to state-court modifications, and it did not ground that rule in any facet of the text of the INA. *See* 23 I&N Dec. 173. In *Matter of Cota-Vargas*, the Board acknowledged that the "language and purpose of section 101(a)(48)(A)" support applying the *Pickering* rule to sentence alterations, *see* 23 I&N Dec. at 852, but found it relevant that paragraph (B) addresses """"suspensions" and not "modifications." Based upon this statutory silence, the Board inferred a congressional intent to credit state-court modifications that were unrelated to the merits of a criminal proceeding. *See id.* Yet paragraph (A)'s definition of "conviction" is equally silent about "vacaturs," and the Board nonetheless determined in *Matter of Pickering* that vacaturs unrelated to the merits will not have immigration consequences. *See* 23 I&N Dec. at 624. Paragraph (A) and paragraph (B) simply do not address vacaturs, modifications, or clarifications. This silence, however, provides no reason to depart from Congress's focus on the alien's original conviction and sentence in either of those provisions.

I likewise do not believe that the *Estrada* test finds any more support in the INA. There, the Board considered a number of characteristics in assessing the effect of a clarification, yet none of them flows directly from the text of the INA itself, *see* 26 I&N Dec. 755-56, and reliance on such varied considerations does not promote uniformity, *cf. Hertz Corp. v. Friend*, 559 U.S. 77, 91-92 (2010) (observing that "highly general multifactor tests . . . [had] failed to achieve a nationally uniform interpretation of federal law"). Moreover, the *Estrada* test may give effect to state-court clarifications that do not call into question the validity of a criminal alien's original sentence. For example, the opinion in *Estrada* suggests that a """"clarification  **\*685**  entered shortly after the original sentence by the same judge who issued the sentence could be given effect for immigration purposes, *see* 26 I&N Dec. 755-56, even if the alien who sought the clarification did so just to avoid immigration consequences. The *Estrada* test thus undermines Congress's decision to attach immigration consequences to sentences of a certain length.

**B.**

 **\*\*11**  In extending the *Pickering* test to all forms of sentence alterations, I have also considered and rejected several additional arguments pressed by the respondents.

**1.**

The respondents first argue that requiring immigration judges to assess the reasons that a state court altered a criminal alien's sentence would require them to act as fact-finders in matters of state criminal law with which they have little familiarity. The *Pickering* test, however, already requires immigration judges to assess the administrative record and make determinations about the reasons that certain state-court orders were entered. *See* 23 I&N Dec. at 625 (examining "the law under which the [post-conviction] court issued its order," "the terms of the order itself," and "the reasons presented by the respondent in requesting that the court vacate the conviction"). The extension of the *Pickering* test to state-court sentence alterations raises no new concerns about the role of immigration judges in assessing the record.

Moreover, the evidence on which immigration judges will rely when assessing state-court sentence alterations will typically be readily available in the record and should require little interpretation of state law. The application of the *Pickering* test demonstrates as much, as adjudicators applying it frequently determine whether a vacatur is valid for immigration purposes by assessing the text of the order of vacatur itself or the alien's motion requesting the vacatur. *See, e.g., Al-Najar v. Mukasey*, 515 F.3d 708, 716 (6th Cir. 2008) (declining to give effect to a vacatur because of "the absence of any substantive legal basis cited

in [the alien's] motion"); *Sanusi v. Gonzales,* 474 F.3d 341, 347 (6th Cir. 2007) (declining to give effect to a vacatur because "[a] colorable legal ground for the granting of a writ of *coram nobis* was not raised in [the alien's] state court petition"); *Alim v. Gonzales,* 446 F.3d 1239, 1251 (11th Cir. 2006) (giving effect to a vacatur after examining the "state court order" and the alien's "coram nobis petition" to determine "the reason underlying the state court's decision to vacate" the **\*686** conviction). The availability of such evidence thus indicates that immigration judges should not need to wade into the intricacies of state criminal law in applying this opinion's rule.

**2.**

The respondents next contend that the Full Faith and Credit Act, 28 U.S.C. § 1738 (the "Act"), requires that immigration judges and the Board give effect to state-court alterations of a criminal sentence, regardless of the reasons for that alteration. The respondents contend that *Matter of Cota-Vargas* supports this argument because, although that decision did not cite the Act, it concluded that a state court's "decision to modify or reduce an alien's criminal sentence nunc pro tunc is entitled *to full faith and credit* by the Immigration Judges and the Board of Immigration Appeals." 23 I&N Dec. at 849 (emphasis added). This argument fails for two independent reasons.

**\*\*12** First, Congress may define terms such as "conviction" for the purposes of federal law in a way that differs from the definition attached to such terms by state courts. Thus, in deciding whether a vacated conviction remains effective for immigration purposes, an immigration judge or the Board merely applies and upholds the definition of conviction in the INA. The adjudicator is not reevaluating or otherwise questioning the validity of the state-court judgment. The adjudicator accordingly does not violate the Full Faith and Credit Act. *See Saleh,* 495 F.3d at 26 ("[T]he BIA is simply interpreting how to apply Saleh's vacated State conviction for receiving stolen property to the INA and is not refusing to recognize or relitigating the validity of Saleh's California state conviction. The full faith and credit statute is not thereby violated."); *Herrera-Inirio,* 208 F.3d at 307 ("Neither the Full Faith and Credit Clause nor the statutory overlay 'purports to prevent federal legislative authorities from writing federal statutes that differ from state statutes or from attaching, to words in a federal statute, a meaning that differs from the meaning attached to the same word when used in a statute enacted by a state.'DD' (quoting *Molina v. INS,* 981 F.2d 14, 19 (1st Cir. 1992) (Breyer, J.))).

The same reasoning applies to sentence alterations. In applying the *Pickering* test to these state-court orders, the immigration judge is simply determining the meaning of the phrase "term of imprisonment or a sentence" in the INA for the purpose of enforcing federal immigration law. Hence, for the same reason that interpreting the term "conviction" in accordance with the *Pickering* test "does not infract applicable principles of full faith and credit," *see Herrera-Inirio,* 208 at 307, applying the *Pickering* test to the **\*687** phrase "term of imprisonment or a sentence" likewise does not implicate, much less violate, the Full Faith and Credit Act.

The respondents attempt to avoid this result on the ground that *Matter of Pickering's* interpretation of "conviction" is required by paragraph (A) of 8 U.S.C. § 1101(a)(48), whereas paragraph (B) does not mandate a similar result for the phrase "term of imprisonment or a sentence." As discussed above, however, I believe that the text and history of this provision suggest that the two paragraphs are properly construed together, such that paragraph (A)'s focus on the original criminal proceeding requires paragraph (B) to be similarly interpreted. Moreover, just as paragraph (B) does not specifically address the effect of state-court "modifications," "clarifications," or other alterations of a sentence, paragraph (A) does not specifically address the effect of state-court "vacaturs" of a conviction. Both paragraphs, in other words, are silent on the effect of state-court orders, so there is no express textual basis for differentiating between the paragraphs in deciding whether to apply the Full Faith and Credit Act.

**\*\*13** The respondents' argument also fails for the second reason that the Full Faith and Credit Act does not apply to federal agencies. By its own terms, that statute provides that "[a]cts, records and judicial proceedings . . . shall have the same full faith and credit *in every court* within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken." 28 U.S.C. § 1738 (emphasis added). The text of the Act is thus clear: it applies to "courts"--but not to "agencies"--and does not require agency officials such as immigration judges

or the Board to give effect to state-court orders. *See Perez v. Cissna*, 914 F.3d 846, 857 (4th Cir. 2019) ("[T]he Act does not apply to agencies. The text of the Act is clear. . . . The [United States Citizenship and Immigration Services ("USCIS")] is not a court. Thus, the plain language of 28 U.S.C. § 1738 establishes that it does not apply to [USCIS]."); *see also Am. Airlines, Inc. v. Dep't of Transp.*, 202 F.3d 788, 799 (5th Cir. 2000) (explaining that the "plain language of [the Act] establishes that it does not apply" to an agency); *N.L.R.B. v. Yellow Freight Sys., Inc.*, 930 F.2d 316, 320 (3d Cir. 1991) (holding that "federal administrative agencies are not bound by section 1738 because they are not "'courts'DD'). [2]

 **\*688** The foregoing observations also dispose of the respondents' broader argument that--even apart from the Act--an immigration judge's assessment of state-court sentence alterations would contravene principles of federalism and comity. Contrary to respondent Thompson's argument, an immigration judge's evaluation of the reasoning behind a state-court alteration of an alien's sentence does not "arrogate" to the federal government "the power to determine the effectiveness of state court orders." Instead, as explained above, the immigration judge in such a case simply determines the effect of that order for the purposes of federal immigration law. *See Matter of Velasquez-Rios*, 27 I&N Dec. 470, 474 (BIA 2018) ("We must use *Federal law*, rather than *State law*, to determine the immigration consequences of [a] respondent's . . . conviction." (emphases in original)). The state-court order itself remains effective and unchallenged for all other purposes, and there accordingly exists no intrusion on state law of the sort that principles of federalism and comity are designed to prevent.

### 3.

 **\*\*14** The respondents finally argue that, in determining the impact that a state-court alteration of a sentence should have on the immigration laws, the Attorney General should proceed through rulemaking rather than adjudication. But given that the Board itself adopted its prior tests precisely in the context of administrative adjudications, I do not believe that there is a need for a regulation here. Indeed, Supreme Court precedent confirms my authority as agency head to proceed by adjudication, and my authority here derives from the text of the relevant provisions in the INA.

The Supreme Court has long recognized that agencies may decide whether to announce reinterpretations of a statute through rulemaking or through adjudication. *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974) ("""[T]he choice between rulemaking and adjudication lies in the first instance within the [agency's] discretion."); *see also Velasco-Giron v. Holder*, 773 F.3d 774, 779 (7th Cir. 2014) (explaining that agencies "can choose freely between rules and standards, between rulemaking and adjudication"); *Gao v. Holder*, 595 F.3d 549, 556 (4th Cir. 2010) ("[I]t is a basic principle of administrative law that 'the choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency."DD' (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947)). Indeed, in the decades **\*689** since *Bell Aerospace*, the Supreme Court "has not even *suggested* that a court can constrain an agency's choice between rulemaking and adjudication."DD' *Velasco-Giron*, 773 F.3d at 779 (emphasis added) (quoting Richard J. Pierce, Jr., I Administrative Law Treatise § 6.9 at 510 (5th ed. 2010)). And agencies retain their discretion even when announcing interpretations that may conflict with prior decisions. *See Chisholm v. F.C.C.*, 538 F.2d 349, 364 (D.C. Cir. 1976) ("[A]n administrative agency is permitted to change its interpretation of a statute, especially where the prior interpretation is based on error, no matter how longstanding."); *see also id.* at 365 ("The original interpretation of the [statute] was . . . established by adjudication; thus reversal by adjudication seems particularly appropriate here."). I accordingly conclude that it is appropriate to address these Board precedents in the context of an administrative adjudication, and there is no legal requirement to do so by regulation.

### C.

 **\*\*15** Finally, although I did not request briefing on the subject, the parties to this case have addressed which side should carry the burden of proof when it comes to establishing the state court's reason for altering a sentence under the *Pickering* test. The Board and the courts of appeals have considered this issue in applying *Matter of Pickering* to vacaturs of convictions, and they have allocated the burden in different ways, depending on the procedural posture of the case at hand. *See, e.g., Andrade-Zamora v. Lynch*, 814 F.3d 945, 949 (8th Cir. 2016) (the alien bears the burden to prove that a conviction was vacated because of a procedural or substantive defect when applying for cancellation of removal); *Barakat v. Holder*, 621 F.3d 398, 403-04

(6th Cir. 2010) (the government bears the burden to prove that a conviction was vacated for reasons *other* than a procedural or substantive defect when seeking to establish that an alien is removable); *Rumierz v. Gonzales*, 456 F.3d 31, 37 (1st Cir. 2006) (the alien bears the burden to prove that a conviction was vacated because of a procedural or substantive defect when seeking to reopen removal proceedings).

The courts of appeals have sometimes invoked a burden-shifting framework to describe the burden of proof, *e.g.*, *Barakat*, 621 F.3d at 403 (describing how "the burden of production may shift during removal proceedings"), but regardless of how the issue is described, the bottom line remains the same: When the government alleges that an alien is deportable, the government bears the burden of proving deportability by clear and convincing evidence. 8 U.S.C. § 1229a(c)(3)(A). And when an alien applies for relief from removal, the alien bears the burden to prove that he meets the **\*690** eligibility requirements for the specific form of relief requested. *Id.* § 1229a(c)(4). After all of the evidence has been proffered by the parties, the immigration judge must weigh that evidence and determine whether the party bearing the burden of proof has carried its burden.

The parties to this appeal dispute how these principles should apply in the context of sentence alterations, but I did not request briefing on this issue. *See* 27 I&N Dec. 556. In the absence of such a request, I decline to address the burden-shifting issue anew and thus leave undisturbed the existing body of law applying the *Pickering* test.

### III.

For the reasons explained, the Board's decisions in *Matter of Cota-Vargas*, *Matter of Song*, and *Matter of Estrada* are overruled. The tests described in those cases will no longer govern the immigration-related effects of state-court orders that modify, clarify, or otherwise alter a criminal alien's sentence. Instead, such state-court orders will be given effect for immigration purposes only if based on a procedural or substantive defect in the underlying criminal proceeding. These orders will have no effect for immigration purposes if based on reasons unrelated to the merits of the underlying criminal proceeding, such as rehabilitation or the avoidance of immigration consequences.

**\*\*16** Because the Board's decisions in *Matter of Michael Vernon Thomas* and *Matter of Joseph Lloyd Thompson* were based on these earlier precedents, I vacate the Board's decisions below and remand these cases to the Board to assess the state-court alterations in light of the *Pickering* test. I do not doubt that it would be the rare case where a state court's alteration of an old sentence by three or four days (as in respondents' cases) would reflect a necessary remedy for a fundamental legal defect, rather than an exercise of the trial judge's sentencing discretion. But insofar as the parties litigated these cases under the earlier precedents, I do not wish to foreclose any available arguments in that regard. On remand, the Board may review the evidence in the record, and consider any appropriate requests to reopen the record, to determine whether the state-court alterations in each of these cases arose as a result of a procedural or substantive defect, or for some other reason.

### Footnotes

1    After I certified these cases for my review, Thomas filed a "Motion for Production" asserting that the Due Process Clause entitles him to a chance to respond to any "briefing, memoranda, or other documents" that might influence the decision in his case. The motion is denied. Thomas has received DHS's briefs in these matters, and he had a full and fair opportunity to raise his own arguments and respond to any other party's arguments through his own initial and reply brief.

2    Two Board opinions suggest that 28 U.S.C. § 1738 nonetheless applies to federal agencies. *See Matter of Adamiak*, 23 I&N Dec. 878, 880 (BIA 2006) ("In the absence of a statutory directive to the contrary, we are required by 28 U.S.C. § 1738 (2000) to give full faith and credit to this State court judgment."); *Matter of Rodriguez-Ruiz*, 22 I&N Dec. 1378, 1380 (BIA 2000) ("We will instead accord full faith and credit to this state court judgment. See 28 U.S.C. § 1738."). The plain text of the statute and the federal court precedent cited above indicate that these cases were wrongly decided. These

cases accordingly are overruled to the extent that they suggest that the Full Faith and Credit Act applies to proceedings before immigration judges and the Board.

27 I. & N. Dec. 674 (U.S.Atty.Gen.), Interim Decision 3966, 2019 WL 5546810

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Holding Modified by Matter of C-, BIA, May 28, 1992

20 I. & N. Dec. 327 (BIA), Interim Decision 3152, 1991 WL 353519

United States Department of Justice

Board of Immigration Appeals

MATTER OF U−M−

In Deportation Proceedings

A-29202816

Decided by Board June 5, 1991

**\*\*1**  (1) By federal statute, aggravated felonies and, correspondingly, drug trafficking crimes, are per se particularly serious crimes.

(2) The respondent in deportation proceedings has been convicted of particularly serious crimes, i.e., convictions for the sale of marihuana and lysergic acid diethylamide (LSD) and, therefore, by operation of law, he is ineligible for asylum pursuant to 8 C.F.R. § 208.14(c)(1) (1991) and for withholding of deportation under section 243(h)(2)(B) of the Immigration and Nationality Act, 8 U.S.C.A. § 1253(h)(2)(B) (West Supp.1991), and 8 C.F.R. § 208.16(c)(2)(ii) (1991).

(3) The asylum regulations found at 8 C.F.R. §§ 208.1–.24 (1991) are applicable to the respondent's applications for asylum and withholding of deportation received by the Office of the Immigration Judge on November 14, 1990, since these regulations apply to applications filed on or after October 1, 1990, as provided by 8 C.F.R. § 208.1(a) (1991).

(4) The statutory bar to asylum for an alien convicted of an aggravated felony, found in section 208(a) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a) (1988), as amended by section 515(a)(1) of the Immigration Act of 1990, Pub.L. No. 101–649, 104 Stat. 4978, 5053 (enacted November 29, 1990), does not apply to the respondent's asylum application, where section 515(b)(1) of the 1990 Act, 104 Stat. at 5053, provides that this statutory bar "shall apply to applications for asylum made on or after the date of the enactment of this Act," and the respondent made his application for asylum with the immigration judge on November 14, 1990, approximately 2 weeks before the enactment date.

(5) The amendment to section 243(h)(2)(B) of the Act, providing that an alien convicted of an aggravated felony shall be considered to have committed a particularly serious crime, is effective on the date of enactment of the Immigration Act of 1990, 104 Stat. at 4978 (enacted November 29, 1990), where the 1990 Act is silent as to the effective date of the amendment, and in the absence of an express provision to the contrary, an act of Congress takes effect on its date of enactment.

(6) Where new statutory provisions affecting eligibility for relief from deportation come into effect during the pendency of a deportation hearing or an administrative appeal to this Board, and there exists no statutory directive to the contrary, the new statutory provisions shall be applied to the application for relief before us, and the application may be denied on the basis of the statutory amendment.

**CHARGE:**

Order: Act of 1952—Sec. 241(a)(4)(B) [8 U.S.C. § 1251(a)(4)(B) ]—Convicted of aggravated felony

**\*328**  Sec. 241(a)(11) [8 U.S.C. § 1251(a)(11) ]—Convicted of controlled substance violation

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Lodged: Act of 1952—Sec. 241(a)(2) [8 U.S.C. § 1251(a)(2) ]—Entered without inspection

**ON BEHALF OF RESPONDENT: Pro se**

**ON BEHALF OF SERVICE:**
Christopher Stender
General Attorney

**\*\*2**  BY: Milhollan, Chairman; Dunne, Morris, Vacca, and Heilman, Board Members

In a decision dated January 18, 1991, an immigration judge found the respondent deportable as charged under section 241(a)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(2) (1988), as an alien who had entered the United States without inspection, under section 241(a)(4)(B) of the Act as an alien convicted of an aggravated felony, and under section 241(a)(11) of the Act as an alien convicted of a controlled substance violation. In his decision, the immigration judge also denied the respondent's applications for asylum and withholding of deportation under sections 208(a) and 243(h) of the Act, 8 U.S.C. §§ 1158(a) and 1253(h) (1988), respectively, and ordered the respondent deported from the United States to Uruguay, and alternatively to El Salvador if Uruguay would not accept him. The respondent has appealed from that decision. The appeal will be dismissed.

The respondent, a native and citizen of El Salvador, was convicted in a California court on November 14, 1986, of the crime of sale or transportation of marihuana, a felony, in violation of section 11360(a) of the California Health and Safety Code. For this crime he was granted a 3–year period of probation, the conditions of which required him to serve 90 days in jail and pay $100 to a restitution fund. He was also convicted in a California court on December 13, 1988, of the crime of sale of a controlled substance, namely lysergic acid diethylamide ("LSD"), a felony, in violation of section 11379 of the California Health and Safety Code. He was granted probation for a period of 3 years, the conditions of which included serving 180 days in jail, paying a fine of $100, and paying restitution of $100. On July 19, 1989, probation for these two crimes was revoked on the basis that the respondent was in violation of probation. He was sentenced to 3 years' imprisonment for the 1988 conviction and 2 years' imprisonment for the 1986 conviction, with the sentences to run concurrently. During the deportation proceedings, the respondent testified that his probation was revoked in lieu of filing charges after he was arrested in June 1989 for sale of marihuana. The respondent also admitted having  **\*329**  entered the United States without inspection in July 1981. The Board finds that the respondent's deportability has been established by clear, unequivocal, and convincing evidence, as required by Woodby v. INS, 385 U.S. 276 (1966), and 8 C.F.R. § 242.14(a) (1991).

The immigration judge denied the respondent's applications for asylum and withholding of deportation on the basis that he had been convicted of a particularly serious crime and was thus ineligible for either asylum or withholding of deportation under the new asylum regulations. See 8 C.F.R. §§ 208.1 – .24 (1991). These regulations apply to asylum applications filed on or after October 1, 1990. 8 C.F.R. § 208.1(a) (1991). The respondent's application was received by the Office of the Immigration Judge on November 14, 1990. Under these regulations, an application for withholding of deportation shall be denied if "the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States." 8 C.F.R. § 208.16(c)(2)(ii) (1991). This language parrots the statutory bar to withholding of deportation found in section 243(h)(2)(B) of the Act. Thus, by statute and by the regulation, the respondent is ineligible for withholding of deportation if convicted of a particularly serious crime. Additionally, the respondent's application for asylum shall be denied if "the alien, having been convicted of a final judgment of a particularly serious crime in the United States, constitutes a danger to the community." 8 C.F.R. § 208.14(c)(1) (1991). [1]

**\*\*3**  In the case before us, the respondent has been convicted of sale or transportation of marihuana in 1986, and sale of a controlled substance, namely LSD, in 1988. This Board has previously held that an alien convicted of trafficking in drugs has been convicted of a particularly serious crime, representing criminal behavior which constitutes a danger to the community. Matter of Gonzalez, 19 I & N Dec. 682 (BIA 1988) (convicted of possession of a controlled substance, to wit: heroin, with

intent to deliver). The case now before us arose within the jurisdiction of the United States Court of Appeals **\*330** for the Ninth Circuit, which itself noted that it had ratified the Board's consistent view that convictions for drug possession and trafficking are particularly serious within the meaning of section 243(h)(2)(B). Ramirez–Ramos v. INS, 814 F.2d 1394 (9th Cir.1987); see also Mahini v. INS, 779 F.2d 1419 (9th Cir.1986) (possession with intent to distribute heroin constitutes a particularly serious crime). If an alien has been convicted of a particularly serious crime, it is not required that there be a separate and distinct finding that he constitutes a danger to the community, because once a finding of a particularly serious crime is made, it necessarily follows that the alien is a danger to the community. Ramirez–Ramos v. INS, supra; Matter of Carballe, 19 I & N Dec. 357 (1986), modified on other grounds, Matter of Gonzalez, supra.

The record in most proceedings will have to be analyzed on a case-by-case basis to determine whether the conviction is for a particularly serious crime. This analysis involves such factors as the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and most importantly, whether the type and circumstances of the crime indicate that an alien will be a danger to the community. Matter of Frentescu, 18 I & N Dec. 244 (BIA 1982), modified on other grounds, Matter of Gonzalez, supra. However, some crimes are inherently particularly serious, requiring no further inquiry into the nature and circumstances of the underlying conviction. Matter of Garcia–Garrocho, 19 I & N Dec. 423 (BIA 1986), modified on other grounds, Matter of Gonzalez, supra; Matter of Carballe, supra; Matter of Frentescu, supra.

We find that the crime of trafficking in drugs is inherently a particularly serious crime. The harmful effect to society from drug offenses has consistently been recognized by Congress in the clear distinctions and disparate statutory treatment it has drawn between drug offenses and other crimes. Matter of Gonzalez, supra. Illicit narcotic drugs sold in the United States ruin or destroy the lives of many American citizens each year. Apart from the considerable number of people in this country who die of overdoses of narcotics or who become the victims of homicides related to the unlawful traffic of drugs, many others become disabled by addiction to heroin, cocaine, and other drugs. There are also many in this country who suffer crimes against their persons and property at the hands of drug addicts and criminals who use the proceeds of their crimes to support their drug needs. Additionally, a considerable amount of money is drained from the economy of the United States annually because of unlawful trafficking in drugs. This unfortunate situation has reached epidemic proportions and it tears the very fabric of American society. As we find trafficking in drugs to inherently be a particularly serious crime, no **\*331** further inquiry is required into the nature and circumstances of the respondent's convictions for sale or transportation of marihuana and sale of LSD.

**\*\*4** The Ninth Circuit has recently held in a case involving a conviction for sale of marihuana that it is improper to find that the crime is particularly serious without an analysis of the characteristics and circumstances of the alien's conviction. Beltran–Zavala v. INS, 912 F.2d 1027 (9th Cir.1990). The court stated that section 243(h)(2)(B) of the Act does not erect classes of crimes that are per se particularly serious, observing that if Congress wanted to erect per se classifications of crimes precluding immigration and nationality benefits, it knew how to do so. Id. at 1032.

However, since the court's decision in that case, Congress has acted. Section 243(h)(2)(B) has been amended by section 515(a)(2) of the Immigration Act of 1990, Pub.L. No. 101–649, 104 Stat. 4978, 5053, to provide that an alien convicted of an aggravated felony shall be considered to have committed a particularly serious crime. Section 101(a)(43) of the Act, 8 U.S.C.A. § 1101(a)(43) (West Supp.1991), now defines an "aggravated felony" to include "any illicit trafficking in any controlled substance (as defined in section 102 of the Controlled Substances Act), including any drug trafficking crime as defined in section 924(c)(2) of title 18, United States Code...." [2]

As defined in 18 U.S.C. § 924(c)(2) (1988), a "drug trafficking crime" means "any felony punishable under the Controlled Substances Act (21 U.S.C. §§ 801 et seq.)." As noted above, the respondent was convicted of sale or transportation of marihuana in 1986 and of sale of LSD in 1988. The respondent's convictions are punishable under 21 U.S.C. § 841(a) (1988), and, based upon the terms of imprisonment which may be imposed under 21 U.S.C. § 841(b) (1988), his crimes constitute felonies, as defined in 18 U.S.C. § 3559 (1988). As the respondent has been convicted of a crime punishable as a felony under the Controlled Substances Act, he has been convicted of a drug trafficking crime as defined by 18 U.S.C. § 924(c)(2) (1988). Correspondingly, **\*332** he has been convicted of an aggravated felony within the meaning of section 101(a)(43) of the Act. He therefore has

been convicted of a particularly serious crime for purposes of section 243(h)(2)(B) of the Act and 8 C.F.R. § 208.16(c)(2)(ii) (1991), and is thus ineligible for withholding of deportation.

Given Congress' legislative directive that aggravated felonies, and, correspondingly, drug trafficking crimes, are to be viewed per se as particularly serious crimes, we find that in interpreting the term "particularly serious crime" in the regulatory bar to asylum found in 8 C.F.R. § 208.14(c)(1) (1991), we are constrained to find that any aggravated felony and, correspondingly, any drug trafficking crime per se constitutes a particularly serious crime, without any further inquiry into the nature and circumstances of the crime. The amendment itself may have directly concerned eligibility for withholding of deportation under section 243(h)(2) (B) of the Act, but it cannot be ignored in interpreting 8 C.F.R. § 208.14(c)(1) (1991) that, in Congress' judgment, aggravated felonies or drug trafficking crimes by their very nature constitute particularly serious crimes. In view of the newly enacted legislation, we find that the court's ruling in Beltran–Zavala v. INS, supra, no longer remains applicable.

 **5  As noted above, the respondent filed his applications for asylum and withholding of deportation on November 14, 1990, before the Immigration Act of 1990 and its amendment to section 243(h)(2)(B) were enacted. The 1990 Act is silent as to the effective date of this amendment. In the absence of an express provision to the contrary, an act of Congress takes effect on the date of its enactment. Matthews v. Zane, 20 U.S. (7 Wheat.) 164 (1822); Arnold v. United States, 13 U.S. (9 Cranch) 103 (1815); United States v. Gavrilovic, 551 F.2d 1099 (8th Cir.1977); United States v. Casson, 434 F.2d 415 (D.C.Cir.1970). The Board therefore finds the effective date of the amendment to be the date of the enactment of the 1990 Act, which is November 29, 1990.

Accordingly, we will apply the law existing at the time of our review and determination regarding the respondent's eligibility for relief. An application for relief from deportation is an ongoing application and the law to be applied to that application is that existing at the time the final administrative decision is made.[3] Where new statutory provisions affecting eligibility for relief from deportation come into effect during  **333  the pendency of a deportation hearing or an administrative appeal to this Board, and there exists no statutory directive to the contrary, as is true in the case before us, the new statutory provisions shall be applied to the application for relief before us, and the application may be denied on the basis of the statutory amendment. See Fassilis v. Esperdy, 301 F.2d 429 (2d Cir.1962); Matter of Fong, 10 I & N Dec. 210 (BIA 1963). The amendment is not being given any retroactive application because the respondent is still the subject of administrative adjudication and has thus not established any right to the benefit he is seeking to obtain by his application. See id. When a law is changed before a decision is handed down by an administrative agency, the agency must apply the new law. See Ziffrin v. United States, 318 U.S. 73 (1943); Talanoa v. INS, 397 F.2d 196 (9th Cir.1968); Patsis v. INS, 337 F.2d 733 (8th Cir.1964), cert. denied, 380 U.S. 952 (1965); Matter of George and Lopez–Alvarez, 11 I & N Dec. 419 (BIA 1965). Thus, the Board may properly apply the amended version of section 243(h) of the Act. De Lucia v. INS, 370 F.2d 305, 309 n. 6 (7th Cir.1966), cert. denied, 386 U.S. 912 (1967).

In sum, Congress' determination that aggravated felonies and, correspondingly, drug trafficking crimes, are per se particularly serious crimes applies to the respondent's applications for asylum and withholding of deportation. The respondent asserts on appeal that, in view of the equities in his favor, he should be granted relief as a matter of discretion. However, as an alien convicted of a particularly serious crime, he is by operation of law ineligible for asylum pursuant to 8 C.F.R. § 208.14(c)(1) (1991), and ineligible for withholding of deportation under section 243(h)(2)(B) of the Act and 8 C.F.R. § 208.16(c)(2)(ii) (1991).

 **6  On appeal, the respondent contends that an alleged delay in instituting his deportation proceedings violated sections 242(a) and (i) of the Act, 8 U.S.C. § 1252(a) and (i) (1988). The short answer to this contention is that the decision to institute deportation proceedings involves the exercise of prosecutorial discretion and is one which neither the immigration judge nor this Board reviews. Matter of Ramirez–Sanchez, 17 I & N Dec. 503 (BIA 1980); Matter of Marin, 16 I & N Dec. 581 (BIA 1978); Matter of Geronimo, 13 I & N Dec. 680 (BIA 1971). Additionally, section 242(a), by its own terms, only grants to a "court of competent jurisdiction" in habeas corpus proceedings authority to review or revise any determination of the Attorney General concerning detention, release on bond, or parole pending a final decision of deportability upon a conclusive showing that the Attorney General is not proceeding with such reasonable dispatch as may be warranted by the particular facts and circumstances in the case of any alien to determine deportability. The Board is not the proper  **334  forum for such review, which, in any

event, is applicable only where proceedings have been commenced and only concerns the propriety of determinations regarding detention, bond, or parole. Section 242(i) provides: "In the case of an alien who is convicted of an offense which makes the alien subject to deportation, the Attorney General shall begin any deportation proceeding as expeditiously as possible after the date of the conviction." However, an incarcerated alien does not have a private cause of action under section 242(i), as the statute is concerned, not with aiding criminal aliens, but with interrupting the flow of narcotics into the United States by illegal aliens and with overcrowding of prisons. Prieto v. Gluch, 913 F.2d 1159 (6th Cir.1990); see also Orozco v. INS, 911 F.2d 539 (11th Cir.1990); Gonzalez v. INS, 867 F.2d 1108 (8th Cir.1989).

The respondent also contends on appeal that the use of his criminal convictions to order his deportation constitutes double punishment for a single crime and, accordingly, violates the constitutional protection against double jeopardy. However, his order of deportation has been properly issued pursuant to the immigration laws and regulations. It is not within the province of the Board to pass upon the constitutionality of the statutes it administers. Matter of Cenatice, 16 I & N Dec. 162 (BIA 1977). Moreover, the respondent's argument has been consistently rejected by the courts. See LeTourneur v. INS, 538 F.2d 1368 (9th Cir.), cert. denied, 429 U.S. 1044 (1976); Oliver v. United States Dept. of Justice, 517 F.2d 426 (2d Cir.1975), cert. denied, 423 U.S. 1056 (1976). Deportation from the United States has never been regarded as criminal punishment. Mahler v. Eby, 264 U.S. 32 (1924); Bugajewitz v. Adams, 228 U.S. 585 (1913). It is civil in nature and therefore the procedural safeguards prescribed for criminal cases are not applicable. Carlson v. Landon, 342 U.S. 524 (1952); Bilokumsky v. Tod, 263 U.S. 149 (1923); Chavez–Raya v. INS, 519 F.2d 397 (7th Cir.1975); see also Matter of Valdovinos, 18 I & N Dec. 343 (BIA 1982). Although the respondent has raised additional arguments on appeal in a supplemental brief, our review demonstrates that they are without merit and do not warrant further discussion.

**7** Accordingly, the appeal will be dismissed.

ORDER: The appeal is dismissed.

## Footnotes

1    Pursuant to section 515(a)(1) of the Immigration Act of 1990, Pub.L. No. 101–649, 104 Stat. 4978, 5053 (enacted November 29, 1990), amending section 208 of the Immigration and Nationality Act, an alien who has been convicted of an aggravated felony may not apply for or be granted asylum. However, although the crimes of which the respondent was convicted may be aggravated felonies, this newly enacted statutory bar to asylum does not apply to the respondent's case. Section 515(b)(1) of the 1990 Act provides that this statutory bar "shall apply to applications for asylum made on or after the date of the enactment of this Act." 104 Stat. at 5053. As noted above, the respondent made his application for asylum with the immigration judge on November 14, 1990, approximately 2 weeks before the enactment date.

2    501(a)(2) of the Immigration Act of 1990 amended section 101(a)(43) of the Act to include as an aggravated felony "any illicit trafficking in any controlled substance (as defined in section 102 of the Controlled Substances Act)...." 104 Stat. at 5048. The amendments also made clear that the term "aggravated felony" applied to offenses "whether in violation of Federal or State law." Section 501(a)(5) of the Immigration Act of 1990, 104 Stat. at 5048. The amendments were made effective as if included in the enactment of section 7342 of the Anti–Drug Abuse Act of 1988, Pub.L. No. 100–690, 102 Stat. 4181, 4469–70. See section 501(b) of the Immigration Act of 1990, 104 Stat. at 5048. Section 7342 of the Anti–Drug Abuse Act of 1988, 102 Stat. at 4469–70, which first added the definition of an aggravated felony as provided in section 101(a)(43) of the Act, was enacted on November 18, 1988.

3    In deportation proceedings, a final administrative decision does not exist until the Board renders its decision in the case on appeal or certification, or, where no appeal to the Board is taken, when the right to appeal is waived, or the time allotted for appeal has expired. See Matter of Lok, 18 I & N Dec. 101 (BIA 1981), aff'd, Lok v. INS, 681 F.2d 107 (2d Cir.1982).

AR.05696

20 I. & N. Dec. 327 (BIA), Interim Decision 3152, 1991 WL 353519

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

20 I. & N. Dec. 707 (BIA), Interim Decision 3208, 1993 WL 424164

United States Department of Justice

Board of Immigration Appeals

MATTER OF Z-

In Exclusion Proceedings

A-72969131

*Decided by Board October 5, 1993*

**\*\*1**  (1) Under the precedent decisions of the Board of Immigration Appeals, an "entry" into the United States under section 101(a)(13) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(13) (1988), requires: (1) a crossing into the territorial limits of the United States, i.e., physical presence; (2)(a) inspection and admission by an immigration officer, or (b) actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint.

(2) In exclusion proceedings where the alien has no colorable claim to lawful permanent resident status, the burden of proof is upon the alien to show that he has effected an entry and that exclusion proceedings are therefore improper.

(3) The Board found that the alien had made an entry into the United States when he debarked from his vessel at a place not designated as a port of entry and fled into the interior undetected, with every apparent intention of evading immigration inspection.

(4) The mere fact that the applicant entered an area which was under federal jurisdiction for reasons unrelated to immigration processing does not establish that he was under "official restraint" and does not render his movement something less than an entry.

**EXCLUDABLE:**
Act of 1952-Sec. 212(a)(7)(A)(i)(I) 8 U.S.C. § 1182(a)(7)(A)(i)(I)]-No valid immigrant visa

**ON BEHALF OF APPLICANT:**
Cathy H. Tao, Esquire
261 South Figueroa Street, Suite 205
Los Angeles, California 90012

**ON BEHALF OF SERVICE**
Elena Kusky
General Attorney

BY: Milhollan, Chairman; Dunne, Morris, Vacca, and Heilman, Board Members

In a decision dated July 19, 1993, an immigration judge found that the applicant was not properly in exclusion proceedings under section 235(b) of the Immigration and Nationality Act, 8 U.S.C. § 1225(b) (1988), and he therefore terminated the proceedings. The Immigration and Naturalization Service appealed. The appeal will be dismissed.

The applicant is a male native and citizen of the People's Republic of China. He arrived at the shores of the United States in the early morning hours of May 24, 1993, on a cargo ship with about 200 compatriots. He came ashore with no proper entry documents and was apprehended later in the morning of the same day somewhere in the vicinity of Fort Point, the Presidio, and

the Golden Gate National **708** Recreation Area in San Francisco, California. The Service issued him a Notice to Applicant For Admission Detained for Hearing Before Immigration Judge (Form I-122), alleging that he was excludable under section 212(a)(7)(A)(i)(I) of the Act, 8 U.S.C. § 1182(a)(7)(A)(i)(I) (Supp. IV 1992).

During the proceedings below, the applicant, through counsel, moved for termination of the exclusion proceedings on the ground that he had made an entry into the United States, and that exclusion proceedings were therefore improper. The immigration judge granted the motion, and the Service appealed.

 **\*\*2** The sole issue on appeal is whether the applicant made an "entry" into the United States, as that term is interpreted under the Immigration and Nationality Act. If he did so, exclusion proceedings, which are instituted to prevent or control such entry, are not authorized and must be terminated.

Section 101(a)(13) of the Act, 8 U.S.C. § 1101(a)(13) (1988), defines "entry" for immigration purposes, in relevant part, as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntary or otherwise." This Board, in addressing the more specific questions of whether a given case involves an "entry," has formulated a more precise definition of this term. Under our precedent decisions, an "entry" requires: (1) a crossing into the territorial limits of the United States, i.e., physical presence; (2)(a) inspection and admission by an immigration officer, or (b) actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint. Matter of Patel, Interim Decision 3157 (BIA 1991), and cases cited therein.

In the instant case, the Service contends that no entry has been shown. The Service argues, first, that the alien's intent to evade inspection at the nearest inspection point has not been established, and second, that the applicant was, at all relevant times prior to debarkation and thereafter, under official restraint. We disagree.

The circumstances of the applicant's arrival in the United States are established by the documents submitted by both the applicant and the Service. The applicant himself did not testify.

The applicant came to the shores of the United States aboard a vessel known as the *Pai Sheng,* a cargo ship under the Honduran flag with a crew of 10 and a "cargo" of passengers numbering about 200. At around midnight on the night of May 23, 1993, the *Pai Sheng* took an irregular course outside of normal lanes of shipping and slipped beneath the Golden Gate Bridge in San Francisco, California. As the vessel made its unauthorized approach, it was radar-monitored by an officer of the United States Coast Guard. The officer observed that the vessel was behaving in a suspicious manner and notified other federal **709** agencies in an attempt to get an investigation underway. Meanwhile, the *Pai Sheng* apparently moored at the first available dock inside the bay, a dock at Fort Point which was no longer in general use.

The passengers on board the *Pai Sheng* disembarked at the dock at approximately 1 a.m. on Wednesday, May 24, 1993. At the time of debarkation there were no officers of the Service nor officers of any other enforcement agency on hand at the dock. Thus, the applicant's debarkation went unwitnessed by any United States official. Upon debarkation, the aliens entered the Golden Gate National Recreation Area, Fort Point, and the Presidio, a military base area abutting the Golden Gate Bridge. At this time the area was closed to the public, as it typically was from dusk until after dawn.

 **\*\*3** At about 1:18 a.m., information from a Coast Guard officer regarding the *Pai Sheng* was relayed to an officer of the United States Department of the Interior Park Police. The Coast Guard officer advised that the vessel was suspicious and had docked at or near the Old Coast Guard Station on the south side of San Francisco Bay, close to the Golden Gate Bridge. [1] However, when the Park Police officer arrived, the vessel was already outbound, passing under the Bridge. No one was at or near the dock.

A short time later, between 1:18 a.m. and 1:45 a.m., United States Military Police from the Presidio stopped a pickup truck at a considerable distance from the docks to investigate a vehicle equipment violation. In the truck were either seven or nine undocumented Chinese immigrants. According to the Park Police report, the driver of the truck indicated that he had picked

up the aliens a mile or 2 back, by prearrangement, because he had been promised payment in exchange for delivering them to a location in downtown San Francisco.

At approximately 2 a.m., a Park Police officer observed 50 to 150 more suspected undocumented aliens in a Fort Point parking lot. They were entering a dozen or so private vehicles. Upon the officer's approach, the subjects fled the vehicles and scattered into the nearby woods and hills, while most of the drivers sped away. Four of the vehicles remained and apparently were abandoned. The officer called for assistance, and a coordinated enforcement operation began.

The record reflects that by 10 a.m. on May 24, 1993, officers of the United States Park Service Police, the Golden Gate Bridge Police, Military Police from the Presidio military base, and security officers from a local United States Veterans Administration Hospital had placed in custody 170 of the former passengers of the *Pai Sheng*.

The record further reflects that the aliens apprehended during the **\*710** foregoing operation were not all apprehended in the same place, but were broadly dispersed. A United States Department of the Interior Park Police Incident Report, which was submitted for the record by both parties, states that the ''subjects were rounded up from as far away as the Great Meadow, Lincoln Park, Clement St. and the Golden Gate Bridge.'' Further, 12 aliens from the *Pai Sheng* were apprehended by the San Francisco Police Department after people in residential areas of the city had complained of aliens in their back yards. Another *Pai Sheng* passenger was apprehended at a coffee shop in San Francisco 3 blocks south of the boundary of the Presidio.

The applicant and the other former passengers of the *Pai Sheng* were taken to a building beneath the Golden Gate Bridge to be held until the Immigration and Naturalization Service could effect their immigration processing. The Service issued the applicant a Form I-122, thus commencing these exclusion proceedings. The applicant was alleged to be excludable as an intending immigrant without proper entry papers, in violation of section 212(a)(7)(A)(i)(I) of the Act.

**\*\*4** Later the same day, the Coast Guard intercepted the *Pai Sheng* about 45 miles from San Francisco. The vessel returned to the Bay. According to the affidavit of a Service officer submitted for the record, the vessel's crew were questioned, and some of them agreed to give statements. These statements, and the circumstances under which the ship had operated, indicated to the officer that the *Pai Sheng* was involved in an organized smuggling operation in which 200 or more Chinese immigrants were brought to the United States and delivered without immigration papers, in a manner similar to that of other smuggling operations in the officer's recent experience.

On the basis of the foregoing, the immigration judge found that the applicant had actually and intentionally evaded inspection, had proceeded into the United States free from official restraint, and had thereby effected an entry. The immigration judge therefore terminated the exclusion proceedings.

On appeal, the Service correctly points out that the burden of proof to show that the exclusion proceedings are not proper is upon the applicant. *See* section 291 of the Act, 8 U.S.C. § 1361 (1988); *Matter of Matelot,* 18 I & N Dec. 334, 335 (BIA 1982) (holding that absent a colorable claim to lawful permanent resident status, the relevant burden is upon the alien). In this case, therefore, the applicant must bear the burden of showing the three elements necessary for establishing an entry, namely, (1) physical presence, (2) actual and intentional evasion of inspection at the nearest inspection station, and (3) freedom from official restraint. *Matter of Patel, supra,* at 4; *Matter of Pierre,* 14 I & N Dec. 467, 468 (BIA 1973).

The Service then argues that the applicant cannot have satisfied that **\*711** burden in this case for two reasons. First, the Service argues, the evidence in the record is insufficient to establish that the applicant actually and intentionally evaded inspection. The Service suggests that mere flight or hiding does not establish such intent. The Service suggests that the applicant may, for example, have intended to present himself at the nearest inspection station, and that he may have been acting furtively in the meantime in order to evade the smugglers who ran the illegal operation. While such a scenario is not beyond the realm of the theoretically possible, we find, as did the immigration judge, that the documents in the record establish by a preponderance of

the evidence that the applicant was not attempting to proceed to the nearest inspection station, but actually and intentionally evaded inspection.

In determining the alien's intent in this context, we are not bound to find that no relevant intent has been established simply because the applicant has remained silent, as the Service seems to suggest. Evidence of intent may be established not only by the applicant's own statements, but also by other evidence in the record, even in the face of an applicant's contrary testimony. *Cheng v. INS,* 534 F.2d 1018, 1019 (2d Cir. 1976) (holding that crossing the border from Canada in a smuggler's van at night without headlights, and turning away from the nearest inspection station, provided "overwhelming" evidence of actual and intentional evasion of inspection); *see also Giacone v. Corsi,* 64 F.2d 18 (2d Cir. 1933); *Matter of Estrada-Betancourt,* 12 I & N Dec. 191, 194 (BIA 1967) (finding that an entry was effected when the aliens did not proceed by the ordinary route to the nearest inspection station).

**\*\*5** In the instant case, the unrebutted documentary evidence is most persuasive that the applicant intended to enter the United States illegally. For example, the applicant came to the United States on the *Pai Sheng* in cooperation with a smuggling operation and without travel documents. While the record is silent as to the applicant's own specific arrangements, other passengers of the *Pai Sheng* paid substantial sums to be illegally smuggled to the United States, and there is no reason to believe the applicant was an exception. Further, the applicant, having debarked in San Francisco at night at an abandoned dock, did not seek out United States officials or wait for their arrival. Nor, apparently, did he go to them when they appeared on the scene. In fact, the record appears to reflect that not a single passenger did so. Instead, they all fled the dock area so quickly that, about a quarter of an hour later, when the first enforcement officer arrived to investigate, there was no one left at the docks. Further, when other passengers of the applicant's vessel-and possibly the applicant-saw uniformed officers, they did not request information, ask for asylum, or otherwise **\*712** act consistently with a desire to submit themselves for immigration inspection at the earliest opportunity. Instead, they scattered.

Finally, the applicants who were apprehended were relatively broadly dispersed and clearly trying to evade the authorities. Others evaded the authorities successfully and were not apprehended in the enforcement sweeps described above. There is no evidence in the record that a single alien from the *Pai Sheng* at any time deliberately surrendered himself to the authorities for any reason. These circumstances are markedly different from those in the cases upon which the Service relies for support. *See Matter of Phelisna,* 18 I & N Dec. 272, 273 (BIA 1982), *remanded,* 551 F. Supp. 960 (E.D.N.Y. 1982), *appeal dismissed,* 729 F.2d 1444 (2d Cir. 1983) (Board finding no evasion where the applicant was apprehended near the beach and indicated she was seeking immigration officials); *Pierre v. Rivkind,* 643 F. Supp. 669 (S.D. Fla. 1986), *rev'd on other grounds,* 825 F.2d 1501 (11th Cir. 1987) (finding no evasion where the petitioner landed and hid in a mangrove swamp, but came out and did not run away when authorities called to her).

We find on the basis of the foregoing, and particularly in the absence of any evidence to the contrary, that the evidence here establishes that the applicant, who was a passenger on the *Pai Sheng,* actually and intentionally evaded inspection at the nearest inspection station. The documentary evidence in support of this inference is more than sufficient to overcome the Service's speculations in rebuttal that the applicant could theoretically have had other intentions. The Service's first argument is without merit.

The Service's second argument focuses upon the issue of official restraint. The Service argues that the applicant cannot have satisfied his burden of showing an entry because from the time his vessel entered San Francisco Bay to the time he was apprehended, he was never free from official restraint. The Service contends that the radar surveillance of the applicant's vessel, the restricted nature of the federal area into which he debarked and fled, and the establishment of a perimeter around that area by federal law enforcement officials means that the applicant's presence in the United States was at all times under official, albeit sometimes "constructive," restraint.

**\*\*6** The Service further suggests that the applicant's situation is similar to that of an alien in an airport who attempts to evade immigration or customs officials by hiding in a restroom area, and who does not thereby effect an "entry."

The Service points out that San Francisco's Presidio area, Fort Point, and the Golden Gate National Recreation Area are federally controlled areas under the jurisdiction of the United States armed services and the United States Department of the Interior. These areas **\*713** were closed to the public while the applicant was present within them. The officers who apprehended the aliens of the *Pai Sheng* were, for the most part, officers of the United States Park Police, Military Police, and officers of the Immigration and Naturalization Service. Therefore, the Service urges, the applicant and his fellow passengers from the *Pai Sheng* should be regarded as having been under "constructive restraint" at all times after debarkation.

In support of this argument, the Service submits that under *Matter of Pierre, supra,* an alien has not entered the United States unless he is free from both actual and constructive restraint. *Id.* at 469. Constructive restraint, the Service observes, may in appropriate circumstances consist of mere surveillance. *Id.* Further, such restraint need not be restraint by officers of the Service. *Matter of Patel, supra,* at 10 (quoting *Correa v. Thornburgh,* 901 F.2d 1166, 1172 (2d Cir. 1990)); *Matter of Yam,* 16 I & N Dec. 535 (BIA 1978). Finally, the Service points out, there has been no entry as long as the alien remains in a "restricted area" where "access and egress [are] controlled," and where the alien lacks the freedom "to go at large and mix with the population." *Correa v. Thornburgh, supra,* at 1172; *see also Matter of Patel, supra,* at 6, 10; *Matter of Pierre, supra,* at 469.

In the instant case, the Service argues that the applicant was at all times under surveillance or in a restricted area or both, and so he was at all times under constructive restraint and cannot have entered the United States within the meaning of the Act.

We are not persuaded by the Service's characterization of the facts as showing circumstances of "constructive restraint." As noted above, the record establishes that the applicant's fellow passengers, and evidently the applicant as well, planned in advance to evade immigration and customs authorities. Pursuant to these plans, they entered onto dry land within the territorial boundaries of the United States at an area not designated as a port of entry. The applicant, once debarked, did not meet any customs or immigration officials waiting to process his application for admission. Nor did he proceed directly to the nearest inspection station. Instead, he proceeded freely into the United States and fled for some distance into the interior, where he remained for some time. He was under no official constraints or surveillance. Indeed, although there were grounds for suspicion, and although military police discovered a few aliens within a half hour while investigating something else, no United States official knew with any degree of certainty that a large number of aliens were even present until about an hour after they had debarked.

**\*\*7** Moreover, the applicant here was free, at the time he debarked and for anywhere from a half hour to 9 hours afterward, to leave the area of Fort Point, the Presidio, and the National Recreation Area, and to **\*714** mingle with the general population of San Francisco. Whether this applicant actually did so is of no consequence. As we stated in *Matter of Patel, supra,* "[t]he critical point in such cases is that freedom from official restraint exists, not that such freedom has been exercised." *Id.* at 9; *see also, e.g., United States v. Martin-Plascencia,* 532 F.2d 1316 (9th Cir.), *cert. denied,* 429 U.S. 894 (1976) (finding that an alien at a port of entry effected an entry when he evaded inspectors and fled 50 yards into San Ysidro, Texas).

In this case, the record establishes that the applicant could have exercised such freedom to move beyond the boundaries of the federal park and military base areas, and that nearly a quarter of his fellow passengers from the *Pai Sheng* actually did so. The Service's own evidence establishes that more than a dozen former passengers of the vessel were apprehended in various parts of the city of San Francisco, after having moved beyond the boundaries of the federal areas mentioned above. About 30 more apparently escaped apprehension altogether and were still at large when the enforcement sweeps ended on May 24, 1993.

In view of the foregoing, we find that the argument that the applicant's situation is analogous to that of an alien hiding in an airport, or awaiting final processing there as in *Matter of Patel, supra,* is entirely unpersuasive. The applicant here landed surreptitiously, fled into the interior, and remained there until he was apprehended. He did not arrive at a port of entry and attempt to hide before normal processing, nor was he apprehended while awaiting final processing in a customs enclosure. He instead avoided processing altogether and fled into a National Recreation Area. The Service's analogy between these two sets of circumstances does not hold.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

We find, in short, that the applicant here made an entry into the United States when he debarked from his vessel at a place other than a port of entry and fled into the interior undetected, with every apparent intention of evading immigration inspection. The mere fact that he entered an area which was under federal jurisdiction for reasons unrelated to immigration processing does not render his movement something less than an entry. Since we conclude that the applicant entered the United States prior to his arrest, he can now be removed from the United States only through properly instituted deportation proceedings under section 242(b) of the Act, 8 U.S.C. § 1252(b) (Supp. IV 1992).

In view of the foregoing, the decision of the immigration judge will be upheld, the appeal by the Immigration and Naturalization Service will be dismissed, and the exclusion proceedings will be terminated.

ORDER: The appeal by the Immigration and Naturalization Service is dismissed.

## Footnotes

1    Evidently, no one was certain whether the vessel had docked at the Old Coast Guard Station or at the nearby abandoned dock at Fort Point.

20 I. & N. Dec. 707 (BIA), Interim Decision 3208, 1993 WL 424164

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Joshua M. v. Barr, E.D.Va., February 20, 2020

866 F.3d 573
United States Court of Appeals, Fourth Circuit.

Sonia Calla MEJIA, a/k/
a Sonia Calla-Mejia, Petitioner,

v.

Jefferson B. SESSIONS III, Attorney General;
Elaine Duke, Acting Secretary of the Department
of Homeland Security, Respondents.
American Immigration Lawyers
Association; National Immigrant Justice
Center, Amici Supporting Petitioner.

No. 16-1280
|
Argued: March 23, 2017
|
Decided: August 9, 2017

**Synopsis**
**Background:** Alien, who had previously been removed
to Peru, petitioned for review of order of Department of
Homeland Security, which had concluded that she was
ineligible for asylum.

**Holdings:** The Court of Appeals, Diaz, Circuit Judge, held
that:

[1] alien had no avenue as of right to assert her entitlement to
asylum in administrative proceedings;

[2] as a matter of first impression, aliens subject to reinstated
orders of removal are statutorily precluded from applying for
asylum;

[3] statute denying illegal re-entrants the ability to apply for
asylum did not conflict with United States' obligations; and

[4] period of 30 days for alien to challenge her reinstated order
of removal began to run on date original order of removal
became final.

Petition dismissed in part and denied in part.

Traxler, Circuit Judge, filed opinion dissenting in part.

West Headnotes (17)

**[1]** **Aliens, Immigration, and
Citizenship** 🔑 Discretionary or mandatory

**Aliens, Immigration, and
Citizenship** 🔑 Eligibility; Refugee Status

The Attorney General is not required to grant
asylum to everyone who meets the definition of
refugee; instead, the decision whether asylum
should be granted to an eligible alien is
committed to the Attorney General's discretion.

Immigration and Nationality Act § 101, 🚩 8
U.S.C.A. § 1101(a)(42)(A).

1 Cases that cite this headnote

**[2]** **Aliens, Immigration, and
Citizenship** 🔑 Discretionary or mandatory

By contrast to asylum, if an applicant for
withholding of removal establishes her claim,
the Attorney General cannot remove her to her
native country. Immigration and Nationality Act
§ 241, 8 U.S.C.A. § 1231(b)(3)(A).

3 Cases that cite this headnote

**[3]** **Aliens, Immigration, and
Citizenship** 🔑 Asylum Distinguished from
Withholding of Removal or Deportation

Withholding of removal and asylum differ with
regard to the benefits granted to an alien;
asylum affords aliens broader benefits than a
grant of withholding of removal, including the
opportunity for adjustment to lawful permanent
resident status, and ultimately, citizenship.
Immigration and Nationality Act §§ 208, 241,
8 U.S.C.A. §§ 1158, 1231(a)(5).

2 Cases that cite this headnote

**[4]    Aliens, Immigration, and Citizenship** 🔑 **Presentation and preservation of questions at administrative level**

When an alien has an opportunity to raise an INA claim in administrative proceedings but does not do so, he fails to exhaust his administrative remedies as to that claim. Immigration and Nationality Act § 242, 🚩 8 U.S.C.A. § 1252(d)(1).

1 Cases that cite this headnote

**[5]    Aliens, Immigration, and Citizenship** 🔑 **Exhaustion of remedies in general**

Alien had no avenue as of right to assert her entitlement to asylum in administrative proceedings, and thus alien was not required to exhaust administrative remedies prior to bringing INA asylum-entitlement claim in federal court; alien was subject to reinstated removal order, and thus, under Department of Homeland Security regulations, she could seek only withholding of removal. Immigration and Nationality Act § 242, 🚩 8 U.S.C.A. § 1252(d)(1); 📙 8 C.F.R. §§ 241.8(e), 📙 1208.31(e).

5 Cases that cite this headnote

**[6]    Aliens, Immigration, and Citizenship** 🔑 **Presentation and preservation of questions at administrative level**

Although generally, any claim not raised before the Board of Immigration Appeals (BIA) is waived, a claim is not waived when it would be futile to raise it. Immigration and Nationality Act § 242, 🚩 8 U.S.C.A. § 1252(d)(1).

**[7]    Administrative Law and Procedure** 🔑 **Deference to Agency in General**

To resolve an issue of statutory construction on a challenge to an agency's interpretation, the Court of Appeals applies the familiar two-step framework of 📙 Chevron.

**[8]    Administrative Law and Procedure** 🔑 **Plain, literal, or clear meaning; ambiguity or silence**

At the first step of analyzing an agency's interpretation of a statute under Chevron, the Court of Appeals examines the statute's plain language, and if Congress has spoken clearly on the precise question at issue, the statutory language controls; in conducting this inquiry, the Court of Appeals employs the traditional rules of statutory construction, by considering the overall statutory scheme, legislative history, the history of evolving congressional regulation in the area, and other relevant statutes.

**[9]    Administrative Law and Procedure** 🔑 **Plain, literal, or clear meaning; ambiguity or silence**

At step one of the 📙 Chevron analysis into an agency's interpretation of a statute, the Court of Appeals focuses purely on statutory construction without according any weight to the agency's position.

**[10]   Administrative Law and Procedure** 🔑 **Permissible or reasonable construction**

**Administrative Law and Procedure** 🔑 **Erroneous or unreasonable construction; conflict with statute**

If the Court of Appeals finds that Congress has not spoken clearly on the precise question at issue, in that the statute is silent or ambiguous, the Court defers to the agency's interpretation if it is reasonable; the Court therefore will not usurp an agency's interpretive authority by supplanting its construction with the Court's own, so long as the interpretation is not arbitrary, capricious, or manifestly contrary to the statute.

**[11]    Statutes**  🔑  **Construing together;  harmony**

In considering statutes, the goal of the Court of Appeals is to fit, if possible, all parts into an harmonious whole.

**[12]    Statutes**  🔑  **Plain Language;  Plain, Ordinary, or Common Meaning**

Because the plain language of the statute is the most reliable indicator of Congressional intent, courts look there first.

**[13]    Statutes**  🔑  **General and specific statutes**

As a rule of statutory construction, the specific terms of a statutory scheme govern the general ones; this rule is particularly applicable where Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions.

**[14]    Statutes**  🔑  **General and specific statutes**

Courts apply the general-specific rule of construction to statutes in which a general permission is contradicted by a specific prohibition.

**[15]    Aliens, Immigration, and Citizenship**  🔑  **Ineligible Aliens**

Aliens subject to reinstated orders of removal are statutorily precluded from applying for asylum. Immigration and Nationality Act §§ 208, 241, 🔖 8 U.S.C.A. §§ 1158, 🔖 1231(a)(5).

5 Cases that cite this headnote

**[16]    Aliens, Immigration, and Citizenship**  🔑  **Ineligible Aliens**

Statute denying illegal re-entrants the ability to apply for asylum did not conflict with United States' obligations under international treaty, which provided that signatories shall not impose penalties on account of a person's illegal entry; treaty obligations did not extend so far as

to afford all aliens repeated opportunities to apply for asylum, each and every time they entered United States illegally. Immigration and Nationality Act § 241, 🔖 8 U.S.C.A. § 1231(a)(5).

1 Cases that cite this headnote

**[17]    Aliens, Immigration, and Citizenship**  🔑  **Time Limitations**

Period of 30 days for alien to challenge her reinstated order of removal, which barred her from seeking asylum, began to run on date original order of removal became final. Immigration and Nationality Act § 242, 🚩 8 U.S.C.A. §§ 1252(b)(1), 🚩 1252(d)(1).

6 Cases that cite this headnote

**\*575**  On Petition for Review of an Order of the Department of Homeland Security.

**Attorneys and Law Firms**

**\*576**  ARGUED: Morgan L. Goodspeed, HOGAN LOVELLS US LLP, Washington, D.C., for Petitioner. Manuel Alexander Palau, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. ON BRIEF: Catherine E. Stetson, Evan W. Guimond, Hamida B. Owusu, Mary S. Van Houten, HOGAN LOVELLS US LLP, Washington, D.C., for Petitioner. Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Terri Scadron, Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. Mark Barr, LICHTER IMMIGRATION, Denver, Colorado; Charles Roth, Keren Zwick, NATIONAL IMMIGRANT JUSTICE CENTER, Chicago, Illinois, for Amici Curiae.

Before TRAXLER, DIAZ, and FLOYD, Circuit Judges.

**Opinion**

Petition for review dismissed in part and denied in part by published opinion. Judge Diaz wrote the majority opinion,

which Judge Floyd joined in full and Judge Traxler joined in part. Judge Traxler wrote an opinion dissenting in part.

DIAZ, Circuit Judge:

After enduring years of domestic abuse at the hands of her husband, a Peruvian National Police Officer, Sonia Calla Mejia fled her native Peru and entered the United States illegally in April 2015. The Department of Homeland Security ("DHS") detained Calla Mejia and, following a June 2015 hearing before an Immigration Judge ("IJ") in Texas, removed her to Peru.

Months later, Calla Mejia attempted to re-enter the United States, and was again apprehended by DHS, which reinstated her previous removal order. When Calla Mejia sought asylum, DHS placed her in "withholding of removal-only" proceedings and deemed her ineligible to apply for asylum because of her reinstated removal order. An IJ in Maryland concluded that Calla Mejia was ineligible for asylum but granted her withholding of removal.

Before us, Calla Mejia contends that, irrespective of her status, she is entitled to apply for asylum under 8 U.S.C. § 1158, or, alternatively, because defects in the June 2015 proceedings render the underlying removal order invalid. The government counters that we lack jurisdiction over Calla Mejia's appeal. On the merits, the government asserts that 8 U.S.C. § 1231(a)(5) categorically prohibits individuals with reinstated orders of removal from applying for asylum relief, and, alternatively, rejects Calla Mejia's objections to the June 2015 hearing as meritless.

As we explain, we have jurisdiction to consider Calla Mejia's statutory claim but not her challenges to the June 2015 removal order. With respect to the statutory claim, we hold that Congress has directly spoken to the precise question at issue: an alien subject to a reinstated removal order— like Calla Mejia—is precluded from applying for asylum. Accordingly, we dismiss Calla Mejia's petition for review in part and deny the petition in part.

I.

The first time Calla Mejia fled Peru, she waded across the Rio Grande from Mexico into the United States, where she was apprehended by U.S. Customs & Border Patrol near Laredo, Texas. Calla Mejia told Border Patrol agents that she came

to the United States to "reside and work in New York" for a period of five years. [1] A.R. 218.

**\*577**  While in detention, Calla Mejia was referred to an asylum officer, who conducted a credible-fear interview. Calla Mejia informed the asylum officer that she had been threatened, brutally beaten, and raped by her husband for several years. She explained that when she reported his abuse to the police in Peru, "after [she] told them [her] husband was a police officer they just left [her] there waiting and they never helped [her]." A.R. 212. Calla Mejia told the asylum officer that she couldn't live safely anywhere in Peru because her husband—using the investigative resources at his disposal as a police officer—would undoubtedly look for her and harm her. The asylum officer concluded that Calla Mejia had demonstrated a credible fear of returning to Peru and Calla Mejia was consequently placed in a full removal proceeding pursuant to 8 U.S.C. § 1229a.

After DHS served her with a Notice to Appear, Calla Mejia appeared pro se before an IJ in Texas. This June 2015 Master Calendar Hearing was consolidated with the hearings of seven other women and conducted by the IJ via videoconference. [2] Through a Spanish-language interpreter, the IJ advised the women of their rights in the removal proceedings, including their right to apply for asylum, withholding of removal, and protection under the Convention Against Torture. The IJ also spoke at length about credibility, explaining:

> By now each of you have given at least two separate sworn statements. You gave one to the border patrol when you were apprehended and another to the asylum officer. If those two statements are not consistent with each other you have a credibility problem. Credibility problems are extremely difficult to overcome under our law.

A.R. 556–57.

The IJ then addressed Calla Mejia individually. Calla Mejia confirmed that she understood her rights as explained. The IJ noted that Calla Mejia "told the second officer [she was] fearful of returning to [her] country," but that she "told the first officer [she was] going to live in New York for

five years and [she was] not afraid to return." A.R. 561–62. The IJ informed Calla Mejia, "if you want to apply for asylum, withholding of removal and Convention Against Torture relief, I will allow it, but I should tell you, you have a credibility problem. A serious one." A.R. 562. Calla Mejia subsequently declined to apply for relief, accepted the order of removal, and waived her right to appeal. The IJ issued a final order of removal, and Calla Mejia was removed to Peru on June 22, 2015.

Once removed, Calla Mejia returned to her family home in Peru. Her husband soon learned that she was back, entered her family's house, attacked her, and raped her. Calla Mejia then fled to the United States a second time, where she was immediately apprehended and detained by Border Patrol. Pursuant to 8 U.S.C. § 1231(a)(5), DHS reinstated Calla Mejia's June 2015 order of removal.

Calla Mejia was subsequently transferred to a detention center in Maryland, where, after she expressed a fear of returning **\*578** to Peru, an asylum officer conducted a reasonable-fear interview. The asylum officer found that Calla Mejia credibly established a reasonable fear of persecution in Peru. But because Calla Mejia remained subject to a reinstated order of removal, DHS placed her in "withholding-only" proceedings.

With the aid of counsel, Calla Mejia filed a Form I-589 application and supporting briefs asserting her eligibility for asylum, withholding of removal, and Convention Against Torture protection. Calla Mejia contended that despite her placement in withholding-only proceedings, she was statutorily eligible to apply for asylum. Alternatively, Calla Mejia argued that her original removal order was invalid due to constitutional defects in the June 2015 hearing in Texas.

Calla Mejia appeared before the IJ in February 2016. Her counsel urged that Calla Mejia was eligible to apply for asylum.[3] But the IJ responded that the reinstated removal order rendered Calla Mejia ineligible for asylum and concluded that she lacked the authority to consider the application for asylum. At that point, Calla Mejia's counsel withdrew the application.

Calla Mejia testified regarding the domestic abuse she had suffered and her fear of returning to Peru. The IJ granted Calla Mejia's application for withholding of removal, finding that Calla Mejia credibly established past persecution in the form of domestic violence, the Peruvian government's inability or unwillingness to protect her, and her inability to relocate

safely elsewhere in Peru. Calla Mejia and DHS waived appeal of the IJ's ruling.

This petition for review followed.

## II.

We begin with a brief overview of the relevant statutory provisions of the Immigration and Nationality Act ("INA"). Calla Mejia's claim that she is entitled to seek asylum notwithstanding her reinstated removal order centers on the relationship between two statutes: 8 U.S.C. § 1158, the asylum statute, and 8 U.S.C. § 1231(a)(5), the reinstatement bar. Before discussing these provisions, we first examine the distinction between withholding of removal, which the IJ granted to Calla Mejia in the February 2016 proceedings, and asylum, which Calla Mejia continues to seek.

## A.

**[1]** Eligibility for the discretionary relief of asylum requires an alien to show that she is a "refugee," or a person "unable or unwilling to return to" a country because she has a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (defining the term "refugee"); 8 C.F.R. § 1208.13(b) (providing eligibility standard). Critically, "the Attorney General is *not required* to grant asylum to everyone who meets the definition of refugee." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.5, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Instead, "the decision whether asylum should be granted to an eligible alien is committed to the Attorney General's discretion." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 420, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999).

**[2]** By contrast, "[i]f an applicant for withholding of removal establishes her claim, the Attorney General *cannot* remove her to her native country." **\*579** *Anim v. Mukasey*, 535 F.3d 243, 252 (4th Cir. 2008) (internal quotation marks omitted). Accordingly, to obtain withholding of removal, an alien must satisfy "a more demanding standard of proof than

an asylum claim." *Id.* She "must establish that if she was sent back to her home country, there is a clear probability that her 'life or freedom would be threatened ... because of [her] race, religion, nationality, membership in a particular social group, or political opinion.' " *Id.* at 252–53 (omission and alteration in original) (quoting 8 U.S.C. § 1231(b)(3)(A)); *see also* 8 C.F.R. § 1208.16(b).

 **[3]**  Withholding of removal and asylum also differ with regard to the benefits granted to an alien. "[A]sylum affords [aliens] broader benefits" than a grant of withholding of removal, including the opportunity for adjustment to lawful permanent resident status, and ultimately, citizenship. *Cardoza-Fonseca*, 480 U.S. at 428 n.6, 107 S.Ct. 1207. Asylees may also petition for derivative asylee status for certain family members. 8 C.F.R. § 1208.21. Moreover, while withholding of removal only prevents the removal of an alien to the specific country where she faces persecution—thereby leaving open the possibility of transfer to a third country, *id.* § 1208.16(f)—asylum prevents removal from the United States entirely. Finally, aliens granted withholding of removal are subject to a number of restrictions, including limitations on their ability to work in the United States, *id.* § 247a.12(a)(10), and to travel internationally, *id.* § 241.7.

### B.

As originally enacted, the asylum provision relied on by Calla Mejia granted "an alien ... irrespective of such alien's status," the right to apply for asylum. *See* Refugee Act of 1980, Pub. L. No. 96-212, § 208, 94 Stat. 102, 105. With the exception of a 1990 amendment that prohibited aliens convicted of an aggravated felony from applying for asylum, *see* Immigration Act of 1990, Pub. L. No. 101-649, § 515, 104 Stat. 4978, 5053, the text of the asylum provision remained largely unchanged until 1996, when Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546. IIRIRA recodified the asylum provision at 8 U.S.C. § 1158 and reformatted it into two sections: § 1158(a)(1), which now provides that "[a]ny alien ... irrespective of such alien's status, may apply for asylum," and § 1158(a)(2), which enumerates certain classes of aliens who are ineligible to apply for asylum.

Specifically, as amended, the asylum provision now provides that individuals who could be removed to a "[s]afe third country," § 1158(a)(2)(A), failed to timely apply for asylum, § 1158(a)(2)(B), or were previously denied asylum, § 1158(a)(2)(C), are statutorily ineligible to apply for asylum. Section 1158(a)(2)(D), however, sets out an exception to these exceptions: Notwithstanding a previous denial of asylum, an alien may apply for asylum if the alien successfully demonstrates "the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application."

### C.

In addition to revising § 1158, IIRIRA enacted § 1231(a)(5), which governs the reinstatement of removal orders. Before IIRIRA, aliens who illegally re-entered the United States after removal were placed in the same removal proceedings as those aliens not subject to a previous removal order, affording them additional hearings before an IJ. *See* *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 34–35, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006). Frustrated **\*580** with the duplicative nature of this existing process, Congress sought to "toe[ ] a harder line" with "illegal reentrants," *id.,* by providing:

> If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under [Chapter 12 of Title 8], and the alien shall be removed under the prior order at any time after the reentry.

8 U.S.C. § 1231(a)(5).

As such, IIRIRA enlarged the class of illegal reentrants subject to summary removal after reinstatement, "explicitly insulate[d] the[ir] removal orders from review, and generally foreclose[d] discretionary relief from the terms of the reinstated order." *Fernandez-Vargas*, 548 U.S. at 35, 126 S.Ct. 2422.

To effectuate § 1231(a)(5), the Attorney General promulgated 8 C.F.R. § 241.8. Typically, under this regulation, if an immigration officer determines: (1) "the alien has been subject to a prior order of removal"; (2) "the alien is in fact [the] alien who was previously removed"; and (3) "the alien unlawfully reentered the United States," then the alien has no right to a hearing before an IJ, and shall be summarily removed under the prior order. 8 C.F.R. § 241.8(a)–(c). However, the regulation provides an exception for an alien who expresses a fear of returning to the country designated in the reinstated removal order: under 8 C.F.R. § 241.8(e), "the alien shall be immediately referred to an asylum officer for an interview to determine whether the alien has a reasonable fear of persecution or torture." If an asylum officer concludes that the alien has a "reasonable fear of persecution or torture," the case is referred to an IJ "for full consideration of the request for withholding of removal only." 8 C.F.R. § 1208.31(e). [4] Appeal of the IJ's decision as to the request for withholding of removal lies with the Board of Immigration Appeals ("BIA"). *Id.* A separate regulation permits an individual subject to a reinstated removal order to also seek protection under the Convention Against Torture. *Id.* § 1208.16(c)(4).

### III.

Calla Mejia maintains that the statutory language of the asylum provision, § 1158(a)(1), gives her the right to apply for asylum irrespective of her status. In the alternative, Calla Mejia argues that constitutional and statutory defects in the June 2015 hearing render the underlying removal order invalid. She seeks, on either ground, adjudication of her asylum application on the merits.

### A.

#### 1.

As a threshold matter, we must determine our jurisdiction over Calla Mejia's statutory claim, a question of law that we consider de novo. *Kporlor v. Holder*, 597 F.3d 222, 225 (4th Cir. 2010). The government has moved to dismiss Calla Mejia's petition, premised in part on the ground that Calla Mejia failed to administratively exhaust her asylum-eligibility claim before the IJ and BIA. In response, Calla Mejia urges that, under the existing statutory **\*581** and regulatory scheme, she had no forum to litigate her asylum claim and therefore satisfactorily exhausted the remedies available to her. We agree with Calla Mejia. Specifically, we conclude that we have jurisdiction to hear Calla Mejia's petition because she had no avenue "as of right" to assert her entitlement to asylum while placed in withholding-only proceedings.

[4] Under the INA, an alien must exhaust "all administrative remedies available to the alien *as of right*" before filing a petition for review of a final order of removal. 8 U.S.C. § 1252(d)(1) (emphasis added). "When an alien has an opportunity to raise a claim in administrative proceedings but does not do so, he fails to exhaust his administrative remedies as to that claim." *Etienne v. Lynch*, 813 F.3d 135, 138 (4th Cir. 2015). Notwithstanding this rule, we've recognized that the INA's administrative-exhaustion requirement doesn't deprive us of jurisdiction to consider in the first instance an alien's claim where "the relevant statutes and corresponding regulations [do] not provide the alien with an avenue" to lodge her challenge. *Id.* at 140 (alterations omitted) (quoting *Valdiviez-Hernandez v. Holder*, 739 F.3d 184, 187 (5th Cir. 2013)).

Our reasoning in *Etienne* is instructive. In that case, we considered whether we had jurisdiction to hear an alien's legal challenges to his removal where the alien failed to raise them in the DHS expedited removal proceedings. *Id.* at 138. The government contended that we lacked jurisdiction because the alien failed to exhaust his administrative remedies pursuant to § 1252(d)(1). *Id.* After examining DHS regulations and applicable agency forms—which "h[eld] out" to aliens in

expedited removal proceedings only the opportunity to lodge factual challenges to removal—we rejected the government's argument. *Id.* at 141–42. Reasoning that "[e]xhaustion of administrative remedies means using all steps that the agency *holds out*, and doing so *properly*," we concluded that the alien wasn't required to raise his legal challenges to removal before DHS to satisfy § 1252(d)(1). *Id.* at 141 (alterations omitted) (quoting *Woodford v. Ngo*, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)).

 **[5]**  As an alien subject to a reinstated removal order, Calla Mejia likewise had no avenue to assert her statutory claim of entitlement to asylum before the IJ and BIA because, under existing DHS regulations, she was entitled "as of right" to seek *only* withholding of removal. *See* 8 C.F.R. §§ 241.8(e), 1208.31(e). Once an asylum officer finds that an alien has shown a reasonable fear of persecution or torture, the agency holds out to individuals subject to a reinstated order of removal a hearing before an IJ and possible appeal to the BIA "for withholding of removal *only*." *Id.* § 1208.31(e) (emphasis added).

Contrary to the view of the dissent, the mere opportunity to mention a claim in administrative proceedings is not the same as having an avenue "as of right" to do so. The dissent makes much of the fact that Calla Mejia filed before the IJ a Form I-589 Application for Asylum and asserts that the BIA could have decided the legal arguments she raised as to her entitlement. But our colleague ignores that DHS regulations expressly limit Calla Mejia from seeking anything other than withholding of removal. While the IJ and BIA could listen to Calla Mejia's statutory claim, the regulations are clear that asylum is unavailable to her in the administrative proceedings. An opinion written by the IJ and BIA to that effect—no matter how carefully considered—does not change the fact that Calla Mejia had no "avenue" to assert her entitlement to asylum in proceedings reserved for seeking withholding of removal.

 **\*582**  Moreover, we can readily dispel the government's suggestion that administrative relief was available to Calla Mejia because the Attorney General, pursuant to 8 C.F.R. § 1003.1(h)(1), could have reviewed her case and potentially rescinded the regulation that foreclosed her eligibility to apply for asylum. The regulation provides that the Attorney General may be referred a case from the BIA in only three ways:

(1) if the Attorney General directs the referral; (2) if the Chairman or majority of the BIA believes the case should be referred; or (3) if the Secretary of Homeland Security directs the referral. 8 C.F.R. § 1003.1(h)(1)(i)–(iii). Calla Mejia therefore could not have triggered the Attorney General's review of her case.

 **[6]**  Thus, because controlling DHS regulations limit individuals like Calla Mejia to seeking only "full consideration of [their] request for withholding of removal," *id.*, we conclude that Calla Mejia exhausted all administrative remedies available to her "as of right" pursuant to 8 U.S.C. § 1252(d)(1). [5] The government also contends that Calla Mejia waived her statutory claim because she withdrew her motion to apply for asylum when the IJ granted her application for withholding of removal and because she didn't appeal to the BIA. Although "[g]enerally, any claim not raised before the BIA is waived[,] ... a claim is not waived when it would be futile to raise it." *Selgeka v. Carroll*, 184 F.3d 337, 345 (4th Cir. 1999). [6] Calla Mejia's asylum claim falls within this futility exception because the BIA—bound to follow DHS regulations and without authority to overturn them—applies 8 C.F.R. § 1208.31(e) to preclude individuals subject to a reinstated removal order from applying for asylum. *See Orquera v. Ashcroft*, 357 F.3d 413, 424 n.8 (4th Cir. 2003) (observing that where adjudicative administrative body lacked power to invalidate an INS regulation as unconstitutional or contrary to the authorizing statute, "rais[ing] these arguments with the [adjudicative body] would have been futile" (citing *Selgeka*, 184 F.3d at 345)).

The government acknowledges that the BIA would have applied the regulation and dismissed Calla Mejia's appeal as to her asylum claim, but contends that Calla Mejia should have appealed to the BIA nonetheless. The fact remains, however, that having been granted the only remedy available to her under the statutory and regulatory scheme, any attempt by Calla Mejia to seek asylum before the BIA would have been fruitless. Moreover, doing as the government suggests would have required Calla Mejia to remain detained while awaiting the BIA's inevitable application of DHS regulations and subsequent dismissal of her appeal for asylum. We won't countenance such a pointless endeavor.

**\*583** Having determined that we have jurisdiction over Calla Mejia's statutory claim for asylum, we turn to the merits.

### 2.

**[7]** **[8]** **[9]** Calla Mejia's petition challenges the validity of the agency's interpretation of the reinstatement bar to preclude individuals subject to reinstated removal orders from applying for asylum. To resolve this issue of statutory construction, we apply the familiar two-step framework prescribed by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). At *Chevron's* first step, we examine the statute's plain language; if Congress has spoken clearly on the precise question at issue, the statutory language controls." *Ojo v. Lynch*, 813 F.3d 533, 538–39 (4th Cir. 2016) (internal quotation marks omitted). In conducting this inquiry, "we employ the traditional rules of statutory construction," by "consider[ing] the overall statutory scheme, legislative history, the history of evolving congressional regulation in the area, and other relevant statutes." *Philip Morris USA, Inc. v. Vilsack*, 736 F.3d 284, 289 (4th Cir. 2013) (alteration and internal quotation marks omitted). At step one of *Chevron* "we focus purely on statutory construction without according any weight to the agency's position." *Ojo*, 813 F.3d at 539 (internal quotation marks omitted).

**[10]** If we find that "Congress has not so spoken, in that the statute is silent or ambiguous, we defer to the agency's interpretation if it is reasonable. *Id.* at 539 (internal quotation marks omitted). "We therefore will not usurp an agency's interpretive authority by supplanting its construction with our own, so long as the interpretation is not arbitrary, capricious, or manifestly contrary to the statute." *Philip Morris USA*, 736 F.3d at 290 (internal quotation marks omitted).

### 3.

The question whether an individual subject to a reinstated removal order is ineligible to seek asylum is one of first impression in our circuit. Six of our sister circuits have considered the question and all agree that such an individual is ineligible to apply for asylum. *See Garcia Garcia v. Sessions*, 856 F.3d 27, 31 (1st Cir. 2017); *Cazun v. Att'y Gen. U.S.*, 856 F.3d 249, 251 (3d Cir. 2017); *Jimenez-Morales v. U.S. Att'y Gen.*, 821 F.3d 1307, 1310 (11th Cir. 2016); *Perez-Guzman*, 835 F.3d at 1070; *Ramirez-Mejia v. Lynch*, 794 F.3d 485, 491 (5th Cir. 2015), *pet'n for reh'g en banc denied*, 813 F.3d 240 (5th Cir. 2016); *Herrera-Molina v. Holder*, 597 F.3d 128, 139 (2d Cir. 2010).

Three of these circuits have held that the reinstatement bar clearly precludes an individual subject to a reinstated removal order from seeking asylum relief. *See Jimenez-Morales*, 821 F.3d at 1310 (examining § 1231(a)(5) and § 1158 and concluding that "[a]s asylum is a form of relief from removal" contained in Chapter 12 of Title 8 of the U.S. Code, an individual subject to a reinstated removal order "is not eligible for and cannot seek asylum"); *Ramirez–Mejia*, 794 F.3d at 490 (considering § 1158's "discretionary nature" and concluding that "[a]ffording asylum relief to aliens whose removal orders are reinstated would be inconsistent with [ § 1231(a)(5)]"); *Herrera-Molina*, 597 F.3d at 139 (examining the plain language of § 1231(a)(5) and DHS regulations and holding that "relief other than withholding of removal ... is not available to this petitioner").

The remaining circuits have forged a different path. After attempting to harmonize § 1158 and § 1231(a)(5) by looking to the plain language of the provisions, employing canons of statutory construction, and reviewing the legislative history of IIRIRA, the Third and Ninth Circuits **\*584** concluded that Congress had not spoken directly to the instant issue. *See Cazun*, 856 F.3d at 255–59; *Perez-Guzman*, 835 F.3d at 1074–77. The First Circuit, by contrast, assumed without deciding that an ambiguity exists in the interplay of § 1158(a)(1) and § 1231(a)(5). *Garcia Garcia*, 856 F.3d at 38. These courts thus moved on to *Chevron's* second step, and once there, found the agency's interpretation of § 1231(a)(5) to bar asylum relief to those subject to reinstated removal orders—a construction embodied in 8 C.F.R. § 1208.31(e)—to be reasonable and therefore entitled to deference. *See Garcia Garcia*, 856 F.3d at 38–41; *Cazun*, 856 F.3d at 259–61; *Perez-Guzman*, 835 F.3d at 1079–82.

There is much to commend in the view of the First, Third, and Ninth Circuits that the agency's interpretation of § 1231(a)(5) to preclude asylum relief is a reasonable one and thereby entitled to deference. But as we explain below, we discern no ambiguity in the interplay between § 1231(a)(5) and § 1158(a)(1). We think it clear that, by enacting the reinstatement bar, Congress intended to preclude individuals subject to reinstated removal orders from applying for asylum. Accordingly, we hold that Calla Mejia is ineligible to apply for asylum.

a.

**[11]** **[12]** In considering these statutes, our goal is to "fit, if possible, all parts into an harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). Because "the plain language of the statute is the most reliable indicator of Congressional intent," we look there first. *Ojo*, 813 F.3d at 539 (alteration and internal quotation marks omitted).

The plain text of § 1158 and § 1231(a)(5) reveals a tension between these provisions. Section 1158(a)(1) proclaims that "[a]ny alien ... irrespective of such alien's status, may apply for asylum." And, § 1231(a)(5) commands that an alien subject to a reinstated order of removal "may not apply for any relief under [Chapter 12 of Title 8]." At first glance, then, the broad grant of eligibility for asylum in § 1158(a)(1) seems just as absolute as the broad prohibition on relief for aliens subject to reinstated removal orders in § 1235(a)(5). And yet, neither provision is absolute.

To begin with, § 1158 is restricted by its own terms. Specifically, § 1158(a)(1)'s guarantee that "[a]ny alien" may apply for asylum is limited by § 1158(a)(2)'s clarification that there are some types of aliens who may not apply for asylum. In the same way, § 1231(a)(5)'s prohibition on applying for relief is subject to an important caveat, in that § 1231(b)(3)(A) restricts the Attorney General from removing an alien who qualifies for withholding of removal. Thus, notwithstanding the reinstatement bar's broad language, "that section does not bar

*all* types of relief." *Cazun*, 856 F.3d at 264 (Hardiman, J., concurring in judgment). In other words, the text of both provisions—though at first blush absolute—allows for "interpretive flexibility." Pet'r's Br. at 26.

We therefore reject Calla Mejia's contention that the asylum statute is unambiguous in its broad application to "[a]ny alien ... *irrespective of such alien's status*." 8 U.S.C. § 1158(a)(1) (emphasis added). Calla Mejia argues that the only exceptions to this categorical rule of eligibility appear within the closed universe of § 1158 itself, none of which apply to Calla Mejia, and that Congress therefore intended all aliens, even those subject to reinstated removal orders, to be eligible to seek asylum.

Calla Mejia's textual arguments—lodged as they are in a statutory vacuum—do little to assist us with our interpretative **\*585** task. In support of her view that Congress spoke directly to this issue in the text of the asylum statute, Calla Mejia argues that Congress broadened the class of aliens who could seek asylum when, by enacting IIRIRA, it amended the relevant modifier contained in § 1158(a)(1)'s grant of eligibility from "an alien" to "any alien." But Calla Mejia's claim that Congress's intent is made clear because it selected for § 1158(a)(1) a word with a particularly "expansive meaning," *United States v. Gonzales*, 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997), applies equally to § 1231(a)(5)'s bar on "any relief," selected by Congress on the same day.

Similarly unavailing is Calla Mejia's argument that § 1231(a)(5) is inapplicable to forms of relief that do not explicitly reference the reinstatement bar. In her view, if Congress truly intended to exempt individuals subject to reinstated removal orders from § 1158(a)(1)'s broad reach, it would have done so by including within § 1158 an explicit cross-reference to § 1231(a)(5). But, as the government points out, if the reinstatement bar applied only to those types of relief amended to cross-reference § 1231(a)(5), then the reinstatement bar would be rendered superfluous "because Congress did not [so] specifically amend any of the relief provisions under Chapter 12 of Title 8." Gov't's Br. at 31. Moreover, Calla Mejia's favored construction would directly contravene the Supreme Court's recognition that §

1231(a)(5) bars an alien subject to a reinstated removal order from applying for adjustment of status, notwithstanding the fact that the adjustment-of-status provision, 8 U.S.C. § 1255, contains no reference to the reinstatement bar. *See Fernandez-Vargas*, 548 U.S. at 35, 126 S.Ct. 2422.

But we also don't agree with the government that the plain text of § 1231(a)(5) resolves this issue. According to the government, § 1231(a)(5) could not more plainly state that an alien subject to a reinstated removal order "is not eligible and may not apply for any relief under" Chapter 12 of Title 8, wherein the asylum statute can be found. Thus, because asylum is clearly a "form of relief under this chapter" to which the reinstatement bar applies, the government says we're bound to give effect to Congress's unambiguous intent. But, as with Calla Mejia's textual arguments, the government's argument falls short because it too fails to square the reinstatement bar's prohibition on seeking "any relief" with the broad grant of eligibility in the asylum provision.

**[13]**  Accordingly, we turn to canons of statutory construction to harmonize these provisions. [7] *Chevron*, 467 U.S. at 843 n.9, 104 S.Ct. 2778 (instructing courts to employ traditional tools of statutory construction to ascertain Congress's clear intent). "As a rule of statutory construction, ... the specific terms of a statutory scheme govern the general ones." *D.B. v. Cardall*, 826 F.3d 721, 735 (4th Cir. 2016) (citing *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 132 S.Ct. 2065, 2071, 182 L.Ed.2d 967 (2012)). This rule is "particularly applicable where 'Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions,' as it has done in the immigration context." *Id.* (quoting *RadLAX*, 132 S.Ct. at 2071).

**[14]**  Though it is admittedly "[s]ometimes ... difficult to determine whether a provision is a general or a specific one," we conclude that the reinstatement bar is more specific than the asylum provision **\*586** and therefore controls our statutory inquiry. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 187 (2012). We apply the general-specific rule of construction "to statutes in which a general permission ... is contradicted by a specific prohibition." *D.B.*, 826 F.3d at 735 (internal quotation marks omitted). These provisions readily fall within these categories: § 1158(a)(1) contains a general

permission—allowing "[a]ny alien" to apply for asylum—that is contradicted by § 1231(a)(5)'s specific prohibition —forbidding individuals subject to reinstated orders of removal from seeking relief. Thus, "in order to 'eliminate the contradiction,' " we construe § 1231(a)(5) to serve as a specific exception to § 1158(a)(1)'s general grant of eligibility to apply for asylum. *D.B.*, 826 F.3d at 736 (quoting *RadLAX*, 132 S.Ct. at 2071).

Calla Mejia's argument that § 1158(a)(1) is the specific provision to which the general provision of § 1231(a)(5) must yield incorrectly frames the inquiry. She urges that the reinstatement bar only generally forbids an individual subject to a reinstated removal order from applying for "any relief," § 1231(a)(5), while the asylum statute deals with one specific form of relief from removal: asylum. But the question we must resolve is not *what* type of relief is available; instead, the antecedent question is *who* is entitled to apply for that relief. The reinstatement bar "comes closer to addressing the very problem posed by the case at hand and is thus more deserving of credence." Scalia & Garner, *supra*, at 183.

Stated differently, the asylum provision lays out general (and qualified) terms of eligibility for asylum. This grant of permission presupposes that the recipient of the grant— the alien—is amenable to regulation. The reinstatement bar, on the other hand, deals with one specific subset of those recipients—aliens subject to reinstated removal orders—and attaches to this subset a categorical exemption from all forms of relief found in Chapter 12 of Title 8 of the U.S. Code, including asylum. In our view, a law that attaches a categorical prohibition on a specific subset of aliens is most sensibly read to control when it conflicts with the law that grants permission.

Classifying the reinstatement bar as a specific exception to § 1158(a)(1)'s general grant of eligibility more effectively harmonizes the provisions than Calla Mejia's proposed method. As an alternative to her invocation of the general-specific canon, Calla Mejia asks us to narrowly construe the undefined term of "relief" in § 1231(a)(5) so as to "[encompass] ordinary waivers of the deportation rules," such as voluntary departure, adjustment of status, and cancellation of removal, "but exclud[e] forms of redress that amount to humanitarian protection—asylum, withholding of removal,

and [Convention Against Torture] protection." Pet'r's Br. at 27 (emphasis omitted). Putting aside the question of whether withholding of removal and protection under the Convention Against Torture are properly categorized as "protection" or "relief," we think it beyond doubt that asylum is a form of "relief." *E.g., United States v. Denedo*, 556 U.S. 904, 909, 129 S.Ct. 2213, 173 L.Ed.2d 1235 (2009) (defining the "familiar meaning" of "relief" as "any 'redress or benefit' provided by a court" (quoting *Black's Law Dictionary* 1317 (8th ed. 2004))). [8] Calla Mejia's proposed construction would impermissibly override Congress's intention to limit the types of relief available to **\*587** aliens who illegally re-enter the United States after removal.

By enacting § 1231(a)(5), Congress sought to crack down on aliens who illegally re-enter the United States after removal by "enlarg[ing] the class of illegal reentrants whose orders may be reinstated and limit[ing] the possible relief from a removal order available to them." *Fernandez-Vargas*, 548 U.S. at 33, 126 S.Ct. 2422. That withholding of removal and protection under the Convention Against Torture remain available to Calla Mejia does not, as she suggests, require us to ignore Congress's intent to bar her from applying for any relief, including asylum. Instead, we must give effect to both statutes, and construing § 1231(a)(5) to create a specific exception to § 1158(a)(1)'s general grant of eligibility to seek asylum accomplishes this goal.

To be sure, as Calla Mejia notes, Congress sought to ensure the availability of asylum to those aliens fleeing persecution. *See, e.g.,* H.R. Rep. No. 104-469, pt. 1, at 13 (1996) (discussing IIRIRA's revisions to procedures for removal and noting "[t]hroughout the process, the procedures protect those aliens who present credible claims for asylum by giving them an opportunity for a full hearing on their claims"). But Congress also sought to streamline the removal process for illegal re-entrants and to attach consequences to re-entry, including by restricting the forms of relief available to those who re-enter following removal. *See, e.g., id.* at 155 ("[T]he ability to cross into the United States over and over with no consequences undermines the credibility of our efforts to secure the border."). In light of this statutory purpose, we reject Calla Mejia's view that Congress's desire to make asylum available to aliens as a general matter overrides Congress's intention to single out illegal re-entrants and bar them from seeking certain forms of relief.

**[15]** In sum, we conclude that the interplay between § 1231(a)(5) and § 1158 is unambiguous: Congress intended that aliens subject to reinstated orders of removal be precluded from applying for asylum. [9]

### b.

Calla Mejia's remaining argument, premised on international law, is also unpersuasive. She says that barring illegal re-entrants from applying for asylum violates the *Charming Betsy* canon of interpretation—which requires courts to "construe ... statute[s] consistent with our obligations under international law," *Kofa v. INS*, 60 F.3d 1084, 1090 (4th Cir. 1995) (en banc) (citing *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804))—because it breaches our obligations under the 1967 United Nations Protocol Relating to the Status of Refugees. [10] Specifically, Calla Mejia points to Article 31(1) of the Protocol, which provides that signatories "shall **\*588** not impose penalties, on account of [an applicant's] illegal entry or presence." Protocol Relating to the Status of Refugees, art. 31(1), Jan. 31, 1967, 19 U.S.T. 6223. Calla Mejia claims that § 1231(a)(5)'s limitation on asylum constitutes such an impermissible "penalty" for those who illegally re-enter the United States after removal. The government counters that the United States' obligations under the Protocol do not extend so far as to "afford all aliens repeated opportunities to apply for asylum, each and every time they enter the United States illegally." Gov't's Br. at 37–38.

**[16]** We think the government has the better of this argument. Calla Mejia offers no support for her contention that denying illegal re-entrants the ability to apply for asylum constitutes a "penalty," a key term undefined by the Protocol. And the Supreme Court has emphasized that asylum is a "discretionary mechanism" that corresponds to a "precatory" provision of the Protocol. *Cardoza–Fonseca*, 480 U.S. at 441, 107 S.Ct. 1207. We therefore perceive no basis for concluding that depriving aliens, upon illegal re-entry, additional opportunities to apply for discretionary relief constitutes a "penalty."

Crucially, the opportunity to apply for withholding of removal and Convention Against Torture protection remains available to aliens notwithstanding a reinstated removal order. It could

be that "[i]f withholding of removal and [Convention Against Torture] protection were also eliminated for aliens who illegally reentered," Calla Mejia's argument would win the day. *Ramirez-Mejia*, 813 F.3d at 241. But, "Congress did not go so far," and we therefore agree with our sister circuits that barring illegal re-entrants from applying for asylum doesn't conflict with our international treaty obligations. *Id.*; *see also* *Garcia Garcia*, 856 F.3d at 41–42 (no conflict with Articles 28 or 34 of the U.N. Protocol); *Cazun*, 856 F.3d at 257 n.16 (no conflict with Articles 28, 31(1), or 34 of the U.N. Protocol).

### B.

Calla Mejia alternatively seeks to apply for asylum on the ground that her reinstated order of removal is invalid because it relies on a removal order that was entered in violation of her statutory and due process rights. To this end, Calla Mejia alleges that at the June 2015 hearing, the IJ: (1) failed to sufficiently inform her that she was eligible for asylum or that she could apply for asylum, and discouraged her from doing so; (2) failed to sufficiently advise her of the right to appeal; and (3) failed to inform her that she was eligible for pre-conclusion voluntary departure under 8 U.S.C. § 1229c(a)(1). Because we find that Calla Mejia's petition was not timely filed as to the underlying order of removal—which became final on June 10, 2015—we lack jurisdiction to address Calla Mejia's objections to the June 2015 hearing. [11]

Ordinarily, under 8 U.S.C. § 1231(a)(5), after DHS makes the findings necessary for reinstatement, "the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed." Calla Mejia seeks to avoid this broad limitation by relying on the jurisdictional **\*589** provision of The REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231. Codified at 8 U.S.C. § 1252(a)(2)(D), this provision states that notwithstanding "any other provision of this chapter (other than this section) which limits or eliminates judicial review," courts of appeals retain jurisdiction to resolve "constitutional claims or questions of law raised upon a petition for review filed ... in accordance with this section."

The jurisdictional limitation of § 1231(a)(5) clearly falls outside the scope of § 1252: It appears in a different section

of Title 8, Chapter 12, and is therefore overridden by § 1252(a)(2)(D). Accordingly, we agree with Calla Mejia that § 1231(a)(5) doesn't deprive us of jurisdiction to review the constitutional claims and questions of law that arise from an underlying removal order in the reinstatement context.

*See, e.g.*, *Villegas de la Paz v. Holder*, 640 F.3d 650, 656 (6th Cir. 2010) ("[Section] 1252(a)(2)(D) re-vests the circuit courts with jurisdiction over constitutional claims or questions of law raised in the context of reinstatement proceedings."); *Lorenzo v. Mukasey*, 508 F.3d 1278, 1281 (10th Cir. 2007) ("[W]e may no longer categorically hold that we lack jurisdiction to review constitutional and statutory claims related to *all* underlying removal orders.").

However, our jurisdictional inquiry doesn't end here. While the REAL ID Act gives us jurisdiction to review Calla Mejia's constitutional and legal challenges to the underlying June 2015 removal order, her petition must still be "filed ... in accordance with [ § 1252]." 8 U.S.C. § 1252(a)(2)(D). As the government notes, § 1252(b)(1) requires that the petition "be filed not later than 30 days after the date of the final order of removal." Calla Mejia doesn't argue otherwise, but instead asserts that to give the "jurisdiction-restoring provision" of § 1252(a)(2)(D) any "real effect," we must construe § 1252(b)(1)'s deadline to refer to the date on which the *reinstated* order of removal—not the original order —becomes final. Pet'r's Opp'n to Resp't's Mot. to Dismiss, at 16. Under Calla Mejia's favored construction, because her reinstated order of removal became final 30 days before she filed the instant petition, we have jurisdiction.

**[17]** In light of the plain text and purpose of § 1251(b)(1), we reject Calla Mejia's reading and hold that the 30-day deadline runs from the date an *original* order of removal becomes final. And, as we've recognized, the 30-day time limit of § 1252(b)(1) constrains our review of an underlying order of removal, even where an alien raises constitutional or legal challenges. *See* *Galicia-Vargas v. Holder*, 586 Fed.Appx. 119, 120 (4th Cir. 2014) (citing § 1252(b)(1) and finding no jurisdiction to review alien's challenges to underlying 1998 removal order because his "petition for review is not timely *as to the underlying order of removal*" (emphasis added)). We reaffirm that holding today.

To accept Calla Mejia's argument "would defeat the purpose of the statute's time bar by allowing a challenge to an underlying removal order any time a reinstated order is issued." *Verde-Rodriguez v. Att'y Gen. U.S.*, 734 F.3d 198, 203 (3d Cir. 2013). Congress was clear when it enacted the REAL ID Act that the intended "overall effect of the proposed reforms" in the Act—including the jurisdictional provision of § 1251(a)(2)(D)—was "to give every alien a fair opportunity to obtain judicial review while restoring order and common sense to the judicial review process." H.R. Rep. 109-72, at 174H.R. Rep. 109-72, at 174 (2005) (Conf. Rep.), *as reprinted in* 2005 U.S.C.C.A.N. 240, 299. Central to this goal of "order and common sense" was Congress's desire that aliens "not be able to ignore the thirty-day time limit on seeking review." *Id.*

**\*590** Calla Mejia warns that our interpretation of § 1252(b)(1) contravenes the REAL ID Act and effectively "abolish[es] review of *all* underlying orders in reinstatement," thereby raising " 'serious constitutional problems' "— namely, Suspension Clause concerns. [12] Pet'r's Opp'n to Resp't's Mot. to Dismiss, at 12, 17 (quoting *INS v. St. Cyr*, 533 U.S. 289, 300, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001)). Not so. Rather, we think it more than feasible that an individual removed to her home country could illegally re-enter the United States, have the original removal order reinstated by DHS, and petition for review—all within a month's time.

Moreover, given that an alien may move to reopen her removal proceedings pursuant to 8 U.S.C. § 1229a(c)(7), we find Calla Mejia's concerns unavailing. *See Luna v. Holder*, 637 F.3d 85, 87 (2d Cir. 2011) (describing § 1229a(c)(7)'s motion to reopen process as "an adequate and effective substitute for habeas review" that resolves Suspension Clause concerns raised by § 1252(b)(1)'s 30-day deadline). In this case, Calla Mejia could have moved to reopen her removal proceedings, providing via affidavit or other evidence the material facts to be considered. *See* 8 C.F.R. § 1003.2(c). And Calla Mejia could have sought such relief even after she was removed to Peru, *see William v. Gonzales*, 499 F.3d 329, 333 (4th Cir. 2007), and had ninety days after the removal order became final to do so, 8 U.S.C. § 1229a(c)(7)(C)(i). Moreover, even if Calla Mejia failed to file the motion within the statutory time limit, she could still seek to equitably toll the deadline. *Kuusk v. Holder*, 732 F.3d 302, 305 (4th Cir. 2013). Given the avenues available to an alien subject to a reinstated removal order to seek judicial review of the underlying removal order, we cannot agree with Calla Mejia that the government's proposed construction of § 1252(b)(1)—which we now adopt—renders the REAL ID Act "toothless."

Thus, because Calla Mejia did not timely file her challenge to the June 2015 order of removal, we lack jurisdiction to review her claims.

*PETITION FOR REVIEW DISMISSED IN PART AND DENIED IN PART*

TRAXLER, Circuit Judge, concurring in part and dissenting in part:

Calla Mejia was in front of the immigration judge with her lawyer. She made a motion for asylum. The judge was ready to rule. However, Calla Mejia opted instead to withdraw her motion for asylum and to waive her right to appeal the asylum issue. The immigration judge therefore did not rule on the asylum issue. No appeal was taken to the BIA. Yet somehow we are now ruling on the asylum issue that Calla Mejia raised and abandoned. We have no jurisdiction to do so and I dissent.

I.

*Calla Mejia's First Illegal Entry Into the United States*

Calla Mejia first illegally entered the United States in April 2015, crossing the Rio Grande near Laredo, Texas. She was immediately apprehended and questioned by a border patrol agent. When asked why she entered the United States, Calla Mejia told the agent she wished "to reside and work in New York, New York," J.A. 217, and denied that she would "be harmed or face persecution" if she returned to Peru, J.A. 218. The agent determined that Calla Mejia was inadmissible and placed her, **\*591** initially, in expedited removal proceedings.

*See* 8 U.S.C. § 1225(b)(1). After she had been detained for some period of time, however, Calla Mejia expressed a fear that she would be harmed if she were returned to Peru. Therefore, an Asylum Officer ("AO") conducted a credible-fear interview. *See* 8 U.S.C. § 1225(b)(1)(A). During the interview, Calla Mejia indicated that she was afraid to return

to Peru because her husband routinely abused her physically and even threatened her with death. Calla Mejia claimed that she reported this abuse to the police, but that they took no action because her husband was a police officer. She also claimed that she could not avoid her husband's abuse by relocating to a different part of Peru—she believed that his position as a police officer would enable him to find her. When asked why she initially told the Border Patrol agents that she "did not fear returning to Peru," Calla Mejia responded that she did, in fact, tell the Border Patrol agents that she feared returning to Peru, but that the agents stated they "[did not] care." J.A. 214. Following this interview, the AO concluded that Calla Mejia had a credible fear of persecution in Peru on account of her membership in a particular social group, *see* 8 U.S.C. § 1225(b)(1)(B)(ii), and referred her for a full removal proceeding during which she could seek relief from removal, *see* 8 U.S.C. § 1229a.

DHS issued Calla Mejia a Notice to Appear, charging that she was removable as an immigrant who did not possess a valid entry document "at the time of application for admission." 8 U.S.C. § 1182(a)(7)(A)(i)(I). On June 10, 2015, Calla Mejia appeared pro se at a Master Calendar hearing before an immigration judge "to determine whether or not those facts and allegations [in the Notice to Appear] are true and correct." J.A. 545.

The Immigration Judge offered Calla Mejia an opportunity to consult an attorney before continuing with the removal proceedings, but Calla Mejia declined and indicated she wanted to proceed on her own. Calla Mejia admitted the allegations set forth in the Notice to Appear and conceded that she had entered the United States "illegally." J.A. 561. After the immigration judge determined that Calla Mejia was removable, Calla Mejia identified Peru as her preferred country of removal.

Calla Mejia did not apply for relief from removal and waived any appeal from the proceedings. The immigration judge asked if there was "any reason [she could] not return to Peru," and Calla Mejia stated that she "told the officer [she] was fearful [of] returning to [her] country." *Id.* The immigration judge noted that Calla Mejia would have a serious "credibility problem" because she had "told the first officer [she was] going to live in New York for five years and [she was] not afraid to return." J.A. 562. Nonetheless, the judge indicated that if Calla Mejia wanted to apply for asylum, withholding of removal and protection under the Convention Against

Torture, the court would "allow it." *Id.* Calla Mejia stated that she did not wish to apply for relief from removal, that she understood the order of removal was final, and that she did not wish to appeal.

The immigration judge entered a final order of removal on June 10, 2015. Before executing the order of removal, DHS issued to Calla Mejia a standard Form I-294 Warning to Alien Ordered Removed or Deported, which admonished her that she was "prohibited from entering, attempting to enter, or being in the United States" "[f]or a period of 10 years from the date of [her] departure from the United States." J.A. 13. Additionally, the Form I-294 issued to Calla Mejia provided, in bold font, the following:

> **WARNING:** **Title 8 United States Code, Section 1326** **provides that it is a  \*592  crime for an alien who has been removed from the United States to enter, attempt to enter, or be found in the United States during the period in which he or she is barred from so doing without the Attorney General's consent. Any alien who violates this section of law is subject to prosecution for a felony. Depending on the circumstances of the removal, conviction could result in a sentence of imprisonment for a period of from 2 to 20 years and/or a fine of up to $250,000.**

J.A. 13. Calla Mejia was removed to Peru on June 22, 2015.

*Calla Mejia's Second Illegal Entry and DHS's
Reinstatement of the Prior Order of Removal*

Calla Mejia waited for about two months before illegally crossing the Mexican border into the United States for a second time. On August 19, 2015, she was apprehended by border patrol agents near Laredo, Texas, once again. On August 21, 2015, DHS served Calla Mejia with a Form I-871 indicating that because she had unlawfully reentered the United States after having been previously removed, she was subject to removal by reinstatement of her prior order of

removal pursuant to section 241(a)(5) of the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. § 1231(a)(5). Calla Mejia signed an acknowledgement indicating that she did "not wish to make a statement contesting [the] determination" that she was removable. J.A. 201. DHS thus issued an order on August 21, 2015, concluding that Calla Mejia was "subject to removal through reinstatement of the [June 10, 2015, order of removal], in accordance with [ 8 U.S.C. § 1231(a)(5) ]." J.A. 201.

Before DHS could execute the reinstated order of removal, however, Calla Mejia again expressed a fear of returning to Peru. DHS therefore referred her to a USCIS AO for a reasonable-fear interview "to determine whether [she] should be referred to an immigration judge to apply for withholding or deferral of removal." J.A. 178. The AO informed Calla Mejia that she had "the right to have an attorney or representative present," but Calla Mejia declined legal representation and asked to "[p]roceed" with the interview. J.A. 177. Calla Mejia then told the AO about physical and mental abuse she suffered at the hands of her husband, and about her inability to seek protection from the authorities because of her husband's employment as a police officer. She believed that if she ever returned to Peru, her husband would find her, "[m]istreat [her], hit [her], even kill [her]." J.A. 193. The AO determined that the interview testimony by Calla Mejia "established that there is a reasonable possibility of suffering harm constituting persecution in the country to which [she] has been ordered removed ... on account of ... membership in a particular social group." J.A. 176. Accordingly, the proceedings against Calla Mejia were referred to an immigration judge "for a determination in accordance with 8 CFR § 208.31(e)." J.A. 595.

*Calla Mejia's Application for Asylum*

Calla Mejia obtained counsel and filed a Form I-589 Application for Asylum and for Withholding of Removal. Because she had been placed in withholding-only proceedings, Calla Mejia also submitted a formal written motion setting forth her reasons for believing that she was eligible for asylum. Specifically, Calla Mejia asserted that her original order of removal was invalid because she had not been given a genuine chance to apply for relief. And because she "did not meaningfully waive her rights to seek asylum or pursue an appeal during her first removal proceedings," she

argued that she remained eligible for asylum in the present proceedings. Calla Mejia also **\*593** contended that "the relevant provisions of the [INA] do not preclude an individual subject to a reinstatement of removal order from applying for asylum." J.A. 134.

At the merits hearing, before taking testimony as to Calla Mejia's claim for withholding of removal, the immigration judge addressed her application for asylum, stating that she was "inclined to conclude that [Calla Mejia was] not eligible for asylum." J.A. 13. The immigration judge offered to "flesh" out her reasoning on the asylum issue "in a written decision," but noted that would "take some more time." J.A. 13. Calla Mejia responded through counsel that she had been in detention for "almost six months" and was "adamant" about getting released from custody as soon as possible. J.A. 15. Calla Mejia therefore "opt[ed] just for the withholding only proceeding," J.A. 14-15, and indicated that if the immigration judge granted her withholding claim, she would "withdraw" the asylum application and "waive any appeal of the asylum issue," J.A. 16.

Following Calla Mejia's testimony, the immigration judge found that "she [met] all of the requirements for withholding under the INA." J.A. 40. The judge informed Calla Mejia that if she wanted to pursue her asylum claim, "for the record ... I would certainly want to do a ... thorough decision on that and issue a written decision," which Calla Mejia could appeal. J.A. 41. The immigration judge then explained that she would "do a very short decision orally granting ... withholding of removal," and that if Calla Mejia "waive[d] appeal, [the oral decision] would be a final order." J.A. 44. However, the immigration judge indicated that if Calla Mejia wished to pursue the asylum claim, the court would not issue a decision until later in a written order. Beyond any doubt the immigration judge was willing and able to issue a ruling on Calla Mejia's claim for asylum.

At this point, Calla Mejia indicated that she would "rather have the decision now" and unequivocally stated that she was "withdraw[ing] that [asylum claim] for the oral decision today," so as to obtain her release from detention. J.A. 45. The immigration judge then ruled, granting Calla Mejia's "application for withholding of removal under the INA." J.A. 46. Counsel confirmed that Calla Mejia was waiving appeal of the immigration judge's order, and DHS likewise waived appeal. On February 17, 2016, the immigration judge entered an order granting Calla Mejia's claim for withholding of removal under the INA. There this case should have ended.

*Calla Mejia's Petition for Review*

A month later, however, on March 17, 2016, Calla Mejia filed this petition for review in our court, asserting the very claim she raised and then withdrew during proceedings before the immigration judge—that she had the right to raise an asylum claim before the immigration judge even though she was subject to a reinstated order of removal. [1] Calla Mejia based this contention on the plain language of the INA, which provides that "[a]ny alien" may apply for asylum "irrespective of such alien's status." 8 U.S.C. § 1158(a)(1). According to Calla Mejia, "DHS wrongfully *denied [her] the chance* to apply for asylum." Brief of Appellant at 17 (emphasis added). And she now seeks an order from this court sending her asylum issue back **\*594** to an immigration judge where she was before.

The Attorney General responded by filing a motion to dismiss the petition for review for lack of jurisdiction. The Attorney General argued that Calla Mejia failed to exhaust her asylum claim before the immigration judge or the BIA, having "filed a motion requesting asylum," but having withdrawn that motion "at the conclusion of her proceedings in Immigration Court." Respondent's Motion To Dismiss at 8. Noting that Calla Mejia "also expressly waived appeal to the [BIA] and filed no such appeal," the Attorney General asserted that "there is no decision from the Immigration Judge or the [BIA] regarding Petitioner's asylum arguments" for this court to review. *Id.*

Calla Mejia filed a memorandum in opposition to the motion to dismiss. Relying on *Etienne v. Lynch*, 813 F.3d 135 (4th Cir. 2015), she argued that "[u]nder current agency regulations, ... Calla Mejia had no right to seek asylum from either an immigration judge or the BIA," and that the exhaustion rule therefore did not preclude her from raising an asylum claim in her petition for review to this court. Petitioner's Opposition to Motion to Dismiss at 6.

Finally, in reply, the Attorney General emphasized that Calla Mejia "had an opportunity to file an appeal to the Board of Immigration Appeals raising her current legal claims, but failed to avail herself of that opportunity." Respondent's Reply to Opposition to Motion to Dismiss at 1 (citing 8 C.F.R. § 1208.31(e)). In responding to Calla Mejia's argument that the "agency afforded her no avenue for appeal" with regard to her asylum claim, the Attorney General contended that this ignored both "the extensive colloquy before the Immigration Judge prior to her waiver of her appeal rights," and "the regulation at 8 C.F.R. § 1208.31(e), which specifically authorized an appeal to the Board." *Id.* at 2; *see* 8 C.F.R. § 1208.31(e) ("Appeal of the immigration judge's decision shall lie to the Board of Immigration Appeals."). The Attorney General argued that Calla Mejia's belief that the BIA "was going to rule against her [did] not relieve her of the obligation to exhaust her administrative remedies by filing an appeal with the [BIA]." *Id.* at 6.

## II.

According to the majority, Calla Mejia may now escape the consequences of her considered and strategic decision to withdraw her claim for asylum and waive any appeal of that issue because, in its view, Calla Mejia had no forum to litigate her asylum claim and because the immigration judge and the BIA would have likely ruled against her. For the reasons discussed below, I cannot agree with the majority's decision to allow Calla Mejia to make an end run around the administrative tribunal, and to its willingness to excuse Calla Mejia from her counseled choices and the representations she made to the immigration judge. I would dismiss Calla Mejia's petition for review in its entirety for lack of jurisdiction, and I would not reach the merits of the asylum claim.

### A. *Exhaustion*

An alien must exhaust "all administrative remedies available to the alien as of right" before filing a petition for review of a final order of removal. 8 U.S.C. § 1252(d)(1). An alien who fails to raise a particular claim before the BIA fails to exhaust that claim. *See Tiscareno-Garcia v. Holder*, 780 F.3d 205, 210 (4th Cir. 2015). This court lacks jurisdiction to review any claim that is not administratively exhausted. *See id.;* 8 U.S.C. § 1252(d)(1).

This court has excused the exhaustion requirement for due process claims because **\*595** the BIA generally has *no authority to address or remedy* such constitutional claims. *See Farrokhi v. INS*, 900 F.2d 697, 700-01 (4th Cir. 1990). When the constitutional claims concern procedural errors

that may be addressed and remedied by the BIA, however, exhaustion is still required. *See Kurfees v. INS*, 275 F.3d 332, 337 (4th Cir. 2001). As my colleagues rightly observe, we excused the exhaustion requirement in *Etienne v. Lynch*, 813 F.3d 135, 138 (4th Cir. 2015). There, we explained that "in expedited removal proceedings, an alien has *no opportunity* to challenge the legal basis of his removal," and thus need not satisfy the exhaustion requirement. *Id.* at 138 (emphasis added). Stated differently, the alien there was not provided "with an avenue to challenge the legal conclusion" that he was subject to expedited removal. *Id.* at 140 (internal quotation marks omitted).

This case is not like *Etienne*. First, the BIA has the authority to decide the legal argument raised by Calla Mejia —that "the relevant provisions of the [INA] do not preclude an individual subject to a reinstatement of removal order from applying for asylum," J.A. 134, and that "[t]o the extent that 8 C.F.R. § 208.31(e) allows withholding of removal only, this regulation conflicts with controlling statutory authority," J.A. 135 (internal quotation marks omitted). By contrast, *Etienne* involved expedited removal proceedings, over which a DHS officer—who need not be an attorney or have any specialized legal training—presides. *See Etienne*, 813 F.3d at 139. Unlike an immigration judge, a DHS officer is typically not qualified to address questions of law such as whether an alien is an "aggravated felon" subject to expedited removal proceedings. Furthermore, "aliens subject to expedited removal [not only] do not appear before an IJ" but "they cannot appeal an adverse decision to the BIA." *Valdiviez-Hernandez v. Holder*, 739 F.3d 184, 187 (5th Cir. 2013). Thus, with a claim that the hearing officer could not address and that could not be appealed to the BIA, Etienne had no "avenue to challenge the legal conclusion" that he was subject to expedited removal proceedings. *Etienne*, 813 F.3d at 140 (internal quotation marks omitted).

In contrast, Calla Mejia not only had an opportunity to raise her asylum claim, but she in fact filed a Form I-589 Application for Asylum. The immigration judge had the claim before her and the authority to decide whether Calla Mejia could apply for asylum in light of the relevant statutes and regulations. And the immigration judge repeatedly assured Calla Mejia that she would consider the issue carefully in a written opinion from which an appeal to the BIA could

be taken. However, the immigration judge also gave Calla Mejia a choice: either an oral decision granting withholding of removal to be entered immediately, or a written decision addressing the asylum claim to be entered later. Calla Mejia affirmatively withdrew her asylum claim so as not to delay the entry of the order granting withholding and her release from detention.

Calla Mejia now asks us to consider an asylum claim that has not been ruled upon by the immigration judge or presented to the BIA. To the extent she contends that the exhaustion requirement should be excused because it would have been futile to present her claim to the BIA in view of the agency's longstanding practice of affording withholding-only proceedings in accordance with its own regulation, I cannot agree. Congress "expressly requires exhaustion of administrative remedies." *Temu v. Holder*, 740 F.3d 887, 899 n.4 (4th Cir. 2014) (Agee, J., dissenting); *see* 8 U.S.C. § 1252(d)(1) (requiring exhaustion of remedies). Accordingly, courts must "strictly enforce[ ]" this requirement. *Temu*, 740 F.3d at 899 n.4 (Agee, J., dissenting). **\*596** Where "Congress has mandated exhaustion," the statutory exhaustion requirement "is at odds with traditional doctrines of administrative exhaustion, under which a litigant ... need not exhaust where doing so would otherwise be futile." *Booth v. Churner*, 532 U.S. 731, 741 n.6, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). The INA requires exhaustion "irrespective of the forms of relief sought and offered through administrative avenues," and it is improper to "read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise." *Id.*

*Booth* does state that exhaustion may not be required "where the relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint." *Id.* at 736, 121 S.Ct. 1819. But to the extent a futility-like exception to the exhaustion rule survived *Booth*, it is extremely narrow, *see, e.g., United States v. Copeland*, 376 F.3d 61, 66-67 (2d Cir. 2004), and does not apply here. *Booth* concluded that an inmate's claim for monetary relief had to be exhausted even though the prison's internal grievance procedure had no provision for the recovery of money damages. Under *Booth*, a remedy is available as of right where "the administrative process has

authority to take some action in response to a complaint, but not the remedial action [the complainant] demands." *Booth*, 532 U.S. at 736, 121 S.Ct. 1819. Such was the case here.

Before bringing her asylum eligibility claim to this court, Calla Mejia should have presented it to the BIA, despite the long odds of success, for it to consider anew.

### B. *Waiver*

Finally, even assuming that futility could, in some instances, excuse a failure to exhaust, the merits of Calla Mejia's argument are still not properly before us. As the government contends, Calla Mejia did not merely fail to raise the asylum question, she raised the issue and then intentionally and affirmatively withdrew it and explicitly gave up the right to appeal to the BIA. Calla Mejia thus did not simply *forfeit* the issue, she *waived* the issue, which extinguishes any claim of error and leaves us with nothing to review. *See United States v. Olano*, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (noting that "forfeiture is the failure to make the timely assertion of a right," while "waiver is the intentional relinquishment or abandonment of a known right," and explaining that issues that are waived are not reviewable at all, because waiver "extinguish[es]" any error (internal quotation marks omitted)); *United States v. Robinson*, 744 F.3d 293, 298 (4th Cir. 2014) ("[W]hen a claim is waived, it is not reviewable on appeal, even for plain error. Rather, a valid waiver means that there was no error at all. ... A party who identifies an issue, and then explicitly withdraws it, has waived the issue." (internal citation and quotation marks omitted)).

Relying on *Selgeka v. Carroll*, 184 F.3d 337 (4th Cir. 1999), the majority contends that there is no waiver here, because it would have been futile for Calla Mejia to raise the asylum issue. *See* Majority Op. at 582. I believe the majority misreads *Selgeka*. Although the court in *Selgeka* stated that "a claim is not waived when it would be futile to raise it," 184 F.3d at 345, courts have frequently been inexact in their usage of the terms "waiver" and "forfeiture." *See Freytag v. Com'r*, 501 U.S. 868, 894 n.2, 111 S.Ct. 2631,

115 L.Ed.2d 764 (1991) (noting that the Supreme Court has "so often used [waiver and forfeiture] interchangeably that it may be too late to introduce precision") (Scalia, J., concurring); **\*597** *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.,* 369 F.3d 385, 395 n.7 (4th Cir. 2004) (en banc) (noting that "[w]hile cases often use the terms 'forfeit' and 'waive' interchangeably, there is an important distinction"). Given that the facts of *Selgeka* involved a simple failure to raise an issue and the court's statement that "[n]othing in the record suggests that Selgeka made a knowing and intelligent decision to waive his due process claim," *Selgeka*, 184 F.3d at 345, I think *Selgeka's* statement that "a claim is not waived when it would be futile to raise it," *id.,* simply means that a futile claim is not *forfeited* by the failure to raise it.

In this case, because Calla Mejia knowingly waived the asylum issue, there simply is no error and nothing for this court to review. The majority therefore errs by rejecting the government's argument that Calla Mejia waived any right to seek review of the asylum issue. Nothing in *Selgeka* requires a contrary conclusion.

### III.

In the federal judicial system, proceedings before the Courts of Appeals are not de novo affairs where the appellate judges decide the facts for themselves and resolve all legal issues without any regard for what happened below. Instead, the job of an appellate court is to review and correct prejudicial legal errors made by district courts or administrative tribunals. In this case, however, there is nothing for us to review, because no tribunal or administrative agency has even considered the asylum issue, much less erred in resolving it. With respect to the opinion of my colleagues in the majority, I must dissent from the majority's decision that we have jurisdiction to decide Calla Mejia's asylum claim.[2] I concur in the majority's decision that we lack jurisdiction to decide the balance of Calla Mejia's petition for review.

### All Citations

866 F.3d 573

## Footnotes

1   The parties dispute whether and when Calla Mejia expressed fear of returning to Peru. No stretch of logic is required to conclude that Calla Mejia did at some point express fear, as she was undisputedly referred to an asylum officer. *Cf.* 🚩8 U.S.C. § 1225(b)(1)(A)(ii) (providing that an immigration officer "shall refer [an] alien for an interview by an asylum officer" if the alien expresses "an intention to apply for asylum" or indicates "a fear of persecution").

2   A Master Calendar Hearing is typically an alien's first appearance before an IJ in removal proceedings. As a general matter, the purpose of the hearing is to explain to the alien the charges of removability, advise the alien of her rights in the proceedings, ask the alien whether she admits or denies the factual allegations and her removability under the charges, and schedule additional hearings. *See* 8 C.F.R. § 1240.10.

3   Calla Mejia's counsel requested that DHS re-charge Calla Mejia and seek her removal in a full proceeding, rather than by reinstatement, so that she could apply for asylum. DHS declined to exercise prosecutorial discretion.

4   This regulation was originally promulgated as 8 C.F.R. § 208.31(e), but was recodified in 2008 at 8 C.F.R. § 1208.31(e) to reflect the transfer of functions of INS to DHS. *See* Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824, 9834 (Feb. 28, 2003). Where applicable, we refer to the recodified regulations.

5   Considering the same statutory asylum-eligibility issue raised by Calla Mejia, the Ninth Circuit in *Perez-Guzman v. Lynch* rejected the government's assertion that, because the petitioner failed to put the BIA on notice of this statutory argument, he had not exhausted his administrative remedies. 835 F.3d 1066, 1073 (9th Cir. 2016). In the court's view, because "the BIA had no authority to disregard [ 8 C.F.R. § 1208.31(e)]," the petitioner did not need to exhaust his argument for asylum eligibility. *Perez-Guzman*, 835 F.3d at 1073. So too here.

6   Even accepting the dissent's view that *Selgeka* doesn't mean what it says and that its futility rule applies to "forfeited" rather than "waived" claims, we cannot agree that Calla Mejia "relinquish[ed] or abandon[ed] ... a known right." *See* Dissent Op., at 596 (quoting *United States v. Olano*, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). Calla Mejia was limited to "full consideration of the request for withholding of removal only" before the IJ and appeal to the BIA therefrom, 8 C.F.R. § 1208.31(e). She could not have abandoned a right she did not have.

7   The government proposes that the "later-enacted" § 1231(a)(5) should prevail over § 1158. But this tie-breaker is unavailable to us because both provisions were codified simultaneously in IIRIRA.

8   We note also that asylum differs from withholding of removal and protection under the Convention Against Torture in important ways. Specifically, entitlement to asylum requires less proof, is discretionary, and grants broader benefits to an alien.

9   As a result, contrary to Calla Mejia's assertion, the rule of lenity—which in the immigration context "stands for the proposition that ambiguities in deportation statutes should be construed in favor of the noncitizen," *Espinal-Andrades v. Holder*, 777 F.3d 163, 170 (4th Cir. 2015)—has no role to play. *See Hernandez v. Holder*, 783 F.3d 189, 196 (4th Cir. 2015) ("[B]ecause the rule of lenity is a last resort, not a primary tool of construction ... it applies only where there is a grievous ambiguity or uncertainty in the statute.") (internal citations, quotation marks, and alterations omitted).

10  The United States acceded to the Protocol, which incorporated the United Nations Convention Relating to the Status of Refugees, in 1968. *INS v. Stevic*, 467 U.S. 407, 416, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). "The

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Protocol bound parties to comply with the substantive provisions of Articles 2 through 34" of the Convention. *Id.*

11    In so holding, we do not evaluate the manner in which the IJ conducted the June 2015 "rights presentation" to the asylum applicants. We note, however, that a discussion of an asylum applicant's credibility is incomplete without reference to the uniform view among the circuit courts of appeals, including ours, that initial "border" interviews "should be carefully scrutinized for reliability before being utilized by the fact-finder to evaluate an applicant's credibility." *Qing Hua Lin v. Holder*, 736 F.3d 343, 355 (4th Cir. 2013) (Thacker, J., concurring) (collecting cases).

12    *See* U.S. Const. art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.").

1    Technically, Calla Mejia did not petition for review of the February 17, 2016, order. Instead, Calla Mejia filed a petition for review of the August 21, 2015, decision to reinstate the prior order of removal, asserting that the reinstated order of removal became final at the conclusion at the withholding-only proceedings. The government does not argue to the contrary.

2    Because I believe this court lacks jurisdiction over it, I express no opinion on the proper resolution of the asylum issue raised by Calla Mejia.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Mellouli v. Lynch, 575 U.S. 798 (2015)

Case 3:20-cv-07721-SI     Document 58-5     Filed 11/10/20     Page 500 of 1271

135 S.Ct. 1980, 192 L.Ed.2d 60, 83 USLW 4382, 15 Cal. Daily Op. Serv. 5429...

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Ottey v. Barr, 2nd Cir.(N.Y.), July 7, 2020

135 S.Ct. 1980
Supreme Court of the United States

Moones MELLOULI, Petitioner

v.

Loretta E. LYNCH, Attorney General.

No. 13–1034.
|
Argued Jan. 14, 2015.
|
Decided June 1, 2015.

**Synopsis**

**Background:** Alien, a citizen of Tunisia, petitioned for review of an order of Board of Immigration Appeals (BIA) finding him removable following his Kansas drug paraphernalia possession conviction. The United States Court of Appeals for the Eighth Circuit, Loken, Circuit Judge, denied the petition, 719 F.3d 995, and certiorari was granted.

**Holdings:** The Supreme Court, Justice Ginsburg, held that:

[1] alien's Kansas conviction for concealing unnamed pills in his sock did not trigger removal under federal statute authorizing removal for violating a law relating to a controlled substance, and

[2] BIA's interpretation of the federal removal statute, under which convictions for paraphernalia possession trigger removal whether or not they necessarily implicate a federally controlled substance, was not entitled to deference under *Chevron.*

Reversed.

Justice Thomas filed a dissenting opinion in which Justice Alito joined.

**West Headnotes (8)**

[1] **Aliens, Immigration, and Citizenship** ⚷ Controlled substances offenses

Alien's Kansas misdemeanor drug paraphernalia possession conviction for concealing unnamed pills in his sock did not trigger removal under federal statute authorizing removal for violating a law relating to a controlled substance; although the Kansas drug-paraphernalia possession law related to a controlled substance, it was immaterial under that law whether that substance was defined under federal law, and the State did not charge, or seek to prove, that alien possessed a substance on the federal controlled substance schedules. Immigration and Nationality Act, § 237(a)(2)(B)(i), 8 U.S.C.A. § 1227(a)(2)(B)(i); Comprehensive Drug Abuse Prevention and Control Act of 1970, § 102, 21 U.S.C.A. § 802; West's K.S.A. 21–5709(b)(2).

55 Cases that cite this headnote

[2] **Aliens, Immigration, and Citizenship** ⚷ Crime and Related Grounds

Because Congress predicated deportation on convictions, not conduct, the "categorical approach" historically taken in determining whether a state conviction renders an alien removable under the immigration statute looks to the statutory definition of the offense of conviction, not to the particulars of an alien's behavior; the state conviction triggers removal only if, by definition, the underlying crime falls within a category of removable offenses defined by federal law. Immigration and Nationality Act, § 237(a)(2)(B)(i), 8 U.S.C.A. § 1227(a)(2)(B)(i).

61 Cases that cite this headnote

[3] **Aliens, Immigration, and Citizenship** ⚷ Crime and Related Grounds

Mellouli v. Lynch, 575 U.S. 798 (2015)

135 S.Ct. 1980, 192 L.Ed.2d 60, 83 USLW 4382, 15 Cal. Daily Op. Serv. 5429...

An alien's actual conduct is irrelevant to the inquiry under the categorical approach historically taken in determining whether a state conviction renders an alien removable under the immigration statute, as the adjudicator must presume that the conviction rested upon nothing more than the least of the acts criminalized under the state statute. Immigration and Nationality Act, § 237(a)(2)(B)(i), 8 U.S.C.A. § 1227(a)(2)(B)(i).

46 Cases that cite this headnote

**[4]** **Aliens, Immigration, and Citizenship** 🔑 **Crime and Related Grounds**

The "modified categorical approach" used to determine whether a state conviction renders an alien deportable applies to state statutes that contain several different crimes, each described separately; in such cases, a court may determine which particular offense the noncitizen was convicted of by examining the charging document and jury instructions, or in the case of a guilty plea, the plea agreement, plea colloquy, or some comparable judicial record of the factual basis for the plea. Immigration and Nationality Act, § 237(a)(2)(B)(i), 8 U.S.C.A. § 1227(a)(2)(B)(i).

16 Cases that cite this headnote

**[5]** **Aliens, Immigration, and Citizenship** 🔑 **Crime and Related Grounds**

When applying the "modified categorical approach" used to determine whether a state conviction renders an alien deportable when state statutes contain several different crimes, each described separately, off limits to the adjudicator is any inquiry into the particular facts of the case. Immigration and Nationality Act, § 237(a)(2)(B)(i), 8 U.S.C.A. § 1227(a)(2)(B)(i).

30 Cases that cite this headnote

**[6]** **Statutes** 🔑 **Design, structure, or scheme**

Statutes should be interpreted as a symmetrical and coherent regulatory scheme.

3 Cases that cite this headnote

**[7]** **Administrative Law and Procedure** 🔑 **Denial of admission; removal**

**Aliens, Immigration, and Citizenship** 🔑 **Law questions**

Board of Immigration Appeals' (BIA) interpretation of the federal removal statute, under which drug possession and distribution convictions trigger removal only if they necessarily involve a federally controlled substance, while convictions for paraphernalia possession, an offense less grave than drug possession and distribution, trigger removal whether or not they necessarily implicate a federally controlled substance, was not entitled to deference under *Chevron*. Immigration and Nationality Act, § 237(a)(2)(B)(i), 8 U.S.C.A. § 1227(a)(2)(B)(i).

36 Cases that cite this headnote

**[8]** **Aliens, Immigration, and Citizenship** 🔑 **Controlled substances offenses**

To trigger removal under federal statute authorizing removal for violating a law relating to a controlled substance, the Government must connect an element of the alien's conviction to a drug defined in the federal statute incorporating the controlled substance schedules. Immigration and Nationality Act, § 237(a)(2)(B)(i), 8 U.S.C.A. § 1227(a)(2)(B)(i); Comprehensive Drug Abuse Prevention and Control Act of 1970, § 102, 21 U.S.C.A. § 802.

40 Cases that cite this headnote

**\*1981** *Syllabus* [*]

Petitioner Moones Mellouli, a lawful permanent resident, pleaded guilty to a misdemeanor offense under Kansas law, the possession of drug paraphernalia "to ... store [or] conceal ... a controlled substance." Kan. Stat. Ann. § 21–

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 502 of 1271

Mellouli v. Lynch, 575 U.S. 798 (2015)
135 S.Ct. 1980, 192 L.Ed.2d 60, 83 USLW 4382, 15 Cal. Daily Op. Serv. 5429...

5709(b)(2). The sole "paraphernalia" Mellouli was charged with possessing was a sock in which he had placed four unidentified orange tablets. Citing Mellouli's misdemeanor conviction, an Immigration Judge ordered him deported under 8 U.S.C. § 1227(a)(2)(B)(i), which authorizes the deportation (removal) of an alien "convicted of a violation of ... any law or regulation of a State, the United States, or **\*1982** a foreign country relating to a controlled substance (as defined in section 802 of Title 21)." Section 802, in turn, limits the term "controlled substance" to a "drug or other substance" included in one of five federal schedules. 21 U.S.C. § 802(6). Kansas defines "controlled substance" as any drug included on its own schedules, without reference to § 802. Kan. Stat. Ann. § 21–5701(a). At the time of Mellouli's conviction, Kansas' schedules included at least nine substances not on the federal lists. The Board of Immigration Appeals (BIA) affirmed Mellouli's deportation order, and the Eighth Circuit denied his petition for review.

*Held* : Mellouli's Kansas conviction for concealing unnamed pills in his sock did not trigger removal under § 1227(a)(2)(B)(i). Pp. 1985 – 1991.

(a) The categorical approach historically taken in determining whether a state conviction renders an alien removable looks to the statutory definition of the offense of conviction, not to the particulars of the alien's conduct. The state conviction triggers removal only if, by definition, the underlying crime falls within a category of removable offenses defined by federal law. The BIA has long applied the categorical approach to assess whether a state drug conviction triggers removal under successive versions of what is now § 1227(a)(2)(B)(i). *Matter of Paulus,* 11 I. & N. Dec. 274, is illustrative. At the time the BIA decided *Paulus,* California controlled certain "narcotics" not listed as "narcotic drugs" under federal law. *Id., at 275*. The BIA concluded that an alien's California conviction for offering to sell an unidentified "narcotic" was not a deportable offense, for it was possible that the conviction involved a substance controlled only under California, not federal, law. Under the *Paulus* analysis, Mellouli would not be deportable. The state law involved in Mellouli's conviction, like the California statute in *Paulus,* was not confined to federally controlled substances; it also included substances controlled only under state, not federal, law.

The BIA, however, announced and applied a different approach to drug-paraphernalia offenses (as distinguished from drug possession and distribution offenses) in *Matter of Martinez Espinoza,* 25 I. & N. Dec. 118. There, the BIA ranked paraphernalia statutes as relating to "the drug trade in general," reasoning that a paraphernalia conviction "relates to" any and all controlled substances, whether or not federally listed, with which the paraphernalia can be used. *Id., at 120–121*. Under this reasoning, there is no need to show that the type of controlled substance involved in a paraphernalia conviction is one defined in § 802.

The BIA's disparate approach to drug possession and distribution offenses and paraphernalia possession offenses finds no home in § 1227(a)(2)(B)(i)'s text and "leads to consequences Congress could not have intended." *Moncrieffe v. Holder,* 569 U.S. ——, ——, 133 S.Ct. 1678, 1690, 185 L.Ed.2d 727. That approach has the anomalous result of treating less grave paraphernalia possession misdemeanors more harshly than drug possession and distribution offenses. The incongruous upshot is that an alien is *not* removable for *possessing* a substance controlled only under Kansas law, but he *is* removable for using a sock to contain that substance. Because it makes scant sense, the BIA's interpretation is owed no deference under the doctrine described in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694. Pp. 1985 – 1989.

(b) The Government's interpretation of the statute is similarly flawed. The Government argues that aliens who commit **\*1983** *any* drug crime, not just paraphernalia offenses, in States whose drug schedules substantially overlap the federal schedules are deportable, for "state statutes that criminalize hundreds of federally controlled drugs and a handful of similar substances, are laws 'relating to' federally controlled substances." Brief for Respondent 17. While the words "relating to" are broad, the Government's reading stretches the construction of § 1227(a)(2)(B)(i) to the breaking point, reaching state-court convictions, like Mellouli's, in which "[no] controlled substance (as defined in [ § 802] )" figures as an element of the offense. Construction of § 1227(a)(2)(B)(i) must be faithful to the text, which limits the meaning of "controlled substance," for removal purposes, to the substances controlled under § 802. Accordingly, to

Mellouli v. Lynch, 575 U.S. 798 (2015)

135 S.Ct. 1980, 192 L.Ed.2d 60, 83 USLW 4382, 15 Cal. Daily Op. Serv. 5429...

trigger removal under § 1227(a)(2)(B)(i), the Government must connect an element of the alien's conviction to a drug "defined in [§ 802]." Pp. 1989 – 1991.

719 F.3d 995, reversed.

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C.J., and SCALIA, KENNEDY, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. THOMAS, J., filed a dissenting opinion, in which ALITO, J., joined.

**Attorneys and Law Firms**

Jon Laramore, Indianapolis, IN, for Petitioner.

Rachel P. Kovner, for Respondent.

Jon Laramore, Counsel of Record, D. Lucetta Pope, Daniel E. Pulliam, Faegre Baker Daniels LLP, Indianapolis, IN, for Petitioner.

Katherine Evans, Benjamin Casper, University of Minnesota Law School Center for New Americans, Minneapolis, MN, Michael Sharma–Crawford, Sharma–Crawford, Attys. at Law, LLC, Kansas City, MO, John Keller, Sheila Stuhlman, Immigrant Law Center of Minnesota, St. Paul, MN, for Petitioner.

Donald B. Verrilli, Jr., Solicitor General, Counsel of Record, Joyce R. Branda, Acting Assistant Attorney General, Edwin S. Kneedler, Deputy Solicitor General, Rachel P. Kovner, Assistant to the Solicitor General, Donald E. Keener, W. Manning Evans, Attorneys, Department of Justice, Washington, DC, for Respondent.

**Opinion**

Justice GINSBURG delivered the opinion of the Court.

This case requires us to decide how immigration judges should apply a deportation (removal) provision, defined with reference to federal drug laws, to an alien convicted of a state drug-paraphernalia misdemeanor.

Lawful permanent resident Moones Mellouli, in 2010, pleaded guilty to a misdemeanor offense under Kansas law, the possession of drug paraphernalia to "store, contain, conceal, inject, ingest, inhale or otherwise introduce a controlled substance into the human body." Kan. Stat.

Ann. § 21–5709(b)(2) (2013 Cum. Supp.). The sole "paraphernalia" Mellouli was charged with possessing was a sock in which he had placed four orange tablets. The criminal charge and plea agreement did not identify the controlled substance involved, but Mellouli had acknowledged, prior to the charge and plea, that the tablets were Adderall. Mellouli was sentenced to a suspended term of 359 days and 12 months' probation.

[1]    In February 2012, several months after Mellouli successfully completed probation, Immigration and Customs Enforcement **1984** officers arrested him as deportable under 8 U.S.C. § 1227(a)(2)(B)(i) based on his Kansas misdemeanor conviction. Section 1227(a)(2)(B)(i) authorizes the removal of an alien "convicted of a violation of ... any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21)." We hold that Mellouli's Kansas conviction for concealing unnamed pills in his sock did not trigger removal under § 1227(a)(2)(B)(i). The drug-paraphernalia possession law under which he was convicted, Kan. Stat. Ann. § 21–5709(b), by definition, related to a controlled substance: The Kansas statute made it unlawful "to use or possess with intent to use any drug paraphernalia to ... store [or] conceal ... a controlled substance." But it was immaterial under that law whether the substance was *defined in* 21 U.S.C. § 802. Nor did the State charge, or seek to prove, that Mellouli possessed a substance on the § 802 schedules. Federal law (§ 1227(a)(2)(B)(i)), therefore, did not authorize Mellouli's removal.

I

A

This case involves the interplay between several federal and state statutes. Section 1227(a)(2)(B)(i), a provision of the Immigration and Nationality Act, 66 Stat. 163, as amended, authorizes the removal of an alien "convicted of a violation of ... any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21), other than a single offense involving possession for one's own use of 30 grams or less of

AR.05728

135 S.Ct. 1980, 192 L.Ed.2d 60, 83 USLW 4382, 15 Cal. Daily Op. Serv. 5429...

marijuana." Section 1227(a)(2)(B)(i) incorporates 21 U.S.C. § 802, which limits the term "controlled substance" to a "drug or other substance" included in one of five federal schedules. § 802(6).

The statute defining the offense to which Mellouli pleaded guilty, Kan. Stat. Ann. § 21–5709(b), proscribes "possess[ion] with intent to use any drug paraphernalia to," among other things, "store" or "conceal" a "controlled substance." Kansas defines "controlled substance" as any drug included on its own schedules, and makes no reference to § 802 or any other federal law. § 21–5701(a). [1] At the time of Mellouli's conviction, Kansas' schedules included at least nine substances not included in the federal lists. See § 65–4105(d)(30), (31), (33), (34), (36) (2010 Cum. Supp.); § 65–4111(g) (2002); § 65–4113(d)(1), (e), (f) (2010 Cum. Supp.); see also Brief for Respondent 9, n. 2.

The question presented is whether a Kansas conviction for using drug paraphernalia to store or conceal a controlled substance, § 21–5709(b), subjects an alien to deportation under § 1227(a)(2)(B)(i), which applies to an alien "convicted of a violation of [a state law] relating to a controlled substance (as defined in [ § 802] )."

## B

Mellouli, a citizen of Tunisia, entered the United States on a student visa in 2004. He attended U.S. universities, earning a bachelor of arts degree, *magna cum laude,* as well as master's degrees in applied mathematics and economics. After completing his education, Mellouli worked as an actuary and taught mathematics at the University of Missouri–Columbia. In 2009, he became a conditional permanent resident and, in 2011, a lawful permanent **\*1985** resident. Since December 2011, Mellouli has been engaged to be married to a U.S. citizen.

In 2010, Mellouli was arrested for driving under the influence and driving with a suspended license. During a postarrest search in a Kansas detention facility, deputies discovered four orange tablets hidden in Mellouli's sock. According to a probable-cause affidavit submitted in the state prosecution, Mellouli acknowledged that the tablets were Adderall and that he did not have a prescription for the drugs. Adderall,

the brand name of an amphetamine-based drug typically prescribed to treat attention-deficit hyperactivity disorder, [2] is a controlled substance under both federal and Kansas law. See 21 CFR § 1308.12(d)(1) (2014) (listing amphetamine" and its "salts" and "isomers"); Kan. Stat. Ann. § 65–4107(d)(1) (2013 Cum. Supp.) (same). Based on the probable-cause affidavit, a criminal complaint was filed charging Mellouli with trafficking contraband in jail.

Ultimately, Mellouli was charged with only the lesser offense of possessing drug paraphernalia, a misdemeanor. The amended complaint alleged that Mellouli had "use[d] or possess[ed] with intent to use drug paraphernalia, to-wit: a sock, to store, contain, conceal, inject, ingest, inhale or otherwise introduce into the human body a controlled substance." App. 23. The complaint did not identify the substance contained in the sock. Mellouli pleaded guilty to the paraphernalia possession charge; he also pleaded guilty to driving under the influence. For both offenses, Mellouli was sentenced to a suspended term of 359 days and 12 months' probation.

In February 2012, several months after Mellouli successfully completed probation, Immigration and Customs Enforcement officers arrested him as deportable under § 1227(a)(2)(B)(i) based on his paraphernalia possession conviction. An Immigration Judge ordered Mellouli deported, and the Board of Immigration Appeals (BIA) affirmed the order. Mellouli was deported in 2012.

Under federal law, Mellouli's concealment of controlled-substance tablets in his sock would not have qualified as a drug-paraphernalia offense. Federal law criminalizes the sale of or commerce in drug paraphernalia, but possession alone is not criminalized at all. See 21 U.S.C. § 863(a)– (b). Nor does federal law define drug paraphernalia to include common household or ready-to-wear items like socks; rather, it defines paraphernalia as any "equipment, product, or material" which is "primarily *intended or designed for use* " in connection with various drug-related activities. § 863(d) (emphasis added). In 19 States as well, the conduct for which Mellouli was convicted—use of a sock to conceal a controlled substance—is not a criminal offense. Brief for National Immigrant Justice Center et al. as *Amici Curiae* 7. At most, it is a low-level infraction, often not attended by a right to counsel. *Id.,* at 9–11.

AR.05729

135 S.Ct. 1980, 192 L.Ed.2d 60, 83 USLW 4382, 15 Cal. Daily Op. Serv. 5429...

The Eighth Circuit denied Mellouli's petition for review. 719 F.3d 995 (2013). We granted certiorari, 573 U.S. ——, 134 S.Ct. 2873, 189 L.Ed.2d 831 (2014), and now reverse the judgment of the Eighth Circuit.

## II

**[2]  [3]  [4]  [5]**  We address first the rationale offered by the BIA and affirmed by the Eighth Circuit, which differentiates paraphernalia offenses from possession and distribution offenses. Essential background, **\*1986** in evaluating the rationale shared by the BIA and the Eighth Circuit, is the categorical approach historically taken in determining whether a state conviction renders an alien removable under the immigration statute.[3] Because Congress predicated deportation "on convictions, not conduct," the approach looks to the statutory definition of the offense of conviction, not to the particulars of an alien's behavior. Das, *The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law,* 86 N.Y.U. L. Rev. 1669, 1701, 1746 (2011). The state conviction triggers removal only if, by definition, the underlying crime falls within a category of removable offenses defined by federal law. *Ibid.* An alien's actual conduct is irrelevant to the inquiry, as the adjudicator must "presume that the conviction rested upon nothing more than the least of the acts criminalized" under the state statute. *Moncrieffe v. Holder,* 569 U.S. ——, ——, 133 S.Ct. 1678, 1684–1685, 185 L.Ed.2d 727 (2013) (internal quotation marks and alterations omitted).[4]

The categorical approach "has a long pedigree in our Nation's immigration law." *Id.,* at ——, 133 S.Ct., at 1685. As early as 1913, courts examining the federal immigration statute concluded that Congress, by tying immigration penalties to *convictions,* intended to "limi[t] the immigration adjudicator's assessment of a past criminal conviction to a legal analysis of the statutory offense," and to disallow "[examination] of the facts underlying the crime." Das, *supra,* at 1688, 1690.

Rooted in Congress' specification of conviction, not conduct, as the trigger for immigration consequences, the categorical approach is suited to the realities of the system. Asking immigration judges in each case to determine the circumstances underlying a state conviction would burden a system in which "large numbers of cases **\*1987** [are

resolved by] immigration judges and front-line immigration officers, often years after the convictions." Koh, *The Whole Better than the Sum: A Case for the Categorical Approach to Determining the Immigration Consequences of Crime,* 26 Geo. Immigration L. J. 257, 295 (2012). By focusing on the legal question of what a conviction *necessarily* established, the categorical approach ordinarily works to promote efficiency, fairness, and predictability in the administration of immigration law. See *id.,* at 295–310; Das, *supra,* at 1725–1742. In particular, the approach enables aliens "to anticipate the immigration consequences of guilty pleas in criminal court," and to enter " 'safe harbor' guilty pleas [that] do not expose the [alien defendant] to the risk of immigration sanctions." Koh, *supra,* at 307. See Das, *supra,* at 1737–1738.[5]

The categorical approach has been applied routinely to assess whether a state drug conviction triggers removal under the immigration statute. As originally enacted, the removal statute specifically listed covered offenses and covered substances. It made deportable, for example, any alien convicted of "import[ing]," "buy[ing]," or "sell[ing]" any "narcotic drug," defined as "opium, coca leaves, cocaine, or any salt, derivative, or preparation of opium or coca leaves, or cocaine." Ch. 202, 42 Stat. 596–597. Over time, Congress amended the statute to include additional offenses and additional narcotic drugs.[6] Ultimately, the Anti–Drug Abuse Act of 1986 replaced the increasingly long list of controlled substances with the now familiar reference to "a controlled substance (as defined in [ § 802] )." See § 1751, 100 Stat. 3207–47. In interpreting successive versions of the removal statute, the BIA inquired whether the state statute under which the alien was convicted covered federally controlled substances and not others.[7]

*Matter of Paulus,* 11 I. & N. Dec. 274 (1965), is illustrative. At the time the BIA decided *Paulus,* the immigration statute made deportable any alien who had been "convicted of a violation of ... any law or regulation relating to the illicit possession of or traffic in narcotic drugs or marihuana." *Id.,* at 275. California controlled certain "narcotics," such as peyote, not listed as "narcotic drugs" under federal law. *Ibid.* The BIA concluded that an alien's California conviction for offering to sell an unidentified "narcotic" was not a deportable offense, for it was possible that the conviction involved a substance, such **\*1988** as peyote, controlled only under California law. *Id.,* at 275–

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 506 of 1271

Mellouli v. Lynch, 575 U.S. 798 (2015)

135 S.Ct. 1980, 192 L.Ed.2d 60, 83 USLW 4382, 15 Cal. Daily Op. Serv. 5429...

276. Because the alien's conviction was not necessarily predicated upon a federally controlled "narcotic drug," the BIA concluded that the conviction did not establish the alien's deportability. *Id.,* at 276.

Under the *Paulus* analysis, adhered to as recently as 2014 in *Matter of Ferreira,* 26 I. & N. Dec. 415 (BIA 2014),[8] Mellouli would not be deportable. Mellouli pleaded guilty to concealing unnamed pills in his sock. At the time of Mellouli's conviction, Kansas' schedules of controlled substances included at least nine substances—*e.g.,* salvia and jimson weed—not defined in § 802. See Kan. Stat. Ann. § 65–4105(d)(30), (31). The state law involved in Mellouli's conviction, therefore, like the California statute in *Paulus,* was not confined to federally controlled substances; it required no proof by the prosecutor that Mellouli used his sock to conceal a substance listed under § 802, as opposed to a substance controlled only under Kansas law. Under the categorical approach applied in *Paulus,* Mellouli's drug-paraphernalia conviction does not render him deportable. In short, the state law under which he was charged categorically "relat[ed] to a controlled substance," but was not limited to substances "defined in [ § 802]."[9]

The BIA, however, announced and applied a different approach to drug-paraphernalia offenses (as distinguished from drug possession and distribution offenses) in *Matter of Martinez Espinoza,* 25 I. & N. Dec. 118 (2009). There, the BIA ranked paraphernalia statutes as relating to "the drug trade in general." *Id.,* at 121. The BIA rejected the argument that a paraphernalia conviction should not count at all because it targeted implements, not controlled substances. *Id.,* at 120. It then reasoned that a paraphernalia conviction "relates to" any and all controlled substances, whether or not federally listed, with which the paraphernalia can be used. *Id.,* at 121. Under this reasoning, there is no need to show that the type of controlled substance involved in a paraphernalia conviction is one defined in § 802.

The Immigration Judge in this case relied upon *Martinez Espinoza* in ordering Mellouli's removal, quoting that decision for the proposition that " 'the requirement of a correspondence between the Federal and State controlled substance schedules, embraced by *Matter of Paulus* ... has never been extended' " to paraphernalia offenses. App. to

Pet. for Cert. 32 (quoting *Martinez Espinoza,* 25 I. & N. Dec., at 121). The BIA affirmed, reasoning that Mellouli's conviction for possession of drug paraphernalia "involves drug trade in general and, thus, is covered under [ § 1227(a)(2)(B)(i) ]." App. to Pet. for Cert. 18. Denying Mellouli's petition for review, the Eighth Circuit deferred to the BIA's decision in *Martinez Espinoza,* and held that a Kansas paraphernalia conviction " 'relates to' a federal controlled substance because it is a crime ... 'associated **\*1989**  with the drug trade in general.' " 719 F.3d, at 1000.

**[6]** **[7]**  The disparate approach to state drug convictions, devised by the BIA and applied by the Eighth Circuit, finds no home in the text of § 1227(a)(2)(B)(i). The approach, moreover, "leads to consequences Congress could not have intended." *Moncrieffe,* 569 U.S., at ——, 133 S.Ct., at 1690. Statutes should be interpreted "as a symmetrical and coherent regulatory scheme." *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (internal quotation marks omitted). The BIA, however, has adopted conflicting positions on the meaning of § 1227(a)(2)(B)(i), distinguishing drug possession and distribution offenses from offenses involving the drug trade in general, with the anomalous result that minor paraphernalia possession offenses are treated more harshly than drug possession and distribution offenses. Drug possession and distribution convictions trigger removal only if they necessarily involve a federally controlled substance, see *Paulus,* 11 I. & N. Dec. 274, while convictions for paraphernalia possession, an offense less grave than drug possession and distribution, trigger removal whether or not they necessarily implicate a federally controlled substance, see *Martinez Espinoza,* 25 I. & N. Dec. 118. The incongruous upshot is that an alien is *not* removable for *possessing* a substance controlled only under Kansas law, but she *is* removable for using a sock to contain that substance. Because it makes scant sense, the BIA's interpretation, we hold, is owed no deference under the doctrine described in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

III

Offering an addition to the BIA's rationale, the Eighth Circuit reasoned that a state paraphernalia possession conviction categorically relates to a federally controlled substance so long as there is "nearly a complete overlap" between the drugs controlled under state and federal law. 719 F.3d, at 1000. [10] The Eighth Circuit's analysis, however, scarcely explains or ameliorates the BIA's anomalous separation of paraphernalia possession offenses from drug possession and distribution offenses.

Apparently recognizing this problem, the Government urges, as does the dissent, that the overlap between state and federal drug schedules supports the removal of aliens convicted of *any* drug crime, not just paraphernalia offenses. As noted, § 1227(a)(2)(B)(i) authorizes the removal of any alien "convicted of a violation of ... any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in [ § 802 ] )." According to the Government, the words "relating to" modify "law or regulation," rather than "violation." Brief for Respondent 25–26 (a limiting phrase ordinarily modifies the last antecedent). Therefore, the Government argues, aliens who commit "drug crimes" in States whose drug schedules substantially overlap the federal schedules are removable, for "state statutes that criminalize hundreds of federally controlled drugs and a handful of similar substances, are laws 'relating to' federally controlled substances." Brief for Respondent 17.

 **\*1990** We do not gainsay that, as the Government urges, the last reasonable referent of "relating to," as those words appear in § 1227(a)(2)(B)(i), is "law or regulation." The removal provision is thus satisfied when the elements that make up the state crime of conviction relate to a federally controlled substance. As this case illustrates, however, the Government's construction of the federal removal statute stretches to the breaking point, reaching state-court convictions, like Mellouli's, in which "[no] controlled substance (as defined in [ § 802 ] )" figures as an element of the offense. We recognize, too, that the § 1227(a)(2)(B)(i) words to which the dissent attaches great weight, *i.e.,* "relating to," *post,* at 1991 – 1992, are "broad" and "indeterminate." *Maracich v. Spears,* 570 U.S. ——, ——, 133 S.Ct. 2191, 2199– 2200, 186 L.Ed.2d 275 (2013) (internal quotation marks and brackets omitted). [11] As we cautioned in *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995), those words, "extend[ed] to the furthest stretch of [their] indeterminacy, ... stop nowhere." "[C]ontext," therefore, may "tu [g] ... in favor of a narrower reading." *Yates v. United States,* 574 U.S. ——, ——, 135 S.Ct. 1074, 1083, 191 L.Ed.2d 64 (2015). Context does so here.

The historical background of § 1227(a)(2)(B)(i) demonstrates that Congress and the BIA have long required a direct link between an alien's crime of conviction and a particular federally controlled drug. *Supra,* at 1987 – 1988. The Government's position here severs that link by authorizing deportation any time the state statute of conviction bears some general relation to federally controlled drugs. The Government offers no cogent reason why its position is limited to state drug schedules that have a "substantial overlap" with the federal schedules. Brief for Respondent 31. A statute with *any* overlap would seem to be *related to* federally controlled drugs. Indeed, the Government's position might well encompass convictions for offenses related to drug activity more generally, such as gun possession, even if those convictions do not actually involve drugs (let alone federally controlled drugs). The Solicitor General, while resisting this particular example, acknowledged that convictions under statutes "that have some connection to drugs indirectly" might fall within § 1227(a)(2)(B)(i). Tr. of Oral Arg. 36. This sweeping interpretation departs so sharply from the statute's text and history that it cannot be considered a permissible reading.

 **[8]** In sum, construction of § 1227(a)(2)(B)(i) must be faithful to the text, which limits the meaning of "controlled **\*1991** substance," for removal purposes, to the substances controlled under § 802. We therefore reject the argument that *any* drug offense renders an alien removable, without regard to the appearance of the drug on a § 802 schedule. Instead, to trigger removal under § 1227(a)(2)(B)(i), the Government must connect an element of the alien's conviction to a drug "defined in [ § 802 ]."

* * *

For the reasons stated, the judgment of the U.S. Court of Appeals for the Eighth Circuit is reversed.

*It is so ordered.*

Justice THOMAS, with whom Justice ALITO joins, dissenting.

The Court reverses the decision of the United States Court of Appeals for the Eighth Circuit on the ground that it misapplied the federal removal statute. It rejects the Government's interpretation of that statute, which would supply an alternative ground for affirmance. Yet it offers no interpretation of its own. Lower courts are thus left to guess which convictions qualify an alien for removal under 8 U.S.C. § 1227(a)(2)(B)(i), and the majority has deprived them of their only guide: the statutory text itself. Because the statute renders an alien removable whenever he is convicted of violating a law "relating to" a federally controlled substance, I would affirm.

I

With one exception not applicable here, § 1227(a)(2) (B)(i) makes removable "[a]ny alien who at any time after admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of title 21)." I would hold, consistent with the text, that the provision requires that the conviction arise under a "law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of title 21)." Thus, Mellouli was properly subject to removal if the Kansas statute of conviction "relat[es] to a controlled substance (as defined in section 802 of title 21)," regardless of whether his particular conduct would also have subjected him to prosecution under federal controlled-substances laws. See *ante*, at 1986 ("An alien's actual conduct is irrelevant to the inquiry"). The majority's 12 references to the sock that Mellouli used to conceal the pills are thus entirely beside the point. [1]

The critical question, which the majority does not directly answer, is what it means for a law or regulation to "relat[e] to a controlled substance (as defined in section 802 of title 21)." At a minimum, we know that this phrase does not require a complete overlap between the substances controlled

under the state law and those controlled under 21 U.S.C. § 802. To "relate to" means " 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.' " *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 383, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (quoting Black's Law Dictionary 1158 (5th ed. 1979)). In ordinary parlance, one thing can "relate to" **\*1992** another even if it also relates to other things. As ordinarily understood, therefore, a state law regulating various controlled substances may "relat[e] to a controlled substance (as defined in section 802 of title 21)" even if the statute also controls a few substances that do not fall within the federal definition.

The structure of the removal statute confirms this interpretation. Phrases like "relating to" and "in connection with" have broad but indeterminate meanings that must be understood in the context of "the structure of the statute and its other provisions." *Maracich v. Spears,* 570 U.S. ——, ——, 133 S.Ct. 2191, 2200, 186 L.Ed.2d 275 (2013) ("in connection with"); see also *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) ("relate to"); see generally *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.,* 519 U.S. 316, 324, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997) (describing the Court's efforts to interpret the " 'clearly expansive' " "relate to" language in the pre-emption provision of the Employee Retirement Income Security Act of 1974). In interpreting such phrases, we must be careful to honor Congress' choice to use expansive language. *Maracich, supra,* at ——, 133 S.Ct., at 2199 (GINSBURG, J., dissenting) (noting that a statute should be interpreted broadly in light of Congress' decision to use sweeping language like "in connection with"); see also, *e.g., Alaska Dept. of Environmental Conservation v. EPA,* 540 U.S. 461, 484, 124 S.Ct. 983, 157 L.Ed.2d 967 (2004) (GINSBURG, J.) (interpreting Environmental Protection Agency's authority in light of the "notably capacious terms" contained in its authorizing statute).

Here, the "structure of the statute and its other provisions" indicate that Congress understood this phrase to sweep quite broadly. Several surrounding subsections of the removal statute reveal that when Congress wanted to define with greater specificity the conduct that subjects an alien to removal, it did so by omitting the expansive phrase

135 S.Ct. 1980, 192 L.Ed.2d 60, 83 USLW 4382, 15 Cal. Daily Op. Serv. 5429...

"relating to." For example, a neighboring provision makes removable "[a]ny alien who ... is convicted under any law of purchasing, selling, offering for sale, exchanging, using, owning, possessing, or carrying ... any weapon, part, or accessory *which is* a firearm or destructive device (as defined in section 921(a) of title 18)." 8 U.S.C. § 1227(a)(2)(C) (emphasis added). This language explicitly requires that the object of the offense fit within a federal definition. Other provisions adopt similar requirements. See, *e.g.*, § 1227(a)(2)(E)(i) (making removable "[a]ny alien who ... is convicted of a crime of domestic violence," where "the term 'crime of domestic violence' means any crime of violence (as defined in section 16 of title 18) ... committed by" a person with a specified family relationship with the victim); see generally 🚩 § 1101(a)(43) (defining certain aggravated felonies using federal definitions as elements). That Congress, in this provision, required only that a law *relate to* a federally controlled substance, as opposed to *involve* such a substance, suggests that it understood "relating to" as having its ordinary and expansive meaning. See, *e.g.,* *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983).

Applying this interpretation of "relating to," a conviction under Kansas' drug paraphernalia statute qualifies as a predicate offense under § 1227(a)(2)(B)(i). That state statute prohibits the possession or use of drug paraphernalia to "store, contain, conceal, inject, ingest, inhale or otherwise introduce a controlled substance into the human body." Kan. Stat. Ann. § 21–5709(b)(2) (2013 Cum. Supp.). And, as **\*1993** used in this statute, a "controlled substance" is a substance that appears on Kansas' schedules, § 21–5701(a), which in turn consist principally of federally controlled substances. *Ante,* at 1984 – 1985; see also Brief for Petitioner 3 (listing nine substances on Kansas' schedules that were not on the federal schedules at the time of Mellouli's arrest); Brief for Respondent 8 (noting that, at the time of Mellouli's arrest, more than 97 percent of the named substances on Kansas' schedules were federally controlled). The law certainly "relat[es] to a controlled substance (as defined in section 802 of title 21)" because it prohibits conduct involving controlled substances falling within the federal definition in § 802.

True, approximately three percent of the substances appearing on Kansas' lists of "controlled substances" at the time of Mellouli's conviction did not fall within the federal definition, *ante,* at 1984 – 1985, meaning that an individual convicted of possessing paraphernalia may never have used his paraphernalia with a federally controlled substance. But that fact does not destroy the relationship between the *law* and federally controlled substances. Mellouli was convicted for violating a state law "relating to a controlled substance (as defined in section 802 of title 21)," so he was properly removed under 8 U.S.C. § 1227(a)(2)(B)(i).

## II

### A

The majority rejects this straightforward interpretation because it "reach[es] state-court convictions ... in which '[no] controlled substance (as defined in [ § 802] )' figures as an element of the offense." *Ante,* at 1990. This assumes the answer to the question at the heart of this case: whether the removal statute does in fact reach such convictions. To answer that question by assuming the answer is circular.

The majority hints that some more limited definition of "relating to" is suggested by context. See *ibid.* I wholeheartedly agree that we must look to context to understand indeterminate terms like "relating to," which is why I look to surrounding provisions of the removal statute. These "reveal that when Congress wanted to define with greater specificity the conduct that subjects an alien to removal, it did so by omitting the expansive phrase 'relating to.' " *Supra,* at 1992. For its part, the majority looks to the context of other provisions referring to "controlled substances" without a definitional parenthetical, *ante,* at 1990, n. 11, and rejoins that the most natural reading of the statute "shrinks to the vanishing point the words 'as defined in [ § 802],' " *ante,* at 1988, n. 9. But the definition of controlled substances *does* play a role in my interpretation, by requiring that the law bear some relationship to *federally* controlled substances. Although we need not establish the precise boundaries of that relationship in this case given that Kansas' paraphernalia law clearly qualifies under any reasonable definition of "relating to," the definition of controlled substances imposes a meaningful limit on the statutes that qualify.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

B

The majority *appears* to conclude that a statute "relates to" a federally controlled substance if its "definition of the offense of conviction" necessarily includes as an element of that offense a federally controlled substance. *Ante,* at 1986. The text will not bear this meaning.

The first problem with the majority's interpretation is that it converts a removal provision expressly keyed to features of the statute itself into one keyed to features **\*1994** of the underlying generic offense. To understand the difference, one need look no further than this Court's decision in *Moncrieffe v. Holder,* 569 U.S. ——, 133 S.Ct. 1678, 185 L.Ed.2d 727 (2013). In that case, removal was predicated on the generic offense of "illicit trafficking in a controlled substance." *Id.,* at ——, 133 S.Ct., at 1683. Thus, in order to satisfy the federal criteria, it was necessary for the state offense at issue to have as elements the same elements that make up that generic offense. *Id.,* at ——, 133 S.Ct., at 1684–1685. By contrast, § 1227(a)(2)(B)(i) does not refer to a generic offense for which we must discern the relevant criteria from its nature. Instead, it establishes the relevant criteria explicitly, and does so for the law of conviction itself rather than for some underlying generic offense—that is, the law of conviction must "relat[e] to" a federally controlled substance.

The only plausible way of reading the text here to refer to a generic offense that has as one element the involvement of a federally controlled substance would be to read "relating to" as modifying "violation" instead of "law." Under that reading, the statute would attach immigration consequences to a "*violation* ... relating to a controlled substance (as defined in section 802 of title 21)," rather than a violation of a "*law* ... relating to a controlled substance (as defined in section 802 of title 21)." Yet the majority expressly—and correctly—rejects as grammatically incorrect Mellouli's argument that the "relating to" clause modifies "violation." *Ante,* at 1989 – 1990.

Having done so, the majority can reconcile its outcome with the text only by interpreting the words "relating to" to mean "regulating only." It should be obvious why the majority does not make this argument explicit. Even assuming "regulating only" were a *permissible* interpretation of "relating to"—for

it certainly is not the most natural one—that interpretation would be foreclosed by Congress' pointed word choice in the surrounding provisions. And given the logical upshot of the majority's interpretation, is it even more understandable that it avoids offering an explicit exegesis. For unless the Court ultimately adopts the modified categorical approach for statutes, like the one at issue here, that define offenses with reference to "controlled substances" generally, and treats them as divisible by each separately listed substance, *ante,* at 1986, n. 4, its interpretation would mean that *no* conviction under a controlled-substances regime more expansive than the Federal Government's would trigger removal. [2] Thus, whenever a State moves first in subjecting some newly discovered drug to regulation, every alien convicted during the lag between state and federal regulation would be immunized from the immigration consequences of his conduct. Cf. Brief for Respondent 10 (explaining that two of the nine nonfederally controlled substances on Kansas' schedules at the time Mellouli was arrested became federally controlled within a year of his arrest). And the Government could never, under **\*1995** § 1227(a)(2)(B)(i), remove an alien convicted of violating the controlled-substances law of a State that defines "controlled substances" with reference to a list containing even one substance that does not appear on the federal schedules.

Finding no support for its position in the text, the majority relies on the historical background, *ante,* at 1990, and especially the Board of Immigration Appeals' (BIA) decision in *Matter of Paulus,* 11 I. & N. Dec. 274 (1965)— a surprising choice, given that the majority concludes its discussion of that history by acknowledging that the BIA's atextual approach to the statute makes "scant sense," *ante,* at 1988 – 1989. To the extent that the BIA's approach to § 1227(a)(2)(B)(i) and its predecessors is consistent with the majority's, it suffers from the same flaw: It fails to account for the text of the removal provision because it looks at whether the *conviction* itself necessarily involved a substance regulated under federal law, not at whether the statute related to one. See *Paulus,* 11 I. & N. Dec., at 276 ("[O]nly a *conviction* for illicit possession of or traffic in a substance which is defined as a narcotic drug under federal laws can be the basis for deportation" (emphasis added)); *Matter of Ferreira,* 26 I. & N. Dec. 415, 418–419 (BIA 2014) (modeling its categorical approach to § 1227(a)(2)(B)(i) after the

Mellouli v. Lynch, 575 U.S. 798 (2015)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 511 of 1271

135 S.Ct. 1980, 192 L.Ed.2d 60, 83 USLW 4382, 15 Cal. Daily Op. Serv. 5429...

analysis in *Moncrieffe,* which, as explained above, keyed removal to the characteristics of the offense).

Section 1227(a)(2)(B)(i) requires only that the state law itself, not the "generic" offense defined by the law, "relat[e] to" a federally controlled substance. The majority has not offered a textual argument capable of supporting a different conclusion.

* * *

The statutory text resolves this case. True, faithfully applying that text means that an alien may be deported for committing an offense that does not involve a federally controlled substance. Nothing about that consequence, however, is so outlandish as to call this application into doubt. An alien may be removed only if he is convicted of violating a law, and I see nothing absurd about removing individuals who are unwilling to respect the drug laws of the jurisdiction in which they find themselves.

The majority thinks differently, rejecting the only plausible reading of this provision and adopting an interpretation that finds no purchase in the text. I fail to understand why it chooses to do so, apart from a gut instinct that an educated professional engaged to an American citizen should not be removed for concealing unspecified orange tablets in his sock. Or perhaps the majority just disapproves of the fact that Kansas, exercising its police powers, has decided to criminalize conduct that Congress, exercising its limited powers, has decided not to criminalize, *ante,* at 1985 – 1986. Either way, that is not how we should go about interpreting statutes, and I respectfully dissent.

**All Citations**

575 U.S. 798, 135 S.Ct. 1980, 192 L.Ed.2d 60, 83 USLW 4382, 15 Cal. Daily Op. Serv. 5429, 2015 Daily Journal D.A.R. 5899, 25 Fla. L. Weekly Fed. S 306

---

## Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1    At the time of Mellouli's conviction, Kan. Stat. Ann. §§ 21–5701(a) and 21–5709(b) (2013 Cum. Supp.) were codified at, respectively, §§ 21–36a01(a) and 21–36a09(b) (2010 Cum. Supp.).

2    See H. Silverman, The Pill Book 23 (13th ed. 2008).

3    We departed from the categorical approach in *Nijhawan v. Holder,* 557 U.S. 29, 129 S.Ct. 2294, 174 L.Ed.2d 22 (2009), based on the atypical cast of the prescription at issue, 8 U.S.C. § 1101(a)(43)(M)(i). That provision defines as an "aggravated felony" an offense "involv[ing] fraud or deceit in which the loss to the victim or victims exceeds $10,000." The following subparagraph, (M)(ii), refers to an offense "described in section 7201 of title 26 (relating to tax evasion) in which the revenue loss to the Government exceeds $10,000." No offense "described in section 7201 of title 26," we pointed out, "has a specific loss amount as an element." 557 U.S., at 38, 129 S.Ct. 2294. Similarly, "no widely applicable federal fraud statute ... contains a relevant monetary loss threshold," *id.,* at 39, 129 S.Ct. 2294 and "[most] States had no major fraud or deceit statute with any relevant monetary threshold," *id.,* at 40, 129 S.Ct. 2294. As categorically interpreted, (M)(ii), the tax evasion provision, would have no application, and (M)(i), the fraud or deceit provision, would apply only in an extraordinarily limited and haphazard manner. *Ibid.* We therefore concluded that Congress intended the monetary thresholds in subparagraphs (M)(i) and (M)(ii) to apply "to the specific circumstances surrounding an offender's commission of [the defined] crime on a specific occasion." *Ibid.* In the main, §

Mellouli v. Lynch, 575 U.S. 798 (2015)

135 S.Ct. 1980, 192 L.Ed.2d 60, 83 USLW 4382, 15 Cal. Daily Op. Serv. 5429...

1227(a)(2)(B)(i), the provision at issue here, has no such circumstance-specific thrust; its language refers to crimes generically defined.

4    A version of this approach, known as the "modified categorical approach," applies to "state statutes that contain several different crimes, each described separately." *Moncrieffe v. Holder,* 569 U.S. ——, ——, 133 S.Ct. 1678, 1684, 185 L.Ed.2d 727 (2013). In such cases, "a court may determine which particular offense the noncitizen was convicted of by examining the charging document and jury instructions, or in the case of a guilty plea, the plea agreement, plea colloquy, or some comparable judicial record of the factual basis for the plea." *Ibid.* (internal quotation marks omitted). Off limits to the adjudicator, however, is any inquiry into the particular facts of the case. Because the Government has not argued that this case falls within the compass of the modified-categorical approach, we need not reach the issue.

5    Mellouli's plea may be an example. In admitting only paraphernalia possession, Mellouli avoided any identification, in the record of conviction, of the federally controlled substance (Adderall) his sock contained. See *supra,* at 1984 – 1985.

6    The 1956 version of the statute, for example, permitted removal of any alien "who at any time has been convicted of a violation of, or a conspiracy to violate, any law or regulation relating to the illicit possession of or traffic in narcotic drugs, or who has been convicted of a violation of, or a conspiracy to violate, any law or regulation governing or controlling the taxing, manufacture, production, compounding, transportation, sale, exchange, dispensing, giving away, importation, exportation, or the possession for the purpose of the manufacture, production, compounding, transportation, sale, exchange, dispensing, giving away, importation, or exportation of opium, coca leaves, heroin, marihuana, any salt derivative or preparation of opium or coca leaves or isonipecaine or any addiction-forming or addiction-sustaining opiate." Narcotic Control Act of 1956, § 301(b), 70 Stat. 575.

7    See, *e.g.,* *Matter of Fong,* 10 I. & N. Dec. 616, 619 (BIA 1964) (a Pennsylvania conviction for unlawful use of a drug rendered alien removable because "every drug enumerated in the Pennsylvania law [was] found to be a narcotic drug or marijuana within the meaning of [the federal removal statute]"), overruled in part on other grounds, *Matter of Sum,* 13 I. & N. Dec. 569 (1970).

8    The Government acknowledges that *Ferreira* "assumed the applicability of [the *Paulus* ] framework." Brief for Respondent 49. Whether *Ferreira* applied that framework correctly is not a matter this case calls upon us to decide.

9    The dissent maintains that it is simply following "the statutory text." *Post,* at 1991. It is evident, however, that the dissent shrinks to the vanishing point the words "as defined in [ § 802]." If § 1227(a)(2)(B)(i) stopped with the words "relating to a controlled substance," the dissent would make sense. But Congress did not stop there. It qualified "relating to a controlled substance" by adding the limitation "as defined in [ § 802]." If those words do not confine § 1227(a)(2)(B)(i)'s application to drugs defined in § 802, one can only wonder why Congress put them there.

10    The BIA posited, but did not rely on, a similar rationale in *Martinez Espinoza. See* 25 I. & N. Dec., 118, 121 (2009) (basing decision on a "distinction between crimes involving the possession or distribution of a *particular* drug and those involving other conduct associated with the drug trade in general").

11    The dissent observes that certain provisions of the immigration statute involving firearms and domestic violence "specif[y] the conduct that subjects an alien to removal" without "the expansive phrase 'relating to.' " *Post,* at 1992. From this statutory context, the dissent infers that Congress must have intended the words "relating to" to have expansive meaning. *Post,* at 1992 – 1993. But the dissent overlooks another contextual clue—*i.e.,* that other provisions of the immigration statute tying immigration consequences to controlled-substance offenses contain no reference to § 802. See 8 U.S.C. § 1357(d) (allowing detainer of any alien who has been "arrested by a Federal, State, or local law enforcement official for a violation of any law relating to controlled substances"); § 1184(d)(3)(B)(iii) (allowing Secretary of Homeland Security to deny

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 513 of 1271

**Mellouli v. Lynch, 575 U.S. 798 (2015)**
135 S.Ct. 1980, 192 L.Ed.2d 60, 83 USLW 4382, 15 Cal. Daily Op. Serv. 5429...

certain visa applications when applicant has at least three convictions of crimes "relating to a controlled substance or alcohol not arising from a single act"). These provisions demonstrate that when Congress seeks to capture conduct involving a "controlled substance," it says just that, not "a controlled substance (as defined in [ 📑 § 802] )."

1    It is likewise beside the point that the pills were, in fact, federally controlled substances, that Mellouli concealed them in his sock while being booked into jail, that he was being booked into jail for his second arrest for driving under the influence in less than one year, that he pleaded to the paraphernalia offense after initially being charged with trafficking contraband in jail, or that he has since been charged with resisting arrest and failure to display a valid driver's license upon demand.

2    If the Court ultimately adopts the modified categorical approach, it runs into new textual problems. Under that approach, an alien would be subject to removal for violating Kansas' drug paraphernalia statute whenever a qualifying judicial record reveals that the conviction involved a federally controlled substance. If that result is permissible under the removal statute, however, then Kansas' paraphernalia law must qualify as a law "relating to" a federally controlled substance. Otherwise, the text of the statute would afford no basis for his removal. It would then follow that any alien convicted of "a violation of" that law is removable under 📑 § 1227(a)(2)(B)(i), *regardless* of whether a qualifying judicial record reveals the controlled substance at issue.

---

**End of Document**                                         © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by U.S. v. Piper, D.Vt., August 12, 2013

206 F.3d 253
United States Court of Appeals,
Second Circuit.

Jean Patrick MICHEL, Petitioner,

v.

IMMIGRATION AND NATURALIZATION
SERVICE, Respondent.

Docket No. 98–4368.
|
Argued Aug. 10, 1999.
|
Decided Feb. 4, 2000.

**Synopsis**

Alien sought review of an order of the Board of Immigration Appeals affirming his deportation. The Court of Appeals, Calabresi, Circuit Judge, held that: (1) alien was not deprived of his right to counsel at removal hearing: (2) alien was not deprived of due process right to full and fair removal hearing; and (3) alien's two convictions for criminal possession of stolen property in the fifth degree did not arise out of a single scheme of criminal misconduct. In an opinion by Sotomayor, Circuit Judge, the Court of Appeals further held that the BIA reasonably determined that alien's two convictions under New York law for possession of stolen property in the fifth degree, involving possession of stolen bus transfers, constituted crimes involving moral turpitude and thus warranted removal.

Affirmed.

José A. Cabranes, Circuit Judge, filed an opinion concurring in the judgment.

Calabresi, Circuit Judge, filed an opinion dissenting in part.

West Headnotes (14)

**[1]** **Aliens, Immigration, and Citizenship** ⚷ Assistance of counsel

**Constitutional Law** ⚷ Admission and exclusion; deportation

Under the Due Process Clause and the Immigration and Nationality Act, an alien is entitled to representation of his own choice at his own expense in a removal proceeding. U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, §§ 240(b)(4)(A), 292, as amended, 8 U.S.C.A. §§ 1229a(b)(4)(A), 1362; 8 C.F.R. § 240.10(a)(1).

4 Cases that cite this headnote

**[2]** **Aliens, Immigration, and Citizenship** ⚷ Assistance of counsel

Alien was not deprived of his right to counsel at removal hearing on theory that, due to his limited access to the phone, he was unable to contact anyone on the list of lawyers he was given prior to his hearing, where the immigration judge (IJ) offered to postpone the hearing so that alien might seek representation, and alien clearly chose to continue the hearing and to represent himself, even after being warned that he could lose his case. U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, §§ 240(b)(4)(A), 292, as amended, 8 U.S.C.A. §§ 1229a(b)(4)(A), 1362; 8 C.F.R. § 240.10(a)(1).

**[3]** **Aliens, Immigration, and Citizenship** ⚷ Assistance of counsel

Alien was not deprived of right to representation in removal hearing when the immigration judge (IJ) refused postponement after alien requested representation, where this took place at the very end of the proceeding, after the IJ had made his decision that alien was eligible for removal, and long after the initial meeting at which alien had waived his right to representation. U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, §§ 240(b)(4)(A), 292, as amended, 8 U.S.C.A. §§ 1229a(b)(4)(A), 1362; 8 C.F.R. § 240.10(a)(1).

AR.05739

**[4]** **Aliens, Immigration, and Citizenship** ⟜ Conduct of hearing; fairness in general

**Constitutional Law** ⟜ Admission and exclusion; deportation

Alien was not deprived of due process right to full and fair removal hearing, where the immigration judge (IJ) went well out of his way to ensure that alien knew what was happening at all times during the proceeding and never prevented alien from presenting arguments or evidence in his favor, and the IJ adjourned the hearing several times before making his decision to ensure that he had complete and accurate information. U.S.C.A. Const.Amend. 5.

5 Cases that cite this headnote

**[5]** **Federal Courts** ⟜ Determination and Disposition of Cause

Where no harm results from Court of Appeals' failing to answer a question, the doctrine of judicial restraint provides a fully adequate justification for deciding the case on the best and narrowest ground available, particularly where resolving the issue might call into question a prior decision of the court, which would require the approval of all of the active judges of the court.

2 Cases that cite this headnote

**[6]** **Aliens, Immigration, and Citizenship** ⟜ Number of crimes or convictions

Alien's two convictions for criminal possession of stolen property in the fifth degree did not arise out of a single scheme of criminal misconduct, so as not to provide basis for removal, though they were for identical conduct, where there was no evidence that the crimes, committed two months apart, were the result of a single plan. Immigration and Nationality Act, § 237(a)(2)(A)(ii), as amended, 8 U.S.C.A. § 1227(a)(2)(A)(ii).

3 Cases that cite this headnote

**[7]** **Administrative Law and Procedure** ⟜ Denial of admission; removal

**Aliens, Immigration, and Citizenship** ⟜ Law questions

Finding of the Board of Immigration Appeals (BIA) that alien's crimes involved "moral turpitude" so as to justify removal warranted *Chevron* deference, since the BIA was interpreting a term contained in the Immigration and Nationality Act (INA). Immigration and Nationality Act, § 237(a)(2)(A)(ii), as amended, 8 U.S.C.A. § 1227(a)(2)(A)(ii).

12 Cases that cite this headnote

**[8]** **Administrative Law and Procedure** ⟜ Deference to Agency in General

**Administrative Law and Procedure** ⟜ Relationship of agency with statute in general

**Administrative Law and Procedure** ⟜ Relationship of agency with rule or statute in general

When reviewing an agency determination, federal courts accord substantial deference to the agency's interpretations of the statutes and regulations that it administers, but courts owe no deference to an agency's interpretations of state or federal criminal laws.

8 Cases that cite this headnote

**[9]** **Administrative Law and Procedure** ⟜ Denial of admission; removal

**Aliens, Immigration, and Citizenship** ⟜ Law questions

Where the Board of Immigration Appeals (BIA) is interpreting section of the Immigration and Nationality Act (INA) making eligible for removal an alien who has been convicted of two or more crimes involving moral turpitude, *Chevron* deference is warranted, but where the BIA is interpreting state or federal criminal

laws under which an alien is convicted, Court of Appeals must review its decision de novo. Immigration and Nationality Act, § 237(a)(2)(A)(ii), as amended, 8 U.S.C.A. § 1227(a)(2)(A)(ii).

28 Cases that cite this headnote

[10] **Aliens, Immigration, and Citizenship** Fraud, forgery, and theft offenses

The Board of Immigration Appeals (BIA) reasonably determined that alien's two convictions under New York law for possession of stolen property in the fifth degree, involving possession of stolen bus transfers, constituted crimes involving moral turpitude and thus warranted removal, where the criminal statute specifically required the violator's knowledge that the property was stolen, and the BIA also considered in a sufficiently detailed and reasoned fashion alien's argument as to trivial nature of the offenses, which it found to be irrelevant, so that determination was entitled to deference under *Chevron.* Immigration and Nationality Act, § 237(a)(2)(A)(ii), as amended, 8 U.S.C.A. § 1227(a)(2)(A)(ii); N.Y.McKinney's Penal Law § 165.40.

24 Cases that cite this headnote

[11] **Administrative Law and Procedure** Permissible or reasonable construction

In order to determine whether agency's interpretation of term in statute it administers is reasonable, so as to warrant *Chevron* deference, it is not necessary that Court of Appeals conclude that the agency's interpretation of the statute is the only permissible interpretation, nor that it believes it to be the best interpretation of the statute; rather, in order to affirm the agency's determination, court need only conclude that its interpretation is reasonable and that it considered the matter in a detailed and reasoned fashion.

4 Cases that cite this headnote

[12] **Aliens, Immigration, and Citizenship** Crimes of moral turpitude in general

As a general rule, if a statute encompasses both acts that do and do not involve moral turpitude, the Board of Immigration Appeals (BIA) cannot sustain a deportability finding on that statute. Immigration and Nationality Act, § 237(a)(2)(A)(ii), as amended, 8 U.S.C.A. § 1227(a)(2)(A)(ii).

10 Cases that cite this headnote

[13] **Aliens, Immigration, and Citizenship** Crimes of moral turpitude in general

Decision of the Board of Immigration Appeals (BIA) to categorically equate guilty knowledge or intent, where that is a necessary element of the criminal statute at issue, with "moral turpitude" for purposes of section of the Immigration and Nationality Act (INA) making eligible for removal an alien convicted of two or more crimes involving moral turpitude, without regard to the seriousness of the particular conduct giving rise to alien's convictions, was a reasonable interpretation of the INA. Immigration and Nationality Act, § 237(a)(2)(A)(ii), as amended, 8 U.S.C.A. § 1227(a)(2)(A)(ii).

40 Cases that cite this headnote

[14] **Aliens, Immigration, and Citizenship** Crimes of moral turpitude in general

Corrupt scienter is the touchstone of "moral turpitude" within section of the Immigration and Nationality Act (INA) making eligible for removal an alien convicted of two or more crimes involving moral turpitude. Immigration and Nationality Act, § 237(a)(2)(A)(ii), as amended, 8 U.S.C.A. § 1227(a)(2)(A)(ii).

28 Cases that cite this headnote

## Attorneys and Law Firms

**\*255** Mitchell D. Kessler, New York, N.Y., for Petitioner.

Diogenes P. Kekatos, Assistant United States Attorney for the Southern District of New York, for Mary Jo White, United States Attorney for the Southern District of New York (Steven M. Haber, Assistant United States Attorney for the Southern District of New York, on the brief), for Respondent.

**\*256** Before: CALABRESI, CABRANES, and SOTOMAYOR, Circuit Judges.

## Opinion

Judge JOSÉ A. CABRANES files a separate opinion with respect to the single scheme of criminal misconduct" issue, and concurs in the judgment of the Court. Judge CALABRESI dissents from the majority's holding with respect to whether Michel's crimes involve 'moral turpitude' and files a separate opinion to that effect.

CALABRESI, Circuit Judge, delivering the unanimous opinion of the Court with respect to Parts I and II, and the majority opinion with respect to Part III, in which SOTOMAYOR, Circuit Judge, joins:

Jean Patrick Michel, 37, a native of Haiti and a permanent resident of the United States for the past eighteen years, petitions this Court for review of the decision of the Board of Immigration Appeals ("BIA") affirming that he was eligible for removal under 8 U.S.C. § 1227(a)(2)(A)(ii) (Supp. III 1997) as an alien who was "convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct." Michel seeks review on a number of grounds, claiming lack of representation, absence of a fair removal hearing, and that the BIA erred in holding that his crimes did not arise out of a single scheme of criminal misconduct. We deal with all three of these issues in this opinion and affirm the BIA's decision with respect to all of them. [1] Michel also claims that his crimes do not "involv[e] moral turpitude." The Court will address that issue, and affirm the BIA's conclusion that Michel's crimes involved "moral turpitude," in Part IV of a majority opinion by Judge Sotomayor, in which Judge Cabranes joins.

I. Background

Michel entered the United States in September 1971 as a lawful permanent resident. In November 1997, however, the Immigration and Naturalization Service ("INS") began proceedings to deport him since he had been convicted twice of criminal possession of stolen property in the fifth degree. On each occasion, Michel pled guilty to possession of stolen bus transfers.

At the removal hearing on November 20, 1997, Michel appeared without counsel. He had hoped that Father Robert Vitaglione (called Father Bob), who had been his representative in a previous immigration case, would represent him. [2] See Certified Administrative Record in A30 675 667 ("R.") at 53. Father Bob, however, could not attend the hearing because one of his church members had been involved in an accident. As a result, before any evidence was taken in the hearing, the Immigration Judge ("IJ") explained to Michel that he had a right to representation. See id. at 57–58. The IJ then asked the petitioner whether he wanted counsel during the hearing or whether he would proceed without representation. Michel responded that he would "speak for [him]self." Id. at 58.

After this exchange, the IJ began to question the petitioner about the allegations in the notice, which stated that Michel was deportable under § 1227(a)(2)(A)(ii), since (1) he had twice been convicted of criminal possession of stolen property in the fifth degree, and (2) those two crimes did not arise out of a single scheme of criminal misconduct. See id. at 151. He also asked Michel about his immigration history. The IJ then adjourned the hearing in order to get Michel's complete immigration file from the INS, including the file from Michel's previous **\*257** deportation proceedings. Because there was a question as to whether Michel's father—with whom Michel has not been in contact for over twenty-three years—had become a citizen when Michel was a minor, thus making Michel a citizen, the IJ asked the INS to find Michel's father's file as well. In addition, before adjourning the hearing to allow the INS time to find the missing information, the IJ again reminded the petitioner that he could contact an attorney or representative to aid him when the hearing reconvened. See id. at 75–76.

The hearing resumed on November 26, 1997, but the INS had not located any of the files relating to Michel or his father. The IJ once again adjourned the hearing, requesting that the INS redo its search because he did not want to proceed without complete information.

When the hearing reconvened on December 3, 1997, the INS presented evidence that Michel's father had become a citizen in July 1996. Since Michel was, by then, over the age of eighteen, he could not derive citizenship from his father. *See id.* at 91–92. The IJ then told Michel that his two convictions made him removable under the statute and asked where he would like to be sent. Michel did not offer a preference, other than to remain in the United States, at which point counsel for the INS designated Haiti. The IJ tried to determine if there were any grounds upon which Michel could request asylum, thereafter advising Michel that, although he would provide Michel with an application for asylum and a one-week period to pursue that claim, such a claim did not appear to be viable. The IJ also noted that Michel was not eligible for a waiver of deportation as he had received one in 1993. *See* 8 U.S.C. § 1229b(c)(6) (providing that an alien who has previously received relief in a deportation proceeding is ineligible for a second cancellation of removal). When the IJ asked Michel if he had anything additional to say, Michel asked to see Father Bob. *See* R. at 100. The IJ denied this request because he did not think it would serve any purpose. *See id.* The IJ then rendered his decision on the record, ordering Michel deported. Michel indicated that he would appeal.

Michel retained counsel for his appeal to the BIA. On October 27, 1998, the BIA, with one member concurring in part and dissenting in part, affirmed the order of deportation. *See* R. at 2–4. The BIA rejected Michel's claim that his right to counsel had been violated, as well as his claim that he did not receive a full and fair removal hearing. *See id.* In addition, the BIA found no merit to Michel's argument that the triviality of his crimes should be considered when deciding whether they involved "moral turpitude," because the "seriousness of a criminal offense.. is [not] determinative of whether a crime involves moral turpitude." *Id.* at 4. Finally, the BIA found that the two crimes did not arise from a single scheme of criminal misconduct. *See id.*

Michel filed a timely petition for review in this Court. *See* 8 U.S.C. § 1252(a)(1). Before us, Michel raises the same issues he raised before the BIA: (1) that he was deprived of his right to representation; (2) that he did not receive the process he was due in his deportation hearing; (3) that his crimes arose out of a single scheme of criminal misconduct; and (4) that his crimes were not ones that involved moral turpitude. The INS argues that the BIA correctly ruled against Michel on all counts. [3] We here consider the first three of Michel's four arguments. The Court will address the merits of Michel's

fourth contention in Part IV of a majority opinion by Judge Sotomayor, in which Judge Cabranes joins.

**\*258** II. Michel's Right to Representation and Due Process Claims

[1] Under the Due Process Clause and the Immigration and Nationality Act, an alien is entitled to representation of his own choice at his own expense. *See Montilla v. INS,* 926 F.2d 162, 166 (2d Cir.1991); *see also* 8 U.S.C. § 1362 (providing that in removal proceedings, the person concerned has the privilege of being represented, though at no expense to the Government). To that end, 8 U.S.C. § 1229a(b)(4)(A) directs the Attorney General to adopt regulations to ensure that "the alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings." And the regulations adopted by the Attorney General require the IJ to "[a]dvise the respondent of his or her right to representation, at no expense to the government, by counsel of his or her own choice authorized to practice in the proceedings and require the respondent to state then and there whether he or she desires representation." 8 C.F.R. § 240.10(a)(1) (1999).

We have interpreted this rule to allow a waiver of counsel to be found only "where it was possible to make a specific finding that the alien indicated—through what he said to the immigration judge—that he wanted to proceed without counsel." *Montilla,* 926 F.2d at 169. For example, in *Montilla,* we found that the petitioner had not waived his right to counsel, because, although he was asked whether he wanted to be represented at the hearing, his answer was nonresponsive, "demonstrat[ing his] complete ignorance on this subject." *Id.* In *Hidalgo–Disla v. INS,* 52 F.3d 444 (2d Cir.1995), however, we held that an immigration judge did not act improperly in proceeding, despite the absence of an express waiver of representation by the petitioner, after the judge had granted two adjournments and had warned the petitioner that he should be prepared to proceed on the third hearing date with or without a representative. As we reasoned there, "[i]f an immigration judge could not proceed with a hearing, after two adjournments, without the alien's express waiver, an alien seeking to stave off deportation would be able to win an infinite number of adjournments, and would be better off appearing *without* a lawyer than with one." *Id.* at 447.

**[2]**  In this case, Michel argues that he was deprived of his right to counsel since, due to his limited access to the phone, he was unable to contact anyone on the list of lawyers he was given prior to his hearing. This argument is unpersuasive. The IJ offered to postpone Michel's hearing so that he might seek representation, and Michel clearly chose to continue the hearing and to represent himself, even after being warned that he could lose his case:

> IJ: Now, do you want some time to try to find a representative, a lawyer, or do you want to speak for yourself and go ahead with your removal/deportation case today?
>
> Michel: I would start myself.
>
> IJ: You want to speak for yourself?
>
> Michel: Yes.
>
> IJ: Do you understand that you could lose your case today? That it's a possibility in other words?
>
> Michel: Yes.
>
> IJ: You do understand that?
>
> Michel: Yes.
>
> IJ: Okay. And you feel that you're able to go ahead and speak for yourself?
>
> Michel: Yes.

R. at 58. Accordingly, there is no merit to this portion of Michel's claim of deprivation of his right to representation.

**[3]**  Michel also contends that he made repeated complaints regarding his inability to obtain counsel. These assertions are not borne out by the record. Contrary to Michel's claims, he requested representation only once, and that was *after* the IJ had determined that Michel could be removed and deported:

> **\*259**  IJ: Okay. So is there anything additional? I can't think of anything additional, to tell you the truth. Is there anything else you want to explain to me?
>
> Michel: Well, I would like—I was—I was talking to you last week. I was telling you that I was going to wait to talk to Father Bob.
>
> IJ: Well, if I thought it would serve some purpose, I could try to put your case off. It would be still another eight

days before Father Bob comes here, and I don't see anything that he could do for you. What can he give you advice about that you haven't already answered yourself?

> Michel: Well, maybe—maybe I will sit down with him and then have a little bit more understanding and—
>
> IJ: Well, as far as I'm concerned, sir, no offense, but you had that chance in '93. Father Bob's office represented you then and I don't see that it's going to serve any purpose to put your case off again. You had the opportunity to call them or write them a letter long ago to get advice about your situation, okay?

*Id.* at 100.

This exchange might be troubling if it had been Michel's initial response to the IJ's question as to representation. But it took place, instead, at the very end of the proceeding, after the IJ had made his decision that Michel was eligible for removal, and long after the initial meeting at which Michel had waived his right to representation. We cannot require the IJ to postpone a proceeding every time a party believes that the hearing is going badly, and, as a result, seeks to re-think his or her decision to forego representation. *See* 🔖 *Hidalgo–Disla,* 52 F.3d at 447. We therefore reject Michel's claim that he was deprived of his right to representation.

**[4]**  To the extent that Michel is also asserting that he was not afforded a full and fair hearing as required by the Due Process Clause, *see* 🔶 *Felzcerek v. INS,* 75 F.3d 112, 115 (2d Cir.1996), we find his claim meritless. The IJ in this case went well out of his way to ensure that Michel knew what was happening at all times during the proceeding and never prevented Michel from presenting arguments or evidence in his favor. We note additionally that the IJ adjourned the hearing several times before making his decision to ensure that he had complete and accurate information. We conclude that the IJ acted, procedurally, exactly as we would hope that an IJ would, and that the hearing, far from being "a procedural sham" as Michel alleges, was instead fundamentally fair and was conducted in full compliance with the Due Process Clause of the Fifth Amendment.

III. Michel's Claim That His Crimes Did Not Arise Out of a Single Scheme of Criminal Misconduct Under 🔖 8 U.S.C. § 1227(a)(2)(A)(ii)

Under 8 U.S.C. § 1227(a)(2)(A)(ii), an alien who is "convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct," may be deported. Michel was convicted under New York Penal Law § 165.40, which provides in relevant part that

> [a] person is guilty of criminal possession of stolen property in the fifth degree when he knowingly possesses stolen property, with intent to benefit himself or a person other than an owner thereof or to impede the recovery by an owner thereof.

N.Y. Penal Law § 165.40 (McKinney 1999). The IJ found that Michel's two convictions under this statute constituted "crimes involving moral turpitude" that did not arise "out of a single scheme of criminal misconduct." The BIA—by a divided vote—affirmed this decision, concluding that the crimes were in fact separate and **260** distinct and that they were convictions involving moral turpitude because "knowledge of the stolen nature of the goods is an element of the offense." R. at 4. In this part, we review the BIA's finding that the crimes did not arise out of a single scheme of criminal misconduct.

The phrase "single scheme of criminal misconduct" in 8 U.S.C. § 1227(a)(2)(A)(ii) is not defined by the statute or in its legislative history. See Akindemowo v. INS, 61 F.3d 282, 284–85 (4th Cir.1995). In Nason v. INS, 394 F.2d 223 (2d Cir.1968), this Court adopted an expansive definition of the phrase, permitting a specific, coherent plan of future action to constitute a single scheme of criminal misconduct. See id. at 227. Nason was decided before Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), in which the Supreme Court held that deference to an agency's construction of a statute is appropriate where that agency is charged with the administration of the law and where "the agency's answer is based on a permissible construction." Id. at 843, 104 S.Ct. 2778. The INS, therefore, argues that, rather than follow our definition in Nason, we should now defer to the BIA's interpretation of "single scheme of criminal misconduct," limiting this phrase to "acts, which although separate crimes

in and of themselves, were performed in furtherance of a single criminal episode, such as where one crime constitutes a lesser offense of another or where two crimes flow from and are the natural consequence of a single act of criminal misconduct." In re Adetiba, Interim Decision, 20 I. & N. Dec. 506, 511, 1992 WL 195812 (1992).

**[5]** We have held, in post-Chevron cases, that the BIA is entitled to deference when interpreting other provisions of the Immigration and Nationality Act, as long as those interpretations are reasonable. See, e.g., Ahmetovic v. INS, 62 F.3d 48, 51 (2d Cir.1995) (according deference to the BIA's interpretation of "particularly serious crime"). But, to date, we have not answered the specific question of whether we should engage in a Chevron analysis with respect to the phrase "single scheme of criminal misconduct" or whether, instead, we should continue to follow our definition in Nason. And we need not decide that issue today. [4]

**[6]** Under either definition—the broader one provided in Nason or the narrower one urged by the INS—Michel's crimes cannot be said to have arisen out of a single scheme of criminal misconduct. Michel's argument boils down to a claim that he was convicted for the same offense on **261** both occasions and therefore the convictions should be considered part of a single scheme. But even under the expansive view embraced in Nason, it is not enough that Michel's convictions are for identical conduct. As the Nason court explained,

> [i]t is here, especially, that Nason's stress on the similarity between the two crimes misses the mark. It should be noted that the statute does not speak in terms of a "common scheme or plan." The impropriety of such a test is readily apparent for it could be invoked to save an alien who repeated a successful crime already tried and had the good fortune to employ not only the same methods, but also to have chosen the same or a similar victim. Congress meant to give the alien a second chance, not to spare the recidivist.

Nason, 394 F.2d at 227.

Because Michel presented no evidence that his crimes—committed two months apart—were the result of a single plan he had devised to steal bus transfers, he cannot succeed on his claim under this Circuit's broad, pre-*Chevron* definition of the phrase. And he certainly cannot succeed under the BIA's narrower one. We therefore affirm the BIA's determination that Michel's two convictions did not arise out of a single scheme of criminal misconduct under 8 U.S.C. § 1227(a)(2)(A)(ii).

SOTOMAYOR, Circuit Judge, announcing the judgment of the Court and delivering the majority opinion of the Court with respect to Parts IV and V, in which CABRANES, Circuit Judge, joins:

IV. Moral Turpitude Under 8 U.S.C. § 1227(a)(2)(A)(ii)
Michel's final argument on appeal is that he is not removable because his crimes did not "involv[e] moral turpitude" within the meaning of § 237(a)(2)(A)(ii) of the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. § 1227(a)(2)(A)(ii)(Supp. III 1997) stating that an alien "convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct," shall be removed. Specifically, Michel argues that his criminal offenses—possession of stolen bus transfers in violation of N.Y. Penal Law § 165.40—were so trivial in nature that they cannot be characterized as crimes involving moral turpitude. For the reasons discussed below, we affirm the determination of the Bureau of Immigration Appeals ("BIA") that Michel's two criminal offenses constituted crimes involving moral turpitude and thus warrant removal under § 1227(a)(2)(A)(ii).

A. The BIA's Determination
In analyzing whether Michel's two criminal offenses involved moral turpitude, the BIA began by referring to the particular section of the New York State Penal Law that Michel twice violated:

> A person is guilty of criminal possession of stolen property in the fifth degree when he knowingly possesses stolen property, with intent to benefit himself or a person other

than an owner thereof or to impede the recovery by an owner thereof.

N.Y. Penal Law § 165.40 (McKinney 1999) (*quoted in* Certified Administrative Record in A30 675 667 ("R.") at 3). The BIA concluded that, because section 165.40 requires knowledge that the property was stolen, Michel's offenses were necessarily crimes involving moral turpitude:

> This Board has held that a conviction for possession of stolen goods is a conviction for a crime involving moral turpitude if knowledge of the stolen nature of the goods is an element of the offense. *See Matter of Salvail, 17 I. & N. Dec. 19, 1979 WL 44356 (BIA 1979)*. The statute under which [Michel] was convicted, New York State Penal [Law] § 165.40, specifically requires knowledge that the property was stolen.

R. at 4. In making its determination, the BIA dismissed Michel's argument that the trivial nature of his crimes should preclude a finding of moral turpitude:

> **\*262** Further, despite [Michel]'s assertions on appeal concerning the triviality of his crime[s], this Board has determined that neither the seriousness of a criminal offense nor the severity of the sentence imposed is determinative of whether a crime involves moral turpitude. *See Matter of Serna, 20 I. & N. Dec. 579, 1992 WL 301779 (BIA 1992)*. Accordingly, we agree with the Immigration Judge that [Michel]'s convictions for criminal possession of stolen property are crimes involving moral turpitude.

*Id.*

B. Standard of Review

**[7]** The INS argues that, in reviewing the BIA's moral turpitude finding, we should defer to the BIA's interpretation of the term "moral turpitude" because that interpretation is reasonable. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (holding that, where a statute is silent or ambiguous as to a specific issue, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency"). Unlike, for example, the phrase "single scheme of criminal misconduct" discussed in Part III *ante,* this Court has not provided a relevant pre-*Chevron* definition of the phrase "crimes involving moral turpitude." This case raises the straightforward question of whether the BIA's finding of "moral turpitude" with respect to Michel's section 165.40 violations warrants *Chevron* deference. We conclude that it does.

**[8]** **[9]** When reviewing an agency determination, federal courts accord substantial deference to the agency's interpretations of the statutes and regulations that it administers. *See INS v. Cardoza–Fonseca,* 480 U.S. 421, 448, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (citing *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778). By contrast, courts owe no deference to an agency's interpretations of state or federal criminal laws, because the agency is not charged with the administration of such laws. Therefore, notwithstanding some apparent confusion among the circuits on this issue, [1] we join the Fifth Circuit in the view that, where the BIA is interpreting § 237(a)(2)(A)(ii) of the INA, *Chevron* deference is warranted, but where the BIA is interpreting state or federal criminal laws, we must review its decision de novo. *See Hamdan v. INS,* 98 F.3d 183, 185 (5th Cir.1996) ("We must uphold the BIA's determination of what conduct constitutes moral turpitude [under the INA] if it is reasonable. However, a determination that the elements of a crime constitute moral turpitude for purposes of deportation pursuant to [the INA] is a question of law, which we review de novo.") (citations omitted). Because Michel challenges the BIA's interpretation of the term "moral turpitude" in § 237(a) (2)(A)(ii) of the INA—not its construction of New York Penal Law § 165.40—we analyze his claim subject to the *Chevron* framework.

## C. The Reasonableness of the BIA's Moral Turpitude Finding

**[10]** **[11]** Applying the *Chevron* approach, we first ask whether "Congress has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. In answering this question, we note that the term "moral turpitude" is not defined anywhere in the INA and that the INA's legislative history sheds no light on Congress's intent. *See Cabral v. INS,* 15 F.3d 193, 194–95 (1st Cir.1994). Because **\*263** nothing in the statute or its legislative history informs our understanding of the term "moral turpitude," we proceed to *Chevron* step two, which requires us to determine whether the BIA's interpretation of the term "moral turpitude" is reasonable. *See Chevron,* 467 U.S. at 844, 104 S.Ct. 2778. In making this assessment, "[i]t is not necessary that we conclude that the agency's interpretation of the statute is the only permissible interpretation, nor that we believe it to be the best interpretation of the statute." *Skubel v. Fuoroli,* 113 F.3d 330, 336 (2d Cir.1997) (citing *Chevron,* 467 U.S. at 843 n. 11, 104 S.Ct. 2778). Rather, in order to affirm the BIA's determination, we need only conclude that its interpretation is reasonable and that it "considered the matter in a detailed and reasoned fashion." *Chevron,* 467 U.S. at 865, 104 S.Ct. 2778. We conclude that the BIA has satisfied these criteria.

**[12]** **[13]** **[14]** In this case, the BIA reasoned that, because section 165.40 specifically requires the violator's knowledge that the property was stolen, Michel's offenses were necessarily crimes involving moral turpitude. *See* R. at 4 (citing *In re Salvail,* 17 I. & N. Dec. 19, 1979 WL 44356 (BIA 1979)). Essentially, the BIA made a categorical finding of "moral turpitude" based on the elements of section 165.40, without regard to the particular conduct giving rise to Michel's convictions under that section. We note that, "[a]s a general rule, if a statute encompasses both acts that do and do not involve moral turpitude, the BIA cannot sustain a deportability finding on that statute." *Hamdan,* 98 F.3d at 187. In the instant case, however, upon a de novo review of the relevant criminal statute, we conclude that all violations of New York Penal Law § 165.40 are, by their nature, morally turpitudinous because knowledge is a requisite element of section 165.40 and corrupt scienter is the touchstone of moral turpitude. *See, e.g., Hamdan,* 98 F.3d at 186 ("Among the tests to determine if a crime involves moral turpitude is whether the act is accompanied by a vicious motive or a corrupt mind.") (quoting the BIA's definition of

"moral turpitude"); Okoroha v. INS, 715 F.2d 380, 382 (8th Cir.1983) (affirming the BIA's conclusion that "possession of stolen mail [is] a crime of moral turpitude because knowledge that the article of mail ha[s] been stolen [i]s an essential element of the offense"); United States ex rel. Meyer v. Day, 54 F.2d 336, 337 (2d Cir.1931) (stating that "it is in the intent that moral turpitude inheres"); In re Flores, 17 I. & N. Dec. 225, 227, 1980 WL 121870 (BIA 1980) ("An evil or malicious intent is said to be the essence of moral turpitude.");

In re Abreu–Semino, 12 I. & N. Dec. 775, 777, 1968 WL 14106 (BIA 1968) (stating that "moral turpitude normally inheres in the intent"); In re P—, 6 I. & N. Dec. 795, 798, 1955 WL 8755 (BIA 1955) (same).

Applying this principle to its moral turpitude analysis, the BIA in this case articulated its long-standing position that, where knowledge is a necessary element of a crime under a particular criminal statute, moral turpitude inheres in that crime. See, e.g., In re Ajami, Interim Dec. BIA 3405, 1999 WL 487022 (BIA July 13, 1999) ("If the statute defines a crime in which moral turpitude necessarily inheres, then the conviction is for a crime involving moral turpitude for immigration purposes, and our analysis ends.") citing In re Short, 20 I. & N. Dec. 136, 139, 1989 WL 331878 (BIA 1989)); In re Bart, 20 I. & N. Dec. 436, 437–38, 1992 WL 195800 (BIA 1992) (holding that if guilty knowledge is an element of a bad check offense, the crime is one involving moral turpitude citations omitted); In re Salvail, 17 I. & N. Dec. at 20 ("Conviction under the [Canadian Criminal Code for knowing possession of stolen goods] is a conviction for a crime involving moral turpitude, as it specifically requires knowledge of the stolen nature of the goods."); In re McNaughton, 16 I. & N. Dec. 569, 574, 1978 WL 36469 (BIA 1978) (stating that "whenever a crime has involved intent to defraud, it has been found **264** to involve moral turpitude"); In re P—, 6 I. & N. Dec. at 798 (holding that, where the statute contained the element of criminal intent, the crime involved moral turpitude); In re R—, 6 I. & N. Dec. 772, 774, 1955 WL 8749 (BIA 1955) (holding that, because knowledge was an essential element of the crime of receiving stolen goods, the crime involved moral turpitude).

Judge Calabresi's dissent suggests that the BIA's categorical approach to its moral turpitude determination somehow constitutes an abandonment of the general definition of moral turpitude articulated in Hamdan v. INS, 98 F.3d 183

(2d Cir.1996). See post at 270. We disagree. The Hamdan definition explicitly states that "[a]mong the tests to determine if a crime involves moral turpitude is whether the act is accompanied by a vicious motive or a corrupt mind." Id. at 186. We cannot conclude that the BIA's decision to equate knowledge or intent with a "vicious motive or corrupt mind" constituted an unreasonable interpretation of § 237(a)(2)(A)(ii).

As a policy matter, moreover, the BIA's categorical approach was sound. It is the essence of evenhanded administration of the law to define rules ex ante and apply them regardless of the particular circumstances of a given case.[2] The BIA's categorical approach to moral turpitude determinations promotes uniformity and relieves the INS of the oppressive administrative burden of scrutinizing the specific conduct giving rise to criminal offenses. See Cabral, 15 F.3d at 197 n. 6 ("[N]either the administrative officials in a deportation proceeding nor the courts on review of administrative action are under the oppressive burden of taking and considering evidence of the circumstances of a particular offense so as to determine whether there were extenuating factors which might relieve the offender of the stigma of moral obliquity.")

(nternal quotation marks omitted); cf. Chiaramonte v. INS, 626 F.2d 1093, 1098 (2nd Cir.1980) (stating that because of comity concerns and practical considerations, "an alien adjudged guilty by a foreign tribunal of a crime of moral turpitude may not attempt to demonstrate ... [in a deportation proceeding] that his actions were only undertaken in response to exceptional circumstances and that he is morally blameless"). As the BIA stated in a recent case:

[T]he principle of not looking behind a record of conviction provides this Board with the only workable approach in cases where deportability is premised on the existence of a conviction. If we were to allow evidence that is not part of the record of conviction as proof of whether an alien [committed a crime involving moral turpitude], we essentially would be inviting the parties to present any and all evidence bearing on an alien's conduct leading to the conviction.... Such an endeavor is inconsistent both with the streamlined adjudication that a deportation hearing is intended to provide and with the settled proposition that an Immigration Judge cannot adjudicate guilt or innocence.

If we were to make an exception ..., there would be no clear stopping point where this Board could limit the scope of seemingly dispositive but extrinsic evidence

bearing on [an alien]'s deportability. We believe that the harm to the system induced by the consideration of such extrinsic evidence far outweighs the beneficial effect of allowing it to form the evidentiary basis of a finding of deportability.

**\*265** *In re Pichardo–Sufren,* Interim Dec. BIA 3275, 1996 WL 230227 (BIA 1996) (citations omitted). [3] In affirming the BIA's moral turpitude determination, furthermore, we find that the BIA considered Michel's arguments in a sufficiently "detailed and reasoned fashion."

*Chevron,* 467 U.S. at 865, 104 S.Ct. 2778. Judge Calabresi's dissent takes issue with the BIA's statement that "despite [Michel]'s assertions on appeal concerning the triviality of his crime[s], ... neither the seriousness of a criminal offense nor the severity of the sentence imposed is *determinative* of whether a crime involves moral turpitude."

R. at 4 (citing *In re Serna,* 20 I. & N. Dec. 579, 581–82, 1992 WL 301779 (BIA 1992)) (emphasis added). Noting that "[w]ords matter," Judge Calabresi essentially argues that the BIA confused the distinction between relevancy and determinativeness. *See post* at 268–69. But, just as words matter, so do context and precedent. Indeed, words—particularly in the American judicial system—do not exist in a vacuum. Read in context and in light of BIA precedent, we find the BIA's analysis to be unmistakably clear: Michel's triviality argument was *irrelevant* to the BIA's moral turpitude determination.

This reading finds support in the fact that (1) the BIA adopted a categorical approach to its moral turpitude inquiry, determining that Michel's crimes inherently involved moral turpitude; and (2) the BIA cited the *Serna* case, which clarified "that neither the seriousness of the offense nor the severity of the sentence imposed is determinative of whether a crime involves moral turpitude. It is *rather* a question of the offender's evil intent or corruption of the mind.... Thus, the fact that a crime may be considered only a minor offense does not preclude a finding that it involves moral turpitude." *In re Serna,* 20 I. & N. Dec. at 581–82 (citations omitted) (emphasis added). It also finds support in recent BIA precedent. In *In re Phong Nguyen Tran,* 1996 WL 170083 (BIA Mar. 28, 1996), for example, the BIA stated:

> Where knowing or intentional conduct is an element of a morally

reprehensible offense, we have found moral turpitude to be present.... Neither the seriousness of a criminal offense nor the severity of the sentence imposed therefor is determinative of whether a crime involves moral turpitude. *Therefore,* the fact that the [alien] was convicted of a misdemeanor rather than a felony *has no bearing* on whether or not the offense for which he was convicted is a crime involving moral turpitude.

*Id.* (citing *In re Serna,* 20 I. & N. Dec. at 581–82) (emphasis added). In short, a careful reading of the BIA's statement in this case, taken in conjunction with *Serna* and similar BIA decisions, plainly indicates that the BIA used *not determinative* to mean *irrelevant.*

We therefore believe that the BIA considered Michel's triviality argument in a sufficiently detailed and reasoned fashion and found that the trivial nature of Michel's offenses had no bearing upon its analysis. Under *Chevron,* we are not permitted to second-guess the BIA's conclusion in this regard.

For the foregoing reasons, we conclude that the BIA's categorical approach to its moral turpitude determination in this case was reasonable and based on a permissible **\*266** construction of § 237(a)(2)(A)(ii) of the INA.

V. Conclusion

For the reasons set forth in Parts I and II, we unanimously reject Michel's claims that the proceedings before the Immigration Judge violated his rights to representation or due process. For the reasons set forth in Part III of Judge Calabresi's majority opinion, in which Judge Sotomayor joins, the Court also rejects Michel's claim that his two criminal convictions arose out of a single scheme of criminal misconduct. Finally, for the reasons identified in Part IV above, in which Judge Cabranes joins, the Court rejects Michel's claim that his crimes did not involve moral turpitude. Accordingly, we deny Michel's petition for review and affirm the BIA's October 27, 1998 order of removal.

JOSÉ A. CABRANES, Circuit Judge, concurring in the judgment of the Court:

I concur in Judge Calabresi's (partial) majority opinion, except for Part III, and in the entirety of Judge Sotomayor's (partial) majority opinion. Nevertheless, I write separately to express my view that we are required to defer to the Board of Immigration Appeals ("BIA") with respect to its construction of the phrase "single scheme of criminal misconduct" in 8 U.S.C. § 1227(a)(2)(A)(ii).

Before discussing my disagreement, however, I pause to offer some assistance to those who may be perplexed by the decision of my two colleagues to split the writing of a majority opinion, and the decision of one of them to write both a (partial) majority opinion and a (partial) dissent—with the extraordinary result that we publish today four opinions, one opinion more than there are judges on the panel. For the benefit of our hapless readers, I offer here a brief scorecard for the disposition of this case:

(1) Judge Calabresi, Judge Sotomayor, and I agree that Michel was not deprived of the right to representation at his removal hearings and that those hearings gave Michel more than the process he was due.

(2) The panel also agrees that Michel's crimes did not constitute a "single scheme of criminal misconduct," although I would further hold that the BIA's definition of "single scheme of criminal misconduct" is entitled to our deference —thereby would avoid any suggestion that this issue remains a live one within this Circuit (more on this anon).

(3) Judge Sotomayor and I agree, contrary to the views of Judge Calabresi, that Michel, who was twice convicted of criminal possession of stolen property in the fifth degree in violation of New York Penal Law § 165.40, was "convicted of two or more crimes involving moral turpitude."

(4) Accordingly, a majority of the members of this panel— namely, Judge Sotomayor and I—agree that the judgment of the BIA should be affirmed in its entirety, and we enter our judgment to that effect.

* * * * * *

With that, I turn to the substance of my disagreement with Judge Calabresi and Judge Sotomayor on the question of whether we are required to defer to the BIA's definition of "single scheme of criminal misconduct." As Judge Calabresi notes in his (partial) majority opinion, the phrase "single scheme of criminal misconduct" in § 1227(a)(2)(A)(ii) in not defined by the statute or in its legislative history. See ante at 260. The BIA, however, has defined the phrase to mean "acts, which although separate crimes in and of themselves, were performed in furtherance of a single criminal episode, such as where one crime constitutes a lesser offense of another or where two crimes flow from and are the natural consequence of a single act of criminal misconduct." In re Adetiba, 20 I. & N. Dec. 506, 511, 1992 WL 195812 (B.I.A.1992). In my view, this definition —adopted by the agency with authority to enforce the statute at issue—is "eminently reasonable, even if not compelled." *267 Akindemowo v. INS, 61 F.3d 282, 286 (4th Cir.1995). Accordingly, under the Supreme Court's decision in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), I believe that we are obligated to accept it as "controlling." See id. at 844, 104 S.Ct. 2778 (holding that "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency").

Judge Calabresi and Judge Sotomayor do not expressly disagree with this conclusion, but rather choose to defer the Chevron issue to another day on the ground that Michel's crimes did not constitute a "single scheme of criminal misconduct" under either the BIA's definition of the phrase or the definition adopted by this Court—a generation before Chevron—in Nason v. INS, 394 F.2d 223, 227 (2nd Cir.1968). See ante at 260–61. In my view, however, there is no reason to leave this issue, which is squarely presented for our decision, for another day. Thus, I would hold, as has every other Court of Appeals to consider the issue thus far, that the BIA's definition of the phrase is entitled to deference, see Akindemowo, 61 F.3d at 284–87; Thanh Huu Nguyen v. INS, 991 F.2d 621, 623 (10th Cir.1993); Iredia v. INS, 981 F.2d 847, 849 (5th Cir.1993); see also Balogun v. INS, 31 F.3d 8, 9 (1st Cir.1994)(per curiam), [1] and I would expressly disavow our substitute definition in Nason.

Although my colleagues seek to justify their decision to avoid the Chevron issue on the venerable ground of judicial restraint, see ante at 260 n. 4, their decision to reaffirm a precedent clearly abrogated by the Supreme Court is, in my view, more akin to the judicial usurpation eschewed by the Supreme Court in Chevron. By their decision today, my colleagues effectively require the BIA to continue its general

policy of applying this Court's pre–*Chevron* definition of the phrase "single scheme of criminal misconduct" within this Circuit, while applying the agency's own interpretation in those circuits that dutifully have followed *Chevron*. *See Adetiba*, 20 I. & N. Dec. at 510 (discussing the BIA's decision to "follow [its] approach outside of those jurisdictions ... that have followed a more expansive interpretation"); *see also Akindemowo*, 61 F.3d at 286 (discussing the BIA's policy). In so doing, my colleagues disregard "our frequently expressed concern to avoid disparate treatment situated aliens under the immigration laws," *Aguirre v. INS*, 79 F.3d 315, 317 (2nd Cir.1996) (citing cases), and perpetuate a situation in which some aliens face removal and others not, depending solely on where they reside. Just as in *Aguirre*, where we concluded that "the interests of nationwide uniformity [in the administration of immigration laws] outweigh[ed] our adherence to Circuit precedent," *id.*, in this case I **\*268** would hold that *Nason* is not longer good law. [2]

For these reasons, I respectfully disagree with my colleagues' choice not to decide the looming *Chevron* issue concerning the phrase "single scheme of criminal misconduct." Instead, I would hold that the BIA's definition is entitled to deference, and I would expressly disavow the substitute definition we adopted in *Nason*. Because Michel's crimes—committed two months apart—plainly were not part of a "single scheme of criminal misconduct" under the BIA's definition, and because I otherwise agree with my colleagues' majority opinion, I concur in the judgment of the Court of affirm the judgment of the BIA in its entirety.

CALABRESI, Circuit Judge, dissenting from Part IV.C of the majority opinion and from the judgment of the Court:

I agree with the majority that because Congress has not, in 8 U.S.C. 1227(a)(2)(A)(ii), directly addressed the question of what crimes involv[e] moral turpitude, we must determine only whether the agency's reading of the law is reasonable. See *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778. And, as the majority also makes clear, [i]t is not necessary that we conclude that the agency's interpretation of the statute is the only permissible interpretation, nor that we believe it to be the best interpretation of the statute in order to uphold it. *Skubel v. Fuoroli*, 113 F.3d 330, 336 (2d Cir.1997). But this does not change the fact that statutory interpretation is, in the final analysis, a matter for the courts, *Rosario v.*

*INS*, 962 F.2d 220, 222 (2d Cir.1992), that our review is not merely for minimum rationality, *Detsel v. Sullivan*, 895 F.2d 58, 63 (2d Cir.1990), and that [a]dministrative agencies must articulate a logical basis for their decisions, including a rational connection between the facts found and the choices made. *Id.* (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)).

This means that under *Chevron*, we may defer to an agency interpretation only if the agency has adequately explained its rationale and the factual basis for its decision. See *Detsel*, 895 F.2d at 63. Conversely, we should not accept an agency's decision simply because it is possible to conceive of a basis for the agency's action. Our inquiry should be more searching, see *id.,* and, at the least, in order to find that the agency's construction is reasonable, we should be able to point to evidence that it considered the matter in a detailed and reasoned fashion. *Chevron,* 467 U.S. at 865, 104 S.Ct. 2778.

In this case, the BIA said two things and only two things when it was asked whether Michel's crimes involved moral turpitude: (1) that it has always held possession of stolen property (with the knowledge that it is stolen) to be a crime involving moral turpitude and (2) that neither the seriousness of the crime nor the severity of the sentence is determinative of whether a crime involves moral turpitude. *See* R. at 4. These were the sole responses that the agency gave to Michel's request that it *consider* the fact that his crimes were seemingly minor ones. In my view, they are not enough to qualify the BIA's holding as adequately explained for the purposes of *Chevron.*

**\*269** The BIA's statement that the seriousness of the crime is *not determinative* does not tell us why the agency did not *consider* Michel's claim that his convictions, given their allegedly trivial nature, were not for crimes involving moral turpitude. To say that something is not determinative is obviously not the same as saying that it is irrelevant and hence is not to be weighed at all. Thus, while I can understand and can agree with what the BIA *said*—that the gravity of the offense should not decide the question—I cannot, without more explanation, accept the statement as justifying what it *did*, which was to treat the alleged triviality of the conduct as irrelevant to its decision.

On this issue, the majority purports to read the BIA's language "in context" and holds that it is clear that what the BIA meant to say was that "Michel's triviality argument was irrelevant." In other words, the majority permits the BIA to equate *irrelevant* with *not determinative*. But saying the *irrelevant* is the same as *not determinative* is like saying green is puce; it isn't, and no amount of talk will make it so. Words matter. And I cannot subscribe to an approach that, in order to affirm a result the court deems desirable, allows an agency to employ language in ways that are at war with the words it uses. I believe instead it is the job of the courts to make agencies describe exactly what they are doing. I believe this because only in this way can agencies be held responsible to Congress and ultimately to the people.

Suppose a group of constituents seeks to make sure that triviality of crimes is a matter that is considered in deportation cases. The group goes to talk to a Senator. The Senator reads that the BIA has consistently said that the seriousness or triviality of a crime is *not determinative* of the issue of moral turpitude. That Senator may well conclude that the BIA position is perfectly sensible. Indeed, we all agree that it would be. But the Senator might react very differently, as might the public, if the BIA had said *clearly* and *expressly* what the majority says it to say in this case, that the seriousness or triviality of a crime is *irrelevant* to moral turpitude.

Nor does the BIA's other explanation for its decision suffice. Here, too, more is needed under *Chevron*. I agree completely with the majority's view that a categorical approach under 📄 § 1227(a)(2)(A)(ii)(one that would not require an analysis of moral turpitude as to each criminal law violated but instead allowed such decisions to be made broadly with respect to whole categories of crimes) could constitute a possible and not unreasonable interpretation of the statute. But we can only defer to such a reading of 📄 § 1227(a)(2)(A)(ii) if an adequate justification for this approach is provided by the BIA. To describe a practice, moreover, is not to justify it or to explain it. As a result, to say, as the BIA did, that it has consistently held that knowing possession of stolen property constitutes moral turpitude, even if true, is not enough. And the fact that the majority thinks that a categorical approach to moral turpitude is a good one, and spends considerable time explaining why, is of no help either. It is the BIA that must explain why it chooses to adopt an approach, not us. Indeed, I dissent from the majority's holding precisely because, regardless of how much we as judges may like the

categorical approach, the BIA has not itself justified what it appears to be doing in this case.

In support of its position that the BIA has adequately told us why it has decided to employ a broad categorical approach, the majority points to 📄 *In re Picardo–Sufren*, 1996 WL 230227 (BIA 1996). But that case stands for the unremarkable proposition that the BIA will not look "behind the record of conviction" when determining whether a particular person's crime involve moral turpitude. Moreover, the BIA in *Picardo–Sufren* well explained the reasons for this position. In doing so, it echoed what this Court and others, long before *Chevron*, had said in also holding **\*270** hat the singular circumstances of an individual petitioner's crimes should not be considered, and only the minimum criminal conduct necessary to sustain a conviction under a given statute is relevant to a determination of whether the violation at issue involved moral turpitude.[1] *See United States ex rel. Guarino v. Uhl*, 107 F.2d 399, 400 (2nd Cir.1939); *see also Hamdan*, 98 F.3d at 189.

The issue here, however, it not whether the BIA should consider Michel's particular circumstances (why and how he violated this particular statute) but rather whether the BIA has justified an approach that, instead of analyzing moral turpitude as to each statute violated, allows such decisions to be made broadly with respect to whole groups of crimes, i.e., all crimes involving the possession of stolen property. As noted above, the BIA, in cases like *In re Picardo–Sufren*, has explained why it is unwise to look to the individual circumstances to each wrongdoing. I, therefore, agree that the particular events underlying Michel's crime should not be considered here. but hat in no way indicates that the BIA has adequately explained why deciding moral turpitude by broad categories of crimes is the proper approach.

Aside from not justifying its categorical approach or explaining how *not determinative* can equal *irrelevant,* the BIA's decision, in fact, violates its own long-standing definition of "moral turpitude." That definition provides that:

> [m]oral turpitude refers generally to conduct that shocks the conscience as being inherently base, vile, or depraved, and contrary to the accepted morality and the duties owed between persons or to society in general. Moral

turpitude has been defined as an act which is per se morally reprehensible and intrinsically wrong or malum in se, so it is the nature of the act itself and not the statutory prohibition of it which renders a crime one of moral turpitude. Among the tests to determine if a crimes involves moral turpitude is whether the act is accompanied by a vicious motive or a corrupt mind.

*Hamdan, 98 F.3d at 186* (citations omitted)(quoting from the BIA decision in *Hamdan*). Given the fact that this definition of "moral turpitude" appears to require some analysis of whether a particular crime is "inherently base, vile, or depraved, or contrary to the accepted morality and the duties owed between persons or to society in general," it is hard to understand how the gravity of the crime can play *no* part in the inquiry. And it is even more difficult to see how this definition can be applied in an approach that looks solely to broad categories of crimes.

Let me be absolutely clear. I am not saying that the alleged triviality in this **\*271** case forecloses moral turpitude. The BIA can surely seek to show that the stealing of transfers (or whatever behavior it determines constitutes the minimum conduct for violating the statute), even if seemingly a trivial act, in an "inherently base, vile, or depraved" crime. Nor am I contending that the BIA cannot abandon its *Hamdan* definition and (after explaining why the change is appropriate) adopt a definition of moral turpitude that relies solely on broad categories of crimes, such as possession of stolen property if one knows that it is stolen. I am only saying that in the case before us, the BIA has done neither of these.[2]

The majority believes that the categorical approach employed by the BIA here—any crime that involves "corrupt scienter" involves moral turpitude—has been adequately justified by the agency. It does so, at least in part, because the majority deems such a result to be "sound." I, instead, am not satisfied that the BIA has considered, let alone explained, its decision in the detailed fashion that is required by *Chevron*, a fashion that is an essential element of our obligation to defer to what the *agency* decides is "sound." Accordingly, I would remand the case to the BIA for a fuller explanation and therefore respectfully dissent from the majority's denial of Michel's petition.[3]

## All Citations

206 F.3d 253

## Footnotes

1    Judge Cabranes concurs in this opinion with respect to Michel's first two claims, but writes separately with respect to the "single scheme of criminal misconduct" issue.

2    Father Bob, although apparently not a lawyer, was authorized to represent aliens at deportation hearings as an 'accredited representative.' *See* 8 U.S.C. § 1229a(b)(4)(A); 8 C.F.R. § 292.2(d) (1999).

3    The INS also contends that, even if the BIA did not properly decide the case, we should nonetheless affirm because Michel has been convicted of an "aggravated felony" and is therefore deportable based on that offense. Because this Court affirms the BIA's determination on other grounds, we need not address the merits of this argument in this opinion.

4    In his concurrence, Judge Cabranes argues that, by declining to decide the issue today, we "effectively require the INS to continue its general policy of applying this Court's pre-*Chevron* [i.e., the *Nason* ] definition of the phrase 'single scheme of criminal misconduct' within this Circuit, while applying the agency's own interpretation" in other circuits. Although the BIA stated in *In re Adetiba*, 20 I. & N. Dec. at 511, that it would continue to apply the *Nason* definition within this Circuit, we note that, in this case, the BIA elected to apply its own definition of "single scheme of criminal misconduct" rather than the pre-*Chevron* definition articulated

in *Nason. See* R. at 4. We therefore reject the proposition that the BIA will necessarily continue to apply the *Nason* definition of "single scheme of criminal misconduct" until this Court ultimately decides the issue.

Where, as here, no harm results from our failing to answer a question, we believe that the "doctrine of judicial restraint provides a fully adequate justification for deciding [the] case on the best and narrowest ground available." *Air Courier Conference of Am. v. American Postal Workers Union,* 498 U.S. 517, 531, 111 S.Ct. 913, 112 L.Ed.2d 1125 (1991) (Stevens, J. concurring in the judgment). That doctrine is particularly appropriate in the situation before us, for here, resolving the issue might call into question a prior decision of this court, *Nason.* And that is something that we cannot do without the approval of all of the active judges of the court. Moreover, the circumstances of this case would make this request all the more unusual, because we would be asking these judges to take the time to review and to express their approval of our abandonment of *Nason* where that approval, even if given, would be unnecessary to decide this case, where it would, in other words, constitute no more than dicta.

1    *See generally* *Franklin v. INS,* 72 F.3d 571, 577–78 (8th Cir.1995) (Bennett, J, dissenting) (noting an apparent circuit split over the applicable standard of review for BIA findings of moral turpitude). *Compare* *Rodriguez–Herrera v. INS,* 52 F.3d 238, 240 n. 4 (9th Cir.1995) (stating that whether a state criminal statute involves moral turpitude is a question of law to be reviewed *de novo* ), *with* *Cabral v. INS,* 15 F.3d 193, 194–97 (1st Cir.1994) (applying the *Chevron* approach to determine whether a state crime involved "moral turpitude" within the meaning of the INA).

2    The Sentencing Guidelines, for example, designate "crimes of violence" according to the elements of the offense and require judges to impose sentences without looking at the underlying facts of the conviction. *See* *United States v. Telesco,* 962 F.2d 165, 166–67 (2d Cir.1992) (holding that, when a crime is designated as a "crime of violence" by the Sentencing Commission, this Circuit shall employ a categorical approach and the sentencing court may not inquire into the facts underlying that offense).

3    Judge Calabresi's dissent would appear to require the BIA to analyze whether hypothetical cases—having nothing to do with the particular case at hand—would violate section 165.40. Judge Calabresi would ask the BIA to discuss, for example, whether "picking up a penny when one is a penny short of the amount needed for admission to a homeless shelter violate[s] § 165.40." *Post* at 270 n.1. While Judge Calabresi is correct that the BIA cannot justify a categorical approach if the relevant statute encompasses both acts that do and do not involve moral turpitude, no rule of law, much less *Chevron,* requires the BIA to engage in such didactic exercises. In this case, it is enough that the BIA noted that knowledge is a requisite element of section 165.40.

1    In *Gonzalez–Sandoval v. INS,* 910 F.2d 614, 616 (9th Cir.1990), a panel of the Ninth Circuit adhered to that Court's pre–*Chevron* definition of the phrase "single scheme of criminal misconduct"—a definition that is similar to the definition adopted by this Court in *Nason.* Nevertheless, there is no indication from the *Gonzalez–Sandoval* opinion that the panel in that case gave any consideration whatsoever to *Chevron. See* *Iredia,* 981 F.2d at 849 ("The only case decided after *Chevron* [that rejects the BIA's definition], *Gonzalez–Sandoval,* does not address the issue." (citation omitted)). Moreover, the BIA has considered the Ninth Circuit's definition, and has rejected in explicitly. In *Adetiba,* the BIA argued that the Ninth Circuit's definition "would result in extreme absurdities" because it would "insulate from deportability individuals who formulate a plan at one time for criminal behavior involving multiple separate crimes, while making deportable those who commit only two such crimes without a plan." 20 I. & N. Dec. at 511.

For these reasons, the Ninth Circuit's decision in *Gonzalez–Sandoval* is both an outlier and, in my view, incorrect. Therefore, rather than suggesting, as I believe my colleagues do, that we might follow the Ninth Circuit's dubious lead, I would follow the lead of every Court of Appeals to consider the issue in light of *Chevron,* and I would adopt the BIA's definition.

2    Where, as in this case, on e of our previous decisions has plainly been abrogated by the Supreme Court, I do not believe we are required to seek "approval of all of the active judges of the court" to state as much. *Ante* at 260 n.4. Nevertheless, even assuming tht a "mini en banc" would be required to overrule *Nason*—as Judge

Calabresi and Judge Sotomayor suggest, *see id.*—my colleagues greatly exaggerate the significance of the procedure in this instance. For one thing, deferring the *Chevron* question to another day, as the majority has chosen to do, will not obviate the presumed need for a mini en banc—it will merely postpone the inevitable. In addition, I am confident that the other judges of this court would, without taking much time at all to review the matter, reach the conclusion that *Nason* does not survive *Chevron.*

1    In this respect, I note that although Michel's alleged behavior—possession of stolen bus transfers—may seem to constitute the least necessary to violate § 165.40, I would also ask the BIA, as part of a full explanation for its decision in this case, to consider whether in fact yet more minor wrongdoings would also contravene the statute. For example, would picking up a penny when one is a penny short of the amount needed for admission to a homeless shelter violate § 165.40, of the individual picking up the coin knows that the person who dropped it is aware of the loss and is looking for the penny? In my view, this is essential if the BIA employs a categorical approach because then the BIA must explain why this specific statute fits into the applicable category, given the minimum conduct needed to violate it. *See Hamdan,* 98 F.3d at 189 ("The general rule is that, absent specific evidence to the contrary in the record of conviction, the statute must be read at the minimum criminal conduct necessary to sustain a conviction under the statute." (citing *Guarino,* 107 F.2d at 400)). Requiring the BIA to do this is not indulging in abstract hypotheticals as the majority suggests. It is simply asking the BIA to consider what the minimum conduct needed to violate a statute is, and to decide whether *that* conduct is morally turpitudinous That is precisely what *Hamdan* and *Guarino* mandate and correctly so, for only once that is done can the BIA say categorically that *all* violations of the statute entail moral turpitude.

2    There are in fact at least three decisions involving specificity and moral turpitude that could be made. The first is whether the decision maker should consider the individual circumstances of the perpetrator or simply the crime committed. In *Pichardo–Sufren*, the BIA opted for the latter and justified that choice. The second involves whether the decision maker should consider the range of crimes the violated statute encompasses or focus instead on the actual statutory violation. On this point, courts have urged decision makers to look to the minimum conduct that is necessary to support a conviction under a statute when deciding whether the statute entails turpitude. *See, e.g., Guarino,* 107 F.2d at 400; *cf. Hamdan,* 98 F.3d at 187–89 (reversing the BIA's order of deportation because the petitioner had been convicted under a statute that included conduct that did not constitute moral turpitude and it was unclear whether the petitioner had been convicted under a section of the statute that involved moral turpitude or one that did not). Finally, the decision maker could employ a broader categorical approach. It could say, as the BIA did in this case, that any statute that fits into a wide range of laws—i.e., all those that prohibit possession of stolen property with the knowledge that it is stolen—connotes moral turpitude. And it could justify this position on grounds of administrative convenience. In fact, any of these three possibilities *could* be justified if it was consistent with the BIA's other pronouncements regarding moral turpitude and was adequately explained. But the choice made in this case is both hard to accept in the light of the *Hamdan* definition and made without any justification.

3    Because I dissent from the disposition of case, I cannot ignore the INS's argument that the BIA can be affirmed on other grounds, i.e., the other crime allegedly committed by Michel. The short answer is that, as the BIA pointed out in its opinion, the IJ made no findings with respect to any such crime. *See* R. at 3. Since the alleged crime is neither part of the deportation notice sent to Michel nor of the record before us, we cannot treat it as relevant to the issue before us.

---

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

879 F.3d 691
United States Court of Appeals, Sixth Circuit.

David E. MILLER, Petitioner-Appellant,

v.

Tony MAYS, Warden, Respondent-Appellee.

No. 14-6445
|
Argued: November 30, 2016
|
Decided and Filed: January 9, 2018
|
Rehearing En Banc Denied March 14, 2018 [*]

**Synopsis**

**Background:** State prisoner petitioned for federal habeas relief after his state-court conviction for first-degree murder and death

sentence were affirmed on direct appeal,  674 S.W.2d 279 and 771 S.W.2d 401, and denial of post-conviction relief was affirmed, 54 S.W.3d 743. The District Court denied the petition, and denied prisoner's motion to alter or amend the judgment, 655 F.Supp.2d 838. Prisoner appealed. The Court of Appeals, 694 F.3d 691, affirmed. Prisoner moved for relief from judgment under catch-all provision on basis that procedural default of his ineffective assistance of counsel claim could be excused. The United States District Court for the Eastern District of Tennessee, No. 3:01-cv-00487, Robert Leon Jordan, J., denied the motion. Prisoner was granted certificate of appealability and appealed.

**Holdings:** The Court of Appeals, Julia Smith Gibbons, Circuit Judge, held that:

[1] prisoner had not been diligent in pursuing relief;

[2] competing policies of finality of judgments did not weigh in favor of granting relief;

[3] prejudice incurred by alleged failure of trial counsel to reasonably investigate defendant's background and present mitigating evidence to jury at resentencing was uncertain; and

[4] district court did not abuse its discretion in denying relief from judgment to prisoner under catch-all provision.

Affirmed.

Helene N. White, Circuit Judge, filed dissenting opinion.

West Headnotes (20)

[1]    **Habeas Corpus**  👉  Relief from judgment;  revocation or modification

The catch-all provision for obtaining relief from a judgment applies only in exceptional or extraordinary circumstances where principles of equity mandate relief, but such circumstances rarely occur in the habeas context. 28 U.S.C.A. § 2254; Fed. R. Civ. P. 60(b)(6).

15 Cases that cite this headnote

**[2]     Federal Civil Procedure**     Catch-all provisions

Motions for obtaining relief from a judgment under the catch-all provision necessitate a case-by-case inquiry in which the district court intensively balances numerous factors, including the competing policies of the finality of judgments and the incessant command of the court's conscience that justice be done in light of all the facts; these factors can include the risk of injustice to the parties as well as the risk of undermining the public's confidence in the judicial process. Fed. R. Civ. P. 60(b)(6).

8 Cases that cite this headnote

**[3]     Federal Courts**     Altering, amending, modifying, or vacating judgment or order;  proceedings after judgment

The denial of a motion for obtaining relief from a judgment under the catch-all provision is reviewed for an abuse of discretion; this discretion is especially broad due to the underlying equitable principles involved. Fed. R. Civ. P. 60(b)(6).

4 Cases that cite this headnote

**[4]     Criminal Law**     Right to counsel

As a general rule, there is no constitutional right to an attorney in state post-conviction proceedings. U.S. Const. Amend. 6.

**[5]     Habeas Corpus**     Ineffectiveness or want of counsel

A petitioner generally cannot claim ineffective assistance of post-conviction counsel during federal habeas review to excuse the procedural default of claims not raised in state court. U.S. Const. Amend. 6.

2 Cases that cite this headnote

**[6]     Habeas Corpus**     Ineffectiveness or want of counsel

A federal habeas petitioner asserting an otherwise-defaulted ineffective assistance of trial counsel (IATC) claim, as an exception to the general rule that there is no constitutional right to an attorney in state post-conviction proceedings, must present a substantial IATC claim, show that state law required him to bring the IATC claim during an initial-review post-conviction proceeding, and show that he received either no assistance or ineffective assistance during that initial state post-conviction proceeding. U.S. Const. Amend. 6; 28 U.S.C.A. § 2254.

1 Cases that cite this headnote

**[7]     Federal Civil Procedure**     Catch-all provisions

An adjustment of an equitable ruling as to when federal statutory relief is available usually is not, by itself, an extraordinary circumstance meriting relief from a judgment under the catch-all provision. Fed. R. Civ. P. 60(b)(6).

10 Cases that cite this headnote

**[8]    Habeas Corpus    Relief from judgment;  revocation or modification**

Death-sentenced state prisoner had not been diligent in pursuing relief under Supreme Court case allowing prisoner to show cause to excuse otherwise-defaulted ineffective assistance of trial counsel (IATC) claim, as narrow exception to general rule that there was no constitutional right to attorney in state post-conviction proceedings, weighing against granting relief from judgment under catch-all provision, where 18 months had elapsed between motion and time Supreme Court case was decided and prisoner did not raise that case in his prior certiorari petition; although Court of Appeals case precluded him from seeking relief, he could have, but did not, challenge procedural default of IATC claim in 12 months between time Supreme Court case was decided and point at which Court of Appeals case was decided or four months after Court of Appeals case was amended. U.S. Const. Amend. 6; 28 U.S.C.A. § 2254; Fed. R. Civ. P. 60(b)(6).

**[9]    Federal Civil Procedure    Time for instituting proceedings**

The determination of whether a motion for obtaining relief from a judgment under the catch-all provision has been made within a reasonable time is fact-specific; reasonableness is evaluated by considering a movant's diligence in seeking relief. Fed. R. Civ. P. 60(b)(6).

7 Cases that cite this headnote

**[10]    Habeas Corpus    Relief from judgment;  revocation or modification**

When considering on a motion for obtaining relief from a judgment under the catch-all provision whether a habeas petitioner has shown cause to excuse an otherwise-defaulted ineffective assistance of trial counsel (IATC) claim, as required to qualify for the exception to the general rule that there is no constitutional right to attorney in state post-conviction proceedings, a court examines the time between the date of the decision constituting a change in the law and the date that the motion was filed; a court also looks to whether the petitioner raised the issue in his petition for rehearing or for Supreme Court review. U.S. Const. Amend. 6; 28 U.S.C.A. § 2254; Fed. R. Civ. P. 60(b)(6).

3 Cases that cite this headnote

**[11]    Habeas Corpus    Relief from judgment;  revocation or modification**

Even in cases involving the death penalty, a court on a motion for obtaining relief from a judgment under the catch-all provision must afford profound respect to the finality interests stemming from its prior decision denying habeas relief, but still must balance those interests against conventional notions of finality that did not have any place where life or liberty is at stake and infringement of constitutional rights is alleged, and that finality interests must be considered in concert with the more irreversible finality of the petitioner's execution. 28 U.S.C.A. § 2254; Fed. R. Civ. P. 60(b)(6).

1 Cases that cite this headnote

**[12]    Habeas Corpus    Relief from judgment;  revocation or modification**

Competing policies of finality of judgments did not weigh in favor of granting relief to death-sentenced Tennessee prisoner from habeas judgment under catch-all provision, as required to excuse otherwise-defaulted ineffective assistance of trial counsel (IATC) claim, as narrow exception to general rule that there was no constitutional right to attorney in state post-conviction proceedings, since Tennessee had interest in finality of its judgments and state and federal courts provided prisoner with considerable opportunities for review; although prisoner did not have opportunity to litigate his IATC claim on the merits in course of his federal habeas proceedings, that alone did not outweigh finality interests at stake when he had opportunity to challenge procedural default of his IATC claim before his habeas judgment became final but failed to do so, and his interest in avoiding death penalty was not, by itself, enough to overcome finality interests at stake. U.S. Const. Amend. 6; 28 U.S.C.A. § 2254; Fed. R. Civ. P. 60(b) (6).

3 Cases that cite this headnote

---

**[13]     Criminal Law ⚷ Deficient representation and prejudice in general**

To demonstrate that his counsel was constitutionally ineffective, a defendant must show that (1) his counsel's performance was deficient, that is, objectively unreasonable under prevailing professional norms, and (2) it prejudiced his defense. U.S. Const. Amend. 6.

---

**[14]     Criminal Law ⚷ Presumptions and burden of proof in general**

In considering the deficiency prong of an ineffective assistance of counsel claim, a court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and attempts to eliminate the distorting effects of hindsight. U.S. Const. Amend. 6.

---

**[15]     Criminal Law ⚷ Adequacy of investigation of sentencing issues**
**Criminal Law ⚷ Presentation of evidence regarding sentencing**

The failure to reasonably investigate the defendant's background and present mitigating evidence to the jury at sentencing can constitute ineffective assistance of counsel; in making this determination, a court focuses on whether the investigation supporting counsel's decision to not introduce mitigating evidence was itself reasonable which turns on both the quantum of evidence known to counsel as well as whether that evidence should have led a reasonable attorney to investigate further. U.S. Const. Amend. 6.

1 Cases that cite this headnote

---

**[16]     Criminal Law ⚷ Adequacy of investigation of sentencing issues**
**Criminal Law ⚷ Presentation of evidence regarding sentencing**

On an ineffective assistance of counsel claim based on failure to reasonably investigate the defendant's background and present mitigating evidence to the jury at sentencing, choices made after less than a complete investigation are reasonable precisely to the extent that a reasonable professional judgment supported the limitations on the investigation; such choices include whether to present expert testimony at the penalty phase. U.S. Const. Amend. 6.

1 Cases that cite this headnote

---

**[17]     Habeas Corpus ⚷ Relief from judgment; revocation or modification**

Prejudice incurred by alleged failure of trial counsel to reasonably investigate defendant's background and present mitigating evidence to jury at sentencing was uncertain, weighing against granting relief to death-sentenced Tennessee prisoner from habeas judgment under catch-all provision, as required to excuse otherwise-defaulted ineffective assistance of trial counsel (IATC) claim, as narrow exception to general rule that there was no constitutional right to attorney in state post-conviction proceedings, since post-conviction mitigation evidence presented through expert testimony was not substantially different in strength and subject matter from what counsel presented at resentencing exclusively through lay witnesses. U.S. Const. Amend. 6; 28 U.S.C.A. § 2254; Fed. R. Civ. P. 60(b)(6).

1 Cases that cite this headnote

[18]  **Criminal Law**    Death Penalty

In the context of an ineffective assistance of trial counsel claim in a death-penalty proceeding, prejudice is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. U.S. Const. Amend. 6.

[19]  **Criminal Law**    Adequacy of investigation of mitigating circumstances

**Criminal Law**    Presentation of evidence in sentencing phase

On an ineffective assistance of counsel claim in a death-penalty proceeding, prejudice from the deficient investigation or presentation of mitigating evidence requires new evidence that differs in a substantial way, in strength and subject matter, from the evidence actually presented at sentencing; a court then reweighs the evidence in aggravation against the totality of available mitigating evidence, both that adduced at trial and that adduced in post-conviction proceedings. U.S. Const. Amend. 6.

[20]  **Habeas Corpus**    Relief from judgment;  revocation or modification

District court did not abuse its discretion in denying relief from habeas judgment to death-sentenced Tennessee prisoner under catch-all provision, as required to excuse otherwise-defaulted ineffective assistance of trial counsel (IATC) claim, as narrow exception to general rule that there was no constitutional right to attorney in state post-conviction proceedings, since claim was not unquestionably meritorious because prisoner's ability to establish prejudice was uncertain, and ineffective assistance was not so clear that it overcame other relevant equitable factors weighing against relief, especially prisoner's lack of diligence in raising his claim. U.S. Const. Amend. 6; 28 U.S.C.A. § 2254; Fed. R. Civ. P. 60(b)(6).

1 Cases that cite this headnote

**\*695**  Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville. No. 3:01-cv-00487— Robert Leon Jordan, District Judge.

## Attorneys and Law Firms

ARGUED: Stephen M. Kissinger, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., Knoxville, Tennessee, for Appellant. Jennifer Lynn Smith, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. ON BRIEF: Stephen M. Kissinger, FEDERAL DEFENDER SERVICES OF EASTERN

TENNESSEE, INC., Knoxville, Tennessee, for Appellant. Jennifer Lynn Smith, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

Before: SILER, GIBBONS, and WHITE, Circuit Judges.

GIBBONS, J., delivered the opinion of the court in which SILER, J., joined. WHITE, J. (pp. 706–10), delivered a separate dissenting opinion.

## OPINION

JULIA SMITH GIBBONS, Circuit Judge.

David Miller was convicted and sentenced to death for the 1981 murder of Lee Standifer. His sentence was upheld by the Tennessee Supreme Court and we affirmed the dismissal of his § 2254 *habeas* petition. Seeking to revisit his ineffective-assistance-of-trial-counsel (IATC) claim in light of *Martinez v. Ryan*, 566 U.S. 1, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), and *Trevino v. Thaler*, 569 U.S. 413, 133 S.Ct. 1911, 185 L.Ed.2d 1044 (2013), Miller now appeals the district court's denial of his motion for relief from judgment under Federal Rule of Civil Procedure 60(b)(6). For the reasons that follow, we affirm the decision of the district court.

### I.

#### A.

We previously reviewed the facts underlying Miller's conviction in *Miller v. Colson*, 694 F.3d 691 (6th Cir. 2012). As relevant **\*696** here, Lee Standifer was murdered in Knoxville, Tennessee, on May 20, 1981. *Id.* at 693. She was stabbed with a large knife and a fireplace poker, bound with a rope, and dragged into a wooded area. *Id.* The evidence at trial established that Miller and Standifer had been on a date that night. *Id.* At some point, they returned to the home of Benjamin Thomas, where Miller was staying. *Id.* When Thomas returned home, he found Miller cleaning the basement floor, found streaks of blood inside the house, and later found Standifer's body in his backyard along with a blood-stained t-shirt belonging to Miller. *Id.* Miller was arrested and, after waiving his *Miranda* rights, admitted to hitting Standifer with his fist and dragging her outside. *Id.*

On June 11, 1981, Miller was examined by Dr. George Gee, a psychiatrist at the Helen Ross McNabb Mental Health Center. *Id.* at 694 n.1. In a written evaluation, Gee described Miller as "sociopathic but certainly mentally competent to stand trial." *Id.*

Miller was subsequently indicted for Standifer's murder. *Id.* at 693. The trial court granted Miller's motion for a second psychiatric examination in order to determine his competency to stand trial. *Id.* The court instructed Gee to determine both Miller's mental state at the time of Standifer's death and whether he was currently competent to stand trial. *Id.* at 693–94. After again examining Miller, Gee issued a letter stating that Miller's affect and thought processes were normal and that he did not believe Miller was insane at the time of the offense. *Id.* at 694. Prior to trial, Miller requested that the trial court appoint a psychiatrist to assist in the preparation of his defense. *Id.* The court denied the motion, finding Miller was not entitled to a second expert. *Id.* Miller was convicted of first-degree murder and sentenced to death. *Id.*

Miller appealed his conviction and sentence, arguing, in part, that the trial court erred by refusing to provide him with an independent psychiatrist. *Id.* The Tennessee Supreme Court affirmed Miller's conviction but remanded the case for resentencing because the State had impermissibly introduced evidence of prior arrests during the sentencing phase. *Id.* On remand, Miller renewed his motion for a new trial, arguing that the trial court's refusal to grant him the assistance of a psychiatric expert during

the guilt phase violated his due-process rights in light of the then-recent decision in *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). *Miller*, 694 F.3d at 694–95. The trial court denied the motion without explanation and a second jury sentenced Miller to death. *Id.* The Tennessee Supreme Court affirmed. *Id.* Miller's request for state post-conviction relief was also denied. *Miller v. State*, 54 S.W.3d 743 (Tenn. 2001).

B.

In May 2002, Miller filed a petition for a writ of *habeas corpus* under 28 U.S.C. § 2254, raising twenty-five grounds for relief. Miller's thirteenth claim alleged that he had received ineffective assistance of counsel at resentencing because his attorneys failed to investigate mitigating evidence and failed to retain competent mental-health experts to diagnose Miller and explain how his mental disorders led to Standifer's death. The district court found this claim procedurally defaulted because Miller had failed to raise it during state post-conviction proceedings and had not shown cause and prejudice to excuse the default. On appeal, we did not consider this IATC claim because there was not a certificate of appealability (COA) on the issue.   **\*697** *See Miller*, 694 F.3d at 701. We considered only whether denying state funds for an independent mental-health expert during the guilt phase of Miller's trial violated *Ake v. Oklahoma* and whether the jury instructions at trial were proper. *Id.* at 696–701. Finding no error, we affirmed. *Id* at 701. [1]

C.

In September 2013, Miller filed a motion for relief from judgment under Rule 60(b)(6). He argued that the procedural default of his IATC claim could now be excused under *Martinez*, 566 U.S. at 1, 132 S.Ct. 1309, *Trevino*, 569 U.S. at 413, 133 S.Ct. 1911, and *Hodges v. Colson*, 727 F.3d 517 (6th Cir. 2013), because he had presented a substantial claim of ineffective assistance of trial counsel, because post-conviction counsel was ineffective for failing to raise this claim, and because the balance of equities favored a federal merits-based review of his claim.

The district court denied Miller's motion, finding that he had not shown sufficient extraordinary circumstances to merit relief. The district court first recognized that our decision in *McGuire v. Warden, Chillicothe Correctional Institution*, 738 F.3d 741, 750 (6th Cir. 2013), established that *Martinez* and *Trevino*, alone, do not constitute extraordinary circumstances for the purposes of Rule 60(b)(6). The court noted that *Martinez* and *Trevino* did not change the constitutional rights of criminal defendants but rather impacted access to federal statutory relief.

The district court then considered whether other equitable factors, on balance, favored Miller's request for Rule 60(b)(6) relief. First, the district court recognized that although Miller had presented new evidence in the affidavit submitted by John Halstead, Miller's post-conviction counsel, the affidavit of Mark Olive, Miller's counsel at resentencing, was substantially similar to the testimony Olive had previously presented in connection with Miller's § 2254 petition. Second, the court held that policy considerations, including the finality of judgments, did not weigh in Miller's favor. Third, the district court concluded that Miller had not been diligent in pursuing relief because he had not raised his *Martinez* claim for eighteen months—from the time *Martinez* was decided in March 2012 until Miller filed his Rule 60(b)(6) motion in September 2013. Considering these factors together, the district court concluded that Rule 60(b)(6) relief was inappropriate.

Alternatively, the court held that even if Rule 60(b)(6) relief was appropriate, *Martinez* and *Trevino* still did not excuse the default of Miller's IATC claim because he had not put forward a "substantial claim" of ineffective assistance. The court noted that Olive, as trial counsel, was objectively reasonable in investigating and presenting Miller's background despite the fact that he did not renew his request for funds to hire a psychological expert. It also held that Olive could not be blamed for failing to persuade a series of state courts to provide Miller an expert. The court did not reach the question of prejudice.

Miller was granted a COA as to whether, in light of *Martinez* and *Trevino*, he had demonstrated extraordinary circumstances **\*698** meriting Rule 60(b)(6) relief. Miller now appeals.

## II.

**[1]** Federal Rule of Civil Procedure 60(b)(6) is a "catchall provision" providing relief from a final judgment for any reason not otherwise captured in Rule 60(b). *West v. Carpenter*, 790 F.3d 693, 696–97 (6th Cir. 2015) (citing *McGuire*, 738 F.3d at 750). Rule 60(b)(6) applies only in "exceptional or extraordinary circumstances where principles of equity mandate relief," *id.*, but such circumstances "rarely occur" in the *habeas* context. *Sheppard v. Robinson*, 807 F.3d 815, 820 (6th Cir. 2015) (quoting *Gonzalez v. Crosby*, 545 U.S. 524, 535, 125 S.Ct. 2641, 162 L.Ed.2d 480 (2005)).

**[2]** Rule 60(b)(6) motions necessitate "a case-by-case inquiry" in which the district court "intensively balance[s] numerous factors, including the competing policies of the finality of judgments and the incessant command of the court's conscience that justice be done in light of all the facts." *West*, 790 F.3d at 697 (quoting *McGuire*, 738 F.3d at 750). These factors can include "the risk of injustice to the parties" as well as "the risk of undermining the public's confidence in the judicial process." *Buck v. Davis*, ––– U.S. ––––, 137 S.Ct. 759, 778, 197 L.Ed.2d 1 (2017) (citation omitted).

**[3]** We review the denial of a Rule 60(b) motion for an abuse of discretion. *West*, 790 F.3d at 697. In the Rule 60(b)(6) context, this discretion is "especially broad due to the underlying equitable principles involved." *Id.* (citing *Tyler v. Anderson*, 749 F.3d 499, 509 (6th Cir. 2014)).

## III.

**[4]** **[5]** **[6]** As a general rule, there is no constitutional right to an attorney in state post-conviction proceedings. *Coleman v. Thompson*, 501 U.S. 722, 752, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Consequently, a petitioner generally cannot claim ineffective assistance of post-conviction counsel during federal *habeas* review to excuse the procedural default of claims not raised in state court. *Id.* The Supreme Court, however, carved out a "narrow exception" to this rule, allowing a prisoner to show cause to excuse an otherwise-defaulted IATC claim. *Martinez*, 566 U.S. at 9, 132 S.Ct. 1309. To qualify for this exception, a petitioner must present a substantial IATC claim, show that state law required him to bring the IATC claim during an initial-review post-conviction proceeding, and show that he received either no assistance or ineffective assistance during that initial state post-conviction proceeding. *Id.* at 14, 132 S.Ct. 1309. *Trevino* expanded this exception to situations where there was no meaningful opportunity to present the IATC claim on direct appeal. 569 U.S. at 413, 133 S.Ct. 1911.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**[7]**  Although we initially suggested that *Martinez* did not apply in Tennessee, *see* *Hodges v. Colson*, 711 F.3d 589, 612 (6th Cir. 2013), *amended by* 727 F.3d 517 (6th Cir. 2013), we have since recognized that *Martinez* and *Trevino* apply in the state, *see* *Sutton v. Carpenter*, 745 F.3d 787, 795 (6th Cir. 2014). The applicability of this exception, however, does not necessarily result in the availability of Rule 60(b)(6) relief. We have consistently held that *Martinez* and *Trevino*, as intervening decisions, do not alone "sufficiently change[ ] the balance of the factors for consideration under Rule 60(b)(6) to warrant relief." *Henness v. Bagley*, 766 F.3d 550, 557 (6th Cir. 2014); *see also Abdur'Rahman v. Carpenter*, 805 F.3d 710, 714 (6th Cir. 2015); *Wright v. Warden, Riverbend Maximum Sec. Inst.*, 793 F.3d 670, 672 (6th Cir. 2015). This is because we **\*699** do not interpret *Martinez* and *Trevino* as "a change in the constitutional rights of criminal defendants, but rather [as] an adjustment of an equitable ruling ... as to when federal statutory relief is available." *McGuire*, 738 F.3d at 750–51. Such a change in decisional law "is usually not, by itself, an extraordinary circumstance meriting Rule 60(b)(6) relief." *Id.* at 750 (quoting *Stokes v. Williams*, 475 F.3d 732, 735 (6th Cir. 2007) (internal quotation marks and citation omitted)). The district court thus correctly recognized that *Martinez* and *Trevino* are not enough and proceeded to consider Miller's other arguments in equity. We will do the same.

### IV.

**[8]**  Miller maintains that, in addition to *Martinez* and *Trevino*, he has shown extraordinary circumstances warranting Rule 60(b)(6) relief because (1) he was diligent in pursuing Rule 60(b)(6) relief; (2) he has a substantial life interest in avoiding the death penalty; (3) the finality interest is diminished here because his IATC claim has not yet been litigated on the merits in either state or federal court; and (4) he has presented a substantial IATC claim. The district court rejected these arguments, finding that Miller was not diligent, giving considerable weight to the finality of judgments, and holding that his IATC claim was not substantial.[2] As we discuss below, the district court did not abuse its discretion in weighing these equitable interests and concluding that Miller's equitable arguments failed to show extraordinary circumstances warranting Rule 60(b)(6) relief.

### A.

**[9]**  **[10]**  A Rule 60(b)(6) motion must be made "within a reasonable time." Fed. R. Civ. P. 60(c)(1). This is a fact-specific determination. *Tyler*, 749 F.3d at 510. We evaluate reasonableness by considering a petitioner's diligence in seeking relief. *See Sheppard*, 807 F.3d at 821; *Wright*, 793 F.3d at 672. In situations similar to Miller's, we examine the time between the date of the decision constituting a change in the law and the date that the Rule 60(b)(6) motion was filed. *See Gonzalez*, 545 U.S. at 536–37, 125 S.Ct. 2641 (finding an eight-month delay was not diligent); *Wright*, 793 F.3d at 672 (noting that a Rule 60(b) motion was diligently filed when done within twelve months of *Martinez*). We also look to whether the petitioner raised the issue in his petition for rehearing or for Supreme Court review. *See Sheppard*, 807 F.3d at 821 (finding a petitioner was not diligent when *Martinez* could have been, but was not, raised in a *certiorari* petition); *see also Gonzalez*, 545 U.S. at 537, 125 S.Ct. 2641 (finding a petitioner was not diligent when he did not raise the issue in either his rehearing or *certiorari* petition).



The Supreme Court decided 🟨 *Martinez* on March 20, 2012. 566 U.S. at 1, 132 S.Ct. 1309. At that point, we had heard argument on Miller's 🟨 § 2254 petition but had yet to issue a decision. *See Miller*, 694 F.3d at 691. Miller did not bring 🟨 *Martinez* to our attention prior to our decision on **\*700** September 13, 2012, nor did he raise the issue in his petition for rehearing. *Id.* And when Miller sought Supreme Court review of his 🟨 § 2254 petition on March 21, 2013, he made no argument with respect to 🟨 *Martinez*. On March 26, 2013, we decided 🟨 *Hodges v. Colson*, which suggested that 🟥 *Martinez* did not apply in Tennessee. 711 F.3d at 612. On May 28, 2013, the Supreme Court decided 🟨 *Trevino*, which expanded the 🟨 *Martinez* exception. 🟨 *Trevino*, 569 U.S. at 413, 133 S.Ct. 1911. That same day, the Court denied Miller's petition for a writ of *certiorari*, making the dismissal of his 🟨 § 2254 petition final. On August 14, 2013, we amended 🟥 *Hodges* such that it no longer decided the question of 🟨 *Martinez*'s applicability to Tennessee prisoners.[3] *Compare* 🟨 *Hodges*, 711 F.3d at 612, *with* 🟨 *Hodges*, 727 F.3d at 540. Miller filed his 🟨 Rule 60(b)(6) motion on September 20, 2013.

The district court held that Miller was not diligent because eighteen months had elapsed between the time 🟨 *Martinez* was decided and his 🟨 Rule 60(b)(6) motion. The district court looked to *Smith v. Colson*, 566 U.S. 901, 132 S.Ct. 1790, 182 L.Ed.2d 611 (2012) (Mem.), where a similarly situated prisoner had argued for 🟨 *Martinez* relief in his *certiorari* petition, to suggest that Miller could have done the same. Additionally, the district court looked to the Supreme Court's decision in 🟨 *Ryan v. Schad*, 570 U.S. 521, n.2, 133 S.Ct. 2548, 186 L.Ed.2d 644 (2013) (per curiam), which it interpreted to disapprove of a four-month delay in seeking to vacate a judgment under 🟨 *Martinez*.

On appeal, Miller relies heavily on the argument that he was precluded from seeking relief under 🟨 *Martinez* and 🟨 *Trevino* until our original decision in 🟨 *Hodges* was amended in August 2014, and thus, he was diligent in pursuing relief because he filed his 🟨 Rule 60(b)(6) motion within six weeks of 🟥 *Hodges* being amended. We find this argument unpersuasive. First, it ignores the fact that Miller could have, but did not, challenge the procedural default of his IATC claim in the twelve months between the time 🟨 *Martinez* was decided (March 2012) and the point at which we first decided 🟨 *Hodges* (March 2013). Second, nothing prevented Miller from immediately seeking 🟨 Rule 60(b)(6) relief after 🟨 *Trevino* was decided—a case that necessarily called into question our initial decision in 🟨 *Hodges*. Even if we accepted the proposition that 🟥 *Hodges* initially provided a valid bar, we would not extend that bar past the point at which 🟨 *Trevino* was decided in May 2013.

We cannot excuse Miller's failure to challenge the procedural default of his IATC claim for more than sixteen months—the twelve months between 🟨 *Martinez* and 🟥 *Hodges* and the four months between 🟨 *Trevino* and his 🟨 Rule 60(b)(6) motion. Miller has gone beyond the eight-month delay that constituted a lack of diligence in 🟨 *Gonzalez*, 545 U.S. at 537, 125 S.Ct. 2641, and the twelve-month delay that we accepted as diligent in 🟨 *Wright*, 793 F.3d at 672. Furthermore, Miller failed to raise 🟨 *Martinez* in his *certiorari* petition, a fact we previously found dispositive on the question of diligence. *Sheppard*, 807 F.3d at 821. On these facts, we cannot say that Miller was diligent in pursuing relief under 🟨 *Martinez*.

B.

**[11]**  There is no question that Tennessee has an interest in the finality of its judgments. *Wright*, 793 F.3d at 672. And even in cases involving the death penalty, we must afford "profound respect" to the finality interests stemming from our prior **\*701** decision denying *habeas* relief. *Sheppard*, 807 F.3d at 821 (citing *Calderon v. Thompson*, 523 U.S. 538, 556, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998)). However, we still must balance these interests against the Supreme Court's admonition that "[c]onventional notions of finality ... have no place where life or liberty is at stake and infringement of constitutional rights is alleged," *Sanders v. United States*, 373 U.S. 1, 8, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); *see also Wright*, 793 F.3d at 673; *Thompson v. Bell*, 580 F.3d 423, 444 (6th Cir. 2009), and our recognition that finality interests must be considered in concert with the "more irreversible finality of [Miller's] execution." *Wright*, 793 F.3d at 673 (quoting *Thompson*, 580 F.3d at 444).

**[12]**  The state and federal courts have provided Miller with considerable opportunities for review. Miller was tried, convicted, and sentenced to death in 1982. *See State v. Miller*, 674 S.W.2d 279, 280 (Tenn. 1984). His conviction and sentence were reviewed on direct appeal by the Tennessee Supreme Court, which affirmed his conviction but remanded his case for resentencing. *Id.* at 284. After he was again sentenced to death, the Tennessee Supreme Court affirmed and the United States Supreme Court denied his petition for a writ of *certiorari*. *State v. Miller*, 771 S.W.2d 401 (Tenn. 1989), *cert. denied*, 497 U.S. 1031, 110 S.Ct. 3292, 111 L.Ed.2d 801 (1990). Miller also had the opportunity to seek state post-conviction relief. *See Miller v. State*, No. 03C01-9805-CR-00188, 1999 WL 1046415 (Tenn. Crim. App. Nov. 19, 1999). The Tennessee Supreme Court denied his request for post-conviction relief and the U.S. Supreme Court again declined to grant his *certiorari* petition. *Miller v. State*, 54 S.W.3d 743 (Tenn. 2001), *cert. denied*, 536 U.S. 927, 122 S.Ct. 2598, 153 L.Ed.2d 785 (2002). Miller then raised twenty-five claims for relief on federal *habeas* review, the dismissal of which we affirmed on appeal. *See Miller*, 694 F.3d at 693. Again, in May 2013, the Supreme Court declined to review Miller's case when it denied his petition for a writ of *certiorari* on the § 2254 petition. *See Miller v. Colson*, 569 U.S. 1007, 133 S.Ct. 2739, 186 L.Ed.2d 197 (2013) (Mem.).

Miller argues that despite this procedural history, he has not had an opportunity to litigate his IATC claim on the merits in the course of his federal *habeas* proceedings. It is difficult to dispute this point given that the district court refused to consider his IATC claim on the grounds that it was procedurally defaulted. We refuse to accept, however, that this alone outweighs the finality interests at stake when Miller had the opportunity to challenge the procedural default of his IATC claim before his *habeas* judgment became final but failed to do so. Similarly, we cannot say that Miller's interest in avoiding the death penalty is, by itself, enough to overcome the finality interests at stake. *See Sheppard*, 807 F.3d at 821. Because neither of Miller's proposed interests overcomes the state and judicial interests in finality and because those finality interests are strengthened given the extended history of this case, we agree with the district court that the balance of these interests does not favor Rule 60(b)(6) relief in this case.

## C.

Although the district court did consider the merits of Miller's IATC claim in response to Miller's pending motion, it is unclear whether the court was determining only that Miller had not presented a "substantial" IATC claim as required by *Martinez*, or whether it was evaluating the merits of Miller's underlying claim as an equitable factor weighing for or against Rule 60(b)(6) relief. On appeal, Miller argues **\*702** that the strength of his IATC claim is an equitable factor that we must consider in determining whether Rule 60(b)(6) relief is appropriate. In doing so, he relies on the Supreme Court's recent decision in *Buck*, 137 S.Ct. at 775–80, our decision in *Wright*, 793 F.3d at 673, and a recent Third Circuit decision, *Cox v. Horn*, 757 F.3d 113, 124–25 (3d Cir. 2014).

### 1.

As an initial matter, we are hesitant to agree that *Buck*, *Wright*, and *Cox* necessarily require us to consider the merits of Miller's IATC claim. Although the Supreme Court, in deciding *Buck*, considered the merits of the petitioner's ineffective-assistance-of-counsel claim, it did so because one issue before the Court was the substantive question as to whether the petitioner had received ineffective assistance. *Buck*, 137 S.Ct. at 775. When the Court considered whether the petitioner had established extraordinary circumstances under Rule 60(b)(6), it looked to only three factors: (1) that Buck "may have been sentenced to death in part because of his race," which would have punished him on the basis of an immutable characteristic; (2) that the state had conceded error and had consented to resentencing in similarly situated cases; and (3) that the state had a competing finality interest. *Id.* at 777–79. Contrary to Miller's argument on appeal, the *Buck* Court did not consider the merits of the ineffective-assistance claim for the purposes of Rule 60(b)(6), nor did it assign greater weight to the change in the law because of the substantiality of that claim. Instead, it was focused on the injection of race into the sentencing determination, the state's actions in similar cases, and notions of finality.

Miller is correct that we have previously considered the merits of the underlying ineffective-assistance claim in deciding whether a district court erred in denying Rule 60(b)(6) relief. *See* *Wright*, 793 F.3d at 673. In that case, we credited the petitioner for being diligent in pursuing relief, but held that his diligence was outweighed by state and judicial interests in the finality of judgments. *Id.* at 672–73. We also noted that the weakness of the underlying ineffective-assistance claim was "important" in finding that the equities weighed against reopening the case. *Id.* at 673. Similarly, the Third Circuit has said it was "appropriate" to consider the merits of the underlying claim because "[a] court need not provide a remedy under 60(b)(6) for claims of dubious merit that only weakly establish ineffective assistance...." *Cox*, 757 F.3d at 124–25.

Because Rule 60(b)(6) determinations are fact-specific and require "a case-by-case inquiry," *West*, 790 F.3d at 697 (citation omitted), we cannot say that we must, as a matter of course, consider the merits of Miller's IATC claim simply because it was appropriate to do so in *Wright* and *Cox*. However, we will assume it is appropriate in this case and proceed to evaluate Miller's IATC claim for the purpose of considering whether it changes the balance of equities with respect to his Rule 60(b)(6) motion.

### 2.

In his *habeas* petition, Miller argued that Olive was constitutionally ineffective at resentencing for "fail[ing] to retain competent mental health professionals with the skill and knowledge to diagnose [Miller's] mental disorders and/or disturbances ... or to explain how those disturbances led to ... Standifer's death," which left the resentencing jury "uninformed ... regarding an important statutory mitigating factor" and without a "scientific explanation for [Miller's] otherwise incomprehensible acts." DE 18, Page ID 89; JA 22. In his **\*703** Rule 60(b)(6) motion, Miller restates this claim more broadly as Olive's "failure to present compelling evidence that Miller's actions ... were directly attributable to his profound mental illness at the time of the offense *and* that his mental illness was directly attributable to the almost unspeakable physical and sexual trauma he suffered as a child, and/or organic brain damage." DE 112, Page ID 486; CA6 R. 12, at 27–28. Miller now faults Olive for both failing to call an expert and failing to "fully" or "adequately investigate" Miller's background and history of trauma. DE 112, Page ID 489. At oral argument, Miller clarified that this claim is grounded in Olive's failure to request any expert assistance at resentencing.

Miller argues that this was deficient performance because there was no strategic justification or excuse for Olive not to have pursued all reasonably available mitigating evidence. And that it was prejudicial because expert testimony would have allowed him to present a "far different story" to the resentencing jury that would have explained the "bizarre aspects" of the murder and resulted in at least one juror voting against the death penalty. CA6 R. 12, at 33.

### 3.

[13]   To demonstrate that his counsel was constitutionally ineffective, Miller must show that "(1) his counsel's performance was deficient, that is, objectively unreasonable under prevailing professional norms, and (2) it prejudiced his defense." *Cornwell v. Bradshaw*, 559 F.3d 398, 405 (6th Cir. 2009) (citing *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

[14]   [15]   [16]   In considering the deficiency prong, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and attempt "to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. However, the "failure to reasonably investigate the defendant's background and present mitigating evidence to the jury at sentencing can constitute ineffective assistance of counsel." *Goodwin v. Johnson*, 632 F.3d 301, 318 (6th Cir. 2011) (citing *Wiggins v. Smith*, 539 U.S. 510, 521–22, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)). In making this determination, we focus "on whether the investigation supporting counsel's decision not to introduce mitigating evidence ... was itself reasonable." *Clark v. Mitchell*, 425 F.3d 270, 284 (6th Cir. 2005) (citation omitted). This turns on both "the quantum of evidence known to counsel ... as well as whether that evidence should have led a reasonable attorney to investigate further." *Id.* Choices "made after less than a complete investigation are reasonable precisely to the extent that a reasonable professional judgment supported the limitations on the investigation." *Goodwin*, 632 F.3d at 318–19 (quoting *Wiggins*, 539 U.S. at 528, 123 S.Ct. 2527). Such choices include whether to present expert testimony at the penalty phase. *See Jackson v. Bradshaw*, 681 F.3d 753, 771 (6th Cir. 2012); *see also Hartman v. Bagley*, 492 F.3d 347, 360 (6th Cir. 2007) ("[C]ounsel might quite reasonably have made a strategic decision to present [an expert's report as to] mitigation findings through the more sympathetic lens of family members' testimony.").

[17]   We cannot excuse Olive's failure to engage any expert in support of Miller's case for mitigation. Olive does not claim, and the record does not indicate, that the court would have refused access to a neutral expert, such as Gee, for the purposes of resentencing. The record indicates that Olive had notice of how expert testimony could have helped Miller's case at the penalty phase. His pre-trial investigation uncovered   **704** evidence of physical abuse, sexual abuse, abandonment, and neglect. He also learned of numerous instances of Miller suffering severe head trauma, hearing voices, and experiencing blackouts. Prior to resentencing, Olive obtained additional social-services and educational records providing further evidence that Miller had suffered physical and sexual abuse. This evidence suggested that Miller may have been suffering from a head injury, mental defect, or mental disease. But Olive chose not to consult with any expert to further investigate Miller's condition or present testimony connecting Miller's background and condition with Standifer's murder, evidence that would have been consistent with the theory of mitigation Olive presented.

Instead, Olive presented Miller's background, evidence of abuse, and the theory that Miller may have suffered an adolescent head injury through lay testimony. Olive framed this to the resentencing jury as a non-statutory mitigating factor. He also requested, and received, the following statutory mitigating instruction at resentencing:

> The capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was subsequently impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected his judgment. [4]

App. 109; Supp. App. 98. But Olive made these decisions without consulting—or even requesting to consult with—an expert to understand what testimony, if any, such an expert could provide or whether there was something more to investigate with respect to Miller's mental health. This leads us to seriously question the reasonableness of Olive's investigation at resentencing. *See Goodwin*, 632 F.3d at 318. Had Olive consulted with an expert, or even requested the opportunity to do so, and then declined to present expert testimony, we would be much more likely to say that such a decision was objectively reasonable. Indeed, our past decisions suggest that establishing deficiency is considerably more difficult when counsel has made an informed decision regarding mitigation after consulting with experts. *See Landrum v. Mitchell*, 625 F.3d 905, 931–32 (6th Cir. 2010) (counsel was not deficient when, after completing a thorough investigation and obtaining a court-appointed expert, he made the "strategic decision not to present [the expert's] underdeveloped testimony"); *Hartman*, 492 F.3d at 359–60 (counsel was reasonable in declining to present expert testimony after consulting with a forensic psychologist and deciding to present the psychologist's findings "through the more sympathetic lens" of the defendant's family members); *Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006) (counsel was not objectively unreasonable because he had "attempted to obtain psychological testimony as well as the services of a mitigation expert" as part of a broader investigation); *Campbell v. Coyle*, 260 F.3d 531, 555 (6th Cir. 2001) (counsel's failure to detect defendant's mental disorder was reasonable because he had relied on the evaluation of a psychologist).

[18]    [19]    Even if Olive's performance was deficient, Miller must still show prejudice to succeed on his IATC claim. This presents a much more difficult hurdle for Miller. In the context of a death-penalty proceeding, the Supreme Court defines **\*705** prejudice as "a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052. Prejudice from the deficient investigation or presentation of mitigating evidence requires "new evidence" that "differ[s] in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Clark*, 425 F.3d at 286 (quoting *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005)). We then "reweigh the evidence in aggravation against the totality of available mitigating evidence, both that adduced at trial and that adduced in post-conviction proceedings." *Goodwin*, 632 F.3d at 327.

In order to find prejudice, we must assume that the expert called to testify would have presented new evidence that favored mitigation. *See Clark*, 425 F.3d at 286. To do so, we start with the evidence that Olive did present in his case for mitigation at resentencing. Olive presented a theory of mitigation focused on Miller's background. This included testimony from Miller's mother about the absence of Miller's biological father, her struggle with alcoholism, and the physical abuse Miller suffered at the hands of his stepfather—including a serious untreated head injury. Olive also presented testimony that Miller had been seriously injured while he was in foster care and that he had been subject to sexual abuse as a young adult. In its summation, the state attempted to minimize the strength of testimony and argument as to how Miller's age, upbringing, and intoxication—from both alcohol and LSD—constituted sufficient factors to preclude the death penalty. Finally, the jury was explicitly instructed to consider whether Miller's capacity and impairment by way of mental disease, mental defect, or intoxication substantially affected his judgment.

On federal *habeas* review, Miller presented declarations from three expert witnesses in the areas of psychiatry, psychology, and neurology. Pablo Stewart, a clinical and forensic psychiatrist, expressed his opinion that Miller developed Posttraumatic Stress Disorder and severe depression as a result of his childhood and adolescence and that Miller suffered from auditory and visual hallucinations around the time of Standifer's murder, as well as other "clear symptoms of psychosis and dissociation." App. 53. Stewart concluded that Miller suffered from "multiple neurocognitive disorders." App. 54. Thomas Hyde, a neurology expert, opined that Miller's behavior was "consistent with developmental or acquired frontal lobe dysfunction" that could have been a result of traumatic head injury and would have impacted his ability to control his impulses and manage his anger. Hyde Decl., App. 61. David Lisak, a clinical psychologist, stated that Miller's alcohol and drug use stemmed from his history of psychological trauma and physical abuse. Lisak also opined that Miller's behavior during Standifer's murder was consistent with "an outburst of unbridled rage and aggression" that could be associated with heavy alcohol and drug use. [5] Lisak Decl., App. 85.

Miller continues to cite these reports as the new evidence in support of his claim that Olive was constitutionally ineffective. Although we recognize that the conclusions offered by Miller's post-conviction experts were not presented at resentencing, the **\*706** reports are not evidence that is substantially different in strength and subject matter from what Olive presented at resentencing. *See* *Clark*, 425 F.3d at 286–87. Olive "presented most of the same facts that the post-conviction mitigation witnesses said should have been presented." *Landrum*, 625 F.3d at 932–33 (finding that expert testimony drawing conclusions from a defendant's troubled upbringing did not "differ[ ] significantly both in strength and subject matter from the evidence actually presented at sentencing"); *see also* *Hartman*, 492 F.3d at 360–61 (finding post-conviction expert testimony was not new when compared to mitigation evidence provided exclusively from lay witnesses). Olive's theory of mitigation encompassed Miller's neglect and abuse as a child, the possibility that he suffered a traumatic head injury, and his drug and alcohol use around the time of Standifer's murder. Although Olive used lay witnesses to do so, he presented the same facts that now underlie the evidence Miller claims is new. Thus, we question whether Miller can succeed in establishing the prejudice prong of his IATC claim.

Finally, even if we were to credit Miller's evidence and assume that an expert would have presented similarly favorable testimony, we would still have to find that the evidence sufficiently changed the balance such that at least one juror would have voted against death. *See* Tenn. Code Ann. § 39-13-204(i). Because we have sufficient concerns with Miller's ability to establish new evidence, we decline to engage in such balancing here.

\* \* \*

[20]   Given our uncertainty as to Miller's ability to establish prejudice, we cannot agree that his IATC claim is "unquestionably meritorious." Nor can we say that he has presented such a clear case of ineffective assistance that it overcomes the other relevant equitable factors weighing against Rule 60(b)(6) relief, especially Miller's lack of diligence in raising his *Martinez* claim —a factor to which we have previously given considerable weight. *See* *Sheppard*, 807 F.3d at 821. Thus, in light of the Supreme Court's instruction that extraordinary circumstances are rare in the *habeas* context, *Gonzalez*, 545 U.S. at 535, 125 S.Ct. 2641, and the "especially broad" discretion we must give to the district court in this context, *West*, 790 F.3d at 697, we conclude that the district court did not abuse its discretion in finding that Miller failed to establish extraordinary circumstances under Rule 60(b)(6). We therefore affirm the district court's denial of Miller's request for Rule 60(b)(6) relief. [6]

V.

For the foregoing reasons, we affirm the denial of Miller's Rule 60(b)(6) motion.

**DISSENT**

HELENE N. WHITE, Circuit Judge, dissenting.

Because Miller's case presents a "rare" circumstance in which Rule 60(b)(6) relief is appropriate in a habeas proceeding, *cf.* *Gonzalez v. Crosby*, 545 U.S. 524, 535, 125 S.Ct. 2641, 162 L.Ed.2d 480 (2005), I respectfully dissent.

**\*707** Relief under Rule 60(b)(6) is available only in "exceptional or extraordinary circumstances where principles of equity mandate relief." *West v. Carpenter*, 790 F.3d 693, 696–97 (6th Cir. 2015) (citation omitted). As the majority observes, a "change in decisional law is usually not, by itself, an 'extraordinary circumstance' meriting Rule 60(b)(6) relief," *Stokes v. Williams*, 475 F.3d 732, 735 (6th Cir. 2007) (citation omitted), and this court has held that *Martinez*/*Trevino*, by themselves, are not "extraordinary" in the Rule 60(b)(6) context, *see Henness v. Bagley*, 766 F.3d 550, 557 (6th Cir. 2014). Further, determining whether a circumstance presented in a 60(b)(6) motion is "exceptional or extraordinary" involves a "case-by-case inquiry ... [that] intensively balance[s] numerous factors, including the competing policies of the finality of judgments and the incessant command of the court's conscience that justice be done in light of all the facts." *West*, 790 F.3d at 697 (citation omitted). Whether a habeas petitioner presents "extraordinary" circumstances is determined partly in view of how diligent he was in seeking Rule 60(b)(6) relief after a change in decisional law. *See Gonzalez*, 545 U.S. at 537, 125 S.Ct. 2641; *see also* Fed. R. Civ. P. 60(c)(1) (a movant must file his motion "within a reasonable time").

I consider these same balancing factors but reach a different conclusion: that the equities weigh heavily in favor of Miller, and accordingly that the district court abused its discretion in denying him relief under Rule 60(b)(6).

**(1) Diligence**

As the majority explains, we examine the time between the date of the decision constituting a change in law and the date the Rule 60(b)(6) motion was filed. Maj. Op. at 699. Eighteen months elapsed between the Supreme Court's decision in *Martinez v. Ryan*, 566 U.S. 1, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012) on March 20, 2012 and Miller's filing of his 60(b)(6) motion on September 20, 2013. Alternatively, the majority reasons that sixteen months elapsed between *Martinez* and the 60(b)(6) motion, deducting the two months between this court's decision in *Hodges v. Colson*, 711 F.3d 589, 612 (6th Cir. Mar. 26, 2013) (which cast doubt on *Martinez*'s application in Tennessee) and the Supreme Court's decision in *Trevino v. Thaler*, 569 U.S. 413, 133 S.Ct. 1911, 185 L.Ed.2d 1044 (2013) (which was decided on May 28, 2013 and extended *Martinez*'s equitable holding to states that make it "virtually" impossible to bring an ineffective-assistance claim on direct appeal). *Trevino*, 569 U.S. at 417, 133 S.Ct. 1911. It is this sixteen-month period that the majority "cannot excuse," especially in light of cases in which twelve and eight months between a change in law and the filing of a 60(b)(6) motion showed, respectively, diligence and a lack thereof. Maj. Op. at 700–01 (citing *Wright v. Warden, Riverbend Maximum Sec. Inst.*, 793 F.3d 670, 672 (6th Cir. 2015) and *Gonzalez*, 545 U.S. at 537, 125 S.Ct. 2641).

We found the petitioner in _Wright_ was diligent in filing his 60(b)(6) motion twelve months after _Martinez_ was decided (but months before _Trevino_ was). _793 F.3d at 672._ Although Wright may have been diligent in pressing his _Martinez_ claim, as a Tennessee petitioner, that claim was not available to him at that time. The Supreme Court drew a clear line in _Martinez_, stating that it was recognizing only a "narrow exception" to the rule of _Coleman v. Thompson,_ 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), that ineffective assistance of post-conviction counsel is not cause to excuse a procedural default. _566 U.S. at 9, 132 S.Ct. 1309._ This narrow exception applied only "where the State _barred_ the defendant from raising [ineffective-assistance] claims on direct appeal." **\*708** _Id._ at 17, 132 S.Ct. 1309 (emphasis added). _Martinez_ did not apply nationwide, only to states that placed claims of ineffective assistance outside the direct-appeal process. We observed in our first _Hodges_ opinion that "Tennessee's system does not implicate the same concerns as those that triggered the rule in _Martinez_ because in Tennessee a collateral proceeding is not 'the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial.' " _711 F.3d at 612_ (quoting _Martinez,_ 566 U.S. at 8, 132 S.Ct. 1309).

It was not until _Trevino_ was decided on May 28, 2013 that the narrow _Martinez_ exception to _Coleman_ was extended to cover states that allow a prisoner to raise a claim of ineffective assistance on direct appeal but do not provide defendants with a "meaningful opportunity to present" that claim. _Trevino,_ 569 U.S. at 428, 133 S.Ct. 1911. Indeed, despite Wright's diligence in raising his _Martinez_ claim, if we had decided the merits and had only _Martinez_ (and not _Trevino_) to follow, we would have been bound to hold that Tennessee is not covered by _Martinez._ In other words, absent the intervening decision _Trevino,_ the diligence of the petitioner in _Wright_ could not have mattered because he would have had no applicable change in law to rely on. The same goes for Miller. We cannot expect habeas petitioners to be diligent in bringing futile motions.

This is all to say that I disagree with the majority that _Martinez's_ date of decision is the proper point from which to measure whether Miller was diligent in filing his 60(b)(6) motion. Instead, the proper starting point is _Trevino,_ decided the same day the Court denied Miller's petition for certiorari. _Trevino_ extended _Martinez_ to apply to "a State that in theory grants permission [to bring an ineffective-assistance claim on direct appeal] but, as a matter of procedural design and systemic operation, denies a meaningful opportunity to do so." _569 U.S. at 429, 133 S.Ct. 1911. That_ was a holding applicable to Tennessee, as we implicitly recognized when we amended _Hodges_ to remove the suggestion that _Martinez_ was inapplicable to Tennessee convictions. _727 F.3d 517 (6th Cir. Aug. 14, 2013)._ Under the circumstances, Miller's filing his 60(b)(6) motion just shy of four months after _Trevino_ was diligent.

### (2) Finality

I agree with the majority that Tennessee has a strong finality interest in its criminal judgment, and agree as well that this interest must be balanced against Miller's interest in avoiding the "more irreversible finality of [his] execution." Maj. Op. at 701 (quoting _Wright,_ 793 F.3d at 673). _See Calderon v. Thompson,_ 523 U.S. 538, 556, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998) ("A State's interests in finality are compelling when a federal court of appeals issues a mandate denying federal habeas relief."); _but see Sanders v. United States,_ 373 U.S. 1, 8, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963) ("Conventional notions of finality of litigation have no place where life or liberty is at stake and infringement of constitutional rights is alleged.").

AR.05772

The majority emphasizes that Miller has had multiple opportunities, in state and federal proceedings, to obtain review of his conviction and sentence; and although his ineffective-assistance claim has never been addressed on the merits, this is a consequence of his procedural default of the issue. But not all defaulted claims are equal. It matters that counsel's ineffectiveness goes to the heart of the jury's decision to impose a death sentence, and, as I discuss below, that Miller's claim is a substantial one.

At re-sentencing, the paramount defense objective was to avoid the imposition of the death penalty. Mitigating evidence showing **\*709** that Miller suffered from mental illness, trauma, or organic brain damage was the most "significant factor" in arguing in favor of that objective, and expert mental-health assistance was needed to evaluate, prepare, and present it. The state's interest in the finality of its judgments must be "tempered by its interest in the fair and accurate adjudication of criminal cases." *Cf. id.* at 7–9. Here, if Miller's "interest in avoiding the death penalty" cannot be said to "overcome the [state's] finality interests at stake," Maj. Op. at 701–02, it also cannot be said that the latter overcomes the former. The interests are at least in equipoise.

## (3) Merits

I join the majority in assuming that consideration of the merits is appropriate, and, for the same reasons set out in the majority opinion, I agree that trial counsel Olive's "failure to engage any expert in support of Miller's case for mitigation" is inexcusable. *Id.* at 703. I respectfully disagree, however, with the conclusion that Olive's ineffectiveness did not prejudice Miller. Had Olive obtained the assistance of a mental-health expert, whether neutral or independent, there was a "reasonable probability ... that

the [jury] would have concluded that the balance of aggravating and mitigating factors did not warrant death." *Strickland v. Washington*, 466 U.S. 668, 695, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This probability is sufficient to "undermine confidence in the outcome" of Miller's re-sentencing. *Id.* at 694, 104 S.Ct. 2052.

In finding a lack of prejudice, the majority asserts that the lay witnesses' mitigation testimony at re-sentencing did not vary in a substantial way in strength and subject matter from the evidence Miller now offers in the form of declarations by Drs. Stewart, Hyde, and Lisak. I disagree.

The evidence given by lay witnesses was "troubled youth" testimony, including that Miller was neglected and physically abused by his parents. At most, these lay witnesses could support that Miller's background drove him to substance abuse. The lay witnesses were not equipped to analyze Miller's school, child protective services, medical, or penal records. Nor could the lay testimony address Miller's psychological problems or organic brain damage.

In contrast, Dr. Hyde, a neurologist, examined Miller and found that he suffered from developmental or acquired frontal-lobe dysfunction, which can cause individuals to "have difficulty with impulse control, prioritization, judgment, reasoning, and anger management." Hyde Decl. at 5. Dr. Hyde also noted that Miller had an extensive history of bipolar disorder, which made him "particularly susceptible to impulsive and inappropriate behavior under periods of emotional distress[,]" and that Miller's substance abuse was likely an attempt at self-medication. *Id.* at 5–6. As the three declarations Miller obtained for his federal habeas petition show, an expert could have explained to the jury how Miller's traumatic childhood affected him psychologically and neurologically and influenced him to murder Standifer in a violent rage. The lay witnesses were of no help on this issue. The expert testimony is substantially different in strength and subject matter, and "[t]here is reason to think that" "access to the type of meaningful assistance in evaluating, preparing, and presenting the defense that *Ake* requires would have mattered." *McWilliams v. Dunn*, ––– U.S. ––––, 137 S.Ct. 1790, 1801, 198 L.Ed.2d 341 (2017).

Further, although Olive did argue that Miller was the victim of sexual abuse as a young adult at the hands of a clergyman, he completely failed to inform the re-sentencing jury about the prolonged sexual **\*710** abuse Miller was subjected to by his own mother, which Dr. Lisak opined caused "rage that stemmed from the confluence of his step-father's brutality, and his mother's incestuous abuse....". Lisak Decl. at 27. Miller committed the sudden, brutal murder of a female intimate partner. There is reason to think that the jury would have viewed this crime differently had Miller been examined by a competent expert who

could explain that it was influenced by childhood abuse that left him with "untreated, profound levels of rage that he directed at women." *Id.* Further, when Miller's mother was cross examined about what the majority acknowledges was "a serious untreated head injury," Maj. Op. at 705, she agreed with the government that Miller "didn't receive any serious injuries from that episode." Resentencing Tr. at 636. Expert testimony would have made the serious nature of the injuries clear.

The majority finds support in *Landrum v. Mitchell,* 625 F.3d 905 (6th Cir. 2010), for its conclusion that Miller was not prejudiced because the mental-health experts supporting his federal habeas petition do not present evidence that "differs significantly both in strength and subject matter from the evidence actually presented at sentencing." *Id.* at 933. But Miller's case is far different from *Landrum.* In *Landrum,* we concluded that defense counsel was not ineffective. Counsel obtained funds for a psychologist, had her examine Landrum, and made the strategic decision not to present her testimony. *Id.* at 932. Here, defense counsel obtained no expert mental-health assistance on the mitigation issue at all, and we have concluded that he was ineffective. Further, the evidence of prejudice that *Landrum* observed was absent in that case is present here. *Cf. id.* at 933 ("In Landrum's case, nothing in the post-conviction record suggests that his childhood was drastically different from what the jury heard or that he suffers from a mental or physical condition that would explain or significantly mitigate his crimes."). The opinions of the post-conviction experts here *do* suggest that Miller's mental and neurological conditions would explain and significantly mitigate his crime.

In sum, Miller's post-conviction experts show the types of mitigating evidence that Olive could have uncovered had he sought the expert mental-health assistance—whether independent or neutral—that Miller was entitled to at his re-sentencing. Had the jury heard such evidence, there is a reasonable probability that it would have concluded that "the balance of aggravating and mitigating circumstances did not warrant death." *See Strickland,* 466 U.S. at 695, 104 S.Ct. 2052.

\* \* \*

Miller diligently brought his Rule 60(b)(6) motion less than four months after *Trevino* was decided. Both Miller and the State of Tennessee have considerable finality interests—Miller in avoiding the judgment of a death sentence and the state in enforcing it. Miller raises a substantial ineffective-assistance claim that his trial counsel was ineffective for failing to seek *any* expert mental-health assistance at re-sentencing, and has shown that there is a reasonable probability that this failure prejudiced him. Together, these factors give rise to the "exceptional or extraordinary circumstances where principles of equity mandate relief" under Rule 60(b)(6). *West,* 790 F.3d at 697 (citation omitted). I would reverse the district court's denial of this relief.

**All Citations**

879 F.3d 691

---

# Footnotes

\*     Judge White would grant rehearing for the reasons stated in her dissent.

1     We note, at the outset, that the Supreme Court's recent decision in *McWilliams v. Dunn,* ––– U.S. ––––, 137 S.Ct. 1790, 198 L.Ed.2d 341 (2017), held that *Ake* clearly established a defendant's right to an independent expert. Although this may be relevant to Miller's *habeas* claim regarding the denial of state funds for an independent health expert during

the guilt phase of his trial, it does not impact our decision here that the district court properly denied Miller's request for [] Rule 60(b)(6) relief as to his IATC claim.

2    The district court also considered whether the affidavits from both trial and post-conviction counsel presented new evidence related to his IATC claim. It concluded that the affidavit from trial counsel did not present any new evidence and that the affidavit from post-conviction counsel, although new, addressed only the deficiencies in Miller's post-conviction representation and not the underlying IATC claim. For this reason, it does not appear that the district court considered the affidavits to weigh in favor of finding extraordinary circumstances. Because Miller does not challenge this determination on appeal, we do not consider it here.

3    We did not explicitly determine that [] *Martinez* and [] *Trevino* applied in Tennessee until March 19, 2014, when we decided [] *Sutton,* 745 F.3d at 792.

4    Although the resentencing court agreed to the instruction, it did note that it was "difficult to see" evidence in the record to support such an instruction. App. 109.

5    Although we adopt these conclusions here for the purposes of evaluating Miller's claim of new evidence, we question whether a neutral, court-appointed expert would have reached such conclusions given Gee's testimony at trial that Miller was neither insane nor incompetent.

6    If Miller had shown extraordinary circumstances entitling him to [] Rule 60(b)(6) relief, he would still need to show that his underlying IATC claim was a "substantial" one and that he had received ineffective assistance of counsel during his initial post-conviction proceedings in order to show that he was eligible for consideration on the merits. *See* [] *Martinez,* 566 U.S. at 14, 132 S.Ct. 1309; [] *Trevino,* 569 U.S. at 429, 133 S.Ct. 1911. Because we conclude that the district court was within its discretion in denying Miller [] Rule 60(b)(6) relief, we need not reach these questions.

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.  

523 F.3d 784
United States Court of Appeals,
Seventh Circuit.

Mpoyi MITONDO, Petitioner,

v.

Michael B. MUKASEY, Attorney General
of the United States, Respondent.

No. 06-3178.
|
Argued Aug. 8, 2007.
|
Decided April 24, 2008.

**Synopsis**

**Background:** Alien who was citizen of Democratic Republic of the Congo, formerly known as Zaire, petitioned for review of order of Board of Immigration Appeals (BIA), affirming immigration judge's (IJ) denial of asylum on ground of fraud.

**Holdings:** The Court of Appeals, Easterbrook, Chief Judge, held that:

[1] final disposition of asylum-only proceeding was reviewable, and

[2] substantial evidence supported agency's finding that alien was not credible.

Petition denied.

West Headnotes (4)

**[1]    Aliens, Immigration, and
Citizenship    Decisions reviewable**

An order that is proper only if the alien is removable implies an order of removal, as required for jurisdiction to review the final disposition of an asylum-only proceeding. Immigration and Nationality Act, §§ 217(b)(2), 242(a)(1), 8 U.S.C.A. §§ 1187(b)(2), 1252(a)(1); 8 C.F.R. § 217.4(a)(1).

2 Cases that cite this headnote

**[2]    Aliens, Immigration, and
Citizenship    Decisions reviewable**

Although no final order of removal had been entered for alien, whose application for asylum was denied by immigration judge (IJ) and affirmed by Board of Immigration Appeals (BIA), final disposition of asylum-only proceeding was reviewable, since removal order was implied by order that was proper only if alien was removable. Immigration and Nationality Act, § 242(a)(1), 8 U.S.C.A. § 1252(a)(1).

7 Cases that cite this headnote

**[3]    Aliens, Immigration, and
Citizenship    Adverse credibility
determinations in general**

Agency's finding, in denying alien's application for asylum on ground of fraud, that alien was not credible, was supported by substantial evidence, pursuant to Real ID Act, including that hostel voucher allegedly issued to alien by priests was issued before alien claimed to have met priests, alien professed ignorance about travel documentation at first hearing but then recited detailed story on documentation at second hearing, and forensic evidence undercut alien's second story about how his surname and picture came to be on stolen passport. Real ID Act, § 101(a)(3), 8 U.S.C.A. § 1158(b)(1)(B)(iii); Immigration and Nationality Act, § 217(b)(2), 8 U.S.C.A. 1187(b)(2); 8 C.F.R. § 217.4(a)(1).

22 Cases that cite this headnote

**[4]    Aliens, Immigration, and
Citizenship    Presentation and preservation
of questions at administrative level**

Alien forfeited arguments on appeal that were not presented to Board of Immigration Appeals (BIA).

**Attorneys and Law Firms**

**\*785** Shannon M. Shepherd (argued), Azulay, Horn & Seiden, Chicago, IL, for Petitioner.

Siu Ping Wong, Wendy Benner-Leon (argued), Department of Justice Civil Division, Immigration Litigation, Washington, DC, for Respondent.

Before EASTERBROOK, Chief Judge, and COFFEY and MANION, Circuit Judges.

## Opinion

EASTERBROOK, Chief Judge.

Mpoyi Mitondo, a citizen of the Democratic Republic of the Congo (known as Zaire between 1971 and 1997), arrived in the United States from Scotland bearing a French passport. Citizens of France do not need visas to enter the United States, and Mitondo did not have one.

Only cursory checks are made of persons who carry the passports of nations participating in the visa-waiver program. But one of the checks is for the passport's legitimacy, and Mitondo was detained because a blank bearing the number of the passport he presented had been stolen. He soon confessed that the passport was not his, and that he is not French. His request to stay in the United States has been processed under the "asylum-only" **\*786** approach applicable to those who claim entitlement to enter without visas. Before arriving, Mitondo had waived any ground other than asylum for remaining in the United States beyond 90 days. See 8 U.S.C. § 1187(b)(2); 8 C.F.R. § 217.4(a)(1).

Mitondo contends that he has been persecuted on account of his politics. He supports the Union for Democracy and Social Progress (Union pour la Démocratie et le Progrès Social, or UDPS), which is on the outs with the ruling People's Party for Reconstruction and Democracy. UDPS is a recognized party with representatives in the legislature, and its leader Étienne Tshisekedi wa Mulumba served three stints as Prime Minister. But supporters of the UDPS sometimes receive rough handling from the police during political demonstrations. Mitondo testified that he endured ghastly treatment during May 2005, after Joseph Kabila, Congo's President, postponed scheduled elections. The UDPS called a general strike, and Mitondo says that during a demonstration in Mbuji-Mayi he was arrested, thrown into a filthy cell where his hands were tied behind his back and a hood kept over his head, beaten four times, and then sent to the fields for forced labor-from which he escaped after two weeks. Mitondo met Roman Catholic priests who helped him to escape to Zambia, where a second group of priests provided him with tickets and (false) documentation that enabled him to reach Glasgow, receive the stolen passport, and enter the United States equipped with a voucher for prepaid stay at a youth hostel in Chicago.

The immigration judge accepted Mitondo's claim to membership in the UDPS (a claim backed up by the party's records and affidavits from its officials) but was skeptical about the story of his detention and beatings in May 2005. The voucher had been issued in Glasgow to a "V. Mitondo," the same name on the passport, before Mitondo had escaped from his captors and thus before he could have met the priests-about whom he has supplied no details. Asked to explain how this could be so, Mitondo replied: "I don't know how they arranged these travel documents or how they arranged any, any of this."

After a six-week continuation so that both sides could gather additional evidence, Mitondo's memory improved. Now he testified that the person in Glasgow who gave him the documents told him that a Vital Mitondo had planned to travel to the United States but had backed out. Mpoyi's photograph then replaced Vital's on the passport, and Mpoyi claimed to be Vital in order to use the voucher. The IJ was skeptical of this story and continued the hearing to allow forensic examination of the passport. An expert concluded that the document was "free from any conclusive physical evidence indicating data entry alteration, page substitution, or photo-substitution." In other words, Mpoyi's photo was the first to have been placed on the stolen blank. Mitondo had no explanation for this, which demolished his revised story.

The IJ then denied Mitondo's application for asylum, finding that he was willing to lie to enter the United States-Mitondo concedes as much in light of the bogus claim of French citizenship-and had lied about the events of May 2005 in particular. Cf. Alsagladi v. Gonzales, 450 F.3d 700 (7th Cir.2006) (fraud in obtaining entry to the United States is a good reason to reject a request for asylum). The IJ relied on three particular discrepancies: First, the hostel voucher was issued before Mitondo claims to have met the priests; second, Mitondo's testimony that he took over travel documents from someone else is inconsistent with his earlier sworn statement that he had no idea how the documentation **\*787** was

arranged; third, the forensic evidence undercut Mitondo's second story about how his surname and picture came to be on the stolen passport. The Board of Immigration Appeals affirmed.

**[1]** **[2]** Jurisdiction is the first question. Because Mitondo was placed in asylum-only proceedings following his failed effort to enter the United States, no formal order of removal has been entered. A court of appeals reviews final orders of removal, 8 U.S.C. § 1252(a)(1), but, for reasons given in *Jiménez Viracacha v. Mukasey,* 518 F.3d 511 (7th Cir.2008), an order that is proper only if the alien is remov*able* implies an order of removal. At least three other courts of appeals have reached the same conclusion and have held that there is jurisdiction to review the final disposition of an asylum-only proceeding. See *Shehu v. Attorney General,* 482 F.3d 652, 656 (3d Cir.2007); *Kanacevic v. INS,* 448 F.3d 129, 134-35 (2d Cir.2006); *Nreka v. Attorney General,* 408 F.3d 1361, 1366-67 (11th Cir.2005).

**[3]** Mitondo's principal argument is that the agency's decision is not supported by substantial evidence, because the problems that the IJ identified do not "go to the heart of" his claim for asylum. Many decisions, in this and other circuits, state that inconsistencies on minor details do not justify disbelief of an alien's claim to have suffered persecution. See, e.g., *Giday v. Gonzales,* 434 F.3d 543, 551-52 (7th Cir.2006). Mitondo observes that none of the IJ's reasons concerns the events that (he maintains) occurred in Mbuji-Mayi in May 2005. Some other evidence in the record suggests that a crackdown on UDPS members began in June 2005, and the documents that Mitondo presented to establish his membership in the UDPS do not show his presence in Mbuji-Mayi during May 2005 (though they do establish his activities on behalf of the party in earlier months). But the IJ did not mention these problems and so, Mitondo maintains, the judiciary can't rely on them either. See *SEC v. Chenery Corp.,* 318 U.S. 80, 88-89, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

Dissatisfied with judicial reluctance to accept immigration judges' credibility decisions, Congress enacted this provision in 2005 as part of the Real ID Act:

Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor. There is no presumption of credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal.

8 U.S.C. § 1158(b)(1)(B)(iii). This subsection applies only to claims for asylum made after May 11, 2005, see 119 Stat. 230, 305 (2005), and Mitondo's application is the first time this circuit has been required to apply the new law.

This statute abrogates decisions that focus on "whether an inconsistency, inaccuracy, or falsehood goes to the heart of the **\*788** applicant's claim". It also specifies that "[t]here is no presumption of credibility". Beyond that, the statute requires courts to use in immigration proceedings the same deferential approach traditionally applied to credibility findings in labor cases and other administrative controversies. See, e.g., *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Elliott v. CFTC,* 202 F.3d 926 (7th Cir.2000).

Asylum cases pose thorny challenges in evaluating testimony. Applicants regularly tell horrific stories that, if true, show past persecution and a risk of worse to come. But these stories rarely are susceptible to documentary proof, because persecutors don't publish records of their misdeeds. (Though they sometimes *keep* such records, they remain secret until the regime has fallen.) Countries that oppress their citizens may be disordered in other ways-so that, for example, medical records are unreliable, and victims cannot use them to demonstrate injuries received at the hands of police, or may record events in ways that complicate interpretation (for example, whether an abortion was compulsory or voluntary may be omitted from the file or noted in a way that foreigners find opaque).

Most claims of persecution can be neither confirmed nor refuted by documentary evidence. Even when it is certain that a particular incident occurred, there may be doubt about whether a given alien was among the victims. Then the alien's oral narration must stand or fall on its own terms. Yet many aliens, who want to remain in the United States for economic or social reasons unrelated to persecution, try to deceive immigration officials. Often they are coached by friends or organizations that disapprove of this nation's restrictions on immigration and do what they can to help others remain here. Occasionally the coaches (like smugglers who provide transportation and bogus credentials) do this for pay rather than out of friendship or commitment. How is an immigration judge to sift honest, persecuted aliens from those who are feigning?

The belief that many people form from watching television and movies-that this can be done by careful attention to a witness's demeanor-has been tested and rejected by social scientists. Looking for mannerisms, hesitations, and perspiration is the method of the lie detector without the polygraph machine. In a large-scale test of lie-detecting abilities, in which people told matched pairs of true and false stories, a television audience (which had access to the speakers' demeanor) did no better than chance at separating truth from fiction, while newspaper readers spotted the lie 64% of the time and people listening to the radio got it right 73%. Richard Wiseman, *Quirkology: How We Discover the Big Truths in Small Things* 50-81 & references at 287-90 (2007). In other words, if you want to find a liar you should close your eyes and pay attention to *what* is said, not *how* it is said or what the witness looks like while saying it. See Stephen Porter & John C. Yuille, *The Language of*

*Deceit: An Investigation of the Verbal Cues to Deception in the Interrogation Context,* 20 L. & Human Behavior 443 (1996); Michael J. Saks, *Enhancing and Restraining Accuracy in Adjudication,* 51 L. & Contemp. Probs. 243, 263-64 (Aut.1988). And even then the error rate is high.

So what gives the liar away? Wiseman's book recounts what is known about this subject. The major clue, apart from factual gaffes and inconsistencies that amount to confessions, is the amount of detail. "When it comes to lying, the more information you give away, the greater are the chances that some of it will come back to haunt you. As a result, liars tend to say **\*789** less, and to provide fewer details". *Id.* at 58-59. What's more, "[l]iars often try to distance themselves psychologically from their falsehoods, and so they tend to include fewer references to themselves, and their feelings, in their stories." *Id.* at 59. Truth-tellers have normal amounts of memory failure. But "[w]hen it comes to relatively unimportant information, [liars] seem to develop super-powered memories and often recall the smallest of details. In contrast, truth-tellers know that they have forgotten certain details and are happy to admit it." *Id.* at 59-60. In a nutshell: details matter, and the story's periphery may expose a liar. This is not a novel point; our opinion in *Carradine v. Barnhart,* 360 F.3d 751, 753 (7th Cir.2004), says much the same thing, in reliance on these empirical findings.

In immigration cases an additional set of clues may be available. An alien who is repeating a story fed to him by handlers may be able to testify up to a certain point but then run out of information at the place where the briefing stopped. The IJ suspected that of Mitondo, who professed ignorance about travel documentation at the first hearing, then recited a detailed story on this topic at the second hearing.

The immigration judge paid close attention to the details of Mitondo's story, which did not hang together even after its amendment. Mitondo's current explanation for the shortcomings-that he was confused or nervous-is generic and would make it impossible to disbelieve any story, however fanciful. The IJ was not obliged to believe that Mitondo was too jittery to produce an internally consistent story. Substantial evidence supports the agency's decision that he is not credible.

When documentary proof one way or the other is unavailable, the agency must use the details of an alien's story to make an evaluation of its truth. Section 1158(b)(1)(B)(iii) permits it

to do so, using whatever combination of considerations seems best in the situation at hand. This is not to say that an IJ may make irrational assumptions about how dictators subjugate their citizens, see *Banks v. Gonzales,* 453 F.3d 449 (7th Cir.2006), or how the society of a foreign nation operates, see *Pramatarov v. Gonzales,* 454 F.3d 764 (7th Cir.2006); *Grupee v. Gonzales,* 400 F.3d 1026 (7th Cir.2005); *Zhen Li Iao v. Gonzales,* 400 F.3d 530 (7th Cir.2005). Those are subjects on which proof is available. Once the background facts about the alien's native land have been assembled, however, and a question remains about whether the applicant is among that nation's victims, § 1158(b)(1)(B)(iii) permits the agency to make a decision despite the irreducible uncertainty in any evaluation of oral testimony.

**[4]**    Mitondo's other arguments were not presented to the Board of Immigration Appeals and have been forfeited.

The petition for review is denied.

**All Citations**

523 F.3d 784

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Disapproved of by   Ozoanya v. Reno,   W.D.La.,   August 28, 1997

970 F.Supp. 130
United States District Court,
E.D. New York.

Guillermo MOJICA, Plaintiff,

v.

Janet RENO, as Attorney General of the United
States; Doris Meissner, as Commissioner
of the Immigration and Naturalization
Service; Edward McElroy, as New York
District Director of the Immigration and
Naturalization Service; John B.Z. Caplinger, as
New Orleans District Director of the Immigration
and Naturalization Service; Immigration
and Naturalization Service, Respondents.
Saul NAVAS, Plaintiff,
v.

Janet RENO, as Attorney General of the United
States; Doris Meissner, as Commissioner
of the Immigration and Naturalization
Service; Edward McElroy, as New York
District Director of the Immigration and
Naturalization Service; Immigration and
Naturalization Service, Respondents.

Nos. CV 97–1085(JBW), CV 97–1869(JBW).
|
July 11, 1997.

**Synopsis**

Two long-time permanent residents subject to deportation petitioned for writ of habeas corpus, challenging Attorney General's policy of automatic deportation of certain legal permanent residents based on her conclusion that there must be retroactive application of Antiterrorism and Effective Death Penalty Act (AEDPA) provision barring legal residents convicted of certain crimes from seeking discretionary waiver of deportation. The District Court, Weinstein, Senior District Judge, held that: (1) district court retained jurisdiction under its general habeas corpus powers; (2) petitioner satisfied "in custody" requirement for habeas jurisdiction despite not being in actual physical custody; (3) district court had personal jurisdiction over District Director of New Orleans office of Immigration and Naturalization Service (INS), who

had intially detained petitioner; (4) Attorney General was appropriate custodian for habeas purposes; (5) venue in district was appropriate; and (6) AEDPA provision may not be applied retroactively to petitioners.

Writs issued; deportation order vacated.

West Headnotes (49)

**[1]**    **International Law**    Domestic statutes and regulations

Statute should be construed, whenever possible, so as to avoid conflict with international law.

**[2]**    **Administrative Law and Procedure**    Deference to Agency in General

Determination of level of deference due to administrative interpretation of laws involves dual inquiry; court must decide whether to apply agency's statutory construction, and, alternatively, it must determine whether question involves kind of interpretation that is sole province of judiciary.

**[3]**    **Administrative Law and Procedure**    Review for arbitrary, capricious, unreasonable, or illegal actions in general

Any action taken by agency must fail if it is arbitrary and capricious.

**[4]**    **Administrative Law and Procedure**    Deference given to agency in general

Where agency decision is one of policy, court is instructed to defer to any "reasonable" agency decisions.

**[5]**    **Constitutional Law**    Encroachment on Judiciary

Mojica v. Reno, 970 F.Supp. 130 (1997)

In contrast to discretionary policy questions left open in legislation to administrative interpretation, questions of statutory construction are for judiciary.

**[6]    Constitutional Law** 🔑 Interpretation of constitution in general

**Constitutional Law** 🔑 Interpretation of statutes

While in performance of assigned constitutional duties each branch of government must initially interpret Constitution, final word on interpretation of Constitution and of congressionally enacted statutes must ultimately come from judiciary.

**[7]    Administrative Law and Procedure** 🔑 Review for arbitrary, capricious, unreasonable, or illegal actions in general

Any action taken by administrative agency may be reviewed under arbitrary and capricious test.

**[8]    Declaratory Judgment** 🔑 Jurisdiction of Federal Courts

If district court has habeas corpus jurisdiction and venue is proper, it also is competent to issue declaratory judgment. 🚩 28 U.S.C.A. §§ 1391, 🚩 2201, 2202, 🚩 2241.

**[9]    Habeas Corpus** 🔑 Aliens

District court retained jurisdiction under its general habeas corpus powers to review aliens' challenge to Attorney General's interpretation of law regarding effective date of provision of Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which bars legal permanent residents convicted of certain crimes from seeking discretionary waiver of deportation. Immigration and Nationality Act, §§ 106(a)(10), 212(c), as amended, 🚩 8 U.S.C.A. §§ 1105a(a)(10), 🚩 1182(c); 🚩 28 U.S.C.A. § 2241.

27 Cases that cite this headnote

**[10]    Habeas Corpus** 🔑 Aliens

While jurisdiction-modifying amendments to Immigration and Nationality Act (INA) manifest Congress's desire to streamline the deportation process, the Antiterrorism and Effective Death Penalty Act (AEDPA) and the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) leave undisturbed independent authority of federal district courts to entertain general habeas corpus petitions. Immigration and Nationality Act, § 106(a)(10), as amended, 🚩 8 U.S.C.A. § 1105a(a)(10); 🚩 28 U.S.C.A. § 2241.

5 Cases that cite this headnote

**[11]    Aliens, Immigration, and Citizenship** 🔑 Retroactive operation

Deportation orders which became administratively final after October 30, 1996, but proceedings for which commenced before April 1, 1997, were governed by Illegal Immigration Reform and Immigrant Responsibility Act's (IIRIRA's) transitional, rather than permanent, rules, which prohibited appeal in case of alien who is deportable for having committed one of enumerated crimes. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 309(c), 🚩 8 U.S.C.A. § 1101 note.

1 Cases that cite this headnote

**[12]    Habeas Corpus** 🔑 Aliens

Neither Illegal Immigration Reform and Immigrant Responsibility Act's (IIRIRA's) transitional rules, nor its permanent provisions, specifically address or amend general habeas jurisdiction of district courts, as required by clear statement rule governing repeals of habeas jurisdiction. 🚩 28 U.S.C.A. § 2241.

1 Cases that cite this headnote

**[13]    Habeas Corpus    Federal Courts**

Only upon clear statutory statement, that is, specific, express and unambiguous directive, can court conclude that Congress meant to repeal independent avenue of habeas jurisdiction.

2 Cases that cite this headnote

**[14]    Habeas Corpus    Federal Courts**

Purpose of clear statement rule governing repeals of habeas jurisdiction is for courts not to have to resort to divining phantom or unarticulated congressional intentions to repeal habeas jurisdiction where there is statutory silence.

2 Cases that cite this headnote

**[15]    Habeas Corpus    Aliens**

Habeas proceedings remained proper mechanism to challenge final deportation orders after 1961 Immigration Act, which provided that courts of appeal "shall be the sole and exclusive procedure for judicial review of all orders of deportation except" as provided elsewhere in section, so that question whether jurisdiction-modifying amendments to Immigration and Nationality Act (INA) in Antiterrorism and Effective Death Penalty Act (AEDPA) and Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) repealed general habeas jurisdiction in those cases remained relevant, where, until recent amendments, exceptions included provision for habeas corpus, and legislative history contained statement that "the section in no way disturbs the Habeas Corpus Act." Immigration and Nationality Act, §§ 106(a), 106(a)(10), as amended, 8 U.S.C.A. §§ 1105a(a), 1105a(a)(10).

7 Cases that cite this headnote

**[16]    Habeas Corpus    Aliens**

Relative absence of case law addressing alien's ability to bring habeas action under general habeas corpus statute when Immigration and Nationality Act (INA) provided for exclusive jurisdiction for review of final orders of deportation in courts of appeal did not suggest that general habeas jurisdiction was not available, where there was no reason for reviewing courts to focus on whether general habeas statute or judicial review provision of Immigration and Nationality Act was proper basis for jurisdiction. Immigration and Nationality Act, § 106(a)(10), as amended, 8 U.S.C.A. § 1105a(a)(10); 28 U.S.C.A. § 2241.

1 Cases that cite this headnote

**[17]    Habeas Corpus    Aliens**

Clear statement rule governing repeals of habeas jurisdiction militated against limiting scope of general habeas corpus statute as statutory source of jurisdiction to review final orders of deportation, based on Congress' perceived general policy objectives in enacting Antiterrorism and Effective Death Penalty Act (AEDPA) of expediting deportation of criminal aliens, to situations where there is threat of fundamental miscarriage of justice; by its terms, general habeas statute was not limited to constitutional claims or claims of fundamental miscarriage of justice, and nothing in text or history of AEDPA or Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) specifically mentioned habeas statute, much less limited or repealed it. Immigration and Nationality Act, § 106(a)(10), as amended, 8 U.S.C.A. § 1105a(a)(10); 28 U.S.C.A. § 2241.

17 Cases that cite this headnote

**[18]    Habeas Corpus    Federal Courts**

General habeas corpus statute granted jurisdiction to district courts. 28 U.S.C.A. § 2241(a).

**[19]    Habeas Corpus    Aliens**

Petitioners satisfied "in custody" requirement for habeas jurisdiction, though one of them was not in physical custody, where they were subject to final orders of deportation, and petitioner not in physical custody was subject to notice of surrender and had been released on $2,000 bond.

🚩 28 U.S.C.A. § 2241.

4 Cases that cite this headnote

[20]    **Habeas Corpus** 👉 Aliens

Where petitioner is subject to final order of deportation, "custody" requirement for habeas jurisdiction is satisfied, particularly where petitioner has been released on condition of posting bond.

5 Cases that cite this headnote

[21]    **Habeas Corpus** 👉 Necessity, Nature, and Sufficiency of Restraint or Detention

Common law writ of habeas corpus does not require actual physical detention.

[22]    **Habeas Corpus** 👉 In general; territorial limitations in general

In habeas corpus proceeding, appropriate forum is governed by whether court has personal jurisdiction over petitioner's custodians and whether petitioner satisfies traditional venue considerations. 🚩 28 U.S.C.A. § 2241.

1 Cases that cite this headnote

[23]    **Habeas Corpus** 👉 In general; territorial limitations in general

In habeas proceeding, court has personal jurisdiction so long as custodian can be reached by service of process. 🚩 28 U.S.C.A. § 2241.

[24]    **Habeas Corpus** 👉 In general; territorial limitations in general

Personal jurisdiction of habeas court is fixed at time that habeas petition is filed. 🚩 28 U.S.C.A. § 2241.

[25]    **Habeas Corpus** 👉 Aliens

District court had personal jurisdiction in habeas proceeding over District Director of New Orleans office of Immigration and Naturalization Service (INS), who had initially detained petitioner; by allowing petitioner to return to New York, but continuing to claim power to control his actions and seeking his surrender to detention facility in Louisiana, District Director not only transacted business within New York, but also did so in same court on same manner, so that he could be reached by service of process under New York's service of process rules.

🚩 28 U.S.C.A. § 2241; N.Y.McKinney's CPLR 302(a)(1); Fed.Rules Civ.Proc.Rule 4(e)(1), 28 U.S.C.A.

10 Cases that cite this headnote

[26]    **Courts** 👉 Business contacts and activities; transacting or doing business

Under New York state law, process may be served on nondomiciliary who transacts any business within state even if defendant never enters New York, so long as defendant's activities in New York are purposeful and transaction is related to claim asserted. N.Y.McKinney's CPLR 302(a)(1).

[27]    **Habeas Corpus** 👉 Parties; Standing
        **Habeas Corpus** 👉 Process or notice

Attorney General of United States was appropriate custodian for petitioner's habeas action and could be reached by service under New York law, where she could direct her subordinates to carry out any order directed to her to produce or release petitioner. 🚩 28 U.S.C.A. § 2241; 🔖 N.Y.McKinney's CPLR 301.

**WESTLAW** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

8 Cases that cite this headnote

[28]  **Habeas Corpus** ⚷ Federal Courts

**Habeas Corpus** ⚷ Transfer of prisoner pending proceedings

Habeas petition may be heard in place other than where petitioner is being detained; Attorney General may not frustrate Great Writ by moving prisoners around country. 🚩 28 U.S.C.A. § 2241.

1 Cases that cite this headnote

[29]  **Habeas Corpus** ⚷ Aliens

Traditional venue considerations strongly favored adjudicating alien's habeas petition in Eastern District of New York, where, until his transfer from detention facility in New York, he had never been in Louisiana, crime for which he became deportable took place in Eastern District of New York, witnesses and evidence necessary to establish his eligibility for discretionary waiver of deportation were all located in New York, his attorneys were located in New York, there was possibility of backlog of habeas petitions in Louisiana, which could result in delay of his right to habeas review, Immigration and Naturalization Service (INS) would not be prejudiced if required to litigate in New York, where it has been traditionally well-represented, and alien's 23–year–long residence in Eastern District of New York gave court strong interest in adjudicating his case. 🚩 28 U.S.C.A. § 2241.

12 Cases that cite this headnote

[30]  **Habeas Corpus** ⚷ In general; territorial limitations in general

Courts apply traditional venue considerations in habeas proceeding where venue is not fixed by statute.

1 Cases that cite this headnote

[31]  **Venue** ⚷ Place in which action may be brought or tried in general

Traditional venue considerations include, but are not necessarily limited to, location where material events took place, where records and witnesses pertinent to claim are likely to be found, convenience of forum for respondent and petitioner, and familiarity of court with applicable laws.

9 Cases that cite this headnote

[32]  **Statutes** ⚷ Power to enact; validity

**Statutes** ⚷ Language and Intent; Express Provisions

In determining temporal effect of new legislation, courts review statutory provision to determine whether there are any constitutional bars to retroactive implementation, they ascertain whether statute itself manifests express congressional design favoring retroactivity, and, where they can divine no explicit constitutional prohibition or congressional design, they determine time that legislation comes into effect, keeping in mind that default rule underlying all judicial interpretation of statutes is against retroactive application.

2 Cases that cite this headnote

[33]  **Aliens, Immigration, and Citizenship** ⚷ Retroactive operation

**Constitutional Law** ⚷ Admission and exclusion; deportation

Retroactive application of Antiterrorism and Effective Death Penalty Act (AEDPA) provision barring legal permanent residents convicted of certain crimes from seeking discretionary waiver of deportation violated due process, where statute itself did not even provide for retroactivity, Attorney General's opinion offered no explanation for retroactive rule, and, under AEDPA's vast expansion of relevant crimes leading to automatic deportation, harsh consequences of retroactive application would be imposed against people who committed crimes that may have been treated leniently

in criminal justice system and even in cases where immigration judges had already weighed evidence and concluded that it was in interests of United States for immigrant to remain. U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, § 106, as amended, 8 U.S.C.A. § 1105a.

8 Cases that cite this headnote

**[34]    Constitutional Law**    Retrospective laws and decisions; change in law

Due process requirement for retroactive legislation is conditioned upon rationality requirement beyond that applied to other legislation; retroactive characteristics of legislation must not only meet basic due process requirement of being supported by legitimate purpose furthered by rational means, but there must also be independent rationale for retroactivity. U.S.C.A. Const.Amend. 5.

**[35]    Statutes**    Language and Intent; Express Provisions

Without manifest congressional design expressed in clear statutory language, default rule in statutory interpretation requires prospective implementation.

**[36]    Statutes**    Nature and definition of retroactive statute

Courts determining potential retroactive effect of new legislation must review totality of circumstances with solid sense of traditional American notions of fairness and justice.

**[37]    Statutes**    Retroactivity

In determining potential retroactive effect of new legislation, court must have eye toward particularly harsh consequences for unpopular groups or individuals unlucky enough to be targets of fleeting politically-motivated passionate outbursts.

**[38]    Aliens, Immigration, and Citizenship**    Constitutional and statutory provisions

Given recognition of importance of giving proper advice on immigration consequences of disposition of case to criminally accused noncitizen, unauthorized interpretation of immigration laws affecting calculus of risks and relevant rights attaches new and unfair legal consequence to choices reasonably made by affected individual relying on then applicable law, supporting claim against retrospective application of new law.

1 Cases that cite this headnote

**[39]    Criminal Law**    Retroactive operation

Retroactivity of criminal statute depends on when crime is committed, and not on any later date; people have right to know possible consequences of their actions and to know that those consequences will not lightly be changed.

**[40]    Aliens, Immigration, and Citizenship**    Retroactive operation

Labeling long existing statutory right of legal permanent resident to seek relief from deportation as "purely discretionary" was irrelevant to analysis regarding retroactivity of amendment to immigration statute barring legal residents convicted of certain crimes from seeking discretionary waiver of deportation. Immigration and Nationality Act, § 212(c), as amended, 8 U.S.C.A. § 1182(c).

**[41]    Statutes**    Retroactivity

People are entitled to rely on law even when Congress has power to make laws that dash expectations.

**[42]    Statutes**    Retroactivity

Right to rely on settled law is essential to system of law in which people can have some measure of

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

certainty that they will have fair notice of system of rules that will govern consequences of their actions.

**[43]    Aliens, Immigration, and Citizenship** 🔑 Discretionary relief in general

Application for discretionary relief from deportation did not operate as prospective injunction to be governed by law in effect at time injunction was issued, though successful application for discretionary relief prevented penalty of deportation for past misconduct from being imposed in future, where discretionary relief was being barred based upon conduct that never previously carried such bar. Immigration and Nationality Act, § 212(c), as amended, 🔖 8 U.S.C.A. § 1182(c).

**[44]    Aliens, Immigration, and Citizenship** 🔑 Removal or Deportation; Grounds

Any ambiguities in immigration statutes must be read to avoid deportation consequences.

**[45]    Aliens, Immigration, and Citizenship** 🔑 Retroactive operation

Any doubts regarding whether Congress plainly expressed its decision not to make Antiterrorism and Effective Death Penalty Act (AEDPA) provision barring legal permanent residents convicted of certain crimes from seeking discretionary waiver of deportation applicable to pre-Act conduct or events doubt must be resolved in favor of aliens, who are now on brink of deportation based on government's misreading of applicability of that statutory provision. Immigration and Nationality Act, § 212(c), as amended, 🔖 8 U.S.C.A. § 1182(c).

3 Cases that cite this headnote

**[46]    Aliens, Immigration, and Citizenship** 🔑 Law questions

**Statutes** 🔑 Attorney General

Decision of Attorney General in favor of retroactive application of section of Antiterrorism and Effective Death Penalty Act (AEDPA) barring legal permanent residents convicted of certain crimes from seeking discretionary waiver of deportation was not entitled to deference, where Attorney General's opinion was not based on statutory construction or purposes served by retroactivity. Immigration and Nationality Act, § 212(c), as amended, 🔖 8 U.S.C.A. § 1182(c).

16 Cases that cite this headnote

**[47]    Administrative Law and Procedure** 🔑 Erroneous or unreasonable construction; conflict with statute

When agency's interpretation conflicts with established rule of statutory construction with substantive overtones, precedence is given to rule of statutory construction.

**[48]    Administrative Law and Procedure** 🔑 Plain, literal, or clear meaning; ambiguity or silence

Deference to agency resolution of any ambiguity in statute depends on viability of assumption that Congress left that ambiguity to agency to resolve.

**[49]    Statutes** 🔑 Language and Intent; Express Provisions

Where issue is retroactivity of statute, fundamental principle is that Congress should not be seen as having acted against deeply-rooted understanding of justice and human rights unless it has clearly indicated its intent to do so.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*135** Bretz & Associates, Irwin Berowitz, Alan Strauss, New York City, for Petitioner Mojica.

The Legal Aid Society by Helaine Barnett, Gemma Solimene, Olivia Cassin, Scott A. Rosenberg, Brooklyn, NY, Manuel D. Vargas, New York City, for Petitioner Navas.

Zachary W. Carter, United States Attorney, Eastern District of New York, Brooklyn, NY by Scott Dunn, Mary Elizabeth Delli–Pizzi, for Respondent–Defendants.

AMENDED MEMORANDUM AND JUDGMENTS

WEINSTEIN, Senior District Judge.

I. Introduction......................................................................................... 136

II. Facts................................................................................................... 136

  A.  Discretionary Relief from Deportation and the Recent Amendments........ .............. 136

  B.  Saul Navas................................................................................ .............. 138

  C.  Guillermo Mojica............................................................................ 140

III. Constitutional, Statutory and Historical Context.................................................. 142

  A.  History of Immigration................................................................ .............. 143

  B.  Human Rights Obligations of the United States.................................... 146

  C.  Habeas Corpus.................................................................................. 152

  D.  Presumption Against Retroactivity................................................ .............. 154

  E.  Judicial Review of Administrative Actions.......................................... .............. 155

IV. Jurisdiction.......................................................................... .............. 156

  A.  Subject Matter Jurisdiction.......................................................... .............. 156

    (1)  Statutory Background.........................................................................157

      (a)  Section 2241 of Title 28.......................................................... .............157

      (b)  INA Section 106(a), The AEDPA, and The IIRIRA.......................................158

    (2)  Habeas Corpus Jurisdiction Under Section 2241 Not Repealed......................... ....................159

    (3)  Scope of Section 2241 Habeas Review........................................................163

    (4)  Section 2241 Habeas Corpus Jurisdiction Available in Instant Case................................ ...................163

      (a)  A District Court May Review a Section 2241 Petition..........................................163

      (b)  Petitioners in Custody For Habeas Purposes........................................ ...................164

  B.  Eastern District of New York Is the Proper Forum: Personal Jurisdiction .............. 165
     and Venue.................................................................................

(1)    Court Has Personal Jurisdiction Over Petitioners' Custodians.................................................165

(2)    Venue Is Proper with Regard to Petitioners.................................................................167

V.  Protection of Legal Permanent Residents Against Arbitrary Deportation......... .............. 168

   A.  Statutory History of Section 212(c) and Section 440(d)...........................................168

   B.  Section 440(d) Does Not Retroactively Eliminate Right of Petitioners to a
       Fairness Hearing...........................................................................168

     (1)    Constitutional Barriers to Retroactivity................................................169

     (2)    Manifest Congressional Design........................................................172

     (3)    Applying the Default Rule Against Retroactivity.......................................173

       (a)    Basic Application of Landgraf....................................................173

       (b)    Traditional Principles of Statutory Interpretation...............................180

       (c)    No Deference to the Administrative Agency.......................................180

       (d)    A Fortiori Application to Those Whose Cases Were Being Processed by the INS...........182

VI.  Conclusion.....................................................................................182

**\*136  I. Introduction**

This is an important case of first impression, the resolution of which will affect the rights of many legal permanent residents. Petitioners, long time United States residents, seek a court ruling that they are entitled to a hearing determining whether they should not be deported because of humanitarian factors—commonly known as section 212(c) relief. At issue is the new policy and practice of the United States Attorney General to automatically deport certain legal permanent residents. Her action is predicated on her conclusion that there must be retroactive application of section 440(d) of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub.No. 104–132, 110 Stat. 1214 (1996). Section 440(d) bars legal permanent residents convicted of certain crimes from seeking a 212(c) waiver of deportation.

The Attorney General, it is charged, without notice and without reason, arbitrarily and capriciously reversed the ruling of the Board of Immigration Appeals that petitioners had a right to a 212(c) hearing. The government contends:

1) this court has no jurisdiction to consider this issue, and 2) even though the petitioners were convicted of crimes before passage of the AEDPA, they have no entitlement to a waiver hearing—that is to say, rehabilitation, hardship, deleterious effects on family and other 212(c) factors are now retroactively irrelevant.

It is not necessary to consider petitioners' constitutional arguments because the case can be decided as a matter of statutory interpretation. Nevertheless, in construing the statutes' meaning, history, statutory and other protections, and constitutional context provide useful background. The courts have the obligation to consider the context of legislation to determine meaning; this duty is independent of any theory of textualism in interpretation. *See, e.g.,* John F. Manning, Textualism as a Nondelegation Doctrine, 97 Colum.L.Rev. 673 (1997).

To prevent the extended bureaucracy and the executive departments from abusing their powers, Congress has fashioned an extensive set of protections for all individuals

resident in our land, providing appeals and other controls by the Judiciary. Moreover, Congress can be presumed to have acted in the high moral and ethical traditions of the United States after consideration of relevant historical and political factors and with consciousness of the United States' role as global defender of human rights. The courts cannot assume, as the government now in effect suggests they should, that Congress acted contrary to the design and thrust of closely related law.

For reasons set forth below, this court has habeas corpus and declaratory judgment competence, and personal jurisdiction over petitioners' custodians. Venue is proper, and petitioners are entitled to the hearing they seek. This conclusion was set forth in the memorandum and order of this court entered May 30, 1997. *See* *Mojica v. Reno,* 1997 WL 289700 (E.D.N.Y.1997). That memorandum and order was issued without an explanatory memorandum to expedite appeals.

## II. Facts

### A. Discretionary Relief from Deportation and the Recent Amendments

It is conceded that petitioners Saul Navas and Guillermo Mojica would have been, until quite recently, eligible for a 212(c) hearing. The government argues that, in the wake of the AEDPA, they are no longer eligible. Section 212(c) relief, its history, and recent amendments to it are addressed immediately below.

Legal permanent residents convicted of a crime making them deportable have long had a right to seek a waiver of exclusion or deportation under section 212(c) of the Immigration and Nationality Act (INA) as long as they had a "lawful unrelinquished domicile of seven consecutive years in the United States." *See* INA § 212(c), 8 U.S.C. § 1182(c) (added by Immigration and Nationality Act of 1952); *see also* *Francis v. INS,* 532 F.2d 268 (2d Cir.1976) (holding that section 212(c) relief is available in deportation as well as exclusion proceedings); *Matter of Silva,* 16 Int. Dec. 26 (BIA 1976) (adopting and applying *Francis* holding nationwide). It is conceded that petitioners have had more **\*137** than the necessary domicile in the United States to have triggered section 212(c) rights to a hearing. It is important to bear in mind that to understand that the right is to a hearing only and to the exercise of discretion, not to immunity from deportation.

A long-time legal permanent resident accused of any crime triggering deportability could thus be assured that, even if he or she pled guilty or was convicted in criminal proceedings after the trial, there would be available a waiver of deportation in subsequent deportation proceedings before an Immigration Judge. *See generally* *Matter of Lok,* 18 Int. Dec. 101 (BIA 1981), *aff'd on other grounds,* *Lok v. INS,* 681 F.2d 107 (2d Cir.1982) (if the individual could expect to have the seven years by the time of deportation proceedings he or she could be assured of being able to seek the waiver). The Immigration Judge's decision to grant the waiver depends upon a weighing of many factors. Among the favorable elements considered by an Immigration Judge under section 212(c) are family ties within the United States, residence of long duration in this country (particularly when the inception of residence occurred at a young age), evidence of hardship to the individual and family if deportation were to occur, service in this country's armed forces, a history of employment, existence of property or business ties, evidence of value and service to the community, proof of rehabilitation, and other evidence attesting to an individual's good character and likelihood of future positive contributions to American society. *See generally Matter of Marin,* 16 Int. Dec. 581 (BIA 1978).

Until April 24, 1996, a section 212(c) waiver was precluded only for a legal permanent resident whose crimes fell within the INA definition of an "aggravated felony" and who had served five years or more in prison for the crimes. *See* Immigration Act of 1990 (IMMACT), Pub.L. No. 101–649, Section 511(a), 104 Stat. 4978, 5052 (1990), as amended by the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Section 306(a)(10), Pub.L. No. 102–232, 105 Stat. 1733, 1751 (1991) (imposing limitation on § 212(c) relief).

On April 24, 1996, Congress enacted the AEDPA, Pub.L. No. 104–132, 110 Stat. 1214 (1996), which included a provision—section 440(d)—barring section 212(c) relief for individuals "deportable by reason of having committed any criminal offense" coming within several broad classes of crimes, including many relatively minor offenses, regardless of the sentence imposed by the criminal judge, or whether any sentence of imprisonment at all was imposed. Specifically, section 440(d) amended section 212(c) to provide that the waiver is not applicable to an individual who is deportable by reason of having committed (1) an aggravated felony, regardless of the sentence imposed or served, (2) a controlled substance violation, (3) a firearm offense, (4) one of

various miscellaneous crimes, or (5) two or more crimes said to involve "moral turpitude"—a category of offenses that includes certain crimes that fail to live up to this hyperbolic appellation. Under this provision, for example, a legal permanent resident convicted of one minor drug possession charge, or two misdemeanor petty theft or public transportation fare evasion charges—turnstile jumping in the New York City subway system leading to a "theft of services" misdemeanor conviction is considered a crime of "moral turpitude" — is now subject to automatic deportation without any opportunity to present to an Immigration Judge any mitigating equities.

Under the Attorney General's view, any such person could now be picked up off the streets for crimes of this nature committed many years ago, torn from his or her family, job or business, and deported without the fight to seek a waiver with an Immigration Judge on section 212(c) grounds. Immediately after the AEDPA's enactment, the Immigration and Naturalization Service (INS) began arguing that section 440(d) applied in all pending and subsequently initiated deportation cases, regardless of whether the conduct or events triggering the section's restrictions pre-dated the AEDPA.

This position was rejected by the Board of Immigration Appeals (BIA) in a June 27, 1996 decision. The BIA held that section 440(d) may not be applied retroactively to an individual who sought 212(c) relief prior to **138** the AEDPA's enactment on April 24, 1996. *Matter of Soriano,* Int. Dec. 3289, 1996 WL 426888 (BIA June 27, 1996).

The INS sought review of the BIA's *Soriano* decision by the Attorney General. On September 12, 1996, the Attorney General vacated the BIA's decision without providing for public notice or hearing contrary arguments. Some months later, she issued a brief written decision, unsupported by relevant authority, concluding that section 440(d) should be applied to all pending 212(c) waiver cases, even in cases where it was triggered by events pre-dating the AEDPA's enactment. The Attorney General found that "nothing in the language of the newly enacted statute, AEDPA § 440(d), specifies either that it is to be applied in pending deportation proceedings, or that it is not to be." *Matter of Soriano,* Int. Dec. 3289, 1996 WL 426888, at screen page 41 (beginning at screen page 37, AG Op. Feb. 21, 1997). The Attorney General *ipse dixit* decided in favor of retroactivity even in pending cases.

Although of no direct relevance in the instant case, Congress has enacted further statutory reforms related to section 212(c). Specifically, section 212(c) was repealed, effective April 1, 1997, by the "Illegal Immigration Reform and Immigrant Responsibility Act of 1996" (IIRIRA), Section 304(b), Pub.L. No. 104–208, Division C, 110 Stat. 3009 (1996). The IIRIRA replaced section 212(c) relief with a new form of prospective relief for lawful permanent residents called Cancellation of Removal. *See* IIRIRA § 304(a)(3) (new INA § 240A(a)). In general, the repeal and new cancellation relief in the IIRIRA does not apply in proceedings initiated prior to April 1, 1997 —as were petitioners' proceedings. *See* IIRIRA § 309(c)(1) (providing that general rule is that the IIRIRA does not apply to deportation proceedings commenced before April 1, 1997); IIRIRA § 309(c)(2) and (3) (providing the Attorney General with the option to apply IIRIRA law in certain deportation cases pending on April 1, 1997); new 8 C.F.R. § 240.40, published at 62 Fed.Reg. 10371 (March 6, 1997) (following general rule only); and new 8 C.F.R. § 240.16, published at 62 Fed.Reg. 10374 (March 6, 1997) (indicating that at some undetermined time in the future, the Attorney General may pursue options to apply IIRIRA law in certain cases).

The government now argues that section 440(d) applies to all legal permanent residents in deportation proceedings on or after the date of enactment of the AEDPA, regardless of when they committed or were convicted of an offense covered by that section. Under the government's reading, legal permanent residents, many with relatively minor convictions, would now be subject to automatic deportation even if the conduct and conviction took place years or decades ago and even if section 212(c) proceedings were pending when the AEDPA was adopted.

**B. Saul Navas**

Petitioner Navas is a twenty-two year old native and citizen of Panama who lives in St. Albans, New York, within the Eastern District of New York. He was admitted to the United States as a legal permanent resident on July 10, 1987 when he was twelve years old. Since the time of his admission into the United States over nine years ago, he has continuously resided here. Navas's entire immediate family, which includes his mother and step-father, one brother, two half siblings and five step-siblings, resides in the United States. All members of his family are either United States citizens or legal permanent residents. In Panama, Navas has no immediate family and no means of support.

AR.05791

Navas attended Junior High School and High School up to the twelfth grade in Queens, New York. Thereafter he worked in New York City as a delivery boy, as a stock boy, as a building maintenance worker, and as a waiter.

On May 2, 1995, Navas was sentenced in the New York Supreme Court, Queens County as a result of two guilty pleas to offenses committed in Queens. In the first case which involved driving a stolen automobile, Navas was convicted of criminal possession of stolen property in the third degree. In the second case, a purse snatching incident, Navas was convicted of robbery in the third degree. He received concurrent sentences of  **\*139**  one and a half years to four and a half years incarceration. Because he was a fit candidate for rehabilitation, Navas was accepted into the "Shock Incarceration Program" at Lakeview Correctional Facility to serve his sentence. He successfully completed the program on January 8, 1996, and, as a result, was required to serve only eight months.

While Navas was in the Shock program, the INS commenced deportation proceedings against him. In its order to show cause, dated July 21, 1995, the INS alleged that Navas was deportable under section 241(a)(2)(A)(ii) of the Immigration and Nationality Act (INA), which at that time provided that an alien was deportable by reason of having committed two crimes of moral turpitude that did not arise out of a single scheme of criminal conduct.

Navas first appeared before an Immigration Judge on October 11, 1995. At that time he was given an adjournment until November 8, 1995 to retain an attorney. On November 8, 1995, Navas, acting *pro se* and still incarcerated, admitted the allegations listed in the order to show cause and was found deportable by the Immigration Judge. The Immigration Judge advised Navas of the availability of a waiver of deportation pursuant to section 212(c) and encouraged him to apply for such waiver.

On December 8, 1995, Navas filed his application for a 212(c) waiver of deportation with the Office of the Immigration Judge in Napanoch, New York. On or about January 8, 1996, due to his successful completion of the Shock Incarceration Program, Navas was released from state custody. He was, however, immediately taken into custody by the INS and detained at Wyoming County Jail, in Warsaw, New York. The INS set a $9,000 bond for Navas's release. Navas's request that venue be changed to New York City was granted and the INS transferred Navas to its detention facility located at 201

Varick Street, New York, New York where Navas remained in the custody of the INS until May 10, 1996.

On April 24, 1996, the President signed the AEDPA into law. Navas's individual hearing for 212(c) relief was held on May 9, 1996. At his hearing, evidence was admitted and testimony taken from Navas and other witnesses. After all the evidence was presented, the Immigration Judge determined that Navas was eligible for a section 212(c) waiver and granted him a waiver on the merits of the case. Among the positive factors considered by the Immigration Judge were Navas's residency in the United States since a very young age, his substantial family ties to the United States, and his history of employment. The deportation proceedings against Navas were terminated. At that time, the INS reserved its right to appeal the IJ's decision.

On May 10, 1996, the day after Navas's individual hearing, INS released him from detention at Varick Street, without his having to post a bond. By notice of appeal dated May 14, 1996, the INS appealed the Immigration Judge's decision solely on the merits of the case. The INS did not challenge Navas's statutory eligibility to apply for a 212(c) waiver. While the INS timely filed its notice of appeal, the INS did not perfect its appeal as required by the BIA's briefing schedule. The notice provided that the INS submit its brief by June 27, 1996 and that Navas submit his brief on or before August 28, 1996.

On June 27, 1996, as already explained, the Board of Immigration Appeals held that section 440(d) may not be applied retroactively to persons such as Mr. Navas who applied for a waiver of deportation prior to April 24, 1996. The INS sought review of the BIA decision by the Attorney General.

By motion dated August 21, 1996, more than three weeks after the INS's time to submit its brief to the BIA had expired, the INS requested an extension of time to submit its brief. Navas filed a motion to dismiss the INS's appeal on the ground that 1) the INS had not submitted a timely brief in support of its appeal and 2) in support on the merits of the Immigration Judge's decision granting Navas a waiver.

On September 12, 1996, the Attorney General vacated the BIA decision 📄 in *Soriano,* 1996 WL 426888 (BIA June 27 1996). On September 30, 1996, the President signed into law the Illegal Immigration Reform and  **\*140**  Immigrant Responsibility Act of 1996, Pub.L. 104–207, 110 Stat. 3009

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(IIRIRA). Among other things, the IIRIRA amended AEDPA section 440(d) to remove the requirement that in order to trigger the bar to section 212(c) relief, the two crimes of moral turpitude had to have been committed within five years of entry, effective as if included in the AEDPA. *See* IIRIRA § 237(a)(2)(A)(ii).

On February 21, 1997, the Attorney General issued her decision in *Matter of Soriano,* Int. Dec. 3289, 1996 WL 426888 (beginning at screen page 37, AG Op. Feb. 21 1997), holding that the amendments to INA section 212(c) made by AEDPA section 440(d) apply to all deportation proceedings in which an application for relief under section 212(c) was pending when the AEDPA was signed into law. Thereafter, the BIA began systematically ordering deported all immigrants with pending applications for a waiver of deportation that were affected by section 440(d).

Relying upon the Attorney General's retroactivity decision, the BIA, on March 14, 1997, sustained the INS's appeal in Navas's case and ordered him deported to Panama. It did not address Navas's motion to dismiss the INS's appeal nor the merits of the appeal and never ruled on the INS's motion to file a late memorandum of law in support of its appeal. As of the date of the BIA's decision and order Navas has been subject to a final order of deportation.

On April 11, 1997, Navas filed a Petition for Review with the United States Court of Appeals for the Second Circuit to protect his appeal rights in case that court determines that it may exercise jurisdiction to entertain the issues raised in the petition. But see *Hincapie–Nieto v. Immigration and Naturalization Service,* 92 F.3d 27 (2d Cir.1996) (finding no court of appeals jurisdiction). On April 15, 1997, Navas filed the instant petition for Habeas Corpus with this court.

By notice dated May 8, 1997, the INS ordered Navas, then resident and at large in Queens, within the Eastern District of New York, to surrender on May 27, 1997 at its Deportation Branch located at 26 Federal Plaza, New York, New York. The INS released him on $2,000 bond. The government has stipulated that it will not deport him until the present proceeding is terminated following appeals from the judgment of this court. If deported from the United States, Navas, it may be assumed, will not be able to return here to his family.

**C. Guillermo Mojica**

Guillermo Mojica was born on April 15, 1941. He is a native and citizen of Colombia. He has been a legal permanent resident of the United States for twenty-five years, since June 8, 1972. He has lived in Queens, New York ever since he came to the United States.

Mojica married his present wife on November 28, 1980 at a ceremony in Queens. She became a naturalized United States citizen on May 15, 1990. They have two United States citizen children: a daughter, Alexandra, born in Queens on November 13, 1973, and a son, Jean Paul, born in Manhattan on May 29, 1979. The family lives in Elmhurst, Queens, New York.

By federal indictment filed in 1988 in this district, the government alleged that Mojica conspired with others to distribute cocaine in violation of, *inter alia,* section 846 of title 21. Mojica pled guilty to the charge of conspiracy to distribute cocaine. He had no prior convictions. He was sentenced to one year in prison. He began serving his sentence on March 21, 1989. He was released from prison on March 12, 1990. He was not subject to supervision after release.

Some four years after his release in the spring of 1994, Mojica renewed his Alien Registration Card. He encountered no problems with the renewal. The INS neither inquired into his conviction nor began deportation proceedings. A year later, in April of 1995, Mojica applied for United States citizenship, paying the $95.00 fee and filing the appropriate form at 26 Federal Plaza in Manhattan. As required by law, he noted on the application that he had been an illicit trafficker in narcotic drugs and that he had been arrested, cited, charged, indicted, convicted, and imprisoned for violation of the law. He also attached a letter requesting "clemency for [his] unlawful activity which occurred in 1988."

**\*141** On January 9, 1996, when he and his wife were returning from a visit to see family in Ecuador, Mojica was detained at JFK airport. He was held until 7:00 the next morning, when he was paroled into the United States. Parole is a mechanism permitting the INS to allow an alien to remain free within the borders of the United States without "admitting" the alien into this country. It is based on a fiction whereby, although free to move about within the United States, the alien remains "at the threshold of admission." *See* 8 C.F.R. § 235.3(c). The INS inspector took Mojica's passport and Alien Registration Card (Green Card) and he was told to report to INS at 26 Federal Plaza on February 12, 1996, and to bring with him certified copies of his almost eight year-old criminal case disposition. The INS Airport Director at

JFK later requested that a certified copy of Mojica's record of conviction be sent to the Supervisory Immigration Inspector so the Service could "sustain exclusion charges" and place Mojica in exclusion proceedings.

Contemporaneously, the INS sent Mojica a notice that his naturalization interview was to be conducted on March 12, 1996. The notice advised Mojica to bring his passport and Green Card. On February 12, 1996, Mojica went to the INS at 26 Federal Plaza as ordered with certified copies of his Eastern District criminal case disposition. The INS did not return Mojica's passport or Green Card. Instead, it told him that it would contact him. At this deferred inspection, Mojica was accompanied by his attorney, who filed a notice of appearance with the INS. Mojica did not go to his naturalization interview as scheduled on March 12. The INS, however, did not close his case; it noted in the file that the application would remain valid for one year. On April 10, 1996 Mojica's attorney wrote to the INS at 26 Federal Plaza asking it to return Mojica's Green Card. No reply was received.

On April 24, 1996, as already noted in connection with Navas, the President signed into law the AEDPA. (For clarity the statutory chronology is repeated as to Mojica.) As discussed above, section 440(d) of the AEDPA added a provision that INA Section 212(c) waivers of deportation are no longer available for persons "deportable by reason of having committed any criminal offense covered in section 241(a)(2)(A)(iii) [or] (B).... "

On May 28, 1996, Mojica's attorney sent a second letter to the INS at 26 Federal Plaza, New York, asking the INS to expedite the proceedings. The next day, Mojica, on his own initiative, went to the INS office at 26 Federal Plaza to ask for his passport. He arrived at 10:00 a.m. and asked for his papers. He was told to wait. Then, at approximately noon, the INS told him that his papers were being processed and that his documents would be returned to him that afternoon. Instead, however, of preparing to return Mojica's documents, an inspector in the Office of Deferred Inspections filled out another form, "Record of Deportable Alien." Then, at approximately 4:30 p.m. the INS admitted Mojica into the United States as a lawful permanent resident. *See Matter of V—Q—,* 9 Int. Dec. at 79–80 (BIA 1960) (citations omitted) (admission is defined as "the freeing of an alien from the legal restraints to which the immigration laws subject him.... 'Admission' occurs when an authorized employee of the Service communicates in a tangible manner to an applicant for

admission his determination that the applicant has established that he is not inadmissible under the immigration laws. At the point such communication is made and received by the applicant, 'admission' has occurred").

The INS immediately served Mojica with a Warrant for the Arrest of Alien. The warrant alleged that Mojica, whom the Service had just admitted into the United States, was "within the United States in violation of the immigration laws." The INS also served Mojica with an order to show cause, charging him with deportability pursuant to INA sections 241(a)(2)(A)(iii) and 241(a)(2)(B)(i). Thus, at the same time that the INS determined that Mojica was not inadmissible for his drug trafficking conviction, and therefore not subject to exclusion proceedings, it charged him with deportability for the same conviction. The order to show cause, which was to be filed with an Immigration Judge at *142 201 Varick Street, ordered Mojica to appear for a hearing before an Immigration Judge at that same location. Here he was served with notice that he was being detained without bond. He was then transported to the Varick Street INS lockup, where he was accepted into custody.

Although the INS had notices of appearance from Mojica's attorney and was thus aware that he was represented by counsel, Mojica was not taken before an Immigration Judge while at Varick Street. Instead, on June 5, 1996, the INS transferred him from Varick Street to the INS detention facility at Oakdale, Louisiana.

On June 27, 1996, as pointed out above, the Board of Immigration Appeals decided 🚩 *Matter of Soriano,* Int. Dec. 3289, 1996 WL 426888 (BIA June 27, 1996), holding that the AEDPA's bar to 212(c) relief for aliens "deportable by reason of having committed any criminal offense covered in section 241(a)(2)(A)(iii) [or] (B)" should not apply to aliens who had 212(c) applications pending on or before April 24, 1996.

On July 5, 1996, more than five weeks after he was taken into custody, Mojica saw an Immigration Judge in Louisiana for the first time. At the hearing, his attorney appeared telephonically from Brooklyn, and requested a change of venue to New York. Venue was not changed. The case was adjourned until August 2, 1996, when Mojica conceded deportability and was found deportable. He applied for relief from deportation pursuant to INA section 212(c).

The Immigration Judge found that he was ineligible for section 212(c) relief because the passage of the AEDPA

on April 24, 1996 amended section 212(c) to provide that it is no longer available to aliens who are in deportation proceedings if they have been convicted of certain crimes, including drug trafficking crimes. Because Mojica was in deportation proceedings, and he had been convicted of a drug trafficking crime, the Immigration Judge reasoned that Mojica was ineligible for section 212(c) relief. He ordered Mojica deported from the United States.

Mojica mailed a notice of appeal. It was received in a timely fashion, on August 20, 1996, by the Board.

On September 12, 1996, as already noted, the Attorney General vacated the June 27, 1996 decision of the BIA 🚩 in *Matter of Soriano,* Int. Dec.3289, 1996 WL 426888 (beginning at screen page 1, BIA June 27, 1996) (beginning at screen page 37, AG Op. Feb. 21, 1997).

On October 21, 1996, a bond redetermination hearing was held for Mojica. Mojica's counsel appeared telephonically from New York City. He was granted release on a bond of $12,000.00, which was posted the next day by his daughter, Alexandra. The INS notified the Executive Office for Immigration Review that Mojica would be returning to his home.

On February 3, 1997, the BIA dismissed Mojica's appeal. Eleven days later, the INS issued a Notice to Deliver the Alien.

On February 21, 1997, the Attorney General issued her opinion in *Soriano* supporting her September 12, 1996 vacateur of the BIA's June 27, 1996 decision. 🚩 *Matter of Soriano,* Int. Dec.3289, 1996 WL 426888 (beginning at screen page 1, BIA June 27, 1996) (beginning at screen page 37, AG Op. Feb.. 21, 1997). The ruling provided that the AEDPA section 440(d) amendment to INA section 212(c) should be applied retroactively to all deportation proceedings pending on April 24, 1996.

On March 4, 1997, Mojica filed a petition for a writ of habeas corpus in this court. The next day, the court ordered Mojica to surrender to the INS in Oakdale, Louisiana. Mojica flew from LaGuardia Airport to Oakdale, and was accepted by the INS on May 7, 1997. As in the case of Navas, the government has agreed not to deport Mojica pending termination of the instant proceeding and appeals.

## III. Constitutional, Statutory and Historical Context

While federal judicial supremacy in interpretation of the United States Constitution has been acknowledged since the time of Justice John Marshall, all public officials **\*143** have an independent obligation to follow the Constitution on their own motion. Congress and the President—as well as the courts—are expected to adhere whole-heartedly to our commitments to the dignity of persons as embodied in that document and in our history, giving its language substance and meaning. *See, e.g.,* Larry Alexander and Frederick Schauer, On Extrajudicial Constitutional Interpretation, 110 Harv.L.Rev. 1359 (1997) (authorities cited).

In construing a statute courts approach their task with the assumption that Congress and the President acted with sensitivity to the fundamental thrust of our history as one of the world's foremost proponents of the rule of law and human rights, including fairness to all within our borders. It is therefore appropriate when deciding the meaning of the important new statutes dealing with legal permanent residents to put these provisions in their historical and constitutional setting. With this need in mind, as an aid to understanding the relevant provisions, the discussion that follows briefly touches upon the history of: (1) immigration in this country, (2) the international role of this county as a global leader in the defense of human rights (3) habeas corpus, (4) the ex post facto rule and its sibling, retroactivity, and (5) United States internal law designed to check arbitrary and capricious conduct by the bureaucracy.

### A. History of Immigration

Ours is a nation of immigrants and their descendants. Except for the Native Americans whose ancestors were believed to have walked over the Bering Straits land bridge from Asia some twenty-five millennia ago (*See* 🚩 *Bradley v. Milliken,* 484 F.2d 215, 274 (6th Cir.1973) (dissenting opinion), all of us trace our genealogy to overseas forebears who arrived here within the past few hundred years. *Cf.* Tunku Varadarajan, Skeleton May Prove Indians were not the First Americans, Times (London), June 11, 1997, at 12. In our early history immigrants were welcomed to fill an enormous shortage of labor and to settle huge spaces almost devoid—by European standards—of people. Since the colonial period, those seeking religious toleration, political freedom and economic opportunity have been freely received. This trend of unrivaled openness and acceptance continues. *See, generally,* Thomas A. Aleinikoff and David A. Martin,

Immigration: Process and Policy 39–63 (1991) (detailed history of immigration to the United States); Gabriel Chin, The Civil Rights Revolution Comes to Immigration Law: A New Look at the Immigration and Nationality Act of 1965, 75 N.C.L.Rev. 273 (1996); see also, William Branigin, U.S. Posts 27% Rise in Legal Immigration; Almost 916,000 People Admitted Last Year, Wash. Post, Apr. 23, 1997, at A15.

This country has grown and prospered in a climate of constant refreshment by the introduction into our midst of adventurous spirits willing to leave the security and predictability of what they knew in their lands and rulers adjured for the hope of full equality of rights and opportunities within our borders. This American attribute is also the result of more than a collective self-conception, uncontrived and spontaneous development of custom, or nostalgic harkening back to the lore of our national beginnings. See, e.g., Peter H. Schuck, The Transformation of Immigration Law, 84 Colum. L.Rev. 1, 8 (1984) ("American society has always prided itself on the inclusive, assimilative conception of nationhood that it embraces and offers to those who would join us. These qualities of openness have been a dominant feature of our self-definition and national myths."). Our treatment of aliens is rooted deeply in the fertile soil of constitutional and statutory design.

Unlike some European nations which favor citizenship and repatriation by theories of "blood" and "race," full citizenship by birth and easy administrative methods of obtaining citizenship have almost always been favored in this country. See U.S. Const. Amend. 14, § I ("All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside"); Civil Rights Act of 1866, ch. 31, 14 Stat. 27 (confirming concept of *jus soli*—citizenship conferred automatically to African–Americans by birth in United States), currently codified at 8 U.S.C. § 1401 (defining persons who **\*144** acquire citizenship at birth); The Act of June 2, 1924, 43 Stat. 253 (conferring citizenship upon all indigenous peoples born within the United States), currently codified at 8 U.S.C. § 1401 (defining persons who acquire citizenship at birth); *see also,* *United States v. Wong Kim Ark,* 169 U.S. 649, 18 S.Ct. 456, 42 L.Ed. 890 (1898); Jeffery B. Morris and Richard B. Morris, Encyclopedia of American History 630–644 (7th ed.1996) (immigration since colonial times and ethnic evaluation); Peter H. Schuck, The Transformation of Immigration Law, 84 Colum. L.Rev. 1, 9 & n. 26 (1984) (noting 1740 British statute

allowing various groups to obtain rights of British subjects in the colonies). If we are not a "melting pot," it is generally true that we have at least constitutionally offered full integration to all citizens and residents, providing open access to our social, political, technological and economic structures (with some notable historical exceptions including the enslavement of African–Americans and the near genocide of indigenous peoples). *Cf., e.g.,* Voting Rights Act of 1965, 42 U.S.C. § 1971 *et seq.*

Yet, it also cannot be gainsaid that there have been major exceptions to our positive constitutional and statutory river of equal rights policy and our national ethos of openness. Enslavement of those of African origin, the destruction of many Native American nations and the internment of Japanese–Americans are among the most obvious aberrations. There exists a constant tension with a more restrictive impulse. Streams of nativism and xenophobia have percolated and bubbled-up, typically in reaction to waves of immigration responding to demands for labor, based on unfounded fears about the criminality or inferiority of new immigrants. For instance, even though free immigration ruled the day in general, anti-alien sentiment started before the Revolution with statements by some our major leaders against German and other non-British subjects. *See, e.g.,* Marion T. Bennett, American Immigration Policies, A History 3, 7, 297 & n. 3 (1963) (against unrestricted immigration at one time or another were John Adams, John Quincy Adams, Benjamin Franklin, Alexander Hamilton, Patrick Henry, John Jay, Thomas Jefferson, Rufus King, James Madison, Gouverneur Morris and George Washington); *but cf.* Gil Loescher and John A. Scanlan, Calculated Kindness xiii (1986) (George Washington favored free immigration).

The Alien and Sedition Acts of 1798—clearly political in tone and enacted under the aegis of the High Federalists to enhance their political control—serve as further examples of deviation from our basic policy of easy acquisition of citizenship and full rights of resident aliens. As summarized in Jean Edward Smith's biography of John Marshall, the great Chief Justice-to-be, then a member of Congress, strongly opposed barriers to citizenship:

> The [Federalist] party also capitalized on the situation [with France] to pass the infamous alien and sedition acts of 1798—an ill-considered attempt to stifle domestic criticism. These laws involved four measures passed by Congress in June and July. The first, the Naturalization Act of June 18, 1798, extended the period of residence required for

naturalization from five years to fourteen. The Federalists believed that most immigrants voted Republican, and they sought to keep them off the voters rolls as long as possible. The Alien Act of June 25, 1798, authorized the president to expel any nonnaturalized person of foreign birth whom he judged "dangerous to the peace and safety of the United States." The Alien Enemies Act of July 6, 1798, authorized the president, in the event of war, to designate as alien enemies any citizen or subject of a hostile nation residing in the United States and to make regulations to their apprehension, restraint, or removal....

[John] Marshall watched these developments with growing concern.... In fact, Marshall was the only party leader to question the legislation and the only one to recognize that the acts gave the Republicans an issue with which to win back popular support. The High Federalists, in their eagerness to put the country on a war footing had overreached.

Jean Edward Smith, John Marshall, Definer of a Nation, 239 (1996). Marshall continued to oppose the Acts, and they were allowed to lapse. *Id.* at 244; *see also, e.g.,* Gerald L. **\*145** Neuman, Strangers to the Constitution 52–71 (1996) (Alien and Sedition Act debates). This was not the last dispute about aliens.

It is well known that prejudice against the Irish, the Chinese, the Japanese, the Italians, the Jews, the Mexicans and others emerged as these groups emigrated in substantial numbers; it persisted long after their arrival. *See, e.g.,* John Higham, Strangers in the Land, Patterns of American Nativism *passim* (1955) (also noting, *e.g.,* nativist opposition to Scandinavians and Catholics); Albert Eiseman, From Many Lands, *passim* (Athenium, 1970); Lucy E. Salyer, Laws Harsh as Tigers, Chinese Immigrants and the Shaping of Modern Immigration Laws (1995); J.R. Garcia, Operation Wetback: The Mass Deportation of Mexican Undocumented Workers in 1954 (1980).

For the most part, however, these attitudes were—and continue to be—relatively small eddies in the broader river of tolerance, and our need for the foreign born as labor. *See* Higham, Strangers in the Land, Patterns of American Nativism at 115 (business and industry "defense of immigration because of the need for unskilled labor"); *see also, e.g.,* Marion T. Bennett, American Immigration Policies, A History, 13, 53 (1963) ("Americans tended to welcome the foreigners;" the Know–Nothing Party of the mid–19th century failed to reduce the immigration tide

since political needs of the two major parties, technological improvements in transportation, cheap land grants, and industrialists building a huge manufacturing capacity in steel and other products encouraged immigration); Select Commission on Immigration and Refugee Policy Staff Report, U.S. Immigration Policy and the National Interest (1981), *reprinted in* Thomas A. Aleinikoff and David A. Martin, Immigration: Process and Policy 45 (1991) ("After the Civil War, the country's desire for immigrants seemed insatiable"); *see also,* Blaine Harden and Jay Matthews, New Mix Enlivens N.Y. Melting Pot; Immigrants Are Vital Tonic After Decades of Population Drain, Wash. Post, May 26, 1997, at A1 (New York "is thriving, in large measure, because hundreds of thousands of [immigrants] are re-enacting grandpa's elbow-grease story ... immigrants are a windfall ... New York demographers credit immigrants with heading off a potentially 'catastrophic' population drain."); *cf.* John Cassidy, The Melting–Pot Myth, The New Yorker, July 14, 1997, at 40–43 (economic costs and benefits of current immigration).

Perhaps the country's most marked xenophobic paroxysm occurred in the 1920's with the closing of the immigration door and the favoring of West Europeans over Italians, Jews, Asians and others through numerical restrictions by country. *See, e.g.,* Marion T. Bennett, American Immigration Policies, A History, 40–70 (1963). The 1924 Exclusionary Act had a particularly disastrous effect in the 1930's and early 1940's when many thousands of Hitler's victims were excluded by the 1924 law, anti-Semitism, and prejudice of State Department officials. *See, e.g.,* Alberta Eiseman, From Many Lands 190–91 (1970) (Japanese); Gil Loescher and John A. Scanlan, Calculated Kindness, Refugees and America's Half–Open Door xiv (1986) ("In 1939 ... President Roosevelt implicitly acknowledging the strength of popular anti-Semitism, provided no support for a bill introduced by Congress which would have provided special immigration opportunities for up to 20,000 refugee children.").

World War II marked the end of that regrettable interlude, ushering in a return to an epoch of tolerance, equality and openness. Since 1945 "the United States has revived its traditional rhetoric of welcome—and matched its words with action." Gil Loescher and John Scanlan, Calculated Kindness, Refugees and America's Half Open Door xiv (1986). It was clear that after the revealed horrors of the effects of prejudice in Europe and elsewhere—a major factor in leading to the deaths of tens of millions in World War II—"restrictionism was out of place for a nation which aspired to moral and

political leadership in the world." *Id.* at 143. "Since the end of World War II American immigration policies have become noticeably less racist and more humane." *Id.* at 21. This was only partly due to the politics of our anti-communist struggle. *Id.* at 219.

In the 1960s the United States afforded itself the moral satisfaction of passing a nondiscriminatory immigration act, "avoiding" **\*146** the "crabbed and xenophobic one of 1924." Nathan Glazer, A Clamor at the Gates, The New American Immigration 7 (1985). The issue was no longer "whom we shall welcome," but how many, and how they could be treated with dignity, due process and equality as legal residents once they arrived. *Id.* at 11; *see also, e.g., Application of Griffiths,* 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973) (invalidating exclusion of legal permanent residents of Connecticut from practicing law on Equal Protection grounds); *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973) (striking down, on Equal Protection grounds, New York law that only United States citizens could hold permanent state civil service status); *but cf.* Peter D. Salins, Assimilation, American Style x (1997) (recent recurrence of a cycle of nativism "after a full half century of remission").

Signing the Immigration and Nationality Act of 1965, which eliminated the national origins system, President Lyndon B. Johnson spoke to the underlying values of the Act. At the foot of the Statue of Liberty in New York Harbor, the new law, he declared,

> repairs a deep and painful flaw in the fabric of American justice, it corrects a cruel and enduring wrong in the conduct of the American nation. It will make us truer to ourselves as a country and as a people.

Alberta Eiseman, From Many Lands, 201–02 (1970). This retreat from the attitude that aliens had no rights to embrace a regime grounded on notions that immigrants deserved to be treated "fairly" is well summarized by Professor Peter H. Schuck in his "Immigration Law and the Problem of Community":

> [A]profound ideological transformation has begun to undermine the individualistic foundations of classical immigration law, especially its core notion that the government owes no legal obligation to aliens apart from those flowing from the terms and conditions upon which it consented to their entry. By conceiving of entry as only a *privilege,* conditioned on an alien's acceptance of the limited claims and inferior status offered by the government, traditional courts hoped to reconcile restrictive nationalism with individualistic values. This "right-privilege" distinction, so familiar to the constitutional lawyers of an earlier day, was a seductive principle through which courts thought to vindicate the dominant ideals of consent, sovereignty and national community.
>
> During the 1960s and 1970s, however, the American legal system outside the immigration field experienced a tidal wave of change, one that is now beginning to wash over immigration law, traditionally a most insular specialty.

Peter H. Schuck, Immigration Law and the Problem of Community, in Nathan Glazer, Clamor At the Gates, The New American Immigration, 297 (1985). *See also, e.g.,* Peter H. Schuck The Transformation of Immigration Law, 84 Colum.L Rev. 1 (1984); Note, Preserving Procedural Due Process for Legal Immigrants, 65 Fordham L.Rev.2065 (1997). In addition to internal United States constitutional doctrine strengthening the protection of resident aliens and an adherence to historic values alluded to by President Johnson at the 1965 Act's signing, powerful international forces were at work towards the same ends.

### B. Human Rights Obligations of the United States

In his magisterial Foreign Affairs and the U.S. Constitution, Professor Louis Henkin points out that an older view was that aliens need not be protected under the Constitution in the same way as citizens. *See generally,* Louis Henkin, Foreign Affairs and the U.S. Constitution 293–97 (2d ed.1997). Treatment of aliens was viewed as an aspect of foreign relations, intimately related to foreign policy interests. *Id.* at 295. Thus,

> When it became clear that equal protection was required by the federal government, rethinking (and justifying) long-established

distinctions between citizens and aliens did not come readily and (at the end of the twentieth century) may not have come or been fully recognized yet.

*Id.* at 295. Where "the distinction between citizen and alien appears to have little significance for U.S. foreign relations," Professor **\*147** Henkin suggests, discrimination against aliens needs reconsideration. *Id.* at 296–97.

Congress and the President are presumed to know the persuasive and controlling effects on United States jurisprudence of the International Covenant in human rights and other like-manifestations of the law of nations which apply to aliens within United States borders. *See* Louis Henkin, Foreign Affairs and the U.S. Constitution 297 (2d ed.1997). The law of nations (and with it the developing law of human rights) has been treated as a part of the law of the United States since colonial times. *Id.* at 136, n. 17; *see also* Louis Henkin, "Evolving Concepts of International Human Rights and the Current Consensus" 170 F.R.D. 275, 275–81 (1997)170 F.R.D. 275, 275–81 (1997) (paper presented at the International Human Rights Session, Judicial Conference–Second Circuit, June 15, 1996). At the conference Professor Henkin declared: "How a nation treats its own inhabitants is now everybody's business potentially." *Id.* at 276.

There is no point in rehearsing the exact nature of each of the many relevant rights now applicable internationally. Given that this is a case of statutory construction, it is not necessary to declare in which way this country is constitutionally bound. *See* Henkin, Evolving Concepts, 170 F.R.D. at 284 (1997) (international human rights law as a guide to statutory interpretation); *Lareau v. Manson,* 507 F.Supp. 1177, 1189 n. 9 (D.Conn.1980) (Cabranes, J.) (same), *affirmed in part,* 651 F.2d 96 (2d Cir.1981); International Human Rights Instruments § 440.7 (Richard B. Lillich 2d ed.1990) (collecting articles and United States opinions relying on Universal Declaration of Human Rights). Congress—as the lawmaker of the leading proponent of international human rights law—is certainly aware of the elements of current international law that, absent an overriding national policy, it will follow.

Relevant as statutory guides are some of the provisions of the Universal Declaration of Human Rights:

*Article 9*

No one shall be subjected to arbitrary ... exile; ...

*Article 10*

Everyone is entitled in full equality to a fair and public hearing by an independent and impartial tribunal, in the determination of his rights and obligations; ...

*Article 11(2)*

Nor shall a heavier penalty be imposed than the one that was applicable at the time the penal offense was committed....

Universal Declaration of Human Rights, *adopted* on Dec. 10, 1948 United Nations General Assembly Resolution 217A (III), *reprinted in* International Human Rights Instruments 440.1 (Richard B. Lillich 2d ed.1990).

These provisions and other like-documents may be construed to reflect the fight to stay of a lawfully present long-term resident alien. *Cf.* Patrick M. McFadden, The Right to Stay, 29 Vand. J. Transnat'l L. 1 (1996); Louis B. Sohn and Thomas Buergenthal, The Movement of Persons Across Borders 89 (1992) (in expelling aliens a "State must observe the requirements of due process of law, international and domestic").

Regional conventions also contain provisions protecting the fights of resident aliens against arbitrary expulsion and adding to the development of the growing consensus of human rights law as part of international law. *See e.g.,* 1969 American Convention on Human Rights, Act 22(6) and (8), *reprinted in* International Human Rights Instruments 190.1 (Richard B.R. Lillich 2d ed.1990); American Declaration of Human Rights, *reprinted in* International Human Rights Instruments § 430.1 (Richard B. Lillich 2d ed.1990); 1981 African Charter on Human and People's Rights, *reprinted in* International Human Rights Instruments 530.1 (Richard B. Lillich 2d ed.1990).

Article 3 of the 1995 European Convention on Human Rights and Fundamental Freedom recognizes that length of residence in the country increases the weight of an alien's right to stay. *See* International Human Rights Instruments §§ 500.1, 510.1 (Richard B. Lillich 2d ed.1990). It provides:

(1) Nationals of any Contracting Party lawfully residing in the territory of another Party may be expelled only if they

endanger **148** national security or offend against *ordre public* or morality.

(2) Except where imperative considerations of national security otherwise require, a national of any Contracting Party who has been so lawfully residing for more than two years in the territory of any other Party shall not be expelled without first being allowed to submit reasons against his expulsion and to appeal to, and be represented for the purpose before, a competent authority or a person or persons specially designated by the competent authority.

(3) Nationals of any contracting Party who have been lawfully residing for more than ten years in the territory of any other Party may only be expelled for reasons of national security or if the other reasons mentioned in paragraph I of this article are of a particularly serious nature.

Article I of the 1984 Seventh Protocol to the European Convention for the Protection of Human Rights and Fundamental Freedoms provides:

(1) An alien lawfully resident in the territory of a State shall not be expelled therefrom except in pursuance of a decision reached in accordance with law and shall be allowed:

(a) to submit reasons against his expulsion,

(b) to have his case reviewed, and

(c) to be represented for these purposes before the competent authority or a person or persons designated by that authority.

(2) An alien may be expelled before the exercise of his rights under paragraph (1)(a), (b) and (c) of this Article, when such expulsion is necessary in the interests of public order or is grounded on reasons of national security.

*Id.*

In construing the Law of the European Convention on Human Rights, the European Court, the European Commission of Human Rights, and scholars have noted that in considering expulsion, two aspects must be considered: (1) the rights of the alien to be treated fairly, to a hearing, and to submit reasons against expulsion and, (2) the rights of the alien's family legally within the country not to suffer unduly because of expulsion. Relying on the Seventh Protocol—Freedom from Expulsion of Individual Aliens—and interpreting it,

authors D.J. Harris, M. O'Boyle and C. Warbrick state, in reference to the first aspect:

> This guarantees that an alien 'lawfully resident in the territory of a state shall not be expelled except in pursuance of a decision reached in accordance with law' and only, in most cases, after specified procedural rights have been respected. In contrast with Article 4 of the Fourth Protocol, it concerns cases of individual, rather than collective, expulsion. However, unlike Article 4, it requires only that the rule of law be complied with; it is not a prohibition on expulsion.
>
> The requirement that the expulsion be 'in accordance with law' can likewise be taken to have the autonomous meaning that it has in other Convention provisions. Where Article 1 applies, the applicant must be allowed '(a) to submit reasons against his expulsion, (b) to have his case reviewed, and (c) to be represented for these purposes before the competent authority or a person or persons designated by that authority' (Article 1(1)). Exceptionally, an alien may be expelled before he has exercised these procedural rights where the expulsion is 'necessary in the interests of public order or is grounded on reasons of national security' (Article 1(2)). In both of these cases, ... the exceptions should be applied taking into account the principle of proportionality and the rights set out in Article 1(1) should be available after expulsion.
>
> ... [T]he alien's right to submit reasons against his expulsion applies 'even before being able to have his case reviewed'. As to the right to have the expulsion decision 'reviewed', this 'does not necessarily require a two-stage procedure before different authorities'; it would be sufficient for the 'competent authority' that took the decision to consider the matter again. The 'competent authority' does not have to give the alien or his representative an oral **149** hearing; a written procedure would suffice. Nor does it have to have a power of decision; it is enough that it may make a recommendation to the body that does take the final decision. Clearly, the 'competent authority' does not itself have to be a judicial body that complies with Article 6, Convention. As a result, although Article I offers an alien at least the possibility of having his arguments against expulsion taken into account by the executive, ... it offers only a modest guarantee of procedural due process.

D.J. Harris, M. O'Boyle and C. Warbrick, Law of the European Convention on Human Rights 565–66 (1995).

On the second and perhaps more telling point—the effect on family—Harris, O'Boyle and Warbrick, write:

> One developing aspect of the positive obligation of a state to respect family life concerns the position of family members who do not have an independent right to enter or stay in a Convention state where other family members have a right to reside. The essence of family life is the right to live together. Initially, the Commission in *Agee v. UK* regarded the place where family life was to be enjoyed as the place where the father or husband had a right to reside. The Convention does not protect the right to live in a contracting state. Agee had no right to stay in the United Kingdom and it was not shown that his wife could not accompany him if he were deported from the United Kingdom. Accordingly, the United Kingdom would not fail to respect his right to family life if it expelled him from its territory. However, the Commission later accepted that there could be factors which bore on the possibility of effective family life if the other members of the family were compelled to follow the husband/father which undermined the absoluteness of its original criterion. More fundamentally, the discriminatory quality of the test —why should the place of ordinary residence of the family be where the father may go rather than where the mother may—also reduced the impact of the *Agee* rule.

It should be recognized that imposing the obligation on a state to admit a person to its territory or to allow him to stay when he has no right of residence there is a sensitive matter. The Court acknowledged this in *Abdulaziz, Cabalas and Balkandali v. UK* when it said:

> 'The duty imposed by Article 8 cannot be considered as extending to a general obligation on the part of a contracting state to respect the choice by married couples of the country of their matrimonial residence and to accept the non-national spouses for settlement in that country.'

In this case, the applicants had not shown that there were obstacles to establishing family life in their own (the applicants were non-United Kingdom national women with rights of residence there) or their husbands' (their husbands were non-United Kingdom nationals with no right of residence there) home countries. If any future case could not be dealt with on the basis of a conflict with the state's duties under Article 14 (as this case was), then the *Abdulaziz* case leaves it open to a woman or a child to show why they could not enjoy family life in the country of their husband's or father's residence. The strongest cases are where the Convention state members of the family have no right in the law of the alien member state to join him there.... Otherwise, the obstacles to the family members joining the other outside the Convention state will have to be substantial—economic or cultural disadvantage will generally be insufficient. That Convention rights would not be enjoyed there ought to be a more compelling reason— whether a woman, unwilling to do so, would have to submit to Islamic regime in the place of her husband's right of residence might be an example. In addition to drawbacks, arising in the state of the husband's residence, advantages not available there but available to family members in the Convention state, such as imperative medical treatment might constitute an obstacle to establishing effective family life abroad. It is suggested that the Commission and Court ought to keep the test of sufficient hardship distinct from that of **\*150** Article 3, to take into account that what is at stake is the family relationship and not just the likely treatment of one individual.

The duty to respect family life may be stronger where family life has already been established in the state and stronger still where it has been established there for some time. Where the state then seeks to remove a family member who has no right to stay, *he,* as well as the other members of the family, will be able to assert a right to respect for his family life. If the deportation of the family member makes the maintenance of family life practically impossible, then the obligation to respect family life will exclude the removal of the applicant. In *Berrehab v. Netherlands,* the applicant was a Moroccan national whose right to stay in the Netherlands was dependent on him being the husband of a Dutch national. The Court decided that the failure of the Netherlands authorities to grant the applicant a residence permit after their divorce did not respect his family ties with his daughter, since contact with her at the level he had previously enjoyed would have been impracticable following his expulsion. The principle was extended in *Moustaquim v. Belgium* where a deportation order served on a young Moroccan national, who was a second generation immigrant in Belgium, was held to violate his right under Article 8(1). The applicant had been brought to Belgium by

his parents as an infant and, besides his parents, seven brothers and sisters lived in Belgium. Moustaquim was able to demonstrate strong family attachments. It was not suggested that the remainder of the family depart with the applicant. Accordingly, his family life could be enjoyed only in Belgium and the unwillingness of the authorities to allow him to stay violated his right to respect for family life. Similarly in *Beldjoudi v. France,* the Court considered that the deportation from France of a long-settled Algerian national would fail to respect his family life enjoyed in France with his French national wife. The judgment gives special protection to aliens who have established family life in a Convention state and Judge Martens went so far as to suggest the assimilation of 'integrated aliens' and nationals. The *Beldioudi* case switches the relevance of the possibility of family life being enjoyed under Article 8(2). the right to respect for family life for an alien in a Convention state embraces a right to remain, dependent on the demonstration that he has a long and well established family life there. This right, it now appears to be the case, is independent of the conditions in the state to which removal is proposed. The state's obligation to respect with such well-established family life is to allow it to continue where it has been enjoyed. It is a different question whether it might justifiably interfere with the continued enjoyment of family life within the terms of Article 8(2) and it is here that the conditions in the state of destination become relevant. Whilst it sometimes seems as though an applicant in this kind of case is complaining about an interference in breach of a negative obligation (the deportation order), what he is really seeking is a positive benefit, the right to stay in the state in order to enjoy his family life.

D.J. Harris, M. O'Boyle and C. Warbrick, Law of the European Convention on Human Rights 331–34 (1995) (citations omitted); *see also, Council of Europe Press, European Convention on Human Rights, Collected Texts* (1995) (showing adherences, declarations and reservations by country and dates); *cf.,* 28 U.S.C. § 994(d) (federal sentencing context; family ties may be considered with respect to "the nature, extent, place of service, or other incidents of an appropriate sentence"); 18 U.S.C. § 3553; *United States v. Johnson,* 964 F.2d 124, 128–29 (2d Cir.1992) (extraordinary family circumstances are a valid reason for a downward departure in federal sentencing; "we are reluctant to wreak extraordinary destruction on dependants who rely solely on the defendant for their

upbringing"); *United States v. Rose,* 885 F.Supp. 62, 63 (E.D.N.Y.1995).

Particularly with respect to expulsion of aliens, the European Convention on Human Rights is having an impact on internal law of the European Nations since international human rights provisions are part of each nation's law. *See generally* Murray Hunt, Using **\*151** Human Rights Law in English Courts, 153, 235, 241, 243, 247 (1997). This is much the same process as the United States went through when the Federal Supremacy clause was first applied to the states. *See, e.g., id.* at 59; Louis Henkin, Richard Crawford Pugh, Oscar Schachter and Hans Smit, International Law: Cases and Materials 203, 679 (3d ed.1993).

The Restatement (Third) of the Foreign Relations Law of the United States (1987) contains over a score of main entries on the protection of aliens in the United States. The comments and supporting notes are too extensive to quote, but among the black letter rules are the following:

§ 721. Applicability of Constitutional Safeguards

The provisions of the United States Constitution safeguarding individual rights generally control the United States government in the conduct of its foreign relations as well as in domestic matters, and generally limit governmental authority whether it is exercised in the United States or abroad, and whether such authority is exercised unilaterally or by international agreement.

§ 722. Rights of Aliens

(1) An alien in the United States is entitled to the guarantees of the United States Constitution other than those expressly reserved for citizens.

(2) Under Subsection (1), an alien in the United States may not be denied the equal protection of the laws, but equal protection does not preclude reasonable distinctions between aliens and citizens, or between different categories of aliens.

In addition to the individual rights of the alien, the state of which he is a national may pursue remedies against the United States for abuse of its national's rights under United States or International Law. *See id.* § 701 (Obligation to Respect Human Rights); § 711 (State Responsibility for Injury to Nationals of Other States); § 712 (State Responsibility for Economic Injury to Nationals of Other States); § 713

AR.05802

(Remedies for Injury to Nationals of Other States); § 902 (Interstate Claims and Remedies).

The above exposition relates to interpretation of statutes in the light of developing human rights law of which Congress will take cognizance. Petitioners go further and argue that if the statutes here at issue were to be interpreted to mean what the government says they mean, the United States could not give them that meaning without violating its international obligations. It is unnecessary to rely upon that position, which is summarized briefly below.

Petitioner's argument relies on Article 13 of the International Covenant on Civil and Political rights, which provides, as already noted, that an alien facing expulsion "shall ... be allowed to submit reasons against his expulsion and to have his case reviewed by ... competent authority...." Article 13, it is alleged, violates petitioners' right to a statutory section 212(c) hearing clearly available prior to enactment of the AEDPA.

"In the absence of a congressional enactment, United States courts are 'bound by the law of nations, which is a part of the law of the land.' " *Filatriga v. Pena–Irala,* 630 F.2d 876, 887 (2d Cir.1980) (quoting *The Nereide,* 13 U.S. (9 Cranch) 388, 422, 3 L.Ed 769 (1815)). In *Filatriga,* the plaintiffs filed a tort action in federal court. The action did not arise directly under a treaty of the United States. *Filatriga,* 630 F.2d at 880. Thus, the court first had to decide whether the alleged conduct violated the law of nations. The court found that the conduct did violate international law.

The *Filatriga* court noted that in *The Paquete Habana,* 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900), "a standard that began as one of comity only, had ripened ... into 'a settled rule of international law' by 'the general assent of civilized nations.' " *Filatriga,* 630 F.2d at 881 (quoting *Habana,* 175 U.S. at 694, 20 S.Ct. at 297). Therefore, "the courts must interpret international law ... as it has evolved and exists among the nations of the world today." *Filatriga,* 630 F.2d at 881. The requirement of "the general assent of civilized nations" ensures that laws not found universally cannot be claimed a binding international law. *See id.* One of the authorities to which the *Filatriga* court looked was the United Nations. The court cited the **\*152** Universal Declaration of Human Rights, General Assembly Resolution 217(III)(A) (Dec. 10, 1948), as a source of customary international law.

*Id.* at 882. It also relied upon the Declaration on the Protection of All Persons from Being subjected to Torture, General Assembly Resolution 3452, 30 U.N. GAOR Supp. (No. 34) 91, U.N. Doc. A/1034 (1975). Although these covenants were enacted less than fifty years ago, the court considered them part of universally accepted international customary law.

**[1]**  Article 9, paragraph (4) of the International Covenant on Civil and Political Rights 6 I.L.M. 368 I.L.M. 368 (1967), signed by the United States on October 5, 1977, mandates that "[a]nyone who is deprived of his liberty by ... detention shall be entitled to take proceedings before a court, in order that that court may decide without delay on the lawfulness of his detention and order his release if the detention is not lawful." Article 9, petitioners argue, has a direct bearing on the instant case, because Mojica and Navas claim they are being deprived of their liberty. There exists, they submit, within the United States a mechanism to ensure that persons unlawfully detained can contest detention in court—petitions for writs of habeas corpus. To construe the AEDPA and the IIRIRA in a manner that deprives the petitioners of the opportunity to have their petitions entertained would arguably be to violate the International Covenant on Civil and Political Rights. In any event, as already noted, under the law of the Second Circuit, as well as under Supreme Court precedent, where a statute can be construed so as to avoid conflict with international law, it should be so construed.

It is not necessary to decide the merits of petitioners' argument on the binding effect of international law. To ensure that United States law does not conflict with international law, " 'an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains....' " *Filatriga v. Pena–Irala,* 630 F.2d 876, 887 (2d Cir.1980) (quoting *The* *Charming Betsy,* 6 U.S. (2 Cranch) 64, 2 L.Ed. 208 (1804), quoted *in* *Lauritzen v. Larsen,* 345 U.S. 571, 578, 73 S.Ct. 921, 926–27, 97 L.Ed. 1254 (1953)). *See also, e.g.,* Richard B. Lillich and Horst Hannum, International Human Rights, Problems of Law, Policy and Practice 157, 159, 16, 272 (3d ed.1995); *cf.* Judicial Conference, Second Circuit, 170 F.R.D. 312–318 (1997) (public debate by members of Court of Appeals, Second Circuit on effect of treaties and human rights law on internal law of United States).

### C. Habeas Corpus

The writ of habeas corpus is an ancient instrument of common law jurisprudence dating back to the early days of post-Norman Conquest England. *See* Developments in the Law: Federal Habeas Corpus, 83 Harv. L.Rev. 1038, 1042 (1970). In subsequent centuries common law courts used the writ, in one form of another, as a means of ensuring liberty to individuals held by authority of competing English judicial institutions. *Id.* at 1043. Of critical importance to Americans in the history and development of the writ of habeas corpus is that, "[w]hile the [English] Habeas Corpus Act was never extended to the American colonies, the writ as a part of the common law was considered to be the heritage of every Englishman." *Id.* at 1045. Without any affirmative statute granting the right to the writ of habeas corpus, in the years immediately proceeding the formation of the United States, the Great Writ had already been woven into the fabric of the English common law inherited by the former American colonies.

From its earliest days, the Supreme Court has emphasized the central role of the writ of habeas corpus in Anglo–American jurisprudence in protecting individual liberty:

> The general power of issuing this great remedial writ [of habeas corpus], is incident to this court as a supreme court of record. It is a power given to such a court by the common law. Every court possesses necessarily certain incidental powers as a court. This is proved by every day's practice. If this court possessed no powers but those given by statute, it could not protect itself from insult and outrage. It could not enforce obedience to its immediate orders. It could not imprison for contempts in its presence. It could not compel **\*153** the attendance of a witness, nor oblige him to testify. It could not compel the attendance of jurors, in cases where it has original cognizance, nor punish them for improper conduct. These powers are not given by the constitution, nor by statute, but flow from the common law.... The power to punish offences against the government is not necessarily incident to a court. But the power of issuing writs of habeas corpus, for the purpose of relieving from illegal imprisonment, is one of those inherent powers, bestowed by the law upon every superior court of record, as incidental to its nature, for the protection of the citizen.

> .... The common law, in short, forms an essential part of all our ideas. It informs us, that the power of issuing the writ of habeas corpus belongs incidentally to every superior court of record; that it is part of their inherent rights and duties thus to watch over and protect the liberty of the individual.

*Ex parte* 🚩 *Bollman,* 8 U.S. (4 Cranch) 75, 79–80, 2 L.Ed. 554 (1807). The *Bollman* Court admitted "that for the meaning of the term habeas corpus, resort may unquestionably be had to the common law; but the power to award the writ by any of the courts of the United States, must be given by written law." *Id.* at 93–94. As if to minimize the potential threats to liberty inherent in such a conclusion, the Court quickly went on to affirm the grant of authority to issue writs of habeas corpus in the Judiciary Act of 1789. It noted,

> that this act was passed by the first congress of the United States, sitting under a constitution which had declared 'that the privilege of the writ of habeas corpus should not be suspended, unless when, in cases of rebellion or invasion, the public safety might require it.' Acting under the immediate influence of this injunction, they must have felt, with peculiar force, the obligation of providing efficient means by which this great constitutional privilege should receive life and activity; for if the means be not in existence, the privilege itself would be lost, although no law for its suspension should be enacted. Under the impression of this obligation, they give, to all the courts, the power of awarding writs of habeas corpus.

*Id.* at 95–96. The *Bollman* Court was by no means the only early nineteenth century Court to review the history of the writ of habeas in describing the writ's importance:

> The writ of habeas corpus is a high prerogative writ, known to the common law, the great object of which is the liberation of those who may be imprisoned without sufficient cause. It is in the nature of a writ of error, to examine the legality of the commitment. The English judges, being originally under the influence of the crown, neglected to issue this writ where the government entertained suspicions which could not be sustained by evidence; and the writ when issued was sometimes disregarded or evaded, and great individual oppression was suffered in consequence of delays in bringing prisoners to trial. To remedy this evil the celebrated habeas corpus act of the

31st of Charles II. was enacted, for the purpose of securing the benefits for which the writ was given.

*Ex parte Watkins,* 28 U.S. (3 Pet.) 193, 202, 7 L.Ed. 650 (1830).

Subsequently the Supreme Court explained:

> To determine whether habeas corpus could be used to test the legality of a given restraint on liberty, this Court has generally looked to common-law usages and the history of habeas corpus both in England and in this country.

*Jones v. Cunningham,* 371 U.S. 236, 237, 83 S.Ct. 373, 375, 9 L.Ed.2d 285 (1963).

Again and again our courts have emphasized that the writ of habeas corpus is part of the very core of constitutional liberties that protect those within our borders. In a case involving unlawful search and seizure, Justice Jackson described "the most fundamental distinctions between our form of government ... and the police-state," *Johnson v. United States,* 333 U.S. 10, 17, 68 S.Ct. 367, 371, 92 L.Ed. 436 (1948), in the following terms:

> It would not be possible to add to the emphasis with which the framers of our Constitution and this court have declared **\*154** the importance to political liberty and to the welfare of our country of the due observance of the rights guaranteed under the Constitution by these two Amendments. [The legacy of the Constitution and constitutional jurisprudence is] [t]hat such rights are declared to be indispensable to the full enjoyment of personal security, personal liberty, and private property;

> that they are to be regarded as the very essence of constitutional liberty; and that the guaranty of them is as important and as imperative as the guaranties of the other fundamental rights of the individual citizen——the right to trial by jury, to the writ of habeas corpus, and to due process of law."

*Id.,* 333 U.S. at 17 n. 8, 68 S.Ct. at 371 n. 8, 92 L.Ed. 436 (internal citations and quotation marks omitted). Echoing this sentiment in a case involving a criminal violation of the Federal Tax Code, a district court reviewed fundamental constitutional rights:

> Among the large number of individual rights guaranteed by the federal Constitution are those against unreasonable searches and seizures and self-incrimination and those affirming the rights to counsel and to habeas corpus. These rights have two characteristics in common: all extend to aid the individual in extra-judicial contact with the government; all are directed to the preservation of the right to be exempt from all unauthorized, arbitrary or unreasonable inquiries and disclosures in respect of (the people's) personal and private affairs.

*United States v. Tarlowski,* 305 F.Supp. 112 (E.D.N.Y.1969).

The critical nature of the right to habeas corpus is reviewed in a dissent by Justice Rutledge joined by Justice Black and Justice Murphy. Soon after the Second World War, expressing concern at the majority's holding that territorial jurisdiction is a prerequisite to filing a petition for a writ of habeas corpus with a district court, Justice Rutledge wrote: "[T]he experience of less fortunate countries should serve as a warning against the unwarranted curtailment of the jurisdiction of our courts to protect the liberty of the

individual by means of the writ of *habeas corpus*." 🚩 *Ahrens v. Clark,* 335 U.S. 188, 210, 68 S.Ct. 1443, 1454, 92 L.Ed. 1898 (1948).

The ancient and continued fundamental importance of the availability of habeas corpus cannot be ignored:

> Habeas corpus is meant to be "efficacious ... in all manners of illegal confinement." [William Blackstone, Commentaries 129 (6th ed. 1775).] Yet if the writ is to be an efficacious check on the confinement and deprivation of liberty attending physical removal of persons from the United States, judicial review of [deportation and] removal orders must not be precluded. Ultimately, habeas corpus functions to "insure the integrity of the process" by which the state deprives individuals of their liberty. [William F. Duker, A Constitutional History of Habeas Corpus 3 (1980).] If the integrity of the American legal system is to be insured, the Great Writ must be extended to all whose liberty the state might deprive.

Trevor Morrison, Note, Removed from the Constitution?: Deportable Aliens Access to Habeas Corpus Under the New Immigration Legislation, 35 Colum. J. Transnat'l L. (Forthcoming Sept. 1997) (manuscript at 33, on file with the court).

This brief review of the importance of habeas corpus ends with a reminder from the last century pertaining to any threat to individual liberty:

> It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed.

🚩 *Boyd v. United States,* 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746 (1886).

**D. Presumption Against Retroactivity**

Anglo-American law has long presumed that in the absence of explicit language, new statutes may be applied only prospectively. This legal presumption predates the formation **\*155** of our nation and has been incorporated into the American legal system from its inception. *See, e.g.,* 🏳 *Landgraf v. USI Film Products,* 511 U.S. 244, 266 n. 17, 114 S.Ct. 1483, 1497 n. 17, 128 L.Ed.2d 229 (1994) (quoting Kent, C.J., *in Dash v. Van Kleeck,* 7 Johns 477, 503 (N.Y.1811) ("It is a principle of the English common law, as ancient as the law itself, that a statute, even of its omnipotent parliament, is not to have retrospective effect"). Chief Justice John Marshall explained the presumption in favor of prospective effect of statutes:

> It is a principle which has always been held sacred in the United States, that laws by which human action is to be regulated look forwards, not backwards; and are never to be construed retrospectively unless the language of the act shall render such construction indispensable.

*Reynolds v. McArthur,* 27 U.S. (2 Pet.) 417, 7 L.Ed.470 (1829).

This core principle, essential for just and legitimate governance, has been reiterated throughout the last two centuries. *See, e.g.,* 🏳 *Landgraf v. USI Film Products,* 511 U.S. 244, 266, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994) ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly...."); 🏳 *Union Pacific R.R. Co. v. Laramie Stock Yards Co.,* 231 U.S. 190, 202, 34 S.Ct. 101, 104, 58 L.Ed. 179 (1913) ("The principle of these cases [on statutory construction] forbids a retroactive operation to be given to the statute under consideration. To do so would cause in a high degree the evil and injustice of retroactive legislation."); *Winfree v. Northern Pac. Ry. Co.,* 227 U.S. 296, 302, 33 S.Ct. 273, 274, 57 L.Ed. 518 (1913) (statute "should not be construed as retrospective [because i]t introduced a new policy and quite radically changed the existing law").

### E. Judicial Review of Administrative Actions

**[2]**  **[3]**  The judiciary is often called upon to review the administrative execution of laws passed by Congress. The determination of the level of deference due to an administrative interpretation of the laws involves a dual inquiry. The court must decide whether to apply the agency's statutory construction. *Chevron v. Natural Resources Defense,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Alternatively, the court must determine whether the question involves the kind of interpretation that is the sole province of the judiciary. Regardless of the approach, any action taken by an agency must fail if it is arbitrary and capricious.

**[4]**  In *Chevron,* the Supreme Court provided a basic standard:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the Court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction of the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron v. Natural Resources Defense,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). This two-step analysis provides a method for determining "the issue of the appropriate role of courts when they review agency resolutions of *policy* issues." 1 Kenneth Culp Davis, Richard J. Pierce, Jr., Administrative Law Treatise § 1.7 (3d ed.1994) (emphasis supplied). Where the agency decision is one of policy, the court is instructed to defer to any "reasonable" agency decisions. *Chevron,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Although "[t]he second step of *Chevron* has provoked great controversy among judges and scholars," (1 Kenneth Culp Davis, Richard J. Pierce, Jr., Administrative Law Treatise § 1.7 (3d ed.1994)), there is no question that agency decisions that are irrational and **\*156** unreasonable will not be upheld. The basic proposition that the judiciary will not give weight to the actions of administrative agencies that "are arbitrary, capricious, or manifestly contrary to the statute" is uncontroverted. *INS v. Cardoza Fonseca,* 480 U.S. 421, 444 n. 29, 107 S.Ct. 1207, 1220 n. 29, 94 L.Ed.2d 434 (1987); *see generally, e.g.,* Richard J. Pierce, Jr., et al., Administrative Law and Process 111–129 (2d ed.1992).

**[5]**  **[6]**  In contrast to discretionary policy questions left open in legislation to administrative interpretation, questions of statutory construction are for the judiciary. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). For the last two centuries, this maxim has provided a touchstone in judicial review. While "[i]n the performance of assigned constitutional duties each branch of the government must initially interpret the Constitution," *United States v. Nixon,* 418 U.S. 683, 703, 94 S.Ct. 3090, 3105, 41 L.Ed.2d 1039 (1974), ultimately the final word on the interpretation of the supreme law of the land, the Constitution, and of congressionally enacted statutes must come from the judiciary. As the *Chevron* Court itself recognized, "The judiciary is the final authority on issues of statutory construction...." *Chevron v. Natural Resources Defense,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984). Where courts must rely on common law principles of statutory construction as interpreted by the Supreme Court, "[t]here is ... no reason for courts—the supposed experts in analyzing judicial decisions—to defer to agency interpretations of the Court's opinions." *Akins v. Federal Election Comm'n.,* 101 F.3d 731, 741 (D.C.Cir.1996), *cert. granted,* 520 U.S. 1273, 117 S.Ct. 2451, 138 L.Ed.2d 210 (1997).

**[7]** Finally, any action taken by an administrative agency may be reviewed under the arbitrary and capricious test. The Supreme Court's initial and most deferential statement of the rule required that an administrative action must be upheld "if any state of facts reasonably can be conceived that would sustain" the agency's decision. *Pacific States Box & Basket Co. v. White,* 296 U.S. 176, 185, 56 S.Ct. 159, 163, 80 L.Ed. 138 (1935). "[T]his formulation [is similar to] what has become known as the loose rational relation test [in constitutional law]. The court continues to use this exceptionally deferential version of the arbitrary and capricious test in some important areas of judicial review" in areas of law not relevant to the instant case. 2 Kenneth Culp Davis, Richard J. Pierce, Jr., Administrative Law Treatise § 11.4 (3d ed.1994). Modern case law supports much closer judicial scrutiny. *See, e.g., Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The exact meaning of "arbitrary and capricious" remains unclear, but in the context of INS decisions, a court must rely on guidance provided by the court of appeals for the Second Circuit. An "inadequate basis for the decision [is an important factor in determining] that the [Board of Immigration Appeals] acted in an arbitrary and capricious manner." *Vargas v.INS,* 938 F.2d 358, 362 (2d Cir.1991).

In reviewing the actions taken by the INS, following the orders of the Attorney General, with respect to Mojica and Navas, a court will have to make the following determinations: First, has the INS made reasonable policy determination in interpreting the ambiguous sections, if any, of the AEDPA? Second, with respect to any questions relating strictly to statutory construction, what is the proper construction relying on common law principles and judicial interpretations of those principles? Finally, considering the actions that the INS took with respect to Mojica and Navas, were any findings necessary to support those actions arbitrary or capricious?

## IV. Jurisdiction

### A. Subject Matter Jurisdiction

**[8]** This case presents jurisdictional issues of great moment. If a district court has habeas corpus jurisdiction and venue is proper under sections 1391 and 2241 of title 28, it also is competent to issue a declaratory judgment. 28 U.S.C. §§ 2201, 2202; Charles A. Wright, Law of Federal Courts 712–20 (5th ed.1994).

**\*157 [9]** The government contends that this court lacks subject matter jurisdiction over these petitions to consider the retroactivity of AEDPA section 440(d). Relying on jurisdiction-modifying provisions of the AEDPA and the IIRIRA, the government asserts that the only remaining judicial review relating to final orders of deportation for legal permanent resident criminal aliens such as petitioners is in the court of appeals, and that such review is available only for substantial constitutional claims. As the petitioners' claims are not of the substantial constitutional variety, the government avers, they cannot be reviewed by any court.

Petitioners, in contrast, assert that this court does have jurisdiction to consider their claims. They point out that the theory of jurisdiction that the government urges upon the court would bar them from obtaining judicial review on a straight question of law——the proper statutory construction of AEDPA section 440(d). Petitioners argue that the refusal of the Immigration Judge (with respect to Mojica) and the Board of Immigration Appeals (BIA) (with respect to both petitioners) to consider the merits of petitioners' section 212(c) applications, as a matter of law, was based on a misconstruction of the effective date of AEDPA section 440(d). Petitioners neither seek review of discretionary determinations nor revisitation of administrative factual findings; they challenge an interpretation of law. Accordingly, the court need not decide whether there is jurisdiction to review discretionary determinations or findings of fact. *See United States v. Shaughnessy,* 353 U.S. 72, 77 S.Ct. 618, 1 L.Ed.2d 652 (1957).

Petitioners argue that the government's tendered construction of judicial review under AEDPA is implausible. If the government's position were to be accepted, it would present a situation in which the deportation process for them and others like them, from beginning to end, would be entrusted solely to the executive branch without any opportunity for correction of legal errors, except those of "substantial constitutional" proportion. They assert that Congress, in enacting the AEDPA and the IIRIRA, did not vest the Attorney General with unreviewable and absolute power to deport legal permanent residents. The government's interpretation would call into question the most basic tenets of out tripartite system of government which has since *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), assigned to the judiciary the final responsibility for interpreting the law.

Petitioners' argument is persuasive. The government is incorrect as a matter of statutory construction. Congress could not have intended the result that the government's position ordains.

 [10]   The court retains subject matter jurisdiction under its general habeas corpus powers, which Congress did not eliminate. The statutory changes wrought by the AEDPA and the IIRIRA bar the judicial review that was once available pursuant section 106 of the Immigration and Nationality Act, section 1105a(a)(10) of Title 8 of the United States Code.

*See* AEDPA § 401(e) (eliminating the old INA § 106, 8 U.S.C. § 1105a(a)(10)); AEDPA § 440(a) (providing for a new INA § 106, 8 U.S.C. § 1105a(a)(10)); IIRIRA § 306(b)–(c) (repealing INA § 106, 8 U.S.C. § 1105a with respect to actions filed on or after Sept. 30, 1996). While the amendments manifest Congress's desire to streamline the deportation process, the AEDPA and the IIRIRA leave undisturbed the independent authority of federal district courts to entertain habeas petitions under section 2241 of Title 28. The reasons for this conclusion are demonstrated below.

Because this issue is one of statutory interpretation, petitioners' constitutional arguments based on the Suspension Clause, the Due Process Clause, and the Separation of Powers principles embodied in Article III of the Constitution need not be reached. *But see,* Note, The Constitutional Requirement of Judicial Review for Administrative Deportation Decisions, 110 Harv. L.Rev. 1850 (1997).

**(1) Statutory Background**

**(a) Section 2241 of Title 28**

Section 2241 of Title 28 of the United States Code establishes federal courts' power **\*158** to grant the writ of habeas corpus. It provides in relevant part that:

> (a) Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions.

> (a) ....

> (c) The Writ of habeas corpus shall not extend to a prisoner unless—

> (1) He is in custody under color or by color of the authority of the United States or

> (1) ....

> (3) He is in custody in violation of the Constitution or laws or treaties of the United States ...

28 U.S.C. § 2241(a), (c)(1), (c)(3). Section 2241 is the direct descendant of section 14 of the Judiciary Act of 1789 and the 1867 Act which expanded the scope of the writ. *See,* Act of Sept. 24, 1789, ch. 20, § 14, 1 Stat. 82; Act of Feb. 5, 1867, ch. 28, 14 Stat. 385; *see also Felker v. Turpin,* 518 U.S. 651, ——, 116 S.Ct. 2333, 2338, 135 L.Ed.2d 827 (1996).

**(b) INA Section 106(a), The AEDPA, and The IIRIRA**

Legal permanent residents have always had the right to test the legality of their deportation orders before an Article III court. Until the enactment of the 1952 Immigration Act, the procedure for doing so was by means of a habeas corpus action in district court. *See Heikkila v. Barber,* 345 U.S. 229, 235, 73 S.Ct. 603, 605–06, 97 L.Ed. 972 (1953) ("Now, as before, [an alien] may attack a deportation order only by habeas corpus."). After 1952, an alien could challenge a deportation order in habeas actions as well as in an action for declaratory relief pursuant to the Administrative Procedure Act (APA). *See Shaughnessy v. Pedreiro,* 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868 (1955).

The Immigration Act of 1961 amended the INA, substantially altering the system of judicial review and establishing the regime that remained in place until the recent amendments. Specifically, the 1961 Act sought to eliminate the APA declaratory actions. In their stead section 106(a) of the INA provided that petitions for review before the courts of appeal "shall be the sole and exclusive procedure for judicial review of all final orders of deportation except" as provided elsewhere in the section. 8 U.S.C. § 1105a (amended Apr. 24, 1996 by AEDPA §§ 401(e), 440(a), and prospectively repealed Sept. 30, 1996 by IIRIRA § 306(b)–(c)). Sub-section (a)(10) of section 1105a authorized habeas corpus review:

> (10) Habeas Corpus

[A]ny alien held in custody pursuant to an order of deportation may obtain judicial review thereof by habeas corpus proceedings.

8 U.S.C. § 1105a(a)(10) (amended Apr. 24, 1996 by AEDPA §§ 401(e), 440(a), and prospectively repealed Sept. 30, 1996 by IIRIRA § 306(b)–(c)).

On April 24, 1996, the AEDPA became law. Section 401(e) of the Act, entitled "Elimination of Custody Review by Habeas Corpus," struck the habeas corpus provision of INA section 106(a). AEDPA Section 440(a) substituted new language: "Any final order of deportation against an alien who is deportable by reason of having committed [certain crimes] shall not be subject to review by any court." AEDPA § 440(a), 110 Stat. 1276–77 (1996) (amending and codified at 8 U.S.C. § 1105a(a)(10) which paragraph was prospectively repealed Sept. 30, 1996 by IIRIRA § 306(b)–(c)).

There was no mention of section 2241 of Title 28 in the AEDPA.

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") was enacted on September 30, 1996 and further amended the procedures governing judicial review of deportation orders. *See generally* IIRIRA § 306(a), Pub.L. No. 104–208, 110 Stat. 3009 (Sept. 30, 1996). The IIRIRA contains two sets of provisions, transitional and permanent. The permanent changes made by the Act govern deportation proceedings commenced after April 1, 1997. *See* IIRIRA § 309(c). The transitional provisions, which are not codified in the United States Code, apply to deportation proceedings commenced before April 1, 1997, where **\*159** the deportation order became administratively final after October 30, 1996. *See* § 309(c)(4). A deportation order that became administratively final on or before October 30, 1996 is governed by the Immigration and Naturalization Act, as amended through September 30, 1996.

 [11]    Because petitioners' deportation orders became administratively final after October 30, 1996, their cases are governed by the IIRIRA's transitional rules, specifically section 309(c)(4)(G). Section 309(c)(4)(G) provides that "there shall be no appeal permitted in the case of an alien who is inadmissible or deportable by reason of having committed" one of the enumerated crimes. Because each of the petitioners committed one of the enumerated crimes, they are subject to section 309(c)(4)(G).

 [12]    Neither the IIRIRA's transitional rules, nor its permanent provisions, specifically address or amend the habeas jurisdiction of the district courts under section 2241 of Title 28.

### (2) Habeas Corpus Jurisdiction Under Section 2241 Not Repealed

 [13]    The interplay between section 2241 and the recently enacted modifications of judicial review implicates the clear statement rule—a rule governing repeals of habeas jurisdiction. Almost one-hundred thirty years ago, and again last year, the Supreme Court explicitly admonished that congressional intent to repeal habeas jurisdiction must be express and that "[r]epeals by implication are not favored."

*Felker v. Turpin,* 518 U.S. 651, ——, 116 S.Ct. 2333, 2338, 135 L.Ed.2d 827 (1996); *see also Ex Parte Yerger,* 75 U.S. 85, 105, 19 L.Ed. 332, 8 Wall. 85 (1868). In both *Felker* and *Yerger* the Court refused to read jurisdiction-modifying statutes enacted by Congress as repealing other avenues of habeas jurisdiction that had not been specifically abrogated, much less mentioned, by those jurisdiction-modifying statutes. Only upon a clear statutory statement —a specific, express and unambiguous directive—can a court conclude that Congress meant to repeal an independent avenue of habeas jurisdiction. Such a clear statement is absent from the governing statutes in the present case.

*Yerger* involved the scope of a Congressional limitation on the appellate jurisdiction of the Supreme Court. In 1867 Congress expanded power of the federal courts to issue writs of habeas corpus, allowing such writs "in all cases where any person may be restrained of his or her liberty in violation of the constitution, or any treaty or law of the United States." *See* Act of Feb. 5, 1867, ch.28, 14 Stat. 385. The same legislation also expanded the appellate jurisdiction of the Supreme Court, authorizing appeals from any final decision of the circuit courts on a habeas petition. *See id.,* 14 Stat. 386. The following year Congress retreated and revoked this appellate jurisdiction, repealing " 'so much of the [1867] act ... as authorized an appeal from the judgment of the Circuit Court to the Supreme Court of the United States.' " *See Ex Parte Yerger,* 75 U.S. 85, 87, 19 L.Ed. 332, 8 Wall. 85 (1868) (quoting Act of March 27, 1868, ch.34 § 2, 15 Stat. 44).

The question considered by the *Yerger* Court was whether the 1868 Act also revoked the Supreme Court's power to entertain habeas petitions under section 14 of the Judiciary Act of 1789. The Court held that it did not, explaining that the text of the 1868 Act addressed only jurisdiction over appeals conferred by the 1867 Act and that it made no reference to habeas jurisdiction under the 1789 Act.

Last year in *Felker* the Court—in considering the validity of an AEDPA jurisdiction-modifying provision unrelated to the provision here at issue—reaffirmed the rule against repeals by implication. Specifically, it held that while the AEDPA "gatekeeping" provision—section 106(b)(3)(E)—legitimately precluded review by appeal or petition for certiorari a denial of an application for leave to file a second or successive habeas petition in district court, the Act could not be read to foreclose the section 2241 avenue of original habeas review. Noting the parallels to *Yerger,* the Court unanimously held that since the AEDPA "makes no mention of our authority to hear habeas petitions filed as original matters in this Court ... we decline to find a ... repeal of § 2241 of Title 28 ... by implication ...." **\*160** *Felker v. Turpin,* 518 U.S. 651, ——, 116 S.Ct. 2333, 2338, 135 L.Ed.2d 827 (1996).

The instant case involves an issue not dissimilar to those confronted by the *Yerger* and *Felker* Courts: whether recent jurisdiction-modifying amendments to the INA repeal by implication an independent and unrelated statutory source of jurisdiction—section 2241 of Title 28—thereby depriving courts of this long-established habeas jurisdiction.

As noted, the AEDPA amended the INA, with section 401(e) deleting the habeas provision providing a method for judicial review of deportation orders by habeas corpus proceedings and section 440(a) inserting new language establishing that deportation orders against aliens convicted of certain crimes "shall not be subject to review by any court." *See* AEDPA §§ 401(e), 440(a). Similarly, IIRIRA section 309(c)(4)(G)—the interim amendment of INA section 106—provided that "there shall be no appeal permitted" in the case of certain criminal aliens and new INA section 242(g), codified at section 1252 of Title 8 of the United States Code, added by IIRIRA section 306, provided that "no court shall have jurisdiction ... except as provided in" this section. *See* IIRIRA §§ 306, 309. It is clear that, by these provisions, Congress intended to speed the process of deportation of criminal aliens by restricting judicial review of final orders of deportation.

Nevertheless, as was the case in *Yerger* and *Felker,* there is no indication that Congress intended to take the dramatic—and arguably unconstitutional—step of repealing the habeas statute with roots traceable to our nation's beginnings. *See, e.g.,* Act of Sept. 24, 1789, ch. 20, § 14, 1 Stat. 82 (ancestor of section 2241(a) of Title 28); Act of Feb. 5, 1867, ch.28, 14 Stat. 385 (ancestor of section 2241(c)(3) of Title 28); *see also Ex Parte Yerger,* 75 U.S. 85, 95, 19 L.Ed. 332, 8 Wall. 85 (1868) ("The great writ of habeas corpus has been for centuries esteemed the best and only sufficient defense of personal freedom"). *See also,* Trevor Morrison, Note, Removed from the Constitution?: Deportable Aliens Access to Habeas Corpus Under the New Immigration Legislation, 35 Colum. J. Transnat'l L. (Forthcoming Sept. 1997) (manuscript at 29, on file with the court) (arguing that AEDPA and "IIRIRA must ... either be read as leaving intact some access to challenge [deportation orders controlled by AEDPA] and [removal orders [controlled by IIRIRA] by habeas corpus or be struck down as unconstitutional."). The AEDPA does not amend, or even mention, section 2241 of Title 28. Nor does the IIRIRA.

In keeping with *Felker* and *Yerger,* the court cannot here find that Congress repealed section 2241 by implication. *See, e.g., Ojo v. INS,* 106 F.3d 680, 681 (5th Cir.1997) (holding that AEDPA cannot be interpreted to have altered requirements *by implication* for habeas review sought pursuant to section 2241 of Title 28); *cf. Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1018, 104 S.Ct. 2862, 2880–81, 81 L.Ed.2d 815 (1984) ("where two statutes are 'capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective' ") (citations omitted).

**[14]**    Congress is expert in the process of law-making. Had it desired to repeal section 2241, or render it inapplicable to challenges to deportation orders, it would have taken the necessary steps to do so. It must be presumed that Congress was mindful of the necessity for a clear statement to that effect. Congress is presumed to "know the law."

*See generally, Director, OWCP v. Perini North River Associates,* 459 U.S. 297, 319, 103 S.Ct. 634, 648, 74 L.Ed.2d 465 (1983); *see also Cannon v. University of Chicago,* 441 U.S. 677, 696–97, 99 S.Ct. 1946, 1957–58, 60 L.Ed.2d

560 (1979) (same). As the *Felker* Court acknowledged, Congress knows how to repeal habeas jurisdiction. Where it intends to do so, it states that intention expressly. *See Felker v. Turpin,* 518 U.S. 651, ——, 116 S.Ct. 2333, 2338, 135 L.Ed.2d 827 (1996) (AEDPA section 103 expressly eliminated original habeas jurisdiction in the courts of appeals by amending Federal Rules of Appellate Procedure.). This —as Congress is doubtless aware—is the purpose of the clear statement rule: courts do not have to resort to divining phantom or unarticulated congressional intentions to repeal habeas jurisdiction where there is statutory silence. In **\*161** the wake of the AEDPA and the IIRIRA, section 2241 remains a viable basis for habeas jurisdiction.

Other cases interpreting the AEDPA amendments are consistent with this conclusion. Courts have noted that despite the AEDPA's withdrawal of jurisdiction, "some means of seeking judicial relief remain[s] available." *Yesil v. Reno,* 958 F.Supp. 828, 837 & n. 7 (S.D.N.Y.1997) (citing cases); *see Hincapie–Nieto v. INS,* 92 F.3d 27, 30–31 (2d Cir.1996) ("at least some avenue of judicial relief remains available"; "we express no opinion on the nature of the remedy or the scope of review that remains available in any court"); *Kolster v. INS,* 101 F.3d 785, 790–91 (1st Cir.1996) (same); *Salazar–Haro v. INS,* 95 F.3d 309, 311 (3d Cir.1996) ("we do not foreclose judicial review of all claims by aliens arising in the course of deportation proceedings"), *cert. denied,* 520 U.S. 1239, 117 S.Ct. 1842, 137 L.Ed.2d 1046 (1997). District courts addressing the AEDPA's effect on section 2241 jurisdiction have been almost unanimous in their agreement that section 2241 is available and has not been repealed. *See, e.g., Yesil v. Reno,* 958 F.Supp. 828 (S.D.N.Y.1997); *Eltayeb v. Ingham,* 950 F.Supp. 95 (S.D.N.Y.1997); *Duldulao v. Reno,* 958 F.Supp. 476 (D.Haw.1997); *Dunkley v. Perryman,* 1996 WL 464191 (N.D.Ill.1996); *Mbiya v. INS,* 930 F.Supp. 609 (N.D.Ga.1996); *but see Theck v. INS,* 1997 WL 37565 (N.D.Cal.1997) (dismissal for lack of jurisdiction).

**[15]**    From the government's perspective, the conclusion that section 2241 was not repealed by the AEDPA or the IIRIRA is irrelevant because, it argues, it has long been the case that habeas proceedings are not the proper mechanism to challenge final deportation orders. The government's theory is that Congress removed section 2241 as an independent source of habeas jurisdiction in the context of deportation some 35 years ago in enacting the 1961 Immigration Act.

As part of that Act, Congress established procedures in INA section 106(a) providing the "sole and exclusive" mechanism for challenging final deportation orders. In doing so, the government asserts, Congress restricted section 2241's general authorization of habeas review, rendering it inapplicable to deportation orders. As already demonstrated, section 106(a) of the INA stated (prior to repeal) that petitions for review before the courts of appeal "shall be the sole and exclusive procedure for ... the judicial review of all final orders of deportation ... except" as provided elsewhere in the section. *See* INA § 106(a), 8 U.S.C. § 1105a(a) (prospectively repealed Sept. 30, 1996 by IIRIRA § 306(b)–(c)). Until the recent amendments, the "except[ions] provided ... in this section [106(a) ]" included a provision for habeas corpus. *See* INA § 106(a)(10), 8 U.S.C. § 1105a(a)(10) (as it existed prior to amendments by AEDPA §§ 401(e), 440(a), Apr. 24, 1996, and the prospective repeal by IIRIRA § 306(b)–(c), Sept. 30, 1996). The government points out that, at that time prior to amendment and eventual repeal of section 106(a) of the INA, section 2241 was not referenced as an exception to the "sole and exclusive" procedure, and extrapolates from this omission that Congress effectively repealed (i.e. prohibited the applicability of) section 2241 in the context of final deportation orders, replacing it with habeas corpus review provided by section 106(a)(10). *See* Gov. Mem. at 12 ("with respect to final deportation orders, INA section 106(a)(10)'s authorization of habeas review for aliens in custody was not in addition to, but in substitution for, the general authorization of habeas review at section 2241 ").

Thus, under the government's theory, after the AEDPA repealed the habeas exception at INA section 106(a)(10), the only remaining mechanism for judicial review of final deportation orders is petition for review in the court of appeals. This contention is not persuasive. As with the AEDPA and the IIRIRA, the text of the relevant 1961 legislation is devoid of any reference—abrogating or otherwise—to section 2241 of Title 28. Nor does the legislative history support the government's position. In fact, the house report provides, after having noted that section 106(a) of the INA enumerates habeas corpus petitions as

an exception to the "sole and exclusive" procedure, that "[t]he section in no way disturbs the Habeas Corpus Act." *See* H.R.Rep. No. 1086, 87th Cong., 1st Sess. **\*162** (Aug. 30, 1961), *reprinted in* U.S.C.C.A.N.1961, 2950, 2973. The reference to leaving undisturbed the "Habeas Corpus Act" is somewhat ambiguous, but no reasonable interpretation supports the government's view.

The most plausible reading of this reference is that it refers to specifically to section 2241 by its progenitor—the Habeas Corpus Act—and it expresses Congress's intention to leave that section undisturbed. *See Sunal v. Large,* 157 F.2d 165, 168 (4th Cir.1946), *affirmed,* 332 U.S. 174, 67 S.Ct. 1588, 91 L.Ed. 1982 (explaining that section 451 of title 28 [predecessor of section 2241] issued from the Habeas Corpus Act). Another reading is that Congress was merely referring to the INA section 106(a)(10) exception by another name, the "Habeas Corpus Act," and that the report is therefore without any reference to section 2241. The reading that is not plausible is the one that would have to be adopted in order to prop up the government's theory: that the "Habeas Corpus Act" reference is only to the INA section 106(a)(10) habeas exception and that it silently communicates a limitation upon the applicability of section 2241. Because section 2241 is nowhere mentioned—much less in a limiting manner—in other sections of the legislative history, there is no support for such a reading. Thus, similar to the AEDPA and the IIRIRA, the absence of the sort of clear statement required by the *Yerger* and *Felker* Courts to signal the intention to repeal—or amend—an independent source of habeas jurisdiction necessitates that the court reject the government's argument regarding the 1961 Act.

 [16]   At most, the 1961 Act may have, as a practical matter, suspended application of section 2241 because jurisdiction would be exercised in the first instance by the courts of appeals. When the courts of appeals later lost that jurisdiction, section 2241 was no longer suspended. On this point, it is worth noting that the few courts considering deportation matters and the interplay between the general habeas provision and INA section 106(a)(10) after the 1961 Act and before the enactment of the AEDPA did not read the 1961 Act to foreclose section 2241 jurisdiction. *See e.g., Orozco v. U.S. I.N.S.,* 911 F.2d 539, 541 (11th Cir.1990)

(citing *United States ex rel. Marcello v. District Director of Immigration & Naturalization Service,* 634 F.2d 964, 967 (5th Cir.), *cert. denied,* 452 U.S. 917, 101 S.Ct. 3052, 69 L.Ed.2d 421 (1981) ("Challenges to deportation proceedings are cognizable under 28 U.S.C. § 2241."); *Sotelo Mondragon v. Ilchert,* 653 F.2d 1254, 1255 (9th Cir.1980) (finding jurisdiction to review deportation order under INA section 106(a)(10) and section 2241). The government infers that the paucity of cases addressing an alien's ability to bring a habeas action pursuant to section 2241 during this period suggests that section 2241 jurisdiction was not available. Reliance on such a spurious inference is misplaced. The relative absence of case law is indicative of little and is not surprising. On occasions where habeas actions were brought, there was no reason for reviewing courts to focus specifically on whether section 2241 or section 106(a)(10) of the INA was the proper basis for jurisdiction. Nothing turned on the distinction.

The government further argues that prior to the enactment of the AEDPA and the IIRIRA, habeas corpus relief under INA section 106(a)(10) was unavailable to review final orders of deportation. It asserts that it would make little sense for the court to hold that such review is now available under section 2241 particularly on the heels of the AEDPA's elimination of the INA provision providing for habeas review and in light of Congress's desire to streamline the deportation process.

The accuracy of the government's characterization of INA section 106(a)(10) appears debatable. *See, e.g., Garay v. Slattery,* 23 F.3d 744 (2d Cir.1994) (habeas available to review denial of stay; no issue presented regarding availability of habeas review to challenge final order of deportation); *Stevic v. Sava,* 678 F.2d 401, 404 n. 5 (no issue presented regarding availability of habeas review to challenge final order of deportation), *judgment reversed,* 467 U.S. 407, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984); *See also, Williams v. INS,* 795 F.2d 738, 745 (9th Cir.1986) (affirming habeas jurisdiction to review final order of deportation; "custody" operative); *Sotelo Mondragon v. Ilchert,* 653 F.2d 1254, 1255 (9th Cir.1980) (same); *United* **\*163** *States ex rel. Marcello v. District Director of Immigration & Naturalization Service,* 634 F.2d 964, 971–72

(5th Cir.) (same), *cert. denied,* 452 U.S. 917, 101 S.Ct. 3052, 69 L.Ed.2d 421 (1981).

The fact of the matter is that this question does not need to be settled. Section 2241 of title 28 and the case law interpreting it contain no relevant qualifications or limitations. Even assuming the government's characterization about the limited applicability of INA section 106(a)(10) were true, there is no reason to import those limitations into the distinct context of section 2241 jurisdiction.

### (3) Scope of Section 2241 Habeas Review

[17]   With the exception of the *Yesil* court, district courts that have held that section 2241 provides a statutory source of jurisdiction to review final orders of deportation have also held that the scope of section 2241 jurisdiction has been narrowed. Generally, these courts have held that section 2241 review must be limited to situations where there is a threat of "a fundamental miscarriage of justice." *Eltayeb v. Ingham,* 950 F.Supp. 95, 100 (S.D.N.Y.1997); *see also, e.g,* *Mbiya v. INS,* 930 F.Supp. 609, 612 (N.D.Ga.1996) (same; preservation of writ only to extent required by the Constitution); *Powell v. Jennifer,* 937 F.Supp. 1245, 1252–53 (E.D.Mich.1996) ("grave constitutional error or a fundamental miscarriage of justice").

The rationale for attenuating the scope of section 2241 has been to give voice to Congress's perceived general policy objectives in enacting the AEDPA. "Congress desired to expedite the deportation of criminal aliens and to restrict all judicial review of final orders of deportation to the greatest extent possible," the *Mbiya* court explained, and thus the AEDPA amendment of INA section 106(a), "strongly suggests that Congress intended to preserve the writ of habeas corpus under § 2241 in these cases only to the extent required by the Constitution." *Mbiya v. INS,* 930 F.Supp. 609, 612 (N.D.Ga.1996). "A narrow application of § 2241 is necessary to accommodate the balance between an alien's constitutional right to habeas review and Congress's power over matters of immigration." *Eltayeb v. Ingham,* 950 F.Supp. 95, 100 (S.D.N.Y.1997)

"Accommodation" of general policy goals based on "suggest[ions]" of congressional intent are, however, not appropriate in this context. Fidelity to *Felker* and *Yerger* and the requirements of the clear statement rule militates against reading such limitations into the scope of section 2241. By its terms, section 2241 is not limited to constitutional claims or claims of fundamental miscarriage of justice. *See* 28 U.S.C. § 2241. And as already noted, there is nothing in either the text or history of the AEDPA or the IIRIRA that specifically mentions section 2241, much less limits or repeals it. *Felker* specifically rejected this type of repeal or limitation by "implication" found by other courts, and thus, given the absence of a specific amendment, the scope of section 2241 remains unaffected. *Cf. Yesil v. Reno,* 958 F.Supp. 828, 839 (S.D.N.Y.1997) (not reaching question of limitation of habeas jurisdiction to substantial constitutional claims).

Even if the government's interpretation that section 2241 had been truncated by implication were correct, there is no reason to apply its conclusion to a case of first impression—as is this one—construing the statute, rather than to a run-of-the-mill application of that construction.

### (4) Section 2241 Habeas Corpus Jurisdiction Available in Instant Case

#### (a) A District Court May Review a Section 2241 Petition

[18]   The government's argument that petitioners have come to wrong court—and that they should be in the court of appeals if anywhere—is incorrect, having been predicated on the assertion that section 2241 habeas jurisdiction was not available. As explained at length above, section 2241 habeas jurisdiction remains available. In light of the plain language of section 2241, the decision in *Hincapie–Nieto v. INS,* 92 F.3d 27, 31 (2d Cir.1996) and case law throughout the country, jurisdiction properly lies here.

Section 2241 provides in relevant part as follows: "Writs of habeas corpus may be granted by the Supreme Court, any justice **\*164** thereof, the *district courts* and any circuit judge within their respective jurisdictions." 28 U.S.C. §

2241(a) (emphasis added). The statute, by its plain terms, is unambiguous in its grant of jurisdiction to district courts.

In *Hincapie–Nieto,* the court of appeals did not address this precise issue, but the case supports this reading. While the court held that AEDPA 440(a) did repeal that court's jurisdiction to review a final order of deportation where the alien had been convicted of one of the AEDPA-covered crimes, it did so on the express basis that habeas jurisdiction had not been entirely eliminated since "some avenue for judicial relief remains available." *Hincapie–Nieto v. INS,* 92 F.3d 27, 31 (2d Cir.1996). The court neither specified the proper forum nor limited access to particular fora: "We express no opinion on the nature of the remedy or the scope of review that remains available in any court." *Id.* District courts, confronted directly with the same question, have rejected the contention that they lack jurisdiction. *See, e.g.,* 🔖 *Yesil v. Reno,* 958 F.Supp. 828, 840 (S.D.N.Y.1997) (finding district court jurisdiction); 🔖 *Eltayeb v. Ingham,* 950 F.Supp. 95, 99 (S.D.N.Y.1997) (same); 🔖 *Mbiya v. INS,* 930 F.Supp. 609, 612 (N.D.Ga.1996) (same).

**(b) Petitioners in Custody For Habeas Purposes**

One of the requirements of 🔖 section 2241 of Title 28 is that the petitioner be in "custody." It reads, in relevant part, that "[t]he writ of habeas corpus shall not extend to a prisoner unless ... [h]e is in custody in violation of the Constitution or laws or treaties of the United States...." *See* 🔖 28 U.S.C. § 2241.

 **[19]** Both petitioners meet this requirement. Mojica is, at present, in physical custody. While Navas is not now held physically, he is subject to a final order of deportation and was issued a notice to surrender and is presently released on bond. The law is clear that these facts are sufficient to satisfy the "custody" requirement for purposes of habeas review.

The writ of habeas corpus is not a formalistic remedy whose availability is strictly limited to persons in actual physical restraint. As the Supreme Court explained in holding that parolees satisfy the "custody" requirement:

> History, usage, and precedent can leave no doubt that, besides physical imprisonment, there are other

restraints on a man's liberty, restraints not shared by the public generally ... sufficient ... to support the issuance of habeas corpus....

🔖 *Jones v. Cunningham,* 371 U.S. 236, 240, 83 S.Ct. 373, 375, 9 L.Ed.2d 285 (1963).

> It is not now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose——the protection of individuals against erosion of their right to be free from wrongful restraints upon their liberty.

🔖 *Jones,* 371 U.S. at 243, 83 S.Ct. at 377; *see also* 🔖 *Hensley v. Municipal Court,* 411 U.S. 345, 351, 93 S.Ct. 1571, 1574 36 L.Ed.2d 294 (1973) (releasing petitioner on own recognizance pending appeal); 🔖 *Barry v. Brower,* 864 F.2d 294, 296 (3d Cir.1988) ("probationary sentence remained open"); 🔶 *Pringle v. Court of Common Pleas,* 744 F.2d 297, 300 (3d Cir.1984) (released on parole and bail).

 **[20]** In the immigration context courts have also held that physical restraint is not required for habeas jurisdiction. Where the petitioner is subject to a final order of deportation, the "custody" requirement is satisfied, particularly where the alien has been released on condition of posting a bond. *See, e.g.,* 🔖 *Nakaranurack v. United States,* 68 F.3d 290, 293 (9th Cir.1995) ("so long as he is subject to a final order of deportation, an alien is deemed to be 'in custody' "); 🔖 *Arias v. Rogers,* 676 F.2d 1139, 1142 (7th Cir.1982) (petitioner released on bond after commencement of deportation proceedings "in custody"); 🔖 *Eltayeb v. Ingham,* 950 F.Supp. 95, 99 n. 5 (alien released on own recognizance and subject to deportation order "in custody");

🔖 *Parco v. Morris,* 426 F.Supp. 976, 978 n. 4 (E.D.Pa.1977) ( "where an order of deportation is outstanding the 'custody' requirement for habeas corpus jurisdiction is satisfied").

*See also* 🔖 *Flores v. U.S. Immigration and Naturalization*

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

*Service,* 524 F.2d 627, 629 (9th Cir.1975); *Narayan v. Ilchert,* 799 F.Supp. 1047, 1050 n. 3 (N.D.Cal.1992); *Gurbisz* **\*165** *v. U.S.,* 675 F.Supp. 436, 441 (N.D.Ill.1987).

 **[21]**  The government argues that this well-settled case law defining "in custody" is inapplicable in the instant case because the AEDPA and the IIRIRA have eliminated this court's habeas jurisdiction except to the extent required by the Constitution and that the Constitution, as informed by the common law, requires "actual physical detention." On both points, the government is wrong. As discussed, *supra,* this court's section 2241 jurisdiction is unaffected by the AEDPA and the IIRIRA because Congress failed to repeal or amend such jurisdiction explicitly. In addition, even if the Suspension Clause's "custody" requirement were applicable and governed by the common law, the common law does not require actual physical detention. *See Jones v. Cunningham,* 371 U.S. 236, 238–39, 83 S.Ct. 373, 374–75, 9 L.Ed.2d 285 (finding that common law writ did not require actual physical detention).

Here, petitioners are both subject to a final order of deportation and were initially released only on condition of posting a bond. Moreover, Mojica is now in physical custody, and Navas is subject to a notice to surrender and has been released on $2,000 bond. They satisfy the "in custody" requirement for purposes of habeas review.

In sum, all the conditions necessary for the court to exercise subject matter jurisdiction over petitioners' claims exist: section 2241 remains available as a source of habeas jurisdiction; the scope of that jurisdiction is not limited so as to exclude petitioners' claims'; it is proper for a district court to entertain a section 2241 petition; and the petitioners are in custody for the purpose of habeas corpus.

### B. Eastern District of New York Is the Proper Forum: Personal Jurisdiction and Venue

 **[22]**  The fact that subject matter jurisdiction exists does not end the inquiry. In a habeas corpus proceeding, the appropriate forum is governed by two factors: (1) whether the court has personal jurisdiction over the petitioner's custodians and (2) whether the petitioner satisfies traditional venue considerations. The two inquiries are distinct and must be addressed separately.

The government contests personal jurisdiction and venue as to petitioner Mojica; no such contentions are made in respect to petitioner Navas. As shown below, this court has personal jurisdiction over both petitioners' custodians and the Eastern District of New York is the most convenient and appropriate venue for both habeas actions. Because appropriate personal jurisdiction and venue with regard to Navas is beyond dispute, discussion here focuses on Mojica.

### (1) Court Has Personal Jurisdiction Over Petitioners' Custodians

 **[23]**  In a habeas proceeding, the court has personal jurisdiction "so long as the custodian can be reached by service of process." *Braden v. 30th Judicial Circuit Court of Kentucky,* 410 U.S. 484, 495, 93 S.Ct. 1123, 1130, 35 L.Ed.2d 443 (1973) (district court in Kentucky had personal jurisdiction over petition filed by Alabama inmate); *see also U.S. ex rel. Sero v. Preiser,* 506 F.2d 1115, 1128 (2d Cir.1974), *cert. denied,* 421 U.S. 921, 95 S.Ct. 1587, 43 L.Ed.2d 789 (1975) (jurisdictional grant in section 2241(a) co-extensive with scope of service of process); *Yesil v. Reno,* 958 F.Supp. at 835–36 (S.D.N.Y.1997) (habeas action proper in S.D.N.Y. although petitioner was released on bond by Louisiana INS district director); *Eltayeb v. Ingham,* 950 F.Supp. 95, 99 (S.D.N.Y.1997) (government's Rule 59(e) motion pending).

 **[24]**  Personal jurisdiction is fixed at the time that the habeas petition is filed. *See, e.g., Ledesma–Valdes v. Sava,* 604 F.Supp. 675, 679 (S.D.N.Y.1985). So long as the court had personal jurisdiction at the time that petitioner filed the action, surrender and physical detention in Oakdale in the midst of the proceedings did not affect this court's jurisdiction; this finding is conceded by the government.

 **[25]**  The government asserts that even if the court has subject matter jurisdiction pursuant to section 2241, it cannot entertain Mojica's petition because it lacks personal jurisdiction for habeas purposes since the only proper custodian-respondent to Mojica's **\*166** petition is the INS district director in New Orleans, Louisiana who is outside of the court's personal jurisdiction.

The government's contentions as to the proper custodian and the court's reach are incorrect. Here, there are several custodians, including the Louisiana District Director of the

INS, the Attorney General, the Commissioner of the INS, and the New York District Director of the INS. The habeas statute does not "specify who the person having custody will be," nor does it state that there may be only one custodian. *Nwankwo v. Reno,* 828 F.Supp. 171, 174 (E.D.N.Y.1993) (citations and internal quotation marks omitted). "Nowhere does the statute speak of an immediate custodian...." *Id.* All these custodians can be reached by service of process.

First, the District Director for the New Orleans district office of the INS, John B.Z. Caplinger, is a custodian over Mojica, as the government concedes. Because he can be reached by service of process, this court has personal jurisdiction. Rule 4(e)(1) of the Federal Rules of Civil Procedure allows service of process under the rules of the state in which the district court sits. The State of New York's service of process rules govern. *See Yesil v. Reno,* 958 F.Supp. 828, 835 (S.D.N.Y.1997); *Eltayeb v. Ingham,* 950 F.Supp. 95, 99 (S.D.N.Y.1997); *Nwankwo v. Reno,* 828 F.Supp. 171, 175 (E.D.N.Y.1993) (analyzing former Rule 4(c)(2)(C)(i) and (e) now replaced by new Rule 4(e).

**[26]** Under New York state law, process may be served on a non-domiciliary who "transacts *any* business within the state" even if the defendant never enters New York, so long as the defendant's activities here were purposeful and the transaction is related to the claim asserted. N.Y. C.P.L.R. § 302(a)(1) (emphasis added). *See, e.g., PDK Labs v. Friedlander,* 103 F.3d 1105 (2d Cir.1997); *Kreutter v. McFadden Oil Corp.,* 71 N.Y.2d 460, 522 N.E.2d 40, 527 N.Y.S.2d 195 (1988).

Mojica's only connection to Oakdale, Louisiana has been his detention there by the INS and Caplinger. After Mojica's initial detention in Oakdale, he was released on bond, but only after a telephonic bond redetermination hearing during which he was represented by his present attorneys in New York. When his bond was posted, Caplinger knew Mojica was coming back to his home in Corona, New York. By allowing Mojica to return to New York, but continuing to claim the power to control his actions, to seek his surrender, and to deport him, respondent Caplinger has "transact[ed] ... business within the state." N.Y. C.P.L.R. § 302(a)(1).

Caplinger's recent order to Mojica to return to Louisiana from New York was implemented and enforced by the government's New York-based attorneys. In enforcing the unlawful deportation order against Mojica and by seeking his surrender to Oakdale pending resolution of this matter, respondent Caplinger "purposefully thrust himself into the [Eastern] District of New York," *Yesil v. Reno,* 958 F.Supp. 828, 835 (S.D.N.Y.1997), and has taken coercive enforcement action against a long-time resident of New York.

*See Parke–Bernet Galleries, Inc. v. Franklyn,* 26 N.Y.2d 13, 17, 18, 256 N.E.2d 506, 508–09, 308 N.Y.S.2d 337, 340–41 (N.Y.1970). Respondent Caplinger thus not only transacted business in New York, but did so in this very court, and with regard to the very claim Mojica brings before this court, namely the legality of his deportation order. He is thus amenable to service under CPLR 302(a)(1), and the court has personal jurisdiction over him.

**[27]** The Attorney General of the United States is also a custodian for habeas purposes and can be reached by service under New York law. *See Nwankwo v. Reno,* 828 F.Supp. 171, 175–76 (E.D.N.Y.1993). In *Nwankwo,* the petitioner was convicted in the Eastern District of New York and, upon completion of his sentence, was taken into INS custody and transferred to Oakdale for deportation proceedings. He subsequently filed a habeas petition in the Eastern District of New York. The *Nwankwo* court held that the personal jurisdiction requirement was satisfied. It found that the Attorney General was an appropriate custodian because she could "direct her subordinates to carry out any order directed to her to produce or release the petitioner." **\*167** *Nwankwo,* 828 F.Supp. at 174 (citations and internal quotation marks omitted).

*Billiteri v. United States Board of Parole,* 541 F.2d 938 (2d Cir.1976), on which the government relies, can be distinguished from the instant case as it was in *Nwankwo. Billiteri* held that the Parole Board is not the prisoner's custodian when the prisoner has not been released on parole and is still in physical detention. *Billiteri* is inapplicable because the warden of a prison is not a delegate or agent of the Parole Board, whereas a District Director of the INS acts only pursuant to powers delegated by the Attorney General.

The Attorney General is here an appropriate respondent. "Because the Attorney General, in her official capacity, clearly transacts business in New York," she can be reached by service of process. *Nwankwo v. Reno,* 828 F.Supp. 171, 175 (E.D.N.Y.1993). *See* N.Y.C.P.L.R. § 301 (service reaches non-domiciliary who regularly transacts business in

New York State, even if the cause of action has no connection to the state). *See also Welinsky v. Resort of the World, 839 F.2d 928 (2d Cir.1988); cf. Strait v. Laird,* 406 U.S. 341, 346, 92 S.Ct. 1693, 1696, 32 L.Ed.2d 141 (1972) (California court has habeas jurisdiction over petition filed by an army reservist residing in California although reservist's custodian—commanding officer—was located in Indiana; commanding officer's contacts with California through the chain of command were enough to give the officer "presence" within California for habeas purposes).

**[28]** It is important to note that were the government correct that a habeas petition may be heard only where the petitioner is detained, then the Attorney General "could seriously undermine the remedy of habeas corpus by detaining illegally a large group of persons in one facility so that the 'resulting torrent of habeas corpus petitions' would overwhelm" the local court. *Nwankwo v. Reno,* 828 F.Supp. 171, 175 (E.D.N.Y.1993); *see also Strait v. Laird,* 406 U.S. 341, 345, 92 S.Ct. 1693, 1696, 32 L.Ed.2d 141 (1972) (requiring habeas petitions to be filed in only one district would "ignore reality" and result in inefficient concentration of cases). *But see Wang v. Reno,* 862 F.Supp. 801, 813 (E.D.N.Y.1994) (distinguishing *Nwankwo* because no backlog would delay *Wang* petition as in *Nwankwo* ).

The laws of the state of New York allow for service of process over all of Mojica's custodians, including Caplinger. Mojica is a longstanding resident of New York with substantial ties to this state. Among other things, both his family and attorneys reside and transact business here. Moreover, Caplinger permitted Mojica to return to New York, yet retained the right to control his liberty while Mojica was residing in New York. The personal jurisdiction requirement is satisfied. The Attorney General may not frustrate the courts and negate the Great Writ by moving prisoners around the country.

**(2) Venue Is Proper with Regard to Petitioners**

**[29]   [30]** Venue with regard to Mojica is proper in the Eastern District, and *a fortiori* with respect to Navas. While the habeas corpus statute does not contain a venue provision applicable to this case—the habeas statute's explicit venue provision, subsection 2241(d), pertains only to "a person in custody under the judgment and sentence of a State court"—the Supreme Court has made clear that courts should apply

"traditional venue considerations" in a habeas proceeding where venue is not fixed by statute. *See Braden v. 30th Judicial Circuit Court of Kentucky,* 410 U.S. 484, 493, 93 S.Ct. 1123, 1128–29, 35 L.Ed.2d 443 (1973); *see also U.S. ex rel. Sero v. Preiser,* 506 F.2d 1115, 1130 & n. 11 (2d Cir.1974) (appropriateness of habeas venue in New York "bolstered" by analogy to section 1391(e) which looks to residence of plaintiff); *Nwankwo v. Reno,* 828 F.Supp. 171, 176 & n. 2 (E.D.N.Y.1993).

**[31]** Such traditional venue considerations include, but are not necessarily limited to: (1) the location where the material events took place, (2) where records and witnesses pertinent to the claim are likely to be found, (3) the convenience of the forum for respondent and petitioner, and (4) the familiarity of the court with the applicable laws. *See Braden v. 30th Judicial Circuit Court of Kentucky,* **\*168** 410 U.S. 484, 493–94, 93 S.Ct. 1123, 1128–29, 35 L.Ed.2d 443 (1973).

In the instant case, these considerations strongly militate in favor of adjudicating Mojica's habeas petition in the Eastern District of New York. Until his transfer from the INS's Varick Street detention center in New York, Mojica had never been in Louisiana. The crime for which he became deportable took place in the Eastern District of New York. Witnesses and evidence necessary to establish his eligibility for 212(c) relief are all located in New York.

Mojica would be severely disadvantaged by having to bring a habeas proceeding in Louisiana since his attorneys are located in New York and have expended extensive efforts on this matter in the Eastern District. *See Yesil v. Reno,* 958 F.Supp. 828, 836 (S.D.N.Y.1997). The choice of forum could significantly affect Mojica's rights because the law varies from circuit to circuit, and as a resident of the Second Circuit for over twenty years, Mojica should have his case decided under Second Circuit law. *Id.* There is also a possibility of a backlog habeas petitions in Louisiana, which could result in Mojica's right to habeas review being significantly delayed while he remained in detention in Louisiana, without realistic access to his attorneys or family. *See Nwankwo v. Reno,* 828 F.Supp. 171, 174 (E.D.N.Y.1993) ( "common sense administration of justice" meant court should hear case given large volume of habeas petitions in Western District of Louisiana).

In contrast, the government and respondent Caplinger are not prejudiced if they are required to litigate in this court. As the *Yesil* court noted, the INS traditionally has been well represented in this district and can litigate here as well as in Louisiana. *Yesil v. Reno,* 958 F.Supp. 828, 836 (S.D.N.Y.1997). That is not true for Mojica, who likely would be required to retain new counsel in Louisiana, since his counsel has no office in Louisiana and could not practicably provide adequate representation if the case were transferred.

Additionally, this court has an interest in adjudicating petitioner's case. Respondent Caplinger has caused the surrender for deportation of a resident of the State of New York who has resided for the last twenty-three years in the Eastern District of New York and has never had any previous contact with Louisiana. *See Yesil v. Reno,* 958 F.Supp. 828, 836 (S.D.N.Y.1997) (adjudicating habeas petition of alien released on bond from Oakdale INS facility and living in New York at time of habeas petition).

Because there is subject matter jurisdiction pursuant to section 2241 of Title 28, personal jurisdiction over the custodians, and the Eastern District of New York is the proper venue, the court has the power to address petitioners' claims. That substantive issue is dealt with below.

## V. Protection of Legal Permanent Residents Against Arbitrary Deportation

### A. Statutory History of Section 212(c) and Section 440(d)

The history of relevant provisions of law allowing for hearings before deportation for reasons of compassion and justice are set out in Part II.A., *supra.* They need not be repeated here.

### B. Section 440(d) Does Not Retroactively Eliminate Right of Petitioners to a Fairness Hearing

[32] *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), delineated the approach that courts must take in determining the temporal effect of new legislation. First, courts review the statutory provision to determine whether there are any constitutional bars to retroactive implementation. Second, they ascertain whether the statute itself manifests express congressional design favoring retroactivity. Finally, where courts can divine

no explicit constitutional prohibition or congressional design, they must determine the time that the legislation comes into effect, keeping in mind that the default rule underlying all judicial interpretation of statutes is against retroactive application. With section 440(d) of the AEDPA, Congress expressed no clear intent favoring retroactivity, and there may be constitutional barriers to retroactivity. This analysis leads to a conclusion against **\*169** retroactivity; the government cannot prevent petitioners from applying for section 212(c) discretionary relief and having their petitions determined on the merits.

### (1) Constitutional Barriers to Retroactivity

[33] The Constitution is infused with the common-law aversion to retroactivity:

> It is ... not surprising that the antiretroactivity principle finds expression in several provisions of our Constitution. The Ex Post Facto Clause flatly prohibits retroactive application of penal legislation. Article I, § 10, cl. 1 prohibits States from passing another type of retroactive legislation, laws "impairing the Obligation of Contracts." The Fifth Amendment's Takings Clause prevents the Legislature (and other government actors) from depriving private persons of vested property rights except for a "public use" and upon payment of "just compensation." The prohibitions on "Bills of Attainder" in Art. §§ 9–10 prohibit legislation from singling out disfavored persons and meeting out summary punishment for past conduct ... The Due Process Clause also protects the interest in fair notice and repose that may be compromised by retroactive legislation; a justification sufficient to validate a state's prospective application under the Clause "may not suffice" to warrant its retroactive application."

*Landgraf v. USI Film Products,* 511 U.S. 244, 265, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994) (citations and footnotes omitted). Of all the constitutional arguments that might be made against retroactive application of the AEDPA, the due process argument is, in the present instance, the strongest.

**[34]** The heart of the due process requirement for retroactive legislation is "conditioned upon a rationality requirement beyond that applied to other legislation." *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 223, 109 S.Ct. 468, 479, 102 L.Ed.2d 493 (1988) (Scalia, J., concurring). Like any aspect of legislation, retroactive characteristics must meet the basic due process requirement of being "supported by a legitimate legislative purpose furthered by a rational means." *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 729, 104 S.Ct. 2709, 2717–18, 81 L.Ed.2d 601 (1984). With retroactive legislation, there must be an independent rationale for retroactivity. *See id.,* 467 U.S. at 730, 104 S.Ct. at 2718. A purpose that supports a law's prospective characteristics is not sufficient, in itself, to support retroactively. *See id.*

In the present case, Congress offered no purpose for retroactivity itself The statute, read as a whole, does not even provide for retroactivity. The Attorney General's opinion in *Matter of Soriano,* Int. Dec.3289, 1996 WL 426888 (beginning at screen page 37, AG Op. Feb.. 21, 1997), offers no explanation for a retroactive rule. Instead her opinion merely defends retroactivity as permissible. Even in the most deferential areas of rational basis review, such an absence of purpose is a significant factor that can lead a court to strike down a government program as lacking a rational basis. Compare *Allegheny Pittsburgh Coal Co. v. Webster County,* 488 U.S. 336, 343–44, 109 S. Ct. 633, 637–38, 102 L.Ed.2d 688 (1989) (striking down differential real-estate tax scheme where there was no clear state policy) with *Nordlinger v. Hahn,* 505 U.S. 1, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) (upholding differential real-estate tax scheme where it furthered California's interest in protecting home-owners from escalating real-estate values).

Cases where the Supreme Court has upheld retroactive statutes against due process challenges are characterized by circumstances not applicable here. First, they involved challenges to statutes where congressional policy on retroactive application is unambiguous. For example, *Usery v. Turner Elkhorn,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), concerned an attack on a congressional program for allocating the costs of Black Lung injuries sustained by workers on the job. Congress had to balance the issue of retroactivity with the problem of developing an equitable plan that avoided unfair burdens on current producers and recognized that past employers had benefitted from the activity that was the cause of the harms Congress sought to **\*170** ameliorate. *See also United States v. Sperry,* 493 U.S. 52, 64–65, 110 S.Ct. 387, 396–97, 107 L.Ed.2d 290 (1989) (upholding method for allocating costs of Iran–United States Claims Tribunal as preventing windfalls and equitably distributing costs). In other cases, the Court noted that retroactivity was necessary to address the problem of actors modifying their behavior for inappropriate economic gain during the pendency of legislation. *See, e.g., Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 730–31, 104 S.Ct. 2709, 2718–19, 81 L.Ed.2d 601 (1984) (retroactivity of provisions on withdrawal from pension plans designed to check against employers withdrawing from plans during the lengthy legislative process). In still others, retroactivity was designed to correct inequities that resulted from unexpected judicial interpretations of prior law (*see General Motors Corp. v. Romein,* 503 U.S. 181, 191, 112 S.Ct. 1105, 1112, 117 L.Ed.2d 328 (1992)) or were targeted to correct an unexpected loophole created by prior law. *See United States v. Carlton,* 512 U.S. 26, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994) (permitting one year retroactivity for statute correcting a mistake in prior law).

The Supreme Court's recognition of the need to evaluate separately the rationality of retroactivity post-dates older cases upholding retroactive deportation laws. Even those older deportation cases identified a congressional purpose in the retroactivity itself For example, in *Harisiades v. Shaughnessy,* 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952) and *Galvan v. Press,* 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954), the Court identified congressional security interests in the deportation of past and current members of the Communist Party. As the Court explained in *Harisiades,* the Communist Party's action to "drop aliens from membership, at least in form, in order to immunize them from the consequences of their party membership" made the distinction between past and present membership meaningless and required a statute that looked to past

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

membership. *Harisiades v. Shaughnessy,* 342 U.S. 580, 593, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1952). The statute considered in *Marcello v. Bonds,* 349 U.S. 302, 75 S.Ct. 757, 99 L.Ed. 1107 (1955), and *Lehmann v. United States,* 353 U.S. 685, 77 S.Ct. 1022, 1 L.Ed.2d 1122 (1957), was also plainly intended to be retroactive. *See Lehmann,* 353 U.S. at 689–90, 77 S.Ct. at 1024–25. The Court's decisions, however, did not take up the question whether this clearly stated congressional policy satisfied due process requirements. Its decisions referred only to Ex Post Facto objections.

In the instant situation courts are left to guess at what purpose could be served by applying section 440(d) retroactively. Without any guidance from Congress, the court may be tempted to analogize to discover possible purposes supporting retroactivity. Such an exercise in hypotheticals is not generally permissible. *See Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 730, 104 S.Ct. 2709, 2718, 81 L.Ed.2d 601 (1984) (requiring an independent rationale for retroactive application). In any event, the prospective scheme created by the AEDPA bears little rational relationship to the way that the law would work if it were applied retroactively.

First, as applied prospectively, the AEDPA serves to provide notice of the severe and certain deportation consequences that will flow from commission of any of the crimes enumerated in section 440(d). It may therefore be seen as making clear the very high standards to which immigrants will be held. It may well have a deterrent effect. By contrast, when applied retroactively to crimes that were treated leniently in the criminal justice system, the statute works only to upset and frustrate expectations.

Retroactive application would create a situation in which people who have lived in the community, have established themselves as valuable members of society, and who are needed to support their families, are summarily deported without regard to the present and future interests of their families or the community at large. *Cf.* Barry R. Chiswick, The Performance of Immigrants in the United States Labor Market 95, 110 in Economic Aspects of International Migration (Herbert Giersch ed.1994) (discussing the "high[ ] level of ability and motivation" **\*171** among immigrant workers). Moreover, under the AEDPA's vast expansion of the relevant crimes leading to automatic deportation, these

consequences would be visited on people who committed crimes that may have been treated leniently in the criminal justice system.

The arbitrariness of retroactive application is illustrated by the case of Mojica. Although he was deportable, the INS showed no interest in commencing deportation proceedings. To the contrary, it demonstrated a studied indifference to his presence, electing on numerous occasions not to institute proceedings. And it did so despite the fact that Mojica was incarcerated and that it had a clear opportunity to place him under detainer. Arguably the INS had made a judgment that Mojica was a likely candidate for waiver of deportation under the existing law. Meanwhile, Mojica reestablished his life with his citizen wife and citizen children, proceeded with his business, and created a record that arguably demonstrated that he is a valuable member of our society for whom there should at least be some consideration of equities prior to deportation. Congress has certainly not offered a rationale for subjecting him to summary deportation. Cruelty to the family which has reestablished a relationship with someone who has been incarcerated and now is torn once again from the bosom of the family for the crime he or she paid for many years ago does not seem to have been part of congressional design.

Retroactivity generally targets those whom the INS had once decided *not* to detain and place in deportation proceedings. It denies them the relief that was available to their fellow inmates who had deportation proceedings against them commenced in a timely manner. For legal permanent residents such as petitioner Mojica, deportation proceedings do not follow criminal incarceration. Instead, they are triggered by unwitting contacts with the INS following a trip abroad, an application for citizenship, or an application for a replacement permanent resident card. When deportation proceedings actually begin depends on when these events occur, and on whether the INS then institutes proceedings. By choosing not to pursue deportation for legal residents such as Mojica, the INS demonstrated a belief that such individuals need not be deported. The irony is that those whom the INS deemed strong candidates for deportation had the opportunity to seek section 212(c) relief from deportation, and, as discussed further below, had a good chance at prevailing. In contrast, persons deemed excellent candidates for section 212(c) relief because of strong family ties, value to their communities, and manifest rehabilitation are now told that they are to be automatically deported without any opportunity of section 212(c) individual merit-based review. Not only does such an interpretation lack any legislative support for the required distinct rationale

(*Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 730, 104 S.Ct. 2709, 2718, 81 L.Ed.2d 601 (1984)), such an absurd proposition flies in the face of what appears to be Congress's design in enacting the AEDPA——facilitating the quick removal of criminal aliens who pose a threat to society while continuing to provide avenues of individual merit-based review for long term legal residents who have been rehabilitated and who are vital members of American families and American communities.

The irrationality of the Attorney General's construction of the statute is further evidenced by the fact that the BIA is required under this interpretation to order the deportation of aliens in proceedings where the Immigration Judges have already weighed the evidence in the case and have concluded that it is in the interests of the United States for the immigrant to remain. These are cases where a person has shown true rehabilitation; where there are dependent family members; and where a person with a prior addiction who committed a drug-related crime has overcome the addiction and led a crime-free and upstanding life.

In sum, not only has Congress failed to articulate any rational purpose, but after a year of the government's attempts at retroactive application, it still can identify no rational purpose for the retroactive application of section 440(d).

**\*172  (2) Manifest Congressional Design**

[35]    Without manifest congressional design expressed in clear statutory language, the default rule in statutory interpretation requires prospective implementation. *See*

*Landgraf v. USI Film Products,* 511 U.S. 244, 272, 114 S.Ct. 1483, 1501, 128 L.Ed.2d 229 (1994); *See also*

*Jeffries v. Wood,* 114 F.3d 1484, 1494 (9th Cir.1997) (discussing judicial statutory interpretation post-*Landgraf* ). With respect to section 440(d) of the AEDPA, as with the legislation reviewed in *Landgraf,* "[t]he absence of ... language [on retroactivity] cannot realistically be attributed to oversight or to unawareness of the retroactivity issue."

*Landgraf,* 511 U.S. at 256, 114 S.Ct. at 1492. "In statutory construction, [courts] presume Congress legislated with an awareness of relevant judicial decisions." *Jeffries,* 114 F.3d 1484, 1495. As with the legislation in *Landgraf,* "[i]t is entirely possible——indeed, highly probable——that ... Congress viewed the matter as an ... issue to be resolved by the courts." *Landgraf,* 511 U.S. at 256, 114 S.Ct. at 1492.

Where it agrees upon and purposely enacts provisions explicitly meant to have retroactive effect, Congress has no trouble finding the words to do so. The following is a listing of the AEDPA Title IV immigration provisions which Congress elected to apply to pre–Act conduct or events:

Section 401(f)—"The amendments made by this section shall take effect on the date of enactment of this Act and *shall apply to all aliens without regard to the date of entry or attempted entry into the United States.*" (emphasis supplied). Here, Congress determined that the relief-restricting and rights-limiting provisions of section 401 (enacting new alien terrorist removal procedures) applied to any alien even if the alleged terrorist conduct pre-dated AEDPA.

Section 413(g)—"The amendments made by this section shall take effect on the date of the enactment of this Act and *shall apply to applications filed before, on, or after such date if final action has not been taken on them before such date.*" (emphasis supplied). Here, Congress determined that the relief-restricting provisions of section 413 (denying various forms of relief to alien terrorists) applied to an alien even if the alleged terrorist conduct pre-dated AEDPA as long as no final action had been taken on the application for relief prior to AEDPA's enactment.

Section 421(b)—"The amendment made by subsection (a) shall take effect on the date of the enactment of this Act and *apply to asylum determinations made on or after such date.*" (emphasis supplied). Here, Congress determined that the relief-restricting provision of section 421(a) (denying asylum relief to alien terrorists) applied to an alien even if the alleged terrorist conduct pre-dated AEDPA as long as no asylum determination had been made prior to AEDPA's enactment.

Section 435(b)—"The amendment made by subsection (a) *shall apply to aliens against whom deportation proceedings are initiated after the date of the enactment of this Act.*" (emphasis supplied). Here, Congress determined that the deportability-expanding provision in section 435(a) (expanding the types of offenses that make an alien deportable under category of crimes of moral turpitude) applied to an alien even if the alleged criminal conduct and conviction pre-dated AEDPA as long as the individual was not placed in deportation proceedings before AEDPA's enactment.

Section 440(f)—"The amendments made by subsection (e) *shall apply to convictions entered on or after the date of the enactment of this Act, except that the amendment made by subsection (e)(3) shall take effect as if included in the enactment of section 222 of the Immigration and Nationality Technical Corrections Act of 1994.*" (emphasis supplied). Here, Congress determined that the deportability-expanding and relief-limiting provisions of section 440(e) (expanding the types of offenses that bring an alien's conviction within the definition of an aggravated felony and that therefore expand deportability and at the same time limit eligibility for relief) applied in the case of an alien even if the alleged criminal conduct pre-dated AEDPA as long as the individual was not convicted before AEDPA's enactment, and, **\*173** applied in the case of an alien covered by subsection (e)(3) (relating to conviction for alien smuggling) even if the conviction pre-dated AEDPA.

Section 441(b)—"The amendment made by subsection (a) *shall apply to criminal proceedings initiated after the date of enactment of this Act.*" (emphasis supplied). Here, Congress determined that the criminal defense-limiting provisions of section 441(a) (limiting attacks on an underlying deportation order in a criminal prosecution for illegal reentry after deportation) applied in the case of an alien even if the underlying criminal conduct pre-dated AEDPA as along as the individual was not placed in criminal proceedings before AEDPA's enactment. It should be noted that section 441(a) is a criminal provision whose applicability in individual criminal prosecutions is ultimately governed by the Ex Post Facto doctrine; however, even with respect to the applicability of an amendment when Congress knew that it would not have the last word, Congress included express language calling for application of the amendment in some cases based on pre-Act conduct where Congress wished for such retroactive application.

These provisions (whose constitutionality is not now being challenged) show that where Congress chose to deviate from the principle of prospectivity, it singled out the specific situation where it wanted to change the legal consequences of pre-Act events and specified the degree of retroactivity. In contrast these various formulations for retroactive application to pre-Act conduct, by implication Congress designated section 440(d) as a prospective provision since it included no language providing for its application to pre-Act conduct or events. In this sense, the situation with section

440(d) is no different than one described by the Supreme Court over twenty-five years ago: "Obviously ... when Congress wished to provide [for retroactive application], it knew how to do so expressly." *Touche Ross & Co. v. Redington,* 442 U.S. 560, 571, 99 S.Ct. 2479, 2487, 61 L.Ed.2d 82 (1979).

### (3) Applying the Default Rule Against Retroactivity

#### (a) Basic Application of *Landgraf*

Even if there were no constitutional barrier to retroactivity, section 440(d) must be read as having prospective effect only. To state that the law is prospective does not end the court's task in determining the application of the statute. The *Landgraf* court explained:

> A statute does not operate "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment.... Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event. Any test of retroactivity will likely leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity. However, retroactivity is a matter on which judges tend to have sound instincts ... and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance.

*Landgraf v. USI Film Products,* 511 U.S. 244, 269–70, 114 S.Ct. 1483, 1499, 128 L.Ed.2d 229 (1994). (citations and internal quotation marks omitted).

The *Landgraf* Court's reasoning supporting the presumption against retroactivity sheds further light on how courts are to fulfill their role in resolving "disagreement in hard cases" of statutory interpretation:

> The legislature's unmatched powers allow it to sweep away settled expectations suddenly and without individualized consideration. Its responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals.

**\*174** *Landgraf v. USI Film Products,* 511 U.S. 244, 266, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994).

**[36]** Courts determining the potential retroactive effect of new legislation must review the totality of the circumstances with a solid sense of traditional American notions of fairness and justice:

> Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted.... In a free, dynamic society ... a rule of law that gives people confidence about the legal consequences of their actions is a fundamental engine driving the engine of society.

*Landgraf v. USI Film Products,* 511 U.S. 244, 265, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994) (citations and internal quotation marks omitted).

**[37]** A court must have an eye toward the particularly harsh consequences for "unpopular groups or individuals" unlucky enough to be the targets of fleeting politically-motivated passionate outbursts. Special attention to reviled, outcast groups is needed in a variety of contexts. *See, e.g.,* *United States v. Fuentes–Barahona,* 111 F.3d 651, 652 (9th Cir.1997) (on statutory Sentencing Guidelines). There are few groups of adults and children so routinely ostracized and so voiceless in our democracy as non-enfranchised, non-citizen immigrants even though they form a vibrant and integral part of American society. The cruelty of retroactivity is obvious.

**[38]** The government's argument can be reduced to a syllogism: The *Landgraf* presumption only applies when there is retroactivity; deportation for past convictions (or perhaps for any past conduct) is never retroactive; therefore the *Landgraf* presumption is irrelevant to the reading of the AEDPA's scope. Whether deportation statutes can be removed from *Landgraf* analysis through this syllogism requires review of *Landgraf* and the constitutional and statutory interpretation doctrine in which it is rooted. *Landgraf* reaffirmed some 200 years of precedent that recognizes that retroactive laws are presumptively unjust.

*See* *Landgraf,* 511 U.S. 244, 270–71, 114 S.Ct. 1483, 1499–1500, 128 L.Ed.2d 229 (1994); *United States v. Heth,* 7 U.S. (3 Cranch) 399, 2 L.Ed. 479 (1806). The Court stated: "Because it accords with widely held intuitions about how statutes ordinarily operate, a presumption against retroactivity will generally coincide with legislative and public expectations." *Landgraf,* 511 U.S. at 272, 114 S.Ct. at 1500.

Although *Landgraf* is a case about statutory interpretation, it expressly refers to the Supreme Court's constitutional jurisprudence to inform its discussion of the statutory presumption against retroactivity and unfair retroactive effects. The Court had occasion to revisit this constitutional backdrop this term in *Lynce v. Mathis,* 519 U.S. 433, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997); *see also, Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (habeas corpus changes not applicable to pending cases); *see also,* *Skubel v. Fuoroli,* 113 F.3d 330, 334–38 (2d Cir.1997). Quoting *Landgraf,* the Court explained in *Lynce* that the presumption against retroactivity "is deeply rooted in our jurisprudence and embodies a legal doctrine centuries older than the Republic." *Lynce,* 519 U.S. at ——, 117 S.Ct. at 895 (quoting *Landgraf,* 511 U.S. at 265, 114 S.Ct. at 1497). *Lynce* proceeded to explain that:

in both the civil and the criminal contexts, the Constitution places limits on the sovereign's ability to use its law-making power to modify bargains it has made with its subjects. The basic principle is one that protects not just the rich and the powerful, but also the indigent defendant engaged in negotiations that may lead to an acknowledgment of guilt and a suitable punishment.

*Lynce,* 519 U.S. at ——, 117 S.Ct. at 895 (emphasis added).

[39] The longstanding case law on what makes a criminal statute retroactive provides helpful analogies. Any change from a discretionary system to a system of mandatory penalties for prior crimes is retroactive. That is because the individual is being deprived of the ability to bring equitable circumstances to bear on his case. *See Warden,* **\*175** *Lewisburg Penitentiary v. Marrero,* 417 U.S. 653, 663, 94 S.Ct. 2532, 2538, 41 L.Ed.2d 383 (1974) (statute taking away parole eligibility for offenses subject to parole according to the law at the time they were committed could be found to be constitutionally impermissible as an ex post facto law);

*Lindsey v. Washington,* 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937) (a statute changing a maximum sentence to a mandatory sentence for an offense committed prior to statute's enactment is an impermissible ex post facto law). Retroactivity depends on when the crime is committed, and not on any later date. In a system of law people have a right to know the possible consequences of their actions and to know that these consequences will not lightly be changed.

Even if retroactivity is measured from conviction rather than from commission of the crime it is suspect. Once the individual is accused of a crime and has to make choices during criminal proceedings, he or she begins actual reliance on expectations of the law. In criminal proceedings the accused faces a number of choices. The defendant may (1) plead guilty as charged (or, in some jurisdictions, *nolo contendere* ); (2) plead guilty to a lesser offense in exchange for dropping of a more serious charge; or (3) contest the charge and go to trial. If convicted the defendant may choose to appeal or waive appeal. In particular a defendant who plea bargains must choose among various possible dispositions, weighing various possible sentencing outcomes and other consequences. Those consequences include whether the plea will lead to deportation.

These choices are faced by the innocent as well as the guilty. Though innocent, an individual accused of a crime may choose to plead guilty to a lesser charge in order to get out of jail (with a sentence of "time served" only) after a high bail has been set or, even if out on bail, in order to avoid any jail time. This is particularly true with respect to individuals in certain racial, ethnic, or other categories who are more likely to be treated harshly at each stage of the criminal process, including arrest, charging, setting of bail, plea bargaining, and sentencing. *See generally* "Race and Criminal Justice" in The Real War on Crime: The Report of the National Criminal Justice Commission, ch. 4 (Steven R. Donziger, ed.1996). The court can take judicial notice, based on experience in the Eastern District of New York, that non-citizens are more likely to be harshly treated by the criminal justice system, particularly, as in the instant case, if they are Latinos accused of drug-related crimes.

Those facing a higher risk of detention before trial because they can not meet bail requirements have a greater incentive to accept a plea that will allow them to avoid a prison sentence. Even if prison time cannot be avoided, the defendant may plead to a lesser charge in order to avoid the risk of a finding of guilt and a stiffer sentence based on a more serious charge. Among the reasons an individual might agree to a plea to avoid any jail time, or more jail time, is simply to be able to retain employment and the ability to care for his or her family on a day-to-day basis.

Of the non-citizens convicted in United States district courts during 1994, 92.3 percent entered guilty pleas. J. Scalia, Non-citizens in the Federal Criminal Justice System, 1984–94, U.S. Department of Justice, Bureau of Justice Statistics Special Report (Aug.1996). For a non-citizen, the choice to forego trial and plead guilty is often critically dependent on information regarding possible immigration consequences.

*See United States v. Del Rosario,* 902 F.2d 55, 61 (D.C.Cir.1990)(Mikva, J., concurring), *cert. denied,* 498 U.S. 942, 111 S.Ct. 352, 112 L.Ed.2d 316 (1990) ("The possibility of being deported can be——and frequently is——the most important factor in a criminal defendant's decision how to plead"); *Williams v. State,* 641 N.E.2d 44 (Ind.1994)

("The possibility of deportation ... is a consequence which undoubtedly would enter into the decision-making process of a defendant considering a plea bargain"); *People v. Pozo,* 746 P.2d 523, 529 (Colo.1987) ("In cases involving alien criminal defendants, for example, thorough knowledge of fundamental principles of deportation law may have significant impact on a client's decisions concerning plea negotiations and defense strategies"); *see also* **\*176** *Costello v. INS,* 376 U.S. 120, 130–31, 84 S.Ct. 580, 586, 11 L.Ed.2d 559 (1964) (noting that if immigrant had been aware that he faced deportation, he could have offered to plead to charges that would not have made him deportable).

The importance of immigration consequences can be seen in the following hypothetical example of the effects of the new law were it given retroactive effect.

Mr. A, a lawful permanent resident of many years residence in the United States was arrested several years ago after he was found in a car in which the police found marijuana. He denied that the marijuana found was his. Nevertheless, he was charged with the New York State crime of criminal possession of marijuana in the third degree (New York Penal Law Section 221.20) (unlawfully possesses more than eight ounces of preparations, compounds, mixtures or substances containing marijuana). Mr. A had a job and family to support. He also did not want his family or employer to know of his arrest. He therefore desperately wished to avoid a prison sentence. Thus, in order to avoid the possibility of a prison sentence if he took the case to trial and was nevertheless found guilty, he chose on advice of his defense counsel to plead to the misdemeanor offense of possession of marijuana in the fourth degree (New York Penal Law Section 221.15) (possesses more than two ounces) even though he continued to deny knowledge of the marijuana. He chose to do so based on an understanding that he would be sentenced only to probation for the misdemeanor charge. His choice was also based on his understanding that, even though the conviction for the misdemeanor charge would make him deportable, were INS to bring deportation proceedings against him he would have the right to apply to an Immigration Judge for a waiver of deportation based on numerous equities in his case. Mr. A also waived appeal. He has no further arrests and continues to work and support his wife and United States citizen children.

Recently, years later, Mr. A applied for citizenship. Instead of granting him citizenship, the naturalization examiner learns of his past conviction and initiates deportation proceedings against him. If section 440(d) is applied to Mr. A, he will be subject to automatic deportation despite the fact that he was convicted years ago and despite the fact that before April 24, 1996, he had a statutory right to apply for a waiver of deportation. He would be automatically ordered deported because his minor drug conviction renders him deportable under INA Section 241(a)(2)(B)(i), one of the grounds for which one cannot obtain a waiver under AEDPA section 440(d).

If Mr. A had known that he would later be retroactively subject to a law making him mandatorily deportable if convicted of this New York State misdemeanor of criminal possession of marijuana in the fourth degree (possesses more than two ounces), he could have agreed to plead guilty only to criminal possession of marijuana in the fifth degree (possesses more than 25 grams of marijuana) or the violation of unlawful possession of marijuana. Ironically, he then would probably have avoided not only mandatory deportation, but deportability altogether. This is because Congress has made an exception to deportability for a conviction for one offense involving possession of 30 grams or less of marijuana. *See* pre-IIRIRA INA Section 241(a)(2)(B)(i).

The importance of immigration consequences of pleas in criminal cases cannot be underestimated. Deportation to a country where a legal permanent resident of the United States has not lived since childhood; or where the immigrant has no family or means of support; or where he or she would be permanently separated from a spouse, children and other loved ones, is surely a consequence of serious proportions that any immigrant would want to consider in entering a plea. As Justice Black wrote: "To banish [an immigrant] from home, family and adopted country is punishment of the most drastic kind." *Lehmann v. United States,* 353 U.S. 685, 691, 77 S.Ct. 1022, 1025, 1 L.Ed.2d 1122 (1957) (Black, J., concurring); *see also Lok v. INS,* 548 F.2d 37, 39 (2d Cir.1977) ("[d]eportation is a sanction which in severity surpasses all but the most Draconian **\*177** criminal penalties"). An immigrant can be expected to weigh the likelihood of this drastic punishment just as he or she would weigh other matters in a plea—such as the likely sentence, the availability of parole, and the overall disruption the plea will cause to his life.

Recognizing this central role of deportation consequences, the courts have, to varying extents, imposed on criminal defense counsel a duty to advise clients properly of the immigration consequences of pleading guilty. *See e.g.,* *Michel v. United States,* 507 F.2d 461, 465–466 (2nd Cir.1974) (recognized defense counsel's obligation to advise about the "indirect consequences the guilty plea may trigger," including deportation); *Williams v. State,* 641 N.E.2d 44 (Ind.1994) ("attorney's duties to a client are [not] limited by a bright line between the direct consequences of a guilty plea and those consequences considered collateral"); *People v. Soriano,* 194 Cal.App.3d 1470, 240 Cal.Rptr. 328 (1987) (citing ABA standards as evidence of defense counsel's obligation to advise clients fully about collateral consequences of their guilty pleas); *People v. Pozo,* 746 P.2d 523 (Colo.1987) ("attorneys must inform themselves of material legal principles that may significantly impact the particular circumstances of their clients"); *People v. Correa,* 108 Ill.2d 541, 92 Ill.Dec. 496, 485 N.E.2d 307 (1985).

In several states, the criminal courts are required by statute to warn defendants of possible immigration consequences as a condition of accepting a guilty plea. Currently, at least thirteen states require deportation advisories as part of the criminal court's plea allocution. *See, e.g.,* California, Cal.Penal Code § 1016.5; Connecticut, Conn. Gen.Stat. Ann. § 54–1j; Massachusetts, Mass. Gen. Laws Ann. ch. 278, § 29D; New York, N.Y.Crim. Proc. Law § 220.50(7); Ohio, Ohio Rev.Code Ann. § 2943.031; Oregon, Or.Rev.Stat. § 135.385; Texas, Tex.Code Crim. Proc. Ann., art. 26.13; and Washington, Wash. Rev.Code Ann. § 10.40.200.

Bar and defender associations and organizations counsel criminal defense lawyers to advise their non-citizen clients of immigration consequences of criminal convictions. The National Legal Aid and Defender Association has recognized the duty of defense counsel in the plea bargaining process to "be fully aware of, and make sure the client is fully aware of ... consequences of conviction such as deportation." See NLADA Performance Guidelines for Criminal Defense Representation (1994), Guideline 6.2(a)(3) and commentary ("Deportation ... can be a devastating effect of conviction for non-citizens"); *See also* NLADA Performance Guideline 6.3(a) and commentary (requiring that defense counsel explain "the potential consequences of the agreement" and

noting that collateral consequences, such as deportation, can "be greater than direct ones"). The American Bar Association has also counseled that defense lawyers advise their criminally accused clients of immigration consequences. ABA Standards for Criminal Justice, Pleas of Guilty, Std. 14–3.2 (2d ed.1982), commentary at 75 (where it is apparent that a defendant faces deportation as a result of a conviction or the defendant asks a question regarding these possible consequences, counsel "should fully advise the defendant of these consequences").

The duty to advise non-citizen clients of immigration consequences is reflected in the training and daily practice of criminal defense lawyers and organizations. For example, The Legal Aid Society routinely instructs its attorneys to inquire as to the citizenship status of their clients and to advise their non-citizen clients of immigration consequences. In fact, the Legal Aid Society has on staff a lawyer whose sole responsibility is to provide assistance and advice to the organization's legal staff and clients on immigration consequences of criminal proceedings and adjudications. The Society also includes training on immigration consequences in its instruction for new lawyers and provides regular updates and special training to its lawyer staff.

In sum, courts, state legislatures, and criminal defense lawyers consider it a duty of defense lawyers (or in some cases the criminal courts themselves) to give proper advice to a criminally accused non-citizen of immigration consequences of the disposition of the criminal case. Given this recognition of the **\*178** importance of immigration consequences, surely an unauthorized interpretation of the immigration laws affecting the calculus of risks and relevant rights must be seen as attaching a new and unfair legal consequence to the choices reasonably made by an affected individual relying on the then law.

[40]   The government argues that the long existing statutory right of a legal permanent resident to seek relief from deportation is "purely discretionary," and argues that eliminating the statutory right to seek the relief can be characterized as merely altering jurisdiction or the availability of future prospective relief. *See* *Matter of Soriano,* Int. Dec.3289, 1996 WL 426888 (beginning at screen page 37, AG Op. Feb. 21, 1997).

The mere label of relief as discretionary is irrelevant to retroactivity analysis. It is well-established, for example, that changing a maximum sentence to a mandatory sentence has

retroactive effect, even though the court always had the discretion to impose the maximum. *Lindsey v. Washington,* 301 U.S. 397, 400–02, 57 S.Ct. 797, 798–99, 81 L.Ed. 1182 (1937). Similarly, changing the possibility of deportation to automatic deportation alters radically the consequences that immigrants face. As explained above, the law prior to the AEDPA allowed and in some cases required criminal defense attorneys to advise legal permanent residents entering guilty pleas that they faced some risk of deportation, but that many circumstances, such as demonstrating true rehabilitation, the need to care for their families, and otherwise showing themselves to be productive members of society, would give them a reasonable chance of remaining. A lawyer could tell a client that at least half of section 212(c) applications have been granted. During fiscal years 1989 through 1994, over half of the total number of applications for section 212(c) relief decided by the Executive Office for Immigration Review (comprised of Immigration Judges and the BIA) were granted. *See* U.S. Department of Justice Executive Office for Immigration Review Statistical Sheet 1, Jan. 19, 1995, attached to Petitioners' Memorandum of Law, Ex. CC. The grant rate was undoubtedly even higher for the population that is now taking the brunt of the retroactive application of the AEDPA section 440(d)—legal permanent residents who committed crimes—some minor—many years ago.

If the person's crime was relatively minor, and if his or her equities were great, the established practice of the BIA would suggest a likelihood of there being no deportation consequences to a conviction. The language of a 1970 BIA decision explaining the exercise of discretion in this area has become text book "law" upon which practitioners rely in advising clients, as indicated in the following quotation from a standard reference work:

> Where adverse factors are present in a given application it may be necessary for the applicant to offset these by a showing of unusual or even outstanding equities. Generally favorable factors such as family ties, hardship, length of residence in the United States, etc., will be considered as countervailing factors meriting favorable exercise of administrative discretion. In the absence of adverse factors, adjustment will ordinarily be granted....

National Lawyers Guild, Immigration Law and Defense, § 8.3(d) (quoting *Matter of Arai,* 13, Int. Dec. 494, 498 (B.I.A.1970)). Thus the client knew that his or her own conduct, like the good-time credits considered in *Weaver v. Graham,* 450 U.S. 24, 28–29, 101 S.Ct. 960, 963–64, 67 L.Ed.2d 17 (1981), would play a central role in determining whether the client would ultimately face deportation. Certainly, no lawyer could promise a client that he or she would be granted 212(c) relief. Nevertheless, the right to apply for the waiver has been a statutory right which has played a central role in decisions made by criminally accused lawful permanent residents and other actors in the criminal justice system for decades.

[41] [42] The Attorney General dismissed this argument saying that no such advice could reasonably be given because "[for] the past forty years, the law has been settled that Congress may legislate to alter the immigration consequences of past criminal convictions or acts." *Matter of Soriano,* Int. Dec.3289, 1996 WL 426888 (beginning at screen page 1, BIA June 27, 1996) (beginning **\*179** at screen page 37, AG Op. Feb. 21, 1997). This argument begs the question. Whenever a court is faced with a *Landgraf* issue the question is whether Congress has acted clearly to upset expectations, and the issue is therefore always one of expectations that Congress arguably has the power to override if it so chooses. *Landgraf* stands for the proposition that people are entitled to rely on the law even when Congress has the power to make laws that dash expectations. This right to rely on settled law is essential to a system of law in which people can have some measure of certainty that they will have fair notice of the system of rules that will govern the consequences of their actions. It is the essence of the Rule of Law in which we take such pride.

[43] There is no merit to the government's assertion that *Landgraf* has no applicability to these cases because a section 212(c) application should be viewed as a prospective injunction that is properly governed by the law in effect at the time the injunction is issued. This argument misconstrues *Landgraf*'s discussion of the role of current law in injunction cases. *See* *Landgraf v. USI Film Products,* 511 U.S. 244, 273–74, 114 S.Ct. 1483, 1501–02, 128 L.Ed.2d 229 (1994).

As the Court's citations make clear, the reference to "in futuro" injunctions refers to situations in which a court issues an injunction that will govern the ongoing conduct of the parties. In two of the cases cited in *Landgraf*, *Duplex Printing Press Co. v. Deering,* 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921), and *American Steel Foundries v. Tri–City C.T. Council,* 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189 (1921)—the Court held that the Clayton Act's provisions on injunctions restraining labor activity should be applied to cases that were under judicial consideration. This result allowed the courts to issue orders regarding future activity that would comport with congressional guidance on the propriety of such injunctions. These principles have no application to the cases at bar where retroactive imposition of mandatory deportation provisions would radically alter the "legal consequences" of a conviction which is an "event [ ] completed before [the law's] enactment." *Landgraf,* 511 U.S. at 270, 114 S.Ct. at 1499 (emphasis added); *See also id.,* 511 U.S. at 293, 114 S.Ct. at 1508 (Scalia, J., concurring) (occurrence of primary conduct accorded new significance by the legislation is the "relevant event" for purposes of retroactivity analysis).

Acceptance of the government's claim that the AEDPA's restrictions on 212(c) relief are not retroactive because section 212(c) operates "prospectively" would undercut the Supreme Court's analysis of the statutory provisions at issue in the *Landgraf* case itself. That is, the damage remedies which were found impermissibly retroactive in *Landgraf* operated "prospectively" in the same sense, for compensatory and punitive damages for past misconduct would have been paid out in the future just as a successful section 212(c) application prevents the penalty of deportation for past misconduct from being imposed in the future. This cannot, however, obscure the reality that, just as the damage remedy proscribed in *Landgraf* would have been imposed based upon past conduct previously immune from such a remedy, section 212(c) relief is barred based upon past conduct that never previously carried such a bar.

In summary, "[i]n this area of law, involving as it may the equivalent of banishment or exile, we do well to eschew technicalities and fictions and to deal instead with realities." *Costello v. INS.* 376 U.S. 120, 131, 84 S.Ct. 580, 587, 11 L.Ed.2d 559 (1964). The reality here is that section 440(d) effects a drastic change in the law relating to the immigration consequences for a lawful permanent resident of the past

commission and conviction of certain criminal convictions. By taking away the substantive right to apply for a waiver of deportation, the new law as interpreted by the Attorney General makes deportation automatic for convictions falling within the enumerated categories. As the court of appeals for the Second Circuit has held, with respect to the AEDPA's habeas amendments, if "the new statute would require a different outcome, application of the new statute would be retroactive." *Boria v. Keane,* 90 F.3d 36, 37 (2d Cir.1996). The AEDPA section 440(d) certainly imposes a different outcome, namely mandatory deportation instead of a real possibility of avoiding deportation by demonstrating favorable factors. This is just the **\*180** sort of retroactive effect that flies in the face of the anti-retroactivity principles expressed by the Supreme Court in *Landgraf.*

**(b) Traditional Principles of Statutory Interpretation**

[44] The Supreme Court has repeatedly held that any ambiguities in immigration statutes must be read to avoid deportation consequences. *See, e.g., INS v. Cardoza–Fonseca,* 480 U.S. 421, 449, 107 S.Ct. 1207, 1222, 94 L.Ed.2d 434 (1987) (discussing "the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien"). The Court has explained:

> If [the language of the statute and the absence of legislative history] continued to leave the matter in some doubt, we would nonetheless be constrained by accepted principles of statutory construction in this area of the law to resolve that doubt in favor of the petitioner. As the Court has emphasized, deportation is a drastic measure and at times the equivalent of banishment or exile. It is the forfeiture for misconduct of residence in this country. Such a forfeiture is a penalty. To construe this statutory provision less generously to the alien might find support in logic. But since the stakes are considerable for the individual, we will not assume that Congress meant to trench on his freedom beyond that which is required by the narrowest of

several possible meanings of the words used.

*Costello v. INS,* 376 U.S. 120, 128, 84 S.Ct. 580, 585, 11 L.Ed.2d 559 (1964) (citations and internal quotation marks omitted).

The Court has applied this principle to issues relating to the temporal reach of deportation legislation, finding that "[i]n the absence of a clear and definite expression, we are not at liberty to conclude that Congress intended that any alien, no matter how long a resident of this country, or however well disposed toward our government, must be deported, if at any time in the past, no matter when, or under what circumstances, or for what time, he was a member of the described organization." *Kessler v. Strecker,* 307 U.S. 22, 30, 59 S.Ct. 694, 698, 83 L.Ed. 1082 (1939) (interpreting statute providing for deportability based on membership in a subversive organization).

 **[45]**  If there is any ambiguity in a deportation statute, this rule of statutory construction requires an interpretation that favors the alien. This means that should a court have any lingering doubts regarding whether Congress plainly expressed its decision to not make the AEDPA section 440(d) applicable to pre-Act conduct or events, that doubt must be resolved in favor of petitioners, and other individuals like them who are now on the brink of deportation based on the government's misreading of the applicability of that statutory provision.

This rule of statutory construction serves a complementary function to the prospectivity rule explained in *Landgraf.* As discussed above, the *Landgraf* Court directed courts interpreting statutes to pay special attention to "unpopular groups or individuals." This rule of resolving ambiguities in favor of aliens is one specific example of general *Landgraf* principles.

### (c) No Deference to the Administrative Agency
 **[46]**  Contrary to the government's position, the decision of the Attorney General in *Matter of Soriano,* Int. Dec.3289, 1996 WL 426888 (beginning at screen page 37, AG Op. Feb. 21, 1997), is not entitled to deference under *Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron,* the first

question in interpreting a statute is "whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. at 2781. If the answer is yes, there is no need to proceed to consider the agency's interpretation. *Id.* In the cases at bar, the statute, read in context and against the backdrop of *Landgraf,* precludes the conclusion that Congress left the statute ambiguous. Congress knew that it had to include specific language to make provisions applicable retroactively; it did so to differing degrees with respect to other AEDPA immigration provisions; and it decided not to do so with respect to section 440(d). Such congressional  **\*181**  expression dictates the conclusion that section 440(d) may not be applied retroactively, whatever the opinion of the Attorney General. *See INS v. Cardoza–Fonseca,* 480 U.S. 421, 447–48, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.") (citations omitted).

Even if there were some ambiguity in the statute, however, the general rule of deference to agency interpretations does not apply. Here, the Attorney General's opinion is not based on statutory construction but rather on her interpretation of judicial default rules enunciated by the Supreme Court. Accordingly, deference is wholly inappropriate. *See Akins v. Federal Election Commission,* 101 F.3d 731 (D.C.Cir.1996) (en banc) (rejecting *Chevron* deference for agency interpretation of Supreme Court construction of statute: "[a]gencies have no special qualifications or legitimacy in interpreting Court opinions"); *Vargas v. INS,* 938 F.2d 358, 363 (2d Cir.1991) (administrative agency decision not presented as statutory interpretation cannot command Chevron deference).

 **[47]**  In any case, when an agency's interpretation conflicts with an established rule of statutory construction with substantive overtones, courts have given precedence to the rule of statutory construction. *See EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (the "[l]ong-standing principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States' " overrode any deference due under *Chevron* to the EEOC's interpretation of Title VII as applying extra-territorially); *Muscogee (Creek) Nation v. Hodel,* 851 F.2d 1439 (D.C.Cir.1988), *cert. denied,* 488 U.S. 1010, 109

S.Ct. 795, 102 L.Ed.2d 786 (1989) (applying the canon that ambiguous statutes should be construed in favor of American Indians precluding deference to the agency's interpretation). The agency's interpretation must give way to the Supreme Court's long held rule of statutory construction that any ambiguities in deportation statutes should be resolved in favor of the alien. *See Vargas, 938 F.2d at 363* (*Chevron* must yield to principle of lenity in construing deportation statute). It must also recede to the *Landgraf* rules of construction disfavoring retroactive interpretations of statutes.

[48]    The general rule of deference to agency interpretations is premised on the assumption "that Congress, when it left an ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." *See Smiley v. Citibank, 517 U.S. 735, ——, 116 S.Ct. 1730, 1733, 135 L.Ed.2d 25 (1996).* Deference to an agency resolution of any ambiguity depends on the viability of the assumption that Congress left that ambiguity to the agency to resolve. In the context of retroactivity, *Landgraf* requires that Congress itself weigh the merits and demerits of retroactive application. The decision of to whom the statute applies and whether it should be read as delegating the question of retroactive application is not the sort of question that Congress can be expected to leave to an administrative agency. *See Teitelbaum v. Chater, 949 F.Supp. 1206, 1214 n. 7 (E.D.Pa.1996)* (concluding that any ambiguity as to retroactive application of new disability rules "is more likely due to imperfect draftsmanship and not Congressional intent to allow the Commissioner to 'fill in the gaps' "); *cf. Harper v. Virginia Dept. of Taxation, 509 U.S. 86, 93, 113 S.Ct. 2510, 2516, 125 L.Ed.2d 74 (1993)* (referring to "quintessentially 'legislative' prerogative to make rules of law retroactive or prospective").

[49]    Where the issue is retroactivity, the fundamental principle is that Congress should not be seen as having acted against our deeply-rooted understanding of justice and human rights unless it has clearly indicated its intent to do so. It is not for the Attorney General to usurp Congress's obligation to think seriously about whether any national interest is served in the upsetting of past law including the past bargains that underlie the criminal justice system and international concerns.

*182    The Attorney General's opinion is also undeserving of deference because it offers no interpretation at all of the statute or the purposes served by retroactivity. The opinion does not analyze the text of the statute. It does not offer any animating policy principles. It merely asserts improperly, as has been demonstrated, that retroactivity analysis does not apply.

Although it is not necessary to determine whether the Attorney General even had authority to issue her opinion overturning the decision of the Board of Immigration Appeals in *Matter of Soriano, Int. Dec. 3289 (beginning at screen page 37, AG Op. Feb. 21, 1997)* since decisions of the BIA under section 440(b) of the AEDPA of the BIA are "final," the court notes that PRE–AEDPA law in this area supports the proposition that "the Attorney General cannot dictate the actions of the Board of Immigration Appeals, but must permit it to exercise its own independent discretion." 3 Charles Gordon, Stanley Mailmov, and Stephen Yale–Locks, Immigration Law and Procedure § 74.07[6] (1996). It is enough now to hold that *Soriano* was wrong on the merits. It constituted an arbitrary abuse of power by the Attorney General.

In view of this conclusion there is no need to consider whether any procedural error or late filing of a brief constituted laches by the government. *Cf. Anwar v. INS, 107 F.3d 339 (5th Cir.1997)* (where petitioner could not show he was a refugee, a failure to extend the deadline for his brief supporting a claim for discretionary grant of asylum created no prejudice).

### (d) *A Fortiori* Application to Those Whose Cases Were Being Processed by the INS

What has been demonstrated above supports a decision that retroactivity to the date of the crime or of the conviction is improper. *A fortiori,* that conclusion would protect petitioner Navas who not only was convicted long before the new statutes were adopted, but who already was being processed by the INS with the expectation that the then current section 212(c) ameliorative procedure would apply. *See, Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).*

### VI. Conclusion

Petitioners are in the legal custody of respondents for habeas corpus purposes. The court has personal jurisdiction over

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

petitioners' custodians. Venue lies in the Eastern District of New York.

Section 440(d) of the AEDPA, which bars legal permanent residents who have been convicted of certain crimes from seeking a discretionary waiver of deportation, may not be applied retroactively to petitioners.

Without deciding them on the merits, petitioners' equal protection claims are dismissed as unnecessary for the disposition of these cases. Petitioner Mojica's laches claim is dismissed for the same reason.

The court has subject matter jurisdiction over these matters and has the power to issue writs of habeas corpus and declaratory judgments on behalf of the petitioners. Writs of habeas corpus are issued on behalf of petitioners. Petitioners' orders of deportation are vacated.

Respondents shall resume petitioners' deportation proceedings to adjudicate applications for waivers of deportation pursuant to section 212(c) of Immigration and Nationality Act without regard to section 440(d) of the AEDPA in accordance with this memorandum and judgment.

Enforcement of this judgment is stayed pending completion of appeals. Respondents have agreed not to deport petitioners until judicial review of deportation proceedings against petitioners is complete.

So Ordered.

**All Citations**

970 F.Supp. 130

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

133 S.Ct. 1678, 185 L.Ed.2d 727, 81 USLW 4265, 13 Cal. Daily Op. Serv. 3994...

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Gordon v. Barr, 4th Cir., July 8, 2020

133 S.Ct. 1678
Supreme Court of the United States

Adrian MONCRIEFFE, Petitioner

v.

Eric H. HOLDER, Jr., Attorney General.

No. 11–702.
|
Argued Oct. 10, 2012.
|
Decided April 23, 2013.

**Synopsis**

**Background:** Alien, a Jamaican citizen, petitioned for review of a decision of Board of Immigration Appeals (BIA) ordering his removal. The Court of Appeals for the Fifth Circuit, Jones, Chief Judge, 662 F.3d 387, entered an order denying petition, and certiorari was granted.

**[Holding:]** The Supreme Court, Justice Sotomayor, held that alien's state conviction for possession of marijuana with intent to distribute was not for an aggravated felony under Immigration and Nationality Act (INA); abrogating Garcia v. Holder, 638 F.3d 511, Julce v. Mukasey, 530 F.3d 30.

Reversed and remanded.

Justice Thomas filed a dissenting opinion.

Justice Alito filed a dissenting opinion.

West Headnotes (8)

**[1]** **Aliens, Immigration, and
Citizenship** 👉 Controlled substances offenses

A conviction under either state or federal law may qualify as an aggravated felony under the Immigration and Nationality Act (INA), but a state offense constitutes a felony punishable

under the Controlled Substances Act (CSA), and, thus, an aggravated felony under the INA, only if it proscribes conduct punishable as a felony under that federal law. Immigration and Nationality Act, § 237(a)(2)(A)(iii), 8 U.S.C.A. § 1227(a)(2)(A)(iii); 18 U.S.C.A. § 924(c)(2); Controlled Substances Act, § 401, 21 U.S.C.A. § 841.

170 Cases that cite this headnote

**[2]** **Aliens, Immigration, and
Citizenship** 👉 Aggravated felonies in general

When the Government alleges that a state conviction qualifies as an aggravated felony under the Immigration and Nationality Act (INA), the court generally employs a categorical approach to determine whether the state offense is comparable to an offense listed in the INA. Immigration and Nationality Act, § 237(a)(2)(A) (iii), 8 U.S.C.A. § 1227(a)(2)(A)(iii).

120 Cases that cite this headnote

**[3]** **Aliens, Immigration, and
Citizenship** 👉 Aggravated felonies in general

Under the categorical approach for determining whether a state conviction qualifies as an aggravated felony under the Immigration and Nationality Act (INA), the court looks not to the facts of the particular prior case, but instead to whether the state statute defining the crime of conviction categorically fits within the generic federal definition of a corresponding aggravated felony. Immigration and Nationality Act, § 237(a)(2)(A)(iii), 8 U.S.C.A. § 1227(a) (2)(A)(iii).

421 Cases that cite this headnote

**[4]** **Aliens, Immigration, and
Citizenship** 👉 Aggravated felonies in general

Under the Immigration and Nationality Act (INA), a state offense is a categorical match with a generic federal offense only if a conviction of the state offense necessarily

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 609 of 1271

Moncrieffe v. Holder, 569 U.S. 184 (2013)

133 S.Ct. 1678, 185 L.Ed.2d 727, 81 USLW 4265, 13 Cal. Daily Op. Serv. 3994...

involved facts equating to the generic federal offense, and whether the noncitizen's actual conduct involved such facts is irrelevant. Immigration and Nationality Act, § 237(a)(2)(A)(iii), 8 U.S.C.A. § 1227(a)(2)(A)(iii).

243 Cases that cite this headnote

**[5]    Aliens, Immigration, and Citizenship** ☞ Aggravated felonies in general

Because the court examines what the state conviction necessarily involved, not the facts underlying the case, in determining under the categorical approach whether the conviction was for an aggravated felony under the Immigration and Nationality Act (INA), it must presume that the conviction rested upon nothing more than the least of the acts criminalized, and then determine whether even those acts are encompassed by the generic federal offense; however, the court's focus on the minimum conduct criminalized by the state statute is not an invitation to apply legal imagination to the state offense, and there must be a realistic probability, not a theoretical possibility, that the state would apply its statute to conduct that falls outside the generic definition of a crime. Immigration and Nationality Act, § 237(a)(2)(A)(iii), 8 U.S.C.A. § 1227(a)(2)(A)(iii).

566 Cases that cite this headnote

**[6]    Aliens, Immigration, and Citizenship** ☞ Controlled substances offenses

Under categorical approach, alien's Georgia conviction for possession of marijuana with intent to distribute did not necessarily involve facts that corresponded to a felony offense under Controlled Substances Act (CSA), and, thus, it was not for an aggravated felony rendering alien deportable under Immigration and Nationality Act (INA); fact of alien's conviction standing alone did not reveal either whether remuneration or more than a small amount of marijuana was involved, conviction could have corresponded to either felony or misdemeanor offense under CSA, and possession with intent to distribute marijuana was not presumptively a felony under

CSA; abrogating *Garcia v. Holder*, 638 F.3d 511, *Julce v. Mukasey*, 530 F.3d 30. Immigration and Nationality Act, § 237(a)(2)(A)(iii), 8 U.S.C.A. § 1227(a)(2)(A)(iii); 18 U.S.C.A. § 924(c)(2); Controlled Substances Act, §§ 401(a)(1), (b)(1)(D), (b)(4), 404, 21 U.S.C.A. §§ 841(a)(1), (b)(1)(D), (b)(4), 844; West's Ga.Code Ann. § 16–13–30(j)(1).

130 Cases that cite this headnote

**[7]    Aliens, Immigration, and Citizenship** ☞ Aggravated felonies in general

The categorical approach for determining whether a state conviction qualifies as an aggravated felony under the Immigration and Nationality Act (INA) serves practical purposes: it promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact. Immigration and Nationality Act, § 237(a)(2)(A)(iii), 8 U.S.C.A. § 1227(a)(2)(A)(iii).

37 Cases that cite this headnote

**[8]    Aliens, Immigration, and Citizenship** ☞ Aggravated felonies in general

The categorical approach for determining whether a state conviction qualifies as an aggravated felony under the Immigration and Nationality Act (INA) was designed to avoid the potential unfairness of two noncitizens, each convicted of the same offense, receiving different aggravated felony determinations depending on what evidence remained available or how it was perceived by an individual immigration judge. Immigration and Nationality Act, § 237(a)(2)(A)(iii), 8 U.S.C.A. § 1227(a)(2)(A)(iii).

30 Cases that cite this headnote

133 S.Ct. 1678, 185 L.Ed.2d 727, 81 USLW 4265, 13 Cal. Daily Op. Serv. 3994...

**\*\*1680** *Syllabus* [*]

**\*184**  Under the Immigration and Nationality Act (INA), a noncitizen convicted of an "aggravated felony" is not only deportable, 8 U.S.C. § 1227(a)(2)(A)(iii), but also ineligible for discretionary relief. The INA lists as an "aggravated felony" "illicit trafficking in a controlled substance," § 1101(a)(43)(B), which, as relevant here, includes the conviction of an offense that the Controlled Substances Act (CSA) makes punishable as a felony, *i.e.,* by more than one year's imprisonment, see 18 U.S.C. §§ 924(c)(2), 3559(a)(5). A conviction under state law "constitutes a 'felony punishable under the [CSA]' only if it proscribes conduct punishable as a felony under that federal law." Lopez v. Gonzales, 549 U.S. 47, 60, 127 S.Ct. 625, 166 L.Ed.2d 462.

Petitioner Moncrieffe, a Jamaican citizen here legally, was found by police to have 1.3 grams of marijuana in his car. He pleaded guilty under Georgia law to possession of marijuana with intent to distribute. The Federal Government sought to deport him, reasoning that his conviction was an aggravated felony because possession of marijuana with intent to distribute is a CSA offense, 21 U.S.C. § 841(a), punishable by up to five years' imprisonment, § 841(b)(1)(D). An Immigration Judge ordered Moncrieffe removed, and the Board of Immigration Appeals affirmed. The Fifth Circuit denied Moncrieffe's petition for review, rejecting his reliance on § 841(b)(4), which makes marijuana distribution punishable as a misdemeanor if the offense involves a small amount for no remuneration, and holding that the felony provision, § 841(b)(1)(D), provides the default punishment for his offense.

*Held:* If a noncitizen's conviction for a marijuana distribution offense fails to establish that the offense involved either remuneration or more than a small amount of marijuana, it is not an aggravated felony under the INA. Pp. 1683 – 1694.

(a) Under the categorical approach generally employed to determine whether a state offense is comparable to an offense listed in the INA, see, *e.g.,* Nijhawan v. Holder, 557 U.S. 29, 33–38, 129 S.Ct. 2294, 174 L.Ed.2d 22, the noncitizen's actual conduct is irrelevant. Instead "the state statute defining the crime of conviction" is examined to see whether it fits within the "generic" federal definition of a corresponding aggravated felony. Gonzales v. Duenas–Alvarez, 549 U.S. 183, 186, 127 S.Ct. 815, 166 L.Ed.2d 683. The state offense is a categorical  **\*185**  match only if a conviction of that offense " 'necessarily' involved ... facts equating to [the] generic [federal offense]." Shepard v. United States, 544 U.S. 13, 24, 125 S.Ct. 1254, 161 L.Ed.2d 205. Because this Court examines what the state conviction necessarily involved and not the facts underlying the case, it presumes that the conviction "rested upon [nothing] more than the least of th[e] acts" criminalized, before determining whether even those acts are encompassed by the generic federal offense. **\*\*1681** Johnson v. United States, 559 U.S. 133, 137, 130 S.Ct. 1265, 176 L.Ed.2d 1. Pp. 1683 – 1685.

(b) The categorical approach applies here because "illicit trafficking in a controlled substance" is a "generic crim[e]." Nijhawan, 557 U.S., at 37, 129 S.Ct. 2294. Thus, a state drug offense must meet two conditions: It must "necessarily" proscribe conduct that is an offense under the CSA, and the CSA must "necessarily" prescribe felony punishment for that conduct. Possession of marijuana with intent to distribute is clearly a federal crime. The question is whether Georgia law necessarily proscribes conduct punishable as a felony under the CSA. Title 21 U.S.C. § 841(b)(1)(D) provides that, with certain exceptions, a violation of the marijuana distribution statute is punishable by "a term of imprisonment of not more than 5 years." However, one of those exceptions, § 841(b)(4), provides that "any person who violates [the statute] by distributing a small amount of marihuana for no remuneration shall be treated as" a simple drug possessor, *i.e.,* as a misdemeanant. These dovetailing provisions create two mutually exclusive categories of punishment for CSA marijuana distribution offenses: one a felony, the other not. The fact of a conviction under Georgia's statute, standing alone, does not reveal whether either remuneration or more than a small amount was involved, so Moncrieffe's conviction could correspond to either the CSA felony or the CSA misdemeanor. Thus, the conviction did not "necessarily" involve facts that correspond to an offense punishable as a felony under the CSA. Pp. 1685 – 1687.

(c) The Government's contrary arguments are unpersuasive. The Government contends that § 841(b)(4) is irrelevant because it is merely a mitigating sentencing factor, not an

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 611 of 1271

Moncrieffe v. Holder, 569 U.S. 184 (2013)

133 S.Ct. 1678, 185 L.Ed.2d 727, 81 USLW 4265, 13 Cal. Daily Op. Serv. 3994...

element of the offense. But that understanding is inconsistent with *Carachuri–Rosendo v. Holder,* 560 U.S. ——, 130 S.Ct. 2577, 177 L.Ed.2d 68, which recognized that when Congress has chosen to define the generic federal offense by reference to punishment, it may be necessary to take account of federal sentencing factors too. The Government also asserts that any marijuana distribution conviction is presumptively a felony, but the CSA makes neither the felony nor the misdemeanor provision the default. The Government's approach would lead to the absurd result that a conviction under a statute that punishes misdemeanor conduct only, such as § 841(b)(4) itself, would nevertheless be a categorical aggravated felony.

**\*186** The Government's proposed remedy for this anomaly—that noncitizens be given an opportunity during immigration proceedings to demonstrate that their predicate marijuana distribution convictions involved only a small amount of marijuana and no remuneration—is inconsistent with both the INA's text and the categorical approach. The Government's procedure would require the Nation's overburdened immigration courts to conduct precisely the sort of *post hoc* investigation into the facts of predicate offenses long deemed undesirable, and would require uncounseled noncitizens to locate witnesses years after the fact.

Finally, the Government's concerns about the consequences of this decision are exaggerated. Escaping aggravated felony treatment does not mean escaping deportation, because any marijuana distribution offense will still render a noncitizen deportable as a controlled substances offender. Having been found not to be an aggravated felon, the noncitizen may seek relief from removal such as asylum or cancellation of removal, but the Attorney General may, in his discretion, deny relief if he **\*\*1682** finds that the noncitizen is actually a more serious drug trafficker. Pp. 1686 – 1693.

662 F.3d 387, reversed and remanded.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C.J., and SCALIA, KENNEDY, GINSBURG, BREYER, and KAGAN, JJ., joined. THOMAS, J., and ALITO, J., filed dissenting opinions.

**Attorneys and Law Firms**

Thomas C. Goldstein, Washington, DC, for Petitioner.

Pratik A. Shah, Washington, DC, for Respondent.

Pamela S. Karlan, Jeffrey L. Fisher, Stanford Law School, Supreme Court Litigation Clinic, Stanford, CA, Angel L. Arias, Arias Law Group, P.A., Hollywood, FL, Thomas C. Goldstein, Counsel of Record, Kevin K. Russell, Amy Howe, Tejinder Singh, Goldstein & Russell, P.C., Washington, DC, for Petitioner.

Donald B. Verrilli, Jr., Solicitor General, Stuart F. Delery, Acting Assistant Attorney General, Edwin S. Kneedler, Deputy Solicitor General, Pratik A. Shah, Assistant to the Solicitor General, Counsel of Record, Donald E. Keener, W. Manning Evans, Attorneys, Department of Justice, Washington, DC, for Respondent.

**Opinion**

Justice SOTOMAYOR delivered the opinion of the Court.

**\*187** The Immigration and Nationality Act (INA), 66 Stat. 163, 8 U.S.C. § 1101 *et seq.,* provides that a noncitizen who has been convicted of an " aggravated felony" may be deported from this country. The INA also prohibits the Attorney General from granting discretionary relief from removal to an aggravated felon, no matter how compelling his case. Among the crimes that are classified as aggravated felonies, and thus lead to these harsh consequences, are illicit drug trafficking offenses. We must decide whether this category includes a state criminal statute that extends to the social sharing of a small amount of marijuana. We hold it does not.

I

A

The INA allows the Government to deport various classes of noncitizens, such as those who overstay their visas, and those who are convicted of certain crimes while in the United States, including drug offenses. § 1227. Ordinarily, when a noncitizen is found to be deportable on one of these grounds, he may ask the Attorney General for certain forms of discretionary relief from removal, like asylum (if he has a well-founded fear of persecution in his home country) and cancellation of removal (if, among other things, he has been lawfully present in the United States for a number of years).

133 S.Ct. 1678, 185 L.Ed.2d 727, 81 USLW 4265, 13 Cal. Daily Op. Serv. 3994...

§§ 1158, 1229b. But if a noncitizen has been convicted of one of a narrower set of crimes classified as "aggravated felonies," then he is not only deportable, § 1227(a)(2)(A)(iii), but also ineligible for these discretionary forms of relief. See §§ 1158(b)(2)(A)(ii), (B)(i); §§ 1229b(a)(3), (b)(1)(C). [1]

**1683 [1] *188 The INA defines "aggravated felony" to include a host of offenses. § 1101(a)(43). Among them is "illicit trafficking in a controlled substance." § 1101(a)(43)(B). This general term is not defined, but the INA states that it "includ[es] a drug trafficking crime (as defined in section 924(c) of title 18)." *Ibid.* In turn, 18 U.S.C. § 924(c)(2) defines "drug trafficking crime" to mean "any felony punishable under the Controlled Substances Act," or two other statutes not relevant here. The chain of definitions ends with § 3559(a)(5), which provides that a "felony" is an offense for which the "maximum term of imprisonment authorized" is "more than one year." The upshot is that a noncitizen's conviction of an offense that the Controlled Substances Act (CSA) makes punishable by more than one year's imprisonment will be counted as an "aggravated felony" for immigration purposes. A conviction under either state or federal law may qualify, but a "state offense constitutes a 'felony punishable under the Controlled Substances Act' only if it proscribes conduct punishable as a felony under that federal law." *Lopez v. Gonzales,* 549 U.S. 47, 60, 127 S.Ct. 625, 166 L.Ed.2d 462 (2006).

B

Petitioner Adrian Moncrieffe is a Jamaican citizen who came to the United States legally in 1984, when he was three. During a 2007 traffic stop, police found 1.3 grams of marijuana in his car. This is the equivalent of about two or three marijuana cigarettes. Moncrieffe pleaded guilty to possession of marijuana with intent to distribute, a violation of Ga.Code Ann. § 16–13–30(j)(1) (2007). Under a Georgia statute providing more lenient treatment to first-time offenders, *189 § 42–8–60(a) (1997), the trial court withheld entering a judgment of conviction or imposing any term of imprisonment, and instead required that Moncrieffe complete five years of probation, after which his charge will be expunged altogether. [2] App. to Brief for Petitioner 11–15.

Alleging that this Georgia conviction constituted an aggravated felony, the Federal Government sought to deport Moncrieffe. The Government reasoned that possession of marijuana with intent to distribute is an offense under the CSA, 21 U.S.C. § 841(a), punishable by up to five years' imprisonment, § 841(b)(1)(D), and thus an aggravated felony. An Immigration Judge agreed and ordered Moncrieffe removed. App. to Pet. for Cert. 14a–18a. The Board of Immigration Appeals (BIA) affirmed that conclusion on appeal. *Id.,* at 10a–13a.

The Court of Appeals denied Moncrieffe's petition for review. The court rejected Moncrieffe's reliance upon § 841(b)(4), a provision that, in effect, makes marijuana distribution punishable only as a misdemeanor if the offense involves a small amount of marijuana for no remuneration. It held that in a federal criminal prosecution, "the default sentencing range for a marijuana distribution offense is the CSA's felony provision, § 841(b)(1)(D), rather than the misdemeanor provision." **1684 662 F.3d 387, 392 (C.A.5 2011). Because Moncrieffe's Georgia offense penalized possession of marijuana with intent to distribute, the court concluded that it was "equivalent to a federal felony." *Ibid.*

We granted certiorari, 566 U.S. ——, 132 S.Ct. 1857, 182 L.Ed.2d 642 (2012), to resolve a conflict among the Courts of Appeals with respect to whether a conviction under a statute that criminalizes conduct described by both § 841's felony provision and its misdemeanor provision, such as a statute that punishes all *190 marijuana distribution without regard to the amount or remuneration, is a conviction for an offense that "proscribes conduct punishable as a felony under" the CSA. [3] *Lopez,* 549 U.S., at 60, 127 S.Ct. 625. We now reverse.

II

A

[2] [3] [4] When the Government alleges that a state conviction qualifies as an "aggravated felony" under the INA, we generally employ a "categorical approach" to determine whether the state offense is comparable to an offense listed in the INA. See, *e.g., Nijhawan v. Holder,* 557 U.S. 29, 33–38, 129 S.Ct. 2294, 174 L.Ed.2d 22 (2009); *Gonzales*

133 S.Ct. 1678, 185 L.Ed.2d 727, 81 USLW 4265, 13 Cal. Daily Op. Serv. 3994...

v. Duenas–Alvarez, 549 U.S. 183, 185–187, 127 S.Ct. 815, 166 L.Ed.2d 683 (2007). Under this approach we look "not to the facts of the particular prior case," but instead to whether "the state statute defining the crime of conviction" categorically fits within the "generic" federal definition of a corresponding aggravated felony. Id., at 186, 127 S.Ct. 815 (citing Taylor v. United States, 495 U.S. 575, 599–600, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990)). By "generic," we mean the offenses must be viewed in the abstract, to see whether the state statute shares the nature of the federal offense that serves as a point of comparison. Accordingly, a state offense is a categorical match with a generic federal offense only if a conviction of the state offense " 'necessarily' involved ... facts equating to [the] generic [federal offense]." Shepard v. United States, 544 U.S. 13, 24, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005) (plurality opinion). Whether the noncitizen's actual conduct involved such facts "is quite irrelevant." United States ex rel. Guarino v. Uhl, 107 F.2d 399, 400 (C.A.2 1939) (L. Hand, J.).

[5]    Because we examine what the state conviction necessarily involved, not the facts underlying the case, we must presume *191 that the conviction " rested upon [nothing] more than the least of th[e] acts" criminalized, and then determine whether even those acts are encompassed by the generic federal offense. Johnson v. United States, 559 U.S. 133, 137, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010); see Guarino, 107 F.2d, at 400. But this rule is not without qualification. First, our cases have addressed state statutes that contain several different crimes, each described separately, and we have held that a court may determine which particular offense the noncitizen was convicted of by examining the charging document and jury instructions, or in the case of a guilty plea, the plea agreement, plea colloquy, or " 'some comparable judicial record' of the factual basis for the plea." Nijhawan, 557 U.S., at 35, 129 S.Ct. 2294 (quoting Shepard, 544 U.S., at 26, 125 S.Ct. 1254). Second, our focus on the minimum conduct criminalized by the state statute is not an **1685 invitation to apply "legal imagination" to the state offense; there must be "a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime." Duenas–Alvarez, 549 U.S., at 193, 127 S.Ct. 815.

This categorical approach has a long pedigree in our Nation's immigration law. See Das, The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law, 86 N.Y.U.L.Rev. 1669, 1688–1702, 1749–1752 (2011) (tracing judicial decisions back to 1913). The reason is that the INA asks what offense the noncitizen was "convicted" of, 8 U.S.C. § 1227(a)(2)(A)(iii), not what acts he committed. "[C]onviction" is "the relevant statutory hook."[4] Carachuri–Rosendo v. Holder, 560 U.S. ——, ——, 130 S.Ct. 2577, 2588, 177 L.Ed.2d 68 (2010); see United States ex rel. Mylius v. Uhl, 210 F. 860, 862 (C.A.2 1914).

*192 B

[6]    The aggravated felony at issue here, "illicit trafficking in a controlled substance," is a "generic crim[e]." Nijhawan, 557 U.S., at 37, 129 S.Ct. 2294. So the categorical approach applies. Ibid. As we have explained, supra, at 1682 – 1683, this aggravated felony encompasses all state offenses that "proscrib[e] conduct punishable as a felony under [the CSA]." Lopez, 549 U.S., at 60, 127 S.Ct. 625. In other words, to satisfy the categorical approach, a state drug offense must meet two conditions: It must "necessarily" proscribe conduct that is an offense under the CSA, and the CSA must "necessarily" prescribe felony punishment for that conduct.

Moncrieffe was convicted under a Georgia statute that makes it a crime to "possess, have under [one's] control, manufacture, deliver, distribute, dispense, administer, purchase, sell, or possess with intent to distribute marijuana." Ga.Code Ann. § 16–13–30(j)(1). We know from his plea agreement that Moncrieffe was convicted of the last of these offenses. App. to Brief for Petitioner 11; Shepard, 544 U.S., at 26, 125 S.Ct. 1254. We therefore must determine whether possession of marijuana with intent to distribute is "necessarily" conduct punishable as a felony under the CSA.

We begin with the relevant conduct criminalized by the CSA. There is no question that it is a federal crime to "possess with intent to ... distribute ... a controlled substance," 21 U.S.C. § 841(a)(1), one of which is marijuana, § 812(c).[5] So far, the state and federal provisions correspond. But this is not enough, because the generically defined federal crime is "any felony punishable under the Controlled Substances

Moncrieffe v. Holder, 569 U.S. 184 (2013)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 614 of 1271

133 S.Ct. 1678, 185 L.Ed.2d 727, 81 USLW 4265, 13 Cal. Daily Op. Serv. 3994...

Act," 18 U.S.C. § 924(c)(2), not just any "offense under the *193 CSA." Thus we must look to what punishment the CSA imposes for this offense.

Section 841 is divided into two subsections that are relevant here: (a), titled "Unlawful acts," which includes the offense just described, and (b), titled "Penalties." Subsection (b) tells us how "any person who violates subsection (a)" shall be punished, **1686 depending on the circumstances of his crime (*e.g.,* the type and quantity of controlled substance involved, whether it is a repeat offense). [6] Subsection (b)(1)(D) provides that if a person commits a violation of subsection (a) involving "less than 50 kilograms of marihuana," then "such person shall, except as provided in paragraphs (4) and (5) of this subsection, be sentenced to a term of imprisonment of not more than 5 years," *i.e.,* as a felon. But one of the exceptions is important here. Paragraph (4) provides, "Notwithstanding paragraph (1)(D) of this subsection, any person who violates subsection (a) of this section by distributing a small amount of marihuana for no remuneration shall be treated as" a simple drug possessor, 21 U.S.C. § 844, which *194 for our purposes means as a misdemeanant. [7] These dovetailing provisions create two mutually exclusive categories of punishment for CSA marijuana distribution offenses: one a felony, and one not. The only way to know whether a marijuana distribution offense is "punishable as a felony" under the CSA, *Lopez,* 549 U.S., at 60, 127 S.Ct. 625, is to know whether the conditions described in paragraph (4) are present or absent.

A conviction under the same Georgia statute for "sell[ing]" marijuana, for example, would seem to establish remuneration. The presence of remuneration would mean that paragraph (4) is not implicated, and thus that the conviction is necessarily for conduct punishable as a felony under the CSA (under paragraph (1)(D)). In contrast, the fact of a conviction for possession with intent to distribute marijuana, standing alone, does not reveal whether either remuneration or more than a small amount of marijuana was involved. It is possible neither was; we know that Georgia prosecutes this offense when a defendant possesses only a small amount of marijuana, see, *e.g., Taylor v. State,* 260 Ga.App. 890, 581 S.E.2d 386, 388 (2003) (6.6 grams), and that "distribution" does not require remuneration, see, *e.g., Hadden v. State,* 181 Ga.App. 628, 628–629, 353 S.E.2d 532, 533–534 (1987). So Moncrieffe's **1687 conviction could correspond to either the CSA felony or the CSA misdemeanor. Ambiguity on this point means that the conviction did not "necessarily" involve *195 facts that correspond to an offense punishable as a felony under the CSA. Under the categorical approach, then, Moncrieffe was not convicted of an aggravated felony.

### III

#### A

The Government advances a different approach that leads to a different result. In its view, § 841(b)(4)'s misdemeanor provision is irrelevant to the categorical analysis because paragraph (4) is merely a "mitigating exception," to the CSA offense, not one of the "elements" of the offense. Brief for Respondent 12. And because possession with intent to distribute marijuana is "presumptive[ly]" a felony under the CSA, the Government asserts, any state offense with the same elements is presumptively an aggravated felony. *Id.,* at 37. These two contentions are related, and we reject both of them.

First, the Government reads our cases to hold that the categorical approach is concerned only with the "elements" of an offense, so § 841(b)(4) "is not relevant" to the categorical analysis. *Id.,* at 20. It is enough to satisfy the categorical inquiry, the Government suggests, that the "elements" of Moncrieffe's Georgia offense are the same as those of the CSA offense: (1) possession (2) of marijuana (a controlled substance), (3) with intent to distribute it. But that understanding is inconsistent with *Carachuri–Rosendo,* our only decision to address both "elements" and "sentencing factors." There we recognized that when Congress has chosen to define the generic federal offense by reference to punishment, it may be necessary to take account of federal sentencing factors too. See 560 U.S., at ——, 130 S.Ct., at 2581–2582. In that case the relevant CSA offense was simple possession, which "becomes a 'felony punishable under the [CSA]' only because the sentencing factor of recidivism authorizes additional punishment beyond one year, the criterion for a felony." *Id.,* at ——, 130 S.Ct., at 2590 (SCALIA, J., concurring in judgment). We therefore called *196 the generic federal offense "recidivist simple possession," even though such a crime is not actually "a separate offense" under the CSA, but rather an " 'amalgam' " of offense elements and sentencing factors. *Id.,* at ——,

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 615 of 1271

Moncrieffe v. Holder, 569 U.S. 184 (2013)

133 S.Ct. 1678, 185 L.Ed.2d 727, 81 USLW 4265, 13 Cal. Daily Op. Serv. 3994...

and n. 3, ——, 130 S.Ct., at 2581–2582, and n. 3, 2583–2584 (majority opinion).

In other words, not only must the state offense of conviction meet the "elements" of the generic federal offense defined by the INA, but the CSA must punish that offense as a felony. Here, the facts giving rise to the CSA offense establish a crime that may be either a felony or a misdemeanor, depending upon the presence or absence of certain factors that are not themselves elements of the crime. And so to qualify as an aggravated felony, a conviction for the predicate offense must necessarily establish those factors as well.

The Government attempts to distinguish *Carachuri–Rosendo* on the ground that the sentencing factor there was a "narrow" aggravating exception that turned a misdemeanor into a felony, whereas here § 841(b)(4) is a narrow mitigation exception that turns a felony into a misdemeanor. Brief for Respondent 40–43. This argument hinges upon the Government's second assertion: that any marijuana distribution conviction is "presumptively" a felony. But that is simply incorrect, and the Government's argument collapses as a result. Marijuana distribution is neither a felony nor a misdemeanor until we know whether the conditions in paragraph (4) **1688 attach: Section 841(b)(1)(D) makes the crime punishable by five years' imprisonment "*except* as provided" in paragraph (4), and § 841(b)(4) makes it punishable as a misdemeanor "*[n]otwithstanding* paragraph (1)(D)" when only "a small amount of marihuana for no remuneration" is involved. (Emphasis added.) The CSA's text makes neither provision the default. Rather, each is drafted to be exclusive of the other.

Like the BIA and the Fifth Circuit, the Government believes the felony provision to be the default because, in practice, that is how federal criminal prosecutions for marijuana *197 distribution operate. See 662 F.3d, at 391–392; *Matter of Aruna,* 24 I. & N. Dec. 452, 456–457 (2008); Brief for Respondent 18–23. It is true that every Court of Appeals to have considered the question has held that a defendant is eligible for a 5–year sentence under § 841(b)(1)(D) if the Government proves he possessed marijuana with the intent to distribute it, and that the Government need not negate the § 841(b)(4) factors in each case. See, *e.g., United States v. Outen,* 286 F.3d 622, 636–639 (C.A.2 2002) (describing § 841(b)(4) as a "mitigating exception"); *United States*

*v. Hamlin,* 319 F.3d 666, 670–671 (C.A.4 2003) (collecting cases). Instead, the burden is on the defendant to show that he qualifies for the lesser sentence under § 841(b)(4). Cf. *id.,* at 671.

We cannot discount § 841's text, however, which creates no default punishment, in favor of the procedural overlay or burdens of proof that would apply in a hypothetical federal criminal prosecution. In *Carachuri–Rosendo,* we rejected the Fifth Circuit's " 'hypothetical approach,' " which examined whether conduct " 'could have been punished as a felony' 'had [it] been prosecuted in federal court.' " 560 U.S., at ——, ——, 130 S.Ct., at 2584, 2585–2586.[8] The outcome in a hypothetical prosecution is not the relevant inquiry. Rather, our "more focused, categorical inquiry" is whether the record of conviction of the predicate *198 offense necessarily establishes conduct that the CSA, on its own terms, makes punishable as a felony. *Id.,* at ——, 130 S.Ct., at 2588–2589.

The analogy to a federal prosecution is misplaced for another reason. The Court of Appeals cases the Government cites distinguished between elements and sentencing factors to determine which facts must be proved to a jury, in light of the Sixth Amendment concerns addressed in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The courts considered which "provision ... states a complete crime upon the fewest *facts,*" *Outen,* 286 F.3d, at 638, which was significant after *Apprendi* to identify what a jury had to find before a defendant could receive § 841(b)(1)(D)'s maximum 5–year sentence. But those concerns do not apply in this context. Here we consider a "generic" **1689 federal offense in the abstract, not an actual federal offense being prosecuted before a jury. Our concern is only which facts the CSA relies upon to distinguish between felonies and misdemeanors, not which facts must be found by a jury as opposed to a judge, nor who has the burden of proving which facts in a federal prosecution.[9]

Because of these differences, we made clear in *Carachuri–Rosendo* that, for purposes of the INA, a generic federal offense may be defined by reference to both " 'elements' in the traditional sense" and sentencing factors. 560 U.S., at ——, n. 3, ——, 130 S.Ct., at 2581–2582, and n. 3, 2583–2584; see also *id.,* at ——, 130 S.Ct., at 2581–

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 616 of 1271

Moncrieffe v. Holder, 569 U.S. 184 (2013)

133 S.Ct. 1678, 185 L.Ed.2d 727, 81 USLW 4265, 13 Cal. Daily Op. Serv. 3994...

2582 (SCALIA, J., concurring in judgment) (describing the generic federal offense there as "the Controlled Substances Act felony of possession-plus-recidivism"). Indeed, the distinction between "elements" and "sentencing factors" did not exist when Congress added illicit drug trafficking to the list of aggravated felonies, Anti–Drug Abuse Act of 1988, 102 **\*199** Stat. 4469–4470, and most courts at the time understood both § 841(b)(1)(D) and § 841(b)(4) to contain sentencing factors that draw the line between a felony and a misdemeanor. See, *e.g.*, *United States v. Campuzano,* 905 F.2d 677, 679 (C.A.2 1990). *Carachuri–Rosendo* controls here.

Finally, there is a more fundamental flaw in the Government's approach: It would render even an undisputed misdemeanor an aggravated felony. This is "just what the English language tells us not to expect," and that leaves us "very wary of the Government's position." *Lopez,* 549 U.S., at 54, 127 S.Ct. 625. Consider a conviction under a New York statute that provides, "A person is guilty of criminal sale of marihuana in the fifth degree when he knowingly and unlawfully sells, *without consideration,* [marihuana] of an aggregate weight of *two grams or less* ; or one cigarette containing marihuana." N.Y. Penal Law Ann. § 221.35 (West 2008) (emphasis added). This statute criminalizes only the distribution of a small amount of marijuana for no remuneration, and so all convictions under the statute would fit within the CSA misdemeanor provision, § 841(b)(4). But the Government would categorically deem a conviction under this statute to be an aggravated felony, because the statute contains the corresponding "elements" of (1) distributing (2) marijuana, and the Government believes all marijuana distribution offenses are punishable as felonies.

The same anomaly would result in the case of a noncitizen convicted of a misdemeanor in federal court under § 841(a) and (b)(4) directly. Even in that case, under the Government's logic, we would need to treat the federal misdemeanor conviction as an aggravated felony, because the conviction establishes elements of an offense that is presumptively a felony. This cannot be. "We cannot imagine that Congress took the trouble to incorporate its own statutory scheme of felonies and misdemeanors," only to have courts presume felony treatment and ignore the very factors that distinguish felonies from misdemeanors. *Lopez,* 549 U.S., at 58, 127 S.Ct. 625.

**\*200   \*\*1690** B

Recognizing that its approach leads to consequences Congress could not have intended, the Government hedges its argument by proposing a remedy: Noncitizens should be given an opportunity during immigration proceedings to demonstrate that their predicate marijuana distribution convictions involved only a small amount of marijuana and no remuneration, just as a federal criminal defendant could do at sentencing. Brief for Respondent 35–39. This is the procedure adopted by the BIA in *Matter of Castro Rodriguez,* 25 I. & N. Dec. 698, 702 (2012), and endorsed by Justice ALITO's dissent, *post,* at 1701 – 1702.

This solution is entirely inconsistent with both the INA's text and the categorical approach. As noted, the relevant INA provisions ask what the noncitizen was "convicted of," not what he did, and the inquiry in immigration proceedings is limited accordingly. 8 U.S.C. §§ 1227(a)(2)(A)(iii), 1229b(a)(3); see *Carachuri–Rosendo,* 560 U.S., at ——, 130 S.Ct., at 2585–2586. The Government cites no statutory authority for such case-specific factfinding in immigration court, and none is apparent in the INA. Indeed, the Government's main categorical argument would seem to preclude this inquiry: If the Government were correct that "the fact of a marijuana-distribution conviction *alone* constitutes a CSA felony," Brief for Respondent 37, then all marijuana distribution convictions would categorically be convictions of the drug trafficking aggravated felony, mandatory deportation would follow under the statute, and there would be no room for the Government's follow-on factfinding procedure. The Government cannot have it both ways.

**[7]  [8]**   Moreover, the procedure the Government envisions would require precisely the sort of *post hoc* investigation into the facts of predicate offenses that we have long deemed undesirable. The categorical approach serves "practical" purposes: It promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted **\*201** long after the fact. *Chambers v. United States,* 555 U.S. 122, 125, 129 S.Ct. 687, 172 L.Ed.2d 484 (2009); see also *Mylius,* 210 F., at 862–863. Yet the Government's approach would have our Nation's overburdened immigration courts entertain and

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 617 of 1271

Moncrieffe v. Holder, 569 U.S. 184 (2013)

133 S.Ct. 1678, 185 L.Ed.2d 727, 81 USLW 4265, 13 Cal. Daily Op. Serv. 3994...

weigh testimony from, for example, the friend of a noncitizen who may have shared a marijuana cigarette with him at a party, or the local police officer who recalls to the contrary that cash traded hands. And, as a result, two noncitizens, each "convicted of" the same offense, might obtain different aggravated felony determinations depending on what evidence remains available or how it is perceived by an individual immigration judge. The categorical approach was designed to avoid this "potential unfairness." *Taylor, 495 U.S., at 601, 110 S.Ct. 2143;* see also *Mylius, 210 F., at 863.*

Furthermore, the minitrials the Government proposes would be possible only if the noncitizen could locate witnesses years after the fact, notwithstanding that during removal proceedings noncitizens are not guaranteed legal representation and are often subject to mandatory detention, § 1226(c)(1)(B), where they have little ability to collect evidence. See Katzmann, *The Legal Profession and the Unmet Needs of the Immigrant Poor, 21 Geo. J. Legal Ethics 3, 5–10 (2008);* Brief for National Immigrant Justice Center et al. as *Amici Curiae* 5–18; Brief for Immigration Law Professors as *Amici Curiae* 27–32. A noncitizen in removal proceedings is not at all similarly situated to a defendant in a federal criminal prosecution. The Government's suggestion that the CSA's procedures could readily be replicated in immigration **1691** proceedings is therefore misplaced. Cf. *Carachuri–Rosendo, 560 U.S., at ——, 130 S.Ct., at 2587–2588* (rejecting the Government's argument that procedures governing determination of the recidivism sentencing factor could "be satisfied during the immigration proceeding").

The Government defends its proposed immigration court proceedings as "a subsequent step *outside the categorical approach* in light of *Section 841(b)(4)'s* 'circumstance-specific' *202* nature." Brief for Respondent 37. This argument rests upon *Nijhawan,* in which we considered another aggravated felony, "an offense that ... involves fraud or deceit in which the loss to the victim or victims exceeds $10,000." *8 U.S.C. § 1101(a)(43)(M)(i).* We held that the $10,000 threshold was not to be applied categorically as a required component of a generic offense, but instead called for a "circumstance-specific approach" that allows for an examination, in immigration court, of the "particular circumstances in which an offender committed the crime on a particular occasion." *Nijhawan, 557 U.S., at 38–40, 129*

S.Ct. 2294. The Government suggests the *§ 841(b)(4)* factors are like the monetary threshold, and thus similarly amenable to a circumstance-specific inquiry.

We explained in *Nijhawan,* however, that unlike the provision there, "illicit trafficking in a controlled substance" is a "generic crim[e]" to which the categorical approach applies, not a circumstance-specific provision. *Id., at 37, 129 S.Ct. 2294;* see also *Carachuri–Rosendo, 560 U.S., at ——, n. 11, 130 S.Ct., at 2586–2587 n. 11.* That distinction is evident in the structure of the INA. The monetary threshold is a limitation, written into the INA itself, on the scope of the aggravated felony for fraud. And the monetary threshold is set off by the words "in which," which calls for a circumstance-specific examination of "the conduct involved '*in* ' the commission of the offense of conviction." *Nijhawan, 557 U.S., at 39, 129 S.Ct. 2294.* Locating this exception in the INA proper suggests an intent to have the relevant facts found in immigration proceedings. But where, as here, the INA incorporates other criminal statutes wholesale, we have held it "must refer to generic crimes," to which the categorical approach applies. *Id., at 37, 129 S.Ct. 2294.*

Finally, the Government suggests that the immigration court's task would not be so daunting in some cases, such as those in which a noncitizen was convicted under the New York statute previously discussed or convicted directly under *§ 841(b)(4).* True, in those cases, the record of conviction might reveal on its face that the predicate offense was *203* punishable only as a misdemeanor. But most States do not have stand-alone offenses for the social sharing of marijuana, so minitrials concerning convictions from the other States, such as Georgia, would be inevitable.[10] The Government suggests that even in these other States, the record of conviction may often address the *§ 841(b)(4)* factors, because noncitizens "will be advised of the immigration **1692** consequences of a conviction," as defense counsel is required to do under *Padilla v. Kentucky, 559 U.S. 356, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010),* and as a result counsel can build an appropriate record when the facts are fresh. Brief for Respondent 38. Even assuming defense counsel "will" do something simply because it is required of effective counsel (an assumption experience does not always bear out), this argument is unavailing because there is no reason to believe that state courts will regularly or uniformly

Moncrieffe v. Holder, 569 U.S. 184 (2013)

133 S.Ct. 1678, 185 L.Ed.2d 727, 81 USLW 4265, 13 Cal. Daily Op. Serv. 3994...

admit evidence going to facts, such as remuneration, that are irrelevant to the offense charged.

In short, to avoid the absurd consequences that would flow from the Government's narrow understanding of the categorical approach, the Government proposes a solution that largely undermines the categorical approach. That the only cure is worse than the disease suggests the Government is simply wrong.

C

The Government fears the consequences of our decision, but its concerns are exaggerated. The Government observes **\*204** that, like Georgia, about half the States criminalize marijuana distribution through statutes that do not require remuneration or any minimum quantity of marijuana. *Id.,* at 26–28. As a result, the Government contends, noncitizens convicted of marijuana distribution offenses in those States will avoid "aggravated felony" determinations, purely because their convictions do not resolve whether their offenses involved federal felony conduct or misdemeanor conduct, even though many (if not most) prosecutions involve either remuneration or larger amounts of marijuana (or both).

Escaping aggravated felony treatment does not mean escaping deportation, though. It means only avoiding mandatory removal. See *Carachuri–Rosendo,* 560 U.S., at ——, 130 S.Ct., at 2589. Any marijuana distribution offense, even a misdemeanor, will still render a noncitizen deportable as a controlled substances offender. 8 U.S.C. § 1227(a)(2)(B)(i). At that point, having been found not to be an aggravated felon, the noncitizen may seek relief from removal such as asylum or cancellation of removal, assuming he satisfies the other eligibility criteria. §§ 1158(b), 1229b(a)(1)-(2). But those forms of relief are discretionary. The Attorney General may, in his discretion, deny relief if he finds that the noncitizen is actually a member of one "of the world's most dangerous drug cartels," *post,* at 1696 (opinion of ALITO, J.), just as he may deny relief if he concludes the negative equities outweigh the positive equities of the noncitizen's case for other reasons. As a result, "to the extent that our rejection of the Government's broad understanding of the scope of 'aggravated felony' may have any practical effect on policing our Nation's borders, it is a

limited one." *Carachuri–Rosendo,* 560 U.S., at ——, 130 S.Ct., at 2589.

In any event, serious drug traffickers may be adjudicated aggravated felons regardless, because they will likely be convicted under greater "trafficking" offenses that necessarily establish that more than a small amount of marijuana was involved. See, *e.g.,* Ga.Code Ann. § 16–13–31(c)(1) (Supp.2012) **\*205** (separate provision for trafficking in more than 10 pounds of marijuana). Of course, some offenders' conduct will fall between § 841(b)(4) conduct and the more serious conduct required to trigger a "trafficking" statute. Brief for Respondent 30. Those offenders may avoid aggravated felony status by operation of the categorical approach. But the Government's objection to that underinclusive result is little more than an attack on the **\*\*1693** categorical approach itself. [11] We prefer this degree of imperfection to the heavy burden of relitigating old prosecutions. See *supra,* at 1690 – 1691. And we err on the side of underinclusiveness because ambiguity in criminal statutes referenced by the INA must be construed in the noncitizen's favor. See *Carachuri–Rosendo,* 560 U.S., at ——, 130 S.Ct., at 2589; *Leocal v. Ashcroft,* 543 U.S. 1, 11, n. 8, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004).

Finally, the Government suggests that our holding will frustrate the enforcement of other aggravated felony provisions, like § 1101(a)(43)(C), which refers to a federal firearms statute that contains an exception for "antique firearm[s]," 18 U.S.C. § 921(a)(3). The Government fears that a conviction under any state firearms law that lacks such an exception will be deemed to fail the categorical inquiry. But *Duenas–Alvarez* **\*206** requires that there be "a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime." 549 U.S., at 193, 127 S.Ct. 815. To defeat the categorical comparison in this manner, a noncitizen would have to demonstrate that the State actually prosecutes the relevant offense in cases involving antique firearms. Further, the Government points to § 1101 (a)(43) (P), which makes passport fraud an aggravated felony, except when the noncitizen shows he committed the offense to assist an immediate family member. But that exception is provided in the INA itself. As we held in *Nijhawan,* a circumstance-

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 619 of 1271

Moncrieffe v. Holder, 569 U.S. 184 (2013)

133 S.Ct. 1678, 185 L.Ed.2d 727, 81 USLW 4265, 13 Cal. Daily Op. Serv. 3994...

specific inquiry would apply to that provision, so it is not comparable. 557 U.S., at 37–38, 129 S.Ct. 2294.

\* \* \*

This is the third time in seven years that we have considered whether the Government has properly characterized a low-level drug offense as "illicit trafficking in a controlled substance," and thus an "aggravated felony." Once again we hold that the Government's approach defies "the 'commonsense conception' " of these terms. *Carachuri–Rosendo,* 560 U.S., at ——, 130 S.Ct., at 2584–2585 (quoting *Lopez,* 549 U.S., at 53, 127 S.Ct. 625). Sharing a small amount of marijuana for no remuneration, let alone possession with intent to do so, "does not fit easily into the 'everyday understanding' " of "trafficking," which " 'ordinarily ... means some sort of commercial dealing.' " *Carachuri–Rosendo,* 560 U.S., at ——, 130 S.Ct., at 2584–2585 (quoting *Lopez,* 549 U.S., at 53–54, 127 S.Ct. 625). Nor is it sensible that a state statute that criminalizes conduct that the CSA treats as a misdemeanor should be designated an "aggravated felony." We hold that it may not be. If a noncitizen's conviction for a marijuana distribution offense fails to establish that the offense involved either remuneration or more than **1694 a small amount of marijuana, the conviction is not for an aggravated felony under the INA. The contrary judgment of the Court of Appeals *207 is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice THOMAS, dissenting.

A plain reading of 18 U.S.C. § 924(c)(2) identifies two requirements that must be satisfied for a state offense to qualify as a "felony punishable under the Controlled Substances Act [ (CSA) ]." "First, the offense must be a felony; second, the offense must be capable of punishment under the [CSA]." *Lopez v. Gonzales,* 549 U.S. 47, 61, 127 S.Ct. 625, 166 L.Ed.2d 462 (2006) (THOMAS, J., dissenting). Moncrieffe's offense of possession of marijuana with intent to distribute satisfies both elements. No one disputes that Georgia punishes Moncrieffe's offense as a felony. See Ga.Code Ann. § 16–13–30(j)(2) (Supp.2012).

("Except as otherwise provided in subsection (c) of Code Section 16–13–31 or in Code Section 16–13–2, any person who violates this subsection shall be guilty of a felony and, upon conviction thereof, shall be punished by imprisonment for not less than one year nor more than ten years"). [1] And, the offense is "punishable under the [CSA]," 18 U.S.C. § 924(c)(2), because it involved "possess[ion] with intent to manufacture, distribute, or dispense, a controlled substance," 21 U.S.C. § 841(a)(1). Accordingly, Moncrieffe's offense is a "drug trafficking crime," 18 U.S.C. § 924(c)(2), which constitutes *208 an "aggravated felony" under the Immigration and Nationality Act (INA), 8 U.S.C. § 1101(a)(43)(B). [2]

The Court rejected the plain meaning of 18 U.S.C. § 924(c)(2) in *Lopez,* 549 U.S., at 50, 127 S.Ct. 625. There, the defendant had been convicted of a state felony, but his offense would have been a misdemeanor under the CSA. The Court held that the offense did not constitute a " 'felony punishable under the [CSA]' " because it was not "punishable *as a felony* under that federal law." *Id.,* at 60, 127 S.Ct. 625 (quoting § 924(c)(2); emphasis added). I dissented in *Lopez* and warned that an inquiry into whether a state offense would constitute a felony in a hypothetical federal prosecution would cause "significant inconsistencies." *Id.,* at 63, 127 S.Ct. 625. I explained that one such inconsistency would arise if an alien defendant never convicted of an actual state felony were subject to deportation based on a hypothetical federal prosecution. *Id.,* at 67, 127 S.Ct. 625.

**1695 This precise issue arose in *Carachuri–Rosendo v. Holder,* 560 U.S. ——, 130 S.Ct. 2577, 177 L.Ed.2d 68 (2010). Instead of following the logic of *Lopez,* however, the Court contorted the law to avoid the harsh result compelled by that decision. In *Carachuri–Rosendo,* the defendant was convicted of a crime that the State categorized as a misdemeanor, but his offense would have been a felony under the CSA because he had a prior conviction. 560 U.S., at ——, 130 S.Ct., at ——. The Court held that the offense did not constitute an "aggravated felony" because the state prosecutor had not charged the existence of a prior conviction and, thus, the defendant was not "*actually convicted* of a

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 620 of 1271

Moncrieffe v. Holder, 569 U.S. 184 (2013)
133 S.Ct. 1678, 185 L.Ed.2d 727, 81 USLW 4265, 13 Cal. Daily Op. Serv. 3994...

crime that is itself punishable as a felony under federal law." *Id.,* at ——, 130 S.Ct., at 2589. Concurring in the judgment, I **\*209** explained that the Court's decision was inconsistent with *Lopez* because the defendant's conduct was punishable as a felony under the CSA, but that *Lopez* was wrongly decided and that a proper reading of § 924(c) (2) supported the Court's result. 560 U.S., at ——, 130 S.Ct., at 2580. Carachuri–Rosendo's crime of conviction was a state-law misdemeanor and, as a result, it did not qualify as a "felony punishable under the [CSA]." See *ibid.*

I declined to apply *Lopez* in *Carachuri–Rosendo,* and I am unwilling to apply it here. Indeed, the Court itself declined to follow the logic of *Lopez* to its natural end in *Carachuri–Rosendo.* And, now the majority's ill-advised approach once again leads to an anomalous result. It is undisputed that, for federal sentencing purposes, Moncrieffe's offense would constitute a federal felony unless he could prove that he distributed only a small amount of marijuana for no remuneration. Cf. *United States v. Outen,* 286 F.3d 622, 637–639 (C.A.2 2002) (Sotomayor, J.) (agreeing with the Government that 21 U.S.C. § 841(b)(4) is a mitigating exception to the "default provision" under § 841(b)(1) (D) and that it need not negate the § 841(b)(4) factors to support a sentence under § 841(b)(1)(D)). But, the Court holds that, for purposes of the INA, Moncrieffe's offense would necessarily correspond to a federal misdemeanor, regardless of whether he could in fact prove that he distributed only a small amount of marijuana for no remuneration. *Ante,* at 1687 – 1688 (asserting that neither § 841(b)(1)(D) nor § 841(b)(4) is the "default" provision). The Court's decision, thus, has the effect of treating a substantial number of state felonies as federal misdemeanors, even when they would result in federal felony convictions.

The majority notes that "[t]his is the third time in seven years that we have considered whether the Government has properly characterized a low-level drug offense as ... an 'aggravated felony.' " *Ante,* at 1693. The Court has brought this upon itself. The only principle uniting *Lopez, Carachuri–Rosendo,* and the decision today appears to be **\*210** that the Government consistently loses. If the Court continues to disregard the plain meaning of § 924(c)(2), I expect that these types of cases will endlessly—and needlessly—recur.

I respectfully dissent.

Justice ALITO, dissenting.

The Court's decision in this case is not supported by the language of the Immigration and Nationality Act (INA) or by this Court's precedents, and it leads to results that Congress clearly did not intend.

Under the INA, aliens [1] who are convicted of certain offenses may be removed **\*\*1696** from this country, 8 U.S.C. § 1227(a)(2) (2006 ed. and Supp. V), but in many instances, the Attorney General (acting through the Board of Immigration Appeals (BIA)) has the discretion to cancel removal, §§ 1229b(a), (b). Aliens convicted of especially serious crimes, however, are ineligible for cancellation of removal. § 1229b(a)(3) (2006 ed.). Among the serious crimes that carry this consequence is "illicit trafficking in a controlled substance." § 1101(a)(43)(B).

Under the Court's holding today, however, drug traffickers in about half the States are granted a dispensation. In those States, even if an alien is convicted of possessing tons of marijuana with the intent to distribute, the alien is eligible to remain in this country. Large-scale marijuana distribution is a major source of income for some of the world's most dangerous drug cartels, Dept. of Justice, National Drug Intelligence Center, National Drug Threat Assessment 2, 7 (2011), but the Court now holds that an alien convicted of **\*211** participating in such activity may petition to remain in this country.

The Court's decision also means that the consequences of a conviction for illegal possession with intent to distribute will vary radically depending on the State in which the case is prosecuted. Consider, for example, an alien who is arrested near the Georgia–Florida border in possession of a large supply of marijuana. Under the Court's holding, if the alien is prosecuted and convicted in Georgia for possession with intent to distribute, he is eligible for cancellation of removal. But if instead he is caught on the Florida side of the line and is convicted in a Florida court—where possession with intent to distribute a small amount of marijuana for no remuneration is covered by a separate statutory provision, compare Fla.

Moncrieffe v. Holder, 569 U.S. 184 (2013)

133 S.Ct. 1678, 185 L.Ed.2d 727, 81 USLW 4265, 13 Cal. Daily Op. Serv. 3994...

Stat. § 893.13(3) (2010) with § 893.13(1)(a)(2)—the alien is likely to be ineligible. Can this be what Congress intended?

I

Certainly the text of the INA does not support such a result. In analyzing the relevant INA provisions, the starting point is 8 U.S.C. § 1229b(a)(3), which provides that a lawful permanent resident alien subject to removal may apply for discretionary cancellation of removal if he has not been convicted of any "aggravated felony." The term "aggravated felony" encompasses "illicit tracking in a controlled substance ... including a drug trafficking crime (as defined in [ 18 U.S.C. § 924(c) ] )." 8 U.S.C. § 1101(a)(43)(B). And this latter provision defines a "drug trafficking crime" to include "any felony punishable under the Controlled Substances Act ( 21 U.S.C. 801 et seq.)." 18 U.S.C. § 924(c)(2). Thus "any felony punishable under the [CSA]" is an "aggravated felony."

Where an alien has a prior federal conviction, it is a straightforward matter to determine whether the conviction was for a "felony punishable under the [CSA]." But 8 U.S.C. § 1101(a)(43) introduces a complication. That provision **212 states that the statutory definition of "aggravated felony" " applies to an offense described in this paragraph *whether in violation of Federal or State law.*" (Emphasis added.) As noted, the statutory definition of "aggravated felony" includes a "felony punishable under the [CSA]," and therefore **1697 § 1101(a)(43)(B) makes it necessary to determine what is meant by a state "offense" that is a "felony punishable under the [CSA]."

What § 1101(a)(43) obviously contemplates is that the BIA or a court will identify conduct associated with the state offense and then determine whether that conduct would have supported a qualifying conviction under the federal CSA. [2] Identifying and evaluating this relevant conduct is the question that confounds the Court's analysis. Before turning to that question, however, some preliminary principles should be established.

In Lopez v. Gonzales, 549 U.S. 47, 50, 127 S.Ct. 625, 166 L.Ed.2d 462 (2006), we held that felony status is controlled by federal, not state, law. As a result, once the relevant conduct is identified, it must be determined whether proof of that conduct would support a felony conviction under the CSA. The federal definition of a felony is a crime punishable by imprisonment for more than one year. 18 U.S.C. § 3559(a) (1)-(5). Consequently, if the *213 proof of the relevant conduct would support a conviction under the CSA for which the maximum term of imprisonment is more than one year, the state conviction qualifies as a conviction for an "aggravated felony."

II

This brings us to the central question presented in this case: how to determine and evaluate the conduct that constitutes the state "offense." One possibility is that actual conduct is irrelevant, and that only the elements of the state crime for which the alien was convicted matter. We have called this the "categorical approach," *Taylor v. United States,* 495 U.S. 575, 600, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), and we have *generally* used this approach in determining whether a state conviction falls within a federal definition of a crime, see *id.,* at 600–601, 110 S.Ct. 2143 (" Section 924(e) (2)(B)(i) defines 'violent felony' as any crime punishable by imprisonment for more than a year that 'has as an element'— not any crime that, in a particular case, involves—the use or threat of force. Read in this context, the phrase 'is burglary' in § 924(e)(2)(B)(ii) most likely refers to the elements of the statute of conviction, not to the facts of each defendant's conduct"). But, as will be discussed below, we have also departed in important ways from a pure categorical approach.

The Court's opinion in this case conveys the impression that its analysis is based on the categorical approach, but that is simply not so. On the contrary, a pure categorical approach leads very quickly to the conclusion that petitioner's Georgia conviction was a conviction for an "aggravated felony."

The elements of the Georgia offense were as follows: knowledge, possession of **1698 marijuana, and the intent to distribute it. Ga.Code Ann. § 16–13–30(j)(1) (2007); *Jackson v. State,* 295 Ga.App. 427, 435, n. 28, 671 S.E.2d 902, 909, n. 28 (2009). Proof of those elements would be sufficient to support a conviction under 21 U.S.C. § 841(a), and the maximum *214 punishment for that

Moncrieffe v. Holder, 569 U.S. 184 (2013)

133 S.Ct. 1678, 185 L.Ed.2d 727, 81 USLW 4265, 13 Cal. Daily Op. Serv. 3994...

offense is imprisonment for up to five years, § 841(b)(1)(D) (2006 ed., Supp. V), more than enough to qualify for felony treatment. Thus, under a pure categorical approach, petitioner's Georgia conviction would qualify as a conviction for an "aggravated felony" and would render him ineligible for cancellation of removal.

The Court departs from this analysis because § 841(b)(4) provides a means by which a defendant convicted of violating § 841(a) (2006 ed.) may lower the maximum term of imprisonment to no more than one year. That provision states that "any person who violates [ § 841(a) ] by distributing a small amount of marihuana for no remuneration shall be treated as" a defendant convicted of simple possession, and a defendant convicted of that lesser offense faces a maximum punishment of one year's imprisonment (provided that the defendant does not have a prior simple possession conviction), § 844 (2006 ed., Supp. V). Reading this provision together with § 841(a), the Court proceeds as if the CSA created a two-tiered possession-with-intent-to-distribute offense: a base offense that is punishable as a misdemeanor and a second-tier offense (possession with intent to distribute more than a "small amount" of marijuana or possession with intent to distribute for remuneration) that is punishable as a felony.

If the CSA actually created such a two-tiered offense, the pure categorical approach would lead to the conclusion that petitioner's Georgia conviction was not for an "aggravated felony." The elements of the Georgia offense would not suffice to prove the second-tier offense, which would require proof that petitioner possessed more than a "small amount" of marijuana or that he intended to obtain remuneration for its distribution. Instead, proof of the elements of the Georgia crime would merely establish a violation of the base offense, which would be a misdemeanor.

The CSA, however, does not contain any such two-tiered provision. And § 841(b)(4) does not alter the elements of the **\*215** § 841(a) offense. As the Court notes, every Court of Appeals to consider the question has held that § 841(a) is the default offense and that § 841(b)(4) is only a mitigating sentencing guideline, see *United States v. Outen,* 286 F.3d 622, 636–639 (C.A.2 2002) (Sotomayor,

J.) (describing § 841(b)(4) as a " mitigating exception"); *United States v. Hamlin,* 319 F.3d 666, 670 (C.A.4 2003) (collecting cases), and the Court does not disagree, *ante,* at 1687 – 1689.

Confirmation of this interpretation is provided by the use of the term "small amount" in § 841(b)(4). If § 841(b)(4) had been meant to alter the elements of § 841(a), Congress surely would not have used such a vague term. Due process requires that the elements of a criminal statute be defined with specificity. *Connally v. General Constr. Co.,* 269 U.S. 385, 393, 46 S.Ct. 126, 70 L.Ed. 322 (1926). Accordingly, it is apparent that § 841(b)(4) does not modify the elements of § 841(a) but instead constitutes what is in essence a mandatory sentencing guideline. Under this provision, if a defendant is convicted of violating § 841(a), the defendant may attempt to prove that he possessed only a "small amount" of marijuana and that he did not intend to obtain remuneration for its distribution. If the defendant succeeds in convincing the sentencing judge, the maximum term of imprisonment is lowered to one year.

 **\*\*1699** In sum, contrary to the impression that the Court's opinion seeks to convey, the Court's analysis does not follow the pure categorical approach.

III

Nor is the Court's analysis supported by prior case law. The Court claims that its approach follows from our decision in *Carachuri–Rosendo v. Holder,* 560 U.S. ——, 130 S.Ct. 2577, 177 L.Ed.2d 68 (2010), but that case—unlike the Court's opinion—faithfully applied the pure categorical approach.

In *Carachuri–Rosendo,* the alien had been convicted in a Texas court for simple possession of a controlled substance. *Id.,* at ——, 130 S.Ct., at 2583. At the time of that conviction, Carachuri–Rosendo had a prior state conviction for simple **\*216** possession, but this fact was not charged or proved at his trial and was apparently not taken into account in setting his sentence, which was 10 days in jail. *Id.,* at ——, —— – ——, 130 S.Ct., at 2582–2583. Arguing that Carachuri–Rosendo was ineligible for cancellation of

Moncrieffe v. Holder, 569 U.S. 184 (2013)

133 S.Ct. 1678, 185 L.Ed.2d 727, 81 USLW 4265, 13 Cal. Daily Op. Serv. 3994...

removal, the Government maintained that his second simple possession conviction qualified under the INA as a conviction for an " aggravated felony." *Id.,* at ——, 130 S.Ct., at 2582–2583. This was so, the Government contended, because, if Carachuri–Rosendo's second simple-possession prosecution had been held in federal court, he could have been punished by a sentence of up to two years due to his prior simple possession conviction. *Id.,* at ——, 130 S.Ct., at 2582–2583.

This more severe sentence, however, would have required the federal prosecutor to file a formal charge alleging the prior conviction; Carachuri–Rosendo would have been given the opportunity to defend against that charge; and the heightened sentence could not have been imposed unless the court found that the prior conviction had occurred. *Id.,* at ——, 130 S.Ct., at 2587–2588.

Our rejection of the Government's argument thus represented a straightforward application of the pure categorical approach. The elements of the Texas offense for which Carachuri–Rosendo was convicted were knowledge or intent, possession of a controlled substance without a prescription, and nothing more. *Id.,* at ——, 130 S.Ct., at 2583; Tex. Health & Safety Code Ann. § 481.117(a), (b) (West 2010). Proof of a prior simple possession conviction was not required, and no such proof appears to have been offered. The maximum penalty that could have been imposed under federal law for simple possession (without proof of a prior simple possession conviction) was one year's imprisonment. Thus, proof in federal court of the elements of the Texas offense would not have permitted a felony-length sentence, and consequently the state conviction did not qualify as a felony punishable under the CSA.

**\*217 IV**

Unsupported by either the categorical approach or our prior cases, the decision of the Court rests instead on the Court's belief—which I share—that the application of the pure categorical approach in this case would lead to results that Congress surely did not intend.

Suppose that an alien who is found to possess two marijuana cigarettes is convicted in a state court for possession with intent to distribute based on evidence that he intended to give one of the cigarettes to a friend. Under the pure categorical approach, this alien would be regarded as having committed an "aggravated felony." But this classification is plainly out of step with the CSA's assessment of the severity of the alien's crime because under the CSA **\*1700** the alien could obtain treatment as a misdemeanant by taking advantage of 21 U.S.C. § 841(b)(4).

For this reason, I agree with the Court that such an alien should not be treated as having committed an "aggravated felony." In order to avoid this result, however, it is necessary to depart from the categorical approach, and that is what the Court has done. But the particular way in which the Court has departed has little to recommend it.

To begin, the Court's approach is analytically confused. As already discussed, the Court treats § 841(b)(4) as if it modified the elements of § 841(a), when in fact § 841(b)(4) does no such thing. And the Court obviously knows this because it does not suggest that § 841(b)(4) changes the elements of § 841(a) for criminal law purposes. [3]

**\*218** In addition, the Court's approach leads to the strange and disruptive results noted at the beginning of this opinion. As an initial matter, it leads to major drug trafficking crimes in about half the States being excluded from the category of "illicit trafficking in a controlled substance." Moreover, it leads to significant disparities between equally culpable defendants. We adopted the categorical approach to avoid disparities in our treatment of defendants convicted in different States for committing the same criminal conduct. See *Taylor,* 495 U.S., at 590–591, 110 S.Ct. 2143 (rejecting the view that state law determined the meaning of "burglary" because "[t]hat would mean that a person convicted of unlawful possession of a firearm, or would not, receive a sentence enhancement based on exactly the same conduct, depending on whether the State of his prior conviction happened to call that conduct 'burglary' "). Yet the Court reintroduces significant disparity into our treatment of drug offenders. All of this can be avoided by candidly acknowledging that the categorical approach is not the be-all and end-all.

When Congress wishes to make federal law dependent on certain prior state convictions, it faces a difficult task. The INA provisions discussed above confront this problem, and their clear objective is to identify categories of criminal

133 S.Ct. 1678, 185 L.Ed.2d 727, 81 USLW 4265, 13 Cal. Daily Op. Serv. 3994...

conduct that evidence such a high degree of societal danger that an alien found to have engaged in such conduct should not be allowed to obtain permission to remain in this country. Since the vast majority of crimes are prosecuted in the state courts, Congress naturally looked to state, as well as federal, convictions as a metric for identifying these dangerous aliens.

**\*219** But state criminal codes vary widely, and some state crimes are defined so broadly that they encompass both very serious and much less serious cases. In cases involving such state provisions, a **\*\*1701** pure categorical approach may frustrate Congress' objective.

The Court has said that the categorical approach finds support in the term "conviction." *Taylor, supra,* at 600, 110 S.Ct. 2143; *Shepard v. United States,* 544 U.S. 13, 19, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005). But the Court has never held that a pure categorical approach is dictated by the use of that term, [4] and I do not think that it is. In ordinary speech, when it is said that a person was convicted of or for doing something, the "something" may include facts that go beyond the bare elements of the relevant criminal offense. For example, it might be said that an art thief was convicted of or for stealing a Rembrandt oil painting even though neither the identity of the artist nor the medium used in the painting are elements of the standard offense of larceny. See 3 W. LaFave, Substantive Criminal Law § 19.1(a) (2d ed.2003).

For these reasons, departures from the categorical approach are warranted, and this Court has already sanctioned such departures in several circumstances. See *Taylor, supra,* at 602, 110 S.Ct. 2143 (modified categorical approach);

*Gonzales v. Duenas–Alvarez,* 549 U.S. 183, 193, 127 S.Ct. 815, 166 L.Ed.2d 683 (2007) (categorical approach does not exclude state-law convictions unless there is "a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime"); *Nijhawan v. Holder,* 557 U.S. 29, 32, 129 S.Ct. 2294, 174 L.Ed.2d 22 (2009) (interpreting an enumerated "aggravated felony" in 8 U.S.C. § 1101(a) (43) not to be a generic crime). **\*220** Consistent with the flexibility that the Court has already recognized, I would

hold that the categorical approach is not controlling where the state conviction at issue was based on a state statute that encompasses both a substantial number of cases that qualify under the federal standard and a substantial number that do not. In such situations, it is appropriate to look beyond the elements of the state offense and to rely as well on facts that were admitted in state court or that, taking a realistic view, were clearly proved. Such a look beyond the elements is particularly appropriate in a case like this, which involves a civil proceeding before an expert agency that regularly undertakes factual inquiries far more daunting than any that would be involved here. See, *e.g., Negusie v. Holder,* 555 U.S. 511, 129 S.Ct. 1159, 173 L.Ed.2d 20 (2009).

Applying this approach in the present case, what we find is that the Georgia statute under which petitioner was convicted broadly encompasses both relatively minor offenses (possession of a small amount of marijuana with the intent to share) and serious crimes (possession with intent to distribute large amounts of marijuana in exchange for millions of dollars of profit). We also find that petitioner had the opportunity before the BIA to show that his criminal conduct fell into the category of relatively minor offenses carved out by § 841(b)(4). Administrative Record 16–26. The BIA takes the entirely sensible view that an alien who is convicted for possession with intent to distribute may show that his conviction was not for an "aggravated felony" by proving that his conduct fell within § 841(b)(4). **\*\*1702** *Matter of Castro Rodriguez,* 25 I. & N. Dec. 698, 701–702 (2012). Petitioner, for whatever reason, availed himself only of the opportunity to show that his conviction had involved a small amount of marijuana and did not present evidence—or even contend—that his offense had not involved remuneration. Administrative Record 16–26, 37. As a result, I think we have no alternative but to affirm the decision of the Court of Appeals, which in turn affirmed the BIA.

**All Citations**

569 U.S. 184, 133 S.Ct. 1678, 185 L.Ed.2d 727, 81 USLW 4265, 13 Cal. Daily Op. Serv. 3994, 2013 Daily Journal D.A.R. 5206, 24 Fla. L. Weekly Fed. S 160, 76 A.L.R. Fed. 2d 609

**WESTLAW** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

133 S.Ct. 1678, 185 L.Ed.2d 727, 81 USLW 4265, 13 Cal. Daily Op. Serv. 3994...

## Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1    In addition to asylum, a noncitizen who fears persecution may seek withholding of removal, 8 U.S.C. § 1231(b)(3)(A), and deferral of removal under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), Art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100–20, p. 20, 1465 U.N.T.S. 85; 8 CFR § 1208.17(a) (2012). These forms of relief require the noncitizen to show a greater likelihood of persecution or torture at home than is necessary for asylum, but the Attorney General has no discretion to deny relief to a noncitizen who establishes his eligibility. A conviction of an aggravated felony has no effect on CAT eligibility, but will render a noncitizen ineligible for withholding of removal if he "has been sentenced to an aggregate term of imprisonment of at least 5 years" for any aggravated felonies. 8 U.S.C. § 1231(b)(3)(B).

2    The parties agree that this resolution of Moncrieffe's Georgia case is nevertheless a "conviction" as the INA defines that term, 8 U.S.C. § 1101(a)(48)(A). See Brief for Petitioner 6, n. 2; Brief for Respondent 5, n. 2.

3    Compare 662 F.3d 387 (C.A.5 2011) (case below), *Garcia v. Holder,* 638 F.3d 511 (C.A.6 2011) (is an aggravated felony), and *Julce v. Mukasey,* 530 F.3d 30 (C.A.1 2008) (same), with *Martinez v. Mukasey,* 551 F.3d 113 (C.A.2 2008) (is not an aggravated felony), and *Wilson v. Ashcroft,* 350 F.3d 377 (C.A.3 2003) (same).

4    *Carachuri–Rosendo* construed a different provision of the INA that concerns cancellation of removal, which also requires determining whether the noncitizen has been "*convicted* of any aggravated felony." 8 U.S.C. § 1229b(a)(3) (emphasis added). Our analysis is the same in both contexts.

5    In full, 21 U.S.C. § 841(a)(1) provides,
"Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
"(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance...."

6    In pertinent part, § 841(b)(1)(D) and (b)(4) (2006 ed. and Supp. V) provide,
"Except as otherwise provided in section 849, 859, 860, or 861 of this title, any person who violates subsection (a) of this section shall be sentenced as follows:
. . . . .
"[ ( 1 ) ](D) In the case of less than 50 kilograms of marihuana, except in the case of 50 or more marihuana plants regardless of weight, 10 kilograms of hashish, or one kilogram of hashish oil, such person shall, except as provided in paragraphs (4) and (5) of this subsection, be sentenced to a term of imprisonment of not more than 5 years, a fine not to exceed the greater of that authorized in accordance with the provisions of title 18 or $250,000 if the defendant is an individual or $1,000,000 if the defendant is other than an individual, or both....
. . . . .
"(4) Notwithstanding paragraph (1)(D) of this subsection, any person who violates subsection (a) of this section by distributing a small amount of marihuana for no remuneration shall be treated as provided in section 844 of this title and section 3607 of title 18."

7    Although paragraph (4) speaks only of "distributing" marijuana, the parties agree that it also applies to "the more inchoate offense of possession with intent to distribute that drug." *Matter of Castro Rodriguez,* 25 I. & N. Dec. 698, 699, n. 2 (BIA 2012); see Brief for Petitioner 6, n. 2; Brief for Respondent 8, n. 5.

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 626 of 1271

Moncrieffe v. Holder, 569 U.S. 184 (2013)

133 S.Ct. 1678, 185 L.Ed.2d 727, 81 USLW 4265, 13 Cal. Daily Op. Serv. 3994...

The CSA does not define "small amount." The BIA has suggested that 30 grams "serve[s] as a useful guidepost," *Castro Rodriguez,* 25 I. & N. Dec., at 703, noting that the INA exempts from deportable controlled substances offenses "a single offense involving possession for one's own use of 30 grams or less of marijuana," 8 U.S.C. § 1227(a)(2)(B)(i). The meaning of "small amount" is not at issue in this case, so we need not, and do not, define the term.

8    Justice ALITO states that the statute "obviously" requires examination of whether "conduct associated with the state offense ... *would have* supported a qualifying conviction under the federal CSA." *Post,* at 1697 (dissenting opinion) (emphasis added); see also *post,* at 1699. But this echoes the Fifth Circuit's approach in *Carachuri–Rosendo.* As noted in the text, our opinion explicitly rejected such reasoning based on conditional perfect formulations. See also, *e.g., Carachuri–Rosendo,* 560 U.S., at ——, 130 S.Ct., at 2588–2589 (criticizing approach that "focuses on facts known to the immigration court that *could have* but did not serve as the basis for the state conviction and punishment" (emphasis altered)). Instead, as we have explained, *supra,* at 1687 – 1688, our holding depended upon the fact that Carachuri–Rosendo's conviction did not establish the fact necessary to distinguish between misdemeanor and felony punishment under the CSA. The same is true here.

9    The Government also cites 21 U.S.C. § 885(a)(1), which provides that the Government need not "negative any exemption or exception set forth" in the CSA, and instead "the burden of going forward with the evidence with respect to any such exemption or exception shall be upon the person claiming its benefit." Brief for Respondent 21. Even assuming § 841(b)(4) is such an "exception," § 885(a)(1) applies, by its own terms, only to "any trial, hearing, or other proceeding under" the CSA itself, not to the rather different proceedings under the INA.

10   In addition to New York, it appears that 13 other States have separate offenses for § 841(b)(4) conduct. See Cal. Health & Safety Code Ann. § 11360(b) (West Supp.2013); Colo.Rev.Stat. Ann. § 18–18–406(5) (2012); Fla. Stat. § 893.13(2)(b)(3) (2010); Ill. Comp. Stat., ch. 20, §§ 550/3, 550/4, 550/6 (West 2010); Iowa Code § 124.410 (2009); Minn.Stat. § 152.027(4)(a) (2010); N.M. Stat. Ann. § 30–31–22(E) (Supp.2011); Ohio Rev.Code Ann. § 2925.03(C)(3)(h) ( Lexis 2012 Cum.Supp.); Ore.Rev.Stat. § 475.860(3) (2011); Pa. Stat. Ann., Tit. 35, § 780–113(a)(31) (Purdon Supp.2012); S.D. Codified Laws § 22–42–7 (Supp.2012); Tex. Health & Safety Code Ann. § 481.120(b)(1) (West 2010); W. Va.Code Ann. § 60A–4–402(c) (Lexis 2010).

11   Similarly, Justice ALITO's dissent suggests that he disagrees with the first premises of the categorical approach. He says it is a "strange and disruptive resul[t]" that "defendants convicted in different States for committing the same criminal conduct" might suffer different collateral consequences depending upon how those States define their statutes of conviction. *Post,* at 9. Yet that is the longstanding, natural result of the categorical approach, which focuses not on the criminal conduct a defendant "commit[s]," but rather what facts are necessarily established by a conviction for the state offense. Different state offenses will necessarily establish different facts. Some will track the "uniform" federal definition of the generic offense, and some will not. *Taylor v. United States,* 495 U.S. 575, 590, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). Whatever disparity this may create as between defendants whose real-world conduct was the same, it ensures that all defendants whose convictions establish the same facts will be treated consistently, and thus predictably, under federal law. This was *Taylor* 's chief concern in adopting the categorical approach. See *id.,* at 599–602, 110 S.Ct. 2143.

1    Section 16–13–31(c) (Supp.2012) increases the punishment for trafficking in marijuana, while § 16–13–2(b) (2011) decreases the punishment for simple possession of 1 ounce or less of marijuana. Neither provision is applicable to Moncrieffe's offense of possession of marijuana with intent to distribute.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

133 S.Ct. 1678, 185 L.Ed.2d 727, 81 USLW 4265, 13 Cal. Daily Op. Serv. 3994...

The Court correctly points out that Moncrieffe was sentenced pursuant to § 16–13–2(a) because he was a first-time offender. *Ante,* at 1683. That provision does not alter the felony status of the offense. Rather, it gives courts discretion to impose probation instead of imprisonment and to do so without entering a conviction. As the majority recognizes, petitioner has waived any argument that he was not convicted for purposes of the Immigration and Nationality Act. *Ante,* at 1683, n. 2.

2    See 8 U.S.C. § 1227(a)(2)(A)(iii) (providing that aliens convicted of an "aggravated felony" after admission are deportable); § 1229b(a)(3) (providing that aliens convicted of an "aggravated felony" are ineligible for cancellation of removal); § 1101(a)(43)(B) (defining "aggravated felony" as "illicit trafficking in a controlled substance ... including a drug trafficking crime (as defined in [ 18 U.S.C. § 924(c) ] )"); 18 U.S.C. § 924(c)(2) (defining "drug trafficking crime" as "any felony punishable under the [CSA]").

1    "Alien" is the term used in the relevant provisions of the Immigration and Nationality Act, and this term does not encompass all noncitizens. Compare 8 U.S.C. § 1101(a)(3) (defining "alien" to include "any person not a citizen or national of the United States") with § 1101(a)(22) (defining "national of the United States"). See also *Miller v. Albright,* 523 U.S. 420, 467, n. 2, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998) (GINSBURG, J., dissenting).

2    The Court's disagreement with this proposition, *ante* at 1688, n. 8, is difficult to understand. If, as 8 U.S.C. § 1101(a)(43) quite plainly suggests and the Court has held, a state conviction can qualify as an "aggravated felony," we must determine what is meant by a state "offense" that is a "felony punishable under the [CSA]." There is no way to do this other than by identifying a set of relevant conduct and asking whether, based on that conduct, the alien could have been convicted of a felony if prosecuted under the CSA in federal court. In rejecting what it referred to as a "hypothetical approach," the *Carachuri–Rosendo* Court was addressing an entirely different question, specifically, *which* set of conduct is relevant. *Carachuri–Rosendo v. Holder,* 560 U.S. ——, —— – ——, 130 S.Ct. 2577, 2584, 2588–2589, 177 L.Ed.2d 68 (2010). We held that the relevant set of conduct consisted of that which was in fact charged and proved in the state-court proceeding, not the set of conduct that could have been proved in a hypothetical federal proceeding.

3    The Court defends its interpretation of 21 U.S.C. § 841(a), (b)(4) by arguing that *Carachuri–Rosendo v. Holder,* 560 U.S. ——, 130 S.Ct. 2577, 177 L.Ed.2d 68 (2010), rejected any recourse to a "hypothetical approach" for determining how a criminal prosecution likely would have proceeded, see *ante,* at 1688, and that is true enough. But, as discussed above, see n. 2, *supra,* just because the categorical approach does not require conjecture as to whether a hypothetical federal prosecutor would be likely to charge and prove a prior conviction does not mean that it also precludes analysis of the structure of the federal criminal statute at hand. Indeed, our categorical-approach cases have done little else. See, *e.g., Carachuri–Rosendo, supra,* at ——, 130 S.Ct., at 2587–2588 (discussing procedural protections Carachuri–Rosendo would have enjoyed had he been prosecuted federally); *Gonzales v. Duenas–Alvarez,* 549 U.S. 183, 185, 189–194, 127 S.Ct. 815, 166 L.Ed.2d 683 (2007) (the term "theft offense" in 8 U.S.C. § 1101(a)(43)(G) includes the crime of aiding and abetting a theft offense).

4    Instead, the Court adopted the categorical approach based on a combination of factors, including judicial efficiency. See *Taylor,* 495 U.S., at 601, 110 S.Ct. 2143 ("[T]he practical difficulties and potential unfairness of a factual approach are daunting. In all cases where the Government alleges that the defendant's actual conduct would fit the generic definition of burglary, the trial court would have to determine what that conduct was").

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Mouelle v. Gonzales, 548 U.S. 901 (2006)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 628 of 1271

126 S.Ct. 2964, 165 L.Ed.2d 947, 74 USLW 3720, 74 USLW 3714...

126 S.Ct. 2964
Supreme Court of the United States

Jean MOUELLE, et ux., petitioners,
v.
Alberto R. GONZALES, Attorney General.

No. 05-1092.
|
June 26, 2006.

**Synopsis**

Case below, 🚩 416 F.3d 923.

**Opinion**

On petition for writ of certiorari to the United States Court of Appeals for the Eighth Circuit. Petition for writ of certiorari granted. Judgment vacated, and case remanded to the United States Court of Appeals for the Eighth Circuit for further **\*2965** consideration in light of 71 Federal Register 27,585.

**All Citations**

548 U.S. 901, 126 S.Ct. 2964 (Mem), 165 L.Ed.2d 947, 74 USLW 3720, 74 USLW 3714, 06 Cal. Daily Op. Serv. 5527, 06 Daily Journal D.A.R. 8166

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

Certiorari Granted, Judgment Vacated by Mouelle v. Gonzales, U.S., June 26, 2006

416 F.3d 923
United States Court of Appeals,
Eighth Circuit.

Jean MOUELLE; Germaine Mouelle, Petitioners,

v.

Alberto GONZALES, [1] Attorney General
of the United States, Respondent.

Nos. 03-1760, 03-3086.
|
Submitted: Oct. 21, 2004.
|
Filed: July 29, 2005.
|
Rehearing and Rehearing En
Banc Denied Oct. 26, 2005.

**Synopsis**

**Background:** Aliens petitioned for review of the orders of the Board of Immigration Appeals (BIA), which affirmed the decision of the immigration judge (IJ), denying their asylum and withholding of removal applications, and affirmed the denial of their motion to reopen the removal proceedings.

**Holdings:** The Court of Appeals, Beam, Circuit Judge, held that:

[1] aliens failed to show that the IJ deprived them of procedural due process;

[2] fact that aliens were granted advance parole before leaving the United States and subsequently returning did not change their status as "arriving aliens" in removal proceedings, for purpose of eligibility for adjustment of status to lawful permanent resident alien; and

[3] immigration regulation excluding arriving aliens in removal proceedings from eligibility for adjustment of status was valid exercise of Attorney General's discretion to grant adjustment of status relief.

Petition denied.

Bye, Circuit Judge, filed dissenting opinion.

West Headnotes (5)

**[1]** **Aliens, Immigration, and Citizenship** Effect of Irregularities; Harmless or Prejudicial Error

**Constitutional Law** Asylum, Refugees, and Withholding of Removal

Aliens failed to show that the immigration judge deprived them of procedural due process, in asylum proceeding, by failing to give them sufficient time to fully present their claims, interrupting alien's testimony, interrupting counsel's closing argument, and failing to elicit specific testimony, absent showing that the outcome of the proceeding would have been different had the alleged errors not occurred. U.S.C.A. Const.Amend. 5.

**[2]** **Aliens, Immigration, and Citizenship** Review of Discretion

The Court of Appeals has jurisdiction to review the denial by the Board of Immigration Appeals (BIA) of a motion to reopen for abuse of discretion. Immigration and Nationality Act, § 245(i), 8 U.S.C.A. § 1255(i).

**[3]** **Aliens, Immigration, and Citizenship** Adjustment of Status

Fact that aliens in removal proceedings were granted advance parole before leaving the United States and subsequently returning did not change their status as "arriving aliens" in removal proceedings, who were barred under the Immigration and Nationality Act (INA) from eligibility for adjustment of status to that of lawful permanent resident alien. Immigration and Nationality Act, §§ 235(b)(1)(A)(i), 245(i), 8 U.S.C.A. §§ 1225(b)(1)(A)(i), 1255(i); 8 C.F.R. § 1245.1(c)(8).

3 Cases that cite this headnote

**[4]    Aliens, Immigration, and Citizenship** 🔑 Adjustment of Status

Administrators vested with discretion to adjust an alien's status may exercise that discretion by rule or on a case-by-case basis. Immigration and Nationality Act, § 245(a), 📄 8 U.S.C.A. § 1255(a).

5 Cases that cite this headnote

**[5]    Aliens, Immigration, and Citizenship** 🔑 Adjustment of Status

Immigration regulation, making arriving aliens in removal proceedings ineligible for an adjustment of status to that of lawful permanent resident alien was valid exercise of Attorney General's discretion to grant adjustment of status relief; arriving alien's placement in removal proceedings was characteristic that was reasonably sound basis for choosing not to grant such discretionary relief, since applications for status adjustment would necessarily lengthen removal proceedings. ; Immigration and Nationality Act, § 245(i), 📄 8 U.S.C.A. § 1255(i); 🚩 8 C.F.R. 1245.1(c)(8).

7 Cases that cite this headnote

**Attorneys and Law Firms**

**\*924** Nancy Alaine Peterson, argued, St. Paul, Minnesota, for petitioners.

Barry J. Pettinato, argued, Washington, D.C. (Peter D. Keisler, David V. Bernal, and Jennifer Paisner, on the brief), for respondents.

Before BYE, BEAM, and GRUENDER, Circuit Judges.

**Opinion**

BEAM, Circuit Judge.

Jean and Germaine Mouelle ask us to grant a petition for review regarding two Board of Immigration Appeals (BIA) decisions rendered in their removal proceedings. We deny the petitions.

## I. BACKGROUND

Jean Mouelle, a native and citizen of the Republic of Congo, entered the United States in 1989 as a J-1 exchange visitor so he could pursue masters and doctoral degrees from the University of Idaho. His wife, Germaine, also a native and citizen of the Republic of Congo, entered the United States as a dependent of an exchange visitor. The Mouelles did not return to the Republic of Congo when their nonimmigrant visas expired.

In May 1996, Jean filed an application for asylum and withholding of removal, **\*925** naming Germaine as a dependent. [2] In May 1997, while their asylum application was pending, Jean was presented with the opportunity to go to Canada for field research and to assist a class that he was teaching. Cognizant of their immigration status and the likelihood that they would not be able to reenter the United States if they went to Canada, the Mouelles contacted the Immigration and Naturalization Service [3] and applied for advance parole, which would allow them to reenter the United States. The INS granted that request. The Mouelles left the United States on May 31, 1997, and reentered a day later, on June 1, 1997, at Eastport, Idaho, pursuant to their advance parole.

On April 15, 1998, the INS commenced removal proceedings against the Mouelles, serving them with notices to appear before an immigration judge. At the first removal hearing in August 1998, the INS realized the allegations contained in the notices to appear were inaccurate. The Mouelles, however, agreed to allow the INS to add additional removal charges.

Those new charges sought removal under 📄 8 U.S.C. §§ 1182(a)(7)(A)(i)(I) & (B)(i)(II), essentially for the Mouelles' failure to present proper documentation when they reentered the United States in June 1997. At the next removal hearing in October 1998, the Mouelles admitted that they were inadmissible under subsection (B)(i)(II) when they sought reentry in June 1997, and the immigration judge found that they were also inadmissible under subsection (A)(i)(I). In lieu of removal, Jean renewed his request for asylum and withholding of removal, which apparently had not yet been addressed by the INS. The immigration judge set the matter for an evidentiary hearing in August 1999.

At the evidentiary hearing in August 1999, the immigration judge denied the Mouelles' claims for asylum and withholding of removal. After finding that the Mouelles were removable, the immigration judge granted them the privilege of voluntary departure so long as they depart before October 5, 1999, and post departure bonds.

The Mouelles appealed the immigration judge's ruling to the BIA. The BIA affirmed the immigration judge's decision in February 2003. But because the Mouelles had not posted their departure bonds, the BIA revoked their privilege of voluntary departure, making the Mouelles immediately removable.

During the three-and-a-half years that their appeal was pending, the Mouelles sought employment-based visas. Jean filed an I-140 Immigrant Petition for Alien Worker on April 28, 2001. That petition was denied in November 2001, because Jean had not shown that it was in the nation's interest for the Attorney General to waive the job-offer requirement of 8 U.S.C. § 1153(b)(2)(B). Germaine had an I-140 Immigrant Petition for Alien Worker filed on her behalf by her employer, Presbyterian Homes and Services, Inc. That petition was approved in August 2002 **926 under 8 U.S.C. § 1153(b)(3)(A)(i) or (ii) (skilled workers or professionals).

The Mouelles did not try to adjust their immigration status based on Germaine's approved I-140 petition until March 2003, after the BIA had affirmed the immigration judge's decision. In March 2003, the Mouelles filed applications to adjust their immigration statuses under 8 U.S.C. § 1255(i). And in May 2003, the Mouelles filed a motion to reopen their removal proceedings and remand the matter to the immigration judge so that they could apply for adjustment of status.

In July 2003, the BIA denied the Mouelles' motion to reopen, stating that they "are ineligible for adjustment of status because they are 'arriving aliens' in removal proceedings, notwithstanding the approved [I-140] visa petition."

The Mouelles were scheduled to be removed from the United States on May 7, 2003. We have stayed their removal, pending the resolution of their petitions for review.

The Mouelles have two pending petitions for review that have been consolidated here. The first, No. 03-1760, concerns

the BIA's February 2003 denial of the Mouelles' asylum application. The second, No. 03-3086, concerns the BIA's July 2003 denial of the Mouelles' motion to reopen the removal proceedings. [4]

## II. DISCUSSION

### A. No. 03-1760: Asylum and Withholding of Removal

[1]  With regard to the initial BIA decision in February 2003, denying their claims for asylum and withholding of removal, the Mouelles argue only that the immigration judge violated their Fifth Amendment procedural due process rights. [5] The Mouelles did not present the due process issue to the BIA in their appeal or in their motion to reopen. Thus, we are without jurisdiction to consider it. *Sayaxing v. INS,* 179 F.3d 515, 522–23 (7th Cir.1999). And, even if we had jurisdiction, the Mouelles' due process claim fails because they have not addressed, let alone established, prejudice-"that the outcome of the proceeding may well have been different had the due process violation not occurred." *Ismail v. Ashcroft,* 396 F.3d 970, 975 (8th Cir.2005).

### B. No. 03-3086: Adjustment of Status

[2]  All of the Mouelles' remaining arguments address the BIA's July 2003 denial of their motion to reopen the removal proceedings to allow them to apply for adjustment of status under 8 U.S.C. § 1255(i). "We have jurisdiction to review the BIA's denial of the motion to reopen for abuse of discretion." *Sidikhouya v. Gonzales,* 407 F.3d 950, 951 (8th Cir.2005).

The BIA refused to reopen the Mouelles' removal proceedings because they were "arriving aliens in removal proceedings" under 8 C.F.R. § 1245.1(c)(8) [6] and **927 were thus ineligible to apply for relief under 8 U.S.C. § 1255(i). The Mouelles make two arguments: (1) they were in fact eligible to adjust status under the regulations, and (2) if they were not, the regulations are invalid.

#### 1. Status-Adjustment Eligibility Under the Regulations

As a matter of regulatory construction, the BIA's conclusion was correct. Section 1245.1(c) of the regulations lists certain categories of aliens who are "ineligible to apply

for adjustment of status to that of a lawful permanent resident alien under section 245 of the Act [ 8 U.S.C. § 1255].” And section 1245.10(b) of the regulations-which deals specifically with adjustments under 8 U.S.C. § 1255(i)-incorporates those exclusions through its reference to section 1245.1(b), which, in turn, references section 1245.1(c). One of the section 1245.1(c) categories of ineligible aliens is “[a]ny arriving alien who is in removal proceedings pursuant to ... section 240 of the Act [ 8 U.S.C. § 1229a].” 8 C.F.R. § 1245.1(c)(8).

[3] The Mouelles were in removal proceedings under 8 U.S.C. § 1229a when they made their motion to reopen. But they argue that the BIA abused its discretion by denying their motion based on 8 C.F.R. § 1245.1(c)(8) because they are not arriving aliens. The term “arriving alien” is defined as

> an applicant for admission coming or attempting to come into the United States at a port-of-entry .... An arriving alien remains such even if paroled pursuant to section 212(d)(5) of the Act [ 8 U.S.C. § 1182(d)(5) ], *except that ... an alien who was granted advance parole which the alien applied for and obtained in the United States prior to the alien's departure from and return to the United States, shall not be considered an arriving alien for purposes of section 235(b)(1)(A)(i) of the Act* [ 8 U.S.C. § 1225(b)(1)(A)(i) ].

8 C.F.R. § 1001.1(q) (emphasis added). The Mouelles argue that their receipt of advance parole before going to Canada qualified them for the italicized exception. It did, but that exception is for the limited purpose of 8 U.S.C. § 1225(b)(1)(A)(i), which requires immigration officers to order some arriving aliens immediately removed “without further hearing or review.” In other words, under the regulations, the Mouelles were arriving aliens when they sought reentry and their parole into the United States did not

generally affect that status. But the italicized language does preclude expedited removal in their cases because they were granted advance parole. The regulation does not, however, allow aliens arriving with advance parol to shed their arriving-alien status for the purpose of adjusting immigration status. Rather, the quoted regulation preserves that status notwithstanding the aliens' arrival. And if such aliens are in removal proceedings when they first try to adjust status,[7] the regulations make them ineligible. So the Mouelles were arriving aliens in removal proceedings and were thus barred from adjusting their statuses.

## 2. Validity of 8 C.F.R. § 1245.1(c)(8)

The Mouelles argue, alternatively, that 8 C.F.R. § 1245.1(c)(8) is invalid. After this case had been argued and submitted, *Succar v. Ashcroft,* 394 F.3d 8 (1st Cir.2005), **\*928** was decided. The *Succar* court concluded that 8 C.F.R. § 1245.1(c)(8) was inconsistent with 8 U.S.C. § 1255(a)[8], and was thus invalid under the first step of *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* because “Congress ha[d] directly spoken to the precise question at issue.” 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (quoted in *Succar,* 394 F.3d at 22). We allowed the parties to supplement their briefs, and we accepted an amicus brief in support of the Mouelles from the American Immigration Law Foundation.

We respectfully disagree with the First Circuit's decision in *Succar. Succar* rested on the notion that Congress had explicitly determined what classes of aliens were and were not eligible to apply for discretionary adjustment-of-status relief. 394 F.3d at 29. Given that congressional judgment-constituting, in the court's opinion, a clear expression of its intent-the court held that the regulation was invalid under the first step of *Chevron* because it added eligibility requirements. *Id.* And, even though the statute vested the Attorney General with full discretion to grant or deny adjustment-of-status relief, the court concluded that the regulation could not properly be characterized as a rule-based exercise of that discretion. *Id.*

[4] We do not believe 8 C.F.R. § 1245.1(c)(8) is properly evaluated under *Chevron* 's first step, given the discretionary

AR.05857

4

nature of the relief available under 8 U.S.C. § 1255. While Congress surely did speak to eligibility in the statute, it left the question whether adjustment-of-status relief should be granted to the Attorney General's discretion. 8 U.S.C. § 1255(a) ("[t]he status of an alien who was inspected and admitted or paroled ... *may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe* " (emphasis added)); *id.* § 1255(i)(2) ("the Attorney General *may* adjust the status of the alien") (emphasis added). Administrators vested with such discretion may exercise that discretion by rule or on a case-by-case basis. *Bellis v. Davis,* 186 F.3d 1092, 1094-95 (8th Cir.1999). And we can find no basis upon which to conclude that this regulation does not embody the Attorney General's decision not to afford discretionary relief to the delineated class of aliens-arriving aliens in removal proceedings. Attorney General Reno stated this discretionary-relief basis for the regulation when it was proposed. "[T]he Attorney General has determined that she will not favorably exercise her discretion to adjust the status of arriving aliens who are ordered removed pursuant to section 235(b)(1) of the Act or who are placed in removal proceedings under section 240 of the Act." 62 Fed.Reg. 444, 452 (Jan. 3, 1997). And she again stressed the discretionary nature of status adjustments when the interim rule issued:

> Some commenters objected to the policy statement contained in the proposed rule that amended § [1]245.1(c)(8) and indicated that, as an exercise of discretion, the Attorney General would not adjust the status of arriving aliens ... in proceedings under section 240 of the Act.
>
> ....
>
> In response to the commenters who suggested this policy exceeded the Attorney General's statutory authority, it is noted that section 245 of the Act [ 8 U.S.C. § 1255] clearly and unambiguously states that adjustment of status is **\*929** a discretionary decision, subject to such regulatory limitations as the Attorney General may prescribe.

62 Fed.Reg. 10312, 10326-27 (Mar. 6, 1997). As Judge Friendly wrote with regard to 8 U.S.C. § 1255(a), "We are unable to understand why there should be any general principle forbidding an administrator, vested with discretionary power, to determine by appropriate rulemaking that he will not use it in favor of a particular class on a case-

by-case basis ...." *Fook Hong Mak v. INS,* 435 F.2d 728, 730 (2d Cir.1970); *see also Bellis* 186 F.3d at 1095 (concluding that the Bureau of Prisons validly exercised its discretion to grant early release by "identifying additional categories of inmates who are ineligible for the early-release program"), *aff'd, Lopez v. Davis,* 531 U.S. 230, 243-44, 121 S.Ct. 714, 148 L.Ed.2d 635 (2001).

**[5]** Even though 8 C.F.R. § 1245.1(c)(8) says that the particular class of aliens at issue is "ineligible to apply for adjustment of status," that does not change matters. The *Succar* court concluded this was of primary significance, finding that Congress had unequivocally stated that statutorily eligible aliens must be allowed to apply for status adjustment. 394 F.3d at 28. But why should the Attorney General be forced to exercise his discretion through rules that speak only to the ultimate relief rather than eligibility? If the Attorney General decided that arriving aliens in removal proceedings will not be given adjustment-of-status relief (as she clearly did in promulgating this rule), and if that decision does not contravene the statute (as we conclude it does not), then it makes little sense to invalidate this regulation simply because it speaks in terms of eligibility. *See Lopez,* 531 U.S. at 243-44, 121 S.Ct. 714 ("Even if a statutory scheme requires individualized determinations, which this scheme does not, the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority.... [C]ase-by-case decisionmaking in thousands of cases each year, ... could invite favoritism, disunity, and inconsistency." (citations and quotations omitted)).

The *Succar* court concluded that *INS v. Cardoza-Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), established the difference between statutory eligibility and the Attorney General's discretion to grant relief. It then took that premise and concluded that if Congress had spoken to eligibility, then an administrator with discretion to grant relief cannot impose eligibility requirements that are not found in the statute. We cannot find support for the latter premise in *Cardoza-Fonseca.* The Court in *Cardoza-Fonseca* did emphasize the difference between eligibility and the discretionary decision to grant relief, but it did so in a much different context than that presented here.

The BIA in *Cardoza-Fonseca* had construed the statutory eligibility standard for asylum (a form of discretionary

relief) as requiring the same showing-a clear probability of persecution-as the statutory eligibility standard for withholding of deportation (a form of relief that must be given to an eligible alien). *Id.* at 443, 107 S.Ct. 1207. The Court reasoned that the BIA's construction did not fit the statutes because the difference between the nature of the relief available under each-discretionary versus mandatory-evinced a congressional intent that the eligibility standard for discretionary asylum would be less demanding than the eligibility standard for mandatory withholding. *Id.* at 443-44, 107 S.Ct. 1207. But the Court did not hold that the Attorney General could not by regulation determine who among the class of aliens that is statutorily eligible for discretionary relief would or would not be afforded such relief. It simply held that **\*930** the BIA's interpretation of the statute in that case failed because Congress did not intend the heightened mandatory-withholding showing to apply to discretionary asylum.

This case is quite different. First, the regulation at issue does not purport to interpret statutory eligibility standards, but rather rests on the discretionary authority that Congress explicitly gave the Attorney General to grant adjustment-of-status relief. And, even if we take *Cardoza-Fonseca* as somehow relevant to our inquiry, there is no congressional intent evinced by a similar mandatory-relief provision that limits the Attorney General's ability to determine by regulation which statutorily eligible aliens will get the relief that he has the power, but not the duty, to grant.

As a rule-based exercise of the Attorney General's discretion to allow status adjustments, we conclude section 1245.1(c)(8) of the regulations is not invalid as contrary to the statute. This does not mean, however, that the regulation is necessarily valid. To be valid, such gap-filling regulations must be "reasonable in light of the legislature's revealed design." *Lopez,* 531 U.S. at 242, 121 S.Ct. 714 (quotation omitted); *accord Fook Hong Mak,* 435 F.2d at 731 ("reasonably related to the statutory scheme"). The class

of aliens delineated by 8 C.F.R. 1245.1(c)(8) consists of (1) arriving aliens who are (2) in removal proceedings. As mentioned, arriving aliens are aliens who seek admission to the United States at a port-of-entry. The Attorney General's stated reasons for delineating this class of aliens clearly show that the classification is reasonable under the statutory scheme. *See* 62 Fed.Reg. at 10312-13 & 10326-27. And arriving aliens' placement in removal proceedings is a characteristic that is a reasonably sound basis for choosing not to grant relief under 8 U.S.C. § 1255(i). [9] Applications for such relief would necessarily lengthen removal proceedings (much like they have here), and expediency was one of the goals of the 1996 amendments to the Immigration and Nationality Act. *See* S.Rep. No. 104-249, 1996 WL 180026, at \*2 (Apr. 10, 1996). Thus, we conclude the regulatory bar to status adjustment contained in 8 C.F.R. § 1245.1(c)(8) is valid and the BIA did not abuse its discretion by denying the Mouelles' motion to reopen on that basis.

We have considered all of the Mouelles' other arguments that are properly presented by their petitions for review, and we find them without merit.

III. CONCLUSION
Accordingly, we deny the petitions.

**\*931** BYE, Circuit Judge, dissenting.

I respectfully dissent. I would hold 8 C.F.R. § 1245.1(c)(8) is invalid for the reasons articulated in *Succar v. Ashcroft,* 394 F.3d 8 (1st Cir.2005). Accordingly, I would vacate the removal orders and remand for further proceedings.

**All Citations**

416 F.3d 923

---

## Footnotes

1    Alberto Gonzales has been appointed to serve as Attorney General of the United States, and is substituted as respondent pursuant to Federal Rule of Appellate Procedure 43(c).

2    Jean also came very close to obtaining lawful residency in 1994 when he won the diversity visa lottery. But, as a J-1 nonimmigrant, Jean was required to obtain a "no objection" letter from the Congolese government in order to relieve him of the J-1 two-year foreign residency requirement under 8 U.S.C. § 1182(e). Though Jean ultimately did get the "no objection" letter, he did not get it before his ability to obtain a diversity visa had expired.

3    In March 2003, the functions of the Immigration and Naturalization Service were transferred to the newly formed Department of Homeland Security (DHS). *See* Homeland Security Act of 2002, 6 U.S.C. §§ 101 et seq.

4    The Mouelles also filed a motion for reconsideration with the BIA in August 2003, asking the BIA to reconsider its July 2003 denial of their motion to reopen. The motion for reconsideration was denied in December 2003. The Mouelles have not petitioned for review of that decision, so it is not before us. *See Raffington v. INS,* 340 F.3d 720, 722 (8th Cir.2003).

5    Specifically, the Mouelles argue that the immigration judge failed to give them sufficient time to fully present their asylum and withholding-of-removal claims, interrupted Jean's testimony with questioning, "failed to elicit specific and detailed testimony that was material and significant," drew "odd conclusions before testimony was even completed," interrupted Jean's attorney, and cut off counsel's closing argument.

6    The regulations were duplicated and renumbered while the Mouelles' proceedings were pending. As part of the Homeland Security Act of 2002 and the transfer of immigration responsibilities to the DHS, the regulations were duplicated from Chapter I, renumbered in the 1000 series, and placed in Chapter V of Title 8. We cite to the Chapter V regulations, though the same regulations can be found in Chapter I. For instance 8 C.F.R. § 1245.1(c)(8) matches 8 C.F.R. § 245.1(c)(8).

7    An arriving alien who seeks to *renew* an adjustment application in removal proceedings can do so under certain circumstances. *See* 8 C.F.R. § 1245.2(a).

8    Notably, the Mouelles did not seek to adjust status under section 1255(a). They sought to adjust under section 1255(i). Nonetheless, the reasoning of the *Succar* court, if correct, is broad enough to invalidate the regulation as inconsistent with the statutory scheme at issue.

9    The court in *Succar* opined that the relevant characteristic-placement in removal proceedings-effectively barred most aliens who had been paroled from adjusting status because most paroled aliens were in removal proceedings. 394 F.3d at 18. Thus, the court concluded, the regulation was contrary to 8 U.S.C. § 1255(a) because paroled aliens were among those eligible to adjust status under the statute. As an evidentiary matter, we cannot conclude that the regulation bars most paroled aliens from adjusting status. Unlike the court in *Succar,* we have not been "informed," *id.,* of that fact. And in this case the Attorney General cites DHS statistics suggesting that only about two to three percent of parolees who entered the United States in 2003 have been placed in removal proceedings. Resp. Supp. Br. at 13 n. 1. In fact, the INS did not initiate removal proceedings against the Mouelles until April 15, 1998, over ten months after the Mouelles were paroled into the United States. Moreover, even if we assumed that most aliens paroled into the United States were placed in removal proceedings, 8 U.S.C. § 1255 does not show a congressional intent to vest a few, most, or all paroled aliens with the right to adjust their status. Relief remains discretionary.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

469 F.3d 94
United States Court of Appeals,
Third Circuit.

Goran MUDRIC, Petitioner

v.

ATTORNEY GENERAL OF the
UNITED STATES, Respondent.

No. 05-2913.
|
Submitted Under Third Circuit
LAR 34.1(a) Sept. 13, 2006.
|
Filed Nov. 24, 2006.

**Synopsis**
**Background:** Alien petitioned for review of deportation order of Board of Immigration Appeals (BIA).

**Holdings:** The Court of Appeals, Fisher, Circuit Judge, held that:

[1] alien had no due process entitlement to discretionary benefits of asylum and adjustment of status;

[2] government was not equitably estopped from denying alien's asylum application; and

[3] substantial evidence supported finding that alien's testimony was not credible.

Petition denied.

West Headnotes (7)

[1] **Aliens, Immigration, and Citizenship** Exhaustion of Remedies in General
Normally, the court of appeals has jurisdiction over an alien's claims only where the alien has raised and exhausted his or her administrative remedies as to that claim; however, due process claims are generally exempt from the exhaustion requirement because the Board of Immigration Appeals (BIA) does not have jurisdiction to adjudicate constitutional issues. U.S.C.A. Const.Amend. 5.

49 Cases that cite this headnote

[2] **Aliens, Immigration, and Citizenship** Application
**Constitutional Law** Asylum, Refugees, and Withholding of Removal
Alien had no due process entitlement to the wholly discretionary benefits of asylum and adjustment of status based on his mother's permanent resident alien application, and thus, government did not violate alien's right to due process by delaying consideration of his asylum application and his mother's permanent resident alien application. U.S.C.A. Const.Amend. 5.

24 Cases that cite this headnote

[3] **Aliens, Immigration, and Citizenship** Admission as Privilege or Right
**Aliens, Immigration, and Citizenship** Asylum, Refugees, and Withholding of Removal
An alien seeking admission to the United States through asylum requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative.

3 Cases that cite this headnote

[4] **Estoppel** Particular United States Officers, Agencies, or Proceedings
Even if government was negligent in not processing alien's asylum application in a more expeditious fashion, such negligence did not constitute affirmative misconduct, as required for government to be equitably estopped from denying alien's asylum application.

10 Cases that cite this headnote

**[5]    Estoppel** 👉 **Particular United States Officers, Agencies, or Proceedings**

To prevail on a claim of equitable estoppel against the government in the immigration context, the alien must establish: (1) a misrepresentation; (2) upon which he reasonably relied; (3) to his detriment; and (4) affirmative misconduct.

13 Cases that cite this headnote

**[6]    Aliens, Immigration, and Citizenship** 👉 **Findings or Statement of Reasons**

**Constitutional Law** 👉 **Asylum, Refugees, and Withholding of Removal**

Alien's right to due process was not denied with respect to decision of immigration judge (IJ) denying alien's asylum application, since fact finding by IJ was disclosed to alien, alien had an opportunity to make arguments on his own behalf, and IJ's decision in the case constituted an individualized determination.

18 Cases that cite this headnote

**[7]    Aliens, Immigration, and Citizenship** 👉 **Adverse Credibility Determinations in General**

Substantial evidence supported determination of immigration judge (IJ) that alien's testimony in support of asylum application was not credible; IJ found that alien's testimony that he was a marked man in Serbia because of his relationship with a Muslim woman lacked credibility in light of country reports indicating that consorting between different ethnic groups was common in the former Yugoslavia before the civil war, and alien presented no evidence of past opposition to military service or expression of substantial anti-war sentiments in support of claim that he feared persecution for his moral opposition to military service and to the civil war.

7 Cases that cite this headnote

**Attorneys and Law Firms**

**\*95** Christina L. Harding, Gallagher, Malloy & Georges, Philadelphia, PA, Attorney for Petitioner.

Sonya F. Lawrence, Office of United States Attorney, Philadelphia, PA, Attorney for Respondent.

Before FUENTES, FISHER and McKAY, [*] Circuit Judges.

OPINION OF THE COURT

FISHER, Circuit Judge.

Goran Mudric petitions for review of the legality of his pending deportation. In support of his petition, Mudric alleges his Fifth Amendment right to procedural due process was violated by undue Immigration and Naturalization Service ("INS") [1] delays in processing certain applications related to his case. Mudric also argues that the Government should be estopped from removing him because he was prevented from obtaining lawful status as a result of the Government's own undue delay. **\*96** Finally, Mudric claims procedural due process violations occurred in the course of his asylum hearing. For the reasons stated below, we will deny the petition.

I.

Mudric, an ethnic Serb and native and citizen of the former Yugoslavia, entered the United States without inspection at or near Detroit, Michigan on February 27, 1992. Mudric's mother, Ljiljana Mudric-Meolic, was already residing in the United States at that time, having acquired conditional permanent resident status through her marriage in 1990 to a United States citizen. [2] Mudric formally applied for asylum in 1993 and approximately four years later, on January 24, 1997, INS issued a notice of intent to deny the request for asylum.

Hearings before an Immigration Judge on the subject of Mudric's deportation were held in August of 1997 and February of 1998. [3] At the February 1998 hearing, Mudric testified that he had served in the former Yugoslavian army from 1986 to 1987 and claimed he had suffered persecution at that time because of a relationship he had with a Muslim woman. As evidence of that persecution, Mudric described one incident in which he was hit in the head with a gun by

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

an officer. After that incident, Mudric was allegedly told by friends that he was a "marked man." Mudric offered no further explanation or evidence of persecution. After completing his service in the army, Mudric returned to his home city of Belgrade and eventually became engaged to the unnamed Muslim woman. However, Mudric and the woman never married and the relationship ended when Mudric left for the United States in 1992.

Mudric further testified that he was called back for active service in the army in 1991, at the time of the Yugoslavian Civil War. He only served for two weeks before deserting. When asked why he deserted the army, Mudric replied "I was scared. I was scared. I didn't like it to kill nobody else. Always they teach us and hatred starting too much." When asked whether he had ever expressed any opposition to serving in the army, Mudric testified that he had told only one other fellow soldier, whose reaction he described as "not pleased." When asked what would have happened if he had not deserted the army in 1991, Mudric stated, in effect, he would have to kill or be killed. When asked what would happen if he were forced to return to Serbia, Mudric expressed a fear that he would be punished. Mudric did not specify exactly why and how he would be punished, but speculated that "what I'm, uh, hearing, what I'm seeing now it's Mafia, government, they, they punish a lot of people."

Although an index listing three witnesses prepared to testify at the hearing on Mudric's behalf had been filed by Mudric's attorney, two of those witnesses were not present at the proceedings. Those witnesses were Mudric's mother and a friend. At the beginning of the proceedings, the IJ indicated to counsel for **\*97** Mudric that he believed their testimony would have little probative value because they were not experts and obviously partial to Mudric's claims. Additionally, he noted that competent evidence was already in the record as to the country conditions in Serbia. At the end of Mudric's testimony, the IJ concluded that Mudric's case was ripe for adjudication even without the testimony of witnesses. He stated that witnesses would have little to contribute to the case because "the facts [were] pretty clear." The IJ explained that he would not be granting Mudric's request for reasons set forth in a written decision. That decision reflected the IJ's belief that Mudric's testimony lacked credibility and was completely in conflict with the objective evidence in the record.

The IJ's decision was affirmed without opinion by the Board of Immigration Appeals ("BIA") on June 4, 2002, and Mudric

was granted thirty days to depart voluntarily. Mudric failed to adhere to the BIA's order and was taken into custody by INS on July 16, 2002. Mudric retained new counsel and filed in this Court a petition for review of his order of removal. That petition was dismissed as untimely on April 9, 2003. While the untimely petition for review remained pending, Mudric filed a habeas corpus petition pursuant to 28 U.S.C. § 2241 in the United States District Court for the Eastern District of Pennsylvania as well as a motion for an order to show cause and a motion for stay of removal. The District Court issued an order staying Mudric's removal and requiring his release from custody. However, without taking any substantive action on the § 2241 petition, the District Court converted and transferred it to this Court for treatment as a petition for review, as mandated by the REAL ID Act of 2005 ("REAL ID Act"), Pub.L. No. 109-13, 119 Stat. 231, Div. B, Title I, § 106(c) (May 11, 2005). *See* Bonhometre v. Gonzales, 414 F.3d 442, 445-46 (3d Cir.2005).

II.

The REAL ID Act confers on this Court jurisdiction to review constitutional claims and questions of law raised in a converted and transferred petition for review of an order of removal. 8 U.S.C. § 1252(a)(2)(D); *see* Bonhometre, 414 F.3d at 446. Although Mudric's habeas corpus petition has been converted to a petition for review, our standard of review remains the same. Jordon v. Att'y Gen., 424 F.3d 320, 327-28 (3d Cir.2005). We review de novo constitutional claims and questions of law, including application of law to undisputed facts or adjudicated facts, raised in the initial petition for habeas corpus relief. Kamara v. Att'y Gen., 420 F.3d 202, 211 (3d Cir.2005). In a petition for review, we examine factual and discretionary determinations made by an IJ in adjudicating asylum requests under the familiar substantial evidence standard. Dia v. Ashcroft, 353 F.3d 228, 247-48 (3d Cir.2003). That is, an IJ's decision to deny a request for asylum must be upheld if "supported by reasonable, substantial, and probative evidence on the record considered as a whole ... and can be reversed only if the evidence presented by [petitioner] was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." INS v. Elias-Zacarias, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992); *see also*

*Abdille v. Ashcroft,* 242 F.3d 477, 484 (3d Cir.2001) ("The [IJ's] finding must be upheld unless the evidence not only supports a contrary conclusion, but compels it.").

**[1]** Normally, we have jurisdiction over an alien's claims only where the alien has raised and exhausted his or her administrative remedies as to that claim. **\*98** *Abdulrahman v. Ashcroft,* 330 F.3d 587, 594-95 (3d Cir.2003). However, due process claims are generally exempt from the exhaustion requirement because the BIA does not have jurisdiction to adjudicate constitutional issues. *Sewak v. INS,* 900 F.2d 667, 670 (3d Cir.1990). Thus we review de novo the question of whether Mudric's procedural due process rights have been violated. *Bonhometre,* 414 F.3d at 446.

### III.

**[2]** Turning to the merits of the petition, Mudric alleges that INS delays in the consideration and processing of his asylum claim and his mother's permanent resident alien application prevented him from receiving a grant of asylum and an adjustment to lawful status via his mother. He alleges that conditions in his native Serbia had changed in the approximately four years between the time when he first filed his application for asylum and the time when it was considered by INS. Had his asylum claim been considered before these unspecified changes, Mudric reasons, he would have been entitled to a grant of asylum. In a similar fashion, Mudric argues that his mother, Mudric-Meolic, was prevented from filing an alien relative petition on behalf of Mudric because of an INS delay of eight years in processing her petition to remove conditions on her permanent residence. Mudric suggests in the first instance that these INS delays in themselves worked a violation of due process and mandate the reopening of his removal proceedings. In addition, Mudric argues that the INS delays constitute affirmative government misconduct giving rise to a claim for equitable estoppel against the Government. These claims are entirely without merit.

**[3]** Mudric fails to discern the discretionary nature of both asylum and adjustment of status determinations. While an alien may be eligible for a grant of asylum or an adjustment of status under the immigration laws, he is not entitled to such benefits as a constitutional matter. There is no constitutional right to asylum per se. *Abdulai v. Ashcroft,*

239 F.3d 542, 549 (3d Cir.2001). An alien seeking admission to the United States through asylum "requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Marincas v. Lewis,* 92 F.3d 195, 203 (3d Cir.1996) (quoting *Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982)); *see also INS v. Yang,* 519 U.S. 26, 30, 117 S.Ct. 350, 136 L.Ed.2d 288 (1996) ("[T]he Attorney General's suspension of deportation ... [is] 'an act of grace' which is accorded pursuant to her 'unfettered discretion.'") (citations omitted); *Ameerir v. INS,* 438 F.2d 1028, 1030 (3d Cir.1971) ("Adjustment of status is [ ] a matter of administrative grace, not mere statutory availability.").

Given the discretionary nature of immigration benefits, Mudric's INS delay-as-due process violation claim must fail at the threshold. It is axiomatic that a cognizable liberty or property interest must exist in the first instance for a procedural due process claim to lie. *See Board of Regents of State Colls. v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Furthermore, "to have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* at 577, 92 S.Ct. 2701. Of course, "[p]roperty interests ... are not created by the Constitution," *id.,* and the Supreme Court has recognized that constitutionally protected liberty or property interests may spring from positive rules of law, enacted by the state or federal government and creating a **\*99** substantive entitlement in a particular government benefit. *See, e.g., Connecticut Bd. of Pardons v. Dumschat,* 452 U.S. 458, 463, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981) ("[A] state-created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right.").

Nevertheless, the various discretionary privileges and benefits conferred on aliens by our federal immigration laws do not vest in aliens a constitutional right to have their immigration matters adjudicated in the most expeditious manner possible. *See id.* ("A constitutional entitlement cannot be created ... merely because a wholly and expressly discretionary state privilege has been granted generously in the past."); *INS v. Miranda,* 459 U.S. 14, 18, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982) ("Both the number of applications

received by the INS and the need to investigate their validity may make it difficult for the agency to process an application as promptly as desirable.").

In making a request for immigration benefits, "aliens only have those statutory rights granted by Congress," *Marincas,* 92 F.3d at 203, and no federal statute or regulation prescribes a hard-and-fast deadline for acting upon immigration applications and petitions, such as the ones in this case, submitted to the various agencies that administer our immigration laws. *See Cordoba v. McElroy,* 78 F.Supp.2d 240, 244 (S.D.N.Y.2000). No constitutional injury occurred from the INS delays in this case because Mudric simply had no due process entitlement to the wholly discretionary benefits of which he and his mother were allegedly deprived, much less a constitutional right to have them doled out as quickly as he desired.

**[4]**  **[5]**  Mudric's claim for equitable estoppel is also without merit. While we acknowledge that the doctrine of equitable estoppel can apply to the government in the immigration context, *see DiPeppe v. Quarantillo,* 337 F.3d 326, 335 (3d Cir.2003), to prevail on such a claim, Mudric must establish (1) a misrepresentation; (2) upon which he reasonably relied; (3) to his detriment; and (4) affirmative misconduct. *Id.* In this case, Mudric has alleged nothing more than an INS delay in the processing of his asylum claim and his mother's application to remove conditions on her residence.

While this delay may be unfortunate, even "unjustified" as Mudric alleges, mere delay does not constitute "affirmative misconduct" on the part of the Government. *See Miranda,* 459 U.S. at 19, 103 S.Ct. 281 ("Proof only that the Government failed to process promptly an application falls far short of establishing such conduct.").[4] Even assuming arguendo that the Government was negligent in not processing Mudric and his mother's immigration applications in a more expeditious fashion, such negligence would still not constitute affirmative misconduct. *See INS v. Hibi,* 414 U.S. 5, 8, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973) ("As a general rule laches or neglect of duty on the part of the Government is no defense to a suit by it to enforce a public right or protect a public interest...."). As Mudric has failed to present any evidence of affirmative misconduct on the part of the Government, his claim for equitable estoppel must fail.

Turning next to Mudric's ineffective assistance of counsel claim, we note at the **\*100** outset that the BIA denied Mudric's motion to reopen in part because he failed to document compliance with the threshold requirements set forth in *Matter of Lozada,* 19 I. & N. Dec. 637, 639 (BIA 1988), for bringing an ineffective assistance claim. We have "generally agree[d] that the BIA's three-prong test [set forth in *Lozada* ] is not an abuse of the Board's wide ranging discretion." *Lu v. Ashcroft,* 259 F.3d 127, 133 (3d Cir.2001). Pursuant to *Lu,* we will affirm the BIA's denial of the motion to reopen for failure to comply with the procedural requirements of *Lozada.*

**[6]**  Finally, Mudric challenges the IJ's denial of his asylum request, describing the IJ's decision as "arbitrary and capricious" and a "violation of due process." Draping his claims in the language of procedural due process, Mudric invites this Court to regard his asylum challenge as one of constitutional dimensions. Due process, however, only guarantees an alien in asylum proceedings the opportunity to be heard "at a meaningful time and in a meaningful manner." *Abdulai,* 239 F.3d at 549 (quoting *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). More specifically, it entitled Mudric to (1) fact finding produced to the IJ or BIA and disclosed to him; (2) the ability to make arguments on his own behalf; and (3) an individualized determination of his interests. *Id.* The record reflects that the fact finding by the IJ in this case was disclosed to Mudric and that he had the opportunity to make arguments on his own behalf. In addition, the decision of the IJ in this case constituted an individualized determination. Due process requires no more. *See id.* at 550 ("[T]he question for due process purposes is not whether the [IJ] reached the correct decision; rather it is simply whether the [IJ] made an individualized determination of [the alien's] interest....").

It is apparent that Mudric's denial of asylum claim, stripped of the trappings of due process, is in fact a challenge to the factual and discretionary determinations made by the IJ in adjudicating the asylum claim. Normally, there would be no question that we have jurisdiction to review such a claim on direct petition for review under 8 U.S.C. § 1252. *See, e.g.,  Gao v. Ashcroft,* 299 F.3d 266, 271-72 (3d Cir.2002); *Dia,* 353 F.3d at 247. However, the jurisdictional analysis in this case is somewhat more complicated because of the case's atypical procedural posture.[5] The Government

challenges our longstanding authority to review factual and discretionary determinations made by an IJ in relation to asylum claims. It argues the REAL ID Act and our holding in *Sukwanputra v. Gonzales,* 434 F.3d 627 (3d Cir.2006), precludes us from exercising jurisdiction over any factual and discretionary determinations made in relation to asylum claims, whether the claims are presented pursuant to a direct petition for review or pursuant to transfer/conversion of a habeas petition. Such a claim is overly broad, as the following discussion makes clear.

**\*101** In *Sukwanputra,* we examined 8 U.S.C. § 1158, which governs asylum requests, in light of jurisdictional modifications made by the REAL ID Act. The petitioner had failed to file a timely (within one year) petition for asylum. Under § 1158(a)(2)(D), a tardy application may only be considered if the alien demonstrates to the satisfaction of the Attorney General that an exception is warranted because of changed or extraordinary circumstances. The petitioner challenged the IJ's determination that he did not qualify for an exception to the one-year filing deadline. However, § 1158(a)(3) provides "[n]o court shall have jurisdiction to review any determination of the Attorney General under paragraph § 1158(a)(2)."

In determining whether we had jurisdiction to consider the petitioner's challenge, we noted that the REAL ID Act, by adding 8 U.S.C. § 1252(a)(2)(D), had restored our jurisdiction to hear constitutional claims and questions of law in a criminal alien's petition for review, but that all other jurisdiction-stripping provisions of the INA remained intact, including § 1158(a)(3). Therefore, we concluded that "despite the changes of the REAL ID Act, 8 U.S.C. § 1158(a)(3) continues to divest the court of appeals of jurisdiction to review a decision regarding whether an alien established changed or extraordinary circumstances that would excuse his untimely filing." *Id.* at 635. *Sukwanputra* thus stands for the limited proposition that we continue to lack jurisdiction to review a purely factual determination made by the BIA that exceptional or changed circumstances do not exist under § 1158(a)(2)(D) to justify waiving the § 1158(a)(2)(B) one year time limit for making asylum requests. [6]

**[7]**   Because Mudric's denial of asylum challenge is not a challenge to an exceptional or changed circumstances determination under § 1158(a)(2)(D), we retain jurisdiction to review it under 8 U.S.C. § 1252. *See, e.g., Gao v. Ashcroft,* 299 F.3d 266, 272 (3d Cir.2002); *Dia,* 353 F.3d at 247. Where the BIA summarily affirms the findings of the IJ, we review the IJ' s decision directly. *Konan v. Att'y Gen.,* 432 F.3d 497, 500 (3d Cir.2005). Applying the substantial evidence standard, we must uphold the IJ's determination that Mudric was not eligible for asylum if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Dia,* 353 F.3d at 248. When an IJ denies an asylum claim based in part on an adverse credibility determination, as the IJ did in Mudric's case, we review that determination to ensure that it "was appropriately based on inconsistent statements, contradictory evidences, and inherently improbable testimony ... in view of the background evidence on country conditions." *Id.* at 249.

The IJ found that Mudric's testimony conflicted with the objective evidence on the record. Specifically, the IJ found Mudric's testimony that he was a "marked man" because of his past relationship with a Muslim woman lacked credibility as country reports relied on by the IJ indicated that consorting between different ethnic groups was quite common in the former Yugoslavia in the years before the civil war. [7] In addition, the IJ found there was **\*102**  no credible basis for Mudric's assertions that he feared persecution for his alleged moral opposition to the civil war and serving in the military. In support of this finding, the IJ cited Mudric's failure to seek an exemption from service based on his moral convictions, which was available when Mudric served in the military. He also noted Mudric's failure to provide any evidence that he had previously ever expressed any sentiments against the war or serving in the military.

The IJ concluded that Mudric's fear of returning to Serbia arose from his desertion from the army. In turn, the IJ found the weight of the evidence suggested Mudric had deserted the army not because he was morally opposed to war, but rather to avoid danger to his life. As support for this conclusion, the IJ pointed to the fact that Mudric had presented no evidence of any opposition to service in the military in the past or evidence that he expressed any substantial anti-war sentiments while in Serbia. Based on

these adverse credibility determinations, the IJ concluded that Mudric had failed to demonstrate that he faced a reasonable possibility of persecution on account of his race, religion, nationality, membership in a political group, or political opinion if he was returned to Serbia and thus denied his asylum request. [8]

It is clear the IJ's adverse credibility determinations in this case were not "arbitrary and conjectural in nature," *Dia, 353 F.3d at 250,* but supported by "specific and cogent reason[s]." *Gao, 299 F.3d at 275.* They were based not

on speculation, but on objective evidence in the record. Such findings are entitled to deference and as the IJ's decision in this case was supported by reasonable, substantial, and probative evidence on the record considered as a whole, we must uphold it.

For the foregoing reasons, the petition will be denied.

**All Citations**

469 F.3d 94

---

## Footnotes

*   The Honorable Monroe G. McKay, United States Circuit Judge for the Tenth Circuit, sitting by designation.

1   As a result of the Homeland Security Act of 2002, Pub.L. No. 107-296, 116 Stat. 2135 (2002), the Immigration and Naturalization Service has ceased to exist as an agency within the United States Department of Justice. Its enforcement functions now reside in the Bureau of Immigration and Customs Enforcement (BICE) within the Department of Homeland Security. *See also Vente v. Gonzales, 415 F.3d 296, 299 n. 1 (3d Cir.2005).*

2   On September 24, 1992, Mudric-Meolic filed a petition to remove conditions on her permanent residence. INS approved this application on May 9, 2000. At present, Mudric-Meolic is a naturalized U.S. citizen.

3   At the August 1997 hearing it was established that Mudric had entered without inspection and was therefore subject to deportation. Mudric then renewed his request for asylum. Because Mudric had not provided a full statement of his claim for asylum, the IJ rescheduled a hearing on that matter for February 1998.

4   It should be noted that in *Miranda,* one of the primary cases relied upon by Mudric in support of his equitable estoppel claim, the Court rejected a claim of affirmative misconduct involving the INS's "unreasonable delay" in processing a visa application. 459 U.S. 14, 103 S.Ct. 281.

5   As previously noted, *supra* Part I, Mudric filed a petition for review that was dismissed by this Court as untimely. The petition for review now before us is a converted and transferred habeas petition restating the same claims asserted in the time-barred petition for review. Bearing in mind the judicial review amendments of the REAL ID Act were enacted "to streamline what the Congress saw as uncertain and piecemeal review of orders of removal, divided between the district courts (habeas corpus) and the courts of appeals (petitions for review)," *Bonhometre, 414 F.3d at 446,* we look with disfavor on and do not condone what appears to be in this case an attempt to get more than "one bite at the apple." *Id.* Because of the finite number of cases transferred to us under the REAL ID Act, we do not consider whether this second Petition for Review is properly before us.

6   It would be peculiar and entirely inconsistent for us to conclude that *Sukwanputra* stands for the proposition that we lack jurisdiction to review the adverse credibility determinations in the instant case, as in *Sukwanputra* itself we proceeded to review adverse credibility determinations made by the IJ for substantial evidence. 434 F.3d at 636-37.

7   In reciting the evidence supporting the IJ's decision, we find this particular detail troublesome. As religious, as well as ethnic, hatred was at the center of the terrible civil conflict in the former Yugoslavia, the possibility of persecution based on an interfaith relationship before, during, and after the civil war should probably have

been explored more extensively by the IJ. Nevertheless, there is still enough support for the IJ's decision such that we could not reverse it under our limited standard of review.

8    Because Mudric failed to meet the eligibility requirements for asylum he could not meet the more stringent applicable standard for withholding of removal. *See Janusiak v. INS,* 947 F.2d 46, 47 (3d Cir.1991).

---

**End of Document**                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

131 S.Ct. 898
Supreme Court of the United States

N–A–M, petitioner,
v.
Eric H. HOLDER, Attorney General.

No. 10–5651.
|
Jan. 10, 2011.

**Synopsis**

Case below, 587 F.3d 1052.

**Opinion**

Petition for writ of certiorari to the United States Court of Appeals for the Tenth Circuit denied.

**All Citations**

562 U.S. 1141, 131 S.Ct. 898 (Mem), 178 L.Ed.2d 758, 79 USLW 3399

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

AR.05869

587 F.3d 1052
United States Court of Appeals,
Tenth Circuit.

N–A–M, Petitioner,

v.

Eric H. HOLDER, Jr. Attorney General
of the United States, Respondent,
United Nations High Commissioner for
Refugees; Deborah Anker; Guy S. Goodwin–
Gill; James C. Hathaway; Amici Curiae.

Nos. 07–9580, 08–9527.
|
Nov. 20, 2009.

**Synopsis**
**Background:** Alien, a native of El Salvador, petitioned for review of the decision of the Board of Immigration Appeals (BIA), 2007 WL 3114791, denying her petition for withholding of removal.

**Holdings:** The Court of Appeals held that:

[1] no separate danger-to-the-community assessment was required under statute, and

[2] BIA's reliance on statement in support of warrantless arrest in determining that alien had been convicted of a particularly serious crime did not violate her due process rights.

Affirmed.

Henry, Circuit Judge, filed a concurring opinion.

West Headnotes (5)

[1]    **Aliens, Immigration, and Citizenship** ⚖ Jurisdiction and venue

The Court of Appeals has jurisdiction to review constitutional challenges and questions of law raised in a petition for review from a Board of Immigration Appeals (BIA) decision. Immigration and Nationality Act, § 242(a)(2), 8 U.S.C.A. § 1252(a)(2).

4 Cases that cite this headnote

[2]    **Aliens, Immigration, and Citizenship** ⚖ Crimes and Related Grounds

No separate danger-to-the-community assessment was required under statute empowering Attorney General to deny withholding of removal to an alien upon a determination that the alien "having been convicted of a particularly serious crime is a danger to the community of the United States." Immigration and Nationality Act, § 241, 8 U.S.C.A. § 1231.

8 Cases that cite this headnote

[3]    **Aliens, Immigration, and Citizenship** ⚖ Administrative Review

**Aliens, Immigration, and Citizenship** ⚖ Admissibility

**Constitutional Law** ⚖ Asylum, refugees, and withholding of removal

Board of Immigration Appeals' (BIA) reliance on a "statement in support of warrantless arrest," which allegedly reflected hearsay allegations of sexual misconduct for which alien received no criminal sanction, in determining that alien had been convicted of a particularly serious crime, which precluded withholding of removal, did not violate alien's due process rights. U.S.C.A. Const.Amend. 5; 8 U.S.C.A. § 1231.

8 Cases that cite this headnote

[4]    **Constitutional Law** ⚖ Admission and exclusion; deportation

When facing removal, aliens are entitled only to procedural due process, which provides the opportunity to be heard at a meaningful time and in a meaningful manner. U.S.C.A. Const.Amend. 5.

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 646 of 1271

1 Cases that cite this headnote

**[5]    Aliens, Immigration, and Citizenship** 🔑 Admissibility

The test for admissibility of evidence in a deportation hearing is whether the evidence is probative and its use is fundamentally fair.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1053** Laura L. Lichter, Lichter & Associates, P.C., Denver, CO, for Plaintiff–Appellant.

Margaret J. Perry, Senior Litigation Counsel (Joanne E. Johnson, Attorney, with her on the brief), Office of Immigration Litigation Civil Division, United States Department of Justice, Washington DC, for Defendant–Respondent.

Steven H. Schulman and Vivek Arora, Akin Gump Strauss Hauer & Feld, Washington, **\*1054** DC, filed an Amicus Curiae brief for The United Nations High Commissioner for Refugees, in support of Petitioner.

Deborah Anker, Cambridge, Massachusetts, and Jeff Joseph, Joseph Law Firm, Denver, CO, filed an Amicus Curiae brief for Deborah Anker, Guy S. Goodwill, and James C. Hathaway, in support of Petitioner.

Before HENRY, Chief Judge, MURPHY and TYMKOVICH, Circuit Judges.

**Opinion**

PER CURIAM.

Petitioner N–A–M seeks review of a Board of Immigration Appeals' ("BIA") decision to remove her to her native El Salvador. [1] Although the Immigration Judge determined that N–A–M had a "viable persecution claim," I.J. Dec. at 8, the Immigration Judge denied, and the BIA affirmed, her petition for withholding of removal because she had been convicted of felony menacing—a "particularly serious crime," pursuant to the Refugee Act of 1980, Pub.L. 96–202, 94 Stat. 102, *see* 8 U.S.C. § 1231.

On appeal, N–A–M asserts three legal errors in the BIA's decision: First, she argues that felony menacing does not constitute a "particularly serious offense" as contemplated by § 1231; second, she asserts that the BIA applied the wrong legal framework in adjudicating her case; and third, she contends that she was denied due process of law. Finding no error of law, we affirm.

**BACKGROUND**

Appellant, N–A–M, is a thirty-eight year old preoperative transsexual (male–to–female) from El Salvador. In El Salvador, N–A–M was subjected to multiple instances of persecution due to her transgendered status, and fled to the United States in 2004, entering without inspection.

In June 2005, N–A–M was convicted of felony menacing, in violation of Colo.Rev.Stat. § 18–3–206(1)(a), (b) and reckless endangerment, in violation of Colo.Rev.Stat. § 18–3–208. Upon conviction, N–A–M was sentenced to four years deferred judgment and four years of probation.

In November 2006, N–A–M was served with a Notice to Appear before an immigration judge to show why she should not be removed from the United States. She filed an application for asylum pursuant to 8 U.S.C. § 1158, an application for withholding of removal, pursuant to 8 U.S.C. § 1231(b)(3), and an application for withholding of removal under the regulations implementing the Convention Against Torture, at 8 C.F.R § 1208.16(c), .18. Of these, only N–AM's withholding claim is before us.

Under 8 U.S.C. § 1231(b)(3)(A),

> the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.

However, § 1231(b)(3)(B)(ii) provides an exception to withholding of removal if:

(B) Exception.

Subparagraph (A) does not apply to an alien deportable under section **1055** 1227(a)(4)(D) of this title or if the Attorney General decides that—

....

(ii) the alien, having *been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States; ...*

....

For purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime. For purposes of clause (iv), an alien who is described in section § 1227(a)(4)(B) shall be considered to be an alien with respect to whom there are reasonable grounds for regarding as a danger to the security of the United States.

(emphasis added).

The Immigration Judge found that although N–A–M has suffered persecution as contemplated by § 1231(b)(3)(A), her conviction for felony menacing rendered her eligible for removal pursuant to § 1231(b)(3)(ii). The Immigration Judge stated that although N–A–M "has been persecuted in the past ... [She] has been convicted of a particularly serious crime and thereby constitutes a danger to the community.... And, therefore, even though the respondent has a viable persecution claim, [her] application is denied as a matter of law." I.J. Dec. at 7–8.

In April 2007, N–A–M appealed the Immigration Judge's decision to the BIA, contending that the Immigration Judge erred in his construction of § 1231, and violated her due process rights by considering evidence outside of the record of conviction. In a published decision, the Board affirmed

the decision of the Immigration Judge. *In re N–A–M,* 24 I. & N. Dec. 336 (BIA 2007). Turning first to N–A–M's particularly serious offense claim, the BIA concluded that "Congress did not intend to limit what offenses may be particularly serious crimes to those offenses classified as aggravated felonies." *Id.* at 341. As to N–A–M's danger to the community claim, the BIA observed that it "no longer engage[d] in a separate determination to address whether the alien is a danger to the community." *Id.* at 341. And finally, in addressing N–A–M's due process challenge, the BIA noted that it "may examine all reliable information and [is] not limited to reviewing the record of conviction and sentencing information." *Id.* at 343.

The Board denied N–A–M's petition for rehearing en banc on March 11, 2008. These petitions followed.

**DISCUSSION**

**[1]** Under 8 U.S.C. § 1252(a)(2), we have jurisdiction to review constitutional challenges and questions of law raised in a petition for review from a BIA decision. *Brue v. Gonzales,* 464 F.3d 1227, 1231 (10th Cir.2006) (citing 8 U.S.C. § 1252(a)(2)(D)). We review N–A–M's statutory challenge and her due process claim de novo. [2] *Id.* at 1232. Consistent **1056** with the rule in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the BIA is entitled to deference in interpreting ambiguous provisions of the INA under the specific facts of this case.

1. *Non-aggravated felonies may constitute "particularly serious" crimes for purposes of 8 U.S.C. § 1231.*

N–A–M challenges the BIA's statutory construction of what constitutes a "particularly serious crime" under § 1231. *See* Aplt's Br. at 43. She urges us to accept our sister circuit's limitation of "particularly serious" offenses to aggravated felonies. [3] *See, e.g., Alaka v. Atty. Gen'l of the U.S.,* 456 F.3d 88, 104 (3d Cir.2006) ("The plain language and structure (*i.e.,* context) of the statute indicate that an offense must be an aggravated felony to be sufficiently 'serious.' ") (emphasis in original). Because her conviction did not constitute an

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

aggravated felony, she argues, the BIA erred in classifying her felony menacing conviction as a "particularly serious" offense.

The BIA has developed administrative standards for determining what constitutes a particularly serious crime. *See* *Matter of Frentescu,* 18 I. & N. Dec. 244, 247 (BIA 1982) ("In judging the seriousness of a crime, we look to such factors as the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a danger to the community."). We agree that apart from the designation of certain aggravated felonies as "particularly serious" offenses, the statute contains no limiting language restricting the Attorney General's discretion to label other crimes as "particularly serious." And, "[t]he long history of case-by-case determination of 'particularly serious' crimes" counsels against N–A–M's attempt to craft a bright-line rule. *Delgado v. Holder,* 563 F.3d 863, 868 n. 7, 869 (9th Cir.2009) (noting that nothing in the statutory framework indicates an intent "to eliminate the Attorney General's pre-existing discretion to determine that, under the circumstances presented by an individual case, a crime was 'particularly serious' "). Furthermore, Congress's use of two different terms —"particularly serious" crime and "aggravated felony"— is additionally indicative of substantively distinct meanings. *See, e.g.,* *United States v. Villanueva–Sotelo,* 515 F.3d 1234, 1249 (D.C.Cir.2008). Given these somewhat open-ended definitions, the BIA or the Attorney General is authorized to develop a reasonable construction § 1231 to which we defer under *Chevron.*

**\*1057** 2. *Section 1231 does not require a separate "danger to the community" assessment.*

Section 1231(b)(3)(b)(ii) empowers the Attorney General to deny withholding to alien petitioners upon a determination that the petitioner "having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States." The BIA construes this provision as requiring *only* an inquiry into whether the alien has committed a particularly serious crime. "[O]nce an alien is found to have committed a particularly serious crime, we no longer engage in a separate determination to address whether an alien is a danger to the community." 24 I. & N. Dec.

at 342. N–A–M challenges the BIA's construction of § 1231, contending that the BIA's omission of an inquiry into whether the facts and circumstances of her felony menacing conviction warranted a finding that she is a danger to the community constitutes a misapplication of the legal standard articulated § 1231.

**[2]** Although N–A–M and the distinguished amici make strong arguments that the BIA is not accurately interpreting the statute and its treaty-based under-pinnings, we are constrained by our precedent to hold otherwise. In *Al–Salehi v. INS,* as conceded by Amicus Curiae United Nations High Commissioner for Refugees, we affirmed the BIA's interpretation of § 1231, holding that no separate danger-to-the-community assessment is required under the statute. 47 F.3d 390, 393 (10th Cir.1995) (citing *In re Carballe,* 19 I. & N. Dec. 357, 360 (1986) ("The phrase 'danger to the community' is an aid to defining a 'particularly serious crime,' not a mandate that administrative agencies or the courts determine whether the alien will become a recidivist.")). And, as the Second Circuit noted in *Ahmetovic v. INS,* this "interpretation conflating the two requirements has been accepted by every circuit that has considered the issue." 62 F.3d 48, 53 (2d Cir.1995) (collecting cases); *see* *Choeum v. INS,* 129 F.3d 29, 42–43 (1st Cir.1997) (deferring to the BIA's construction of § 1231); *Yousefi v. INS,* 260 F.3d 318, 327–28 (4th Cir.2001) (same); *Martins v. INS,* 972 F.2d 657, 661 (5th Cir.1992) (same); *Hamama v. INS,* 78 F.3d 233, 240 (6th Cir.1996) (same); *Garcia v. INS,* 7 F.3d 1320, 1323 (7th Cir.1993) (same). We abide by our rule in *Al–Salehi* and affirm the BIA's construction of § 1231 here; indeed, we remind amici that a panel of this court cannot overturn the decision of a previous panel absent a change in the law. *United States v. Edward J.,* 224 F.3d 1216, 1220 (10th Cir.2000).

3. *N–A–M suffered no denial of due process.*

**[3]** **[4]** Following our precedent that the BIA reasonably construed 8 U.S.C. § 1231, we turn to N–A–M's due process challenge. Under our cases, "when facing removal, aliens are entitled only to procedural due process, which provides the opportunity to be heard at a meaningful time and in a meaningful manner." *Schroeck v. Gonzales,* 429 F.3d

947, 952 (10th Cir.2005) (internal quotation marks omitted). N–A–M asserts that the BIA's reliance on a Statement in Support of Warrantless Arrest ("the Statement") in its "particularly serious crime" analysis violated her due process rights. Although the events articulated in the Statement did result in her felony menacing conviction, the document itself, she contends, reflects hearsay allegations of sexual misconduct for which she received no criminal sanction.

[5]  The evidentiary rules are not so strictly applied in immigration hearings. *See Bauge v. INS,* 7 F.3d 1540, 1543 (10th Cir.1993). The test for admissibility of evidence in a deportation hearing is whether **\*1058** the evidence is probative and its use is fundamentally fair. *Id.* Under our precedent dictating the evidentiary rules for immigration proceedings, we find no fundamental unfairness in the BIA's use of the Statement; N–A–M was free to contest the statement with her own evidence. Accordingly, we reject N–A–M's contention that the BIA's reliance on the statement denied her due process.

**CONCLUSION**

The BIA's reasonable construction of § 1231 is entitled to our deference, and N–A–M suffered no deprivation of her due process rights. Accordingly, we AFFIRM the decision of the BIA.

HENRY, Circuit Judge, concurring:

Although I concur in the outcome of this case, I write separately to address two issues. Turning first to N–A–M's claim that only aggravated felonies constitute "particularly serious crimes," although *Chevron* deference directs us to affirm the Bureau of Immigration Appeals' (BIA) rejection of this argument and this provision presents no *Chevron* exception, it is worth noting that our immigration statutory framework is notoriously complex and the meaning of the statutory language has been a moving target since its inception.

Second, I think that the gravamen of this case involves whether the Refugee Act's withholding of removal provision, 8 U.S.C. § 1231(b)(3)(b)(ii), which incorporates our obligations under the United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (July 28, 1951), requires an inquiry into *both* whether N–A–M has been

convicted of a "particularly serious" offense and constitutes a "danger to the community." *Stare decisis* binds us to the language of *Al–Salehi v. INS,* 47 F.3d 390, 393 (10th Cir.1995), which affirmed the BIA's determination that § 1231 does not require a separate inquiry into whether an alien constitutes a danger to the community.

I find, however, N–A–M and amici's arguments persuasive that the interpretation from *Al–Salehi* is at odds with the language of § 1231, with some basic principles of statutory construction, the purpose and intent behind the Refugee Act, and the international legal principles embodied in the Refugee Act. I urge the Attorney General and the Secretary of State to consider the arguments of amici here, the treaty underlying this provision, and the jurisprudence of fellow signatories to the underlying international commitments. Perhaps the BIA should consider reverting to its previous standards.

*I.  Section 1231's "particularly serious" offense inquiry is a moving target and fickle standard.*

In light of the absence of explanatory statutory language defining "particularly serious" for purposes of § 1231, we give the BIA's construction *Chevron* deference. *Brue v. Gonzales,* 464 F.3d 1227, 1234 (10th Cir.2006); *Mosquera–Perez v. INS,* 3 F.3d 553 (1st Cir.1993). I believe it is important to note, however, that several Congressional amendments, substantive administrative changes by the BIA, and a circuit split, subject the provision to different interpretations.

Originally, Congress enacted 8 U.S.C. § 1253(h), now § 1231, in response to our ratification of Protocol 33 to the United Nations' Refugee Convention. Under § 1253(h), withholding was denied to those aliens who "*having been convicted by a final judgment of a particularly serious crime, constitute[ ] a danger to the community of the United States* " (emphasis added). Under this amendment, the BIA determined on a case-by-case basis which crimes were particularly serious, applying **\*1059** the test articulated by the BIA in *Matter of Frentescu,* 18 I. & N. Dec. 244, 247 (BIA 1982) ("In judging the seriousness of a crime, we look to such factors as the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a danger to the community."). Subsequently the BIA identified

a class of crimes as inherently particularly serious, so as to eliminate the case-by-case determinations in those cases. *See, e.g.,* Matter of Garcia–Garrocho, 19 I. & N. Dec. 423, 425 (BIA 1986) ("We find that the applicant's conviction for burglary in the first degree is within the category of crimes that are per se 'particularly serious.' ").

The statutory provision barring "particularly serious" criminals from eligibility from withholding of removal has been subjected to three amendments. With the Immigration Act of 1990, Pub.L. No. 101–649, 104 Stat. 4978, Congress established a per se category of "particularly serious" criminals comprised of aliens convicted of aggravated felonies.

In 1996, with the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214, 1269 (1996), Congress, in order to comply with agreed to international obligations, relaxed its categorical bar on aggravated felons. Delgado v. Holder, 563 F.3d 863, 869 (9th Cir.2009). Congress amended § 1253(h) to permit the Attorney General to overcome the per se rule banning aggravated felons where "necessary to ensure compliance with the 1967 United Nations Protocol Relating to the Status of Refugees." *Id.* (citing the AEDPA, Pub.L. No. 104–132, 110 Stat. 1214, 1269).

Congress addressed this provision again in 1996 with the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Division C of Pub.L. No. 104–208, 110 Stat. 3009–546, 3009–602. The IIRIRA Amendments create the statute's current form and categorically apply a bar from withholding those aggravated felons sentenced to five years' or more imprisonment. *Id.*

Our resolution of the issue presented in this case turns on the meaning behind Congress's post–1990 statutory enactments. Congress's seeming relaxation of the categorical aggravated felony bar suggests an effort to avoid the inclusion of minor crimes in the class of per se "particularly serious" offenses. The extent of that relaxation, however, is subject to debate —or, at least, has been subject to debate both within the administrative agency, as discussed in Section II, and among the courts. *Compare* Ali v. Achim, 468 F.3d 462, 470 (7th Cir.2006) (noting that § 1231 "does not state a general rule that only aggravated felonies can be considered" particularly serious crimes) *with* Alaka v. Atty. Gen'l of the U.S., 456 F.3d 88, 105 (3d Cir.2006) ("We therefore conclude that an offense must be an aggravated felony in order to be classified as a 'particularly serious crime.' ").

The BIA has developed administrative standards for determining what constitutes a particularly serious crime. These standards, however, appear to be somewhat in flux. With *Frentescu* in 1982, the BIA articulated four factors relevant to the § 1231 (at that time, the § 1253(h)) inquiry. Specifically (and logically for that matter), the BIA noted that, "[i]n judging the seriousness of a crime, we look to such factors as [1] the nature of the conviction, [2] the circumstances and underlying facts of the conviction, [3] the type of sentence imposed, and, *most importantly,* [4] whether the type and circumstances of the crime indicate that the alien will be a **\*1060** danger to the community." 18 I. & N. Dec. at 247 (emphasis added).

But over time, however, the BIA retreated substantially from *Frentescu*'s danger-to-the-community prong. In the BIA's 1992 decision, *Matter of C–,* the BIA suggested that, except in the case of the aggravated felony, *Frentescu* remained the administrative standard in terms of defining "particularly serious" offenses. *See Matter of C-,* 20 I. & N. Dec. 529, 534 n. 3 (BIA 1992) ("There will of course continue to be situations requiring a determination whether a 'particularly serious crime' exists under *Frentescu;* such is the case, for example, where the crime does not technically qualify as an aggravated felony under the Act based on the conviction date."). Despite the clear presence of the phrase in the statute and the logical pronouncement in *Frentescu* that the phrase is the most important factor, the "danger to the community" prong is now absent from the BIA's reiteration of the relevant factors in this case. *See In re N–A–M,* 24 I. & N. Dec. 336, at 342 (BIA 2007) ("[W]e examine the nature of the conviction, the type of sentence imposed, and the circumstances and underlying facts of the conviction." (citing Matter of Q–T–M–T–, 21 I. & N. Dec. 639 (BIA 1996))). In fact, it appears that the BIA may now disregard *Frentescu* altogether. *Id.* ("On some occasions, we have focused exclusively on the elements of the offense, *i.e.,* the nature of the crime."); *but see* Brue, 464 F.3d at 1234 (affirming the BIA's use of the proper legal standard when it used only "two of the [four] *Frentescu* factors, including the most important one, danger to the community"). Indeed, in this case, the BIA expressed its conclusion that N–A–M satisfies

the "particularly serious" crime element on the basis of the elements of the offense alone. 24 I. & N. Dec. at 342–43 ("We find that the respondent's offense is a particularly serious crime based solely on its elements.").

Our precedent requires us to defer to the BIA's reasonable construction of § 1231, and we abide by it here. I note, however, that the BIA's continually competing and definitionally inconsistent constructions of § 1231 frustrate our function as a reviewing court and threaten the reasonableness of its interpretations.

## II. N–A–M and amici make persuasive arguments that Al–Salehi is contrary to 8 U.S.C. § 1231.

The Immigration Judge summarily stated that N–A–M constituted a danger to the community that statutorily barred the withholding of removal, a finding that may indeed be factually true as well as legally affirmable. The Immigration Judge, however, did not engage in an analysis as to whether N–A–M actually constituted a danger to the community either under *Frentescu* or any other model. Presumably, the absence of such an analysis is because, as the BIA has now construed § 1231, "this [inquiry] is subsumed within the determination that the crime is a particularly serious one." Aple's Br. at 30; *see In* *Matter of Carballe,* 19 I. & N. Dec. 357, 360 (1986) ("The phrase 'danger to the community' is an aid to defining a 'particularly serious crime....' ").

Although the circuit consensus, including that of our own, *see* *Al–Salehi v. INS,* 47 F.3d 390 (10th Cir.1995), is that *Chevron* calls for deference, the BIA's stance on the "danger to the community" element of § 1231 has been the concern of at least one other circuit. The Second Circuit, in interpreting the meaning of that statute, stated that they are "troubled by the BIA's failure to give separate consideration to whether [petitioner] is a 'danger to the community.' " *Ahmetovic v. I.N.S.,* 62 F.3d 48, 52 (2d Cir.1995).

**\*1061** Although our decision in *Al–Salehi* has been interpreted by other circuits to stand for the blanket proposition that satisfaction of the "particularly serious" offense element of § 1231 is sufficient to deny withholding, *see, e.g.,* *Ahmetovic,* 62 F.3d at 54; *Alaka,*

456 F.3d at 95, our *Al–Salehi* decision contains some important qualifying language. Specifically, we stated in *Al–Salehi* that the BIA's interpretation "in *this* proceeding" is entitled to deference, and "Petitioner, who concedes his prior conviction of an aggravated felony, is ... disqualified;" and "in light of th[e] uncertainty [about the meaning of the (Refugee) Convention], we conclude that the BIA's interpretation of [§ 1253(h)(2)] does not violate Article 33(2)." *See Al–Salehi,* 47 F.3d at 395, 396 (internal quotation marks omitted).

It is important that the facts in *Al–Salehi* were different: Mr. Al–Salehi was convicted of an aggravated felony. Further, both the Seventh Circuit's decision in *Garcia v. INS,* 7 F.3d 1320 (7th Cir.1993), upon which *Al–Salehi* relied, and *In* *Matter of Carballe,* 19 I. & N. Dec. 357, relied upon by the Seventh Circuit, involved aggravated felons. There is also a meritorious argument that our rule governing aggravated felons might not apply to non-aggravated felons, such as N–A–M, or might not apply with the same force. Indeed, another provision in the Immigration and Nationality Act ("INA") indicates that the two substantively distinct categories of offenses—aggravated felonies and non-aggravated felonies—receive disparate treatment under the INA. *See, e.g.,* *Chong v. Dist. Dir. INS,* 264 F.3d 378, 385 (3d Cir.2001) ("The INA bars aggravated felons from entering the United States for ten years." 8 U.S.C. § 1182(a)(9)(A)(ii). [However] a determination that the [ ] petitioner's conviction did not constitute an aggravated felony could allow the petitioner to reenter the United States.").

Furthermore, I see some unnerving textual impediments to the BIA's construction. Notably, a statute must be ambiguous or unclear before *Chevron* comes into play, *see* *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and the statutory language is arguably unambiguous. One of the most basic interpretive canons counsels that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant...." *Hibbs v. Winn,* 542 U.S. 88, 101, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004). To accept the BIA's recent contention that the "danger to the community" inquiry is subsumed within the "particularly serious" offense inquiry seems to run afoul of the clear language of the statute. The statute mentions both a "danger to the community" inquiry and a "particularly serious" offense inquiry; ignoring one of those inquiries does not give full effect to the meaning

to the statute. And, then to take it one step further and to contend that the "particularly serious" offense inquiry can be performed without reference to 🚩 *Frentescu*'s "danger to the community" element, as the BIA does, seems doubly problematic. *See* 🚩 *N–A–M,* 24 I. & N. Dec. at 342 ("On some occasions, we have focused exclusively on the elements of the offense, *i.e.,* the nature of the crime.").

For the reasons above, arguments made by the amicus, United Nations High Commissioner for Refugees (UNHCR) (to whom our Supreme Court has consistently turned for assistance in interpreting our obligations under the Refugee Convention), are noteworthy. *See, e.g.,* 🚩 *Negusie v. Holder,* 555 U.S. 511, 129 S.Ct. 1159, 1175, 173 L.Ed.2d 20 (2009) (citing Office of the United Nations High Commissioner for Refugees, Handbook on Procedures **\*1062** and Criteria for Determining Refugee Status ¶¶ 157, 162 (reedited Jan. 1992) in support of its analysis of the nonrefoulement (the mandatory withholding of deportation) principle); 🚩 *Sale v. Haitian Ctrs. Council,* 509 U.S. 155, 182, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993) (same); 🚩 *INS v. Cardoza–Fonseca,* 480 U.S. 421, 438–39, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) ("In interpreting the Protocol ... we are further guided by the analysis set forth in the Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status (Geneva, 1979).").

As UNHCR notes, our Refugee Act, which implements the Refugee Convention, and specifically, 🚩 § 1231, embodies a Congressional commitment to the international legal principle of *nonrefoulement,* as it appears in Refugee Convention Article 33. *See INS v. Stevic,* 467 U.S. 407, 421, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984) (discussing 8 U.S.C. § 1253(h), now codified at 8 U.S.C. § 1231(b)(3) (2006), and noting that the statutory provision regarding withholding of deportation, as amended, conformed to the language of Article 33); *see also Ins v. Cardoza–Fonseca,* 480 U.S. 421, 441 n. 25, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (stating that "[t]he 1980 Act made withholding of deportation under [INA] § 243(h) mandatory in order to comply with Article 33.1"). And a wealth of persuasive authority reveals that under both the Convention and the Refugee Act implementing the Convention, the "decisive factor is not the seriousness or categorization of the crime that the refugee has committed, but, rather, whether the refugee, in light of the crime and

conviction, poses a *future* danger to the community." UNCHR Am. Br. at 22 (listing several citations).

We can also benefit from reference to international law, as it reveals how other tribunals have interpreted the exact same text. Although citing foreign law is at times controversial, the broad consensus, even among opponents of its use in constitutional law cases, supports its use when determining how other signatories on a treaty interpret that treaty. As Justice Scalia wrote in dissent in 🚩 *Olympic Airways v. Husain*:

> [The] decision stands out for its failure to give any serious consideration to how the courts of our treaty partners have resolved the legal issues before us....
>
> The Court's new abstemiousness with regard to foreign fare is not without consequence: Within the past year, appellate courts in both England and Australia have rendered decisions squarely at odds with today's holding. Because the Court offers no convincing explanation why these cases should not be followed, I respectfully dissent.

🚩 540 U.S. 644, 658, 124 S.Ct. 1221, 157 L.Ed.2d 1146 (2004) (Scalia, J., dissenting); *see* 🚩 *Air France v. Saks,* 470 U.S. 392, 404, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985) ("[W]e 'find the opinions of our sister signatories to be entitled to considerable weight.' " (quoting 🚩 *Benjamins v. British European Airways,* 572 F.2d 913, 919 (2d Cir.1978))).

As pointed out by the Amicus brief from legal scholars, Deborah Anker, Guy S. Goodwin–Gill, and James Hathaway, the interpretation of the international convention by courts in Canada and the United Kingdom differs from our analysis. In interpreting the underlying international convention, the Supreme Court of Canada noted that a government must "make the added determination that the person poses a danger to the safety of the public or to the security of the country ... to justify refoulment." *Pushpanathan v. Minister of Citizenship & Immigration,* [1998] 1 S.C.R. 982, ¶ 12. Similarly, the United **\*1063** Kingdom considers whether an alien is "convicted of a particularly serious crime and is a danger to the community." *Immigration and Nationality Appeals Directorate, Changes to Refugee Leave and Humanitarian Protection* (2005) (quoted in *R v. Sec'y of State for Home Dep't,* [2006] EWHC 3513 (Eng.Q.B.2006)). That other countries—especially, perhaps, these—have interpreted the treaty to have a different meaning from the BIA, calls into

question the interpretation made by the BIA and reveals the need for clarification on the correct meaning.

In conclusion, although the meaning of § 1231's "particularly serious" offense provision is not crystal clear, the BIA's construction of the provision to include non-aggravated felonies is reasonable. Furthermore, in light of our decision in *Al–Salehi,* 47 F.3d at 390, we must affirm the BIA's exclusion of a "danger to the community" assessment

from § 1231. Nevertheless, N–A–M and amici raise noteworthy arguments that merit the separate discussion of this concurrence and hopefully will draw further scrutiny to this matter.

**All Citations**

587 F.3d 1052

## Footnotes

1    N–A–M is a preoperative transgender person and wishes to be addressed as a female. *In re N–A–M,* 24 I & N Dec. 336 (BIA 2007). The Immigration Judge refers to N–A–M as a female, stating that N–A–M "testified that she came from a family of four boys and three girls and at the age of 11 she discovered that she had what we might call a discrepancy in her gender." I.J. Dec. at 2–3. Accordingly, this court refers to N–A–M as a female.

2    Although Respondents do not argue that we are without jurisdiction to examine the "particularly serious" crime challenge, to the extent that there is any dispute, we refer to our decision in *Brue,* which observed that "[w]hile we cannot reweigh evidence to determine if the crime was indeed particularly serious, we can determine [under 8 U.S.C. § 1252(a)(2)] whether the BIA applied the correct legal standard in making its determination.... We review [these] issues raised in the petition de novo." 464 F.3d at 1232 (internal quotation marks omitted).

3    Section 101(a)(43) of the INA defines "aggravated felony" to include, *inter alia,* "a crime of violence (as defined in section 16 of title 18, but not including a purely political offense) for which the term of imprisonment [is] at least one year." 8 U.S.C. § 1101(a)(43)(F) (footnote omitted). In the record before the BIA, N–A–M's felony menacing conviction did not qualify as an "aggravated felony." The parties have informed the court that N–A–M has been resentenced twice since the conviction. First, N–A–M was re-sentenced to a term of one year, with 365 days credit for time served. Then, N–A–M was resentenced again to a term of 364 days. This factual addition might alter the "particularly serious crime" analysis. We, however, are statutorily precluded from consideration of this development under 8 U.S.C. § 1252(b)(4)(A) ("[T]he court of appeals shall decide the petition only on the administrative record on which the order of removal is based."). We posit that even if we were to take the resentencing into account, we would reach the same conclusion.

---

**End of Document**                                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Legal Assistance for Vietnamese Asylum Seekers v. Department of State, Bureau of Consular Affairs, D.C.Cir., February 3, 1995

617 F.2d 745

United States Court of Appeals,
District of Columbia Circuit.

Gholamreza NARENJI, Behzad
Vahedi, Cyrus Vahidnia

v.

Benjamin CIVILETTI, Attorney
General, et al., Appellants.

CONFEDERATION OF IRANIAN STUDENTS

v.

Benjamin R. CIVILETTI, Appellant.

Nos. 79-2460, 79-2461.
|
Argued Dec. 20, 1979.
|
Decided Dec. 27, 1979.
|
As Amended Jan. 2, 1980.
|
Rehearing En Banc Denied Jan. 31, 1980.

**Synopsis**

The United States District Court for the District of Columbia, 481 F.Supp. 1132, declared unconstitutional a regulation which required all immigrant alien postsecondary school students who are natives or citizens of Iran to provide information as to residence and maintenance of nonimmigrant status, and appeal was taken. The Court of Appeals, Robb, Circuit Judge, held that: (1) regulation, which provides that failure to comply with reporting requirement will subject nonimmigrant to deportation proceedings, was within authority delegated by Congress to the Attorney General under the Immigration and Nationality Act; (2) distinctions on basis of nationality may be drawn in the immigration field by Congress or the executive and, so long as such distinctions are not wholly irrational, they must be sustained; and (3) since regulation had rational purpose, regulation did not violate Iranian students' right to equal protection.

Reversed with directions.

MacKinnon, Circuit Judge, filed a concurring opinion, and also filed an opinion setting forth his reasons for voting against rehearing.

Wright, Chief Judge, Robinson, Wald and Mikva, Circuit Judges, filed a joint statement in support of rehearing en banc.

West Headnotes (5)

**[1]    Aliens, Immigration, and Citizenship** ⚷ Validity

Regulation, which required all nonimmigrant alien postsecondary school students who are natives or citizens of Iran to report and provide information as to residence or maintenance of nonimmigrant status, was within authority delegated by Congress to the Attorney General under the Immigration and Nationality Act. Immigration and Nationality Act, §§ 103(a), 214(a), 241(a)(9), 8 U.S.C.A. §§ 1103(a), 1184(a), 1251(a)(9).

**[2]    Aliens, Immigration, and Citizenship** ⚷ Powers and duties

The Immigration and Nationality Act need not specifically authorize each and every action taken by the Attorney General, so long as his action is reasonably related to the duties imposed upon him by the Act. Immigration and Nationality Act, § 103(a), 8 U.S.C.A. § 1103(a).

3 Cases that cite this headnote

**[3]    Aliens, Immigration, and Citizenship** ⚷ Validity

Promulgation of regulation, which required all nonimmigrant alien postsecondary school students who are natives or citizens of Iran to report and provide information as to residence and maintenance of nonimmigrant status, and which provided that failure to comply with reporting requirement would subject nonimmigrant to deportation proceedings, was

directly and reasonably related to the Attorney General's duties and authority under the Immigration and Nationality Act. Immigration and Nationality Act, §§ 103(a), 214(a), 241(a)(9), 8 U.S.C.A. §§ 1103(a), 1184(a), 1251(a)(9).

8 Cases that cite this headnote

[4]    **Constitutional Law** — Country or place of origin

**Constitutional Law** — Status, rights, and disabilities in general

Distinctions on basis of nationality may be drawn in the immigration field by Congress or the executive and, so long as such distinctions are not wholly irrational, they must be sustained as against due process and equal protection challenges. U.S.C.A.Const. Amends. 5, 14.

14 Cases that cite this headnote

[5]    **Aliens, Immigration, and Citizenship** — Validity

**Constitutional Law** — Country or place of origin

Regulation, which required all nonimmigrant alien postsecondary school students who are natives or citizens of Iran to report and provide information as to residence and maintenance of nonimmigrant status, and which provided that failure to comply with reporting requirement would subject nonimmigrant to deportation proceedings, was supported by rational basis inasmuch as controversy involving Iranian students in the United States lay in field of country's foreign affairs and implicated matters over which the president has direct constitutional authority, and thus regulation did not violate Iranian students' right to equal protection. U.S.C.A.Const. Amend. 5.

25 Cases that cite this headnote

**\*746   \*\*164**  Appeal from the United States District Court for the District of Columbia (D.C. Civil Nos. 79-3189 & 79-3210).

**Attorneys and Law Firms**

Robert E. Kopp, Atty., Dept. of Justice, Washington, D. C., with whom Carl S. Rauh, [\*] U. S. Atty., Ronald R. Glancz, Anthony J. Steinmeyer, Michael Jay Singer, Elizabeth Gere Whitaker, Brook Hedge, John F. Cordes, Attys., Dept. of Justice, Washington, D. C., were on the brief, for appellants.

Eric M. Lieberman, New York City, with whom Alan Dranitzke, Washington, D. C., was on the brief, for appellees, Narenji et al.

Charles Gordon, Washington, D. C., for appellee, Confederation of Iranian Students.

Dale F. Swartz, Washington, D. C., was on the brief for amicus curiae, Lawyers Committee for International Human Rights, urging affirmance.

Jordan J. Paust, Houston, Tex., was on the brief for amicus curiae, Human Rights Advocates (U.S.A.), urging affirmance.

Before TAMM, MacKINNON and ROBB, Circuit Judges. Opinion for the Court filed by Circuit Judge ROBB.

Concurring opinion filed by Circuit Judge MacKINNON.

ROBB, Circuit Judge:

This is an appeal from a judgment of the District Court declaring unconstitutional a regulation promulgated by the Attorney General at the direction of the President. In the circumstances of this case the court has concluded that the challenged regulation, 8 C.F.R. s 214.5, issued November 13, 1979, must be sustained.

Regulation 214.5 requires all nonimmigrant alien post-secondary school students who are natives or citizens of Iran to report to a local INS office or campus representative to "provide information as to residence and maintenance of nonimmigrant status." At the time of reporting each student must present his passport and evidence of his school enrollment, of payment of fees, of the number of course hours in which he is enrolled, of his good standing, and his current address in the United States. The **\*747   \*\*165** regulation provides that failure to comply with the reporting

requirement will be considered a violation of the conditions of the nonimmigrant's stay in the United States and will subject him to deportation proceedings under section 241(a)(9) of the Act.

[1]　The regulation is within the authority delegated by Congress to the Attorney General under the Immigration and Nationality Act. That statute charges the Attorney General with "the administration and enforcement" of the Act, 8 U.S.C. s 1103(a), and directs him to "establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority under the provisions of" the Act. Id. He is directed to prescribe by regulation the time for which any nonimmigrant alien is admitted to the United States, and the conditions of such an admission. 8 U.S.C. s 1184(a). Finally, the Act authorizes the Attorney General to order the deportation of any nonimmigrant alien who fails to maintain his nonimmigrant status or to comply with the conditions of such status. 8 U.S.C. s 1251(a)(9). These statutory provisions plainly encompass authority to promulgate regulation 214.5.

[2]　[3]　Recognizing the broad authority conferred upon the Attorney General by the Immigration and Nationality Act the District Court nevertheless thought that the Act does not empower him to draw distinctions among nonimmigrant alien students on the basis of nationality. We do not accept this conclusion. The statute need not specifically authorize each and every action taken by the Attorney General, so long as his action is reasonably related to the duties imposed upon him. See Ahmed v. United States, 480 F.2d 531 (2d Cir. 1973); Pilapil v. INS, 424 F.2d 6, 11 (10th Cir.), cert. denied, 400 U.S. 908, 91 S.Ct. 752, 27 L.Ed.2d 147 (1970); Unification Church v. Attorney General, 189 U.S.App.D.C. 92, 99-100, 581 F.2d 870, 877-78, cert. denied, 439 U.S. 828, 99 S.Ct. 102, 58 L.Ed.2d 122 (1978); Mak v. INS, 435 F.2d 728, 730 (2d Cir. 1970). Furthermore, we note that the Act, 8 U.S.C. s 1303(a), does specifically authorize the Attorney General "to prescribe special regulations and forms for the registration and fingerprinting of . . . (5) aliens of any other class not lawfully admitted to the United States for permanent residence." Finally, failure to maintain nonimmigrant status or to comply with the conditions of such status is specified as a ground for deportation. 8 U.S.C. s 1251(a)(9). We conclude that promulgation of regulation 214.5 is directly and reasonably related to the Attorney General's duties and authority under the Act.

[4]　The District Court concluded that even if authorized by statute regulation 214.5 is unconstitutional because it violates the Iranian students' right to equal protection of the laws. The court found no basis for the "discriminatory classification" of the students established by the regulation. Here again we must differ. Distinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive. See Saxbe v. Bustos, 419 U.S. 65, 95 S.Ct. 272, 42 L.Ed.2d 231 (1974); Mathews v. Diaz, 426 U.S. 67, 81-82, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1970); Fiallo v. Bell, 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977); L. Henkin, Foreign Affairs and the Constitution, 258 (1972); Maltz, Alienage Classifications, 31 Okla.L.Rev. 671, 684-91 (1978). So long as such distinctions are not wholly irrational they must be sustained.

[5]　By way of an affidavit from the Attorney General we are informed that his regulation was issued "as an element of the language of diplomacy by which international courtesies are granted or withdrawn in response to actions by foreign countries. The action implemented by these regulations is therefore a fundamental element of the President's efforts to resolve the Iranian crisis and to maintain the safety of the American hostages in Tehran." The Attorney General refers of course to the lawless seizure of the United States Embassy in Tehran and the imprisonment of the embassy personnel as hostages. Those actions denied to our embassy and citizens the protection to which they are entitled under the *748 **166 Amity Treaty in force between the United States and Iran (284 United Nations Treaty Series 93), and under international law. The lawlessness of this conduct of the Iranian government was recognized by the decision of the World Court on December 15, 1979. United States v. Iran, General List No. 64 (Int'l Ct. Justice, Dec. 15, 1979). Thus the present controversy involving Iranian students in the United States lies in the field of our country's foreign affairs and implicates matters over which the President has direct constitutional authority. Mathews v. Diaz, supra.

The District Court perceived no "overriding national interest" justifying the Attorney General's regulation: it found that "although defendants' regulation is an understandable effort designed to somehow reply to the Iranian attack upon this nation's sovereignty and the seizure of its citizens, it is one that does not support a legitimate national interest". In this we think the District Court erred.

AR.05881

As we have said, classifications among aliens based upon nationality are consistent with due process and equal protection if supported by a rational basis. Mathews v. Diaz, supra ; Fiallo v. Bell, supra. The Attorney General's regulation 214.5 meets that test; it has a rational basis. To reach a contrary conclusion the District Court undertook to evaluate the policy reasons upon which the regulation is based. In doing this the court went beyond an acceptable judicial role. Certainly in a case such as the one presented here it is not the business of courts to pass judgment on the decisions of the President in the field of foreign policy. Judges are not expert in that field and they lack the information necessary for the formation of an opinion. The President on the other hand has the opportunity of knowing the conditions which prevail in foreign countries, he has his confidential sources of information and his agents in the form of diplomatic, consular and other officials. United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 320, 57 S.Ct. 216, 81 L.Ed. 255 (1936).

As the Supreme Court said in Mathews v. Diaz, supra, 426 U.S. at 81, 82, 96 S.Ct. at 1892:

> For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government. Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary. This very case illustrates the need for flexibility in policy choices rather than the rigidity often characteristic of constitutional adjudication. . . . Any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution. The reasons that preclude judicial review

of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization. (Footnotes omitted)

And in Harisiades v. Shaughnessy, 342 U.S. 580, 588-89, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952), Mr. Justice Jackson wrote for the Court:

> It is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference. (Footnote omitted)

This court is not in a position to say what effect the required reporting by several thousand Iranian students, who may be in this country illegally, will have on the attitude and conduct of the Iranian government. That is a judgment to be made by the President and it is not for us to overrule him, in the absence of acts that are clearly in excess of his authority.

*749  **167  In view of the foregoing the judgment of the District Court is reversed with directions to dismiss the complaints and enter judgment for the defendants.

So ordered.

MacKINNON, Circuit Judge (concurring):
I concur completely in the court's opinion but write separately to add additional support for its ruling.

First, to indicate that this is not an isolated act of diplomacy in the international crisis that faces the United States I would stress that the record also reflects that, as part of the same diplomatic effort, the President by order prohibited "crude oil produced in Iran (from entering) the . . . United

States" (Defendant's Ex. 3) and blocked all property and interests of the Government of Iran subject to United States jurisdiction (Defendant's Ex. 4). I also take judicial notice of the reports that substantial forces of the United States Navy have been moved to the Indian Ocean and the President has ordered the Iranian Embassy and consulate to return approximately 85% of its diplomatic staff to Iran.

It is also significant that Regulation 214.5 seeks "to identify Iranian students in the United States who are not maintaining status and to take immediate steps to commence deportation proceedings against such persons" (44 F.Reg. 65727) "in accordance with constitutional due process requirements." (Defendant's Ex. 3).

The disparity in treatment afforded the appellee nonimmigrant alien students who are in violation of our immigration laws is based upon the fact that the Government of their home country has committed, and is committing, a number of violent lawless acts against the United States and its citizens. That unlawful conduct against the United States places appellees, and others similarly situated who owe their allegiance to that country, in a different class for immigration purposes from the nonimmigrants of any other country. Therefore, since their government has made appellees part of a distinctly separate class, the United States under our Constitution may treat them differently because of the reasons that separate them from other aliens in the United States. The different treatment they may receive under subject regulation is directly related to the reasons for their different classification.

The status of Iranian aliens cannot be disassociated from their connection with their mother country since the alien "leaves outstanding a foreign call on his loyalties which international law not only permits our Government to recognize but commands it to respect." Harisiades v. Shaughnessy, 342 U.S. 580, 585-586, 72 S.Ct. 512, 517, 96 L.Ed. 586 (1951). The connection with the home country also means that the power of the United States Government to terminate the alien's stay is a necessary corollary to that observation:

> Under our law, the alien in several respects stands on an equal footing with citizens, but in others has never been conceded legal parity with the citizen. Most importantly, to protract this ambiguous status within the country is not his right but is a matter of permission and tolerance. The Government's power to terminate its hospitality has been

asserted and sustained by this Court since the question first arose.

War, of course, is the most usual occasion for extensive resort to the power. Though the resident alien may be personally loyal to the United States, if his nation becomes our enemy his allegiance prevails over his personal preference and makes him also our enemy, liable to expulsion or internment, and his property becomes subject to seizure and perhaps confiscation. But it does not require war to bring the power of deportation into existence or to authorize its exercise. Congressional apprehension of foreign or internal dangers short of war may lead to its use. So long as the alien elects to continue the ambiguity of his allegiance his domicile here is held by a precarious tenure.

That aliens remain vulnerable to expulsion after long residence is a practice that **750 **168 bristles with severities. But it is a weapon of defense and reprisal confirmed by international law as a power inherent in every sovereign state. Such is the traditional power of the Nation over the alien and we leave the law on the subject as we find it.

342 U.S. at 586-88, 72 S.Ct. at 517-518. (Footnotes omitted)

It is thus my conclusion that the actions of the President and the Attorney General here questioned do "bear (a) reasonable relation to protection of the legitimate interests of the United States," Harisiades v. Shaughnessy, 342 U.S. 580, 584, 72 S.Ct. 512, 516, 96 L.Ed. 586 (1951) and conform to due process requirements. Id. 588-591, 72 S.Ct. 512.

## Opinion
On Suggestions for Rehearing En Banc (D.C.Civil Nos. 79-3189 & 79-3210).

Opinion filed by Circuit Judge MacKINNON setting forth his reasons for voting against rehearing.

Joint statement of Chief Judge J. SKELLY WRIGHT and of Circuit Judges SPOTTSWOOD W. ROBINSON, III, WALD and MIKVA setting forth their reasons for voting to rehear these cases en banc.

Before WRIGHT, Chief Judge, and McGOWAN, TAMM, ROBINSON, MacKINNON, ROBB, WILKEY, WALD, and MIKVA, Circuit Judges.


ORDER

PER CURIAM.

The suggestions for rehearing en banc filed by appellees (Narenji, et al., and Confederation of Iranian Students) and the brief in support thereof filed by amicus curiae (Assoc. of Arab American University Graduates) having been transmitted to the full Court and a majority of judges not having voted in favor thereof, it is

ORDERED, by the Court, en banc, that appellees' aforesaid suggestions for rehearing en banc are denied.


MacKINNON, Circuit Judge:
The following individual opinion responds to the petition for rehearing and the amicus brief.

The principal point raised by Appellees' petition for rehearing en banc points out that the court's opinion does not discuss the Supreme Court's decision in 🔖 Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) which Appellees' assert is the "leading case" on the issues here involved. In claimed reliance thereon Petitioners contend that the "statute vests no greater discretionary authority in the Attorney General" than the passport statute which was involved in Kent. That argument involves such a gross distortion of the facts and the holding in both Kent and this case, that it should be answered.

Kent arose under the passport statute and involved American citizens who were not in violation of the laws of this country but who were denied passports because they refused to sign non-communist affidavits. Whereas this case primarily involves non-immigrant aliens who are in violation of our immigration laws. [1] To say that the Constitution and Immigration Laws vest the President and the Attorney General with no greater rights over illegal aliens than they do over law abiding citizens of the United States is a contention that answers itself. The court's opinion did not discuss Kent because Kent on its facts was substantially distinguishable from the facts of this case.

In this country we have given aliens very substantial rights, and the courts have been zealous in protecting those rights, 🔖 Hampton v. Mow Sun Wong, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976), but we have never held that aliens who are in this nation in violation of our laws have all the rights of law abiding citizens of the United States. The difference in the legal status of the individual involved in Kent and Narenji with respect to their citizenship and compliance with United States laws, thus places **\*751  \*\*169** them in different classes and supports a difference in treatment. This difference in status and the effect of that difference on one's rights under the Immigration Laws was pointed to directly by Justice Douglas, in Kent, supra, when he remarked:

> "We must remember that we are dealing here with citizens who have neither been accused of crimes nor found guilty. 🔖 (357 U.S. at 129, 78 S.Ct. at 1119-1120) . . . The grounds for refusal asserted here do not relate to citizenship or allegiance on the one hand or to criminal or unlawful conduct on the other. 🔖 (357 U.S. at 128, 78 S.Ct. at 1119) . . . If we were dealing with political questions entrusted to the Chief Executive by the Constitution we would have a different case.

🔖 357 U.S. at 130, 78 S.Ct. at 1120 (Emphasis added). The sentence in italics foreshadowed the President's exercise of his power in foreign affairs in the instant crisis.

Moreover, Congress by statute clearly authorized the Attorney General to prescribe regulations with respect to "nonimmigrants," such as Appellees, who do not properly maintain their status and are required to depart the United States. Congress in 🔖 8 U.S.C. s 1184(a) has provided that:

> "admission of . . . nonimmigrant (aliens) shall be for such time and under such conditions as the Attorney General may by regulations prescribe, including . . . such conditions as the

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 660 of 1271

Attorney General shall prescribe, to insure that at the expiration of such time, or upon failure to maintain the status under which he was admitted, or to maintain any status subsequently acquired under Section 248, such alien will depart from the United States."

8 U.S.C. s 1184(a) (Emphasis added). The regulation here in question is so clearly authorized by this statute, and the other statutes referred to in the majority opinion, that petitioners do not present any substantial question by its argument in this case.

Petitioners real objection is to the manner in which the Attorney General through the Regulation has chosen to determine whether those in petitioners' class have maintained their status. The Regulation requires petitioners and others similarly situated to report and only those in violation of law are subject to being sent home. There is nothing novel or illegal about requiring aliens to report. That is the usual requirement which is applied to aliens of all classes. 8 U.S.C. s 1305. The major difference here is one in slightly accelerated timing which is necessitated by the urgency of the present emergency involving Iran. Such regulation is well within the prosecutorial discretion vested in the Attorney General under his duty to enforce the Immigration Laws. Those statutes charge, "The Attorney General shall be charged with the administration and enforcement of this (Immigration and Nationality) Act . . . He shall establish such regulations ; prescribe such . . . reports ; . . . and perform such other acts as he deems necessary for carrying out his authority under the provisions of this Act." 8 U.S.C. s 1103(a). (Emphasis added)

Additional authority, previously referred to, for the Regulation promulgated by the Attorney General stems from 8 U.S.C. s 1303 which provides:

"(a) . . . the Attorney General is authorized to prescribe special regulations and forms for the registration and fingerprinting of . . . (5) aliens of any . . . class not lawfully admitted to the United States for permanent residence." (Emphasis added).

Petitioners here are not admitted for permanent residence and have definitely been made a special "class" separate from non-immigrants of other nations by virtue of the violent and lawless acts which their Government has allowed to be committed against the United States and its envoys duly accredited to Iran. These facts clearly bring the Attorney General's Regulation within the statutory power vested in him by the statutes cited above.

Petitioners also assert that the court's opinion "nowhere indicates how the national identity of non-immigrant students is 'reasonably related' to the obligation of the Attorney General to assure that non-immigrant students are maintaining the lawfulness **170 *752 of their status in the United States and will depart this country when required. (Page 748). This statement, which professes to state the issue here, chooses to ignore the principal fact in the problem, i. e., that the Regulation is confined to Iranian students whose government in violation of all international law, 1 Oppenheim, International Law, s 386, p. 789, has violently infringed in Iran upon the inviolability of over 50 of our diplomatic envoys in that country by countenancing their arrest by so-called "students" and imprisonment as hostages to demands that are beyond the constitutional power of this nation to fulfill. If under such strained circumstances between Iran and the United States, the reasonable relationship of the regulation to the departure of illegal non-immigrant aliens who owe their allegiance to Iran, and to the determination of the location of other non-immigrant Iranian nationals, is not self evident, petitioners are being opaque. The international crisis and confrontation in Iran is of such severity that those who are illegally in this country create a clear and present danger because of their allegiance and illegal status. Under the circumstances it is reasonable even as to those aliens who are legally here but profess their allegiance to Iran, that they should be located in case the international crisis worsens, so that the Government may immediately take proper security measures to protect against the dangers which all aliens of such a foreign nation potentially create under such circumstances.

Petitioners also contend that the Regulation amounts to a "discriminatory classification" of those in their class. The basis for the separate classification and its reasonableness is set forth in the concurring opinion and petitioners have not even attempted to attack or answer that explanation. To repeat, the classification of non-immigrants from Iran, and particularly those who are here illegally, is valid and reasonable because they owe allegiance to Iran and Iran at the present time is the only nation that has with force and violence transgressed upon American property and imprisoned our diplomatic envoys as hostages in violation of our treaty and

199 U.S.App.D.C. 163

international law. I will not further point out the status of such acts under international law except to state that they justify more extreme action than is called for by the Regulation.

Petitioners argue, in effect, that non-immigrant Iranians must be treated the same as all other non-immigrants in the United States. The argument is absurd. In view of the acts of the Iranian Government against the United States and our accredited diplomats, non-immigrant Iranians in the United States at this time, and particularly those who are here illegally, are no more entitled to be treated the same as other non-immigrants than non-immigrants of any other nation would be entitled after their country has committed hostile acts against the United States.

It should also be recognized that prior to the issuance of the Regulation in question the President by Executive Order 12170 of November 14, 1979 did "declare a national emergency to deal with . . . the situation in Iran (which) constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States." Authority: International Emergency Economics Powers Act, 50 U.S.C.A. Sec. 1701 et seq., the National Emergencies Act, 50 U.S.C. Sec. 1601 et seq., and 3 U.S.C. Sec. 301. 44 Fed.Reg. No. 222 Thursday, November 15, 1979. (Deft's. Ex. 4). (Emphasis added)

The argument is advanced that the Regulation deals improperly with Iranian students. The sympathy implicit in that characterization is misplaced. Those who are primarily affected and might be subject to deportation (unless they asked for asylum, delay for valid reasons, or raised compassionate considerations) would be sent home precisely because they are not students. As with the so-called students in Iran, that are blamed for all the mob action that the Government of Iran does not oppose, these students appear to be of the non-studying kind. How they continue to be students eludes me. A student by definition is one who is enrolled and attends educational classes. Those who are the object of this regulation, were admitted for that purpose, but they have not maintained their status as students. Hence, having ceased to be **\*753  \*\*171** valid students, if they ever acquired that status, the basis upon which they were allowed to enter this country has ceased to exist and they are required to return home. This is not punishment, but merely carrying out the understanding to which they agreed when they were allowed to enter the United States. If the illegal Iranian non-immigrants who are the principal focus of this Regulation are

still referred to as students, even though they do not attend classes, then the term student is being misused.[2]

In closing I wish to state that because of the authorities I have set forth previously, I disagree with the dissent which suggests that the President's action should be subjected to further "close scrutiny". In the circumstances this is tantamount to seriously questioning the President's action. It should be pointed out, however, that the question has already received full consideration and more than sufficient time has passed to give the questions full consideration. It is also incorrect to say "that the President has taken this action without express authorization from Congress." (Dissent, n. 4). In the situation with which we are here dealing, the President's power is at its zenith right up to the brink of war and he does act pursuant to the "express authorization" of Congress. The relevant statute provides that whenever "any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government . . . if (their) release is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release . . .". This expressly covers the holding of United States citizens as hostages.

The foregoing Presidential authority has been in existence since the Act of July 27, 1868, R.S. 2001, 15 Stat. 224 which presently appears as Title 22, U.S.C. s 1732. In its entirety it provides:

> Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of American citizenship, the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release; and all the facts and

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

AR.05886

proceedings relative thereto shall as soon as practicable be communicated by the President to Congress.

This direction to the President by Congress is unequivocal. It completely supports every act and order that he has taken to free the United States hostages. No further scrutiny of his acts is required or necessary.

I therefore vote to deny rehearing.

Joint statement of Chief Judge J. SKELLY WRIGHT and of Circuit Judges SPOTTSWOOD W. ROBINSON, III, WALD and MIKVA setting forth their reasons for voting to rehear these cases en banc.

Under challenge in these cases is an executive decision to enforce an immigration **754** **172** statute selectively against a group of aliens because of the conduct of their parent country, thus affecting them solely on the basis of their nationality. [1] Such selective law enforcement poses a novel and serious question implicating an equal protection component of Fifth Amendment due process. [2] Because we believe the question is of exceptional importance, [3] we have voted in favor of en banc reconsideration.

There can be no doubt but that Congress has broad authority, [4] which it may vest in the Executive, to limit immigration on a variety of bases, including nationality. [5] But once an alien has taken up residence in the United States, even temporarily, he or she derives substantial protection from the Constitution and laws of this land. [6] It may be that the President, in these troubled days, has the power to decide that our deep aversion to selective law enforcement against a group solely on the basis of their country of origin must give way to some other imperative. [7] The Supreme Court has **755** **173** certainly suggested that Congress has that power. [8] Nevertheless, the question requires close scrutiny, and our answer must reflect careful consideration of "fine, and often difficult, questions of values." [9]

We presently have no settled opinion on the propriety of the action attacked here. These cases do, however, raise a grave constitutional issue. When the rule of law is being compromised by expediency in many places in the world, it is crucial for our courts to make certain that the United States does not retaliate in kind. We think rehearing by the full court is appropriate and necessary.

**All Citations**

617 F.2d 745, 199 U.S.App.D.C. 163

## Footnotes

*     Carl S. Rauh was United States Attorney at the time briefs were filed.

1     To the extent that aliens covered by the Regulations are in compliance with our laws the regulation only has a minimal effect upon them and they are not subject to deportation.

2     In reply to the amicus brief it should merely be added that it places too much reliance on dissenting opinions. It also incorrectly assumes that non-immigrant aliens who are illegally in the country have some right to remain here without being subject to due process deportation hearings, which is all the subject regulation requires them to face.

    The assertion that the presence of subject illegal aliens does not "in some way (constitute) a clear and present danger to the welfare of the United States or its citizens" is controverted by the ruling of this court on November 19, 1979, in No. 79-2359, Jackalone v. Andrus, "that a demonstration at Lafayette Park has an unacceptable potential for danger to the hostages now being held in the American Embassy in Tehran." Their allegiance to their mother country implicitly creates such hazard. Notice can also be taken of other instances elsewhere in the country where aliens with such allegiance have resorted to mob action in support of the policies being presently carried on in their mother country. Federal Rules of Evidence, Rule 201(b).

1     Narenji v. Civiletti, No. 79-2460 (D.C. Cir. Dec. 27, 1979), at 2-3.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2   See Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

3   Rehearing en banc "is not favored and ordinarily will not be ordered except (1) when consideration by the full court is necessary to secure or maintain uniformity of its decisions, or (2) when the proceeding involves a question of exceptional importance." Fed.R.App.P. 35(a). There is no serious claim of decisional conflict within the circuit.

4   The fact that the President has taken this action without express authorization from Congress is a significant factor in the Constitutional balance. Even the cases upholding the right of the Executive, acting pursuant to congressional authorization, to exercise virtually unfettered discretion in expelling "undesirable aliens from the United States have approved expulsion only upon a specific claim that the alien has acted in a manner contrary to the interests of the United States. See, e. g., Shaughnessy v. Mezei, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953). By way of contrast, in Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958), the Court refused to sanction the withholding of a passport a power usually deemed discretionary absent a state of war or a showing that the individual denied the passport was actually engaged in illegal conduct.

5   As the Court stated in Yamataya v. Fisher (The Japanese Immigrant case), 189 U.S. 86, 97, 23 S.Ct. 611, 613, 47 L.Ed. 721 (1903):

> That Congress may exclude aliens of a particular race from the United States; prescribe the terms and conditions upon which certain classes of aliens may come to this country; establish regulations for sending out of the country such aliens as come here in violation of law; and commit the enforcement of such provisions, conditions, and regulations exclusively to executive officers, without judicial intervention, are principles firmly established by the decisions of this court.

6   Thus the Court has said that immigration statutes may have "the effect of precluding judicial intervention in deportation cases except insofar as . . . required by the Constitution." Heikkila v. Barber, 345 U.S. 229, 234-235, 73 S.Ct. 603, 606, 97 L.Ed. 972 (1953) (emphasis added). The Court recently observed that the cases "generally reflect a close scrutiny of restraints imposed by States on aliens," and that although "we have never suggested that such legislation is inherently invalid, . . . the Court has treated certain restrictions on aliens with 'heightened solicitude,' . . . a treatment deemed necessary since aliens . . . have no direct voice in the political processes." Foley v. Connelie, 435 U.S. 291, 294, 98 S.Ct. 1067, 1070, 55 L.Ed.2d 287 (1978). The Court has reminded us that in the immigration field, as elsewhere, "(i)t is clear, of course, that no Act of Congress can authorize a violation of the Constitution." Almeida-Sanchez v. United States, 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973).

7   In Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943), the Court upheld a curfew for citizens of Japanese descent but cautioned:

> Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality. For that reason, legislative classification or discrimination based on race alone has often been held to be a denial of equal protection. . . . We may assume that these considerations would be controlling here were it not for the fact that the danger of espionage and sabotage, in time of war and of threatened invasion, calls upon the military authorities to scrutinize every relevant fact bearing on the loyalty of populations in the danger areas.

Id. at 100, 63 S.Ct. at 1385 (emphasis added). In Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), the Court emphasized that "(n)othing short of apprehension by the proper military authorities of the gravest imminent danger to the public safety can constitutionally justify" such restrictions. Id. at 218, 65 S.Ct. at 195 (emphasis added). And see Ex parte Endo, 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243 (1944).

8    In ⚑ Harisiades v. Shaughnessy, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952) the Supreme Court discussed the ambiguity of the position of aliens, pointing out that the alien brings with him

a foreign call on his loyalties which international law not only permits our government to recognize but commands it to respect. . . . Though the resident alien may be personally loyal to the United States, if his nation becomes our enemy his allegiance prevails over his personal preference and makes him also our enemy, liable to expulsion or internment, and his property becomes subject to seizure and perhaps confiscation. But it does not require war to bring the power of deportation into existence or to authorize its exercise. Congressional apprehension of foreign or internal dangers short of war may lead to its use. So long as the alien elects to continue the ambiguity of his allegiance his domicile here is held by a precarious tenure.

9    ⚑ Foley v. Connelie, 435 U.S. 291, 244, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978) (upholding New York State's exclusion of aliens from the police force).

---

End of Document    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by IN THE MATTER OF PETITION OF USTELECOM FOR FORBEARANCE PURSUANT TO 47 U.S.C. 160(C) TO ACCELERATE INVESTMENT IN BROADBAND AND NEXT-GENERATION NETWORKS, F.C.C., August 2, 2019

921 F.3d 1102
United States Court of Appeals,
District of Columbia Circuit.

NATIONAL LIFELINE
ASSOCIATION, et al., Petitioners
v.
FEDERAL COMMUNICATIONS COMMISSION
and United States of America, Respondents
Oceti Sakowin Tribal Utility Authority, Intervenor

No. 18-1026
|
Consolidated with 18-1080
|
Argued October 25, 2018
|
Decided February 1, 2019
|
Amended April 10, 2019

**Synopsis**
**Background:** Petitions for review were filed challenging Federal Communications Commission (FCC) order limiting enhanced tribal telecommunications support to service provided using tribal facilities, and to low-income consumers living on rural areas of tribal lands.

**Holdings:** The Court of Appeals, Rogers, Circuit Judge, held that:

[1] FCC action in changing its policy to limit enhanced tribal telecommunications subsidy to service provided using tribal facilities was arbitrary and capricious;

[2] FCC action in changing its policy to limit enhanced tribal telecommunications subsidy to service provided to low-income consumers living on rural areas of tribal lands was arbitrary and capricious;

[3] FCC's notice was insufficient under Administrative Procedure Act's (APA) requirements for notice-and-comment rulemaking; and

[4] FCC improperly made substantive changes to its former policy without commencing new notice-and-comment-rulemaking proceeding.

Petitions granted, order vacated, and matter remanded.

Opinion, 915 F.3d 19, superseded.

**Procedural Posture(s):** Petition for Discretionary Review; Review of Administrative Decision.

West Headnotes (19)

**[1]** **Administrative Law and Procedure** ⚷ Report or opinion; reasons for decision

An agency must articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.

1 Cases that cite this headnote

**[2]** **Administrative Law and Procedure** ⚷ Review for arbitrary, capricious, unreasonable, or illegal actions in general

Agency action is "arbitrary and capricious" under the Administrative Procedure Act (APA) if the agency has relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. 5 U.S.C.A. § 706(2).

1 Cases that cite this headnote

AR.05890

**[3]**    **Administrative Law and Procedure** ⚷ Change of policy; reason or explanation

Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.

**[4]**    **Administrative Law and Procedure** ⚷ Review for arbitrary, capricious, unreasonable, or illegal actions in general

Although the court's review of agency action entails a narrow standard of review under the Administrative Procedure Act (APA), an agency must examine the relevant data and articulate a satisfactory explanation for its action. 5 U.S.C.A. § 706(2).

1 Cases that cite this headnote

**[5]**    **Administrative Law and Procedure** ⚷ Change of policy; reason or explanation

**Administrative Law and Procedure** ⚷ Amendment, repeal, expiration, or change of policy

Arbitrary and capricious standard of review under the Administrative Procedure Act (APA) applies when an agency changes its prior policy, but the new policy must be permissible under the statute, and the agency must acknowledge it is changing its policy and show that there are good reasons for the new policy and that the agency believes it to be better, which the conscious change of course adequately indicates. 5 U.S.C.A. § 706(2).

**[6]**    **Administrative Law and Procedure** ⚷ Change of policy; reason or explanation

Under the Administrative Procedure Act's (APA) arbitrary and capricious standard, an agency cannot ignore its prior factual findings that contradict its new policy nor ignore reliance interests. 5 U.S.C. § 706(2).

**[7]**    **Administrative Law and Procedure** ⚷ Change of policy; reason or explanation

Under the Administrative Procedure Act's (APA) arbitrary and capricious standard, a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by an agency's prior policy. 5 U.S.C.A. § 706(2).

1 Cases that cite this headnote

**[8]**    **Administrative Law and Procedure** ⚷ Review for arbitrary, capricious, unreasonable, or illegal actions in general

Under the Administrative Procedure Act's (APA) arbitrary and capricious standard of review, the reviewing court's role is confined to ensuring that the agency engaged in reasoned decisionmaking, after a searching and careful inquiry of the record. 5 U.S.C. § 706(2).

**[9]**    **Administrative Law and Procedure** ⚷ Substantial evidence

For agency action to be upheld under the Administrative Procedure Act's (APA) arbitrary and capricious standard of review, the agency's substantive decision must be supported by substantial evidence in the administrative record. 5 U.S.C.A. § 706(2).

**[10]**    **Telecommunications** ⚷ Findings and orders

Federal Communications Commission's (FCC) action in changing its policy to limit enhanced tribal telecommunications subsidy to service provided using tribal facilities was arbitrary and capricious, where FCC failed to consider impact of change on subsidy's primary purpose or otherwise explain how it was compatible

with that purpose, to justify its policy reversal in light of its previous findings regarding important role of non-facilities-based providers in promoting affordable telecommunications service, to consider important aspects of problem in adopting tribal facilities requirement, to indicate that it considered effect of eliminating enhanced subsidy for non-facilities-based providers, to show that directing subsidy solely to facilities-based providers would incentivize them to deploy additional facilities and networks, reduce prices, or offer new service plans for low-income consumers, and it ignored serious reliance interests engendered by its policy of forbearance of facilities requirement.

5 U.S.C.A. § 706(2); 47 C.F.R. § 54.403(a)(3).

1 Cases that cite this headnote

**[11]    Telecommunications**    Findings and orders

Federal Communications Commission's (FCC) action in changing its policy to limit enhanced tribal telecommunications subsidy to service provided to low-income consumers living on rural areas of tribal lands was arbitrary and capricious, where FCC failed to consider impact of rural limitation on service access and affordability, and to refer to data considering its impact on incentivizing infrastructure deployment. 5 U.S.C.A. § 706(2); 47 C.F.R. § 54.505(b)(3).

1 Cases that cite this headnote

**[12]    Administrative Law and Procedure**    Notice and comment in general

An agency's substantive rules are subject to the requirements of notice-and-comment rulemaking under the Administrative Procedure Act (APA). 5 U.S.C.A. § 553.

1 Cases that cite this headnote

**[13]    Administrative Law and Procedure**    Contents and sufficiency

To meet the rulemaking requirements of the Administrative Procedure Act (APA), an agency must provide sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully. 5 U.S.C.A. § 553.

**[14]    Administrative Law and Procedure**    Rule differing from published rule

For notice to be sufficient, under the requirements of notice-and-comment rulemaking under the Administrative Procedure Act (APA), the final rule must be a logical outgrowth of the proposed rule in the sense that the original notice must adequately frame the subjects for discussion. 5 U.S.C.A. § 553.

**[15]    Administrative Law and Procedure**    Rule differing from published rule

For notice to be sufficient, under the requirements of notice-and-comment rulemaking under the Administrative Procedure Act (APA), the affected party must have anticipated the agency's final course in light of the initial notice. 5 U.S.C.A. § 553.

**[16]    Telecommunications**    Notice

Limitation of enhanced tribal telecommunications subsidy to service provided to low-income consumers living on rural areas of tribal lands was not logical outgrowth of Federal Communication Commission's (FCC) proposal in notice of proposed rulemaking, and, thus, notice was insufficient under Administrative Procedure Act's (APA) requirements for notice-and-comment rulemaking, where proposal called for using Department of Agriculture's rule excluding towns or cities with populations greater than 10,000, while final rule excluded "urbanized areas" and "urban clusters" with populations greater than 25,000, and FCC failed to provide searchable maps so that affected persons could determine impact of rule until after

440 U.S.App.D.C. 318

final rule was published. 5 U.S.C.A. § 553(b); 47 C.F.R. § 54.505(b)(3).

**[17]** **Administrative Law and Procedure** ☞ **Rule differing from published notice**

For agency notice to be sufficient, under the requirements of notice-and-comment rulemaking under the Administrative Procedure Act (APA), the notice need not predict the exact result reached after a notice and comment rulemaking. 5 U.S.C.A. § 553.

1 Cases that cite this headnote

**[18]** **Telecommunications** ☞ **Notice**

Federal Communication Commission (FCC) improperly made substantive changes to its former policy by limiting enhanced tribal telecommunications support to service provided using tribal facilities, and to low-income consumers living on rural areas of tribal lands, without commencing new notice-and-comment-rulemaking proceeding pursuant to the Administrative Procedure Act (APA), where FCC initially promised it would address any remaining issues in future proceeding more comprehensively focused on advancing broadband deployment on tribal lands, signaling to interested persons that there was no reason to submit further comment regarding facilities requirement and rural limitation in response to FCC's notice until new notice-and-comment rulemaking was commenced, and two-week period between issuance of unpublished draft order and public notice on cutting off lobbying was not adequate period for eliciting meaningful comments. 5 U.S.C.A. § 706(2); 47 C.F.R. §§ 54.403(a)(3), 54.505(b)(3).

**[19]** **Administrative Law and Procedure** ☞ **Time for comment or response**

For agency notice to be sufficient, under the requirements of notice-and-comment rulemaking under the Administrative Procedure Act (APA), when substantial rule changes are proposed, a 30-day comment period is generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment. 5 U.S.C.A. § 553.

1 Cases that cite this headnote

*1105 On Petitions for Review of an Order of the Federal Communications Commission

**Attorneys and Law Firms**

John J. Heitmann, Washington, DC, argued the cause and filed the briefs for petitioners National Lifeline Association, et al.

V. Shiva Goel, Washington, DC, argued the cause for petitioner Crow Creek Sioux Tribe and intervenor Oceti Sakowin Tribal Utility Authority. With him on the joint briefs were Christopher J. Wright and John T. Nakahata, Washington, DC.

Thaila K. Sundaresan, Counsel, Federal Communications Commission, argued the cause for respondents. With her on the brief were Robert B. Nicholson and Frances E. Marshall, Attorneys, U.S. Department of Justice, Thomas M. Johnson Jr., General Counsel, Federal Communications Commission, David M. Gossett, Deputy General Counsel, and Jacob M. Lewis, Associate General Counsel. Richard K. Welch, Deputy Assistant General Counsel, Federal Communications Commission and William T. Shaw, Attorney Advisor, U.S. Department of Justice, entered appearances.

Before: Rogers and Griffith, Circuit Judges, and Randolph, Senior Circuit Judge.

**Opinion**

Rogers, Circuit Judge:

**\*\*321** Responding to Congressional directives, the Federal Communications Commission has adopted programs to make voice and broadband services more available and affordable for low-income consumers by providing a discount on these services through its Lifeline program. Since 1985, eligible low-income consumers may receive a monthly discount of $9.25 on qualifying services, and since 2000, low-income consumers living on Tribal lands may receive an additional $25 per month for these services through the

440 U.S.App.D.C. 318

Tribal Lifeline program in recognition of the additional hurdles to affordable telecommunications service on Tribal lands. In 2017, however, the Commission adopted two limitations that petitioners challenge: First, it limited this enhanced Tribal Lifeline subsidy to services provided by eligible telecommunications carriers that utilize their own fixed or mobile wireless facilities, excluding carriers that resell services provided over other carriers' facilities ("Tribal Facilities Requirement"). Second, it limited the enhanced Tribal Lifeline subsidy to residents of "rural" areas on Tribal lands ("Tribal Rural Limitation").

For the following reasons, we grant the petitions for review. The Commission's adoption of these two limitations was arbitrary and capricious by not providing a reasoned explanation for its change of policy that is supported by record evidence. In adopting the Tribal Facilities Requirement, the Commission's decision evinces no consideration of the exodus of facilities-based providers from the Tribal Lifeline program. Neither does it point to evidence that banning resellers from the Tribal Lifeline program would promote network buildout. Nor does it analyze the impact of **1106 **322 the facilities requirement on Tribal residents who currently rely on wireless resellers. Further, the Commission ignored that its decision is a fundamental change that adversely affects the access and affordability of service for residents of Tribal lands. Similarly, in adopting the Tribal Rural Limitation, the Commission's decision evinces no consideration of the impact on service access and affordability. Its decision does not examine wireless deployment data related to services to which most Tribal Lifeline recipients subscribe.

Various non-harmless procedural deficiencies exist as well. The Commission failed to provide an adequate opportunity for comment on the proposed limitations. For instance, the 2017 supplemental notice of proposed rulemaking lacked key information needed for interested persons to anticipate that small towns below 10,000 in population would be excluded. Because the Commission stated that it intended to address remaining Tribal issues in a future rulemaking, petitioners reasonably did not submit current data on abandonment of the Lifeline program by facilities-based providers. Two weeks' notice in the form of an unpublished draft order was inadequate.

## I.

In the Communications Act of 1934, Congress stated its goal was to "make available, so far as possible, to all the people of the United States ... a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151. Congress reinforced this universal service goal in the Telecommunications Act of 1996, providing that "[q]uality services should be available at just, reasonable, and affordable rates" and that "[c]onsumers in all regions of the Nation, including low-income consumers ... should have access to telecommunications and information services." 47 U.S.C. § 254(b)(1), (3) ("1996 Act"). The Commission has responded, as relevant here, by adopting various iterations of the Lifeline program. Some background is required to place petitioners' current challenges in context.

In 1985, the Commission created the Lifeline program to ensure that low-income consumers had access to affordable, landline telephone service following the divesture of AT&T. [1] Recognizing that "[a]ccess to telephone service has become crucial to full participation in our society and economy" and that "an increase in fixed charges for telephone service" could "cause a significant number of subscribers to cancel service," the Commission provided an offset of subscriber line charges for low-income households. See 1985 Order, note 1, at 941–42. In 1997, still concerned "over the low subscribership levels among low-income consumers," the Commission, in response to § 254 of the 1996 Act, transformed the Lifeline program into a stand-alone universal service program "designed to make residential service more affordable for low-income consumers." [2]

The Lifeline program thus offers each eligible low-income household a baseline monthly discount of $9.25 to offset the costs of a wireline or wireless voice and broadband service plan. 47 C.F.R. § 54.403(a)(1). Lifeline service may be provided only by eligible telecommunications carriers ("ETCs"), which are either certified by state public service commissions or **1107 **323 designated by the Commission. 47 U.S.C. § 214(e)(2), (6). The discount is provided as a subsidy to these ETCs, which in turn pass through the subsidy to provide their services to low-income consumers at reduced costs. 47 C.F.R. § 54.403(a)(1). The ETCs may allow eligible low-income consumers, as defined by § 54.409, to apply their discount to any service plan meeting certain minimum service standards. Id. § 54.401(b).

In 2000, the Commission established the Tribal Lifeline program to provide an enhanced monthly subsidy of $25 for residents of federally recognized Tribal lands. [3] *See* 47 C.F.R. § 54.403(a)(3). There was a "need for immediate Commission action to promote the deployment of telecommunications facilities in tribal areas and to provide the support necessary to increase subscribership ... for the benefit of those living on" Tribal lands. *2000 Tribal Lifeline Order*, note 3, ¶ 5. At that time, statistics showed that households on reservations and other Tribal lands had the lowest reported telephone subscribership levels in the nation. *Id.* ¶¶ 5, 26. The Commission recognized that the critical lack of access to telecommunications services on Tribal lands threatened Tribes' access to no less than "education, commerce, government, and public services" and therefore their "tribal sovereignty and self-governance." *Id.* ¶ 23.

The Commission's "primary goal" in adopting the enhanced subsidy was to "reduce the monthly cost of telecommunications services for qualifying low-income individuals on tribal lands, so as to encourage those without service to initiate service and better enable those currently subscribed to maintain service." *Id.* ¶ 44. It determined that a "substantial additional amount of support" was necessary to increase subscribership in view of "(1) the extraordinarily low average per capita and household incomes in tribal areas, (2) the excessive toll charges that many subscribers incur as a result of limited local calling areas on tribal lands, (3) the disproportionately low subscribership levels in tribal areas, and (4) the apparent limited awareness of, and participation in, the existing Lifeline program." *Id.* Three secondary benefits of the enhanced Tribal subsidy were: (1) encouraging deployment of telecommunications facilities on Tribal lands that currently lack such facilities, (2) spurring competition from new entrants offering alternative technologies, and (3) reducing barriers to increased penetration that are caused by limited local calling areas. *Id.* ¶¶ 52–58.

Prior to adopting the enhanced Tribal subsidy, the Commission had consulted various Tribal leaders in formal field hearings, Commissioner-level meetings, and informal meetings. The Commission then "reaffirm[ed] ... principles of Tribal Sovereignty and the Federal Trust Responsibility," and committed going forward, "to the extent practicable, [to] consult with Tribal governments prior to implementing any regulatory action or policy that will significantly or uniquely

affect Tribal governments, their land and resources." [4] The Commission also agreed to streamline processes and procedures placing "undue burdens" on Indian Tribes. *Tribal Policy Statement*, note 4, at 4082 ¶ 4.

To keep pace with various market forces resulting in the phase out by major carriers **1108   **324 from the Lifeline program, the Commission decided to allow non-facilities-based providers (or "wireless resellers") to provide Lifeline services, beginning in 2005. Under the 1996 Act, an ETC must "offer the services that are supported by Federal universal service support mechanisms" "either using its own facilities or a combination of its own facilities and resale of another carrier's services." 47 U.S.C. § 214(e)(1). Since 1997, the Commission had interpreted "own facilities" to mean that non-facilities-based providers, who purchased telecommunications service wholesale from other carriers that owned the facilities and then resold it to consumers, were ineligible for Lifeline support. Otherwise, wireline resellers would be able to "double recover," once through the universal service subsidy and again through subsidized wholesale rates. *See* *1997 Order*, note 2, ¶ 161. In 2005, the Commission concluded the "own facilities" requirement met the 1996 Act's criteria for forbearance, and excused TracFone, a non-facilities-based provider, from this requirement. [5] Addressing the three forbearance factors in 47 U.S.C. § 160(a), the Commission found (1) the "own facilities" requirement was unnecessary to achieve the Lifeline program's purposes because there is no double recovery as wireless resellers' rates are not subsidized, *2005 Forbearance Order*, note 5, ¶¶ 11–12; (2) the requirement was unnecessary to protect consumers, and forbearance would benefit consumers by offering them previously unavailable choice of providers, *id.* ¶ 15; and (3) forbearance was in the public interest because it would expand eligible participation in the program, *id.* ¶ 24. The Commission observed that only "one-third of [Lifeline-eligible] households" subscribed to Lifeline services and predicted that allowing non-facilities-based providers like TracFone to participate "should expand participation of qualifying consumers." *Id.*

The Commission used the same rationale to extend "own facilities" forbearance to other ETCs. [6] And in 2012, the Commission adopted forbearance from the "own facilities" requirement for all non-facilities-based providers. [7] Consequently, as a result of the Commission's

440 U.S.App.D.C. 318

blanket forbearance, resellers play a critical role in the Lifeline program: by 2015, approximately two-thirds of eligible low-income consumers on Tribal lands relied on non-facilities-based providers for their Lifeline services.

Beginning in 2012, the Commission also emphasized the need to comprehensively improve and modernize Lifeline operations. *2012 Lifeline Reform Order*, note 7, ¶ 2. Expenditures for the Lifeline program had increased substantially, from $582 million in 1998 to $2.4 billion in 2012. *Id.* ¶ 23. To "constrain the growth of the program in order to reduce the burden on all who contribute to the Universal Service Fund," *id.* ¶ 1, the Commission adopted reforms to eliminate waste, fraud, and abuse in the program, establishing, among other things, national eligibility criteria, certification requirements, and independent audit requirements on certain larger carriers. *Id.* ¶ 4.

**\*1109 \*\*325** Then, on June 22, 2015, the Commission initiated a proceeding to achieve "a fundamental, comprehensive restructuring of the program."[8] The Commission sought comment on proposals to change the Lifeline and Tribal Lifeline programs, including whether to "limit enhanced Tribal Lifeline and Link Up support only to those Lifeline providers who have facilities," *2015 Lifeline Second FNPRM*, note 8, ¶ 167, and whether to "focus enhanced Tribal support to those Tribal areas with lower population densities," *id.* ¶¶ 169–70. The Commission made substantial changes to the Lifeline program in April 2016 but did not change the Tribal Lifeline program.[9] For example, the Commission established minimum service standards for broadband and mobile voice services, created a National Verifier program to ensure only eligible subscribers may enroll in Lifeline support, and encouraged the entry of new broadband providers into the Lifeline program. *2016 Lifeline Modernization Order*, note 9, ¶¶ 6–8. The Commission recognized that like telephone service in previous generations, broadband Internet service "has evolved into the essential communications medium of the digital economy." *Id.* ¶ 12. It decided to "maintain the current set of Tribal-specific eligibility programs," "agree[ing] with commenters" that "there is much more progress to be made in increasing penetration and adoption of Lifeline services." *Id.* ¶ 205. Of significance, the Commission also stated that certain Tribal Lifeline eligibility issues it had raised in the *2015 Lifeline Second FNPRM*,

including the proposed facilities requirement and rural limitation, would "remain open for consideration in a future proceeding more comprehensively focused on advancing broadband deployment on Tribal lands." *Id.* ¶ 211 & nn. 570–71.

On October 26, 2017, the Commission released a draft order adopting a facilities requirement and rural limitation for the Tribal Lifeline program.[10] Some comments were submitted to the Commission. A public notice of November 9, 2017 announced the beginning of the Sunshine Period and prohibited interested persons from lobbying the Commission. *See* 47 C.F.R. § 1.1200. A week later, on November 16, 2017, the Commission voted 3-2 in favor of the draft 2017 Order with some modifications.[11] In the *2017 Lifeline Order*, the Commission adopted two limitations that petitioners challenge.

First, the Tribal Facilities Requirement limits enhanced Tribal Lifeline support to "fixed or mobile wireless facilities-based Lifeline service provided on Tribal lands with wireless network facilities covering all or a portion of the relevant Lifeline ETC's service area on Tribal lands." *2017 Lifeline Order*, note 11, ¶ 24. To possess "facilities" for purposes of the enhanced subsidy, "a **\*1110 \*\*326** mobile wireless provider must hold usage rights under a spectrum license or a long-term spectrum leasing arrangement along with wireless network facilities that can be used to provide wireless voice and broadband services." *Id.* "If an ETC offers service using its own as well as others' facilities in its service area on rural Tribal lands, it may only receive enhanced support for the customers it serves using its own last-mile facilities." *Id.* ¶ 26. The Commission stated that the Tribal Facilities Requirement "will focus the enhanced support toward those providers directly investing in voice- or broadband-capable networks" on Tribal lands, ensuring that Tribal Lifeline payments "will be reinvested in the 'provision, maintenance, and upgrading' of facilities" in Tribal areas. *Id.* ¶ 27.

Second, the Tribal Rural Limitation limits enhanced Tribal Lifeline support to residents of "rural" areas on Tribal lands. *Id.* ¶ 3. It adopts the definitions of "rural" and "urban" used in the Commission's Schools and Libraries Program ("E-Rate"), which defines "urban" as "an urbanized area or urban cluster area with a population equal to or greater than 25,000," and "rural" as any area that is not "urban," 47 C.F.R.

§ 54.505(b)(3). *2017 Lifeline Order*, note 11, ¶ 5. The Commission stated that providing enhanced Lifeline support in "more densely populated Tribal lands" was "inconsistent with the Commission's primary purpose of the enhanced support," observing approximately 98% of people living in urban areas in the United States have access to fixed broadband Internet. *Id.* ¶ 9.

Timely petitions for review were filed. Following denial of a stay by the Commission, the court granted petitioners' motion for a judicial stay, concluding "[p]etitioners have demonstrated a likelihood of success on the merits of their arguments that the facilities-based and rural areas limitations ... are arbitrary and capricious." Nos. 18-1026, 18-1080, Order, at 2 (D.C. Cir. Aug. 10, 2018).

## II.

Petitioners challenge the *2017 Lifeline Order*, contending that both the Tribal Facilities Requirement and Tribal Rural Limitation are arbitrary and capricious because the Commission failed to consider several key issues, such as the impact of its action on service access and affordability. Petitioners also contend the Commission failed to provide sufficient notice of the proposed changes, and to initiate, as it stated it would, new notice-and-comment rulemaking before adopting these changes to the Tribal Lifeline program. Petitioners further contend the Commission violated its own procedural requirements by failing to consult Indian tribes in advance.

[1]   [2]   [3]   Under the Administrative Procedure Act, the reviewing court "shall ... hold unlawful and set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). The agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Agency action is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product

of agency expertise." *Id.* Of course, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change." **\*1111  \*\*327** *Encino Motorcars, LLC v. Navarro*, —— U.S. ——, 136 S.Ct. 2117, 2125, 195 L.Ed.2d 382 (2016) (citing *Nat'l Cable & Telecoms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005)).

[4]   [5]   [6]   [7]   [8]   [9]   Although the court's review entails a "narrow" standard of review, "an agency [must] 'examine the relevant data and articulate a satisfactory explanation for its action.' " *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009) (quoting *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856). This same standard applies when an agency changes its prior policy. See *id.* But the new policy must be permissible under the statute, and the agency must acknowledge it is changing its policy and show that "there are good reasons" for the new policy and "that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.* at 515, 129 S.Ct. 1800. An agency cannot ignore its prior factual findings that contradict its new policy nor ignore reliance interests. *Id.* at 515–16, 129 S.Ct. 1800. "[A] reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 516, 129 S.Ct. 1800. This court has thus understood its role to be confined to "ensur[ing] that [agency] engaged in reasoned decisionmaking," *Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1500 (D.C. Cir. 1984), after a "searching and careful inquiry" of the record, *Mississippi v. EPA*, 744 F.3d 1334, 1342 (D.C. Cir. 2013). The agency's substantive decision must be supported by "substantial evidence" in the administrative record. *Comcast Corp. v. FCC*, 579 F.3d 1, 5, 7 (D.C. Cir. 2009).

### A.

[10]   Congress established in the 1996 Act the principles underlying the universal service program as making "[q]uality services" "available at just, reasonable, and affordable rates." 47 U.S.C. § 254(b)(1). Since at least 2000, the Commission has articulated the "primary goal" of

440 U.S.App.D.C. 318

the enhanced Tribal subsidy as "reduc[ing] the monthly cost of telecommunications services for qualifying low-income individuals on tribal lands, so as to encourage those without service to initiate service and better enable those currently subscribed to maintain service." *2000 Tribal Lifeline Order*, note 3, ¶ 44. Although the Commission has recognized the importance of encouraging infrastructure development, *id.* ¶¶ 52–55, the Commission's long-stated primary tenets for the program are availability and affordability. The Commission adopted the enhanced Tribal subsidy specifically for the purpose of increasing "subscribership" in view of the financial obstacles facing Tribal participation. *See id.* ¶ 44. The Commission reaffirmed this understanding of Tribal Lifeline's purpose in 2012, stating that the Tribal Lifeline program was a "direct response to the disproportionately low subscribership to telecommunications services among Tribal communities at the time." *2012 Lifeline Reform Order*, note 7, ¶ 150. Yet in 2017, the Commission ignored the substantial impact of these changes on affordability and access. *See, e.g., 2017 Lifeline Order*, note 11, ¶ 24. While acknowledging that Lifeline funds disbursed to resellers "w[ould] still lower the cost of the consumer's service," *id.* ¶ 23, the Commission explained the Tribal Facilities Requirement on the basis that these funds "cannot directly support the provider's network because the provider does not have one," *id.* This fails to consider the impact of the change on the Lifeline subsidy's "primary purpose" or otherwise explain how it is compatible with that purpose.

**\*1112  \*\*328** The Commission also failed to justify its fundamental policy reversal on forbearing the "own facilities" requirement in light of its previous findings regarding the important role of non-facilities-based providers in promoting affordable telecommunications service. For thirteen years, the Commission forbore from enforcing the "own facilities" requirement base on finding that "the facilities requirement impedes greater utilization of Lifeline-supported services provided by a pure wireless reseller," *2005 Forbearance Order*, note 5, ¶ 9, and that making non-facilities-based providers eligible would increase access to affordable services, *id.* ¶¶ 13, 24. The Commission had found that because Lifeline support to wireless carriers is customer-specific, its previous concern that resellers might receive a double recovery did not apply. *Id.* ¶ 12. The Commission also found that forbearance would "benefit

consumers" because low-income consumers would have "a choice of providers not available to such consumers today for accessing telecommunications services." *Id.* ¶ 15. Yet in 2017, the Commission rescinded its policy of forbearance as to the Tribal Lifeline program without conducting a new forbearance analysis or providing any reasoned explanation for its reversal. *See generally 2017 Lifeline Order*, note 11, ¶¶ 21–30. Even on appeal, the Commission does not acknowledge the policy reversal on the enhanced subsidy, which made reselling attractive economically, instead maintaining that non-facilities-based providers can still participate as Lifeline providers; they are just limited to the baseline monthly subsidy of $9.25. Resp't Br. 54. The Commission never explained why its previous forbearance findings no longer applied. Although the Commission sought comment on whether it should reverse the forbearance findings, it made no new findings with regard to forbearance of the "own facilities" requirement for the enhanced subsidy. *2017 Lifeline Order*, note 11, ¶¶ 69–79. Its reference in its notice of proposed rulemaking to major Commission actions for "waste, fraud, and abuse" against resellers, *see id.* ¶ 68, can provide no justification for the Tribal Facilities Requirement absent evidence that a substantial portion of the two-thirds of services supplied by non-facilities-based providers are, in fact, fraudulent or wasteful, and the Commission pointed to none.

The Commission also "failed to consider ... important aspect[s] of the problem" in adopting the Tribal Facilities Requirement. *State Farm, 463 U.S. at 43, 103 S.Ct. 2856.* First, the Commission's decision does not indicate consideration of facilities-based providers' unwillingness to offer Tribal Lifeline services. Numerous commenters explained that the major facilities-based providers — AT&T, T-Mobile, and Verizon — have relinquished their Lifeline eligibility altogether, and despite maintaining Lifeline eligibility, Sprint also does not offer any Tribal Lifeline services. [12] The statement of a dissenting Commission Member also makes clear the **\*1113  \*\*329** Commission knew that the major facilities-based providers were uninterested in providing Tribal Lifeline services yet failed to address the problem that would be created as a result of changing its policy. For thirteen years, the Commission had justified forbearance in part based on the ability of non-facilities-based providers to offer minimum services at competitive rates by purchasing facilities-based providers'

services wholesale and then reselling them. *See 2012 Lifeline Reform Order*, note 7, ¶ 371. By 2015, the Commission reported "two-thirds of enhanced Tribal support goes to non-facilities-based providers, and it is unclear whether the support is being used to deploy facilities in Tribal areas," still thereby suggesting that eligible consumers relied on non-facilities-based providers for their telecommunications services. *2017 Lifeline Order*, note 11, ¶ 23. This reliance exists because non-facilities-based providers can efficiently reach the low-income population with targeted service plans and because the largest facilities-based providers are unwilling to participate in a program that is unprofitable for them. [13]

Second, the Commission's decision does not indicate that it considered the effect of eliminating the enhanced subsidy for non-facilities-based providers, namely that many low-income consumers on Tribal lands will lose access to affordable telecommunications service. Commenters explained that because certain areas have no facilities-based provider willing to provide Lifeline service, removing the enhanced subsidy from non-facilities-based providers will make those services unavailable to consumers. [14] The Commission was aware that two-thirds of enhanced Tribal support goes to non-facilities-based providers, *see 2017 Lifeline Order*, note 11, ¶ 23, yet never appears to address what would happen to these consumers when the subsidy was removed. Instead, the Commission summarily "conclude[d] that providing the enhanced support to Lifeline providers deploying, building, and maintaining critical last mile infrastructure is a more appropriate way to support the expansion of voice- and broadband-capable networks on Tribal lands." *Id.* ¶ 28. Although the court must "give appropriate deference to predictive judgments" by an agency where supported by "[s]ubstantial evidence," *Time Warner Entm't Co. v. FCC*, 240 F.3d 1126, 1133 (D.C. Cir. 2001), the Commission referred to no evidence that facilities-based providers will make up the gap in services when non-facilities-based providers are ineligible to receive the enhanced Tribal subsidy.

Third, the Commission pointed to no record evidence that directing the enhanced Tribal subsidy solely to facilities-based providers would incentivize them to deploy additional facilities and networks, reduce prices, or offer new service plans for low-income consumers. *See 2017 Lifeline*

*Order*, note 11, ¶ 27. Comments that the Commission points to in its brief on appeal, *see* Resp't's Br. 49–50, do not show how limiting the enhanced subsidy to facilities-based providers will increase network buildout, much less do so in areas where there is no facilities-based provider participating in the Tribal Lifeline program that could receive the enhanced subsidy. Further, the Commission did not meaningfully **\*1114 \*\*330** address comments and evidence that undercut its conclusion, such as economic analysis in the record indicating that subsidizing non-facilities-based subscribership also supports network buildout. [15] Commenters noted that "[f]acilities-based and non-facilities-based carriers ... operate symbiotically" and that "[t]he result of this relationship is enhanced capacity utilization and hence more investment than would happen in the absence of [non-facilities-based carriers]." [16] The Commission has recognized in other contexts that facilities-based providers may contract with resellers "when the [wireless reseller] has better access to some market segments than the host facilities-based service provider" and when the reseller "can better target specific market segments, such as low-income consumers or consumers with lower data-usage needs." [17]

Fourth, the Commission ignored "serious reliance interests" engendered by its policy of forbearance. *See Fox Television*, 556 U.S. at 515, 129 S.Ct. 1800. As in *Encino Motorcars*, 136 S.Ct. at 2126, the Commission's decision does not take into account the reliance interests of both the non-facilities-based providers that had crafted business models and invested significant resources into providing Lifeline service, and the two-thirds of subscribers relying on non-facilities-based providers for their telecommunications service. The Commission neither attempted to estimate the number of consumers who would be unable to afford service without the enhanced subsidy or would lose access to service altogether when non-facilities-based providers discontinued their plans, nor did it consider alternatives to ensure coverage for these consumers or respond to these objections. The dissenting Commissioner raised these concerns, and an agency has an obligation to consider an alternative or objection raised by a dissenting Commissioner that was "neither frivolous nor out of bounds." *Chamber of Commerce v. SEC*, 412 F.3d 133, 144–45 (D.C. Cir. 2005). After the draft 2017 Order was released, ETCs filed data showing that approximately 75% of Tribal Lifeline customers could not afford to pay the additional $25 per month.

Comments also indicated that non-facilities-based providers have developed a business model based on "buying large blocks of minutes from the major carriers and then reselling those minutes as Lifeline packages," thereby depending upon the enhanced subsidy to enable significant numbers of low-income consumers to subscribe to their prepaid or minimal service plans. *See* Navajo Nation Comments, note 12, at 10.

By departing from its prior forbearance policy without reasoned explanation and failing to consider key aspects of the program — e.g., facilities-based providers' unwillingness to offer Tribal Lifeline services, the effect of eliminating the enhanced Tribal subsidy on access and affordability, the effect of directing the subsidy only to facilities-based providers on network buildout, and the reliance interests of these carriers and their consumers — the Commission's adoption of the Tribal Facilities Requirement was arbitrary and capricious.

*See* *State Farm, 463 U.S. at 43, 103 S.Ct. 2856.* In view of these failures by the Commission, the **\*1115 \*\*331** court need not address petitioners' contentions that the Tribal Facilities Requirement violates sections 10, 214, and 254 of the 1996 Act.

### B.

[11] The Commission also did not consider the impact of its Tribal Rural Limitation on service access and affordability. Although referring to the general disparity between urban and rural areas in the United States in terms of telecommunications infrastructure, *see* *2017 Lifeline Order, note 11, ¶ 3,* the Commission pointed to no record evidence that telecommunications services are more available or more affordable for low-income consumers on urban Tribal lands than on rural Tribal lands, such that the enhanced subsidy would be less necessary in urban areas for furthering the Lifeline program's primary goals of access and affordability. *See* *id. ¶¶ 3–9.* Even with a developed infrastructure of network services in urban areas, low-income consumers may still be unable to afford those services without the enhanced Tribal subsidy. The Commission failed to refer to any data considering the relevant impacts on service access and affordability.

The Commission also failed to refer to data considering the impact of its Tribal Rural Limitation on incentivizing infrastructure deployment. The Commission referred to the deployment data only for fixed voice and broadband service. *See* *2017 Lifeline Order, note 11, ¶ 9.* It did not show that it examined deployment data for the *wireless* services, to which the vast majority of Tribal Lifeline recipients subscribe. *See* *id. ¶ 23.* [18] The Commission's conclusion that limiting the enhanced Tribal subsidy to rural lands will incentivize deployment is thus speculative. By failing to "examine the relevant data," the Commission's adoption of the Tribal Rural Limitation was arbitrary and capricious. *NTCH, Inc. v. FCC, 841 F.3d 497, 502 (D.C. Cir. 2016)* (quoting *State Farm, 463 U.S. at 43, 103 S.Ct. 2856*).

### III.

[12] [13] [14] [15] Petitioners challenge the *2017 Lifeline Order* on procedural grounds as well. An agency's substantive rules are subject to the requirements of notice-and-comment rulemaking under the APA. *Mendoza v. Perez, 754 F.3d 1002, 1020–21 (D.C. Cir. 2014).* To meet the rulemaking requirements of section 553 of the APA, an agency "must provide sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully." *Florida Power & Light Co. v. United States, 846 F.2d 765, 771 (D.C. Cir. 1988).* After publishing notice in the Federal Register of "the terms or substance of the proposed rule or a description of the subjects and issues involved," the agency "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C § 553(b), (c). For notice to be sufficient, the final rule must be "a logical outgrowth" of the proposed rule in the sense that the original notice must "adequately frame the subjects for discussion." *Omnipoint Corp. v. FCC, 78 F.3d 620, 631 (D.C. Cir. 1996).* Put otherwise, "the affected party 'should have anticipated' the agency's final course in light of the initial notice." *Covad Commc'ns Co. v. FCC, 450 F.3d 528, 548 (D.C. Cir. 2006).* A reviewing court is to take "due account **\*1116 \*\*332** ... of the rule of prejudicial error." 5 U.S.C. § 706.

### A.

**[16]** Petitioners maintain that the Tribal Rural Limitation is not a "logical outgrowth" of the Commission's proposal in the *2015 Lifeline Second FNPRM*. That proposal called for using the Department of Agriculture's rule excluding towns or cities with populations over 10,000. The final rule excludes "urbanized areas" and "urban clusters" with populations greater than 25,000; in effect, this definition can and does exclude some small towns of significantly less than 25,000 or even 10,000 people (despite contrary terms in the proposed rule). [19] The Commission sought comment on several population-density-based definitions for "rural" lands, but neither the adopted E-Rate definition nor the "urban cluster" methodology was mentioned in the notice.

**[17]** Although agency notice need not predict "the exact result reached after a notice and comment rulemaking," *Pub. Serv. Comm'n v. FCC*, 906 F.2d 713, 717 (D.C. Cir. 1990), comments on the draft 2017 Order indicated the Commission's proposed and final rules were unclear in scope. The Commission failed to provide the searchable maps or digital "shapefiles," so that at least affected persons could determine the impact of the rule, until after the final rule was published. See *2017 Lifeline Order*, note 11, ¶ 15. Insofar as the maps were necessary to appreciate that even towns with populations under 10,000 people (contrary to the Commission's original proposal of excluding towns above 10,000 people) would be excluded from the enhanced subsidy under the "urban cluster" methodology, the *2015 Lifeline Second FNPRM* was inadequate to enable sufficient comment on the proposed rule, much less allow an understanding of the effect of the final rule.

### B.

**[18]** The Commission also improperly adopted the two challenged limitations without commencing a new notice-and-comment-rulemaking proceeding as it had promised. The Commission does not contest that the Tribal Facilities Requirement and Tribal Rural Limitation are substantive changes in the regulations that required a new notice-and-comment-rulemaking proceeding. *Mendoza*, 754 F.3d at 1020–21. Instead, it maintains that it provided all the proceeding it had promised when it proposed the changes in 2015 and kept the docket open for comments after issuing the *2016 Lifeline Modernization Order*. See Resp't's Br. 30–31.

Although an agency may be able to issue multiple orders based on a single notice-and-comment rulemaking, the Commission stated it would address any remaining Tribal issues in a "future proceeding more comprehensively focused on advancing broadband deployment on Tribal lands." *2016 Lifeline Modernization Order*, note 9, ¶ 211. This statement signaled to interested persons that until a new notice-and-comment rulemaking was commenced, there was no reason to submit further comment regarding a facilities requirement and a rural limitation in response to the *2015 Lifeline Second FNPRM*. By referring to a "proceeding" and a "more comprehensive[ ] focus," the Commission gave interested persons every reason to conclude the old docket was closed and additional comments on these proposed **\*1117 \*\*333** limitations could be submitted at a later time as part of a new rulemaking proceeding. This interpretation is consistent with the Commission's own definition of "proceeding" as a process for "obtaining information," 47 C.F.R. § 1.1, as well as the Commission's past practice of referring to a new notice-and-comment-rulemaking proceeding when it promised a "future proceeding." [20] It is also consonant with the APA's definition of a "proceeding" as a rulemaking, an adjudication, or a licensing, 5 U.S.C. § 551(12); *see id.* § 551(5), (7), (9), as the latter were not being considered.

The Commission's procedural error is not harmless; petitioners have additional information that is directly on point — including comments on the geographic maps delineating "urban" versus "rural" areas, data about the cost of services to consumers, updated information about facilities-based providers' relinquishment of eligibility, and econometric studies. See *CSX Transp. v. Surface Transp. Bd.*, 584 F.3d 1076, 1083 (D.C. Cir. 2009). The two-week period between issuance of the unpublished draft 2017 Order on October 26 and the public notice on November 9 cutting off lobbying was not an adequate period for eliciting meaningful comments.

**[19]** When substantial rule changes are proposed, a 30-day comment period is generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment. *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984); *see Prometheus Radio Project v. FCC*, 652 F.3d 431, 453 (3d Cir. 2011). Here, comments on the draft 2017 Order reflect the

inability to comment meaningfully within this brief time.[21]

*See* *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). Petitioners' new data and information demonstrate that inviting another round of comments on these Tribal rural issues would allow the Commission to act on the basis of up-to-date, more comprehensive, and specifically targeted information.[22] New information was presented as well in the course of seeking a stay of the challenged order from the Commission once the Commission made population maps available and better defined "rural."[23] The Commission's promise **\*1118  \*\*334** of a new rulemaking proceeding effectively lulled interested persons into concluding that they did not need to quickly submit additional evidence to the Commission or request additional time. *See CSX Transp.*, 584 F.3d at 1083. In view of the need

for a new notice-and-comment-rulemaking proceeding as promised, the court need not address petitioners' contention that the Commission failed to follow its Tribal consultation policy.

Accordingly, because the Commission's adoption of the Tribal Facilities Requirement and Tribal Rural Limitation was arbitrary and capricious, the court grants the petitions and vacates the *2017 Lifeline Order* as challenged in the petitions, and remands the matter to the Commission for a new notice-and-comment rulemaking proceeding.

**All Citations**

921 F.3d 1102, 440 U.S.App.D.C. 318

## Footnotes

1    *MTS and WATS Market Structure; and Establishment of a Joint Board; Amendment*, Report and Order, 50 Fed. Reg. 939 (Jan. 8, 1985) ("*1985 Order*").

2    *Federal-State Joint Board on Universal Service*, Report and Order, 12 FCC Rcd. 8776, ¶¶ 346, 406 (1997) ("*1997 Order*").

3    *Federal-State Joint Board on Universal Service et al.*, Twelfth Report and Order, 15 FCC Rcd. 12208, ¶¶ 5, 13 (2000) ("*2000 Tribal Lifeline Order*").

4    *Statement of Policy on Establishing a Government-to-Government Relationship with Indian Tribes*, Policy Statement, 16 FCC Rcd. 4078, 4080, 4081 ¶ 2 (2000) ("*Tribal Policy Statement*").

5    *Petition of TracFone Wireless, Inc. for Forbearance from 47 U.S.C. § 214(e)(1)(A) and 47 C.F.R. § 54.201(i)*, Order, 20 FCC Rcd. 15095, 15100 ¶ 9 (2005) ("*2005 Forbearance Order*").

6    *See Virgin Mobile USA, L.P. Petition for Forbearance from 47 U.S.C. § 214(e)(1)(A) et al.*, Order, 24 FCC Rcd. 3381, ¶¶ 19–21 (2009); *i-Wireless, LLC Petition for Forbearance from 47 U.S.C. § 214(e)(1)(A) et al.*, Order, 25 FCC Rcd. 8784, ¶ 7 (2010).

7    *Lifeline and Link Up Reform and Modernization et al.*, Report and Order and Further Notice of Proposed Rulemaking, 27 FCC Rcd. 6656, ¶ 368 (2012) ("*2012 Lifeline Reform Order*").

8    *Lifeline and Link Up Reform and Modernization et al.*, Second Further Notice of Proposed Rulemaking, Order on Reconsideration, Second Report and Order, and Memorandum Opinion and Order, 30 FCC Rcd. 7818, 7824 (2015) ("*2015 Lifeline Second FNPRM*").

9    *Lifeline and Link Up Reform and Modernization et al.*, Third Report and Order, Further Report and Order, and Order on Reconsideration, 31 FCC Rcd. 3962, ¶¶ 205–11 (2016) ("*2016 Lifeline Modernization Order*").

10   *See FCC Fact Sheet: Bridging the Digital Divide for Low-Income Consumers,* Fourth Report and Order, Order on Reconsideration, Memorandum Opinion and Order, Notice of Proposed Rulemaking, and Notice of Inquiry, FCC-CIRC 1711-05 (Oct. 26, 2017).

11   *Bridging the Digital Divide for Low-Income Consumers et al.,* Fourth Report and Order, Order on Reconsideration, Memorandum Opinion and Order, Notice of Proposed Rulemaking, and Notice of Inquiry, 32 FCC Rcd. 10475 (released Dec. 1, 2017) ("*2017 Lifeline Order*"), 83 Fed. Reg. 2075 (Jan. 16, 2016).

12   *See, e.g., Lifeline and Link Up Reform and Modernization et al.*, Comments of Navajo Nation Telecommunications Regulatory Commission, 10 (Aug. 28, 2015) ("Navajo Nation Comments"); *Lifeline and Link Up Reform and Modernization et al.*, Comments of Assist Wireless, LLC & Easy Telephone Services Co., 18–19 (Aug. 31, 2015); *Lifeline and Link Up Reform and Modernization et al.*, Comments of AT&T, 5–6 & n.10 (Aug. 31, 2015); *Lifeline and Link Up Reform and Modernization et al.*, Comments of the Oglala Sioux Tribe Utility Commission, Attachment, 3 (Aug. 31, 2015); *Lifeline and Link Up Reform and Modernization et al.*, Crow Creek Sioux Tribal Resolution, 1 (June 1, 2017); *Lifeline and Link Up Reform and Modernization et al.*, Assist Wireless, LLC, Boomerang Wireless, LLC, and Easy Telephone Services Co. Written *Ex Parte* Presentation, 5 (Nov. 9, 2017) ("Assist *Ex Parte*").

13   *See Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993 et al.*, Eleventh Report, 21 FCC Rcd. 10947, ¶ 28 (2006); *Lifeline and Link Up Reform and Modernization et al.*, Reply Comments of Boomerang Wireless, LLC, 4 (Sept. 30, 2015) ("Boomerang Reply Comments"); *Bridging the Digital Divide for Low-Income Consumers et al.*, Letter from CTIA to FCC, 3–4 (Nov. 8, 2017).

14   *See, e.g.*, Boomerang Reply Comments, note 13, at 6; Assist *Ex Parte*, note 12, at 5.

15   *See* Assist *Ex Parte*, note 12, at 8–9; *see also* Bridging the Digital Divide for Low-Income Consumers et al., Comments of CTIA, 15 (Feb. 21, 2018) ("CTIA Comments").

16   CTIA Comments, Declaration of John Mayo, ¶ 7 (Feb. 19, 2018).

17   *Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993 et al.*, Twentieth Report, 32 FCC Rcd. 8968, ¶ 15 (2017).

18   *See also, e.g., Lifeline and Link Up Reform and Modernization et al.*, Comments of Assist Wireless, LLC and Easy Telephone Service Co., 2 (Aug. 31, 2015); *Lifeline and Link Up Reform and Modernization et al.*, Comments of Boomerang Wireless, LLC, 6–9 (Aug. 31, 2015).

19   *See* Shapefile of Rural Tribal Lands, https://www.usac.org/li/tools/reference-area.aspx.

20   *See, e.g., Improvements to Benchmarks and Related Requirements Governing Hearing Aid-Compatible Mobile Handsets*, Report and Order, 31 FCC Rcd. 9336, ¶¶ 42–43 (2016); *An Inquiry Into the Commission's Policies and Rules Regarding AM Radio Service Directional Antenna Performance Verification*, Second Report and Order and Second Further Notice of Proposed Rulemaking, 23 FCC Rcd. 14267, ¶ 11 (2008).

21   *Bridging the Digital Divide for Low-Income Consumers et al.*, *Ex Parte* Letter of Native Public Media, 1–2 (Nov. 7, 2017); *Bridging the Digital Divide for Low-Income Consumers et al.*, *Ex Parte* Letter of Lifeline Connects Coalition, National Lifeline Association, Boomerang Wireless, LLC and Easy Telephone Services Co., 2–3 (Nov. 9, 2017); *Bridging the Digital Divide for Low-Income Consumers et al.*, *Ex Parte* Letter of Lifeline Connects Coalition, National Lifeline Association, Boomerang Wireless, LLC and Easy Telephone Services Co., 3–5 (Nov. 13, 2017). Assist, Boomerang, and Easy commented that without population maps it was not possible to identify the boundaries of the "rural" area contemplated in the draft 2017 Order. Assist *Ex Parte*, note 12, at 7 n.22.

22   *See 2017 Lifeline Order*, note 11, Notice of Inquiry ¶¶ 123, 125; *Bridging the Digital Divide for Low-Income Consumers et al.*, Comments of the National Lifeline Association, 9–11, 57–62, 106–08 (Feb. 21, 2018); *2017 Lifeline Order*, note 11, Dissenting Statement of Commissioner Mignon L. Clyburn, 32 FCC Rcd. at 10,558.

23   *See Bridging the Digital Divide for Low-Income Consumers et al.*, Joint Petition for Stay of Fourth Report and Order Pending Judicial Review, Declarations of David Dorwat, Joe Fernandez, Joseph G. Wildcat, Jason Schlender, Phyliss J. Anderson, Sarah Stahelin.

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Negusie v. Holder, 555 U.S. 511 (2009)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 680 of 1271

129 S.Ct. 1159, 173 L.Ed.2d 20, 77 USLW 4152, 09 Cal. Daily Op. Serv. 2558...

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Perez-Guzman v. Lynch, 9th Cir., August 31, 2016

129 S.Ct. 1159
Supreme Court of the United States

Daniel Girmai NEGUSIE, Petitioner,

v.

Eric H. HOLDER, Jr., Attorney General.

No. 07–499.
|
Argued Nov. 5, 2008.
|
Decided March 3, 2009.

**Synopsis**

**Background:** Alien, dual national of Eritrea and Ethiopia, petitioned for judicial review of Board of Immigration Appeals' (BIA) order affirming denial by immigration judge (IJ) of application for asylum and withholding of removal. The United States Court of Appeals for the Fifth Circuit denied petition, 231 Fed.Appx. 325, based on "persecutor bar" of Immigration and Nationality Act (INA). Certiorari was granted.

**Holdings:** The United States Supreme Court, Justice Kennedy, held that:

[1] INA's persecutor bar provision was ambiguous as to whether coercion or distress was relevant in determining if alien had participated in persecution; but

[2] BIA's construction of persecutor bar as not requiring any motivation or intent on alien's part was not entitled to *Chevron* deference, since it was based on legal error; and

[3] remand was appropriate rather than Court's providing its own answer to whether persecutor bar contained coercion exception.

Reversed and remanded.

Justice Scalia filed concurring opinion joined by Justice Alito.

Justice Stevens filed opinion concurring in part and dissenting in part joined by Justice Breyer.

Justice Thomas filed dissenting opinion.

West Headnotes (4)

**[1]** **Administrative Law and Procedure** — Aliens, Immigration, and Citizenship

**Aliens, Immigration, and Citizenship** — Law questions

Board of Immigration Appeals (BIA) is accorded *Chevron* deference in its construction of ambiguous terms of Immigration and Nationality Act (INA). Immigration and Nationality Act, § 103(a)(1), 8 U.S.C.A. § 1103(a)(1); 8 C.F.R. § 3.1(d)(1) (1998).

44 Cases that cite this headnote

**[2]** **Aliens, Immigration, and Citizenship** — Participants in persecution

Immigration and Nationality Act's (INA) "persecutor bar," which precluded grant of asylum or withholding of removal if alien had assisted or otherwise participated in persecution based on protected ground, was ambiguous as to whether coercion or distress was relevant in determining existence of such participation, and thus Board of Immigration Appeals (BIA) had discretion to construe relevance of coercion or distress in first instance; INA provision's silence as to relevance of coercion was not conclusive. Immigration and Nationality Act, § 101(a)(42), 8 U.S.C.A. § 1101(a)(42).

41 Cases that cite this headnote

**[3]** **Administrative Law and Procedure** — Asylum, refugees, and withholding of removal

**Aliens, Immigration, and Citizenship** — Law questions

Board of Immigration Appeals' (BIA) construction of Immigration and Nationality Act's (INA) "persecutor bar" as not requiring

129 S.Ct. 1159, 173 L.Ed.2d 20, 77 USLW 4152, 09 Cal. Daily Op. Serv. 2558...

any motivation or intent on alien's part in order to preclude grant of asylum or withholding of removal was not entitled to *Chevron* deference; construction was based on BIA's own rule that motivation and intent were irrelevant, but rule in turn was based on application of earlier United States Supreme Court decision that concerned Displaced Persons Act (DPA), which was different statute reflecting different principles. Immigration and Nationality Act, § 101(a)(42), 8 U.S.C.A. § 1101(a)(42); 50 App.U.S.C.(1952 Ed.) § 1951.

58 Cases that cite this headnote

**[4]    Aliens, Immigration, and Citizenship** 🔑 Remand

Under ordinary remand rule, Board of Immigration Appeals' (BIA) legal error, consisting of finding as to presence of coercion exception in Immigration and Nationality Act's (INA) ambiguous "persecutor bar" based on application of inapplicable statute, called for remand for BIA to make initial determination of INA provision without the legal error, rather than United States Supreme Court's providing definite answer to question. Immigration and Nationality Act, § 101(a)(42), 8 U.S.C.A. § 1101(a)(42).

72 Cases that cite this headnote

**\*\*1160** *Syllabus* [*]

The Immigration and Nationality Act (INA) bars an alien from obtaining refugee status in this country if he "assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). This so-called "persecutor bar" applies to those seeking asylum or withholding of removal, but does not disqualify an alien from receiving a temporary deferral of removal under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT). During the time petitioner, an Eritrean national, was forced to work as a prison guard in that country, the prisoners

he guarded were persecuted on grounds protected under § 1101(a)(42). After escaping to the United States, petitioner applied for asylum and withholding of removal. Concluding that he assisted in the persecution of prisoners by working as an armed guard, the Immigration Judge denied relief on the basis of the persecutor bar, but granted deferral of removal under CAT because petitioner was likely to be tortured if returned to Eritrea. The Board of Immigration Appeals (BIA) affirmed in all respects, holding, *inter alia,* that the persecutor bar applies even if the alien's assistance in persecution was coerced or otherwise the product of duress. The BIA followed its earlier decisions finding *Fedorenko v. United States,* 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686, controlling. The Fifth Circuit affirmed, relying on its precedent following the same reasoning.

*Held:* The BIA and Fifth Circuit misapplied *Fedorenko* as mandating that whether an alien is compelled to assist in persecution is immaterial for persecutor-bar purposes. The BIA must interpret the statute, free from this mistaken legal premise, in the first instance. Pp. 1163 – 1168.

(a) Under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–843, 104 S.Ct. 2778, 81 L.Ed.2d 694, the BIA is entitled to deference in interpreting ambiguous INA provisions, see, *e.g., INS v. Aguirre–Aguirre,* 526 U.S. 415, 424–425, 119 S.Ct. 1439, 143 L.Ed.2d 590. When the BIA has not spoken on "a matter that statutes place primarily in agency hands," this Court's ordinary rule is to remand to allow "the BIA ... to address the matter in the first instance in light of its own experience." *INS v. Orlando Ventura,* 537 U.S. 12, 16–17, 123 S.Ct. 353, 154 L.Ed.2d 272. Pp. 1163 – 1164.

(b) As there is substance both to petitioner's contention that involuntary acts cannot implicate the persecutor bar because "persecution" presumes moral blameworthiness, and to the Government's argument that the question at issue is **\*\*1161** answered by the statute's failure to provide an exception for coerced conduct, it must be concluded that the INA has an ambiguity that the BIA should address in the first instance. *Fedorenko,* which addressed a different statute enacted for a different purpose, does not control the BIA's interpretation of this persecutor bar. In holding that voluntariness was not required with respect to such a bar in the Displaced Persons Act of 1948 (DPA), *Fedorenko* contrasted the omission there of the word "voluntary" with the word's inclusion in a related

129 S.Ct. 1159, 173 L.Ed.2d 20, 77 USLW 4152, 09 Cal. Daily Op. Serv. 2558...

statutory subsection. 449 U.S., at 512, 101 S.Ct. 737. Because Congress did not use the word "voluntary" anywhere in the persecutor bar at issue here, its omission cannot carry the same significance as it did in *Fedorenko.* Moreover, the DPA's exclusion of even those involved in nonculpable, involuntary assistance in persecution was enacted in part to address the Holocaust and its horror, see *id., at 511, n. 32, 101 S.Ct. 737,* whereas the persecutor bar in this case was enacted as part of the Refugee Act of 1980, which was designed to provide a general rule for the ongoing treatment of all refugees and displaced persons, see, *e.g., Aguirre– Aguirre, supra, at 427, 119 S.Ct. 1439.* Pp. 1164 – 1166.

(c) Whether a BIA determination that the persecution bar contains no exception for coerced conduct would be reasonable, and thus owed *Chevron* deference, is a legitimate question; but it is not presented here. In denying petitioner relief, the BIA recited a rule it has developed in its cases: An alien's motivation and intent are irrelevant to the issue whether he "assisted" in persecution; rather, his actions' objective effect controls. A reading of those decisions confirms that the BIA has not exercised its interpretive authority but, instead, has deemed its interpretation to be mandated by *Fedorenko.* This error prevented the BIA from fully considering the statutory question presented. Its mistaken assumption stems from a failure to recognize the inapplicability of the statutory construction principle invoked in *Fedorenko,* as well as a failure to appreciate the differences in statutory purpose. The BIA is not bound to apply the *Fedorenko* rule to the persecutor bar here at issue. Whether the statute permits such an interpretation based on a different course of reasoning must be determined in the first instance by the agency. Pp. 1166 – 1167.

(d) Because the BIA has not yet exercised its *Chevron* discretion to interpret the statute, the proper course is to remand to it for additional investigation or explanation, *e.g., Gonzales v. Thomas,* 547 U.S. 183, 186, 126 S.Ct. 1613, 164 L.Ed.2d 358, allowing it to bring its expertise to bear on the matter, evaluate the evidence, make an initial determination, and thereby help a court later determine whether its decision exceeds the leeway that the law provides, *e.g., id.,* at 186–187, 126 S.Ct. 1613. Pp. 1167 – 1168.

231 Fed.Appx. 325, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C.J., and SCALIA, SOUTER, GINSBURG, and ALITO, JJ., joined. SCALIA, J., filed a concurring opinion, in which ALITO, J., joined, *post,* pp. 1168 – 1170. STEVENS, J., filed an opinion concurring in part and dissenting in part, in which BREYER, J., joined, *post,* pp. 1170 – 1176. THOMAS, J., filed a dissenting opinion, *post,* pp. 1176 – 1185.

## Attorneys and Law Firms

Andrew J. Pincus, Washington, DC, for Petitioner.

Gregory G. Katsas, Washington, DC, for Respondent.

Dan M. Kahan, Scott L. Shuchart, New Haven, CT, Andrew J. Pincus, **\*\*1162** Charles Rothfeld, Mayer Brown LLP, Washington, DC, for Petitioner.

Gregory G. Garre, Acting Solicitor General, Gregory G. Katsas, Assistant Attorney General, Edwin S. Kneedler, Deputy Solicitor General, Thomas H. Dupree, Jr., Deputy Assistant Attorney General, Nicole A. Saharsky, Assistant to the Solicitor General, Donald E. Keener, Keith I. McManus, Kohsei Ugumori, Jennifer J. Keeney, Washington, D.C., for Respondent.

## Opinion

Justice KENNEDY delivered the opinion of the Court.

**\*513** An alien who fears persecution in his homeland and seeks refugee status in this country is barred from obtaining that relief if he has persecuted others.

> "The term 'refugee' does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." Immigration and Nationality **\*514** Act (INA), § 101, 66 Stat. 166, as added by Refugee Act of 1980, § 201(a), 94 Stat. 102–103, 8 U.S.C. § 1101(a) (42).

This so-called "persecutor bar" applies to those seeking asylum, § 1158(b)(2)(A)(i), or withholding of removal, § 1231(b)(3)(B)(i). It does not disqualify an alien from receiving a temporary deferral of removal under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100–20, p. 20, 1465 U.N.T.S. 85; 8 CFR § 1208.17(a) (2008).

AR.05907

129 S.Ct. 1159, 173 L.Ed.2d 20, 77 USLW 4152, 09 Cal. Daily Op. Serv. 2558...

In this case the Board of Immigration Appeals (BIA) determined that the persecutor bar applies even if the alien's assistance in persecution was coerced or otherwise the product of duress. In so ruling the BIA followed its earlier decisions that found *Fedorenko v. United States,* 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981), controlling. The Court of Appeals for the Fifth Circuit, in affirming the agency, relied on its precedent following the same reasoning. We hold that the BIA and the Court of Appeals misapplied *Fedorenko.* We reverse and remand for the agency to interpret the statute, free from the error, in the first instance.

I

Petitioner in this Court is Daniel Girmai Negusie, a dual national of Eritrea and Ethiopia, his father having been a national of the former and his mother of the latter. Born and educated in Ethiopia, he left there for Eritrea around the age of 18 to see his mother and find employment. The year was 1994. After a few months in Eritrea, state officials took custody of petitioner and others when they were attending a movie. He was forced to perform hard labor for a month and then was conscripted into the military for a time. War broke out between Ethiopia and Eritrea in 1998, and he was conscripted again.

**\*515** When petitioner refused to fight against Ethiopia, his other homeland, the Eritrean Government incarcerated him. Prison guards punished petitioner by beating him with sticks and placing him in the hot sun. He was released after two years and forced to work as a prison guard, a duty he performed on a rotating basis for about four years. It is undisputed that the prisoners he guarded were being persecuted on account of a protected ground—*i.e.,* "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). Petitioner testified that he carried a gun, guarded the **\*1163** gate to prevent escape, and kept prisoners from taking showers and obtaining fresh air. He also guarded prisoners to make sure they stayed in the sun, which he knew was a form of punishment. He saw at least one man die after being in the sun for more than two hours. Petitioner testified that he had not shot at or directly punished any prisoner and that he helped prisoners on various occasions. Petitioner escaped from the prison and hid in a container, which was loaded on board a

ship heading to the United States. Once here he applied for asylum and withholding of removal.

In a careful opinion the Immigration Judge, W. Wayne Stogner, found that petitioner's testimony, for the most part, was credible. He concluded that petitioner assisted in persecution by working as an armed guard. The judge determined that although "there's no evidence to establish that [petitioner] is a malicious person or that he was an aggressive person who mistreated the prisoners, ... the very fact that he helped [the government] in the prison compound where he had reason to know that they were persecuted constitutes assisting in the persecution of others and bars [petitioner] from" obtaining asylum or withholding of removal. App. to Pet. for Cert. 16a–17a (citing, *inter alia, Fedorenko, supra*). The judge, however, granted deferral of removal under CAT because petitioner was likely to be tortured if returned to Eritrea.

**\*516** The BIA affirmed the denial of asylum and withholding. It noted petitioner's role as an armed guard in a facility where "prisoners were tortured and left to die out in the sun ... on account of a protected ground." App. to Pet. for Cert. 6a. The BIA held that "[t]he fact that [petitioner] was compelled to participate as a prison guard, and may not have actively tortured or mistreated anyone, is immaterial." *Ibid.* That is because " 'an alien's motivation and intent are irrelevant to the issue of whether he "assisted" in persecution .... [I]t is the objective effect of an alien's actions which is controlling.' " *Ibid.* (quoting *Matter of Fedorenko,* 19 I. & N. Dec. 57, 69 (BIA 1984)). The BIA also affirmed the grant of deferral of removal under CAT.

On petition for review the Court of Appeals agreed with the BIA that whether an alien is compelled to assist in persecution is immaterial for persecutor-bar purposes. *Negusie v. Gonzales,* 231 Fed.Appx. 325, 326 (2007) (*per curiam*) (citing *Fedorenko, supra,* at 512, n. 34, 101 S.Ct. 737). We granted certiorari. 552 U.S. 1255, 128 S.Ct. 1695, 170 L.Ed.2d 352 (2008).

II

Consistent with the rule in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the BIA is entitled to

AR.05908

Negusie v. Holder, 555 U.S. 511 (2009)

129 S.Ct. 1159, 173 L.Ed.2d 20, 77 USLW 4152, 09 Cal. Daily Op. Serv. 2558...

deference in interpreting ambiguous provisions of the INA. The question here is whether an alien who was compelled to assist in persecution can be eligible for asylum or withholding of removal. We conclude that the BIA misapplied our precedent in *Fedorenko* as mandating that an alien's motivation and intent are irrelevant to the issue whether an alien assisted in persecution. The agency must confront the same question free of this mistaken legal premise.

A

**[1]** It is well settled that "principles of *Chevron* deference are applicable to this statutory scheme." *INS v. Aguirre–Aguirre,* 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999). Congress has charged **\*517** the Attorney General with administering the INA, and a "ruling by the Attorney General with respect to all questions of law shall be controlling." **\*\*1164** 8 U.S.C. § 1103(a)(1). Judicial deference in the immigration context is of special importance, for executive officials "exercise especially sensitive political functions that implicate questions of foreign relations." *INS v. Abudu,* 485 U.S. 94, 110, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988). The Attorney General's decision to bar an alien who has participated in persecution "may affect our relations with [the alien's native] country or its neighbors. The judiciary is not well positioned to shoulder primary responsibility for assessing the likelihood and importance of such diplomatic repercussions." *Aguirre–Aguirre,* 526 U.S., at 425, 119 S.Ct. 1439.

The Attorney General, in turn, has delegated to the BIA the " 'discretion and authority conferred upon the Attorney General by law' " in the course of " 'considering and determining cases before it.' " *Ibid.* (quoting 8 CFR § 3.1(d)(1) (1998)). As a consequence, "the BIA should be accorded *Chevron* deference as it gives ambiguous statutory terms 'concrete meaning through a process of case-by-case adjudication.' " *Aguirre–Aguirre, supra,* at 425, 119 S.Ct. 1439 (quoting *INS v. Cardoza–Fonseca,* 480 U.S. 421, 448–449, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)). When the BIA has not spoken on "a matter that statutes place primarily in agency hands," our ordinary rule is to remand to "giv[e] the BIA the opportunity to address the matter in the first instance in light of its own expertise." *INS v. Orlando Ventura,* 537 U.S. 12, 16–17, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) *(per curiam).*

B

**[2]** The parties disagree over whether coercion or duress is relevant in determining if an alien assisted or otherwise participated in persecution. As there is substance to both contentions, we conclude that the statute has an ambiguity that the agency should address in the first instance.

Petitioner argues that the statute's plain language makes clear that involuntary acts do not implicate the persecutor **\*518** bar because " 'persecution' " presumes moral blameworthiness. Brief for Petitioner 23–28. He invokes principles of criminal culpability, concepts of international law, and the rule of lenity. *Id.,* at 28–45. Those arguments may be persuasive in determining whether a particular agency interpretation is reasonable, but they do not demonstrate that the statute is unambiguous. Petitioner all but conceded as much at argument in this Court when he indicated that the BIA has discretion to construe the duress defense in either a narrow or a broad way. Tr. of Oral Arg. 20–24.

The Government, on the other hand, asserts that the statute does not allow petitioner's construction. "The statutory text," the Government says, "directly answers that question: there is no exception" for conduct that is coerced because Congress did not include one. Brief for Respondent 11. We disagree. The silence is not conclusive. The question is whether the statutory text mandates that coerced actions must be deemed assistance in persecution. On that point the statute, in its precise terms, is not explicit. Nor is this a case where it is clear that Congress had an intention on the precise question at issue. Cf. *Cardoza–Fonseca, supra,* at 448–449, 107 S.Ct. 1207.

The Government, like the BIA and the Court of Appeals, relies on *Fedorenko* to provide the answer. This reliance is not without some basis, as the Court there held that voluntariness was not required with respect to another persecutor bar. 449 U.S., at 512, 101 S.Ct. 737. To the extent, however, the Government deems *Fedorenko* to be controlling, it is in error.

**\*\*1165** In *Fedorenko,* the Court interpreted the Displaced Persons Act of 1948 (DPA), 62 Stat. 1009. The DPA was enacted "to enable European refugees driven from their homelands by the [second world] war to emigrate to the United States without regard to traditional immigration quotas." 449 U.S., at 495, 101 S.Ct. 737. Section 2(b) of the

Negusie v. Holder, 555 U.S. 511 (2009)
129 S.Ct. 1159, 173 L.Ed.2d 20, 77 USLW 4152, 09 Cal. Daily Op. Serv. 2558...

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 685 of 1271

DPA provides relief to "any displaced person or refugee as defined in Annex I of the Constitution of the International Refugee Organization" **\*519** of the United Nations (IRO Constitution). 62 Stat. 1009. The IRO Constitution, as codified by Congress, excludes any individual "who can be shown: *(a)* to have assisted the enemy in persecuting civil populations of countries, Members of the United Nations; or *(b)* to have voluntarily assisted the enemy forces since the outbreak of the second world war in their operations against the United Nations." Annex I, Pt. II, § 2, 62 Stat. 3051–3052.

The *Fedorenko* Court held that "an individual's service as a concentration camp armed guard—whether voluntary or involuntary—made him ineligible for a visa" under § 2(*a*) of the IRO Constitution. 449 U.S., at 512, 101 S.Ct. 737. That Congress did not adopt a voluntariness requirement for § 2(a), the Court noted, "is plain from comparing § 2(*a*) with § 2(*b*), which excludes only those individuals who '*voluntarily* assisted the enemy forces.' " *Ibid.* The Court relied on the principle of statutory construction that "the deliberate omission of the word 'voluntary' from § 2(*a*) compels the conclusion that the statute made *all* those who assisted in persecution of civilians ineligible for visas." *Ibid.*

*Fedorenko* does not compel the same conclusion in the case now before us. The textual structure of the statute in *Fedorenko* ("voluntary" is in one subsection but not the other) is not part of the statutory framework considered here. Congress did not use the word "voluntary" in any subsection of the persecutor bar, so its omission cannot carry the same significance.

The difference between the statutory scheme in *Fedorenko* and the one here is confirmed when we " 'look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.' " *Dada v. Mukasey,* 554 U.S. 1, 16, 128 S.Ct. 2307, 2317, 171 L.Ed.2d 178 (2008) (quoting *Gozlon–Peretz v. United States,* 498 U.S. 395, 407, 111 S.Ct. 840, 112 L.Ed.2d 919 (1991)). Both statutes were enacted to reflect principles set forth in international agreements, but the principles differ in significant respects.

**\*520** As discussed, Congress enacted the DPA in 1948 as part of an international effort to address individuals who were forced to leave their homelands during and after the Second World War. *Fedorenko, supra,* at 495, 101 S.Ct. 737. The DPA excludes those who "voluntarily assisted the enemy forces since the outbreak of the second world war,"

62 Stat. 3052, as well as all who "assisted the enemy in persecuting civil populations of countries," *id.,* at 3051. The latter exclusion clause makes no reference to culpability. The exclusion of even those involved in nonculpable, involuntary assistance in Nazi persecution, as an expert testified in *Fedorenko,* may be " '[b]ecause the crime against humanity that is involved in the concentration camp puts it into a different category.' " 449 U.S., at 511, n. 32, 101 S.Ct. 737.

The persecutor bar in this case, by contrast, was enacted as part of the Refugee Act of 1980. Unlike the DPA, which was enacted to address not just the postwar refugee problem but also the Holocaust and its horror, the Refugee Act was designed to provide a general rule for the ongoing treatment of all refugees and displaced persons. As this Court has twice **\*\*1166** recognized, " 'one of Congress' primary purposes' in passing the Refugee Act was to implement the principles agreed to in the 1967 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223 19 U.S.T. 6224, T.I.A.S. 6577 (1968)," as well as the "United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (July 28, 1951), reprinted in 19 U.S.T. 6259 19 U.S.T. 6259." *Aguirre–Aguirre,* 526 U.S., at 427, 119 S.Ct. 1439 (quoting *Cardoza–Fonseca,* 480 U.S., at 436–437, 107 S.Ct. 1207).

These authorities illustrate why *Fedorenko,* which addressed a different statute enacted for a different purpose, does not control the BIA's interpretation of this persecutor bar. Whatever weight or relevance these various authorities may have in interpreting the statute should be considered by the agency in the first instance, and by any subsequent reviewing court, after our remand.

**\*521 C**

[3]    The Government argues that "if there were any ambiguity in the text, the Board's determination that the bar contains no such exception is reasonable and thus controlling." Brief for Respondent 11. Whether such an interpretation would be reasonable, and thus owed *Chevron* deference, is a legitimate question; but it is not now before us. The BIA deemed its interpretation to be mandated by *Fedorenko,* and that error prevented it from a full consideration of the statutory question here presented.

129 S.Ct. 1159, 173 L.Ed.2d 20, 77 USLW 4152, 09 Cal. Daily Op. Serv. 2558...

In denying relief in this case the BIA recited a rule that has developed in its own case law in reliance on *Fedorenko*: "[A]n alien's motivation and intent are irrelevant to the issue of whether he 'assisted' in persecution .... [I]t is the objective effect of an alien's actions which is controlling." App. to Pet. for Cert. 6a. The rule is based on three earlier decisions: *Matter of Laipenieks,* 18 I. & N. Dec. 433 (1983); *Matter of Fedorenko,* 19 I. & N. Dec. 57; and *Matter of Rodriguez–Majano,* 19 I. & N. Dec. 811 (1988).

In *Matter of Laipenieks,* the BIA applied the Court's *Fedorenko* analysis of the DPA to a different postwar statute, which provided for the deportation of anyone associated with the Nazis who "ordered, incited, assisted, or otherwise participated" in persecution based on a protected ground. 8 U.S.C. § 1182(a)(3)(E)(i). Finding no agency or judicial decision on point, the BIA relied on *Fedorenko*. It recognized that the unique structure of the *Fedorenko* statute was not present in § 1182(a)(3)(E)(i), but the BIA nevertheless adopted wholesale the *Fedorenko* rule: "[A]s in *Fedorenko,* ... the plain language of [ § 1182(a)(3)(E)(i) ] mandates a literal interpretation, and the omission of an intent element compels the conclusion that [ § 1182(a)(3)(E)(i) ] makes all those who assisted in the specific persecution deportable." 18 I. & N. Dec., at 464 (emphasis added). In other words, "particular motivations or intent ... is not a relevant factor." *Ibid.*

**\*522** The second decision, *Matter of Fedorenko,* also dealt with § 1182(a)(3)(E)(i), and it involved the same alien whose citizenship was revoked by this Court's *Fedorenko* decision. This time the agency sought to deport him. Fedorenko responded by requesting suspension of deportation. He argued that, unlike the DPA's bar on any assistance—voluntary or involuntary—in persecution, see *Fedorenko, supra,* at 512, 101 S.Ct. 737, the text and structure of § 1182(a)(3)(E)(i) required deportation only of those who voluntarily assisted in persecuting others. The BIA rejected that distinction, noting that it was foreclosed by *Matter of Laipenieks:* "It may be, as [Fedorenko] argues, that his service at Treblinka was involun **\*\*1167** tary.... We need not resolve the issue, however, because as a matter of law [Fedorenko's] motivations for serving as a guard at Treblinka

are immaterial to the question of his deportability under" § 1182(a)(3)(E)(i). 19 I. & N. Dec., at 69–70.

Later, the BIA applied this Court's *Fedorenko* rule to the persecutor bar that is at issue in the present case. In *Matter of Rodriguez–Majano,* the BIA granted relief because the alien's coerced conduct as a guerrilla was not persecution based on a protected ground. 19 I. & N. Dec., at 815–816. Nevertheless, in reaching its conclusion the BIA incorporated without additional analysis the *Fedorenko* rule as applied in *Matter of Laipenieks* and reiterated in *Matter of Fedorenko.* 19 I. & N. Dec., at 814–815. The BIA reaffirmed that "[t]he participation or assistance of an alien in persecution need not be of his own volition to bar him from relief." *Id.,* at 814 (citing *Fedorenko,* 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686).

Our reading of these decisions confirms that the BIA has not exercised its interpretive authority but, instead, has determined that *Fedorenko* controls. This mistaken assumption stems from a failure to recognize the inapplicability of the principle of statutory construction invoked in *Fedorenko,* as well as a failure to appreciate the differences in statutory purpose. The BIA is not bound to apply the *Fedorenko* rule **\*523** that motive and intent are irrelevant to the persecutor bar at issue in this case. Whether the statute permits such an interpretation based on a different course of reasoning must be determined in the first instance by the agency.

### III

**[4]**    Having concluded that the BIA has not yet exercised its *Chevron* discretion to interpret the statute in question, " ' "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." ' " *Gonzales v. Thomas,* 547 U.S. 183, 186, 126 S.Ct. 1613, 164 L.Ed.2d 358 (2006) *(per curiam)* (quoting *Ventura,* 537 U.S., at 16, 123 S.Ct. 353, in turn quoting *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)). This remand rule exists, in part, because "ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion. Filling

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 687 of 1271

Negusie v. Holder, 555 U.S. 511 (2009)
129 S.Ct. 1159, 173 L.Ed.2d 20, 77 USLW 4152, 09 Cal. Daily Op. Serv. 2558...

these gaps ... involves difficult policy choices that agencies are better equipped to make than courts." *National Cable & Telecommunications Assn. v. Brand X Internet Services,* 545 U.S. 967, 980, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005).

Justice STEVENS would have the Court provide a definite answer to the question presented and then remand for further proceedings. That approach, however, is in tension with the "ordinary 'remand' rule." *Ventura, supra,* at 18, 123 S.Ct. 353; see also *Cajun Elec. Power Cooperative, Inc. v. FERC,* 924 F.2d 1132, 1136 (C.A.D.C.1991) (opinion for the court by Silberman, J., joined by R. Ginsburg and Thomas, JJ.) ("[I]f an agency erroneously contends that Congress' intent has been clearly expressed and has rested on that ground, we remand to require the agency to consider the question afresh in light of the ambiguity we see"). *Thomas* is illustrative. There, the agency had not determined whether a family may constitute a social group for the purposes of refugee status. The Ninth Circuit held that the family can constitute a protected social group and that the particular family at issue did qualify. 547 U.S., at 184–185, 126 S.Ct. 1613. The Solicitor General sought review **\*524** in this Court on "whether the Ninth Circuit erred in holding, in the first instance and without prior resolution **\*\*1168** of the questions by the relevant administrative agency, that members of a family can and do constitute a particular social group, within the meaning of the Act." *Id.,* at 185, 126 S.Ct. 1613 (internal quotation marks omitted). He argued that the Ninth Circuit's decision violated the *Ventura* ordinary remand rule. We agreed and summarily reversed. 547 U.S., at 184–185, 126 S.Ct. 1613

*Ventura* and *Thomas* counsel a similar result here. Because of the important differences between the statute before us and the one at issue in *Fedorenko,* we find it appropriate to remand to the agency for its initial determination of the statutory interpretation question and its application to this case. The agency's interpretation of the statutory meaning of "persecution" may be explained by a more comprehensive definition, one designed to elaborate on the term in anticipation of a wide range of potential conduct; and that expanded definition in turn may be influenced by how practical, or impractical, the standard would be in terms of its application to specific cases. These matters may have relevance in determining whether its statutory interpretation is a permissible one.

As the Court said in *Ventura* and reiterated in *Thomas,* " '[t]he agency can bring its expertise to bear upon the matter; it can evaluate the evidence; it can make an initial determination; and, in doing so, it can, through informed discussion and analysis, help a court later determine whether its decision exceeds the leeway that the law provides.' " 547 U.S., at 186–187, 126 S.Ct. 1613 (quoting *Ventura, supra,* at 17, 123 S.Ct. 353). If the BIA decides to adopt a standard that considers voluntariness to some degree, it may be prudent and necessary for the Immigration Judge to conduct additional factfinding based on the new standard. Those determinations are for the agency to make in the first instance.

\* \* \*

**\*525** We reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

Justice SCALIA, with whom Justice ALITO joins, concurring.

I agree with the Court that "the statute has an ambiguity," *ante,* at 1164, with respect to whether an alien who was coerced to assist in persecution is barred from obtaining asylum in the United States. I agree that the agency is entitled to answer that question. *Ibid.* See *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). And I agree that a remand is in order, to give the agency an opportunity to clarify whether its affirmative answer was premised on an erroneous view that this Court's decision in *Fedorenko v. United States,* 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981), compelled it. *Ante,* at 1167 – 1168.

I would not agree to remand if I did not think that the agency has the option of adhering to its decision. The majority appears to leave that question undecided, *ante,* at 1164 (reserving whether "a particular agency interpretation is reasonable"); two Justices forthrightly disagree and would require the agency to recognize at least some sort of duress exception, *post,* at 1173 – 1174 (STEVENS, J., concurring in part and dissenting in part).

129 S.Ct. 1159, 173 L.Ed.2d 20, 77 USLW 4152, 09 Cal. Daily Op. Serv. 2558...

But good reasons for the agency's current practice exist— reasons adequate to satisfy the requirement that an agency act reasonably in choosing among various possible constructions of an ambiguous statute. The statute does not mandate the **\*\*1169** rule precluding the duress defense but does not foreclose it either; the agency is free to retain that rule so long as the choice to do so is soundly reasoned, not based on irrelevant or arbitrary factors (like the *Fedorenko* precedent).

**\*526** The primary contention to the contrary is, in short, that barring aliens who persecuted under duress would punish purely "nonculpable" conduct. That argument suffers from at least three unjustified leaps of logic.

First, it implicitly adopts a view of "culpability" that is neither the only view nor one necessarily applicable here. The culpability of one who harms another under coercion is, and has always been, a subject of intense debate, raising profound questions of moral philosophy and individual responsibility. (The so-called "Nuremberg defense" comes readily to mind.) At common law, duress was not an accepted defense to intentional killing, see 2 W. LaFave, Substantive Criminal Law § 9.7(b), pp. 74–75 (2d ed.2003); and in modern times, some States do not allow it as a defense to lesser crimes, see *id.,* at 81–82, and n. 50. Notably, there is no historical support for the duress defense when a soldier follows a military order he knows to be unlawful. *Id., § 9.7(g),* at 86; see also, *e.g., Axtell's Case,* Kel. J. 13, 84 Eng. Rep. 1060 (K.B.1660); *Prosecutor v. Erdemović,* [1997] 2 ICTY Jud. Rep. 1610, 1635 (Int'l Crim. Trib. for Former Yugoslavia). It is therefore far from clear that precluding a duress defense here would, as petitioner alleges, "disregard principles of blame ... 'universal and persistent' in American law." Brief for Petitioner 32 (quoting *Morissette v. United States,* 342 U.S. 246, 250, 72 S.Ct. 240, 96 L.Ed. 288 (1952)). All of this suggests that those who are coerced to commit wrong are at least *sometimes* "culpable" enough to be treated as criminals.

More importantly, this is not a criminal matter. This Court has long understood that an "order of deportation is not a punishment for crime." *Fong Yue Ting v. United States,* 149 U.S. 698, 730, 13 S.Ct. 1016, 37 L.Ed. 905 (1893). Asylum is a benefit accorded by grace, not by entitlement, and withholding that benefit from all who have intentionally harmed others—whether under coercion or not—is not unreasonable.

Second, petitioner assumes that the persecutor bar must have been intended merely to punish wrongdoing. But in **\*527** the context of immigration law, "culpability" as a relevant factor in determining admissibility is only one facet of a more general consideration: desirability. And there may well be reasons to think that those who persecuted others, even under duress, would be relatively undesirable as immigrants. If, for example, the asylum laws grant entry to those who suffered the persecution, might it not be imprudent to also grant entry to the coerced persecutor, who may end up living in the same community as one of his victims? The Nation has a legitimate interest in preventing the importation of ethnic strife from remote parts of the world, and the agency may resolve the statutory ambiguity in a way that safeguards that interest.

Finally, *even if* culpability is the only relevant factor, and *even if* a narrow, criminal-law based view of culpability is the authoritative one, a bright-line rule excluding all persecutors—whether acting under coercion or not—might *still* be the best way for the agency to effectuate the statutory scheme. See generally Cox & Posner, Second–Order Structure of Immigration Law, 59 Stan. L. Rev. 809 (2007). Immigration judges already face the overwhelming task of attempting to recreate, by a limited number of witnesses speaking through (often poor-quality) translation, **\*\*1170** events that took place years ago in foreign, usually impoverished countries. See *Dia v. Ashcroft,* 353 F.3d 228, 261–262 (C.A.3 2003) (en banc) (Alito, J., concurring in part and dissenting in part). Adding on top of that the burden of adjudicating claims of duress and coercion, which are extremely difficult to corroborate and necessarily pose questions of degree that require intensely fact-bound line-drawing, would increase the already inherently high risk of error. And the *cost* of error (viz., allowing *un*-coerced persecutors to remain in the country permanently) might reasonably be viewed by the agency as significantly greater than the cost of overinclusion under a bright-line rule (viz., denial of asylum to some coerced persecutors—who might anyway be entitled to protection **\*528** under the Convention Against Torture, which includes no analogous persecutor bar).

It is worth noting that although the agency's "objective effects" approach to the statute would seem to sweep beyond the duress scenario to encompass even an alien who had no idea that his actions would "objectively" assist in persecution, see *Castañeda–Castillo v. Gonzales,* 488 F.3d 17, 20 (C.A.1 2007) (en banc), there is no reason why the agency cannot consider questions of *knowledge* separate and apart

AR.05913

129 S.Ct. 1159, 173 L.Ed.2d 20, 77 USLW 4152, 09 Cal. Daily Op. Serv. 2558...

from questions of *duress*. Both can be said to relate to the mental state of the persecutor,[*] but they present different problems which can be grappled with separately. The agency need not provide an "all-embracing answer," *ibid.,* in the present case. It may evaluate problems one by one as they arise, and whatever it might decide about an unknowing persecutor is irrelevant to petitioner, who knew exactly what he was doing.

To be clear, I do not endorse any particular rule. It is to agency officials, not to the Members of this Court, that Congress has given discretion to choose among permissible interpretations of the statute. They deserve to be told clearly whether we are serious about allowing them to exercise that discretion, or are rather firing a warning shot across the bow.

Justice STEVENS, with whom Justice BREYER joins, concurring in part and dissenting in part.

The narrow question of statutory construction presented by this case is whether the so-called "persecutor bar," 8 U.S.C. §§ 1101(a)(42), 1158(b)(2)(A)(i), 1231(b)(3)(B), disqualifies from asylum or withholding of removal an alien whose **\*529** conduct was coerced or otherwise the product of duress. If the answer to that threshold question is "no," courts should defer to the Attorney General's evaluation of particular circumstances that may or may not establish duress or coercion in individual cases. But the threshold question the Court addresses today is a "pure question of statutory construction for the courts to decide." INS v. Cardoza–Fonseca, 480 U.S. 421, 446, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). For that reason, while I agree with the Court's cogent explanation of why its misguided decision in Fedorenko v. United States, 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981), does not govern our interpretation of the persecutor bar, I would provide a definite answer to the question presented and then remand for further proceedings.

I

Judicial deference to agencies' views on statutes they administer was not born in **\*\*1171** Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), nor did the "singularly judicial role of marking the boundaries of

agency choice," Young v. Community Nutrition Institute, 476 U.S. 974, 988, 106 S.Ct. 2360, 90 L.Ed.2d 959 (1986) (STEVENS, J., dissenting), die with that case. In the years before *Chevron,* this Court recognized that statutory interpretation is a multifaceted enterprise, ranging from a precise construction of statutory language to a determination of what policy best effectuates statutory objectives. We accordingly acknowledged that a complete interpretation of a statutory provision might demand both judicial construction and administrative explication. *E.g.,* NLRB v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944) (construing the term "employee" in the National Labor Relations Act but deferring to the National Labor Relations Board's finding that newsboys were employees); see Nathanson, Administrative Discretion in the Interpretation of Statutes, 3 Vand. L.Rev. 470 (1950).

*Chevron* adhered to this approach. There, we recognized that the Clean Air Act did not define "stationary sources," **\*530** 42 U.S.C. § 7502(b)(6) (1982 ed.), but rather implicitly delegated to the Environmental Protection Agency (EPA) the policy question whether States could treat entire plants or only their discrete pollution-emitting devices as sources of pollution for purposes of the Act's permit program. Congress left a gap for the agency to fill, and the agency brought its expertise, political acuity, and information-gathering abilities to bear in doing so. See Chevron, 467 U.S., at 865–866, 104 S.Ct. 2778.[1] In keeping with precedent, see id., at 843–845, and nn. 9, 11–14, 104 S.Ct. 2778, our opinion reaffirmed both that "[t]he judiciary is the final authority on issues of statutory construction," id., at 843, n. 9, 104 S.Ct. 2778, and that courts should defer to an agency's reasonable formulation of policy in response to an explicit or implicit congressional delegation of authority. The *Chevron* framework thus accounts for the different institutional competencies of agencies and courts: Courts are expert at statutory construction, while agencies are expert at statutory implementation. That the distinction can be subtle does not lessen its importance.

In the 25 years since *Chevron* was decided, this Court has continued to recognize that courts and agencies play complementary roles in the project of statutory interpretation. We have repeatedly held that "ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 690 of 1271

Negusie v. Holder, 555 U.S. 511 (2009)

129 S.Ct. 1159, 173 L.Ed.2d 20, 77 USLW 4152, 09 Cal. Daily Op. Serv. 2558...

fashion." *National Cable & Telecommunications Assn. v. Brand X Internet Services,* 545 U.S. 967, 980, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005). But even when confronted with a statute that involves a degree **\*531** of ambiguity—as most statutes do—we have not abdicated our judicial role. The fact that Congress has left a gap for the agency to fill means that courts should defer to the agency's reasonable gap-filling decisions, not that courts should cease to mark the bounds of delegated agency choice.[2]

**\*\*1172** In cases involving agency adjudication, we have sometimes described the court's role as deciding pure questions of statutory construction and the agency's role as applying law to fact. See, *e.g.,* *Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434; *NLRB v. Food & Commercial Workers,* 484 U.S. 112, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987); see also *Republic of Austria v. Altmann,* 541 U.S. 677, 701–702, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004). While this phrasing is peculiar to the adjudicatory context, the principle applies to *Chevron*'s domain more broadly. In the context of agency rulemaking, for instance, we might distinguish between pure questions of statutory interpretation and policymaking, or between central legal issues and interstitial questions. See *Barnhart v. Walton,* 535 U.S. 212, 222, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002).[3] The label is immaterial. What matters is the principle: Certain aspects of statutory interpretation remain within the purview of the courts, even when the statute is not entirely clear, while others are properly understood as delegated by Congress to an expert and accountable administrative body. Statutory language may thus admit of both judicial construction and agency exposition.

**\*532** II

Two of this Court's cases construing the Immigration and Nationality Act (INA), 66 Stat. 166, 8 U.S.C. § 1101 *et seq.,* illustrate the proper division of responsibility between courts and agencies and highlight when *Chevron* deference is appropriate and when it is not. In *Cardoza–Fonseca,* the question was whether the standard of INA § 243(h), 8 U.S.C. § 1253(h) (1982 ed.), which requires an alien to show that she is more likely than not to be subject to persecution if she is deported, also governs applications for asylum under § 208(a), 8 U.S.C. § 1158(a) (1982 ed.), which authorizes

the Attorney General to grant asylum to an alien who has a well-founded fear of persecution in her home country. After considering the INA's language, its legislative history, and the United Nations Protocol that Congress had implemented, the Court determined that the two standards are not the same.

In so holding, we decisively rejected the Government's contention, echoed by Justice SCALIA's concurrence in the judgment, that the Board of Immigration Appeals' (BIA) interpretation of the statute merited deference under our then-recent decision in *Chevron*. "The question whether Congress intended the two standards to be identical is a pure question of statutory construction for the courts to decide," we stated. 480 U.S., at 446, 107 S.Ct. 1207. We therefore did not defer to the BIA's interpretation of the two standards as equivalent but instead employed traditional tools of statutory construction and "concluded that Congress did not intend the two standards to be identical." *Ibid.*[4]

**\*\*1173** **\*533** Importantly, we recognized that *Chevron* deference need not be an all-or-nothing venture. Even after the question of the standards' equivalency was resolved, there remained the question of their application. We explained: "The narrow legal question whether the two standards are the same is, of course, quite different from the question of interpretation that arises in each case in which the agency is required to apply either or both standards to a particular set of facts." 480 U.S., at 448, 107 S.Ct. 1207. And we noted that applying the INA was a task particularly suited to the agency's unique competencies: "There is obviously some ambiguity in a term like 'well-founded fear' which can only be given concrete meaning through a process of case-by-case adjudication. In that process of filling ' "any gap left, implicitly or explicitly by Congress," ' the courts must respect the interpretation of the agency to which Congress has delegated the responsibility for administering the statutory program." *Ibid.* (quoting *Chevron,* 467 U.S., at 843, 104 S.Ct. 2778, in turn quoting *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974)).

In *INS v. Aguirre–Aguirre,* 526 U.S. 415, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999), the Court encountered just the type of agency decision *Cardoza–Fonseca* indicated would warrant *Chevron* deference. The BIA had denied withholding of deportation because it found that the respondent had "committed a serious nonpolitical crime" before he entered the United States, 8 U.S.C. § 1253(h)(2)(C) (1994 ed.). The

Court of Appeals reversed the agency's decision and required it to supplement its balancing test with specific additional factors (such as whether the respondent's acts were grossly out of proportion to their objective and whether the acts were politically necessary and successful).

We reversed the Court of Appeals, concluding that *Chevron* deference should be accorded to the BIA "as it gives **\*534** ambiguous statutory terms 'concrete meaning through a process of case-by-case adjudication.' " 526 U.S., at 425, 119 S.Ct. 1439 (quoting *Cardoza–Fonseca,* 480 U.S., at 448, 107 S.Ct. 1207). The BIA's formulation of a test to apply the statutory standard in individual cases and its application of that test in respondent's case were precisely the sort of agency actions that merited judicial deference.

### III

The threshold question the Court addresses today is the kind of "pure question of statutory construction for the courts to decide" that we answered in *Cardoza–Fonseca, id.,* at 446, 107 S.Ct. 1207, rather than a fact-intensive question of the kind we addressed in *Aguirre–Aguirre*. Just as we decided the narrow legal question presented in *Cardoza–Fonseca* but did not "attempt to set forth a detailed description of how the 'well-founded fear' test should be applied," 480 U.S., at 448, 107 S.Ct. 1207, I would decide the narrow legal question now before us and remand for the agency to determine how the persecutor bar applies in individual cases. [5]

**\*\*1174** For reasons similar to those set forth in my dissent in *Fedorenko,* I think it plain that the persecutor bar does not disqualify **\*535** from asylum or withholding of removal an alien whose conduct was coerced or otherwise the product of duress. Although I agree in full with the Court's conclusion that the majority opinion in *Fedorenko* does not govern our interpretation of the persecutor bar, the differences the Court highlights between the Displaced Persons Act of 1948 (DPA), 62 Stat. 1009, and the Refugee Act of 1980, 94 Stat. 102, only strengthen my conclusion that *voluntary* assistance in persecution is required and that duress and coercion vitiate voluntariness.

The *Fedorenko* Court's construction of the DPA threatened to exclude from the United States concentration camp prisoners who were forced to assist the Nazis in the persecution of other prisoners. In my view, this construction was insupportable—the DPA's exclusion of persons who "assisted the enemy in persecuting civil populations," Constitution of the International Refugee Organization, Annex I, Pt. II, § 2*(a),* 62 Stat. 3051, did not extend to concentration camp prisoners who did so involuntarily. These prisoners were victims, not persecutors.

Without an exception for involuntary action, the Refugee Act's bar would similarly treat entire classes of victims as persecutors. The Act does not support such a reading. The language of the persecutor bar is most naturally read to denote culpable conduct, and this reading is powerfully supported by the statutory context and legislative history.

As this Court has previously recognized—and as the majority acknowledges again today—Congress passed the Refugee Act to implement the United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150 (hereinafter Convention), reprinted in 19 U.S.T. 6259 19 U.S.T. 6259, and the 1967 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577 (hereinafter Protocol). These treaties place a mandatory obligation on signatory states not to "expel or return ('refouler') a refugee in any manner whatsoever to ... territories **\*536** where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Convention, Art. 33(1), 19 U.S. T., at 6276; Protocol, Art. I, 19 U.S. T., at 6225. The Refugee Act's withholding of removal provision specifically tracks this language. 8 U.S.C. § 1231(b)(3)(A); see H.R.Rep. No. 96–608, p. 18 H.R.Rep. No. 96–608, p. 18 (1979) (withholding of removal provision "clearly reflects our legal obligations under international agreements," specifically Convention Article 33). [6]

**\*\*1175** The Convention excludes from the *nonrefoulement* obligation of Article 33 persons who have "committed a crime against peace, a war crime, or a crime against humanity." Convention, Art. 1(F)*(a),* 19 U.S. T., at 6263. It is this exception that the persecutor bar reflects. See, *e.g.,* H.R.Rep. No. 96–608, at 18 H.R.Rep. No. 96–608, at 18 (persecutor bar encompasses "exceptions ... provided in the Convention relating to aliens who have themselves participated in persecution"); H.R. Conf. Rep. No. 96–781, p. 20 (1980). The language of the Convention's exception is critical: We do not normally convict individuals of *crimes* when their actions are coerced or otherwise involuntary. Indeed, the United Nations Handbook, **\*537** to which the Court has

129 S.Ct. 1159, 173 L.Ed.2d 20, 77 USLW 4152, 09 Cal. Daily Op. Serv. 2558...

looked for guidance in the past, states that all relevant factors, including "mitigating circumstances," must be considered in determining whether an alien's acts are of a "criminal nature" as contemplated by Article 1(F). Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status ¶¶ 157, 162 (reedited Jan. 1992). Other states parties to the Convention and Protocol likewise read the Convention's exception as limited to culpable conduct.[7] When we interpret treaties, we consider the interpretations of the courts of other nations, and we should do the same when Congress asks us to interpret a statute in light of a treaty's language. See *Zicherman v. Korean Air Lines Co.,* 516 U.S. 217, 226–228, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996). Congress' effort to conform United States law to the standard set forth in the U.N. Convention and Protocol shows that it intended the persecutor bar to apply only to culpable, voluntary acts—and it underscores that Congress did not delegate the question presented by this case to the agency.

While I would hold that the persecutor bar does not automatically disqualify from asylum or withholding of removal an alien who acted involuntarily,[8] I would leave for the Attorney **\*538** General—and, through his **\*\*1176** own delegation, the BIA—the question how the voluntariness standard should be applied. The agency would retain the ability, for instance, to define duress and coercion; to determine whether or not a balancing test should be employed; and, of course, to decide whether any individual asylum-seeker's acts were covered by the persecutor bar. Those are the sorts of questions suited to the agency's unique competencies in administering the INA. The threshold question before the Court is not.

IV

Because I remain convinced that the narrower interpretation of *Chevron* endorsed by the Court in *Cardoza–Fonseca* was more faithful to the rationale of that case than the broader view the Court adopts today, I am unable to join its opinion. I would answer the question of law that this case presents with an unequivocal "no" and remand to the agency for further proceedings.

Justice THOMAS, dissenting.

The "persecutor bar" in the Immigration and Nationality Act (INA) denies asylum and the withholding of removal to any alien who has "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a) (42), 1158(b)(2)(A), 1231(b)(3)(B)(i). The Board of Immigration Appeals (BIA), principally relying on this Court's decision in *Fedorenko v. United States,* 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981), held that the statute does not require that the persecution be voluntarily inflicted. The Court of Appeals for the Fifth Circuit affirmed.

According to the Court, *Fedorenko,* which construed the similar text of a persecution bar in the Displaced Persons Act of 1948 (DPA), is largely irrelevant to the question presented here. See *ante,* at 1164 – 1166, 1166 – 1167; see also *ante,* at 1170 – 1171 **\*539** SCALIA, J., concurring). The majority further holds that the INA is ambiguous as to "whether coercion or duress is relevant in determining if an alien assisted or otherwise participated in persecution" and that the agency, therefore, should interpret the statute in the first instance to determine whether it reasonably can be read to include a voluntariness requirement. *Ante,* at 1164, 1167 – 1168; see also *ante,* at 1168 (SCALIA, J., concurring). I disagree with both of these conclusions. Because the INA unambiguously precludes any inquiry into whether the persecutor acted voluntarily, *i.e.,* free from coercion or duress, I would affirm the judgment of the Court of Appeals. I respectfully dissent.

I

Petitioner Daniel Girmai Negusie testified to the Immigration Judge (IJ) that he was forced to work as an armed guard for four years at an Eritrean prison camp where prisoners were persecuted because of their religious beliefs. According to petitioner, part of his job was "to firmly control the prisoners, to punish the prisoners, too, by exposing them" to the extreme heat of the African sun. App. 58. The guards "would ... hold [a] stick [with] their hand" and follow prisoners who were being forced to "roll on the ground in the sun." *Id.,* at 23. Because "it was extremely hot," prisoners would quickly "get tired and [feel] shortness of breath and stop" rolling. *Id.,* at 24. They were then beaten. Prisoners typically could not survive this punishment for more than two hours. Indeed, at least

Negusie v. Holder, 555 U.S. 511 (2009)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 693 of 1271

129 S.Ct. 1159, 173 L.Ed.2d 20, 77 USLW 4152, 09 Cal. Daily Op. Serv. 2558...

one prisoner died from sun exposure while petitioner stood **1177 guard. See *ante,* at 1163 (majority opinion).

Petitioner testified that, as a guard, he prevented the prisoners from showering and forbade them from leaving their rooms for fresh air. This form of punishment was particularly severe because the prisons were "built from stone and bricks" with "no cooling system, no ventilation, no windows," and intolerable heat. App. 20, 30. Petitioner also prevented *540 prisoner escapes, for which the punishment was forced sun exposure. And, although petitioner never used "electricity to torture" prisoners, he was aware that his supervisor did. *Id.,* at 61–62.

But petitioner, who had converted to Protestantism when he was confined as a prisoner at the camp, also testified that he did not want to persecute any of the prisoners because his new religion taught him "to be merciful." *Id.,* at 34. Thus, at times he disobeyed his orders. On one occasion, he gave water to a prisoner who was dying from sun exposure. On another occasion, he let female prisoners take showers after they had been denied that privilege "for a long time." *Id.,* at 37. Petitioner also occasionally allowed some of the prisoners to "go outside during the night and during the evenings and ... refresh themselves in the fresh air." *Id.,* at 37–38.

After four years as a prison guard, petitioner deserted his post, swam to a shipping container, and hid inside. See *ante,* at 1163 (majority opinion). The container arrived in the United States with petitioner inside on December 20, 2004. Petitioner applied for asylum and the withholding of removal under the INA, 8 U.S.C. § 1101 *et seq.* He also applied for protection under the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (CAT), under which it is "the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." Foreign Affairs Reform and Restructuring Act of 1998, § 2242(a), 112 Stat. 2681– 822, note following 8 U.S.C. § 1231, p. 263 (United States Policy with Respect to Involuntary Return of Persons in Danger of Subjection to Torture (hereinafter CAT Policy)). See also CAT, Dec. 10, 1984, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85. Petitioner feared that, if returned to Eritrea, he would "be *541 executed" because he had converted to Protestantism and deserted his military post. App. 65, 68.

The INA provides the Executive with the discretion to grant asylum to aliens that are "unable or unwilling" to return to their home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1). The INA also requires the Executive to withhold removal of aliens to a country in which there is a "clear probability" that their "life or freedom would be threatened" because of their "race, religion, nationality, membership in a particular social group, or political opinion." § 1231(b)(3)(A). However, the INA prohibits the Executive from granting asylum or withholding removal if an alien "ordered, incited, assisted, or otherwise participated in the persecution" of any person on account of "race, religion, nationality, membership in a particular social group, or political opinion." § 1158(b)(2)(A)(i) (asylum); § 1231(b)(3)(B) (withholding of removal). Nonetheless, in light of the CAT's requirement that "[n]o State Party shall ... return ... a person to another State where there are substantial grounds for believing **1178 that he would be in danger of being subjected to torture," Art. 3, S. Treaty Doc. No. 100– 20, at 20, regulations implementing that convention provide "deferral of removal" to aliens subject to the INA persecutor bar who would more likely than not be tortured if removed to their home country.[1] *542 8 CFR §§ 1208.16(c)(4), (d)(2), 1208.17(a) (2008); see also CAT Policy (b), at 263 (requiring federal agencies to "prescribe regulations to implement the obligations of the United States under Article 3 of the [CAT], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention").

The IJ denied petitioner's applications for asylum and the withholding of removal, but granted him deferral of removal. The BIA affirmed. In their view, petitioner's conduct objectively qualified as assistance or participation in the persecution of others based on religion. See *ante,* at 1163 (majority opinion). Relying on *Fedorenko,* the IJ and BIA found that even if petitioner was "compelled to participate as a prison guard" against his wishes, his "motivation and intent are irrelevant to the issue of whether he 'assisted' in persecution." *Ante,* at 1163 (some internal quotation marks omitted). Therefore, petitioner was ineligible for asylum or the withholding of removal under the INA. The IJ and BIA agreed, however, that petitioner qualified for deferral of removal because it is "more likely than not that he would be tortured" if returned to Eritrea given that its "government

Negusie v. Holder, 555 U.S. 511 (2009)

129 S.Ct. 1159, 173 L.Ed.2d 20, 77 USLW 4152, 09 Cal. Daily Op. Serv. 2558...

has used deadly force and threatened to use deadly force against deserters." App. to Pet. for Cert. 20a, 19a. The Court of Appeals affirmed. See *Negusie v. Gonzales,* 231 Fed.Appx. 325, 326 (C.A.5 2007) *(per curiam).*

## II

As with all statutory interpretation questions, construction of the INA's persecutor bar must begin with the plain language of the statute. See *Jimenez v. Quarterman, supra,* at 116 – 119, 129 S.Ct. 681, 684–85, 172 L.Ed.2d 475 (2009) (slip op., at 5) (citing *Lamie v. United States Trustee,* 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004)). If the text of a statute governing agency action " 'directly address[es] the precise question at issue,' " then " 'that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.' " *National Assn. of Home Builders v.* **\*543** *Defenders of Wildlife,* 551 U.S. 644, 665, 127 S.Ct. 2518, 2534, 168 L.Ed.2d 467 (2007) (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

### A

A court must first "look to the particular statutory language at issue." *K mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988). As the majority acknowledges, see *ante,* at 1164 – 1165, the text of the INA's persecutor **\*\*1179** bar neither includes the term "voluntary" nor contains an exception for involuntary, coerced conduct. The statute instead applies to *any* alien who "ordered, incited, assisted, or otherwise participated in the persecution of any person" on account of a protected ground. 8 U.S.C. §§ 1101(a)(42), 1158(b)(2)(A)(i), 1231(b)(3)(B)(i).

The statute's key terms also do not imply any voluntariness requirement for persecution. Under the ordinary meaning of the term "persecution" at the time of the statute's enactment in 1980 and its reenactment in 1996, the act of persecution alone is sufficient to classify one's conduct as persecution. See Webster's Ninth New Collegiate Dictionary 877 (1991) (hereinafter Webster's Ninth) (defining "persecution" as "the

act or practice of persecuting esp. those who differ in origin, religion, or social outlook"); see also Webster's New Collegiate Dictionary 855 (1975) (hereinafter Webster's) (same). The term itself includes no intrinsic *mens rea* requirement. As a result, an individual can "persecute"— meaning "harass in a manner designed to injure, grieve, or afflict"—without having designed the act or intended for injury, grief, or affliction to occur. Webster's Ninth 877; see also Webster's 855 (same).

The persecutor bar's inclusion of those who "assist" or "participate" confirms that it does not include a voluntariness requirement. The term "assist" is defined as "to give support or aid," Webster's Ninth 109, or "to help," Oxford American Dictionary 36 (1980) (hereinafter Oxford). See **\*544** also Black's Law Dictionary 111 (5th ed.1979) (hereinafter Black's) (defining "assist" as "[t]o help; aid; succor; lend countenance or encouragement to; participate in as an auxiliary"). And "participate" means simply "to take part," Webster's Ninth 858, or "to have a share, to take part in something," Oxford 487; see also Black's 1007 (defining "participate" as "[t]o receive or have a part or share of; to partake of; experience in common with others; to have or enjoy a part or share in common with others"). Accordingly, this Court has concluded that the ordinary meanings of "assist" and "participate" do not "connote voluntariness." *Pennsylvania Dept. of Corrections v. Yeskey,* 524 U.S. 206, 211, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (participate); see also *Fedorenko,* 449 U.S., at 512, 101 S.Ct. 737 (assist). These are "terms and concepts of breadth," *Russello v. United States,* 464 U.S. 16, 21–22, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983), that require only that an individual take "*some* part in" an activity, or help it to occur in some way, *Reves v. Ernst & Young,* 507 U.S. 170, 178–179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (emphasis in original). Even if participation or assistance is coerced, it remains participation or assistance just the same.

### B

In addition to the particular statutory section of the INA before the Court, "the language and design of the statute as a whole" is instructive in determining the provision's plain meaning. *K mart Corp., supra,* at 291, 108 S.Ct. 1811; see also *Amoco Production Co. v. Gambell,* 480 U.S. 531, 552–553, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). Here, the

AR.05919

Negusie v. Holder, 555 U.S. 511 (2009)

129 S.Ct. 1159, 173 L.Ed.2d 20, 77 USLW 4152, 09 Cal. Daily Op. Serv. 2558...

INA's design and structure buttress the conclusion that the persecutor bar applies irrespective of voluntariness.

First, Congress has evidenced its ability to both specifically require voluntary conduct and explicitly exclude involuntary conduct in other provisions of the INA. See *infra,* at 1184 – 1185. For example, Congress has barred admission to the United States of totalitarian party members unless their membership was "involuntary," **1180 8 U.S.C. § 1182(a)(3)(D)(ii), and it has provided for the termination of asylum when an alien "has voluntarily availed himself or herself" of another **545 country's protections, § 1158(c)(2)(D). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello, supra,* at 23, 104 S.Ct. 296 (internal quotation marks omitted); see, *e.g., Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 452–454, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002). The absence of a voluntariness requirement in the INA persecutor bar is no exception.

Second, federal immigration law provides calibrated remedies, which include partial refuge for specified aliens who have both suffered from and inflicted persecution. Those who have been persecuted and have not engaged in persecution may receive both asylum and the withholding of removal. §§ 1231(b)(3)(A), 1158(b)(1)(A). Those at the other end of the spectrum, who have not been persecuted but have persecuted others, may not receive either asylum or the withholding of removal. §§ 1231(b)(3)(B)(i), 1158(b)(2)(A)(i). And finally, for many individuals who (like petitioner) have both persecuted others and been persecuted, the scheme provides temporary refuge; they will receive deferral of removal under the CAT if they will face torture upon their return to their home country. CAT Policy (a), at 263; see also 8 CFR §§ 1208.13(a), 1208.16(d)(2).

Where "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions," courts should not read one part of the legislative regime (the INA) to provide a different, and conflicting, solution to a problem that has already been specifically addressed elsewhere in the federal immigration regime

(regulations implementing the CAT). *Varity Corp. v. Howe,* 516 U.S. 489, 519, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (THOMAS, J., dissenting); see also *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). Federal law provides only partial protection to a victim of persecution who has also engaged in persecution, voluntarily or not. There simply is no justification for writing **546 into the INA's persecutor bar the greater protections of asylum and the withholding of removal for individuals who were coerced into engaging in persecution. That is, the "assumption of inadvertent omission" of a voluntariness requirement in the INA "is rendered especially suspect upon close consideration of [a statute's] interlocking, interrelated, and interdependent remedial scheme" that addresses the specific problem at issue in a conflicting way. *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 146–147, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). [2]

## **1181 C

Finally, Congress is aware of a judicial interpretation of statutory language and "adopt[s] that interpretation when it re-enacts a statute without change." *Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978); see also *Traynor v. Turnage,* 485 U.S. 535, 546, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988); 2B N. Singer & J. Singer, Sutherland on Statutory Construction § 49.9, pp. 127–133 (7th ed.2008). Here, the statutory and decisional backdrop against which Congress enacted the INA's persecutor bar counsels against grafting a voluntariness requirement onto the statute.

When Congress enacted the INA's persecutor bar, it essentially retained the language used in similar predecessor statutes. Under the 1948 DPA persecutor bar, entry was denied **547 to all who " 'assisted the enemy in persecuting civil[ians].' " *Fedorenko, supra,* at 495, 101 S.Ct. 737 (quoting 62 Stat. 3051). In 1950, Congress added a second persecutor bar to the DPA that applied "to any person who advocated or assisted in the persecution of any person because of race, religion, or national origin." § 13, 64 Stat. 227. In the years that followed, Congress continued to use this same broad language in denying asylum to specific categories of persecutors. See, *e.g.,* § 105, 91 Stat. 1224 (denying permanent residence to aliens from Vietnam,

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 695 of 1271

AR.05920

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 696 of 1271

Negusie v. Holder, 555 U.S. 511 (2009)

129 S.Ct. 1159, 173 L.Ed.2d 20, 77 USLW 4152, 09 Cal. Daily Op. Serv. 2558...

Laos, and Cambodia "who ordered, assisted, or otherwise participated in the persecution of any person because of race, religion, or political opinion"); 8 U.S.C. §§ 1182(a)(3)(E), 1227(a)(4)(D) (authorizing the exclusion of anyone who had been associated with Nazi forces and had "ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion"); § 14(a), 67 Stat. 406 (imposing persecutor bar on "any person who personally advocated or assisted in the persecution of ... [a] group of persons because of race, religion, or national origin").

Congress then enacted the INA bar in 1980. This statute comprehensively labeled as a persecutor "any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." § 201(a), 94 Stat. 102–103. Congress reenacted the INA's persecutor bar in 1996 and retained its breadth. See Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), §§ 305(a)(3), 601(a)(1), 604(a), 110 Stat. 3009–602, 3009–689, 3009–691.

Congress' uninterrupted use of this broad statutory language, which parallels the persecutor bars dating back to 1948, was not accidental. By the time of the 1996 reenactment, this Court had specifically interpreted the plain language of the predecessor bars to apply regardless of the voluntariness of a persecutor's conduct. See *548 Fedorenko, 449 U.S., at 512, 101 S.Ct. 737 (1948 DPA bar); see also United States v. Koreh, 59 F.3d 431, 439 (C.A.3 1995) (1950 DPA bar); United States v. Schmidt, 923 F.2d 1253, 1258 (C.A.7 1991) (1948 DPA bar); Maikovskis v. INS, 773 F.2d 435, 445–446 (C.A.2 1985) (8 U.S.C. § 1251(a)(19) (1982 ed.), transferred to § 1227(a)(4)(D) (2006 ed.)). In particular, this Court had held that the phrase in the 1948 DPA bar, "assisted the enemy in persecuting civil[ians]," contained no "'involuntary assistance' exception." Fedorenko, 449 U.S., at 512, 101 S.Ct. 737. Rather, the statute's "plain language" made clear that "an individual's **1182 service as a concentration camp armed guard—whether voluntary or involuntary—made him ineligible for a visa." Ibid.

In light of this legal backdrop, Congress' decisions in 1980 and 1996 to retain a persecutor bar that broadly applies to anyone who "assisted, or otherwise participated in the persecution" of any person, §§ 1158(b)(2)(A)(i), 1231(b)(3)(B), is significant evidence that Congress did not intend to include any involuntariness exception in the INA bar. This Court must assume, absent textual proof to the contrary, that Congress was aware of the Fedorenko decision when it reenacted the persecutor bar and thus "adopt[ed] that interpretation when it re-enact[ed the] statute without change," Lorillard, supra, at 580, 98 S.Ct. 866.

D

In sum, the INA's persecutor bar does not require that assistance or participation in persecution be voluntary or uncoerced to fall within the statute's reach. It instead "mandates precisely" what it says: "[A]n individual's service as a [prison] camp armed guard—whether voluntary or involuntary—ma[kes] him ineligible for" asylum or withholding of removal if the guard's service involved assistance or participation in the persecution of another person on account of a protected ground. Fedorenko, supra, at 512, 101 S.Ct. 737. Here, it is undisputed that petitioner served at a prison camp where guards persecuted prisoners because of their religious beliefs. See ante, at 1162 – 1163 (majority opinion). It also is undisputed *549 that petitioner carried out the persecution by preventing prisoners from escaping and by standing guard while at least one prisoner died from sun exposure. Ibid. Petitioner, therefore, "assisted, or otherwise participated," in persecution and thus is statutorily disqualified from receiving asylum or withholding of removal under the INA.[3]

III

The majority nevertheless concludes the statute's "silence," ante, at 1164, creates ambiguity, and therefore remands the case to the BIA for it to determine, in the first instance, whether persecution must be voluntary to fall within the terms of the INA's persecutor bar. "The Court's efforts **1183 to derive ambiguity from th[e] utmost clarity" of the persecutor bar, however, "are unconvincing" in every respect. INS v. St. Cyr, 533 U.S. 289, 329, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (SCALIA, J., dissenting).

*550 The majority principally finds ambiguity in the statutory text because it does not include either the word

129 S.Ct. 1159, 173 L.Ed.2d 20, 77 USLW 4152, 09 Cal. Daily Op. Serv. 2558...

"voluntary" or the word "involuntary." See *ante,* at 1165. But a statute cannot be deemed ambiguous until the court "exhaust[s] the aid of the 'traditional tools of statutory construction' " and determines that Congress did not resolve the issue under consideration. *Clark v. Martinez,* 543 U.S. 371, 402, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005) (THOMAS, J., dissenting) (quoting *Chevron,* 467 U.S., at 843, n. 9, 104 S.Ct. 2778). Deeming a statute with broad terms to be ambiguous for that reason alone essentially requires Congress either to obey a judicially imposed clear-statement rule or accept the risk that the courts may refuse to give full effect to a statute's plain meaning in the name of *Chevron* deference. Not every difficult question of statutory construction amounts to a statutory gap for a federal agency to fill. See *ante,* at 1170 – 1172 (opinion of STEVENS, J.). And the Court should not, "in the name of deference, abdicate its responsibility to interpret a statute" simply because it requires some effort. *Global Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc.,* 550 U.S. 45, 77, 127 S.Ct. 1513, 167 L.Ed.2d 422 (2007) (THOMAS, J., dissenting).

The majority makes no attempt to apply the "traditional tools of statutory construction" to the persecutor bar before retreating to ambiguity. See *ante,* at 1164 – 1165. Rather, it merely observes that Congress could have spoken more directly to the issue, which it finds sufficient to render the statute ambiguous on this score. *Ante,* at 1164 – 1165. But the absence of a phrase specifying that the provision applies to both involuntary and voluntary conduct is not definitive proof of ambiguity. It is certainly correct that Congress " 'could have spoken in clearer terms,' " *Clark,* 543 U.S., at 402, 125 S.Ct. 716 (THOMAS, J., dissenting), as it almost always can in any statute. However, this "proves nothing" in evaluating whether the statute is ambiguous. *Ibid.* The question before the Court instead is whether Congress has provided an unambiguous answer in the plain language that it chose to **\*551** use. Here, for the reasons just explained, the traditional tools of statutory interpretation show with "utmost clarity," *St. Cyr, supra,* at 329, 121 S.Ct. 2271 (SCALIA, J., dissenting), that the statute applies regardless of the voluntariness of the alien who participates or assists in persecution. [4]

The majority also finds ambiguity based on differences between the INA and the DPA statutory bar considered in *Fedorenko.* In particular, the majority points to the *Fedorenko*

Court's reliance on a second part of the DPA persecutor bar, which **\*\*1184** applied to those who " '*voluntarily* assisted the enemy forces ... in their operations against the United Nations.' " 449 U.S., at 495, and n. 4, 101 S.Ct. 737 (quoting 62 Stat. 3052; emphasis added). The Court noted that "[u]nder traditional principles of statutory construction, the deliberate omission of the word 'voluntary' from § 2(a)," which addressed the assistance of persecution—but not from § 2(b)—"compel[led] the conclusion that the statute made *all* those who assisted in the persecution of civilians ineligible for visas." 449 U.S., at 512, 101 S.Ct. 737. According to the majority, because the INA persecutor bar, unlike the DPA bar, does not include a provision limited by the word "voluntarily" adjacent to the provision that is not so limited, the absence of the adverb here cannot carry the significance given it in *Fedorenko.* See *ante,* at 1165.

The majority's reasoning is flawed. The mere fact that the INA's persecutor bar is not accompanied by a neighboring **\*552** provision containing the word "voluntarily" does not negate the significance of the term's absence when other INA provisions are explicitly limited to actions undertaken voluntarily. As noted above, see *supra,* at 1165, the INA imposes a voluntariness requirement in a host of statutory provisions, see, *e.g.,* 8 U.S.C. § 1158(c)(2)(D) (terminating asylum when alien has "voluntarily" availed himself of the protection of his country); §§ 1182(a)(3)(D)(i)-(ii) (denying admission and naturalization to those who have been members of, or affiliated with, "the Communist or any other totalitarian party" unless that membership or affiliation was "involuntary"); § 1182(d)(3)(B)(i) (2006 ed., Supp. I) (denying admission to those who have "voluntarily and knowingly" engaged in, endorsed, espoused, or persuaded others to endorse, espouse, or support terrorist activity); § 1229c(a)(1) (allowing an alien to "voluntarily" depart the United States); §§ 1424(a), (d) (precluding naturalization for members of certain totalitarian parties, unless membership was "involuntary"); § 1481(a) (providing for loss of nationality by "voluntarily" performing certain specified acts with the intention of relinquishing nationality). [5]

In the immigration and naturalization context, then, Congress is certainly capable of declaring its preference for a voluntariness requirement. That Congress' explicit references to voluntariness appear in other sections of this particular

Negusie v. Holder, 555 U.S. 511 (2009)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 698 of 1271

129 S.Ct. 1159, 173 L.Ed.2d 20, 77 USLW 4152, 09 Cal. Daily Op. Serv. 2558...

statutory scheme, rather than in subsections of §§ 1158 or 1231, is immaterial. Cf. *Russello,* 464 U.S., at 23, 104 S.Ct. 296; **\*553** *Barnhart,* 534 U.S., at 452–454, 122 S.Ct. 941. And the fact that Congress, in the course of making structural revisions to the statutory regime, eliminated the specific dichotomy the Court noted in *Fedorenko* does not undermine the critical point: The INA expressly includes a voluntariness requirement in several places but does not impose such a requirement in the persecution bar. Thus, the omission of the word "voluntarily" from the persecutor bar in the INA is just as conclusive as its omission from the persecutor bar in the DPA. With respect to both statutes, the deliberate omission **\*\*1185** "compels the conclusion that the statute made *all* those who assisted in the persecution of civilians ineligible for visas." 449 U.S., at 512, 101 S.Ct. 737.

Finally, the majority concludes that the DPA bar is distinguishable from the INA bar because the former was enacted in the context of the " ' "crime against humanity that [was] involved in the concentration camp," ' " which was so horrific that it is in a category all its own. *Ante,* at 1165 (quoting *Fedorenko, supra,* at 511, n. 32, 101 S.Ct. 737). In that unique context, the majority reasons, it made sense to exclude "even those involved in nonculpable, involuntary assistance in Nazi persecution." *Ante,* at 1164. But the majority cannot intend to suggest that all acts of persecution during the Second World War were inherently more depraved or reprehensible than all acts of persecution that have occurred in the decades since the INA's enactment.

Certainly, no such conclusion is compelled by the statutory text. Congress has steadfastly condemned *all* acts of persecution. See 22 U.S.C. §§ 6401(a)(5)-(7) (noting that "Congress has recognized and denounced acts of religious

persecution," which can be "severe and violent" and "particularly widespread, systematic, and heinous under totalitarian governments and in countries with militant, politicized religious majorities"); § 6401(b)(5) (announcing that it is the "policy of the United States" to "stan[d] with the persecuted"); § 501, 78 Stat. 1015 ("The Congress condemns the persecution of **\*554** any persons because of their religion"); Refugee Act of 1980, § 101(a), 94 Stat. 102, note following 8 U.S.C. § 1521 ("The Congress declares that it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands"). There is no reason to deny the INA persecutor bar its full meaning based on a speculative assumption that Congress, in 1980, could not have meant to oppose persecution quite as intensely as it did in the aftermath of World War II. Rather, the INA's persecutor bar naturally extends to all acts of persecution and, therefore, requires the denial of asylum and withholding of removal for "even those involved in nonculpable, involuntary assistance in ... persecution." *Ante,* at 1165 (majority opinion).

IV

Because I conclude that the INA's persecutor bar applies whether or not petitioner's assistance or participation in persecution was voluntary, and because it is conceded that petitioner assisted and participated in persecution while serving as an armed prison guard in Eritrea, I would affirm the decision of the Court of Appeals. Accordingly, I respectfully dissent.

All Citations

555 U.S. 511, 129 S.Ct. 1159, 173 L.Ed.2d 20, 77 USLW 4152, 09 Cal. Daily Op. Serv. 2558, 2009 Daily Journal D.A.R. 3043, 21 Fla. L. Weekly Fed. S 659

## Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

\*    The rationale for the duress defense, however, is conventionally "not that the defendant ... somehow loses his mental capacity to commit the crime in question," but rather that "even though he has done the act the

129 S.Ct. 1159, 173 L.Ed.2d 20, 77 USLW 4152, 09 Cal. Daily Op. Serv. 2558...

crime requires and has the mental state which the crime requires, his conduct ... is excused." 2 W. LaFave, Substantive Criminal Law, § 9.7(a), p. 73 (2d ed. 2003).

1    Notably, the EPA cast its activity not as statutory construction but as public administration; its rulemaking sought to achieve policy goals, such as reducing regulatory complexity and promoting plant modernization. See 46 Fed.Reg. 50766 (1981). To be sure, the EPA argued that its regulation defining "stationary source" as an entire plant was permissible under the Clean Air Act, but the agency treated its rulemaking as a matter of fashioning sound policy, not of discerning the meaning of "stationary source" in the statute.

2    Cf. United States v. Mead Corp., 533 U.S. 218, 236–238, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); Barnhart v. Walton, 535 U.S. 212, 222, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002) (noting that *Mead* "indicated that whether a court should give *[Chevron]* deference depends in significant part upon the interpretive method used and the nature of the question at issue").

3    The Administrative Procedure Act draws a similar distinction in providing that courts "shall decide all relevant questions of law [and] interpret constitutional and statutory provisions" but shall review "agency action, findings, and conclusions" under the arbitrary and capricious/abuse-of-discretion standard. 5 U.S.C. § 706.

4    Justice SCALIA objected in particular to the majority's holding that pure questions of statutory construction are for the courts, not agencies, to decide; he insisted this was unfaithful to *Chevron,* "since in *Chevron* the Court deferred to the Environmental Protection Agency's abstract interpretation of the phrase 'stationary source.' " 480 U.S., at 455, 107 S.Ct. 1207 (opinion concurring in judgment). The majority rejected Justice SCALIA's argument, recognizing that *Chevron* involved an agency's complex policy judgment about how to fill a statutory gap, not a pure question of statutory construction. See 480 U.S., at 445–448, and n. 29, 107 S.Ct. 1207 (quoting extensively from *Chevron*).

5    The majority suggests that this approach is inconsistent with the " 'ordinary "remand" rule' " articulated in Gonzales v. Thomas, 547 U.S. 183, 126 S.Ct. 1613, 164 L.Ed.2d 358 (2006) *(per curiam),* and INS v. Orlando Ventura, 537 U.S. 12, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) *(per curiam). Ante,* at 1167 – 1168. But those cases involved exactly the sort of application of law to fact that is within the agency's purview. In *Thomas,* the Court of Appeals decided that the family at issue "fell within the scope of the statutory term 'particular social group.' " 547 U.S., at 185, 126 S.Ct. 1613. We noted that the BIA had not considered this question, which "require[d] determining the facts and deciding whether the facts as found f[e]ll within a statutory term." *Id.,* at 186, 126 S.Ct. 1613. Accordingly, we held that the court should have remanded to the agency. Similarly, in *Ventura,* the Court of Appeals addressed an issue that the BIA had not reached and concluded that conditions in Guatemala had so improved that no realistic threat of persecution currently existed. The Government argued that the court had not respected the BIA's role as fact-finder," 537 U.S., at 16, 123 S.Ct. 353, and we agreed, reversing the court's judgment insofar as it had not remanded to the agency.

6    Asylum and withholding of removal address concerns different from those addressed by the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (CAT) and its implementing regulations. CAT, Dec. 10, 1984, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85; 8 CFR §§ 1208.16–1208.18 (2008). The CAT prohibits a state party from returning any person to a country where there is substantial reason to believe he might be tortured, but its definition of torture covers a narrower class of harms, imposed by a narrower class of actors, than the asylum and withholding of removal provisions. Most importantly, the CAT limits its definition of torture to acts "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity," Pt. I, Art. 1, ¶ 1, p. 19, while asylum and withholding of removal are available to victims of harm inflicted by private actors,

AR.05924

129 S.Ct. 1159, 173 L.Ed.2d 20, 77 USLW 4152, 09 Cal. Daily Op. Serv. 2558...

without regard to state involvement, see, *e.g., In re Kasinga,* 21 I. & N. Dec. 357, 365 (BIA 1996); *In re H—,* 21 I. & N. Dec. 337, 343–344 (BIA 1996).

7   See, *e.g., Canada v. Asghedom,* [2001] F.C.T. 972, ¶ 28 (Can.Fed.Ct.); *Gurung v. Secretary of State for Home Dept.,* [2002] UKIAT 4870, ¶¶ 108–110 (U.K.Immigr.App.Trib.); *SRYYY v. Minister for Immigration & Multicultural & Indigenous Affairs,* [2005] 147 F.C.R. 1, ¶¶ 126–128 (Austl.Fed.Ct.); Refugee Appeal No. 2142/94, pp. 12–14 (N.Z. Refugee Status App. Auth., Mar. 20, 1997). Notions of culpability have deep roots in asylum law. See generally 2 H. Grotius, De Jure Belli ac Pacis Libri Tres, ch. XXI, § V(1), p. 530 (J. Scott ed., F. Kelsey et al. transl., 1925) ("[P]laces of asylum were available [in ancient times] for those from whose hands a chance missile had slain "a man" and for those with "innocent" minds).

8   Other considerations that are not presented in this case, such as an alien's lack of knowledge that he was involved in a persecutory act, could likewise indicate that he did not act with the requisite culpability. See, *e.g., Castañeda–Castillo v. Gonzales,* 488 F.3d 17, 20–22 (C.A.1 2007) (en banc); *Hernandez v. Reno,* 258 F.3d 806, 814 (C.A.8 2001).

1   "Deferral of removal" was created to accommodate Congress' direction to exclude those who fall within the INA persecutor bar "[t]o the maximum extent consistent with the obligations of the United States under the [CAT]" not to return an alien to a country in which he or she will be tortured. CAT Policy (c), at 263. To accomplish that goal, deferral of removal provides "a less permanent form of protection than withholding of removal and one that is more easily and quickly terminated if it becomes possible to remove the alien consistent with Article 3" of the CAT, 64 Fed.Reg. 8480 (1999), while also "ensur[ing] that [such aliens] are not returned to a country where they would be tortured," *id.,* at 8481.

2   It also is important to acknowledge that the object of the INA is to codify Congress' policy decisions " 'pertaining to the entry of aliens and their right to remain' " in the United States—decisions that are " 'entrusted exclusively to Congress.' " *Kleindienst v. Mandel,* 408 U.S. 753, 766, 767, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) (quoting *Galvan v. Press,* 347 U.S. 522, 531–532, 74 S.Ct. 737, 98 L.Ed. 911 (1954)). In fact, "over no conceivable subject is the legislative power of Congress more complete than it is over" the decision of Congress to admit or to exclude aliens. *Oceanic Steam Nav. Co. v. Stranahan,* 214 U.S. 320, 339, 29 S.Ct. 671, 53 L.Ed. 1013 (1909). Courts therefore must enforce the immigration policy decision reflected in a statute's plain terms, even if Congress has chosen "to forbid the entrance of foreigners within its dominions" altogether, *Fong Yue Ting v. United States,* 149 U.S. 698, 705, 13 S.Ct. 1016, 37 L.Ed. 905 (1893). Likewise, here, where Congress has made a judgment about which persons to admit and exclude from the country, it is not for this Court to question the wisdom of that choice.

3   Justice STEVENS also finds the language of the INA's persecutor bar "plain," but concludes that it must incorporate a culpability requirement because the statute applies to those whose "acts are of a 'criminal nature.' " See *ante,* at 1174, 1175 (opinion concurring in part and dissenting in part). I disagree. The decision to admit an alien is a matter of legislative grace, see n. 2, *supra,* for which judicial review has been "consistently classified" as civil in nature, *Harisiades v. Shaughnessy,* 342 U.S. 580, 594, 72 S.Ct. 512, 96 L.Ed. 586 (1952); see also *Zadvydas v. Davis,* 533 U.S. 678, 720, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (KENNEDY, J., dissenting) (explaining that " 'an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative' " (quoting *Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982))). There is no warrant to read criminal-law requirements into a statute that is "nonpunitive in purpose and effect." *Zadvydas, supra,* at 690, 121 S.Ct. 2491. Further, the conclusory pronouncement in the Office of the United Nations High Commissioner for Refugees' Handbook on Procedures and Criteria for Determining Refugee Status ¶ 162 (reedited Jan. 1992), that "it has to be assumed, although this is not specifically stated, that the acts covered by the present clause must also be of a criminal nature," is insufficient

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 701 of 1271

Negusie v. Holder, 555 U.S. 511 (2009)
129 S.Ct. 1159, 173 L.Ed.2d 20, 77 USLW 4152, 09 Cal. Daily Op. Serv. 2558...

to require criminal proof to deny withholding of removal, contra, *ante,* at 1175 – 1176 (opinion of STEVENS, J.). The United Nations handbook "is not binding on the Attorney General, the BIA, or United States courts." *INS v. Aguirre–Aguirre,* 526 U.S. 415, 427, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999).

4    Because this Court should not delegate the interpretation of the persecutor bar's plain meaning to a federal agency, see *Board of Governors, FRS v. Dimension Financial Corp.,* 474 U.S. 361, 368, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986), it is largely irrelevant whether the BIA properly relied on *Fedorenko v. United States,* 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981), in interpreting the statute, see *ante,* at 1166 – 1167 (majority opinion); *ante,* at 1169 (SCALIA, J., concurring). In any event, the BIA's construction of the INA's persecutor bar correctly reflected the text of the provision. There is no reason to remand the question to the agency when only one construction of the statute is permissible and the agency's original decision adopted that proper construction. See *National Cable & Telecommunications Assn. v. Brand X Internet Services,* 545 U.S. 967, 982–985, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005).

5    Moreover, in the Refugee Act of 1980, which added the persecutor bar to the INA, Congress separately codified its desire to "promote opportunities for resettlement or voluntary repatriation." § 101(a), 94 Stat. 102, note following 8 U.S.C. § 1521. In 1996, when Congress reenacted the statutory text, it retained the persecution bar's broad language while again restricting other sections to voluntary conduct. See IIRIRA, § 304, 110 Stat. 3009–587 (relating to "voluntary departure"); § 402, *id.,* at 3009–656 (relating to "voluntary" participation in pilot programs for confirming employment eligibility); § 604, *id.,* at 3009–692 (providing for termination of asylum when alien "voluntarily" takes certain actions).

---

**End of Document**      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Nijhawan v. Holder, 557 U.S. 29 (2009)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 702 of 1271

129 S.Ct. 2294, 174 L.Ed.2d 22, 77 USLW 4489, 09 Cal. Daily Op. Serv. 7333...

KeyCite Yellow Flag - Negative Treatment

Not Followed as Dicta U.S. v. Valdovinos-Mendez, 9th Cir.(Cal.), April 18, 2011

129 S.Ct. 2294
Supreme Court of the United States

Manoj NIJHAWAN, Petitioner,

v.

Eric H. HOLDER, Jr., Attorney General.

No. 08–495.
|
Argued April 27, 2009.
|
Decided June 15, 2009.

**Synopsis**

**Background:** Alien petitioned for review of the affirmance, by the Board of Immigration Appeals (BIA), of order for his deportation as an aggravated felon. The Court of Appeals for the Third Circuit, 523 F.3d 387, Rendell, Circuit Judge, denied the petition, and certiorari was granted.

**[Holding:]** The Supreme Court, Justice Breyer, held that clear and convincing evidence supported finding that the loss resulting from defendant's offenses was greater than $10,000.

Affirmed.

West Headnotes (4)

**[1]    Statutes    Similarity or difference**

Where Congress uses similar statutory language and similar statutory structure in two adjoining provisions, it normally intends similar interpretations.

15 Cases that cite this headnote

**[2]    Aliens, Immigration, and Citizenship    Fraud, forgery, and theft offenses**

For purposes of statute defining crimes involving fraud or deceit as aggravated felonies, within meaning of the Immigration and Nationality Act's (INA) deportation provision, if the loss involved exceeded $10,000, such threshold amount refers to the specific circumstances in which the defendant committed a fraud or deceit crime on a particular occasion, rather than to the generic definitions of those fraud or deceit crimes. Immigration and Nationality Act, §§ 101(a)(43)(M)(i), 237(a)(2)(A)(iii), 8 U.S.C.A. §§ 1101(a)(43)(M)(i), 1227(a)(2)(A)(iii).

240 Cases that cite this headnote

**[3]    Aliens, Immigration, and Citizenship    Weight and Sufficiency**

A deportation proceeding is a civil proceeding in which the Government does not have to prove its claim beyond a reasonable doubt, but the evidence it offers must meet a "clear and convincing" standard. Immigration and Nationality Act, § 240(c)(3)(A), 8 U.S.C.A. § 1229a(c)(3)(A).

35 Cases that cite this headnote

**[4]    Aliens, Immigration, and Citizenship    Crimes and immorality**

Clear and convincing evidence supported finding, in deportation proceeding arising out of alien's conviction for conspiring to commit various fraud offenses and money laundering, that the loss resulting from his offenses was greater than $10,000, as required to make his fraud and deceit conviction a conviction for an aggravated felony, rendering him deportable; at sentencing alien stipulated that the loss exceeded $100 million, and the sentencing court ordered him to make restitution of $683 million. Immigration and Nationality Act, §§ 101(a)(43)(M)(i), 237(a)(2)(A)(iii), 8 U.S.C.A. §§ 1101(a)(43)(M)(i), 1227(a)(2)(A)(iii); 18

Nijhawan v. Holder, 557 U.S. 29 (2009)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 703 of 1271

129 S.Ct. 2294, 174 L.Ed.2d 22, 77 USLW 4489, 09 Cal. Daily Op. Serv. 7333...

U.S.C.A. §§ 371, 1341, 1343, 1344, 1956(h).

161 Cases that cite this headnote

**2295 *Syllabus* [*]

An alien "convicted of an aggravated felony any time after admission is deportable." 8 U.S.C. § 1227(a)(2)(A)(iii). An "aggravated felony" includes "an offense that ... involves fraud or deceit in which the loss to the ... victims exceeds $10,000." § 1101(a)(43)(M)(i). Petitioner, an alien, was convicted of conspiring to commit mail fraud and related crimes. Because the relevant statutes did not require a finding of loss, the jury made no such finding. However, at sentencing, petitioner stipulated that the loss exceeded $100 million. He was sentenced to prison and required to make $683 million in restitution. The Government subsequently sought to remove him from the United States, claiming that he had been convicted of an "aggravated felony." The Immigration Judge found that petitioner's conviction fell within the "aggravated felony" definition. The Board of Immigration Appeals agreed, as did the Third Circuit, which held that the Immigration Judge could inquire into the underlying facts of a prior fraud conviction for purposes of determining whether the loss to the victims exceeded $10,000.

*Held:* Subparagraph (M)(i)'s $10,000 threshold refers to the particular circumstances in which an offender committed a fraud or deceit crime on a particular occasion rather than to an element of the fraud or deceit crime. Pp. 2298 – 2304.

(a) Words such as "crime," "felony," and "offense" sometimes refer to a generic crime (a "categorical" interpretation), and sometimes refer to the specific acts in **2296 which an offender engaged ("circumstance-specific" interpretation). The basic argument favoring the "categorical" interpretation rests upon *Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607, *Chambers v. United States,* 555 U.S. 122, 129 S.Ct. 687, 172 L.Ed.2d 484, and *James v. United States,* 550 U.S. 192, 127 S.Ct. 1586, 167 L.Ed.2d 532. These cases concerned the Armed Career Criminal Act (ACCA), which enhances the sentence for firearm-law offenders who have prior "violent felony" convictions, 18 U.S.C. § 924(e). The Court held that the word "felony" refers to a generic crime as generally committed. Thus, for example, in *James,* the Court applied the "categorical method" to determine whether an "attempted burglary" was a "violent felony." That method required the Court to examine "not the unsuccessful burglary ... attempted on a particular occasion, but the generic crime of attempted burglary." 550 U.S., at 204–206, 127 S.Ct. 1586. Pp. 2298 – 2300.

(b) Contrary to petitioner's arguments, the "$10,000 loss" provision at issue calls for a "circumstance-specific" interpretation, not a "categorical" one. The "aggravated felony" statute of which it is a part differs from ACCA in general, and the "$10,000 loss" provision differs specifically from ACCA's provisions. Pp. 2300 – 2302.

(1) The "aggravated felony" statute at issue resembles ACCA when it lists several "offenses" in language that must refer to generic crimes. But other "offenses" are listed using language that almost certainly refers to specific circumstances. Title 8 U.S.C. § 1101(a)(43)(P), for example, after referring to "an offense" that amounts to "falsely making, forging, counterfeiting, mutilating, or altering a passport," adds, "except in the case of a first offense for which ... the alien committed the offense for the purpose of assisting ... the alien's spouse, child, or parent ... to violate a provision of this chapter." The language about "forging ... passport[s]" may well refer to a generic crime, but the exception cannot possibly refer to a generic crime, because there is no criminal statute that contains any such exception. Subparagraph (M) (ii), which refers to an offense "described in [26 U.S.C. § 7201] (relating to tax evasion) in which the revenue loss to the government exceeds $10,000," provides another example. Because no § 7201 offense has a specific loss amount as an element, the tax-evasion provision would be pointless, unless the "revenue loss" language calls for circumstance-specific application. Here, the question is to which category subparagraph (M)(i) belongs. Pp. 2300 – 2301.

(2) Subparagraph (M)(i)'s language is consistent with a circumstance-specific approach. The words "in which" (modifying "offense") can refer to the conduct involved *in* the commission of the offense of conviction, rather than to the elements *of* the offense. Moreover, subparagraph (M)(i) appears just prior to subparagraph (M)(ii), the tax-evasion provision, and their structures are identical. Where, as here, Congress uses similar statutory

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 704 of 1271

Nijhawan v. Holder, 557 U.S. 29 (2009)
129 S.Ct. 2294, 174 L.Ed.2d 22, 77 USLW 4489, 09 Cal. Daily Op. Serv. 7333...

language and similar statutory structure in two adjoining provisions, it normally intends similar interpretations. *IBP, Inc. v. Alvarez,* 546 U.S. 21, 34, 126 S.Ct. 514, 163 L.Ed.2d 288. Additionally, applying a categorical approach would leave subparagraph (M)(i) with little, if any, meaningful application. Only three federal fraud statutes appear to contain a relevant monetary loss threshold. And at the time the $10,000 threshold was added, only eight States had fraud and deceit statutes in respect to which that threshold, as categorically interpreted, would have full effect. Congress is unlikely to have intended subparagraph (M)(i) to **\*\*2297** apply in such a limited and haphazard manner. Pp. 2301 – 2302.

(c) This Court rejects petitioner's alternative position that fairness calls for a "modified categorical approach" requiring a jury verdict or a judge-approved equivalent to embody a loss-amount determination, and permitting the subsequent immigration court applying subparagraph (M)(i) to examine only charging documents, jury instructions, and any special jury finding, or their equivalents. The Court's cases developed the evidentiary list to which petitioner points for a very different purpose, namely, to determine which statutory phrase (contained within a statutory provision covering several different generic crimes) covered a prior conviction. Additionally, petitioner's proposal can prove impractical insofar as it requires obtaining from a jury a special verdict on a fact that is not an element of the offense. Further, evidence of loss offered by the Government must meet a "clear and convincing" standard and the loss must be tied to the specific counts covered by the conviction. These considerations mean that petitioner and others in similar circumstances have at least one and possibly two opportunities to contest the loss amount, the first at the earlier sentencing and the second at the deportation hearing. There was nothing unfair about the Immigration Judge's reliance on earlier sentencing-related material here. The defendant's sentencing stipulation and the court's restitution order show that the conviction involved losses considerably greater than $10,000. Absent any conflicting evidence, this evidence is clear and convincing. Pp. 2302 – 2303.

523 F.3d 387, affirmed.

BREYER, J., delivered the opinion for a unanimous Court.

## Attorneys and Law Firms

Thomas E. Moseley, Newark, NJ, for Petitioner.

Curtis E. Gannon, for Respondent.

Peter C. Salerno, New York, NY, Thomas E. Moseley, Newark, NJ, for Petitioner.

Elena Kagan, Solicitor General, Michael F. Hertz, Acting Assistant Attorney General, Edwin S. Kneedler, Deputy Solicitor General, Curtis E. Gannon, Assistant to the Solicitor General, Donald E. Keener, Jennifer J. Keeney, W. Manning Evans, Holly M. Smith, Andrew C. Maclachlan, Saul Greenstein, Erica B. Miles, Washington, D.C., for Respondent.

## Opinion

Justice BREYER delivered the opinion of the Court.

**\*32** Federal immigration law provides that any "alien who is convicted of an *aggravated felony* at any time after admission is deportable." 8 U.S.C. § 1227(a)(2)(A)(iii) (emphasis added). A related statute defines "aggravated felony" in terms of a set of listed offenses that includes "an offense that ... involves fraud or deceit *in which the loss to the victim or victims exceeds $10,000.*" § 1101(a)(43)(M)(i) (emphasis added). See Appendix A. The question before us is whether the italicized language refers to an element of the fraud or deceit "offense" as set forth in the particular fraud or deceit statute defining the offense of which the alien was previously convicted. If so, then in order to determine whether a prior conviction is for the kind of offense described, the immigration judge must look to the criminal fraud or deceit statute to see whether it contains a monetary threshold of $10,000 or more. See *Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990) (so interpreting the Armed Career Criminal **\*\*2298** Act). We conclude, however, that the italicized language does not refer to an element of the fraud or deceit crime. Rather it refers to the particular circumstances in which an offender committed a (more broadly defined) fraud or deceit crime on a particular occasion.

I

Nijhawan v. Holder, 557 U.S. 29 (2009)

129 S.Ct. 2294, 174 L.Ed.2d 22, 77 USLW 4489, 09 Cal. Daily Op. Serv. 7333...

Petitioner, an alien, immigrated to the United States in 1985. In 2002 he was indicted for conspiring to commit mail fraud, wire fraud, bank fraud, and money laundering. 18 U.S.C. §§ 371, 1341, 1343, 1344, 1956(h). A jury found him guilty. But because none of these statutes requires a finding of any particular amount of victim loss, the jury made no finding about the amount of the loss. At sentencing petitioner stipulated that the loss exceeded $100 million. The court then imposed a sentence of 41 months in prison and required restitution of $683 million.

 **\*33**  In 2005 the Government, claiming that petitioner had been convicted of an "aggravated felony," sought to remove him from the United States. The Immigration Judge found that petitioner's conviction was for crimes of fraud and deceit; that the sentencing stipulation and restitution order showed that the victims' loss exceeded $10,000; and that petitioner's conviction consequently fell within the immigration statute's "aggravated felony" definition. See

8 U.S.C. §§ 1101(a)(43)(M)(i), (U) (including within the definition of "aggravated felony" any "attempt or conspiracy to commit" a listed "offense"). The Board of Immigration Appeals agreed. App. to Pet. for Cert. 44a–51a. So did the Third Circuit. 523 F.3d 387 (2008). The Third Circuit noted that the statutes of conviction were silent as to amounts, but, in its view, the determination of loss amounts for "aggravated felony" purposes "requires an inquiry into the underlying facts of the case." *Id.,* at 396 (internal quotation marks omitted).

The Courts of Appeals have come to different conclusions as to whether the $10,000 threshold in subparagraph (M) (i) refers to an element of a fraud statute or to the factual circumstances surrounding commission of the crime on a specific occasion. Compare *Conteh v. Gonzales,* 461 F.3d 45, 55 (C.A.1 2006) (fact-based approach); 523 F.3d 387 (same) (case below); *Arguelles–Olivares v. Mukasey,* 526 F.3d 171, 178 (C.A.5 2008) (same), with *Dulal– Whiteway v. United States Dept. of Homeland Security,* 501 F.3d 116, 131 (C.A.2 2007) (definitional approach); *Kawashima v. Mukasey,* 530 F.3d 1111, 1117 (C.A.9 2008) (same); *Obasohan v. United States Atty. Gen.,* 479 F.3d 785, 791 (C.A.11 2007) (same). We granted certiorari to decide the question.

## II

The interpretive difficulty before us reflects the linguistic fact that in ordinary speech words such as "crime," "felony," "offense," and the like sometimes refer to a generic crime,  **\*34**  say, the crime of fraud or theft in general, and sometimes refer to the specific acts in which an offender engaged on a specific occasion, say, *the* fraud that the defendant planned and executed last month. See *Chambers v. United States,* 555 U.S. 122, 124 – 127, 129 S.Ct. 687, 690–691, 172 L.Ed.2d 484 (2009). The question here, as we have said, is whether the italicized statutory words "offense that involves fraud or deceit *in which the loss to the ... victims exceeds $10,000*" should be interpreted in the first sense (which we shall call "categorical"), *i.e.,* as referring to a generic crime, or in the second sense (which we shall call "circumstance-specific"), as referring to the specific way in which an offender committed the crime on a specific occasion. If the first, we must  **\*\*2299**  look to the statute defining the offense to determine whether it has an appropriate monetary threshold; if the second, we must look to the facts and circumstances underlying an offender's conviction.

## A

The basic argument favoring the first—*i.e.,* the "generic" or "categorical"—interpretation rests upon *Taylor, Chambers,* and *James v. United States,* 550 U.S. 192, 127 S.Ct. 1586, 167 L.Ed.2d 532 (2007). Those cases concerned the Armed Career Criminal Act (ACCA), a statute that enhances the sentence imposed upon certain firearm-law offenders who also have three prior convictions for "a violent felony." 18 U.S.C. § 924(e). See Appendix B, *infra.* ACCA defines "violent felony" to include, first, felonies with elements that involve the use of physical force against another; second, felonies that amount to "burglary, arson, or extortion" or that involve the use of explosives; and third, felonies that "otherwise involv[e] conduct that presents a serious potential risk of physical injury to another." § 924(e)(2)(B).

In *Taylor* and *James* we held that ACCA's language read naturally uses the word "felony" to refer to a generic crime as *generally* committed. *Chambers, supra,* at 124 – 127, 129 S.Ct., at 690–691 (discussing *Taylor,* 495 U.S., at 602, 110

Nijhawan v. Holder, 557 U.S. 29 (2009)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 706 of 1271

129 S.Ct. 2294, 174 L.Ed.2d 22, 77 USLW 4489, 09 Cal. Daily Op. Serv. 7333...

S.Ct. 2143); 🚩 *James, supra,* at 201–202, 127 S.Ct. 1586. The **\*35** Court noted that such an interpretation of the statute avoids "the practical difficulty of trying to ascertain" in a later proceeding, "perhaps from a paper record" containing only a citation (say, by number) to a statute and a guilty plea, "whether the [offender's] prior crime ... did or did not involve," say, violence. 🚩 *Chambers, supra,* at 124 – 127, 129 S.Ct., at 690–691.

Thus in *James,* referring to *Taylor,* we made clear that courts must use the "categorical method" to determine whether a conviction for "attempted burglary" was a conviction for a crime that, in ACCA's language, "involved conduct that presents a serious potential risk of physical injury to another." 🚩 § 924(e)(2)(B)(ii). That method required the court to "examine, not the unsuccessful burglary the defendant attempted on a particular occasion, but the generic crime of attempted burglary." *Chambers, supra,* at 124 – 127, 129 S.Ct., at 690–691 (discussing 🚩 *James, supra,* at 204–206, 127 S.Ct. 1586).

We also noted that the categorical method is not always easy to apply. That is because sometimes a separately numbered subsection of a criminal statute will refer to several different crimes, each described separately. And it can happen that some of these crimes involve violence while others do not. A single Massachusetts statute section entitled "Breaking and Entering at Night," for example, criminalizes breaking into a "building, ship, vessel or vehicle." Mass. Gen. Laws, ch. 266, § 16 (West 2006). In such an instance, we have said, a court must determine whether an offender's prior conviction was for the violent, rather than the nonviolent, break-ins that this single five-word phrase describes (*e.g.,* breaking into a building rather than into a vessel), by examining "the indictment or information and jury instructions," 🏳️ *Taylor, supra,* at 602, 110 S.Ct. 2143, or, if a guilty plea is at issue, by examining the plea agreement, plea colloquy or "some comparable judicial record" of the factual basis for the plea. 🏳️ *Shepard v. United States,* 544 U.S. 13, 26, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005).

Petitioner argues that we should interpret the subsection of the "aggravated felony" statute before us as requiring use **\*36** of this same "categorical" approach. He says that the statute's language, read naturally as in *Taylor,* refers to a generic **\*\*2300** kind of crime, not a crime as committed on a particular occasion. He adds that here, as in *Taylor,* such a reading avoids the practical difficulty of determining the nature of prior conduct from what may be a brief paper record, perhaps noting only a statutory section number and a guilty plea; or, if there is a more extensive record, combing through that record for evidence of underlying conduct. Also, the categorical approach, since it covers only criminal statutes with a relevant monetary threshold, not only provides assurance of a finding on the point, but also assures that the defendant had an opportunity to present evidence about the amount of loss.

B

Despite petitioner's arguments, we conclude that the "fraud and deceit" provision before us calls for a "circumstance-specific," not a "categorical," interpretation. The "aggravated felony" statute of which it is a part differs in general from ACCA, the statute at issue in *Taylor.* And the "fraud and deceit" provision differs specifically from ACCA's provisions.

1

Consider, first, ACCA in general. That statute defines the "violent" felonies it covers to include "burglary, arson, or extortion" and "crime[s]" that have "as an element" the use or threatened use of force. 🚩 18 U.S.C. §§ 924(e)(2)(B) (i)-(ii). This language refers directly to generic crimes. The statute, however, contains other, more ambiguous language, covering "crime[s]" that "*involv[e] conduct* that presents a serious potential risk of physical injury to another." *Ibid.* (emphasis added). While this language poses greater interpretive difficulty, the Court held that it too refers to crimes as generically defined. 🚩 *James, supra,* at 202, 127 S.Ct. 1586.

**\*37** Now compare the "aggravated felony" statute before us. 🚩 8 U.S.C. § 1101(a)(43). We concede that it resembles ACCA in certain respects. The "aggravated felony" statute lists several of its "offenses" in language that must refer to generic crimes. Subparagraph (A), for example, lists "murder, rape, or sexual abuse of a minor." See, *e.g.,* 🔶 *Estrada–Espinoza v. Mukasey,* 546 F.3d 1147, 1152 (C.A.9 2008) (en banc) (applying the categorical approach to "sexual abuse");

Nijhawan v. Holder, 557 U.S. 29 (2009)

129 S.Ct. 2294, 174 L.Ed.2d 22, 77 USLW 4489, 09 Cal. Daily Op. Serv. 7333...

*Singh v. Ashcroft,* 383 F.3d 144, 164 (C.A.3 2004) (same); *Santos v. Gonzales,* 436 F.3d 323, 324 (C.A.2 2005) *(per curiam)* (same). Subparagraph (B) lists "illicit trafficking in a controlled substance." See *Gousse v. Ashcroft,* 339 F.3d 91, 95–96 (C.A.2 2003) (applying categorical approach); *Fernandez v. Mukasey,* 544 F.3d 862, 871–872 (C.A.7 2008) (same); *Steele v. Blackman,* 236 F.3d 130, 136 (C.A.3 2001) (same). And subparagraph (C) lists "illicit trafficking in firearms or destructive devices." Other sections refer specifically to an "offense described in" a particular section of the Federal Criminal Code. See, *e.g.,* subparagraphs (E), (H), (I), (J), (L).

More importantly, however, the "aggravated felony" statute differs from ACCA in that it lists certain other "offenses" using language that almost certainly does not refer to generic crimes but refers to specific circumstances. For example, subparagraph (P), after referring to "an offense" that amounts to "falsely making, forging, counterfeiting, mutilating, or altering a passport," adds, "*except in the case of a first offense for which the alien ... committed the offense for the purpose of assisting ... the alien's spouse, child, or parent ... to violate a provision of this chapter*" (emphasis added). The language about (for example) "forging ... passport[s]" may well refer to a generic crime, but the italicized exception cannot possibly refer to a generic crime. That is because there is **\*\*2301** no such generic crime; there is no criminal statute that contains any such exception. Thus if **\*38** the provision is to have any meaning at all, the exception must refer to the particular circumstances in which an offender committed the crime on a particular occasion. See also subparagraph (N) (similar exception).

The statute has other provisions that contain qualifying language that certainly seems to call for circumstance-specific application. Subparagraph (K)(ii), for example, lists "offense[s] ... described in section 2421, 2422, or 2423 of title 18 (relating to transportation for the purpose of prostitution) *if committed for commercial advantage*" (emphasis added). Of the three specifically listed criminal statutory sections only one subsection (namely, § 2423(d)) says anything about *commercial advantage.* Thus, unless the "commercial advantage" language calls for circumstance-specific application, the statute's explicit references to §§ 2421 and 2422 would be pointless. But see *Gertsenshteyn v. United States Dept. of Justice,* 544 F.3d 137, 144–145 (C.A.2 2008).

Subparagraph (M)(ii) provides yet another example. It refers to an offense "described in section 7201 of title 26 (relating to tax evasion) *in which the revenue loss to the Government exceeds $10,000*" (emphasis added). There is no offense "described in section 7201 of title 26" that has a specific loss amount as an element. Again, unless the "revenue loss" language calls for circumstance-specific application, the tax-evasion provision would be pointless.

The upshot is that the "aggravated felony" statute, unlike ACCA, contains some language that refers to generic crimes and some language that almost certainly refers to the specific circumstances in which a crime was committed. The question before us then is to which category subparagraph (M)(i) belongs.

2

**[1]** Subparagraph (M)(i) refers to "an offense that ... involves fraud or deceit *in which the loss to the victim or victims exceeds $10,000*" (emphasis added). The language of the provision is consistent with a circumstance-specific approach. **\*39** The words "in which" (which modify "offense") can refer to the conduct involved "*in*" the commission of the offense of conviction, rather than to the elements *of* the offense. Moreover, subparagraph (M) (i) appears just prior to subparagraph (M)(ii), the internal revenue provision we have just discussed, and it is identical in structure to that provision. Where, as here, Congress uses similar statutory language and similar statutory structure in two adjoining provisions, it normally intends similar interpretations. *IBP, Inc. v. Alvarez,* 546 U.S. 21, 34, 126 S.Ct. 514, 163 L.Ed.2d 288 (2005).

Moreover, to apply a categorical approach here would leave subparagraph (M)(i) with little, if any, meaningful application. We have found no widely applicable federal fraud statute that contains a relevant monetary loss threshold. See, *e.g.,* 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), 1344 (bank fraud), 371 (conspiracy to defraud the United States), 666 (theft in federally funded programs), 1028 (fraud in connection with identification documents), 1029 (fraud in connection with access devices), 1030 (fraud in connection with computers), 1347 (health care fraud), and 1348 (securities fraud). Petitioner has found only three federal fraud statutes that do so, and those three contain thresholds not of $10,000, but of $100,000 or $1 million, §§ 668 (theft

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 708 of 1271

129 S.Ct. 2294, 174 L.Ed.2d 22, 77 USLW 4489, 09 Cal. Daily Op. Serv. 7333...

by fraud of an artwork worth $100,000 or more), 1031(a) (contract fraud against the United States where the contract is worth at least $1 **2302 million), and 1039(d) (providing enhanced penalties for fraud in obtaining telephone records, where the scheme involves more than $100,000). Why would Congress intend subparagraph (M)(i) to apply to only these three federal statutes, and then choose a monetary threshold that, on its face, would apply to other, nonexistent statutes as well?

We recognize, as petitioner argues, that Congress might have intended subparagraph (M)(i) to apply almost exclusively to those who violate certain state fraud and deceit statutes. So we have examined state law. See Appendix **40 C, *infra*. We have found, however, that in 1996, when Congress added the $10,000 threshold in subparagraph (M)(i), see Illegal Immigration Reform and Immigrant Responsibility Act § 321(a)(7), 110 Stat. 3009–628, 29 States had no major fraud or deceit statute with any relevant monetary threshold. In 13 of the remaining 21 States, fraud and deceit statutes contain relevant monetary thresholds but with amounts significantly higher than $10,000, leaving only 8 States with statutes in respect to which subparagraph (M)(i)'s $10,000 threshold, as categorically interpreted, would have full effect. We do not believe Congress would have intended (M)(i) to apply in so limited and so haphazard a manner. Cf. *United States v. Hayes,* 555 U.S. 415, 426 – 427, 129 S.Ct. 1079, 1087–1088, 172 L.Ed.2d 816 (2009) (reaching similar conclusion for similar reason in respect to a statute referring to crimes involving "domestic violence").

Petitioner next points to 8 U.S.C. § 1326, which criminalizes illegal entry after removal and imposes a higher maximum sentence when an alien's removal was "subsequent to a conviction for commission of an aggravated felony." § 1326(b)(2). Petitioner says that a circumstance-specific approach to subparagraph (M)(i) could create potential constitutional problems in a subsequent criminal prosecution under that statute, because loss amount would not have been found beyond a reasonable doubt in the prior criminal proceeding. The Government, however, stated in its brief and at oral argument that the later jury, during the illegal reentry trial, would have to find loss amount beyond a reasonable doubt, Brief for Respondent 49–50; Tr. of Oral Arg. 39–40, eliminating any constitutional concern. Cf. *Hayes, supra,* at 426 – 427, 129 S.Ct., at 1087.

[2]   We conclude that Congress did not intend subparagraph (M)(i)'s monetary threshold to be applied categorically, *i.e.,* to only those fraud and deceit crimes generically defined to include that threshold. Rather, the monetary threshold applies to the specific circumstances surrounding an offender's commission of a fraud and deceit crime on a specific occasion.

## *41  III

Petitioner, as an alternative argument, says that we should nonetheless borrow from *Taylor* what that case called a "modified categorical approach." He says that, for reasons of fairness, we should insist that a jury verdict, or a judge-approved equivalent, embody a determination that the loss involved in a prior fraud or deceit conviction amounted to at least $10,000. To determine whether that is so, petitioner says, the subsequent immigration court applying subparagraph (M)(i) should examine only charging documents, jury instructions, and any special jury finding (if one has been requested). If there was a trial but no jury, the subsequent court should examine the equivalent judge-made findings. If there was a guilty plea (and no trial), the subsequent court should examine the written plea documents or the plea colloquy. To authorize any broader examination of the prior proceedings, petitioner **2303 says, would impose an unreasonable administrative burden on immigration judges and would unfairly permit him to be deported on the basis of circumstances that were not before *judicially determined* to have been present and which he may not have had an opportunity, prior to conviction, to dispute.

We agree with petitioner that the statute foresees the use of fundamentally fair procedures, including procedures that give an alien a fair opportunity to dispute a Government claim that a prior conviction involved a fraud with the relevant loss to victims. But we do not agree that fairness requires the evidentiary limitations he proposes.

For one thing, we have found nothing in prior law that so limits the immigration court. *Taylor, James,* and *Shepard,* the cases that developed the evidentiary list to which petitioner points, developed that list for a very different purpose, namely that of determining which statutory phrase (contained within a statutory provision that covers several different generic crimes) covered a prior conviction. See *supra,* at 2299 – 2300; *Taylor,* 495 U.S., at 602, 110 S.Ct. 2143; *42 *Shepard,* 544 U.S., at 26, 125 S.Ct. 1254. For another,

Nijhawan v. Holder, 557 U.S. 29 (2009)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 709 of 1271

129 S.Ct. 2294, 174 L.Ed.2d 22, 77 USLW 4489, 09 Cal. Daily Op. Serv. 7333...

petitioner's proposal itself can prove impractical insofar as it requires obtaining from a jury a special verdict on a fact that (given our Part II determination) is not an element of the offense.

 **[3]** Further, a deportation proceeding is a civil proceeding in which the Government does not have to prove its claim "beyond a reasonable doubt." At the same time the evidence that the Government offers must meet a "clear and convincing" standard. 8 U.S.C. § 1229a(c)(3)(A). And, as the Government points out, the "loss" must "be tied to the specific counts covered by the conviction." Brief for Respondent 44; see, *e.g., Alaka v. Attorney General of United States,* 456 F.3d 88, 107 (C.A.3 2006) (loss amount must be tethered to offense of conviction; amount cannot be based on acquitted or dismissed counts or general conduct); *Knutsen v. Gonzales,* 429 F.3d 733, 739–740 (C.A.7 2005) (same). And the Government adds that the "sole purpose" of the "aggravated felony" inquiry "is to ascertain the nature of a prior conviction; it is not an invitation to relitigate the conviction itself." Brief for Respondent 44 (internal quotation marks omitted). Finally, the Board of Immigration Appeals, too, has recognized that immigration judges must assess findings made at sentencing "with an eye to what losses are covered and to the burden of proof employed." *In re Babaisakov,* 24 I. & N. Dec. 306, 319 (2007).

These considerations, taken together, mean that petitioner and those in similar circumstances have at least one and possibly two opportunities to contest the amount of loss, the first at the earlier sentencing and the second at the deportation hearing itself. They also mean that, since the Government must show the amount of loss by clear and convincing evidence, uncertainties caused by the passage of time are likely to count in the alien's favor.

 **[4]** We can find nothing unfair about the immigration judge's having here relied upon earlier sentencing-related material. The defendant's own stipulation, produced for sentencing purposes, shows that the conviction involved losses considerably **\*43** greater than $10,000. The court's restitution order shows the same. In the absence of any conflicting evidence (and petitioner mentions none), this evidence is clear and convincing.

The Court of Appeals concluded that petitioner's prior federal conviction consequently **\*\*2304** falls within the scope of subparagraph (M)(i). And we affirm its judgment.

*It is so ordered.*

APPENDIXES

A

Section 101(a)(43) of the Immigration and Nationality Act, as set forth in 8 U.S.C. 1101(a)(43), provides:

"The term 'aggravated felony' means—

"(A) murder, rape, or sexual abuse of a minor;

"(B) illicit trafficking in a controlled substance (as defined in section 802 of title 21), including a drug trafficking crime (as defined in section 924(c) of title 18);

"(C) illicit trafficking in firearms or destructive devices (as defined in section 921 of title 18) or in explosive materials (as defined in section 841(c) of that title);

"(D) an offense described in section 1956 of title 18 (relating to laundering of monetary instruments) or section 1957 of that title (relating to engaging in monetary transactions in property derived from specific unlawful activity) if the amount of the funds exceeded $10,000;

"(E) an offense described in—

 "(i) section 842(h) or (i) of title 18, or section 844(d), (e), (f), (g), (h), or (i) of that title (relating to explosive materials offenses);

 "(ii) section 922(g)(1), (2), (3), (4), or (5), (j), (n), (*o*), (p), or (r) or 924(b) or (h) of title 18 (relating to firearms offenses); or

 "(iii) section 5861 of title 26 (relating to firearms offenses);

 **\*44** "(F) a crime of violence (as defined in section 16 of title 18, but not including a purely political offense) for which the term of imprisonment at least one year;

"(G) a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment at least one year;

"(H) an offense described in section 875, 876, 877, or 1202 of title 18 (relating to the demand for or receipt of ransom);

"(I) an offense described in section 2251, 2251A, or 2252 of title 18 (relating to child pornography);

"(J) an offense described in section 1962 of title 18 (relating to racketeer influenced corrupt organizations), or an offense described in section 1084 (if it is a second or subsequent offense) or 1955 of that title (relating to gambling offenses), for which a sentence of one year imprisonment or more may be imposed;

"(K) an offense that—

   "(i) relates to the owning, controlling, managing, or supervising of a prostitution business;

   "(ii) is described in section 2421, 2422, or 2423 of title 18 (relating to transportation for the purpose of prostitution) if committed for commercial advantage; or

   "(iii) is described in any of sections 1581–1585 or 1588–1591 of title 18 (relating to peonage, slavery, involuntary servitude, and trafficking in persons);

"(L) an offense described in—

   "(i) section 793 (relating to gathering or transmitting national defense information), 798 (relating to disclosure of classified information), 2153 (relating to sabotage) or 2381 or 2382 (relating to treason) of title 18;

   "(ii) section 421 of title 50 (relating to protecting the identity of undercover intelligence agents); or

   "(iii) section 421 of title 50 (relating to protecting the identity of undercover agents);

"(M) an offense that—

   **2305   *45   "(i) involves fraud or deceit in which the loss to the victim or victims exceeds $10,000; or

   "(ii) is described in section 7201 of title 26 (relating to tax evasion) in which the revenue loss to the Government exceeds $10,000;

"(N) an offense described in paragraph (1)(A) or (2) of section 1324(a) of this title (relating to alien smuggling), except in the case of a first offense for which the alien has affirmatively

shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent (and no other individual) to violate a provision of this chapter

"(O) an offense described in section 1325(a) or 1326 of this title committed by an alien who was previously deported on the basis of a conviction for an offense described in another subparagraph of this paragraph;

"(P) an offense (i) which either is falsely making, forging, counterfeiting, mutilating, or altering a passport or instrument in violation of section 1543 of title 18 or is described in section 1546(a) of such title (relating to document fraud) and (ii) for which the term of imprisonment is at least 12 months, except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent (and no other individual) to violate a provision of this chapter;

"(Q) an offense relating to a failure to appear by a defendant for service of sentence if the underlying offense is punishable by imprisonment for a term of 5 years or more;

"(R) an offense relating to commercial bribery, counterfeiting, forgery, or trafficking in vehicles the identification numbers of which have been altered for which the term of imprisonment is at least one year;

"(S) an offense relating to obstruction of justice, perjury or subornation of perjury, or bribery of a witness, for which the term of imprisonment is at least one year;

*46   "(T) an offense relating to a failure to appear before a court pursuant to a court order to answer to or dispose of a charge of a felony for which a sentence of 2 years' imprisonment or more may be imposed; and

"(U) an attempt or conspiracy to commit an offense described in this paragraph.

"The term applies to an offense described in this paragraph whether in violation of Federal or State law and applies to such an offense in violation of the law of a foreign country for which the term of imprisonment was completed within the previous 15 years. Notwithstanding any other provision of law (including any effective date), the term applies regardless

Nijhawan v. Holder, 557 U.S. 29 (2009)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 711 of 1271

129 S.Ct. 2294, 174 L.Ed.2d 22, 77 USLW 4489, 09 Cal. Daily Op. Serv. 7333...

of whether the conviction was entered before, on, or after September 30, 1996." (Footnotes omitted.)

### B

Armed Career Criminal Act, 18 U.S.C. 924(e), provides:

"(1) In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined under this title and imprisoned not less than fifteen years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person **2306 with respect to the conviction under section 922(g).

"(2) As used in this subsection—

"(A) the term 'serious drug offense' means—

"(i) an offense under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46, for which a maximum term of imprisonment of ten years or more is prescribed by law; or

"(ii) an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture *47 or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), for which a maximum term of imprisonment of ten years or more is prescribed by law;

"(B) the term 'violent felony' means any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that—

"(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

"(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another; and

"(C) the term 'conviction' includes a finding that a person has committed an act of juvenile delinquency involving a violent felony."

### C

We examined state statutes involving fraud or deceit in effect in 1996, when Congress added the $10,000 threshold in subparagraph (M)(i). See Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 321(a)(7), 110 Stat. 3009–628. While perhaps questions could be raised about whether certain of the statutes listed below involve "fraud or deceit" as required by subparagraph (M)(i), we give petitioner the benefit of any doubt and treat the statute as relevant.

### 1

In 29 States plus the District of Columbia, the main statutes in effect in 1996 involving fraud and deceit either did not have any monetary threshold or set a threshold lower than $10,000 even for the most serious grade of the offense.

**48 *Alabama:* see, *e.g.,* Ala.Code §§ 13A–8–2, 13A–8–3, 13A–9–14, 13A–9–14.1, 13A–9–46, 13A–9–47, 13A–9–73 (1996). *Arkansas:* see, *e.g.,* Ark.Code Ann. §§ 5–36–103, 5–37–203, 5–37–204, 5–37–207, 5–37–211 (1996). *California:* see, *e.g.,* Cal.Penal Code Ann. §§ 484, 487, 502.7 (West 1996). *District of Columbia:* see, *e.g.,* D.C.Code §§ 22–3821, 22–3823 (1996). *Georgia:* see, *e.g.,* Ga.Code Ann. §§ 16–8–3, 16–8–12, 16–9–33 (1996). *Idaho:* see, *e.g.,* Idaho Code §§ 18–2403, 18–2407 (Lexis 1996). *Kentucky:* see, *e.g.,* Ky.Rev.Stat. Ann. § 514.040 (West 1996). *Louisiana:* see, *e.g.,* La. Stat. Ann. §§ 14:67, 14:67.11, 14:70.1, 14:70.4, 14:71, 14:71.1 (West 1996). *Maryland:* see, *e.g.,* Md. Ann.Code, Art. 27, §§ 340, 342, 145, 230A, 230C, 230D (Lexis 1996). *Massachusetts:* see, *e.g.,* Mass. Gen. Laws, ch. 266, §§ 30, 37C (West 1996). *Michigan:* see, *e.g.,* Mich. Comp. Laws §§ 750.218, 750.271, 750.280, 750.219a, 750.356c (West 1996). *Mississippi:* see, *e.g.,* Miss.Code Ann. §§ 97–19–21, 97–19–35, 97–19–39, 97–19–71, **2307 97–19–83 (1996). *Missouri:* see, *e.g.,* Mo.Rev.Stat. §§ 570.030, 570.120, 570.130, 570.180 (1996). *Montana:* Mont.Code Ann. §§ 45–

Nijhawan v. Holder, 557 U.S. 29 (2009)

129 S.Ct. 2294, 174 L.Ed.2d 22, 77 USLW 4489, 09 Cal. Daily Op. Serv. 7333...

6–301, 45–6–313, 45–6–315, 45–6–317 (1996). *Nebraska:* see, *e.g.,* Neb.Rev.Stat. Ann. §§ 28–512, 28–518, 28–631 (1996). *Nevada:* see, *e.g.,* Nev.Rev.Stat. §§ 205.0832, 205.0835, 205.370, 205.380 (1996). *New Hampshire:* see, *e.g.,* N.H.Rev.Stat. Ann. §§ 637:4, 637:11, 638:5, 638:20 (1996). *North Carolina:* see, *e.g.,* N.C. Gen.Stat. Ann. §§ 14–100, 14–106, 14–113.13 (1996). *Oklahoma:* see, *e.g.,* Okla. Stat., Tit. 21, §§ 1451, 1462, 1541.1, 1541.2, 1541.3, 1541.4, 1550.2, 1662, 1663 (West 1996). *Pennsylvania:* see, *e.g.,* 18 Pa. Cons.Stat. §§ 3903, 3922, 4110, 4111, 4117 (1996); but see § 4105 (bad check statute amended 1996 to introduce $75,000 threshold). *Rhode Island:* see, *e.g.,* R.I. Gen. Laws §§ 11–18–6, 11–18–7, 11–18–8, 11–18–9, 11–41–4, 11–41–5, 11–41–29, *\*49* 11–41–30 (1996). *South Carolina:* see, *e.g.,* S.C.Code Ann. § 16–13–240 (1996). *South Dakota:* see, *e.g.,* S.D. Codified Laws §§ 22–30A–3, 22–30A–10, 22–30A–17 (1996). *Utah:* see, *e.g.,* Utah Code Ann. §§ 76–6–405, 76–6–412, 76–6–521, 76–10–1801 (Lexis 1996). *Vermont:* see, *e.g.,* Vt. Stat. Ann., Tit. 13, §§ 2001, 2002, 2024, 2531, 2582 (1996). *Virginia:* see, *e.g.,* Va.Code Ann. §§ 18.2–178, 18.2–95, 18.2–195 (Lexis 1996). *Washington:* see, *e.g.,* Wash. Rev.Code §§ 9A.56.020, 9A.56.030 (1996). *West Virginia:* see, *e.g.,* W. Va.Code Ann. § 61–3–24 (Lexis 1996). *Wisconsin:* see, *e.g.,* Wis. Stat. §§ 943.20, 943.395, 943.41 (1996). *Wyoming:* see, *e.g.,* Wyo. Stat. Ann. §§ 6–3–407, 6–3–607, 6–3–802 (1996).

2

In 13 States, conviction under the main fraud and deceit statutes in effect in 1996 could categorically qualify under subparagraph (M)(i). But the relevant monetary thresholds for these offenses—that is, the thresholds such that conviction categorically would satisfy the monetary requirement of subparagraph (M)(i)—were significantly higher than $10,000. Additionally, a number of these States had statutes targeted at particular kinds of fraud without any relevant monetary threshold. *Alaska:* see, *e.g.,* Alaska Stat. §§ 11.46.120, 11.46.180 (1996) ($25,000); but see, *e.g.,* § 11.46.285 (fraudulent use of a credit card, no relevant monetary threshold). *Arizona:* see, *e.g.,* Ariz.Rev.Stat. Ann.

§§ 13–1802 (West 1989), 13–2109 (West 2000) ($25,000); but see, *e.g.,* §§ 13–2103 (receipt of anything of value by fraudulent use of a credit card), 13–2204 (defrauding secured creditors), 13–2205 (defrauding judgment creditors), 13–2206 (West 1989) (fraud in insolvency), all with no relevant monetary threshold. *Colorado:* see, *e.g.,* Colo.Rev.Stat. Ann. § 18–4–401 (Supp.1996) ($15,000), but see, *e.g.,* §§ 18–5–205 (fraud by check), 18–5–207 (1986) (purchase on credit to defraud), both with no relevant monetary threshold.

*Delaware:* see, *e.g.,* *\*50* Del.Code Ann., Tit. 11, §§ 841, 843 (1995) ($50,000); but see, *e.g.,* §§ 903 (unlawful use of credit card), 913 (insurance fraud), 916 (home improvement fraud), all with no relevant monetary threshold.

*Hawaii:* see, *e.g.,* Haw.Rev.Stat. §§ 708–830, 708–830.5 (Lexis 1994) ($20,000); but see, *e.g.,* §§ 708–873 (defrauding secured creditors), 708–8100 (fraudulent use of a credit card), 708–8100.5 (fraudulent encoding of a credit card), 708–8103 (credit card fraud by a provider of goods or services), all with no relevant monetary threshold.

*Indiana:* see, *e.g.,* Ind.Code §§ 35–43–4–1 (West 1993), 35–43–4–2 ($100,000), 35–43–5–7.1 (West Supp.1996) ($50,000); but see, *e.g.,* §§ 35–43–5–3 (deception), 35–43–5–4 (West 1993) (insurance and credit card fraud), 35–43–5–7 (welfare fraud), 35–43– *\*\*2308* 5–8 (fraud on financial institutions), all with no relevant monetary threshold. *Kansas:* see, *e.g.,* Kan. Stat. Ann. §§ 21–3701 (1995), 21–3707 (Supp.1996), 21–3729 (1995), 21–3846 (Supp.1996) ($25,000). *Minnesota:* see, *e.g.,* Minn.Stat. § 609.52 (1996) ($35,000). *New Jersey:* see, *e.g.,* N.J. Stat. Ann. §§ 2C:20–2, 2C:20–4, 2C:21–13, 2C:21–17 (West 1995) ($75,000); but see, *e.g.,* §§ 2C:21–6 (credit cards), 2C:21–12 (defrauding secured creditors), both without a relevant monetary threshold. *New Mexico:* see, *e.g.,* N.M. Stat. Ann. §§ 30–16–6, 30–33–13, 30–44–7, 30–50–4 (1996) ($20,000); but see, *e.g.,* § 30–16–33 (credit card fraud, no relevant monetary threshold). *New York:* see, *e.g.,* N.Y. Penal Law Ann. §§ 155.05 (West 1988), 155.40, 158.20 (West Supp.1998), 176.25 ($50,000); but see, *e.g.,* §§ 190.65 (scheme to defraud), 185.00 (fraud in insolvency), 185.05 (fraud involving security interest), all with no relevant monetary threshold. *Ohio:* see, *e.g.,* Ohio Rev.Code Ann. §§ 2913.02, 2913.11, 2913.21, 2913.40, 2913.45, 2913.47, 2913.48 (Lexis 1996) ($100,000). *Texas:* see, *e.g.,* Tex.

Nijhawan v. Holder, 557 U.S. 29 (2009)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 713 of 1271

129 S.Ct. 2294, 174 L.Ed.2d 22, 77 USLW 4489, 09 Cal. Daily Op. Serv. 7333...

Penal Code Ann. §§ 31.02 (West 1994), 31.03, 35.02 (West Supp.2003) ($20,000); but see, *e.g.,* § 32.31 (credit card or debit card abuse, no relevant monetary threshold).

*51  3

In eight States, the main fraud and deceit statutes in effect in 1996 had relevant monetary thresholds of $10,000. However, a number of these States also had statutes targeted at particular kinds of fraud without any relevant monetary threshold. *Connecticut:* see, *e.g.,* Conn. Gen.Stat. §§ 53a–119, 53a–122 (1996); but see, *e.g.,* §§ 53a–128c, 53a–128i (credit card crimes, no relevant monetary threshold). *Florida:* see, *e.g.,* Fla. Stat. §§ 812.012, 812.014 (1996); but see, *e.g.,* §§ 817.234 (insurance fraud), 817.61 (fraudulent use of credit cards) (1996), both without a relevant monetary threshold. *Illinois:* see, *e.g.,* Ill. Comp. Stat., ch. 720, § 5/16–1 (West 1996); but see, *e.g.,* §§ 5/17–6 (state benefits fraud), 5/17–9 (public aid wire fraud), 5/17–10 (public aid mail fraud), 5/17–13 (fraudulent land sales), all without a relevant monetary threshold. *Iowa:* see, *e.g.,* Iowa Code §§ 714.1, 714.2, 714.8, 714.9 (1996). *Maine:* see, *e.g.,* Me.Rev.Stat. Ann., Tit. 17A, §§ 354, 362 (1996); but see, *e.g.,* §§ 902 (defrauding a creditor), 908 (home repair fraud), both without relevant monetary thresholds. *North Dakota:* see, *e.g.,* N.D. Cent.Code Ann. §§ 12.1–23–02, 12.1–23–05 (1996). *Oregon:* see, *e.g.,* Ore.Rev.Stat. §§ 164.085, 164.057; but see, *e.g.,* §§ 165.055 (fraudulent use of a credit card), 165.692, 165.990 (false claims for health care payments), both without a relevant monetary threshold. *Tennessee:* see, *e.g.,* Tenn.Code Ann. § 39–14–101, 39–14–105, 39–14–118, 39–14–133 (1996).

**All Citations**

557 U.S. 29, 129 S.Ct. 2294, 174 L.Ed.2d 22, 77 USLW 4489, 09 Cal. Daily Op. Serv. 7333, 2009 Daily Journal D.A.R. 8553, 21 Fla. L. Weekly Fed. S 927

# Footnotes

*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

AR.05938   12

N.L.R.B. v. Bell Aerospace Co. Div. of Textron, Inc., 416 U.S. 267 (1974)

94 S.Ct. 1757, 85 L.R.R.M. (BNA) 2945, 40 L.Ed.2d 134, 73 Lab.Cas. P 14,465

KeyCite Yellow Flag - Negative Treatment

Not Followed as Dicta N.L.R.B. v. Hendricks County Rural Elec. Membership Corp., U.S., December 2, 1981

94 S.Ct. 1757

Supreme Court of the United States

NATIONAL LABOR
RELATIONS BOARD, Petitioner,

v.

BELL AEROSPACE COMPANY
DIVISION OF TEXTRON INC.

No. 72—1598.
|
Argued Jan. 14, 1974.
|
Decided April 23, 1974.

## Synopsis

Employer petitioned to review order of the National Labor Relations Board finding that employer was guilty of unfair labor practice in refusing to bargain with union representing buyers, and the Board filed cross petition to enforce bargaining order. The United States Court of Appeals for the Second Circuit, 475 F.2d 485, denied enforcement, and certiorari was granted. The Supreme Court, Mr. Justice Powell, held that Congress intended to exclude from the protections of the National Labor Relations Act all employees properly classified as 'managerial' rather than just those in positions susceptible to conflicts of interest in labor relations; and that the NLRB is not required to proceed by rulemaking, rather than by adjudication, in determining whether particular buyers are 'managerial employees.'

Judgment of the Court of Appeals affirmed in part and reversed in part, and cause remanded.

Mr. Justice White filed an opinion dissenting in part, in which Mr. Justice Brennan, Mr. Justice Stewart, and Mr. Justice Marshall joined.

West Headnotes (12)

**[1]** **Statutes** ⚷ Legislative History

Legislative history is important in construing statute.

5 Cases that cite this headnote

**[2]** **Administrative Law and Procedure** ⚷ Deference to Agency in General

**Administrative Law and Procedure** ⚷ Reenactment of construed statute; incorporation of construction

Court may accord great weight to long-standing interpretation placed on statute by agency charged with its administration, especially where Congress has reenacted the statute without pertinent change.

202 Cases that cite this headnote

**[3]** **Statutes** ⚷ Legislative Construction

Subsequent legislation declaring the intent of an earlier statute is entitled to significant weight.

58 Cases that cite this headnote

**[4]** **Labor and Employment** ⚷ Supervisory personnel

Congress intended to exclude from the protections of the National Labor Relations Act all employees properly classifiable as "managerial," not just those in positions susceptible to conflicts of interest in labor relations. National Labor Relations Act, §§ 2(3, 11, 12), 8(a)(1, 5) as amended 29 U.S.C.A. §§ 152(3, 11, 12), 158(a)(1, 5); Railway Labor Act, § 1, 45 U.S.C.A. § 151; Merchant Marine Act of 1936, § 101 et seq., 46 U.S.C.A. § 1101 et seq.; Social Security Act, § 1101, 42 U.S.C.A. § 1301.

10 Cases that cite this headnote

**[5]** **Labor and Employment** ⚷ Supervisory personnel

The Wagner Act was designed to protect "laborers" and "workers," not vice-presidents

and others clearly within the managerial hierarchy. National Labor Relations Act, § 1 et seq. as amended 29 U.S.C.A. § 151 et seq.

1 Cases that cite this headnote

**[6]** **Labor and Employment** ☞ Employees Within Acts

**Labor and Employment** ☞ Supervisory personnel

A "professional employee" within the coverage of the National Labor Relations Act is not the same thing as a "managerial employee"; term "professional employee" refers to such persons as legal, engineering, scientific and medical personnel and their junior professional assistants. National Labor Relations Act, § 2(12) as amended 29 U.S.C.A. § 152(12).

26 Cases that cite this headnote

**[7]** **Labor and Employment** ☞ Supervisory personnel

Where Congress in enacting the Taft-Hartley Act in 1947 understood that at least some "managerial employees" other than "supervisors" were excluded from the protections of the National Labor Relations Act, and where the NLRB's interpretation of the NLRA as excluding all true "managerial employees" was clearly defined for 1959 Congress which permitted the 1947 definition of employee to stand when it amended the NLRA, the NLRB was not thereafter free to read a new and more restricted meaning into the exclusionary provisions of the NLRA. National Labor Relations Act, § 2(3, 11) as amended 29 U.S.C.A. § 152(3, 11).

96 Cases that cite this headnote

**[8]** **Labor and Employment** ☞ Supervisory personnel

Specific job title of employees is not in itself controlling in determining whether particular employees are "managerial" and thus not covered by the National Labor Relations Act;

rather, the question must be answered in terms of the employees' actual job responsibilities, authority, and relationship to management. National Labor Relations Act, § 2(3, 11) as amended 29 U.S.C.A. § 152(3, 11).

29 Cases that cite this headnote

**[9]** **Labor and Employment** ☞ Administrative Proceedings

It would be appropriate for the NLRB to exclude employees from a bargaining unit on the ground that their participation in a labor organization would create a conflict of interest with their job responsibilities.

5 Cases that cite this headnote

**[10]** **Labor and Employment** ☞ Past policies or position; precedent

The NLRB is not precluded from announcing new principles in an adjudicative proceeding. National Labor Relations Act, § 6 as amended 29 U.S.C.A. § 156.

77 Cases that cite this headnote

**[11]** **Labor and Employment** ☞ Past policies or position; precedent

The choice between rule making and adjudication lies in the first instance within the discretion of the NLRB and, though there may be situations where the Board's reliance on adjudication would amount to an abuse of discretion or a violation of the National Labor Relations Act, its judgment that adjudication best serves the purpose of developing standards is entitled to great weight. National Labor Relations Act, § 6 as amended 29 U.S.C.A. § 156.

203 Cases that cite this headnote

**[12]** **Labor and Employment** ☞ Past policies or position; precedent

In view of the large number of buyers employed in large number of companies throughout the

Case 3:20-cv-07721-SL    Document 58-5    Filed 11/10/20    Page 716 of 1271

N.L.R.B. v. Bell Aerospace Co. Div. of Textron, Inc., 416 U.S. 267 (1974)
94 S.Ct. 1757, 85 L.R.R.M. (BNA) 2945, 40 L.Ed.2d 134, 73 Lab.Cas. P 14,465

country and fact that duties of the buyers vary widely depending on the company or industry, the NLRB was not obliged to proceed by rule making, rather than by adjudication, in determining whether particular buyers were "managerial employees" excluded from the protections of the National Labor Relations Act. National Labor Relations Act, §§ 2(3, 11), 6, 9(c) (1, 2) as amended 🔖 29 U.S.C.A. §§ 152(3, 11), 156, 🔖 159(c)(1, 2); 🔖 5 U.S.C.A. §§ 551(4, 6, 7), 🔖 553.

43 Cases that cite this headnote

**1758 Syllabus *

*267 On a petition by a labor union for a representation election, the National Labor Relations Board (NLRB) held that the buyers employed by respondent company constituted an appropriate collective-bargaining unit and directed an election. The NLRB stated that even though the buyers might be 'managerial employees' they were nevertheless covered by the National Labor Relations Act (NLRA) in the absence of any showing that union organization of the buyers would create a conflict of interest in labor relations. Subsequently the buyers voted for the union, and the NLRB certified it as their exclusive bargaining representative. The company refused to bargain, however, and was found guilty of an unfair labor practice and ordered to bargain. The Court of Appeals denied enforcement on the grounds that (1) it was not certain that the NLRB's decision rested on a factual determination that the buyers were not true 'managerial employees' rather than on a new, and in the court's view, erroneous holding that the NLRB was free to regard all managerial employees as covered by the Act unless their duties met the conflict-of-interest touchstone, and (2) in view of its previous contrary decisions, the NLRB was required to **1759 proceed by rulemaking rather than by adjudication in determining whether buyers are 'managerial employees.' Held:

1. Congress intended to exclude from the protections of the NLRA all employees properly classified as 'managerial,' not just those in positions susceptible to conflicts of interest in labor relations. This is unmistakably indicated by the NLRB's early decisions, the purpose and legislative history of the Taft-Hartley amendments to the NLRA in 1947, the NLRB's

subsequent construction of the Act for more than two decades, and the decisions of the courts of appeals. Pp. 1761—1770.

2. The NLRB is not required to proceed by rulemaking, rather *268 than by adjudication in determining whether buyers or some types of buyers are 'managerial employees.' Pp. 1769 —1772.

(a) The NLRB is not precluded from announcing new principles in an adjudicative proceeding, and the choice between rulemaking and adjudication initially lies within the NLRB's discretion. 🔖 SEC v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995; 🔖 NLRB v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709. Pp. 1771 —1772.

(b) In view of the large number of buyers employed in manufacturing. wholesale, and retail units, and the wide variety of buyers' duties, depending on the company or industry, any generalized standard would have no more than marginal utility, and the NLRB thus has reason to proceed with caution and develop its standards in a case-by-case manner with attention to the specific character of the buyers' authority and duties in each company. Pp. 1771—1772.

🚩 475 F.2d 485, affirmed in part, reversed in part, and remanded.

### Attorneys and Law Firms

Norton J. Come, Washington, D.C., for petitioner.

Richard E. Moot, Buffalo, N.Y., for respondent.

### Opinion

Mr. Justice POWELL delivered the opinion of the Court.

This case presents two questions: first, whether the National Labor Relations Board properly determined *269 that all 'managerial employees,' except those whose participation in a labor organization would create a conflict of interest with their job responsibilities, are covered by the National Labor Relations Act; [1] and second, whether the Board must proceed by rulemaking rather than by adjudication in determining whether certain buyers are 'managerial employees.' We answer both questions in the negative.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

I

Respondent Bell Aerospace Co., Division of Textron, Inc. (company), operates a plant in Wheatfield, New York, where it is engaged in research and development in the design and fabrication of aerospace products. On July 30, 1970, Amalgamated Local No. 1286 of the United Automobile, Aerospace and Agricultural Implement Workers of America (union) petitioned the National Labor Relations Board (Board) for a representation election to determine whether the union would be certified as the bargaining representative of the 25 buyers in the purchasing and procurement department at the company's plant. The company opposed the petition on the ground that the buyers were 'managerial employees' and thus were not covered by the Act.

The relevant facts adduced at the representation hearing are as follows. The purchasing and procurement department receives requisition orders from other departments at the plant and is responsible for purchasing all of the company's needs from outside suppliers. Some items are standardized and may be purchased 'off the shelf' from various distributors and suppliers. Other items  **1760  must be made to the company's specifications, and the requisition orders may be accompanied by detailed blueprints and other technical plans. Requisitions often designate a particular vendor, and in some instances the  *270  buyer must obtain approval before selecting a different one. Where no vendor is specified, the buyer is free to choose one.

Absent specific instructions to the contrary, buyers have full discretion, without any dollar limit, to select prospective vendors, draft invitations to bid, evaluate submitted bids, negotiate price and terms, and prepare purchase orders. Buyers execute all purchase orders up to $50,000. They may place or cancel orders of less than $5,000 on their own signature. On commitments in excess of $5,000, buyers must obtain the approval of a superior, with higher levels of approval required as the purchase cost increases. For the Minute Man missile project, which represents 70% of the company's sales, purchase decisions are made by a team of personnel from the engineering, quality assurance, finance, and manufacturing departments. The buyer serves as team chairman and signs the purchase order, but a representative from the pricing and negotiation department participates in working out the terms.

After the representation hearing, the Regional Director transferred the case to the Board. On May 20, 1971, the Board issued its decision holding that the company's buyers constituted an appropriate unit for purposes of collective bargaining and directing an election. 190 N.L.R.B. 431.

Relying on its recent decision in North Arkansas Electric Cooperative, Inc., 185 N.L.R.B. 550 (1970), the Board first stated that even though the company's buyers might be 'managerial employees,'[2] they  *271  were nevertheless covered by the Act and entitled to its protections. The Board then rejected the company's alternative contention that representation should be denied because the buyers' authority to commit the company's credit, select vendors, and negotiate purchase prices would create a potential conflict of interest between the buyers as union members and the company. In essence, the company argued that buyers would be more receptive to bids from union contractors and would also influence 'make or buy' decisions in favor of 'make,' thus creating additional work for sister unions in the plant. The Board thought, however, that any possible conflict was 'unsupported conjecture' since the buyers' 'discretion and latitude for independent action must take place within the confines of the general directions which the Employer has established' and that 'any possible temptation to allow sympathy for sister unions to influence such decisions could effectively be controlled by the Employer.' 190 N.L.R.B., at 431.

On June 16, 1971, a representation election was conducted in which 15 of the buyers voted for the union and nine against. On August 12, the Board certified the union as the exclusive bargaining representative for the company's buyers. That same day, however, the Court of Appeals for the Eighth Circuit denied enforcement of another Board order in NLRB v. North Arkansas Electric Cooperative, Inc., 446 F.2d 602, and held that 'managerial employees' were not covered by the Act and were therefore not entitled to its protections.[3] Id., at 610.

Encouraged by the Eighth Circuit's decision, the company moved the Board for reconsideration of its earlier  *272  order.  **1761  The Board denied the motion, 196 N.L.R.B. 827 (1972), stating that it disagreed with the Eighth Circuit and would adhere to its own decision in North Arkansas. In the Board's view, Congress intended to exclude from the Act only those 'managerial employees' associated with the 'formulation and implementation of labor relations policies.' Id., at 828. In each case, the 'fundamental touchstone' was 'whether the duties and responsibilities of any managerial employee or group of managerial employees do or do not include determinations which should be made free of

any conflict of interest which could arise if the person involved was a participating member of a labor organization'. Ibid. Turning to the present case, the Board reiterated its prior finding that the company had not shown that union organization of its buyers would create a conflict of interest in labor relations.

The company stood by its contention that the buyers, as 'managerial employees,' were not covered by the Act and refused to bargain with the union. An unfair labor practice complaint resulted in a Board finding that the company had violated ss 8(a)(5) and (1) of the Act, 29 U.S.C. ss 158(a)(5) and (1), and an order compelling the company to bargain with the union. 197 N.L.R.B. 209 (1972). Subsequently, the company petitioned the United States Court of Appeals for the Second Circuit for review of the order and the Board cross-petitioned for enforcement.

The Court of Appeals denied enforcement. 475 F.2d 485 (1973). After reviewing the legislative history of the Taft-Hartley Act of 1947, 61 Stat. 136, and the Board's decisions in this area, the court concluded that Congress had intended to exclude all true 'managerial employees' from the protection of the Act. It explained *273 that this 'exclusion embraced not only an employee 'so closely related to or aligned with management as to place the employee in a position of conflict of interest between his employer on the one hand and his fellow workers on the other' but also one who is 'formulating, determining and effectuating his employer's policies or has discretion, independent of an employer's established policy, in the performance of his duties,' Illinois State Journal-Register, Inc. v. NLRB, 412 F.2d 37, 41 (7 Cir. 1969).' 475 F.2d, at 494. The court added, however, that 'the Board would (not) be precluded, on proper proceedings, from determining that buyers, or some types of buyers, are not true 'managerial employees' and consequently come within the protection of s 8(a)(5) and (1).' Ibid.

Turning to the merits of the present case, the court acknowledged that there was substantial evidence that the company's buyers were not sufficiently high in the managerial hierarchy to constitute true 'managerial employees.' Nevertheless, the court denied enforcement for two reasons. First, it was not certain that the Board's decision rested on a factual determination that these buyers were not true 'managerial employees' rather than on 'its new, and in our view, erroneous holding that it was free to regard all managerial employees as covered by the Act unless

their duties met' the conflict-of-interest touchstone. Id., at 494—495. Second, although the Board was not precluded from holding that buyers, or some types of buyers, were not 'managerial employees,' the court thought that, in view of the Board's long line of cases holding the contrary, it could not accomplish this change of position by adjudication. Rather, the Board should conduct a rule-making proceeding in conformity with s 6 of the Act, 29 U.S.C. s 156. The court therefore remanded the case to the Board for such a proceeding.

*274 We granted the Board's petition for certiorari. 414 U.S. 816, 94 S.Ct. 47, 38 L.Ed.2d 49.

II

[1] [2] [3] [4] We begin with the question whether all 'managerial employees,' rather than just those in positions susceptible to conflicts of interest in labor **1762 relations, are excluded from the protections of the Act. [4] The Board's early decisions, the legislative history of the Taft-Hartley Act of 1947, 61 Stat. 136, and subsequent Board and court decisions in this area provide the necessary guidance for our inquiry. In examining these authorities, we draw on several established principles of statutory construction. In addition to the importance of legislative history, a court may *275 accord great weight to the longstanding interpretation placed on a statute by an agency charged with its administration. [5] This is especially so where Congress has re-enacted the statute without pertinent change. [6] In these circumstances, congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress. [7] We have also recognized that subsequent legislation declaring the intent of an earlier statute is entitled to significant weight. [8] Application of these principles leads us to conclude, as did the Court of Appeals, that Congress intended to exclude from the protections of the Act all employees properly classified as 'managerial.'

A

The Wagner Act, 49 Stat. 449, did not expressly mention the term 'managerial employee.' After the Act's passage, however, the Board developed the concept of 'managerial employee' in a series of cases involving the appropriateness of bargaining units. The first cases established that 'managerial employees' were not to be included in a unit

with rank-and-file employees. **1763 *276 In Freiz & Sons, 47 N.L.R.B. 43, 47 (1943), for example, the Board excluded expediters from a proposed unit of production and maintenance workers because they were 'closely related to the management.' Similarly, in Spicer Mfg. Corp., 55 N.L.R.B. 1491, 1498 (1944), expediters were again excluded from a unit containing office, technical, clerical, and professional employees because 'the authority possessed by (the expediters) to exercise their discretion in making commitments on behalf of the Company stamps them as managerial.' This rationale was soon applied to buyers. See, e.g., Hudson Motor Car Co., 55 N.L.R.B. 509, 512 (1944); Vulcan Corp., 58 N.L.R.B. 733, 736 (1944); Barrett Division, Allied Chem. & Dye Corp., 65 N.L.R.B. 903, 905 (1946); Electric Controller & Mfg. Co., 69 N.L.R.B. 1242, 1245—1246 (1946). The Board summarized its policy on 'managerial employees' in Ford Motor Co., 66 N.L.R.B. 1317, 1322 (1946):

> 'We have customarily excluded from bargaining units of rank and file workers executive employees who are in a position to formulate, determine and effectuate management policies. These employees we have considered and still deem to be 'managerial,' in that they express and make operative the decisions of management.'

Whether the Board regarded all 'managerial employees' as entirely outside the protection of the Act, as well as inappropriate for inclusion in a rank-and-file bargaining unit, is less certain. To be sure, at no time did the Board certify even a separate unit of 'managerial employees' or state that such was possible. The Board was cautious, however, in determining which employees were 'managerial.' For example, in Dravo Corp., 54 N.L.R.B. 1174, 1177 (1944)Dravo Corp., 54 N.L.R.B. 1174, 1177 (1944), the Board excluded buyers and expediters from a unit of office and clerical employees, *277 but reserved the question whether all such employees were to be considered 'managerial':

> 'This is not to say, however, that buyers and expediters are to be denied the right to self-organization and to collective

bargaining under the Act. The precise relationship of the buyers and expediters to management here is not now being determined by us.'

During this period the Board's policy with respect to the related but narrower category of 'supervisory employees' manifested a progressive uncertainty. The Board first excluded supervisors from units of rank-and-file employees, e.g., Mueller Brass Co., 39 N.L.R.B. 167, 171 (1942)Mueller Brass Co., 39 N.L.R.B. 167, 171 (1942), but in Union Collieries Coal Co., 41 N.L.R.B. 961, supplemental decision, 44 N.L.R.B. 165 (1942), it certified a separate unit composed of supervisors who were to be represented by an independent union. Shortly thereafter, in Godchaux Sugars, Inc., 44 N.L.R.B. 874 (1942), the Board approved a unit of supervisors whose union was affiliated with a union of rank-and-file employees. This trend was soon halted, however, by Maryland Drydock Co., 49 N.L.R.B. 733 (1943), where the Board held that supervisors, although literally 'employees' under the Act, could not be organized in any unit. And in Yale & Towne Mfg. Co., 60 N.L.R.B. 626, 628—629 (1945), the Board further held that timestudy men, whose "interests and functions" were "sufficiently akin to those of management," 'should neither be included in a unit with other employees, nor be established as a separate unit.'

Maryland Drydock, supra, was subsequently overruled in Packard Motor Car Co., 61 N.L.R.B. 4, 64 N.L.R.B. 1212 (1945), where the Board held that foremen could constitute an appropriate unit for collective bargaining The Board's position was upheld 5—4 by this Court in *278 Packard Motor Car Co. v. NLRB, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947). In view of the subsequent legislative reversal of the Packard decision, **1764 the dissenting opinion of Mr. Justice Douglas is especially pertinent. Id., at 493, 67 S.Ct. 789. He stated:

'The present decision . . . tends to obliterate the line between management and labor. It lends the sanctions of federal law to unionization at all levels of the industrial hierarchy. It tends to emphasize that the basic opposing forces in industry are not management and labor but the operating group on the one hand and the stockholder and bondholder group on the other. The industrial problem as so defined comes down to a contest over a fair division of the gross receipts of industry between these two groups. The struggle for control or power between

94 S.Ct. 1757, 85 L.R.R.M. (BNA) 2945, 40 L.Ed.2d 134, 73 Lab.Cas. P 14,465

management and labor becomes secondary to a growing unity in their common demands on ownership.

'I do not believe this is an exaggerated statement of the basic policy questions which underlie the present decision. For if foremen are 'employees' within the meaning of the National Labor Relations Act, so are vice-presidents, managers, assistant managers, superintendents, assistant superintendents—indeed, all who are on the payroll of the company, including the president; all who are commonly referred to as the management, with the exception of the directors. If a union of vice-presidents applied for recognition as a collective bargaining agency, I do not see how we could deny it and yet allow the present application. But once vice-presidents, managers, superintendents, foremen all are unionized, management and labor will become more of a solid phalanx than separate factions in warring camps.

'(I)f Congress, when it enacted the National Labor  **\*279** Relations Act, had in mind such a basic change in industrial philosophy, it would have left some clear and unmistakable trace of that purpose. But I find none.' 🚩 Id., at 494—495, 67 S.Ct., at 794—795.

Mr. Justice Douglas also noted that the Wagner Act was intended to protect 'laborers' and 'workers' whose right to organize and bargain collectively had not been recognized by industry, resulting in strikes, strife, and unrest. By contrast, there was no similar history with respect to foremen, managers, superintendents, or vice presidents. 🚩 Id., at 496—497, 67 S.Ct. 789. Furthermore, other legislation indicated that where Congress desired to include managerial or supervisory personnel in the category of employees, it did so expressly. See, e.g., Railway Labor Act of 1926, 44 Stat. 577, 45 U.S.C. s 151; Merchant Marine Act, 1936, as amended, 52 Stat. 953, 46 U.S.C. s 1101 et seq.; Social Security Act, s 1101, 49 Stat. 647.

B

The Packard decision was a major factor in bringing about the Taft-Hartley Act of 1947, 61 Stat. 136. The House bill, H.R. 3020, 80th Cong., 1st Sess. (1947),[9] provided for the exclusion **\*\*1765** of **\*280** 'supervisors,' a category broadly defined to include any individual who had authority to hire, transfer, promote, discharge, reward, or discipline other employees or effectively to recommend

such action. It also excluded (i) those who had authority to determine or effectively recommend the amount of wages earned by other employees; (ii) those employed in labor relations, personnel, and employment departments, as well as police and time-study personnel; and (iii) confidential employees. The Senate version of the bill, S. 1126, 80th Cong., 1st Sess. (1947),[10] also excluded supervisors, but defined that category more narrowly than the House version, distinguishing between 'straw bosses, leadmen, set-up men, and other minor supervisory employees, on the one hand, and the supervisor vested with such genuine management **\*281** prerogatives as the right to hire or fire, discipline, or make effective recommendations with respect to such action.' S.Rep.No. 105, 80th Cong., 1st Sess., 4 (1947). It was the Senate's view that employees such as 'straw bosses,' who had only minor supervisory duties, should be included within the Act's protections.

Significantly, both the House Report and the Senate Report voiced concern over the Board's broad reading of the term 'employee' to include those clearly within the managerial hierarchy. Focusing on Mr. Justice Douglas' dissent in Packard, the Senate Report specifically mentioned that even vice presidents might be unionized under the Board's decision. Ibid. It also noted that unionization of supervisors had hurt productivity, increased the accident rate, upset the balance of power in collective bargaining, and tended to blur the line between management and labor. Id., at 4—5. The House Report echoed the concern for reduction of industrial output and noted that unionization of supervisors had deprived employers of the loyal representations to which they were entitled.[11] And in criticizing the **\*282** Board's expansive reading of the Act's definition of the term 'employees,' the House Report noted that '(w)hen Congress passed the Labor Act, we were concerned, as we said in its preamble, with the welfare of 'workers' and 'wage earners,' not of the boss.' H.R.Rep. No. 245, 80th Cong., 1st Sess., 13 (1947).

**\*\*1766** The Conference Committee adopted the Senate version of the bill. H.R.Conf.Rep. No. 510, 80th Cong., 1st Sess., 35 (1947) U.S.Code Cong.Serv., 1947, pp. 1135, 1141. The House Managers' statement in explanation of the Conference Committee Report stated:

'The conference agreement, in the definition of 'supervisor,' limits such term to those individuals treated as supervisors under the Senate amendment. In the case of persons working in labor relations, personnel and employment departments, it was not thought necessary to make specific provision, as

AR.05945

Case 3:20-cv-07721-SL    Document 58-5    Filed 11/10/20    Page 721 of 1271

N.L.R.B. v. Bell Aerospace Co. Div. of Textron, Inc., 416 U.S. 267 (1974)
94 S.Ct. 1757, 85 L.R.R.M. (BNA) 2945, 40 L.Ed.2d 134, 73 Lab.Cas. P 14,465

was done in the House bill, since the Board has treated, and presumably will continue to treat, such persons as outside the scope of the act. This is the prevailing Board practice with respect to such people as confidential secretaries as well, and it was not the intention of the conferees to alter this practice in any respect. The conference agreement does not treat time-study personnel or guards as supervisors, as did the House bill. Since, however, time-study employees may qualify as professional personnel, the special provisions of the Senate amendment . . . applicable with respect to professional employees will cover many of this category. In the case of guards, the conference agreement does not permit the **\*283** certification of a labor organization as the bargaining representative of guards if it admits to membership, or is affiliated with any organization that admits to membership, employees other than guards.' Id., at 35—36, U.S.Code Cong. Serv. 1947, p. 1141.

**[5]   [6]**   The legislative history of the Taft-Hartley Act of 1947 may be summarized as follows. The House wanted to include certain persons within the definition of 'supervisors,' such as straw bosses, whom the Senate believed should be protected by the Act. As to these persons, the Senate's view prevailed. There were other persons, however, who both the House and the Senate believed were plainly outside the Act. The House wanted to make the exclusion of certain of these persons explicit. In the conference agreement, representatives from both the House and the Senate agreed that a specific provision was unnecessary since the Board had long regarded such persons as outside the Act. Among those mentioned as impliedly excluded were persons working in 'labor relations, personnel and employment departments,' and 'confidential employees.' But assuredly this did not exhaust the universe of such excluded persons. The legislative history strongly suggests that there also were other employees, much higher in the managerial structure, who were likewise regarded as so clearly outside the Act that no specific exclusionary provision was thought necessary. For example, in its discussion of confidential employees, the House Report noted that '(m)ost of the people who would qualify as 'confidential' employees are executives and are excluded from the act in any event.' H.R.Rep.No.245, p. 23 (emphasis added).  [12]  We think  **\*284** the inference is plain  **\*\*1767**  that 'managerial employees' were paramount among this impliedly excluded group. The Court of Appeals in the instant case put the issue well:

'Congress recognized there were other persons so much more clearly 'managerial' that it was inconceivable that the Board would treat them as employees. Surely Congress could not

have supposed that, while 'confidential secretaries' could not be organized, their bosses could be. In other words, Congress failed to enact the portion of Mr. Justice Douglas' Packard dissent relating to the organization of executives, not because it disagreed but because it deemed this unnecessary.' 475 F.2d, at 491—492.  [13]  (Footnote omitted.)

**\*285** C

Following the passage of the Taft-Hartley Act, the Board itself adhered to the view that 'managerial employees' were outside the Act. In Denver Dry Goods, 74 N.L.R.B. 1167, 1175 (1947), assistant buyers, who  **\*286**  were required to set good sales records as examples to sales employees, to assist buyers in the selection of merchandise, and to assume the buyer's duties when the latter was not present, were excluded by the Board on the ground that 'the interests of these employees are more closely identified with those of management.' The Board reiterated this reading of the Act in Palace Laundry Dry Cleaning, 75 N.L.R.B. 320, 323 n. 4 (1947):

'The determination of 'managerial,' like the determination of 'supervisory,' is to some extent necessarily a matter of the degree of authority exercised. We have in the past, and before the passage of the recent amendments to the Act, recognized and defined as 'managerial' employees, executives who formulate and effectuate management policies by expressing  **\*\*1768**  and making operative decisions of their employer, and have excluded such managerial employees from bargaining units. We believe that the Act, as amended, contemplates the continuance of this practice.' (Citations omitted.)

Buyers and assistant buyers were again excluded in Denton's, Inc., 83 N.L.R.B. 35, 37 (1949), because their 'interests . . . are more closely identified with management . . ..'  And in American Locomotive Co., 92 N.L.R.B. 115, 116—117 (1950), the Board held that buyers could neither be included in a unit of office and clerical employees nor placed in a separate unit, stating:

'The Employer maintains that the buyers are representatives of management. As it appears that the buyers are authorized to make substantial purchases for the Employer, we find that they are representatives of management, and as

such may not be accorded bargaining rights under the Act.'

Buyers, who were authorized to bind the employer without prior approval, were also excluded from a unit in **\*287** Curtiss-Wright Corp., 103 N.L.R.B. 458, 464 (1953), because 'they are representatives of management and as such may not be accorded bargaining rights under the Act.'

Finally, in Swift & Co., 115 N.L.R.B. 752, 753—754 (1956), the Board reaffirmed its long-held understanding of the scope of the Act. In refusing to approve a unit of procurement drivers who were found to be representative of management, the Board declared:

'It was the clear intent of Congress to exclude from the coverage of the Act all individuals allied with management. Such individuals cannot be deemed to be employees for the purposes of the Act. Accordingly, we reaffirm the Board's position that representatives of management may not be accorded bargaining rights under the Act . . ..' (Footnotes omitted.)

Until its decision in North Arkansas in 1970, the Board consistently followed this reading of the Act. [14] It never **\*288** certified any unit of 'managerial employees,' separate or otherwise, and repeatedly stated that it was Congress' intent that such employees not be accorded bargaining rights under the Act. And it was this reading which was permitted to stand when Congress again amended the Act in 1959. 73 Stat. 519.

The Board's exclusion of 'managerial employees' defined as those who 'formulate and effectuate management policies by expressing and making operative the decisions of their employer,' [15] has also been approved by courts without exception. See, e.g., Westinghouse Electric Corp. v. NLRB, 424 F.2d 1151, 1158 (CA7), cert. denied, 400 U.S. 831, 91 S.Ct. 63, 27 L.Ed.2d 62 (1970); Illinois State Journal-Register, Inc. v. NLRB, 412 F.2d 37, 41 (CA7 1969); **\*\*1769** Continental Insurance Co. v. NLRB, 409 F.2d 727, 730 (CA2), cert. denied 396 U.S. 902, 90 S.Ct. 215, 24 L.Ed.2d 178 (1969); Retail Clerks International Assn. v. NLRB, 125 U.S.App.D.C. 63, 65—66, 366 F.2d 642, 644—645 (1966) (Burger, J.), cert. denied, 386 U.S. 1017, 87 S.Ct. 1373, 18 L.Ed.2d 455 (1967); [16] **\*289** International Ladies' Garment Workers' Union v. NLRB, 339 U.S. 116, 123 (CA2,

1964) (Marshall, J.). [17] And in NLRB v. North Arkansas Electric Cooperative, Inc., 446 F.2d 602 (1971), the Eighth Circuit reviewed the history of the Act and specifically disapproved the Board's departure from its earlier position.

D

[7]    In sum, the Board's early decisions, the purpose and legislative history of the Taft-Hartley Act of 1947, the Board's subsequent and consistent construction of the Act for more than two decades, and the decisions of the courts of appeals all point unmistakably to the conclusion that 'managerial employees' are not covered by the Act. [18] We agree with the Court of Appeals below that the Board 'is not now free' to read a new and more restrictive meaning into the Act. 475 F.2d, at 494.

[8]    [9]    In view of our conclusion, the case must be remanded to permit the Board to apply the proper legal standard **\*290** in determining the status of these buyers. [19] SEC v. Chenery Corp., 318 U.S. 80, 85, 63 S.Ct. 454, 458, 87 L.Ed. 626 (1943); FTC v. Sperry & Hutchinson Co., 405 U.S. 233, 249, 92 S.Ct. 898, 907, 31 L.Ed.2d 170 (1972). We express no opinion as to whether these buyers fall within the category of 'managerial employees.' [20]

**\*\*1770** III

The Court of Appeals also held that, although the Board was not precluded from determining that buyers or some types of buyers were not 'managerial employees,' it could do so only by invoking its rulemaking procedures under s 6 of the Act, 29 U.S.C. s 156. [21] We disagree.

**\*291** At the outset, the precise nature of the present issue must be noted. The question is not whether the Board should have resorted to rulemaking, or in fact improperly promulgated a 'rule,' when in the context of the prior representation proceeding it held that the Act covers all 'managerial employees' except those meeting the new 'conflict of interest in labor relations' touchstone. Our conclusion that the Board applied the wrong legal standard makes consideration of that issue unnecessary. Rather, the present question is whether on remand the Board must invoke its rulemaking procedures if it determines, **\*292** in light of our opinion, that these buyers are not 'managerial employees'

94 S.Ct. 1757, 85 L.R.R.M. (BNA) 2945, 40 L.Ed.2d 134, 73 Lab.Cas. P 14,465

under the Act. The Court of Appeals thought that rulemaking was required because any Board finding that the company's buyers are not 'managerial' would be contrary to its prior decisions [22] and would presumably be in the nature of a general rule designed 'to fit all cases at all times.'

A similar issue was presented to this Court in its second decision in SEC v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) (Chenery II). [23] There, the respondent corporation argued that in an adjudicative proceeding the Commission could not apply a general standard that it had formulated for the first time in that proceeding. Rather, the Commission was required to resort instead to its rulemaking procedures if it desired to promulgate a new standard that would govern future conduct. **1771 In rejecting this contention, the Court first noted that the Commission had a statutory duty to decide the issue at hand in light of the proper standards and that this duty remained 'regardless of whether those standards previously had been spelled out in a general rule or regulation.' Id., at 201, 67 S.Ct., at 1580. The Court continued:

'The function of filling in the interstices of the (Securities) Act should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future. But any rigid requirement to that effect would make the administrative process inflexible and incapable of dealing with many of the specialized problems which **293 arise. . . . Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order. To insist upon one form of action to the exclusion of the other is to exalt form over necessity.

'In other words, problems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule. Or the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. Or the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule. In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is thus a very definite place for the

case-by-case evolution of statutory standards.' Id., at 202 —203, 67 S.Ct., at 1580 (Emphasis added.)

The Court concluded that 'the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency.' Id., at 203, 67 S.Ct., at 1580.

And in NLRB v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969), the Court upheld a Board order enforcing an election list requirement first promulgated in an earlier adjudicative proceeding in Excelsior Underwear Inc., 156 N.L.R.B. 1236 (1966). The plurality opinion of Mr. **294 Justice Fortas, joined by The Chief Justice, Mr. Justice Stewart, and Mr. Justice White, recognized that '(a)djudicated cases may and do . . . serve as vehicles for the formulation of agency policies, which are applied and announced therein,' and that such cases 'generally provide a guide to action that the agency may be expected to take in future cases.' NLRB v. Wyman-Gordon Co., supra, at 765—766, 89 S.Ct., at 1429. The concurring opinion of Mr. Justice Black, joined by Mr. Justice Brennan and Mr. Justice Marshall, also noted that the Board had both adjudicative and rule-making powers and that the choice between the two was 'within its informed discretion.' Id., at 772, 89 S.Ct. 1426.

[10] [11] [12] The views expressed in Chenery II and Wyman-Gordon make plain that the Board is not precluded from announcing new principles in an adjudicative proceeding and that the choice between rulemaking and adjudication lies in the first instance within the Board's discretion. Although there may be situations where the Board's reliance on adjudication would amount to an abuse of discretion or a violation of the Act, nothing in the present case would justify such a conclusion. Indeed, there is ample indication that adjudication is especially appropriate in the instant context. As the Court of Appeals noted, '(t)here must be tens of thousands of manufacturing, wholesale and retail **1772 units which employ buyers, and hundreds of thousands of the latter.' 475 F.2d, at 496. Moreover, duties of buyers vary widely depending on the company or industry. It is doubtful whether any generalized standard could be framed which would have more than marginal utility. The Board thus has reason to proceed with caution, developing its standards in a case-by-case manner with attention to the specific character of the buyers' authority and duties in each

Case 3:20-cv-07721-SL    Document 58-5    Filed 11/10/20    Page 724 of 1271

N.L.R.B. v. Bell Aerospace Co. Div. of Textron, Inc., 416 U.S. 267 (1974)
94 S.Ct. 1757, 85 L.R.R.M. (BNA) 2945, 40 L.Ed.2d 134, 73 Lab.Cas. P 14,465

company. The Board's judgment that adjudication best serves this purpose is entitled to great weight.

**\*295** The possible reliance of industry on the Board's past decisions with respect to buyers does not require a different result. It has not been shown that the adverse consequences ensuing from such reliance are so substantial that the Board should be precluded from reconsidering the issue in an adjudicative proceeding. Furthermore, this is not a case in which some new liability is sought to be imposed on individuals for past actions which were taken in good-faith reliance on Board pronouncements. There are fines or damages involved here. In any event, concern about such consequences is largely speculative, for the Board has not yet finally determined whether these buyers are 'managerial.'

It is true, of course, that rulemaking would provide the Board with a forum for soliciting the informed views of those affected in industry and labor before embarking on a new course. But surely the Board has discretion to decide that the adjudicative procedures in this case may also produce the relevant information necessary to mature and fair consideration of the issues. Those most immediately affected, the buyers and the company in the particular case, are accorded a full opportunity to be heard before the Board makes its determination.

The judgment of the Court of Appeals is therefore affirmed in part and reversed in part, and the cause remanded to that court with directions to remand to the Board for further proceedings in conformity with this opinion.

Judgment of the Court of Appeals affirmed in part and reversed in part, and cause remanded.

It is so ordered.

Mr. Justice WHITE, with whom Mr. Justice BRENNAN, Mr. Justice STEWART, and Mr. Justice MARSHALL join, dissenting in part.

I concur in Part III of the Court's opinion insofar as it holds that the Board was not required to resort to rulemaking in deciding this case, but I dissent from its holding **\*296** in Part II that managerial employees as a class are not 'employees' within the meaning of the National Labor Relations Act.

Section 7 of the Act, 29 U.S.C. s 157, provides that '(e)mployees shall have the right to self-organization, to form,

join, or assist labor organizations, to bargain collectively through representatives of their own choosing . . ..' Section 8(a)(1), 29 U.S.C. s 158(a)(1), makes it an unfair labor practice to interfere with the rights guaranteed in s 7, and under s 8(a)(5), 29 U.S.C. s 158(a)(5), it is an unfair practice for the employer to refuse to bargain collectively with representatives of his 'employees.' For the purposes of the foregoing sections, the term 'employee' as defined in s 2(3) of the Act, means 'any employee' of the employer, 'but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act . . ..' 29 U.S.C. s 152(3).

The issue in this case is whether the term 'employee' excludes not only those specifically excluded by s 2 but also the broad category of 'managerial' employees, who, although literally 'employees' of the employer and not expressly excluded by s 2, are nevertheless **\*\*1773** not to be considered employees for the purposes of the Act because they make and implement managerial policies. The Court holds that no managerial employee is an employee for the purposes of the Act. I cannot agree with this conclusion.

**\*297** The Act is very plain on its face—'any employee,' with specified exclusions, is entitled to the benefits of the Act. Each of the exclusions is a narrow and precisely defined class, and none of them mentions managerial employees. 'Supervisors' are excluded, but a precise definition of that class, mush narrower than the class of managerial employees, is provided in s 2(11):
'any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.' 29 U.S.C. s 152(11).

Without more, it could not be concluded that Congress meant to exclude a whole category of employees in addition to those expressly excepted in s 2(3). To infer that all managerial

employees are not employees for purposes of the Act because a specified managerial subgroup, supervisors, was expressly excluded, is unwarranted, at least where Congress was careful to define precisely what employees were within the scope of the supervisory exclusion.

What is more, Congress in s 2(12), 🔲 29 U.S.C. s 152(12), has defined a special subclass of professional employees having special skills and duties 'involving the consistent exercise of discretion and judgment in' the performance of their work. These employees are obviously 'employees' for the purposes of the Act; and in s 9, 🔲 29 U.S.C. s 159, after investing the Board with the powers necessary to decide the units appropriate for collective bargaining, it is provided **\*298** that the Board shall not hold any bargaining unit to be appropriate 'if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit.' It is apparent, it seems to me, that there are many professional employees who would qualify as managerial employees; yet the Act clearly treats them as employees for purposes of the Act and Congress assumed they would have full organizational and bargaining rights unless it was provided otherwise in accordance with congressional desires. Hence s 9(b).

Insofar as the face of the Act is concerned, and as compared with an across-the-board exclusion of 'managerial' employees, the present ruling of the Board, which excludes only those managerial employees whose work may involve them in a conflict of interest if they are permitted to bargain collectively, is a far narrower exclusion adhering much more closely to the rationale of the supervisory exclusion and to the apparent intent of Congress. The Court nevertheless not only holds that the term employee may be construed to exclude managerial employees but also that it must be so construed. No narrower exclusion, it is said, in addition to those expressly provided for, will satisfy the Act.

Although it would appear to be a difficult and questionable feat to rewrite the statute so substantially, the Court purports to find license for its result in the legislative history of the 1947 amendments to the Act, read in the light of previous and subsequent Board and court decisions. It is true that the exclusion of supervisors from the definition of employees first occurred in 1947, but, with all respect, I find no basis in the history of these amendments, read in the light of prior Board cases, for concluding that Congress intended to exclude

all **\*299** managerial employees, in addition **\*\*1774** to supervisors, from the benefits of the Act.

As I understand its decisions, the Board at no time prior to 1947 completely excluded the broad category of managerial employees from the class of employees protected by the Act. The Court concedes that the Board's cases during this period involved only the exclusion of managerial employees from bargaining units of rank-and-file workers. Some of the Board's statements may have been ambiguous, but no Board case held or had occasion to hold that managerial employees as a group would not be protected by the Act. As the Court acknowledges, the Board, in one decision excluding buyers and expediters from a unit of office and clerical employees, pointedly expressed the caveat that '(t) his is not to say, however, that buyers and expediters are to be denied the right to self-organization and to collective bargaining under the Act.' Dravo Corp., 54 N.L.R.B. 1174, 1177 (1944)Dravo Corp., 54 N.L.R.B. 1174, 1177 (1944). In Hudson Motor Car Co., 55 N.L.R.B. 509, 512 (1944), where the Board excluded buyers from a bargaining unit of office and clerical employees, the reason given for the exclusion was 'that their duties are closely allied to management, differing materially from those of the other clerical employees.' And in Vulcan Corp., 58 N.L.R.B. 733, 736 (1944), the Board excluded a buyer from a production and maintenance employees' unit, not because a managerial employee could not be accorded bargaining rights, but '(b)ecause of the responsibility of his position and his peculiar relationship to management, and in view of the fact that his interests are apparently different from those of the production and maintenance employees.' This line of Board decisions addressed the question whether certain managerial employees had sufficient community of interest with rank-and-file employees to be included in the same bargaining unit with them, and the Board was exercising its power to designate **\*300** appropriate bargaining units under s 9. It is clear that the Board at no time held managerial employees to be outside the scope of the Act during the period prior to the Taft-Hartley amendments.

The Board's position with respect to supervisors, as a class, vacillated during this time, the Board first excluding supervisors from rank-and-file units but recognizing units confined to supervisory employees, then refusing to recognize any bargaining units of supervisors and finally returning to its earlier rule. But even when the Board determined for a short period that supervisors should not be permitted to organize either with other employees or in separate units, it never went as far as to hold supervisors not to be 'employees' under the Act. This was the Court's understanding of the Board's

position in Packard Motor Car Co. v. NLRB, 330 U.S. 485, 492 n. 3, 67 S.Ct. 789, 91 L.Ed. 1040 (1947), the very case which prompted the 80th Congress to go further than the Board had ever gone and exclude supervisors entirely from the category of employees accorded bargaining rights under the Act.[1] In Maryland Drydock Co., 49 N.L.R.B. 733, 738, 740 (1943), the Board was 'no longer convinced that from the mere determination *301 that a supervisor is an employee it follows that supervisors may constitute **1775 appropriate bargaining units' because 'the benefits which supervisory employees might achieve through being certified as collective-bargaining units would be outweighed not only by the dangers inherent in the commingling of management and employee functions, but also in its possible restrictive effect upon the organizational freedom of rank and file employees.' Shortly, thereafter, the Board, faced with a claim by the employer that foremen are not employees within the meaning of the Act, did not address this possible ground of decision but held instead that it was 'not persuaded that the factors militating against the establishment of units of supervisory employees, set forth in . . . the Maryland Drydock case, are obviated by the circumstance that the union seeking to represent such employees is an independent, unaffiliated union.' General Motors Corp., 51 N.L.R.B. 457, 460 (1943). Moreover, the Board held in Soss Mfg. Co., 56 N.L.R.B. 348 (1944), that while a bargaining unit of supervisory employees might not be appropriate, a supervisor, like other employees, was nonetheless protected against an unfair labor practice: 'We conclude that supervisors are 'employees' and that supervisory status does not by its own force remove an employee from the protection of Section 8(1) and (3)' of the Act. Id., at 353. Ultimately, in the Packard cases, 61 N.L.R.B. 4, 64 N.L.R.B. 1212 (1945), the Board reverted to its earlier rule that bargaining units of supervisors were entitled to recognition under the Act as long as they included no rank-and-file members.

When Congress undertook to amend the Act following this Court's decision in Packard upholding the Board's inclusion of supervisors as employees under the Act, it was acting in light of a renewed Board policy to *302 permit supervisory employees to organize in separate units under the mantle of the Act's protection, an enduring Board policy not to exclude supervisors from the statutory definition of employees, and a further policy which excluded managerial employees from rank-and-file units but had never denied them the right to establish separate bargaining units or placed them outside the Act's definition of 'employee.' The amendments adopted by Congress in 1947 in light of

this pattern of Board practice clearly intended to do away with the Packard decision approving the Board's authority to grant recognition to unions of supervisors. The House and the Senate both proposed to exclude supervisors from the individuals defined as employees for purposes of the Act. The Senate definition of 'supervisor' was limited to individuals with authority, in the employer's interest, to take or recommend action involving the employment of other employees, if the exercise of such authority required the use of independent judgment, S. 1126 s 2(11). But the proposed House definition would also have identified as excluded 'supervisors' (a) those who could determine or effectively recommend the wages to be paid other employees, (b) employees with responsibility in the area of labor relations, personnel, employment, police, or time-study matters, and (c) confidential employees, H.R. 3020 s 2(12). Neither of these proposals sought to exclude in express terms the entire category of 'managerial employees,' i.e., those who are in a position to formulate, determine, and effectuate management policies beyond the area of labor relations, whether by defining such persons as 'supervisors' or by proposing a separate exclusion for 'managerial employees.' Such a step could easily have been taken had Congress intended to exclude these individuals from the protection of the Act. But it was not, despite the fact that the Board had recently considered whether *303 certain employees should be denied organizational rights, either because they were supervisory or, separately, because their job responsibilities involved the exercise of managerial discretion. See, e.g., Ford Motor Co., 66 N.L.R.B. 1317, 1322 (1946); Electric Controller & Mfg. Co., 69 N.L.R.B. 1242 (1946). One would expect that if Congress had intended **1776 to eliminate the Board's authority to accord bargaining rights to managerial employees, as well as supervisors, it would have said so, particularly as Board practice had treated these two categories separately and differently.

The Court would fill this gap by referring to the House Managers' statement accompanying the Conference Committee Report and explaining the adoption of the narrower Senate definition of excluded 'supervisors.' This report is indeed instructive, but it indicates even more clearly, in my opinion, that Congress did not contemplate the exclusion of managerial employees from the coverage of the Act:

'The conference agreement, in the definition of 'supervisor,' limits such term to those individuals treated as supervisors under the Senate amendment. In the case of persons working in labor relations, personnel and employment departments, it was not thought necessary to make specific provision, as

was done in the House bill, since the Board has treated, and presumably will continue to treat, such persons as outside the scope of the act. This is the prevailing Board practice with respect to such people as confidential employees as well, and it was not the intention of the conferees to alter this practice in any respect. The conference agreement does not treat time-study personnel or guards as supervisors, as did the House bill. Since, however, time-study employees may qualify as professional personnel, **\*304** the special provisions of the Senate amendment . . . applicable with respect to professional employees will cover many in this category. In the case of guards, the conference agreement does not permit the certification of a labor organization as the bargaining representative of guards if it admits to membership, or is affiliated with any organization that admits to membership, employees other than guards. The provision dealing with the certification of bargaining units for guards is dealt with in section 9(b) of the conference agreement . . . .' H.R.Conf.Rep. No. 510, 80th Cong., 1st Sess., 35—36, (1947), U.S.Code Cong.Serv.1947, pp. 1135, 1141.

The Court emphasizes that the statutory language adopted in the 1947 amendments did not expressly exclude persons working in labor relations, personnel, or employment departments, or confidential employees, but that these were 'impliedly excluded' from the Act's coverage by dint of the House Managers' statements just quoted. From this premise, the Court proceeds to assume that other categories of employees, similarly not excluded under the express terms of the amended definition of 'employee,' were also impliedly excluded from the Act. In my view, there is no warrant for the assumption that groups of employees, which the statute, or express legislative statements do not address, are to be excluded from the Act; nor is there any legislative debate whatsoever which can reasonably be construed as expressing an authoritative intent to exclude managerial employees as a class.

The House Managers' statement accompanying the Conference Committee Report explains that the Act was not amended expressly to exclude labor relations and confidential employees from coverage under the Act, because it was already prevailing Board practice to exclude these employees. This was not an entirely accurate **\*305** representation of Board practice, which seemed to hold only that such employees should not be included in rank-and-file bargaining units, and not necessarily that they would have no protections under the Act, see, e.g., Murray Ohio Mfg. Co., 61 N.L.R.B. 47 (1945); Ford Motor Co., 66 N.L.R.B. 1317 (1964),

but even accepting the House Managers' statement as an authoritative direction that these workers were not to be considered employees within the meaning of s 2, it does not follow that other groups of employees, regarding whom no such explicit direction was set forth and whom the Board had not treated **\*\*1777** in such a manner, were also intended to be excluded. The statement implied that certain groups of employees were to be excluded, but it also noted that some time-study personnel could qualify as professional employees and could therefore organize in units which a majority of them approved, and that guards were not wholly excluded from the Act, but were restricted to units composed solely of other guards. s 9(b), 29 U.S.C. s 159(b). Given that Congress made specific provision for time-study and plant protection employees, who were to be entitled to bargaining rights, and that it expressed a desire to exclude only labor relations and confidential employees whom it thought the Board had previously held outside the Act, there is no reason to suppose from the further congressional silence that special provisions, whether of inclusion or exclusion, were intended with respect to other categories of employees. If it be argued that the absence of any express treatment of managerial employees by Congress was somehow intended to codify prior Board practice, then the unavoidable fact is that Board decisions had not held that managerial employees were unprotected by the Act. They had only been excluded from rank-and-file bargaining units. Moreover, there is no indication in the legislative history as to what **\*306** Congress might have perceived the Board's rule to be with respect to managerial employees as a class. [2]

Nor is the Court's position much advanced by the few passing references in the House Report and in the floor debates, which the Court cites ante, at 1766—1767 and nn. 12 and 13, for the assumption that 'executives' would be excluded from the Act apart from whether they were confidential employees or not, and for the discussion of supervisors as representatives of management whom the amendments sought to exclude. In none of the cited passages was the category of 'managerial employees,' as the Board had defined it, ever addressed, and the focus of these remarks is clearly directed at the exclusion of supervisors as defined in the proposed amendments. Perhaps it was clear to Congress that a confidential secretary's superior would be excluded by the Act, but such an individual would either be a confidential employee himself, or a supervisor, or both. We are referred to **\*307** nothing in the debates or other congressional materials where the category of managerial employees, as distinguished

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

from the class of supervisory employees, a distinction the Board had previously drawn, is discussed. [3]

**\*\*1778** Finally, if we are to consider the 1947 amendments as intending to enact the views of the dissenting Justices in Packard, it should be noted that the dissent interpreted the National Labor Relations Act to 'put in the employer category all those who acted for management not only in formulating but also in executing its labor policies.' 330 U.S., at 496, 67 S.Ct., at 795. (Emphasis supplied.) See also id., at 500, 67 S.Ct. 789. Limiting the exclusion of managerial employees to those who are charged with the formulation or implementation of labor relations policies, as the Board has now done in the case before us, is **\*308** entirely consistent with this view and with the purposes of the Act. As the Senate Report noted, its concern in changing the law with respect to supervisory employees, as construed by Packard, was that the balance of power in the collective-bargaining process had been upset by 'the successful efforts of labor organizations to invoke the Wagner Act for covering supervisory personnel, traditionally regarded as part of management, into organizations composed of or subservient to the unions of the very men they were hired to supervise.' S.Rep. No. 105, 80th Cong., 1st Sess., 3 (1947). See also H.R.Rep. No. 245, 80th Cong., 1st Sess., 13 (1947); 93 Cong.Rec. 3553. Where an employee may be deemed managerial because of the nature of his duties apart from supervision of other employees, however, there is no reason to suppose that union affiliation, at least in separate units, would raise the same labor relations concern.

Following the Taft-Hartley amendments in 1947, the Board continued to hold, as it had frequently held before, that buyers, and others with managerial interests, were to be excluded from bargaining units of other employees. Denver Dry Goods, 74 N.L.R.B. 1167 (1947); Palace Laundry Dry Cleaning, 75 N.L.R.B. 320 (1947); Denton's Inc., 83 N.L.R.B. 35, 37 (1949); Wise, Smith & Co., 83 N.L.R.B. 1019, 1021 n. 6 (1949); Westinghouse Electric Corp., 89 N.L.R.B. 8, 14 (1950). But in 1950, in American Locomotive Co., 92 N.L.R.B. 115, 117, the Board in rejecting the inclusion of buyers in an office and clerical employees unit or their placement in a separate bargaining unit, said that '(a)s it appears that the buyers are authorized to make substantial purchases for the Employer, we find that they are representatives of management, and as such may not be accorded bargaining rights under the Act.' Reliance for this **\*309** statement was placed on the Wise, Smith &

Co. and Westinghouse Electric cases which involved the appropriateness of placing the managerial employees in a particular bargaining unit. In Swift & Co., 115 N.L.R.B. 752 (1956), the Board held that a proposed unit of procurement drivers could not be accorded bargaining rights, even in a separate unit. There, the Board flatly asserted that it was 'the clear intent of Congress to exclude from the coverage of the Act all individuals allied with management.' Id. at 753—754. The sole support for this statement, which the Board has now repudiated, was a reference to the statutory definitions of 'employee' and 'employer' and to the Conference Committee Report's explanation of the term 'supervisors,' as quoted above and reprinted in the Congressional Record.

The Board thereafter continued to exclude managerial employees from bargaining **\*\*1779** units of other employees, occasionally citing Swift, e.g., Copeland Refrigeration Corp., 118 N.L.R.B. 1364, 1365 n. 2 (1957); AFL—CIO, 120 N.L.R.B. 969 (1958), but more frequently excluding managerial employees from particular units without citing that case or suggesting that the excluded workers were not protected employees. E.g., Mack Trucks, Inc., 116 N.L.R.B. 1576, 1577—1578 (1956); Diana Shop, 118 N.L.R.B. 743, 745 (1957); Federal Tel. & Radio Co., 120 N.L.R.B. 1652, 1654 (1958); Kearney & Trecker Corp., 121 N.L.R.B. 817, 822 (1958); Weaver Motors, 123 N.L.R.B. 209, 216 (1959); Eastern Camera & Photo Corp., 140 N.L.R.B. 569, 572 (1963).

Until the Board overruled Swift in North Arkansas Electric Cooperative, Inc., 185 N.L.R.B. 550 (1970), it had thus actually held only twice that managerial employees could not be afforded protection under the Act, and its support for the conclusion was without any persuasive appeal. It is true, of course, that the Board had not held to the contrary either, and that **\*310** various courts of appeals interpreted and deferred to the Board's position as one of total exclusion of managerial employees from the scope of the Act, although in none of these cases was that conclusion necessary to the result reached. But the Board has now rejected this broad exclusion, and the question is whether the current view should be sustained. That the Board now refuses to follow its prior precedents is no reason to overturn it, for we have frequently sustained Board decisions overruling its prior interpretations of the Act. E.g. Golden State Bottling Co. v. NLRB, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973); Packard Motor Car Co. v. NLRB, 330 U.S. 485, 67 L.Ed. 789, **91**

N.L.R.B. v. Bell Aerospace Co. Div. of Textron, Inc., 416 U.S. 267 (1974)
94 S.Ct. 1757, 85 L.R.R.M. (BNA) 2945, 40 L.Ed.2d 134, 73 Lab.Cas. P 14,465

L.Ed. 1040 (1947). And the face of the Act and the events of 1947 demonstrate that the Board's present decision is a permissible construction of the statute.

Nor did Congress in 1959, when it again amended the statute, expressly or impliedly enact or approve the statutory interpretation announced in Swift & Co. The 1959 amendments dealt with secondary boycotts and picketing, and we are cited to nothing suggesting that the attention of Congress at that time was directed to or focused on the question whether managerial employees were covered or excluded in the statute. Congressional silence does not imply legislative approval of all Board rulings theretofore made. As the Court noted in Boys Markets, Inc. v. Retail Clerk's Union, 398 U.S. 235, 241—242, 90 S.Ct. 1583, 1587, 26 L.Ed.2d 199 (1970), which overruled Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962):

'Nor can we agree that conclusive weight should be accorded to the failure of Congress to respond to Sinclair on the theory that congressional silence should be interpreted as acceptance of the decision. The Court has cautioned that '(i)t is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law.' *311 Girouard v. United States, 328 U.S. 61, 69, 66 S.Ct. 826, 830, 90 L.Ed. 1084 (1946). Therefore, in the absence of any persuasive circumstances evidencing a clear design that congressional inaction be taken as acceptance of Sinclair, the mere silence of Congress is not a sufficient reason for refusing to consider the decision.'

See also Commissioner of Internal Revenue v. Glenshaw Glass Co., 348 U.S. 426, 431, 75 S.Ct. 473, 476, 99 L.Ed.

483 (1955). Similarly, from the congressional silence in 1959 concerning Swift's exclusion of managerial employees from the protection of the Act, it should not be assumed that Congress intended to approve of Swift and foreclose the possibility of the Board's reconsidering Swift and overruling it on further and more examining reflection. NLRB v. Seven-Up Co., 344 U.S. 344, 350—352, 73 S.Ct. 287, 290—292, 97 L.Ed. 377 (1953).

**1780 The Board's decisions in this area have not established a cohesive and precise pattern of rulings. It is often difficult to tell whether an individual decision is based on the propriety of excluding certain employees from a particular bargaining unit or whether the worker under consideration is thought to be outside the scope of the Act. But this Court has consistently said that it will accept the Board's determination of whether a particular individual is an 'employee' under the Act if that determination 'has 'warrant in the record' and a reasonable basis in law,' NLRB v. Hearst Publications, Inc., 322 U.S. 111, 131, 64 S.Ct. 851, 861, 88 L.Ed. 1170 (1944); NLRB v. United Insurance Co., 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968). There is no reason here to hamstring the Board and deny a broad category of employees those protections of the Act which neither the statutory language nor its legislative history requires, simply because the Board at one time interpreted the Act— erroneously it seems to me—to exclude all managerial as well as supervisory employees.

I respectfully dissent.

**All Citations**

416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134, 85 L.R.R.M. (BNA) 2945, 73 Lab.Cas. P 14,465

---

## Footnotes

* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1 As amended, 61 Stat. 136, 73 Stat. 519, 29 U.S.C. s 151 et seq.

2 The opinion revealed that Board Member Jenkins did not view the company's buyers as exercising managerial functions and therefore considered them 'employees' under the Act to the same extent as production and maintenance employees. 190 N.L.R.B., at 431 n. 2. A majority of the Board, however, apparently accepted the company's contention that the buyers were managerial employees. Id., at 432 n. 3.

3    As mentioned, the Board had relied on its North Arkansas decision in the present case. The Eighth Circuit's earlier opinion concerning a related issue in the same case is reported at 412 F.2d 324 (1969).

4    Section 2(3) of the Act defines the term 'employee' as follows:

'The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined.' 29 U.S.C. s 152(3).

Supervisory employees are expressly excluded from the protections of the Act. That term is defined in s 2(11): 'The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.' 29 U.S.C. s 152(11).

5    Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801—1802, 23 L.Ed.2d 371 (1969); Zemel v. Rusk, 381 U.S. 1, 11—12, 85 S.Ct. 1271, 1278—1279, 14 L.Ed.2d 179 (1965); Udall v. Tallman, 380 U.S. 1, 16—18, 85 S.Ct. 792, 801—802, 13 L.Ed.2d 616 (1965); Norwegian Nitrogen Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933).

6    Zemel v. Rusk, supra, 381 U.S., at 11—12, 85 S.Ct., at 1278—1279; Commissioner of Internal Revenue v. Noel Estate, 380 U.S. 678, 682, 85 S.Ct. 1238, 1240, 14 L.Ed.2d 159 (1965); NLRB v. Gullett Gin Co., 340 U.S. 361, 365—366, 71 S.Ct. 337, 340—341, 95 L.Ed. 337 (1951); Helvering v. R. J. Reynolds Tobacco Co., 306 U.S. 110, 114—115, 59 S.Ct. 423, 425—426, 83 L.Ed. 536 (1939); Norwegian Nitrogen Co. v. United States, supra, 288 U.S., at 313, 53 S.Ct., at 357.

7    Zemel v. Rusk, supra, 381 U.S., at 11—12, 85 S.Ct., at 1278—1279; Costanzo v. Tillinghast, 287 U.S. 341, 345, 53 S.Ct. 152, 153, 77 L.Ed. 350 (1932); United States v. Midwest Oil Co., 236 U.S. 459, 472—473, 35 S.Ct. 309, 312—313, 59 L.Ed. 673 (1915).

8    Red Lion Broadcasting Co. v. FCC, supra, 395 U.S., at 380—381, 89 S.Ct., at 1801—1802; Federal Housing Administration v. Darlington, Inc., 358 U.S. 84, 90, 79 S.Ct. 141, 145, 3 L.Ed.2d 132 (1958).

9    Section 2(12) of the House bill defined the term 'supervisor' as follows:

'The term 'supervisor' means any individual—

'(A) who has authority, in the interest of the employer—

'(i) to hire, transfer, suspend, lay off, recall, promote, demote, discharge, assign, reward, or discipline any individuals employed by the employer, or to adjust their grievances, or to effectively recommend any such action; or

'(ii) to determine, or make effective recommendations with respect to, the amount of wages earned by any individuals employed by the employer, or to apply, or to make effective recommendations with respect to the application of, the factors upon the basis of which the wages of any individuals employed by the employer are determined, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the exercise of independent judgment;

94 S.Ct. 1757, 85 L.R.R.M. (BNA) 2945, 40 L.Ed.2d 134, 73 Lab.Cas. P 14,465

'(B) who is employed in labor relations, personnel, employment, police, or time-study matters or in connection with claims matters of employees against employers, or who is employed to act in other respects for the employer in dealing with other individuals employed by the employer, or who is employed to secure and furnish to the employer information to be used by the employer in connection with any of the foregoing; or

'(C) who by the nature of his duties is given by the employer information that is of a confidential nature, and that is not available to the public, to competitors, or to employees generally, for use in the interest of the employer.'

10    Section 2(11) of the Senate bill contained the following definition of the term 'supervisor':

'The term 'supervisor' means any individual having authority, in the interest of the employer to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or to adjust their grievances, or effectively to recommend such action if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.'

11    The Report also makes evident that Congress was concerned with more than just the possibility of a conflict of interest in labor relations if supervisors were unionized:

'Supervisors are management people. They have distinguished themselves in their work. They have demonstrated their ability to take care of themselves without depending upon the pressure of collective action. No one forced them to become supervisors. They abandoned the 'collective security' of the rank and file voluntarily, because they believed the opportunities thus opened to them to be more valuable to them than such 'security.' It seems wrong, and it is wrong, to subject people of this kind, who have demonstrated their initiative, their ambition and their ability to get ahead, to the leveling processes of seniority, uniformity and standardization that the Supreme Court recognizes as being fundamental principles of unionism. ( J. I. Case Co. v. National Labor Relations Board, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944). It is wrong for the foremen, for it discourages the things in them that made them foremen in the first place. For the same reason, that it discourages those best qualified to get ahead, it is wrong for industry, and particularly for the future strength and productivity of our country.' H.R.Rep.No.245, 80th Cong., 1st Sess., 16—17 (1947).

12    The Report stated in reference to 'confidential employees':

'These are people who receive from their employers information that not only is confidential but also that is not available to the public, or to competitors, or to employees generally. Most of the people who would qualify as 'confidential' employees are executives and are excluded from the act in any event.

'The Board, itself, normally excludes from bargaining units confidential clerks and secretaries to such people as these.' Ibid. (Emphasis added.)

In 1946 in Ford Motor Co., 66 N.L.R.B. 1317, 1322, the Board had narrowed its definition of 'confidential employees' to embrace only those who exercised "managerial' functions in the field of labor relations.' The discussion of 'confidential employees' in both the House and Conference Committee Reports, however, unmistakably refers to that term as defined in the House bill, which was not limited just to those in 'labor relations.' Thus, although Congress may have misconstrued recent Board practice, it clearly thought that the Act did not cover 'confidential employees' even under a broad definition of that term.

13    The dissenting opinion first asserts that the Act is 'very plain on its face' and covers all employees except those expressly excluded post, at 1773, but later concedes that the 'Conference Committee implied that certain groups of employees were to be excluded.' Post, at 1777. The dissent then argues that 'managerial employees' were not among those impliedly excluded because 'no such explicit direction was set forth.' Ibid. This overlooks the fact that, as in the case of 'confidential employees' and those working in 'labor relations, personnel and employment departments,' no explicit exclusionary provision was necessary in 1947 because the Board had never approved the organization of 'managerial employees' in either a separate unit or as part of a rank-and-file unit. Indeed, every prior Board decision had resulted in the exclusion of such employees as 'managerial.'

Moreover, it cannot be denied that Congress thought that 'executives' were excluded from the Act, for the House Report so stated in express terms. See n. 12, supra. And the congressional debates, along with the

Senate Report, evinced a concern over the possible extension of the Act to cover corporate vice presidents and other executives who were part of management. See, e.g., 93 Cong.Rec. 3443; 4136; 5014.

In addition, the dissent completely ignores the fundamental change in industrial philosophy which would be accomplished through unionization of 'managerial employees.' As Mr. Justice Douglas explained in his Packard dissent, the Wagner Act was designed to protect 'laborers' and 'workers,' not vice presidents and others clearly within the managerial hierarchy. Extension of the Act to cover true 'managerial employees' would indeed be revolutionary, for it would eviscerate the traditional distinction between labor and management. If Congress intended a result so drastic, it is not unreasonable to expect that it would have said so expressly.

The dissent also relies upon the specific inclusion of 'professional employees' within the Act to support its assertion that 'managerial employees' were to be similarly treated. Post, at 1773. See 29 U.S.C. s 152(12). 'Professional employees,' however, are plainly not the same as 'managerial employees.' As the Conference Committee Report explained, the term 'professional employees' refers to 'such persons as legal, engineering, scientific and medical personnel together with their junior professional assistants.' H.R.Conf.Rep.No.510, 80th Cong., 1st Sess., at 36, U.S.Code Cong.Serv., 1947, p. 1141. In contrast to 'managerial employees,' they are not defined in terms of their authority 'to formulate, determine and effectuate management policies.' Ford Motor Co., 66 N.L.R.B., at 1322.

14    See, e.g., Eastern Camera & Photo Corp., 140 N.L.R.B. 569, 571 (1963); AFL—CIO, 120 N.L.R.B. 969, 973 (1958); General Tel. Co. of Ohio, 112 N.L.R.B. 1225, 1229 (1955).

The cases excluding buyers or those exercising buyers' functions from other units are legion. See, e.g., Ed's Foodland of Spring-field, Inc., 159 N.L.R.B. 1256, 1260 (1966); Albuquerque Div., ACF Ind., Inc., 145 N.L.R.B. 403, 414—415 (1963); Weaver Motors, 123 N.L.R.B. 209, 215—216 (1959); Kearney & Trecker Corp., 121 N.L.R.B. 817, 822 (1958); Temco Aircraft Corp., 121 N.L.R.B. 1085, 1089 (1958); Federal Tel. & Radio Co., 120 N.L.R.B. 1652, 1653—1654 (1958).

Surprisingly, the dissent maintains that the Board 'actually held only twice' that 'managerial employees' were not covered by the Act. Post, at 1779. This is difficult to reconcile with the undisputed fact that until its decision in North Arkansas the Board has never even certified a separate unit of 'managerial employees' and had stated in case after case that mangerial employees were not to be accorded bargaining rights under the Act. E.g., Palace Laundry Dry Cleaning, 75 N.L.R.B. 320 (1947); American Locomotive Co., 92 N.L.R.B. 15 (1950); Curtiss-Wright Corp., 103 N.L.R.B. 458 (1953); swift & Co., 115 N.L.R.B. 752 (1956), and cases cited above.

15    Palace Laundry Dry Cleaning, supra, at 323 n. 4. See Ford Motor Co., 66 N.L.R.B., at 1322.

16    In Retail Clerks International Assn. v. NLRB, supra, Mr. Chief Justice (then Circuit Judge) Burger explained the Board's policy on 'managerial employees':

'The Board also excludes from the protections of the Act, as managerial employees, 'those who formulate, determine, and effectuate an employer's policies,' AFL—CIO, (120 N.L.R.B. 969, 973 (1958)), and those who have discretion in the performance of their jobs, but not if the discretion must conform to an employer's established policy, Eastern Camera and Photo Corp., 140 N.L.R.B. 569, 571 (1963) (store managers who could set prices are not managerial). The rationale for this Board policy, though unarticulated, seems to be the reasonable belief that Congress intended to exclude from the protection of the Act those who comprised a part of 'management' or were allied with it on the theory that they were the one(s) from whom the workers needed protection.' 366 F.2d 642, 645. (Emphasis added.)

17    In International Ladies' Garment Workers' Union v. NLRB, supra, Mr. Justice (then Circuit Judge) Marshall explained that '(a)lthough the Act makes no special provision for 'managerial employees,' under a Board policy of long duration, this category of personnel has been excluded from the protection of the Act.' 339 F.2d 116, 123.

18    The contrary interpretation of the Act urged by the dissent would have far-reaching results. Although a shop foreman would be excluded from the Act, a wide range of executives would be included. A major company, for example, may have scores of executive officers who formulate and effectuate management policies, yet

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

94 S.Ct. 1757, 85 L.R.R.M. (BNA) 2945, 40 L.Ed.2d 134, 73 Lab.Cas. P 14,465

have no supervisory responsibility or identifiable conflict of interest in labor relations. If Congress intended the unionization of such executives, it most certainly would have made its design plain. See n. 13, supra.

19   The Board has had ample experience in defining the term 'managerial' in the manner which we think the Act contemplates. See, e.g., Eastern Camera & Photo Corp., supra, at 571. Of course, the specific job title of the employees involved is not in itself controlling. Rather, the question whether particular employees are 'managerial' must be answered in terms of the employees' actual job responsibilities, authority, and relationship to management.

20   To be sure, it would also be appropriate for the Board to exclude employees from a unit on the ground that their participation in a labor organization would create a conflict of interest with their job responsibilities. New England Telephone, 90 N.L.R.B. 639 (1950). See also Retail Clerks International Assn. v. NLRB, 125 U.S.App.D.C., at 65—66, 366 F.2d, at 644—65. In this respect, respondent has suggested that it was never afforded fair notice and an opportunity to introduce evidence relating specifically to the possibility of a conflict of interest in labor relations. Tr. of Oral Arg. 33—35, 43, 47. At the representation hearing, the hearing officer did not indicate that the conflict-of-interest standard was relevant, and respondent proceeded on the assumption that the only question was whether the buyers were 'managerial employees.' App. 8, 83.

The present record may well be adequate for purposes of this determination. However, if new and relevant information on this point is tendered on remand, the Board should consider reopening the record for purposes of its admission.

21   Section 6 provides:

'The Board shall have authority from time to time to make, amend, and rescind, in the manner prescribed by the Administrative Procedure Act, such rules and regulations as may be necessary to carry out the provisions of this subchapter.' 29 U.S.C. s 156.

The Administrative Procedure Act (APA) defines 'rule' as 'the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy. . . .' 5 U.S.C. s 551(4). The rulemaking requirements include publication in the Federal Register of notice of the proposed rulemaking and hearing; an opportunity for interested persons to participate; a statement of the basis and purpose of the proposed rule; and publication in the Federal Register of the rule as adopted.

The APA defines 'adjudication' as 'agency process for the formulation of an order,' and 'order' is defined as 'the whole or a part of a final disposition whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing.' 5 U.S.C. ss 551(7), (6). Proceedings for 'the certification of worker representatives' are exempted from the Act's procedural requirements for an 'adjudication.' 5 U.S.C. ss 554(a)(6), 556(a), 557(a).

Sections 9(c)(1) and (2) of the National Labor Relations Act (NLRB) empower the Board to investigate petitions involving questions of unit representation, to conduct hearings on such petitions, to direct representation elections, and to certify the results thereof. 29 U.S.C. ss 159(c)(1) and (2). Board determinations on such representation questions would appear to constitute 'orders' within the meaning of the APA. See 5 U.S.C. s 551(6), (7).

The NLRA does not specify in what instances the Board must resort to rulemaking.

22   A number of Board decisions have excluded buyers from units of rank-and-file employees. See n. 14, supra. But American Locomotive Co. and Swift & Co. appear to be the only cases in which the Board has held that buyers are not entitled to organize in a separate unit.

23   Chenery II did not involve s 4 of the APA, 5 U.S.C. s 553, but is nevertheless analogous.

1   'The Board had held that supervisory employees may organize in an independent union, Union Collieries Coal Co., 41 N.L.R.B. 961, 44 N.L.R.B. 165; and in an affiliated union, Godchaux Sugars, Inc., 44 N.L.R.B. 874. Then it held that there was no unit appropriate to the organization of supervisory employees. Maryland

94 S.Ct. 1757, 85 L.R.R.M. (BNA) 2945, 40 L.Ed.2d 134, 73 Lab.Cas. P 14,465

Drydock Co., 49 N.L.R.B. 733; Boeing Aircraft Co., 51 N.L.R.B. 67; Murray Corp. of America, 51 N.L.R.B. 94; General Motors Corp., 51 N.L.R.B. 457. In this case, 61 N.L.R.B. 4, 64 N.L.R.B. 1212; in L. A. Young Spring & Wire Corp., 65 N.L.R.B. 298; Jones & Laughlin Steel Corp., 66 N.L.R.B. 386, 71 N.L.R.B. 1261; and in California Packing Corp., 66 N.L.R.B. 1461, the Board re-embraced its earlier conclusions with the same progressive boldness it had shown in the Union Collieries and Godchaux Sugars cases. In none of this series of cases did the Board hold that supervisors were not employees. See Soss Manufacturing Co., 56 N.L.R.B. 348.'

2    The majority argues that 'no explicit exclusionary provision was necessary in 1947 because the Board had never approved the organization of 'managerial employees' in either a separate unit or as part of a rank-and-file unit.' Ante, at 1767 n. 13. It does not dispute, however, that the Board had never disapproved their organization either, and admits that the Board had stated in Dravo Corp., 54 N.L.R.B. 1174 (1944)Dravo Corp., 54 N.L.R.B. 1174 (1944), that by excluding buyers from a clerical employees unit it did not mean to say they would be denied bargaining rights under the Act. The Board had not held managerial employees excluded prior to 1947, and Congress did not address itself to the class of 'managerial employees' by that term or by reference to the Board's definition. There is, therefore, no justification for excluding from the statutory designation of 'any employee' an entire class that the Board had not previously excluded and that Congress did not expressly deal with in its amendments to the Act or in the legislative materials surrounding their adoption. If Congress had intended to exclude managerial employees, it would have said something about them, since it took such great pains to discuss supervisors and labor relations, confidential, time-study, and plant protection employees.

3    The majority expresses concern that extending organizational and bargaining rights to managerial employees would permit the extension of the Act to vice presidents and other high level executives, thereby blurring the distinction between management and labor. The concern is overblown; for most, if not all, executives will obviously be 'super' supervisors, confidential employees, professionals or within the Board's definition of those employees whose organization would result in a conflict of interest with respect to the company's labor policies. If there are remaining executives outside these categories who should also be excluded, the Board should be told to exclude that particular group, rather than to exclude the managerial class that would reach not only vertically, but laterally, to deny 'hundreds of thousands,' 475 F.2d 485, 496, of buyers and other relatively low-level management employees the organizational benefits and other protections of the Act otherwise available to 'any employee.'

To argue, as the majority does, that had Congress intended to include managerial employees, it would have said so expressly, ignores the fact that the Act covers 'any employee' and that the burden properly falls on those who would exclude managerial employees to demonstrate that it was the intent of Congress to exclude this category it legislated directly to exclude supervisory employees.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

N.L.R.B. v. Yellow Freight Systems, Inc., 930 F.2d 316 (1991)

137 L.R.R.M. (BNA) 2045, 55 Fair Empl.Prac.Cas. (BNA) 998...



KeyCite Yellow Flag - Negative Treatment

Distinguished by Daggett v. Waterfront Commission of New York Harbor, 3rd Cir.(N.J.), May 30, 2019

930 F.2d 316
United States Court of Appeals,
Third Circuit.

NATIONAL LABOR

RELATIONS BOARD, Petitioner,

v.

YELLOW FREIGHT SYSTEMS, INC., Respondent.

No. 90–3272.
|
Argued Nov. 8, 1990.
|
Decided April 11, 1991.
|
As Amended April 22, 1991.

**Synopsis**

National Labor Relations Board (NLRB) petitioned for enforcement of final decision and ordered finding that employer committed unfair labor practices in discharging employee who supported co-worker's sexual harassment claim, the Court of Appeals, Sloviter, Chief Judge, held that: (1) full faith and credit statute did not require NLRB, or Court of Appeals, to accord issue preclusive effect to arbitrator's finding that discharged employee assaulted his supervisor, and (2) with regard to common law preclusion claim, NLRB was not bound to earlier factual finding of arbitrator who was not presented with evidence essential to Board's resolution of that same factual issue in disposing of unfair labor practice charge.

Petition granted.

West Headnotes (2)

[1]     **Labor and Employment** 🔑 Matters Concluded

**Labor and Employment** 🔑 Particular Disputes

Full faith and credit statute did not require National Labor Relations Board (NLRB), or Court of Appeals from whom enforcement of NLRB order was sought, to accord issue preclusive effect in unfair labor practice proceeding to arbitrator's finding that discharged employee assaulted his supervisor; NLRB was not a "court," and making its effectiveness in remedying unfair labor practices dependent upon states' varying views of claim or issue preclusion would compromise uniformity of rights intended by passage of federal labor laws. 28 U.S.C.A. § 1738.

23 Cases that cite this headnote

[2]     **Labor and Employment** 🔑 Particular Disputes

National Labor Relations Board (NLRB) is not bound by earlier factual finding of arbitrator who was not presented with evidence essential to Board's resolution of that same factual issue in disposing of unfair labor practice charge.

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*316** Jeffrey Ivan Pasek, Cohen, Shapiro, Polisher, Shiekman & Cohen (Howard Lesnick (argued), of counsel), Philadelphia, Pa., for respondent.

Jerry M. Hunter, General Counsel, Robert E. Allen, Associate General Counsel, **\*317** Aileen A. Armstrong, Deputy Associate General Counsel, Frederick C. Havard (argued), N.L.R.B., Washington, D.C., for petitioner.

Before SLOVITER, Chief Judge [*], SCIRICA, and SEITZ, Circuit Judges.

OPINION OF THE COURT

SLOVITER, Chief Judge.

The National Labor Relations Board (NLRB or Board) petitions this court to enforce its final decision and order in which it found that the employer, Yellow Freight Systems, Inc., discharged employee Lonnie Bedell for engaging in activities protected by the National Labor Relations Act and therefore committed an unfair labor practice in violation of

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 736 of 1271

N.L.R.B. v. Yellow Freight Systems, Inc., 930 F.2d 316 (1991)

137 L.R.R.M. (BNA) 2045, 55 Fair Empl.Prac.Cas. (BNA) 998...

sections 8(a)(1) and 8(a)(3) of the Act, 29 U.S.C. §§ 158(a)(1) and 158(a)(3) (1988). The employer asserts that we should decline to enforce the Board's decision on the ground that the administrative law judge was bound to a finding in an earlier arbitration proceeding that Bedell assaulted a supervisor. We must therefore decide the extent to which the Board must accord issue preclusive effect to that arbitral finding.

I.

*Facts and Procedural History*

Lonnie Bedell was hired in 1983 as a dock worker at Yellow Freight's Carlstadt, New Jersey facilities. His testimony as to the relevant facts set forth below was credited by the ALJ following a hearing. In April 1986, Bedell observed JoAnne DeGrosa, the sales secretary, crying in the company parking lot after she had dropped her keys. DeGrosa told Bedell that she had been sexually harassed by branch manager Dan Hamlin and sales manager Kenny Dore. Bedell reported the incident to his shop steward the following evening and requested that the steward discuss the allegations with Dore. Dore approached Bedell a day later, and told him that DeGrosa was not a union member and that the matter was none of Bedell's business.

The sexual harassment continued, and DeGrosa was discharged three months later. Bedell accompanied DeGrosa to the New Jersey Division of Civil Rights, assisted her in filing a claim with the Equal Employment Opportunity Commission, and signed an affidavit on her behalf. Thereafter, Bedell posted on the union's bulletin board a newspaper advertisement for an upcoming television series on workplace sexual harassment. As he did so, Bedell commented to a supervisor that Dore and Hamlin "shouldn't have done that to JoAnne DeGrosa." Supp.App. at 61–61B.

Shortly after these events occurred Bedell's supervisors began to give him more arduous and dangerous assignments, such as transporting heavier loads without mechanical assistance and working in the hazardous area of the dock where corrosive liquids are stored, even though he was the most senior dock worker at the Carlstadt facility. Bedell also was subjected to frequent workplace harassment. Although he apparently complained on several occasions to his supervisors and to the union officials, Bedell continued to be harassed. Bedell

left the Carlstadt facility in 1987 and transferred to Yellow Freight's new terminal in Elizabeth, New Jersey. Dore was then appointed as the operations manager in Elizabeth. Bedell was again assigned harder and more demeaning work than he had been assigned before he assisted JoAnne DeGrosa, such as cleaning the coffee room and working without the use of the forklift truck and drag line.

Bedell filed his own charge with the Equal Employment Opportunity Commission on January 19, 1988, in which he asserted that he was being subjected to constant harassment in retaliation for the assistance he rendered to DeGrosa in opposing Dore's and Hamlin's sexual harassment practices. On February 3, 1988, Bedell was assigned to unload and move 40 cartons, each weighing 24 pounds. While he was in the process of placing them into three carts his supervisor Joseph Smidt **\*318** ordered him to consolidate the cartons into two carts.

Bedell and Yellow Freight contest the events that followed this order. Bedell contends that he told Smidt that he would follow the order but added "and I am not a piece of shit," in protest of the continuous harassment. Supp.App. at 88. Yellow Freight claims that he refused to follow the order, exclaiming, "because you're a big piece of shit.... [a]nd you're a scum bag, too." App. at 63–64. Smidt testified that Bedell came toward him waving his hands up and down and staring with a crazed look in his eyes. Smidt is 6 feet 2 inches tall, weighs 260 pounds, is 20 years younger than Bedell, and is a judo and karate champion. Bedell weighs 170 pounds. Smidt testified that he nevertheless feared bodily injury because he had heard rumors that Bedell carried a gun and had used it to threaten others. Smidt testified he turned and walked quickly to Dore's office. Bedell testified Smidt walked away and talked to the shift operation manager who was 30 or 40 feet away, and who told Bedell to go to Dore's office.

Bedell was thereafter discharged for disobeying a direct order and assaulting a supervisor. [1] Bedell filed a second complaint with the Equal Employment Opportunity Commission, alleging that he was fired in retaliation for filing his first EEOC complaint.

Bedell also filed a grievance based on his discharge which was arbitrated at a two-day hearing. Bedell retained personal counsel to represent him who also represented the union, Local 641 of the International Brotherhood of Teamsters, Chauffers, Warehousemen and Helpers of America, AFL–

N.L.R.B. v. Yellow Freight Systems, Inc., 930 F.2d 316 (1991)

137 L.R.R.M. (BNA) 2045, 55 Fair Empl.Prac.Cas. (BNA) 998...

CIO. Bedell was permitted to call his own witnesses and to cross-examine Yellow Freight's witnesses.

The hearing was limited, without objection by Yellow Freight, to the issue of whether there was just cause for Bedell's termination under the collective bargaining agreement entered into between Yellow Freight and the union. Bedell's lawyer stated on the record that he did not intend to raise any of the issues pertaining to Bedell's EEOC charges. The arbitrator found that although Bedell did not disobey a direct order, he did assault his supervisor, and there was therefore just cause for his discharge. He noted in his opinion that, "[t]he grievant's credibility was substantially diminished by the fact that he did not previously grieve what he characterized as unfair treatment when he was ordered to push his carts and not to use the drag line." App. at 491. Bedell appealed the arbitrator's decision to the Superior Court of New Jersey, which affirmed without opinion.

Finally, Bedell filed charges with the National Labor Relations Board alleging that his discharge by Yellow Freight constituted an unfair labor practice. The administrative law judge conducted a hearing after the arbitrator's decision was made. The ALJ found that Yellow Freight committed unfair labor practices in violation of sections 8(a)(1) and 8(a)(3) of the NLRA because Bedell was harassed and discharged for supporting DeGrosa's sexual harassment claim. In so finding, the administrative law judge concluded that much of the testimony supporting Yellow Freight's allegations that Bedell committed an assault was not credible. The ALJ refused to defer to the arbitrator's finding that Bedell had assaulted his supervisor, noting, "[i]t would not be appropriate to do so as the conflicting accounts presented to me for resolution are necessarily enmeshed with the evidence bearing on the EEOC matters." Supp.App. at 12.

The Board affirmed the ALJ's rulings, findings, and conclusions. It adopted the recommended order which directed Yellow Freight to (1) cease and desist from discriminating against and coercing employees **\*319** in the exercise of their rights guaranteed by the NLRA; (2) reinstate Bedell with back pay and full seniority and remove from his files any reference to his unlawful discharge; (3) make available any records necessary to calculate back pay; and (4) post a notice to Yellow Freight's employees of the violation and compliance with the Board's order in a conspicuous place. The Board has petitioned this court to enforce the decision and order pursuant to section 10(e) of the NLRA, 29 U.S.C. § 160(e) (1988).

## II.

### *Statutory Preclusion*

**[1]** According to the general rule regarding issue preclusion, or collateral estoppel, "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." Restatement (Second) of Judgments § 27 (1982); *see also Rider v. Commonwealth of Pennsylvania,* 850 F.2d 982, 989 (3d Cir.), *cert. denied,* 488 U.S. 993, 109 S.Ct. 556, 102 L.Ed.2d 582 (1988).

Yellow Freight contends that either federal statutory or federal common law requires the NLRB to accord issue preclusive effect to the arbitrator's finding that Bedell assaulted his supervisor. Its statutory argument is based on the full faith and credit statute which provides that, "[t]he Acts of the legislature of any State ... [and] [t]he records *and judicial proceedings* of *any court* of any such State ... shall have the same full faith and credit *in every court* within the United States ... as they have by law or usage in the courts of such State ... from which they are taken." 28 U.S.C. § 1738 (1988) (emphasis added). Yellow Freight argues that because New Jersey would give the arbitrator's finding preclusive effect, so also must the Board.

Were we dealing merely with the arbitrator's finding, this case would be easier. Section 1738 does not by its terms apply to the findings of an arbitrator, and the Supreme Court has held that section 1738 preclusive effect need not be given to an unreviewed arbitration award. *See McDonald v. City of West Branch,* 466 U.S. 284, 287, 104 S.Ct. 1799, 1801, 80 L.Ed.2d 302 (1984). The Court reasoned that arbitration cannot provide an adequate substitute for a judicial proceeding to protect federal statutory and constitutional rights. *See Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 477, 102 S.Ct. 1883, 1895, 72 L.Ed.2d 262 (1982) (arbitration decisions not subject to mandate of § 1738).

When a state court has affirmed an arbitration award, different considerations apply because then the issue is the preclusive effect to be given to a state court judgment. In *Jalil v.*

AR.05962

N.L.R.B. v. Yellow Freight Systems, Inc., 930 F.2d 316 (1991)

137 L.R.R.M. (BNA) 2045, 55 Fair Empl.Prac.Cas. (BNA) 998...

*Avdel Corp.,* 873 F.2d 701, 704 (3d Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990), we held that section 1738 did not require that we afford preclusive weight to a state court's affirmance of an arbitrator's decision that an employee was discharged for insubordination rather than union activity because we concluded that the state court's review was narrow and it did not address the Title VII issues which were raised in the federal suit. The opinion suggests, however, that if the issues adjudicated by the state court were identical to those in the federal suit, section 1738 would require preclusion, [2] provided that the grievant was afforded a full and fair opportunity to litigate his claim in arbitration and the state court review is not too narrow to warrant the application of collateral **\*320** estoppel. *Cf.* *Bottini v. Sadore Management Corp.,* 764 F.2d 116, 121 (2d Cir.1985) (state court scope of review of arbitrator's decision too narrow to give state judgment preclusive effect). We need not decide whether the New Jersey Superior Court judgment was based on a similarly restrictive review because we conclude that in any event section 1738 does not apply to the NLRB.

The terms of the statute require only *courts* of the United States to give issue preclusive effect to state court decisions. The directive of section 1738 has been literally applied. The same analysis used in holding that section 1738 does not require giving preclusive effect to state administrative factfinding, *see* *University of Tennessee v. Elliott,* 478 U.S. 788, 794, 106 S.Ct. 3220, 3223, 92 L.Ed.2d 635 (1986), or arbitration awards, *see* *McDonald,* 466 U.S. at 287–88, 104 S.Ct. at 1801–02, because they are not "judicial proceedings" requires a conclusion that federal administrative agencies are not bound by section 1738 because they are not "courts."

In *Elliott,* the Court noted that section 1738 was enacted before the development of administrative agencies, 478 U.S. at 795, 106 S.Ct. at 3224, and thus limited its consideration of the preclusive effect to be given to state administrative decisions to the federal common law, eschewing the statute. If the phrase "judicial proceedings" is not broad enough to encompass the decisions of administrative law judges or the NLRB itself, then the phrase "courts" is similarly too narrow to encompass the Board's decision and order.

There are sound policy reasons why the Board should not be constrained by section 1738. Under that statute, preclusive

effect is given to a state court judgment only to the extent the state itself would accord the judgment preclusive effect. *See, e.g.,* Kremer, 456 U.S. at 466, 102 S.Ct. at 1889; *Jalil,* 873 F.2d at 704. If section 1738 were applicable to the Board, then its effectiveness in remedying unfair labor practices would be dependent upon the states' varying views of claim or issue preclusion. Such a result would compromise the uniformity of rights intended by the passage of the federal labor laws. *Cf.* *Garner v. Teamsters Union,* 346 U.S. 485, 490, 74 S.Ct. 161, 165, 98 L.Ed. 228 (1953) (discussing Congress's intention in enacting Labor Management Relations Act provisions to avoid "diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies"). Moreover, we deem it significant that Yellow Freight cites no case, nor have we found one, that holds that notwithstanding the language of section 1738 restricting its application to courts, administrative agencies are similarly bound to its command.

Yellow Freight argues that even if the Board is not required to accord issue preclusive effect to the New Jersey Superior Court's summary affirmance of the arbitrator's decision, this court must do so because, as a "court," we fall within the literal language of section 1738. We cannot accept this effort to effect indirectly what cannot be accomplished directly. If a reviewing court must deny enforcement of a Board order whenever its decision relies on facts inconsistent with those earlier found by an arbitrator and upheld by a state court, then we would in effect be forcing the Board to accord issue preclusive effect to the arbitrator's factfinding. Whatever the merits of such a legal rule, we have already concluded that it cannot be supported by section 1738. Because it would be anomalous to conclude that although the Board is not statutorily required to defer to the arbitrator's factfinding, the same statute works to deny enforcement of its orders whenever it fails to so defer, we decline to so hold. [3]

### III.

### *Common Law Preclusion*

**[2]** Of course, our conclusion that section 1738 is inapplicable here does not end our inquiry, for courts have "frequently **\*321** fashioned federal common-law rules of preclusion in the absence of a governing statute." *Elliott,*

N.L.R.B. v. Yellow Freight Systems, Inc., 930 F.2d 316 (1991)

137 L.R.R.M. (BNA) 2045, 55 Fair Empl.Prac.Cas. (BNA) 998...

478 U.S. at 794, 106 S.Ct. at 3224; see also McDonald, 466 U.S. at 288, 104 S.Ct. at 1801 ("Because federal courts are not required by statute to give res judicata or collateral-estoppel effect to an unappealed arbitration award, any rule of preclusion would necessarily be judicially fashioned."). Thus, in Elliott the Supreme Court applied common law preclusion principles to Title VII litigation, holding that "when a state agency 'acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' ... federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." 478 U.S. at 799, 106 S.Ct. at 3226 (quoting United States v. Utah Constr. & Mining Co., 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966)).

Common law preclusion also has been applied to collaterally estop the NLRB from finding the existence of a collective bargaining agreement when a federal court had earlier ruled that no binding labor agreement had been formed. See, e.g., NLRB v. Donna–Lee Sportswear Co., 836 F.2d 31 (1st Cir.1987); see also NLRB v. Heyman, 541 F.2d 796 (9th Cir.1976) (Board precluded from determining that employer's repudiation of agreement and refusal to negotiate constituted an unfair labor practice where a federal court had earlier rescinded the collective bargaining agreement).

Yellow Freight contends that a common law rule of preclusion should be applied here because federal labor policy strongly encourages the private resolution of labor disputes. Federal courts have indeed consistently given highly favorable status to consensual arbitration. See, e.g., Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 243, 90 S.Ct. 1583, 1588, 26 L.Ed.2d 199 (1970) (noting importance of arbitration as an instrument of federal policy for resolving disputes between labor and management); NLRB v. A. Duie Pyle, Inc., 730 F.2d 119, 124 (3d Cir.1984) (law gives highly favorable status to private, amicable resolution of labor disputes); NLRB v. Pincus Bros., Inc.–Maxwell, 620 F.2d 367, 372 (3d Cir.1980) (acknowledging national policy in favor of the private resolution of labor disputes through consensual arbitration). We note, however, that Yellow Freight's rule of preclusion might tend to undermine this federal preference for arbitration because if the Board were required to defer to the arbitrator's factual findings, employees might decide to forgo arbitration of their grievances in order to preserve their unfair labor practice claims.

In any event, the policy in favor of arbitration must be balanced against a federal policy to ensure the ability of the NLRB to remedy unfair labor practices. The preeminence of the congressional policy in favor of remedying unfair labor practices is reflected in section 10(a) of the NLRA, which states that the Board's power to prevent such practices "shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise." 29 U.S.C. § 160(a) (1988). This section has been cited to emphasize that the Board acts in the public interest to enforce public, not private rights, and that the "parties cannot by contractual agreement divest the Board's function to operate in the public interest." Gulf State Mfrs. v. NLRB, 598 F.2d 896, 901 (5th Cir.1979) (en banc).

The Board itself, recognizing the value of arbitration under certain circumstances, has voluntarily and as a matter of its own discretion adopted a deferral policy under which it will defer to an arbitrator's award provided certain conditions are met: the proceedings appear to have been fair and regular, all parties have agreed to be bound, the decision of the arbitrator is not clearly repugnant to the purposes and policies of the Act, and the arbitrator has adequately considered the unfair labor practice issue. See, e.g., Olin Corp., 268 N.L.R.B. 573, 573–74 (1984); Spielberg Mfg. Co., 112 N.L.R.B. 1080 (1955); NLRB v. Al Bryant, Inc., 711 F.2d 543, 549 (3d Cir.1983), cert. denied, 464 U.S. 1039, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984).

**\*322** Although we have held that it is the court's responsibility to ensure that the Board follow its own policies, see NLRB v. Pincus Bros., Inc.–Maxwell, 620 F.2d at 372, we review the Board's deferral decisions for abuse of discretion only. Al Bryant, 711 F.2d at 550; NLRB v. General Warehouse Corp., 643 F.2d 965, 970 (3d Cir.1981). We have explicitly recognized the importance of the Board's condition that deferral depends on the arbitrator's consideration of the statutory issue. In Al Bryant we stated, "[t]he requirement that the statutory issues have been presented to and decided by the arbitrator is of particular significance to insure that the Board does not abdicate its responsibility to protect statutory rights." 711 F.2d at 550;

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

AR.05964

N.L.R.B. v. Yellow Freight Systems, Inc., 930 F.2d 316 (1991)

137 L.R.R.M. (BNA) 2045, 55 Fair Empl.Prac.Cas. (BNA) 998...

*see also* NLRB v. General Warehouse Corp., 643 F.2d 965 (3d Cir.1981) (Board not required to accord claim preclusive effect to arbitrator's decision that there was just cause for employee's discharge because arbitrator never considered unfair labor practice issues before the Board).

Yellow Freight concedes that the arbitrator never considered whether unfair labor practices had been committed and that, under the Board's deferral policy, the Board should decide whether the unfair labor practice charges at issue have merit. Nevertheless, Yellow Freight argues that in considering the merits the NLRB should be required to defer to specific facts found by the arbitrator, namely that Bedell assaulted his supervisor. The Sixth Circuit rejected a similar claim, holding that deference to an arbitrator's factfinding is not warranted in cases where "the arbitrator was not fully apprised of the facts relevant to the unfair labor practice charge." Grand Rapids Die Casting Corp. v. NLRB, 831 F.2d 112, 116 (6th Cir.1987). We agree with that court's reasoning that "[i]t makes little sense to defer to the arbitrator's specific factual findings where deference overall was refused because of the inadequacy of the factual presentation to the arbitrator." *Id.*

The motivations and the credibility of the parties and their witnesses may take on an entirely new light once the additional facts related to the unfair labor practice charge are introduced. In the present case, for example, the administrative law judge had reason to question the credibility of Yellow Freight's witnesses' version of the facts in light of the evidence presented to him regarding Bedell's past employment relationship with his supervisors. On the other hand, the arbitrator never heard much of the evidence of Dore's harassment of Bedell in retaliation for Bedell's assistance to DeGrosa. Moreover, the arbitrator, who discounted Bedell's credibility on the ground that Bedell had not previously grieved his treatment, was apparently unaware that Bedell had complained about harassment in the EEOC claim that he filed shortly before his discharge.

Because the evidence related to the unfair labor practice claim, here the history of discrimination and Bedell's earlier efforts to alleviate the conditions under which he was forced to work, was not presented to the arbitrator, the ALJ did not abuse his discretion in concluding that the conflicting accounts of Bedell's actions on the day he was discharged from Yellow Freight were "necessarily enmeshed with the evidence bearing on the EEOC matters," Supp.App. at 12, and that deference to the arbitrator's factfinding was therefore not required.

We need not in this case decide whether the Board would ever be bound as a matter of common law issue preclusion to defer to an arbitrator's factual findings in a case where deference to an arbitrator's award was not required under the Board's own deferral policy. It is sufficient to resolve the issue before us to hold that the Board is not bound to the earlier factual finding of an arbitrator when the arbitrator was not presented with evidence essential to the Board's resolution of that same factual issue in disposing of an unfair labor practice charge. [4]

**\*323** IV.

*Conclusion*

For the foregoing reasons, we will enforce in its entirety the decision of the National Labor Relations Board ordering Yellow Freight to reinstate Lonnie Bedell with back pay and to cease and desist from engaging in unfair labor practices.

**All Citations**

930 F.2d 316, 137 L.R.R.M. (BNA) 2045, 55 Fair Empl.Prac.Cas. (BNA) 998, 56 Empl. Prac. Dec. P 40,734, 118 Lab.Cas. P 10,702

## Footnotes

\*    The Honorable Dolores K. Sloviter became Chief Judge on February 1, 1991.

1    According to the arbitrator, "if the grievant's physical action toward his supervisor placed the supervisor in reasonable fear of imminent hostile touching or bodily injury, then such actions—especially when viewed in combination with the loud and angry words spoken by the grievant—constituted an assault on the supervisor

137 L.R.R.M. (BNA) 2045, 55 Fair Empl.Prac.Cas. (BNA) 998...

which would satisfy both the criteria for summary discharge expressly established by the National Master Freight Agreement and the criteria universally applied in the work place." App. at 489–90.

2    In *Jalil,* we distinguished *Rider v. Commonwealth of Pennsylvania,* 850 F.2d at 988, where we gave preclusive effect to a Pennsylvania Commonwealth Court judgment holding that the hiring of female guards to monitor female prisoners was a bona fide occupational qualification. We note that the statement in *Jalil* that in *Rider* "we held that an earlier state court *affirmance* of an arbitrator's decision precluded a federal discrimination action," 873 F.2d at 705 (emphasis added), was incorrect because in *Rider* the Commonwealth Court vacated the arbitrator's decision on the ground that it was not rationally derived from the terms of the collective bargaining agreement. *See* 850 F.2d at 986. Thus, *Rider* did not concern the preclusive effect to be given an arbitrator's decision, reviewed or unreviewed.

3    In light of our conclusion that section 1738 does not constrain NLRB factfinding, we need not consider the Board's alternative argument that section 10(a) of the NLRA, 29 U.S.C. § 160(a) (1988), constitutes an implied repeal of section 1738 as applied to NLRB factfinding.

4    Because we conclude that the administrative law judge permissibly found that Lonnie Bedell did not in fact assault his supervisor, we need not address Yellow Freight's contention that in the absence of this finding the Board's conclusion was not supported by substantial evidence.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

99 Cal. Daily Op. Serv. 4444, 1999 Daily Journal D.A.R. 5711

179 F.3d 1166
United States Court of Appeals,
Ninth Circuit.

Alberto NORIEGA–PEREZ, Petitioner,

v.

UNITED STATES of America, Respondent.

No. 96–70513.
|
Argued and Submitted Oct. 9, 1998.
|
Filed June 9, 1999.

**Synopsis**

Petitioner who had been previously convicted, imprisoned, and fined for conspiracy to possess forged, counterfeit, and false documents brought action challenging final order of Executive Office of Immigration Review (EOIR), Joseph E. McGuire, J., imposing monetary fine for civil document fraud. The Court of Appeals, Roll, District Judge, sitting by designation, held that: (1) imposition of fine in civil proceedings did not violate double jeopardy clause; (2) such fine was civil not criminal, for purposes of determining whether imposition of fine by administrative law judge (ALJ) violated separation of powers doctrine; and (3) imposition of fine by ALJ rather than by judge subject to constitutional article governing judiciary did not violate separation of powers doctrine.

Affirmed.

Ferguson, Circuit Judge, dissented and filed opinion.

West Headnotes (18)

**[1]    Fines**  🔑  **Excessive fines**

Fine of $96,000 imposed by Executive Office of Immigration Review (EOIR) for civil document fraud did not violate Eighth Amendment, in that it was not grossly disproportional to gravity of offense, where individual upon which fine was imposed had possessed and counterfeited over 300 fraudulent immigration documents and social security cards, and Immigration and Naturalization Service (INS) asserted that its cost of investigation was approximately $48,000.
U.S.C.A. Const.Amend. 8.

**[2]    Witnesses**  🔑  **Particular Circumstances Affecting Danger of Prosecution**

Petitioner seeking review of decision of Executive Office of Immigration Review (EOIR) imposing fine for civil document fraud had no valid claim of Fifth Amendment privilege to assert, where he had already pleaded guilty to criminal charges based on his actions and thus could not be criminally prosecuted again.
U.S.C.A. Const.Amend. 5.

**[3]    Witnesses**  🔑  **Claim of privilege**

Even assuming that petitioner seeking review of decision of Executive Office of Immigration Review (EOIR) imposing fine for civil document fraud had valid claim of Fifth Amendment privilege to assert, he failed to assert basis of his fear of incrimination with the requisite specificity. U.S.C.A. Const.Amend. 5.

**[4]    Aliens, Immigration, and
Citizenship**  🔑  **Actions for civil penalties**

Administrative law judge (ALJ) did not abuse his discretion when, in civil immigration document fraud proceedings, he denied motion to continue hearing filed by individual charged with document fraud; ALJ had previously granted three extensions of time.

2 Cases that cite this headnote

**[5]    Double Jeopardy**  🔑  **Fines, penalties, and
forfeitures**

Double jeopardy clause was not violated when monetary fine for civil document fine was imposed on individual by Executive Office of Immigration Review (EOIR) after he had been convicted of conspiracy to possess forged, counterfeit, and false documents, even if such fine constituted a criminal penalty; document fraud and conspiracy to commit document fraud were separate offenses that could be

tried separately. U.S.C.A. Const.Amend. 5; 18 U.S.C.A. §§ 371, 1546; Immigration and Nationality Act, § 274c(a)(1, 2), 8 U.S.C.A. § 1324c(a)(1, 2).

3 Cases that cite this headnote

[6]  **Aliens, Immigration, and Citizenship** ⬿ Constitutional and statutory provisions

**Constitutional Law** ⬿ Executive Exercise of Statutory Authority as Encroaching on Judiciary

Statute providing for imposition of fine for immigration document fraud in civil proceedings imposed civil not criminal penalty, for purposes of determining whether imposition of such fine by administrative law judge (ALJ) violated separation of powers doctrine, inasmuch as evaluation under *Hudson* factors was mixed; order that charged individual cease and desist his unlawful acts was not affirmative restraint, sanction was historically treated as civil in nature, prohibited conduct required showing of scienter, fine was intended to have deterrent but not retributive effect, and, although the conduct resulting in fine had been penalized, the criminal sanction was enacted in 1924, while civil penalty was not enacted until 1990. 18 U.S.C.A. § 1546; Immigration and Nationality Act, § 274c(a)(1, 2), 8 U.S.C.A. § 1324c(a)(1, 2).

1 Cases that cite this headnote

[7]  **Constitutional Law** ⬿ Executive Exercise of Statutory Authority as Encroaching on Judiciary

Under *Hudson* analysis for determining whether fine is civil or criminal, as applied to determination whether jurisdiction of administrative law judge (ALJ) violates separation of powers doctrine, the first inquiry is whether the legislature in establishing the penalizing mechanism indicated either expressly or impliedly a preference for one label or another.

[8]  **Constitutional Law** ⬿ Executive Exercise of Statutory Authority as Encroaching on Judiciary

Under *Hudson* analysis for determining whether fine is civil or criminal, as applied to determination whether jurisdiction of administrative law judge (ALJ) violates separation of powers doctrine, even where legislature has indicated intention to establish a civil penalty, whether the statutory scheme was so punitive either in purpose or effect as to transform what was clearly intended as a civil remedy into a criminal penalty must nevertheless be considered.

[9]  **Constitutional Law** ⬿ Executive Exercise of Statutory Authority as Encroaching on Judiciary

Under *Hudson* analysis for determining whether fine is civil or criminal, as applied to determination whether jurisdiction of administrative law judge (ALJ) violates separation of powers doctrine, legislative label of statute authorizing fine will govern unless seven useful guideposts show by the clearest proof that the civil penalty is so punitive that it is actually criminal in nature.

[10]  **Constitutional Law** ⬿ Encroachment on Judiciary

Under *Hudson* analysis for determining whether fine is civil or criminal, as applied to determination whether jurisdiction of administrative law judge (ALJ) violates separation of powers doctrine, seven useful guideposts for determining whether penalty is criminal in nature are whether sanction: (1) involves affirmative disability or restraint; (2) has historically been treated as criminal punishment; (3) requires showing of scienter; (4) promotes traditional aims of criminal punishment, i.e., retribution and deterrence; (5) applies to behavior which is already a crime; (6) has alternative noncriminal purpose; and (7) is not excessive in relation to alternative purposes.

99 Cal. Daily Op. Serv. 4444, 1999 Daily Journal D.A.R. 5711

4 Cases that cite this headnote

**[11]    Constitutional Law** ⚿ **Encroachment on Judiciary**

Monetary fines do not constitute an "affirmative disability or restraint" under *Hudson* analysis for determining whether fine is civil or criminal, as applied to determination whether jurisdiction of administrative law judge (ALJ) violates separation of powers doctrine.

2 Cases that cite this headnote

**[12]    Constitutional Law** ⚿ **Encroachment on Judiciary**

Mere presence of purpose of deterrence is insufficient to render a sanction criminal, for purposes of determining whether imposition of sanction by administrative law judge (ALJ) violates separation of powers doctrine.

**[13]    Aliens, Immigration, and Citizenship** ⚿ **Actions for civil penalties**

**Constitutional Law** ⚿ **Executive Exercise of Statutory Authority as Encroaching on Judiciary**

Imposition of civil fine for immigration document fraud by administrative law judge (ALJ) rather than by judge subject to constitutional article governing the judiciary did not violate separation of powers doctrine; courts subject to article retained the essential attributes of judicial power since ALJs did not have authority to enforce fine, ALJ's jurisdiction was over a particularized area of the law, statute providing for fine involved public right to regulate immigration, Congress acted with proper purpose in enacting statute, and Congress's delegation of authority did not endanger litigants' rights to have claims decided by judges free of potential domination by other branches of government. U.S.C.A. Const. Art. 3, § 1 et seq.; Immigration and Nationality Act, § 274c, 🔖 8 U.S.C.A. § 1324c.

**[14]    Constitutional Law** ⚿ **Encroachment on Judiciary**

Because administrative law judges (ALJ) lack the characteristics of judges appointed pursuant to constitutional article governing judicial powers, including life tenure, they are generally prohibited from exercising judicial power. U.S.C.A. Const. Art. 3, § 1 et seq.

1 Cases that cite this headnote

**[15]    Constitutional Law** ⚿ **Encroachment on Judiciary**

In determining constitutionality of congressional delegation of matters to forum not subject to constitutional article governing judiciary, court balances four nondeterminative factors: extent to which essential attributes of judicial power are reserved to courts subject to article, and conversely, extent to which forum not subject to article exercises the range of jurisdiction and powers normally vested only in courts subject to article, origins and importance of right to be adjudicated, and concerns that drove Congress to depart from requirements of article. U.S.C.A. Const. Art. 3, § 1 et seq.

**[16]    Constitutional Law** ⚿ **Executive Exercise of Statutory Authority as Encroaching on Judiciary**

Appropriate level of judicial review of decision of administrative law judge (ALJ), for purposes of determining whether congressional delegation of matters to ALJ violates constitutional article governing the judiciary, ensures that courts subject to article retain appearance and reality of control over interpretation, declaration, and application of federal law. U.S.C.A. Const. Art. 3, § 1 et seq.

1 Cases that cite this headnote

**[17]    Administrative Law and Procedure** ⚿ **Substantial evidence**

1 Cases that cite this headnote

99 Cal. Daily Op. Serv. 4444, 1999 Daily Journal D.A.R. 5711

Pursuant to Administrative Procedure Act (APA), factual findings may only be overturned on appeal if they are unsupported by substantial evidence; this standard is less deferential than clearly erroneous standard. 5 U.S.C.A. § 551 et seq.

1 Cases that cite this headnote

**[18]    Constitutional Law    Encroachment on Judiciary**

Efficiency is a valid concern that may drive Congress to depart from the requirements of constitutional article governing the judiciary. U.S.C.A. Const. Art. 3, § 1 et seq.

## Attorneys and Law Firms

*1168 Rehman H. Bashey and Michael B. King, Lane, Powell, Spears & Lubersky, Seattle, Washington, for the petitioner.

Francis W. Fraser and Jennifer H. Zawid, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the respondent.

Petition to Review Decision of the Executive Office of Immigration Review. Judge Joseph E. McGuire, Presiding. OCAHO No. 95C00009.

Before: FERGUSON and REINHARDT, Circuit Judges, and ROLL, District Judge. *

## Opinion

*1169 ROLL, District Judge:

Petitioner Alberto Noriega–Perez appeals from a summary decision of an Administrative Law Judge (ALJ) imposing a monetary fine for civil document fraud. The civil action was commenced after Noriega–Perez had entered a plea of guilty to conspiracy to possess forged, counterfeit, and false documents. The summary decision is affirmed.

### I. Background

On December 2, 1992, Noriega–Perez was indicted in the District Court for the Southern District of California for conspiracy to possess forged, counterfeit, and false immigration documents. Thereafter, Noriega–Perez entered a plea of guilty to one count of "Conspiracy to Possess Forged, Counterfeit, and False Documents" in violation of 18 U.S.C. §§ 371 and 1546. The district court accepted the guilty plea, fined Noriega–Perez $20,000, and sentenced him to 18 months of imprisonment, followed by three years of supervised release. Noriega–Perez did not file an appeal, but his sentence was reduced in June 1994 to time served and the fine reduced to $5,000 pursuant to a petition for a writ of habeas corpus.

Two months after Noriega–Perez's guilty plea, the Immigration and Naturalization Service (INS) issued a Notice of Intent to Fine (Notice) him for civil document fraud in violation of 8 U.S.C. § 1324c. The conduct alleged in the Notice-forging temporary immigration documents and possessing fraudulent immigration forms and social security cards-was related to the conduct that underlaid Noriega–Perez's guilty plea for conspiracy to commit document fraud. The INS sought to order Noriega–Perez to cease and desist from his unlawful action and to pay a "civil money penalty" of $176,000. Noriega–Perez filed a pro se response to the INS asserting that he had already been sentenced for the wrongful acts alleged in the Notice.

On January 23, 1995, the INS filed a two-count complaint with the Executive Office for Immigration Review (EOIR), Office of the Chief Administrative Hearing Officer (OCAHO), charging Noriega–Perez with document fraud pursuant to 8 U.S.C. § 1324c. The complaint alleged the same violations contained in the Notice and requested $96,000 in civil money penalties. Specifically, the United States charged that Noriega–Perez violated the Immigration and Nationality Act, 8 U.S.C. § 1324c, by (1) forging eight temporary immigration documents, (2) possessing 298 fraudulent INS Forms I–94, (3) possessing 21 fraudulent U.S. Social Security cards, and (4) possessing one fraudulent INS Form I–151. In his pro se response to the complaint, Noriega–Perez denied the allegations and affirmatively asserted, as one of multiple grounds for relief, that the fine constituted a second punishment for the same crime.

After a series of discovery motions and rulings, on October 27, 1995, the ALJ granted the INS's motion for summary decision on the merits. The ALJ then ordered the parties

to submit briefs recommending appropriate penalties and addressing Noriega–Perez's claim that imposition of the fine would constitute double jeopardy.

In its brief to the ALJ, the INS sought a $96,000 fine. The INS based the fine amount on a memorandum prepared by special agent Alejandro Kastner of the Investigation Unit of the San Diego INS district office. Agent Kastner reported that the investigation of Noriega–Perez and his alleged coconspirators involved many hours of investigation by numerous units. The total cost of the investigation was approximately $48,000. The INS also denied that the imposition of a civil fine after the government had already imposed criminal punishment implicated the double jeopardy clause.

On November 15, 1995, Noriega–Perez filed a motion in response to the ALJ's request for additional briefing. He raised several arguments against the judgment including his previously-raised double **\*1170** jeopardy claim and further asserted that the ALJ lacked subject-matter jurisdiction because ALJs are not Article III judges. Noriega–Perez also indicated that he could not recommend an appropriate penalty pursuant to the ALJ's order because he did not have sufficient information.

The ALJ issued his Final Decision and Order on March 2, 1996. The ALJ considered a number of factors before imposing a fine of $96,000. He considered Noriega–Perez's monetary motivation, failure to offer mitigating factors, and prior conviction for transferring counterfeit Federal Reserve notes. He also ordered Noriega–Perez to cease and desist from engaging in future document fraud.

In response to Noriega–Perez's legal arguments, the ALJ noted that the jurisdictional argument was not properly before him because the enabling statute did not give him the power to dismiss actions based on constitutional infirmities. Additionally, the ALJ found that under United States v. Halper, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), the fine was remedial in nature and therefore did not violate the double jeopardy clause.

 **[1]**   **[2]**   **[3]**   **[4]**   Noriega–Perez now appeals from the ALJ's final order. Although he raises many issues, only the double jeopardy claim and the Article III claim merit discussion. [1]

## II. Statutory Scheme

In an attempt to reduce the flow of illegal immigration into the United States, Congress enacted the Immigration Reform and Control Act of 1986 (IRCA). The purpose of IRCA was to "close the back door on illegal immigration so that the front door on legal immigration may remain open." *See* H.R.Rep. No. 101–723(i), at 46 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5649–5650. Because it believed that "[e]mployment is the magnet that attracts aliens here illegally," *id.*, Congress made it unlawful for an employer knowingly to hire an unauthorized alien to work in the United States. *See* 8 U.S.C. § 1324a. IRCA also established an employment verification system which required employers to examine various documents establishing eligibility of employment, and to retain a verification form establishing the employee's eligibility. *See* 8 U.S.C. §§ 1324a(b)(1), (2), and (3).

In 1990, Congress strengthened IRCA by enacting 8 U.S.C. § 1324c. Section 1324c establishes a monetary penalty for those who knowingly forge an employment eligibility document, or use or possess such a falsely made document, in order to meet, **\*1171** or enable another person to meet, the employment eligibility requirements of chapter 12, Title 8 of the United States Code. *See* 8 U.S.C. §§ 1324c(a), (c)(3). Section 1324c grants the adjudication of cases arising under it to ALJs. *See* 8 U.S.C. §§ 1324c(d)(2), (5).

## III. Double Jeopardy

 **[5]**   The Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Noriega–Perez asserts that his conviction followed by his civil fine violated the double jeopardy clause. We disagree.

The facts are undisputed. On May 10, 1993, Noriega–Perez entered a guilty plea to conspiracy to commit document fraud under the general conspiracy statute, 18 U.S.C. § 371. Thereafter, on May 2, 1996, Noriega–Perez was fined for document fraud pursuant to 8 U.S.C. § 1324c(a)(1)-(2). Noriega–Perez claims that under the standard announced in

99 Cal. Daily Op. Serv. 4444, 1999 Daily Journal D.A.R. 5711

*Hudson v. United States,* 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), the civil fine actually constituted a form of criminal punishment. Accordingly, he maintains, he could not be fined after having been convicted for the same acts.

Whether the civil penalty should be denominated criminal under *Hudson* is irrelevant, however, to resolving Noriega–Perez's double-jeopardy claim if the previous criminal conviction was for a different offense. *See id.* at 493 ("The [Double Jeopardy] Clause protects only against the imposition of multiple criminal punishments for the same offense." (emphasis omitted)). That is the case here; Noriega-Perez was first convicted of conspiracy to commit document fraud, not document fraud itself. Subsequently, his civil penalty was assessed for document fraud, not conspiracy to commit document fraud. It is clear that no double jeopardy violation occurred because conspiracy to commit an offense and the offense itself are separate offenses that can be tried separately. *See United States v. Felix,* 503 U.S. 378, 390–91, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1992); *Garrett v. United States,* 471 U.S. 773, 778, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985); *United States v. Saccoccia,* 18 F.3d 795, 798 (9th Cir.1994); *United States v. Hoelker,* 765 F.2d 1422, 1427 (9th Cir.1985); *United States v. Brooklier,* 637 F.2d 620 (9th Cir.1981). [2]

Double jeopardy protections guarantee that the United States may not criminally punish Noriega–Perez twice for the same offense. The threshold question for double jeopardy purposes is whether the two offenses for which Noriega–Perez was punished are the same. They are not. Even if Noriega–Perez's fine imposed pursuant to section 1324c constituted a criminal penalty under *Hudson,* the double jeopardy clause is not violated.

## IV. Separation of Powers

Congress entrusted the adjudication of document fraud cases under section 1324c to ALJs. *See* 8 U.S.C. § 1324c(d) (2). *See also* 28 C.F.R. § 68 *et seq.* Noriega–Perez claims that this grant of jurisdiction violates the separation of powers because an Article III judge did not preside over his case. The issue of whether section 1324c's grant of jurisdiction to an ALJ violates the separation of powers involves a two-part

inquiry into (1) whether the fine provided for in the statute is civil or criminal in nature, and (2) considering the nature of the fine, whether the grant of jurisdiction to an ALJ is constitutional.

## A. *Hudson* Inquiry

[6] [7] Although the *Hudson* analysis of whether the fine at issue is civil or criminal in nature need not be reached in addressing **\*1172** Noriega–Perez's double jeopardy claim, it must guide our discussion of his Article III claim because the classification of a sanction imposed by an ALJ as civil in nature is highly probative, although not necessarily determinative, of the constitutionality of the ALJ's jurisdiction. [3] Under *Hudson,* the first inquiry is whether the legislature "in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or another." 118 S.Ct. at 493 (quoting *United States v. Ward,* 448 U.S. 242, 248, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)). Congressional intent is clear here. Congress labeled section 1324c a civil sanction. *See* 8 U.S.C. § 1324c(d)(3) (classifying the sanction as a "civil money penalty").

[8] [9] Even where the legislature has indicated an intention to establish a civil penalty, whether the statutory scheme was "so punitive either in purpose or effect as to transform what was clearly intended as a civil remedy into a criminal penalty" must nevertheless be considered. *Hudson,* 118 S.Ct. at 493 (internal quotations and citations omitted). The legislative label of section 1324c will govern, however, unless seven "useful guideposts" show by the clearest proof that the civil penalty is so punitive that it is actually criminal in nature. *Id.*

[10] The seven guideposts are whether the sanction (1) involves an affirmative disability or restraint, (2) has historically been treated as a criminal punishment, (3) requires a showing of scienter, (4) promotes the traditional aims of criminal punishment-retribution and deterrence, (5) applies to behavior which is already a crime, (6) has an alternative non-criminal purpose, and (7) is not excessive in relation to the alternative purposes. *Id.* We consider each in turn.

*Affirmative Disability or Restraint*

 **[11]**   Monetary fines do not constitute an affirmative disability or restraint. *See Hudson,* 118 S.Ct. at 496. Although Noriega–Perez was also ordered to "cease and desist" his unlawful acts, this even more clearly does not fall within "affirmative restraint." *Id.* It does not constitute a disability as that term has been viewed historically for *Hudson* purposes. Accordingly, neither imprisonment, nor its equivalent, was imposed on Noriega–Perez.

*Historical Treatment*

Monetary fines have not "historically been viewed as punishment." *Hudson,* 118 S.Ct. at 495. "[T]he payment of fixed or variable sums of money ... ha[s] been recognized as enforceable by civil proceedings since the original revenue law of 1789." *Id.* at 496 (citation omitted). In particular, monetary penalties for violations of immigration regulation, whether imposed on individuals or regulated companies, have historically been treated as civil in nature. *See Hepner v. United States,* 213 U.S. 103, 109–10, 29 S.Ct. 474, 53 L.Ed. 720 (1909) ("a civil action is an appropriate mode of proceeding" to collect a monetary penalty for knowingly inducing an alien "to migrate to the United States for the purpose of performing labor here"); *United States v. Atlantic Fruit Co.,* 206 F. 440, 440–42 (2d Cir.1913) (a civil fine could **\*1173** be maintained pursuant to a statute requiring steamship companies to post immigration laws); *Millon v. United States,* 219 F. 186, 186 (2d Cir.1914) (the government may impose a monetary penalty in a civil action for "knowingly assisting ... the migration or importation of any contract laborer into the United States").

Document fraud in the immigration context has been punishable since 1924. The 1924 statute criminalized the forging of reentry permits and levied fines of up to $10,000. *See* Act, ch. 190, § 21, 62 Stat. 862 (1924). The 1952 revision of the statute, codified at 18 U.S.C. § 1546, criminalized the fraud and misuse of visas, permits, and other immigration documents. Section 1546 provides that an individual convicted of immigration fraud shall be fined not more than $2,000, imprisoned up to five years, or both. In 1986, the potential fine for immigration fraud was increased to $250,000. Congress did not classify as civil a fine for immigration-related document fraud until 1990, when Congress enacted the statute at issue here, 8 U.S.C. § 1324c.

For the majority of its existence the criminal statute punishing document fraud allowed for the imposition of imprisonment as well as a fine. Section 1324c, however, provides only for the imposition of a fine. In *Hudson,* the Supreme Court resolved a similar situation. The criminal counterparts to the civil sanction at issue in that case also provided for fines, imprisonment, or both. *See* 18 U.S.C. §§ 371, 656, and 1005. Nevertheless, the Court found that the sanction at issue was historically civil. Accordingly, the historical treatment of the sanction imposed by section 1324c indicates that it is civil in nature.

*Scienter*

The conduct prohibited requires a showing of scienter, which is a traditional requirement of criminal liability, before sanctions may be imposed. Section 1324c(a) prohibits a party from "knowingly" engaging in the specified conduct. This factor tends to support Noriega–Perez's claim that the fine is criminal in nature.

*Traditional Aims of Punishment*

 **[12]**   The traditional aims of criminal punishment are retribution and deterrence. There is no indication that section 1324c's provision for civil fines is intended to promote retribution, although as the government concedes, it is intended to have a deterrent effect. Although section 1324c may promote deterrence, "the mere presence of this purpose is insufficient to render a sanction criminal, as deterrence 'may serve civil as well as criminal goals.' " *Hudson,* 118 S.Ct. at 496 (citation omitted). The fines provision was also intended to serve a remedial purpose, namely, lessening the attractiveness of U.S. jobs to illegal immigrants. Accordingly, this factor is mixed.

*Behavior Which Has Been Criminalized*

18 U.S.C. § 1546 criminalizes the precise conduct penalized in the instant case. This factor is not determinative, however, particularly given the amount of time that elapsed between the criminalizing of this conduct and the establishment of a civil penalty. Section 1324c was passed in 1990, while the comparative criminal sanction was originally enacted in 1924. *See* Act, ch. 190, § 21, 62 Stat. 862 (1924). As the Supreme Court noted in *United States v. Ward*, "the placement of criminal penalties in one statute and the placement of civil penalties in another statute enacted 70 years later tends to dilute the force of the fifth ... criterion." *Ward*, 448 U.S. at 250, 100 S.Ct. 2636 (finding that a monetary fine for an environmental offense was civil in nature despite the fact that the same conduct was subject to a criminal offense).

*Non–Criminal Purposes*

Section 1324c furthers several non-punitive purposes, including (1) reimbursing the government for enforcement expenditures under the Immigration and Naturalization Act, 8 U.S.C. § 1330(3)(A), (2) ensuring that persons committing fraud do not profit from their acts, *see* **United** ***1174*** *States v. Ursery,* 518 U.S. 267, 291, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996), and (3) immigration regulation. *Cf. Cole v. U.S. Dep't of Agric.,* 133 F.3d 803, 806 (11th Cir.1998) (distinguishing between regulatory and criminal goals). *See also* Immigration & Naturalization Service v. National Center for Immigrants' Rights, 502 U.S. 183, 187–94, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991) (noting that IRCA expresses Congress' determination that employment of undocumented aliens was an important part of U.S. immigration law).

*Excessiveness of Penalty*

The INS based its recommendation of a $96,000 fine in this case on the fact that the investigation of Noriega–Perez and his alleged coconspirators involved many hours of investigation by numerous agents, at a cost of approximately $48,000.

The imposition of a $96,000 civil fine for more than 300 fraudulent violations is not excessive in light of the Act's remedial purposes. *See* United States v. Lippert, 148 F.3d 974, 977 (8th Cir.1998) (fine not excessive where it was difficult to prove the government's damages and the government incurred investigative and enforcement costs).

In sum, evaluation under the seven *Hudson* factors is mixed. On balance the factors here do not demonstrate by the clearest proof that section 1324c's monetary sanction is so punitive that it is criminal in nature. [4] Accordingly, section 1324c imposes a civil, not criminal, sanction.

## B. Article III

[13]    Noriega–Perez asserts that the imposition of the fine by an ALJ pursuant to section 1324c violated the separation of powers. According to Noriega–Perez, such a fine could only have been imposed by an Article III judge. For the reasons set forth below, we disagree.

### 1. Background

[14]    "On its most fundamental plane, the separation of powers doctrine protects the whole constitutional structure by requiring that each branch retain its essential powers and independence." Pacemaker Diagnostic Clinic of America v. Instromedix, 725 F.2d 537, 544 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984). Article III, section 1, of the U.S. Constitution provides in pertinent part:

> The judicial Power of the United States shall be vested in one supreme Court and in such inferior Court as the Congress may from time to time ordain and establish. The Judges of the supreme and inferior Courts, shall hold their Offices during good Behavior, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in office.

Because ALJs lack the characteristics of Article III judges, including life tenure, they are generally prohibited from exercising "judicial power." *See* *Simpson v. Office of Thrift Supervision,* 29 F.3d 1418, 1422 (9th Cir.1994), *cert. denied,* 513 U.S. 1148, 115 S.Ct. 1096, 130 L.Ed.2d 1064 (1995).

The resolution of disputes by non-Article III judges, such as ALJs, implicates serious concerns regarding our constitutionally established system of checks and balances. "A judiciary free from control by the Executive and the Legislature is essential if there is a right to have claims decided by judges who are free from potential domination by other branches of government." *United States v. Will,* 449 U.S. 200, 218, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980).

Importantly, however, "neither [the Supreme Court] nor Congress has read the **\*1175** Constitution as requiring every federal question arising under the federal law ... to be tried in an Art. III court." *Thomas v. Union Carbide Agric. Prods., Co.,* 473 U.S. 568, 582, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) (quoting *Palmore v. United States,* 411 U.S. 389, 407, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973)). Congress began authorizing adjudication by agencies in 1789, when it empowered the Comptroller within the Treasury Department to resolve all disputes concerning claims against the Treasury. Since then, a line of Supreme Court cases has developed excepting certain actions from initial adjudication by an Article III body. The Supreme Court first validated the adjudication of a federal question by a non-Article III forum in 1828. *See* *American Ins. Co. v. Canter,* 26 U.S. 511, 1 Pet. 511, 7 L.Ed. 242 (1828) (upholding territorial court's authority to hear admiralty cases). Thereafter, in 1855, the Supreme Court articulated another exception to the general requirements of Article III adjudication, holding that a non-Article III forum could resolve disputes involving "public rights." *See* *Murray's Lessee v. Hoboken Land & Improvement Co.,* 59 U.S. 272, 18 How. 272, 15 L.Ed. 372 (1855).

In *Northern Pipeline v. Marathon Pipe Line Co.,* the Supreme Court articulated three narrow classes of cases in which Article III concerns do not mandate resolution of federal disputes by Article III judges: (1) public rights; (2) territorial courts; and (3) military courts. 458 U.S. 50, 69, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (Brennan, J; plurality). Although the boundaries of, as well as the importance

of the distinction between, public and private rights for Article III purposes have shifted over the years, compare *Northern Pipeline,* 458 U.S. at 69, 102 S.Ct. 2858 with *Union Carbide,* 473 U.S. at 589, 105 S.Ct. 3325, and *Granfinanciera v. Nordberg,* 492 U.S. 33, 54–56, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), the field of immigration-with which we are concerned here-has remained solidly within "public rights" and the statutory delegation to agencies of the power to adjudicate immigration issues has been consistently upheld by the courts. *See, e.g.,* *Crowell v. Benson,* 285 U.S. 22, 51, 52 S.Ct. 285, 76 L.Ed. 598 (1932); *Zakonaite v. Wolf,* 226 U.S. 272, 33 S.Ct. 31, 57 L.Ed. 218 (1912); *Turner v. Williams,* 194 U.S. 279, 24 S.Ct. 719, 48 L.Ed. 979 (1904); *Morel v. Immigration & Naturalization Serv.,* 144 F.3d 248, 251–52 (3d Cir.1998); *Austin v. Shalala,* 994 F.2d 1170, 1177–78 (5th Cir.1993).

*2. Schor Inquiry*

**[15]**    Since *Northern Pipeline,* the Supreme Court has moved away from a formalistic approach to separation of powers questions. *See* *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986). The Court has recognized that "our precedents in this area do not admit of easy synthesis.... Rather, the constitutionality of a given congressional delegation of adjudicative functions to a non-Article III body must be assessed by reference to the purpose underlying the requirements of Article III." *Id.* at 846–47, 106 S.Ct. 3245. *Schor* suggests the balancing of four non-determinative factors in determining the constitutionality of congressional delegation of matters to a non-Article III forum:

> Among the factors upon which we have focused are the extent to which the "essential attributes of judicial power" are reserved to Article III courts, and conversely, the extent to which the non-Article III forum exercises the range of jurisdiction and powers normally vested only in Article III courts, the origins and importance of the right to be adjudicated, and the

concerns that drove Congress to depart from requirements of Article III.

*Id.* at 851, 106 S.Ct. 3245.

Although the Supreme Court has approved of the imposition of civil fines by administrative agencies for violations of U.S. immigration law, *see Austin v. Shalala,* 994 F.2d 1170, 1177–78 (5th Cir.1993) (citing **\*1176** *Lloyd Sabaudo Societa v. Elting,* 287 U.S. 329, 335, 53 S.Ct. 167, 77 L.Ed. 341 (1932)), the determination that the sanction imposed in this case is civil does not end our inquiry. "[P]ractical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III." *Thomas,* 473 U.S. at 586, 105 S.Ct. 3325. In determining the constitutionality of congressional delegation of adjudicatory power over section 1324c fines to a non-Article III forum, the four factors articulated in *Schor* must be considered.

*Extent to Which the Essential Attributes of Judicial Power Are Reserved to Article III Courts*

In order to retain the essential attributes of judicial power, "there must be both the appearance and the reality of control by Article III judges over the interpretation, declaration, and application of federal law." *Pacemaker Diagnostic Clinic,* 725 F.2d at 544. Under section 1324c, hearings conducted pursuant to section 1324c are governed by the Administrative Procedure Act (APA), 5 U.S.C. § 554. *See* 8 U.S.C. § 1324c(d)(2)(B). *See also* 28 C.F.R. § 86 *et seq.* Although aspects of section 1324c are troublesome, Article III courts retain their essential attributes under section 1324c's adjudicatory scheme.

[16]     Important to this determination is the level of judicial review retained over ALJ decisions. *See Schor,* 478 U.S. at 853, 106 S.Ct. 3245 (noting the importance of de novo appellate review of questions of law).[5] An appropriate level of judicial review ensures that Article III courts retain "the appearance and reality of control ... over the interpretation,

declaration, and application of federal law." *Pacemaker Diagnostic Clinic,* 725 F.2d at 544. Section 1324c provides for appellate review in that "[a] person or entity adversely affected by a final order under this section may ... file a petition in the Court of Appeals for the appropriate circuit for review of the order". 8 U.S.C. § 1324c(d)(5). This section imposes a de novo standard of review on conclusions of law. *See Villegas–Valenzuela v. Immigration & Naturalization Service,* 103 F.3d 805, 808 (9th Cir.1996) ("We review questions of statutory interpretation de novo."). *See also Maka v. Immigration & Naturalization Service,* 904 F.2d 1351, 1355 (9th Cir.1990) ("We review de novo an agency's conclusions of law.... 'Within the de novo framework we give a certain amount of deference to an agency's reasonable construction of a statute it is charged with administering.' ") (citation omitted), *amended* 904 F.2d 1351 (9th Cir.1990).

[17]     Pursuant to the APA, factual findings may only be overturned on appeal if they are "unsupported by substantial evidence." *Mester Mfg. Co. v. Immigration & Naturalization Service,* 879 F.2d 561, 565 (9th Cir.1989).[6] This standard is less deferential than the "clearly erroneous" standard viewed with disfavor in *Northern Pipeline. See Northern Pipeline,* 458 U.S. at 85, 102 S.Ct. 2858. It is similar to the "supported by the evidence" standard imposed in the adjudicatory scheme found constitutional in *Crowell v. Benson,* 285 U.S. 22, 46–48, 52 S.Ct. 285, 76 L.Ed. 598 (1932). *See also Northern Pipeline,* 458 U.S. at 85, 102 S.Ct. 2858.

Pursuant to section 1324c, an ALJ may impose a fine. Although this may seem to be within the purview of an Article III court, this concern is mitigated because ALJs do not have the authority to enforce the fine. Section 1324c explicitly requires **\*1177** that the government seek enforcement of the final order in "any appropriate district court" if a party fails to comply with the ALJ's order. *See* 8 U.S.C. § 1324c(d) (6). *See also* 28 C.F.R. § 68.53. Accordingly, under section 1324c, Article III courts retain the essential attributes of judicial power.

99 Cal. Daily Op. Serv. 4444, 1999 Daily Journal D.A.R. 5711

*Limited Jurisdiction Assigned to Administrative Agency*

Section 1324c provides ALJs with limited jurisdiction to impose a sanction. They may only impose a civil fine. Although Noriega–Perez argues that section 1324c entrusts non-Article III forums with the "essential attributes" of Article III courts because the penalty imposed by section 1324c is criminal in nature, *Hudson* compels the conclusion that section 1324c imposes a civil, not criminal, sanction.

Furthermore, the grant of jurisdiction to administrative tribunals under section 1324c is limited in scope. The ALJ is given jurisdiction over a "particularized area of law." *Schor,* 478 U.S. at 852, 106 S.Ct. 3245 (citation omitted). Section 1324c applies only to fraud committed "for the purpose of satisfying requirements of [the Immigration and Nationality Act]." 8 U.S.C. § 1324c(a)(2). The bankruptcy scheme invalidated in *Northern Pipeline,* on the other hand, involved a broad grant of jurisdiction extending to "all civil proceedings ... arising in or related to cases under title 11." *Northern Pipeline,* 458 U.S. at 85, 102 S.Ct. 2858 (quoting 28 U.S.C. § 1471(b)). Therefore, the jurisdiction granted to ALJs under section 1324c is limited in scope.

*Nature of the Right to be Adjudicated*

Section 1324c involves the public right to regulate immigration. *See Crowell,* 285 U.S. at 51, 52 S.Ct. 285 (1932). As discussed above, public rights is one of the areas best established as suitable for adjudication by an administrative agency. *See Northern Pipeline,* 458 U.S. at 67–68, 102 S.Ct. 2858. Additionally, because section 1324c imposes a civil sanction, it does not implicate the important rights afforded to criminal defendants under the Constitution.

Controlling the unlawful employment of undocumented aliens has been recognized as an important aspect of U.S. immigration law. *See Immigration & Naturalization Serv.*

*v. National Center for Immigrants' Rights, Inc.,* 502 U.S. 183, 187, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991). In fact, the Supreme Court has long recognized that the power to exclude alien laborers is "necessarily intertwined with the power to punish any who assist in their introduction." *Lees v. United States,* 150 U.S. 476, 478–79, 14 S.Ct. 163, 37 L.Ed. 1150 (1893). [7] Furthermore, as the Fifth Circuit has noted, the Supreme Court "has approved the use of administrative agencies in adjudicating violations of the customs and immigration laws and assessing penalties therefor." *Austin v. Shalala,* 994 F.2d 1170, 1177–78 (5th Cir.1993) (citing *Lloyd Sabaudo Societa Anonima Per Azioni v. Elting,* 287 U.S. 329, 335, 53 S.Ct. 167, 77 L.Ed. 341 (1932)). Accordingly, section 1324c properly implicates the adjudication of the public right to regulate immigration.

*Congressional Concerns Behind Section 1324c*

The fourth and final factor, congressional concerns behind passage of section 1324c, demonstrates that Congress acted with a proper purpose. Noriega–Perez relies on statements made by Senator Alan Simpson three years after the enactment of section 1324c. *See* **\*1178** 139 Cong. Rec. S15958, S15964 (daily ed. Nov. 17, 1993). He maintains that these statements suggest that Congress possessed an improper purpose when it enacted section 1324c because it was concerned with the inefficient prosecution of these cases pursuant to section 1324c's criminal counterpart. We do not agree that the statements establish an improper purpose.

**[18]** Efficiency is a valid concern that may drive "Congress to depart from the requirements of Article III." *Schor,* 478 U.S. at 851, 106 S.Ct. 3245. In *Schor,* the Supreme Court upheld a statute creating a non-Article III forum that was intended "to create an inexpensive and expeditious alternative forum." *Id.* at 855, 106 S.Ct. 3245. Other federal courts have recognized that efficiency and reduced expense are proper purposes for committing matters for adjudication by administrative tribunals. *See United States v. Seals,* 130 F.3d 451, 460 (D.C.Cir.1997), *cert. denied,* 524 U.S. 928, 118 S.Ct. 2323, 141 L.Ed.2d 697 (1998). [8]

In fact, efficiency is one of the primary reasons Congress grants adjudicatory functions to non-Article III judges. *See* Richard H. Fallon, Jr., *Of Legislative Courts, Administrative Agencies, and Article III,* 101 Harv. L.Rev. 915, 935–36 (1988). Few, if any, non-Article III courts would survive judicial scrutiny if efficiency became an impermissible reason for their establishment.

Accordingly, examination of all four *Schor* factors demonstrates that 🔖 section 1324c does not disturb "the whole constitutional structure" by impermissibly delegating Article III judicial power to a non-Article III court.

### 3. Free of Potential Domination By Other Branches

The four *Schor* factors, however, address only one of the purposes of Article III, to protect "the role of the independent judiciary within the constitutional scheme," 🔖 *Schor,* 478 U.S. at 850, 106 S.Ct. 3245. We must also consider whether the delegation at issue here endangers litigants' "right to have claims decided before judges who are free of potential domination by other branches of government." *Id.* Although the congressional scheme embodied in 🔖 section 1324c poses little danger to the role of the independent judiciary, the possible domination by the executive branch necessitates an additional inquiry. This issue is a of particular concern where, as here, the parties are compelled to proceed before a non-Article III tribunal.

The Supreme Court has pointed to a party's consent to an initial adjudication before a non-Article III tribunal as a significant factor in determining that Article III permits adjudication. *See* 🔖 *Schor,* 478 U.S. at 848–50, 855, 106 S.Ct. 3245 (separation of powers concerns are diminished where the decision to invoke the non-Article III forum is left entirely to the parties and the power of the federal judiciary to take jurisdiction of these matters is unaffected). Nevertheless, we conclude that, because of the due process protections afforded by the scheme at issue here and the historic treatment of immigration issues as matters subject to initial adjudication in an administrative forum, Congress' delegation of adjudicatory power over 🔖 section 1324c disputes does not violate Article III. *See* Paul Verkuil, *Separation of Powers, The Role of Law, and the Idea of Independence,* 30 Wm. & Mary L.Rev. 301, 316–17 (1988).

### Conclusion

Because we reject both of the constitutional challenges to the fine imposed in this case and because 🔖 section 1324c involves a civil fine constitutionally imposed in a non-Article III forum, we affirm.

FERGUSON, Circuit Judge, Dissenting:

Under today's ruling, the majority holds that Congress has the power to authorize **\*1179** the criminal punishment of an illegal act before an administrative tribunal that has only minimal oversight from Article III courts. It is surprising to me that the Ninth Circuit disregards the constitutional separation of powers for the sake of increasing the administrative bureaucracy in this manner. As I read the Constitution, Article III prohibits such Congressional redistribution of the judicial power.[1]

The majority's decision is wrong for two reasons. First, it incorrectly concludes that the penalty imposed on Noriega–Perez is not a form of criminal punishment for Article III purposes. Second, it completely fails to understand that Article III and the doctrine of separation of powers prohibits Congress from giving an administrative agency the power to adjudicate the criminal punishment present in this case. I will address both of those problems in turn.

### I

A good portion of the majority opinion focuses on analyzing 🔖 8 U.S.C. § 1324c under 🔖 *Hudson v. United States,* 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), and concluding that petitioner was not punished criminally. In the context of petitioner's Article III claim that his being fined for immigration document fraud by a non-Article III court violated principles of separation of powers, the majority's analysis is both misguided and incorrect. A proper analysis of petitioner's case would conclude that his being fined for immigration document fraud is a form of criminal punishment for Article III purposes.

### A

99 Cal. Daily Op. Serv. 4444, 1999 Daily Journal D.A.R. 5711

A test developed in one area of the law cannot simply be grafted onto another area of the law without risking serious jurisprudential problems. The majority's analysis of *Hudson* does just that by taking a test developed for the protections of personal liberties such as Fifth and Sixth Amendment guarantees and grafting it onto an Article III analysis designed to protect the structural integrity of our three branches of government. For that reason, the majority's reliance on *Hudson* is completely misplaced in this case.

*Hudson v. United States,* 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), is the latest in the Supreme Court's Double Jeopardy Clause jurisprudence. In the case, the Court used a two part test to determine if a second instance of punishment is civil or criminal: first, did the legislature indicate expressly or impliedly that the punishment was criminal; and second, if not, was the statutory scheme so punitive in purpose or effect that it is transformed into a criminal penalty. *Id.* at 493. That second part of the analysis is guided by the seven factors listed in *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), as helpful in determining whether an act of Congress is penal or regulatory in character. Under the seven *Mendoza–Martinez* factors, the Court found that the statute at issue in *Hudson* did not constitute criminal punishment giving rise to double jeopardy concerns. *Hudson,* 118 S.Ct. at 495–96.

Although *Hudson* arose in the double jeopardy context, in ruling on the Article III issue in this case the majority introduces its analysis of *Hudson* with the following statement: "[*Hudson*] must guide our discussion of [Noriega–Perez's] Article III claim because the classification of a sanction imposed by an ALJ as civil in nature is highly probative, although not necessarily determinative, of the constitutionality of the ALJ's jurisdiction." Slip op. at 5979. The majority provides no explanation or citation for why *Hudson,* a double jeopardy case, "must guide" an analysis of Article III issues. Moreover, as shown below, using *Hudson* and *Mendoza–Martinez* in the Article III context is unprecedented and misguided.

 **\*1180**  To see why *Hudson* and *Mendoza–Martinez* are not applicable to the Article III context, a look at *Mendoza–Martinez* is necessary. In *Mendoza–Martinez,* the Supreme Court decided that the federal statutes imposing loss of citizenship as punishment for leaving or remaining outside the country to avoid the draft were criminal statutes requiring the

protections of the Fifth and Sixth Amendments. *Mendoza–Martinez,* 372 U.S. at 165–66, 83 S.Ct. 554. The Court reached that conclusion by considering the legislative history of the statutes. See *id.* at 169–84, 83 S.Ct. 554. In *dicta,* the Court listed seven factors used by it in the past to determine if a statute is penal or regulatory:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter,* whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned....

*Id.* at 168–69, 83 S.Ct. 554 (internal footnotes omitted). The Court, though, did not apply those factors, instead just stating in a conclusory fashion that "we are convinced that application of these criteria to the face of the statutes [in this case] supports the conclusion that they are punitive...." *Id.* at 169, 83 S.Ct. 554.

Since then, the Court has used the *Mendoza–Martinez* factors sparingly and in only limited contexts. In the cases that do use the *Mendoza–Martinez* factors, the Court has looked to whether Fifth and Sixth Amendment protections apply, *see, e.g., United States v. Ward,* 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980), whether the Due Process Clause has been violated, *see, e.g., Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Schall v. Martin,* 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984), whether a law constitutes a bill of attainder, *see, e.g., Nixon v. Administrator of General Services,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), and whether a law constitutes criminal punishment for the purposes of the Double Jeopardy

Clause, *see Hudson v. United States,* 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997). None of those cases involved a look to the constitutional structural guarantees behind our form of government that are relevant to an Article III analysis.

In fact, that the *Mendoza–Martinez* test is applicable only in certain contexts is a truth that has been recognized by courts time and time again. The Supreme Court stated this fact explicitly in *Austin v. United States,* 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993). In that case, the Court refused to apply *Mendoza–Martinez* to an Excessive Fines Clause claim. *See id.* at 610 n. 6, 113 S.Ct. 2801. Likewise, in discussing *Mendoza–Martinez,* the Ninth Circuit has noted the Supreme Court's "warn[ing] against lifting a test for punishment from one constitutional provision and applying it to another." *See Russell v. Gregoire,* 124 F.3d 1079, 1086 n. 6 (9th Cir.1997) (citing *United States v. Ursery,* 518 U.S. 267, 116 S.Ct. 2135, 2146, 135 L.Ed.2d 549 (1996)), *cert denied,* 523 U.S. 1007, 118 S.Ct. 1191, 140 L.Ed.2d 321 (1998). Finally, in an exhaustive analysis of this topic, the New Jersey Supreme Court concluded that the *Mendoza–Martinez* factors are extremely context-sensitive and not to be applied outside the areas already recognized by the United States Supreme Court. *Doe v. Poritz,* 142 N.J. 1, 662 A.2d 367, 399–404 (N.J.1995).[2]

**\*1181** That the *Mendoza–Martinez* /*Hudson* factors cannot be applied indiscriminately to any constitutional inquiry is apparent not only from the case law that actually says so but also from looking at the factors themselves and the Article III considerations before the Court in this case. Looking to whether a statute imposes punishment in the manner that both *Mendoza–Martinez* and *Hudson* do is useful in determining whether an individual's constitutional rights have been violated. Concerns about criminal prosecutions without due process and the protections of the Fifth and Sixth Amendments or in violation of the Double Jeopardy Clause naturally lend themselves to an analysis of whether the statute at issue is penal or regulatory.

On the other hand, Article III has more global concerns than an individual's constitutional protections. Article III, and the doctrine of separation of powers of which it is a part, safeguards the structure of government through guaranteeing the integrity of the judicial branch. *See Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 582–83, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) ("These requirements protect the role of the independent judiciary within the constitutional scheme of tripartite government and assure impartial adjudication in federal courts."). *Mendoza–Martinez* and *Hudson* do not address such concerns and cannot be used to do so. The majority's use of the seven factors to begin its analysis of an Article III issue is misguided.

B

Even if I were to agree that the *Mendoza–Martinez* /*Hudson* factors were the appropriate analytical framework for determining whether the punishment here was criminal or civil in nature, I believe the majority has misapplied those factors in a way that seriously misses the fact that petitioner here was punished criminally.

The majority has misapplied key components of the *Mendoza–Martinez* / *Hudson* analysis. In looking to whether the sanction has historically been regarded as punishment, the majority states that "monetary penalties for violations of immigration regulation ... have historically been treated as civil in nature." Slip op. at 5980. All of the cases the majority cites for that proposition, however, involve a more specific area of law than the broad category of "violations of immigration regulation"; they all involve monetary penalties for assisting an alien in illegally entering this country. *See Hepner v. United States,* 213 U.S. 103, 104–05, 29 S.Ct. 474, 53 L.Ed. 720 (1909) (statute prohibiting inducing an alien "to migrate to the United States for purpose of performing labor here"); *Millon v. United States,* 219 F. 186, 186 (2d Cir.1914) (same); *United States v. Atlantic Fruit Co.,* 206 F. 440, 442 (2d Cir.1913) (statute regulating steamships bringing aliens into country).

Noriega–Perez's actions did not involve bringing people into this country; he forged official documents. Although his actions fall within the broad category of "immigration," they are materially different than bringing people into this country because they are illegal regardless of United States immigration requirements.

Moreover, unlike in *Hudson* where the fine covered people working within the heavily regulated banking industry, the monetary fine here is being imposed on an individual not engaged in a heavily regulated industry. Imposing fines on an individual for a violation of a statute has certainly historically been viewed as punishment for a wrongdoing.

*See Browning–Ferris Indus. v. Kelco Disposal, Inc.,*
492 U.S. 257, 265, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989)
(stating that at the time of the drafting and ratification of the
Eighth Amendment, "the word 'fine' was understood to mean
a payment to a sovereign as punishment for some offense.
Then, as now, fines were assessed in criminal, rather than in
private civil, actions."); *see also Department of Revenue
v. Kurth Ranch,* 511 U.S. 767, 779, 114 S.Ct. 1937, 128
L.Ed.2d 767 (1994) ( "[F]ines, penalties, and forfeitures are
readily characterized as sanctions."); **\*1182** *Ingraham
v. Wright,* 430 U.S. 651, 664, 97 S.Ct. 1401, 51 L.Ed.2d
711 (1977) ("Bail, fines, and punishment traditionally have
been associated with the criminal process...."). Referring to
the statute at issue here, the Fifth Circuit has stated that
the fine under § 1324c is a "punishment of the crime."
*Velasquez–Tabir v. INS,* 127 F.3d 456, 460 (5th Cir.1997).
Although the Supreme Court found a monetary penalty not to
be historically viewed as punishment in the *Hudson* context,
it is clear that a monetary penalty of the type here—against an
individual for a criminal act not related to a heavily regulated
industry—is historically regarded as punishment.

Legislative history also indicates that sanctions for document
fraud in violation of this provision of the immigration laws
were historically regarded as criminal punishment. In 1993,
in a statement referencing the original immigration document
fraud legislation enacted in 1990, Senator Alan Simpson
stated the following:

> In 1990, I offered an amendment to the
> Immigration Act of 1990 to create civil
> penalties for document fraud. This
> amendment was necessary because
> U.S. attorneys were reluctant to bring
> criminal charges against aliens and
> others who used fraudulent documents
> to obtain immigration or employment
> benefits. By establishing new civil
> penalties for this type of document
> fraud, immigration officers could file
> complaints and bring these charges
> without involving the U.S. attorneys.

139 Cong. Rec. S15958, S15964 (daily ed. Nov. 17, 1993)
(statement of Sen. Simpson). He also stated:

> You may be interested to know that a
> similar provision was included in the
> 1990 immigration law, which Senator
> Kennedy and I cosponsored, where
> we addressed the use of fraudulent
> documents to obtain immigration
> benefits. The INS has been very
> pleased with the process and has
> successfully brought actions against
> individuals which otherwise might
> have been left at the very bottom of the
> case pile in the Federal criminal court
> system.

139 Cong. Rec. S2897, S2903 (daily ed. March 16, 1993)
(statement of Sen. Simpson). Those two statements indicate
that Congress's intent was to remove these crimes from
criminal court and put them under the jurisdiction of the
administrative agency so that the sanctions could be applied
more swiftly and surely. That intent shows that historically
the sanction for immigration document fraud has been seen
as criminal punishment, for the crime was historically dealt
with in criminal court.

The other major error in the majority's *Mendoza–Martinez
/Hudson* analysis is that it fails to look at § 1324c "on
its face." *See Hudson,* 118 S.Ct. at 494. According to the
majority, the imposition of a $96,000 fine in this case of more
than 300 violations of the statute is not excessive. *See* slip op.
at 5983. That analysis, though, ignores *Hudson* 's command
that, in conducting the *Mendoza–Martinez* analysis, courts
are to "attribute no significance to the sanctions actually
imposed...." *See United States v. Mayes,* 158 F.3d 1215, 1223
(11th Cir.1998), *cert. denied,* 525 U.S. 1185, 119 S.Ct. 1130,
143 L.Ed.2d 123 (1999).

Considering the statute on its face affects the analysis for
three of the *Mendoza–Martinez* factors: whether the statute
promotes the traditional aims of punishment, whether there
are alternative non-criminal purposes for the statute, and
whether the penalty is excessive. If the majority were to
analyze the statute on its face, those three factors would point
to a conclusion that the statute is criminally punitive.

99 Cal. Daily Op. Serv. 4444, 1999 Daily Journal D.A.R. 5711

Section 1324c provides that the penalty shall be "not less than $250 and not more than $2,000 for each document that is the subject of a violation." 8 U.S.C. § 1324c(d)(3)(A). Nowhere does the statute tie the per-violation fine or the ALJ's discretion to impose a penalty within the stated range to the amount the government or the employer lost due to the violations. **\*1183** That scheme must be looked at in light of the Supreme Court's stated difference between civil and criminal actions: "the[re is a] line between civil, remedial actions brought primarily to protect the government from financial loss and actions intended to authorize criminal punishment to vindicate public justice." *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 548–49, 63 S.Ct. 379, 87 L.Ed. 443 (1943). Using *Hess* as the basis of analysis, the statute, looked at on its face, falls on the criminal side of the relevant *Hudson* factors because of the lack of correlation between the penalty and any facts regarding the crime: the statute promotes the traditional aims of punishment by deterring, it does so to the exclusion of any alternative non-criminal purposes, [3] and it is excessive. Accordingly, under *Mendoza–Martinez* and *Hudson,* the imposition of fines in accordance with § 1324c would have to be considered a form of criminal punishment.

On a more general level, the majority has misused the *Mendoza–Martinez* and *Hudson* factors. The majority uses the *Mendoza–Martinez* /*Hudson* factors as if they were completely determinative of the issue at hand. After analyzing each of the seven factors under separate headings, the majority balances them and concludes that "the factors here do not demonstrate by the clearest proof that section 1324c's monetary sanction is so punitive that it is criminal in nature." Slip op. at 5983. In reaching this conclusion, the majority has ignored the multiple warnings from the Supreme Court that the *Mendoza–Martinez* factors are "certainly neither exhaustive nor dispositive." *Ward,* 448 U.S. at 249, 100 S.Ct. 2636; *accord United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 365 n. 7, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984). Rather, they are "useful guideposts" in determining if something is "punishment in the constitutional sense of that word." *Wolfish,* 441 U.S. at 538, 99 S.Ct. 1861; *Hudson,* 118 S.Ct. at 493. Giving the factors full dispositive weight, as the majority does, flies in the face of the Supreme Court's description of the factors as non-dispositive useful guideposts.

The majority also errs in its analysis of the *Mendoza–Martinez* /*Hudson* factors by failing to look to other factors outside of the *Mendoza–Martinez* /*Hudson* list that may also have a bearing on this case. *Mendoza–Martinez* 's list of factors is by no means an "exhaustive" list. *See Ward,* 448 U.S. at 249, 100 S.Ct. 2636. Other considerations should be taken into account, especially considering the differing nature of the inquiry we must make here—the appropriateness of resolution of Noriega–Perez's case before a non-Article III judge—from the inquiry in *Hudson* itself. Factors such as the seriousness of the offense, whether it has traditionally been tried before a jury, and whether it would fall into the mala in se category of crimes are important. Under those additional factors, there is further proof that the statute punishing document fraud is criminal rather than civil.

When looked at in the context framed above, *i.e.,* in the proper historical context, on its face, with the *Mendoza–Martinez* /*Hudson* factors given their appropriate non-dispositive weight, and with other factors that are relevant added into the mix, the statute under which petitioner was fined can be described only as a form of **\*1184** criminal punishment. The majority's conclusion to the contrary clouds its analysis of the central issue in this case: whether the ALJ's imposition of the fine violated Article III's guarantees.

II

Article III requires that federal judges serving with life tenure during good behavior and with protection against diminished compensation exercise "[t]he judicial Power of the United States." The provisions of Article III "guarantee that the process of adjudication itself remain[ ] impartial." *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 58, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (Brennan, J., plurality). Without Article III protections, "the judge might behave with all the violence of *an oppressor.*" The Federalist No. 47, at 246 (James Madison) (Bantam Classic ed., 1982). Under the majority's opinion, this Court takes a significant step toward unleashing the "violence of an oppressor" by authorizing the imposition of a criminal fine by a non-independent administrative body.

Article III and the doctrine of separation of powers protects "the whole constitutional structure by requiring that each branch retain its essential powers and independence."

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

99 Cal. Daily Op. Serv. 4444, 1999 Daily Journal D.A.R. 5711

*Pacemaker Diagnostic Clinic of America, Inc. v. Instromedix, Inc.,* 725 F.2d 537, 544 (9th Cir.1984) (en banc). In its recent decisions focusing on separation of powers in the Article III context, the Supreme Court has "declined to adopt formalistic and unbending rules" to determine when the doctrine is breached by a "non-Article III tribunal impermissibly threaten[ing] the institutional integrity of the Judicial Branch." *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 851, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986). Instead, it has adopted a flexible balancing test:

> [I]n reviewing Article III challenges, we have weighed a number of factors, none of which has been deemed determinative, with an eye to the practical effect that the congressional action will have on the constitutionally assigned role of the federal judiciary. Among the factors upon which we have focused are [1] the extent to which the essential attributes of judicial power are reserved to Article III courts, and, conversely, [2] the extent to which the non-Article III forum exercises the range of jurisdiction and powers normally vested only in Article III courts, [3] the origins and importance of the right to be adjudicated, and [4] the concerns that drove Congress to depart from the requirements of Article III.

*Id.* (internal citation and quotations omitted); *accord Simpson v. Office of Thrift Supervision,* 29 F.3d 1418, 1422 (9th Cir.1994). The majority incorrectly applies the *Schor* test and concludes that the ALJ's fine here did not violate the Constitution. A proper application of the *Schor* test necessitates a conclusion that 8 U.S.C. § 1324c compromises Article III guarantees and is unconstitutional.

Under *Schor,* the first two factors require a look at how the congressional enactment affects the balance of judicial power between the Article III and non-Article III courts. Under § 1324c(d)(5), Article III courts retain some of their essential attributes because a person fined has recourse

in Article III courts via an appeal to a Court of Appeals. *See Simpson,* 29 F.3d at 1423. However, the Article III court does not have the power of de novo review, something the *Schor* Court found vitally important in upholding the adjudicatory powers of the Commodity Futures Trading Commission. *Schor,* 478 U.S. at 853, 106 S.Ct. 3245. Nor does § 1324c require an Article III court order to enforce the fine, something the *Schor* Court also found important. *See id.* Also, unlike in *Schor,* the hearing before the ALJ was not an option that Noriega–Perez could have opted out of in favor of Article III adjudication. *See id.* at 848–50, 106 S.Ct. 3245. And, finally, *Schor* emphasized that the scheme at issue there did not offend Article III because it merely involved counterclaim jurisdiction that was **\*1185** necessary to make the "procedure workable," *id.* at 856, 106 S.Ct. 3245; that is not at all the case here. All of these factors contribute to Article III courts being deprived of the essential attributes of the judicial power in the context of immigration document fraud fines. Merely reciting the usual standards of judicial review from the APA, *see* slip op. at 5987–88, does nothing to change this fact.

Under the second prong of *Schor,* § 1324c gives non-Article III courts the original decision making function with respect to fining an individual for private conduct not related to a regulated industry. Enforcement of § 1324c goes as follows: the INS, a part of the executive branch under 8 U.S.C. § 1551 (placing the INS under the Department of Justice), brings charges of document fraud against an individual for resolution before another part of the executive branch, the EOIR, *see* 8 U.S.C. § 1101(b)(4) (placing the EOIR under the Attorney General); *see also* 8 C.F.R. § 3.0. Resolution of such a matter is something traditionally "vested only in Article III courts." *See Schor,* 478 U.S. at 851, 106 S.Ct. 3245. As noted in the discussion of the *Hudson* factors, fining an individual is a form of criminal punishment. *See Browning–Ferris,* 492 U.S. at 265, 109 S.Ct. 2909; *Ingraham,* 430 U.S. at 664, 97 S.Ct. 1401. Criminal punishment is something exclusively reserved for Article III courts. *See Northern Pipeline,* 458 U.S. at 70 n. 24, 102 S.Ct. 2858 (Brennan, J., plurality) (Non–Article III adjudication is not permitted for "any criminal matters, although the Government is a proper party."); *see also In re Hipp, Inc.,* 895 F.2d 1503, 1511 (5th Cir.1990)

(noting that, within the public rights exception, non-Article III adjudication "has never encompassed criminal matters") (citing R. Fallon, *Of Legislative Courts, Administrative Agencies, and Article III,* 101 Harv. L.Rev. 915, 952 & n. 208 (1988)). Although various courts have approved the delegation of parts of the criminal process to non-Article III magistrates, *see Peretz v. United States,* 501 U.S. 923, 936, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991) (consented-to voir dire); *United States v. Raddatz,* 447 U.S. 667, 683–84, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) (suppression hearings); *United States v. Seals,* 130 F.3d 451, 459 (D.C.Cir.1997) (grand jury proceedings), *cert. denied,* 524 U.S. 928, 118 S.Ct. 2323, 141 L.Ed.2d 697 (1998), delegating the entire punishment function to the executive raises concerns about the aggrandizement of power in one branch and has never been sanctioned under Article III. The majority's efforts to do so are unprecedented. Under a proper analysis, balancing the first two factors of the *Schor* test shows that although Article III courts retain some of their essential attributes, the non-Article III court exercises a substantial and important portion of Article III jurisdiction and power.

The other two *Schor* factors look to the particular right at issue and Congress' intentions in transferring the adjudication of that right to a non-Article III court. Here, in a very general sense, § 1324c does involve immigration matters, and immigration has indeed historically been within the body of "public rights" capable of being adjudicated outside Article III courts. *See Crowell v. Benson,* 285 U.S. 22, 51, 52 S.Ct. 285, 76 L.Ed. 598 (1932) ("Familiar illustrations of administrative agencies created for the determination of [public rights] are found in connection with the exercise of the congressional power as to ... immigration...."). Yet, declaring this an immigration matter within the category of immigration matters traditionally delegable to a non-Article III tribunal is deceptive and wrong. Immigration is within the penumbra of legislatively-created public rights because the right to enter this country is one created by Congress. In that respect, immigration is the *quintessential* "legislatively-created public right" because it fits within the plain meaning of the term. Not surprisingly, all of the cases cited by the majority, and all of the cases I could find, focusing on the delegation of immigration matters to administrative courts involve violations stemming out of bringing people into this country **\*1186** in violation of the legislatively-created public right to enter.[4]

This case, however, is wholly different. This case involves the imposition of a fine on someone who is not trying illegally to access or assist in the accessing of a public right. Here, we have the simple act of document fraud—an act that is illegal regardless of any legislatively-created rights. In this case, the offense just happens to involve immigration documents. If this matter is seen as within the realm of immigration and public rights, then so would assaulting an INS official. Under today's ruling, because the assault would be related to the public right of immigration, a person could be tried for that assault before an ALJ and fined accordingly.

Taking the majority's ruling outside the immigration context shows similarly alarming results. The federal government heavily regulates the banking industry. Thus, by the majority's rationale, Congress could place the punishment of passing forged checks before an ALJ without raising any Article III concerns as long as the punishment is a fine rather than imprisonment. Similarly outrageous scenarios can be imagined in each and every area of the law that Congress regulates because the majority's holding boils down to this simple one-sentence syllogism: if related to any area of regulation, the crime is really just a public right that can be delegated to an ALJ.

Some line has to be drawn, and the majority has not articulated a principle by which to do so. Looking to history provides an adequate answer in this case as non-Article III adjudication of this offense is a recent development. Until 1990 with the enactment of 8 U.S.C. § 1324c, punishment for immigration document fraud had historically been a criminal matter handled by an Article III court. *See* 18 U.S.C. § 1546. Congress's purpose for removing immigration document fraud matters from Article III adjudication was to remove them from the federal criminal courts that were backlogged with drug and violent crime matters. 139 Cong. Rec. S2897, S2903 (daily ed. Mar. 16, 1993) (statement of Sen. Simpson). In doing so, Congress ensured that the INS would exact fines from individuals who would otherwise have their cases "left at the very bottom of the case pile in the Federal criminal court system." *Id.* Congress shifted what had previously been seen as the responsibility of an Article III court to a non-Article III court for the purpose of quickening the process and avoiding the delays inherent in Article III adjudication. In a regulatory context, that might be acceptable; however, when dealing with individual conduct that is not associated with a well-regulated industry, such a

99 Cal. Daily Op. Serv. 4444, 1999 Daily Journal D.A.R. 5711

purpose is suspect and a threat to the principle of separation of powers.

The majority claims that efficiency is a valid purpose for the transfer of public rights to administrative tribunals. *See* slip op. at 1178. Certainly, that is true with respect to purely regulatory matters. However, in the context of the criminal law and the imposition of criminal fines on private individuals, efficiency cannot justify compromising constitutional protections. If Congress merely had to state that for efficiency purposes it was changing a penalty from criminal to civil and placing the matter before an administrative court, it would have a simple way of evading the constitutional protections given to criminal defendants, such as the right to counsel and a jury trial, because of the simple fact **\*1187** that, as noted above, many crimes are related to an area within the regulatory power of Congress. In this context, efficiency is not a legitimate congressional concern for transferring the adjudication of this matter to an administrative body.

The majority's final consideration under its Article III analysis shows how little it values the principles behind an independent judiciary. Somehow the majority concludes that the compelled adjudication of this matter before an ALJ does not pose the threat of giving adjudicatory authority to judges who are "potential[ly] dominat[ed] by other branches of the government." *See* slip op. at 5992. The majority does not explain how an ALJ who is a part of the executive branch is not dominated by that very branch. Furthermore, there is

no escaping the fact that the ALJ who is deciding the case necessarily has a conflict of interest because any fine levied by the ALJ will go to the branch of government controlling the ALJ. The scheme here is exactly the type of "domination" feared by the *Schor* Court.

The Constitution creates a delicate balance of power between the three branches of government that must be vigilantly safeguarded. When one branch of government removes powers from another branch and places those powers in the control of the third branch, it is for the judiciary to place a stop to the mischief. As applied here, the four *Schor* factors indicate that "the practical effect that the congressional action will have on the constitutionally assigned role of the federal judiciary," *Schor,* 478 U.S. at 851, 106 S.Ct. 3245, is to weaken Article III courts by intruding on their traditional power to adjudicate immigration document fraud cases. This Court should hold § 1324c unconstitutional under the separation of powers doctrine.

Because I believe that § 1324c is unconstitutional, Noriega–Perez's fine under that provision should be vacated, and the INS's complaint against him dismissed. I respectfully dissent from the majority's conclusion to the contrary.

### All Citations

179 F.3d 1166, 99 Cal. Daily Op. Serv. 4444, 1999 Daily Journal D.A.R. 5711

---

### Footnotes

\*  The Honorable John M. Roll, District Judge for the District of Arizona, sitting by designation.

1  Noriega–Perez raises five other issues on appeal. First, he claims that the fine of $96,000 imposed upon him by the ALJ constitutes an excessive fine under the Eighth Amendment. This challenge fails because a fine of $96,000 for possessing and counterfeiting over 300 fraudulent documents is hardly "grossly disproportional" to the gravity of Noriega–Perez's offense, particularly considering the INS' assertion that its cost of investigation was approximately $48,000. *See* United States v. Bajakajian, 524 U.S. 321, 118 S.Ct. 2028, 2037–38, 141 L.Ed.2d 314 (1998). Second, Noriega–Perez asserts that it was improper for the ALJ to grant summary judgment because of his assertion of his Fifth Amendment right against self-incrimination. However, petitioner had no valid claim of Fifth Amendment privilege to assert, for he had already pleaded guilty to criminal charges based on his actions and thus could not be criminally prosecuted again. Even assuming he did have a valid Fifth Amendment privilege, he failed to assert the basis of his fear of incrimination with the requisite specificity. *See* Brunswick Corp. v. Doff, 638 F.2d 108, 110 (9th Cir.1981). Third, Noriega–Perez complains that the ALJ improperly denied his motion for a continuance of the hearing.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

99 Cal. Daily Op. Serv. 4444, 1999 Daily Journal D.A.R. 5711

The ALJ had previously granted petitioner three extensions of time and did not abuse his discretion in denying the fourth such request. Fourth, petitioner claims that the ALJ erred in failing to order the INS to respond to a discovery request. Noriega–Perez has failed to show, however, that the documents he requested were relevant and could have affected the outcome of the summary judgment motion. Finally, petitioner contends that he was unconstitutionally denied a jury trial. It follows from our holding that an administrative hearing complies with the Constitution that a jury trial was not required.

2   Neither party discussed this aspect of the double jeopardy issue, perhaps because the majority did not address it in *Hudson.* Although Justice Stevens discussed this issue in his concurrence, the majority chose not to address it because it had not been presented in the petition for certiorari. *Hudson,* 118 S.Ct. at 494 n. 5. Nevertheless this part of the double jeopardy inquiry remains a necessary part of double jeopardy analysis.

3   The *Hudson/Kennedy* guideposts are pertinent to this inquiry because a finding that the sanction imposed by section 1324c is criminal would implicate the safeguards that attend a criminal prosecution. *See Austin v. United States,* 509 U.S. 602, 610 n. 6, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993). Furthermore, the Supreme Court has previously utilized *Kennedy v. Mendoza–Martinez* to determine whether congressional action constituted punishment in the separation of powers context. *See Nixon v. Administrator of Gen. Servs.,* 433 U.S. 425, 477, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (finding that a congressional Act did not violate the Bill of Attainder Clause because it did not impose a punishment). Significantly, the Supreme Court noted that "the Bill of Attainder Clause was an important ingredient of the doctrine of separation of powers." *Id.* at 470, 97 S.Ct. 2777. *See also United States v. Brown,* 381 U.S. 437, 442–43, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965) (noting that Article III and the Bill of Attainder Clause serve the separation of powers doctrine).

4   Although the dissent argues that the majority gives the *Hudson/Kennedy* guideposts too much deference, this application is consistent with many other appellate court opinions that have given the factors great weight. *See, e.g., Louis v. Commissioner of Internal Revenue,* 170 F.3d 1232 (9th Cir.1999); *Herbert v. Billy,* 160 F.3d 1131 (6th Cir.1998); *Securities and Exchange Comm'n v. Palmisano,* 135 F.3d 860 (2d Cir.1998).

5   Although informative, this factor is not necessarily determinative. *See Thomas,* 473 U.S. at 583, 105 S.Ct. 3325 ("Many matters that involve the application of legal standards to facts and affect private interests are routinely decided by agency action with limited or no review by Article III courts."). *See also Morel,* 144 F.3d at 251–52 ("[R]elevant Supreme Court authority does not mandate judicial review by an Article III court of questions of law underlying legislatively-created public rights such as immigration.") (citation omitted).

6   "[Substantial evidence] means such relevant evidence, as a reasonable mind might accept as adequate to support a conclusion." *Maka,* 904 F.2d at 1355.

7   Federal immigration law has historically addressed immigrant labor concerns by providing for non-criminal sanctions against individuals and regulated companies attempting to evade regulation. *See Grant Brothers Constr. Co. v. United States,* 232 U.S. 647, 658, 34 S.Ct. 452, 58 L.Ed. 776 (1914) (upholding the award of a civil fine against a defendant who "solicited the migration and importation into the United States ... of a designated alien laborer"); *Millon,* 219 U.S. at 187; *United States v. Banister,* 70 F. 44, 44 (C.C.D.Vt.1895).

8   *Cf. Mistretta v. United States,* 488 U.S. 361, 363–64, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989).

1   I do not dissent from the majority's conclusion that petitioner's fine did not violate the Double Jeopardy clause.

2   *Doe v. Poritz* was decided before the United States Supreme Court's decision in *Hudson v. United States.* One of *Doe* 's conclusions was that the *Mendoza–Martinez* factors did not apply in double jeopardy cases. Obviously, now that *Hudson* has been decided, *Doe* 's conclusion with respect to double jeopardy analysis was wrong. However, *Hudson* does not detract from the court's analysis that *Mendoza–Martinez* is context-sensitive.

3   The majority contends that there are several non-punitive purposes for § 1324c. Three of the four suggested purposes, *see* slip op. at 1174, are just alternative formulations of the deterrence rationale. The

99 Cal. Daily Op. Serv. 4444, 1999 Daily Journal D.A.R. 5711

other stated purpose, to "reimburs[e] the government for enforcement expenditures," *id.* at 1174, is clearly not a purpose of the statute when looked at on its face. A simple hypothetical demonstrates this fact: If the government spent $100,000 in enforcing 📄 § 1324c and the investigation discovered only one document, the most the government could recover would be $2,000. However, if the government spent the same $100,000 but happened upon a stash of 10,000 forged documents, the government could recover a minimum of $2,500,000 and a maximum of $20,000,000. I am at a loss as to how the majority can reconcile such absurd possibilities under the statutory scheme with a purpose of "reimbursing the government for enforcement expenditures."

4    The majority cites 📄 *Lees v. United States,* 150 U.S. 476, 14 S.Ct. 163, 37 L.Ed. 1150 (1893), as evidence that the power to exclude alien laborers is a public right because it is associated with "the power to punish any who assist in their introduction." *See* slip op. at 1177–78 (citing 📄 *Lees,* 150 U.S. at 478–79, 14 S.Ct. 163). The majority reasons that because of that relationship recognized by the Supreme Court, Congress can give an ALJ jurisdiction over immigration document fraud. However, *Lees* had nothing to do with the power to place a matter before an ALJ but rather with whether Congress had the power to regulate the issue at all. No one here disputes Congress has the power to regulate immigration document fraud.

---

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 763 of 1271
North Carolina Growers' Ass'n, Inc. v. United Farm Workers, 702 F.3d 755 (2012)
20 Wage & Hour Cas.2d (BNA) 34

702 F.3d 755
United States Court of Appeals,
Fourth Circuit.

NORTH CAROLINA GROWERS' ASSOCIATION,
INCORPORATED; National Christmas Tree
Association; Florida Fruit & Vegetable Association;
Virginia Agricultural Growers Association,
Incorporated; Snake River Farmers Association;
National Council of Agricultural Employers; North
Carolina Christmas Tree Association; North Carolina
Pickle Producers Association; Florida Citrus Mutual;
North Carolina Agribusiness Council, Incorporated;
Maine Forest Products Council; Alta Citrus, LLC;
Everglades Harvesting & Hauling, Incorporated;
Desoto Fruit & Harvesting, Incorporated; Forest
Resources Association; Titan Peach Farms,
Incorporated; H–2A USA, Incorporated; Overlook
Harvesting Company, LLC, Plaintiffs–Appellees,
v.
UNITED FARM WORKERS; James Cease;
Mario Centeno–Rodriguez; Juan Cisneros–
Ibarra; Luis Enrique Cisneros–Ibarra; Reymundo
Gutierrez; Carlos Luis Guzman–Centeno; Jose
Raul Guzman–Centeno; Abelardo Hernandez–
Aguas; Gregorio Huertas–Samano; Pedro Ibarra–
Avila; Atanacio Lugo–Rincon; Obdula Maldonado–
Abellaneda; Miguel Angel Olguin–Hernandez;
Arturo Olguin–Monroy; Omera Rodriguez–
Guzman; Desiderio Tovar–Zapata; Alejandro
Trejoleon, Intervenors/Defendants–Appellants,
and
Hilda L. Solis, in her official capacity as United
States Secretary of Labor; United States
Department of Labor; Janet Napolitano,
in her official capacity as United States
Secretary of Homeland Security; United States
Department of Homeland Security, Defendants
Howard Berman; Judy Chu; George Miller;
Lynn Woolsey, Amici Supporting Appellants
USA Farmers, Inc., Amicus Supporting Appellees.

No. 11–2235.
|
Argued: Oct. 23, 2012.

|
Decided: Dec. 21, 2012.

**Synopsis**

**Background:** Growers' associations, farmers, and related lobbying organizations filed a complaint against the Department of Labor and other federal agencies, seeking to enjoin the Department's suspension of various regulations for temporary agricultural workers and reinstated other prior regulations. The United States District Court for the Middle District of North Carolina, William L. Osteen, Jr., J., issued a preliminary injunction. Farm workers' union intervened as defendants, and filed a purported class action counterclaim against the plaintiffs on behalf of certain agricultural workers who had been paid at wage rates based on the lower "adverse effect wage rate" (AEWR) in effect during the preliminary injunction. The district court granted plaintiffs' summary judgment motion, determining that federal defendants violated Administrative Procedure Act (APA), and denied union's motion for partial summary judgment on its counterclaim, and federal defendants and union appealed.

**Holdings:** The Court of Appeals, Barbara Milano Keenan, Circuit Judge, held that:

[1] Department's reinstatement of the 1987 regulations qualified as "rule making" under the APA;

[2] Department did not invoke the "good cause" exception of the APA and, therefore, was required to satisfy the APA's notice and comment requirements; and

[3] Department's action was arbitrary and capricious, in that the Department failed to follow notice and comment procedures.

Affirmed.

Wilkinson, Circuit Judge, filed concurring opinion.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment; Motion for Preliminary Injunction.

West Headnotes (12)

**[1]    Administrative Law and Procedure** 🔑 Procedural correctness or compliance in general

As part of process of reviewing agency action, courts are charged with ensuring that agencies comply with the procedural requirements of the Administrative Procedure Act (APA); while court's review of an agency's final decision is narrow, it must be strict in reviewing an agency's compliance with procedural rules. 📒 5 U.S.C.A. § 706(2).

9 Cases that cite this headnote

**[2]    Labor and Employment** 🔑 Regulatory Agencies and Officers

By reinstating the superseded and void 1987 regulations, Department of Labor (DOL) engaged in the "formulating" and the "repealing" aspects of "rule making" under the Administrative Procedure Act (APA), thereby triggering the statute's notice and comment requirements. 📒 5 U.S.C.A. §§ 551, 📒 553.

3 Cases that cite this headnote

**[3]    Administrative Law and Procedure** 🔑 Good Cause in General

Administrative Procedure Act (APA) good cause requirement, that an agency articulate its basis for dispensing with normal notice and comment, is not a procedural formality, but serves the crucial purpose of ensuring that the exceptions do not "swallow the rule." 📒 5 U.S.C.A. § 553(b)(3)(B).

**[4]    Administrative Law and Procedure** 🔑 Impracticable or unnecessary; time constraints

Notice and comment on a rule may be found to be "impracticable" within meaning of Administrative Procedure Act's (APA) good cause exception for dispensing with normal notice and comment requirements for rulemaking when the due and required execution of the agency functions would be unavoidably prevented by its undertaking public rule-making proceedings. 📒 5 U.S.C.A. § 553.

1 Cases that cite this headnote

**[5]    Administrative Law and Procedure** 🔑 Impracticable or unnecessary; time constraints

"Unnecessary" prong of the good cause exception for dispensing with normal notice and comment requirements for rulemaking applies when an administrative rule is a routine determination, insignificant in nature and impact, and inconsequential to the industry and to the public. 📒 5 U.S.C.A. § 553(b)(3)(B).

2 Cases that cite this headnote

**[6]    Administrative Law and Procedure** 🔑 Public interest; harm

Circumstances justifying reliance on Administrative Procedure Act's (APA) good cause exception for dispensing with normal notice and comment requirements for rulemaking are rare, and will be accepted only after a reviewing court examines closely the proffered reason for an agency's deviation from public notice and comment; good cause exception applies only in "emergency situations," or in cases when delay could result in serious harm. 📒 5 U.S.C.A. § 553(b)(3)(B).

1 Cases that cite this headnote

**[7]    Administrative Law and Procedure** 🔑 Exception to rulemaking procedures

**Administrative Law and Procedure** 🔑 Theory or grounds not provided or relied upon by agency

**Administrative Law and Procedure** 👈 Timing of theory and grounds asserted

Court considers an explanation for invoking of Administrative Procedure Act's (APA) good cause exception for dispensing with normal notice and comment requirements that the agency has advanced at the time of the rule making; post-hoc explanations that an agency did not have to comply with regular notice and comment procedures are viewed with skepticism, and, court may not supply a reasoned basis for the agency's action that the agency itself has not given. 5 U.S.C.A. § 553(b)(3)(B).

5 Cases that cite this headnote

**[8]     Administrative Law and Procedure** 👈 Good Cause in General

Although an agency need not explicitly invoke the Administrative Procedure Act's (APA) good cause exception for dispensing with normal notice and comment requirements, the contemporaneous agency record must manifest plainly the agency's reliance on the exception in its decision to depart from the required notice and comment procedures. 5 U.S.C.A. § 553(b)(3)(B).

2 Cases that cite this headnote

**[9]     Labor and Employment** 👈 Regulatory Agencies and Officers

Department of Labor (DOL), which engaged in the "formulating" and the "repealing" aspects of "rule making" under the Administrative Procedure Act (APA) by reinstating superseded and void 1987 regulations, failed to either explicitly or implicitly invoke the good cause exception for dispensing with normal notice and comment requirements, but rather, concluded that it had complied with that applicable notice and comment procedures. 5 U.S.C.A. § 553(b)(3)(B).

**[10]     Labor and Employment** 👈 Regulatory Agencies and Officers

Department of Labor's (DOL) suspension of 2008 regulations, and reinstatement of the 1987 regulations for the H–2A program for foreign agricultural workers was arbitrary and capricious in that Department, which stated that it would not receive or consider comments that were not only "relevant and important," but were integral to the proposed agency action and the conditions that such action sought to alleviate, did not provide a meaningful opportunity for comment, and did not solicit or receive relevant comments regarding the substance or merits of either set of regulations, and thus ignored important aspects of the problem; as a result of the Department's content restriction, the Department refused to receive comments on and to consider or explain "relevant and significant issues," and the 10-day comment period did not provide a meaningful opportunity for adequate comment. 5 U.S.C.A. § 553(b, c); Immigration and Nationality Act, § 101(a)(15)(H)(ii)(a), 🚩 8 U.S.C.A. § 1101(a)(15)(H)(ii)(a).

4 Cases that cite this headnote

**[11]     Administrative Law and Procedure** 👈 Interpretive rules and pronouncements

**Administrative Law and Procedure** 👈 Construction without force of law; informal construction

"Interpretative rules" are not subject to the Administrative Procedure Act's (APA) notice and comment requirements; however, interpretative rules only are entitled to deference as articulated in *Skidmore*. 5 U.S.C.A. § 553(b)(3)(A).

5 Cases that cite this headnote

**[12]     Labor and Employment** 👈 Rules and regulations

Department of Labor's (DOL) rule extending Fair Labor Standards Act's (FLSA) overtime pay

provisions to Christmas tree farmers did not have the power to persuade where Department failed to comply with Administrative Procedure Act (APA) notice and comment requirements in suspending prior regulations for temporary agricultural workers and reinstating other prior regulations. 5 U.S.C.A. § 553(b)(3)(A).

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*758 ARGUED:** Naomi Ruth Tsu, Southern Poverty Law Center, Atlanta, Georgia, for Appellants. Robin Elizabeth Shea, Constangy, Brooks & Smith, LLC, Winston–Salem, North Carolina, for Appellees. **ON BRIEF:** Andrew H. Turner, Buescher, Goldhammer & Kelman, Denver, Colorado; Gregory S. Schell, Migrant Farm–Worker Justice Project, Lake Worth, Florida; Robert J. Willis, Law Office of Robert J. Willis, Raleigh, North Carolina, for Appellants. William R. Loftis, Jr., Constangy, Brooks & Smith, LLC, Winston–Salem, North Carolina, for Appellees. Jonathan G. Cedarbaum, Lillian Howard Potter, Annie L. Owens, Wilmer Cutler Pickering Hale and Dorr, LLP, Washington, D.C., for Amici Supporting Appellants. Leon R. Sequeira, Seyfarth Shaw LLP, Washington, D.C., for Amicus Supporting Appellees.

Before WILKINSON, KEENAN, and DIAZ, Circuit Judges.

Affirmed by published opinion. Judge KEENAN wrote the opinion, in which Judge WILKINSON and Judge DIAZ joined. Judge WILKINSON wrote a separate concurring opinion.

## OPINION

BARBARA MILANO KEENAN, Circuit Judge:

This appeal involves a regulatory action by the Department of Labor (the Department), which suspended various regulations for temporary agricultural workers and reinstated other prior regulations. We primarily consider: (1) whether the Department's action constituted "rule making" under the Administrative Procedure Act (the APA), 5 U.S.C. §§ 553, and 701 through 706; and (2) if the action was "rule making," whether the Department satisfied the APA's "notice and comment" requirements.

**\*759** We conclude that the district court correctly determined that the Department: (1) engaged in "rule making" when reinstating the prior regulations; and (2) failed to comply with the notice and comment procedures mandated by the APA. We also conclude that the Department did not invoke the "good cause exception" provided by the APA to excuse its failure to comply with these notice and comment requirements. Accordingly, we hold that the district court did not err in invalidating the Department's action on the ground that it was arbitrary and capricious.

I.

### 1. The 1987 Regulations

In 1986, Congress passed the Immigration Reform and Control Act amendments to the Immigration and Nationality Act, which permitted the temporary admission of foreign workers to engage in agricultural jobs in the United States (the H–2A program). See 8 U.S.C. § 1101(a)(15)(H)(ii)(a). In 1987, the Department promulgated regulations governing the H–2A program to effectuate Congress' intent that domestic agricultural workers (U.S. workers) be given preference over foreign agricultural workers (H–2A workers), and that the employment of H–2A workers would not adversely affect the wages or working conditions of U.S. workers (collectively, the 1987 regulations, or the 1987 rule). See Labor Certification Process for the Temporary Employment of Aliens in Agriculture; Adverse Effect Wage Rate Methodology, 54 Fed.Reg. 28,037 (July 5, 1989); Labor Certification Process for the Temporary Employment of Aliens in Agriculture and Logging, 52 Fed.Reg. 20,496 (June 1, 1987). An agricultural employer seeking to participate in the H–2A program is required to apply with the Department and certain other federal agencies, certifying that there are insufficient U.S. workers available to perform work for the employer and agreeing to abide by requirements regarding wages, housing, and working conditions. See 52 Fed.Reg. at 20,513–20,516.

The 1987 regulations required, among other things, that participating employers pay H–2A workers and similarly-situated U.S. workers a wage rate calculated by a formula, which is known as an "adverse effect wage rate" (AEWR). See 54 Fed.Reg. at 28,038. AEWRs are minimum hourly wage rates that must be paid under the H–2A program to

foreign and U.S. agricultural workers, and are intended to ensure that H–2A workers do not have an adverse effect on the wages and working conditions of similarly-employed U.S. workers. *Feller v. Brock,* 802 F.2d 722, 724 (4th Cir.1986); 54 Fed.Reg. at 28,038. With only minor amendments, such as the annual recalculations of the AEWRs, the 1987 regulations remained in effect until January 16, 2009.

### 2. *The 2008 Regulations*

In February 2008, the Department published a notice of proposed rule making, stating that the agency intended to make substantial changes to the H–2A program. Temporary Agricultural Employment of H–2A Aliens; Modernizing the Labor Certification Process and Enforcement, 73 Fed.Reg. 8538 (Feb. 13, 2008). A 60–day comment period was provided, during which the Department received 11,000 comments. *See* Temporary Agricultural Employment of H–2A Aliens; Modernizing the Labor Certification Process and Enforcement, 73 Fed.Reg. 77,110, 77,111 (Dec. 18, 2008); Extension of Comment Period, 73 Fed.Reg. 16,243 (Mar. 27, 2008). A final rule was published in December 2008 and became effective on January 17, 2009 (collectively, the 2008 regulations, or the 2008 rule). *See* 73 Fed.Reg. 77,110 (Dec. 18, 2008). The 2008 regulations **\*760** changed the method by which AEWRs were calculated.[1] 73 Fed.Reg. at 77,166–77,178. Many agricultural employers relied on the terms of the 2008 regulations when entering into labor and production contracts, and in making other business commitments for the 2009 growing season. There is no dispute that the 2008 regulations were validly promulgated.

The classification of foreign seasonal workers employed on Christmas tree farms also is at issue in this appeal. Under the Department's prior practice, such workers were defined as "agricultural" employees under the H–2A program, but as "non-agricultural," "forestry" employees under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 through 219. The Department's distinction in this regard was material, because, among other things, persons "employed in agriculture" do not qualify to receive "overtime" pay under the provisions of the FLSA. 29 U.S.C. § 213(b)(12). Therefore, under the Department's prior practice, growers of Christmas trees not only were required to provide their H–2A workers with housing, meals, and transportation benefits set forth in the Immigration Reform and Control amendments to the Immigration and Nationality Act, but also were required to pay the H–2A workers for overtime hours worked.

In 2004, this Court found that the Department's position regarding the classification of H–2A workers on Christmas tree farms, adopted without rule making allowing notice and comment and without a formal adjudication, lacked any statutory foundation and was not a persuasive interpretation of the FLSA. On that basis, this Court invalidated the Department's determination. *Dep't of Labor v. N.C. Growers Ass'n,* 377 F.3d 345 (4th Cir.2004). In accordance with this precedent, the 2008 regulations defined H–2A workers on Christmas tree farms as "agricultural" employees for purposes of both the H–2A program and the FLSA. *See* 73 Fed.Reg. at 77,201–77,202.

### 3. *The 2009 Suspension*

In March 2009, just two months after the 2008 regulations took effect, Hilda Solis, the newly-appointed Secretary of Labor, issued a "notice of proposed suspension" of the 2008 regulations (the 2009 Notice). Temporary Employment of H–2A Aliens in the United States, 74 Fed.Reg. 11,408 (Mar. 17, 2009). In the 2009 Notice, the Department proposed to suspend the 2008 regulations, during a nine-month period, for further review and reconsideration "in light of issues that have arisen since the publication of the [2008 regulations]." 74 Fed.Reg. at 11,408. The 2009 Notice also stated that during the period that the 2008 regulations would be suspended, the Department proposed "to reinstate on an interim basis" the 1987 regulations to avoid a "regulatory vacuum" in the H–2A program. *Id.*

The Department articulated various reasons in the 2009 Notice to support the proposed suspension and reinstatement, including: (1) a lack of agency resources to implement the 2008 regulations efficiently; (2) delays resulting from processing increased numbers of H–2A applications under the 2008 regulations, which volume was expected to impede the Department's performance of its statutory duty "to process H–2A applications within a strict timeframe"; (3) the Department's inability "to implement the sequence of operational events" required to process applications under the 2008 regulations; (4) the Department's **\*761** inability to develop an "automated review system" for applications, requiring the Department to review them manually; (5) the 2008 regulations were a "complex new regulatory program," the implementation of which was proving disruptive and confusing to the Department and to stakeholders; (6) avoidance of disruption during "the severe economic conditions" facing the country; (7) the Department "may differ" with the policy positions of the prior

Administration, on which the 2008 regulations were based; (8) growers "require clear and consistent guidance" to "plan and staff their operations appropriately for the impending growing season"; and (9) continuing to implement the 2008 regulations would not be an efficient use of resources by stakeholders or the Department in the event that the agency soon would issue a different rule. 74 Fed.Reg. at 11,408–11,409.

For agricultural employers who submitted H–2A applications before the proposed suspension, the Department stated that it would process their applications under the 2008 regulations then in effect. 74 Fed.Reg. at 11,409–11,410; Temporary Employment of H–2A Aliens in the United States, 74 Fed.Reg. 25,972, 25,979 (May 29, 2009). The Department allowed a 10–day period to receive comments on the proposed suspension, citing the need for expediency, and stated that the Department only would consider comments concerning the suspension action itself, and not regarding the merits of either set of regulations (the content restriction):

> Please provide written comments only on whether the Department should suspend the [2008 regulations] for further review and consideration of the issues that have arisen since [their] publication. Comments concerning the substance or merits of the [2008 regulations] or the [1987 regulations] will not be considered.

74 Fed.Reg. at 11,408. During this 10–day period, 800 comments were received. 74 Fed.Reg. at 25,973.

On May 29, 2009, after two months of consideration, the Department published a "final rule; suspension of rule" that suspended the 2008 regulations, and reinstated the 1987 regulations, for a nine-month period effective June 29, 2009 (collectively, the 2009 Suspension). 74 Fed.Reg. 25,972 (May 29, 2009). In addition to the reasons set forth in the 2009 Notice, the Department also included as grounds supporting the decision the likely depressive economic effects of the 2008 regulations, and the lack of training by the Department, state agencies, and H–2A employers. 74 Fed.Reg. at 25,972–25,974. Although the Department acknowledged that many agricultural employers had planned for the 2009 growing season relying on the terms of the 2008

regulations, the Department partly discounted the possibility that the suspension would cause excessive disruption, noting that employers had operated under the 1987 regulations for several years and were familiar with their terms. 74 Fed.Reg. at 25,980.

Under the 2009 Suspension, agricultural employers hiring H–2A workers would be required to pay the higher wage rate afforded under the directives contained in the 1987 regulations. The Department also published higher AEWRs near the end of May 2009, which were scheduled to take effect one month later. [2] See Labor Certification Process for the Temporary Employment of Aliens in Agriculture and Logging: 2009 AEWRs and Other Provisions, 74 Fed.Reg. 26,016 (May 29, 2009). Additionally, due to the 2009 Suspension, H–2A workers employed on Christmas **762** tree farms again would be classified as "agricultural" employees for purposes of the H–2A program, but as "non-agricultural" employees for purposes of the FLSA, the same classification invalidated by this Court in N.C. Growers Ass'n. 74 Fed.Reg. at 25,982.

### 4. The NCGA Files Suit To Enjoin Suspension

In June 2009, the North Carolina Growers' Association, Inc., and other growers' associations, farmers, and related lobbying organizations (collectively, the NCGA), filed a complaint in the district court against the Department and other federal agencies (collectively, the federal defendants). The NCGA sought to enjoin the Department's 2009 Suspension, arguing that such action violated the APA. The district court granted the NCGA's summary judgment motion, and issued a preliminary injunction prohibiting implementation of the 2009 Suspension.

As a result of the district court's injunction, the 2008 regulations continued to govern administration of the H–2A program, and H–2A and U.S. agricultural workers were paid at lower wage rates for nine months based on the 2008 AEWRs and the 2008 regulations. [3] Thousands of agricultural workers and employers were affected by the changes in these regulations.

### 5. The 2010 Regulations

In September 2009, the Department issued another notice of proposed rule making in a second attempt to replace the 2008 regulations. [4] See Temporary Agricultural Employment of H–2A Aliens, 74 Fed.Reg. 45,906 (Sept. 4, 2009) After issuing

notice and receiving comment, the Department published new regulations governing the H–2A program (the 2010 regulations). *See* Temporary Agricultural Employment of H– 2A Aliens, 75 Fed.Reg. 6884 (Feb. 12, 2010). The 2010 regulations largely restored the H–2A program to the status quo before 2008, and reinstituted the wages and working conditions established under the 1987 regulations. The 2010 regulations are not at issue in this appeal.

### 6. *The Claims In The NCGA's Suit*

The district court held that the NCGA's claims against the federal defendants were moot, in light of the Department's promulgation of the 2010 regulations. In December 2009, the district court permitted the United Farm Workers, the Farm Labor Organizing Committee, AFL–CIO, and representative H–2A workers (collectively, the Farm Workers) to intervene as defendants in this case. The Farm Workers filed a purported class action counterclaim against the NCGA on behalf of H– 2A workers and U.S. agricultural workers who had been paid at wage rates based on the lower AEWRs in effect during the preliminary injunction.

The Farm Workers sought the difference between the higher wages that would have been paid under the reinstated 1987 regulations, and the lower wages actually received by the workers under the 2008 regulations as a result of the district court's preliminary injunction. The Farm Workers sought payment of this wage differential for the period between June 29, 2009, the date that the reinstatement of the 1987 regulations would have taken effect, and March 14, 2010, the last day **\*763** before the uncontested 2010 regulations took effect.

The parties filed cross motions for summary judgment on the issue whether the 2009 Suspension was promulgated in compliance with the APA. In its summary judgment decision, the district court held that issuance of the 2009 Suspension, that is, "the suspension of the 2008 Rule and reinstatement of the 1987 Rule[,] constituted 'rule making' " under the APA and required compliance with the APA's notice and comment procedures. The court further concluded that the 2009 Suspension violated the APA, because the Department refused to consider comments addressing the substance of either the 2008 regulations or the 1987 regulations. According to the court, these were relevant issues that the Department was required to consider before suspending the 2008 regulations and reinstating the 1987 regulations.

The district court held that the Department's failure to consider such comments rendered the Department's action imposing the 2009 Suspension arbitrary and capricious. The court granted the NCGA's motion for summary judgment, denied the Farm Workers' motion for partial summary judgment, and dismissed with prejudice the Farm Workers' counterclaims. The Farm Workers timely appealed.

### II.

We review de novo a district court's decision awarding summary judgment. Laber v. Harvey, 438 F.3d 404, 415 (4th Cir.2006) (en banc). Summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Couch v. Jabe, 679 F.3d 197, 200 (4th Cir.2012); Fed.R.Civ.P. 56(a).

The APA requires that agencies follow certain procedures before issuing a rule. 5 U.S.C. § 553. When an agency is engaged in "rule making," the agency must: (1) publish a general notice of proposed rule making in the Federal Register that includes "the terms or substance of the proposed rule or a description of the subjects and issues involved"; (2) give "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments"; and (3) "[a]fter consideration of the relevant matter presented ... incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(b), (c).

The important purposes of this notice and comment procedure cannot be overstated. The agency benefits from the experience and input of comments by the public, which help "ensure informed agency decisionmaking." Spartan Radiocasting Co. v. FCC, 619 F.2d 314, 321 (4th Cir.1980). The notice and comment procedure also is designed to encourage public participation in the administrative process. *See* Chocolate Mfrs. Ass'n v. Block, 755 F.2d 1098, 1103 (4th Cir.1985). Additionally, the process helps ensure "that the agency maintains a flexible and open-minded attitude towards its own rules," *id.* (citation omitted), because the opportunity to comment "must be a meaningful opportunity," Prometheus Radio Project v. FCC, 652 F.3d 431, 450 (3d Cir.2011) (citation omitted).

**[1]** Under the APA, a reviewing court will overturn an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, ... [or] without observance of procedure required by law." 5 U.S.C. § 706(2); *see also* *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 41, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (informal rule making procedures may be set aside if arbitrary, capricious, or not in accordance with law); *Almy v. Sebelius,* 679 F.3d 297, 302 (4th Cir.2012) (same). **\*764** As part of this review process, courts are charged with ensuring that agencies comply with the procedural requirements of the APA. *Chrysler Corp. v. Brown,* 441 U.S. 281, 313, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979).

We have recognized that courts best provide oversight of an agency decision "by scrutinizing process and by determining whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Kennecott v. EPA,* 780 F.2d 445, 449 (4th Cir.1985) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). These tasks are "the heart of the judicial inquiry," *id.* at 449, and fall within courts' "special areas of competence," *Chamber of Commerce of U.S. v. SEC,* 443 F.3d 890, 899–900 (D.C.Cir.2006) (citation omitted). Thus, while our review of an agency's final decision is narrow, "we must be strict in reviewing an agency's compliance with procedural rules." *Chocolate Mfrs. Ass'n,* 755 F.2d at 1103 (quoting *BASF Wyandotte Corp. v. Costle,* 598 F.2d 637, 641 (1st Cir.1979)).

### III.

**[2]** We first consider the issue whether the Department's suspension of the 2008 regulations or its reinstatement of the 1987 regulations qualified as "rule making" under the APA, thereby triggering the statute's notice and comment requirements. If the contested action did not qualify as "rule making," as the Farm Workers contend, the Department was not required to provide notice and comment and the district court erred in enjoining the 2009 Suspension. However, if the Department did engage in "rule making," as the NCGA contends, the agency was required to comply with regular notice and comment procedures barring an express exception afforded under the APA.

The district court assumed, without deciding, that the Department's suspension of the 2008 regulations qualified as "rule making." The court held that "[i]n addition to withdrawing a rule, [the Department] *effectively formulated a new rule by reinstating the 1987 Rule.*" (Emphasis added). The court further held that "rule making" under the APA "explicitly covers rule formulation," and, thus, reinstatement of the 1987 regulations required compliance with regular notice and comment procedures.

The Farm Workers contend that the district court's analysis was erroneous in two respects. First, the Farm Workers argue that the act of "reinstating" a rule does not fall within the definition of "rule making." According to the Farm Workers, "reinstating" means restoring something that is not new, while "formulating" means creating something new. Second, the Farm Workers contend that the Department's reinstatement of regulations that previously had been subject to notice and comment procedures did not require a "second rule making process before reinstatement." We disagree with the Farm Workers' arguments.

We begin by considering the relevant statutory language. Under the APA, a "rule" is defined as

> the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing.

**\*765** 5 U.S.C. § 551(4). The APA provides a "broad" definition of the term "rule making," *Ohio River Valley Envtl. Coal., Inc. v. Kempthorne,* 473 F.3d 94, 102 (4th Cir.2006), which comprises the "agency process for *formulating,*

AR.05995

amending, or repealing a rule." 5 U.S.C. § 551(5) (emphasis added). The parties do not dispute that the 1987 and 2008 regulations each constitute a "rule" under the APA. Instead, they dispute whether the Department's action qualified as "formulating" a rule, thereby constituting "rule making." As described above, an agency engaging in "rule making" is required under the APA to provide notice of a proposed rule and the opportunity for comment. *See* 5 U.S.C. § 553.

We are not persuaded by the Farm Workers' textual argument that, under the APA, the act of "reinstating" a rule does not qualify as "formulating" a rule. This argument is not supported by any precedent, and actually is undermined by a definition of the term "formulating" cited by the Farm Workers, which is "to reduce to or express in or as if in a formula," or to "put into a systematized statement or expression." *See* Webster's Third New International Dictionary 894 (1986). Notably absent from this definition is any requirement of originality or novelty in the substance or text of the subject matter expressed. Thus, under this definition of "formulating," it is immaterial whether the rule at issue was newly drafted or was drawn from another source.

When the 2008 regulations took effect on January 17, 2009, they superseded the 1987 regulations for all purposes relevant to this appeal. As a result, the 1987 regulations ceased to have any legal effect, and their reinstatement would have put in place a set of regulations that were new and different "formulations" from the 2008 regulations.

We also find no merit in the Farm Workers' argument that the Department's action was not "rule making," but was merely a suspension of regulations as occurred in *American Mining Congress v. EPA,* 907 F.2d 1179, 1191 (D.C.Cir.1990) *(AMC),* and *American Federation of Government Employees v. OPM,* 821 F.2d 761, 764 (D.C.Cir.1987) *(AFGE).* Those cases concerned instances in which Congress, rather than the agency itself, caused the suspension of the regulation at issue. *AMC,* 907 F.2d at 1183–84; *AFGE,* 821 F.2d at 763–64. This factor, among others, renders these cases inapposite, because the APA's focus on promoting public notice and comment is not affected when Congress steps in and compels agency action. *See Chocolate Mfrs. Ass'n,* 755 F.2d at 1103.

The Department's own conduct, however, is highly relevant and shows that the Department viewed the reinstatement of the 1987 regulations as "rule making." The Department published the 2009 Notice (entitled "Notice of proposed suspension of rule"), proposing both to suspend the 2008 regulations and to reinstate the 1987 regulations, and the Department sought and considered comments on such action. 74 Fed.Reg. at 11,408–11,409. The Department later promulgated the 2009 Suspension (entitled "Final rule; suspension of rule"), and explained the basis for its decision. 74 Fed.Reg. at 25,972–25,984. Similar attempts by an agency "to comply with APA notice-and-comment procedures suggest that the agency believed them to be applicable," and support the conclusion that "those procedures were applicable." *Manufactured Housing Inst. v. EPA,* 467 F.3d 391, 399 (4th Cir.2006); *see also Kempthorne,* 473 F.3d at 102.

We therefore conclude that, by reinstating the superseded and void 1987 regulations (albeit temporarily), the Department engaged in the "formulating" and the "repealing" aspects of "rule making" under **\*766** the APA. *See* 5 U.S.C. § 551(5). Thus, we hold that the Department's reinstatement of the 1987 regulations qualified as "rule making" under the "broad language" of that term, and that the Department was required to comply with the APA's notice and comment procedures. *See* 5 U.S.C. § 553; *Kempthorne,* 473 F.3d at 102.

## IV.

The Farm Workers contend, nonetheless, that the Department did not violate the APA, because the Department's action fell within the "good cause" exception to the APA's notice and comment requirements. These notice and comment requirements do not apply "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest" (the good cause exception). 5 U.S.C. § 553(b)(3)(B).

[3] The APA requires that the agency relying on the good cause exception "incorporate[ ] the finding [of good cause] and a brief statement of reasons therefor in the rules issued." 5 U.S.C. § 553(b)(3)(B). This requirement, that an agency

articulate its basis for dispensing with normal notice and comment, is not a procedural formality but serves the crucial purpose of ensuring that the exceptions do not "swallow the rule." *Cf. Mobil Oil Corp. v. Dep't of Energy,* 610 F.2d 796, 803 (Temp.Emer.Ct.App.1979) (conclusory statement or mere recital of good cause is not sufficient to qualify as good cause, otherwise, an exception to the notice requirement would be satisfied upon mere invocation of the rule).

**[4]**    Under the first statutory ground for good cause, notice and comment on a rule may be found to be "impracticable" when "the due and required execution of the agency functions would be unavoidably prevented by its undertaking public rule-making proceedings." *Nat'l Nutritional Foods Ass'n v. Kennedy,* 572 F.2d 377, 384–85 (2d Cir.1978) (Friendly, J.) (quoting S.Rep. No. 752, at 200 (1945)); *see also Util. Solid Waste Activities Group v. EPA,* 236 F.3d 749, 754–55 (D.C.Cir.2001) (the "impracticable" basis for good cause applies "when an agency finds that due and timely execution of its functions would be impeded by the notice and comment otherwise required" under the APA) (quoting *United States Department of Justice, Attorney General's Manual on the Administrative Procedure Act* 30–31 (1947)). Examples of such circumstances under which good cause existed include an agency determination that new rules were needed "to address threats posing a possible imminent hazard to aircraft, persons, and property within the United States," or were "of life-saving importance to mine workers in the event of a mine explosion," or were necessary to "stave off any imminent threat to the environment or safety or national security." *Mack Trucks, Inc. v. EPA,* 682 F.3d 87, 93 (D.C.Cir.2012) (citations and internal quotation marks omitted).

**[5]**    The second statutory ground, the "unnecessary" prong of the good cause exception, applies when an administrative rule is "a routine determination, insignificant in nature and impact, and inconsequential to the industry and to the public." *Id.* at 94 (quoting *Util. Solid Waste Activities Group,* 236 F.3d at 755). Congress intended that rule making be exempted as "unnecessary" when amendments are "minor or merely technical," and of little public interest. *Nat'l Nutritional Foods Ass'n,* 572 F.2d at 384–85 (quoting S.Rep. No. 752, at 200); *see also Attorney General's Manual* at 30–31 (the "unnecessary" prong of the good cause exception refers to "the issuance of a minor rule or amendment **\*767** in which the public is not particularly interested"). Lastly, the third statutory ground for good cause addresses circumstances

when notice and comment on a rule are "contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). This public interest prong of the good cause exception "connotes a situation in which the interest of the public would be defeated by any requirement of advance notice." *Util. Solid Waste Activities Group,* 236 F.3d at 755 (quoting *Attorney General's Manual* at 31). Good cause is found on this basis "only in the rare circumstances when ordinary procedures—generally presumed to serve the public interest—would in fact harm that interest." *Mack Trucks,* 682 F.3d at 95.

We construe the good cause exception narrowly. *United States v. Gould,* 568 F.3d 459, 469 (4th Cir.2009). There is a high bar to invoke the exception because "[t]he legislative history of the [APA] demonstrates that Congress intended the exceptions in § 553(b)(3)(B) to be narrow ones." *Nat'l Nutritional Foods Ass'n,* 572 F.2d at 384. Indeed, "Congress expected, and the courts have held, that the various exceptions to the notice-and-comment provisions of section 553 will be narrowly construed and only reluctantly countenanced." *N.J. Dep't of Envtl. Prot. v. EPA,* 626 F.2d 1038, 1045 (D.C.Cir.1980).

**[6]**    As a result, the circumstances justifying reliance on the good cause exception are "rare," and will be accepted only after a reviewing court "examine[s] closely" the proffered reason for an agency's deviation from public notice and comment. *Council of the S. Mountains, Inc. v. Donovan,* 653 F.2d 573, 580 (D.C.Cir.1981) (citation omitted). The good cause exception applies only in "emergency situations," or in cases when delay "could result in serious harm." *Jifry v. FAA,* 370 F.3d 1174, 1179 (D.C.Cir.2004); *see also Natural Res. Def. Council, Inc. v. Evans,* 316 F.3d 904, 911 (9th Cir.2003) ( "[N]otice and comment procedures should be waived only when delay would do real harm.") (citation and internal quotation marks omitted); *Util. Solid Waste Activities Group,* 236 F.3d at 754 (good cause exception "should be limited to emergency situations") (citation omitted).

**[7]**    We consider an explanation for good cause that the agency has advanced at the time of the rule making. *See Gould,* 568 F.3d at 469–70; *see also United States v. Garner,* 767 F.2d 104, 116–17 (5th Cir.1985) (agency action must be upheld, "if at all, on the basis articulated by the

Case 3:20-cv-07721-SI  Document 58-5  Filed 11/10/20  Page 773 of 1271
North Carolina Growers' Ass'n, Inc. v. United Farm Workers, 702 F.3d 755 (2012)
20 Wage & Hour Cas.2d (BNA) 34

agency itself" (quoting *State Farm,* 463 U.S. at 50, 103 S.Ct. 2856)). Post-hoc explanations that an agency did not have to comply with regular notice and comment procedures are viewed with skepticism. *See, e.g., United States v. Johnson,* 632 F.3d 912, 928 (5th Cir.2011); *Buschmann v. Schweiker,* 676 F.2d 352, 356–58 (9th Cir.1982). And, manifestly, we "may not supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm,* 463 U.S. at 43, 103 S.Ct. 2856.

The present record reveals that the Department did not expressly invoke the good cause exception when reinstating the 1987 regulations. *See* 5 U.S.C. § 553(b)(3)(B). Indeed, in undertaking its reinstatement of the 1987 regulations, the Department quoted the notice and comment requirements of § 553(b) and (c), but omitted the text of the good cause exception in subsection (b)(3)(B). *See* 74 Fed.Reg. at 25,978. Moreover, nowhere did the Department state that allowing for notice and substantive comment on reinstatement of the 1987 regulations would be "impracticable," "unnecessary," or "contrary to the public interest," the only grounds for good cause provided by the statute. 5 U.S.C. § 553(b)(3)(B).

**\*768  [8]**  We cannot lightly accept arguments that an agency, while failing to refer to the good cause exception, nevertheless implicitly relied on the exception. The statutory requirements in § 553(b)(3)(B) are clear, and they constitute an important part of the APA's procedural safeguards related to agency rule making. *See Buschmann,* 676 F.2d at 356–58. Although we do not impose a rigid requirement that an agency must explicitly invoke the good cause exception, the contemporaneous agency record must manifest plainly the agency's reliance on the exception in its decision to depart from the required notice and comment procedures. *See Nat'l Customs Brokers & Forwarders Ass'n of Am., Inc. v. United States,* 59 F.3d 1219, 1224 (Fed.Cir.1995) (excusing agency's failure to "expressly cite section 553(b)(3)(B)," when the agency "expressly noted that the interim regulations were not subject to the notice and public procedure requirements of 5 U.S.C. 553," and otherwise made clear its reliance on the exception (citation omitted)).

**[9]**  The Department did not plainly manifest its reliance on the good cause exception in this case. Rather, the record reflects the Department's position that the APA's notice and comment provisions were applicable, but that the agency had satisfied such obligations.

The Department actually provided notice and sought comment on the issue "whether to suspend the [2008 regulations] and reinstate on an interim basis the [1987 regulations]." 74 Fed.Reg. at 11,409. The Department stated the reasons why it "believe[d] that the 10–day comment period for this rule-making [was] reasonable." 74 Fed.Reg. at 25,978. The Department also stated that "comments on the merits of the [2008 and 1987 regulations] would be appropriate when the merits of the program are actually at issue," apparently referring to a time after the period of suspension if the Department decided to engage in further rule making. *Id.* at 25,979. The Department did not justify its content restriction on the basis of urgency or exigency, but rather on its stated judgment that the merits of either program were not actually "at issue" because the 1987 regulations were reinstated only as "a temporary measure." [5] *Id.* at 25,979.

The 2009 Notice and Suspension therefore demonstrate that the Department attempted to justify its suspension of the 2008 regulations and its reinstatement of the 1987 regulations on the basis that such action complied with the APA's regular notice and comment procedure. Accordingly, we do not accept the proposition that "good cause" was invoked by the rationale offered by the Department in support of the proposed rule making. Such a conclusion would undermine the good cause exception, by permitting a party to invoke the exception only when challenged.

We hold that the language of the 2009 Notice and Suspension fails to show that **\*769** the Department invoked the good cause exception, either explicitly or implicitly. Instead, the record plainly reflects that the Department concluded that the APA's notice and comment procedures were applicable, but that it had complied with such requirements. *Id.* at 25,978–25,979.

### V.

Having determined that the Department's reinstatement of the 1987 regulations qualified as "rule making" under the APA, and that the Department did not invoke the APA's good cause exception, we turn to consider the issue whether the agency

action complied with the notice and comment provisions of the APA. We need not address this issue at length, because the record clearly demonstrates that the Department did not satisfy its notice and comment obligations.

The district court focused on the "content restriction" in its analysis whether the Department complied with the APA's notice and comment requirements. As recited above, the content restriction provided that "[c]omments concerning the substance or merits of the [2008 regulations] or the [1987 regulations] will not be considered." 74 Fed.Reg. at 11,408. The court noted that the Department "refused to consider comments that it received as to those rules' substance and merits." According to the court, such comments were "relevant and important" to the Department's stated basis for its decision to suspend the 2008 regulations, namely, the severe economic circumstances facing the country. The court further explained that the Department's refusal to consider such comments was a failure to "give interested persons an opportunity to participate in the rule making," and a "failure to consider important aspects of the problem."

The Farm Workers, however, argue that the 10–day comment period was reasonable, and was adequate to provide notice and the opportunity for public comment. They also point to the fact that 800 comments were received, contending that this volume of response indicates that the Department provided adequate opportunity for comment. According to the Farm Workers, the Department adequately explained its action and "responded to the public's comments with reasoned explanations." Thus, the Farm Workers assert that the district court improperly attempted to craft additional procedural requirements, beyond those mandated by the APA, in concluding that the content restriction prevented the Department from receiving comments on matters "relevant and important" to the "rule making." We disagree with the Farm Workers' arguments.

The notice and comment provisions of the APA require, among other things, that the agency give "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," and that the agency shall explain its decision, "[a]fter consideration of the relevant matter presented." 5 U.S.C. § 553(b), (c). In addition, the Supreme Court has emphasized that agency action "normally" will be deemed arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem." *State Farm,* 463 U.S. at 43, 103

S.Ct. 2856. We likewise have explained that during notice and comment proceedings, the agency is obligated to identify and respond to relevant, significant issues raised during those proceedings. *S.C. ex rel. Tindal v. Block,* 717 F.2d 874, 885–86 (4th Cir.1983).

 **[10]**    By the very terms of the 2009 Notice, the Department stated that it would not receive or consider comments that were not only "relevant and important," but were integral to the proposed agency action and the conditions that such **\*770** action sought to alleviate. In the 2009 Notice, the Department stated that it proposed to suspend the 2008 regulations and reinstate the 1987 regulations, because of difficulties in operating the H–2A program under the 2008 regulations, including a lack of resources, inability to implement operations, and processing delays. 74 Fed.Reg. at 11,409. These reasons for the 2009 Suspension were significant, substantive matters, which raised questions whether the review process provided in the 2008 regulations was more or less efficient than the review process provided in the 1987 regulations.

We therefore agree with the district court that, as a result of the Department's content restriction, the Department refused to receive comments on and to consider or explain "relevant and significant issues." *See* 5 U.S.C. § 553(b), (c); *Tindal,* 717 F.2d at 885. Moreover, the content restriction was so severe in scope, by preventing any discussion of the "substance or merits" of either set of regulations, that the opportunity for comment cannot be said to have been "a meaningful opportunity." *Prometheus Radio Project,* 652 F.3d at 450.

Our conclusion that the Department did not provide a meaningful opportunity for comment further is supported by the exceedingly short duration of the comment period. Although the APA has not prescribed a minimum number of days necessary to allow for adequate comment, based on the important interests underlying these requirements, *Chocolate Mfrs. Ass'n,* 755 F.2d at 1103, the instances actually warranting a 10–day comment period will be rare. Such instances are generally characterized by the presence of exigent circumstances in which agency action was required in a mere matter of days. *See, e.g., Omnipoint Corp. v. FCC,* 78 F.3d 620, 629–30 (D.C.Cir.1996) (upholding 15–day comment period given the "urgent necessity for rapid administrative action" evidenced by "congressional mandate

[to act] without administrative or judicial delays" (citation omitted)); *Northwest Airlines, Inc. v. Goldschmidt,* 645 F.2d 1309, 1321 (8th Cir.1981) (upholding 7–day comment period and invocation of the good cause exception, when agency needed to resolve expeditiously dispute among airlines about aircraft landing "time slots," or risk widespread flight disruption).

We also observe that when the Department earlier engaged in rule making related to the 2008 regulations, the agency received about 11,000 comments over a 60–day comment period. *See* 73 Fed.Reg. at 77,111; 73 Fed.Reg. at 16,243. In this context, the 800 comments received over the 10–day comment period allowed here do not support the Farm Workers' argument that the Department provided adequate opportunity for comment.

Accordingly, because the Department did not provide a meaningful opportunity for comment, and did not solicit or receive relevant comments regarding the substance or merits of either set of regulations, we have no difficulty in concluding that the Department "ignored important aspects of the problem." *Kempthorne,* 473 F.3d at 103. Therefore, we hold that the Department's reinstatement of the 1987 regulations was arbitrary and capricious in that the Department's action did not follow procedures required by law. *See* 5 U.S.C. § 706(2); *see also Mack Trucks,* 682 F.3d at 95–96 (vacating agency interim rule when good cause exception did not apply, and APA notice and comment procedures were not followed); *Buschmann,* 676 F.2d at 358 (same); *Kollett v. Harris,* 619 F.2d 134, 144–46 (1st Cir.1980) (holding "invalid" "procedurally defective" interim regulations that were issued without notice and comment, and in the absence of good cause).

**\*771** VI.

Under the terms of the 2009 Notice and Suspension, the Department also proposed that H–2A workers employed on Christmas tree farms be defined as "agricultural" workers for purposes of the H–2A program, but defined as "non-agricultural" workers under the FLSA. 74 Fed.Reg. at 25,982. As a result of this distinction, Christmas tree workers would be entitled to various benefits under the H–2A program, and overtime pay benefits under the FLSA. The Farm Workers contend that the district court improperly applied the APA's

notice and comment requirements to this determination, which was merely interpretive in character and construed the term "agriculture," within the meaning of the FLSA. Thus, the Farm Workers contend that the 2009 Notice and Suspension lawfully returned Christmas tree farmers to a classification they had enjoyed before our *N.C. Growers Ass'n* decision. We disagree with the Farm Workers' arguments.

**[11]** **[12]** "Interpretative rules" are not subject to the APA's notice and comment requirements. 5 U.S.C. § 553(b)(A). However, interpretative rules only are entitled to deference as articulated in *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). *See S. Utah Wilderness Alliance v. Dabney,* 222 F.3d 819, 829–30 (10th Cir.2000); *Watkins v. Cantrell,* 736 F.2d 933, 943 (4th Cir.1984). In our *N.C. Growers Ass'n* decision, applying such *Skidmore* deference, we considered the Department's similar classification of Christmas tree workers under the FLSA. 377 F.3d at 353–54. And, in *N.C. Growers Ass'n,* we concluded that the Department's interpretation of the FLSA lacked any statutory support and did not have "the power to persuade." *Id.* (citing *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161).

We noted in *N.C. Growers Ass'n* that the Department's interpretation was not the product of "notice and comment rulemaking," and thus "lack[ed] the thoroughness of such rules." 377 F.3d at 354. The interpretation of the FLSA set forth in the 2009 Suspension fares no better, because the 2009 Suspension likewise was not subject to notice and comment. Accordingly, we adhere to our decision reached in *N.C. Growers Ass'n.*

VII.

In sum, we hold that the Department's reinstatement of the 1987 regulations for the H–2A program qualified as "rule making" under the APA. We further hold that the Department did not invoke the "good cause" exception of the APA and, therefore, was required to satisfy the APA's notice and comment requirements. Because the Department did not comply with those statutory requirements, the Department's action was arbitrary and capricious, in that the Department failed to follow procedures required by law. Finally, we hold that the Department's action did not validly extend the FLSA's overtime pay provisions to Christmas tree farmers, and we remain bound by our decision in *N.C. Growers Ass'n.*

For these reasons, we affirm the district court's award of summary judgment to the NCGA.

*AFFIRMED*

WILKINSON, Circuit Judge, concurring:

The different sets of regulations at issue in this case obviously reflect a political back-and-forth between employers seeking to more easily hire foreign agricultural workers through the H–2A program and those representing domestic agricultural workers, whose wages and employment prospects could be adversely affected by guest workers from abroad. The 1987 regulations, 54 Fed.Reg. 28,037; 52 Fed.Reg. 20,496, embodied one set of priorities. **\*772** The 2008 regulations, 73 Fed.Reg. 77,110, embodied another and very different pro-employer set of priorities. The 2009 Suspension, 74 Fed.Reg. 25,972, and 2010 regulations, 75 Fed.Reg. 6884, then signaled a return, in the main, to the earlier 1987 emphasis on worker wage protection.

There is nothing necessarily wrong with this sort of seesaw. No one expects agency views to be frozen in time or to be immune from electoral mandates that will predictably result in alterations and modifications of agency rules and regulations.

Changes in course, however, cannot be solely a matter of political winds and currents. The Administrative Procedure Act requires that the pivot from one administration's priorities to those of the next be accomplished with at least some fidelity to law and legal process. Otherwise, government becomes a matter of the whim and caprice of the bureaucracy, and regulated entities will have no assurance that business planning predicated on today's rules will not be arbitrarily upset tomorrow. Thus, the APA contemplates what is essentially a hybrid of politics and law—change yes, but only with a measure of deliberation and, hopefully, some fair grounding in statutory text and evidence.

I readily concur in Judge Keenan's fine opinion because it demonstrates, as did the district court's decision, that the very rudiments of process were absent here. It quite defies belief that the 2009 Notice of Proposed Suspension of Rule deemed comments on the merits of the regulations to be suspended or the regulations to be reinstated out of bounds. *See* 74 Fed.Reg. 11,408. In other words, the very agency actions that would most affect those subject to the varying sets of regulations were ruled off limits to discussion.

This all risks giving the impression that the agency had already made up its mind and that the comment period was, at best, for show and provided only in an effort to do the minimum necessary to squeak by judicial review. The confusion was further compounded when the 2009 Notice invited comments on whether the Department should suspend the 2008 regulations, but then stated that comments concerning the "substance or merits" of those very same regulations "will not be considered." *Id.* How in the world was a prospective commenter to know what could and could not be commented on, or what the agency would or would not deem worthy of its attention? The situation was further worsened by the highly abbreviated comment period allowed for what was, in reality, a complicated matter involving widespread real-world impacts on the different participants in the agricultural community and the difficulties and problems involved with the various regulations' implementation.

It is not a matter of tying an agency's hands in the face of a fresh electoral mandate. After all, the Department was able to achieve its objectives with the 2010 regulations. To have approved the process at issue in this case, however, would have been to generate a blueprint for agency unaccountability, at odds with the very idea that government at all levels is subject to the written law.

**All Citations**

702 F.3d 755, 20 Wage & Hour Cas.2d (BNA) 34

## Footnotes

1    The Department published the AEWR rates for 2008 in a separate notice. *See* Labor Certification Process for the Temporary Employment of Aliens in Agriculture and Logging: 2008 AEWRs and Other Provisions, 73 Fed.Reg. 10,288 (Feb. 26, 2008).

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2    This would result in a higher hourly wage both for H–2A workers and for U.S. agricultural workers who worked alongside the H–2A workers.

3    For example, under the 2008 AEWR, an H–2A worker in North Carolina would be paid $8.85 per hour rather than $9.34 per hour under the 2009 Suspension. *See* 74 Fed.Reg. at 26,016 (2009 Suspension AEWR); 73 Fed.Reg. at 10,289 (2008 AEWR).

4    Appeals from the district court's preliminary injunction order to this Court were later withdrawn in light of the Department's action promulgating the 2010 regulations.

5    The Department also stated that the suspension of the 2008 regulations and the reinstatement of the 1987 regulations would take effect after 30 days, pursuant to a separate notice and comment procedural rule set forth in 5 U.S.C. § 553(d). 74 Fed.Reg. at 25,978–25,979. The fact that the Department provided 30 days' notice before the effective date of the suspension and reinstatement, but did not attempt to argue that the agency had "good cause" to dispense with this procedural requirement under the separate good cause exception found in § 553(d)(3), further demonstrates that the Department did not rely upon the good cause exception in any aspect of the notice and comment proceedings. *See* 5 U.S.C. § 553(d)(3) (providing, in relevant part, that "the required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except ... as otherwise provided by the agency for good cause found and published with the rule").

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Owner-Operator Independent Drivers Ass'n, Inc. v. New
Prime, Inc., 8th Cir.(Mo.), August 10, 1999

645 F.2d 1309
United States Court of Appeals,
Eighth Circuit.

NORTHWEST AIRLINES, INC., Petitioner,

v.

Neil E. GOLDSCHMIDT, Secretary of the
Department of Transportation et al., Respondents,
and
Pan American Airways et al., Intervenors.

No. 80-2015.
|
Submitted Jan. 15, 1981.
|
Decided April 2, 1981.

**Synopsis**

Airline sought review of rule of the Department of
Transportation allocating reservations of takeoff and landing
slots at Washington National Airport. The Court of Appeals,
McMillian, Circuit Judge, held that: (1) order was reviewable;
(2) Department of Transportation had authority to issue the
rule; (3) the rule was not arbitrary and capricious; (4) good
cause was shown for limitation of the period for comment
and for making the rule effective upon promulgation; and (5)
Secretary was not required to prepare environmental impact
statement.

Petition for review denied.

West Headnotes (17)

[1]　**Aviation**　　Finality; interlocutory review

Order of the Secretary of Transportation
allocating reserve landing and takeoff slots at
an airport, although only a temporary allocation
of slots, was final agency action as it denied in
part the rights of several air carriers to operate
at the airport and granted such rights to other
air carriers; order was thus reviewable. Federal
Aviation Act of 1958, § 1006(a) as amended 49
U.S.C.A. § 1486(a).

1 Cases that cite this headnote

[2]　**Aviation**　　Preservation of error; waiver and
estoppel; record

Record which contained notice and request for
comments published in the federal register, some
of the comments received by the Secretary of
Transportation, and various affidavits and the
promulgated rule, and the department's published
explanation and supplementary materials was
sufficient for reviewing claim of lack of statutory
authority of the Secretary for the rule, of arbitrary
and capricious agency action, and of procedural
inadequacy.

4 Cases that cite this headnote

[3]　**Aviation**　　Operation and Management

**Aviation**　　Exclusive, concurrent, and
primary jurisdiction

Rule of Secretary of Transportation allocating
reserved slots for takeoffs and landings at
an airport was not an economic regulation
within the exclusive jurisdiction of the Civil
Aeronautics Board but rather was a regulation
of the efficient utilization of the navigable air
space. Department of Transportation Act, § 3(e)
(1), 49 U.S.C.A. § 1652(e)(1); Federal Aviation
Act of 1958, § 307(a, c) as amended 49 U.S.C.A.
§ 1348(a, c).

[4]　**Administrative Law and
Procedure**　　Relationship of agency with
statute in general

Construction of a statute by an agency charged
with its administration is entitled to substantial
deference by reviewing courts.

3 Cases that cite this headnote

[5]　**Aviation**　　Particular Subjects of Control and
Regulation

Secretary of Transportation has responsibility
and authority not only for aviation safety but also
for airspace management. Federal Aviation Act

of 1958, § 307(a, c) as amended 49 U.S.C.A. § 1348(a, c).

**[6]**    **Aviation** 👈 Operation and use of facilities in general

Authority to issue a rule allocating the reservation of slots for takeoffs and landing at a particular airport was not a matter of aviation safety transferred to the Federal Aviation Administration under the Department of Transportation Act and thus was not a matter reserved exclusively to the FAA, so that the Secretary of Transportation had authority to issue such an order. Department of Transportation Act, §§ 3(e)(4), 6(c)(1), 49 U.S.C.A. §§ 1652(e)(4), 1655(c)(1).

1 Cases that cite this headnote

**[7]**    **Aviation** 👈 Aviation facilities and services; airports

**Aviation** 👈 Aviation facilities and services; airports

In promulgating rule allocating reservations for takeoff and landing slots at airport, Secretary of Transportation engaged in informal rule making subject to the procedural requirements of the Administrative Procedure Act and subject to judicial review; determination would be affirmed unless found to be arbitrary, capricious, or an abuse of discretion or otherwise not in accordance with law. 5 U.S.C.A. §§ 553, 706(2)(A–D).

7 Cases that cite this headnote

**[8]**    **Aviation** 👈 Operation and use of facilities in general

Evidence that takeoff and landing reservations for air carrier operations at airport had been limited primarily to alleviate congestion and delays in the air and on the ground, that the demands for access for air carriers consistently exceeded the reserved slots per hour, and that the airlines had become unable to agree as to the allocation of reserved takeoff and landing slots

demonstrated the need for rule making by the Secretary of Transportation.

**[9]**    **Aviation** 👈 Aviation facilities and services; airports

Evidence supported Secretary of Transportation's allocation of reserved takeoff and landing slots for air carriers at National Airport in Washington in a manner which required five carriers to give up one or more slots in specific hours during the day, required 12 carriers to slide one slot to the latest hour of operations, and allocated the yielded slots among new and other carriers.

**[10]**    **Aviation** 👈 Operation and use of facilities in general

Fact that air carriers did not reach a final agreement for allocation of takeoff and landing slots at one airport did not preclude the Secretary of Transportation from using that proposal as a guide in promulgating the rule allocating those slots.

**[11]**    **Aviation** 👈 Operation and use of facilities in general

In allocating reserved takeoff and landing slots for air carriers at Washington National Airport, Secretary of Transportation did not improperly favor the New York-Washington market even though one carrier which was granted a number of slots currently provided service to Washington National only from New York where the allocation of slots was not tied to carrier service in any particular market and carriers could use the allocated slots at the airport to provide service between Washington and any other city, subject to CAB approval.

**[12]**    **Aviation** 👈 Aviation facilities and services; airports

Standard of review of Secretary of Transportation's rule allocating reserve takeoff

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 780 of 1271

Northwest Airlines, Inc. v. Goldschmidt, 645 F.2d 1309 (1981)
11 Envtl. L. Rep. 20,845

and landing slots at one airport was one of minimal rationality.

**[13]    Aviation**   Aviation facilities and services; airports

Secretary of Transportation, in asking for comments on proposed allocation of reserved takeoff and landing slot reservations at one airport was not required to publish the terms or substance of one allocation which was allegedly under active consideration; notice which requested public comment on the mechanism which should be used for the temporary allocation of reservations was sufficiently descriptive of the subject in issues involved. 5 U.S.C.A. § 553(b).

2 Cases that cite this headnote

**[14]    Aviation**   Aviation facilities and services; airports

Evidence that Department of Transportation first learned on October 14 that airlines would be unable to agree on allocation of reserved takeoff and landing slot at one airport after November 30, that lead time was required to enable carriers to make necessary schedule adjustments and notify the travelling public, and that the closing date for the submission of "stop press pages" for the Official Airline Guide of December was November 6 presented good cause to justify the Secretary's decision to reduce the normal time period for comments and to declare its regulation allocating those time slots effective upon issuance. 5 U.S.C.A. § 553(d)(3).

8 Cases that cite this headnote

**[15]    Aviation**   Operation and use of facilities in general

**Aviation**   Aviation facilities and services; airports

Department of Transportation rule allocating reserved takeoff and landing slots at airport did not constitute a form of licensing and thus did not require an adjudicatory hearing. 5 U.S.C.A. § 551(4).

**[16]    Environmental Law**   Aviation

Secretary of Transportation was not required to prepare an environmental impact statement when promulgating a rule allocating reserved takeoff and landing slots at airport, even though the rule required an increase in the number of reserved carrier operations from 22 to 37 during the latest hour of operations at the airport, 10 p. m. National Environmental Policy Act of 1969, § 102, 42 U.S.C.A. § 4332.

**[17]    Aviation**   Operation and use of facilities in general

Secretary of Transportation did not err in failing to prepare a regulatory analysis of economic impact when promulgating a rule allocating reserved takeoff and landing slots at airport where the Secretary did prepare a regulatory valuation after issuing the rule in which the economic impact of the rule was found to be minimal.

**Attorneys and Law Firms**

**\*1311** Ronald D. Eastman (argued), Jeffrey D. Komarow, Barry S. Spector, Cadwalader, Wickersham & Taft, Washington, D. C., for petitioner Northwest Airlines, Inc. and intervenors.

Gerry Levenberg, P.C. (argued), and Jeffrey S. Christie, Van Ness, Feldman & Sutcliffe, A Professional Corp., Washington, D. C., for New York Air.

Thomas G. Allison, Gen. Counsel, U. S. Dept. of Transportation (argued), Kenneth Weinstein, Trial Atty., U. S. Dept. of Transportation, Washington, D. C., for respondents.

Before BRIGHT, McMILLIAN and ARNOLD, Circuit Judges.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## Opinion

McMILLIAN, Circuit Judge.

Northwest Airlines, Inc. (Northwest) brought this action for judicial review of Special Federal Aviation Regulation 43 (SFAR 43), 45 Fed.Reg. 72637 (1980) (to be codified at 14 C.F.R. Part 93), issued on October 29, 1980, by the Secretary of the Department of Transportation (the Secretary) under s 307(a), (c) of the Federal Aviation Act of 1958 (the FA Act), as amended, 49 U.S.C. s 1348(a), (c). SFAR 43 temporarily allocates Instrument Flight Rules (IFR) reservations for takeoffs and landings ("slots") at Washington, D. C.'s National Airport (National). Other carriers and interested groups have appeared as intervenors. [1] The Civil Aeronautics Board (CAB) has filed an amicus brief in support of the Secretary.

On November 21, 1980, following oral argument, this court denied Northwest's motion for a stay of SFAR 43 pending review. **\*1312** An expedited briefing schedule was established and this appeal followed.

In the late 1960's several of the nation's airports experienced severe congestion, resulting in numerous and substantial delays. In 1968 the Federal Aviation Administration (FAA) issued the High Density Traffic Airports Rule (HDAR), 14 C.F.R. s 93.121-.133 (1980) (effective April 27, 1969), in order to reduce delays in takeoffs and landings at five crowded airports (Kennedy International Airport, LaGuardia Airport, Newark Airport, O'Hare Airport, and National) and thus promote efficient utilization of the navigable airspace. [2] HDAR limits the number of IFR operations (takeoffs and landings, or "slots") [3] that can be reserved to 60 per hour at National, for 16 hours per day, from 0700 to 2200 hours (7 a. m. to 10 p. m.), and allocates the slots among three different classes of airport users. Commercial air carriers have 40 slots per hour, air taxis have 8 slots per hour, and general or private aviation has 12 slots per hour. 14 C.F.R. s 93.123(a).

HDAR does not limit the total number of operations at high density airports. Operations under Visual Flight Rules (VFR) [4] are not restricted by HDAR, as long as the operation can be accommodated without significant additional delay to reserved operations. Id. s 93.129(b). Nor are extra sections of scheduled air carrier flights restricted. Id. s 93.123(b)(4). In addition, IFR operations beyond those allocated by reservation are permitted if the operations can be accommodated without significant additional delay to reserved operations. Id. s 93.129(a).

Although the need for slot limitations has changed at several of the high density airports since 1968, see note 2 supra, conditions evidently have not improved at National. Air carrier demands for increased access at National have continued (National is the most conveniently located of the three airports serving the Washington, D. C. metropolitan area; Dulles International Airport and Baltimore/Washington International Airport are farther away from downtown Washington and not on the new Washington subway line). However, the runways, ground facilities and passenger terminals at National are outdated and overcrowded. Severe congestion in the air and on the ground and the prospect of delay remain serious problems. In addition, the communities surrounding National have actively opposed increased use of National, primarily because of noise pollution.

Until October, 1980, allocation of the 40 slots per hour among the air carriers serving National had been achieved by voluntary agreement through airline scheduling committees (ASC) made up of all air carriers operating at the airport, under a grant of antitrust immunity from the CAB. The National ASC meets approximately every six months and reports the terms of the slot allocation agreements to the Airport Reservation Office of FAA's Air Traffic Service.

In October, 1980, the National ASC was unable to reach any agreement on slot allocations for the period after November 30, 1980, largely because a new air carrier, New York Air, announced that it wanted to serve the New York City-Washington, D. C. corridor and requested 20 slots at peak operation hours (early morning and late afternoon), beginning December 1, 1980. [5] In the **\*1313** past new entrants had requested fewer slots and had been accommodated by minor adjustments by the other air carriers. New York Air, however, refused to reduce its demand for 20 slots at peak hours, apparently because ten round trip flights per day during commuter hours was the minimum service necessary to compete effectively with Eastern Air Lines' New York-Washington shuttle.

On October 14, 1980, the National ASC notified the FAA by letter that it was unable to agree on slot allocations after November 30, 1980. On October 16, the Secretary issued a Notice and Request for Comments, Notice 80-14, 45 Fed.Reg. 69403 (published on October 20, 1980). The notice requested public comments on the mechanism that should

be used for the temporary allocation of IFR reservations or slots available for operations of air carriers at National for the period from December 1, 1980, to April 26, 1981. The notice stated that comments would be received until 5:30 p. m., October 23, 1980. The notice did not describe any specific allocation mechanism. Thirty-seven comments were submitted. On October 29, 1980, the Secretary issued SFAR 43, effective immediately. [6]

SFAR 43 was ostensibly based upon the air carriers' agreement for slot allocations for the period from October 26, 1980, to November 30 and adjusted according to the allocation which had received the most support at the October meeting of the National ASC. [7] Under SFAR 43 several air carriers received fewer slots than they had in November and the twelve carriers with the most slots under the November schedule were required to slide one slot to the less desirable 2200 hour (10 p. m.). The new entrants and several other carriers received slot allocations from the yielded slots. [8] SFAR 43 specifically provided that any adjustments and exchanges could be made pursuant to any future ASC agreement, subject to CAB authorization. SFAR 43 allocated eighteen slots to New York Air.

In support of its claim that SFAR 43 is unlawful and should be set aside, Northwest argues that (1) the Secretary has no statutory authority to allocate slots among air carriers, (2) SFAR 43 is not a product of "reasoned decision-making" and is "arbitrary and capricious," and (3) the Secretary did not comply with certain procedural requirements before issuing SFAR 43. For the reasons discussed below, we disagree with the arguments advanced by Northwest and deny the petition for review.

I. Jurisdiction

Neither Northwest nor the Secretary has discussed in detail the question of our jurisdiction to review SFAR 43. The Secretary refers to SFAR 43 as a final order under the FA Act. Northwest states that this court has jurisdiction to review a final order under the FA Act under s 1006(a) of the FA Act, 49 U.S.C. s 1486(a). We agree.

Recent case law, particularly from the Court of Appeals for the District of Columbia Circuit, has construed the word "order" "for purposes of special review statutes expansively, to permit direct review (in the courts of appeals) of regulations promulgated through informal notice-and-comment rule-making." Sima Products Corp. v. McLucas, 612 F.2d 309,

313 (7th Cir.) (citations omitted), cert. denied, 446 U.S. 908, 100 S.Ct. 1834, 64 L.Ed.2d 260 (1980); accord, *1314 City of Rochester v. Bond, 195 U.S.App.D.C. 345, 603 F.2d 927, 932-35 & n.26 (1979); Investment Company Institute v. Board of Governors, 179 U.S.App.D.C. 311, 551 F.2d 1270 (1977); Deutsche Lufthansa Aktiengesellschaft v. CAB, 156 U.S.App.D.C. 191, 479 F.2d 912 (1973). See generally Currie & Goodman, Judicial Review of Federal Administrative Action: Quest for the Optimum Forum, 75 Colum.L.Rev. 1 (1975); Verkuil, Judicial Review of Informal Rulemaking, 60 Va.L.Rev. 185 (1974). These cases construe "order" "to mean any agency action capable of review on the basis of the administrative record." Sima Products Corp. v. McLucas, supra, 612 F.2d at 313.

[1] [2] We think that the administrative record in the present case is a sufficient basis for judicial review of SFAR 43. [9] The record contains the notice and request for comments published in the Federal Register, some of the comments received by the Secretary, various affidavits, the promulgated rule and its published explanation, and supplementary materials. This record is sufficient for reviewing Northwest's claims of lack of statutory authority, arbitrary and capricious agency action, and procedural inadequacy. See id. at 314-15; Rodway v. United States Department of Agriculture, 168 U.S.App.D.C. 387, 514 F.2d 809, 816 (1975).

II. Statutory Authority

[3] Northwest challenges the statutory authority of the Secretary to issue SFAR 43 on a variety of grounds. First, Northwest argues that SFAR 43 is an economic regulation and thus a matter within the exclusive jurisdiction of the CAB. We disagree. Under the bifurcated regulatory scheme designed by Congress to govern civil air transportation, the FA Act divided regulatory responsibility between the CAB and the FAA. The FAA, unlike the CAB, is now a constituent part of the Department of Transportation, see s 3(e)(1) of the Department of Transportation Act (DOT Act), 49 U.S.C. s 1652(e)(1). "FAA/DOT bears the primary responsibility for safety regulation while the CAB administers and enforces the economic provisions of the (FA) Act." Delta Air Lines, Inc. v. CAB, 177 U.S.App.D.C. 100, 543 F.2d 247, 259 (1976). All regulation, including safety regulation, ultimately has some economic impact. We agree with the Secretary, however, that the fact that SFAR 43 may have an incidental economic impact upon the air carriers operating at National

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 783 of 1271

Northwest Airlines, Inc. v. Goldschmidt, 645 F.2d 1309 (1981)
11 Envtl. L. Rep. 20,845

(by limiting particular air carriers' operations) does not transform SFAR 43 into an economic regulation. Rather, we agree with the Secretary that SFAR 43 is neither an economic regulation nor a safety regulation per se, but instead a regulation of the efficient utilization of the navigable airspace of the United States.

The Secretary cites s 307(a), (c) of the FA Act, 49 U.S.C. s 1348(a), (c), as the statutory authority for the issuance of SFAR 43. [10] Section 307(a) of the FA Act, 49 U.S.C. s 1348(a), provides:

> **\*1315** The Secretary of Transportation is authorized and directed to develop plans for and formulate policy with respect to the use of the navigable airspace; and assign by rule, regulation, or order the use of the navigable airspace under such terms, conditions, and limitations as he may deem necessary in order to insure the safety of aircraft and the efficient utilization of such airspace. He may modify or revoke such assignment when required in the public interest.

Section 307(c) of the FA Act, 49 U.S.C. s 1348(c), provides:

> The Secretary of Transportation is further authorized and directed to prescribe air traffic rules and regulations governing the flight of aircraft, for the navigation, protection, and identification of aircraft, for the protection of persons and property on the ground, and for the efficient utilization of the navigable airspace, including rules as to safe altitudes of flight and rules for the prevention of collision between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects.

The Secretary argues that the statutory authority to insure the efficient utilization of the navigable airspace clearly encompasses the authority to allocate slots at National.

[4]   We found little case law [11] directly on point; however, our review is guided by our recognition that the construction of a statute by an agency charged with its administration is entitled to substantial deference by reviewing courts. E. g., Frontier Airlines, Inc. v. CAB, 621 F.2d 369, 372 (10th Cir. 1980), citing United States v. Rutherford, 442 U.S. 544, 553, 99 S.Ct. 2470, 2476, 61 L.Ed.2d 68 (1979). We find no compelling indications that the Secretary's interpretation of the statute is wrong. E. g., United States Steel Corp. v. EPA, 605 F.2d 283, 293 (7th Cir. 1979) (citing Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969)), cert. denied, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980). The plain language of the statute grants the Secretary broad authority to "assign by rule, regulation, or order the use of the navigable airspace under such terms, conditions, and limitations as he may deem necessary in order to insure the efficient utilization of such airspace," s 307(a) of the FA Act, 49 U.S.C. s 1348(a), and to "prescribe air traffic rules and regulations governing the flight of aircraft, for the efficient utilization of the navigable airspace," s 307(c) of the FA Act, 49 U.S.C. s 1348(c). See also H.R.Rep.No.2360, 85th Cong., 2d Sess. (hereinafter House Report), reprinted in 2 (1958) U.S.Code Cong. & Ad.News 3741, 3741-42, and discussion infra.

The term "navigable airspace," as defined in s 101 of the FA Act, 49 U.S.C. s 1301(29), means "airspace above the minimum altitudes of flight prescribed by regulations issued under this chapter, and shall include airspace needed to insure safety in take-off and landing of aircraft." As described in a slightly different context, the scope of federal control of the navigable airspace is

> intensive and exclusive. Planes do not wander about in the sky like vagrant clouds. They move only by federal permission, subject to federal inspection in the hands of federally certificated personnel and under an intricate system of federal commands. The moment a ship taxis onto a runway it is caught up in an elaborate and detailed system of controls.

Northwest Airlines, Inc. v. Minnesota, 322 U.S. 292, 303, 64 S.Ct. 950, 956, 88 L.Ed. 1283 (1944) (Jackson, J.,

concurring). Although the issue in the present case is not one of state versus federal control of the navigable airspace, the above description does illustrate that federal control of the navigable airspace is exclusive and comprehensive.

**\*1316** **[5]** Northwest argues, however, that nothing in s 307(a), (c) of the FA Act, 49 U.S.C. s 1348(a), (c), authorizes the Secretary to regulate the efficient use of the navigable airspace other than in relation to safety matters. Because the Secretary does not justify the issuance of SFAR 43 as a safety regulation, Northwest argues that the Secretary does not have the authority to issue a non-safety airspace regulation. We do not read the statute so narrowly and agree with the Secretary that, under the FA Act, the Secretary has responsibility and authority not only for aviation safety but also for airspace management. This responsibility and authority for the efficient utilization of the navigable airspace is distinct and in addition to that for aviation safety. Both s 307(a) and (c) refer to the safety of aircraft and the efficient utilization of the navigable airspace. Section 103(c) of the FA Act, 49 U.S.C. s 1303(c), directs the Secretary to consider, as in the public interest, "(t)he control of the use of the navigable airspace of the United States."

In addition, the legislative history of the FA Act supports the Secretary's claim to a separate responsibility and authority, distinct from that for aviation safety, to regulate the efficient use of the navigable airspace. The House Report describes the responsibility and authority of the Administrator of the newly created Federal Aviation Agency as including both "the advancement and promotion of civil aeronautics generally, including the promulgation and enforcement of safety regulations," and "the management of the national airspace." House Report, supra, 2 (1958) U.S.Code Cong. & Ad.News at 3741. The legislative history further expressly describes the "plenary authority" of the Administrator to include both the authority to "allocate airspace and control its use by both civil and military aircraft" and to "make and enforce safety regulations governing the design and operation of civil aircraft." Id. at 3741-42. Thus, we conclude that the Secretary's authority to regulate the efficient utilization of the navigable airspace is not restricted to safety considerations only.

**[6]** Northwest further argues that, to the extent the Secretary has authority to regulate the efficient utilization of the navigable airspace, such authority was transferred from the Secretary to the Administrator of the FAA under the proviso contained in s 6(c)(1) of the DOT Act, 49 U.S.C. s 1655(c)

(1), and cannot be transferred elsewhere in the Department of Transportation, s 3(e)(4) of the DOT Act, 49 U.S.C. s 1652(e)(4). Northwest thus argues that only the FAA has authority to regulate the use of the navigable airspace and to issue SFAR 43. We disagree. Section 6(c)(1) of the DOT Act, 49 U.S.C. s 1655(c)(1), provides in part:

> There are hereby transferred to and vested in the Secretary all functions, powers, and duties of the Federal Aviation Agency, and of the Administrator and other officers and offices thereof, including the development and construction of a civil supersonic aircraft: Provided, however, That there are hereby transferred to the Federal Aviation Administrator, and it shall be his duty to exercise the functions, powers, and duties of the Secretary pertaining to aviation safety (other than those relating to the transportation, packaging, marking, or description of hazardous materials) as set forth in sections 306, 307, 308, 309, 312, 313, 314, 1101, 1105 and 1111 (49 U.S.C. 1347, 1348, 1349, 1350, 1353, 1354, 1355, 1501, 1505, and 1511), and titles VI, VII, IX, and XII (49 U.S.C. 1421 et seq., 1441 et seq., 1471 et seq., and 1521 et seq.) of the Federal Aviation Act of 1958, as amended.

As noted by the Secretary, the proviso in this section transfers from the Secretary to the Administrator of the FAA "the functions, powers, and duties of the Secretary (earlier transferred to the Secretary from the Federal Aviation Agency) pertaining to aviation safety." Id. (emphasis added). Because all the parties agree that SFAR 43 is not a safety regulation, it would seem that SFAR 43 is not a matter of aviation safety transferred to the FAA under the **\*1317** proviso of s 6(c)(1), 49 U.S.C. s 1655(c)(1), and thus is not a matter reserved exclusively to the FAA.

We note that the Secretary has delegated by regulation to the Administrator of the FAA the authority to carry out the powers and duties transferred to the Secretary by s 6(c)(1)

of the DOT Act, 49 U.S.C. s 1655(c)(1). 49 C.F.R. s 1.47(a) (1980). This subdelegation of authority by the Secretary to the Administrator of the FAA, however, does not deprive the Secretary of the authority, vested in the Secretary by statute, to act. Cf. Campbell v. Doe, 54 U.S. (13 How.) 244, 249, 14 L.Ed. 130 (1852). [12]

### III. On the Merits

Northwest also attacks SFAR 43 on the merits, arguing that SFAR 43 is arbitrary, capricious and unreasonable, and thus not a product of "reasoned decision-making," Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841, 851 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). Northwest specifically argues that the Secretary erroneously relied upon the October 1980 meeting of the National ASC as a basis for the slot allocation in SFAR 43; that SFAR 43 capriciously favors a particular market, the New York-Washington market, and a particular carrier, New York Air, at the expense of other markets and other carriers; that the Secretary arbitrarily refused to consider temporarily suspending the HDAR operations ceiling limitation at National; and that the Secretary failed to consider temporarily reducing the slot allocations of general or private aviation as an alternative to SFAR 43.

 **[7]** In promulgating SFAR 43, the Secretary engaged in informal rulemaking, subject to the procedural requirements of s 4 of the Administrative Procedure Act (APA), 5 U.S.C. s 553, and to judicial review under s 10 of the APA, 5 U.S.C. s 706(2)(A)-(D). See ss 307(d), 1006(a) of the FA Act, 49 U.S.C. ss 1348(d), 1486(a). "Our role as a reviewing court is a limited one." National Small Shipments Traffic Conference, Inc. v. CAB, 199 U.S.App.D.C. 335, 618 F.2d 819, 826 (1980). We must affirm the challenged regulations unless we find the Secretary's action "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." s 10(e)(2)(A) of the APA, 5 U.S.C. s 706(2)(A).

> This standard of review is a highly deferential one. It presumes agency action to be valid. Moreover, it forbids the court's substituting its judgment for that of the agency and requires affirmance if a rational basis exists for the agency's decision.

> That is not to say, however, that we must rubber-stamp the agency decision as correct. To do so would render the appellate process a superfluous (although time-consuming)

ritual. Rather, the reviewing court must assure itself that the agency decision was "based on a consideration of the relevant factors" (and that the agency) "has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent."

 Ethyl Corp. v. EPA, 176 U.S.App.D.C. 373, 541 F.2d 1, 33-36 (banc) (citations and footnotes omitted), cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).

 **[8]** First, we must determine whether the Secretary has "made out a case for rulemaking at all (because) a 'regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist.' " Home Box Office, Inc. v. FCC, 185 U.S.App.D.C. 142, 567 F.2d 9, 36, cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977), citing **\*1318** City of Chicago v. FPC, 147 U.S.App.D.C. 312, 458 F.2d 731, 742 (1971), cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1971). We are satisfied that there is evidence in the record which supports the need for rulemaking. As discussed above, in 1968 the FAA limited IFR reservations for air carrier operations at National to 40 per hour under the HDAR, primarily to alleviate congestion and delays, in the air and on the ground, caused by the increasing commercial demands on the outdated and limited facilities at that airport. Demands for access by air carriers consistently exceeded the 40 operations or slots per hour limitation and, for more than a decade, the competing demands of the air carriers were resolved voluntarily by the National ASC. In October, 1980, the National ASC was unable to reach an agreement as to slot allocations for the period after November 30, 1980. Thus faced with the prospect of an emergency (the Secretary refers to the prospect of "chaos in the skies"), the Secretary decided an alternate method for allocating the 40 slots per hour among the air carriers would have to be developed and implemented. SFAR 43 was the ultimate result.

 **[9]** Under the standard of review outlined above, we must affirm the Secretary's action unless it is "arbitrary or capricious." We have carefully reviewed the record and find that the Secretary's action is supported by a rational basis. See Ethyl Corp. v. EPA, supra, 541 F.2d at 37. In other words, we find that SFAR 43 is rational, based upon a consideration of all the relevant factors, and adequately explained. See Citizens to Protect Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823,

28 L.Ed.2d 136 (1971). At the heart of SFAR 43 is an attempt to administratively accommodate the demands of the air carriers for increased access to National with the physical limitations imposed by the condition and age of the airport's facilities, the surrounding communities' desire for reduced aircraft noise, and the need for "efficient utilization of the navigable airspace." The Secretary also sought to minimize disruption of existing airline schedules and service patterns, to provide adequate advance notice to the traveling public, and to consider the procompetitive policy of the Airline Deregulation Act of 1978, Pub.L.No. 95-504, 92 Stat. 1705 (amending the FA Act, 49 U.S.C. s 1301 et seq.). The Secretary developed SFAR 43 by using the November, 1980, slot allocation as a basis and then adjusting that allocation by consideration of the October, 1980, meeting of the National ASC. In essence SFAR 43 requires five carriers to give up one or more slots in specific hours during the day, requires twelve carriers to "slide" one slot to the latest hour of operations (2200 hours or 10 p. m.), and then reserves and allocates the yielded slots among the new entrants and several other carriers.

[10]    With respect to the specific challenges made by Northwest, we note first that the Secretary recognized that the carriers in fact reached no agreement during the October, 1980, meeting of the National ASC. In an effort to disrupt airline schedules as little as possible, the Secretary viewed the October, 1980, meeting as an approximation of the agreement that the air carriers came closest to adopting and used it to adjust the November, 1980, allocation. The fact that the air carriers did not reach a final agreement (which failure precipitated the need for rulemaking in the first place) does not mean that the Secretary could not use the proposal the carriers came closest to adopting as a basis for rulemaking.

[11]    Nor do we agree that the Secretary improperly favored the New York-Washington market and New York Air. As noted by the Secretary, SFAR 43, including the eighteen slots allocated to New York Air, was based in large part upon the October, 1980, meeting of the National ASC, during which proceeding several votes indicated that many of the carriers supported such an allocation. The record shows that the Secretary did not consider the need for increased service in the New York-Washington market or any particular market before issuing SFAR 43, other than to note that additional reduced fare service would **1319 increase competition and thus be consistent with the general procompetitive policy of the Airline Deregulation Act of 1978. We also note that the allocation of slots under SFAR 43 is not tied to a carrier's

service in any particular market; carriers may use allocated slots at National to provide service between Washington, D. C. and other cities, subject to CAB approval.

Nor can we agree that the Secretary failed to consider all relevant factors or to consider alternatives, such as temporarily suspending the HDAR carrier limit of 40 IFR reservations per hour or reducing the HDAR general or private aviation limit of 12 IFR reservations per hour. The Secretary addressed several proposed alternatives and explained why modification of HDAR was not an acceptable alternative. Briefly, the Secretary noted that the congestion at National which prompted the implementation of HDAR has in no way abated and that, in view of the proposed reduction of carrier slots from 40 to 36 per hour, as of April 26, 1981, under the Metropolitan Washington Airports Policy, any modification of the HDAR to increase carrier operations, even temporarily, would be inconsistent with such policy.

[12]    Finally, we note that our standard of review of the Secretary's action is one of minimal rationality. Our task has been to carefully examine the record to ensure, as a matter of administrative law, that the Secretary's action was rational and based on consideration of the relevant factors. We do not pass judgment upon the wisdom of the Secretary's action nor are we empowered to substitute our decision for that of the Secretary. Frankly, we believe the carriers' substantive objections to SFAR 43 could be fairly summarized as dissatisfaction with the Secretary's decision, which is, of course, not a basis for invalidation of administrative action.

See Citizens to Protect Overton Park, Inc. v. Volpe, supra, 401 U.S. at 416, 91 S.Ct. at 823; Ethyl Corp. v. EPA, supra, 541 F.2d at 36-37 & nn. 76-78.

IV. Procedural Adequacy

Northwest next argues that the Secretary violated the procedural requirements of the APA, 5 U.S.C. s 553,[13] by providing inadequate notice of the rulemaking proceedings, by allowing inadequate time for comment, and by making the final rule effective on its date of issuance.

Northwest first alleges that the Secretary was actively considering an allocation proposal like SFAR 43 at the time the notice was issued and therefore should have incorporated the proposal or proposals then under consideration in the notice and request for comments. We disagree.

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 787 of 1271

Northwest Airlines, Inc. v. Goldschmidt, 645 F.2d 1309 (1981)
11 Envtl. L. Rep. 20,845

Section 4 (of the APA) requires that prior to final promulgation of a rule the agency must make public "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. s 553(b) (3). The courts have added useful flesh to this statutory language. The notice should be sufficiently descriptive of the "subjects and issues involved" so that interested parties may offer informed criticism and comments. But the notice need not contain "every precise proposal which (the agency) may ultimately adopt as a rule."

Ethyl Corp. v. EPA, supra, 541 F.2d at 48 (citations omitted), citing California Citizens Band Ass'n v. United States, 375 F.2d 43, 48 (9th Cir.), cert. denied, 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967).

**[13]** We do not know whether the Secretary was in fact actively considering a particular method of slot allocation at the time the notice and request for comments was issued. We note that publication of the terms or substance of a proposed rule in **\*1320** fact under consideration by the agency would certainly be more consistent with the spirit of the APA. However, the notice requirement may be satisfied either by publication of "the terms or substance of the proposed rule or a description of the subjects and issues involved." Here, the notice requested public comment on the mechanism that should be used for the temporary allocation of IFR reservations or slots available for air carrier operations under the HDAR at National. We find this brief statement was "sufficiently descriptive of the 'subjects and issues involved' so that interested parties (could) offer informed criticism and comments." Ethyl Corp. v. EPA, supra, 541 F.2d at 48. We note that the Secretary received thirty-seven comments from air carriers and other interested parties in just seven days.

Northwest also argues that the seven-day period allowed for comments was totally inadequate. The Secretary defends this unusually short comment period on the basis of the "good cause" exception of 5 U.S.C. s 553(b)(B). Section 553(b)(B) provides that notice and comment may be excused "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." [14] In addition, Northwest challenges the Secretary's decision to make SFAR 43 effective upon the date of issuance.

The Secretary justifies this action under the "good cause" exception of 5 U.S.C. s 553(d)(3). Section 553(d) (3) provides that "(t)he required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except as otherwise provided by the agency for good cause found and published with the rule."

**[14]** Although some dispute exists over whether the "good cause" exception of s 553(d)(3) encompasses more situations than the "good cause" exception of s 553(b) (B), [15] we need not determine in the present case whether the two "good cause" exceptions carry the same meaning. [16] In **\*1321** our view the urgent necessity for rapid administrative action under the circumstances of the present case would justify the Secretary's finding of "good cause" under either exception. On October 14, 1980, the FAA first learned that the National ASC, for the first time in its history, would be unable to agree on slot allocations after November 30, 1980. Within two days, on October 16, 1980, the Secretary issued Notice 80-14, 45 Fed.Reg. 69403 (published October 20, 1980), requesting comments until October 23, 1980. The November slot allocation was going to expire on November 30, 1980. Some lead time was required to enable the carriers to make any necessary schedule adjustments, to notify the traveling public, and to rearrange ticket reservations taken under unapproved schedules already submitted by the carriers to the Official Airline Guide (OAG). The closing date for the submission of "Stop Press" pages for the December 1, 1980, issue of the OAG was November 6, 1980. The closing date for the submission of schedules to the December 15, 1980, issue of the OAG was November 4, 1980. Obviously, the rapid resolution of the slot allocation problem at National was not only in the interest of the traveling public, particularly on the eve of the winter holiday season, but also consistent with the national interest in the efficient utilization of the navigable airspace. We recognize that "judicial review of a rule promulgated under an exception to the APA's notice-and-comment requirement must be guided by Congress's expectation that such exceptions will be narrowly construed and only reluctantly countenanced." New Jersey v. EPA, 200 U.S.App.D.C. 174, 626 F.2d 1038, 1045 (1980) (citations omitted) (discussion of 5 U.S.C. s 553(b)(B)). Under the circumstances of the present case, however, we find that "good cause" existed to justify the Secretary's decision to reduce the period for comments and declare the regulation effective upon issuance.

**[15]**  Northwest next argues that SFAR 43 constituted a form of licensing, not rulemaking, and therefore required an adjudicatory hearing under the APA because SFAR 43 modifies the carriers' existing rights to operate at National. We do not agree. In our view SFAR 43 is a "rule" under the definition set out in the APA: "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy " 5 U.S.C. s 551(4). SFAR 43 does not lose its character as a rule because it modifies carriers' claimed rights [17] to slot allocations at National. See Air Line Pilots Ass'n International v. Quesada, 276 F.2d 892, 896 (2d Cir. 1960) (challenge to FAA rule limiting pilot licenses to age 60), cert. denied, 366 U.S. 962, 81 S.Ct. 1923, 6 L.Ed.2d 1254 (1961).

**[16]**  Northwest next argues that the Secretary's failure to prepare an environmental impact statement (EIS) violated s 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. s 4332(2)(C), because SFAR 43 requires an increase in the number of reserved carrier operations (from 22 to 37) scheduled during the latest hour of operations at National (2200 hours or 10 p. m.). The Secretary, however, argues that the maximum number of reserved carrier operations, 40 slots per hour, as established under the HDAR, is not changed by SFAR 43. SFAR 43 does not require an increase in carrier operations at 2200 hours (10 p. m.). The carriers remain free under both SFAR 43 and the HDAR to arrange their schedules as necessary up to the 40 slot per hour limit. SFAR 43 does not change the HDAR Limitations. [18] Because **\*1322** the potential number of reserved carrier operations under the HDAR remains the same under SFAR 43, the environmental impact of SFAR 43 is minimal. Moreover, the Secretary in promulgating

SFAR 43 has in effect only substituted one method of slot allocation (the mandatory reallocation in SFAR 43) for another (the voluntary reallocation of the ASC). We find that the promulgation of SFAR 43 did not constitute a "major federal action significantly affecting the quality of the human environment" and therefore no EIS was required.

**[17]**  Northwest finally argues that the Secretary improperly failed to prepare a regulatory analysis of economic impact as required by DOT Regulatory Policies and Procedures, 44 Fed.Reg. 11034 (1979), implementing Executive Order No. 12044, 43 Fed.Reg. 12661 (1978). We do not agree. The Secretary determined that although SFAR 43 did not merit a regulatory impact analysis under P 10(a), (f) [19] of the DOT Regulatory Policies and Procedures, it was a significant regulation because it concerned a matter in which there was substantial public interest and thus did require the preparation of a regulatory evaluation. However, under P 10(g) [20] of the DOT Regulatory Policies and Procedures, the preparation of the requisite regulatory analysis or evaluation may be delayed until after the issuance of an emergency regulation. We earlier discussed the time limitations and the need for urgent administrative action which faced the Secretary in late October, 1980, prior to the issuance of SFAR 43. We note that the Secretary did prepare a regulatory evaluation of SFAR 43, issued on December 29, 1980, in which the economic impact of SFAR 43 was found to be minimal. [21]

Accordingly, the petition for review is denied.

### All Citations

645 F.2d 1309, 11 Envtl. L. Rep. 20,845

---

### Footnotes

1      Pan American World Airways, Inc., Air Florida, Inc., Delta Air Lines, Inc., Eastern Air Lines, Inc., and American Airlines, Inc. join Northwest in opposing SFAR 43. New York Airlines, Inc. and ANA, Inc. (Air North) support SFAR 43. Virginians for Dulles, a group of citizens that live in the vicinity of National and generally favor reduced use of National, and the Aircraft Owners and Pilots Association (AOPA), a group representing private aviation interests, also support SFAR 43.

2      HDAR no longer applies to operations at Newark Airport and only partially applies to operations at Kennedy and O'Hare. 14 C.F.R. s 93.133 (1980).

3   The Instrument Flight Rules are FAA regulations applicable to flight operations in adverse weather conditions. For safety reasons, all air carrier flights must be conducted under IFR regardless of weather conditions. Thus, air carriers must have reservations at high density airports regardless of weather conditions.

4   Aircraft other than air carriers may operate under VFR under favorable weather conditions (generally, when the ceiling is at least 1,000 feet and visibility is at least three miles).

5   Due to other problems, New York Air did not plan to begin actual operations until December 14, 1980, and yielded its slots (as allocated under SFAR 43) for the first two weeks of December. New York Air began its New York-Washington service on December 19, 1980. Brief of New York Airlines, Inc. at 3.

6   The next day, October 21, 1980, the Secretary issued a Notice of Proposed Rulemaking, proposing several procedures for allocating slots at National on a long-term basis. Notice 80-16, 45 Fed.Reg. 71236 (1980) (published on October 27, 1980).

7   Northwest strenuously argues that the National ASC during its October, 1980, meeting never reached any agreement on the slot allocations. Brief of Northwest Airlines, Inc. at 29-30.

8   On November 19, 1980, the Secretary issued Notice 80-14aNotice 80-14a implementing the slot allocation set forth in SFAR 43. Two tables attached as an appendix to the notice describe the final allocation of slots at National on an hour-by-hour basis for the period from December 1 to December 13, 1980 (when New York Air would not be operational) and from December 14 to April 26, 1981 (when New York Air would be operational).

9   In addition, the agency action must be final, that is, "one which imposes an obligation, denied a right, or fixes some legal relationship." Puget Sound Traffic Ass'n v. CAB, 175 U.S.App.D.C. 410, 536 F.2d 437, 439 (1976), citing Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 112-13, 68 S.Ct. 431, 436-37, 92 L.Ed. 568 (1948); see also McManus v. CAB, 286 F.2d 414, 417 (2d Cir.), cert. denied, 366 U.S. 928, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961). We think that SFAR 43, although only a temporary allocation of slots, is a final agency action. SFAR 43 denies in part the rights of several air carriers to operate at National and grants such rights to other air carriers.

    It was not suggested that SFAR 43 did not meet the finality requirement. We note that motions for reconsideration filed by Air Florida and Northwest were denied by the Secretary on December 29, 1980.

10  In view of our discussion of the Secretary's authority under s 307(a), (c) of the FA Act, 49 U.S.C. s 1348(a), (c), we do not address the question of the Secretary's asserted authority as the proprietor of National to issue SFAR 43 under s 2 of the Washington National Airport Act, as amended, Pub.L.No. 76-674, 54 Stat. 686 (1940), which provides in part:

    The Secretary of Transportation shall have control over, and responsibility for, the care, operation, maintenance, and protection of the airport, together with the power to make and amend such rules and regulations as he may deem necessary to the proper exercise thereof.

11  Aircraft Owners & Pilots Ass'n v. Volpe, Civ. No. 927-69 (D.D.C. May 14, 1969), aff'd per curiam, No. 23,146 (D.C.Cir. Nov. 19, 1969), is an unpublished case discussed by both the Secretary and Northwest. In this case the Aircraft Owners & Pilots Association sought to enjoin implementation of the HDAR at the five congested airports covered by the regulation. Injunctive relief was denied.

12  And where a duty is especially enjoined on the Secretary of the Treasury, although he may perform it through the Commissioner of the General Land-Office, who may well be presumed to act under his authority where the contrary does not appear; yet where the Secretary has interposed and decided the matter, as in the case under consideration, his decision must be considered as the only one under the law.
    Campbell v. Doe, 54 U.S. (13 How.) 244, 249, 14 L.Ed. 130 (1852).

13  5 U.S.C. s 553(b) provides in part:

    General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include

    (1) a statement of the time, place and nature of public rule making proceedings;

    (2) reference to the legal authority under which the rule is proposed; and

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 790 of 1271

Northwest Airlines, Inc. v. Goldschmidt, 645 F.2d 1309 (1981)
11 Envtl. L. Rep. 20,845

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

14    The propriety of administrative reliance upon the "good cause" exception in 5 U.S.C. s 553(b)(B) in order to dispense with the APA's requisite notice-and-comment in the context of certain regulations promulgated by EPA under the constraints of tight statutory deadlines established by the Clean Air Act Amendments of 1977, Pub.L.No. 95-95, 91 Stat. 685 (recodified at 42 U.S.C. ss 7401-7642 (Supp. I 1977)), has been the subject of controversy in recent case law. See discussion in New Jersey v. EPA, 200 U.S.App.D.C. 174, 626 F.2d 1038, 1045-49 (1980). Compare Western Oil & Gas Ass'n v. EPA, 633 F.2d 803 (9th Cir. 1980) (no "good cause"); New Jersey v. EPA, supra, 626 F.2d 1038 (no "good cause"); United States Steel Corp. v. EPA, 595 F.2d 207 (5th Cir.) (no "good cause"), rehearing granted in part, 598 F.2d 915 (1979); Sharon Steel Corp. v. EPA, 597 F.2d 377 (3d Cir. 1979) (no "good cause"), with Republic Steel Corp. v. Costle, 621 F.2d 797 (6th Cir. 1980) ("good cause"); United States Steel Corp. v. EPA, 605 F.2d 283 (7th Cir. 1979) ("good cause"), cert. denied, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980).

15    Compare the position of the Seventh Circuit in United States Steel Corp. v. EPA, supra, 605 F.2d at 289-90 ("good cause" under s 553(d)(3) should encompass more situations than "good cause" under s 553(b)(B)), with the position of the District of Columbia Circuit in New Jersey v. EPA, supra, 626 F.2d at 1048 (s 553(d)(3) and s 553(b)(B) should be interpreted similarly). See also 1 K. Davis, Administrative Law Treatise s 6.29, at 590 (2d ed. 1978) (similar construction).

16    In United States v. Gavrilovic, 551 F.2d 1099 (8th Cir. 1977), we considered what constitutes "good cause" under s 553(d)(3). We noted from that section's legislative history that

the APA was not intended to unduly hamper agencies from making a rule effective immediately or at some time earlier than 30 days. However, the good cause exception was not to be an "escape clause which may be arbitrarily exercised but requires legitimate grounds supported in law and fact by the required finding." Legitimate grounds were defined as an "urgency of conditions coupled with demonstrated and unavoidable limitations of time," and that the primary consideration was to be the "convenience or necessity of the people affected."

We think it clear that Congress intended to impose upon an administrative agency the burden of showing a public necessity for an early effective date and that an agency cannot arbitrarily find good cause. In determining whether the good cause exception is to be invoked, an administrative agency is required to balance the necessity for immediate implementation against principles of fundamental fairness which require that all affected persons be afforded a reasonable time to prepare for the effective date of its ruling.

Id. at 1104-05 (citations and footnotes omitted).

17    The Secretary asserts that under the ASC agreements, no particular carrier is entitled to a slot and no carrier has any kind of "grandfather" rights in its existing slot allocation. Brief of the Secretary at 46.

18    We note that the Secretary is under a district court order not to implement any changes in the HDAR at National. Virginians for Dulles v. Goldschmidt, Civ. No. 507-70-A (E.D.Va. Sept. 21, 1979) (order on remand). Although we express no opinion as to its sufficiency, we also note the Secretary has prepared a final EIS evaluating the environmental impact of the Washington National Airport Policy, including the proposed reduction of reserved carrier operations under the HDAR to 36 slots per hour, effective April 26, 1981. See 45 Fed.Reg. 62398, 62405 (Sept. 18, 1980).

19    P 10(a), (f), 44 Fed.Reg. 11034, 11043 (1979), provides:

a. Except as indicated in paragraph 10g of this Order, an initiating office prepares and places in the public docket a draft Regulatory Analysis for each of its proposed regulations that:

(1) Will result in an annual effect on the economy of $100 million or more;

(2) Will result in a major effect on the general economy in terms of costs, consumer prices, or production;

(3) Will result in a major increase in costs or prices for individual industries, levels of government, or geographic regions;

(4) Will have a substantial impact on the United States balance of trade; or

(5) The Secretary or head of the initiating office determines deserves such analysis.

f. The initiating office prepares a final Regulatory analysis for each final regulation that meets the criteria of paragraph 10a of this Order, otherwise, a final Evaluation, in accordance with the requirements of paragraph 10e of this Order, is prepared. The Regulatory Analysis or the Evaluation is placed in the public docket at the time of or before issuing the final regulation and the regulation is accompanied by a statement of how the public may obtain a copy of the Regulatory Analysis or the Evaluation for review.

20   P 10(g), id., provides:

g. An emergency regulation that otherwise would be nonsignificant is excepted from the requirements for any Evaluation. For an emergency regulation that otherwise would be significant, the initiating office prepares and places in the public docket as soon as possible after issuance of the notice or final regulation a Regulatory Analysis or Evaluation, whichever is appropriate, unless an exception is granted by the Secretary.

21   The regulatory evaluation did state that if further accounting data demonstrated other than minimal economic impact, supplementary analysis of SFAR 43 would be undertaken as part of the regulatory analysis prepared for the proposed permanent slot allocation regulation. See Notice 80-16, 45 Fed.Reg. 71236 (Oct. 27, 1980).

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

392 F.3d 970
United States Court of Appeals,
Eighth Circuit.

Vladimir OBLESHCHENKO; Natalia
Obleshchenko; Yekaterina Obleshchenko;
Yelena Obleshchenko, Petitioners,

v.

John ASHCROFT, Attorney General of the
United States of America, Respondent.

No. 02–4123.
|
Submitted: Oct. 18, 2004.
|
Filed: Dec. 20, 2004.

**Synopsis**
**Background:** Alien and family petitioned for review of an
order of the Board of Immigration Appeals (BIA) upholding
the denial by an immigration judge of their applications for
asylum and withholding of deportation.

**Holdings:** The Court of Appeals, Morris Sheppard Arnold,
Circuit Judge, held that:

[1] aliens did not have a protected liberty or property interest
with respect to asylum claim, and thus had no right to
effective assistance of counsel under the Fifth Amendment's
due process clause, and

[2] aliens were not prejudiced by counsel's alleged failures,
and thus counsel's performance could not amount to due
process ineffective assistance of counsel with respect to
withholding of deportation claim.

Affirmed.

West Headnotes (4)

[1]    **Aliens, Immigration, and
Citizenship** 🔑 Assistance of counsel

**Constitutional Law** 🔑 Asylum, refugees, and
withholding of removal

Aliens did not have a protected liberty interest
or property interest with respect to asylum claim,
and thus had no right to effective assistance
of counsel under the Fifth Amendment's due
process clause, given that the statute in effect
when the aliens applied for asylum provided
that, even if they qualified as refugees, the
Attorney General still had discretion to deny
asylum. U.S.C.A. Const.Amend. 5; Immigration
and Nationality Act, § 208, as amended, 🚩 8
U.S.C.A. § 1158.

6 Cases that cite this headnote

[2]    **Aliens, Immigration, and
Citizenship** 🔑 Effect of irregularities;
harmless or prejudicial error

**Constitutional Law** 🔑 Admission and
exclusion; deportation

In order to prevail on a due-process ineffective-
assistance claim, aliens had to establish that they
were prejudiced by counsel's performance, by
showing that their attorney's performance was
so inadequate that it may well have resulted
in a deportation that would not otherwise have
occurred. U.S.C.A. Const.Amend. 5.

6 Cases that cite this headnote

[3]    **Aliens, Immigration, and
Citizenship** 🔑 Effect of irregularities;
harmless or prejudicial error

**Constitutional Law** 🔑 Asylum, refugees, and
withholding of removal

Aliens were not prejudiced by counsel's alleged
failure to file application for asylum on the
basis of religious persecution and to include
evidence corroborating their religious affiliation,
and thus counsel's performance could not
amount to due process ineffective assistance
of counsel at withholding of deportation
proceedings, given that, when asked at his
deportation hearing to explain why his asylum
application never mentioned the religious
persecution, alien gave three different answers,

casting doubt on his credibility, and, in reaching his decision, the immigration judge relied on the State Department's country report documenting the Ukrainian government's tolerance of different religions and the absence of government-sponsored religious persecution. U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, § 243, 8 U.S.C.A. § 1253(h)(1).

5 Cases that cite this headnote

**[4]  Aliens, Immigration, and Citizenship ⚷ Weight and Sufficiency**

Substantial evidence supported immigration judge's rejection of aliens' applications for asylum and withholding of deportation.

**Attorneys and Law Firms**

**\*971**  Patricia G. Mattos, argued, St. Paul, MN, for appellant.

James A. Hunolt, argued, U.S. Dept. of Justice, Washington, D.C., appellee.

Before MORRIS SHEPPARD ARNOLD, BOWMAN, and RILEY, Circuit Judges.

**Opinion**

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Vladimir Obleshchenko, his wife, and his children petition for review of an order of the Board of Immigration Appeals (BIA) upholding the denial by an immigration judge (IJ) of the Obleshchenkos' applications for asylum and withholding of deportation. The Obleshchenkos argue that their counsel for the hearing before the IJ provided them with ineffective assistance and that the IJ's decision on the merits was incorrect. We affirm.

I.

**[1]**  Because deportation proceedings are civil and not criminal, the only possible ground for a claim of ineffective assistance of counsel in the current circumstances is the fifth amendment's due process clause. *Nativi–Gomez v.*

*Ashcroft,* 344 F.3d 805, 807 (8th Cir.2003). But in order for such a claim to succeed, the Obleshchenkos must have "a protected liberty or property interest," which cannot be found in "statutorily created relief that is subject to the unfettered discretion of a governmental authority." *Id.* at 808–09. The statute in effect when the Obleshchenkos applied for asylum provided that, even if they qualified as refugees, the Attorney General still had discretion to deny them asylum. 8 U.S.C. § 1158 (1994); *INS v. Cardoza–Fonseca,* 480 U.S. 421, 428 n. 5, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Thus, they had no right to effective assistance with respect to their asylum claim.

Withholding deportation is another matter entirely, because deportation must be withheld if the Obleshchenkos' "li[ves] or freedom would be threatened" in the Ukraine "on account of ... religion," 8 U.S.C. § 1253(h)(1) (1994), and therefore they have a liberty interest in having their deportation withheld. We have serious doubts, however, that a fifth amendment right to counsel exists in civil deportation proceedings. Constitutional rights are rights against the government; that is, they ensure that the government will not act in a certain way. Because this is necessarily as true of rights secured by the fifth amendment as it is of any other constitutional **\*972** right, we find it difficult to see how an individual, such as the Obleshchenkos' attorney, who is not a state actor, can deprive anyone of due process rights.

We are aware, however, that other circuits have held that due process can be violated by the ineffective assistance of counsel at deportation or exclusion proceedings, *see, e.g.,* *Xu Yong Lu v. Ashcroft,* 259 F.3d 127, 131–32 (3d Cir.2001); *Lozada v. INS,* 857 F.2d 10, 13–14 (1st Cir.1988), and the government has not argued to the contrary. We therefore assume without deciding that the Obleshchenkos had a right to have their counsel effectively represent them in their withholding-of-deportation claim. *Cf.* *Nativi–Gomez,* 344 F.3d at 808 n. 1.

**[2]**  In order to prevail on a due-process ineffective-assistance claim, the Obleshchenkos must establish that they were prejudiced by their counsel's performance, *Esposito v. INS,* 987 F.2d 108, 111 (2d Cir.1993) (per curiam); *Matter of Lozada,* 19 I. & N. Dec. 637, 638, 640 (BIA 1988), by showing that their attorney's performance was so inadequate that it " 'may well have resulted in a deportation

that would not otherwise have occurred.' " *See United States v. Torres–Sanchez,* 68 F.3d 227, 230 (8th Cir.1995) (quoting *United States v. Santos–Vanegas,* 878 F.2d 247, 251 (8th Cir.1989); *see also Al–Khouri v. Ashcroft,* 362 F.3d 461, 466 (8th Cir.2004). We believe that this standard is akin to the requirement under the sixth amendment that there be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," where "reasonable probability" means "a probability sufficient to undermine confidence in the outcome." *See Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

[3]    To determine whether the Obleshchenkos have demonstrated prejudice, we ask whether there is a reasonable probability that the IJ would have altered his judgment had the Obleshchenkos been represented by what they consider competent counsel. As the IJ's order indicates, the biggest obstacle for the Obleshchenkos in proving that they faced religious persecution was the absence of a claim of religious persecution in their asylum application and the absence of corroborating evidence of religious affiliation. According to the Obleshchenkos, competent counsel would have built a record before the IJ that included both an amended application for asylum on the basis of religious persecution and evidence corroborating the Obleshchenkos' Baptist affiliation.

Even if the record had included this evidence, however, our confidence in the IJ's decision would not have been undermined, because the weight of two items of evidence that supported the IJ's decision would not change materially. First, when asked at his deportation hearing to explain why his asylum application never mentioned the religious persecution to which he testified at the hearing, Mr. Obleshchenko gave three different answers, casting doubt on his credibility. Revealingly, not once did Mr. Obleshchenko blame his attorney for failing to file a revised application. Instead, he maintained that he misunderstood the application, was afraid to reveal the information (even though he showed no hesitation at the hearing), and was waiting for a hearing before speaking about the persecution he suffered (without explaining why he thought it important to wait). Second, in reaching his decision, the IJ relied on the State Department's country report documenting the Ukrainian

government's tolerance of different religions and the absence of government-sponsored religious persecution.

Furthermore, although the Obleshchenkos contend that competent counsel would have provided the IJ with corroborating **\*973** evidence of their religious affiliation, the only corroborating document they filed on appeal to the BIA (where they had different representation and first raised their ineffective-assistance claim) was a letter from a Baptist pastor in the Ukraine who said that the Obleshchenkos attended his church until 1990; they did not provide any evidence of their Baptist affiliation during the years after 1990. Those later years are the most critical to this case, since during that period the Ukraine declared its independence from the communist Soviet Union and Mr. Obleshchenko was subjected to the beating that caused the Obleshchenkos to flee the Ukraine. Thus, we do not think that the letter would have swayed the IJ.

We therefore believe it reasonably plain that the IJ would have denied the Obleshchenkos' application for withholding deportation even if their counsel had acted as they assert she should have. We therefore detect no prejudice to the Obleshchenkos resulting from their counsel's performance.

II.

[4]    We also reject the Obleshchenkos' assertion that the IJ erred in rejecting their applications. The evidence that we have rehearsed above provided an ample basis for the result that the IJ reached. There was substantial evidence on the record as a whole for disbelieving the Obleshchenkos' account, and the IJ gave specific, cogent reasons for his disbelief. *See Perinpanathan v. INS,* 310 F.3d 594, 597 (8th Cir.2002).

III.

We therefore affirm the decision of the BIA.

**All Citations**

392 F.3d 970

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

96 S.Ct. 2140, 92 L.R.R.M. (BNA) 2737, 48 L.Ed.2d 736, 78 Lab.Cas. P 11,456

KeyCite Yellow Flag - Negative Treatment

Distinguished by Sarauer v. International Association of Machinists and Aerospace Workers, District No. 10, 7th Cir.(Wis.), July 20, 2020

96 S.Ct. 2140
Supreme Court of the United States

OIL, CHEMICAL AND ATOMIC WORKERS, INTERNATIONAL UNION, AFL-CIO, et al., Petitioners,

v.

MOBIL OIL CORPORATION, etc.

No. 74-1254.
|
Argued March 29, 1976.
|
Decided June 14, 1976.

**Synopsis**

Some two years after unions and an oil company had entered into an agency-shop agreement covering seamen employed in the oil company's oil tankers, the oil company brought a suit claiming that the agreement was invalid and unenforceable because it violated Texas' right-to-work laws. The District Court applied the Texas right-to-work laws and held the agreement invalid, and, after a contrary panel opinion, 483 F.2d 603, the Court of Appeals, 504 F.2d 272, affirmed. The Supreme Court, Mr. Justice Marshall, held that it is the employees' predominant job situs, rather than a generalized weighing of factors or the place of hiring, that triggers operation of federal statutory provisions allowing states to enact right-to-work laws, and that the Texas right-to-work laws were therefore inapplicable to the case at bar since the employees' job situs was on the high seas.

Reversed.

Mr. Chief Justice Burger concurred in the judgment.

Mr. Justice Stevens filed concurring statement.

Mr. Justice Powell filed opinion concurring in the judgment.

Mr. Justice Stewart dissented and filed opinion in which Mr. Justice Rehnquist joined.

West Headnotes (2)

**[1]**    **Labor and Employment** 🗝️ Rights of employees in general

**Labor and Employment** 🗝️ What law governs

Employees' predominant job situs, rather than generalized weighing of factors or place of hiring, triggers operation of provision in federal labor laws permitting states to adopt right-to-work laws; such laws cannot void agreements establishing union or agency shops when situs at which all employees covered by agreement perform most of their work is located outside of state having such right-to-work laws. National Labor Relations Act, §§ 8(a)(3), 14(b) as amended 29 U.S.C.A. §§ 158(a)(3), 164(b).

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 796 of 1271

Oil, Chemical and Atomic Workers Intern. Union, AFL-CIO v...., 426 U.S. 407 (1976)

96 S.Ct. 2140, 92 L.R.R.M. (BNA) 2737, 48 L.Ed.2d 736, 78 Lab.Cas. P 11,456

52 Cases that cite this headnote

**[2]**    **Labor and Employment**    What law governs

Where predominant job situs of seamen on oil company's oil tankers was high seas, outside territorial boundaries of State of Texas, Texas' right-to-work laws could not govern validity of agency-shop provision in collective bargaining agreement between unions and seamen's employer, and it was immaterial that Texas might have more contacts than any other state with employment relationship. National Labor Relations Act, §§ 8(a)(3), 9(e)(1), 14(b) as amended 29 U.S.C.A. §§ 158(a)(3), 159(e)(1), 164(b); Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185; Vernon's Ann.Tex.Civ.St. art. 5154a; Railway Labor Act, § 2, subd. 11, 45 U.S.C.A. § 152, subd. 11.

53 Cases that cite this headnote

**2140    *407**  Syllabus [*]

Section 8(a)(3) of the National Labor Relations Act permits union- or agency-shop agreements between employers and unions, but s 14(b) authorizes States to exempt themselves from s 8(a)(3) and to enact "right-to-work" laws prohibiting union or agency shops. About two years after petitioner unions and respondent employer had entered into an agency-shop agreement covering seamen employed on respondent's oil tankers, respondent brought suit claiming that the agreement was invalid and unenforceable because it violated Texas' right-to-work laws. Since, Inter alia, all final decisions for hiring the seamen are made in Texas, the majority of the then employed seamen reside in Texas, and respondent's **2141** personnel records are maintained and payroll checks are written there, the District Court held that Texas had an "intimate concern" with the agreement, notwithstanding that the seamen spend the vast majority of their working hours away from Texas on the high seas, and that therefore Texas' right-to-work laws were applicable under s 14(b) and rendered the agreement void and unenforceable. The Court of Appeals affirmed, stressing that Texas was the place of hiring. Held:

1. It is the employees' predominant job situs rather than a generalized weighing of factors or the place of hiring that triggers operation of s 14(b), and under s 14(b) right-to-work laws cannot void agreements permitted by s 8(a) (3) when the situs at which all the employees covered by the agreement perform most of their work is located outside of a State having such laws. Pp. 2144-2147.

(a) Insofar as s 8(a)(3) deals with union- and agency-shop agreements, it focuses both in effect and purpose on Post -hiring conditions, conditions that have a major impact on the job situs. Pp. 2144-2145.

**\*408** (b) Similarly, s 14(b)'s primary concern is with state regulation of the Post -hiring employer-employee-union relationship, the center of which is the job situs, I. e., the place where the work that is the very Raison d' etre of the relationship is performed; and because of this close relationship between s 14(b) and job situs, s 14(b) does not allow enforcement of right-to-work laws with regard to an employment relationship whose principal job situs is outside of a State having such laws. Pp. 2145-2146.

(c) Under the job situs test, as opposed to a place of hiring test, the possibility of patently anomalous extraterritorial applications of any given State's right-to-work laws will be minimized and parties entering a collective-bargaining agreement will easily be able to determine in virtually all situations whether a union- or agency-shop provision is valid. Pp. 2146-2147.

2. Under the job situs test Texas' right-to-work laws cannot govern the validity of the agency-shop agreement in question, because most of the employees' work is done on the high seas, outside the territorial bounds of Texas. It is immaterial that Texas

Oil, Chemical and Atomic Workers Intern. Union, AFL-CIO v...., 426 U.S. 407 (1976)

96 S.Ct. 2140, 92 L.R.R.M. (BNA) 2737, 48 L.Ed.2d 736, 78 Lab.Cas. P 11,456

may have more contacts than any other State with the employment relationship involved, since there is no reason to conclude under s 14(b) that in every employment situation Some State's law with respect to union-security agreements must apply, and it is fully consistent with national labor policy to conclude, if the predominant job situs is outside the boundary of any State, that no State has a sufficient interest in the employment relationship and that hence no State's right-to-work laws can apply. P. 2147.

504 F.2d 272, reversed.

**Attorneys and Law Firms**

Laurence Gold, Washington, D. C., for petitioners.

James W. Hambright, Beaumont, Tex., for respondent. **\*409**

**Opinion**

Mr. Justice MARSHALL delivered the opinion of the Court.

Section 8(a)(3) of the National Labor Relations Act, 49 Stat. 452, as amended, 61 Stat. 140, 29 U.S.C. s 158(a)(3), permits employers as a matter of federal law to enter into agreements with unions to establish union or agency shops. [1] Section 14(b) of the Act, 61 Stat. 151, 73 Stat. 541, **\*\*2142** 29 U.S.C. s 164(b), however, allows individual States and Territories to exempt themselves from s 8(a)(3) and to enact so-called "right-to-work" laws prohibiting union or agency shops. [2] We must decide **\*410** whetherunder s 14(b), Texas' right-to-work laws can void an agency-shop agreement covering unlicensed seamen who, while hired in Texas and having a number of other contacts with the State, spend the vast majority of their working hours on the high seas.

I

Petitioners (hereinafter Union) [3] represent the unlicensed seamen who work on respondent employer's oil tankers. In November 1969 the Union and respondent entered into a collective-bargaining agreement which provided for an agency shop: "For the duration of the Agreement all employees hired shall, as a condition of employment, become members of the Union and/or in the alternative pay the regular union dues and initiation fees within 31 days from the employment date." App. 281. Almost two years after entering into the agreement, respondent filed suit in the United States District Court for the Eastern District of Texas under s 301 of the Labor Management Relations Act, 61 Stat. 156, 29 U.S.C. s 185, claiming that the agency-shop provision was invalid and unenforceable because it violated Texas' right-to-work laws. [4]

Uncontested evidence was presented at trial concerning the relevant locations of various aspects of the relationship **\*411** between the Union, the respondent, and the seamen. Because this evidence bears heavily on the contentions of the parties, we shall summarize it in some detail. Respondent is a division of Mobil Oil Corp., New York corporation, and operates a fleet of eight oceangoing tankers which transport respondent's petroleum products from Texas to Atlantic coast ports. Respondent is headquartered in Beaumont, Tex., and maintains its personnel records there. Sixty percent of the applications to be unlicensed seamen on respondent's ships are made in Beaumont and 40% in New York. The final hiring decisions are made in Beaumont. Of the 289 unlicensed seamen who are employed to man the tankers, 123 maintain residence in Texas, and 60 in New York. [5] One hundred and fifty-two of the seamen list Beaumont as their shipping port a designation that determines travel allowances to and from a seaman's residence and the remainder list either New York or Providence, R. I. Seamen can elect to be paid their wages aboard ship, to have their paychecks sent from the Beaumont office to designated recipients, or to use a combination of these two schemes. The collective-bargaining agreement whose agency-shop provision is at issue here was negotiated and executed in New York. It was re-executed in Texas.

Oil, Chemical and Atomic Workers Intern. Union, AFL-CIO v...., 426 U.S. 407 (1976)

96 S.Ct. 2140, 92 L.R.R.M. (BNA) 2737, 48 L.Ed.2d 736, 78 Lab.Cas. P 11,456

A typical trip by one of respondent's tankers from Beaumont, the Texas port, to Providence or New York, the Atlantic ports, takes from 4 ½ to 5 days. Loading and unloading in port takes from 18 to 30 hours. No more than 10% To 20% Of the **2143 seamen's work time is spent within the territorial bounds of Texas.

Based on the above evidence, fully reflected in its *412 findings of fact, the District Court concluded that "(te acts performed in the State of Texas in the administration and performance of the collective bargaining agreement are such that the State of Texas is intimately concerned with the collective bargaining agreement and with the employees working thereunder." App. 29. Relying on this "intimate concern," the court held that the Texas right-to-work laws were applicable under s 14(b) and that the agency-shop provision was therefore void and unenforceable.

A three-member division of the United States Court of Appeals for the Fifth Circuit, one judge dissenting, reversed. 483 F.2d 603 (1973). The court concluded that the Texas right-to-work laws could not apply since the employees' principal job situs is not in Texas but rather is on the high seas. On rehearing en banc the full court, over the dissent of six of its members, vacated the division opinion and affirmed the judgment of the District Court. 504 F.2d 272 (1974). The court identified and analyzed the interests that Texas has in the employment relationship at issue, placing special stress on the fact that all final hiring decisions take place in Texas. It held that "the federal labor legislation, the predominance of Texas contacts over any other jurisdiction, and the significant interest which Texas has in applying its right to work law to this employment relationship warrant application of the Texas law and, consequently, invalidation of the agency shop provision." Id., at 275. We granted certiorari, 423 U.S. 820, 96 S.Ct. 32, 46 L.Ed.2d 37 (1975), and we now reverse.

II

[1] All parties are agreed that the central inquiry in this case is whether s 14(b) permits the application of Texas' right-to-work laws to the agency-shop provision in the collective-bargaining agreement between the *413 Union and respondent.[6] Only if it is to be so read is the agency-shop provision unenforceable.[7] The parties are similarly agreed that a State can apply its right-to-work laws only with respect to employment rationships with which the State has adequate contact. The crux of the differences between the parties concerns whether the contacts between Texas and the employment relationship in this case are sufficient to come under s 14(b).

The Union, as well as the United States as Amicus curiae, argues that the nature of the concerns at which s 14(b) is directed mandates that job situs be the controlling factor in determining the applicability of s 14(b), and that since in this case the employees' principal job situs is on the high seas outside the territorial bounds of the State the agency-shop provision at issue is valid. Respondent contends that "(t)he sufficiency of a state's interest in applying its law is to be determined by looking to the whole employment relationship." Brief for Respondent 15. Giving weight to all the contacts between Texas and the employment relationship, see Supra, at 2142-2143, respondent concludes that Texas can validly apply its right-to-work laws under *414 s 14(b). A third approach, the one adopted by the dissenting opinion in this case, is that t location of the hiring process should be determinative of the applicability of a State's right-to-work laws. Under this test, also, Texas' contacts in this case would be sufficient to apply its laws.

**2144 In light of what we understand Congress' concerns in both s 8(a)(3) and s 14(b) to have been, we conclude that it is the employees' predominant job situs rather than a generalized weighing of factors or the place of hiring that triggers the operation of s 14(b). We hold that under s 14(b), right-to-work laws cannot void agreements permitted by s 8(a)(3) when the situs at which all the employees covered by the agreement perform most of their work is located outside of a State having such laws.

Under s 8(3) of the Wagner Act, enacted in 1935, closed shops, union shops, and agency shops were all permitted. But in 1947, in s 8(a)(3), as added by the Taft-Hartley Act, Congress reacted to widespread abuses of closed-shop agreements by banning such arrangements.[8] Union and agency shops were still permitted, however, by s 8(a)(3). That provision makes employment

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 799 of 1271

Oil, Chemical and Atomic Workers Intern. Union, AFL-CIO v...., 426 U.S. 407 (1976)

96 S.Ct. 2140, 92 L.R.R.M. (BNA) 2737, 48 L.Ed.2d 736, 78 Lab.Cas. P 11,456

discrimination in favor of or against labor unions an unfair labor practice but contains the following proviso which we have held to apply to agency shops as well as union shops, NLRB v. General Motors Corp., 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963):

"Provided, That nothing in this subchapter or in any other statute of the United States, shall preclude an employer from making an agreement with **\*415** a labor organization . . . to require as a condition of employment membership therein on or after the thirtieth day following thbeginning of such employment or the effective date of such agreement, whichever is the later . . . ."

While permitting agency- and union-shop agreements, however, Congress provided certain safeguards for employees who were subject to such agreements. Thus a second proviso to s 8(a)(3) warns:

> "(N)o employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership."

Like its decision to ban closed-shop agreements, Congress' decision in s 8(a) (3) to provide these safeguards reflects a concern with compulsory unionism. But, in stark contrast to closed-shop agreements, these safeguards and the agency- or union-shop agreements to which they apply are not focused on the hiring process. Rather, they are directed at conditions that must be fulfilled by an employee only After he is already hired, at least 30 days after he is already working at the job-site.[9] Moreover, quite apart from the safeguards that it **\*416** provided, Congress' decision to allow union-securit agreements at all reflects its concern that, at least as a matter of federal law, the parties to a collective-bargaining agreement be allowed to provide that there be no employees who are getting the benefits of union representation without paying for them. Again, the focus of this concern is Not the hiring process, but rather the benefits to be derived from union representation during the period of employment **\*\*2145** while the employee is on the job. Thus, the Senate Committee Report on what became the Taft-Hartley Act observed that s 8(a) (3) gives "employers and unions who feel that (union-security) agreements promoted stability by eliminating 'free riders' the right to continue such arrangements." S.Rep.No.105, 80th Cong., 1st Sess., 7 (1947), 1 Leg.Hist. 413. "Congress recognized that in the absence of a union-security provision 'many employees sharing the benefits of what unions are able to accomplish by collective bargaining will refuse to pay their share of the cost.' S.Rep.No.105, 80th Cong., 1st Sess., p. 6, 1 Leg.Hist. L.M.R.A. 412." NLRB v. General Motors Corp., supra, at 740-741, 83 S.Ct., at 1458.

In short, insofar as it deals with union security agreements less onerous than the closed-shop agreement, s 8(a)(3) focuses in both effect and purpose on Post -hiring conditions, conditions which have a major impact on the job situs.

While s 8(a)(3) articulates a national policy that certain union-security agreements are valid as a matter of federal law, s 14(b) reflects Congress' decision that any **\*417** State or Territory that wishes to may exempt itself from that policy. Section 14(b) allows a State or Territory to ban agreements "requiring membership in a labor organization as a condition of employment."[10] We have recognized that with respect to those state laws which s 14(b) permits to be exempted from s 8(a)(3)'s national policy "(t)here is . . . conflict between state and federal law; but it is a conflict sanctioned by Congress with directions to give the right of way to state laws . . . ." Retail Clerks v. Schermerhorn, 375 U.S. 96, 103, 84 S.Ct. 219, 222, 11 L.Ed.2d 179 (1963). The question here, of course, is whether Texas' contacts with this employment relationship are adequate to call into play s 14(b)'s mandated deference to state law.

Oil, Chemical and Atomic Workers Intern. Union, AFL-CIO v...., 426 U.S. 407 (1976)

96 S.Ct. 2140, 92 L.R.R.M. (BNA) 2737, 48 L.Ed.2d 736, 78 Lab.Cas. P 11,456

Section 14(b) simply mirrors that part of s 8(a)(3) which focuses on Post - hiring conditions of employment. As its language reflects, s 14(b) was designed to make clear that s 8(a)(3) left the States free to pursue "their own more restrictive policies in the matter of union-security agreements." Algoma Plywood Co. v. Wisconsin Board, 336 U.S. 301, 314, 69 S.Ct. 584, 591, 93 L.Ed. 691 (1949). Since s 8(a)(3) already prohibits the closed shop, the more restrictive policies that s 14(b) allows the States to enact relate not to the hiring process but rather to conditions that would come into effect only After an individual is hired. It is evident, then, that s 14(b)'s primary concern is with state regulation of the Post -hiring employer-employee-union relationship. And the center of the post-hiring relationship is the job situs, the place where the work that is the very Raison d' etre of the relationship is performed.

The centrality of job situs to Congress' concern in s 14(b) is also suggested by the House Committee Report on the bill that contained the substance of what was  *418  finally enacted as s 14(b). That report reflects the House's intent that agreements providing for agency or union shops would be valid "only if they are valid undethe laws of any State in which they are to be performed." H.R.Rep.No.245, 80th Cong., 1st Sess., 34 (1947), 1 Leg.Hist. 325. Where an agreement is "performed" may be open to some debate, but we think the most reasonable reading of the phrase is that union-security agreements are "performed" on the job situs. Thus, the import of the House Report is that the committee viewed what became s 14(b) as allowing a State to ban agreements calling for work to be performed within the State. While the Taft-Hartley Act as finally enacted does not contain the precise wording of the House bill, there is no indication that any language changes were designed to alter this focus on the place of performance.

Whether taken separately or together, the place of hiring and the other factors on which respondent relies the employees' place of residence, the locale of personnel records, the place at which payroll checks  **2146  are written, etc. are not nearly as central to the concerns of s 14(b) as the employees' job situs. And, because of this close relationship between s 14(b) and job situs we conclude that s 14(b) does not allow enforcement of right-to-work laws with regard to an employment relationship whose principal job situs is outside of a State having such laws.

Two practical considerations bolster our conclusion that the employees' predominant job situs should determine the applicability of a State's right-to-work laws under s 14(b). First, the use of a job situs test will minimize the possibility of patently anomalous extra-territorial applications of any given State's right-to-work laws. Use of a job situs test will insure that the laws of a State with a continuing and current relationship  *419  with the employees in question will govern the validity vel non of any union-shop or agency-shop provision. On the other hand, if place of hiring were to be the determinative factor, Texas, for instance, could apply its right-to-work laws to employees who work solely in Connecticut simply because the relevant hiring decisions were made perhaps many years ago in Texas. We cannot believe that it was Congress' purpose in passing s 14(b) tsanction such a result.

A test such as the one adopted by the Court of Appeals that evaluates all of a jurisdiction's employment relationship contacts in order to determine the applicability of its right-to-work laws under s 14(b) might not result in irrational extraterritorial applications. But such a test does suffer the disadvantages of being both less predictable and more difficult of application than a job situs test. Under a job situs test, parties entering a collective-bargaining agreement will easily be able to determine in virtually all situations whether a union- or agency-shop provision is valid. By contrast, bargaining parties would often be left in a state of considerable uncertainty if they were forced to identify and evaluate all the relevant contacts of a jurisdiction in order to determine the potential validity of a proposed union-security provision. The unpredictability that such a test would inject into the bargaining relationship, as well as the burdens of litigation that would result from it, make us unwilling to impute to Congress any intent to adopt such a test. [11]

*420  III

 [2]   Having concluded that predominant job situs is the controlling factor in determining whether, under s 14(b), a State can apply its right-to-work laws to a given employment relationship the disposition of this case is clear. Because most of the employees' work is done on the high seas, outside the territorial bounds of the State of Texas, Texas' right-to-work laws cannot govern the validity of the agency-shop provision at issue here. It is immaterial that Texas may have more contacts than any other

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 801 of 1271

Oil, Chemical and Atomic Workers Intern. Union, AFL-CIO v...., 426 U.S. 407 (1976)

96 S.Ct. 2140, 92 L.R.R.M. (BNA) 2737, 48 L.Ed.2d 736, 78 Lab.Cas. P 11,456

State with the employment relationship in this case, since there is no reason to conclude under s 14(b) that in every employment situation Some State or Territory's law with respect to union-security agreements must be applicable. [12] Federal policy favors permitting **2147 such agreements unless a State or Territory with a sufficient interest in the relationship expresses a contrary policy via right-to-work laws. It is therefore fully consistent with national labor policy to conclude, if the predominant job situs is outside the boundary of any State, that no State *421 has a sufficient interest in the employment relationship and that no State's right-to-work laws can apply.

Accordingly, the judgment of the Court of Appeals is reversed.

So ordered.

Mr. Chief Justice BURGER concurs in the judgment.

Mr. Justice STEVENS, concurring.

As I read s 14(b), the prepositional phrase "in any State or Territory" modifies the immediately preceding noun "employment." This reading is consistent with the analysis in the Court's opinion, which I join except for its suggestion that federal policy favors permitting union-shop and agency-shop agreements.

Mr. Justice POWELL, concurring in the judgment.

Although I concur in the judgment of the Court, I do not think it necessary to determine in this case whether a "job situs" test is appropriate or required generally. The only issue before the Court is whether federal or state law should apply to the employment contracts of maritime workers whose job situs is the high seas and who thereby enjoy a special status. As noted by Judge Ainsworth, writing for the six dissenting members of the Court of Appeals:

"(S)eamen have traditionally maintained an exceptional status in regard to the regulation and control of their employment, and . . . section 14(b) cannot reasonably be construed to remove them from that category. Seamen, particularly the type of blue-water seamen involved here, as wards of admiralty have been accorded a special status and protection under federal maritime law unknown to state law in the domain of the master-servant relationship. Unlike the land-based worker, the seaman's employment *422 and all of the rights and restrictions flowing therefrom, are determined by federal statutory and admiralty law, not state law. . . .

" . . . The consistent and traditional control by federal law of every phase of maritime employment relationships and contracts refutes the proposition that (respondent's) contacts with Texas justify injecting state law into federal maritime affairs." 504 F.2d 272, 284-286 (CA5 1974) (footnotes omitted).

I join in reversing the judgment of the Court of Appeals, as I do not believe s 14(b) can be construed reasonably to apply to these seamen.

Mr. Justice STEWART, with whom Mr. Justice REHNQUIST joins, dissenting.

The respondent, Mobil Oil Corp., is a New York corporation with its home office in New York City. The Gulf-East Coast Operations Division of Mobil's Marine Transportation Department, located in Beaumont, Tex., operates eight oceangoing American-flag tankers. These ships transport petroleum products between Texas and various ports on the Atlantic coast. Every month each tanker normally makes two round-trip voyages. On the average voyage a ship is at sea for four or five days and spends approximately 18 to 30 hours in port to load or unload its cargo.

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 802 of 1271

Oil, Chemical and Atomic Workers Intern. Union, AFL-CIO v...., 426 U.S. 407 (1976)

96 S.Ct. 2140, 92 L.R.R.M. (BNA) 2737, 48 L.Ed.2d 736, 78 Lab.Cas. P 11,456

The petitioner Maritime Local 8-801 of the Oil, Chemical and Atomic Workers International  **2148  Union represents the 289 blue-water seamen who man the tankers. When this lawsuit began, 123 of these 289 employees claimed Texas as their residence, [1] and 152 of them had requested  *423  the company to list Beaumont a their home port. Although 40% Of the seamen had first applied for work in New York, the remainder had applied for the jobs in Texas, and the final hiring decision for all of them had been made in Beaumont. Texas has collected unemployment compensation insurance premiums for all of these employees, regardless of what State any of them might have designated as his home address or shipping port.

The seamen perform all of their duties aboard ship. They work for approximately 85 days and then receive 37 days of paid shore leave. Eighty to 90% Of their work is performed on the high seas.

In 1969 Mobil and the Union concluded a collective-bargaining agreement in New York that covered these seagoing employees. Among other provisions, the agreement contained an agency-shop clause that required all the employees to become "members of the union and/or in the alternative pay the regular union dues and initiation fees within 31 days from the employment date." App. 281. In a challenge to this clause Mobil brought the present suit under s 301 of the Labor Management Relations Act, 1947, 29 U.S.C. s 185, and under 28 U.S.C. s 2201, seeking a declaratory judgment that the clause is invalid because it violates the "right-to-work" laws of Texas. [2]

The District Court, agreeing with Mobil that Texas was more intimately involved with the employment relationship than any other State, held that Texas' right-to-work laws applied to the agreement. It accordingly declared the agency-shop provision invalid and unenforceable. A divided panel of the Court of Appeals for the Fifth Circuit initially reversed this judgment, 483 F.2d 603 (1973), but on rehearing en banc, that court affirmed  *424  the judgment of the District Court. 504 F.2d 272 (1974). The en banc appellate court analyzed all the relevant contacts that Texas has with the employees in question and concluded that "federal labor legislation, the predominance of Texas contacts over any other jurisdiction, and the significant interest which Texas has in applying its right to work law to this employment relationship warrant application of the Texas law an consequently, invalidation of the agency shop provision." Id., at 275.

I

Sections 8(a)(3) and 14(b) of the National Labor Relations Act, 29 U.S.C. ss 158(a)(3) and 164(b), delineate the federal interest in union-security arrangements. The first proviso of Section 8(a)(3) [3] says  *425  that no law  **2149  of the United States "shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein on or after the thirtieth day" of employment. The second proviso qualifies the first:
"(N)o employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership."
Together, these two provisions sanction a "union shop" agreement, which, although permitting employment of those who are not union members, requires employees to join the union (or pay dues in lieu of membership) 30 days after employment has begun. But they outlaw a "closed shop" agreement, which requires union membership as a precondition to both initial and continued employment. NLRB v. General Motors Corp., 373 U.S. 734, 738-739, 83 S.Ct. 1453, 1457, 10 L.Ed.2d 670 (1963).

These provisions modified s 8(3) of the National Labor Relations Act, 49 Stat. 452, which permitted not only union shops, but closed shops as well. See NLRB v. General Motors Corp., supra, at 739-740, 83 S.Ct., at 1457-1458;  *426  S.Rep. No. 105, 80th Cong., 1st Sess., 6 (1947); H.Conf.Rep. No. 510, 80th Cong., 1st Sess., 41 (1947), U.S.Cong.Serv.1947, p. 1135. Section

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 803 of 1271

Oil, Chemical and Atomic Workers Intern. Union, AFL-CIO v...., 426 U.S. 407 (1976)

96 S.Ct. 2140, 92 L.R.R.M. (BNA) 2737, 48 L.Ed.2d 736, 78 Lab.Cas. P 11,456

8(a)(3) was designed to curb the abuses of compulsory unionism, which "create(d) too great a barrier to free employment," S.Rep. No. 105, Supra, at 6, but at the same time, to continue to afford unions a measure of security by enabling them to prevent "free riders." Id., at 7. As the Court stated in the General Motors Case, Supra, at 740-741, 83 S.Ct., at 1458:

"(T)hese additions (to s 8(a)(3)) were intended to accomplish twin purposes. On the one hand, the most serious abuses of compulsory unionism were eliminated by abolishing the closed shop. On the other hand, Congress recognized that in the absence of a union-security provision 'many employees sharing the benefits of what unions are able to accomplish by collective bargaining will refuse to pay their share of the cost.' "

Section 8(a)(3) thus accommodated the competing interests by eliminating the union hiring hall while assuring that "(a)s far as the federal law was concerned, all employees could be required to pay their way." 373 U.S., at 741, 83 S.Ct., at 1458, see S.Rep. No. 105, Supra, at 6-7.

But Congress chose not to establish a uniform national rule permitting the union shop. States were to be left free to determine that security arrangements of any sort were against the public interest. Algoma Plywood Co. v. Wisconsin Board, 336 U.S. 301, 313-314, 69 S.Ct. 584, 590-591, 93 L.Ed. 691 (1949). This was made clear in s 14(b) of the National Labor Relations Act, as added by the Labor Management Relations Act, 29 U.S.C. s 164(b), which states:

> "Nothing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory **\*427** in which such execution or application is prohibited by State or Territorial law."

Congress added this section to the Act "to forestall the inference that federal policy was to be exclusive." **\*\*2150** Algoma Plywood Co., supra, at 314, 69 S.Ct. at 591. Section 14(b) "was designed to prevent other sections of the Act from completely extinguishing state power over certain union-security arrangements. . . . It was desired to 'make certain' that s 8(a)(3) could not 'be said to authorize arrangements of this sort in States where such arrangements were contrary to the State policy.' " Retail Clerks v. Schermerhorn, 373 U.S. 746, 751, 83 S.Ct. 1461, 1464, 10 L.Ed.2d 678 (1963), quoting H.R.Conf.Rep. No. 510, Supra, at 60.

To summarize, ss 8(a)(3) and 14(b) together exhaust the federal interest in the types of union-security agreements employers and unions may make. The closed shop is absolutely prohibited. And any lesser security arrangement, though consistent with the federal interest, is sanctioned only if it harmonizes with state policy.

It is undisputed that Texas law forbids union-shop agreements.[4] The issue presented by this case, then, is whether this Texas law may extend to bar the security provision contained in the collective-bargaining agreement between the petitioners and the respondent. The petitioners contend that the applicability of state right-to-work laws depends upon where the work is to be performed. They conclude that because the employees in question perform 80% To 90% Of their work on the high seas, the federal policy "favoring" union-shop provisions should prevail.[5] The Government as Amicus curiae, **\*428** aeeing with the petitioners, asserts that Texas does not have a substantial enough interest to apply its labor policies since little work is performed within its borders. The respondent, in turn, relying upon the decisions of the District Court and the Court of Appeals, claims that the place of hiring is the key to analyzing the choice-of-law problem.

The language of s 14(b) provides no clear guidance for determining whose law should prevail in a multijurisdictional situation. Section 14(b) does prescribe a threshold: In order to apply its right-to-work laws, a State must be the place of "execution" or "application" of the union-security agreement. "Execution" and "application" are, however, broadly inclusive nouns. It is hardly

96 S.Ct. 2140, 92 L.R.R.M. (BNA) 2737, 48 L.Ed.2d 736, 78 Lab.Cas. P 11,456

conceivable that a State would wish to enforce its right-to-work laws unless the collective-bargaining agreement was in some sense either executed or applied in the State. Yet clearly each of a number of States in a multistate situation could plausibly argue that it is the situs of "application" or "execution." The State **\*429** of "execution," for example, could be considered to be either the State where the contract was signed or the State where the terms of the contract are to be carried out. "Application" could refer either to the hiring process or the performance of the work. In short, there is no intelligent way to infer from s 14(b)'s expansive language which of a number of arguably relevant aspects of the employment relationship should be deemed **\*\*2151** the dispositive contact for deciding which State's law is to apply.

The specific legislative history of s 14(b) is of no greater aid in resolving the dilemma. [6] Congress simply did not address the choice-of-law problems that would inevitably arise in multistate work force situations. We are, however, not entirely without signposts. When Congress legislated with respect to union-security agreements in 1947, it did not write on a clean slate, for few issues in American labor history had been as controverted as the moral legitimacy and, indeed, the legality, of union-security agreements. It is unnecessary for the purpose of this case to review the history of that long controversy. [7] . It is sufficient only to realize that Congress did **\*430** not resolve it, but instead left eh individual State free to outlaw union-security agreements in the interest of a perceived policy of keeping industrial relations more individualistic, open, and free.

Although apparently no recorded legislative history exists to interpret the design of the Texas Legislature, the language of the statutes suggests that their principal purpose was, indeed, to democratize the hiring process. The Preamble of Public Policy contained in  Art. 5154a, s 1, Tex.Rev.Civ.Stat.Ann. (1971), states in part:

"Because of the activities of labor unions affecting the economic conditions of the country and the State, entering as they do into practically every business and industrial enterprise, it is the sense of the Legislature that such organizations affect the public interest and are charged with a public use. The working man, unionist or non-unionist, must be protected. The right to work is the right to live." (Emphasis added.)

Article 5207a states in part:

"Section 1. The inherent right of a person to work and bargain freely with his employer, individually or collectively, for terms and conditions of his employment shall not be denied or infringed by law, or by any organization of whatever nature.

"Sec. 2. No person shall be denied employment on account of membership or nonmembership in a labor union."

Finally, Art. 5154g, s 1, states:

"It is hereby declared to be the public policy of the State of Texas that the right of persons to work shall not be denied or abridged on account of membership **\*431** or non-membership in any labor union or labor organization and that in the exercise of such rights all persons shall be free from threats, force, iimidation or coercion."

Each of these passages bespeaks an interest in a free hiring process and in preserving the freedom of the working man or woman to pursue and continue in employment, unhindered by coerced but unwanted union association. [8]

**\*\*2152** In Lunsford v. City of Bryan, 156 Tex. 520, 523, 297 S.W.2d 115, 117 (1957), the Supreme Court of Texas interpreted these statutes: "The intent seems obvious to protect employees in the exercise of the right of free choice of joining or not joining a union. The purpose of the statute is to afford equal opportunity to work to both classes of employees." This authoritative state judicial interpretation thus confirms what seems manifest from the language of the statutes: Texas' right-to-work laws

Oil, Chemical and Atomic Workers Intern. Union, AFL-CIO v...., 426 U.S. 407 (1976)

96 S.Ct. 2140, 92 L.R.R.M. (BNA) 2737, 48 L.Ed.2d 736, 78 Lab.Cas. P 11,456

are concerned with the process by which employees are hired and the conditions which, after their hiring, may burden their employment.

In the light of these purposes I agree with the District Court and the Court of Appeals that the laws of Texas govern the union-security agreement in this case. It is true that a number of States might legitimately assert an interest in the hiring process. The State where the employees reside, the State where the conditions of employment were negotiated, and the State where the hiring decision actually took place all have their claims. I believe, however, that the State where **\*432** the hiring actually takes place is, so far as the issue now before us goes, the most relevant jurisdiction for choice-of-law purposes, and that State in this case is Texas. [9]

In the first place, it seems clear that the State where the hiring actually takes place is the State most deeply concerned with the conditions of hire. The policy of a State such as Texas, which favors unrestricted hiring, will be seriously undermined when union-security agreements control the hiring that takes place within its jurisdiction. Moreover, the State where the hiring actually occurs normally provides the bulk of the work force from which the employees are drawn. And while a rule designating the laws of the State where the bargaining agreement was negotiated would provide for ease of application, it would also encourage forum shopping by both unions and management seeking the sanction of state laws that would most favor their interests.

Against this analysis, both the Government, as Amicus, and the petitioners contend that job situs should be the determining factor in applying right-to-work laws. The parties do not explain, however, what the relevance of job situs is to laws that concern themselves exclusively **\*433** with the hiring process. Cf. A. Von Mehren & D. Trautman, The Law of Multistate Problems 76-79, 102-105 (1965). Indeed, the place where work is actually performed is probably the least relevant factor in the entire employment relationship for resolving conflicts over the legality of union-security agreements. It is undeniable, as the petitioners point out, that the job situs is where most of the day-to-day contact between employer and employees occurs. But right-to-work laws do not reflect a concern with job safety, or work rules, or hours of employment, or grievance procedures, or other similar conditions of employment with which the jurisdiction where the work actually takes place is legitimately concerned. [10] **\*434** A **\*\*2153** job situs test for the resolution of which State's union-security law applies is, therefore, so arbitrary in my view as to approach irrationality.

## II

But even if I could agree with the petitioners that the jobsite is the critical factor in determining what law should control the legality of union-security agreements, I would still find the laws of Texas applicable in this case. Quite simply, the employees here involved clearly perform a larger share of their employment duties in Texas than in any other State.

By contrast, the petitioners perceive this case as presenting a vertical conflict between Texas law and "federal law." If the law of the jurisdiction where the work is performed controls, then, according to that perception, the "federal" rule Ipso facto prevails, since 80% To 90% Of the work is performed on the high seas.

The petitioners suggest alternative and somewhat inconsistent theories to justify the intrusion of "federal law" into this case. The first is that the high seas are, like the District of Columbia, a federal territory over which Congress exercises exclusive, pre-emptive jurisdiction. [11] This theory is untenable. Congress undoubtedly has power under the Admiralty Clause, Art. III, s 2, to **\*435** pre-empt the entire field of maritime law. *E. g., Panama R. Co. v. Johnson*, 264 U.S. 375, 386, 44 S.. 391, 393, 68 L.Ed. 748 (1924); *Knickerbocker Ice Co. v. Stewart*, 253 U.S. 149, 160, 40 S.Ct. 438, 440, 64 L.Ed. 834 (1920); see G. Gilmore & C. Black, The Law of Admiralty 45-47 (1975); Currie, Federalism and the Admiralty: "The Devil's Own Mess," 1960 Sup.Ct.Rev. 158, 158-165. It has exercised this power liberally to regulate, for example, various aspects of maritime employment. See 46 U.S.C. ss 563-568. Nevertheless, as Mr. Justice Frankfurter stated for the Court in *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 373, 79 S.Ct. 468, 480, 3 L.Ed.2d 368 (1959):

"Although the corpus of admiralty law is federal in the sense that it derives from the implications of Article III evolved by the courts, to claim that all enforced rights pertaining to matters maritime are rooted in federal law is a destructive oversimplification

Case 3:20-cv-07721-SI   Document 58-5   Filed 11/10/20   Page 806 of 1271

Oil, Chemical and Atomic Workers Intern. Union, AFL-CIO v...., 426 U.S. 407 (1976)

96 S.Ct. 2140, 92 L.R.R.M. (BNA) 2737, 48 L.Ed.2d 736, 78 Lab.Cas. P 11,456

of the highly intricate interplay of the States and the National Government in their regulation of maritime commerce. It is true that state law must yield to the needs of a uniform federal maritime law when this Court finds inroads on a harmonious system. But this limitation still leaves the States a wide scope."

 **\*\*2154** It is unnecessary here to delineate the "wide scope" within which the States may legislate about things maritime. To refute the notion that the high seas are a species of federal enclave, it is sufficient to point out that the Court has found state legislation pre-empted Only when the nature of the problem required the application of a uniform rule or when the state law unduly hampered maritime commerce. See, E. g., Askew v. American Waterways Operators, Inc., 411 U.S. 325, 337-344, 93 S.Ct. 1590, 1598-1601, 36 L.Ed.2d 280 (1973); Kossick v. United Fruit Co., 365 U.S. 731, 738-739, 81 S.Ct. 886, 891-92, 6 L.Ed.2d 56 (1961); Huron Cement Co. v. Detroit, 362 U.S. 440, 444, 80 S.Ct. 813, 816, 4 L.Ed.2d 852 (1960). The Court has never struck **\*436** down a state law on the ground that the States are jurisdictionally incompetent to legisle over matters that occur within the ocean "territory."

The petitioners appear also to argue, however, that even if the high seas are not a territory over which Congress exercises exclusive lawmaking power, the Texas rule outlawing union shops must fall because the Federal Government has pre-empted the field of maritime labor relations. Cf. Southern Pacific Co. v. Jensen, 244 U.S. 205, 216, 37 S.Ct. 524, 529, 61 L.Ed. 1086 (1917); Currie, Supra, at 165 Passim. It is true that Congress has deeply involved itself in the affairs of seamen. Federal maritime law covers, among other things, maritime liens for the collection of wages, 46 U.S.C. s 953, the rights of seamen to receive at every port half of unpaid wages earned, 46 U.S.C. s 597, and double payment of wages withheld without sufficient cause, 46 U.S.C. s 596, physical qualifications and requirements for seamen, 46 U.S.C. s 672, and disciplinary problems, 46 U.S.C. ss 701-710.

Despite this manifest federal interest in many aspects of the maritime employment relationship, I think that Texas law still controls. Section 14(b) on its face clearly settles any apparent conflict between state and federal law in favor of the state rule. In enacting s 14(b) Congress concluded that diversity in the area of union-security agreements would compromise no federal interest. "By making the matter one of state law, Congress has not only authorized multiformity on the subject, but practically guaranteed it." Motor Coach Employees v. Lockridge, 403 U.S. 274, 317, 91 S.Ct. 1909, 1933, 29 L.Ed.2d 473 (1971) (White, J., dissenting).

When Congress has in the past determined that the nature of an interstate industry requires application of a uniform rule to govern union-security agreements, it has not hesitated to act. For example, before 1951 the Railway Labor Act, 45 U.S.C. s 152 Fifth, prohibited the **\*437** union shop. Fully aware of s 14(b) of the National Labor Relations Act, Congress amended the Railway Labor Act in 1951 to permit railroad carriers and their employees to enter into union-shop agreements "(n)otwithstanding any other provisions of this (Act), or of any other state or law of the United States, or Territory thereof, or of any State . . . ." 45 U.S.C. s 152 Eleventh. See Railway Employes' Dept. v. Hanson, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956). That Congress has not similarly legislated for the maritime industry is compelling evidence that it finds compatible with federal interests diversity among the States as to permissible union-security agreements.

In conclusion, I believe that the place of hiring is the critical factor in determining the choice of law for union-security agreements. But even if the place where the work is to be performed is the criterion, Texas law should still be applied since under this collective-bargaining agreement more work is performed in that State than in any other, and Congress has refrained from either establishing or indicating a need for a uniform rule to the contrary in maritime employment. I would, therefore, affirm the judgment before us.

**All Citations**

426 U.S. 407, 96 S.Ct. 2140, 48 L.Ed.2d 736, 92 L.R.R.M. (BNA) 2737, 78 Lab.Cas. P 11,456

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 807 of 1271

Oil, Chemical and Atomic Workers Intern. Union, AFL-CIO v...., 426 U.S. 407 (1976)

96 S.Ct. 2140, 92 L.R.R.M. (BNA) 2737, 48 L.Ed.2d 736, 78 Lab.Cas. P 11,456

# Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499, 505.

1    A "union shop" agreement provides that no one will be employed who does not join the union within a short time after being hired. An "agency shop" agreement generally provides that while employees do not have to join the union, they are required usually after 30 days to pay the union a sum equal to the union initiation fee and are obligated as well to make periodic payments to the union equal to the union dues. See NLRB v. General Motors Corp., 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963). The "union shop" and "agency shop" varieties of "union security" agreements are to be distinguished from the "closed shop" agreement, barred by s 8(a)(3), which provides that the employer will hire no one who is not a member of the union at the time of hiring.

2    Section 14(b) provides in full:
      "Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."

      It is settled that s 14(b) encompasses the agency-shop as well as the union-shop agreement. Retail Clerks v. Schermerhorn, 373 U.S. 746, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963).

3    There are two petitioners in this case, Oil, Chemical and Atomic Workers International Union, AFL-CIO, and its Local 8-801. Both are parties to the collective-bargaining agreement with respondent.

4    Texas' right-to-work laws prohibit, Inter alia, the denial of employment to anyone because of a failure to pay "any fee, assessment, or sum of money whatsoever" to a union. Tex.Rev.Civ.Stat.Ann., Art. 5154a, s 8a (1971). The parties are agreed that the law encompasses agency-shop provisions. See Op. Atty. Gen. Tex. No. WW-1018 (1961).

5    The residences of the remainder are spread over 20 other States.

6    The Union does not claim that Texas' contacts are so minimal as to make the application of the Texas laws in any way unconstitutional. Nor does respondent argue that Congress lacked the power, if it wished, to prohibit state right-to-work laws altogether.

7    There is nothing in either s 14(b)'s language or legislative history to suggest that there may be applications of right-to-work laws which are not encompassed under s 14(b) but which are nonetheless permissible. As we recognized in Retail Clerks v. Schermerhorn, 375 U.S., at 103, 84 S.Ct., at 222, it is "s 14(b) (which) gives the States power to outlaw even a union-security agreement that passes muster by federal standards." Cf. Kentucky State AFL-CIO v. Puckett, 391 S.W.2d 360 (Ky.1965); Grimes & Hauer, Inc. v. Pollock, 163 Ohio St. 372, 127 N.E.2d 203 (1955).

8    See NLRB v. General Motors Corp., 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963); S.Rep.No.105, 80th Cong., 1st Sess., 6, 1 Legislative History of the Labor Management Relations Act, 1947 (hereinafter Leg.Hist.), p. 412 (1948).

9    In explaining the distinction that s 8(a)(3) draws between closed shops on the one hand and lesser union-security agreements on the other, Senator Taft noted:
      "The great difference is that in the first instance a man can get a job without joining the union or asking favors of the union, and once he has the job he can continue in it for 30 days, and during that time the employer will have an opportunity to ascertain whether he is a capable employee. The fact that the employee will have to pay dues to the union seems to me to be much less important. The important thing is that the man will have the job." 93 Cong.Rec. 4886 (1947), 2 Leg.Hist. 1422.

10   See n. 2, Supra.

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 808 of 1271

Oil, Chemical and Atomic Workers Intern. Union, AFL-CIO v...., 426 U.S. 407 (1976)

96 S.Ct. 2140, 92 L.R.R.M. (BNA) 2737, 48 L.Ed.2d 736, 78 Lab.Cas. P 11,456

11    Our use of a job situs test is consistent with the National Labor Relations Board's application of s 14(b) under the statutory provision, 29 U.S.C. s 159(e)(1) (1946 ed., Supp. I), requiring the Board in certain circumstances to conduct employee elections to authorize the negotiation of union-security agreements. In determining the employees who were eligible to vote for and be covered by a union-security agreement, the Board in both Giant Food Shopping Center, Inc., 77 N.L.R.B. 791 (1948), and Western Electric Co., 84 N.L.R.B. 1019 (1949), indicated that the laws of one State prohibiting such agreements could not apply to employees whose job situs was in another State or Territory.

12    The Court of Appeals argued that to refuse to "allow Texas to apply its law here would create the bizarre consequence of exempting the maritime industry from the operation of section 14(b)." 504 F.2d 272, 280-281 (1974). It further observed, pointing to the 1951 amendment to the Railway Labor Act, 45 U.S.C. s 152 Eleventh, that "when Congress has decided to supersede section 14(b) and state right to work laws, it has done so expressly." 504 F.2d, at 281. In applying a job situs test to this case, we create no "exemption" from s 14(b) for the maritime industry. Under this test, a State can still apply its right-to-work laws to maritime workers, such as longshoremen, whose job situs is within the State. Moreover, the Railway Labor Act amendments are simply irrelevant to this case. The issue that we decide here is not whether s 14(b) has been superseded, but rather whether it applies in the first instance.

1    Sixty of the employees listed New York as their residence, 21 New Jersey, 16 Florida, 13 Louisiana, 10 Maine, and 10 Rhode Island. The remainder resided in 16 other States.

2    It is conceded that these state laws prohibit an agency agreement of the kind here involved. See n. 4, Infra.

3    Section 8(a)(3) reads in full:

"It shall be an unfair labor practice for an employer

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made; and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: Provided further, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership . . . ."

4    In Opinion No. WW-1018 (1961), the Attorney General of Texas held that union-shop agreements violate Art. 5154a, s 8a, Art. 5207a, s 2, and Art. 5154g, s 1, Tex.Rev.Civ.Stat.Ann. (1971).

5    It is not at all obvious that federal policy favors union-shop agreements. It is true that such agreements are legal in States that have not passed legislation forbidding them, whereas Congress might have reversed the burden by making all union-security agreements illegal except in States that choose to permit them. Burdens in the law, however, are allocated for a variety of reasons, only one of which is to make more difficult the achievement of a disfavored result. Another equally plausible explanation for the wording of s 14(b) is that Congress might have determined that less disruption in the state lawmaking process would result if union-shop agreements were permitted absent state legislation. In 1947, when Congress was considering the Labor Management Relations Act, only 12 States barred the union shop. S.Rep. No. 105, 80th Cong., 1st Sess., 6 (1947). Had Congress placed the burden of legislating on States wishing to Legalize the union shop, three-fourths of the States would have had to enact legislation. As s 14(b) was in fact worded, no state

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 809 of 1271

Oil, Chemical and Atomic Workers Intern. Union, AFL-CIO v...., 426 U.S. 407 (1976)

96 S.Ct. 2140, 92 L.R.R.M. (BNA) 2737, 48 L.Ed.2d 736, 78 Lab.Cas. P 11,456

legislation was required to preserve the status quo. In sum, there is simply no way of deducing from the construction of s 14(b) whether, despite leaving the issue to the States, Congress preferred or disfavored the union shop.

6   The en banc opinion of the Court of Appeals relied upon language in the House Report that condemned the evils of the union hiring hall in the maritime industry to support the proposition that the place of hiring is the critical factor in determining the choice of law. 504 F.2d 272, 277, and n. 10 (CA5 1974). As the context of the cited language makes clear, however, see S.Rep. No. 105, Supra, at 6-7, Congress' concern over the hiring hall led it to outlaw the closed shop. Having forbidden agreements making union membership a precondition to employment, Congress exhausted the federal interest in the union hiring hall.

7   See generally R. Morris, Government and Labor In Early America, 136-207 (1946); P. Sultan, Right-To-Work Laws: A Study in Conflict 12-30 (1958); J. Toner, The Closed Shop 1-92 (1942); Dempsey, The Right-To-Work Controversy, 16 Lab.L.J. 387 (1965); Warshal, "Right-to-Work," Pro and Con, 17 Lab.L.J. 131 (1966); Simons, Some Reflections on Syndicalism, 52 J.Pol.Econ. 1 (1944).

8   For an analysis of the effect of the Texas right-to-work laws, see Meyers, Effects of "Right-To-Work" Laws: A Study of the Texas Act, 9 Ind. & Lab.Rel.Rev. 77, 84 (1955) (concluding that laws had had "little effect" on the rate of union organization in all but a few selected industries).

9   The final hiring decision for all of the employees here involved was made in Beaumont, Tex. It could be argued that the interests of both Texas and New York, where a minority of the employees applied for their jobs (and which permits union shops), could be accommodated through an arrangement by which the union-security laws of each State were applied to those of the work force who had applied for work within each jurisdiction. See Comment, 88 Harv.L.Rev. 1620, 1629-1630 (1975). Such a solution, however, which would likely place members of the same crew under different regimes, could easily disrupt the management of labor relations and would create unjustifiable uncertainties in the law. Cf. Dale System, Inc. v. Time, Inc., 116 F.Supp. 527 (D.C.Conn. 1953); A. Von Mehren & D. Trautman, The Law of Multistate Problems 395 (1965). I would hold, therefore, that a uniform rule must be applied to all employees who are governed by a single collective-bargaining agreement.

10   The Court suggests, Ante at 2147, that adopting a choice-of-law rule that focuses upon the place of hiring might result in the extraterritorial application of a State's laws. This contention begs the question. It is true that some components of the employment relationship are found outside Texas. But this is inevitable in a multijurisdictional collective-bargaining agreement. Since the one activity hiring that is relevant to the Texas statutes does take place in Texas, not at sea, their application under the facts of this case does not give extraterritorial effect to Texas' laws.

The petitioners argue that if the place of hiring is dispositive for conflict-of-laws purposes, s 14(b)'s strictures will be evaded, since companies will simply relocate in that minority of States that have enacted right-to-work laws. The answer to this contention turns upon what is meant by evasion. The rule I would adopt centers upon where the actual, not some fictional, hiring decision is made. Thus, a sham relocation in a right-to-work State would not be sufficient to engage that State's union-security rules if the actual hiring decisions continued to be made in a jurisdiction that permitted union-shop agreements.

If, on the other hand, evasion is used to characterize a genuine corporate relocation, including hiring, which is motivated by a quest for more favorable labor laws, then the short answer is that there is nothing illegitimate or devious about a company's moving to a new location to take advantage of lower prevailing wage rates, taxes, raw materials, or production costs, Or to operate under more favorable laws.

11   It is worth noting that a conflict between the law of a federal Territory and that of a State is not a vertical conflict at all. A vertical conflict is characterized by the conflict between a superior and an inferior lawmaking authority, both of which may operate within the same territory. A state law legalizing the Closed shop, for example, would conflict and have to give way to the federal law outlawing such arrangements. A horizontal conflict, on the other hand, exists when the laws of two or more equally competent lawmaking bodies, all of which have plenary jurisdiction within their respective territories, are in conflict. A conflict between the laws of two States would properly be characterized as horizontal, as would that between the laws of the District of Columbia and a State.

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Independent Petroleum Ass'n of America v. Babbitt,
D.D.C., February 13, 1998

78 F.3d 620
United States Court of Appeals,
District of Columbia Circuit.

OMNIPOINT CORPORATION, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION
and the United States of America, Respondents.

GO Communications
Corporation, et al., Intervenors.

Nos. 95–1374, 95–1391, 95–1409 and 95–1412.
|
Argued Sept. 28, 1995.
|
Decided March 8, 1996.

**Synopsis**

Small businesses petitioned for judicial review of Federal
Communications Commission (FCC) order implementing
Communications Act as to competitive bidding, eliminating
gender-based and race-based preferences of Commission's
entrepreneurs' C block auction rules for wireless broadband
personal communications services (PCS). The Court of
Appeals, Sentelle, Circuit Judge, held that: (1) small
businesses had standing to petition for judicial review; (2)
Commission's establishment of date seven days after its
issuance of further notice of proposed rule making as deadline
for comments on its proposed changes to auction rules did
not violate Administrative Procedure Act (APA) on ground
that Commission failed to provide adequate time for notice
and comment; (3) good cause existed for Commission making
its final rule effective immediately upon publication, rather
than after normally required 30–day period; (4) Commission
had good cause to waive reply comments on its rule-
making proposal; (5) Commission could properly eliminate
second round of comment before issuing final rule as to
modified affiliation exception; (6) Commission's actions in
eliminating preferences were not arbitrary and capricious;
(7) Commission did not violate governing statute, instructing
Commission to ensure that businesses owned by members
of minority groups and women were given opportunity to
participate in provision of spectrum-based services; (8) order
was nondiscriminatory in both purpose and effect; and (9)
expanded affiliation rule did not violate Communications Act.

Affirmed.

Wald, Circuit Judge, dissented in part and filed opinion.

West Headnotes (30)

**[1]** **Federal Civil Procedure** 🔑 In general;
injury or interest

**Federal Civil Procedure** 🔑 Causation;
redressability

Plaintiff may secure constitutional standing if he
can show injury in fact that is fairly traceable
to defendant's action and is redressable by relief
requested.

**[2]** **Administrative Law and
Procedure** 🔑 Injury in general

Plaintiff may secure judicial review under
Administrative Procedure Act (APA) if he can
demonstrate that injuries he asserts fall within
zone of interests sought to be protected by
relevant statute. 5 U.S.C.A. § 551 et seq.

**[3]** **Telecommunications** 🔑 Judicial review or
intervention

Small business that held personal
communications services (PCS) license had
standing to petition for judicial review of
Federal Communications Commission (FCC)
order implementing Communications Act as to
competitive bidding, eliminating gender-based
and race-based preferences of Commission's
entrepreneurs' C block auction rules for wireless
broadband PCS, despite contention that it was
necessary that business be able and ready to
utilize challenged 49% equity option; business
complained that 49% equity option, although
facially neutral, was racially discriminatory as
Commission did not allow nonminority-owned
small businesses adequate time to take advantage
of option, and business' injury was its inability to
compete equally in auction if option was indeed

racially discriminatory. U.S.C.A. Const.Amend. 14; 5 U.S.C.A. § 551 et seq.; Communications Act of 1934, § 309(j)(3)(B), (j)(4)(D), 47 U.S.C.A. § 309(j)(3)(B), (j)(4)(D).

1 Cases that cite this headnote

**[4]    United States    Standing**

For standing purposes, when party challenges government set-aside program, injury in fact is denial of equal treatment resulting from imposition of barrier.

1 Cases that cite this headnote

**[5]    Telecommunications    Judicial review or intervention**

Small businesses had standing to petition for judicial review of Federal Communications Commission (FCC) order implementing Communications Act as to competitive bidding, eliminating gender-based and race-based preferences of Commission's entrepreneurs' C block auction rules for wireless broadband personal communications services (PCS); as small businesses under Commission's definition, businesses were within zone of statutorily protected interests of governing statute, and businesses adequately alleged injury by affiliation rule adopted in Commission order, as that rule allowed major companies to participate in auction and qualify for small business advantages, thereby reducing likelihood that businesses would be able to outbid their competitors at auction. U.S.C.A. Const.Amend. 14; 5 U.S.C.A. § 551 et seq.; Communications Act of 1934, § 309(j)(3)(B), (j)(4)(D), 47 U.S.C.A. § 309(j)(3)(B), (j)(4)(D).

2 Cases that cite this headnote

**[6]    Telecommunications    Judicial review or intervention**

Small business had standing to petition for judicial review of Federal Communications Commission (FCC) order implementing

Communications Act as to competitive bidding, eliminating gender-based and race-based preferences of Commission's entrepreneurs' C block auction rules for wireless broadband personal communications services (PCS); business' investors allegedly withdrew their investments due to Commission's notice of proposed rule making eliminating minority and gender preferences, those changes were implemented in subject Commission order, and, hence, business suffered injury traceable to Commission's action which was redressable by relief requested. U.S.C.A. Const.Amend. 14; 5 U.S.C.A. § 551 et seq.; Communications Act of 1934, § 309(j)(3)(B), (j)(4)(D), 47 U.S.C.A. § 309(j)(3)(B), (j)(4)(D).

**[7]    Telecommunications    Administrative procedure**

Federal Communications Commission's (FCC) establishment of date seven days after its issuance of further notice of proposed rulemaking as deadline for comments on its proposed changes, in implementing Communications Act as to competitive bidding, so as to eliminate gender-based and race-based preferences of Commission's entrepreneurs' C block auction rules for wireless broadband personal communications services (PCS), did not violate Administrative Procedure Act (APA) on ground that Commission failed to provide adequate time for notice and comment; comment period was sufficient, given urgent necessity for rapid administrative action under the circumstances, and complaining small businesses were not harmed by short comment period. 5 U.S.C.A. §§ 553, 553(c), 706; Communications Act of 1934, § 309(j)(3)(B), (j)(4)(D), 47 U.S.C.A. § 309(j)(3)(B), (j)(4)(D); 47 C.F.R. § 1.415(c).

2 Cases that cite this headnote

**[8]**   **Administrative Law and Procedure**   Notice and comment in general

Reasonable notice of administrative agency's proposed rule making shall be given. 5 U.S.C.A. § 553(c).

1 Cases that cite this headnote

**[9]**   **Telecommunications**   Administrative procedure

Good cause existed for Federal Communications Commission (FCC) making its final rule, eliminating gender-based and race-based preferences of Commission's entrepreneurs' C block auction rules for wireless broadband personal communications services (PCS), effective immediately upon publication, rather than after normally required 30–day period; Commission was under congressional deadline to act quickly, precarious nature of financial investments of prospective C block bidders, as well as headstart already given to other blocks as result of litigation delay, supported expedited proceeding, delay in auction would undermine public interest by delaying additional competition in wireless marketplace, and parties were afforded time they claimed to need to make adjustment to new rules. 5 U.S.C.A. § 553(d)(3); Communications Act of 1934, § 309(j)(3)(B), (j)(4)(D); 47 U.S.C.A. § 309(j)(3)(B), (j)(4)(D).

**[10]**   **Administrative Law and Procedure**   Effective Date; Prospective or Retroactive Effect

In determining whether good cause exists for administrative agency to make its final rule effective in less than 30 days after its publication, agency should balance necessity for immediate implementation against principles of fundamental fairness which require that all affected persons be afforded reasonable amount of time to prepare for effective date of its ruling. 5 U.S.C.A. § 553(d)(3).

3 Cases that cite this headnote

**[11]**   **Administrative Law and Procedure**   Publication or Notice of Adopted Rule

Purpose of 30–day waiting period prescribed by Administrative Procedure Act (APA) between publication of administrative agency final rule and its effective date is to give affected parties reasonable time to adjust their behavior before final rule takes effect. 5 U.S.C.A. § 553(d)(3).

6 Cases that cite this headnote

**[12]**   **Telecommunications**   Administrative procedure

Federal Communications Commission (FCC) had good cause to waive reply comments on its proposal to eliminate gender-based and race-based preferences of Commission's entrepreneurs' C block auction rules for wireless broadband personal communications services (PCS); expedition of rulemaking proceeding was necessary to reduce harm resulting from delay, which had resulted from judicial stay of prior Commission order. Communications Act of 1934, § 309(j)(3)(B), (j)(4)(D), 47 U.S.C.A. § 309(j)(3)(B), (j)(4)(D); 47 C.F.R. §§ 1.3, 1.415(c).

**[13]**   **Telecommunications**   Rules and regulations

Under Federal Communications Commission (FCC) regulation, "good cause" for Commission to waive its own rules exists when particular facts would make strict compliance inconsistent with the public interest. 47 C.F.R. § 1.3.

1 Cases that cite this headnote

**[14]**   **Administrative Law and Procedure**   Deference to Agency in General

Court of Appeals reviews administrative agency's interpretation of its own regulation under standard more deferential than that afforded under *Chevron* analysis for review of agency's application of statute entrusted by Congress to agency's administration.

1 Cases that cite this headnote

**[15]** **Administrative Law and Procedure** Erroneous or unreasonable construction; conflict with rule or statute

Provided that administrative agency's interpretation of its own regulation does not violate Constitution or federal statute, it must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.

1 Cases that cite this headnote

**[16]** **Telecommunications** Administrative procedure

Federal Communications Commission's (FCC) final rule, extending affiliation rule to all small businesses and requiring that affiliates be under applicable financial caps, for purposes of Commission's entrepreneurs' C block auction rules for wireless broadband personal communications services (PCS), was "logical outgrowth" of issue as framed in Commission's further notice of proposed rulemaking and, thus, Commission acted within its authority when it modified affiliation exception based on comments responding to the further notice rather than to eliminate it as proposed in the further notice, and Commission could properly eliminate second round of comment before issuing final rule. 5 U.S.C.A. § 551 et seq.; Communications Act of 1934, § 309(j)(3)(B), (j)(4)(D), 47 U.S.C.A. § 309(j)(3)(B), (j)(4)(D).

2 Cases that cite this headnote

**[17]** **Administrative Law and Procedure** Notice and comment in general

In deciding whether second round of comment is required before administrative agency issues final rule differing from proposed rule based on comments agency received during first round of comment, Court of Appeals looks to see whether final rule promulgated by agency is logical outgrowth of proposed rule.

3 Cases that cite this headnote

**[18]** **Administrative Law and Procedure** Notice and comment in general

For purposes of deciding whether second round of comment is required before administrative agency issues final rule differing from proposed rule based on comments agency received during first round of comment, final rule is not "logical outgrowth" of proposed rule when changes are so major that original notice did not adequately frame subjects for discussion.

6 Cases that cite this headnote

**[19]** **Telecommunications** Personal communication services

Federal Communications Commission's (FCC) actions in eliminating race-based and gender-based preferences of Commission's entrepreneurs' C block auction rules for wireless broadband personal communications services (PCS) were not arbitrary and capricious; Commission reasonably believed that justifying old rules under strict scrutiny would have been difficult and time-consuming, Commission's decision to level benefits of 49% equity ownership option upward rather than downward was justified, and Commission properly weighed reliance interests of affected parties when it extended 49% equity option to all potential applicants, rather than just to minority-owned applicants. U.S.C.A. Const.Amend. 14; 5 U.S.C.A. § 706(2)(A); Communications Act of 1934, § 309(j)(3)(B), (j)(4)(D), 47 U.S.C.A. § 309(j)(3)(B), (j)(4)(D).

Omnipoint Corp. v. F.C.C., 78 F.3d 620 (1996)

316 U.S.App.D.C. 259, 2 Communications Reg. (P&F) 816

**[20]    Administrative Law and Procedure** 🔑 Review for arbitrary, capricious, unreasonable, or illegal actions in general

Administrative agency's decision is arbitrary and capricious if it entirely failed to consider important aspect of problem. 🚩 5 U.S.C.A. § 706(2)(A).

1 Cases that cite this headnote

**[21]    Administrative Law and Procedure** 🔑 Wisdom, judgment, or opinion in general

**Administrative Law and Procedure** 🔑 Review for arbitrary, capricious, unreasonable, or illegal actions in general

Under arbitrary and capricious standard for review of administrative agency decision, scope of review is narrow, and Court of Appeals is not to substitute its judgment for that of agency. 🚩 5 U.S.C.A. § 706(2)(A).

1 Cases that cite this headnote

**[22]    Administrative Law and Procedure** 🔑 Review for arbitrary, capricious, unreasonable, or illegal actions in general

Under arbitrary and capricious standard for review of administrative agency decision, Court of Appeals' duty is to ensure that Commission has examined relevant data and articulated satisfactory explanation for its action. 🚩 5 U.S.C.A. § 706(2)(A).

**[23]    Administrative Law and Procedure** 🔑 Rules, Regulations, and Other Policymaking

Administrative agency may properly consider avoidance of litigation-related delay when revising its rules.

**[24]    Telecommunications** 🔑 Personal communication services

Federal Communications Commission (FCC) did not violate governing statute, instructing Commission to ensure that businesses owned by members of minority groups and women were given opportunity to participate in provision of spectrum-based services, when Commission eliminated gender-based and race-based preferences of Commission's entrepreneurs' C block auction rules for wireless broadband personal communications services (PCS); Commission complied with statute by considering use of tax certificates, bidding credits, and other procedures for auction, and modified rules would incidentally benefit businesses owned by women and minorities, as many such businesses would qualify as small businesses. Communications Act of 1934, 🚩 § 309(j)(4)(D), 🚩 47 U.S.C.A. § 309(j)(4)(D).

3 Cases that cite this headnote

**[25]    Telecommunications** 🔑 Personal communication services

Federal Communications Commission (FCC) order, eliminating gender-based and race-based preferences of Commission's entrepreneurs' C block auction rules for wireless broadband personal communications services (PCS), was nondiscriminatory in both purpose and effect, despite contention that time given nonminority, male-owned businesses to take advantage of newly-available 49% equity ownership option by owners that were not small businesses was significantly less than that provided to women and minority-owned businesses, to whom option had already been available; Commission properly took into account reliance interests of affected parties in expanding option to all potential applicants, and reasonably concluded that nonminority businesses had sufficient time to take advantage of option. U.S.C.A. Const.Amend. 14; Communications Act of 1934, 🚩 § 309(j)(3)(B), 🚩 (j)(4)(D), 🚩 47 U.S.C.A. § 309(j)(3)(B), 🚩 (j)(4)(D).

1 Cases that cite this headnote

**[26] Constitutional Law** 👈 Intentional or purposeful action

For purposes of contention that administrative agency decision has impermissible racially discriminatory intent, proof of agency's intent includes clear pattern of agency action, unexplainable on grounds other than race, historical background of decision, specific sequence of events leading up to challenged decision, and departures from normal procedural sequence. U.S.C.A. Const.Amend. 14.

**[27] Telecommunications** 👈 Judicial review or intervention

Small businesses' failure to raise it before Federal Communications Commission (FCC) did not preclude them from raising on appeal issue of whether affiliation rule adopted by Commission violated Communications Act provision requiring Commission, in designing auction procedures, to seek to promote economic opportunity and competition by disseminating licenses among wide variety of applicants, including small businesses, on judicial review of Commission order eliminating gender-based and race-based preferences of entrepreneurs' C block auction rules for wireless broadband personal communications services (PCS); attempting to raise issue before Commission would have been futile, as Commission was rapidly expediting proceeding and appeared wedded to procedures it had employed. Communications Act of 1934, 📄 §§ 309(j)(3)(B), 405(a), 📄 47 U.S.C.A. §§ 309(j)(3)(B), 405(a).

5 Cases that cite this headnote

**[28] Administrative Law and Procedure** 👈 In general; necessity

As a general rule, claims not presented to administrative agency may not be made for first time to reviewing court.

6 Cases that cite this headnote

**[29] Telecommunications** 👈 Exhaustion of remedies

Because statute governing petition for rehearing before Federal Communications Commission (FCC) contains traditionally recognized exceptions to exhaustion doctrine, reviewing court may consider arguments not raised before Commission where issues by their nature could not have been raised, or would have been futile to raise, before Commission. Communications Act of 1934, § 405(a), 47 U.S.C.A. § 405(a).

6 Cases that cite this headnote

**[30] Telecommunications** 👈 Personal communication services

Expanded affiliation rule adopted by Federal Communications Commission (FCC) did not violate Communications Act provision requiring Commission to seek to promote economic opportunity and competition by disseminating licenses among wide variety of applicants, including small businesses, on judicial review of Commission order eliminating gender-based and race-based preferences of entrepreneurs' C block auction rules for wireless broadband personal communications services (PCS); modification of affiliation rule aided participation by small businesses in auction by providing additional means for them to meet their financial needs, companies with gross revenues of $40 million or less retained significant advantages under rule, and elimination of affiliation provision would have harmed many minority-owned businesses that had been relying on it. Communications Act of 1934, 📄 § 309(j)(3)(B), 📄 47 U.S.C.A. § 309(j)(3)(B); 47 C.F.R. § 24.720(b)(3).

2 Cases that cite this headnote

**\*625 \*\*264** On Petitions for Review of an Order of the Federal Communications Commission.

**Attorneys and Law Firms**

Mark J. Tauber, argued the cause, for petitioner Omnipoint Corp., with whom Emilio W. Cividanes and Mark J. O'Connor were on the briefs.

Keith J. Harrison, argued the cause, for petitioner QTEL Wireless, Inc., with whom Jeffrey W. King was on the briefs.

Eliot J. Greenwald, argued the cause, for petitioners New Wave LLC, et al., with whom John Q. Hearne and Mark D. Wilkerson were on the briefs.

Christopher J. Wright, Deputy General Counsel, Federal Communications Commission, argued the cause, for respondents, with whom William E. Kennard, General Counsel, Daniel M. Armstrong, Associate General Counsel, James M. Carr, Joel Marcus, and John P. Stern, Counsel, Federal Communications Com'n, and Anne K. Bingaman, Assistant Attorney General, and Robert B. Nicholson, Attorney, U.S. Department of Justice, were on the brief. John E. Ingle, Deputy Associate General Counsel, Federal Communications Commission, and Robert J. Wiggers, Attorney, U.S. Department of Justice, entered appearances, for respondents.

Ashton R. Hardy, argued the cause and filed the briefs, for intervenor Radiofone, Inc.

Edgar F. Czarra, Jr., argued the cause, for intervenors Cook Inlet Region, Inc., et al., with whom Harris Weinstein, Kurt A. Wimmer, Lawrence R. Sidman, Judith A. Mather, J. Roger Wollenberg, William R. Richardson, Jr., Lynn R. Charytan, George Petrutsas, Carl W. Northrop, Emmett A. Johnston, Shelley L. Spencer, Phyllis A. Whitten, David E. Springer, John C. Spinrad, Stephen G. Kraskin and Sylvia L. Lesse were on the brief. Jonathan D. Blake entered an appearance, for intervenor American PCS, L.P. Frederick M. Joyce entered an appearance, for intervenor Essex USA, LLC. David Cosson and L. Marie Guillory entered appearances, for intervenor Nat. Telephone Co-op. Ass'n. Jonathan D. Hart entered an appearance, for intervenors BET Holdings, Inc., and Page Call, Inc. James L. Winston and Walter E. Diercks entered appearances, for intervenor Nat. Ass'n of Black Owned Broadcasters, Inc. Debra M. Richards, pro se, entered an appearance. Thomas A. Hart, Jr., entered an appearance, for intervenor Nat. Paging & Personal Communications Ass'n.

Before EDWARDS, Chief Judge, and WALD and SENTELLE, Circuit Judges.

**Opinion**

Opinion for the court filed by Circuit Judge SENTELLE.

Opinion dissenting in part filed by Circuit Judge WALD.

SENTELLE, Circuit Judge:

In this consolidated proceeding, we consider three separate petitions for review of a Federal Communication Commission order. All petitioners allege that the Commission violated the APA and its own regulations in promulgating its *Implementation of Section 309(j) of the Communications Act—Competitive Bidding, Sixth Report and Order,* F.C.C. 95–301 (July 18, 1995) ("*Sixth R & O*"), which eliminated the gender- and race-based provisions of the Commission's C block auction rules for broadband PCS, but each petitioner also raises separate claims. One petitioner claims that the Commission's actions in eliminating the provisions were arbitrary **\*626** **\*\*265** and capricious under 5 U.S.C. § 706(2)(A); one alleges that the Commission's actions discriminated against white males; and the third contends that the Sixth Report and Order violated § 309(j)(3)(B) of the Communications Act as it undermined the Commission's mandate to aid small businesses.

After reviewing the claims, we find that the Commission's actions were justified and did not violate the APA, the Commission's own regulations or its statutory mandate.

## I. BACKGROUND

Broadband PCS is a new type of wireless communication technology that will provide a variety of mobile telephone services in competition with existing cellular services. The FCC partitioned the broadband spectrum into six blocks, labeled A though F. It opted to allocate the spectrum in three separate auctions: the first auction was for licenses in blocks A and B; the second, for licenses in blocks C and F; and the third, for licenses in blocks D and E. We are concerned with the second auction here.

Blocks C and F were designated "entrepreneurs' blocks." Eligibility for these blocks was limited "to entities that, together with their affiliates and certain investors, have gross revenues of less than $125 million in each of the last two years

and total assets of less than $500 million." *Implementation of Section 309(j) of the Communications Act—Competitive Bidding, Fifth Report and Order,* 9 F.C.C.R. 5532, 5585 ¶ 121 (1994) ("*Fifth R & O* "), on recon., *Fifth Memorandum Opinion and Order,* 10 F.C.C.R. 403 (1994) ("*Fifth M & O* "). The rules establishing the entrepreneurs' blocks were adopted by the Commission in order to satisfy 47 U.S.C. § 309(j)(3)(B), which mandated that the Commission promulgate rules that would "disseminat[e] licenses among a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women."

Broadband PCS is a highly capital intensive business. *See Fifth R & O* ¶ 174. As such, the primary impediment to participation by designated entities is a lack of access to capital. Accordingly, the FCC structured the auction rules to allow bidders in the entrepreneurs' blocks to obtain substantial investment from other companies.

It did this primarily in three ways. First, the FCC structured the attribution rules to allow those companies that were not allowed to bid on blocks C and F to invest in entities that bid on those blocks. Specifically, as much as 75% of the total equity of C block applicants could be held by as few as three passive nonvoting investors that would be too large themselves to bid in the entrepreneurs' blocks. Second, the Commission gave a 10% bidding credit, or discount off the bidding price, to small businesses. And third, successful bidders were given favorable installment terms.

Additionally, the Commission adopted rules designed to enhance opportunities for businesses owned by women and members of minority groups in an effort to comply with the directive of 47 U.S.C. § 309(j)(4)(D), which instructed the Commission to ensure that women and minorities have "the opportunity to participate in the provision of spectrum-based services." These rules provided the following benefits: (1) a woman- or minority-owned applicant could have a single passive non-voting investor with an interest as large as 49.9% if the applicant held a 50.1% interest ("49% equity option"); *Fifth R & O* ¶¶ 160–62; (2) a special exception to the affiliation rule allowed an individual member of a minority group to participate as a member of the control group of a minority-owned C block applicant even though the individual's other business properties would otherwise make the applicant too large for the entrepreneurs' block; *Fifth M & O* ¶¶ 40–41; and (3) minority-and women-owned

businesses were to receive an additional 15% bidding credit, tax certificates and more favorable installment payment plans than other small businesses. *Fifth R & O* ¶¶ 130–47.

The A and B block auctions were held in March, 1995, and the C block auction was scheduled to take place in May, 1995. However, in February, Telephone Electronics Corporation (TEC) moved to stay the auctions, asserting that the FCC's race- and gender-based rules were unconstitutional. **\*627  \*\*266** On March 15, we granted a stay of "[t]hose portions of the [auction rules] establishing minority and gender preferences, the C block auction employing those preferences, and the application process for that auction." *Telephone Electronics Corp. v. FCC,* No. 95–1015, 1995 WL 364043 (D.C.Cir. May 1, 1995). We found that TEC had "demonstrated the requisite likelihood of success on the merits." *Id.* TEC later withdrew its petition for review, and this Court dissolved the stay on May 1. *Telephone Electronics Corp. v. FCC,* No. 95–1015 (D.C.Cir. May 1, 1995) (order granting dismissal of petition for review). The FCC then rescheduled the C block auction without revising its women-and-minority-based provisions.

On June 12, three days before the new due date for filing applications to participate in the C block auction, the Supreme Court announced its decision in *Adarand Constructors v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). In that case, the Court ruled that strict scrutiny must be applied to all racially based government actions, holding that such actions "are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Id.* at ——, 115 S.Ct. at 2113.

In light of this decision, the Commission suspended the filing deadline for C block applications on June 13. Ten days later, the Commission released a Further Notice of Proposed Rulemaking in which it suggested modifications to the C block auction rules. *Implementation of Section 309(j) of the Communications Act—Competitive Bidding, Further Notice of Proposed Rulemaking,* F.C.C. 95–263 (released June 23, 1995) ("FNPRM"). Recognizing *Adarand* had made the C block rules subject to considerable legal uncertainty, the FCC "propose[d] to eliminate all race- and gender-based provisions contained in [its] competitive bidding rules ... in order to avoid delay caused by ... legal challenges." FNPRM ¶ 2.

Believing it was necessary to hold the C block auction as soon as possible, the Commission set a two-week deadline for filing comments and did not invite reply comments. On the same day that it issued the FNPRM, the Commission also scheduled the C block auction for August 29, 1995, with short-form applications for the auction due July 28.

On July 18, the Commission issued its *Sixth R & O*. In this R & O, the Commission adopted most of the rule changes proposed in the FNPRM. It leveled all benefits upward, thereby making available to all small businesses the favorable terms that previously had been available only to small businesses owned by women and minorities. *See Sixth R & O* ¶¶ 18, 32, 35–48. The Commission ordered that the amended rules would take effect immediately upon publication in the Federal Register. *Id.* at ¶ 60. This occurred July 21, 1995. 60 Fed.Reg. 37786 (July 21, 1995).

Three days later Omnipoint Corporation, a small business that holds a PCS license for the New York Major Trading Area, petitioned this Court for review of the *Sixth R & O* and asked for an emergency stay. *Omnipoint Corp. v. FCC*, 78 F.3d 620 (1995). Omnipoint contended that the Commission had committed procedural violations of the Administrative Procedure Act (APA) and had violated the equal protection rights of white males by extending the 49% equity option to all bidders. On July 27, this Court issued a stay of this rule and ordered an expedited briefing schedule.

On August 2, QTEL Wireless, Inc., a minority-owned small business that had been prepared to participate in the PCS auction prior to the Commission's stay in June, filed a motion to expand this Court's review of the FCC's eligibility rules and to consolidate its action with the *Omnipoint* case. QTEL asked this Court to broaden its review to include the other substantive changes in the rules regarding women-and-minority-owned businesses, namely the bidding credit provisions, the special exception to the affiliation rule and the favorable installment plan terms. We granted QTEL's motion on August 8.

Shortly thereafter, a group of joint petitioners (New Wave LLC, Central Alabama Partnership L.P. 132 and Mobile Tri–States L.P. 130), all of which qualified as small **\*628 \*\*267** businesses under the FCC's rules, filed two separate petitions for review of the *Sixth R & O*. The joint petitioners contended that the changes, particularly the leveling upward of the special exception to the affiliation rule, violated the Commission's congressional mandate to ensure small

businesses were provided an opportunity to participate in the PCS market. We consolidated these petitions with the *Omnipoint* case on August 18.

## II. STANDING

**[1] [2]** Before addressing the merits of this claim, we must first determine whether petitioners have standing to bring this suit. As we have stated previously, a plaintiff may secure constitutional standing if he can "show injury in fact that is fairly traceable to the defendant's action and is redressable by the relief requested." *Animal Legal Defense Fund, Inc. v. Espy*, 23 F.3d 496, 498 (D.C.Cir.1994); *see also Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982). A plaintiff may secure judicial review under the APA if he can demonstrate that the injuries he asserts fall within the "zone of interests" sought to be protected by a relevant statute. *Animal Legal Defense Fund, Inc.,* 23 F.3d at 499; *see also Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987).

**[3]** Omnipoint complains that the 49% equity option, although facially neutral, is racially discriminatory as the Commission did not allow non-minority-owned small businesses adequate time to take advantage of the 49% option. As a result, Omnipoint argues that it cannot compete on an equal footing with minority- and women-owned businesses in the C block auction.

**[4]** We hold that Omnipoint does have standing. Contrary to the intervenors' assertions, it is not necessary that Omnipoint be "able and ready" to utilize the 49% equity option in order to secure standing. Rather, when a party challenges a government set-aside program, "the 'injury in fact' ... is the denial of equal treatment resulting from the imposition of the barrier." *Northeastern Florida Chapter of the Assoc. Gen. Contractors v. Jacksonville,* 508 U.S. 656, 666, 113 S.Ct. 2297, 2303, 124 L.Ed.2d 586 (1993); *see also Adarand,* 515 U.S. at ——, 115 S.Ct. at 2105 (citation omitted). Omnipoint's injury is its inability to compete equally in the C block auction if the 49% equity option is indeed racially discriminatory.

**[5]** Joint petitioners claim to have standing under 5 U.S.C. § 702, which grants standing to those "aggrieved by agency action within the meaning of a relevant statute." We find that, as small businesses under the Commission's definition, joint petitioners are within the zone of statutorily protected interests of § 309(j), which was designed to promote opportunities for small businesses and prevent anticompetitive concentration of spectrum licenses in a few large companies. *See* 47 U.S.C. §§ 309(j)(3)(B) and 309(j)(4)(D).

Further, joint petitioners adequately allege injury by the affiliation rule adopted in the *Sixth R & O* as that rule allows major companies to participate in the C block auction and qualify for small business advantages, thereby reducing the likelihood that small businesses such as the joint petitioners will be able to outbid their competitors at auction.

**[6]** QTEL also has standing to assert its claim. QTEL's investors allegedly withdrew their investments due to the Commission's notice of proposed rulemaking eliminating the minority and gender preferences. *See Declaration of Q.T. Kenan, President of QTEL Wireless* at ¶ 11. These changes were implemented in the *Sixth R & O.* Hence, QTEL suffered injury "traceable to the [Commission's] action" which is redressable by the relief requested. *Animal Legal Defense Fund, Inc., 23 F.3d at 498.*

## III. MERITS

Having determined that petitioners have standing to litigate, we now address the merits of their claims.

**\*629   \*\*268   *A. QTEL's Claims***

*1. Did the FCC violate the APA?*

QTEL first alleges that the FCC violated the APA, 5 U.S.C. § 553, and the Commission's own statutory requirement, 47 C.F.R. § 1.415(c), by providing inadequate time for notice and comment, by making the final rule effective on the date of its issuance and by dispensing with reply comments in the rulemaking process. Omnipoint also raises the claim that the FCC violated the APA by making the final rule effective immediately upon publication, and both Omnipoint

and the joint petitioners join QTEL in its claim that the Commission violated its own regulations by dispensing with reply comments.

**[7]** The Commission published its proposal to eliminate the race- and gender-based provisions in the Federal Register on June 30, 1995. *Further Notice of Proposed Rulemaking,* 60 Fed.Reg. 34200 (proposed June 30, 1995). It established July 7, 1995 as the deadline for comments on the proposed changes. QTEL contends that this action violated the APA as the Commission failed to provide adequate time for notice and comment.

**[8]** Reasonable notice of a proposed rulemaking shall be given, *Fund for Animals v. Frizzell,* 530 F.2d 982, 988 (D.C.Cir.1975); however, notice is not required "when the agency finds (and incorporates the finding and a brief statement of the reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). Notice is adequate if it provides "interested persons an opportunity to participate in the rule making through submission of written data, views or arguments." 5 U.S.C. § 553(c).

Here, the Commission "compl[ied] with the strict language of section 553" as it gave interested parties notice of its proposed rules and provided public procedures for comment in the FNPRM. *Fund for Animals,* 530 F.2d at 988. QTEL contends, however, that this "strict compliance" was inadequate. It asserts that, because of the magnitude of the changes proposed by the Commission, the time provided here did not allow for meaningful public comment.

We disagree with this proposition, however, and find that the comment period provided by the FCC was sufficient given the "urgent necessity for rapid administrative action under the circumstances." *Northwest Airlines v. Goldschmidt,* 645 F.2d 1309, 1321 (D.C.Cir.1981). These circumstances included a congressional mandate to implement the C block auction "without administrative or judicial delays;" 47 U.S.C. § 309(j)(3)(A); *see also Florida Power & Light Co. v. United States,* 846 F.2d 765, 772 (D.C.Cir.), *cert. denied,* 490 U.S. 1045, 109 S.Ct. 1952, 104 L.Ed.2d 422 (1988) (holding that fifteen-day comment period was adequate given Congressional deadline imposed on Nuclear

Regulatory Commission); *Petry v. Block,* 737 F.2d 1193, 1200–01 (D.C.Cir.1984) (holding that the limited time Congress gave the Department of Agriculture was a "crucial factor in establishing 'good cause' " under § 553(b)(B)); preservation of the interests of small businesses, minorities and women that Congress sought to protect through § 309(j); and preservation of a viable market for C block licenses. In its *Sixth R & O,* the Commission specifically found that existing business relationships were more likely to survive if the auction was not significantly delayed. *Sixth R & O* ¶ 8. Also, it noted that delay of the C block auction would postpone competition in the wireless marketplace, thereby harming the ability of latter entrants to compete. *Id.* at ¶ 7. We find no reason to disagree with these findings, and hold that they were sufficient to justify the shortened comment period provided by the Commission in this case.

Additionally, we note that, contrary to QTEL's assertions, interested parties actually had more than seven days in which to file comments as notice of the proposed agency action was given prior to July 30. In *Fund for Animals,* we found that the short comment time provided by the Fish and Wildlife Service (FWS) was reasonable as the appellants had actually received notice prior to the August date when the proposed federal regulations were published in the Federal Register. *Fund for Animals,* 530 F.2d at 989–90. **\*630 \*\*269** We held that public statements issued by the FWS in May and June had provided notice to appellants of the proposed action of the agency, noting that "[i]t is a vital part of appellants' business to be knowledgeable in [their] field." *Id.* at 990.

Here, the Commission published a public notice on June 13 announcing suspension of the filing deadline for applications to participate in the C block auction. Also, the FNPRM was issued by the Commission on June 23, seven days before its June 30 publication in the Federal Register. Hence, like the petitioners in *Fund for Animals,* the parties in this case received notice of the proposed agency action prior to June 30 and, therefore, had more than seven days in which to comment on the proposed rule.

In addition, we find petitioners and intervenors were not harmed by the short comment period. *See* 5 U.S.C. § 706 (providing that reviewing court take "due account ... of the rule of prejudicial error"). The Commission received 45 comments and 42 letters addressing its proposed rule, the majority of which supported the FCC's effort to commence

the auction quickly and avoid litigation by leveling up. It also reviewed the comments received and took them into account in its decision. In fact, the Commission modified one of the proposed rules in response to the comments filed. *Sixth R & O* ¶ 32; *see also* Florida Power & Light, 846 F.2d at 772 (rejecting claim that a comment period was inadequate where comments were filed, were considered by the agency, and affected the final rule). Further, QTEL has since had a considerable period of time to consider the rule, but has failed to identify any substantive challenges it would have made had it been given additional time. *See id.;* Air Transport Ass'n of America v. Civil Aeronautics Board, 732 F.2d 219, 224 n. 11 (D.C.Cir.1984) (finding harmless error where petitioner "[did] not explain what it would have said had it been given" an opportunity to respond).

**[9]   [10]**    QTEL and Omnipoint also claim that the Commission violated the APA by making the final rule effective immediately upon publication. A rule is to take effect "not less than 30 days" after its publication unless good cause is found by the agency and published with the rule. 5 U.S.C. § 553(d)(3). In determining whether good cause exists, an agency should "balance the necessity for immediate implementation against principles of fundamental fairness which require that all affected persons be afforded a reasonable amount of time to prepare for the effective date of its ruling." United States v. Gavrilovic, 551 F.2d 1099, 1105 (8th Cir.1977).

In the *Sixth R & O,* the Commission stated that good cause existed to have the rules take effect immediately as "the C block auction for broadband PCS [wa]s scheduled to commence on August 29, 1995, and initial short-form applications [wer]e due July 28, 1995." *Sixth R & O* ¶ 60. The Commission found it was necessary for the revised rules to take effect prior to the due date of the short-form applications "in order to avoid the delays and litigation risks associated with prior rules." *Id.*

Petitioners contend that this tight deadline problem was of the Commission's own making; hence, any need for expedition was simply "bootstrapping" by the Commission. We disagree, however, and find that a number of factors justified the need for expedition, not simply the August 29 auction date.

First, as we noted above, the Commission was under a congressional deadline to act quickly. Second, the precarious nature of the financial investments of prospective C block

bidders, as well as the headstarts already given to the A and B blocks as a result of the litigation delay, also supported an expedited proceeding. *See Sixth R & O* ¶¶ 1, 7. And third, a delay in the C block auction would undermine the public interest by delaying additional competition in the wireless marketplace. *Id.; see also Buckeye Cablevision, Inc. v. FCC,* 387 F.2d 220, 228 n. 34 (D.C.Cir.1967) (holding that Commission's desire to minimize harm to public was sufficient "good cause" to make rule effective on date of publication in Federal Register).

 **[11]**    Additionally, the purpose of the thirty-day waiting period is to give affected parties a reasonable time to adjust their behavior before the final rule takes effect. *See*   **\*631**

**\*\*270** *American Federation of Government Employees v. Block,* 655 F.2d 1153, 1156 (D.C.Cir.1981). In its comments requesting the stay, Omnipoint argued that it needed at least 60–90 days to adjust to the rule change. *Comments of Omnipoint Corp.,* July 7, 1995, at 2. We find that, although the Commission did not allow much time for affected parties to adjust to the new rules, the stay and the delay caused by this litigation have afforded parties like Omnipoint the time they claimed to need to make this adjustment.

*2. Did the FCC violate its own regulations?*

 **[12]    [13]    [14]    [15]**    QTEL, Omnipoint and the joint petitioners also claim the Commission violated its own regulations because it did not request reply comments. The Commission's regulations provide that a reasonable time will be provided for filing reply comments. 47 C.F.R. § 1.415(c). The Commission may waive its own rules, however, "for good cause shown." 47 C.F.R. § 1.3. Good cause exists where "particular facts would make strict compliance inconsistent with the public interest." *Northeast Cellular Telephone Co., L.P. v. FCC,* 897 F.2d 1164, 1166 (D.C.Cir.1990) (citing *WAIT Radio v. FCC,* 418 F.2d 1153, 1159 (D.C.Cir.1969), *cert. denied,* 409 U.S. 1027, 93 S.Ct. 461, 34 L.Ed.2d 321 (1972)). We review an agency's interpretation of its own regulation under a standard "more deferential ... than that afforded under *Chevron*." *National Medical Enterprises v. Shalala,* 43 F.3d 691, 697 (D.C.Cir.1995). "[P]rovided an agency's interpretation of its own regulation does not violate the constitution or a federal statute, it must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Id.* (quoting *Stinson v. United States,* 508 U.S. 36, 45, 113 S.Ct. 1913, 1919,

123 L.Ed.2d 598 (1993) (internal quotations and citations omitted)).

In the FNPRM, the Commission stated it was not requesting reply comments in order "to facilitate swift action on [its] rule changes." FNPRM ¶ 2. The Commission noted that it needed "to make such changes quickly in order to minimize the effects of the modified rules on existing business relationships" and to avoid further delaying "the expeditious dissemination of broadband PCS licenses to entrepreneurs." *Id.*

We find that the Commission's reasons constitute good cause and, therefore, hold that the Commission properly waived its reply comment provision. Contrary to petitioners' assertions, expedition of the rulemaking proceeding was necessary in order to reduce the harm resulting from delay. In April, potential applicants had informed the FCC that the *TEC* stay had had an immediately "chilling effect on potential lenders, investors and strategic partners ... [that was] detrimental to capital formation by [would-be C block participants]." *Comments on Emergency Petition for Waiver by Independent Cellular Consultants PCS, Inc.* at 7 (April 3, 1995). Additionally, another commenter noted that, in the wake of that stay, "the uncertainty and delay ... surrounding the entrepreneur block auctions ... caused potential financing sources to begin actively to considering other more secure investment opportunities." *Comments of DCR Communications, Inc.* at 2 (April 3, 1995). And most commenters to the FNPRM urged the Commission to proceed quickly. *See Sixth R & O* ¶¶ 10, 14, 27, 48.

 **[16]**    Petitioners assert, however, that, even if the Commission was justified in waiving the right to reply comments, its actions were still invalid under the APA as a second round of comment is necessary when an agency alters its course during the rulemaking proceeding. Here, the affiliation rule the Commission adopted in the *Sixth R & O* differed from the one it had proposed in the FNPRM.

 **[17]    [18]**    In deciding whether a second round of comment is required, this Court looks to see "whether the final rule promulgated by the agency is a 'logical outgrowth' of the proposed rule." *American Water Works Ass'n. v. EPA,* 40 F.3d 1266, 1274 (D.C.Cir.1994). A final rule is not a logical outgrowth of a proposed rule "when the changes are so major that the original notice did not adequately frame the subjects for discussion."   **\*632    \*\*271** *Connecticut Light and*

316 U.S.App.D.C. 259, 2 Communications Reg. (P&F) 816

*Power Co. v. Nuclear Regulatory Commission,* 673 F.2d 525, 533 (D.C.Cir.), *cert. denied,* 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982).

In the FNPRM, the Commission announced its tentative conclusion that "it would be imprudent to extend [that affiliation rule] exception to all entrepreneurs" as such a change would allow large wireless companies to dominate the C block auction. FNPRM ¶ 19. Several commenters suggested a solution to this problem, proposing that, in addition to extending the affiliation rule to all small businesses, the Commission should also require that the affiliates be under the applicable financial caps. They contended that this proposed rule would prevent the larger companies from being able to participate in the auction, but at the same time would protect the reliance interests of those companies currently utilizing the exception.

The Commission agreed with the commenters and adopted this proposal. The Commission asserts that this final rule was a "logical outgrowth" of the proposed rule as it was "a compromise between the rule that was tentatively proposed and the rule that was tentatively rejected."

We agree with the Commission that this final rule was a "logical outgrowth" of the issue as framed in the FNPRM. The Commission acted well within its authority when it chose to modify the affiliation exception based on comments responding to the FNPRM rather than to eliminate it.

*See* United Steelworkers of America, AFL–CIO–CLC v. Marshall, 647 F.2d 1189, 1221 (D.C.Cir.), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981) ("[A] final rule may properly differ from a proposed rule ... when the record evidence warrants the change."). The commenters' solution to this problem allowed the Commission to adopt a rule that was actually more consistent with both the Commission's desire to avoid disrupting the existing plans of prospective auction participants and its overall approach of leveling benefits upward in order to remove the rules' race and gender preferences than the Commission's earlier version. Further, the "public interest in expedition and finality" in this case outweighed the advantages of additional comment.

*Action Alliance of Senior Citizens of Phil. v. Bowen,* 846 F.2d 1449, 1455–56 (D.C.Cir.1988), *cert. denied,* 502 U.S. 938, 112 S.Ct. 371, 116 L.Ed.2d 323 (1991).

*3. Were the FCC's actions arbitrary and capricious?*

**[19] [20] [21] [22]** QTEL contends that the Commission's action in eliminating the race- and gender-based provisions was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A), as these modifications were not supported by evidence in the record. An agency's decision is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). Under the arbitrary and capricious standard, the scope of review is narrow, and we are "not to substitute [our] judgment for that of the agency." *Id.; see also Atlantic Tele–Network, Inc. v. FCC,* 59 F.3d 1384, 1388 (D.C.Cir.1995). Our "duty is to ensure that the Commission has examined the relevant data and articulated a satisfactory explanation for its action...." *Atlantic Tele–Network, Inc.,* 59 F.3d at 1389 (quoting *Florida Cellular Mobil Communications Corp. v. FCC,* 28 F.3d 191, 197 (D.C.Cir.1994), *cert. denied,* 514 U.S. 1016, 115 S.Ct. 1357, 131 L.Ed.2d 215 (1995) (internal quotation and citation omitted)). Applying this deferential standard, we conclude that the Commission's action survives review.

After *Adarand,* the Commission had three alternatives: (1) it could retain the option and attempt to justify it under *Adarand;* (2) it could level the 49% equity option upward; or (3) it could eliminate the option. Given those alternatives, the Commission decided to level the benefits upward.

**[23]** QTEL contends that the Commission acted unreasonably when it elected not to attempt to defend its original rules after *Adarand.* We disagree. The Commission reasonably believed that justifying the old rules under "strict scrutiny" would have been difficult and time-consuming. Only last March, we stayed the C block auction, finding **\*633 \*\*272** TEC had demonstrated the "requisite likelihood of success on the merits" in its claim that the Commission's race-and-gender-based rules were unconstitutional. The possibility of further delay due to additional litigation if the Commission retained the race-based rules was great. As we have noted previously, an agency may properly consider the avoidance of litigation-related delay when revising its rules. *See, e.g., Florida Cellular Mobil Communications Corp.,* 28 F.3d at 196–98; *Office of Communication of United Church of Christ v. FCC,* 707 F.2d 1413, 1435–37 (D.C.Cir.1983).

Further, the Commission, although not conceding that the rules would not withstand strict scrutiny, did state that it did not believe the rules would withstand such scrutiny without the taking of additional evidence. *See Sixth R & O ¶ 11.* In light of the significant delays this would require, the Commission justifiably rejected this option. Hence, we hold that the Commission did not act unreasonably when it opted not to defend its race- and gender-based rules in light of *Adarand,* but rather, sought to commence the auction quickly and avoid litigation by leveling benefits upward.

Also, we find the Commission's decision to level the benefits upward rather than downward was justified. By selecting this option, the Commission avoided any issue under *Adarand,* and yet complied with the congressional directive to create opportunities for small businesses and for women- and minority-owned businesses to participate in the PCS market. As the Commission explained, expanding this option to all applicants would benefit all bidders by giving them added flexibility in acquiring capital, a factor that would be critical to a potential bidder's success in the C block auction.

QTEL contends that expansion of the 49% equity option to include all applicants will lead to *de facto* transfers of control, thereby allowing large companies to participate in the C block auction. Significant safeguards exist within the rules, however, to protect against such "shams." For example, qualifying entities must still maintain *de facto* and *de jure* control of the business, and the agency has an opportunity to review the entity's structure during the application process. *See* 47 C.F.R. § 24.720(k); *Fifth R & O* ¶ 117; *Fifth M & O* ¶¶ 128–29; *Sixth R & O* ¶ 17.

Also, the Commission properly weighed the reliance interests of affected parties when it extended the 49% equity option to all potential applicants. *See National Ass'n of Independent Television Producers and Distributors v. FCC,* 502 F.2d 249, 255 (D.C.Cir.1974) (holding that the Commission was required to take into account petitioners' justifiable reliance upon old rule when enacting new rule). Eliminating the rule would have harmed many of the small, minority- and female-owned businesses which could not have otherwise attracted capital. QTEL is the only small, minority-owned business that has claimed to have lost investors because of the Commission's change in rules post-*Adarand.* Nothing in the record, however, suggests that QTEL's experience mirrored the situation others faced. In fact, intervenors supporting the Commission argued just the opposite.

*4. Did the FCC violate its governing statute?*

**[24]** QTEL also complains that the modified C block auction rules conflict with the Commission's governing statute which instructed the Commission to "ensure that small businesses, rural telephone companies, and businesses owned by members of minority groups and women are given the opportunity to participate in the provision of spectrum-based services, and, for such purposes, consider the use of tax certificates, bidding preferences, and other procedures." 47 U.S.C. § 309(j)(4)(D). QTEL asserts that, as the Commission was acting contrary to congressional intent when it eliminated the race- and gender-based preferences in the *Sixth R & O,* no deference must be shown to the Commission's interpretation of the statute. *See American Federation of Gov't Employees, Locals No. 214 v. Federal Labor Relations Authority,* 798 F.2d 1525, 1528 (D.C.Cir.1986).

We find this argument meritless as the amended rules are entirely consistent with the Commission's statutory obligations. The Commission complied with § 309(j)(4)(D) by **\*634  \*\*273** considering the use of tax certificates, bidding credits and other procedures for the C block auction.

*See Time Warner Entertainment Co. v. FCC,* 56 F.3d 151, 175 (D.C.Cir.1995) (holding that when a statute by its terms requires the Commission to consider certain factors "[t]hat means only that [the FCC] must 'reach an express and considered conclusion' about the bearing of a factor, but is not required 'to give any specific weight' to it." (internal citations omitted)). Additionally, the modified rules will incidentally benefit businesses owned by women and minorities as many such businesses will qualify as small businesses. *See* FNPRM n. 39 (according to U.S. Census Data, "approximately 99% of all women-owned businesses and 99% of all minority-owned businesses generated net receipts of $1 million or less").

*B. Omnipoint's Claims*

**[25]  [26]** Omnipoint contends that the rule would have a racially discriminatory effect as the time given non-minority, male-owned businesses to take advantage of the 49% equity option was significantly less than that provided to women and minority-owned businesses. It asserts that the amount of time provided was insufficient for businesses owned by white males to utilize the option. It argues that this regulation, even though facially neutral, must be invalidated as it has a racially discriminatory intent or purpose. *See Arlington Heights v. Metropolitan Housing Development Corp.,* 429

U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). Proof of an agency's intent includes "a clear pattern [of agency action], unexplainable on grounds other than race[;] ... [t]he historical background of the decision [;] ... the specific sequence of events leading up to the challenged decision [; and] ... [d]epartures from the normal procedural sequence...." *Id.* at 266–67, 97 S.Ct. at 564.

Omnipoint cites several factors as evidence of the Commission's discriminatory intent. First, the C block auction rules were designed and justified as a measure to aid women and minorities, *Fifth R & O* ¶ 110, and in the *Sixth R & O* the Commission stated it was retaining the 49% equity option in order to preserve "existing business relationships formed under [its] prior rules and in anticipation of the C block auction." *Sixth R & O* ¶ 1. Second, in adopting this new rule, the Commission departed from its normal rulemaking procedures as it offered no opportunity for reply comments and accelerated the time provided for notice and comment. Finally, non-discriminatory options were available to the Commission that would have achieved the same results as expanding the option to all businesses. For example, Omnipoint suggests the Commission could have eliminated the 49% exception and still held the auction as scheduled.

We disagree with Omnipoint's contentions, and find the regulation nondiscriminatory in both purpose and effect. As we stated above, we believe that the Commission properly took into account the reliance interests of affected parties when it decided to retain the 49% equity option and expand it to all potential applicants. Contrary to Omnipoint's contentions, that the Commission considered the effect a rule change would have on minority-and-women-owned businesses does not evince its discriminatory intent.

In addition, we find that the rulemaking proceeding was shortened in order to preserve the business relationships of all potential bidders, not just women and minorities. Indeed, most commenters urged the Commission to move quickly in order to avoid additional delay in the C block auction, including many non-minority, male-owned entities. As the Commission noted, opposition to the race and gender neutral rules came not from non-minorities and males, but rather, from women and minorities.

We also find that the Commission reasonably concluded that the petitioners and others like them had sufficient time to take advantage of the 49% equity option. As evidence of this, we note that at least one white male-owned business adjusted

to the rule change in the time provided. In addition, parties wishing to utilize this option are not required to do so before the auction, but may convert to this structure at any time. *See* 47 C.F.R. § 1.2105(c)(4)(i).

**\*635  \*\*274**  *C. Joint Petitioners' Claims*

The joint petitioners also assert that the affiliation rule adopted by the Commission violates § 309(j)(3)(B) of the Communications Act, which states that, in designing auction procedures, the Commission shall seek to promote "economic opportunity and competition ... by disseminating licenses among a wide variety of applicants, *including small businesses.*" (emphasis added). The joint petitioners contend that by making the affiliation rule race- and gender-neutral the Commission undermined its statutory mandate to aid bona fide small businesses as this change allows major companies to qualify as small businesses by simply forming new commonly owned corporations to be the applicant. Arguing that this rule is inconsistent with the Commission's governing statute, petitioners assert that it is beyond the agency's discretion and may be reversed and remanded without the normal deference accorded to an agency by the reviewing court. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

[27]  We must first determine whether the joint petitioners are barred from raising this issue. Although they concede that they failed to raise this issue before the Commission, they contend that they were barred from doing so as the Commission stated in the FNPRM that it was not inviting reply comments. They assert that any attempt to raise the issue after issuance of the *Sixth R & O* would have been futile as the auction was to commence August 29, a few days after the statutory time period for filing petitions for reconsideration.

[28]  [29]  As a general rule, claims not presented to the agency may not be made for the first time to a reviewing court. *See United States v. L.A. Tucker Truck Lines,* 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952). Section 405 codifies this requirement by requiring parties to petition the FCC for rehearing before raising a new issue on judicial review. 47 U.S.C. § 405(a). This Court has construed § 405 to require that complainants give the FCC a "'fair opportunity' to pass on a legal or factual argument" before coming to court. *Washington Ass'n for Television and Children (WATCH) v. FCC,* 712 F.2d 677, 680–82 (D.C.Cir.1983)

316 U.S.App.D.C. 259, 2 Communications Reg. (P&F) 816

(citation omitted); *see also City of Brookings Mun. Tel. Co. v. FCC,* 822 F.2d 1153, 1163 (D.C.Cir.1987). Because section 405 also contains the "traditionally recognized exceptions to the exhaustion doctrine," a reviewing court may consider arguments where issues by their nature could not have been raised, or would have been futile, to raise before the agency. *WATCH,* 712 F.2d at 682; *accord Office of Communication of the United Church of Christ v. FCC,* 779 F.2d 702, 706–07 (D.C.Cir.1985).

We agree with the joint petitioners that attempting to raise this issue before the Commission would have been futile as the Commission was rapidly expediting the proceeding and appeared "wedded to the procedures that it had employed." *City of Brookings Mun. Tel. Co.,* 822 F.2d at 1163. Any changes in the rule after the issuance of the *Sixth R & O* would have almost certainly resulted in a delay, inconsistent with the Commission's shortened timeline. Hence, this issue is properly before us for review. However, on the merits of the issue, we hold for the Commission.

Although § 309 does not define "small businesses," the Commission in its original C block rules defined small businesses as those with "a net worth not in excess of $6 million with average net income after Federal income taxes for the two preceding years not in excess of $2 million." *Fifth R & O* ¶ 172. In 1994, the Commission raised the small business threshold for broadband PCS to the $40 million gross revenues standard, recognizing that "in certain telecommunications industry sectors, [the prior] limit may not be high enough." *Id.* The rules contained an exemption for minority-owned businesses, which were allowed to ignore the gross revenues of their affiliates. *Fifth M & O* ¶¶ 40–41. In its *Sixth R & O,* the Commission expanded this exemption to include all small businesses, provided the annual gross revenue of such affiliates was below $125 million and the total assets of all such affiliates was below $500 million. *Sixth R & O* ¶ 32.

**\*636 \*\*275 [30]** The joint petitioners argue that the Commission did not adequately justify this expansion, noting that there is no rational connection between the Commission's actions and the purpose of § 309(j), which is to provide opportunities for small businesses to participate in the auction for spectrum-based services. They disagree with the Commission's proffered justification—that the capital requirements of the PCS business are so large that they required the extension of the affiliation rule to companies with greater assets and revenues—and contend that the original $40 million standard was adequate, noting that in the *Fifth R & O* the Commission found "there [was] substantial support in the record for [this] standard." *Fifth R & O* ¶ 175. The joint petitioners allege that this change will harm small businesses owned by women and minorities as 99% of these businesses have revenues below $1 million. *Sixth R & O* at ¶ 8 n. 29.

The joint petitioners also contend that no support exists in the record for finding that elimination of the rule rather than its expansion would have upset established business relationships. They note that large companies with assets between $40 to $125 million could still have participated in the C block auction if the exception had been eliminated. The only difference would be that such firms would not qualify as small businesses and, therefore, would not receive the small business benefits.

We hold that the Commission did not violate § 309(j) by modifying the affiliation rule. Nothing in the statute prohibited the Commission from extending additional benefits to companies whose affiliates have gross revenues up to $125 million, and the Commission adequately justified the extension of the rule. Prior to the A and B block auctions, the Commission stated: "We expect broadband PCS to be a highly capital intensive business requiring bidders to expend tens of millions of dollars to acquire a license and construct a system even in the smaller broadband PCS markets." *Fifth R & O* ¶ 174. The Commission's experience with the A and B block auctions confirmed this prediction as even large telecommunication companies did not bid on their own but joined together as partnerships.

By making a limited affiliation exception available to a broader range of businesses, the FCC created an additional vehicle for small businesses to pool their resources. Recognizing the benefits of pooling, the FCC determined that

> all small businesses, including those owned by minorities and women, should not be precluded from pooling their resources in this capital intensive service.... In addition, small businesses experienced in managing smaller businesses should not be penalized because they own or are otherwise affiliated with other

businesses whose assets and revenues must be considered on a cumulative basis and aggregated for purposes of qualifying for the C block auction.

*Sixth R & O* ¶ 32. Thus, modification of the affiliation rule aids participation by small businesses in the C block auction by providing an additional means for small businesses to meet their financial needs. We find it entirely reasonable for the Commission to extend an additional advantage to more companies that qualified to bid in the entrepreneurs' blocks. We also note that companies with gross revenues of $40 million or less retain significant advantages, including the ability to form consortia with other small businesses. 47 C.F.R. § 24.720(b)(3).

In addition, elimination of this provision would have harmed many of the minority-owned businesses that had been relying upon the rule. *See International Union, United Auto., Aerospace & Agric. Implement Workers of America v. Brock, 783 F.2d 237, 248 (D.C.Cir.1986)* (noting that the public justifiably relies upon administrative agencies' rules and interpretations). Here, a bidder who had been relying on the 49% equity option would have an established business relationship with only one investor and would have to find new investors in order to convert to the 25% equity structure. In contrast, a bidder who had been relying upon the 25% structure would have relationships with a number of investors, one of whom might be willing to take advantage of the 49% investment option. Thus, the Commission reasonably **\*637** **\*\*276** decided to "cap" the affiliation exception and make it race-neutral.

## IV. CONCLUSION

We conclude that the Commission did not violate the APA or its own regulations by providing a shortened period for notice and comment, by making the rule effective immediately and by dispensing with reply comments in the rulemaking process. In addition, we find the Commission, in adopting rules that eliminated race- and gender-based preferences by leveling benefits upward, did not act arbitrarily and capriciously in violation of 5 U.S.C. § 706(2)(A); did not discriminate against white males; and did not violate its statutory mandate to aid small business under § 309(j)(3)(B). Hence, we uphold the Commission's *Sixth R & O.*

WALD, Circuit Judge, dissenting in part:

Although I concur with most of the panel's analysis regarding the Federal Communications Commission's ("FCC") *Sixth Report & Order,* I believe that the FCC failed to provide the reasoned explanation for its decision to expand the 49% equity option to include all C block applicants which is required by § 706(2)(A) of the Administrative Procedure Act ("APA"). [1] Accordingly, I would vacate those portions of the *Sixth Report & Order* which expand the 49% option and remand to the FCC to provide, if it can, an adequate explanation of why it abandoned its earlier position that extending the 49% option to all qualifying applicants would permit larger companies to circumvent the C block financial caps.

In authorizing the auction of spectrum licenses, the Communications Act directs the FCC to promulgate regulations which promote the goal of "disseminating licenses among a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women." 47 U.S.C. § 309(j)(3)(B) (1988). As the majority acknowledges, the Commission also recognized that in order to compete successfully in the broadband personal communication services ("PCS") market, small businesses would require amounts of capital usually accessible only to larger companies. *See* Majority opinion ("Maj. op.") at 265. In the first set of rules issued by the FCC governing the C block auction, the Commission determined that it could best achieve a balance between these two objectives—preserving opportunities for small and minority- or women-owned businesses to participate in the PCS market, and permitting small businesses to obtain significant investment from larger entities—by allowing up to three large investors to hold passive, nonvoting equity blocks of up to 25% each in a qualifying entity (the "25% equity option"). The Commission explained that

the 25 percent limitation on equity investment interests will serve as a safeguard that the very large entities who are excluded from bidding in these blocks do not, through their investments in qualified firms, circumvent the gross revenue/total

asset caps. At the same time, it will afford qualified bidders a reasonable measure of flexibility in obtaining needed financing from other entities....

*Implementation of Section 309(j) of the Communications Act—Competitive Bidding, Fifth Report and Order,* 9 FCCRcd 5532, 5601–02 ¶ 159 (1994) ("*Fifth Report & Order*"), *on recon., Fifth Memorandum Opinion and Order,* 10 FCCRcd 403 (1994). To ensure that control over the C block licenses remained with the actual applicants, rather than with the larger companies who might utilize the 25% equity option to gain control of a C block license, the FCC stipulated that the control group in any small company exercising the 25% option must hold at least 25% of the equity, 50.1% of the voting stock, and all general partnership interests. *Id.* ¶ 158. The Commission also prohibited successful C block bidders from assigning or transferring their license to any other entity for three years, and from assigning or transferring it to an entity with income and assets over the  **\*638  \*\*277** C block financial caps for an additional two years. *Id.* ¶ 128.

For minority- and women-owned businesses, however, the FCC developed an additional option to help these entities surmount the more severe difficulties the Commission found they faced in attracting investment capital. Under this alternative, an entity with income and assets over the eligibility caps could own up to 49.9% of passive, nonvoting equity in a minority- or women-owned business (the "49% option"). In support of this decision, the Commission explained that "women and minorities have especially acute problems in obtaining financing.... [T]o afford women and minority-owned businesses more flexibility in attracting financing, it is necessary to provide these entities with an alternative, somewhat more relaxed option regarding the attribution of revenues of passive investors." *Id.* ¶ 160.

Confronted with the inevitability of new legal challenges to the 49% option in the wake of the Supreme Court's decision in *Adarand,* the FCC decided to expand its availability to *all* eligible C block applicants, not just minority-and women-owned businesses, rather than delay the auction while the constitutionality of a restricted option was litigated. As the majority notes, the Commission explained in its order setting forth this change that expansion of the 49% option was preferable to either defending the *Fifth Report & Order* against a legal attack based on *Adarand* 's strict scrutiny

principle or eliminating the option altogether; this middle course of action, the Commission thought, would avoid diminishing the value of the licenses through delay of the auction, and it would protect the deals struck by minority- and women-owned businesses and their investors in reliance on the original rules. *See* Maj. op. at 271–272; *Implementation of Section 309(j) of the Communications Act—Competitive Bidding, Further Notice of Proposed Rulemaking,* F.C.C. 95–263 (June 23, 1995) ¶¶ 7–10; *Implementation of Section 309(j) of the Communications Act—Competitive Bidding, Sixth Report and Order,* F.C.C. 95–301 (July 18, 1995) ("*Sixth Report & Order*") ¶ 11. In response to concerns expressed by commenters that this expansion might allow large companies to penetrate a significant proportion of the C block market, in contravention of congressional intent, the Commission answered:

> With respect to the *Control Group Minimum 50.1 Percent Equity Option,* we previously explained that in order to guard against abuses, the control group of applicants choosing this option must own at least 50.1 percent of the applicant's equity, as well as retain control and hold at least 50.1 percent of the voting stock. We have previously concluded that this requirement reduces substantially the danger that a well-capitalized investor with substantial ownership stake will be able to assume *de facto* control of the applicant.

*Sixth Report & Order* ¶ 17.

I do not take issue with the Commission's contention that defense of the original scheme or elimination of the 49% option entirely might have decreased the value of the licenses through delay or harmed C block applicants who had relied on the original rules. Both of these concerns may indeed be acceptable grounds for changing the substance of the original agency proposal. *See, e.g., Florida Cellular Mobil Communications Corp. v. FCC,* 28 F.3d 191, 196 (D.C.Cir.1994), *cert. denied,* 514 U.S. 1016, 115 S.Ct. 1357, 131 L.Ed.2d 215 (1995) (delay); *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 220, 109 S.Ct. 468, 477–78,

102 L.Ed.2d 493 (1988) (Scalia, J., concurring) (reliance on prior rule). My problem with the Commission's announced rationale for extending the 49% option to all small business applicants is rather this: in setting forth the initial auction rules, the Commission explicitly declined to extend the 49% equity option to all C block applicants because of its concern that even with the safeguards outlined above, the opportunity to make such a substantial investment in all C block entities, rather than just minority- and women-owned businesses, would allow large companies to exercise too much control over too many licenses that are targeted for small businesses. In its post-*Adarand* version of the auction rules, however, the Commission contends that expansion of the 49% option to include all C block applicants does not pose any such risk. By way of assurance, it asserts only that existing **\*639 \*\*278** restrictions on the 49% option—which are identical to those initially imposed on the 25% option—are now sufficient to protect against the dangers of big company capture they identified previously. I would like to know why the Commission is suddenly confident that if this expansion does produce a dramatic increase in penetration of the C block license market by large entities, as some of the petitioners claim it will and as the Commission previously worried it would, protection for the reliance interests of minority-and women-owned businesses will not have been secured at the expense of the FCC's statutory mandate to reserve this block of PCS licenses principally for small businesses. Because its about-face may have such significant consequences in determining the identity of those who hold these licenses, I believe the Commission needs to give a more thorough explanation for why it no longer worries about back-door control by bigger businesses.

I appreciate the concern expressed by my colleagues and the Commission regarding the potential effects of delay on the value of the C block auctions, and in these circumstances, the FCC might well have been justified in providing a less thorough rationale than usual for its change in course. But at a minimum, it should have explained why existing safeguards were sufficient to protect against excessive penetration by large companies, or it might have acknowledged the continuing threat of such penetration, but proposed to engage in heightened oversight to prevent this result. It has done neither. Even in the face of pressure for expeditious action, the APA's requirement that an agency must provide a "reasoned explanation" for its actions still applies. *See, e.g.,* *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983) ("an agency rule would be arbitrary and capricious if the agency has ... entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency"); *Florida Cellular Mobil Communications,* 28 F.3d at 196 ("the fact that an agency rule represents a change in course simply requires courts to make sure that their prior policies are being deliberately changed, not casually ignored, and that the agency has articulated permissible reasons for that change" (quoting *Clinton Memorial Hosp. v. Shalala,* 10 F.3d 854, 859 (D.C.Cir.1993)). If this requirement is to have any meaning, I believe we are obliged to remand those portions of the FCC's *Sixth Report & Order* which expand the 49% equity option so that the agency may explain how its original fears of big business control have been assuaged or countermanded.

### All Citations

78 F.3d 620, 316 U.S.App.D.C. 259, 2 Communications Reg. (P&F) 816

---

## Footnotes

1    The APA directs a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994).

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Not Followed on State Law Grounds State v. Aduka, Ga., March 15, 2018

130 S.Ct. 1473
Supreme Court of the United States

Jose PADILLA, Petitioner,

v.

KENTUCKY.

No. 08–651.
|
Argued Oct. 13, 2009.
|
Decided March 31, 2010.

**Synopsis**

**Background:** Defendant convicted on drug-related charges filed motion for post-conviction relief, alleging that his attorney was ineffective in misadvising him about potential for deportation as consequence of his guilty plea. The Hardin Circuit Court denied motion. Defendant appealed. The Court of Appeals reversed and remanded. Commonwealth of Kentucky appealed. The Kentucky Supreme Court, Lambert, C.J., 253 S.W.3d 482, reversed. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Stevens, held that:

[1] counsel engaged in deficient performance by failing to advise defendant that his plea of guilty made him subject to automatic deportation, abrogating *Commonwealth v. Fuartado,* 170 S.W.3d 384; *U.S. v. Gonzalez,* 202 F.3d 20; *U.S. v. Del Rosario,* 902 F.2d 55; *U.S. v. Yearwood,* 863 F.2d 6; *Santos–Sanchez v. U.S.,* 548 F.3d 327; *Broomes v. Ashcroft,* 358 F.3d 1251; *U.S. v. Campbell,* 778 F.2d 764; *Oyekoya v. State,* 558 So.2d 990; *State v. Rosas,* 183 Ariz. 421, 904 P.2d 1245; *State v. Montalban,* 810 So.2d 1106; *Commonwealth v. Frometa,* 520 Pa. 552, 555 A.2d 92, and

[2] defendant's claim was subject to *Strickland* ineffective assistance test, not only to extent that he alleged affirmative misadvice, but also to extent that he alleged omissions by counsel, abrogating *U.S. v. Couto,* 311 F.3d 179, 188;

*U.S. v. Kwan,* 407 F.3d 1005; *Sparks v. Sowders,* 852 F.2d 882; *U.S. v. Russell,* 686 F.2d 35; *State v. Rojas–Martinez,* 125 P.3d 930; *In re Resendiz,* 25 Cal.4th 230, 105 Cal.Rptr.2d 431, 19 P.3d 1171.

Reversed and remanded.

Justice Alito filed opinion concurring in the judgment, in which Chief Justice Roberts joined.

Justice Scalia filed dissenting opinion in which Justice Thomas joined.

West Headnotes (13)

[1]     **Criminal Law**      Plea

Before deciding whether to plead guilty, a defendant is entitled to the effective assistance of competent counsel. U.S.C.A. Const.Amend. 6.

300 Cases that cite this headnote

[2]     **Criminal Law**      Deficient representation and prejudice in general

In addressing an ineffective assistance claim under *Strickland,* the Supreme Court first determines whether counsel's representation fell below an objective standard of reasonableness, and then asks whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. U.S.C.A. Const.Amend. 6.

3154 Cases that cite this headnote

[3]     **Criminal Law**      Deficient representation in general

The first prong of the ineffective assistance test, i.e., constitutional deficiency, is necessarily linked to the practice and expectations of the legal community, in that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms. U.S.C.A. Const.Amend. 6.

**Padilla v. Kentucky, 559 U.S. 356 (2010)**
Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 830 of 1271

130 S.Ct. 1473, 176 L.Ed.2d 284, 78 USLW 4235, 10 Cal. Daily Op. Serv. 3989...

227 Cases that cite this headnote

**[4]    Criminal Law** 🔑 **Deficient representation in general**

Although prevailing norms of practice as reflected in bar association standards are only guides, and not inexorable commands, these standards may be valuable measures of the prevailing professional norms of effective representation, for purposes of addressing an ineffective assistance claim. U.S.C.A. Const.Amend. 6.

104 Cases that cite this headnote

**[5]    Criminal Law** 🔑 **Plea**

Counsel engaged in deficient performance, as required to establish ineffective assistance, by failing to advise defendant that his plea of guilty to drug distribution made him subject to automatic deportation, where consequences of defendant's plea could easily be determined from reading removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect; abrogating 🚩 *Commonwealth v. Fuartado,* 170 S.W.3d 384; 🚩 *U.S. v. Gonzalez,* 202 F.3d 20; 🚩 *U.S. v. Del Rosario,* 902 F.2d 55; 🚩 *U.S. v. Yearwood,* 863 F.2d 6; 🚩 *Santos–Sanchez v. U.S.,* 548 F.3d 327; 🚩 *Broomes v. Ashcroft,* 358 F.3d 1251; 🚩 *U.S. v. Campbell,* 778 F.2d 764; 🚩 *Oyekoya v. State,* 558 So.2d 990; 🚩 *State v. Rosas,* 183 Ariz. 421, 904 P.2d 1245; 🚩 *State v. Montalban,* 810 So.2d 1106; 🚩 *Commonwealth v. Frometa,* 520 Pa. 552, 555 A.2d 92. U.S.C.A. Const.Amend. 6; 🟨 8 U.S.C.A. § 1227(a)(2)(B)(i).

96 Cases that cite this headnote

**[6]    Criminal Law** 🔑 **Plea**

When the law is not succinct and straightforward as to whether a guilty plea will result in deportation, a criminal defense attorney, in order to provide effective assistance, need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences; but when the deportation consequence is truly clear, the duty to give correct advice is equally clear. U.S.C.A. Const.Amend. 6.

1369 Cases that cite this headnote

**[7]    Criminal Law** 🔑 **Plea**

Defendant's claim that his counsel provided ineffective assistance by failing to advise him that guilty plea could result in deportation was subject to *Strickland* ineffective assistance test, not only to extent that he alleged affirmative misadvice, but also to extent that he alleged omissions by counsel; abrogating 🚩 *U.S. v. Couto,* 311 F.3d 179, 188; 🚩 *U.S. v. Kwan,* 407 F.3d 1005; 🚩 *Sparks v. Sowders,* 852 F.2d 882; 🚩 *U.S. v. Russell,* 686 F.2d 35; 🚩 *State v. Rojas–Martinez,* 125 P.3d 930; 🚩 *In re Resendiz,* 25 Cal.4th 230, 105 Cal.Rptr.2d 431, 19 P.3d 1171. U.S.C.A. Const.Amend. 6.

53 Cases that cite this headnote

**[8]    Criminal Law** 🔑 **Plea**

For purposes of an ineffective assistance claim, counsel has a critical obligation to advise the client of the advantages and disadvantages of a plea agreement. U.S.C.A. Const.Amend. 6.

189 Cases that cite this headnote

**[9]    Criminal Law** 🔑 **Plea**

It is quintessentially the duty of counsel to provide her client with available advice about an issue like deportation resulting from a guilty plea, and the failure to do so satisfies the first prong of the *Strickland* analysis of an ineffective assistance claim. U.S.C.A. Const.Amend. 6.

388 Cases that cite this headnote

**[10]    Criminal Law** 🔑 **Plea**

Padilla v. Kentucky, 559 U.S. 356 (2010)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 831 of 1271

130 S.Ct. 1473, 176 L.Ed.2d 284, 78 USLW 4235, 10 Cal. Daily Op. Serv. 3989...

To obtain relief on a claim that an attorney provided ineffective assistance by failing to properly advise a defendant on the consequences of a guilty plea, the defendant must convince the court that a decision to reject the plea bargain would have been rational under the circumstances. U.S.C.A. Const.Amend. 6.

2109 Cases that cite this headnote

[11]    Criminal Law ⚖ Guilty pleas; plea negotiations, plea hearings, motion to withdraw

The negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel. U.S.C.A. Const.Amend. 6.

535 Cases that cite this headnote

[12]    Criminal Law ⚖ Adequacy of Representation

It is the Supreme Court's responsibility under the Constitution to ensure that no criminal defendant, whether a citizen or not, is left to the mercies of incompetent counsel. U.S.C.A. Const.Amend. 6.

32 Cases that cite this headnote

[13]    Criminal Law ⚖ Plea

In order to provide effective assistance, counsel must inform her client whether his plea carries a risk of deportation. U.S.C.A. Const.Amend. 6.

1028 Cases that cite this headnote

**1475   *356 Syllabus *

Petitioner Padilla, a lawful permanent resident of the United States for over 40 years, faces deportation after pleading guilty to drug-distribution charges in Kentucky. In postconviction proceedings, he claims that his counsel not only failed to advise him of this consequence before he entered the plea, but also told him not to worry about deportation since he had lived **1476 in this country

so long. He alleges that he would have gone to trial had he not received this incorrect advice. The Kentucky Supreme Court denied Padilla postconviction relief on the ground that the Sixth Amendment's effective-assistance-of-counsel guarantee does not protect defendants from erroneous deportation advice because deportation is merely a "collateral" consequence of a conviction.

*Held:* Because counsel must inform a client whether his plea carries a risk of deportation, Padilla has sufficiently alleged that his counsel was constitutionally deficient. Whether he is entitled to relief depends on whether he has been prejudiced, a matter not addressed here. Pp. 1478–1487.

(a) Changes to immigration law have dramatically raised the stakes of a noncitizen's criminal conviction. While once there was only a narrow class of deportable offenses and judges wielded broad discretionary authority to prevent deportation, immigration reforms have expanded the class of deportable offenses and limited judges' authority to alleviate deportation's harsh consequences. Because the drastic measure of deportation or removal is now virtually inevitable for a vast number of noncitizens convicted of crimes, the importance of accurate legal advice for noncitizens accused of crimes has never been more important. Thus, as a matter of federal law, deportation is an integral part of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes. Pp. 1478–1480.

(b) 📙 *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, applies to Padilla's claim. Before deciding whether to plead guilty, a defendant is entitled to

"the effective assistance of competent counsel." 📙 *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763. The Supreme Court of Kentucky rejected Padilla's ineffectiveness claim on the ground that the advice he sought about deportation concerned only collateral matters. However, this Court has never distinguished between direct and collateral consequences in defining the scope of constitutionally "reasonable professional assistance" *357 required under 📙 *Strickland,* 466 U.S., at 689, 104 S.Ct. 2052. The question whether that distinction is appropriate need not be considered in this case because of the unique nature of deportation. Although removal proceedings are civil, deportation is intimately related to the criminal process, which makes it uniquely difficult to classify as either a direct or a collateral consequence. Because that distinction is thus ill-suited to evaluating a *Strickland* claim concerning

130 S.Ct. 1473, 176 L.Ed.2d 284, 78 USLW 4235, 10 Cal. Daily Op. Serv. 3989...

the specific risk of deportation, advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel. Pp. 1480–1482.

(c) To satisfy *Strickland*'s two-prong inquiry, counsel's representation must fall "below an objective standard of reasonableness," 466 U.S., at 688, 104 S.Ct. 2052, and there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.,* at 694, 104 S.Ct. 2052. The first, constitutional deficiency, is necessarily linked to the legal community's practice and expectations. *Id.,* at 688, 104 S.Ct. 2052. The weight of prevailing professional norms supports the view that counsel must advise her client regarding the deportation risk. And this Court has recognized the importance to the client of " '[p]reserving the ... right to remain in the United States' " and "preserving the possibility of" discretionary relief from deportation. *INS v. St. Cyr,* 533 U.S. 289, 323, 121 S.Ct. 2271, 150 L.Ed.2d 347. Thus, this is not a hard case in which to find deficiency: The consequences of Padilla's plea could easily be determined **1477 from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect. There will, however, undoubtedly be numerous situations in which the deportation consequences of a plea are unclear. In those cases, a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry adverse immigration consequences. But when the deportation consequence is truly clear, as it was here, the duty to give correct advice is equally clear. Accepting Padilla's allegations as true, he has sufficiently alleged constitutional deficiency to satisfy *Strickland*'s first prong. Whether he can satisfy the second prong, prejudice, is left for the Kentucky courts to consider in the first instance. Pp. 1482–1484.

(d) The Solicitor General's proposed rule—that *Strickland* should be applied to Padilla's claim only to the extent that he has alleged affirmative misadvice—is unpersuasive. And though this Court must be careful about recognizing new grounds for attacking the validity of guilty pleas, the 25 years since *Strickland* was first applied to ineffective-assistance claims at the plea stage have shown that pleas are less frequently the subject of collateral challenges than convictions after a trial. Also, informed consideration of possible deportation can benefit both the State and noncitizen defendants, who may be able to reach agreements that better satisfy the interests of both parties. This decision will not *358 open the floodgates to challenges of convictions obtained through plea bargains. Cf. *Hill v. Lockhart,* 474 U.S. 52, 58, 106 S.Ct. 366, 88 L.Ed.2d 203. Pp. 1484–1486.

253 S.W.3d 482, reversed and remanded.

STEVENS, J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, BREYER, and SOTOMAYOR, JJ., joined. ALITO, J., filed an opinion concurring in the judgment, in which ROBERTS, C.J., joined. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined.

**Attorneys and Law Firms**

Stephen B. Kinnaird, for petitioner.

Michael R. Dreeben for United States as amicus curiae, by special leave of Court, supporting affirmance.

Wm. Robert Long, Jr., for respondent.

Richard E. Neal, U'Sellis & Kitchen, PLC, Louisville, KY, Timothy G. Arnold, Dept. of Public Advocacy, Frankfort, KY, of counsel, Stephanos Bibas, University of Pennsylvania, Philadelphia, PA, Stephen B. Kinnaird, Counsel of Record, Alexander M.R. Lyon, D. Scott Carlton, Mitchell A. Mosvick, Elizabeth A. Stevens, Leeann N. Rosnick, Adam S. Cherensky, Paul, Hastings, Janofsky & Walker LLP, Washington, D.C., for Petitioner.

Jack Conway, Attorney General of Kentucky, Wm. Robert Long, Jr., Counsel of Record, Matthew R. Krygiel, Assistant Attorneys General, Office of Criminal Appeals, Office of the Attorney General, Frankfort, Kentucky, for Respondent.

**Opinion**

Justice STEVENS delivered the opinion of the Court.

*359 Petitioner Jose Padilla, a native of Honduras, has been a lawful permanent resident of the United States for more than 40 years. Padilla served this Nation with honor as a member of the U.S. Armed Forces during the Vietnam War. He now faces deportation after pleading guilty to the transportation of a large amount of marijuana in his tractor-trailer in the Commonwealth of Kentucky. [1]

**1478 In this postconviction proceeding, Padilla claims that his counsel not only failed to advise him of this

Padilla v. Kentucky, 559 U.S. 356 (2010)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 833 of 1271

130 S.Ct. 1473, 176 L.Ed.2d 284, 78 USLW 4235, 10 Cal. Daily Op. Serv. 3989...

consequence prior to his entering the plea, but also told him that he " 'did not have to worry about immigration status since he had been in the country so long.' " 253 S.W.3d 482, 483 (Ky.2008). Padilla relied on his counsel's erroneous advice when he pleaded guilty to the drug charges that made his deportation virtually mandatory. He alleges that he would have insisted on going to trial if he had not received incorrect advice from his attorney.

Assuming the truth of his allegations, the Supreme Court of Kentucky denied Padilla postconviction relief without the benefit of an evidentiary hearing. The court held that the Sixth Amendment's guarantee of effective assistance of counsel does not protect a criminal defendant from erroneous advice about deportation because it is merely a "collateral" consequence *360 of his conviction. Id., at 485. In its view, neither counsel's failure to advise petitioner about the possibility of removal, nor counsel's incorrect advice, could provide a basis for relief.

We granted certiorari, 555 U.S. 1169, 129 S.Ct. 1317, 173 L.Ed.2d 582 (2009), to decide whether, as a matter of federal law, Padilla's counsel had an obligation to advise him that the offense to which he was pleading guilty would result in his removal from this country. We agree with Padilla that constitutionally competent counsel would have advised him that his conviction for drug distribution made him subject to automatic deportation. Whether he is entitled to relief depends on whether he has been prejudiced, a matter that we do not address.

I

The landscape of federal immigration law has changed dramatically over the last 90 years. While once there was only a narrow class of deportable offenses and judges wielded broad discretionary authority to prevent deportation, immigration reforms over time have expanded the class of deportable offenses and limited the authority of judges to alleviate the harsh consequences of deportation. The "drastic measure" of deportation or removal, Fong Haw Tan v. Phelan, 333 U.S. 6, 10, 68 S.Ct. 374, 92 L.Ed. 433 (1948), is now virtually inevitable for a vast number of noncitizens convicted of crimes.

The Nation's first 100 years was "a period of unimpeded immigration." C. Gordon & H. Rosenfield, Immigration Law

and Procedure § 1.(2)(a), p. 5 (1959). An early effort to empower the President to order the deportation of those immigrants he "judge[d] dangerous to the peace and safety of the United States," Act of June 25, 1798, ch. 58, 1 Stat. 571, was short lived and unpopular. Gordon § 1.2, at 5. It was not until 1875 that Congress first passed a statute barring convicts and prostitutes from entering the country, Act of Mar. 3, 1875, ch. 141, 18 Stat. 477. Gordon § 1.2b, at 6. In 1891, Congress added to the list of excludable persons those "who have been convicted of a felony or other infamous *361 crime or misdemeanor involving moral turpitude." Act of Mar. 3, 1891, ch. 551, 26 Stat. 1084.[2]

The Immigration Act of 1917 (1917 Act) brought "radical changes" **1479 to our law. S.Rep. No. 1515, 81st Cong., 2d Sess., pp. 54–55 (1950). For the first time in our history, Congress made classes of noncitizens deportable based on conduct committed on American soil. Id., at 55. Section 19 of the 1917 Act authorized the deportation of "any alien who is hereafter sentenced to imprisonment for a term of one year or more because of conviction in this country of a crime involving moral turpitude, committed within five years after the entry of the alien to the United States ... ." 39 Stat. 889. And § 19 also rendered deportable noncitizen recidivists who commit two or more crimes of moral turpitude at any time after entry. Ibid. Congress did not, however, define the term "moral turpitude."

While the 1917 Act was "radical" because it authorized deportation as a consequence of certain convictions, the Act also included a critically important procedural protection to minimize the risk of unjust deportation: At the time of sentencing or within 30 days thereafter, the sentencing judge in both state and federal prosecutions had the power to make a recommendation "that such alien shall not be deported." Id., at 890.[3] This procedure, known as a judicial recommendation *362 against deportation, or JRAD, had the effect of binding the Executive to prevent deportation; the statute was "consistently ... interpreted as giving the sentencing judge conclusive authority to decide whether a particular conviction should be disregarded as a basis for deportation," Janvier v. United States, 793 F.2d 449, 452 (C.A.2 1986). Thus, from 1917 forward, there was no such creature as an automatically deportable offense. Even as the class of deportable offenses expanded, judges retained discretion to ameliorate unjust results on a case-by-case basis.

Although narcotics offenses—such as the offense at issue in this case—provided a distinct basis for deportation as early as 1922, [4] the JRAD procedure was generally available to avoid deportation in narcotics convictions. See *United States v. O'Rourke,* 213 F.2d 759, 762 (C.A.8 1954). Except for "technical, inadvertent and insignificant violations of the laws relating to narcotics," *ibid.,* it appears that courts treated narcotics offenses as crimes involving **\*\*1480** moral turpitude for purposes of the 1917 Act's broad JRAD provision. See *ibid.* (recognizing that until 1952 a JRAD in a narcotics **\*363** case "was effective to prevent deportation" (citing *Dang Nam v. Bryan,* 74 F.2d 379, 380–381 (C.A.9 1934))).

In light of both the steady expansion of deportable offenses and the significant ameliorative effect of a JRAD, it is unsurprising that, in the wake of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Second Circuit held that the Sixth Amendment right to effective assistance of counsel applies to a JRAD request or lack thereof, see *Janvier,* 793 F.2d 449. See also *United States v. Castro,* 26 F.3d 557 (C.A.5 1994). In its view, seeking a JRAD was "part of the sentencing" process, *Janvier,* 793 F.2d, at 452, even if deportation itself is a civil action. Under the Second Circuit's reasoning, the impact of a conviction on a noncitizen's ability to remain in the country was a central issue to be resolved during the sentencing process—not merely a collateral matter outside the scope of counsel's duty to provide effective representation.

However, the JRAD procedure is no longer part of our law. Congress first circumscribed the JRAD provision in the 1952 Immigration and Nationality Act (INA), [5] and in 1990 Congress entirely eliminated it, 104 Stat. 5050. In 1996, Congress also eliminated the Attorney General's authority to grant discretionary relief from deportation, 110 Stat. 3009–596, an authority that had been exercised to prevent the deportation of over 10,000 noncitizens during the 5-year period prior to 1996, *INS v. St. Cyr,* 533 U.S. 289, 296, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). Under contemporary law, if a noncitizen has committed a removable offense after the 1996 effective date of these amendments, **\*364** his removal is practically inevitable but for the possible exercise of limited remnants of equitable discretion vested in the Attorney General to cancel removal for noncitizens convicted

of particular classes of offenses. [6] See 8 U.S.C. § 1229b. Subject to limited exceptions, this discretionary relief is not available for an offense related to trafficking in a controlled substance. See § 1101(a)(43)(B); § 1228.

These changes to our immigration law have dramatically raised the stakes of a noncitizen's criminal conviction. The importance of accurate legal advice for noncitizens accused of crimes has never been more important. These changes confirm our view that, as a matter of federal law, deportation is an integral part—indeed, sometimes the most important part [7]—of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes.

II

**[1]** Before deciding whether to plead guilty, a defendant is entitled to "the effective **\*\*1481** assistance of competent counsel." *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); *Strickland,* 466 U.S., at 686, 104 S.Ct. 2052. The Supreme Court of Kentucky rejected Padilla's ineffectiveness claim on the ground that the advice he sought about the risk of deportation concerned only collateral matters, *i.e.,* those matters not within the sentencing authority of the state trial court. [8] **\*365** 253 S.W.3d, at 483–484 (citing *Commonwealth v. Fuartado,* 170 S.W.3d 384 (2005)). In its view, "collateral consequences are outside the scope of representation required by the Sixth Amendment," and, therefore, the "failure of defense counsel to advise the defendant of possible deportation consequences is not cognizable as a claim for ineffective assistance of counsel." 253 S.W.3d, at 483. The Kentucky high court is far from alone in this view. [9]

We, however, have never applied a distinction between direct and collateral consequences to define the scope of constitutionally "reasonable professional assistance" required under *Strickland,* 466 U.S., at 689, 104 S.Ct. 2052. Whether that distinction is appropriate is a question we need not consider in this case because of the unique nature of deportation.

We have long recognized that deportation is a particularly severe "penalty," *Fong Yue Ting v. United States,* 149

Padilla v. Kentucky, 559 U.S. 356 (2010)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 835 of 1271

130 S.Ct. 1473, 176 L.Ed.2d 284, 78 USLW 4235, 10 Cal. Daily Op. Serv. 3989...

U.S. 698, 740, 13 S.Ct. 1016, 37 L.Ed. 905 (1893); but it is not, in a strict sense, a criminal sanction. Although removal proceedings are civil in nature, see *INS v. Lopez–Mendoza,* 468 U.S. 1032, 1038, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984), deportation is nevertheless intimately related to the criminal process. Our law has enmeshed criminal convictions and **\*366** the penalty of deportation for nearly a century, see Part I, *supra,* at 1478–1481. And, importantly, recent changes in our immigration law have made removal nearly an automatic result for a broad class of noncitizen offenders. Thus, we find it "most difficult" to divorce the penalty from the conviction in the deportation context. *United States v. Russell,* 686 F.2d 35, 38 (C.A.D.C.1982). Moreover, we are quite confident that noncitizen defendants facing a risk of deportation for a particular offense find it even more difficult.

See *St. Cyr,* 533 U.S., at 322, 121 S.Ct. 2271 ("There can be little doubt that, as a general matter, alien defendants considering whether to enter into a plea agreement are acutely aware of the **\*\*1482** immigration consequences of their convictions").

Deportation as a consequence of a criminal conviction is, because of its close connection to the criminal process, uniquely difficult to classify as either a direct or a collateral consequence. The collateral versus direct distinction is thus ill suited to evaluating a *Strickland* claim concerning the specific risk of deportation. We conclude that advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel. *Strickland* applies to Padilla's claim.

### III

**[2] [3] [4]** Under *Strickland,* we first determine whether counsel's representation "fell below an objective standard of reasonableness." 466 U.S., at 688, 104 S.Ct. 2052. Then we ask whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.,* at 694, 104 S.Ct. 2052. The first prong—constitutional deficiency—is necessarily linked to the practice and expectations of the legal community: "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.,* at 688, 104 S.Ct. 2052. We long have recognized that "[p]revailing norms of practice as reflected in American Bar Association standards and the like ... are

guides to determining what is reasonable ... ." *Ibid.;* **\*367** *Bobby v. Van Hook,* 558 U.S. 4, ——, 130 S.Ct. 13, 16, 175 L.Ed.2d 255 (2009) *(per curiam)*; *Florida v. Nixon,* 543 U.S. 175, 191, and n. 6, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004); *Wiggins v. Smith,* 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Williams v. Taylor,* 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Although they are "only guides," *Strickland,* 466 U.S., at 688, 104 S.Ct. 2052, and not "inexorable commands," *Bobby,* 558 U.S., at ——, 130 S.Ct., at 17, these standards may be valuable measures of the prevailing professional norms of effective representation, especially as these standards have been adapted to deal with the intersection of modern criminal prosecutions and immigration law.

The weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation. National Legal Aid and Defender Assn., Performance Guidelines for Criminal Defense Representation § 6.2 (1995); G. Herman, Plea Bargaining § 3.03, pp. 20–21 (1997); Chin & Holmes, Effective Assistance of Counsel and the Consequences of Guilty Pleas, 87 Cornell L.Rev. 697, 713–718 (2002); A. Campbell, Law of Sentencing § 13:23, pp. 555, 560 (3d ed.2004); Dept. of Justice, Office of Justice Programs, 2 Compendium of Standards for Indigent Defense Systems, Standards for Attorney Performance, pp. D10, H8–H9, J8 (2000) (providing survey of guidelines across multiple jurisdictions); ABA Standards for Criminal Justice, Prosecution Function and Defense Function 4–5.1(a), p. 197 (3d ed.1993); ABA Standards for Criminal Justice, Pleas of Guilty 14–3.2(f), p. 116 (3d ed.1999). "[A]uthorities of every stripe—including the American Bar Association, criminal defense and public defender organizations, authoritative treatises, and state and city bar publications—universally require defense attorneys to advise as to the risk of deportation consequences for non-citizen clients ... ." Brief for Legal Ethics, Criminal Procedure, and Criminal Law Professors as *Amici Curiae* 12–14 (footnotes omitted) (citing, *inter alia,* National Legal Aid and Defender Assn., Performance Guidelines for Criminal Prosecution, §§ 6.2–6.4 (1997); S. Bratton & E. Kelley, Practice Points: Representing a Noncitizen **\*368** in a Criminal Case, 31 The Champion 61 (Jan./ Feb.2007); N. Tooby, Criminal Defense of Immigrants **\*\*1483** § 1.3 (3d ed.2003); 2 Criminal Practice Manual §§ 45:3, 45:15 (West 2009)).

Padilla v. Kentucky, 559 U.S. 356 (2010)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 836 of 1271

130 S.Ct. 1473, 176 L.Ed.2d 284, 78 USLW 4235, 10 Cal. Daily Op. Serv. 3989...

We too have previously recognized that " '[p]reserving the client's right to remain in the United States may be more important to the client than any potential jail sentence.' " *St. Cyr,* 533 U.S., at 3223, 121 S.Ct. 2271 (quoting 3 Bender, Criminal Defense Techniques §§ 60A.01, 60A.02[2] (1999)). Likewise, we have recognized that "preserving the possibility of" discretionary relief from deportation under § 212(c) of the 1952 INA, 661952 INA, 66 Stat. 187, repealed by Congress in 1996, "would have been one of the principal benefits sought by defendants deciding whether to accept a plea offer or instead to proceed to trial." *St. Cyr,* 533 U.S., at 323, 121 S.Ct. 2271. We expected that counsel who were unaware of the discretionary relief measures would "follo[w] the advice of numerous practice guides" to advise themselves of the importance of this particular form of discretionary relief. *Ibid.,* n. 50.

**[5]** In the instant case, the terms of the relevant immigration statute are succinct, clear, and explicit in defining the removal consequence for Padilla's conviction. See 8 U.S.C. § 1227(a)(2)(B)(i) ("Any alien who at any time after admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States or a foreign country relating to a controlled substance ..., other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable"). Padilla's counsel could have easily determined that his plea would make him eligible for deportation simply from reading the text of the statute, which addresses not some broad classification of crimes but specifically commands removal for all controlled substances convictions except for the most trivial of marijuana possession offenses. Instead, Padilla's counsel provided him false assurance that his conviction would not result in his removal from this country. This is not a hard case in which to find deficiency: **\*369** The consequences of Padilla's plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect.

**[6]** Immigration law can be complex, and it is a legal specialty of its own. Some members of the bar who represent clients facing criminal charges, in either state or federal court or both, may not be well versed in it. There will, therefore, undoubtedly be numerous situations in which the deportation consequences of a particular plea are unclear or uncertain. The duty of the private practitioner in such cases is more limited. When the law is not succinct and straightforward (as

it is in many of the scenarios posited by Justice ALITO), a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences. [10] But when the deportation consequence is truly clear, as it was in this case, the duty to give correct advice is equally clear.

Accepting his allegations as true, Padilla has sufficiently alleged constitutional deficiency to satisfy the first prong of *Strickland.* Whether Padilla is entitled to relief on his claim will depend on whether he can satisfy *Strickland* 's second prong, prejudice, **\*\*1484** a matter we leave to the Kentucky courts to consider in the first instance.

IV

**[7]** The Solicitor General has urged us to conclude that *Strickland* applies to Padilla's claim only to the extent that he has alleged affirmative misadvice. In the United States' view, "counsel is not constitutionally required to provide advice on matters that will not be decided in the criminal case ...," though counsel is required to provide accurate advice if she **\*370** chooses to discusses these matters. Brief for United States as *Amicus Curiae* 10.

Respondent and Padilla both find the Solicitor General's proposed rule unpersuasive, although it has support among the lower courts. See, *e.g., United States v. Couto,* 311 F.3d 179, 188 (C.A.2 2002); *United States v. Kwan,* 407 F.3d 1005 (C.A.9 2005); *Sparks v. Sowders,* 852 F.2d 882 (C.A.6 1988); *United States v. Russell,* 686 F.2d 35 (C.A.D.C.1982); *State v. Rojas–Martinez,* 2005 UT 86, 125 P.3d 930, 935; *In re Resendiz,* 25 Cal.4th 230, 105 Cal.Rptr.2d 431, 19 P.3d 1171 (2001). Kentucky describes these decisions isolating an affirmative misadvice claim as "result-driven, incestuous ... [,and] completely lacking in legal or rational bases." Brief for Respondent 31. We do not share that view, but we agree that there is no relevant difference "between an act of commission and an act of omission" in this context. *Id.,* at 30; *Strickland,* 466 U.S., at 690, 104 S.Ct. 2052 ("The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally

Padilla v. Kentucky, 559 U.S. 356 (2010)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 837 of 1271

130 S.Ct. 1473, 176 L.Ed.2d 284, 78 USLW 4235, 10 Cal. Daily Op. Serv. 3989...

competent assistance"); see also *State v. Paredez,* 136 N.M. 533, 538–539, 101 P.3d 799, 2004–NMSC–036.

**[8]** **[9]** A holding limited to affirmative misadvice would invite two absurd results. First, it would give counsel an incentive to remain silent on matters of great importance, even when answers are readily available. Silence under these circumstances would be fundamentally at odds with the critical obligation of counsel to advise the client of "the advantages and disadvantages of a plea agreement." *Libretti v. United States,* 516 U.S. 29, 50–51, 116 S.Ct. 356, 133 L.Ed.2d 271 (1995). When attorneys know that their clients face possible exile from this country and separation from their families, they should not be encouraged to say nothing at all. [11] Second, it would deny a **\*371** class of clients least able to represent themselves the most rudimentary advice on deportation even when it is readily available. It is quintessentially the duty of counsel to provide her client with available advice about an issue like deportation and the failure to do so "clearly satisfies the first prong of the *Strickland* analysis." *Hill v. Lockhart,* 474 U.S. 52, 62, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (White, J., concurring in judgment).

We have given serious consideration to the concerns that the Solicitor General, respondent, and *amici* have stressed regarding the importance of protecting the finality of convictions obtained through guilty pleas. We confronted a similar "floodgates" concern in *Hill,* see *id.,* at 58, 106 S.Ct. 366, but nevertheless applied **\*\*1485** *Strickland* to a claim that counsel had failed to advise the client regarding his parole eligibility before he pleaded guilty. [12]

**[10]** A flood did not follow in that decision's wake. Surmounting *Strickland* 's high bar is never an easy task. See, *e.g.,* 466 U.S., at 689, 104 S.Ct. 2052 ("Judicial scrutiny of counsel's performance must be highly deferential"); *id.,* at 693, 104 S.Ct. 2052 (observing that "[a]ttorney errors ... are as likely to be utterly harmless in a **\*372** particular case as they are to be prejudicial"). Moreover, to obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances. See *Roe v. Flores–Ortega,* 528 U.S. 470, 480, 486, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000). There is no reason

to doubt that lower courts—now quite experienced with applying *Strickland*—can effectively and efficiently use its framework to separate specious claims from those with substantial merit.

It seems unlikely that our decision today will have a significant effect on those convictions already obtained as the result of plea bargains. For at least the past 15 years, professional norms have generally imposed an obligation on counsel to provide advice on the deportation consequences of a client's plea. See, *supra,* at 1483–1484. We should, therefore, presume that counsel satisfied their obligation to render competent advice at the time their clients considered pleading guilty. *Strickland,* 466 U.S., at 689, 104 S.Ct. 2052.

Likewise, although we must be especially careful about recognizing new grounds for attacking the validity of guilty pleas, in the 25 years since we first applied *Strickland* to claims of ineffective assistance at the plea stage, practice has shown that pleas are less frequently the subject of collateral challenges than convictions obtained after a trial. Pleas account for nearly 95% of all criminal convictions. [13] But they account for only approximately 30% of the habeas petitions filed. [14] The nature of relief secured by a successful collateral **\*373** challenge to a guilty plea—an opportunity to withdraw the plea and proceed to trial—imposes its own significant limiting principle: Those who collaterally attack their guilty pleas lose the benefit of the bargain obtained as a result of the plea. Thus, a different calculus informs **\*\*1486** whether it is wise to challenge a guilty plea in a habeas proceeding because, ultimately, the challenge may result in a *less favorable* outcome for the defendant, whereas a collateral challenge to a conviction obtained after a jury trial has no similar downside potential.

Finally, informed consideration of possible deportation can only benefit both the State and noncitizen defendants during the plea-bargaining process. By bringing deportation consequences into this process, the defense and prosecution may well be able to reach agreements that better satisfy the interests of both parties. As in this case, a criminal episode may provide the basis for multiple charges, of which only a subset mandate deportation following conviction. Counsel who possess the most rudimentary understanding of the deportation consequences of a particular criminal offense may be able to plea bargain creatively with the prosecutor in order to craft a conviction and sentence that reduce the likelihood

Padilla v. Kentucky, 559 U.S. 356 (2010)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 838 of 1271

130 S.Ct. 1473, 176 L.Ed.2d 284, 78 USLW 4235, 10 Cal. Daily Op. Serv. 3989...

of deportation, as by avoiding a conviction for an offense that automatically triggers the removal consequence. At the same time, the threat of deportation may provide the defendant with a powerful incentive to plead guilty to an offense that does not mandate that penalty in exchange for a dismissal of a charge that does.

[11]   In sum, we have long recognized that the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel. *Hill,* 474 U.S., at 57, 106 S.Ct. 366; see also *Richardson,* 397 U.S., at 770–771, 90 S.Ct. 1441. The severity of deportation—"the equivalent of banishment or exile," *Delgadillo v. Carmichael,* 332 U.S. 388, 390–391, 68 S.Ct. 10, 92 L.Ed. 17 (1947)—only underscores how critical it is for counsel  *374  to inform her noncitizen client that he faces a risk of deportation. [15]

V

[12]   [13]   It is our responsibility under the Constitution to ensure that no criminal defendant—whether a citizen or not—is left to the "mercies of incompetent counsel." *Richardson,* 397 U.S., at 771, 90 S.Ct. 1441. To satisfy this responsibility, we now hold that counsel must inform her client whether his plea carries a risk of deportation. Our longstanding Sixth Amendment precedents, the seriousness of deportation as a consequence of a criminal plea, and the concomitant impact of deportation on families living lawfully in this country demand no less.

Taking as true the basis for his motion for postconviction relief, we have little difficulty **1487 concluding that Padilla has sufficiently alleged that his counsel was constitutionally deficient. Whether Padilla is entitled to relief will depend on whether he can demonstrate prejudice as a result thereof, a question we do not reach because it was not passed on below.  *375  See *Verizon Communications Inc. v. FCC,* 535 U.S. 467, 530, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002).

The judgment of the Supreme Court of Kentucky is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

Justice ALITO, with whom THE CHIEF JUSTICE joins, concurring in the judgment.

I concur in the judgment because a criminal defense attorney fails to provide effective assistance within the meaning of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), if the attorney misleads a noncitizen client regarding the removal consequences of a conviction. In my view, such an attorney must (1) refrain from unreasonably providing incorrect advice and (2) advise the defendant that a criminal conviction may have adverse immigration consequences and that, if the alien wants advice on this issue, the alien should consult an immigration attorney. I do not agree with the Court that the attorney must attempt to explain what those consequences may be. As the Court concedes, "[i]mmigration law can be complex"; "it is a legal specialty of its own"; and "[s]ome members of the bar who represent clients facing criminal charges, in either state or federal court or both, may not be well versed in it." *Ante,* at 1483. The Court nevertheless holds that a criminal defense attorney must provide advice in this specialized area in those cases in which the law is "succinct and straightforward"—but not, perhaps, in other situations. *Ante,* at 1483–1484. This vague, halfway test will lead to much confusion and needless litigation.

I

Under *Strickland,* an attorney provides ineffective assistance if the attorney's representation does not meet reasonable professional standards. *466 U.S., at 688, 104 S.Ct. 2052.* Until today, the longstanding and unanimous position of the federal  *376  courts was that reasonable defense counsel generally need only advise a client about the *direct* consequences of a criminal conviction. See, *e.g., United States v. Gonzalez,* 202 F.3d 20, 28 (C.A.1 2000) (ineffective-assistance-of-counsel claim fails if "based on an attorney's failure to advise a client of his plea's immigration consequences"); *United States v. Banda,* 1 F.3d 354, 355 (C.A.5 1993) (holding that "an attorney's failure to advise a client that deportation is a possible consequence of a guilty plea does not constitute ineffective assistance of counsel"); see generally Chin & Holmes, Effective Assistance of Counsel and the Consequences of Guilty Pleas, 87 Cornell L.Rev. 697, 699 (2002) (hereinafter Chin & Holmes) (noting that "virtually all jurisdictions"—including "eleven federal circuits, more than thirty states, and the District of

Padilla v. Kentucky, 559 U.S. 356 (2010)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 839 of 1271

130 S.Ct. 1473, 176 L.Ed.2d 284, 78 USLW 4235, 10 Cal. Daily Op. Serv. 3989...

Columbia"—"hold that defense counsel need not discuss with their clients the collateral consequences of a conviction," including deportation). While the line between "direct" and "collateral" consequences is not always clear, see *ante,* at 1481, n. 8, the collateral-consequences rule expresses an important truth: Criminal defense attorneys have expertise regarding the conduct of criminal proceedings. They are not expected to possess—and very often do not possess—expertise in other areas of the law, and it is unrealistic to expect them to provide expert advice on **\*\*1488** matters that lie outside their area of training and experience.

This case happens to involve removal, but criminal convictions can carry a wide variety of consequences other than conviction and sentencing, including civil commitment, civil forfeiture, the loss of the right to vote, disqualification from public benefits, ineligibility to possess firearms, dishonorable discharge from the Armed Forces, and loss of business or professional licenses. Chin & Holmes 705–706. A criminal conviction may also severely damage a defendant's reputation and thus impair the defendant's ability to obtain future employment or business opportunities. All of those consequences are "seriou[s]," see *ante,* at 1486, but this Court has **\*377** never held that a criminal defense attorney's Sixth Amendment duties extend to providing advice about such matters.

The Court tries to justify its dramatic departure from precedent by pointing to the views of various professional organizations. See *ante,* at 1482 ("The weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation"). However, ascertaining the level of professional competence required by the Sixth Amendment is ultimately a task for the courts. *E.g.,*

*Roe v. Flores–Ortega,* 528 U.S. 470, 477, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000). Although we may appropriately consult standards promulgated by private bar groups, we cannot delegate to these groups our task of determining what the Constitution commands. See *Strickland, supra,* at 688, 104 S.Ct. 2052 (explaining that "[p]revailing norms of practice as reflected in American Bar Association standards ... are guides to determining what is reasonable, but they are only guides"). And we must recognize that such standards may represent only the aspirations of a bar group rather than an empirical assessment of actual practice.

Even if the only relevant consideration were "prevailing professional norms," it is hard to see how those norms

can support the duty the Court today imposes on defense counsel. Because many criminal defense attorneys have little understanding of immigration law, see *ante,* at 1483, it should follow that a criminal defense attorney who refrains from providing immigration advice does not violate prevailing professional norms. But the Court's opinion would not just require defense counsel to warn the client of a general *risk* of removal; it would also require counsel in at least some cases, to specify what the removal *consequences* of a conviction would be. See *ante,* at 1483–1484.

The Court's new approach is particularly problematic because providing advice on whether a conviction for a particular offense will make an alien removable is often quite complex. "Most crimes affecting immigration status are not **\*378** specifically mentioned by the [Immigration and Nationality Act (INA) ], but instead fall under a broad category of crimes, such as *crimes involving moral turpitude* or *aggravated felonies.*" M. Garcia & L. Eig, CRS Report for Congress, Immigration Consequences of Criminal Activity (Sept. 20, 2006) (summary) (emphasis in original). As has been widely acknowledged, determining whether a particular crime is an "aggravated felony" or a "crime involving moral turpitude [ (CIMT) ]" is not an easy task. See R. McWhirter, ABA, The Criminal Lawyer's Guide to Immigration Law: Questions and Answers 128 (2d ed.2006) (hereinafter ABA Guidebook) ("Because of the increased complexity of aggravated felony law, this edition devotes a new [30–page] chapter to the subject"); *id.,* § 5.2, at 146 (stating that the aggravated felony list at 8 U.S.C. § 1101(a)(43) is not clear **\*\*1489** with respect to several of the listed categories, that "the term 'aggravated felonies' can include misdemeanors," and that the determination of whether a crime is an " aggravated felony" is made "even more difficult" because "several agencies and courts interpret the statute," including Immigration and Customs Enforcement, the Board of Immigration Appeals (BIA), and Federal Circuit and district courts considering immigration-law and criminal-law issues); ABA Guidebook § 4.65, at 130 ("Because nothing is ever simple with immigration law, the terms 'conviction,' 'moral turpitude,' and 'single scheme of criminal misconduct' are terms of art"); *id.,* § 4.67, at 130 ("[T]he term 'moral turpitude' evades precise definition").

Defense counsel who consults a guidebook on whether a particular crime is an "aggravated felony" will often find that the answer is not "easily ascertained." For example, the ABA Guidebook answers the question "Does simple possession count as an aggravated felony?" as follows: "Yes,

Padilla v. Kentucky, 559 U.S. 356 (2010)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 840 of 1271

130 S.Ct. 1473, 176 L.Ed.2d 284, 78 USLW 4235, 10 Cal. Daily Op. Serv. 3989...

*at least in the Ninth Circuit.*" § 5.35, at 160 (emphasis added). After a dizzying paragraph that attempts to explain the evolution of the Ninth Circuit's view, the ABA Guidebook continues: "Adding to the confusion, however, is that the Ninth **\*379** Circuit has conflicting opinions depending on the context on whether simple drug possession constitutes an aggravated felony under ⚑ 8 U.S.C. § 1101(a)(43)." *Id., § 5.35, at 161 (citing cases distinguishing between whether a simple possession offense is an aggravated felony "for immigration purposes" or for "sentencing purposes"). The ABA Guidebook then proceeds to explain that "*attempted *possession,"* id., § 5.36, at 161 (emphasis added), of a controlled substance *is* an aggravated felony, while "[c]onviction under the federal *accessory* after the fact statute is *probably not* an aggravated felony, but a conviction for accessory after the fact to the manufacture of methamphetamine *is* an aggravated felony," *id.,* § 537, at 161 (emphasis added). Conspiracy or attempt to commit drug trafficking are aggravated felonies, but "[s]olicitation is not a drug-trafficking offense because a generic solicitation offense is not an offense related to a controlled substance and therefore not an aggravated felony." *Id.,* § 5.41, at 162.

Determining whether a particular crime is one involving moral turpitude is no easier. See *id.*, at 134 ("Writing bad checks *may or may not* be a CIMT" (emphasis added)); *ibid.* ("[R]eckless assault coupled with an element of injury, but not serious injury, is *probably not* a CIMT" (emphasis added)); *id.*, at 135 (misdemeanor driving under the influence is generally not a CIMT, but may be a CIMT if the DUI results in injury or if the driver knew that his license had been suspended or revoked); *id.*, at 136 ("If there is no element of actual injury, the endangerment offense *may not* be a CIMT" (emphasis added)); *ibid.* ("Whether [a child abuse] conviction involves moral turpitude *may* depend on the subsection under which the individual is convicted. Child abuse done with criminal negligence *probably* is not a CIMT" (emphasis added)).

Many other terms of the INA are similarly ambiguous or may be confusing to practitioners not versed in the intricacies of immigration law. To take just a few examples, it may **\*380** be hard, in some cases, for defense counsel even to determine whether a client is an alien, [1] or whether a **\*\*1490** particular state disposition will result in a "conviction" for purposes of federal immigration law. [2] The task of offering advice about the immigration consequences of a criminal conviction is further complicated by other problems, including significant variations among Circuit interpretations of federal immigration statutes; the frequency with which immigration law changes; different rules governing the immigration consequences of juvenile, first-offender, and foreign convictions; and the relationship between the "length and type of sentence" and the determination "whether [an alien] is subject to removal, eligible for relief from removal, or qualified to become a naturalized citizen," Immigration Law and Crimes § 2:1, at 2–2 to 2–3.

In short, the professional organizations and guidebooks on which the Court so heavily relies are right to say that "nothing **\*381** is ever simple with immigration law"—including the determination whether immigration law clearly makes a particular offense removable. ABA Guidebook § 4.65, at 130; Immigration Law and Crimes § 2:1. I therefore cannot agree with the Court's apparent view that the Sixth Amendment requires criminal defense attorneys to provide immigration advice.

The Court tries to downplay the severity of the burden it imposes on defense counsel by suggesting that the scope of counsel's duty to offer advice concerning deportation consequences may turn on how hard it is to determine those consequences. Where "the terms of the relevant immigration statute are succinct, clear, and explicit in defining the removal consequence[s]" of a conviction, the Court says, counsel has an affirmative duty to advise the client that he will be subject to deportation as a result of the plea. *Ante,* at 1483. But "[w]hen the law is not succinct and straightforward ..., a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." *Ante,* at 1483–1484. This approach is problematic for at least four reasons.

First, it will not always be easy to tell whether a particular statutory provision is "succinct, clear, and explicit." How can an attorney who lacks general immigration law expertise be sure that a seemingly clear statutory provision actually means what it seems to say when read in isolation? What if the application of the provision to a particular case is not clear but a cursory examination of case law or administrative decisions would provide a definitive answer? See Immigration Law and Crimes § 2:1, at 2–2 ("Unfortunately, a practitioner or respondent cannot tell easily whether a conviction is for a removable offense .... [T]he cautious practitioner or apprehensive respondent will not know **\*\*1491** conclusively the future immigration consequences of a guilty plea").

Second, if defense counsel must provide advice regarding only one of the many collateral consequences of a criminal **\*382** conviction, many defendants are likely to be misled. To take just one example, a conviction for a particular offense may render an alien excludable but not removable. If an alien charged with such an offense is advised only that pleading guilty to such an offense will not result in removal, the alien may be induced to enter a guilty plea without realizing that a consequence of the plea is that the alien will be unable to reenter the United States if the alien returns to his or her home country for any reason, such as to visit an elderly parent or to attend a funeral. See ABA Guidebook § 4.14, at 111 ("Often the alien is both *excludable* and *removable*. At times, however, the lists are different. Thus, the oddity of an alien that is inadmissible but not deportable. This alien should not leave the United States because the government will not let him back in" (emphasis in original)). Incomplete legal advice may be worse than no advice at all because it may mislead and may dissuade the client from seeking advice from a more knowledgeable source.

Third, the Court's rigid constitutional rule could inadvertently head off more promising ways of addressing the underlying problem—such as statutory or administrative reforms requiring trial judges to inform a defendant on the record that a guilty plea may carry adverse immigration consequences. As *amici* point out, "28 states and the District of Columbia have *already* adopted rules, plea forms, or statutes requiring courts to advise criminal defendants of the possible immigration consequences of their pleas." Brief for State of Louisiana et al. 25; accord, Chin & Holmes 708 ("A growing number of states require advice about deportation by statute or court rule"). A nonconstitutional rule requiring trial judges to inform defendants on the record of the risk of adverse immigration consequences can ensure that a defendant receives needed information without putting a large number of criminal convictions at risk; and because such a warning may be given on the record, courts would not later have to determine whether the defendant was misrepresenting the **\*383** advice of counsel. Likewise, flexible statutory procedures for withdrawing guilty pleas might give courts appropriate discretion to determine whether the interests of justice would be served by allowing a particular defendant to withdraw a plea entered into on the basis of incomplete information. Cf. *United States v. Russell,* 686 F.2d 35, 39–40 (C.A.D.C.1982) (explaining that a district court's discretion to set aside a guilty plea under the Federal Rules of Criminal Procedure should be guided by, among other

considerations, "the possible existence of prejudice to the government's case as a result of the defendant's untimely request to stand trial" and "the strength of the defendant's reason for withdrawing the plea, including whether the defendant asserts his innocence of the charge").

Fourth, the Court's decision marks a major upheaval in Sixth Amendment law. This Court decided *Strickland* in 1984, but the majority does not cite a single case, from this or any other federal court, holding that criminal defense counsel's failure to provide advice concerning the removal consequences of a criminal conviction violates a defendant's Sixth Amendment right to counsel. As noted above, the Court's view has been rejected by every Federal Court of Appeals to have considered the issue thus far. See, *e.g., Gonzalez,* 202 F.3d, at 28; *Banda,* 1 F.3d, at 355; Chin & Holmes 697, 699. The majority appropriately acknowledges that the lower courts **\*\*1492** are "now quite experienced with applying *Strickland,*" *ante,* at 1485, but it casually dismisses the longstanding and unanimous position of the lower federal courts with respect to the scope of criminal defense counsel's duty to advise on collateral consequences.

The majority seeks to downplay its dramatic expansion of the scope of criminal defense counsel's duties under the Sixth Amendment by claiming that this Court in *Hill v. Lockhart,* 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), similarly "applied *Strickland* to a claim that counsel had failed to advise the client regarding his parole eligibility before he pleaded guilty." *Ante,* at 1485. That **\*384** characterization of *Hill* obscures much more than it reveals. The issue in *Hill* was whether a criminal defendant's Sixth Amendment right to counsel was violated where counsel misinformed the client about his eligibility for parole. The Court found it " 'unnecessary to determine whether there may be circumstances under which erroneous advice by counsel as to parole eligibility may be deemed constitutionally ineffective assistance of counsel, because in the present case we conclude that petitioner's allegations are insufficient to satisfy the *Strickland v. Washington* requirement of 'prejudice.' " 474 U.S., at 60, 106 S.Ct. 366. Given that *Hill* expressly and unambiguously refused to decide whether criminal defense counsel must *avoid misinforming* his or her client as to *one* consequence of a criminal conviction (parole eligibility), that case plainly provides no support whatsoever for the proposition that counsel must *affirmatively advise* his or her client as to *another* collateral consequence (removal). By the Court's strange logic, *Hill* would support its decision here

even if the Court had held that misadvice concerning parole eligibility does *not* make counsel's performance objectively unreasonable. After all, the Court still would have "applied *Strickland* " to the facts of the case at hand.

II

While mastery of immigration law is not required by *Strickland,* several considerations support the conclusion that affirmative misadvice regarding the removal consequences of a conviction may constitute ineffective assistance.

First, a rule prohibiting affirmative misadvice regarding a matter as crucial to the defendant's plea decision as deportation appears faithful to the scope and nature of the Sixth Amendment duty this Court has recognized in its past cases. In particular, we have explained that "a guilty plea cannot be attacked as based on inadequate legal advice unless counsel was not 'a reasonably competent attorney' and the advice was not 'within the range of competence demanded of attorneys **\*385** *in criminal cases.*' " *Strickland,* 466 U.S., at 687, 104 S.Ct. 2052 (quoting *McMann v. Richardson,* 397 U.S. 759, 770, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); emphasis added). As the Court appears to acknowledge, thorough understanding of the intricacies of immigration law is not "within the range of competence demanded of attorneys *in criminal cases.*" See *ante,* at 1483 ("Immigration law can be complex, and it is a legal specialty of its own. Some members of the bar who represent clients facing criminal charges, in either state or federal court or both, may not be well versed in it"). By contrast, reasonably competent attorneys should know that it is not appropriate or responsible to hold themselves out as authorities on a difficult and complicated subject matter with which they are not familiar. Candor concerning the limits of one's professional expertise, in other words, is within the range of duties reasonably expected of defense attorneys in criminal cases. As the dissenting judge on **\*\*1493** the Kentucky Supreme Court put it, "I do not believe it is too much of a burden to place on our defense bar the duty to say, 'I do not know.' " 253 S.W.3d 482, 485 (2008).

Second, incompetent advice distorts the defendant's decisionmaking process and seems to call the fairness and integrity of the criminal proceeding itself into question. See *Strickland,* 466 U.S., at 686, 104 S.Ct. 2052 ("In

giving meaning to the requirement [of effective assistance of counsel], we must take its purpose—to ensure a fair trial —as the guide"). When a defendant opts to plead guilty without definitive information concerning the likely effects of the plea, the defendant can fairly be said to assume the risk that the conviction may carry indirect consequences of which he or she is not aware. That is not the case when a defendant bases the decision to plead guilty on counsel's express misrepresentation that the defendant will not be removable. In the latter case, it seems hard to say that the plea was entered with the advice of constitutionally competent counsel—or that it embodies a voluntary and intelligent decision to forsake constitutional **\*386** rights. See *ibid.* ("The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result").

Third, a rule prohibiting unreasonable misadvice regarding exceptionally important collateral matters would not deter or interfere with ongoing political and administrative efforts to devise fair and reasonable solutions to the difficult problem posed by defendants who plead guilty without knowing of certain important collateral consequences.

Finally, the conclusion that affirmative misadvice regarding the removal consequences of a conviction can give rise to ineffective assistance would, unlike the Court's approach, not require any upheaval in the law. As the Solicitor General points out, "[t]he vast majority of the lower courts considering claims of ineffective assistance in the plea context have [distinguished] between defense counsel who remain silent and defense counsel who give affirmative misadvice." Brief for United States as *Amicus Curiae* 8 (citing cases). At least three Courts of Appeals have held that affirmative misadvice on immigration matters can give rise to ineffective assistance of counsel, at least in some circumstances. [3] And several other Circuits have held that affirmative misadvice concerning nonimmigration consequences of a conviction can violate the Sixth Amendment even if those consequences **\*387** might be deemed "collateral." [4] By contrast, it appears that **\*\*1494** no court of appeals holds that affirmative misadvice concerning collateral consequences in general and removal in particular can *never* give rise to ineffective assistance. In short, the considered and thus far unanimous view of the lower federal courts charged with administering *Strickland* clearly supports the conclusion that that Kentucky Supreme Court's position goes too far.

In concluding that affirmative misadvice regarding the removal consequences of a criminal conviction may constitute ineffective assistance, I do not mean to suggest that the Sixth Amendment does no more than require defense counsel to avoid misinformation. When a criminal defense attorney is aware that a client is an alien, the attorney should advise the client that a criminal conviction may have adverse consequences under the immigration laws and that the client should consult an immigration specialist if the client wants advice on that subject. By putting the client on notice of the danger of removal, such advice would significantly reduce the chance that the client would plead guilty under a mistaken premise.

III

In sum, a criminal defense attorney should not be required to provide advice on immigration law, a complex specialty **\*388** that generally lies outside the scope of a criminal defense attorney's expertise. On the other hand, any competent criminal defense attorney should appreciate the extraordinary importance that the risk of removal might have in the client's determination whether to enter a guilty plea. Accordingly, unreasonable and incorrect information concerning the risk of removal can give rise to an ineffectiveness claim. In addition, silence alone is not enough to satisfy counsel's duty to assist the client. Instead, an alien defendant's Sixth Amendment right to counsel is satisfied if defense counsel advises the client that a conviction may have immigration consequences, that immigration law is a specialized field, that the attorney is not an immigration lawyer, and that the client should consult an immigration specialist if the client wants advice on that subject.

Justice SCALIA, with whom Justice THOMAS joins, dissenting.

In the best of all possible worlds, criminal defendants contemplating a guilty plea ought to be advised of all serious collateral consequences of conviction, and surely ought not to be misadvised. The Constitution, however, is not an all-purpose tool for judicial construction of a perfect world; and when we ignore its text in order to make it that, we often find ourselves swinging a sledge where a tack hammer is needed.

The Sixth Amendment guarantees the accused a lawyer "for his defence" against a "criminal prosecutio[n]"—not for sound advice about the collateral consequences of

conviction. For that reason, and for the practical reasons set forth in Part I of Justice ALITO's concurrence, I dissent from the Court's conclusion that the Sixth Amendment requires counsel to provide accurate advice concerning the potential removal consequences of a guilty plea. For the same reasons, but unlike the concurrence, I do not believe that affirmative misadvice about those consequences renders **\*\*1495** an attorney's **\*389** assistance in defending against the prosecution constitutionally inadequate; or that the Sixth Amendment requires counsel to warn immigrant defendants that a conviction may render them removable. Statutory provisions can remedy these concerns in a more targeted fashion, and without producing permanent, and legislatively irreparable, overkill.

\* \* \*

The Sixth Amendment as originally understood and ratified meant only that a defendant had a right to employ counsel, or to use volunteered services of counsel. See, *United States v. Van Duzee,* 140 U.S. 169, 173, 11 S.Ct. 758, 35 L.Ed. 399 (1891); W. Beaney, Right to Counsel in American Courts 21, 28–29 (1955). We have held, however, that the Sixth Amendment requires the provision of indigent defendants at government expense, *Gideon v. Wainwright,* 372 U.S. 335, 344–345, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), and that the right to "the assistance of counsel" includes the right to *effective* assistance, *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Even assuming the validity of these holdings, I reject the significant further extension that the Court, and to a lesser extent the concurrence, would create. We have until today at least retained the Sixth Amendment's textual limitation to criminal prosecutions. "[W]e have held that 'defence' means defense at trial, not defense in relation to other objectives that may be important to the accused." *Rothgery v. Gillespie County,* 554 U.S. 191, ——, 128 S.Ct. 2578, 2594, 171 L.Ed.2d 366 (2008) (ALITO, J., concurring) (summarizing cases). We have limited the Sixth Amendment to legal advice directly related to defense against prosecution of the charged offense —advice at trial, of course, but also advice at postindictment interrogations and lineups, *Massiah v. United States,* 377 U.S. 201, 205–206, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *United States v. Wade,* 388 U.S. 218, 236–238, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and in general advice at all phases of the prosecution where the defendant would

130 S.Ct. 1473, 176 L.Ed.2d 284, 78 USLW 4235, 10 Cal. Daily Op. Serv. 3989...

be at a disadvantage when pitted alone against the legally trained agents of the state, see **\*390** *Moran v. Burbine,* 475 U.S. 412, 430, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). Not only have we not required advice of counsel regarding consequences collateral to prosecution, we have not even required counsel appointed to defend against one prosecution to be present when the defendant is interrogated in connection with another possible prosecution arising from the same event. *Texas v. Cobb,* 532 U.S. 162, 164, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001).

There is no basis in text or in principle to extend the constitutionally required advice regarding guilty pleas beyond those matters germane to the criminal prosecution at hand—to wit, the sentence that the plea will produce, the higher sentence that conviction after trial might entail, and the chances of such a conviction. Such matters fall within "the range of competence demanded of attorneys in criminal cases," *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). See *id.,* at 769–770, 90 S.Ct. 1441 (describing the matters counsel and client must consider in connection with a contemplated guilty plea). We have never held, as the logic of the Court's opinion assumes, that once counsel is appointed all professional responsibilities of counsel—even those extending beyond defense against the prosecution—become constitutional commands. Cf. *Cobb, supra,* at 171, n. 2, 121 S.Ct. 1335; *Moran, supra,* at 430, 106 S.Ct. 1135. Because the subject of the misadvice here was not the prosecution for which Jose Padilla was entitled to effective assistance of counsel, the Sixth Amendment has no application.

**\*\*1496** Adding to counsel's duties an obligation to advise about a conviction's collateral consequences has no logical stopping-point. As the concurrence observes,

"[A] criminal convictio[n] can carry a wide variety of consequences other than conviction and sentencing, including civil commitment, civil forfeiture, the loss of the right to vote, disqualification from public benefits, ineligibility to possess firearms, dishonorable discharge from the Armed Forces, and loss of business or professional licenses.... All of those consequences are 'serious,' ... ." *Ante,* at 1487–1488 (ALITO, J., concurring in judgment).

**\*391** But it seems to me that the concurrence suffers from the same defect. The same indeterminacy, the same inability to know what areas of advice are relevant, attaches to misadvice. And the concurrence's suggestion that counsel must warn defendants of potential removal consequences, see *ante,* at 1484–1485—what would come to be known as the "*Padilla* warning"—cannot be limited to those consequences except by judicial caprice. It is difficult to believe that the warning requirement would not be extended, for example, to the risk of heightened sentences in later federal prosecutions pursuant to the Armed Career Criminal Act, 18 U.S.C. § 924(e). We could expect years of elaboration upon these new issues in the lower courts, prompted by the defense bar's devising of ever-expanding categories of plea-invalidating misadvice and failures to warn—not to mention innumerable evidentiary hearings to determine whether misadvice really occurred or whether the warning was really given.

The concurrence's treatment of misadvice seems driven by concern about the voluntariness of Padilla's guilty plea. See *ante,* at 1483. But that concern properly relates to the Due Process Clauses of the Fifth and Fourteenth Amendments, not to the Sixth Amendment. See *McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969); *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). Padilla has not argued before us that his guilty plea was not knowing and voluntary. If that is, however, the true substance of his claim (and if he has properly preserved it) the state court can address it on remand. [1]    **\*392** But we should not smuggle the claim into the Sixth Amendment.

The Court's holding prevents legislation that could solve the problems addressed by today's opinions in a more precise and targeted fashion. If the subject had not been constitutionalized, legislation could specify which categories of misadvice about matters ancillary to the prosecution invalidate plea agreements, what collateral consequences counsel must bring to a defendant's attention, and what warnings must be given. [2]   Moreover, legislation could provide consequences for the misadvice, **\*\*1497** nonadvice, or failure to warn, other than nullification of a criminal conviction after the witnesses and evidence needed for retrial have disappeared. Federal immigration law might provide, for example, that the near-automatic removal which follows from certain criminal convictions will not apply where the conviction rested upon a guilty plea induced by counsel's

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

130 S.Ct. 1473, 176 L.Ed.2d 284, 78 USLW 4235, 10 Cal. Daily Op. Serv. 3989...

misadvice regarding removal consequences. Or legislation might put the government to a choice in such circumstances: Either retry the defendant or forgo the removal. But all that has been precluded in favor of today's sledge hammer.

In sum, the Sixth Amendment guarantees adequate assistance of counsel in defending against a pending criminal prosecution. We should limit both the constitutional obligation to provide advice and the consequences of bad advice to that well defined area.

### All Citations

559 U.S. 356, 130 S.Ct. 1473, 176 L.Ed.2d 284, 78 USLW 4235, 10 Cal. Daily Op. Serv. 3989, 22 Fla. L. Weekly Fed. S 211

## Footnotes

\*  The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1  Padilla's crime, like virtually every drug offense except for only the most insignificant marijuana offenses, is a deportable offense under 8 U.S.C. § 1227(a)(2)(B)(i).

2  In 1907, Congress expanded the class of excluded persons to include individuals who "admit" to having committed a crime of moral turpitude. Act of Feb. 20, 1907, ch. 1134, 34 Stat. 899.

3  As enacted, the statute provided:
"That the provision of this section respecting the deportation of aliens convicted of a crime involving moral turpitude shall not apply to one who has been pardoned, nor shall such deportation be made or directed if the court, or judge thereof, sentencing such alien for such crime shall, at the time of imposing judgment or passing sentence or within thirty days thereafter, ... make a recommendation to the Secretary of Labor that such alien shall not be deported in pursuance of this Act." 1917 Act, 39 Stat. 889–890.

This provision was codified in 8 U.S.C. § 1251(b) (1994 ed.) (transferred to § 1227 (2006 ed.)). The judge's nondeportation recommendation was binding on the Secretary of Labor and, later, the Attorney General after control of immigration removal matters was transferred from the former to the latter. See *Janvier v. United States,* 793 F.2d 449, 452 (C.A.2 1986).

4  Congress first identified narcotics offenses as a special category of crimes triggering deportation in the 1922 Narcotic Drug Act. Act of May 26, 1922, ch. 202, 42 Stat. 596. After the 1922 Act took effect, there was some initial confusion over whether a narcotics offense also had to be a crime of moral turpitude for an individual to be deportable. See *Weedin v. Moy Fat,* 8 F.2d 488, 489 (C.A.9 1925) (holding that an individual who committed narcotics offense was not deportable because offense did not involve moral turpitude). However, lower courts eventually agreed that the narcotics offense provision was "special," *Chung Que Fong v. Nagle,* 15 F.2d 789, 790 (C.A.9 1926); thus, a narcotics offense did not need also to be a crime of moral turpitude (or to satisfy other requirements of the 1917 Act) to trigger deportation. See *United States ex rel. Grimaldi v. Ebey,* 12 F.2d 922, 923 (C.A.7 1926); *Todaro v. Munster,* 62 F.2d 963, 964 (C.A.10 1933).

5  The INA separately codified the moral turpitude offense provision and the narcotics offense provision within 8 U.S.C. § 1251(a) (1994 ed.) under subsections (a)(4) and (a)(11), respectively. See 66 Stat. 201, 204, 206. The JRAD procedure, codified in 8 U.S.C. § 1251(b) (1994 ed.), applied only to the "provisions of subsection (a)(4)," the crimes-of-moral-turpitude provision. 66 Stat. 208; see *United States v. O'Rourke,* 213 F.2d 759, 762 (C.A.8 1954) (recognizing that, under the 1952 INA, narcotics offenses were no longer eligible for JRADs).

130 S.Ct. 1473, 176 L.Ed.2d 284, 78 USLW 4235, 10 Cal. Daily Op. Serv. 3989...

6    The changes to our immigration law have also involved a change in nomenclature; the statutory text now uses the term "removal" rather than "deportation." See *Calcano–Martinez v. INS,* 533 U.S. 348, 350, n. 1, 121 S.Ct. 2268, 150 L.Ed.2d 392 (2001).

7    See Brief for Asian American Justice Center et al. as *Amici Curiae* 12–27 (providing real-world examples).

8    There is some disagreement among the courts over how to distinguish between direct and collateral consequences. See Roberts, Ignorance is Effectively Bliss: Collateral Consequences, Silence, and Misinformation in the Guilty–Plea Process, 95 Iowa L.Rev. 119, 124, n. 15 (2009). The disagreement over how to apply the direct/collateral distinction has no bearing on the disposition of this case because, as even Justice ALITO agrees, counsel must, at the very least, advise a noncitizen "defendant that a criminal conviction may have adverse immigration consequences," *post,* at 1487 (opinion concurring in judgment). See also *post,* at 1494 ("I do not mean to suggest that the Sixth Amendment does no more than require defense counsel to avoid misinformation"). In his concurring opinion, Justice ALITO has thus departed from the strict rule applied by the Supreme Court of Kentucky and in the two federal cases that he cites, *post,* at 1487.

9    See, *e.g.,* *United States v. Gonzalez,* 202 F.3d 20 (C.A.1 2000); *United States v. Del Rosario,* 902 F.2d 55 (C.A.D.C.1990); *United States v. Yearwood,* 863 F.2d 6 (C.A.4 1988); *Santos–Sanchez v. United States,* 548 F.3d 327 (C.A.5 2008); *Broomes v. Ashcroft,* 358 F.3d 1251 (C.A.10 2004); *United States v. Campbell,* 778 F.2d 764 (C.A.11 1985); *Oyekoya v. State,* 558 So.2d 990 (Ala.Ct.Crim.App.1989); *State v. Rosas,* 183 Ariz. 421, 904 P.2d 1245 (App.1995); *State v. Montalban,* 2000–2739 (La.2/26/02), 810 So.2d 1106; *Commonwealth v. Frometa,* 520 Pa. 552, 555 A.2d 92 (1989).

10   As Justice ALITO explains at length, deportation consequences are often unclear. Lack of clarity in the law, however, does not obviate the need for counsel to say something about the possibility of deportation, even though it will affect the scope and nature of counsel's advice.

11   As the Commonwealth conceded at oral argument, were a defendant's lawyer to know that a particular offense would result in the client's deportation and that, upon deportation, the client and his family might well be killed due to circumstances in the client's home country, any decent attorney would inform the client of the consequences of his plea. Tr. of Oral Arg. 37–38. We think the same result should follow when the stakes are not life and death but merely "banishment or exile," *Delgadillo v. Carmichael,* 332 U.S. 388, 390–391, 68 S.Ct. 10, 92 L.Ed. 17 (1947).

12   However, we concluded that, even though *Strickland* applied to petitioner's claim, he had not sufficiently alleged prejudice to satisfy *Strickland* 's second prong. *Hill,* 474 U.S., at 59–60, 106 S.Ct. 366. This disposition further underscores the fact that it is often quite difficult for petitioners who have acknowledged their guilt to satisfy *Strickland* 's prejudice prong.

Justice ALITO believes that the Court misreads *Hill, post,* at 1491–1492. In *Hill,* the Court recognized—for the first time—that *Strickland* applies to advice respecting a guilty plea. 474 U.S. at 58, 106 S.Ct. 366 ("We hold, therefore, that the two-part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel"). It is true that *Hill* does not control the question before us. But its import is nevertheless clear. Whether *Strickland* applies to Padilla's claim follows from *Hill,* regardless of the fact that the *Hill* Court did not resolve the particular question respecting misadvice that was before it.

13   See Dept. of Justice, Bureau of Justice Statistics, Sourcebook of Criminal Justice Statistics 2003, p. 418 (31st ed. 2005) (Table 5.17) (only approximately 5%, or 8,612 out of 68,533, of federal criminal prosecutions go to trial); *id.,* at 450 (Table 5.46) (only approximately 5% of all state felony criminal prosecutions go to trial).

14   See V. Flango, National Center for State Courts, Habeas Corpus in State and Federal Courts 36–38 (1994) (demonstrating that 5% of defendants whose conviction was the result of a trial account for approximately 70% of the habeas petitions filed).

130 S.Ct. 1473, 176 L.Ed.2d 284, 78 USLW 4235, 10 Cal. Daily Op. Serv. 3989...

15    To this end, we find it significant that the plea form currently used in Kentucky courts provides notice of possible immigration consequences. Ky. Admin. Office of Courts, Motion to Enter Guilty Plea, Form AOC–491 (Rev.2/2003), http://courts.ky.gov/NR/rdonlyres/ 55E1F54E–ED5C–4A30–B1D5– 4C43C7ADD63C/0/491.pdf (as visited Mar. 29, 2010, and available in Clerk of Court's case file). Further, many States require trial courts to advise defendants of possible immigration consequences. See, *e.g.,* Alaska Rule Crim. Proc. 11(c)(3)(C) (2009–2010); Cal.Penal Code Ann. § 1016.5 (West 2008); Conn. Gen.Stat. § 54– 1j (2009); D. C.Code § 16–713 (2001); Fla. Rule Crim. Proc. 3.172(c)(8) (Supp.2010); Ga.Code Ann. § 17–7–93(c) (1997); Haw.Rev.Stat. Ann. § 802E–2 (2007); Iowa Rule Crim. Proc. 2.8(2)*(b)*(3) (Supp.2009); Md. Rule 4–242 (Lexis 2009); Mass. Gen. Laws, ch. 278, § 29D (2009); Minn. Rule Crim. Proc. 15.01 (2009); Mont.Code Ann. § 46–12–210 (2009); N. M. Rule Crim. Form 9–406 (2009); N. Y.Crim. Proc. Law Ann. § 220.50(7) (West Supp.2009); N. C. Gen.Stat. Ann. § 15A–1022 (Lexis 2007); Ohio Rev.Code Ann. § 2943.031 (West 2006); Ore.Rev.Stat. § 135.385 (2007); R. I. Gen. Laws § 12–12–22 (Lexis Supp.2008); Tex.Code. Ann.Crim. Proc., Art. 26.13(a)(4) (Vernon Supp.2009); Vt. Stat. Ann., Tit. 13, § 6565(c)(1) (Supp.2009); Wash. Rev.Code § 10.40.200 (2008); Wis. Stat. § 971.08 (2005–2006).

1    Citizens are not deportable, but "[q]uestions of citizenship are not always simple." ABA Guidebook § 4.20, at 113 (explaining that U.S. citizenship conferred by blood is " 'derivative,' " and that "[d]erivative citizenship depends on a number of confusing factors, including whether the citizen parent was the mother or father, the immigration laws in effect at the time of the parents' and/or defendant's birth, and the parents' marital status").

2    "A disposition that is not a 'conviction,' under state law may still be a 'conviction' for immigration purposes." *Id., § 4.32,* at 117 (citing *Matter of Salazar–Regino,* 23 I. & N. Dec. 223, 231, 2002 WL 339535 (BIA 2002) (en banc)). For example, state law may define the term "conviction" not to include a deferred adjudication, but such an adjudication would be deemed a conviction for purposes of federal immigration law. See ABA Guidebook § 4.37; accord, D. Kesselbrenner & L. Rosenberg, Immigration Law and Crimes § 2:1, p. 2–2 (2008) (hereinafter Immigration Law and Crimes) ("A practitioner or respondent will not even know whether the Department of Homeland Security (DHS) or the Executive Office for Immigration Review (EOIR) will treat a particular state disposition as a conviction for immigration purposes. In fact, the [BIA] treats certain state criminal dispositions as convictions even though the state treats the same disposition as a dismissal").

3    See *United States v. Kwan,* 407 F.3d 1005, 1015–1017 (C.A.9 2005); *United States v. Couto,* 311 F.3d 179, 188 (C.A.2 2002); *Downs–Morgan v. United States,* 765 F.2d 1534, 1540–1541 (C.A.11 1985) (limiting holding to the facts of the case); see also *Santos–Sanchez v. United States,* 548 F.3d 327, 333– 334 (C.A.5 2008) (concluding that counsel's advice was not objectively unreasonable where counsel did not purport to answer questions about immigration law, did not claim any expertise in immigration law, and simply warned of "possible" deportation consequence; use of the word "possible" was not an affirmative misrepresentation, even though it could indicate that deportation was not a certain consequence).

4    See *Hill v. Lockhart,* 894 F.2d 1009, 1010 (C.A.8 1990) (en banc) ("[T]he erroneous parole-eligibility advice given to Mr. Hill was ineffective assistance of counsel under *Strickland v. Washington*"); *Sparks v. Sowders,* 852 F.2d 882, 885 (C.A.6 1988) ("[G]ross misadvice concerning parole eligibility can amount to ineffective assistance of counsel"); *id.,* at 886 (KENNEDY, J., concurring) ("When the maximum possible exposure is overstated, the defendant might well be influenced to accept a plea agreement he would otherwise reject"); *Strader v. Garrison,* 611 F.2d 61, 65 (C.A.4 1979) ("[T]hough parole eligibility dates are collateral consequences of the entry of a guilty plea of which a defendant need not be informed if he does not inquire, when he is grossly misinformed about it by his lawyer, and relies upon that misinformation, he is deprived of his constitutional right to counsel").

1    I do not mean to suggest that the Due Process Clause would surely provide relief. We have indicated that awareness of "direct consequences" suffices for the validity of a guilty plea. See *Brady,* 397 U.S., at 755,

**Padilla v. Kentucky, 559 U.S. 356 (2010)**

130 S.Ct. 1473, 176 L.Ed.2d 284, 78 USLW 4235, 10 Cal. Daily Op. Serv. 3989...

90 S.Ct. 1463 (internal quotation marks omitted). And the required colloquy between a federal district court and a defendant required by Federal Rule of Criminal Procedure 11(b) (formerly Rule 11(c)), which we have said approximates the due process requirements for a valid plea, see ⚑ *Libretti v. United States,* 516 U.S. 29, 49–50, 116 S.Ct. 356, 133 L.Ed.2d 271 (1995), does not mention collateral consequences. Whatever the outcome, however, the effect of misadvice regarding such consequences upon the validity of a guilty plea should be analyzed under the Due Process Clause.

2       As the Court's opinion notes, *ante,* at 1486, n. 15, many States—including Kentucky—already require that criminal defendants be warned of potential removal consequences.

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

Pereira v. Sessions, 138 S.Ct. 2105 (2018)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 849 of 1271

201 L.Ed.2d 433, 86 USLW 4462, 18 Cal. Daily Op. Serv. 6019...

KeyCite Yellow Flag - Negative Treatment

Disagreement Recognized by United States v. Ramos Gonzalez, D.Neb., February 11, 2019

138 S.Ct. 2105
Supreme Court of the United States

Wescley Fonseca PEREIRA, Petitioner

v.

Jefferson B. SESSIONS, III, Attorney General.

No. 17−459.
|
Argued April 23, 2018.
|
Decided June 21, 2018.

**Synopsis**

**Background:** Noncitizen, a native and citizen of Brazil, filed petition for review of Board of Immigration Appeals (BIA) order upholding immigration judge's (IJ) denial of his application for cancellation of removal and order of removal. The Court of Appeals for the First Circuit, Kermit V. Lipez, Circuit Judge, 866 F.3d 1, denied petition. Certiorari was granted.

**[Holding:]** The Supreme Court, Justice Sotomayor, held that a putative "notice to appear" that fails to designate the specific time or place of a noncitizen's removal proceedings is not a "notice to appear under section 1229(a)" of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), and so does not trigger the Act's stop-time rule ending the noncitizen's period of continuous presence in the United States, abrogating Moscoso–Castellanos v. Lynch, 803 F.3d 1079, O'Garro v. U.S. Atty. Gen., 605 Fed.Appx. 951, Guaman–Yuqui v. Lynch, 786 F.3d 235, Gonzalez–Garcia v. Holder, 770 F.3d 431, Yi Di Wang v. Holder, 759 F.3d 670, and Urbina v. Holder, 745 F.3d 736.

Reversed and remanded.

Justice Kennedy filed a concurring opinion.

Justice Alito filed a dissenting opinion.

**Procedural Posture(s):** Petition for Writ of Certiorari; Review of Administrative Decision.

West Headnotes (11)

**[1]**    **Aliens, Immigration, and Citizenship** ⟜ Adjustment of status

   **Aliens, Immigration, and Citizenship** ⟜ Cancellation of Removal or Suspension of Deportation in General

   Under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), the Attorney General of the United States has discretion to "cancel removal" and adjust the status of certain nonpermanent residents. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 304(a), 8 U.S.C.A. § 1229b(b).

Case 3:20-cv-07721-SI   Document 58-5   Filed 11/10/20   Page 850 of 1271

**Pereira v. Sessions, 138 S.Ct. 2105 (2018)**
201 L.Ed.2d 433, 86 USLW 4462, 18 Cal. Daily Op. Serv. 6019...

5 Cases that cite this headnote

**[2]   Aliens, Immigration, and Citizenship** 🔑 Continuous Physical Presence or Unrelinquished Domicile

To be eligible for cancellation of removal, a nonpermanent resident must meet certain enumerated criteria, including that he or she must have been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of an application for such relief. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 304(a), 🏳 8 U.S.C.A. § 1229b(b)(1)(A).

35 Cases that cite this headnote

**[3]   Aliens, Immigration, and Citizenship** 🔑 Continuous Physical Presence or Unrelinquished Domicile

Lawful permanent residents may be eligible for cancellation of removal if, inter alia, they have continuously resided in the United States for at least seven years. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 304(a), 🏳 8 U.S.C.A. § 1229b(a)(2).

4 Cases that cite this headnote

**[4]   Aliens, Immigration, and Citizenship** 🔑 Stop time rule

Under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), the period of continuous physical presence in the United States required for a noncitizen to obtain cancellation of removal stops if and when the noncitizen has committed certain enumerated offenses that would constitute grounds for removal or inadmissibility. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 304(a), 🏳 8 U.S.C.A. § 1229b(d)(1)(B).

13 Cases that cite this headnote

**[5]   Aliens, Immigration, and Citizenship** 🔑 Stop time rule
**Aliens, Immigration, and Citizenship** 🔑 Notice;  order to show cause

A putative "notice to appear" that fails to designate the specific time or place of a noncitizen's removal proceedings is not a "notice to appear under section 1229(a)" of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), and so does not trigger the Act's stop-time rule ending the noncitizen's period of continuous presence in the United States, for purposes of the noncitizen's application for cancellation of removal; abrogating 🚩 *Moscoso–Castellanos v. Lynch,* 803 F.3d 1079, 🚩 *O'Garro v. U.S. Atty. Gen.,* 605 Fed.Appx. 951, 🚩 *Guaman–Yuqui v. Lynch,* 786 F.3d 235, 🚩 *Gonzalez–Garcia v. Holder,* 770 F.3d 431, 🚩 *Yi Di Wang v. Holder,* 759 F.3d 670, and 🚩 *Urbina v. Holder,* 745 F.3d 736. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 304(a), 🏳 8 U.S.C.A. §§ 1229(a), 🏳 (a)(1), 🏳 (a)(1)(G)(i), 🏳 1229b(b)(1), 🏳 (d)(1)(A).

338 Cases that cite this headnote

**[6]   Administrative Law and Procedure** 🔑 Plain, literal, or clear meaning;  ambiguity or silence

Court need not resort to *Chevron* deference where Congress has supplied a clear and unambiguous answer to the interpretive question at hand.

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 851 of 1271

Pereira v. Sessions, 138 S.Ct. 2105 (2018)
201 L.Ed.2d 433, 86 USLW 4462, 18 Cal. Daily Op. Serv. 6019...

36 Cases that cite this headnote

[7]    **Statutes**  ⚷  **Similarity or difference**

It is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning.

17 Cases that cite this headnote

[8]    **Statutes**  ⚷  **Particular Words and Phrases**

For purposes of statutory interpretation, the word "under" is a chameleon that must draw its meaning from its context.

2 Cases that cite this headnote

[9]    **Aliens, Immigration, and Citizenship**  ⚷  **Stop time rule**

Word "under," as used in the stop-time rule of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), which provides that, for purposes of a nonresident's application for cancellation of removal, any period of the nonresident's continuous physical presence in the United States is deemed to end when the nonresident is served a notice to appear under section 1229(a) of the Act, means "in accordance with" or "according to." Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 304(a), 🔖 8 U.S.C.A. §§ 1229(a), 🔖 1229b(d)(1)(A).

194 Cases that cite this headnote

[10]    **Aliens, Immigration, and Citizenship**  ⚷  **Notice;  order to show cause**
**Aliens, Immigration, and Citizenship**  ⚷  **Hearing**
**Aliens, Immigration, and Citizenship**  ⚷  **Time for hearing;  continuance**

Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) expressly vests the Government with power to change the time or place of a noncitizen's removal proceedings, so long as it provides written notice specifying the new time or place of the proceedings as well as the consequences of failing to appear. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 304(a), 🔖 8 U.S.C.A. § 1229(a)(2).

259 Cases that cite this headnote

[11]    **Aliens, Immigration, and Citizenship**  ⚷  **Stop time rule**

Congress enacted the stop-time rule of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), which prevents the continuous-presence clock from continuing to run once a nonresident seeking cancellation of removal is served with a notice to appear, to prevent noncitizens from exploiting administrative delays to "buy time" during which they accumulate periods of continuous presence. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 304(a), 🔖 8 U.S.C.A. §§ 1229(a), 🔖 1229b(d)(1)(A).

39 Cases that cite this headnote

**West Codenotes**

Pereira v. Sessions, 138 S.Ct. 2105 (2018)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 852 of 1271

201 L.Ed.2d 433, 86 USLW 4462, 18 Cal. Daily Op. Serv. 6019...

**Held Invalid**

⚑ 8 C.F.R. § 1003.18.

**\*2107**  *Syllabus* [*]

Under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), nonpermanent residents who are subject to removal proceedings may be eligible for cancellation of removal if, among other things, they have "been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of [an] application" for cancellation. 8 U.S.C. § 1229(b)(1)(A). Under the stop-time rule, however, the period of continuous presence is "deemed to end ... when the alien is served a notice to appear under section 1229(a)." § 1229(d)(1)(A). Section 1229(a), in turn, provides that the Government shall serve noncitizens in removal proceedings with a written " 'notice to appear,' " specifying, among other things, "[t]he time and place at which the [removal] proceedings will be held." § 1229(a)(1)(G)(i). Per a 1997 regulation stating that a "notice to appear" served on a noncitizen need only provide "the time, place and date of the initial removal hearing, where practicable," 62 Fed.Reg. 10332, the Department of Homeland Security (DHS), at least in recent years, almost always serves noncitizens with notices that fail to specify the time, place, or date of initial removal hearings whenever the agency deems it impracticable to include such information. The Board of Immigration Appeals (BIA) has held that such notices trigger the stop-time rule even if they do not specify the time and date of the removal proceedings.

Petitioner Wescley Fonseca Pereira is a native and citizen of Brazil who came to the United States in 2000 and remained after his visa expired. Following a 2006 arrest for operating a vehicle while under the influence of alcohol, DHS served Pereira with a document titled "notice to appear" that did not specify the date and time of his initial removal hearing, instead ordering him to appear at a time and date to be set in the future. More than a year later, in 2007, the Immigration Court mailed Pereira a more specific notice setting the date and time for his initial hearing, but the notice was sent to the wrong address and was returned as undeliverable. As a result, Pereira failed to appear, and the Immigration Court ordered him removed in absentia.

In 2013, Pereira was arrested for a minor motor vehicle violation and detained by DHS. The Immigration Court reopened the removal proceedings after Pereira demonstrated that he never received the 2007 notice. Pereira then applied for cancellation of removal, arguing that he had been continuously present in the United States for more than 10 years and that the stop-time rule was not triggered by DHS' initial 2006 notice because the document lacked information about the time and date of his removal hearing. The Immigration Court disagreed and ordered Pereira removed. The BIA agreed with the Immigration **\*2108** Court that the 2006 notice triggered the stop-time rule, even though it failed to specify the time and date of Pereira's initial removal hearing. The Court of Appeals for the First Circuit denied Pereira's petition for review of the BIA's order. Applying the framework set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694, it held that the stop-time rule is ambiguous and that the BIA's interpretation of the rule was a permissible reading of the statute.

*Held* : A putative notice to appear that fails to designate the specific time or place of the noncitizen's removal proceedings is not a "notice to appear under § 1229(a)," and so does not trigger the stop-time rule. Pp. 2112 – 2120.

(a) The Court need not resort to *Chevron* deference, for the unambiguous statutory text alone is enough to resolve this case. Under the stop-time rule, "any period of ... continuous physical presence" is "deemed to end ... when the alien is served a notice to appear under section 1229(a)." 8 U.S.C. § 1229b(d)(1). By expressly referencing § 1229(a), the statute specifies where to look to find out what "notice to appear" means. Section 1229(a), in turn, clarifies that the type of notice "referred to as a 'notice to appear' " throughout the statutory section is a "written notice ... specifying," as relevant here, "[t]he time and place

201 L.Ed.2d 433, 86 USLW 4462, 18 Cal. Daily Op. Serv. 6019...

at which the [removal] proceedings will be held." § 1229(a)(1)(G)(i). Thus, to trigger the stop-time rule, the Government must serve a notice to appear that, at the very least, "specif[ies]" the "time and place" of the removal hearing.

The Government and dissent point out that the stop-time rule refers broadly to a notice to appear under " § 1229(a)"—which includes paragraph (1), as well as paragraphs (2) and (3). But that does not matter, because only paragraph (1) bears on the meaning of a "notice to appear." If anything, paragraph (2), which allows for a "change or postponement" of the proceedings to a "new time and place," § 1229(a)(2)(A)(i), bolsters the Court's interpretation of the statute because the provision presumes that the Government has already served a "notice to appear" that specified a time and place as required by § 1229(a)(1)(G)(i). Another neighboring provision, § 1229(b)(1), lends further support for the view that a "notice to appear" must specify the time and place of removal proceedings to trigger the stop-time rule. Section 1229(b)(1) gives a noncitizen "the opportunity to secure counsel before the first [removal] hearing date" by mandating that such "hearing date shall not be scheduled earlier than 10 days after the service of the notice to appear." For that provision to have any meaning, the "notice to appear" must specify the time and place that the noncitizen, and his counsel, must appear at the removal proceedings. Finally, common sense reinforces the conclusion that a notice that does not specify when and where to appear for a removal proceeding is not a "notice to appear" that triggers the stop-time rule. After all, an essential function of a "notice to appear" is to provide noncitizens "notice" of the information (*i.e.,* the "time" and "place") that would enable them "to appear" at the removal hearing in the first place. Without conveying such information, the Government cannot reasonably expect noncitizens to appear for their removal proceedings. Pp. 2112 – 2116.

(b) The Government and the dissent advance a litany of counterarguments, all of which are unpersuasive. To begin, the Government mistakenly argues that § 1229(a) is not definitional. That is wrong. Section 1229(a) speaks in definitional terms, requiring that a notice to appear specify, among other things, the **\*2109** "time and place at which the proceedings will be held." As such, the dissent is misguided in arguing that a defective notice to appear, which fails to specify time-and-place information, is still a notice to appear for purposes of the stop-time rule. Equally unavailing is the Government's (and the dissent's) attempt to generate ambiguity in the statute based on the word "under." In light of the plain language and statutory context, the word "under," as used in the stop-time rule, clearly means "in accordance with" or "according to" because it connects the stop-time trigger in § 1229b(d)(1) to a "notice to appear" that specifies the enumerated time-and-place information. The Government fares no better in arguing that surrounding statutory provisions reinforce its preferred reading of the stop-time rule, as none of those provisions supports its atextual interpretation. Unable to root its reading in the statutory text, the Government and dissent raise a number of practical concerns, but those concerns are meritless and do not justify departing from the statute's clear text. In a final attempt to salvage its atextual interpretation, the Government turns to the alleged statutory purpose and legislative history of the stop-time rule. Even for those who consider statutory purpose and legislative history, however, neither supports the Government's position. Requiring the Government to furnish time-and-place information in a notice to appear is entirely consistent with Congress' stated objective of preventing noncitizens from exploiting administrative delays to accumulate lengthier periods of continuous precedent. Pp. 2116 – 2120.

866 F.3d 1, reversed and remanded.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C.J., and KENNEDY, THOMAS, GINSBURG, BREYER, KAGAN, and GORSUCH, JJ., joined. KENNEDY, J., filed a concurring opinion. ALITO, J., filed a dissenting opinion.

**Attorneys and Law Firms**

David J. Zimmer, Boston, MA, for Petitioner.

Frederick Liu, for Respondent.

David J. Zimmer, Alexandra Lu, Goodwin Procter LLP, Jeffrey B. Rubin, Todd C. Pomerleau, Rubin Pomerleau PC, Boston, MA, William M. Jay, Goodwin Procter LLP, Washington, DC, for Petitioner.

Noel J. Francisco, Solicitor General, Chad A. Readler, Acting Assistant Attorney General, Edwin S. Kneedler, Deputy Solicitor General, Jonathan C. Bond, Assistant to the Solicitor General, Donald E. Keener, John W. Blakeley, Patrick J. Glen, Attorneys, Department of Justice, Washington, D.C., for Respondent.

## Opinion

Justice SOTOMAYOR delivered the opinion of the Court.

Nonpermanent residents, like petitioner here, who are subject to removal proceedings and have accrued 10 years of continuous physical presence in the United States, may be eligible for a form of discretionary relief known as cancellation of removal. 8 U.S.C. § 1229b(b)(1). Under the so-called "stop-time rule" set forth in § 1229b(d)(1)(A), however, that period of continuous physical presence is "deemed to end ... when the alien is served a notice to appear under section 1229(a)." Section 1229(a), in turn, provides that the Government shall serve noncitizens in removal proceedings with "written notice (in this section referred to as a 'notice to appear') ... specifying" several required pieces of information, including "[t]he time and **\*2110** place at which the [removal] proceedings will be held." § 1229(a)(1)(G)(i). [1]

The narrow question in this case lies at the intersection of those statutory provisions. If the Government serves a noncitizen with a document that is labeled "notice to appear," but the document fails to specify either the time or place of the removal proceedings, does it trigger the stop-time rule? The answer is as obvious as it seems: No. A notice that does not inform a noncitizen when and where to appear for removal proceedings is not a "notice to appear under section 1229(a)" and therefore does not trigger the stop-time rule. The plain text, the statutory context, and common sense all lead inescapably and unambiguously to that conclusion.

I

A

**[1]** **[2]** **[3]** Under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), 110 Stat. 3009–546, the Attorney General of the United States has discretion to "cancel removal" and adjust the status of certain nonpermanent residents. § 1229b(b). To be eligible for such relief, a nonpermanent resident must meet certain enumerated criteria, the relevant one here being that the noncitizen must have "been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of [an] application" for cancellation of removal. § 1229b(b)(1)(A). [2]

**[4]** IIRIRA also established the stop-time rule at issue in this case. Under that rule, "any period of ... continuous physical presence in the United States shall be deemed to end ... when the alien is served a notice to appear under section 1229(a) of this title." [3] § 1229b(d)(1)(A). Section 1229(a), in turn, provides that "written notice (in this section referred to as a 'notice to appear') shall be given ... to the alien ... specifying":

"(A) The nature of the proceedings against the alien.

"(B) The legal authority under which the proceedings are conducted.

"(C) The acts or conduct alleged to be in violation of law.

"(D) The charges against the alien and the statutory provisions alleged to have been violated.

"(E) The alien may be represented by counsel and the alien will be provided (i) a period of time to secure counsel under subsection (b)(1) of this section and (ii) a current list of counsel prepared under subsection (b)(2) of this section.

"(F)(i) The requirement that the alien must immediately provide (or have provided) the Attorney General with a written record of an address and telephone number (if any) at which the alien may be contacted respecting proceedings under section 1229a of this title.

"(ii) The requirement that the alien must provide the Attorney General immediately with a written record of any **2111 change of the alien's address or telephone number.

"(iii) The consequences under section 1229a(b)(5) of this title of failure to provide address and telephone information pursuant to this subparagraph.

"**(G)(i) The time and place at which the [removal] proceedings will be held.**

"(ii) The consequences under section 1229a(b)(5) of this title of the failure, except under exceptional circumstances, to appear at such proceedings." § 1229(a)(1) (boldface added).

The statute also enables the Government to "change or postpon[e] ... the time and place of [the removal] proceedings." § 1229(a)(2)(A). To do so, the Government must give the noncitizen "a written notice ... specifying ... the new time or place of the proceedings" and "the consequences ... of failing, except under exceptional circumstances, to attend such proceedings." *Ibid.* The Government is not required to provide written notice of the change in time or place of the proceedings if the noncitizen is "not in detention" and "has failed to provide [his] address" to the Government. § 1229(a)(2)(B).

The consequences of a noncitizen's failure to appear at a removal proceeding can be quite severe. If a noncitizen who has been properly served with the "written notice required under paragraph (1) or (2) of section 1229(a)" fails to appear at a removal proceeding, he "shall be ordered removed in absentia" if the Government "establishes by clear, unequivocal, and convincing evidence that the written notice was so provided and that the alien is removable." § 1229a(b)(5)(A). Absent "exceptional circumstances," a noncitizen subject to an in absentia removal order is ineligible for some forms of discretionary relief for 10 years if, "at the time of the notice described in paragraph (1) or (2) of section 1229(a)," he "was provided oral notice ... of the time and place of the proceedings and of the consequences" of failing to appear. § 1229a(b)(7). In certain limited circumstances, however, a removal order entered in absentia may be rescinded—*e.g.,* when the noncitizen "demonstrates that [he] did not receive notice in accordance with paragraph (1) or (2) of section 1229(a)." § 1229a(b)(5)(C)(ii).

B

In 1997, shortly after Congress passed IIRIRA, the Attorney General promulgated a regulation stating that a "notice to appear" served on a noncitizen need only provide "the time, place and date of the initial removal hearing, where practicable." 62 Fed.Reg. 10332 (1997). Per that regulation, the Department of Homeland Security (DHS), at least in recent years, almost always serves noncitizens with notices that fail to specify the time, place, or date of initial removal hearings whenever the agency deems it impracticable to include such information. See Brief for Petitioner 14; Brief for Respondent 48–49; Tr. of Oral Arg. 52–53 (Government's admission that "almost 100 percent" of "notices to appear omit the time and date of the proceeding over the last

201 L.Ed.2d 433, 86 USLW 4462, 18 Cal. Daily Op. Serv. 6019...

three years"). Instead, these notices state that the times, places, or dates of the initial hearings are "to be determined." Brief for Petitioner 14.

In *Matter of Camarillo,* 25 I. & N. Dec. 644 (2011), the Board of Immigration Appeals (BIA) addressed whether such notices trigger the stop-time rule even if they do not specify the time and date of the removal proceedings. The BIA concluded that they do. *Id., at 651.* It reasoned that the statutory phrase "notice to appear 'under section [1229](a)' " in the stop-time rule "merely specifies the document the DHS must serve on the alien to trigger the  **\*2112**  'stop-time' rule," but otherwise imposes no "substantive requirements" as to what information that document must include to trigger the stop-time rule. *Id., at 647.*

C

Petitioner Wescley Fonseca Pereira is a native and citizen of Brazil. In 2000, at age 19, he was admitted to the United States as a temporary "non-immigrant visitor." App. to Pet. for Cert. 3a. After his visa expired, he remained in the United States. Pereira is married and has two young daughters, both of whom are United States citizens. He works as a handyman and, according to submissions before the Immigration Court, is a well-respected member of his community.

In 2006, Pereira was arrested in Massachusetts for operating a vehicle while under the influence of alcohol. On May 31, 2006, while Pereira was detained, DHS served him (in person) with a document labeled "Notice to Appear." App. 7–13. That putative notice charged Pereira as removable for overstaying his visa, informed him that "removal proceedings" were being initiated against him, and provided him with information about the "[c]onduct of the hearing" and the consequences for failing to appear. *Id.,* at 7, 10–12. Critical here, the notice did not specify the date and time of Pereira's removal hearing. Instead, it ordered him to appear before an Immigration Judge in Boston "on a date to be set at a time to be set." *Id.,* at 9 (underlining in original).

More than a year later, on August 9, 2007, DHS filed the 2006 notice with the Boston Immigration Court. The Immigration Court thereafter attempted to mail Pereira a more specific notice setting the date and time for his initial removal hearing for October 31, 2007, at 9:30 a.m. But that second notice was sent to Pereira's street address rather than his post office box (which he had provided to DHS), so it was returned as undeliverable. Because Pereira never received notice of the time and date of his removal hearing, he failed to appear, and the Immigration Court ordered him removed in absentia. Unaware of that removal order, Pereira remained in the United States.

In 2013, after Pereira had been in the country for more than 10 years, he was arrested for a minor motor vehicle violation (driving without his headlights on) and was subsequently detained by DHS. The Immigration Court reopened the removal proceedings after Pereira demonstrated that he never received the Immigration Court's 2007 notice setting out the specific date and time of his hearing. Pereira then applied for cancellation of removal, arguing that the stop-time rule was not triggered by DHS' initial 2006 notice because the document lacked information about the time and date of his removal hearing.

The Immigration Court disagreed, finding the law "quite settled that DHS need not put a date certain on the Notice to Appear in order to make that document effective." App. to Pet. for Cert. 23a. The Immigration Court therefore concluded that Pereira could not meet the 10–year physical-presence requirement under § 1229b(b), thereby rendering him statutorily ineligible for cancellation of removal, and ordered Pereira removed from the country. The BIA dismissed Pereira's appeal. Adhering to its precedent in *Camarillo,* the BIA agreed with the Immigration Court that the 2006 notice triggered the stop-time rule and that Pereira thus failed to satisfy the 10–year physical-presence requirement and was ineligible for cancellation of removal.

The Court of Appeals for the First Circuit denied Pereira's petition for review of the BIA's order. 866 F.3d 1 (2017). Applying the framework set forth in *Chevron*  **\*2113**  *U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct.

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 857 of 1271

Pereira v. Sessions, 138 S.Ct. 2105 (2018)
201 L.Ed.2d 433, 86 USLW 4462, 18 Cal. Daily Op. Serv. 6019...

2778, 81 L.Ed.2d 694 (1984), the Court of Appeals first found that the stop-time rule in § 1229b(d)(1) is ambiguous because it "does not explicitly state that the date and time of the hearing must be included in a notice to appear in order to cut off an alien's period of continuous physical presence." 866 F.3d, at 5. Then, after reviewing the statutory text and structure, the administrative context, and pertinent legislative history, the Court of Appeals held that the BIA's interpretation of the stop-time rule was a permissible reading of the statute. *Id.,* at 6–8.

## II

### A

**[5]**    The Court granted certiorari in this case, 583 U.S. ——, 138 S.Ct. 735, 199 L.Ed.2d 602 (2018), to resolve division among the Courts of Appeals on a simple, but important, question of statutory interpretation: Does service of a document styled as a "notice to appear" that fails to specify "the items listed" in § 1229(a)(1) trigger the stop-time rule?[4] Pet. for Cert. i.

As a threshold matter, the Court notes that the question presented by Pereira, which focuses on all "items listed" in § 1229(a)(1), sweeps more broadly than necessary to resolve the particular case before us. Although the time-and-place information in a notice to appear will vary from case to case, the Government acknowledges that "[m]uch of the information Section 1229(a)(1) calls for does not" change and is therefore "included in standardized language on the I–862 notice-to-appear form." Brief for Respondent 36 (referencing 8 U.S.C. §§ 1229(a)(1)(A)-(B), (E)-(F), and (G)(ii)). In fact, the Government's 2006 notice to Pereira included all of the information required by § 1229(a)(1), except it failed to specify the date and time of Pereira's removal proceedings. See App. 10–12. Accordingly, the dispositive question in this case is much narrower, but no less vital: Does a "notice to appear" that does not specify the "time and place at which the proceedings will be held," as required by § 1229(a)(1)(G)(i), trigger the stop-time rule?[5]

**[6]**    In addressing that narrower question, the Court need not resort to *Chevron* deference, as some lower courts have done, for Congress has supplied a clear and unambiguous answer to the interpretive question at hand. See 467 U.S., at 842–843, 104 S.Ct. 2778 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress"). A putative **\*2114** notice to appear that fails to designate the specific time or place of the noncitizen's removal proceedings is not a "notice to appear under section 1229(a)," and so does not trigger the stop-time rule.

### B

The statutory text alone is enough to resolve this case. Under the stop-time rule, "any period of ... continuous physical presence" is "deemed to end ... when the alien is served a notice to appear under section 1229(a)." 8 U.S.C. § 1229b(d)(1). By expressly referencing § 1229(a), the statute specifies where to look to find out what "notice to appear" means. Section 1229(a), in turn, clarifies that the type of notice "referred to as a 'notice to appear'" throughout the statutory section is a "written notice ... specifying," as relevant here, "[t]he time and place at which the [removal] proceedings will be held." § 1229(a)(1)(G)(i). Thus, based on the plain text of the statute, it is clear that to trigger the stop-time rule, the Government must serve a notice to appear that, at the very least, "specif[ies]" the "time and place" of the removal proceedings.

Pereira v. Sessions, 138 S.Ct. 2105 (2018)

201 L.Ed.2d 433, 86 USLW 4462, 18 Cal. Daily Op. Serv. 6019...

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 858 of 1271

It is true, as the Government and dissent point out, that the stop-time rule makes broad reference to a notice to appear under "section 1229(a)," which includes paragraph (1), as well as paragraphs (2) and (3). See Brief for Respondent 27–28; *post,* at 2123 – 2124 (opinion of ALITO, J.). But the broad reference to § 1229(a) is of no consequence, because, as even the Government concedes, only paragraph (1) bears on the meaning of a "notice to appear." Brief for Respondent 27. By contrast, paragraph (2) governs the "[n]otice of change in time or place of proceedings," and paragraph (3) provides for a system to record noncitizens' addresses and phone numbers. Nowhere else within § 1229(a) does the statute purport to delineate the requirements of a "notice to appear." In fact, the term "notice to appear" appears only in paragraph (1) of § 1229(a).

If anything, paragraph (2) of § 1229(a) actually bolsters the Court's interpretation of the statute. Paragraph (2) provides that, "in the case of any change or postponement in the time and place of [removal] proceedings," the Government shall give the noncitizen "written notice ... specifying ... the new time or place of the proceedings." § 1229(a)(2)(A)(i). By allowing for a "change or postponement" of the proceedings to a "new time or place," paragraph (2) presumes that the Government has already served a "notice to appear under section 1229(a)" that specified a time and place as required by § 1229(a)(1)(G)(i). Otherwise, there would be no time or place to "change or postpon[e]." § 1229(a)(2). Notably, the dissent concedes that paragraph (2) confirms that a notice to appear must "state the 'time and place' of the removal proceeding as required by § 1229(a)(1)." *Post,* at 2116. The dissent nevertheless retorts that this point is "entirely irrelevant." *Ibid.* Not so. Paragraph (2) clearly reinforces the conclusion that "a notice to appear under section 1229(a)," § 1229b(d)(1), must include at least the time and place of the removal proceedings to trigger the stop-time rule.

[7]    Another neighboring statutory provision lends further contextual support for the view that a "notice to appear" must include the time and place of the removal proceedings to trigger the stop-time rule. Section 1229(b)(1) gives a noncitizen "the opportunity to secure counsel before the first [removal] hearing date" by mandating that such "hearing date shall not be scheduled earlier than 10 days after the service of the notice to appear." For § 1229(b)(1) to have any meaning, the "notice to appear"  **2115**  must specify the time and place that the noncitizen, and his counsel, must appear at the removal hearing. Otherwise, the Government could serve a document labeled "notice to appear" without listing the time and location of the hearing and then, years down the line, provide that information a day before the removal hearing when it becomes available. Under that view of the statute, a noncitizen theoretically would have had the "opportunity to secure counsel," but that opportunity will not be meaningful if, given the absence of a specified time and place, the noncitizen has minimal time and incentive to plan accordingly, and his counsel, in turn, receives limited notice and time to prepare adequately. It therefore follows that, if a "notice to appear" for purposes of § 1229(b)(1) must include the time-and-place information, a "notice to appear" for purposes of the stop-time rule under § 1229b(d)(1) must as well. After all, "it is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." *Taniguchi v. Kan Pacific Saipan, Ltd.,* 566 U.S. 560, 571, 132 S.Ct. 1997, 182 L.Ed.2d 903 (2012) (internal quotation marks omitted). [6]

Finally, common sense compels the conclusion that a notice that does not specify when and where to appear for a removal proceeding is not a "notice to appear" that triggers the stop-time rule. If the three words "notice to appear" mean anything in this context, they must mean that, at a minimum, the Government has to provide noncitizens "notice" of the information, *i.e.,* the "time" and "place," that would enable them "to appear" at the removal hearing in the first place. Conveying such time-and-place information to a noncitizen is an essential function of a notice to appear, for without it, the Government cannot reasonably expect the noncitizen to appear for his removal proceedings. To hold otherwise would empower the Government to trigger the stop-time rule merely by sending noncitizens a barebones document labeled "Notice to Appear," with no mention of the time and place of the removal proceedings, even though such documents would do little if anything to facilitate appearance

at those proceedings.[7] " ' 'We are not willing **\*2116** to impute to Congress ... such [a] contradictory and absurd purpose,' " *United States v. Bryan,* 339 U.S. 323, 342, 70 S.Ct. 724, 94 L.Ed. 884 (1950), particularly where doing so has no basis in the statutory text.

### III

Straining to inject ambiguity into the statute, the Government and the dissent advance several overlapping arguments. None is persuasive.

### A

First, the Government posits that § 1229(a) "is not worded in the form of a definition" and thus cannot circumscribe what type of notice counts as a "notice to appear" for purposes of the stop-time rule. Brief for Respondent 32. Section 1229(a), however, does speak in definitional terms, at least with respect to the "time and place at which the proceedings will be held": It specifically provides that the notice described under paragraph (1) is "referred to as a 'notice to appear,' " which in context is quintessential definitional language.[8] It then defines that term as a "written notice" that, as relevant here, "specif[ies] ... [t]he time and place at which the [removal] proceedings will be held." § 1229(a)(1)(G)(i). Thus, when the term "notice to appear" is used elsewhere in the statutory section, including as the trigger for the stop-time rule, it carries with it the substantive time-and-place criteria required by § 1229(a).

Resisting this straightforward understanding of the text, the dissent posits that " § 1229(a)(1)'s language can be understood to define what makes a notice to appear *complete*." *Post,* at 2126 (emphasis in original). In the dissent's view, a defective notice to appear is still a "notice to appear" even if it is incomplete—much like a three-wheeled Chevy is still a car. *Post,* at 2126 – 2127. The statutory text proves otherwise. Section 1229(a)(1) does not say a "notice to appear" is "complete" when it specifies the time and place of the removal proceedings. Rather, it defines a "notice to appear" as a "written notice" that "specif[ies]," at a minimum, the time and place of the removal proceedings. § 1229(a)(1)(G)(i). Moreover, the omission of time-and-place information is not, as the dissent asserts, some trivial, ministerial defect, akin to an unsigned notice of appeal. Cf. *Becker v. Montgomery,* 532 U.S. 757, 763, 768, 121 S.Ct. 1801, 149 L.Ed.2d 983 (2001). Failing to specify integral information like the time and place of removal proceedings unquestionably would "deprive [the notice to appear] of its essential **\*2117** character." *Post,* at 2127, n. 5; see *supra,* at 2115 – 2116, n. 7.[9]

### B

The Government and the dissent next contend that Congress' use of the word "under" in the stop-time rule renders the statute ambiguous. Brief for Respondent 22–23; *post,* at 2122 – 2123. Recall that the stop-time rule provides that "any period of ... continuous physical presence" is "deemed to end ... when the alien is served a notice to appear under section 1229(a)." § 1229b(d)(1)(A). According to the Government, the word "under" in that provision means "subject to," "governed by," or "issued under the authority of." Brief for Respondent 24. The dissent offers yet another alternative, insisting that "under" can also mean "authorized by." *Post,* at 2122. Those definitions, the Government and dissent maintain, support the BIA's view that the stop-time rule applies so long as DHS serves a notice that is "authorized by," or "subject to or governed by, or issued under

the authority of" § 1229(a), even if the notice bears none of the time-and-place information required by that provision. See Brief for Respondent 24; *post,* at 2122 – 2123.

**[8]  [9]**  We disagree. It is, of course, true that "[t]he word 'under' is [a] chameleon" that " 'must draw its meaning from its context.' " *Kucana v. Holder,* 558 U.S. 233, 245, 130 S.Ct. 827, 175 L.Ed.2d 694 (2010) (quoting *Ardestani v. INS,* 502 U.S. 129, 135, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991)). But nothing in the text or context here supports either the Government's or the dissent's preferred definition of "under." Based on the plain language and statutory context discussed above, we think it obvious that the word "under," as used in the stop-time rule, can only mean "in accordance with" or "according to," for it connects the stop-time trigger in § 1229b(d)(1) to a "notice to appear" that contains the enumerated time-and-place information described in § 1229(a)(1)(G)(i). See 18 Oxford English Dictionary 950 (2d ed. 1989) (defining "under" as "[i]n accordance with"); Black's Law Dictionary 1525 (6th ed. 1990) (defining "under" as "according to"). So construed, the stop-time rule applies only if the Government serves a "notice to appear" "[i]n accordance with" or "according to" the substantive time-and-place requirements set forth in § 1229(a). See *Kirtsaeng v. John Wiley & Sons, Inc.,* 568 U.S. 519, 530, 133 S.Ct. 1351, 185 L.Ed.2d 392 (2013) (internal quotation marks omitted). Far from generating any "degree of ambiguity," *post,* at 2122, the word "under" provides the glue that bonds the stop-time rule to the substantive time-and-place requirements mandated by § 1229(a).

## C

The Government argues that surrounding statutory provisions reinforce its preferred reading. See Brief for Respondent 25–27. It points, for instance, to two separate provisions relating to in absentia removal orders: § 1229a(b)(5)(A), which provides that a noncitizen may be removed in **\*2118** absentia if the Government has provided "written notice required under paragraph (1) or (2) of section 1229(a)"; and § 1229a(b)(5)(C)(ii), which provides that, once an in absentia removal order has been entered, the noncitizen may seek to reopen the proceeding if, *inter alia,* he "demonstrates that [he] did not receive notice in accordance with paragraph (1) or (2) of section 1229(a)." According to the Government, those two provisions use the distinct phrases "required under" and "in accordance with" as shorthand for a notice that satisfies § 1229(a)(1)'s requirements, whereas the stop-time rule uses the phrase "under section 1229(a)" to encompass a different type of notice that does not necessarily include the information outlined in § 1229(a)(1). See Brief for Respondent 25–26. That logic is unsound. The Government essentially argues that phrase 1 ("written notice required under paragraph (1) ... of section 1229(a)") and phrase 2 ("notice in accordance with paragraph (1) ... of section 1229(a)") can refer to the same type of notice even though they use entirely different words, but that phrase 3 ("notice to appear under section 1229(a)") cannot refer to that same type of notice because it uses words different from phrases 1 and 2. But the Government offers no convincing reason why that is so. The far simpler explanation, and the one that comports with the actual statutory language and context, is that each of these three phrases refers to notice satisfying, at a minimum, the time-and-place criteria defined in § 1229(a)(1).

Equally unavailing is the Government's invocation of § 1229a(b)(7). Brief for Respondent 26–27. Under that provision, a noncitizen who is ordered removed in absentia is ineligible for various forms of discretionary relief for a 10–year period if the noncitizen, "at the time of the notice described in paragraph (1) or (2) of section 1229(a) of [Title 8], was provided oral notice ... of the time and place of the proceedings" and "of the consequences ... of failing, other than because of exceptional circumstances," to appear. § 1229a(b)(7). The Government argues that the express reference to "the time and place of the proceedings" in § 1229a(b)(7) shows that, when Congress wants to attach substantive significance to whether a noncitizen

201 L.Ed.2d 433, 86 USLW 4462, 18 Cal. Daily Op. Serv. 6019...

is given information about the specific "time and place" of a removal proceeding, it knows exactly how to do so. Brief for Respondent 26–27. But even if § 1229a(b)(7) may impose harsher consequences on noncitizens who fail to appear at removal proceedings after having specifically received oral notice of the time and place of such proceedings, that reveals nothing about the distinct question here—*i.e.*, whether Congress intended the stop-time rule to apply when the Government fails to provide written notice of the time and place of removal proceedings. As to that question, the statute makes clear that Congress fully intended to attach substantive significance to the requirement that noncitizens be given notice of at least the time and place of their removal proceedings. A document that fails to include such information is not a "notice to appear under section 1229(a)" and thus does not trigger the stop-time rule.

### D

Unable to find sure footing in the statutory text, the Government and the dissent pivot away from the plain language and raise a number of practical concerns. These practical considerations are meritless and do not justify departing from the statute's clear text. See *Burrage v. United States,* 571 U.S. 204, 218, 134 S.Ct. 881, 187 L.Ed.2d 715 (2014).

**[10]**   The Government, for its part, argues that the "administrative realities of  **\*2119**  removal proceedings" render it difficult to guarantee each noncitizen a specific time, date, and place for his removal proceedings. See Brief for Respondent 48. That contention rests on the misguided premise that the time-and-place information specified in the notice to appear must be etched in stone. That is incorrect. As noted above, § 1229(a)(2) expressly vests the Government with power to change the time or place of a noncitizen's removal proceedings so long as it provides "written notice ... specifying ... the new time or place of the proceedings" and the consequences of failing to appear. See § 1229(a)(2); Tr. of Oral Arg. 16–19. Nothing in our decision today inhibits the Government's ability to exercise that statutory authority after it has served a notice to appear specifying the time and place of the removal proceedings.

The dissent raises a similar practical concern, which is similarly misplaced. The dissent worries that requiring the Government to specify the time and place of removal proceedings, while allowing the Government to change that information, might encourage DHS to provide "arbitrary dates and times that are likely to confuse and confound all who receive them." *Post,* at 2125. The dissent's argument wrongly assumes that the Government is utterly incapable of specifying an accurate date and time on a notice to appear and will instead engage in "arbitrary" behavior. See *ibid.* The Court does not embrace those unsupported assumptions. As the Government concedes, "a scheduling system previously enabled DHS and the immigration court to coordinate in setting hearing dates in some cases." Brief for Respondent 50, n. 15; Brief for National Immigrant Justice Center as *Amicus Curiae* 30–31. Given today's advanced software capabilities, it is hard to imagine why DHS and immigration courts could not again work together to schedule hearings before sending notices to appear.

Finally, the dissent's related contention that including a changeable date would "mislead" and "prejudice" noncitizens is unfounded. *Post,* at 2124. As already explained, if the Government changes the date of the removal proceedings, it must provide written notice to the noncitizen, § 1229(a)(2). This notice requirement mitigates any potential confusion that may arise from altering the hearing date. In reality, it is the dissent's interpretation of the statute that would "confuse and confound" noncitizens, *post,* at 2124, by authorizing the Government to serve notices that lack any information about the time and place of the removal proceedings.

### E

**[11]**   In a last ditch effort to salvage its atextual interpretation, the Government invokes the alleged purpose and legislative history of the stop-time rule. Brief for Respondent 37–40. Even for those who consider statutory purpose and legislative

201 L.Ed.2d 433, 86 USLW 4462, 18 Cal. Daily Op. Serv. 6019...

history, however, neither supports the Government's atextual position that Congress intended the stop-time rule to apply when a noncitizen has been deprived notice of the time and place of his removal proceedings. By the Government's own account, Congress enacted the stop-time rule to prevent noncitizens from exploiting administrative delays to "buy time" during which they accumulate periods of continuous presence. *Id.,* at 37–38 (citing H.R. Rep. No. 104–469, pt. 1, p. 122 (1996)). Requiring the Government to furnish time-and-place information in a notice to appear, however, is entirely consistent with that objective because, once a proper notice to appear is served, the stop-time rule is triggered, and a noncitizen would be unable to manipulate or delay removal proceedings to "buy time." At the end of the **\*2120** day, given the clarity of the plain language, we "apply the statute as it is written." *Burrage,* 571 U.S., at 218, 134 S.Ct. 881.

IV

For the foregoing reasons, the judgment of the Court of Appeals for the First Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice KENNEDY, concurring.
I agree with the Court's opinion and join it in full.

This separate writing is to note my concern with the way in which the Court's opinion in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), has come to be understood and applied. The application of that precedent to the question presented here by various Courts of Appeals illustrates one aspect of the problem.

The first Courts of Appeals to encounter the question concluded or assumed that the notice necessary to trigger the stop-time rule found in 8 U.S.C. § 1229b(d)(1) was not "perfected" until the immigrant received all the information listed in § 1229(a)(1). *Guamanrrigra v. Holder,* 670 F.3d 404, 410 (C.A.2 2012) (*per curiam*); see also *Dababneh v. Gonzales,* 471 F.3d 806, 809 (C.A.7 2006); *Garcia–Ramirez v. Gonzales,* 423 F.3d 935, 937, n. 3 (C.A.9 2005) (*per curiam*).

That emerging consensus abruptly dissolved not long after the Board of Immigration Appeals (BIA) reached a contrary interpretation of § 1229b(d)(1) in *Matter of Camarillo,* 25 I. & N. Dec. 644 (2011). After that administrative ruling, in addition to the decision under review here, at least six Courts of Appeals, citing *Chevron,* concluded that § 1229b(d)(1) was ambiguous and then held that the BIA's interpretation was reasonable. See *Moscoso–Castellanos v. Lynch,* 803 F.3d 1079, 1083 (C.A.9 2015); *O'Garro v. United States Atty. Gen.,* 605 Fed.Appx. 951, 953 (C.A.11 2015) (*per curiam*); *Guaman– Yuqui v. Lynch,* 786 F.3d 235, 239–240 (C.A.2 2015) (*per curiam*); *Gonzalez–Garcia v. Holder,* 770 F.3d 431, 434–435 (C.A.6 2014); *Yi Di Wang v. Holder,* 759 F.3d 670, 674–675 (C.A.7 2014); *Urbina v. Holder,* 745 F.3d 736, 740 (C.A.4 2014). But see *Orozco–Velasquez v. Attorney General United States,* 817 F.3d 78, 81–82 (C.A.3 2016). The Court correctly concludes today that those holdings were wrong because the BIA's interpretation finds little support in the statute's text.

In according *Chevron* deference to the BIA's interpretation, some Courts of Appeals engaged in cursory analysis of the questions whether, applying the ordinary tools of statutory construction, Congress' intent could be discerned, 467 U.S., at 843, n. 9,

201 L.Ed.2d 433, 86 USLW 4462, 18 Cal. Daily Op. Serv. 6019...

104 S.Ct. 2778, and whether the BIA's interpretation was reasonable, *id., at 845, 104 S.Ct. 2778.* In *Urbina v. Holder,* for example, the court stated, without any further elaboration, that "we agree with the BIA that the relevant statutory provision is ambiguous." 745 F.3d, at 740. It then deemed reasonable the BIA's interpretation of the statute, "for the reasons the BIA gave in that case." *Ibid.* This analysis suggests an abdication of the Judiciary's proper role in interpreting federal statutes.

The type of reflexive deference exhibited in some of these cases is troubling. And when deference is applied to other questions of statutory interpretation, such as an agency's interpretation of the statutory provisions that concern the scope of its own authority, it is more troubling still. **\*2121** See *Arlington v. FCC,* 569 U.S. 290, 327, 133 S.Ct. 1863, 185 L.Ed.2d 941 (2013) (ROBERTS, C.J., dissenting) ("We do not leave it to the agency to decide when it is in charge"). Given the concerns raised by some Members of this Court, see, *e.g., id., at 312–328, 133 S.Ct. 1863;* *Michigan v. EPA,* 576 U.S. ——, ——, 135 S.Ct. 2699, 2712–2714, 192 L.Ed.2d 674 (2015) (THOMAS, J., concurring); *Gutierrez–Brizuela v. Lynch,* 834 F.3d 1142, 1149–1158 (C.A.10 2016) (Gorsuch, J., concurring), it seems necessary and appropriate to reconsider, in an appropriate case, the premises that underlie *Chevron* and how courts have implemented that decision. The proper rules for interpreting statutes and determining agency jurisdiction and substantive agency powers should accord with constitutional separation-of-powers principles and the function and province of the Judiciary. See, *e.g., Arlington, supra,* at 312–316, 133 S.Ct. 1863 (ROBERTS, C.J., dissenting).

Justice ALITO, dissenting.

Although this case presents a narrow and technical issue of immigration law, the Court's decision implicates the status of an important, frequently invoked, once celebrated, and now increasingly maligned precedent, namely, *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under that decision, if a federal statute is ambiguous and the agency that is authorized to implement it offers a reasonable interpretation, then a court is supposed to accept that interpretation. Here, a straightforward application of *Chevron* requires us to accept the Government's construction of the provision at issue. But the Court rejects the Government's interpretation in favor of one that it regards as the best reading of the statute. I can only conclude that the Court, for whatever reason, is simply ignoring *Chevron.*

I

As amended, the Immigration and Nationality Act generally requires the Government to remove nonpermanent resident aliens who overstay the terms of their admission into this country. See 8 U.S.C. §§ 1227(a)(1)(B)–(C). But under certain circumstances, the Government may decide to cancel their removal instead. See § 1229b. To be eligible for such relief, an alien must demonstrate that he or she "has been physically present in the United States for a continuous period of not less than 10 years." § 1229b(b)(1)(A). "For purposes of" that rule, however, "any period of ... continuous physical presence in the United States shall be deemed to end ... when the alien is served a notice to appear under section 1229(a) of this title." § 1229b(d)(1). That language acts as a stop-time rule, preventing the continuous-presence clock from continuing to run once an alien is served with a notice to appear.

The question presented by this case is whether the stop-time rule is triggered by service of a notice to appear that is incomplete in some way. A provision of the amended Immigration and Nationality Act requires that the Government serve an alien who it seeks to remove with a notice to appear "specifying" a list of things, including "[t]he nature of the proceedings against the alien," "[t]he legal authority under which the proceedings are conducted," "[t]he acts or conduct alleged to be in violation of

201 L.Ed.2d 433, 86 USLW 4462, 18 Cal. Daily Op. Serv. 6019...

law," "[t]he charges against the alien and the statutory provisions alleged to have been violated," and (what is relevant here) "[t]he time and place at which the proceedings will be held." §§ 1229(a)(1)(A), (B), (C), (D), (G)(i).

Petitioner Wescley Pereira is a Brazilian citizen who entered the United States lawfully  **\*2122**  in 2000 but then illegally overstayed his nonimmigrant visa. In 2006, the Government caused him to be served in person with a document styled as a notice to appear for removal proceedings. Pereira concedes that he overstayed his visa and is thus removable, but he argues that he is nonetheless eligible for cancellation of removal because he has now been in the country continuously for more than 10 years. He contends that the notice served on him in 2006 did not qualify as a notice to appear because it lacked one piece of information that such a notice is supposed to contain, namely, the time at which his removal proceedings were to be held. Thus, Pereira contends, that notice did not trigger the stop-time rule, and the clock continued to run.

The Board of Immigration Appeals (BIA) has rejected this interpretation of the stop-time rule in the past. It has held that "[a]n equally plausible reading" is that the stop-time rule "merely specifies the document the [Government] must serve on the alien to trigger the 'stop-time' rule and does not impose substantive requirements for a notice to appear to be effective in order for that trigger to occur." *In re* Camarillo, 25 I. & N. Dec. 644, 647 (2011). It therefore held in this case that Pereira is ineligible for cancellation of removal.

## II

### A

Pereira, on one side, and the Government and the BIA, on the other, have a quasi-metaphysical disagreement about the meaning of the concept of a notice to appear. Is a notice to appear a document that contains certain essential characteristics, namely, all the information required by § 1229(a)(1), so that any notice that omits any of that information is not a "notice to appear" at all? Or is a notice to appear a document that is conventionally called by that name, so that a notice that omits some of the information required by § 1229(a)(1) may still be regarded as a "notice to appear"?

Picking the better of these two interpretations might have been a challenge in the first instance. But the Court did not need to decide that question, for under *Chevron* we are obligated to defer to a Government agency's interpretation of the statute that it administers so long as that interpretation is a " 'permissible' " one. *INS v. Aguirre–Aguirre,* 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999). All that is required is that the Government's view be "reasonable"; it need not be "the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.,* 556 U.S. 208, 218, 129 S.Ct. 1498, 173 L.Ed.2d 369 (2009). Moreover, deference to the Government's interpretation "is especially appropriate in the immigration context" because of the potential foreign-policy implications. *Aguirre–Aguirre, supra,* at 425, 119 S.Ct. 1439. In light of the relevant text, context, statutory history, and statutory purpose, there is no doubt that the Government's interpretation of the stop-time rule is indeed permissible under *Chevron*.

### B

By its terms, the stop-time rule is consistent with the Government's interpretation. As noted, the stop-time rule provides that "any period of ... continuous physical presence in the United States shall be deemed to end ... when the alien is served a notice to appear under section 1229(a) of this title." § 1229b(d)(1). A degree of ambiguity arises from Congress's use of the word "under," for as the Court recognizes, " '[t]he word "under" is [a] chameleon,' " *ante,* at 2117, having " 'many dictionary

Pereira v. Sessions, 138 S.Ct. 2105 (2018)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 865 of 1271

201 L.Ed.2d 433, 86 USLW 4462, 18 Cal. Daily Op. Serv. 6019...

definitions' " and no "uniform, **\*2123** consistent meaning," *Kirtsaeng v. John Wiley & Sons, Inc.,* 568 U.S. 519, 531, 133 S.Ct. 1351, 185 L.Ed.2d 392 (2013). Everyone agrees, however, that "under" is often used to mean "authorized by." See, *e.g.,* Webster's New World College Dictionary 1453 (3d ed. 1997) ("authorized ... by"); American Heritage Dictionary 1945 (3d ed. 1992) ("With the authorization of"); see also Brief for Respondent 24 (agreeing that "under" can mean "subject to," "governed by," or "issued under the authority of"); Brief for Petitioner 28. And when the term is used in this way, it does not necessarily mean that the act done pursuant to that authorization was done in strict compliance with the terms of the authorization. For example, one might refer to a litigant's disclosure "under" Rule 26(a) of the Federal Rules of Civil Procedure even if that disclosure did not comply with Rule 26(a) in every respect. Or one might refer to regulations promulgated "under" a statute even if a court later found those regulations inconsistent with the statute's text.

That use of the word "under" perfectly fits the Government's interpretation of the stop-time rule. The Government served Pereira with a notice to appear "under" § 1229(a) in the sense that the notice was "authorized by" that provision, which states that a notice to appear "shall be given" to an alien in a removal proceeding and outlines several rules governing such notices. On that reasonable reading, the phrase "under section 1229(a)" acts as shorthand for the type of document governed by § 1229(a).

<div align="center">C</div>

That interpretation is bolstered by the stop-time rule's cross-reference to " section 1229(a)." § 1229b(d)(1). Pereira interprets that cross-reference as picking up every substantive requirement that applies to notices to appear. But those substantive requirements are found only in § 1229(a)*(1)*. Thus, the cross-reference to " section 1229(a)," as opposed to " section 1229(a)(1)," tends to undermine Pereira's interpretation, because if Congress had meant for the stop-time rule to incorporate the substantive requirements located in § 1229(a)(1), it presumably would have referred specifically to that provision and not more generally to " section 1229(a)." We normally presume that "[w]hen Congress want[s] to refer only to a particular subsection or paragraph, it [says] so," *NLRB v. SW General, Inc.,* 580 U.S. ——, ——, 137 S.Ct. 929, 939, 197 L.Ed.2d 263 (2017), and it is instructive that neighboring statutory provisions in this case are absolutely riddled with such specific cross-references. [1] In the stop-time rule, however, Congress chose to insert a broader cross-reference, one that refers to the general process of serving notices to appear as a whole. See § 1229(a). Thus, Pereira essentially "wants to cherry pick from the material covered by the statutory cross-reference. But if Congress had intended to refer to the definition in [ § 1229(a)(1) ] alone, it presumably would have done so." *Cyan, Inc. v. Beaver County Employees Retirement Fund,* 583 U.S. ——, ——, 138 S.Ct. 1061, 1070, 200 L.Ed.2d 332 (2018). [2]

<div align="center">**\*2124**  D</div>

Statutory history also strongly supports the Government's argument that a notice to appear should trigger the stop-time rule even if it fails to include the date and time of the alien's removal proceeding. When Congress enacted the stop-time rule, it decreed that the rule should "apply to notices to appear issued before, on, or after the date of the enactment of this Act." Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 309(c)(5), 110 Stat. 3009–627. This created a problem: Up until that point, there was no such thing as a "notice to appear," so the reference to "notices to appear issued before ... this Act" made little sense. When Congress became aware of the problem, it responded by clarifying that the stop-time rule should apply not only to notices to appear, but also "to orders to show cause ... issued before, on, or after the date" of the clarifying amendment's enactment. Nicaraguan Adjustment and Central American Relief Act, § 203(1), 111 Stat. 2196, as amended 8 U.S.C. § 1101 note. That clarification sheds considerable light on the question presented here because orders to show cause did

201 L.Ed.2d 433, 86 USLW 4462, 18 Cal. Daily Op. Serv. 6019...

not necessarily include the date or location of proceedings (even if they otherwise served a function similar to that now served by notices to appear). See 8 U.S.C. § 1252b(a)(2)(A) (1994 ed.).

That statutory history supports the Government's interpretation twice over. First, it demonstrates that when it comes to triggering the stop-time rule, Congress attached no particular significance to the presence (or absence) of information about the date and time of a removal proceeding. Congress was more than happy for the stop-time rule to be activated either by notices to appear or by orders to show cause, even though the latter often lacked any information about the date and time of proceedings.

Second, and even more important, the statutory history also shows that Congress clearly thought of orders to show cause as the functional equivalent of notices to appear for purposes of the stop-time rule. After an initially confusing reference to "notices to appear" issued before the creation of the stop-time rule, Congress clarified that it had meant to refer to "orders to show cause." By equating orders to show cause with notices to appear, Congress indicated that when the stop-time rule refers to "a notice to appear," it is referring to a category of documents that do not necessarily provide the date and time of a future removal proceeding. [3]

E

Finally, Pereira's contrary interpretation leads to consequences that clash with any conceivable statutory purpose. Pereira's interpretation would require the Government to include a date and time on every notice to appear that it issues. But at the moment, the Government lacks the ability to do that with any degree of accuracy. The Department of Homeland Security sends out the initial notice to appear, but the removal proceedings themselves are scheduled by the Immigration Court, which is part of the Department of Justice. See 8 C.F.R. § 1003.18(a) (2018). The Department of Homeland Security cannot dictate the scheduling of a matter on the **2125** docket of the Immigration Court, and at present, the Department of Homeland Security generally cannot even access the Immigration Court's calendar. In re Camarillo, 25 I. & N. Dec., at 648; Tr. of Oral Arg. 52–53. The Department of Homeland Security may thus be hard pressed to include on initial notices to appear a hearing date that is anything more than a rough estimate subject to considerable change. See § 1229(a)(2); see also ante, at 2119 (disclaiming any effect on the Government's ability to change initial hearing dates).

Including an estimated and changeable date, however, may do much more harm than good. See Gonzalez–Garcia v. Holder, 770 F.3d 431, 434–435 (C.A.6 2014). It is likely to mislead many recipients and to prejudice those who make preparations on the assumption that the initial date is firm. And it forces the Government to go through the pointless exercise of first including a date that it knows may very well be altered and then changing it once the real date becomes clear. Such a system serves nobody's interests.

Statutory interpretation is meant to be "a holistic endeavor," and sometimes language "that may seem ambiguous in isolation" becomes clear because "only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." United Sav. Assn. of Tex. v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). The real-world effects produced by Pereira's interpretation—arbitrary dates and times that are likely to confuse and confound all who receive them—illustrate starkly the merits of the Government's alternative construction.

III

Based on the relevant text, context, statutory history, and statutory purpose, the Government makes a convincing case that the stop-time rule can be triggered even by a notice to appear that omits the date and time of a removal proceeding. But the

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 867 of 1271

Pereira v. Sessions, 138 S.Ct. 2105 (2018)
201 L.Ed.2d 433, 86 USLW 4462, 18 Cal. Daily Op. Serv. 6019...

Court holds instead that in order "to trigger the stop-time rule, the Government must serve a notice to appear that, at the very least, 'specif[ies]' the 'time and place' of the removal proceedings." *Ante*, at 2113. According to the Court, that conclusion is compelled by the statutory text, the statutory context, and "common sense." *Ante*, at 2115. While the Court's interpretation may be reasonable, the Court goes much too far in saying that it is the *only* reasonable construction.


A


Start with the text. As noted, the stop-time rule provides that "any period of ... continuous physical presence in the United States shall be deemed to end ... when the alien is served a notice to appear under section 1229(a)." § 1229b(d)(1). The Court does not dispute that it is entirely consistent with standard English usage to read this language as the Government and I do. See *ante*, at 2117. It therefore follows that the stop-time rule itself does not foreclose the Government's interpretation.

That leaves only § 1229(a)(1), which specifies the information that a notice to appear must contain. The Court's treatment of this provision contradicts itself. On the one hand, the Court insists that this provision is "definitional" and that it sets out the essential characteristics without which a notice is not a notice to appear. *Ante*, at 2116. But on the other hand, the Court states that it "leaves for another day whether a putative notice to appear that omits any of the other categories of information enumerated in § 1229(a)(1) triggers the stop-time rule." *Ante*, at 2113, n. 5. The Court cannot have **\*2126** it both ways. If § 1229(a)(1) is definitional and sets out the essential characteristics of a notice to appear, then the omission of any required item of information makes a putative notice to appear a nullity. So if the Court means what it says—that its interpretation of § 1229(a)(1)'s language leaves open the consequences of omitting other categories of information—that is tantamount to admitting that § 1229(a)(1) itself cannot foreclose the Government's interpretation. [4]

In any event, the Government's interpretation can easily be squared with the text of § 1229(a)(1). That provision states that a "written notice (*in this section referred to as a 'notice to appear'*) shall be given in person to the alien ... specifying" 10 categories of information, including the "time and place" of the removal proceeding. § 1229(a)(1) (emphasis added). According to Pereira, that language cinches the case against the Government's interpretation: By equating a "notice to appear" with a "written notice ... [that] specif[ies]" the relevant categories of information, § 1229(a)(1) establishes that a notice lacking any of those 10 pieces of information cannot qualify as a "notice to appear" and thus cannot trigger the stop-time rule. In Pereira's eyes, § 1229(a)(1) defines what a notice to appear is, and most of the Court's opinion is to the same effect.

This may be a plausible interpretation of § 1229(a)(1)'s language, but it is not the only one. It is at least as reasonable to read that language as simply giving a name to the new type of notice to which that provision refers. Or to put the point another way, § 1229(a)(1)'s language can be understood to define what makes a notice to appear *complete*. See *In re Camarillo, supra*, at 647. Under that interpretation, a notice that omits some of the information required by § 1229(a)(1) might still be a "notice to appear."

We often use language in this way. In everyday life, a person who sees an old Chevy with three wheels in a junkyard would still call it a car. Language is often used the same way in the law. Consider the example of a notice of appeal. Much like a notice to appear, a notice of appeal must meet several substantive requirements; all notices of appeal, for example, "must be signed." Fed. Rule Civ. Proc. 11(a). So what happens if a notice of appeal is incomplete in some way—say, because it is unsigned but otherwise impeccable? If a court clerk wanted to point out the lack of a signature to an attorney, the clerk is far more likely to say, "there is a problem with your notice of appeal," than to say, "there is a problem with this document you filed; it's not signed and therefore I don't know what to call it, but I can't call it a notice of appeal because it is unsigned."

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 868 of 1271

201 L.Ed.2d 433, 86 USLW 4462, 18 Cal. Daily Op. Serv. 6019...

Furthermore, just because a legal document is incomplete, it does not necessarily follow that it is without legal effect. Consider again the notice of appeal. As a general matter, an appeal "may be taken" in a civil case "only by filing a notice of appeal" "within 30 days after entry of the judgment or order appealed from." Fed. Rules App. Proc. 3(a), 4(a)(1)(A). While an unsigned notice of appeal does not meet the substantive requirements set out in Rule 11, in **\*2127** *Becker v. Montgomery,* 532 U.S. 757, 763, 768, 121 S.Ct. 1801, 149 L.Ed.2d 983 (2001), this Court unanimously held that a litigant who filed a timely but unsigned notice of appeal still beat the 30–day clock for filing appeals. As we explained, "imperfections in noticing an appeal should not be fatal where no genuine doubt exists about who is appealing, from what judgment, to which appellate court." *Id.,* at 767, 121 S.Ct. 1801.

If Rule 11 of the Federal Rules of Civil Procedure can be read in this way, it is not unreasonable to do the same with § 1229(a)(1). And in trying to distinguish an empty signature line on a notice of appeal as a "trivial, ministerial defect," *ante,* at 2116, the Court gives the game away by once again assuming its own conclusion. Whether the omission of the date and time certain on a notice to appear is essential for present purposes is the central issue in this case, and the Court gives no textually based reason to think that it is. The Government could reasonably conclude that a notice to appear that omits the date and time of a proceeding is still a notice to appear (albeit a defective one), much in the same way that a complaint without the e-mail address of the signer is still a complaint (albeit a defective one, see Rule 11(a)), or a clock missing the number "8" is still a clock (albeit a defective one).

Pereira and the Court are right that § 1229(a)(1) sets out the substantive requirements for notices to appear, but that fact alone does not control whether an incomplete notice to appear triggers the stop-time rule. [5]

### B

With the text of both the stop-time rule and § 1229(a)(1) irreducibly ambiguous, the Court must next look to two neighboring provisions to support its conclusion that its interpretation is the only reasonable one. Neither provision is sufficient.

The Court first observes that the second paragraph of § 1229(a) allows the Government to move or reschedule a removal proceeding unilaterally and then to inform the alien of "the new time or place of the proceedings." § 1229(a)(2)(A)(i). "By allowing for a 'change or postponement' of the proceedings to a 'new time or place,' " the Court reasons, "paragraph (2) presumes that the Government has already served a 'notice to appear ...' that specified a time and place as required." *Ante,* at 2114.

That is entirely correct—and entirely irrelevant. No one doubts that § 1229(a)(1) requires that a notice to appear include the "time and place" of the removal proceeding. See § 1229(a)(1)(G)(i). Indeed, that is common ground between the two parties. See Brief for Petitioner 10–11; Brief for Respondent 3. Paragraph (2) undoubtedly assumes that notices to appear will state the "time and place" of the removal proceeding as required by § 1229(a)(1), but it has nothing to say about whether the failure to include that information affects the operation of the stop-time rule. By suggesting otherwise, the Court is merely reasoning backwards from its conclusion.

The other provision cited by the Court, § 1229(b)(1), is no more helpful. As the Court explains, § 1229(b)(1) generally precludes the Government from scheduling a hearing date " 'earlier than 10 days **\*2128** after the service of the notice to appear' " in order to give the alien " 'the opportunity to secure counsel.' " *Ante,* at 2114. Unless a notice to appear includes the time and place of the hearing, the Court frets, "the Government could serve a document labeled 'notice to appear' without listing the

201 L.Ed.2d 433, 86 USLW 4462, 18 Cal. Daily Op. Serv. 6019...

time and location of the hearing and then, years down the line, provide that information a day before the removal hearing when it becomes available." *Ibid.* But that remote and speculative possibility depends entirely on the Immigration Court's allowing a removal proceeding to go forward only one day after an alien (and the Government) receives word of a hearing date. See 8 C.F.R. § 1003.18(a). Even assuming that such an unlikely event were to come to pass, the court's decision would surely be subject to review on appeal. See generally 8 C.F.R. § 1003.1, 8 U.S.C. § 1252. Regardless, the Court's interpretation of the stop-time rule would not prevent a similar type of problem from arising. When the Government sends an initial notice to appear from now on, it may be forced by the Court's interpretation to guess that the hearing will take place far in the future, only to learn shortly afterwards that the hearing is in fact imminent. An alien lulled into a false sense of security by that initial notice to appear will have as little meaningful " 'opportunity to secure counsel' " and "time to prepare adequately," *ante,* at 2114, as one who initially received a notice to appear without any hearing date.


C

Finally, the Court turns to "common sense" to support its preferred reading of the text. According to the Court, it should be "obvious" to anyone that "a notice that does not specify when and where to appear for a removal proceeding is not a 'notice to appear.' " *Ante,* at 2110, 2115. But what the Court finds so obvious somehow managed to elude every Court of Appeals to consider the question save one. See *Moscoso–Castellanos v. Lynch,* 803 F.3d 1079, 1083 (C.A.9 2015); *O'Garro v. U.S. Attorney General,* 605 Fed.Appx. 951, 953 (C.A.11 2015) (*per curiam* ); *Guaman–Yuqui v. Lynch,* 786 F.3d 235, 240 (C.A.2 2015) (*per curiam* ); *Gonzalez–Garcia v. Holder,* 770 F.3d 431, 434–435 (C.A.6 2014); *Yi Di Wang v. Holder,* 759 F.3d 670, 675 (C.A.7 2014); *Urbina v. Holder,* 745 F.3d 736, 740 (C.A.4 2014).

That is likely because the Court's "common sense" depends on a very specific understanding of the purpose of a notice to appear. In the Court's eyes, notices to appear serve primarily as a vehicle for communicating to aliens when and where they should appear for their removal hearings. That is certainly a reasonable interpretation with some intuitive force behind it. But that is not the only possible understanding or even necessarily the best one. As the Government reasonably explains, a notice to appear can also be understood to serve primarily as a charging document. See Tr. of Oral Arg. 39–45. Indeed, much of § 1229(a)(1) reinforces that view through the informational requirements it imposes on notices to appear. See, *e.g.,* § 1229(a)(1)(A) ( "nature of the proceedings"); § 1229(a)(1)(B) ("legal authority" for "the proceedings"); § 1229(a)(1)(C) ("acts or conduct alleged"); § 1229(a)(1)(D) ("charges against the alien"); *ibid.* ("statutory provisions alleged to have been violated"). Interpreted in this way, a notice to appear hardly runs afoul of "common sense" by simply omitting the date and time of a future removal proceeding. [6]

**\*2129** Today's decision appears even less commonsensical once its likely consequences are taken into account. As already noted, going forward the Government will be forced to include an arbitrary date and time on every notice to appear that it issues. See *supra,* at 2124 – 2125. Such a system will only serve to confuse everyone involved, and the Court offers no explanation as to why it believes otherwise. Although the Court expresses surprise at the idea that its opinion will " 'forc[e] the Government' to guess when and where a hearing will take place," *ante,* at 2115, n. 6, it is undisputed that the Government currently lacks the capability to do anything other than speculate about the likely date and time of future removal proceedings. See Tr. of Oral Arg. 47–49, 52–53. At most, we can hope that the Government develops a system in the coming years that allows it to determine likely dates and times before it sends out initial notices to appear. But nothing in either today's decision or the statute can guarantee such an outcome, so the Court is left crossing its fingers and hoping for the best. *Ante,* at 2115, n. 6, 2118 – 2119.

* * *

AR.06094

Once the errors and false leads are stripped away, the most that remains of the Court's argument is a textually permissible interpretation consistent with the Court's view of "common sense." That is not enough to show that the Government's contrary interpretation is unreasonable. Choosing between these competing interpretations might have been difficult in the first instance. But under *Chevron,* that choice was not ours to make. Under *Chevron,* this Court was obliged to defer to the Government's interpretation.

In recent years, several Members of this Court have questioned *Chevron* 's foundations. See, *e.g., ante,* at 2120 – 2121 (KENNEDY, J., concurring); *Michigan v. EPA,* 576 U.S. ——, —— – ——, 135 S.Ct. 2699, 2712–2714, 192 L.Ed.2d 674 (2015) (THOMAS, J., concurring); *Gutierrez–Brizuela v. Lynch,* 834 F.3d 1142, 1149 (C.A.10 2016) (Gorsuch, J., concurring). But unless the Court has overruled *Chevron* in a secret decision that has somehow escaped my attention, it remains good law.

I respectfully dissent.

**All Citations**

138 S.Ct. 2105, 201 L.Ed.2d 433, 86 USLW 4462, 18 Cal. Daily Op. Serv. 6019, 2018 Daily Journal D.A.R. 5953, 27 Fla. L. Weekly Fed. S 406

## Footnotes

\*       The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1       The Court uses the term "noncitizen" throughout this opinion to refer to any person who is not a citizen or national of the United States. See 8 U.S.C. § 1101(a)(3).

2       Lawful permanent residents also may be eligible for cancellation of removal if, *inter alia,* they have continuously resided in the United States for at least seven years. See § 1229b(a)(2).

3       The period of continuous physical presence also stops if and when "the alien has committed" certain enumerated offenses that would constitute grounds for removal or inadmissibility. See § 1229b(d)(1)(B). That provision is not at issue here.

4       Compare *Orozco–Velasquez v. Attorney General United States,* 817 F.3d 78, 83–84 (C.A.3 2016) (holding that the stop-time rule unambiguously requires service of a "notice to appear" that meets § 1229(a)(1)'s requirements), with *Moscoso–Castellanos v. Lynch,* 803 F.3d 1079, 1083 (C.A.9 2015) (finding the statute ambiguous and deferring to the BIA's interpretation); *O'Garro v. United States Atty. Gen.,* 605 Fed.Appx. 951, 953 (C.A.11 2015) (*per curiam* ) (same); *Guaman–Yuqui v. Lynch,* 786 F.3d 235, 239–240 (C.A.2 2015) (*per curiam* ) (same); *Gonzalez–Garcia v. Holder,* 770 F.3d 431, 434–435 (C.A.6 2014) (same); *Yi Di Wang v. Holder,* 759 F.3d 670, 674–675 (C.A.7 2014) (same); *Urbina v. Holder,* 745 F.3d 736, 740 (C.A.4 2014) (same).

5       The Court leaves for another day whether a putative notice to appear that omits any of the other categories of information enumerated in § 1229(a)(1) triggers the stop-time rule. Contrary to the dissent's assertion, this exercise of judicial

201 L.Ed.2d 433, 86 USLW 4462, 18 Cal. Daily Op. Serv. 6019...

restraint is by no means "tantamount to admitting" that the Government's (and dissent's) atextual interpretation is a permissible construction of the statute. *Post,* at 2126 (opinion of ALITO, J.).

6    The dissent argues that, if a notice to appear must furnish time-and-place information, the Government "may be forced by the Court's interpretation to guess that the hearing will take place far in the future, only to learn shortly afterwards that the hearing is in fact imminent." *Post,* at 2128. In such a scenario, the dissent hypothesizes, a noncitizen would be "lulled into a false sense of security" and thus would have little meaningful opportunity to secure counsel and prepare adequately. *Ibid.* But nothing in our interpretation of the statute "force[s]" the Government to guess when and where a hearing will take place, *ibid.,* nor does our interpretation prevent DHS and the Immigration Courts from working together to streamline the scheduling of removal proceedings, see *infra,* at 2119. Far from "lull[ing]" noncitizens into a false sense of security, *post,* at 2128, our reading (unlike the Government's and the dissent's) still gives meaning to a noncitizen's "opportunity to secure counsel before the first [removal] hearing date," 🔖 § 1229(b)(1), by informing the noncitizen that the Government is committed to moving forward with removal proceedings at a specific time and place. Equipped with that knowledge, a noncitizen has an incentive to obtain counsel and prepare for his hearing.

7    At oral argument, the Government conceded that a blank piece of paper would not suffice to trigger the stop-time rule because (in its view) such a hypothetical notice would fail to specify the charges against the noncitizen. Tr. of Oral Arg. 39–40 (arguing that notice to appear must "tell the alien what proceedings he must appear for and why he must appear for them"). The dissent also endorses the view that a notice to appear "can also be understood to serve primarily as a charging document." *Post,* at 2128. But neither the Government nor the dissent offers any convincing basis, much less one rooted in the statutory text, for treating time-and-place information as any less crucial than charging information for purposes of triggering the stop-time rule. Furthermore, there is no reason why a notice to appear should have only one essential function. Even if a notice to appear functions as a "charging document," that is not mutually exclusive with the conclusion that a notice to appear serves another equally integral function: telling a noncitizen when and where to appear. At bottom, the Government's self-serving position that a notice to appear must specify charging information, but not the time-and-place information, reveals the arbitrariness inherent in its atextual approach to the stop-time rule.

8    Congress has employed similar definitional language in other statutory schemes. See, *e.g.,* 🔖 21 U.S.C. § 356(b)(1) (creating new class of "fast track product[s]" by setting out drug requirements and providing: "In this section, such a drug is referred to as a 'fast track product' "); 🔖 § 356(a)(1) ("In this section, such a drug is referred to as a 'breakthrough therapy' "); 38 U.S.C. § 7451(a)(2) ("hereinafter in this section referred to as 'covered positions' "); 42 U.S.C. § 285g–4(b) ("hereafter in this section referred to as 'medical rehabilitation' ").

9    The dissent maintains that Congress' decision to make the stop-time rule retroactive to certain pre-IIRIRA "orders to show cause" "sheds considerable light on the question presented" because orders to show cause did not necessarily include time-and-place information. *Post,* at 2123 – 2124. That argument compares apples to oranges. Even if the stop-time rule sometimes applies retroactively to an order to show cause, that provides scant support for the dissent's view that, under the new post-IIRIRA statutory regime, an entirely different document called a "notice to appear," which, by statute, must specify the time and place of removal proceedings, see 🔖 § 1229(a)(1)(G)(i), need not include such information to trigger the stop-time rule.

1    See, *e.g.,* § 1229a(b)(5)(A) ("paragraph (1) ... of 🔖 section 1229(a)"); § 1229a(b)(5)(C)(ii) (same); § 1229a(b)(7) (same); § 1229a(b)(5)(B) ("address required under 🔖 section 1229(a)(1)(F)"); see also § 1229a(b)(7) (referring to 🔖 § 1229(a)(1)(G)(i)'s "time and place" requirement).

2    According to the Court, "the broad reference to 🔖 § 1229(a) is of no consequence, because, as even the Government concedes, only paragraph (1) bears on the meaning of a 'notice to appear.' " *Ante,* at 2114. But that is precisely the point: If "only paragraph (1) bears on the meaning of a 'notice to appear,' " then Congress's decision to refer to 🔖 § 1229(a) more broadly indicates that it meant to do something *other* than to pick up the substantive requirements of 🔖 § 1229(a)(1).

3    Although the Court charges me with "compar[ing] apples to oranges," *ante,* at 2117, n. 9, Congress was the one that equated orders to show cause and notices to appear for purposes of the stop-time rule. By ignoring that decision, the Court rewrites the statute to *its* taste.

4    Nor can the Court get away with labeling its self-contradictions as "judicial restraint." *Ante,* at 2113, n. 5. Either § 1229(a)(1) sets out the essential characteristics of a notice to appear or it does not; the Court cannot stop at a halfway point unsupported by either text or logic while maintaining that its resting place is "clear" in light of the statutory text. *Ante,* at 2113.

5    Of course, courts should still demand that the Government justify why whatever is left off a notice to appear does not deprive it of its essential character as a "notice to appear." As the Government rightly concedes, for example, a blank sheet of paper would not constitute a "notice to appear." Tr. of Oral Arg. 39; see Brief for Respondent 35–36. But for all the reasons the Government gives, omission of the date and time of a future removal proceeding is not, by itself, enough to turn a notice to appear into something else.

6    The Court responds to this point in two ways. First, it faults me for failing to offer a reason "rooted in the statutory tex[t] for treating time-and-place information as any less crucial than charging information for purposes of triggering the stop-time rule." *Ante,* at 2116, n. 7. But exactly the same criticism can be leveled against the Court's own reading, which noticeably fails to offer any reason "rooted in the statutory text" why time-and-place information should be treated as any *more* crucial than charging information for purposes of triggering the stop-time rule. Second, the Court also observes misleadingly that "there is no reason why a notice to appear should have only one essential function," and that a notice to appear might thus serve the dual purpose of both presenting charges and informing an alien "when and where to appear." *Ibid.* Of course it might, but it is also equally reasonable to interpret a notice to appear as serving only one of those functions. Under *Chevron,* it was the Government—not this Court—that was supposed to make that interpretive call.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   AR.06097   24

16 Cal. Daily Op. Serv. 9616, 2016 Daily Journal D.A.R. 9134

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Mejia v. Sessions, 4th Cir., August 9, 2017

835 F.3d 1066
United States Court of Appeals, Ninth Circuit.

Rony Estuardo PEREZ–GUZMAN,
AKA Ronnie Perez–Guzman, Petitioner,

v.

Loretta E. LYNCH, Attorney General, Respondent.

No. 13–70579
|
Argued and Submitted May
4, 2016 Pasadena, California
|
Filed August 31, 2016

**Synopsis**

**Background:** Alien, a native and citizen of Guatemala, petitioned for review of order of the Board of Immigration Appeals (BIA), upholding Immigration Judge's finding that, as alien subject to reinstated removal order, he was not eligible for asylum, and denying his application for withholding of removal and relief under the Convention Against Torture (CAT).

**Holdings:** The Court of Appeals, Fisher, Circuit Judge, held that:

[1] as prerequisite to asserting his eligibility for asylum on petition for review before the Court of Appeals, alien who was subject to reinstated order of removal did not have to first exhaust his administrative remedies, and

[2] regulation promulgated by the Attorney General, which expressly barred individuals in reinstatement proceedings from applying for asylum, was reasonable interpretation of apparently conflicting provisions of the Immigration and Nationality Act (INA), which was entitled to Chevron deference.

Petition denied.

West Headnotes (22)

[1] **Aliens, Immigration, and Citizenship** ⟜ Presentation and preservation of questions at administrative level

As prerequisite to asserting his eligibility for asylum on petition for review before the Court of Appeals, alien who was subject to reinstated order of removal did not have to first exhaust his administrative remedies by raising issue before the Board of Immigration Appeals (BIA), given that regulation which the BIA was obligated to follow explicitly barred individuals in reinstatement proceedings from applying for asylum; requiring alien to raise issue before the BIA would have been futile. 8 C.F.R. § 1208.31(e).

2 Cases that cite this headnote

[2] **Administrative Law and Procedure** ⟜ Futility

While the Court of Appeals generally lacks jurisdiction to review a final agency order unless administrative remedies have been exhausted, exhaustion is not required if it would be futile to raise particular issue before agency.

[3] **Administrative Law and Procedure** ⟜ Plain, literal, or clear meaning; ambiguity or silence

In deciding whether agency's interpretation of statute that it administers is entitled to Chevron deference, court must first determine whether Congress has directly spoken to the precise question at issue; if intent of Congress is clear, then court's inquiry ends, and it must give effect to Congress' unambiguously expressed intent.

4 Cases that cite this headnote

**[4]**    **Administrative Law and Procedure** ⬤ Plain, literal, or clear meaning; ambiguity or silence

**Administrative Law and Procedure** ⬤ Permissible or reasonable construction

In deciding whether agency's interpretation of statute that it administers is entitled to *Chevron* deference, court, after determining that Congress has not spoken to a particular issue or that statute is ambiguous, then moves on to second step of *Chevron* analysis and considers whether the implementing agency's construction of statute is reasonable; *Chevron* requires a federal court to accept agency's reasonable construction of statute, even if agency's reading differs from what the court believes is the best statutory interpretation.

6 Cases that cite this headnote

**[5]**    **Administrative Law and Procedure** ⬤ Asylum, refugees, and withholding of removal

**Aliens, Immigration, and Citizenship** ⬤ Ineligible Aliens

**Aliens, Immigration, and Citizenship** ⬤ Law questions

While the Immigration and Nationality Act (INA), in authorizing "any" alien, "irrespective of such alien's [immigration] status," to apply for asylum, while at same time barring aliens subject to reinstated removal orders from "apply[ing] for any relief" under chapter of the INA that included asylum provision, was ambiguous as to whether alien in reinstatement proceedings was eligible to apply for asylum, regulation promulgated by the Attorney General, which expressly barred individuals in reinstatement proceedings from applying for asylum, was reasonable interpretation of these apparently conflicting INA provisions, which was entitled to *Chevron* deference. Immigration and Nationality Act §§ 208(a)(1), 241(a)(5), 8

U.S.C.A. §§ 1158(a)(1), 1231(a)(5); 8 C.F.R. § 1208.31(e).

8 Cases that cite this headnote

**[6]**    **Statutes** ⬤ Language

**Statutes** ⬤ Undefined terms

**Statutes** ⬤ Context

In interpreting statute, court begins with language of statute, reading it in context and giving undefined terms their ordinary meanings.

1 Cases that cite this headnote

**[7]**    **Statutes** ⬤ Construing together; harmony

Court's goal when interpreting statute is to understand statute as a symmetrical and coherent regulatory scheme and to fit, if possible, all parts into a harmonious whole.

1 Cases that cite this headnote

**[8]**    **Statutes** ⬤ Words of number or amount

Read naturally, the word "any," when used in statute, has an expansive meaning.

**[9]**    **Statutes** ⬤ What constitutes ambiguity; how determined

**Statutes** ⬤ Context

Within a particular statute, ambiguity is creature of statutory context.

1 Cases that cite this headnote

**[10]**    **Aliens, Immigration, and Citizenship** ⬤ Presentation of questions in brief or petition

Statutory construction argument that government raised for the first time at oral argument was waived, and would not be considered by the Court of Appeals on alien's petition for review of decision of the Board of Immigration Appeals (BIA) finding that alien was ineligible for asylum and denying his application for withholding of

16 Cal. Daily Op. Serv. 9616, 2016 Daily Journal D.A.R. 9134

removal and relief under the Convention Against Torture (CAT).

7 Cases that cite this headnote

**[11]    Statutes**  ⬩ General and specific terms and provisions; ejusdem generis

**Statutes**  ⬩ General and specific statutes

Under the generalia specialibus non derogant canon of statutory construction, a narrow, precise and specific statutory provision is not overridden by another provision covering a more generalized spectrum of issues.

2 Cases that cite this headnote

**[12]    Statutes**  ⬩ Other Statutes

When two statutes come into conflict, courts assume that Congress intended specific provisions to prevail over more general ones.

2 Cases that cite this headnote

**[13]    Aliens, Immigration, and Citizenship**  ⬩ Constitutional and Statutory Provisions

Principle that any lingering ambiguities in removal statutes are to be construed in favor of alien functions as tiebreaker in the case of insoluble, or lingering, ambiguity, but does not prevent agency from resolving statutory ambiguity through valid regulation.

**[14]    Administrative Law and Procedure**  ⬩ Time for Initiating Proceedings or Filing Initial Document

Procedural challenges to agency rules under the Administrative Procedure Act (APA) are subject to general six-year period of limitations. 🔖 5 U.S.C.A. § 551 et seq.; 28 U.S.C.A. § 2401(a).

6 Cases that cite this headnote

**[15]    Administrative Law and Procedure**  ⬩ Time for Initiating Proceedings or Filing Initial Document

Challenges to mere procedural violation in adoption of administrative regulation or other agency action must be brought within six years of the agency rulemaking, whereas challenges to the substance of agency's decision, as exceeding its Constitutional or statutory authority, may be brought any time within six years of agency's application of the disputed decision to the challenger. 28 U.S.C.A. § 2401(a).

4 Cases that cite this headnote

**[16]    Aliens, Immigration, and Citizenship**  ⬩ Proceedings for adoption and review

While alien's challenge to regulation promulgated by Attorney General, as allegedly being an unreasonable interpretation of provisions of the Immigration and Nationality Act (INA) and thus not entitled to 🔖 Chevron deference, was substantive challenge, which alien timely raised in his petition for review of the Board of Immigration Appeals' (BIA's) application of regulation in refusing to consider alien's asylum claim, alien's arguments about alleged procedural errors in promulgation of regulation were untimely, as not having been brought within six years of promulgation of regulation in question. 28 U.S.C.A. § 2401(a); 🔖 8 C.F.R. § 1208.31(e).

1 Cases that cite this headnote

**[17]    Stipulations**  ⬩ Matters which may be subject of stipulation

There is no impropriety in a court's refusing to accept what is, in effect, parties' stipulation on question of law.

**[18]    Aliens, Immigration, and Citizenship**  ⬩ Proceedings for adoption and review

Publication, in the Federal Register, of regulation promulgated by the Attorney General, to bar individuals in reinstatement proceedings from applying for asylum, was legally sufficient notice

16 Cal. Daily Op. Serv. 9616, 2016 Daily Journal D.A.R. 9134

to all interested or affected persons, regardless of actual knowledge or hardship resulting from ignorance. 🔖 8 C.F.R. § 1208.31(e).

**[19]**　**Administrative Law and Procedure** 🔑 Aliens, Immigration, and Citizenship

　　**Aliens, Immigration, and Citizenship** 🔑 Law questions

🔖 *Chevron* deference is especially appropriate in immigration context, where officials exercise especially sensitive political functions that implicate questions of foreign relations.

**[20]**　**Administrative Law and Procedure** 🔑 Permissible or reasonable construction

At step two of 🔖 *Chevron* analysis, court is not deciding between plausible statutory constructions, but evaluating agency's interpretation of statute.

3 Cases that cite this headnote

**[21]**　**Aliens, Immigration, and Citizenship** 🔑 Reinstatement of order

Reinstatement proceedings under the Immigration and Nationality Act (INA) were designed to be different and far more summary procedure than regular removal proceedings, and to that end, Congress intended to subject more individuals to reinstatement proceedings, and to limit the possible relief from a removal order available to them, in amending provision of the INA dealing with detention and removal of aliens subject to removal order to provide streamlined reinstatement process. Immigration and Nationality Act § 241(a)(5), 🔖 8 U.S.C.A. § 1231(a)(5).

12 Cases that cite this headnote

**[22]**　**Aliens, Immigration, and Citizenship** 🔑 Reinstatement of order

Government has discretion to forgo reinstatement and to instead place an alien subject to prior removal order in ordinary removal proceedings. Immigration and Nationality Act § 241(a)(5), 🔖 8 U.S.C.A. § 1231(a)(5).

5 Cases that cite this headnote

**Attorneys and Law Firms**

　***1069** Eric M. Fraser (argued), Osborn Maledon, P.A., Phoenix, Arizona, for Petitioner.

Tim Ramnitz (argued); Anthony C. Payne, Senior Litigation Counsel; Joyce R. Branda, Acting Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

Keren Zwick (argued), National Immigrant Justice Center, Chicago, Illinois; Stephen W. Manning, Immigrant Law Group P.C., Portland, Oregon; Robin L. Goldfaden, Lawyers' Committee for Civil Rights of the San Francisco Bay Area, San Francisco, California; for Amicus Curiae American Immigration Lawyers Association, Lawyers' Committee for Civil Rights of the San Francisco Bay Area, and National Immigrant Justice Center.

On Petition for Review of an Order of the Board of Immigration Appeals, Agency No. AXXX–XX2–241

Before: Raymond C. Fisher, Milan D. Smith, Jr., and Jacqueline H. Nguyen, Circuit Judges.

**OPINION**

FISHER, Circuit Judge:

Rony Estuardo Perez–Guzman (Perez), a native and citizen of Guatemala, entered ***1070** the United States without inspection for the first time in 2011. The Department of Homeland Security (DHS) apprehended and removed him after expedited removal proceedings. Perez reentered the United States in 2012 and was again apprehended by DHS, which reinstated the earlier removal order. After an asylum officer found Perez had established a reasonable fear of being tortured if removed to Guatemala, he was

referred to an Immigration Judge (IJ) for consideration of his applications for withholding of removal and protection under the Convention Against Torture (CAT). Because Perez was subject to a reinstated removal order, the IJ declined to consider his application for asylum. The IJ denied on the merits his requests for withholding of removal and protection under CAT, and the Board of Immigration Appeals (BIA) affirmed.

The parties agree that we must remand to the BIA on Perez's claims for withholding of removal and protection under CAT in light of intervening circuit precedent. The issue we consider here is whether an individual subject to a reinstated removal order is eligible to apply for asylum under the Immigration and Nationality Act (INA), as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). We hold Congress has not clearly expressed whether 8 U.S.C. § 1231(a)(5), enacted by IIRIRA, prevents an individual subject to a reinstated removal order from applying for asylum under 8 U.S.C. § 1158. We conclude, however, that the Attorney General's regulation preventing Perez from applying for asylum under these circumstances is a reasonable interpretation of the statutory scheme, and is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Accordingly, we remand to the BIA only for reconsideration of Perez's withholding and CAT claims.

## I. Background

### A. Factual Background

Perez alleges that three incidents in his home county of Guatemala make him eligible for asylum, withholding of removal and CAT protection. First, Perez was struck by a stray bullet fired by members of a gang extorting a local businessman and gave a statement to police about the gang members involved in the shooting. After they were released from jail, the gang members visited Perez's house while he was away.

Second, Perez discovered his name appeared on a "death squad kill list" compiled by a group of police officers and soldiers who engaged in extrajudicial law enforcement by executing suspected gang members, guerrillas and other

criminals. Other individuals on the list were later killed, including Perez's cousin. Shortly after his cousin's murder, Perez fled his hometown.

Finally, Perez was abducted by individuals purporting to be Guatemalan police officers. The kidnappers blindfolded Perez, tied him to a chair and beat him before realizing they had abducted the wrong man. The kidnappers discussed killing Perez, but released him with the threat that they would kill him if he reported the attack.

Perez left Guatemala and entered the United States for the first time in June 2011, but was stopped by the Border Patrol. He later testified before the IJ that the Border Patrol agents never asked him whether he feared returning to Guatemala, but only "came out with a paper" for him to sign certifying that he had entered the country illegally. Records of a brief interview conducted during the expedited **\*1071** removal process, however, note Perez answered in the negative when asked whether he feared returning to Guatemala. He was removed to Guatemala in July 2011.

Perez reentered the United States and was apprehended a second time in January 2012. DHS reinstated his earlier removal order. Because Perez expressed a fear of returning to Guatemala, he was referred to an asylum officer, who found his fear of persecution or torture was reasonable and referred him to an IJ for further proceedings.

Before the IJ, Perez sought asylum, withholding of removal and protection under CAT. The IJ, however, concluded Perez was ineligible for asylum because he had previously been removed and DHS had reinstated his earlier removal order. The IJ also denied Perez's applications for withholding of removal and CAT protection, concluding he had not established a likelihood that he would either be persecuted on a protected ground or tortured with government consent or acquiescence if returned to Guatemala. The BIA affirmed the denial of withholding of removal and CAT protection on the merits. It explained it would not reach the merits of Perez's asylum claim and that "[b]ecause the Department of Homeland Security ... reinstated a prior order of removal in this case, the Immigration Judge's consideration was limited to the applicant's request for withholding of removal and CAT protection. *See* 8 C.F.R. § 1208.31(e)."

### B. Legal Background

Perez's claim turns on the interplay between two provisions of the INA—8 U.S.C. § 1158, the asylum statute, and 8 U.S.C. § 1231(a)(5), the reinstatement bar. [1]

The Refugee Act of 1980 directed the Attorney General to establish procedures for granting asylum and enacted the initial version of § 1158, which afforded any alien the right to apply for asylum irrespective of immigration status. *See* Refugee Act of 1980, Pub. L. No. 96–212, § 208, 94 Stat. 102 (codified as amended at 8 U.S.C. § 1158). Although Congress later amended the statute to prevent individuals convicted of aggravated felonies from receiving asylum, *see* Immigration Act of 1990, Pub. L. No. 101–649, § 515, 104 Stat. 4978, the law governing asylum applications remained largely unchanged until the enactment of IIRIRA, Pub. L. No. 104–208, Div. C, 110 Stat. 3009 (1996).

In its post-IIRIRA form, § 1158(a)(1) retains its original scope, stating that "[*a*]*ny alien* who is physically present in the United States ... *irrespective of such alien's status*, may apply for asylum in accordance with this section." § 1158(a)(1) (emphasis added). A few statutory exceptions qualify this broad eligibility, barring asylum applications from individuals who can be resettled in another country, *see* § 1158(a)(2)(A), failed to timely apply, *see* § 1158(a)(2)(B), or previously were denied asylum, *see* § 1158(a)(2)(C). Section 1158(a)(2)(D) creates an exception to the exceptions in subsections (a)(2)(B) and (C), stating in relevant part that an individual may make a second application for asylum notwithstanding a previous denial if he shows changed circumstances affecting his eligibility for asylum. *See* § 1158(a)(2)(D).

IIRIRA also revised the effect of reinstatement, the summary removal process whereby the government reinstates and executes an individual's previous removal order rather than initiating a new removal proceeding against him. Before IIRIRA, only a subset of individuals who illegally reentered the country were subject to reinstatement **\*1072** of their earlier removal orders; the rest were placed in ordinary removal proceedings, even on subsequent reentries. *See* *Fernandez–Vargas v. Gonzales*, 548 U.S. 30, 33–35, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006). In addition, individuals in the "limited class of illegal reentrants" subject to reinstatement could still "seek some varieties of discretionary relief" from their reinstated removal order. *Id.* at 34, 126 S.Ct. 2422. With IIRIRA, however, Congress replaced the old reinstatement provisions with "one that toed a harder line," and "[u]nlike its predecessor, ... applie[d] to all illegal reentrants, explicitly insulate[d] the [reinstated] removal orders from review, and generally foreclose[d] discretionary relief from the terms of the reinstated order." *Id.* at 34–35, 126 S.Ct. 2422 (noting the availability of withholding of removal). This reinstatement bar, codified at § 1231(a)(5), states

> [i]f the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, *the alien is not eligible and may not apply for any relief under this chapter*, and the alien shall be removed under the prior order at any time after the reentry.

§ 1231(a)(5) (emphasis added). "[T]his chapter" refers to chapter 12 of title 8 of the U.S. Code, which contains both the asylum statute and reinstatement bar.

Consistent with this section, the Attorney General promulgated 8 C.F.R. § 1208.31(e), [2] which states in relevant part that "[i]f an asylum officer determines that an alien [subject to a reinstated removal order] has a reasonable fear of persecution or torture, the officer shall so inform the alien and issue a ... [r]eferral to [an] Immigration Judge, *for full consideration of the request for withholding of removal only*." 8 C.F.R. § 1208.31(e) (emphasis added). [3] The notice published in the Federal Register stated in its summary that "[f]or persons subject to reinstatement, ... the rule establishes a screening mechanism" similar to the one used in expedited removal proceedings. *See* Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8478 (Feb. 19, 1999). The notice went on to explain that the new process was intended "to rapidly identify and assess" claims for withholding of removal and CAT protection made

16 Cal. Daily Op. Serv. 9616, 2016 Daily Journal D.A.R. 9134

by individuals subject to reinstated removal orders and other forms of expedited removal to "allow for the fair and expeditious resolution of such claims without unduly disrupting the streamlined removal processes applicable to these aliens." *Id.* at 8479; *see also id.* at 8485 (discussing 8 C.F.R. § 1208.31 specifically). The notice further stated the agency's conclusion that such individuals, including "aliens subject to reinstatement of a previous removal order under [§ 1231(a)(5)]," were "ineligible for asylum" but "may be entitled to withholding of removal" or CAT protection. *Id.* at 8485. The notice identified a number of statutes giving the agency authority to **\*1073** promulgate regulations to govern asylum and withholding procedures, including § 1158. *See id.* at 8487 (listing the authorities for 8 C.F.R. Part 208 generally).

## II. Discussion

As noted, the parties agree remand is appropriate on Perez's withholding of removal and CAT claims in light of intervening circuit precedent. The only disputed question is whether Perez is entitled to a remand on his asylum claim as well. We conclude he is not.

### A. Exhaustion

[1] [2] At the outset, we reject the government's contention that Perez failed to exhaust his argument for asylum eligibility before the BIA. Although we generally lack jurisdiction to review a final agency order unless administrative remedies have been exhausted, *see Alvarado v. Holder*, 759 F.3d 1121, 1127 (9th Cir. 2014), exhaustion is not required where it would be futile to raise a particular issue before the agency.

Here, the BIA rejected Perez's asylum claim under 8 C.F.R. § 1208.31(e), which bars individuals in reinstatement proceedings from applying for asylum. Because the BIA had no authority to disregard this regulation, exhaustion would have been futile. *See Coyt v. Holder*, 593 F.3d 902, 905 (9th Cir. 2010) ("Because the BIA has no authority to declare a regulation invalid, 'the exhaustion doctrine does not bar review of a question concerning the validity of an INS regulation because of a conflict with a statute.' " (quoting *Espinoza–Gutierrez v. Smith*, 94 F.3d 1270, 1273 (9th Cir.

1996))); *Espinoza–Gutierrez*, 94 F.3d at 1273 (observing that an argument contesting the validity of an agency's own regulations will "necessarily ... fall[ ] on deaf ears" because the BIA "simply has no authority to invalidate a regulation that it is bound to follow").

### B. Asylum

Perez argues the asylum statute's language permitting "[a]ny alien" to apply for asylum "irrespective of such alien's status" unambiguously permits him to apply for asylum notwithstanding his reinstated removal order. § 1158(a)(1). The government, in response, argues the reinstatement bar's statement that an individual subject to a reinstated removal order "is not eligible and may not apply for any relief under this chapter" unambiguously makes Perez ineligible to apply for asylum, a form of relief arising under the same chapter. § 1231(a)(5). The question is whether § 1158's permission to apply for asylum or § 1231(a)(5)'s denial of any relief falling within the same chapter governs the class of individuals who, like Perez, are subject to reinstated removal orders.

[3] [4] To answer this question of statutory interpretation, we follow the framework laid out in *Chevron*. "Under the first step, we determine 'whether Congress has directly spoken to the precise question at issue.' " *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1054 (9th Cir. 2010) (quoting *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778). If the intent of Congress is clear, our inquiry ends and we give effect to Congress' unambiguously expressed intent. *See id.* If, on the other hand, Congress has not spoken to a particular issue or the statute is ambiguous, we may consider the responsible agency's interpretation of the statutory scheme. "[I]f the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." **\*1074** *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005).

[5] In addressing this question, we are not writing on a clean slate. Three other circuits have already considered

the interplay between § 1258 and § 1231. Each has concluded that individuals subject to reinstated removal orders may not apply for asylum relief. *See Jimenez–Morales v. U.S. Att'y Gen.*, 821 F.3d 1307, 1310 (11th Cir. 2016); *Ramirez–Mejia v. Lynch*, 794 F.3d 485, 491 (5th Cir. 2015) (relying on § 1231(a)(5)'s plain language, as well as relevant regulations and case law); *Herrera–Molina v. Holder*, 597 F.3d 128, 138–39 (2d Cir. 2010) (discussing § 1231(a)(5)'s text as well as relevant circuit precedent and regulations). Although we find these opinions persuasive in some respects, those circuits did not discuss § 1158(a)(1), but mentioned it only in passing, *see Ramirez–Mejia*, 794 F.3d at 490, or not at all, *see Jimenez–Morales*, 821 F.3d at 1310; *Herrera–Molina*, 597 F.3d at 138–39. Thus, although we reach the same conclusion as these other courts, we do so on somewhat different reasoning.

## 1. *Chevron* Step One

[6]  [7]  At step one of *Chevron*, we conclude Congress has not directly spoken to the interplay of § 1158(a)(1) and § 1231(a)(5). On the contrary, § 1158(a)(1) and § 1231(a)(5) are in apparent conflict. Section 1158 broadly grants "any alien" the opportunity to seek asylum, "regardless of such alien's status," subject only to a few exceptions not applicable here. Section 1231, by contrast, expressly bars aliens subject to reinstated removal orders from any relief under chapter 12, the chapter that includes asylum. In attempting to resolve this apparent conflict, we begin with the language of the statute, reading it in context and giving undefined terms their ordinary meanings. *See CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 283–84, 131 S.Ct. 1101, 179 L.Ed.2d 37 (2011); *Synagogue v. United States*, 482 F.3d 1058, 1061–62 (9th Cir. 2007). "Our goal is to understand the statute 'as a symmetrical and coherent regulatory scheme' and to 'fit, if possible, all parts into a harmonious whole.'" *Gila River Indian Cmty. v. United States*, 729 F.3d 1139, 1145 (9th Cir. 2013) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000)).

[8]  [9]  Each party argues the plain language of § 1158 and § 1231(a)(5) can be harmonized by interpreting one section as establishing an absolute rule to which the other section must yield. Perez contends § 1231(a)(5) does not really bar "any relief" under chapter 12, whereas the government says § 1158(a)(1) does not really permit "any alien" to apply for asylum. "Read naturally, the word 'any' has an expansive meaning." *United States v. Gonzales*, 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997). But within a particular statute, "[a]mbiguity is a creature ... of statutory context." *Brown v. Gardner*, 513 U.S. 115, 118, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994); *see also Dada v. Mukasey*, 554 U.S. 1, 16, 128 S.Ct. 2307, 171 L.Ed.2d 178 (2008) ("In reading a statute we must not 'look merely to a particular clause,' but consider 'in connection with it the whole statute.'" (quoting *Kokoszka v. Belford*, 417 U.S. 642, 650, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974)).

[10]  We agree with the parties that although both subsections use absolute language, each is qualified in certain respects when read in context. The text of § 1158(a)(1) states that "[a]ny" alien may apply for asylum "in accordance with this section," regardless of immigration status. § 1158(a)(1). The rest of § 1158, however, undercuts the breadth of that guarantee **\*1075** by including a series of exceptions preventing certain aliens from applying under specific circumstances. *See* § 1158(a)(2)(A)–(C). Section 1231(a)(5)'s text is perhaps stronger in stating that the reinstatement of a prior removal order precludes "any relief under this chapter." § 1231(a)(5). But our well-settled interpretation of § 1231(a)(5) recognizes that, notwithstanding the prohibition on "any relief," withholding of removal and CAT protection are available to individuals in reinstatement proceedings. *See Ixcot v. Holder*, 646 F.3d 1202, 1207 (9th Cir. 2011) ("Notwithstanding the seemingly absolute bar ... aliens subject to [ § 1231(a)(5) ] 'may seek withholding of removal'...." (quoting *Fernandez–Vargas*, 548 U.S. at 35 n.4, 126 S.Ct. 2422)); *Ortiz–Alfaro v. Holder*, 694 F.3d 955, 956 n.1 (9th Cir. 2012) (assuming CAT "constrains the Attorney General from removing aliens ...

16 Cal. Daily Op. Serv. 9616, 2016 Daily Journal D.A.R. 9134

notwithstanding" the language of § 1231(a)(5)). The Attorney General's regulations agree. *See* 8 C.F.R. § 1208.31(e) (allowing withholding of removal); 8 C.F.R. § 1208.16(c)(4) (allowing CAT protection); 8 C.F.R. § 214.14(c)(1)(ii) (allowing U Visas).[4]

The relevant question, however, is not simply whether the two provisions are absolute, but how Congress intended to harmonize them. If one subsection's text were clearly intended to take precedence over the other, our inquiry would be at an end. That *both* provisions are qualified in certain respects moves us no closer to a clear answer. Neither subsection gives an indication of how Congress intended to resolve a conflict between the two. We therefore turn to the other "traditional tools of statutory construction" in search of an answer. *See* *Chevron*, 467 U.S. at 843 n.9, 104 S.Ct. 2778.

 **[11]**   **[12]**   Both Perez and the government invoke the canon of *generalia specialibus non derogant*—the "principle that the specific governs the general"—to advance their preferred interpretation of the statutory scheme. *See* *Nitro–Lift Techs., LLC v. Howard*, ––– U.S. ––––, 133 S.Ct. 500, 504, 184 L.Ed.2d 328 (2012). The canon provides that a "narrow, precise, and specific" statutory provision is not overridden by another provision "covering a more generalized spectrum" of issues. *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153–54, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976). When two statutes come into conflict, courts assume Congress intended specific provisions to prevail over more general ones, *see* *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228–29, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957), the assumption being that the more specific of two conflicting provisions "comes closer to addressing the very problem posed by the case at hand and is thus more deserving of credence," Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 183 (2012).

As Scalia and Garner acknowledge, however, it is "[s]ometimes ... difficult to determine whether a provision is a general or a specific one." *Id.* at 187. Here, the difficulty is that each subsection is specific in certain respects and general in others. Section 1158(a)(1) is more specific in that it **\*1076** speaks narrowly to the rules governing asylum applications. Conversely, § 1231(a)(5) is more

specific in that it speaks directly to the particular subset of individuals, like Perez, who are subject to reinstated removal orders. Although the government's position may have a slight edge, both parties' arguments on this point are sensible. We conclude the general-specific canon does not help to *clearly* discern Congress's intent as to which section should take precedence here.

Nor does the legislative history of § 1158 and § 1231(a)(5) resolve this ambiguity. IIRIRA's amendments to the INA show Congress intended to add more detail to the existing asylum scheme while simultaneously expanding the scope and consequences of the reinstatement of an earlier removal order. Because neither party has identified any legislative materials speaking directly to the availability of asylum in reinstatement proceedings, however, we conclude the legislative history "is silent on the precise issue before us." *Chevron*, 467 U.S. at 862, 104 S.Ct. 2778.

Perez and amici argue IIRIRA broadened the scope of § 1158 when it amended the statute slightly to allow "[a]ny alien," rather than "an alien," to apply for asylum. But the rest of § 1158(a)(1)'s text reenacted the existing language permitting the alien, "regardless of such alien's status, to apply for asylum." *Compare* 8 U.S.C. § 1158(a) (1980) (permitting "an alien physically present in the United States, ..., irrespective of such alien's status, to apply for asylum"), *with* *id.* § 1158(a)(1) (1996) (providing that "[a]ny alien who is physically present in the United States ..., irrespective of such alien's status, may apply for asylum"). We are reluctant to assume Congress' intent is clear from this change alone, and must read this amendment in concert with the simultaneous enactment of § 1231(a)(5), which was a completely new addition in IIRIRA. In adopting both changes simultaneously, Congress effectively adopted "a clear limitation in one section"—§ 1231(a)(5)—"without amending another section" dealing with the same subject matter. *See* *Ramirez–Mejia*, 794 F.3d at 490. This might suggest Congress assumed § 1231(a)(5)'s use of the phrase "any relief under this chapter" would most naturally be read as precluding asylum applications. *See* *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991) ("It is presumable that Congress legislates with knowledge of our basic rules of statutory construction....").

[13]   In sum, when read in context and compared with each other, § 1158(a)(1) and § 1231(a)(5) reveal no clear congressional intent on how to resolve a claim, like Perez's, which places the two sections in conflict. Both provisions appear to establish broad and conflicting rules. On closer examination, however, it is apparent that both provisions are qualified in certain respects—§ 1158 by various textual exceptions, and § 1231(a)(5) by the government's practice and our precedent. Furthermore, we cannot say the general-specific canon clearly resolves the ambiguity in the statutory scheme.[5] We therefore **\*1077** conclude Congress has not spoken directly to whether individuals subject to reinstated removal orders may apply for asylum. We accordingly proceed to *Chevron*'s second step, where we ask whether the agency's interpretation of an ambiguous statute is a permissible construction of the statutory scheme.

*See* Chevron, 467 U.S. at 843, 104 S.Ct. 2778.

### 2. *Chevron* Step Two

Before we address the substance of the agency's interpretation, we must briefly discuss Perez and amici's argument that 8 C.F.R. § 1208.31(e) should not be accorded Chevron deference because the agency failed to adequately explain its reasoning when it promulgated the regulation in 1999. We do not reach the merits of this argument because it is untimely.

### a. Timeliness

[14]   [15]   [16]   [17]   Procedural challenges to agency rules under the Administrative Procedure Act are subject to the general six-year limitations period in the U.S. Code. *See* Wind River Mining Corp. v. United States, 946 F.2d 710, 713–14 (9th Cir. 1991) (citing 28 U.S.C. § 2401(a)). Under Wind River, challenges to a "mere procedural violation in the adoption of a regulation or other agency action" must be brought within six years of the agency rulemaking, whereas challenges to "the substance of an agency's decision as exceeding constitutional or statutory authority" may be brought any time "within six years of the agency's application of the disputed decision to the challenger." Id. at 715–16.

Whether Perez's challenges are timely therefore depends on whether they are procedural or substantive.[6]

Perez's central claim is that the Attorney General's refusal to consider his asylum application is based on an unreasonable interpretation of § 1158 and § 1231(a)(5). The parties agree this is a substantive challenge. Because it was brought within six years of the BIA's refusal to consider Perez's asylum application, it is timely. *See* Cal. Sea Urchin Comm'n v. Bean, 828 F.3d 1046, 1050 (9th Cir.2016) (holding timely a challenge to "the present application of an earlier rule that allegedly contradicted the agency's statutory authority").

Perez and amici also argue that 8 C.F.R. § 1208.31 merits no deference at Chevron step two because the agency allegedly failed to explain its interpretation of § 1158 and § 1231 when it originally promulgated the regulation. This portion of their challenge, in other words, alleges "a procedural violation in the adoption of a regulation." Wind River, 946 F.2d at 714. We conclude that although Perez's arguments about the substance of 8 C.F.R. § 1208.31's interpretation are timely, his arguments about the alleged procedural **\*1078** errors in its promulgation are not. We therefore decline to consider them. *See also* Sai Kwan Wong v. Doar, 571 F.3d 247, 262–63 (2d Cir. 2009) (collecting cases).

The Supreme Court's recent decision in Encino Motorcars, LLC v. Navarro, —— U.S. ——, 136 S.Ct. 2117, 195 L.Ed.2d 382 (2016), supports this approach. There, the Court held an agency regulation that represented a change in longstanding agency position was not entitled to Chevron deference because the agency had failed to adequately explain its change in position. The Court explained that a "basic *procedural* requirement[ ] of administrative rulemaking is that an agency must give adequate reasons for its decisions." Id. at 2125 (emphasis added); *see also* id. (" Chevron deference is not warranted where the regulation is 'procedurally defective'—that is, where the agency errs by failing to follow the correct procedures in issuing the regulation."). "Of course," it noted, "a party might be foreclosed in some instances from challenging the procedures used to promulgate

16 Cal. Daily Op. Serv. 9616, 2016 Daily Journal D.A.R. 9134

a given rule." *Id.* (citing *JEM Broad. Co. v. FCC*, 22 F.3d 320, 324–26 (D.C. Cir. 1994)).

[18] *JEM Broadcasting* arose in a similar procedural posture to this case. The FCC had earlier promulgated a rule preventing review of certain license applications that included inaccurate or incomplete information. *See JEM Broad.*, 22 F.3d at 322–23. The FCC subsequently declined to review JEM's defective application by citing that rule, and JEM sought to "attack ... the *procedural genesis* of the [rule] in the context of an *enforcement action*," by arguing the rule had been improperly promulgated without notice and comment years earlier. *Id.* at 324. The D.C. Circuit held JEM's challenge was untimely.

> JEM does not claim ... that the "hard look" rules are unconstitutional, that they exceed the scope of the FCC's substantive authority, or ... that the rules are premised on an erroneous interpretation of a statutory term....
>
> [C]hallenges to the *procedural lineage of agency regulations*, whether raised by direct appeal ... or as a defense to an agency enforcement proceeding, will not be entertained outside the ... period provided by statute.

*Id.* at 325 (quoting *Mountain States Tel. & Tel. Co. v. FCC*, 939 F.2d 1035, 1040 (D.C. Cir. 1991)). Although it recognized that "some parties—such as those not yet in existence when a rule is promulgated"—would "never ... have the opportunity to challenge the procedural lineage of rules that are applied to their detriment," the court concluded "the law countenances this result because of the value of repose." *Id.* at 326. We have reached the same conclusion. *See Wind River*, 946 F.2d at 715 ("The government's interest in finality outweighs a late-comer's desire to protest the agency's action as a matter of policy or procedure."); *see also Cedars–Sinai Med. Ctr. v. Shalala*, 177 F.3d 1126, 1129 (9th Cir. 1999) (noting a limitations period on procedural challenges is necessary "so that regulations are not indefinitely subject to challenge in court"). [7]

**\*1079** In the absence of binding contrary authority, we apply the approach required by *Wind River* and approved by the Supreme Court in *Encino Motorcars* to conclude Perez's procedural challenge to 8 C.F.R. § 1208.31(e) falls outside the limitations period. We therefore move on to determine whether 8 C.F.R. § 1208.31(e) is a permissible construction of the statute under *Chevron* step two.

### b. The Chevron Step Two Inquiry

[19] At step two of *Chevron*, we must "accept the agency's construction of the statute" so long as that reading is reasonable, "even if the agency's reading differs from what the court believes is the best statutory interpretation." *Brand X Internet Servs.*, 545 U.S. at 980, 125 S.Ct. 2688. Deference "is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.' " *INS v. Aguirre–Aguirre*, 526 U.S. 415, 425, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) (quoting *INS v. Abudu*, 485 U.S. 94, 110, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988)). With these principles in mind, we consider whether 8 C.F.R. § 1208.31(e), which prevents individuals subject to reinstated removal orders from applying for asylum but permits them to seek withholding of removal, is a reasonable interpretation of § 1158 and § 1231. We conclude it is. [8]

[20] First, the regulation is consistent with a reasonable judgment that § 1231(a)(5) is a more specific provision than § 1158, even if not conclusively so, and is therefore "more deserving of credence" when the two provisions conflict. Scalia & Gardner, *supra*, at 183. As discussed, both parties advance reasonable arguments for why the canon favors their interpretations of the statutory scheme. At step two, however, "we are not deciding between two plausible statutory constructions; we are evaluating an agency's interpretation of a statute under *Chevron*." *Morales–Izquierdo v. Gonzales*, 486 F.3d 484, 492 (9th Cir. 2007) (en banc). It **\*1080** was not unreasonable for the agency to conclude § 1231(a)(5)'s prohibition on "any relief under this chapter" forecloses individuals from applying for asylum relief. Indeed, the other circuits to consider this issue have concluded it does. *See Jimenez–Morales*, 821 F.3d at 1310; *Ramirez–Mejia*, 794 F.3d at 490; *Herrera–Molina*, 597 F.3d at 138–39.

**[21]** Second, the agency's approach is consistent with Congress' intent in IIRIRA that the reinstatement of a previous removal order would cut off certain avenues for relief from removal. Reinstatement was designed to be "a different and far more summary procedure" than regular removal. *Morales–Izquierdo*, 486 F.3d at 491. To that end, Congress intended § 1231(a)(5) to subject more individuals to reinstatement proceedings and to "limit[ ] the possible relief from a removal order available to them." *Fernandez–Vargas*, 548 U.S. at 33, 126 S.Ct. 2422; *see also* *Ramirez–Mejia*, 794 F.3d at 490. Forbidding asylum applications from individuals in reinstatement proceedings, although harsh, is in keeping with this approach. *See* *Barnhart v. Walton*, 535 U.S. 212, 219, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002) (upholding an agency construction that made "considerable sense in terms of the statute's basic objectives"). Furthermore, the agency's interpretation is a reasonable construction of the legislative history we discussed above, which is at least consistent with the view that, in enacting § 1158(a)(1) and § 1231(a)(5) together, Congress assumed the phrase "any relief under this chapter" would include the asylum provision in the statute. *See* *Chevron*, 467 U.S. at 862, 104 S.Ct. 2778 (noting that when legislative history "as a whole is silent" on the "precise issue" before the court, it may nonetheless be "consistent" with a particular interpretation of the statute). Had Congress intended to include a carve-out for asylum relief, it could have done so explicitly when it wrote § 1231(a)(5) or revised § 1158.

There are nonetheless some weaknesses in the agency's approach, but they are not fatal to its interpretation. We have already noted that, notwithstanding § 1231(a)(5)'s bar on "any relief" under chapter 12, the Attorney General has interpreted that section to permit individuals to seek withholding of removal, CAT protection and U Visas— all forms of relief that, like asylum, arise under chapter 12. *See* 8 C.F.R. §§ 214.14(c)(1)(ii), 1208.16(c)(4), 1208.31(e). The government suggests this policy draws a reasonable line between discretionary and nondiscretionary relief, and the Supreme Court acknowledged "the practical import of th[at] distinction," albeit in a slightly different context. *Cf.* *INS v. Cardoza–Fonseca*, 480 U.S. 421, 444, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (holding it was "not ...

at all anomalous" that asylum applicants and applicants for withholding were governed by different standards of proof and stating there was "no basis for the ... assertion that the discretionary/mandatory distinction has no practical significance").

This explanation, however, fails to account for why, under the Attorney General's regulations, individuals in reinstatement proceedings are permitted to apply for U Visas—a form of discretionary relief—but not for asylum. It may be relevant that U Visas were created in 2000, four years after IIRIRA implemented the revised asylum statute and the reinstatement bar. *See* Victims of Trafficking and Violence Prevention Act of 2000, Pub. L. No. 106–386, § 1513, 114 Stat. 1464. In concluding that the Attorney General's approach in 8 C.F.R. § 1208.31(e) is reasonable under *Chevron*, however, we note the Supreme Court apparently found nothing inconsistent between the "absolute terms" by which **\*1081** § 1231(a)(5) bars relief and the government's decision to make certain forms of relief from removal available in reinstatement proceedings. *See* *Fernandez–Vargas*, 548 U.S. at 35 n.4, 126 S.Ct. 2422 ("Notwithstanding the absolute terms in which the bar on relief is stated, even an alien subject to [ § 1231(a)(5) ] may seek *withholding of removal* under [ § 1231(b)(3) ] ..., or under 8 C.F.R. §§ 241.8(e) and 208.31....." (emphasis added)); *see also* *Jimenez–Morales*, 821 F.3d at 1310 (citing *Fernandez–Vargas*, 548 U.S. at 35 n.4, 126 S.Ct. 2422); *Herrera–Molina*, 597 F.3d at 139 n.8 (same). [9] Although the availability of asylum is an important component of our immigration law, it is not unreasonable to conclude Congress intended to bar this form of relief to persons in reinstated removal proceedings while preserving relief for individuals able to meet the higher standards for withholding of removal and CAT relief. *See* *Ramirez–Mejia v. Lynch*, 813 F.3d 240, 241 (5th Cir. 2016) (denying rehearing en banc) ("Even if withholding of removal and CAT protection are slightly less potent remedies than asylum, the difference may well be consistent with Congress's intent to penalize illegal reentry. We need not justify the difference, but we note possible reasons for it.").

**[22]** In addition, although the Attorney General's interpretation makes sense as applied to an individual who has already had an opportunity to seek asylum upon his initial entry to the United States, it does not account for

AR.06109

16 Cal. Daily Op. Serv. 9616, 2016 Daily Journal D.A.R. 9134

individuals in reinstatement proceedings who may have compelling claims based on new circumstances arising subsequent to their previous removal proceedings. The Attorney General's interpretation of § 1231(a)(5) may have dire humanitarian consequences for individuals in reinstatement who seek relief from removal, either because they were previously denied asylum and are now subject to changed circumstances or because they were improperly denied an opportunity to seek asylum during their earlier removal from the United States. However, the government has discretion to forgo reinstatement and instead place an individual in ordinary removal proceedings. See *Villa–Anguiano v. Holder*, 727 F.3d 873, 878 (9th Cir. 2013). Once in ordinary proceedings, the individual can raise an asylum application without implicating § 1231(a)(5)'s bar. The government has followed this procedure before, *see, e.g., Maldonado Lopez v. Holder*, No. 12-72800 (9th Cir. dismissed Feb. 4, 2014), and we assume it will continue to exercise that discretion in appropriate cases, such as those presenting strong humanitarian concerns. To the extent this consideration "really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress," it cannot invalidate the agency's interpretation at *Chevron*'s second step. See *Chevron*, 467 U.S. at 866, 104 S.Ct. 2778.

In sum, despite our reservations, we are not persuaded that 8 C.F.R. § 1208.31(e)'s interpretation of § 1231(a)(5) and § 1158(a)(1) is an unreasonable construction of the statute. See *Chevron*, 467 U.S. at 843–44, 104 S.Ct. 2778. It is consistent with the broad language of § 1231(a)(5), with Congress' intent to make reinstatement an expedited process for removing **\*1082** individuals who reenter the United States and with the overall legislative history of both provisions.

Perez's remaining arguments to the contrary are not persuasive. First, Perez and amici argue the Attorney General's interpretation of § 1231(a)(5) is contrary to the structure of § 1158 itself. They focus in particular on § 1158(a)(2)(D), which provides that an applicant's second asylum application "may be considered" if he shows changed circumstances materially affecting his eligibility for asylum. Perez and amici argue that if § 1231(a)(5)

categorically forbids an individual in reinstatement from applying for asylum, § 1158(a)(2)(D) is superfluous. This argument incorrectly assumes that any individual to whom § 1158(a)(2)(D) applies will *necessarily* be subject to a reinstated removal order. Not so. The reinstatement of a prior removal order is neither "automatic" nor "obligatory," and the Attorney General has discretion not to reinstate an individual's earlier removal order and instead place him in ordinary removal proceedings. See *Villa–Anguiano*, 727 F.3d at 878 (quoting *Alcala v. Holder*, 563 F.3d 1009, 1013 (9th Cir. 2009)). If the Attorney General elects to place an individual who previously applied for and was denied asylum into ordinary removal proceedings upon his reentry to the United States, § 1158(a)(2)(D) is not superfluous. On the contrary, it affirmatively authorizes a second asylum claim in light of his changed circumstances—something that would ordinarily be precluded by § 1158(a)(2)(C). [10]

Second, Perez and amici argue the asylum statute is a "closed universe" unaffected by other portions of the INA. In other words, they suggest § 1158's enumerated exceptions for eligibility to apply for asylum are exhaustive. Amici note the asylum scheme makes no reference to § 1231(a)(5), and suggest § 1158 was intended to govern asylum applications independent of the rest of the INA. The Attorney General, however, is not unreasonable for adopting a contrary view. None of the various provisions for relief under the INA explicitly refers to § 1231(a)(5), but § 1231(a)(5) specifies "any relief under this chapter." No explicit cross-reference to every affected section is necessary for us to conclude that "any relief under this chapter" can reasonably be read to preclude applications for asylum, a form of relief arising under chapter 12.

For the foregoing reasons, we hold that 8 C.F.R. § 1208.31(e) is a reasonable interpretation of the interplay between § 1158 and § 1231, and we must therefore defer to it under *Chevron*. In keeping with that regulation, Perez is not eligible to apply for asylum under § 1158 as long as he is subject to a reinstated removal order.

### C. Withholding of Removal and CAT Relief

After the BIA concluded Perez had not shown past persecution on account of his membership in a particular social group, we held witnesses who testify against gang members may constitute a "particular social group." *See* Henriquez–Rivas v. Holder, 707 F.3d 1081, 1092 (9th Cir. 2013) (en banc). In addition, after the BIA rejected Perez's CAT claim because there was no evidence the Guatemalan government sanctioned his abuse by police, we held that local officials' acquiescence in torture is sufficient to entitle an applicant to CAT relief, even if the national government did

**\*1083** not acquiesce in the treatment. *See* Madrigal v. Holder, 716 F.3d 499, 509 (9th Cir. 2013). In light of these intervening authorities, the parties agree we should remand on Perez's claims for withholding of removal and CAT relief.

### III. Conclusion

We remand for the agency to reconsider Perez's applications for withholding of removal and CAT protection in light of Henriquez–Rivas v. Holder, 707 F.3d 1081 (9th Cir. 2013) (en banc), and Madrigal v. Holder, 716 F.3d 499 (9th Cir. 2013). We affirm the BIA's conclusion that it could not consider Perez's application for asylum relief in light of his reinstated removal order.

**PETITION GRANTED IN PART AND DENIED IN PART; REMANDED TO THE BIA.**

Each party shall bear its own costs on appeal.

**All Citations**

835 F.3d 1066, 16 Cal. Daily Op. Serv. 9616, 2016 Daily Journal D.A.R. 9134

### Footnotes

1  Unless otherwise noted, all citations are to title 8 of the United States Code.

2  The regulation was originally promulgated as 8 C.F.R. § 208.31(e), but the administrative regulations governing immigration proceedings were recodified in 2003 to reflect the transfer of the Immigration and Nationality Service's functions to DHS. *See* Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824 (Feb. 28, 2003). For convenience, we refer to the regulation as 8 C.F.R. § 1208.31(e) throughout this opinion.

3  A separate regulation permits an individual subject to a reinstated removal order to seek CAT protection as well. *See* 8 C.F.R. § 1208.16(c)(4).

4  The government suggested for the first time at oral argument that the two sections do not actually conflict if "relief" is understood as a term of art under the INA. It posits that, in barring any "relief," § 1231(a)(5) does not prevent individuals from seeking nondiscretionary forms of "protection" like withholding of removal and protection under CAT. Although one other circuit found this purported distinction persuasive, *see* Ramirez–Mejia, 794 F.3d at 489, we treat this argument as waived because any textual distinction between the two terms was raised for the first time at oral argument, *see* Harger v. Dep't of Labor, 569 F.3d 898, 904 n.9 (9th Cir. 2009).

5  Perez also cites the "longstanding principle of construing any lingering ambiguities in [removal] statutes in favor of the alien." INS v. Cardoza–Fonseca, 480 U.S. 421, 449, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Like the rule of lenity, this rule is a tiebreaker in the case of insoluble—or "lingering"—ambiguity. *Id.*; *see* Lagandaon v. Ashcroft, 383 F.3d 983, 993 (9th Cir. 2004). As we have held in the criminal context,

however, "[t]he rule of lenity ... does not prevent an agency from resolving statutory ambiguity through a valid regulation." *Pacheco–Camacho v. Hood*, 272 F.3d 1266, 1271–72 (9th Cir. 2001) (citing *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 n.18, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995)); *see also Mujahid v. Daniels*, 413 F.3d 991, 998–99 (9th Cir. 2005) (prioritizing the rule of lenity over *Chevron* deference "is tenuous at best and requires us to fill in more blanks than we are willing to do").

6    Perez argues we should not rule on timeliness because the government did not raise it until supplemental briefing. We have given both parties "ample opportunity to address the issue" through supplemental briefing, and will exercise our discretion to decide it. *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447–48, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993). Although the government suggested in supplemental briefing that Perez's challenge is substantive, there is no "impropriety in refusing to accept what in effect [is the parties'] stipulation on a question of law." *Id.* at 448, 113 S.Ct. 2173. In addition, the government noted that "[i]f this were ... a procedural challenge ... it would be time-barred."

7    Perez also argues his challenge is timely because the agency "fail[ed] to put aggrieved parties on reasonable notice of the rule's content." *JEM Broad.*, 22 F.3d at 326. We disagree. We noted in *Wind River* that " '[p]ublication in the Federal Register is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance.' " 946 F.2d at 714 (alteration in original) (quoting *Shiny Rock Mining Corp. v. United States*, 906 F.2d 1362, 1364 (9th Cir. 1990)). Here, the notice published in the Federal Register was sufficient to inform an interested party the regulation created a streamlined system for assessing claims from individuals in reinstatement proceedings and that the agency viewed such individuals as ineligible for asylum. *See* 64 Fed. Reg. at 8485, discussed above at pp. 9–10.

8    Perez and amici argue 8 C.F.R. § 1208.31(e) does not merit *Chevron* deference because the agency failed to exercise its interpretive authority at all and treated § 1231(a)(5) as unambiguous. They therefore suggest we should remand to the agency under the rule expressed in *Negusie v. Holder*, 555 U.S. 511, 129 S.Ct. 1159, 173 L.Ed.2d 20 (2009), and *Gila River Indian Community v. United States*, 729 F.3d 1139 (9th Cir. 2013). We reject this suggestion. The government's argument on appeal that the statute is unambiguous does not tell us how the agency viewed the statute when it initially promulgated the regulation. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (noting appellate counsel's "convenient litigating position" is not entitled to deference). Rather, agency action rises or falls on the agency's own contemporaneous reasoning, and where we have remanded under *Negusie* the administrative record has more clearly shown that "the agency misapprehended the clarity of the statute" and "mistakenly derermine[d] that its interpretation [was] *mandated* by plain meaning, or some other binding rule," *Gila River*, 729 F.3d at 1149 (emphasis added). The administrative history does not discuss the specific language of the asylum statute, but neither does it suggest the agency saw § 1231(a)(5) as compelling the regulation's particular approach to asylum, withholding of removal or CAT protection. On the contrary, the agency's explanation shows it applied its expertise by crafting an expedited screening process and balancing the fair resolution of claims for relief from removal against Congress' desire to provide for streamlined removal of certain classes of individuals, including those subject to reinstated removal orders. *See* 64 Fed. Reg. at 8485, discussed above at pp. 9–10.

9    In *Fernandez–Vargas*, the Supreme Court parenthetically described 8 C.F.R. §§ 241.8(e) and 208.31 as "raising the possibility of asylum." 548 U.S. at 35 n.4, 126 S.Ct. 2422. This appears to have been an oversight; although both regulations refer to "asylum officers," they clearly permit only withholding from

removal. Indeed, the main text of the Court's footnote correctly refers only to "seek[ing] withholding of removal" under those regulations.

10   Perez is a first-time asylum claimant, and alleges no circumstances that materially changed between his removal from the United States and his subsequent reentry. We therefore have no opportunity here to determine how 🔖 § 1158(a)(2)(D) might affect 🔖 § 1231(a)(5) in a case where those two provisions are actually in conflict.

---

**End of Document**                     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Northern Mariana Islands v. U.S., D.D.C., November 25, 2009

737 F.2d 1193
United States Court of Appeals,
District of Columbia Circuit.

Joanna PETRY, et al., Appellants,

v.

John BLOCK, Secretary of Agriculture, et al.

No. 83–1612.
|
Argued Feb. 8, 1984.
|
Decided June 29, 1984.

**Synopsis**

The Secretary of Agriculture appealed preliminary injunction ordered by the United States District Court for the District of Columbia, John H. Pratt, J., setting aside interim regulation promulgated by the Secretary pursuant to amendment of child care food program. The Court of Appeals, 697 F.2d 1169, reversed and remanded. Plaintiffs thereafter appealed from judgment of the District Court. The Court of Appeals, Starr, Circuit Judge, held that: (1) the Secretary adequately described information and data relied upon in drafting interim rule; (2) Department's adoption of reimbursement rule was not arbitrary or capricious; and (3) Department justifiably invoked good cause exception to notice and comment requirements of Administrative Procedure Act.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Preliminary Injunction.

West Headnotes (7)

**[1]    Public Assistance** 🔑 Administrative proceedings

The Secretary of Agriculture adequately described information and data relied upon in drafting interim rule implementing requirement of the the Omnibus Budget Reconciliation Act of 1981 to reduce by ten percent amounts paid by Secretary as reimbursement for administrative expenses of participants in child care food program where Secretary made available to requesting parties consulting firm's study and the Department's own study. Omnibus Budget Reconciliation Act of 1981, § 101 et seq., 95 Stat. 357; § 820(c), 42 U.S.C.A. § 1753 note.

**[2]    Administrative Law and Procedure** 🔑 Wisdom, judgment, or opinion in general

The Court of Appeals is not to substitute its judgment for that of an agency; rather, it is to conduct a searching and careful inquiry, the keystone of which is to ensure that agency engaged in reasoned decision making.

**[3]    Administrative Law and Procedure** 🔑 Necessity

It is responsibility of agency itself to supply evidence of reasoned decision making in statement of basis and purposes required by the Administrative Procedure Act to be published with final rule. 5 U.S.C.A. § 553(c).

2 Cases that cite this headnote

**[4]    Administrative Law and Procedure** 🔑 Review for arbitrary, capricious, unreasonable, or illegal actions in general

Agency action will normally be found arbitrary and capricious only if agency has relied on factors which Congress has not intended it to consider, entirely failed to consider important aspect of problem, offered explanation for its decision that runs counter to evidence before agency, or is so implausible that it could not be ascribed to difference in view or product of agency expertise.

1 Cases that cite this headnote

**[5]    Public Assistance** 🔑 Administrative proceedings

Department of Agriculture's adoption of final child care food program reimbursement rule was not arbitrary and capricious, although it was contended that Secretary of Agriculture failed adequately to consider certain information contained in comments submitted by opponents of new regulation, where the Department clearly addressed criticisms leveled at data relied upon at interim rule stage and also set forth responsive view with respect to other points raised by comments. 5 U.S.C.A. § 706(2)(A).

1 Cases that cite this headnote

[6]    **Administrative Law and Procedure** ⚬ Exceptions to Rulemaking Procedures

Exceptions to the Administrative Procedure Act notice-and-comment procedures are to be narrowly construed and only reluctantly countenanced. 5 U.S.C.A. § 553.

7 Cases that cite this headnote

[7]    **Public Assistance** ⚬ Administrative proceedings

The Department of Agriculture justifiably invoked good cause exception to notice and comment requirements of Administrative Procedure Act to adopt interim rule implementing requirement of Omnibus Budget Reconciliation Act of 1981 to reduce by ten percent amounts paid by the Secretary of Agriculture as reimbursement for administrative expenses of participants in child care food program in light of extremely limited time given by Congress under the Act for adoption of reimbursement rule in relation to amount of work required to produce rule. Omnibus Budget Reconciliation Act of 1981, § 101 et seq., 95 Stat. 357; 5 U.S.C.A. § 553(b).

12 Cases that cite this headnote

**\*1194   \*\*47**  Appeal from the United States District Court for the District of Columbia (Civil Action No. 82–01682).

**Attorneys and Law Firms**

Kathleen A. McKee, Alexandria, Va., for appellants.

Freddi Lipstein, Atty., Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Stanley S. Harris, U.S. Atty., Washington, D.C. (at the time the brief was filed), and Robert E. Kopp, Atty. Dept. of Justice, Washington, D.C., were on the brief, for appellees.

Leonard Schaitman and Nicholas S. Zeppos, Attys., Dept. of Justice, Washington, D.C., also entered appearances, for appellees.

Paula Roberts and Barbara Milstein, Washington, D.C., were on the brief of amicus curiae urging reversal.

Before WALD, BORK and STARR, Circuit Judges.

**Opinion**

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This case presents procedural and substantive challenges to a rule implementing reductions in federal spending which were mandated by Congress in the summer of 1981. Appellants are participants in the Child Care Food Program, a federal financial assistance program administered by the United States Department of Agriculture. They brought this action in June 1982, challenging a regulation [1] adopted by the Secretary of Agriculture to implement certain provisions of the watershed Omnibus Budget Reconciliation Act of 1981 ("OBRA"). [2]

At the outset of this litigation, plaintiffs moved for a preliminary injunction to set aside the new regulation, on the theory that the Department had misinterpreted the relevant provisions of OBRA. Instead **\*1195   \*\*48** of mandating a reduction in certain Child Care Food Program expenditures, the statute, plaintiffs argued, required only a reduction in the maximum allowable rates payable. [3] The District Court agreed and granted the preliminary injunction on June 28, 1982. By order dated August 31, 1982, this court stayed the preliminary injunction pending appeal.

238 U.S.App.D.C. 46

In *Petry v. Block,* 697 F.2d 1169 (D.C.Cir.1983), this court reversed the District Court's decision and remanded the case. Our decision "upheld the Secretary [of Agriculture's] interpretation of [OBRA's] amendment" of the Child Care Food Program ("CCFP") statute, but noted that "issues remain for resolution by the District Court relating to the manner in which the challenged regulation was promulgated and its reasonableness in the light of facts presented." *Id.* at 1171. On remand, appellants argued that the Department's adoption of this regulation ran afoul of both OBRA and Administrative Procedure Act ("APA") [4] requirements. They moved for summary judgment, requesting that the new regulation be invalidated and the entire matter remanded to the Department for promulgation of a new regulation.

In a Memorandum Opinion and Order dated March 29, 1983, the District Court denied appellants' motion, and granted summary judgment in favor of the appellees. Appellants now seek review of that decision. We affirm.

I

The Child Care Food Program provides financial assistance to the several States to defray the cost of meals served to needy children in child care centers and day care facilities. CCFP also reimburses a portion of administrative expenses incurred by sponsoring organizations, which supervise day-care homes and assist in the administration of the program. [5]

OBRA, a widely publicized measure passed in 1981, was aimed at reducing the level of federal expenditures. The measure was designed, in relevant part, to make numerous changes in the funding of federal welfare programs, including the program here in question. To this end, OBRA amended the CCFP statute to require a ten percent reduction in amounts paid by the Secretary of Agriculture as reimbursement for sponsoring organizations' administrative expenses. [6] As the case comes to us, no curtailments other than for administrative expenses are at issue.

In the spirit of the day, OBRA placed administrative agencies on an unusually fast track to implement the mandated changes. Accordingly, the measure provided for, among other things, expedited implementation of the reduction in CCFP administrative reimbursements. Specifically, section 820(c) of OBRA directed the Secretary to promulgate implementing regulations "[n]ot later than 60 days after the date of

enactment" of OBRA. [7] Because OBRA was signed into law on August 13, 1981, the statute had the effect of requiring **1196 **49 the Secretary to promulgate new reimbursement regulations on or before October 12, 1981. OBRA further provided that the new reimbursement system was to take effect on January 1, 1982. *See* section 820(a)(6) of OBRA, 42 U.S.C. § 1753 note (Supp. V 1981). The stage was thus set for the events that led to this litigation.

The responsibility for developing new reimbursement regulations fell upon the shoulders of the Department's Food and Nutrition Service ("FNS"), which is charged with administering CCFP and other federally funded child nutrition programs. Espying OBRA's likely passage on the horizon, FNS collected data during the summer of 1981 with respect to reimbursement practices, but determined that nothing beyond preliminary steps could be taken prior to OBRA's actual passage. Declaration of George Braley, Deputy Administrator for Special Nutrition Programs, FNS, ¶¶ 5–6 ("Braley Declaration"). [8]

The timing of FNS' labors on the new regulation is not disputed by the parties, although the appellants argue vigorously that the Secretary, through FNS, failed to work with sufficient diligence and dispatch in this task. FNS completed the first draft of the regulation in good measure on September 17, 1981. Braley Declaration ¶ 10. After this auspicious beginning, the proposed rule entered FNS' internal clearance procedure on October 2, 1981. Defendants' Response to Plaintiffs' Interrogatories and Request for Production of Documents, *reprinted in* Appendix ("App."), at 36a. The review of the draft regulation continued in early October, at which point storm clouds of delay loomed large. "[I]t appeared unlikely to FNS that clearance and publication of the proposed rule, allowance for a sixty-day comment period, analysis of comments, and publication of a final rule would be possible by January 1, 1982 ...." Braley Declaration ¶ 10. As a result, FNS withdrew the regulation from the clearance process and redrafted it as an interim rule. The proposed interim rule was placed in the clearance process on October 22, 1981.

These well-laid plans then went awry. In November 1981, an error was discovered in the reimbursement formula set forth in the proposed interim rule which would have resulted in an overreduction of reimbursements. The clearance procedure was again aborted, and the draft regulation reworked to eliminate the error contained in the formula. As the calendar

fatefully moved toward New Year's Day, a new draft was completed on December 8, 1981, and promptly placed into FNS' internal clearance procedures.

Clearance proved to be a six-week process. After subsequently gaining agency and OMB clearance, the regulation was finally published on January 26, 1982 as an interim rule. 47 Fed.Reg. 3539–41 (1982). [9] The new rule was, however, made effective retroactively as of January 1, 1982, which will be recalled was the effective date mandated **\*1197 \*\*50** by OBRA. [10] The notice of the interim rule also announced a sixty-day comment period. During this ensuing period, the Department received 125 comments. After reviewing the comments, the Secretary determined that no change was warranted in the rule before its adoption in final form. On June 25, 1982, the final rule, identical to the interim rule announced in the preceding January, was published. 47 Fed.Reg. 27,540–44 (1982).

## II

In light of this procedural history, appellants mount an attack against the new reimbursement regulation on three grounds. First, they argue that the initial issuance of the regulation in January 1982 as an interim rule—with retroactive effect—violated the requirement of 🚩 section 553(b) of the APA that prior notice be given of a proposed rulemaking and public comment procedures followed. As a second prong of this initial ground of attack, appellants strenuously argue that the circumstances presented here do not justify invocation of the 🚩 section 553(b)(B) "good cause" exemption from the 🚩 section 553(b) requirement. [11]

Appellants claim, secondly, that appellees breached their APA obligation to disclose a summary of the information and data relied upon in drafting the regulation sufficient to enable interested parties to submit "meaningful" comments on the interim regulation. Third and finally, appellants charge that the Department's decision to adopt the final rule was arbitrary and capricious, in that the Department failed to consider all relevant evidence in reaching its decision.

We first address the latter two objections, which go to the final rule now in effect, and then consider the "good cause" question, which goes only to the promulgation in 1982 of the now superceded interim rule.

## A

**[1]**    Appellants claim that the Secretary failed to describe adequately the "information and data relied upon in drafting" the interim rule, Appellants' Brief at 28, and that this asserted error fatally infects the rule as adopted. We disagree. [12]

In support of their argument, appellants rather unfairly characterize the information set forth in the January 26, 1982 notice of the interim rule. This notice cited the Department's "review of available data" and information generated by a nationwide study of the Program conducted for the Department by ABT Associates, a private consulting firm, as support for (1) the Department's view of economies of scale in the sponsoring organizations, (2) the Department's estimate of actual payments made under the old regulations, and (3) the adjustments necessary to bring payout rates down to OBRA-mandated levels. It is undisputed that the Secretary made available to requesting parties the ABT study's raw data and the Department's own study. Braley Declaration ¶ 14. The Department, moreover, did not rely upon **\*1198 \*\*51** materials not made available to interested parties. Id.

Appellants nonetheless argue that the Department's actions were insufficient to ensure informed responses to the interim rule. They apparently are of the view that a much more extensive explanation of the two studies described in the January 26, 1982 notice was required by two prior appellate decisions, namely 🚩 *Portland Cement Ass'n v. Ruckelshaus, 486 F.2d 375 (D.C.Cir.1973), cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974),* and 🚩 *United States v. Nova Scotia Food Products Corp., 568 F.2d 240 (2d Cir.1977).* This argument, to put it gently, misinterprets these decisions. In *Portland Cement,* the "critical defect" was the "inability of petitioners to obtain—in timely fashion—the test results and procedures used on existing [cement] plants which formed a partial basis for the emission control level adopted." 🚩 *486 F.2d at 392.* Similarly, in *Nova Scotia,* "all the scientific research was collected by the agency, and none of it was disclosed to interested parties as the material upon which the proposed rule would be fashioned." 🚩 *568 F.2d at 251.* The situations presented by those two cases, involving nondisclosure of information or data relied upon by the agency, are a far cry from the case at hand. Here, the agency in its announcement of the rule adequately described

238 U.S.App.D.C. 46

the information on which it relied, *see* 47 Fed.Reg. at 3539–40, and later made that information available upon request. Inapposite as they so manifestly are, *Portland Cement* and *Nova Scotia* simply cannot be twisted so as to require notices of proposed or interim rules to contain elaborate reproduction of underlying studies.

B

Appellants also argue that the Department's adoption of the final CCFP reimbursement rule in the summer of 1982 violated the bedrock requirement of APA section 706(2)(A) that agency action not be "arbitrary" or "capricious." The charge in this respect appears to be that the Secretary failed adequately to consider certain information contained in the comments submitted by opponents of the new regulation. The result of this inattention, appellants claim, is that the Department continued to rely upon allegedly flawed data which formed the basis for the interim rule, thereby rendering the final rule arbitrary and capricious.

**[2]** **[3]** **[4]** Under this well-worn standard of review, it is settled that this court "is not to substitute its judgment for that of the agency." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,* ——U.S. ——, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Rather, the court is to conduct a " 'searching and careful' inquiry, the keystone of which is to ensure that the [agency] engaged in reasoned decisionmaking." *International Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 815 (D.C.Cir.1983) (citations omitted). It is the responsibility of "[t]he agency itself [to] supply the evidence of that reasoned decisionmaking in the statement of basis and purpose" required by section 553(c) of the APA to be published with the final rule. *International Brotherhood of Teamsters v. United States,* 735 F.2d 1525, 1531 (D.C.Cir.1984). Agency action will normally be found arbitrary and capricious only

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence

> before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Manufacturers, supra,* 103 S.Ct. at 2867.

**[5]** It is clear that, measured against this standard, the Department's final rule can by no means be deemed arbitrary or capricious. A review of the Department's June 25, 1982 notice to the final rule belies the claim that the Department "summarily dismiss[ed]" the criticisms contained in the comments as "baseless." Appellants Reply **\*1199** **\*\*52** Br. at 14. Quite to the contrary, the Department squarely addressed the criticisms leveled at the data relied upon at the interim rule stage, and also set forth responsive views with respect to other points raised by the comments.

The position advanced by appellants, and other commenting parties who opposed the new rule, seems to reduce to the idea that the rule was defective because the levels of administrative costs and actual federal reimbursements of those costs varied from State to State, and that this variation was not satisfactorily captured in the rulemaking. The result of this defect, appellants claim, is that the final rule "achieve[s] cost savings in excess of the 10% authorized by statute." Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment at 12.

In answer to this challenge, the Department defended its reliance upon two data sources: the ABT Associates statistical study of day care centers mandated by Congress, and reimbursement records from sponsoring organizations operating in the fourteen States where CCFP is administered by the Department.[13] The Department explained that the process employed to select the States and sponsors included in the statistical model "conformed to accepted statistical practices." 47 Fed.Reg. at 27,542. Therefore, the Department concluded that "while conditions for certain sponsors in certain States may not be identical to those observed in the study, the sample is valid for the Program as a whole." *Id.* Similarly, the Department defended the representativeness of the data base developed from information provided by sponsoring organizations in the fourteen-State sample:

> The total number of sponsors was 196, or a little less than one-third of all sponsors in the Program. These sponsors

operated over 15,000 homes, also about one-third of all homes nationwide. The size of the source, therefore, offers a high degree of likelihood that the results would be applicable throughout the Program. Moreover, there is no reason to believe that conditions in [these States' programs] differ substantially from those in State agency programs. *Id.* On the basis of this showing, we agree with the District Court's conclusion that while appellants have "demonstrate[d] *individual* examples in which" the new regulation would decrease reimbursements by more than 10%, they have "fail[ed] to provide evidence countering the Department's conclusions regarding the program" as a whole. Memorandum Opinion at 11 (emphasis added).

The Department also considered, discussed, and rejected various proposals set forth in the comments with respect to the mathematical formula used in computation of the new reimbursement rates. *Id.* at 27,542–43. This discussion seems eminently reasonable, evincing a particular concern for the impact of the new rule on smaller sponsoring organizations.

In the course of this discussion, the Department explained that the new rates "cannot be tailored to conditions in a particular State," given that the revised rates "must ensure that expenditures are reduced nationally in compliance with the law." *Id.* This point seems entirely well-taken. Appellants' contentions in this respect sound rather like an argument that reimbursement rates should not be reduced through any device or formula. While appellants' feelings in this respect are perfectly understandable, they are rendered quite beside the point by the express provisions of OBRA. In sum, the actions by the Secretary here do not remotely approach the level of arbitrariness and caprice. [14]

**\*1200  \*\*53  C**

Having determined that appellants' other APA-based claims are without merit, we turn to the question whether the Secretary erred in promulgating the interim rule. That question squarely presents the issue whether the notice-and-comment procedures mandated by the APA were properly bypassed under the circumstances presented here.

Section 553(b) of the APA provides that "[g]eneral notice of proposed rulemaking shall be published in the Federal Register ...." However, this requirement is not applicable

when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

5 U.S.C. § 553(b)(B).

The Department's January 26, 1982 adoption of the interim rule obviously failed to meet the notice-and-comment requirement of section 553(b). Mindful of this failure, the Secretary invoked the statutorily provided "good cause" exception, observing that "[s]ince the effective date of this [regulation] is January 1, 1982, it is impracticable for there to be prior notice and public comment thereon." 47 Fed.Reg. at 3540. The question before us is whether the Department's recourse to this statutory exception was permissible.

1

[6]  [7]    The requirements of section 553 have been elucidated by a growing body of case law. As an elementary principle, it is clear that exceptions to section 553 notice-and-comment procedures are to be "narrowly construed and only reluctantly countenanced." *American Fed'n of Gov't Employees v. Block,* 655 F.2d 1153, 1156 (D.C.Cir.1981) ("*AFGE*") (quoting *State of New Jersey Department of Environmental Protection v. EPA,* 626 F.2d 1038, 1045 (D.C.Cir.1980)). In *AFGE,* this court stated:

As the legislative history of the APA makes clear ... the exceptions at issue here are *not* "escape clauses" that may be arbitrarily utilized at the agency's whim. Rather, use of these exceptions by administrative agencies should be limited to emergency situations; furthermore, the grounds justifying the

238 U.S.App.D.C. 46

agency's use of the exception should be incorporated within the published rule.

655 F.2d at 1156 (emphasis in original) (citations omitted).

On reviewing the totality of the circumstances presented by this case, we conclude that the Department justifiably invoked the "good cause" exception of section 553(b)(B). For here the combination of several extraordinary factors validates the Department's adoption of the interim rule under the mantle of "good cause."

First, we return to the obvious and overriding factor that OBRA was itself a highly extraordinary piece of legislation, imposing taxing demands on much of the federal bureaucracy. As the Third Circuit has stated, "OBRA was the product of a major, highly publicized, and vigorously debated effort by Congress and the President to reverse the growth of federal spending by systematically reducing the level of expenditures in a wide range of federal programs." *Philadelphia Citizens in Action v. Schweiker,* 669 F.2d 877, 878 (3d Cir.1982). Further, both Congress and the President articulated a profound sense of "urgency" in the need for implementation of the legislation. *Id.* at 884.

OBRA imposed a complex web of administrative duties, establishing different effective dates for different provisions. But the Act as a whole clearly envisioned very speedy adoption of the mandated changes. To bring this broad point home to the facts before us, numerous OBRA-mandated modifications in programs administered by FNS presented that office with regulation-drafting **\*1201 \*\*54** responsibilities quite in addition to the fast track implementation of new reimbursement rules for CCFP. Some of these other modifications—including modifications in the Summer Food Service Program and other changes to the CCFP—had effective dates of October 1, 1981, rather than the January 1, 1982 effective date of the CCFP administrative reimbursement amendments. The regulations necessary to implement such statutory changes in corporating earlier effective dates therefore had, as a practical matter, to be given priority in FNS' workload over the CCFP reimbursement regulations if the Department was to comply with other congressionally imposed requirements.

In our view, the extremely limited time given by Congress to the Secretary for adoption of the reimbursement regulations is a crucial factor in establishing "good cause." Contrary to appellants' sweeping assertion that "[t]he record in this case ... is replete with unexplained delays," Appellants' Brief at 20, appellees have persuasively demonstrated that Departmental personnel worked diligently in researching, drafting, and processing the challenged rule. During the period from OBRA's passage to September 17, 1981, when the first draft of the regulation was completed, FNS had to process information contained in two data bases detailing reimbursement statistics for CCFP on a program-wide basis: data from fourteen States where FNS directly administers CCFP, and data from a nationwide sample of States and sponsors conducted by ABT Associates. In particular, it was necessary for FNS "to double check projections and calculations, which increased the time required to obtain the necessary information to formulate a reimbursement schedule." Braley Declaration ¶ 9. Also during this period, FNS staff conducted several meetings "with representatives of sponsoring organizations to discuss ideas about changes in CCFP administrative reimbursement regulations ...." *Id.* at ¶ 7.

By the time the first draft regulation entered the Department's review process in October 1981, less than 90 days remained before the January 1, 1982 implementation deadline. At the time the Department was considering the possibility of redrafting the regulation as an interim rule, only 75 days remained to complete the process. The Department concluded that under this truncated timeframe it would be "impracticable," 47 Fed.Reg. at 3540, to complete the standard notice-and-comment process in time to meet the January 1 deadline. The decision was thus born, as we have seen, to issue an interim rule.

This decision was entirely reasonable, given the requisite time to conduct a notice-and-comment proceeding. The APA, to be sure, does not specify a minimum time for submission of comments in an informal rulemaking. The Administrative Conference of the United States has opined, for the guidance of administrative agencies, that the shortest period in which parties can meaningfully review a proposed rule and file informed responses is thirty days. [15] However, there is scarcely anything talismanic about that particular length of time. Indeed, a thirty-day period is, in the Administrative Conference's view, "an inadequate time to allow people to respond to proposals that are complex or based on scientific or technical data." [16] The Administrative Conference itself

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

thus suggests a sixty-day period as "a more reasonable *minimum* time for coment." [17] And that is precisely the period subsequently provided by the Secretary for comments on the interim rule. [18]

**\*1202 \*\*55** Thus, in early October 1981, the Department could look forward, if it did not abandon traditional rulemaking proceedings, at a minimum to (1) a barebones period of thirty days for comments to be filed, (2) additional time thereafter as required to consider these comments, and (3) then, if necessary, still more time to redraft the rule in final form. The Department also faced the possibility of further delay as a result of OMB's review of the rule.

Finally, the Department would confront the section 553(d) requirement of thirty-days notice before a final rule becomes effective. Even assuming that the Department could have (1) cut the comment period to the bone, (2) expedited its consideration of the comments filed, and (3) invoked the "good cause" exception to section 553(d), we are quite unable to conclude that the Secretary's decision in early October that insufficient time was left to complete standard form rulemaking was unreasonable, or that he failed to support invocation of the "good cause" exception of section 553(b)(B). [19]

Indeed, the Department's early October pessimism about its chances of completing a standard rulemaking proceeding in a timely fashion appears fully borne out by delays the Department encountered in its efforts to promulgate the interim rule. As described in part I, *supra,* the discovery of an error in the draft interim rule delayed completion of work on the draft until December 8, 1981. If the Department, instead of producing an interim rule on this date, had completed work on a draft proposed rule, it is clear beyond peradventure that insufficient time would have existed between December 8, 1981 and the January 1, 1982 implementation deadline—even allowing for a late January final adoption of the rule—for a truncated 30-day comment period and reasoned agency consideration of and reaction to the comments. [20]

Further, the hypothetical proposed rule would, as of December 8, 1981, still have been subject to Departmental and OMB clearance—a process which consumed six weeks in the promulgation of the interim rule. While it may be true that the Department would have been under greater pressure to complete its work had it decided to continue work on a proposed rule, it is highly doubtful in light of what in fact happened that the Department would have been able to complete a proposed rule in sufficient time for a standard rulemaking to be completed.

A secondary mitigating factor here is the paucity of personnel in FNS in relation to the amount of work manifestly required to produce the regulations within this abbreviated time frame. Uncontroverted record evidence establishes that during most of this period FNS had only three full-time staff members assigned to work on *all* OBRA-mandated changes in CCFP and Summer Food Service Program regulations; of these employees, one worked full-time on the CCFP reimbursement regulation. Braley Declaration ¶ 4. While agency understaffing in a rulemaking process would not, without more, normally constitute grounds for the "good cause" exception, the OBRA-mandated regulatory changes here were sufficiently extensive and burdensome to warrant the District Court's consideration of agency personnel shortages in this case.

### 2

Our decision with respect to the good cause exception is entirely in keeping with the Third Circuit's recent decision in *Philadelphia* **\*1203 \*\*56** *Citizens, supra,* which likewise involved a fast-track OBRA provision. At issue there was a challenge to interim regulations published by the Department of Health & Human Services, pursuant to OBRA, with respect to the Aid to Families with Dependent Children ("AFDC") program. The new AFDC regulations were required by OBRA to be in place by October 1, 1981. This schedule justified, in the Third Circuit's view, invocation of the section 553(b)(B) "good cause" exception. To be sure, an additional three months was available here to FNS to complete its OBRA-mandated rulemaking. Nevertheless, the additional time available in this instance for changing the CCFP reimbursement regulations does not, in view of other exigent demands upon FNS and the time needed to complete a notice-and-comment rulemaking, lead us to an outcome contrary to that reached in *Philadelphia Citizens.*

In so concluding, we are mindful that strict congressionally imposed deadlines, without more, by no means warrant invocation of the good cause exception. Indeed, this court in *State of New Jersey, supra,* rejected agency arguments that a "tight statutory schedule" constitutes "good cause." But it is clear beyond cavil that we are duty bound to analyze the entire set of circumstances before us, just as

the court did in *State of New Jersey.* There, unlike here, it was readily available to the agency to publish information (States' proposed classifications of air-quality-control regions as "attainment," "nonattainment," or "unclassifiable" when measured against the Clean Air Act's air quality standards) as a proposed rule and then to receive comments. 626 F.2d at 1042–43.[21] Here, as we have already seen, the Secretary was required, in order to comply with the OBRA mandate, to develop a complex reimbursement formula. That formula was developed only in connection with the review and evaluation of voluminous data and complex analyses, and after consultation with sponsoring organizations. The complexity of the enterprise is eloquently suggested by the discovery in November 1981 of an error which had infected the draft formula.

Under the entire circumstances before us, we therefore conclude, as did the District Court, that the statutorily provided exception was satisfied in this case.

### 3

Even were we to conclude that the Secretary did not have good cause to issue the interim rule without notice and comment, we would face hopelessly intractable problems in framing an appropriate remedy. This unhappy situation is strongly suggested by the very curious posture of appellants' good cause arguments, once their other APA arguments, discussed above, are rejected as without merit. Appellants' across-the-board attack on the final rule constituted the only articulated theory of their case. Once the final rule is affirmed, any relief for the Department's invocation of the good cause exception as to the interim rule would become quite difficult, if not impossible, to frame.

First, the Department's treatment of post-promulgation comments offered in this proceeding "suggests that the agency has been open-minded," with the result that "real 'public reconsideration of the issued rule' has taken place." *Levesque v. Block,* 723 F.2d 175, 188 (1st Cir.1983). Thus, any presumption against a "late" comment period following adoption of an interim rule has been overcome in this case, with the result that remand to the agency for further proceedings would not in any event be necessary. *Id.* at 187–89.

*1204 **57 Second, OBRA's clear mandate that reductions in administrative reimbursements commence on January 1, 1982, presents a formidable barrier to any remedy which would reinstate the pre-OBRA regulation for the period covered by the interim rule or which would otherwise increase the funding available to sponsoring organizations above the level established by OBRA. The facts of this case differ significantly from *Levesque v. Block, supra,* in which the First Circuit ordered retroactive payments of Food Stamp Program benefits improperly reduced by an interim rule. In *Levesque,* the relevant section of OBRA did not establish any deadlines for implementation, leaving that determination to the discretion of the Secretary of Agriculture. Further, the First Circuit determined that a relevant section of "OBRA II," the Omnibus Budget Reconciliation Act of 1982,[22] was not self-executing. In contrast, the two OBRA I sections relevant to the case at hand, when read together, fit squarely within the category of statutes made self-executing by inclusion of an effective date. *Levesque, supra,* 723 F.2d at 186–87.[23] Therefore, Congress' clearly expressed intention that reimbursement reductions were to commence as of January 1, 1982, must be given effect.[24]

Appellants seemed to concede this point below, stating that they

> do not disagree with [appellees'] contention [that] Congress did not intend the payment of federal grant monies contrary to [the] federal statute. What [appellants] are challenging is the [appellees'] use of data that is inaccurate and inadequate to calculate reductions ... thereby resulting in *savings in excess of the amount authorized by statute.*[25]

The District Court concluded from this statement that appellants "only ask that funds be reallocated and ... do not seek expenditures in excess of the statutory maximum." Memorandum Opinion at 4. Appellants have not, however, suggested either below or in this court either a legal rationale to justify or a practical formula to effect such a "reallocation." Indeed, any such reallocation would have to be undertaken

238 U.S.App.D.C. 46

pursuant to yet another reimbursement formula, different from the one now in place, but which would also generate the specific cost reductions mandated by OBRA. [26]

**\*1205  \*\*58** Such an exercise would be quite difficult. It would as well, to put it mildly, be disruptive to the orderly administration of CCFP. Braley Declaration ¶¶ 28–31. More fundamentally, it would be futile: in light of our conclusion that the final rule, as adopted, is neither arbitrary nor capricious, the interim rule, which was *identical* to the final rule, was *a fortiori* similarly invulnerable to a frontal attack against its substantive provisions. Moreover, we cannot ignore the telling fact that the regulation has indeed been effective in securing the expenditure reductions ordered by Congress. *See* note 14, *supra.*

Thus, even were we to hold, as appellants invite us to do, that the Secretary improperly invoked the good cause exception, we would find ourselves quite unable to fashion a remedy for enforcement of this rule during the now long-gone interim period. Affirmance of the District Court on this independent ground would be entirely in keeping with the Supreme Court's admonition that a federal court exercising its equitable powers in reviewing agency action "must act within the bounds of the statute and without intruding upon the administrative province, [and] may adjust its relief to the exigencies of the case ...." *Ford Motor Co. v. NLRB,* 305 U.S. 364, 373, 59 S.Ct. 301, 307, 83 L.Ed. 221 (1939). *Accord, Indiana & Michigan Elec. Co. v. FPC,* 502 F.2d 336, 346 (D.C.Cir.1974), *cert. denied,* 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975).

### III

The judgment of the District Court is therefore

*Affirmed.*

## All Citations

737 F.2d 1193, 238 U.S.App.D.C. 46

---

## Footnotes

1   7 C.F.R. § 226.12(a)(3) (1984). The rulemaking at issue in this case also amended 7 C.F.R. § 226.16(d)(4)(ii); this regulation, however, is not challenged by appellants.

2   Pub.L. 97–35, 95 Stat. 357 (Aug. 13, 1981).

3   Both the pre- and post-OBRA versions of 7 C.F.R. § 226.12(a)(3) are explained in note 9, *infra.* Appellants' theory at the time of their motion for a preliminary injunction was that OBRA required only that the rates themselves be reduced by an average of ten percent. *Petry v. Block,* 697 F.2d 1169, 1170 (D.C.Cir.1983). The post-OBRA version of this regulation, however, reduced the maximum rates anywhere from twenty to thirty-seven percent, *id.* at 1171, in order to effect a ten-percent reduction in "administrative reimbursements actually provided." *Id.* at 1170.

4   5 U.S.C. § 551 *et seq.* (1982).

5   42 U.S.C. § 1766 (Supp. V 1981). Appellants comprise members of all three groups which benefit from CCFP: minor children (represented by their parents), participating child care centers and day care homes, and sponsoring organizations. Appellants' Brief at 8.

6   The amendment reducing reimbursements is set out in section 810(d)(3)(B) of OBRA (codified at 42 U.S.C. § 1766(f)(3)(B) (Supp. V 1981)). This section directed the Department to include in the new rule an "increase in the economy of scale factors used to distinguish institutions that sponsor a greater number of family or group day care homes from those that sponsor a lesser number of such homes."

7   Reprinted as a note 42 U.S.C. § 1753 (Supp. V 1981).

8   While the District Court did not make express factual findings in all these respects, appellants did not controvert below in any fashion the facts as set forth here. Indeed, the District Court docket sheet indicates

that plaintiffs-appellants never filed a Statement of Genuine Issues, pursuant to Local Rule 1–9(i), in order to contest the defendants-appellees' Statement of Material Facts as to Which There Is No Genuine Issue.

9    The new rule was designed to reduce Department payments to sponsoring organizations by approximately $1.8 million. 47 Fed.Reg. at 3539. To effect this reduction, the new rule changed the classification system used to group sponsoring organizations by size for reimbursement purposes. The then-existing three-tier system provided the following maximum allowable reimbursement levels:

| Number of homes sponsored | Reimbursement per home per year |
| --- | --- |
| First 25 homes | $53 |
| 26-75 homes | 41 |
| Each home over 75 | 35 |

The new rule provided for a four-tier system, designed to reflect previously unaccounted for economics of scale realized by large sponsoring organizations. *Id.* 7 C.F.R. § 226.12(a)(3) now allows reimbursement at the following levels:

| Number of homes sponsored | Reimbursement per home per year |
| --- | --- |
| First 50 homes | $42 |
| 51-200 homes | 32 |
| 201-1000 homes | 25 |
| Each home over 1000 | 22 |

10    Monthly claims for reimbursement must be submitted not later than ten days after the end of the month. 7 C.F.R. § 226.10(c). By getting the interim rule on the books before the end of January 1982, the Secretary insured that the reimbursements made for that month would be subject to the OBRA-mandated ten percent cutback, thus complying with the January 1, 1982 effective date of the controlling provision of OBRA.

11    Another "good cause" exception, contained in section 553(d)(3), may be applicable in certain cases where the requirements of section 553(d) are not met. *American Fed'n of Gov't Employees v. Block,* 655 F.2d 1153, 1155–56 (D.C.Cir.1981). This exception was not invoked by the Department in this case, and we therefore do not discuss it.

12    We observe at the outset that the District Court fell into error in its analysis of this issue and the good cause issue by considering the fact that in 1971 the Department voluntarily placed under APA coverage its rulemaking proceedings concerning "public property, loans, grants, benefits, or contracts," which would otherwise be exempt from APA requirements pursuant to 5 U.S.C. § 553(a)(2). *See* 36 Fed.Reg. 13,804 (1971). Under *Rodway v. Department of Agriculture,* 514 F.2d 809, 814 (D.C.Cir.1975), the fact that an agency chose to operate under the APA is irrelevant to an analysis of that agency's compliance with its provisions.

13    In the remaining States, CCFP is administered by state agencies which receive federal aid from the Department.

14    Indeed, the reasonableness of the new reimbursement regime is strongly supported by undisputed record evidence as to the impact of the new regulation. In twelve States where the Department directly administers CCFP, administrative reimbursements "made in the first quarter of 1982 and in the first three quarters of 1982 were reduced 10.1% and 8.72% respectively from the last quarter of 1981." Braley Declaration ¶ 15. An FNS canvass of a number of State-administered programs revealed that reimbursements for the first quarter of 1982 were 5% lower than for the fourth quarter of 1981. *Id.* at ¶ 16. Such reductions represent substantial progress toward the reductions mandated by OBRA.

15    Administrative Conference of the United States, A GUIDE TO FEDERAL AGENCY RULEMAKING 124 (1983).

16    *Id.*

17    *Id.* (emphasis in original).

18    We obviously are not presented with, and thus express no view whatever on, the question as to what period of time may be appropriate for a comment period under the APA. We simply note the considered views and recommendations of the Administrative Conference of the United States to suggest that precious little time for a comment period was available under the circumstances here.

19    We further note that the primacy of the January 1, 1982 implementation deadline compels us to reject appellants' argument that the regulations should be set aside because the Department failed to meet the October 13, 1981 deadline for promulgating the regulations. This view of the matter, if accepted, would utterly frustrate Congress' intent (satisfied by the regulation now in place) to overhaul the system as of January 1, 1982, and would, in effect, create a penalty, which is at complete odds with Congress' mandate, for the Department's failure to promulgate the rules in a timely fashion.

20    The Department's review of the 125 comments submitted after the interim rule was announced appears to have taken approximately 3 months.

21    The other decision of this court holding that an agency failed to meet the good cause exception is National Association of Farmworkers Organizations v. Marshall, 628 F.2d 604 (D.C.Cir.1980). In that case, the Secretary of Labor had promulgated immediately effective final rules, without public notice and comment, approving pesticides for use in areas where ten and eleven-year old children were employed as agricultural workers.

In marked contrast to the factual setting of the instant case, no statutory deadlines were at work in Marshall. Instead, the Secretary improperly invoked the exigent circumstances of an impending harvest season to justify his precipitous actions. Id. at 621.

22    Pub.L. No. 97–253, § 192(a), 96 Stat. 763, 788 (1982).

23    Although it could be argued that OBRA's effective date as to the CCFP amendments was "made subject to implementing regulations," Levesque, 723 F.2d at 186, the fact that OBRA also provided for adoption of those regulations prior to its effective date, see OBRA § 820(c), compels the conclusion that OBRA's CCFP amendments were "self-executing" within the meaning of Levesque.

24    The facts of Buschmann v. Schweiker, 676 F.2d 352 (9th Cir.1982), another decision invalidating an interim rule and ordering payment of federal benefits improperly withheld, also differ substantially from the instant case. Most importantly, the underlying statute there did not, as here, establish an implementation deadline. We further note that the Buschmann court failed to explain whether the underlying statute directed the adoption of a benefit formula different from the old formula reinstated by the court for the interim period. To the extent that the Ninth Circuit's opinion may be interpreted as ordering a payment of benefits contrary to the provisions of the underlying statute, we would respectfully be strongly disinclined to follow that rather provocative path.

25    Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment at 11 (emphasis added).

26    Moreover, if we assume, as seems likely, that all Fiscal Year 1982 funds allocated for CCFP administrative reimbursements have been distributed to the States and sponsoring organizations, and have been spent, any reallocation of those funds would be, to say the least, highly problematic. See Ambach v. Bell, 686 F.2d 974, 986 (D.C.Cir.1982) (holding in the context of a motion for preliminary injunction that once federal funds are "distributed to the States and obligated, they cannot be recouped," and that "it [would] be impossible ... to award the plaintiffs the relief they request if they should eventually prevail on the merits"); West Virginia Association of Community Health Centers, Inc. v. Heckler, 734 F.2d 1570, 1576–1577 (D.C.Cir.1984) (discussing cases in which recoupment is possible).

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Pickering v. Gonzales, 465 F.3d 263 (2006)

2006 Fed.App. 0369A

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Ward v. Holder, 6th Cir., August 15, 2013

465 F.3d 263
United States Court of Appeals,
Sixth Circuit.

Christopher PICKERING, Petitioner,

v.

Alberto GONZALES, Attorney General, Respondent.

No. 03–3928.
|
Argued: Dec. 1, 2004.
|
Decided and Filed: Oct. 4, 2006.

**Synopsis**

**Background:** Resident alien, a native of Canada, petitioned for review of a decision by the Board of Immigration Appeals (BIA), 2003 WL 21358480, permanently barring him from the United States.

**[Holding:]** The Court of Appeals, Walter Herbert Rice, Senior District Judge, held that evidence did not support BIA's determination that alien's Canadian drug possession conviction was quashed by the Canadian court solely for the purpose of avoiding deportation.

Petition granted; reversed.

Superseding 454 F.3d 525.

West Headnotes (13)

**[1]**    **Aliens, Immigration, and Citizenship**    Law questions

The Court of Appeals reviews questions of law raised in removal proceedings de novo.

**[2]**    **Aliens, Immigration, and Citizenship**    Fact Questions

In order to reverse a Board of Immigration Appeals (BIA) factual determination in a removal hearing, the evidence must compel a contrary conclusion.

**[3]**    **Aliens, Immigration, and Citizenship**    Effect of expungement or vacation

When a court vacates an alien's conviction for reasons solely related to rehabilitation or to avoid adverse immigration hardships, rather than on the basis of a procedural or substantive defect in the underlying criminal proceedings, the conviction is not eliminated for immigration purposes.

21 Cases that cite this headnote

**[4]**    **Aliens, Immigration, and Citizenship**    Effect of expungement or vacation

An alien's conviction vacated for rehabilitative or immigration reasons remains valid for immigration purposes, while one vacated because of procedural or substantive infirmities does not.

22 Cases that cite this headnote

**[5]**    **Aliens, Immigration, and Citizenship**    Effect of expungement or vacation

An alien's conviction is vacated for rehabilitative purposes, so that the conviction may not be eliminated for immigration purposes, where state law provides a means for the trial court to enable alien to avoid certain continuing effects under state law from that conviction.

8 Cases that cite this headnote

**[6]**    **Aliens, Immigration, and Citizenship**    Effect of expungement or vacation

An alien's motive in seeking to quash his conviction is relevant, in determining whether the conviction was quashed solely

for rehabilitative purposes or to avoid adverse immigration hardships, so that the conviction remains valid for immigration purposes, only to the extent that the court relied upon alien's motive in quashing the conviction.

15 Cases that cite this headnote

[7] **Aliens, Immigration, and Citizenship** 🔑 Crimes and immorality

Substantial evidence did not support determination by the Board of Immigration Appeals (BIA) that resident alien's Canadian drug possession conviction was quashed by the Canadian court solely for the purpose of avoiding deportation from the United States, and thus, alien's removal was not justified on the basis of that conviction; the order of the Canadian court was silent on the question of its motivation, the BIA did not consider the hearing on the motion to quash, and alien's petition to the Canadian court cited legal authority for quashing the conviction that was unrelated to any immigration motive.

3 Cases that cite this headnote

[8] **Aliens, Immigration, and Citizenship** 🔑 Presumptions and burden of proof

When the government seeks to deport a resident alien, it carries a heavy burden.

[9] **Aliens, Immigration, and Citizenship** 🔑 Weight and Sufficiency

To support a determination that a resident alien is deportable, the government must establish its allegations by clear, unequivocal, and convincing evidence.

3 Cases that cite this headnote

[10] **Aliens, Immigration, and Citizenship** 🔑 Presumptions and burden of proof

Once the government has established its prima facie case for deportability of a resident alien, the burden of going forward to produce evidence of non-deportability then shifts to the alien.

1 Cases that cite this headnote

[11] **Aliens, Immigration, and Citizenship** 🔑 Presumptions and burden of proof

The government bears the burden of proving that a vacated conviction remains valid for immigration purposes.

15 Cases that cite this headnote

[12] **Aliens, Immigration, and Citizenship** 🔑 Remand

Generally, where the reviewing court cannot sustain the decision of the Board of Immigration Appeals (BIA), because the BIA has failed to offer a legally sufficient basis for its decision, the appropriate remedy is to remand to the BIA for further consideration.

1 Cases that cite this headnote

[13] **Aliens, Immigration, and Citizenship** 🔑 Remand

The Court of Appeals does not have the authority to remand to the Board of Immigration Appeals (BIA) for consideration of additional evidence in a removal proceeding where one of the parties seeks to introduce such. Immigration and Nationality Act, § 242(a)(1), 🚩 8 U.S.C.A. § 1252(a)(1).

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*265 ARGUED:** Russell R. Abrutyn, Marshal E. Hyman & Associates, Troy, Michigan, for Petitioner. Greg D. Mack, United States Department of Justice, Washington, D.C., for Respondent. **ON BRIEF:** Marshal E. Hyman, Marshal E. Hyman & Associates, Troy, Michigan, for Petitioner. Greg D. Mack, Donald Keener, United States Department of Justice, Washington, D.C., for Respondent.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2006 Fed.App. 0369A

Before DAUGHTREY and GILMAN, Circuit Judges, and RICE, Senior District Judge. *

**AMENDED OPINION**

WALTER HERBERT RICE, Senior District Judge.

Petitioner Christopher Pickering seeks review of a Board of Immigration Appeals ("BIA") order permanently barring him from the United States, based on a Canadian conviction for a drug offense, for which he was later pardoned pursuant to Canadian law, and which was later quashed by a Canadian appellate court.

Finding prejudicial error, we grant the Petition for Review.

Petitioner is a native and citizen of Canada. On November 6, 1980, he was indicted in Ontario, Canada, for the unlawful possession of Lysergic Acid Diethylamide ("LSD"). He pled guilty. His sentence required him to pay a fine of $300.00 (Canadian) or, in default of payment, to serve 30 days in custody.

In 1991, Petitioner entered the United States as a non-immigrant, intra-company transferee. His wife and their two children followed him as derivative non-immigrants. In 1992, the Immigration and Naturalization Service ("INS")[1] approved a Petition for Alien Worker (Form I–140) filed on behalf of Petitioner's wife by her employer. Mrs. Pickering later applied for adjustment of status based on the approved I–140, and Petitioner and their children filed derivative adjustment of status applications based on their relationship to Mrs. Pickering. On June 17, 1993, the INS approved Mrs. Pickering and the children's adjustment of status applications, making them lawful permanent residents.

On February 28, 1996, Petitioner received a pardon of his LSD conviction. Notwithstanding the pardon, his attempt to adjust his status was denied. On May 7, 1997, Petitioner filed a notice of appeal, **\*266** with the Canadian court, seeking to have that conviction quashed. In a judgment dated June 20, 1997, the Canadian court quashed the Petitioner's 1980 conviction for unlawful possession of LSD. On August 21, 1998, the Petitioner's application for adjustment of status was again denied and removal proceedings were initiated, with the Immigration Judge finding the Petitioner to be removable on the basis of his LSD conviction. In his decision, the Immigration Judge declined to give effect to the Canadian court's order quashing the conviction, concluding that the court's action was solely for rehabilitative purposes, entered in order to avoid adverse immigration consequences and to allow the Petitioner to live permanently in the United States. The Petitioner appealed the Immigration Judge's decision to the BIA, and the BIA issued a published opinion denying Petitioner's appeal. *Matter of Pickering,* 23 I & N Dec. 621 (BIA 2003).

The BIA had jurisdiction, pursuant to 8 C.F.R. § 1003.1(b), to review the decision of the Immigration Judge who ordered Petitioner's removal. The BIA decision is a final agency decision. 8 C.F.R. § 1241.1. The Petitioner's Petition for Review was filed in a timely manner pursuant to 8 U.S.C. § 1252(b)(1). This Court has jurisdiction to review the BIA decision pursuant to 8 U.S.C. § 1252(a).

**[1]  [2]**   We review questions of law raised in removal proceedings *de novo. Huicochea–Gomez v. INS,* 237 F.3d 696, 699 (6th Cir.2001). However, in order to reverse a BIA factual determination, the evidence must compel a contrary conclusion. *Koliada v. INS,* 259 F.3d 482, 486 (6th Cir.2001).

**[3]  [4]  [5]**   Pickering first argues that the BIA's decision fails as a matter of law. However, a review of that decision and the applicable case law reveals that the BIA correctly interpreted the law by holding that, when a court vacates an alien's conviction for reasons solely related to rehabilitation or to avoid adverse immigration hardships, rather than on the basis of a procedural or substantive defect in the underlying criminal proceedings, the conviction is not eliminated for immigration purposes. *Matter of Pickering,* 23 I & N Dec. 621, 624 (BIA 2003). This interpretation of the law is consistent with that of other circuits and with our own interpretation. A conviction vacated for rehabilitative or immigration reasons remains valid for immigration purposes, while one vacated because of procedural or substantive infirmities does not.[2] *See Zaitona v. INS,* 9 F.3d 432 (6th Cir.1993); *see also Murillo–Espinoza v. INS,* 261 F.3d 771 (9th Cir.2001); *Herrera–Inirio v. INS,* 208 F.3d 299 (1st Cir.2000); *Sandoval v. INS,* 240 F.3d 577 (7th Cir.2001); *but compare Renteria–Gonzalez v. INS,* 322 F.3d 804

(5th Cir.2002) (holding that all convictions remain valid for immigration purposes) *with* Discipio v. Ashcroft, 369 F.3d 472 (5th Cir.2004) (following precedent in Renteria–Gonzalez, while criticizing it as overbroad).

The BIA upheld the Immigration Judge's order that Petitioner was removable based on the quashed drug conviction, ruling that the Canadian court had quashed the Petitioner's drug conviction solely for immigration purposes, in other words, to avoid adverse immigration consequences. Matter of Pickering, 23 I & N Dec. at 625, J.A. at 38. In determining that the Petitioner's conviction remained valid for immigration purposes, despite the **267** order of the Canadian court quashing the conviction, the BIA relied on "the law under which the Canadian court issued its order and the terms of the order itself, as well as the reasons presented by the respondent in requesting that the court vacate the conviction." *Id.*

However, the record used by the BIA to determine that the Canadian court acted solely for immigration purposes appears to be incomplete. The BIA based its ruling on the fact that the "judgment only refers, as the grounds for ordering the conviction quashed, to the respondent's request and his supporting affidavit." *Id.* In fact, the Canadian court, in quashing the Petitioner's conviction, relied on "the notice of appeal filed herein and the affidavit of the [Petitioner] and [the] hearing ..." J.A. at 62. There is nothing in the record before us regarding the hearing that the Canadian court relied upon, in part, to quash the conviction.

 [6]   The Petitioner, in his notice of appeal and affidavit, stated that he was appealing his conviction because of the bar it placed on his permanent immigration to the United States. J.A. at 58, ¶ 5; 61, ¶ 18. The BIA imparted the Petitioner's motivation for seeking to have the conviction quashed onto the Canadian court as its rationale for quashing the conviction. Matter of Pickering, 23 I & N Dec. at 625, J.A. at 38. However, the motive of the Petitioner in seeking to have his conviction quashed is of limited relevance to our inquiry. *See* Sandoval v. INS, 240 F.3d 577, 583 (7th Cir.2001). Such motive is relevant only to the extent that the Canadian court relied upon it in quashing the conviction. As the record before us does not include a record of the hearing and is, therefore, incomplete, it is impossible to tell the extent to which the Canadian court relied upon Petitioner's motive, or even why the Canadian court acted in the manner it did.

The government relies on this Court's ruling in Zaitona, 9 F.3d at 437, to support the proposition that "where the record, as here, provides a reasonable basis to conclude that a motion to quash or vacate a conviction is driven by immigration hardships and not [by] remedying statutory or constitutional violations, ... a conviction remains a conviction for immigration purposes." Final Brief of Respondent at 35. Zaitona, however, is easily distinguishable on the facts.

 [7]   In Zaitona, the only explanation offered by the state court for vacating the conviction was so that it might consider a Judicial Recommendation Against Deportation ("JRAD"). Zaitona, 9 F.3d at 437. Immediately following the vacation of his conviction, Zaitona pleaded guilty to the identical crime. The only difference between the first and second sentence was the JRAD. Id. In Zaitona, "[i]t was unimportant to [the Court's] determination that Zaitona's attorney may have originally surrounded his request for the JRAD with language of ineffective assistance of counsel ...," because it was apparent from the order of the court and the record that the conviction was vacated solely for immigration reasons. Id. Unlike Zaitona, in the instant case, the order of the Canadian court is silent on the question of its motivation, referring instead to the Petitioner's request, supporting affidavit and "hearing." Matter of Pickering, 23 I & N Dec. at 625, J.A. at 38. In Zaitona, the record provided more than a "reasonable basis" for concluding that the judgment was vacated for immigration reasons. Indeed, the record clearly revealed "substantial evidence that the [ ] court's action was taken for the sole purpose of relieving Zaitona from deportation." Zaitona, 9 F.3d at 437. Here, the record before us lacks the record **268** of the hearing upon which the Canadian judge relied, at least in part, in quashing the conviction.

As the order of the Canadian court is silent on the question of *its* motivation or rationale, the BIA looked to the notice of appeal and affidavit filed by the Petitioner, ruling that neither identified a basis to question the integrity of the underlying criminal proceeding or conviction. There is no reference to the hearing before the Canadian court, no indication that the BIA had that record in its possession and no indication that it reviewed it in any fashion to determine the rationale behind the decision of that court. Id. In its decision, the BIA distinguished the Petitioner's case from its ruling in

2006 Fed.App. 0369A

*Matter of Rodriguez–Ruiz,* 22 I & N Dec. 1378. J.A. at 36, 23 I & N Dec. at 623. In *Rodriguez–Ruiz,* a state court vacated a conviction pursuant to a state law that authorized vacation based on the legal merits of the underlying provision.

22 I & N Dec. at 1379. In the instant case, because the Canadian court made no reference to any legal authority, the BIA presumed that its decision was made solely for immigration purposes. J.A. at 38, 23 I & N Dec. at 625. While assuming that the Canadian court adopted the Petitioner's motive, the BIA has also assumed that it ignored the legal basis the Petitioner articulated for seeking to have his conviction quashed.

In his notice of appeal to the Canadian court (J.A. at 58, ¶ 6), and in the affidavit in support of said appeal (J.A. at 61, ¶ 21), the Petitioner indicates that he is appealing his conviction pursuant to § 24(1) of the Canadian Charter of Rights and Freedoms. Section 24(1) provides that: "[a]nyone whose rights or freedoms, as guaranteed by this Charter, have been infringed or denied, may appeal to a court of competent jurisdiction to obtain such remedy as the court considers appropriate and just." Affidavit of Kent Roach, J.A. at 40, ¶ 7. The Petitioner presented expert testimony, via affidavit, which concluded that, in order to quash the Petitioner's conviction, the Canadian court "must have concluded that [his] rights under the Canadian Charter of Rights and Freedoms [had] been violated." *Id.* at 41, ¶ 8.

According to the expert testimony provided by the Petitioner, which was undisputed by the government, a Canadian court can quash a conviction under § 24(1) of the Charter only for reasons related to a violation of rights granted Canadian citizens in the Canadian Charter of Rights and Freedoms. *Id.* at 41, ¶ 10. If the Canadian court acted pursuant to the legal authority cited and relied upon by the Petitioner, it could not have acted solely for immigration reasons. In presuming that the Canadian court quashed the conviction for immigration reasons, the BIA concluded that the Canadian court assumed the Petitioner's motives as stated in his affidavit and notice of appeal, but did not consider the legal authority he cited.

 **[8]**    **[9]**    **[10]**    **[11]**    When the government seeks to deport a resident alien, it carries a heavy burden. *Berenyi v. District Director, Immigration and Naturalization Service,* 385 U.S. 630, 636, 87 S.Ct. 666, 17 L.Ed.2d 656 (1967). To support a determination that an immigrant is deportable, the government must establish its allegations by "clear,

unequivocal, and convincing evidence." *Zaitona,* 9 F.3d at 434 (quoting *Woodby v. INS,* 385 U.S. 276, 285, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966)). [3] Once the **\*269** INS has established its *prima facie* case, the burden of going forward to produce evidence of non-deportability then shifts to the petitioner. *Id.* (internal citations and quotation marks omitted). As an initial matter, the government has satisfied its *prima facie* case by pointing to evidence that the Petitioner was convicted of a drug crime. The Petitioner, for his part, has produced evidence that the conviction for which the government wishes to deport him has been vacated by a court of competent jurisdiction. This is sufficient to meet his burden under *Zaitona* of showing non-deportability. Accordingly, the Petitioner is deportable only if the government can show, with clear and convincing evidence, that the conviction was vacated solely for immigration reasons. *See id.; see also* *Cruz–Garza v. Ashcroft,* 396 F.3d 1125, 1130 (10th Cir.2005). To prove deportability in this case, the government must produce evidence of a conviction that remains valid for immigration purposes. In order to meet its burden, the government must prove, with clear and convincing evidence, that the Petitioner's conviction was quashed solely for rehabilitative reasons or reasons related to his immigration status, i.e., to avoid adverse immigration consequences. The government has failed to meet its burden. [4]

The BIA relied on the Petitioner's notice of appeal and affidavit in determining that the Canadian court acted on the basis of the Petitioner's immigration status. In doing so, it overlooked the fact that the record was incomplete without a record of the hearing held by the Canadian court, and minimized or even ignored the fact that the Petitioner appealed his conviction pursuant to a law that allows a remedy only for procedural or substantive defects in the underlying conviction. The conclusion that the Canadian court acted solely for immigration reasons can only be reached by inference, based on the Petitioner's notice of appeal and affidavit. As the record from the Canadian court appears to be incomplete, and the BIA relied on certain parts of the Petitioner's affidavit and notice of appeal, while minimizing or ignoring other parts, the evidence supporting **\*270** deportation can hardly be described as "clear and convincing."

The BIA, in the instant case, upheld the Immigration Judge's finding that the government had met its burden of proving

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

that the Petitioner was deportable with clear and convincing evidence. That determination "must be upheld if 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.' " *INS v. Elias–Zacarias, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)* (quoting 8 U.S.C. § 1105a(a)(4)). Under this deferential standard, we may not reverse the BIA determination simply because we would have decided the matter differently. *Mikhailevitch v. INS, 146 F.3d 384, 388 (6th Cir.1998); Klawitter v. INS, 970 F.2d 149, 151–52 (6th Cir.1992).* In order to reverse a BIA factual determination, the evidence must compel a contrary conclusion. *Koliada v. INS, 259 F.3d 482, 486 (6th Cir.2001).* In order to meet its burden in this case, the government either would have had to present direct evidence that demonstrates that the Canadian court quashed the conviction for immigration reasons, or present evidence from which one could infer and conclude that the Canadian court acted solely to affect Pickering's immigration status. This, the government failed to do.

The Petitioner was found by the IJ, and later the BIA, to be deportable based upon a Canadian drug conviction. The conviction, however, had been quashed. A vacated conviction remains valid for immigration purposes only if it was vacated *solely* for rehabilitative reasons. The IJ, and later the BIA, found that the Petitioner's quashed conviction was still valid for immigration purposes, apparently concluding that it had been vacated solely for rehabilitation reasons, to wit: to allow the petitioner to remain in this country. It is the opinion of this Court that the evidence on the record does not support such a finding. Specifically, we conclude that the government has failed to satisfy its burden of proving deportability with clear and convincing evidence.

**[12]** Generally, where a reviewing court cannot sustain an agency decision, because the agency has failed to offer a legally sufficient basis for its decision, the appropriate remedy is to remand to the agency for further consideration. *See I.N.S. v. Ventura, 537 U.S. 12, 16–17, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002); see also N'Diom v. Gonzales, 442 F.3d 494, 496 (6th Cir.2006).* However, that rule applies most often in asylum cases where the BIA has failed to consider evidence on the record, or has insufficiently articulated its reasoning. *N'Diom, 442 F.3d at 498–99.* In this case, while

the Petitioner is not seeking asylum, but rather is asking us to review the removal proceedings in which an IJ and the BIA concluded that he was deportable, a proceeding under a different statutory section than an application for asylum, the dispositive difference appears to be that this is not a situation where the hearing officer failed to consider evidence on the record or insufficiently articulated his reasoning.

**[13]** Were we to remand for further proceedings, the only way that the government might satisfy its burden is by introducing evidence not currently on the record. In reviewing removal proceedings, under 8 U.S.C. § 1252(a)(1), while we have broader powers of review than are granted courts in reviewing petitions for asylum, we do not have the authority to remand for consideration of additional evidence where one of the parties seeks to introduce such, and there is nothing to indicate that Congress intended to grant us the authority to **\*271** do such *sua sponte.*[5]

The record before the BIA at the time it made its decision did not contain evidence sufficient to support a finding of deportability. Had the BIA properly applied the facts before it to the law, it would have held that the Petitioner was not deportable. The proper course in the circumstances before us is to reverse without a remand for further consideration. *See Cruz–Garza v. Ashcroft, 396 F.3d 1125 (10th Cir.2005)* (reversing and vacating BIA ruling in a factually analogous situation).

We conclude that the INS did not prove by clear and convincing evidence that Pickering's conviction remained valid for immigration purposes. The INS did not prove that the Canadian court quashed the Petitioner's conviction solely to avoid adverse immigration consequences. The BIA held that the government had satisfied its burden of proving the Petitioner deportable, and the evidence compels a contrary conclusion. We thus hold that the BIA and the Immigration Judge erred in finding that Pickering was deportable. Accordingly, the judgment of the BIA is REVERSED and we REMAND this case to the Board of Immigration Appeals for entry of an order terminating deportation proceedings and quashing the order of deportation.

**All Citations**

465 F.3d 263, 2006 Fed.App. 0369A

# Footnotes

*   The Honorable Walter H. Rice, Senior United States District Court Judge for the Southern District of Ohio, sitting by designation.

1   The functions of the Immigration and Naturalization Service have been transferred to the Department of Homeland Security, pursuant to the Homeland Security Act of 2002, Pub.L. No. 107–296, 116 Stat. 2135.

2   A conviction is vacated for rehabilitative purposes where state law provides a means for the trial court to enable a Defendant to avoid certain continuing effects under state law from that conviction. *See* Murillo–Espinoza v. INS, 261 F.3d 771 (9th Cir.2001); *see also* United States v. Campbell, 167 F.3d 94 (2nd Cir.1999).

3   Zaitona, a 1993 decision, pre-dates a 1996 amendment to 8 U.S.C. § 1229a(c)(3) that deleted the term "unequivocal" from the Immigration and Nationality Act. We think the amendment has only a minimal effect on the standard, if any, because evidence that is "equivocal" could not be considered "clear and convincing." Nevertheless, we acknowledge that, as the government argues, the current standard is "clear and convincing evidence." *See also* 8 C.F.R. § 1240.8(a).

4   The government argues, in a supplemental brief filed after the close of oral argument, that the burden to prove that the conviction was *not* quashed solely for immigration reasons lies with the Petitioner. However, we agree with the determination of the BIA, the Seventh Circuit and the Tenth Circuit that the government bears the burden of proving that a vacated conviction remains valid for immigration purposes. *See* Matter of Kaneda, I. & N. Dec. 677, 680 (1977); Sandoval 240 F.3d at 581–82; Cruz–Garza v. Ashcroft, 396 F.3d 1125, 1130 (10th Cir.2005). Even were the burden with the Petitioner, he has met that burden. The order of the Canadian court quashing the Petitioner's conviction relies on the affidavit of the Petitioner, the notice of appeal, and on a hearing held in the matter. In his affidavit seeking to have his conviction quashed, the Petitioner relied on Canadian legal authority that would allow the Canadian court to act only if there existed some procedural or substantive defect in the conviction. The only legal authority cited anywhere in the record of the Canadian court allows it to act only to redress violations of the Petitioner's rights. When a court acts pursuant to a law that allows it to act based only on the merits of the underlying position, it is presumed not to have acted contrary to that law, solely to enable the Petitioner to avoid adverse immigration consequences.

    *See* Matter of Rodriguez–Ruiz, 22 I & N Dec. 1378, 1379–80; *see also* Cruz–Garza, 396 F.3d at 1131–32 (holding that where state court acted pursuant to legal authority that allowed reduction of conviction based on reasons unrelated to adverse immigration consequences, the government failed to demonstrate that the petitioner was deportable even though evidence on the record allowed for the reasonable inference that the court was motivated, at least in part, by a desire to avoid said consequences).

5   Section 1252(a)(1) provides that:

    Judicial review of a final order of removal ... is governed only by chapter 158 of Title 28, except ... that the court may not order the taking of additional evidence under section 2347(c) of Title 28.

    Where applied, § 1252(a)(1) has most often limited the petitioner's ability to introduce new evidence on review, or the court's ability to require the BIA to open the record to take additional evidence. *See* Lin v. Gonzales, 150 Fed.Appx. 326 (5th Cir.2005).

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Lee v. U.S. Citizenship and Immigration Services, 4th
Cir.(Md.), January 25, 2010

432 F.3d 193
United States Court of Appeals,
Third Circuit.

Gummersindo J. PINHO; Danielle Pinho, Appellants

v.

Alberto R. GONZALES, * Attorney General of the
United States; Michael Chertoff, * Secretary of
the Department of Homeland Security; Andrea
Quarantillo, District Director Newark District of
the United States Citizenship and Immigration
Services; Department of Homeland Security; United
States Citizenship and Immigration Services.

No. 04–3837.
|
Argued Sept. 15, 2005.
|
Dec. 20, 2005.

**Synopsis**
**Background:** Alien, a native of Portugal, and his wife,
a United States citizen, brought suit seeking a declaratory
judgment that the denial of his adjustment of status was
arbitrary, capricious and unlawful because his vacated state
conviction should no longer be a bar to his eligibility
for adjustment. The United States District Court for the
District of New Jersey, Dennis M. Cavanaugh J., granted the
government's motion for summary judgment, and appeal was
taken.

**Holdings:** The Court of Appeals, Fisher, Circuit Judge, held
that:

[1] agency action was a final and non-discretionary action
subject to judicial review, and

[2] alien's prior conviction for possession of cocaine was
vacated based on a defect in the underlying criminal
proceedings, and was therefore no longer a conviction for
immigration purposes.

Reversed and remanded.

McKee, Circuit Judge, dissented in part.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (10)

**[1]** **Aliens, Immigration, and
Citizenship** ⬦ Decisions reviewable

Bureau of Immigration and Customs
Enforcement (BICE) Administrative Appeals
Office (AAO) action of denying alien's request
for adjustment of immigration status based
on marriage to a United States citizen, based
on its determination that alien was statutorily
ineligible based on a prior conviction, was a
final and non-discretionary agency action subject
to judicial review; there was no provision for
Board of Immigration Appeals (BIA) review
of the an AAO status-adjustment eligibility
decision, and the determination itself and denial
of employment authorization were clear adverse
effects that raised the possibility that alien
could suffer irreparable harm if unable to secure
immediate judicial consideration of his claim. 5
U.S.C.A. § 704; 28 U.S.C.A. § 1331.

75 Cases that cite this headnote

**[2]** **Administrative Law and
Procedure** ⬦ Persons Affected or Aggrieved;
Injury

**Administrative Law and
Procedure** ⬦ Reviewability

**Administrative Law and
Procedure** ⬦ What constitutes finality in
general

To support Administrative Procedure Act (APA)
jurisdiction, the agency action must be final, it
must adversely affect the party seeking review,
and it must be non-discretionary. 5 U.S.C.A. §
704.

30 Cases that cite this headnote

**[3]**  **Administrative Law and Procedure**  🔑  What constitutes finality in general

As a general matter, two conditions must be satisfied for agency action to be "final": first, the action must mark the consummation of the agency's decisionmaking process, it must not be of a merely tentative or interlocutory nature; and, second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow. 5 U.S.C.A. § 704.

18 Cases that cite this headnote

**[4]**  **Administrative Law and Procedure**  🔑  Requirements for exhaustion

Where the Administrative Procedure Act (APA) applies, an appeal to superior agency authority is a prerequisite to judicial review only when expressly required by statute or when an administrative rule requires appeal before review and the administrative action is made inoperative pending that review. 5 U.S.C.A. § 704.

7 Cases that cite this headnote

**[5]**  **Aliens, Immigration, and Citizenship**  🔑  Decisions reviewable

A decision by the Bureau of Immigration and Customs Enforcement (BICE) Administrative Appeals Office is final, and subject to judicial review, where there are no deportation proceedings pending in which the decision might be reopened or challenged. 5 U.S.C.A. § 704.

24 Cases that cite this headnote

**[6]**  **Administrative Law and Procedure**  🔑  Permissible or reasonable construction

**Federal Courts**  🔑  Statutes, regulations, and ordinances, questions concerning in general

An appellate court exercises plenary review of a District Court's statutory interpretation, but afford deference to a reasonable interpretation adopted by the agency.

2 Cases that cite this headnote

**[7]**  **Administrative Law and Procedure**  🔑  Erroneous or unreasonable construction; conflict with statute

An appellate court will not disturb an agency's settled, authoritative interpretation of a statute it is charged with implementing unless that interpretation is plainly unreasonable in light of the plain language of the statute taken as a whole.

2 Cases that cite this headnote

**[8]**  **Aliens, Immigration, and Citizenship**  🔑  Collateral attack on conviction

An alien whose conviction is vacated on collateral attack because the alien's trial counsel was ineffective under the Sixth Amendment, no longer stands "convicted" for immigration purposes. U.S.C.A. Const.Amend. 6; Immigration and Nationality Act, § 101(a)(48)(A), 🚩 8 U.S.C.A. § 1101(a)(48)(A).

18 Cases that cite this headnote

**[9]**  **Aliens, Immigration, and Citizenship**  🔑  Effect of expungement or vacation

To determine the basis for a vacatur order, in determining whether a vacated criminal conviction remains a "conviction" for immigration purposes, the agency must look first to the order itself and if the order explains the court's reasons for vacating the conviction, the agency's inquiry must end there, but if the order does not give a clear statement of reasons, the agency may look to the record before the court when the order was issued; no other evidence of reasons may be considered. Immigration and Nationality Act, § 101(a)(48)(A), 🚩 8 U.S.C.A. § 1101(a)(48)(A).

16 Cases that cite this headnote

**[10]**  **Aliens, Immigration, and Citizenship**  🔑  Controlled substances offenses

Alien's prior conviction for possession of cocaine was vacated based on a defect in the underlying criminal proceedings, and was therefore no longer a conviction for purposes of application for adjustment of status based on marriage to a United States citizen; in his pleading for post-conviction relief, the alien raised only one claim, namely, ineffective assistance of counsel, the state did not file an answer, and the judge's vacatur order referred to placement in Pre-Trial Intervention (PTI) program, which was reached in settlement of alien's ineffective assistance claim. Immigration and Nationality Act, §§ 101(a)(48)(A), 212, 🚩 8 U.S.C.A. §§ 1101(a)(48)(A), 🟡 1182.

24 Cases that cite this headnote

**Attorneys and Law Firms**

**\*195** Thomas E. Moseley (Argued), Newark, NJ, for Appellants.

Susan C. Cassell (Argued), Office of United States Attorney, Newark, NJ, for Appellees.

Before ROTH, McKEE and FISHER, Circuit Judges.

OPINION OF THE COURT

FISHER, Circuit Judge.

In this case we are asked to decide when a vacated criminal conviction remains a "conviction," and when it does not, for purposes of determining an immigrant's eligibility for deportation. We conclude that the government may reasonably draw a distinction between convictions vacated for rehabilitative purposes and those vacated because of underlying defects in the criminal proceedings, and we establish a categorical test to guide this determination. Applying this test, we will reverse the judgment of the District Court.

I.

A.

Petitioner Gummersindo Pinho, a native of Portugal, is married to a United States citizen with whom he has two children, who are also U.S. citizens. In February 1992, Pinho was arrested and charged with three third-degree drug offenses under New Jersey law: possession of cocaine ("Count I"), possession with intent to distribute cocaine ("Count II"), and possession with intent to distribute cocaine on or near school property ("Count III"). Because he had no prior criminal record, Pinho applied for admission into New Jersey's "Pre–Trial Intervention" program ("PTI"), under which criminal proceedings would be postponed pending Pinho's completion of a rehabilitation program, at which point the charges would be dropped. Admission into PTI did not require an admission of guilt. [1]

**\*196** Pinho's application to PTI was rejected, however. At the time, the local state prosecutor's office, acting in accordance with a directive of the state Attorney General, had a per se rule against accepting into PTI any defendant against whom there was a viable case for possession with intent to distribute drugs at or near a school. *See* 🚩 *State v. Caliguiri,* 158 N.J. 28, 726 A.2d 912, 921 (1999). This rule was later invalidated by the New Jersey Supreme Court as contravening the purposes of the statute governing PTI. *Id.* Under the New Jersey Rules, appeal of denials of PTI applications was permitted only following a conviction or guilty plea. *N.J. Rules Governing Criminal Practice* Rule 3.28(f), (g) (1992 version).

On August 17, 1992, Pinho pleaded guilty to Count I, possession of cocaine. He was represented at the time of the plea by the same attorney who helped him apply to PTI. Counts II and III were dismissed. Pinho's sentence was two years' probation, a substance abuse evaluation, an assessment of $1,080, and the loss of his driving privileges for six months.

On June 2, 1997, some five years later, and after he had served his sentence, Pinho, now represented by different counsel, applied for post-conviction relief in New Jersey Superior Court, contending that he had received ineffective assistance of counsel in connection with his rejection from PTI. The motion was timely, *see* N.J. Court Rule 3.22–12(a) (providing that motions for post-conviction relief are timely within five years). In the motion, Pinho alleged that his prior counsel had failed to ascertain whether the conduct underlying Count

III had actually occurred near a school. It is undisputed that while the building had previously been a school, it was, at the time of the alleged crime, in fact not a school, but rather a maintenance and storage building. Pinho contended that, had this fact been known, he would not have been deemed ineligible for PTI through the operation of the per se rule. [2] New Jersey courts have held that counsel's failure to establish PTI eligibility can support ineffective assistance claims. *See State v. Marrero,* 155 N.J.Super. 567, 383 A.2d 131, 132 (1978); *State v. Cruz,* No. A–5184–02T5 (N.J.Super.Ct.2004) (unpublished).

The state did not file an answer to Pinho's motion, and the court held a hearing on his claim on March 10, 1998. At that hearing, the court observed:

> [The parties] have been dealing with this matter for several months, the upshot of which was that there would be an application by Mr. Pinho to P–T–I. If acceptable then the matter would be dismissed **\*197** once he was placed in P–T–I—and since Mr. Pinho has been accepted into P–T–I, I think the previous judgment of conviction can be vacated.

Transcript at 3, *New Jersey v. Pinho,* No. 1009–6–92 (N.J.Super.Ct. Mar. 10, 1998). [3] The prosecutor responded, "Very good, Judge, I move for that dismissal if need be." *Id.* By letter dated May 1, 1998, the prosecutor's office consented to Pinho's admission to PTI. The letter explained that "[t]his approval is based upon the facts and circumstances of this case and this defendant." Letter from John N. Shaughnessy, Assistant Prosecutor, County of Middlesex, New Jersey, to Ronald W. Reba (May 1, 1998). All charges against Pinho were then dismissed by order dated May 21, 1998. The order provided:

> Upon application of Pretrial Intervention Program for an Order to dismiss the above captioned ... indictments ... pursuant to Rule 3:28 ... the Court having considered the report of the Pretrial Intervention Program concerning the defendant's participation.... It is on this 21st day of May 1998 ORDERED that the ... indictments ... [be]

dismissed ... [and] the clerk ... is hereby directed to mark the court record "Complaint dismissed—matter adjusted." Order of Dismissal, New Jersey v. Pinho, No. 1009–6–92 (N.J.Super.Ct. May 21, 1998).

B.

In January 2000, Pinho applied to the Newark District Office of the Immigration and Naturalization Service ("INS") for an adjustment of his immigration status to "permanent resident" under 8 U.S.C. § 1255, based upon his marriage to a U.S. citizen. In a decision dated December 11, 2000, the INS denied adjustment on the ground that Pinho was inadmissible to the United States under 8 U.S.C. § 212(a)(2)(A)(i)(II), which provides that "any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of a violation of ... any law or regulation of a State ... relating to a controlled substance ... is inadmissible." [4] The agency reasoned that Pinho's 1992 plea to Count I in New Jersey met the definition of "conviction" in § 1011(a)(48)(A). That section provides:

> The term 'conviction' means, with respect to an alien, a formal judgment of guilt of the alien entered by a court, or, if adjudication of guilt has been withheld, where (i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or **\*198** has admitted sufficient facts to warrant a finding or guilt, and (ii) the judge has ordered some form of punishment, penalty or restraint on the alien's liberty to be imposed.

In reaching its decision, the agency relied heavily upon a Board of Immigration Appeals ("BIA") decision, *In re Roldan–Santoyo,* 22 I. & N. Dec. 512 (B.I.A.1999), in which the agency had held that "an alien is considered convicted for immigration purposes upon the initial satisfaction of the requirements of [ 8 U.S.C. § 1101(a) (48)(A) ] and that he remains convicted notwithstanding a subsequent state action purporting to erase all evidence of the original determination of guilt through a rehabilitative procedure." *Roldan–Santoyo,* 22 I. & N. Dec. at 523. The Newark District Director certified his decision to the Associate Commissioner for Examinations; the Associate Commissioner affirmed on June 28, 2001. The INS Office of Administrative Appeals affirmed on July 25, 2002.

### C.

On December 31, 2003, Pinho and his wife filed a complaint in District Court seeking a declaratory judgment that the denial of his adjustment of status was arbitrary, capricious and unlawful because his vacated state conviction should no longer be a bar to his eligibility for adjustment. [5]

Pinho's argument in the District Court hinged on the status of his conviction under 8 U.S.C. § 1101(a)(48)(A). The BIA interprets § 1101(a)(48)(A) to draw a distinction between convictions vacated because of the immigrant's subsequent participation in a rehabilitation program, and convictions vacated because of underlying substantive or constitutional defects. *See In re Pickering,* 23 I. & N. Dec. 621 (B.I.A.2003). Pinho argued that his conviction had been vacated in settlement of his ineffective assistance of counsel claim, rather than as part of a rehabilitation program. Pinho relied largely on three cases: *Herrera–Inirio v. INS,* 208 F.3d 299 (1st Cir.2000), *In re Rodriguez–Ruiz,* 22 I. & N. Dec. 1378 (B.I.A.2000), and *Pickering,* 23 I. & N. Dec. at 621.

In *Herrera–Inirio,* an immigrant argued that his prior conviction should not be operative for immigration purposes, although he conceded that it had been vacated through a rehabilitative program. The court reviewed the legislative history of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009–546 (1996), and rejected the argument, noting that "[t]he emphasis that Congress placed on the original admission of guilt plainly indicates that a subsequent dismissal of charges, based solely on rehabilitative goals and *not on the merits of the charge or on a defect in the underlying* **\*199** *criminal proceedings,* does not vitiate that original admission." *Herrera–Inirio,* 208 F.3d at 306 (emphasis added).

In *Rodriguez–Ruiz,* decided a few months after *Herrera–Inirio,* the BIA suspended the termination proceedings of an immigrant who had pleaded guilty to a charge of sexual abuse under New York law. Months after the plea, the court that had entered the plea entered an order explicitly vacating it; its order stated:

It is ORDERED, that pursuant to CPL 440, [6] the judgment had in this Court on March 24, 1999 based upon a plea colloquy ... convicting said Defendant of the crime of Sexual Abuse 3rd and the sentence of one (1) year probation are in all respects vacated, on the legal merits, as if said conviction had never occurred and the matter is restored to the docket for further proceedings.

*Rodriguez–Ruiz,* 22 I. & N. Dec. at 1379. The government argued that this was merely a *Roldan* situation; the BIA disagreed:

[W]e find that the order of the New York court does not constitute a state action which purports to expunge, dismiss, cancel, vacate, discharge, or otherwise remove a guilty plea or other record of guilt or conviction *by operation of a state rehabilitative statute.* The New York criminal law provision under which the respondent's conviction was vacated is neither an expungement statute nor a rehabilitative statute.

*Id.* at 1379–80 (internal citation omitted) (emphasis added). [7]

Finally, in *Matter of Pickering,* 23 I. & N. Dec. 621 (B.I.A.2003), the BIA explicitly endorsed the distinction suggested in *Herrera–Inirio.* After reviewing the existing legal landscape, the BIA held:

In accord with the federal court opinions applying the definition of a conviction at section 101(a)(48) (A) of the Act, we find that there

is a significant distinction between convictions vacated on the basis of a procedural or substantive defect in the underlying proceedings and those vacated because of post-conviction events, such as rehabilitation or immigration hardships. Thus, if a court with jurisdiction vacates a conviction based on a defect in the underlying criminal proceedings, the respondent no longer has a "conviction" within the meaning of section 101(a)(48)(A). If, however, a court vacates a conviction for reasons unrelated to the merits of the underlying criminal proceedings, the respondent remains "convicted" for immigration purposes.

*Pickering,* 23 I. & N. Dec. at 624.

The District Court deemed Pinho's vacated conviction a "conviction" for immigration purposes, reasoning that "Pinho pled guilty in 1992, served his sentence and now asks this Court to ignore Congressional intent and case law to order the [Department of Homeland Security] to grant him an employment authorization form. Based on these facts, this Court cannot grant [Pinho's] request." *Pinho v. Ashcroft,* No. 03cv6232, at 11 (D.N.J. Aug. 9, 2004). Expressing its suspicion that Pinho's ineffective assistance claim was simply an attempt to engineer a better position on his adjustment of status application, the District Court granted the government's motion for summary judgment, and Pinho appealed.

**\*200 II.**

**[1]**   Neither the parties nor the District Court questioned whether jurisdiction existed in that court, so we must therefore consider the question anew. *See Soltane v. Immigration and Naturalization Service,* 381 F.3d 143 (2004) ("[W]e are required to consider the issue of subject matter jurisdiction, even though neither party contends that it is lacking here.")

(citing *Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986)). The agency decision at issue here was made by the Bureau of Immigration and Customs Enforcement ("BICE")[8] Newark

District Office, and affirmed by the BICE Administrative Appeals Office ("AAO"). There was no hearing before an Immigration Judge ("IJ"), and no appeal to the BIA. We must ascertain whether the District Court had jurisdiction to review a decision by the AAO in these circumstances, and if so, whether it had jurisdiction to review this particular decision. We hold that on these facts the District Court had jurisdiction under 28 U.S.C. § 1331 and Section 704 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 704, to review the AAO's determination of Pinho's statutory eligibility for adjustment of status.

**[2]**   To support APA jurisdiction, the agency action must be final, it must adversely affect the party seeking review, and it must be non-discretionary.[9] We consider these requirements in turn.

**[3]**   Jurisdiction under the APA is available for review of "final agency action." The Supreme Court has explained the finality requirement as follows:

As a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the "consummation" of the agency's decisionmaking process,

*Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 113, 68 S.Ct. 431, 92 L.Ed. 568 (1948)—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow," *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 71, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970).

*Bennett v. Spear,* 520 U.S. 154, 178, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). The agency action at issue here satisfies these two conditions.

Finality requires exhaustion of administrative remedies. If there remain steps that the immigrant can take to have an action reviewed within the agency, then the action is not final and judicial review is premature. In this case, the agency offered no further procedures that Pinho could invoke to have his claim of statutory eligibility heard. There is no provision for BIA review of an AAO status-adjustment eligibility decision. *See* 8 CFR § 3.1(b). If the agency institutes removal proceedings against an immigrant, then the immigrant **\*201** may renew his or her application during those proceedings, 8

C.F.R. § 245.2, but we do not find this possibility sufficient to render the AAO's eligibility determination "tentative or interlocutory" in this case.

The reason is simple: if the agency does not seek to deport the immigrant, there can never be an appeal within the agency by which any higher level of administrative authority can be invoked to review the legal determination made by the AAO. Because applications for adjustment of status can be renewed, and are often made in the first instance, during deportation proceedings, those proceedings will in some cases address the issues considered by the AAO, *see, e.g.,* *Herrera–Inirio v. INS,* 208 F.3d 299, 303 (1st Cir.2000) (question whether vacated conviction constituted "conviction" under § 1011(a)(48)(A) addressed during deportation hearing), so that judicial review would be barred, *see, e.g.,* *Howell v. INS,* 72 F.3d 288, 293 (2d Cir.1995) (finding jurisdiction lacking once deportation proceedings had begun). [10] However, in this case, Pinho's adjustment of status application was not filed because of pending deportation proceedings, but rather because of his marriage to a U.S. citizen. Because the Department of Homeland Security ("DHS") did not provide an avenue for administrative appeal of the AAO decision, Pinho had no further opportunity to challenge the legality of the decision within the agency, and would have none at all, were he forced to await deportation proceedings that the agency may or may not choose to institute. In *Howell,* the Second Circuit left open the question of jurisdiction where there were no pending deportation proceedings in which the immigrant could raise his adjustment claims. Subsequently, the district court in *Chen v. Reno,* 1997 WL 316482, 1997 U.S. Dist. LEXIS 8072 (S.D.N.Y.1997), was faced with that issue —the question we are faced with in this case. In *Chen,* the District Court found that jurisdiction did lie, explaining:

> A litigant has a right to a prompt resolution of decisions concerning his status affording him the opportunity to make personal, educational, or career plans.... Chen has exhausted his administrative remedies because as a denied applicant not in deportation proceedings, he has no further options under the regulatory or statutory scheme to force a prompt decision by the INS.

**\*202** *Id.* at 1997 WL 316482, at \*2, 1997 U.S. Dist. LEXIS 8072, at \*6–7.

[4] In our view, *Chen* is a proper application of the guidance given by the Supreme Court in *Darby v. Cisneros,* 509

U.S. 137, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993), and *McCarthy v. Madigan,* 503 U.S. 140, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992). *Darby* held that agency action is final when the "aggrieved party has exhausted all administrative remedies expressly prescribed by statute or agency rule.... [W]here the APA applies, an appeal to 'superior agency authority' is a prerequisite to judicial review *only* when expressly required by statute or when an administrative rule requires appeal before review and the administrative action is made inoperative pending that review." *Darby,* 509 U.S. at 154, 113 S.Ct. 2539. In the case at bar, not only was there no administrative remedy "expressly prescribed," but the applicable regulation expressly provided that there was no administrative appeal available. And the AAO's decision was "operative" from the moment it was entered. A ruling that Pinho must wait for possible future deportation proceedings in order to challenge the AAO's legal determination would sit ill at ease with *Darby.*

[5] We hold that an AAO decision is final where there are no deportation proceedings pending in which the decision might be reopened or challenged. But even if the possibility of renewing an adjustment application in future deportation proceedings were thought to cast doubt on the finality of an AAO decision, this case falls into one of the categories "in which the interests of the individual weigh heavily against requiring administrative exhaustion," *McCarthy,* 503 U.S. at 146, 112 S.Ct. 1081, namely, circumstances in which an "indefinite timeframe for administrative action," *id.* at 147, 112 S.Ct. 1081 results in prejudice to the individual who must await that action. The decision whether or not to institute deportation proceedings is entirely within the discretion of the agency. There are no steps that Pinho can take to force the question in order to have his claim resolved. If the only route to the courts is through deportation proceedings, then the agency retains sole control over whether an individual's purely legal claim—one which has not been made non-reviewable by statute—may ever be brought before the courts. [11] Such a result would be plainly at odds not only with the APA, but also with broader principles of separation of powers. [12]

**\*203** It is also apparent that legal consequences flow directly from the determination that Pinho was not eligible for adjustment of status because of his prior conviction. In addition to the ineligibility determination itself, which prevented him from being considered for adjustment, the

AAO's ruling had as a direct result the subsequent denial by the District Office of Pinho's application for employment authorization. That authorization was required, *inter alia,* for the renewal of Pinho's driver's license and for his continued employment. Both the agency's obligations—to consider Pinho's application for adjustment—and Pinho's rights—to be considered for adjustment, and to renew his driver's license —were determined by the AAO's ruling. The determination itself and the denial of the employment authorization are clear adverse effects, and raise the possibility that Pinho "may suffer irreparable harm if unable to secure immediate judicial consideration of his claim," *McCarthy,* 503 U.S. at 147, 112 S.Ct. 1081, if he is prohibited from driving or working while awaiting the uncertain possibility of future agency proceedings.

We must also ask whether the action at issue here was discretionary. It is important to distinguish carefully between a denial of an application to adjust status, and a determination that an immigrant is legally ineligible for adjustment of status. This distinction is central to the question of subject-matter jurisdiction, and is easy to elide. Indeed, such distinctions are crucial to administrative law generally; the framework of judicial review of agency action that has evolved over the past half-century is grounded in a sharp distinction between decisions committed to agency discretion, and decisions, whether "ministerial" or "purely legal," governed directly by the applicable statute or regulation. *See, e.g., Norton v. Southern Utah Wilderness Alliance,* 542 U.S. 55, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004); *Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988). Whatever the label, our caselaw distinguishes between actions which an agency official may freely decide to take or not to take, and those which he is obligated by law to take or not to take. In the case of adjustment of status, an eligible immigrant may have his application denied within the discretion of the agency. But the immigrant's eligibility itself is determined by statute. To treat all denials of adjustment as discretionary, even when based on eligibility determinations that are plainly matters of law, is to fundamentally misunderstand the relationship between the executive and the judiciary.

In *Soltane,* 381 F.3d at 143, we considered the question whether an AAO determination of statutory eligibility for a particular immigration classification is discretionary. We held that it is not. In that case, Camphill Soltane, a non-profit organization filed a petition on behalf of an employee for classification as a special religious worker. The District Office denied the petition, and Soltane **\*204** appealed to the AAO, which affirmed the District Office. Soltane then sought review of the AAO decision in district court. We held that, under the APA and 8 U.S.C. § 1252(a)(B)(ii), review of AAO decisions is within the jurisdiction of the district court so long as those decisions are not committed to agency discretion, and that the determination of whether Soltane met the specific eligibility criteria set out in the governing statute was not discretionary. *Soltane,* 381 F.3d at 147–48. Since *Soltane,* the REAL ID Act, Pub.L. No. 109–13, 119 Stat. 231 (May 11, 2005), has further restricted the jurisdiction of the district courts to review discretionary agency actions. Non-discretionary actions, however, and purely legal determinations made by the agency, remain subject to judicial review. *See, e.g., Sepulveda v. Gonzales,* 407 F.3d 59, 63 (2d Cir.2005) ( "[ Section] 1252(a)(2)(B) does not bar judicial review of nondiscretionary, or purely legal, decisions....").

Determination of *eligibility* for adjustment of status—unlike the *granting* of adjustment itself—is a purely legal question and does not implicate agency discretion. The determination at issue here, whether a prior conviction precludes eligibility for adjustment of status, was also at issue in *Sepulveda.* In that case, the Second Circuit held that statutory restrictions on the jurisdiction of district courts to hear challenges to removal orders and other discretionary actions do not affect the district courts' "jurisdiction to determine whether [the statutory provision] is applicable, e.g., whether the petitioner is in fact an alien, whether he has in fact been convicted, and whether his offense is one that is within the scope of [one of the enumerated sections]." *Sepulveda,* 407 F.3d at 63 (citing *Santos–Salazar v. U.S. Dep't of Justice,* 400 F.3d 99, 104 (2d Cir.2005)). The determination at issue here is precisely such a determination: whether under the applicable statutory language as interpreted by the BIA, Pinho was "convicted" so as to render him ineligible for adjustment of status. This is a legal question, not one committed to agency discretion.

The agency action at issue here was final and non-discretionary, it adversely affected Pinho, and it has not been made non-reviewable by statute. Under the APA, therefore, Pinho is "entitled to judicial review" of the AAO's decision. [13]

**[6]** Because the District Court had jurisdiction to review the AAO decision, we have jurisdiction over this appeal under 28 U.S.C § 1291. We exercise plenary review of the District Court's statutory interpretation, but afford deference to a reasonable interpretation adopted by the agency. *See* *Acosta v. Ashcroft,* 341 F.3d 218, 222 (3d Cir.2003). It is the agency's burden, however, to establish the facts supporting inadmissibility "by clear, unequivocal and convincing evidence." *See* *Sandoval v. INS,* 240 F.3d 577, 581 (7th Cir.2001).

The question before us is whether the terms of the order vacating Pinho's 1992 conviction were such as to remove that conviction from the scope of 8 U.S.C. § 1101(a)(48)(A), which, in conjunction with 8 U.S.C. § 1182(a)(2)(A), governs the admissibility of aliens to the United States.

### III.

### A.

When the Immigration and Nationality Act was first passed, it lacked a definition **\*205** of the term "conviction." The INS relied on state law in determining whether an immigrant was "convicted." *See* Roldan, 22 I. & N. Dec. at 514–15. State convictions that were subsequently vacated were accordingly not treated as "convictions" for immigration purposes. The agency was increasingly bedeviled by the diversity of state rehabilitative programs and the resulting difficulty in fashioning a uniform national immigration policy with respect to prior convictions. In *In re Ozkok,* 19 I. & N. Dec. 546 (B.I.A.1988), the BIA adopted a three-part definition of "conviction for the express purpose of evaluating diverse state rehabilitative programs by a common measure."

When Congress included a definition of "conviction" in the 1996 amendments to the INA, it used, almost verbatim, the first two parts of the *Ozkok* test. The statutory definition provides its entirety:

> The term "conviction" means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where—

i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and

ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

8 U.S.C. § 1101(a)(48)(A). [14]

The new definition is disjunctive, encompassing at least two possible procedural contexts. The first disjunct is "a formal judgment of guilt of the alien entered by a court." The meaning of this clause is plain enough, echoing as it does the dictionary definition, *see Webster's Third New International Dictionary* at 499 ("... the act of proving, finding, or adjudging a person guilty of an offense or crime."), and thus offers no solution to the problem of withheld judgments. That job is handled by the second disjunct-those situations in which "adjudication of guilt has been withheld." "Withhold" means "... to desist or refrain from granting ... to keep in one's possession or control." *Webster's Third New International Dictionary* at 2627. The definition provides that in situations in which the judge refrains from granting a judgment of conviction, the defendant will nonetheless stand "convicted" for immigration purposes if he has pleaded or been found guilty or admitted sufficient facts to support a finding of guilt, and the judge has imposed some penalty upon him. In our recent decision in *Acosta v. Ashcroft,* 341 F.3d 218 (3d Cir.2003), we considered whether the definition covered a defendant who pleaded nolo contendere and completed a period of probation, and whose indictment was subsequently dismissed. We accepted the BIA's position, as set forth in *Roldan,* 22 I. & N. Dec. 512, that the new definition requires treating a person in that situation as "convicted."

Section 1101(a)(48)(A), thus, by its terms and by the BIA's interpretation, plainly encompasses at least those situations in which an alien has a judgment of guilt entered by a court, and those in which the judgment of guilt was never entered because it was withheld, but where the alien has pleaded or admitted sufficient facts, and some penalty was imposed. There remains the question of how the statute applies to convictions that are imposed but **\*206** subsequently vacated. [15] We have not had occasion to review the agency's interpretation of § 1101(a)(48)(A) with respect to vacated convictions, or with respect to distinctions among vacated convictions.

Nothing in the statute specifically addresses vacated convictions. Clearly they are not convictions that have been withheld. If they are covered, then, it will be under the first disjunct: "a formal judgment of guilt of the alien entered by a court." Undoubtedly a conviction that is later vacated by a court must have been initially entered by a court. The statute is entirely silent with respect to the subsequent procedural history of a "judgment entered by a court," and the undoubted congressional purpose of closing the "withheld judgment" loophole tells us nothing whatsoever about what Congress's purpose was with respect to vacaturs, or whether it had any purpose at all in that regard. [16]

The statutory provision governing inadmissibility, 8 U.S.C. § 1182(a)(2)(A), provides that "any alien convicted of, or who admits committing acts which constitute the essential elements of ... a violation of ... any law or regulation of a State ... is inadmissible." [17] However broad that language may appear, the agencies charged with implementing the statute have never read it to state a blanket deportability rule. The BIA's current interpretation distinguishes between what we may call "rehabilitative" vacaturs and "substantive" vacaturs. The agency's position is that

> if a court with jurisdiction vacates a conviction based on a defect in the underlying criminal proceedings, the respondent no longer has a "conviction" within the meaning of section 101(a)(48)(A). If, however, a court vacates a conviction for reasons unrelated to the merits of the underlying criminal proceedings, the respondent remains "convicted" for immigration purposes.

*Pickering,* 23 I. & N. Dec. at 624.

The BIA, in the cases leading up to *Pickering,* was faced with applying the new definition to three distinct sets of circumstances. The easy cases are those like *Roldan,* in which the judgment of guilt is never entered, but is withheld pending completion of a rehabilitative program. These cases are straightforwardly covered by the statutory definition, and *Roldan* breaks no new ground. The second category are cases in which a judgment is entered, but later vacated explicitly in order to prevent deportation or other federal immigration consequences. *Pickering* considered this type of case, and held the conviction to remain in force under the **\*207** definition. The third category are cases in which a judgment is entered, but later vacated because of substantive defects in the initial proceeding. *Rodriguez–Ruiz* was such a case, and

the BIA held the conviction not to fall within the scope of the definition.

The BIA, in short, interprets §§ 1148 and 1182 to create a distinction between vacated convictions based on the reasons for the vacatur. We have not yet decided whether the distinction drawn by the agency between rehabilitative and substantive vacaturs is a reasonable one in light of the statutory language, [18] nor have we decided—as we must in this case—how we, and the agency, are to tell the difference.

### B.

**[7]** We will not disturb an agency's settled, authoritative interpretation of a statute it is charged with implementing unless that interpretation is plainly unreasonable in light of the plain language of the statute taken as a whole. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *United States v. Mead Corp.,* 533 U.S. 218, 229–32, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). The most comprehensive explanation of the agency's interpretation is found in *Roldan,* 22 I. & N. Dec. at 515–20. Relying on the joint conference report, the BIA noted the "Congressional intent that even in cases where adjudication is 'deferred,' the original finding or confession of guilt is sufficient to establish a 'conviction' for purposes of the immigration laws." *Roldan,* 22 I. & N. Dec. at 518 (quoting H.R. Conf. Rep. No. 104–828, at 224 (1996)). The BIA then analogized from *deferred adjudications* to *vacated convictions,* and discerned a "clear indication that Congress intends that the determination of whether an alien is convicted for immigration purposes be fixed at the time of the original determination of guilt, coupled with the imposition of some punishment." *Roldan,* 22 I. & N. Dec. at 521. The statute, of course, says nothing about vacated convictions. Still less does the statute, or the legislative history, address the distinction between rehabilitative and substantive vacaturs. Nor, finally, was the question of vacated convictions properly before the BIA in *Roldan:* Roldan's judgment was deferred, not vacated. Nonetheless, the BIA opined that "it simply would defy logic for us, in a case concerning a conviction in a state which effects rehabilitation through the technical erasure of the record of conviction, to provide greater deference to that state's determination that a conviction no longer exists

[than to a state which 'never considered him convicted']."
*Roldan,* 22 I. & N. Dec. at 521. By this inference, the BIA corralled within § 1101(a)(48)(A) all post-conviction expungement procedures that are analogous to withholding judgment. [19] This analogy **\*208** paves the road from *Roldan* to *Pickering.* We find the BIA's logic not unreasonable: to parse the difference between those past determinations of guilt declared "no longer to exist" and those declared "never to have existed" is to follow the rabbit into a metaphysical hole where courts rightly fear to tread. [20]

*Roldan'* s holding is expressly limited to convictions vacated under "rehabilitative procedure[s]"; the BIA emphasized that its decision

> does not address the situation where the alien has had his or her conviction vacated by a state court on direct appeal, wherein the court determines that vacation of the conviction is warranted on the merits, or on grounds relating to a violation of a fundamental statutory or constitutional right in the underlying criminal proceedings.

*Roldan,* 22 I. & N. Dec. at 523. In *Rodriguez–Ruiz,* the BIA takes it as given that such a vacated conviction would not be a conviction under § 1101(a)(48)(A). There was little need to explain that assumption, because the INS did not argue otherwise, contending only that the vacatur at issue was not "warranted on the merits."

The distinction between substantive and rehabilitative vacaturs is rooted in the history of immigration enforcement. That history is relevant both to our review of the reasonableness of the agency interpretation of the statute, because the statutory language was adopted against the background of consistent agency practice with respect to vacated convictions. The BIA held as early as 1943 that an expunged conviction was not a "conviction" for immigration purposes, and adhered to that position with only occasional exceptions until *Roldan. See In re V-,* No. 56033/701 (B.I.A.1943); *In re D-,* 7 I. & N. Dec. 670, 674 (1958) (where a conviction has been expunged, "there has, as a

matter of law, been no conviction for immigration purposes"); *In re G-,* 9 I. & N. Dec. 159, 169 (B.I.A.1960) (Attorney General's opinion) ( " *Pino v. Landon,* [349 U.S. 901, 75 S.Ct. 576, 99 L.Ed. 1239 (1959) (per curiam reversal of First Circuit determination that a vacated state conviction was a conviction for immigration purposes) ] would seem, therefore, to make it an a fortiori conclusion in a nonnarcotics case that an expungement of an alien's conviction under section 1203.4 of the California Penal Code withdraws the support of that conviction from a deportation order under section 241(a)(4) and brings it to the ground.").

The BIA, on the advice of the Attorney General, made an exception for vacated drug offenses [21] in 1959, see *In re A F,* 8 I. & N. Dec. 429 (B.I.A.1959), and was shortly thereafter urged to extend that exception to other types of crimes. It declined to do so on several grounds, notably because "[t]he contrary rule has been in effect since at least 1943 [and t]here has been no Congressional criticism of this rule." *In re G-,* 9 I. & N. Dec. 159, 163 (B.I.A.1960). The BIA reiterated the **\*209** rule—that with the exception of drug convictions, expunged convictions are not "convictions"—right up to the passage of the 1996 IIRIRA amendments. In 1996, the Board held:

> We agree with the respondent that if his conviction has been expunged ... he is no longer deportable.... For many years this Board has recognized that a criminal conviction that has been expunged ... may not support an order of deportation.... However, an exception to this rule exists for expunged drug convictions.... Congress did not intend for aliens convicted of drug offenses to escape deportation on the basis of a state procedure authorizing a technical erasure of the conviction. [Drug crimes are] an exception to the line of cases by this Board ruling that a conviction which has been expunged ... could not be made the basis for deportation proceedings.... However, the Attorney General specifically limited this exception to drug offenses.... [That exception] should not be extended beyond drug cases.

*In re Fructoso Luviano–Rodriguez,* 21 I. & N. Dec. 235, 237–238 (B.I.A.1996).

After the introduction of the new statutory definition of "conviction" in the 1996 amendments, the BIA shifted course in *Roldan,* analogizing, as described above, rehabilitative vacaturs to withheld judgments. Certainly the statutory language as enacted closes any definitional loophole through

which withheld judgments might escape the "conviction" label. But the BIA's analogy to the "withheld judgment" prong of the statutory definition pulls with it only rehabilitative vacaturs. The "hallowed principle of precedent ... going back over fifty years," James A.R. Nafziger & Michael Yimesgen, *The Effect of Expungement on Removability of Non–Citizens,* 36 U. Mich. J.L. Reform 915, 930 (2003)—that is, the government's long history of treating vacated convictions as nullities for immigration purposes—was preserved for those vacaturs that were not the functional equivalent of rehabilitative withheld judgments—those vacaturs, in other words, that were based on underlying defects in the conviction itself.

[8] The BIA has not explained precisely why it thinks substantive vacaturs do not fit the 🚩 § 1101(a)(48)(A) definition. The foregoing account, however, is sufficient to support our determination that the distinction is reasonable. [22] Given its longstanding, **\*210** consistent practice, the agency may reasonably read the statutory language analyzed above to authorize its drawing this distinction among vacated convictions. We therefore begin our analysis with the proposition that an alien whose conviction is vacated on collateral attack because the alien's trial counsel was ineffective under the Sixth Amendment, no longer stands "convicted" for immigration purposes. The question is whether Pinho's is such a case, and, more importantly, how that determination is to be made.

## C.

We are thus faced with the question of just what the BIA means by "based on" and "for reasons." It is easy enough to determine what a vacatur order is "based on" when the court issuing the order holds a hearing and then issues a written decision, complete with findings of fact and conclusions of law. But not all orders come with such clear explanations. Such was the order in the case at bar. Pinho filed a motion for post-conviction relief, and raised ineffective assistance as his only ground. The prosecution did not answer that motion. At the hearing on the motion, the parties agreed that Pinho's conviction would be vacated, he would be placed in the PTI program, and the charges would be dismissed. The one-sentence order of dismissal simply cites the PTI placement.

Facially, then, one might say that the conviction was vacated "based on" the parties' agreement to Pinho's PTI placement.

After all, the words of the judge at the hearing were: "[S]ince Mr. Pinho has been accepted into PTI, I think the previous judgment of conviction can be vacated." Acceptance into PTI is, likewise, on its face a "reason[ ] unrelated to the merits of the underlying criminal proceedings."

**\*211** But our inquiry cannot end there. The fact that the parties agreed to settle rather than proceed to trial on the ineffective assistance claim should not be dispositive. Indeed, it may be that the likelihood that the prosecution will agree to a settlement such as PTI placement will increase proportionally with the strength of the alien's constitutional claim. If the BIA in *Pickering* had meant to require an adjudication of the merits of aliens' claims of substantive defects in the original conviction in order to make out an adequate "basis," it could have said so. But it did not. It has instead drawn its line between vacaturs "based on" underlying defects and vacaturs granted "for reasons" not related to underlying defects, and it is readily apparent that the set of vacaturs "based on" underlying defects is not necessarily coextensive with the set of vacaturs based on adjudications of underlying defects. We must therefore inquire as to the reasons underlying the vacatur order, and it would obviously be begging the question simply to invoke the PTI acceptance yet again. The prosecutor's offer of PTI placement did not spring into being *ex nihilo;* rather, it was by way of settlement of Pinho's collateral attack on the constitutional validity of his conviction. The relevant "reason," then, for our *Pickering* analysis, is plainly the reason for the settlement agreement.

That agreement, as the judge states at the March 10 colloquy, was the "upshot" of negotiations between the attorneys, who "have been dealing with this matter for several months." The "matter" the attorneys had been "dealing with" was Pinho's motion for post-conviction relief based on ineffective assistance of counsel. Of signal importance to this case is the fact that that motion was the only pleading before the judge. The state did not answer the motion. At no time did Pinho, or the state, or the judge, raise any issue other than ineffective assistance. The government asks us to hold that the vacatur order was not "based on" the ineffective assistance motion, even though there was no other basis for vacatur offered at any point in the proceedings. The government asks us, in other words, to hold that the agency may permissibly find a motive in a state-court ruling that is nowhere stated in the record. This we decline to do.

At oral argument the government contended that the motives of state prosecutors and judges might change over time

and might not be reflected in the record. Perhaps a new prosecutor, reviewing old cases, might decide that some of his predecessor's policies had been unduly harsh. Perhaps such a prosecutor, when presented with a post-conviction relief claim brought by a defendant who had been denied entry into a pretrial diversion program years earlier because of a now-discredited policy, might decide to "do the right thing," and help that defendant avoid the immigration consequences of his guilty plea. Perhaps a state judge, looking at the case, would see a hard-working family man threatened with deportation based on a relatively minor crime committed a decade earlier, and decide to help that hard-working family man get around the federal immigration laws. Perhaps, perhaps. We present this hypothetical to highlight the fact that it is precisely that: a hypothetical proposed by the government about possible motives of state actors nowhere found in the record. Were we to allow the Department of Homeland Security to base its legal determinations of immigrants' statutory eligibility for adjustment of status upon hypothetical scenarios such as this, we would be opening the door to—indeed in many cases due process would require—a flood of subpoenas to judges and prosecutors of sovereign states ordering them to appear in federal immigration proceedings **\*212** to answer questions about motives, feelings, and sympathies that appear nowhere in any written record, but that may have prompted their official actions. Behind the expansive interpretation of "reason" and "basis" urged by the government, we see the specter of such unseemly inquisitions.

How else, indeed, could Pinho have challenged the agency's claim that the vacatur order was not "really" based on his ineffective assistance claim? Would he not have to call the prosecutor and ask him why, exactly, he agreed to PTI placement? Would he not have to call the judge and ask him why, exactly, he agreed to vacate the conviction and dismiss the charges? And if the answers were unfavorable to the government's theory, would it not seek, in cross-examination, to establish that the state actors harbored secret motives, such as undue sympathy for an immigrant or animosity toward federal immigration law?

We cannot endorse a test which requires speculation about, or scrutiny of, the reasons for judges' actions other than those reasons that appear on the record.[23] Whether or not constitutional avoidance requires this result,[24] avoidance of absurdities surely does. *See Sheridan v. United States,* 487 U.S. 392, 108 S.Ct. 2449, 101 L.Ed.2d 352 (1988) ("[C]ourts should strive to avoid attributing absurd designs to

Congress...."). But most important are basic considerations of comity. When, as in this case, there arises a dispute over the "reason" or "basis" for a decision, if the parties are permitted to speculate about unstated motives that perhaps underlie vacatur orders, there will be little alternative to calling judges and prosecutors as witnesses in immigration proceedings. We do not deem such a prospect to be in keeping with longstanding principles of federal respect for state decisions as to the meaning of state law. "[T]he respect that federal courts owe the States and the States' procedural rules," *Coleman v. Thompson,* 501 U.S. 722, 726, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), is owed no less by federal agencies than by federal courts. The Supreme Court has repeatedly emphasized that state courts are the ultimate authorities on the meaning of state law. Other than "a few exceptional cases in which the Constitution imposes a duty or confers a power on a particular branch of a State's government," *Bush v. Gore,* 531 U.S. 98, 112, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), the authority of state courts to determine state-law questions is clear: "[C]omity and respect for federalism compel us to defer to the decisions of state courts on issues of state law. That practice reflects our understanding that the decisions of state courts are definitive pronouncements of the will of the States as sovereigns." *Id.* Recognizing the force of this longstanding **\*213** principle, the BIA correctly declined the government's invitation in *Rodriguez–Ruiz* to "look behind" a state-court ruling and decide whether that ruling was correct under state law.[25] The same considerations govern the search for unstated motives: both contravene long-settled principles of federalism. A state law may be declared unconstitutional; it may not, however, simply be rewritten. So too, we hold, with vacatur orders.

The government could have avoided this problem altogether. As the Supreme Court has emphasized, the definition of "conviction" for purposes of applying federal laws is a question of federal law. *Dickerson v. New Banner Institute, Inc.,* 460 U.S. 103, 111–12, 103 S.Ct. 986, 74 L.Ed.2d 845 (1983) ( "[W]hether one has been 'convicted' within the language of [federal] statutes is necessarily ... a question of federal, not state, law, despite the fact that the predicate offense and its punishment are defined by the law of the State."). Further, the executive branch is entitled to great deference in formulating immigration policy, an "especially sensitive political function [ ] that implicate[s] questions of foreign relations," *I.N.S. v. Abudu,* 485 U.S. 94, 110, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988). Given the expansive

statutory definition of "conviction," and the deference the agency's interpretation is owed, the agency could have chosen to contend that as a matter of federal law *all* vacated state convictions remain "convictions" under § 1101(a)(48)(A), whether rehabilitative or substantive. If the agency wishes to adopt this interpretation of the statutory definition it may do so, through rulemaking or adjudication, and it may defend that interpretation before the courts. But the agency has not done so, and it is another matter entirely for the agency to distinguish among vacated convictions based on the reasons for the vacatur, and then to arrogate to itself the power to find hidden reasons lurking beneath the surface of the rulings of state courts. Under the Supremacy Clause, the Department of Homeland Security may, pursuant to statutory authority, properly interpret § 1101(a)(48)(A) to encompass convictions vacated by order of state courts. But it is far from clear that it may *rewrite* state-court rulings as to the legal basis for those orders. Our Federalism has not yet come to that.

### D.

In this case, the District Court openly expressed its suspicion that Pinho's ineffective assistance motion was, *sub silentio,* something else entirely. "It is troubling that [Pinho] admitted guilt, served his sentence and then waited approximately three years to seek post-conviction relief based on ineffective assistance...." *Pinho v. Ashcroft,* No. 03cv6232, at 10 (D.N.J. Aug. 9, 2004). The District Court then turned for guidance to an unpublished district court opinion, *Lim v. Ashcroft,* [26] involving similar issues, noting that "Chief Judge Bissell shared the same concerns of this Court," namely "that there was no reason for the state to entertain petitioner's post-conviction motion for any purpose other than to benefit petitioner before the INS or this Court...." *Id.* at 11. The District Court then stated explicitly that "Chief Judge Bissell's opinion in *Lim* ... is a factor in denying Plaintiff's motion." **\*214** *Id.* The District Court's quasi-adoption of *Lim* is noteworthy for more than its procedural irregularity. In *Lim* the district court accused the state judge and prosecutor of being practitioners, or willing victims, of outright duplicity. A brief discussion of *Lim* is therefore warranted here, because it is an object lesson in the pitfalls of the government's proposed approach.

Lim pled guilty in New Jersey in 1996 to kidnapping; in 1998, the INS began removal proceedings. In 2001, Lim sought postconviction relief in state court, contending that he had received ineffective assistance of counsel, and petitioned the district court to stay deportation pending exhaustion of the state claim. After the state court granted Lim post-conviction relief, the district court took it upon itself to review the state court's state-law ruling, [27] and declared the entire proceeding to be a sham: "[T]his Court determines that there was a significantly deficient legal foundation for the state court's vacation of Mr. Lim's kidnapping conviction." *Lim,* No. 01–CV–3271, 2002 WL 1967945, at \*5. Regardless of what the state court said it found, according to the district court, it did not "really" find ineffective assistance. The District Court concluded that a hidden motive was at work:

> [I]n accommodating the proposed plea arrangement, the state court acted not on the basis of a meritorious claim of ineffective assistance of counsel, but for some other reason.... The [state court's own] remarks unmistakably show that the state court vacated the kidnapping conviction out of concern for Mr. Lim's immigration plight, not because there was any merit in his collateral attack on the kidnapping charge.
>
> *Id.* at \*9. The prosecutor and the judge were, according to the district court, played for fools; they were made the dupes of a conniving lawyer who "played to the[ir] interests" in "contriv[ing] a fictional disposition ... as a means to subvert federal statutes." *Id.* at \*10. The post-conviction relief petition was thus a fraud: "[I]t is apparent that the petition for post-conviction relief that was pursued in this case was not used to test the merit of Mr. Lim's claim of ineffective assistance of counsel, but rather as a vehicle to engineer a result that would benefit petitioner in proceedings before the INS or this Court...." *Id.* at \*9.

The concern, then, that the District Court in this case "shared" with the court in *Lim* is that the integrity of legal proceedings in state courts cannot be trusted. This Court does not approve of accusations of dishonesty or complicity in "subversion" leveled at state courts and prosecutors. We will not accept an interpretation of the **\*215** Immigration and Nationality Act that permits, let alone requires, speculation by federal agencies about the secret motives of state judges and prosecutors.

The temptation to second-guess the motives of state officials is a predictable byproduct of inadequate judicial guidance as to the permissible bounds of agency inquiry into the basis for state-court actions. The powers of immigration officials are extensive, and if immigrants are to have any certainty as to the

effect criminal proceedings in state courts may have on their immigration status, those bounds must be drawn plainly and brightly. Where definitions are broad, so must they be clear. It cannot be the case that whether a conviction is a conviction depends on whether an immigration official suspects a state judge of secretly harboring subversive motives. If the relationship between state criminal proceedings and federal immigration proceedings is to be governed by the rule of law, then that law must be a law of rules.

**[9]** We therefore announce the following categorical test for classification of vacated convictions under the INA.[28] To determine the basis for a vacatur order, the agency must look first to the order itself. If the order explains the court's reasons for vacating the conviction, the agency's inquiry must end there. If the order does not give a clear statement of reasons, the agency may look to the record before the court when the order was issued. No other evidence of reasons may be considered.[29]

IV.

**[10]** Applying this rule to the case at hand is straightforward. In his pleading, Pinho raised only one claim: ineffective assistance of counsel. The state did not file an answer. The judge's vacatur order refers to the PTI placement agreement, which was reached in settlement of Pinho's ineffective

assistance claim. The only basis for the vacatur appearing in the order or the pleadings is Pinho's ineffective assistance claim. Under the distinction articulated in *Pickering,* therefore, Pinho's conviction was vacated "based on a defect in the underlying criminal proceedings," and Pinho accordingly "no longer has a 'conviction' within the meaning of section 101(a)(48)(A)." *Pickering,* 23 I. & N. Dec. at 624.

The AAO therefore erred as a matter of law in determining Pinho to be ineligible for adjustment of status under §§ 1101 **\*216** and 1182, and the District Court erred in affirming that determination. We wish to emphasize that while we may, and must, ensure that purely legal determinations are made by the agency in accordance with law, the decision whether in fact to *grant* adjustment of status is a matter entrusted to the discretion of the agency, and we lack the power to review denials of adjustment applications as such. When we have instructed the agency on the correct legal standard, we have said all that we may say. We will accordingly reverse the judgment below and remand to the District Court for the granting of relief consistent with this opinion.

**All Citations**

432 F.3d 193

---

**Footnotes**

*    Substituted pursuant to FED. R.APP. P. 43(c)
1    The PTI program worked in 1992 just as it does today: once a defendant is accepted, the judge postpones all proceedings against him for at most thirty-six months, after which the judge must either dismiss the indictment, postpone proceedings further, or restore proceedings. With respect to dismissal, the relevant rule provides:

   On the recommendation of the program director and with the consent of the prosecutor and the defendant, ["the designated judge shall"] dismiss the complaint, indictment or accusation against the defendant, such a dismissal to be designated 'matter adjusted—complaint (or indictment or accusation) dismissed.'

   *N.J. Rules Governing Criminal Practice,* Rule 3–28 (1992 version).

   The New Jersey Supreme Court has issued guidelines for operation of PTI. Guideline 4 provides: "Enrollment in PTI programs should be conditioned upon neither informal admission nor entry of a plea of guilty. Enrollment of defendants who maintain their innocence should be permitted unless the defendant's attitude would render pre-trial intervention ineffective." The accompanying comment provided:

   A PTI program is presented to defendants as an opportunity to earn a dismissal of charges for social reasons and reasons of present and future behavior, legal guilt or innocence notwithstanding.... Within the context of pretrial intervention, when and whether guilt should be admitted is a decision for counselors....

Neither admission of guilt nor acknowledgment or responsibility is required. Steps to bar participation solely on such grounds would be an unwarranted discrimination.

*N.J. Rules Governing Criminal Practice,* Rule 3–28, Guideline 4, Comment (1992 version).

2    Eligibility, of course, does not guarantee acceptance, which remained in the prosecutor's discretion. Because of the operation of the rule, though, Pinho was never even considered. So while he might eventually have been rejected even with effective assistance of counsel, he would not have been rejected *because of the rule.* In this respect, Pinho's 1992 PTI application mirrors his 2000 adjustment of status application. In each case a non-discretionary eligibility determination served as the gatekeeper for a discretionary action.

3    The record does not contain a vacatur order other than this statement from the bench. It is not disputed, however, that the conviction was in fact vacated. Whether the subsequent dismissal order may be treated as an implicit vacatur order, or whether the judge's statement from the bench was itself the vacatur order is of little moment. A paper record merely memorializes a judicial act, and the record is clear that the judicial act was carried out: Pinho's conviction was "dismiss[ed], cancel [ed] ... discharge[d] or otherwise remove[d]."

*Sandoval v. I.N.S.,* 240 F.3d 577, 583 (7th Cir.2001).

4    Neither the Newark District Office, the Office of Administrative Appeals, the District Court, nor the government on appeal, analyzes 8 U.S.C. § 1182(a)(2)(C), which provides that

[a]ny alien who the consular or immigration officer knows or has reason to believe is or has been an illicit trafficker in any such controlled substance or is or has been a knowing assister, abettor, conspirator, or colluder with others in the illicit trafficking in any such controlled substance, is inadmissible.

We therefore express no opinion on how that provision would apply in this case.

5    On June 30, 2004, and in the context of the previously filed action, Pinho filed a motion for injunctive relief, seeking an order directing the Newark office to grant him an employment authorization form, which was required by New Jersey for renewal of his driver's license. Pinho argued that denial of the authorization form was contrary to the applicable regulation governing eligibility, 8 C.F.R. § 274a.12(c)(9). The parties agree that the employment authorization has been granted, mooting any injunctive relief we might order. *See* Letter from Thomas E. Moseley to Marcia Waldron, Clerk of the Court, United States Court of Appeals for the Third Circuit, Sep. 9, 2005; letter from Christopher J. Christie, United States Attorney for the District of New Jersey, to Marcia Waldron, Clerk of the Court, United States Court of Appeals for the Third Circuit, Sep. 9, 2005. We therefore do not have properly before us the question of whether the agency violated 8 C.F.R. § 274a.12(c)(9) when it denied his application for employment authorization.

6    Article 440 of the New York Criminal Procedure Law, *N.Y.Crim. Proc. Law* § 440, pertains to post-judgment motions.

7    The BIA refused, as the government urged, to "go behind" the state court judgment and question whether the state court had followed its own laws in entering the vacatur. 🚩 *Rodriguez–Ruiz,* 22 I. & N. Dec. at 1379.

8    On March 1, 2003, the INS's functions were transferred to the Bureau of Immigration and Customs Enforcement ("BICE") and the U.S. Customs and Immigration Service ("USCIS") of the United States Department of Homeland Security ("DHS"). *See Knapik v. Ashcroft,* 384 F.3d 84, 86 n. 2 (3d Cir.2004) (citing Homeland Security Act of 2002, Pub.L. No. 107–296, §§ 441, 451 & 471, 116 Stat. 2135, codified at 6 U.S.C. §§ 251, 271 & 291). Faced with this profusion of administrative bodies, we will adopt "the agency" as shorthand for the DHS and its sub-units.

9    🚩 Section 1252(a)(2)(B) of Title 8 of the United States Code, which also strips the district courts of jurisdiction over discretionary agency determinations, is in that respect at least partly duplicative of the APA requirement.

10    The cursory treatment of exhaustion by the Seventh Circuit in *McBrearty v. Perryman,* 212 F.3d 985 (7th Cir.2000), is not on point. In that case, the plaintiffs "sought judicial review of the refusal by the district director of the immigration service *to adjust* their status...." *Id.* at 986 (emphasis added). The Seventh Circuit

dismissed the complaint for want of jurisdiction on the ground that "[t]he suit was premature, since, as the plaintiffs acknowledge, they could obtain review of the district director's decision by the Board of Immigration Appeals if and when the immigration service institutes removal (i.e. deportation) proceedings against them. They have thus failed to exhaust their administrative remedies." *Id.* (internal citation omitted). But the Seventh Circuit confuses the *existence* of a claim with the *exhaustion* of administrative remedies. The *McBrearty* plaintiffs were not challenging a *legal determination of their statutory eligibility* for adjustment, but rather a *refusal to adjust* their status. This distinction makes all the difference. The refusal to adjust—a discretionary determination—was (as the court notes) barred by 🚩 § 1252(a)(2)(B). While it is true that the plaintiffs could have renewed their adjustment application in removal proceedings, that fact is irrelevant to the District Court's lack of jurisdiction: under 🚩 Section 1252(a)(2)(B) the court had no jurisdiction because the plaintiffs had no claim at all, *not* because they had failed to exhaust a valid claim. *McBrearty* is not about exhaustion, and is redeemed from making law without proper analysis only by its facts; it surely cannot be said to stand for the proposition that immigrants stating a legal claim—one *not* barred by 🚩 § 1252—must always wait for deportation proceedings.

11    The Fifth Circuit, in 📄 *Cardoso v. Reno,* 216 F.3d 512 (5th Cir.2000), held that denials of adjustment of status may reach the courts only through review of deportation proceedings. Because the court did not attempt to distinguish between denials of adjustment of status applications, and legal determinations of eligibility for status adjustment, it is not clear whether the *Cardoso* holding has much to do with the case at hand here. In *Cardoso,* the court considered three separate jurisdictional dismissals of immigration claims. One of them involved a claim that an application for adjustment of status had been wrongly denied as a matter of law. The applicant had filed for adjustment prior to her twenty-first birthday. However, the agency did not rule on the application for three years, at which point it denied the application on the grounds that the applicant was no longer eligible because she was no longer a minor. *Id.* at 514. The court held that the applicant could not invoke judicial review because the agency decision was not final, although it conceded that there were no deportation proceedings pending against the applicant. *Id.* at 518. We think it important as a matter of administrative law to distinguish between (reviewable) non-discretionary legal determinations, and (non-reviewable) discretionary determinations. Because the Fifth Circuit did not do so, we cannot tell with certainty whether we are in conflict on the question resolved in this case.

12    *See, e.g.,* Cynthia R. Farina, *Statutory Interpretation and the Balance of Power in the Administrative State,* 89 Colum. L.Rev. 452, 495–96 (1989) ("By the time of the ratification, the prevailing understanding of separation of powers was no longer a simplistic call for absolute segregation of conceptually distinct functions. The experience between independence and the Constitutional Convention had caused American political theorists to rethink the nature of governmental authority. They came to conclude that ... all power in government shared the same fundamental quality: it was dangerous unless adequately offset and controlled. And so ... the words 'separation of powers' came to connote something far more subtle and intricate than a mere, abstractly logical division. The phrase expressed the expectation that, through the carefully orchestrated disposition and sharing of authority, restraint would be found in power counterbalancing power.").

13    Having concluded that jurisdiction exists under the APA, we think it inadvisable to speculate, in the absence of briefing, about alternative jurisdictional avenues by which AAO decisions might be reviewed. We will await cases which in which the parties contest jurisdiction and put the issue squarely before us.

14    *See* 🚩 *Ozkok,* 19 I. & N. Dec. at 551–52. The third part of the test, which was omitted from the statutory definition, dealt with pre-judgment probation, and provided that such probation would be sufficient for a "conviction" if "a judgment of conviction or adjudication of guilt may be entered if the person violates the terms of the probation ..." 🚩 *Id.* at 552.

15    For our purposes here, we will treat the terms "vacated" and "expunged," which appear variously in the BIA opinions, as synonymous. The salient procedural situation is one in which a conviction is voided or invalidated,

"dismiss[ed], cancel[ed] ... discharge[d] or otherwise remove [d]," *Sandoval v. I.N.S.,* 240 F.3d 577, 583 (7th Cir.2001), whatever the label, and whatever the subsequent availability of the record of the conviction.

16    *Cf. Acosta,* 341 F.3d at 226 n. 6 ("[W]e infer a congressional intent not to incorporate ... a distinction ['between rehabilitative statutes that defer[ ] adjudication and those which expunge [ ] a prior admission or adjudication of guilt'] into the INA, but we do not infer that the elimination of such a distinction was the sole purpose of passing the revised definition of conviction in Section 101(a)(48)(A).")

17    It is conceivable, of course, that under § 1182(a)(2)(A) an immigrant might have admitted committing the relevant acts even where the § 1101(a)(48)(A) definition of "conviction" does not encompass the circumstances of his conviction. We need not decide this question here, because in this case, the admission and the guilty plea are one and the same. Had he been admitted to the PTI program, he need not have admitted anything.

18    Our decision in *Acosta* pertains only to *deferred* judgments; as we noted, the "charges against [Acosta] were ultimately dismissed without any adjudication of guilt." 341 F.3d at 221.

19    Some commentators have pointed out that state-deferred adjudications and state expungement statutes "are like apples and oranges," because while an expungement is a state's final determination of a person's legal status, "[d]eferring adjudication of guilt ... simply represents an initial step that may [or may not] lead to formal expungement." James A.R. Nafziger & Michael Yimesgen, *The Effect of Expungement on Removability of Non–Citizens,* 36 U. Mich. J.L. Reform 915, 930 (2003). It is certainly true that deferred judgments and expungements are different, and it may well be that a sound immigration policy would take that difference into account, but we do not sit in judgment of the soundness of immigration policy: the question before us is simply whether the language of § 1101(a)(48)(A) may reasonably be read by the agency as encompassing both.

20    This is the jurisprudential cousin of the "grandfather" time-travel hypothetical: would it be possible to go back in time and murder one's own grandfather? Does a court—even one of general jurisdiction—have the power to declare that an earlier event *never happened? See, e.g.,* Hon. Leon R. Yankwich, *The Federal Penal System,* 10 F.R.D. 539, 555 (1950) (suggesting that following expungement, a person can "claim truthfully that he *has never* been convicted of a felony").

21    Lest the significance of this exception be overestimated, we note that although Pinho's offense was a drug offense, the above-noted exception referred only to rehabilitative vacaturs. Pinho's claim, by contrast, is that his was not a rehabilitative vacatur.

22    We do not, accordingly, read the statute as requiring unambiguously that all convictions, even those vacated because of substantive defects, are included in the definition. In this we join the published opinions of at least the First, Second, and Seventh Circuits, and depart from the Fifth Circuit. *See Herrera–Inirio v. I.N.S.,* 208 F.3d 299, 305 (1st Cir.2000); *United States v. Campbell,* 167 F.3d 94, 98 (2d Cir.1999); *Sandoval v. I.N.S.,* 240 F.3d 577, 583–84 (7th Cir.2001); *Renteria–Gonzalez v. I.N.S.,* 322 F.3d 804, 817–22 (5th Cir.2002). In *Renteria–Gonzalez,* the Fifth Circuit, in holding that a guilty plea followed by a Judicial Recommendation Against Deportation ("JRAD") remains a conviction for immigration purposes, observed that "five circuits, including this court, have concluded that a vacated or otherwise expunged state conviction remains valid under § 1101(a)(48)(A)," 322 F.3d at 814, which is true enough if we interpret "a" to mean "some" rather than "all" (that is, "a vacated conviction *may* remain valid" as opposed to "a vacated conviction *must* remain valid"). The use of the ambiguous phrasing is misleading in this context, because the other circuits listed, and now this Court, accept the distinction made by the BIA between convictions which do remain valid and convictions which do not. Indeed, in *Renteria–Gonzalez,* Judge Benavides concurred specially to emphasize that "the majority opinion paints with too broad a brush ... [because] none of the convictions in the five cases cited by the majority was vacated based on the merits of the underlying criminal proceeding, i.e., a violation of a statutory or constitutional right with respect to the criminal conviction." 322

F.3d at 820. Because Renteria–Gonzalez's conviction was likewise not vacated because of a substantive defect, Judge Benavides continues, "any indication in the majority opinion that a conviction vacated based on the merits constitutes a conviction under § 1101(a)(48)(A) is entirely dicta...." *Id.* at 823 n. 24.

The breadth of *Renteria–Gonzalez'* s holding remains unclear. Soon after the decision was issued, an immigration judge cited *Renteria–Gonzalez* in holding that a conviction that had been vacated due to "procedural and substantive flaws in the underlying proceeding" remained valid under § 1101(a)(48)(A), and the Fifth Circuit, per Judge Benavides, "reluctantly" dismissed the petition for review, holding that, although the circuit was now "out of step with the rest of the nation," it was bound by *Renteria–Gonzalez.* *Discipio v. Ashcroft,* 369 F.3d 472, 474–75 (2004). However, the Justice Department subsequently petitioned the court to vacate *Discipio* and remand the case to the BIA for dismissal. The Justice Department argued that because § 1101(a)(48)(A) "is silent on the effect of a vacated conviction on an alien's immigration status, [the Fifth Circuit] should defer to the Board's" interpretation as set forth in *Pickering,* that substantive vacaturs are not "convictions." *Discipio v. Ashcroft,* 417 F.3d 448 (5th Cir.2005). The panel agreed to remand the case, and rehearing en banc was denied as moot, *Id.* at 450, leaving the precise holding of *Renteria–Gonzalez* up in the air. At the very least, it is clear that to read *Renteria–Gonzalez* to cover substantive vacaturs is to stretch it far beyond its facts.

Accepting the distinction between substantive and rehabilitative vacaturs not only gives proper deference to the agency's interpretation, but also serves to avoid the constitutional problems that might arise under a reading which brings constitutionally protected conduct or constitutionally infirm proceedings into the category of "conviction"—cases, for example, involving an alien who was convicted of conduct subsequently deemed constitutionally protected, or whose conviction was reversed on direct appeal because of insufficient evidence, or whose conviction was vacated on collateral attack because of a plain constitutional defect. The agency does not read the statute as encompassing such situations, however, so these difficult cases have not come before us.

23    *Cf. Sandoval,* 240 F.3d at 583 ("The INS also alleges that the modification [of Sandoval's conviction] was entered solely for immigration purposes, and is thus ineffective. This allegation is unfounded. The judge's modification was in response to Sandoval's properly filed motion stating a cognizable claim of ineffective assistance of counsel. That Sandoval may have filed his motion in response to the threat of deportation is irrelevant. Further, even if the state court judge's decision to modify Sandoval's sentence was motivated by the consequences of the federal immigration law, that fact would not render the modification ineffective for immigration purposes.").

24    For example, both judges and prosecutors enjoy absolute immunity from damage suits and criminal prosecution arising from their official acts. *See Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). It is unclear how the principle of immunity might extend to subpoenaed testimony about unstated motives. Our decision today avoids this issue.

25    We thus decline the government's similar invitation here to decide the ineffective assistance claim ourselves. *See* Brief for Appellee, at 11–12.

26    *Lim v. Ashcroft,* No. 01–CV–3271, 2002 WL 1967945 (D.N.J.2002) (unpublished). We remind the District Court that unpublished district court opinions are not a source of law.

27    The court summarized the proceedings as follows:

[T]he transcript shows that at the outset the court was presented with an arrangement in the nature of a plea agreement, that had been reached prior to the hearing between Mr. Lim and state authorities. Pursuant to the arrangement, the following actions were taken at the hearing: (1) the state court permitted Mr. Lim to withdraw his earlier plea to the kidnapping charge and enter a plea of guilty to a charge in the

original indictment of aggravated assault; (2) the court vacated the kidnapping conviction and stated that the date of the new plea should be treated for immigration purposes as having been entered on March 18, 1996 (a fictitious date as far as the record reveals); (3) the state dismissed voluntarily the remaining charges; (4) the court sentenced Mr. Lim to time served. All agreed that the foregoing arrangement's purpose was to facilitate Mr. Lim in avoiding deportation; by attempting to amend the date of conviction, Mr. Lim and his counsel sought to avoid the AEDPA amendment and preserve his eligibility for Section 212(c) consideration.

*Lim,* 2002 WL 1967945, at *3.

28    Although Judge McKee agrees with the rationale and result of our decision, he does not agree that we need to establish a formal test to properly resolve this appeal. He therefore does not endorse the majority's categorical test.

29    Our test is informed by our decisions in *United States v. Taylor,* 98 F.3d 768 (3d Cir.1996), and *United States v. Joshua,* 976 F.2d 844 (3d Cir.1992). In those cases we had to determine how to classify a prior crime for purposes of the Federal Sentencing Guidelines. We held that "a sentencing court should look solely to the conduct alleged in the count of the indictment charging the offense of conviction...." *Taylor,* 98 F.3d at 771 (quoting *Joshua,* 976 F.2d at 856). Thus, to determine whether a prior crime was a "crime of violence," the sentencing court could look only at the conduct alleged in the indictment for the count which was proved or admitted. The court could not look outside the indictment to determine whether the defendant actually committed other acts which did not appear in the indictment on that count.

Our test also accords deference to the BIA's formulation in *Pickering,* which provides that "in making this determination [of the basis for a vacatur] we look to the law under which the ... court issued its order and the terms of the order itself, as well as the reasons presented by the respondent in requesting that the court vacate the conviction." *Pickering,* 23 I. & N. Dec. at 625.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.    AR.06152    20

813 F.3d 240
United States Court of Appeals,
Fifth Circuit.

Fany Jackeline RAMIREZ–MEJIA, also
known as Fany Ramirez, also known as
Fany Ramirez de Quinteros, Petitioner

v.

Loretta LYNCH, U.S. Attorney General, Respondent.

No. 14–60546.
|
Feb. 11, 2016.

**Attorneys and Law Firms**

Andrea Lauren Penedo, Fragomen, Del Rey, Bernsen & Loewy, L.L.P., Alexander I. Afanassiev, Esq., Quan Law Group, P.L.L.C., Houston, TX, for Petitioner.

Alison Ruth Drucker, Carmel Morgan, Esq., Trial Attorney, Office of Immigration Litigation, U.S. Department of Justice Office of Immigration Litigation, Washington, DC, for Respondent.

Rebecca Ann Sharpless, Coral Gables, FL, Charles Roth, Chicago, IL, Karen Musalo, San Francisco, CA, for Amicus Curiae.

Petition for Review of an Order of the Board of Immigration Appeals.

Before WIENER, SOUTHWICK, and GRAVES, Circuit Judges.

*ON PETITION FOR REHEARING EN BANC*

LESLIE H. SOUTHWICK, Circuit Judge:

Fany Jackeline Ramirez–Mejia petitioned for rehearing en banc of our July 21, 2015 decision. No member of the panel or judge in regular active service requested that the court be polled. Thus, the petition for rehearing en banc is DENIED. *See* FED. R.APP. P. 35; 5TH CIR. R. 35.

Our panel decision details the facts in this case. *See* Ramirez–Mejia v. Lynch, 794 F.3d 485, 487–89 (5th Cir.2015). Ramirez–Mejia's petition for rehearing en banc re-

urges the same issues she raised in her appellate briefing. We address the question of asylum again in light of the petition.

Ramirez–Mejia contends this court erroneously held "that aliens whose removal orders are reinstated may not apply for asylum." *Id.* at 491. By statute, any alien whose removal order has been reinstated "may not apply for any relief under this **\*241** chapter." 8 U.S.C. § 1231(a)(5). It is obvious that Congress wanted illegal reentry to have serious consequences. We held that in light of the statute, asylum is unavailable for an alien like Ramirez–Mejia. That is not to say Ramirez–Mejia, and similarly situated aliens, are defenseless. She still has a right to seek withholding of removal or protection under the Convention Against Torture ("CAT"). She did so in this case.

We acknowledge that asylum is distinct from withholding of removal and CAT protection. Indeed, asylum may be the easiest of the three to justify. To qualify for asylum, an alien must present evidence of past persecution or a well-founded fear of future persecution, the latter of which requires a showing "that a reasonable person in the same circumstances would fear persecution if deported." *Sharma v. Holder,* 729 F.3d 407, 413 (5th Cir.2013). The standard for withholding of removal or CAT protection "is even higher than the standard for asylum, requiring a showing that it is *more likely than not* that the alien's life or freedom would be threatened by persecution on one of those grounds." *Orellana–Monson v. Holder,* 685 F.3d 511, 518 (5th Cir.2012) (emphasis added). Further, "asylum affords broader benefits." *I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 428 n. 6, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Asylum prevents a removal order from being entered and offers an alien a path to legal status. *See id.* In contrast, withholding of removal and CAT protection do not bar removal generally, but rather they bar removal to a designated country. *See id.;* 8 C.F.R. §§ 208.16(f), 208.17.

None of those distinctions alter our analysis of Section 1231(a)(5). Even if withholding of removal and CAT protection are slightly less potent remedies than asylum, the difference may well be consistent with Congress's intent to penalize illegal reentry. We need not justify the difference, but we note possible reasons for it.

In passing, Ramirez–Mejia suggests that consideration for asylum cannot be limited because it is a critical component in the United States' compliance with treaty obligations. The argument is unconvincing. The Supreme Court has clarified that asylum is a discretionary mechanism that corresponds with Article 34 of the United Nations Convention Relating to the State of Refugees, a "precatory" provision.

*See* 🔖 *Cardoza–Fonseca,* 480 U.S. at 441, 107 S.Ct. 1207. We find no treaty obligation in conflict with our holding. If withholding of removal and CAT protection were also eliminated for aliens who illegally reentered, the argument that our international obligations were being ignored would have some resonance. Congress did not go so far.

We reaffirm that " 🔖 Section 1231(a)(5)'s plain language, relevant regulations, and analogous case law" dictate our conclusion that asylum is not available as relief to an alien who is found guilty of illegal reentry.

Ramirez–Mejia's petition for rehearing en banc is DENIED.

**All Citations**

813 F.3d 240 (Mem)

---

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Disagreed With by Perez-Guzman v. Lynch, 9th Cir., August 31, 2016

794 F.3d 485
United States Court of Appeals,
Fifth Circuit.

Fany Jackeline RAMIREZ–MEJIA, also
known as Fany Ramirez, also known as
Fany Ramirez de Quinteros, Petitioner

v.

Loretta LYNCH, U.S. Attorney General, Respondent.

No. 14–60546.
|
July 21, 2015.

**Synopsis**

**Background:** Alien, a native and citizen of Honduras whose removal order had been reinstated, petitioned for review Board of Immigration Appeals' (BIA) dismissal of her appeal of immigration judge's (IJ) denial of her applications for asylum, withholding of removal, and protection under the Convention Against Torture (CAT).

**Holdings:** The Court of Appeals, Leslie H. Southwick, Circuit Judge, held that:

[1] on issue of apparent first impression in the Circuit, an alien whose removal order was reinstated was ineligible for asylum;

[2] alien was ineligible for asylum due to reinstatement of her removal order despite her parole into United States;

[3] alien was not entitled to withholding of removal on ground that her life or freedom would be threatened in Honduras due to membership in her family; and

[4] alien would not likely be tortured by or with the consent of Honduran government if she returned to Honduras, precluding CAT relief.

Petition denied.

West Headnotes (11)

**[1]** **Aliens, Immigration, and Citizenship** 🔑 Jurisdiction and venue

Court of Appeals has jurisdiction to review the lawfulness of the reinstatement of a removal order but not the underlying removal order.

9 Cases that cite this headnote

**[2]** **Aliens, Immigration, and Citizenship** 🔑 Substantial evidence in general

**Aliens, Immigration, and Citizenship** 🔑 Law questions

In an immigration case, Court of Appeals reviews questions of law de novo and findings of fact for substantial evidence.

**[3]** **Aliens, Immigration, and Citizenship** 🔑 Substantial evidence in general

Under the substantial-evidence standard for reviewing findings of fact in an immigration case, reversal requires the applicant to demonstrate that the evidence is so compelling that no reasonable factfinder could reach a contrary conclusion.

**[4]** **Aliens, Immigration, and Citizenship** 🔑 Reinstatement of order

**Aliens, Immigration, and Citizenship** 🔑 Ineligible Aliens

Asylum was a form of "relief" under statute providing that an alien whose removal order was reinstated was ineligible for any relief; asylum was a form of redress from removal because, if granted, it prevented the removal from going forward. Immigration and Nationality Act, §§ 208(a), (b)(2), 241(a)(5), 8 U.S.C.A. §§ 1158(a), (b)(2), 1231(a)(5); 8 C.F.R. § 241.8(a, b, e).

10 Cases that cite this headnote

**[5]    Aliens, Immigration, and
Citizenship** 🔑 Relief from Denial of
Admission or Removal in General

**Aliens, Immigration, and
Citizenship** 🔑 Reinstatement of order

Statute providing that an alien whose removal
order is reinstated is ineligible for any relief was
designed to enlarge the class of illegal reentrants
whose orders may be reinstated and limit the
possible relief from a removal order available to
them. Immigration and Nationality Act, § 241(a)
(5), 📒 8 U.S.C.A. § 1231(a)(5).

7 Cases that cite this headnote

**[6]    Aliens, Immigration, and
Citizenship** 🔑 Reinstatement of order

**Aliens, Immigration, and
Citizenship** 🔑 Effect of parole; rights of
paroled aliens

**Aliens, Immigration, and
Citizenship** 🔑 Ineligible Aliens

Alien, a native and citizen of Honduras, was
ineligible for asylum because her removal order
had been reinstated following her illegal reentry,
even though she was paroled into the United
States for the purpose of pursuing her claims
for withholding of removal and protection under
Convention Against Torture (CAT); nothing
about the grant of temporary parole to pursue
relief canceled the relevance of alien's earlier
illegal reentry after having been removed.
Immigration and Nationality Act, §§ 212(d)
(5), 241(a)(5), 📒 8 U.S.C.A. §§ 1182(d)(5),
1231(a)(5); 📒 8 C.F.R. § 1208.16(c)(2).

6 Cases that cite this headnote

**[7]    Aliens, Immigration, and
Citizenship** 🔑 Asylum Distinguished from
Withholding of Removal or Deportation

**Aliens, Immigration, and
Citizenship** 🔑 Relief Under Treaties Against
Torture

Unlike forms of relief from removal, such as
asylum, withholding of removal, as well as
Convention Against Torture (CAT) protection,
prevents an alien from being returned to the place
of danger; it does not prevent removal if some
other country will accept the alien. 📒 8 C.F.R. §
1208.16(f).

12 Cases that cite this headnote

**[8]    Aliens, Immigration, and
Citizenship** 🔑 Membership in social group

Alien, a native and citizen of Honduras, was not
persecuted by gang members, who had allegedly
killed her brother, on account of her membership
in her family, and thus, she was not entitled to
withholding of removal on ground that her life
or freedom would be threatened in Honduras due
to membership in a particular social group; gang
members allegedly threatened alien to obtain
information her brother had supposedly given
her, and other members of her family, who
remained in Honduras, had not faced persecution
on the basis of their membership in the family.
📒 8 C.F.R. § 1208.16(b).

16 Cases that cite this headnote

**[9]    Aliens, Immigration, and
Citizenship** 🔑 Economic deprivation

Economic extortion is not a form of persecution
under immigration law.

4 Cases that cite this headnote

**[10]    Aliens, Immigration, and
Citizenship** 🔑 Government action or
acquiescence

A public official's willful blindness to torture
constitutes acquiescence, as would support
granting relief under Convention Against
Torture (CAT). 📒 8 C.F.R. §§ 1208.16(c)(2),
1208.18(a)(1).

11 Cases that cite this headnote

**[11]**   **Aliens, Immigration, and**
           **Citizenship** 🔑 **Standard for relief**

           **Aliens, Immigration, and**
           **Citizenship** 🔑 **Government action or**
           **acquiescence**

Alien, a native and citizen of Honduras, would not likely be tortured by or with the consent of Honduran government if she returned to Honduras, as required to obtain relief under Convention Against Torture (CAT); although country reports noted gang violence and police corruption in Honduras, and police there allegedly recommended against filing a report after alien's brother's murder by gang members and responded with indifference when she disclosed an arrested gang member's threats, alien did not allege that public officials expressed any intent to acquiesce in her torture if she did not leave Honduras, she was not tortured before leaving Honduras or after returning following her first and second removal, her brother's wife and family members were not tortured despite remaining in Honduras after her brother's murder, and her brother's wife had not been harmed since moving to another part of Honduras. 📑 8 C.F.R. § 1208.16(c)(2).

7 Cases that cite this headnote

**Attorneys and Law Firms**

**\*487**  Andrea Lauren Penedo (argued), Foster, L.L.P., Alexandre I. Afanassiev, Esq., Quan Law Group, P.L.L.C., Houston, TX, for Petitioner.

Carmel Morgan, Esq. (argued), Trial Attorney, Tangerlia Cox, Tangerlia Cox, for Respondents.

Petition for Review of an Order of the Board of Immigration Appeals.

Before WIENER, SOUTHWICK, and GRAVES, Circuit Judges.

**Opinion**

LESLIE H. SOUTHWICK, Circuit Judge:

Fany Jackeline Ramirez–Mejia's removal order was reinstated following her illegal reentry into the United States. The Board of Immigration Appeals ruled she may not apply for asylum and is ineligible for withholding of removal or protection under the Convention Against Torture. We agree and DENY the petition for review.

In March 2006, Ramirez–Mejia, a native and citizen of Honduras, was apprehended while illegally entering the United States. She was subsequently removed from the country. She returned to the United States the next month.

In January 2012, Ramirez–Mejia was arrested for theft. Her removal order was reinstated the following day. When questioned by an immigration officer, she expressed a fear of returning to Honduras. In an interview with an asylum officer, she explained that she feared she would be killed by the same individuals who killed her brother. Based on this testimony, the asylum officer referred her case to an immigration judge ("IJ") for a hearing. At the hearing, Ramirez–Mejia testified that her brother had been murdered in May 2003. She asserted that her family attempted to file a police report, but that the police told them to "leave things the way they are...." She also alleged that, in November 2005, she began receiving anonymous notes demanding that she disclose information her brother had supposedly revealed to her. Ramirez–Mejia claimed that her failure to respond led the individuals responsible for the murder to open fire on her father's business while she was present in February 2006. The police subsequently captured one of the assailants. While in custody, the assailant allegedly threatened Ramirez–Mejia and questioned her about her brother when she went to the police station to file a report.

Ramirez–Mejia maintained that she fled Honduras in response to these events.  **\*488**  She also asserted that the individuals sought extortion money from her father after her departure and renewed their anonymous threats when she returned to Honduras in March 2006 following her removal from the United States.

The IJ noted that Ramirez–Mejia's testimony did not "seem plausible" but accepted it as credible. Nevertheless, the IJ concluded that Ramirez–Mejia was ineligible for withholding of removal or protection under the Convention Against

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Torture ("CAT"). The IJ noted that she had not demonstrated persecution based on membership in a protected group and rejected her argument that her nuclear family constituted a protected group. The IJ also concluded that Ramirez–Mejia failed to show that the Honduran government would allow her to be tortured. In January 2013, the Board of Immigration Appeals ("BIA") dismissed Ramirez–Mejia's appeal. In February, she was removed to Honduras.

In March, Ramirez–Mejia moved to reopen her case based on the discovery of previously unavailable evidence. This evidence included: (1) an affidavit in which the wife of her brother stated that he had been a gang member and was killed by a rival gang, and that she had received threatening notes following his murder; (2) her brother's death certificate; (3) affidavits in which her parents described their extortion at the hands of the gang; (4) a criminal complaint from February 2006 describing the robbery of her father's business and subsequent capture of one of the perpetrators (no mention of gunfire is made); (5) a psychological report for Ramirez–Mejia; (6) a declaration from an expert on Central American gangs; (7) a statement in which a witness to the 2006 robbery stated that the perpetrator captured by police threatened to kill Ramirez–Mejia; (8) articles about gang violence in Honduras; (9) anonymous threatening notes; and (10) a notarized statement in which Ramirez–Mejia asserted that the Honduran public ministry advised her to return to the United States after she filed a complaint about the notes.

In May, the BIA granted the motion to reopen and remanded the case so that an IJ could determine Ramirez–Mejia's eligibility for withholding of removal and CAT protection in light of the new evidence. In June, Ramirez–Mejia applied for parole so that she could be present for the presentation of her case. The Department of Homeland Security ("DHS") granted the request, and Ramirez–Mejia was paroled into the United States in December 2013.

In February 2014, Ramirez–Mejia presented her case. She testified about her brother's murder, the incident at her father's business, and the threats. Additionally, an expert on Central American gangs testified about gang violence in Honduras and the government's inability to control their actions. He stated that Ramirez–Mejia would face a high risk of harm or death upon returning to the country. Finally, Ramirez–Mejia's husband testified that when he visited her in Honduras after her most recent removal they rarely ventured outside due to fear.

The IJ denied withholding of removal and CAT protection. The IJ assumed the credibility of Ramirez–Mejia and her witnesses, but held that her family did not constitute a protected group, and that she had not been targeted on the basis of her familial status. The IJ also held that Ramirez–Mejia had not demonstrated that she would be tortured by the gang with the government's acquiescence. Finally, the IJ declined to consider Ramirez–Mejia's eligibility for asylum because her removal order had been reinstated. *See* 8 U.S.C. § 1231(a)(5); 8 C.F.R. § 241.8(a).

**\*489** The BIA dismissed Ramirez–Mejia's appeal. She timely filed a petition for review with this court.

## DISCUSSION

[1] [2] [3] This court has jurisdiction to review the lawfulness of a reinstatement order but not the underlying removal order. *See Ojeda–Terrazas v. Ashcroft,* 290 F.3d 292, 295 (5th Cir.2002). We consider the BIA's order and any findings or conclusions it adopted from the IJ. *Hakim v. Holder,* 628 F.3d 151, 153 (5th Cir.2010). We review questions of law *de novo* and findings of fact for substantial evidence. *Id.* Under the substantial-evidence standard, reversal requires the applicant to demonstrate "that the evidence is so compelling that no reasonable factfinder could reach a contrary conclusion." *Chen v. Gonzales,* 470 F.3d 1131, 1134 (5th Cir.2006).

Ramirez–Mejia claims that she is eligible for asylum, and that the BIA erred by ruling that she could not apply for asylum due to the reinstatement of her removal order. Alternatively, she claims that her parole into the country following the reopening of her case rendered the reinstatement statute inapplicable to her. She also argues that she is eligible for withholding of removal and CAT protection.

### *I. Effects of Ramirez–Mejia's Reinstatement Order*

An alien who illegally reenters the country after removal "is not eligible and may not apply for any relief under this chapter" and "shall be removed under the prior order at any time after the reentry." 8 U.S.C. § 1231(a)(5). The alien is not entitled to a hearing prior to reinstatement but may make a statement before an immigration officer. 8 C.F.R.

§§ 241.8(a), (b). If the alien expresses a fear of persecution or torture upon return to the country of removal, the alien is referred to an asylum officer. § 241.8(e). The involvement of asylum officers is not because of eligibility for asylum but for another purpose, *i.e.,* consideration for "withholding of removal only" once an asylum officer determines that the fear is reasonable. *Id.;* § 208.31(e).

[4] Ramirez–Mejia argues that the BIA erred by concluding that Section 1231(a)(5) and its accompanying regulations precluded her from applying for asylum following the reinstatement of her removal order because asylum is not a form of "relief" under the statute. Thus, since she is physically present in the United States and none of the limiting exceptions or conditions governing asylum apply to her, she maintains that she must be allowed to apply for asylum. *See* 8 U.S.C. §§ 1158(a), (b)(2).

The immigration statutes do not define the word "relief." Nevertheless, "its familiar meaning encompasses any 'redress or benefit' provided by a court." *United States v. Denedo,* 556 U.S. 904, 909, 129 S.Ct. 2213, 173 L.Ed.2d 1235 (2009) (quoting BLACK'S LAW DICTIONARY 1317 (8th ed.2004)). Asylum is a form of redress from removal because, if granted, it prevents the removal from going forward. Courts routinely refer to asylum as a form of relief from removal and frequently employ the phrase "asylum relief." *See, e.g., Jama v. ICE,* 543 U.S. 335, 337, 125 S.Ct. 694, 160 L.Ed.2d 708 (2005); *Wang v. Holder,* 569 F.3d 531, 540 (5th Cir.2009); *Morales–Izquierdo v. Gonzales,* 486 F.3d 484, 491 (9th Cir.2007). On the other hand, we agree with the government's statement at oral argument that withholding of removal and application of the CAT are often referred to as forms of protection, not relief. *See, e.g., Wang,* 569 F.3d at 535.

**\*490** Under Section 1231(a)(5), an alien whose removal order is reinstated is ineligible "for *any* relief under this chapter...." 8 U.S.C. § 1231(a)(5) (emphasis added). "Read naturally, the word 'any' has an expansive meaning...." *United States v. Gonzales,* 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997). When the word is not qualified by restrictive language, "there is no basis in the text for limiting" the word or clause it modifies. *Id.* Thus, Section 1231(a)(5), read plainly, broadly denies all forms of redress from

removal, including asylum. This conclusion is confirmed by the statute's admonition that an alien who illegally reenters the country "shall be removed under the prior order at any time after the reentry." 8 U.S.C. § 1231(a)(5). Affording asylum relief to aliens whose removal orders are reinstated would be inconsistent with this provision. Additionally, the statute's accompanying regulations, which reiterate its blanket denial of relief and recognize an exception for withholding of removal but not asylum, also support this conclusion. *See* 8 C.F.R. §§ 241.8(a), (e); *see also* § 208.31(e).

Ramirez–Mejia argues that this interpretation of Section 1231(a)(5) conflicts with Section 1158, which outlines the general requirements and procedures for asylum relief. According to her, Congress intended Section 1158's criteria and conditions to be the only limitations on asylum. We disagree. Section 1158 does not "create any substantive or procedural right or benefit," and "[t]he Attorney General may provide by regulation for any ... conditions or limitations on the consideration of an application for asylum...." 8 U.S.C. §§ 1158(d)(5)(B), (d)(7). The Supreme Court emphasized the discretionary nature of asylum relief when it stated that the Attorney General is not required to grant an alien asylum even when the eligibility criteria are met. *See INS v. Cardoza–Fonseca,* 480 U.S. 421, 441, 444–45, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). These interpretations of Section 1158 show that it was intended to be amenable to limitation by regulation and by the exercise of discretion.

[5] In addition, Section 1231(a)(5) imposes a statutory limit. It was designed to "enlarge[ ] the class of illegal reentrants whose orders may be reinstated and limit[ ] the possible relief from a removal order available to them." *Fernandez–Vargas v. Gonzales,* 548 U.S. 30, 33, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006). Congress has many options in revising statutory schemes. Adopting a clear limitation in one section without amending another section specifically dealing with the same subject is one such option. The judiciary's role is not to question the method of an amendment but only to interpret its effect. The clear language in Section 1231(a)(5) suffices to bar all relief from removal, even asylum.

This analysis is consistent with existing case law. At least one circuit has recognized that " 'aliens subject to reinstatement of a previous removal order under [ Section 1231(a)(5) ]' are 'ineligible for asylum.' " *See Herrera–Molina v. Holder,* 597 F.3d 128, 139 (2d Cir.2010) (quoting Regulations Concerning the Conventions Against Torture, 64 Fed.Reg. 8478, 8485 (Feb. 19, 1999)). Neither the Supreme Court nor this court has explicitly addressed the issue, but both have held that aliens subject to reinstatement orders are ineligible for adjustments of status under Section 1231(a)(5). *See Fernandez–Vargas,* 548 U.S. at 46–47, 126 S.Ct. 2422; *Silva Rosa v. Gonzales,* 490 F.3d 403, 410 (5th Cir.2007).

Those cases provide a useful analogy. Like Section 1158, the adjustment-of-status provisions do not mention reinstatement orders. *See* 8 U.S.C. § 1255. Moreover, like asylum, adjustments **\*491** of status are not specifically listed as a type of relief under Section 1231(a)(5). Nevertheless, the Supreme Court and this court both held that aliens were not eligible for an adjustment of status under Section 1231(a)(5). *See Fernandez–Vargas,* 548 U.S. at 46–47, 126 S.Ct. 2422; *Silva Rosa,* 490 F.3d at 410.

In summary, Section 1231(a)(5)'s plain language, relevant regulations, and analogous case law all compel the conclusion that aliens whose removal orders are reinstated may not apply for asylum. Accordingly, the BIA did not err by declining to consider Ramirez–Mejia's eligibility for asylum relief.

*II. Ramirez–Mejia's Parole Into the United States*

**[6]**     Ramirez–Mejia also argues that Section 1231(a)(5) is inapplicable to her because it only applies to aliens who reentered the United States illegally. She last entered the country under a grant of parole pursuant to 8 U.S.C. § 1182(d)(5). Thus, she argues that the government, by paroling her into the United States to determine whether she was eligible for "withholding of removal only," displaced her prior illegal reentry and rendered her eligible for asylum. The argument is imaginative but errant.

The Immigration and Nationality Act gave the Attorney General authority to exercise discretion in granting parole and to place "such conditions as he may prescribe" on the parolee. *See* 8 U.S.C. § 1182(d)(5)(A). Even though that statute remains unchanged, parole authority now resides with the DHS. [1]  Additionally, parole does not create an entitlement to remain in the United States: "when the purposes of such parole ... have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Id.* Regulations provide further requirements and procedures for parole. *See* 8 C.F.R. § 212.5.

Ramirez–Mejia was granted parole for the purpose of pursuing withholding of removal and CAT protection. Though her presence in the country was with the permission of the DHS, we see no basis for concluding that her authorized presence overrode the effect of her earlier illegal entry. Nothing about the grant of temporary parole to pursue relief cancels the relevance of her earlier illegal reentry after having been removed. She thus remains subject to the provisions of Section 1231(a)(5).

We also see no relevance to the fact that, under certain circumstances, a removal order may not be reinstated after a removed alien legally reenters the country. For example, after the passage of a prescribed period of time, a prior removal order will not prevent a removed alien from applying for or obtaining admission to the country. *See* § 1182(a)(9); *In re Torres–Garcia,* 23 I. & N. Dec. 866, 871–72 (BIA 2006). Such circumstances are inapplicable in this case. Ramirez–Mejia has not been admitted to the United States following her removal, and her parole has no effect on her status under the law. *See* 8 U.S.C. § 1182(d)(5)(A); *Leng May Ma v.* **\*492** *Barber,* 357 U.S. 185, 188, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958).

Ramirez–Mejia's parole did not render Section 1231(a)(5) inoperative.

*III. Withholding of Removal*

**[7]**     Withholding of removal is required when an alien is able to "establish that his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 1208.16(b). If the alien shows past persecution based on membership in a relevant group, the burden shifts to the government to show that the threat of persecution no longer exists or can be

WESTLAW     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

mitigated through relocation within the country of removal. § 1208.16(b)(1)(i)-(ii). Otherwise, the alien must show that he will "more likely than not" suffer persecution.[2] § 1208(b)(1)(iii), (2). Unlike forms of relief from removal, such as asylum, withholding of removal (as well as CAT protection) prevents an alien from being returned to the place of danger; it does not prevent removal if some other country will accept the alien. *See* § 1208.16(f).

**[8]** The IJ concluded that Ramirez–Mejia's family did not meet the "particularity" and "social visibility" requirements of a "particular social group." *See Orellana–Monson v. Holder,* 685 F.3d 511, 520–21 (5th Cir.2012). It also concluded that she did not establish that she was persecuted "on account of" her membership in her family. The BIA affirmed based on the latter rationale and declined to address whether Ramirez–Mejia's family constituted a "particular social group."[3] We agree with that conclusion and likewise do not address whether her family was a particular social group.

Ramirez–Mejia argues that she was persecuted, at least in part, on the basis of her family membership because the gang referred to and sought information about her brother in the anonymous notes, sought extortion money from her parents, and referred to her brother in the note sent to her brother's wife. She also cites testimony in which her expert witness stated that a gang's animosity toward an individual may come to extend to the family as a whole. She concludes that "[w]ithout her relationship to her brother, the gang would not have asked her about any hypothetical 'information.' "

These arguments are unpersuasive. The primary purpose of the threats was to obtain information Ramirez–Mejia's brother had supposedly given her. Ramirez–Mejia emphasizes that the gang members mentioned her and her brother by name when issuing the threats. Referring to individuals by name indicates little, and certainly does not, in and of itself, evince intent to persecute on the basis of membership within a family. Accordingly, this evidence does not undermine the IJ's conclusion that Ramirez–Mejia's "worth to the persecutors is predicated on her knowledge of some supposed secret and not based upon the fact of her familial relationship to her brother."

**\*493** Ramirez–Mejia maintains that "[a]ny request for information by the gang members was ... inseparable from her relationship with her brother." She does not explain why that

is so. Logically, there is no reason to suppose that those who persecute to obtain information also do so out of hatred for a family, or vice versa. As a result, the evidence that gang members sought information from Ramirez–Mejia about her brother, without more, does not support her claim that the gang intended to persecute her on account of her family. This is particularly true in light of the fact that other members of her family, who have remained in Honduras, have not faced persecution on the basis of their membership in the family.

**[9]** Finally, the fact that the gang sought to extort Ramirez–Mejia's family is irrelevant for purposes of the persecution analysis, because this court "do [es] not recognize economic extortion as a form of persecution under immigration law...." *Castillo–Enriquez v. Holder,* 690 F.3d 667, 668 (5th Cir.2012) (citations and quotations omitted).

Because Ramirez–Mejia has not demonstrated that no reasonable factfinder could conclude that she was not persecuted on account of her family membership, *see Chen,* 470 F.3d at 1134, we agree with the BIA's conclusion that Ramirez–Mejia does not qualify for withholding of removal.

*IV. CAT Protection*

**[10]** To be eligible for CAT protection, an alien must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). In assessing the likelihood of torture, the factfinder may consider evidence of past torture, the alien's ability to relocate within the country of removal to avoid torture, and human rights violations within the country of removal. § 1208.16(c)(3). "Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person ... by or at the instigation of or with the consent or acquiescence of a public official...." § 1208.18(a)(1). Willful blindness to torture constitutes acquiescence. *Ontunez–Tursios v. Ashcroft,* 303 F.3d 341, 354 (5th Cir.2002).

**[11]** The BIA accepted the IJ's finding that Ramirez–Mejia would not more likely than not be tortured by or with the consent of the Honduran government if she returned to Honduras. The IJ observed that Ramirez–Mejia, her family, and her brother's wife had not been tortured in the past; she did not show an inability to relocate to a part of Honduras where her likelihood of harm would be diminished, as her brother's

wife had done; and she did not show acquiescence to violence by the Honduran police, who in fact arrested a gang member and requested that she give a statement after the robbery of her father's business in 2006.

Ramirez–Mejia does not specifically contest these findings. Instead, she emphasizes the country reports discussing gang violence and police corruption in Honduras. She also reiterates her allegations that the police recommended against filing a report after her brother's murder and responded with indifference when she disclosed the arrested gang member's threats in 2006 and the anonymous notes in 2013. This evidence, she claims, shows that it is more probable than not that she will be tortured if removed to Honduras.

Ramirez–Mejia has not demonstrated that no reasonable factfinder could conclude that she did not qualify for CAT protection. *See* Chen, 470 F.3d at 1134. First, she has not contested the finding that she was not tortured before leaving **\*494** Honduras or after returning following her first and second removal. Nor has she contested the finding that her brother's wife and family members were not tortured, despite remaining in Honduras after her brother's murder. Finally, the fact that her brother's wife has not been harmed since moving to another part of Honduras suggests that any danger of harm could be mitigated through relocation. Based on this evidence, a reasonable factfinder could have found that Ramirez–Mejia would not more likely than not be tortured if removed to Honduras. Although the country reports and alleged threats emphasized by Ramirez–Mejia may weigh against this conclusion, they do not *compel* the opposite conclusion. *See id.*

Second, Ramirez–Mejia has offered little evidence that the government would acquiesce in gang members' attempts to harm her. Although she alleged that the police told her not to report her brother's murder and "not to get involved with these people," she did not allege that the police stated or otherwise indicated that they would permit harm to befall her if she did file a report. Additionally, she asserted that the police allowed her to be threatened by a gang member after the robbery of her father's business in 2006, but she acknowledged that the police arrested the gang member and insisted that she file a report against him. Finally, she alleged that officials advised her to leave the country when she disclosed the anonymous notes she had received. Again, however, she did not allege that the officials expressed any intent to acquiesce in her torture if she did not leave. This evidence, as well as the country reports and related testimony, does not compel the conclusion that the government would acquiesce in Ramirez–Mejia's torture if she returned to Honduras.

We agree with the BIA's conclusion that Ramirez–Mejia does not qualify for CAT protection.

Petition DENIED.

**All Citations**

794 F.3d 485

## Footnotes

1   It seems agreed that authority over granting parole was transferred from the Attorney General to the DHS in 2002 as a result of the Act that created the DHS; we need not trace the statutory route of the transfer here. *See* Matter of Castillo–Padilla, 25 I. & N. Dec. 257, 261 & n. 1 (BIA 2010). One reference to the authority of the DHS Secretary is in 6 U.S.C. § 202(4), which provides that the Secretary is to establish and administer rules governing parole.

2   This standard is more stringent than the "well-founded fear" standard applicable to asylum. *See* INS v. Cardoza–Fonseca, 480 U.S. 421, 430–32, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987).

3   Contrary to Ramirez–Mejia's contention, the BIA did not concede that her family constituted a particular social group. Rather, it found as follows: "However the proposed social group may be defined, the applicant has not established that gang members targeted her to punish her for or to overcome her group membership."

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

254 Fed.Appx. 113
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

Mohammad Asim RASHID, Petitioner,

v.

Michael B. MUKASEY [1], U.S.
Attorney General, Respondent.

No. 07–0539–ag.
|
Nov. 20, 2007.

**Synopsis**

**Background:** Alien, a native and citizen of Pakistan, petitioned for review of order of the Board of Immigration Appeals (BIA) affirming decision of Immigration Judge, Brigitte LaForest, denying his application for asylum, withholding of removal, and relief under the Convention Against Torture.

**Holding:** The Court of Appeals held that substantial evidence supported immigration judge's adverse credibility determination with respect to alien's applications for withholding of removal and relief under the Convention Against Torture.

Petition denied.

West Headnotes (1)

[1]    **Aliens, Immigration, and
       Citizenship** 🔑 Adverse credibility
       determinations in general

Substantial evidence supported immigration judge's adverse credibility determination with respect to alien's applications for withholding of removal and relief under the Convention Against Torture; there were discrepancies between alien's testimony and his asylum application concerning the only two incidents of persecution that alien alleged he had suffered in Pakistan, and, alien

fraudulently used an alias to obtain credit cards and was convicted for fraudulent use of a United States passport in attempting to re-enter the country. Immigration and Nationality Act, § 242(b)(4)(B), 🚩 8 U.S.C.A. § 1252(b)(4)(B).

**\*114** UPON DUE CONSIDERATION of this petition for review of a Board of Immigration Appeals ("BIA") decision, it is hereby ORDERED, ADJUDGED, AND DECREED that the petition for review is DISMISSED in part and DENIED in part.

**Attorneys and Law Firms**

Hector M. Roman, Roman & Singh, LLP, Jackson Heights, NY, for Petitioner.

Michael B. Mukasey, Attorney General, Civil Division, Leslie McKay, Senior Litigation Counsel, Sarah Maloney, Attorney, U.S. Department of Justice, Office of Immigration Litigation, Washington, D.C., for Respondent.

PRESENT: Hon. ROBERT D. SACK, Hon. REENA RAGGI, and Hon. PETER W. HALL, Circuit Judges.

*SUMMARY ORDER*

**\*\*1** Petitioner Mohammad Asim Rashid, a native and citizen of Pakistan, seeks review of a January 25, 2007 order of the BIA affirming the June 21, 2005 decision of Immigration Judge ("IJ") Brigitte LaForest, denying his application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). *In re Mohammad Asim Rashid a.k.a. Lester Louis Lockett a.k.a. Maliek Anwar,* No. A78 385 389 (B.I.A. Jan. 25, 2007), *aff'g* No. A78 385 389 (Immig. Ct. N.Y. City June 21, 2005). We assume the parties' familiarity with the underlying facts and procedural history in this case.

Where, as here, the BIA adopts the decision of the IJ and supplements the IJ's decision, this Court reviews the decision of the IJ as supplemented by the BIA. *See Yan Chen v. Gonzales,* 417 F.3d 268, 271 (2d Cir.2005). However, this Court lacks jurisdiction to review the agency's finding that an asylum application was untimely under 8 U.S.C. § 1158(a)(2)(B), or that neither changed nor extraordinary

circumstances excused the untimeliness under 8 U.S.C. § 1158(a)(2)(D). 8 U.S.C. § 1158(a)(3). Notwithstanding that provision, we retain jurisdiction to review constitutional

**\*115** claims and "questions of law." 8 U.S.C. § 1252(a)(2)(D).

Here, the IJ's findings that Rashid's asylum application was untimely and that this untimeliness was not excused by changed or extraordinary circumstances are purely factual determinations which do not implicate constitutional claims or questions of law. Accordingly, we dismiss that portion of Rashid's petition for review that challenges the denial of asylum. See Joaquin–Porras v. Gonzales, 435 F.3d 172, 179–80 (2d Cir.2006).

With regard to Rashid's claims for withholding of removal and CAT relief, this Court reviews the agency's factual findings, including adverse credibility determinations, under the substantial evidence standard, treating them as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B). See, e.g., Zhou Yun Zhang v. INS, 386 F.3d 66, 73 & n. 7 (2d Cir.2004), overruled in part on other grounds by Shi Liang Lin v. U.S. Dept. of Justice, 494 F.3d 296 (2d Cir.2007). Here, the IJ's adverse credibility determination is supported by substantial evidence. The discrepancies between Rashid's testimony and his asylum application concerned the only two incidents of persecution that Rashid alleged he had suffered in Pakistan. As such, these discrepancies went to the heart of his claim. See Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir.2002). The IJ offered Rashid an opportunity to explain these discrepancies, but she found his explanations inadequate, and we are not compelled to credit them now. See Majidi v. Gonzales, 430 F.3d 77, 80–81 (2d Cir.2005).

**\*\*2** The IJ's adverse credibility determination was further reinforced by Rashid's fraudulent use of an alias to obtain

credit cards, and his conviction for fraudulent use of a United States passport in attempting to re-enter the country.

See Edimo–Doualla v. Gonzales, 464 F.3d 276, 288 (2d Cir.2006). A petitioner's use of a fraudulent document to enter the United States cannot by itself form the basis of an adverse credibility determination if the petitioner was in the process of escaping "immediate danger or imminent persecution," see id., but the record in this case fails to evidence any such imminency. Rashid himself testified that he had departed Pakistan two years before the use at issue. Moreover, the passport was used to effect a re-entry prompted by the denial of admission to Canada. In these circumstances, the fraud properly bore on credibility. See Matter of Pula, 19 I. & N. Dec. 467, 474 (B.I.A.1987) (noting that although "the use of fraudulent documents to escape the country of persecution itself is not a significant adverse factor ... entry under the assumed identity of a United States citizen with a United States passport ... is a very serious fraud").

Because Rashid's assertion that he had been or would be subjected to persecution or torture in Pakistan depended upon his credibility, the IJ properly denied Rashid's withholding of removal and CAT claims. See Paul v. Gonzales, 444 F.3d 148, 156 (2d Cir.2006); Wu Biao Chen v. INS, 344 F.3d 272, 275 (2d Cir.2003).

For the foregoing reasons, the petition for review is DISMISSED in part and DENIED in part. As we have completed our review, any stay of removal that the Court previously granted in this petition is VACATED, and any pending motion for a stay of removal in this petition is DISMISSED as moot. Any pending request for oral argument in this petition is DENIED in accordance with Federal Rule of Appellate Procedure 34(a)(2), and Second Circuit Local Rule 34(d)(1)Second Circuit Local Rule 34(d)(1).

**All Citations**

254 Fed.Appx. 113, 2007 WL 4105828

---

## Footnotes

1    Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Michael B. Mukasey is automatically substituted for former Attorney General Alberto R. Gonzales as a respondent in this case.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by IN RE: SALVADOR CANELA-GARCIA, BIA, May 1, 2014

645 F.3d 1073
United States Court of Appeals,
Ninth Circuit.

Ruben REYES–TORRES, Petitioner,

v.

Eric H. HOLDER Jr., Attorney General, Respondent.

Ruben Reyes–Torres, Petitioner,

v.

Eric H. Holder Jr., Attorney General, Respondent.

Nos. 08–74452, 09–70214.
|
Argued and Submitted Sept. 15, 2010.
|
Filed April 7, 2011.

**Synopsis**

**Background:** Citizen of Mexico, who had obtained lawful permanent resident status, sought relief from deportation in form of cancellation of removal. Immigration Judge (IJ) denied relief. Permanent resident appealed. Board of Immigration Appeals (BIA) affirmed. Permanent resident subsequently moved to reopen and to reconsider. IJ denied motion. Permanent resident appealed. BIA dismissed appeal. Permanent resident petitioned for judicial review.

**Holdings:** The Court of Appeals, Thomas, Circuit Judge, held that:

[1] physical removal of permanent resident seven days after final order of removal had been entered did not preclude him from pursuing motion to reopen and reconsider;

[2] conviction of permanent resident in 1984 for alien transportation could not constitute removable aggravated felony; and

[3] state controlled substance conviction that had been vacated could not considered conviction for immigration purposes.

Petition granted.

Wallace, Senior Circuit Judge, filed dissenting opinion.

West Headnotes (3)

**[1]** **Aliens, Immigration, and Citizenship**  ⬤  **Time Limitations**

Physical removal of lawful permanent resident, citizen of Mexico, by United States seven days after final order of removal had been entered did not preclude him from pursuing motion to reopen deportation proceeding and to reconsider his requested relief from deportation in form of cancellation of removal; although permanent resident did not file his motion until after he had been forcibly removed, Attorney General did not have power under regulatory "departure bar" to unilaterally reduce time in which he could have filed his motion to reopen from statutorily mandated 90 days to seven days. 8 C.F.R. § 1003.2(d).

20 Cases that cite this headnote

**[2]** **Aliens, Immigration, and Citizenship**  ⬤  **Retroactive operation**

Conviction of lawful permanent resident, citizen of Mexico, in 1984 for alien transportation could not constitute removable aggravated felony, since Anti–Drug Abuse Act (ADAA), which created category of crimes denominated "aggravated felonies" and provided that aliens convicted of such aggravated felonies were subject to deportation had not been enacted until November 18, 1988. Immigration and Nationality Act, § 237(a)(2)(A)(iii), 8 U.S.C.A. § 1227(a)(2)(A)(iii).

**[3]** **Aliens, Immigration, and Citizenship**  ⬤  **Effect of expungement or vacation**

State controlled substance conviction that had been vacated on ground that lawful permanent resident, citizen of Mexico, had

11 Cal. Daily Op. Serv. 4203, 2011 Daily Journal D.A.R. 5027

not been adequately informed of immigration consequences of guilty plea could not considered conviction for immigration purposes and could not serve as basis for removability, since government had burden to prove that it had been vacated solely for rehabilitative reasons or reasons related to his immigration status; although resident had initially conceded removability by admitting allegations in notice to appear, he never conceded factual allegations underlying that conviction. Immigration and Nationality Act, § 237(a)(2)(B)(i), 8 U.S.C.A. § 1227(a)(2)(B)(i).

2 Cases that cite this headnote

**Attorneys and Law Firms**

*1074 Karla Kraus, San Diego, CA, for the petitioner.

Daniel I. Smulow, Office of Immigration Litigation, Washington, D.C., for the respondent.

Trina Realmuto, Boston, MA, for amicus curiae National Immigration Project of the National Lawyers Guild.

Beth Werlin, Washington, D.C., for amicus curiae American Immigration Council.

On Petition for Review of an Order of the Board of Immigration Appeals. Agency No. AXXX–XX6–480.

Before: J. CLIFFORD WALLACE and SIDNEY R. THOMAS, Circuit Judges, and RICHARD MILLS, Senior District Judge.*

Opinion by Judge THOMAS; Dissent by Judge WALLACE.

## OPINION

THOMAS, Circuit Judge:

In this petition for review, we consider whether the Board of Immigration Appeals ("BIA") has jurisdiction to review a *1075 motion to reconsider and reopen filed after a petitioner has been involuntarily removed from the United

States. We conclude that it has jurisdiction and we grant the petition for review.

I

Reyes–Torres is a native and citizen of Mexico who obtained lawful permanent resident status in 1964. Since then he has been convicted of two crimes relevant to this petition. In 1984, Reyes–Torres was convicted of transporting aliens in violation of 8 U.S.C. § 1324(a)(2). In 2007, he was convicted of possession of a controlled substance in violation of California Health and Safety Code § 11377(a).

The Department of Homeland Security ("DHS") served Reyes–Torres with a Notice to Appear ("NTA") in 2008, charging him with being removable pursuant to: (1) 8 U.S.C. § 1227(a)(2)(A)(iii) as an alien who has been convicted of an aggravated felony; and (2) 8 U.S.C. § 1227(a)(2)(B)(i) as an alien who has been convicted of a law relating to a controlled substance. At a hearing before an immigration judge ("IJ"), Reyes–Torres admitted the factual allegations in the NTA, contested removability on the basis of the aggravated felony charge, and conceded removability on the basis of his controlled substance violation. He also stated his intention to seek relief from deportation in the form of cancellation of removal. Such relief is unavailable to permanent residents who have been convicted of any aggravated felony. 8 U.S.C. § 1229b(a)(3).

The IJ issued a written decision finding that Reyes–Torres's alien transportation conviction constituted an aggravated felony and he was therefore ineligible for relief in the form of cancellation of removal. In light of this finding, and in light of Reyes–Torres's concession of removability on the controlled substance conviction, the IJ ordered him removed to Mexico. Reyes–Torres appealed to the BIA and it affirmed the IJ's decision on September 26, 2008.

Reyes–Torres was removed from the United States on October 3, 2008. On October 22, 2008, a California Superior Court judge granted Reyes–Torres's motion to withdraw his guilty plea to the controlled substance charge resulting in his 2007 controlled substance conviction. The judge granted the motion on the ground that Reyes–Torres was not adequately informed of the immigration consequences of the plea. On October 27, 2008, Reyes–Torres filed with the BIA a motion

to reconsider and reopen proceedings based on the new evidence of the vacated conviction.

On December 22, 2008, the BIA dismissed Reyes–Torres's motion to reopen and reconsider, concluding that it lacked jurisdiction because Reyes–Torres had been removed from the United States prior to its filing. The BIA cited the "departure bar" in 8 C.F.R. § 1003.2(d) for this proposition. Reyes–Torres timely petitioned for review of both the BIA's September 26, 2008 decision dismissing his appeal (Case No. 08–74452) and the BIA's December 22, 2008 decision dismissing his motion to reconsider and reopen (Case No. 09–70214). The court sua sponte consolidated the petitions.

II

[1]  The regulatory "departure bar" at issue in this case reads:

> A motion to reopen or a motion to reconsider shall not be made by or on behalf of a person who is the subject of exclusion, deportation, or removal proceedings subsequent to his or her departure from the United States.

8 C.F.R. § 1003.2(d). The BIA argues that its interpretation of the departure bar strips it of jurisdiction to hear motions to **\*1076** reopen or reconsider filed by aliens who have already been removed from the United States.

We recently examined the departure bar in *Coyt v. Holder,* 593 F.3d 902 (9th Cir.2010). Coyt entered the United States without inspection and, twenty years later, the Immigration and Naturalization Service initiated removal proceedings against him. *Id.* at 903. Coyt conceded removability but applied for cancellation of removal or voluntary departure. *Id.* The IJ granted a sixty-day voluntary departure period. *Id.* at 904. The BIA affirmed the IJ's decision, granting Coyt an additional thirty days to depart voluntarily. *Id.* at 904. Due to a miscommunication with his attorney, Coyt did not receive notice of the BIA's decision, and did not depart

within the requisite thirty days. *Id.* When Coyt eventually learned of the BIA's decision, he moved for the BIA to reissue its decision so that the thirty-day voluntary departure period would restart, arguing ineffective assistance of counsel. *Id.* On the same day, Coyt was removed. *Id.*

The BIA issued an order finding Coyt's removal resulted in the withdrawal of his motion to reissue, citing 8 C.F.R. § 1003.2(d). *Id.* That section reads in full:

> A motion to reopen or a motion to reconsider shall not be made by or on behalf of a person who is the subject of exclusion, deportation, or removal proceedings subsequent to his or her departure from the United States. Any departure from the United States, including the deportation or removal of a person who is the subject of exclusion, deportation, or removal proceedings, occurring after the filing of a motion to reopen or a motion to reconsider, shall constitute a withdrawal of such motion.

8 C.F.R. § 1003.2(d).

Coyt petitioned this court for review and we granted his petition. *Id.* at 903. We explained that the first step in analyzing a regulation under *Chevron* requires us to determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 905 (quoting *Chevron, U.S.A. v. Nat'l Res. Def. Council,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). We then analyzed Congress's amendments to the Immigration and Nationality Act, which granted aliens subject to a removal order the right to file a motion to reopen. *Id.* at 906 (citing 8 U.S.C. § 1229a(c)(7)(A)). These amendments, collectively known as the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), provide that within ninety days, the alien may file a motion to reopen, and the Attorney General must remove the alien. 8 U.S.C. §§ 1229a(c)(7)(C); 1231(a)(1)

(A); *see also* *id.* § 1229a(c)(6)(B) (granting aliens thirty days to file a motion to reconsider).

After reviewing the statutes, we determined that "the intent of Congress is clear," and that "in passing IIRIRA, Congress anticipated that petitioners would be able to pursue relief after departing from the United States." *Coyt,* 593 F.3d at 906. As such, we held that:

> The only manner in which we can harmonize the provisions simultaneously affording the petitioner a ninety day right to file a motion to reopen and requiring the alien's removal within ninety days is to hold, consistent with the other provisions of IIRIRA, that the physical removal of a petitioner by the United States does not preclude the petitioner from pursuing a motion to reopen.

*Id.* at 907.

There is no principled legal distinction to be drawn between *Coyt* and this case. The only factual difference between the cases is that Coyt filed his motion to reopen prior to his involuntary departure. **\*1077** Reyes–Torres did not file his motion to reopen and reconsider until after he was removed. This distinction is immaterial in light of Congress's clear intent in passing IIRIRA. Reyes–Torres was forcibly removed seven days after the final order of removal was entered. If we accept the government's argument, the Attorney General would have the power to unilaterally reduce the time in which Reyes–Torres could have filed his motion to reopen from the statutorily mandated ninety days to seven days. Because such a result would "completely eviscerate the statutory right to reopen provided by Congress," we reaffirm our holding in *Coyt* that "the physical removal of a petitioner by the United States does not preclude the petitioner from pursuing a motion to reopen." *Id.*

III

**[2]** Reyes–Torres also appeals the BIA's September 26, 2008 decision affirming the IJ's conclusion that his alien transportation conviction constituted an aggravated felony. We do not find it necessary to decide whether the 1984 conviction constituted an aggravated felony for removal purposes in light of our holding in *Ledezma–Galicia v. Holder,* 636 F.3d 1059 (9th Cir.2010). In *Ledezma–Galicia,* we held that 8 U.S.C. § 1227(a)(2)(A)(iii) does not apply to convictions that occurred prior to the enactment of the Anti–Drug Abuse Act of 1988 ("ADAA"). *Id.* at 1080–81. The ADAA—which created the category of crimes denominated "aggravated felonies" and provided that aliens convicted of such aggravated felonies were subject to deportation—was enacted November 18, 1988. Anti–Drug Abuse Act of 1988, Pub.L. No. 100–690, 102 Stat. 4181. Because Reyes–Torres's conviction for alien transportation occurred prior to November 18, 1988, it cannot constitute a removable aggravated felony.

**[3]** The fact that Reyes–Torres was deemed removable under 8 U.S.C. § 1227(a)(2)(B)(i) due to his 2007 controlled substance conviction does not alter the analysis. The 2007 guilty plea has since been vacated and can no longer serve as a basis for removability.[1] *See* *Cardoso– Tlaseca v. Gonzales,* 460 F.3d 1102, 1107 (9th Cir.2006) ("[A] conviction vacated because of a procedural or substantive defect is not considered a conviction for immigration purposes and cannot serve as the basis for removeability." (internal quotation marks and citation omitted)); *Wiedersperg v. INS,* 896 F.2d 1179, 1182 (9th Cir.1990) ("This and other courts have clearly established that the nullification of a conviction upon which deportability is premised deprives deportation of a legal basis."). The fact that Reyes–Torres sought to vacate his 2007 controlled substance conviction in light of the immigration consequences does not change the reasoning because the petitioner's motive is not the crucial inquiry. *See* *Pickering v. Gonzales,* 465 F.3d 263, 267 (6th Cir.2006). Instead, the inquiry must focus on the state court's rationale for vacating the conviction, and the burden is on the government to prove that it was vacated "*solely* for rehabilitative reasons or reasons related to his immigration status...." *Cardoso–Tlaseca v. Gonzales,* 460 F.3d at 1107 n. 3 (citing *Pickering v. Gonzales,* **\*1078** 454 F.3d 525 (6th Cir.2006), *amended and superseded by* *Pickering,* 465 F.3d at 263); *see also* *Pickering,* 465 F.3d at 266–67 (explaining the difference between a conviction vacated for rehabilitative or immigration reasons

and a conviction vacated for procedural or substantive infirmities). This question is not before us because it is one that "must be determined in the first instance by the BIA on remand." *Cardoso–Tlaseca, 460 F.3d at 1107.* Until the BIA determines that the conviction was not vacated on the merits, Reyes–Torres was not properly found removable under the INA on a ground separate and distinct from a pre–1988 aggravated felony conviction, unlike the petitioner in *Becker v. Gonzales, 473 F.3d 1000 (9th Cir.2007).* Therefore, because the 2007 controlled substance conviction has been vacated, the 1984 aggravated felony conviction is the only remaining basis for removability, and *Ledezma–Galicia* controls the determination.

We grant the petition for review and remand this case to the BIA for further action consistent with this opinion.

**PETITION GRANTED.**

WALLACE, Senior Circuit Judge, dissenting:
The majority's decision fails to follow the well-established principles of agency deference and misreads our recent precedent for determining whether an aggravated felon is eligible for cancellation of removal. Therefore, I dissent.

**I.**

In October 2008, Ruben Reyes–Torres, who had become a lawful permanent resident, was removed from the United States based on his state conviction for unlawfully possessing a controlled substance. *See 8 U.S.C. § 1227(a)(2)(B)(i) (2008).* During his removal proceedings, Reyes–Torres conceded removability on the basis of his controlled substance conviction, but requested cancellation of removal pursuant to *8 U.S.C. § 1229b(a).* This request was denied, however, because Reyes–Torres had also been convicted of an aggravated felony—smuggling aliens—in 1984.

Shortly after his removal to Mexico, Reyes–Torres filed a motion to reopen and reconsider his removal proceedings with the Board of Immigration Appeals (Board). According to Reyes–Torres, he was entitled to relief because he had recently withdrawn his guilty plea on the controlled substance charge. The Board, however, denied the motion because

Reyes–Torres had departed the United States prior to filing the motion. *See 8 C.F.R. § 1003.2(d).*

Reyes–Torres raises two issues for our review. He first challenges the Board's refusal to reopen and reconsider his removal proceedings. Reyes–Torres also contends that the immigration courts erred when they held that his 1984 conviction for alien smuggling constitutes an aggravated felony. I would deny Reyes–Torres's petition for review on both issues.

**II.**

Reyes–Torres's motion to reopen and reconsider his removal proceedings was denied based on the Board's departure bar, which is set forth at *8 C.F.R. § 1003.2(d).* That section, enacted by the United States Attorney General, provides:

> A motion to reopen or a motion to reconsider shall not be made by or on behalf of a person who is the subject of exclusion, deportation, or removal proceedings subsequent to his or her departure from the United States. Any departure from the United States, including the deportation or removal of a person who is the subject of exclusion, deportation, or removal proceedings, occurring after the filing of a motion to reopen or a **\*1079** motion to reconsider, shall constitute a withdrawal of such motion.

*Id.* Relying on *Coyt v. Holder, 593 F.3d 902 (9th Cir.2010),* the majority concludes that the departure regulation cannot stand in this case because Reyes–Torres was involuntarily deported. In my view, the majority should have given appropriate deference to the Board's reasonable interpretation of its own regulation. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)* (requiring deference to an agency's interpretation of an ambiguous statutory or regulatory provision unless the agency's interpretation is unreasonable).

The Board has explained that it lacks the power to provide administrative relief to an alien who has departed the territory of the United States. *In re Armendarez–Mendez*, 24 I. & N. Dec. 646 (BIA 2008). Since the early 1950s, the Board has consistently maintained this position and regularly applied this bar to departed aliens. *See In re G—— Y B——*, 6 I. & N. Dec. 159 (BIA 1954). The Board defines section 1003.2(d) as jurisdictional. *Armendarez–Mendez*, 24 I. & N. Dec. at 652. Thus, the Board explains that this regulatory bar limits its adjudicative authority and capacity to consider claims of departed aliens, even when—as is the case here—the alien's departure is involuntary. *See id*.

The Board's interpretation of its departure rule as a jurisdictional bar is not unreasonable or implausible. *See Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778. While it may seem "linguistically awkward to consider the forcible removal of an alien as 'constitut[ing] a withdrawal' of any pending motions filed by the alien," the issue is not whether the Board's interpretation of its own regulation is somewhat awkward. *Zhang v. Holder*, 617 F.3d 650, 660 (2d Cir.2010) (alteration in original). Instead, we must consider whether the agency's interpretation is "plainly erroneous or inconsistent with the regulation." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 672, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007) (internal quotation marks omitted). Here, the plain language of section 1003.2(d) does not preclude the Board's interpretation, and Reyes–Torres points to nothing in the Immigration and Nationality Act (INA) that prohibits the Board from treating its departure bar as a jurisdictional rule. Accordingly, under *Chevron, we should defer to the Board's interpretation of its own departure provision. See* 467 U.S. at 842–43, 104 S.Ct. 2778; *Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (explaining that the judiciary should defer to an agency's plausible reading of its own regulations).

I recognize that Congress has enacted legislation allowing aliens the right to file at least one motion to reopen with the Board. *See* 8 U.S.C. § 1229a(c)(7)(A). I also appreciate the general rule that an administrative agency cannot contract a statutory grant of jurisdiction. *See Union Pac. R.R. v. Bhd. of Locomotive Eng'rs*, —— U.S. ——, 130 S.Ct. 584, 597–98, 175 L.Ed.2d 428 (2009). The general rule holds true, however, only to the extent that Congress has not given the agency authority to adopt rules of jurisdictional dimension. *See id*. (emphasizing that the controlling statute did not allow the agency to limit the scope of its own jurisdiction). This case therefore is unlike the agency regulation at issue in *Union Pacific*. Here, Congress has expressly delegated very broad rule-making authority to the Attorney General to establish regulations as necessary to enforce our nation's immigration laws. *See* 8 U.S.C. § 1103(g)(2) (authorizing the Attorney General to "establish such regulations, ... review such **\*1080** administrative determinations in immigration proceedings, delegate such authority, and perform such acts as the Attorney General determines to be necessary" under the INA). Based on this authority, the Attorney General has seen fit to establish the departure bar and limit the Board's power to reopen removal proceedings when an alien leaves the United States. 8 C.F.R. § 1003.2(d).

Significantly, Congress's silence on the propriety of the removal bar, despite repeated amendments to the INA, demonstrates legislative acquiescence to the Attorney General's authority to enact a departure regulation. *Zhang, 617 F.3d at 662, citing* Immigration Act of 1990, Pub.L. No. 101–649 § 545(d)(1) (Nov. 29, 1990). Because Congress has acquiesced to the Attorney General's authority to limit an alien's right to file a motion to reopen, and given that the Board's interpretation of that limitation is reasonable, we should defer to the Board.

It is true that our sister circuits have split over the validity of the departure bar. The Sixth and Seventh Circuits, for instance, have invalidated section 1003.2(d), concluding that the Attorney General lacks authority to limit the Board's jurisdiction over motions to reopen. *Pruidze v. Holder, 632 F.3d 234, 237 (6th Cir.2011); Marin–Rodriguez v. Holder, 612 F.3d 591, 595 (7th Cir.2010).* Meanwhile, the Fifth and Tenth Circuits have issued decisions upholding the departure bar. *See Contreras–Bocanegra v. Holder, 629 F.3d 1170, 1170 (10th Cir.2010)* (treating the departure bar "as a complete jurisdictional bar against motions to reopen"); *Navarro–Miranda v. Ashcroft, 330 F.3d 672, 675–76 (5th Cir.2003)* (denying a petition for review based on section 1003.2(d)). Because the Fifth and Tenth Circuits' decisions are faithful to the deference required by *Chevron,* I would follow those cases and uphold the departure bar here.

## III.

Nor do I agree with the majority's interpretation of our recent decision in *Ledezma–Galicia v. Holder,* 636 F.3d 1059, 1074–76 (9th Cir.2010). There, a divided panel of this court held that the INA precludes an aggravated felony conviction, if obtained prior to November 18, 1988, from serving as *grounds for removal* under 8 U.S.C. § 1227(a)(2)(A)(iii). *Id.* at 1080–81. Because Reyes–Torres's alien smuggling conviction was obtained in 1984, the majority reasons that Reyes–Torres is not eligible for *cancellation of removal* in this case. I disagree.

A close reading of *Ledezma–Galicia* indicates that its holding is irrelevant to the issue of cancellation of removal. As the majority explained in that case, its reasoning applies to "the aggravated felony ground of deportation *only.*" *Id.* at 1070–71. This is so, because the temporal limitation on which *Ledezma–Galicia* relies, section 7344(b) of the Anti–Drug Abuse Act of 1988, is restricted on its face to the narrow question of whether certain aggravated felonies are "grounds for deportation." *See* Pub.L. No. 100–690 § 7344(b) (Nov. 18, 1988). Thus, other immigration consequences of an aggravated felony conviction, such as ineligibility for cancellation of removal, do not share the same temporal limitation. *See Ledezma–Galicia,* 636 F.3d at 1078–80; *Lopez–Castellanos v. Gonzales,* 437 F.3d 848, 852–54 (9th Cir.2006) (explaining that the definition of "aggravated felony" applies to all aliens but that the temporal reach of associated immigration consequences must be analyzed separately).

Significantly, we have already addressed the "immigration consequences" at issue here: whether an alien's pre–1988 aggravated felony conviction renders him ineligible **\*1081** for cancellation of removal. *See id.* In *Becker v. Gonzales,* 473 F.3d 1000 (9th Cir.2007), we explicitly held that "[a]n alien convicted of *any* aggravated felony *at any time* is not eligible for cancellation of removal." *Id.* at 1002 (emphases added). Thus, *Becker* definitively provides that when an alien is properly found removable under the INA on a ground separate and distinct from a pre–1988 aggravated felony conviction, that conviction can still render the alien ineligible for cancellation of removal. *Id.*

In light of *Becker,* it makes no difference that *Ledezma–Galicia* precludes the immigration tribunals from considering Reyes–Torres's 1984 aggravated felony conviction as a basis for removal. On this point, the majority erroneously concludes, without citing anything in the record, that Reyes–Torres was removed as a result of his 1984 aggravated felony conviction. The administrative record, however, reveals that this is not the case. Instead, the immigration tribunals relied upon Reyes–Torres's aggravated felony conviction *only* as precluding his request for cancellation of removal.

To be sure, Reyes–Torres was initially *charged* with being removable based on both his controlled substance conviction and his aggravated felony conviction. During his removal proceedings, however, Reyes–Torres *conceded* removability on the basis of his controlled substance conviction. Based on this concession, the Board and the immigration judge explicitly recognized that they did not need to decide whether Reyes–Torres was removable as a result of his 1984 conviction for smuggling aliens. *See* Administrative Record at 25–28 (finding Reyes–Torres removable based on his admissions to the immigration judge—i.e., his concession of removability as a result of his controlled substance conviction); *id.* at 72–73 ("As the respondent has conceded removability, the only issue before the Court is whether the respondent is statutorily barred from relief in the form of cancellation of removal"). Thus, rather than use his aggravated felony conviction as grounds for removal, the immigration tribunals simply accepted Reyes–Torres's concession of removability on the controlled substance ground. *See Shin v. Mukasey,* 547 F.3d 1019, 1024 (9th Cir.2008) (holding that where a non-citizen concedes removability, "the government's burden in this regard is satisfied"). Then, consistent with *Becker,* the immigration judge and the Board simply determined that Reyes–Torres's prior aggravated felony conviction for smuggling aliens made him ineligible for cancellation of removal. *See* 473 F.3d at 1002. The immigration tribunals therefore did not violate *Ledezma–Galicia* when they denied Reyes–Torres's request for relief.

Relying on *Cardoso–Tlaseca v. Gonzales,* 460 F.3d 1102, 1107 (9th Cir.2006), the majority incorrectly asserts that Reyes–Torres could not have been removed as a result of his concessions because, *after* Reyes–Torres's removal proceedings became final, he successfully withdrew his guilty plea on the controlled substance conviction. But, in

considering whether the Board erred in issuing its final order of removal, we are restricted to the facts presented to the immigration tribunals during Reyes–Torres's removal proceedings. *See* *Fisher v. I.N.S.,* 79 F.3d 955, 963 (9th Cir.1996) (explaining that judicial review of agency action must be confined to the *original record* upon which *that action* was premised); 8 U.S.C. § 1252(b)(4)(A) ("[T]he court of appeals shall decide the petition *only on the administrative record on which the order of removal is based* " (emphasis added)). At the time of Reyes–Torres's removal proceedings, his controlled substance conviction was a completely valid basis for removal. Thus, because our review is confined **\*1082** to the *original record* on which Reyes–Torres's final order of removal is based, we are precluded from concluding that the Board erred by relying on that conviction. *See* *Fisher,* 79 F.3d at 963. To the extent that Reyes–Torres's controlled substance conviction was later vacated, we can consider this conviction only as it relates to Reyes–Torres's challenge to the Board's decision denying his motion to reopen. *See id.* This distinction is key.

In fact, recognizing that our review of an alien's removal proceedings is limited to the evidence introduced during those proceedings, Reyes Torres does not challenge the Board's final removal order on the basis that his controlled substance conviction was ultimately vacated. Instead, he invokes *Cardoso–Tlaseca* for the proposition that the Board erred when it denied his motion to reopen the underlying removal proceedings. Yet, as the majority fails to acknowledge, Reyes–Torres never asserted any argument premised on *Cardoso–Tlaseca* when this case was pending before the Board. Because Reyes–Torres did not exhaust this legal theory, either during his removal proceedings or as part of his motion to reopen, we lack jurisdiction to consider the argument upon which the majority bases its holding. *See* *Barron v. Ashcroft,* 358 F.3d 674, 678 (9th Cir.2004) (explaining that an alien's failure to raise an issue to the Board generally constitutes a failure to exhaust, which deprives this court of jurisdiction to consider the issue).

Moreover, even if our review of Reyes–Torres's removal order permitted us to consider the substantive impact of the withdrawal of his controlled substance conviction, I would still deny the petition for review. As discussed earlier, Reyes–Torres explicitly conceded removability, which is in itself a separate and distinct basis for finding him removable. *See* *Shin,* 547 F.3d at 1024; 8 C.F.R. § 1240.10(c) ("If [an

alien] admits ... his or her removability ... and the immigration judge is satisfied that no issues of law or fact remain, the immigration judge may determine that removability as charged has been established by the admissions of the [alien]"). An alien's voluntary concession of removability does not become invalid simply because the alien recants his concession after the Board enters its removal order. *See id.* Reyes–Torres conceded to removability as part of a strategic decision to pursue cancellation of removal. The fact that he was denied relief on the basis of his aggravated felony conviction does not somehow undo Reyes–Torres's original concession to removability on a separate and distinct ground. [1]

Even *Cardoso–Tlaseca,* the primary authority on which the majority relies, recognizes that the substantive ramifications of a prior conviction are not altered when that conviction is merely vacated to avoid adverse immigration consequences. *See* **\*1083** 460 F.3d at 1107 n. 3 (observing that when a petitioner's conviction is vacated for immigration purposes, that conviction can still serve as the basis for finding the alien removable). Here, the record provides that Reyes–Torres's prior conviction was vacated because he was upset with the immigration consequences that resulted from his guilty plea. Yet, the majority not only relies on facts that were not raised during Reyes–Torres's removal proceedings, it *definitively* concludes that Reyes–Torres's controlled substance conviction—which was not vacated until *after* his removal proceedings became final—could not possibly have been the basis for the Board's removal order. This is a proposition that I cannot accept. [2]

In sum, the majority impermissibly bases its decision on facts that were never introduced during Reyes–Torres's removal proceedings. The majority then ignores our exhaustion doctrine and disregards Reyes–Torres's concession of removability. Finally, even though the immigration tribunals explicitly refused to treat Reyes–Torres as removable based on his aggravated felony conviction, the majority rewrites the Board's final order of removal in an effort to invoke *Ledezma–Galicia*—a decision that has no applicability where, as here, an alien is removed for reasons that are separate and distinct from the aggravated felony. Accordingly, while *Becker* compels the conclusion that Reyes–Torres's 1984 aggravated felony conviction renders him ineligible for cancellation of removal, the majority refuses to follow our precedent, charting its own course. In doing so, the majority

not only disregards *Becker,* it needlessly creates an intra-circuit conflict with our decisions in *Fisher, Barron,* and *Shin.*

I dissent.

**All Citations**

645 F.3d 1073, 11 Cal. Daily Op. Serv. 4203, 2011 Daily Journal D.A.R. 5027

## Footnotes

| | |
|---|---|
| * | The Honorable Richard Mills, Senior United States District Judge for the Central District of Illinois, sitting by designation. |
| 1 | The dissent places great weight on the fact that Reyes–Torres initially conceded removability by admitting the allegations in the Notice to Appear. However, Reyes–Torres merely conceded that he had been convicted in state court; he never conceded the factual allegations underlying that conviction. Because that conviction has since been vacated, his concession is no longer accurate. This distinguishes the instant case from *Shin v. Mukasey,* 547 F.3d 1019, 1024 (9th Cir.2008), wherein the petitioner conceded removability on the ground she was not in possession of valid documents for admission and she never recanted that factual concession. |
| 1 | The majority refuses to give any weight to Reyes–Torres's concession of removability. The majority reasons that while Reyes–Torres admitted to a controlled substance conviction, "he never conceded the factual allegations underlying that conviction." The majority does not explain why this should make any difference. Under section 1240.10(c), Reyes–Torres was not required to admit to the underlying factual allegations for his concession of removability to be binding. *Shin,* 547 F.3d at 1024; *see also Fernandez–Rivas v. Holder,* 400 Fed.Appx. 307, 307 (9th Cir.2010) ("Fernandez–Rivas is bound by his attorney's concession of removability before the IJ"). As the Second Circuit has explained, "Admissions by parties are not subject to judicial scrutiny to ensure that the admissions are fully supported by the underlying record." *See Hoodho v. Holder,* 558 F.3d 184, 191 (2d Cir.2009). Regardless, Reyes–Torres did not just admit to the conviction, he also specifically conceded to being a removable alien. This is all that is required by *Shin.* |
| 2 | The majority correctly observes that the Board should decide in the first instance whether Reyes–Torres sought to vacate his controlled substance conviction due to potential immigration consequences. *See Cardoso–Tlaseca,* 460 F.3d at 1107 n. 3. The majority, however, does not even follow the approach it purports to adopt. Instead, the majority definitively states that Reyes–Torres's "2007 guilty plea has since been vacated and can no longer serve as a basis of removability." This statement is difficult to reconcile with *Cardoso–Tlaseca* and begs the question of what is left for the Board to decide on remand. |

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Not Followed on State Law Grounds   The Utility Reform Network v. Public Utilities Com., Cal.App. 1 Dist., February 5, 2014

91 S.Ct. 1420

Supreme Court of the United States

Elliott L. RICHARDSON, Secretary of Health, Education and Welfare, Petitioner,

v.

Pedro PERALES.

No. 108.

|

Argued Jan. 13, 1971.

|

Decided May 3, 1971.

**Synopsis**

Action to review Appeals Council determination denying disability benefits to social security claimant. The United States District Court for the Western District of Texas, 288 F.Supp. 313, entered judgment for claimant, and appeal was taken. The Court of Appeals, 412 F.2d 44, affirmed and remanded and subsequently denied petition for rehearing, 416 F.2d 1250, and certiorari was granted. The Supreme Court, Mr. Justice Blackmun, held that a written report by licensed physician who has examined claimant and who sets forth in his report his medical findings in his area of competence may be received as evidence in social security disability claim hearing and, despite its hearsay character, absence of cross-examination, and presence of opposing direct medical testimony and testimony by claimant himself, may constitute substantial evidence supportive of finding by hearing examiner adverse to claimant, when claimant has not exercised his right to subpoena reporting physician and thereby provide himself with opportunity for cross-examination.

Reversed and remanded.

Mr. Justice Douglas, with whom Mr. Justice Black and Mr. Justice Brennan concurred, dissented and filed opinion.

West Headnotes (4)

**[1]**   **Social Security**   Counsel or other representation

Social security hearings should be understandable to layman claimant, should not necessarily be stiff and comfortable only for trained attorney, and should be liberal and not strict in tone and operation, so long as procedures are fundamentally fair. Social Security Act, § 205(a, b), 42 U.S.C.A. § 405(a, b); Social Security Administration Regulations, § 404.927, 42 U.S.C.A. App.

3691 Cases that cite this headnote

**[2]**   **Social Security**   Medical and other expert evidence in general

Written report by licensed physician who has examined claimant and who sets forth in his report his medical findings in his area of competence may be received as evidence in social security disability claim hearing and, despite its hearsay character, absence of cross-examination, and presence of opposing direct medical testimony and testimony by claimant

himself, may constitute substantial evidence supportive of finding by hearing examiner adverse to claimant, when claimant has not exercised his right to subpoena reporting physician and thereby provide himself with opportunity for cross-examination. Social Security Act, §§ 205(g), 216(i) (1), 223(d) (1), 42 U.S.C.A. §§ 405(g), 416(i) (1), 423(d) (1).

30541 Cases that cite this headnote

**[3]**     **Social Security**    Medical and other expert evidence in general

Use of a medical advisor in a social security disability claim hearing is not unconstitutional or improper. Social Security Act, §§ 205(g), 216(i) (1), 223(d) (1), 42 U.S.C.A. §§ 405(g), 416(i) (1), 423(d) (1).

527 Cases that cite this headnote

**[4]**     **Social Security**    Evidence
          **Social Security**    Admissibility

Administrative Procedure Act provisions relating to submission of evidence conform, and are consistent with, rather than differ from or supersede, authority given Secretary of Health, Education and Welfare to establish procedures and to regulate and provide for nature and extent of proofs and evidence and method of taking and furnishing same in order to establish right to benefits, and to receive evidence even though inadmissible under rules of evidence applicable to court procedure; hearsay, under either Act, is admissible up to point of relevancy. 5 U.S.C.A. § 556(d); Social Security Act, § 205(a, b), 42 U.S.C.A. § 4405(a, b).

4206 Cases that cite this headnote

**\*\*1421   \*389**  Syllabus [*]

Written reports by physicians who have examined claimant for disability insurance benefits under Social Security Act constitute 'substantial evidence' supporting a nondisability finding within the standard of s 205(g) of the Act, notwithstanding the reports' hearsay character, the absence of cross-examination (through claimant's failure to exercise his subpoena rights), and the directly opposing testimony by the claimant and his medical witness; and procedure followed under Act does not violate due process requirements.

412 F.2d 44 and 416 F.2d 1250, reversed and remanded.

### Attorneys and Law Firms

Daniel M. Friedman, Washington, D.C., for petitioner.

Richard Tinsman, San Antonio, Tex., for respondent.

### Opinion

**\*\*1422   \*390**  Mr. Justice BLACKMUN delivered the opinion of the Court.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

In 1966 Pedro Perales, a San Antonio truck driver, then aged 34, height 5 11 , weight about 220 pounds, filed a claim for disability insurance benefits under the Social Security Act. Sections 216(i)(1), 68 Stat. 1080, and 223(d) (1), 81 Stat. 868, of that Act,    42 U.S.C. s 416(i)(1) and   42 U.S.C. s 423(d)(1) (1964 ed., Supp. V), both provide that the term 'disability' means 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which * * *.'[1] Section 205(g),   42 U.S.C. s 405(g), relating to judicial review, states, 'The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive * * *.'

The issue here is whether physicians' written reports of medical examinations they have made of a disability claimant may constitute 'substantial evidence' supportive of a finding of nondisability, within the s 205(g) standard, when the claimant objects to the admissibility of those reports and when the only live testimony is presented by his side and is contrary to the reports.

I

In his claim Perales asserted that on September 29, 1965, he became disabled as a result of an injury to his back sustained in lifting an object at work. He was seen by a neurosurgeon, Dr. Ralph A. Munslow, who first recommended conservative treatment. When this provided no relief, myelography was performed and surgery for a possible protruded intervertebral disc at L—5 was advised. The patient at first hesitated about surgery **391** and appeared to improve. On recurrence of pain, however, he consented to the recommended procedure. Dr. Munslow operated on November 23. The surgical note is in the margin.[2] No disc protrusion or other definitive pathology was identified at surgery. The post-operative diagnosis was: 'Nerve root compression syndrome, left.' The patient was discharged from Dr. Munslow's care on January 25, 1966, with a final diagnosis of 'Neuritis, lumbar, mild.'

Mr. Perales continued to complain, but Dr. Munslow and Dr. Morris H. Lampert, a neurologist called in consultation, were still unable to find any objective neurological explanation for his complaints. Dr. Munslow advised that he return to work.

In April 1966 Perales consulted Dr. Max Morales, Jr., a general practitioner of San Antonio. Dr. Morales hospitalized the patient from April 15 to May 2. his final **392** discharge diagnosis was: 'Back sprain, lumbo-sacral spine.'

Perales then filed his claim. As required by s 221 of the Act,   **1423** 42 U.S.C. s 421, the claim was referred to the state agency for determination. The agency obtained the hospital records and a report from Dr. Morales. The report set forth no physical findings or laboratory studies, but the doctor again gave as his diagnosis: 'Back sprain—lumbosacral spine,' this time 'moderately severe,' with 'Ruptured disk not ruled out.' The agency arranged for a medical examination, at no cost to the patient, by Dr. John H. Langston, an orthopedic surgeon. This was done May 25.

Dr. Langston's ensuing report to the Division of Disability Determination was devastating from the claimant's standpoint. The doctor referred to Perales' being 'on crutches or cane' since his injury. He noted a slightly edematous condition in the legs, attributed to 'inactivity and sitting around'; slight tenderness in some of the muscles of the dorsal spine, thought to be due to poor posture; and 'a very mild sprain (of those muscles) which would resolve were he actually to get a little exercise and move.' Apart from this, and from the residuals of the pantopaque myelography and hemilaminectomy, Dr. Langston found no abnormalities of the lumbar spine. Otherwise, he described Perales as a 'big physical healthy specimen * * * obviously holding back and limiting all of his motions, intentionally. * * * His upper extremities, though they are completely uninvolved by his injury, he holds very rigidly as though he were semi-paralyzed. His reach and grasp are very limited but intentionally so. * * * Neurological examination is entirely normal to detailed sensory examination with pinwheel, vibratory sensations, and light touch. Reflexes are very active and there is no atrophy anywhere.' The **393** orthopedist's summarization, impression, and prognosis are in the margin.[3]

The state agency denied the claim. Perales requested reconsideration. Dr. Morales submitted a further report to the agency and an opinion to the claimant's attorney. This outlined the surgery and hospitalizations and his own conservative and continuing

treatment of the patient, the medicines prescribed, the administration of ultrasound therapy, and the patient's constant complaints. The doctor concluded that the patient had not made a complete recovery from his surgery that he was not malingering, that his injury was permanent, and that he was totally and permanently disabled. [4] He recommended against any further surgery.

**\*\*1424** **\*394** The state agency then arranged for an examination by Dr. James M. Bailey, a board-certified psychiatrist with a sub-specialty in neurology. Dr. Bailey's report to the agency on August 30, 1966, concluded with the following diagnosis: 'Paranoid personality, manifested by hostility, feelings of persecution and long history of strained interpersonal relationships.

'I do not feel that this patient has a separate psychiatric illness at this time. It appears that his personality is conducive to anger, frustrations, etc.'

The agency again reviewed the file. The Bureau of Disability Insurance of the Social Security Administration made its independent review. The report and opinion of Dr. Morales, as the claimant's attending physician, were considered, as were those of the other examining physicians. The claim was again denied.

Perales requested a hearing before a hearing examiner. The agency then referred the claimant to Dr. Langston and to Dr. Richard H. Mattson for electromyography studies. Dr. Mattson's notes referred to 'some chronic or past disturbance of function in the nerve supply' to the left and right anterior tibialis muscles and right **\*395** extensor digitorium brevis muscles that was 'strongly suggestive of lack of maximal effort' and was 'the kind of finding that is typically associated with a functional or psychogenic component to weakness.' There was no evidence of 'any active process effecting (sic) the nerves at present.' Dr. Langston advised the agency that Dr. Mattson's finding of 'very poor effort' verified what Dr. Langston had found on the earlier physical examination.

The requested hearing was set for January 12, 1967, in San Antonio. Written notice thereof was given the claimant with a copy to his attorney. The notice contained a definition of disability, advised the claimant that he should bring all medical and other evidence not already presented, afforded him an opportunity to examine all documentary evidence on file prior to the hearing, and told him that he might bring his own physician or other witnesses and be represented at the hearing by a lawyer.

The hearing took place at the time designated. A supplemental hearing was held March 31. The claimant appeared at the first hearing with his attorney and with Dr. Morales. The attorney formally objected to the introduction of the several reports of Drs. Langston, Bailey, Mattson, and Lampert, and of the hospital records. Various grounds of objection were asserted, including hearsay, absence of an opportunity for cross-examination, absence of proof the physicians were licensed to practice in Texas, failure to demonstrate that the hospital records were proved under the Business Records Act, and the conclusory nature of the reports. These objections were overruled and the reports and hospital records were introduced. The reports of Dr. Morales and of Dr. Munslow were then submitted by the claimant's counsel and admitted.

At the two hearings oral testimony was submitted by claimant Perales, by Dr. Morales, by a former fellow **\*396** employee of the claimant, by a vocational expert, and by Dr. Lewis A. Leavitt, a physician board-certified in physical medicine and rehabilitation, and chief of, and professor in, the Department of Physical Medicine at Baylor University College of **\*\*1425** Medicine. Dr. Leavitt was called by the hearing examiner as an independent 'medical adviser,' that is, as an expert who does not examine the claimant but who hears and reviews the medical evidence and who may offer an opinion. The adviser is paid a fee by the Government. The claimant, through his counsel, objected to any testimony by Dr. Leavitt not based upon personal examination or upon a hypothetical. Dr. Leavitt testified over this objection and was cross-examined by the claimant's attorney. He stated that the consensus of the various medical reports was that Perales had a mild low-back syndrome of musculo-ligamentous origin.

The hearing examiner, in reliance upon the several medical reports and the testimony of Dr. Leavitt, observed in his written decision, 'There is objective medical evidence of impairment which the heavy preponderance of the evidence indicates to be of mild severity. * * * Taken altogether, the Hearing Examiner is of the conclusion that the claimant has not met the burden of proof.' He specifically found that the claimant 'is suffering from a low back syndrome of musculo-ligamentous origin, and of mild severity'; that while he 'has an emotional overlay to his medical impairment it does not require psychiatric treatment and

is of minimal contribution, if any, to his medical impairment or to his general ability to engage in substantial gainful activity'; that '(n) either his medical impairment nor his emotional overlay, singly or in combination, constitute a disability as defined' in the Act; and that the claimant is capable of engaging as a salesman in work in which he had previously engaged, of working as a watchman or **\*397** guard where strenuous activity is not required, or as a ticket-taker or janitor. The hearing examiner's decision then, was that the claimant was not entitled to a period of disability or to disability insurance benefits.

It is to be noted at this point that s 205(d) of the Act, 📁 42 U.S.C. s 405(d), provides that the Secretary has power to issue subpoenas requiring the attendance and testimony of witnesses and the production of evidence and that the Secretary's regulations authorized by s 205(a), 📁 42 U.S.C. s 405(a), provide that a claimant may request the issuance of subpoenas, 20 CFR s 404.926. Perales, however, who was represented by counsel, did not request subpoenas for either of the two hearings.

The claimant then made a request for review by the Appeals Council and submitted as supplemental evidence a judgment dated June 2, 1967, in Perales' favor against an insurance company for workmen's compensation benefits aggregating $11,665.84, plus medical and related expenses, and a medical report letter dated December 28, 1966, by Dr. Coyle W. Williams, apparently written in support of a welfare claim made by Perales. In his letter the doctor noted an essentially negative neurological and physical examination except for tenderness in the lumbar area and limited straight leg raising. He observed, 'I cannot explain all his symptoms on a physical basis. I would recommend he would recondition himself and return to work. My estimation, he as a 15% permanent partial disability of the body as a whole.' The Appeals Council ruled that the decision of the hearing examiner was correct.

Upon this adverse ruling the claimant instituted the present action for review pursuant to s 205(g). Each side moved for summary judgment on the administrative transcript. The District Court stated that it was reluctant to accept as substantial evidence the opinions of medical **\*398** experts submitted in the form of unsworn written reports, the admission of which would have the effect of denying the opposition an opportunity for cross-examination; that the opinion of a doctor who had never examined the claimant is entitled to little or no probative value, especially when opposed by substantial evidence including the oral testimony of an examining physician; and that what was before the court amounted to hearsay upon hearsay. The **\*\*1426** case was remanded for a new hearing before a different examiner. 📁 Perales v. Secretary, 288 F.Supp. 313 (WD Tex. 1968). On appeal the Fifth Circuit noted the absence of any request by the claimant for subpoenas and held that, having this right and not exercising it, he was not in a position to complain that he had been denied the rights of confrontation and of cross-examination. It held that the hearsay evidence in the case was admissible under the Act; that, specifically, the written reports of the physicians were admissible in the administrative hearing; that Dr. Leavitt's testimony also was admissible; but that all this evidence together did not constitute substantial evidence when it was objected to and when it was contradicted by evidence from the only live witnesses. 🚩 Cohen v. Perales, 412 F.2d 44 (1969).

On rehearing, the Court of Appeals observed that it did not mean by its opinion that uncorroborated hearsay could never be substantial evidence supportive of a hearing examiner's decision adverse to a claimant. It emphasized that its ruling that uncorroborated hearsay could not constitute substantial evidence was applicable only when the claimant had objected and when the hearsay was directly contradicted by the testimony of live medical witnesses and by the claimant in person. Cohen v. Perales, 416 F.2d 1250 (1969). Certiorari was granted in order to review and resolve this important procedural due process issue. 397 U.S. 1035, 90 S.Ct. 1365, 25 L.Ed.2d 646 (1970).

**\*399** II

We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict. We have, on the one hand, an absence of objective findings, an expressed suspicion of only functional complaints, of malingering, and of the patient's unwillingness to do anything about remedying an unprovable situation. We have, on the other hand, the claimant's and his personal physician's earnest pleas that significant and disabling residuals from the mishap of September 1965 are indeed present.

The issue revolves, however, around a system which produces a mass of medical evidence in report form. May material of that kind ever be 'substantial evidence' when it stands alone and is opposed by live medical evidence and the client's own contrary personal testimony? The courts below have held that it may not.

### III

The Social Security Act has been with us since 1935. Act of August 14, 1935, 49 Stat. 620. It affects nearly all of us. The system's administrative structure and procedures, with essential determinations numbering into the millions, are of a size and extent difficult to comprehend. But, as the Government's brief here accurately pronounces, 'Such a system must be fair—and it must work.'[5]

Congress has provided that the Secretary

'shall have full power and authority to make rules and regulations and to establish procedures * * * necessary or appropriate to carry out such provisions, and shall adopt reasonable and proper rules and  **400**  regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder.' s 205(a), 42 U.S.C. s 405(a).

Section 205(b) directs the Secretary to make findings and decisions; on request to give reasonable notice and opportunity for a hearing; and in the course of any hearing to receive evidence. It then provides:

> 'Evidence may be received at any hearing before the Secretary even though inadmissible under rules of evidence applicable to court procedure.'

**1427  In carrying out these statutory duties the Secretary has adopted regulations that state, among other things: 'The hearing examiner shall inquire fully into the matters at issue and shall receive in evidence the testimony of witnesses and any documents which are relevant and material to such matters. * * * The * * * procedure at the hearing generally * * * shall be in the discretion of the hearing examiner and of such nature as to afford the parties a reasonable opportunity for a fair hearing.' 20 C.F.R. s 404.927.

 [1]    From this it is apparent that (a) the Congress granted the Secretary the power by regulation to establish hearing procedures; (b) strict rules of evidence, applicable in the courtroom, are not to operate at social security hearings so as to bar the admission of evidence otherwise pertinent; and (c) the conduct of the hearing rests generally in the examiner's discretion. There emerges an emphasis upon the informal rather than the formal. This, we think, is as it should be, for this administrative procedure, and these hearings, should be understandable to the layman claimant, should not necessarily be stiff and comfortable only for the trained attorney, and should  **401**  be liberal and not strict in tone and operation. This is the obvious intent of Congress so long as the procedures are fundamentally fair.

### IV

With this background and this atmosphere in mind, we turn to the statutory standard of 'substantial evidence' prescribed by s 205(g). The Court has considered this very concept in other, yet similar, contexts. The National Labor Relations Act, s 10(e), in its original form, provided that the NLRB's findings of fact 'if supported by evidence, shall be conclusive.' 49 Stat. 454. The Court said this meant 'supported by substantial evidence' and that this was

'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).

The Court has adhered to that definition in varying statutory situations. See NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939); Universal Camera Corp. v. NLRB, 340 U.S. 474, 477—487, 71 S.Ct. 456, 459—464, 95 L.Ed. 456 (1951); Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 619—620, 86 S.Ct. 1018, 1026—1027, 16 L.Ed.2d 131 (1966).

V

We may accept the propositions advanced by the claimant, some of them long established, that procedural due process is applicable to the adjudicative administrative proceeding involving 'the differing rules of fair play, which through the years, have become associated with differing types of proceedings,' Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1515, 4 L.Ed.2d 1307 (1960); that the 'right' to Social Security benefits is in one sense 'earned.' Flemming v. Nestor, 363 U.S. 603, 610, 80 S.Ct. 1367, 1372, 4 L.Ed.2d 1435 (1960); and that the

'extent to which procedural due process must be afforded the recipient is influenced by the extent to **\*402** which he may be 'condemned to suffer grievous loss'. * * * Accordingly * * * 'consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action. " Goldberg v. Kelly, 397 U.S. 254, 262—263, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970).

The question, then, is as to what procedural due process requires with respect to examining physicians' reports in a social security disability claim hearing.

 **\*\*1428** **[2]** We conclude that a written report by a licensed physician who has examined the claimant and who sets forth in his report his medical findings in his area of competence may be received as evidence in a disability hearing and, despite its hearsay character and an absence of cross-examination, and despite the presence of opposing direct medical testimony and testimony by the claimant himself, may constitute substantial evidence supportive of a finding by the hearing examiner adverse to the claimant, when the claimant has not exercised his right to subpoena the reporting physician and thereby provide himself with the opportunity for cross-examination of the physician.

We are prompted to this conclusion by a number of factors that, we feel, assure underlying reliability and probative value:

1. The identity of the five reporting physicians is significant. Each report presented here was prepared by a practicing physician who had examined the claimant. [6] A majority (Drs. Langston, Bailey, and Mattson) were **\*403** called into the case by the state agency. Although each received a fee, that fee is recompense for his time and talent otherwise devoted to private practice or other professional assignment. We cannot, and do not, ascribe bias to the work of these independent physicians, or any interest on their part in the outcome of the administrative proceeding beyond the professional curiosity a dedicated medical man possesses.

2. The vast workings of the social security administrative system make for reliability and impartiality in the consultant reports. We bear in mind that the agency operates essentially, and is intended so to do, as an adjudicator and not as an advocate or adversary. This is the congressional plan. We do not presume on this record to say that it works unfairly. [7]

3. One familiar with medical reports and the routine of the medical examination, general or specific, will recognize their elements of detail and of value. The particular reports of the physicians who examined claimant Perales were based on personal consultation and personal examination and rested on accepted medical procedures and tests. The operating neurosurgeon, Dr. Munslow, provided his pre-operative observations and diagnosis, his findings at surgery, his post-operative diagnosis, and his post-operative observations. Dr. Lampert, the neurologist, provided the history related to him by the patient, Perales' complaints, the physical examination and neurologic tests, and his professional impressions and recommendations. Dr. Langston, the orthopedist, did the same post-operatively, and described the orthopedic tests and  *404  neurologic examination he performed, the results and his impressions and prognosis. Dr. Mattson, who did the post-operative electromyography, described the results of that test, and his impressions. And Dr. Bailey, the psychiatrist, related the history, the patient's complaints, and the psychiatric diagnosis that emerged from the typical psychiatric examination.

These are routine, standard, and unbiased medical reports by physician specialists concerning a subject whom they had seen. That the reports were adverse to Perales' claim is not in itself bias or an indication of nonprobative character.

 **1429  4. The reports present the impressive range of examination to which Perales was subjected. A specialist in neurosurgery, one in neurology, one in psychiatry, one in orthopedics, and one in physical medicine and rehabilitation add up to definitive opinion in five medical specialties, all somewhat related, but different in their emphases. It is fair to say that the claimant received professional examination and opinion on a scale beyond the reach of most persons and that this case reveals a patient and careful endeavor by the state agency and the examiner to ascertain the truth.

5. So far as we can detect, there is no inconsistency whatsover in the reports of the five specialists. Yet each result was reached by independent examination in the writer's field of specialized training.

6. Although the claimant complains of the lack of opportunity to cross-examine the reporting physicians, he did not take advantage of the opportunity afforded him under 20 CFR s 404.926 to request subpoenas for the physicians. The five-day period specified by the regulation for the issuance of the subpoenas surely afforded no real obstacle to this, for he was notified that the documentary evidence on file was available for examination before the hearing and, further, a supplemental  *405  hearing could be requested. In fact, in this very case there was a supplemental hearing more than two and a half months after the initial hearings. This inaction on the claimant's part supports the Court of Appeals' view, 🚩 412 F.2d, at 50—51, that the claimant as a consequence is to be precluded from now complaining that he was denied the rights of confrontation and cross-examination.

7. Courts have recognized the reliability and probative worth of written medical reports even in formal trials and, while acknowledging their hearsay character, have admitted them as an exception to the hearsay rule. Notable is Judge Parker's well-known ruling in the war-risk insurance case of Long v. United States, 59 F.2d 602, 603—604 (CA4 1932), which deserves quotation here, but which, because of its length, we do not reproduce. The Second Circuit has made a like ruling in White v. Zutell, 263 F.2d 613, 615 (1959), and in so doing, relied on the Business Records Act, 28 U.S.C. s 1732.

8. Past treatment by reviewing courts of written medical reports in social security disability cases is revealing. Until the decision in this case, the courts of appeals, including the Fifth Circuit, with only an occasional criticism of the medical report practice, [8] uniformly recognized reliability and probative value in such reports. The courts have reviewed administrative determinations, and upheld many adverse ones, where the only supporting evidence has been reports of this kind, buttressed sometimes, but often not, by testimony of a medical adviser such as Dr. Leavitt. [9] In these cases admissibility was  *406  not contested, but  **1430  the decisions do demonstrate traditional and ready acceptance of the written medical report in social security disability cases.

9. There is an additional and pragmatic factor which, although not controlling, deserves mention. This is what Chief Judge Brown has described as '(t)he sheer magnitude of that administrative burden,' and the resulting necessity for written reports

without 'elaboration through the traditional facility of oral testimony.' Page v. Celebrezze, 311 F.2d 757, 760 (CA5 1963). With over 20,000 disability claim hearings annually, the cost of providing live medical testimony at those hearings, where need has not been demonstrated by a request for a subpoena, over and above the cost of the examinations requested by hearing examiners, would be a substantial drain on the trust fund and on the energy of physicians already in short supply.

## VI

1. Perales relies heavily on the Court's holding and statements in Goldberg v. Kelly, supra, particularly the comment that due process requires notice 'and an effective opportunity to defend by confronting any adverse witnesses * * *.' 397 U.S., at 267—268, 90 S.Ct., at 1020. Kelly, however, **\*407** had to do with termination of AFDC benefits without prior notice. It also concerned a situation, the Court said, 'where credibility and veracity are at issue, as they must be in many termination proceedings.' 397 U.S., at 269, 90 S.Ct., at 1021.

The Perales proceeding is not the same. We are not concerned with termination of disability benefits once granted. Neither are we concerned with a change of status without notice. Notice was given to claimant Perates. The physicians' reports were on file and available for inspection by the claimant and his counsel. And the authors of those reports were known and were subject to subpoena and to the very cross-examination that the claimant asserts he has not enjoyed. Further, the specter of questionable credibility and veracity is not present; there is professional disagreement with the medical conclusions, to be sure, but there is no attack here upon the doctors' credibility or veracity. Kelly affords little comfort to the claimant.

2. Perales also, as the Court of Appeals stated 412 F.2d, at 53, 416 F.2d, at 1251, would describe the medical reports in question as 'mere uncorroborated hearsay' and would relate this to Mr. Chief Justice Hughes' sentence in Consolidated Edison Co. v. NLRB, 305 U.S., at 230, 59 S.Ct., at 217: 'Mere uncorroborated hearsay or rumor does not constitute substantial evidence.'

Although the reports are hearsay in the technical sense, because their content is not produced live before the hearing examiner, we feel that the claimant and the Court of Appeals read too much into the single sentence from Consolidated Edison. The contrast the Chief Justice was drawing, at the very page cited, was not with material that would be deemed formally inadmissible in judicial proceedings but with material 'without a basis in evidence having rational probative force.' This was not a blanket rejection by the Court of administrative **\*408** reliance on hearsay irrespective of reliability and probative value. The opposite was the case.

**[3]** 3. The claimant, the District Court, and the Court of Appeals also criticize the use of Dr. Leavitt as a medical adviser. 288 F.Supp., at 314; 142 F.2d, at 53—54. See also Mefford v. Gardner, 383 F.2d 748, 759—761 (CA6 1967). Inasmuch as medical advisers are used in approximately 13% of disability claim hearings, comment as to this practice is indicated. We see nothing 'reprehensible' in the practice, as the claimant would describe it. The trial examiner **\*\*1431** is a layman; the medical adviser is a board-certified specialist. He is used primarily in complex cases for explanation of medical problems in terms understandable to the layman-examiner. He is a neutral adviser. This particular record discloses that Dr. Leavitt explained the technique and significance of electromyography. He did offer his own opinion on the claimant's condition. That opinion, however, did not differ from the medical reports. Dr. Leavitt did not vouch for the accuracy of the facts assumed in the reports. No one understood otherwise. See Doe v. Department of Transportation, 412 F.2d 674, 678—680 (CA8 1969). We see nothing unconstitutional or improper in the medical adviser concept and in the presence of Dr. Leavitt in this administrative hearing.

4. Finally, the claimant complains of the system of processing disability claims. He suggests, and is joined in this by the briefs of amici, that the Administrative Procedure Act, rather than the Social Security Act, governs the processing of claims and specifically provides for cross-examination, 5 U.S.C. s 556(d). (1964 ed., Supp. V). The claimant goes on to assert that in

any event the hearing procedure is invalid on due process grounds. He says that the hearing examiner has the responsibility for gathering the evidence and 'to make the **\*409** Government's case as strong as possible'; that naturally he leans toward a decision in favor of the evidence he has gathered; that justice must satisfy the appearance of justice, citing Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954), and In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955); and that an 'independent hearing examiner such as in the' Longshoremen's and Harbor Workers' Compensation Act should be provided.

We need not decide whether the APA has general application to social security disability claims, for the social security administrative procedure does not vary from that prescribed by the APA. Indeed, the latter is modeled upon the Social Security Act. See Final Report of the Attorney General's Committee on Administrative Procedure, contained in Administrative Procedure in Government Agencies, S.Doc.No.8, 77th Cong., 1st Sess., 157 (1941); see also the remarks of Senator McCarran, chairman of the Judiciary Committee of the Senate, 92 Cong.Rec. 2155. The cited s 556(d) provides that any documentary evidence 'may be received' subject to the exclusion of the irrelevant, the immaterial, and the unduly repetitious. It further provides that a 'party is entitled to present his case or defense by oral or documentary evidence * * * and to conduct such cross-examination as may be required for a full and true disclosure of the facts' and in 'determining claims for money or benefits * * * an agency may, when a party will not be prejudiced thereby, adopt procedures for the submission of all or part of the evidence in written form.'

[4]  These provisions conform, and are consistent with, rather than differ from or supersede, the authority given the Secretary by the Social Security Act's ss 205(a) and (b) 'to establish procedures,' and 'to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in **\*410** order to establish the right to benefits,' and to receive evidence 'even though inadmissible under rules of evidence applicable to court procedure.' Hearsay, under either Act, is thus admissible up to the point of relevancy.


The matter comes down to the question of the procedure's integrity and fundamental fairness. We see nothing that works in derogation of that integrity and of that fairness in the admission of consultants' reports, subject as they are to being material and to the use of the subpoena and consequent cross-examination. This precisely fits the statutorily prescribed 'cross-examination as may be required for a full and true disclosure of the facts.' That is the standard. It is clear and workable and does not fall short of procedural due process.

**\*\*1432**  Neither are we persuaded by the advocate-judge-multiple-hat suggestion. It assumes too much and would bring down too many procedures designed, and working well, for a governmental structure of great and growing complexity. The social security hearing examiner, furthermore, does not act as counsel. He acts as an examiner charged with developing the facts. The 44.2% reversal rate for all federal disability hearings in cases where the state agency does not grant benefits, M. Rock, An Evaluation of the SSA Appeals Process, Report No. 7, U.S. Department of HEW, p. 9 (1970), attests to the fairness of the system and refutes the implication of impropriety.

We therefore reverse and remanded for further proceedings. We intimate no view as to the merits. It is for the District Court now to determine whether the Secretary's findings, in the light of all material proffered and admissible, are supported by 'substantial evidence' within the command of s 205(g).

It is so ordered.

Reversed and remanded.


**\*411**  Mr. Justice DOUGLAS, with whom Mr. Justice BLACK and Mr. Justice BRENNAN concur, dissenting.

This claimant for social security disability benefits had a serious back injury. The doctor who examined him testified that he was permanently disabled. His case is defeated, however, by hearsay evidence of doctors and their medical reports about this claimant. Only one doctor who examined him testified at the hearing. Five other doctors who had once examined the claimant did

not testify and were not subject to cross-examination. But their reports were admitted in evidence. Still another doctor testified on the hearsay in the documents of the other doctors. All of this hearsay may be received, as the Administrative Procedure Act ( 5 U.S.C. s 556(d) (1964 ed., Supp. V)) provides that '(a)ny oral or documentary evidence may be received.' But this hearsay evidence cannot by itself be the basis for an adverse ruling. The same section of the Act states that '(a) party is entitled * * * to conduct such cross-examination as may be required for a full and true disclosure of the facts.'[1]

**\*412** As a consequence the Court of Appeals said:

'Our opinion holds, and we reaffirm, that mere uncorroborated hearsay evidence as to the physicial condition of a claimant, standing alone and without more, in a social security disability case tried before a hearing examiner, as in our case, is not substantial evidence that will support a decision of the examiner adverse to the claimant, if the claimant objects to the hearsay evidence and if the hearsay evidence is directly contradicted by the **\*1433** testimony of live medical witnesses and by the claimant who (testifies) in person before the examiner, as was done in the case at bar.' 416 F.2d 1250, 1251.

Cross-examination of doctors in these physical injury cases is, I think, essential to a full and fair disclosure of the facts.[2]

The conclusion reached by the Court of Appeals that hearsay evidence alone is not 'substantial' enough to sustain a judgment adverse to the claimant is supported not only by the Administrative Procedure Act but also by the Social Security Act itself. Although Congress provided in the Social Security Act that '(e)vidence may be received at any hearing before the Secretary even **\*413** though inadmissible under rules of evidence applicable to court procedure,' see 42 U.S.C. s 405(b), Congress also provided that findings of the Secretary were to be conclusive only 'if supported by substantial evidence.' 42 U.S.C. s 405(g). (Emphasis added.) Uncorroborated hearsay untested by cross-examination does not by itself constitute 'substantial evidence.' See Consolidated Edison Co. v. NLRB, 305 U.S. 197, 230, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). Particularly where, as in this case, a disability claimant appears and testifies as to the nature and extent of his injury and his family doctor testifies in his behalf supporting the fact of his disability, the Secretary should not be able to support an adverse determination on the basis of medical reports from doctors who did not testify or the testimony of an HEW employee who never even examined the claimant as a patient.

This case is minuscule in relation to the staggering problems of the Nation. But when a grave injustice is wreaked on an individual by the presently powerful federal bureaucracy, it is a matter of concern to everyone, for these days the average man can say: 'There but for the grace of God go I.'

One doctor whose word cast this claimant into limbo never saw him, never examined him, never took his vital statistics or saw him try to walk or bend or lift weights.

He was a 'medical adviser' to HEW. The use of circuit-riding doctors who never see or examine claimants to defeat their claims should be beneath the dignity of a great nation. Three other doctors who were not subject to cross-examination were experts retained and paid by the Government. Some, we are told, who were subject to no cross-examination were employed by the workmen's compensation insurance company to defeat respondent's claim.

**\*414** Judge Spears who first heard this case said that the way hearing officers parrot 'almost word for word the conclusions' of the 'medical adviser' produced 'nausea' in him. Judge Spears added:

'(H)earsay evidence in the nature of ex parte statements of doctors on the critical issue of a man's present physical condition is just a violation of the concept with which I am familiar and which bears upon the issue of fundamental fair play in a hearing.

'Then, when you pyramid hearsay from a so-called medical advisor, who, himself, has never examined the man who claims benefits, then you just compound it—compound a situation that I simply cannot tolerate in my own mind, and I can't see why a hearing examiner wants to abrogate his duty and his responsibility and turn it over to some medical advisor.'

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Review of the evidence is of no value to us. The vice is in the procedure which allows it in without testing it by cross-examination. Those defending a claim look to defense-minded experts **1434 for their salvation. Those who press for recognition of a claim look to other experts. The problem of the law is to give advantage to neither, but to let trial by ordeal of cross-examination distill the truth.

The use by HEW of its stable of defense doctors without submitting them to cross-examination is the cutting of corners—a practice in which certainly the Government should not indulge. The practice is barred by the rules which Congress has provided; and we should enforce them in the spirit in which they were written.

I would affirm this judgment.

**All Citations**

402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842

## Footnotes

\*     The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1     Not pertinent here are the durational aspects of disability specified in the statute's definition.

2     'Midline incision is made in upper border of the spine of L4 downward in the midline to the upper sacrum. Dissection is carried down and in the subperiosteal space exposing the interspaces at L4—5 and L5 S1. At each interspace, partial laminectomy is carried out on the left and of the bone adjacent to the interspace followed by resection of the intervening ligament in order that the interspace could be thoroughly explored both by inspection as well as by palpation. In each instance, there was no protrusion of the disc identified. Further resection downward over the sacrum is carried out in order that we do not overlook the fragment of disc that may have extruded extra-durally in this space but none is found. 'There seems to be more tightness of structures particularly of the roots in the dural sac and the lumbar area than one usually encountered. It is felt that this is the situation representing the root compression syndrome, the exact mechanics of which is not apparent. It is felt that for this reason that hemilaminectomy of the left L—5 would afford the patient additional decompression and this is carried out. After this had been done the dural sac bulges upward in a more normal position. Repeat inspection through the intact dura reveals no evidence of an intradural mass. Likewise the anterior aspect of the canal appears normal. \* \* \*'

3     'IMPRESSION: He may have a very mild chronic back sprain associated with the congenital anomalies as seen on x-ray, but it has been a long time since I have been so impressed with the obvious attempt of a patient to exaggerate his difficulties by simply just standing there and not moving—not even the uninvolved upper extremities. Thus, he has a tremendous psychological overlay to this illness, and I sincerely suggest that he be seen by a psychiatrist.
'PROGNOSIS: He should have intensive physio-therapy in the form of active exercise, including walking, bicycling, and an all out attempt at conservative rehabilitation. Were he to follow this program, and were it to be effective, I would estimate the time necessary at about three to six months. This is also considering that he does not have any serious psychiatric disease, though he obviously does have a tremendous psychological overlay to his illness.'

4     'Diagnosis in this case should be considered as crush injury to disc in the lumbo-sacral region of the spine resulting in either a ruptured disc or a slipped disc which was subsequently operated on by Dr. Ralph Munslow. Since the operation, the patient has not made a complete recovery; on the contrary, the patient continues to complain as bitterly now as he did prior to surgery.

'Since I started seeing this patient on April 13, I have had occasion to see and talk with him over 30 times. During this period and with this number of visits, I have become thoroughly convinced that this man is not malingering. I am completely convinced of his sincerity and of the genuine and truthful nature of his complaints. From my own observations and from physical examination, it is my considered opinion that this patient has indeed an injury to the lumbo-sacral region of the spine which has not been corrected by surgery. My opinion is that the injury sustained is of a permanent nature and that as things presently stand, the patient is totally, completely, and permanently disabled. It is my considered opinion that this patient in the condition in which he finds himself at this time would not be able to continue gainful employment as a common laborer. Inasmuch as this patient has had previous surgery to the affected area, I do not know that further surgery would have anything to offer him, and have told him that about the most I could offer him would be a support belt to help relieve the symptoms, by the use of a walking cane, and analgesics for relief of the symptoms.'

5    Brief 14.

6    Although, as noted above, one stated ground of objection was the absence of proof of the physicians' Texas licensure, we do not understand that there is any serious issue as to the possession of Texas licenses by Drs. Munslow, Lampert, Langston, Bailey, and Mattson.

7    We are advised by the Government's brief, p. 18, nn. 7 and 8, that in fiscal 1968, 515,938 disability claims were processed; that, of these, 343,628 (66.601%) were allowed prior to the hearing stage; that approximately one-third of the claims that went to hearing were allowed; and that 320,164 consultant examinations were obtained.

8    Ratliff v. Celebrezze, 338 F.2d 978, 982 (CA6 1964); but see Miracle v. Celebrezze, 351 F.2d 361, 365, 382—383 (CA6 1965).

9    Ber v. Celebrezze, 332 F.2d 293, 296—298 (CA2 1964); Stancavage v. Celebrezze, 323 F.2d 373, 374 (CA3 1963); Dupkunis v. Celebrezze, 323 F.2d 380, 382 (CA3 1963); Cochran v. Celebrezze, 325 F.2d 137, 138 (CA4 1963); Cuthrell v. Celebrezze, 330 F.2d 48, 50—51 (CA4 1964); Aldridge v. Celebrezze, 339 F.2d 190, 191 (CA5 1964); Dodsworth v. Celebrezze, 349 F.2d 312, 313—314 (CA5 1965); Bridges v. Gardner, 368 F.2d 86, 89 (CA5 1966); Green v. Gardner, 391 F.2d 606 (CA5 1968); Martin v. Finch, 415 F.2d 793, 794 (CA5 1969); Breaux v. Finch, 421 F.2d 687, 689 (CA5 1970); Phillips v. Celebrezze, 330 F.2d 687, 689 (CA6 1964); Justice v. Gardner, 360 F.2d 998, 1000—1001 (CA6 1966);

Moon v. Celebrezze, 340 F.2d 926, 928 (CA7 1965); Pierce v. Gardner, 388 F.2d 846, 847 (CA7 1967), cert. denied, 393 U.S. 885, 89 S.Ct. 197, 21 L.Ed.2d 162; Celebrezze v. Sutton, 338 F.2d 417, 419—420 (CA8 1964); Brasher v. Celebrezze, 340 F.2d 413, 414 (CA8 1965); McMullen v. Celebrezze, 335 F.2d 811, 815 (CA9 1964), cert. denied, 382 U.S. 854, 86 S.Ct. 106, 15 L.Ed.2d 92; Flake v. Gardner, 399 F.2d 532, 534 (CA9 1968); Celebrezze v. Warren, 339 F.2d 833, 836 (CA10 1964); McMillin v. Gardner, 384 F.2d 596, 597 (CA10 1967).

1    S.Rep.No.752, 79th Cong., 1st Sess., 22—23.
'The right of cross-examination extends, in a proper case, to written evidence submitted pursuant to the last sentence of the subsection as well as to cases in which oral or documentary evidence is received in open hearing. * * * To the extent that cross-examination is necessary to bring out the truth, the party should have it. * * *'
The House Judiciary Committee expressed a like view.
'The provision on its face does not confer a right of so-called 'unlimited' cross-examination. Presiding officers will have to make the necessary initial determination whether the cross-examination is pressed to unreasonable lengths by a party or whether it is required for the 'full and true disclosure of the facts' stated in the provision. Nor is it the intention to eliminate the authority of agencies to confer sound discretion upon presiding officers in the matter of its extent. The test is—as the section states—whether it is required 'for a full and true disclosure of the facts. * * *' The right of cross-examination extends, in a proper case, to written evidence submitted pursuant to the last sentence of the section as well as to cases in which oral or documentary evidence is received in open hearing. * * * To the extent that cross-examination is necessary to bring out the truth, the party must have it. * * *' H.R.Rep.No.1980, 79th Cong., 2d Sess., 37.

2    While the Administrative Procedure Act allows statutory exceptions of procedures different from those in the Act, 5 U.S.C. s 556 (1964 ed., Supp. V), there is no explicit ban in the Social Security Act (42 U.S.C. s 405) against the

**Richardson v. Perales, 402 U.S. 389 (1971)**
91 S.Ct. 1420, 28 L.Ed.2d 842

right of cross-examination. And the Regulations of the Secretary provide that there must be 'a reasonable opportunity for a fair hearing.' 20 CFR s 404.927.

---

**End of Document**                                                                 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.            AR.06188

Roberts v. United States, Not Reported in Fed. Supp. (2018)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 964 of 1271

2018 WL 3453508
Only the Westlaw citation is currently available.
United States District Court, E.D. Tennessee,
Greeneville.

Joshua ROBERTS, Petitioner,
v.
UNITED STATES of America, Respondent.

Nos. 2:11-CR-63, 2:15-CV-143
|
Filed 07/17/2018

**Attorneys and Law Firms**

J. Gregory Bowman, U.S. Department of Justice (USAO Greene) Office of U.S. Attorney, Greeneville, TN, for Respondent.

**MEMORANDUM OPINION AND ORDER**

J. Ronnie Greer, United States District Judge

 **\*1** Pending before the Court is the motion of Joshua Roberts ("Roberts" or "Petitioner"), a federal inmate, to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 and his amendments thereto [Docs. 251, 297-98]. The Court finds the materials thus submitted, together with the record of the underlying criminal case (2:11-CR-63), conclusively show Roberts is not entitled to relief on any of the claims asserted in his petition. Accordingly, the Court will decide this matter without an evidentiary hearing, *see United States v. Todaro*, 982 F.2d 1025, 1028 (6th Cir. 1993), and will DENY Roberts' motion.

**I. PROCEDURAL AND FACTUAL BACKGROUND**
A federal grand jury indicted Roberts on August 9, 2011, charging him, along with multiple co-defendants, with a conspiracy to distribute 28 grams or more of crack cocaine in violation of 21 U.S.C. § 846 and 841(b)(1)(B) [Doc. 15]. Roberts, however, was not arrested until July 1, 2013, when he was obtained from state custody by way of a writ of habeas corpus ad prosequendum [Doc. 54]. He was arraigned on July 1, 2013, appointed counsel and entered a plea of not guilty [Doc. 65]. Roberts then filed a series of substantive and evidentiary motions: motion to unseal document [Doc.

75]; motion to suppress evidence of a male suspect running or being suspected of retrieving a weapon [Doc. 82]; motion to suppress evidence of marijuana [Doc. 86]; motion to suppress audio-visual records [Doc. 88]; motion in limine to exclude his prior felony convictions [Doc. 90]; motion to suppress evidence of room keys [Doc. 92].

On the motion to suppress marijuana [Doc. 86], the government agreed it would not use that evidence in its case in chief, and the Court then found that motion moot [Doc. 128]. The Court also granted Roberts' motion to unseal [Doc. 132]. An evidentiary hearing was held before United States Magistrate Judge Dennis Inman on September 19, 2013. The Court treated Roberts' motion to suppress [Doc. 82], in actuality, as a motion *in limine* [Doc. 144]. The Court found the officer's testimony that Roberts ran towards the rear of the motel suite when a co-defendant opened the hotel door was relevant but that no witness could speculate as to the reasons Roberts ran as he did. [Doc. 144 at 2-3]. Regarding Roberts' motion to suppress all audio-visual records [Doc. 88], the Court again treated this as a motion in limine. The Court noted that video recordings were from recording devices on the officers, which recorded their entry into the motel room and the events that transpired therein. After reviewing the evidence, the Court denied Roberts' motion to exclude the audio-visual evidence [*Id.* at 4]. The Court deferred Roberts' motion *in limine* regarding the use of his prior felony convictions to the District Court [*Id.* at 6]. On Roberts' motion to suppress evidence regarding his possession of the keys to the two motel rooms in his pocket, [Doc. 92], the Court recommended the motion be denied [Doc. 145]. Roberts objected to the Report and Recommendation [Doc. 152]. The District Court overruled the objections and adopted it as the order of the Court [Doc. 153].

 **\*2** On November 5, 2013, the government filed an Information to establish a prior conviction [Doc. 172], indicating that Roberts had a prior felony drug conviction for which he was sentenced to eight years in the Tennessee Department of Correction in the Criminal Court for Knox County, Tennessee.

On November 19, 2013, prior to the start of his jury trial, the District Court conducted a *Lafler/Frye* hearing. At that hearing, the Assistant United States Attorney indicated that while nothing had been reduced to writing, it had offered a plea to a lesser included offense and that it would forego filing the 851 enhancement [Doc. 305 at 3]. The Court then inquired of Roberts' counsel if that had been discussed with Roberts

Roberts v. United States, Not Reported in Fed. Supp. (2018)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 965 of 1271

and he confirmed that he had [Doc. 305 at 4-5]. The following colloquy then occurred between the Court and Roberts:

THE COURT: Mr. Roberts, you've heard [AUSA] Mr. Bowman's outline of the informal discussions that were had in this case, you've heard Mr. Lloyd [Defendant's counsel] indicate to me that he conveyed all of that information to you; is that correct?

DEFENDANT: Yes, sir.

THE COURT: All right, and upon receipt of that information, did you discuss with Mr. Lloyd, as he has indicated, the pros and cons of potentially pursuing such an agreement in this case?

DEFENDANT: Yes, sir.

THE COURT: All right. And did you consider your attorney's advice with respect to that discussion, if in fact any advice was given?

DEFENDANT: Yes, sir.

THE COURT: All right. But did you ultimately make the decision about how to react, if at all, to that, to those informal discussions?

DEFENDANT: Yes, sir.

THE COURT: Was it your decision to not pursue such an agreement?

DEFENDANT: Yes, sir.

THE COURT: In other words, to the extent an informal agreement was offered, that is for you to plead guilty to a lesser included offense and the government would agree not to file a section 851 notice, was it your decision to reject such an offer?

DEFENDANT: Yes, sir.

THE COURT: All right. Did you understand that had you pursued and ultimately accepted such an offer, you would have faced a 5 year mandatory minimum sentence—well, maybe not. You would have faced a sentence of less than the 10 year mandatory minimum sentence in the case?

DEFENDANT: Yes, sir.

THE COURT: And you understand that overall a decision to accept such an offer might have resulted in a lower

sentence than you will potentially face if you take this case to trial and are convicted?

DEFENDANT: Yes, sir.

THE COURT: Nevertheless, is it your decision to reject any plea offer and proceed to trial today?

DEFENDANT: Yes, sir.

[Doc. 305 at 5-7].

The jury trial then commenced. A number of Roberts' co-defendants testified about their activities with Roberts. Roberts also testified in his own defense, denying he ever saw crack cocaine while in Johnson City, Tennessee, and denying he had anything to do with a conspiracy to distribute cocaine. After a two-day trial, the jury convicted Roberts as charged [Doc. 185]. Roberts filed a motion for acquittal and for a new trial [Doc. 206], which the Court denied [Doc. 230].

A presentence report was prepared which, after applying a number of adjustments, calculated his total offense level to be 28 with a criminal history category of IV, resulting in an advisory guideline imprisonment range of 110–137 months. However, because of the statutorily enhanced minimum sentence of 10 years, Roberts' advisory guideline range was 120–137 months. PSR ¶ 70. Roberts objected to the obstruction of justice enhancement, the disparate treatment between crack cocaine and powder cocaine under the guidelines, and that the PSR did not downwardly adjust his offense level by two levels for his minor role in the offense [Doc. 227 at 2-3]. Roberts' counsel also filed a detailed sentencing memorandum asking for the statutory minimum sentence [Doc. 228 at 3]. On March 24, 2014, the Court sentenced Roberts to the statutory minimum sentence of 10 years [Doc. 234]. Roberts timely appealed his conviction and sentence [Doc. 236].

**\*3** On appeal, he argued there was a fatal variance between the indictment and the evidence presented at trial, that the District Court erroneously admitted evidence at the trial including the admission of the police audio, the motel keys found in Roberts' pocket, that it wrongfully permitted the government to cross-examine him regarding his knowledge of crack cocaine and his assertion that they were just watching TV when the officers arrived, that the District Court erred in denying his motion for mistrial based on the government's question that Roberts was a member of the

**Roberts v. United States, Not Reported in Fed. Supp. (2018)**

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 966 of 1271

Gangster Disciples, and for prosecutorial misconduct during closing argument.

The Sixth Circuit accurately summarized the evidence presented at trial against Roberts as follows:

> In June 2011, during a card game in Knoxville, Tennessee, Dwayne Turner told Defendant and four other friends that they could "make 500 [dollars] off of an eight ball" in Johnson City, Tennessee. An "eight ball" refers to one-eighth of an ounce, or approximately 3.5 grams, of cocaine. It usually costs between $250 and $300. Defendant responded, "[W]e need to see what that's about."

> Turner contacted Marquesha Jones, his paramour, after the card game. He asked Jones to accompany the group to Johnson City and rent hotel rooms in her name. She agreed in exchange for reimbursement and prescription pills. The group left Knoxville for Johnson City on the night of June 22, 2011. During the trip, Jones personally transported crack cocaine at Turner's request. The conspirators arrived in Johnson City "a little after midnight" on June 23. Jones paid for three rooms at a local Red Roof Inn, renting the rooms until June 24.

> Testifying for the United States at Defendant's trial, Jones described the illegal activity that took place at the Red Roof Inn. Jones witnessed Defendant chop up crack cocaine with a razor blade and weigh it on a digital scale. She observed Turner sell crack cocaine from his room and send "customers" to the two other rooms to purchase drugs. Because some customers wanted to buy from only Turner, Defendant also brought crack cocaine to Turner's room, where Turner completed transactions and provided Defendant with the sale proceeds. The crack cocaine sold out by the evening of June 23, so Defendant, Jones, and two other conspirators drove back to Knoxville to resupply. The group returned to Johnson City that night.

> On the morning of June 24, the conspirators shifted operations to a neighboring Motel 6 because Turner believed the Red Roof Inn was "getting too hot." Jones rented Rooms 109 and 231 at the Motel 6. Jones testified that she stayed at the Motel 6 that morning for only an hour and a half, before returning to Knoxville in order to go to work.

> Motel 6 staff noticed "suspicious activity" and contacted the Johnson City Police Department that day, informing the department that Jones had rented two rooms and that several individuals were staying in those rooms. Thomas

> Garrison, a Vice and Narcotics Investigator, went to the Motel 6 with Sergeant Eric Dougherty and Officer Mark Hollis.

> Upon arriving at the motel, Investigator Garrison detected a "strong odor of marijuana" near Room 231. The officers approached the room in order to conduct a "knock-and-talk." Turner opened the door, and Investigator Garrison saw Defendant run into the bedroom adjacent to the hotel suite's living room. Turner attempted to slam the door shut as the officers pushed their way into the room. Defendant, Turner, and co-conspirators Jamica Woods and Shanna Clark were inside the room at the time of entry. Investigator Garrison immediately followed Defendant into the bedroom and placed him in handcuffs while the other officers secured the living room. Sergeant Dougherty conducted a pat-down of Turner and found a small bag of marijuana.

> **\*4** Investigator Garrison obtained Jones's phone number from Clark. He contacted Jones to ask for permission to search the room, but she represented herself to be Jones's sister. Investigator Garrison instead sought and received verbal consent to search the hotel room from Turner, and the subsequent search revealed four bags containing 67.51 grams of crack cocaine, two sets of digital scales, a razor blade, and a box of plastic sandwich bags used to package the drugs. After searching Room 231, the officers went to the hotel manager and looked through the hotel records, which indicated Jones had also rented Room 109. The officers obtained permission from hotel management to search that room, which was empty, and they found two bags containing a total of 23.46 grams of crack cocaine.

> Defendant was indicted alongside some of his co-conspirators for conspiring to possess with intent to distribute 28 grams or more of crack cocaine, in violation of 21 U.S.C. § 841(a)(1), based on the discovery of crack cocaine in the two motel rooms. Four of his co-conspirators pleaded guilty for their roles in the conspiracy; charges against a fifth co-defendant, Marquez Holloway, were dismissed.

[Doc. 247 at 2-4]. After considering all of Roberts' arguments, on February 27, 2015, the Sixth Circuit affirmed the judgment of the District Court. On May 8, 2015, Roberts timely filed this § 2255 petition. On June 15, 2017, Roberts filed an amendment to his motion to vacate [Doc. 298]. The United

States filed responses [Docs. 297 and 300]. This matter is now ripe for review.

## II. STANDARD OF REVIEW

This Court must vacate and set aside Petitioner's sentence if it finds that "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack ..." 28 U.S.C. § 2255. Under Rule 4 of the Governing Rules, the Court is to consider initially whether the fact of the motion itself, together with the annexed exhibits and prior proceedings in the case, reveal the movant is not entitled to relief. If it plainly appears the movant is not entitled to relief, the Court may summarily dismiss the § 2255 motion under Rule 4.

When a defendant files a § 2255 motion, he must set forth facts which entitle him to relief. *Green v. Wingo*, 454 F.2d 52, 53 (6th Cir. 1972); *O'Malley v. United States*, 285 F.2d 733, 735 (6th Cir. 1961). "Conclusions, not substantiated by allegations of fact with some probability of verity, are not sufficient to warrant a hearing." *O'Malley*, 285 F.2d at 735 (citations omitted). A motion that merely states general conclusions of law without substantiating allegations with facts is without legal merit. *Loum v. Underwood*, 262 F.2d 866, 867 (6th Cir. 1959); *United States v. Johnson*, 940 F.Supp. 167, 171 (W.D. Tenn. 1996). To warrant relief under 28 U.S.C. § 2255 because of constitutional error, the error must be one of constitutional magnitude which had a substantial and injurious effect or influence on the proceedings. *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (citation omitted) (§ 2254 case); *Clemmons v. Sowders*, 34 F.3d 352, 354 (6th Cir. 1994). *See also United States v. Cappas*, 29 F.3d 1187, 1193 (7th Cir. 1994) (applying *Brecht* to a § 2255 motion). If the sentencing court lacked jurisdiction, then the conviction is void and must be set aside. *Williams v. United States*, 582 F.2d 1039, 1041 (6th Cir.), *cert. denied*, 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661 (1978). To warrant relief for a non-constitutional error, petitioner must show a fundamental defect in the proceeding that resulted in a complete miscarriage of justice or an egregious error inconsistent with the rudimentary demands of fair procedure.

*Reed v. Farley*, 512 U.S. 339, 354, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994); *Grant v. United States*, 72 F.3d 503, 506 (6th Cir.), *cert. denied*, 517 U.S. 152 (1982).

## III. ANALYSIS

**\*5** Roberts makes several arguments in his § 2255 motion: (1) his lawyer did not allow him to make his own decisions [Doc. 251 at 4]; (2) his lawyer held "back evidence of calls and letters that would have made the jury make a different decision" and failed to investigate the jail calls that would have exonerated him [*Id.*; Doc. 297 at 1-2]; (3) instead of allowing him to take a plea, he advised him there was no evidence against him [*Id.*]; (4) his lawyer did not listen to his recommendations on what questions to ask at trial [*Id.*]; (5) his lawyer did not review the evidence against him [*Id.*]; (6) his lawyer did not communicate with the other defense attorneys in the case [*Id.*]; (7) his lawyer was ineffective for failing to object to the predicate offense that triggered the mandatory minimum sentence [Doc. 298 at 1]. The Court will address each argument in turn.

### 1. Roberts' claim that his counsel did not allow him to make his own decisions [Doc. 251 at 4].

Roberts states that "instead of allowing me to make my own decisions for myself, [counsel] persuaded me to do what he wanted me to do," [Doc. 251 at 4]. Roberts does not identify what particular decision he claims his counsel made that he did not otherwise concur in. In fact, it is clear from the record that Roberts made his own decisions at all critical stages in his case. For example, when it came to refusing to enter into a plea agreement with the United States, Roberts made the decision. At the *Lafler/Frye* hearing, the following colloquy occurred between the Court and Roberts regarding his decision not to enter into a plea agreement:

THE COURT: In other words, to the extent an informal agreement was offered, that is for you to plead guilty to a lesser included offense and the government would agree not to file a section 851 notice, was it your decision to reject such an offer?

DEFENDANT: Yes, sir.

...

THE COURT: And you understand that overall a decision to accept such an offer might have resulted in a lower

sentence that you will potentially face if you take this case to trial and are convicted?

DEFENDANT: Yes, sir.

THE COURT: Nevertheless, is it your decision to reject any plea offer and proceed to trial today?

DEFENDANT: Yes, sir.

[Doc. 305 at 5-7]. Insofar as the decision to reject the plea offer and proceed to trial is concerned, the record demonstrates that decision was Roberts', and he confirmed as much before the Court under oath.

The same is true when it came to deciding whether he should take the witness stand and testify. The following colloquy occurred between the Court and Roberts prior to his taking the stand in his own defense:

THE COURT: [Defense counsel] Mr. Lloyd tells me that you have in fact decided that you will testify in this case. Is that correct?

DEFENDANT: Yes, sir.

THE COURT: All right. Is that your free and voluntary decision to do so?

DEFENDANT: Yes, sir.

THE COURT: Has anybody pressured you or threatened you or in any way induced you—

DEFENDANT: No, sir.

THE COURT: —to exercise your right to testify in this case?

DEFENDANT: No, sir.

THE COURT: And is it then still your decision that you will testify in the case?

DEFENDANT: Yes, sir.

[Doc. 191 at 54-55]. When it came to deciding whether to testify, Roberts also advised the Court that it was his decision, that it was voluntary, and that no one had pressured or threatened him or in any way induced him to exercise his right to testify. Roberts' argument that his counsel made all his decisions for him is simply factually incorrect and is undercut by his own testimony to the Court. Because it appears that Roberts made his own decisions in the case, and because he fails to identify any deficiency in his counsel's performance, this issue is without merit.

**2. Roberts' claim that his counsel "held back evidence that would have made the jury make a different decision" and failed to investigate the jail calls which would have exonerated him [Docs. 251 at 4; 297 at 1-2].**

**\*6** Roberts contends that he notified counsel that he wanted counsel to investigate jail phone calls between himself and Jamica Woods, a co-defendant in this case, that would have proven "he knew nothing of her dealings." Roberts claims his counsel failed to conduct interviews of witnesses who would have exonerated him. Concerning the jail calls, Roberts indicates these calls were between Woods and himself in which Woods took responsibility for the cocaine. He claims his counsel should have investigated and introduced that evidence to the jury.

The Supreme Court stated in *Strickland* that defense attorneys have "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. "This duty includes the obligation to investigate all witnesses who may have information concerning [a] client's guilt or innocence." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). But "[a] defense counsel has no obligation to ... interview a witness whose testimony would not have exculpated the defendant." *Millender v. Adams*, 376 F.3d 520, 527 (6th Cir. 2004) (quoting *Millender v. Adams*, 187 F.Supp.2d 852, 877 (E.D. Mich. 2002) ) (citing *Marra v. Larkins*, 111 F.Supp.2d 575, 585 n. 13 (E.D. Pa. 2000) ).

When the Court examines the facts of this case, it becomes clear that Roberts' claim in this regard is without merit. The Sixth Circuit noted that, at trial, Dwayne Turner testified that he told Roberts that he could make $500 off an "eight ball" in Johnson City and that Roberts responded "We need to see what that's about." Roberts then traveled to Johnson City in the same car with Jamica Woods, following right behind Turner. Marquesha Jones, Turner's paramour, also accompanied them on the trip to Johnson City and paid for the rooms, one of which Roberts stayed in. Jones testified at trial that she witnessed Roberts chop up crack cocaine and weigh it on a digital scale at the hotel room. After selling what crack

Roberts v. United States, Not Reported in Fed. Supp. (2018)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 969 of 1271

cocaine they had, they then travelled back to Knoxville to pick up more cocaine and returned the next day where they stayed at the Motel 6. There, the management contacted the Johnson City Police Department after noticing "suspicious activity." When law enforcement arrived, officers testified they smelled a strong odor of marijuana coming from room 231, where Roberts was present. They knocked on the door, and when Turner opened the door, officers saw Roberts take off running into the bedroom. He was quickly subdued. After obtaining consent to search the room, they discovered 67.1 grams of crack cocaine, two sets of digital scales, a razor blade, and a box of plastic sandwich bags used to package the drugs for resale. In room 109, where Roberts was staying, they found 23.46 grams of crack cocaine.

The first issue are the jail calls in which Woods, according to Roberts, takes responsibility for the cocaine. First, although Roberts testified, he never mentioned anything about Woods claiming the cocaine was hers at any point. Contrary to his claim that the cocaine belonged to Woods, he testified at trial that Turner had actually claimed the cocaine was his, not Woods [Doc. 191 at 60]. Second, even accepting Roberts' claim that Woods took responsibility for the cocaine, that would not exculpate him in the least. He was convicted of a conspiracy, not simple possession. To establish a conspiracy, "the government must prove, beyond a reasonable doubt, '(1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy.' " *United States v. Robinson*, 547 F.3d 632, 641 (6th Cir. 2008) (quoting *United States v. Caver*, 470 F.3d 220, 232 (6th Cir. 2006) ). Even if Woods took ownership of the cocaine that would not mean that Roberts had not entered a conspiracy to distribute cocaine. The government did not have to prove the cocaine actually belonged to Roberts to obtain a conviction for conspiracy. "[I]t is enough to show that each member of the conspiracy realized that he was participating in a joint venture, even if he did not know the identities of every other member, or was not involved in all the activities in furtherance of the conspiracy." *Robinson*, 547 F.3d at 641 (quoting *United States v. Martinez*, 430 F.3d 317, 332-33 (6th Cir. 2005) ). Roberts does not identify any other evidence he claims should have been introduced which was not. This issue is without merit.

### 3. Roberts' claim that Counsel did not allow Roberts to enter a plea agreement [Doc. 251 at 4].

*7  Roberts claims that "instead of allowing me to take a plea, [counsel] told me Greeneville had no real evidence against me and promised that he could beat it for me!" On November 19, 2013, this Court held a *Lafler/Frye* hearing, as required by the Supreme Court [Doc. 305]. Under oath, Roberts acknowledged that he did not wish to pursue a plea agreement in this case and that it was his choice—and his choice alone—not to pursue any such agreement. For Roberts to now claim that the decision not to take a plea agreement was not his but his attorney's is disingenuous at best. *See United States v. Owenby*, No. 2:12-CR-118, 2017 WL 951698, at *6 (E.D. Tenn. Mar. 9, 2017) (citing *United States v. Peterson*, 414 F.3d 825, 827 (7th Cir. 2005) ("Judges need not let litigants contradict themselves so readily; a [ § 2255] motion that can succeed only if the defendant committed perjury at the plea proceedings may be rejected out of hand unless the defendant has a compelling explanation for the contradiction") ). This claim has no merit.

### 4. Roberts' claim that counsel did not listen to his recommendations on questions to ask at trial.

Roberts argues that counsel did not ask certain questions that he was instructed to ask at trial. Roberts does not identify the specific questions he advised counsel to ask. Without such a showing, it is impossible for the Court to determine the result of the trial would be different. Therefore, Roberts' claim fails to show he was prejudiced by counsel's performance with regard to these questions at trial. In any event, trial strategy, for the most part, is left to the discretion of counsel. *See Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. Strategic choices about which lines of defense to pursue are owed deference commensurate with the reasonableness of the professional judgments on which they are based. *Id.* Roberts has offered no evidence to overcome the presumption that counsels' approach was a matter of sound trial strategy. This issue is without merit.

### 5. Roberts' claim that his attorney did not review the evidence against him.

Roberts claims that his attorney did not review the evidence against him. As noted, to succeed on a claim that he was denied effective assistance of counsel, he must show his counsel made errors so serious that "counsel was not functioning as the counsel guaranteed by the Sixth Amendment". *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

Roberts v. United States, Not Reported in Fed. Supp. (2018)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 970 of 1271

Second, he must show the deficient performance prejudiced him. *Id.*

A review of the record in this case demonstrates that Roberts' claim his counsel did not review the discovery with him is meritless. He admitted before the Court that it was only after consultation with his attorney that he decided not to take a plea agreement [Doc. 305 at 5-7]. He also admitted that it was only after consultation with his attorney that he decided to take the witness stand in his own defense [Doc. 191 at 54-55]. He can point to none of his counsel's actions in relation to discovery that were deficient. In fact, his counsel filed numerous motions addressing the very evidence that was introduced against. The United States Magistrate Judge held evidentiary hearings for which Roberts was present, addressing the very evidence Roberts claims his counsel never reviewed with him. Again, this claim is spurious and is without merit.

### 6. Roberts' claim that counsel did not approach the attorneys of the codefendants.

Roberts claims counsel "did not take time to talk to the lawyers of codefendants, when two [tried] to testify on my behalf!" [Doc. 251 at 4]. As noted above, a defendant who files a § 2255 motion must set forth facts which entitle him to relief. *Green*, 454 F.2d at 53. Petitioner has not identified the two defendants, nor has he filed an affidavit from either indicating a willingness to testify. He has not alleged what their testimony would have been, giving the Court any basis to determine that the testimony, if given, had the potential to alter the result of the trial. This issue is without merit.

### 7. Roberts' claim that counsel was deficient in not objecting to the predicate offense that triggered the enhanced mandatory minimum sentence of 10 years.

**\*8** Roberts argues that a conviction under Tennessee Code Annotated § 39-17-417 does not match the federal generic definition of a violation under the Controlled Substance Act and thus cannot be used to enhance his sentence under § 841(b)(1)(B). In support, he contends that following the Supreme Court decision in *Mathis v. United States*, —— U.S. ——, 136 S.Ct. 2243, 195 L.Ed.2d 604 (2016), his prior felony drug conviction no longer qualifies as a valid predicate offense to enhance his sentence.

The government filed a notice to seek enhanced punishment, increasing the mandatory minimum from five years to ten years if he were convicted [Doc. 172]. The notice indicates that Roberts pled guilty on January 30, 2009, to "possession with the intent to sell cocaine," a class B felony violation of Tennessee Code Annotated § 39-17-417, and was sentenced to eight years in the TDOC [Doc. 172-1]. This conviction formed the basis for the enhancement of Roberts' sentence in this case.

Having been convicted of a conspiracy to distribute crack cocaine under federal law, Roberts was subject to the same punishment as those convicted of the underlying offense set forth in 21 U.S.C. § 841(a). See 21 U.S.C. § 846 ("Any person who ... conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the ... conspiracy"). Section 841(b)(1)(B) provides that "If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 10 years...." A "felony drug offense" means any offense punishable by more than one year of imprisonment that "prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances." 21 U.S.C. § 802(44).

Roberts was convicted of a violation of Tennessee Code Annotated § 39-17-417, a Class B felony offense for which Tennessee law authorizes a term of imprisonment of "not less than eight (8) nor more than thirty (30) years." Tenn. Code. Ann. § 40-35-111(b)(2). Moreover, § 39-17-417 criminalizes the sale of a controlled substance, conduct that clearly "relates to" a controlled substance and would qualify as a prior felony drug offense under § 841(b)(1)(B). *See also Stone v. Butler*, 2017 WL 5618289 at *2 (E.D. Ky. Nov. 20, 2017)* ("Courts have therefore consistently held that a conviction under Tennessee's controlled substances act qualifies as a valid predicate for an enhancement under 21 U.S.C. § 841(b)(1)(A)").

Petitioner's reliance on *Mathis* is misplaced. In *Mathis*, the Supreme Court addressed whether a prior conviction constituted a "serious drug offense" within the meaning of 18 U.S.C. § 924(e)(1), the Armed Career Criminal Act.

Roberts v. United States, Not Reported in Fed. Supp. (2018)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 971 of 1271

What constitutes a "serious drug offense" under § 924(e)(1) is not the same as what constitutes a "prior felony drug conviction" under § 844, which applied to enhance Roberts' sentence. In fact, under § 924(e)(1), a "serious drug offense" includes only those felony drug offenses for which "a maximum term of imprisonment of ten years or more is prescribed by law," which, a "prior felony drug offense" for enhancement purposes only requires the offense be punishable by more than one year. Thus, *Mathis* is not applicable here. In any event, Roberts was not sentenced under the Armed Career Criminal Act, but enhanced under § 841(b)(1)(B). His argument that counsel's performance was deficient for failing to object to this offense based on the application of *Mathis* is without merit.

**IV. CONCLUSION**

**\*9** For the reasons set forth above, the Court holds that Roberts' conviction and sentence were not in violation of the Constitution or laws of the United States. Accordingly, his motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 and his amendments thereto [Docs. 251, 297-98] are **DENIED** and his motion **DISMISSED**.

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.

A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit disapproves of the issuance of blanket denials of certificates of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). The district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). *Id.*

Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Having examined each of the petitioner's claims under the Slack standard, the Court finds that reasonable jurists could not conclude that this Court's dismissal of petitioner's claims was debatable or wrong. Therefore, the Court will deny petitioner a certificate of appealability as to each claim raised.

A separate judgment will enter.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3453508

---

**End of Document**          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

844 F.3d 392
United States Court of Appeals, Third Circuit.

Raul Rivas RODRIGUEZ, a/
k/a Raul Rivas, Petitioner

v.

ATTORNEY GENERAL UNITED
STATES of America, Respondent

No. 16-1354
|
Submitted Under Third Circuit
LAR 34.1(a) November 18, 2016
|
(Opinion Filed: December 19, 2016)

**Synopsis**
**Background:** Alien, a citizen of the Dominican Republic and
a lawful permanent resident of the United States, petitioned
for review of the dismissal, by the Board of Immigration
Appeals (BIA), of his appeal from the denial of his motion
to terminate removal proceedings, and of an order for his
removal.

**Holdings:** The Court of Appeals, Shwartz, Circuit Judge, held
that:

[1] BIA's conclusion that alien's motion to terminate removal
proceedings could be denied based on a deferred adjudication
contravened requirement that alien be given notice of the acts
or conduct alleged to be in violation of law, and

[2] alien met his burden to show that his state court criminal
convictions had been vacated.

Petition granted.

West Headnotes (11)

**[1]** **Aliens, Immigration, and**
**Citizenship** 🔑 Notice; order to show cause

**Constitutional Law** 🔑 Admission and
exclusion; deportation

Board of Immigration Appeals (BIA) conclusion
that alien's motion to terminate removal
proceedings, on basis that his state court
convictions had been vacated, could be denied
based on the deferred adjudication, contravened
requirement that an alien be given notice of
the acts or conduct alleged to be in violation
of law; to remove alien on basis of a prior
deferred adjudication would base his removal on
an entirely different factual ground from that set
forth in the notice to appear and would violate his
due process rights to notice of the bases for his
removal; notice of removal did not specify alien's
participation in a deferred adjudication program
as a basis for removal. U.S.C.A. Const. Amend.
5; Immigration and Nationality Act § 239, 8
U.S.C.A. § 1229(a)(1)(c).

**[2]** **Aliens, Immigration, and**
**Citizenship** 🔑 Presumptions and burden of
proof

Alien met his burden, in proceedings on his
motion to terminate removal proceedings, to
show that his State court criminal convictions
had been vacated within meaning of the
Immigration and Nationality Act (INA); prior
to his immigration hearing, alien petitioned the
State court for post-conviction relief on basis
that he received ineffective assistance of counsel
because his trial counsel failed to advise him
of the possible immigration consequences of a
conviction, and thereafter, by agreement of the
parties, the guilty verdicts were vacated and alien
was placed on pretrial probation as part of a
deferred adjudication agreement in which it was
agreed that the charges would be dropped if alien
successfully completed his pretrial probation.
U.S.C.A. Const. Amend. 6.

**[3]** **Aliens, Immigration, and**
**Citizenship** 🔑 Jurisdiction and venue

Although Court of Appeals generally lacks
jurisdiction to review any final order of
removal against an alien who is removable by
reason of having committed a covered criminal
offense, it has jurisdiction to review an order

of removal to extent it raises constitutional claims or questions of law, and thus Court had jurisdiction to determine whether the disposition of alien's Pennsylvania criminal charge constituted a conviction for immigration purposes. Immigration and Nationality Act §§ 237, 242, 8 U.S.C.A. §§ 1227(a)(2)(B), 1252(a)(2)(C)-(D).

**[4]    Aliens, Immigration, and Citizenship** ⚷ Review of initial decision or administrative review

Although Board of Immigration Appeals' (BIA) opinion in removal proceedings was the final order, such that Court of Appeals' review would typically be confined to BIA's opinion, since BIA had expressly adopted Immigration Judge's (IJ) opinion, Court would also review that opinion to extent BIA adopted it.

**[5]    Aliens, Immigration, and Citizenship** ⚷ Jurisdiction and venue

Court of Appeals had jurisdiction, on review in removal proceedings, to determine whether the disposition of alien's State criminal charge constituted a conviction for immigration purposes.

**[6]    Aliens, Immigration, and Citizenship** ⚷ Findings or statement of reasons

**Aliens, Immigration, and Citizenship** ⚷ Findings or statement of reasons

Immigration Judge (IJ) and Board of Immigration Appeals (BIA) erred, when concluding, in removal proceedings, that state court likely vacated alien's convictions to allow him to avoid their immigration consequences, by failing to restrict themselves to the factual record and impermissibly speculating about the secret motives of state judges and prosecutors; although IJ relied on facts that alien's trial counsel testified at the state post-conviction relief hearing that he

had properly advised alien of the immigration consequences of a potential conviction, and that state court denied alien's petition for relief, those facts did not show that state court vacated the convictions to allow alien to avoid those immigration consequences, and no evidence undermined conclusion that the Commonwealth settled because of alien's pending ineffectiveness claim, and BIA, after adopting IJ's findings, quoted state court's address to alien and, in finding that the statements showed that the court vacated alien's convictions to allow him to avoid those immigration consequences, speculated as to unexpressed motives of the state court. Immigration and Nationality Act §§ 101, 237, 8 U.S.C.A. §§ 1101(a)(48)(A), 1227(a)(2)(B)(i).

**[7]    Aliens, Immigration, and Citizenship** ⚷ Effect of expungement or vacation

An alien whose criminal conviction was vacated is no longer "convicted" under the Immigration and Nationality Act (INA) where the conviction was vacated on basis of a substantive or procedural defect in the underlying criminal proceedings, but where a court vacates a conviction for reasons unrelated to the merits of the underlying criminal proceedings, such as for rehabilitation or to allow the alien to avoid the immigration effects of the conviction, then the alien remains convicted for immigration purposes. Immigration and Nationality Act § 237, 8 U.S.C.A. § 1227(a)(2)(B)(i).

1 Cases that cite this headnote

**[8]    Aliens, Immigration, and Citizenship** ⚷ Presumptions and burden of proof

An alien who seeks relief from removal imposed as result of a criminal conviction bears burden of proving that his conviction was vacated. 8 C.F.R. § 1240.8(d).

[9]   **Aliens, Immigration, and Citizenship** 👈 Findings or statement of reasons

Immigration Judge (IJ), in seeking to determine whether a vacated conviction is nonetheless a conviction for immigration purposes, may rely only on reasons explicitly stated in the record, and may not impute an unexpressed motive for vacating a conviction or speculate about the secret motives of state judges and prosecutors. Immigration and Nationality Act §§ 101, 237, 8 U.S.C.A. §§ 1101(a)(48)(A), 1227(a)(2)(B)(i).

[10]   **Constitutional Law** 👈 Non-citizens; aliens

If an alien is a lawful permanent resident of the United States and remains physically present there, he may not be deprived of his life, liberty or property without due process of law. U.S.C.A. Const. Amend. 5.

[11]   **Constitutional Law** 👈 Admission and exclusion; deportation

Essential to the due process rights of a noncitizen permanent resident is that before his deportation, he is entitled to notice of the nature of the charge and a hearing at least before an executive or administrative tribunal. U.S.C.A. Const. Amend. 5.

**\*394**  Petition for Review of an Order of the Board of Immigration Appeals (Agency No. AXXX-XX0-387) Immigration Judge: Hon. Walter A. Durling

**Attorneys and Law Firms**

Fabian Lima, Esq., 1500 Walnut Street, Suite 206, Philadelphia, PA 19102, Counsel for Petitioner

Juria L. Jones, Esq., Holly M. Smith, Esq., United States Department of Justice, Office of Immigration Litigation, P.O. Box 878, Ben Franklin Station, Washington, DC 20044, Counsel for Respondent

Before: AMBRO, SHWARTZ, FUENTES, Circuit Judges.

OPINION

SHWARTZ, Circuit Judge.

Raul Rivas Rodriguez ("Rivas") petitions for review of the decision of the Board of Immigration Appeals ("BIA") dismissing his appeal from an order of the Immigration **\*395**  Judge ("IJ") denying his motion to terminate removal proceedings and ordering him removed to the Dominican Republic. Because the conviction that served as a basis for his removal has been vacated, and the Notice of Removal did not specify his participation in a deferred adjudication program as a basis for removal, we will grant the petition.

I

[1]   Rivas, a native and citizen of the Dominican Republic, was admitted to the United States as a legal permanent resident when he was two years old. In September 2013, following a bench trial in the Philadelphia Municipal Court, he was convicted of the purchase, receipt, and intentional possession of phencyclidine ("PCP"), and was sentenced to eighteen months' probation.

Following these convictions, the United States Department of Homeland Security initiated removal proceedings against Rivas and served him with a "Notice to Appear." A.R. 569-71. The Notice stated that he was subject to removal pursuant to 8 U.S.C. § 1227(a)(2)(B)(i) for having been convicted of two state law violations relating to a controlled substance.

[2]   Prior to his immigration hearing and after receiving this notice, Rivas petitioned the Municipal Court for relief from his convictions under the Pennsylvania Post Conviction Relief Act ("PCRA"). He argued that he received ineffective assistance of counsel because his trial counsel failed to advise him of the possible immigration consequences arising from his conviction and for advising him not to appeal the trial verdict. During the three-day PCRA hearing, Rivas's trial counsel testified that he advised Rivas of the immigration consequences flowing from a conviction and that he could not recall the advice he gave regarding an appeal but "probably would have advised [Rivas] that ... it is still not a winnable case...." A.R. 149. After the hearings, and at the request of

the Commonwealth, the Municipal Court denied the PCRA petition and then, by agreement of the parties, vacated the guilty verdicts and placed Rivas on pretrial probation for three years as part of a deferred adjudication agreement. Included in the order vacating the judgment were conditions requiring Rivas to: (1) "stipulate to all of the Commonwealth's evidence in the underlying trial"; (2) reside in Pennsylvania; (3) report to court; (4) participate, if necessary, in employment training as well as drug testing and treatment; and (5) "agree that any violation of any of these conditions will result in a Negotiated Stipulated Trial." A.R. 120. The Commonwealth agreed to withdraw the charges if Rivas successfully completed his pretrial probation.

Rivas thereafter filed a motion to terminate his removal proceedings on the ground that his convictions, which constituted the basis for his potential removal, had been vacated. His motion also averred that "[t]he sentences have not been vacated solely to avoid the immigration consequences of his conviction." A.R. 128. The IJ denied Rivas's motion and ordered him removed to the Dominican Republic. The IJ found that since Rivas's trial counsel testified at the PCRA hearings that he did advise Rivas of the immigration consequences of an adverse judgment, and since the Municipal Court denied the PCRA petition, the IJ was "convinced that the primary and probably the only reason for the conviction vacatur was to permit the respondent to avoid the [i]mmigration consequences of his drug conviction." App. I 9-10.

**[3]** **[4]** The BIA agreed, finding that the Municipal Court vacated Rivas's convictions **\*396** to allow him to avoid their immigration consequences. The BIA also found that even if Rivas's convictions had been vacated on substantive grounds, the terms of the order vacating the convictions still amounted to a "conviction" under the Immigration and Nationality Act ("INA"). Specifically, the BIA found that since Rivas stipulated to all of the state's evidence against him as part of the agreement vacating his convictions, and since his liberty was restrained under the resulting probation program, he remained "convicted" under immigration law and was removable. Consequently, the BIA affirmed the IJ's denial of Rivas's motion to terminate on two independent grounds. Rivas petitions for review.

II [1]

**[5]** **[6]** Section 1227(a)(2)(B)(i) of the INA provides that "[a]ny alien who at any time after admission has been convicted of a violation of ... any law or regulation of a State ... relating to a controlled substance ... is deportable." The issue here is whether the disposition of Rivas's state court criminal proceedings render him "convicted" for purposes of the INA. [2]

A

**[7]** **[8]** A petitioner whose criminal conviction was vacated is no longer "convicted" under the INA where the conviction was vacated on the basis of a substantive or procedural defect in the underlying criminal proceedings. In re Pickering, 23 I. & N. Dec. 621, 624 (BIA 2003), rev'd on other grounds, 465 F.3d 263 (6th Cir. 2006). Conversely, where "a court vacates a conviction for reasons unrelated to the merits of the underlying criminal proceedings," such as for rehabilitation or to allow a petitioner to avoid the immigration effects of the conviction, then the petitioner "remains 'convicted' for immigration purposes." Id.; see also Cruz v. Att'y Gen., 452 F.3d 240, 242 (3d Cir. 2006) (concluding that Pickering provides a reasonable interpretation of § 1227(a)(2)(B)(i)); Pinho v. Gonzales, 432 F.3d 193, 208–10 (3d Cir. 2005) (same). A petitioner who seeks relief from removal bears the burden of proving that his conviction was vacated. 8 C.F.R. § 1240.8(d); Syblis v. Att'y Gen., 763 F.3d 348, 352 (3d Cir. 2014).

Rivas filed a motion for post-conviction relief based on alleged ineffective assistance of trial counsel. After three days of hearings, which included testimony from trial counsel, the Commonwealth agreed to **\*397** a settlement pursuant to which Rivas's convictions were vacated. Although Rivas demonstrated that his convictions were vacated, the IJ and BIA concluded that Rivas failed to show they were vacated within the meaning of the immigration laws.

**[9]** To determine whether a vacated conviction is nonetheless a conviction for immigration purposes, the IJ must examine the state court record to identify the reasons why the state court vacated the conviction. Pinho, 432 F.3d at 215. To complete this task, the IJ "must look first to the order [that vacated the conviction]. If the order explains the court's reasons for vacating the conviction, the [IJ]'s inquiry must end

there. If the order does not give a clear statement of reasons, the [IJ] may look to the record before the court when the order was issued. No other evidence of reasons may be considered."

Id. Thus, the IJ may rely only on reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction. See id.; Cruz, 452 F.3d at 244, 248 (holding that the BIA could reasonably determine that a conviction was vacated to allow a petitioner to avoid immigration consequences where a state prosecutor's letter stipulating the terms of a settlement agreement explicitly stated that the petitioner's scheduled deportation was a reason for the state's support for vacating the conviction). Put simply, "[w]e will not ... permit[ ] ... speculation ... about the secret motives of state judges and prosecutors." Pinho, 432 F.3d at 214–15.

Here, both the IJ and the BIA opined that the state court likely vacated Rivas's convictions to allow him to avoid the convictions's immigration consequences. To support this conclusion, the IJ relied on the facts that Rivas's trial counsel testified at the PCRA hearings that he did advise his client of the immigration consequences of a potential conviction, and that the state court denied Rivas's PCRA petition. However, these facts do not show that the state court vacated the convictions to allow Rivas to avoid his immigration consequences. Moreover, though trial counsel's testimony might have weakened Rivas's ineffective-assistance-of-counsel claim, the record fails to show that his counsel's alleged ineffectiveness was not the reason the convictions were vacated. We know only that the application to vacate was based on two ineffective-assistance-of-counsel claims stemming from the alleged failure of Rivas' counsel to advise him of the immigration consequences of his convictions and advice to forgo appealing his convictions, and that the convictions were in fact vacated. See Pinho, 432 F.3d at 211–13 (holding that where the record shows that the state did not answer a pending ineffective-assistance-of-counsel claim before agreeing to settlement, this supports the conclusion that the settlement was reached as a result of the constitutional claim). [3] In addition, the IJ did not point to any evidence undermining the conclusion that the Commonwealth settled because of Rivas's pending ineffectiveness claim with respect to his trial counsel's failure to advise him to appeal the convictions. In fact, the IJ repeatedly asserted that the state court record was not clear as **398 to the reasons why the prosecutor agreed to settle Rivas's claim and why the court vacated his convictions.

Moreover, the BIA failed to confine itself to the factual record. Beyond adopting the IJ's findings, it also quoted the following passage wherein the state court addressed Rivas and discussed the vacatur of his convictions:

> [B]ecause you know the consequences of what would have happened with the conviction that you had.... Everybody understands it, what would have happened over a possession conviction for PCP. You have been given an incredible opportunity here, and I think it's the right opportunity, and I think it's the right result, but you need to understand it is that opportunity. And if there [are] temptations, go the other way, criminal activity, drug use, anything, there's no margin for error. If you want to be here with your family and you want to move forward in your life and do things, then you need to understand that.

App. I 5 (alterations, other than the ellipses, in original). The BIA found that these statements showed that the court vacated Rivas's convictions to allow him to avoid the resultant immigration consequences. In reaching this finding, however, it speculated as to the unexpressed motives of the state court —an analysis which we barred in Pinho, 432 F.3d at 215. It is not plain in the above passage that the consequences of convictions to which the court refers are immigration consequences, as opposed to penal consequences flowing from a conviction. Moreover, even if the passage addresses the immigration consequences of the convictions, it does not indicate the reasons why the court vacated the convictions and does not show that the court vacated the convictions because of those consequences. Thus, like the IJ, the BIA erred in failing to restrict itself to the factual record and impermissibly speculated about the "secret motives of state judges and prosecutors." Pinho, 432 F.3d at 215.

In sum, Rivas met his burden to show that his convictions were vacated for purposes of the immigration laws, and the record does not show that Rivas's convictions were vacated to avoid their immigration consequences.

B

The BIA also found that even if Rivas's convictions had been vacated on substantive grounds, he nonetheless stood "convicted" for purposes of the immigration laws under the terms of the deferred adjudication agreement. Specifically, it found that since the state court's order vacating Rivas's convictions was conditioned on his stipulating to all of the state's evidence against him for the underlying convictions, and since the order imposed conditions that restricted Rivas's liberty, he stood "convicted" for purposes of the INA. See

🚩 8 U.S.C. § 1101(a)(48)(A) (stating that a petitioner is "convicted" under the INA if he has "admitted sufficient facts to warrant a finding of guilt" and "the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed"). We need not decide whether the deferred adjudication agreement could render Rivas "convicted" under the INA since basing Rivas's removal on his deferred adjudication would violate his due process rights. [4]

**\*399 [10]  [11]**  "It is well established that if an alien is a lawful permanent resident of the United States and remains physically present there....[,] He may not be deprived of his life, liberty or property without due process of law."

📄 Kwong Hai Chew v. Colding, 344 U.S. 590, 596, 73 S.Ct. 472, 97 L.Ed. 576 (1953). Essential to the due process rights of a noncitizen permanent resident is that "before his expulsion[,] he is entitled to notice of the nature of the charge and a hearing at least before an executive or administrative

tribunal." 📄 Id. at 597, 73 S.Ct. 472; see also 📄 United States v. Torres, 383 F.3d 92, 104 (3d Cir. 2004) (citing

📄 Kwong Hai Chew and reiterating that an alien in removal proceedings has a due process right to, among other things, "notice of the charges against him").

The INA sets forth the notice that must be given to an alien before removal proceedings can commence:

In removal proceedings under section 1229a of this title, written notice ... shall be given in person to the alien ... specifying the following:

(A) The nature of the proceedings against the alien.

(B) The legal authority under which the proceedings are conducted.

(C) The acts or conduct alleged to be in violation of law.

(D) The charges against the alien and the statutory provisions alleged to have been violated.

📄 8 U.S.C. § 1229(a)(1); see 📄 Choeum v. I.N.S., 129 F.3d 29, 38–39 (1st Cir. 1997) (holding that the due process right to notice owed to a noncitizen permanent resident charged with removability is coextensive with the notice required by 📄 § 1229(a)(1)).

The only Notice to Appear that DHS served upon Rivas specified that he was charged with removability on the basis of two factual predicates: First, "[y]ou were, on September 26, 2013, convicted in the Municipal Court at Philadelphia for the offense of [i]ntentional possession of a controlled substance by person not registered, to wit PCP, in violation of Pa. C.S.A Title 35 Section 780-113 subsection A16." A.R. 571. Second, "[y]ou were, on September 26, 2013, convicted in the Municipal Court at Philadelphia for the offense of [p]urchase/ receipt of controlled substance by unauthorized person, to wit: PCP, in violation of Pa. C.S.A Title 35 Section 780-113 subsection A19." A.R. 571. The Government never lodged additional immigration charges against Rivas. See 8 C.F.R. § 1240.10(e) ("At any time during the proceeding, additional or substituted charges of inadmissibility and/or deportability and/or factual allegations may be lodged by the Service in writing."). As a result, Rivas never received notice charging him as removable on the basis of the terms of the 2015 deferred adjudication agreement, entered almost two years after the convictions identified in the Notice to Appear.

Consequently, the BIA's finding that Rivas's motion to terminate removal proceedings could be denied based on the deferred adjudication contravenes 📄 § 1229(a)(1)(c)'s requirement that the alien be given notice of "[t]he acts or conduct alleged to be in violation of law." To remove Rivas on the basis of a deferred adjudication in 2015 would base his removal on an entirely different factual ground from that set forth in the Notice to Appear and would violate Rivas's due process rights to notice of the **\*400** bases for his removal. [5]

III

For the foregoing reasons, we will grant Rivas's petition for review.

All Citations

844 F.3d 392

## Footnotes

1  The IJ had jurisdiction under 8 C.F.R. § 1240.1(a), and the BIA had jurisdiction pursuant to 8 C.F.R. § 1003.1(b)(3). Although we generally lack jurisdiction "to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in [ § 1227(a)(2)(B) ]," we have jurisdiction to review an order of removal to the extent it raises "constitutional claims or questions of law." 8 U.S.C. § 1252(a)(2)(C)-(D). Consequently, we have jurisdiction to determine "whether, as a matter of law, the disposition of [Rivas'] Pennsylvania criminal charge constitutes a 'conviction' for immigration purposes." Frias–Camilo v. Att'y Gen., 826 F.3d 699, 702 n.4 (3d Cir. 2016) (citation omitted). Since the BIA's opinion is the "final order," this Court's review is typically confined to the BIA's opinion. Abdulai v. Ashcroft, 239 F.3d 542, 549 (3d Cir. 2001). Where, as here, the BIA expressly adopts the IJ's opinion, this Court also reviews that opinion to the extent the BIA adopted it. Sandie v. Att'y Gen., 562 F.3d 246, 250 (3d Cir. 2009).

2  The INA defines "conviction" as follows:
    (i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and
    (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.
    8 U.S.C. § 1101(a)(48)(A).

3  Contrary to the Government's argument, Rumierz v. Gonzales, 456 F.3d 31 (1st Cir. 2006), does not apply to Rivas's vacatur. There, because the petitioner's motion for post-conviction relief did not specify any substantive reasons to vacate his conviction, the court held that the petitioner could not show that his conviction was vacated on substantive grounds where it was vacated pursuant to an agreement and the record was otherwise silent as to the reason for the vacatur. Id. In contrast, Rivas's motion for post-conviction relief did specify substantive grounds upon which he challenged his convictions, and so Rumierz is inapplicable.

4  Rivas argues that the DHS waived its right to rely on the deferred adjudication as a basis for removal. Although he casts this argument in terms of waiver, the real complaint is that he did not receive notice that he might be removed on this ground. Because his brief repeatedly states that the Notice to Appear charged him as removable on the basis of the Pennsylvania convictions and that by holding him removable on the basis of the deferred adjudication agreement the BIA "created an entirely new reason for upholding the IJ's decision," he has in essence asserted that his due process rights were violated. Petitioner Br. at 3.

5  If the immigration authorities wish to pursue Rivas's removal based on an assertion that he stands "convicted" of a controlled substance offense as a result of the terms of his deferred adjudication, then they can initiate removal proceedings anew by serving notice to Rivas stating the grounds upon which he is charged with removability. Duhaney v. Att'y Gen., 621 F.3d 340, 349 (3d Cir. 2010) ("Although there are common elements of fact between the two removal proceedings, the critical acts and the necessary documentation were different.... Accordingly, we hold that the doctrine of res judicata did not bar the Government from lodging additional charges of removability after Duhaney's 2000 conviction was vacated."). Nothing herein constitutes a view as to whether such proceedings should be commenced or would succeed.

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

4 A. 1

Supreme Court of Pennsylvania.

ROSE and others

v.

KEYSTONE SHOE CO. [1]

April 12, 1886.

**Synopsis**

Error to common pleas No. 2, county of Philadelphia.

Feigned issue, under a sheriff's rule for interpleader, between Keystone Shoe Company, Limited, plaintiffs, and George L. Rose, George L. McAlpin, and William W. McAlpin, trading as Rose, McAlpin & Co., defendants, to test the ownership of certain goods levied upon by the sheriff as the property of Thomas P. Smith and Samuel S. Smith, trading as T. P. & S. S. Smith, and claimed by the said the Keystone Shoe Company, Limited. Rose, McAlpin & Co. sold to T. P. & S. S. Smith a bill of goods, taking in payment promissory notes, upon which they obtained a judgment on April 26, 1884, for $799.40, and on May 24, 1884, levying upon certain property as the property of T. P. & S. S. Smith, which was claimed by the Keystone Shoe Company, Limited, a company organized under act June 2, 1874, (P. L. 271,) and supplements, whereupon this feigned issue was formed to try the title to the property. On the trial, before FELL, J., the plaintiffs in the feigned issue offered numerous witnesses, receipts, and vouchers. The defendants offered no evidence whatever. The property levied upon and claimed by the Keystone Shoe Company, Limited, was derived from two sources: (1) Goods purchased in the market which never had at any time been the property of T. P. & S. S. Smith; and (2) goods purchased from the vendees of the sheriff, the sheriff having previously sold the goods to these vendees as the property of T. P. & S. S. Smith. The judgment notes upon which the sheriff's sale was made were given for the exact amount of the indebtedness of T. P. & S. S. Smith to the firm creditors to whom they were given. Executions were issued thereon, and the sale made March 28, 1884. A part of the goods here in question were purchased at this sale by the judgment creditors, who subsequently sold the said goods to the plaintiff, the Keystone Shoe Company, Limited. Notes of the latter were given in payment, which were paid at maturity. The evidence disclosed that, of these four judgment notes upon which the sheriff's sale was made, two were given February 11, 1884, and the other two on March 17, 1884.

They were entered in court on March 20, 1884. One of them was given to John B. Iredell, a brother-in-law of the Smiths, as trustee for his wife, his wife's cousin, his sister-in-law, and one of T. B. Smith's daughters, for loans by them of $582.69. Another of them was given to Edward S. Deemer, book-keeper, for 14 months' salary and for loan, of $1,173.49. Another of them was given to Sarah S. Smith, mother of the Smiths, for loans made to each of them individually, amounting to $4,339.58; and the last of them was given to David Florman, father-in-law of S. S. Smith, trustee for his daughter, the wife of S. S. Smith, for amount loaned by her, and amounts due two of her children, $1,694.93. The Keystone Shoe Company, Limited, was composed of John B. Iredell, who contributed $200, and was manager; Elizabeth F. Smith, wife of S. S. Smith, who contributed $1,200, (borrowed for a few days from T. P. Smith,) and was president; and Mary L. Smith, wife of T. P. Smith, who contributed $1,200, (borrowed from T. P. & S. S. Smith,) and was secretary and treasurer. T. P. and S. S. Smith were employed by the company, at a salary of $35 each per week, and, by powers of attorney, managed the whole business.

Defendants requested the court to charge as follows:

'That the loans or advances by Mrs. Sarah P. Smith to her sons individually, and put into the business by them as part of their capital, did not constitute a valid consideration for a confessed judgment by the firm.'*Answer*. 'If the money went into the firm for the firm use, it was a valid consideration for the judgment, notwithstanding it was loaned to her sons individually, and put into the firm by them as a part of their capital.'

'That the use of the debtors' money in making the purchase from the sheriff's vendees for the Keystone Company made the transaction fraudulent as to creditors.'*Answer*. 'If the purchase was made with the debtors' money or on their account, this view is correct,—the transaction was fraudulent. A loan to their wives to make up their subscriptions to the stock of the Keystone Company does not affect the title to the goods.'

'That the transfer of the sum of $1,100 on the books of the firm, from the capital account of S. S. Smith to his wife's credit, in August, 1883, could not constitute her a creditor of the firm so as to entitle her to claim against partnership creditors.'*Answer*. 'It would not make her a creditor of the firm. If loaned to the firm for its use, although entered against one of the partners by them, it would be a firm debt; if

2 Sadler 243

an individual debt for money which went into the firm, the copartners could confess a judgment for it.'

The court further charged the jury, *inter alia:*

'The loan of money to Mary L. and Elizabeth F. Smith by their husbands, for two days, as testified to, to enable them to make their first payments on the stock of the Keystone Company, and which was repaid from money then due to them, does not in itself affect the title of the Keystone Company.'

Verdict and judgment for plaintiffs; whereupon defendants took this writ, assigning for error the answers to the above points, and so much of the charge as is set forth above.

The use of the debtor's money, either directly or indirectly, in repurchasing his goods from the purchasers at the sheriff's sale, especially when accompanied with other indications of fraud, makes the repurchase fraudulent and void against creditors, and the goods subject to levy and sale on a subsequent execution against the debtor. *Bentz* v. *Rockey*, 69 Pa. St. 71; *Schott* v. *Chancellor*, 20 Pa. St. 195; *Connelly* v. *Walker*, 45 Pa. St. 450; *Mitchell* v. *Stiles*, 13 Pa. St. 309; *Passmore* v. *Eldridge*, 12 Serg. & R. 201. The transfer by the Smiths of their partnership property to individual creditors, under the circumstances, was a fraud against the firm creditors, and therefore the confessions of judgment for such purpose were void. *Marks* v. *Hill*, 15 Grat. 400; *Ex parte Mayou*, 11 Jur. (N. S.) 433, L. C.; *Stewart* v. *Slater*, 6 Duer, 83; *Stewart* v. *Slater*, 6 Duer, 83; *Ferson* v. *Monroe*, 21 N. H. 462; 2 Lindl. Partn. 655, note; *Knauth* v. *Bassett*, 34 Barb. 31; *Sylvester* v. *Smith*, 9 Mass. 119; *Loyd* v. *Freshfield*, 2 Car. & P. 325; *Menagh* v. *Whitwell*, 52 N. Y. 146; *Burtus* v. *Tisdall*, 4 Barb. 571; *Ransom* v. *Van Deventer*, 41 Barb. 307; *Wilson* v. *Robertson*, 21 N. Y. 587; *McNaughton's Appeal*, 12 Wkly. Notes Cas. 540; *Donnally* v. *Ryan*, 41 Pa. St. 306; *Brooke* v. *Evans*, 5 Watts, 200; *Graeff* v. *Hitchman*, Id. 454; *Clay* v. *Cottrell*, 18 Pa. St. 413; *Purdy* v. *Powers*, 6 Pa. St. 492. The gift of Mrs. Sarah P. Smith to her sons of $1,100 could not afterwards be turned into a debt. *Crawford* v. *Davis*, 99 Pa. St. 578; *Pringle* v. *Pringle*, 59 Pa. St. 286; *Homer's Appeal*, 2 Penny. 289; *Egbert* v. *Payne*, 1 Penny. 350; *Zimmerman* v. *Streeper*, 75 Pa. St. 147; *Taylor's Appeal*, Id. 115; *Pier* v. *Siegel*, 42 Leg. Int. 363; *Crawford's Appeal*, 11 Leg. Int. 52; *Madeira's Appeal*, 17 Wkly. Notes Cas. 202; *Conley* v. *Bentley*, 87 Pa. St. 40; *Herr's Appeal*, 5 Watts & S. 499; *Parvin* v. *Capewell*, 45 Pa. St. 89.

The court below was clearly correct in charging that the money furnished by Mrs. Sarah P. Smith was a valid consideration for the judgment if the money went into the firm. *Siegel* v. *Chidsey*, 28 Pa. St. 279; *Walker* v. *Bank*, 98 Pa. St. 574; *Lint* v. *Shultz*, 37 Leg. Int. 426; *Lint* v. *Shultz*, 37 Leg. Int. 426; *Coffin's Appeal*, 15 Wkly. Notes Cas. 52. The court below were also correct in charging that, if the purchase was made with the debtor's money, the transaction was fraudulent. The loan to their wives to make up their subscription does not effect the title of the goods. The authorities cited by plaintiffs fully sustain this. Their argument is open to the objection that it assumes that the debtor's money *was* used. The court left the consideration of that fact to the jury.

West Headnotes (7)

**[1]**    **Appeal and Error**  ⚖  Fraud or misrepresentation

**Appeal and Error**  ⚖  Proceedings in Equity

The good faith of a transaction, which included the confession of judgments by partners to relatives for money loaned, the purchase of the goods by such judgment creditors at sheriff's sale, and the subsequent formation of a limited company with these goods, with the partners employed therein at a salary, is a question for the jury, which will not be reviewed on appeal.

1 Cases that cite this headnote

**[2]**    **Fraudulent Conveyances**  ⚖  Confession of judgment

A partnership on the verge of insolvency may confess judgment to a bona fide creditor, even though it gives such creditor a preference.

**[3]**    **Fraudulent Conveyances**  ⚖  Confession of judgment

**Partnership**  ⚖  Confession of judgment

A firm may validly confess judgment for money loaned to the individual partners, if it was put into the business as part of the capital.

**[4]**  **Fraudulent Conveyances** 🔑 Nature and form of transaction

The fact that a debtor's personal property, which is sold on execution by the holder of confessed judgments, is afterwards purchased from the latter with funds loaned by the debtor, is not conclusive evidence of fraud. The question in such case is for the jury.

2 Cases that cite this headnote

**[5]**  **Marriage and Cohabitation** 🔑 Power to make or receive

A husband not indebted nor about to enter a hazardous business, may give his wife a portion of his property and such gift will be upheld against subsequent creditors.

**[6]**  **Marriage and Cohabitation** 🔑 Trade or business

Where the wives of judgment debtors form a company and purchase from the sheriff's vendees under an execution against their husbands, the fact that their husbands loaned them individual money to pay their subscription to the company's stock will not of itself invalidate the company's title.

**[7]**  **Partnership** 🔑 Confession of judgment

**Partnership** 🔑 Payment or security of individual debt

Money loaned to partners individually, if put into the partnership business by them as part of their capital, constitutes a valid consideration to support a judgment confessed by the firm for such loan as against subsequent judgment creditors of the firm.

**Attorneys and Law Firms**

*Lincoln L. Eyre* and *R. L. Ashurst*, for plaintiffs in error.

*R. Alexander*, for defendant in error.

**Opinion**

PER CURIAM.

The learned judge ruled the law correctly. If the money was loaned to the partners individually, yet if it was put into the business **\*4** by them as part of their capital, it constituted a valid consideration to support the judgment confessed by them. The good faith of the transaction was a question of fact for the jury, and was well submitted. Judgment affirmed.

**All Citations**

4 A. 1, 2 Sadler 243

## Footnotes

1    Edited by Messrs. Hatfield and Cresswell, of the Philadelphia bar.

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

🏴 KeyCite Yellow Flag - Negative Treatment

Declined to Extend by East Bay Sanctuary Covenant v. Barr, N.D.Cal., July 24, 2019

869 F.3d 1176
United States Court of Appeals, Tenth Circuit.

R-S-C, Petitioner,

v.

Jefferson B. SESSIONS, III, United States Attorney General,[*] Respondent.

American Immigration Lawyers Association; National Immigrant Justice Center, Amici Curiae.

No. 15-9572
|
FILED September 6, 2017

**Synopsis**

**Background:** Indigenous Guatemalan woman filed petition for review of Board of Immigration Appeals (BIA) order dismissing her appeal of immigration judge's (IJ) decision granting withholding of removal, but dismissing her asylum application.

**Holdings:** The Court of Appeals, Ebel, Circuit Judge, held that:

[1] alien illegally reentered United States, and

[2] Attorney General's rule that aliens subject to reinstated removal orders were barred from applying for asylum was reasonable.

Petition denied.

West Headnotes (5)

[1]  **Aliens, Immigration, and Citizenship** 🔑 Crimes and Related Grounds

Alien illegally reentered United States, for purposes of determining her eligibility for asylum, even though alien came into custody of immigration authorities on or about same day that she entered United States, absent evidence that alien presented herself at border in search of immigration officer to file asylum application.

Immigration and Nationality Act § 241, 🏴 8 U.S.C.A. § 1231(a)(5).

2 Cases that cite this headnote

[2]  **Administrative Law and Procedure** 🔑 Plain, literal, or clear meaning; ambiguity or silence

**Administrative Law and Procedure** 🔑 Permissible or reasonable construction

If statute is silent or ambiguous with respect to specific issue, 🏴 Chevron requires federal court to accept implementing agency's construction of statute if agency's construction is reasonable.

[3]  **Aliens, Immigration, and Citizenship** 🔑 Ineligible Aliens

**Aliens, Immigration, and Citizenship** 🔑 Law questions

Attorney General's rule that aliens subject to reinstated removal orders were barred from applying for asylum, but could nevertheless apply for withholding of removal, was consistent with reasonable interpretation of statutory scheme, and thus warranted 🏴 Chevron deference, even though Immigration and Nationality Act (INA) entitled "any alien … irrespective of such alien's status" to apply for asylum, where INA also provided that aliens who illegally reentered United States and whose prior removal orders had been reinstated were "not eligible and may not apply for any relief under this chapter," provisions at issue were each more specific than other in different respects, there was no indication that Attorney General viewed withholding-only principle as unambiguously compelled by Congress, and it was not unreasonable for Attorney General to decide that reinstatement subsection was more specific and operated with stronger force than asylum section and that Congress wanted harsh consequences for illegal reentrants regardless of

any potential inconsistency with international law. Immigration and Nationality Act §§ 208, 241, 8 U.S.C.A. §§ 1158(a)(1), 1231(a)(5); 8 C.F.R. §§ 1208.31(e), 1208.31(g)(2)(i).

3 Cases that cite this headnote

[4]    **Administrative Law and Procedure**    Plain, literal, or clear meaning; ambiguity or silence

Agency receives *Chevron* deference only when it exercises delegated interpretive authority, and agency exercises no such authority when it treats statute as unambiguous.

[5]    **Aliens, Immigration, and Citizenship**    Rights of Aliens in General

Immigration equivalent of principle of leniency is animated by harsh penalty of deportation— it has nothing to do with denying aliens extra benefits while lawfully present in United States.

**\*1177 Petition for Review from the Board of Immigration Appeals**

**Attorneys and Law Firms**

Maria E. Andrade, Andrade Legal, Boise, Idaho, for Petitioner.

Corey L. Farrell, Trial Attorney (Benjamin C. Mizer, Principal Deputy Assistant Attorney General, and Terri J. Scadron, Assistant Director, with him on the briefs), Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington D.C., for Respondent.

Mark Barr, Lichter Immigration, Denver, Colorado, Charles Roth and Zeren Zwick, National Immigrant Justice Center, Chicago, Illinois, filed a for Amici Curiae.

Before EBEL and LUCERO, Circuit Judges.[1]

**Opinion**

EBEL, Circuit Judge.

There is an apparent conflict, which is squarely presented in this case, between two provisions of the Immigration and Nationality Act (INA). The asylum section provides that "[*a*]*ny alien* ..., irrespective of such alien's status, *may apply for asylum*[.]" 8 U.S.C. § 1158(a)(1) (emphasis added). By contrast, the reinstatement provision mandates that a previously deported alien who illegally reenters the United States will have his prior removal order reinstated and "is *not eligible* and *may not apply for any relief....*" Id. § 1231(a)(5) (emphasis added). Tasked with administering these provisions, the Attorney General has determined that the latter subsection prevails—an illegal reentrant with a reinstated removal order is not eligible for asylum relief. 8 C.F.R. § 1208.31(e), (g)(2)(i).

R-S-C illegally reentered the United States after having been removed and her prior removal order was reinstated, thus under the Attorney General's interpretation of the INA, she cannot apply for asylum. She now challenges the Attorney General's regulations as inconsistent with the INA's asylum guarantee. We conclude that Congress has not clearly expressed whether aliens governed by the reinstatement provision may apply for asylum. However, the Attorney General's regulations are consistent with a reasonable interpretation of the statutory scheme, so they are entitled to administrative deference. Accordingly, we DENY the petition for review.

**\*1178 I. BACKGROUND**

**A. Legal Background**

1. International Agreements and Statutes

The United States has acceded to, and agreed to be bound by, the 1951 U.N. Convention Relating to the Status of Refugees (Refugee Convention), 189 U.N.T.S. 150 (July 28, 1951). See 1967 Protocol Relating to the Status of Refugees, 19 U.S.T. 6223 (Nov. 6, 1968); INS v. Cardoza-Fonseca, 480 U.S. 421, 429, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). The Refugee Convention contains two principles relevant to this case. First, Article 33.1 provides that "[*n*]*o Contracting*

*State shall expel or return ('refouler') a refugee ... where his life or freedom would be threatened* on account of his race, religion, nationality, membership of a particular social group or political opinion." 19 U.S.T. at 6267 (emphasis added). This prohibition on deporting aliens to a country of risk is known as the "nonrefoulement" principle. Cardoza-Fonseca, 480 U.S. at 440, 107 S.Ct. 1207. Second, Article 34 states that "[t]he Contracting States shall as far as possible *facilitate the assimilation and naturalization of refugees.*" Id. (emphasis added).

Congress imbued these international commitments with the force of law when it enacted the Refugee Act of 1980 (Refugee Act), Pub. L. 96-212, 94 Stat. 102-18, which amended the INA in certain respects. The Refugee Act prohibited the Attorney General from deporting any alien to a country if such deportation would endanger that alien's life or freedom based on certain characteristics of the alien. Id. § 203(e), 94 Stat. 107. In addition, the Refugee Act also directed the Attorney General to "establish a procedure for an alien ... irrespective of such alien's status, to apply for asylum." Id. § 201(b), 94 Stat. 105. Whether the alien ultimately received asylum was a discretionary decision entrusted to the Attorney General. Id.; see also Cardoza-Fonseca, 480 U.S. at 428 n.5, 107 S.Ct. 1207.

Congress then passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. 104-208, 110 Stat. 3009 (codified as amended in scattered sections of 8 U.S.C.), which refashioned the above principles into their current form. As for nonrefoulement, the statute now provides that "the Attorney General *may not remove an alien* to a country if the Attorney General decides that *the alien's life or freedom would be threatened* in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A) (emphasis added). The implementing regulations refer to this prohibition as "withholding of removal." 8 C.F.R. § 1208.16.

IIRIRA also revised the asylum section of the INA, which now provides that "[a]ny alien who is physically present in the United States or who arrives in the United States ..., *irrespective of such alien's status,* may apply for asylum in accordance with [section 1158]...." 8 U.S.C. § 1158(a)(1) (emphasis added). Section 1158 further states

that "the Attorney General *may* grant asylum to an alien," § 1158(b)(1)(A) (emphasis added), except in certain enumerated circumstances, § 1158(b)(2)(A). Thus, as it was in the Refugee Act, the determination of whether an eligible applicant actually receives asylum is within the discretion of the Attorney General. Id.; see also INS v. Aguirre-Aguirre, 526 U.S. 415, 420, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) ("[W]hereas withholding is mandatory ..., the decision whether asylum should be granted to an eligible alien is committed to the Attorney General's discretion."). Finally, the asylum section provides that "[t]he Attorney General may by regulation *establish additional* **\*1179** *limitations* and conditions, consistent with [section 1158], under which an alien shall be ineligible for asylum...." § 1158(b)(2)(C) (emphasis added).

IIRIRA also addressed a separate issue altogether, which is at the heart of this case: reinstatement of previous removal orders. Congress was frustrated with existing procedures for deporting aliens who repeatedly re-entered the United States unlawfully. [2] In order to expedite the removal process for these repeat offenders and deter illegal reentry, Congress mandated:

> If the Attorney General finds that an alien *has reentered the United States illegally* after having been removed ... under an order of removal, the prior order of removal is reinstated ... and is not subject to being reopened or reviewed, *the alien is not eligible and may not apply for any relief* under this chapter, and the alien shall be removed under the prior order at any time after the reentry.

8 U.S.C. § 1231(a)(5). In interpreting this reinstatement provision, the Supreme Court explained that it "applies to all illegal reentrants, explicitly insulates the [prior] removal orders from review, and *generally forecloses discretionary relief* from the terms of the reinstated order." Fernandez-Vargas v. Gonzales, 548 U.S. 30, 34, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006) (emphasis added).

2. Apparent Conflict and Attorney General's Regulations

After IIRIRA's amendments, there is an apparent conflict between two sections of our immigration laws. While the asylum section entitles "any alien ... irrespective of such alien's status" to apply for asylum, § 1158(a)(1), the reinstatement provision precludes aliens with reinstated removal orders from obtaining "any relief," § 1231(a)(5). So the question is whether an alien subject to reinstatement is eligible for asylum relief.

The Attorney General has answered this question in the negative. Regulations promulgated by the Immigration and Naturalization Service (INS)—an agency formerly under the purview of the Attorney General—preclude aliens subject to reinstated removal orders from applying for asylum, but those aliens may nevertheless apply for withholding of removal.[3] 8 C.F.R. § 1208.31(e) (When the asylum officer initially concludes the alien warrants relief, the immigration judge may consider "the request for *withholding of removal only*." (emphasis added)); id. § 1208.31(g)(2)(i) (When the asylum officer initially concludes the alien does *not* warrant relief, and the immigration judge disagrees with that determination, "[t]he immigration judge shall consider *only the alien's application for withholding of removal*...." (emphasis added)); see also Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8485 (Feb. 19, 1999) ("Unlike the broad class of arriving **\*1180** aliens who are subject to expedited removal, ... aliens [with reinstated removal orders] are *ineligible for asylum*." (emphasis added)).[4] Thus, when an alien with a reinstated removal order credibly expresses a reasonable fear of persecution, that alien is placed in "withholding-only" proceedings, with no opportunity to apply for asylum. AR 861. This withholding-only rule is consistent with the United States' nonrefoulement obligation, as well as the statutory prohibition on deporting aliens to a country wherein the alien would suffer persecution on the basis of certain personal characteristics. 8 U.S.C. § 1231(b)(3)(A).

Unfortunately, the Attorney General's restriction on asylum makes a difference to an applicant because asylum "affords broader benefits" than withholding of removal. Cardoza-Fonseca, 480 U.S. at 428 n.6, 107 S.Ct. 1207. Asylum status offers protection from deportation to any country, 8 C.F.R. § 208.22, a pathway to a green card and U.S. citizenship, id. § 209.2, the ability to travel outside the United States without being barred from reentry, id. § 223.1, and derivative asylum status for spouses and children, id. § 208.21. Withholding of removal, however, offers none of those benefits—it only protects the applicant from removal to a country of risk, and does not even foreclose the possibility of deportation to a safe third country. See id. § 208.22; see also Garcia v. Sessions, 856 F.3d 27, 32 (1st Cir. 2017) (describing difference in benefits between asylum and withholding of removal).

With this statutory and regulatory regime in mind, we turn to the facts of the case before us.

**B. Factual Background**

R-S-C is an indigenous Guatemalan woman who has come to the United States without inspection three times to escape persecution in her home country. In Guatemala she was raped on numerous occasions, sodomized, physically beaten and strangled, kidnapped, and extorted—all while local law enforcement authorities did nothing to prevent these abuses. She suffered this persecution, in substantial part, because she was an indigenous Guatemalan woman in a country that routinely condoned and encouraged severe mistreatment of its own indigenous women.

After the local Guatemalan police refused to protect her from some of these reported abuses, R-S-C first fled to the United States in January 2014 without inspection and was apprehended by border officials. R-S-C told them that she "had fear, and that [she] had come fleeing because [others] wanted to kill [her]." AR 205. She testified that the officers did not believe her, and that they accused all Guatemalans of being "liars." Id. Without referring her to an asylum officer to investigate her claimed fear of persecution, the border officials summarily deported R-S-C. She was ordered removed on January 13, 2014.

R-S-C stated that upon return to Guatemala she was drugged, raped, and left for dead on a riverbank. Shortly thereafter, she again made her way to the United States and arrived in early April 2014 without inspection. After being apprehended by immigration officials, she asked them to "please help [her] because [she] was fearful of returning to [her] country." AR 213. According to R-S-C, an officer called her a "liar" based on her failure to **\*1181** bring along her children to the United States. AR 214. Again without referring her to an asylum

officer for an interview, border officials deported R-S-C on April 9, 2014.

R-S-C testified that when she returned to Guatemala, violent threats and extortion against her continued. So she fled to the United States again, this time accompanied by her eight-year-old son. She arrived in the United States without inspection on July 7, 2014, at or near Hidalgo, Texas, and was apprehended by immigration authorities on or about that same day. On July 23, 2014, the Department of Homeland Security (DHS) notified R-S-C of its intent to reinstate the prior January 13, 2014 removal order, thereby triggering the relief bar of 8 U.S.C. § 1231(a)(5). R-S-C signed a form declining to contest DHS's determination that she was subject to reinstatement. She did, however, express again her fear of returning to Guatemala. This time, immigration officials referred R-S-C to an asylum officer for an interview about her claimed fear of persecution. [5]

The asylum officer found that R-S-C did not have a reasonable fear of persecution if returned to Guatemala. An immigration judge, however, subsequently reviewed and vacated that decision and placed R-S-C in "withholding-only" proceedings. Nevertheless, because of asylum's superior benefits (e.g., the pathway to citizenship, the ability to travel internationally, and the chance to apply for asylum status for a spouse and children), R-S-C asked the immigration judge to award asylum rather than withhold of removal. After a hearing, the immigration judge issued a decision on January 5, 2015, awarding R-S-C withholding of removal but ignoring R-S-C's request for asylum. R-S-C appealed to the Board of Immigration Appeals (BIA) on the asylum issue, arguing that even illegal reentrants with reinstated removal orders are eligible for asylum. The BIA disagreed, and dismissed the appeal. R-S-C now petitions this Court for review.

## II. DISCUSSION

We first address R-S-C's threshold argument that the reinstatement provision does not apply to her because she did not illegally reenter the United States. Finding no merit to that contention, we proceed to answer the principal question presented in this appeal. Because Congress did not clearly resolve the conflict between § 1158(a)(1) and § 1231(a)(5) through the statutory text, we assess whether the Attorney General's interpretation is reasonable. Because the withholding-only rule is consistent with a reasonable

construction of the statutory scheme, it is entitled to deference under *1182 Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

### A. Applicability of the Reinstatement of Removal Provision to R-S-C

The reinstatement of removal provision is triggered when an alien "*reenter*[*s*] the United States *illegally*" after having been previously removed. 8 U.S.C. § 1231(a)(5) (emphasis added). R-S-C argues on appeal that the reinstatement statute and its attendant regulations do not apply to her request for relief because she did not "reenter" the United States "illegally" within the meaning of the statute. In effect, she is challenging the immigration officer's determination that she illegally reentered the United States. She contends that her July 7, 2014 arrival at or near Hidalgo, Texas was not an "entry" into the United States because she was merely attempting to present herself to immigration officials to apply for asylum. And even if that did constitute an entry, it was not "illegal" because her country of origin, Guatemala, does not have an in-country processing program for refugee applicants to the United States, so arrival at the U.S. border was the only way to seek relief.

The problems with this argument are two-fold. First, R-S-C expressly declined to contest the determination that she reentered the United States illegally. Before her prior removal order was reinstated, R-S-C was given notice on a form that stated: "You illegally reentered the United States on or about July 7, 2014 at or near Hidalgo, TX." AR 866 (emphasis added). R-S-C affixed her signature next to a declaration that she "d[id] not wish to make a statement contesting this determination." Id. She could have, at that time, explained that she was looking for the nearest immigration officer in order to make her case for asylum, see, e.g. Cordova-Soto v. Holder, 659 F.3d 1029, 1031 (10th Cir. 2011) (alien submitted sworn statement contesting determination that she illegally reentered the United States), but she intentionally relinquished her right to do so.

[1] Second, even if R-S-C's legal arguments are correct—i.e., that earnestly seeking out an immigration official to apply for asylum is not an illegal reentry within the meaning of the reinstatement statute—the administrative record here does not support that version of the facts. The INA restricts our review of R-S-C's petition only to the administrative record,

see 8 U.S.C. § 1252(b)(4)(A), and "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary," id. § 1252(b)(4)(B). There is simply no evidence in this record suggesting that R-S-C presented herself at the border in search of an immigration officer to file an asylum application. See Anderson v. Napolitano, 611 F.3d 275, 279 (5th Cir. 2010) (denying a petition for review of a reinstatement decision based on the alien's failure to point out evidence that undermines the immigration officer's determination of illegal reentry). To be sure, the record suggests that R-S-C came into the custody of immigration authorities in Hidalgo, TX on or about the same day that she entered the United States—but that fact alone could just as well be a testament to the skilled efforts of U.S. border patrol agents who quickly apprehended a recently-entered alien.

Without evidence that R-S-C was affirmatively seeking out an immigration officer to apply for asylum, even if that were legally sufficient to transform an entry without inspection into a lawful entry, we must regard the immigration officer's determination as "conclusive." 8 U.S.C. § 1252(b)(4)(B). This is especially true when R-S-C intentionally abandoned her right to make a statement contesting that **1183** determination. Accordingly, we decline to set aside the reinstatement decision on the ground that R-S-C did not illegally reenter the United States.

### B. Statutory Conflict Between the Asylum and Reinstatement Provisions

[2] [3] We turn now to the principal question presented: Can an illegal reentrant with a reinstated removal order apply for asylum? In answering this question, we proceed along Chevron's two-step framework. First, we examine "whether Congress has directly spoken to the precise question at issue." Chevron, 467 U.S. at 842, 104 S.Ct. 2778. In light of the apparent conflict between the asylum and reinstatement provisions, we conclude that the statutory command is ambiguous. Second, because "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843, 104 S.Ct. 2778. "If the implementing agency's construction is *reasonable*, Chevron requires a federal court to accept the agency's construction of the statute[.]"

Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) (emphasis added). In this case, because the Attorney General's withholding-only rule is consistent with a reasonable interpretation of the statutory scheme, it warrants Chevron deference. [6]

### 1. Chevron Step One—Congress Did Not Clearly Resolve the Question

The statutory text does not clearly indicate whether illegal reentrants with reinstated removal orders are eligible to apply for asylum. Section 1158(a)(1) entitles "*any alien ... irrespective of such alien's status*" to apply for asylum. (emphasis added). Section 1231(a)(5), by contrast, provides that a specific class of aliens—those who illegally reentered the United States and whose prior removal orders have been reinstated—are "*not eligible and may not apply for any relief* under this chapter[.]" [7] (emphasis added). It is apparent that these two provisions are at odds with one another. The parties both attempt to explain how their preferred provision unambiguously controls over the other, but we are not persuaded. For several reasons, this intra-statutory conflict obscures any clear **1184** command from Congress on whether aliens subject to reinstated removal orders may apply for asylum.

First, and most obviously, each provision appears to encompass the other. Section 1158(a)(1)'s language referring to "*any* alien ... irrespective of such alien's status" logically includes aliens with reinstated removal orders. (emphasis added). At the same time, § 1231(a)(5)'s reference to "*any* relief" naturally encompasses asylum as a particular form of prohibited relief. (emphasis added). The statutory text of each subsection thus appears to incorporate the other, and Congress has offered no reliable indicator of which provision takes precedence over the other.

R-S-C counters that the reference to "any alien ... irrespective of such alien's status" communicates an unmistakable command, while the phrase "any relief" is ambiguous, so the clear should trump the vague. The argument goes as follows. The asylum subsection, by its own terms, unquestionably applies to all aliens. By contrast, the reinstatement provision is equivocal because the apparent prohibition on applying for

"any relief" does not truly foreclose all forms of immigration relief. That is because even an alien subject to reinstatement may nevertheless apply for withholding of removal. 8 U.S.C. § 1231(b)(3)(A). Thus, the undefined and qualified reference to "any relief" cannot take precedence over the clear statement that "any alien ... irrespective of such alien's status" may apply for asylum.

We reject this argument for several reasons. At the outset, the absence of any statutory definition for the term "relief" supports, rather than detracts from, our conclusion that Congress has failed to address the precise issue in this case. Furthermore, the fact that "any relief" has a caveat elsewhere in the statute does no more to undermine the breadth of the reinstatement provision than the enumerated exceptions to asylum eligibility undercut the scope of the asylum guarantee. See § 1158(a)(2)(A)-(C) (exceptions to asylum eligibility). In other words, *both* provisions are "qualified in certain respects when read in context." Perez-Guzman, 835 F.3d at 1074 (9th Cir.); accord Cazun, 856 F.3d at 255-56 (3d Cir.). We therefore decline to give the asylum subsection controlling weight based upon this theory. [8]

Second, we find no clarity in the well-established principle that, when two statutes conflict, the "specific governs the general." Nitro-Lift Techs., LLC v. Howard, 568 U.S. 17, 21, 133 S.Ct. 500, 184 L.Ed.2d 328 (2012). We often apply this interpretive canon because "the more specific of two conflicting provisions 'comes closer to addressing the very problem posed by the case at hand and is thus more deserving of credence.' " Perez-Guzman, 835 F.3d at 1075 (9th Cir.) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 183 (2012)). But the provisions at issue here are each more specific than the other in different respects. Section 1158(a)(1) speaks narrowly to a specific form of immigration relief—asylum —but **\*1185** applies broadly to all aliens. Meanwhile, § 1231(a)(5) addresses a specific subset of aliens—those with reinstated removal orders—but mandates a broad denial of all forms of relief. Further, the statute does not clearly indicate whether our specific-general inquiry should focus on the *type of relief* or instead the *class of affected aliens*. We therefore cannot say that Congress has unambiguously addressed the dilemma that arises when an illegal reentrant with a reinstated removal order seeks asylum relief. See Cazun, 856 F.3d at

256 (3d Cir.) (observing the same issue with respect to these provisions); Perez-Guzman, 835 F.3d at 1075-76 (9th Cir.) (same).

Third, the absence of any "reinstatement exception" within the asylum section does not clearly indicate that asylum is insulated from the reach of the reinstatement of removal provision. R-S-C argues that if Congress intended asylum eligibility to be unavailable to a certain class of aliens (e.g., those with reinstated removal orders), it would have included that exception *in the asylum section* where all the other exceptions to asylum eligibility are located. 8 U.S.C. § 1158(a)(2) (exceptions to asylum eligibility); see also § 1158(b)(2) (exceptions to when the Attorney General may exercise his discretion to award asylum to eligible aliens). But this demands too much of Congress. If Congress wants to preclude the availability of all relief for a particular class of aliens, it should not be required to hunt through the INA and to insert a specific exception for each form of relief (e.g., asylum, voluntary departure, adjustment of status, cancellation of removal, etc.)—it should be sufficient to state categorically, as it did here, that a specific subset of aliens are barred from receiving any relief, which naturally encompasses the forms of relief set forth elsewhere in the statute.

For these reasons, we cannot say that the statutory text itself resolves the question presented. Congress clearly addressed the issues of asylum eligibility and reinstated removal orders separately, but Congress has not "directly spoken to the precise question at issue" here, Chevron, 467 U.S. at 842, 104 S.Ct. 2778, which is whether an illegal reentrant with a reinstated removal order may apply for asylum. Without any clear answer from the statutory scheme, we turn to the Attorney General's interpretation of the INA to determine whether it is reasonable.

### 2. Chevron Step Two—The Attorney General's Withholding-Only Rule Is Entitled to Deference

At Chevron's second step, we analyze whether "the implementing agency's construction is reasonable," and if so we must "accept the agency's construction of the statute." Brand X Internet Servs., 545 U.S. at 980, 125 S.Ct. 2688. Before proceeding to analyze that question, however, we address R-S-C's threshold argument that the Attorney

General perceived the withholding-only rule as compelled by statute. We reject that contention and further determine that the withholding-only rule is consistent with a reasonable construction of the statutory scheme. Thus it is entitled to Chevron deference.

### i. Whether the Attorney General Perceived That the Withholding-Only Rule Was Compelled By Statute

[4] R-S-C and *amici curiae* argue that Chevron deference does not apply here because the Attorney General failed to perceive any ambiguity in the statutory scheme and instead viewed the withholding-only principle as compelled by Congress. An agency receives Chevron deference only when it exercises delegated interpretive authority—and an agency **\*1186** exercises no such authority when it treats a statute as unambiguous. Am. Fed'n of Gov't Emps., Local 1592 v. Fed. Labor Relations Auth., 836 F.3d 1192, 1295-96 (10th Cir. 2016) (citation omitted); *see also* Negusie v. Holder, 555 U.S. 511, 523, 129 S.Ct. 1159, 173 L.Ed.2d 20 (2009) (concluding that the BIA did not "exercise[ ] its Chevron discretion to interpret the statute in question" when the BIA adopted a rule it believed was compelled by Supreme Court precedent interpreting a similar statute). When promulgating the withholding-only regulations at issue in this case, the Attorney General did not expressly acknowledge the tension between § 1158(a)(1) and § 1231(a)(5). See Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478 (Feb. 19, 1999); Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10,312 (Mar. 6, 1997).

But the Attorney General's silence on this statutory interplay does not mean the Attorney General missed the ambiguity. Without some affirmative indication in the regulatory record that the Attorney General believed the withholding-only rule was compelled by Congress, we will not assume as much. See Am. Fed'n of Gov't Emps., Local 1592, 836 F.3d at 1295-96 (remanding for reconsideration of an agency rule when the agency *explicitly* stated that its interpretation was compelled by statutory text). This is in accord with our sibling circuits which have held that the regulatory record's silence on this precise issue does not mean the Attorney General believed

his hands were tied by Congress. See Garcia, 856 F.3d at 38 n.10 (1st Cir.); Perez-Guzman, 835 F.3d at 1079 n.8 (9th Cir.). Accordingly, we reject this threshold argument and proceed to consider whether the withholding-only regulations warrant Chevron deference.

### ii. Whether the Withholding-Only Rule Receives Chevron Deference

The Attorney General's regulations are consistent with a reasonable interpretation of the statutory scheme. Thus, they are entitled to deference. At the outset, we note that our analysis is colored by the Supreme Court's instruction that "judicial deference in the immigration context is of special importance" because of the foreign-affairs implications inherent in immigration policy. Negusie, 555 U.S. at 517, 129 S.Ct. 1159 (citation omitted). Whether to allow certain aliens to apply for asylum could "affect our relations with the alien's native country or its neighbors[,]" so we take care to step cautiously in this field. Id. (quoting INS v. Aguirre-Aguirre, 526 U.S. 415, 425, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999)) (alteration omitted). With this in mind, we conclude that the Attorney General's interpretation is permissible for several reasons.

First and foremost, it is reasonable for the Attorney General to conclude that § 1231(a)(5) means just what it says: that certain aliens are not eligible for "any relief." It is also reasonable to conclude that the reference to "any relief" naturally means *all* forms of relief (other than mandatory withholding of removal), including asylum. Given that the Attorney General's interpretation aligns with this statutory language, we are inclined to find that it is at least reasonable, even if it conceivably conflicts with another part of the INA statute.

Second, although we determined that the specific-general canon of statutory interpretation does not conclusively indicate which provision should take precedence, it is not unreasonable for the Attorney General to decide that the reinstatement subsection is more specific in the relevant respect. Section 1231(a)(5) addresses a **\*1187** specific class of affected aliens (those subject to reinstatement of removal), whereas § 1158(a)(1) focuses on a particular form of relief (asylum). Because immigration cases are

presented to the Attorney General as *individual persons*, not *forms of relief*, it is reasonable for the Attorney General to focus on the section of the INA that carves out a subset of persons for special treatment, rather than another section that establishes rules for a particular kind of relief that apply across the board.

Third, the Attorney General could reasonably conclude that the reinstatement provision operates with stronger force than the asylum section. Section 1231(a)(5) speaks in mandatory terms, *requiring* the Attorney General to deny relief to aliens with reinstated removal orders. § 1231(a) (5) ("alien *is not eligible* and *may not apply* for any relief" (emphasis added)). Conversely, § 1158(b) makes the award of asylum subject to the *discretion* of the Attorney General. § 1158(b) ("the Attorney General *may* grant asylum to an alien who has applied" (emphasis added)); see also Aguirre-Aguirre, 526 U.S. at 420, 119 S.Ct. 1439 ("[T]he decision whether asylum should be granted to an eligible alien is committed to the Attorney General's discretion."). As one of our sibling circuits has recognized in addressing this issue, "[i]t would be strange to find that granting asylum is discretionary, but that the Attorney General *must* allow [a petitioner with a reinstated removal order] to apply, even in the face of contradictory text." Cazun, 856 F.3d at 260 (3d Cir.).

Fourth, the asylum section expressly authorizes the Attorney General to "establish *additional limitations* and conditions, consistent with [ section 1158], under which an alien shall be ineligible for asylum...." § 1158(b)(2)(C) (emphasis added). This delegation of authority means that Congress was prepared to accept administrative dilution of the asylum guarantee in § 1158(a)(1). By contrast, Congress did not water down the reinstatement mandate. Under § 1231(a) (5), the Attorney General has no discretion to decide that some kinds of relief are immune from the eligibility bar after a removal order is reinstated. Thus, the Attorney General could have reasonably concluded that the reinstatement provision reflects a stronger congressional command than the asylum section.[9]

Finally, the Attorney General's determination reasonably furthers IIRIRA's purpose in strengthening the reinstatement provision. Before IIRIRA, the INA subjected "only a limited class of illegal reentrants" to reinstatement of removal (e.g., "anarchists" and "subversives"), but "even those affected could seek some varieties of discretionary relief[.]" Fernandez-Vargas v. Gonzales, 548 U.S. 30, 34, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006) (quotation marks, citation omitted). But in IIRIRA, Congress replaced this more lenient regime with the current reinstatement provision, which "toed a harder line" by applying its mandate to "all illegal reentrants **\*1188** ...and [by] generally foreclos[ing] discretionary relief from the terms of the reinstated order." Id. at 35, 126 S.Ct. 2422. This statutory sequence suggests that Congress intended to fortify the effect of the reinstatement provision, and the Attorney General's interpretation is faithful to that statutory purpose. See Cazun, 856 F.3d at 260 (3d Cir.); Garcia, 856 F.3d at 40 (1st Cir.).[10]

Despite the foregoing considerations, R-S-C offers two theories for why the Attorney General's interpretation is nevertheless unreasonable. First, she argues that any ambiguity should be construed in compliance with international law. See Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804) (federal statutes "ought never to be construed to violate the law of nations if any other possible construction remains"). Article 34 of the Refugee Convention, to which the United States acceded in 1968, provides that signatory nations "shall as far as possible facilitate the assimilation and naturalization of refugees." Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, 6267 (Nov. 6, 1968). Article 28 further provides that signatories "shall issue to refugees ... travel documents for the purpose of travel outside their territory, unless compelling reasons of national security or public order otherwise require[.]" Id. In the United States, asylum status complies with these standards—it offers a path to citizenship and enables the alien to travel abroad without fear of being turned away upon reentry. Withholding of removal, however, does not provide such benefits. R-S-C thus contends that the Attorney General's withholding-only interpretation is out of step with international law, and so is unreasonable.

But the conflict with international law is not so obvious. As the Supreme Court has noted, Article 34's assimilation principle is "precatory; it does not require the implementing authority actually to grant asylum to all those who are eligible." INS v. Cardoza-Fonseca, 480 U.S. 421, 441, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Furthermore, Article 28's travel guarantee is qualified by an exception permitting

signatories to restrict travel for reasons of national security or public order. It is not unreasonable for the Attorney General to conclude that strictly enforcing IIRIRA's relief bar advances U.S. national security or the public order. See Garcia, 856 F.3d at 41-43 (1st Cir.) (finding that the withholding-only rule did not violate the Refugee Convention). [11]

More fundamentally, the Attorney General's denial of asylum eligibility flows naturally enough from the statutory scheme, and it is conceivable that Congress was willing to accept a collision with international law in order to address what it perceived was a severe illegal-immigration problem. "Mindful that Congress has the power to legislate beyond the limits posed by international law," Serra v. Lappin, 600 F.3d 1191, 1198 (9th Cir. 2010) (internal **1189 quotation marks, citation omitted), it is not unreasonable for the Attorney General to conclude that, for reasons related to national security and public order, Congress wanted harsh consequences for illegal reentrants regardless of any potential inconsistency with the Refugee Convention.

 [5] Second, R-S-C asks us to apply the immigration equivalent of the rule of lenity to resolve this interpretive question in her favor. See Cardoza-Fonseca, 480 U.S. at 449, 107 S.Ct. 1207 (referring to the "longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien" (emphasis added) (citations omitted)). This principle of leniency is animated by the harsh penalty of *deportation*—it has nothing to do with denying aliens extra benefits while lawfully present in the United States. See INS v. Errico, 385 U.S. 214, 225, 87 S.Ct. 473, 17 L.Ed.2d 318 (1966) ("We resolve the doubts in favor of [the

alien] because *deportation* is a drastic measure and at times the equivalent of banishment or exile[.] It is the forfeiture for misconduct of a residence in this country." (emphasis added) (internal citation omitted) (quoting Fong Haw Tan v. Phelan, 333 U.S. 6, 10, 68 S.Ct. 374, 92 L.Ed. 433 (1948)). R-S-C does not face removal to another country because her removal has been withheld pursuant to § 1231(b)(3)(A). Instead, she faces the denial of the incremental benefits that accompany asylum status, including the right to travel internationally, a pathway to citizenship, and derivative asylum status for her children. Because these concerns do not trigger the leniency principle, we do not fault the Attorney General for adopting a stricter approach which bars asylum eligibility to illegal reentrants with reinstated removal orders—especially when that rule otherwise seems to reflect a reasonable interpretation of the statutory scheme. [12]

### CONCLUSION

The INA does not clearly answer the question whether an illegal reentrant with a reinstated removal order may apply for asylum. The Attorney General, however, has reasonably interpreted the ambiguous statutory scheme in concluding that such an alien is not eligible for asylum relief. We therefore defer to the Attorney General's interpretation, and DENY the petition for review. [13]

**All Citations**

869 F.3d 1176

---

### Footnotes

\*    Pursuant to Fed. R. App. P. 43(c)(2), Jefferson B. Sessions, III, replaces Loretta Lynch as the United States Attorney General.

1    The Honorable Neil Gorsuch participated in the oral argument but not in the decision, in this case. The practice of this Court permits the remaining two panel judges, if in agreement, to act as a quorum in resolving the appeal. See 28 U.S.C. § 46(d); see also United States v. Wiles, 106 F.3d 1516, 1516, n* (10th Cir. 1997) (noting that this Court allows remaining panel judges to act as a quorum to resolve an appeal). In this case, the two remaining panel members are in agreement.

2    H.R. Rep. No. 104-469(I), at 107, available at 1996 WL 168955 ("Existing procedures to deny entry to and to remove illegal aliens from the United States are cumbersome and duplicative."); id. at 155 ("[T]he ability

to cross into the United States over and over with no consequences undermines the credibility of our efforts to secure the border.").

3    The regulations also offer relief under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), Dec. 10, 1984, 1465 U.N.T.S. 85, based upon a showing that the applicant would likely be tortured if returned to his home country. See 8 C.F.R. § 1208.31(c). That form of relief is materially similar to withholding of removal under 8 U.S.C. § 1231(b)(3)(A), but because it is not implicated here, we do not address it.

4    These regulations were originally promulgated as 8 C.F.R. §§ 208.31(e), 208.31(g)(2)(i), but were recodified in 2003 with a "1" preceding each section. Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824 (Feb. 28, 2003). For convenience, we refer to the recodified sections throughout this opinion.

5    Federal law *requires* immigration officials to refer an alien for an interview with an asylum officer whenever that alien expresses a fear of persecution upon return to her country of origin. 8 U.S.C. § 1225(b)(1)(A)(ii). However, R-S-C does not appear to challenge the original January 13, 2014 removal order itself as void on the ground that she was unlawfully deported without such an interview. Even if she did attack the validity of that removal order, we most likely would not have jurisdiction to entertain such a challenge. See 8 U.S.C. § 1231(a)(5) ("the prior order of removal ... is not subject to being reopened or reviewed"); see also Garcia-Marrufo v. Ashcroft, 376 F.3d 1061, 1063-64 (10th Cir. 2004) ("[O]ur jurisdiction is limited to considering whether the reinstatement order was properly entered—we cannot consider the propriety of the underlying removal order."). Nor does R-S-C argue that the reinstatement decision—which we do have jurisdiction to review—is defective on the ground that it relies on a removal order that itself was constitutionally tainted. See Garcia, 856 F.3d at 50-52 (Stahl, J., dissenting) (explaining how, under the U.S. Constitution's Suspension Clause and 8 U.S.C. § 1252(a)(2)(D), jurisdiction exists to attack the constitutionality of a reinstatement decision predicated on a removal order that was entered in violation of Due Process).

6    Every federal court of appeals to have considered this issue has determined that the reinstatement provision bars aliens with reinstated removal orders from obtaining asylum, either because Congress clearly said so by the plain terms of the statute or because the Attorney General's reasonable regulations warrant Chevron deference. See Jimenez-Morales v. U.S. Att'y Gen., 821 F.3d 1307, 1310 (11th Cir. 2016) (resolving the issue on the plain terms of the statute); Ramirez-Mejia v. Lynch, 794 F.3d 485, 489-91 (5th Cir. 2015) (same); Herrera-Molina v. Holder, 597 F.3d 128, 138-39 (2d Cir. 2010) (same); Garcia v. Sessions, 856 F.3d 27, 35-41 (1st Cir. 2017) (deferring to Attorney General's reasonable interpretation); Cazun v. Att'y Gen. U.S., 856 F.3d 249, 254-61 (3d Cir. 2017) (same); Perez-Guzman v. Lynch, 835 F.3d 1066, 1074-77, 1079-82 (9th Cir. 2016) (same). In the cases that did not apply Chevron deference, the courts did not substantively analyze the effect of the asylum provision, 8 U.S.C. § 1158(a)(1), but rather "mentioned it only in passing[.]" Perez-Guzman, 835 F.3d at 1074 (citations omitted) (addressing the earlier cases that declined to apply Chevron deference). They focused instead on the seemingly absolute language of the reinstatement provision, which bars aliens subject to its terms from receiving "any relief." 8 U.S.C. § 1231(a)(5).

7    "[U]nder this chapter" refers to Chapter 12 of Title 8 of the U.S. Code. The provisions on asylum, set forth at 8 U.S.C. § 1158, are located within the same Chapter 12, so there is no dispute that the rules for asylum are "under this chapter," as referenced in § 1231(a)(5).

8    It may seem odd that, under § 1231(b)(3)(A), the Attorney General must grant withholding of removal to qualifying aliens, including to aliens subject to the all-inclusive relief bar in § 1231(a)(5). The government attempts to square this incongruity in the statutory scheme by offering its own version of what "relief" should mean in the context of the reinstatement provision, arguing that withholding of removal is a form of *protection*, not "relief." We reject this proposed definition, which is unmoored from the text of the statute. The mandatory withholding-of-removal subsection need not be categorized under a different label (such as "protection") in order to make sense of the statutory scheme because withholding of removal operates effectively as an *exception* to the reinstatement provision's general relief bar.

9    R-S-C makes much of the caveat that the Attorney General's "additional limitations" must be "*consistent with* [ *section 1158*]," which is the section establishing asylum eligibility and rules for awarding asylum. § 1158(b)(2)(C) (emphasis added). She argues that carving out a subset of aliens who may not apply for asylum is *not* consistent with the § 1158(a)(1)'s guarantee of asylum eligibility for "any alien ... irrespective of such alien's status[.]" We reject this reading of the statutory text. It would mean that the Attorney General could not impose *any* limitations on asylum eligibility because any regulation that "limits" eligibility *necessarily* undermines the statutory guarantee that "any alien ... irrespective of such alien's status" may apply for asylum.

Thus, R-S-C's preferred construction would render § 1158(b)(2)(C) meaningless, disabling the Attorney General from adopting further limitations while the statute clearly empowers him to do so.

10    Legislative history confirms the point. Members of the House Judiciary Committee were frustrated with the "cumbersome" procedures for removing illegal aliens, and believed "[t]he asylum system [was being] abused by those who seek to use it as a means of 'backdoor' immigration." H.R. Rep. No. 104-469(I), at 107, available at 1996 WL 168955. The Committee also expressed a special frustration about illegal reentry and the lack of consequences for aliens who repeatedly cross the border. Id. at 155. These statements add further support to the position reflected in the withholding-only rule that Congress wanted the reinstatement provision to have real teeth.

11    It also warrants noting that the Refugee Convention's nonrefoulement principle—which prohibits the deportation of aliens to countries where the alien will experience persecution—is given full effect by the Attorney General's withholding-only rule.

12    R-S-C raises additional less developed arguments in favor of her preferred interpretation of the statutory scheme. We find them without merit, or otherwise not sufficient to unsettle the reasonable interpretation adopted by the Attorney General.

13    We grant Petitioner's Motion for Leave to Proceed on Appeal Without Prepayment of Costs or Fees (non-PLRA).

---

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

495 F.3d 17
United States Court of Appeals,
Second Circuit.

Yasser Nasser SALEH, Petitioner,

v.

Alberto GONZALES, Attorney General
of the United States, Respondent.

Docket No. 05–5909–ag.

|

Argued: April 30, 2007.

|

Decided: July 17, 2007.

|

Amended: Aug. 3, 2007.

**Synopsis**

**Background:** Alien, a native and citizen of Yemen, petitioned for review of the decision of the Board of Immigration Appeals (BIA) affirming decisions of Immigration Judge denying his motion to terminate removal proceedings, finding him removable, and denying his application for relief.

**Holdings:** The Court of Appeals, Feinberg, Circuit Judge, held that:

[1] alien remained "convicted" of a removable offense for federal immigration purposes, even though the state court amended its judgment of conviction to effectively expunge his conviction of a removable offense under state law, and

[2] BIA did not violate full faith and credit statute.

Petition denied.

West Headnotes (8)

[1]     **Aliens, Immigration, and
        Citizenship**  ⛯  Effect of expungement or
        vacation

        Alien, a native and citizen of Yemen, remained "convicted" of a removable offense for federal immigration purposes, even though the state

court amended its judgment of conviction to effectively expunge his conviction of a removable offense under state law. Immigration and Nationality Act, §§ 101(a)(48)(A), 237(a)(2)(A)(i), 8 U.S.C.A. §§ 1101(a)(48)(A), 1227(a)(2)(A)(i); West's Ann.Cal.Penal Code § 496(a).

4 Cases that cite this headnote

[2]     **Federal Courts**  ⛯  Criminal Justice

        Whether one has been convicted within the language of federal statutes is necessarily a question of federal, not state, law, despite the fact that the predicate offense and its punishment are defined by the law of the state.

1 Cases that cite this headnote

[3]     **Administrative Law and
        Procedure**  ⛯  Aliens, immigration, and
        citizenship

        **Aliens, Immigration, and
        Citizenship**  ⛯  Law questions

        To affirm the Board of Immigration Appeals' (BIA) interpretation of a statute, the court need only conclude that the agency's interpretation is rational and consistent with the statute.

[4]     **Aliens, Immigration, and
        Citizenship**  ⛯  Effect of expungement or
        vacation

        When a conviction is amended nunc pro tunc solely to enable a defendant to avoid immigration consequences, in contrast to an amendment or vacatur on the merits, there is no reason to conclude that the alien is any less suitable for removal. Immigration and Nationality Act, § 101(a)(48)(A), 8 U.S.C.A. § 1101(a)(48)(A).

3 Cases that cite this headnote

[5]    Aliens, Immigration, and
Citizenship        Effect of expungement or
vacation

An alien remains convicted of a removable
offense for federal immigration purposes when
the predicate conviction is vacated simply to
aid the alien in avoiding adverse immigration
consequences and not because of any procedural
or substantive defect in the original conviction.
Immigration and Nationality Act, § 101(a)(48)
(A), 8 U.S.C.A. § 1101(a)(48)(A).

9 Cases that cite this headnote

[6]    Aliens, Immigration, and
Citizenship        Validity

States        Full faith and credit in each state to
the public acts, records, etc. of other states

Statute defining "conviction" for purposes of
federal immigration law does not violate full
faith and credit clause, given that neither the
constitutional clause nor its statutory analogue,
binding federal courts, purports to prevent
federal legislative authorities from writing
federal statutes that differ from state statutes or
from attaching, to words in a federal statute, a
meaning that differs from the meaning attached
to the same word when used in a statute enacted
by a state. U.S.C.A. Const. Art. 4, § 1; 28
U.S.C.A. § 1738; Immigration and Nationality
Act, § 101(a)(48)(A), 8 U.S.C.A. § 1101(a)
(48)(A).

[7]    Aliens, Immigration, and
Citizenship        Effect of expungement or
vacation

Judgment        Full Faith and Credit

Board of Immigration Appeals (BIA) did not
violate full faith and credit statute by finding
alien removable based on alien's prior state
conviction for receiving stolen property, a
removable offense, which was later changed by
the state to a petty theft conviction to avoid
immigration consequences; the BIA was not
refusing to recognize or relitigating the validity

of alien's state conviction. U.S.C.A. Const. Art.
4, § 1; Immigration and Nationality Act, § 101(a)
(48)(A), 8 U.S.C.A. § 1101(a)(48)(A); 28
U.S.C.A. § 1738.

7 Cases that cite this headnote

[8]    Aliens, Immigration, and
Citizenship        Stop time rule

For purposes of cancellation of removal, alien's
period of continuous residence in the United
states ended when he was convicted of a
removable offense, which occurred after alien
was in the United States for only three years.
Illegal Immigration Reform and Immigrant
Responsibility Act of 1996, § 304(a), 8
U.S.C.A. § 1229b(a)(2), (d)(1).

**Attorneys and Law Firms**

*18  Eric W. Schultz, Sacks, Kolken & Schultz, Buffalo, NY,
for Petitioner.

*19  Shane Cargo, Assistant United States Attorney,
(Michael J. Garcia, United States Attorney, Sara L.
Shudofsky, Assistant United States Attorney, on the brief),
United States Attorney's Office for the Southern District of
New York, for Respondent.

Before: FEINBERG, SOTOMAYOR, and HALL, Circuit
Judges.

**Opinion**

FEINBERG, Circuit Judge:

Yasser Nasser Saleh, a lawful permanent resident of the
United States, was charged as removable under section 237(a)
(2)(A)(i) of the Immigration and Nationality Act ("INA"),
8 U.S.C. § 1227(a)(2)(A)(i). The basis of the charge was
his conviction in state court of receiving stolen property,
which is a removable offense, i.e., a "crime involving moral
turpitude" ("CIMT") for which a sentence of one year or
longer could have been imposed. In an effort to escape the
adverse immigration consequences of that conviction, Saleh
thereafter obtained an amendment of the judgment so that

he instead stood convicted of petty theft, which is not a removable offense.

In this petition, Saleh seeks review of the decision of the Board of Immigration Appeals ("BIA") affirming decisions of the Immigration Judge ("IJ") (A) rejecting Saleh's argument that he no longer stands convicted of a removable offense and therefore denying his motion to terminate his removal proceedings and (B) finding Saleh removable as charged and denying his application for relief from removal. *In re Saleh,* No. A41 982 414 (B.I.A. Oct. 4, 2005), *aff'g* No. A41 982 414 (Immig. Ct. Buffalo Apr. 22, 2004).

In reviewing these decisions, the principal question before us is whether the BIA erred in concluding that Saleh remains "convicted" of a removable offense for federal immigration purposes even though the state court amended its judgment of conviction to effectively expunge his conviction of a removable offense under state law. For the reasons set forth below, we hold that the BIA did not err because the amendment was secured solely to aid Saleh in avoiding immigration consequences and was not based on any procedural or substantive defect in the original conviction. We therefore deny the petition.

## I. BACKGROUND

Saleh, a native and citizen of Yemen, was admitted to the United States as a lawful permanent resident in 1990. In 1993, Saleh was convicted in a California state court, following his plea of nolo contendere, of receiving stolen property in violation of section 496(a) of the California Penal Code.[1] The offense carries a maximum sentence of one-year imprisonment, see Cal. Pen.Code § 496(a), although the court imposed a lower sentence.[2] In July 2001, the Immigration and Naturalization **\*20** Service ("INS") commenced removal proceedings,[3] charging that Saleh was removable under 8 U.S.C. § 1227(a)(2)(A)(i) because his 1993 crime qualifies as a CIMT, committed within 10 years after the date of admission, for which a sentence of one year or longer could have been imposed.

Subsequently, for the announced purpose of escaping adverse immigration consequences, Saleh moved in California state court for an amendment of the judgment convicting him of receiving stolen property, effective nunc pro tunc, so that

he would instead stand convicted of petty theft in violation of section 488 of the California Penal Code. Because this is not a crime for which a sentence of one year or longer could have been imposed, it is not a removable offense. In a declaration accompanying Saleh's motion, his counsel expressly referred to the immigration consequences of Saleh's original conviction, stating that "the alternative disposition of petty theft, which carries a six month maximum sentence would not have the adverse immigration consequences." Moreover, no evidence or argument presented to that court identified any substantive or procedural defects in Saleh's conviction. The California court granted the motion.

Saleh thereafter asked the IJ to terminate the agency's removal proceedings, arguing that petty theft is not a removable offense. The IJ denied the motion, reasoning that, despite the California court's amendment to the judgment of conviction, Saleh remained "convicted" of receiving stolen property, a removable offense for federal immigration purposes, because the amendment was not "based on any showing of innocence or any suggestion that the conviction had been improperly obtained." Instead, the IJ found that the conviction was amended "solely for the purpose of circumventing the immigration laws of the United States."[4]

After the IJ denied Saleh's motion to terminate his removal proceedings and the BIA declined to entertain his interlocutory appeal of that decision, Saleh contested removability and sought relief from removal. He initially filed a Form I–191, a prerequisite to obtaining a waiver of deportation under former section 212(c) of the INA. Subsequently, however, Saleh abandoned his application for 212(c) relief and instead filed a motion to substitute an application for cancellation of removal.[5] The IJ found Saleh removable and denied his application for cancellation of removal as untimely.

The BIA adopted and affirmed the IJ's decision and dismissed the appeal. Relying **\*21** on its prior decision in *Matter of Pickering,* 23 I. & N. Dec. 621 (BIA 2003), the BIA agreed with the IJ that Saleh remained "convicted" of a removable offense for federal immigration purposes because the amendment of the judgment of conviction was not based on "any substantive or procedural defect in the underlying criminal proceedings," and Saleh was therefore removable. Saleh filed a timely petition for review.

## II. ANALYSIS

In his petition, Saleh argues that the BIA erred in finding him removable and in denying his application for cancellation of removal. In support, he argues principally that (A) the BIA's interpretation of the INA, under which he remains convicted of a removable offense, (1) is not entitled to deference under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) and (2) violates 28 U.S.C. § 1738, which obliges federal courts to give full faith and credit to state acts, records, and judicial proceedings; and (B) the BIA erroneously concluded that he was ineligible for cancellation of removal. We reject each of his arguments.

### A. Did the BIA err in concluding that Saleh remains convicted of a removable offense for federal immigration purposes?

#### 1. Is the BIA's interpretation of the INA at issue in this case entitled to deference under Chevron?

The BIA determined that Saleh was removable pursuant to 8 U.S.C. § 1227(a)(2)(A)(i), which makes removable any alien who "(I) is convicted of a crime involving moral turpitude committed within five years (or 10 years in the case of an alien provided lawful permanent resident status ...) after the date of admission, and (II) is convicted of a crime for which a sentence of one year or longer may be imposed." The BIA properly concluded that Saleh's original conviction for receiving stolen property, in violation of Cal. Pen.Code § 496(a), satisfies these requirements. See Michel v. INS, 206 F.3d 253, 263 (2d Cir.2000). Although Saleh thus stood convicted of a removable offense under state law at one time, he subsequently secured an amendment of the State's judgment in an effort to avoid adverse immigration consequences and not because of any procedural or substantive defect in the original conviction. Therefore, the issue before us is whether, under these circumstances, Saleh remains "convicted" of a removable offense for federal immigration purposes, viz. within the meaning of 8 U.S.C. § 1227(a)(2)(A)(i) and the INA's definition of "conviction," 8 U.S.C. § 1101(a)(48)(A).[6]

[1] [2] This is a question of federal statutory interpretation. We have previously observed that "[w]hether one has been 'convicted' within the language of [federal] statutes is necessarily ... a question of federal, not state, law, despite the fact that the predicate offense and its punishment are defined by the law of the State." United States v. Campbell, 167 F.3d 94, 97 (2d Cir.1999) (alterations in original, citation omitted); cf. Dickerson v. New Banner **22** Inst., Inc., 460 U.S. 103, 119–20, 103 S.Ct. 986, 74 L.Ed.2d 845 (1983) (holding that in "the absence of a plain indication to the contrary, ... it is to be assumed when Congress enacts a statute that it does not intend to make its application dependent on state law" (alterations in original, citation omitted)).

We review the BIA's interpretation of the INA under the familiar two-step analysis set forth in Chevron, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694. See INS v. Aguirre–Aguirre, 526 U.S. 415, 424–25, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999). First, we determine whether the provision in question is ambiguous; "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842–43, 104 S.Ct. 2778. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute," and thus entitled to deference. Id. at 843, 104 S.Ct. 2778.

Turning to the first step of this analysis, we conclude that Congress' intent on the treatment of vacated or amended convictions under 8 U.S.C. § 1101(a)(48)(A) is ambiguous. Saleh was deemed removable because, inter alia, he is an alien who "is convicted of a crime involving moral turpitude," 8 U.S.C. § 1227(a)(2)(A)(i), and conviction is defined, in pertinent part, as "a formal judgment of guilt of the alien entered by a court," 8 U.S.C. § 1101(a)(48)(A). This language permits a spectrum of possible interpretations. On one end of the spectrum, Congress may have intended that where an alien receives any type of post-conviction relief—either through an amendment nunc pro tunc, an expungement, or some other remedy—the immigration law should treat the conviction as if it never occurred, regardless of the reason for the relief. Under this view, the expungement means that the defendant no longer "is convicted of [the original] crime"

and there is no longer any "formal judgment of guilt of the alien entered by a court." On the other end of the spectrum, Congress may have intended that no post-conviction relief whatsoever should have any effect on whether an alien stands "convicted" of a removable offense, again, regardless of the reason for the relief. Or, Congress may have intended some middle position: that certain types of post-conviction relief would affect an alien's "conviction" status under the INA, but others would not, depending upon the reason for the relief. Neither the relevant statutory language nor legislative history allows us to conclude that any of these interpretations represents Congress' unambiguous intent. See, e.g., *Pinho v. Gonzales,* 432 F.3d 193, 206 (3d Cir.2005); *Murillo–Espinoza v. INS,* 261 F.3d 771, 774 (9th Cir.2001).

 **[3]**    Accordingly, we turn to *Chevron*'s second step, which directs us to consider whether the BIA adopted "a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. In making this assessment, "[i]t is not necessary that we conclude that the agency's interpretation of the statute is the only permissible interpretation, nor that we believe it to be the best interpretation of the statute." *Skubel v. Fuoroli,* 113 F.3d 330, 336 (2d Cir.1997) (citing *Chevron,* 467 U.S. at 843 n. 11, 104 S.Ct. 2778). Rather, to affirm the BIA's determination, we need only conclude that the agency's interpretation is " 'rational and consistent with the statute.' " *Protection & Advocacy for Persons with Disabilities v. Mental Health & Addiction Servs.,* 448 F.3d 119, 124 (2d Cir.2006) (quoting *Sullivan v. Everhart,* 494 U.S. 83, 89, 110 S.Ct. 960, 108 L.Ed.2d 72 (1990)).

The BIA has adopted an interpretation of 8 U.S.C. § 1101(a)(48)(A) that distinguishes between convictions vacated on the merits, which the BIA does not treat as "convictions" within the meaning of the provision, and convictions vacated for other reasons, including to avoid immigration hardships, which the BIA continues to treat as "convictions." Because Saleh's conviction fell into the latter category, the BIA concluded that the nunc pro tunc amendment did not affect his conviction status for removability purposes. For reasons to be discussed, we reject Saleh's contention that the interpretation is unreasonable. [7]

Over the last 20 years, there has been a consistent broadening of the meaning of "conviction" in the INA. Until 1996, the INA did not contain a statutory definition of "conviction," and for most of that time, the BIA generally took the position that an alien whose conviction is vacated or expunged under state law no longer stood convicted of a removable offense for federal immigration purposes. See *Matter of Ozkok,* 19 I. & N. Dec. 546, 550–52 (BIA 1988). In 1988, the BIA acknowledged, albeit in a somewhat different context from the instant case, that its own prior approach was unduly deferential to state definitions of conviction and had thus frustrated congressional intent: "[F]orm has been placed over substance, and aliens who are clearly guilty of criminal behavior and whom Congress intended to be considered 'convicted' have been permitted to escape the immigration consequences normally attendant upon a conviction." *Id.* at 551. Accordingly, the BIA attempted in *Ozkok* to remedy the problem, adopting a broader test for determining whether a conviction existed for federal immigration purposes.

But Congress was of the opinion that the BIA had not gone far enough. See *Francis v. Gonzales,* 442 F.3d 131, 140 (2d Cir.2006) (noting that "Congress subsequently indicated its dissatisfaction with the *Ozkok* test when it amended the INA to change the definition of conviction in 1996"). Congress therefore codified, for the first time, a definition of the term "conviction" in the INA. See 8 U.S.C. § 1101(a)(48)(A) (1996); see also *Francis,* 442 F.3d at 140. This definition was specifically intended to broaden the definition of "conviction" under the INA that had been previously used by the BIA. See *Francis,* 442 F.3d at 139 (noting that "[t]he applicable definition of 'conviction' was narrower [prior to Congress' intervention] than it is today"). In particular, Congress expanded the *Ozkok* definition by including convictions where the adjudication of guilt was deferred. As the Conference Report on the amendments explained, "there exist[s] in the various states a myriad of provisions for ameliorating the effects of a conviction. As a result, aliens who have clearly been guilty of criminal behavior and whom Congress intended to be considered 'convicted' have escaped the immigration consequences normally attendant upon a conviction." H.R. Conf. Rep. No. 104–828 at 224.

Interpreting the new definition, the BIA identified two primary aims that it believed Congress sought to accomplish: to focus the conviction inquiry on the "original determination of guilt" and to "implement a uniform federal approach."

*Matter of Roldan–Santoyo,* 22 I. & N. Dec. 512, 521–22 (BIA 1999). Relying on these rationales, the BIA, in a series of cases culminating in **\*24** *Matter of Pickering,* 23 I. & N. Dec. 621 (BIA 2003), reversed on other grounds, *Pickering v. Gonzales,* 465 F.3d 263 (6th Cir.2006), further expanded the definition of conviction beyond the particular procedural mechanism considered by Congress in its 1996 amendments to the INA. In *Pickering,* the BIA concluded that Congress objected generally to many state actions allowing aliens to "escape the immigration consequences normally attendant upon a conviction," H.R. Conf. Rep. No. 104–828 at 224, and that Congress did not intend to allow an alien to escape those consequences by means of a state vacatur that was not on the merits. *Pickering* gave effect to this objective by holding that the federal immigration consequences of all post-conviction relief will be determined by considering the State court's motivation in granting the relief, e.g., avoiding immigration hardships, recognizing the defendant's rehabilitation, or a substantive or procedural defect in the predicate conviction. Specifically, the BIA held that

> [T]here is a significant distinction between convictions vacated on the basis of a procedural or substantive defect in the underlying proceedings and those vacated because of post-conviction events, such as rehabilitation or immigration hardships. Thus, if a court with jurisdiction vacates a conviction based on a defect in the underlying criminal proceedings, the respondent no longer has a "conviction" within the meaning of section 101(a)(48)(A) [ 8 U.S.C. § 1101(a)(48)(A)]. If, however, a court vacates a conviction for reasons unrelated to the merits of the underlying criminal proceedings, the respondent remains "convicted" for immigration purposes.

*Id.* at 624.

Relying in part on this reasoning, the BIA in the appeal now before us concluded that Saleh remained convicted of the original removable offense because the amendment to Saleh's judgment of conviction was obtained solely to avoid "immigration hardships" and not to remedy a procedural or substantive defect in the underlying proceedings.

The BIA's interpretation in both *Pickering* and the instant case is reasonable. For one thing, the interpretation is entirely consistent with Congress' intent in enacting the 1996 amendments to broaden the definition of conviction and advances the two purposes earlier identified by the BIA: it focuses on the original attachment of guilt (which only a vacatur based on some procedural or substantive defect would call into question) and imposes uniformity on the enforcement of immigration laws. Second, from a practical perspective, while state convictions are a useful way for the federal government to identify individuals who, because of their criminal history, may be appropriate for removal, there will still remain individuals who are guilty of "morally turpitudinous" conduct, see *Michel,* 206 F.3d at 263, and therefore suitable for removal even though they do not have a still-standing conviction for a removable offense under state law. Cf. *Dickerson,* 460 U.S. at 120, 103 S.Ct. 986 (noting that state convictions "provide a convenient, although somewhat inexact, way of identifying 'especially risky people' " and that "[t]here is no inconsistency in the refusal of Congress to be bound by post-conviction state actions ... that vary widely from State to State and that provide less than positive assurance that the person in question no longer poses an unacceptable risk of dangerousness." (internal citations omitted)). Under *Pickering,* these individuals will remain removable, as Congress intended.

**[4]** Particularly as applied to post-conviction relief granted to aid the defendant in avoiding immigration hardship, we think the BIA's position eminently reasonable: **\*25** When a conviction is amended nunc pro tunc solely to enable a defendant to avoid immigration consequences, in contrast to an amendment or vacatur on the merits, there is no reason to conclude that the alien is any less suitable for removal.[8]

For this reason, we find particularly instructive the settled law of our sister circuits, which holds that the BIA has reasonably concluded that an alien remains convicted of a removable offense for federal immigration purposes when a state vacates the predicate a conviction pursuant to a rehabilitative statute. See, e.g., *Pickering,* 465 F.3d at 266; *Alim v. Gonzales,*

446 F.3d 1239, 1249–50 (11th Cir.2006); *Pinho,* 432 F.3d at 195; *Ramos v. Gonzales,* 414 F.3d 800, 805–06 (7th Cir.2005); *Cruz–Garza,* 396 F.3d at 1129; *Resendiz–Alcaraz v. Ashcroft,* 383 F.3d 1262, 1268–71 (11th Cir.2004); *Murillo–Espinoza,* 261 F.3d at 774; *Herrera–Inirio v. INS,* 208 F.3d 299, 305 (1st Cir.2000). Saleh attempts to distinguish away this body of law by arguing that his vacatur, by contrast, had absolutely nothing to do with rehabilitation. We agree, of course, but his argument proves too much. It would make little sense for federal law to ignore vacaturs for rehabilitation, which, at least in some cases, reflect a measured judgment that the defendant is rehabilitated, but recognize vacaturs that solely aim to help the defendant avoid adverse immigration consequences.

**[5]** In light of the foregoing, we join those of our sister circuits that have considered the question in holding that the BIA's conclusion—that an alien remains convicted of a removable offense for federal immigration purposes when the predicate conviction is vacated simply to aid the alien in avoiding adverse immigration consequences and not because of any procedural or substantive defect in the original conviction—is a permissible construction of the statute and is therefore entitled to deference. See, e.g., *Sanusi v. Gonzales,* 474 F.3d 341, 342–43 (6th Cir.2007) ("We deny the petitions for review on the ground that the state court's vacation of Sanusi's conviction was ineffective for immigration purposes because it was done solely for the purpose of ameliorating the immigration consequences to petitioner.") (citing *Zaitona v. INS,* 9 F.3d 432 (6th Cir.1993); *Ali v. Ashcroft,* 395 F.3d 722, 728–29 (7th Cir.2005)). [9]

2. Does the BIA's construction of 8 U.S.C. § 1101(a)(48)(A) violate the full faith and credit statute?

**[6]** We turn now to Saleh's additional argument that the interpretation the BIA adopted, and which we here deem reasonable, violates the statutory analogue of the full faith and credit clause. See 28 U.S.C. § 1738 (federal courts must give full faith and credit to state acts, records, and judicial proceedings); cf. **\*26** U.S. Const. art. IV, § 1. We agree with the First Circuit that "section 1101(a)(48)(A) does not infract applicable principles of full faith

and credit," *Herrera–Inirio,* 208 F.3d at 307, because "neither the constitutional clause nor its statutory analogue (binding federal courts) purports to prevent federal legislative authorities from writing federal statutes that differ from state statutes or from attaching, to words in a federal statute, a meaning that differs from the meaning attached to the same word when used in a statute enacted by a state," *Molina v. INS,* 981 F.2d 14, 19 (1st Cir.1992) (Breyer, J.).

**[7]** Similarly, we have held that the full faith and credit statute does not prevent a federal court from taking cognizance of a state youthful offender adjudication as a prior conviction in sentencing even though the adjudication is not regarded as a conviction under state law:

> "[T]he 'principles of federalism and comity embodied in the full faith and credit statute,' *Growe v. Emison,* 507 U.S. 25, 35, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993), are not endangered when a sentencing court, not questioning the propriety of the state's determination in any way, interprets how to apply New York's youthful offender adjudications to a Guidelines analysis.... The federal sentencing court is neither refusing to recognize nor relitigating the validity of [defendant's] New York state judgment of conviction or his youthful offender sentence. Instead, it is merely noticing and acting upon the *fact* of [defendant's] prior conviction."

*United States v. Jones,* 415 F.3d 256, 265 (2d Cir.2005) (internal citations omitted). Here, too, the BIA is simply interpreting how to apply Saleh's vacated State conviction for receiving stolen property to the INA and is not refusing to recognize or relitigating the validity of Saleh's California state conviction. The full faith and credit statute is not thereby violated.

**B. Did the BIA properly deny Saleh's application for cancellation of removal?**

**[8]** Finally, the BIA did not err in affirming the IJ's denial of Saleh's application for cancellation of removal. The application was untimely. In any event, Saleh was ineligible for the relief because he does not satisfy the provision's seven-year continuous residence requirement, 8 U.S.C. § 1229b(a)(2). His conviction of a removable offense (which, for the above reasons, stands for federal immigration purposes) triggers the "stop-time rule," 8 U.S.C. § 1229b(d)(1), under which an alien's continuous residency

or physical presence ends, for purposes of cancellation of removal, on the date he commits a qualifying offense or on the date a notice to appear is filed. Accordingly, Saleh's period of continuous residence ended, at the very latest, in 1993, after only three years in the country. See generally *Tablie v. Gonzales,* 471 F.3d 60, 61–62 (2d Cir.2006). [10]

III. CONCLUSION

We have considered all of Saleh's arguments on appeal and find them to be without merit. For the foregoing reasons, we deny Saleh's petition for review. The **\*27** pending motion for a stay of removal in this case is denied as moot.

**All Citations**

495 F.3d 17

---

## Footnotes

1  The statute provides, in pertinent part, that "[e]very person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment in a state prison, or in a county jail for not more than one year." *Cal. Pen.Code § 496(a).* Saleh was convicted under section 496.1 of the California Penal Code. That provision has since been recodified as section 496(a). Throughout, this opinion references the provision at its current location in section 496(a).

2  This was neither Saleh's first nor last brush with the law. He had already been convicted in 1992 of unlawfully discharging a firearm and driving while intoxicated, and was thereafter convicted in 1997 of criminal mischief, in 1998 of driving while intoxicated, and in 2000 of driving while intoxicated.

3  On March 1, 2003, the INS was reconstituted into two agencies, the Bureau of Immigration and Customs Enforcement and the U.S. Citizenship and Immigration Services, both within the Department of Homeland Security. See *Jian Hui Shao v. Bd. of Immigration Appeals,* 465 F.3d 497, 499 n. 3 (2d Cir.2006) Because the proceedings in this case began before that date, we will continue to refer to the agency as the "INS."

4  Although the Government bears the burden of proving, by clear and convincing evidence, that Saleh is removable, see *8 U.S.C. § 1229a(c)(3)(A);* *Zerrei v. Gonzales,* 471 F.3d 342, 345 (2d Cir.2006) (per curiam); see also *Pickering v. Gonzales,* 465 F.3d 263, 268–69 (6th Cir.2006); *Cruz–Garza v. Ashcroft,* 396 F.3d 1125, 1130 (10th Cir.2005), Saleh did not dispute before the IJ or the BIA or in his brief in this appeal that the California court amended the judgment of conviction to help him avoid immigration hardships, so we deem any argument to the contrary waived. See *Yueqing Zhang v. Gonzales,* 426 F.3d 540, 542 n. 1 (2d Cir.2005).

5  Saleh abandoned his 212(c) application because, after filing the Form I–191, his counsel determined that Saleh had also been convicted of a firearms offense, see supra note 2, which rendered him ineligible for 212(c) relief.

6  That provision defines "conviction" as

[A] formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where —(i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

*8 U.S.C. § 1101(a)(48)(A).*

7    Although Saleh claims that the agency erred as a matter of law in reaching its decision, we will construe his argument as urging that the BIA's interpretation was unreasonable.

8    We note that we have already embraced, in a slightly different context, approximately the BIA's standard in *Pickering.* In *Campbell,* we held that the district court could apply a sentencing enhancement called for by federal law for a vacated state aggravated felony conviction because "[defendant's] conviction was not reversed, and the vacatur order was not based on any showing of innocence or on any suggestion that the conviction had been improperly obtained." 167 F.3d at 98. Although *Campbell* is not controlling in this case, we continue to believe that this standard, which the BIA has substantially adopted and applied to the removal context in *Pickering,* is consistent with congressional intent.

9    We note that our holding in this case is limited to post-conviction relief granted solely to avoid adverse immigration consequences and not because of any procedural or substantive defect in the original conviction, and we leave for another day the effect of post-conviction relief granted for other reasons.

10    After the filing of the original opinion in this case, it was brought to the Court's attention that the "stop-time" rule may not apply retroactively to offenses committed before April 1, 1997, the effective date of the Illegal Immigrant and Immigrant Responsibility Act of 1996. That issue is presently before another panel of this Court but was never presented here by Saleh. Accordingly, we deem Saleh to have waived that argument. *See* *Yueqing Zhang,* 426 F.3d at 542 n. 1. Nothing in this opinion should be construed as deciding whether the "stop-time" rule applies retroactively.

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Scheerer v. U.S. Atty. Gen., 445 F.3d 1311 (2006)

19 Fla. L. Weekly Fed. C 433

🚩 KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Akhtar v. Gonzales, 5th Cir., May 23, 2006

445 F.3d 1311
United States Court of Appeals,
Eleventh Circuit.

Germar SCHEERER, Petitioner,

v.

UNITED STATES ATTORNEY
GENERAL, Respondent.

Nos. 04–16231, 05–11303.
|
April 13, 2006.

**Synopsis**

**Background:** German alien petitioned for review of Board of Immigration Appeals (BIA) orders denying asylum and finding him ineligible for adjustment of status.

**Holdings:** The Court of Appeals, Black, Circuit Judge, held that:

[1] alien was not eligible for asylum;

[2] immigration judge (IJ) failed to make fact findings necessary to support conclusion that asylum application was frivolous; and

[3] regulation barring arriving aliens in removal proceedings from seeking adjustment of status was invalid.

Relief granted in part and denied in part.

West Headnotes (14)

[1]     **Aliens, Immigration, and
Citizenship** 🔑 Stay pending review

Alien's petition for review of final order of removal does not automatically stay his or her removal, and alien who fails to move for stay of removal must continue appeal from abroad. Illegal Immigration Reform and Immigrant

Responsibility Act of 1996, 🚩 8 U.S.C.A. § 1252(b)(3)(B).

[2]     **Aliens, Immigration, and
Citizenship** 🔑 Review of initial decision or administrative review

Where Board of Immigration Appeals (BIA) summarily affirms immigration judge's (IJ's) decision, court reviews IJ's decision as if it were BIA's.

4 Cases that cite this headnote

[3]     **Aliens, Immigration, and
Citizenship** 🔑 Substantial evidence in general

Denial of asylum may be reversed only if evidence presented by applicant is so powerful that reasonable factfinder would have to conclude requisite fear of persecution exists. Illegal Immigration Reform and Immigrant

Responsibility Act of 1996, § 604(a), 🚩 8 U.S.C.A. § 1158.

[4]     **Aliens, Immigration, and
Citizenship** 🔑 Past Persecution

**Aliens, Immigration, and
Citizenship** 🔑 Well Founded Fear of Future Persecution

To be eligible for asylum, alien must, with specific and credible evidence, establish (1) past persecution on account of race, religion, nationality, membership in particular social group, or political opinion, or (2) well-founded fear of future persecution on account of statutorily-protected ground. Illegal Immigration Reform and Immigrant Responsibility Act of

1996, § 604(a), 🚩 8 U.S.C.A. §§ 1101(a)(42)

(A), 🚩 1158; 🚩 8 C.F.R. § 208.13(a).

11 Cases that cite this headnote

[5]     **Aliens, Immigration, and
Citizenship** 🔑 Political opinion in general

Scheerer v. U.S. Atty. Gen., 445 F.3d 1311 (2006)

Case 3:20-cv-07721-SI   Document 58-5   Filed 11/10/20   Page 1005 of 1271

19 Fla. L. Weekly Fed. C 433

Alien seeking asylum may establish past persecution or well-founded fear of future persecution under theory of imputed political opinion where he shows political opinion was correctly or incorrectly attributed to him and he was persecuted because of that opinion. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 604(a), 8 U.S.C.A. §§ 1101(a)(42)(A), 1158; 8 C.F.R. § 208.13(a).

3 Cases that cite this headnote

[6]  **Aliens, Immigration, and Citizenship** 🔑 Acts Constituting Persecution

**Aliens, Immigration, and Citizenship** 🔑 Grounds for Persecution; Protected Groups

Fear of prosecution under fairly administered laws of general application does not entitle alien to asylum or withholding of removal unless alien shows prosecution is based on statutorily-protected ground and that punishment under that law is sufficiently extreme to constitute persecution. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 604(a), 8 U.S.C.A. §§ 1101(a)(42)(A), 1158; 8 C.F.R. § 208.13(a).

7 Cases that cite this headnote

[7]  **Aliens, Immigration, and Citizenship** 🔑 Weight and Sufficiency

German alien, convicted for violation of German law proscribing incitement of racial hatred, failed to establish "persecution," as required to support asylum claim; evidence did not support his claim that prosecution was on account of imputed political opinion, and sentence imposed, which was well below statutory maximum, was not disproportionately severe. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 604(a), 8 U.S.C.A. §§ 1101(a)(42)(A), 1158; 8 C.F.R. § 208.13(a).

3 Cases that cite this headnote

[8]  **Administrative Law and Procedure** 🔑 Asylum, refugees, and withholding of removal

**Aliens, Immigration, and Citizenship** 🔑 Law questions

*De novo* review of Board of Immigration Appeals (BIA) finding that alien's asylum application was frivolous is tempered with deference to BIA's statutory interpretation, if reasonable. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 604(a), 8 U.S.C.A. § 1158(d)(6).

6 Cases that cite this headnote

[9]  **Aliens, Immigration, and Citizenship** 🔑 Findings or statement of reasons

Finding that asylum application was frivolous cannot stand without specific finding in first instance that applicant deliberately fabricated material portions of asylum application. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 604(a), 8 U.S.C.A. § 1158(d); 8 C.F.R. § 208.20.

6 Cases that cite this headnote

[10]  **Aliens, Immigration, and Citizenship** 🔑 Findings or statement of reasons

Adverse credibility determination alone cannot support finding that asylum application was frivolously filed; rather, immigration judge (IJ) must make specific findings as to which material elements of application were deliberately falsified. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 604(a), 8 U.S.C.A. § 1158(d); 8 C.F.R. § 208.20.

9 Cases that cite this headnote

[11]  **Administrative Law and Procedure** 🔑 Plain, literal, or clear meaning; ambiguity or silence

Scheerer v. U.S. Atty. Gen., 445 F.3d 1311 (2006)

19 Fla. L. Weekly Fed. C 433

**Administrative Law and Procedure** 🔑 Permissible or reasonable construction

When reviewing agency's interpretation of statute it administers, court applies *Chevron* deference under which, unless Congress has directly spoken to precise question at issue, agency's interpretation will be upheld if reasonable.

3 Cases that cite this headnote

**[12]** **Administrative Law and Procedure** 🔑 Erroneous or unreasonable construction; conflict with statute

Where Congress has given express delegation of authority to agency to elucidate specific provision of statute by regulation, agency's legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to statute.

5 Cases that cite this headnote

**[13]** **Administrative Law and Procedure** 🔑 Aliens, Immigration, and Citizenship

**Aliens, Immigration, and Citizenship** 🔑 Law questions

Judicial deference to agency's statutory interpretations is especially appropriate in immigration context, where officials exercise especially sensitive political functions that implicate questions of foreign relations.

1 Cases that cite this headnote

**[14]** **Aliens, Immigration, and Citizenship** 🔑 Validity

Regulation barring arriving aliens in removal proceedings from seeking adjustment of status was invalid as unreasonable construction of governing statute, which indicated congressional presumption that arriving aliens, nearly all of whom would be in removal proceedings, would be eligible for adjustment of status. Illegal Immigration Reform and Immigrant

Responsibility Act of 1996, 8 U.S.C.A. § 1255(a); 8 C.F.R. § 1245.1(c)(8).

15 Cases that cite this headnote

**West Codenotes**

**Held Invalid**

🚩 8 C.F.R. § 1245.1(c)(8)

**Attorneys and Law Firms**

**\*1313** Robert Scott Oswald, Noto & Oswald, P.C., Washington, DC, for Scheerer.

Russell J.E. Verby, David V. Bernal, S. Nicole Nardone, U.S. Dept. of Justice, OIL, Washington, DC, for Respondent.

Petition for Review of a Decision of the Board of Immigration Appeals.

Before BLACK, HULL and FARRIS[*], **\*1314** Circuit Judges.

**Opinion**

BLACK, Circuit Judge:

Germar Scheerer petitions this Court for review of two Board of Immigration Appeals (BIA) decisions. First, Scheerer seeks review of the BIA's decision affirming, without opinion, an immigration judge's (IJ's) order (1) denying his application for asylum and withholding of removal under the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1158, 1231(b)(3), as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.L. No. 104–208, 110 Stat. 3009 (1996) (amended by the REAL ID Act of 2005, Pub.L. No. 109–13, 119 Stat. 302 (2005)),[1] and (2) finding his application frivolous. Second, Scheerer challenges the BIA's determination that, as an arriving alien in removal proceedings, he was ineligible to reopen his proceedings for an adjustment of status pursuant to 🚩 8 C.F.R. § 1245.1(c)(8). After review, we grant the petitions in part, and deny in part.

Scheerer v. U.S. Atty. Gen., 445 F.3d 1311 (2006)

19 Fla. L. Weekly Fed. C 433

## I. BACKGROUND

Scheerer, a native and citizen of Germany, fled his homeland in 1995 after he was convicted and sentenced to 14 months' imprisonment for inciting racial hatred in violation of the German Penal Code, Strafgesetzbuch [StGB] art. 130, §§ 3–5 (F.R.G.) (Section 130). [2] A chemist, Scheerer published a report, based on samples taken from the site of the Auschwitz concentration camp, which alleged the gas and delousing chambers in which mass killings occurred manifested no residual chemical signs of Zyklon B use. From this, Scheerer inferred the mass killings that occurred during the Holocaust could not have happened as is commonly believed. The highest court in Germany upheld his conviction and sentence.

To avoid his sentence and likely future prosecution in Germany, Scheerer fled to Spain in March 1996, and, fearing extradition, to England in June 1996. After a series of newspaper articles urged his extradition, Scheerer fled to the United States, entering this country on August 9, 2000, as a conditional parolee with a departure date of no later than November 18, 2000.

Scheerer filed an application for asylum on October 17, 2000. On February 1, 2001, the Immigration and Naturalization Service (INS, now the Department of Homeland Security (DHS)) issued him a Referral Notice, informing Scheerer that his application was being referred to an IJ, to whom he could again direct his asylum request. On April 2, 2001, the INS issued Scheerer a Notice to Appear, finding him removable pursuant to 8 U.S.C. § 1182(a)(7)(A)(i)(I) for failure to possess a valid entry document.

An IJ conducted several hearings on Scheerer's asylum application from September 2001 until June 2003, ultimately issuing a decision finding, in relevant part: (1) Scheerer was removable as charged in the Notice to Appear; (2) Scheerer presented no cognizable claim of past persecution or a well-founded fear of future persecution entitling him to asylum or withholding of removal; [3] and (3) Scheerer's **\*1315** asylum application was frivolous. Scheerer appealed the IJ's order, and the BIA affirmed without opinion on November 8, 2004. [4]

On December 7, 2004, Scheerer moved the BIA to reopen his case for an adjustment of status to that of a lawful permanent resident alien based on his September 11, 2004, marriage

to a United States citizen. The BIA denied his motion on March 3, 2005, finding Scheerer, an arriving alien in removal proceedings, was subject to a regulatory bar, 8 C.F.R. § 1245.1(c)(8), which rendered him ineligible to apply for adjustment of status. Scheerer then filed two timely petitions for review of both BIA decisions with this Court, which we consolidated and docketed for oral argument.

[1] In November 2005, Scheerer was removed to Germany after this Court denied his emergency motion to stay removal pending this appeal. Despite his removal, Scheerer's appeal continues unabated [5] and raises three issues: (1) whether the BIA erred in denying his petition for asylum and withholding of removal; (2) whether the BIA erred in finding his asylum application was frivolous; and (3) whether the Attorney General exceeded his authority in promulgating 8 C.F.R. § 1245.1(c)(8).

## II. DISCUSSION

A. *Claim for Asylum and Withholding of Removal*

[2] [3] Where the BIA summarily affirms the IJ's decision, we review the IJ's decision as if it were the BIA's. *Al Najjar v. Ashcroft,* 257 F.3d 1262, 1284 (11th Cir.2001). We review the IJ's denial of an asylum application under a "substantial evidence" standard. "The [IJ's] factual determination that [an alien] is removable and not entitled to asylum must be upheld if it is supported by substantial evidence." *Mazariegos v. U.S. Att'y Gen.,* 241 F.3d 1320, 1323 (11th Cir.2001). "[A] denial of asylum may be reversed *only* if the evidence presented by the applicant is so powerful that a reasonable factfinder would *have* to conclude the requisite fear of persecution exists." *Id.*

[4] To be eligible for asylum, the applicant bears the burden of proving statutory "refugee" status. *See* 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 208.13(a). That is, the alien must, with specific and credible evidence, establish (1) past persecution on account of race, religion, nationality, membership in a particular social group, or political opinion; or (2) a well-founded fear of future persecution on account of a statutorily-protected ground. *See* 8 C.F.R. § 208.13(b).

[5] [6] An alien may establish past persecution or a well-founded fear of future persecution under a theory of imputed political opinion where he shows a political opinion

AR.06232

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1008 of 1271

Scheerer v. U.S. Atty. Gen., 445 F.3d 1311 (2006)

19 Fla. L. Weekly Fed. C 433

was correctly or incorrectly attributed to him and he was persecuted because of that opinion. See 🚩 *Al Najjar,* 257 F.3d at 1289. Fear of prosecution under fairly administered laws, on the other hand, does not ordinarily entitle an alien to asylum or withholding of removal. *See, e.g.,* 📑 **\*1316** *Barreto–Claro v. U.S. Att'y Gen.,* 275 F.3d 1334, 1340 (11th Cir.2001) (citing *Janusiak v. INS,* 947 F.2d 46 (3d Cir.1991)). If, however, the alien shows the prosecution is based on a statutorily-protected ground, and if the punishment under that law is sufficiently extreme to constitute persecution, the law may provide the basis for asylum or withholding of removal even if the law is generally applicable. *See* 📑 *Chang v. INS,* 119 F.3d 1055, 1060–61 (3d Cir.1997); 📑 *Abedini v. INS,* 971 F.2d 188, 191–92 (9th Cir.1992); *Behzadpour v. United States,* 946 F.2d 1351, 1353 (8th Cir.1991).

Scheerer relies on two theories to argue the IJ erred in holding he failed to establish statutory "refugee" status. First, characterizing his report as purely scientific, historical, and factual, Scheerer contends the German government ascribed an anti-Semitic ideology to his research, thereby persecuting him under Section 130 for an imputed political opinion. Second, Scheerer argues he was persecuted under a generally-applicable law because his prosecution under Section 130 was politically motivated and resulted in disproportionately severe punishment. We reject both arguments.

**[7]** As to Scheerer's first argument, the administrative record is devoid of any evidence that the German government ascribed a political opinion to him and then punished him for that imputed belief. Rather, as the IJ held, the evidence only reflects that Scheerer was "held to account by a highly developed and sophisticated legal system, ... received due process, was convicted, and sentenced to a term well below the statutorily established maximum." Substantial evidence thus supports the IJ's conclusion that the only inference to be drawn from the record is that "[Scheerer] has been subjected to legitimate prosecution" in Germany. Scheerer has, therefore, failed to produce sufficient evidence to compel a finding that he suffered past persecution, or has a well-founded fear of future persecution, on account of an imputed political opinion.

Turning to his second argument, substantial evidence supports the IJ's conclusion that Scheerer cannot establish past persecution, or a well-founded fear of future persecution, under a generally-applicable law. We need not address whether Scheerer's prosecution under Section 130 was

politically motivated because he failed to establish his sentence to 14 months' imprisonment was, as he argues, "extreme and disproportionate" punishment rising to the level of persecution. Scheerer offers no substantive argument on this point, relying on conclusory speculation from the lawyer who defended him in his German prosecution that "the sentence appears to be inappropriately high." The record simply does not support this assertion. As the IJ emphasized, Scheerer's sentence was well below the statutory maximum of 5 years' imprisonment and others convicted of the same crime have received significantly harsher sentences.[6] We thus agree with the IJ that "[t]he totality of the record does not reveal any substantial basis for finding [Scheerer's] 14–month sentence to be disproportionate, and either especially unconscionable or merely a pretext."[7] As a result, Scheerer has failed to carry his burden of establishing **\*1317** past persecution, or a well-founded fear of future persecution, due to his prosecution under a generally-applicable German law.

On this record, substantial evidence supports the IJ's conclusions that Scheerer was unable to establish past persecution, or a well-founded fear of future persecution, either on account of an imputed political opinion or under a generally-applicable law. We accordingly affirm the denial of Scheerer's claim for asylum and withholding of removal.[8]

**B.** *Frivolous Asylum Application*

Scheerer next argues the IJ erred in finding his asylum application was frivolous. He asserts, more specifically, the finding lacks support for two reasons. First, Scheerer argues the IJ based the frivolousness finding on a determination that he was not credible, without concluding a material element of his asylum application was deliberately fabricated. Second, he contends he was not afforded an opportunity to account for any discrepancies or implausible aspects of his claim.

**[8]** "We review *de novo* the statutory interpretation finding by the [BIA] that [an applicant] filed a frivolous asylum application under 📑 Section 1158(d)(6)." 📑 *Barreto–Claro,* 275 F.3d at 1338. "This plenary review is, however, tempered with deference to the [BIA's interpretation]," if reasonable. *Id.*

If an alien knowingly files a frivolous application for asylum having received notice of the consequences of filing such a frivolous application, the alien is permanently ineligible to receive immigration benefits. 📑 8 U.S.C. § 1158(d)(4)(A), (d)(6). Under 📑 8 C.F.R. § 208.20:

Scheerer v. U.S. Atty. Gen., 445 F.3d 1311 (2006)

19 Fla. L. Weekly Fed. C 433

[A]n asylum application is frivolous if any of its material elements is deliberately fabricated. Such finding shall only be made if the immigration judge or [BIA] is satisfied that the applicant, during the course of the proceedings, has had sufficient opportunity to account for any discrepancies or implausible aspects of the claim.

**[9]** Because the consequences of a finding of frivolousness are so severe, 8 C.F.R. § 208.20 delineates a specific framework the IJ must follow before making such a finding. The IJ must first find material aspects of the alien's asylum application were demonstrably false and such fabrications were knowingly and deliberately made. *Id.; see also* Barreto–Claro, 275 F.3d at 1339. The alien must then be given ample opportunity during his hearing to address and account for any deliberate, material fabrications upon which the IJ may base a finding of frivolousness. *Id.* Under 8 C.F.R. § 208.20, therefore, a finding of frivolousness cannot stand without a specific finding in the first instance that the applicant deliberately fabricated material portions of his asylum application. *Id.*

**[10]** We have never addressed, however, whether a finding of frivolousness under 8 C.F.R. § 208.20 flows directly from an adverse credibility determination. In *Muhanna v. Gonzales*, on the other hand, the Third Circuit held an adverse credibility determination alone cannot support a finding of frivolousness; rather, the IJ must make specific findings as to which material elements of the asylum application were deliberately falsified, as required by 8 C.F.R. § 208.20. 399 F.3d 582, 588–89 (3d Cir.2005). Noting the IJ primarily based the finding of frivolousness on her opinion that the alien was "someone who is not honest at all," the Third Circuit held:

**\*1318** [U]nder 8 C.F.R. § 208.20 a finding of frivolousness

does not flow automatically from an adverse credibility determination .... Inconsistencies between testimony and an asylum application, while certainly relevant to a credibility determination that may result in the denial of an applicant's asylum claim, do not equate to a frivolousness finding under Section 1158(d)(6), which carries with it much greater consequences. It is because of those severe consequences that the regulation requires more: a finding of deliberate fabrication of a "material element" of an application, plus an opportunity for the alien to account for inconsistencies.

*Id.* [9]

We agree with the Third Circuit that because 8 C.F.R. § 208.20 mandates the IJ specifically find material elements of an asylum application were deliberately fabricated, an adverse credibility determination alone cannot support a finding of frivolousness. As in *Muhanna,* the IJ in this case did not support the finding of frivolousness by reference to any specific material falsehoods in Scheerer's asylum application. Instead, the finding was primarily based on Scheerer's untenable defense to his prosecution in Germany, the legal insufficiency of his asylum claim, and the IJ's conclusion that Scheerer "is not above falsehood." [10] The IJ thus considered the legal insufficiency of Scheerer's claim and an adverse credibility determination to be coextensive with a finding of frivolousness without examining what specific, material aspects of Scheerer's application were knowingly false. These findings were insufficient to support a finding of frivolousness. The IJ, therefore, erred in concluding Scheerer's application for asylum was frivolous and we accordingly vacate that part of the BIA's November 8, 2004, decision affirming that finding.

**C.** *Validity of* 8 C.F.R. § 1245.1(c)(8)

Finally, Scheerer contends the regulatory bar prohibiting him from applying for an adjustment of status, 8 C.F.R. § 1245.1(c)(8), is invalid because it conflicts with

congressional intent as expressed in the governing statute, 8 U.S.C. § 1255(a). For the reasons set forth below, we agree. [11]

 [11]    We review questions of statutory interpretation and other issues of law *de novo. See* United States v. Trainor, 376 F.3d 1325, 1330 (11th Cir.2004). When reviewing an agency's interpretation of a statute it administers, however, we apply the two-step test articulated in Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). *See also* Lewis v. Barnhart, 285 F.3d 1329, 1333 (11th Cir.2002). First, we must determine "whether Congress has directly spoken to the precise question at issue." Chevron, 467 U.S. at 842, 104 S.Ct. at 2781. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the **\*1319** agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842–43, 104 S.Ct. at 2781. If Congress has not directly addressed the matter, or if the statute is ambiguous with respect to the matter, we move to *Chevron*'s second step to decide "whether the agency's [regulation] is based on a permissible construction of the statute." Id. at 843, 104 S.Ct. at 2782.

 [12]    [13]    Where Congress has not merely failed to address a precise question, but has given an "express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," the agency's "legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Id. at 843–44, 104 S.Ct. at 2778. Indeed, "judicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.' " INS v. Aguirre–Aguirre, 526 U.S. 415, 425, 119 S.Ct. 1439, 1445, 143 L.Ed.2d 590 (1999) (quoting INS v. Abudu, 485 U.S. 94, 110, 108 S.Ct. 904, 915, 99 L.Ed.2d 90 (1988)).

To assess the validity of 8 C.F.R. § 1245.1(c)(8), we begin with the statute it implements, 8 U.S.C. § 1255. [12] Under that provision:

> The status of an alien who was inspected and admitted or paroled into the United States ... may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

8 U.S.C. § 1255(a). In addition to this general adjustment provision, the statute renders several categories of aliens ineligible for such relief. Pursuant to 8 U.S.C. § 1255(c), alien crewmen, aliens who accept unauthorized employment or are in unlawful immigration status, aliens deportable for engaging in terrorist activities, and certain aliens with visa defects or other problems with their immigration status cannot avail themselves of an adjustment of status under subsection (a).

The regulation at issue, 8 C.F.R. § 1245.1(c)(8), operates within this statutory framework to bar another category of aliens from applying for adjustment of status, providing:

> The following categories of aliens are ineligible to apply for adjustment of status to that of a lawful permanent resident alien under [ 8 U.S.C. § 1255]
>
> ....
>
> Any arriving alien who is in removal proceedings pursuant to [ 8 U.S.C. §§ 1225(b)(1) or 1229a].

8 C.F.R. § 1245.1(c)(8). [13] Our task is thus to determine whether, under *Chevron*'s **\*1320** two-step analysis, this regulation accords with congressional intent as manifested in the governing statute, 8 U.S.C. § 1255.

We are not the first circuit court to consider this question. One circuit has upheld 8 C.F.R. § 1245.1(c)(8), while three circuits have invalidated it. In *Mouelle v. Gonzales,* the Eighth Circuit held 8 C.F.R. § 1245.1(c)(8) is valid as a reasonable exercise of the Attorney General's rule-based discretion under § 1255. 416 F.3d 923, 930 (8th Cir.2005). The court first opined that because § 1255 gives the Attorney General discretionary authority to grant or deny relief on the merits, he could, consistent with that authority, promulgate a functionally-indistinguishable regulation rendering a particular class of aliens ineligible

Scheerer v. U.S. Atty. Gen., 445 F.3d 1311 (2006)

19 Fla. L. Weekly Fed. C 433

to apply for relief in the first instance. 🚩 *Id.* at 928–30. Thus, under *Chevron* 's first step, the court determined 📄 § 1255 is ambiguous regarding the Attorney General's authority to make eligibility determinations. 🚩 *Id.* at 929–30. Under *Chevron* 's second step, the court held the regulation is a permissible construction of the governing statute because the Attorney General's justification for the regulation was reasonable, and the regulation accords with Congress's intent under IIRIRA to expedite the removal of arriving aliens. *Id.* Accordingly, the Eighth Circuit upheld 🚩 8 C.F.R. § 1245.1(c)(8).

The First, Third, and Ninth Circuits, however, have invalidated the regulation. The First and Ninth Circuits resolved the question under *Chevron*'s first step, noting while 📄 § 1255 gives the Attorney General discretionary authority to grant relief on the merits, Congress carefully and unambiguously defined by statute the categories of aliens eligible to apply, in the first instance, for adjustment of status. 📄 *Succar v. Ashcroft,* 394 F.3d 8, 29 (1st Cir.2005); *accord* 📄 *Bona v. Gonzales,* 425 F.3d 663, 668–70 (9th Cir.2005). Both circuits opine that when Congress intended to limit those categories of aliens eligible to apply for relief, it specifically and explicitly did so in 📄 § 1255(c), even providing for exceptions to those exclusions in 📄 § 1255(i). *See* 📄 *Succar,* 394 F.3d at 25–26; 📄 *Bona,* 425 F.3d at 669. The First and Ninth Circuits reason because 🚩 8 C.F.R. § 1245.1(c)(8) is an eligibility restriction which "redefines certain aliens as ineligible to apply for adjustment of status ... whom a statute," 📄 8 U.S.C. § 1255(a), defines as eligible to apply[,]" the regulation is invalid as contrary to Congress's clearly expressed intent. 📄 *Succar,* 394 F.3d at 9; *accord* 📄 *Bona,* 425 F.3d at 670.

The Third Circuit joined the First and Ninth Circuits in invalidating 🚩 8 C.F.R. § 1245.1(c)(8), albeit under different reasoning. 📄 *Zheng v. Gonzales,* 422 F.3d 98 (3d Cir.2005). The Third Circuit held, under *Chevron*'s first step, that 📄 § 1255's detailed eligibility standards do not indicate a clear congressional intent to preempt the field from further regulation. 📄 *Id.* at 116. Under *Chevron*'s second step, however, the Third Circuit held 🚩 8 C.F.R. § 1245.1(c)(8) is

not based on a permissible construction of the statute because it is inconsistent with the eligibility standards set forth in 📄 § 1255. 🚩 *Id.* at 119–20.

**[14]** We join in holding 🚩 8 C.F.R. § 1245.1(c)(8) is invalid and follow the Third Circuit's analysis as articulated in the detailed and comprehensive opinion written by Judge Becker on behalf of the panel. As to the first step of the *Chevron* analysis, Scheerer urges us to hold 📄 § 1255's detailed eligibility standards indicate a clear congressional intent to preempt the field from further regulation. *1321 The Supreme Court, however, rejected this line of reasoning in 📄 *Lopez v. Davis,* 531 U.S. 230, 243–44, 121 S.Ct. 714, 723–24, 148 L.Ed.2d 635 (2001), and we decline to follow it here.[14] *See also* 📄 *Mourning v. Family Publ'ns Serv., Inc.,* 411 U.S. 356, 372, 93 S.Ct. 1652, 1662, 36 L.Ed.2d 318 (1973) (explaining statutory disclosure requirements for some transactions does not preclude agency from imposing similar requirements on other transactions). Because precedent establishes that statutory eligibility standards alone do not reflect a clear congressional intent to preempt further agency regulation, we find, under the first step of the *Chevron* analysis, 📄 § 1255 is at best ambiguous as to whether the Attorney General may regulate eligibility to apply for adjustment of status.

Turning to the second step of the *Chevron* analysis, we must determine whether 🚩 8 C.F.R. § 1245.1(c)(8) is "based on a permissible construction of the statute." 📄 *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782. We begin with the governing statute, 📄 § 1255, which grants eligibility to adjust status to any alien "who was inspected and admitted *or paroled* into the United States." 📄 8 U.S.C. § 1255(a) (emphasis added). Paroled aliens, deemed "arriving aliens" under 🚩 8 C.F.R. § 1.1(q), are not admitted to the United States; rather, they are treated as "applicants for admission." 📄 8 U.S.C. § 1182(d)(5)(A); *see also* 📄 §§ 1101(a)(13)(B), 🚩 1225(a)(1). Applicants for admission, in turn, "shall be detained for a [removal] proceeding" if an immigration officer determines they are "not clearly and beyond a doubt entitled to be admitted." *Id.* § 1225(b)(2)(A). The statute thus defines parolees as arriving aliens—i.e., applicants for admission, who are placed in removal proceedings unless they are "*clearly and beyond a doubt* entitled to be admitted." *Id.* (emphasis added). Given

the demanding standard for admission, paroled aliens are arriving aliens, nearly all of whom are placed in removal proceedings. [15] It is clear from the statutory text, therefore, that Congress intended for virtually all parolees to be in removal proceedings. *See* Zheng, 422 F.3d at 117.

Section 1255, however, indicates that despite being placed in removal proceedings, parolees are, as a general class, eligible to apply for an adjustment of status. The statute explicitly states "[t]he status of an alien who was inspected and admitted *or paroled* into the United States ... may be adjusted by the Attorney General ... if (1) **\*1322** the alien makes an application for such an adjustment." 8 U.S.C. § 1255(a) (emphasis added). By its language, then, § 1255 plainly contemplates that paroled aliens may apply for adjustment of status, though the Attorney General need not grant it. The vast majority of aliens paroled into the United States will, however, be in removal proceedings by virtue of the statutory scheme. We thus conclude that by allowing parolees, as a class, to apply for adjustment of status in § 1255, Congress did not intend the mere fact of removal proceedings would render an alien ineligible to apply for adjustment of status. *See* Zheng, 422 F.3d at 118; *see also* Succar, 394 F.3d at 25 ("Congress chose not to disqualify from eligibility all of those aliens 'inspected and admitted or paroled' in removal or other judicial proceedings."). In sum, the governing statute places parolees in removal proceedings but also renders them eligible, as a general rule, to apply for adjustment of status.

Turning to the regulation, 8 C.F.R. § 1245.1(c)(8) excludes "[a]ny arriving alien in removal proceedings" from applying for adjustment of status. Thus, whereas the statute, § 1255, contemplates that parolees—arriving aliens, virtually all of whom are placed in removal proceedings—should be eligible to apply for an adjustment of status, the regulation, 8 C.F.R. § 1245.1(c)(8), excludes the same class from eligibility. *See* Zheng, 422 F.3d at 118–20. Given this intractable conflict between the statute and the regulation, we hold 8 C.F.R. § 1245.1(c)(8) is not based on a permissible

construction of 8 U.S.C. § 1255, and invalidate the regulation accordingly. We agree with the Third Circuit that, "[w]hile the statute may be ambiguous enough to allow for some regulatory eligibility standards, it does not so totally abdicate authority to the Attorney General as to allow a regulation, like [8 C.F.R.] § 1245.1(c)(8), that essentially reverses the eligibility structure set out by Congress." Zheng, 422 F.3d at 120.

In sum we cannot say, in light of *Lopez*, § 1255's detailed eligibility standards evince a clear congressional intent to preempt the Attorney General from further regulating in the area. Under the first step of the *Chevron* analysis, § 1255 is, therefore, at best ambiguous as to whether the Attorney General may regulate eligibility to apply for adjustment of status. Turning to the second step of the *Chevron* analysis, it is apparent from the statutory scheme that Congress intended to allow most paroled aliens to apply for an adjustment of status; the regulation, however, bars almost all such aliens from eligibility. Thus, the regulation is not based on a permissible construction of the governing statute.

Because we hold 8 C.F.R. § 1245.1(c)(8) is invalid, we reverse the BIA's March 3, 2005, decision relying on the regulation to deny Scheerer's motion to reopen his proceedings, and remand the case to the BIA for proceedings consistent with this opinion.

III. CONCLUSION

For the foregoing reasons, we affirm the denial of Scheerer's asylum application, vacate the determination that his asylum application was frivolous, reverse the BIA's denial of his motion to reopen his proceedings, and remand the case for further proceedings consistent with this opinion.

PETITIONS DENIED IN PART, AND GRANTED IN PART.

All Citations

445 F.3d 1311, 19 Fla. L. Weekly Fed. C 433

Scheerer v. U.S. Atty. Gen., 445 F.3d 1311 (2006)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1013 of 1271

19 Fla. L. Weekly Fed. C 433

# Footnotes

\*     Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

1     Because Scheerer's removal and asylum proceedings commenced after April 1, 1997, the permanent provisions of IIRIRA govern his petitions for review.

2     Section 130, captioned "Volksverhetzung" (Incitement of the Masses), criminalizes, in relevant part, publicly approving of, denying, or otherwise trivializing an act committed under the rule of National Socialism in a manner capable of disturbing the public order. StGB art. 130, §§ 3–5.

3     As Scheerer renewed his asylum application in these removal proceedings, his application was deemed to state claims for both asylum and withholding of removal. *See* 8 C.F.R. § 208.3(b) ("An asylum application shall be deemed to constitute at the same time an application for withholding of removal ....").

4     The BIA first entered an order affirming the IJ's decision on September 17, 2004. To correct a defect in the service of that decision, however, the BIA vacated that order, reinstated the proceedings, and reissued its affirmance on November 8, 2004.

5     *See Weng v. U.S. Att'y Gen.,* 287 F.3d 1335, 1337 (11th Cir.2002) (stating, under the permanent provisions of IIRIRA, "even if a petition for review is filed, IIRIRA permits the [DHS] to remove aliens immediately following a BIA decision, and allows aliens to continue their appeals from abroad"); *see also* 8 U.S.C. § 1252(b)(3)(B) (replacing 8 U.S.C. § 1105a(c)).

6     Specifically, the IJ referred to the cases of Günter Deckert and Otto Remer, who were sentenced to 24 months' and 20 months' imprisonment, respectively, for the same crime.

7     In holding Scheerer's punishment is not persecutory, we do not mean to suggest a sentence of 14 months' imprisonment can never constitute persecution. We merely hold that, on this particular record, Scheerer's sentence was not, as he contends, "extreme and disproportionate" punishment rising to the level of persecution.

8     Because he has failed to demonstrate he is eligible for asylum, Scheerer has necessarily failed to meet the higher burden of proof required for withholding of removal. *See Al Najjar,* 257 F.3d at 1292–93, 1303.

9     The Seventh Circuit reached the same conclusion in *Lin v. Gonzales,* 140 Fed.Appx. 621, 623–24 (7th Cir.2005). As an unpublished opinion, however, *Lin* lacks precedential authority and is not binding on the Seventh Circuit. *See* 7th Cir. R. 53; *Nazarova v. INS,* 171 F.3d 478, 485 (7th Cir.1999).

10    The IJ found Scheerer was not credible because he admitted to using the pen name "Ernst Gauss," and referred to Otto Remer (who, like Scheerer, was convicted for inciting racial hatred through his public questioning of the Holocaust) as a "friend" and "another German." *See Otto Remer, 84, Nazi Officer; Helped Foil Anti–Hitler Plot,* N.Y. Times, October 9, 1997, at D22.

11    After carefully considering the other arguments raised with respect to this issue, we conclude they are without merit and do not discuss them.

12    In response to early criticism of the regulation, the Attorney General referenced the statute it implements. "[I]t is noted," the Attorney General stated, "that [ 8 U.S.C. § 1255] clearly and unambiguously states that adjustment of status is a discretionary decision, subject to such regulatory limitations as the Attorney General may prescribe." 62 Fed.Reg. 10312, 10326–27 (1997).

13    8 C.F.R. § 1245.1(c)(8) is identical to 8 C.F.R. § 245.1(c)(8). Section 1245.1(c)(8) applies to the Executive Office for Immigration Review in the Department of Justice, while § 245.1(c)(8) applies to the immigration agencies in the DHS. As part of the Homeland Security Act of 2002, Pub.L. No. 107–296, 116 Stat. 2125 (2002), which abolished the INS and transferred its functions to the DHS, the regulations were duplicated from Chapter I, renumbered in the 1000 series, and placed in Chapter V of Title 8. While we cite to the Chapter V regulations, the same regulations can be found in Chapter I.

**Scheerer v. U.S. Atty. Gen., 445 F.3d 1311 (2006)**
Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1014 of 1271

19 Fla. L. Weekly Fed. C 433

14    *Lopez* involved 18 U.S.C. § 3621(e)(2)(B), which gives the Bureau of Prisons (BOP) discretionary authority to grant an early release to prisoners convicted of nonviolent offenses who successfully complete a substance abuse treatment program. Prisoners convicted of a violent offense are not eligible for such relief. *Id.* Pursuant to its authority under § 3621(e)(2)(B), the BOP issued a regulation, 28 C.F.R. § 550.58(a)(1)(vi)(B), denying early release to prisoners who commit a felony involving a firearm. Lopez argued the regulation was invalid because "by identifying a class of inmates ineligible for sentence reductions under § 3621(e)(2)(B), ... Congress has barred the Bureau from identifying further categories of ineligible inmates." *Lopez,* 531 U.S. at 239, 121 S.Ct. at 721. The Supreme Court rejected the argument that the statutory eligibility standards preempted further regulation. *See id.* at 240–41, 121 S.Ct. at 721–22. Additionally, the Court validated the regulation under *Chevron*'s two-step analysis, holding the statute did not answer "the precise question at issue," and the regulation was based on a reasonable interpretation of the statute. *Id.* at 241–45, 121 S.Ct. at 722–24.

15    Indeed, in *Succar* "it was represented in the briefs before [the First Circuit] that the 'majority of the intended beneficiaries of parolee adjustment of status are in removal proceedings.' The Attorney General [did] not dispute this statement." *Succar,* 394 F.3d at 21. As the Third Circuit observed, however, "[m]ore compelling than any statistic ... is the statutory structure that indicates that parolees will, by default, be in removal proceedings." *Zheng,* 422 F.3d at 117.

---

**End of Document**                © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI   Document 58-5   Filed 11/10/20   Page 1015 of 1271

Sessions v. Dimaya, 138 S.Ct. 1204 (2018)

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Hendrickson v. Kizziah, 6th Cir.(Ky.), December 27, 2019

138 S.Ct. 1204
Supreme Court of the United States

Jefferson B. SESSIONS, III,
Attorney General, Petitioner
v.
James Garcia DIMAYA.

No. 15–1498.
|
Argued Jan. 17, 2017.
|
Reargued Oct. 2, 2017.
|
Decided April 17, 2018.

**Synopsis**
**Background:** Native of the Philippines filed petition for review of Board of Immigration Appeals' (BIA) determination that his California convictions for first-degree burglary were categorically "crimes of violence" rendering him removable for having been convicted of aggravated felony. The United States Court of Appeals for the Ninth Circuit, Reinhardt, Circuit Judge, 803 F.3d 1110, granted petition. Certiorari was granted.

**[Holding:]** The Supreme Court, Justice Kagan, held that residual clause of the federal criminal code's definition of "crime of violence," as incorporated into the Immigration and Nationality Act's (INA) definition of aggravated felony, was impermissibly vague in violation of due process, abrogating United States v. Gonzalez-Longoria, 831 F.3d 670.

Affirmed.

Justice Gorsuch filed opinion concurring in part and concurring in judgment.

Chief Justice Roberts filed dissenting opinion in which Justices Kennedy, Thomas, and Alito joined.

Justice Thomas filed dissenting opinion in which Justices Kennedy and Alito joined in part.

**Procedural Posture(s):** Petition for Writ of Certiorari; On Appeal; Review of Administrative Decision.

West Headnotes (12)

**[1]** **Aliens, Immigration, and Citizenship** ⬥ Crimes of violence

To decide whether a person's conviction falls within the ambit of the residual clause of the federal criminal code's definition of "crime of violence," as incorporated into the Immigration and Nationality Act's (INA) definition of "aggravated felony," courts use a distinctive form of what is called the categorical approach.

🚩 8 U.S.C.A. § 1101(a)(43)(F); 🚩 18 U.S.C.A. § 16(b)

44 Cases that cite this headnote

**[2]** **Aliens, Immigration, and Citizenship** ⬥ Crimes of violence

In determining whether a person's conviction falls within the ambit of the residual clause of the federal criminal code's definition of "crime of violence," as incorporated into the Immigration and Nationality Act's (INA) definition of "aggravated felony," the question is not whether the particular facts underlying a conviction posed the substantial risk that the federal criminal code's definition demands, and neither is the question whether the statutory elements of a crime require or entail the creation of such a risk in each case that the crime covers; the inquiry instead turns on the nature of the offense generally speaking. 🚩 8 U.S.C.A. § 1101(a)(43)(F); 🚩 18 U.S.C.A. § 16(b).

28 Cases that cite this headnote

**[3]** **Aliens, Immigration, and Citizenship** ⬥ Crimes of violence

In determining whether a person's conviction falls within the ambit of the residual clause of

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1016 of 1271

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

the federal criminal code's definition of "crime of violence," as incorporated into the Immigration and Nationality Act's (INA) definition of "aggravated felony," the federal criminal code requires a court to ask whether the ordinary case of an offense poses the requisite risk. 🚩 8 U.S.C.A. § 1101(a)(43)(F); 🚩 18 U.S.C.A. § 16(b).

66 Cases that cite this headnote

**[4]    Aliens, Immigration, and Citizenship**    🔑    Crimes of violence

The analysis used to determine whether a person's conviction falls within the ambit of the residual clause of the federal criminal code's definition of "crime of violence," as incorporated into the Immigration and Nationality Act's (INA) definition of "aggravated felony," differs from the form of categorical approach used to determine whether a prior conviction is for a particular listed offense, say, murder or arson; in that context, courts ask what the elements of a given crime always require, in effect asking what is legally necessary for a conviction. 🚩 8 U.S.C.A. § 1101(a)(43)(F); 🚩 18 U.S.C.A. § 16(b).

31 Cases that cite this headnote

**[5]    Constitutional Law**    🔑    Vagueness

The prohibition of vagueness in criminal statutes is an essential of due process, required by both ordinary notions of fair play and the settled rules of law. (Per Justice Kagan with three justices concurring and one justice concurring in the result.) U.S.C.A. Const.Amend. 5.

17 Cases that cite this headnote

**[6]    Constitutional Law**    🔑    Criminal Law
**Constitutional Law**    🔑    Encroachment on legislature
**Constitutional Law**    🔑    Certainty and definiteness; vagueness

The void-for-vagueness doctrine guarantees that ordinary people have fair notice of the conduct a statute proscribes, and the doctrine guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges; in that sense, the doctrine is a corollary of the separation of powers, requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not. (Per Justice Kagan with three justices concurring and one justice concurring in the result.) U.S.C.A. Const.Amend. 5; U.S.C.A. Const. Art. 3, § 1 et seq.

43 Cases that cite this headnote

**[7]    Constitutional Law**    🔑    Certainty and definiteness; vagueness

The degree of vagueness that the Constitution's Due Process Clause allows depends in part on the nature of the enactment. (Per Justice Kagan with three justices concurring and one justice concurring in the result.) U.S.C.A. Const.Amend. 5.

6 Cases that cite this headnote

**[8]    Aliens, Immigration, and Citizenship**    🔑    Civil proceedings in general

The removal of an alien is a civil matter. (Per Justice Kagan with three justices concurring and one justice concurring in the result.)

6 Cases that cite this headnote

**[9]    Constitutional Law**    🔑    Aliens, immigration, and citizenship

The most exacting vagueness standard should apply in removal of alien cases. (Per Justice Kagan with three justices concurring and one justice concurring in the result.) U.S.C.A. Const.Amend. 5.

6 Cases that cite this headnote

Sessions v. Dimaya, 138 S.Ct. 1204 (2018)

Case 3:20-cv-07721-SI   Document 58-5   Filed 11/10/20   Page 1017 of 1271

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

**[10]** **Aliens, Immigration, and Citizenship** 🔑 Crimes of violence

**Constitutional Law** 🔑 Admission and exclusion; deportation

Residual clause of the federal criminal code's definition of "crime of violence," as incorporated into the Immigration and Nationality Act's (INA) definition of "aggravated felony," was impermissibly vague in violation of due process; residual clause called for court to identify crime's ordinary case in order to measure crime's risk and to apply the substantial risk standard to that judge-imagined abstraction of the ordinary case; abrogating 🚩 *United States v. Gonzalez-Longoria,* 831 F.3d 670. U.S.C.A. Const.Amend. 5; 🚩 8 U.S.C.A. § 1101(a)(43)(F); 🚩 18 U.S.C.A. § 16(b).

607 Cases that cite this headnote

**[11]** **Aliens, Immigration, and Citizenship** 🔑 Crimes of violence

A court applying the residual clause of the federal criminal code's definition of "crime of violence," as incorporated into the Immigration and Nationality Act's (INA) definition of "aggravated felony," gets to consider everything that is likely to take place for as long as a crime is being committed. 🚩 8 U.S.C.A. § 1101(a)(43)(F); 🚩 18 U.S.C.A. § 16(b).

225 Cases that cite this headnote

**[12]** **Aliens, Immigration, and Citizenship** 🔑 Crimes of violence

In interpreting statutes like the residual clause of the federal criminal code's definition of "crime of violence," as incorporated into the Immigration and Nationality Act's (INA) definition of "aggravated felony," "physical force" means force capable of causing physical pain or injury. 🚩 8 U.S.C.A. § 1101(a)(43)(F); 🚩 18 U.S.C.A. § 16(b).

168 Cases that cite this headnote

**West Codenotes**

**Held Unconstitutional**

🚩 18 U.S.C.A. § 16(b)

**Recognized as Unconstitutional**

🚩 18 U.S.C.A. § 924(e)(2)(B)

**\*1207** *Syllabus* [*]

The Immigration and Nationality Act (INA) virtually guarantees that any alien convicted of an "aggravated felony" after entering the United States will be deported. See 🟡 8 U.S.C. §§ 1227(a)(2)(A)(iii), 🟡 1229b(a)(3), 🟡 (b)(1)(C). An aggravated felony includes "a crime of violence (as defined in [🚩 18 U.S.C. § 16] ...) for which the term of imprisonment [is] at least one year." 🚩 § 1101(a)(43)(f). 🚩 Section 16's definition of a crime of violence is divided into two clauses—often referred to as the elements clause, 🚩 § 16(a), and the residual clause, 🚩 § 16(b). The residual clause, the provision at issue here, defines a "crime of violence" as "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." To decide whether a person's conviction falls within the scope of that clause, courts apply the categorical approach. This approach has courts ask not whether "the particular facts" underlying a conviction created a substantial risk, 🟡 *Leocal v. Ashcroft,* 543 U.S. 1, 7, 125 S.Ct. 377, 160 L.Ed.2d 271, nor whether the statutory elements of a crime require the creation of such a risk in each and every case, but whether "the ordinary case" of an offense poses the requisite risk, 🚩 *James v. United States,* 550 U.S. 192, 208, 127 S.Ct. 1586, 167 L.Ed.2d 532.

Respondent James Dimaya is a lawful permanent resident of the United States with two convictions for first-degree burglary under California law. After his second offense, the Government sought to deport him as an aggravated felon. An Immigration Judge and the Board of Immigration Appeals

Case 3:20-cv-07721-SI     Document 58-5     Filed 11/10/20     Page 1018 of 1271

Sessions v. Dimaya, 138 S.Ct. 1204 (2018)
200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

held that California first-degree burglary is a "crime of violence" under 🚩 § 16(b). While Dimaya's appeal was pending in the Ninth Circuit, this Court held that a similar residual clause in the Armed Career Criminal Act (ACCA)—defining "violent felony" as any felony that "otherwise involves conduct that presents a serious potential risk of physical injury to another," 🚩 18 U.S.C. § 924(e)(2)(B)—was unconstitutionally "void for vagueness" under the Fifth Amendment's Due Process Clause. 🚩 *Johnson v. United States,* 576 U.S. ——, 135 S.Ct. 2551, 2561–2563, 192 L.Ed.2d 569. Relying on *Johnson,* the Ninth Circuit held that 🚩 § 16(b), as incorporated into the INA, was also unconstitutionally vague.

*Held* : The judgment is affirmed.

🚩 803 F.3d 1110, affirmed.

Justice KAGAN delivered the opinion of the Court with respect to Parts I, III, IV–B, and V, concluding that 🚩 § 16's residual clause is unconstitutionally vague. Pp. 1213 – 1216, 1218 – 1223.

(a) A straightforward application of *Johnson* effectively resolves this case. 🚩 Section 16(b) has the same two features as ACCA's residual clause—an ordinary-case requirement and an ill-defined risk threshold—combined in the same constitutionally problematic way. To begin, ACCA's residual clause created "grave uncertainty about how to estimate the risk posed by a crime" because it "tie[d] the judicial assessment **\*1208** of risk" to a speculative hypothesis about the crime's "ordinary case," but provided no guidance on how to figure out what that ordinary case was. 🚩 576 U.S., at ——, 135 S.Ct., at 2557. Compounding that uncertainty, ACCA's residual clause layered an imprecise "serious potential risk" standard on top of the requisite "ordinary case" inquiry. The combination of "indeterminacy about how to measure the risk posed by a crime [and] indeterminacy about how much risk it takes for the crime to qualify as a violent felony," 🚩 *id.,* at ——,135 S.Ct., at 2558, resulted in "more unpredictability and arbitrariness than the Due Process Clause tolerates," 🚩 *id.,* at ——,135 S.Ct., at 2558. 🚩 Section 16(b) suffers from those same two flaws. Like ACCA's residual clause, 🚩 § 16(b) calls for a court to

identify a crime's "ordinary case" in order to measure the crime's risk but "offers no reliable way" to discern what the ordinary version of any offense looks like. 🚩 *Id.,* at ——, 135 S.Ct., at 2558. And its "substantial risk" threshold is no more determinate than ACCA's "serious potential risk" standard. Thus, the same "[t]wo features" that "conspire[d] to make" ACCA's residual clause unconstitutionally vague also exist in 🚩 § 16(b), with the same result. 🚩 *Id.,* at ——,135 S.Ct., at 2557. Pp. 1213 – 1216.

(b) The Government identifies three textual discrepancies between ACCA's residual clause and 🚩 § 16(b) that it claims make 🚩 § 16(b) easier to apply and thus cure the constitutional infirmity. None, however, relates to the pair of features that *Johnson* found to produce impermissible vagueness or otherwise makes the statutory inquiry more determinate. Pp. 1218 – 1223.

(1) First, the Government argues that 🚩 § 16(b)'s express requirement (absent from ACCA) that the risk arise from acts taken "in the course of committing the offense," serves as a "temporal restriction"—in other words, a court applying 🚩 § 16(b) may not "consider risks arising *after* " the offense's commission is over. Brief for Petitioner 31. But this is not a meaningful limitation: In the ordinary case of any offense, the riskiness of a crime arises from events occurring during its commission, not events occurring later. So with or without the temporal language, a court applying the ordinary case approach, whether in 🚩 § 16's or ACCA's residual clause, would do the same thing—ask what usually happens when a crime is committed. The phrase "in the course of" makes no difference as to either outcome or clarity and cannot cure the statutory indeterminacy *Johnson* described.

Second, the Government says that the 🚩 § 16(b) inquiry, which focuses on the risk of "physical force," "trains solely" on the conduct typically involved in a crime. Brief for Petitioner 36. In contrast, ACCA's residual clause asked about the risk of "physical injury," requiring a second inquiry into a speculative "chain of causation that could possibly result in a victim's injury." *Ibid.* However, this Court has made clear that "physical force" means "force capable of causing physical pain or injury." 🚩 *Johnson v. United States,* 559 U.S. 133, 140, 130 S.Ct. 1265, 176 L.Ed.2d 1. So under 🚩 § 16(b) too, a court must not only identify the conduct typically involved

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

in a crime, but also gauge its potential consequences. Thus, the force/injury distinction does not clarify a court's analysis of whether a crime qualifies as violent.

Third, the Government notes that § 16(b) avoids the vagueness of ACCA's residual clause because it is not preceded by a "confusing list of exemplar crimes." Brief for Petitioner 38. Those enumerated crimes were in fact too varied to assist this Court in giving ACCA's residual clause meaning. But to say that they failed to resolve the clause's vagueness is hardly to **\*1209** say they caused the problem. Pp. 1218 – 1223.

(2) The Government also relies on judicial experience with § 16(b), arguing that because it has divided lower courts less often and resulted in only one certiorari grant, it must be clearer than its ACCA counterpart. But in fact, a host of issues respecting § 16(b)'s application to specific crimes divide the federal appellate courts. And while this Court has only heard oral arguments in two § 16(b) cases, this Court vacated the judgments in a number of other § 16(b) cases, remanding them for further consideration in light of ACCA decisions. Pp. 1221 – 1223.

Justice KAGAN, joined by Justice GINSBURG, Justice BREYER, and Justice SOTOMAYOR, concluded in Parts II and IV–A:

(a) The Government argues that a more permissive form of the void-for-vagueness doctrine applies than the one *Johnson* employed because the removal of an alien is a civil matter rather than a criminal case. This Court's precedent forecloses that argument. In *Jordan v. De George,* 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886, the Court considered what vagueness standard applied in removal cases and concluded that, "in view of the grave nature of deportation," the most exacting vagueness standard must apply. *Id.,* at 231, 71 S.Ct. 703. Nothing in the ensuing years calls that reasoning into question. This Court has reiterated that deportation is "a particularly severe penalty," which may be of greater concern to a convicted alien than "any potential jail sentence." *Jae Lee v. United States,* 582 U.S. ——, ——, 137 S.Ct. 1958, 1968, 198 L.Ed.2d 476. Pp. 1212 – 1213.

(b) Section 16(b) demands a categorical, ordinary-case approach. For reasons expressed in *Johnson,* that approach cannot be abandoned in favor of a conduct-based approach, which asks about the specific way in which a defendant committed a crime. To begin, the Government once again "has not asked [the Court] to abandon the categorical approach in residual-clause cases," suggesting the fact-based approach is an untenable interpretation of § 16(b). 576 U.S., at ——, 135 S.Ct., at 2561. Moreover, a fact-based approach would generate constitutional questions. In any event, § 16(b)'s text demands a categorical approach. This Court's decisions have consistently understood language in the residual clauses of both ACCA and § 16 to refer to "the statute of conviction, not to the facts of each defendant's conduct." *Taylor v. United States,* 495 U.S. 575, 601, 110 S.Ct. 2143, 109 L.Ed.2d 607. And the words "by its nature" in § 16(b) even more clearly compel an inquiry into an offense's normal and characteristic quality—that is, what the offense ordinarily entails. Finally, given the daunting difficulties of accurately "reconstruct[ing]," often many years later, "the conduct underlying [a] conviction," the conduct-based approach's "utter impracticability"—and associated inequities—is as great in § 16(b) as in ACCA. *Johnson,* 576 U.S., at ——, 135 S.Ct., at 2562. Pp. 1216 – 1218.

Justice GORSUCH, agreeing that the Immigration and Nationality Act provision at hand is unconstitutionally vague for the reasons identified in *Johnson v. United States,* 576 U.S. ——, 135 S.Ct. 2551, 192 L.Ed.2d 569, concluded that the void for vagueness doctrine, at least properly conceived, serves as a faithful expression of ancient due process and separation of powers principles the Framers recognized as vital to ordered liberty under the Constitution. The Government's argument that a less-than-fair-notice standard should apply where (as here) a person faces only civil, not criminal, consequences from a statute's **\*1210** operation is unavailing. In the criminal context, the law generally must afford "ordinary people ... fair notice of the conduct it punishes," *id.,* at ——, 135 S.Ct., at 2556, and it is hard to see how the Due Process Clause might often require any less than that in the civil context. Nor is there any good reason to single out civil deportation for assessment under the fair notice standard because of the special gravity of its penalty when so many civil laws impose so many similarly severe sanctions. Alternative approaches that do not concede

Sessions v. Dimaya, 138 S.Ct. 1204 (2018)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1020 of 1271

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

the propriety of the categorical ordinary case analysis are more properly addressed in another case, involving either the Immigration and Nationality Act or another statute, where the parties have a chance to be heard. Pp. 1200 – 1220.

KAGAN, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, III, IV–B, and V, in which GINSBURG, BREYER, SOTOMAYOR, and GORSUCH, JJ., joined, and an opinion with respect to Parts II and IV–A, in which GINSBURG, BREYER, and SOTOMAYOR, JJ., joined. GORSUCH, J., filed an opinion concurring in part and concurring in the judgment. ROBERTS, C.J., filed a dissenting opinion, in which KENNEDY, THOMAS, and ALITO, JJ., joined. THOMAS, J., filed a dissenting opinion, in which KENNEDY and ALITO, JJ., joined as to Parts I–C–2, II–A–1, and II–B.

**Attorneys and Law Firms**

Edwin S. Kneedler, Washington, D.C., for Petitioner.

E. Joshua Rosenkranz, New York, NY, for Respondent.

Ian Heath Gershengorn, Acting Solicitor General, Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Edwin S. Kneedler, Deputy Solicitor General, John F. Bash, Assistant to the Solicitor General, Donald E. Keener, Bryan S. Beier, Attorneys, Department of Justice, Washington, D.C., for Petitioner.

Andrew Knapp, Southwestern Law School, Los Angeles, CA, E. Joshua Rosenkranz, Thomas M. Bondy, Brian P. Goldman, Naomi J. Mower, Randall C. Smith, Ned Hirschfeld, Orrick, Herrington & Sutcliffe LLP, New York, NY, for Respondent.

**Opinion**

Justice KAGAN announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, III, IV–B, and V, and an opinion with respect to Parts II and IV–A, in which Justice GINSBURG, Justice BREYER, and Justice SOTOMAYOR join.

Three Terms ago, in *Johnson v. United States,* this Court held that part of a federal law's definition of "violent felony" was impermissibly vague. See 576 U.S. ——, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015). The question in this case is whether a similarly worded clause in a statute's definition of "crime of violence" suffers from the same constitutional

defect. Adhering to our analysis in *Johnson,* we hold that it does.

I

The Immigration and Nationality Act (INA) renders deportable any alien convicted of an "aggravated felony" after entering the United States. 8 U.S.C. § 1227(a)(2)(A)(iii). Such an alien is also ineligible for cancellation of removal, a form of discretionary relief allowing some deportable aliens to remain in the country. See §§ 1229b(a)(3), (b)(1)(C). Accordingly, **\*1211** removal is a virtual certainty for an alien found to have an aggravated felony conviction, no matter how long he has previously resided here.

The INA defines "aggravated felony" by listing numerous offenses and types of offenses, often with cross-references to federal criminal statutes. § 1101(a)(43); see *Luna Torres v. Lynch,* 578 U.S. ——, ——, 136 S.Ct. 1619, 1623, 194 L.Ed.2d 737 (2016). According to one item on that long list, an aggravated felony includes "a crime of violence (as defined in section 16 of title 18 ...) for which the term of imprisonment [is] at least one year." § 1101(a)(43)(F). The specified statute, 18 U.S.C. § 16, provides the federal criminal code's definition of "crime of violence." Its two parts, often known as the elements clause and the residual clause, cover:

"(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

"(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

Section 16(b), the residual clause, is the part of the statute at issue in this case.

**[1] [2] [3] [4]** To decide whether a person's conviction "falls within the ambit" of that clause, courts use a distinctive form of what we have called the categorical approach. *Leocal v. Ashcroft,* 543 U.S. 1, 7, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004). The question, we have explained, is not

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

whether "the particular facts" underlying a conviction posed the substantial risk that § 16(b) demands. *Ibid.* Neither is the question whether the statutory elements of a crime require (or entail) the creation of such a risk in each case that the crime covers. [1] The § 16(b) inquiry instead turns on the "nature of the offense" generally speaking. *Ibid.* (referring to § 16(b)'s "by its nature" language). More precisely, § 16(b) requires a court to ask whether "the ordinary case" of an offense poses the requisite risk. *James v. United States,* 550 U.S. 192, 208, 127 S.Ct. 1586, 167 L.Ed.2d 532 (2007); see *infra,* at 1213 - 1214.

In the case before us, Immigration Judges employed that analysis to conclude that respondent James Dimaya is deportable as an aggravated felon. A native of the Philippines, Dimaya has resided lawfully in the United States since 1992. But he has not always acted lawfully during that time. Twice, Dimaya was convicted of first-degree burglary under California law. See Cal. Penal Code Ann. §§ 459, 460(a). Following his second offense, the Government initiated a removal proceeding against him. Both an Immigration Judge and the Board of Immigration Appeals held that California first-degree burglary is a "crime of violence" under § 16(b). "[B]y its nature," the Board reasoned, the offense "carries a substantial risk of the use of force." App. to Pet. for Cert. 46a. Dimaya sought review in the Court of Appeals for the Ninth Circuit.

While his appeal was pending, this Court held unconstitutional part of the definition of "violent felony" in the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e). ACCA prescribes a 15–year **1212 mandatory minimum sentence if a person convicted of being a felon in possession of a firearm has three prior convictions for a "violent felony." § 924(e)(1). The definition of that statutory term goes as follows:

> "any crime punishable by imprisonment for a term exceeding one year ... that—

> "(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

> "(ii) is burglary, arson, or extortion, involves use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another.*" § 924(e)(2)(B) (emphasis added).

The italicized portion of that definition (like the similar language of § 16(b)) came to be known as the statute's residual clause. In *Johnson v. United States,* the Court declared that clause "void for vagueness" under the Fifth Amendment's Due Process Clause. 576 U.S., at ——576 U.S., at ——, ——, 135 S.Ct., at 2561–2563.

Relying on *Johnson,* the Ninth Circuit held that § 16(b), as incorporated into the INA, was also unconstitutionally vague, and accordingly ruled in Dimaya's favor. See *Dimaya v. Lynch,* 803 F.3d 1110, 1120 (2015). Two other Circuits reached the same conclusion, but a third distinguished ACCA's residual clause from § 16's. [2] We granted certiorari to resolve the conflict. *Lynch v. Dimaya,* 579 U.S. ——, 137 S.Ct. 31, 195 L.Ed.2d 902 (2016).

II

[5] [6] "The prohibition of vagueness in criminal statutes," our decision in *Johnson* explained, is an "essential" of due process, required by both "ordinary notions of fair play and the settled rules of law." 576 U.S., at ——, 135 S.Ct., at 2557 (quoting *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)). The void-for-vagueness doctrine, as we have called it, guarantees that ordinary people have "fair notice" of the conduct a statute proscribes. *Papachristou v. Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). And the doctrine guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges. See *Kolender v. Lawson,* 461 U.S. 352, 357–358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). In that sense, the doctrine is a corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not. Cf. *id.,* at 358, n. 7, 103 S.Ct. 1855 ("[I]f the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, [it would] substitute the judicial for the legislative department" (internal quotation marks omitted)).

Sessions v. Dimaya, 138 S.Ct. 1204 (2018)

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

**[7]** **[8]** The Government argues that a less searching form of the void-for-vagueness doctrine applies here than in *Johnson* because this is not a criminal case. See Brief for Petitioner 13–15. As the Government notes, this Court has stated that "[t]he degree of vagueness that the Constitution [allows] depends in part on the nature of the enactment": In particular, the Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Hoffman Estates v. Flipside, Hoffman Estates,* **\*1213** *Inc.,* 455 U.S. 489, 498–499, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). The removal of an alien is a civil matter. See *Arizona v. United States,* 567 U.S. 387, 396, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012). Hence, the Government claims, the need for clarity is not so strong; even a law too vague to support a conviction or sentence may be good enough to sustain a deportation order. See Brief for Petitioner 25–26.

**[9]** But this Court's precedent forecloses that argument, because we long ago held that the most exacting vagueness standard should apply in removal cases. In *Jordan v. De George,* we considered whether a provision of immigration law making an alien deportable if convicted of a "crime involving moral turpitude" was "sufficiently definite." 341 U.S. 223, 229, 71 S.Ct. 703, 95 L.Ed. 886 (1951). That provision, we noted, "is not a criminal statute" (as § 16(b) actually is). *Id.,* at 231, 71 S.Ct. 703; *supra,* at 1210–1211. Still, we chose to test (and ultimately uphold) it "under the established criteria of the 'void for vagueness' doctrine" applicable to criminal laws. 341 U.S., at 231, 71 S.Ct. 703. That approach was demanded, we explained, "in view of the grave nature of deportation," *ibid.*—a "drastic measure," often amounting to lifelong "banishment or exile," *ibid.* (quoting *Fong Haw Tan v. Phelan,* 333 U.S. 6, 10, 68 S.Ct. 374, 92 L.Ed. 433 (1948)).

Nothing in the ensuing years calls that reasoning into question. To the contrary, this Court has reiterated that deportation is "a particularly severe penalty," which may be of greater concern to a convicted alien than "any potential jail sentence." *Jae Lee v. United States,* 582 U.S. ——, ——, 137 S.Ct. 1958, 1968, 198 L.Ed.2d 476 (2017) (quoting *Padilla v. Kentucky,* 559 U.S. 356, 365, 368, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010)). And we have observed that

as federal immigration law increasingly hinged deportation orders on prior convictions, removal proceedings became ever more "intimately related to the criminal process." *Chaidez v. United States,* 568 U.S. 342, 352, 133 S.Ct. 1103, 185 L.Ed.2d 149 (2013) (quoting *Padilla,* 559 U.S., at 365, 130 S.Ct. 1473). What follows, as *Jordan* recognized, is the use of the same standard in the two settings.

For that reason, the Government cannot take refuge in a more permissive form of the void-for-vagueness doctrine than the one *Johnson* employed. To salvage § 16's residual clause, even for use in immigration hearings, the Government must instead persuade us that it is materially clearer than its now-invalidated ACCA counterpart. That is the issue we next address, as guided by *Johnson* 's analysis.

### III

*Johnson* is a straightforward decision, with equally straightforward application here. Its principal section begins as follows: "Two features of [ACCA's] residual clause conspire to make it unconstitutionally vague." 576 U.S., at ——, 135 S.Ct., at 2557. The opinion then identifies each of those features and explains how their joinder produced "hopeless indeterminacy," inconsistent with due process. *Id.,* at ——, 135 S.Ct., at 2558. And with that reasoning, *Johnson* effectively resolved the case now before us. For § 16's residual clause has the same two features as ACCA's, combined in the same constitutionally problematic way. Consider those two, just as *Johnson* described them:

"In the first place," *Johnson* explained, ACCA's residual clause created "grave uncertainty about how to estimate the risk posed by a crime" because it "tie[d] the judicial assessment of risk" to a hypothesis about the crime's "ordinary case." *Id.,* at ——, 135 S.Ct., at 2557. Under the clause, a court focused on neither the "real-world **\*1214** facts" nor the bare "statutory elements" of an offense. *Ibid.* Instead, a court was supposed to "imagine" an "idealized ordinary case of the crime"—or otherwise put, the court had to identify the "kind of conduct the 'ordinary case' of a crime involves." *Ibid.* But how, *Johnson* asked, should a court figure that out? By using a "statistical analysis of the state reporter? A survey? Expert evidence? Google? Gut instinct?" *Ibid.* (internal quotation marks omitted). ACCA

AR.06247

Sessions v. Dimaya, 138 S.Ct. 1204 (2018)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1023 of 1271

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

provided no guidance, rendering judicial accounts of the "ordinary case" wholly "speculative." *Ibid. Johnson* gave as its prime example the crime of attempted burglary. One judge, contemplating the "ordinary case," would imagine the "violent encounter" apt to ensue when a "would-be burglar [was] spotted by a police officer [or] private security guard." *Id.,* at ——-——, 🚩 *135 S.Ct., at 2558.* Another judge would conclude that "any confrontation" was more "likely to consist of [an observer's] yelling 'Who's there?' ... and the burglar's running away." 🚩 *Id.,* at ——, 135 S.Ct., at 2558. But how could either judge really know? "The residual clause," *Johnson* summarized, "offer[ed] no reliable way" to discern what the ordinary version of any offense looked like. *Ibid.* And without that, no one could tell how much risk the offense generally posed.

Compounding that first uncertainty, *Johnson* continued, was a second: ACCA's residual clause left unclear what threshold level of risk made any given crime a "violent felony." See *ibid.* The Court emphasized that this feature alone would not have violated the void-for-vagueness doctrine: Many perfectly constitutional statutes use imprecise terms like "serious potential risk" (as in ACCA's residual clause) or "substantial risk" (as in 🚩 § 16's). The problem came from layering such a standard on top of the requisite "ordinary case" inquiry. As the Court explained:

> "[W]e do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct; the law is full of instances where a man's fate depends on his estimating rightly ... some matter of degree[.] The residual clause, however, requires application of the 'serious potential risk' standard to an idealized ordinary case of the crime. Because the elements necessary to determine the imaginary ideal are uncertain[,] this abstract inquiry offers significantly less predictability than one that deals with the actual ... facts."

🚩 *Id.,* at ——, 135 S.Ct., at 2561 (some internal quotation marks, citations, and alterations omitted).

So much less predictability, in fact, that ACCA's residual clause could not pass constitutional muster. As the Court again put the point, in the punch line of its decision: "By combining indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony, the residual

clause" violates the guarantee of due process. 🚩 *Id.,* at ——, 135 S.Ct., at 2558. [3]

**\*1215** **[10]** 🚩 Section 16's residual clause violates that promise in just the same way. To begin where *Johnson* did, 🚩 § 16(b) also calls for a court to identify a crime's "ordinary case" in order to measure the crime's risk. The Government explicitly acknowledges that point here. See Brief for Petitioner 11 ("🚩 Section 16(b), like [ACCA's] residual clause, requires a court to assess the risk posed by the ordinary case of a particular offense"). And indeed, the Government's briefing in *Johnson* warned us about that likeness, observing that 🚩 § 16(b) would be "equally susceptible to [an] objection" that focused on the problems of positing a crime's ordinary case. Supp. Brief for Respondent, O.T. 2014, No. 13–7120, pp. 22–23. Nothing in 🚩 § 16(b) helps courts to perform that task, just as nothing in ACCA did. We can as well repeat here what we asked in *Johnson* : How does one go about divining the conduct entailed in a crime's ordinary case? Statistical analyses? Surveys? Experts? Google? Gut instinct? See 🚩 *Johnson, 576 U.S., at* ——, 135 S.Ct., at 2557; *supra,* at 1213 - 1214; *post,* at 1231 – 1232 (GORSUCH, J., concurring in part and concurring in judgment). And we can as well reiterate *Johnson* 's example: In the ordinary case of attempted burglary, is the would-be culprit spotted and confronted, or scared off by a yell? See *post,* at 1231 - 1232 (opinion of GORSUCH, J.) (offering other knotty examples). Once again, the questions have no good answers; the "ordinary case" remains, as *Johnson* described it, an excessively "speculative," essentially inscrutable thing. 🚩 576 U.S., at ——, 135 S.Ct., at 2558; accord *post,* at 1256 (THOMAS, J., dissenting). [4]

And 🚩 § 16(b) also possesses the second fatal feature of ACCA's residual clause: uncertainty about the level of risk that makes a crime "violent." In ACCA, that threshold was "serious potential risk"; in 🚩 § 16(b), it is "substantial risk." See *supra,* at 1211, 1212. But the Government does not argue that the latter formulation is any more determinate than the former, and for good reason. As THE CHIEF JUSTICE's valiant attempt to do so shows, that would be slicing the baloney mighty thin. See *post,* at 1244 – 1245 (dissenting opinion). And indeed, *Johnson* as much as equated the two phrases: Return to the block quote above, and note how

Case 3:20-cv-07721-SI   Document 58-5   Filed 11/10/20   Page 1024 of 1271

Sessions v. Dimaya, 138 S.Ct. 1204 (2018)
200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

*Johnson*—as though anticipating this case—refers to them interchangeably, as alike examples of imprecise "qualitative standard[s]." See *supra,* at 1214; 576 U.S., at ——, 135 S.Ct., at 2561. Once again, the point is not that such a non-numeric standard is alone problematic: In *Johnson* 's words, "we do not doubt" the constitutionality of applying § 16(b)'s "substantial risk [standard] to real-world conduct." *Id.,* at ——, 135 S.Ct., at 2561 (internal quotation marks omitted). The difficulty comes, in § 16's residual clause **\*1216** just as in ACCA's, from applying such a standard to "a judge-imagined abstraction"—*i.e.,* "an idealized ordinary case of the crime." *Id.,* at ——, ——, 135 S.Ct., at 2558, 2561. It is then that the standard ceases to work in a way consistent with due process.

In sum, § 16(b) has the same "[t]wo features" that "conspire[d] to make [ACCA's residual clause] unconstitutionally vague." *Id.,* at ——, 135 S.Ct., at 2557. It too "requires a court to picture the kind of conduct that the crime involves in 'the ordinary case,' and to judge whether that abstraction presents" some not-well-specified-yet-sufficiently-large degree of risk." *Id.,* at ——, 135 S.Ct., at 2556–2557. The result is that § 16(b) produces, just as ACCA's residual clause did, "more unpredictability and arbitrariness than the Due Process Clause tolerates." *Id.,* at ——, 135 S.Ct., at 2558.

## IV

The Government and dissents offer two fundamentally different accounts of how § 16(b) can escape unscathed from our decision in *Johnson.* Justice THOMAS accepts that the ordinary-case inquiry makes § 16(b) "impossible to apply." *Post,* at 1256. His solution is to overthrow our historic understanding of the statute: We should now read § 16(b), he says, to ask about the risk posed by a particular defendant's particular conduct. In contrast, the Government, joined by THE CHIEF JUSTICE, accepts that § 16(b), as long interpreted, demands a categorical approach, rather than a case-specific one. They argue only that "distinctive textual features" of § 16's residual clause make applying it "more

predictable" than its ACCA counterpart. Brief for Petitioner 28, 29. We disagree with both arguments.

### A

The essentials of Justice THOMAS's position go as follows. Section 16(b), he says, cannot have one meaning, but could have one of two others. See *post,* at 1256. The provision cannot demand an inquiry merely into the elements of a crime, because that is the province of § 16(a). See *supra,* at 1211 (setting out § 16(a)'s text). But that still leaves a pair of options: the categorical, ordinary-case approach and the "underlying-conduct approach," which asks about the specific way in which a defendant committed a crime. *Post,* at 1255. According to Justice THOMAS, each option is textually viable (although he gives a slight nod to the latter based on § 16(b)'s use of the word "involves"). See *post,* at 1254 – 1256. What tips the scales is that only one—the conduct approach—is at all "workable." *Post,* at 1256. The difficulties of the ordinary-case inquiry, Justice THOMAS rightly observes, underlie this Court's view that § 16(b) is too vague. So abandon that inquiry, Justice THOMAS urges. After all, he reasons, it is the Court's "plain duty," under the constitutional avoidance canon, to adopt any reasonable construction of a statute that escapes constitutional problems. *Post,* at 1256 – 1257 (quoting *United States ex rel. Attorney General v. Delaware & Hudson Co.,* 213 U.S. 366, 407, 29 S.Ct. 527, 53 L.Ed. 836 (1909)).

For anyone who has read *Johnson,* that argument will ring a bell. The dissent there issued the same invitation, based on much the same reasoning, to jettison the categorical approach in residual-clause cases. 576 U.S., at ——576 U.S., at ————, 135 S.Ct., at 2578–2580 (opinion of ALITO, J.). The Court declined to do so. It first noted that the Government had not asked us to switch to a fact-based inquiry. It then observed that the Court "had good reasons" for originally adopting the categorical approach, based partly on ACCA's text **\*1217** (which, by the way, uses the word "involves" identically) and partly on the "utter impracticability" of the alternative. *Id.,* at ——, 135 S.Ct., at 2562 (majority opinion). "The only plausible interpretation" of ACCA's residual clause, we concluded, "requires use of the categorical approach"—even if that

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

approach could not in the end satisfy constitutional standards. *Ibid.* (internal quotation marks and alteration omitted).

The same is true here—except more so. To begin where *Johnson* did, the Government once again "has not asked us to abandon the categorical approach in residual-clause cases." *Ibid.* To the contrary, and as already noted, the Government has conceded at every step the correctness of that statutory construction. See *supra,* at 1214 - 1215. And this time, the Government's decision is even more noteworthy than before —precisely because the *Johnson* dissent laid out the opposite view, presenting it in prepackaged form for the Government to take off the shelf and use in the § 16(b) context. Of course, we are not foreclosed from going down Justice THOMAS's path just because the Government has not done so. But we find it significant that the Government cannot bring itself to say that the fact-based approach Justice THOMAS proposes is a tenable interpretation of § 16's residual clause.

Perhaps one reason for the Government's reluctance is that such an approach would generate its own constitutional questions. As Justice THOMAS relates, *post,* at 1253, 1256 - 1257, this Court adopted the categorical approach in part to "avoid[ ] the Sixth Amendment concerns that would arise from sentencing courts' making findings of fact that properly belong to juries." *Descamps v. United States,* 570 U.S. 254, 267, 133 S.Ct. 2276, 186 L.Ed.2d 438 (2013). Justice THOMAS thinks that issue need not detain us here because "the right of trial by jury ha[s] no application in a removal proceeding." *Post,* at 1256 - 1257 (internal quotation marks omitted). But although this particular case involves removal, § 16(b) is a criminal statute, with criminal sentencing consequences. See *supra,* at 1211. And this Court has held (it could hardly have done otherwise) that "we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context." *Leocal,* 543 U.S., at 12, n. 8, 125 S.Ct. 377. So Justice THOMAS's suggestion would merely ping-pong us from one constitutional issue to another. And that means the avoidance canon cannot serve, as he would like, as the interpretive tie breaker.

In any event, § 16(b)'s text creates no draw: Best read, it demands a categorical approach. Our decisions have consistently understood language in the residual clauses of both ACCA and § 16 to refer to "the statute of conviction, not to the facts of each defendant's conduct." *Taylor*

*v. United States,* 495 U.S. 575, 601, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990); see *Leocal,* 543 U.S., at 7, 125 S.Ct. 377 ( Section 16 "directs our focus to the 'offense' of conviction ... rather than to the particular facts"). Simple references to a "conviction," "felony," or "offense," we have stated, are "read naturally" to denote the "crime as *generally* committed." *Nijhawan v. Holder,* 557 U.S. 29, 34, 129 S.Ct. 2294, 174 L.Ed.2d 22 (2009); see *Leocal,* 543 U.S., at 7, 125 S.Ct. 377; *Johnson,* 576 U.S., at ——, 135 S.Ct., at 2561–2562. And the words "by its nature" in § 16(b) make that meaning all the clearer. The statute, recall, directs courts to consider whether an offense, *by its nature,* poses the requisite risk of force. An offense's "nature" means its "normal and characteristic quality." Webster's Third New International Dictionary 1507 (2002). So § 16(b) tells courts to figure out what an offense normally—or, as we have repeatedly **\*1218** said, "ordinarily"—entails, not what happened to occur on one occasion. And the same conclusion follows if we pay attention to language that is *missing* from § 16(b). As we have observed in the ACCA context, the absence of terms alluding to a crime's circumstances, or its commission, makes a fact-based interpretation an uncomfortable fit. See *Descamps,* 570 U.S., at 267, 133 S.Ct. 2276. If Congress had wanted judges to look into a felon's actual conduct, "it presumably would have said so; other statutes, in other contexts, speak in just that way." *Id.,* at 267–268, 133 S.Ct. 2276.[5] The upshot of all this textual evidence is that § 16's residual clause—like ACCA's, except still more plainly—has no "plausible" fact-based reading. *Johnson,* 576 U.S., at ——, 135 S.Ct., at 2562.

And finally, the "utter impracticability"—and associated inequities—of such an interpretation is as great in the one statute as in the other. *Ibid.* This Court has often described the daunting difficulties of accurately "reconstruct [ing]," often many years later, "the conduct underlying [a] conviction." *Ibid.*; *Descamps,* 570 U.S., at 270, 133 S.Ct. 2276; *Taylor,* 495 U.S., at 601–602, 110 S.Ct. 2143. According to Justice THOMAS, we need not worry here because immigration judges have some special factfinding talent, or at least experience, that would mitigate the risk of error attaching to that endeavor in federal courts. See *post,* at 1257

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1026 of 1271

Sessions v. Dimaya, 138 S.Ct. 1204 (2018)
200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

- 1258. But we cannot see putting so much weight on the superior factfinding prowess of (notoriously overburdened) immigration judges. And as we have said before, 🚩 § 16(b) is a criminal statute with applications outside the immigration context. See *supra*, at 1211, 1217. Once again, then, we have no ground for discovering a novel interpretation of 🚩 § 16(b) that would remove us from the dictates of *Johnson*.

### B

Agreeing that is so, the Government (joined by THE CHIEF JUSTICE) takes a narrower path to the same desired result. It points to three textual discrepancies between ACCA's residual clause and 🚩 § 16(b), and argues that they make 🚩 § 16(b) significantly easier to apply. But each turns out to be the proverbial distinction without a difference. None relates to the pair of features—the ordinary-case inquiry and a hazy risk threshold—that *Johnson* found to produce impermissible vagueness. And none otherwise affects the determinacy of the statutory inquiry into whether a prior conviction is for a violent crime. That is why, contrary to the Government's final argument, the experience of applying *both* statutes has generated confusion and division among lower courts.

### 1

The Government first—and foremost—relies on 🚩 § 16(b)'s express requirement **\*1219** (absent from ACCA) that the risk arise from acts taken "in the course of committing the offense." Brief for Petitioner 31. (THE CHIEF JUSTICE's dissent echoes much of this argument. See *post*, at 1236 – 1237.) Because of that "temporal restriction," a court applying 🚩 § 16(b) may not "consider risks arising *after* " the offense's commission is over. *Ibid.* In the Government's view, 🚩 § 16(b)'s text thereby demands a "significantly more focused inquiry" than did ACCA's residual clause. *Id.*, at 32.

**[11]**    To assess that claim, start with the meaning of 🚩 § 16(b)'s "in the course of" language. That phrase, understood in the normal way, includes the conduct occurring throughout a crime's commission—not just the conduct sufficient to satisfy the offense's formal elements. The Government agrees with that construction, explaining that the words "in the course of" sweep in everything that happens while a crime

continues. See Tr. of Oral Arg. 57–58 (Oct. 2, 2017) (illustrating that idea with reference to conspiracy, burglary, kidnapping, and escape from prison). So, for example, conspiracy may be a crime of violence under 🚩 § 16(b) because of the risk of force while the conspiracy is ongoing (*i.e.*, "in the course of" the conspiracy); it is irrelevant that conspiracy's elements are met as soon as the participants have made an agreement. See *ibid.*; 📄 *United States v. Doe, 49 F.3d 859, 866 (C.A.2 1995)*. Similarly, and closer to home, burglary may be a crime of violence under 🚩 § 16(b) because of the prospects of an encounter while the burglar remains in a building (*i.e.*, "in the course of" the burglary); it does not matter that the elements of the crime are met at the precise moment of his entry. See Tr. of Oral Arg. 57–58 (Oct. 2, 2017); 🚩 *James, 550 U.S., at 203, 127 S.Ct. 1586*. In other words, a court applying 🚩 § 16(b) gets to consider everything that is likely to take place for as long as a crime is being committed.

Because that is so, 🚩 § 16(b)'s "in the course of" language does little to narrow or focus the statutory inquiry. All that the phrase excludes is a court's ability to consider the risk that force will be used after the crime has entirely concluded —so, for example, after the conspiracy has dissolved or the burglar has left the building. We can construct law-school-type hypotheticals fitting that fact pattern—say, a burglar who constructs a booby trap that later knocks out the homeowner. But such imaginative forays cannot realistically affect a court's view of the *ordinary case* of a crime, which is all that matters under the statute. See *supra,* at 1211 – 1212, 1213 - 1214. In the ordinary case, the riskiness of a crime arises from events occurring during its commission, not events occurring later. So with or without 🚩 § 16(b)'s explicit temporal language, a court applying the section would do the same thing—ask what usually happens when a crime goes down.

And that is just what courts did when applying ACCA's residual clause—and for the same reason. True, that clause lacked an express temporal limit. But not a single one of this Court's ACCA decisions turned on conduct that might occur after a crime's commission; instead, each hinged on the risk arising from events that could happen while the crime was ongoing. See, *e.g.*, 🚩 *Sykes v. United States, 564 U.S. 1, 10, 131 S.Ct. 2267, 180 L.Ed.2d 60 (2011)* (assessing the risks attached to the "confrontations that initiate and

terminate" vehicle flight, along with "intervening" events); *Chambers v. United States,* 555 U.S. 122, 128, 129 S.Ct. 687, 172 L.Ed.2d 484 (2009) (rejecting the Government's argument that violent incidents "occur[ring] long after" a person unlawfully failed to report to prison rendered that crime a violent felony). Nor could those decisions have done otherwise, **\*1220** given the statute's concern with the ordinary (rather than the outlandish) case. Once again, the riskiness of a crime in the ordinary case depends on the acts taken during—not after—its commission. Thus, the analyses under ACCA's residual clause and 🚩 § 16(b) coincide.

The upshot is that the phrase "in the course of" makes no difference as to either outcome or clarity. Every offense that could have fallen within ACCA's residual clause might equally fall within 🚩 § 16(b). And the difficulty of deciding whether it does so remains just as intractable. Indeed, we cannot think of a single federal crime whose treatment becomes more obvious under 🚩 § 16(b) than under ACCA because of the words "in the course of."[6] The phrase, then, cannot cure the statutory indeterminacy *Johnson* described.

Second, the Government (and again, THE CHIEF JUSTICE's dissent, see *post,* at 1244 - 1245) observes that 🚩 § 16(b) focuses on the risk of "physical force" whereas ACCA's residual clause asked about the risk of "physical injury." The 🚩 § 16(b) inquiry, the Government says, "trains solely" on the conduct typically involved in a crime. Brief for Petitioner 36. By contrast, the Government continues, ACCA's residual clause required a second inquiry: After describing the ordinary criminal's conduct, a court had to "speculate about a chain of causation that could possibly result in a victim's injury." *Ibid.* The Government's conclusion is that the 🚩 § 16(b) inquiry is "more specific." *Ibid.*

 **[12]**  But once more, we struggle to see how that statutory distinction would matter. To begin with, the first of the Government's two steps—defining the conduct in the ordinary case—is almost always the difficult part. Once that is accomplished, the assessment of consequences tends to follow as a matter of course. So, for example, if a crime is likely enough to lead to a shooting, it will also be likely enough to lead to an injury. And still more important, 🚩 § 16(b) involves two steps as well—and essentially the same ones. In interpreting statutes like 🚩 § 16(b), this Court has

made clear that "physical force" means "force capable of causing physical pain or injury." 🟨 *Johnson v. United States,* 559 U.S. 133, 140, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010) (defining the term for purposes of deciding what counts as a "violent" crime). So under 🚩 § 16(b) too, a court must not **\*1221** only identify the conduct typically involved in a crime, but also gauge its potential consequences. Or said a bit differently, evaluating the risk of "physical force" itself entails considering the risk of "physical injury." For those reasons, the force/injury distinction is unlikely to affect a court's analysis of whether a crime qualifies as violent. All the same crimes might—or, then again, might not—satisfy both requirements. Accordingly, this variance in wording cannot make ACCA's residual clause vague and 🚩 § 16(b) not.

Third, the Government briefly notes that 🚩 § 16(b), unlike ACCA's residual clause, is not preceded by a "confusing list of exemplar crimes." Brief for Petitioner 38. (THE CHIEF JUSTICE's dissent reiterates this argument, with some additional references to our caselaw. See *post,* at 1246 – 1248.) Here, the Government is referring to the offenses ACCA designated as violent felonies independently of the residual clause (*i.e.,* burglary, arson, extortion, and use of explosives). See *supra,* at 1212. According to the Government, those crimes provided "contradictory and opaque indications" of what non-specified offenses should also count as violent. Brief for Petitioner 38. Because 🚩 § 16(b) lacks any such enumerated crimes, the Government concludes, it avoids the vagueness of ACCA's residual clause.

We readily accept a part of that argument. This Court for several years looked to ACCA's listed crimes for help in giving the residual clause meaning. See, *e.g.,* 🚩 *Begay v. United States,* 553 U.S. 137, 142, 128 S.Ct. 1581, 170 L.Ed.2d 490 (2008); 🚩 *James,* 550 U.S., at 203, 127 S.Ct. 1586. But to no avail. As the Government relates (and *Johnson* explained), the enumerated crimes were themselves too varied to provide such assistance. See Brief for Petitioner 38–40; 🟨 576 U.S., at ——, 135 S.Ct., at 2561. Trying to reconcile them with each other, and then compare them to whatever unlisted crime was at issue, drove many a judge a little batty. And more to the point, the endeavor failed to bring any certainty to the residual clause's application. See Brief for Petitioner 38–40.

But the Government's conclusion does not follow. To say that ACCA's listed crimes failed to resolve the residual clause's

vagueness is hardly to say they caused the problem. Had they done so, *Johnson* would not have needed to strike down the clause. It could simply have instructed courts to give up on trying to interpret the clause by reference to the enumerated offenses. (Contrary to THE CHIEF JUSTICE's suggestion, see *post,* at 1247 - 1248, discarding an interpretive tool once it is found not to actually aid in interpretation hardly "expand[s]" the scope of a statute.) That *Johnson* went so much further—invalidating a statutory provision rather than construing it independently of another—demonstrates that the list of crimes was not the culprit. And indeed, *Johnson* explicitly said as much. As described earlier, *Johnson* found the residual clause's vagueness to reside in just "two" of its features: the ordinary-case requirement and a fuzzy risk standard. See 576 U.S., at ———, 135 S.Ct., at 2557– 2558; *supra,* at 1213 – 1214. Strip away the enumerated crimes—as Congress did in § 16(b)—and those dual flaws yet remain. And ditto the textual indeterminacy that flows from them.

2

Faced with the two clauses' linguistic similarity, the Government relies significantly on an argument rooted in judicial experience. Our opinion in *Johnson,* the Government notes, spoke of the longstanding "trouble" that this Court and others had in "making sense of [ACCA's] residual clause." *1222 576 U.S., at ——, 135 S.Ct., at 2559–2560; see Brief for Petitioner 45. According to the Government, § 16(b) has not produced "comparable difficulties." *Id.,* at 46. Lower courts, the Government claims, have divided less often about the provision's meaning, and as a result this Court granted certiorari on "only a single Section 16(b) case" before this one. *Ibid.* [7] "The most likely explanation," the Government concludes, is that "Section 16(b) is clearer" than its ACCA counterpart. *Id.,* at 47.

But in fact, a host of issues respecting § 16(b)'s application to specific crimes divide the federal appellate courts. Does car burglary qualify as a violent felony under § 16(b)? Some courts say yes, another says no. [8] What of statutory rape? Once again, the Circuits part ways. [9] How about evading arrest? The decisions point in different directions. [10] Residential trespass? The same is true. [11] Those

examples do not exhaust the current catalogue of Circuit conflicts concerning § 16(b)'s application. See Brief for National Immigration Project of the National Lawyers Guild et al. as *Amici Curiae* 7–18 (citing divided appellate decisions as to the unauthorized use of a vehicle, firearms possession, and abduction). And that roster would just expand with time, mainly because, as *Johnson* explained, precious few crimes (of the thousands that fill the statute books) have an obvious, non-speculative—and therefore undisputed —"ordinary case." See 576 U.S., at ———, 135 S.Ct., at 2557–2558.

Nor does this Court's prior handling of § 16(b) cases support the Government's argument. To be sure, we have heard oral argument in only two cases arising from § 16(b) (including this one), as compared with five involving ACCA's residual clause (including *Johnson* ). [12] But while some of *1223 those ACCA suits were pending before us, we received a number of petitions for certiorari presenting related issues in the § 16(b) context. And after issuing the relevant ACCA decisions, we vacated the judgments in those § 16(b) cases and remanded them for further consideration. [13] That we disposed of the ACCA and § 16(b) petitions in that order, rather than its opposite, provides no reason to disregard the indeterminacy that § 16(b) shares with ACCA's residual clause.

And of course, this Court's experience in deciding ACCA cases only supports the conclusion that § 16(b) is too vague. For that record reveals that a statute with all the same hallmarks as § 16(b) could not be applied with the predictability the Constitution demands. See *id.,* at ———, 135 S.Ct., 2558–2560; *supra,* at 1213– 1215. The Government would condemn us to repeat the past— to rerun the old ACCA tape, as though we remembered nothing from its first showing. But why should we disregard a lesson so hard learned? "Insanity," Justice Scalia wrote in the last ACCA residual clause case before *Johnson,* "is doing the same thing over and over again, but expecting different results." *Sykes,* 564 U.S., at 28, 131 S.Ct. 2267 (dissenting opinion). We abandoned that lunatic practice in *Johnson* and see no reason to start it again.

Sessions v. Dimaya, 138 S.Ct. 1204 (2018)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1029 of 1271

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

V

*Johnson* tells us how to resolve this case. That decision held that "[t]wo features of [ACCA's] residual clause conspire[d] to make it unconstitutionally vague." 576 U.S., at ——, 135 S.Ct., at 2557. Because the clause had both an ordinary-case requirement and an ill-defined risk threshold, it necessarily "devolv[ed] into guesswork and intuition," invited arbitrary enforcement, and failed to provide fair notice. *Id.,* at ——, 135 S.Ct., at 2559. Section 16(b) possesses the exact same two features. And none of the minor linguistic disparities in the statutes makes any real difference. So just like ACCA's residual clause, § 16(b) "produces more unpredictability and arbitrariness than the Due Process Clause tolerates." *Id.,* at ——, 135 S.Ct., at 2558. We accordingly affirm the judgment of the Court of Appeals.

*It is so ordered.*

Justice GORSUCH, concurring in part and concurring in the judgment.

Vague laws invite arbitrary power. Before the Revolution, the crime of treason in English law was so capaciously construed that the mere expression of disfavored opinions could invite transportation or death. The founders cited the crown's abuse of "pretended" crimes like this as one of their reasons for revolution. See Declaration of Independence ¶ 21. Today's vague laws may not be as invidious, but they can invite the exercise of arbitrary **\*1224** power all the same—by leaving the people in the dark about what the law demands and allowing prosecutors and courts to make it up.

The law before us today is such a law. Before holding a lawful permanent resident alien like James Dimaya subject to removal for having committed a crime, the Immigration and Nationality Act requires a judge to determine that the ordinary case of the alien's crime of conviction involves a substantial risk that physical force may be used. But what does that mean? Just take the crime at issue in this case, California burglary, which applies to everyone from armed home intruders to door-to-door salesmen peddling shady products. How, on that vast spectrum, is anyone supposed to locate the ordinary case and say whether it includes a substantial risk of physical force? The truth is, no one knows. The law's silence leaves

judges to their intuitions and the people to their fate. In my judgment, the Constitution demands more.

*

I begin with a foundational question. Writing for the Court in *Johnson v. United States,* 576 U.S. ——, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015), Justice Scalia held the residual clause of the Armed Career Criminal Act void for vagueness because it invited "more unpredictability and arbitrariness" than the Constitution allows. *Id.,* at ——, 135 S.Ct., at 2558. Because the residual clause in the statute now before us uses almost exactly the same language as the residual clause in *Johnson,* respect for precedent alone would seem to suggest that both clauses should suffer the same judgment.

But first in *Johnson* and now again today Justice THOMAS has questioned whether our vagueness doctrine can fairly claim roots in the Constitution as originally understood. See, *e.g., post,* at 1242 – 1245 (dissenting opinion); *Johnson, supra,* at 1226 – 1233 (opinion concurring in judgment) ( 576 U.S., at —— – ——, 135 S.Ct., at 2566–2573 ). For its part, the Court has yet to offer a reply. I believe our colleague's challenge is a serious and thoughtful one that merits careful attention. At day's end, though, it is a challenge to which I find myself unable to subscribe. Respectfully, I am persuaded instead that void for vagueness doctrine, at least properly conceived, serves as a faithful expression of ancient due process and separation of powers principles the framers recognized as vital to ordered liberty under our Constitution.

Consider first the doctrine's due process underpinnings. The Fifth and Fourteenth Amendments guarantee that "life, liberty, or property" may not be taken "without due process of law." That means the government generally may not deprive a person of those rights without affording him the benefit of (at least) those "customary procedures to which freemen were entitled by the old law of England." *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 28, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (Scalia, J., concurring in judgment) (internal quotation marks omitted). Admittedly, some have suggested that the Due Process Clause does less work than this, allowing the government to deprive people of their liberty through whatever procedures (or lack of them) the government's current laws may tolerate. *Post,* at 1243, n. 1 (opinion of THOMAS, J.) (collecting authorities). But in

my view the weight of the historical evidence shows that the clause sought to ensure that the people's rights are never any less secure against governmental invasion than they were at common law. Lord Coke took this view of the English due process guarantee. 1 E. Coke, The Second Part of the Institutes of **\*1225** the Laws of England 50 (1797). John Rutledge, our second Chief Justice, explained that Coke's teachings were carefully studied and widely adopted by the framers, becoming " 'almost the foundations of our law.' "

*Klopfer v. North Carolina,* 386 U.S. 213, 225, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967). And many more students of the Constitution besides—from Justice Story to Justice Scalia —have agreed that this view best represents the original understanding of our own Due Process Clause. See, *e.g.,*

*Murray's Lessee v. Hoboken Land & Improvement Co.,* 18 How. 272, 277, 15 L.Ed. 372 (1856); 3 J. Story, Commentaries on the Constitution of the United States § 1789, p. 661 (1833);

*Pacific Mut., supra,* at 28–29, 111 S.Ct. 1032 (opinion of Scalia, J.); Eberle, Procedural Due Process: The Original Understanding, 4 Const. Comment. 339, 341 (1987).

Perhaps the most basic of due process's customary protections is the demand of fair notice. See *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926); see also Note, Textualism as Fair Notice, 123 Harv. L. Rev. 542, 543 (2009) ("From the inception of Western culture, fair notice has been recognized as an essential element of the rule of law"). Criminal indictments at common law had to provide "precise and sufficient certainty" about the charges involved. 4 W. Blackstone, Commentaries on the Laws of England 301 (1769) (Blackstone). Unless an "offence [was] set forth with clearness and certainty," the indictment risked being held void in court. *Id.,* at 302 (emphasis deleted); 2 W. Hawkins, Pleas of the Crown, ch. 25, §§ 99, 100, pp. 244–245 (2d ed. 1726) ("[I]t seems to have been anciently the common practice, where an indictment appeared to be [in]sufficient, either for its uncertainty or the want of proper legal words, not to put the defendant to answer it").

The same held true in civil cases affecting a person's life, liberty, or property. A civil suit began by obtaining a writ— a detailed and specific form of action asking for particular relief. Bellia, Article III and the Cause of Action, 89 Iowa L. Rev. 777, 784–786 (2004); Subrin, How Equity Conquered Common Law: The Federal Rules of Civil Procedure in Historical Perspective, 135 U. Pa. L. Rev. 909, 914–915 (1987). Because the various civil writs were clearly defined, English subjects served with one would know with particularity what legal requirement they were alleged to have violated and, accordingly, what would be at issue in court. *Id., at 917;* Moffitt, Pleadings in the Age of Settlement, 80 Ind. L.J. 727, 731 (2005). And a writ risked being held defective if it didn't provide fair notice. *Goldington v. Bassingburn,* Y.B. Trin. 3 Edw. II, f. 27b (1310) (explaining that "the law of the land" that "no one [could] be taken by surprise" by having to "answer in court for what [one] has not been warned to answer").

The requirement of fair notice applied to statutes too. Blackstone illustrated the point with a case involving a statute that made "stealing sheep, or other cattle" a felony. 1 Blackstone 88 (emphasis deleted). Because the term "cattle" embraced a good deal more then than it does now (including wild animals, no less), the court held the statute failed to provide adequate notice about what it did and did not cover —and so the court treated the term "cattle" as a nullity. *Ibid.* All of which, Blackstone added, had the salutary effect of inducing the legislature to reenter the field and make itself clear by passing a new law extending the statute to "bulls, cows, oxen," and more "by name." *Ibid.*

This tradition of courts refusing to apply vague statutes finds parallels in early American practice as well. In *The Enterprise,* **\*1226** 8 F.Cas. 732 (No. 4,499) (C.C.N.Y. 1810), for example, Justice Livingston found that a statute setting the circumstances in which a ship may enter a port during an embargo was too vague to be applied, concluding that "the court had better pass" the statutory terms by "as unintelligible and useless" rather than "put on them, at great uncertainty, a very harsh signification, and one which the legislature may never have designed." *Id., at 735.* In *United States v. Sharp,* 27 F.Cas. 1041 (No. 16,264) (C.C.Pa.1815), Justice Washington confronted a statute which prohibited seamen from making a "revolt." *Id., at 1043.* But he was unable to determine the meaning of this provision "by any authority ... either in the common, admiralty, or civil law." *Ibid.* As a result, he declined to "recommend to the jury, to find the prisoners guilty of making, or endeavouring to make a revolt, however strong the evidence may be." *Ibid.* [1]

Nor was the concern with vague laws confined to the most serious offenses like capital crimes. Courts refused to apply vague laws in criminal cases involving relatively modest penalties. See, *e.g., McJunkins v. State,* 10 Ind. 140, 145 (1858). They applied the doctrine in civil cases too. See, *e.g., Drake v. Drake,* 15 N.C. 110, 115 (1833); *Commonwealth v. Bank of Pennsylvania,* 3 Watts & Serg. 173, 177 (Pa.1842).

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

As one court put it, "all laws" "ought to be expressed in such a manner as that its meaning may be unambiguous, and in such language as may be readily understood by those upon whom it is to operate." *McConvill v. Mayor and Aldermen of Jersey City,* 39 N.J.L. 38, 42 (1876). " 'It is impossible ... to dissent from the doctrine of Lord Coke, that acts of parliament ought to be plainly and clearly, and not cunningly and darkly penned, especially in penal matters.' " *Id., at 42–43.*

These early cases, admittedly, often spoke in terms of construing vague laws strictly rather than declaring them void. See, *e.g., post,* at 1243 – 1244 (opinion of THOMAS, J.); *Johnson,* 576 U.S., at ———, 135 S.Ct., at 2567–2568 (opinion of THOMAS, J.). But in substance void the law is often exactly what these courts did: rather than try to construe or interpret **\*1227** the statute before them, judges frequently held the law simply too vague to apply. Blackstone, for example, did not suggest the court in his illustration should have given a narrowing construction to the term "cattle," but argued against giving it any effect *at all.* 1 Blackstone 88; see also Scalia, *Assorted Canards of Contemporary Legal Analysis,* 40 Case W. Res. L. Rev. 581, 582 (1989) ("I doubt ... that any modern court would go to the lengths described by Blackstone in its application of the rule that penal statutes are to be strictly construed"); Note, *Indefinite Criteria of Definiteness in Statutes,* 45 Harv. L. Rev. 160, n. 3 (1931) (explaining that "since strict construction, in effect, nullified ambiguous provisions, it was but a short step to declaring them void *ab initio* "); *supra,* at 1226, n. 1 (state courts holding vague statutory terms "void" or "null").

What history suggests, the structure of the Constitution confirms. Many of the Constitution's other provisions presuppose and depend on the existence of reasonably clear laws. Take the Fourth Amendment's requirement that arrest warrants must be supported by probable cause, and consider what would be left of that requirement if the alleged crime had no meaningful boundaries. Or take the Sixth Amendment's mandate that a defendant must be informed of the accusations against him and allowed to bring witnesses in his defense, and consider what use those rights would be if the charged crime was so vague the defendant couldn't tell what he's alleged to have done and what sort of witnesses he might need to rebut that charge. Without an assurance that the laws supply fair notice, so much else of the Constitution risks becoming only a "parchment barrie[r]" against arbitrary power. The Federalist No. 48, p. 308 (C. Rossiter ed. 1961) (J. Madison).

Although today's vagueness doctrine owes much to the guarantee of fair notice embodied in the Due Process Clause, it would be a mistake to overlook the doctrine's equal debt to the separation of powers. The Constitution assigns "[a]ll legislative Powers" in our federal government to Congress. Art. I, § 1. It is for the people, through their elected representatives, to choose the rules that will govern their future conduct. See The Federalist No. 78, at 465 (A. Hamilton) ("The legislature ... prescribes the rules by which the duties and rights of every citizen are to be regulated"). Meanwhile, the Constitution assigns to judges the "judicial Power" to decide "Cases" and "Controversies." Art. III, § 2. That power does not license judges to craft new laws to govern future conduct, but only to "discer[n] the course prescribed by law" as it currently exists and to "follow it" in resolving disputes between the people over past events. *Osborn v. Bank of United States,* 9 Wheat. 738, 866, 6 L.Ed. 204 (1824).

From this division of duties, it comes clear that legislators may not "abdicate their responsibilities for setting the standards of the criminal law," *Smith v. Goguen,* 415 U.S. 566, 575, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974), by leaving to judges the power to decide "the various crimes includable in [a] vague phrase," *Jordan v. De George,* 341 U.S. 223, 242, 71 S.Ct. 703, 95 L.Ed. 886 (1951) (Jackson, J., dissenting). For "if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large[,][t]his would, to some extent, substitute the judicial for the legislative department of government." *Kolender v. Lawson,* 461 U.S. 352, 358, n. 7, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (internal quotation marks omitted). Nor is the worry only that vague laws risk allowing judges to **\*1228** assume legislative power. Vague laws also threaten to transfer legislative power to police and prosecutors, leaving to them the job of shaping a vague statute's contours through their enforcement decisions. See *Grayned v. City of Rockford,* 408 U.S. 104, 108–109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis").

These structural worries are more than just formal ones. Under the Constitution, the adoption of new laws restricting liberty is supposed to be a hard business, the product of an

Case 3:20-cv-07721-SI Document 58-5 Filed 11/10/20 Page 1032 of 1271

Sessions v. Dimaya, 138 S.Ct. 1204 (2018)
200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

open and public debate among a large and diverse number of elected representatives. Allowing the legislature to hand off the job of lawmaking risks substituting this design for one where legislation is made easy, with a mere handful of unelected judges and prosecutors free to "condem[n] all that [they] personally disapprove and for no better reason than [they] disapprove it." *Jordan, supra,* at 242, 71 S.Ct. 703 (Jackson, J., dissenting). Nor do judges and prosecutors act in the open and accountable forum of a legislature, but in the comparatively obscure confines of cases and controversies. See, *e.g.,* A. Bickel, The Least Dangerous Branch: The Supreme Court at the Bar of Politics 151 (1962) ("A vague statute delegates to administrators, prosecutors, juries, and judges the authority of *ad hoc* decision, which is in its nature difficult if not impossible to hold to account, because of its narrow impact"). For just these reasons, Hamilton warned, while "liberty can have nothing to fear from the judiciary alone," it has "every thing to fear from" the union of the judicial and legislative powers. The Federalist No. 78, at 466. No doubt, too, for reasons like these this Court has held "that the *more important* aspect of vagueness doctrine 'is not actual notice, but ... the requirement that a legislature establish minimal guidelines to govern law enforcement' " and keep the separate branches within their proper spheres. *Kolender, supra,* at 358, 103 S.Ct. 1855 (quoting *Goguen, supra,* at 575, 94 S.Ct. 1242 (emphasis added)).

\*

Persuaded that vagueness doctrine enjoys a secure footing in the original understanding of the Constitution, the next question I confront concerns the standard of review. What degree of imprecision should this Court tolerate in a statute before declaring it unconstitutionally vague? For its part, the government argues that where (as here) a person faces only civil, not criminal, consequences from a statute's operation, we should declare the law unconstitutional only if it is "unintelligible." But in the criminal context this Court has generally insisted that the law must afford "ordinary people ... fair notice of the conduct it punishes." *Johnson,* 576 U.S., at ——, 135 S.Ct., at 2557. And I cannot see how the Due Process Clause might often require any less than that in the civil context either. Fair notice of the law's demands, as we've seen, is "the first essential of due process." *Connally,* 269 U.S., at 391, 46 S.Ct. 126. And as we've seen, too, the Constitution sought to preserve a common law tradition that

usually aimed to ensure fair notice before any deprivation of life, liberty, or property could take place, whether under the banner of the criminal or the civil law. See *supra,* at 1224 – 1227.

First principles aside, the government suggests that at least this Court's precedents support adopting a less-than-fair-notice standard for civil cases. But even that much I do not see. This Court has already expressly held that a "stringent vagueness test" should apply to at least some civil laws— those abridging basic **\*1229** First Amendment freedoms. *Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). This Court has made clear, too, that due process protections against vague laws are "not to be avoided by the simple label a State chooses to fasten upon its conduct or its statute." *Giaccio v. Pennsylvania,* 382 U.S. 399, 402, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966). So the happenstance that a law is found in the civil or criminal part of the statute books cannot be dispositive. To be sure, this Court has also said that what qualifies as fair notice depends "in part on the nature of the enactment." *Hoffman Estates,* 455 U.S., at 498, 102 S.Ct. 1186. And the Court has sometimes "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.,* at 498– 499, 102 S.Ct. 1186. But to acknowledge these truisms does nothing to prove that civil laws must always be subject to the government's emaciated form of review.

In fact, if the severity of the consequences counts when deciding the standard of review, shouldn't we also take account of the fact that today's civil laws regularly impose penalties far more severe than those found in many criminal statutes? Ours is a world filled with more and more civil laws bearing more and more extravagant punishments. Today's "civil" penalties include confiscatory rather than compensatory fines, forfeiture provisions that allow homes to be taken, remedies that strip persons of their professional licenses and livelihoods, and the power to commit persons against their will indefinitely. Some of these penalties are routinely imposed and are routinely graver than those associated with misdemeanor crimes—and often harsher than the punishment for felonies. And not only are "punitive civil sanctions ... rapidly expanding," they are "sometimes more severely punitive than the parallel criminal sanctions *for the same conduct.*" Mann, Punitive Civil Sanctions: The Middleground Between Criminal and Civil Law, 101 Yale

L.J. 1795, 1798 (1992) (emphasis added). Given all this, any suggestion that criminal cases warrant a heightened standard of review does more to persuade me that the criminal standard should be set *above* our precedent's current threshold than to suggest the civil standard should be buried *below* it.

Retreating to a more modest line of argument, the government emphasizes that this case arises in the immigration context and so implicates matters of foreign relations where the Executive enjoys considerable constitutional authority. But to acknowledge that the *President* has broad authority to act in this general area supplies no justification for allowing *judges* to give content to an impermissibly vague law.

Alternatively still, Justice THOMAS suggests that, at least at the time of the founding, aliens present in this country may not have been understood as possessing any rights under the Due Process Clause. For support, he points to the Alien Friends Act of 1798. An Act Concerning Aliens § 1, 1 Stat. 571; *post*, at 1244 – 1248 (opinion of THOMAS, J.). But the Alien Friends Act—better known as the "Alien" part of the Alien and Sedition Acts—is one of the most notorious laws in our country's history. It was understood as a temporary war measure, not one that the legislature would endorse in a time of tranquility. See, *e.g.,* Fehlings, Storm on the Constitution: The First Deportation Law, 10 Tulsa J. Comp. & Int'l L. 63, 70–71 (2002). Yet even then it was widely condemned as unconstitutional by Madison and many others. It also went unenforced, may have cost the Federalist Party **\*1230** its existence, and lapsed a mere two years after its enactment. With this fuller view, it seems doubtful the Act tells us a great deal about aliens' due process rights at the founding. [2]

Besides, none of this much matters. Whether Madison or his adversaries had the better of the debate over the constitutionality of the Alien Friends Act, Congress is surely free to extend existing forms of liberty to new classes of persons—liberty that the government may then take only after affording due process. See, *e.g.,* Sandin v. Conner, 515 U.S. 472, 477–478, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); Easterbrook, Substance and Due Process, 1982 S.Ct. Rev. 85, 88 ("If ... the constitution, statute, or regulation creates a liberty or property interest, then the second step —determining 'what process is due'—comes into play"). Madison made this very point, suggesting an alien's admission in this country could in some circumstances be analogous to "the grant of land to an individual," which "may be of favor not of right; but the moment the grant is made, the favor becomes a right, and must be forfeited before it can

be taken away." Madison's Report 319. And, of course, that's exactly what Congress eventually chose to do here. Decades ago, it enacted a law affording Mr. Dimaya lawful permanent residency in this country, extending to him a statutory liberty interest others traditionally have enjoyed to remain in and move about the country free from physical imprisonment and restraint. See Dimaya v. Lynch, 803 F.3d 1110, 1111 (C.A.9 2015); 8 U.S.C. §§ 1101(20), 1255. No one suggests Congress *had* to enact statutes of this sort. And exactly what processes must attend the deprivation of a statutorily afforded liberty interest like this may pose serious and debatable questions. Cf. Murray's Lessee, 18 How., at 277 (approving summary procedures in another context). But however summary those procedures might be, it's hard to fathom why fair notice of the law—the most venerable of due process's **\*1231** requirements—would not be among them.

Connally, 269 U.S., at 391, 46 S.Ct. 126. [3]

Today, a plurality of the Court agrees that we should reject the government's plea for a feeble standard of review, but for a different reason. *Ante,* at 1212 – 1213. My colleagues suggest the law before us should be assessed under the fair notice standard because of the special gravity of its civil deportation penalty. But, grave as that penalty may be, I cannot see why we would single it out for special treatment when (again) so many civil laws today impose so many similarly severe sanctions. Why, for example, would due process require Congress to speak more clearly when it seeks to deport a lawfully resident alien than when it wishes to subject a citizen to indefinite civil commitment, strip him of a business license essential to his family's living, or confiscate his home? I can think of no good answer.

\*

With the fair notice standard now in hand, all that remains is to ask how it applies to the case before us. And here at least the answer comes readily for me: to the extent it requires an "ordinary case" analysis, the portion of the Immigration and Nationality Act before us fails the fair notice test for the reasons Justice Scalia identified in *Johnson* and the Court recounts today.

Just like the statute in *Johnson*, the statute here instructs courts to impose special penalties on individuals previously "convicted of" a "crime of violence." 8 U.S.C. §§ 1227(a)

(2)(A)(iii), ■ 1101(a)(43)(F). Just like the statute in *Johnson*, the statute here fails to specify which crimes qualify for that label. Instead, and again like the statute in *Johnson*, the statute here seems to require a judge to guess about the ordinary case of the crime of conviction and then guess whether a "substantial risk" of "physical force" attends its commission.

■ 18 U.S.C. § 16(b); ▢ *Johnson,* 576 U.S., at ——, ——, 135 S.Ct., at 2556–2558. *Johnson* held that a law that asks so much of courts while offering them so little by way of guidance is unconstitutionally vague. And I do not see how we might reach a different judgment here.

Any lingering doubt is resolved for me by taking account of just some of the **\*1232** questions judges trying to apply the statute using an ordinary case analysis would have to confront. Does a conviction for witness tampering ordinarily involve a threat to the kneecaps or just the promise of a bribe? Does a conviction for kidnapping ordinarily involve throwing someone into a car trunk or a noncustodial parent picking up a child from daycare? These questions do not suggest obvious answers. Is the court supposed to hold evidentiary hearings to sort them out, entertaining experts with competing narratives and statistics, before deciding what the ordinary case of a given crime looks like and how much risk of violence it poses? What is the judge to do if there aren't any reliable statistics available? Should (or must) the judge predict the effects of new technology on what qualifies as the ordinary case? After all, surely the risk of injury calculus for crimes like larceny can be expected to change as more thefts are committed by computer rather than by gunpoint. Or instead of requiring real evidence, does the statute mean to just leave it all to a judicial hunch? And on top of all that may be the most difficult question yet: at what level of generality is the inquiry supposed to take place? Is a court supposed to pass on the ordinary case of burglary in the relevant neighborhood or county, or should it focus on statewide or even national experience? How is a judge to know? How are the people to know?

The implacable fact is that this isn't your everyday ambiguous statute. It leaves the people to guess about what the law demands—and leaves judges to make it up. You cannot discern answers to any of the questions this law begets by resorting to the traditional canons of statutory interpretation. No amount of staring at the statute's text, structure, or history will yield a clue. Nor does the statute call for the application of some preexisting body of law familiar to the judicial power. The statute doesn't even ask for application of common

experience. Choice, pure and raw, is required. Will, not judgment, dictates the result.

\*

Having said this much, it is important to acknowledge some limits on today's holding too. I have proceeded on the premise that the Immigration and Nationality Act, as it incorporates § 16(b) of the criminal code, commands courts to determine the risk of violence attending the ordinary case of conviction for a particular crime. I have done so because no party before us has argued for a different way to read these statutes in combination; because our precedent seemingly requires this approach; and because the government itself has conceded (repeatedly) that the law compels it. ▢ *Johnson, supra,* at 1217, 135 S.Ct., at 2561–2562; ▢ *Taylor v. United States,* 495 U.S. 575, 600, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990); Brief for Petitioner 11, 30, 32, 36, 40, 47 (conceding that an ordinary case analysis is required).

But any more than that I would not venture. In response to the problems engendered by the ordinary case analysis, Justice THOMAS suggests that we should overlook the government's concession about the propriety of that approach; reconsider our precedents endorsing it; and read the statute as requiring us to focus on the facts of the alien's crime as committed rather than as the facts appear in the ordinary case of conviction. *Post,* at 1252 – 1259. But normally courts do not rescue parties from their concessions, maybe least of all concessions from a party as able to protect its interests as the federal government. And normally, too, the crucible of adversarial testing is crucial to sound judicial decisionmaking. We rely on it to "yield insights (or reveal pitfalls) we cannot muster guided only by our own **\*1233** lights." ▢ *Maslenjak v. United States,* 582 U.S. ——, ——, 137 S.Ct. 1918, 1931, 198 L.Ed.2d 460 (2017) (GORSUCH, J., concurring in part and concurring in judgment).

While sometimes we may or even must forgo the adversarial process, I do not see the case for doing so today. Maybe especially because I am not sure Justice THOMAS's is the only available alternative reading of the statute we would have to consider, even if we did reject the government's concession and wipe the precedential slate clean. We might also have to consider an interpretation that would have courts ask not whether the alien's crime of conviction ordinarily involves a risk of physical force, or whether the defendant's particular

Sessions v. Dimaya, 138 S.Ct. 1204 (2018)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1035 of 1271

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

crime involved such a risk, but whether the defendant's crime of conviction *always* does so. After all, the language before us requires a conviction for an "offense ... that, *by its nature,* involves a substantial risk of physical force." 🚩 18 U.S.C. § 16(b) (emphasis added). Plausibly, anyway, the word "nature" might refer to an inevitable characteristic of the offense; one that would present itself automatically, whenever the statute is violated. See 10 Oxford English Dictionary 247 (2d ed. 1989). While I remain open to different arguments about our precedent and the proper reading of language like this, I would address them in another case, whether involving the INA or a different statute, where the parties have a chance to be heard and we might benefit from their learning.

It's important to note the narrowness of our decision today in another respect too. Vagueness doctrine represents a procedural, not a substantive, demand. It does not forbid the legislature from acting toward any end it wishes, but only requires it to act with enough clarity that reasonable people can know what is required of them and judges can apply the law consistent with their limited office. Our history surely bears examples of the judicial misuse of the so-called "substantive component" of due process to dictate policy on matters that belonged to the people to decide. But concerns with substantive due process should not lead us to react by withdrawing an ancient procedural protection compelled by the original meaning of the Constitution.

Today's decision sweeps narrowly in yet one more way. By any fair estimate, Congress has largely satisfied the procedural demand of fair notice even in the INA provision before us. The statute lists a number of specific crimes that can lead to a lawful resident's removal—for example, murder, rape, and sexual abuse of a minor. 🚩 8 U.S.C. § 1101(a)(43)(A). Our ruling today does not touch this list. We address only the statute's "residual clause" where Congress ended its own list and asked us to begin writing our own. Just as Blackstone's legislature passed a revised statute clarifying that "cattle" covers bulls and oxen, Congress remains free at any time to add more crimes to its list. It remains free, as well, to write a new residual clause that affords the fair notice lacking here. Congress might, for example, say that a conviction for any felony carrying a prison sentence of a specified length opens an alien to removal. Congress has done almost exactly this in other laws. See, *e.g.,* 🚩 18 U.S.C. § 922(g). What was done there could be done here.

But those laws are not this law. And while the statute before us doesn't rise to the level of threatening death for "pretended offences" of treason, no one should be surprised that the Constitution looks unkindly on any law so vague that reasonable people cannot understand its terms and judges do not know where to begin in applying it. A government of laws and not **\*1234** of men can never tolerate that arbitrary power. And, in my judgment, that foundational principle dictates today's result. Because I understand them to be consistent with what I have said here, I join Parts I, III, IV–B, and V of the Court's opinion and concur in the judgment.

Chief Justice ROBERTS, with whom Justice KENNEDY, Justice THOMAS, and Justice ALITO join, dissenting.

In *Johnson v. United States,* we concluded that the residual clause of the Armed Career Criminal Act was unconstitutionally vague, given the "indeterminacy of the wide-ranging inquiry" it required. 📙 576 U.S. ——, ——, 135 S.Ct. 2551, 2557, 192 L.Ed.2d 569 (2015). Today, the Court relies wholly on *Johnson*—but only some of *Johnson*—to strike down another provision, 🚩 18 U.S.C. § 16(b). Because 🚩 § 16(b) does not give rise to the concerns that drove the Court's decision in *Johnson*, I respectfully dissent.

I

The term "crime of violence" appears repeatedly throughout the Federal Criminal Code. 🚩 Section 16 of Title 18 defines it to mean:

> "(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> "(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

This definition of "crime of violence" is also incorporated in the definition of "aggravated felony" in the Immigration and Nationality Act. 🚩 8 U.S.C. § 1101(a)(43)(F) ("aggravated felony" includes "a crime of violence (as defined in section 16 of title 18, but not including a purely political offense) for which the term of imprisonment [is] at least one

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Sessions v. Dimaya, 138 S.Ct. 1204 (2018)

Case 3:20-cv-07721-SI Document 58-5 Filed 11/10/20 Page 1036 of 1271

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

year" (footnote omitted)). A conviction for an aggravated felony carries serious consequences under the immigration laws. It can serve as the basis for an alien's removal from the United States, and can preclude cancellation of removal by the Attorney General. §§ 1227(a)(2)(A)(iii), 1229b(a)(3).

Those consequences came to pass in respondent James Dimaya's case. An Immigration Judge and the Board of Immigration Appeals interpreted § 16(b) to cover Dimaya's two prior convictions for first-degree residential burglary under California law, subjecting him to removal. To stave off that result, Dimaya argued that the language of § 16(b) was void for vagueness under the Due Process Clause of the Fifth Amendment.

The parties begin by disputing whether a criminal or more relaxed civil vagueness standard should apply in resolving Dimaya's challenge. A plurality of the Court rejects the Government's argument in favor of a civil standard, because of the "grave nature of deportation," *Jordan v. De George,* 341 U.S. 223, 231, 71 S.Ct. 703, 95 L.Ed. 886 (1951); see *ante,* at 1226 (plurality opinion); Justice GORSUCH does so for broader reasons, see *ante,* at 1218 – 1231 (GORSUCH, J., concurring in part and concurring in judgment). I see no need to resolve which standard applies, because I would hold that § 16(b) is not unconstitutionally vague even under the standard applicable to criminal laws.

## II

This is not our first encounter with § 16(b). In *Leocal v. Ashcroft,* 543 U.S. 1, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004), we were asked to decide whether either subsection of § 16 covers a particular category of state crimes, specifically DUI offenses **\*1235** involving no more than negligent conduct. 543 U.S., at 6, 125 S.Ct. 377. Far from finding § 16(b) "hopeless[ly] indetermina[te]," *Johnson,* 576 U.S., at ——, 135 S.Ct., at 2558, we considered the provision clear and unremarkable: "while § 16(b) is broader than § 16(a) in the sense that physical force need not actually be applied," the provision "simply covers offenses that naturally involve a person acting in disregard of the risk that physical force might be used against another in committing an offense," *Leocal,*

543 U.S., at 10–11, 125 S.Ct. 377. Applying that standard to the state offense at issue, we concluded—unanimously—that § 16(b) "cannot be read to include [a] conviction for DUI causing serious bodily injury under Florida law." *Id.,* at 11, 125 S.Ct. 377.

*Leocal* thus provides a model for how courts should assess whether a particular crime "by its nature" involves a risk of the use of physical force. At the outset, our opinion set forth the elements of the Florida DUI statute, which made it a felony "for a person to operate a vehicle while under the influence and, 'by reason of such operation, caus[e] ... [s]erious bodily injury to another.' " 543 U.S., at 7, 125 S.Ct. 377. Our § 16(b) analysis, in turn, focused on those specific elements in concluding that a Florida offender's acts would not naturally give rise to the requisite risk of force "in the course of committing the offense." *Id.,* at 11, 125 S.Ct. 377. "In no 'ordinary or natural' sense," we explained, "can it be said that a person risks having to 'use' physical force against another person in the course of operating a vehicle while intoxicated and causing injury." *Ibid.*

The Court holds that the same provision we had no trouble applying in *Leocal* is in fact incapable of reasoned application. The sole justification for this turnabout is the resemblance between the language of § 16(b) and the language of the residual clause of the Armed Career Criminal Act (ACCA) that was at issue in *Johnson.* The latter provision defined a "violent felony" to include "any crime punishable by imprisonment for a term exceeding one year ... that ... is burglary, arson, or extortion, involves use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another.*" 18 U.S.C. § 924(e)(2) (B)(ii) (emphasis added).

In *Johnson,* we concluded that the ACCA residual clause (the "or otherwise" language) gave rise to two forms of intractable uncertainty, which "conspire[d]" to render the provision unconstitutionally vague. 576 U.S., at ——, 135 S.Ct., at 2557. First, the residual clause asked courts to gauge the "potential risk" of "physical injury" posed by the conduct involved in the crime. *Ibid.* That inquiry, we determined, entailed not only an evaluation of the "criminal's behavior," but also required courts to consider "how the idealized ordinary case of the crime subsequently plays out." *Ibid.* Second, the residual clause obligated courts to compare that

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

risk to an indeterminate standard—one that was inextricably linked to the provision's four enumerated crimes, which presented differing kinds and degrees of risk. *Id.,* at ——, 135 S.Ct., at 2558. This murky confluence of features, each of which "may [have been] tolerable in isolation," together "ma[de] a task for us which at best could be only guesswork." *Id.,* at ——, 135 S.Ct., at 2560.

Section 16(b) does not present the same ambiguities. The two provisions do correspond to some extent. Under our decisions, both ask the sentencing court to consider whether a particular offense, defined without regard to the facts of the conviction, poses a specified risk. And, relevant to both statutes, we have explained **\*1236** that in deciding whether statutory elements inherently produce a risk, a court must take into account how those elements will ordinarily be fulfilled. See *James v. United States,* 550 U.S. 192, 208, 127 S.Ct. 1586, 167 L.Ed.2d 532 (2007) (this categorical inquiry asks "whether the conduct encompassed by the elements of the offense, in the ordinary case, presents" the requisite risk).[1] In the Court's view, that effectively resolves this case. But the Court too readily dismisses the significant textual distinctions between § 16(b) and the ACCA residual clause. See also *ante,* at 1224 (opinion of GORSUCH, J.). Those differences undermine the conclusion that § 16(b) shares each of the "dual flaws" of that clause. *Ante,* at 1221 - 1222 (majority opinion).

To begin, § 16(b) yields far less uncertainty "about how to estimate the risk posed by a crime." *Johnson,* 576 U.S., at ——, 135 S.Ct., at 2557. There are three material differences between § 16(b) and the ACCA residual clause in this respect. First, the ACCA clause directed the reader to consider whether the offender's conduct presented a "*potential* risk" of injury. Forced to give meaning to that befuddling choice of phrase—which layered one indeterminate term on top of another—we understood the word "potential" to signify that "Congress intended to encompass possibilities even more contingent or remote than a simple 'risk.' " *James,* 550 U.S., at 207–208, 127 S.Ct. 1586. As we explained in *Johnson,* that made for a "speculative" inquiry "detached from statutory elements." 576 U.S., at ——, 135 S.Ct., at 2558. In other words, the offense elements could not constrain the risk inquiry in the manner they do here. See *Leocal,*

543 U.S., at 11, 125 S.Ct. 377. The "serious potential risk" standard also forced courts to assess in an expansive way the "collateral consequences" of the perpetrator's acts. For example, courts had to take into account the concern that *others* might cause injury in attempting to apprehend the offender. See *Sykes v. United States,* 564 U.S. 1, 8–9, 131 S.Ct. 2267, 180 L.Ed.2d 60 (2011). Section 16(b), on the other hand, asks about "risk" alone, a familiar concept of everyday life. It therefore calls for a commonsense inquiry that does not compel a court to venture beyond the offense elements to consider contingent and remote possibilities.

Second, § 16(b) focuses exclusively on the risk that the offender will "use [ ]" "physical force" "against" another person or another person's property. Thus, unlike the ACCA residual clause, "§ 16(b) plainly does not encompass all offenses which create a 'substantial risk' that *injury will result from* a person's conduct." *Leocal,* 543 U.S., at 10, n. 7, 125 S.Ct. 377 (emphasis added). The point is not that an inquiry into the risk of "physical force" is markedly more determinate than an inquiry into the risk of "physical injury." But see *ante,* at 1220 – 1221. The difference **\*1237** is that § 16(b) asks about the risk that the offender himself will *actively employ* force against person or property. That language does not sweep in all instances in which the offender's acts, or another person's reaction, might result in unintended or negligent harm.

Third, § 16(b) has a temporal limit that the ACCA residual clause lacked: The "substantial risk" of force must arise "in the course of committing the offense." Properly interpreted, this means the statute requires a substantial risk that the perpetrator will use force while carrying out the crime. See *Leocal,* 543 U.S., at 10, 125 S.Ct. 377 ("The reckless disregard in § 16 relates ... to the risk that the use of physical force against another might be required in committing a crime."). The provision thereby excludes more attenuated harms that might arise following the completion of the crime. The ACCA residual clause, by contrast, contained no similar language restricting its scope. And the absence of such a limit, coupled with the reference to "potential" risks, gave courts free rein to classify an offense as a violent felony based on injuries that might occur after the offense was over and done. See, *e.g., United States v. Benton,* 639 F.3d 723, 732 (C.A.6 2011) (finding that "solicitation to commit

AR.06262

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1038 of 1271

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

aggravated assault" qualified under the ACCA residual clause on the theory that the solicited individual might subsequently carry out the requested act).

Why does any of this matter? Because it mattered in *Johnson*. More precisely, the expansive language in the ACCA residual clause contributed to our determination that the clause gave rise to "grave uncertainty about how to estimate the risk posed by a crime." 576 U.S., at ——, 135 S.Ct., at 2558. "Critically," we said—a word that tends to mean something—*picturing the criminal's behavior is not enough*." *Ibid.* (emphasis added). Instead, measuring "potential risk" "seemingly require[d] the judge to imagine how the idealized ordinary case of the crime *subsequently plays out*." *Ibid.* (emphasis added). Not so here. In applying § 16(b), considering "the criminal's behavior" *is* enough.

Those three distinctions—the unadorned reference to "risk," the focus on the offender's own active employment of force, and the "in the course of committing" limitation—also mean that many hard cases under ACCA are easier under § 16(b). Take the firearm possession crime from *Johnson* itself, which had as its constituent elements (1) unlawfully (2) possessing (3) a short-barreled shotgun. None of those elements, "by its nature," carries "a substantial risk" that the possessor will use force against another "in the course of committing the offense." Nothing inherent in the act of firearm possession, even when it is unlawful, gives rise to a substantial risk that the owner will then shoot someone. See *United States v. Serafin,* 562 F.3d 1105, 1113 (C.A.10 2009) (recognizing that "*Leocal* instructs [a court] to focus not on whether possession will likely *result* in violence, but instead whether one possessing an unregistered weapon necessarily risks the need to employ force to commit possession").[2] Yet short-barreled shotgun **\*1238** possession presented a closer question under the ACCA residual clause, because the "serious potential risk" language seemingly directed us to consider "the circumstances and conduct that ordinarily attend the offense," in addition to the offense itself. *Johnson,* 576 U.S., at ——, 135 S.Ct., at 2582 (ALITO, J., dissenting); see *id.,* at ——, 135 S.Ct., at 2584 (reasoning that the crime must qualify because "a person who chooses to break the law and risk the heavy criminal penalty incurred by possessing a notoriously dangerous weapon is [likely] to use that weapon in violent ways").

Failure to report to a penal institution, the subject of *Chambers v. United States,* 555 U.S. 122, 129 S.Ct. 687, 172 L.Ed.2d 484 (2009), is another crime "whose treatment becomes more obvious under § 16(b) than under ACCA," *ante,* at 1220. In *Chambers,* the Government argued that the requisite risk of injury arises not necessarily at the time the offender fails to report to prison, but instead later, when an officer attempts to recapture the fugitive. 555 U.S., at 128, 129 S.Ct. 687. The majority is correct that we ultimately "reject[ed]" the Government's contention. *Ante,* at 1219 - 1220. But we did so after "assum[ing] for argument's sake" its premise—that is, "the relevance of violence that may occur long after an offender fails to report." 555 U.S., at 128, 129 S.Ct. 687; see *id.,* at 129, 129 S.Ct. 687 (looking at 160 cases of "failure to report" and observing that "none at all involved violence ... during the commission of the offense itself, [nor] during the offender's later apprehension"). The "in the course of committing the offense" language in § 16(b) helpfully forecloses that debate.

DUI offenses are yet another example. Because § 16(b) asks about the risk that the offender will "use[ ]" "physical force," we readily concluded in *Leocal* that the subsection does not cover offenses where the danger arises from the offender's negligent or accidental conduct, including drunk driving. 543 U.S., at 11, 125 S.Ct. 377. Applying the ACCA residual clause proved more trying. When asked to decide whether the clause covered drunk driving offenses, a majority of the Court concluded that the answer was no. *Begay v. United States,* 553 U.S. 137, 128 S.Ct. 1581, 170 L.Ed.2d 490 (2008). Our decision was based, however, on the inference that the clause must cover only "purposeful, 'violent,' and 'aggressive' conduct"—a test derived not from the "conduct that presents a serious potential risk of physical injury" language, but instead by reference to (what we guessed to be) the unifying characteristics of the enumerated offenses. *Id.,* at 144–145, 128 S.Ct. 1581. Four Members of the Court criticized that test, see *id.,* at 150–153, 128 S.Ct. 1581 (Scalia, J., concurring in judgment); *id.,* at 158–160, 162–163, 128 S.Ct. 1581 (ALITO, J., dissenting), though they themselves disagreed about whether DUIs were covered, see *id.,* at 153–154, 128 S.Ct. 1581 (opinion of

Scalia, J.); *id.,* at 156–158, 128 S.Ct. 1581 (opinion of ALITO, J.). And the Court distanced itself from the *Begay* requirement only a few years later when confronting the crime of **\*1239** vehicular flight. See *Sykes,* 564 U.S., at 12–13, 131 S.Ct. 2267; *Johnson,* 576 U.S., at ——, ——, 135 S.Ct., at 2559–2560.

Which brings me to the second part of the Court's analysis: its objection that § 16(b), like the ACCA residual clause, leaves "uncertainty about the level of risk that makes a crime 'violent.' " *Ante,* at 1215. The "substantial risk" standard in § 16(b) is significantly less confusing because it is not tied to a disjointed list of paradigm offenses. Recall that the ACCA provision defined a "violent felony" to include a crime that "is burglary, arson, or extortion, involves use of explosives, or *otherwise* involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii) (emphasis added). As our Court recognized early on, that "otherwise" told the reader to understand the "serious potential risk of physical injury" standard by way of the four enumerated crimes. *James,* 550 U.S., at 203, 127 S.Ct. 1586. But how, exactly? That question dogged our residual clause cases for years, until we said *no más* in *Johnson.*

In our first foray, *James,* we resolved the case by asking whether the risk posed by the crime of attempted burglary was "comparable to that posed by its closest analog among the enumerated offenses," which was completed burglary. 550 U.S., at 203, 127 S.Ct. 1586. While that rule "[took] care of attempted burglary," it "offer[ed] no help at all with respect to the vast majority of offenses, which have no apparent analog among the enumerated crimes." *Johnson,* 576 U.S., at ——, 135 S.Ct., at 2558. The *James* dissent, for its part, would have determined the requisite degree of risk from the least dangerous of the enumerated crimes, and compared the offense to that. 550 U.S., at 218–219, 127 S.Ct. 1586 (opinion of Scalia, J.). But that approach also proved to be harder than it sounded. See *id.,* at 219–227, 127 S.Ct. 1586.

After *James* came *Begay,* in which we concluded that the enumerated offenses served as an independent limitation on the *kind* of crime that could qualify. 553 U.S., at 142, 128 S.Ct. 1581; see *Chambers,* 555 U.S., at 128, 129 S.Ct. 687 (applying the *Begay* standard). As discussed, that

test was short lived (though we did not purport to wholly repudiate it). See *Sykes,* 564 U.S., at 13, 131 S.Ct. 2267. Finally, in *Sykes*—our penultimate residual clause case—we acknowledged the prior use of the closest-analog test in *James,* but instead focused on whether the risk posed by vehicular flight was "similar in degree of danger" to the listed offenses of arson and burglary. 564 U.S., at 8–10, 131 S.Ct. 2267. As a result, Justice Scalia's dissent characterized the *Sykes* majority as applying the test from his prior dissent in *James,* not *James* itself. See 564 U.S., at 29–30, 33, 131 S.Ct. 2267. This series of precedents laid bare our "repeated inability to craft a principled test out of the statutory text," *id.,* at 34, 131 S.Ct. 2267 (opinion of Scalia, J.), as the Court ultimately acknowledged in *Johnson,* 576 U.S., at ——, 135 S.Ct., at 2558–2559.

The enumerated offenses, and our Court's failed attempts to make sense of them, were essential to *Johnson* 's conclusion that the residual clause "leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony." *Id.,* at ——, 130 S.Ct., at 2558. As *Johnson* explained, the issue was not that the statute employed a fuzzy standard. That kind of thing appears in the statute books all the time. *Id.,* at ——, ——, 135 S.Ct., at 2558, 2561. In the majority's retelling today, the difficulty inhered solely in the fact that the statute paired such a standard with the ordinary case inquiry. See *ante,* at 1214, 1215 – 1216, 1221 - 1222. But that **\*1240** account sidesteps much of *Johnson* 's reasoning. See 576 U.S., at ——, ——, ——, ——, 135 S.Ct., at 2556–2558, 2558, 2558–2560, 2561. Our opinion emphasized that the word "otherwise" "force[d]" courts to interpret the amorphous standard "in light of" the four enumerated crimes, which are "not much more similar to one another in kind than in degree of risk posed." *Id.,* at ——, ——, 135 S.Ct., at 2558, 2559. Or, as *Johnson* put it more vividly, "[t]he phrase 'shades of red,' standing alone, does not generate confusion or unpredictability; but the phrase 'fire-engine red, light pink, maroon, *navy blue,* or colors that otherwise involve shades of red' assuredly does so." *Id.,* at ——, 135 S.Ct., at 2561. Indeed, the author of *Johnson* had previously, and repeatedly, described this feature of the residual clause as the "crucial ... respect" in which the law was problematic. See *James,* 550 U.S., at 230, n. 7, 127 S.Ct. 1586 (opinion of Scalia, J.); *Sykes,* 564 U.S., at 35, 131 S.Ct. 2267 (opinion of Scalia, J.).

Sessions v. Dimaya, 138 S.Ct. 1204 (2018)

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

With 🚩 § 16(b), by contrast, a court need simply consider the meaning of the word "substantial"—a word our Court has interpreted and applied innumerable times across a wide variety of contexts. [3] The court does not need to give that familiar word content by reference to four different offenses with varying amounts and kinds of risk.

In its effort to recast a considerable portion of *Johnson* as dicta, the majority speculates that if the enumerated offenses had truly mattered to the outcome, the Court would have told lower courts to "give up on trying to interpret the clause by reference to" those offenses, rather than striking down the provision entirely. 🚩 *Ante,* at 1221. No litigant in *Johnson* suggested that solution, which is not surprising. Such judicial redrafting could have expanded the reach of the criminal provision—surely a job for Congress alone.

In any event, I doubt the majority's proposal would have done the trick. And that is because the result in *Johnson* did not follow from the presence of one frustrating textual feature or another. Quite the opposite: The decision emphasized that it was the "sum" of the "uncertainties" in the ACCA residual clause, confirmed by years of experience, that "convince[d]" us the provision was beyond salvage. 🚩 *Johnson,* 576 U.S., at ——, 135 S.Ct., at 2560. Those failings do not characterize the provision at issue here.

### III

The more constrained inquiry required under 🚩 § 16(b)— which asks only whether the offense elements naturally carry with them a risk that the offender will use force **\*1241** in committing the offense—does not itself engender "grave uncertainty about how to estimate the risk posed by a crime." And the provision's use of a commonplace substantial risk standard—one not tied to a list of crimes that lack a unifying feature—does not give rise to intolerable "uncertainty about how much risk it takes for a crime to qualify." That should be enough to reject Dimaya's facial vagueness challenge. [4]

Because I would rely on those distinctions to uphold 🚩 § 16(b), the Court reproaches me for not giving sufficient weight to a "core insight" of *Johnson. Ante,* at 1215, n. 4; see *ante,* at 1231 (opinion of GORSUCH, J.) (arguing that

🚩 § 16(b) runs afoul of *Johnson* "to the extent [ 🚩 § 16(b) ] requires an 'ordinary case' analysis"). But the fact that the ACCA residual clause required the ordinary case approach was not itself sufficient to doom the law. We instead took pains to clarify that our opinion should not be read to impart such an absolute rule. See 🚩 *Johnson,* 576 U.S., at ——, 135 S.Ct., at 2560. I would adhere to that careful holding and not reflexively extend the decision to a different statute whose reach is, on the whole, far more clear.

The Court does the opposite, and the ramifications of that decision are significant. First, of course, today's holding invalidates a provision of the Immigration and Nationality Act—part of the definition of "aggravated felony"—on which the Government relies to "ensure that dangerous criminal aliens are removed from the United States." Brief for United States 54. Contrary to the Court's back-of-the-envelope assessment, see *ante,* at 1222, n. 12, the Government explains that the definition is "critical" for "numerous" immigration provisions. Brief for United States 12.

In addition, 🚩 § 16 serves as the universal definition of "crime of violence" for all of Title 18 of the United States Code. Its language is incorporated into many procedural and substantive provisions of criminal law, including provisions concerning racketeering, money laundering, domestic violence, using a child to commit a violent crime, and distributing information about the making or use of explosives. See 18 U.S.C. §§ 25(a)(1), 🚩 842(p)(2), 🚩 1952(a), 🚩 1956(c)(7)(B)(ii), 🚩 1959(a)(4), 🚩 2261(a), 3561(b). Of special concern, 🚩 § 16 is replicated in the definition of "crime of violence" applicable to 🚩 § 924(c), which prohibits using or carrying a firearm "during and in relation to any crime of violence," or possessing a firearm "in furtherance of any such crime." 🚩 §§ 924(c)(1)(A), 🚩 (c)(3). Though I express no view on whether 🚩 § 924(c) can be distinguished from the provision we consider here, the Court's holding calls into question convictions under what the Government warns us is an "oft-prosecuted offense." Brief for United States 12.

Because *Johnson* does not compel today's result, I respectfully dissent.

**\*1242** Justice THOMAS, with whom Justice KENNEDY and Justice ALITO join as to Parts I–C–2, II–A–1, and II–B, dissenting.

I agree with THE CHIEF JUSTICE that 18 U.S.C. § 16(b), as incorporated by the Immigration and Nationality Act (INA), is not unconstitutionally vague. Section 16(b) lacks many of the features that caused this Court to invalidate the residual clause of the Armed Career Criminal Act (ACCA) in *Johnson v. United States,* 576 U.S. ——, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015). ACCA's residual clause—a provision that this Court had applied four times before *Johnson*—was not unconstitutionally vague either. See *id.,* at ——, 135 S.Ct., 2563–2564 (THOMAS, J., concurring in judgment); *id.,* at ——, 135 S.Ct., at 2580–2583 (ALITO, J., dissenting). But if the Court insists on adhering to *Johnson,* it should at least take *Johnson* at its word that the residual clause was vague due to the " 'sum' " of its specific features. *Id.,* at ——, 135 S.Ct., at 2560 (majority opinion). By ignoring this limitation, the Court jettisons *Johnson* 's assurance that its holding would not jeopardize "dozens of federal and state criminal laws." *Id.,* at ——, 135 S.Ct., at 2561.

While THE CHIEF JUSTICE persuasively explains why respondent cannot prevail under our precedents, I write separately to make two additional points. First, I continue to doubt that our practice of striking down statutes as unconstitutionally vague is consistent with the original meaning of the Due Process Clause. See *id.,* at ——, 135 S.Ct., at 2566–2567 (opinion of THOMAS, J.). Second, if the Court thinks that § 16(b) is unconstitutionally vague because of the "categorical approach," see *ante,* at 1209 – 1216, then the Court should abandon that approach—not insist on reading it into statutes and then strike them down. Accordingly, I respectfully dissent.

I

I continue to harbor doubts about whether the vagueness doctrine can be squared with the original meaning of the Due Process Clause—and those doubts are only amplified in the removal context. I am also skeptical that the vagueness doctrine can be justified as a way to prevent delegations of core legislative power in this context. But I need not resolve these questions because, if the vagueness doctrine has any basis in the Due Process Clause, it must be limited to cases in which the statute is unconstitutionally vague as applied to the person challenging it. That is not the case for respondent, whose prior convictions for first-degree residential burglary in California fall comfortably within the scope of § 16(b).

A

The Fifth Amendment's Due Process Clause provides that no person shall be "deprived of life, liberty, or property, without due process of law." Section 16(b), as incorporated by the INA, cannot violate this Clause unless the following propositions are true: The Due Process Clause requires federal statutes to provide certain minimal procedures, the vagueness doctrine is one of those procedures, and the vagueness doctrine applies to statutes governing the removal of aliens. Although I need not resolve any of these propositions today, each one is questionable. I will address them in turn.

1

First, the vagueness doctrine is not legitimate unless the "law of the land" view of due process is incorrect. Under that view, due process "require[s] only that our Government ... proceed ... according to written constitutional and statutory provision[s] **\*1243** before depriving someone of life, liberty, or property." *Nelson v. Colorado,* 581 U.S. ——, ——, n. 1, 137 S.Ct. 1249, 1264, n. 1, 197 L.Ed.2d 611 (2017) (THOMAS, J., dissenting) (internal quotation marks omitted). More than a half century after the founding, the Court rejected this view of due process in *Murray's Lessee v. Hoboken Land & Improvement Co.,* 18 How. 272, 15 L.Ed. 372 (1856). See *id.,* at 276 (holding that the Due Process Clause "is a restraint on the legislative as well as on the executive and judicial powers of the government"). But the textual and historical support for the law-of-the-land view is not insubstantial. [1]

2

Sessions v. Dimaya, 138 S.Ct. 1204 (2018)

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

Even under *Murray's Lessee,* the vagueness doctrine is legitimate only if it is a "settled usag[e] and mod[e] of proceeding existing in the common and statute law of England, before the emigration of our ancestors." *Id.,* at 277. That proposition is dubious. Until the end of the 19th century, "there is little indication that anyone ... believed that courts had the power under the Due Process Claus[e] to nullify statutes on [vagueness] ground[s]." *Johnson, supra, at ——,* 135 S.Ct., at 2569 (opinion of THOMAS, J.). That is not because Americans were unfamiliar with vague laws. Rather, early American courts, like their English predecessors, addressed vague laws through statutory construction instead of constitutional law. See Note, Void for Vagueness: An Escape From Statutory Interpretation, 23 Ind. L.J. 272, 274–279 (1948). They invoked the rule of lenity and declined to apply vague penal statutes on a case-by-case basis. See *Johnson,* 576 U.S., at ——————, 135 S.Ct., at 2566–2568 (opinion of THOMAS, J.); *e.g., ante,* at 1225 – 1226, and n. 1 (GORSUCH, J., concurring in part and concurring in judgment) (collecting cases).[2] The modern vagueness doctrine, which claims the judicial authority to "strike down" vague legislation on its face, did not emerge until the turn of the 20th century. See **\*1244** *Johnson,* 576 U.S., at ——————, 135 S.Ct., at 2568–2570 (opinion of THOMAS, J.).

The difference between the traditional rule of lenity and the modern vagueness doctrine is not merely semantic. Most obviously, lenity is a tool of statutory construction, which means States can abrogate it—and many have. Hall, Strict or Liberal Construction of Penal Statutes, 48 Harv. L. Rev. 748, 752–754 (1935); see also Scalia, Assorted Canards of Contemporary Legal Analysis, 40 Case W. Res. L. Rev. 581, 583 (1989) ("Arizona, by the way, seems to have preserved a fair and free society without adopting the rule that criminal statutes are to be strictly construed" (citing Ariz. Rev. Stat. § 1–211C (1989))). The vagueness doctrine, by contrast, is a rule of constitutional law that States cannot alter or abolish. Lenity, moreover, applies only to "penal" statutes, 1 Blackstone, Commentaries on the Laws of England 88 (1765), but the vagueness doctrine extends to all regulations of individual conduct, both penal and nonpenal. *Johnson,* 576 U.S., at ——, 135 S.Ct., at 2566 (opinion of THOMAS, J.); see also Note, Indefinite Criteria of Definiteness in Statutes, 45 Harv. L. Rev. 160, 163 (1931) (explaining that the modern vagueness doctrine was not merely an "extension of the rule of strict construction of penal statutes" because

it "expressly include[s] civil statutes within its scope," reflecting a "regrettable disregard" for legislatures).[3] In short, early American courts were not applying the modern vagueness doctrine by another name. They were engaged in a fundamentally different enterprise.

Tellingly, the modern vagueness doctrine emerged at a time when this Court was actively interpreting the Due Process Clause to strike down democratically enacted laws —first in the name of the "liberty of contract," then in the name of the "right to privacy." See *Johnson,* 576 U.S., at ——————, 135 S.Ct., at 2568–2570 (opinion of THOMAS, J.). That the vagueness doctrine "develop[ed] on the federal level concurrently with the growth of the tool of substantive due process" does not seem like a coincidence. Note, 23 Ind. L.J., at 278. Like substantive due process, the vagueness doctrine provides courts with "open-ended authority to oversee [legislative] choices." *Kolender v. Lawson,* 461 U.S. 352, 374, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (White, J., dissenting). This Court, for example, has used the vagueness doctrine to invalidate antiloitering laws, even though those laws predate the Declaration of Independence. See *Johnson, supra,* at —— (opinion of THOMAS, J.) ( 576 U.S., at ——, 135 S.Ct., at 2568) (discussing *Chicago v. Morales,* 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999)).

This Court also has a bad habit of invoking the Due Process Clause to constitutionalize rules that were traditionally left to the democratic process. See, *e.g.,* *Williams v. Pennsylvania,* 579 U.S. ——, 136 S.Ct. 1899, 195 L.Ed.2d 132 (2016); *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *Foucha v. Louisiana,* 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992); cf. *Montgomery v. Louisiana,* 577 U.S. ——, 136 S.Ct. 718, 193 L.Ed.2d 599 (2016). If vagueness is another example of this practice, **\*1245** then that is all the more reason to doubt its legitimacy.

3

Even assuming the Due Process Clause prohibits vague laws, this prohibition might not apply to laws governing the removal of aliens. Cf. *Johnson,* 576 U.S., at ——, n. 7,

135 S.Ct., at 2581, n. 7 (opinion of THOMAS, J.) (stressing the need for specificity when assessing alleged due process rights). The Founders were familiar with English law, where " 'the only question that ha[d] ever been made in regard to the power to expel aliens [was] whether it could be exercised by the King without the consent of Parliament.' " Demore v. Kim, 538 U.S. 510, 538, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003) (O'Connor, J., concurring in part and concurring in judgment) (quoting Fong Yue Ting v. United States, 149 U.S. 698, 709, 13 S.Ct. 1016, 37 L.Ed. 905 (1893)). And, in this country, the notion that the Due Process Clause governed the removal of aliens was not announced until the 20th century.

Less than a decade after the ratification of the Bill of Rights, the founding generation had an extensive debate about the relationship between the Constitution and federal removal statutes. In 1798, the Fifth Congress enacted the Alien Acts. One of those Acts, the Alien Friends Act, gave the President unfettered discretion to expel any aliens "he shall judge dangerous to the peace and safety of the United States, or shall have reasonable grounds to suspect are concerned in any treasonable or secret machinations against the government thereof." An Act Concerning Aliens § 1, 1 Stat. 571. This statute was modeled after the Aliens Act 1793 in England, which similarly gave the King unfettered discretion to expel aliens as he "shall think necessary for the publick Security." 33 Geo. III, ch. 4, § 18, in 39 Eng. Stat. at Large 16. Both the Fifth Congress and the States thoroughly debated the Alien Friends Act. Virginia and Kentucky enacted resolutions (anonymously drafted by Madison and Jefferson) opposing the Act, while 10 States enacted counter-resolutions condemning the views of Virginia and Kentucky. See Fehlings, Storm on the Constitution: The First Deportation Law, 10 Tulsa J. Comp. & Int'l L. 63, 85, 103 (2002).

The Jeffersonian Democratic–Republicans, who viewed the Alien Friends Act as a threat to their party and the institution of slavery,[4] raised a number of constitutional objections. Some of the Jeffersonians argued that the Alien Friends Act violated the Fifth Amendment's Due Process Clause. They complained that the Act failed to provide aliens with all the accouterments of a criminal trial. See, e.g., Kentucky Resolutions ¶ 6, in 4 The Debates in the Several Conventions on the Adoption of the Federal Constitution 541–542 (J. Elliot ed. 1836) (Elliot's Debates); 8 Annals of Cong. 1982–1983 (1798) (statement of Rep. Gallatin); Madison's Report on the Virginia Resolutions (Jan. 7, 1800), **1246** in 6 Writings

of James Madison 361–362 (G. Hunt ed. 1906) (Madison's Report).[5]

The Federalists gave two primary responses to this due process argument. First, the Federalists argued that the rights of aliens were governed by the law of nations, not the Constitution. See, e.g., Randolph, Debate on Virginia Resolutions, in The Virginia Report of 1799–1800, pp. 34–35 (1850) (Virginia Debates) (statement of George K. Taylor) (arguing that aliens "were not a party to the [Constitution]" and that "cases between the government and aliens ... arise under the law of nations"); id., at 100 (statement of William Cowan) (identifying the source of rights "as to citizens, the Constitution; as to aliens, the law of nations"); A. Addison, A Charge to the Grand Juries of the County Courts of the Fifth Circuit of the State of Pennsylvania 18 (1799) (Charge to the Grand Juries) ("[T]he Constitution leaves aliens, as in other countries, to the protection of the general principles of the law of nations"); Answer to the Resolutions of the State of Kentucky, Oct. 29, 1799, in 4 Records of the Governor and Council of the State of Vermont 528 (1876) (denying "that aliens had any rights among us, except what they derived from the law of nations, and rights of hospitality"). The law of nations imposed no enforceable limits on a nation's power to remove aliens. See, e.g., 1 E. de Vattel, Law of Nations, §§ 230–231, pp. 108–109 (J. Chitty et al. transl. and ed. 1883).

Second, the Federalists responded that the expulsion of aliens "did not touch life, liberty, or property." Virginia Debates 34. The founding generation understood the phrase "life, liberty, or property" to refer to a relatively narrow set of core private rights that did not depend on the will of the government. See Wellness Int'l Network, Ltd. v. Sharif, 575 U.S. ——, ——, 135 S.Ct. 1932, 1942–1943, 191 L.Ed.2d 911 (2015) (THOMAS, J., dissenting); Nelson, Adjudication in the Political Branches, 107 Colum. L. Rev. 559, 566–568 (2007) (Nelson). Quasi-private rights—"privileges" or "franchises" bestowed by the government on individuals—did not qualify and could be taken away without judicial process. See B & B Hardware, Inc. v. Hargis Industries, Inc., 575 U.S. ——, ——, 135 S.Ct. 1293, 1304–1305, 191 L.Ed.2d 222 (2015) (THOMAS, J., dissenting); Nelson 567–569. The Federalists argued that an alien's right to reside in this country was one such privilege. See, e.g., Virginia Debates 34 (arguing that "ordering away an alien ... was not a matter of right, but of favour," which did not require a jury trial); Report of the Select Committee of the House of Representatives, Made to the House of Representatives on

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

Feb. 21, 1799, 9 Annals of Cong. 2987 (1799) (stating that aliens "remain in the country ... merely as matter of favor and permission" and can be removed at any time without a criminal trial); Charge to the Grand Juries 11–13 (similar). According to the Minority Address of the Virginia Legislature (anonymously drafted by John Marshall), "[T]he right of remaining in our country is vested in no alien; he enters and remains by the courtesy of the sovereign power, and that courtesy may at pleasure be withdrawn" without judicial process. Address of the Minority in the Virginia Legislature to the People of that State 9–10 (1799) (Virginia Minority Address). Unlike "a grant of **\*1247** land," the "[a]dmission of an alien to residence ... is revocable, like a permission." A. Addison, Analysis of the Report of the Committee of the Virginia Assembly 23 (1800). Removing a resident alien from the country did not affect "life, liberty, or property," the Federalists argued, until the alien became a naturalized citizen. See *id.,* at 23–24; Charge to the Grand Juries 11–13. That the alien's permanent residence was conferred by statute would not have made a difference. See Nelson 571, 580–582;

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.,* 574 U.S. ——, ——, n. 2, 135 S.Ct. 831, 848, n. 2, ——L.Ed.2d —— (2015) (THOMAS, J., dissenting).

After the Alien Friends Act lapsed in 1800, Congress did not enact another removal statute for nearly a century. The States enacted their own removal statutes during this period, see G. Neuman, Strangers to the Constitution 19–43 (1996), and I am aware of no decision questioning the legality of these statutes under State due-process or law-of-the-land provisions. Beginning in the late 19th century, the Federal Government reinserted itself into the regulation of immigration. When this Court was presented with constitutional challenges to Congress' removal laws, it initially rejected them for many of the same reasons that Marshall and the Federalists had cited in defense of the Alien Friends Act. Although the Court rejected the Federalists' argument that resident aliens do not enjoy constitutional rights, see *Wong Wing v. United States,* 163 U.S. 228, 238, 16 S.Ct. 977, 41 L.Ed. 140 (1896), it agreed that civil deportation statutes do not implicate "life, liberty, or property," see, *e.g., Harisiades v. Shaughnessy,* 342 U.S. 580, 584–585, 72 S.Ct. 512, 96 L.Ed. 586 (1952) ("[T]hat admission for permanent residence confers a 'vested right' on the alien [is] not founded in precedents of this Court"); *United States ex rel. Turner v. Williams,* 194 U.S. 279, 290, 24 S.Ct. 719, 48 L.Ed. 979 (1904) ("[T]he deportation of an alien who is found to be here in violation of law is not a

deprivation of liberty without due process of law"); *Fong Yue Ting,* 149 U.S., at 730, 13 S.Ct. 1016 ("[Deportation] is but a method of enforcing the return to his own country of an alien who has not complied with [statutory] conditions.... He has not, therefore, been deprived of life, liberty, or property without due process of law"); *id.,* at 713–715, 13 S.Ct. 1016 (similar). Consistent with this understanding, "federal immigration laws from 1891 until 1952 made no express provision for judicial review." *Demore,* 538 U.S., at 538, 123 S.Ct. 1708 (opinion of O'Connor, J.).

It was not until the 20th century that this Court held that nonpenal removal statutes could violate the Due Process Clause. See *Wong Yang Sung v. McGrath,* 339 U.S. 33, 49, 70 S.Ct. 445, 94 L.Ed. 616 (1950). That ruling opened the door for the Court to apply the then-nascent vagueness doctrine to immigration statutes. But the Court upheld vague standards in immigration laws that it likely would not have tolerated in criminal statutes. See, *e.g., Boutilier v. INS,* 387 U.S. 118, 122, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967) ( " 'psychopathic personality' "); *Jordan v. De George,* 341 U.S. 223, 232, 71 S.Ct. 703, 95 L.Ed. 886 (1951) (" 'crime involving moral turpitude' "); cf. *Mahler, supra,* at 40 (" 'undesirable residents' "). Until today, this Court has never held that an immigration statute is unconstitutionally vague.

Thus, for more than a century after the founding, it was, at best, unclear whether federal removal statutes could violate the Due Process Clause. And until today, this Court had never deemed a federal removal statute void for vagueness. Given this history, it is difficult to conclude that a ban on **\*1248** vague removal statutes is a "settled usag[e] and mod[e] of proceeding existing in the common and statute law of England, before the emigration of our ancestors" protected by the Fifth Amendment's Due Process Clause. *Murray's Lessee,* 18 How., at 277.

### B

Instead of a longstanding procedure under *Murray's Lessee,* perhaps the vagueness doctrine is really a way to enforce the separation of powers—specifically, the doctrine of nondelegation. See Chapman & McConnell, Due Process as Separation of Powers, 121 Yale L.J. 1672, 1806 (2012) ("Vague statutes have the effect of delegating lawmaking

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

authority to the executive"). Madison raised a similar objection to the Alien Friends Act, arguing that its expansive language effectively allowed the President to exercise legislative (and judicial) power. See Madison's Report 369– 371. And this Court's precedents have occasionally described the vagueness doctrine in terms of nondelegation. See, *e.g.,*

🚩 *Grayned v. City of Rockford,* 408 U.S. 104, 108–109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) ("A vague law impermissibly delegates basic policy matters"). But they have not been consistent on this front. See, *e.g.,* *Aptheker v. Secretary of State,* 378 U.S. 500, 516, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964) (" 'The objectionable quality of vagueness ... does not depend upon ... unchanneled delegation of legislative powers' "); 🚩 *Maynard v. Cartwright,* 486 U.S. 356, 361, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) ( "Objections to vagueness under the Due Process Clause rest on the lack of notice").

I agree that the Constitution prohibits Congress from delegating core legislative power to another branch. See *Department of Transportation v. Association of American Railroads,* 575 U.S. ——, ——, 135 S.Ct. 1225, 1241, 191 L.Ed.2d 153 (2015) (*AAR* ) (THOMAS, J., concurring in judgment) ("Congress improperly 'delegates' legislative power when it authorizes an entity other than itself to make a determination that requires an exercise of legislative power"); accord, *Whitman v. American Trucking Assns., Inc.,* 531 U.S. 457, 487, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (THOMAS, J., concurring). But I locate that principle in the Vesting Clauses of Articles I, II, and III—not in the Due Process Clause. *AAR, supra,* at ——————, 🚩 135 S.Ct., at 1228–1229 (opinion of THOMAS, J.); see also 🚩 *Hampton v. Mow Sun Wong,* 426 U.S. 88, 123, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976) (Rehnquist, J., dissenting) ("[T]hat there was an improper delegation of authority ... has not previously been thought to depend upon the procedural requirements of the Due Process Clause"). In my view, impermissible delegations of legislative power violate this principle, not just delegations that deprive individuals of "life, liberty, or property," Amdt. 5.

Respondent does not argue that 🚩 § 16(b), as incorporated by the INA, is an impermissible delegation of power. See Brief for Respondent 50 (stating that "there is no delegation question" in this case). I would not reach that question here, because this case can be resolved on narrower grounds. See Part I–C, *infra.* But at first blush, it is not at all obvious that the

nondelegation doctrine would justify wholesale invalidation of 🚩 § 16(b).

If 🚩 § 16(b) delegates power in this context, it delegates power primarily to the Executive Branch entities that administer the INA—namely, the Attorney General, immigration judges, and the Board of Immigration Appeals (BIA). But Congress does not "delegate" when it merely authorizes the Executive Branch to exercise a power that it already has. See *AAR, supra,* **\*1249** at ——, 135 S.Ct., at 1229 (opinion of THOMAS, J.). And there is some founding-era evidence that "the executive Power," Art. II, § 1, includes the power to deport aliens.

Blackstone—one of the political philosophers whose writings on executive power were "most familiar to the Framers," Prakash & Ramsey, The Executive Power Over Foreign Affairs, 111 Yale L.J. 231, 253 (2001)—described the power to deport aliens as executive and located it with the King. Alien friends, Blackstone explained, are "liable to be sent home whenever the king sees occasion." 1 Commentaries on the Laws of England 252 (1765). When our Constitution was ratified, moreover, "[e]minent English judges, sitting in the Judicial Committee of the Privy Council, ha[d] gone very far in supporting the ... expulsion, by the executive authority of a colony, of aliens." 🚩 *Demore,* 538 U.S., at 538, 123 S.Ct. 1708 (opinion of O'Connor, J.) (quoting *Fong Yue Ting,* 149 U.S., at 709, 13 S.Ct. 1016). Some of the Federalists defending the Alien Friends Act similarly argued that the President had the power to remove aliens. See, *e.g.,* Virginia Debates 35 (statement of George K. Taylor) (arguing that the power to remove aliens is "most properly entrusted" with the President, since "[h]e, by the Constitution, was bound to execute the laws" and is "the executive officer, with whom all persons and bodies whatever were accustomed to communicate"); Virginia Minority Address 9 (arguing that the removal of aliens "is a measure of general safety, in its nature political and not forensic, the execution of which is properly trusted to the department which represents the nation in all its interior relations"); Charge to the Grand Juries 29–30 ("As a measure of national defence, this discretion, of expulsion or indulgence, seems properly vested in the branch of the government peculiarly charged with the direction of the executive powers, and of our foreign relations. There is in it a mixture of external policy, and of the law of nations, that justifies this disposition"). More recently, this Court recognized that "[r]emoval decisions"

implicate "our customary policy of deference to the President in matters of foreign affairs" because they touch on "our relations with foreign powers and require consideration of changing political and economic circumstances." *Jama v. Immigration and Customs Enforcement,* 543 U.S. 335, 348, 125 S.Ct. 694, 160 L.Ed.2d 708 (2005) (internal quotation marks omitted). Taken together, this evidence makes it difficult to confidently conclude that the INA, through § 16(b), delegates core legislative power to the Executive.

Instead of the Executive, perhaps § 16(b) impermissibly delegates power to the Judiciary, since the Courts of Appeals often review the BIA's application of § 16(b). I assume that, at some point, a statute could be so devoid of content that a court tasked with interpreting it "would simply be making up a law—that is, exercising legislative power." Lawson, Delegation and Original Meaning, 88 Va. L. Rev. 327, 339 (2002); see *id.,* at 339–340 (providing examples such as a gibberish-filled statute or a statute that requires " 'goodness and niceness' "). But I am not confident that our modern vagueness doctrine—which focuses on whether regulations of individual conduct provide "fair warning," are "clearly defined," and do not encourage "arbitrary and discriminatory enforcement," *Grayned,* 408 U.S., at 108, 92 S.Ct. 2294; *Kolender,* 461 U.S., at 357, 103 S.Ct. 1855—accurately demarcates the line between legislative and judicial power. The Founders understood that the interpretation of legal texts, even vague ones, remained an exercise of core judicial power. See **\*1250** *Perez v. Mortgage Bankers Assn.,* 575 U.S. ——, ————, 135 S.Ct. 1199, 1216–1217, 191 L.Ed.2d 186 (2015) (THOMAS, J., concurring in judgment); Hamburger, The Constitution's Accommodation of Social Change, 88 Mich. L. Rev. 239, 303–310 (1989). Courts were expected to clarify the meaning of such texts over time as they applied their terms to specific cases. See *id.,* at 309–310; Nelson, Originalism and Interpretive Conventions, 70 U. Chi. L. Rev. 519, 526 (2003). Although early American courts declined to apply vague or unintelligible statutes as appropriate in individual cases, they did not wholesale invalidate them as unconstitutional delegations of legislative power. See *Johnson,* 576 U.S., at ————–————, and n. 3, 135 S.Ct., at 2567–2568, and n. 3 (opinion of THOMAS, J.).

C

1

I need not resolve these historical questions today, as this case can be decided on narrower grounds. If the vagueness doctrine has any basis in the original meaning of the Due Process Clause, it must be limited to case-by-case challenges to particular applications of a statute. That is what early American courts did when they applied the rule of lenity. See *id.,* at ——, 135 S.Ct., at 2560. And that is how early American courts addressed constitutional challenges to statutes more generally. See *ibid.* ("[T]here is good evidence that [antebellum] courts ... understood judicial review to consist 'of a refusal to give a statute effect as operative law in resolving a case,' a notion quite distinct from our modern practice of ' "strik[ing] down" legislation' " (quoting Walsh, Partial Unconstitutionality, 85 N.Y.U.L. Rev. 738, 756 (2010))).

2

This Court's precedents likewise recognize that, outside the First Amendment context, a challenger must prove that the statute is vague as applied to him. See *Holder v. Humanitarian Law Project,* 561 U.S. 1, 18–19, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010); *United States v. Williams,* 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008); *Maynard,* 486 U.S., at 361, 108 S.Ct. 1853; *Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495, and n. 7, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (collecting cases). *Johnson* did not overrule these precedents. While *Johnson* weakened the principle that a facial challenge requires a statute to be vague in *all* applications," 576 U.S., at ——, 135 S.Ct., at 2561 (emphasis added), it did not address whether a statute must be vague as applied to the person challenging it. That question did not arise because the Court concluded that ACCA's residual clause was vague as applied to the crime at issue there: unlawful possession of a short-barreled shotgun. See *id.,* at ——, 135 S.Ct., at 2560.

In my view, § 16(b) is not vague as applied to respondent. When respondent committed his burglaries in 2007 and 2009, he was "sufficiently forewarned ... that the statutory consequence ... is deportation." *De George,* 341 U.S., at

232, 71 S.Ct. 703. At the time, courts had "unanimous[ly]" concluded that residential burglary is a crime of violence, and not "a single opinion ... ha [d] held that [it] is *not*."

*United States v. M.C. E.,* 232 F.3d 1252, 1255–1256 (C.A.9 2000); see also *United States v. Davis,* 881 F.2d 973, 976 (C.A.11 1989) (explaining that treating residential burglary as a crime of violence was "[i]n accord with common law tradition and the settled law of the federal circuits"). Residential burglary "ha[d] been considered a violent offense for hundreds of years ... because of the potential for mayhem if burglar encounters resident." *United States v. Pinto,* 875 F.2d 143, 144 (C.A.7 1989). The Model Penal **\*1251** Code had recognized that risk, see ALI, Model Penal Code § 221.1, Comment 3(c), p. 75 (1980); the Sentencing Commission had recognized that risk; see United States Sentencing Commission, Guidelines Manual § 4B1.2(a)(2) (Nov. 2006); and this Court had repeatedly recognized that risk, see, *e.g.,* *James v. United States,* 550 U.S. 192, 203, 127 S.Ct. 1586, 167 L.Ed.2d 532 (2007); *Taylor v. United States,* 495 U.S. 575, 588, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). In *Leocal v. Ashcroft,* 543 U.S. 1, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004), this Court unanimously agreed that burglary is the "classic example" of a crime of violence under § 16(b), because it "involves a substantial risk that the burglar will use force against a victim in completing the crime." *Id.,* at 10, 125 S.Ct. 377.

That same risk is present with respect to respondent's statute of conviction—first-degree residential burglary, Cal.Penal Code Ann. §§ 459, 460(a) (West 1999). The California Supreme Court has explained that the State's burglary laws recognize "the dangers to personal safety created by the *usual* burglary situation." *People v. Davis,* 18 Cal.4th 712, 721, 76 Cal.Rptr.2d 770, 958 P.2d 1083, 1089 (1998) (emphasis added). " '[T]he fact that a building is used as a home ... increases such danger,' " which is why California elevates residential burglary to a first-degree offense. *People v. Rodriguez,* 122 Cal.App.4th 121, 133, 18 Cal.Rptr.3d 550, 558 (2004); see also *People v. Wilson,* 208 Cal.App.3d 611, 615, 256 Cal.Rptr. 422, 425 (1989) ("[T]he higher degree ... is intended to prevent those situations which are most dangerous, most likely to cause personal injury" (emphasis deleted)). Although unlawful entry is not an element of the offense, courts "unanimous [ly]" agree that the offense

still involves a substantial risk of physical force. *United States v. Avila,* 770 F.3d 1100, 1106 (C.A.4 2014); accord, *United States v. Maldonado,* 696 F.3d 1095, 1102, 1104 (C.A.10 2012); *United States v. Scanlan,* 667 F.3d 896, 900 (C.A.7 2012); *United States v. Echeverria–Gomez,* 627 F.3d 971, 976 (C.A.5 2010); *United States v. Becker,* 919 F.2d 568, 573 (C.A.9 1990). First-degree residential burglary requires entry into an inhabited dwelling, with the intent to commit a felony, against the will of the homeowner—the key elements that create the risk of violence. See *United States v. Park,* 649 F.3d 1175, 1178–1180 (C.A.9 2011); *Avila, supra,* at 1106–1107; *Becker, supra,* at 571, n. 5. As this Court has explained, "[t]he main risk of burglary arises not from the simple physical act of wrongfully entering onto another's property, but rather from the possibility of a face-to-face confrontation between the burglar and a third party." *James, supra,* at 203, 127 S.Ct. 1586.

Drawing on *Johnson* and the decision below, the Court suggests that residential burglary might not be a crime of violence because " 'only about seven percent of burglaries actually involve violence.' " *Ante,* at 1214, n. 3 (citing *Dimaya v. Lynch,* 803 F.3d 1110, 1116, n. 7 (C.A.9 2015)); see Bureau of Justice Statistics, S. Catalano, National Crime Victimization Survey: Victimization During Household Burglary 1 (Sept. 2010), https://www.bjs.gov/content/pub/pdf/vdhb.pdf (as last visited Apr. 13, 2018). But this statistic—which measures actual violence against a member of the household, see *id.,* at 1, 12—is woefully underinclusive. It excludes other potential victims besides household members—for example, "a police officer, or a bystande[r] who comes to investigate," *James, supra,* at 203, 127 S.Ct. 1586. And § 16(b) requires only a risk of physical force, not actual physical force, and that risk would seem to be present whenever someone is home during the burglary. Further, *Johnson* is not conclusive because, unlike **\*1252** ACCA's residual clause, § 16(b) covers offenses that involve a substantial risk of physical force "against the person *or property* of another." (Emphasis added.) Surely the ordinary case of residential burglary involves at least one of these risks. According to the statistics referenced by the Court, most burglaries involve either a forcible entry (*e.g.,* breaking a window or slashing a door screen), an attempted forcible entry, or an unlawful entry when someone is home.

AR.06272

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

See Bureau of Justice Statistics, *supra,* at 2 (Table 1). Thus, under any metric, respondent's convictions for first-degree residential burglary are crimes of violence under § 16(b).

### 3

Finally, if facial vagueness challenges are ever appropriate, I adhere to my view that a law is not facially vague " '[i]f any fool would know that a particular category of conduct would be within the reach of the statute, if there is an unmistakable core that a reasonable person would know is forbidden by the law.' " *Morales,* 527 U.S., at 112, 119 S.Ct. 1849 (THOMAS, J., dissenting) (quoting *Kolender,* 461 U.S., at 370–371, 103 S.Ct. 1855 (White, J., dissenting)). The residual clause of ACCA had such a core. See *Johnson,* 576 U.S., at ——, 135 S.Ct., at 2560; *id.,* at ——, 135 S.Ct., at 2580–2581 (ALITO, J., dissenting). And § 16(b) has an even wider core, as THE CHIEF JUSTICE explains. Thus, the Court should not have invalidated § 16(b), either on its face or as applied to respondent.

### II

Even taking the vagueness doctrine and *Johnson* at face value, I disagree with the Court's decision to invalidate § 16(b). The sole reason that the Court deems § 16(b) unconstitutionally vague is because it reads the statute as incorporating the categorical approach—specifically, the "ordinary case" approach from ACCA's residual clause. Although the Court mentions "[t]wo features" of § 16(b) that make it vague—the ordinary-case approach and an imprecise risk standard—the Court admits that the second feature is problematic only in combination with the first. *Ante,* at 1214. Without the ordinary-case approach, the Court "do[es] not doubt" the constitutionality of § 16(b). *Ante,* at 1215.

But if the categorical approach renders § 16(b) unconstitutionally vague, then constitutional avoidance requires us to make a reasonable effort to avoid that interpretation. And a reasonable alternative interpretation is available: Instead of asking whether the ordinary case of

an alien's offense presents a substantial risk of physical force, courts should ask whether the alien's actual underlying conduct presents a substantial risk of physical force. I will briefly discuss the origins of the categorical approach and then explain why the Court should abandon it for § 16(b).

### A

### 1

The categorical approach originated with Justice Blackmun's opinion for the Court in *Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). The question in *Taylor* was whether ACCA's reference to "burglary" meant burglary as defined by state law or burglary in the generic sense. After "devoting 10 pages of [its] opinion to legislative history," *id.,* at 603, 110 S.Ct. 2143 (Scalia, J., concurring in part and concurring in judgment), and finding that Congress had made "an inadvertent casualty in [the] complex drafting process," *id.,* at 589–590, 110 S.Ct. 2143 (majority opinion), the Court concluded that ACCA referred to burglary in the generic sense, *id.,* at 598, 110 S.Ct. 2143. The Court then addressed how the Government would prove that a **\*1253** defendant was convicted of generic burglary, as opposed to another offense. *Id.,* at 599–602, 110 S.Ct. 2143. *Taylor* rejected the notion that the Government could introduce evidence about the "particular facts" of the defendant's underlying crime. *Id.,* at 600, 110 S.Ct. 2143. Instead, the Court adopted a "categorical approach," which focused primarily on the "statutory definition of the prior offense." *Id.,* at 602, 110 S.Ct. 2143.

Although *Taylor* was interpreting one of ACCA's enumerated offenses, this Court later extended the categorical approach to ACCA's residual clause. See *James,* 550 U.S., at 208, 127 S.Ct. 1586. That extension required some reworking. Because ACCA's enumerated-offenses clause asks whether a prior conviction "is burglary, arson, or extortion," 18 U.S.C. § 924(e)(2)(B)(ii), *Taylor* instructed courts to focus on the definition of the underlying crime. The residual clause, by contrast, asks whether a prior conviction "involves conduct that presents a serious potential risk of physical injury to another." § 924(e)(2)(B)(ii). Thus, the Court held that the

Sessions v. Dimaya, 138 S.Ct. 1204 (2018)

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

categorical approach for the residual clause asks "whether the conduct encompassed by the elements of the offense, *in the ordinary case,* presents a serious potential risk of injury to another." *James, supra,* at 208, 127 S.Ct. 1586 (emphasis added). This "ordinary case" approach allowed courts to apply the residual clause without inquiring into the individual facts of the defendant's prior crime.

*Taylor* gave a few reasons why the categorical approach was the correct reading of ACCA, see 495 U.S., at 600–601, 110 S.Ct. 2143, but the "heart of the decision" was the Court's concern with limiting the amount of evidence that the parties could introduce at sentencing. *Shepard v. United States,* 544 U.S. 13, 23, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005). Specifically, the Court was worried about potential violations of the Sixth Amendment. If the parties could introduce evidence about the defendant's underlying conduct, then sentencing proceedings might devolve into a full-blown minitrial, with factfinding by the judge instead of the jury. See *id.,* at 24–26, 125 S.Ct. 1254; *Taylor, supra,* at 601, 110 S.Ct. 2143. While this Court's decision in *Almendarez–Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), allows judges to find facts about a defendant's prior convictions, a full-blown minitrial would look "too much like" the kind of factfinding that the Sixth Amendment requires the jury to conduct. *Shepard,* 544 U.S., at 25, 125 S.Ct. 1254. By construing ACCA to require a categorical approach, then, the Court was following "[t]he rule of reading statutes to avoid serious risks of unconstitutionality." *Ibid.*

2

I disagreed with the Court's decision to extend the categorical approach to ACCA's residual clause. See *James,* 550 U.S., at 231–232, 127 S.Ct. 1586 (dissenting opinion). The categorical approach was an " ' unnecessary exercise,' " I explained, because it created the same Sixth Amendment problem that it tried to avoid. *Id.,* at 231, 127 S.Ct. 1586. Absent waiver, a defendant has the right to have a jury find "every fact that is by law a basis for imposing or increasing punishment," including the fact of a prior conviction. *Apprendi v. New Jersey,* 530 U.S. 466, 501, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (THOMAS, J., concurring).

The exception recognized in *Almendarez–Torres* for prior convictions is an aberration, has been seriously undermined by subsequent precedents, and should be reconsidered. See *Mathis v. United States,* 579 U.S. ——, ——, 136 S.Ct. 2243, 2258–2259, 195 L.Ed.2d 604 (2016) (THOMAS, J., concurring); **\*1254** *Shepard, supra,* at 27–28, 125 S.Ct. 1254 (THOMAS, J., concurring in part and concurring in judgment). In my view, if the Government wants to enhance a defendant's sentence based on his prior convictions, it must put those convictions in the indictment and prove them to a jury beyond a reasonable doubt. [6]

B

My objection aside, the ordinary-case approach soon created problems of its own. The Court's attempt to avoid the Scylla of the Sixth Amendment steered it straight into the Charybdis of the Fifth. The ordinary-case approach that was created to honor the individual right to a jury is now, according to the Court, so vague that it deprives individuals of due process.

I see no good reason for the Court to persist in reading the ordinary-case approach into § 16(b). The text of § 16(b) does not mandate the ordinary-case approach, the concerns that led this Court to adopt it do not apply here, and there are no prudential reasons for retaining it. In my view, we should abandon the categorical approach for § 16(b).

1

The text of § 16(b) does not require a categorical approach. The INA declares an alien deportable if he is "convicted of an aggravated felony" after he is admitted to the United States. 8 U.S.C. § 1227(a)(2)(A)(iii). Aggravated felonies include "crime[s] of violence" as defined in § 16. § 1101(a)(43)(F). Section 16, in turn, defines crimes of violence as follows:

"(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

"(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the

person or property of another may be used in the course of committing the offense."

At first glance, § 16(b) is not clear about the precise question it poses. On the one hand, the statute might refer to the metaphysical "nature" of the offense and ask whether it ordinarily involves a substantial risk of physical force. On the other hand, the statute might refer to the underlying facts of the offense that the offender committed; the words "by its nature," "substantial risk," and "may" would mean only that an offender who engages in risky conduct cannot benefit from the fortuitous fact that physical force was not actually used during his offense. The text can bear either interpretation. See

*Nijhawan v. Holder,* 557 U.S. 29, 33–34, 129 S.Ct. 2294, 174 L.Ed.2d 22 (2009) ("[I]n ordinary speech words such as 'crime,' 'felony,' 'offense,' and the like sometimes refer to a generic crime ... and sometimes refer to the specific acts in which an offender engaged on a specific occasion"). It is entirely natural to use words like "nature" and "offense" to refer to an offender's actual underlying conduct. [7]

**\*1255** Although both interpretations are linguistically possible, several factors indicate that the underlying-conduct approach is the better one. To begin, § 16(b) asks whether an offense "involves" a substantial risk of force. The word "involves" suggests that the offense must *necessarily* include a substantial risk of force. See The New Oxford Dictionary of English 962 (2001) ("include (something) as a necessary part or result"); Random House Dictionary of the English Language 1005 (2d ed. 1987) ("1. to include as a necessary circumstance, condition, or consequence"); Oxford American Dictionary 349 (1980) ("1. to contain within itself, to make necessary as a condition or result"). That condition is always satisfied if the Government must prove that the alien's underlying conduct involves a substantial risk of force, but it is not always satisfied if the Government need only prove that the "ordinary case" involves such a risk. See *Johnson,* 576 U.S., at ——, 135 S.Ct., at 2580 (ALITO, J., dissenting). Tellingly, the other aggravated felonies in the INA that use the word "involves" employ the underlying-conduct approach. See 8 U.S.C. § 1101(a)(43)(M)(i) ("an offense that involves fraud or deceit in which the loss to the victim or victims exceeds $10,000"); § 1101(h)(3) ("any crime of reckless driving or of driving while intoxicated or under the influence of alcohol or of prohibited substances if such crime involves personal injury to another"). As do the similarly

worded provisions of the Comprehensive Crime Control Act of 1984, the bill that contained § 16(b). See, *e.g.,* 98 Stat. 2059 (elevating the burden of proof for the release of "a person found not guilty only by reason of insanity of an offense involving bodily injury to, or serious damage to the property of, another person, or involving a substantial risk of such injury or damage"); *id.,* at 2068 (establishing the sentence for drug offenses "involving" specific quantities and types of drugs); *id.,* at 2137 (defining violent crimes in aid of racketeering to include "attempting or conspiring to **\*1256** commit a crime involving maiming, assault with a dangerous weapon, or assault resulting in serious bodily injury").

A comparison of § 16(b) and § 16(a) further highlights why the former likely adopts an underlying-conduct approach. Section 16(a) covers offenses that have the use, attempted use, or threatened use of physical force "as an element." Because § 16(b) covers "other" offenses and is separated from § 16(a) by the disjunctive word "or," the natural inference is that § 16(b) asks a different question. In other words, § 16(b) must require immigration judges to look beyond the elements of an offense to determine whether it involves a substantial risk of physical force. But if the elements are insufficient, where else should immigration judges look to determine the riskiness of an offense? Two options are possible, only one of which is workable.

The first option is to consult the underlying facts of the alien's crime and then assess its riskiness. This approach would provide a definitive answer in every case. And courts are already familiar with this kind of inquiry. Cf. *Johnson, supra,* at ——, 135 S.Ct., at 2561 (noting that "dozens" of similarly worded laws ask courts to assess "the riskiness of conduct in which an individual defendant engages *on a particular occasion* "). Nothing suggests that Congress imposed a more limited inquiry when it enacted § 16(b) in 1984. At the time, Congress had not yet enacted ACCA's residual clause, this Court had not yet created the categorical approach, and this Court had not yet recognized a Sixth Amendment limit on judicial factfinding at sentencing, see

*Chambers v. United States,* 555 U.S. 122, 132, 129 S.Ct. 687, 172 L.Ed.2d 484 (2009) (ALITO, J., concurring in judgment).

The second option is to imagine the "ordinary case" of the alien's crime and then assess the riskiness of that hypothetical offense. But the phrase "ordinary case" does not appear in the statute. And imagining the ordinary case, the Court reminds us, is "hopeless[ly] indetermina[te]," "wholly 'speculative,' " and mere "guesswork." *Ante,* at 1213 - 1214, 1223 (quoting *Johnson, supra,* at ——— (576 U.S., at ———, ———, 135 S.Ct., at 2558)); see also *Chambers, supra,* at 133, 129 S.Ct. 687 (opinion of ALITO, J.) (observing that the categorical approach is "nearly impossible to apply consistently"). Because courts disfavor interpretations that make a statute impossible to apply, see A. Scalia & B. Garner, Reading Law 63 (2012), this Court should reject the ordinary-case approach for § 16(b) and adopt the underlying-facts approach instead. See *Johnson, supra,* at ———, 135 S.Ct., at 2578 (ALITO, J., dissenting) ("When another interpretation is ready at hand, why should we assume that Congress gave the clause a meaning that is impossible—or even, exceedingly difficult—to apply").

2

That the categorical approach is not the better reading of § 16(b) should not be surprising, since the categorical approach was never really about the best reading of the text. As explained, this Court adopted that approach to avoid a potential Sixth Amendment problem with sentencing judges conducting minitrials to determine a defendant's past conduct. But even assuming the categorical approach solved this Sixth Amendment problem in criminal cases, no such problem arises in immigration cases. "[T]he provisions of the Constitution securing the right of trial by jury have no application" in a removal proceeding. *Turner,* 194 U.S., at 290, 24 S.Ct. 719. And, in criminal cases, the underlying-conduct approach would be perfectly constitutional if the Government included the defendant's prior conduct in the indictment, **\*1257** tried it to a jury, and proved it beyond a reasonable doubt. See *Johnson,* 576 U.S., at ———, 135 S.Ct., at 2579 (ALITO, J., dissenting). Nothing in § 16(b) prohibits the Government from proceeding this way, so the plurality is wrong to suggest that the underlying-conduct approach would necessarily "ping-pong us from one constitutional issue to another." *Ante,* at 1217.

If constitutional avoidance applies here at all, it requires us to *reject* the categorical approach for § 16(b). According to the Court, the categorical approach is unconstitutionally vague. And, all agree that the underlying-conduct approach would not be. See *Johnson,* 576 U.S., at ———, 135 S.Ct., at 2561 (majority opinion) ("[W]e do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct"). Thus, if the underlying-conduct approach is a "reasonabl[e]" interpretation of § 16(b), it is our "plain duty" to adopt it. *United States ex rel. Attorney General v. Delaware & Hudson Co.,* 213 U.S. 366, 407, 29 S.Ct. 527, 53 L.Ed. 836 (1909). And it is reasonable, as explained above.

In *Johnson,* the Court declined to adopt the underlying-conduct approach for ACCA's residual clause. See 576 U.S., at ———, 135 S.Ct., at 2561–2562. The Court concluded that the categorical approach was the only reasonable reading of ACCA because the residual clause uses the word "convictions." *Id.,* at ———, 135 S.Ct., at 2561–2562. The Court also stressed the "utter impracticability of requiring a sentencing court to reconstruct, long after the original conviction, the conduct underlying that conviction." *Ibid.*

Neither of these arguments is persuasive with respect to the INA. Moreover, this Court has already rejected them. In *Nijhawan,* this Court unanimously concluded that one of the aggravated felonies in the INA—"an offense that ... involves fraud or deceit in which the loss to the victim or victims exceeds $10,000," § 1101(a)(43)(M)(i)—applies the underlying-conduct approach, not the categorical approach. 557 U.S., at 32, 129 S.Ct. 2294. Although the INA also refers to "convict[ions]," § 1227(a)(2)(A)(iii), the Court was not swayed by that argument. The word "convict[ion]" means only that the defendant's underlying conduct must " 'be tied to the specific counts covered by the conviction,' " not "acquitted or dismissed counts or general conduct." *Id.,* at 42, 129 S.Ct. 2294. As for the supposed practical problems with proving an alien's prior conduct, the Court did not find that argument persuasive either. "[T]he 'sole purpose' of the 'aggravated felony' inquiry," the Court explained, " 'is to ascertain the nature of a prior conviction; it is not an invitation to relitigate the conviction itself.' " *Ibid.* And because the INA places the burden on the Government to

Sessions v. Dimaya, 138 S.Ct. 1204 (2018)

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

prove an alien's conduct by clear and convincing evidence, § 1229a(c)(3)(A), "uncertainties caused by the passage of time are likely to count in the alien's favor," *id., at 42, 129 S.Ct. 2294.*

There are additional reasons why the practical problems identified in *Johnson* should not matter for § 16(b)—even assuming they should have mattered for ACCA's residual clause, see *Lewis v. Chicago,* 560 U.S. 205, 217, 130 S.Ct. 2191, 176 L.Ed.2d 967 (2010) ("[I]t is not our task to assess the consequences of each approach and adopt the one that produces the least mischief. Our charge is to give effect to the law Congress enacted"). In a removal proceeding, any difficulties with identifying an alien's past conduct will fall on immigration judges, not federal courts. But those judges are already accustomed to finding facts about the conduct underlying an alien's prior convictions, since some of **\*1258** the INA's aggravated felonies employ the underlying-conduct approach. The BIA has instructed immigration judges to determine such conduct based on "any evidence admissible in removal proceedings," not just the elements of the offense or the record of conviction. See *Matter of Babaisakov,* 24 I. & N. Dec. 306, 307 (2007). No one has submitted any evidence that the BIA's approach has been "utter[ly] impracticab[le]" or "daunting[ly] difficul[t]" in practice. *Ante,* at 1218. And even if it were, "how much time the agency wants to devote to the resolution of particular issues is ... a question for the agency itself." *Ali v. Mukasey,* 521 F.3d 737, 741 (C.A.7 2008). Hypothetical burdens on the BIA should not influence how this Court interprets § 16(b).

In short, we should not blithely assume that the reasons why this Court adopted the categorical approach for ACCA's residual clause also apply to the INA's list of aggravated felonies. As *Nijhawan* explained, "the 'aggravated felony' statute, unlike ACCA, contains some language that refers to generic crimes and some language that almost certainly refers to the specific circumstances in which a crime was committed." 557 U.S., at 38, 129 S.Ct. 2294. "The question" in each case is "to which category [the aggravated felony] belongs." *Ibid.* As I have explained, § 16(b) belongs in the underlying-conduct category. Because that is the better reading of § 16(b)'s text—or at least a reasonable reading—the Court should have adopted it here.

3

I see no prudential reason for maintaining the categorical approach for § 16(b). The Court notes that the Government "explicitly acknowledges" that § 16(b) employs the categorical approach. *Ante,* at 1215. But we cannot permit the Government's concessions to dictate how we interpret a statute, much less cause us to invalidate a statute enacted by a coordinate branch. See *United States Nat. Bank of Ore. v. Independent Ins. Agents of America, Inc.,* 508 U.S. 439, 446–447, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993); *Young v. United States,* 315 U.S. 257, 258–259, 62 S.Ct. 510, 86 L.Ed. 832 (1942). This Court's "traditional practice" is to "refus[e] to decide constitutional questions" when other grounds of decision are available, "whether or not they have been properly raised before us by the parties." *Neese v. Southern R. Co.,* 350 U.S. 77, 78, 76 S.Ct. 131, 100 L.Ed. 60 (1955) (*per curiam* ); see also Vermeule, Saving Constructions, 85 Geo. L.J. 1945, 1948–1949 (1997) (explaining that courts commonly "decide an antecedent statutory issue, even one waived by the parties, if its resolution could preclude a constitutional claim"). This Court has raised potential saving constructions "on our own motion" when they could avoid a ruling on constitutional vagueness grounds, even in cases where the Government was a party. *United States v. L. Cohen Grocery Co.,* 255 U.S. 81, 88, 41 S.Ct. 298, 65 L.Ed. 516 (1921). We should have followed that established practice here.

Nor should *stare decisis* prevent us from rejecting the categorical approach for § 16(b). This Court has never held that § 16(b) incorporates the ordinary-case approach. Although *Leocal* held that § 16(b) incorporates a version of the categorical approach, the Court must not feel bound by that decision, as it largely overrules it today. See *ante,* at 1222, n. 7. Surely the Court cannot credibly invoke *stare decisis* to defend the categorical approach—the same approach it says only a "lunatic" would continue to apply. *Ante,* at 1223. If the Court views the categorical approach that way —the same way *Johnson* viewed it—then it must also agree that "[s]tanding by [the categorical approach] **\*1259** would undermine, rather than promote, the goals that *stare decisis* is meant to serve." 576 U.S., at ——, 135 S.Ct., at 2563. That is especially true if the Court's decision leads to the

invalidation of scores of similarly worded state and federal statutes, which seems even more likely after today than it did after *Johnson*. Instead of adhering to an interpretation that it thinks unconstitutional and then using that interpretation to strike down another statute, the Court should have taken this opportunity to abandon the categorical approach for § 16(b) once and for all.

\* \* \*

The Court's decision today is triply flawed. It unnecessarily extends our incorrect decision in *Johnson*. It uses a constitutional doctrine with dubious origins to invalidate yet another statute (while calling into question countless more). And it does all this in the name of a statutory interpretation that we should have discarded long ago. Because I cannot follow the Court down any of these rabbit holes, I respectfully dissent.

**All Citations**

138 S.Ct. 1204, 200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446, 2018 Daily Journal D.A.R. 3331, 27 Fla. L. Weekly Fed. S 161

---

## Footnotes

\*     The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1     The analysis thus differs from the form of categorical approach used to determine whether a prior conviction is for a particular listed offense (say, murder or arson). In that context, courts ask what the elements of a given crime always require—in effect, what is legally necessary for a conviction. See, *e.g., Descamps v. United States,* 570 U.S. 254, 260–261, 133 S.Ct. 2276, 186 L.Ed.2d 438 (2013); *Moncrieffe v. Holder,* 569 U.S. 184, 190–191, 133 S.Ct. 1678, 185 L.Ed.2d 727 (2013).

2     Compare *Shuti v. Lynch,* 828 F.3d 440 (C.A.6 2016) (finding § 16(b) unconstitutionally vague); *United States v. Vivas–Ceja,* 808 F.3d 719 (C.A.7 2015) (same), with *United States v. Gonzalez–Longoria,* 831 F.3d 670 (C.A.5 2016) (en banc) (upholding § 16(b)).

3     *Johnson* also anticipated and rejected a significant aspect of Justice THOMAS's dissent in this case. According to Justice THOMAS, a court may not invalidate a statute for vagueness if it is clear in any of its applications—as he thinks is true of *completed* burglary, which is the offense Dimaya committed. See *post,* at 1250 – 1252. But as an initial matter, *Johnson* explained that supposedly easy applications of the residual clause might not be "so easy after all." 576 U.S., at ——576 U.S., at ——·——, 135 S.Ct., at 2560. The crime of completed burglary at issue here illustrates that point forcefully. See *id.,* at ——, 135 S.Ct., at 2558 (asking whether "an ordinary burglar invade[s] an occupied home by night or an unoccupied home by day"); *Dimaya v. Lynch,* 803 F.3d 1110, 1116, n. 7 (C.A.9 2015) (noting that only about seven percent of burglaries actually involve violence); Cal. Penal Code Ann. §§ 459, 460 (West 2010) (sweeping so broadly as to cover even dishonest door-to-door salesmen). And still more fundamentally, *Johnson* made clear that our decisions "squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." 576 U.S., at ——, 135 S.Ct., at 2561.

4     THE CHIEF JUSTICE's dissent makes light of the difficulty of identifying a crime's ordinary case. In a single footnote, THE CHIEF JUSTICE portrays that task as no big deal: Just eliminate the "atypical" cases, and (presto!) the crime's nature and risk are revealed. See *post,* at 1226, n. 1. That rosy view—at complete odds with *Johnson*—underlies his whole dissent (and especially, his analysis of how § 16(b) applies to particular

Sessions v. Dimaya, 138 S.Ct. 1204 (2018)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1054 of 1271

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

offenses, see *post,* at 1226 – 1229). In effect, THE CHIEF JUSTICE is able to conclude that 🚩 § 16(b) can survive *Johnson* only by refusing to acknowledge one of the two core insights of that decision.

5    For example, in 📄 *United States v. Hayes,* 555 U.S. 415, 129 S.Ct. 1079, 172 L.Ed.2d 816 (2009), this Court held that a firearms statute referring to former crimes as "committed by" specified persons requires courts to consider underlying facts. 📄 *Id.,* at 421, 129 S.Ct. 1079. And in 📄 *Nijhawan v. Holder,* 557 U.S. 29, 129 S.Ct. 2294, 174 L.Ed.2d 22 (2009), the Court similarly adopted a non-categorical interpretation of one of the aggravated felonies listed in the INA because of the phrase, appended to the named offense, "in which the loss to the victim or victims exceeds $10,000." 📄 *Id.,* at 34, 36, 129 S.Ct. 2294 (emphasis deleted). Justice THOMAS suggests that *Nijhawan* rejected the relevance of our ACCA precedents in interpreting the INA's aggravated-felony list—including its incorporation of 🚩 § 16(b). *Post,* at 1257 – 1258. But that misreads the decision. In *Nijhawan,* we considered an item on the INA's list that looks nothing like ACCA, and we concluded —no surprise here—that our ACCA decisions did not offer a useful guide. As to items on the INA's list that *do* mirror ACCA, the opposite conclusion of course follows.

6    In response to repeated questioning at two oral arguments, the Government proposed one (and only one) such crime—but we disagree that 🚩 § 16(b)'s temporal language would aid in its analysis. According to the Government, possession of a short-barreled shotgun could count as violent under ACCA but not under 🚩 § 16(b) because shooting the gun is "not in the course of committing the crime of possession." Tr. of Oral Arg. 59–60 (Oct. 2, 2017); see Tr. of Oral Arg. 6–7 (Jan. 17, 2017); Brief for Petitioner 32–34. That is just wrong: When a criminal shoots a gun, he does so while ("in the course of ") possessing it (except perhaps in some physics-defying fantasy world). What makes the offense difficult to classify as violent is something different: that while some people use the short-barreled shotguns they possess to commit murder, others merely store them in a nearby firearms cabinet—and it is hard to settle which is the more likely scenario. Compare *Johnson,* 576 U.S., at ——-——, 135 S.Ct., at 2584 (ALITO, J., dissenting) ("It is fanciful to assume that a person who [unlawfully possesses] a notoriously dangerous weapon is unlikely to use that weapon in violent ways"), with 📄 *id.,* at ——, 135 S.Ct., at 2565 (THOMAS, J., concurring) (Unlawful possession of a short-barreled shotgun "takes place in a variety of ways ... many, perhaps most, of which do not involve likely accompanying violence" (internal quotation marks omitted)). But contrary to THE CHIEF JUSTICE's suggestion, see *post,* at 1245 – 1246 (which, again, is tied to his disregard of the ordinary-case inquiry, see *supra,* at 1215, n. 4), that issue must be settled no less under 🚩 § 16(b) than under ACCA.

7    And, THE CHIEF JUSTICE emphasizes, we decided that one unanimously! See *post,* at —— (discussing 📄 *Leocal v. Ashcroft,* 543 U.S. 1, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004)). But one simple application does not a clear statute make. As we put the point in *Johnson* : Our decisions "squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." 📄 576 U.S., at ——, 135 S.Ct., at 2561; see *supra,* at 1215, n. 4.

8    Compare 🚩 *Escudero–Arciniega v. Holder,* 702 F.3d 781, 784–785 (C.A.5 2012) (*per curiam* ) (yes, it does), and 📄 *United States v. Guzman–Landeros,* 207 F.3d 1034, 1035 (C.A.8 2000) (*per curiam* ) (same), with 📄 *Sareang Ye v. INS,* 214 F.3d 1128, 1133–1134 (C.A.9 2000) (no, it does not).

9    Compare 🚩 *Aguiar v. Gonzales,* 438 F.3d 86, 89–90 (C.A.1 2006) (statutory rape involves a substantial risk of force); 🚩 *Chery v. Ashcroft,* 347 F.3d 404, 408–409 (C.A.2 2003) (same); and 🚩 *United States v. Velazquez–Overa,* 100 F.3d 418, 422 (C.A.5 1996) (same), with 🚩 *Valencia v. Gonzales,* 439 F.3d 1046, 1052 (C.A.9 2006) (statutory rape does not involve such a risk).

10    Compare *Dixon v. Attorney Gen.,* 768 F.3d 1339, 1343–1346 (C.A.11 2014) (holding that one such statute falls under § 16(b)), with *Flores–Lopez v. Holder,* 685 F.3d 857, 863–865 (C.A.9 2012) (holding that another does not).

11    Compare *United States v. Venegas–Ornelas,* 348 F.3d 1273, 1277–1278 (C.A.10 2003) (residential trespass is a crime of violence), with *Zivkovic v. Holder,* 724 F.3d 894, 906 (C.A.7 2013) (it is not).

12    From all we can tell—and all the Government has told us, see Brief for Petitioner 45–52—lower courts have also decided many fewer cases involving § 16(b) than ACCA's residual clause. That disparity likely reflects the Government's lesser need to rely on § 16(b). That provision is mainly employed (as here) in the immigration context, to establish an "aggravated felony" requiring deportation. See *supra,* at 1211. But immigration law offers many other ways to achieve that result. The INA lists 80 or so crimes that count as aggravated felonies; only if a conviction is not for one of those specified offenses need the Government resort to § 16(b) (or another catch-all provision). See *Luna Torres v. Lynch,* 578 U.S. ––––, ––––, 136 S.Ct. 1619, 1623, 194 L.Ed.2d 737 (2016). By contrast, ACCA enumerates only four crimes as a basis for enhancing sentences; the Government therefore had reason to use the statute's residual clause more often.

13    See, *e.g., Armendariz–Moreno v. United States,* 555 U.S. 1133, 129 S.Ct. 993, 173 L.Ed.2d 288 (2009) (vacating and remanding for reconsideration in light of *Begay v. United States,* 553 U.S. 137, 128 S.Ct. 1581, 170 L.Ed.2d 490 (2008), and *Chambers v. United States,* 555 U.S. 122, 129 S.Ct. 687, 172 L.Ed.2d 484 (2009)); *Castillo–Lucio v. United States,* 555 U.S. 1133, 129 S.Ct. 993, 173 L.Ed.2d 288 (2009) (same); *Addo v. Mukasey,* 555 U.S. 1132, 129 S.Ct. 991, 173 L.Ed.2d 284 (2009) (vacating and remanding in light of *Chambers*); *Serna–Guerra v. Holder,* 556 U.S. 1279, 129 S.Ct. 2764, 174 L.Ed.2d 268 (2009) (same); *Reyes–Figueroa v. United States,* 555 U.S. 1132, 129 S.Ct. 998, 173 L.Ed.2d 286 (2009) (same).

1    Many state courts also held vague laws ineffectual. See, *e.g., State v. Mann,* 2 Ore. 238, 240–241 (1867) (holding statute that prohibited "gambling devices" was "void" because "the term has no settled and definite meaning"); *Drake v. Drake,* 15 N.C. 110, 115 (1833) (explaining that "if the terms in which [a statute] is couched be so vague as to convey no definite meaning to those whose duty it is to execute it ... it is necessarily inoperative"); *McConvill v. Mayor and Aldermen of Jersey City,* 39 N.J.L. 38, 44 (1876) (holding that an ordinance was "bad for vagueness and uncertainty in the thing forbidden"); *State v. Boon,* 1 N.C. 103, 105 (1801) (refusing to apply a statute because "no punishment whatever can be inflicted; without using a discretion and indulging a latitude, which in criminal cases ought never to be allowed a Judge"); *Ex parte Jackson,* 45 Ark. 158, 164 (1885) (declaring a statutory prohibition on acts "injurious to the public morals" to be "vague" and "simply null" (emphasis deleted)); *McJunkins v. State,* 10 Ind. 140, 145 (1858) ("It would therefore appear that the term *public indecency* has no fixed legal meaning—is vague and indefinite, and cannot in itself imply a definite offense"); *Jennings v. State,* 16 Ind. 335, 336 (1861) ("We are of opinion that for want of a proper definition, no act is made criminal by the terms 'public indecency,' employed in the statute"); *Commonwealth v. Bank of Pennsylvania,* 3 Watts & Serg. 173, 177 (Pa.1842) (holding "the language of [shareholder election] legislation so devoid of certainty" that "no valid election [could have] been held, and that none can be held without further legislation"); *Cheezem v. State,* 2 Ind. 149, 150 (1850) (finding statute to "contai[n] no prohibition of any kind whatever" and thus declaring it "a nullity"); see also Note, *Statutory Standards of Personal Conduct: Indefiniteness and Uncertainty as Violations of Due Process,* 38 Harv. L. Rev. 963, 964, n. 4 (1925) (collecting cases).

2    See, *e.g.,* Virginia Resolutions in 4 Debates on the Federal Constitution 528 (J. Elliot ed. 1836) (explaining that the Act, "by uniting legislative and judicial powers to those of executive, subverts ... the particular organization, and positive provisions of the federal constitution"); Madison's Report on the Virginia Resolutions (Jan. 7, 1800) in 17 Papers of James Madison 318 (D. Mattern ed. 1991) (Madison's Report) (contending that the Act violated "the only preventive justice known to American jurisprudence," because "[t]he ground of suspicion is to be judged of, not by any judicial authority, but by the executive magistrate alone"); L. Canfield & H. Wilder,

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

The Making of Modern America 158 (H. Anderson et al. eds. 1952) ("People all over the country protested against the Alien and Sedition Acts"); M. Baseler, "Asylum for Mankind": America, 1607–1800, p. 287 (1998) ("The election of 1800 was a referendum on—and a repudiation of—the Federalist 'doctrines' enunciated in the debates" over, among other things, the Alien Friends Act); Moore, Aliens and the Constitution, 88 N.Y.U.L. Rev. 801, 865, n. 300 (2013) ( "The Aliens Act and Sedition Act were met with widespread criticism"); Lindsay, Immigration, Sovereignty, and the Constitution of Foreignness, 45 Conn. L. Rev. 743, 759 (2013) ("[T]he [Alien Friends] Act proved wildly unpopular among the American public, and contributed to the Republican electoral triumph in 1800 and the subsequent demise of the Federalist Party"). Whether the law was unenforced or, at most, enforced only once, the literature is not quite clear. Compare Sidak, War, Liberty, and Enemy Aliens, 67 N.Y.U.L Rev. 1402, 1406 (1992) (explaining the Act was never enforced); Cole, Enemy Aliens, 54 Stan. L. Rev. 953, 989 (2002) (same); Klein & Wittes, Preventative Detention in American Theory and Practice, 2 Harv. Nat'l Sec. J. 85, 102, n. 71 (2011) (same); Rosenfeld, Deportation Proceedings and Due Process of Law, 26 Colum. Hum. Rts. L. Rev. 713, 726, 733 (1995) (same); with Fehlings, Storm on the Constitution: The First Deportation Law, 10 Tulsa J. Comp. & Int'l L. 63, 109 (2002) (stating that the Act was enforced once, on someone who was planning on leaving the country in a few months anyway).

3   This Court already and long ago held that due process requires affording aliens the "opportunity, at some time, to be heard" before some lawful authority in advance of removal—and it's unclear how that opportunity might be meaningful without fair notice of the law's demands. The Japanese Immigrant Case, 189 U.S. 86, 101, 23 S.Ct. 611, 47 L.Ed. 721 (1903). Nor do the cases Justice THOMAS cites hold that a statutory right to lawful permanent residency in this country can be withdrawn without due process. Post, at —— (dissenting opinion). Rather, each merely holds that the particular statutory removal procedures under attack comported with due process. See Harisiades v. Shaughnessy, 342 U.S. 580, 584–585, 72 S.Ct. 512, 96 L.Ed. 586 (1952) (rejecting argument that an "alien is entitled to constitutional [due process] protection ... to the same extent as the citizen " before removal (emphasis added)); United States ex rel. Turner v. Williams, 194 U.S. 279, 289–290, 24 S.Ct. 719, 48 L.Ed. 979 (1904) (deporting an alien found to be in violation of a constitutionally valid law doesn't violate due process); Fong Yue Ting v. United States, 149 U.S. 698, 730, 13 S.Ct. 1016, 37 L.Ed. 905 (1893) (deporting an alien who hasn't "complied with the conditions" required to stay in the country doesn't violate due process). Even when it came to judicially unenforceable privileges in the past, "executive officials had to respect statutory privileges that had been granted to private individuals and that Congress had not authorized the officials to abrogate." Nelson, Adjudication in the Political Branches, 107 Colum. L. Rev. 559, 581 (2007) (emphasis deleted). So in a case like ours it would've been incumbent on any executive official to determine that the alien committed a qualifying crime and statutory vagueness could pose a disabling problem even there.

1   All this "ordinary case" caveat means is that while "[o]ne can always hypothesize unusual cases in which even a prototypically violent crime might not present a genuine risk," courts should exclude those atypical cases in assessing whether the offense qualifies. James, 550 U.S., at 208, 127 S.Ct. 1586. As we have explained, under that approach, it is not the case that "every conceivable factual offense covered by a statute" must pose the requisite risk "before the offense can be deemed" a crime of violence. Ibid. But the same is true of the categorical approach generally. See ibid. (using the terms just quoted to characterize both the ordinary case approach and the categorical approach for enumerated offenses set forth in Taylor v. United States, 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990)); Moncrieffe v. Holder, 569 U.S. 184, 191, 133 S.Ct. 1678, 185 L.Ed.2d 727 (2013); Gonzales v. Duenas–Alvarez, 549 U.S. 183, 193, 127 S.Ct. 815, 166 L.Ed.2d 683 (2007).

2   The Court protests that this straightforward analysis fails to take account of the crime's ordinary case. Ante, at 1219 – 1220, n. 6. But the fact that the element of "possession" may "take[ ] place in a variety of ways"— for instance, one may possess a firearm "in a closet, in a storeroom, in a car, in a pocket," "unloaded,

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

disassembled, or locked away," *Johnson,* 576 U.S., at ——, 135 S.Ct., at 2565 (THOMAS, J., concurring in judgment)—matters very little. That is because none of the alternative ways of satisfying that element produce a substantial risk that the possessor will use physical force against the person or property of another.

And no one would say that a person "possesses" a gun by firing it or threatening someone with it. Cf. *id.,* at ——, 135 S.Ct., at 2565 (opinion of THOMAS, J.) ("[T]he risk that the Government identifies arises not from the act of possessing the weapon, but from the act of using it."). The Court's insistence that this offense is nonetheless "difficult to classify" under § 16(b), *ante,* at 1220, n. 6, is surprising in light of our assessment, just two Terms ago, that § 16 does not cover "felon-in-possession laws and other firearms offenses," *Luna Torres v. Lynch,* 578 U.S. ——, ——, 136 S.Ct. 1619, 1630, 194 L.Ed.2d 737 (2016).

To name a round dozen: *Ayestas v. Davis,* 584 U.S. ——, ——, 138 S.Ct. 1080, 1093–1094, —— L.Ed.2d —— (2018); *Life Technologies Corp. v. Promega Corp.,* 580 U.S. ——, —————, 137 S.Ct. 734, 739–742, 197 L.Ed.2d 33 (2017); *Virginia v. Hicks,* 539 U.S. 113, 119–120, 122–124, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003); *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 196–198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002); *Slack v. McDaniel,* 529 U.S. 473, 483–484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *Gentile v. State Bar of Nev.,* 501 U.S. 1030, 1075–1076, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991); *Cage v. Louisiana,* 498 U.S. 39, 41, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) (*per curiam* ); *Steadman v. SEC,* 450 U.S. 91, 98, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981); *Palermo v. United States,* 360 U.S. 343, 351–353, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959); *United States v. E.I. du Pont de Nemours & Co.,* 353 U.S. 586, 593–596, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957); *Levinson v. Spector Motor Service,* 330 U.S. 649, 670–671, 67 S.Ct. 931, 91 L.Ed. 1158 (1947); *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

The Court also finds it probative that "a host of issues" respecting § 16(b) "divide" the lower courts. *Ante,* at 1222. Yet the Court does little to explain how those alleged conflicts vindicate its particular concern about the provision (namely, the ordinary case inquiry). And as the Government illustrates, many of those divergent results likely can be chalked up to material differences in the state offense statutes at issue.

Compare *Escudero–Arciniega v. Holder,* 702 F.3d 781, 783–785 (C.A.5 2012) (*per curiam* ) (reasoning that New Mexico car burglary "requires that the criminal lack authorization to enter the vehicle—a requirement alone which will most often ensure some force [against property] is used"), with *Sareang Ye v. INS,* 214 F.3d 1128, 1134 (C.A.9 2000) (finding it relevant that California car burglary does not require unlawful or unprivileged entry); see Reply Brief 17–20, and nn. 5–6.

See, *e.g.,* *In re Winship,* 397 U.S. 358, 382–384, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Black, J., dissenting); Rosenkranz, The Objects of the Constitution, 63 Stan. L. Rev. 1005, 1041–1043 (2011); Berger, "Law of the Land" Reconsidered, 74 Nw. U.L. Rev. 1, 2–17 (1979); Corwin, The Doctrine of Due Process of Law Before the Civil War, 24 Harv. L. Rev. 366, 368–373 (1911); see also 4 The Papers of Alexander Hamilton 35 (Syrett & Cooke eds. 1962) ("The words 'due process' have a precise technical import, and ... can never be referred to an act of legislature").

Before the 19th century, when virtually all felonies were punishable by death, English courts would sometimes go to extremes to find a reason to invoke the rule of lenity. See Hall, Strict or Liberal Construction of Penal Statutes, 48 Harv. L.Rev. 748, 751 (1935); *e.g., ante,* at 1225 – 1227 (GORSUCH, J., concurring in part and concurring in judgment) (citing Blackstone's discussion of a case about "cattle"). As the death penalty became less common, courts on this side of the Atlantic tempered the rule of lenity, clarifying that the rule

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1058 of 1271

Sessions v. Dimaya, 138 S.Ct. 1204 (2018)

200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

requires an "ambiguity" in the text and cannot be used "to defeat the obvious intention of the legislature."
*United States v. Wiltberger,* 5 Wheat. 76, 5 L.Ed. 37 (1820) (Marshall, C.J.).

Early American courts also declined to apply nonpenal statutes that were "unintelligible." *Johnson v. United States,* 576 U.S. ——, ——, n. 3, 135 S.Ct. 2551, 2568, n. 3, 192 L.Ed.2d 569 (2014) (THOMAS, J., concurring in judgment); *e.g., ante,* at 1225 – 1226, and n. 1 (opinion of GORSUCH, J.) (collecting cases). Like lenity, however, this practice reflected a principle of statutory construction that was much narrower than the modern constitutional vagueness doctrine. Unintelligible statutes were considered inoperative because they were impossible to apply to individual cases, not because they were unconstitutional for failing to provide "fair notice." See *Johnson,* 576 U.S., at ——, n. 3, 135 S.Ct., at 2568, n. 3 (opinion of THOMAS, J.).

3    This distinction between penal and nonpenal statutes would be decisive here because, traditionally, civil deportation laws were not considered penal. See *Bugajewitz v. Adams,* 228 U.S. 585, 591, 33 S.Ct. 607, 57 L.Ed. 978 (1913); *Fong Yue Ting v. United States,* 149 U.S. 698, 709, 730, 13 S.Ct. 1016, 37 L.Ed. 905 (1893). Although this Court has applied a kind of strict construction to civil deportation laws, that practice did not emerge until the mid–20th century. See *Fong Haw Tan v. Phelan,* 333 U.S. 6, 10, 68 S.Ct. 374, 92 L.Ed. 433 (1948).

4    The Jeffersonian Democratic–Republicans who opposed the Alien Friends Act primarily represented slave States, and their party's political strength came from the South. See Fehlings, Storm on the Constitution: The First Deportation Law, 10 Tulsa J. Comp. & Int'l L. 63, 84 (2002). The Jeffersonians opposed any federal control over immigration, which their constituents feared would be used to pre-empt State laws that prohibited the entry of free blacks. *Id.,* at 84–85; see also Berns, Freedom of the Press and the Alien and Sedition Laws: A Reappraisal, 1970 S.Ct. Rev. 109, 116 ("Whether pro- or anti-slavery, most southerners, including Jefferson and Madison ... were united behind a policy of denying to the national government any competence to deal with the question of slavery"). The fear was that "mobile free Negroes would intermingle with slaves, encourage them to run away, and foment insurrection." I. Berlin, Slaves Without Masters 92 (1974).

5    The Jeffersonians also argued that the Alien Friends Act violated due process because, if aliens disobeyed the President's orders to leave the country, they could be convicted of a crime and imprisoned without a trial. See, *e.g.,* Kentucky Resolutions ¶ 6, 4 Elliot's Debates 541. That charge was false. The Alien Friends Act gave federal courts jurisdiction over alleged violations of the President's orders. See § 4, 1 Stat. 571.

6    The Sixth Amendment is, thus, not a reason to maintain the categorical approach in criminal cases. Contra, *ante,* at 1217 – 1218 (plurality opinion). Even if it were, the Sixth Amendment does not apply in immigration cases like this one. See Part II–B–2, *infra.* The plurality contends that, if it must contort the text of § 16(b) to avoid a Sixth Amendment problem in criminal cases, then it must also contort the text of § 16(b) in immigration cases, even though the Sixth Amendment problem does not arise in the immigration context. See *ante,* at 1217 – 1218, 1218. But, as I have explained elsewhere, this "lowest common denominator" approach to constitutional avoidance is both ahistorical and illogical. See *Clark v. Martinez,* 543 U.S. 371, 395–401, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005) (dissenting opinion).

7    See, *e.g.,* 18 U.S.C. § 3553(a)(2) (directing sentencing judges to consider "the nature and circumstances of the offense"); *Schware v. Board of Bar Examiners of N. M.,* 353 U.S. 232, 242–243, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) (describing "the nature of the offense" committed by a bar applicant as "recruiting persons to go overseas to aid the Loyalists in the Spanish Civil War"); *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 482, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (O'Connor, J., dissenting) (describing "the nature of the offense at issue" as not "involving grave physical injury" but rather as a "business dispute between two companies in the oil and gas industry"); *United States v. Broce,* 488 U.S. 563, 585–587, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989) (Blackmun, J., dissenting) (describing "the nature of the charged offense"

Case 3:20-cv-07721-SI   Document 58-5   Filed 11/10/20   Page 1059 of 1271

Sessions v. Dimaya, 138 S.Ct. 1204 (2018)
200 L.Ed.2d 549, 86 USLW 4189, 18 Cal. Daily Op. Serv. 3446...

in terms of the specific facts alleged in the indictment); *People v. Golba,* 273 Mich.App. 603, 611, 729 N.W.2d 916, 922 (2007) ("[T]he underlying factual basis for a conviction governs whether the offense 'by its nature constitutes a sexual offense against an individual who is less than 18 years of age.' " (quoting Mich. Comp. Laws § 28.722(e)(xi) (2006))); A Fix for Animal Abusers, Boston Herald, Nov. 22, 2017, p. 16 ("prosecutors were so horrified at the nature of his offense—his torture of a neighbor's dog"); P. Ward, Attorney of Convicted Ex–Official Accuses Case's Judge, Pittsburgh Post–Gazette, Nov. 10, 2015, p. B1 (identifying the "nature of his offense" as "taking money from an elderly, widowed client, and giving it to campaign funds"); Cross–Burning–Article Painted an Inaccurate Picture of Young Man in Question, Seattle Times, Aug. 12, 1991, p. A9 ("[The defendant] took no steps to prevent the cross that was burned from being constructed on his family's premises and later ... assisted in concealing a second cross.... This was the nature of his offense"); N. Libman, A Parole/Probation Officer Talks With Norma Libman, Chicago Tribune, May 29, 1988, p. I31 (describing "the nature of the offense" as "not serious" if "there was no definitive threat on life" or if "the dollar- and cents- amount was not great"); E. Walsh, District–U.S. Argument Delays Warrant for Escapee's Arrest, Washington Post, May 29, 1986, p. C1 (describing "the nature of Murray's alleged offenses" as "point [ing] at two officers a gun that was later found to contain one round of ammunition").

---

**End of Document** <span style="float:right">© 2020 Thomson Reuters. No claim to original U.S. Government Works.</span>

KeyCite Yellow Flag - Negative Treatment

Distinguished by Gappy v. Sessions, 6th Cir., September 26, 2017

654 Fed.Appx. 608
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See
also U.S.Ct. of Appeals 4th Cir. Rule 32.1.
United States Court of Appeals, Fourth Circuit.

Daniel Gemechu SHANTU, Petitioner,

v.

Loretta E. LYNCH, Attorney General, Respondent.

No. 15–1175
|
Argued: March 24, 2016
|
Decided: July 13, 2016

**Synopsis**

**Background:** Alien, citizen of Ethiopia, applied for asylum,
withholding of removal, and relief under Convention Against
Torture (CAT). Immigration Judge (IJ) denied asylum, but
granted withholding of removal. Alien moved to reopen,
and Board of Immigration Appeals (BIA) denied his motion.
Alien moved to reconsider, and BIA denied his motion. Alien
appealed. BIA affirmed. Alien petitioned for judicial review.

**[Holding:]** The Court Of Appeals, Pamela Harris, Circuit
Judge, held that denial of motion by alien for reconsideration
of discretionary denial of asylum after granting withholding
of removal was abuse of discretion, and thus remand was
required.

Petition granted.

West Headnotes (3)

**[1]** **Aliens, Immigration, and**
**Citizenship** 🔑 Grounds and Factors
Considered

A discretionary denial of asylum must be
reexamined if withholding of removal is granted.

8 C.F.R. § 1208.16(e).

2 Cases that cite this headnote

**[2]** **Aliens, Immigration, and**
**Citizenship** 🔑 Findings, statement of reasons,
and determination

**Aliens, Immigration, and**
**Citizenship** 🔑 Remand

Denial of motion by alien, citizen of Ethiopia, for
reconsideration of discretionary denial of asylum
after granting withholding of removal was abuse
of discretion, and thus remand was required,
where neither immigration judge (IJ) nor Board
of Immigration Appeals fully considered or
balanced factors applicable to discretionary
denial; IJ simply concluded that alien's "forum
shopping" and dishonesty when obtaining his
visa precluded discretionary grant of asylum, and
Board simply affirmed IJ's decision. 8 C.F.R.
§§ 1003.2, 1208.16(e).

2 Cases that cite this headnote

**[3]** **Aliens, Immigration, and**
**Citizenship** 🔑 Clear Probability Standard for
Withholding of Removal

The government needs an especially compelling
reason to deny discretionary asylum to a refugee
who meets the high standard for withholding
of removal, given the disfavored nature of that
status. 8 C.F.R. § 1208.16(e).

1 Cases that cite this headnote

**\*609** On Petition for Review of an Order of the Board of
Immigration Appeals.

**Attorneys and Law Firms**

ARGUED: Alan M. Parra, LAW OFFICE OF ALAN M.
PARRA, Silver Spring, Maryland, for Petitioner. Rachel
Louise Browning, UNITED STATES DEPARTMENT

OF JUSTICE, Washington, D.C., for Respondent. ON BRIEF: Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Blair O'Connor, Assistant Director, Civil Division, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

Before KING, DIAZ, and HARRIS, Circuit Judges.

**Opinion**

Petition for review granted; vacated and remanded by unpublished opinion. Judge Harris wrote the opinion, in which Judge King and Judge Diaz joined.

Unpublished opinions are not binding precedent in this circuit.

PAMELA HARRIS, Circuit Judge:

When an alien's application for asylum is denied on discretionary grounds but the same alien is granted withholding of removal, 8 C.F.R. § 1208.16(e) provides that "the denial of asylum shall be reconsidered," in light of certain enumerated factors. Petitioner Daniel Gemechu Shantu finds himself in precisely this position, and he contends that the Board of Immigration Appeals ("BIA" or "Board") has not reconsidered his asylum application as required by the regulation. Shantu filed a motion for reconsideration with the BIA on that basis, which the agency denied.

We agree that Shantu's asylum claim has not yet received reconsideration under 8 C.F.R. § 1208.16(e), and, for that reason, we find that the BIA abused its discretion when it denied Shantu's motion. Accordingly, we vacate the Board's decision and remand this matter to the agency.

## I.

### A.

Petitioner Shantu is a native and citizen of Ethiopia. Shantu was persecuted in his home country on account of his Oromo ethnicity and his religion, and he was subjected to multiple detentions, beatings, and arrests.

Traveling on a student visa, Shantu left Ethiopia in August of 2004 to attend a graduate program in theology in Norway. He returned to Ethiopia about a year later to do research related to his degree and to marry his fiancée, who was still living in the country. At Shantu's wedding on October 15, 2005, a family friend who was also an opposition leader made a speech that touched on political issues. Shantu and his wife were arrested eleven days later, and although Shantu's wife was soon released, Shantu was detained, tortured, and beaten until December 5, 2005.

**\*610** Shantu and his wife immediately left Ethiopia for Norway, departing on December 8, 2005. Shantu's wife traveled on a "family reunification visa," which Shantu had obtained for her before leaving Norway. But Shantu left Norway again on July 20, 2006, before completing his degree, to come to the United States. He was admitted to the United States on a nonimmigrant business visitor visa, which he overstayed. Shantu submitted a timely application for asylum, withholding of removal, and Convention Against Torture ("CAT") protection.

Shantu's wife visited him in the United States in 2007, and he has not seen her since. On April 7, 2008, she gave birth to their son, whom Shantu has never met. Shantu's wife became a student in Norway and remained there on a student visa, which, according to Shantu, has now expired. Shantu has never applied for asylum in Norway.

### B.

To be eligible for asylum in the United States, an applicant must establish that he is a "refugee," 8 U.S.C. § 1158(b)(1)(A)—that is, that he is unwilling or unable to return to his country of citizenship "because of persecution or a well-founded fear of persecution on account of" a protected characteristic like religion or "membership in a particular social group," id. § 1101(a)(42). Even then, however, a refugee is only " 'eligible for asylum,' which the Attorney General (or his or her designee) 'in his [or her] discretion' may grant." Zuh v. Mukasey, 547 F.3d 504, 507 (4th Cir. 2008) (alteration and emphasis in original) (quoting INS v. Cardoza–Fonseca, 480 U.S. 421, 443, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)); see 8 U.S.C. § 1158(b)(1)(A).

Discretionary denials of asylum are " 'exceedingly rare' and are generally based on egregious conduct by the applicant." Zuh, 547 F.3d at 507 (quoting Huang v. INS, 436 F.3d 89, 92 (2d Cir. 2006)). "The exercise of discretionary judgment with respect to a refugee's asylum claim," we have explained, "should include the examination of 'a totality of the circumstances' in view of the BIA's policy that '[t]he danger of persecution will outweigh all but the most egregious of adverse factors.' " Dankam v. Gonzales, 495 F.3d 113, 119 n.2 (4th Cir. 2007) (alteration and emphasis in original) (quoting Huang, 436 F.3d at 98). In Zuh, we articulated a non-exhaustive list of factors to be balanced as part of the consideration of the "totality of the circumstances." 547 F.3d at 510–11. "On the positive side," we explained, an IJ should weigh:

1) Family, business, community, and employment ties to the United States, and length of residence and property ownership in this country;

2) Evidence of hardship to the alien and his family if deported to any country, or if denied asylum such that the alien cannot be reunited with family members (as derivative asylees) in this country;

3) Evidence of good character, value, or service to the community, including proof of genuine rehabilitation if a criminal record is present;

4) General humanitarian reasons, such as age or health;

5) Evidence of severe past persecution and/or well-founded fear of future persecution, including consideration of other relief granted or denied the applicant (e.g., withholding of removal or CAT protection).

Id. at 511. And "[o]n the negative side," an IJ should consider the:

1) Nature and underlying circumstances of the exclusion ground;

**\*611** 2) Presence of significant violations of immigration laws;

3) Presence of a criminal record and the nature, recency, and seriousness of that record, including evidence of recidivism;

4) Lack of candor with immigration officials, including an actual adverse credibility finding by the IJ;

5) Other evidence that indicates bad character or undesirability for permanent residence in the United States.

Id. We emphasized that "an IJ need not analyze or even list" every one of the enumerated factors, "[b]ut at the very least, an IJ must demonstrate that he or she reviewed the record and balanced the relevant factors" and must also "discuss the positive or adverse factors that support his or her decision." Id. (emphasis in original).

As rare as a discretionary denial of asylum may be, it is "even more rare" when the same applicant is granted withholding of removal. Id. at 507. That is because withholding of removal requires a more demanding showing than asylum: The applicant must establish by the preponderance of the evidence that his "life or freedom would be threatened" on account of a protected characteristic if he were deported to his home country. See 8 U.S.C. § 1231(b)(3)(A); Zuh, 547 F.3d at 507 & n.2. If the applicant makes this showing, the government must withhold deportation. 8 U.S.C. § 1231(b)(3)(A). But unlike an award of asylum, withholding of removal does not permit the applicant to become a lawful permanent resident or to bring his family to the United States, and it leaves him "subject to deportation to a willing third country." Zuh, 547 F.3d at 508 (citing Huang, 436 F.3d at 95). For that reason, we have made clear that a discretionary denial of asylum coupled with a grant of withholding of removal leaves an applicant in an "unusual legal status" and generally is justified only by especially "egregious negative activity" by the applicant. Id. at 507–08 (citation and internal quotation marks omitted).

Consistent with this understanding, the regulation at 8 C.F.R. § 1208.16(e) [1]—upon which we relied in Zuh, 547 F.3d at 510—"provide[s] special and unusual rights to an alien who has been denied asylum" on discretionary grounds but granted withholding of removal, Huang, 436 F.3d at 92. Specifically, 8 C.F.R. § 1208.16(e) states:

In the event that an applicant is denied asylum solely in the exercise of discretion, and the applicant is subsequently granted withholding of deportation or removal under this section, thereby effectively precluding admission of the applicant's spouse or minor children following to join him or her, the denial of asylum shall be reconsidered. Factors to be considered will include the reasons for the denial and reasonable alternatives available to the applicant such as reunification with his or her spouse or minor children in a third country.

The application of this regulation to Shantu's case is at issue here.

### C.

Shantu's application for asylum, withholding of removal, and CAT protection was referred to immigration court, and Shantu appeared before an Immigration Judge ("IJ") in Baltimore, Maryland. Shantu admitted that he was a removable **\*612** alien and presented three witnesses, as well as his own testimony, in support of his claims.

On August 2, 2007, the IJ issued a decision denying Shantu's application for asylum but granting him withholding of removal. [2] The IJ found the testimony of Shantu and his three witnesses credible and concluded that Shantu had suffered past persecution and possessed a well-founded fear of future persecution. He also found that Shantu had not been "firmly resettled" in Norway. J.A. 127. But despite the fact that Shantu was eligible for asylum, the IJ denied Shantu's asylum application in an exercise of discretion.

The IJ based the discretionary denial of asylum on two factors. First, the IJ found that Shantu had engaged in "forum shopping" by "com[ing] to the United States seeking asylum in this nation rather than seeking protection" in Norway, where "he clearly was permitted to be." J.A. 127. The IJ concluded that Shantu "should not be rewarded as a matter of discretion for forum shopping when he clearly was safe in Norway." J.A. 128. Second, the IJ found that Shantu had lied to immigration officials when he obtained a visitor visa because he came to the United States with the intention of seeking asylum here.

The IJ did find, however, that Shantu was eligible for withholding of removal because it was "more likely than not, given the past history, that [his] life or freedom [would] be placed in danger if he were to be required to return to Ethiopia." J.A. 128. The IJ did not then reconsider the denial of asylum or contemplate the effect that the "unusual legal status" of being granted withholding of removal but denied asylum would have on Shantu's ability to reunite with his wife. See Zuh, 547 F.3d at 508 (quoting Huang, 436 F.3d at 95); see also 8 C.F.R. § 1208.16(e).

Shantu appealed the IJ's decision to the Board of Immigration Appeals and, on April 24, 2009, a single member of the Board dismissed the matter. The Board's decision first noted its obligation under In re Pula, 19 I. & N. Dec. 467, 473 (B.I.A. 1987), to examine the "totality of the circumstances" in making a discretionary asylum decision. Next, the Board acknowledged Zuh, which we decided after the IJ issued his opinion but before the BIA ruled on Shantu's appeal. The Board listed some of the factors enumerated in that opinion, including "evidence of hardship to the alien and his family if deported to any country, or if denied asylum such that the alien cannot be reunited with family members"; "evidence of good character"; "general humanitarian reasons"; "evidence of severe past persecution or a well-founded fear of future persecution"; "lack of candor with immigration officials"; "presence of a criminal record or significant violations of immigration laws"; and "other evidence of bad character or undesirability for permanent residence in the United States." J.A. 95.

But the Board did not apply most of these factors to Shantu's personal circumstances or weigh the positive considerations against the negative ones. Rather, the Board simply adopted and affirmed the IJ's decision. The Board agreed with the IJ that Shantu had found "safe haven" in Norway and saw no evidence that Shantu could not return there. The Board further noted that Shantu's family ties were in Norway because his wife was still there. And the Board agreed with the IJ's findings that Shantu had engaged in forum shopping by choosing to apply for asylum in the United States, and that Shantu had **\*613** lied to immigration officials to obtain

a visa. Finally, and "very importantly," J.A. 96, the Board relied on the fact that Shantu had been granted withholding of removal as a factor supporting the discretionary denial of asylum, in that it protected Shantu from further persecution in Ethiopia.

Shantu did not seek direct review of the Board's 2009 decision, but on May 18, 2010, he filed a motion asking the BIA to reopen his case under its sua sponte authority. See 8 C.F.R. § 1003.2(a). Shantu explained that his wife was unable to sponsor him for a family reunification visa in Norway because he had already sponsored her for one, and that his inability to reunite with his wife and son was causing hardship for his family. The same single member of the Board denied the motion on March 16, 2011, finding that Shantu had not shown that his circumstances were "materially different" than before. J.A. 66.

Shantu subsequently obtained new counsel and, on September 15, 2014, he filed a motion to reconsider the discretionary denial of asylum under 8 C.F.R. § 1208.16(e), the regulation directly at issue here. He argued that neither the IJ nor the BIA had meaningfully examined whether he could be reunited with his family in light of the grant of withholding of removal, as required by the regulation, and that the IJ had just assumed, without factual basis, that he could return to Norway. He also stated that his Ethiopian passport had expired, and that his wife's and son's temporary Norwegian visas had also expired. And he produced evidence that he had attempted to obtain a visa to return to Norway, but his application was denied because he did not have a valid United States travel document—a result of his withholding of removal status. Finally, Shantu argued that the previous decisions in his case were legally erroneous because the IJ and BIA had improperly relied on the finding that Norway was a "safe haven," and had failed to properly weigh the factors outlined in Zuh.

The same single member of the Board denied Shantu's motion for reconsideration on January 27, 2015. The Board noted that 8 C.F.R. § 1208.16(e) "require[s] reconsideration of any discretionary denial of asylum when the alien is subsequently granted withholding of removal, and directs consideration of factors including the reasons for the denial of asylum and available alternatives for family reunification." J.A. 3. The Board also noted that the expiration of visas and passports was "an ordinary occurrence with the lapse of time," and that Shantu had failed to address his "lack of candor to

immigration officials under which discretionary asylum was properly denied." Id. Finally, the Board stated that "the factors prescribed by regulation and Zuh v. Mukasey" had already been "properly considered" by the IJ and the Board in the three previous decisions. Id. (citation omitted). Accordingly, the motion for reconsideration was denied.

Shantu filed a timely petition for review of the BIA's denial of his motion for reconsideration.

## II.

We first consider the requirements of the regulation at the heart of this case, 8 C.F.R. § 1208.16(e). The provision states that a discretionary denial of asylum "shall be reconsidered" in the event that the applicant is "subsequently granted withholding of deportation or removal," because this rare situation "effectively preclud[es] admission of the applicant's spouse or minor children following to join him or her." 8 C.F.R. § 1208.16(e). Among the "[f]actors to be considered" upon reconsideration are "the reasons for the denial" and the "reasonable alternatives available to the applicant such as reunification **614** with his or her spouse or minor children in a third country." Id.

[1] Neither the BIA nor the federal courts have had much occasion to interpret 8 C.F.R. § 1208.16(e), perhaps because the situation to which the regulation applies hardly ever arises. See Zuh, 547 F.3d at 507 (noting that a discretionary denial of asylum is "exceedingly rare" and that a grant of withholding of removal to someone denied discretionary asylum is "even more rare" than that). As the Board itself acknowledged in this case, however, it is clear that the regulation makes "reconsideration" mandatory. And the meaning of the word "reconsideration" is plain enough. See Dickenson–Russell Coal Co. v. Sec'y of Labor, 747 F.3d 251, 258 (4th Cir. 2014) ("The plain meaning of language in a regulation governs unless that meaning would lead to absurd results." (quoting Forest Watch v. U.S. Forest Serv., 410 F.3d 115, 117 (2d Cir. 2005))). The regulation clearly mandates that a discretionary denial of asylum be reexamined if withholding of removal is granted, in light of the enumerated considerations.

But beyond this basic requirement, the meaning of 8 C.F.R. § 1208.16(e) is less clear. For instance, it is not apparent from the provision's text when in the asylum adjudication process the required reconsideration must occur, or who—the Board or an IJ—must do the reconsidering. And as the Second Circuit has observed, the regulation also "does not specify the mechanism that initiates review—i.e., by motion, through direct appeal, or as a result of the BIA's own initiative." Huang, 436 F.3d at 93.

Both the Second Circuit and the BIA have considered some of these questions, at least in passing, although neither has definitively resolved them. In Huang, the Second Circuit rejected the government's contention that 8 C.F.R. § 1208.16(e) "place[d] a duty solely on [a] petitioner to move for reconsideration, as opposed to requiring the BIA (or the IJ for that matter) to reconsider any denial of asylum sua sponte." Id. at 93. The court then held that a petitioner is not required to bring a motion for reconsideration under 8 C.F.R. § 1208.16(e)—but it did not rule out the possibility that a petitioner could bring such a motion. See id. at 93–94. In addition, the court observed that the command " 'the denial of asylum shall be reconsidered' " is phrased in the passive voice, and that, "[r]ead normally, the passive voice in such a phrase mandates action by the party which previously had acted, i.e., the BIA." Id. at 93 (emphasis in original) (quoting 8 C.F.R. § 1208.16(e)). But the following year, the Board said—without analysis or discussion—that, "[u]nder 8 C.F.R. § 1208.16(e) (2006), when an alien is denied asylum solely in the exercise of discretion but is subsequently granted withholding of removal, the Immigration Judge must reconsider the denial of asylum." In re T–Z–, 24 I. & N. Dec. 163, 176 (B.I.A. 2007). Taken together, these opinions suggest that either the Board or an IJ is authorized to provide the reconsideration required under 8 C.F.R. § 1208.16(e), either sua sponte or in response to a motion.

In this case, the government appears to have taken an approach different from the one it advanced in Huang. Though it did not address the matter in its brief, at oral argument the government asserted that 8 C.F.R. § 1208.16(e) is intended to trigger "automatic reconsideration"

by the IJ at the time of initial review of an asylum application. As a procedural matter, according to the government, the regulation does not give the Board authority to reconsider a denial of asylum after a case is closed; such reconsideration may proceed **615 only under a different regulation, 8 C.F.R. § 1003.2. [3]

We need not, and do not, consider arguments raised for the first time at oral argument. See W. Va. CWP Fund v. Stacy, 671 F.3d 378, 389 (4th Cir. 2011). But to the extent the government has suggested that Shantu's motion under 8 C.F.R. § 1208.16(e) was improper, we note that the Board took no issue with Shantu's procedural choice and did not deny his motion on that basis. And perhaps for that reason, the government expressly stated at oral argument that it was not seeking dismissal on jurisdictional grounds, but rather explaining its interpretation of a rarely-invoked regulation. Finally, given that neither the BIA nor any court has adopted the government's latest position—which is directly contrary to the one it advanced in Huang, when it argued that "reconsideration" under 8 C.F.R. § 1208.16(e) could proceed only on a separate motion by the applicant, see 436 F.3d at 93—we observe that Shantu had every reason to believe he was entitled to file a motion for reconsideration pursuant to that regulation.

We need not delve further into the questions surrounding 8 C.F.R. § 1208.16(e) to resolve this case. Regardless of whether it was the Board or the IJ that was required to reconsider Shantu's application for asylum, or precisely how and when that reconsideration was to take place, the unambiguous and fundamental command of 8 C.F.R. § 1208.16(e) is that there be some reexamination of a discretionary denial of asylum when withholding of removal is granted, under the factors set out in the regulation. And as we discuss below, that requirement was not satisfied here.

### III.

#### A.

We have jurisdiction to review Shantu's petition under 8 U.S.C. § 1252. We assume without deciding that the Board's decision may be reviewed only for an abuse of discretion,

as the government contends. [4] Accordingly, we will reverse the Board's denial of Shantu's motion for reconsideration "only if the Board acted arbitrarily, irrationally, or contrary to law." Narine v. Holder, 559 F.3d 246, 249 (4th Cir. 2009) (quoting Mohammed v. Gonzales, 400 F.3d 785, 791 (9th Cir. 2005)).

## B.

[2] We find that the Board abused its discretion when it denied Shantu's motion for reconsideration. The Board denied the motion based on its conclusion that "the factors prescribed by regulation and Zuh v. Mukasey were properly considered by the Immigration Judge and the Board in prior decisions." J.A. 3 (citation omitted). But an examination of the BIA's and IJ's "prior decisions" reveals this determination to be contrary to law. We are mindful, of course, that our review is limited to the Board's January 27, 2015 decision denying Shantu's motion for reconsideration; the **\*616** BIA's earlier decisions were not timely appealed. But because that 2015 decision expressly incorporates and relies upon the Board's and IJ's previous decisions, we can determine whether the Board abused its discretion in 2015 only by examining its prior reasoning. See Nken v. Holder, 585 F.3d 818, 822 (4th Cir. 2009) ("[A]n administrative order," including one of the BIA, "cannot be upheld unless the grounds upon which the agency acted ... were those upon which its action can be sustained." (quoting SEC v. Chenery Corp., 318 U.S. 80, 95, 63 S.Ct. 454, 87 L.Ed. 626 (1943))).

First, there can be no doubt that the IJ did not reexamine his own discretionary denial of asylum after granting Shantu withholding of removal, as the government suggests 8 C.F.R. § 1208.16(e) required him to do. The IJ considered Shantu's asylum application only once in his sixteen-page opinion, and he did so in the paragraphs preceding the grant of withholding of removal. And at no point did the IJ address most of the factors enumerated by 8 C.F.R. § 1208.16(e). He made no mention of 8 C.F.R. § 1208.16(e) itself, nor did he address the hardship that Shantu's unusual immigration status might place on his family. Rather, he simply concluded that Shantu's "forum shopping" and

dishonesty when obtaining his visa precluded a discretionary grant of asylum.

The Board did not provide the reconsideration required by 8 C.F.R. § 1208.16(e), either. The Board issued its 2009 opinion rejecting Shantu's appeal of the IJ's determination after we decided Zuh, which clarified our view that the decision to grant withholding of removal while denying discretionary asylum is typically justified "only when the Government has demonstrated egregious negative activity by the applicant." 547 F.3d at 507. Yet although the Board acknowledged the factors we enumerated in Zuh, it did not apply them to Shantu's particular case, balance them, or consider whether any misconduct by Shantu was, in fact, "egregious." Rather, the Board simply affirmed the IJ's decision, concluding that Shantu had found "safe haven" in Norway and had "family ties" there, that Shantu had engaged in impermissible "forum shopping," and that Shantu had "lied to immigration officials" to obtain his United States visa. J.A. 95–96.

Finally, in the brief decision denying Shantu's motion to reopen, the Board incorrectly stated that "the factors considered by the Immigration Judge were in accord with law in the United States Court of Appeals for the Fourth Circuit," and declined to "further consider the denial of [Shantu's] application for asylum." J.A. 66. The Board's express refusal to "further consider" Shantu's case cannot constitute the "reconsideration" required by 8 C.F.R. § 1208.16(e).

Accordingly, we find that neither the IJ nor the Board provided the reconsideration of Shantu's asylum application that 8 C.F.R. § 1208.16(e) requires, and that the Board's determination otherwise was contrary to law and an abuse of discretion. See Narine, 559 F.3d at 249. We therefore remand this matter to the BIA so that Shantu's asylum application may be reconsidered in light of the requirements of 8 C.F.R. § 1208.16(e) and the law of this Circuit. See Cordova v. Holder, 759 F.3d 332, 338 (4th Cir. 2014) ("[W]hen a BIA order does not demonstrate that the agency has considered an issue, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." (quoting Nken, 585 F.3d at 822)). We reiterate our view that Shantu's current immigration

status is disfavored and justified only by "egregious negative activity." Zuh, 547 F.3d at 507.

## *617 IV.

### A.

**[3]** Although the BIA must determine how best to proceed with this case on remand, we offer a few additional observations that might inform the agency's reconsideration. First, we note that the Board's 2009 decision relies on the suggestion in In re Pula that a grant of withholding of removal makes the denial of discretionary asylum more justifiable, given that the applicant will not be deported to harm's way. See 19 I. & N. Dec. at 474. But in Zuh, we made it clear—relying in part on § 1208.16(e) itself [5]— that the opposite is true: The government needs an especially compelling reason to deny discretionary asylum to a refugee who meets the high standard for withholding of removal, given the disfavored nature of that status. 547 F.3d at 507–08, 510. To the extent that In re Pula and Zuh conflict, the Board of course is bound by our ruling in Zuh.

Second, although the IJ found expressly that Shantu was not "firmly resettled" in Norway, both the IJ and the Board relied heavily on a determination that Shantu had engaged in impermissible "forum shopping" because he had found "safe haven" in Norway. But as the Second Circuit has noted, "the regulation giving IJs discretion to deny asylum to applicants staying in a 'safe third country' before arrival in the United States" was repealed on January 5, 2001. Tandia v. Gonzales, 437 F.3d 245, 248 (2d Cir. 2006) (per curiam). Accordingly, the Second Circuit went on to hold, an IJ may only deny discretionary asylum based on a stay in a third country if the applicant was "firmly resettled" there. Id. at 249 (citations omitted); see also Alsagladi v. Gonzales, 450 F.3d 700, 702 (7th Cir. 2006) ("[T]he United States does not require refugees to remain in the first nation they reach after their escape, unless they have become firmly settled there, or a treaty so provides." (citations omitted)). Although the government takes the position that "safe haven" remains a factor that may properly be considered in a discretionary asylum determination, the Board may wish to consider on remand whether that is so—and whether, in any event, the

so-called "forum shopping" in this case rose to the level of "egregious negative activity," see Zuh, 547 F.3d at 507.

Finally, we observe that the only other basis for the discretionary denial of Shantu's asylum application was the IJ's and the Board's conclusion that Shantu lied to consular officials to obtain his visa. We do not question the importance of discouraging fraudulent conduct by asylum seekers. But given that "[t]he BIA has explicitly cautioned that manner of entry cannot, as a matter of law, suffice as a basis for a discretionary denial of asylum in the absence of other adverse factors," Huang, 436 F.3d at 99 (citing In re Pula, 19 I. & N. Dec. at 473–74), we do question whether the way in which Shantu obtained his temporary visa constituted "egregious" misconduct.

### B.

In addition, we note that this case may provide the BIA an opportunity to clarify its interpretation of 8 C.F.R. § 1208.16(e). While we find the meaning of the word "reconsider" to be evident, we have noted above that the regulation's text does not reveal when in the normal process of adjudicating *618 an asylum application the reconsideration should occur, or what entity should do the reconsidering. We do not reach these questions because they do not affect the resolution of the case that is before us; Shantu's asylum application was not properly reconsidered at any stage of the process. Furthermore, we are cognizant that the BIA should interpret the regulation in the first instance. Cf. INS v. Orlando Ventura, 537 U.S. 12, 16, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) ("Generally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands."); Gonzales v. Thomas, 547 U.S. 183, 186, 126 S.Ct. 1613, 164 L.Ed.2d 358 (2006); Nken, 585 F.3d at 822. We encourage the BIA to take that opportunity on remand.

### V.

Because Shantu's asylum application did not receive the reconsideration mandated by 8 C.F.R. § 1208.16(e), we find that the BIA's denial of his motion for reconsideration was an abuse of discretion. Accordingly, we grant Shantu's

petition for review and remand the case to the BIA for further proceedings.

PETITION FOR REVIEW GRANTED; VACATED AND REMANDED

**All Citations**

654 Fed.Appx. 608

## Footnotes

1       Shantu's motion for reconsideration relied on both 8 C.F.R. §§ 208.16(e) and 1208.16(e), which are identical regulations. "As applied to the BIA," however, "8 C.F.R. § 208.16(e) ... is actually designated at 8 C.F.R. § 1208.16(e)." Huang, 436 F.3d at 90 n.1. Accordingly, we refer only to 8 C.F.R. § 1208.16(e) in this opinion.

2       The IJ found that Shantu's application for CAT protection was mooted by the grant of withholding of removal and Shantu does not contest this conclusion.

3       This provision authorizes the Board to, "at any time[,] reopen or reconsider on its own motion any case in which it has rendered a decision," and it outlines the requirements for a motion for reconsideration filed by a party. 8 C.F.R. § 1003.2(a)-(b). The government noted in its brief that a motion to reconsider under 8 C.F.R. § 1003.2(b) must be filed within 30 days of the Board's final decision, but it waived reliance on this requirement, conceding that the time limit was "not a basis for the Board's decision" to deny reconsideration in this case. Gov't Br. at 22 n.5; see also 8 U.S.C. § 1229a(c)(6)(B).

4       This is the standard of review that applies to a motion for reconsideration brought under 8 C.F.R. § 1002.3, see Narine v. Holder, 559 F.3d 246, 249 (4th Cir. 2009), and Shantu has not argued that a different standard should apply here.

5       In Zuh we cited 8 C.F.R. § 208.16(e), 547 F.3d at 510, but, again, that provision is identical to 8 C.F.R. § 1208.16(e). See supra n.1.

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Tovar-Rodriguez v. Gonzales, 9th Cir., December 8, 2005

368 F.3d 1160
United States Court of Appeals,
Ninth Circuit.

Surinder SIDHU, Petitioner,

v.

John ASHCROFT, [*] Respondent.

No. 02-73220.
|
Submitted March 31, 2004. [**]
|
Filed May 27, 2004.

**Synopsis**

**Background:** Alien petitioned for review of the decision of the Board of Immigration Appeals (BIA) which found alien excludable from United States.

**[Holding:]** The Court of Appeals, Tallman, Circuit Judge, held that alien was never free from official restraint for purposes of determining whether alien effected entry into United States.

Petition denied.

West Headnotes (4)

**[1]**    **Aliens, Immigration, and Citizenship** 🔑 Review of Initial Decision or Administrative Review

Where the Board of Immigration Appeals (BIA) affirms the decision of the Immigration Judge (IJ) without opinion, the Court of Appeals reviews the decision of the IJ as the final agency decision.

3 Cases that cite this headnote

**[2]**    **Aliens, Immigration, and Citizenship** 🔑 Mode and Effect of Entry or Reentry

Under Immigration and Nationality Act (INA), excludable aliens, those seeking admission from outside the United States, are entitled to fewer procedural protections than deportable aliens, those already physically present in the United States; once an alien effected an entry into the United States, regardless of whether the entry was lawful or not, the relatively greater protections of deportation proceedings were required. Immigration and Nationality Act, § 101 et seq., 🚩 8 U.S.C.A. § 1101 et seq.

1 Cases that cite this headnote

**[3]**    **Aliens, Immigration, and Citizenship**  🔑  Mode and Effect of Entry or Reentry

In determining whether an alien was properly placed in exclusion proceedings or should have been placed in deportation proceedings, "entry" is defined as: (1) a crossing into the territorial limits of the United States, i.e., physical presence; (2) inspection and admission by an immigration officer, or actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint. Immigration and Nationality Act, § 101(a)(13), 🚩 8 U.S.C.A. § 1101(a)(13).

6 Cases that cite this headnote

**[4]**    **Aliens, Immigration, and Citizenship**  🔑  Mode and Effect of Entry or Reentry

Alien was never free from official restraint for purposes of determining whether alien effected entry into United States, and thus alien was properly subjected to exclusion hearing, as opposed to deportation hearing; after alien's passport was stamped admitted, she was subjected to secondary inspection, and never left security area at airport. Immigration and Nationality Act, § 101(a)(13), 🚩 8 U.S.C.A. § 1101(a)(13).

6 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1161** Garish Sarin, Los Angeles, CA, for the Petitioner.

Luis E. Perez, Washington, DC, for the Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Before PREGERSON, BEEZER, and TALLMAN, Circuit Judges.

**Opinion**

TALLMAN, Circuit Judge.

Surinder Sidhu petitions for review of a final order of exclusion issued by the Board of Immigration Appeals (BIA). The BIA affirmed without opinion the Immigration Judge's (IJ) Order, which found Sidhu excludable from the United States pursuant to § 212(a)(6)(E)(i) of the Immigration and Nationality Act (INA) for knowingly assisting an undocumented alien to enter the country in violation of the immigration laws. Sidhu seeks review of this decision, contending that she should have been placed in deportation rather than exclusion proceedings because she had "entered" the United States. [1]

The question for decision is whether Sidhu effected an "entry" within the meaning of 🚩 8 U.S.C. § 1101(a)(13) when she was detained by authorities before exiting the secondary inspection area at a port of entry. We hold that Sidhu did not make an "entry" into the country when she was detained by customs officials before exiting a controlled access area at an airport. Accordingly, Sidhu was not entitled to deportation proceedings, and we deny the petition for review.

I

Sidhu, a native and citizen of India, was admitted to the United States as a lawful permanent resident on May 30, 1993. On June 12, 1995, she sought to re-enter the United States at Los Angeles International Airport (LAX), on a China Airlines flight from Taiwan. When she arrived, a primary immigration inspector performed a verbal inspection and stamped her passport as admitted.

After Sidhu proceeded through primary inspection, Officer Roldan, a Supervisory Immigration Inspector at LAX working in secondary inspection, requested Sidhu's assistance. Officer Roldan was trying to communicate with a young Indian male who was found wandering around the primary inspection area without any documentation or identification. [2] Sidhu ascertained **\*1162** that the young man's name was Yatwinder Singh and that he placed his documents in the trash in the men's restroom. She communicated this information to Officer Roldan. [3]

While Officer Roldan was working with Sidhu, he was notified that primary inspection had referred Sidhu to secondary inspection for further investigation. She was referred after the primary inspector stamped her passport because his query to the Treasury Enforcement Communications System (TECS), which tends to retrieve reports slowly, had subsequently indicated that the inspector should check the National Alien Information Look Out computer system (NAIL). Officer Roldan checked NAIL and learned that Sidhu was a suspected alien smuggler. The NAIL report, provided by Hawaiian immigration inspectors, recounted that on July 11, 1994, Sidhu entered the United States at the Honolulu, Hawaii, airport. After the passengers deplaned, an Indian man arrived at inspection without any documents. The Hawaii inspectors learned that the Indian man used Sidhu's son's alien registration card to board the flight.

Upon learning this information in Los Angeles, Officer Roldan became suspicious that Sidhu was involved with Singh's attempt to enter the United States illegally due to the similar modus operandi she had used in the Hawaiian incident. After asking Sidhu some preliminary questions, he decided to use an interpreter. [4] Subhadra Murphy interpreted for Officer Roldan in the Hindi language. Sidhu gave a sworn statement based on the questions asked by Officer Roldan and interpreted by Murphy. [5]

Initially, Officer Roldan questioned Sidhu regarding her family, residency, and her most recent entries into the United States. When he asked about Yatwinder Singh, the 11-year-old boy found on the plane, she first stated that she had never seen him before Officer Roldan requested her assistance. Officer Roldan then obtained an airline passenger manifest from China Airlines for Sidhu's flight. It revealed that Sidhu checked in at the Taipei airport with an 11-year-old boy named Rojit Mahajan and that they sat next to each other on the plane. When confronted with this information, Sidhu revealed that the young man's true name was Yatwinder Singh and she admitted that he was her nephew. Sidhu told Officer Roldan that Singh's father sent Singh's mother the false passport and paid for Sidhu's expenses to bring him to the United States. Sidhu stated that her brother had been killed in the Punjab by Indian terrorists and her family wanted Singh to go to the United States for safety. She admitted that she checked in with him, sat next to him on the plane, knew he was traveling with fraudulent documents, and knew that he had been instructed to destroy the documents when he arrived at LAX. Officer Roldan then showed her the U.S. Passport that Officer Ramero found in the trash where Singh told him it would be. She identified it as the one that Singh used to board the plane.

Officer Roldan questioned Sidhu regarding her last entry into the United States **\*1163** through Honolulu. Sidhu admitted that in exchange for $500, she had allowed an Indian man to use her son's green card at the Bangkok Airport to board the flight to Honolulu. She sat next to him on the plane and then he appeared at inspection without appropriate documents.

After Sidhu finished giving the statement, Officer Roldan took Sidhu into custody. The government initiated exclusion proceedings and contended that Sidhu was inadmissible because she had engaged in alien smuggling. At Sidhu's exclusion hearing on October 28, 1997, Officers Roldan and Ramero testified as to the events discussed above. The IJ issued an oral decision, finding that Sidhu was excludable because the government established by clear and convincing evidence that she had engaged in alien smuggling in violation of INA § 212(a)(6)(E)(i), 8 U.S.C. § 1182(a)(6)(E)(i). Sidhu appealed this ruling to the BIA, which summarily affirmed.

## II

**[1]**    We have jurisdiction pursuant to 8 U.S.C. § 1105a(a). [6] Where, as here, the BIA affirms the decision of the IJ without opinion, we review the decision of the IJ as the final agency decision. *See* *Falcon Carriche v. Ashcroft,* 350 F.3d 845, 849 (9th Cir.2003).

## III

**[2]**    Under the version of the INA in effect at the time of Sidhu's exclusion proceedings, "excludable" aliens, those seeking admission from outside the United States, were entitled to fewer procedural protections than "deportable" aliens, those already physically present in the United States. *See Xi v. INS,* 298 F.3d 832, 838 (9th Cir.2002); *see also* *Landon v. Plasencia,* 459 U.S. 21, 25-27, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982). [7] Once an alien effected an "entry" into the United States, regardless of whether the entry was lawful or not, the relatively greater protections of deportation proceedings were required. *See* *Shaughnessy v. United States,* 345 U.S. 206, 212, 73 S.Ct. 625, 97 L.Ed. 956 (1953); *see also* *Landon,* 459 U.S. at 30-32, 103 S.Ct. 321 (holding that the question of whether an alien has made an entry may be decided at either a deportation or exclusion hearing).

**[3]**    The determination of whether Sidhu was properly placed in exclusion proceedings or should have been placed in deportation proceedings depends upon whether she effected an entry. At the time that Sidhu attempted to return to the United States, "entry" was defined as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession." INA § 101(a)(13), 8 U.S.C. § 1101(a)(13). The BIA has adopted a more detailed definition, which requires: "(1) a crossing into the territorial limits of the United States, *i.e.,* physical presence; (2)(a) inspection and admission by an immigration officer, or (b) actual and intentional evasion of inspection at the **\*1164** nearest inspection point; and (3) freedom from official restraint." *See* *Matter of Patel,* 20 I. & N. Dec. 368, 370 (1991).

*This circuit has never formally adopted the BIA's test,* although we have cited to it with approval, *see* *Espinoza-Gutierrez v. Smith,* 94 F.3d 1270, 1273 n. 2 (9th Cir.1996), and several of our sister circuits have adopted it, *see* *Nyirenda v. INS,* 279 F.3d 620, 624 (8th Cir.2002); *Yang v. Maugans,* 68 F.3d 1540, 1545 (3d Cir.1995); *Correa v. Thornburgh,* 901 F.2d 1166, 1171 (2d Cir.1990); *Farquharson v. United States Att'y Gen.,* 246 F.3d 1317, 1320-21 (11th Cir.2001). Because the BIA's more detailed formulation has served our sister circuits well, we now join them and formally adopt the BIA's standard.

## IV

**[4]**    Sidhu challenges her placement in exclusion proceedings, asserting that she effected an "entry" into the United States and therefore she was entitled to a deportation proceeding. After her passport was stamped "admitted," she contends she was not under surveillance or under any official restraint, but was only helping Officer Roldan communicate with Singh. In contrast, the government counters that Sidhu was properly placed in exclusion proceedings because she did not "enter" the United States. Since she never left the Federal Special Services area at LAX, the government concludes that she was never free from official restraint.

04 Cal. Daily Op. Serv. 4562

Sidhu undoubtedly established physical presence, the first prong of the test for assessing whether an entry was made. She was detained after the flight landed and she entered the airport complex. It is arguable whether or not she was inspected and admitted by an immigration officer. Although she passed primary inspection and her passport was stamped admitted, she was still required to pass through secondary inspection. Regardless of whether Sidhu established inspection and admission, she fails to establish the third element; she was not free from official restraint.

A primary inspector questioned Sidhu and stamped her passport "admitted." When he received the TECS report information at a later time-but before Sidhu exited the controlled area-he notified his supervisor. Using this information, Officer Roldan, in secondary inspection, determined that Sidhu was illegally attempting to bring an alien into the United States.

At LAX, the secondary inspection area is located approximately 30 feet behind the primary inspection line, next to the luggage claim area. It is at the southern end of the inspection area, but still within the Federal Special Services area. Officer Roldan prevented Sidhu from leaving the inspection area and he placed her into custody. Because Sidhu never exited secondary inspection, she was not free from official restraint. *See* Correa, 901 F.2d at 1169-72 (holding that an alien who passed primary inspection, but was stopped by USDA agents for a more intensive agricultural inspection was never free from official restraint because she remained in a restricted "Customs Enclosure" area and was "never free to physically enter the United States or to go at large and mix with the general population"); *see also* United States v. Oscar, 496 F.2d 492, 493 (9th Cir.1974) (finding, in a criminal context, that aliens were not free from official restraint of the customs officials because they were taken into custody in secondary inspection at the San Ysidro Port of Entry).

Sidhu contends that our decision in United States v. Martin-Plascencia, 532 F.2d 1316 (9th Cir.1976), mandates a different result. In *Martin-Plascencia,* we found that an alien who crawled through **\*1165** two fences, and ran fifty yards undetected before he was apprehended attempting to scale a city wall at San Ysidro, was not under any type of official restraint. *Id.* at 1317-18. The facts of this case are distinctly different from those in *Martin-Plascencia.* While crossing the border, Martin-Plascencia was never under any customs surveillance or restraint. In contrast, Sidhu was under such surveillance from the moment she entered the airport until she was detained. At no point was she free to exit the airport and "go at large and mix with the general population." *See* Correa, 901 F.2d at 1172.

Because Sidhu was taken into custody in secondary inspection at LAX, she was never free from official restraint. Accordingly, she did not effect an entry and was not entitled to a deportation hearing.

**PETITION DENIED.**

**All Citations**

368 F.3d 1160, 04 Cal. Daily Op. Serv. 4562

## Footnotes

\*    The petition for review correctly identified the Immigration and Naturalization Service (INS) as the respondent in this transition rule case. Illegal Immigration Reform and Immigrant Responsibility Act § 309(c), Pub.L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996), as amended. On March 1, 2003, the INS ceased to exist as an independent agency within the Department of Justice (DOJ) and its functions were transferred to the newly formed Department of Homeland Security. Because this appeal challenges a decision issued by the Executive Office of Immigration Review (encompassing both the Board of Immigration Appeals (BIA) and the immigration courts), which is a component of the DOJ, Attorney

General Ashcroft, as the head of the DOJ, is substituted for the INS. *See* 8 U.S.C. § 1252(b)(3) (2000) (respondent is Attorney General where immigration court proceeding commenced after April 1, 1997).

**    This panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R.App. P. 34(a)(2).

1      We have addressed Sidhu's remaining claims, that the IJ improperly admitted evidence in violation of her right to due process, and that the IJ's decision that she engaged in alien smuggling was not supported by substantial evidence, in a concurrently-filed memorandum disposition.

2      Because Sidhu and the young man appeared to be of the same nationality, Officer Roldan hoped that Sidhu would be able to communicate with him.

3      Officer Ramero was assigned to search the restroom trash. He located U.S. Passport No. 033992553, containing the name Rojit Mahajan, and turned it over to his supervisor.

4      Until this point, Sidhu and Officer Roldan had communicated in English.

5      At the exclusion hearing, Officer Roldan testified that Murphy and Sidhu appeared to communicate well. There were no unusually long pauses and it did not appear as though Murphy had to repeat any questions. The statement was read back to Sidhu and she indicated that she did not need to make any corrections.

6      The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) repealed 8 U.S.C. § 1105a and replaced it with new rules for judicial review now codified at 8 U.S.C. § 1252. *See* IIRIRA § 306(c)(1), Pub.L. No. 104 208, 110 Stat. 3009 (Sept. 30, 1996), *as amended by* the Extension of Stay in the United States for Nurses Act, Pub.L. No. 104-302, 110 Stat. 3656 (Oct. 11, 1996). However, this case is governed by IIRIRA's transitional rules and we continue to have jurisdiction pursuant to 8 U.S.C. § 1105a because the INS commenced exclusion proceedings against Sidhu prior to April 1, 1997, and the final order of exclusion was entered after October 30, 1996. *See* IIRIRA § 309(c)(1).

7      IIRIRA merged deportation and exclusion proceedings into the broader category of "removal" proceedings. *See* *Kalaw v. INS,* 133 F.3d 1147, 1149 n. 2 (9th Cir.1997).

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

898 F.3d 720
United States Court of Appeals, Seventh Circuit.

Sarbjit SINGH, Petitioner,

v.

Jefferson B. SESSIONS III, Attorney
General of the United States, Respondent.

Nos. 17-1579 & 17-2852
|
Argued January 3, 2018
|
Decided July 26, 2018

**Synopsis**

**Background:** Alien, a citizen of India and a lawful permanent
resident of the United States, petitioned for review of
the denial, by the Board of Immigration Appeals (BIA),
of his motion to reopen removal proceedings, and of its
determination that his Indiana conviction for deception
carried a possible sentence of "one year or longer" and that
Government's concession that such conviction did not support
removal was binding.

**[Holding:]** The Court of Appeals, Sykes, Circuit Judge, held
that alien failed to meet his burden of establishing that his
Indiana conviction for deception was vacated based on an
underlying substantive or procedural defect rather than for
immigration or other purposes.

Petitions denied.

**Procedural Posture(s):** Original Jurisdiction; Review of
Administrative Decision.

West Headnotes (6)

**[1]** **Aliens, Immigration, and
Citizenship** 🔑 Review of discretion

Court of Appeals' review of the denial of
alien's motion to reopen removal proceedings is
deferential; relief is warranted only if Board of
Immigration Appeals (BIA) abused its discretion
—that is, if its decision to deny the motion to
reopen was made without a rational explanation,

inexplicably departed from established policies,
or rested on an impermissible basis such as
invidious discrimination against a particular race
or group.

1 Cases that cite this headnote

**[2]** **Aliens, Immigration, and
Citizenship** 🔑 Grounds and Factors
Considered

Alien failed to meet his burden of establishing
that his Indiana conviction for deception was
vacated based on an underlying substantive or
procedural defect rather than for immigration or
other purposes, and thus denial of his motion to
reopen the final order for his removal was not
an abuse of discretion; although alien's Indiana
conviction for deception was vacated, it was not
vacated as result of a postconviction motion,
but as result of a plea deal between alien and
the prosecutor, and the deception was vacated
"by agreement of" the parties. Ind. Code Ann. §
35-50-3-2.

**[3]** **Aliens, Immigration, and
Citizenship** 🔑 New evidence, facts, or
circumstances

An alien who seeks to reopen a final order
of removal has the heavy burden to establish
the existence of new or previously unavailable
evidence that would likely alter the result.

**[4]** **Aliens, Immigration, and
Citizenship** 🔑 Presentation and preservation
of questions at administrative level

**Aliens, Immigration, and
Citizenship** 🔑 Presentation of questions in
brief or petition

Any challenge by alien, in proceedings on his
motion to reopen an order for his removal, to
decision which allocated the burden of proof on a
motion to reopen based on a vacated conviction,
was both unexhausted and waived; alien did not
challenge the burden of proof before the Board
of Immigration Appeals (BIA) and did not cite
that decision before the Court of Appeals.

[5]    **Statutes**  🔑  Plain Language; Plain, Ordinary, or Common Meaning

**Statutes**  🔑  Plain, literal, or clear meaning; ambiguity

Statutory words and phrases are given their ordinary meaning, and when the meaning of the statutory text is clear, Court of Appeals does not venture into legislative history.

2 Cases that cite this headnote

[6]    **Aliens, Immigration, and Citizenship**  🔑  Reopening, Reconsideration, or Remand

Department of Homeland Security (DHS) was not bound, in proceedings on alien's motion to reopen the order for his removal, by its initial concession that his Indiana conviction for deception did not carry a sentence of one year or longer; DHS had express regulatory authority to lodge new or additional charges or factual allegations at any time during removal proceedings. 8 C.F.R. §§ 1003.30, 1240.10(e).

**\*721** Petitions for Review of an Order of the Board of Immigration Appeals. No. AXXX-XX6-846

**Attorneys and Law Firms**

Helen Harnett, Attorney, IMMIGRATION ATTORNEYS, LLP, Chicago, IL, for Petitioner.

Virginia Lee Gordon, OIL, Attorneys, DEPARTMENT OF JUSTICE, Civil Division, Immigration Litigation, Washington, DC, for Respondent.

Before Easterbrook and Sykes, Circuit Judges, and Reagan, District Judge. \*

**Opinion**

Sykes, Circuit Judge.

Sarbjit Singh, an Indian citizen and lawful permanent resident, faces removal from the United States for the second

time. [1] He was first removed in 2006 based on a 2004 Indiana felony conviction for corrupt business influence. IND. CODE § 35-45-6-2. Singh reentered the country in 2010 to pursue postconviction relief in Indiana. Three weeks later a state judge vacated the conviction and accepted his guilty plea to the crime of deception (a misdemeanor) in its stead. Id. § 35-43-5-3. Singh thereafter asked the Board of Immigration Appeals to reopen and reconsider the removal order. The Board granted the motion and remanded the case to an immigration judge.

A second round of removal proceedings ensued. The government initially conceded that the deception offense did not support removal and sought Singh's removal on other grounds. It later changed course and issued a new charge alleging that Singh was removable based on the deception conviction, which it argued was "a crime involving moral turpitude ... for which a sentence of one year or longer may be imposed." 8 U.S.C. § 1227(a)(2)(A)(i). Singh responded that the government's initial concession was binding and, regardless, **\*722** deception is not a removable offense because it is not punishable by a sentence of "one year or longer."

The immigration judge entered a new removal order, reasoning that the government's concession was not binding because the Department of Homeland Security has express regulatory authority to lodge new or additional charges in removal proceedings "[a]t any time." See 8 C.F.R. §§ 1003.30, 1240.10(e). And because the deception offense carries a possible sentence of "not more than one (1) year," IND. CODE § 35-50-3-2, the judge held that it qualifies as a crime for which a sentence of "one year or longer may be imposed." The Board affirmed the removal order.

Meanwhile, Singh went back to state court and entered into an agreement with the prosecutor to vacate the deception conviction in exchange for a guilty plea to a misdemeanor offense of dealing in drug paraphernalia. The state judge accepted the deal, and Singh returned to the Board with a motion to reopen and reconsider the second removal order. Like before, he notified the Board that the state court had vacated the conviction that served as the predicate for his removal. This time the Board denied the motion. To warrant reopening, Singh had the burden to show that his conviction was vacated based on a substantive or procedural defect in the underlying criminal proceedings; a conviction vacated for other reasons—e.g., rehabilitation or immigration hardship—

remains valid for immigration purposes. *See* In re Chavez-Martinez, 24 I. & N. Dec. 272, 274 (BIA 2007). The court record clearly showed that the vacatur was based on a plea agreement, *not* a substantive or procedural defect in the underlying conviction, so the Board held that Singh had not carried his burden.

Singh seeks review of both orders, arguing first that the Board abused its discretion in refusing to reopen his case based on the vacatur of the deception conviction. In the alternative he argues that deception does not carry a possible sentence of "one year or longer" and that the government's concession to that effect is binding. These arguments are meritless, so we deny both petitions for review.

## I. Background

Singh entered the United States in 1993 and was immediately placed in exclusion proceedings. He applied for asylum and withholding of removal, claiming that he faced persecution on account of his religion. An immigration judge denied the applications and on December 1, 1995, issued an exclusion order. Singh appealed to the Board of Immigration Appeals, but before the Board ruled, he married a U.S. citizen and filed for an adjustment of status and waiver of inadmissibility. On July 21, 2000, the Immigration and Naturalization Service approved the petitions and granted Singh permanent residency.

Three years later Singh was arrested in Indiana and charged with corrupt business influence, fraud, deception, dealing in drug paraphernalia, and maintaining a common nuisance. In 2004 he pleaded guilty to corrupt business influence, a Class C felony under Indiana law, § 35-45-6-2, and the other charges were dropped.

The Department of Homeland Security issued a Notice to Appear charging Singh with four grounds of removability. An immigration judge found him removable on two of those grounds: (1) he was convicted of an aggravated felony related to racketeering, 8 U.S.C. § 1227(a)(2)(A)(iii); and (2) within five years of admission, he was convicted of a crime involving moral turpitude with a possible sentence of one year or longer, § 1227(a)(2)(A)(i). The Board affirmed, and Singh was removed on September 21, 2006.

*723 On June 27, 2010, Singh was readmitted on a visitor visa and a nonimmigrant waiver of inadmissibility so he could pursue postconviction relief in Indiana state court. The Elkhart Superior Court agreed to vacate his felony conviction for corrupt business influence. In its place the judge accepted Singh's guilty plea to the crime of deception, a misdemeanor punishable by imprisonment "for a fixed term of not more than one (1) year." § 35-50-3-2. Because Singh's removal order was predicated on a now vacated conviction, he moved the Board to reopen and reconsider his case. The Board granted the motion and remanded the case to the immigration court.

An immigration judge presided over three years of renewed proceedings as Singh attempted to regain his status as a lawful permanent resident. At a hearing in March 2014, the government lodged new charges of removability alleging that Singh had fraudulently procured readmission, 8 U.S.C. § 1227(a)(1)(A), and overstayed his nonimmigrant visa, *id.* § 1227(a)(1)(B). The government also withdrew the previous charge of removability stemming from Singh's conviction for corrupt business influence. In doing so the government erroneously conceded that the moral-turpitude provision no longer applied because the substituted conviction for deception was not a crime punishable by a sentence "for one year or longer." § 1227(a)(2)(A)(i).

Nearly a year later, the government changed its position and issued a new charge of removability based on the deception conviction. Additional rounds of briefing and hearings followed. On November 24, 2015, the immigration judge found Singh removable under the moral-turpitude provision based on the deception conviction.

Singh appealed to the Board, arguing that (1) the government's concession regarding the deception offense should be treated as a binding admission, and (2) deception is not a crime for which a sentence of "one year or longer" may be imposed. The Board rejected these arguments and affirmed. First, the Board explained that the government's mistaken concession was not binding because the Department of Homeland Security has regulatory authority to lodge new or additional charges in removal proceedings "[a]t any time." 8 C.F.R. §§ 1003.30, 1240.10(e). Second, the Board held that because the Indiana deception offense is punishable by a term of "not more than one (1) year," § 35-50-3-2, it qualifies as a crime for which a sentence of "one year or longer" may be

imposed. The Board entered this new final order on February 17, 2017.

Before the Board issued its ruling, however, Singh returned to state court and negotiated an agreement with the prosecutor to vacate the deception conviction in exchange for a guilty plea to a different misdemeanor charge. The judge approved the deal, vacated the conviction "[b]y agreement of the parties," and accepted Singh's guilty plea to dealing in drug paraphernalia. IND. CODE § 35-48-4-8.5. Singh waited until March 17—a month *after* the Board issued its final decision—to notify the Board of this development. He then moved a second time to reopen and reconsider his case, arguing that the now-vacated deception conviction could no longer serve as the basis for his removal.

This second effort to reopen the case was unsuccessful. Under Board precedent, an alien seeking to reopen a final order of removal on the basis of a vacated conviction must prove that the conviction was vacated because of a substantive or procedural defect. *See Chavez-Martinez*, 24 I. & N. Dec. at 274. The records Singh submitted with his motion showed that the state court vacated the conviction "by agreement **\*724** of the parties," *not* because of a defect in the underlying conviction. As such, the Board held that Singh did not carry his burden under *Chavez-Martinez* and declined to reopen the case.

## II. Discussion

**[1]** Singh seeks review of both the final order of removal and the denial of his motion to reopen. Our review of the latter is deferential. Relief is warranted only if the Board abused its discretion—that is, if its decision to deny the motion to reopen "was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group." *Victor v. Holder*, 616 F.3d 705, 708 (7th Cir. 2010) (internal quotation marks omitted). Singh's challenge to the removal order raises two legal questions, so our review is de novo. *Alvarado-Fonseca v. Holder*, 631 F.3d 385, 389 (7th Cir. 2011).

### A. Motion to Reopen

**[2]** **[3]** An alien who seeks to reopen a final order of removal has the "heavy burden" to establish the existence of new or previously unavailable evidence that would likely alter

the result. *INS v. Abudu*, 485 U.S. 94, 110, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988). Singh argues that he presented such evidence—namely, court filings showing that his conviction for deception, which formed the basis of the second removal order, was vacated after the Board's decision.

It's not enough, however, for Singh to show that the conviction was vacated. He must also show *why* it was vacated. If the state court vacated Singh's conviction "solely on the basis of immigration hardships or rehabilitation, rather than on the basis of a substantive or procedural defect in the underlying criminal proceedings, the conviction ... will continue to serve as a valid factual predicate for a charge of removability despite its vacatur." *Chavez-Martinez*, 24 I. & N. Dec. at 273; *see also* *In re Pickering*, 23 I. & N. Dec. 621, 624 (BIA 2003), *rev'd on other grounds*, 465 F.3d 263 (6th Cir. 2006) ("If ... a court vacates a conviction for reasons unrelated to the merits of the underlying criminal proceedings, the [alien] remains 'convicted' for immigration purposes."). The Board has held that the alien—not the government—has the burden to show that the conviction was vacated based on an underlying substantive or procedural defect and not for immigration or other purposes. *Chavez-Martinez*, 24 I. & N. Dec. at 274.

**[4]** We have not yet addressed *Chavez-Martinez*'s allocation of the burden on a motion to reopen based on a vacated conviction. But Singh did not challenge the burden of proof before the Board and did not even cite *Chavez-Martinez* in his brief in this court. As the government notes, his failure to present the issue to either the Board or us means that any challenge to *Chavez-Martinez* is both unexhausted and waived. *Chavarria-Reyes v. Lynch*, 845 F.3d 275, 279 (7th Cir. 2016) (explaining exhaustion); *Haichun Liu v. Holder*, 692 F.3d 848, 851 (7th Cir. 2012) (explaining waiver). Given these procedural impediments, this is not a proper case for us to weigh in.[2]

Singh argues instead that he presented enough evidence to warrant reopening his case. He submitted the following documents to the Board: (1) the Indiana court **\*725** order vacating his deception conviction; (2) various court filings and orders related to his new drug-paraphernalia conviction; and (3) a copy of the Indiana Rules of Post-Conviction Remedies. The court record plainly shows that Singh's deception conviction was vacated. Singh relies on the Indiana Rules for the proposition that an application for

postconviction relief must be based on the merits of the underlying conviction.

But the deception conviction wasn't vacated as a result of a postconviction motion. Rather, the court record establishes that the conviction was vacated as a result of a plea agreement between Singh and the state prosecutor. More specifically, on October 24, 2016, Singh and the prosecutor entered into a written agreement asking the court to vacate the deception conviction and accept Singh's guilty plea to the drug-paraphernalia charge in its place. The judge approved the plea deal the same day, vacating the deception conviction "by agreement of the parties" and accepting Singh's guilty plea to the paraphernalia offense. On this record it's no wonder the Board held that Singh had not met his burden under *Chavez-Martinez*. No evidence shows that the vacatur was based on a substantive or procedural defect in the conviction. The Board did not abuse its discretion in denying Singh's motion to reopen.

**B. Removal Order**

The Board classified the Indiana misdemeanor offense of deception as "a crime involving moral turpitude ... for which a sentence of one year or longer may be imposed," a predicate for removal. § 1227(a)(2)(A)(i). Singh concedes that deception is a crime involving moral turpitude. He disputes only the Board's conclusion that it is a crime "for which a sentence of one year or longer may be imposed."

The statutory phrase "one year or longer" plainly encompasses *either* a sentence of one year *or* a sentence of longer than one year. *See Dominguez-Herrera v. Sessions*, 850 F.3d 411, 419 (8th Cir. 2017) (holding that a sentence that "shall not exceed one year" is a sentence that falls within the meaning of the phrase "one year or more"); *Ceron v. Holder*, 747 F.3d 773, 777 (9th Cir. 2014) (holding that a sentence "not exceeding one year" is a sentence that likewise falls within the meaning of the phrase "one year or longer"). Indiana's deception offense is punishable by a sentence of "not more than one (1) year," § 35-50-3-2, so the crime falls squarely within the statutory language.

Singh responds that the phrase "one year or longer" is ambiguous. For support he relies on two unpublished decisions of the Board interpreting the phrase in different ways. *See In re Adeyinka*, 2011 WL 1792662, at *2 (BIA Apr. 15, 2011) (holding that *only* a sentence of "longer than 1 year" qualifies as "one year or longer"); *In re Chavez-Gonzalez*,

2010 Immig. Rptr. LEXIS 4234, at *3 (BIA Aug. 30, 2010) (holding that a potential sentence of one year qualifies as "one year or longer"). He also traces the legislative history of the moral-turpitude provision, arguing that Congress intended it to include only felony crimes. Based on these supposed ambiguities, Singh asks us to apply the Rule of Lenity. *See, e.g.*, *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004).

**[5]** Ambiguity cannot be created where none exists. Statutory words and phrases are given their ordinary meaning, *see Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227, 134 S.Ct. 870, 187 L.Ed.2d 729 (2014), and when the meaning of the statutory text is clear, we do not "[v]entur[e] into legislative **\*726** history," *In re Bronk*, 775 F.3d 871, 876 (7th Cir. 2015). Moreover, two thinly reasoned, unpublished Board decisions cannot obfuscate this clear statutory text.

**[6]** Singh's backup argument is that the government is bound by its initial concession that deception does not carry a sentence of "one year or longer." He analogizes this to a tactical concession by an immigration attorney on behalf of his client. *See, e.g.*, *Selimi v. INS*, 312 F.3d 854, 860 (7th Cir. 2002); *In re Velasquez*, 19 I. & N. Dec. 377, 382 (BIA 1986). The analogy is inapt. The Department of Homeland Security has express regulatory authority to lodge new or additional charges or factual allegations "[a]t any time" during removal proceedings. *See* 8 C.F.R. §§ 1003.30, 1240.10(e). Here the government did exactly what the regulation allows: it added new factual allegations and a new charge of removability while Singh's proceedings were ongoing.

Singh also relies on *Gordon v. INS*, 36 F.3d 249 (2d Cir. 1994), and *Rarogal v. INS*, 42 F.3d 570 (9th Cir. 1994), but neither case advances his argument. In *Gordon* the court required the government to adhere to its agreement not to deport an alien until after a related case was decided. *36 F.3d at 251.* In *Rarogal* the court determined that the immigration judge had abused his discretion when he ordered the removal of an alien when the government had conceded that he was entitled to relief. *42 F.3d at 572–73.* Importantly, the government did not change its position, lodge new charges, or otherwise argue for removal after making the concession. These cases do not restrict

the government's broad regulatory authority to file new or additional charges in removal proceedings.

Finally, Singh maintains that the government's authority to file new charges in removal proceedings is not so broad as to allow it "to lodge the exact same charges or allegations repeatedly." He emphasizes what he sees as the inequity of allowing the government to file a new charge against him years after his case was reopened. We see no unfairness here. First, the regulation places no limitation on the government's authority to lodge previously withdrawn charges. And the government's use of its charging authority did not produce any case-specific unfairness. Singh was not prejudiced by the delay; to the contrary, in accordance with 8 C.F.R. § 1240.10(e), the immigration judge gave him a reasonable continuance to respond to the newly alleged ground of removability. The legal issue was fully and fairly aired and correctly decided.

The petitions for review therefore are

DENIED.

**All Citations**

898 F.3d 720

---

## Footnotes

\*     Of the Southern District of Illinois, sitting by designation.

1     The petitioner's first name is spelled "Sarabjit" in recent filings before the agency and this court. We use "Sarbjit" to remain consistent with the Board's orders.

2     There is a circuit split on the question of who bears the burden to show the reason for the vacatur. *Compare* *Rumierz v. Gonzales*, 456 F.3d 31, 37–39 (1st Cir. 2006) (requiring the alien seeking reopening to show why his conviction was vacated), *with* *Nath v. Gonzales*, 467 F.3d 1185, 1188–89 (9th Cir. 2006) (reaching the opposite conclusion).

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1081 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by California ex rel. Lockyer v. U.S. Dept. of Agriculture,
N.D.Cal., October 11, 2006

705 F.2d 506
United States Court of Appeals,
District of Columbia Circuit.

SMALL REFINER LEAD PHASE–
DOWN TASK FORCE, Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Anne M.
Gorsuch, Administrator, United States
Environmental Protection Agency, Respondents,
Exxon Corporation, et al., Texas City
Refining, Inc., Environmental Defense
Fund, et al., Texaco, Inc., et al., Intervenors.

SMALL REFINER LEAD PHASE–
DOWN TASK FORCE, Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Anne M.
Gorsuch, Administrator, United States
Environmental Protection Agency, Respondents,
Exxon Corporation, Sun Refining and Marketing
Company, Texas City Refining, Inc., Environmental
Defense Fund, et al., Texaco, Inc., et al., Intervenors.

SMALL REFINER LEAD PHASE–
DOWN TASK FORCE, Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Anne M.
Gorsuch, Administrator, United States
Environmental Protection Agency, Respondents,
Environmental Defense Fund, et al., United
Refining Company, Texaco, Inc., et al., Exxon
Corporation, et al., Texas City Refining, Inc., Natural
Resources Defense Council, Inc., Intervenors.
PLATEAU, INC., Petitioner,

v.

Anne M. GORSUCH, Administrator, United States
Environmental Protection Agency and United States
Environmental Protection Agency, Respondents.
SIMMONS OIL COMPANY, Petitioner,

v.

Anne M. GORSUCH, Administrator, United States
Environmental Protection Agency and United States
Environmental Protection Agency, Respondents.

Nos. 82–2282, 82–2283, 82–
2308, 82–2395 and 82–2521.
|
Argued Jan. 17, 1983.
|
Orders Issued Jan. 26, 1983 and
Feb. 9, 1983.
|
Opinion Issued April 22, 1983.
|
As Amended July 6, 1983.

**Synopsis**

Petitions were filed seeking review of an Environmental Protection Agency regulation setting lead-content limits for leaded gasoline produced by certain small refiners. The Court of Appeals, Wald, Circuit Judge, held that: (1) Environmental Protection Agency's final uniform 1.10 gplg lead-content limit for leaded gasoline was reasonable; (2) Environmental Protection Agency did not give adequate notice that it might issue a strict 1.90 gplg interim lead-content limit for leaded gasoline produced by certain small refiners and this procedural error was reversible error; furthermore, 1.90 gplg interim standard would be vacated on alternative ground that record failed to support EPA's belief that most small refiners could meet the interim standard at a reasonable cost; and (3) past ownership requirement contained in the definition of "small refinery" in Environmental Protection Agency regulation setting lead-content limits for leaded gasoline produced by certain small refiners was invalid for lack of notice and because that agency was silent as to why it chose a certain date as a cutoff date.

Orders in accordance with opinion.

West Headnotes (30)

**[1]    Environmental Law 🔑 Lead**

Environmental Protection Agency has statutory authority to require small refiners to reduce gasoline lead levels below sliding-scale standard without making specific findings concerning the

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1082 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

need to do so. Clean Air Act, § 211(g)(2), as amended, 42 U.S.C.A. § 7545(g)(2).

**[2]    Environmental Law    Lead**

Environmental Protection Agency could issue lead-content regulations which were stricter than that necessary to meet the ambient air quality standard for lead. Clean Air Act, §§ 109(b), 211(c), as amended, 42 U.S.C.A. §§ 7409(b), 7545(c).

1 Cases that cite this headnote

**[3]    Environmental Law    Regulations and rulemaking in general**

Clean Air Act, unlike the Administrative Procedure Act, requires the Environmental Protection Agency to issue a "proposed rule" before issuing a final regulation. Clean Air Act § 307(d)(3), as amended, 42 U.S.C.A. § 7607(d)(3).

4 Cases that cite this headnote

**[4]    Environmental Law    Hearing and determination;  statement of reasons**

Clean Air Act, unlike the Administrative Procedure Act, requires the Environmental Protection Agency to give a detailed explanation of its reasoning at the "proposed rule" stage of a regulation as well as at the final rule stage.

7 Cases that cite this headnote

**[5]    Environmental Law    Air pollution**

In Clean Air Act provision barring reversal on procedural grounds unless errors are "so serious and related to matters of such central relevance" that "there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made," first clause has no independent force and will automatically be satisfied by any error that creates a "substantial likelihood that the rule would have been significantly changed." Clean

Air Act § 307(d)(8), as amended, 42 U.S.C.A. § 7607(d)(8).

1 Cases that cite this headnote

**[6]    Environmental Law    Air pollution**

Clean Air Act's requirement that Environmental Protection Agency's procedural error be "arbitrary and capricious" means that reviewing court must affirm reasonable EPA decisions about how to implement rule-making procedures under Clean Air Act but does not mean that EPA can ignore those procedures if it has a reasoned basis for doing so. Clean Air Act, § 307(d), (d)(9)(D)(i), as amended, 42 U.S.C.A. § 7607(d), (d)(9)(D)(i).

10 Cases that cite this headnote

**[7]    Environmental Law    Harmless error**

Failure to observe Administrative Procedure Act rulemaking procedures, if reversible error under the APA, is reversible error under the Clean Air Act as well notwithstanding Clean Air Act requirement that there be a "substantial likelihood that the rule would have been significantly changed" if the error had not been made. Clean Air Act § 307(d)(8), 42 U.S.C.A. § 7607(d)(8).

**[8]    Environmental Law    Mobile sources; motor vehicles**

In regulating fuel additives under the Clean Air Act, EPA may consider economic effects of its regulation. Clean Air Act § 211(c), as amended, 42 U.S.C.A. § 7547(c).

1 Cases that cite this headnote

**[9]    Environmental Law    Lead**

Environmental Protection Agency, in setting lead-content limits for leaded gasoline, was required to explain why it chose one numerical standard rather than another.

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

**[10]** **Administrative Law and**
**Procedure** ⚷ Scientific and technical matters

Court will uphold an agency's choice of a numerical standard if it is within a zone of reasonableness.

39 Cases that cite this headnote

**[11]** **Administrative Law and**
**Procedure** ⚷ Validity

Generally, an agency can subclassify an industry for purposes of regulatory analysis in any reasonable manner.

2 Cases that cite this headnote

**[12]** **Environmental Law** ⚷ Lead

Environmental Protection Agency's final uniform 1.10 gplg lead-content limit for leaded gasoline was reasonable. Clean Air Act, § 211(c)(1)(A), as amended, 🔖 42 U.S.C.A. § 7545(c)(1)(A).

**[13]** **Environmental Law** ⚷ Inventory, emission limits, and modelling
**Environmental Law** ⚷ Notice and comment

While petitioner must raise technical objections to Environmental Protection Agency's use of predictive model with reasonable specificity during period for public comment, EPA retains as affirmative duty to examine key assumptions of the model. Clean Air Act § 307(d)(7)(B), as amended, 42 U.S.C.A. § 7607(d)(7)(B).

21 Cases that cite this headnote

**[14]** **Environmental Law** ⚷ Inventory, emission limits, and modelling

Environmental Protection Agency has power to use predictive model, but must explain the assumptions and methodology used in preparing the model and, if the methodology is challenged, provide a complete analytic defense. Clean Air Act § 307(d), as amended, 42 U.S.C.A. § 7607(d).

13 Cases that cite this headnote

**[15]** **Administrative Law and**
**Procedure** ⚷ Allocation of resources;  choice of proceedings or remedies

Court must defer to agency's decision on how to balance the cost and complexity of a more elaborate predictive model against the oversimplification of a simpler model.

8 Cases that cite this headnote

**[16]** **Administrative Law and**
**Procedure** ⚷ Review for arbitrariness, capriciousness, unreasonableness, or illegality

Reviewing court should consider the regulatory-flexibility analysis as part of its overall judgment whether a rule is reasonable and may, in an appropriate case, strike down a rule because of a defect in the flexibility analysis. 🔖 5 U.S.C.A. § 611(b).

11 Cases that cite this headnote

**[17]** **Environmental Law** ⚷ Lead

Environmental Protection Agency, in establishing a final uniform lead-content limit for leaded gasoline, erred in relying on evidence that the agency had added to the record near the end of or after the close of the comment period and too late for effective rebuttal; however, that error did not necessitate invalidation of the final standard where petitioner failed to show that there was "substantial likelihood" that petitioner, if given a chance to comment, could have convinced EPA to choose a different standard. Clean Air Act § 307(d)(9), as amended, 42 U.S.C.A. § 7607(d)(9).

2 Cases that cite this headnote

**[18]** **Environmental Law** ⚷ Notice and comment

It is incumbent upon a petitioner objecting to Environmental Protection Agency's late submission of documents to indicate with "reasonable specificity" what portions of the

Case 3:20-cv-07721-SI   Document 58-5   Filed 11/10/20   Page 1084 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

documents it objects to and how it might have responded if given the opportunity. Clean Air Act, § 307(d)(7)(B), as amended, 42 U.S.C.A. § 7607(d)(7)(B).

10 Cases that cite this headnote

[19] **Environmental Law**  Evidence

When Environmental Protection Agency improperly adds documents to docket near the end of or after the close of the period for public comment, reviewing court should not consider any evidence in those documents to which a petitioner objects in determining whether there is enough evidence in the record to support the final rule. Clean Air Act § 307(d), as amended, 42 U.S.C.A. § 7607(d).

2 Cases that cite this headnote

[20] **Environmental Law**  Lead

**Environmental Law**  Notice and comment

Environmental Protection Agency did not give adequate notice that it might issue a strict 1.90 gplg interim lead-content limit for leaded gasoline produced by certain small refiners and this procedural error was reversible error; furthermore, 1.90 gplg interim standard would be vacated on alternative ground that record failed to support EPA's belief that most small refiners could meet the interim standard at a reasonable cost. Clean Air Act, § 307(d), (d)(8), as amended, 42 U.S.C.A. § 7607(d), (d)(8).

10 Cases that cite this headnote

[21] **Environmental Law**  Determination, Judgment, and Relief

Where Environmental Protection Agency's interim lead-content limit for leaded gasoline produced by small refiners was vacated for lack of notice and lack of support in the record, court would leave it to the agency to choose a replacement rather than reinstate the old rule.

3 Cases that cite this headnote

[22] **Administrative Law and Procedure**  Rule differing from published notice

If final agency rule deviates too sharply from the proposal, affected parties will be deprived of notice and an opportunity to respond to the proposal.

47 Cases that cite this headnote

[23] **Environmental Law**  Regulations and rulemaking in general

Under Administrative Procedure Act and Clean Air Act, an agency's final rule must be a "logical outgrowth" of the proposed rule. Clean Air Act, § 307(d), as amended, 42 U.S.C.A. § 7607(d); 5 U.S.C.A. § 553.

38 Cases that cite this headnote

[24] **Environmental Law**  Lead

Petitioner, which challenged validity of Environmental Protection Agency regulations setting lead-content limits for leaded gasoline produced by certain small refiners, received adequate notice of past-production requirement contained in regulation's definition of "small refinery." Clean Air Act, § 307(d), as amended, 42 U.S.C.A. § 7607(d).

25 **Environmental Law**  Lead

Past ownership requirement contained in the definition of "small refinery" in Environmental Protection Agency regulation setting lead-content limits for leaded gasoline produced by certain small refiners was invalid for lack of notice and because agency was silent as to why it chose a certain date as a cutoff date. Clean Air Act, § 307(d)(3), as amended, 42 U.S.C.A. § 7607(d)(3).

[26] **Administrative Law and Procedure**  Contents and sufficiency

Agency notice must describe range of alternatives being considered with reasonable

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1085 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

specificity. Clean Air Act, § 307(d), as amended, 42 U.S.C.A. § 7607(d); 5 U.S.C.A. § 553.

14 Cases that cite this headnote

**[27]    Administrative Law and Procedure    Procedural matters in general**

Even if agency has not given notice in statutorily prescribed fashion, actual notice will render the error harmless. 5 U.S.C.A. §§ 552(a), 553; Clean Air Act, § 307(d), as amended, 42 U.S.C.A. § 7607(d).

11 Cases that cite this headnote

**[28]    Environmental Law    Regulations and rulemaking in general**

Generally, Environmental Protection Agency must itself provide notice of a regulatory proposal and cannot bootstrap notice from a public comment.

7 Cases that cite this headnote

**[29]    Administrative Law and Procedure    Arbitrariness and capriciousness; reasonableness**

A rule without a stated reason is necessarily arbitrary and capricious.

2 Cases that cite this headnote

**[30]    Environmental Law    Stay of administrative order or proceedings**

Court, which found past-ownership requirement contained in definition of a small refinery invalid on grounds of lack of notice and lack of support in the record, was not prohibited from staying Environmental Protection Agency's enforcement of the past-ownership requirement. Clean Air Act, § 211(f)(5), as amended, 42 U.S.C.A. § 7545(f)(5).

**\*509    \*\*204** Petitions for Review of an Order of the Environmental Protection agency.

**Attorneys and Law Firms**

L.L. Hank Hankla, Washington, D.C., with whom Matthew A. Low, Washington, D.C., was on the brief, for petitioner, Small Refiner Lead Phase-Down Task Force.

Patrick M. Raher, Washington, D.C., with whom David J. Hayes, Washington, D.C., was on the brief, for petitioner, Plateau, Inc.

Scott M. DuBoff, Washington, D.C., with whom John P. Proctor and Sharon L. Steen, Washington, D.C., were on the brief, for petitioner, Simmons Oil Company.

Samuel I. Gutter, Atty., E.P.A., Washington, D.C., with whom Carol Dinkins, Asst. Atty. Gen., Washington, D.C., Robert M. Perry, Associate Administrator and Gen. Counsel, Houston, Tex., Gerald K. Gleason, Asst. Gen. Counsel, Robert A. Weissman and Robert E. Kenney, Attys., E.P.A., and David E. Dearing, Atty., Dept. of Justice, Washington, D.C., were on the brief, for respondents.

G. William Frick, Washington, D.C., for intervenors, Texaco, Inc., et al. Roy L. **\*\*205    \*510** Jacobs and Thomas Murphy, Washington, D.C., also entered appearances for Texaco, Inc., et al.

Robert V. Percival, Washington, D.C., for intervenors, Environmental Defense Fund and Consumers Union of the United States, Inc. Alan Mark Silbergeld, Washington, D.C., also entered an appearance for intervenors.

Eric A. Goldstein, Brooklyn, N.Y., was on the brief for intervenor, Natural Resources Defense Council, Inc.

Richard P. Noland and Monica A. Otee, Washington, D.C., were on the brief for intervenor, Texas City Refining, Inc.

Frederick M. Lowther, James McNab, III, and Michael E. Nannes, Washington, D.C., were on the brief for intervenor, United Refining Co.

# TABLE OF CONTENTS

**Page**

Case 3:20-cv-07721-SI   Document 58-5   Filed 11/10/20   Page 1086 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

| | |
|---|---|
| I. BACKGROUND | 511 |
| A. Early Regulation of Gasoline Lead | 512 |
| B. The Current Regulation | 512 |
| C. Issues Presented | 514 |
| II. EPA's STATUTORY AUTHORITY | 514 |
| A. Authority to Regulate Small Refiners | 515 |
| B. The Relationship Between the Gasoline Lead Standard and the | |
| Ambient Air Quality Standard for Lead | 516 |
| III. JUDICIAL REVIEW UNDER CLEAN AIR ACT § 307(d) | 518 |
| A. Notice of Rulemaking and Statement of Basis and Purpose | 518 |
| B. The Record for Judicial Review | 519 |
| C. Substantive Review | 519 |
| D. Procedural Review | 521 |
| IV. THE 1.10 gplg FINAL STANDARD | 523 |
| A. EPA's Explanation | 523 |
| 1. Health Effects | 523 |
| 2. Feasibliity | 524 |
| 3. Equity and Efficiency | 525 |
| B. What Constitutes Adequate Agency Reasoning | 525 |
| C. Reasonableness of the Final Standard | 526 |
| 1. Agency Reversal of Position | 526 |
| 2. Health Effects | 527 |
| a. Gasoline Lead Generally | 527 |
| i. The Correlation Between Gasoline Lead and Blood Lead Levels | 527 |
| ii. Incidence of Lead Poisoning | 529 |
| iii. Public Comments | 530 |
| iv. Conclusion on Health Effects | 531 |

b. The Health Effects of Small Refiner Lead Use    531

i. Sales to Urban Areas    531

ii. Health Effects in Rural Areas    533

3. Feasibility    534

a. Timely Objection    534

b. EPA's Use of Aggregate Analysis    535

4. Equity and Efficiency    536

5. Summary    536

D. Regulatory Flexibility Analysis    537

1. Reviewability of the Analysis    537

2. Adequacy of the Analysis    539

E. The July 1, 1983 Effective Date    539

F. Late Docketing of Comments    540

G. Conclusion    541

V.    THE INTERIM 1.90 gplg STANDARD    542

A. Notice    542

B. Feasibility    544

C. What Standard Does EPA Return To?    545

VI.    THE DEFINITION OF "SMALL REFINERY"    546

A. The Standard for Adequate Notice    546

B. Past Production Requirement    547

C. Past Ownership Requirement    548

1. Notice from EPA    548

2. Actual Notice    549

3. Notice by Others    549

4. The July 1, 1981 Cutoff Date    551

5. Conclusion    551

D. Our Power to Issue a Stay    551

VII.    CONCLUSION    552

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1088 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

APPENDIX I                                        552

APPENDIX II                                       554

**\*511  \*\*206**  Before WILKEY, WALD and MIKVA, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Petitioners Small Refiner Lead Phase-Down Task Force (SRTF), Plateau, Inc., and Simmons Oil Co. seek review of an Environmental Protection Agency (EPA) regulation that sets lead-content limits for leaded gasoline produced by certain "small" refiners. 47 Fed.Reg. 49,322 (Oct. 29, 1982) (to be codified at 40 C.F.R. § 80.2, .4, .7, .20). In brief, the new rule: (1) narrows EPA's previous definition of "small refinery"; (2) requires small refiners to meet an interim standard of no more than 1.90 grams of lead per gallon of leaded gasoline (grams per leaded gallon or gplg) as of November 1, 1982; and (3) requires small refiners to meet a final standard (equal to the large refiner standard) of no more than 1.10 gplg as of July 1, 1983.

We vacate the interim 1.90 gplg standard because EPA promulgated it without adequate notice and the standard is not supported by the evidence in the record. We also vacate one clause in the definition of "small refinery" as promulgated without adequate notice and not supported by the evidence in the record. We uphold the remainder of the regulation, including the 1.10 gplg final standard, as within EPA's statutory authority, not arbitrary, capricious, or an abuse of discretion, and not procedurally flawed.

## I. BACKGROUND

Adding lead to gasoline is an inexpensive way to produce the high-octane gasoline needed by today's high-compression auto and truck engines. Other methods of producing high-octane gasoline require refiners to invest large sums in refining equipment and also involve higher operating costs. In particular, a refinery that uses less lead must use more crude oil to produce the same amount of gasoline. Use of lead in gasoline, however, has grave social costs. Lead is highly poisonous to people and gasoline lead emissions are a major

contributor to lead poisoning, with small children at greatest risk. [1]

Section 211(c)(1)(A) of the Clean Air Act, 42 U.S.C. § 7545(c)(1)(A), authorizes EPA to regulate fuel additives which "may reasonably be anticipated to endanger the public health or welfare." At various times over the last decade, EPA has used this **\*512  \*\*207** authority to regulate the lead content of gasoline. In this part, we first review EPA's early efforts to regulate gasoline lead and then summarize the regulations that are challenged in this case.

### A. Early Regulation of Gasoline Lead

EPA first issued lead content regulations in 1973. The regulations required refiners to limit the lead content of gasoline to 1.7 grams per gallon (gpg) beginning on January 1, 1975, steadily decreasing thereafter to 0.5 gpg on January 1, 1979. [2] In contrast to the grams per leaded gallon (gplg) standards at issue here, this earlier standard was a "pooled" average for all gasoline—leaded and unleaded—produced by a particular refiner. Thus, refiners that produced a high proportion of unleaded gasoline could use more lead per gallon of leaded gasoline than refiners that produced primarily leaded gasoline. [3] EPA exempted small refiners from the lead content rules until January 1, 1977, "in recognition of the special lead-time problems faced by this group." [4] We upheld this regulation in its entirety. *Ethyl Corp. v. EPA*, 541 F.2d 1 (D.C.Cir.) (en banc), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976).

EPA later postponed the effective date of the 0.5 gpg standard until October 1, 1980, and large refiners have been obeying it since then. [5] However, in 1977, Congress granted small refiners partial relief from EPA's lead content rules until October 1, 1982. [6] To qualify as "small," a refinery had to: (1) have been in operation before October 1, 1976; (2) have crude oil capacity of 50,000 barrels per day (bpd) or less; and (3) be owned or controlled by a refiner with total crude oil capacity of 137,500 bpd or less. Clean Air Act § 211(g)(1)(B), 42 U.S.C. § 7545(g)(1)(B). Congress barred EPA from requiring a small refinery to reduce lead content below a "sliding-scale" standard that was linked to refinery size. Refineries producing gasoline at 5,000 bpd or less could use 2.65 gpg; 5,001 to

Case 3:20-cv-07721-SI   Document 58-5   Filed 11/10/20   Page 1089 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)
18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

10,000 bpd refineries could use 2.15 gpg; and so on down to 0.80 gpg for 20,001 to 25,000 bpd refineries. Congress gave EPA broad discretion to regulate small refineries on and after October 1, 1982, "taking into account the experience under the [sliding-scale standard]." *Id.* § 211(g)(2), 42 U.S.C. § 7545(g)(2).

In 1979, EPA promulgated a new regulation requiring small refineries to meet the 0.5 gpg large refinery standard as of October 1, 1982. [7] We upheld the regulation by unpublished order. *Coastal States Gas Corp. v. EPA,* No. 79–2174 (D.C.Cir. Sept. 17, 1980).

In addition to these direct controls on the lead content of gasoline, EPA also promulgated a national ambient air quality standard for lead of 1.5 micrograms per cubic meter (ug/m$^3$). [8] We upheld the regulation on appeal. *Lead Industries Association v. EPA,* 647 F.2d 1130 (D.C.Cir.), *cert. denied,* 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980).

B. *The Current Regulation*
On February 22, 1982, roughly seven months before the 0.5 gpg small refinery standard was to take effect, EPA published a notice of proposed rulemaking in which it solicited comments on whether it should relax the 0.5 gpg standard either for all refiners or for small refiners only. EPA also solicited comments on how to define "small refinery." The rulemaking notice was short and obviously tentative; EPA did not even issue a proposed rule. 47 Fed.Reg. 7812 (Feb. 22, 1982). [9]

**\*513  \*\*208** In its notice of proposed rulemaking, EPA further proposed to suspend indefinitely the October 1, 1982 deadline for small refiners to meet the 0.5 gpg standard. The agency explained that the suspension would permit small refiners to delay making the capital investments needed to meet the 0.5 gpg standard. It promised small refiners that the final rule "will take into account the lead time required for construction of any processing equipment needed for compliance." *Id.* at 7814/2.

After receiving hundreds of comments from health specialists, industry, public interest groups, state and local governments, etc., EPA concluded that lead exposure was still a major health problem and that gasoline lead was "a significant contributor to this problem through its presence in the air, dirt and dust." *Id.* at 38,078/1 (Aug. 27, 1982). For

large refiners, EPA therefore decided that instead of relaxing the 0.5 gpg standard, it would tighten that standard further in the future, and issued a proposed rule to accomplish that goal.

The proposed rule changed the lead content limit from 0.5 grams per gallon (gpg) to 1.10 grams per *leaded* gallon (gplg). *Id.* at 38,078/3. Since slightly less than half of all gasoline produced today is leaded, this change would not affect current lead emissions. However, in the future, as use of leaded gasoline declines (cars built in 1975 and later years use unleaded gasoline only), the "pooled" gpg standard would have permitted refiners to use more lead per leaded gallon, while the gplg standard will not. EPA now estimates that under a uniform 0.50 gpg pooled standard, 1990 lead use would have been 38.8 billion grams, while under a uniform 1.10 gplg leaded-only standard, 1990 lead use will be only 16.2 billion grams, a 58% reduction. [10]

EPA proposed a looser 2.50 gplg standard for small refiners. Also, small refiners that used less than 2.50 gplg would be able to sell unused "lead credits" to other refiners under an inter-refiner averaging scheme. However, EPA proposed to define "small refinery" narrowly, to include only refineries that: (1) were in operation prior to October 1, 1976; (2) had average gasoline production of 10,000 bpd or less during the most recent calendar quarter; and (3) were not owned or controlled by a refiner with total average production during the most recent calendar quarter of more than 70,000 bpd. *Id.* at 38,088. EPA solicited comments on: whether a 2.50 gplg standard was too generous and "whether a standard such as 2.15 gp[l]g ... may be more appropriate"; whether the special small refiner standard "should be limited to some definite time period"; and whether there were any loopholes in the definition of small refinery that might permit small refiners to "expand their production of leaded gasoline." *Id.* at 38,082/1, 38,085/3.

Finally, EPA suspended for one month the October 1, 1982 date for small refiners to meet the 0.5 gpg large refiner standard. EPA explained that it would take final action on the proposed 2.50 gplg small refiner standard before November 1, 1982, and stated again that the suspension would permit small refiners to defer the capital investments needed to comply with a strict standard. *Id.* at 38,091/1.

On October 29, 1982, only 2 days before the 0.5 gpg standard was to go into effect for small refiners, EPA promulgated a uniform 1.10 gplg standard for both large and small refiners, reasoning that permanent special treatment for small refiners

Case 3:20-cv-07721-SI   Document 58-5   Filed 11/10/20   Page 1090 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

would be "inequitable and inconsistent with the purposes of the Clean Air Act." *Id.* at 49,324/1 (Oct. 29, 1982). The agency required large refiners to meet the new standard beginning November 1, 1982. It recognized, however, that its February and August proposals gave small refiners "some reason to ... delay[ ] projects designed to meet a more stringent standard," and therefore gave small refiners until July 1, 1983 to meet the 1.10 gplg large refiner standard. *Id.* In the interim period from November 1, 1982 to July 1, 1983, EPA required small refiners to meet only a 1.90 gplg standard, explaining that this standard "should generally be achievable by [small] refineries through the use of the [inter-refinery] averaging provisions in the regulations." *Id.* at 49,324/2.

EPA also further tightened the definition of "small refinery" to include only refineries that: (1) were in operation before October 1, 1976; (2) had average gasoline production of 10,000 bpd or less during each **\*514 \*\*209** calendar quarter since July 1, 1981; and (3) were not owned or controlled since July 1, 1981 by a refiner with total average production of more than 70,000 bpd. *Id.* at 49,331–32.

C. *Issues Presented*

No large refiner challenges EPA's change from a 0.5 gpg standard to a 1.10 gplg standard. SRTF, representing 13 small refiners, argues that EPA exceeded its statutory authority in promulgating a uniform 1.10 gplg final standard for all refiners, that the 1.10 gplg final standard is substantively flawed, and that the 1.90 gplg interim standard is procedurally and substantively flawed. Finally, SRTF argues that EPA did not give adequate notice that the final definition of "small refinery" might require a refiner to have produced no more than 10,000 bpd in any calendar quarter since July 1, 1981 ("past production requirement"). Plateau, Inc., a small refiner, presents procedural and substantive challenges to the interim standard and to the effective date of the final standard.

Simmons Oil Co., a small refiner that was owned by a large refiner until January 4, 1982, argues that EPA did not give adequate notice that it might require a refinery, to qualify as "small," not to have been owned or controlled by a large refiner after July 1, 1981 ("past ownership requirement"). Amicus Giant Industries supports Simmons' challenge to the past ownership requirement.

Several intervenors support the final rules: large refiners (Texaco, Gulf, Sun, and Exxon, on a joint brief); a mid-sized refiner (Texas City Refining); a refinery that was "small" under the old, but not under the new definition (United

Refining); environmental organizations (Natural Resources Defense Council and Environmental Defense Fund); and a consumer organization (Consumers Union).

We denied SRTF's motion for stay pending appeal, but on January 12, 1983, granted Simmons' motion for stay of the past ownership requirement. After oral argument on January 17, we issued an order on January 26 (reprinted as an appendix to this opinion), in which we upheld the final 1.10 gplg standard and the past production requirement, but vacated the 1.90 gplg interim standard primarily for lack of notice. Our order gave a brief statement of reasons and noted that a full opinion would follow. On February 9, we issued a second short order (also reprinted as an appendix) vacating the past ownership requirement for lack of notice. [11] We chose this unusual course because our disposition made speed of the essence—our decisions vacating the interim standard and the past ownership requirement will have practical effect only until the final standard takes effect on July 1.

This opinion explains more fully the reasoning that underlay our initial orders. In part II, we uphold EPA's statutory authority to set a small refiner standard stricter than the old sliding-scale standard. Part III discusses the standard for judicial review of EPA rulemaking under the Clean Air Act. Part IV concludes that the 1.10 gplg final standard is reasonable. Part V vacates the 1.90 gplg interim standard for lack of notice and lack of support in the record. Part VI upholds the past production requirement but vacates the past ownership requirement for lack of notice and lack of support in the record.

II. EPA'S STATUTORY AUTHORITY

The parties agree that EPA has authority under § 211(c)(1)(A), 42 U.S.C. § 7545(c)(1)(A), to regulate lead in gasoline, since lead is a fuel additive that "may reasonably be anticipated to endanger public health or welfare." *See Ethyl Corp.,* 541 F.2d at 11–32. [12] SRTF argues, however, **\*515 \*\*210** that § 211(g)(2), 42 U.S.C. § 7545(g)(2), prohibits EPA from requiring small refiners to reduce gasoline lead levels below the sliding-scale standard unless it makes specific findings concerning the need to do so. SRTF also argues that EPA cannot set a gasoline lead standard stricter than necessary to meet the ambient air quality standard for lead. [13] We reject both arguments.

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1091 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

A. *Authority to Regulate Small Refiners*

 [1]    Section 211(g)(2) grants EPA broad authority to regulate small refiners on and after October 1, 1982, subject only to the condition that EPA must "tak[e] into account" experience under the sliding-scale standard:

> The Administrator may promulgate such regulations *as he deems appropriate* with respect to the reduction of the average lead content of gasoline refined by small refineries on and after October 1, 1982, taking into account the experience under the [sliding-scale] provisions of this paragraph.

(Emphasis added.)

On its face, this condition is a mild one. It merely requires EPA in good faith to *consider* past experience, and does not require EPA to make specific findings concerning the need for a strict small refiner standard. Congress did require specific findings elsewhere in § 211 and elsewhere in the Act. In particular, § 211(c)(2)(C), 42 U.S.C. § 7545(c)(2)(C), permits the Administrator to prohibit use of a fuel additive altogether only if "he finds, and publishes such finding" that the prohibition will not cause the use of another, equally dangerous additive. [14] As we noted in a related context, "this is the *only* conclusion the Administrator is expressly required to 'find' before regulating a fuel or fuel additive for health reasons." *Ethyl Corp.,* 541 F.2d at 12 (emphasis in original). We must assume that Congress' use of the weaker phrase "take into account" in § 211(g)(2) was intentional. [15]

The legislative history confirms this "plain language" reading of the statute. The House had granted permanent special treatment to small refiners. 123 Cong.Rec. 16,951–52 (1977), *reprinted in* 4 *Leg.Hist., supra* note 12, at 3320–24. The Senate, however, adopted a weaker version calling only for a five-year grace period, to last until October 1, 1982. Senator Muskie, the floor manager for the 1977 amendments, explained:

> The amendment provides a *temporary* relaxation in the average lead requirement for small refineries ... until October 1, 1982. This will allow time for them to install the necessary equipment to produce gasoline with lower lead content or to make alternate plans.

*Id.* at 18,474, 3 *Leg.Hist.* 1059 (emphasis added).

In conference, the House "concur[red] in the Senate provision" with several small changes. H.R.Rep. No. 564, 95th Cong., 1st Sess. 162 (1977) ( "Conf.Rep."), 3 *Leg.Hist.* 381, 542, 1977 U.S.Code Cong. & Ad.News 1502, 1543. One of these changes was to add the "taking into account" requirement. The Conference Committee explained, however, that EPA would nevertheless have **\*516  \*\*211** broad discretion to regulate small refiners after October 1, 1982:

> [O]n the basis of experience under this provision, the Administrator shall promulgate such standards *as he sees fit* for the period beyond October 1, 1982....

*Id.* (emphasis added).

In short, the legislative history of § 211(g)(2) confirms EPA's broad discretion to regulate small refiners, and give no hint that the agency must make specific findings before doing so. Finally, EPA's interpretation is "entitled to deference." *Federal Election Commission v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981). [16]

We conclude, then, that § 211(g)(2) requires EPA in good faith to take experience under the sliding-scale standard into account, but does not require specific findings concerning that experience. *Accord Ethyl Corp.,* 541 F.2d at 32 n. 66 (the requirement in § 211(c)(2)(A) that EPA, before regulating a fuel additive must "consider[ ]" regulating auto emissions

Case 3:20-cv-07721-SI   Document 58-5   Filed 11/10/20   Page 1092 of 1271

Small Refiners Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

under § 202 instead, "means, of course, no more than it says: actual good faith consideration of the specified ... options").[17]

The only remaining question is whether EPA adequately considered experience under the sliding-scale standard in selecting a lead-content limit for small refiners. As we held in construing similar language in the Clean Water Act, EPA must reach an "express and considered conclusion" about the bearing of experience under the sliding-scale standard, but need not give "any specific weight" to this factor. *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1045 (D.C.Cir.1978); *accord BASF Wyandotte Corp. v. Costle*, 598 F.2d 637, 662 (1st Cir.1979), *cert. denied*, 444 U.S. 1096, 100 S.Ct. 1063, 62 L.Ed.2d 784 (1980). Here, EPA devoted an entire rulemaking to the issue of the appropriate lead standard for small refiners. It concluded that:

> experience under the two-tiered approach has been that it fosters inequities, as small refineries are granted a competitive advantage over large refineries.... [T]his two-tiered approach can no longer be justified, in light of the health effects of lead exposure and the scope and profitability of small refinery operations.

47 Fed.Reg. at 49,324/3. Thus, EPA has complied with the statutory command to take past experience into account.[18]

B. *The Relationship Between the Gasoline Lead Standard and the Ambient Air Quality Standard for Lead*

[2] SRTF also argues that EPA lacks authority to control gasoline lead except to the extent necessary to meet the ambient air quality standard for lead, and that even under the sliding-scale standard, no areas that are served by small refineries would violate the ambient air standard. To prevail, SRTF must overcome the deference that we give to EPA's interpretation of its governing statute. It falls far short; indeed, we find no support for SRTF's construction in the statutory language, the legislative history, or sound policy.

Nothing in § 211 expressly prevents EPA from regulating fuel additives unless necessary to meet the ambient air quality standards established under sections 108 and **\*517 \*\*212** 109. Indeed, § 211 does not even cross-refer to sections 108 and 109. In contrast, when Congress wanted EPA to consider other sections of the Act before regulating fuel additives, it said so. In particular, § 211(c)(2)(A), 42 U.S.C. § 7545(c)(2)(A), requires EPA, before regulating a fuel additive, to "consider[ ]" regulating auto emissions under § 202 instead. Thus, § 211 on its face permits EPA to regulate gasoline lead whether or not the ambient air standard for lead is being met.

*Cf. Ethyl Corp.*, 541 F.2d at 54 n. 124 (finding "no basis in the statute" for the claim that EPA must establish an ambient air standard for lead under § 108 before regulating gasoline lead under § 211).

SRTF points out that both § 108 (governing ambient air quality standards) and § 211 (governing fuel additives) allow EPA to regulate a pollutant only if it "may reasonably be anticipated to endanger public health or welfare." But the fact that the Clean Air Act establishes the same *threshold* standard for EPA's power to establish ambient air standards and its power to regulate fuel additives does not mean that the *substantive* standard that EPA sets for a fuel additive must be tied to the substantive standard it sets for ambient air quality. On the contrary, § 109(b)(1), 42 U.S.C. § 7409(b)(1), prescribes a specific substantive standard—"requisite to protect the public health" allowing "an adequate margin of safety."[19] Section 211(c), in contrast, broadly authorizes EPA to "control or prohibit" the sale of fuel additives.

Similarly, other sections of the Act have the same threshold standards as sections 108 and 211, yet each has its own substantive standard. *See, e.g.*, §§ 111 (new source performance standards), 202 (motor vehicle emission standards).[20] Thus, Congress' use of the same threshold standard in these disparate sections cannot imply that they share the same substantive standard.

The legislative history confirms the conclusion that EPA can set different substantive standards under sections 109 (ambient air quality) and 211 (fuel additives). Until 1977, different sections of the Act had different threshold standards. In particular, § 108(a)(1)(A) had a different standard ("has an adverse effect on public health or welfare") than § 211(c)(1)(A) ("will endanger the public health or welfare").[21] In 1977, Congress established a uniform formula ("may reasonably be anticipated to endanger public health or welfare") for the

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1093 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

threshold decision whether "the Administrator *may* regulate a pollutant." H.R.Rep., *supra* note 12, at 50, 4 *Leg.Hist.* 2517, 1977 U.S.Code Cong. & Ad.News at 1128 (emphasis added). [22] Nothing suggests that Congress also meant to establish a uniform substantive standard tied to the ambient air quality standards. The legislative history of the 1977 amendments mentions § 108 only as one of a list of sections to which the new threshold standard will apply. [23] Moreover, Congress left the substantive standards in §§ 111 and 202 unchanged, and thus could not possibly have intended to set up a single overriding substantive standard.

 **\*518    \*\*213** SRTF's construction would also be foolish as a policy matter. First, sections 109 and 211 are designed to accomplish different goals. Section 109 establishes only *ambient air* standards. To meet the ambient standards, the states must develop emission limits for individual pollution sources. Necessarily, these individual source limits will be stricter in some geographic areas than in others. Section 211, in contrast, permits EPA to establish *nationally uniform* emission limits on fuel additives. [24] Those limits may be more or less stringent than needed to meet the ambient air standards in any particular area. Thus, it would not make sense to force regulation under § 211 to move in lockstep with the ambient air standards promulgated under § 109.

Second, the ambient air standard for lead does not fully protect the public health against the adverse effects of gasoline lead. Lead is a heavy element that quickly settles out of the air onto the ground, where it can be ingested or inhaled along with dust and dirt. The ambient standard does not take full account of dirt and dust lead. *See Environmental Protection Agency, Fuels and Fuel Additives: Denial of Petition to Repeal Lead Phasedown Regulations, 45 Fed.Reg. 54,090, 54,*093/1 (1980) (ambient standard for lead was "not designed to protect against exposure from non-air sources, including those resulting from automobile emissions") (footnote omitted). Also, some of the lead used by rural refiners will make its way into the food chain to be eaten by urban children (who are at greatest risk of lead poisoning). We decline to read § 211 as precluding EPA from regulating these indirect sources of lead exposure. [25]

For the foregoing reasons, we hold that EPA may issue lead-content regulations under § 211(c) that are stricter than necessary to meet the ambient air quality standard for lead issued under § 109(b). [26] Having disposed of SRTF's statutory objections to EPA's authority, we turn to

the substantive and procedural validity of the lead-content regulations. We begin by reviewing the special statutory provisions for judicial review of EPA rulemaking under the Clean Air Act.

## III. JUDICIAL REVIEW UNDER CLEAN AIR ACT § 307(D)

In 1977, Congress—concerned that the Administrative Procedure Act (APA), 5 U.S.C. § 553, did not provide procedures adequate for the complex scientific issues involved in EPA rulemaking—created new procedures for most rulemaking under the Clean Air Act, including rulemaking under § 211. Clean Air Act § 307(d), 42 U.S.C. § 7607(d). This part contains an overview of the § 307(d) procedures.

### A. *Notice of Rulemaking and Statement of Basis and Purpose*

Under the APA, 5 U.S.C. § 553(b)(3), an agency must publish in the *Federal Register* a notice of proposed rulemaking which "shall include ... either the terms or substance of the proposed rule or a description of the subjects and issues involved." Clean Air Act § 307(d)(3) requires a much more detailed notice of rulemaking. EPA must publish a notice of proposed rulemaking "as provided under [APA] section 553(b)." In addition, this notice "shall be accompanied by a statement of its basis and purpose," which:

 **\*519    \*\*214** shall include a summary of—

(A) the factual data on which the proposed rule is based;

(B) the methodology used in obtaining the data and in analyzing the data; and

(C) the major legal interpretations and policy considerations underlying the proposed rule.

**[3]    [4]** Thus, there are basically two major differences between APA § 553(b) and Clean Air Act § 307(d)(3). First, the Clean Air Act, unlike the APA, requires EPA to issue a "proposed rule." Although § 307(d)(3) does not *explicitly* require EPA to issue a proposed rule, it refers to the agency's duty to explain "the factual data on which the proposed rule is based" and "the major legal interpretations and policy considerations underlying the proposed rule."

Case 3:20-cv-07721-SI   Document 58-5   Filed 11/10/20   Page 1094 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

Also, at the final rule stage, § 307(d)(6) requires EPA to explain "any major changes in the promulgated rule from the proposed rule." EPA cannot comply with these statutory requirements unless it issues a "proposed rule." [27] Second, the APA requires an agency to explain its reasoning only when it issues a final rule. In contrast, Clean Air Act § 307(d)(3) requires EPA to give a detailed explanation of its reasoning at the "proposed rule" stage as well.

Turning to the notice of final rulemaking, APA § 553(c) requires an agency to provide only a "*concise general statement of basis and purpose*" (emphasis added). In contrast, § 307(d)(6) requires a more detailed explanation— a "statement of basis and purpose" (without the qualifiers "concise" and "general"). In particular, the statement of basis and purpose must include the specific items required at the proposed rule stage and must also include "an explanation of the reasons for any major changes in the promulgated rule from the proposed rule" and "a response to each of the significant comments, criticisms, and new data submitted ... during the comment period."

B. *The Record for Judicial Review*

The APA does not prescribe any procedures for assembling a "record" for judicial review of informal rulemaking. The Clean Air Act, in contrast, requires EPA to establish a "rulemaking docket" that is open to the public and must include: (1) the notice of proposed rulemaking and accompanying statement of basis and purpose; (2) "[a]ll data, information, and documents" on which EPA relies in its statement of basis and purpose; (3) other documents which become available after the proposed rule is published and which "the Administrator determines are of central relevance to the rulemaking"; (4) all written comments and documents submitted to EPA during the comment period; (5) a transcript of any public hearings; and (6) the notice of final rulemaking and accompanying EPA explanation. [28] The final rule must be based entirely on material that has "been placed in the docket as of the date of ... promulgation," and the material in the docket is the exclusive record for judicial review. [29]

C. *Substantive Review*

The standard for substantive judicial review of EPA action under the Clean Air Act is taken directly from the APA: The court may reverse only if EPA's action was "arbitrary, capricious, an abuse of discretion, **\*520 \*\*215** or otherwise not in accordance with law." Clean Air Act § 307(d)

(9)(A), 42 U.S.C. § 7607(d)(9)(A); *see* 5 U.S.C. § 706(2)(A) (parallel APA provision).

Congress considered but ultimately rejected a proposal to establish a "substantial evidence" standard of review for the Clean Air Act. It did so to avoid any suggestion that EPA should be subject to a stricter standard of review than other agencies. *See* 123 Cong.Rec. 26,851 (1977), 3 *Leg. Hist.* 366 (statement of Sen. Muskie) ("the Environmental Protection Agency should [not] be singled out in this way"). [30] Congress was aware, however, that there may be "little practical difference" between substantial evidence review and arbitrary and capricious review. Conf.Rep. at 178, 3 *Leg. Hist.* 558, 1977 U.S.Code Cong. & Ad.News at 1559; [31] *see* Sierra Club v. Costle, 657 F.2d 298, 323 n. 67 (D.C.Cir.1981); Lead Industries Association v. EPA, 647 F.2d 1130, 1146 n. 30 (D.C.Cir.1980), *cert. denied,* 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980) (both discussing substantive review under § 307(d)). [32]

The scope of review under the "arbitrary and capricious" formula is well established. We must engage in a "searching and careful" review of the record. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *see* Ethyl Corp., 541 F.2d at 35. For its decision to be sustained, "the agency must consider all of the relevant factors and demonstrate a reasonable connection between the facts on the record and the resulting policy choice." Sierra Club v. Costle, 657 F.2d at 323 (footnote omitted). When the facts are uncertain, the Administrator "should so state and go on to identify the considerations he found persuasive." Industrial Union Department, AFL–CIO v. Hodgson, 499 F.2d 467, 476 (D.C.Cir.1974); *see* Lead Industries Association, 647 F.2d at 1146–47. In short, we must, in Judge Leventhal's phrase, take a "hard look" at both the facts and the agency's reasoning. [33]

In taking this hard look, however, we have only limited power to second-guess the agency's reasoning. We can and do insist that the agency's reasons and policy choices—" 'not deviate from or ignore the ascertainable legislative intent.' "

Ethyl Corp., 541 F.2d at 36 (quoting Greater Boston Television Corp. v. FCC, 444 F.2d 841, 850 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971)). Beyond that, however, we can only require the **\*521**

AR.06319

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1095 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

**\*\*216** agency's reasons and policy choices to conform to "certain minimal standards of rationality." *Id.* If so, the rule is reasonable and must be upheld.

### D. *Procedural Review*

Under the APA, the reviewing court must reverse agency action taken "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), after taking "due account ... of the rule of prejudicial error," *id.* § 706 (last clause). Clean Air Act § 307(d), at least on its face, more narrowly circumscribes judicial power to reverse EPA action on procedural grounds. As under the APA, the court must reverse agency action taken "without observance of procedure required by law." Clean Air Act § 307(d)(9)(D), 42 U.S.C. § 7607(d)(9)(D). However, the court must also find that EPA's "failure to observe such procedure is arbitrary or capricious," *id.* § 307(d)(9)(D)(i), 42 U.S.C. § 7607(d)(9)(D)(i), and that the procedural errors were "so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made," *id.* § 307(d)(8), 42 U.S.C. § 7607(d)(8).[34]

Unfortunately, it is not clear what these restrictions on procedural reversal mean. "Arbitrary and capricious" review generally refers to the requirement that an agency "must consider all the relevant factors" and reach a "reasonable" conclusion. *Sierra Club v. Costle,* 657 F.2d at 323. Yet Congress could hardly have intended to leave EPA free to ignore the procedural requirements of § 307(d), so long as the agency gives a decent reason for doing so.

**[5]** The requirement that the errors be "so serious and related to matters of such central relevance" that "there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made" is also ambiguous. The first clause ("so serious and related to matters of such central relevance") has no independent force; it will automatically be satisfied by any error that creates "a substantial likelihood that the rule would have been significantly changed." This leaves the problem of interpreting the two key terms—"substantial likelihood" and "significant change"—neither of which has a precise meaning. These terms appear on their face to be stricter than the APA's "prejudicial error" rule, which requires only a *possibility* that the error would have resulted in *some* change in the final rule. *See, e.g.,* *Weyerhaeuser Co. v. Costle,* 590 F.2d 1011, 1031 n. 27 (D.C.Cir.1978) ("we cannot be sure that under the correct procedures the Agency would have reached the same conclusion"). But it is hard to say how much stricter the Clean Air Act standard is.

The legislative history provides a partial answer to these puzzles, and leads us to conclude that there is less to § 307(d)'s requirements for procedural reversal than meets the eye. Section 307(d) derives from the House version of the 1977 Clean Air Act Amendments; the Senate bill had no comparable provision. The House bill provided for oral hearings and for limited cross-examination on "disputed issue[s] of material fact." Cross-examination could be conducted only "to such extent and in such manner as the Administrator considers necessary and appropriate in view of the nature of the issues involved, the number of participants and the nature of their interests, and any need for expedition." H.R. 6161, 95th Cong., 1st Sess. sec. 305(a), § 307(d)(5)(B) (1977), 4 *Leg.Hist.* 2220, 2431. Moreover, the House report explains that the right to cross-examine on issues of "fact" refers only to " 'adjudicative facts' " and further cautions that "[i]n many cases, such facts may not be present, or ... policy considerations [may be] so dominant as to reduce to insignificance the question whether one **\*522 \*\*217** particular 'adjudicative' fact is true or not." H.R.Rep. at 321, 4 *Leg.Hist.* 2788, 1977 U.S.Code Cong. & Ad.News at 1400 (footnote omitted).

The House committee recognized that the various limits on the right to cross-examination were imprecise, so that questions could arise over, *e.g.,* "whether a given question involves 'facts' or 'policy' or whether a given fact is 'legislative' or 'adjudicative.' " *Id.* at 322, 4 *Leg.Hist.* 2789, 1977 U.S.Code Cong. & Ad.News at 1401. It restricted procedural reversal to avoid disputes over the manner in which EPA structured cross-examination:

> To prevent rulemaking from bogging down in arguments about such matters, and to underline that the agency is authorized to adapt rulemaking procedures to the individual case, the committee has limited the extent to which the Administrator's decisions on such procedural matters may be reversed during judicial review.
>
> ... [T]he court is directed to consider two factors. The first is whether the Administrator's determination on the procedural point is "arbitrary or capricious."

The second is whether the procedural errors "were so serious and related to matters of such central relevance to

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1096 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made."

*Id.* (citations to the bill omitted).

In the House bill, consistent with the committee explanation, the "arbitrary and capricious" requirement was contained not in § 307(d)(9)(D) (governing procedural review generally), but in § 307(d)(5), the subsection that directed EPA to hold an oral hearing and allow cross-examination. H.R. 6161, *supra*, sec. 305(a), § 307(d)(5)(C), 4 *Leg.Hist.* 2432. Thus, the "arbitrary and capricious" test applied only to EPA decisions concerning the oral hearing and cross-examination and did not apply to procedural issues arising out of other subsections. Moreover, the provision did not authorize EPA to violate the procedural dictates of the Act; rather, it merely insured that EPA could take reasonable steps to *implement* the cross-examination procedures.

Less clear is the scope of the requirement that a procedural error create a "substantial likelihood that the rule would have been significantly changed." The House also directed this requirement primarily at procedures for cross-examination, but it applies on its face to all procedural determinations. The legislative history, unfortunately, provides no help on what "substantial likelihood" and "significant change" mean. We can say this much, though. The House did not intend to cut back on the procedural review provisions of the APA. Rather, the House was concerned that the APA procedures were "inadequate," H.R.Rep. at 318, 4 *Leg.Hist.* 2785, 1977 U.S.Code Cong. & Ad.News at 1397, and wanted to add *new* procedural protections, but also wanted to minimize disputes over EPA's compliance with the new procedures.

The Conference Committee deleted the cross-examination provisions in the House bill but retained the limits on procedural reversal (moving the "arbitrary and capricious" requirement from the truncated § 307(d)(5) to § 307(d)(9) (D)). These limits are not mentioned in either the Conference Report or in the House and Senate debates on the Conference Committee bill. So far as appears, Congress never considered their residual meaning once the right to cross-examination was gone. [35] It appears, however, that the Senate accepted the House understanding that § 307(d) did not cut back on existing APA procedural safeguards. Thus, Senator Muskie explained that he had opposed the House proposal for "substantial **\*523 \*\*218** evidence" review because he

believed that EPA ought to be subject to the same scrutiny as other agencies, no more, no less:

> I am not suggesting that the courts should not discharge their duties with respect to EPA as they do with other agencies; at the same time, I want to emphasize ... that nothing in the bill or its legislative history was meant to single out EPA for special scrutiny either.

123 Cong.Rec. 26,851 (1977), 3 *Leg.Hist.* 366; *see id.* at 27,075, 3 *Leg.Hist.* 333 (statement of Rep. Broyhill) ("these new procedural requirements ... will assure the opportunity for more extensive public participation in the rulemaking process").

[6] In light of this history, we must interpret the final version of § 307(d) to carry forward the House understanding of what the procedural restrictions meant, so far as that understanding makes sense in the context of the final bill. We therefore conclude that § 307(d)(9)(D)(i)'s requirement that EPA's procedural error be "arbitrary and capricious" means that we must affirm reasonable EPA decisions about how to implement the § 307(d) procedures. It does not mean that EPA can ignore those procedures so long as it has a reasoned basis for doing so.

[7] [8] The scope of § 307(d)(8)'s requirement that a procedural error create a "substantial likelihood that the rule would have been significantly changed" remains uncertain, for we do not know what "substantial likelihood" and "significant change" mean. At a minimum, failure to observe the basic APA procedures, if reversible error under the APA, is reversible error under the Clean Air Act as well. On the other hand, § 307(d)(8) sets a restrictive tone for our review of procedural errors that would not violate the APA. *See* *Sierra Club v. Costle,* 657 F.2d at 391 ("The essential message of so rigorous a standard [for procedural reversal] is that Congress was concerned that EPA's rulemaking not be casually overturned for procedural reasons."). [36] We defer any effort to give further content to the terms "substantial likelihood" and "significant change" until our discussion below of concrete factual situations.

IV. THE 1.10 GPLG FINAL STANDARD

To restate briefly the aspects of the regulatory scheme that are relevant to this part, EPA's prior regulations limited large refiner lead use to 0.5 gpg. Small refiners were subject to a sliding-scale standard that was to expire on October 1,

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1097 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

1982, after which they would have to meet the 0.5 gpg large refiner standard. In August 1982, EPA proposed to replace the 0.5 gpg large refiner standard with a stricter 1.10 gplg standard. For small refiners, EPA proposed a permanent 2.50 gplg standard, but also solicited comments on whether the special standard for small refiners should be permanent or temporary.

On October 29, 1982, the agency promulgated a uniform 1.10 gplg standard, effective November 1, 1982 for large refiners and July 1, 1983 for small refiners. Until July 1, 1983, small refiners had to meet a 1.90 gplg interim standard. This part reviews the basis for the 1.10 gplg final standard; part V reviews the 1.90 gplg interim standard.

A. *EPA's Explanation*

In deciding to issue a uniform 1.10 gplg standard, EPA considered basically three factors. It relied principally on the adverse health effects of gasoline lead, but also considered at length the cost of reducing gasoline lead (including the cost to small refiners of meeting a uniform standard), and the equity and efficiency aspects of requiring small refiners to meet the same standard as large refiners.

1. *Health Effects*

After reviewing the available evidence, EPA reached the following general conclusions. First, "lead exposure is a major **524 **219 health problem" that results from the cumulative impact of "a combination of sources, including food, water, air, leaded paint and dust." Therefore, efforts should be made to "reduce [all] preventable sources of lead exposure." 47 Fed.Reg. at 38,072.[37] Second, gasoline lead is a major and preventable source of air and dust lead. *Id.* Therefore, "further action by EPA to reduce lead in gasoline is ... prudent and reasonable." *Id.* at 49,330/1. Third, the 1.10 gplg standard would significantly reduce future lead use as compared to a 0.50 gpg standard. *Id.* at 49,329 (estimating a 58% reduction in 1990, from 38.8 billion grams to 16.2 billion grams).

In its notice of proposed rulemaking, EPA had justified a looser standard for small refiners on the grounds that excess lead exposure was more of an urban than a rural problem and small refineries "are characterized by a more rural production and consumption pattern." *Id.* at 38,081/1. Moreover, the possibility of high lead emission levels in specific urban areas served by small refiners did "not appear to be a significant problem." *Id.* at 38, 085/1.

The notice of final rulemaking discusses in general terms the deleterious effects of gasoline lead. It does not, however, directly rebut the inference from the notice of proposed rulemaking that gram for gram, small refinery emissions are less harmful because most small refineries serve rural customers. However, in a separate document entitled "Supplemental Responses to Comments," issued with and incorporated by reference in its notice of final rulemaking, EPA explained that small rural refiners could sell gasoline to pipelines serving urban consumers and that it could not effectively regulate such sales.[38] EPA also explained that small refiner lead use could not be ignored as insignificant. To the contrary, a permanent dual standard would increase lead use in 1990 from 16.2 billion grams to 20.0 billion grams (a 23% increase); small refiners would produce 34% of all gasoline lead.[39]

2. *Feasibility*

EPA analyzed the cost to small refiners of complying with the 1.10 gplg standard and implicitly concluded that most small refineries could meet it.[40] Moreover, while large refineries enjoyed some economies of scale, the proposed 2.50 gplg small refiner standard "was far in excess of that amount which was necessary to put [small refineries] **525 **220 on an equal footing with large refineries." *Id.* at 49,324/2. Finally, EPA noted that for small refiners, who produce mostly leaded gasoline, the 1.10 gplg leaded-only standard would be significantly less stringent than a 0.50 gpg pooled standard. *Id.* at 49,330.

3. *Equity and Efficiency*

EPA found that a uniform standard was preferable on efficiency grounds because a dual standard in effect subsidized small refiners that would otherwise be unable to produce gasoline at competitive prices. A uniform standard was also preferable on equity grounds because: (1) a dual standard gave a competitive advantage to small refiners; (2) the greatest benefits from a dual standard would go to those few small refiners who had not already made the capital investments needed to comply with the 0.5 gpg standard; and (3) small refiners had been on notice for over five years that they would eventually have to meet the same standard as large refiners. *Id.* at 49,324/1.

B. *What Constitutes Adequate Agency Reasoning*

Case 3:20-cv-07721-SI   Document 58-5   Filed 11/10/20   Page 1098 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

[9] EPA argues that to justify the uniform 1.10 gplg standard, it need only show that gasoline lead threatens human health and that the new regulation will reduce gasoline lead. By EPA's logic, adverse health effects would permit it to justify any lead standard at all, without explaining why it chose the level it did. We cannot accept such incomplete reasoning. EPA must also explain why it chose 1.10 gplg rather than some other standard.

[10] We do not demand certainty where there is none. There may be no strong reason for choosing 1.10 gplg rather than a somewhat higher or lower number. If so, we will uphold the agency's choice of a numerical standard if it is within a "zone of reasonableness." *National Association of Broadcasters v. Copyright Royalty Tribunal,* 675 F.2d 367, 374 (D.C.Cir.1982); *Hercules, Inc. v. EPA,* 598 F.2d 91, 107 (D.C.Cir.1978) (citing cases). But our deference to its ultimate choice does not relieve EPA of the duty to explain why 1.10 gplg is an appropriate standard. A simpleminded argument that "gasoline lead is bad and our rule reduces gasoline lead" does not satisfy that duty.

[11] Second, EPA must explain why small refiners contribute to the health problems created by lead emissions. We note that this requirement implicitly presupposes that EPA *must* consider small refiners as a separate category of the gasoline refining industry. In general, an agency can subclassify an industry for purposes of regulatory analysis in any reasonable manner. *See Weyerhaeuser Co. v. Costle,* 590 F.2d at 1055 (petitioners have a "heavy burden" in challenging EPA's subcategorization of the paper mill industry). Here, however, EPA was obliged to treat small refiners as a discrete class for three reasons.

Section 211(g)(2), 42 U.S.C. § 7545(g)(2), directs EPA to "tak[e] into account" experience under the old sliding-scale standard before regulating small refiners. Also, EPA proposed a separate standard for small refiners and must, under § 307(d)(6)(A), 42 U.S.C. § 7607(d)(6)(A), explain "the reasons for any major changes in the promulgated rule from the proposed rule." Moreover, the Regulatory Flexibility Act, 5 U.S.C. §§ 603–604, requires EPA to consider "significant alternatives" to the chosen rule that accomplish the same end but minimize economic impact on "small entities."[41] Unless EPA analyzes small refiners as a discrete class, it cannot review experience under the sliding-scale standard, explain why it abandoned a dual standard,

or consider significant alternatives under the Regulatory Flexibility Act.

Third, we cannot restrict our review to health considerations. Whether or not § 211(c)(2)(A) *requires* EPA to consider the economic effects of fuel additive regulations, *526 **221 a question we do not address, all parties agree that it permits EPA to do so,[42] and EPA in fact considered economic effects at length. Since economic considerations formed a major part of EPA's rationale, we must review its economic reasoning as part of our review of whether its overall decision was reasonable.

C. *Reasonableness of the Final Standard*
[12] SRTF challenges the basis for EPA's conclusions on the health impacts of lead use and the feasibility of the 1.10 gplg standard.[43] We consider its principal arguments in turn and conclude that EPA's decision to impose a uniform 1.10 gplg standard is supported by substantial evidence in the record viewed as a whole.

1. *Agency Reversal of Position*
As an initial matter, SRTF argues that we must review EPA's action with extra rigor because, in its final rule, EPA reversed its position in the August proposal that small refiners deserved special treatment. We do not think that heightened scrutiny is appropriate in this case.

We have held that "sudden and profound alterations in an agency's policy constitute 'danger signals' that the will of Congress is being ignored,"[44] and that "an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored."[45] Here, however, there has been no change of policy. Since 1973, EPA has consistently concluded that while small refiners need some extra lead *527 **222 time, they should eventually meet the same standard as large refiners. In February 1982, EPA announced that it was *considering* a change in policy, and in August 1982, it *proposed* a change. But the agency ultimately adhered to its longstanding position in favor of a uniform standard.

We do not see why EPA's action in considering but not adopting a change of course sends a "danger signal" that the final rule ignores the will of Congress. On the contrary, that EPA rethought but ultimately adhered to its original view is positive evidence of careful decisionmaking.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI     Document 58-5     Filed 11/10/20     Page 1099 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

*Cf.*  *National Wildlife Federation v. Gorsuch,* 693 F.2d 156, 169 (D.C.Cir.1982) (EPA's reconsideration of its interpretation of the Clean Water Act "is sufficient evidence of thoroughness to meet the standard for deference" to the agency's interpretation).

### 2. *Health Effects*

SRTF presents two arguments concerning the health basis for the uniform 1.10 gplg standard. First, it notes that a 1.10 gplg/2.50 gplg dual standard would already produce substantial reductions in lead use, and argues that nothing in the record shows that the additional reductions from limiting small refiners to 1.10 gplg will have significant health benefits. Second, SRTF argues that small refineries are generally located in rural areas and therefore do not adversely affect the health of urban children. In subsection a, we find that EPA had ample basis in the record for generally seeking further reductions in gasoline lead. In subsection b, we find sufficient basis in the record for EPA's belief that small refiners contribute to the lead emissions problem.

### a. *Gasoline Lead Generally*

When EPA first issued lead-content regulations in 1973, there was no firm evidence that gasoline lead was harmful, only a "significant risk" that it was.  *Ethyl Corp.,* 541 F.2d at 12. Today, in contrast, there is compelling evidence that gasoline lead is a major cause of lead poisoning in young children. We discuss here only a few of the major pieces of evidence.

### i. *The Correlation Between Gasoline Lead and Blood Lead Levels*

Gasoline lead correlates strongly with blood lead levels. A comprehensive study ("NHANES II") by the Centers for Disease Control (CDC) shows that between 1976 and 1980, as gasoline lead use (under the spur of EPA regulation) declined from 105,000 tons per six-month period to 50,000 tons, mean blood lead levels declined in virtual lockstep from 16 ug/dl to less than 10 ug/dl. *See* Figure 1.[46] The percentage of people with excessive blood lead levels (30 ug/dl or above) showed a similar decline. As Dr. Vernon Houk, Acting Director of CDC's Center for Environmental Health, explained:

> This reduction was real. It was not due to chance, laboratory error, nor sampling of age, sex, race, urban

vs. rural areas, income levels, or geographic regions. The most significant environmental change during this time was the reduced amount of lead used in the production of gasoline.... [This data] clearly demonstrates **\*528 \*\*223** that as we have removed lead from gasoline, we have also removed lead from ourselves and our children.[47]

Other studies show that when gasoline lead use peaks sharply each summer, blood lead levels peak sharply as well.[48]



Leaded gasoline is the only lead source that can explain this data. Both of the other two major sources of lead (lead paint and food) are roughly constant year-round; thus, neither would produce a summer peak in blood lead levels. Also, neither showed a sharp decline in recent years.[49]

Other evidence also suggests that gasoline lead is a major cause of lead poisoning, **\*529 \*\*224** through its presence in the air, in dirt, and in dust. Gasoline lead is the source of over 90% of air lead, and there is a well-established relationship between inhalation of air lead and increases in blood lead.[50] Also soil analysis shows that "lead levels ... in the front yards of urban homes are two to three times greater than ... in the back yards."[51] Gasoline lead can explain this pattern; the other major sources of dirt and dust lead (lead paint and stationary lead sources) cannot. Moreover, the concentrated lead in dirt and dust can easily produce lead poisoning. An urban child who licks her finger after running it across a table left undusted for several days can consume several times the "safe" daily dose of lead.[52]

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1100 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

### ii. *Incidence of Lead Poisoning*

In the NHANES II study, the percentage of young children (aged 6 months to 5 years) with blood lead levels of 30 ug/dl or more dropped from 4.65% in 1976–1978 to 2.07% in 1978–1980.[53] The record does not indicate how many children are currently suffering from lead poisoning, but the percentage probably dropped again in 1981 in response to the EPA-mandated decrease in large refiner lead use from 0.8 gpg to 0.5 gpg effective October 1, 1980.[54] Nevertheless, lead exposure remains a serious national problem. Even if the percentage of children with blood lead levels of 30 ug/dl or more has dropped as low as 1%, that still means 150,000 children with lead poisoning.

While urban children are at greatest risk, lead also poses a significant risk to the health of rural children. In the NHANES II survey, 2.1% of rural children, including 10% of rural black children, had blood lead levels of 30 ug/dl or higher (1976–1980 average), as compared to 4.0% of all children.[55]

Moreover, recent studies suggest that the recognized danger point of 30 ug/dl is too high and that lead reduces intelligence at blood lead levels as low as 10–15 ug/dl. For example, one study found a systematic relationship between intellectual performance and dentine lead level;[56] another found "an average difference of seven IQ points between children with blood lead levels of 12 [ug/dl] and below, and those of 13 [ug/dl] and above."[57] Other studies have correlated blood lead levels of 10–15 ug/dl **\*530 \*\*225** with altered brain activity. For example, a recent study found a linear decrease in the amplitude of "slow" brain waves for all lead levels measured, from 6 ug/dl to 59 ug/dl.[58]

EPA concluded that these studies of low-level health effects, while not fully conclusive, were "suggestive of a potentially lower maximum safe level of blood lead [than 30 ug/dl]." 47 Fed.Reg. at 38,07 7/1. Even a moderate cut in the "safe" blood lead level from 30 ug/dl to 25 ug/dl would almost double the number of children with excessive blood lead levels, and a major cut to, say, 10 ug/dl would put half of the children in the U.S. at risk of lead poisoning.[59] EPA deferred any attempt to set a new "safe" level pending further research, but stated that the studies supported "the need to take all reasonable steps to control lead emissions." *Id.* at 38,07 7/2. We can find no fault with that conclusion.

### iii. *Public Comments*

EPA's decision to reduce gasoline lead further was supported by the overwhelming majority of comments from health experts. All 60 comments from independent health professionals opposed EPA's February proposal to relax the 0.5 gpg standard; many supported a tighter standard.[60] For example, Dr. Glenn Austin, President of the American Academy of Pediatrics, stated:

> [W]e now recognize that much lower levels of lead absorption cause impairment of intellectual function in growing children.... We urge you to retain and further tighten the standards for reduction of lead in the atmosphere from gasoline and all other sources.[61]

Similarly, all 32 comments from state and local governments opposed loosening the 0.5 gpg standard; the 25 commenters from this group who discussed a special standard for small refiners unanimously opposed such a standard.[62]

These comments are consistent with a 1980 report by the National Academy of Sciences, *Lead in the Human Environment.* The National Academy of Sciences found "convincing" evidence of "a significant hazard of detrimental biological effects in children,"[63] and recommended a "serious effort ... to reduce the baseline level of exposure to lead for the general population of the United States."[64] These conclusions deserve special weight because Congress specifically instructed EPA to consider the recommendations of the National Academy of Sciences and, if a regulation "differs in any important respect from any of these recom **\*531** mendations, **\*\*226** [to explain] the reasons for such differences." Clean Air Act § 307(d)(3), 42 U.S.C. § 7607(d)(3).

### iv. *Conclusion on Health Effects*

In sum, the demonstrated connection between gasoline lead and blood lead, the demonstrated health effects of blood lead levels of 30 ug/dl or above, and the significant risk of adverse health effects from blood lead levels as low as 10–15 ug/dl, would justify EPA in banning lead from gasoline entirely. Necessarily, then, there are health benefits from any intermediate reduction.

AR.06325

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1101 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

EPA did not, however, adequately explain the health basis for choosing a 1.10 gplg standard rather than some other standard. An EPA consultant used NHANES II data to estimate that the proposed 1.10 gplg/2.50 gplg standard would produce a mean blood level in 1990 of 7.7 ug/dl for whites and 10.1 ug/dl for blacks. [65] However, EPA did not estimate the mean blood level it expected from any other standard, or state what mean blood lead level it wanted to reach.

EPA has been more careful than this in the past (*e.g.,* in promulgating the ambient air quality standard for lead). It had ample data to work from and has little excuse for being so sloppy. Fortunately, we are able in subsection 5 to find a rational basis *other* than health effects for EPA's choice of 1.10 gplg as the stopping place.

### b. *The Health Effects of Small Refiner Lead Use*

EPA, in its August proposal, noted that lead emissions are a more serious problem in urban than in rural areas and that small refineries are mostly located in rural areas. It concluded that small refiner lead use had little effect on the health problems of urban children. In October, however, EPA retracted this conclusion, reasoning that small refineries could ship gasoline to urban areas via pipeline. [66]

SRTF argues that the record does not support EPA's concern about possible sales to pipelines. In particular, EPA failed to adduce data to rebut SRTF's own survey of small refiners, which showed that only four small refiners sold leaded gasoline to major Northeast and Midwest pipelines, for a total amount of about 20,000 bpd. [67] EPA responds that a mere possibility of sales to pipelines justifies its decision to regulate small refiners. [68]

As an initial matter, we cannot agree with EPA's view of how much factual support it needs to justify a decision to regulate. EPA has undoubted power to regulate even where "the evidence [is] difficult to come by, uncertain, or conflicting." *Ethyl Corp.,* 541 F.2d at 28. But the agency must make a reasonable effort to develop the facts. Where it has not made that effort, EPA cannot regulate on the basis of a guess about what the facts might be. *See id.* (agency has no power "to act on hunches or wild guesses").

On the merits of SRTF's claim, we find, despite some flaws in EPA's reasoning, sufficient basis in the record for its

conclusion that small refiner lead use is a health hazard. Even if small refiners use only a small percentage of total gasoline lead, EPA can reasonably require them to do their part in reducing total lead emissions, so long as the health impact of small refiner lead use is roughly commensurate with their market share. We think EPA has shown that.

#### i. *Sales to Urban Areas*

SRTF correctly notes that neither EPA nor the commenters claiming that small refiners had access to pipelines produced any tangible evidence to that effect beyond citing isolated examples. [69] Nevertheless, **\*532 \*\*227** SRTF is at least partially hoist on its own data. Its figure of 20,000 bpd is a bare minimum estimate. SRTF only counted sales to major Northeast and Midwest pipelines, and excluded other pipelines. [70] Also, SRTF polled only the 64 small "processing" refineries, and excluded 14 small "blenders" that EPA treats as small refineries. [71] Despite these distortions, SRTF's own number shows that 16% of the 124,000 bpd of leaded gasoline produced by small processing refineries is sold to pipelines. [72] This is a significant percentage, especially since it is a minimum estimate.

Also, some small refiners are located in or near urban areas and directly sell gasoline to those areas, without using pipelines. EPA did not discuss this point in its notice of final rulemaking, but was certainly aware of it. The issue of direct small refiner sales to urban areas was a major one, and EPA both commissioned an independent contractor to study direct sales and discussed such sales in its notice of proposed rulemaking. [73]

The contractor, Sobotka & Co., Inc. ("Sobotka"), estimated that small refiners directly sold 33% of their output in metropolitan areas of at least 250,000 population. [74] Sobotka did not explain its methodology, and called its estimate "extremely rough and ... based on little data." [75] Moreover, SRTF criticized the Sobotka study and arrived at a lower estimate of direct sales (23%), and EPA did not explain the discrepancy. **\*533 \*\*228** [76] But even SRTF's estimate that 23% of small refiner output is sold in urban areas is high enough to refute any claim that small refiner lead use does not threaten the health of urban children.

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

Moreover, total small refiner sales to urban areas are the sum of direct small refiner sales to nearby urban areas (SRTF estimate = 23%) and small refiner sales to more distant areas by pipelines (SRTF estimate = 16%). Thus, we can estimate that at least 39% of small refiner output, and probably more, is sold in urban areas. Furthermore, this percentage would increase over time under a dual standard. EPA estimated that under a 2.50 gplg/1.10 gplg dual standard, small refiners would have a competitive advantage and would gain market share in the leaded gasoline market at the expense of large refiners. By 1990, they would produce 34% of all gasoline lead compared to 9% in 1982. [77] This gain in market share would almost surely portend increased penetration of urban markets now served primarily by large refiners.

### ii. *Health Effects in Rural Areas*

EPA was not concerned solely with small refiner sales to urban areas. Rather, it was also concerned, both in the proposed and final rules, that lead emissions threaten health in rural areas as well. For example, EPA's notice of proposed rulemaking referred to the "widespread" exposure to lead "among the general population," 47 Fed.Reg. at 38,072/2, and solicited comments "on the impact of the proposed small refinery definition on lead emissions in specific urban *and rural* areas," *id.* at 38,085/2 (emphasis added).

In fact, rural blood lead levels are only slightly lower than urban blood lead levels. As noted earlier, a significant percentage of rural children have blood lead levels of 30 ug/dl or more. [78] Moreover, in the NHANES II survey, rural blood lead levels show the same dramatic decline as urban lead levels in response to reductions in gasoline lead. [79] To be sure, EPA did not explicitly focus on this data. Had EPA done so, however, it necessarily would have had to conclude, using the same logic that it applied on a nationwide basis, that gasoline lead use threatens health in rural areas to much the same extent as in urban areas.

In sum, the record supports EPA's belief that some small refineries sell gasoline to urban areas and also supports the agency's concern with lead emissions in rural as well as urban areas. Thus, EPA's ultimate conclusion that small refiner lead use threatens health is reasonable.

In so concluding, we recognize that EPA was less explicit than it could have been in explaining the health dangers

of small refiner lead use. We recognize, too, the settled doctrine that neither the courts nor counsel for the agency may "substitute new reasons for those offered by the agency." *Portland Cement Association v. Ruckelshaus,* 486 F.2d 375, 395 (D.C.Cir.1973) (citing, *e.g., Burlington Truck Lines v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974); *see Weyerhaeuser Co. v. Costle,* 590 F.2d at 1030. But this is not a case where EPA failed to give any reasons or gave unsupported reasons for its belief that small refiner lead use threatens health. Rather, **\*534  \*\*229** EPA merely failed to articulate its reasons in any detail, forcing us to dig into the record to understand them fully. In the circumstances of this case, we think that EPA has not crossed "the line from the tolerably terse to the intolerably mute." *Greater Boston Television Corp. v. FCC,* 444 F.2d at 852 (footnote omitted).

### 3. *Feasibility*

As noted earlier, EPA concluded that most small refiners could meet the 1.10 gplg final standard but the agency was willing to let those who could not meet the standard fall by the wayside. [80] SRTF argues that EPA improperly used an aggregate model to predict that most small refiners could meet the standard; in particular, the model relies on an untested scheme for interrefinery trading of lead credits.

EPA did indeed base most of its analysis of the cost and feasibility of a 1.10 gplg standard on an aggregate model developed by the Department of Energy and used by EPA's contractor Sobotka. That model treated all small refineries as if they were a single small refinery with costs, output, lead use, octane-enhancing capacity, etc., equal to a weighted average for all small refineries. Sobotka modeled large refineries similarly. As it recognized, the model assumes that small refineries can engage in "unlimited" trading of blending components at zero cost. Since interrefinery trading in fact involves some transaction costs, the model "overstate[s]" small refinery ability to produce high-octane gasoline without using lead and understates the cost of meeting a uniform standard. [81]

EPA concluded that the assumption of interrefinery trading was basically sound. It stated in explaining the final rule that "refineries that are temporarily short of octane producing capability will be able to attain the 1.10 gplg standard ...

Case 3:20-cv-07721-SI   Document 58-5   Filed 11/10/20   Page 1103 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

through purchases of blending stocks or by use of the [lead credit trading] provisions of the regulation." 47 Fed.Reg. at 49,32 4/2.

SRTF does not dispute Sobotka's conclusion that small refiners, in aggregate, have enough octane-enhancing capacity to meet the 1.10 gpglg standard. It argues instead that the record does not support EPA's belief that most individual small refineries can meet the 1.10 gpglg standard through interrefinery trading.

### a. Timely Objection

Before turning to the merits of EPA's use of an aggregate model, we address a procedural matter. EPA included Sobotka's methodology in the record at an early date and referred to that methodology in its notice of proposed rulemaking. See id. at 38,08 0/3 (Sobotka has calculated costs "using the Department of Energy's Refinery model"). SRTF, however, failed directly to attack that methodology. EPA argues that SRTF is barred from doing so now by § 307(d)(7) (B), 42 U.S.C. § 7607(d)(7)(B), which provides:

> Only an objection ... which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review.

[13] We agree that SRTF cannot raise at this late date technical objections to the model. On the other hand, EPA retains a duty to examine key assumptions as part of its affirmative "burden of promulgating and explaining a non-arbitrary, non-capricious rule." National Lime Association v. EPA, 627 F.2d 416, 433 (D.C.Cir.1980); see International *535 **230 Harvester Co. v. Ruckelshaus, 478 F.2d 615, 643 (D.C.Cir.1973). Here, aggregate analysis is a vital assumption underlying the Sobotka model. Thus, EPA must justify that assumption even if no one objects to it during the comment period, and SRTF may properly ask this court to review whether EPA has done so.

### b. EPA's Use of Aggregate Analysis

[14]  [15]  Any model is an abstraction from and simplification of the real world. Nevertheless, administrative agencies have undoubted power to use predictive models. See Sierra Club v. Costle, 657 F.2d at 332–35. The agency must "explain the assumptions and methodology used in preparing the model" and, if the methodology is challenged, must "provide a 'complete analytic defense.' " Id. at 333 (quoting American Public Gas Ass'n v. FPC, 567 F.2d 1016, 1039 (D.C.Cir.1977), cert. denied, 435 U.S. 907, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978)). We will also look for evidence that the agency is conscious of the limits of the model. See id. at 334. Ultimately, however, we must defer to the agency's decision on how to balance the cost and complexity of a more elaborate model against the oversimplification of a simpler model. We can reverse only if the model is so oversimplified that the agency's conclusions from it are unreasonable.

The key abstraction at issue here is treating all small refineries as a single refinery with characteristics equal to a weighted average of small refineries. This abstraction is reasonable only if, as EPA believed, small refineries that lack octane-enhancing equipment can purchase high-octane blending components or lead credits from better equipped refineries at reasonable cost. [82]

EPA did not attempt to determine how many small refiners would be able to purchase blending components or at what cost. However, refiners have long been free to buy and sell blending components in the normal course of business, and many do so. "Blenders" produce gasoline entirely by buying blending components and mixing those components together in appropriate proportions. Moreover, a number of processing refineries produce primarily low-octane components, which they mix with purchased high-octane components to make gasoline. Indeed, as Sobotka noted, the 17 small refineries that lack catalytic reformers already "probably cannot make merchantable gasoline [even] at ... 3 or 4 grams of lead per gallon ... [unless] they use blending components made in other and better equipped refineries." [83]

Also, the final rule facilitates a second form of interrefinery trading: Refineries that wish to use more than 1.10 gpglg can buy "lead credits" from refineries that use less than 1.10 gpglg. Although lead-credit trading was a new idea, EPA had sufficient reason to believe that a market for lead credits would develop. First, the gasoline refining industry is highly

competitive. Thus, refiners with excess octane-enhancing capacity will thus be willing to sell lead credits if it is profitable to do so, just as they now sell high-octane blending components. **\*536  \*\*231** [84] EPA predicted that the market price for lead credits would settle at about the marginal value of lead to large refiners of one cent per gram. [85] Second, EPA's experience with similar programs—the "offset" and "bubble" policies under the Clean Air Act, and the oil import quota and crude oil "entitlements" programs—suggests that such "paper" trading is likely to develop. [86] Third, many commenters supported interrefinery averaging, [87] and most commenters who opposed averaging took for granted that averaging would take place. [88]

In short, evidence in the record supports Sobotka's assumption that there will develop a smoothly functioning market in which small refiners will be able to buy blending components, lead credits, or both. Accordingly, we must uphold EPA's conclusions about the cost and feasibility of the 1.10 gplg standard.

#### 4. *Equity and Efficiency*

There is little for us to review in EPA's conclusion that equity and efficiency favor a uniform standard. SRTF does not dispute EPA's conclusion that a uniform standard is more efficient. [89] EPA's decision that a uniform standard is more equitable than a dual standard is a policy choice that is "not susceptible to the same type of verification or refutation by reference to the record as are some factual questions." *Industrial Union Department, AFL–CIO v. Hodgson,* 499 F.2d 467, 475 (D.C.Cir.1974); *see Lead Industries Association,* 647 F.2d at 1147. Our cases require EPA adequately to explain the reasons for its policy choice, but EPA has done so. It reasoned that a dual standard would give a competitive advantage to small refiners, especially those small refiners who had not already invested in octane-enhancing equipment, and that small refiners had long been on notice that they would have to meet a uniform standard. We must accept those reasons so long as they are rational, and we think they are.

#### 5. *Summary*

We have separately considered and upheld each of the major conclusions—on health effects, feasibility, and equity and efficiency—underlying EPA's decision to impose a uniform standard. Necessarily, then, EPA's justification for the 1.10 gplg standard, taken as a whole, is reasonable, with one caveat adverted to earlier: We are given scant aid by EPA in ascertaining why it chose 1.10 gplg rather than some other uniform standard.

EPA explained that it had balanced health benefits against cost to the industry as a whole. The 1.10 gplg standard would produce lead emissions "equivalent to [emissions] under the existing standards" and, in **\*537  \*\*232** the future, would "result in lower lead levels than the current standards." 47 Fed.Reg. at 38,07 0/1. The degree of future reduction was an "accommodation" that "will achieve EPA's goals of accelerated reductions in lead usage ... without giving rise to unreasonable costs." *Supplemental Response to Comments, supra* note 38, at II–2, J.A. at 1327. Although we continue to be troubled by EPA's failure explicitly to consider the health benefits of alternative standards, we cannot say that EPA's balancing of costs against benefits was so seriously flawed that the final rule is unreasonable.

#### D. *Regulatory Flexibility Analysis*

Under the Regulatory Flexibility Act, Pub.L. No. 96–354, 94 Stat. 1164 (1980) (codified at 5 U.S.C. §§ 601– 612), all agencies, as part of the rulemaking process, must conduct a "regulatory flexibility analysis" for any rule that has "a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). The flexibility analysis must, among other things, discuss how a rule will affect small entities, describe "significant alternatives" that would "minimize any significant economic impact of the rule on small entities," and explain "why each one of such alternatives was rejected." *Id.* § 604(a)(3) (describing the "final regulatory flexibility analysis" to be issued with the final rule); *see id.* § 603 (describing the "initial regulatory flexibility analysis" to be issued with the proposed rule).

EPA prepared and included in the record both an initial and a final regulatory flexibility analysis. SRTF complains that the final analysis failed to discuss significant alternatives to a uniform standard or explain why those alternatives were rejected. EPA responds that Congress has foreclosed judicial review of agency compliance with the Regulatory Flexibility Act.

The scope of judicial review of a regulatory flexibility analysis is a question of first impression. We conclude after reviewing the statute and the legislative history that we may

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

Case 3:20-cv-07721-SI   Document 58-5   Filed 11/10/20   Page 1105 of 1271

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

consider the adequacy of EPA's regulatory flexibility analysis as part of our overall review of whether the rule is reasonable. On the merits of SRTF's claims, however, we conclude that EPA has considered a reasonable range of alternatives and given sufficient reasons for rejecting them.

### 1. *Reviewability of the Analysis*

**[16]** Section 611(b) of the Regulatory Flexibility Act expressly limits judicial review of agency compliance with the Act:

> Any regulatory flexibility analysis prepared under sections 603 and 604 of this [Act] and the compliance or noncompliance of the agency with the provisions of this [Act] shall not be subject to judicial review.

However, § 611(b) continues:

> When an action for judicial review of a rule is instituted, any regulatory flexibility analysis for such rule shall constitute part of the whole record of agency action in connection with the review.

On its face, § 611(b), at a minimum, forbids the courts to review agency compliance with the Regulatory Flexibility Act except as part of their review of the underlying rule. It may mean no more than this, so that a defect in the flexibility analysis would be a factor in the reviewing court's overall decision whether a rule is reasonable. It may also mean, as EPA claims, that a reviewing court can only consider in its overall decision whatever flexibility analysis the agency sees fit to prepare, and cannot overturn a rule because the regulatory flexibility analysis is grossly inadequate or even totally absent. Neither result is compelled by the statutory language. For further guidance, we therefore turn to the legislative history.

Congress adopted the Regulatory Flexibility Act in an unusual fashion which limits the value of some of the traditional guides to legislative intent. Its immediate precursors were H.R. 4660, 96th Cong., 1st Sess. (1979) and S. 299, 96th Cong., 2d Sess., 126 Cong.Rec. S10,930–31 (daily ed. Aug. 6, 1980), neither of which restricted judicial **\*538 \*\*233** review of agency compliance with the Act.[90] However, the Senate rejected S. 299 as reported by the Judiciary Committee and adopted instead a substitute bill offered by Senator Culver on the Senate floor. *See* 126 Cong.Rec. S10,931–33 (daily ed. Aug. 6, 1980).[91]

Senator Culver offered along with the bill an extensive section-by-section analysis of the bill akin to a committee report. *Id.* at S10,934–43. We think it appropriate to give substantial weight to this description of the bill. Indeed, since the Senate did not debate the judicial review provisions of the Act, we have little else to go on in ascertaining its intent.

Senator Culver's substitute report explained that § 611(b) was meant to ensure that agencies obey the Act by permitting courts to review the flexibility analysis as part of their overall review of the reasonableness of a rule. On the other hand, it avoided disruption of the rulemaking process by precluding courts from separately reviewing the flexibility analysis:

> In any judicial review, the issue before the court will remain whether the rule itself is valid.... In making that determination, the court will consider the contents of the regulatory flexibility analysis along with other relevant material.

> ... [T]he bill strikes a balance between two central aims .... The first is to ensure that an agency's compliance with the objectives of this bill be subject to meaningful ... judicial oversight....

> On the other hand, the bill avoids the substantial disruption of agency rulemaking inherent in allowing separate judicial review of the regulatory flexibility analysis itself in the manner of an environmental impact statement.

*Id.* at S10,939. Senator Culver also made it clear that a major error in the regulatory flexibility analysis may be, but does not have to be, grounds for overturning a rule:

> [I]f an agency ... completely *and consciously* ignores the ... requirement

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1106 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

to perform regulatory flexibility analyses, an injured party would have grounds to argue that this fact is evidence of the unreasonableness of the rule.... In addition, if an agency completely fails to respond to a clearly available significant alternative ... raised in public comments, then this failure would be grounds for finding the rule unreasonable under established case law. [92]

The Senate bill was brought directly to the House floor and adopted without change. The House apparently accepted the Senate view that a defect in the analysis may lead a court to conclude that the rule is unreasonable. For example, Representative Butler, a primary sponsor of the now superseded House bill, explained:

Judicial review of the lack of or adequacy of the regulatory flexibility analysis is permitted to the extent it is relevant to a review of the validity of the final rule.... [T]he failure to perform an analysis of a reasonable alternative consistent with the desired regulatory goal may be adequate grounds for a determination that the final rule is unreasonable.

*Id.* at H8472–73 (daily ed. Sept. 8, 1980); *see id.* at H8459 (statement of Rep. Kastenmeier):

The bill's treatment of judicial review is intended to strike a balance between two necessary goals. First, to [avoid interlocutory review]; and Second, the desire to insure that agencies take seriously their obligation under the law by providing for **\*539  \*\*234** review of regulatory

flexibility analyses as part of the entire record. [93]

We hold, based on this history, that a reviewing court should consider the regulatory flexibility analysis as part of its overall judgment whether a rule is reasonable and may, in an appropriate case, strike down a rule because of a defect in the flexibility analysis. We turn, therefore, to the merits of SRTF's objections.

2. *Adequacy of the Analysis*

In its Final Regulatory Flexibility Analysis, EPA analyzed five alternatives: a uniform 0.50 gpg pooled standard; a uniform 0.40 gpg pooled standard; a uniform 1.10 gplg leaded-only standard; a 1.10 gplg/1.90 gplg dual standard; and a uniform 1.10 gplg standard with a "phase-in" period for small refiners. *Final Regulatory Flexibility Analysis, supra* note 84, at 3, J.A. at 1421. SRTF complains that EPA failed to consider less restrictive standards such as a 1.10 gplg/2.50 gplg dual standard.

This complaint is frivolous. Taking the rulemaking as a whole, EPA considered an appropriate range of alternatives, including the 1.10 gplg/2.50 gplg dual standard. EPA discussed that standard at length in its statement of basis and purpose and in its *Supplemental Response to Comments*. We concluded in subsection C that EPA properly rejected it. EPA should have analyzed that option in its regulatory flexibility analysis as well, but its failure to do so is a purely technical flaw that does not affect the reasonableness of the final rule. [94]

E. *The July 1, 1983 Effective Date*

Plateau argues that the July 1, 1983 effective date for the 1.10 gplg standard does not give it enough time to install the new equipment it needs to meet the standard. It explains that it had been building the needed equipment but stopped when EPA issued its February notice of proposed rulemaking and cannot now finish the aborted construction by July 1. We conclude that EPA's decision to grant an eight-month period between date of promulgation and effective date was reasonable.

EPA recognized that its February notice gave small refiners "some reason to believe that they might not be subject to the same standard as large refineries" and that small refiners "may therefore have delayed projects designed to meet a more

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1107 of 1271

Small Refiners Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

stringent standard." 47 Fed.Reg. at 49,32 4/1. It granted an eight-month delay in the effective date to compensate for the eight months of uncertainty between the February notice and the October final rule. *Id.* at 49,324/2.

Plateau claims that it will have to start all over with a new "isomerization project" that will take two years to complete because its previous plan to install a "reformer" will not suffice to meet the "severe" final standard. We fail to understand the factual basis for this claim. Because small refiners produce mostly leaded gasoline, the 1.10 gplg final standard permits them to use substantially more lead than the 0.5 gpg standard it replaces. Thus, nothing EPA has done has forced Plateau to make new plans.

**\*540  \*\*235**  To be sure, start-up delays may in some cases make it difficult to complete a mothballed project within the originally scheduled time. However, even then, small refiners that eventually plan to install new equipment can probably comply in the interim by purchasing blending components or lead credits. EPA recognized and relied on this fallback possibility:

> Even if the eight-month period is too short to permit compliance through construction programs in some cases, refineries that are temporarily short of octane producing capability will be able to attain the 1.10 gpg standard ... through purchases of blending stocks or by use of the averaging provisions of the regulation.

*Id.* at 49,324. Especially in light of this fallback option, EPA's choice of an eight-month delay in the effective date to compensate for the eight-month duration of the rulemaking proceeding strikes us as sensible. [95]

### F. *Late Docketing of Comments*

**[17]**  SRTF also objects to the final rule on a procedural ground—EPA relied on evidence that the agency had added to the record either near the end of or after the close of the comment period and too late for effective rebuttal. In particular, EPA docketed a number of Sobotka studies on October 7 and 8 (the comment period closed on October 8),

and docketed several other Sobotka studies on October 27, only two days before the final rule was issued.

This late docketing was highly improper. We have held that EPA may, in an appropriate case, add documents submitted by others to the docket after the close of the comment period. *Sierra Club v. Costle,* 657 F.2d at 396–400. Here, however, EPA itself added evidence to the record both near the end of and after the close of the comment period, and presumably intended to rely on that evidence. Interested parties had little or no opportunity to reply. *Sierra Club* prohibits such conduct in no uncertain terms:

> If ... documents ... upon which EPA intended to rely had been entered on the docket too late for any meaningful public comment ..., then both the structure and spirit of section 307 would have been violated.

*Id.* at 398; *see Kennecott Corp. v. EPA,* 684 F.2d 1007, 1019 (D.C.Cir.1982) (EPA improperly placed economic forecast data in the record only one week before issuing its final regulations).

We do not go so far as to hold that it is *per se* improper for EPA to add evidence to the record at the end of or after the close of the comment period. EPA may sometimes be able to show that the late entry did not foreclose an opportunity for "meaningful public comment." For example, it might be proper for EPA to develop new evidence in order to respond to a particular comment, so long as it gives the commenter an opportunity to reply to the new evidence. *Cf. id.* at 399 (Environmental Defense Fund was aware that industry group had submitted new data after the close of the comment period, had "many weeks" to respond, and in fact did so). Here, however, EPA has not shown that it afforded any rebuttal opportunity.

**[18]**  It is also incumbent upon a petitioner objecting to the agency's late submission **\*541  \*\*236** of documents to indicate with "reasonable specificity" what portions of the documents it objects to and how it might have responded if given the opportunity. *Cf.* Clean Air Act § 307(d)(7) (B), 42 U.S.C. § 7607(d)(7)(B) (objections to a rule must be raised with "reasonable specificity during the period for public comment ... [unless] it was impracticable to raise

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1108 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

such objection within such time"); *American Petroleum Institute v. Costle,* 665 F.2d 1176, 1191 (D.C.Cir.1981) (requiring parties to raise objections which arise after the end of the comment period with "reasonable specificity" in a petition to the agency for reconsideration), *cert. denied,* 455 U.S. 1034, 102 S.Ct. 1737, 72 L.Ed.2d 152 (1982). Here, however, SRTF raises a number of specific objections to the Sobotka studies.[96] We therefore turn to the standard for reviewing those objections.

**[19]** In general, there are two possible sources of reversible error from EPA's late docketing of evidence. First, since EPA did not provide an opportunity to reply to the late evidence, we should not, we think, consider any evidence to which a petitioner objects in determining whether there is enough evidence in the record to support the final rule. In reaching our conclusion that the 1.10 gpgl standard is reasonable, we have not relied on the portions of the Sobotka studies to which SRTF objects. Necessarily, then, any controversial portions of the late-submitted studies are not "vital to EPA's support for the rule." *Sierra Club,* 657 F.2d at 399.

Second, it is possible that although we can find support for the rule without relying on the late evidence, the agency may in fact have relied on that evidence to reach a different result than it would otherwise have reached. To convince us to reverse on this ground, SRTF must show that there is a "substantial likelihood that the rule would have been significantly changed" had it been given a rebuttal opportunity. Clean Air Act § 307(d)(8), 42 U.S.C. § 7607(d) (8).

In this case, EPA did refer briefly to some of the late studies in its final statement of basis and purpose. *See, e.g.,* 47 Fed.Reg. at 49,324/2 (small refiners can produce gasoline at 1.40 gpgl at about the same cost as large refiners at 1.10 gpgl). Thus, the studies played some role in EPA's decision—how much, it is hard to say. However, the same information was available (though in somewhat less detail) from the timely-submitted comments of the Department of Energy, on which EPA could properly have relied.[97] Moreover, SRTF's specific complaints are grounded primarily on a single underlying objection to Sobotka's use of aggregate analysis. SRTF had ample opportunity to object to that modeling assumption, and we have already considered and rejected its objections. Thus, there is not a "substantial likelihood" that SRTF, if given the chance to comment on the additional Sobotka studies, could have convinced EPA to choose a different standard.

We conclude that EPA has committed error, but not reversible error.

### G. *Conclusion*

In places the record is sparse and EPA's analysis weak. We have had to search for scraps of hard data or indirect evidence that the agency even thought about major issues. But the ultimate standard is not whether the agency's analysis is impeccable, but whether it is reasonable; not whether most of the evidence supports the agency's position but whether enough of it does; not whether the agency's policy choices are wise but whether they are rational. Against that high standard, SRTF has the burden of convincing us that EPA improperly declined to subsidize small refiners by allowing them to spew more lead into the air than their **\*542 \*\*237** competitors. In that task, it has failed. The 1.10 gpgl final standard is reasonable.

### V. THE INTERIM 1.90 GPLG STANDARD

**[20]** To review the relevant aspects of the final rule, prior EPA regulations made small refiners subject to a sliding-scale lead content standard until October 1, 1982 and to a 0.5 gpg standard thereafter. In February 1982, EPA proposed to relax the 0.5 gpg standard and also proposed to suspend the October 1, 1982 deadline pending completion of the rulemaking. The suspension, EPA explained, would permit small refiners to defer investing in equipment needed to meet the 0.5 gpg standard:

> Because attainment of the 0.5 gpg standard will likely require substantial capital investment on the part of small refineries in the near future ..., the effective date of that standard for small refineries should be postponed pending the outcome of the analysis on the entire lead phasedown issue.

47 Fed.Reg. at 7814/2. EPA unequivocally promised small refiners that the final rule would give them enough time to construct any new equipment they might need:

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1109 of 1271

Any final decision regarding standards for small refineries *will* take into account the lead time required for construction of any processing equipment needed for compliance.

*Id.* (emphasis added).

In August 1982, EPA proposed a permanent 2.50 gplg standard for small refiners. It suspended the October 1 compliance date for the 0.5 gpg standard for only one month, but explained that it would issue a final rule before November 1. EPA expected and wanted small refiners to continue to defer capital investment needed to meet the 0.5 gpg standard:

> [T]he basis for this suspension is the need to defer the necessity for small refineries to decide whether to make the substantial expenditures required to meet a more stringent lead standard during the time that the Agency is still considering amendments to the lead phasedown program.

*Id.* at 38,091/1.

On October 29, 1982, EPA promulgated a 1.10 gplg final standard for small refiners effective July 1, 1983 and a 1.90 gplg interim standard effective November 1, 1982. It explained that small refiners currently averaged 2.17 gplg and that the 1.90 gplg standard would require "only a slight decrease in average lead use" and "should generally be achievable by [small] refineries through use of the averaging provisions in the regulations." *Id.* at 49, 324/2.

SRTF and Plateau argue that EPA did not give adequate notice that it might impose with no lead time a standard significantly stricter than the sliding-scale standard and that the record does not support EPA's conclusion that most small refiners could meet the interim standard.

A. *Notice*

As an initial matter, the 1.90 gplg standard is significantly stricter than the proposed 2.50 gplg standard, which was itself stricter than the sliding-scale standard.[98] Thus, it does not satisfy EPA's promise to the small refiners that they could safely delay capital investments pending EPA's issuance of a final rule. EPA implicitly recognized as much when it explained that small refiners "generally" could meet the standard "through averaging." The question, then, is whether anything in the proposed rulemaking gave adequate notice that EPA might issue such a strict interim standard. We think not.

**\*543  \*\*238**  We discuss in part VI *infra* what constitutes adequate notice under Clean Air Act § 307(d). For present purposes, we need merely note that, as under the APA, the final rule must be a "logical outgrowth" of the agency's proposal. *United Steelworkers v. Marshall,* 647 F.2d 1189, 1221 (D.C.Cir.1980), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981); *Weyerhaeuser Co. v. Costle,* 590 F.2d 1011, 1031 (D.C.Cir.1978).

EPA argues that the 1.90 gplg interim standard was a logical outgrowth of the August proposal because it was "within the range of alternative standards being considered by EPA."[99] The August notice of proposed rulemaking expressed concern that the proposed 2.50 gplg standard might be too high and invited comments on "whether a standard such as 2.15 gp[l]g ... may be more appropriate." 47 Fed.Reg. at 38,082/1. The 1.90 gplg standard, EPA reasons, is encompassed by the phrase "such as 2.15 gplg."

This argument misses the point. EPA has argued that the August proposal gave fair notice of a 1.90 gplg final standard. The issue, however, is whether the August proposal gave notice of a 1.90 gplg *interim* standard, effective immediately. On that issue, EPA did not give fair notice. On the contrary, EPA stated unequivocally, both in February and August, that its final rule "will" give small refiners who wish to meet the new standard by constructing new equipment enough lead time to do so. It never hinted that it might immediately require small refiners to meet a strict interim standard.[100] Unsurprisingly, therefore, no one commented on what interim standard would be feasible.

Intervenors argue that the small refiners had no right to rely on EPA's statements that it would give adequate lead time, and that the small refiners should have prepared for the possibility that EPA would allow the 0.5 gpg standard to take effect

Case 3:20-cv-07721-SI Document 58-5 Filed 11/10/20 Page 1110 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

on November 1, 1982. Therefore, the small refiners cannot complain about the much less stringent 1.9 gpgl interim standard. [101]

However, even if EPA could have allowed the 0.5 gpg standard to take effect, it did not do so; instead, it promulgated a new 1.90 gpgl interim standard. EPA could not validly issue that new standard without first providing notice and an opportunity to comment. *Cf.* *Weyerhaeuser Co. v. Costle,* 590 F.2d at 1031 n. 27 (EPA's failure to give notice deprived the industry of an opportunity to comment on key facts; it is beside the point that EPA might have been able to justify the rule even using the industry's figures).

Second, we doubt the validity of intervenors' premise—that EPA could have allowed the 0.5 gpg standard to take effect on November 1. Unless EPA had a strong reason for breaking its promise of adequate lead time, a court might well have concluded that its action was arbitrary.

The question remains whether EPA's failure to give notice meets the standard for reversal on procedural grounds laid out in Clean Air Act § 307(d)(8), 42 U.S.C. § 7607(d)(8)—"a substantial likelihood that the rule would have been significantly changed if such errors had not been made." As we concluded in part III.D *supra,* where the procedural error would have been reversible error under the APA, § 307(d)(8) **\*544** **\*\*239** does not restrict our power, indeed our duty, to reverse EPA's action on procedural grounds. Under that test, EPA's failure to give notice on a major portion of a rule is reversible error. [102]

**B.** *Feasibility*

We also do not find substantial evidence to support EPA's belief that most small refiners could meet the 1.90 gpgl interim standard at reasonable cost. As noted above, EPA reasoned that small refiners currently averaged 2.17 gpgl and that 1.90 gpgl was only a "slight decrease" that "should generally be achievable ... through use of the averaging provisions in the regulations." We have two problems with this analysis.

First, the 2.17 average is not representative of what most individual small refiners can achieve. Most small refineries are processing refineries, and EPA's own data show that small processing refineries averaged 2.36 gpgl. [103] Only by including blenders could EPA arrive at 2.17. Moreover, SRTF

cogently objects (and EPA fails to respond) that EPA's data include three refineries that do not qualify as small, and that corrected data would show that small processing refineries averaged 2.50 gpgl. This would be consistent with SRTF's own evidence—that of the 64 small processing refineries, 40 used 2.50 gpgl or more, and 14 of these used 3.00 gpgl or more. [104] Thus, to meet the 1.90 gpgl interim standard, a typical small refiner would have to reduce lead use by much more than EPA believed.

Second, EPA recognized that small refiners could generally meet the interim standard only *through averaging.* We concluded in part IV.C.3.b *supra* that the record supports EPA's belief that a market for lead credits would develop. But EPA imposed the interim standard with only two days lead time. Nothing in the record supports EPA's implausible belief that a lead credit market would spring up overnight.

We recognize that the time lag before a lead credit market will develop is not susceptible of proof by hard evidence. Had EPA considered the issue, we would be reluctant to second-guess its judgment. But, so far as we can tell, EPA never did so. Instead, it blithely assumed that lead credits would be readily available. [105] We conclude that EPA improperly relied on lead-credit trading as a reason to believe that small refiners could immediately meet the interim standard. [106]

Both of these flaws are serious. Taken together, they undermine the principal bases for EPA's conclusion that the 1.90 gpgl standard is feasible. Moreover, their import is magnified by the lack of an opportunity for public comment, which "undermines our usual assumption that notice and comment rulemaking, by virtue of its accessibility **\*545** **\*\*240** to public scrutiny, will achieve rational results." *Weyerhaeuser Co. v. Costle,* 590 F.2d at 1031. We conclude that the interim standard is not supported by the evidence in the record. [107]

**C.** *What Standard Does EPA Return To?*

[21]  In light of the foregoing, we vacate the portion of 40 C.F.R. § 80.20(b)(1)(i) that requires small refineries to limit gasoline lead content to 1.90 gpgl for gasoline production up to the refinery's past production level. We leave in force the requirement in § 80.20(b)(1)(ii) that leaded gasoline produced in excess of a refinery's past production level may not exceed 1.10 gpgl.

Case 3:20-cv-07721-SI   Document 58-5   Filed 11/10/20   Page 1111 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

When an agency replaces an existing rule with a new rule, and we vacate all or part of the new rule, we must decide whether the prior rule continues in effect or whether our action leaves no rule in effect. In at least some cases, we have no power to reinstate the prior rule and must remand to the agency to determine the appropriate replacement. *See* *Burlington Northern, Inc. v. United States,* 459 U.S. 131, 103 S.Ct. 514, 74 L.Ed.2d 311 (1982) (Court of Appeals lacks power to reinstate old ICC rate after invalidating revised rate). On the other hand, we have sometimes assumed that a decision vacating a new rule will reinstate the old rule. *E.g.,* *Natural Resources Defense Council, Inc. v. Gorsuch,* 685 F.2d 718, 728 (D.C.Cir.1982) (implicitly assuming that EPA will return to its previous regulation defining "source" under the Clean Air Act).

We believe the better course is generally to vacate the new rule without reinstating the old rule. This avoids any problem of the court overstepping its authority, and leaves it to the agency to craft the best replacement for its own rule. Failure to reinstate the old rule creates a temporary regulatory vacuum, but the court's power to delay the mandate in a case for a reasonable period, plus the agency's limited power to issue a replacement on an emergency basis without notice and comment, should usually suffice to avoid untoward consequences.

We think it appropriate to follow this general rule here. [108] Indeed, it would be irrational to order the agency to return to the old 0.5 gpg standard for small refiners (which would have become effective on November 1, 1982) because that standard is stricter than both the invalidated 1.90 gplg interim standard and the 1.10 gplg final standard. We therefore vacate the interim standard and leave it to the agency to choose a suitable replacement.

Our decision leaves EPA without a regulatory limit on small refinery lead use. The unexpected nature of this regulatory vacuum, plus the public health danger posed by unrestricted lead use and the absence of any unfairness to small refiners in such a course of action, would justify EPA in immediately promulgating a temporary lead content regulation which does not require small refiners to reduce lead use to a level **546 **241 significantly below previous lead-use levels. *See* 5 U.S.C. §§ 553(b)(B) (agency may for "good cause" issue rules without notice or public procedure) (made applicable to Clean Air Act by 42 U.S.C. §§ 7607(d)(1)

(last sentence)), 553(d)(3) ("good cause" exception to 30-day period between publication of a rule and the rule's effective date); *American Federation of Government Employees v. Block,* 655 F.2d 1153, 1156 (D.C.Cir.1981) (these exceptions to the § 553 procedures permit agency to issue temporary rules in "emergency situations"). [109]

The last paragraph is taken almost verbatim from our order of January 26, 1983. *See* Appendix I. In that order, we delayed issuing the mandate for one week to give EPA an opportunity to issue such an emergency rule. In response, EPA established a new interim standard equal to the old sliding-scale standard, and made assorted conforming changes in the fuel additive regulations. 48 Fed.Reg. 5724 (1983). This seems to us to be an entirely appropriate resolution, and confirms our decision not to reinstate the old rule.

## VI. THE DEFINITION OF "SMALL REFINERY"

We turn next to the basis for EPA's definition of "small refinery." To review the relevant regulatory background, in 1977, Congress had defined "small refinery" in terms of capacity limits. A refinery, to qualify as "small," needed to have crude oil capacity of 50,000 bpd or less and could not be owned or controlled by a refiner with total crude oil capacity of 137,500 bpd or more. Clean Air Act § 211(g)(1)(B), 42 U.S.C. § 7545(g)(1)(B).

In August 1982, EPA proposed to redefine "small refinery" in terms of *production* limits. Under the proposal, a "small" refinery could not have produced more than 10,000 bpd during the most recent calendar quarter and could not be owned or controlled by a refiner with total production during the most recent calendar quarter of 70,000 bpd or more [hereinafter a "large refiner"]. 47 Fed.Reg. at 38,083–85. The agency also requested comments on means to ensure that the new definition would not permit small refineries to increase current production levels:

> The standard is not intended to allow small refineries to expand their production of leaded gasoline above their current levels, and thereby increase total emissions of lead into the environment. The Agency invites

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

comments on methods to assure that such a proliferation of leaded gasoline does not occur.

*Id.* at 38,085/3.

In October, EPA revised the definition of small refinery to include only refineries that had produced no more than 10,000 bpd during each calendar quarter since July 1, 1981 ("past production requirement") and were not owned or controlled since July 1, 1981 by a large refiner ("past ownership requirement"). The past production requirement, it explained, would prevent refineries that could produce more than 10,000 bpd from "backsliding"—reducing production to less than 10,000 bpd in order to qualify as "small" refineries. *Id.* at 49,325/2. The past ownership requirement, EPA explained, would prevent a large refiner that owns a small refinery from selling the small refinery so that the newly independent small refiner could use more lead. *Id.* at 49,325–26.

SRTF claims that EPA did not give adequate notice of the past production requirement and Simmons claims that EPA did not give adequate notice of the past ownership requirement.

### A. The Standard for Adequate Notice

**[22]** EPA undoubtedly has authority to promulgate a final rule that differs in some particulars from its proposed rule. As we noted in *International Harvester Co. v. Ruckelshaus, 478 F.2d 615, 632 n. 51 (D.C.Cir.1973),* "[a] contrary rule would lead to the absurdity that ... the agency can learn **\*547  \*\*242** from the comments on its proposals only at the peril of starting a new procedural round of commentary." However, if the final rule deviates too sharply from the proposal, affected parties will be deprived of notice and an opportunity to respond to the proposal.

**[23]** Courts have devised various verbal formulas for the extent to which an agency can make changes in the final rule that were not clearly presaged by the notice of proposed rulemaking. This court has held, both under the APA and under Clean Air Act § 307(d), that the final rule must be a "logical outgrowth" of the proposed rule. *Sierra Club v. Costle, 657 F.2d at 352 (Clean Air Act); United Steelworkers v. Marshall, 647 F.2d at 1221 (APA); accord BASF Wyandotte Corp. v. Costle, 598 F.2d 637, 642 (1st Cir.1979)* (APA), *cert. denied, 444 U.S. 1096, 100 S.Ct. 1063,*

*62 L.Ed.2d 784 (1980); Taylor Diving & Salvage Co. v. United States Department of Labor, 599 F.2d 622, 626 (5th Cir.1979)* (APA). [110] The Third Circuit has phrased the test as whether the agency's notice would "fairly apprise interested persons of the 'subjects and issues' [of the rulemaking]." *American Iron & Steel Institute v. EPA, 568 F.2d 284, 293 (3d Cir.1977); accord Consolidation Coal Co. v. Costle, 604 F.2d 239, 248 (4th Cir.1979), rev'd on other grounds sub nom. EPA v. National Crushed Stone Association, 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980).*

These general formulas, however, more rephrase than answer the underlying question of how much notice is enough. In any particular case, the answer to that question must turn on how well the notice that the agency gave serves the policies underlying the notice requirement. Notice, as we see it, serves three distinct purposes.

First, notice improves the quality of agency rulemaking by ensuring that agency regulations will be "tested by exposure to diverse public comment." *BASF Wyandotte Corp., 598 F.2d at 641.* Second, notice and the opportunity to be heard are an essential component of "fairness to affected parties." *National Association of Home Health Agencies v. Schweiker, 690 F.2d 932, 949 (D.C.Cir.1982).* Third, by giving affected parties an opportunity to develop evidence in the record to support their objections to a rule, notice enhances the quality of judicial review. *See Marathon Oil Co. v. EPA, 564 F.2d 1253, 1271 n. 54 (9th Cir.1977)* ("Such comment is often an invaluable source of information to a reviewing court attempting to evaluate complex statistical and technological decisions.").

Against these values, we must balance the public interest in expedition and finality. The notice requirement should not force an agency endlessly to repropose a rule because of minor changes, nor should a court vacate and remand an otherwise reasonable rule because of a minor procedural flaw. With these competing policies in mind, we turn to the particular notice problems posed by the past production and past ownership requirements.

### B. Past Production Requirement

**[24]** The basic concern that EPA expressed in its August notice was that the new definition—framed in terms of production limits rather than capacity limits—might contain

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

loopholes that would allow small refiners to increase lead use over current levels. EPA's request for comments on how to prevent increases in lead use, on its face, was directed primarily at production increases by already qualifying small refineries rather than increases in the number of refineries that qualify as "small." But we think that, in context, EPA's request can fairly be read also to encompass loopholes that would permit refineries to alter production in order to qualify as small. In response, numerous commenters noted a loophole of the latter sort—refiners that produced slightly more than 10,000 bpd would find it profitable to cut production to just under 10,000 bpd to take advantage of **\*548** **\*\*243** a dual standard. [111] EPA responded by adding the past production requirement to the definition of "small refinery."

We think that SRTF received adequate notice of the past production requirement. It is true that the proposal did not list specific "loopholes" that EPA might try to close. Without any specific indication of what changes EPA might try to make, commenters were hampered in effectively opposing those changes. *See* Home Box Office, Inc. v. FCC, 567 F.2d 9, 36 (D.C.Cir.) (agency must "make its views known to the public in a concrete and focused form so as to make criticism or formulation of alternatives possible"), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). This shortcoming is especially important in light of Congress' intent, expressed in § 307(d), that EPA provide a detailed proposal for interested parties to focus their comments on. [112]

Nevertheless, we think SRTF was on adequate notice of the past production requirement, for two independent reasons. First, SRTF was aware generally that EPA was seeking to identify and close as-yet-undefined loopholes that might affect SRTF's members. We think SRTF was therefore obliged to take reasonable steps—a letter of inquiry to EPA ought to have sufficed—to keep informed of EPA's thinking on this matter. Had SRTF done so, EPA presumably would have informed it that other commenters had proposed a past production requirement. [113]

Second, SRTF was almost surely *in fact* aware that United Refining Co. and others had proposed a past production requirement. SRTF's attorney attended the public hearing and thus presumably heard United propose the requirement at the hearing. Also, SRTF was closely involved in the entire rulemaking, was monitoring the docket, and responded to other information entered in the docket to which it objected. [114]

C. *Past Ownership Requirement*

[25]   We are unable, however, to find adequate notice of the past ownership requirement. The requirement derives from a single comment, by Asamera Oil, noting that large refiners might sell small refining facilities to permit the small facilities to qualify for a higher lead standard, and that two large refiners had recently sold small facilities. [115] EPA responded by adding the past ownership requirement. *Id.* at 49,325–26.

1. *Notice from EPA*

In contrast to the past production requirement, the past ownership requirement does not close a loophole created by EPA's switch from capacity limits to production limits. Large refiners would have the same opportunity to sell small facilities either way. The rule, seen with the benefit of hindsight, makes some sense because it closes a loophole of sorts. But the test, imperfectly **\*549** **\*\*244** captured in the phrase "logical outgrowth," is whether Simmons, *ex ante,* should have anticipated that such a requirement might be imposed. We think not. The connection between EPA's request for comments and the past ownership requirement is simply too tenuous.

[26]   EPA also argues that it gave general notice that it might make unspecified changes in the definition of small refinery. This purported notice, however, is too general to be adequate. Agency notice must describe the range of alternatives being considered with reasonable specificity. Otherwise, interested parties will not know what to comment on, and notice will not lead to better-informed agency decisionmaking. *See* Home Box Office, 567 F.2d at 36 (quoted in subsection B *supra* );

Rodway v. United States Department of Agriculture, 514 F.2d 809, 814 (D.C.Cir.1975) (general reference to changes in food stamp program is inadequate notice of particular change); S.Rep. No. 752, 79th Cong., 1st Sess. 14 (1945), *reprinted in* Senate Judiciary Committee, *Administrative Procedure Act: Legislative History* 187, 200 (Comm. Print 1946) ("*APA Legislative History* ") (notice must "fairly apprise interested persons of the issues involved"). [116]

This is doubly true under Clean Air Act § 307(d)(3), which requires EPA to issue a specific "proposed rule" as a focus for comments. We note that the requirement of "reasonable specificity" merely holds EPA to the same standard that private parties must meet in objecting to a rule. *See* §

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1114 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

307(d)(7)(B), 42 U.S.C. § 7607(d)(7)(B) (parties must raise objections to a rule "with reasonable specificity during the period for public comment").

### 2. *Actual Notice*

**[27]**  EPA also points out that *Platt's Oil Marketing Bulletin* discussed Asamera's comment and argues that this source put Simmons on actual notice of the past ownership requirement.[117] Our cases recognize that even if the agency has not given notice in the statutorily prescribed fashion, actual notice will render the error harmless. *See, e.g.,* Sierra Club v. Costle, 657 F.2d at 355, 360, 398–99; *cf.* 5 U.S.C. § 552(a) ("Except to the extent that a person has actual and timely notice ... thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published."). Here, however, EPA proffers no proof that Simmons had actual notice, only speculation. Simmons denies receiving actual notice,[118] and we have no basis for doubting its denial.

### 3. *Notice by Others*

**[28]**  EPA also argues that Simmons was under a duty to monitor the docket and that if it had done so, it would have seen Asamera's comment and realized that it ought to respond. We disagree. As a general rule, EPA must *itself* provide notice of a regulatory proposal. Having failed to do so, it cannot bootstrap notice from a comment.

The APA does not require comments to be entered on a public docket. Thus, notice necessarily must come—if at all —from the agency. *See* S.Rep. No. 752, *supra,* at 14, *APA Legislative History* at 200 ("*Agency* notice must be sufficient to fairly apprise interested parties of the issues involved ....") (emphasis added); *cf.* Wagner Electric Corp. v. Volpe, 466 F.2d 1013, 1019 (3d Cir.1972) (that some "knowledgeable manufacturers" responded to an inadequate notice **\*550 \*\*245** with comments relating to the final rule "is not relevant. Others [were] possibly not so knowledgeable ....").

We see no warrant for applying a different rule under Clean Air Act § 307(d) merely because § 307(d) provides for a public record. Section 307(d), like the APA, is phrased in terms of the notice that the *agency* must give. Congress established a clearly defined record to facilitate judicial review and to enhance agency decisionmaking. *See* Sierra

Club v. Costle, 657 F.2d at 392–95; Pedersen, *Formal Records and Informal Rulemaking,* 85 Yale L.J. 38, 70–74 (1975). Nothing in the text or legislative history of the statute hints that Congress intended to require private parties to scrutinize the record for notice of issues that the agency did not raise itself.

On the contrary, the additional notice requirements in § 307(d)(3) suggest that Congress intended agency notice under the Clean Air Act to be more, not less, extensive than under the APA. The legislative history supports this view. *See, e.g.,* H.R.Rep. at 319, 4 *Leg.Hist.* 2786, 1977 U.S.Code Cong. & Ad.News at 1398 (the new procedures will "insure an effective opportunity for public participation in the rulemaking process"); 123 Cong.Rec. 27,075 (1977), 3 *Leg.Hist.* 333 (statement of Rep. Broyhill) (the new procedures "will assure the opportunity for more extensive public participation in the rulemaking process").

Finally, EPA's construction would ill-serve the purposes behind the notice requirement. It would turn notice into an elaborate treasure hunt, in which interested parties, assisted by high-priced guides (called "lawyers"), must search the record for the buried treasure of a possibly relevant comment. Inevitably, many parties will not attempt this costly search and many others will fail in their search. The agency will not get the informed feedback it needs, the parties will feel unfairly treated, and there will be a meager record for us to review.

This case well illustrates these problems. Simmons, a small Montana refiner, would have had to hire Washington counsel to read over 1100 written comments in search of two relevant pages tucked away in the middle of a single comment, on an issue that EPA gave no notice of. Unsurprisingly, Simmons failed to notice or to rebut Asamera's comment.

Had Simmons been on notice that EPA was considering a past ownership requirement, it could have advanced several arguments against the requirement. First, Simmons could have argued that large refiners would not sell small facilities merely to take advantage of the short period remaining until July 1, 1983, after which small refiners must meet the same lead standard as large refiners. Simmons might also have argued that February 22, 1982, the date when EPA initially proposed relaxing the lead-content limits for small refiners, was a better cut-off date than July 1, 1981, because there was no incentive for large refiners to sell small facilities prior to the February proposal.

On a factual level, Simmons could have noted that it bought its refinery on January 4, 1982, at a time when it expected to have to meet a uniform 0.5 gpg standard beginning on October 1, 1982. It could also have pointed out that it was the *only* small refinery to have been sold by a large refiner (EPA incorrectly thought there were two [119]).

We do not know, of course, how EPA would have responded to these comments. But whether or not notice would have led to a different rule, it would have permitted EPA to get its facts straight. It also would have forced EPA to focus on key issue—the choice of cutoff date—on which the notice of final rulemaking is conspicuously silent.

**\*551   \*\*246** 4. *The July 1, 1981 Cutoff Date*

[29]    EPA's silence on why it chose July 1, 1981 as a cutoff date provides an independent reason for vacating the past ownership requirement. A rule without a stated reason is necessarily arbitrary and capricious. *See, e.g.,*

*Action on Smoking & Health v. CAB,* 699 F.2d 1209, 1219 (D.C.Cir.1983) (remanding for further proceedings "the three proposals ... that the Board disposed of without reasons"); *State Farm Mutual Automobile Insurance Co. v. Department of Transportation,* 680 F.2d 206, 231 (D.C.Cir.) ("There must be *some* reason to support *any* reasoned decision.") (emphasis in original), *cert. granted,* 459 U.S. 987, 103 S.Ct. 340, 74 L.Ed.2d 382 (1982). Agency counsel's attempted explanation, of course, comes too late.

5. *Conclusion*

For the foregoing reasons, we vacate the requirement in 40 C.F.R. § 80.2(p)(3) that a refinery, to qualify as "small," must not have been owned or controlled during any period since July 1, 1981 by a large refiner. We leave in force the remainder of § 80.2(p)(3), which requires that a small refinery not be currently owned or controlled by a large refiner.

D. *Our Power to Issue a Stay*

[30]    We stayed EPA's enforcement of the past ownership requirement over EPA's objection that we had no power to do so. Therefore, a brief explanation of why we think we had this power is appropriate.

EPA relies on Clean Air Act § 211(f)(5), 42 U.S.C. § 7545(f)(5), which states (emphasis added): "No action of

the Administrator under this *section* may be stayed by any court pending judicial review of such action." Our review of the legislative history, however, convinces us that Congress meant to preclude judicial stays only under *subsection* 211(f) (governing "new fuels and fuel additives"), and did not prohibit a judicial stay of regulations issued under other parts of § 211.

Subsection 211(f), including the no-stay provision, was not part of the 1970 version of the Clean Air Act, but was added by § 222 of the 1977 amendments. [120] The subsection derives entirely from the Senate bill; the House had no comparable provision. In brief, the Senate wanted to prohibit all new fuel additives, but also permitted EPA to waive the prohibition if certain conditions were met. Significantly, the Senate bill did not prohibit judicial stays. [121]

The no-stay provision in subsection (f)(5) was added in conference. The Conference Report gives no hint that this provision applies to anything except the particular amendment—concerning new fuel additives—that Congress was considering. The Committee explained:

> The House concurs in the Senate amendment [§ 211(f) ] with the following amendments: .... (5) no action of the Administrator shall be stayed by any court pending judicial review of such action.

Conf.Rep. at 161, 3 *Leg.Hist.* 541, 1977 U.S.Code Cong. & Ad.News at 1541–42. Significantly, this explanation omits the key words "under this section" contained in the actual amendment.

The House, in post-Conference debate, made no reference to § 211(f) at all. In the Senate, Senator Muskie explained § 211(f), but did not refer to the no-stay provision in § 211(f)(5). Rather, his remarks were narrowly focused on new fuel additives:

> The conference adopted an amendment to deal with the problem of the fuel additive MMT which will effectively deal with this situation .... [EPA] has been given broad authority

Case 3:20-cv-07721-SI Document 58-5 Filed 11/10/20 Page 1116 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

to prohibit the use of an additive
expeditiously between the period
6 months after enactment until
September 15, 1978.

123 Cong.Rec. 26,849 (1977), 3 *Leg.Hist.* 362. [122]

**\*552  \*\*247**  In short, the legislative history gives no hint
that Congress meant to prohibit judicial stays under all of §
211. Had Congress so intended, we think some explanation
would have been forthcoming. We also do not know why
Congress prohibited stays under § 211(f), but a plausible
reason, suggested by Senator Muskie's comments, would be
to ensure that the Administrator could move quickly to ban
new fuel additives without the risk that manufacturers of such
additives could obtain a judicial stay of the ban.

In light of this history, we hold that § 211(f)(5) prohibits only
judicial stays of agency action under § 211(f). The broader
phrasing of § 211(f)(5)—"under this section"—we take to be
a product of rushed drafting in conference. [123]

## VII. CONCLUSION

EPA's final 1.10 gplg gasoline lead standard is *affirmed,* as
is the past production requirement in the definition of "small
refinery." EPA's interim 1.90 gplg standard is *vacated* for
lack of notice and lack of record evidence that a market for
lead credits will develop virtually overnight. We also *vacate*
the past ownership requirement in the definition of "small
refinery" for lack of notice and lack of an explanation for the
July 1, 1981 cutoff date.

## APPENDIX I

## ORDER

Nos. 82–2282, 82–2283, 82–2308, 82–2395, 82–2521

Order issued January 26, 1983.

Before WILKEY, WALD and MIKVA, Circuit Judges.

Order PER CURIAM.

PER CURIAM:

Petitioners Small Refiner Lead Phase-Down Task Force
(SRTF), Plateau, Inc., and Simmons Oil Co. challenge various
aspects of an EPA regulation that sets lead-content limits
for leaded gasoline produced by certain "small" refiners. 47
Fed.Reg. 49,322 (Oct. 29, 1982) (to be codified at 40
C.F.R. §§ 80.2, .4, .7, .20). In brief, the new rule
narrows EPA's previous definition of "small refinery" and
requires small refiners to meet an interim standard of no more
than 1.90 grams of lead per gallon of leaded gasoline (gplg)
as of November 1, 1982, and a final standard of no more
than 1.10 gplg as of July 1, 1983. (The rule also requires
large refiners to meet the more stringent 1.10 gplg standard
beginning November 1, 1982, but no large refiners have
challenged this standard.) Because our disposition of the case
makes speed of the essence, we are issuing an order today,
with a full opinion explaining our rationale to follow shortly.

With two exceptions, we uphold the regulation in its entirety
as within EPA's statutory authority, not arbitrary, capricious,
or an abuse of discretion, and not procedurally flawed. First,
we vacate the interim 1.90 gplg standard because EPA did
not give adequate notice that it might immediately require
small refiners to significantly reduce lead use. Clean Air
Act § 307(d)(3), 42 U.S.C. § 7607(d)(3); *see United
Steelworkers **\*553  \*\*248** v. Marshall,* 647 F.2d 1189, 1221
(D.C.Cir.1980) (final rule must be a " 'logical outgrowth'
of the rulemaking proceeding") (quoting *South Terminal
Corp. v. EPA,* 504 F.2d 646, 659 (1st Cir.1974)), *cert. denied,*
453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981);
*Weyerhaeuser Co. v. Costle,* 590 F.2d 1011, 1028–31
(D.C.Cir.1978). To the contrary, throughout the eight-month
rulemaking period, EPA had assured small refiners that its
final rule "will take into account the lead time required
for construction of any processing equipment needed for
compliance." Notice of Proposed Rulemaking, 47 Fed.Reg.
7814 (Feb. 22, 1982); *see also* Final Notice of Rulemaking,
47 Fed.Reg. 38,090, 38,091 (Aug. 27, 1982) (suspending
effective date of small refiner standard for 30 days "to defer
the necessity for small refineries to decide whether to make
the substantial capital expenditures required to meet a more
stringent lead standard during the time that the Agency is still
considering amendments to the lead phasedown program").

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1117 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

In addition, EPA's conclusion that the interim standard is feasible relies heavily on a new and untested scheme for inter-refinery trading of lead credits. *See* 47 Fed.Reg. at 49,324, col. 2. EPA assumed both that a market for lead credits would develop and that it would develop swiftly enough to permit small refiners to meet the interim standard by purchasing lead credits. EPA's belief that a market for lead credits will eventually develop is reasonable and is supported by the record. However, given the paucity of evidence in the record to support EPA's belief that a lead credit market will develop fast enough and extensively enough to materially assist the small refiners in meeting the 1.90 gpgl interim standard, EPA was not warranted in factoring such a scheme into its decision to impose that standard.

Second, we defer decision on Simmons' challenge to the historic ownership requirement in 40 C.F.R. § 80.2(p)(3) pending receipt of briefs on the issue by Simmons and EPA. Our stay of the historic ownership requirement contained in that section remains in effect. We reject EPA's argument that § 211(f)(5) of the Clean Air Act, 42 U.S.C. § 7545(f)(5), prohibits a stay. Our review of the legislative history of that section convinces us that it applies only to actions of the EPA Administrator under § 211(f), and does not prohibit a judicial stay of regulations promulgated under other parts of § 211.

In light of the foregoing, we vacate so much of 40 C.F.R. § 80.20(b)(1)(i) as requires small refineries to limit the lead content of leaded gasoline to 1.90 grams per gallon for gasoline production not exceeding the refinery's historic production level. We leave in force the requirement in § 80.20(b)(1)(i) that production of leaded gasoline "in excess of the historic production level may not exceed 1.10 grams per gallon."

When an agency replaces an existing regulation with a new regulation, and we vacate all or part of the new regulation, we must decide whether the agency's prior regulation continues in effect or whether our action leaves no regulation in effect. *Compare* Natural Resources Defense Council, Inc. v. Gorsuch, 685 F.2d 718, 728 (D.C.Cir.1982) (implicitly assuming that EPA will return to its previous regulation defining "source" under the Clean Air Act) *with* Burlington Northern, Inc. v. United States, 459 U.S. 131, 103 S.Ct. 514, 74 L.Ed.2d 311 (1982) (Court of Appeals lacks power to reinstate old ICC rate after invalidating revised rate).

In this case, returning to the old standard would be irrational, because the 0.5 grams per gallon (gpg) standard for small refiners (which would have become effective on November 1, 1982) is stricter than both the invalidated 1.90 gpgl interim standard and the 1.10 gpgl final standard. We therefore vacate only the interim standard and not EPA's conclusion that the old standard should be replaced. *See* Burlington Northern, 103 S.Ct. at 522 n. 9 (Court of Appeals should have vacated "only the Commission's new rate calculation and not **554 **249 the Commission's conclusion that the [previous] rate was too low").

Our decision leaves EPA without a regulatory limit on small refinery lead use for production of leaded gasoline not exceeding the refinery's historic production level. The unexpected nature of this regulatory vacuum, plus the public health danger posed by unrestricted lead use and the absence of any unfairness to small refiners in such a course of action, would justify EPA in immediately promulgating a temporary lead-content regulation which does not require small refiners to reduce lead use to a level significantly below previous lead-use levels. *See* 5 U.S.C. §§ 553(b)(B) (agency may for "good cause" issue rules without notice or public procedure) (made applicable to Clean Air Act by 42 U.S.C. § 7607(d)(1) (last sentence)), 553(d)(3) ("good cause" exception to 30-day period between publication of a rule and the rule's effective date); American Federation of Government Employees v. Block, 655 F.2d 1153, 1156 (D.C.Cir.1981) (these exceptions to the § 553 procedures permit an agency to issue temporary rules in "emergency situations"). It is for EPA, not for the courts, to decide if an interim standard is needed and what that standard should be. *Cf. Burlington Northern, supra* (Court of Appeals lacks power to set railroad rates). We will delay issuing the mandate in this case until Wednesday, February 2, 1983 to give EPA an opportunity to promulgate such an emergency rule. [1]

APPENDIX II

ORDER

No. 82–2521

Order issued February 9, 1983.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1118 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

Before WILKEY, WALD and MIKVA, Circuit Judges.

**Opinion**

Order PER CURIAM.

PER CURIAM:

Petitioner Simmons Oil Co. challenges one aspect of an EPA regulation that sets lead-content limits for gasoline produced by certain "small" refiners. 47 Fed.Reg. 49,322 (Oct. 29, 1982) (to be codified at 40 C.F.R. §§ 80.2, .4, .7, .20). In relevant part, the new rule defines "small refinery" to include only refiners that are not and *were not* "during any period of ownership or control since July 1, 1981" owned or controlled by a refiner with total gasoline production greater than 70,000 barrels per day (bpd). *Id.* at 49,332 (to be codified at 40 C.F.R. § 80.2(p)(3)). Simmons, a small refiner that was owned by a large refiner until January 4, 1982, challenges this past ownership requirement as having been promulgated without adequate notice and as arbitrary and capricious.

On January 12, 1983, we stayed the past ownership requirement pending decision on the merits. Our disposition of the case makes speed of the essence; the practical effect of our decision expires on July 1, 1983, after which small refiners must meet the same lead-content standard as large refiners. We are therefore issuing an order today, with a full opinion explaining our rationale to follow shortly. We now lift the stay but vacate the past ownership requirement because EPA did not give adequate notice that it might impose such a requirement.

Previous regulations had used capacity limits to define "small refinery" and had a *current* ownership requirement —a refinery could qualify as small only if it (1) had crude oil capacity of 50,000 bpd or less and (2) was not owned or controlled by a refiner with crude oil capacity greater than 137,500 bpd [hereinafter called a "large refiner"]. 40 C.F.R. § 80.2(p) (1982). In August, 1982, EPA issued a proposed rule in which it switched from capacity limits to production limits. *See* 47 Fed.Reg. 38,078, 38,084 (Aug. 27, 1982) (explaining the proposed change). **\*555  \*\*250** Under the proposed rule, a refinery, to qualify as "small," had to (1) have average gasoline production of 10,000 bpd or less during the most recent calendar quarter and (2) not be owned or controlled by a refiner with average gasoline

production greater than 70,000 bpd during the most recent calendar quarter. *Id.* at 38,088 (proposed to be codified at 40 C.F.R. § 80.2(p)(2)–(3)). The proposal did not alter the current ownership requirement except to the extent that it redefined "large refiner."

EPA received some 400 written comments on various aspects of the proposed lead-content rule. One commenter, Asamera Oil, suggested that under the current ownership requirement, there was an incentive for large refiners to sell small facilities to take advantage of the less stringent lead-content limits applicable to small refiners. Asamera Oil (U.S.), Inc. Comments, Sept. 22, 1982, at 11–13, J.A. at 381, 392–94.[1] EPA was persuaded by Asamera's comment and therefore added the past ownership requirement to which Simmons now objects. *See* 47 Fed.Reg. at 49,325–26. The change affects Simmons and perhaps one other refiner.

EPA presents two arguments why Simmons was on notice of this change. First, EPA points out that its Notice of Proposed Rulemaking solicited comments on methods to assure that the change from capacity limits to production limits would not permit small refiners "to expand their production of leaded gasoline." *Id.* at 38,085. This request for comments, EPA suggests, should have put Simmons on notice that the ownership criterion might be revised. In our view, however, the change from a current ownership requirement to a past ownership requirement was not a "logical outgrowth" of EPA's invitation for comments on loopholes created by the change from capacity limits to production limits. *See United Steelworkers v. Marshall,* 647 F.2d 1189, 1221 (D.C.Cir.1980) (final rule must be a " 'logical outgrowth' of the rulemaking proceeding") (quoting *South Terminal Corp. v. EPA,* 504 F.2d 646, 659 (1st Cir.1974)), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981); *Weyerhaeuser Co. v. Castle,* 590 F.2d 1011, 1028–31 (D.C.Cir.1978).

EPA also argues that Asamera's comment was sufficient to put Simmons on notice that it ought to submit comments opposing the past ownership requirement. We disagree. Under Clean Air Act § 307(d), no less than under the Administrative Procedure Act, the agency *itself* must provide fair notice of what it plans to do. Having failed to do this, EPA cannot bootstrap notice from a comment. *See* S.Rep. No. 752, 79th Cong., 1st Sess. 14 (1946) ("*Agency* notice must be sufficient to fairly apprise interested parties of the issues involved, so

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1119 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

that they may present responsive data or arguments relating thereto.") (emphasis added); *cf.* *Wagner Electric Corp. v. Volpe,* 466 F.2d 1013, 1019 (3d Cir.1972) (that some "knowledgeable manufacturers" responded to an inadequate notice with comments relating to the final rule "is not relevant. Others [were] possibly not so knowledgeable ....").

Had it received comments from Simmons on this issue, EPA might well have concluded that the change from a current ownership requirement to a past ownership requirement was not needed in light of the temporary nature of the small refiner exemption. Alternatively, Simmons might have persuaded EPA that the July 1, 1981 cutoff date (which EPA did not explain) should have been changed—perhaps to February 22, 1982, the date when EPA initially proposed relaxing lead-content limits for small refiners. Thus, there is a "substantial likelihood that the rule would have been significantly changed" had EPA given proper notice. Clean Air Act § 307(d)(8), **\*556** **\*\*251** 42 U.S.C. § 7607(d)(8) (standard for invalidating a rule on procedural grounds).

In light of the foregoing, we vacate the requirement in 40 C.F.R. § 80.2(p)(3) that a refinery, to qualify as "small," must not have been owned or controlled during any period since July 1, 1981 by a refiner with total gasoline production greater than 70,000 bpd. We leave in force that portion of § 80.2(p)(3) which requires that a small refinery not be currently owned or controlled by a large refiner. EPA remains free, of course, to institute expedited rulemaking with a view toward possibly repromulgating a new regulation to replace the vacated portion of § 80.2(p)(3).

The mandate will issue immediately.

### All Citations

705 F.2d 506, 18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201, 13 Envtl. L. Rep. 20,390, 13 Envtl. L. Rep. 20,391, 13 Envtl. L. Rep. 20,490

---

## Footnotes

1   Notes 46–65, 78–79 *infra* and accompanying texts discuss the health hazards posed by gasoline lead.

2   38 Fed.Reg. 33,734, 33,741 (1973) (codified at 40 C.F.R. § 80.20(a)(1) (1976)).

3   For example, if a refiner produces 50% unleaded gasoline, it can use as much as 1.0 grams per leaded gallon (gplg) and still comply with a 0.5 gpg standard.

4   38 Fed.Reg. at 33,74 $^0$/$_2$; *see* 40 C.F.R. § 80.20(b) (1976). (In citing to the *Federal Register,* we use the notation "33,74 $^0$/$_2$" as shorthand for page 33,740, col. 2.)

5   44 Fed.Reg. 53,144 (1979) (codified at 40 C.F.R. § 80.20(a)(6) (1980)).

6   Clean Air Act Amendments of 1977, Pub.L. No. 95–95, § 223, 91 Stat. 685, 764 (codified at Clean Air Act § 211(g), 42 U.S.C. § 7545(g)).

7   44 Fed.Reg. 46,275 (1979) (codified at 40 C.F.R. § 80.20(a)(5), (b) (1982)).

8   43 Fed.Reg. 46,246 (1978) (codified at 40 C.F.R. § 50.12 (1982)). Clean Air Act § 109, 42 U.S.C. § 7409, directs EPA to issue "primary" and "secondary" ambient air quality standards for "criteria" pollutants identified under § 108(a), 42 U.S.C. § 7408(a). For lead, EPA established 1.5 ug/m $^3$ as both the primary and the secondary ambient air quality standard.

9   Six months earlier, Vice President Bush had listed the lead content regulation as one of 30 regulations that would be subject to "in-depth agency reconsideration" and possible regulatory relief. Remarks of Vice President George Bush at the Presidential Task Force on Regulatory Relief Briefing 1 (Aug. 12, 1981), *reprinted in* Joint Appendix ("J.A.") at 1555, 1555.

10  *See* Notice of Final Rulemaking, 47 Fed.Reg. 49,322, 49,329 (Oct. 29, 1982).

Small Refiners Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

11    Our earlier order had deferred decision on this issue pending receipt of briefs from the parties. Simmons had
      filed its petition for review much later than SRTF and Plateau, and was therefore on a later briefing schedule.

12    When *Ethyl Corp.* was decided, § 211 required EPA to find that a fuel additive "will endanger" the public
      health or welfare. We held that this language did not require EPA to prove actual harm to health or welfare—
      a "significant risk" of harm was enough. 541 F.2d at 12. Congress subsequently reworded this standard—
      to "may reasonably be anticipated to endanger"—with the specific purpose of endorsing the *Ethyl* decision.
      *See* H.R.Rep. No. 294, 95th Cong., 1st Sess. 43–51 (1977) [hereinafter cited as H.R.Rep.], *reprinted in* 4
      Environmental Policy Division, Congressional Research Service, *A Legislative History of the Clean Air Act
      Amendments of 1977,* at 2468, 2510–18 (Comm.Print 1978) [hereinafter cited as *Leg.Hist.* ], *and in* 1977
      U.S.Code Cong. & Ad.News 1077, 1121–29.

13    SRTF Brief at 53–59; SRTF Reply Brief at 41–48.

14    *See also* 42 U.S.C. § 7521(f)(3) (before issuing high-altitude motor vehicle regulations, "the Administrator
      *shall consider and make a finding* with respect to [economic impact, technological feasibility, and expected
      air quality improvement]") (emphasis added); *cf. id.* § 7408(a)(2) ("Air quality criteria for an air pollutant *shall
      accurately reflect* the latest scientific knowledge....") (emphasis added).

15    Both in the original passage of the Clean Air Act in 1970 and the 1977 amendments, Congress rejected
      a proposal to require EPA to make "findings" before regulating fuel additives under § 211 generally. *See
      Ethyl Corp., 541 F.2d at 21–24* (reviewing legislative history of 1970 Act); H.R.Rep., *supra* note 12, at
      51, 4 *Leg.Hist.* 2518, 1977 U.S.Code Cong. & Ad.News at 1129 (in considering the 1977 amendments, "the
      committee expressly rejected an amendment which would have ... required a finding by the Administrator").
      Thus, it is most unlikely that Congress' failure to require findings under § 211(g)(2) (dealing specifically with
      small refiners) was inadvertent.

16    *See also, e.g.,* Federal Election Commission, 454 U.S. at 39, 102 S.Ct. at 46 (agency interpretation must
      be accepted if "sufficiently reasonable" even if it is not "the only reasonable one or even the reading the court
      would have reached" on its own); *EPA v. National Crushed Stone Ass'n, 449 U.S. 64, 83, 101 S.Ct. 295,
      306, 66 L.Ed.2d 268 (1980); National Wildlife Fed'n v. Gorsuch, 693 F.2d 156, 166–71 (D.C.Cir.1982).*

17    *Cf.* Weyerhaeuser Co. v. Costle, 590 F.2d 1011, 1046 (D.C.Cir.1978) (Clean Water Act § 304(b)(1)(B), 33
      U.S.C. § 1314(b)(1)(B), directs EPA to "consider" certain factors; this requires the agency only to " 'take into
      account' " those factors "without prescribing any structure for EPA's deliberations"); *BASF Wyandotte Corp.
      v. Costle,* 598 F.2d 637, 656 & n. 36 (1st Cir.1979) (construing same section of Clean Water Act in similar
      fashion), *cert. denied,* 444 U.S. 1096, 100 S.Ct. 1063, 62 L.Ed.2d 784 (1980).

18    We address in part IV *infra* the separate question whether EPA's decision to adopt a uniform 1.10 gplg
      standard was reasonable.

19    Section 109(b), 42 U.S.C. § 7409(b), directs EPA to issue both "primary" and "secondary" ambient air
      quality standards. The primary standard, contained in § 109(b)(1), is quoted in text. The secondary standard,
      prescribed in § 109(b)(2), is the level "requisite to protect the public welfare from any known or anticipated
      adverse effects associated with the ... pollutant."

20    The substantive standards are: § 111(a), 42 U.S.C. § 7411(a) ("degree of emission limitation ... achievable
      through application of the best technological system of continuous emission reduction which ... has been
      adequately demonstrated"); § 202(a)(3)(A)(i), 42 U.S.C. § 7521(a)(3)(A)(i) ("greatest degree of emission
      reduction achievable through the application of [available] technology").

21    *See* 42 U.S.C. §§ 1857c–3(a)(1)(A), 1857f–6c(c)(1)(A) (1976) (the previous codification of §§ 108(a)(1)(A)
      and 211(c)(1)(A)).

22    *See also* H.R.Rep. No. 564, 95th Cong., 1st Sess. 183 (1977), 3 *Leg.Hist.* 381, 563, 1977 U.S.Code Cong.
      & Ad.News 1502, 1564 [hereinafter cited as Conf.Rep.] (1977 amendments establish a "uniform standard of
      proof" for when EPA "could" regulate air pollutants).

23  *See id.;* H.R.Rep., *supra* note 12, at 49–50, 4 *Leg.Hist.* 2516–17, 1977 U.S.Code Cong. & Ad.News at 1127–28.

24  In this case, EPA issued nationally uniform lead-content standards, and petitioners do not challenge the agency's decision to do so. Thus, we have no occasion to decide whether or not § 211 *requires* EPA to issue uniform standards.

25  In adopting the "may reasonably be anticipated to endanger" standard, Congress specifically intended to "assure consideration of the cumulative impact of all sources of a pollutant," including food and water sources. H.R.Rep., *supra* note 12, at 49, 4 *Leg.Hist.* 2516, 1977 U.S.Code Cong. & Ad.News at 1127.

26  In light of this conclusion, we need not address the other premise on which SRTF's argument rests—that small refineries do not contribute to violations of the ambient air standard for lead. We note, however, that this premise is shaky as well, since at least some portion of small refiner output is consumed in urban areas. *See* notes 66–77 *infra* and accompanying text.

27  We express no view on whether the "proposed rule" must take any particular form, so long as it is specific enough to comply with § 307(d).

28  Clean Air Act § 307(d)(2), (3), (4)(B)(i), (6), 42 U.S.C. § 7607(d)(2), (3), (4)(B)(i), (6).

29  *Id.* § 307(d)(6)(C), (7)(A), 42 U.S.C. § 7607(d)(6)(C), (7)(A). For a more thorough review of the rulemaking record requirements of § 307(d), including a discussion of the legislative history, see *Sierra Club v. Costle,* 657 F.2d 298, 392–400 (D.C.Cir.1981).

There is one exception to the rule that the material in the docket becomes the record for judicial review. The docket must include drafts of proposed rules submitted by EPA to the Office of Management and Budget (OMB) for interagency review, any comments on the drafts by OMB or other agencies, and any written EPA responses. *Id.* § 307(d)(4)(B)(ii), 42 U.S.C. § 7607(d)(4)(B)(ii). This material is not, however, part of the record for judicial review. *See id.* § 307(d)(7)(A), 42 U.S.C. § 7607(d)(7)(A).

30  *See also* Conf.Rep., *supra* note 22, at 178, 3 *Leg.Hist.* 558, 1977 U.S.Code Cong. & Ad.News at 1559 ("to avoid misinterpretations or confusion regarding the intent underlying a change in the existing scope of review, it was the decision of the conferees to retain the 'arbitrary and capricious' scope of review").

31  *See also* 123 Cong.Rec. 27,075 (1977), 3 *Leg.Hist.* 333 (statement of Rep. Broyhill explaining Conference Committee version of § 307(d)) (similar to Conference Report).

32  One possible source of a practical distinction between the two tests under the APA is absent under § 307(d). A "basic requirement" for substantial evidence review under the APA is "a record that is to be the basis of agency action." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971); *see Ethyl Corp.,* 541 F.2d at 37 n. 79 (the "primary difference" is that " 'substantial evidence' review is limited to evidence developed in formal hearings"). Section 307(d), in contrast, combines "arbitrary and capricious" review with a well-defined record on which EPA must base its final rule.

33  *See* Leventhal, *Environmental Decisionmaking and the Role of the Courts,* 122 U.Pa.L.Rev. 509, 514 (1974) ("The court does not make the ultimate decision, but it insists that the agency take a 'hard look' at all relevant factors."). For a review of the development of the phrase "hard look review," see *National Lime Ass'n v. EPA,* 627 F.2d 416, 451 n. 126 (D.C.Cir.1980). See *id.* at 452–53 & nn. 128–38 for a survey of the strictures that such review imposes on agencies.

In enacting § 307(d), Congress specifically approved this "hard look" review. *See* Conf.Rep., *supra* note 22, at 178, 3 *Leg.Hist.* 558, 1977 U.S.Code Cong. & Ad.News at 1559 ("[T]he conferees intend that the courts continue their thorough, comprehensive review which has characterized judicial proceedings under the Clean Air Act thus far."); H.R.Rep., *supra* note 12, at 323, 4 *Leg.Hist.* 2790, 1977 U.S.Code Cong. & Ad.News at 1402 (endorsing the judicial practice of "engaging in searching review without substituting their judgment for that of the Administrator").

34  In addition, all objections to an EPA rule, whether substantive or procedural, must be "raised with reasonable specificity during the period for public comment ... [unless] it was impracticable to raise such objection within

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1122 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

such time." Clean Air Act § 307(d)(7)(B), 42 U.S.C. § 7607(d)(7)(B); *see* Lead Industries Association, 647 F.2d at 1173 (§ 307(d)(7)(B) "applies to *all* objections") (emphasis in original).

35    The Conference Committee's consideration of § 307(d) was apparently rushed. Its report includes two paragraphs explaining a change in § 307(d)(3)(C) (from "policy considerations" to "policy options") that was never made. *See* Conf.Rep., *supra* note 22, at 178, 3 *Leg.Hist.* 558, 1977 U.S.Code Cong. & Ad.News at 1558–59. The 84 technical amendments to the Clean Air Act contained in § 14(a) of the Safe Drinking Water Amendments of 1977, Pub.L. No. 95–190, 91 Stat. 1393, 1399–1405, are further evidence of the Committee's haste.

36    *See also* American Petroleum Inst. v. Costle, 665 F.2d 1176, 1187 (D.C.Cir.1981) (quoting this statement from *Sierra Club* ), *cert. denied,* 455 U.S. 1034, 102 S.Ct. 1737, 72 L.Ed.2d 152 (1982).

37    EPA discussed the health effects of lead exposure at length in its August notice of proposed rulemaking. *See* 47 Fed.Reg. at 38,071–77. The notice of final rulemaking reaffirms the tentative findings in the notice of proposed rulemaking but does not repeat the analysis of health effects. *Id.* at 49,33 0/1. Our discussion therefore relies heavily on the notice of proposed rulemaking.

38    Environmental Protection Agency, *Supplemental Responses to Comments on the February 22, 1982, and August 27, 1982, Proposals to Amend the Gasoline Lead Content Regulations* III–1 to –2 (Oct. 29, 1982), J.A. at 1319, 1329–30 [hereinafter cited as *Supplemental Response to Comments* ].

39    EPA estimates that total industry use of lead in 1990 would be 16.2 billion grams under a uniform 1.10 gplg standard. 47 Fed.Reg. at 49,32 9. Current leaded gasoline production by small refiners is 2.714 billion gallons per year, *id.* at 49,32 7/3, and a 2.50 gplg standard implies that small refiners can use an *additional* 1.40 gplg. Thus, if small refinery production remains constant, the 2.50 gplg standard implies *additional* annual use of as much as 2.714 billion gallons x 1.40 gplg = 3.8 billion grams, and total industry use of 20.0 billion grams. *Total* small refiner use could be as much as 2.714 billion gallons x 2.50 gplg = 6.8 billion grams of lead per year, or 34% of the total industry use of 20 billion grams.

   EPA noted the increasing market share of small refiners as a problem in *Supplemental Response to Comments, supra* note 38, at III–4, J.A. at 1332 (under a dual standard, small refiners "would contribute a larger and larger part of total automotive lead emissions").

40    EPA did not state this conclusion explicitly, but it is implicit in, *e.g.,* EPA's discussion of the need for an 8-month delay before the final standard takes effect, 47 Fed.Reg. at 49,32 4/2, and its reference to "the scope and profitability of small refinery operations," *id.* at 49,32 4/3. *See also Supplemental Response to Comments, supra* note 38, at III–5, J.A. at 1333 ("The Agency has attempted to reach its environmental goal without ... undue cost, but reduction of lead ... must be the driving consideration.").

41    Part IV.D *infra* discusses the Regulatory Flexibility Act in more detail.

42    In Ethyl Corp., 541 F.2d at 54 n. 124, we questioned, without giving reasons and without deciding the matter, whether EPA "is allowed to consider at all the economic effects of [fuel additive] regulations." *But see* Union Elec. Co. v. EPA, 427 U.S. 246, 257 n. 5, 96 S.Ct. 2518, 2525 n. 5, 49 L.Ed.2d 474 (1976) (dictum) (§ 211(c)(2)(A) "expressly permit[s]" consideration of economic and technological feasibility). The cumulative weight of several pieces of evidence convinces us that EPA can consider economic factors, notwithstanding the contrary hint in *Ethyl Corp.*

   First, nothing in § 211(c)(2)(A) limits EPA's discretion to consider all relevant factors, including economic factors, when regulating fuel additives. Quite the contrary, § 211(c)(2)(A) *requires* EPA to consider "other technologically or economically feasible means of achieving emission standards under [§ 202 (governing automobile emission standards) ]." Thus, EPA must consider economic factors whenever regulation under § 202 can achieve the same health benefits as regulation under § 211.

   Second, when EPA regulates a fuel additive for the specific reason that the additive may degrade the performance of an auto emission control device, it must, under § 211(c)(2)(B), conduct "a cost benefit analysis." While § 211(c)(2)(A), which applies to this case, does not require cost-benefit analysis, it seems unlikely that Congress would mandate cost-benefit analysis for fuel additive regulations under § 211(c)(2)

AR.06347

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1123 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

(B) and at the same time forbid EPA from considering cost at all for fuel additive regulations issued under § 211(c)(2)(A).

Third, the legislative history confirms that Congress expected cost to be a factor in EPA's regulation of fuel additives under § 211(c)(2)(A). *See* H.R.Rep. No. 1783 (Conf.Rep.), 91st Cong., 2d Sess. 53 (1970), *reprinted in* 1 Congressional Research Service, Environmental Policy Division, *A Legislative History of the Clean Air Amendments of 1970,* at 151, 203 (Comm.Print 1974) ("*1970 Leg.Hist.*"), *and in* 1970 U.S.Code Cong. & Ad.News 5374, 5385 ("Before controlling or prohibiting manufacture or sale [of a fuel additive], the Administrator is required to consider specific technical and cost factors."); S.Rep. No. 1196, 91st Cong., 2d Sess. 35, *1970 Leg.Hist.* 397, 435 (Congress gave EPA power to "control" as well as to "prohibit" fuel additives in order to "achieve maximum control of auto emissions at a minimum cost").

Fourth, Congress took economic feasibility into account in granting small refiners a looser sliding-scale standard from 1977 to 1982. This further suggests that it considered economic factors to be relevant under § 211 generally.

43   SRTF Brief at 25–36, 39–47; SRTF Reply Brief at 9, 24–31, 37–41; *see also* Plateau Brief at 27–30; Plateau Reply Brief at 18–23.

44   *State Farm Mut. Auto. Ins. Co. v. Department of Transp.,* 680 F.2d 206, 221 (D.C.Cir.), *cert. granted,* 459 U.S. 987, 103 S.Ct. 340, 74 L.Ed.2d 382 (1982).

45   *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970) (footnote omitted), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971); *see also Hatch v. FERC,* 654 F.2d 825, 833–35 (D.C.Cir.1981); *Natural Resources Defense Council, Inc. v. SEC,* 606 F.2d 1031, 1049 n. 23 (D.C.Cir.1979); *Pacific Legal Found. v. Department of Transp.,* 593 F.2d 1338, 1343–44 (D.C.Cir.), *cert. denied,* 444 U.S. 830, 100 S.Ct. 57, 62 L.Ed.2d 38 (1979).

46   Figure 1 is taken from Statement by Dr. Vernon Houk, Acting Director, Center for Environmental Health, Centers for Disease Control, on Regulations on Fuel and Fuel Additives 10 (Apr. 15, 1982), *reprinted in* Natural Resources Defense Council Brief, Supplemental Appendix ("NRDC App.") item 4. The acronym NHANES II stands for Second National Health and Nutrition Examination Survey.

This and the other studies cited in the opinion were criticized by various commenters. EPA responded to the criticisms in a number of ways: explaining why some critiques were unfounded; commissioning new studies to examine others; accepting still others as partially valid. *See generally* 47 Fed.Reg. at 38,073–77; *Supplemental Response to Comments, supra* note 38, at VIII–1 to –21, IX–1 to –9, J.A. at 1371–1400. We have reviewed the criticisms and EPA's responses and find that EPA has amply discharged its duty to respond "to each of the significant comments, criticisms, and new data submitted ... during the comment period." Clean Air Act § 307(d)(6)(B), 42 U.S.C. § 7607(d)(6)(B).

47   Statement by Dr. Vernon Houk, *supra* note 46, at 8.

48   *See* Memorandum by Dr. Joel Schwartz, Office of Policy and Resource Management, Energy Policy Division, EPA, on Health Effects of Gasoline Lead Emissions 9–10 (May 11, 1982), J.A. at 274, 286–91; I. Billick, *Prediction of Pediatric Blood Levels from Gasoline Consumption* (unpublished HUD report, Apr. 21, 1982).

49   *See* ICF, Inc., *The Relationship Between Gasoline Lead Emissions and Blood Poisoning in Americans* 11–12 (unpublished EPA report, Oct. 1982), J.A. at 1255, 1269–70 (food lead); D. Hsia, *Blood Lead of Chicago Children and Its Sources, 1967–1980,* at 9 (unpublished EPA report, July 1982) (concluding that gasoline is responsible for 55% of blood lead levels in Chicago children, lead paint for only 25%). Also, adults consume little lead paint, and infants less than a year old consume little canned food (an important source of food lead), yet both adults and small infants show drops in mean blood lead levels similar to other age groups. ICF, Inc., *supra,* at 12–13, J.A. at 1270–71; Memorandum by Dr. Joel Schwartz, *supra* note 48, at 8–9, J.A. at 285–86.

50   EPA surveyed the major studies in its statement of basis and purpose for the lead ambient air quality standard. *See* 43 Fed.Reg. 46,246, 46,254 (1978).

51   Memorandum by Dr. Joel Schwartz, *supra* note 48, at 1, J.A. at 274.

52   *Id.* at 7, J.A. at 281.

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1124 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

53    Memorandum by Dr. James Pirkle, Center for Environmental Health, Centers for Disease Control, on Percentage Distributions of NHANES II Blood Lead Data By Age, at 4 (May 12, 1982), J.A. at 305, 308.

54    The percentage of children screened by CDC with lead poisoning dropped from 4.3% in 1980 to 3.55% in 1981. Memorandum by Dr. Joel Schwartz, *supra* note 48, at 5, J.A. at 280. These percentages are higher than the NHANES II percentages discussed in text because the CDC screening program concentrates on high-risk groups.

55    Annest, O'Connell, Roberts & Murphy, *Blood Lead Levels from the Second National Health and Nutrition Examination Survey, 1976–1980,* in American Public Health Ass'n, *Silver Anniversary of the National Health Survey Act: Contributed Papers Session* 31, 37 (Hyattsville, Md., Oct. 1981), *reprinted in* NRDC App., *supra* note 46, item 5.

56    Needleman, Gunnoe, Leviton, Reed, Peresie, Maher & Barrett, *Deficits in Psychologic and Classroom Performance of Children with Elevated Dentine Lead Levels,* 300 New Eng.J.Med. 689 (1979). While this study did not correlate dentine lead levels with blood lead levels, the tested children presumably had blood lead levels in line with national norms; thus, most had blood lead levels well below 30 ug/dl.

The National Academy of Sciences concluded that the Needleman study was "largely successful in overcoming the methodological deficiencies of earlier studies" and was a "major contribution" that provided "significant evidence that some 'average' children may be at risk." National Academy of Sciences, National Research Council, Committee on Lead in the Human Environment, *Lead in the Human Environment* 73 (1980).

57    Yule, Lansdown, Millar & Urbanowicz, *The Relationship Between Blood Lead Concentrations, Intelligence and Attainment in a School Population: A Pilot Study,* 23 Dev.Med.Child. Neurology 567, 569 (1981).

58    Otto, Benignus, Muller & Barton, *Effects of Age and Body Lead Burden on CNS Function in Young Children I: Slow Cortical Potentials,* 52 Electroencephalography & Clinical Neurophysiology 229 (1981). *See generally Low Level Lead Exposure: The Clinical Implications of Current Research* (H. Needleman ed. 1980).

59    *See* Memorandum by Dr. James Pirkle, *supra* note 53, at 2, J.A. at 306 (in NHANES II study, 2.1% of children tested during 1978–1980 had blood lead levels of 30 ug/dl or higher; 3.7% had blood lead levels of 25 ug/dl or higher). Ten ug/dl was the mean blood lead level for all persons in 1980, according to NHANES II data. *See* Figure 1 *supra.* Mean blood lead levels for small children were somewhat higher. Annest, Mahaffey, Cox & Roberts, *Blood Lead Levels for Persons 6 Months-74 Years of Age: United States, 1976–80,* in National Center for Health Statistics, *Advance Data from Vital and Health Statistics* 4–5 (No. 79, May 12, 1982).

60    *See* 47 Fed.Reg. at 38,07 4/1 (60 of 64 comments opposed loosening); Memorandum from Richard Kozlowski, Director, EPA Field Operations and Support Division, to Kathleen Bennett, Assistant EPA Administrator for Air, Noise and Radiation, at 2 (June 3, 1982), *reprinted in* NRDC App., *supra* note 46, item 3 (four doctors sponsored by the Lead Industries Association favored rescission). (Mr. Kozlowski's memorandum refers to a fifth doctor who supported rescission; we assume that this was an error that was corrected in the later *Federal Register* notice.)

61    Letter from Dr. Glenn Austin, President, American Academy of Pediatrics (Apr. 9, 1982), J.A. at 77; *see* Statement of the American Medical Association 2 (July 6, 1982), J.A. at 254, 255 ("further decreases in blood lead levels are necessary").

62    *See* 47 Fed.Reg. at 38,07 4/1; Memorandum from Richard Kozlowski to Kathleen Bennett, *supra* note 60, at 2.

63    National Academy of Sciences, *supra* note 56, at 236–37.

64    *Id.* at 254.

65    ICF, Inc., *supra* note 49, at 38–39, J.A. at 1296–97.

66    *See* text accompanying notes 38–39 *supra.*

67    *See* SRTF Comments, Oct. 8, 1982, at 21, J.A. at 738, 759.

68    EPA Brief at 34–36; *see* NRDC Brief at 5, 21.

69    *See, e.g.,* Asamera Oil (U.S.), Inc. Comments, Sept. 22, 1982, at 8, J.A. at 381, 389 (giving one example); Environmental Defense Fund Comments, Oct. 8, 1982, at 18, J.A. at 776, 794 ("a large proportion" of small refineries are located near pipelines). The only numerical estimate of sales to pipelines (other than SRTF's)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

is by another small refiner association. *See* American Petroleum Refiners Association Comments, Oct. 4, 1982, at 12, J.A. at 490, 502 ("small" refiners sold 34,000 bpd of leaded gasoline to the "six pipelines serving major metropolitan areas").

This and similar conclusions about whether there is record evidence on a particular issue must be qualified by the disclaimer "to the best of our knowledge." We have perused the almost 2000 pages of joint appendix and 350 pages of public hearing transcript with a fair amount of care. We have read closely the almost 550 pages of briefs. Where these items were insufficient, we have asked EPA to supply us with specific additional portions of the record. We do not pretend, however, to have read every page of the record nor could we reasonably be expected to do so. Ultimately, we must depend on the parties to tell us where in that record to look. Evidence that they have not cited and that we have not found on our own must, of practical necessity, not be weighed in the balance.

70   The American Petroleum Refiners Association admitted that "[s]mall refiners do sell into a number of [other] pipelines," but asserted that those pipelines do not serve "major metropolitan areas." American Petroleum Refiners Association Comments, *supra* note 69, at 12 n. *, J.A. at 502 n. *. Without attempting to parse what areas the American Petroleum Refiners counted as "major metropolitan areas," a term it did not define, we feel safe in assuming that most pipelines predominantly serve urban areas, for a pipeline's profits generally depend on high volume shipments.

71   "Processing" refineries refine gasoline from crude oil or other basic feedstocks. "Blenders" mix already refined high-octane components to produce marketable gasoline. SRTF, needless to say, represents only processing refineries.

72   Leaded gasoline production by the 64 small processing refineries from July 1, 1981 through March 30, 1982 was approximately 33,738,000,000 barrels or 124,000 bpd. *See* Letter from Jimmie Peterson, Director, Office of Oil and Gas, Energy Information Administration, to Martin Wagner, Acting Director, EPA Energy Policy Division, at 2 (Sept. 29, 1982), J.A. at 1301, 1302.

73   *See* 47 Fed.Reg. at 38,085. EPA found in its notice of proposed rulemaking that small refineries had a "substantial" market share in only one urban area. It concluded that there was not a "significant problem" of small refiner lead use causing specific urban areas "to experience significantly higher lead concentrations." *Id.* at 38, 085/1. However, small refiner sales to urban areas can be a significant percentage of small refiner output even if (as EPA concluded in its notice of proposed rulemaking) they are not a large percentage of total gasoline sales by all refiners in any one urban area.

74   Sobotka & Co., Inc., *Estimated Gasoline Disposition Between Urban and Nonurban Areas for Selected Group of Small Refineries and Blending Plants* (Oct. 7, 1982), J.A. at 1215.

75   Sobotka & Co., Inc., *Disposition of Gasoline Production By Small Refiners—Rural vs. Urban Areas* 2 (May 7, 1982), J.A. at 327, 328 (an earlier report using a different definition of small refinery).

76   Letter from L.L. Hank Hankla, Attorney for SRTF, to Kathleen Bennett, Assistant EPA Administrator for Air, Noise & Radiation Programs, at 4 (July 30, 1982), J.A. at 215, 218. The 23% figure was based on an earlier EPA definition of small refinery; a revised SRTF figure would likely have been somewhat lower.

77   For EPA's 1990 estimate, see note 39 *supra* and accompanying text.

78   *See* text accompanying note 55 *supra*.

79   Memorandum from Dr. James Pirkle, Center for Environmental Health, Centers for Disease Control, on Sampling of the Urban Population and the Downward Trend in NHANES II Blood Lead Levels, figs. 14–15 (Aug. 24, 1982). On reflection, this result is not hard to understand. First, most people live and work in towns, even in rural areas. Second, lead settles quickly to the ground; thus, gasoline lead exposure depends only on the density of traffic in the immediate vicinity. Therefore, gasoline lead exposure in a town in, say, Wyoming will be comparable to lead exposure in a similar-sized town in the suburbs of a major city.

80   *See* note 40 *supra* and accompanying text. The analysis in the text of whether the record supports the conclusion that most small refiners can meet the 1.10 gplg standard should not be read to suggest that § 211 precludes EPA from setting a standard that most small refiners cannot meet. Even if EPA must consider small refiners as a discrete class (as we concluded, *see* text accompanying note 41 *supra*) and must also

Small Refiners Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

Case 3:20-cv-07721-SI   Document 58-5   Filed 11/10/20   Page 1126 of 1271

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

consider the economic effects of fuel additive regulations (a question that we avoided, *see* note 42 *supra* and accompanying text), nothing in § 211 requires EPA, after duly considering economic impact on small refiners, to grant them special benefits.

81   Sobotka & Co., Inc., *Potential for Cost Reduction and Energy Savings Realized Through Modification of Lead Phasedown Regulation* II–9 to –10 (Nov. 20, 1981); J.A. at 12, 21–22.

82   EPA's conclusion that most small refiners can meet the 1.10 gpgl standard will also be justified if variation among small refiners is small enough so that the model fairly depicts what most small refiners can achieve without interrefinery trading. There is conflicting evidence in the record on how many small refineries have enough octane-enhancing equipment to meet the new standard. *Compare* Crown Central Petroleum Corp. Comments, Oct. 6, 1982, at 5–6, J.A. at 872, 876–77 (only 15 small refineries lack the "catalytic reformers" needed to produce high octane gasoline) *with* Sobotka & Co., Inc., *Diversity Among Small Refiners Eligible for Higher Lead Use Concentrations* 1–2 (Oct. 6, 1982), J.A. at 1231, 1231–32 (17 small refineries have no and 28 have only limited octane-enhancing capability; unless these refiners can purchase blending components or lead credits, they "will be at a disadvantage in the manufacture of gasoline (or will be unable to make gasoline)"). In light of this conflict, which EPA did not try to resolve, we are unable to conclude that most small refineries can meet the 1.10 gpgl standard without interrefinery trading.

83   Sobotka & Co., Inc., *Diversity Among Small Refiners, supra* note 82, at 1, J.A. at 1231.

84   *See* Environmental Protection Agency, *Final Regulatory Flexibility Analysis for Lead Phasedown Regulations* 11, 21–22 (Oct. 1982), J.A. at 1418, 1429, 1439–40 (making this argument and noting that the Herfindahl market concentration index for the petroleum refining industry is only 0.04, indicating a highly competitive industry).

85   *See id.* at 25, J.A. at 1443 ("since the marginal value of lead to large refineries is 0.9 cents per gram in 1983, [small refiners] should be able to purchase lead rights ... for about this price").

86   *See* Sobotka & Co., Inc., *Potential for Cost Reduction, supra* note 81, at VI–4 to –6, J.A. at 26–28 (describing precedent for lead credit trading).

87   *See, e.g.,* United States Department of Justice Comments, Oct. 8, 1982, at 3–4, J.A. at 599, 602–03 ("incentives provided by basic market forces" will create a market for lead credits); Texaco U.S.A. Comments, Oct. 8, 1982, at 18, J.A. at 665, 682 (averaging will provide small refiners "ample flexibility" in meeting the large refiner limit); Mid-Continent Energy Co. Comments, Oct. 7, 1982, at 2, J.A. at 578, 579 (averaging "would be a necessity for small companies to compete in the market").

88   *See* 47 Fed.Reg. at 49,326 (summarizing objections to averaging).

89   Both the Department of Justice and the Department of Energy supported a uniform standard on efficiency grounds. *See* United States Department of Justice Comments, May 17, 1982, at 10–12, J.A. at 113, 123–25; Department of Energy Comments, Oct. 8, 1982, enclosure 3, at 2, J.A. at 798, 811.

90   *See* H.R.Rep. No. 519, 96th Cong., 1st Sess. 11–12 (1979); S.Rep. No. 878, 96th Cong., 2d Sess. 9–10 (1980), *reprinted in* 1980 U.S.Code Cong. & Ad.News 2788, 2796–97.

91   Neither SRTF nor EPA noticed this history. They therefore engage in a pointless debate on the significance of language in the Senate Report suggesting that judicial review is available.

92   126 Cong.Rec. S10,939 (daily ed. Aug. 6, 1980). The italicized words "and consciously" were not present in Senator Culver's original analysis, but Senator Culver proposed adding them in a letter to House Speaker O'Neill (dated after the Senate passed the bill) "in response to [Speaker O'Neill's concerns] with regard to the judicial review provisions of [the Senate bill]." *See id.* at H8466 (daily ed. Sept. 8, 1980) (reprinting the letter).

93   *See also id.* at H8461 (statement of Rep. Bedell) ("regulatory flexibility analyses can be examined by the courts when the validity of final rules is being determined"); *id.* at H8462 (statement of Rep. Moorhead) ("the regulatory analysis ... will be part of the record on review of the rule itself"); *id.* at H8471 (statement of Rep. Roth) ("If the Agency fails to do the required analysis or fails to take its own study into account when the final rule is published, the regulation is subject to being struck down by the courts.").
One speaker believed that the Act provided for full-scale review of the regulatory analysis, *see id.* at H8463 (statement of Rep. McDade) ("the court should strike down the regulation" if the regulatory analysis is

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Small Refiners Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1127 of 1271

inadequate), and one believed that it barred all review, *see id.* at H8470 (statement of Rep. Danielson) ("the language of the bill itself" precludes review).

94  SRTF's and Plateau's remaining objections to EPA's flexibility analysis merely rehash their objections to the rule in general. For example, SRTF complains that EPA used an aggregate model and failed to consider the supposed rural nature of small refineries. These issues are fully addressed elsewhere in this opinion.

95  Plateau also claims that it had no notice of the possibility that EPA might provide only eight-months lead time before imposing a uniform final standard. Plateau Brief at 15–18. However, in its August proposal, EPA specifically solicited comments on "whether the special standard for small refineries should be limited to some definite time period." 47 Fed.Reg. at 38,08 5/3. This request was sufficient to put Plateau on notice that it ought to submit comments on how much lead time it needed and why. Plateau chose not to submit comments on this issue.

To be sure, EPA did not proffer a particular time period or periods that it was considering, but Plateau has not suggested that its hypothetical comments would have been altered had it known that EPA was specifically contemplating an eight-month time period. *See BASF Wyandotte Corp. v. Costle,* 598 F.2d 637, 644 (1st Cir.1979) (petitioners "have not shown us that the content of their criticisms would have been different" had the agency given more detailed notice), *cert. denied,* 444 U.S. 1096, 100 S.Ct. 1063, 62 L.Ed.2d 784 (1980).

96  *See, e.g.,* SRTF Brief at 42 n. 37 (objecting to Sobotka's calculation of the cost to small refiners of meeting a 1.10 gplg standard); notes 74–76 *supra* and accompanying text (discussing SRTF's objection to Sobotka's calculation of direct small refiner sales to urban areas).

97  Department of Energy Comments, *supra* note 89, enclosure 3, at 2, J.A. at 811 (small refiner costs at 1.4 gplg are equal to large refiner costs at 1.17 gplg).

98  The sliding scale standard was 2.65 gpg for refineries producing 5000 bpd or less and 2.15 gpg for refineries producing 5,001 to 10,000 bpd. Clean Air Act § 211(g)(2), 42 U.S.C. § 7545(g)(2). In the first quarter of 1982, small processing refineries produced 72% leaded gasoline. *See* Letter from Jimmie Peterson, *supra* note 72, at 2, J.A. at 1302. A refinery that was subject to a 2.65 gpg standard and produced 72% leaded gasoline could use up to 3.7 gplg; a similar refinery subject to a 2.15 gpg standard could use up to 3.0 gplg. Actual average lead use was somewhat lower—roughly 2.5 gplg for small processing refineries. *See* notes 103–04 *infra* and accompanying text.

99  EPA Brief at 58.

100  The only suggestion in the record that EPA was considering a strict interim standard is a single question asked at the public hearing by Dr. Joel Schwartz of EPA's Office of Policy Analysis. Dr. Schwartz inquired of a panel of large refiners:

Now you've already testified that you think that if there is a separate standard for small refiners it should phase out quickly over time. I wonder if you could ... give us some indication what you think would be an appropriate level that would not unduly burden the refiners over the transition period ...?

Transcript of Lead Phasedown Hearing, Sept. 7, 1982, at 41. As discussed in part VI.C.3 *infra,* neither the APA nor the Clean Air Act requires parties to a rulemaking to scrutinize the record for tiny clues as to what the agency might do. This single question does not come close to being adequate notice of a possible interim standard.

101  Texaco Brief at 48–49; Environmental Defense Fund Brief at 18–22.

102  As we further concluded in part III.D, the additional requirement in § 307(d)(9)(D)(i), 42 U.S.C. § 7607(d)(9)(D)(i), that the procedural error is grounds for reversal only if "arbitrary or capricious" applies only to EPA decisions on how to implement the § 307(d) procedures. It cannot excuse failure to give adequate notice of a final rule.

103  Small processing refineries produced 72% leaded gasoline, *see* Letter from Jimmie Peterson, *supra* note 72, at 2, J.A. at 1302, and used an average of 1.7 gpg during the second quarter of 1982, *see* Sobotka & Co., Inc., *Comparison of Recent Lead Use By Small Refiners with Lead Use Under the Current Rule and Under the New Rule* 1 (Oct. 27, 1982), J.A. at 1464, 1464. They therefore used 1.7 gpg/.72 = 2.36 gplg.

104  SRTF Comments, *supra* note 67, at 10, J.A. at 748.

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1128 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

105    This assumption was apparently wrong. At oral argument, counsel for SRTF stated that only two or three small refiners had been able to purchase lead credits and that apparently only one large refiner was as yet selling these credits. Transcript of Oral Argument, Jan. 17, 1983, at 7.

106    At oral argument, EPA noted that its regulations permit small refiners to exceed 1.90 gplg for short periods of time, so long as they average 1.90 gplg or less for the five-month "compliance period" from November 1, 1982 to March 31, 1983. It argued that small refiners therefore had five months, not two days, to purchase lead credits. Transcript of Oral Argument, *supra* note 105, at 55–56. We believe, however, that small refiners could not reasonably choose to use illegal amounts of lead in the hope they could cure the violation by buying lead credits in the future.

107    In light of this conclusion, we do not reach SRTF's claim that much of the record evidence concerning the interim standard was docketed after the close of the comment period. *Cf.* part IV.F *supra* (EPA's late docketing of evidence to support the final standard was improper, but not grounds for reversal).

We also do not reach Plateau's complaint that EPA lacked proper reason under the APA, 5 U.S.C. § 553(d), to issue the interim standard without 30-days advance notice. We note a puzzle, however. Both Plateau and EPA assume that § 553(d) applies to this case. It does not, and Clean Air Act § 307(d), which does apply, does not require 30-days advance notice. On the other hand, nothing in the legislative history of § 307(d) explains this omission, and it may well have been inadvertent. We leave to another day the question whether Clean Air Act § 307(d) should be read to incorporate the APA's 30-day notice period.

108    We need not address in this case the existence or scope of any possible exceptions to this general rule. A court can, of course, give the agency specific guidance on some issues that will arise on remand. For example, in this case we suggested in our order of January 26, 1983 that EPA could issue immediately a temporary lead standard not "significantly below previous lead-use levels." *See also National Ass'n of Recycling Indus. v. ICC,* 704 F.2d 638, 640 (D.C.Cir.1983) (per curiam) (ICC improperly approved rail rate; court leaves the rate in effect pending ICC determination of the correct rate and instructs the ICC to include a refund provision in its final order).

109    EPA may also, of course, institute regular rulemaking procedures with a view to adopting a more stringent interim standard, and may (within reason and statute) expedite such a rulemaking.

110    *See also PPG Indus. v. Costle,* 659 F.2d 1239, 1250 (D.C.Cir.1981); *Weyerhaeuser Co. v. Costle,* 590 F.2d 1011, 1031 (D.C.Cir.1978); *South Terminal Corp. v. EPA,* 504 F.2d 646, 659 (1st Cir.1974) (the first case to use the "logical outgrowth" formula).

111    *See, e.g.,* Transcript of Lead Phasedown Hearing, *supra* note 100, at 177–81 (oral comments of United Refining Co.); United Refining Co. Comments, Oct. 4, 1982, at 2–9, J.A. at 413, 415–22; Environmental Defense Fund Comments, *supra* note 69, at 12, J.A. at 788; Crown Central Petroleum Corp. Comments, *supra* note 82, at 8, J.A. at 879; United States Department of Justice Comments, *supra* note 87, at 8–11, J.A. at 607–10; Farmland Industries, Inc. Comments, Sept. 24, 1982, at 2, J.A. at 406, 407.

112    Part III.A *supra* discusses notice requirements under Clean Air Act § 307(d)(3).

113    It would have been better yet for EPA to issue a supplemental notice describing the loopholes it intended to close. Such a notice, if issued early enough to permit responsive comments, need not have extended the overall length of the rulemaking. *See Sierra Club v. Costle,* 657 F.2d 298, 358–60 (D.C.Cir.1981) (finding no error in EPA's giving notice in the middle of a rulemaking that it had reassessed certain assumptions).

114    *See, e.g.,* notes 74–76 *supra* and accompanying text (describing SRTF responses to a Sobotka study).

115    Asamera Oil (U.S.) Inc. Comments, *supra* note 69, at 11–13, J.A. at 392–94. The Department of Justice also noted this problem, but EPA has not adverted to the Justice Department's comments either in its explanation of the past ownership requirement in the *Federal Register* or in its briefs to this court. United States Department of Justice Comments, *supra* note 87, at 9, 11, J.A. at 608, 610.

116    *See also American Iron & Steel Inst. v. EPA,* 568 F.2d 284, 291 (3d Cir.1977) (agency notice must fairly apprise interested persons "of all significant subjects and issues involved"; EPA's notice of proposed effluent

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1129 of 1271

Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506 (1983)

18 ERC 1681, 18 ERC 1683, 18 ERC 2033, 227 U.S.App.D.C. 201...

regulations for "Iron and Steel Manufacturing" did not fairly apprise makers of specialty alloy steel that they would be subject to separate regulation); *Kollett v. Harris,* 619 F.2d 134, 144 (1st Cir.1980) (general reference to income attribution in proposal for social security regulation was not adequate notice that agency might impute certain parental income to disabled child).

117    *See Platt's Oil Marketing Bulletin,* Sept. 27, 1982, at 3, col. 1.

118    Simmons Reply Brief at 4 n. 3.

119    *See* 47 Fed.Reg. at 49,326/1 ("Since January 1982, two of these refineries have been sold and the sale of a third announced, according to [Asamera]."). The other small refinery that Asamera believed had been sold by a large refiner is now owned by Giant Industries. Simmons asserts that Giant's facility does not qualify as a "small refinery" for reasons other than the past ownership requirement, Simmons Brief at 24–25, and Giant and EPA concede the point, *see* EPA Brief in Response to Simmons at 6 n. 6; Giant Industries Brief at 4 n. 1.

120    Clean Air Act Amendments of 1977, *supra* note 6, sec. 222(a)sec. 222(a), § 211(f)(5)§ 211(f)(5), 91 Stat. at 764.

121    *See* S.252, 95th Cong., 1st Sess. § 36 (1977), 3 *Leg. Hist.* 575, 679–80.

122    In earlier debate, Senator Muskie explained the need for § 211(f) at greater length. Apparently, oil companies had replaced tetraethyl lead with the additive "MMT" in order to produce high-octane gasoline without using lead. The auto companies complained that this new additive was damaging their catalytic converters. Senator Muskie explained:

> [O]il companies have recently started adding MMT to unleaded gasoline to raise its octane rating. This was done without regard to MMT's effect on the over 25 million catalysts in cars on the road.
> I consider this a total breach of good faith by the oil companies, and an outrageous act against the American consumer.
> The committee ... requir[ed] the removal of all additives introduced into unleaded fuel since 1975 when catalysts were first introduced. This ban can be waived by the Administrator if ... the additive will not impair the emission performance of vehicles produced in 1975 or afterward.

123 Cong.Rec. 18,034 (1977), 3 *Leg.Hist.* 759.

123    We have earlier noted the apparent haste with which the Conference Committee considered the 1977 amendments to the Clean Air Act. *See* note 35 *supra.*

1    EPA may also, of course, institute regular rulemaking procedures with a view to adopting a more stringent interim standard, and may (within reason and statute) expedite such a rulemaking.

1    The Comments of the Department of Justice, at 9, 11 (Oct. 8, 1982), J.A. at 599, 608, 610, suggested a similar change, but EPA has not adverted to those comments either in its explanation of the past ownership rule in the *Federal Register* or in its briefs to this court.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SL   Document 58-5   Filed 11/10/20   Page 1130 of 1271

Sosa v. Alvarez-Machain, 542 U.S. 692 (2004)

124 S.Ct. 2739, 159 L.Ed.2d 718, 72 USLW 4660, 158 Oil & Gas Rep. 601...

KeyCite Yellow Flag - Negative Treatment

Not Followed as Dicta Doe v. Rafael Saravia, E.D.Cal., November 24, 2004

124 S.Ct. 2739
Supreme Court of the United States

Jose Francisco SOSA, Petitioner,

v.

Humberto ALVAREZ–MACHAIN, et al.

United States, Petitioner,

v.

Humberto Alvarez–Machain, et al.

Nos. 03–339, 03–485.
|
Argued March 30, 2004.
|
Decided June 29, 2004.

**Synopsis**

**Background:** Plaintiff, a Mexican national acquitted of murder after being abducted and transported to the United States to face prosecution, brought action under Alien Tort Statute (ATS) and Federal Tort Claims Act (FTCA) against United States, Drug Enforcement Agency (DEA) agents, former Mexican policeman, and Mexican civilians, alleging that his abduction violated his civil rights. The United States District Court for the Central District of California partially granted defendants' motion to dismiss, and the Court of Appeals, 107 F.3d 696, reversed in part and remanded. On remand, the District Court, Stephen V. Wilson, J., entered summary judgment against former policeman, substituted United States for DEA agents, and dismissed abductee's FTCA claims. Abductee and policeman appealed. The Ninth Circuit Court of Appeals, McKeown, Circuit Judge, 331 F.3d 604, affirmed in part, reversed in part and remanded. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Souter, held that:

[1] whatever liability the United States allegedly had for alien's arrest by Mexican nationals, allegedly at instigation of the DEA, so that he could be transported across the border and lawfully arrested by federal officers, rested on events that occurred in Mexico, so as to fall within the "foreign country" exception to waiver of government's immunity under the FTCA;

[2] "foreign country" exception to waiver of government's immunity bars all claims against government based on any injury suffered in foreign country, regardless of where the tortious act or omission giving rise to that injury occurred; and

[3] single illegal detention, of less than one day, of Mexican national, custody of whom was then transferred to lawful authorities in the United States for prompt arraignment, violated no norm of customary international law so well defined as to support creation of cause of action that district court could hear under the ATS; abrogating Sami v. United States, 617 F.2d 755 (C.A.D.C.1979); Cominotto v. United States, 802 F.2d 1127 (C.A.9 1986); Couzado v. United States, 105 F.3d 1389 (C.A.11 1997); Martinez v. Lamagno, 1994 WL 159711, judgt. order reported at 23 F.3d 402 (C.A.4 1994); Leaf v. United States, 588 F.2d 733 (C.A.9 1978); and Donahue v. United States Dept. of Justice, 751 F.Supp. 45 (S.D.N.Y.1990).

Reversed.

Justice Scalia concurred in part and concurred in judgment and filed opinion, in which Chief Justice Rehnquist and Justice Thomas joined.

Justice Ginsburg concurred in part and concurred in judgment and filed opinion, in which Justice Breyer joined.

Justice Breyer concurred in part and concurred in judgment and filed opinion.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (12)

[1]   **United States** ⚖ Waiver of immunity; limitations and exceptions in general

   **United States** ⚖ Private Person's Liability as Measure

   Federal Tort Claims Act (FTCA) was designed primarily to remove sovereign immunity of the United States from suits in tort and, with certain

Sosa v. Alvarez-Machain, 542 U.S. 692 (2004)
Case 3:20-cv-07721-SL    Document 58-5    Filed 11/10/20    Page 1131 of 1271

124 S.Ct. 2739, 159 L.Ed.2d 718, 72 USLW 4660, 158 Oil & Gas Rep. 601...

specific exceptions, to render government liable in tort as private individual would be under like circumstances. 🏷 28 U.S.C.A. §§ 1346, 2671 et seq.

103 Cases that cite this headnote

---

**[2]    United States** 🔑 **In general; place of injury**

Whatever liability the United States allegedly had for alien's arrest in Mexico by Mexican nationals, allegedly at instigation of officials in the Drug Enforcement Agency (DEA), so that he could be transported across the border and lawfully arrested by federal officers, rested on events that occurred in Mexico, so as to fall within the "foreign country" exception to waiver of government's sovereign immunity under the Federal Tort Claims Act (FTCA).

🏷 28 U.S.C.A. § 2680(k).

84 Cases that cite this headnote

---

**[3]    United States** 🔑 **In general; place of injury**

"Foreign country" exception to waiver of government's sovereign immunity under the Federal Tort Claims Act (FTCA) bars all claims against federal government based on any injury suffered in foreign country, regardless of where the tortious act or omission giving rise to that injury occurred; abrogating 🚩 *Sami v. United States,* 617 F.2d 755 (C.A.D.C.1979); 🚩 *Cominotto v. United States,* 802 F.2d 1127 (C.A.9 1986); 🚩 *Couzado v. United States,* 105 F.3d 1389 (C.A.11 1997); 🚩 *Martinez v. Lamagno,* 1994 WL 159771, judgt. order reported at 🚩 23 F.3d 402 (C.A.4 1994); 🚩 *Leaf v. United States,* 588 F.2d 733 (C.A.9 1978); and 🚩 *Donahue v. United States Dept. of Justice,* 751 F.Supp. 45 (S.D.N.Y.1990). 🏷 28 U.S.C.A. § 2680(k).

74 Cases that cite this headnote

---

**[4]    United States** 🔑 **In general; place of injury**

"Foreign country" exception to waiver of government's sovereign immunity under the Federal Tort Claims Act (FTCA) codifies Congress' unwillingness to subject the United States to liabilities depending on laws of foreign power. 🏷 28 U.S.C.A. § 2680(k).

160 Cases that cite this headnote

---

**[5]    Action** 🔑 **Statutory rights of action**

**Federal Courts** 🔑 **Tort claims**

Alien Tort Statute (ATS), pursuant to which the district courts "have cognizance...of all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States," is jurisdictional statute, in sense that it only addresses power of courts to entertain certain claims and does not create statutory cause of action for aliens. 28 U.S.C.A. § 1350.

125 Cases that cite this headnote

---

**[6]    Federal Courts** 🔑 **Tort claims**

Though the Alien Tort Statute (ATS), pursuant to which the district courts "have cognizance...of all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States," is jurisdictional statute, which does not create statutory cause of action for aliens, it was not intended to lie fallow until specific causes of action were authorized by further legislation, but was meant to have practical effect from moment that it became law, by providing basis for district courts to exercise jurisdiction over a modest number of causes of action recognized under the law of nations, such as for offenses against ambassadors, violations of safe conduct, and possibly for piracy. 28 U.S.C.A. § 1350.

211 Cases that cite this headnote

---

**[7]    Federal Courts** 🔑 **Tort claims**

District courts should exercise caution in deciding to hear claims allegedly based on present-day law of nations under the Alien Tort Statute (ATS), and should require any

124 S.Ct. 2739, 159 L.Ed.2d 718, 72 USLW 4660, 158 Oil & Gas Rep. 601...

claim based on present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms, offenses against ambassadors, violations of safe conduct and piracy, that Congress had in mind when it enacted the ATS. 28 U.S.C.A. § 1350.

206 Cases that cite this headnote

**[8]**    **Action** ☞ Statutory rights of action

**Constitutional Law** ☞ Creation of rights of action

Decision to create private right of action is one better left to legislative judgment in great majority of cases.

84 Cases that cite this headnote

**[9]**    **Federal Courts** ☞ Tort claims

Courts have no Congressional mandate to seek out and define new and debatable violations of law of nations, in deciding whether to exercise jurisdiction over suit under the Alien Tort Statute (ATS). 28 U.S.C.A. § 1350.

25 Cases that cite this headnote

**[10]**    **Federal Courts** ☞ Tort claims

Determination as to whether alleged norm of international law is sufficiently definite that violation thereof will support cause of action which district may hear under the Alien Tort Statute (ATS) should, and inevitably must, involve element of judgment about practical consequences of making that cause available to litigants in federal court. 28 U.S.C.A. § 1350.

112 Cases that cite this headnote

**[11]**    **Aliens, Immigration, and Citizenship** ☞ Violation of law of nations

**Federal Courts** ☞ Tort claims

When deciding whether alleged norm of international law is sufficiently definite that violation thereof will support cause of action that

district may hear under the Alien Tort Statute (ATS), district court, in absence of any treaty, or of any controlling executive or legislative act or judicial decision, must resort to the customs and usages of civilized nations and, as evidence thereof, to works of jurists and commentators, not for their speculations as to what the law ought to be, but for trustworthy evidence of what the law really is. 28 U.S.C.A. § 1350.

90 Cases that cite this headnote

**[12]**    **Aliens, Immigration, and Citizenship** ☞ Torts Covered

**Federal Courts** ☞ Tort claims

Single illegal detention, of less than one day, of Mexican national, custody of whom was then transferred to lawful authorities in the United States for prompt arraignment, violated no norm of customary international law so well defined as to support creation of cause of action that district court could hear under the Alien Tort Statute (ATS). 28 U.S.C.A. § 1350.

148 Cases that cite this headnote

**\*\*2742  \*692** *Syllabus* [*]

The Drug Enforcement Administration (DEA) approved using petitioner Sosa and other Mexican nationals to abduct respondent Alvarez–Machain (Alvarez), also a Mexican national, from Mexico to stand trial in the United States for a DEA agent's torture and murder. As relevant here, after his acquittal, Alvarez sued the United States for false arrest under the Federal Tort Claims Act (FTCA), which waives sovereign immunity in suits "for ... personal injury ... caused by the negligent or wrongful act or omission of any [Government] employee while acting within the scope of his office or employment," 28 U.S.C. § 1346(b)(1); and sued Sosa for violating the law of nations under the Alien Tort Statute (ATS), a 1789 law giving district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations ...," § 1350. The District Court dismissed the FTCA claim, but awarded Alvarez summary judgment and damages on the ATS claim. The Ninth Circuit

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Sosa v. Alvarez-Machain, 542 U.S. 692 (2004)

124 S.Ct. 2739, 159 L.Ed.2d 718, 72 USLW 4660, 158 Oil & Gas Rep. 601...

affirmed the ATS judgment, but reversed the FTCA claim's dismissal.

*Held:*

1. The FTCA's exception to waiver of sovereign immunity for claims "arising in a foreign country," 28 U.S.C. § 2680(k), bars claims based on any injury suffered in a foreign country, regardless of where the tortious act or omission occurred. Pp. 2747–2754.

(a) The exception on its face seems plainly applicable to the facts of this action. Alvarez's arrest was said to be "false," and thus tortious, only because, and only to the extent that, it took place and endured in Mexico. Nonetheless, the Ninth Circuit allowed the action to proceed under what is known as the "headquarters doctrine," concluding that, because Alvarez's abduction was the direct result of wrongful planning and direction by DEA agents in California, his claim did not "aris[e] in" a foreign country. Because it will virtually always be possible to assert negligent activity occurring in the United States, such analysis must be viewed with skepticism. Two considerations confirm this Court's skepticism and lead it to reject the headquarters doctrine. Pp. 2747–2749.

**\*\*2743 \*693** (b) The first consideration applies to cases like this one, where harm was arguably caused both by action in the foreign country and planning in the United States. Proximate cause is necessary to connect the domestic breach of duty with the action in the foreign country, for the headquarters' behavior must be sufficiently close to the ultimate injury, and sufficiently important in producing it, to make it reasonable to follow liability back to that behavior. A proximate cause connection is not itself sufficient to bar the foreign country exception's application, since a given proximate cause may not be the harm's exclusive proximate cause. Here, for example, assuming the DEA officials' direction was a proximate cause of the abduction, so were the actions of Sosa and others in Mexico. Thus, at most, recognition of additional domestic causation leaves an open question whether the exception applies to Alvarez's claim. P. 2750.

(c) The second consideration is rooted in the fact that the harm occurred on foreign soil. There is good reason to think that Congress understood a claim "arising in" a foreign country to be a claim for injury or harm occurring in that country. This was the common usage of "arising under" in contemporary state borrowing statutes used to determine which State's

limitations statute applied in cases with transjurisdictional facts. And such language was interpreted in tort cases in just the same way that the Court reads the FTCA today. Moreover, there is specific reason to believe that using "arising in" to refer to place of harm was central to the foreign country exception's object. When the FTCA was passed, courts generally applied the law of the place where the injury occurred in tort cases, which would have been foreign law for a plaintiff injured in a foreign country. However, application of foreign substantive law was what Congress intended to avoid by the foreign country exception. Applying the headquarters doctrine would thus have thwarted the exception's object by recasting foreign injury claims as claims not arising in a foreign country because of some domestic planning or negligence. Nor has the headquarters doctrine outgrown its tension with the exception. The traditional approach to choice of substantive tort law has lost favor, but many States still use that analysis. And, in at least some cases the Ninth Circuit's approach would treat as arising at headquarters, even the later methodologies of choice point to the application of foreign law. There is also no merit to an argument that the headquarters doctrine should be permitted when a State's choice-of-law approach would not apply the foreign law of the place of injury. Congress did not write the exception to apply when foreign law would be applied. Rather, the exception was written at a time when "arising in" meant where the harm occurred; and the **\*694** odds are that Congress meant simply that when it used the phrase. Pp. 2750–2754.

2. Alvarez is not entitled to recover damages from Sosa under the ATS. Pp. 2754–2769.

(a) The limited, implicit sanction to entertain the handful of international law *cum* common law claims understood in 1789 is not authority to recognize the ATS right of action Alvarez asserts here. Contrary to Alvarez's claim, the ATS is a jurisdictional statute creating no new causes of action. This does not mean, as Sosa contends, that the ATS was stillborn because any claim for relief required a further statute expressly authorizing adoption of causes of action. Rather, the reasonable inference from history and practice is that the ATS was intended to have practical effect the moment it became law, **\*\*2744** on the understanding that the common law would provide a cause of action for the modest number of international law violations thought to carry personal liability at the time: offenses against ambassadors, violation of safe conducts, and piracy. Sosa's objections to this view are unpersuasive. Pp. 2754–2761.

(b) While it is correct to assume that the First Congress understood that district courts would recognize private causes of action for certain torts in violation of the law of nations and that no development of law in the last two centuries has categorically precluded federal courts from recognizing a claim under the law of nations as an element of common law, there are good reasons for a restrained conception of the discretion a federal court should exercise in considering such a new cause of action. In deriving a standard for assessing Alvarez's particular claim, it suffices to look to the historical antecedents, which persuade this Court that federal courts should not recognize claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the 18th-century paradigms familiar when § 1350 was enacted. Pp. 2761–2769.

(i) Several reasons argue for great caution in adapting the law of nations to private rights. First, the prevailing conception of the common law has changed since 1790. When § 1350 was enacted, the accepted conception was that the common law was found or discovered, but now it is understood, in most cases where a court is asked to state or formulate a common law principle in a new context, as made or created. Hence, a judge deciding in reliance on an international norm will find a substantial element of discretionary judgment in the decision. Second, along with, and in part driven by, this conceptual development has come an equally significant rethinking of the federal courts' role in making common law. In *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188, this Court denied the existence of any federal "general" common law, which largely withdrew to havens of specialty, with the general practice being to look *\*695* for legislative guidance before exercising innovative authority over substantive law. Third, a decision to create a private right of action is better left to legislative judgment in most cases. *E.g.,* *Correctional Services Corp. v. Malesko,* 534 U.S. 61, 68, 122 S.Ct. 515, 151 L.Ed.2d 456. Fourth, the potential implications for the foreign relations of the United States of recognizing private causes of action for violating international law should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs. Fifth, this Court has no congressional mandate to seek out and define new and debatable violations of the law of nations, and modern indications of congressional understanding of the

judicial role in the field have not affirmatively encouraged greater judicial creativity. Pp. 2761–2765.

(ii) The limit on judicial recognition adopted here is fatal to Alvarez's claim. Alvarez contends that prohibition of arbitrary arrest has attained the status of binding customary international law and that his arrest was arbitrary because no applicable law authorized it. He thus invokes a general prohibition of arbitrary detention defined as officially sanctioned action exceeding positive authorization to detain under the domestic law of some government. However, he cites little authority that a rule so broad has the status of a binding customary norm today. He certainly cites nothing to justify the federal courts in taking his rule as the predicate for a federal lawsuit, for its implications **\*\*2745** would be breathtaking. It would create a cause of action for any seizure of an alien in violation of the Fourth Amendment, supplanting the actions under 42 U.S.C. § 1983 and *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619, that now provide damages for such violations. And it would create a federal action for arrests by state officers who simply exceed their authority under state law. Alvarez's failure to marshal support for his rule is underscored by the Restatement (Third) of Foreign Relations Law of the United States, which refers to prolonged arbitrary detention, not relatively brief detention in excess of positive authority. Whatever may be said for his broad principle, it expresses an aspiration exceeding any binding customary rule with the specificity this Court requires. Pp. 2765–2769.

331 F.3d 604, reversed.

SOUTER, J., delivered the opinion of the Court, Parts I and III of which were unanimous, Part II of which was joined by REHNQUIST, C. J., and STEVENS, O'CONNOR, SCALIA, KENNEDY, and THOMAS, JJ., and Part IV of which was joined by STEVENS, O'CONNOR, KENNEDY, GINSBURG, and BREYER, JJ. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, in which REHNQUIST, C. J., and THOMAS, J., joined, *post,* p. 2769. GINSBURG, J., filed an opinion concurring in part and concurring in the judgment, in which BREYER, J., joined, *post,* p. 2776. BREYER, J., filed an opinion concurring in part and concurring in the judgment, *post,* p. 2782.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

124 S.Ct. 2739, 159 L.Ed.2d 718, 72 USLW 4660, 158 Oil & Gas Rep. 601...

**Attorneys and Law Firms**

Paul D. Clement, Washington, DC, for petitioner in No. 03–485.

Carter G. Phillips, Washington, DC, for petitioner in No. 03–339.

Paul L. Hoffman, Venice, CA, for respondents.

Charles S. Leeper, Spriggs & Hollingsworth, Washington, D.C., Carter G. Phillips, Counsel of Record, Joseph R. Guerra, Marinn F. Carlson, Maria T. DiGiulian, Ryan D. Nelson, Sidley, Austin, Brown & Wood LLP, Washington, D.C., Counsel for Petitioner.

Mark D. Rosenbaum, Ranjana Natarajan, Dilan Esper, Alan Castillo, ACLU Foundation of Southern California, Los Angeles, California, Steven R. Shapiro, American Civil Liberties Union, New York, New York, Paul L. Hoffman, Counsel of Record, Erwin Chemerinsky, Michael Morrison, Schonbrun, DeSimone, Seplow, Harris & Hoffman, Venice, California, Ralph G. Steinhardt, George Washington University Law School, Washington, D.C., for Respondent Dr. Humberto Alvarez-Machain, Douglas E. Mirell, W. Allan Edmiston, Rachel Shujman, Tiffany J. Zwicker, Los Angeles, California, Arturo Carrillo, The International Human Rights Clinic, George Washington University Law School, Washington, D.C., Alan Rubin, Adelson & Rubin, Los Angeles, California.

William H. Taft, IV, Legal Adviser Department of State, Washington, D.C., Theodore B. Olson, Solicitor General, Counsel of Record, Stuart E. Schiffer, Acting Assistant Attorney General, Paul D. Clement, Edwin S. Kneedler, Deputy Solicitors General, Gregory G. Katsas, Deputy Assistant Attorney General, Gregory G. Garre, Assistant to the Solicitor General, Douglas N. Letter, Barbara L. Herwig, Robert M. Loeb, Attorneys, Department of Justice, Washington, D.C., for the United States as Respondent Supporting Petitioner.

Charles S. Leeper, Spriggs & Hollingsworth, Washington, D.C., Carter G. Phillips, Counsel of Record, Joseph R. Guerra, **2746 Marinn F. Carlson, Maria T. DiGiulian, Ryan D. Nelson, Sidley, Austin, Brown & Wood, LLP, Washington, D.C., for Petitioner.

Theodore B. Olson, Solicitor General, Counsel of Record, Stuart E. Schiffer, Acting Assistant Attorney General, Paul D. Clement, Deputy Solicitor General, Jeffrey A. Lamken, Assistant to the Solicitor General, Douglas N. Letter, Barbara L. Herwig, Robert M. Loeb, Attorneys, Department of Justice, Washington, D.C., for Petitioner.

**Opinion**

Justice SOUTER delivered the opinion of the Court.

**\*697** The two issues are whether respondent Alvarez–Machain's allegation that the Drug Enforcement Administration instigated his abduction from Mexico for criminal trial in the United States supports a claim against the Government under the Federal Tort Claims Act (FTCA or Act), 28 U.S.C. §§ 1346(b)(1), 2671– 2680, and whether he may recover under the Alien Tort Statute (ATS), 28 U.S.C. § 1350. We hold that he is not entitled to a remedy under either statute.

I

We have considered the underlying facts before, *United States v. Alvarez–Machain,* 504 U.S. 655, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992). In 1985, an agent of the Drug Enforcement Administration (DEA), Enrique Camarena–Salazar, was captured on assignment in Mexico and taken to a house in Guadalajara, where he was tortured over the course of a 2–day interrogation, then murdered. Based in part on eyewitness testimony, DEA officials in the United States came to believe that respondent Humberto Alvarez–Machain (Alvarez), a Mexican physician, was present at the house and acted to prolong the agent's life in order to extend the interrogation and torture. *Id.,* at 657, 112 S.Ct. 2188.

In 1990, a federal grand jury indicted Alvarez for the torture and murder of Camarena–Salazar, and the United States District Court for the Central District of California issued a **\*698** warrant for his arrest. 331 F.3d 604, 609 (C.A.9 2003) (en banc). The DEA asked the Mexican Government for help in getting Alvarez into the United States, but when the requests and negotiations proved fruitless, the DEA approved a plan to hire Mexican nationals to seize Alvarez and bring him to the United States for trial. As so planned, a group of Mexicans, including petitioner Jose Francisco Sosa, abducted Alvarez from his house, held him overnight in a motel, and brought him by private plane to El Paso, Texas, where he was arrested by federal officers. *Ibid.*

124 S.Ct. 2739, 159 L.Ed.2d 718, 72 USLW 4660, 158 Oil & Gas Rep. 601...

Once in American custody, Alvarez moved to dismiss the indictment on the ground that his seizure was "outrageous governmental conduct," *Alvarez–Machain, 504 U.S., at 658, 112 S.Ct. 2188,* and violated the extradition treaty between the United States and Mexico. The District Court agreed, the Ninth Circuit affirmed, and we reversed, *id., at 670, 112 S.Ct. 2188,* holding that the fact of Alvarez's forcible seizure did not affect the jurisdiction of a federal court. The case was tried in 1992, and ended at the close of the Government's case, when the District Court granted Alvarez's motion for a judgment of acquittal.

**\*\*2747** In 1993, after returning to Mexico, Alvarez began the civil action before us here. He sued Sosa, Mexican citizen and DEA operative Antonio Garate–Bustamante, five unnamed Mexican civilians, the United States, and four DEA agents. *331 F.3d, at 610.* So far as it matters here, Alvarez sought damages from the United States under the FTCA, alleging false arrest, and from Sosa under the ATS, for a violation of the law of nations. The former statute authorizes suit "for ... personal injury ... caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). The latter provides in its entirety that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation **\*699** of the law of nations or a treaty of the United States." § 1350.

The District Court granted the Government's motion to dismiss the FTCA claim, but awarded summary judgment and $25,000 in damages to Alvarez on the ATS claim. A three-judge panel of the Ninth Circuit then affirmed the ATS judgment, but reversed the dismissal of the FTCA claim. 266 F.3d 1045 (2001).

A divided en banc court came to the same conclusion. *331 F.3d, at 641.* As for the ATS claim, the court called on its own precedent, "that [the ATS] not only provides federal courts with subject matter jurisdiction, but also creates a cause of action for an alleged violation of the law of nations." *Id., at 612.* The Circuit then relied upon what it called the "clear and universally recognized norm prohibiting arbitrary arrest and detention," *id., at 620,* to support the conclusion that Alvarez's arrest amounted to a tort in violation of international law. On the FTCA claim, the

Ninth Circuit held that, because "the DEA had no authority to effect Alvarez's arrest and detention in Mexico," *id., at 608,* the United States was liable to him under California law for the tort of false arrest, *id., at 640–641.*

We granted certiorari in these companion cases to clarify the scope of both the FTCA and the ATS. 540 U.S. 1045, 124 S.Ct. 807, 157 L.Ed.2d 692 (2003). We now reverse in each.

## II

The Government seeks reversal of the judgment of liability under the FTCA on two principal grounds. It argues that the arrest could not have been tortious, because it was authorized by 21 U.S.C. § 878, setting out the arrest authority of the DEA, and it says that in any event the liability asserted here falls within the FTCA exception to waiver of sovereign immunity for claims "arising in a foreign country," 28 U.S.C. § 2680(k). We think the exception applies and decide on that ground.

## \*700 A

**[1]** The FTCA "was designed primarily to remove the sovereign immunity of the United States from suits in tort and, with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances." *Richards v. United States,* 369 U.S. 1, 6, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); see also 28 U.S.C. § 2674. The Act accordingly gives federal district courts jurisdiction over claims against the United States for injury "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." § 1346(b)(1). But the Act also limits its **\*\*2748** waiver of sovereign immunity in a number of ways. See § 2680 (no waiver as to, *e.g.,* "[a]ny claim arising out of the loss, miscarriage, or negligent transmission of letters or postal matter," "[a]ny claim for damages caused by the imposition or establishment of a quarantine by the United States," or "[a]ny claim arising from the activities of the Panama Canal Company").

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

[2]    Here the significant limitation on the waiver of immunity is the Act's exception for "[a]ny claim arising in a foreign country," § 2680(k), a provision that on its face seems plainly applicable to the facts of this action. In the Ninth Circuit's view, once Alvarez was within the borders of the United States, his detention was not tortious, see 331 F.3d, at 636–637; the appellate court suggested that the Government's liability to Alvarez rested solely upon a false arrest claim. Id., at 640–641. Alvarez's arrest, however, was said to be "false," and thus tortious, only because, and only to the extent that, it took place and endured in Mexico.[1] The actions **701 in Mexico are thus most naturally understood as the kernel of a "claim arising in a foreign country," and barred from suit under the exception to the waiver of immunity.

[3]    Notwithstanding the straightforward language of the foreign country exception, the Ninth Circuit allowed the action to proceed under what has come to be known as the "headquarters doctrine." Some Courts of Appeals, reasoning that "[t]he entire scheme of the FTCA focuses on the place where the negligent or wrongful act or omission of the government employee occurred," *Sami v. United States,* 617 F.2d 755, 761 (C.A.D.C.1979), have concluded that the foreign country exception does not exempt the United States from suit "for acts or omissions occurring here which have their operative effect in another country," *id.,* at 762 (refusing to apply § 2680(k) where a communique sent from the United States by a federal law enforcement officer resulted in plaintiff's wrongful detention in Germany).[2] Headquarters claims "typically involve allegations of negligent guidance in an office within the United States of employees who cause damage while in a foreign country, or of activities which take place within a foreign country." *Cominotto v. United States,* 802 F.2d 1127, 1130 (C.A.9 1986). In such instances, these courts have concluded that § 2680(k) does not bar suit.

*702  The reasoning of the Ninth Circuit here was that, since Alvarez's abduction in Mexico was the direct result of wrongful **2749 acts of planning and direction by DEA agents located in California, "Alvarez's abduction fits the headquarters doctrine like a glove." 331 F.3d, at 638.

"Working out of DEA offices in Los Angeles, [DEA agents] made the decision to kidnap Alvarez and ... gave [their Mexican intermediary] precise instructions on whom to recruit, how to seize Alvarez, and how he should be treated during the trip to the United States. DEA officials in Washington, D. C., approved the details of the operation. After Alvarez was abducted according to plan, DEA agents supervised his transportation into the United States, telling the arrest team where to land the plane and obtaining clearance in El Paso for landing. The United States, and California in particular, served as command central for the operation carried out in Mexico." Id., at 638–639.

Thus, the Ninth Circuit held that Alvarez's claim did not "aris[e] in" a foreign country.

The potential effect of this sort of headquarters analysis flashes the yellow caution light. "[I]t will virtually always be possible to assert that the negligent activity that injured the plaintiff [abroad] was the consequence of faulty training, selection or supervision—or even less than that, lack of careful training, selection or supervision—in the United States." *Beattie v. United States,* 756 F.2d 91, 119 (C.A.D.C.1984) (Scalia, J., dissenting). Legal malpractice claims, *Knisley v. United States,* 817 F.Supp. 680, 691– 693 (S.D.Ohio 1993), allegations of negligent medical care, *Newborn v. United States,* 238 F.Supp.2d 145, 148–149 (D.D.C.2002), and even slip-and-fall cases, *Eaglin v. United States, Dept. of Army,* 794 F.2d 981, 983–984 (C.A.5 1986), can all be repackaged as headquarters claims based on a failure to train, a failure to warn, the offering of bad advice, or the adoption of a negligent policy. If *703 we were to approve the headquarters exception to the foreign country exception, the " 'headquarters claim' [would] become a standard part of FTCA litigation" in cases potentially implicating the foreign country exception. *Beattie, supra,* at 119 (Scalia, J., dissenting). The headquarters doctrine threatens to swallow the foreign country exception whole, certainly at the pleadings stage.

The need for skepticism is borne out by two considerations. One of them is pertinent to cases like this one, where harm was arguably caused both by individual action in a foreign country as well as by planning in the United States; the other is suggested simply because the harm occurred on foreign soil.

Case 3:20-cv-07721-SL   Document 58-5   Filed 11/10/20   Page 1138 of 1271

Sosa v. Alvarez-Machain, 542 U.S. 692 (2004)

124 S.Ct. 2739, 159 L.Ed.2d 718, 72 USLW 4660, 158 Oil & Gas Rep. 601...

B

Although not every headquarters case is rested on an explicit analysis of proximate causation, this notion of cause is necessary to connect the domestic breach of duty (at headquarters) with the action in the foreign country (in a case like this) producing the foreign harm or injury. It is necessary, in other words, to conclude that the act or omission at home headquarters was sufficiently close to the ultimate injury, and sufficiently important in producing it, to make it reasonable to follow liability back to the headquarters behavior. Only in this way could the behavior at headquarters properly be seen as the act or omission on which all FTCA liability must rest under § 2675. See, *e.g., Cominotto, supra,* at 1130 ("[A] headquarters claim exists where negligent acts in the United States proximately cause harm in a foreign country"); *Eaglin, supra,* at 983 (noting that headquarters cases require "a plausible proximate nexus or connection between acts or omissions in the United States and the resulting damage or injury in a foreign country").

**\*\*2750** Recognizing this connection of proximate cause between domestic behavior and foreign harm or injury is not, however, sufficient of itself to bar application of the foreign country exception to a claim resting on that same foreign consequence. **\*704** Proximate cause is causation substantial enough and close enough to the harm to be recognized by law, but a given proximate cause need not be, and frequently is not, the exclusive proximate cause of harm. See, *e.g.,* 57A Am.Jur.2d § 529 (2004) (discussing proper jury instructions in cases involving multiple proximate causes); *Beattie, supra,* at 121 (Scalia, J., dissenting) ("[I]n the ordinary case there may be *several* points along the chain of causality" pertinent to the enquiry). Here, for example, assuming that the direction by DEA officials in California was a proximate cause of the abduction, the actions of Sosa and others in Mexico were just as surely proximate causes, as well. Thus, understanding that California planning was a legal cause of the harm in no way eliminates the conclusion that the claim here arose from harm proximately caused by acts in Mexico. At most, recognition of additional domestic causation under the headquarters doctrine leaves an open question whether the exception applies to the claim.

C

Not only does domestic proximate causation under the headquarters doctrine fail to eliminate application of the foreign country exception, but there is good reason to think that Congress understood a claim "arising in" a foreign country in such a way as to bar application of the headquarters doctrine. There is good reason, that is, to conclude that Congress understood a claim "arising in a foreign country" to be a claim for injury or harm occurring in a foreign country.

28 U.S.C. § 2680(k). This sense of "arising in" was the common usage in state borrowing statutes contemporary with the Act, which operated to determine which State's statute of limitations should apply in cases involving transjurisdictional facts. When the FTCA was passed, the general rule, as set out in various state statutes, was that "a cause of action arising in another jurisdiction, which is barred by the laws of that jurisdiction, will [also] be barred in the domestic courts." 41 A.L.R.4th 1025, 1029, § 2, 1985 WL 287457 (1985). These borrowing statutes **\*705** were typically restricted by express terms to situations where a cause of action was time barred in the State *"where [the] cause of action arose, or accrued, or originated."* 75 A.L.R. 203, 211 (1931) (emphasis in original). Critically for present purposes, these variations on the theme of "arising in" were interpreted in tort cases in just the same way that we read the FTCA today. A commentator noted in 1962 that, for the purposes of these borrowing statutes, "[t]he courts unanimously hold that a cause of action sounding in tort arises in the jurisdiction where the last act necessary to establish liability occurred"; *i.e.,* "the jurisdiction in which injury was received." Ester, Borrowing Statutes of Limitation and Conflict of Laws, 15 U. Fla. L.Rev. 33, 47.

There is, moreover, specific reason to believe that using "arising in" as referring to place of harm was central to the object of the foreign country exception. Any tort action in a court of the United States based on the acts of a Government employee causing harm outside the State of the district court in which the action is filed requires a determination of the source of the substantive law that will govern liability. When the FTCA was passed, the dominant principle in choice-of-law analysis for tort cases was *lex loci delicti:* courts generally applied the law of the place where the injury occurred. See Richards v. **\*\*2751** *United States,* 369 U.S., at 11–12, 82 S.Ct. 585 ("The general conflict-of-laws rule, followed by a vast majority of the States, is to apply the law of the place of injury to the substantive rights of the parties" (footnote omitted)); see also Restatement (First) of Conflict of Laws § 379 (1934) (defendant's liability

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1139 of 1271

Sosa v. Alvarez-Machain, 542 U.S. 692 (2004)

124 S.Ct. 2739, 159 L.Ed.2d 718, 72 USLW 4660, 158 Oil & Gas Rep. 601...

determined by "the law of the place of wrong"); [3] *id.,* § 377, Note 1 (place of wrong for **\*706** torts involving bodily harm is *"the place where the harmful force takes effect upon the body"* (emphasis in original)); *ibid.* (same principle for torts of fraud and torts involving harm to property). [4] For a plaintiff injured in a foreign country, then, the presumptive choice in American courts under the traditional rule would have been to apply foreign law to determine the tortfeasor's liability. See, *e.g., Day & Zimmermann, Inc. v. Challoner,* 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975) (per curiam) (noting that Texas would apply Cambodian law to wrongful-death action involving explosion in Cambodia of an artillery round manufactured in United States); *Thomas v. FMC Corp.,* 610 F.Supp. 912 (M.D.Ala.1985) (applying German law to determine American manufacturer's liability for negligently designing and manufacturing a Howitzer that killed decedent in Germany); *Quandt v. Beech Aircraft Corp.,* 317 F.Supp. 1009 (D.Del.1970) (noting that Italian law applies to allegations of negligent manufacture in Kansas that resulted in an airplane crash in Italy); *Manos v. Trans World Airlines,* 295 F.Supp. 1170 (N.D.Ill.1969) (applying Italian law to determine American corporation's liability for negligent manufacture of a plane that crashed in Italy); see also, *e.g., Dallas v. Whitney,* 118 W.Va. 106, 188 S.E. 766 (1936) (Ohio law applied where blasting operations on a West Virginia highway caused property damage in Ohio); **\*707** *Cameron v. Vandegriff,* 53 Ark. 381, 13 S.W. 1092 (1890) (Arkansas law applied where a blasting of a rock in Indian territory inflicted injury on plaintiff in Arkansas).

[4] The application of foreign substantive law exemplified in these cases was, however, what Congress intended to avoid by the foreign country exception. In 1942, the House Committee on the Judiciary considered an early draft of the FTCA that would have exempted all claims "arising in a foreign country in behalf of an alien." H.R. 5373, 77th Cong., 2d Sess., § 303(12). The bill was then revised, at the suggestion of the Attorney General, to omit the last five words. In explaining the amendment to the House Committee on the Judiciary, Assistant Attorney General Shea said that

"[c]laims arising in a foreign country have been exempted from this bill, H.R. 6463, whether or not the claimant is an **\*\*2752** alien. Since liability is to be determined by the law of the situs of the wrongful act or omission it is wise to restrict the bill to claims arising in this country. This seems desirable because the law of the particular State is being applied. Otherwise, it will lead I think to a good deal of difficulty." Hearings on H.R. 5373 et al. before the

House Committee on the Judiciary, 77th Cong., 2d Sess., 35 (1942).

The amended version, which was enacted into law and constitutes the current text of the foreign country exception, 28 U.S.C. § 2680(k), thus codified Congress's "unwilling[ness] to subject the United States to liabilities depending upon the laws of a foreign power." *United States v. Spelar,* 338 U.S. 217, 221, 70 S.Ct. 10, 94 L.Ed. 3 (1949). See also *Sami v. United States,* 617 F.2d, at 762 (noting *Spelar's* explanation but attempting to recast the object behind the foreign country exception); *Leaf v. United States,* 588 F.2d 733, 736, n. 3 (C.A.9 1978).

The object being to avoid application of substantive foreign law, Congress evidently used the modifier "arising in a foreign country" to refer to claims based on foreign harm or **\*708** injury, the fact that would trigger application of foreign law to determine liability. That object, addressed by the quoted phrase, would obviously have been thwarted, however, by applying the headquarters doctrine, for that doctrine would have displaced the exception by recasting claims of foreign injury as claims not arising in a foreign country because some planning or negligence at domestic headquarters was their cause. [5] And that, in turn, would have resulted in applying foreign law of the place of injury, in accordance with the choice-of-law rule of the headquarters jurisdiction.

Nor, as a practical matter, can it be said that the headquarters doctrine has outgrown its tension with the exception. It is true that the traditional approach to choice of substantive tort law has lost favor, Simson, The Choice–of–Law Revolution in the United States: Notes on Rereading Von Mehren, 36 Cornell Int'l L.J. 125 (2002) ("The traditional methodology of place of wrong ... has receded in importance, and new approaches and concepts such as governmental interest analysis, most significant relationship, and better rule of law have taken over center stage" (footnotes omitted)). [6] **\*709** But a good many States still employ essentially the same choice-of-law analysis in tort cases that the First Restatement exemplified. Symeonides, **\*\*2753** Choice of Law in the American Courts, 51 Am. J. Comp. L. 1, 4–5 (2003) ("Ten states continue to adhere to the traditional method in tort conflicts"); see, *e.g., Raskin v. Allison,* 30 Kan.App.2d 1240, 1242, 1241, 57 P.3d 30, 32 (2002) (under "traditional choice of law principles largely reflected in the original Restatement,"

Mexican law applied to boating accident in Mexican waters because "the injuries were sustained in Mexican waters").

Equally to the point is that in at least some cases that the Court of Appeals's approach would treat as arising at headquarters, not the foreign country, even the later methodologies of choice point to the application of foreign law. The Second Restatement itself, encouraging the general shift toward using flexible balancing analysis to inform choice of law, [7] includes a default rule for tort cases rooted in the traditional approach: "[i]n an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless ... some other state has a more significant relationship ... to the occurrence and the parties." Restatement 2d § 146; see also *id., Comment e* ("On occasion, conduct and personal injury will occur in different states. In such instances, the local law of the state of injury will usually be applied to determine most issues involving the tort"). In practice, then, the new dispensation frequently leads to the traditional application of the  **\*710**  law of the jurisdiction of injury. See, *e.g.,* 🔷 *Dorman v. Emerson Elec. Co.,* 23 F.3d 1354 (C.A.8 1994) (applying Canadian law where negligent saw design in Missouri caused injury in Canada); 🔷 *Bing v. Halstead,* 495 F.Supp. 517 (S.D.N.Y.1980) (applying Costa Rican law where letter written and mailed in Arizona caused mental distress in Costa Rica); *McKinnon v. F.H. Morgan & Co.,* 170 Vt. 422, 750 A.2d 1026 (2000) (applying Canadian law where a defective bicycle sold in Vermont caused injuries in Quebec).

In sum, current flexibility in choice-of-law methodology gives no assurance against applying foreign substantive law if federal courts follow headquarters doctrine to assume jurisdiction over tort claims against the Government for foreign harm. Based on the experience just noted, the expectation is that application of the headquarters doctrine would in fact result in a substantial number of cases applying the very foreign law the foreign country exception was meant to avoid. [8]

 **\*\*2754**  Before concluding that headquarters analysis should have no part in applying the foreign country exception, however,  **\*711**  a word is needed to answer an argument for selective application of headquarters doctrine, that it ought to be permitted when a State's choice-of-law approach would not apply the foreign law of place of injury. See 🚩 *In re "Agent Orange" Product Liability Litigation,* 580 F.Supp. 1242, 1254 (E.D.N.Y.1984) (noting that the purpose of the

exception did not apply to the litigation at hand because foreign law was not implicated). The point would be well taken, of course, if Congress had written the exception to apply when foreign law would be applied. But that is not what Congress said. Its provision of an exception when a claim arises in a foreign country was written at a time when the phrase "arising in" was used in state statutes to express the position that a claim arises where the harm occurs; and the odds are that Congress meant simply this when it used the "arising in" language. [9] Finally, even if it were not a stretch to equate "arising in a foreign country" with "implicating foreign law," the result of accepting headquarters analysis for foreign injury cases in which no application of foreign law would ensue would be a scheme of federal jurisdiction that would vary from State to State, benefiting or penalizing plaintiffs accordingly. The idea that Congress would have intended any  **\*712**  such jurisdictional variety is too implausible to drive the analysis to the point of grafting even a selective headquarters exception onto the foreign country exception itself. We therefore hold that the FTCA's foreign country exception bars all claims based on any injury suffered in a foreign country, regardless of where the tortious act or omission occurred.

### III

Alvarez has also brought an action under the ATS against petitioner Sosa, who argues (as does the United States supporting him) that there is no relief under the ATS because the statute does no more than vest federal courts with jurisdiction, neither creating nor authorizing the courts to recognize any particular right of action without further congressional action. Although we agree the statute is in terms only jurisdictional, we think that at the time of enactment the jurisdiction enabled federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law. We do not believe, however, that the limited, implicit sanction to entertain the handful of international law *cum* common law claims understood in 1789 should be taken as authority to recognize the right of action asserted by Alvarez here.

#### A

**[5]**   Judge Friendly called the ATS a "legal Lohengrin," 🚩  **\*\*2755**  *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1015 (C.A.2

Sosa v. Alvarez-Machain, 542 U.S. 692 (2004)

Case 3:20-cv-07721-SL    Document 58-5    Filed 11/10/20    Page 1141 of 1271

124 S.Ct. 2739, 159 L.Ed.2d 718, 72 USLW 4660, 158 Oil & Gas Rep. 601...

1975); "no one seems to know whence it came," *ibid.,* and for over 170 years after its enactment it provided jurisdiction in only one case. The first Congress passed it as part of the Judiciary Act of 1789, in providing that the new federal district courts "shall also have cognizance, concurrent with the courts of the several States, or the circuit courts, as the case may be, of all causes where an alien sues for a tort only in violation of the *713 law of nations or a treaty of the United States." Act of Sept. 24, 1789, ch. 20, § 9, 1 Stat. 77. [10]

The parties and *amici* here advance radically different historical interpretations of this terse provision. Alvarez says that the ATS was intended not simply as a jurisdictional grant, but as authority for the creation of a new cause of action for torts in violation of international law. We think that reading is implausible. As enacted in 1789, the ATS gave the district courts "cognizance" of certain causes of action, and the term bespoke a grant of jurisdiction, not power to mold substantive law. See, *e.g.,* The Federalist No. 81, pp. 447, 451 (J. Cooke ed. 1961) (A.Hamilton) (using "jurisdiction" interchangeably with "cognizance"). The fact that the ATS was placed in § 9 of the Judiciary Act, a statute otherwise exclusively concerned with federal-court jurisdiction, is itself support for its strictly jurisdictional nature. Nor would the distinction between jurisdiction and cause of action have been elided by the drafters of the Act or those who voted on it. As Fisher Ames put it, "there is a substantial difference between the jurisdiction of the courts and the rules of decision." 1 Annals of Cong. 807 (Gales ed. 1834). It is unsurprising, then, that an authority on the historical origins of the ATS has written that "section 1350 clearly does not create a statutory cause of action," and that the contrary suggestion is "simply frivolous." Casto, The Federal Courts' Protective Jurisdiction over Torts Committed in Violation of the Law of Nations, 18 Conn. L.Rev. 467, 479, 480 (1986) (hereinafter Casto, Law of Nations); cf. Dodge, The Constitutionality of the Alien Tort Statute: Some Observations on Text and Context, 42 Va. J. Int'l L. 687, 689 (2002). *714 In sum, we think the statute was intended as jurisdictional in the sense of addressing the power of the courts to entertain cases concerned with a certain subject.

But holding the ATS jurisdictional raises a new question, this one about the interaction between the ATS at the time of its enactment and the ambient law of the era. Sosa would have it that the ATS was stillborn because there could be no claim for relief without a further statute expressly authorizing adoption of causes of action. *Amici* professors of federal jurisdiction and legal history take a different tack, that federal courts

could entertain claims once the jurisdictional grant was on the books, because torts in violation of the law of nations would have been recognized within the common law of the time. Brief for Vikram Amar et al. as *Amici Curiae.* We think history and practice give the edge to this latter position.

1

[6] "When the *United States* declared their independence, they were bound to receive the law of nations, in its modern state of purity and refinement." Ware v. Hylton, 3 Dall. 199, 281, 1 L.Ed. 568 (1796) (Wilson, J.). In the years of the early **2756 Republic, this law of nations comprised two principal elements, the first covering the general norms governing the behavior of national states with each other: *"the science which teaches the rights subsisting between nations or states, and the obligations correspondent to those rights,"* E. de Vattel, Law of Nations, Preliminaries § 3 (J. Chitty et al. transl. and ed. 1883) (hereinafter Vattel) (footnote omitted), or *"that code of public instruction which defines the rights and prescribes the duties of nations, in their intercourse with each other,"* 1 J. Kent, Commentaries on American Law *1. This aspect of the law of nations thus occupied the executive and legislative domains, not the judicial. See 4 W. Blackstone, Commentaries on the Laws of England 68 (1769) (hereinafter Commentaries) ("[O]ffences against" the law of nations are "principally incident to whole states or nations").

*715 The law of nations included a second, more pedestrian element, however, that did fall within the judicial sphere, as a body of judge-made law regulating the conduct of individuals situated outside domestic boundaries and consequently carrying an international savor. To Blackstone, the law of nations in this sense was implicated "in mercantile questions, such as bills of exchange and the like; in all marine causes, relating to freight, average, demurrage, insurances, bottomry ...; [and] in all disputes relating to prizes, to shipwrecks, to hostages, and ransom bills." *Id.,* at 67. The law merchant emerged from the customary practices of international traders and admiralty required its own transnational regulation. And it was the law of nations in this sense that our precursors spoke about when the Court explained the status of coast fishing vessels in wartime grew from "ancient usage among civilized nations, beginning centuries ago, and gradually ripening into a rule of international law ...." The Paquete Habana, 175 U.S. 677, 686, 20 S.Ct. 290, 44 L.Ed. 320 (1900).

There was, finally, a sphere in which these rules binding individuals for the benefit of other individuals overlapped with the norms of state relationships. Blackstone referred to it when he mentioned three specific offenses against the law of nations addressed by the criminal law of England: violation of safe conducts, infringement of the rights of ambassadors, and piracy. 4 Commentaries 68. An assault against an ambassador, for example, impinged upon the sovereignty of the foreign nation and if not adequately redressed could rise to an issue of war. See Vattel 463–464. It was this narrow set of violations of the law of nations, admitting of a judicial remedy and at the same time threatening serious consequences in international affairs, that was probably on minds of the men who drafted the ATS with its reference to tort.


2

Before there was any ATS, a distinctly American preoccupation with these hybrid international norms had taken **\*716** shape owing to the distribution of political power from independence through the period of confederation. The Continental Congress was hamstrung by its inability to "cause infractions of treaties, or of the law of nations to be punished," J. Madison, Journal of the Constitutional Convention 60 (E. Scott ed. 1893), and in 1781 the Congress implored the States to vindicate rights under the law of nations. In words that echo Blackstone, the congressional resolution called upon state legislatures to "provide expeditious, exemplary and adequate punishment" for "the violation of safe conducts or passports, ... of hostility against such as are in amity ... with the United States, ... infractions of the immunities of ambassadors and other public ministers ... **\*\*2757** [and] infractions of treaties and conventions to which the United States are a party." 21 Journals of the Continental Congress 1136–1137 (G. Hunt ed.1912) (hereinafter Journals of the Continental Congress). The resolution recommended that the States "authorise suits ... for damages by the party injured, and for compensation to the United States for damage sustained by them from an injury done to a foreign power by a citizen." *Id.,* at 1137; cf. Vattel 463–464 ("Whoever offends ... a public minister ... should be punished ..., and ... the state should, at the expense of the delinquent, give full satisfaction to the sovereign who has been offended in the person of his minister"). Apparently only one State acted upon the recommendation, see Public Records of the State of Connecticut, 1782, pp. 82, 83 (L. Larabee ed.1982) (1942 compilation, exact date of Act unknown), but Congress had

done what it could to signal a commitment to enforce the law of nations.

Appreciation of the Continental Congress's incapacity to deal with this class of cases was intensified by the so-called Marbois incident of May 1784, in which a French adventurer, De Longchamps, verbally and physically assaulted the Secretary of the French Legion in Philadelphia. See **\*717** *Republica v. De Longchamps,* 1 Dall. 111, 1 L.Ed. 59 (O.T. Phila.1784). [11] Congress called again for state legislation addressing such matters, and concern over the inadequate vindication of the law of nations persisted through the time of the Constitutional Convention. See 1 Records of the Federal Convention of 1787, p. 25 (M. Farrand ed.1911) (speech of J. Randolph). During the Convention itself, in fact, a New York City constable produced a reprise of the Marbois affair and Secretary Jay reported to Congress on the Dutch Ambassador's protest, with the explanation that " 'the federal government does not appear ... to be vested with any judicial Powers competent to the Cognizance and Judgment of such Cases.' " Casto, Law of Nations 494, and n. 152.

The Framers responded by vesting the Supreme Court with original jurisdiction over "all Cases affecting Ambassadors, other public ministers and Consuls." U.S. Const., Art. III, § 2, and the First Congress followed through. The Judiciary Act reinforced this Court's original jurisdiction over suits brought by diplomats, see 1 Stat. 80, ch. 20, § 13, created alienage jurisdiction, § 11, and, of course, included the ATS, § 9. See generally Randall, Federal Jurisdiction over International Law Claims: Inquiries into the Alien Tort Statute, 18 N.Y.U.J. Int'l L. & Pol. 1, 15–21 (1985) (hereinafterRandall) **\*718** discussing foreign affairs implications of the Judiciary Act); W. Casto, The Supreme Court in the Early Republic 27–53 (1995).


3

Although Congress modified the draft of what became the Judiciary Act, see generally **\*\*2758** Warren, New Light on the History of the Federal Judiciary Act of 1789, 37 Harv. L.Rev. 49 (1923), it made hardly any changes to the provisions on aliens, including what became the ATS, see Casto, Law of Nations 498. There is no record of congressional discussion about private actions that might be subject to the jurisdictional provision, or about any need for further legislation to create private remedies; there is

Sosa v. Alvarez-Machain, 542 U.S. 692 (2004)

124 S.Ct. 2739, 159 L.Ed.2d 718, 72 USLW 4660, 158 Oil & Gas Rep. 601...

no record even of debate on the section. Given the poverty of drafting history, modern commentators have necessarily concentrated on the text, remarking on the innovative use of the word "tort," see, *e.g.,* Sweeney, A Tort only in Violation of the Law of Nations, 18 Hastings Int'l & Comp. L.Rev. 445 (1995) (arguing that "tort" refers to the law of prize), and the statute's mixture of terms expansive ("all suits"), see, *e.g.,* Casto, Law of Nations 500, and restrictive ("for a tort only"), see, *e.g.,* Randall at 28–31 (limiting suits to torts, as opposed to commercial actions, especially by British plaintiffs). [12] The historical scholarship has also placed the ATS within the competition between federalist and antifederalist forces over the national role in foreign relations. *Id.,* at 22–23 (nonexclusiveness of federal jurisdiction under the ATS may reflect compromise). But despite considerable scholarly attention, it is fair to say **\*719** that a consensus understanding of what Congress intended has proven elusive.

Still, the history does tend to support two propositions. First, there is every reason to suppose that the First Congress did not pass the ATS as a jurisdictional convenience to be placed on the shelf for use by a future Congress or state legislature that might, someday, authorize the creation of causes of action or itself decide to make some element of the law of nations actionable for the benefit of foreigners. The anxieties of the preconstitutional period cannot be ignored easily enough to think that the statute was not meant to have a practical effect. Consider that the principal draftsman of the ATS was apparently Oliver Ellsworth, [13] previously a member of the Continental Congress that had passed the 1781 resolution and a member of the Connecticut Legislature that made good on that congressional request. See generally W. Brown, The Life of Oliver Ellsworth (1905). Consider, too, that the First Congress was attentive enough to the law of nations to recognize certain offenses expressly as criminal, including the three mentioned by Blackstone. See An Act for the Punishment of Certain Crimes Against the United States, § 8, 1 Stat. 113–114 (murder or robbery, or other capital crimes, punishable as piracy if committed on the high seas), and § 28, *id.,* at 118 (violation of safe conducts and assaults against ambassadors punished by imprisonment and fines described as "infract[ions of] the law of nations"). It would have been passing strange for Ellsworth and this very Congress to vest federal courts expressly with jurisdiction to entertain civil causes brought by aliens alleging violations of the law of nations, but to no effect whatever until the Congress should take further action. There is too much in the historical record to believe that Congress **\*\*2759** would have enacted the ATS only to leave it lying fallow indefinitely.

**\*720** The second inference to be drawn from the history is that Congress intended the ATS to furnish jurisdiction for a relatively modest set of actions alleging violations of the law of nations. Uppermost in the legislative mind appears to have been offenses against ambassadors, see *id.,* at 118; violations of safe conduct were probably understood to be actionable, *ibid.,* and individual actions arising out of prize captures and piracy may well have also been contemplated, *id.,* at 113–114. But the common law appears to have understood only those three of the hybrid variety as definite and actionable, or at any rate, to have assumed only a very limited set of claims. As Blackstone had put it, "offences against this law [of nations] are principally incident to whole states or nations," and not individuals seeking relief in court. 4 Commentaries 68.

4

The sparse contemporaneous cases and legal materials referring to the ATS tend to confirm both inferences, that some, but few, torts in violation of the law of nations were understood to be within the common law. In *Bolchos v. Darrel,* 3 F.Cas. 810 (No. 1,607) (S.C. 1795), the District Court's doubt about admiralty jurisdiction over a suit for damages brought by a French privateer against the mortgagee of a British slave ship was assuaged by assuming that the ATS was a jurisdictional basis for the court's action. Nor is *Moxon v. The Fanny,* 17 F. Cas. 942 (No. 9,895) (D.Pa.1793), to the contrary, a case in which the owners of a British ship sought damages for its seizure in United States waters by a French privateer. The District Court said in dictum that the ATS was not the proper vehicle for suit because "[i]t cannot be called a suit for a tort only, when the property, as well as damages for the supposed trespass, are sought for." *Id.,* at 948. But the judge gave no intimation that further legislation would have been needed to give the District Court jurisdiction over a suit limited to damages.

**\*721** Then there was the 1795 opinion of Attorney General William Bradford, who was asked whether criminal prosecution was available against Americans who had taken part in the French plunder of a British slave colony in Sierra Leone. 1 Op. Atty. Gen. 57. Bradford was uncertain, but he made it clear that a federal court was open for the prosecution of a tort action growing out of the episode:

"But there can be no doubt that the company or individuals who have been injured by these acts of hostility have a remedy by a *civil* suit in the courts of the United States; jurisdiction being expressly given to these courts in all cases where an alien sues for a tort only, in violation of the laws of nations, or a treaty of the United States ...." *Id.,* at 59.

Although it is conceivable that Bradford (who had prosecuted in the Marbois incident, see Casto, Law of Nations 503, n. 201) assumed that there had been a violation of a treaty, 1 Op. Atty. Gen., at 58, that is certainly not obvious, and it appears likely that Bradford understood the ATS to provide jurisdiction over what must have amounted to common law causes of action.

B

Against these indications that the ATS was meant to underwrite litigation of a narrow set of common law actions derived from the law of nations, Sosa raises two main objections. First, he claims that this conclusion makes no sense in view of the Continental Congress's 1781 recommendation to state legislatures to pass laws authorizing **\*\*2760** such suits. Sosa thinks state legislation would have been "absurd," Reply Brief for Petitioner Sosa 5, if common law remedies had been available. Second, Sosa juxtaposes Blackstone's treatise mentioning violations of the law of nations as occasions for criminal remedies, against the statute's innovative reference to "tort," as evidence that there was no familiar **\*722** set of legal actions for exercise of jurisdiction under the ATS. Neither argument is convincing.

The notion that it would have been absurd for the Continental Congress to recommend that States pass positive law to duplicate remedies already available at common law rests on a misunderstanding of the relationship between common law and positive law in the late 18th century, when positive law was frequently relied upon to reinforce and give standard expression to the "brooding omnipresence" [14] of the common law then thought discoverable by reason. As Blackstone clarified the relation between positive law and the law of nations, "those acts of parliament, which have from time to time been made to enforce this universal law, or to facilitate the execution of [its] decisions, are not to be considered as introductive of any new rule, but merely as declaratory of the old fundamental constitutions of the kingdom; without

which it must cease to be a part of the civilized world." 4 Commentaries 67. Indeed, Sosa's argument is undermined by the 1781 resolution on which he principally relies. Notwithstanding the undisputed fact (per Blackstone) that the common law afforded criminal law remedies for violations of the law of nations, the Continental Congress encouraged state legislatures to pass criminal statutes to the same effect, and the first Congress did the same, *supra,* at 2758. [15]

**\*723** Nor are we convinced by Sosa's argument that legislation conferring a right of action is needed because Blackstone treated international law offenses under the rubric of "public wrongs," whereas the ATS uses a word, "tort," that was relatively uncommon in the legal vernacular of the day. It is true that Blackstone did refer to what he deemed the three principal **\*\*2761** offenses against the law of nations in the course of discussing criminal sanctions, observing that it was in the interest of sovereigns "to animadvert upon them with a becoming severity, that the peace of the world may be maintained," 4 Commentaries 68. [16] But Vattel explicitly linked **\*724** the criminal sanction for offenses against ambassadors with the requirement that the state, "at the expense of the delinquent, give full satisfaction to the sovereign who has been offended in the person of his minister." Vattel 463–464. Cf. Stephens, Individuals Enforcing International Law: The Comparative and Historical Context, 52 DePaul L.Rev. 433, 444 (2002) (observing that a "mixed approach to international law violations, encompassing both criminal prosecution ... and compensation to those injured through a civil suit, would have been familiar to the founding generation"). The 1781 resolution goes a step further in showing that a private remedy was thought necessary for diplomatic offenses under the law of nations. And the Attorney General's Letter of 1795, as well as the two early federal precedents discussing the ATS, point to a prevalent assumption that Congress did not intend the ATS to sit on the shelf until some future time when it might enact further legislation.

In sum, although the ATS is a jurisdictional statute creating no new causes of action, the reasonable inference from the historical materials is that the statute was intended to have practical effect the moment it became law. The jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time.

AR.06369

IV

[7]   We think it is correct, then, to assume that the First Congress understood that the district courts would recognize private causes of action for certain torts in violation of the law of nations, though we have found no basis to suspect Congress had any examples in mind beyond those torts corresponding to Blackstone's three primary offenses: violation of safe conducts, infringement of the rights of ambassadors, and piracy. We assume, too, that no development in the two centuries from the enactment of § 1350 to the birth of the

**\*725**  modern line of cases beginning with *Filartiga v. Pena–Irala,* 630 F.2d 876 (C.A.2 1980), has categorically precluded federal courts from recognizing a claim under the law of nations as an element of common law; Congress has not in any relevant way amended § 1350 or limited civil common law power by another statute. Still, there are good reasons for a restrained conception of the discretion a federal court should exercise in considering a new cause of action of this kind. Accordingly, we think courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of **\*\*2762**  the 18th-century paradigms we have recognized. This requirement is fatal to Alvarez's claim.

A

A series of reasons argue for judicial caution when considering the kinds of individual claims that might implement the jurisdiction conferred by the early statute. First, the prevailing conception of the common law has changed since 1789 in a way that counsels restraint in judicially applying internationally generated norms. When § 1350 was enacted, the accepted conception was of the common law as "a transcendental body of law outside of any particular State but obligatory within it unless and until changed by statute." *Black and White Taxicab & Transfer Co. v. Brown and Yellow Taxicab & Transfer Co.,* 276 U.S. 518, 533, 48 S.Ct. 404, 72 L.Ed. 681 (1928) (Holmes, J., dissenting). Now, however, in most cases where a court is asked to state or formulate a common law principle in a new context, there is a general understanding that the law is not so much found or discovered as it is either made or created. Holmes explained famously in 1881 that

"in substance the growth of the law is legislative ... [because t]he very considerations which judges most rarely mention, and always with an apology, are the secret root from which the law draws all the juices of life.  **\*726**  I mean, of course, considerations of what is expedient for the community concerned." The Common Law 31–32 (Howe ed.1963).

One need not accept the Holmesian view as far as its ultimate implications to acknowledge that a judge deciding in reliance on an international norm will find a substantial element of discretionary judgment in the decision.

Second, along with, and in part driven by, that conceptual development in understanding common law has come an equally significant rethinking of the role of the federal courts in making it. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), was the watershed in which we denied the existence of any federal "general" common law, *id.,* at 78, 58 S.Ct. 817, which largely withdrew to havens of specialty, some of them defined by express congressional authorization to devise a body of law directly, *e.g., Textile Workers v. Lincoln Mills of Ala.,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) (interpretation of collective-bargaining agreements); Fed. Rule Evid. 501 (evidentiary privileges in federal-question cases). Elsewhere, this Court has thought it was in order to create federal common law rules in interstitial areas of particular federal interest. *E.g., United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 726–727, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). [17]  And although we have even assumed competence to make judicial rules of decision of particular importance to foreign relations, such as the act of state doctrine, see *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 427, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), the general practice has been to look for legislative guidance before exercising innovative authority over substantive law. It would be remarkable to take a more aggressive role in exercising a jurisdiction that remained largely in shadow for much of the prior two centuries.

[8]   **\*727**  Third, this Court has recently and repeatedly said that a decision to create a private right of action is one better left to legislative judgment in the great  **\*\*2763**  majority of cases. *Correctional Services Corp. v. Malesko,* 534 U.S. 61, 68, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001); *Alexander v. Sandoval,* 532 U.S. 275, 286–287, 121 S.Ct.

1511, 149 L.Ed.2d 517 (2001). The creation of a private right of action raises issues beyond the mere consideration whether underlying primary conduct should be allowed or not, entailing, for example, a decision to permit enforcement without the check imposed by prosecutorial discretion. Accordingly, even when Congress has made it clear by statute that a rule applies to purely domestic conduct, we are reluctant to infer intent to provide a private cause of action where the statute does not supply one expressly. While the absence of congressional action addressing private rights of action under an international norm is more equivocal than its failure to provide such a right when it creates a statute, the possible collateral consequences of making international rules privately actionable argue for judicial caution.

Fourth, the subject of those collateral consequences is itself a reason for a high bar to new private causes of action for violating international law, for the potential implications for the foreign relations of the United States of recognizing such causes should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs. It is one thing for American courts to enforce constitutional limits on our own State and Federal Governments' power, but quite another to consider suits under rules that would go so far as to claim a limit on the power of foreign governments over their own citizens, and to hold that a foreign government or its agent has transgressed those limits. Cf. *Sabbatino, supra,* at 431–432, 84 S.Ct. 923. Yet modern international law is very much concerned with just such questions, and apt to stimulate calls for vindicating private interests in § 1350 cases. Since many attempts by federal courts to craft remedies for the violation **\*728** of new norms of international law would raise risks of adverse foreign policy consequences, they should be undertaken, if at all, with great caution. Cf. *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 813 (C.A.D.C.1984) (Bork, J., concurring) (expressing doubt that § 1350 should be read to require "our courts [to] sit in judgment of the conduct of foreign officials in their own countries with respect to their own citizens").

[9]    The fifth reason is particularly important in light of the first four. We have no congressional mandate to seek out and define new and debatable violations of the law of nations, and modern indications of congressional understanding of the judicial role in the field have not affirmatively encouraged greater judicial creativity. It is true that a clear mandate appears in the Torture Victim Protection Act of 1991,

106 Stat. 73, providing authority that "establish[es] an unambiguous and modern basis for" federal claims of torture and extrajudicial killing, H.R.Rep. No. 102–367, pt. 1, p. 3 (1991). But that affirmative authority is confined to specific subject matter, and although the legislative history includes the remark that § 1350 should "remain intact to permit suits based on other norms that already exist or may ripen in the future into rules of customary international law," *id.,* at 4, Congress as a body has done nothing to promote such suits. Several times, indeed, the Senate has expressly declined to give the federal courts the task of interpreting and applying international human rights law, as when its ratification of the International Covenant on Civil and Political Rights declared that the substantive provisions of the document were not self-executing. 138 Cong. Rec. 8071 (1992).

**\*\*2764**    **B**

These reasons argue for great caution in adapting the law of nations to private rights. Justice SCALIA, *post,* p. 2769 (opinion concurring in part and concurring in judgment), concludes that caution is too hospitable, and a word is in order **\*729** to summarize where we have come so far and to focus our difference with him on whether some norms of today's law of nations may ever be recognized legitimately by federal courts in the absence of congressional action beyond § 1350. All Members of the Court agree that § 1350 is only jurisdictional. We also agree, or at least Justice SCALIA does not dispute, *post,* at 2770, 2772–2773, that the jurisdiction was originally understood to be available to enforce a small number of international norms that a federal court could properly recognize as within the common law enforceable without further statutory authority. Justice Scalia concludes, however, that two subsequent developments should be understood to preclude federal courts from recognizing any further international norms as judicially enforceable today, absent further congressional action. As described before, we now tend to understand common law not as a discoverable reflection of universal reason but, in a positivistic way, as a product of human choice. And we now adhere to a conception of limited judicial power first expressed in reorienting federal diversity jurisdiction, see *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), that federal courts have no authority to derive "general" common law.

Whereas Justice SCALIA sees these developments as sufficient to close the door to further independent

judicial recognition of actionable international norms, other considerations persuade us that the judicial power should be exercised on the understanding that the door is still ajar subject to vigilant doorkeeping, and thus open to a narrow class of international norms today. *Erie* did not in terms bar any judicial recognition of new substantive rules, no matter what the circumstances, and post-*Erie* understanding has identified limited enclaves in which federal courts may derive some substantive law in a common law way. For two centuries we have affirmed that the domestic law of the United States recognizes the law of nations. See, *e.g.,* Sabbatino, 376 U.S., at 423, 84 S.Ct. 923 ("[I]t is, of course, true that United States *730 courts apply international law as a part of our own in appropriate circumstances"); [18] The Paquete Habana, 175 U.S., at 700, 20 S.Ct. 290 ("International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination"); *The Nereide,* 9 Cranch 388, 423, 3 L.Ed. 769 (1815) (Marshall, C.J.) ("[T]he Court is bound by the law of nations which is a part of the law of the land");

see also Texas Industries, Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 641, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981) (recognizing that "international disputes implicating ... our relations with foreign nations" are one of the "narrow areas" in which "federal common law" continues to exist). It would take some explaining to say now that federal courts must avert **2765 their gaze entirely from any international norm intended to protect individuals.

We think an attempt to justify such a position would be particularly unconvincing in light of what we know about congressional understanding bearing on this issue lying at the intersection of the judicial and legislative powers. The First Congress, which reflected the understanding of the framing generation and included some of the Framers, assumed that federal courts could properly identify some international norms as enforceable in the exercise of § 1350 jurisdiction. We think it would be unreasonable to assume that the First Congress would have expected federal courts to lose all capacity to recognize enforceable international norms simply because the common law might lose some metaphysical cachet on the road to modern realism. Later Congresses *731 seem to have shared our view. The position we take today has been assumed by some federal courts for 24 years, ever since the Second Circuit decided *Filartiga v. Pena–Irala,* 630 F.2d 876 (C.A.2 1980), and for practical purposes the point of today's disagreement has been focused since the exchange between Judge Edwards and Judge Bork in Tel–Oren v. Libyan Arab Republic, 726 F.2d 774 (C.A.D.C.1984). Congress, however, has not only expressed no disagreement with our view of the proper exercise of the judicial power, but has responded to its most notable instance by enacting legislation supplementing the judicial determination in some detail. See *supra,* at 2763 (discussing the Torture Victim Protection Act).

While we agree with Justice SCALIA to the point that we would welcome any congressional guidance in exercising jurisdiction with such obvious potential to affect foreign relations, nothing Congress has done is a reason for us to shut the door to the law of nations entirely. It is enough to say that Congress may do that at any time (explicitly, or implicitly by treaties or statutes that occupy the field), just as it may modify or cancel any judicial decision so far as it rests on recognizing an international norm as such. [19]

C

[10]   We must still, however, derive a standard or set of standards for assessing the particular claim Alvarez raises, and *732 for this action it suffices to look to the historical antecedents. Whatever the ultimate criteria for accepting a cause of action subject to jurisdiction under § 1350, we are persuaded that federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted. See, *e.g.,* United States v. Smith, 5 Wheat. 153, 163–180, n. a, 5 L.Ed. 57 (1820) (illustrating the specificity with which the law of nations defined piracy). This limit upon judicial recognition is generally consistent with the reasoning of many of the courts and **2766 judges who faced the issue before it reached this Court. See *Filartiga, supra,* at 890 ("[F]or purposes of civil liability, the torturer has become—like the pirate and slave trader before him—*hostis humani generis,* an enemy of all mankind"); *Tel–Oren, supra,* at 781 (Edwards, J., concurring) (suggesting that the "limits of section 1350's reach" be defined by "a handful of heinous actions—each of which violates definable, universal and obligatory norms");

see also In re Estate of Marcos Human Rights Litigation, 25 F.3d 1467, 1475 (C.A.9 1994) ("Actionable violations of international law must be of a norm that is specific, universal,

Sosa v. Alvarez-Machain, 542 U.S. 692 (2004)

Case 3:20-cv-07721-SL    Document 58-5    Filed 11/10/20    Page 1148 of 1271

124 S.Ct. 2739, 159 L.Ed.2d 718, 72 USLW 4660, 158 Oil & Gas Rep. 601...

and obligatory"). And the determination whether a norm is sufficiently definite to support a cause of action [20] should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of **\*733** making that cause available to litigants in the federal courts. [21]

[11]  Thus, Alvarez's detention claim must be gauged against the current state of international law, looking to those sources we have long, albeit cautiously, recognized.

> **\*734** "[W]here there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations; **\*\*2767** and, as evidence of these, to the works of jurists and commentators, who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is." *The Paquete Habana,* 175 U.S., at 700, 20 S.Ct. 290.

[12]  To begin with, Alvarez cites two well-known international agreements that, despite their moral authority, have little utility under the standard set out in this opinion. He says that his abduction by Sosa was an "arbitrary arrest" within the meaning of the Universal Declaration of Human Rights (Declaration), G.A. Res. 217A (III), U.N. Doc. A/810 (1948). And he traces the rule against arbitrary arrest not only to the Declaration, but also to article nine of the International Covenant on Civil and Political Rights (Covenant), Dec. 16, 1966, 999 U.N.T.S. 171, [22] to which the United States is a party, and to various other conventions to which it is not. But the Declaration does not of its own force impose obligations as a matter of international law. See Humphrey, The UN Charter and the Universal Declaration of Human Rights, in The International Protection of Human Rights 39, 50 (E. Luard ed.1967) (quoting Eleanor Roosevelt calling the Declaration " 'a statement of principles ... setting up a common standard of achievement for all peoples and all nations' " **\*735** and " 'not a treaty or international agreement ... impos[ing] legal obligations' "). [23] And, although the Covenant does bind the United States as a matter of international law, the United States ratified the Covenant on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts. See *supra,* at 2763. Accordingly, Alvarez cannot say that the Declaration and Covenant themselves establish the relevant and applicable rule of international law. He instead attempts to show that prohibition of arbitrary arrest has attained the status of binding customary international law.

Here, it is useful to examine Alvarez's complaint in greater detail. As he presently argues it, the claim does not rest on the cross-border feature of his abduction. [24] Although the District Court granted relief in part on finding a violation of international law in taking Alvarez across the border from Mexico to the United States, the Court of Appeals rejected that ground of liability for failure to identify a norm of requisite force prohibiting a forcible abduction across a border. Instead, it relied on the conclusion that the law of the United States did not authorize Alvarez's arrest, because the DEA lacked extraterritorial authority under 21 U.S.C. § 878, and because **\*\*2768** Federal Rule of Criminal Procedure 4(d)(2) limited the warrant for Alvarez's arrest to "the jurisdiction of the United States." [25] It is this position that Alvarez takes now: **\*736** that his arrest was arbitrary and as such forbidden by international law not because it infringed the prerogatives of Mexico, but because no applicable law authorized it. [26]

Alvarez thus invokes a general prohibition of "arbitrary" detention defined as officially sanctioned action exceeding positive authorization to detain under the domestic law of some government, regardless of the circumstances. Whether or not this is an accurate reading of the Covenant, Alvarez cites little authority that a rule so broad has the status of a binding customary norm today. [27] He certainly cites nothing to justify the federal courts in taking his broad rule as the predicate for a federal lawsuit, for its implications would be breathtaking. His rule would support a cause of action in federal court for any arrest, anywhere in the world, unauthorized by the law of the jurisdiction in which it took place, and would create a cause of action for any seizure of an alien in violation of the Fourth Amendment, supplanting the actions under Rev. Stat. § 1979, 42 U.S.C. § 1983, and **\*737** *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), that now provide damages remedies for such violations. It would create an action in federal court for arrests by state officers who simply exceed their authority; and for the violation of any limit that the law of any country might place on the authority of its own officers to arrest. And all of this assumes that Alvarez could establish that Sosa was acting on behalf of a

government when he made the arrest, for otherwise he would need a rule broader still.

Alvarez's failure to marshal support for his proposed rule is underscored by the Restatement (Third) of Foreign Relations Law of the United States (1986), which says in its discussion of customary international human rights law that a "state violates international law if, as a matter of state policy, it practices, encourages, or condones ... prolonged arbitrary detention." 2 *Id.,* § 702. Although the Restatement does not explain its requirements of a "state policy" and of "prolonged" detention, the implication is clear. Any credible invocation of a principle **2769 against arbitrary detention that the civilized world accepts as binding customary international law requires a factual basis beyond relatively brief detention in excess of positive authority. Even the Restatement's limits are only the beginning of the enquiry, because although it is easy to say that some policies of prolonged arbitrary detentions are so bad that those who enforce them become enemies of the human race, it may be harder to say which policies cross that line with the certainty afforded by Blackstone's three common law offenses. In any event, the label would never fit the reckless policeman who botches his warrant, even though that same officer might pay damages under municipal law. *E.g.,* 🔖 *Groh v. Ramirez,* 540 U.S. 551, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004). [28]

*738 Whatever may be said for the broad principle Alvarez advances, in the present, imperfect world, it expresses an aspiration that exceeds any binding customary rule having the specificity we require. [29] Creating a private cause of action to further that aspiration would go beyond any residual common law discretion we think it appropriate to exercise. [30] It is enough to hold that a single illegal detention of less than a day, followed by the transfer of custody to lawful authorities and a prompt arraignment, violates no norm of customary international law so well defined as to support the creation of a federal remedy.

* * *

The judgment of the Court of Appeals is

*Reversed.*

*739 Justice SCALIA, with whom THE CHIEF JUSTICE and Justice THOMAS join, concurring in part and concurring in the judgment.

There is not much that I would add to the Court's detailed opinion, and only one thing that I would subtract: its reservation of a discretionary power in the Federal Judiciary to create causes of action for the enforcement of international-law-based norms. Accordingly, I join Parts I, II, and III of the Court's opinion in these consolidated cases. Although I agree with much in Part IV, I cannot join it because the judicial lawmaking role it invites would commit the Federal Judiciary to a task it **2770 is neither authorized nor suited to perform.

I

The question at hand is whether the Alien Tort Statute (ATS), 28 U.S.C. § 1350, provides respondent Alvarez–Machain (hereinafter respondent) a cause of action to sue in federal court to recover money damages for violation of what is claimed to be a customary international law norm against arbitrary arrest and detention. The ATS provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." *Ibid.* The challenge posed by this action is to ascertain (in the Court's felicitous phrase) "the interaction between the ATS at the time of its enactment and the ambient law of the era." *Ante,* at 2755. I begin by describing the general principles that must guide our analysis.

At the time of its enactment, the ATS provided a federal forum in which aliens could bring suit to recover for torts committed in "violation of the law of nations." The law of nations that would have been applied in this federal forum was at the time part of the so-called general common law. See Young, Sorting out the Debate Over Customary International Law, 42 Va. J. Int'l L. 365, 374 (2002); Bradley & Goldsmith, *740 Customary International Law as Federal Common Law: A Critique of the Modern Position, 110 Harv. L.Rev. 815, 824 (1997); Brief for Vikram Amar et al. as *Amici Curiae* 12–13.

General common law was not federal law under the Supremacy Clause, which gave that effect only to the Constitution, the laws of the United States, and treaties. U.S. Const., Art. VI, cl. 2. Federal and state courts adjudicating questions of general common law were not adjudicating

questions of federal or state law, respectively—the general common law was neither. See generally Clark, Federal Common Law: A Structural Reinterpretation, 144 U. Pa. L.Rev. 1245, 1279–1285 (1996). The nonfederal nature of the law of nations explains this Court's holding that it lacked jurisdiction in New York Life Ins. Co. v. Hendren, 92 U.S. 286, 23 L.Ed. 709 (1876), where it was asked to review a state-court decision regarding "the effect, under the general public law, of a state of sectional civil war upon [a] contract of life insurance." Ibid. Although the case involved "the general laws of war, as recognized by the law of nations applicable to this case," ibid., it involved no federal question. The Court concluded: "The case, ... having been presented to the court below for decision upon principles of general law alone, and it nowhere appearing that the constitution, laws, treaties, or executive proclamations, of the United States were necessarily involved in the decision, we have no jurisdiction." Id., 92 U.S., at 287.

This Court's decision in Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), signaled the end of federal-court elaboration and application of the general common law. Erie repudiated the holding of Swift v. Tyson, 16 Pet. 1, 10 L.Ed. 865 (1842), that federal courts were free to "express our own opinion" upon "the principles established in the general commercial law." Id., 16 Pet., at 19, 18. After canvassing the many problems resulting from "the broad province accorded to the so-called 'general law' as to which federal courts exercised an independent judgment," *741 304 U.S., at 75, 58 S.Ct. 817, the Erie Court extirpated that law with its famous declaration that "[t]here is no federal general common law." Id., at 78, 58 S.Ct. 817. Erie affected the status of the law of nations in federal courts not merely by the implication of its holding but quite **2771 directly, since the question decided in Swift turned on the "law merchant," then a subset of the law of nations. See Clark, supra, at 1280–1281.

After the death of the old general common law in Erie came the birth of a new and different common law pronounced by federal courts. There developed a specifically federal common law (in the sense of judicially pronounced law) for a "few and restricted" areas in which "a federal rule of decision is necessary to protect uniquely federal interests, and those in which Congress has given the courts the power to develop substantive law." Texas Industries, Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 640, 101 S.Ct. 2061, 68

L.Ed.2d 500 (1981) (internal quotation marks and citations omitted). Unlike the general common law that preceded it, however, federal common law was self-consciously "made" rather than "discovered," by judges who sought to avoid falling under the sway of (in Holmes's hyperbolic language) "[t]he fallacy and illusion" that there exists "a transcendental body of law outside of any particular State but obligatory within it unless and until changed by statute." Black and White Taxicab & Transfer Co. v. Brown and Yellow Taxicab & Transfer Co., 276 U.S. 518, 533, 48 S.Ct. 404, 72 L.Ed. 681 (1928) (dissenting opinion).

Because post-Erie federal common law is made, not discovered, federal courts must possess some federal-common-law-making authority before undertaking to craft it. "Federal courts, unlike state courts, are not general common-law courts and do not possess a general power to develop and apply their own rules of decision." Milwaukee v. Illinois, 451 U.S. 304, 312, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981).

The general rule as formulated in Texas Industries, 451 U.S., at 640–641, 101 S.Ct. 2061, is that "[t]he vesting of jurisdiction in the federal courts does not in and of itself give rise to authority *742 to formulate federal common law." This rule applies not only to applications of federal common law that would displace a state rule, but also to applications that simply create a private cause of action under a federal statute. Indeed, Texas Industries itself involved the petitioner's unsuccessful request for an application of the latter sort—creation of a right of contribution to damages assessed under the antitrust laws. See id., at 639–646, 101 S.Ct. 2061. See also Northwest Airlines, Inc. v. Transport Workers, 451 U.S. 77, 99, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981) (declining to create a federal-common-law right of contribution to damages assessed under the Equal Pay Act and Title VII).

The rule against finding a delegation of substantive lawmaking power in a grant of jurisdiction is subject to exceptions, some better established than others. The most firmly entrenched is admiralty law, derived from the grant of admiralty jurisdiction in Article III, § 2, cl. 3, of the Constitution. In the exercise of that jurisdiction federal courts develop and apply a body of general maritime law, "the well-known and well-developed venerable law of the sea which arose from the custom among seafaring men." R.M.S. Titanic, Inc. v. Haver, 171 F.3d 943, 960 (C.A.4 1999)

(Niemeyer, J.) (internal quotation marks omitted). At the other extreme is *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), which created a private damages cause of action against federal officials for violation of the Fourth Amendment. We have said that the authority to create this cause of action was derived from "our general jurisdiction to decide all cases 'arising under the Constitution, laws, or treaties of the United States.' " **2772 *Correctional Services Corp. v. Malesko,* 534 U.S. 61, 66, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) (quoting 28 U.S.C. § 1331). While *Bivens* stands, the ground supporting it has eroded. For the past 25 years, "we have consistently refused to extend *Bivens* liability to any new context." *Correctional Services Corp., supra,* at 68, 122 S.Ct. 515. *Bivens* is "a relic of the heady days in which this Court assumed common-law powers to create causes of action." 534 U.S., at 75, 122 S.Ct. 515 (SCALIA, J., concurring).

## *743 II

With these general principles in mind, I turn to the question presented. The Court's detailed exegesis of the ATS conclusively establishes that it is "a jurisdictional statute creating no new causes of action." *Ante,* at 2761. The Court provides a persuasive explanation of why respondent's contrary interpretation, that "the ATS was intended not simply as a jurisdictional grant, but as authority for the creation of a new cause of action for torts in violation of international law," is wrong. *Ante,* at 2755. Indeed, the Court properly endorses the views of one scholar that this interpretation is " 'simply frivolous.' " *Ibid.* (quoting Casto, The Federal Courts' Protective Jurisdiction over Torts Committed in Violation of the Law of Nations, 18 Conn. L.Rev. 467, 479, 480 (1986)).

These conclusions are alone enough to dispose of the present case in favor of petitioner Sosa. None of the exceptions to the general rule against finding substantive lawmaking power in a jurisdictional grant apply. *Bivens* provides perhaps the closest analogy. That is shaky authority at best, but at least it can be said that *Bivens* sought to enforce a command of our *own* law—the *United States* Constitution. In modern international human rights litigation of the sort that has proliferated since *Filartiga v. Pena–Irala,* 630 F.2d 876 (C.A.2 1980), a federal court must first *create* the underlying federal command. But "the fact that a rule

has been recognized as [customary international law], by itself, is not an adequate basis for viewing that rule as part of federal common law." Meltzer, Customary International Law, Foreign Affairs, and Federal Common Law, 42 Va. J. Int'l L. 513, 519 (2002). In Benthamite terms, creating a federal command (federal common law) out of "international norms," and then constructing a cause of action to enforce that command through the purely jurisdictional grant of the ATS, is nonsense upon stilts.

## *744 III

The analysis in the Court's opinion departs from my own in this respect: After concluding in Part III that "the ATS is a jurisdictional statute creating no new causes of action," *ante,* at 2761, the Court addresses at length in Part IV the "good reasons for a restrained conception of the *discretion* a federal court should exercise in considering a new cause of action" under the ATS. *Ibid.* (emphasis added). By framing the issue as one of "discretion," the Court skips over the antecedent question of authority. This neglects the "lesson of *Erie,*" that "grants of jurisdiction alone" (which the Court has acknowledged the ATS to be) "are not themselves grants of lawmaking authority." Meltzer, *supra,* at 541. On this point, the Court observes only that no development between the enactment of the ATS (in 1789) and the birth of modern international human rights litigation under that statute (in 1980) "has categorically *precluded* federal courts from recognizing a claim under the law of nations as an element of common law." *Ante,* at 2761 (emphasis added). This turns our jurisprudence regarding federal common law on its head. The question is not what case or congressional action *prevents* federal courts from applying the law **2773 of nations as part of the general common law; it is what *authorizes* that peculiar exception from *Erie's* fundamental holding that a general common law *does not exist.*

The Court would apparently find authorization in the understanding of the Congress that enacted the ATS, that "district courts would recognize private causes of action for certain torts in violation of the law of nations." *Ante,* at 2761. But as discussed above, that understanding rested upon a notion of general common law that has been repudiated by *Erie.*

The Court recognizes that *Erie* was a "watershed" decision heralding an avulsive change, wrought by "conceptual development in understanding common law ... [and

Case 3:20-cv-07721-SL   Document 58-5   Filed 11/10/20   Page 1152 of 1271

Sosa v. Alvarez-Machain, 542 U.S. 692 (2004)

124 S.Ct. 2739, 159 L.Ed.2d 718, 72 USLW 4660, 158 Oil & Gas Rep. 601...

accompanied by an] equally significant rethinking of the role of the federal courts in making it." *Ante,* at 2762. The Court's **\*745** analysis, however, does not follow through on this insight, interchangeably using the unadorned phrase "common law" in Parts III and IV to refer to pre-*Erie* general common law and post-*Erie* federal common law. This lapse is crucial, because the creation of post-*Erie* federal common law is rooted in a positivist mindset utterly foreign to the American common-law tradition of the late 18th century. Post-*Erie* federal common lawmaking (all that is left to the federal courts) is so far removed from that general-common-law adjudication which applied the "law of nations" that it would be anachronistic to find authorization to do the former in a statutory grant of jurisdiction that was thought to enable the latter. [*] Yet that is precisely what the discretion-only analysis in Part IV suggests.

**\*746** Because today's federal common law is not our Framers' general common law, the question presented by the suggestion of discretionary authority to enforce the law of nations is not whether to extend old-school general-common-law adjudication. Rather, it is whether to create new federal common law. The Court masks the novelty of its approach when it suggests that the difference between us is that I would "close the door to further independent judicial recognition of actionable international norms," whereas the Court would permit the exercise of judicial power **\*\*2774** "on the understanding that the door is still ajar subject to vigilant doorkeeping." *Ante,* at 2764. The general common law was the old door. We do not close that door today, for the deed was done in *Erie. Supra,* at 2770. Federal common law is a *new* door. The question is not whether that door will be left ajar, but whether this Court will open it.

Although I fundamentally disagree with the discretion-based framework employed by the Court, we seem to be in accord that creating a new federal common law of international human rights is a questionable enterprise. We agree that:

- "[T]he general practice has been to look for legislative guidance before exercising innovative authority over substantive law [in the area of foreign relations]. It would be remarkable to take a more aggressive role in exercising a jurisdiction that remained largely in shadow for much of the prior two centuries." *Ante,* at 2762.

- "[T]he possible collateral consequences of making international rules privately actionable argue for judicial caution." *Ante,* at 2763.

- "It is one thing for American courts to enforce constitutional limits on our own State and Federal Governments' power, but quite another to consider suits under rules that would go so far as to claim a limit on the power of foreign governments over their own citizens, and to hold **\*747** that a foreign government or its agent has transgressed those limits." *Ibid.*

- "[M]any attempts by federal courts to craft remedies for the violation of new norms of international law would raise risks of adverse foreign policy consequences." *Ibid.*

- *"Several times, indeed, the Senate has expressly declined to give the federal courts the task of interpreting and applying international human rights law." Ante,* at 2763.

These considerations are not, as the Court thinks them, reasons why courts must be circumspect in use of their extant general-common-law-making powers. They are reasons why courts cannot possibly be thought to have been given, and should not be thought to possess, federal-common-law-making powers with regard to the creation of private federal causes of action for violations of customary international law.

To be sure, today's opinion does not itself precipitate a direct confrontation with Congress by creating a cause of action that Congress has not. But it invites precisely that action by the lower courts, even while recognizing (1) that Congress understood the difference between granting jurisdiction and creating a federal cause of action in 1789, *ante,* at 2755, (2) that Congress understands that difference today, *ante,* at 2763, and (3) that the ATS itself supplies only jurisdiction, *ante,* at 2761. In holding open the possibility that judges may create rights where Congress has not authorized them to do so, the Court countenances judicial occupation of a domain that belongs to the people's representatives. One does not need a crystal ball to predict that this occupation will not be long in coming, since the Court endorses the reasoning of "many of the courts and judges who faced the issue before it reached this Court," including the Second and Ninth Circuits. *Ante,* at 2765.

The Ninth Circuit brought us the judgment that the Court reverses today. Perhaps its decision in this particular case, **\*748** like the decisions of other lower federal courts that receive passing attention in the Court's opinion, "reflects a more assertive view of federal judicial discretion over claims based on customary international law than the position we take today." **\*\*2775** *Ante,* at 2768, n. 27. But the

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1153 of 1271

Sosa v. Alvarez-Machain, 542 U.S. 692 (2004)
124 S.Ct. 2739, 159 L.Ed.2d 718, 72 USLW 4660, 158 Oil & Gas Rep. 601...

verbal formula it applied is the same verbal formula that the Court explicitly endorses. Compare *ante,* at 2765 (quoting

*In re Estate of Marcos Human Rights Litigation,* 25 F.3d 1467, 1475 (C.A.9 1994), for the proposition that actionable norms must be " 'specific, universal, and obligatory' "), with

331 F.3d 604, 621 (C.A.9 2003) (en banc) (finding the norm against arbitrary arrest and detention in this action to be "universal, obligatory, and specific"); *id.,* at 619 ("[A]n actionable claim under the [ATS] requires the showing of a violation of the law of nations that is specific, universal, and obligatory" (internal quotation marks omitted)). Endorsing the very formula that led the Ninth Circuit to its result in this action hardly seems to be a recipe for restraint in the future.

The Second Circuit, which started the Judiciary down the path the Court today tries to hedge in, is a good indicator of where that path leads us: directly into confrontation with the political branches. *Kadic v. Karadžíc,* 70 F.3d 232 (C.A.2 1995), provides a case in point. One of the norms at issue in that case was a norm against genocide set forth in the Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9, 1948, 78 U.N.T.S. 278. The Second Circuit held that the norm was actionable under the ATS after applying Circuit case law that the Court today endorses. 70 F.3d, at 238–239, 241–242. The Court of Appeals then did something that is perfectly logical and yet truly remarkable: It dismissed the determination by Congress and the Executive that this norm should *not* give rise to a private cause of action. We *know* that Congress and the Executive made this determination, because Congress inscribed it into the Genocide Convention Implementation Act of 1987, 18 U.S.C. § 1091 *et seq.,* a law signed by the **\*749** President attaching criminal penalties to the norm against genocide. The Act, Congress said, shall not "be construed as creating any substantive or procedural right enforceable by law by any party in any proceeding." § 1092. Undeterred, the Second Circuit reasoned that this "decision not to create a *new* private remedy" could hardly be construed as *repealing* by implication the cause of action supplied by the ATS. 70 F.3d, at 242 (emphasis added). Does this Court truly wish to encourage the use of a jurisdiction-granting statute with respect to which there is "no record of congressional discussion about private actions that might be subject to the jurisdictional provision, or about any need for further legislation to create private remedies; [and] no record even of debate on the section," *ante,* at 2758, to override a clear indication from the political branches that a

"specific, universal, and obligatory" norm against genocide is *not* to be enforced through a private damages action? Today's opinion leads the lower courts right down that perilous path.

Though it is not necessary to resolution of the present action, one further consideration deserves mention: Despite the avulsive change of *Erie,* the Framers who included reference to "the Law of Nations" in Article I, § 8, cl. 10, of the Constitution would be entirely content with the post-*Erie* system I have described, and quite terrified by the "discretion" endorsed by the Court. That portion of the general common law known as the law of nations was understood to refer to the accepted practices of nations in their dealings with one another (treatment of ambassadors, immunity of foreign sovereigns from suit, etc.) and with actors on the high seas hostile to all nations and beyond all their territorial jurisdictions (pirates). Those accepted practices have for the most part, if not in their entirety, been enacted into **\*\*2776** United States statutory law, so that insofar as they are concerned the demise of the general common law is inconsequential. The notion that a law of nations, redefined to mean the consensus of states on *any* subject, can be used by a private citizen to **\*750** control a sovereign's treatment of *its own citizens* within *its own territory* is a 20th-century invention of internationalist law professors and human rights advocates. See generally Bradley & Goldsmith, Critique of the Modern Position, 110 Harv. L.Rev., at 831–837. The Framers would, I am confident, be appalled by the proposition that, for example, the American peoples' democratic adoption of the death penalty, see, *e.g.,* Tex. Penal Code Ann. § 12.31 (West 2003), could be judicially nullified because of the disapproving views of foreigners.

\* \* \*

We Americans have a method for making the laws that are over us. We elect representatives to two Houses of Congress, each of which must enact the new law and present it for the approval of a President, whom we also elect. For over two decades now, unelected federal judges have been usurping this lawmaking power by converting what they regard as norms of international law into American law. Today's opinion approves that process in principle, though urging the lower courts to be more restrained.

This Court seems incapable of admitting that some matters —*any* matters—are none of its business. See, *e.g.,* *Rasul*

Sosa v. Alvarez-Machain, 542 U.S. 692 (2004)    Case 3:20-cv-07721-SL    Document 58-5    Filed 11/10/20    Page 1154 of 1271

124 S.Ct. 2739, 159 L.Ed.2d 718, 72 USLW 4660, 158 Oil & Gas Rep. 601...

*v. Bush, ante,* 542 U.S. 446, 124 S.Ct. 2686, 159 L.Ed.2d 548, 2004 WL 1432134 (2004); *INS v. St. Cyr,* 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). In today's latest victory for its Never Say Never Jurisprudence, the Court ignores its own conclusion that the ATS provides only jurisdiction, wags a finger at the lower courts for going too far, and then—repeating the same formula the ambitious lower courts *themselves* have used—invites them to try again.

It would be bad enough if there were some assurance that future conversions of perceived international norms into American law would be approved by this Court itself. (Though we know ourselves to be eminently reasonable, self-awareness of eminent reasonableness is not really a substitute for democratic election.) But in this illegitimate lawmaking endeavor, the lower federal courts will be the principal **\*751** actors; we review but a tiny fraction of their decisions. And no one thinks that all of them are eminently reasonable.

American law—the law made by the people's democratically elected representatives—does not recognize a category of activity that is so universally disapproved by other nations that it is automatically unlawful here, and automatically gives rise to a private action for money damages in federal court. That simple principle is what today's decision should have announced.

Justice GINSBURG, with whom Justice BREYER joins, concurring in part and concurring in the judgment.
I join in full the Court's disposition of Alvarez's claim pursuant to 28 U.S.C. § 1350. See *ante,* at 2754–2769. As to Alvarez's Federal Tort Claims Act (FTCA or Act) claim, see *ante,* at 2747–2754, although I agree with the Court's result and much of its reasoning, I take a different path and would adopt a different construction of 28 U.S.C. § 2680(k). Alvarez's case against the Government does not call for any comparison of old versus newer choice-of-law methodologies. See **\*\*2777** *ante,* at 2752–2753. See generally Kay, Theory into Practice: Choice of Law in the Courts, 34 Mercer L.Rev. 521, 525–584 (1983). In particular, the Court's discussion of developments in choice of law after the FTCA's enactment hardly illuminates the meaning of that statute, and risks giving undue prominence to a jurisdiction-selecting approach the vast majority of States have long abandoned. See Symeonides, *Choice of Law in the American Courts in 2002: Sixteenth Annual Survey,* 51 Am. J. Comp. L. 1, 5–6 (2003) (*lex loci delicti* rule has been abandoned in 42 States).

I

The FTCA renders the United States liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. The Act gives federal district courts "exclusive jurisdiction **\*752** of civil actions on claims against the United States, for money damages ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." § 1346(b)(1). Congress included in the FTCA a series of exceptions to that sovereign-immunity waiver. Relevant to this litigation, the Act expressly excepts "[a]ny claim arising in a foreign country." § 2680(k). I agree with the Court, see *ante,* at 2747–2754, that this provision, the foreign-country exception, applies here, and bars Alvarez's tort claim against the United States. But I would read the words "arising in," as they appear in § 2680(k), to signal "place where the act or omission occurred," § 1346(b)(1), not "place of injury," *ante,* at 2752, 2754, and n. 9.[1]

**\*753** A

On its face, the foreign-country exception appears to cover this litigation. See *ante,* at 2747. Alvarez's suit is predicated on an arrest in Mexico alleged to be "false" only because it occurred there. Sosa's conduct in Mexico, implicating questions of Mexican law, is, as the Court notes, "the kernel" of Alvarez's claim. *Ante,* at 2748. Once Alvarez was inside United States **\*\*2778** borders, the Ninth Circuit observed, no activity regarding his detention was tortious. See 331 F.3d 604, 636–637 (C.A.9 2003). Government liability to Alvarez, as analyzed by the Court of Appeals, rested solely upon a false-arrest claim. *Id.,* at 640–641. Just as Alvarez's arrest was "false," and thus tortious, only because, and only to the extent that, it took place and endured in Mexico, so damages accrued only while

Case 3:20-cv-07721-SL    Document 58-5    Filed 11/10/20    Page 1155 of 1271

Sosa v. Alvarez-Machain, 542 U.S. 692 (2004)

124 S.Ct. 2739, 159 L.Ed.2d 718, 72 USLW 4660, 158 Oil & Gas Rep. 601...

the alleged wrongful conduct continued abroad. *Id., at 636–637.*

Critical in the Ninth Circuit's view, "DEA agents had no authority under federal law to execute an extraterritorial arrest of a suspect indicted in federal court in Los Angeles." *Id., at 640;* see *ante,* at 2748, n. 1. See also *Fermino v. Fedco, Inc.,* 7 Cal.4th 701, 715, 30 Cal.Rptr.2d 18, 872 P.2d 559, 567 (1994) (defining as tortious "the nonconsensual, intentional confinement of a person, *without lawful privilege,* for an appreciable length of time, however short" (emphasis added and internal quotation marks omitted)); App. to Pet. for Cert. in No. 03–339, P. 184a (same). Once Alvarez arrived in El Paso, Texas, "the actions of domestic law enforcement set in motion a ***754** supervening prosecutorial mechanism which met all of the procedural requisites of federal due process." *331 F.3d, at 637;* see *ante,* at 2748, n. 1.

Accepting, as the Ninth Circuit did, that no tortious act occurred once Alvarez was within United States borders, the Government's liability on Alvarez's claim for false arrest necessarily depended on the foreign location of the arrest and implicated foreign law. While the Court of Appeals focused on whether United States law furnished authority to seize Alvarez in Mexican territory, see *331 F.3d, at 626–631,* Mexican law equally could have provided—or denied—authority for such an arrest. Had Sosa and the arrest team been Mexican law enforcement officers, authorized by Mexican law to arrest Alvarez and to hand him over to United States authorities, for example, no false-arrest claim would have been tenable. Similarly, there would have been no viable false-arrest claim if Mexican law authorized a citizen's arrest in the circumstances presented here. Indeed, Mexican and Honduran agents seized other suspects indicted along with Alvarez, respectively in Mexico and Honduras; "Alvarez's abduction was unique in that it involved neither the cooperation of local police nor the consent of a foreign government." *Id., at 623,* n. 23.

The interpretation of the FTCA adopted by the Ninth Circuit, in short, yielded liability based on acts occurring in Mexico that entangled questions of foreign law. Subjecting the United States to liability depending upon the law of a foreign sovereign, however, was the very result § 2680(k)'s foreign-country exception aimed to exclude. See *United States v. Spelar,* 338 U.S. 217, 221, 70 S.Ct. 10, 94 L.Ed. 3 (1949).

B

I would construe the foreign-country exception, § 2680(k), in harmony with the FTCA's sovereign-immunity waiver, § 1346(b), which refers to the place where the negligent or intentional act occurred. See Brief for ***755** United States in No. 03–485, p. 45 (urging that § 2680(k) should be applied by looking to "where the prohibited act is committed"); *id.,* at 46 ("the foreign country exception must be viewed together with [§ ]1346," which points to "the law of the place where the [allegedly wrongful] act or omission occurred" (internal quotation marks and citations omitted and emphasis deleted)).

Interpretation of § 2680(k) in the light of § 1346, as the Government maintains, is grounded in this Court's precedent. In **2779 construing § 2680(k)'s reference to a "foreign country," this Court has "draw[n] support from the language of § 1346(b), the principal provision of the [FTCA]." *Smith v. United States,* 507 U.S. 197, 201, 113 S.Ct. 1178, 122 L.Ed.2d 548 (1993) (internal quotation marks omitted). In *Smith,* the Court held that a wrongful-death action "based exclusively on acts or omissions occurring in Antarctica" was barred by the foreign-country exception. *Id., at 198–199, 113 S.Ct. 1178.* Were it not, the Court noted, "§ 1346(b) would instruct courts to look to the law of a place that has no law [*i.e.,* Antarctica] in order to determine the liability of the United States—surely a bizarre result." *Id., at 201–202, 113 S.Ct. 1178.* Thus, in *Smith,* the Court presumed that the place "where the act or omission occurred" for purposes of the sovereign-immunity waiver, § 1346(b)(1), coincided with the place where the "claim ar[ose]" for purposes of the foreign-country exception, § 2680(k). See also *Beattie v. United States,* 756 F.2d 91, 122 (C.A.D.C.1984) (Scalia, J., dissenting) ("[A] claim 'arises' for purposes of § 2680(k) where there occurs the alleged [standard-of-care] violation ... (attributable to government action or inaction) nearest to the injury ...."); *Sami v. United States,* 617 F.2d 755, 761–762 (C.A.D.C.1979) (looking to where "the act or omission complained of occurred" in applying § 2680(k)).

Case 3:20-cv-07721-SI Document 58-5 Filed 11/10/20 Page 1156 of 1271

Sosa v. Alvarez-Machain, 542 U.S. 692 (2004)
124 S.Ct. 2739, 159 L.Ed.2d 718, 72 USLW 4660, 158 Oil & Gas Rep. 601...

Harmonious construction of §§ 1346(b) and 2680(k) accords with Congress' intent in enacting the foreign-country exception. Congress was "unwilling to subject the United States to liabilities depending upon the laws of a foreign power." **\*756** *Spelar,* 338 U.S., at 221, 70 S.Ct. 10. The legislative history of the FTCA suggests that Congress viewed cases in which the relevant *act or omission* occurred in a foreign country as entailing too great a risk of foreign-law application. Thus, Assistant Attorney General Francis M. Shea, in explaining the finally enacted version of the foreign-country exception to the House Committee on the Judiciary, emphasized that, when an *act or omission* occurred in a foreign country, § 1346(b) would direct a court toward the law of that country: "Since liability is to be determined by *the law of the situs of the wrongful act or omission it is wise to restrict the bill to claims arising in this country.*" Hearings on H.R. 5373 et al. before the House Committee on the Judiciary, 77th Cong., 2d Sess., 35 (1942) (emphasis added); see *ante,* at 2751–2752. [2] In the enacting Congress' view, it thus appears, §§ 1346(b) and 2680(k) were aligned so as to block the United States' waiver of sovereign immunity when the relevant act or omission took place overseas. See *supra,* at 2777, n. 1.

True, the Court has read *renvoi* into § 1346(b)(1)'s words "in accordance with the law of." See *Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962) ("the [FTCA] ... requires application of the *whole* law of the State where the act or omission occurred" (emphasis added)). [3] That, however, is no **\*\*2780** reason to resist defining the place where a claim arises for § 2680(k) purposes to mean the place where the liability-creating act **\*757** or omission occurred, with no *renvoi* elsewhere. It is one thing to apply *renvoi* to determine which State, within the United States, supplies the governing law, quite another to suppose that Congress meant United States courts to explore what choice of law a foreign court would make. [4]

In 1948, when the FTCA was enacted, it is also true, Congress reasonably might have anticipated that the then prevailing choice-of-law methodology, reflected in the Restatement (First) of Conflicts, would lead mechanically to the law of the place of injury. See Restatement (First) of Conflicts § 377 (1934) ( "The place of wrong is in the state where the last event necessary to make an actor liable for an alleged tort takes place."); *Richards,* 369 U.S., at 11–12, 82 S.Ct.

585 ("The general conflict-of-laws rule, followed by a vast majority of the States, [wa]s to apply the law of the place of injury to the substantive rights of the parties." (footnote omitted)); *ante,* at 2750–2751, 2752, n. 5 (same). Generally, albeit not always, the place where the negligent or intentional act or omission takes place coincides with the place of injury. [5] Looking to the whole law of the State where the wrongful "act or omission occurred" would therefore ordinarily lead to application of that State's own law. But cf. *ante,* at 2751–2752, 2754 (adopting a place-of-injury rule for § 2680(k)).

**\*758** II

The Ninth Circuit concluded that the foreign-country exception did not bar Alvarez's false-arrest claim because that claim "involve[d] federal employees working from offices in the United States to guide and supervise actions in other countries." 331 F.3d, at 638. In so holding, the Court of Appeals applied a " 'headquarters doctrine,' " whereby "a claim can still proceed ... if harm occurring in a foreign country was proximately caused by acts in the United States." *Ibid.*

There is good reason to resist the headquarters doctrine described and relied upon by the Ninth Circuit. The Court of Appeals' employment of that doctrine renders the FTCA's foreign-country exception inapplicable whenever some authorization, support, or planning takes place in the United States. But "it will virtually always be possible to assert that the negligent [or intentional] activity that injured the plaintiff was the consequence of faulty training, selection or supervision—or even less than that, lack of careful training, selection or supervision—in the United States." *Beattie,* 756 F.2d, at 119 (Scalia, J., dissenting); see *ante,* at 2749 (same). Hence the headquarters doctrine, which considers whether steps toward the commission **\*\*2781** of the tort occurred within the United States, risks swallowing up the foreign-country exception.

Furthermore, the Court of Appeals failed to address the choice-of-law question implicated by both §§ 1346(b) and 2680(k) whenever tortious acts are committed in multiple states. Both those provisions direct federal courts "in multistate tort actions, to look in the first instance to the law of the place where the acts of negligence [or the intentional

tort] took place." *Richards, 369 U.S., at 10, 82 S.Ct. 585.* In cases involving acts or omissions in several states, the question is which acts count. "Neither the text of the FTCA nor *Richards* provides any guidance ... when the alleged acts or omissions occur in more than one state. Moreover, the legislative **\*759** history of the FTCA sheds no light on this problem." *Gould Electronics Inc. v. United States, 220 F.3d 169, 181 (C.A.3 2000);* see *Raflo v. United States, 157 F.Supp.2d 1, 9 (D.D.C.2001)* (same).

Courts of appeals have adopted varying approaches to this question. See *Simon v. United States, 341 F.3d 193, 202 (C.A.3 2003)* (listing five different choice-of-law methodologies for *§ 1346(b)(1));* *Gould Electronics, 220 F.3d, at 181–183* (same). [6] Having canvassed those different approaches, Third Circuit Judge Becker concluded that "clarity is the most important virtue in crafting a rule by which [a federal court would] choose a jurisdiction." *Simon, 341 F.3d, at 204.* Eschewing "vague and overlapping" approaches that yielded "indeterminate" results, Judge Becker "appl[ied] [under *§ 1346(b)(1)* ] the choice-of-law regime of the jurisdiction in which the last significant act or omission occurred. This has the salutary effect of avoiding the selection of a jurisdiction based on a completely incidental 'last contact,' **\*760** while also avoiding the conjecture that [alternative] inquires often entail." *Ibid.* I agree.

A "last significant act or omission" rule applied under *§ 2680(k)* would close the door to the headquarters doctrine as applied by the Ninth Circuit in this litigation. By directing attention to the place where the last significant act or omission occurred, rather than to a United States location where some authorization, support, or planning may have taken place, the clear rule advanced by Judge Becker preserves *§ 2680(k)* as the genuine limitation Congress intended it to be.

The "last significant act or omission" rule works in this litigation to identify Mexico, not California, as the place where the instant controversy arose. I would **\*\*2782** apply that rule here to hold that Alvarez's tort claim for false arrest under the FTCA is barred under the foreign-country exception.

Accordingly, I concur in the Court's judgment and concur in Parts I, III, and IV of its opinion.

Justice BREYER, concurring in part and concurring in the judgment.

I join Justice GINSBURG's concurrence and join the Court's opinion in respect to the Alien Tort Statute (ATS) claim. The Court says that to qualify for recognition under the ATS a norm of international law must have a content as definite as, and an acceptance as widespread as, those that characterized 18th-century international norms prohibiting piracy. *Ante,* at 2765–2766. The norm must extend liability to the type of perpetrator (*e.g.,* a private actor) the plaintiff seeks to sue. *Ante,* at 2766, n. 20. And Congress can make clear that courts should not recognize any such norm, through a direct or indirect command or by occupying the field. See *ante,* at 2765. The Court also suggests that principles of exhaustion might apply, and that courts should give "serious weight" to the Executive Branch's view of the impact on foreign **\*761** policy that permitting an ATS suit will likely have in a given case or type of case. *Ante,* at 2766, n. 21. I believe all of these conditions are important.

I would add one further consideration. Since enforcement of an international norm by one nation's courts implies that other nations' courts may do the same, I would ask whether the exercise of jurisdiction under the ATS is consistent with those notions of comity that lead each nation to respect the sovereign rights of other nations by limiting the reach of its laws and their enforcement. In applying those principles, courts help ensure that "the potentially conflicting laws of different nations" will "work together in harmony," a matter of increasing importance in an ever more interdependent world. *F. Hoffmann–La Roche Ltd. v. Empagran S. A., ante,* 542 U.S., at 164, 124 S.Ct. 2359, 2366, 159 L.Ed.2d 226 (2004); cf. *Murray v. Schooner Charming Betsy, 2 Cranch 64, 118, 2 L.Ed. 208 (1804).* Such consideration is necessary to ensure that ATS litigation does not undermine the very harmony that it was intended to promote. See *ante,* at 2756–2757.

These comity concerns normally do not arise (or at least are mitigated) if the conduct in question takes place in the country that provides the cause of action or if that conduct involves that country's own national—where, say, an American assaults a foreign diplomat and the diplomat brings suit in an American court. See *Restatement (Third) of Foreign Relations Law of the United States §§ 402(1), (2) (1986)* (hereinafter Restatement) (describing traditional bases of territorial and nationality jurisdiction). They do arise, however, when foreign persons injured abroad bring

Sosa v. Alvarez-Machain, 542 U.S. 692 (2004)

124 S.Ct. 2739, 159 L.Ed.2d 718, 72 USLW 4660, 158 Oil & Gas Rep. 601...

Case 3:20-cv-07721-SL    Document 58-5    Filed 11/10/20    Page 1158 of 1271

suit in the United States under the ATS, asking the courts to recognize a claim that a certain kind of foreign conduct violates an international norm.

Since different courts in different nations will not necessarily apply even similar substantive laws similarly, workable harmony, in practice, depends upon more than substantive uniformity among the laws of those nations. That is to say, substantive uniformity does not *automatically* mean **\*762** that universal jurisdiction is appropriate. Thus, in the 18th century, nations reached consensus not only on the substantive principle that acts of piracy were universally wrong but also on the jurisdictional principle that any nation that found a pirate could prosecute him. See, *e.g.,* *United States v. Smith,* 5 Wheat. 153, 162, 5 L.Ed. 57 (1820) (referring to "the **\*\*2783** general practice of all nations in punishing all persons, whether natives or foreigners, who have committed [piracy] against any persons whatsoever, with whom they are in amity").

Today international law will sometimes similarly reflect not only substantive agreement as to certain universally condemned behavior but also procedural agreement that universal jurisdiction exists to prosecute a subset of that behavior. See Restatement § 404, and Comment *a;* International Law Association, Final Report on the Exercise of Universal Jurisdiction in Respect of Gross Human Rights Offences 2 (2000). That subset includes torture, genocide, crimes against humanity, and war crimes. See *id.,* at 5–8; see also, *e.g., Prosecutor v. Furundzija,* Case No. IT–95–17/1–T, ¶¶ 155–156 (International Tribunal for Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in Territory of Former Yugoslavia Since 1991, Dec. 10, 1998); *Attorney Gen. of Israel v. Eichmann,* 36 I.L.R. 277 (Sup.Ct. Israel 1962).

The fact that this procedural consensus exists suggests that recognition of universal jurisdiction in respect to a limited set of norms is consistent with principles of international comity. That is, allowing every nation's courts to adjudicate foreign conduct involving foreign parties in such cases will not significantly threaten the practical harmony that comity principles seek to protect. That consensus concerns criminal jurisdiction, but consensus as to universal criminal jurisdiction itself suggests that universal tort jurisdiction would be no more threatening. Cf. Restatement § 404, Comment *b.* That is because the criminal courts of many nations combine civil and criminal proceedings, allowing those injured **\*763** by criminal conduct to be represented, and to recover damages, in the criminal proceeding itself. Brief for European Commission as *Amicus Curiae* 21, n. 48 (citing 3 Y. Donzallaz, La Convention de Lugano du 16 septembre 1988 concernant la compétence judiciaire et l'exécution des décisions en matière civile et commerciale, ¶¶ 5203–5272 (1998); EC Council Regulation Art. 5, § 4, No. 44/2001, 2001 O.J. (L 12/1) (Jan. 16, 2001)). Thus, universal criminal jurisdiction necessarily contemplates a significant degree of civil tort recovery as well.

Taking these matters into account, as I believe courts should, I can find no similar procedural consensus supporting the exercise of jurisdiction in these cases. That lack of consensus provides additional support for the Court's conclusion that the ATS does not recognize the claim at issue here—where the underlying substantive claim concerns arbitrary arrest, outside the United States, of a citizen of one foreign country by another.

**All Citations**

542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718, 72 USLW 4660, 158 Oil & Gas Rep. 601, 04 Cal. Daily Op. Serv. 5790, 2004 Daily Journal D.A.R. 7907, 17 Fla. L. Weekly Fed. S 515

## Footnotes

| \* | The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499. |

124 S.Ct. 2739, 159 L.Ed.2d 718, 72 USLW 4660, 158 Oil & Gas Rep. 601...

1    In the Ninth Circuit's view, it was critical that "DEA agents had no authority under federal law to execute an extraterritorial arrest of a suspect indicted in federal court in Los Angeles." 331 F.3d, at 640. Once Alvarez arrived in the United States, "the actions of domestic law enforcement set in motion a supervening prosecutorial mechanism which met all of the procedural requisites of federal due process." Id., at 637.

2    See also Couzado v. United States, 105 F.3d 1389, 1395 (C.A.11 1997) (" '[A] claim is not barred by section 2680(k) where the tortious conduct occurs in the United States, but the injury is sustained in a foreign country' " (quoting Donahue v. United States Dept. of Justice, 751 F.Supp. 45, 48 (S.D.N.Y.1990))); Martinez v. Lamagno, No. 93–1573, 1994 WL 159771, *2, judgt. order reported at 23 F.3d 402 (C.A.4 1994) (per curiam) (unpublished opinion) ("A headquarters claim exists where negligent acts in the United States proximately cause harm in a foreign country"), rev'd on other grounds, 515 U.S. 417, 115 S.Ct. 2227, 132 L.Ed.2d 375 (1995); Leaf v. United States, 588 F.2d 733, 736 (C.A.9 1978) ("A claim 'arises', as that term is used in ... 2680(k), where the acts or omissions that proximately cause the loss take place"); cf. Eaglin v. United States, Dept. of Army, 794 F.2d 981, 983 (C.A.5 1986) (assuming, arguendo, that headquarters doctrine is valid).

3    See also Restatement (Second) of Conflict of Laws 412 (1969) (hereinafter Restatement 2d) ("The original Restatement stated that, with minor exceptions, all substantive questions relating to the existence of a tort claim are governed by the local law of the 'place of wrong.' This was described ... as 'the state where the last event necessary to make an actor liable for an alleged tort takes place.' Since a tort is the product of wrongful conduct and of resulting injury and since the injury follows the conduct, the state of the 'last event' is the state where the injury occurred").

4    The FTCA was passed with precisely these kinds of garden-variety torts in mind. See S.Rep. No. 1400, 79th Cong., 2d Sess., 31 (1946) ( "With the expansion of governmental activities in recent years, it becomes especially important to grant to private individuals the right to sue the Government in respect to such torts as negligence in the operation of vehicles"); see generally Feres v. United States, 340 U.S. 135, 139–140, 71 S.Ct. 153, 95 L.Ed. 152 (1950) (Congress was principally concerned with making the Government liable for ordinary torts that "would have been actionable if inflicted by an individual or a corporation").

5    The application of foreign law might nonetheless have been avoided in headquarters cases if courts had been instructed to apply the substantive tort law of the State where the federal act or omission occurred, regardless of where the ultimate harm transpired. But in Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962), we held that the Act requires "the whole law (including choice-of-law rules) ... of the State where the [allegedly tortious federal] act or omission occurred," id., at 3, 11, 82 S.Ct. 585. Given the dominant American choice-of-law approach at the time the Act was passed, that would have resulted in the application of foreign law in virtually any case where the plaintiff suffered injury overseas.

6    See also Rydstrom, Modern Status of Rule that Substantive Rights of Parties to a Tort Action are Governed by the Law of the Place of the Wrong, 29 A.L.R.3d 603, 608, § 2[a], 1970 WL 22385 (1970) ("[M]any courts [are] now abandoning the orthodox rule that the substantive rights of the parties are governed by the law of the place of the wrong" (footnotes omitted)). We express no opinion on the relative merits of the various approaches to choice questions; our discussion of the subject is intended only to indicate how, as a positive matter, transjurisdictional cases are likely to be treated today.

7    Under the Second Restatement, tort liability is determined "by the local law of the state which ... has the most significant relationship to the occurrence and the parties," taking into account "the place where the injury occurred," "the place where the conduct causing the injury occurred," "the domicil, residence, nationality, place of incorporation and place of business of the parties," and "the place where the relationship, if any, between the parties is centered." Restatement 2d § 145.

124 S.Ct. 2739, 159 L.Ed.2d 718, 72 USLW 4660, 158 Oil & Gas Rep. 601...

8    The courts that have applied the headquarters doctrine, believing it to be intimated by our emphasis, in *Richards v. United States, supra,* on the place of the occurrence of the negligent act, have acknowledged the possibility that foreign law may govern FTCA claims as a function of *Richards's* further holding that the whole law of the pertinent State (including its choice-of-law provisions) is to be applied. See, *e.g.,* *Leaf,* 588 F.2d, at 736, n. 3. Some courts have attempted to defuse the resulting tension with the object behind the foreign country exception. See, *e.g.,* *Sami v. United States,* 617 F.2d 755, 763 (C.A.D.C.1979) (believing that norm against application of foreign law when contrary to forum policy is sufficient to overcome possible conflict). We think that these attempts to resolve the tension give short shrift to the clear congressional mandate embodied by the foreign country exception. Cf. Shapiro, Choice of Law Under the Federal Tort Claims Act: *Richards* and Renvoi Revisited, 70 N.C.L.Rev. 641, 659–660 (1992) (noting that the *Richards* rule that the totality of a State's law is to be consulted may undermine the object behind the foreign country exception).

9    It is difficult to reconcile the Government's contrary reading with the fact that two of the Act's other exceptions specifically reference an "act or omission." See 28 U.S.C. § 2680(a) (exempting United States from liability for "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation"); § 2680(e) ("Any claim arising out of an act or omission of any employee of the Government in administering [certain portions of the Trading with the Enemy Act of 1917]"). The Government's request that we read that phrase into the foreign country exception, when it is clear that Congress knew how to specify "act or omission" when it wanted to, runs afoul of the usual rule that "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." 2A N. Singer, Statutes and Statutory Construction § 46:06, p. 194 (6th rev.ed.2000).

10   The statute has been slightly modified on a number of occasions since its original enactment. It now reads in its entirety: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

11   The French minister plenipotentiary lodged a formal protest with the Continental Congress, 27 Journals of the Continental Congress 478, and threatened to leave Pennsylvania "unless the decision on Longchamps Case should give them full satisfaction." Letter from Samuel Hardy to Gov. Benjamin Harrison of Virginia, June 24, 1784, in 7 Letters of Members of the Continental Congress 558, 559 (E. Burnett ed.1934). De Longchamps was prosecuted for a criminal violation of the law of nations in state court.
     The Congress could only pass resolutions, one approving the state-court proceedings, 27 Journals of the Continental Congress 503, another directing the Secretary of Foreign Affairs to apologize and to "explain to Mr. De Marbois the difficulties that may arise ... from the nature of a federal union," 28 *id.,* at 314, and to explain to the representative of Louis XVI that "many allowances are to be made for" the young Nation, *ibid.*

12   The restriction may have served the different purpose of putting foreigners on notice that they would no longer be able to prosecute their own criminal cases in federal court. Compare, *e.g.,* 3 Commentaries 160 (victims could start prosecutions) with the Judiciary Act § 35 (creating the office of the district attorney). Cf. 1 Op. Atty. Gen. 41, 42 (1794) (British consul could not himself initiate criminal prosecution, but could provide evidence to the grand jury).

13   The ATS appears in Ellsworth's handwriting in the original version of the bill in the National Archives. Casto, Law of Nations 498, n. 169.

14   See *Southern Pacific Co. v. Jensen,* 244 U.S. 205, 222, 37 S.Ct. 524, 61 L.Ed. 1086 (1917) (Holmes, J., dissenting).

15   Being consistent with the prevailing understanding of international law, the 1781 resolution is sensibly understood as an act of international politics, for the recommendation was part of a program to assure the world that the new Republic would observe the law of nations. On the same day it made its recommendation to state legislatures, the Continental Congress received a confidential report, detailing negotiations between American representatives and Versailles. 21 Journals of the Continental Congress 1137–1140. The King

Sosa v. Alvarez-Machain, 542 U.S. 692 (2004)

Case 3:20-cv-07721-SL    Document 58-5    Filed 11/10/20    Page 1161 of 1271

124 S.Ct. 2739, 159 L.Ed.2d 718, 72 USLW 4660, 158 Oil & Gas Rep. 601...

was concerned with the British capture of the ship *Marquis de la Fayette* on its way to Boston, *id.,* at 1139, and he "expresse[d] a desire that the plan for the appointment of consuls should be digested and adopted, as the Court of France wished to make it the basis of some commercial arrangements between France and the United States," *id.,* at 1140. The congressional resolution would not have been all that Louis XVI wished for, but it was calculated to assure foreign powers that Congress at least intended their concerns to be addressed in the way they would have chosen. As a French legal treatise well known to early American lawyers, see Helmholz, Use of the Civil Law in Post–Revolutionary American Jurisprudence, 66 Tulane L.Rev. 1649 (1992), put it, "the laws ought to be written, to the end that the writing may fix the sense of the law, and determine the mind to conceive a just idea of that which is established by the law, and that it not [be] left free for every one to frame the law as he himself is pleased to understand it ...." 1 J. Domat, The Civil Law in its Natural Order 108 (W. Strahan transl. and L. Cushing ed. 1861). A congressional statement that common law was up to the task at hand might well have fallen short of impressing a continental readership.

16    Petitioner says animadversion is "an archaic reference to the imposition of *punishment.*" Reply Brief for Petitioner Sosa 4 (emphasis in original). That claim is somewhat exaggerated, however. To animadvert carried the broader implication of "turn[ing] the attention officially or judicially, tak[ing] legal cognizance of anything deserving of chastisement or censure; *hence,* to proceed by way of punishment or censure." 1 Oxford English Dictionary 474 (2d ed.1989). Blackstone in fact used the term in the context of property rights and damages. Of a man who is disturbed in his enjoyment of "qualified property" "the law will animadvert hereon as an injury." 2 Commentaries 395. See also 9 Papers of James Madison 349 (R. Rutland ed. 1975) ("As yet foreign powers have not been rigorous in animadverting on us" for violations of the law of nations).

17    See generally R. Fallon, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System, ch. 7 (5th ed.2003); Friendly, In Praise of *Erie*—and of the New Federal Common Law, 39 N.Y.U.L.Rev. 383, 405–422 (1964).

18    *Sabbatino* itself did not directly apply international law, see 376 U.S., at 421–423, 84 S.Ct. 923, but neither did it question the application of that law in appropriate cases, and it further endorsed the reasoning of a noted commentator who had argued that *Erie* should not preclude the continued application of international law in federal courts, 376 U.S., at 425, 84 S.Ct. 923 (citing Jessup, The Doctrine of Erie Railroad v. Tompkins Applied to International Law, 33 Am. J. Int'l L. 740 (1939)).

19    Our position does not, as Justice SCALIA suggests, imply that every grant of jurisdiction to a federal court carries with it an opportunity to develop common law (so that the grant of federal-question jurisdiction would be equally as good for our purposes as § 1350), see *post,* at 2773, n. Section 1350 was enacted on the congressional understanding that courts would exercise jurisdiction by entertaining some common law claims derived from the law of nations; and we know of no reason to think that federal-question jurisdiction was extended subject to any comparable congressional assumption. Further, our holding today is consistent with the division of responsibilities between federal and state courts after *Erie,* see *supra,* at 2762, 2764, as a more expansive common law power related to 28 U.S.C. § 1331 might not be.

20    A related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual. Compare *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 791–795 (C.A.D.C.1984) (Edwards, J., concurring) (insufficient consensus in 1984 that torture by private actors violates international law), with *Kadic v. Kar#dzíc,* 70 F.3d 232, 239–241 (C.A.2 1995) (sufficient consensus in 1995 that genocide by private actors violates international law).

21    This requirement of clear definition is not meant to be the only principle limiting the availability of relief in the federal courts for violations of customary international law, though it disposes of this action. For example, the European Commission argues as *amicus curiae* that basic principles of international law require that before asserting a claim in a foreign forum, the claimant must have exhausted any remedies available in the domestic legal system, and perhaps in other forums such as international claims tribunals. See Brief for European Commission as *Amicus Curiae* 24, n. 54 (citing I. Brownlie, Principles of Public International Law 472–481

124 S.Ct. 2739, 159 L.Ed.2d 718, 72 USLW 4660, 158 Oil & Gas Rep. 601...

(6th ed.2003)); cf. Torture Victim Protection Act of 1991, § 2(b), 106 Stat. 73 (exhaustion requirement). We would certainly consider this requirement in an appropriate case.

Another possible limitation that we need not apply here is a policy of case-specific deference to the political branches. For example, there are now pending in Federal District Court several class actions seeking damages from various corporations alleged to have participated in, or abetted, the regime of apartheid that formerly controlled South Africa. See *In re South African Apartheid Litigation,* 238 F.Supp.2d 1379 (JPML 2002) (granting a motion to transfer the cases to the Southern District of New York). The Government of South Africa has said that these cases interfere with the policy embodied by its Truth and Reconciliation Commission, which "deliberately avoided a 'victors' justice' approach to the crimes of apartheid and chose instead one based on confession and absolution, informed by the principles of reconciliation, reconstruction, reparation and goodwill." Declaration of Penuell Mpapa Maduna, Minister of Justice and Constitutional Development, Republic of South Africa, reprinted in App. to Brief for Government of Commonwealth of Australia et al. as *Amici Curiae* 7a, ¶ 3.2.1 (emphasis deleted). The United States has agreed. See Letter of William H. Taft IV, Legal Adviser, Dept. of State, to Shannen W. Coffin, Deputy Asst. Atty. Gen., Oct. 27, 2003, reprinted in *id.,* at 2a. In such cases, there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy.

Cf. 🔖 *Republic of Austria v. Altmann,* 541 U.S. 677, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004) (discussing the State Department's use of statements of interest in cases involving the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.*).

22   Article nine provides that "[n]o one shall be subjected to arbitrary arrest or detention," that "[n]o one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law," and that "[a]nyone who has been the victim of unlawful arrest or detention shall have an enforceable right to compensation." 999 U.N.T. S., at 175–176.

23   It has nevertheless had substantial indirect effect on international law. See Brownlie, *supra,* at 535 (calling the Declaration a "good example of an informal prescription given legal significance by the actions of authoritative decision-makers").

24   Alvarez's brief contains one footnote seeking to incorporate by reference his arguments on cross-border abductions before the Court of Appeals. Brief for Respondent Alvarez–Machain 47, n. 46. That is not enough to raise the question fairly, and we do not consider it.

25   The Rule has since been moved and amended and now provides that a warrant may also be executed "anywhere else a federal statute authorizes an arrest." Fed. Rule Crim. Proc. 4(c)(2).

26   We have no occasion to decide whether Alvarez is right that 21 U.S.C. § 878 did not authorize the arrest.

27   Specifically, he relies on a survey of national constitutions, Bassiouni, Human Rights in the Context of Criminal Justice: Identifying International Procedural Protections and Equivalent Protections in National Constitutions, 3 Duke J. Comp. & Int'l L. 235, 260–261 (1993); a case from the International Court of Justice, *United States v. Iran,* 1980 I.C.J. 3, 42; and some authority drawn from the federal courts, see Brief for Respondent Alvarez–Machain 49, n. 50. None of these suffice. The Bassiouni survey does show that many nations recognize a norm against arbitrary detention, but that consensus is at a high level of generality. The *Iran* case, in which the United States sought relief for the taking of its diplomatic and consular staff as hostages, involved a different set of international norms and mentioned the problem of arbitrary detention only in passing; the detention in that case was, moreover, far longer and harsher than Alvarez's. See 1980 I.C. J., at 42, ¶ 91 ("detention of [United States] staff by a group of armed militants" lasted "many months"). And the authority from the federal courts, to the extent it supports Alvarez's position, reflects a more assertive view of federal judicial discretion over claims based on customary international law than the position we take today.

28   In this action, Sosa might well have been liable under Mexican law. Alvarez asserted such a claim, but the District Court concluded that the applicable law was the law of California, and that under California law Sosa had been privileged to make a citizen's arrest in Mexico. Whether this was correct is not now before us, though we discern tension between the court's simultaneous conclusions that the detention so lacked any legal basis as to violate international law, yet was privileged by state law against ordinary tort recovery.

124 S.Ct. 2739, 159 L.Ed.2d 718, 72 USLW 4660, 158 Oil & Gas Rep. 601...

29    It is not that violations of a rule logically foreclose the existence of that rule as international law. Cf. *Filartiga v. Pena–Irala,* 630 F.2d 876, 884, n. 15 (C.A.2 1980) ("The fact that the prohibition of torture is often honored in the breach does not diminish its binding effect as a norm of international law."). Nevertheless, that a rule as stated is as far from full realization as the one Alvarez urges is evidence against its status as binding law; and an even clearer point against the creation by judges of a private cause of action to enforce the aspiration behind the rule claimed.

30    Alvarez also cites, Brief for Respondent Alvarez–Machain 49–50, a finding by a United Nations working group that his detention was arbitrary under the Declaration, the Covenant, and customary international law. See Report of the United Nations Working Group on Arbitrary Detention, U.N. Doc. E/CN.4/1994/27, pp. 139–140 (Dec. 17, 1993). That finding is not addressed, however, to our demanding standard of definition, which must be met to raise even the possibility of a private cause of action. If Alvarez wishes to seek compensation on the basis of the working group's finding, he must address his request to Congress.

\*    The Court conjures the illusion of common-law-making continuity between 1789 and the present by ignoring fundamental differences. The Court's approach places the law of nations on a federal-law footing unknown to the First Congress. At the time of the ATS's enactment, the law of nations, being part of general common law, was *not* supreme federal law that could displace state law. *Supra,* at 2770. By contrast, a judicially created federal rule based on international norms *would be* supreme federal law. Moreover, a federal-common-law cause of action of the sort the Court reserves discretion to create would "arise under" the laws of the United States, not only for purposes of Article III but also for purposes of *statutory* federal-question jurisdiction. See *Illinois v. Milwaukee,* 406 U.S. 91, 99–100, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972).

The lack of genuine continuity is thus demonstrated by the fact that today's opinion renders the ATS unnecessary for federal jurisdiction over (so-called) law-of-nations claims. If the law of nations can be transformed into federal law on the basis of (1) a provision that merely grants jurisdiction, combined with (2) some residual judicial power (from whence nobody knows) to create federal causes of action in cases implicating foreign relations, then a grant of federal-question jurisdiction would give rise to a power to create international-law-based federal common law just as effectively as would the ATS. This would mean that the ATS became largely superfluous as of 1875, when Congress granted general federal-question jurisdiction subject to a $500 amount-in-controversy requirement, Act of Mar. 3, 1875, § 1, 18 Stat. 470, and entirely superfluous as of 1980, when Congress eliminated the amount-in-controversy requirement, Pub.L. 96–486, 94 Stat. 2369.

1    In common with § 2680(k), most of the exceptions listed in § 2680 use the "claim arising" formulation. See §§ 2680(b), (c), (e), (h), (j), (*l* ), (m), and (n). Only two use the "act or omission" terminology. See § 2680(a) (exception for "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation ... or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty ..."); § 2680(e) (no liability for "[a]ny claim arising out of an act or omission of any employee of the Government in administering [certain provisions concerning war and national defense]"). It is hardly apparent, however, that Congress intended only §§ 2680(a) and (e) to be interpreted in accord with § 1346(b). Congress used the phrase "arising out of" for § 2680 exceptions that focus on a governmental act or omission. See § 2680(b) (exception for "[a]ny claim arising out of the loss, miscarriage, or negligent transmission of letters or postal matter"); § 2680(h) (no liability for "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contractual rights"). Given that usage, and in light of the legislative history of § 2680(k), omission of a reference to an "act or omission of any employee" from that provision may reflect only Congress' attempt to use the least complex statutory language feasible. Cf. *Sami v. United States,* 617 F.2d 755, 762, n. 7

Sosa v. Alvarez-Machain, 542 U.S. 692 (2004)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1164 of 1271

124 S.Ct. 2739, 159 L.Ed.2d 718, 72 USLW 4660, 158 Oil & Gas Rep. 601...

(C.A.D.C.1979) ("We do not think the omission of a specific reference to acts or omissions in § 2680(k) was meaningful or that the focus of that exemption shifted from acts or omissions to resultant injuries.").

2    The foreign-country exception's focus on the location of the tortious act or omission is borne out by a further colloquy during the hearing before the House Committee on the Judiciary. A member of that Committee asked whether he understood correctly that "any representative of the United States who *committed a tort* in England or some other country could not be reached under [the FTCA]." Hearings on H.R. 5373 et al., at 35

(emphasis added). Assistant Attorney General Shea said yes to that understanding of § 2680(k). *Ibid.*

3    *Renvoi* is "[t]he doctrine under which a court in resorting to foreign law adopts as well the foreign law's conflict-of-laws principles, which may in turn refer the court back to the law of the forum." Black's Law Dictionary 1300 (7th ed.1999).

4    Reading *renvoi* into § 1346(b)(1), even to determine which State supplies the governing law, moreover, is questionable. See Shapiro, Choice of Law Under the Federal Tort Claims Act: *Richards* and Renvoi Revisited, 70 N.C.L.Rev. 641, 679 (1992) ("It is only fair that federal liability be determined by the law where the federal employee's negligence took place, as Congress intended. The simplicity of the internal law approach is preferable to the complexity and opportunity for manipulation of *[Richards ']* whole law construction.").

5    Enacting the FTCA, Congress was concerned with quotidian "wrongs which would have been actionable if inflicted by an individual or a corporation," *Feres v. United States,* 340 U.S. 135, 139–140, 71 S.Ct. 153, 95 L.Ed. 152 (1950), such as vehicular accidents, see S.Rep. No. 1400, 79th Cong., 2d Sess., 31 (1946). See also *ante,* at 2751, n. 4. The place of injury in such torts almost inevitably would be the place the act or omission occurred as well.

6    As cataloged by the Court of Appeals for the Third Circuit, these are: "(1) applying different rules to different theories of liability; (2) choosing the place of the last allegedly-wrongful act or omission; (3) determining which asserted act of wrongdoing had the most significant effect on the injury; (4) choosing the state in which the United States' physical actions could have prevented injury; and (5) determining where the 'relevant' act or omission occurred." *Simon,* 341 F.3d, at 202. For cases applying and discussing one or another of those five approaches, see *Ducey v. United States,* 713 F.2d 504, 508, n. 2 (C.A.9 1983) (considering where "physical acts" that could have prevented the harm would have occurred); *Hitchcock v. United States,* 665 F.2d 354, 359 (C.A.D.C.1981) (looking for the "relevant" act or omission); *Bowen v. United States,* 570 F.2d 1311, 1318 (C.A.7 1978) (noting "the alternatives of the place of the last act or omission having a causal effect, or the place of the act or omission having the most significant causal effect," but finding that both rules would lead to the same place); *Raflo v. United States,* 157 F.Supp.2d 1, 10 (D.D.C.2001) (applying *Hitchcock's* relevance test by looking for the place where the "most substantial portion of the acts or omissions occurred"); *Kohn v. United States,* 591 F.Supp. 568, 572 (E.D.N.Y.1984) (applying different States' choice-of-law rules on an act-by-act basis).

---

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

949 F.3d 1312
United States Court of Appeals, Eleventh Circuit.

Hamid SOW, Petitioner,

v.

U.S. ATTORNEY GENERAL, Respondent.

Nos. 17-15245; 18-12162
|
(February 14, 2020)

**Synopsis**

**Background:** Citizen of Guinea filed petition for review of Board of Immigration Appeals' (BIA) denial of his motion to remand his asylum application based upon ineffective assistance of counsel and motion to reopen based upon new evidence.

**[Holding:]** The Court of Appeals, Wilson, Circuit Judge, held that BIA was arbitrary and capricious in denying alien's motions.

Petition granted.

**Procedural Posture(s):** Review of Administrative Decision.

West Headnotes (7)

**[1]**    **Aliens, Immigration, and Citizenship**    ⚷    Review of discretion

Court of Appeals reviews of Immigration Appeals' (BIA) denial of motion to reopen for abuse of discretion, limiting its review to determining whether there has been exercise of administrative discretion and whether matter of exercise has been arbitrary or capricious.

1 Cases that cite this headnote

**[2]**    **Aliens, Immigration, and Citizenship**    ⚷    Review of initial decision or administrative review

Where Board of Immigration Appeals (BIA) adopted immigration judge's (IJ) decision or reasoning, Court of Appeals reviews both BIA's and IJ's decisions.

**[3]**    **Aliens, Immigration, and Citizenship**    ⚷    Assistance of counsel

Petitioner in removal proceedings is entitled to effective assistance of counsel where counsel has been obtained.

**[4]**    **Aliens, Immigration, and Citizenship**    ⚷    Assistance of counsel

To establish ineffective assistance of counsel in removal proceeding, alien must show that (1) his counsel's performance was deficient and (2) counsel's deficiencies prejudiced his case.

AR.06390

**[5]**    **Aliens, Immigration, and Citizenship** 🔑 Assistance of counsel

To establish deficient performance, alien alleging ineffective assistance of counsel in removal proceedings must show that his counsel's performance was deficient to point that it impinged upon hearing's fundamental fairness such that alien was unable to reasonably present his case.

**[6]**    **Aliens, Immigration, and Citizenship** 🔑 Assistance of counsel

To show prejudice, alien alleging ineffective assistance of counsel in removal proceedings must demonstrate that performance of counsel was so inadequate that there is reasonable probability that but for attorney's error, proceedings' outcome would have been different.

**[7]**    **Aliens, Immigration, and Citizenship** 🔑 New evidence, facts or circumstances
        **Aliens, Immigration, and Citizenship** 🔑 Ineffectiveness of counsel

Board of Immigration Appeals (BIA) was arbitrary and capricious in denying Guinea citizen's motion to remand his asylum application based upon ineffective assistance of counsel and motion to reopen based upon new evidence, where alien repeatedly sought to review and correct evidence collected on his behalf while he was detained, but his attorney did not familiarize himself with case, either did not listen or could not understand him due to language barrier and attorney's failure to obtain interpreter, and submitted inconsistent affidavits, and immigration judge's denial of asylum was based entirely on inconsistencies in evidence. 📙 8 C.F.R. § 1003.102(r).

**Attorneys and Law Firms**

**\*1313**  Keren Zwick, National Immigrant Justice Center, Chicago, IL, Adele El-Khouri, Elaine Goldenberg, Jeremy S. Kreisberg, Munger Tolles & Olson, LLP, Washington, DC, for Petitioner.

Jeffrey Ronald Meyer, Ubaid ul-Haq, U.S. Department of Justice, Civil Division, Office of Immigration Litigation, Washington, DC, Michelle Ressler, District Counsel's Office, Miami, FL, for Respondent.

Petitions for Review of a Decision of the Board of Immigration Appeals, Agency No. A XXX-XX4-539

Before WILSON and NEWSOM, Circuit Judges, and COOGLER,[*] District Judge.

**Opinion**

WILSON, Circuit Judge:

Hamid Sow, a citizen of Guinea, seeks review of the Board of Immigration Appeals' (BIA) denial of his motion to remand based upon ineffective assistance of counsel and motion to reopen based upon new evidence. After careful review and with the benefit of oral argument, we conclude that the BIA abused its discretion in denying Sow's motion to remand based on ineffective assistance of counsel. We therefore **\*1314** grant Sow's petition for review, vacate the BIA's decisions, and remand to the BIA with instructions to remand to the IJ for reconsideration of Sow's asylum application.[1]

# I. Factual and Procedural Background

*A. Underlying Facts*

In December 2016, Sow entered the United States and immediately applied for asylum based on his membership in a particular social group—the homosexual community. His application for asylum alleged the following.

Sow was raised in Conakry, Guinea where he had to hide his sexuality because of the stigma against homosexuals in his devout Muslim community. For the same reason, he had to hide his relationship with a man named Alpha Oumar Barry. When Sow's sister discovered the true nature of Sow and Alpha's [2] relationship, Sow immediately fled his house for fear that his uncle, a prominent Iman, would kill him. While he was in hiding, a friend informed Sow that his family and other members of the community had tortured and then burned him alive. His friend also reported that Sow's uncle had instructed the community members to, once found, either kill Sow or turn him into the police for failing his family and the laws of Islam.

Sow fled to Morocco, where he intended to stay with a cousin. But by the time he arrived at his cousin's house, his cousin had learned of Sow's sexuality. As a result, he brutally beat Sow. A taxi driver found Sow and took him to a hospital, but the hospital staff refused to treat Sow because of his sexuality. The taxi driver then took him to a friend's home. The driver's friend cared for Sow for nearly six months while he recovered from his injuries. He then helped Sow obtain a Mexican visa.

Shortly after arriving in Mexico, Sow traveled to the United States. He presented himself at the United States border on December 23, 2016, where he informed an officer of his fear of returning to Guinea because he was a homosexual.

*B. Representation and Merits Hearing*

While detained, Sow was in contact with two friends: Ibrahim Barry and Aminata Diallo. Ibrahim reached out to an attorney, Joseph Gurian, on Sow's behalf. Gurian agreed to represent Sow. Ibrahim and Diallo then began to gather evidence for Gurian to use in support of Sow's asylum application.

Shortly after Gurian agreed to represent Sow, Sow began calling Gurian. Sow, who speaks only French, had to rely on other detainees to help him communicate with Gurian, who speaks only English. After a couple unproductive calls, Gurian informed Sow that he would secure a French interpreter. Gurian also asked Sow to send him documents related to Sow's case. Sow asked if Gurian would meet with him at the detention center, but Gurian refused. Sow then sent Gurian his asylum application and a statement detailing his fear of returning to Guinea.

A few days later, Sow called Gurian and, again relying on other detainees to translate, requested copies of the documents that Ibrahim and Diallo had collected on his behalf. Sow did not receive any documents. [3]  During their next call, Sow again  **\*1315** requested access to the evidence so that he and Gurian could discuss his case. Gurian told Sow that he would obtain an interpreter and call back at a particular time so they could discuss his case. Gurian did not call at the arranged time. Gurian later admitted that he missed the call because the interpreter cancelled.

Gurian eventually visited the detention center, but the visit lasted only thirty minutes and there was no interpreter present. The only evidence that Sow was able to review was an affidavit written by Sow's aunt, Oumou Hawa Barry. Sow tried to communicate that Oumou is forgetful and that she was unfamiliar with the events leading to his displacement. He described her statement as "no good." But without a translator, Gurian did not fully understand Sow's concerns. According to Sow, Gurian "dismissed" him, told him the letter "was good," and informed him that he would "not get a chance to review the rest of the evidence." Gurian then gave Sow a questionnaire written in both English and French and asked him to draft a new statement based on his answers.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Sow answered the questionnaire, relying on other detainees to translate his responses to English. A few days later, Gurian picked up the statement, but did not review it with Sow. Sow requested another meeting so he could review the evidence. Gurian eventually agreed to meet with Sow once more before the merits hearing. The meeting, again conducted without an interpreter, lasted only twenty-five minutes. Gurian neither brought any of the evidence for Sow to review nor discussed the substance of the case with Sow.

Sow and Gurian did not meet again until thirty minutes before the merits hearing. Gurian again failed to bring an interpreter. During this meeting, Sow finally had the opportunity to briefly review the two affidavits submitted by his friend, Djibril Barry. Sow tried to communicate to Gurian that the content of the affidavits "did not match up with what happened" and that the dates of the same events listed in Djibril's two affidavits were inconsistent. But because there was no interpreter present, the message was not properly relayed. Sow attempted to express his concerns in English, telling Gurian "[t]his evidence is no good." But Gurian dismissed his concerns. Sow also stated that Gurian did not prepare him for direct or cross-examination, and that he did not even know a government lawyer would be present until the hearing began.

Before Sow's merits hearing, Gurian submitted the following evidence: the State Department's 2016 Guinea Human Rights Report, a news article describing lynchings targeting homosexual people in Conakry, two photographs allegedly showing Alpha's dead body, Diallo's affidavit, and two affidavits each from Djibril and Oumou.

At the beginning of the hearing, the Immigration Judge (IJ) noted that Sow submitted two applications for asylum. He asked Gurian which application Sow intended to rely on. Gurian responded that he did not know that Sow had submitted two applications. When the IJ noted that the second was more detailed, Gurian said that he "imagine[d]" that was the one Sow wanted to move forward with.

During his testimony, Sow detailed his experience in Guinea. He testified that he and his homosexual friends were persistently persecuted, that his friend was killed in 2009 for being homosexual, and that other homosexual friends had been imprisoned. He said that he had been in a relationship with Alpha for six years and that they were first persecuted for being homosexual in April 2015 when a neighbor told the police that she saw them kissing. The police charged Sow with engaging in homosexual activity, which is illegal in Guinea, and jailed him. While visiting him **\*1316** in jail, his uncle beat Sow. After two months in jail, Sow swore to his uncle that he was not homosexual, and his uncle eventually secured his release.

Sow further testified that in May 2016, Sow's sister discovered explicit pictures of Alpha and Sow, exposing their relationship. Sow fled. He later learned that his family and members of the community apprehended Alpha, tortured him, and then burned him alive.

On cross-examination, the government asked Sow to explain inconsistencies in Djibril's two affidavits.[4] Sow responded that he could not explain the inconsistencies because he had not had an opportunity to read the affidavits. Gurian stated that he believed there were two individuals named Djibril Barry. Sow had to correct Gurian and confirm there was only one.

In his oral decision, the IJ said that he "unfortunately" had to deny Sow's application based solely on an adverse credibility finding. In coming to this conclusion, the IJ specifically highlighted the inconsistencies in Djibril's and Oumou's statements. He noted that, if it were true that Sow were a homosexual, then he "clearly should get" asylum. Likewise, he said "if [Sow was] telling the truth I would in a heartbeat grant him asylum."

*C. Merits Appeal and Motion to Remand*

Sow, represented by new counsel, appealed to the BIA. He argued that the IJ erred in failing to assess Sow's well-founded fear of future persecution. Sow also filed a motion to remand based on ineffective assistance of counsel,[5] which included several attachments. For example, he attached an affidavit from Djibril explaining the inconsistencies in his previous affidavits, both of which Gurian submitted to the IJ. It stated that Djibril had intended to send only his second affidavit and that the earlier version

had been written by his younger brother, who had helped write the statement while Djibril was hospitalized. When Djibril was discharged, he noticed the mistakes and sent a corrected affidavit. Djibril also stated that he had tried to help Oumou draft her affidavit. He characterized Oumou as "not very well" and noted that she "forgets things."

Sow also attached an affidavit from Ibrahim. Ibrahim stated that, when he was gathering evidence, he noticed inconsistencies in the affidavits and informed Gurian of those inconsistencies. Gurian dismissed his concerns. Despite the warning, Ibrahim thought Gurian seemed surprised about the inconsistencies when they spoke after the merits hearing. When Ibrahim asked whether Gurian had even read the evidence before the hearing, Gurian said he had not had much time to review the documents.

Sow also attached an email chain between Ibrahim and Gurian from March 2017. In the emails, Ibrahim offered to serve as the interpreter and asked Gurian the dates and times he needed to be available. Gurian never responded with a proposed date.

The BIA denied Sow's motion to remand. It held that the IJ did not clearly err in making an adverse credibility determination **\*1317** and the record did not establish that Sow was entitled to relief "independent of his discredited claim of past harm." It also denied Sow's ineffective assistance of counsel claim, reasoning that Gurian "reasonably relied on, and submitted the evidence provided by, the respondent and his friends." According to the BIA, "submitting evidence that [Sow] was involved in collecting" did not "render[ ] [Gurian's] performance ineffective."

### D. Motion to Reopen

Two months later, Sow filed a motion to reopen based on new evidence. He attached a Guinean arrest warrant that was issued on June 14, 2017. The warrant states that Sow was caught having "carnal relations" with a friend in his Conakry home and his friend was then "beaten, burned, and immediately surrendered of his spirit." The warrant also states that Sow's family requested that a warrant be issued for his "acts of homosexuality, and of indecent assault on the good traditions that harm the reputation of an African family" in violation of Articles 267, 271, and 277 of the Guinean Criminal Code. Sow also attached an affidavit prepared by Ibrahima Sory Barry, a member of the Guinean National Police Force. Ibrahima verified the validity of the warrant and stated that if Sow returned to Guinea, it would be his duty to arrest him.

The BIA denied Sow's motion to reopen, reasoning that "[t]he new evidence submitted does not address the grounds of adverse credibility finding [sic], and therefore does not show that a different outcome may be warranted."

Sow timely appealed both the BIA's denial of his motion to remand based on ineffective assistance of counsel and its denial of his motion to reopen based on new evidence. [6] This is his consolidated appeal.

## II. Ineffective Assistance of Counsel

Sow contends that the BIA erred in denying his motion to remand based on ineffective assistance of counsel. He argues that that his counsel acted deficiently by not (1) communicating with him about the substance of his case; (2) allowing Sow to review the evidence despite Sow's repeated requests; and/or (3) adequately preparing for the merits hearing. Sow further maintains that these deficient acts were prejudicial because, if Gurian had fulfilled his basic obligations, he would not have submitted the flawed affidavits that were the basis for the adverse credibility finding. The government did not address the ineffective assistance of counsel claim.

[1]    [2]    Where, as here, a motion to remand seeks additional proceedings to introduce additional evidence, we apply the same standard of review as a motion to reopen. See *Najjar v. Ashcroft*, 257 F.3d 1262, 1301 (11th Cir. 2001). We review the BIA's denial of a motion to reopen for abuse of discretion, limiting our review to "determining whether there has been an exercise of administrative discretion and whether the matter of exercise has been arbitrary or capricious." *Ali v. U.S. Att'y Gen.*, 443

F.3d 804, 808 (11th Cir. 2006) (per curiam) (quotation omitted). Where, as here, the BIA adopted the IJ's decision or reasoning, we review both the BIA's and the IJ's decisions. *See Jiang v. U.S. Att'y Gen.*, 568 F.3d 1252, 1256 (11th Cir. 2009).

**\*1318** **[3]** **[4]** **[5]** **[6]** A petitioner in removal proceedings is entitled to "to *effective* assistance of counsel where counsel has been obtained." *Dakane v. U.S. Att'y Gen.*, 399 F.3d 1269, 1273 (11th Cir. 2005) (per curiam) (quotation omitted). To establish ineffective assistance of counsel, the petitioner must show that (1) his counsel's performance was deficient and (2) counsel's deficiencies prejudiced his case. *Id.* at 1273–74. To establish deficient performance, the petitioner mush show that his counsel's performance "was deficient to the point that it impinged upon the fundamental fairness of the hearing such that the alien was unable to reasonably present" his case. *Id.* (quotation omitted). And to show prejudice, the petitioner must demonstrate that the performance of counsel was "so inadequate that there is a reasonable probability that but for the attorney's error, the outcome of the proceedings would have been different." *Id.* at 1274 (citation omitted).

Pursuant to federal regulations, an immigration practitioner must maintain communication with the client throughout the duration of the client-practitioner relationship and must take reasonable steps to do so "in a language that the client understands." 8 C.F.R. § 1003.102(r). A practitioner's responsibilities in maintaining such communication include "[p]romptly comply[ing] with reasonable requests for information" and reasonable consultation "with the client about the means by which the client's objectives are to be accomplished." *Id.* A practitioner must "meet with the client sufficiently in advance of a hearing or other matter to ensure adequate preparation of the client's case." *Id.*; *see also Figeroa v. I.N.S.*, 886 F.2d 76, 79 (4th Cir. 1989) ("At the very least, whether in a trial, an administrative proceeding, or settlement, plea or business related negotiations, an attorney is ethically bound to act in the best interests of his client, and to follow his client's wishes." (citing ABA Code of Professional Responsibility, Canons 6, 7 and EC7–1)).

**[7]** We acknowledge the highly deferential standard of review that the BIA is due. But the unique facts of Sow's case present the rare situation where we must find that the BIA was arbitrary and capricious in exercising its discretion. *Ali*, 443 F.3d at 808.

First, Sow established deficient performance. The BIA reasoned that Gurian's performance was not deficient because he reasonably relied on evidence that Sow was directly involved in gathering. But Sow was not involved in gathering evidence. Because Sow was detained, his involvement was limited to reviewing evidence that Ibrahim, Diallo, and Gurian collected on his behalf. Sow repeatedly sought to review and correct the mounting evidence. But his efforts were unsuccessful, as Gurian refused to allow Sow access. When Sow finally had the opportunity to review some of the evidence, he attempted to communicate his concerns to Gurian. But Gurian either did not listen, or could not understand Sow, no doubt due to the language barrier and lack of an interpreter. In fact, Gurian failed to obtain an interpreter for *any* of their meetings or phone conversations, a sanctionable offense. *See* 8 C.F.R. § 1003.102. As a result, Sow was unable to communicate with his counsel about the substance of his case.

Gurian also failed to familiarize himself with the case. For example, during the merits hearing, Gurian was unaware of basic facts like how many asylum applications Sow had submitted and how many individuals named Djibril Barry were involved in the case. And because of Gurian's failure to review the evidence, he submitted contradictory affidavits. The evidence was not only internally inconsistent—he submitted multiple, contradictory affidavits prepared by Djibril Barry—but it was also inconsistent with his own client's account. **\*1319** As the Third Circuit has said in a similar context, "evidentiary inconsistencies ... would have been avoided by competent counsel." *Fadiga v. U.S. Att'y Gen.*, 488 F.3d 142, 162 (3d Cir. 2007). Taken together, Gurian's many deficient acts "impinged upon the fundamental fairness of the hearing such that [Sow] was unable to reasonably present" his case. *Dakane*, 399 F.3d at 1273–74 (quotation omitted).

AR.06395

Second, Sow established that counsel's deficiencies prejudiced his case. The IJ's denial of asylum was based entirely on the inconsistencies in the evidence, and competent counsel would have realized that the affidavits included inaccuracies and never would have submitted them. The IJ further stated that, if Sow was "credible, then the Court will believe that he is gay and therefore, suffered in his country on account of being gay ... so if he had been persecuted on account of his sexual orientation then he should, in fact, be given asylum based upon past persecution." We therefore do not need to speculate as to whether the outcome may have been different if Gurian had performed adequately. The IJ's uniquely direct statement confirms that it would have. Because the IJ explicitly said that he would have granted Sow's application but for the evidentiary inconsistencies, we have no trouble concluding that there is a reasonable probability that the outcome of Sow's merits hearing would have been different with adequate assistance of counsel. *See* 🔖 *id.* at 1274.

Accordingly, we grant Sow's petition, vacate the BIA's decision, and remand to the BIA with instructions to remand to the IJ for reconsideration of Sow's asylum application.

**PETITION GRANTED.**

**All Citations**

949 F.3d 1312, 28 Fla. L. Weekly Fed. C 833

### Footnotes

| | |
|---|---|
| * | The Honorable L. Scott Coogler, United States District Judge for the Northern District of Alabama, sitting by designation. |
| 1 | Because we are granting relief based on Sow's ineffective assistance of counsel claim, we decline to address his motion to reopen based on new evidence. |
| 2 | Multiple individuals involved in this case—none of whom are related—have the last name Barry. We therefore refer to these individuals by their first names. |
| 3 | Gurian later told Sow that he had indeed mailed the documents, but there is no evidence to support this statement. |
| 4 | The inconsistencies were glaring. In one affidavit, Djibril's account of Alpha's death tracked Sow's account. But the other affidavit describes a wholly separate incident. Djibril said Alpha was killed months after Sow's family discovered the true nature of Alpha and Sow's relationship. According to this second affidavit, Alpha died after a man punched him while he and Sow were walking in the streets of Conakry. |
| 5 | Sow styled his motion as a "motion to reopen and remand," but we construe it as a motion to remand because he filed the motion while his appeal to the BIA was pending. *See* 🔖 8 C.F.R. § 1241.1. |
| 6 | Sow also argues that "[i]f [we do] not grant relief on Mr. Sow's ineffective assistance claim, [we] should nonetheless remand for the more limited purpose of requiring the BIA to assess Mr. Sow's fear of future persecution." Because we remand based on Sow's ineffective assistance claim, we need not consider this alternative ground for relief. |

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

558 S.W.3d 126
Missouri Court of Appeals, Western District.

STATE of Missouri, Respondent,

v.

Karbino William Deng BARAC, Appellant.

WD 81267
|
OPINION FILED: September 25, 2018
|
MODIFIED October 23, 2018

**Synopsis**

**Background:** Following a bench trial, defendant was convicted in the Circuit Court, Buchanan County, Daniel F. Kellogg, J., of driving while intoxicated as a chronic offender. Defendant appealed.

**[Holding:]** The Court of Appeals, Cynthia L. Martin, J., held that sufficient evidence supported conviction.

Affirmed.

**Procedural Posture(s):** Appellate Review.

West Headnotes (13)

[1]    **Criminal Law**    Sufficiency of evidence to convict

Court of Appeals assesses the sufficiency of the evidence to support a conviction in a court-tried case using the same standard as in a jury-tried case.

1 Cases that cite this headnote

[2]    **Criminal Law**    Sufficiency of evidence to convict

To determine whether the evidence is sufficient to support the conviction in a bench-tried case, Court of Appeals must look to the elements of the crime and consider each in turn to determine whether a reasonable factfinder could find each of the elements beyond a reasonable doubt.

1 Cases that cite this headnote

[3]    **Criminal Law**    Presumptions

In looking at the elements of a crime to determine whether the evidence is sufficient to support the conviction in a bench-tried case, Court of Appeals is required to take the evidence in the light most favorable to the State and grant the State all reasonable inferences from the evidence, disregarding all contrary inferences.

1 Cases that cite this headnote

[4]    **Criminal Law**    Presumptions
       **Criminal Law**    Sufficiency of evidence to convict

In reviewing the sufficiency of the evidence in a court-tried case, Court of Appeals will not supply missing evidence or grant the state unreasonable, speculative, or forced inferences.

1 Cases that cite this headnote

[5]    **Automobiles**    Driving while intoxicated

If the key is in the ignition and the engine is running, a person "operates" a vehicle for purpose of a driving while intoxicated prosecution, even if that person is sleeping or unconscious.

1 Cases that cite this headnote

[6]    **Automobiles**    Driving while intoxicated

In those cases in which the accused engine was not running at the time in question, the State must present significant additional evidence of driving or operating and the connection of driving or operating in an intoxicated state to sustain a criminal conviction for driving while intoxicated.

[7]    **Criminal Law**    Reasonable doubt

Court of Appeals' task on appeal of a driving while intoxicated conviction is to determine whether the State presented sufficient evidence that a reasonable factfinder could find beyond a reasonable doubt that the defendant was driving or operating a motor vehicle and that he did so while intoxicated.

1 Cases that cite this headnote

[8]    **Automobiles** 👉 Driving while intoxicated
       **Automobiles** 👉 Driving while intoxicated

To sustain a conviction for driving while intoxicated, the State must establish, through direct or circumstantial evidence, the temporal connection between the defendant's last operation of a motor vehicle and his observed intoxication.

1 Cases that cite this headnote

[9]    **Automobiles** 👉 Driving while intoxicated

To sustain a driving while intoxicated conviction, when driving or operating is not personally observed by an eyewitness, circumstantial evidence may be used to prove that the defendant was driving or operating a vehicle while intoxicated.

[10]   **Automobiles** 👉 Driving while intoxicated

Examples of "significant additional evidence" as it relates to the "drive" or "operate" element of driving while intoxicated include, but are not limited to: (1) lights inside or outside the vehicle were illuminated, (2) the key was in the ignition, (3) the accused was found behind the steering wheel, (4) the accused was the sole occupant of the vehicle, (5) the vehicle was found in a lane of traffic, and (6) the vehicle was registered to the accused.

[11]   **Automobiles** 👉 Driving while intoxicated
       **Automobiles** 👉 Refusal of test, admissibility

To sustain a driving while intoxicated conviction, refusal to take a breath test can constitute

evidence from which a reasonable inference can be drawn that the driver was intoxicated at the time of the operation of the vehicle.

[12]   **Automobiles** 👉 Driving while intoxicated

Sufficient evidence supported conviction for driving while intoxicated; shortly after being dispatched to check the wellbeing of a person in a vehicle parked on the Interstate, police officer observed that defendant's vehicle was parked precariously, so that its front end was less than a foot from a concrete bridge and the vehicle was only inches away from the guardrail, defendant was seated in the driver's seat and was slumped over with his head resting on the steering wheel, vehicle's key was in the ignition and turned to the "on" position, and blood test indicated that defendant had a blood alcohol content more than four times the legal limit.

[13]   **Criminal Law** 👉 Historical facts and matters of common knowledge or belief
       **Criminal Law** 👉 Geographical facts in general

Both a trial court and an appellate court may take judicial notice of current history, of geographical facts, and of facts commonly known to all mankind, because Courts should not admit themselves more ignorant than the rest of mankind.

**\*128 Appeal from the Circuit Court of Buchanan County, Missouri,** The Honorable Daniel F. Kellogg, Judge

**Attorneys and Law Firms**

Evan J. Buchheim, Jefferson City, MO, for respondent.

Casey A. Taylor, Columbia, MO, for appellant.

Before Division Four: Karen King Mitchell, Chief Judge, Presiding, Mark D. Pfeiffer, Judge and Cynthia L. Martin, Judge

## Opinion

Cynthia L. Martin, Judge

Karbino William Deng Barac ("Barac") appeals from the trial court's entry of judgment convicting him of driving while intoxicated as an aggravated offender after a bench trial. Barac argues that there was insufficient evidence to establish the offense's temporal requirement--that Barac had operated the vehicle *while* intoxicated. We affirm.

### Factual and Procedural History [1]

On April 5, 2017, at approximately 6 p.m., Officer Jason Hill ("Jason Hill") of the St. Joseph, Missouri Police Department was dispatched to a wellbeing check on Interstate 229 near Exit 22. Officer Hill testified that, when he received the call, he was already driving south on 22nd Street, so he was not far from the location of the wellbeing check. Officer Hill described the vehicle as resting on Interstate 229, directly before the bridge over 22nd Street. The vehicle was positioned so that it was six to twelve inches from the concrete bridge, and was parked parallel to the guardrail, which was only a few inches away from the vehicle so that no one could enter or exit the vehicle on the passenger side.

When Officer Hill approached the vehicle, he saw Barac slumped with his head on the steering wheel. Officer Hill opened the vehicle's door, and Barac immediately became uncooperative and combative. Officer Hill smelled a strong odor of intoxicants coming from Barac's body and noticed Barac's bloodshot, watery eyes. Further, Barac's speech was slurred, but as the encounter continued, Barac's speech improved. Officer Hill asked Barac to submit to a portable breath test. Barac refused. Officer Hill testified that he did not attempt to conduct any field **\*129** sobriety tests at the scene because it was apparent to him that Barac would refuse to participate. Thereafter, Officer Hill placed Barac under arrest and escorted him to the patrol car. Barac used short, uncertain steps, walking slowly toward the patrol car. Officer Hill transported Barac to the station. While at the station, Barac refused to submit to a breath or blood test, so Officer Hill obtained a warrant to take a blood sample. Barac's blood sample indicated that he had a blood alcohol content of .359 percent.

While on the scene, Officer Hill confirmed that the vehicle was registered to Barac. Officer Hill testified that, while the vehicle was not running, the vehicle's key was in the ignition and turned to the "on" position so that Officer Hill had to turn the key counterclockwise to remove it from the ignition. Officer Hill also testified that he found no containers of alcohol around the vehicle, and during a subsequent inventory search of the car, he found no containers of alcohol in the car itself. On cross-examination, Officer testified that he did not feel the vehicle's hood to determine whether it was hot and that he did not check if the vehicle had gas. Officer Hill then testified that he did not know how long the vehicle had been parked on the scene.

The State charged Barac with driving while intoxicated as a persistent offender in violation of section 577.010. [2] The State later amended the charges to driving while intoxicated as a chronic offender in violation of section 577.010. After a bench trial, the trial court found Barac guilty of driving while intoxicated as an aggravated offender and sentenced him to five years' imprisonment.

Barac appeals.

### Standard of Review

 **[1]**    **[2]**    **[3]**    **[4]**   We assess the sufficiency of the evidence to support a conviction in a court-tried case using the same standard as in a jury-tried case. *State v. Sutton*, 427 S.W.3d 359, 360 (Mo. App. W.D. 2014). To determine whether the evidence is sufficient to support the conviction, " 'we must look to the elements of the crime and consider each in turn to determine whether a reasonable [factfinder] could find each of the elements beyond a reasonable doubt.' " *Id.* (quoting *State v. Thenhaus*, 117 S.W.3d 702, 703 (Mo. App. E.D. 2003) ). In doing so " 'we are required to take the evidence in the light most favorable to the State and grant the State all reasonable inferences from the evidence, disregarding all contrary inferences.' " *Id.* (quoting *Thenaus*, 117 S.W.3d at 703). "However, [we] 'will not supply missing evidence or grant the state unreasonable, speculative, or forced inferences.' " *State v. Thompson*, 538 S.W.3d 390, 393 (Mo. App. W.D. 2018).

### Analysis

Barac raises a single point on appeal in which he argues that there was insufficient evidence to prove beyond a reasonable doubt that he was driving while intoxicated as an aggravated

offender. Barac does not deny that he was intoxicated when Officer Hill arrived on the scene and does not dispute that his prior convictions render him an aggravated offender. Instead, Barac argues that the State failed to present sufficient evidence from which a reasonable factfinder could have found beyond a reasonable doubt that Barac operated his vehicle *while* intoxicated. In other words, Barac challenges the sufficiency of the evidence to support the temporal connection between Barac's alleged operation of the vehicle and his intoxication. Barac asserts that, because no witness testified that they **\*130** actually observed Barac driving the vehicle and because Officer Hill testified that the engine was not running when he found Barac slumped over the steering wheel, the question at trial was whether the evidence presented by the State demonstrated that Barac operated the vehicle while intoxicated before Officer Hill arrived on the scene. Barac contends that, pursuant to relevant precedent, the evidence presented was insufficient to demonstrate that Barac had done so. We disagree.

 **[5]** "A person commits the offense of driving while intoxicated if he or she operates a vehicle while in an intoxicated condition." Section 577.010.1. As used in Chapter 577, " '[d]rive,' 'driving,' 'operates' or 'operating,' means physically driving or operating a vehicle or vessel." Section 577.001(9). Our Supreme Court has concluded, using the dictionary definitions of "drive" and "operate," that a defendant "drives" a vehicle when he or she "guide[s] it along or through anything," and that a defendant "operates" a vehicle when he or she causes the car to function by direct personal effort or work." *Cox v. Dir. of Revenue*, 98 S.W.3d 548, 550 (Mo. banc 2003). Thus, if the key is in the ignition and the engine is running, a person "operates" a vehicle, even if that person is sleeping or unconscious. *Id.* When Officer Hill found Barac slumped over the vehicle's steering wheel, the key was in the ignition and was turned to the "on" position, but the engine was not running. Thus, the situation does not align with the test for "operates" set forth in *Cox.*

 **[6]** **[7]** **[8]** **[9]** **[10]** **[11]** "[I]n those cases in which the accused engine was not running at the time in question, the State must present 'significant additional evidence of driving [or operating] and the connection of driving [or operating] in an intoxicated state ... to sustain a criminal conviction.' " *State v. Chambers*, 207 S.W.3d 194, 197 (Mo. App. S.D. 2006) (quoting *State v. Anderson*, 107 S.W.3d 447, 450 (Mo. App. S.D. 2003) ). Thus, our task on appeal is to determine "whether the State presented sufficient evidence

that a reasonable [factfinder] could find beyond a reasonable doubt that [Barac] was driving or operating a motor vehicle and that he did so while intoxicated." *Id.* " '[T]he State must establish, through direct or circumstantial evidence, the temporal connection between the defendant's last operation of a motor vehicle and his observed intoxication.' " *State v. Baker*, 499 S.W.3d 730, 733 (Mo. App. W.D. 2016) (quoting *State v. Shoemaker*, 448 S.W.3d 853, 856 (Mo. App. W.D. 2014) ). When driving or operating is not personally observed by an eyewitness, circumstantial evidence may be used to prove that that the defendant was driving or operating a vehicle while intoxicated. *Id.* "Examples of ... 'significant additional evidence' as it relates to the 'drive' [or 'operate'] element of [driving while intoxicated] includes, but is not limited to: lights inside or outside the vehicle were illuminated; the key was in the ignition; the accused was found behind the steering wheel; the accused was the sole occupant of the vehicle; the vehicle was found in a lane of traffic; and the vehicle was registered to the accused." *Id.* at 734 (citing *Chambers*, 207 S.W.3d at 198-99; *State v. Karl*, 270 S.W.3d 514, 517 (Mo. App. W.D. 2008); *State v. Thurston*, 84 S.W.3d 536, 538-40 (Mo. App. S.D. 2002) ). Further, "[r]efusal to take a [breath] test can constitute evidence from which a reasonable inference can be drawn that the driver was intoxicated at the time of the operation of the vehicle." *Id.*

In *State v. Baker*, we considered whether the State presented "significant additional evidence" that the defendant drove or operated his vehicle while intoxicated. *Id.* at 733. There, the State presented evidence that an eyewitness called 911 after **\*131** observing the defendant's vehicle parked in the middle of a busy intersection, blocking a lane of traffic. *Id.* at 734, 735. The eyewitness saw the sole occupant of the vehicle leaning back in the driver's seat of the vehicle, with his arm hanging out the window. *Id.* at 734. The officer dispatched to the scene saw a vehicle parked in the middle of an intersection with the driver's door open and the defendant's sandals on the driver's side floorboard. *Id.* The officer also observed the vehicle's key in its ignition in the "on" position, but the engine was not running. *Id.* The vehicle's head lights and rear lights were illuminated. *Id.* The officer observed two open and largely consumed bottles

of whiskey in the vehicle. *Id.* at 735. The officer confirmed that the vehicle was registered to the defendant, who the officer saw staggering away from the vehicle barefoot. *Id.* at 734. The defendant ultimately fell face down in a nearby yard. *Id.* When the officer approached the defendant, the officer smelled a strong odor of intoxicants coming from the defendant's person and observed other signs of intoxication. *Id.* at 735. The defendant refused to take field sobriety tests and refused to submit to a chemical breath test. *Id.*

We concluded that, from that evidence, the trial court could have reasonably inferred that, while the defendant was intoxicated, he:

> drove his vehicle into the middle of a busy intersection; stopped his vehicle so as to block a lane of traffic without putting on his flashers (as a reasonable and sober person would do upon having mechanical issues); passed out behind the steering wheel of his vehicle next to his two open McCormick whiskey bottles that he had been consuming in large quantities; was noticed shortly thereafter by another driver in this moderate to heavy traffic intersection who called 9-1-1; awakened shortly thereafter and continued to be so intoxicated that he attempted to stagger away from his vehicle on foot without shoes that he was previously wearing and which were—not so coincidentally—found in the driver's-side floorboard by the foot pedals of his vehicle; fell face first into the grass twenty-five feet from his car; and belligerently refused field sobriety testing or breathalyzer testing.

*Id.* Based on the evidence presented and the reasonable inferences drawn therefrom, we concluded that the State presented "sufficient and significant circumstantial evidence for a reasonable trier of fact to find beyond a reasonable doubt that [the defendant] drove or operated his vehicle in temporal connection to his severe intoxication." *Id.*; *see also State v. Varnell*, 316 S.W.3d 510, 518 (Mo. App. W.D. 2010) (concluding that "where the defendant's blood alcohol level was almost three times the legal limit, and he was at a temporal and geographical distance from a source of alcohol, it strains credulity to suggest that he was not intoxicated at the time of driving").

**[12]** Here, the trial court had before it the following evidence: At approximately 6 p.m. on Wednesday, April 5, 2017, Officer Hill was dispatched to check the wellbeing of a person in a vehicle parked on Interstate 229 near an exit. Officer Hill arrived shortly thereafter. Officer Hill observed that the vehicle was parked precariously, so that its front end was less than a foot from a concrete bridge, and the vehicle was parallel to and only inches away from the guardrail so that no one could enter into or exit from the passenger side of the vehicle. Barac was seated in the driver's seat and was slumped over with his head resting on the steering wheel. When Barac awoke, he was immediately uncooperative, combative, and showed signs of intoxication. Officer Hill determined that the **\*132** vehicle was registered to Barac. Officer Hill found the key in the vehicle's ignition and turned to the "on" position so that he had to turn it counterclockwise to remove it from the ignition, though the vehicle's engine was not running. Officer Hill found no containers of alcohol around the vehicle or in the vehicle. After being arrested on suspicion of driving while intoxicated, Barac refused to submit to a breath or blood test, requiring a warrant to test Barac's blood. The blood test indicated that Barac had a blood alcohol content of .359 percent, more than four times the legal limit.

**[13]** From this evidence, the trial court could have reasonably inferred that the vehicle, precariously parked on an interstate at 6 p.m. on a weekday evening, had not been at that location for an extended period when Officer Hill was dispatched to and arrived at the scene. [3] The vehicle's position on the interstate also permitted the reasonable inference that whoever drove the vehicle before to that location did so erratically. Barac was found slumped over in the driver's seat with his forehead resting on the steering wheel, was the only person in a vehicle registered to him, and the passenger door could not be utilized given the vehicle's parked location, permitting the inference that Barac had driven the vehicle to its parked location. Barac's blood alcohol content was over four times the legal limit, and there was no alcohol in or near the vehicle, permitting the reasonable inference that Barac consumed the alcohol in his system before he parked the

vehicle on the interstate. *See Varnell*, 316 S.W.3d at 518. Barac refused to take a breath test, permitting the inference that Barac was the driver of the vehicle and was intoxicated when the vehicle was parked on Interstate 229 near an exit. *See Baker*, 499 S.W.3d at 734.

We conclude that all of the evidence and inferences drawn therefrom, when viewed in the light most favorable to the conviction, "constitute[ ] sufficient and significant circumstantial evidence for a reasonable trier of fact to find beyond a reasonable doubt that [Barac] drove or operated his vehicle in temporal connection to his severe intoxication." *Id.* at 735. In other words, it was reasonable for the trial court to conclude that Barac was intoxicated at the time he drove the vehicle on Interstate 229 to the place where it was parked.

Barac cites a trio of cases to support his position that the evidence and reasonable inferences drawn therefrom do not constitute sufficient and significant circumstantial evidence permitting a reasonable factfinder to conclude that Barac drove or operated the vehicle while he was intoxicated: *State v. Hatfield*, 351 S.W.3d 774 (Mo. App. W.D. 2011); *State v. Davis*, 217 S.W.3d 358 (Mo. App. W.D. 2007); and *State v. Chambers*, 207 S.W.3d 194 (Mo. App. S.D. 2006). These cases are readily distinguishable.

In *Hatfield*, a police officer was dispatched to the scene of an accident at approximately 11:00 a.m. **\*133** 351 S.W.3d at 775. When he arrived, the officer observed a car parked in the driveway of a home with a damaged front end, and saw damage to a fence and to the lawn. *Id.* at 775-76. The defendant was standing outside of the vehicle, and the defendant displayed multiple indicia of intoxication. *Id.* at 776. The State did not introduce any evidence regarding whether the defendant had access to alcohol at or near the scene. *Id.* at 780-81. The defendant later refused to perform field sobriety tests or to submit to a chemical breath test. *Id.* at 781. We concluded that "the State failed to temporally connect [the defendant's] intoxication when [the officer] arrived at the scene to his previous operation of the vehicle." *Id.* at 780. To support our conclusion, we noted that "the time which elapsed between the [defendant's] operation of the vehicle and his refusal to submit to field sobriety and chemical breath tests is unknown, and the

State failed to negate the possibility that he had access to alcohol in the meantime." *Id.* at 781. *Hatfield* is distinguishable. Here, the evidence and reasonable inferences drawn therefrom permit the conclusion that Barac's vehicle had not been parked for an extended period of time on Interstate 229 before Officer Hill was dispatched, and that Barac, who had a blood alcohol content of over four times the legal limit, had no access to alcohol in his parked vehicle.

In *Davis*, we concluded that there was insufficient evidence to demonstrate beyond a reasonable doubt that the defendant drove while intoxicated. 217 S.W.3d at 361. There, an officer was dispatched to the scene of an accident at 10:20 p.m. *Id.* at 359. When the officer arrived three minutes later, he saw that a vehicle had crashed into a light pole, but no one was in or around the vehicle. *Id.* A woman reported that the vehicle's occupant had fled to an address two or three blocks away. *Id.* The officer went to the address and found two men in the backyard. *Id.* The defendant admitted to crashing his car into the light pole. *Id.* The defendant displayed signs of intoxication and denied having consumed alcohol since the accident. *Id.* Police officers found empty beer cans in the car, including under the driver's seat. *Id.* The defendant was charged with and convicted of driving while intoxicated. *Id.* The State argued on appeal that the factfinder could have made the reasonable inference that the accident occurred just moments before the officer arrived on the scene, but we rejected that argument. *Id.* at 360-61. We concluded that "nothing in the record [established] the approximate time [the defendant] was operating the vehicle or the time the accident occurred" so that there was no evidence to "indicate[ ] how much time elapsed between the accident and the arrest." *Id.* at 361. *Davis* is distinguishable because, Barac's vehicle was precariously parked on an interstate where it can be inferred it would not have been for an extended period before Officer Hill was dispatched, and Barac was found in the vehicle, with no access to alcohol, despite having a blood alcohol content over four times the legal limit, supporting the reasonable inference that Barac was intoxicated when he drove and then parked his vehicle on Interstate 229.

*Chambers* involved a defendant found slumped over the steering wheel of a car parked in a residential driveway. 207 S.W.3d at 195. Police found beer bottles under and inside the vehicle, and a breath test revealed that the defendant had a blood alcohol content of .208. *Id.* at 196. When asked by a police officer whether he had operated the vehicle, the defendant responded "next question." *Id.* The owner of the residence testified that he was alerted to the car's presence in his driveway by barking dogs. *Id.* The Southern District concluded that the State failed to meet its burden to prove beyond a reasonable **\*134** doubt that the defendant was intoxicated while he drove or operated a motor vehicle. *Id.* at 199. The Southern District cited to the unpredictability of the owner's dogs in alerting the owner to potential threats by barking and rejected the State's characterization of defendant's statement "next question" as an admission. *Id.* at 198-99. Unlike *Chambers*, Barac's vehicle was parked near a bridge on an interstate in St. Joseph at 6 p.m. on a weekday, and no alcohol was found in or near

the vehicle. The factfinder could have reasonably inferred that the vehicle had not been parked on the interstate for an extended period before Officer Hill arrived on the scene, and that Barac did not consume alcohol in or near his vehicle after he was parked on the interstate, leaving no reasonable explanation for his .359 percent blood alcohol content other than that he drove while intoxicated to the location where his vehicle was found.

Barac's point on appeal is denied.

### Conclusion

We affirm the trial court's judgment.

All concur

**All Citations**

558 S.W.3d 126

### Footnotes

1     We view the facts in the light most favorable to the conviction. *State v. Sutton*, 427 S.W.3d 359, 359 n.1 (Mo. App. W.D. 2014).

2     All statutory references are to RSMo 2016 unless otherwise indicated.

3     Barac argues in his reply brief that, because the State did not present evidence at trial about the amount of traffic on Interstate 229 where the vehicle was found parked, the trial court could not have inferred that the vehicle had not been in that location long before Officer Hill was dispatched. However, both a trial court and an appellate court may take judicial notice of "current history, of geographical ... facts, and of facts commonly known to all mankind." *Reineman v. Larkin*, 222 Mo. 156, 121 S.W. 307, 311 (Mo. 1909). Courts may do so because they "should not admit themselves more ignorant than the rest of mankind." *Id.* The trial court's recognition that traffic flow on an interstate in a populated area around 6 p.m. on a weekday makes it unlikely that a precariously parked vehicle will go unreported for long was a permissible inference.

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Followed with Reservations by Bedoya-Melendez v. U.S. Atty. Gen., 11th Cir., May 17, 2012

554 F.3d 673
United States Court of Appeals,
Seventh Circuit.

Zvonko STEPANOVIC, Petitioner,

v.

Mark R. FILIP, Acting Attorney General
of the United States, Respondent.

No. 07-3883.
|
Argued Oct. 20, 2008.
|
Decided Jan. 28, 2009.
|
Rehearing and Rehearing En
Banc Denied April 6, 2009.

**Synopsis**

**Background:** Alien, a citizen of Serbia and Montenegro, petitioned for review of an order of the Board of Immigration Appeals (BIA), declaring him ineligible for cancellation of removal pursuant to the battered spouse provision of the Immigration and Nationality Act (INA).

**Holdings:** The Court of Appeals, Kanne, Circuit Judge, held that:

[1] determination that alien ineligible for cancellation of removal pursuant to extreme cruelty provision of the Immigration and Nationality Act was discretionary, and thus Court of Appeals lacked jurisdiction to review it, and

[2] BIA did not alter legal standard for demonstrating extreme cruelty by requesting that alien provide medical or psychiatric evidence of harm.

Petition dismissed.

## West Headnotes (7)

**[1]** **Aliens, Immigration, and Citizenship** Review of Initial Decision or Administrative Review

When the Board of Immigration Appeals (BIA) undertakes an independent review of the record and does not rely exclusively on the findings of the immigration judge (IJ), the Court of Appeals review the BIA's decision directly and not that of the IJ.

**[2]** **Aliens, Immigration, and Citizenship** Jurisdiction and Venue

The Court of Appeals may not review the decision of the Board of Immigration Appeals (BIA) to deny an alien's application for cancellation of removal unless the alien presents a constitutional claim or question of law. Immigration and Nationality Act, §§ 240A, 242(a)(2)(B, D), 8 U.S.C.A. §§ 1229b, 1252(a)(2)(B, D).

7 Cases that cite this headnote

**[3]** **Aliens, Immigration, and Citizenship** Jurisdiction and Venue

Determination that Serbian alien had not been subjected to extreme cruelty by his wife, and thus was ineligible for cancellation of removal pursuant to extreme cruelty provision of the Immigration and Nationality Act, was discretionary decision, and thus the Court of Appeals lacked jurisdiction to review it; to determine whether alien was subjected to extreme cruelty, the Court would be required to do more than plug the facts into a formula, and the term "extreme cruelty" was not self-explanatory, and reasonable people could differ as to its meaning. Immigration and Nationality Act, §§ 240A, 242(a)(2)(B, D), 8 U.S.C.A. §§ 1229b, 1252(a)(2)(B, D).

8 Cases that cite this headnote

**[4]    Aliens, Immigration, and
Citizenship** 🔑 Jurisdiction and Venue

A pure question of law, restoring appellate
jurisdiction under the REAL ID Act, arises
in situations in which an immigration case
comes out one way if the Constitution or
statute means one thing, and the other way if
it means something different. Immigration and
Nationality Act, 242(a)(2)(D), 8 U.S.C.A. §
1252(a)(2)(D).

2 Cases that cite this headnote

**[5]    Aliens, Immigration, and
Citizenship** 🔑 Jurisdiction and Venue

Factual or discretionary determinations in an
immigration case do not constitute reviewable
questions of law under the REAL ID Act.
Immigration and Nationality Act, 242(a)(2)(D),
8 U.S.C.A. § 1252(a)(2)(D).

2 Cases that cite this headnote

**[6]    Aliens, Immigration, and
Citizenship** 🔑 Cancellation of Removal or
Suspension of Deportation in General

**Aliens, Immigration, and
Citizenship** 🔑 Weight and Sufficiency

Board of Immigration Appeals (BIA) did not
alter legal standard for demonstrating extreme
cruelty by requesting that Serbian alien seeking
cancellation of removal under extreme cruelty
provision of the Immigration and Nationality Act
(INA) provide medical or psychiatric evidence
of the alleged harm he suffered from his wife's
alleged cruel conduct; alien did not claim that
he suffered physical harm, the extreme cruelty
determination was discretionary, and the BIA did
not require medical or psychiatric evidence, but
merely stated that alien failed to meet his burden
of proof, in part, because he presented no medical
or psychiatric evidence of harm. Immigration

and Nationality Act, § 240A, 8 U.S.C.A. §
1229b; 8 C.F.R. § 204.2(c)(1)(vi).

6 Cases that cite this headnote

**[7]    Aliens, Immigration, and
Citizenship** 🔑 Jurisdiction and Venue

A claim on appeal in an immigration case
does not become a question of law, which
would be reviewable under the REAL ID Act,
simply because the alien characterizes it as such.
Immigration and Nationality Act, 242(a)(2)(D),
8 U.S.C.A. § 1252(a)(2)(D).

**Attorneys and Law Firms**

**\*675** Larry J. Hagen (argued), Oak Park, IL, for Petitioner.

Sunah Lee (argued), Department of Justice Civil Division,
Immigration Litigation, Washington, DC, for Respondent.

Before BAUER, KANNE, and WILLIAMS, Circuit Judges.

**Opinion**

KANNE, Circuit Judge.

Zvonko Stepanovic is a citizen of Serbia and Montenegro [1]
who faces removal from the United States. He seeks review of
an order of the Board of Immigration Appeals declaring him
ineligible for cancellation of removal pursuant to the battered
spouse provision of the Immigration and Nationality Act
§ 240A(b)(2), 8 U.S.C. § 1229b(b)(2). The government
contends that this court lacks jurisdiction to review the BIA's
determination that Stepanovic was not subjected to "extreme
cruelty" under § 1229b(b)(2). We agree and conclude
that 8 U.S.C. § 1252(a)(2) prevents us from exercising
jurisdiction over the BIA's determination. Accordingly, we
dismiss the petition.

## I. BACKGROUND

Stepanovic was born in a region of the former Republic of
Yugoslavia that is now in Serbia. In 1993, he married Silvana

Simic, and the two moved to South Africa. The couple had one child, Kristina, before obtaining an amicable divorce in 1996. Silvana and Kristina remained in South Africa until 1997, and they now live in Florida.

On September 30, 1997, the United States admitted Stepanovic as a non-immigrant visitor with authorization to remain for a period not to exceed six months. He became a self-employed cross-country truck driver and lived in Chicago. In 1998, Stepanovic met Sonja Jovanovic, a U.S. citizen working in a Serbian restaurant, and the two began dating.

Stepanovic remained in the United States past the authorized six-month time period, and in 2002, immigration authorities detained him in Spokane, Washington. On May 8, 2002, the Immigration and Naturalization Service [2] sought to remove him for being in the United States illegally, pursuant to 8 U.S.C. § 1227(a)(1)(B)- *676 (C)(I). Stepanovic returned to Chicago after being released on a bond.

Approximately one month later, Stepanovic married Jovanovic and moved into her Chicago apartment. At a hearing before an immigration judge in January 2003, Stepanovic conceded removability, but at a later hearing in July, he stated that he would seek relief from removal because of his marriage to a United States citizen.

In November 2003, Stepanovic returned from a long-distance trucking trip, expecting Jovanovic to pick him up where he typically parked. She failed to appear, and he spent the night in his truck. Stepanovic received a ride home from a friend the next day, only to find that Jovanovic had locked him out of the apartment. When she finally answered the door, she appeared angry and would not let him enter. She handed him two bags of clothes and told him to leave, threatening to call the police if he did not. Jovanovic never allowed Stepanovic back into the apartment, and the two eventually divorced.

At a hearing in October 2004, Stepanovic informed the IJ that he and Jovanovic had separated and that he now intended to petition for cancellation of removal. On December 5, 2005, the IJ held a hearing on the merits of Stepanovic's application for cancellation of removal for battered spouses who have been subjected to "extreme cruelty," pursuant to 8 U.S.C. § 1229b(b)(2). In addition to the aforementioned facts, Stepanovic presented evidence that Jovanovic became involved with another man during their marriage and may

have been unfaithful. Stepanovic stated that he heard from friends that Jovanovic later married this same man.

Stepanovic conceded that he was never battered or subjected to physical harm, but he claimed that he suffered mental and emotional distress as a result of these events, the deterioration of his marriage, Jovanovic's continued refusal to return his phone calls, and occasionally seeing her in public with another man. At the conclusion of the hearing, the IJ denied Stepanovic's application because he failed to meet his burden of proof for cancellation of removal, including that he did not establish that his ex-wife subjected him to "extreme cruelty." [3] The IJ granted Stepanovic's alternative request for voluntary departure and designated South Africa as the country of removal. Stepanovic appealed the IJ's decision to the BIA.

On October 31, 2007, the BIA dismissed his appeal. The BIA agreed with the IJ that Stepanovic failed to demonstrate that he was subjected to extreme cruelty by his spouse under § 1229b(b)(2). The BIA held that "[i]n light of this determination, we need not reach the other arguments raised on appeal regarding the other eligibility criteria for cancellation of removal."

## II. ANALYSIS

[1] Stepanovic appeals the BIA's decision that he failed to prove that he was subjected to extreme cruelty. Because the BIA undertook an independent review of the record and did not rely exclusively on the IJ's findings, we review the BIA's decision directly and not that of the IJ. *Peralta-Cabrera v. Gonzales*, 501 F.3d 837, 843 (7th Cir.2007). Stepanovic also claims that the BIA incorrectly altered the legal standard for establishing extreme cruelty by requiring psychiatric or medical *677 evidence that his emotional suffering rose to the level of extreme cruelty.

### A. Battered Spouse Provision of the INA

Under the INA's battered spouse provision, the "Attorney General may cancel removal" of an alien who is removable if the petitioner establishes the elements of 8 U.S.C. § 1229b(b)(2), including that he "has been battered or subjected to extreme cruelty by a spouse or parent who is or was a United States citizen." *Id.* § 1229b(b)(2)(A)(i)(I). [4]

AR.06406

Congress has not defined "extreme cruelty" or provided a legal standard for determining its existence for the purposes of § 1229b(b)(2). However, the DHS promulgated a regulation that permits a battered spouse of a citizen or lawful permanent resident to self-petition for adjustment of status, and it defines "battery or extreme cruelty" as including, but not limited to:

> being the victim of any act or threatened act of violence, including any forceful detention, which results or threatens to result in physical or mental injury. Psychological or sexual abuse or exploitation, including rape, molestation, incest (if the victim is a minor), or forced prostitution shall be considered acts of violence. Other abusive actions may also be acts of violence under certain circumstances, including acts that, in and of themselves, may not initially appear violent but that are a part of an overall pattern of violence.

8 C.F.R. § 204.2(c)(1)(vi).

Based on the statute and the DHS regulation, Stepanovic asserts that his ex-wife's conduct and the deterioration of their marriage resulted in emotional and mental injury and constituted extreme cruelty under § 1229b(b)(2).

*B. Jurisdiction Under 8 U.S.C. § 1252(a)(2)*

Before reaching the merits of Stepanovic's claims, we must have jurisdiction to review the BIA's determination that Stepanovic failed to demonstrate extreme cruelty. Congress has delegated many immigration decisions to the Attorney General, and in so doing has expressly circumscribed our jurisdiction to review certain judgments. *See* 8 U.S.C. § 1252(a)(2); *Khan v. Mukasey*, 517 F.3d 513, 517 (7th Cir.2008). The applicable jurisdictional provision, entitled "Denials of discretionary relief," provides:

> Notwithstanding any other provision of law ... and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review-(i) any judgment regarding the granting of relief under section 1229b ... of this title....

8 U.S.C. § 1252(a)(2)(B).

**[2]** Stepanovic seeks relief under § 1229b, so we must turn to the exception to the jurisdiction-removal provision, found in subparagraph (D), which states:

> Nothing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional **\*678** claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section.

8 U.S.C. § 1252(a)(2)(D). Thus, reading the two provisions together, we may not review the BIA's decision to deny an alien's application for cancellation of removal under § 1229b unless the alien presents a constitutional claim or question of law.

Stepanovic makes two separate arguments. First, he asserts that the BIA's determination of extreme cruelty is non-discretionary, and is therefore a reviewable decision outside the scope of § 1252(a)(2)(B). Second, he argues that the BIA altered the legal standard for establishing extreme cruelty, which he states should constitute a reviewable question of law. We address each argument and find both unpersuasive.

*1. Discretionary Nature of the Extreme Cruelty Determination*

**[3]** Stepanovic first urges us to find that the extreme cruelty determination is non-discretionary and therefore within our jurisdiction to review. The government disagrees, arguing that the determination is discretionary and not reviewable.

Congress did not define the phrase "any judgment regarding the granting of relief" for the purposes of § 1252(a)(2)(B)(i). The statute is clear that, at a minimum, we may not review any discretionary determination regarding relief under § 1229b. *See, e.g., Martinez-Maldonado v. Gonzales, 437 F.3d 679, 682 (7th Cir.2006)* ("[ Section 1252(a)(2)(B)] bars judicial review made in immigration cases, with a few exceptions...."); *Cevilla v. Gonzales, 446 F.3d 658, 661 (7th Cir.2006)* ("[W]hile the purpose of the door-closing statute appears to be to place *discretionary* rulings beyond the power of judicial review (hence the caption of subsection (B)), the statute itself, read literally, goes further and places all rulings other than those resolving questions of law or constitutional issues beyond the power of judicial review." (emphasis added)).

**[4]** **[5]** Subsection (D) of the jurisdictional statute restores our jurisdiction to review only constitutional claims or questions of law. *See* 8 U.S.C. § 1252(a)(2)(D). We have interpreted the phrase "questions of law" to permit judicial review of only "pure" questions of law. *See Viracacha v. Mukasey, 518 F.3d 511, 515 (7th Cir.2008); Cevilla, 446 F.3d at 661* (explaining that Congress intended "to distinguish between 'statutory-construction questions' and 'factual questions' and to permit judicial review only of answers to the former"). A "pure" question of law arises in "situations in which a case comes out one way if the Constitution or statute means one thing, and the other way if it means something different." *Viracacha, 518 F.3d at 515.* Therefore, factual or discretionary determinations do not constitute reviewable questions of law under § 1252(a)(2)(D). *See Leguizamo-Medina v. Gonzales, 493 F.3d 772, 774 (7th Cir.2007); Cevilla, 446 F.3d at 661.*

This court has not previously addressed our jurisdiction to review an IJ's extreme cruelty determination for the purposes of § 1229b(b)(2). We have, however, held repeatedly that an analogous issue is *not* subject to judicial review: whether an alien will suffer "exceptional and extremely unusual hardship" in order to obtain cancellation of removal under § 1229b(b)(1). *See Martinez-Maldonado, 437 F.3d at 682* ("Our Court and others have confirmed that the application of [ § 1252(a)(2)(B)] strips us of jurisdiction in discretionary cancellation of removal cases."); ***679** Mireles v. Gonzales, 433 F.3d 965, 968 (7th Cir.2006)* ("We lack jurisdiction to review [petitioner's] contention that the agency should have exercised discretion in his favor [under § 1229b].... This is true whether the alien's argument is that the agency abused its discretion or that it failed to conduct a thorough review of the record." (citations omitted)); *Leyva v. Ashcroft, 380 F.3d 303, 307 (7th Cir.2004)* ("The meaning of 8 U.S.C. § 1252(a)(2)(B)(i) is clear: we may not review the Attorney General's judgment regarding whether or not to grant cancellation of removal under 8 U.S.C. § 1229b(b)(1)."); *Kharkhan v. Ashcroft, 336 F.3d 601, 604 (7th Cir.2003).* [5]

Stepanovic has not presented a convincing reason why the extreme cruelty determination under § 1229b(b)(2) should be treated differently than "exceptional and extremely unusual" hardship under § 1229b(b)(1). Both are subject to the jurisdiction-removal provision in § 1252(a)(2)(B), and Stepanovic is challenging the BIA's factual findings, its application of those facts to the law, and its exercise of discretion in denying relief under § 1229b(b)(2). We lack jurisdiction to review these determinations, just as we may not review similar issues under § 1229b(b)(1). *See, e.g., Mireles, 433 F.3d at 968.*

Furthermore, three of the four circuits that have addressed this precise question have held that the extreme cruelty determination is discretionary and not subject to judicial review. *See Ramdane v. Mukasey, 296 Fed.Appx. 440, 442, 2008 U.S.App. LEXIS 20356, at *4 (6th Cir.2008); Wilmore v. Gonzales, 455 F.3d 524, 528 (5th Cir.2006); Perales-Cumpean v. Gonzales, 429 F.3d 977, 982 (10th Cir.2005). But see Hernandez v. Ashcroft, 345 F.3d 824, 833-35 (9th Cir.2003).*

In *Perales-Cumpean,* the Tenth Circuit explained that a non-discretionary decision is one "for which there is a clear standard, and for which no evaluation of non-discretionary criteria is required." *429 F.3d at 982.* Conversely, a discretionary determination is one involving "a 'judgment call' by the agency, or for which there is 'no algorithm' on which review may be based." *Id.* To determine whether one has suffered extreme cruelty, a court must do more than "simply plug[ ] facts into a formula." *Id.* The Fifth Circuit agreed, comparing the extreme cruelty determination to the extreme hardship determination under *§ 1229b(b)(1),* which it had already held was discretionary because the term was "not self-explanatory, and reasonable men could easily differ as to [its] construction." *Wilmore, 455 F.3d at 527* (alteration in original) (quotations omitted). The Sixth Circuit recently followed suit, noting that it previously held that extreme hardship is a discretionary decision not subject to review, and that it "[had] been given no reason to believe that extreme cruelty is treated differently." *Ramdane, 296 Fed.Appx. 440, 442, 2008 U.S.App. LEXIS 20356, at *4.*

The Ninth Circuit is the only circuit to hold that the extreme cruelty determination is non-discretionary and reviewable. *Hernandez, 345 F.3d at 833-35.* In *Hernandez,* the court explained that "extreme cruelty involves a question of fact, determined through the application of legal standards." *Id. at 834.* The court compared extreme cruelty to deciding whether **\*680** an applicant was battered or was a "habitual drunkard" (both of which the Ninth Circuit considers non-discretionary), and it held that extreme cruelty is a similar type of "clinical" finding. *Id.* The court also distinguished the extreme cruelty and extreme hardship determinations by noting that extreme hardship is a more nebulous standard that seeks to separate those applicants deemed particularly worthy of cancellation of removal, whereas extreme cruelty simply establishes an applicant's status as a survivor of domestic violence. *Id. at 835.*

Stepanovic acknowledges the "arduous task" of persuading this court to follow the Ninth Circuit's view that the agency's extreme cruelty determination is non-discretionary. (Petr.'s Br. 24.) His assessment is accurate. We agree with the Fifth, Sixth, and Tenth Circuits that the extreme cruelty determination is discretionary, and we may not review the manner in which the BIA exercises its discretion. *See Mireles,*

*433 F.3d at 969.* As the Tenth Circuit noted, an IJ does not determine extreme cruelty by simply plugging facts into a formula or applying an algorithm. *See Perales-Cumpean, 429 F.3d at 982.* Rather, the IJ must determine the facts of a particular case, make a judgment call as to whether those facts constitute cruelty, and, if so, whether the cruelty rises to such a level that it can rightly be described as extreme. Stepanovic himself acknowledges that the agency possesses "unfettered discretion" in deciding whether a petitioner suffered extreme cruelty. (Petr.'s Br. 25.) Consequently, we find that the extreme cruelty determination under *§ 1229b(b)(2)* falls within the jurisdiction-removal statute, and thus beyond our jurisdiction to review.

*2. The BIA's Request of Medical or Psychiatric Evidence of Harm*

[6] Stepanovic also claims that the BIA altered the legal standard for demonstrating extreme cruelty, which he argues is a reviewable question of law under *§ 1252(a)(2)(D).* Specifically, he states that the BIA "ratchet [ed] up" the extreme cruelty standard, which he argues is found in 8 C.F.R. § 240.2(c), by requiring psychological or medical documentation of his injury. Stepanovic argues that by so doing, the BIA imposed an unannounced, *post hoc* standard that "the BIA knows, and probably expects, petitioner cannot meet."

[7] As previously stated, our jurisdiction is limited to review of only "pure" questions of law. *See Viracacha, 518 F.3d at 515.* A claim on appeal does not become a question of law simply because the litigant characterizes it as such. *See Zamora-Mallari v. Mukasey, 514 F.3d 679, 694 (7th Cir.2008)* ( "A petitioner may not create the jurisdiction that Congress chose to remove simply by cloaking an ... argument in constitutional garb.") (alteration in original) (quotations omitted); *Leguizamo-Medina, 493 F.3d at 774* ("[O]nly 'pure' legal questions (as opposed to characterizations or 'mixed' questions) are covered by subsection (D)."); *see also Xiao Ji Chen v. U.S. Dep't of Justice, 471 F.3d 315, 330 (2d Cir.2006)* (rejecting petitioner's attempt to transform a factual claim into a legal question by asserting that the IJ failed to apply the law and noting that "[a] petitioner cannot overcome the lack of jurisdiction to review by invocation of such rhetoric").

Stepanovic's argument that he presents a reviewable question of law is mistaken. The BIA applied the correct legal standard-extreme cruelty-and we are not authorized to review *how* the BIA exercised its discretion under that standard. *See Mireles,* 433 F.3d at 969. At its core, Stepanovic's argument is "merely [a] quarrel[ **\*681** ] over the correctness of the factual findings or justification for the discretionary choices." *Chen,* 471 F.3d at 329. Further, he has not convinced us that the DHS's regulation defining extreme cruelty, 8 C.F.R. § 204.2(c)(1)(vi), limits the BIA's discretion to such an extent that it may not request psychiatric or medical evidence supporting Stepanovic's claims. This is particularly so because he does not claim that he suffered physical harm, and his ex-wife's conduct is not objectively extreme or cruel. As we have already stated, the extreme cruelty determination is discretionary. While the DHS's definition may be helpful in deciding whether an applicant suffered extreme cruelty, the regulation *itself* provides considerable discretion by using the "phrases 'includes, but is not limited to' and 'may ... be acts of violence under certain circumstances.' " *Perales-Cumpean,* 429 F.3d at 984 (alteration in original) (quoting 8 C.F.R. § 204.2(c)(1)(vi)); *see also Wilmore,* 455 F.3d at 527 (agreeing with *Perales-Cumpean* that the DHS regulation does not render the extreme cruelty determination non-discretionary). Therefore, the regulation does not constrain the BIA's discretion to such an extent that the BIA's order in this case exceeded its bounds.

Furthermore, even if the regulation defining extreme cruelty did limit the BIA's discretion to some extent, the BIA did nothing in this case to *alter* that definition, nor did the BIA create a new prerequisite for relief under § 1229b(b)(2). Here, the BIA did not *require* psychological or medical evidence of Stepanovic's injury when it concluded that Stepanovic "failed to establish that he was the victim of extreme cruelty by his ex-wife, and he failed to adequately support his claim with psychiatric or medical documents, or *other evidence* which would establish that his psychological or emotional suffering rose to the level of 'extreme cruelty.' " Rather, the BIA simply explained that Stepanovic failed to produce evidence to meet his burden of proof, in part because he presented no medical evidence of harm. Requiring an applicant to prove an element of his petition for cancellation of removal is certainly distinct from altering the legal framework under which the applicant may receive such relief. In reality, Stepanovic challenges the BIA's factual determination that he was not subject to extreme cruelty, and he attempts to re-characterize this issue as a "question of law." But it is not such a question.

### III. CONCLUSION

Stepanovic appeals the BIA's determination that he did not suffer cruelty that was sufficiently extreme to receive cancellation of removal pursuant to § 1229b(b)(2). Because this determination falls squarely within the jurisdiction-removal statute, and Stepanovic presents no "reviewable" question of law or constitutional claim, we lack jurisdiction to review it according to § 1252(a)(2)(B). For the above reasons, Stepanovic's petition for review is DISMISSED for lack of jurisdiction.

**All Citations**

554 F.3d 673

### Footnotes

1     Following a referendum vote on May 21, 2006, Montenegro's Parliament declared independence from Serbia on June 3, 2006. Serbia recognized Montenegro's independence and declared an end to the union of the two states. On June 28, 2006, Montenegro became a member state of the United Nations. These events occurred after the immigration judge's order in the proceedings below, although they do not affect our analysis in this appeal.

2     On March 1, 2003, the INS ceased to exist as an independent agency, and the Department of Homeland Security assumed its functions.

3   The IJ also found that Stepanovic failed to demonstrate a viable marriage and that Stepanovic's daughter was not a qualifying relative under the statute, 8 U.S.C. § 1229b(b)(2), because she was not a lawful permanent resident.

4   An applicant for cancellation of removal under § 1229b(b)(2) also must demonstrate (1) physical presence for a continuous period of not less than three years immediately preceding the application; (2) good moral character during such period; (3) that he or she is not inadmissible or deportable under other provisions and has not been convicted of an aggravated felony; and (4) that removal would result in extreme hardship to the alien, his child, or his parent. 8 U.S.C. § 1229b(b)(2)(A)(ii)-(v).

5   *Leyva* and *Kharkhan* were both decided before § 1252(a)(2)(D) became effective in May 2005, as part of the Real ID Act of 2005, Pub.L. No. 109-13, 119 Stat. 231, 310. The addition of § 1252(a)(2)(D), however, did not affect our holding that the BIA's determination of "exceptional and extremely unusual hardship" is not subject to judicial review according to § 1252(a)(2)(B). *See Mireles,* 433 F.3d at 968-69.

---

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

386 U.S.App.D.C. 357

KeyCite Yellow Flag - Negative Treatment
Distinguished by Bloomberg L.P. v. Commodity Futures Trading Com'n, D.D.C., June 7, 2013

569 F.3d 514
United States Court of Appeals,
District of Columbia Circuit.

Joseph STILWELL, et al., Petitioners

v.

OFFICE OF THRIFT SUPERVISION, Respondent.

No. 08–1259.
|
Argued April 23, 2009.
|
Decided July 7, 2009.

**Synopsis**
**Background:** Private investor filed petition for review of Office of Thrift Supervision (OTS) order upholding regulation allowing subsidiaries of mutual holding companies to limit their minority shareholders to 10% of subsidiary's total minority stock.

**Holdings:** The Court of Appeals, Kavanaugh, Circuit Judge, held that:

[1] investor had standing to challenge regulation;

[2] investor's challenge was ripe for adjudication; and

[3] regulation was not arbitrary and capricious.

Petition denied.

West Headnotes (4)

[1]     **Federal Civil Procedure** 👉 In general; injury or interest

     **Federal Civil Procedure** 👉 Causation; redressability

     To demonstrate standing under Article III, plaintiff must show injury in fact caused by

defendant and redressable by judicial relief. U.S.C.A. Const. Art. 3, § 2, cl. 1.

10 Cases that cite this headnote

[2]     **Finance, Banking, and Credit** 👉 Savings and loans and related entities

     Private investor had standing to challenge Office of Thrift Supervision (OTS) regulation allowing subsidiaries of mutual holding companies (MHC) to limit their minority shareholders to 10% of subsidiary's total minority stock, even though no MHC had yet adopted optional provision limiting size of any individual's minority stake, where investor regularly bought minority stakes in subsidiaries created by mutual holding companies, regulation was adopted out of concern that investor and others were using their leverage in voting on stock benefit plans to take advantage of results of stock offerings, and it was substantially probable that MHC subsidiaries would adopt charter provisions that would cause investor economic harm. 12 C.F.R. §§ 575.9(c), 575.14(c)(3).

4 Cases that cite this headnote

[3]     **Finance, Banking, and Credit** 👉 Savings and loans and related entities

     Private investor's challenge to Office of Thrift Supervision (OTS) regulation allowing subsidiaries of mutual holding companies (MHC) to limit their minority shareholders to 10% of subsidiary's total minority stock was ripe for adjudication, even though no MHC had yet adopted optional provision limiting size of any individual's minority stake, where OTS rule was final, and there was substantial probability that MHC subsidiaries would adopt optional charter provision it made available. 12 C.F.R. §§ 575.9(c), 575.14(c)(3).

2 Cases that cite this headnote

[4]     **Finance, Banking, and Credit** 👉 Savings and loans and related entities

     Office of Thrift Supervision (OTS) regulation allowing subsidiaries of mutual holding

companies (MHC) to limit their minority shareholders to 10% of subsidiary's total minority stock was not arbitrary and capricious, despite investor's contentions that OTS failed to present any substantial empirical evidence justifying the new regulation, and that new rule would exacerbate problem of allowing management to give itself generous stock plans, where rule did not violate any particular statutory provision, OTS explained its concern that minority shareholders could use and were using their leverage to "take unfair advantage" of proceeds resulting from stock offerings, and optional charter provision did not affect separate OTS regulation requiring that majority of minority shareholders approve stock benefit plans. 12 C.F.R. §§ 575.9(c), 575.14(c)(3).

8 Cases that cite this headnote

**\*515** On Petition for Review of an Order of the Office of Thrift Supervision.

**Attorneys and Law Firms**

Paul M. Smith argued the cause and filed the briefs for petitioners.

Christopher A. Sterbenz, Trial Attorney, U.S. Department of the Treasury, argued the cause for respondent. With him on the brief were Dirk S. Roberts, Deputy Chief Counsel, and Elizabeth R. Helke, Special Counsel.

Gregory Taylor was on the brief for amicus curiae American Bankers Association in support of respondent.

Before GINSBURG, HENDERSON, and KAVANAUGH, Circuit Judges.

**Opinion**

Opinion for the Court filed by Circuit Judge KAVANAUGH.

**\*516** KAVANAUGH, Circuit Judge.

**\*\*359** A new Office of Thrift Supervision regulation allows subsidiaries of mutual holding companies to limit their minority shareholders to 10% of the subsidiary's total minority stock. The idea is to prevent activist minority

investors from taking advantage of voting rules that require a majority of the minority shareholders to approve management stock benefit plans. OTS was concerned that large minority stockholders would leverage their voting power so as to unduly interfere in certain areas of corporate governance— for example, by pressuring the institution to engage in stock repurchases or sale of the institution. The rule is thus akin to an anti-takeover device.

Joseph Stilwell is a private investor who has previously acquired more than 10% of minority stock in some subsidiaries of mutual holding companies—and who wants to do so again. He challenges the new OTS rule as arbitrary and capricious under the Administrative Procedure Act. Applying the deferential arbitrary and capricious test, we conclude that the OTS rule is reasonable and reasonably explained. OTS struck a permissible balance between the goals of deterring management's self-dealing and preventing abusive short-term investment strategies. We find no legal basis to upset that policy choice, and we therefore must deny the petition.

I

The Home Owners' Loan Act of 1933 authorizes the Federal Government to issue charters to mutual savings associations. 12 U.S.C. § 1464(a). Under the federal charter, those associations are owned and governed by their members, who have the right to vote on "all questions requiring action by the members" and the right to receive an "equal distribution of assets, *pro rata* to the value of their accounts" in the event the association is liquidated, dissolved, or wound up. 12 C.F.R. § 544.1. This ownership structure differs from that of a stock bank, shares of which are bought and sold by members of the public at large.

One drawback to the mutual association structure is its inability to raise capital by offering ownership stakes to the public in the form of stock. Federal law does, however, permit mutual savings associations to raise outside capital if they first convert themselves to a mutual holding company (MHC) structure. *See* 12 U.S.C. § 1467a(*o*); 12 C.F.R. Pt. 575. Two new entities emerge from such a conversion—an MHC owned entirely by the mutual association's original set of member-owners, and a subsidiary company in stock form owned by the MHC. In some cases, the MHC structure may also include the creation of a "mid-tier" holding company controlled by the MHC and owning all of the stock of the

reorganizing mutual association. *See* 12 C.F.R. §§ 575.2(q), 575.14(a).

To raise capital, the MHC may sell a minority stake of the subsidiary to the general public in a stock offering. *See* 12 U.S.C. § 1467a(*o*)(8)(B); 12 C.F.R. § 575.8(a)(2). In so doing, it raises capital while retaining a majority stake in—and hence control of—the subsidiary. In addition to allowing mutual associations to generate outside capital, this MHC structure allows directors, officers, and employees of the mutual association to receive compensation in the form of stock in the subsidiary.

Congress created the Office of Thrift Supervision as an agency in the Department of the Treasury to regulate mutual associations, including the process by which those associations can convert to the MHC structure. *See* 12 U.S.C. § 1467a(*o*)(3). OTS regulations set forth the basic charter form for the MHCs (and **\*\*360 \*517** any mid-tier holding companies) along with their subsidiaries. The regulations also include several "optional" pre-approved charter provisions that MHC subsidiaries may choose to adopt. *See* 12 C.F.R. §§ 575.9(a)-(c), 575.14(c).

OTS rules also govern the process by which MHC subsidiaries may create stock benefit plans for the benefit of their directors, officers, and employees. *See generally id.* §§ 563b.500, 575.8. To prevent management's self-dealing, OTS has required that those benefit plans be approved by a majority vote of the *minority* shareholders in the MHC subsidiary. *Id.* § 575.8(c). In recent years, however, OTS has become concerned that minority shareholders (including Joseph Stilwell, the petitioner in this case) may be using their leverage in voting on those plans to take advantage of the results of the stock offering—for example, by demanding that management repurchase its stock or sell the institution. *See* OTS Br. at 41–44; Optional Charter Provisions in Mutual Holding Company Structures, 72 Fed.Reg. 35,205, 35,206 (June 27, 2007) (notice of proposed rulemaking).

To address this problem, OTS adopted a new rule following notice to and comment from the interested public. *See* Optional Charter Provisions in Mutual Holding Company Structures, 73 Fed.Reg. 39,216 (July 9, 2008) (final rule). The rule creates an optional provision that MHC subsidiaries may include in their respective charters. Under the optional provision, MHC subsidiaries may prohibit any person or entity from acquiring, or offering to acquire, more than 10%

of the MHC subsidiary's total *minority* stock within five years after the minority stock issuance. 12 C.F.R. §§ 575.9(c), 575.14(c)(3).[\*]

Shortly after OTS's adoption of the rule, petitioner Joseph Stilwell and a few affiliated companies filed the present petition for review. Stilwell is a private investor who regularly buys minority stakes in subsidiaries created by mutual holding companies. During the rulemaking process, Stilwell opposed the proposed rule on the grounds that it would inappropriately favor the interests of MHC management, disenfranchise minority shareholders, and undermine sound corporate governance. Letter from Spencer L. Schneider, Counsel to Stilwell, to OTS Chief Counsel (Aug. 24, 2007); Letter from Spencer L. Schneider, Counsel to Stilwell, to OTS Chief Counsel (Nov. 20, 2007). He makes substantially the same claims in his petition for review to this Court, and he argues that the rule is arbitrary and capricious under the APA.

**\*\*361 \*518** II

Before proceeding to Stilwell's challenge to the rule on its merits, we first consider whether his claim is justiciable. OTS argues that Stilwell lacks standing because the rule has not caused him an injury; it also contends that Stilwell's petition is not ripe. We disagree on both counts.

A

[1]    To demonstrate standing under Article III of the Constitution, Stilwell must show an injury in fact caused by the defendant and redressable by judicial relief. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Pub. Citizen v. Nat'l Highway Traffic Safety Admin.,* 489 F.3d 1279, 1289 (D.C.Cir.2007). The regulation at issue here directly regulates mutual holding company (MHC) subsidiaries, not investors. As an investor, Stilwell therefore has a more difficult burden to demonstrate standing; he has to show a "substantial probability" of injury as a result of the rule. *St. John's United Church of Christ v. FAA,* 520 F.3d 460, 462 (D.C.Cir.2008) (internal quotation marks omitted).

In light of Stilwell's past practice and future investment plans, he has demonstrated such a substantial probability.

There is plainly a high—indeed, a near-certain—probability that at least some MHC subsidiaries selling minority stock to the public will adopt the optional provision limiting the size of any individual's minority stake. OTS proposed and ultimately adopted this new approach for this precise reason: to help solve the perceived problems posed by activists like Stilwell investing in MHC subsidiaries. *See generally* Optional Charter Provisions in Mutual Holding Company Structures, 72 Fed.Reg. 35,205, 35,206 (June 27, 2007) (notice of proposed rulemaking); OTS Br. at 44. Comments on the rule—including from representatives of prominent bankers' trade associations—supported the rule on the same grounds. *See, e.g.,* Letter from Patricia A. Milon, Chief Legal Officer, America's Cmty. Bankers, to OTS Chief Counsel (Aug. 27, 2007); Letter from Christopher M. Paridon, Counsel to Am. Bankers Ass'n, to OTS Chief Counsel (Aug. 27, 2007); Letter from Christopher Cole, Regulatory Counsel, Independent Cmty. Bankers of Am., to OTS Chief Counsel (Aug. 27, 2007). Indeed, amicus curiae American Bankers Association notes that "the outcome of this case will have a very real impact upon the ability of mutual associations to defend themselves." American Bankers Ass'n Br. at 3. There is no doubt, moreover, that a MHC subsidiary's adoption of the optional charter provision will harm Stilwell's economic interests: He has previously obtained, and wants to continue to obtain, more than 10% of the minority stock of certain MHC subsidiaries. We agree with Stilwell, therefore, that "it is more than a little ironic that OTS would suggest Petitioners lack standing and then, later in the same brief, label Petitioner Stilwell as a prime example [of] one of the activist MHC shareholders who supposedly have created the very problem the Rule was intended to address." Stilwell Reply Br. at 7.

**[2]** Under the OTS rule, it is substantially probable that MHC subsidiaries will adopt charter provisions that will cause Stilwell economic harm; he therefore has standing to challenge the rule as a violation of the APA. *See* Clinton v. City of New York, 524 U.S. 417, 432–33, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (finding standing based on probable economic injury caused by government action changing market conditions); St. John's, 520 F.3d at 462 ("substantial probability" of injury needed for injury-in-fact); Sabre, Inc. v. Dep't of Transp., 429 F.3d 1113, 1119 (D.C.Cir.2005) (finding standing where it **362 *519** was "reasonably certain that [petitioner's] business decisions will be affected"). Put more generally, when an agency adopts a rule with the purpose and substantially probable effect of

economically helping regulated Party A and hindering Party B, Party B ordinarily will have standing to challenge the rule. So it is here.

## B

**[3]** Stilwell's challenge is also ripe. The OTS rule is concededly a final rule, and there is a substantial probability that MHC subsidiaries will adopt the optional charter provision it makes available. This, in turn, will harm Stilwell's investment prospects. Because Stilwell is challenging the validity of the OTS rule itself—and not the charter provision's subsequent adoption by any particular mutual association— there is no persuasive reason to postpone consideration of his challenge. *See* Sabre, 429 F.3d at 1119–21. For ripeness purposes, this case is no different from the myriad cases in which we entertain challenges to an agency's final rule. We therefore turn to the merits.

## III

**[4]** On the merits, Stilwell advances two main reasons that the OTS rule is arbitrary and capricious under the APA. Stilwell does not argue that the rule violates any particular statutory provision. Therefore, this is a *State Farm* case, not a Chevron case. *See* Motor Vehicle Mfrs. Ass'n v. State Farm, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); Chevron USA, Inc. v. Natural Res. Def. Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *State Farm,* we must uphold OTS's rule so long as it is reasonable and reasonably explained. *See* State Farm, 463 U.S. at 43, 103 S.Ct. 2856. Applying this deferential standard, we reject Stilwell's arguments.

*First,* Stilwell contends that OTS failed to present any substantial empirical evidence justifying the new regulation. In essence, Stilwell claims that the new regulation is a solution in search of a problem. Although Stilwell has made a forceful submission, this claim is ultimately resolved by the deferential nature of arbitrary and capricious review of agency rules. *See* Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). The APA imposes no general obligation on agencies to produce empirical evidence. Rather, an agency has to justify its rule with a reasoned explanation. Moreover,

agencies can, of course, adopt prophylactic rules to prevent potential problems before they arise. An agency need not suffer the flood before building the levee.

Here, OTS thoroughly explained its concern that minority shareholders could use and were using their leverage to "take unfair advantage" of the proceeds resulting from the stock offering. *See* Optional Charter Provisions in Mutual Holding Company Structures, 72 Fed.Reg. 35,205, 35,206 (June 27, 2007) (notice of proposed rulemaking). OTS based its proposed rule on its long experience of supervising mutual savings associations; its view found support in various comments submitted in response to the proposed rule. Optional Charter Provisions in Mutual Holding Company Structures, 73 Fed.Reg. 39,216, 39,217 (July 9, 2008) (final rule). We see no basis, at least under the deferential arbitrary and capricious test, for overruling OTS's considered judgment of the need for this regulation. *See* Consumer Elecs. Ass'n v. FCC, 347 F.3d 291, 300 (D.C.Cir.2003).

*Second,* Stilwell argues that the new rule will exacerbate the problem of allowing management to give itself generous stock plans. Stilwell argues, in particular, that the new rule makes it too difficult for minority shareholders to prevent the majority from doing so. Although Stilwell is **\*\*363 \*520** correct that the rule will make it harder for some minority shareholders to prevent MHC subsidiaries from adopting stock compensation plans, that alone does not establish that the rule is arbitrary and capricious. As OTS explained, the optional charter provision does not affect the separate OTS regulation—readopted shortly before this rule—requiring that a majority of minority shareholders approve stock benefit plans. *See* Optional Charter Provisions, 73 Fed.Reg. at 39,218–19; 12 C.F.R. § 575.8(c). Because that voting requirement remains in place, minority shareholders as a class continue to have the power to vote down stock benefit plans.

Perhaps more to the point, OTS has discretion under this statutory scheme to balance the power of majority and minority shareholders in order to achieve its multiple regulatory objectives. Those objectives include *both* preventing majority shareholders from granting themselves overly generous stock packages *and* preventing minority shareholders from taking advantage of their veto power over such packages, to the harm of the institution. One can certainly quibble with the balance struck by OTS. But we find no basis under the arbitrary and capricious test for overturning its assessment.

Relatedly, Stilwell claims that the rule eliminates the right of minority shareholders to solicit proxies in excess of 10% of the minority shares, thereby unduly weakening them. But the premise of this argument is inaccurate. As OTS explained in the preamble to the rule, the treatment of such proxies as "beneficial ownership" for the purposes of the 10% limit is by no means automatic. Rather, the treatment depends on whether the proxies are held in circumstances that "give rise to a ... control determination" under OTS's separate control regulations. Optional Charter Provisions, 73 Fed.Reg. at 39,219; *see also* 12 C.F.R. §§ 574.4(a)-(b). In the absence of such a control determination, a minority shareholder therefore would typically be able to solicit and vote proxies in excess of 10% of the minority shares without violating the rule. OTS Br. at 53. In short, OTS's approach to this issue does not rise to the level of arbitrary and capricious behavior for the purposes of the APA.

* * *

We deny the petition for review.

*So ordered.*

**All Citations**

569 F.3d 514, 386 U.S.App.D.C. 357

## Footnotes

\*     The full text of the optional provision for MHC subsidiaries reads as follows:
       Beneficial Ownership Limitation. No person may directly or indirectly offer to acquire or acquire the
       beneficial ownership of more than 10 percent of the outstanding stock of any class of voting stock of the

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1192 of 1271
**Stilwell v. Office of Thrift Supervision, 569 F.3d 514 (2009)**
386 U.S.App.D.C. 357

association held by persons other than the association's mutual holding company. This limitation expires on [insert date within five years of minority stock issuance] and does not apply to a transaction in which an underwriter purchases stock in connection with a public offering, or the purchase of stock by an employee stock ownership plan or other tax-qualified employee stock benefit plan that is exempt from the approval requirements under § 574.3(c)(1)(vii) of the Office's regulations.

In the event a person acquires stock in violation of this section, all stock beneficially owned by such person in excess of 10 percent of the stock held by stockholders other than the mutual holding company shall be considered "excess shares" and shall not be counted as stock entitled to vote and shall not be voted by any person or counted as voting stock in connection with any matters submitted to the stockholders for a vote.

12 C.F.R. § 575.9(c). The optional charter provision available to subsidiaries of mid-tier MHCs is virtually identical. *Id.* § 575.14(c)(3).

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by United States v. Johnston, 7th Cir.(Ill.), May 11, 2020

139 S.Ct. 544
Supreme Court of the United States

Denard STOKELING, Petitioner

v.

UNITED STATES.

No. 17–5554.
|
Argued Oct. 9, 2018.
|
Decided Jan. 15, 2019.

**Synopsis**

**Background:** Defendant entered a guilty plea, in the United States District Court for the Southern District of Florida, No. 1:15–cr–20815–JLK–1, to possessing a firearm and ammunition after having been convicted of a felony, and defendant, who had three prior felony convictions, including a Florida conviction for robbery, did not receive a mandatory minimum 15–year sentence under the Armed Career Criminal Act (ACCA)Armed Career Criminal Act (ACCA). Government appealed.

The United States Court of Appeals for the Eleventh Circuit, 684 Fed.Appx. 870, vacated the sentence and remanded for resentencing. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Thomas, held that:

[1] a robbery offense that requires the criminal to overcome the victim's resistance necessitates the use of physical force and therefore categorically qualifies as a predicate violent felony under the ACCA's elements clause, and

[2] robbery under Florida law, which has as an element the use of force sufficient to overcome a victim's resistance, categorically qualifies as a predicate violent felony under the ACCA's elements clause.

Court of Appeals affirmed.

Justice Sotomayor filed a dissenting opinion, in which Chief Justice Roberts, Justice Ginsburg, and Justice Kagan joined.

**Procedural Posture(s):** Appellate Review; Sentencing or Penalty Phase Motion or Objection.

West Headnotes (17)

**[1]**    **Robbery** 🔑 **Force**

Under Florida law, the use of force necessary to commit robbery requires resistance by the victim that is overcome by the physical force of the offender. West's F.S.A. § 812.13(1).

202 L.Ed.2d 512, 19 Cal. Daily Op. Serv. 550, 2019 Daily Journal D.A.R. 403...

58 Cases that cite this headnote

[2]     **Sentencing and Punishment** ← Particular offenses

A robbery offense that requires the criminal to overcome the victim's resistance necessitates the use of physical force, and thus, a prior felony conviction for such a robbery offense categorically qualifies as a predicate violent felony under the elements clause of the Armed Career Criminal Act (ACCA), which defines violent felony as any offense that has as an element the use, attempted use, or threatened use of physical force. 🚩 18 U.S.C.A. § 924(e)(2)(B)(i).

137 Cases that cite this headnote

[3]     **Larceny** ← Nature and elements in general
        **Robbery** ← Nature and elements in general
        **Robbery** ← Force

At common law, an unlawful taking was merely larceny unless the crime involved violence, and violence was committed, as required for the common-law felony of robbery, which consisted of taking the property of another from the person or presence of another by force or violence, if sufficient force was exerted to overcome the resistance encountered.

11 Cases that cite this headnote

[4]     **Robbery** ← Force

At common law, it was robbery to seize another's watch or purse, and use sufficient force to break a chain or guard by which it was attached to his person, or to run against another, or rudely push him about, for the purpose of diverting his attention and robbing him.

[5]     **Robbery** ← Force

At common law, it was robbery to pull a diamond pin out of a woman's hair when doing so tore away hair attached to the pin.

[6]     **Robbery** ← Nature and elements in general
        **Robbery** ← Force

The common law did not distinguish between gradations of violence, for purposes of the common-law felony of robbery, which consisted of taking the property of another from the person or presence of another by force or violence, and if an act physically overcame a victim's resistance, however slight that resistance might be, it necessarily constituted violence.

8 Cases that cite this headnote

[7]     **Robbery** ← Nature and elements in general
        **Robbery** ← Force

"Force," within the meaning of the common-law felony of robbery, which consisted of taking the property of another from the person or presence of another by force or violence, means power, violence, or pressure directed against a person or thing, or unlawful violence threatened or committed against persons or property.

202 L.Ed.2d 512, 19 Cal. Daily Op. Serv. 550, 2019 Daily Journal D.A.R. 403...

2 Cases that cite this headnote

**[8]**    **Statutes**    🔑    Statutory terms with common law meanings

      **Statutes**    🔑    Other Statutes

If a word in a statute is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.

7 Cases that cite this headnote

**[9]**    **Sentencing and Punishment**    🔑    Violent or Nonviolent Character of Offense

Physical force, for purpose of the elements clause of the Armed Career Criminal Act (ACCA), which defines a predicate violent felony as any offense that has as an element the use, attempted use, or threatened use of physical force, requires force exerted by and through concrete bodies, thereby distinguishing physical force, from, for example, intellectual force or emotional force. 🚩 18 U.S.C.A. § 924(e)(2)(B)(i).

24 Cases that cite this headnote

**[10]**    **Sentencing and Punishment**    🔑    Violent or Nonviolent Character of Offense

"Physical force," for purposes of the elements clause of the Armed Career Criminal Act (ACCA), which defines a predicate violent felony as any offense that has as an element the use, attempted use, or threatened use of physical force, means violent force, that is, force capable of causing physical pain or injury to another person. 🚩 18 U.S.C.A. § 924(e)(2)(B)(i).

120 Cases that cite this headnote

**[11]**    **Sentencing and Punishment**    🔑    Particular offenses

A prior conviction under Florida law for misdemeanor battery does not qualify as a predicate violent felony under the elements clause of the Armed Career Criminal Act (ACCA), which defines violent felony as any offense that has as an element the use, attempted use, or threatened use of physical force, because the force necessary for misdemeanor battery does not require resistance or even physical aversion on the part of the victim; the unwanted nature of the physical contact itself suffices to render it unlawful. 🚩 18 U.S.C.A. § 924(e)(2)(B)(i).

36 Cases that cite this headnote

**[12]**    **Assault and Battery**    🔑    Physical or bodily contact;  touching

Common-law battery does not require force capable of causing physical pain or injury.

29 Cases that cite this headnote

**[13]**    **Sentencing and Punishment**    🔑    Violent or Nonviolent Character of Offense

Only the potentiality of causing physical pain or injury to another person, without a requirement of any particular degree of likelihood or probability that the force used will cause physical pain or injury, is necessary, for an offense to require physical force, for purposes of the elements clause of the Armed Career Criminal Act (ACCA), which defines

a predicate violent felony as any offense that has as an element the use, attempted use, or threatened use of physical force. 🚩 18 U.S.C.A. § 924(e)(2)(B)(i).

52 Cases that cite this headnote

[14]   **Sentencing and Punishment**   👈 Particular offenses

Robbery under Florida law, which has as an element the use of force sufficient to overcome a victim's resistance, necessitates the use of physical force, and thus, a prior felony conviction for robbery under Florida law categorically qualifies as a predicate violent felony under the elements clause of the Armed Career Criminal Act (ACCA), which defines violent felony as any offense that has as an element the use, attempted use, or threatened use of physical force.

🚩 18 U.S.C.A. § 924(e)(2)(B)(i); 🚩 West's F.S.A. § 812.13(1).

204 Cases that cite this headnote

[15]   **Robbery**   👈 Force

Mere snatching of property from another does not meet the requirement, for robbery under Florida law, that resistance by the victim must be overcome by the physical force of the offender. 🚩 West's F.S.A. § 812.13(1).

14 Cases that cite this headnote

[16]   **Robbery**   👈 Force

A defendant who grabs the victim's fingers and peels them back to steal money commits robbery in Florida. 🚩 West's F.S.A. § 812.13(1).

[17]   **Robbery**   👈 Force

A defendant who steals a gold chain does not use force, within the meaning of Florida's robbery statute, simply because the victim feels his fingers on the back of her neck. 🚩 West's F.S.A. § 812.13(1).

1 Cases that cite this headnote

**West Codenotes**

**Recognized as Unconstitutional**

🚩 18 U.S.C.A. § 924(e)(2)(B)(ii)

**\*547** *Syllabus* [*]

Petitioner Stokeling pleaded guilty to possessing a firearm and ammunition after having been convicted of a felony, in violation of 🚩 18 U.S.C. § 922(g)(1). Based on Stokeling's prior criminal history, the probation office recommended the mandatory minimum 15–year prison term that the Armed Career Criminal Act (ACCA) Armed Career Criminal Act (ACCA) provides for 🚩 § 922(g) violators who have three previous convictions "for a violent felony," 🚩 § 924(e). As relevant here, Stokeling

objected that his prior Florida robbery conviction was not a "violent felony," which ACCA defines, in relevant part, as "any crime punishable by imprisonment for a term exceeding one year" that "has as an element the use, attempted use, or threatened use of physical force against the person of another," 🚩 § 924(e)(2)(B)(i). The District Court held that Stokeling's actions during the robbery did not justify an ACCA sentence enhancement, but the Eleventh Circuit reversed.

*Held* :

1. ACCA's elements clause encompasses a robbery offense that requires the defendant to overcome the victim's resistance. Pp. 549 – 555.

(a) As originally enacted, ACCA prescribed a sentence enhancement for certain individuals with three prior convictions "for robbery or burglary," 18 U.S.C.App. § 1202(a) (1982 ed., Supp. II), and defined robbery as an unlawful taking "by force or violence," § 1202(c)(8)—a clear reference to common-law robbery, which required a level of "force" or "violence" sufficient to overcome the resistance of the victim, however slight. When Congress amended ACCA two years later, it replaced the enumerated crimes with the elements clause, an expanded enumerated offenses clause, and the now-defunct residual clause. The new elements clause extended ACCA to cover *any* offense that has as an element "the use, attempted use, or threatened use of physical *force*," 🚩 § 924(e)(2)(B)(i) (emphasis added). By replacing robbery with a clause that has "force" as its touchstone, Congress retained the same common-law definition that undergirded the definition of robbery in the original ACCA. This understanding is buttressed by the then widely accepted definitions of robbery among the States, a significant majority of which defined nonaggravated robbery as requiring a degree of force sufficient only to overcome a victim's resistance. Under Stokeling's reading, many of those state robbery statutes would not qualify as ACCA predicates. But federal criminal statutes should not be construed in ways that would render them **\*548** inapplicable in many States. Pp. 549 – 553.

(b) This understanding of "physical force" comports with 🔖 *Johnson v. United States,* 559 U.S. 133, 130 S.Ct. 1265, 176 L.Ed.2d 1. The force necessary for misdemeanor battery addressed in *Johnson* does not require resistance or even physical aversion on the part of the victim. Rather, the "slightest offensive touching" would qualify. 🔖 *Id.,* at 139, 130 S.Ct. 1265. It is thus different in kind from the force necessary to overcome resistance by a victim, which is inherently "violent" in the sense contemplated by *Johnson* and "suggest[s] a degree of power that would not be satisfied by the merest touching." *Ibid. Johnson* did not purport, as Stokeling suggests, to establish a force threshold so high as to exclude even robbery from ACCA's scope. Pp. 552 – 554.

(c) Stokeling's suggested definition of "physical force"—force "reasonably expected to cause pain or injury"—is inconsistent with the degree of force necessary to commit robbery at common law. Moreover, the Court declined to adopt this standard in *Johnson.* Stokeling's proposal would prove exceedingly difficult to apply, would impose yet another indeterminable line-drawing exercise on the lower courts, and is not supported by 🔖 *United States v. Castleman,* 572 U.S. 157, 134 S.Ct. 1405, 188 L.Ed.2d 426. Pp. 553 – 555.

2. Robbery under Florida law qualifies as an ACCA-predicate offense under the elements clause. The term "physical force" in ACCA encompasses the degree of force necessary to commit common-law robbery. And the Florida Supreme Court has made clear that the robbery statute requires "resistance by the victim that is overcome by the physical force of the offender." 🔖 *Robinson v. State,* 692 So.2d 883, 886. Pp. 554 – 555.

🔖 684 Fed.Appx. 870, affirmed.

THOMAS, J., delivered the opinion of the Court, in which BREYER, ALITO, GORSUCH, and KAVANAUGH, JJ., joined. SOTOMAYOR, J., filed a dissenting opinion, in which ROBERTS, C.J., and GINSBURG and KAGAN, JJ., joined.

AR.06422

Stokeling v. U.S., 139 S.Ct. 544 (2019)

Case 3:20-cv-07721-SI   Document 58-5   Filed 11/10/20   Page 1198 of 1271

202 L.Ed.2d 512, 19 Cal. Daily Op. Serv. 550, 2019 Daily Journal D.A.R. 403...

**Attorneys and Law Firms**

Brenda G. Bryn, Fort Lauderdale, FL, for Petitioner.

Frederick Liu, Washington, DC, for Respondent.

Amir H. Ali, Roderick & Solange, MacArthur Justice Center, Washington, DC, Michael Caruso, Federal Public Defender, Brenda G. Bryn, Andrew L. Adler, Assistant Federal Public Defenders, Office of the Federal Public Defender, Fort Lauderdale, FL, for Petitioner.

Noel J. Francisco, Solicitor General, Brian A. Benczkowski, Assistant Attorney General, Eric J. Feigin, Frederick Liu, Assistants to the Solicitor General, John M. Pellettieri, Attorney, Department of Justice, Washington, DC, for Respondent.

**Opinion**

Justice THOMAS delivered the opinion of the Court.

This case requires us to decide whether a robbery offense that has as an element the use of force sufficient to overcome a victim's resistance necessitates the use of "physical force" within the meaning of the Armed Career Criminal Act (ACCA)Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(2)(B)(i). We conclude that it does.

**\*549** I

In the early hours of July 27, 2015, two people burgled the Tongue & Cheek restaurant in Miami Beach, Florida. Petitioner Denard Stokeling was an employee of the restaurant, and the Miami Beach Police identified him as a suspect based on surveillance video from the burglary and witness statements. After conducting a criminal background check, police learned that Stokeling had previously been convicted of three felonies—home invasion, kidnaping, and robbery. When confronted, Stokeling admitted that he had a gun in his backpack. The detectives opened the backpack and discovered a 9–mm semiautomatic firearm, a magazine, and 12 rounds of ammunition.

Stokeling pleaded guilty in federal court to possessing a firearm and ammunition after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). The probation office recommended that Stokeling be sentenced as an armed career criminal under ACCA, which provides that a person who violates § 922(g) and who has three previous convictions for a "violent felony" shall be imprisoned for a minimum of 15 years. § 924(e). ACCA defines "violent felony" as "any crime punishable by imprisonment for a term exceeding one year" that

"(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

"(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." § 924(e)(2)(B).

As relevant here, Stokeling objected that his 1997 Florida robbery conviction was not a predicate offense under ACCA. This conviction, he argued, did not qualify under the first clause—the "elements clause"—because Florida robbery does not have "as an element the use, attempted use, or threatened use of physical force." [*]

 **[1]**    Under Florida law, robbery is defined as "the taking of money or other property ... from the person or custody of another, ... when in the course of the taking there is the use of force, violence, assault, or putting in fear." Fla. Stat. § 812.13(1) (1995). The Florida Supreme Court has explained that the "use of force" necessary to commit robbery requires "resistance by the victim that is overcome by the physical force of the offender." *Robinson v. State,* 692 So.2d 883, 886 (1997).

Instead of applying a categorical approach to the elements clause, the District Court evaluated whether the facts of Stokeling's robbery conviction were serious enough to warrant an enhancement. The court concluded that, although Stokeling " 'grabbed [the victim] by the neck and tried to remove her necklaces' " as she " 'held onto' " them, his actions did not "justify an enhancement." Sentencing Hearing in 15–cv–20815 (SD Fla.), Doc. 45, pp. 10–11. The court then sentenced Stokeling to less than half of the mandatory minimum 15–year term of imprisonment provided by ACCA.

The Eleventh Circuit reversed. 684 Fed.Appx. 870 (2017). It held that the District Court erred in making its own factual determination about the level of violence involved in Stokeling's particular robbery offense. *Id.,* at 871. The court also rejected Stokeling's argument that ***550** Florida robbery does not categorically require sufficient force to constitute a violent felony under ACCA's elements clause. *Id.,* at 871–872.

We granted certiorari to address whether the "force" required to commit robbery under Florida law qualifies as "physical force" for purposes of the elements clause. 584 U.S. ——, 138 S.Ct. 1438, 200 L.Ed.2d 716 (2018). We now affirm.

<div align="center">II</div>

 **[2]**    Construing the language of the elements clause in light of the history of ACCA and our opinion in *Johnson v. United States,* 559 U.S. 133, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010), we conclude that the elements clause encompasses robbery offenses that require the criminal to overcome the victim's resistance.

<div align="center">A</div>

As originally enacted, ACCA prescribed a 15–year minimum sentence for any person who received, possessed, or transported a firearm following three prior convictions "for robbery or burglary." 18 U.S.C. App. § 1202(a) (1982 ed., Supp. II). Robbery was defined in relevant part as "any felony consisting of the taking of the property of another from the person or presence of another *by force or violence*." § 1202(c)(8) (1982 ed., Supp. II) (emphasis added).

 **[3]**    The statute's definition mirrored the elements of the common-law crime of robbery, which has long required force or violence. At common law, an unlawful taking was merely larceny unless the crime involved "violence." 2 J. Bishop, Criminal Law § 1156, p. 860 (J. Zane & C. Zollman eds., 9th ed. 1923). And "violence" was "committed if sufficient force [was] exerted to overcome the resistance encountered." *Id.,* at 861.

 **[4]**    **[5]**    A few examples illustrate the point. Under the common law, it was robbery "to seize another's watch or purse, and use sufficient force to break a chain or guard by which it is attached to his person, or to run against another, or rudely push him about, for the purpose of diverting his attention and robbing him." W. Clark & W. Marshall, Law of Crimes 554 (H. Lazell ed., 2d ed. 1905) (Clark & Marshall) (footnotes omitted). Similarly, it was robbery to pull a diamond pin out of a woman's hair when doing so tore away hair attached to the pin. See 2 W. Russell, Crimes and Indictable Misdemeanors 68 (2d ed. 1828). But the crime was larceny, not robbery, if the thief did not have to overcome such resistance.

202 L.Ed.2d 512, 19 Cal. Daily Op. Serv. 550, 2019 Daily Journal D.A.R. 403...

[6]    In fact, common-law authorities frequently used the terms "violence" and "force" interchangeably. See *ibid.* (concluding that "if any injury be done to the person, or there be any struggle by the party to keep possession of the property before it be taken from him, there will be a sufficient actual 'violence' " to establish robbery); Clark & Marshall 553 ("Sufficient *force* must be used to overcome resistance.... If there is any injury to the person of the owner, or if he resists the attempt to rob him, and his resistance is overcome, there is sufficient *violence* to make the taking robbery, however slight the resistance" (emphasis added)). The common law also did not distinguish between gradations of "violence." If an act physically overcame a victim's resistance, "however slight" that resistance might be, it necessarily constituted violence. *Ibid.*; 4 W. Blackstone, Commentaries on the Laws of England 242 (1769) (distinguishing "taking ... by force" from "privately stealing," and stating that the use of this "violence" differentiates robbery from other larcenies); see also 3 *id.,* at 120 (explaining, in the battery context, that "the **\*551** law cannot draw the line between different degrees of violence, and therefore totally prohibits the first and lowest stage of it").

[7]    The overlap between "force" and "violence" at common law is reflected in modern legal and colloquial usage of these terms. "Force" means "[p]ower, violence, or pressure directed against a person or thing," Black's Law Dictionary 656 (7th ed. 1999), or "unlawful violence threatened or committed against persons or property," Random House Dictionary of the English Language 748 (2d ed. 1987). Likewise, "violence" implies force, including an "unjust or unwarranted use of force." Black's Law Dictionary, at 1564; accord, Random House Dictionary, at 2124 ("rough or injurious physical force, action, or treatment," or "an unjust or unwarranted exertion of force or power, as against rights or laws").

Against this background, Congress, in the original ACCA, defined robbery as requiring the use of "force or violence"—a clear reference to the common law of robbery. See *Samantar v. Yousuf,* 560 U.S. 305, 320, n. 13, 130 S.Ct. 2278, 176 L.Ed.2d 1047 (2010) ("Congress 'is understood to legislate against a background of common-law ... principles' "). And the level of "force" or "violence" needed at common law was by this time well established: "Sufficient force must be used to overcome resistance ... however slight the resistance." Clark & Marshall 553.

In 1986, Congress amended the relevant provisions of ACCA to their current form. The amendment was titled Expansion of Predicate Offenses for Armed Career Criminal Penalties. See Career Criminals Amendment Act of 1986, § 1402, 100 Stat. 3207100 Stat. 3207–39. This amendment replaced the two enumerated crimes of "robbery or burglary" with the current elements clause, a new enumerated-offenses list, and a (now-defunct) residual clause. See *Johnson v. United States,* 576 U.S. ——, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015). In the new statute, robbery was no longer enumerated as a predicate offense. But the newly created elements clause extended ACCA to cover *any* offense that has as an element "the use, attempted use, or threatened use of physical *force*." 18 U.S.C. § 924(e)(2)(B)(i) (2012 ed.) (emphasis added).

[8]    " '[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.' " *Hall v. Hall,* 584 U.S. ——, ——, 138 S.Ct. 1118, 1128, 200 L.Ed.2d 399 (2018) (quoting Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 537 (1947)). That principle supports our interpretation of the term "force" here. By retaining the term "force" in the 1986 version of ACCA and otherwise "[e]xpan[ding]" the predicate offenses under ACCA, Congress made clear that the "force" required for common-law robbery would be sufficient to justify an enhanced sentence under the new elements clause. We can think of no reason to read "force" in the revised statute to require anything more than the degree of "force" required in the 1984 statute. And it would be anomalous to read "force" as *excluding* the quintessential ACCA-predicate crime of robbery, despite the amendment's retention of the term "force" and its stated intent to expand the number of qualifying offenses.

The symmetry between the 1984 definition of robbery (requiring the use of "force or violence") and the 1986 elements clause (requiring the use of "physical force") is striking. By replacing robbery as an enumerated offense with a clause that has "force" as its touchstone, Congress made clear that "force" retained the same common-law definition that undergirded the original definition of robbery adopted a **\*552** mere two years earlier. That conclusion is reinforced by the fact that the original 1984 statute defined "robbery" using terms with well-established common-law meanings.

**Stokeling v. U.S., 139 S.Ct. 544 (2019)**
Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1201 of 1271

202 L.Ed.2d 512, 19 Cal. Daily Op. Serv. 550, 2019 Daily Journal D.A.R. 403...

Our understanding of "physical force" is further buttressed by the then widely accepted definitions of robbery in the States. In 1986, a significant majority of the States defined nonaggravated robbery as requiring force that overcomes a victim's resistance. The Government counts 43 States that measured force by this degree, 5 States that required "force" to cause bodily injury, and 2 States and the District of Columbia that permitted force to encompass something less, such as purse snatching. App. B to Brief for United States. Stokeling counters that, at most, 31 States defined force as overcoming victim resistance. Reply Brief 21. We need not declare a winner in this numbers game because, either way, it is clear that many States' robbery statutes would not qualify as ACCA predicates under Stokeling's reading.

His reading would disqualify more than just basic-robbery statutes. Departing from the common-law understanding of "force" would also exclude other crimes that have as an element the force required to commit basic robbery. For instance, Florida requires the same element of "force" for both armed robbery and basic robbery. See Fla. Stat. § 812.13(2)(a) (distinguishing armed robbery from robbery by requiring the additional element of "carr[ying] a firearm or other deadly weapon" during the robbery). Thus, as Stokeling's counsel admitted at oral argument, "armed robbery in Florida" would not qualify under ACCA if his view were adopted. Tr. of Oral Arg. 3–4; see United States v. Lee, 886 F.3d 1161, 1163, n. 1 (C.A.11 2018) (treating "Florida strong-arm robbery [*i.e.,* basic robbery], armed robbery, and attempted robbery ... the same for purposes of analyzing the ACCA's elements clause").

Where, as here, the applicability of a federal criminal statute requires a state conviction, we have repeatedly declined to construe the statute in a way that would render it inapplicable in many States. See, *e.g.,* United States v. Castleman, 572 U.S. 157, 167, 134 S.Ct. 1405, 188 L.Ed.2d 426 (2014) (reading "physical force" to include common-law force, in part because a different reading would render 18 U.S.C. § 922(g)(9) "ineffectual in at least 10 States"); Voisine v. United States, 579 U.S. ——, ——, 136 S.Ct. 2272, 2280, 195 L.Ed.2d 736 (2016) (declining to interpret § 912(a)(33)(A) in a way that would "risk rendering § 922(g)(9) broadly inoperative" in 34 States and the District of Columbia). That approach is appropriate here as well.

## B

**[9]  [10]**   Our understanding of "physical force" comports with Johnson v. United States, 559 U.S. 133, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010). There, the Court held that " 'actua[l] and intentiona[l] touching' "—the level of force necessary to commit common-law misdemeanor battery—did not require the "degree of force" necessary to qualify as a "violent felony" under ACCA's elements clause. Id., at 138, 140, 130 S.Ct. 1265. To reach this conclusion, the Court parsed the meaning of the phrase "physical force." First, it explained that the modifier "physical" "plainly refers to force exerted by and through concrete bodies—distinguishing physical force, from, for example, intellectual force or emotional force." Id., at 138, 130 S.Ct. 1265. The Court then considered "whether the term 'force' in [the elements clause] has the specialized meaning that it bore in the common-law definition of battery." Id., at 139, 130 S.Ct. 1265. After reviewing  **\*553**  the context of the statute, the Court rejected the Government's suggestion that "force" encompassed even the "slightest offensive touching." *Ibid.* Instead, it held that "physical force" means "*violent* force—that is, force capable of causing physical pain or injury to another person." Id., at 140, 130 S.Ct. 1265. Applying that standard to a Florida battery law criminalizing "*any* intentional physical contact," the Court concluded that the law did not require the use of "physical force" within the meaning of ACCA. *Ibid.*

**[11]**   Stokeling argues that *Johnson* rejected as insufficient the degree of "force" required to commit robbery under Florida law because it is not "substantial force." We disagree. The nominal contact that *Johnson* addressed involved physical force that is different in kind from the violent force necessary to overcome resistance by a victim. The force necessary for misdemeanor

battery does not require resistance or even physical aversion on the part of the victim; the "unwanted" nature of the physical contact itself suffices to render it unlawful. See *State v. Hearns,* 961 So.2d 211, 216 (Fla.2007).

By contrast, the force necessary to overcome a victim's physical resistance is inherently "violent" in the sense contemplated by *Johnson,* and "suggest[s] a degree of power that would not be satisfied by the merest touching." 559 U.S., at 139, 130 S.Ct. 1265. This is true because robbery that must overpower a victim's will—even a feeble or weak-willed victim—necessarily involves a physical confrontation and struggle. The altercation need not cause pain or injury or even be prolonged; it is the physical contest between the criminal and the victim that is itself "capable of causing physical pain or injury." *Id.,* at 140, 130 S.Ct. 1265. Indeed, *Johnson* itself relied on a definition of "physical force" that specifically encompassed robbery: " '[f]orce consisting in a physical act, *esp. a violent act directed against a robbery victim.*' " *Id.,* at 139, 130 S.Ct. 1265 (quoting Black's Law Dictionary 717 (9th ed. 2009); emphasis added). Robbery thus has always been within the " 'category of violent, active crimes' " that Congress included in ACCA. 559 U.S., at 140, 130 S.Ct. 1265.

 **[12]**    To get around *Johnson,* Stokeling cherry picks adjectives from parenthetical definitions in the opinion, insisting that the level of force must be "severe," "extreme," "furious," or "vehement." These adjectives cannot bear the weight Stokeling would place on them. They merely supported *Johnson* 's actual holding: that common-law battery does not require "force capable of causing physical pain or injury." *Ibid. Johnson* did not purport to establish a force threshold so high as to exclude even robbery from ACCA's scope. Moreover, Stokeling ignores that the Court also defined "violence" as " ' *unjust or improper* force.' " *Ibid.* (emphasis added). As explained above, the common law similarly linked the terms "violence" and "force." Overcoming a victim's resistance was *per se* violence against the victim, even if it ultimately caused minimal pain or injury. See Russell, Crimes and Indictable Misdemeanors, at 68.

### C

In the wake of *Johnson,* the Court has repeated its holding that "physical force" means " 'force capable of causing physical pain or injury.' " *Sessions v. Dimaya,* 584 U.S. ——, —— – ——, 138 S.Ct. 1204, 1220, 200 L.Ed.2d 549 (2018) (quoting *Johnson, supra,* at 140, 130 S.Ct. 1265); see also *Castleman, supra,* at 173–174, 134 S.Ct. 1405 (Scalia, J., concurring in part and concurring in judgment).

 **\*554**  **[13]**    Finding this definition difficult to square with his position, Stokeling urges us to adopt a new, heightened reading of physical force: force that is "reasonably expected to cause pain or injury." For the reasons already explained, that definition is inconsistent with the degree of force necessary to commit robbery at common law. Moreover, the Court declined to adopt that standard in *Johnson,* even after considering similar language employed in a nearby statutory provision, 18 U.S.C. § 922(g)(8)(C)(ii). 559 U.S., at 143, 130 S.Ct. 1265. The Court instead settled on "force *capable* of causing physical pain or injury." *Id.,* at 140, 130 S.Ct. 1265 (emphasis added). "Capable" means "susceptible" or "having attributes ... required for performance or accomplishment" or "having traits conducive to or features permitting." Webster's Ninth New Collegiate Dictionary 203 (1983); see also Oxford American Dictionary and Thesaurus 180 (2d ed. 2009) ("having the ability or quality necessary to do"). *Johnson* thus does not require any particular degree of likelihood or probability that the force used will cause physical pain or injury; only potentiality.

Stokeling's proposed standard would also prove exceedingly difficult to apply. Evaluating the statistical probability that harm will befall a victim is not an administrable standard under our categorical approach. Crimes can be committed in many different ways, and it would be difficult to assess whether a crime is categorically likely to harm the victim, especially when the statute

AR.06427

202 L.Ed.2d 512, 19 Cal. Daily Op. Serv. 550, 2019 Daily Journal D.A.R. 403...

at issue lacks fine-tuned gradations of "force." We decline to impose yet another indeterminable line-drawing exercise on the lower courts.

Stokeling next contends that *Castleman* held that minor uses of force do not constitute "violent force," but he misreads that opinion. In *Castleman,* the Court noted that for purposes of a statute focused on domestic-violence misdemeanors, crimes involving relatively "minor uses of force" that might not "constitute 'violence' in the generic sense" could nevertheless qualify as predicate offenses. 572 U.S., at 165, 134 S.Ct. 1405. The Court thus had no need to decide more generally whether, under *Johnson,* conduct that leads to relatively minor forms of injury—such as "a cut, abrasion, [or] bruise"—"necessitate[s]" the use of "violent force." 572 U.S., at 170, 134 S.Ct. 1405. Only Justice Scalia's separate opinion addressed that question, and he concluded that force as small as "hitting, slapping, shoving, grabbing, pinching, biting, and hair pulling," *id.,* at 182, 134 S.Ct. 1405 (alterations omitted), satisfied *Johnson* 's definition. He reasoned that "[n]one of those actions bears any real resemblance to mere offensive touching, and all of them are capable of causing physical pain or injury." 572 U.S., at 182, 134 S.Ct. 1405. This understanding of "physical force" is consistent with our holding today that force is "capable of causing physical injury" within the meaning of *Johnson* when it is sufficient to overcome a victim's resistance. Such force satisfies ACCA's elements clause.

### III

**[14]**  We now apply these principles to Florida's robbery statute to determine whether it "has as an element the use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i). We conclude that it does.

**[15]**  As explained, Florida law defines robbery as "the taking of money or other property ... from the person or custody of another, ... when in the course of the taking there is the use of force, violence, assault, or putting in fear." Fla. Stat. § 812.13(1). The Florida Supreme Court  **\*555**  has made clear that this statute requires "resistance by the victim that is overcome by the physical force of the offender." *Robinson v. State,* 692 So.2d 883, 886 (1997). Mere "snatching of property from another" will not suffice. *Ibid.*

**[16]**   **[17]**  Several cases cited by the parties illustrate the application of the standard articulated in *Robinson*. For example, a defendant who grabs the victim's fingers and peels them back to steal money commits robbery in Florida. *Sanders v. State,* 769 So.2d 506, 507–508 (Fla.App.2000). But a defendant who merely snatches money from the victim's hand and runs away has not committed robbery. *Goldsmith v. State,* 573 So.2d 445 (Fla.App.1991). Similarly, a defendant who steals a gold chain does not use " ' force,' within the meaning of the robbery statute," simply because the victim "fe[els] his fingers on the back of her neck." *Walker v. State,* 546 So.2d 1165, 1166–1167 (Fla.App.1989). It is worth noting that, in 1999, Florida enacted a separate "sudden snatching" statute that proscribes this latter category of conduct; under that statute, it is unnecessary to show either that the defendant "used any amount of force beyond that effort necessary to obtain possession of the money or other property" or that "[t]here was any resistance by the victim to the offender." Fla. Stat. § 812.131 (1999).

Thus, the application of the categorical approach to the Florida robbery statute is straightforward. Because the term "physical force" in ACCA encompasses the degree of force necessary to commit common-law robbery, and because Florida robbery requires that same degree of "force," Florida robbery qualifies as an ACCA-predicate offense under the elements clause. Cf. *Descamps v. United States,* 570 U.S. 254, 261, 133 S.Ct. 2276, 186 L.Ed.2d 438 (2013) ("If the relevant statute has the same elemen[t]," "then the prior conviction can serve as an ACCA predicate").

202 L.Ed.2d 512, 19 Cal. Daily Op. Serv. 550, 2019 Daily Journal D.A.R. 403...

IV

In sum, "physical force," or "force capable of causing physical pain or injury," *Johnson, 559 U.S., at 140, 130 S.Ct. 1265* includes the amount of force necessary to overcome a victim's resistance. Robbery under Florida law corresponds to that level of force and therefore qualifies as a "violent felony" under ACCA's elements clause. For these reasons, we affirm the judgment of the Eleventh Circuit.

*It is so ordered.*

Justice SOTOMAYOR, with whom THE CHIEF JUSTICE, Justice GINSBURG, and Justice KAGAN join, dissenting.

In *Johnson v. United States,* 559 U.S. 133, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010), this Court ruled that the words "physical force" in the Armed Career Criminal Act (ACCA) Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(2), denote a heightened degree of force, rather than the minimal contact that would have qualified as "force" for purposes of the common-law crime of battery. *Id., at 139–140, 130 S.Ct. 1265.* This case asks whether Florida robbery requires such "physical force," and thus qualifies as a "violent felony" under the ACCA, even though it can be committed through use of only slight force. See § 924(e)(2)(B). Under *Johnson,* the answer to that question is no. Because the Court's contrary ruling distorts *Johnson,* I respectfully dissent.

I

As the majority explains, petitioner Denard Stokeling pleaded guilty in 2016 to being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The Government and the probation department **\*556** argued for an increased sentence under the ACCA. Stokeling objected.

The ACCA imposes a 15–year mandatory-minimum sentence on any § 922(g) offender who has been convicted of at least three qualifying predicate convictions. § 924(e)(1). As relevant here, a past conviction can qualify as an ACCA predicate if it is what ACCA calls a "violent felony"—that is, "any crime punishable by imprisonment for a term exceeding one year" that

"(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

"(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." § 924(e)(2)(B).

Clause (i) is often called the "elements clause" (or "force clause"), because it requires each qualifying crime to have an element involving force. The first part of clause (ii) is often called the "enumerated clause," because it enumerates certain generic crimes —such as burglary—that Congress sought to cover. The final part of clause (ii), often called the "residual clause," once offered a catchall to sweep in otherwise uncovered convictions, but the Court struck it down as unconstitutionally vague in 2015. See *Johnson v. United States,* 576 U.S. ——, ——, 135 S.Ct. 2551, 2563, 192 L.Ed.2d 569. So the elements clause and the enumerated clause are now the only channels by which a prior conviction can qualify as an ACCA "violent felony."

Whether Stokeling is subject to the ACCA's 15–year mandatory minimum hinges on whether his 1997 conviction for Florida robbery, see App. 10, qualifies under the elements clause. To determine whether a conviction qualifies as a violent felony under

the ACCA, courts apply a method called the categorical approach. See *Taylor v. United States,* 495 U.S. 575, 600–602, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). In the elements-clause context, that method requires asking whether the least culpable conduct covered by the statute at issue nevertheless "has as an element the use, attempted use, or threatened use of physical force against the person of another." See § 924(e)(2); *Johnson,* 559 U.S., at 137, 130 S.Ct. 1265. If it does not, then the statute is too broad to qualify as a "violent felony." In determining what a state crime covers for purposes of this federal sentencing enhancement, federal courts look to, and are constrained by, state courts' interpretations of state law. See *id.,* at 138, 130 S.Ct. 1265.

As relevant here, Florida law defines robbery as "the taking of money or other property ... from the person or custody of another ... when in the course of the taking there is the use of force, violence, assault, or putting in fear." Fla. Stat. § 812.13(1) (2017). The Florida Supreme Court has interpreted the statute's reference to force to require "force sufficient to overcome a victim's resistance." *Robinson v. State,* 692 So.2d 883, 887 (1997). Otherwise, the "degree of force used is immaterial." *Montsdoca v. State,* 84 Fla. 82, 86, 93 So. 157, 159 (1922). If the resistance is minimal, the force need only be minimal as well.

## II

Florida robbery, as interpreted and applied by the Florida courts, covers too broad a range of conduct to qualify as a "violent felony" under the ACCA. Both the text and purpose of the ACCA—particularly as they have already been construed by our precedents—demonstrate why.

## *557 A

In considering the text of the ACCA, we do not write on a clean slate. As everyone seems to agree, the key precedent here is this Court's decision in *Johnson v. United States,* 559 U.S. 133, 130 S.Ct. 1265, 176 L.Ed.2d 1. See *ante,* at 549, 552. But while the majority claims to honor *Johnson, ante,* at 552 – 554, it does so in the breach.

*Johnson* concerned whether Florida battery qualified as an ACCA predicate under the elements clause. This Court held that it did not. To arrive at that answer, the Court was required to interpret what exactly Congress meant when it used the words "physical force" to define the kind of "violent felony" that should be captured by the ACCA's elements clause. See 559 U.S., at 138–143, 130 S.Ct. 1265.

Rather than parsing "cherry pick[ed] adjectives," *ante,* at 553, it is instructive to look to how *Johnson* actually answered that question. Writing for the Court, Justice Scalia explained:

"We think it clear that in the context of a statutory definition of '*violent* felony,' the phrase 'physical force' means *violent* force—that is, force capable of causing physical pain or injury to another person. See *Flores v. Ashcroft,* 350 F.3d 666, 672 (C.A.7 2003) (Easterbrook, J.). Even by itself, the word 'violent' in § 924(e)(2)(B) connotes a substantial degree of force. Webster's Second 2846 (defining 'violent' as '[m]oving, acting, or characterized, by physical force, esp. by extreme and sudden or by unjust or improper force; furious; severe; vehement ...'); 19 Oxford English Dictionary 656 (2d ed. 1989) ('[c]haracterized by the exertion of great physical force or strength'); Black's [Law Dictionary] 1706 [ (9th ed. 2009) ] ('[o]f, relating to, or characterized by strong physical force'). When the adjective 'violent' is attached to the noun 'felony,' its connotation of strong physical force is even clearer. See *id.,* at 1188 (defining 'violent felony' as '[a] crime characterized by extreme physical force, such as murder, forcible rape, and assault and battery with a dangerous weapon'); see also *United*

202 L.Ed.2d 512, 19 Cal. Daily Op. Serv. 550, 2019 Daily Journal D.A.R. 403...

*States v. Doe,* 960 F.2d 221, 225 (C.A.1 1992) (Breyer, C.J.) ('[T]he term to be defined, "violent felony," ... calls to mind a tradition of crimes that involve the possibility of more closely related, active violence')." 559 U.S., at 140–141, 130 S.Ct. 1265.

In other words, in the context of a statute delineating "violent felon[ies]," the phrase "physical force" signifies a degree of force that is "*violent,*" "substantial," and "strong"—"that is, force capable of causing physical pain or injury to another person." See *id., at 140,* 130 S.Ct. 1265; see also *id., at 142,* 130 S.Ct. 1265 ("As we have discussed ... the term 'physical force' itself normally connotes force strong enough to constitute 'power'—and all the more so when it is contained in a definition of 'violent felony' ").

The majority, slicing *Johnson* up, concentrates heavily on the phrase "capable of causing physical pain or injury" and emphasizes the dictionary definition of the word "capable" to suggest that *Johnson* "does not require any particular degree of likelihood or probability" of "pain or injury"—merely, as with any law professor's eggshell-victim hypothetical, "potentiality." *Ante, at* 10–11. Our opinions, however, should not be "parsed as though we were dealing with the language of a statute," *Reiter v. Sonotone Corp.,* 442 U.S. 330, 341, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), and in any event, the majority's parsing goes astray. It is clear in context that the Court in *Johnson* did not mean the word "capable" in the way that the majority uses it today, because *Johnson* rejected an **\*558** interpretation of "physical force" that would have included a crime of battery that could be satisfied by "[t]he most 'nominal contact,' such as a 'ta[p] ... on the shoulder without consent.' " 559 U.S., at 138, 130 S.Ct. 1265. As any first-year torts student (or person with a shoulder injury) quickly learns, even a tap on the shoulder is "capable of causing physical pain or injury" in certain cases. So the Court could not have meant "capable" in the "potentiality" sense that the majority, see *ante,* at 554, ascribes to it. Rather, it meant it in the sense that its entire text indicates: "force capable of causing physical pain or injury" in the sense that a "strong" or "substantial degree of force" can cause physical pain or injury. See *Johnson,* 559 U.S., at 140, 130 S.Ct. 1265. The phrase denoted, that is, a heightened degree of force.

Florida robbery, as interpreted by the Florida Supreme Court, cannot meet *Johnson* 's definition of physical force. As noted above, Florida robbery requires "force sufficient to overcome a victim's resistance." *Robinson,* 692 So.2d, at 887. But that can mean essentially no force at all. See *McCloud v. State,* 335 So.2d 257, 258 (Fla.1976) ("Any degree of force suffices to convert larceny into a robbery"); *Montsdoca,* 84 Fla., at 86, 93 So., at 159 ("The degree of force used is immaterial"). For example, the force element of Florida robbery is satisfied by a pickpocket who attempts to pull free after the victim catches his arm. See *Robinson,* 692 So.2d, at 887, n. 10 (citing *Colby v. State,* 46 Fla. 112, 113, 35 So. 189, 190 (1903)). Florida courts have held the same for a thief who pulls cash from a victim's hand by " 'peel[ing] [his] fingers back,' " regardless of "[t]he fact that [the victim] did not put up greater resistance." *Sanders v. State,* 769 So.2d 506, 507 (Fla.App.2000). The Government concedes, similarly, that a thief who grabs a bag from a victim's shoulder also commits Florida robbery, so long as the victim instinctively holds on to the bag's strap for a moment. See Tr. of Oral Arg. 32–34; see also *Benitez–Saldana v. State,* 67 So.3d 320, 322–323 (Fla.App.2011). And Stokeling points to at least one person who was convicted of Florida robbery after causing a bill to rip while pulling cash from a victim's hand. See App. B to Brief for Petitioner.

While these acts can, of course, be accomplished with more than minimal force, they need not be. The thief who loosens an already loose grasp or (assuming the angle is right) tears the side of a $5 bill has hardly used any force at all. Nor does the thief who simply pulls his arm free from a store employee's weak grasp or snatches a handbag onto which a victim fleetingly holds use "force capable of causing physical pain or injury to another person" in the sense that *Johnson* meant the phrase, because he does not use "a substantial degree of force" or "strong physical force." See *Johnson,* 559 U.S., at 140, 130 S.Ct. 1265. By providing that "[a]ny degree of force suffices to convert larceny into a robbery," *McCloud,* 335 So.2d, at 258— and thus making robbers out of thieves who use minimal force—Florida expands its law beyond the line that *Johnson* drew.

The least culpable conduct proscribed by Fla. Stat. § 812.13 does not entail "physical force," § 924(e)(2)(B)(i), as this Court properly construed that phrase in *Johnson*.

## B

The purpose underlying the ACCA confirms that a robbery statute that sweeps as broadly as Florida's does not qualify as an ACCA predicate.

As noted above, the ACCA prescribes a 15–year mandatory-minimum prison term for anyone convicted of being a felon in

**\*559** possession of a firearm so long as that person has three qualifying past convictions. In *Begay v. United States,* 553 U.S. 137, 128 S.Ct. 1581, 170 L.Ed.2d 490 (2008), this Court explained that, "[a]s suggested by its title, the Armed Career Criminal Act focuses upon the special danger created when a particular type of offender—a violent criminal or drug trafficker—possesses a gun." *Id.,* at 146, 128 S.Ct. 1581. The ACCA, that is to say, does not look to past crimes simply to get a sense of whether a particular defendant is generally a recidivist; rather, it looks to past crimes to determine specifically "the kind or degree of danger the offender would pose were he to possess a gun." *Ibid.*

*Begay* considered whether a New Mexico felony conviction for driving under the influence of alcohol (DUI) qualified as an ACCA predicate under the now-defunct residual clause. See *id.,* at 141–142, 128 S.Ct. 1581. Felony DUI, the Court explained, did not fit with the types of crimes that Congress was trying to capture, because while it "reveal[ed] a degree of callousness toward risk," it did not "show an increased likelihood that the offender is the kind of person who might deliberately point [a] gun and pull the trigger." *Id.,* at 146, 128 S.Ct. 1581. The Court had "no reason to believe that Congress intended a 15–year mandatory prison term where that increased likelihood does not exist." *Ibid.*

The same is true here. The lower grade offenders whom Florida still chooses to call "robbers" do not bear the hallmarks of being the kind of people who are likely to point a gun and pull the trigger, nor have they committed the more aggravated conduct —pointing a weapon, inflicting bodily injury—that most people think of when they hear the colloquial term "robbery." Under Florida law, "robbers" can be glorified pickpockets, shoplifters, and purse snatchers. No one disputes that such an offender, if later discovered illegally in possession of a firearm, will in many cases merit greater punishment as a result of the past offense; unless it occurred far in the past, such a conviction will typically increase that defendant's advisory sentencing range under the U.S. Sentencing Guidelines. See *Rosales–Mireles v. United States,* 585 U.S. ——, —— – ——, 138 S.Ct. 1897, 1903–1904, 201 L.Ed.2d 376 (2018); United States Sentencing Commission, Guidelines Manual §§ 1B1.1(a)(6)-(7), 4A1.1, 4A1.2(e) (Nov. 2018). But there is "no reason to believe that Congress intended a 15–year mandatory prison term" for such offenders, who do not present the increased risk of gun violence that more aggravated offenders present. See *Begay,* 553 U.S., at 146, 128 S.Ct. 1581.

## III

Unable to rely heavily on text, precedent, or purpose to support its holding that Florida robbery qualifies as an ACCA "violent felony," the majority turns to the common law, to legislative and statutory history, and finally to what it perceives as the consequences of ruling for Stokeling. None of these rationales is persuasive.

202 L.Ed.2d 512, 19 Cal. Daily Op. Serv. 550, 2019 Daily Journal D.A.R. 403...

## A

The majority observes that Florida's statute requires no less force than was necessary to commit common-law robbery. That may well be true: The majority notes, for example, that at common law "it was robbery to pull a diamond pin out of a woman's hair when doing so tore away hair attached to the pin," *ante,* at 550, and as anyone who has ever pulled a bobby pin out of her hair knows, hair can break from even the most minimal force. In the majority's telling, however, the ACCA itself "encompasses the degree of force necessary to commit common-law robbery." **\*560** *Ante,* at 555. That proposition is flatly inconsistent with *Johnson.*

In explaining its interpretation of "physical force," the Court in *Johnson* expressly rejected the common law's definition of "force," see 559 U.S., at 139, 130 S.Ct. 1265 instead recognizing that the phrase should be "give[n] ... its ordinary meaning," *id.,* at 138, 130 S.Ct. 1265. At common law, "force" could be "satisfied by even the slightest offensive touching." *Id.,* at 139, 130 S.Ct. 1265. But as the Court observed, "[a]lthough a common-law term of art should be given its established common-law meaning, we do not assume that a statutory word is used as a term of art where that meaning does not fit." *Ibid.* (citation omitted). Rather, "context determines meaning," *ibid.,* and, "in the context of a statutory definition of '*violent* felony,' " the ordinary rather than the common-law meaning of "force" was what fit, *id.,* at 140, 130 S.Ct. 1265.

The majority now says that while *Johnson* rejected the common-law meaning of force with regard to battery, it nevertheless meant somehow to preserve the common-law meaning of force with regard to robbery. See *ante,* at 550 – 551, 552 – 554. In other words, to reach its conclusion, the majority must construe "physical force" in § 924(e)(2)(B)(i) to bear two different meanings —*Johnson* 's and the majority's—depending on the crime to which it is being applied. That is a radical and unsupportable step.

To be clear, the majority does not simply rule that the phrase "physical force" carries the common-law meaning in one place but a different meaning in another statutory provision. There would certainly be precedent for that. See, *e.g., United States v. Castleman,* 572 U.S. 157, 162–168, 134 S.Ct. 1405, 188 L.Ed.2d 426 (2014) (explaining why the phrase "physical force" took on a common-law meaning, rather than its ACCA meaning under *Johnson,* in the context of a statute defining a " 'misdemeanor crime of domestic violence' "). *Johnson,* in fact, expressly reserved the question whether "physical force" might mean something different in the context of a different statutory definition. See 559 U.S., at 143–144, 130 S.Ct. 1265.

What *Johnson* did not do, however, was suggest that "physical force" in a single clause—the elements clause—that *Johnson* addressed might mean two different things for two different crimes. See *id.,* at 143, 130 S.Ct. 1265 ("We have interpreted the phrase 'physical force' only in the context of a statutory definition of 'violent felony' "); see also *id.,* at 138–142, 130 S.Ct. 1265. *Johnson* had good reason not to say so: because that is not how we have said that statutory interpretation works. See, *e.g., Clark v. Martinez,* 543 U.S. 371, 378, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005) (observing that a single statutory word or phrase "cannot ... be interpreted to do" two different things "at the same time"); *Ratzlaf v. United States,* 510 U.S. 135, 143, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) (similar).

Starting today, however, the phrase "physical force" in § 924(e)(2)(B)(i) will apparently lead a Janus-faced existence. When it comes to battery, that phrase will look toward ordinary meaning; when it comes to robbery, that same piece of statutory text will look toward the common law. To the extent that is a tenable construction, the majority has announced a brave new world of textual interpretation. To the extent that a phrase so divided cannot stand, meanwhile, one could be forgiven for thinking that the majority, though it claims to praise *Johnson,* comes instead to bury it.

**Stokeling v. U.S., 139 S.Ct. 544 (2019)**

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1209 of 1271

202 L.Ed.2d 512, 19 Cal. Daily Op. Serv. 550, 2019 Daily Journal D.A.R. 403...

**\*561**  B

To shore up its argument that the ACCA's use of the phrase "physical force," at least in the context of robbery, takes on the common-law meaning of "force," the majority invokes the history of the ACCA. Statutory history is no help to the majority here.

As the majority notes, a precursor to the ACCA prescribed a mandatory-minimum sentence for people convicted of firearm offenses who had three qualifying prior convictions "for robbery or burglary." 18 U.S.C. App. § 1202(a) (1982 ed., Supp. II). That statute defined robbery, as relevant, as "the taking of the property of another ... by force or violence." § 1202(c)(8) (1982 ed., Supp. II). See *ante,* at 549 – 550. In other words, it is undisputed that at one point, in a previous statute, Congress enumerated robbery as a qualifying predicate and used the words "force or violence" to describe a generic version of the crime.

Then, in 1986, Congress changed the statute, substituting instead the language we know today. See Career Criminals Amendment Act of 1986, § 1402, 100 Stat. 3207 100 Stat. 3207–39. Gone was any explicit reference to "robbery"; in its place came not only the elements clause (our focus here) but also the enumerated clause (which retained an express reference to "burglary" but omitted "robbery") and the capacious residual clause (struck down in 2015). See *ante,* at 551; *supra,* at 556; see also *Taylor,* 495 U.S., at 582–584, 110 S.Ct. 2143. So Congress did two salient things: It expanded the predicates in general, and it deleted an express reference to robbery.

The majority reasons that because (1) the old law's definition of "robbery" as a taking involving "force or violence" matched various common-law definitions of robbery, (2) Congress kept the word "force" (though not "or violence") in the new law's elements clause while deleting the word "robbery," and (3) Congress meant to expand the enhancement's reach in a general sense, Congress must have meant for the phrase "physical force" in the new law also to carry the common-law meaning of robbery. See *ante,* at 550 – 552. The conclusion that the majority draws from these premises does not follow, for at least four reasons.

First, as already discussed, the question whether Congress' use of the phrase "physical force" in the new law—that is, in the ACCA's elements clause—carries the common-law meaning of "force" was already asked and answered by *Johnson* : It does not. See 559 U.S., at 138–143, 145, 130 S.Ct. 1265; *supra,* at 559 – 560. This part of the majority's argument may be couched in statutory history, but it is no more than an attempt to relitigate *Johnson*.

Second, Congress deleted the word "robbery" from the statute altogether while still enumerating robbery's former neighbor, "burglary," in the enumerated clause. See *supra,* at 556, 561. When Congress keeps one piece of statutory text while deleting another, we generally "have no trouble concluding that" it does so with purpose, see, *e.g., Director of Revenue of Mo. v. CoBank ACB,* 531 U.S. 316, 324, 121 S.Ct. 941, 148 L.Ed.2d 830 (2001), absent some reason to believe that the missing term simply got "lost in the shuffle," *United States v. Wilson,* 503 U.S. 329, 336, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992). See also, *e.g., Russello v. United States,* 464 U.S. 16, 23–24, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) ("Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended"). Here, it is inconceivable that Congress simply lost track of robbery, one of only two generic **\*562** crimes that it enumerated in the old statute. Accordingly, if Congress had wanted to retain the old statute's specific emphasis on robbery, the natural reading is that it would have accomplished that goal the same way it did with burglary: by making it an enumerated offense. That it did not do so is telling.

Third, the fact that Congress wished to "expan[d] the predicate offenses triggering the sentence enhancement," *Taylor,* 495 U.S., at 582, 110 S.Ct. 2143 is entirely consistent with paring back the statute's sweep with regard to robbery specifically. I may wish to expand the contents of my refrigerator, but that does not mean that I will buy more of every single item that is currently in it the next time I go shopping. Here, the ACCA—with its (new, generalized) elements clause, its (augmented) enumerated

clause, and (until recently) its highly capacious residual clause—undeniably expanded the precursor statute's bare enumeration of robbery and burglary, regardless of how many robbery statutes qualify as predicates specifically under the elements clause. [1]

Fourth, even assuming that Congress wanted robbery to remain largely encompassed by the ACCA despite deleting the word from the precursor statute, that intent is fully consistent with properly applying *Johnson* here. The majority, by focusing on the elements clause, ignores the residual clause, which—until it was declared unconstitutional in 2015—provided a home for many crimes regardless of whether they included an element of violent "physical force." [2] Hewing to a proper reading of *Johnson,* in other words, does not require assuming that Congress constricted the precursor statute's application to robbery when it enacted today's ACCA; whatever robberies would have qualified under the old statute presumably could have still qualified under the residual clause during its nearly 20–year existence.

In short, the statutory history does not undermine the conclusion that the ACCA's elements clause, under our precedents, is not broad enough to encompass Florida's robbery statute. Congress deleted the word "robbery," kept the word "burglary," supplemented burglary with the catchall residual clause that still captured many **\*563** robberies outside the elements clause, and used the phrase "physical force" in the elements clause to define a type of "violent felony," which *Johnson* tells us requires more force than the term's common-law meaning denotes. See 559 U.S., at 138–143, 145, 130 S.Ct. 1265. Statutory history cannot get the majority past both the text and the force of *stare decisis* here.

## C

That leaves the majority with only the practical consequences that it asserts would follow if this Court were to hold that Florida robbery does not qualify under the ACCA's elements clause. See *ante,* at 551 – 552. While looking to how an interpretation of a federal statute would affect the applicability of related state statutes can be a useful approach in these cases, see, *e.g., Castleman,* 572 U.S., at 167, 134 S.Ct. 1405 the results that follow from a proper reading of *Johnson* are not nearly as incongruous as the majority suggests.

To begin, take the majority's assertion "that many States' robbery statutes would not qualify as ACCA predicates," *ante,* at 551, if the Court were to apply *Johnson* as it was written. The accuracy of this statement is far less certain than the majority's opinion lets on. While Stokeling and the Government come close to agreeing that at least 31 States' robbery statutes do have an overcoming-resistance requirement, see *ante,* at 551, that number is not conclusive because neither Stokeling nor the Government has offered an accounting of how many of those States allow minimal force to satisfy that requirement, as Florida does. Because robbery laws vary from State to State, and because even similarly worded statutes may be construed differently by different States' courts, some of those 31 States may well require more force than Florida does. See, *e.g., United States v. Doctor,* 842 F.3d 306, 312 (C.A.4 2016) (ruling that "there is no indication that South Carolina robbery by violence"—a statute cited by the Government here—"can be committed with minimal actual force"); see also *Gonzales v. Duenas–Alvarez,* 549 U.S. 183, 193, 127 S.Ct. 815, 166 L.Ed.2d 683 (2007) (explaining that the categorical approach "requires a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime"). [3]

Furthermore, even if it is true that "that many States' robbery statutes would not qualify as ACCA predicates" under a faithful reading of *Johnson,* see *ante,* at 551, that outcome would stem just as much (if not more) from the death of the residual clause as from a decision in this case. As discussed above, various state robbery statutes qualified under that expansive clause for nearly 20 years, until vagueness problems led this Court to strike the **\*564** clause down as unconstitutional. See *supra,* at 562 – 563, and n. 2; see also *Johnson v. United States,* 576 U.S. ——, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2015). The fall of that clause would therefore be an independent cause of any drop in qualifying predicates, regardless of what this Court decides today. (A drop in robbery statutes qualifying as ACCA predicates could also, of course, be traceable to Congress' decision not to continue

**Stokeling v. U.S., 139 S.Ct. 544 (2019)**
Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1211 of 1271

202 L.Ed.2d 512, 19 Cal. Daily Op. Serv. 550, 2019 Daily Journal D.A.R. 403...

enumerating robbery when it enacted the ACCA in the first place.) In short, the majority, fearful for the camel, errs in blaming the most recent straw. [4]

Separately, even if a number of simple robbery statutes were to cease qualifying as ACCA predicates, that does not mean—as the majority implies, see *ante*, at 552—that the same fate necessarily would befall most or even many aggravated robbery statutes. The majority offers the single example of Florida aggravated robbery, noting that "Florida requires the same element of 'force' for both armed robbery and basic robbery." *Ibid*. But while the majority accurately describes Florida law, there is scant reason to believe that a great many other States' statutes would be similarly affected, because the effect that hewing to *Johnson* would have on Florida aggravated robbery stems from the idiosyncrasy that Florida aggravated robbery requires neither displaying a weapon nor threatening or inflicting bodily injury. [5] The result for Florida aggravated robbery therefore sheds little light on what would happen to other aggravated-robbery statutes, the vast majority of which do (and did at the time of the ACCA's enactment) appear to provide for convictions on such grounds—and whose validity as ACCA predicates would not necessarily turn on the question the Court faces today. [6] The majority mistakes one anomalous result **\*565** for a reason not to apply *Johnson* as it was written.

<div align="center">IV</div>

This Court's decision in *Johnson* tells us that when Congress wrote the words "physical force" in the context of a statute targeting "violent felon [ies]," it eschewed the common-law meaning of those words and instead required a higher degree of force. See 559 U.S., at 138–143, 145, 130 S.Ct. 1265. *Johnson* resolves this case. Florida law requires no more than minimal force to commit Florida robbery, and Florida law therefore defines that crime more broadly than Congress defined the elements clause.

The crime that most people think of when they think of "robbery" is a serious one. That is all the more reason, however, that this Court should not allow a dilution of the term in state law to drive the expansion of a federal statute targeted at violent recidivists. Florida law applies the label "robbery" to crimes that are, at most, a half-notch above garden-variety pickpocketing or shoplifting. The Court today does no service to Congress' purposes or our own precedent in deeming such crimes to be "violent felonies"—and thus predicates for a 15–year mandatory-minimum sentence in federal prison.

I respectfully dissent.

**All Citations**

139 S.Ct. 544, 202 L.Ed.2d 512, 19 Cal. Daily Op. Serv. 550, 2019 Daily Journal D.A.R. 403, 27 Fla. L. Weekly Fed. S 621

<div align="center">**Footnotes**</div>

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

\*    The Government did not argue that Florida robbery should qualify under § 924(e)(2)(B)(ii), presumably because robbery is not among the enumerated offenses and the Court held the "residual clause" unconstitutionally vague in *Johnson v. United States,* 576 U.S. ——, 135 S.Ct. 2551, 2563, 192 L.Ed.2d 569 (2015).

1    Of course, whether Congress wished to pull back the throttle with regard to robbery across the whole ACCA is less certain. (Recall that Congress also enacted the capacious residual clause.) But that is why the statutory history cannot

Stokeling v. U.S., 139 S.Ct. 544 (2019)

Case 3:20-cv-07721-SI    Document 58-5    Filed 11/10/20    Page 1212 of 1271

202 L.Ed.2d 512, 19 Cal. Daily Op. Serv. 550, 2019 Daily Journal D.A.R. 403...

tell us what the majority claims that it can about the elements clause specifically. Instead, the more reliable guide is the new text that Congress enacted to replace the old. Cf. *West Virginia Univ. Hospitals, Inc. v. Casey,* 499 U.S. 83, 98, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991) ("The best evidence of [Congress'] purpose is the statutory text adopted by both Houses of Congress and submitted to the President"). And here, Congress omitted generic robbery altogether and made the "violent felony" clause at issue require "physical force." See *supra,* at 556, 557 – 558, 561.

2    In fact, the case in which this Court ruled that its decision striking down the residual clause applied retroactively on collateral review centered on a Florida robbery conviction under § 812.13(1). See *Welch v. United States,* 578 U.S. ——, —— – ——, 136 S.Ct. 1257, 1262–1263, 194 L.Ed.2d 387 (2016). The Eleventh Circuit, reviewing the defendant's ACCA enhancement on direct appeal, had ruled that Florida robbery (including when, under previous law, it could be accomplished merely "by sudden snatching") qualified as an ACCA predicate under the residual clause without deciding whether it also qualified under the elements clause. See *United States v. Welch,* 683 F.3d 1304, 1310–1314 (2012). Other Circuits likewise ruled, in the years before the clause's demise, that other state robbery statutes qualified under the residual clause. See, *e.g., United States v. Mitchell,* 743 F.3d 1054, 1062–1063 (C.A.6 2014) (collecting cases).

3    The majority is able to suggest that following *Johnson* would beget a larger practical effect because it frames the question presented more broadly than is warranted. The majority avers that "[t]his case requires us to decide whether a robbery offense that has as an element the use of force sufficient to overcome a victim's resistance necessitates the use of 'physical force' within the meaning of the [ACCA]." *Ante,* at 548. But this case hinges on the fact that the Florida courts have ruled that the amount of resistance offered—and therefore the amount of force necessary to overcome it—is irrelevant. See *supra,* at 558 – 559. In other words, this case presents only the narrower question whether a robbery offense that has as an element the use of force sufficient to overcome a victim's resistance—even if that resistance is minimal—necessitates the use of "physical force" within the meaning of the ACCA. See also Brief for Petitioner i. If a state robbery statute's overcoming-resistance requirement were pegged under state law to more than minimal resistance, this would be a different case.

4    The majority's doubling down on *Johnson* 's "capable of causing physical pain or injury" language, see *ante,* at 533 – 554, suggests nostalgia for the residual clause (which reads: "otherwise involves conduct that presents a serious potential risk of physical injury to another," 18 U.S.C. § 924(e)(2)(B)). Congress could, at any time, re-enumerate robbery (and any other crimes it might have intended the residual clause to cover) if it so chose. The majority's decision today, meanwhile—with its endorsement of the mere "potentiality" of injury, see *ante,* at 554—risks sowing confusion in the lower courts for years to come.

5    Specifically, hewing to a proper reading of *Johnson* would also affect Florida's aggravated robbery statute because the crime's only element involving force is the one that it shares with Florida simple robbery. See Fla. Stat. § 812.13(1). In Florida, robbery becomes aggravated if the defendant "carrie[s] a weapon, see § 812.13(2), but that means that the crime sweeps in offenders who never brandished, used, or otherwise intimated that they were armed, see, *e.g., State v. Burris,* 875 So.2d 408, 413 (Fla.2004), and therefore prevents the crime from necessarily involving the "threatened use of physical force," see 18 U.S.C. § 924(e)(2)(B)(i). See also Tr. of Oral Arg. 4 (explaining this point).

6    See, *e.g.,* Ala. Code § 13A–8–41(a)(2) (2015); Alaska Stat. §§ 11.41.500(a)(2)-(3) (2016); Ariz. Rev. Stat. Ann. § 13–1904(A)(2) (2018); Ark. Code Ann. §§ 5–12–103(a)(2)–(3) (2013); Cal. Penal Code Ann. §§ 12022.53, 12022.7 (West 2018 Cum. Supp.); Colo. Rev. Stat. Ann. § 18–4–302(1)(b) (2018); Conn. Gen. Stat. §§ 53a–134(a)(1), (3) (2017); Del. Code Ann., Tit. 11, §§ 832(a)(1)-(3) (2015); Ga. Code Ann. § 16–8–41(a) (2018); Haw. Rev. Stat. §§ 708–840(1)(a), (b)(ii) (2014); Ill. Comp. Stat., ch. 720, §§ 5/18–1(b)(1), 5/18–2(a)(3)–(4) (2018 Cum. Supp.); Ind. Code § 35–42–5–1 (2018 Cum. Supp.); Kan. Stat. Ann. § 21–5420(b)(2) (Supp. 2017); Ky. Rev. Stat. Ann. §§ 515.020(1)(a), (c) (Lexis 2014); La. Rev. Stat. Ann. §§ 14:64.1(A), 14:64.3, 14:64.4(A)(1) (West 2016); Me. Rev. Stat. Ann., Tit. 17–A, § 651(1)(D) (2018 Cum. Supp.); Md. Crim. Law Code Ann. § 3–403(a)(2) (2012); Mich. Comp. Laws

Ann. § 750.529 (West 2004); Minn. Stat. § 609.245(2) (2018); Miss. Code Ann. § 97–3–79 (2014); 🔖 Mo. Rev. Stat. §§ 570.023(1)(1), (3)-(4) (2016); Neb. Rev. Stat. §§ 28–324, 🔖 28–1205 (2015); N.H. Rev. Stat. Ann. § 636:1(III)(b) (2016); N.Y. Penal Law Ann. §§ 160.10(2)(a)-(b), 160.15(1), (3)-(4) (West 2015); N.D. Cent. Code Ann. §§ 12.1–22–01(1)–(2) (2012); Ohio Rev. Code Ann. §§ 2911.01(A)(1), (3) (Lexis 2014); Okla. Stat. Ann., Tit. 21, §§ 797(1)-(3), 801 (2015); Ore. Rev. Stat. §§ 164.405(1)(a), 164.415(1)(b)-(c) (2017); 18 Pa. Cons. Stat. §§ 3701(a)(1)(i)-(ii), (iv) (2015); R.I. Gen. Laws § 11–39–1(a) (2002); S.D. Codified Laws § 22–30–6 (2017); Tenn. Code Ann. §§ 39–13–402(a), 39–13–403(a) (2011); Tex. Penal Code Ann. § 29.03(a) (West 2011); Utah Code §§ 76–6–302(1)(a)–(b) (2017); Vt. Stat. Ann., Tit. 13, § 608(c) (2009); 🔖 Va. Code Ann. §§ 18.2–53.1, 🔖 18.2–58 (2014); Wash. Rev. Code §§ 9A.56.200(1)(a)(ii)-(iii) (2015); W. Va. Code Ann. § 61–2–12(a) (Lexis 2014); Wis. Stat. § 943.32(2) (2005); Wyo. Stat. Ann. §§ 6–2–401(c) (2017); see also Reply Brief 22–23; App. to Reply Brief 9a–18a (listing 29 States with aggravated-robbery statutes that could have qualified at the time of the ACCA's enactment because of a weapon-using, weapon-displaying, or weapon-representing element; an additional 10 States, excluding duplicates, that could have potentially qualified at that time because of a physical-injury element; and an additional 15 States, some duplicative, with potentially qualifying statutes that have been enacted since).

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Superseded by Regulation as Stated in IN RE: ABDULLAH HASSIM, BIA,
May 9, 2007

394 F.3d 8
United States Court of Appeals,
First Circuit.

Wissam SUCCAR, Petitioner,

v.

John ASHCROFT, Attorney General, Respondent.

No. 03–2445.
|
Heard Oct. 7, 2004.
|
Decided Jan. 5, 2005.

**Synopsis**
**Background:** Alien, a citizen of Lebanon who had been
paroled into the United States and subsequently married a
U.S. citizen, petitioned for review of decision that he was
ineligible for adjustment of status.

**[Holding:]** The Court of Appeals, Lynch, Circuit Judge, held
that as a matter of first impression, regulation which defined
aliens who had been paroled into the United States but placed
in removal proceedings as ineligible for adjustment of status,
was contrary to congressional intent and thus invalid.

Vacated and remanded.

West Headnotes (4)

**[1]**  **Aliens, Immigration, and**
**Citizenship** 🔑 Jurisdiction and venue
Court of Appeals was not statutorily barred,
by statute prohibiting judicial review of
the Attorney General's discretionary decisions
regarding orders of removal, from reviewing
the validity of Immigration and Naturalization
Service (INS) regulation which defined certain
aliens as ineligible for adjustment of status;
issue of whether the challenged regulation
conflicted with a statute involved the Attorney

General's authority rather than his discretion.
Immigration and Nationality Act, § 242(a)(2)
(B), 🚩 8 U.S.C.A. § 1252(a)(2)(B); 🚩 8 C.F.R.
§ 245.1(c)(8).

53 Cases that cite this headnote

**[2]**  **Aliens, Immigration, and**
**Citizenship** 🔑 Validity
Immigration and Naturalization Service (INS)
regulation which defined aliens who had been
paroled into the United States but placed in
removal proceedings as ineligible for adjustment
of status, was invalid; regulation was contrary
to congressional intent as expressed in statute
defining persons who have parole status as
eligible for adjustment of status. Immigration
and Nationality Act, § 245(a), 🚩 8 U.S.C.A. §
1255(a); 🚩 8 C.F.R. § 245.1(c)(8).

56 Cases that cite this headnote

**[3]**  **Administrative Law and**
**Procedure** 🔑 Plain, literal, or clear meaning;
ambiguity or silence
*Chevron* deference to an agency's statutory
interpretation is called for only when the devices
of judicial construction have been tried and
found to yield no clear sense of congressional
intent.

15 Cases that cite this headnote

**[4]**  **Administrative Law and**
**Procedure** 🔑 Erroneous or unreasonable
construction; conflict with statute
An agency interpretation of a relevant provision
which conflicts with the agency's earlier
interpretation is entitled to considerably less
deference than a consistently held agency view.

14 Cases that cite this headnote

**West Codenotes**

**Held Invalid**

🚩 8 C.F.R. § 245.1(c)(8)

**Attorneys and Law Firms**

**\*9** Saher J. Macarius for petitioner.

Anthony P. Nicastro, with whom Peter D. Keisler, Assistant Attorney General, Civil Division, Barry J. Pettinato, Senior Litigation Counsel, and Anthony C. Payne, Attorney, Office of Immigration Litigation, Civil Division, United States Justice Department, were on brief, for respondent.

Mary Kenney, with whom Nadine K. Wettstein, American Immigration Law Foundation, Iris Gomez, and Massachusetts Law Reform Institute were on brief, for The American Immigration Law Foundation, Massachusetts Law Reform Institute, Massachusetts Immigrant and Refugee Advocacy Coalition, International Institute of Boston, and The Harvard Immigration and Refugee Clinic of Greater Boston Legal Services, amici curiae.

Before LYNCH, Circuit Judge, STAHL, Senior Circuit Judge, LIPEZ, Circuit Judge.

**Opinion**

LYNCH, Circuit Judge.

This case raises issues of first impression in immigration law as to the validity of a regulation promulgated in 1997 by the Attorney General, 🚩 8 C.F.R. § 245.1(c)(8). The regulation redefines certain aliens as ineligible to apply for adjustment of status to lawful permanent residents whom a statute, 📙 8 U.S.C. § 1255(a), defines as eligible to apply. Under that regulation, the Attorney General will not consider an application for adjustment of status from the entire category of aliens who have been granted parole status but have been placed in removal proceedings.

The essence of the Attorney General's argument is that since he has been given ultimate discretion to deny adjustment of status after application, the validity of the regulation is itself not subject to judicial review, and, if it were, the regulation must be upheld as a permissible exercise of that ultimate discretion. We disagree on both points. We hold that there is no statutory bar to review and that the regulation is contrary to the language and intent of the statute, 📙 8 U.S.C. § 1255(a). As a result, **\*10** we vacate the order removing

Wissam Succar from the United States and remand for further proceedings.

Our reasons, which we explain in more depth below, are as follows. The mere fact that a statute gives the Attorney General discretion as to whether to grant relief after application does not by itself give the Attorney General the discretion to define eligibility for such relief. That is clear from 📙 INS v. Cardoza–Fonseca, 480 U.S. 421, 443, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Courts must still interpret the statute. Where the statute is silent on eligibility, the agency involved may reasonably choose to exercise its discretion to withhold relief by excluding certain persons from eligibility for such relief. 📙 Lopez v. Davis, 531 U.S. 230, 121 S.Ct. 714, 148 L.Ed.2d 635 (2001).

Here, the statute is not silent—it defines persons who have parole status as eligible for adjustment of status and does not carve out an exception for parolees who are in removal proceedings. See 📙 8 U.S.C. § 1255. That lack of a carve out for parolees in removal proceedings is itself significant, given that the statute contains a number of carve outs as to eligibility for adjustment of status. Some carve outs exclude persons from eligibility to apply who would otherwise meet more general eligibility requirements. Further, other carve outs create eligibility in persons otherwise ineligible. Congress thus has created a comprehensive scheme.

Viewing the larger statutory context, we find Congress has also been explicit about where the Attorney General has been granted discretion and where he has not. By contrast with other areas, there is no explicit grant of discretion to redefine eligibility to apply for adjustment of status of parolees to exclude those in removal proceedings. Congress did not place the decision as to which applicants for admission are placed in removal proceedings into the discretion of the Attorney General, but created mandatory criteria. See 🚩 8 U.S.C. §§ 1225(b)(1), (2). In addition, persons cannot be granted paroled status at all if they pose a security risk; they are to be ordered removed and this order must be reported to the Attorney General. 📙 8 U.S.C. § 1255(c)(1).

The statutory scheme reflects Congress's careful balancing of the country's security needs against the national interests Congress wished to advance through adjustment of status proceedings. The regulation upsets the balance Congress created.

Checking our construction of the statute against the legislative history of ⚐ section 1255, we find the regulation to be inconsistent with the intent expressed in the statute. In 1960, when Congress included paroled aliens as aliens who are eligible for adjustment of status relief through ⚐ section 1255, it did so to solve certain problems, which we describe later. The effect of the regulation is to re-institute the problems Congress wished to solve. Further, until the 1997 promulgation of the regulation, the Attorney General had consistently interpreted ⚐ section 1255 in a manner consistent with the statute and the legislative history and inconsistent with the 1997 regulation.

In response to the Attorney General's argument that the 1996 enactment of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) justifies the 1997 regulation, we note the Attorney General's concession that IIRIRA, which altered so much of the immigration laws, left untouched the language of ⚐ section 1255, as enacted in 1960, on the matter in question. That being so, the relevance of the Attorney General's remaining arguments, largely based on general policy said to be embodied in IIRIRA, is doubtful. **\*11** To the contrary, IIRIRA tends to strengthen, not weaken, the petitioner's claim that the regulation is invalid. Finally, the purported policy justifications of expediting removal of aliens and administrative ease must give way to clear congressional intent.

## I.

Wissam Succar is a native and citizen of Lebanon. Succar arrived at Miami International Airport on October 21, 1998, when his flight from Lebanon to Panama stopped in the United States. He approached an official at the airport, stating that he wished to apply for asylum.

An immigration officer questioned Succar at the airport. Because Succar did not have the proper documentation for admission, he was taken into government custody and held at the Krome detention facility in Miami, Florida. An asylum pre-screening officer met with Succar on November 19, 1998, and determined that he had a credible fear of persecution based on his involvement with the Christian militias in Lebanon. The officer found that the facts as recounted by Succar could establish his eligibility for asylum and a

credible fear of harm on the basis of an imputed political opinion. Succar was placed into removal proceedings and was subsequently paroled into the United States on November 30, 1998. Succar has remained in parole status.

Over one year later, on January 19, 2000, Succar admitted the allegations in the Notice to Appear and conceded removability; he renewed his application for asylum, withholding of removal, and protection under the Convention Against Torture. On March 1, 2000, a hearing was held on his asylum application and the trial was set for April 18, 2000. On April 18, after a hearing on the merits of his application, the Immigration Judge (IJ) denied Succar's request for asylum and withholding of removal. Succar appealed this decision to the Board of Immigration Appeals (BIA).

On February 19, 2001, while his appeal was pending before the BIA and while he was paroled into the United States, Succar married a United States citizen. Succar's wife filed an immigrant visa petition for him, and the petition was approved on April 26, 2001. The approval form directed Succar to contact the local INS office to obtain Form I–485, the application for adjustment of status to a permanent resident. Believing that he met the statutory eligibility requirements for adjustment of status, on October 17, 2001, Succar filed a motion with the BIA to remand the proceedings to the IJ for consideration of his application for adjustment of status under ⚐ 8 U.S.C. § 1255(a). This motion was unopposed by the INS. [1] The BIA granted the motion on December 18, 2001 and remanded the case to the IJ for further proceedings. The remand proved to be fruitless for the INS soon took the position that under 🚩 8 C.F.R. § 245.1,[2] Succar was ineligible to apply for adjustment of status either before the IJ in the removal proceedings or, separately, before the Immigration Service's district director.

**\*12** At a July 29, 2002 hearing, Succar submitted his adjustment of status application to the IJ. In the middle of the hearing, the IJ stated that based on 🚩 8 C.F.R. § 245.1, "I am confident that I don't have the authority to adjust status to someone who's an arriving alien." The IJ denied the adjustment of status application as a matter of law, and then continued, "The Immigration Service doesn't have the authority to adjust his status unless they are willing to terminate this case with me and if that be the case, I'll happily do it but I don't have the authority to terminate...." In his oral decision of the same day, the IJ stated:

The respondent is an arriving alien and, therefore, he is not eligible to adjust status before the Immigration Judge. Additionally the respondent is not eligible to adjust status before the District Director of the Immigration Service in that he is in [removal] proceedings. As I indicated to both counsel, if the Immigration Service wished to have me terminate these proceedings or even to conditionally terminate them, I would have done so in order to afford the Immigration Service an opportunity to see whether an adjustment of status ought to be granted. However, that was not agreed to by the Immigration Service counsel.

The regulations provide under 8 C.F.R. Section 245.1(c)(8) that any arriving alien who is in removal proceedings pursuant to Section 235(b)(1) or Section 240 of the Act is ineligible to adjust status.

The IJ also reaffirmed the previous order of removal to Lebanon.

The petitioner appealed both parts of the IJ's decision to the BIA, and on September 24, 2003, the BIA affirmed the IJ's determination in full. On the adjustment of status issue, the BIA concurred with the IJ that Succar was "ineligible for adjustment of status because he is an "arriving alien."[3] Succar timely appealed the BIA's decision to this court.

## II.

We set the issues in the broader context of the requirements of immigration law.

### A. Classes of Aliens

Before 1996, non-citizens were divided into two categories: (a) applicants for admission and (b) non-citizens present in the United States who had previously made an entry into the country either with, or without, an inspection. An applicant for admission, also called an arriving alien, was an individual seeking admission who had not yet entered the country.[4] After an inspection, if an applicant was not admitted, he or she was subject to an *exclusion* proceeding to determine admissibility into the United States. The second category, non-citizens who had previously made an entry, were treated as being present in the **\*13** United States. They were subject to *deportation* proceedings to determine whether they would be deported or admitted to stay.

In 1996, Congress passed IIRIRA. *See generally* Reno v. American–Arab Anti–Discrimination Comm., 525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999); Goncalves v. Reno, 144 F.3d 110 (1st Cir.1998). Among many other changes, Congress eliminated the definition of the term "entry" and replaced it with the terms "admission" and "admitted." *See* IIRIRA, Pub.L. No. 104–208, 110 Stat. 3009–575 (1996). Admission and admitted now include only "the *lawful* entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A)(emphasis added). The main impact of this change is to re-characterize aliens who are present in the United States, but who have not been inspected and admitted. They are now considered "applicants for admission" along with other arriving aliens. The statute requires that all aliens who are seeking admission or readmission to the United States be inspected by immigration officers, prior to a determination of their status. *See* 8 U.S.C. § 1225(a)(3).

Congress also eliminated deportation and exclusion proceedings and replaced them with removal proceedings, which were applicable to all aliens who were (1) in the United States without an inspection, (2) inspected and not admitted, or (3) previously admitted but now subject to removal. *See* 8 U.S.C. §§ 1225(b)(2), 1227(a). Special removal proceedings were established for two types of individuals arriving in the United States: those who are (1) suspected of being terrorists or a security threat, 8 U.S.C. § 1225(c), or (2) stowaways, 8 U.S.C. § 1225(a)(2). Congress established expedited removal proceedings for arriving non-citizens who are charged as inadmissible due to lack of proper documents or material misrepresentations at entry. *See* 8 U.S.C. § 1225(b)(1). Expedited removal proceedings provide little opportunity for relief; however, aliens in this situation can seek asylum. *See* 8 U.S.C. § 1225(b)(1)(A). If the alien alleges a credible fear based on one of the statutory grounds, she receives an interview with an asylum pre-screening officer. If the officer finds that she has alleged facts sufficient to justify a credible fear, then the alien will be referred to an immigration judge. 8 C.F.R. § 235.3(b)(4); 8 C.F.R. § 235.6(a)(1)(ii).

The last type of proceeding is the standard removal proceeding for persons present in the United States, regardless

of whether they are applicants for admission or have been living in the United States previously. 8 U.S.C. § 1225(b)(2); 8 U.S.C. § 1229a. Congress did not restrict the type of relief available to individuals in removal proceedings under section 1229a. Significantly, the statute does not by its terms prevent this class of individuals from applying for adjustment of status.

### B. Adjustment of Status

Adjustment of status is "a technical term describing a process whereby certain aliens physically present in the United States may obtain permanent resident status ... without leaving the United States." 3B Am.Jur.2d *Aliens & Citizens* § 2134. Before 1960, adjustment of status in the United States was only available to non-citizens legally in the country. *See* Immigration and Nationality Act, Pub.L. No. 414, 66 Stat. 217 (1952)(INA). Any immigrant present in the United States who was eligible for adjustment of status, but who was no longer in valid immigration status, had to obtain an immigrant visa at a United States post abroad in order to obtain permanent resident status. *See* **\*14** S.Rep. No. 86–1651 (1960), *reprinted in* 1960 U.S.C.C.A.N. 3124, 3136. To process the immigrant visa at the consular post abroad, an immigrant residing in the United States had to apply to the INS for preexamination and voluntary departure in order to insure that he would be able to be readmitted into the country once he obtained the immigrant visa. *See id.*

In 1960, Congress established the current procedure for adjustment of status to obviate the need for departure and reentry for aliens temporarily in the United States. Congress explicitly expanded the group of individuals eligible for adjustment of status to include all aliens who have been "inspected and admitted or paroled." *See* Joint Resolution of July 14, 1960, Pub.L. No. 86–648, 74 Stat. 505 (codified as amended at 8 U.S.C. § 1255(a)) ("The status of an alien ... who was *inspected and admitted or paroled* into the United States may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence ....") (emphasis added).

"Admitted aliens" means individuals who have presented themselves for inspection by an immigration officer and who have been allowed to enter the country. *See* 8 U.S.C. § 1101(a)(13)(A). "Paroled aliens" are otherwise inadmissible aliens who are given permission by the Attorney General to enter temporarily. 8 U.S.C. § 1182(d)(5)(A). The statute governing parole states:

> The Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States.... [5]

8 U.S.C. § 1182(d)(5)(A).

In addition to being "inspected and admitted or paroled," aliens must be eligible to receive an immigrant visa and this visa must be immediately available to them. 8 U.S.C. § 1255(a). Aliens seeking an immigrant visa must first receive approval of an immigrant petition, which is usually filed by an employer or a relative. The alien must then wait for and receive an immigrant visa number, which means that a visa has been assigned. [6] Dep't of Homeland **\*15** Sec., Citizenship & Immigration Servs., *How do I get an Immigrant Visa Number, at* http://uscis.gov/graphics/howdoi/immvisa.htm (last modified October 31, 2003).

### C. Parole

The purpose of parole is to permit a non-citizen to enter the United States temporarily while investigation of eligibility for admission takes place. [7] Congress has ordered certain aliens removed; they are not eligible for parole. 8 U.S.C. § 1225(c)(1). Congress has set forth the conditions for parole in the statute. *See* 8 U.S.C. § 1182(d)(5)(A). Congress authorizes the Attorney General to allow parole "temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Accordingly, the Attorney General has promulgated regulations. 8

C.F.R. § 212.5. Under the regulations, aliens in one of five groups can be paroled for urgent humanitarian reasons or significant public benefit "provided the aliens present neither a security risk nor a risk of absconding." 8 C.F.R. § 212.5(b). These five groups are: (1) aliens with a serious medical condition, (2) women who have been medically certified as pregnant, (3) aliens who are defined as juveniles in certain circumstances, (4) aliens who will be witnesses in judicial proceedings, and (5) aliens whose continued detention is not in the public interest as determined by the officials charged with exercising this discretion. 8 C.F.R. § 212.5(b)(1)-(5). In making their decisions, immigration officers can consider whether the alien has "[c]ommunity ties" such as close relatives with known addresses. 8 C.F.R. § 212.5(d)(2). Arriving aliens who claim asylum and establish a credible fear with an asylum pre-screening officer can be paroled at the point of entry while they pursue their asylum application. [8]

A paroled individual is not considered "admitted" into the United States: he is an "applicant for admission." 8 U.S.C. § 1101(13)(B). He is not detained and is allowed to temporarily enter the United **16** States. However, "when the purposes of such parole ... have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). It appears from the face of the statute that the Attorney General has no discretion in this determination. As soon as the reasons for parole have been served, the individual must be returned to custody.

By statute, paroled individuals [9] are eligible for adjustment of status if they meet the other statutory eligibility requirements. 8 U.S.C. § 1255(a). Section 1255 makes no distinction between those who are in removal proceedings and those who are not for purposes of adjustment of status.

Since the 1960 enactment of section 1255(a), Congress has on several occasions amended other provisions of 8 U.S.C. § 1255 to restrict the class of people who are eligible to receive adjustment of status. For example, alien crewmen, aliens continuing or accepting unauthorized employment, and aliens admitted in transit without a visa are not eligible to adjust status under section 1255(a), unless they fall into limited exceptions to the bar on eligibility. 8 U.S.C. § 1255(c). Congress also limited the ability of an alien to adjust status if the alien is married in the United States while in judicial proceedings. 8 U.S.C. § 1255(e)(1). [10] Significantly, Congress has never taken parolees, as a group, out of the class of eligible aliens, despite over a dozen opportunities—where section 1255 was otherwise amended—to do so.

Parolees, although they are physically present in the United States, are treated as if they were at the border seeking admission. Before the 1996 IIRIRA statutory changes, parolees were subject to exclusion proceedings. Post–IIRIRA, individuals who are paroled and are seeking asylum are subject to removal proceedings. As arriving aliens, parolees are subject to removal proceedings. "[I]f the examining officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a [removal] proceeding...." 8 U.S.C. § 1225(b)(2)(A). Parolees are generally not "clearly and beyond a doubt" entitled to admission. However, as parolees, they are not in detention. Until the final order of removal, which in some circumstances—such as where the applicant is applying for asylum—can take years, paroled aliens in removal proceedings, such as Succar, live, work and form relationships within the United States.

### D. Parolees and Adjustment of Status

Before the promulgation of 8 C.F.R. § 245.1(c)(8), paroled aliens in exclusion proceedings had an independent avenue to apply for adjustment of status. [11] In re **17** Castro–Padron, 21 I. & N. Dec. 379, 379–80, 1996 WL 379828 (BIA 1996). The BIA held that in exclusion proceedings, jurisdiction over an alien's application for adjustment of status lay with the district director of the immigration agency, not the IJ. Id. at 379. The Board explained, "[A]pplicants [in exclusion proceedings] can file their adjustment application with the district director of the [INS], who has sole jurisdiction over the application and can act on the application independently of these [exclusion] proceedings." Id. at 380.

Historically, the district director had jurisdiction over the adjustment application of both aliens in deportation proceedings who were admitted and aliens in exclusion proceedings who were paroled. [12] *In re Manneh,* 16 I. & N. Dec. 272, 274, 1977 WL 39268 (BIA 1977). In 1961, regulations gave the IJ the authority in deportation cases to renew admitted aliens' adjustment applications that were denied by the district director and to adjudicate initial applications for such aliens in deportation proceedings. *Id.* With this change, the district director no longer had authority over adjustment applications once deportation proceedings began. *Id.* However, the Board determined that this enlarged jurisdiction did not apply when the alien was in exclusion proceedings: the district director retained sole authority for adjustment of status applications. *Id.*

In 1997, the Attorney General [13] promulgated new regulations, which were said to implement IIRIRA. The regulations created a new definition for the term arriving alien:

> The term arriving alien means an applicant for admission coming or attempting to come into the United States at a port of entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. An arriving alien remains such even if paroled pursuant to section 212(d)(5) of the Act....
>
> 8 C.F.R. § 1.1(q).

Armed with this new definition of arriving alien, the Attorney General made a substantive change to the adjustment of status regulations. The Attorney General made several categories of aliens ineligible to apply for adjustment of status under 8 U.S.C. § 1255(a), including "*[a]ny arriving alien who is in removal proceedings* pursuant to section 235(b)(1) or section 240 of the Act." 8 C.F.R. § 245.1(c)(8) (emphasis added). It is this particular provision of **\*18** the regulation that is challenged before this court.

The Attorney General also enacted regulations regarding the proper place for an eligible individual to file for adjustment of status. A key regulation states:

> An alien [who believes he or she is eligible for adjustment of status] shall apply to the director having jurisdiction over his or her place of residence.... After an alien, *other than an arriving alien,* is in deportation or removal proceedings, his or her application for adjustment of status ... shall be made and considered only in those proceedings.... An arriving alien, *other than an alien in removal proceedings,* who believes he or she meets the eligibility requirements ..., shall apply to the director having jurisdiction over his or her place of arrival.

8 C.F.R. § 245.2(a)(1) (emphasis added). A parolee in removal proceedings thus no longer has the ability to apply before anyone, either the district director or the IJ, for adjustment of status. By contrast, a parolee who is not in removal proceedings (as an arriving alien) can, consistent with earlier practice, apply to the district director for adjustment of status. We are informed that most arriving alien parolees are placed in removal proceedings. The new regulatory scheme is, thus, a break from earlier practice.

In promulgating 8 C.F.R. § 245.1(c)(8) in 1997, the Attorney General explained the rationale for the new regulation:

> Consistent with Congress' intent that arriving aliens ... be removed in an expedited manner through the procedures provided ..., the Attorney General has determined that she will not favorably exercise her discretion to adjust the status of arriving aliens who are ordered removed....

62 Fed.Reg. 444, 452 (January 3, 1997). In an effort to quickly remove aliens, the regulation aimed to eliminate avenues available to arriving aliens in removal proceedings that allow

such aliens to "delay their removal through an application for adjustment of status." *Id.* The Attorney General explained that an arriving alien will not be able to adjust status within the United States. If an arriving alien is eligible for an immigrant visa, she will be "required to return to ... her country of residence and request it through the consular process available to all aliens outside of the United States." *Id.* The Attorney General believed that if "the Service decides as a matter of prosecutorial discretion, not to initiate removal proceedings but to parole the arriving alien, the alien will be able to apply for adjustment of status before the district director." *Id.*

Under the new regulations, arriving aliens in removal proceedings (regardless of whether they otherwise meet the statutory criteria for adjustment of status) must leave the United States and go through consular processing in order to adjust status; the respondent has represented that this is the only option available to them. But there are significant limitations even as to this avenue. Non-citizens are subject to 8 U.S.C. § 1182(a)(9)(B)(i), which bars non-citizens from reentry into the United States for three years if they were unlawfully present in the United States for more than 180 days but less than one year and for ten years if they were unlawfully present for more than one year. [14] Any waiver of this statutory bar is in the absolute discretion of the Attorney General. 8 U.S.C. § 1182(a)(9)(B)(v). Also, non-citizens who have not been admitted into the **\*19** United States are ineligible for voluntary departure. 8 U.S.C. § 1229c(a)(4). Following any involuntary removal, they will be ineligible for readmission for five years unless the Attorney General grants a waiver. 8 U.S.C. § 1182(a)(9)(A)(i), (iii). Parolees have, by definition, not been admitted, and thus will generally be subject to this five year bar for involuntary removal as well. Denying paroled aliens in removal proceedings the ability to adjust status within the United States thus creates a significant hardship on these individuals and their families.

Of course, as the Attorney General has stated, the immigration agency in theory can decide to terminate the removal proceedings in the alien's favor, which would allow the arriving alien—who would then not be in removal proceedings—to apply for adjustment of status before the district director. The government as prosecutor in the removal proceedings may, in its discretion, terminate the proceedings in order to permit the alien to apply for adjustment of status. But as this case demonstrates, the BIA has apparently taken the position that neither it nor the IJ may suspend or terminate the proceedings for this purpose without the government's consent.

## III.

*Availability of Judicial Review of Statutory Interpretation Claim*

**[1]** The Attorney General first argues that 8 U.S.C. § 1252(a)(2)(B) precludes judicial review of the Attorney General's denial of Succar's application for adjustment of status because the Attorney General, through the promulgation of 8 C.F.R. § 245.1(c)(8), made a discretionary determination that arriving aliens do not merit adjustment of status under 8 U.S.C. § 1255. We disagree and exercise review.

Section 1252 provides for judicial review of orders of removal, and sets forth limitations on this review. The Attorney General relies on § 1252(a)(2)(B), which reads in part as follows:

(B) Denials of discretionary relief

Notwithstanding any other provision of law, no court shall have jurisdiction to review—

(i) any judgment regarding the granting of relief under section ... 1255 of this title

8 U.S.C § 1252(a)(2)(B)(i). Both the Supreme Court and this court have consistently rejected arguments that Congress has eliminated judicial review of the legal question of interpretation of the statute as to whether an alien is eligible for consideration of relief. [15]

Succar challenges the Attorney General's regulation as being contrary to the statute; that is a classic issue for the court to decide. The issue presented is a purely legal question and as such is not within the jurisdictional bar of 8 U.S.C. § 1252(a)(2)(B). That is the ruling of *Zadvydas v. Davis,* 533 U.S. 678, 688, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), which exercised judicial review over a challenge to the extent of the Attorney General's authority to detain an alien indefinitely under the post-removal-period detention statute because the

authority of the Attorney General to act is "not a matter of **\*20** discretion" and is subject to judicial review. So here the challenge goes to the Attorney General's statutory authority and not his discretion. *See* *Subhan v. Ashcroft,* 383 F.3d 591, 594 (7th Cir.2004) (interpreting 8 U.S.C. § 1252(a)(2)(B) as preserving jurisdiction when the decision is not "a judgment denying a request for adjustment of status" under 8 U.S.C. § 1255); *see also* *Montero–Martinez v. Ashcroft,* 277 F.3d 1137, 1141 (9th Cir.2002) (Section 1252(a)(2)(B)(i) does not preclude review of "purely legal and hence non-discretionary" questions.); *Prado v. Reno,* 198 F.3d 286, 288 (1st Cir.1999) (Whether a court can exercise review depends on the grounds upon which the decision of the BIA rests and "the precise nature of the claims made in the petition.").

Quite literally, the Attorney General did not, under 8 U.S.C. § 1252(a)(2)(B)(i), make "a judgment regarding the granting of relief under section 1255," because the effect of the regulation is to preclude an alien from even applying for relief under section 1255. *See* *Subhan,* 383 F.3d at 594 (exercising jurisdiction over the IJ's decision even though the effect of the decision is the same as that of a denial of an adjustment of status application; the court has jurisdiction because "the purpose behind [8 U.S.C. § 1252(a)(2)(B)(i) ] is presumably to shield from judicial review judgments regarding the propriety of adjusting an alien's status, and no such judgment has ever been made with regard to the [petitioner]").

This court has jurisdiction to review Succar's claim under 28 U.S.C. § 1331, which grants courts general federal question jurisdiction, *Reno v. Catholic Soc. Servs., Inc.,* 509 U.S. 43, 56, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993), and the Administrative Procedure Act (APA), which gives a court power to " 'hold unlawful and set aside' not only agency action that is 'arbitrary' or 'capricious,' but also agency action that is 'otherwise not in accordance with law' or is 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.' " *Cousins v. Sec'y of the United States Dep't of Transp.,* 880 F.2d 603, 608 (1st Cir.1989) (quoting 5 U.S.C. § 706(2)(A, C)). "It is 'central to the real meaning of "the rule of law," [and] not particularly controversial' that a federal agency does not have the power to act unless Congress, by statute, has empowered it to do so." *Transohio Sav. Bank v. Dir., Office of Thrift Supervision,* 967 F.2d 598, 621 (D.C.Cir.1992) (quoting Edward L. Rubin, *Law and Legislation in the Administrative State,* 89 Colum. L.Rev. 369, 402 (1989)) (alteration in *Transohio* ). When an agency action is contrary to the scope of a statutory delegation of authority or is an arbitrary and capricious exercise of that authority, that action must be invalidated by reviewing courts.

## IV.

*A. Merits: Validity of Regulation Vis–à–Vis the Statute*

**[2]**    The question presented is whether the regulation, 8 C.F.R. § 245.1(c)(8), is invalid as clearly contrary to 8 U.S.C. § 1255(a) or as an arbitrary or capricious exercise of the Attorney General's delegated authority. The regulation affects certain arriving aliens who have been granted parole into the United States and have also been placed in removal proceedings. As explained above, before adoption of 8 C.F.R. § 245.1(c)(8) in 1997, this category of aliens, if they met the other statutory requirements, could apply for adjustment of status with the local district director. The effect of 8 C.F.R. § 245.1(c)(8) is to deny eligibility for relief under 8 U.S.C. § 1255 to this category of aliens by precluding consideration of their applications **\*21** either before the district director or before an IJ.

Succar and supporting amici [16] launch a three-fold attack on the regulation. First, they argue the regulation is flatly inconsistent with congressional intent as expressed in 8 U.S.C. § 1255(a) and the legislative history. Alternatively, they argue there are two possible interpretations of the regulation which must be adopted to avoid a conflict between the regulation and the statute. Finally, they argue that the Attorney General has acted ultra vires. Succar argues that 8 U.S.C. § 1255(a) expressly mentions persons in parole status (without restricting that status to those not in removal proceedings) as among those eligible to apply for adjustment of status, and therefore Congress intends for any decision made within the Attorney General's admitted discretion to be made on an individualized basis after an eligible alien applies, not as a categorical eligibility exclusion. [17]

The Attorney General defends the regulation, arguing that 8 U.S.C. § 1255(a) expressly states that the decision to grant adjustment of status is subject to the Attorney General's discretion and that the regulation is no more than a valid exercise of that discretion. The Attorney General points out that the regulation does not make all of those in parole status ineligible to apply for adjustment of status, only those who have been placed in removal proceedings. However, it was represented in the briefs before this court that the "majority of the intended beneficiaries of parolee adjustment of status are in removal proceedings." The Attorney General does not dispute this statement.

Paroled individuals must be placed in removal proceedings "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A). The Attorney General argues that the challenged regulation does not effectuate a final exclusion from eligibility because even though these individuals cannot apply while they are physically in the United States, the alien can leave the United States and then apply for an immigrant visa at the embassy or consular office in his home country.

The petitioner responds that the result of such a requirement, contrary to congressional intent, is that many aliens would be barred from even applying from outside the country for long periods of time because of the statutory bars discussed above. 8 U.S.C. § 1182(a)(9). [18] As **22 we shall see, in enacting section 1255(a) in 1960, Congress expressed an intent that eligible aliens be able to adjust status without having to leave the United States, to relieve the burden on the United States citizen with whom the aliens had the requisite family or other relationship, on the United States consulates abroad, and on the alien. That was one of the primary purposes of the legislation.

The Attorney General also argues that the passage of IIRIRA, Pub.L. No. 104–208, 110 Stat. 3009 (1996), altered the immigration laws in many restrictive ways. Petitioner counters that IIRIRA did indeed tighten restrictions, but points out that application for adjustment of status by parolees was one of the few areas untouched. This, the petitioner says, reflected Congress's consistent understanding that the immigration agency would consider applications for adjustment of status from parolees, whether in removal proceedings or not.

**B. Standard of Review**

Two points are undisputed: Congress has granted the Attorney General some degree of discretion to adjust the status of statutorily specified aliens in 8 U.S.C. § 1255 and Congress has granted the Attorney General authority to promulgate regulations which guide the exercise of this discretion. 8 U.S.C. § 1103(g)(2). When there is no challenge to whether Congress authorized the Attorney General to issue regulations, we are faced with only two questions.

[3] We first ask whether "Congress has directly spoken to the precise question at issue." *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If so, courts, as well as the agency, "must give effect to the unambiguously expressed intent of Congress." *Id. at 842–43.* As the Supreme Court has said in the immigration context:

> The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

*INS v. Cardoza–Fonseca,* 480 U.S. at 447–48, 107 S.Ct. 1207 (quoting *Chevron USA Inc.,* 467 U.S. at 843 n. 9, 104 S.Ct. 2778) (internal quotation marks omitted). "*Chevron* [ ] deference to [an agency's] statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent." *Gen. Dynamics Land Sys., Inc. v. Cline,* 540 U.S. 581, 124 S.Ct. 1236, 1248, 157 L.Ed.2d 1094 (2004).

In determining whether a statute exhibits *Chevron*-type ambiguity, and hence warrants deference to the Attorney General's interpretation, courts look at both the most natural reading of the language and the consistency

of the "interpretive clues" Congress provided. *Gen. Dynamics Land Sys., Inc.,* 124 S.Ct. at 1240, 1248. In determining the meaning of a statute, our analysis begins with the language of the statute. See *Leocal v. Ashcroft,* 543 U.S. 1, 125 S.Ct. 377, 382, 160 L.Ed.2d 271 (2004) (reversing INS interpretation of term "crime of violence" in 8 U.S.C. § 1227(a)(2)(A)(iii) and **\*23** 8 U.S.C. § 1101(a)(43)(f)). "[W]e construe language in its context and in light of the terms surrounding it." *Id.* Another "regular interpretive method" is reference to statutory history to see if any "serious question ... even about purely textual ambiguity" is left. *Gen. Dynamics Land Sys., Inc.,* 124 S.Ct. at 1248.

However, whenever Congress has left a gap for the agency to fill, then we reach the second question, for the agency's regulation is "given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Chevron USA, Inc.,* 467 U.S. at 843–44, 104 S.Ct. 2778; *see* *Household Credit Servs., Inc. v. Pfennig,* 541 U.S. 232, 124 S.Ct. 1741, 1746–47, 158 L.Ed.2d 450 (2004).

If the statutory terms are ambiguous, then the principle of *Chevron* deference to the Attorney General's choice must apply. *Cardoza–Fonseca,* 480 U.S. at 448, 107 S.Ct. 1207. Indeed, the Supreme Court has said that "judicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.' " *INS v. Aguirre–Aguirre,* 526 U.S. 415, 425, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) (quoting *INS v. Abudu,* 485 U.S. 94, 110, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988)). [19] That said, the court has not hesitated to reject an INS interpretation as contrary to congressional intent. *See, e.g., Leocal,* 125 S.Ct. at 382; *Cardoza–Fonseca,* 480 U.S. at 448–49, 107 S.Ct. 1207.

*C. Statutory Ambiguity*

Each party initially argues that the statute is unambiguous, in its favor. The Attorney General argues that the statute unambiguously grants him discretion to allow or deny adjustment of status to an alien. One way to exercise that discretion, the Attorney General argues, is to make certain categories of otherwise eligible aliens ineligible to apply and so ineligible to warrant the favorable exercise of the Attorney

General's discretion. In the Attorney General's view, this is the end of the matter.

We agree that the statute gives the Attorney General discretion, but disagree that this ends the analysis as to whether the Attorney General can promulgate this particular categorical eligibility exclusion. The Supreme Court itself has ruled that the two questions of discretion as to the ultimate relief and discretion as to eligibility exclusions are distinct. *See Cardoza–Fonseca,* 480 U.S. at 443–44, 107 S.Ct. 1207 (distinguishing between the discretion in the Attorney General as to the ultimate decision to grant relief and the underlying process and criteria for eligibility for relief); *see also Goncalves,* 144 F.3d at 125 ("Analytically, the decision whether an alien is eligible to be considered for a particular discretionary form of relief is a statutory question separate from the discretionary **\*24** component of the administrative decision whether to grant relief.").

The statute, we find, is unambiguous on this issue and that congressional clarity works against the Attorney General. We reject the respondent's argument that Congress authorized 8 C.F.R. § 245.1(c)(8), making parolees in removal proceedings ineligible to adjust status, either by "express delegation or the introduction of an interpretive gap." *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 696, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991). Congress has spoken clearly on the issue of eligibility for adjustment of status and has reserved for itself the determination of whether a non-citizen should be able to apply for this relief. The Attorney General cannot promulgate a regulation that categorically excludes from application for adjustment of status a category of otherwise eligible aliens; this is contrary to congressional intent in section 1255.

*1. Text of the Statute*

We look first to 8 U.S.C. § 1255 itself, which provides:

§ 1255. Adjustment of status of nonimmigrant to that of person admitted for permanent residence

(a) Status as person admitted for permanent residence on application and eligibility for immigrant visa

The status of an alien who was *inspected and admitted or paroled* into the United States or the status of any other

alien having an approved petition for classification ... may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

8 U.S.C. § 1255(a) (emphasis added). Congress defined certain categories of aliens who were eligible to apply for adjustment of status, 8 U.S.C. § 1255(a), and refined the definition by specifically excluding certain aliens from eligibility, 8 U.S.C. §§ 1255(c), (e). By statute, two categories of aliens are eligible to apply. First is an alien who was inspected and admitted. Second is an alien who was paroled. 8 U.S.C. § 1255(a). The Attorney General's regulation carves out an exception from this second category of eligible aliens, by making paroled aliens who are placed in removal proceedings ineligible for adjustment of status relief, even if they otherwise meet the statutory requirements. 8 C.F.R. § 245.1(c)(8).

Congress unambiguously reserved to itself the determination of who is eligible to apply for adjustment of status relief. 8 C.F.R. § 245.1(c)(8) conflicts with the statute in several ways.

First, Congress itself explicitly determined categories of aliens (those aliens who had been "inspected and admitted or paroled") who are eligible for adjustment of status if they otherwise meet the statutory requirements. 8 U.S.C. § 1255(a). Despite numerous amendments to 8 U.S.C. § 1255 since 1960, Congress has not limited the eligibility of paroled aliens under section 1255(a). [20] The statute has never **25** stated that an alien is ineligible to adjust status if he is in removal proceedings.

Second, when Congress desired to limit the ability of a non-citizen who might otherwise have been eligible to apply for adjustment of status under 1255(a), it has done so explicitly by defining several categories of aliens as not eligible to apply. For example, alien crewmen, aliens continuing or accepting unauthorized employment, and aliens admitted in transit without a visa are not eligible to adjust status under section

1255(a) unless they fall into limited exceptions. 8 U.S.C. § 1255(c) ("[S]ubsection (a) [of 8 U.S.C. § 1255] *shall not be applicable to* ....")(emphasis added). Another category of aliens that Congress has explicitly determined is ineligible to apply for relief under section 1255(a) is the alien who is seeking to obtain an immigrant visa based on a marriage entered into while judicial proceedings are pending regarding the alien's right to be admitted or remain in the United States. 8 U.S.C. § 1255(e). [21] The statute is clear that even if these individuals were "inspected and admitted or paroled" and complied with the other statutory requirements, they are not eligible to apply.

There are two themes. First, Congress explicitly rendered ineligible a certain category of aliens to apply. Second, that category of excluded aliens included *some* in removal proceedings, but Congress chose not to disqualify from eligibility all of those aliens "inspected and admitted or paroled" in removal or other judicial proceedings. In those limited circumstances when the involvement in proceedings works to hamper an individual's ability to adjust status, Congress has explicitly said so.

Third, Congress also has determined that some aliens whom it has deemed ineligible under 8 U.S.C. § 1255(c) might in some limited circumstances still be eligible for adjustment of status relief. For example, in 8 U.S.C. § 1255(i), Congress allows adjustment of status for certain aliens who entered the United States without inspection or who are categorized in section 1255(c) of the statute as being ineligible. Congress states that if these aliens are beneficiaries of either "(i) a petition for classification under [8 U.S.C. § ] 1154 ... that was filed with the Attorney General on or before April 30, 2001; or (ii) an application for a labor certification under [8 U.S.C. § ] 1182(a)(5)(A) ... that was filed ... on or before such date," then they "may apply to the Attorney General for adjustment of ... status to that of an alien lawfully admitted for permanent residence." *See* 8 U.S.C. § 1255(i). [22] When **26** Congress has wanted to impose special restrictions on the applications for certain categories of aliens that it has deemed eligible, or conversely to open up eligibility for aliens that were ineligible, it has done so explicitly. But Congress has imposed no restrictions on applying for adjustment of status for a paroled alien based on that alien's being in removal proceedings.

*2. Context of the Statutory Scheme*

The terms and provisions of 🔖 8 U.S.C. § 1255(a) must be understood in the larger context of the statutory scheme. The immigration laws about adjustment of status are not a haphazard compilation of provisions; they are a calibrated set of rules that govern an area of national importance. Congress in many instances has specifically determined when to give discretion to the Attorney General and when to make its own policy choices. Viewing the statutory scheme in this manner clarifies two things: first, that the exclusion of parolees in removal proceedings renders ineligible most of the class that Congress rendered eligible by including parolees (for Congress clearly stated that most parolees would be in removal proceedings), and second, that the congressional choice to delegate to the Attorney General some circumscribed discretion over the ultimate decision of who is granted adjustment of status [23] is not authorization for discretion in other areas.

We explain: one policy choice Congress made was to allow (in some instances) aliens who were otherwise inadmissible on arrival the opportunity to seek adjustment of status relief if they met certain statutory criteria. *See* 🔖 8 U.S.C. § 1255. In 🔖 8 U.S.C. § 1182, Congress defines the classes of aliens who are ineligible for visas or admission to the United States and makes various exceptions from these blanket rules. *See* 🔖 8 U.S.C. § 1182(a). Congress also allows for parole of these inadmissible aliens for "urgent humanitarian reasons" or "significant public benefit." 🔖 8 U.S.C. § 1182(d)(5)(A). Congress specifically says parolees are not considered admitted. *Id.* Despite their status as inadmissible, Congress has also made the policy determination that these paroled aliens should be eligible to apply for adjustment of status, which essentially can act as an admission. 🔖 8 U.S.C. § 1255(a).

🔖 Section 1182 is integral to determinations made in "inspection," which is provided for in 🚩 8 U.S.C. § 1225. All arriving aliens and aliens who are present in the United States without an inspection are **\*27** "applicants for admission," 🚩 8 U.S.C. § 1225(a)(1), and they "*shall* be inspected." 🚩 8 U.S.C. § 1225(a)(3) (emphasis added). 🔖 Section 1225(b) provides for the inspection of aliens arriving in the United

States and certain other aliens who have not been admitted or paroled. *See* 🚩 8 U.S.C. § 1225(b). If aliens being inspected are not "clearly and beyond a doubt" admissible, under 🔖 section 1182, then they must be referred to removal proceedings. *See* 🚩 8 U.S.C. § 1225(b)(2)(A).

This context shows that Congress purposefully classified paroled individuals as "inadmissible," and it also determined that they should generally be placed in removal proceedings. But Congress also explicitly allowed paroled individuals to adjust status if they meet the other statutory requirements.

Further, the larger statutory scheme makes clear that in the context of adjustment of status, Congress is particular about where it grants "discretion" to the Attorney General. Congress has specified the conditions under which an arriving alien (including a paroled alien) is to be determined inadmissible and *must* be placed in removal proceedings. The determination as to placing an alien into removal is not a decision committed to agency discretion by Congress. Rather, Congress has defined the terms for initiating removal proceedings against arriving aliens in 🚩 8 U.S.C. § 1225(b)(2)(A), which provides that,

> [I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the *alien shall be detained for a [removal proceeding].*

🚩 8 U.S.C. § 1225(b)(2)(A). Congress used the word "shall" to mandate that an immigration officer who cannot determine that the applicant for admission is clearly entitled to be admitted has no choice but to place the alien in removal proceedings. After the alien is placed in removal, the Attorney General may parole the alien into the United States in some instances, [24] but the alien still must go through removal proceedings. [25]

The incorrectness of the Attorney General's argument can be seen by looking at one of its logical implications. The

Attorney General is also given discretion as to the ultimate decision in determining whether to grant asylum to aliens who are eligible for this relief. 8 U.S.C. § 1158(a); *28 *Cardoza–Fonseca,* 480 U.S. at 443–44, 107 S.Ct. 1207. [26] If this grant of discretion meant what the government argues here, it would be logical that the Attorney General could similarly decline to allow asylum by issuing a regulation that refused to process applications from categories of asylum applicants.

But that is not so. If the asylum applicant meets the eligibility requirements—if, in other words, the Attorney General determines that an applicant for asylum establishes she has "a well founded fear of persecution" on account of one of the statutory grounds—the alien must be allowed to apply. The Attorney General may only exercise his discretion in granting the asylum. [27] 8 U.S.C. § 1158(b); 8 U.S.C. § 1101(a)(42)(A). Similarly, if the paroled adjustment of status applicant meets the eligibility requirements, the Attorney General may exercise his discretion only in the decision whether to grant permanent resident status. In both asylum and adjustment of status, an alien who satisfies the eligibility requirements to apply "does not have a right to the [relief]," but he is "eligible" to apply for it. *Cardoza–Fonseca,* 480 U.S. at 443–44, 107 S.Ct. 1207 (emphasis removed).

Although the regulation, 8 C.F.R. § 245.1(c)(8), denying adjustment of status to parolees in removal proceedings is itself framed in terms of who is eligible to apply, the Attorney General argues the regulation is simply a determination at the outset that of the eligible parolees, the Attorney General will not exercise its discretion favorably to those who are in removal proceedings. The Attorney General relies on *Lopez v. Davis,* 531 U.S. 230, 121 S.Ct. 714, 148 L.Ed.2d 635 (2001), for the proposition that categorically excluding otherwise eligible individuals is an appropriate use of his discretion as to the ultimate decision granted in 8 U.S.C. § 1255(a).

*Lopez* is distinguishable. In *Lopez,* the Supreme Court upheld a regulation of the Bureau of Prisons (BOP), 28 C.F.R. § 550.58(a)(1)(vi)(B), which categorically denied early release to prisoners whose current offense was a drug felony involving the carrying, possession, or use of a firearm. *See Lopez,* 531 U.S. at 233, 121 S.Ct. 714. The relevant statute states, "The period a prisoner convicted of a nonviolent offense remains in custody after successfully completing a treatment program may be reduced by the [BOP], but such reduction may not be more than one year from *29 the term the prisoner must otherwise serve." 18 U.S.C. § 3621(e)(2)(B). The Supreme Court framed the question as whether "the Bureau has discretion to delineate, as an additional category of ineligible inmates, those whose current offense is a felony involving a firearm." *Lopez,* 531 U.S. at 238, 121 S.Ct. 714. The Court answered this question in the affirmative, agreeing with the BOP that "Congress simply did not address how the Bureau should exercise its discretion within the class of inmates who satisfy the statutory prerequisites for early release." *Id.* at 239–40, 121 S.Ct. 714 (internal quotation marks omitted). The Court noted:

> Beyond instructing that the Bureau has discretion to reduce the period of imprisonment for a nonviolent offender who successfully completes drug treatment, *Congress has not identified any further circumstance in which the Bureau either must grant the reduction, or is forbidden to do so.* In this familiar situation, where Congress has enacted a law that does not answer "the precise question at issue," all we must decide is whether the Bureau, the agency empowered to administer the early release program, has filled the statutory gap "in a way that is reasonable in light of the legislature's revealed design."

*Id.* at 242, 121 S.Ct. 714 (emphasis added)(quoting *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 257, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995)). In the face of congressional silence, the Court held that it was not unreasonable for the BOP to exercise its discretion and exclude a class of prisoners as ineligible for early release. *Id.* at 242–43, 121 S.Ct. 714.

By contrast, Congress has not been silent here. There are differences in the two statutes. In the adjustment of status statute here, Congress made numerous and explicit policy choices about who is eligible for adjustment of status relief, who is ineligible, and of those ineligible, who is nonetheless eligible with certain application restrictions. *See* 8 U.S.C. § 1255(a) (setting out basic eligibility requirements for adjustment of status); 8 U.S.C. §§ 1255(c), (e) (limiting the eligibility of otherwise eligible aliens); 8 U.S.C. § 1255(i) (allowing eligibility to otherwise ineligible aliens). The statutory immigration scheme also constrains

the Attorney General's discretion in several ways, including mandating when an arriving alien must be placed in removal proceedings, 🚩 8 U.S.C. § 1225(b)(2)(A), limiting the discretion of the Attorney General to parole aliens, 🚩 8 U.S.C. § 1182(d)(5), and denying the Attorney General the ultimate discretion to adjust the status of some otherwise eligible aliens, 🚩 8 U.S.C. § 1255(f). *Lopez* is a *Chevron* step two case because of congressional silence; our case, however, is a *Chevron* step one case because Congress has clearly spoken on the issue of eligibility. We find the Attorney General's regulation to be inconsistent with that congressional determination. *See* 🚩 *Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 91, 122 S.Ct. 1155, 152 L.Ed.2d 167 (2002). [28]

**\*30** From the language and structure of the statute alone, we find the regulation to be inconsistent with the expressed intent of Congress. [29] Still, we do not lightly overturn regulations.

*D. Legislative History*

Questions have been raised about the appropriateness of use of legislative history at stage one of the *Chevron* analysis.

*See, e.g.,* 🚩 *Coke v. Long Island Care at Home, Ltd.,* 376 F.3d 118, 127 (2d Cir.2004). In fact, the Supreme Court has often referred to legislative history at stage one, most recently in 🚩 *Gen. Dynamics Land Sys., Inc. v. Cline,* 540 U.S. 581, 124 S.Ct. 1236, 1243, 157 L.Ed.2d 1094 (2004), and in a series of earlier cases. *See* 🚩 *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (using "later [congressional] Acts" which spoke "more specifically to the topic at hand" to determine whether the statute evidenced a clear congressional intent in *Chevron* step one); 🚩 *MCI Telecomms. v. AT & T,* 512 U.S. 218, 232–33, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994) (examining legislative histories of later enactments and finding them inconclusive); *Pauley,* 501 U.S. at 697–99, 111 S.Ct. 2524 (examining the text of statute and legislative history to determine that Congress intended to delegate to the agency broad policymaking discretion); 🚩 *Pension Benefit Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 648–50, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (using legislative history in *Chevron* step one as another "traditional tool[ ] of statutory construction" to conclude that the statute did not "evince a clear congressional intent"); 🚩 *Bowen v. Georgetown Univ.*

*Hosp.,* 488 U.S. 204, 214, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (using legislative history as a check where statutory text is clear that the Secretary had no authority); 🚩 *Japan Whaling Ass'n v. Am. Cetacean Soc'y,* 478 U.S. 221, 233–41, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) (examining legislative history and determining that Congress has not directly spoken to the issue). [30]

**\*31** Our view is that where traditional doctrines of statutory interpretation have permitted use of legislative history, its use is permissible and even may be required at stage one of *Chevron.* This appears to be the functional approach of some other circuits as well. *See* 🚩 *Coke,* 376 F.3d at 127 (using legislative history at step one "without attaching primacy" to it); *Am. Rivers v. F.E.R.C.,* 201 F.3d 1186, 1196 & n. 16 (9th Cir.2000) (adhering to the practice of considering legislative history in *Chevron* step one).

Our approach encompasses the traditional rule that where the plain text of the statute is unmistakably clear on its face, there is no need to discuss legislative history. *See* 🚩 *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 481, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). *Sutton,* however, does not go on to say that resort to legislative history is impermissible where used as a check on the understanding of the statute as viewed in light of its text and the statutory scheme as a whole. Even the dissent in *General Dynamics* admits that legislative history may confirm when the plain text reading is correct. 🚩 *Gen. Dynamics Land Sys., Inc.,* 124 S.Ct. at 1252 (Thomas, J., dissenting) ("Although the statute is clear, and hence there is no need to delve into the legislative history, this history merely confirms that the plain reading of the text is correct."). Indeed, Justice Thomas's dissent (joined by Justice Kennedy) itself considers legislative history. 🚩 *Id.* at 1252–55; *see also* 🚩 *Pension Benefit Guar. Corp.,* 496 U.S. at 649, 110 S.Ct. 2668; 🚩 *Bowen,* 488 U.S. at 214, 109 S.Ct. 468 (using legislative history as a check where statutory text is clear that the Secretary had no authority); 🚩 *Japan Whaling Ass'n,* 478 U.S. at 233–41, 106 S.Ct. 2860 (looking at legislative history to see whether it contradicts implicit grant of authority to agency in statutory text).

This circuit has used the approach of considering legislative history in *Chevron* stage one analysis where appropriate to discern and/or to confirm legislative intent. *See* 🚩 *Goldings*

*v. Winn,* 383 F.3d 17, 21 (1st Cir.2004) ( "If the language of the statute is plain and admits of no more than one meaning *or if the statute's legislative history* reveals an unequivocal answer as to the statute's meaning, we do not look to the interpretation that may be given to the statute by the agency charged with its enforcement") (emphasis added) (quoting *Arnold v. United Parcel Serv., Inc.,* 136 F.3d 854, 858 (1st Cir.1998));

*Arnold,* 136 F.3d at 858 (resorting to legislative history when the text of the statute is not unambiguously clear); *see also Strickland v. Comm'r, Maine Dept. of Human Servs.,* 48 F.3d 12, 17, 20 (1st Cir.1995) (examining legislative history, "albeit skeptically," in *Chevron* step one).

The perceived dangers of the use of legislative history are particularly lessened where the legislative history is used as a check on an understanding obtained from text and structure. As we shall see, the legislative history, which is not disputed by the respondent, seems to pose none of the problems of potential manipulation of the system by members of Congress. *See Strickland,* 48 F.3d at 17 n. 3 (reciting the arguments of critics that "legislative history is written by staffers rather than by Congress itself; that it is easily manipulated; that it complicates the tasks of execution and obedience; and that it often is **\*32** shaped by members of Congress who cannot achieve passage of a desired interpretation in the actual text of an enacted statute").

In light of Supreme Court case law there is no reason to think legislative history may not play other roles then simply confirming a reading obtained by text and structure at stage one. [31] Our use of the legislative history in that fashion is, we think, unexceptional.

We look to legislative history to check our understanding and determine whether there is a clearly expressed intention by the Congress which is contrary to the plain language of the statute. *See Cardoza–Fonseca,* 480 U.S. at 432 & n. 12, 107 S.Ct. 1207. Petitioner argues that the legislative history evidences Congress's intention to give parolees, regardless of whether they were in removal proceedings, the ability to adjust status and that this intention is consistent with the goals Congress wanted to accomplish in enacting the legislation.

The INA, enacted in 1952, allowed "[t]he status of an alien who was lawfully admitted to the United States as a bona fide nonimmigrant" to be adjusted to that of permanent resident alien if the alien met certain other eligibility requirements. Pub.L. No. 414, 66 Stat. 163, 217 (1952).

The version of 8 U.S.C. § 1255(a) relevant to this case was established in 1960, when Congress amended 8 U.S.C. § 1255 to include paroled aliens as eligible for adjustment of status. Pub.L. No. 86–648, 74 Stat. 504, 505 (1960). At the time the amendment was passed, the statutory provision for the granting of parole to certain inadmissible aliens was substantially similar to the statute governing parole today. [32]

The legislative history of the 1960 amendments is explicit that Congress recognized numerous problems with the process for adjustment of status under the 1952 law and believed these problems were of serious concern. The Senate Report states:

> The Administrative Operations in the application of [the adjustment of status provision], and other related features of the General Immigration Law regarding adjustment of status of aliens within the United States, have been the subject of close scrutiny by the Committees on the Judiciary of both the Senate and the House of Representatives. For a considerable period of time, there has appeared to be a steadily mounting number of cases in which aliens determined by the Immigration and Naturalization Service to be eligible for permanent residence **\*33** in the United States in accordance with all the applicable provisions of the Immigration and Nationality Act, had to comply with what appeared in those cases to be an unnecessary procedure known as preexamination and voluntary departure with a view toward applying for an immigrant visa in one of the U.S. Consular Offices in Canada. During the Fiscal Year ending June 30, 1958, more than 7,000 aliens in the United States had their eligibility to enter as immigrants determined in this country prior to sending them to Canada where they briefly appeared before a U.S. consular officer, and then returned to this country with an immigrant visa.

> In addition, the review of a considerable number of private relief immigration bills seeking adjustment of status of nonimmigrants has further demonstrated to the Committee the desirability of general amendatory legislation on this subject.

S.Rep. No. 86–1651 (1960), *reprinted in* 1960 U.S.C.C.A.N. 3124, 3136.

The Report states that Congress, in amending the adjustment of status statute, wished to avoid a situation that,

not only necessitate[s] the reinstatement of the fallacious procedure known as 'preexamination' and consisting of round trips to Canada for the sole purpose of obtaining an immigrant visa, but will certainly greatly increase the number of private bills. The Congress has repeatedly expressed its disapproval of the 'preexamination' procedure and has similarly expressed its dissatisfaction with the mounting volume of private legislation.

*Id.* at 3137.

In response to those problems, Congress in 1960 amended the adjustment of status provision. The new provision read: "The status of an alien, other than an alien crewman, who was inspected and admitted or paroled into the United States may be adjusted ... to that of an alien lawfully admitted for permanent residence...." 74 Stat. at 505. This change broadened the category of individuals eligible for adjustment of status relief. S.Rep. No. 86–1651 (1960), *reprinted in* 1960 U.S.C.C.A.N. 3124, 3125. [33]

In changing the system, Congress sought to ameliorate three types of problems caused by the old system. Congress wished to eliminate the burden on inspected and admitted or paroled aliens and their American relatives of having to leave the United States and apply from a consular **\*34** office abroad (often from Canada). [34] *See id.* at 3137 ("Aliens eligible to benefit from this legislation ... would also save the expense of journeys to Canada, rather high when consideration is given to the fact that many of the prospective eligible immigrants live with their families in areas rather remote from the U.S. Consular offices in Canada.").

Congress was also concerned with the costs to the government of the then extant system, caused by the large number of private bills presented to it for adjustment of status for named individuals. Congress had repeatedly expressed its "dissatisfaction with the mounting volume of private legislation" introduced to adjust the status of certain aliens. *Id.* at 3137. By adopting the 1960 legislation, Congress wished

to alleviate this burden on itself. *See id.* at 3136. There is some evidence in the legislative history that Congress wished also to alleviate the burden imposed on consular offices to process applications for adjustment of status. The Senate Report emphasizes that in fiscal year 1958, alone, over 7,000 individuals had to leave the United States and apply for a visa in Canada. *Id.* Indeed, the Department of State commented on the legislation.

Finally, in expanding the group of individuals eligible for adjustment of status, Congress clearly evaluated the administrative inconvenience to the INS of the expanded category of those eligible to apply for adjustment of status and nonetheless altered the prior procedure. Indeed, the administrative burdens of the various provisions involved were given "close scrutiny" by Congress. *Id.*

The effect of the regulation before us, limiting the ability of paroled aliens in removal proceedings to adjust status, will predictably be to re-institute the very problems which Congress attempted to eliminate in 1960. It forces paroled aliens in removal proceedings to leave the country to apply for adjustment of status. This imposes considerable burdens on the aliens and, where applicable, their American spouses and relatives. The effect of the regulation, predictably, will be to increase the number of private bills seeking individual adjustment of status, thus burdening Congress. It will also increase the burden on consular offices abroad, because aliens who are otherwise available to adjust status will now have to apply through the consular office.

The 1960 legislative history of 8 U.S.C. § 1255(a) confirms and enhances our understanding of the statute.

### E. Effect of IIRIRA

We consider briefly the arguments of both sides that rely on later revisions to the INA, specifically IIRIRA, to support their different understandings of what Congress meant in the adjustment of status provisions of 8 U.S.C. § 1255. There is no claim that section 1255(a) was amended by IIRIRA or any other statute in any relevant way.

The Attorney General relies on provisions of IIRIRA to argue that the original understanding of the statute in 1960 must **\*35** be altered in light of later law, and the statute must now be read as introducing at least ambiguity into section

1255(a), despite the fact that section 1255(a) itself was not amended. The Attorney General argues that new regulations were required due to IIRIRA's replacement of "entry" with "admission" as the criterion which determines which of two sets of grounds of removal, 8 U.S.C. § 1882(a) or 8 U.S.C. § 1227, applies in removal proceedings. Further, the Attorney General argues, under 8 U.S.C. § 1182(d)(5)(A), a parole of an alien is not the admission of that alien.

Our earlier analysis of the meaning of 8 U.S.C. § 1255(a) in light of the statutory context takes into account the statutory scheme as it exists under IIRIRA. The Attorney General's arguments do not change this understanding; they are unpersuasive because they do not concern the eligibility of paroled aliens to apply for adjustment of status under section 1255(a) or in any way act to limit the eligibility of paroled individuals—a group Congress specifically deemed eligible—to adjust status. The classification of paroled aliens as "not admitted" is not new to the passage of IIRIRA and does not change the treatment of parolees. Also, the reclassification of aliens "present pursuant to an entry" to "applicants for admission" does not affect the status of paroled aliens, who have always been considered applicants for admission.

The petitioner relies on IIRIRA for two points. Specifically, the petitioner argues that since 1960 the agency and Congress have consistently understood the statute to be as petitioner reads it. Moreover, in the major revisions of the immigration laws since 1960, which largely restricted aliens' efforts to remain in this country, Congress has never once restricted the ability of paroled aliens to apply for adjustment of status.

This confirms our understanding of the clear meaning of the statute. [35] Consistent with our interpretation of the statute, in our view, the changes to the statute with the passage of IIRIRA work against the Attorney General's argument, not in favor of it. Under IIRIRA and previous amendments, Congress amended section 1255 to limit the eligibility for adjustment of status so that certain types of aliens may not apply. Historical & Statutory Notes, 1996 Amendments, 8 U.S.C.A. § 1255. Congress has directly addressed the issue of eligibility for adjustment of status on several occasions, yet these amendments did not limit the category of paroled aliens who may apply for adjustment of status, and they neither gave the Attorney General discretion to redefine eligibility

nor did they endorse the additional restrictions on eligibility contained in the Attorney General's regulation. See Brown & Williamson Tobacco, Corp., 529 U.S. at 137, 120 S.Ct. 1291 (relying in part on later actions of Congress which specifically address the regulation of tobacco as evidence that the FDA did not have authority to regulate tobacco).

### F. Reasonableness

Many of the Attorney General's arguments go to the reasonableness of the regulation. This is a *Chevron* step two argument. But as previously explained, **\*36** this is a *Chevron* step one case, and even the Attorney General's reasonable actions cannot control in the face of clear contrary congressional intent.

Even where there is ambiguity, reasonableness is assessed in light of the statutory scheme. For example, the Attorney General justifies the regulation on the basis that the exercise of discretion was consistent with Congress's desire to speed up the removal process through expedited removal proceedings. 62 Fed.Reg. 444, 452 (Jan. 3, 1997). The desire for administrative efficiency cannot displace clear congressional intent.

Also, the Attorney General argues he has a facially legitimate and bona fide reason for the regulation, citing to the Immigration Control and Financial Responsibility Act of 1996, [36] which was intended to "increase control over immigration ... expediting the removal of excludable and deportable aliens, especially criminal aliens, and reducing the abuse of parole and asylum provisions." [37] S.Rep. No. 104–249 at 2 (1994) (not reported in U.S.C.C.A.N.). The short reply is that Congress did not, even in 1996, give the Attorney General unfettered discretion to expedite removal and reduce abuse of parole in disregard of the statutory scheme. Congress expressly did not alter the basic structure of eligibility for application for adjustment of status while simultaneously making a limited category of parolees ineligible. See Cardoza–Fonseca, 480 U.S. at 444–45, 107 S.Ct. 1207 (noting the agency cannot ignore Congress's desired scheme in the asylum area).

[4] Finally, the position that the Attorney General takes in the 1997 regulation is inconsistent with the agency's long-standing previous practice. Arriving aliens in removal proceedings were always able to adjust status before the district director prior to the promulgation of the 1997

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

regulations. *See* *In re Castro–Padron,* 21 I. & N. Dec. 379, 1996 WL 379828 (BIA 1996). As noted in *Cardoza–Fonseca,* "An additional reason for rejecting the [Attorney General's] request for heightened deference to [his] position is the inconsistency of the positions the [agency] has taken through the years. An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *Cardoza–Fonseca,* 480 U.S. at 446 n. 30, 107 S.Ct. 1207 (quoting *Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981)). So even if there were ambiguity in section 1255(a), the agency would be entitled to less than normal deference.

## V.

We find the regulation, 8 C.F.R. § 245.1(c)(8), to be invalid as inconsistent with 8 U.S.C. § 1255(a); accordingly we *vacate* the removal order and *remand* the case to the BIA for proceedings consistent with this opinion. So ordered.

**All Citations**

394 F.3d 8

## Footnotes

1   In March 2003, the relevant functions of the INS were transferred to the Department of Homeland Security and reorganized into the Bureau of Immigration and Customs Enforcement. We refer to the immigration agency throughout as the INS. *Mukamusoni v. Ashcroft,* 390 F.3d 110, 113 n. 1 (1st Cir.2004).

2   8 C.F.R. § 245.1(c)(8) is identical to 8 C.F.R. § 1245.1(c)(8). Section 245.1(c)(8) applies to the immigration agencies in the Department of Homeland Security. Section 1245.1(c)(8) applies to the Executive Office for Immigration Review in the Department of Justice. This case concerns the validity of 8 C.F.R. § 245.1(c)(8).

3   The BIA also affirmed Succar's order of removal. The Board agreed with the IJ "that [Succar] has failed to meet his burden of proof in that he was not credible and did not provide detailed testimony with which to conclude that he was or would be persecuted upon return to Lebanon." The BIA also rejected Succar's claim that the translation during the evidentiary hearing was inadequate, finding that there was "no evidence to suggest that the respondent was precluded from presenting testimony or that he was somehow prejudiced." Succar does not challenge the BIA's affirmance on the merits of the order of removal in this court, but does challenge the order of removal insofar as it precludes decision in the United States of his adjustment of status application. The respondent makes no argument that this somehow removes from the case the issue of the validity of the regulation, but defends on the merits.

4   An "applicant for admission" may be physically present in the country but not yet have "entered" for immigration purposes.

5   The exceptions to the parole authority of the Attorney General do not apply to this case. The limitation from subparagraph B states that an alien who is a refugee cannot be paroled "unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 1157 of the title." 8 U.S.C. § 1182(d)(5)(B). The other limitation deals with aliens who are crewmen serving in good faith on board a vessel. *See* 8 U.S.C. § 1184(f).

6   There are three types of immigrant visas available: (1) family-sponsored immigrant visas, (2) employment-based immigrant visas, and (3) diversity immigrant visas. 8 U.S.C. §§ 1151(a)(1), (2), (3). For immediate

relatives of United States citizens, including spouses, parents, and unmarried children under the age of 21, an immigrant visa number is automatically available upon approval of the visa petition. Dep't of Homeland Sec., Citizenship & Immigration Servs., *How do I get an Immigrant Visa Number?, at* http://uscis.gov/graphics/ howdoi/immvisa.htm (last modified October 31, 2003). All other individuals seeking visas based on familial relationships and individuals seeking to receive visas based on employment must wait for a visa number. These numbers come available in order of preference for different types of relationships and employment.

8 U.S.C. §§ 1153(a), (b)(1). As for relationships, first priority is given to unmarried sons and daughters of United States citizens over the age of 21. 8 U.S.C. § 1153(a). In the employment context, first priority is given to workers with extraordinary abilities, professors and researchers, and certain multinational executives and managers. 8 U.S.C. § 1153(b).

7   There are several types of parole. In 2003, 70% of all parolees were paroled under the most common type of parole, port of entry parole. Dep't of Homeland Sec., Office of Immigration Statistics, *2003 Yearbook of Immigration Statistics* 83. Port of entry parolees are "authorized at the port upon alien's arrival; [port of entry parole] applies to a wide variety of situations and is used at the discretion of the supervisory immigration inspector, usually to allow short periods of entry." *Id.* at 190. Advance parole is a second type of parole; it is issued to an alien residing in the United States who has an unexpected need to travel abroad and whose conditions of stay do not otherwise allow for readmission to the United States. *Id.* Deferred inspection parole is conferred by an immigration inspector when aliens appear with documentation, but after preliminary examination some questions remain about their admissibility. *Id.* The three other types of parole are humanitarian parole, granted in instances of medical emergency; public interest parole, granted for aliens participating in legal proceedings; and overseas parole, which is granted, usually by special statute, to individuals while they are in their home country to allow them to enter the United States.

8   A report to Congress governing the use of the Attorney General's parole authority indicates that aliens establishing a credible fear of persecution can be and often are paroled into the United States while they seek asylum. Immigration & Naturalization Serv., *Report to Congress: Use of the Attorney General's Parole Authority Under the Immigration & Nationality Act: Fiscal Years 1998–1999,* 8 (2003), *available at* http:// uscis.gov/graphics/repsstudies/parolerpt9899.pdf.

9   Succar's application was made during the removal proceedings and the respondent makes no argument that Succar's parole was revoked.

10  The respondent does not argue that Succar is ineligible to adjust status on the ground that he entered into his marriage while his removal proceedings were pending. Regardless, it appears from the record that Succar fits within the exception to this prohibition, 8 U.S.C § 1255(e)(3), as he was granted approval of the I–130 petition, filed by Succar's wife on his behalf, and the request for a bona fide marriage exemption.
The respondent's only argument as to why Succar is ineligible to adjust status is the Attorney General's regulation denying adjustment of status to arriving aliens (including parolees) in removal proceedings.

11  Upon a clarification request from this court on the law prior to the passage of the regulation in question, the Attorney General joined in a letter with the petitioner which explained that prior to 1997, arriving aliens in exclusion proceedings who were statutorily eligible for adjustment of status could apply to the district director for this relief.

12  The pre–1997 regulations allowed one subcategory of parolees, advanced parolees, to bring an initial application for adjustment of status before the IJ and to renew before an IJ applications for adjustment of status previously denied by the district director. *In re Castro–Padron,* 21 I. & N. Dec. 379, 380, 1996 WL 379828 (BIA 1996). Advanced parolees were aliens who had been granted advance parole before leaving the United States. They then left, returned, and were now in exclusion proceedings. They were treated the same as admitted aliens in deportation proceedings, meaning that they could apply to the IJ for adjustment of status. The Board held that this regulation did not apply to other paroled aliens who were arriving for the first

time and were placed in exclusion proceedings—they continued to be limited to pursuing their adjustment applications before the district director only. *Id.*

13    The Attorney General at the time of the promulgation of this regulation was Janet Reno. Successor Attorney General, John Ashcroft, chose to defend this regulation.

14    Succar asserts that he would be barred from reentry into the United States for ten years, and the government does not contend otherwise.

15    A decision by the Attorney General on the merits of the application for adjustment of status under 8 U.S.C. § 1255 is committed to the discretion of the Attorney General. If the BIA had adjudicated and denied Succar's application on the merits, and Succar challenged this decision, then, arguably, this court would not have jurisdiction to review that discretionary determination. This is not what is at issue here; rather the issue is one of statutory interpretation. The two questions are distinct.

16    Both the American Immigration Law Foundation and the Massachusetts Law Reform Institute have participated as amici and we acknowledge their able assistance.

17    The majority of petitioner's efforts to attack the statute are unpersuasive. We explain briefly the futility of these attacks. The Attorney General was expressly given discretion by the statute and has authority to promulgate regulations, so that cannot be the basis of an ultra vires attack.

If a regulation is unreasonable in light of the statute as either arbitrary and capricious or as flatly inconsistent with the clear meaning of the statute as expressed by Congress, the regulation will violate the *Chevron* doctrine, and calling the regulation ultra vires in those circumstances adds nothing to the analysis. *See Chevron USA, Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

Further, while the doctrine of constitutional avoidance permits a court in some instances to adopt a particular construction of a law to avoid issues of unconstitutionality, that doctrine is unavailable here. The claims of petitioner are based not in the Constitution but in a statute.

18    Others, the petitioner argues, will not be able to return to their home countries because they fled, fearing persecution there, the basis for their asylum application. The logical response is that if those aliens prove they are eligible for asylum or withholding of removal, they may, in the discretion of the agency, not be removed. They may then apply for adjustment of status.

19    The regulations guiding the Attorney General's parole decisions do not allow for the parole of aliens thought to be a security risk. 8 C.F.R. § 212.5(b). Further, if the arriving alien is thought to be inadmissible because (1) he has engaged in or is suspected of being a terrorist, 8 U.S.C. § 1182(a)(3)(B), (2) he seeks to enter into the country to engage in actions against the United States government, 8 U.S.C. § 1182(a)(3)(A), or (3) his entry or proposed actions in the United States would have potentially serious adverse foreign policy consequences for the United States, 8 U.S.C. § 1182(a)(3)(C), the alien *shall* be ordered removed, and the order of removal shall be reported to the Attorney General. 8 U.S.C. § 1225(c). The order of removal is subject to limited review procedures. 8 U.S.C. § 1225(c)(2).

20    Since 1960, Congress has amended section 1255(a), specifically, two times. Historical & Statutory Notes, 8 U.S.C.A. § 1255. These two amendments do not have any effect on the eligibility of paroled individuals to adjust status and are not at issue in this case. Both of these amendments to section 1255(a) expanded the category of aliens eligible for adjustment of status and in no way limited the eligibility of a paroled alien to adjust status.

21    This section does not apply if "the alien establishes by clear and convincing evidence to the satisfaction of the Attorney General that the marriage was entered into in good faith and in accordance with the laws of the

place where the marriage took place and the marriage was not entered into for the purpose of procuring the alien's admission as an immigrant." 8 U.S.C. § 1255(e)(3).

22    The statute provides that the "Attorney General *may* accept such application only if the alien remits with such application a sum equaling $1,000 as of the date of receipt of the application." 8 U.S.C. § 1255(i)(1) (emphasis added). "Upon receipt of such an application and the sum hereby required, the Attorney General *may* adjust the status of the alien to that of an alien lawfully admitted for permanent residence," if the alien meets certain statutory requirements. 8 U.S.C. § 1255(i)(2) (emphasis added). This particular provision gives further weight to Congress's intention to distinguish between the two steps necessary for adjustment of status: (1) eligibility to apply and (2) a favorable determination by the Attorney General. Section 1255(i), unlike the other provisions governing who is eligible to apply for adjustment of status, seems to give the Attorney General some discretion over whether these aliens are even eligible to apply, as well as over the decision whether to adjust.

23    "If the word 'discretion' means anything in a statutory or administrative grant of power, it means that the recipient must *exercise his authority* according to his own understanding and conscience." *See Goncalves,* 144 F.3d at 125 (quoting *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 266–67, 74 S.Ct. 499, 98 L.Ed. 681 (1954)) (internal quotation marks omitted)(alteration in *Goncalves* ) (emphasis added). This comports with a doctrine articulated by Judge Jerome Frank in *United States ex rel. Adel v. Shaughnessy,* 183 F.2d 371 (2d Cir.1950), that where Congress has granted an agency discretion, courts may intervene when there has been "a clear failure to exercise discretion" (as well as when that discretion has been abused). *Id.* at 372. In later formulations, courts have said that an agency's "failure to ... exercise its discretion, when properly called upon to do so, is subject to judicial review for arbitrariness and capriciousness." *Wolfe v. Marsh,* 835 F.2d 354, 358 (D.C.Cir.1987). Here, the Attorney General must actually exercise his discretion to determine whether the paroled individuals that Congress has deemed eligible for adjustment of status should be granted this relief.

24    The Attorney General's ability to parole arriving aliens, both prior to removal proceedings and once the individual is placed in removal proceedings, is also constrained. The Attorney General can parole an alien applying for admission temporarily into the United States "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). The Attorney General has no authority to allow an individual to remain in parole once the reasons for the initial parole are exhausted. As soon as a determination that these reasons are exhausted is made, the individual "shall forthwith return or be returned to the custody" of the Service. 8 U.S.C. § 1182(d)(5)(A).

25    Indeed, where Congress has wanted to benefit aliens from certain countries, it has enacted special legislation which allows these individuals to enter the United States and apply for permanent resident status within one year, without being subjected to removal proceedings. *See* Cuban Adjustment Act of 1966, Pub.L. No. 89–732, 80 Stat. 1161 (1966) (allowing Cuban parolees to adjust status after one year of residence in the United States); Lautenberg Amendment, Pub.L. No. 101–167, 103 Stat. 1263 (1990) (allowing parolees from the former Soviet Union, Vietnam, Laos, or Cambodia to adjust status after one year of residence in the United States).

26    In *Cardoza–Fonseca,* the Attorney General argued that the greater standard applicable to withholding of deportation—the alien's life or freedom would be threatened—was also the standard applicable to the grant of asylum because it was anomalous that the standard for asylum, which affords greater benefits, would be less burdensome than the standard for withholding of deportation. *Cardoza–Fonseca,* 480 U.S. at 443, 107 S.Ct. 1207. The Supreme Court distinguished the two statutes to show why the Attorney General's argument was misplaced. The Court explained that if an individual makes the stronger showing and demonstrates that he is eligible for withholding of deportation, that relief is automatic without any discretion of the Attorney

General. By contrast, if an individual demonstrates the lesser well-founded fear standard to be statutorily eligible for asylum, the relief was not automatic; it was then up to the Attorney General to exercise his discretion as to whether to grant the requested relief. *Id.* at 443–44, 107 S.Ct. 1207.

27    It is worth noting that the asylum statute as in force at the time it was interpreted in *Cardoza–Fonseca,* is similar in wording to the adjustment of status statute. The relevant provision in 1987 read:

> [T]he alien may be granted asylum in the discretion of the Attorney general if the Attorney General determines that such alien is a refugee within the meaning of 🚩 section 1101(a)(42)(A) [the well-founded fear standard] of this title.

*Cardoza–Fonseca,* 480 U.S. at 427, 107 S.Ct. 1207 (quoting 8 U.S.C. § 1158(a)).

28    Our holding does not "preclude the [Attorney General] from adopting a uniform set of criteria for consideration in evaluating applications" for adjustment of status. *Lopez,* 531 U.S. at 249, 121 S.Ct. 714 (Stevens, J., dissenting). We agree that Congress's eligibility determinations do not limit the considerations that "may guide the Attorney General in exercising [his] discretion to determine who, among those eligible, will be accorded grace." *Lopez,* 531 U.S. at 243, 121 S.Ct. 714 (quoting *INS v. Yueh–Shaio Yang,* 519 U.S. 26, 31, 117 S.Ct. 350, 136 L.Ed.2d 288 (1996) (internal quotation marks omitted)).
However, there is one important point: because eligibility is explicit in this statute, the Attorney General cannot categorically refuse to exercise discretion favorably for classes deemed eligible by the statute. The agency cannot get in through the back door of the relief stage what it cannot do at the eligibility stage. This limitation is consistent with *Yueh–Shaio Yang,* which did not involve the agency excluding a class of otherwise eligible aliens. *Lopez,* 531 U.S. at 248 n. 4, 121 S.Ct. 714 (Stevens, J., dissenting). It involved the question of whether a classification could be considered at all in the exercise of the Attorney General's ultimate discretion to grant relief from deportation. *Id.* Perhaps whether the alien is in removal proceedings could be a consideration in the weighing against the favorable exercise of discretion, but it cannot be the basis of a categorical exclusion.

29    The Attorney General also relies on *INS v. Bagamasbad,* 429 U.S. 24, 97 S.Ct. 200, 50 L.Ed.2d 190 (1976), to support his argument. There the IJ and BIA had, without determining eligibility, relied on the petitioner's misrepresentation to a consular office to deny adjustment of status. The court of appeals concluded that a determination of eligibility was required nonetheless. The Supreme Court reversed the court of appeals on the ground that "[a]s a general rule[,] courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach." *Id.* at 25, 97 S.Ct. 200. The case does not provide much guidance here. Petitioner argues only that Congress, by setting conditions for eligibility, wished there to be case by case consideration. In *Bagamasbad,* there was individualized consideration of the case.

30    The most frequently cited source for a purported rule that reference to legislative history is impermissible at stage one is Justice Kennedy's statement, in a footnote, that the use of legislative history in stage one is impermissible. *See* *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 293 n. 4, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988) (noting in the first step of a *Chevron* inquiry that "any reference to legislative history is in the first instance irrelevant"). However, Justice Kennedy's analysis on this point did not command a majority; only one other Justice joined. *Id.* And since the decision in *K Mart Corp.,* Justice Kennedy has joined the majority opinions in *Pension Benefit* and *Brown & Williamson Tobacco,* both of which utilize legislative history in the *Chevron* step one analysis. *See* *Pension Benefit Guar. Corp.,* 496 U.S. at 649–50, 110 S.Ct. 2668; *Brown & Williamson Tobacco Corp.,* 529 U.S. at 133, 120 S.Ct. 1291. The footnote in *K Mart* was never authoritative.

31    In fact, the Supreme Court has used legislative history in different ways at stage one. It has used it merely to confirm plain text reading. *Pension Benefit Guar. Corp.,* 496 U.S. at 649, 110 S.Ct. 2668; *Bowen,*

*488 U.S. at 214, 109 S.Ct. 468; Japan Whaling Ass'n,* 478 U.S. at 233–41, 106 S.Ct. 2860. It has used legislative history to give content to specific statutory terms said to have different textual meanings. *Gen. Dynamics Land Sys., Inc.,* 124 S.Ct. at 1244 (statutory term "age" in ADEA refers to use of ADEA as a remedy for "unfair preference based on relative youth"). In *Brown & Williamson Tobacco Corp.,* the Supreme Court stressed that "a reviewing court should not confine itself to examining a particular statutory provision in isolation." 529 U.S. at 132, 120 S.Ct. 1291. In addition to the requirement to read the text in context and in light of its place in the overall statutory scheme, the court also found permissible resort to "other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Id.* at 133, 120 S.Ct. 1291. The court then explored the legislative history of both the original and later statutes. *Id.* at 144–55, 120 S.Ct. 1291.

32 "The Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien...." INA, Pub.L. No. 414, 66 Stat. 188 (1952).

33 The 1960 legislation can be viewed as striking a balance—while it broadened the number of aliens able to apply for adjustment of status, it also defined the category of aliens eligible so that only the deserving could be considered for the relief. This structure comports with Congress's concern to allow only worthy aliens the opportunity to apply for adjustment of status. As the Senate Report states,

> The language of the instant bill has been carefully drawn so as not to grant undeserved benefits to the unworthy or undesirable immigrant. This legislation will not benefit the alien who has entered the United States in violation of the law.

S. Rep. No. 86–1651 (1960), *reprinted in* 1960 U.S.C.C.A.N. 3124, 3136. Congress mentioned that it believed that the legislation would benefit mainly aliens "who[ ] are spouses of U.S. citizens, or skilled specialists whose services are urgently needed in the United States, or ministers of religious denominations, or members of other general or special nonquota immigrant classes." *Id.* at 3137. Congress also specifically intended to benefit those individuals who had been paroled into the country as refugees. *Id.* at 3124.

34 The specific focus of Congress on these problems of who may apply for adjustment of status and how also indicates that Congress considered the matter to be important, and so did not leave it to the agency. *See Brown & Williamson Tobacco Corp.,* 529 U.S. at 159, 120 S.Ct. 1291 (citing Justice Stephen Breyer, *Judicial Review of Questions of Law and Policy,* 38 Admin. L.Rev. 363, 370 (1986) ("A court may also ask whether the legal question is an important one. Congress is more likely to have focused upon, and answered, major questions, while leaving interstitial matters to answer themselves in the course of the statute's daily administration.")).

35 When Congress speaks "subsequently and more specifically to the topic at hand," this can shed light as to the meaning of the statute. *Brown & Williamson Tobacco Corp.,* 529 U.S. at 133, 120 S.Ct. 1291; *see also Monessen Southwestern Ry. Co. v. Morgan,* 486 U.S. 330, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988) (When Congress has amended a statute in other ways, but not addressed the specific issue in question, court can consider congressional silence in the appropriate historical context and use it as evidence of congressional intent not to abrogate well-established doctrine.).

36 The Immigration Control and Financial Responsibility Act of 1996, SB 1664, was passed by the Senate on May 2, 1996. It was placed in conference with the House counterpart, and was the predecessor of what became IIRIRA.

37 Legislative history of subsequently enacted statutes "will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment." *See Doe v. Chao,* 540 U.S. 614, 124 S.Ct. 1204, 1212, 157 L.Ed.2d 1122 (2004). An expressed intent in the legislative history of a later more general statute can not overcome the expressed intent in the statute specifically in question.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

434 F.3d 627
United States Court of Appeals,
Third Circuit.

Ellyana SUKWANPUTRA; Yulius Sukwanputra, Petitioners

v.

Alberto GONZALES, Attorney General United States of America [*] Respondent.

No. 04–3336.
|
Argued Oct. 18, 2005.
|
Filed Jan. 19, 2006.

**Synopsis**

**Background:** Aliens, natives and citizens of Indonesia, petitioned for review of order of the Board of Immigration Appeals (BIA), which adopted and affirmed immigration judge's decision denying the application for asylum and withholding of removal pursuant to the Immigration and Nationality Act (INA), and protection under the Convention Against Torture (CAT).

**Holdings:** The Court of Appeals, Cowen, Circuit Judge, held that:

one-year statutory period of limitations provided for in the Immigration and Nationality Act (INA) was not unconstitutional;

despite the changes of the REAL ID Act, factual or discretionary determinations continue to fall outside the jurisdiction of the court of appeals entertaining a petition for review;

"benefit of the doubt" standard did not apply to alien's application for asylum in immigration judge's determination whether alien had established changed or extraordinary circumstances excusing her untimely application;

immigration judge's refusal to give any weight to documentary evidence and to afford alien an opportunity to authenticate the documents through other means was error;

adverse credibility determination in deciding alien's withholding of removal claim was not supported by substantial evidence; and

immigration judge's remarks during removal proceedings gave the appearance that the immigration judge had a predisposition to find against alien.

Petition granted, BIA order vacated, and remanded.

**Attorneys and Law Firms**

**\*629** Joseph C. Hohenstein, (Argued), Orlow and Orlow, P.C., Philadelphia, PA, for Petitioners.

Jonathan Potter, (Argued), United States Department of Justice, Office of Immigration Litigation, Civil Division, Ben Franklin Station, Washington, DC, Stephen A. Sherman, United States Department of Justice, Tax Division, Ben Franklin Station, Washington, DC, for Respondent.

Before SCIRICA, Chief Judge, VAN ANTWERPEN and COWEN, Circuit Judges.

**Opinion**

COWEN, Circuit Judge.

Ellyana and Yulius Sukwanputra petition for review of an order of the Board of Immigration Appeals ("BIA") which adopted and affirmed an Immigration Judge's ("IJ") decision denying the application for asylum and withholding of removal pursuant to the Immigration and Nationality Act ("INA"), and protection under the Convention Against Torture ("CAT"). For the reasons stated below, we will grant the petition, vacate the order of the BIA, and remand for further proceedings consistent with this opinion.

**\*630** I.

Ellyana Sukwanputra and her husband, Yulius Sukwanputra, [1] are natives and citizens of Indonesia. Petitioner claims persecution in Indonesia on account of her Chinese ethnicity and Catholic religion. In support, she relates numerous incidents of persecution spanning a twenty year period from her childhood until the late 1990s. Three of the incidents are relevant to our decision, which we discuss below.

First, Petitioner alleges that in 1985, in her hometown of Malang, a mob of native Indonesians burned down her father's store as part of widespread attacks on Chinese-owned stores. Petitioner, who was a child at the time, allegedly remembers hearing rioters say, "Burn it down, this belong to Chinese!" Despite the widespread destruction and looting, the police and army in Indonesia allegedly did nothing to stop the attacks.

Petitioner claims that similar governmental inaction led to the prolongation of riots in Unjung Pandang in September 1997. Prompted by the prospect of marriage, Petitioner alleges that she and her then-future husband traveled to the Island of Sulawesi, Unjung Pandang, so that she could meet his parents who lived there. Petitioner laments that during their visit, a group of native Indonesians allegedly burned down her husband's family restaurant. Petitioner allegedly recalls hearing the rioters yell, "Burn and kill the Chinese!" After escaping the restaurant, petitioner and her husband stayed at the local police station for two days until the riots ended.

Third, petitioner cites to the massive riots that plagued Jakarta in May 1998. Petitioner asserts that following her graduation from college, she was living in Jakarta looking for employment when massive riots broke out there. Petitioner relates that during the riots many Indonesian women were raped and killed. Petitioner allegedly hid with friends inside a house, but could hear the voices of rioters on the streets and the sounds of them beating on the house. Petitioner recalls that after the riots she fled to Malang to stay with her parents.

On May 17, 1999, petitioners entered the United States on non-immigrant visitor's visas. They were authorized to remain in the United States until November 16, 1999, and both overstayed their visas. On June 25, 2001, they were placed in removal proceedings.

II.

On or about May 4, 2001, petitioner filed an application for asylum and withholding of removal under the INA, and protection under CAT. The case was referred to Immigration Judge Donald Ferlise, who conducted a hearing on the merits. In addition to her own testimony, petitioner presented to the IJ documentary evidence in support of her application. The IJ admitted some of the documents into evidence, including petitioner's written application, her sworn affidavits, and a country package which included the 2001 Department of State Report on Human Rights Practices. However, the IJ refused to give any weight to the following documents: petitioners' birth certificates, their marriage certificate, petitioner's husband's Indonesia identification card, a death certificate for petitioner's brother, and their child's birth certificate. The IJ reasoned that the documents were not **\*631** certified as required under 8 C.F.R. § 287.6.

On October 28, 2002, the IJ issued a decision denying the application for asylum, withholding of removal, and CAT protection. The IJ found that the asylum application was untimely and that petitioner had failed to establish changed circumstances materially affecting her eligibility for asylum or extraordinary circumstances relating to the delay. The IJ also found that petitioner had not demonstrated entitlement to withholding of removal or protection under CAT. The IJ premised his finding, in part, on the purported implausibility that petitioner was present "at all of these [three] major events even though they were quite far apart in distance." (Decision at 10.) As to these three critical events, the IJ found petitioner's testimony not to be credible. (Decision at 10.)

On August 5, 2005, the BIA entered its order affirming and adopting the IJ's decision. The BIA rejected petitioner's claim that the IJ exhibited bias violating their due process rights. The BIA concluded that while some of the IJ's statements were "injudicious," there was insufficient evidence to show that the IJ's conduct prevented petitioner from fully presenting her evidence.

## III.

The BIA's jurisdiction arose under 8 C.F.R. § 1003.1(b)(3). We have jurisdiction to review the BIA's final order of removal under 8 U.S.C. § 1252(a)(1).

Insofar as the BIA adopted the findings of the IJ, we must review the decision of the IJ. *Abdulai v. Ashcroft,* 239 F.3d 542, 549 n.2 (3d Cir.2001) ("When the BIA defers to an IJ, a reviewing court must, as a matter of logic, review the IJ's decision to assess whether the BIA's decision to defer was appropriate."). As to matters which the BIA issued its own opinion and did not summarily adopt the findings of the IJ, we must review the decision of the BIA. *Li v. Attorney General,* 400 F.3d 157, 162 (3d Cir.2005).

## IV.

## A.

Petitioners argue that one-year statutory period of limitations for filing an asylum application provided in 8 U.S.C. § 1158(a)(2)[2] violates the Supremacy Clause of the United States Constitution and the Due Process Clause, and that the judicial review bar provided in 8 U.S.C. § 1158(a)(3), which precludes judicial review of determinations of the Attorney General made under 8 U.S.C. § 1158(a)(2), also violates the Due Process Clause. We consider each of these arguments below, under a de novo review. *Abdulrahman v. Ashcroft,* 330 F.3d 587, 595–96 (3d Cir.2003).

AR.06466

### 1.

 Citing to the Supremacy Clause, petitioners argue that the one-year statutory period of limitations provided in § 1158(a)(2) conflicts with Article 34 of 1951 United Nations Convention Relating to the Status of Refugees ("1951 Convention"). By acceding to the 1967 United  **\*632**  Nations Protocol Relating to the Status of Refugees ("1967 Protocol"), the United States agreed to comply with the substantive provisions of the 1951 Convention. *INS v. Cardoza–Fonseca,* 480 U.S. 421, 429, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *INS v. Stevic,* 467 U.S. 407, 416, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). However, Article 34 is not self-executing. *See Stevic,* 467 U.S. at 428 n. 22, 104 S.Ct. 2489. As such, Article 34 provides no enforceable rights beyond those granted by the INA. *See id; Al–Fara v. Gonzales,* 404 F.3d 733, 743 (3d Cir.2005). Accordingly, the one-year statutory period provided in § 1158(a)(2) for filing an asylum application does not violate the Supremacy Clause. [3]

### 2.

 Petitioners' claim that the statutory period of limitations provided in § 1158(a)(2) violates the Due Process Clause is also unavailing. Although the Fifth Amendment entitles aliens to the "the opportunity to be heard at a meaningful time and in a meaningful manner," *Dia v. Ashcroft,* 353 F.3d 228, 238–239 (3d Cir.2003) (quoting *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)), "it d[oes] not violate due process for Congress to impose a reasonable limitations period upon the filing of naturalization petitions." *INS v. Pangilinan,* 486 U.S. 875, 885, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988). The state "may erect reasonable procedural requirements for triggering the right to an adjudication, be they statutes of limitations ... [a]nd ... certainly accords *due* process when it terminates a claim for failure to comply with a reasonable procedural or evidentiary rule." *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 437, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (internal citations and quotations marks omitted) (emphasis in original).

The one-year period of limitations for filing an asylum application under 8 U.S.C. § 1158(a)(2)(B), which is tempered by the tolling provisions of § 1158(a)(2)(D), provides an asylum applicant an "opportunity to be heard at a meaningful time and in a meaningful manner." *Eldridge,* 424 U.S. at 333, 96 S.Ct. 893 (citation and internal quotation marks omitted). The one-year period is not an unreasonable requirement for triggering the right to an adjudication, and, thus, an alien is not deprived of due process when his or her asylum claim is denied for failure to comply with the requirement. For these reasons, we conclude that the one-year statutory limitations period provided in § 1158(a)(2) does not violate the Due Process Clause.

### 3.

 Petitioners' contention that the judicial review bar of 8 U.S.C. § 1158(a)(3) violates the Due Process Clause likewise lacks merit. "Deportation is not a criminal proceeding and has never been held to be punishment ... [, and thus] [n]o judicial review is guaranteed by the Constitution." *Carlson v. Landon,* 342 U.S. 524, 537, 72 S.Ct. 525, 96 L.Ed. 547 (1952). Rather, "[t]he power to expel aliens, being essentially a power of the political branches of government, the legislative and executive,  **\*633**  may be exercised entirely through executive officers, with such opportunity for judicial review of their action *as congress may see fit to authorize or permit." Id.* (internal quotation marks and citation omitted) (emphasis added). As clearly indicated in 8 U.S.C. § 1158(a)(3), Congress did not authorize an opportunity for judicial review of determinations made by the executive

branch regarding the timeliness of an asylum application. *See 🔖 Tarrawally v. Ashcroft,* 338 F.3d 180, 185 (3d Cir.2003). Because judicial review is not constitutionally guaranteed, the judicial review bar of 🔖 § 1158(a)(3) does not violate the Due Process Clause.

## B.

Failing their constitutional arguments, petitioners next challenge the IJ's determination that petitioner did not qualify for an exception to the one-year filing deadline for asylum applications. Pursuant to 🔖 8 U.S.C. § 1158(a)(2)(B), an alien must file an asylum application within one year of the date of the alien's arrival in the United States. 🔖 8 U.S.C. § 1158(a)(2)(B). A late-filed application may be considered if the alien demonstrates either "changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application...." 🔖 8 U.S.C. § 1158(a)(2)(D).

Petitioner entered the United States on May 17, 1999, but did not file her asylum application until May 4, 2001. The IJ determined that the asylum application was untimely and that petitioner had failed to establish changed circumstances materially affecting her eligibility for asylum or extraordinary circumstances relating to the delay, as required under 🔖 8 U.S.C. § 1158(a)(2)(D) to excuse a failure to meet the one-year deadline. Petitioners contend that the IJ applied the wrong legal standard in making his determination under 🔖 § 1158(a)(2)(D) that petitioner had failed to demonstrate such changed or extraordinary circumstances. Petitioners posit further that the record evidence reflects the existence of such changed or extraordinary circumstances so as to warrant the late filing. The government contends that pursuant to 🔖 8 U.S.C. § 1158(a)(3), this Court does not have jurisdiction to review the IJ's decision relating to the untimeliness of the asylum application.

The restriction on judicial review of determinations made by the Attorney General regarding the timeliness of an asylum application is addressed in 🔖 8 U.S.C. § 1158(a)(3). That provision states that "[n]o court shall have jurisdiction to review any determination of the Attorney General under paragraph (2)," 🔖 8 U.S.C. § 1158(a)(3), which paragraph includes the provision relating to whether an asylum applicant has demonstrated the existence of changed or extraordinary circumstances, 🔖 8 U.S.C. § 1158(a)(2)(D). In *Tarrawally,* this Court held that "the language of 🔖 8 U.S.C. § 1158(a)(3) clearly deprives us of jurisdiction to review an IJ's determination that an asylum petition was not filed within the one year limitations period, and that such period was not tolled by extraordinary circumstances." 🔖 338 F.3d at 185.

Since our decision in *Tarrawally,* Congress enacted the REAL ID Act of 2005 ("REAL ID Act"). The REAL ID Act authorizes judicial review of constitutional claims and questions of law, notwithstanding any other provision of the chapter which eliminates or limits judicial review. *See* REAL ID Act 🔖 § 106(a)(1)(A)(iii), adding 🔖 8 U.S.C. § 1252(a)(2)(D) ("Nothing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial **\*634** review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed within an appropriate court of appeals in accordance with this section."). [4] By virtue of 🔖 § 1252(a)(2)(D), constitutional claims or questions of law raised in a petition for review elude the jurisdiction-stripping provisions of the INA. The effect of this provision is to restore to the court of appeals jurisdiction to review constitutional claims and questions of law.

 Despite the special treatment accorded constitutional claims and questions of law, 🚩 § 1252(a)(2)(D) does not exempt factual or discretionary challenges from the jurisdiction-stripping provisions of the INA. Thus, 🚩 § 1252(a)(2)(D) does not prohibit a

court of appeals from construing provisions which limit judicial review, such as 📙 § 1158(a)(3), as precluding review of factual or discretionary challenges. Accordingly, we join our sister courts in concluding that despite the changes of the REAL ID Act, factual or discretionary determinations continue to fall outside the jurisdiction of the court of appeals entertaining a petition for review. *Accord* 🚩 *Ramadan v. Gonzales,* 427 F.3d 1218, 1222 (9th Cir.2005); 🚩 *Chacon–Botero v. U.S. Atty. Gen.,* 427 F.3d 954, 957 (11th Cir.2005); 📙 *Vasile v. Gonzales,* 417 F.3d 766, 768 (7th Cir.2005).

Mindful of these jurisdictional concerns, we now turn to the issues presented in this petition for review. Here, petitioners first contend that the IJ applied the wrong legal standard in making his determination under 📙 8 U.S.C. § 1158(a)(2)(D) whether petitioner had established changed or extraordinary circumstances excusing her untimely application. Petitioners posit that the IJ should have applied a "benefit of the doubt" standard. As to this particular issue, we do not need to decide whether this issue raises a "constitutional claim[ ] or question[ ] of law" to which our jurisdiction extends under 🚩 8 U.S.C. § 1252(a)(2)(D), since, as explained below, we find the argument to be wholly without merit.

 In support of their argument for a "benefit of the doubt" standard, petitioners cite to the Handbook on the Procedures and Criteria for Determining Refugee Status, issued by the Office of the United Nations High Commissioner for Refugees ("UNHCR Handbook"). The UNHCR Handbook, in relevant part, describes the difficulty of proof inherent in an asylum seeker's situation. UNHCR Handbook ¶ 196. To account for this difficulty, the Handbook advises that "if the applicant's account appears credible, he should, unless there are good reasons to the contrary, be given *the benefit of the doubt."* UNHCR Handbook ¶ 196 (emphasis added).

Petitioners' reliance on the "benefit of the doubt" standard as set forth in the UNHCR Handbook is misguided for several reasons. First and foremost, "the [UNHCR] Handbook is not binding on the INS or American courts." 🚩 *Abdulai v. Ashcroft,* 239 F.3d 542, 553 (3d Cir.2001). Second, the UNHCR Handbook sets forth procedures for determining refugee status, not for assessing the circumstances surrounding the late filing of an asylum application. Third, even if the UNHCR Handbook were binding and relevant to the timeliness determination, the "benefit of the doubt" standard has no application to **\*635** the facts of this case since the IJ found that petitioner's account was implausible and lacking in credibility. *See* UNHCR Handbook ¶ 196 (*"if the applicant's account appears credible,* he should, unless there are good reasons to the contrary, be given the benefit of the doubt.") (emphasis added). For these reasons, we conclude that petitioners' claim that the IJ applied the wrong legal standard does not raise a colorable claim of legal error. [5] As a consequence, we need not reach the jurisdictional issue of whether their claim falls within the judicial review provision of 🚩 8 U.S.C. § 1252(a)(2)(D).

 Petitioners' remaining argument is that the evidence in the record demonstrates changed circumstances materially affecting asylum eligibility or extraordinary circumstances relating to the delay, as required under 📙 8 U.S.C. § 1158(a)(2)(D) to excuse the late filing. We must first determine whether this contention raises a "question[ ] of law" to which our jurisdiction extends, 🚩 8 U.S.C. § 1252(a)(2)(D), [6] or a factual or discretionary matter outside of our jurisdiction, 📙 8 U.S.C. § 1158(a)(3).

An untimely application for asylum may be considered only "if the alien demonstrates to the satisfaction of the Attorney General" that she qualifies for an exception to one-year filing deadline. 📙 8 U.S.C. § 1158(a)(2)(D). This language requiring an asylum applicant to make a demonstration to the Attorney General's "satisfaction" implies that the Attorney General's determination entails an exercise of discretion. *See* 📙 *Vasile,* 417 F.3d at 768. Petitioners' claim that she met her burden of demonstrating changed circumstances materially affecting asylum eligibility or extraordinary circumstances relating to the delay challenges that exercise of discretion. Such a claim does not raise a constitutional claim or question of law covered by the REAL ID Act's judicial review provision. We therefore agree with our sister courts that, despite the changes of the REAL ID Act, 📙 8 U.S.C. § 1158(a)(3) continues to divest the court of appeals of jurisdiction to review a decision regarding whether an

alien established changed or extraordinary circumstances that would excuse his untimely filing. 🚩 *Ramadan,* 427 F.3d at 1222; 🔖 *Chacon–Botero,* 427 F.3d at 957; 🔖 *Vasile,* 417 F.3d at 768–69. Therefore, we conclude that we do not have jurisdiction to review petitioners' challenge.

C.

Petitioners also argue that the IJ erroneously excluded evidence under 8 C.F.R. § 287.6, and that the evidence would have corroborated petitioner's testimony. The authentication regulation of 8 C.F.R. § 287.6 provides, in pertinent part, as follows:

> In any proceeding under this chapter, an official record or entry therein, when admissible for any purpose, shall be evidenced by an official publication thereof, or by a copy attested by an officer so authorized.... The attested copy, with the additional foreign certificates if any, must be certified by an officer in the Foreign Service of the United States, **\*636** stationed in the foreign country where the record is kept.

8 C.F.R. § 287.6. In 🔖 *Liu v. Ashcroft,* 372 F.3d 529 (3d Cir.2004), we declared that "8 C.F.R. § 287.6 is not an absolute rule of exclusion, and is not the exclusive means of authenticating records before an immigration judge." 🔖 *Id.* at 533. In doing so, we adopted the government's reading of the authentication regulation, reasoning that while the government's reading might not have been the most obvious one, it was not plainly erroneous and, moreover, "asylum applicants can not always reasonably be expected to have an authenticated document from an alleged persecutor." 🔖 *Id.* at 532 (internal citation and quotation marks omitted).

In this case, the IJ refused to give any weight to unauthenticated documentary evidence on the basis of section 287.6 alone, and failed to afford petitioner an opportunity to authenticate the documents through other means. In addition, the documentary evidence, if found to be genuine, would corroborate petitioner's testimony. For example, the address on petitioner's husband's identification card and the 1999 marriage certificate support petitioner's testimony that the reason she was in Unjung Pandang in September 1997 when the riots broke out was to meet her husband's family in anticipation of their eventual marriage. Because the documentary evidence, if considered, might have resulted in a favorable credibility determination, we find that remand is appropriate so that the authenticity of the documents [7] may be reconsidered, and, if found genuine, the credibility of the petitioner reevaluated for purposes of the withholding of removal claim. [8]

D.

Petitioners also contend that the IJ's adverse credibility determination was not supported by substantial evidence. Adverse credibility determinations are reviewed under the substantial evidence standard. 🚩 *Gao v. Ashcroft,* 299 F.3d 266, 272 (3d Cir.2002). "We look at an adverse credibility determination to ensure that it was appropriately based on inconsistent statements, contradictory evidence, and inherently improbable testimony ... in view of the background evidence on country conditions." 🔖 *Dia,* 353 F.3d at 249 (internal citation and quotation marks omitted). An adverse credibility determination based on speculation or conjecture, rather than on evidence in the record, will be reversed. 🚩 *Gao,* 299 F.3d at 272. "Where an IJ bases an adverse credibility determination in part on 'implausibility' as the IJ did here, such a conclusion will be properly grounded in the record only if it is made against the background of the general country conditions." 🔖 *Dia,* 353 F.3d at 249.

In this case, the IJ made an adverse credibility determination with respect to three incidents of alleged persecution.[9]  **\*637**  The IJ found incredible petitioner's presence "at all of these major events even though they were quite far apart in distance." (Decision at 10.) However, the IJ's adverse credibility determination was not based upon any evidence in the record, *Dia,* 353 F.3d at 249, but upon speculation and conjecture. Furthermore, as noted above, the evidence which the IJ erroneously excluded under 8 C.F.R. § 287.6, if found to be genuine, would corroborate petitioner's testimony. Accordingly, remand is appropriate so that the credibility issue bearing upon the withholding of removal claim may be reconsidered.

E.

Next, petitioners assert that the IJ failed to consider whether there was a pattern or practice of persecution against Chinese and/or Christians in Indonesia. This issue was properly raised before the BIA, and, thus, the Court has jurisdiction to review it. *See* 8 U.S.C. § 1252(d)(1).

To establish a well-founded fear of persecution, an applicant must first demonstrate a subjective fear of persecution through credible testimony that her fear is genuine. *Zubeda v. Ashcroft,* 333 F.3d 463, 469 (3d Cir.2003). Second, the applicant must show, objectively that "a reasonable person in the alien's circumstances would fear persecution if returned to the country in question." *Id.* To satisfy the objective prong, a petitioner must show he or she would be individually singled out for persecution or demonstrate that "there is a pattern or practice in his or her country of nationality ... of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion ..." 8 C.F.R. § 208.13(b)(2)(iii)(A). Although the INA regulations do not define what conditions constitute a "pattern or practice of persecution," this Court has held that, "to constitute a pattern or practice, the persecution of the group must be systematic, pervasive, or organized." *Lie v. Ashcroft,* 396 F.3d 530, 537 (3d Cir.2005) (citation and internal quotation marks omitted). In addition, as with any claim of persecution, the acts must be committed by the government or forces the government is either unable or unwilling to control. *Id.* (citation and internal quotation marks omitted).

Here, the IJ found that petitioner had not established a well-founded fear of persecution, without specifically addressing whether a pattern or practice of persecution existed in Indonesia. Accordingly, on remand, petitioners' claim that there is a pattern or practice of persecution of Chinese Christians in Indonesia must be considered.[10]

F.

Finally, petitioners contend that the IJ's conduct during the removal hearing violated their due process rights. As judicial officers, immigration judges have the " 'responsibility to function as neutral and impartial arbiters' and 'must assiduously refrain from becoming advocates for either party.' " *Abdulrahman,* 330 F.3d at 596 (citations and internal quotation marks omitted). This requirement of neutrality is "especially important where, as in this class of cases, the determination of the trier of fact are subject to particularly narrow appellate scrutiny." *Id.* at 599.

In this case, in derogation of his responsibility to appear neutral and impartial, the  **\*638**  IJ interjected intemperate and bias-laden remarks. While petitioner was testifying on cross-examination regarding her desire for her sister to come to the United States to obtain further education and a better job here, the IJ stated:

Look for a better job. Ma'am she has no right to be here. You have no right to be here. All of the applicants that are applying for asylum have no right to be here. You don't come to the United States to look for a job! That's not the purpose of asylum. You don't come here to look for a job, or look for a house, or look for a better car, and than as an afterthought say, well, the only way I'm going to be able to stay here is if I can convince a Judge that I'm going to be persecuted. It's not the way the law works. Now, if you're telling your sister to come to the United States to pretend to be a student to have her come here, you're guilty of visa fraud. That is a felony. You can go to jail for that! You have to understand, the whole world does not revolve around you and the other Indonesians that just want to live here because they enjoy the United States better than they enjoy living in Indonesia. It is not a world that revolves around you and your ethnic group.

We are deeply troubled by the IJ's remarks, none of which had any basis in the facts introduced, or the arguments made, at the hearing. There was no evidence adduced at the hearing that petitioner was seeking asylum only because she enjoyed the quality of life here better than that in Indonesia, nor was there any basis for the IJ's remarks that petitioner might be guilty of visa fraud. In particular, the IJ's statement that the "whole world does not revolve around you and the other Indonesians that just want to live here because they enjoy the United States" gives the appearance that the IJ has a predisposition to find against petitioner. [11]

"[E]ven if the IJ was not actually biased—and we do not speculate here as to h[is] state of mind—the mere appearance of bias on h[is] part could still diminish the stature of the judicial process [ ]he represents." *Wang v. Attorney General,* 423 F.3d 260, 269 (3d Cir.2005) (citation and internal quotation marks omitted). As stated by the Supreme Court, "justice must satisfy the appearance of justice." *Offutt v. United States,* 348 U.S. 11, 13, 75 S.Ct. 11, 99 L.Ed. 11 (1954). Thus, although we need not reach the due process issue, in order to ensure fairness and the appearance of impartiality, we strongly encourage that on remand, the BIA assign any further proceedings to a different IJ. *See Korytnyuk v. Ashcroft,* 396 F.3d 272, 287 n. 20 (3d Cir.2005) ("[W]hile we recognize that the assignment of an [IJ] is within the province of the Attorney General, if on remand an IJ's services are needed, we believe the parties would be far better served by the assignment to those proceedings of a different IJ.") (citations and internal quotation marks omitted).

For the foregoing reasons, the petition for review will be granted, the order of the BIA vacated, and this case remanded for further proceedings consistent with the dictates of this opinion.

**All Citations**

434 F.3d 627

## Footnotes

| | |
|---|---|
| * | Caption amended pursuant to Rule 43(c), Fed. R.App. P. |
| 1 | The application, filed by Ellyana Sukwanputra, seeks refugee status for her husband, Yulius Sukwanputra, as a derivative applicant. Unless otherwise indicated, reference to the singular "petitioner" refers to Ellyana Sukwanputra. |
| 2 | An alien may apply for asylum if he "demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States." 8 U.S.C. § 1158(a)(2)(B). A tardy |

AR.06472

application may be considered if the alien demonstrates to the satisfaction of the Attorney General the existence of either of the following circumstances: "changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application within the period specified in subparagraph (B)." 8 U.S.C. § 1158(a)(2)(D).

3    In addition, the one-year statutory period withstands a Supremacy Clause challenge based on the application of the "last in time" rule. *See Kappus v. Comm'r of Internal Revenue*, 337 F.3d 1053, 1057 (D.C.Cir.2003). Under this rule, "[w]hen a statute conflicts with a treaty, the later of the two enactments prevails over the earlier." *Id.* (citing *Whitney v. Robertson,* 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888)). Congress added § 1158(a) to the INA as part of the 1980 amendments to that Act. *Cardoza–Fonseca,* 480 U.S. at 427, 107 S.Ct. 1207. Thus, § 1158(a)(2) could not unconstitutionally violate the 1967 Protocol, even if it was self-executing.

4    Section 106(a) of the REAL ID Act took effect on May 11, 2005, and applies to cases in which the final administrative order of removal, deportation, or exclusion was issued before, on, or after the date of the enactment. *See* REAL ID Act § 106(b). Thus, even though the final administrative order of removal in this case was issued before the date of the enactment, § 1252(a)(2)(D) applies to this case.

5    Petitioners also claim that the untimely filing should be excused because there was no evidence of intentional delay in the record. However, the absence of intentional conduct on the part of the asylum applicant in creating the circumstances which caused the delay is merely one element that the asylum applicant must prove to excuse a failure to file within the one-year deadline. 8 C.F.R. § 208.4(a)(5).

6    Petitioners do not raise a constitutional challenge relating to the IJ's determination of untimeliness.

7    *See* list of documents *supra* Part II. Based upon our review of the hearing transcript, it does not appear that petitioner's diploma, her husband's baptismal certificate, the religious marriage certificate, or their child's social security card was found inadmissible under 8 C.F.R. § 287.6, *see* R. at 70, although petitioners have indicated to the contrary on appeal. Our ruling herein would apply equally to those documents if they had been found inadmissible under 8 C.F.R. § 287.6.

8    Petitioners do not specifically challenge the IJ's denial of relief under CAT, beyond mentioning in a footnote that the claim differs from claims for asylum and withholding of removal regarding burdens of proof and levels of harm required to merit relief. We will therefore not entertain the CAT claim. *See Nagle v. Alspach,* 8 F.3d 141, 143 (3d Cir.1993).

9    *See* factual recitation *supra* Part I.

10    Significantly, we do not hold that a pattern or practice of persecution in Indonesia in fact exists, nor do we hold that the *Lie* decision establishes that a pattern or practice does not exist since the record in this case contains a 2001 country report whereas the record in *Lie* contained an earlier 1999 country report. *Lie,* 396 F.3d at 537.

11    This is not the first time we have been troubled by the conduct of the IJ who presided over the proceedings in this case. In *Fiadjoe v. Attorney General,* 411 F.3d 135 (3d Cir.2005), we reversed an adverse credibility determination made by Judge Donald Ferlise, finding that his questioning amounted to "bullying" and was "extreme[ly] insensitiv[e]," and his tone was "hostile and at times became extraordinarily abusive." 411 F.3d at 144, 154.

---

End of Document    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

770 F.3d 1071
United States Court of Appeals,
Second Circuit.

SUZHEN MENG, Petitioner,

v.

Eric H. HOLDER, Jr., United States
Attorney General, Respondent.

Docket No. 12–2258–ag.
|
Argued: Aug. 26, 2014.
|
Decided: Nov. 3, 2014.

**Synopsis**

**Background:** Alien, a native of China, petitioned for review of a Board of Immigration Appeals decision, which upheld an Immigration Judge's order of removal, denial of an application for asylum and withholding of removal, and denial of relief pursuant to the Convention Against Torture (CAT).

**Holdings:** The Court of Appeals, Reena Raggi, Circuit Judge, held that:

[1] the statutory "persecutor bar" precluded the alien's application for asylum and withholding of removal, and

[2] the alien failed to establish that it was more likely than not that she would be tortured if removed to her home country.

Petition denied

West Headnotes (3)

[1] **Aliens, Immigration, and Citizenship** 🔑 Review of initial decision or administrative review

Where the Board of Immigration Appeals (BIA) upholds an Immigration Judge's (IJ) decision and closely tracks the IJ's reasoning, the Court of Appeals may consider both the IJ's and the BIA's opinions for the sake of completeness.

1 Cases that cite this headnote

[2] **Aliens, Immigration, and Citizenship** 🔑 Participants in persecution

Substantial evidence supported an Immigration Judge's determination that an alien, a native of China, assisted in the persecution of women who became pregnant in violation of China's family planning policy, and thus the alien was ineligible for either asylum or withholding of removal under the statutory "persecutor bar," where the alien, in her role as a public security officer, registered and reported unauthorized pregnancies to Chinese authorities for more than two decades with knowledge that forced abortions and sterilizations were the typical punishment meted out to women she reported for unauthorized pregnancies. Immigration and Nationality Act, §§ 208(b)(2)(A)(i), 241(b)(3)(B)(i), 8 U.S.C.A. §§ 1158(b)(2)(A)(i), 1231(b)(3)(B)(i); 8 C.F.R. § 208.13(c).

2 Cases that cite this headnote

[3] **Aliens, Immigration, and Citizenship** 🔑 Standard for relief

The prior 14-day detention and beating of an alien, a native of China, did not demonstrate that it was more likely than not that the alien would be tortured if removed to her home country, as required for relief under the Convention against Torture (CAT), where, after the alien was released from her detention, she remained in China for more than ten months without experiencing any further harm, the Chinese authorities returned her passport, thereby allowing her to travel outside China, and the alien's husband and children have remained in China unharmed. 8 C.F.R. §§ 208.16(c)(2), 1208.16(c)(3).

2 Cases that cite this headnote

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**Attorneys and Law Firms**

**\*1072** Gary J. Yerman, The Yerman Group, LLC, New York, NY, for Petitioner.

Alison Marie Igoe, Senior Counsel (Stuart F. Delery, Principal Deputy Assistant Attorney General; Lyle Jentzer, Senior Counsel, on the brief), Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for Respondent.

Before: WINTER, RAGGI, CARNEY, Circuit Judges.

**Opinion**

REENA RAGGI, Circuit Judge:

Petitioner Suzhen Meng is a native and citizen of the People's Republic of China who seeks asylum, withholding of removal, and relief pursuant to the Convention Against Torture ("CAT") based on past political persecution in China, which she claims to have experienced because, as a local public security officer, she refused to collect security fees and reported police corruption. Meng now petitions this court for review of the May 9, 2012 decision of the Board of Immigration Appeals ("BIA") upholding the April 22, 2010 decision of Immigration Judge ("IJ") Javier E. Balasquide, which denied Meng such relief and ordered her removal from the United States. *See In re Suzhen Meng,* No. A089 224 906 (B.I.A. May 9, 2012), *aff'g* No. A089 224 906 (Immig.Ct.N.Y.C. Apr. 22, 2010).

Meng contends that the agency erred in concluding that the statutory "persecutor bar" rendered her ineligible for asylum and withholding of removal. *See* 8 U.S.C. §§ 1158(b)(2)(A)(i), 1231(b)(3)(B)(i). She maintains that her actions as a public security officer, specifically, her reporting women pregnant in violation of China's family planning limitations to local authorities, were insufficient as a matter of law to constitute "assistance" in persecution. Meng also challenges the agency's finding that she failed to carry her burden for CAT relief.

For the reasons explained in this opinion, we identify no error in the agency's rulings and, accordingly, we deny the petition for review.

**I. *Background***

### A. *Meng's Application for Relief*

On February 25, 2008, Meng was admitted to the United States as a nonimmigrant visitor with authorization to remain for six months. Five months later, on July 24, 2008, Meng filed for asylum, withholding of removal, and CAT relief, stating that she had suffered past political persecution when, as a public security officer in her local community, she refused to collect a security fee from residents and wrote a letter to the local public security bureau alleging that the police chief was corrupt. Meng asserted that, as a result of these actions, her passport was confiscated and **\*1073** she was arrested and held in custody for 14 days, during which time a guard slapped her in the face several times and fellow prisoners beat her on instruction of the guards. Ten months later, Meng's passport was returned when she promised not to engage in any further anti-government activities, whereupon she left China.

### B. *Meng's Immigration Hearing*

On September 16, 2008, Meng was charged as subject to removal for having overstayed her visa. *See* 8 U.S.C. § 1182(a)(7)(A)(i)(I). At an October 1, 2009 hearing before the IJ, Meng pursued her claim for relief from removal by testifying to the persecution alleged in her application. She also testified to her job responsibilities as a public security officer, a position she had held for 22 years. Meng stated that, in that capacity, she oversaw approximately 1,100 households, and that her duties included reporting all pregnant women to China's family planning office, including women pregnant in violation of state limitations. Meng understood that when she reported a policy-violating woman to authorities, that woman would be punished, typically by being forced to undergo an abortion or sterilization. Indeed, she testified to having seen such women dragged away forcibly by the police. Nevertheless, Meng voluntarily continued to serve as a security officer and to make her reports, although she sometimes advised women whom she would report as being pregnant in violation of family planning policy to go into hiding or to flee.

### C. *Denial of Relief*

On April 22, 2010, the IJ denied Meng's application for relief and ordered her removed. Although the IJ found Meng credible, he ruled that her active assistance in the persecution of women pregnant in violation of China's family planning policy barred her from receiving asylum or withholding of removal. The IJ further denied Meng CAT relief, concluding

that she had failed to show that it was more likely than not that she would be tortured if returned to China.

The BIA essentially agreed with the IJ and dismissed Meng's appeal, prompting this petition for review.

## II. *Discussion*

### A. *Standard of Review*

On a petition for review of a BIA decision, we apply the deferential substantial-evidence standard to the agency's findings of fact, treating them as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see Shunfu Li v. Mukasey,* 529 F.3d 141, 146 (2d Cir.2008). We apply *de novo* review, however, to questions of law, including whether an alien's conduct could render her a "persecutor" as that term is statutorily defined. *See* 8 U.S.C. §§ 1158(b)(2)(A)(i), 1231(b)(3)(B)(i); *Yanqin Weng v. Holder,* 562 F.3d 510, 513 (2d Cir.2009).

**[1]** Where, as here, the BIA upholds the IJ's decision and "closely tracks the IJ's reasoning, this Court may consider both the IJ's and the BIA's opinions for the sake of completeness." *Maldonado v. Holder,* 763 F.3d 155, 158–59 (2d Cir.2014).

### B. *Asylum and Withholding of Removal: The "Persecutor Bar"*

Asylum is a form of discretionary relief that allows an otherwise removable alien to remain and work in the United States if she demonstrates that she is a "refugee," *i.e.,* an alien who "is unable or unwilling to return to, and is unable or unwilling to avail ... herself of the protection of, [her native] country because of [past] persecution **\*1074** or a well founded fear of [future] persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *See* 8 U.S.C. §§ 1101(a), 1158(b)(1)(A), (b)(3), (c)(1); 8 C.F.R. §§ 1208.13(b), 1208.21; *Mei Fun Wong v. Holder,* 633 F.3d 64, 68 (2d Cir.2011). Withholding of removal, meanwhile, is a form of mandatory relief that prevents the removal of an alien to a country where "the alien's life or freedom would be threatened ... because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3).

Both forms of relief are subject to a statutory "persecutor bar," which renders an alien ineligible for either asylum or withholding if she has "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* §§ 1158(b)(2)(A)(i), 1231(b)(3)(B)(i); *see Xu Sheng Gao v. U.S. Att'y Gen.,* 500 F.3d 93, 97–98 (2d Cir.2007). This court has identified four factors relevant to determining when this persecutor bar applies: (1) "the alien must have been involved in acts of persecution"; (2) a "nexus must be shown between the persecution and the victim's race, religion, nationality, membership in a particular social group, or political opinion"; (3) if the alien "did not [herself] incite, order, or actively carry out" the persecution, her conduct "must have assisted the persecution"; and (4) the alien must have had "sufficient knowledge that ... her actions may assist in persecution to make those actions culpable." *Balachova v. Mukasey,* 547 F.3d 374, 384–85 (2d Cir.2008) (internal quotation marks omitted). Where evidence indicates that an alien assisted in persecution, the alien seeking relief from removal bears "the burden of proving by a preponderance of the evidence" that she "did not so act." 8 C.F.R. § 208.13(c); *see Zhang Jian Xie v. INS,* 434 F.3d 136, 139 (2d Cir.2006).

**[2]** Here, the IJ and BIA concluded that Meng had assisted in the persecution of women who became pregnant in violation of China's family planning policy because, in her role as a public security officer, she had reported such women to Chinese authorities for more than two decades knowing that, as a result, any number of these women would be subjected to forced abortions or sterilizations. Meng does not—and cannot—dispute that forced abortions and involuntarily sterilizations constitute persecution on a protected ground; they are statutorily defined as such. *See* 8 U.S.C. § 1101(a)(42); *Yan Yan Lin v. Holder,* 584 F.3d 75, 80 (2d Cir.2009) ("It is settled law that forced abortion is persecution on account of political opinion."). Nor does she dispute that women in her community who became pregnant in violation of family planning policy were subjected to such persecution. Instead, Meng contends that the record evidence was insufficient as a matter of law to admit a finding that she "assisted" in such persecution. She maintains that her actions in registering and reporting unauthorized pregnancies were merely tangential, passive accommodations of the persecutory conduct of Chinese family planning authorities,

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

which *Zhang Jian Xie v. INS,* 434 F.3d at 143, holds is not enough to constitute assistance in persecution. *See also Xu Sheng Gao v. U.S. Att'y Gen.,* 500 F.3d at 99–100 (holding mere association with persecutory enterprise insufficient to trigger persecutor bar). Indeed, Meng argues that *Xu Sheng Gao* requires evidence that one of her reports led to a specific forced abortion or involuntary sterilization to admit a finding of assistance. *See id.* In fact, the cited precedents do not support Meng's arguments.

 **\*1075**  In *Zhang Jian Xie,* at the same time that this court observed that conduct "passive in nature" and "tangential" to third-party acts of oppression is insufficient to manifest "assistance," we stated that "active" conduct, having "direct consequences for the victims," can constitute "assistance in persecution." 434 F.3d at 143. Here, Meng's conduct was clearly active and not passive. She affirmatively identified pregnant women in her community, including those pregnant in violation of China's family planning policy, and she deliberately reported these women to authorities. Nor was she merely associated with a persecutory enterprise. She was integral to the effectuation of persecution. Meng's reporting of policy-violating women was no "minor" action, but the critical step that set in motion the entire persecutory scheme of enforcement. *Cf. id.* (upholding agency's imposition of persecutor bar even though petitioner's assistance was "arguably minor"). Indeed, without Meng's reports, authorities would not have known which women had violated family planning policy. Moreover, Meng's actions had direct consequences for the victims insofar as her reports were the basis for women being subjected to forced abortions and sterilizations. Meng not only admitted knowing that her conduct had this effect; she testified that it was the reason she sometimes urged the women whom she reported to hide or flee. Nevertheless, with knowledge that her conduct triggered persecution, Meng voluntarily continued to serve for more than two decades as a public security officer and to report women for unauthorized pregnancies. This record was sufficient to admit the agency finding that Meng assisted in persecution. *See In re Suzhen Meng,* No. 089 224 906, at 2 (finding that "as a result of [Meng's] actions, the Family Planning officials went to women's homes who had illegal pregnancies, seized them, and subjected them to forced abortions and sterilizations").

*Xu Sheng Gao v. U.S. Attorney General* compels no different conclusion. In that case, the alien who reported offending booksellers to Chinese authorities knew only that there was a possibility that the booksellers "*could* " be arrested and imprisoned, but nothing indicated that any bookseller had, in fact, been subjected to such treatment. 500 F.3d at 100 (emphasis in original). Rather, the most serious sanction that petitioner knew ever to have been imposed on a reported bookseller was revocation of a business license. *See id.* It was in these circumstances—with no evidence of persecution *ever* resulting from the alien's conduct—that we were "unable to conclude" that the alien had "the requisite level of knowledge that his acts assisted in persecution to sustain a finding that he was a 'persecutor' under the statute." *Id.* at 102. By contrast, here, Meng admitted knowing that forced abortions and sterilizations were the typical punishment meted out to women she reported for unauthorized pregnancies. Where, as in this case, the occurrence of the persecution is undisputed, and there is such evidence of "culpable knowledge that the consequences of one's actions would assist in acts of persecution," *Xu Sheng Gao* specifically states that "the evidence need not [further] show that the alleged persecutor had specific actual knowledge that his actions assisted in a particular act of persecution." *Id.* at 103.[1]

 **\*1076** *Yanqin Weng v. Holder* also affords Meng no support in challenging the application of the persecutor bar to this case. 562 F.3d at 515. In *Yanqin Weng,* the petitioning alien, a nurse's assistant, provided post-surgical medical care to women in China who had undergone forced abortions and, on one occasion, sat outside the locked door of a room where women awaiting forced abortions were being held until delayed doctors arrived to perform the procedures. *See id.* at 512, 515. In concluding that the persecutor bar did not apply to these circumstances, this court observed that the petitioner's provision of *post*-surgical care did not contribute to the abortions. *See id.* at 515. As for petitioner's guarding women facing forced abortions, that one-time occurrence was deemed to have "deviated markedly from her routine duties" and lasted only ten minutes before petitioner, in fact, helped one of the women escape, which resulted in petitioner losing her job. *Id.* Here, as already noted, Meng's reporting of women pregnant in violation of China's family planning policy did contribute directly to the forced abortion and sterilization of these women. Further, Meng engaged in such reporting over a period of two decades. In short, her assistance in persecution was not a single, marked departure from her duties, but a regular, and important, aspect of her duties. While Meng may have encouraged some women to hide or flee to avoid the persecution that she knew would follow

from her conduct, the record indicates that Meng nevertheless persisted in reporting women with unauthorized pregnancies as long as she served as a public security official.

Accordingly, because the record evidence was sufficient to support a finding that Meng assisted in persecution, we identify no legal error in the agency's determination that the persecutor bar rendered Meng ineligible for asylum or withholding of removal.

### D. *CAT Relief*

**[3]**    A petitioner seeking CAT relief must demonstrate that it is "more likely than not" that she will be tortured if removed to her home country. *See* 8 C.F.R. § 208.16(c)(2); *Yan Yan Lin v. Holder,* 584 F.3d at 82. Here, we identify no error in the agency's denial of CAT relief for failure to satisfy this requirement.

Meng essentially relies on evidence of her past 14–day detention and beatings to argue likely future persecution. We need not here decide if this experience rose to the level of "torture," *but see* 8 C.F.R. § 1208.18(a)(2) (defining torture as "extreme form of cruel and inhuman treatment"); *Kyaw Zwar Tun v. INS,* 445 F.3d 554, 567 (2d Cir.2006) ("[T]orture requires proof of something more severe than the kind of treatment that would suffice to prove persecution."), because even assuming that the issue were resolved in Meng's favor, she would not have demonstrated agency error.

Past torture does not give rise to a presumption of future torture. Rather, it serves as evidence of the *possibility* of future torture. *See* 8 C.F.R. § 1208.16(c)(3). Here, the following facts demonstrate why such a possibility cannot be converted into the requisite likelihood: (1) after Meng's release from detention, she remained in China for more

than 10 months without experiencing any further harm; (2) Chinese authorities returned her passport, thereby allowing her to travel outside China; and (3) Meng's husband and children remain in China unharmed. *See Melgar de Torres v. Reno,* 191 F.3d 307, 313 (2d Cir.1999) (holding that where **\*1077** family members remain unharmed in petitioner's native country, objective fear of future harm is undermined); *see also Mu Xiang Lin v. U.S. Dep't of Justice,* 432 F.3d 156, 160 (2d Cir.2005) (upholding denial of CAT relief where petitioner offered no "particularized evidence" that she would be tortured in her country of removal). We therefore conclude that substantial evidence supports the agency's determination that Meng has not demonstrated that it is "more likely than not" that she will be tortured if returned to China.

### III. *Conclusion*

To summarize, we conclude:

1. The statutory persecutor bar rendered Meng ineligible for asylum and withholding of removal because, for over 20 years, she reported the identities of women with unauthorized pregnancies, knowing that, as a result, many of these women would be subjected to forced abortions and sterilizations. This showing was legally sufficient to demonstrate her assistance in persecution.

2. Meng is not entitled to CAT relief because she has not established that it is more likely than not that she will be tortured if removed to China.

Accordingly, the petition for review is DENIED.

### All Citations

770 F.3d 1071

---

### Footnotes

1    *Xu Sheng Gao* also concluded that the reporting petitioner did not assist in persecution that reflected the discretionary decision of others at the end of an attenuated chain of authority. *See* 500 F.3d at 101–02. But where, as here, Meng's reports regularly resulted in persecution, she knew that, and she nevertheless continued to report, we conclude that the agency has a substantial basis for finding assistance and applying the persecutor bar.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Thompson v. Barr, 1st Cir., May 21, 2020

521 F.3d 1000
United States Court of Appeals,
Eighth Circuit.

Marekegn Asfaw TAMENUT, Petitioner,

v.

Michael B. MUKASEY, Attorney General of
the United States of America,[1] Respondent.

No. 05–4418.
|
Submitted: July 19, 2007.
|
Filed: March 11, 2008.

**Synopsis**

**Background:** Alien, a citizen of Ethiopia, petitioned for review of order of Board of Immigration Appeals (BIA) refusing to exercise its authority to sua sponte reopen removal proceedings. The Court of Appeals, C. Arlen Beam, Circuit Judge, 477 F.3d 580, denied the petition.

**[Holding:]** On rehearing en banc, the Court of Appeals held that it lacked jurisdiction to review BIA's decision declining to exercise its sua sponte authority to reopen removal proceedings.

Petition dismissed.

Beam, Circuit Judge, filed opinion dissenting.

West Headnotes (9)

**[1]** **Administrative Law and Procedure** Presumptions as to Reviewability

There is a basic presumption of judicial review of final agency action, but this presumption may be overridden in certain circumstances.

**[2]** **Administrative Law and Procedure** Actions Committed to Agency Discretion in General

Even where a jurisdiction-stripping statute does not preclude review of a particular agency action, the Court of Appeals must still consider whether that agency action is committed to agency discretion by law under the Administrative Procedure Act (APA). 5 U.S.C.A. § 701(a)(2).

12 Cases that cite this headnote

**[3]** **Administrative Law and Procedure** Actions Committed to Agency Discretion in General

The committed to agency discretion exception to judicial review in the Administrative Procedure Act (APA) is a very narrow exception that is applicable in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply. 5 U.S.C.A. § 701(a)(2).

4 Cases that cite this headnote

**[4]** **Administrative Law and Procedure** Meaningful standard for review

Under the Administrative Procedure Act (APA), judicial review of an agency decision is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. 5 U.S.C.A. § 701(a)(2).

14 Cases that cite this headnote

**[5]** **Administrative Law and Procedure** Actions Committed to Agency Discretion in General

The application of the committed to agency discretion exception to judicial review in the Administrative Procedure Act (APA) requires careful examination of the statute on which the

4 Cases that cite this headnote

claim of agency illegality is based. 5 U.S.C.A. § 701(a)(2).

5 Cases that cite this headnote

**[6]** **Administrative Law and Procedure** Actions Committed to Agency Discretion in General

In determining whether the committed to agency discretion exception to judicial review in the Administrative Procedure Act (APA) applies, the Court of Appeals considers both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action. 5 U.S.C.A. § 701(a)(2).

1 Cases that cite this headnote

**[7]** **Aliens, Immigration, and Citizenship** Jurisdiction and venue

Court of Appeals lacked jurisdiction to review decision of the Board of Immigration Appeals (BIA) which declined to exercise its sua sponte authority to reopen removal proceedings; regulation establishing BIA's authority to reopen sua sponte for exceptional circumstances set no standards for that decision. 8 C.F.R. § 1003.2(a).

49 Cases that cite this headnote

**[8]** **Aliens, Immigration, and Citizenship** Jurisdiction and venue

Alien, a citizen of Ethiopia, failed to raise colorable constitutional claim, precluding judicial review of decision of Board of Immigration Appeals (BIA) declining to exercise its authority to reopen removal proceedings; alien's claim that BIA failed to consider all relevant circumstances disputed BIA's fact-specific discretionary decision. U.S.C.A. Const.Amend. 5.

26 Cases that cite this headnote

**[9]** **Constitutional Law** Admission and exclusion; deportation

The Due Process Clause guarantees that removal proceedings will be fundamentally fair. U.S.C.A. Const.Amend. 5.

1 Cases that cite this headnote

**Attorneys and Law Firms**

***1001** Herbert A. Igbanugo, Minneapolis, MN (Katie A. DeGrio, on the brief), for petitioner.

David E. Dauenheimer, USDOJ, OIL, Washington, DC, for respondent.

Before LOKEN, Chief Judge, WOLLMAN, BEAM, MURPHY, BYE, RILEY, MELLOY, SMITH, COLLOTON, GRUENDER, BENTON, and SHEPHERD, Circuit Judges, en banc.

**Opinion**

PER CURIAM.

The question before the en banc court is whether this court has jurisdiction over a petition for review filed by Marekegn Asfaw Tamenut challenging the decision of the Board of Immigration Appeals (BIA) not to reopen *sua sponte* proceedings relating to Tamenut's removal from the United States. We conclude that the decision whether to reopen removal proceedings *sua sponte* is committed to the BIA's discretion by law, 5 U.S.C. § 701(a)(2), and that we lack jurisdiction to review the agency's discretionary decision. We therefore dismiss the petition for review.

I.

Section 240 of the Immigration and Nationality Act ("INA") provides that "[a]n immigration judge shall conduct proceedings for deciding the ... deportability of an alien." 8 U.S.C. § 1229a(a)(1); *see* 8 C.F.R. pt. 1240. The decision of an immigration judge (IJ) that an alien is removable may be appealed to the BIA. 8 C.F.R. §§ 1003.1(b)(2), 1240.15.

The BIA "function[s] as an appellate body charged with the review of ... administrative adjudications." *Id.* § 1003.1(d).

In a removal proceeding, an alien may file one motion to reopen proceedings. 8 U.S.C. § 1229a(c)(7)(A); 8 C.F.R. § 1003.2(c)(2). The motion to reopen must be filed within ninety days of the final administrative order of removal. 8 U.S.C. § 1229a(c)(7)(C)(i); 8 C.F.R. § 1003.2(c)(2). The motion must "state the new facts that will be proven at a hearing if the motion is granted." **\*1002** 8 U.S.C. § 1229a(c)(7)(B); 8 C.F.R. § 1003.2(c)(1).

The governing regulations also provide that the BIA may reopen proceedings on its own motion. The relevant provision states in full:

> (a) General. *The Board may at any time reopen or reconsider on its own motion any case in which it has rendered a decision.* A request to reopen or reconsider any case in which a decision has been made by the Board, which request is made by the Service, or by the party affected by the decision, must be in the form of a written motion to the Board. The decision to grant or deny a motion to reopen or reconsider is within the discretion of the Board, subject to the restrictions of this section. The Board has discretion to deny a motion to reopen even if the party moving has made out a *prima facie* case for relief.

8 C.F.R. § 1003.2(a) (first emphasis added). The present version of this regulation was promulgated in 1996, pursuant to statutory authority providing that the Attorney General "shall establish such regulations, ... review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out this section." 8 U.S.C. § 1103(g)(2).[2]

On March 30, 1998, Tamenut filed an application for asylum, withholding of removal, and relief under the Convention Against Torture. On October 22, 1999, an IJ denied the application. On March 28, 2003, the BIA affirmed without opinion. Tamenut filed a petition for review, which a panel of this court denied. *Tamenut v. Ashcroft,* 361 F.3d 1060 (8th Cir.2004) (per curiam).

The BIA received Tamenut's first motion to reopen on June 7, 2004, and denied it as untimely on August 20, 2004. On October 4, 2005, the BIA received Tamenut's second motion to reconsider and reopen. This motion also requested that the BIA reopen the proceedings on its own motion. On November 21, 2005, the BIA denied Tamenut's motion as untimely. The BIA acknowledged it retained "limited discretionary powers" under § 1003.2(a) to reopen proceedings on its own motion, but stated that this power is confined to "exceptional situations," and concluded that Tamenut's situation did not merit this relief. (R. 2) (citing *Matter of J–J–,* 21 I & N Dec. 976 (BIA 1997)).

Tamenut filed a petition for review, arguing that the BIA abused its discretion by declining to reopen *sua sponte,* and that the BIA's decision violated the Due Process Clause. A panel of this court concluded that if it "were writing on a clean slate," then it "probably would conclude that we lack jurisdiction," *Tamenut v. Gonzales,* 477 F.3d 580, 581 (8th Cir.2007), but determined that it was bound by *Recio–Prado v. Gonzales,* 456 F.3d 819, 821–22 (8th Cir.2006), and *Ghasemimehr v. Gonzales,* 427 F.3d 1160, 1162 (8th Cir.2005), to hold that the BIA's refusal to reopen *sua sponte* is subject to judicial review. The panel then concluded that the BIA did not abuse its discretion or violate Tamenut's constitutional rights, and thus denied the petition for review. *Tamenut,* 477 F.3d at 582. A dissenting judge would have dismissed the petition for lack of jurisdiction. **\*1003** *Id.* at 582–83 (Riley, J., dissenting). We granted rehearing en banc to consider the jurisdictional question.

## II.

This court has jurisdiction to review all final orders of removal. 8 U.S.C. § 1252(a)(1), (b). Although the statute does not mention orders denying motions to reopen or reconsider, we have held that the grant of jurisdiction extends to review of these decisions. *See Esenwah v. Ashcroft,* 378

F.3d 763, 764 (8th Cir.2004); *De Jimenez v. Ashcroft,* 370 F.3d 783, 788–89 (8th Cir.2004). We adopted the view of the Seventh Circuit that "Congress has not clearly expressed an intent to depart from the long line of Supreme Court and appellate court decisions interpreting 'order of deportation' to include orders denying motions to reconsider and reopen."

*See id.* at 789 (quoting *Chow v. INS,* 113 F.3d 659, 664 (7th Cir.1997)). In considering the scope of § 1252(a)(1), we do not perceive a material difference between the BIA's decision to deny a party's motion to reopen and the BIA's decision to refuse a party's request that the agency reopen proceedings on its own motion. Thus, to the extent the BIA's refusal to reopen proceedings *sua sponte* is not committed to agency discretion, we would have jurisdiction to review the decision pursuant to § 1252.

**[1] [2]** There is a "basic presumption of judicial review" of final agency action, *Lincoln v. Vigil,* 508 U.S. 182, 190, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993), but this presumption may be overridden in certain circumstances. The Administrative Procedure Act declares that its provisions for judicial review do not apply when (1) a statute precludes judicial review, or (2) agency action is committed to agency discretion by law. 5 U.S.C. § 701(a). The INA does include a statutory provision that precludes judicial review of decisions by the Attorney General (other than the granting of relief under 8 U.S.C. § 1158(a)), which are specified under subchapter II of the INA to be in the discretion of the Attorney General. 8 U.S.C. § 1252(a)(2)(B)(ii). Because the INA does not specifically address the Attorney General's authority to reopen proceedings on his own motion, § 1252(a)(2)(B)(ii) does not preclude judicial review of the BIA's refusal to reopen *sua sponte.* Even where a jurisdiction-stripping statute does not preclude review of a particular agency action, however, we must still consider whether that agency action is "committed to agency discretion by law" under § 701(a)(2) of the APA. *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985); *see, e.g., Ngure v. Ashcroft,* 367 F.3d 975, 981–82 (8th Cir.2004); *Kambolli v. Gonzales,* 449 F.3d 454, 461 (2d Cir.2006).

**[3] [4] [5] [6]** The "committed to agency discretion" exception is a "very narrow exception" that "is applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (quoting S.Rep. No. 79–752, at 26 (1945)S.Rep. No. 79–752, at 26 (1945)), *abrogated on other grounds by Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). The Supreme Court has explained that "review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Chaney,* 470 U.S. at 830, 105 S.Ct. 1649. The application of the "committed to agency discretion" exception to judicial review "requires careful examination of the statute on which the claim of agency illegality is based." *Webster v. Doe,* 486 U.S. 592, 600, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988). In conducting this examination, we consider "both the nature of the administrative action at issue **\*1004** and the language and structure of the statute that supplies the applicable legal standards for reviewing that action." *Secretary of Labor v. Twentymile Coal Co.,* 456 F.3d 151, 156 (D.C.Cir.2006) (internal quotation omitted). The absence of any statutory factors to guide the agency's decision-making process, in combination with the open-ended nature of the inquiry, generally supports the conclusion that the "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see Southern Ry. Co. v. Seaboard Allied Milling Corp.,* 442 U.S. 444, 455, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979); *State of North Dakota v. Yeutter,* 914 F.2d 1031, 1035 (8th Cir.1990).

**[7]** Ten courts of appeals, finding no meaningful standard against which to judge the agency's exercise of discretion, have held that the BIA's decision whether to reopen proceedings on its own motion is committed to agency discretion by law. *Luis v. INS,* 196 F.3d 36, 40 (1st Cir.1999); *Ali v. Gonzales,* 448 F.3d 515, 518 (2d Cir.2006); *Calle–Vujiles v. Ashcroft,* 320 F.3d 472, 474–75 (3d Cir.2003); *Doh v. Gonzales,* 193 Fed.Appx. 245, 246 (4th Cir.2006) (per curiam); *Enriquez–Alvarado v. Ashcroft,* 371 F.3d 246, 248–50 (5th Cir.2004); *Harchenko v. INS,* 379 F.3d 405, 410–11 (6th Cir.2004); *Pilch v. Ashcroft,* 353 F.3d 585, 586 (7th Cir.2003); *Ekimian v. INS,* 303 F.3d 1153, 1159 (9th Cir.2002); *Belay–Gebru v. INS,* 327

F.3d 998, 1000–01 (10th Cir.2003); *Anin v. Reno,* 188 F.3d 1273, 1279 (11th Cir.1999). We now reach the same conclusion.

The statute governing motions to reopen speaks only to motions filed by a party; it does not establish any standard to guide the agency's discretion whether to reopen on its own motion. *See* 8 U.S.C. § 1229a(c)(7). The regulation establishing the BIA's authority to reopen *sua sponte* was promulgated pursuant to a general grant of regulatory authority that sets no standards for this decision. *See* 8 U.S.C. § 1103(g). The regulation itself, 8 C.F.R. § 1003.2(a), provides no guidance as to the BIA's appropriate course of action, sets forth no factors for the BIA to consider in deciding whether to reopen *sua sponte,* places no constraints on the BIA's discretion, and specifies no standards for a court to use to cabin the BIA's discretion. *See* *Interstate Commerce Comm'n v. Brotherhood of Locomotive Eng'rs,* 482 U.S. 270, 282, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987); *South Dakota v. Ubbelohde,* 330 F.3d 1014, 1027 (8th Cir.2003) (stating that the "committed to agency discretion" exception applies only where statutes do not "provide even minimal guidance to limit agency discretion"). The use of permissive and discretionary language in the first sentence of § 1003.2(a) further supports the inference that the agency action is unreviewable. *See* *Southern Ry.,* 442 U.S. at 456, 99 S.Ct. 2388; *Association of Irritated Residents v. EPA,* 494 F.3d 1027, 1032–33 (D.C.Cir.2007).

We are mindful that the BIA has said it may reopen proceedings on its own motion in "exceptional situations," *In re J–J–,* 21 I & N Dec. at 984, and that agency decisions about the presence of "exceptional circumstances," a similar phrase, are reviewable for abuse of discretion in some contexts, such as where the phrase is further defined by statute or regulation. *See, e.g.,* 8 U.S.C. § 1229a(e)(1) ("The term 'exceptional circumstances' refers to exceptional circumstances (such as battery or extreme cruelty to the alien or any child or parent of the alien, serious illness of the alien, or serious illness or death of the spouse, child, or parent of the alien, but not including less compelling circumstances) beyond the control of the alien."). We agree with other circuits, however, that there is no statutory, regulatory, or case-law definition of "exceptional situation" applicable to

the BIA's *sua sponte* power under ***1005** § 1003.2(a), *e.g.,* *Ekimian,* 303 F.3d at 1159, and that the use of the permissive term "may" in the regulation further implies that the BIA is under no obligation to reopen any particular case. *Enriquez -Alvarado,* 371 F.3d at 249–50. Assuming that a settled course of adjudication could establish a meaningful standard by which to measure the agency's future exercise of discretion, the mere fact that the BIA has acknowledged the existence of its authority to reopen *sua sponte* in what it deems to be "exceptional situations" is not sufficient to establish a meaningful standard for judging whether the BIA is *required* to reopen proceedings on its own motion. *See* *Calle–Vujiles,* 320 F.3d at 474–75. Therefore, we hold that the BIA's decision whether to reopen proceedings on its own motion pursuant to 8 C.F.R. § 1003.2(a) is committed to agency discretion by law.

Although this court lacks jurisdiction over Tamenut's challenge to the BIA's decision not to reopen *sua sponte,* we generally do have jurisdiction over any colorable constitutional claim. *See* *Mouawad v. Gonzales,* 485 F.3d 405, 411 (8th Cir.2007); *Torres–Aguilar v. INS,* 246 F.3d 1267, 1271 (9th Cir.2001). *See generally* *Webster,* 486 U.S. at 603, 108 S.Ct. 2047; *Sanders,* 430 U.S. at 109, 97 S.Ct. 980. To be colorable, a constitutional claim must have "some possible validity." *Torres–Aguilar,* 246 F.3d at 1271.

**[8]** **[9]** Tamenut argues that the BIA violated the Due Process Clause by misinterpreting BIA precedent and failing to consider all of the relevant circumstances of Tamenut's case. We think these contentions are simply "cloaking an abuse of discretion argument in constitutional garb," *Onyinkwa v. Ashcroft,* 376 F.3d 797, 799 n. 1 (8th Cir.2004) (quoting *Torres–Aguilar,* 246 F.3d at 1271), and are thus insufficient to justify judicial review. The Due Process Clause guarantees that removal proceedings will be "fundamentally fair." *Al Khouri v. Ashcroft,* 362 F.3d 461, 464 (8th Cir.2004). Tamenut quarrels with the BIA's fact-specific discretionary decision whether to reopen his case, but he points to nothing that calls into doubt the fundamental fairness of the procedures employed.

For these reasons, we join ten other circuits in concluding that the BIA's decision whether to reopen proceedings on its

own motion under 8 C.F.R. § 1003.2(a) is committed to agency discretion by law. We also conclude that Tamenut has not advanced a colorable claim that the BIA violated his constitutional rights. Accordingly, we dismiss the petition for review.

BEAM, Circuit Judge, dissenting.

Based upon an analysis under 8 U.S.C. § 1252, I believe we have jurisdiction over a petition for review challenging the BIA's decision not to reopen the record sua sponte in a removal proceeding. Therefore, I write separately in dissent.

The old adage "don't think you're on the right road just because it's a well-beaten path," is applicable here. [3]  In this case, I choose a different path from that taken by the en banc court and many circuits—one that is not new, but just a little less traveled. While the parties did not raise the question of whether **\*1006** 8 U.S.C. § 1252(a)(2)(B)(ii) affects our jurisdiction, we must examine all the bases of our subject matter jurisdiction, on our own motion if necessary.

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.L. No. 104–208, 110 Stat. 3009 (1996), "implements restrictions on federal court jurisdiction over several categories of BIA decisions." Zhao v. Gonzales, 404 F.3d 295, 302 n. 2 (5th Cir.2005). These restrictions are codified at 8 U.S.C. § 1252, representing Congress's clear intent in immigration proceedings. Accordingly, the jurisdiction proscription in the IIRIRA itself should be the first and only place we look to determine our jurisdiction in this case.

Section 1252(a)(2)(B)(ii) proscribes judicial review of "any ... decision or action of the Attorney General ... the authority for which is *specified under this subchapter* [8 U.S.C. §§ 1151–1381] to be in the discretion of the Attorney General" (emphasis added). Because § 1252(a)(2)(B)(ii) only strips our jurisdiction to review the use of discretionary authority "specified under this subchapter," its proscription would not apply to motions to reopen where the quantum of discretion is established by the agency in its implementing regulations. *See* 8 C.F.R. § 1003.2(a). *See, e.g., Ahmed v. Gonzales,* 447 F.3d 433, 436–37 (5th Cir.2006) (applying *Zhao* and determining that it had authority to review motions

to continue because the quantum of discretion exercised by the Attorney General in those instances is furnished by the federal regulation and is not specified in the subchapter as § 1252(a)(2)(B)(ii) contemplates); *Zhao,* 404 F.3d at 303 (same, in motion to reopen context); *Medina–Morales v. Ashcroft,* 371 F.3d 520, 529 (9th Cir.2004) (same, in motion to reopen context). It is here where I part ways with the court majority even though we all agree that we have jurisdiction to entertain Tamenut's petition for review under section 1252. *Ante* at 4.

It matters not, in my view, whether we are reviewing decisions on motions to reopen under 8 C.F.R. § 1003.2(a) or § 1003.2(c). Or, for that matter, whether we are reviewing motions for continuances under 8 C.F.R. § 1003.29. Regardless, the discretion established for reviewing any of these motions is established in the regulations, not the statutes.

Further, I do not view *Heckler* as a road block. *Cf.* *Zhao,* 404 F.3d at 302–04 (finding jurisdiction to review motions to reopen without conducting a *Heckler* analysis); *Medina– Morales,* 371 F.3d at 528–29 (same). I recognize that there are times when the standards against which we judge a BIA's decision are nonexistent, but reviewing decisions under § 1003.2(a) is not one of those times. The BIA has ruled that it will reopen cases in exceptional circumstances. *Matter of J–J–,* 21 I. & N. Dec. 976, 984 (BIA 1997) (holding that the Board's power to reopen or reconsider cases sua sponte is limited to exceptional circumstances and is not meant to cure filing defects or circumvent the regulations, where enforcing them might result in hardship). This body of agency law combined with case law pertaining to when exceptional circumstances have been found ought to be sufficient for us to unearth a meaningful standard of review in the § 1003.2(a) context, especially given the alternative. *See* *Ekimian v. INS,* 303 F.3d 1153, 1161 (9th Cir.2002) (Bright, J. dissenting); *see also* *Ramirez–Perez v. Ashcroft,* 336 F.3d 1001, 1005–06 n. 15 (9th Cir.2003) (recognizing that a history of case law may sufficiently establish standards upon which to review a BIA's decision). Given this highly deferential and strict standard of review, it may very well be that most BIA decisions that provide some reasons for

not reopening will be **\*1007** summarily upheld. The critical factor, however, is that review is proper.

Denying jurisdiction in these cases has clear policy consequences. Giving unfettered authority to administrative agencies to strip our jurisdiction is a slippery slope and one I am not willing to travel downward needlessly. Recognizing the "strong presumption in favor of judicial review of administrative action," 🚩 *INS v. St. Cyr,* 533 U.S. 289, 298, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), I dissent.

**All Citations**

521 F.3d 1000

## Footnotes

1    Michael B. Mukasey has been appointed Attorney General, and is substituted as respondent pursuant to Federal Rule of Appellate Procedure 43(c).

2    The provision authorizing the BIA to reopen proceedings at any time on its own motion originally was promulgated by the Attorney General in 1958, 23 Fed.Reg. 9,118 (Nov. 26, 1958), pursuant to a statute declaring that "[t]he Attorney General shall establish such regulations, ... and perform such other acts as he deems necessary for carrying out his authority under the provisions of [the INA]." Immigration and Nationality Act of 1952, Pub.L. 414, § 103(a), 66 Stat. 163, 173 (1952).

3    Or, perhaps, Sophie Tucker's verse in the 1927 song "Fifty Million Frenchmen Can't Be Wrong," an observation proven grossly inaccurate when France constructed the Maginot Line to defend itself from invasion by Germany at the outset of World War II. Sophie Tucker–Free Music Downloads, etc., http://www.artistdirect.com/nad/window/media/page/0,,253277–812683–WMLO, 00.html (last visited Mar. 4, 2008). This defensive line was generally considered one of the great failures of military history. 7 The New Encyclopedia Britannica 672–73 (16th ed.1998).

---

**End of Document**                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

105 S.Ct. 1694, 85 L.Ed.2d 1, 53 USLW 4410

KeyCite Yellow Flag - Negative Treatment

Abrogation Recognized by Pickett v. City of Perryton, Texas, N.D.Tex., February 4, 2020

105 S.Ct. 1694
Supreme Court of the United States

TENNESSEE, Appellant,

v.

Cleamtee GARNER, etc., et al.

MEMPHIS POLICE DEPARTMENT, et al., Petitioners,

v.

Cleamtee GARNER, etc., et al.

Nos. 83–1035, 83–1070.

|

Argued Oct. 30, 1984.

|

Decided March 27, 1985.

**Synopsis**

Father, whose unarmed son was shot by police officer as son was fleeing from the burglary of an unoccupied house, brought wrongful death action under the federal civil rights statute against the police officer who fired the shot, the police department and others. The United States District Court for the Western District of Tennessee, Harry W. Wellford, J., after remand, 600 F.2d 52, rendered judgment for defendants, and father appealed. The Court of Appeals for the Sixth Circuit, 710 F.2d 240, reversed and remanded. Certiorari was granted. The Supreme Court, Justice White, held that: (1) apprehension by use of deadly force is a seizure subject to the Fourth Amendment's reasonableness requirement; (2) deadly force may not be used unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others; (3) Tennessee statute under authority of which police officer fired fatal shot was unconstitutional insofar as it authorized use of deadly force against apparently unarmed, nondangerous fleeing suspect; and (4) the fact that unarmed suspect had broken into a dwelling at night did not automatically mean that he was dangerous.

Judgment of Court of Appeals affirmed and case remanded.

Justice O'Connor, with whom the Chief Justice and Justice Rehnquist joined, dissented, with opinion.

West Headnotes (13)

**[1]    Arrest    Use of force**

Tennessee law forbids the use of deadly force in the arrest of a misdemeanant. T.C.A. § 40–7–108.

88 Cases that cite this headnote

**[2]    Arrest    What Constitutes a Seizure or Detention**

When a police officer restrains the freedom of a person to walk away, the officer has seized that person. U.S.C.A. Const.Amend. 4.

105 S.Ct. 1694, 85 L.Ed.2d 1, 53 USLW 4410

216 Cases that cite this headnote

**[3]    Arrest** 🗝 What Constitutes a Seizure or Detention

**Arrest** 🗝 Use of force

Apprehension by use of deadly force is a "seizure" subject to the reasonableness requirement of the Fourth Amendment. U.S.C.A. Const.Amend. 4.

1202 Cases that cite this headnote

**[4]    Arrest** 🗝 Grounds for warrantless arrest in general

A police officer may arrest a person if he has probable cause to believe that person has committed a crime.

225 Cases that cite this headnote

**[5]    Searches and Seizures** 🗝 Fourth Amendment and reasonableness in general

Because one of the factors in Fourth Amendment balancing test is extent of the intrusion, reasonableness of a seizure depends on not only when a seizure is made, but also how it is carried out. U.S.C.A. Const.Amend. 4.

525 Cases that cite this headnote

**[6]    Arrest** 🗝 Use of force

Use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable, and where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. U.S.C.A. Const.Amend. 4.

2065 Cases that cite this headnote

**[7]    Arrest** 🗝 Use of force

A police officer may not seize an unarmed, nondangerous suspect by shooting him dead. U.S.C.A. Const.Amend. 4.

324 Cases that cite this headnote

**[8]    Arrest** 🗝 Use of force

Tennessee statute providing that if, after a police officer has given notice of an intent to arrest a criminal suspect, the suspect flees or forcibly resists, the officer may use all the necessary means to effect the arrest, is unconstitutional insofar as it authorizes the use of deadly force against an apparently unarmed, nondangerous fleeing suspect. T.C.A. § 40–7–108; U.S.C.A. Const.Amend. 4.

98 Cases that cite this headnote

**[9]    Arrest** 🗝 Use of force

Where police officer has probable cause to believe that a criminal suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force; thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime

involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given. T.C.A. § 40–7–108; U.S.C.A. Const.Amend. 4.

2198 Cases that cite this headnote

**[10]**    **Arrest** 👉 Use of force

Common law allowed the use of whatever force was necessary to effect the arrest of a fleeing felon, though not a misdemeanant.

27 Cases that cite this headnote

**[11]**    **Arrest** 👉 Pursuit

In evaluating, under the Fourth Amendment, reasonableness of police procedures for apprehending fleeing suspects the court looked to prevailing rules in individual jurisdictions not only to determine the balance of such policies but also with an eye to rule that the court is hesitant to declare police practice of long standing unreasonable if doing so would severely hamper effective law enforcement. U.S.C.A. Const.Amend. 4.

363 Cases that cite this headnote

**[12]**    **Arrest** 👉 Use of force

Police officer responding to nighttime burglary call could not reasonably have believed that the fleeing suspect, who was young, slight of build and unarmed, posed any threat, and fact that suspect, who was fatally shot, was suspected burglar could not of itself automatically justify use of deadly force to effect his apprehension. T.C.A. § 40–7–108; U.S.C.A. Const.Amend. 4.

1296 Cases that cite this headnote

**[13]**    **Arrest** 👉 Use of force

Although the armed burglar would present a different situation, the fact that unarmed suspect has broken into a dwelling at night does not automatically mean he is physically dangerous, so as to justify use of deadly force in effectuating his apprehension. T.C.A. § 40–7–108; U.S.C.A. Const.Amend. 4.

76 Cases that cite this headnote

**\*\*1696** *Syllabus* [*]

 **\*1**   A Tennessee statute provides that if, after a police officer has given notice of an intent to arrest a criminal suspect, the suspect flees or forcibly resists, "the officer may use all the necessary means to effect the arrest." Acting under the authority of this statute, a Memphis police officer shot and killed appellee-respondent Garner's son as, after being told to halt, the son fled over a fence at night in the backyard of a house he was suspected of burglarizing. The officer used deadly force despite being "reasonably sure" the suspect was unarmed and thinking that he was 17 or 18 years old and of slight build. The father subsequently brought an action in Federal District Court, seeking damages under 42 U.S.C. § 1983 for asserted violations of his son's constitutional rights. The District Court held that the statute and the officer's actions were constitutional. The Court of Appeals reversed.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

*Held:* The Tennessee statute is unconstitutional insofar as it authorizes the use of deadly force against, as in this case, an apparently unarmed, nondangerous fleeing suspect; such force may not be used unless necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others. Pp. 1699–1707.

**\*2** (a) Apprehension by the use of deadly force is a seizure subject to the Fourth Amendment's reasonableness requirement. To determine whether such a seizure is reasonable, the extent of the intrusion on the suspect's rights under that Amendment must be balanced against the governmental interests in effective law enforcement. This balancing process demonstrates that, notwithstanding probable cause to seize a suspect, an officer may not always do so by killing him. The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. Pp. 1699–1701.

(b) The Fourth Amendment, for purposes of this case, should not be construed in light of the common-law rule allowing the use of whatever force is necessary to effect the arrest of a fleeing felon. Changes in the legal and technological context mean that that rule is distorted almost beyond recognition when literally applied. Whereas felonies were formerly capital crimes, few are now, or can be, and many crimes classified as misdemeanors, or nonexistent, at common law are now felonies. Also, the common-law rule developed at a time when weapons were rudimentary. And, in light of the varied rules adopted in the States indicating a long-term movement away from the common-law rule, particularly in the police departments themselves, that rule is a dubious indicium of the constitutionality of the Tennessee statute. There is no indication that holding a police practice such as that authorized by the **\*\*1697** statute unreasonable will severely hamper effective law enforcement. Pp. 1701–1706.

(c) While burglary is a serious crime, the officer in this case could not reasonably have believed that the suspect—young, slight, and unarmed—posed any threat. Nor does the fact that an unarmed suspect has broken into a dwelling at night automatically mean he is dangerous. Pp. 1706–1707.

📄 710 F.2d 240 (CA6 1983), affirmed and remanded.

### Attorneys and Law Firms

*Henry L. Klein* argued the cause for petitioners in No. 83-1070. With him on the briefs were *Clifford D. Pierce, Jr., Charles V. Holmes,* and *Paul F. Goodman. W.J. Michael Cody,* Attorney General of Tennessee, argued the cause for appellant in No. 83-1035. With him on the briefs were *William M. Leech, Jr.,* former Attorney General, and *Jerry L. Smith,* Assistant Attorney General.

**\*3** *Steven L. Winter* argued the cause for appellee-respondent Garner. With him on the brief was *Walter L. Bailey, Jr.*†

† Briefs of *amici curiae* urging affirmance were filed for the Florida Chapter of the National Bar Association by *Deitra Micks;* and for the Police Foundation et al. by *William Josephson, Robert Kasanof, Philip Lacovara,* and *Margaret Bush Wilson.*

### Opinion

Justice WHITE delivered the opinion of the Court.

This case requires us to determine the constitutionality of the use of deadly force to prevent the escape of an apparently unarmed suspected felon. We conclude that such force may not be used unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.

I

At about 10:45 p.m. on October 3, 1974, Memphis Police Officers Elton Hymon and Leslie Wright were dispatched to answer a "prowler inside call." Upon arriving at the scene they saw a woman standing on her porch and gesturing toward the adjacent house. [1] She told them she had heard glass breaking and that "they" or "someone" was breaking in next door. While Wright radioed the dispatcher to say that they were on the scene, Hymon went behind the house. He heard a door slam and saw someone run across the backyard. The fleeing suspect, who was appellee-respondent's decedent, Edward Garner, stopped at a 6-feet-high chain link fence at the edge of the yard. With the aid of a flashlight, Hymon was able to see Garner's face and hands. He saw no sign of a weapon, and, though not certain, was "reasonably sure" and "figured" that Garner was unarmed. App. 41, 56; Record 219. He thought Garner was 17 or 18 years old and **\*4** about 5′5″ or 5′7″ tall. [2] While Garner was crouched at the base of the fence, Hymon called out "police, halt" and took a few steps toward him. Garner then began to climb over the fence. Convinced that if Garner made it over the fence he would elude capture, [3] Hymon shot him. The bullet hit Garner in the back of the head. Garner was taken by ambulance to a hospital, where he died on the operating table. Ten dollars and a purse taken from the house were found on his body. [4]

**\*\*1698** **[1]**  In using deadly force to prevent the escape, Hymon was acting under the authority of a Tennessee statute and pursuant to Police Department policy. The statute provides that "[i]f, after notice of the intention to arrest the defendant, he either flee or forcibly resist, the officer may use all the necessary means to effect the arrest." **\*5** Tenn.Code Ann. § 40–7–108 (1982). [5] The Department policy was slightly more restrictive than the statute, but still allowed the use of deadly force in cases of burglary. App. 140–144. The incident was reviewed by the Memphis Police Firearm's Review Board and presented to a grand jury. Neither took any action. *Id.,* at 57.

Garner's father then brought this action in the Federal District Court for the Western District of Tennessee, seeking damages under 42 U.S.C. § 1983 for asserted violations of Garner's constitutional rights. The complaint alleged that the shooting violated the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. It named as defendants Officer Hymon, the Police Department, its Director, and the Mayor and city of Memphis. After a 3-day bench trial, the District Court entered judgment for all defendants. It dismissed the claims against the Mayor and the Director for lack of evidence. It then concluded that Hymon's actions were authorized by the Tennessee statute, which in turn was constitutional. Hymon had employed the only reasonable and practicable means of preventing Garner's escape. Garner had "recklessly and heedlessly attempted to vault over the fence to escape, thereby assuming the risk of being fired upon." App. to Pet. for Cert. A10.

The Court of Appeals for the Sixth Circuit affirmed with regard to Hymon, finding that he had acted in good-faith reliance on the Tennessee statute and was therefore within the scope of his qualified immunity. 600 F.2d 52 (1979). It remanded for reconsideration of the possible liability of the city, however, in light of *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), which had come down after the District Court's decision. The District Court was **\*6** directed to consider whether a city enjoyed a qualified immunity, whether the use of deadly force and hollow point bullets in these circumstances was constitutional, and whether any unconstitutional municipal conduct flowed from a "policy or custom" as required for liability under *Monell.* 600 F.2d, at 54–55.

The District Court concluded that *Monell* did not affect its decision. While acknowledging some doubt as to the possible immunity of the city, it found that the statute, and Hymon's actions, were constitutional. Given this conclusion, it declined to consider the "policy or custom" question. App. to Pet. for Cert. A37–A39.

The Court of Appeals reversed and remanded. 710 F.2d 240 (1983). It reasoned that the killing of a fleeing suspect is a "seizure" under the Fourth Amendment, [6] and is therefore constitutional only if "reasonable." The Tennessee statute failed as applied to this case because it did not adequately limit the use of deadly force by distinguishing between felonies of different magnitudes—"the facts, as found, did not justify the use of deadly force under the Fourth Amendment." *Id.,* at 246. Officers

cannot resort to deadly force unless they "have probable cause ... to believe that the suspect [has committed a felony and] poses a threat to the safety of the **1699 officers or a danger to the community if left at large." *Ibid.* [7]

**7** The State of Tennessee, which had intervened to defend the statute, see 28 U.S.C. § 2403(b), appealed to this Court. The city filed a petition for certiorari. We noted probable jurisdiction in the appeal and granted the petition. 465 U.S. 1098, 104 S.Ct. 1589, 80 L.Ed.2d 122 (1984).

## II

**[2]  [3]**   Whenever an officer restrains the freedom of a person to walk away, he has seized that person. *United States v. Brignoni-Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975). While it is not always clear just when minimal police interference becomes a seizure, see *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.

### A

**[4]  [5]**   A police officer may arrest a person if he has probable cause to believe that person committed a crime. *E.g., United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). Petitioners and appellant argue that if this requirement is satisfied the Fourth Amendment has nothing to say about *how* that seizure is made. This submission ignores the many cases in which this Court, by balancing the extent of the intrusion against the need for it, has examined the reasonableness of **8** the manner in which a search or seizure is conducted. To determine the constitutionality of a seizure "[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983); see *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979); *United States v. Martinez-Fuerte,* 428 U.S. 543, 555, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976). We have described "the balancing of competing interests" as "the key principle of the Fourth Amendment." *Michigan v. Summers,* 452 U.S. 692, 700, n. 12, 101 S.Ct. 2587, 2593, n. 12, 69 L.Ed.2d 340 (1981). See also *Camara v. Municipal Court,* 387 U.S. 523, 536–537, 87 S.Ct. 1727, 1734–1735, 18 L.Ed.2d 930 (1967). Because one of the factors is the extent of the intrusion, it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out. *United States v. Ortiz,* 422 U.S. 891, 895, 95 S.Ct. 2585, 2588, 45 L.Ed.2d 623 (1975); *Terry v. Ohio,* 392 U.S. 1, 28–29, 88 S.Ct. 1868, 1883–1884, 20 L.Ed.2d 889 (1968).

Applying these principles to particular facts, the Court has held that governmental interests did not support a lengthy detention of luggage, *United States v. Place, supra,* an airport seizure not "carefully **1700** tailored to its underlying justification," *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion), surgery under general anesthesia to obtain evidence, *Winston v. Lee,* 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), or detention for fingerprinting without probable cause, *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *Hayes v. Florida,* 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985). On the other hand, under the same approach it has upheld the taking of fingernail scrapings from a suspect, *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973), an unannounced entry into a home to prevent the destruction of evidence, *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), administrative housing inspections without probable cause to believe that a code violation will be found,

105 S.Ct. 1694, 85 L.Ed.2d 1, 53 USLW 4410

*Camara v. Municipal Court, supra,* and a blood test of a drunken-driving suspect, *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). In each of these cases, the question was whether **\*9** the totality of the circumstances justified a particular sort of search or seizure.

### B

The same balancing process applied in the cases cited above demonstrates that, notwithstanding probable cause to seize a suspect, an officer may not always do so by killing him. The intrusiveness of a seizure by means of deadly force is unmatched. The suspect's fundamental interest in his own life need not be elaborated upon. The use of deadly force also frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment. Against these interests are ranged governmental interests in effective law enforcement.[8] It is argued that overall violence will be reduced by encouraging the peaceful submission of suspects who know that they may be shot if they flee. Effectiveness in making arrests requires the resort to deadly **\*10** force, or at least the meaningful threat thereof. "Being able to arrest such individuals is a condition precedent to the state's entire system of law enforcement." Brief for Petitioners 14.

Without in any way disparaging the importance of these goals, we are not convinced that the use of deadly force is a sufficiently productive means of accomplishing them to justify the killing of nonviolent suspects. Cf. *Delaware v. Prouse, supra,* 440 U.S., at 659, 99 S.Ct., at 1399. The use of deadly force is a self-defeating way of apprehending a suspect and so setting the criminal justice mechanism in motion. If successful, it guarantees that that mechanism will not be set in motion. And while the meaningful threat of deadly force might be thought to lead to the arrest of more live suspects by discouraging escape attempts,[9] the presently available evidence **\*\*1701** does not support this thesis.[10] The fact is that a majority of police departments **\*11** in this country have forbidden the use of deadly force against nonviolent suspects. See *infra,* at 1704–1705. If those charged with the enforcement of the criminal law have abjured the use of deadly force in arresting nondangerous felons, there is a substantial basis for doubting that the use of such force is an essential attribute of the arrest power in all felony cases. See *Schumann v. McGinn,* 307 Minn. 446, 472, 240 N.W.2d 525, 540 (1976) (Rogoskeske, J., dissenting in part). Petitioners and appellant have not persuaded us that shooting nondangerous fleeing suspects is so vital as to outweigh the suspect's interest in his own life.

[6] [7] [8] [9] The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead. The Tennessee statute is unconstitutional insofar as it authorizes the use of deadly force against such fleeing suspects.

It is not, however, unconstitutional on its face. Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where **\*12** feasible, some warning has been given. As applied in such circumstances, the Tennessee statute would pass constitutional muster.

### III

## A

**[10]**   It is insisted that the Fourth Amendment must be construed in light of the common-law rule, which allowed the use of whatever force was necessary to effect the arrest of a fleeing felon, though not a misdemeanant. As stated in Hale's posthumously published Pleas of the Crown:

> "[I]f persons that are pursued by these officers for felony or the just suspicion thereof ... shall not yield themselves to **\*\*1702** these officers, but shall either resist or fly before they are apprehended or being apprehended shall rescue themselves and resist or fly, so that they cannot be otherwise apprehended, and are upon necessity slain therein, because they cannot be otherwise taken, it is no felony." 2 M. Hale, Historia Placitorum Coronae 85 (1736).

See also 4 W. Blackstone, Commentaries *289. Most American jurisdictions also imposed a flat prohibition against the use of deadly force to stop a fleeing misdemeanant, coupled with a general privilege to use such force to stop a fleeing felon. *E.g.,* *Holloway v. Moser,* 193 N.C. 185, 136 S.E. 375 (1927); *State v. Smith,* 127 Iowa 534, 535, 103 N.W. 944, 945 (1905); *Reneau v. State,* 70 Tenn. 720 (1879); *Brooks v. Commonwealth,* 61 Pa. 352 (1869); *Roberts v. State,* 14 Mo. 138 (1851); see generally R. Perkins & R. Boyce, Criminal Law 1098–1102 (3d ed. 1982); Day, Shooting the Fleeing Felon: State of the Law, 14 Crim.L.Bull. 285, 286–287 (1978); Wilgus, Arrest Without a Warrant, 22 Mich.L.Rev. 798, 807–816 (1924). But see *Storey v. State,* 71 Ala. 329 (1882); *State v. Bryant,* 65 N.C. 327, 328 (1871); *Caldwell v. State,* 41 Tex. 86 (1874).

**\*13**   The State and city argue that because this was the prevailing rule at the time of the adoption of the Fourth Amendment and for some time thereafter, and is still in force in some States, use of deadly force against a fleeing felon must be "reasonable." It is true that this Court has often looked to the common law in evaluating the reasonableness, for Fourth Amendment purposes, of police activity. See, *e.g.,* *United States v. Watson,* 423 U.S. 411, 418–419, 96 S.Ct. 820, 825–826, 46 L.Ed.2d 598 (1976); *Gerstein v. Pugh,* 420 U.S. 103, 111, 114, 95 S.Ct. 854, 861, 863, 43 L.Ed.2d 54 (1975); *Carroll v. United States,* 267 U.S. 132, 149–153, 45 S.Ct. 280, 283–285, 69 L.Ed. 543 (1925). On the other hand, it "has not simply frozen into constitutional law those law enforcement practices that existed at the time of the Fourth Amendment's passage." *Payton v. New York,* 445 U.S. 573, 591, n. 33, 100 S.Ct. 1371, 1382, n. 33, 63 L.Ed.2d 639 (1980). Because of sweeping change in the legal and technological context, reliance on the common-law rule in this case would be a mistaken literalism that ignores the purposes of a historical inquiry.

## B

It has been pointed out many times that the common-law rule is best understood in light of the fact that it arose at a time when virtually all felonies were punishable by death. [11]  "Though effected without the protections and formalities of an orderly trial and conviction, the killing of a resisting or **\*14** fleeing felon resulted in no greater consequences than those authorized for punishment of the felony of which the individual was charged or suspected." American Law Institute, Model Penal Code § 3.07, Comment 3, p. 56 (Tentative Draft No. 8, 1958) (hereinafter Model Penal Code Comment). Courts have also justified the common-law rule by emphasizing the relative dangerousness of felons. See, *e.g.,* *Schumann v. McGinn,* 307 Minn., at 458, 240 N.W.2d, at 533; *Holloway v. Moser, supra,* 193 N.C., at 187, 136 S.E., at 376 (1927).

Neither of these justifications makes sense today. Almost all crimes formerly punishable by death no longer are or can be. See, *e.g.,* **\*\*1703** *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977). And while in earlier times "the gulf between the felonies and the minor offences was broad and deep," 2 Pollock & Maitland 467, n. 3; *Carroll v. United States, supra,* 267 U.S., at 158, 45 S.Ct., at 287, today

the distinction is minor and often arbitrary. Many crimes classified as misdemeanors, or nonexistent, at common law are now felonies. Wilgus, 22 Mich.L.Rev., at 572–573. These changes have undermined the concept, which was questionable to begin with, that use of deadly force against a fleeing felon is merely a speedier execution of someone who has already forfeited his life. They have also made the assumption that a "felon" is more dangerous than a misdemeanant untenable. Indeed, numerous misdemeanors involve conduct more dangerous than many felonies. [12]

There is an additional reason why the common-law rule cannot be directly translated to the present day. The common-law rule developed at a time when weapons were rudimentary. Deadly force could be inflicted almost solely in a hand-to-hand struggle during which, necessarily, the safety **\*15** of the arresting officer was at risk. Handguns were not carried by police officers until the latter half of the last century. L. Kennett & J. Anderson, The Gun in America 150–151 (1975). Only then did it become possible to use deadly force from a distance as a means of apprehension. As a practical matter, the use of deadly force under the standard articulation of the common-law rule has an altogether different meaning—and harsher consequences—now than in past centuries. See Wechsler & Michael, A Rationale for the Law of Homicide: I, 37 Colum.L.Rev. 701, 741 (1937). [13]

One other aspect of the common-law rule bears emphasis. It forbids the use of deadly force to apprehend a misdemeanant, condemning such action as disproportionately severe. See *Holloway v. Moser,* 193 N.C., at 187, 136 S.E., at 376; *State v. Smith,* 127 Iowa, at 535, 103 N.W., at 945. See generally Annot., 83 A.L.R.3d 238 (1978).

In short, though the common-law pedigree of Tennessee's rule is pure on its face, changes in the legal and technological context mean the rule is distorted almost beyond recognition when literally applied.

### C

**[11]**    In evaluating the reasonableness of police procedures under the Fourth Amendment, we have also looked to prevailing **\*16** rules in individual jurisdictions. See, *e.g.,* *United States v. Watson,* 423 U.S., at 421–422, 96 S.Ct., at 826–827. The rules in the States are varied. See generally Comment, 18 Ga.L.Rev. 137, 140–144 (1983). Some 19 States have codified the common-law rule, [14] though in two of these **\*\*1704** the courts have significantly limited the statute. [15] Four States, though without a relevant statute, apparently retain the common-law rule. [16] Two States have adopted the Model Penal Code's **\*17** provision verbatim. [17] Eighteen others allow, in slightly varying language, the use of deadly force only if the suspect has committed a felony involving the use or threat of physical or deadly force, or is escaping with a deadly weapon, or is likely to endanger life or inflict serious physical injury if not arrested. [18] Louisiana and Vermont, though without statutes or case law on point, do forbid the use of deadly force to prevent any but violent felonies. [19] The remaining States either have no relevant statute or case law, or have positions that are unclear. [20]

**\*18**    It cannot be said that there is a constant or overwhelming trend away from the common-law rule. In recent years, some States have reviewed their laws and expressly rejected abandonment of the **\*\*1705** common-law rule. [21] Nonetheless, the long-term movement has been away from the rule that deadly force may be used against any fleeing felon, and that remains the rule in less than half the States.

This trend is more evident and impressive when viewed in light of the policies adopted by the police departments themselves. Overwhelmingly, these are more restrictive than the common-law rule. C. Milton, J. Halleck, J. Lardner, & G. Abrecht, Police Use of Deadly Force 45–46 (1977). The Federal Bureau of Investigation and the New York City Police Department, for example, both forbid the use of firearms except when necessary to prevent death or grievous bodily harm. *Id.,* at 40–41; App. 83. For accreditation by the Commission on Accreditation for Law Enforcement Agencies, a department must restrict the use of deadly force to situations where "the officer reasonably believes that the action is in defense of human life ... or in defense of any person

in immediate danger of serious physical injury." Commission on Accreditation for Law Enforcement Agencies, Inc., Standards for Law Enforcement Agencies 1–2 (1983) (italics deleted). A 1974 study reported that the police department regulations in a majority of the large cities of the United States allowed the firing of a weapon only when a **\*19** felon presented a threat of death or serious bodily harm. Boston Police Department, Planning & Research Division, The Use of Deadly Force by Boston Police Personnel (1974), cited in *Mattis v. Schnarr,* 547 F.2d 1007, 1016, n. 19 (CA8 1976), vacated as moot *sub nom. Ashcroft v. Mattis,* 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977). Overall, only 7.5% of departmental and municipal policies explicitly permit the use of deadly force against any felon; 86.8% explicitly do not. K. Matulia, A Balance of Forces: A Report of the International Association of Chiefs of Police 161 (1982) (table). See also Record 1108–1368 (written policies of 44 departments). See generally W. Geller & K. Karales, Split-Second Decisions 33–42 (1981); Brief for Police Foundation et al. as *Amici Curiae.* In light of the rules adopted by those who must actually administer them, the older and fading common-law view is a dubious indicium of the constitutionality of the Tennessee statute now before us.


D


Actual departmental policies are important for an additional reason. We would hesitate to declare a police practice of long standing "unreasonable" if doing so would severely hamper effective law enforcement. But the indications are to the contrary. There has been no suggestion that crime has worsened in any way in jurisdictions that have adopted, by legislation or departmental policy, rules similar to that announced today. *Amici* noted that "[a]fter extensive research and consideration, [they] have concluded that laws permitting police officers to use deadly force to apprehend unarmed, non-violent fleeing felony suspects actually do not protect citizens or law enforcement officers, do not deter crime or alleviate problems caused by crime, and do not improve the crime-fighting ability of law enforcement agencies." *Id.,* at 11. The submission is that the obvious state interests in apprehension are not sufficiently served to warrant the use of lethal weapons against all fleeing felons. See *supra,* at 1700–1701, and n. 10.

 **\*20** Nor do we agree with petitioners and appellant that the rule we have adopted requires the police to make impossible, split-second evaluations of unknowable facts. See Brief for Petitioners 25; Brief for Appellant 11. We do not deny the **\*\*1706** practical difficulties of attempting to assess the suspect's dangerousness. However, similarly difficult judgments must be made by the police in equally uncertain circumstances. See, *e.g., Terry v. Ohio,* 392 U.S., at 20, 27, 88 S.Ct., at 1879, 1883. Nor is there any indication that in States that allow the use of deadly force only against dangerous suspects, see nn. 15, 17–19, *supra,* the standard has been difficult to apply or has led to a rash of litigation involving inappropriate second-guessing of police officers' split-second decisions. Moreover, the highly technical felony/misdemeanor distinction is equally, if not more, difficult to apply in the field. An officer is in no position to know, for example, the precise value of property stolen, or whether the crime was a first or second offense. Finally, as noted above, this claim must be viewed with suspicion in light of the similar self-imposed limitations of so many police departments.


IV


The District Court concluded that Hymon was justified in shooting Garner because state law allows, and the Federal Constitution does not forbid, the use of deadly force to prevent the escape of a fleeing felony suspect if no alternative means of apprehension is available. See App. to Pet. for Cert. A9–A11, A38. This conclusion made a determination of Garner's apparent dangerousness unnecessary. The court did find, however, that Garner appeared to be unarmed, though Hymon could not be certain that was the case. *Id.,* at A4, A23. See also App. 41, 56; Record 219. Restated in Fourth Amendment terms, this means Hymon had no articulable basis to think Garner was armed.

 **[12]**  **[13]**  In reversing, the Court of Appeals accepted the District Court's factual conclusions and held that "the facts, as found, did not justify the use of deadly force." 710 F.2d, at 246. **\*21** We agree. Officer Hymon could not reasonably have believed