105 S.Ct. 1694, 85 L.Ed.2d 1, 53 USLW 4410

that Garner—young, slight, and unarmed—posed any threat. Indeed, Hymon never attempted to justify his actions on any basis other than the need to prevent an escape. The District Court stated in passing that "[t]he facts of this case did not indicate to Officer Hymon that Garner was 'non-dangerous.' " App. to Pet. for Cert. A34. This conclusion is not explained, and seems to be based solely on the fact that Garner had broken into a house at night. However, the fact that Garner was a suspected burglar could not, without regard to the other circumstances, automatically justify the use of deadly force. Hymon did not have probable cause to believe that Garner, whom he correctly believed to be unarmed, posed any physical danger to himself or others.

The dissent argues that the shooting was justified by the fact that Officer Hymon had probable cause to believe that Garner had committed a nighttime burglary. *Post*, at 1711, 1712. While we agree that burglary is a serious crime, we cannot agree that it is so dangerous as automatically to justify the use of deadly force. The FBI classifies burglary as a "property" rather than a "violent" crime. See Federal Bureau of Investigation, Uniform Crime Reports, Crime in the United States 1 (1984). [22] Although the armed burglar would present a different situation, the fact that an unarmed suspect has broken into a dwelling at night does not automatically mean he is physically dangerous. This case demonstrates as much. See also *Solem v. Helm,* 463 U.S. 277, 296–297, and nn. 22–23, 103 S.Ct. 3001, 3012–3013, and nn. 22–23, 77 L.Ed.2d 637 (1983). In fact, the available statistics demonstrate that burglaries only rarely involve physical violence. During the 10-year period from 1973–1982, only 3.8% of all burglaries involved violent crime. Bureau of Justice Statistics, **1707 Household *22 Burglary 4 (1985). [23] See also T. Reppetto, Residential Crime 17, 105 (1974); Conklin & Bittner, Burglary in a Suburb, 11 Criminology 208, 214 (1973).

## V

We wish to make clear what our holding means in the context of this case. The complaint has been dismissed as to all the individual defendants. The State is a party only by virtue of 28 U.S.C. § 2403(b) and is not subject to liability. The possible liability of the remaining defendants—the Police Department and the city of Memphis—hinges on *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and is left for remand. We hold that the statute is invalid insofar as it purported to give Hymon the authority to act as he did. As for the policy of the Police Department, the absence of any discussion of this issue by the courts below, and the uncertain state of the record, preclude any consideration of its validity.

The judgment of the Court of Appeals is affirmed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

Justice O'CONNOR, with whom THE CHIEF JUSTICE and Justice REHNQUIST join, dissenting.
The Court today holds that the Fourth Amendment prohibits a police officer from using deadly force as a last resort to *23 apprehend a criminal suspect who refuses to halt when fleeing the scene of a nighttime burglary. This conclusion rests on the majority's balancing of the interests of the suspect and the public interest in effective law enforcement. *Ante,* at 1699. Notwithstanding the venerable common-law rule authorizing the use of deadly force if necessary to apprehend a fleeing felon, and continued acceptance of this rule by nearly half the States, *ante,* at 1703–1704, the majority concludes that Tennessee's statute is unconstitutional inasmuch as it allows the use of such force to apprehend a burglary suspect who is not obviously armed or otherwise dangerous. Although the circumstances of this case are unquestionably tragic and unfortunate, our constitutional holdings must be sensitive both to the history of the Fourth Amendment and to the general implications of the Court's reasoning. By disregarding the serious and dangerous nature of residential burglaries and the longstanding practice of many States, the Court effectively creates a Fourth Amendment right allowing a burglary suspect to flee unimpeded from a police officer who has probable cause to arrest, who has ordered the suspect to halt, and who has no means short of firing his weapon to prevent escape. I do not believe that the Fourth Amendment supports such a right, and I accordingly dissent.

I

The facts below warrant brief review because they highlight the difficult, split-second decisions police officers must make in these circumstances. Memphis Police Officers Elton Hymon and Leslie Wright responded to a late-night call that a burglary was in progress at a private residence. When the officers arrived at the scene, the caller said that "they" were breaking into the house next door. App. in No. 81–5605 **1708 (CA6), p. 207. The officers found the residence had been forcibly entered through a window and saw lights *24 on inside the house. Officer Hymon testified that when he saw the broken window he realized "that something was wrong inside," *id., at 656,* but that he could not determine whether anyone—either a burglar or a member of the household—was within the residence. *Id.,* at 209. As Officer Hymon walked behind the house, he heard a door slam. He saw Edward Eugene Garner run away from the house through the dark and cluttered backyard. Garner crouched next to a 6-foot-high fence. Officer Hymon thought Garner was an adult and was unsure whether Garner was armed because Hymon "had no idea what was in the hand [that he could not see] or what he might have had on his person." *Id., at 658–659.* In fact, Garner was 15 years old and unarmed. Hymon also did not know whether accomplices remained inside the house. *Id., at 657.* The officer identified himself as a police officer and ordered Garner to halt. Garner paused briefly and then sprang to the top of the fence. Believing that Garner would escape if he climbed over the fence, Hymon fired his revolver and mortally wounded the suspected burglar.

Appellee-respondent, the deceased's father, filed a *42 U.S.C. § 1983* action in federal court against Hymon, the city of Memphis, and other defendants, for asserted violations of Garner's constitutional rights. The District Court for the Western District of Tennessee held that Officer Hymon's actions were justified by a Tennessee statute that authorizes a police officer to "use all the necessary means to effect the arrest," if "after notice of the intention to arrest the defendant, he either flee or forcibly resist." *Tenn.Code Ann. § 40–7–108* (1982). As construed by the Tennessee courts, this statute allows the use of deadly force only if a police officer has probable cause to believe that a person has committed a felony, the officer warns the person that he intends to arrest him, and the officer reasonably believes that no means less than such force will prevent the escape. See, *e.g.,* *25 Johnson v. State,* 173 Tenn. 134, 114 S.W.2d 819 1938). The District Court held that the Tennessee statute is constitutional and that Hymon's actions as authorized by that statute did not violate Garner's constitutional rights. The Court of Appeals for the Sixth Circuit reversed on the grounds that the Tennessee statute "authorizing the killing of an unarmed, nonviolent fleeing felon by police in order to prevent escape" violates the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment. *710 F.2d 240, 244 (1983).*

The Court affirms on the ground that application of the Tennessee statute to authorize Officer Hymon's use of deadly force constituted an unreasonable seizure in violation of the Fourth Amendment. The precise issue before the Court deserves emphasis, because both the decision below and the majority obscure what must be decided in this case. The issue is not the constitutional validity of the Tennessee statute on its face or as applied to some hypothetical set of facts. Instead, the issue is whether the use of deadly force by Officer Hymon under the circumstances of this case violated Garner's constitutional rights. Thus, the majority's assertion that a police officer who has probable cause to seize a suspect "may not always do so by killing him," *ante,* at 1700, is unexceptionable but also of little relevance to the question presented here. The same is true of the rhetorically stirring statement that "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." *Ante,* at 1701. The question we must address is whether the Constitution allows the use of such force to apprehend a suspect who resists arrest by attempting to flee the scene of a nighttime burglary of a residence.

II

For purposes of Fourth Amendment analysis, I agree with the Court that Officer  **1709  Hymon "seized" Garner by shooting him. Whether that seizure was reasonable and therefore permitted by the Fourth Amendment requires a careful balancing  *26 of the important public interest in crime prevention and detection and the nature and quality of the intrusion upon legitimate interests of the individual. *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983). In striking this balance here, it is crucial to acknowledge that police use of deadly force to apprehend a fleeing criminal suspect falls within the "rubric of police conduct ... necessarily [involving] swift action predicated upon the on-the-spot observations of the officer on the beat." *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). The clarity of hindsight cannot provide the standard for judging the reasonableness of police decisions made in uncertain and often dangerous circumstances. Moreover, I am far more reluctant than is the Court to conclude that the Fourth Amendment proscribes a police practice that was accepted at the time of the adoption of the Bill of Rights and has continued to receive the support of many state legislatures. Although the Court has recognized that the requirements of the Fourth Amendment must respond to the reality of social and technological change, fidelity to the notion of *constitutional*—as opposed to purely judicial—limits on governmental action requires us to impose a heavy burden on those who claim that practices accepted when the Fourth Amendment was adopted are now constitutionally impermissible. See, *e.g.,* *United States v. Watson,* 423 U.S. 411, 416–421, 96 S.Ct. 820, 824–827, 46 L.Ed.2d 598 (1976); *Carroll v. United States,* 267 U.S. 132, 149–153, 45 S.Ct. 280, 283–285, 69 L.Ed. 543 (1925). Cf. *United States v. Villamonte-Marquez,* 462 U.S. 579, 585, 103 S.Ct. 2573, 2582, 77 L.Ed.2d 22 (1983) (noting "impressive historical pedigree" of statute challenged under Fourth Amendment).

The public interest involved in the use of deadly force as a last resort to apprehend a fleeing burglary suspect relates primarily to the serious nature of the crime. Household burglaries not only represent the illegal entry into a person's home, but also "pos[e] real risk of serious harm to others." *Solem v. Helm,* 463 U.S. 277, 315–316, 103 S.Ct. 3001, 3023, 77 L.Ed.2d 637 (1983) (BURGER, C.J., dissenting). According to recent Department of Justice statistics, "[t]hree-fifths of all rapes in the home,  *27 three-fifths of all home robberies, and about a third of home aggravated and simple assaults are committed by burglars." Bureau of Justice Statistics Bulletin, Household Burglary 1 (January 1985). During the period 1973–1982, 2.8 million such violent crimes were committed in the course of burglaries. *Ibid.* Victims of a forcible intrusion into their home by a nighttime prowler will find little consolation in the majority's confident assertion that "burglaries only rarely involve physical violence." *Ante,* at 1707. Moreover, even if a particular burglary, when viewed in retrospect, does not involve physical harm to others, the "harsh potentialities for violence" inherent in the forced entry into a home preclude characterization of the crime as "innocuous, inconsequential, minor, or 'nonviolent.' " *Solem v. Helm, supra,* at 316, 103 S.Ct., at 3023 (BURGER, C.J., dissenting). See also Restatement of Torts § 131, Comment *g* (1934) (burglary is among felonies that normally cause or threaten death or serious bodily harm); R. Perkins & R. Boyce, Criminal Law 1110 (3d ed. 1982) (burglary is dangerous felony that creates unreasonable risk of great personal harm).

Because burglary is a serious and dangerous felony, the public interest in the prevention and detection of the crime is of compelling importance. Where a police officer has probable cause to arrest a suspected burglar, the use of deadly force as a last resort might well be the only means of apprehending the suspect. With respect to a particular burglary, subsequent investigation simply cannot represent a substitute for immediate apprehension of the criminal suspect at the scene. See President's Commission  **1710  on Law Enforcement and Administration of Justice, Task Force Report: The Challenge of Crime in a Free Society 97 (1967). Indeed, the Captain of the Memphis Police Department testified that in his city, if apprehension is not immediate, it is likely that the suspect will not be caught. App. in No. 81–5605 (CA6), p. 334. Although some law enforcement agencies may choose to assume the risk that a criminal will remain at large, the  *28 Tennessee statute reflects a legislative determination that the use of deadly force in prescribed circumstances will serve generally to protect the public. Such statutes assist the police in apprehending suspected perpetrators of serious crimes and provide notice that a lawful police order to stop and submit to arrest may not be ignored with impunity. See, *e.g.,* *Wiley v. Memphis Police Department,* 548 F.2d 1247, 1252–1253 (CA6), cert. denied, 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed.2d 78 (1977); *Jones v. Marshall,* 528 F.2d 132, 142 (CA2 1975).

The Court unconvincingly dismisses the general deterrence effects by stating that "the presently available evidence does not support [the] thesis" that the threat of force discourages escape and that "there is a substantial basis for doubting that the use of such force is an essential attribute to the arrest power in all felony cases." *Ante,* at 1701. There is no question that the effectiveness of police use of deadly force is arguable and that many States or individual police departments have decided not to authorize it in circumstances similar to those presented here. But it should go without saying that the effectiveness or popularity of a particular police practice does not determine its constitutionality. Cf. *Spaziano v. Florida,* 468 U.S. 447, 464, 104 S.Ct. 3154, 3164, 82 L.Ed.2d 340 (1984) ("The Eighth Amendment is not violated every time a State reaches a conclusion different from a majority of its sisters over how best to administer its criminal laws"). Moreover, the fact that police conduct pursuant to a state statute is challenged on constitutional grounds does not impose a burden on the State to produce social science statistics or to dispel any possible doubts about the necessity of the conduct. This observation, I believe, has particular force where the challenged practice both predates enactment of the Bill of Rights and continues to be accepted by a substantial number of the States.

Against the strong public interests justifying the conduct at issue here must be weighed the individual interests implicated in the use of deadly force by police officers. The **\*29** majority declares that "[t]he suspect's fundamental interest in his own life need not be elaborated upon." *Ante,* at 1700. This blithe assertion hardly provides an adequate substitute for the majority's failure to acknowledge the distinctive manner in which the suspect's interest in his life is even exposed to risk. For purposes of this case, we must recall that the police officer, in the course of investigating a nighttime burglary, had reasonable cause to arrest the suspect and ordered him to halt. The officer's use of force resulted because the suspected burglar refused to heed this command and the officer reasonably believed that there was no means short of firing his weapon to apprehend the suspect. Without questioning the importance of a person's interest in his life, I do not think this interest encompasses a right to flee unimpeded from the scene of a burglary. Cf. *Payton v. New York,* 445 U.S. 573, 617, n. 14, 100 S.Ct. 1371, 1395, n. 14, 63 L.Ed.2d 639 (1980) (WHITE, J., dissenting) ("[T]he policeman's hands should not be tied merely because of the possibility that the suspect will fail to cooperate with legitimate actions by law enforcement personnel"). The legitimate interests of the suspect in these circumstances are adequately accommodated by the Tennessee statute: to avoid the use of deadly force and the consequent risk to his life, the suspect need merely obey the valid order to halt.

A proper balancing of the interests involved suggests that use of deadly force as a last resort to apprehend a criminal suspect fleeing from the scene of a nighttime **\*\*1711** burglary is not unreasonable within the meaning of the Fourth Amendment. Admittedly, the events giving rise to this case are in retrospect deeply regrettable. No one can view the death of an unarmed and apparently nonviolent 15-year-old without sorrow, much less disapproval. Nonetheless, the reasonableness of Officer Hymon's conduct for purposes of the Fourth Amendment cannot be evaluated by what later appears to have been a preferable course of police action. The officer pursued a suspect in the darkened backyard of a house that from all indications had just been burglarized. The **\*30** police officer was not certain whether the suspect was alone or unarmed; nor did he know what had transpired inside the house. He ordered the suspect to halt, and when the suspect refused to obey and attempted to flee into the night, the officer fired his weapon to prevent escape. The reasonableness of this action for purposes of the Fourth Amendment is not determined by the unfortunate nature of this particular case; instead, the question is whether it is constitutionally impermissible for police officers, as a last resort, to shoot a burglary suspect fleeing the scene of the crime.

Because I reject the Fourth Amendment reasoning of the majority and the Court of Appeals, I briefly note that no other constitutional provision supports the decision below. In addition to his Fourth Amendment claim, appellee-respondent also alleged violations of due process, the Sixth Amendment right to trial by jury, and the Eighth Amendment proscription of cruel and unusual punishment. These arguments were rejected by the District Court and, except for the due process claim, not addressed by the Court of Appeals. With respect to due process, the Court of Appeals reasoned that statutes affecting the fundamental interest in life must be "narrowly drawn to express only the legitimate state interests at stake." 710 F.2d, at 245. The Court of Appeals concluded that a statute allowing police use of deadly force is narrowly drawn and therefore constitutional only if the use of such force is limited to situations in which the suspect poses an immediate threat to others. *Id.,* at 246–247. Whatever the validity of Tennessee's statute in other contexts, I cannot agree that its application in this case resulted in a deprivation

"without due process of law." Cf. *Baker v. McCollan,* 443 U.S. 137, 144–145, 99 S.Ct. 2689, 2694–2695, 61 L.Ed.2d 433 (1979). Nor do I believe that a criminal suspect who is shot while trying to avoid apprehension has a cognizable claim of a deprivation of his Sixth Amendment right to trial by jury. See *Cunningham v. Ellington,* 323 F.Supp. 1072, 1075–1076 (WD Tenn.1971) (three-judge court). Finally, because there is no indication that the use **\*31** of deadly force was intended to punish rather than to capture the suspect, there is no valid claim under the Eighth Amendment. See *Bell v. Wolfish,* 441 U.S. 520, 538–539, 99 S.Ct. 1861, 1873–1874, 60 L.Ed.2d 447 (1979). Accordingly, I conclude that the District Court properly entered judgment against appellee-respondent, and I would reverse the decision of the Court of Appeals.


### III

Even if I agreed that the Fourth Amendment was violated under the circumstances of this case, I would be unable to join the Court's opinion. The Court holds that deadly force may be used only if the suspect "threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm." *Ante,* at 1701. The Court ignores the more general implications of its reasoning. Relying on the Fourth Amendment, the majority asserts that it is constitutionally unreasonable to *use* deadly force against fleeing criminal suspects who do not appear to pose a threat of serious physical harm to others. *Ibid.* By declining to limit its holding to the use of firearms, the Court unnecessarily implies that the Fourth Amendment constrains the use of any police practice that is potentially lethal, no matter how remote the risk. Cf. *Los* **\*\*1712** *Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

Although it is unclear from the language of the opinion, I assume that the majority intends the word "use" to include only those circumstances in which the suspect is actually apprehended. Absent apprehension of the suspect, there is no "seizure" for Fourth Amendment purposes. I doubt that the Court intends to allow criminal suspects who successfully escape to return later with § 1983 claims against officers who used, albeit unsuccessfully, deadly force in their futile attempt to capture the fleeing suspect. The Court's opinion, despite its broad language, actually decides only that the **\*32** shooting of a fleeing burglary suspect who was in fact neither armed nor dangerous can support a § 1983 action.

The Court's silence on critical factors in the decision to use deadly force simply invites second-guessing of difficult police decisions that must be made quickly in the most trying of circumstances. Cf. *Payton v. New York,* 445 U.S., at 619, 100 S.Ct., at 1396 (WHITE, J., dissenting). Police are given no guidance for determining which objects, among an array of potentially lethal weapons ranging from guns to knives to baseball bats to rope, will justify the use of deadly force. The Court also declines to outline the additional factors necessary to provide "probable cause" for believing that a suspect "poses a significant threat of death or serious physical injury," *ante,* at 1697, when the officer has probable cause to arrest and the suspect refuses to obey an order to halt. But even if it were appropriate in this case to limit the use of deadly force to that ambiguous class of suspects, I believe the class should include nighttime residential burglars who resist arrest by attempting to flee the scene of the crime. We can expect an escalating volume of litigation as the lower courts struggle to determine if a police officer's split-second decision to shoot was justified by the danger posed by a particular object and other facts related to the crime. Thus, the majority opinion portends a burgeoning area of Fourth Amendment doctrine concerning the circumstances in which police officers can reasonably employ deadly force.


### IV

The Court's opinion sweeps broadly to adopt an entirely new standard for the constitutionality of the use of deadly force to apprehend fleeing felons. Thus, the Court "lightly brushe[s] aside," *Payton v. New York, supra,* at 600, 100 S.Ct., at 1387, a long-standing police practice that predates the Fourth Amendment and continues to receive the approval of nearly half of the

state legislatures. I cannot accept the majority's creation of a constitutional right to flight for burglary suspects **33** seeking to avoid capture at the scene of the crime. Whatever the constitutional limits on police use of deadly force in order to apprehend a fleeing felon, I do not believe they are exceeded in a case in which a police officer has probable cause to arrest a suspect at the scene of a residential burglary, orders the suspect to halt, and then fires his weapon as a last resort to prevent the suspect's escape into the night. I respectfully dissent.


**All Citations**

471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1, 53 USLW 4410


## Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1    The owner of the house testified that no lights were on in the house, but that a back door light was on. Record 160. Officer Hymon, though uncertain, stated in his deposition that there were lights on in the house. *Id.,* at 209.

2    In fact, Garner, an eighth-grader, was 15. He was 5′ 4″ tall and weighed somewhere around 100 or 110 pounds. App. to Pet. for Cert. A5.

3    When asked at trial why he fired, Hymon stated:
     "Well, first of all it was apparent to me from the little bit that I knew about the area at the time that he was going to get away because, number 1, I couldn't get to him. My partner then couldn't find where he was because, you know, he was late coming around. He didn't know where I was talking about. I couldn't get to him because of the fence here, I couldn't have jumped this fence and come up, consequently jumped this fence and caught him before he got away because he was already up on the fence, just one leap and he was already over the fence, and so there is no way that I could have caught him." App. 52.
     He also stated that the area beyond the fence was dark, that he could not have gotten over the fence easily because he was carrying a lot of equipment and wearing heavy boots, and that Garner, being younger and more energetic, could have outrun him. *Id.,* at 53–54.

4    Garner had rummaged through one room in the house, in which, in the words of the owner, "[a]ll the stuff was out on the floors, all the drawers was pulled out, and stuff was scattered all over." *Id.,* at 34. The owner testified that his valuables were untouched but that, in addition to the purse and the 10 dollars, one of his wife's rings was missing. The ring was not recovered. *Id..,* at 34–35.

5    Although the statute does not say so explicitly, Tennessee law forbids the use of deadly force in the arrest of a misdemeanant. See *Johnson v. State,* 173 Tenn. 134, 114 S.W.2d 819 (1938).

6    "The right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated...." U.S. Const., Amdt. 4.

7    The Court of Appeals concluded that the rule set out in the Model Penal Code "accurately states Fourth Amendment limitations on the use of deadly force against fleeing felons." 710 F.2d, at 247. The relevant portion of the Model Penal Code provides:
     "The use of deadly force is not justifiable ... unless (i) the arrest is for a felony; and (ii) the person effecting the arrest is authorized to act as a peace officer; or is assisting a person whom he believes to be authorized to act as a peace officer, and (iii) the actor believes that the force employed creates no substantial risk of injury to innocent persons; and (iv) the actor believes that (1) the crime for which the arrest is made involved conduct including the use or threatened use

of deadly force; or (2) there is a substantial risk that the person to be arrested will cause death or serious bodily harm if his apprehension is delayed." American Law Institute, Model Penal Code § 3.07(2)(b) (Proposed Official Draft 1962). The court also found that "[a]n analysis of the facts of this case under the Due Process Clause" required the same result, because the statute was not narrowly drawn to further a compelling state interest. 710 F.2d, at 246–247. The court considered the generalized interest in effective law enforcement sufficiently compelling only when the suspect is dangerous. Finally, the court held, relying on Owen v. City of Independence, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), that the city was not immune.

8      The dissent emphasizes that subsequent investigation cannot replace immediate apprehension. We recognize that this is so, see n. 13, *infra;* indeed, that is the reason why there is any dispute. If subsequent arrest were assured, no one would argue that use of deadly force was justified. Thus, we proceed on the assumption that subsequent arrest is not likely. Nonetheless, it should be remembered that failure to apprehend at the scene does not necessarily mean that the suspect will never be caught.

In lamenting the inadequacy of later investigation, the dissent relies on the report of the President's Commission on Law Enforcement and Administration of Justice. It is worth noting that, notwithstanding its awareness of this problem, the Commission itself proposed a policy for use of deadly force arguably even more stringent than the formulation we adopt today. See President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Police 189 (1967). The Commission proposed that deadly force be used only to apprehend "perpetrators who, in the course of their crime threatened the use of deadly force, or if the officer believes there is a substantial risk that the person whose arrest is sought will cause death or serious bodily harm if his apprehension is delayed." In addition, the officer would have "to know, as a virtual certainty, that the suspect committed an offense for which the use of deadly force is permissible." *Ibid.*

9      We note that the usual manner of deterring illegal conduct—through punishment—has been largely ignored in connection with flight from arrest. Arkansas, for example, specifically excepts flight from arrest from the offense of "obstruction of governmental operations." The commentary notes that this "reflects the basic policy judgment that, absent the use of force or violence, a mere attempt to avoid apprehension by a law enforcement officer does not give rise to an independent offense." Ark.Stat.Ann. § 41–2802(3)(a) (1977) and commentary. In the few States that do outlaw flight from an arresting officer, the crime is only a misdemeanor. See, *e.g.,* Ind.Code § 35–44–3–3 (1982). Even forceful resistance, though generally a separate offense, is classified as a misdemeanor. *E.g.,* Ill.Rev.Stat., ch. 38, ¶ 31–1 (1984); Mont.Code Ann. § 45–7–301 (1984); N.H.Rev.Stat.Ann. § 642:2 (Supp.1983); Ore.Rev.Stat. § 162.315 (1983). This lenient approach does avoid the anomaly of automatically transforming every fleeing misdemeanant into a fleeing felon—subject, under the common-law rule, to apprehension by deadly force—solely by virtue of his flight. However, it is in real tension with the harsh consequences of flight in cases where deadly force is employed. For example, Tennessee does not outlaw fleeing from arrest. The Memphis City Code does, § 22–34.1 (Supp.17, 1971), subjecting the offender to a maximum fine of $50, § 1–8 (1967). Thus, Garner's attempted escape subjected him to (a) a $50 fine, and (b) being shot.

10     See Sherman, Reducing Police Gun Use, in Control in the Police Organization 98, 120–123 (M. Punch ed. 1983); Fyfe, Observations on Police Deadly Force, 27 Crime & Delinquency 376, 378–381 (1981); W. Geller & K. Karales, Split-Second Decisions 67 (1981); App. 84 (affidavit of William Bracey, Chief of Patrol, New York City Police Department). See generally Brief for Police Foundation et al. as *Amici Curiae.*

11     The roots of the concept of a "felony" lie not in capital punishment but in forfeiture. 2 F. Pollock & F. Maitland, The History of English Law 465 (2d ed. 1909) (hereinafter Pollock & Maitland). Not all felonies were always punishable by death. See *id.,* at 466–467, n. 3. Nonetheless, the link was profound. Blackstone was able to write: "The idea of felony is indeed so generally connected with that of capital punishment, that we find it hard to separate them; and to this usage the interpretations of the law do now conform. And therefore if a statute makes any new offence felony, the law implies that is shall be punished with death, *viz.* by hanging, as well as with forfeiture...." 4 W. Blackstone, Commentaries *98. See also R. Perkins & R. Boyce, Criminal Law 14–15 (3d ed. 1982); 2 Pollock & Maitland 511.

12    White-collar crime, for example, poses a less significant physical threat than, say, drunken driving. See *Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984); *id.,* at 755, 104 S.Ct., at 2100 (BLACKMUN, J., concurring). See Model Penal Code Comment, at 57.

13    It has been argued that sophisticated techniques of apprehension and increased communication between the police in different jurisdictions have made it more likely that an escapee will be caught than was once the case, and that this change has also reduced the "reasonableness" of the use of deadly force to prevent escape. *E.g.,* Sherman, Execution Without Trial: Police Homicide and the Constitution, 33 Vand.L.Rev. 71, 76 (1980). We are unaware of any data that would permit sensible evaluation of this claim. Current arrest rates are sufficiently low, however, that we have some doubt whether in past centuries the failure to arrest at the scene meant that the police had missed their only chance in a way that is not presently the case. In 1983, 21% of the offenses in the Federal Bureau of Investigation crime index were cleared by arrest. Federal Bureau of Investigation, Uniform Crime Reports, Crime in the United States 159 (1984). The clearance rate for burglary was 15%. *Ibid.*

14    Ala.Code § 13A–3–27 (1982); Ark.Stat.Ann. § 41–510 (1977); Cal.Penal Code Ann. § 196 (West 1970); Conn.Gen.Stat. § 53a–22 (1972); Fla.Stat. § 776.05 (1983); Idaho Code § 19–610 (1979); Ind.Code § 35–41–3–3 (1982); Kan.Stat.Ann. § 21–3215 (1981); Miss.Code Ann. § 97–3–15(d) (Supp.1984); Mo.Rev.Stat. § 563.046 (1979); Nev.Rev.Stat. § 200.140 (1983); N.M.Stat.Ann. § 30–2–6 (1984); Okla.Stat., Tit. 21, § 732 (1981); R.I.Gen.Laws § 12–7–9 (1981); S.D. Codified Laws §§ 22–16–32, 22–16–33 (1979); Tenn.Code Ann. § 40–7–108 (1982); Wash.Rev.Code § 9A.16.040(3) (1977). Oregon limits use of deadly force to violent felons, but also allows its use against any felon if "necessary." Ore.Rev.Stat. § 161.239 (1983). Wisconsin's statute is ambiguous, but should probably be added to this list. Wis.Stat. § 939.45(4) (1981–1982) (officer may use force necessary for "a reasonable accomplishment of a lawful arrest"). But see *Clark v. Ziedonis,* 368 F.Supp. 544 (ED Wis.1973), aff'd on other grounds, 513 F.2d 79 (CA7 1975).

15    In California, the police may use deadly force to arrest only if the crime for which the arrest is sought was "a forcible and atrocious one which threatens death or serious bodily harm," or there is a substantial risk that the person whose arrest is sought will cause death or serious bodily harm if apprehension is delayed. *Kortum v. Alkire,* 69 Cal.App.3d 325, 333, 138 Cal.Rptr. 26, 30–31 (1977). See also *People v. Ceballos,* 12 Cal.3d 470, 476–484, 116 Cal.Rptr. 233, 237–242, 526 P.2d 241, 245–250 (1974); *Long Beach Police Officers Assn. v. Long Beach,* 61 Cal.App.3d 364, 373–374, 132 Cal.Rptr. 348, 353–354 (1976). In Indiana, deadly force may be used only to prevent injury, the imminent danger of injury or force, or the threat of force. It is not permitted simply to prevent escape. *Rose v. State,* 431 N.E.2d 521 (Ind.App.1982).

16    These are Michigan, Ohio, Virginia, and West Virginia. *Werner v. Hartfelder,* 113 Mich.App. 747, 318 N.W.2d 825 (1982); *State v. Foster,* 60 Ohio Misc. 46, 59–66, 396 N.E.2d 246, 255–258 (Com.Pl.1979) (citing cases); *Berry v. Hamman,* 203 Va. 596, 125 S.E.2d 851 (1962); *Thompson v. Norfolk & W.R. Co.,* 116 W.Va. 705, 711–712, 182 S.E. 880, 883–884 (1935).

17    Haw.Rev.Stat. § 703–307 (1976); Neb.Rev.Stat. § 28–1412 (1979). Massachusetts probably belongs in this category. Though it once rejected distinctions between felonies, *Uraneck v. Lima,* 359 Mass. 749, 750, 269 N.E.2d 670, 671 (1971), it has since adopted the Model Penal Code limitations with regard to private citizens, *Commonwealth v. Klein,* 372 Mass. 823, 363 N.E.2d 1313 (1977), and seems to have extended that decision to police officers, *Julian v. Randazzo,* 380 Mass. 391, 403 N.E.2d 931 (1980).

18    Alaska Stat. § 11.81.370(a) (1983); Ariz.Rev.Stat.Ann. § 13–410 (1978); Colo.Rev.Stat. § 18–1–707 (1978); Del.Code Ann., Tit. 11, § 467 (1979) (felony involving physical force *and* a substantial risk that the suspect will cause death or serious bodily injury *or* will never be recaptured); Ga.Code § 16–3–21(a) (1984); Ill.Rev.Stat., ch. 38, ¶ 7–5 (1984); Iowa Code § 804.8 (1983) (suspect has used or threatened deadly force in commission of a felony,

or would use deadly force if not caught); Ky.Rev.Stat. § 503.090 (1984) (suspect committed felony involving use or threat of physical force likely to cause death or serious injury, *and* is likely to endanger life unless apprehended without delay); Me.Rev.Stat.Ann., Tit. 17–A, § 107 (1983) (commentary notes that deadly force may be used only "where the person to be arrested poses a threat to human life"); Minn.Stat. § 609.066 (1984); N.H.Rev.Stat.Ann. § 627:5(II) (Supp.1983); N.J.Stat.Ann. § 2C–3–7 (West 1982); N.Y.Penal Law § 35.30 (McKinney Supp. 1984–1985); N.C.Gen.Stat. § 15A–401 (1983); N.D.Cent.Code § 12.1–05–07.2.d (1976); 18 Pa.Cons.Stat. § 508 (1982); Tex.Penal Code Ann. § 9.51(c) (1974); Utah Code Ann. § 76–2–404 (1978).

19    See La.Rev.Stat.Ann. § 14:20(2) (West 1974); Vt.Stat.Ann., Tit. 13, § 2305 (1974 and Supp.1984). A Federal District Court has interpreted the Louisiana statute to limit the use of deadly force against fleeing suspects to situations where "life itself is endangered or great bodily harm is threatened." *Sauls v. Hutto*, 304 F.Supp. 124, 132 (ED La.1969).

20    These are Maryland, Montana, South Carolina, and Wyoming. A Maryland appellate court has indicated, however, that deadly force may not be used against a felon who "was in the process of fleeing and, at the time, presented no immediate danger to ... anyone...." *Giant Food, Inc. v. Scherry*, 51 Md.App. 586, 589, 596, 444 A.2d 483, 486, 489 (1982).

21    In adopting its current statute in 1979, for example, Alabama expressly chose the common-law rule over more restrictive provisions. Ala.Code 13A–3–27, Commentary, pp. 67–68 (1982). Missouri likewise considered but rejected a proposal akin to the Model Penal Code rule. See *Mattis v. Schnarr*, 547 F.2d 1007, 1022 (CA8 1976) (Gibson, C.J., dissenting), vacated as moot *sub nom. Ashcroft v. Mattis*, 431 U.S. 171, 97 S.Ct. 1739 52 L.Ed.2d 219 (1977). Idaho, whose current statute codifies the common-law rule, adopted the Model Penal Code in 1971, but abandoned it in 1972.

22    In a recent report, the Department of Corrections of the District of Columbia also noted that "there is nothing inherently dangerous or violent about the offense," which is a crime against property. D.C. Department of Corrections, Prisoner Screening Project 2 (1985).

23    The dissent points out that three-fifths of all rapes in the home, three-fifths of all home robberies, and about a third of home assaults are committed by burglars. *Post,* at 1709. These figures mean only that if one knows that a suspect committed a rape in the home, there is a good chance that the suspect is also a burglar. That has nothing to do with the question here, which is whether the fact that someone has committed a burglary indicates that he has committed, or might commit, a violent crime.

The dissent also points out that this 3.8% adds up to 2.8 million violent crimes over a 10-year period, as if to imply that today's holding will let loose 2.8 million violent burglars. The relevant universe is, of course, far smaller. At issue is only that tiny fraction of cases where violence has taken place and an officer who has no other means of apprehending the suspect is unaware of its occurrence.

---

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Cendrawasih v. Holder, 1st Cir., July 2, 2009

472 F.3d 8
United States Court of Appeals,
First Circuit.

Vekky Richard TICOALU, Petitioner,

v.

Alberto R. GONZÁLES, Attorney General
of the United States, Respondent.

No. 05–1620.
|
Submitted Sept. 15, 2006.
|
Decided Dec. 28, 2006.

**Synopsis**
**Background:** Alien, a native and citizen of Indonesia,
petitioned for review of the decision of the Board of
Immigration Appeals (BIA), affirming the decision of the
immigration judge (IJ), denying his application for asylum
and withholding of removal, and denying his motion to
remand.

**Holdings:** The Court of Appeals, Torruella, Circuit Judge,
held that:

[1] enforcement of the one-year limitations period for asylum
applications did not violate alien's due process rights, and

[2] remand to the IJ of Indonesian alien's application
for withholding of removal was warranted, for further
consideration of religious persecution claim.

Affirmed in part, reversed in part, and remanded.

West Headnotes (7)

**[1]    Aliens, Immigration, and
        Citizenship    Law Questions**
        The Court of Appeals reviews legal questions
        *de* novo, in the immigration context, subject to
        established principles of agency deference.

**[2]    Constitutional Law    Aliens, Immigration,
        and Citizenship**
        Due process rights do not accrue to discretionary
        forms of relief in the immigration context.
        U.S.C.A. Const.Amend. 5.

        3 Cases that cite this headnote

**[3]    Aliens, Immigration, and
        Citizenship    Time Limitations for Filing**
        **Constitutional Law    Asylum, Refugees,
        and Withholding of Removal**
        The enforcement of the one-year limitations
        period for asylum applications did not violate
        Indonesian alien's Fifth Amendment due process
        rights; asylum was a discretionary form of
        relief, and due process rights did not accrue
        to discretionary forms of relief. U.S.C.A.
        Const.Amend. 5.

        5 Cases that cite this headnote

**[4]    Aliens, Immigration, and
        Citizenship    Review of Discretion**
        The Court of Appeals reviews the denial by the
        Board of Immigration Appeals (BIA) of alien's
        motion for remand for abuse of discretion.

**[5]    Aliens, Immigration, and
        Citizenship    Administrative Review**
        An "abuse of discretion" occurs where the Board
        of Immigration Appeals (BIA) misinterprets the
        law, or acts either arbitrarily or capriciously.

**[6]    Aliens, Immigration, and
        Citizenship    Substantial Evidence in
        General**
        The Court of Appeals defers to the factual
        determinations of the Board of Immigration
        Appeals (BIA) if they are based on reasonable,
        substantial, and probative evidence.

[7]    **Aliens, Immigration, and Citizenship** 🔑 Remand

Remand to the immigration judge (IJ) of Indonesian alien's application for withholding of removal was warranted, for further consideration of his religious persecution claim, where, pending appeal of the denial of his application, the alien presented new periodical article reporting violence in area of Indonesia in which alien resided just prior to coming to the United States, and alien's brother's asylum claim was granted on grounds of religious persecution. 🚩 8 C.F.R. § 1003.2(c)(1).

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*9**  Yan Wang, on brief for petitioner.

Thomas L. Holzman, Special Attorney, U.S. Department of Justice, Civil Division, Office of Immigration Litigation, Peter D. Keisler, Assistant Attorney General, Civil Division, and Terri J. Scadron, Assistant Director, on brief for respondent.

**\*10**  Before TORRUELLA, Circuit Judge, SILER, * Senior Circuit Judge, and HOWARD, Circuit Judge.

**Opinion**

TORRUELLA, Circuit Judge.

Vekky Richard Ticoalu ("Ticoalu"), a native and citizen of Indonesia, seeks review of a March 30, 2005 decision of the Board of Immigration Appeals ("BIA") adopting and affirming an Immigration Judge's ("IJ") decision to deny his application for asylum and withholding of removal, and declining to grant his motion to remand. Ticoalu submitted the motion to remand while his appeal was pending before the BIA. Ticoalu asserted that new material evidence, including an order granting asylum to his brother, demonstrated worsening country conditions. After careful consideration, we reverse the BIA's denial of the motion to remand, under the circumstances presented in the case.

**I.** *Factual and Procedural History*

Ticoalu was admitted to the United States as a non-immigrant on or about March 7, 2001, with authorization to remain until September 6, 2001. He was placed in removal proceedings upon issuance of a Notice to Appear dated June 6, 2002. Ticoalu filed an application for asylum on or about July 31, 2002—over one year after entering the United States. The application was rejected as untimely and the IJ found that Ticoalu's failure to timely file was not adequately explained either by changed circumstances in his home country affecting his basis for fearing harm, or by any other circumstances beyond his control.

Thereafter, the IJ treated Ticoalu's asylum application as an application for withholding of removal. Ticoalu alleged eligibility for withholding of removal, asserting that it is more likely than not he will be harmed in Indonesia on account of his religion. Specifically, Ticoalu indicated that on two occasions he was a "victim of physical violence at the hands of Muslims" on account of his Christian faith, and that he fears persecution because of the increasing number of Christians killed by Muslims in Indonesia. The two incidents occurred in separate areas of Jakarta in May 1998 and July 2000.

A month after the second incident, Ticoalu left Jakarta and moved back to Manado, the capital of the Sulawesi Utara province, where his parents and the majority of his siblings live. The province forms the northern-most area of the island of Sulawesi. Ticoalu began working there, and experienced no difficulty in either his place of employment or home between his arrival in August 2000 and his departure for the United States in March 2001.

The IJ concluded that Ticoalu was never targeted for harm on account of his religion and that the two alleged incidents were isolated occurrences. The IJ also found that recent violence in Indonesia against Christians is not countrywide and Ticoalu has a safe haven in Manado.

Ticoalu appealed the IJ's denial of his application for withholding of removal to the BIA. While his appeal was pending, Ticoalu submitted a motion to remand. In the motion, Ticoalu indicated that his brother's separate asylum application was granted by another IJ, and he alleged that conditions in Indonesia had worsened. With the motion, Ticoalu included six 2004 periodical articles concerning

events in Indonesia. One of the articles reported inter-religious violence in central Sulawesi. Included in the motion were also a copy of the July 20, 2004 order granting asylum to his brother, and copies of the brother's **11 asylum application and affidavit. Both the brother's application and accompanying affidavit were dated October 18, 2003.

Ticoalu's brother also alleges that he was the victim of inter-religious violence in Jakarta. In 1998, during a religious riot, he was pulled from a bus by Muslim rioters, beaten, and stabbed. He thereafter returned to Modona. In Modona the brother also lived without incident. In his affidavit, the brother says he traveled to the United States in 2000 because of his fear of being subject to inter-religious violence.

The BIA adopted and affirmed the denial of Ticoalu's asylum application and petition for withholding of removal, and denied Ticoalu's motion to remand. In regard to Ticoalu's motion for remand, the BIA determined that the periodical articles, including the article reporting inter-religious violence in central Sulawesi, "contain general background information and are not highly probative of the respondent's specific claim." The BIA also noted that the brother's affidavit was executed prior to Ticoalu's final hearing on October 22, 2003, and is therefore not new evidence and could not be submitted. The BIA did not directly address the probative value of the brother's grant of asylum.

## II. *Discussion*

Ticoalu raises three challenges to the BIA's opinion: (1) that the denial of his asylum application is a due process violation; (2) that substantial evidence supports the BIA's denial of his request for withholding of removal; and (3) that the BIA's denial of his motion to remand is an abuse of discretion. We begin by disposing of the due process claim before moving on to the BIA's denial of Ticoalu's motion to remand. Our reversal of the BIA's denial of the motion to remand precludes the need to address the denial of withholding of removal.

 **[1]    [2]    [3]**    Ticoalu claims that the one-year time limit on asylum applications is a violation of his Fifth Amendment right to due process. Ticoalu does not challenge that he failed to timely file his asylum application, or that he had no justification for the late filing. We review such legal questions *de novo,* subject to established principles of agency deference.

*See* INS v. Aguirre–Aguirre, 526 U.S. 415, 424–25, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999); *DaCosta v. Gonzáles,*

449 F.3d 45, 49 (1st Cir.2006). Our review concludes that Ticoalu does not have a cognizable claim. Due process rights do not accrue to discretionary forms of relief, *id.* at 50 (discretionary forms of relief do not rise to the level of a protected interest), and asylum is a discretionary form of relief. *Romilus v. Ashcroft,* 385 F.3d 1, 8 (1st Cir.2004) ("discretionary relief of asylum").

 **[4]    [5]    [6]**    We review the BIA's denial of Ticoalu's motion for remand for abuse of discretion. *Maindrond v. Ashcroft,* 385 F.3d 98, 100 (1st Cir.2004); *Toban v. Ashcroft,* 385 F.3d 40, 45 (1st Cir.2004). An abuse of discretion occurs "where the BIA misinterprets the law, or acts either arbitrarily or capriciously." *Toban,* 385 F.3d at 45 (quoting *Wang v. Ashcroft,* 367 F.3d 25, 27 (1st Cir.2004)). We defer to the BIA's factual determinations if they are based on "reasonable, substantial, and probative evidence." *Ymeri v. Ashcroft,* 387 F.3d 12, 17 (1st Cir.2004).

 **[7]**    The BIA may only grant a motion to remand "based on new facts if the 'evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing.' " *Toban,* 385 F.3d at 45 (quoting 8 C.F.R. § 1003.2(c)(1)). Here, we defer to the BIA's determination that the five **12 timely periodical articles reporting violence on islands neighboring Sulawesi are not material to Ticoalu's claim. Although we find somewhat compelling Ticoalu's argument that the articles' evidence of violence on the islands neighboring Sulawesi demonstrates a potential danger to his well being, we do not find it unreasonable that the BIA concluded that the information was too general to be "probative of his claim." We find unreasonable, however, the BIA's dismissal of the timely periodical article reporting violence in central Sulawesi. Manado is located in northern Sulawesi and is not so distant from central Sulawesi as to be obviously isolated from the violence reported in the submitted article. The article may undermine the IJ's conclusion, adopted by the BIA, that northern Sulawesi is a safe haven. The article should be reviewed on remand.

The BIA also never directly addressed whether the July 20, 2004 order granting asylum to Ticoalu's brother was material to Ticoalu's claim. We do not understand why this timely order was not discussed by the BIA. The brother was more severely injured by inter-religious violence in Jakarta, but he too returned to Modona afterward. It seems likely that either the IJ in the instant case or the IJ who issued Ticoalu's

brother's order has erred in assessing the extent of inter-religious violence in Indonesia, and, in particular, in Sulawesi. The government suggests that Ticoalu's brother's grant of asylum is only minimally probative because the order is not accompanied by the IJ's decision and therefore the reasoning is not apparent. It would be preferable to understand the IJ's reasoning; however, this does not explain why the BIA would not consider worthy of re-examination the IJ's' potentially conflicting views of the conditions in Indonesia. The order shall be included on remand.

Ticoalu's brother's affidavit and asylum application should also be reviewed on remand. Although the affidavit and application were available at the time of Ticoalu's final hearing, these documents did not become material to Ticoalu's claim until his brother was granted asylum. The order granting asylum to Ticoalu's brother gave new weight to the assertions of these documents. The bench is likely to benefit from their inclusion on remand.

### III. *Conclusion*

The BIA's order is affirmed in part and reversed in part. The case is remanded in accordance with this opinion.

***Affirmed in part, Reversed in part, and Remanded.***

**All Citations**

472 F.3d 8

## Footnotes

\*      Of the Sixth Circuit, sitting by designation.

End of Document                                  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Trump v. Hawaii, 138 S.Ct. 2392 (2018)

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 14 of 912

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Ramos v. Wolf, 9th Cir.(Cal.), September 14, 2020

138 S.Ct. 2392
Supreme Court of the United States

Donald J. TRUMP, President of
the United States, et al., Petitioners

v.

HAWAII, et al.

No. 17–965.
|
Argued April 25, 2018.
|
Decided June 26, 2018.

**Synopsis**

**Background:** State of Hawaiʻi as operator of state university system, individual citizens or lawful permanent residents with relatives applying for immigrant or nonimmigrant visas, and nonprofit organization that operated a mosque in Hawaiʻi brought pre-enforcement action against President, Executive Branch officials and agencies, and the United States, seeking to prohibit implementation and enforcement of Presidential Proclamation to extent that it indefinitely barred entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad). The United States District Court for the District of Hawaiʻi, No. 1:17-cv-00050-DKW-KSC, Derrick Kahala Watson, J., 265 F.Supp.3d 1140, granted plaintiffs' motion for temporary restraining order (TRO) and later granted a nationwide preliminary injunction, which was stayed in part by the Court of Appeals, 2017 WL 5343014, and was stayed by the Supreme Court, ––– U.S. ––––, 138 S.Ct. 542, 199 L.Ed.2d 382. Defendants appealed. The United States Court of Appeals for the Ninth Circuit, 878 F.3d 662, affirmed in part and vacated in part. Certiorari was granted.

**Holdings:** The Supreme Court, Chief Justice Roberts, held that:

[1] President fulfilled requirement, for Immigration and Nationality Act (INA) provision delegating authority to President to suspend entry by aliens or classes of aliens, of

finding that entry of aliens from covered countries would be detrimental to interests of U.S.;

[2] INA provision prohibiting national origin discrimination in issuing immigrant visas does not constrain President's delegated authority to suspend entry by aliens or classes of aliens;

[3] rational basis review would be applied to Establishment Clause claim, which concerned entry of foreign nationals;

[4] Proclamation did not violate the Establishment Clause; and

[5] forcible relocation of U.S. citizens to concentration camps, solely and explicitly on basis of race, is objectively unlawful and outside the scope of Presidential authority, abrogating Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194.

Reversed and remanded.

Justice Kennedy filed a concurring opinion.

Justice Thomas filed a concurring opinion.

Justice Breyer filed a dissenting opinion, in which Justice Kagan joined.

Justice Sotomayor filed a dissenting opinion, in which Justice Ginsburg joined.

West Headnotes (37)

**[1]**    **Aliens, Immigration, and Citizenship** ⚷ **Injunction**

**Federal Courts** ⚷ Case or controversy requirement; justiciability; mootness and ripeness

On certiorari review of affirmance by the Court of Appeals of the District Court's preliminary injunction against implementation and enforcement of Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries, Supreme Court would assume without deciding that

plaintiffs' statutory claims under INA were justiciable, notwithstanding doctrine of consular nonreviewability or any other statutory nonreviewability issue, where Government, as petitioner, did not argue that doctrine of consular nonreviewability went to Supreme Court's jurisdiction, nor did Government point to any provision of INA that expressly stripped Supreme Court of jurisdiction over plaintiffs' claims. Immigration and Nationality Act, §§ 202(a)(1)(A), 212(f), 215(a), 242, 8 U.S.C.A. §§ 1152(a)(1)(A), 1182(f), 1185(a), 1252; Presidential Proclamation No. 9645, Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4257998.

8 Cases that cite this headnote

---

[2]    **Aliens, Immigration, and Citizenship** 🔑 Security and Related Grounds

INA provision delegating authority to President to suspend entry by aliens or classes of aliens, based on finding that their entry would be detrimental to interests of U.S., by its terms exudes deference to President in every clause; it entrusts to President decisions of whether and when to suspend entry, i.e., whenever President finds that entry of aliens would be detrimental to national interest, whose entry to suspend, i.e., all aliens or any class of aliens, for how long, i.e., for such period as President shall deem necessary, and on what conditions, i.e., any restrictions that President may deem to be appropriate. Immigration and Nationality Act, § 212(f), 8 U.S.C.A. § 1182(f).

5 Cases that cite this headnote

---

[3]    **Aliens, Immigration, and Citizenship** 🔑 Security and Related Grounds

INA provision delegating authority to President to suspend entry by aliens or classes of aliens, based on finding that their entry would be detrimental to interests of U.S., vests President with ample power to impose entry restrictions in addition to those elsewhere enumerated in INA.

Immigration and Nationality Act, § 212(f), 8 U.S.C.A. § 1182(f).

3 Cases that cite this headnote

---

[4]    **Aliens, Immigration, and Citizenship** 🔑 Administrative Procedure

President fulfilled requirement, for INA provision delegating authority to President to suspend entry by aliens or classes of aliens, of finding that entry of covered aliens from six predominantly Muslim countries would be detrimental to interests of U.S.; President ordered worldwide, multi-agency review of adequacy of foreign nations' identity-management and information-sharing protocols and review of indicators of foreign nations' national security risk, and Presidential Proclamation set forth extensive findings describing how deficiencies in practices of select foreign governments, several of which were state sponsors of terrorism, deprived Government of sufficient information to assess risks those countries' nationals posed to United States.

Immigration and Nationality Act, § 212(f), 8 U.S.C.A. § 1182(f); Presidential Proclamation No. 9645, § 1(h)(i), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4257998.

1 Cases that cite this headnote

---

[5]    **Aliens, Immigration, and Citizenship** 🔑 Findings or statement of reasons

Assuming that INA provision delegating authority to President to suspend entry by aliens or classes of aliens, based on finding that their entry would be detrimental to interests of U.S., required President to explain the finding with sufficient detail to enable judicial review, and that some form of judicial review of explanation was appropriate, attack on sufficiency of President's findings could not be sustained, with respect to Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries; 12–page Proclamation, which

**Trump v. Hawaii, 138 S.Ct. 2392 (2018)**

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 16 of 912

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

thoroughly described the process, agency evaluations, and recommendations underlying President's chosen restrictions, was more detailed than any prior order a President has issued under the INA provision. Immigration and Nationality Act, § 212(f), 8 U.S.C.A. § 1182(f); Presidential Proclamation No. 9645, § 1(h)(i), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4257998.

**[6]    Aliens, Immigration, and Citizenship**    Standard and Scope of Review

Searching inquiry into persuasiveness of President's justifications, for Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries, would be inconsistent with broad statutory text of INA provision delegating authority to President to suspend entry by aliens or classes of aliens based on finding that their entry would be detrimental to interests of U.S., and would be inconsistent with the deference traditionally accorded the President in that sphere. Immigration and Nationality Act, § 212(f), 8 U.S.C.A. § 1182(f); Presidential Proclamation No. 9645, Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4257998.

1 Cases that cite this headnote

**[7]    Aliens, Immigration, and Citizenship**    Security and Related Grounds

Whether the President's chosen method of addressing perceived risks is justified from a policy perspective is irrelevant to the scope of his authority under INA provision delegating authority to President to suspend entry by aliens or classes of aliens, based on finding that their entry would be detrimental to interests of United States. Immigration and Nationality Act, § 212(f), 8 U.S.C.A. § 1182(f).

2 Cases that cite this headnote

**[8]    United States**    Review of presidential actions

When the President adopts a preventive measure in the context of international affairs and national security, he is not required to conclusively link all of the pieces in the puzzle before courts grant weight to his empirical conclusions.

**[9]    Aliens, Immigration, and Citizenship**    Power to deny admission or remove in general

**Aliens, Immigration, and Citizenship**    Order and Warrant; Enforcement

INA provision delegating authority to President to suspend entry by aliens or classes of aliens for such period as he shall deem necessary, based on finding that their entry would be detrimental to interests of U.S., does not require the President to prescribe in advance a fixed end date for the entry restrictions, and thus, when a President suspends entry in response to a diplomatic dispute or policy concern, he may link the duration of those restrictions, implicitly or explicitly, to the resolution of the triggering condition. Immigration and Nationality Act, § 212(f), 8 U.S.C.A. § 1182(f).

**[10]    Aliens, Immigration, and Citizenship**    Order and Warrant; Enforcement

**Aliens, Immigration, and Citizenship**    Operation and effect in general

Presidential Proclamation, indefinitely barring entry by nationals from six predominantly Muslim countries, did not violate any textual limit on suspension of entry, in INA provision delegating authority to President to suspend entry by aliens or classes of aliens for such period as President deemed necessary, based on finding that their entry would be detrimental to interests of U.S.; Proclamation made clear that its conditional restrictions would remain in force only so long as necessary to address identified inadequacies in identity-management

and information-sharing protocols and identified risks for covered nations, and to that end, Proclamation established ongoing process to engage covered nations and to assess every 180 days whether entry restrictions should be modified or terminated. Immigration and Nationality Act, § 212(f), 8 U.S.C.A. § 1182(f); Presidential Proclamation No. 9645, §§ 1(h), 4(a, b), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4257998.

1 Cases that cite this headnote

**[11]**   **Aliens, Immigration, and Citizenship**  ⬦ Power to deny admission or remove in general

"Class of aliens," within meaning of INA provision delegating authority to President to suspend entry by aliens or classes of aliens, based on finding that their entry would be detrimental to interests of U.S., encompasses a group of people linked by nationality. Immigration and Nationality Act, § 212(f), 8 U.S.C.A. § 1182(f).

**[12]**   **Aliens, Immigration, and Citizenship**  ⬦ Power to deny admission or remove in general

INA provision delegating authority to President to suspend entry of "any aliens" or "any classes of aliens," based on finding that their entry would be detrimental to interests of U.S., does not impose a tailoring requirement, which would prohibit a class from being overbroad.

Immigration and Nationality Act, § 212(f), 8 U.S.C.A. § 1182(f).

**[13]**   **Aliens, Immigration, and Citizenship**  ⬦ Security and Related Grounds

**Aliens, Immigration, and Citizenship**  ⬦ Terrorist activity

**Aliens, Immigration, and Citizenship**  ⬦ Operation and effect in general

Even assuming that INA provision delegating authority to President to suspend entry by aliens or classes of aliens, based on finding that their entry would be detrimental to interests of U.S., did not allow President to expressly override particular provisions of INA, there was no contradiction with another provision of INA, in Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries; rather, Proclamation supported Congress's individualized approach for determining admissibility and promoted the effectiveness of the vetting process by helping to ensure the availability of information needed to make determinations under the various inadmissibility grounds set forth in INA, which were based on connections to terrorism and criminal history.

Immigration and Nationality Act, § 212(f), 8 U.S.C.A. § 1182(f); Presidential Proclamation No. 9645, Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4257998.

2 Cases that cite this headnote

**[14]**   **Aliens, Immigration, and Citizenship**  ⬦ Waiver

**Aliens, Immigration, and Citizenship**  ⬦ Security and Related Grounds

Even assuming that INA provision delegating authority to President to suspend entry by aliens or classes of aliens, based on finding that their entry would be detrimental to interests of U.S., did not allow President to expressly override particular provisions of INA, there was no conflict between Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries, and the Visa Waiver Program, which allowed travel without a visa for short-term visitors from countries that had entered into a rigorous security partnership with the United States. Immigration and Nationality Act, §§ 212(f), 217(a)(12) (A), 8 U.S.C.A. §§ 1182(f), 1187(a)(12) (A); Presidential Proclamation No. 9645, Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4257998.

Trump v. Hawaii, 138 S.Ct. 2392 (2018)

Case 3:20-cv-07721-SI     Document 58-6     Filed 11/10/20     Page 18 of 912

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

5 Cases that cite this headnote

**[15]** **Aliens, Immigration, and Citizenship** 🔑 **Waiver**

**Aliens, Immigration, and Citizenship** 🔑 **Security and Related Grounds**

Congress's decision to authorize a benefit for many of America's closest allies through the Visa Waiver Program, which allows travel without a visa for short-term visitors from countries that have entered into a rigorous security partnership with the United States, does not implicitly foreclose the Executive from imposing tighter restrictions on entry by nationals of certain high-risk countries. Immigration and Nationality Act, § 217(a)(12)(A), 8 U.S.C.A. § 1187(a)(12)(A).

1 Cases that cite this headnote

**[16]** **Aliens, Immigration, and Citizenship** 🔑 **Security and Related Grounds**

INA provision delegating authority to President to suspend entry by aliens or classes of aliens, based on finding that their entry would be detrimental to interests of U.S., vests authority in President to impose additional limitations on entry beyond grounds for exclusion set forth in INA, including additional limitations in response to circumstances that might affect the vetting system or other interests of the United States. Immigration and Nationality Act, § 212(f), 8 U.S.C.A. § 1182(f).

2 Cases that cite this headnote

**[17]** **Aliens, Immigration, and Citizenship** 🔑 **Power to deny admission or remove in general**

**Aliens, Immigration, and Citizenship** 🔑 **Security and Related Grounds**

While it was not necessary, in light of clarity of statutory text, for Supreme Court, in reviewing statutory challenge to Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries, to consider

statutory background and legislative history for INA provision delegating authority to President to suspend entry by aliens or classes of aliens based on finding that their entry would be detrimental to interests of U.S., those sources did not suggest that President's suspension power should be limited to exigencies in which it would be difficult for Congress to react promptly; while precursor wartime statutes confined President's exclusion authority to times of war and national emergency, Congress later removed the national emergency standard, and Congress's conscious departure from its wartime statutes was far more probative than an isolated floor statement.

Immigration and Nationality Act, § 212(f), 8 U.S.C.A. § 1182(f); Presidential Proclamation No. 9645, Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

1 Cases that cite this headnote

**[18]** **Aliens, Immigration, and Citizenship** 🔑 **Immigrant Visas**

**Aliens, Immigration, and Citizenship** 🔑 **Security and Related Grounds**

INA provision prohibiting national origin discrimination in issuing immigrant visas does not constrain President's delegated authority, in another INA provision, to suspend entry by aliens or classes of aliens based on finding that their entry would be detrimental to interests of U.S.; rather, the two provisions operate in different spheres, with the entry suspension provision defining the universe of aliens who are admissible into the U.S. and therefore eligible to receive a visa, and once that provision sets the boundaries of admissibility into U.S., the other provision prohibits discrimination in the allocation of immigrant visas based on nationality and other traits. Immigration and Nationality Act, §§ 202(a)(1)(A), 212(f), 8 U.S.C.A. §§ 1152(a)(1)(A), 1182(f).

**[19]** **Federal Courts** 🔑 **Case or Controversy Requirement**

Federal courts have authority under the Constitution to decide legal questions only in the course of resolving "Cases" or "Controversies." U.S.C.A. Const. Art. 3, § 2, cl. 1.

7 Cases that cite this headnote

**[20]** **Federal Civil Procedure** In general; injury or interest

**Federal Courts** Case or Controversy Requirement

One of the essential elements of a legal case or controversy, as required for federal jurisdiction under Article III, is that the plaintiff have standing to sue. U.S.C.A. Const. Art. 3, § 2, cl. 1.

14 Cases that cite this headnote

**[21]** **Federal Civil Procedure** In general; injury or interest

Article III standing requires more than just a keen interest in the issue; it requires allegations, and, eventually, proof, that the plaintiff personally suffered a concrete and particularized injury in connection with the conduct about which he complains. U.S.C.A. Const. Art. 3, § 2, cl. 1.

14 Cases that cite this headnote

**[22]** **Constitutional Law** Freedom of Religion and Conscience

To establish Article III standing in a case arising from an alleged violation of the Establishment Clause, a plaintiff must show, as in other cases, that he is directly affected by the laws and practices against which his complaints are directed. U.S.C.A. Const. Art. 3, § 2, cl. 1; U.S.C.A. Const.Amend. 1.

4 Cases that cite this headnote

**[23]** **Constitutional Law** Freedom of Religion and Conscience

Individual citizens or lawful permanent residents, with relatives applying for immigrant or nonimmigrant visas, sufficiently alleged a concrete and particularized injury that supported the injury-in-fact element for Article III standing, in action for injunctive relief, alleging that Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries violated the Establishment Clause; plaintiffs alleged the real-world effect that the Proclamation had in keeping them separated from certain relatives who sought to enter the country. U.S.C.A. Const. Art. 3, § 2, cl. 1; U.S.C.A. Const.Amend. 1; Presidential Proclamation No. 9645, Sept. 24, 2017, 82 Fed. Reg. 45161, 🚩 2017 WL 4257998.

6 Cases that cite this headnote

**[24]** **Constitutional Law** Advancement, endorsement, or sponsorship of religion; favoring or preferring religion

The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another. U.S.C.A. Const.Amend. 1.

2 Cases that cite this headnote

**[25]** **Constitutional Law** Nature and scope in general

The admission and exclusion of foreign nationals is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.

8 Cases that cite this headnote

**[26]** **Constitutional Law** Immigration and citizenship

**Constitutional Law** Immigration and citizenship

Because decisions in matters concerning the admission or exclusion of foreign nationals may implicate relations with foreign powers or involve classifications defined in the light of changing political and economic circumstances, such judgments are frequently of a character more appropriate to either the Legislature or the Executive, rather than the Judiciary.

Trump v. Hawaii, 138 S.Ct. 2392 (2018)
201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 20 of 912

1 Cases that cite this headnote

[27] **Aliens, Immigration, and Citizenship** 🔑 Admission as privilege or right

Foreign nationals seeking admission to the United States have no constitutional right to entry.

12 Cases that cite this headnote

[28] **Aliens, Immigration, and Citizenship** 🔑 Constitutional and statutory provisions

**Constitutional Law** 🔑 Judicial encroachment on executive acts taken under statutory authority

When the Executive exercises delegated power, to admit or exclude foreign nationals, negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the asserted constitutional interests of U.S. citizens.

8 Cases that cite this headnote

[29] **Aliens, Immigration, and Citizenship** 🔑 Visa Proceedings

Respect for the political branches' broad power over the creation and administration of the immigration system means that the Government need provide only a statutory citation to explain a visa denial.

2 Cases that cite this headnote

[30] **Constitutional Law** 🔑 Foreign policy and national defense

**Constitutional Law** 🔑 Judicial encroachment on executive acts taken under statutory authority

The narrow standard of judicial review, when the Executive, on the basis of a facially legitimate and bona fide reason, negatively exercises delegated power to admit or exclude foreign

nationals, has particular force in admission and immigration cases that overlap with the area of national security, because judicial inquiry into the national-security realm raises concerns for the separation of powers by intruding on the President's constitutional responsibilities in the area of foreign affairs, and when it comes to collecting evidence and drawing inferences on questions of national security, the lack of competence on the part of the courts is marked.

6 Cases that cite this headnote

[31] **Constitutional Law** 🔑 Foreign policy and national defense

**Constitutional Law** 🔑 Immigration and citizenship

**United States** 🔑 Rights, Privileges, Duties, and Liabilities of President

Any rule of constitutional law that would inhibit the flexibility of the President to respond to changing world conditions should be adopted only with the greatest caution, and judicial inquiry into matters of entry of foreign nationals and national security is highly constrained.

8 Cases that cite this headnote

[32] **Constitutional Law** 🔑 Particular Issues and Applications

Assuming that the Supreme Court, in reviewing Establishment Clause challenge to Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries, could look behind the face of the Proclamation to the extent of applying rational basis review, the Court would consider extrinsic evidence, but would uphold the policy so long as it could reasonably be understood to result from a justification independent of unconstitutional grounds. U.S.C.A. Const.Amend. 1; Presidential Proclamation No. 9645, Sept. 24, 2017, 82 Fed. Reg. 45161, 🚩 2017 WL 4257998.

9 Cases that cite this headnote

**Trump v. Hawaii, 138 S.Ct. 2392 (2018)**

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 21 of 912

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

[33]    **Constitutional Law** 👉 **Particular Issues and Applications**

Supreme Court would apply rational basis review to Establishment Clause challenge to Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries; such circumscribed inquiry applied to any constitutional claim concerning entry of foreign nationals. U.S.C.A. Const.Amend. 1; Presidential Proclamation No. 9645, Sept. 24, 2017, 82 Fed. Reg. 45161, 🚩 2017 WL 4257998.

7 Cases that cite this headnote

[34]    **Constitutional Law** 👉 **Reasonableness or rationality**

Given the standard of review, it should come as no surprise that courts hardly ever strike down a policy as illegitimate under rational basis scrutiny for a constitutional violation.

4 Cases that cite this headnote

[35]    **Aliens, Immigration, and Citizenship** 👉 **Security and Related Grounds**

**Constitutional Law** 👉 **Particular Issues and Applications**

Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries did not violate Establishment Clause, on rational basis review of constitutional claim concerning entry of foreign nationals; quite apart from any religious hostility allegedly reflected in President's statements as presidential candidate and as President, there was persuasive evidence that the facially neutral Proclamation had a legitimate grounding in national security concerns in preventing entry of nationals who could not be adequately vetted and in inducing other nations to improve their identity-management and information-sharing practices, and Proclamation's policy denying certain foreign nationals the privilege of admission reflected results of worldwide review process undertaken by multiple Cabinet officials and their agencies. U.S.C.A. Const.Amend.

1; Presidential Proclamation No. 9645, Sept. 24, 2017, 82 Fed. Reg. 45161, 🚩 2017 WL 4257998.

13 Cases that cite this headnote

[36]    **Aliens, Immigration, and Citizenship** 👉 **Security and Related Grounds**

**Constitutional Law** 👉 **Particular Issues and Applications**

Standing alone, fact that five of the seven nations, currently included in Presidential Proclamation indefinitely barring entry by nationals of those countries, had Muslim-majority populations did not support an inference of religious hostility, on rational basis review of Establishment Clause claim concerning entry of foreign nationals; facially neutral policy covered just 8% of world's Muslim population and was limited to countries that were previously designated by Congress or prior administrations as posing national security risks. U.S.C.A. Const. Amend. 1; Immigration and Nationality Act, § 217(a)(12)(A), 🔖 8 U.S.C.A. § 1187(a)(12)(A); Presidential Proclamation No. 9645, Sept. 24, 2017, 82 Fed. Reg. 45161, 🚩 2017 WL 4257998.

4 Cases that cite this headnote

[37]    **United States** 👉 **Authority for particular actions**

**War and National Emergency** 👉 **Exclusion and internment of nationals of enemy ancestry**

The forcible relocation of U.S. citizens to concentration camps, solely and explicitly on the basis of race, is objectively unlawful and outside the scope of Presidential authority; abrogating

🚩 *Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194.

2 Cases that cite this headnote

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 22 of 912

**Trump v. Hawaii, 138 S.Ct. 2392 (2018)**

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

*\*2399* *Syllabus* [*]

In September 2017, the President issued Proclamation No. 9645, seeking to improve vetting procedures for foreign nationals traveling to the United States by identifying ongoing deficiencies in the information needed to assess whether nationals of particular countries present a security threat. The Proclamation placed entry restrictions on the nationals of eight foreign states whose systems for managing and sharing information about their nationals the President deemed inadequate. Foreign states were selected for inclusion based on a review undertaken pursuant to one of the President's earlier Executive Orders. As part of that review, the Department of Homeland Security (DHS), in consultation with the State Department and intelligence agencies, developed an information and risk assessment "baseline." DHS then collected and evaluated data for all foreign governments, identifying those having deficient information-sharing practices and presenting national security concerns, as well as other countries "at risk" of failing to meet the baseline. After a 50–day period during which the State Department made diplomatic efforts to encourage foreign governments to improve their practices, the Acting Secretary of Homeland Security concluded that eight countries—Chad, Iran, Iraq, Libya, North Korea, Syria, Venezuela, and Yemen —remained deficient. She recommended entry restrictions for certain nationals from all of those countries but Iraq, which had a close cooperative relationship with the U.S. She also recommended including Somalia, which met the information-sharing component of the baseline standards but had other special risk factors, such as a significant terrorist presence. After consulting with multiple Cabinet members, the President adopted the recommendations and issued the Proclamation. Invoking his authority under 8 U.S.C. §§ 1182(f) and 1185(a), he determined that certain restrictions were necessary to "prevent the entry of those foreign nationals about **\*2400** whom the United States Government lacks sufficient information" and "elicit improved identity-management and information-sharing protocols and practices from foreign governments." The Proclamation imposes a range of entry restrictions that vary based on the "distinct circumstances" in each of the eight countries. It exempts lawful permanent residents and provides case-by-case waivers under certain circumstances. It also directs DHS to assess on a continuing basis whether the restrictions should be modified or continued, and to report to the President every 180 days. At the completion of the first such review

period, the President determined that Chad had sufficiently improved its practices, and he accordingly lifted restrictions on its nationals.

Plaintiffs—the State of Hawaii, three individuals with foreign relatives affected by the entry suspension, and the Muslim Association of Hawaii—argue that the Proclamation violates the Immigration and Nationality Act (INA) and the Establishment Clause. The District Court granted a nationwide preliminary injunction barring enforcement of the restrictions. The Ninth Circuit affirmed, concluding that the Proclamation contravened two provisions of the INA: § 1182(f), which authorizes the President to "suspend the entry of all aliens or any class of aliens" whenever he "finds" that their entry "would be detrimental to the interests of the United States," and § 1152(a)(1)(A), which provides that "no person shall ... be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." The court did not reach the Establishment Clause claim.

*Held* :

1. This Court assumes without deciding that plaintiffs' statutory claims are reviewable, notwithstanding consular nonreviewability or any other statutory nonreviewability issue. See *Sale v. Haitian Centers Council, Inc.,* 509 U.S. 155, 113 S.Ct. 2549, 125 L.Ed.2d 128. Pp. 2406 – 2407.

2. The President has lawfully exercised the broad discretion granted to him under § 1182(f) to suspend the entry of aliens into the United States. Pp. 2407 – 2416.

(a) By its terms, § 1182(f) exudes deference to the President in every clause. It entrusts to the President the decisions whether and when to suspend entry, whose entry to suspend, for how long, and on what conditions. It thus vests the President with "ample power" to impose entry restrictions in addition to those elsewhere enumerated in the INA. *Sale,* 509 U.S., at 187, 113 S.Ct. 2549. The Proclamation falls well within this comprehensive delegation. The sole prerequisite set forth in § 1182(f) is that the President "find [ ]" that the entry of the covered aliens "would be detrimental to the interests of the United States." The President has undoubtedly fulfilled that requirement here. He first ordered DHS and other agencies to conduct a comprehensive

evaluation of every single country's compliance with the information and risk assessment baseline. He then issued a Proclamation with extensive findings about the deficiencies and their impact. Based on that review, he found that restricting entry of aliens who could not be vetted with adequate information was in the national interest.

Even assuming that some form of inquiry into the persuasiveness of the President's findings is appropriate, but see *Webster v. Doe,* 486 U.S. 592, 600, 108 S.Ct. 2047, 100 L.Ed.2d 632, plaintiffs' attacks on the sufficiency of the findings cannot be sustained. The 12–page Proclamation is more detailed than any prior order issued under § 1182(f). And such a **\*2401** searching inquiry is inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere. See, *e.g., Sale,* 509 U.S., at 187–188, 113 S.Ct. 2549.

The Proclamation comports with the remaining textual limits in § 1182(f). While the word "suspend" often connotes a temporary deferral, the President is not required to prescribe in advance a fixed end date for the entry restriction. Like its predecessors, the Proclamation makes clear that its "conditional restrictions" will remain in force only so long as necessary to "address" the identified "inadequacies and risks" within the covered nations. Finally, the Proclamation properly identifies a "class of aliens" whose entry is suspended, and the word "class" comfortably encompasses a group of people linked by nationality. Pp. 2408 – 2411.

(b) Plaintiffs have not identified any conflict between the Proclamation and the immigration scheme reflected in the INA that would implicitly bar the President from addressing deficiencies in the Nation's vetting system. The existing grounds of inadmissibility and the narrow Visa Waiver Program do not address the failure of certain high-risk countries to provide a minimum baseline of reliable information. Further, neither the legislative history of § 1182(f) nor historical practice justifies departing from the clear text of the statute. Pp. 2410 – 2413.

(c) Plaintiffs' argument that the President's entry suspension violates § 1152(a)(1)(A) ignores the basic distinction between admissibility determinations and visa issuance that runs throughout the INA. Section 1182 defines the universe of aliens who are admissible into the United States

(and therefore eligible to receive a visa). Once § 1182 sets the boundaries of admissibility, § 1152(a)(1)(A) prohibits discrimination in the allocation of immigrant visas based on nationality and other traits. Had Congress intended in § 1152(a)(1)(A) to constrain the President's power to determine who may enter the country, it could have chosen language directed to that end. Common sense and historical practice confirm that § 1152(a)(1)(A) does not limit the President's delegated authority under § 1182(f). Presidents have repeatedly exercised their authority to suspend entry on the basis of nationality. And on plaintiffs' reading, the President would not be permitted to suspend entry from particular foreign states in response to an epidemic, or even if the United States were on the brink of war. Pp. 2413 – 2416.

3. Plaintiffs have not demonstrated a likelihood of success on the merits of their claim that the Proclamation violates the Establishment Clause. Pp. 2415 – 2423.

(a) The individual plaintiffs have Article III standing to challenge the exclusion of their relatives under the Establishment Clause. A person's interest in being united with his relatives is sufficiently concrete and particularized to form the basis of an Article III injury in fact. Cf., *e.g., Kerry v. Din,* 576 U.S. ——, ——, 135 S.Ct. 2128, ——, 192 L.Ed.2d 183. Pp. 2415 – 2417.

(b) Plaintiffs allege that the primary purpose of the Proclamation was religious animus and that the President's stated concerns about vetting protocols and national security were but pretexts for discriminating against Muslims. At the heart of their case is a series of statements by the President and his advisers both during the campaign and since the President assumed office. The issue, however, is not whether to denounce the President's statements, but the significance of those statements in reviewing a Presidential directive, neutral on its face, addressing a matter within the core of executive responsibility. In doing so, the Court must consider **\*2402** not only the statements of a particular President, but also the authority of the Presidency itself. Pp. 2416 – 2418.

(c) The admission and exclusion of foreign nationals is a "fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50. Although foreign nationals seeking

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

admission have no constitutional right to entry, this Court has engaged in a circumscribed judicial inquiry when the denial of a visa allegedly burdens the constitutional rights of a U.S. citizen. That review is limited to whether the Executive gives a "facially legitimate and bona fide" reason for its action, *Kleindienst v. Mandel,* 408 U.S. 753, 769, 92 S.Ct. 2576, 33 L.Ed.2d 683, but the Court need not define the precise contours of that narrow inquiry in this case. For today's purposes, the Court assumes that it may look behind the face of the Proclamation to the extent of applying rational basis review, *i.e.,* whether the entry policy is plausibly related to the Government's stated objective to protect the country and improve vetting processes. Plaintiffs' extrinsic evidence may be considered, but the policy will be upheld so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds. Pp. 2418 – 2420.

(d) On the few occasions where the Court has struck down a policy as illegitimate under rational basis scrutiny, a common thread has been that the laws at issue were "divorced from any factual context from which [the Court] could discern a relationship to legitimate state interests." *Romer v. Evans,* 517 U.S. 620, 635, 116 S.Ct. 1620, 134 L.Ed.2d 855. The Proclamation does not fit that pattern. It is expressly premised on legitimate purposes and says nothing about religion. The entry restrictions on Muslim-majority nations are limited to countries that were previously designated by Congress or prior administrations as posing national security risks. Moreover, the Proclamation reflects the results of a worldwide review process undertaken by multiple Cabinet officials and their agencies. Plaintiffs challenge the entry suspension based on their perception of its effectiveness and wisdom, but the Court cannot substitute its own assessment for the Executive's predictive judgments on such matters. See *Holder v. Humanitarian Law Project,* 561 U.S. 1, 33–34, 130 S.Ct. 2705, 177 L.Ed.2d 355.

Three additional features of the entry policy support the Government's claim of a legitimate national security interest. First, since the President introduced entry restrictions in January 2017, three Muslim-majority countries—Iraq, Sudan, and Chad—have been removed from the list. Second, for those countries still subject to entry restrictions, the Proclamation includes numerous exceptions for various categories of foreign nationals. Finally, the Proclamation creates a waiver program open to all covered foreign nationals seeking entry as immigrants or nonimmigrants. Under these circumstances, the Government has set forth a sufficient

national security justification to survive rational basis review. Pp. 2420 – 2423.

878 F.3d 662, reversed and remanded.

ROBERTS, C.J., delivered the opinion of the Court, in which KENNEDY, THOMAS, ALITO, and GORSUCH, JJ., joined. KENNEDY, J., and THOMAS, J., filed concurring opinions. BREYER, J., filed a dissenting opinion, in which KAGAN, J., joined. SOTOMAYOR, J., filed a dissenting opinion, in which GINSBURG, J., joined.

**Attorneys and Law Firms**

Noel J. Francisco, Solicitor General, Washington, DC, for Petitioners.

**\*2403** Neal K. Katyal, Washington, DC, for Respondents.

Noel J. Francisco, Solicitor General, Chad A. Readler, Acting Assistant Attorney, General, Jeffrey B. Wall, Edwin S. Kneedler, Deputy Solicitors General, Hashim M. Moopan, Deputy Assistant Attorney, General, Jonathan C. Bond, Michael R. Huston, Assistants to the Solicitor, General, Sharon Swingle, H. Thomas Byron III, Attorney, Department of Justice, Washington, DC, for Petitioners.

Russell A. Suzuki, Acting Attorney General of the, State of Hawaii, Clyde J. Wadsworth, Solicitor General of the, State of Hawaii, Deirdre Marie-Iha, Donna H. Kalama, Kimberly T. Guidry, Robert T. Nakatsuji, Kaliko'onalani D. Fernandes, Kevin M. Richardson, Deputy Attorneys General, Department of the Attorney General, Honolulu, HI, for the State of Hawaii.

Neal Kumar Katyal, Colleen E. Roh Sinzdak, Mitchell P. Reich, Elizabeth Hagerty, Sundeep Iyer, Reedy C. Swanson, Hogan Lovells US LLP, Washington, DC, Thomas P. Schmidt, Sara Solow, Alexander B. Bowerman, Hogan Lovells US LLP, for Respondents.

**Opinion**

Chief Justice ROBERTS delivered the opinion of the Court.

Under the Immigration and Nationality Act, foreign nationals seeking entry into the United States undergo a vetting process to ensure that they satisfy the numerous requirements for admission. The Act also vests the President with authority to restrict the entry of aliens whenever he finds that

**Trump v. Hawaii, 138 S.Ct. 2392 (2018)**

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 25 of 912

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

their entry "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). Relying on that delegation, the President concluded that it was necessary to impose entry restrictions on nationals of countries that do not share adequate information for an informed entry determination, or that otherwise present national security risks. Presidential Proclamation No. 9645, 82 Fed. Reg. 45161 (2017) (Proclamation). The plaintiffs in this litigation, respondents here, challenged the application of those entry restrictions to certain aliens abroad. We now decide whether the President had authority under the Act to issue the Proclamation, and whether the entry policy violates the Establishment Clause of the First Amendment.

### I

### A

Shortly after taking office, President Trump signed Executive Order No. 13769, Protecting the Nation From Foreign Terrorist Entry Into the United States. 82 Fed. Reg. 8977 (2017) (EO–1). EO–1 directed the Secretary of Homeland Security to conduct a review to examine the adequacy of information provided by foreign governments about their nationals seeking to enter the United States. § 3(a). Pending that review, the order suspended for 90 days the entry of foreign nationals from seven countries—Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen—that had been previously identified by Congress or prior administrations as posing heightened terrorism risks. § 3(c). The District Court for the Western District of Washington entered a temporary restraining order blocking the entry restrictions, and the Court of Appeals for the Ninth Circuit denied the Government's request to stay that order. Washington v. Trump, 847 F.3d 1151 (2017) (per curiam ).

In response, the President revoked EO–1, replacing it with **\*2404** Executive Order No. 13780, which again directed a worldwide review. 82 Fed. Reg. 13209 (2017) (EO–2). Citing investigative burdens on agencies and the need to diminish the risk that dangerous individuals would enter without adequate vetting, EO–2 also temporarily restricted the entry (with case-by-case waivers) of foreign nationals from six of the countries covered by EO–1: Iran, Libya, Somalia, Sudan, Syria, and Yemen. §§ 2§§ 2(c), 33(a). The order explained that those countries had been selected because each "is a state sponsor

of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones." § 1(d). The entry restriction was to stay in effect for 90 days, pending completion of the worldwide review.

These interim measures were immediately challenged in court. The District Courts for the Districts of Maryland and Hawaii entered nationwide preliminary injunctions barring enforcement of the entry suspension, and the respective Courts of Appeals upheld those injunctions, albeit on different grounds. International Refugee Assistance Project (IRAP ) v. Trump, 857 F.3d 554 (C.A.4 2017); Hawaii v. Trump, 859 F.3d 741 (C.A.9 2017) (per curiam ). This Court granted certiorari and stayed the injunctions—allowing the entry suspension to go into effect—with respect to foreign nationals who lacked a "credible claim of a bona fide relationship" with a person or entity in the United States. Trump v. IRAP, 582 U.S. ——, ——, 137 S.Ct. 2080, 2088, 198 L.Ed.2d 643 (2017) (per curiam ). The temporary restrictions in EO–2 expired before this Court took any action, and we vacated the lower court decisions as moot. Trump v. IRAP, 583 U.S. ——, 138 S.Ct. 353, 199 L.Ed.2d 203 (2017); Trump v. Hawaii, 583 U.S. ——, 138 S.Ct. 377, 199 L.Ed.2d 275 (2017).

On September 24, 2017, after completion of the worldwide review, the President issued the Proclamation before us—Proclamation No. 9645, Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public–Safety Threats. 82 Fed. Reg. 45161. The Proclamation (as its title indicates) sought to improve vetting procedures by identifying ongoing deficiencies in the information needed to assess whether nationals of particular countries present "public safety threats." § 1(a). To further that purpose, the Proclamation placed entry restrictions on the nationals of eight foreign states whose systems for managing and sharing information about their nationals the President deemed inadequate.

The Proclamation described how foreign states were selected for inclusion based on the review undertaken pursuant to EO–2. As part of that review, the Department of Homeland Security (DHS), in consultation with the State Department and several intelligence agencies, developed a "baseline" for the information required from foreign governments to confirm the identity of individuals seeking entry into the United States, and to determine whether those individuals pose a security threat. § 1(c). The baseline included three components. The first, "identity-management

Trump v. Hawaii, 138 S.Ct. 2392 (2018)

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 26 of 912

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

information," focused on whether a foreign government ensures the integrity of travel documents by issuing electronic passports, reporting lost or stolen passports, and making available additional identity-related information. Second, the agencies considered the extent to which the country discloses information on criminal history and suspected terrorist links, provides travel document exemplars, and facilitates the U.S. Government's receipt of information about airline passengers and crews traveling to the United States. Finally, the agencies weighed various indicators of national security risk, including whether the foreign state is a known or potential **\*2405** terrorist safe haven and whether it regularly declines to receive returning nationals following final orders of removal from the United States. *Ibid.*

DHS collected and evaluated data regarding all foreign governments. § 1(d). It identified 16 countries as having deficient information-sharing practices and presenting national security concerns, and another 31 countries as "at risk" of similarly failing to meet the baseline. § 1(e). The State Department then undertook diplomatic efforts over a 50–day period to encourage all foreign governments to improve their practices. § 1(f). As a result of that effort, numerous countries provided DHS with travel document exemplars and agreed to share information on known or suspected terrorists. *Ibid.*

Following the 50–day period, the Acting Secretary of Homeland Security concluded that eight countries— Chad, Iran, Iraq, Libya, North Korea, Syria, Venezuela, and Yemen—remained deficient in terms of their risk profile and willingness to provide requested information. The Acting Secretary recommended that the President impose entry restrictions on certain nationals from all of those countries except Iraq. §§ 1(g), (h). She also concluded that although Somalia generally satisfied the information-sharing component of the baseline standards, its "identity-management deficiencies" and "significant terrorist presence" presented special circumstances justifying additional limitations. She therefore recommended entry limitations for certain nationals of that country. § 1(i). As for Iraq, the Acting Secretary found that entry limitations on its nationals were not warranted given the close cooperative relationship between the U.S. and Iraqi Governments and Iraq's commitment to combating ISIS. § 1(g).

After consulting with multiple Cabinet members and other officials, the President adopted the Acting Secretary's recommendations and issued the Proclamation. Invoking his authority under 8 U.S.C. §§ 1182(f) and 1185(a),

the President determined that certain entry restrictions were necessary to "prevent the entry of those foreign nationals about whom the United States Government lacks sufficient information"; "elicit improved identity-management and information-sharing protocols and practices from foreign governments"; and otherwise "advance [the] foreign policy, national security, and counterterrorism objectives" of the United States. Proclamation § 1(h). The President explained that these restrictions would be the "most likely to encourage cooperation" while "protect[ing] the United States until such time as improvements occur." *Ibid.*

The Proclamation imposed a range of restrictions that vary based on the "distinct circumstances" in each of the eight countries. *Ibid.* For countries that do not cooperate with the United States in identifying security risks (Iran, North Korea, and Syria), the Proclamation suspends entry of all nationals, except for Iranians seeking nonimmigrant student and exchange-visitor visas. §§ 2(b)(ii), (d)(ii), (e)(ii). For countries that have information-sharing deficiencies but are nonetheless "valuable counterterrorism partner[s]" (Chad, Libya, and Yemen), it restricts entry of nationals seeking immigrant visas and nonimmigrant business or tourist visas. §§ 2§§ 2(a)(i), (c)(i), (g)(i). Because Somalia generally satisfies the baseline standards but was found to present special risk factors, the Proclamation suspends entry of nationals seeking immigrant visas and requires additional scrutiny of nationals seeking nonimmigrant visas. § 2§ 2(h)(ii). And for Venezuela, which refuses to cooperate in information sharing but for which alternative means are available to identify **\*2406** its nationals, the Proclamation limits entry only of certain government officials and their family members on nonimmigrant business or tourist visas. § 2§ 2(f)(ii).

The Proclamation exempts lawful permanent residents and foreign nationals who have been granted asylum. § 3§ 3(b). It also provides for case-by-case waivers when a foreign national demonstrates undue hardship, and that his entry is in the national interest and would not pose a threat to public safety. § 3(c)(i); see also § 3§ 3(c)(iv) (listing examples of when a waiver might be appropriate, such as if the foreign national seeks to reside with a close family member, obtain urgent medical care, or pursue significant business obligations). The Proclamation further directs DHS to assess on a continuing basis whether entry restrictions should be modified or continued, and to report to the President every 180 days. § 4. Upon completion of the first such review period, the President, on the recommendation of the Secretary

of Homeland Security, determined that Chad had sufficiently improved its practices, and he accordingly lifted restrictions on its nationals. Presidential Proclamation No. 9723, 83 Fed. Reg. 15937 (2018).

B

Plaintiffs in this case are the State of Hawaii, three individuals (Dr. Ismail Elshikh, John Doe # 1, and John Doe # 2), and the Muslim Association of Hawaii. The State operates the University of Hawaii system, which recruits students and faculty from the designated countries. The three individual plaintiffs are U.S. citizens or lawful permanent residents who have relatives from Iran, Syria, and Yemen applying for immigrant or nonimmigrant visas. The Association is a nonprofit organization that operates a mosque in Hawaii.

Plaintiffs challenged the Proclamation—except as applied to North Korea and Venezuela—on several grounds. As relevant here, they argued that the Proclamation contravenes provisions in the Immigration and Nationality Act (INA), 66 Stat. 187, as amended. Plaintiffs further claimed that the Proclamation violates the Establishment Clause of the First Amendment, because it was motivated not by concerns pertaining to national security but by animus toward Islam.

The District Court granted a nationwide preliminary injunction barring enforcement of the entry restrictions. The court concluded that the Proclamation violated two provisions of the INA: § 1182(f), because the President did not make sufficient findings that the entry of the covered foreign nationals would be detrimental to the national interest, and § 1152(a)(1)(A), because the policy discriminates against immigrant visa applicants on the basis of nationality. 265 F.Supp.3d 1140, 1155–1159 (Haw.2017). The Government requested expedited briefing and sought a stay pending appeal. The Court of Appeals for the Ninth Circuit granted a partial stay, permitting enforcement of the Proclamation with respect to foreign nationals who lack a bona fide relationship with the United States. This Court then stayed the injunction in full pending disposition of the Government's appeal. 583 U.S. ——, —— S.Ct. ——, —— L.Ed.2d —— (2017)583 U.S. ——, —— S.Ct. ——, —— L.Ed.2d —— (2017).

The Court of Appeals affirmed. The court first held that the Proclamation exceeds the President's authority under

§ 1182(f). In its view, that provision authorizes only a "temporary" suspension of entry in response to "exigencies" that "Congress would be ill-equipped to address." 878 F.3d 662, 684, 688 (2017). The court further reasoned that the Proclamation "conflicts with the INA's finely *2407 reticulated regulatory scheme" by addressing "matters of immigration already passed upon by Congress." Id., at 685, 690. The Ninth Circuit then turned to § 1152(a)(1)(A) and determined that the entry restrictions also contravene the prohibition on nationality-based discrimination in the issuance of immigrant visas. The court did not reach plaintiffs' Establishment Clause claim.

We granted certiorari. 583 U.S. ——, 138 S.Ct. 923, 199 L.Ed.2d 620 (2018).

II

[1] Before addressing the merits of plaintiffs' statutory claims, we consider whether we have authority to do so. The Government argues that plaintiffs' challenge to the Proclamation under the INA is not justiciable. Relying on the doctrine of consular nonreviewability, the Government contends that because aliens have no "claim of right" to enter the United States, and because exclusion of aliens is "a fundamental act of sovereignty" by the political branches, review of an exclusion decision "is not within the province of any court, unless expressly authorized by law." United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 542–543, 70 S.Ct. 309, 94 L.Ed. 317 (1950). According to the Government, that principle barring review is reflected in the INA, which sets forth a comprehensive framework for review of orders of removal, but authorizes judicial review only for aliens physically present in the United States. See Brief for Petitioners 19–20 (citing 8 U.S.C. § 1252).

The justiciability of plaintiffs' challenge under the INA presents a difficult question. The Government made similar arguments that no judicial review was available in Sale v. Haitian Centers Council, Inc., 509 U.S. 155, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993). The Court in that case, however, went on to consider on the merits a statutory claim like the one before us without addressing the issue of reviewability. The Government does not argue that the doctrine of consular nonreviewability goes to the Court's jurisdiction, see Tr. of

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

Oral Arg. 13, nor does it point to any provision of the INA that expressly strips the Court of jurisdiction over plaintiffs' claims, see *Sebelius v. Auburn Regional Medical Center,* 568 U.S. 145, 153, 133 S.Ct. 817, 184 L.Ed.2d 627 (2013) (requiring Congress to "clearly state[ ]" that a statutory provision is jurisdictional). As a result, we may assume without deciding that plaintiffs' statutory claims are reviewable, notwithstanding consular nonreviewability or any other statutory nonreviewability issue, and we proceed on that basis.

### III

The INA establishes numerous grounds on which an alien abroad may be inadmissible to the United States and ineligible for a visa. See, *e.g.,* 8 U.S.C. §§ 1182(a)(1) (health-related grounds), (a)(2) (criminal history), (a)(3)(B) (terrorist activities), (a)(3)(C) (foreign policy grounds). Congress has also delegated to the President authority to suspend or restrict the entry of aliens in certain circumstances. The principal source of that authority, § 1182(f), enables the President to "suspend the entry of all aliens or any class of aliens" whenever he "finds" that their entry "would be detrimental to the interests of the United States." [1]

**\*2408** Plaintiffs argue that the Proclamation is not a valid exercise of the President's authority under the INA. In their view, § 1182(f) confers only a residual power to temporarily halt the entry of a discrete group of aliens engaged in harmful conduct. They also assert that the Proclamation violates another provision of the INA— 8 U.S.C. § 1152(a)(1)(A)—because it discriminates on the basis of nationality in the issuance of immigrant visas.

By its plain language, § 1182(f) grants the President broad discretion to suspend the entry of aliens into the United States. The President lawfully exercised that discretion based on his findings—following a worldwide, multi-agency review— that entry of the covered aliens would be detrimental to the national interest. And plaintiffs' attempts to identify a conflict with other provisions in the INA, and their appeal to the statute's purposes and legislative history, fail to overcome the clear statutory language.

### A

The text of § 1182(f) states:

> "Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate."

**[2]** **[3]** By its terms, § 1182(f) exudes deference to the President in every clause. It entrusts to the President the decisions whether and when to suspend entry ("[w]henever [he] finds that the entry" of aliens "would be detrimental" to the national interest); whose entry to suspend ("all aliens or any class of aliens"); for how long ("for such period as he shall deem necessary"); and on what conditions ("any restrictions he may deem to be appropriate"). It is therefore unsurprising that we have previously observed that § 1182(f) vests the President with "ample power" to impose entry restrictions in addition to those elsewhere enumerated in the INA. *Sale,* 509 U.S., at 187, 113 S.Ct. 2549 (finding it "perfectly clear" that the President could "establish a naval blockade" to prevent illegal migrants from entering the United States); see also *Abourezk v. Reagan,* 785 F.2d 1043, 1049, n. 2 (C.A.D.C.1986) (describing the "sweeping proclamation power" in § 1182(f) as enabling the President to supplement the other grounds of inadmissibility in the INA).

**[4]** The Proclamation falls well within this comprehensive delegation. The sole prerequisite set forth in § 1182(f) is that the President "find[ ]" that the entry of the covered aliens "would be detrimental to the interests of the United States." The President has undoubtedly fulfilled that

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

requirement here. He first ordered DHS and other agencies to conduct a comprehensive evaluation of every single country's compliance with the information and risk assessment baseline. The President then issued a Proclamation setting forth extensive findings describing how deficiencies in the practices of select foreign governments—several of which are state sponsors of terrorism—deprive the Government of "sufficient information to assess the risks [those countries' nationals] pose to the United States." Proclamation § 1(h) (i). Based on that review, the President found that it was in the national interest to restrict entry of aliens who could not be vetted with adequate information **\*2409** —both to protect national security and public safety, and to induce improvement by their home countries. The Proclamation therefore "craft[ed] ... country-specific restrictions that would be most likely to encourage cooperation given each country's distinct circumstances," while securing the Nation "until such time as improvements occur." *Ibid.* [2]

 **[5]** Plaintiffs believe that these findings are insufficient. They argue, as an initial matter, that the Proclamation fails to provide a persuasive rationale for why nationality alone renders the covered foreign nationals a security risk. And they further discount the President's stated concern about deficient vetting because the Proclamation allows many aliens from the designated countries to enter on nonimmigrant visas.

Such arguments are grounded on the premise that § 1182(f) not only requires the President to *make* a finding that entry "would be detrimental to the interests of the United States," but also to explain that finding with sufficient detail to enable judicial review. That premise is questionable. See *Webster v. Doe,* 486 U.S. 592, 600, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (concluding that a statute authorizing the CIA Director to terminate an employee when the Director "shall deem such termination necessary or advisable in the interests of the United States" forecloses "any meaningful judicial standard of review"). But even assuming that some form of review is appropriate, plaintiffs' attacks on the sufficiency of the President's findings cannot be sustained. The 12–page Proclamation—which thoroughly describes the process, agency evaluations, and recommendations underlying the President's chosen restrictions—is more detailed than any prior order a President has issued under § 1182(f). Contrast Presidential Proclamation No. 6958, 3 C.F.R. 133 (1996) (President Clinton) (explaining in one sentence why suspending entry of members of the Sudanese government and armed forces "is in the foreign policy interests of

the United States"); Presidential Proclamation No. 4865, 3 C.F.R. 50–51 (1981) (President Reagan) (explaining in five sentences why measures to curtail "the continuing illegal migration by sea of large numbers of undocumented aliens into the southeastern United States" are "necessary").

 **[6]** **[7]** **[8]** Moreover, plaintiffs' request for a searching inquiry into the persuasiveness of the President's justifications is inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere. "Whether the President's chosen method" of addressing perceived risks is justified from a policy perspective is "irrelevant to the scope of his [ § 1182(f) ] authority." *Sale,* 509 U.S., at 187–188, 113 S.Ct. 2549. And when the President adopts "a preventive measure ... in the context of international affairs and national security," he is "not required to conclusively link all of the pieces in the puzzle before [courts] grant weight to [his] empirical conclusions." *Holder v. Humanitarian Law Project,* 561 U.S. 1, 35, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010).

 **[9]** The Proclamation also comports with the remaining textual limits in § 1182(f). We agree with plaintiffs that the word "suspend" often connotes a "defer[ral] till later," Webster's Third New **\*2410** International Dictionary 2303 (1966). But that does not mean that the President is required to prescribe in advance a fixed end date for the entry restrictions. Section 1182(f) authorizes the President to suspend entry "for such period as he shall deem necessary." It follows that when a President suspends entry in response to a diplomatic dispute or policy concern, he may link the duration of those restrictions, implicitly or explicitly, to the resolution of the triggering condition. See, *e.g.,* Presidential Proclamation No. 5829, 3 C.F.R. 88 (1988) (President Reagan) (suspending the entry of certain Panamanian nationals "until such time as ... democracy has been restored in Panama"); Presidential Proclamation No. 8693, 3 C.F.R. 86–87 (2011) (President Obama) (suspending the entry of individuals subject to a travel restriction under United Nations Security Council resolutions "until such time as the Secretary of State determines that [the suspension] is no longer necessary"). In fact, not one of the 43 suspension orders issued prior to this litigation has specified a precise end date.

 **[10]** Like its predecessors, the Proclamation makes clear that its "conditional restrictions" will remain in force only so long as necessary to "address" the identified "inadequacies and

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

risks" within the covered nations. Proclamation Preamble, and § 1(h); see *ibid.* (explaining that the aim is to "relax[ ] or remove[ ]" the entry restrictions "as soon as possible"). To that end, the Proclamation establishes an ongoing process to engage covered nations and assess every 180 days whether the entry restrictions should be modified or terminated. §§ 4(a), (b). Indeed, after the initial review period, the President determined that Chad had made sufficient improvements to its identity-management protocols, and he accordingly lifted the entry suspension on its nationals. See Proclamation No. 9723, 83 Fed. Reg. 15937.

[11]  [12]  Finally, the Proclamation properly identifies a "class of aliens"—nationals of select countries—whose entry is suspended. Plaintiffs argue that "class" must refer to a well-defined group of individuals who share a common "characteristic" apart from nationality. Brief for Respondents 42. But the text of § 1182(f), of course, does not say that, and the word "class" comfortably encompasses a group of people linked by nationality. Plaintiffs also contend that the class cannot be "overbroad." Brief for Respondents 42. But that simply amounts to an unspoken tailoring requirement found nowhere in Congress's grant of authority to suspend entry of not only "any class of aliens" but "all aliens."

In short, the language of § 1182(f) is clear, and the Proclamation does not exceed any textual limit on the President's authority.

B

Confronted with this "facially broad grant of power," 878 F.3d, at 688, plaintiffs focus their attention on statutory structure and legislative purpose. They seek support in, first, the immigration scheme reflected in the INA as a whole, and, second, the legislative history of § 1182(f) and historical practice. Neither argument justifies departing from the clear text of the statute.

1

[13]  Plaintiffs' structural argument starts with the premise that § 1182(f) does not give the President authority to countermand Congress's considered policy judgments. The President, they say, may supplement the INA, but he

cannot supplant it. And in their view, the Proclamation falls in the latter category because *2411 Congress has already specified a two-part solution to the problem of aliens seeking entry from countries that do not share sufficient information with the United States. First, Congress designed an individualized vetting system that places the burden on the alien to prove his admissibility. See § 1361. Second, instead of banning the entry of nationals from particular countries, Congress sought to encourage information sharing through a Visa Waiver Program offering fast-track admission for countries that cooperate with the United States. See § 1187.

We may assume that § 1182(f) does not allow the President to expressly override particular provisions of the INA. But plaintiffs have not identified any conflict between the statute and the Proclamation that would implicitly bar the President from addressing deficiencies in the Nation's vetting system.

To the contrary, the Proclamation supports Congress's individualized approach for determining admissibility. The INA sets forth various inadmissibility grounds based on connections to terrorism and criminal history, but those provisions can only work when the consular officer has sufficient (and sufficiently reliable) information to make that determination. The Proclamation promotes the effectiveness of the vetting process by helping to ensure the availability of such information.

Plaintiffs suggest that the entry restrictions are unnecessary because consular officers can simply deny visas in individual cases when an alien fails to carry his burden of proving admissibility—for example, by failing to produce certified records documenting his criminal history. Brief for Respondents 48. But that misses the point: A critical finding of the Proclamation is that the failure of certain countries to provide reliable information prevents the Government from accurately determining whether an alien is inadmissible or poses a threat. Proclamation § 1(h). Unless consular officers are expected to apply categorical rules and deny entry from those countries across the board, fraudulent or unreliable documentation may thwart their review in individual cases. And at any rate, the INA certainly does not *require* that systemic problems such as the lack of reliable information be addressed only in a progression of case-by-case admissibility determinations. One of the key objectives of the Proclamation is to encourage foreign governments to

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 31 of 912

**Trump v. Hawaii, 138 S.Ct. 2392 (2018)**

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

improve their practices, thus facilitating the Government's vetting process overall. *Ibid.*

 **[14]**   Nor is there a conflict between the Proclamation and the Visa Waiver Program. The Program allows travel without a visa for short-term visitors from 38 countries that have entered into a "rigorous security partnership" with the United States. DHS, U.S. Visa Waiver Program (Apr. 6, 2016), http:// www.dhs.gov/visa-waiver-program (as last visited June 25, 2018). Eligibility for that partnership involves "broad and consequential assessments of [the country's] foreign security standards and operations." *Ibid.* A foreign government must (among other things) undergo a comprehensive evaluation of its "counterterrorism, law enforcement, immigration enforcement, passport security, and border management capabilities," often including "operational site inspections of airports, seaports, land borders, and passport production and issuance facilities." *Ibid.*

 **[15]**   Congress's decision to authorize a benefit for "many of America's closest allies," *ibid.*, did not implicitly foreclose the Executive from imposing tighter restrictions on nationals of certain high-risk countries. The Visa Waiver Program creates a special exemption for citizens of countries that maintain exemplary security  **\*2412**  standards and offer "reciprocal [travel] privileges" to United States citizens. 8 U.S.C. § 1187(a)(2)(A). But in establishing a select partnership covering less than 20% of the countries in the world, Congress did not address what requirements should govern the entry of nationals from the vast majority of countries that fall short of that gold standard—particularly those nations presenting heightened terrorism concerns. Nor did Congress attempt to determine—as the multi-agency review process did—whether those high-risk countries provide a minimum baseline of information to adequately vet their nationals. Once again, this is not a situation where "Congress has stepped into the space and solved the exact problem." Tr. of Oral Arg. 53.

 **[16]**   Although plaintiffs claim that their reading preserves for the President a flexible power to "supplement" the INA, their understanding of the President's authority is remarkably cramped: He may suspend entry by classes of aliens "similar in nature" to the existing categories of inadmissibility— but not too similar—or only in response to "some exigent circumstance" that Congress did not already touch on in the INA. Brief for Respondents 31, 36, 50; see also Tr. of Oral Arg. 57 ("Presidents have wide berth in this area ... if there's any sort of emergency."). In any event, no Congress that wanted to confer on the President only a residual authority

to address emergency situations would ever use language of the sort in § 1182(f). Fairly read, the provision vests authority in the President to impose additional limitations on entry beyond the grounds for exclusion set forth in the INA— including in response to circumstances that might affect the vetting system or other "interests of the United States."

Because plaintiffs do not point to any contradiction with another provision of the INA, the President has not exceeded his authority under § 1182(f).

### 2

 **[17]**   Plaintiffs seek to locate additional limitations on the scope of § 1182(f) in the statutory background and legislative history. Given the clarity of the text, we need not consider such extra-textual evidence. See *State Farm Fire & Casualty Co. v. United States ex rel. Rigsby*, 580 U.S. ——, ——, 137 S.Ct. 436, 444, 196 L.Ed.2d 340 (2016). At any rate, plaintiffs' evidence supports the plain meaning of the provision.

Drawing on legislative debates over § 1182(f), plaintiffs suggest that the President's suspension power should be limited to exigencies where it would be difficult for Congress to react promptly. Precursor provisions enacted during the First and Second World Wars confined the President's exclusion authority to times of "war" and "national emergency." See Act of May 22, 1918, § 1(a), 40 Stat. 559; Act of June 21, 1941, ch. 210, § 1, 55 Stat. 252. When Congress enacted § 1182(f) in 1952, plaintiffs note, it borrowed "nearly verbatim" from those predecessor statutes, and one of the bill's sponsors affirmed that the provision would apply only during a time of crisis. According to plaintiffs, it therefore follows that Congress sought to delegate only a similarly tailored suspension power in § 1182(f). Brief for Respondents 39–40.

If anything, the drafting history suggests the opposite. In borrowing "nearly verbatim" from the pre-existing statute, Congress made one critical alteration—it removed the national emergency standard that plaintiffs now seek to reintroduce in another form. Weighing Congress's conscious departure from its wartime statutes against an isolated floor statement, the  **\*2413**  departure is far more probative. See

*NLRB v. SW General, Inc.,* 580 U.S. ——, ——, 137 S.Ct. 929, 943, 197 L.Ed.2d 263 (2017) ("[F]loor statements by individual legislators rank among the least illuminating forms of legislative history."). When Congress wishes to condition an exercise of executive authority on the President's finding of an exigency or crisis, it knows how to say just that. See, *e.g.,* 16 U.S.C. § 824*o*–1(b); 42 U.S.C. § 5192; 50 U.S.C. §§ 1701, 1702. Here, Congress instead chose to condition the President's exercise of the suspension authority on a different finding: that the entry of an alien or class of aliens would be "detrimental to the interests of the United States."

Plaintiffs also strive to infer limitations from executive practice. By their count, every previous suspension order under § 1182(f) can be slotted into one of two categories. The vast majority targeted discrete groups of foreign nationals engaging in conduct "deemed harmful by the immigration laws." And the remaining entry restrictions that focused on entire nationalities—namely, President Carter's response to the Iran hostage crisis and President Reagan's suspension of immigration from Cuba—were, in their view, designed as a response to diplomatic emergencies "that the immigration laws do not address." Brief for Respondents 40–41.

Even if we were willing to confine expansive language in light of its past applications, the historical evidence is more equivocal than plaintiffs acknowledge. Presidents have repeatedly suspended entry not because the covered nationals themselves engaged in harmful acts but instead to retaliate for conduct by their governments that conflicted with U.S. foreign policy interests. See, *e.g.,* Exec. Order No. 13662, 3 C.F.R. 233 (2014) (President Obama) (suspending entry of Russian nationals working in the financial services, energy, mining, engineering, or defense sectors, in light of the Russian Federation's "annexation of Crimea and its use of force in Ukraine"); Presidential Proclamation No. 6958, 3 C.F.R. 133 (1997) (President Clinton) (suspending entry of Sudanese governmental and military personnel, citing "foreign policy interests of the United States" based on Sudan's refusal to comply with United Nations resolution). And while some of these reprisals were directed at subsets of aliens from the countries at issue, others broadly suspended entry on the basis of nationality due to ongoing diplomatic disputes. For example, President Reagan invoked § 1182(f) to suspend entry "as immigrants" by almost all Cuban nationals, to apply pressure to the Cuban Government. Presidential

Proclamation No. 5517, 3 C.F.R. 102 (1986). Plaintiffs try to fit this latter order within their carve-out for emergency action, but the proclamation was based in part on Cuba's decision to breach an immigration agreement some 15 months earlier.

More significantly, plaintiffs' argument about historical practice is a double-edged sword. The more ad hoc their account of executive action—to fit the history into their theory—the harder it becomes to see such a refined delegation in a statute that grants the President sweeping authority to decide whether to suspend entry, whose entry to suspend, and for how long.

C

Plaintiffs' final statutory argument is that the President's entry suspension violates § 1152(a)(1)(A), which provides that "no person shall ... be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." They contend that we should interpret the provision as prohibiting nationality-based discrimination throughout **\*2414** the *entire* immigration process, despite the reference in § 1152(a)(1)(A) to the act of visa issuance alone. Specifically, plaintiffs argue that § 1152(a)(1)(A) applies to the predicate question of a visa applicant's eligibility for admission and the subsequent question whether the holder of a visa may in fact enter the country. Any other conclusion, they say, would allow the President to circumvent the protections against discrimination enshrined in § 1152(a)(1)(A).

As an initial matter, this argument challenges only the validity of the entry restrictions on *immigrant* travel. Section 1152(a)(1)(A) is expressly limited to the issuance of "immigrant visa[s]" while § 1182(f) allows the President to suspend entry of "immigrants or nonimmigrants." At a minimum, then, plaintiffs' reading would not affect any of the limitations on nonimmigrant travel in the Proclamation.

In any event, we reject plaintiffs' interpretation because it ignores the basic distinction between admissibility determinations and visa issuance that runs throughout the INA.[3] Section 1182 defines the pool of individuals who

are admissible to the United States. Its restrictions come into play at two points in the process of gaining entry (or admission) [4] into the United States. First, any alien who is inadmissible under 🔖 § 1182 (based on, for example, health risks, criminal history, or foreign policy consequences) is screened out as "ineligible to receive a visa." 8 U.S.C. § 1201(g). Second, even if a consular officer issues a visa, entry into the United States is not guaranteed. As every visa application explains, a visa does not entitle an alien to enter the United States "if, upon arrival," an immigration officer determines that the applicant is "inadmissible under this chapter, or any other provision of law"—including 🔖 § 1182(f). 🔖 § 1201(h).

 [18] 🔖 Sections 1182(f) and 🔖 1152(a)(1)(A) thus operate in different spheres: 🔖 Section 1182 defines the universe of aliens who are admissible into the United States (and therefore eligible to receive a visa). Once 🔖 § 1182 sets the boundaries of admissibility into the United States, 🔖 § 1152(a)(1)(A) prohibits discrimination in the allocation of immigrant visas based on nationality and other traits. The distinction between admissibility—to which 🔖 § 1152(a)(1)(A) does not apply—and visa issuance—to which it does—is apparent from the text of the provision, which specifies only that its protections apply to the "issuance" of "immigrant visa[s]," without mentioning admissibility or entry. Had Congress instead intended in 🔖 § 1152(a)(1)(A) to constrain the President's power to determine who may enter the country, it could easily have chosen language directed to that end. See, *e.g.,* 🔖 §§ 1182(a)(3)(C)(ii), (iii) (providing that certain aliens "*shall not be* **\*2415** *excludable or subject to restrictions or conditions on entry ... because of the alien's past, current, or expected beliefs, statements, or associations*" (emphasis added)). "The fact that [Congress] did not adopt [a] readily available and apparent alternative strongly supports" the conclusion that 🔖 § 1152(a)(1)(A) does not limit the President's delegated authority under 🔖 § 1182(f). *Knight v. Commissioner,* 552 U.S. 181, 188, 128 S.Ct. 782, 169 L.Ed.2d 652 (2008).

Common sense and historical practice confirm as much. 🔖 Section 1152(a)(1)(A) has never been treated as a constraint on the criteria for admissibility in 🔖 § 1182. Presidents have repeatedly exercised their authority to suspend entry on the basis of nationality. As noted, President Reagan relied on 🔖 § 1182(f) to suspend entry "as immigrants by all Cuban nationals," subject to exceptions. Proclamation No. 5517, 51 Fed. Reg. 30470 (1986). Likewise, President Carter invoked 🔖 § 1185(a)(1) to deny and revoke visas to all Iranian nationals. See 🔖 Exec. Order No. 12172, 3 C.F.R. 461 (1979), as amended by 🔖 Exec. Order No. 12206, 3 C.F.R. 249 (1980); Public Papers of the Presidents, Jimmy Carter, Sanctions Against Iran, Vol. 1, Apr. 7, 1980, pp. 611–612 (1980); see also n. 1, *supra.*

On plaintiffs' reading, those orders were beyond the President's authority. The entry restrictions in the Proclamation on North Korea (which plaintiffs do not challenge in this litigation) would also be unlawful. Nor would the President be permitted to suspend entry from particular foreign states in response to an epidemic confined to a single region, or a verified terrorist threat involving nationals of a specific foreign nation, or even if the United States were on the brink of war.

In a reprise of their 🔖 § 1182(f) argument, plaintiffs attempt to soften their position by falling back on an implicit exception for Presidential actions that are "closely drawn" to address "specific fast-breaking exigencies." Brief for Respondents 60–61. Yet the absence of any textual basis for such an exception more likely indicates that Congress did not intend for 🔖 § 1152(a)(1)(A) to limit the President's flexible authority to suspend entry based on foreign policy interests. In addition, plaintiffs' proposed exigency test would require courts, rather than the President, to determine whether a foreign government's conduct rises to the level that would trigger a supposed implicit exception to a federal statute. See 🔖 *Reno v. American–Arab Anti–Discrimination Comm.,* 525 U.S. 471, 491, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (explaining that even if the Executive "disclose[d] its ... reasons for deeming nationals of a particular country a special threat," courts would be "unable to assess their adequacy").

The text of 🔖 § 1152(a)(1)(A) offers no standards that would enable courts to assess, for example, whether the situation in North Korea justifies entry restrictions while the terrorist threat in Yemen does not.

\* \* \*

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

The Proclamation is squarely within the scope of Presidential authority under the INA. Indeed, neither dissent even attempts any serious argument to the contrary, despite the fact that plaintiffs' primary contention below and in their briefing before this Court was that the Proclamation violated the statute.

IV

A

We now turn to plaintiffs' claim that the Proclamation was issued for the unconstitutional purpose of excluding Muslims. Because we have an obligation to assure ourselves of jurisdiction under Article III, **\*2416** we begin by addressing the question whether plaintiffs have standing to bring their constitutional challenge.

**[19] [20] [21] [22]** Federal courts have authority under the Constitution to decide legal questions only in the course of resolving "Cases" or "Controversies." Art. III, § 2Art. III, § 2. One of the essential elements of a legal case or controversy is that the plaintiff have standing to sue. Standing requires more than just a "keen interest in the issue." *Hollingsworth v. Perry,* 570 U.S. 693, 700, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013). It requires allegations—and, eventually, proof—that the plaintiff "personal[ly]" suffered a concrete and particularized injury in connection with the conduct about which he complains. *Spokeo, Inc. v. Robins,* 578 U.S. ——, ——, 136 S.Ct. 1540, 1547–1548, 194 L.Ed.2d 635 (2016). In a case arising from an alleged violation of the Establishment Clause, a plaintiff must show, as in other cases, that he is "directly affected by the laws and practices against which [his] complaints are directed." *School Dist. of Abington Township v. Schempp,* 374 U.S. 203, 224, n. 9, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). That is an issue here because the entry restrictions apply not to plaintiffs themselves but to others seeking to enter the United States.

Plaintiffs first argue that they have standing on the ground that the Proclamation "establishes a disfavored faith" and violates "their own right to be free from federal [religious] establishments." Brief for Respondents 27–28 (emphasis deleted). They describe such injury as "spiritual and dignitary." *Id.,* at 29.

**[23]** We need not decide whether the claimed dignitary interest establishes an adequate ground for standing. The three individual plaintiffs assert another, more concrete injury: the alleged real-world effect that the Proclamation has had in keeping them separated from certain relatives who seek to enter the country. See *ibid.*; *Town of Chester v. Laroe Estates, Inc.,* 581 U.S. ——, —— – ——, 137 S.Ct. 1645, 1651, 198 L.Ed.2d 64 (2017) ("At least one plaintiff must have standing to seek each form of relief requested in the complaint."). We agree that a person's interest in being united with his relatives is sufficiently concrete and particularized to form the basis of an Article III injury in fact. This Court has previously considered the merits of claims asserted by United States citizens regarding violations of their personal rights allegedly caused by the Government's exclusion of particular foreign nationals. See *Kerry v. Din,* 576 U.S. ——, ——, 135 S.Ct. 2128, ——, 192 L.Ed.2d 183 (2015) (plurality opinion); *id.,* at ——, 135 S.Ct., at 2139 (KENNEDY, J., concurring in judgment); *Kleindienst v. Mandel,* 408 U.S. 753, 762, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). Likewise, one of our prior stay orders in this litigation recognized that an American individual who has "a bona fide relationship with a particular person seeking to enter the country ... can legitimately claim concrete hardship if that person is excluded." *Trump v. IRAP,* 582 U.S., at ——, 137 S.Ct., at 2089.

The Government responds that plaintiffs' Establishment Clause claims are not justiciable because the Clause does not give them a legally protected interest in the admission of particular foreign nationals. But that argument—which depends upon the scope of plaintiffs' Establishment Clause rights—concerns the merits rather than the justiciability of plaintiffs' claims. We therefore conclude that the individual plaintiffs have Article III standing to challenge the exclusion of their relatives under the Establishment Clause.

B

**[24]** The First Amendment provides, in part, that "Congress shall make no law **\*2417** respecting an establishment of religion, or prohibiting the free exercise thereof." Our cases recognize that "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente,* 456 U.S. 228,

244, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). Plaintiffs believe that the Proclamation violates this prohibition by singling out Muslims for disfavored treatment. The entry suspension, they contend, operates as a "religious gerrymander," in part because most of the countries covered by the Proclamation have Muslim-majority populations. And in their view, deviations from the information-sharing baseline criteria suggest that the results of the multi-agency review were "foreordained." Relying on Establishment Clause precedents concerning laws and policies applied domestically, plaintiffs allege that the primary purpose of the Proclamation was religious animus and that the President's stated concerns about vetting protocols and national security were but pretexts for discriminating against Muslims. Brief for Respondents 69–73.

At the heart of plaintiffs' case is a series of statements by the President and his advisers casting doubt on the official objective of the Proclamation. For example, while a candidate on the campaign trail, the President published a "Statement on Preventing Muslim Immigration" that called for a "total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on." App. 158. That statement remained on his campaign website until May 2017. *Id.,* at 130–131. Then-candidate Trump also stated that "Islam hates us" and asserted that the United States was "having problems with Muslims coming into the country." *Id.,* at 120–121, 159. Shortly after being elected, when asked whether violence in Europe had affected his plans to "ban Muslim immigration," the President replied, "You know my plans. All along, I've been proven to be right." *Id.,* at 123.

One week after his inauguration, the President issued EO–1. In a television interview, one of the President's campaign advisers explained that when the President "first announced it, he said, 'Muslim ban.' He called me up. He said, 'Put a commission together. Show me the right way to do it legally.' " *Id.,* at 125. The adviser said he assembled a group of Members of Congress and lawyers that "focused on, instead of religion, danger.... [The order] is based on places where there [is] substantial evidence that people are sending terrorists into our country." *Id.,* at 229.

Plaintiffs also note that after issuing EO–2 to replace EO–1, the President expressed regret that his prior order had been "watered down" and called for a "much tougher version" of his "Travel Ban." Shortly before the release of the Proclamation, he stated that the "travel ban ... should be far

larger, tougher, and more specific," but "stupidly that would not be politically correct." *Id.,* at 132–133. More recently, on November 29, 2017, the President retweeted links to three anti-Muslim propaganda videos. In response to questions about those videos, the President's deputy press secretary denied that the President thinks Muslims are a threat to the United States, explaining that "the President has been talking about these security issues for years now, from the campaign trail to the White House" and "has addressed these issues with the travel order that he issued earlier this year and the companion proclamation." *IRAP v. Trump,* 883 F.3d 233, 267 (C.A.4 2018).

The President of the United States possesses an extraordinary power to speak to **\*2418** his fellow citizens and on their behalf. Our Presidents have frequently used that power to espouse the principles of religious freedom and tolerance on which this Nation was founded. In 1790 George Washington reassured the Hebrew Congregation of Newport, Rhode Island that "happily the Government of the United States ... gives to bigotry no sanction, to persecution no assistance [and] requires only that they who live under its protection should demean themselves as good citizens." 6 Papers of George Washington 285 (D. Twohig ed. 1996). President Eisenhower, at the opening of the Islamic Center of Washington, similarly pledged to a Muslim audience that "America would fight with her whole strength for your right to have here your own church," declaring that "[t]his concept is indeed a part of America." Public Papers of the Presidents, Dwight D. Eisenhower, June 28, 1957, p. 509 (1957). And just days after the attacks of September 11, 2001, President George W. Bush returned to the same Islamic Center to implore his fellow Americans—Muslims and non-Muslims alike—to remember during their time of grief that "[t]he face of terror is not the true faith of Islam," and that America is "a great country because we share the same values of respect and dignity and human worth." Public Papers of the Presidents, George W. Bush, Vol. 2, Sept. 17, 2001, p. 1121 (2001). Yet it cannot be denied that the Federal Government and the Presidents who have carried its laws into effect have—from the Nation's earliest days—performed unevenly in living up to those inspiring words.

Plaintiffs argue that this President's words strike at fundamental standards of respect and tolerance, in violation of our constitutional tradition. But the issue before us is not whether to denounce the statements. It is instead the significance of those statements in reviewing a Presidential directive, neutral on its face, addressing a matter within the

core of executive responsibility. In doing so, we must consider not only the statements of a particular President, but also the authority of the Presidency itself.

The case before us differs in numerous respects from the conventional Establishment Clause claim. Unlike the typical suit involving religious displays or school prayer, plaintiffs seek to invalidate a national security directive regulating the entry of aliens abroad. Their claim accordingly raises a number of delicate issues regarding the scope of the constitutional right and the manner of proof. The Proclamation, moreover, is facially neutral toward religion. Plaintiffs therefore ask the Court to probe the sincerity of the stated justifications for the policy by reference to extrinsic statements—many of which were made before the President took the oath of office. These various aspects of plaintiffs' challenge inform our standard of review.

C

[25]    [26]    For more than a century, this Court has recognized that the admission and exclusion of foreign nationals is a "fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977); see *Harisiades v. Shaughnessy,* 342 U.S. 580, 588–589, 72 S.Ct. 512, 96 L.Ed. 586 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations [and] the war power."). Because decisions in these matters may implicate "relations with foreign powers," or involve "classifications defined in the light of changing political and economic circumstances," such judgments "are frequently of a character more appropriate to **\*2419** either the Legislature or the Executive." *Mathews v. Diaz,* 426 U.S. 67, 81, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976).

[27]    [28]    Nonetheless, although foreign nationals seeking admission have no constitutional right to entry, this Court has engaged in a circumscribed judicial inquiry when the denial of a visa allegedly burdens the constitutional rights of a U.S. citizen. In *Kleindienst v. Mandel,* the Attorney General denied admission to a Belgian journalist and self-described "revolutionary Marxist," Ernest Mandel, who had been invited to speak at a conference at Stanford University.

*408 U.S., at 756–757, 92 S.Ct. 2576.* The professors who wished to hear Mandel speak challenged that decision under the First Amendment, and we acknowledged that their constitutional "right to receive information" was implicated. *Id., at 764–765, 92 S.Ct. 2576.* But we limited our review to whether the Executive gave a "facially legitimate and bona fide" reason for its action. *Id., at 769, 92 S.Ct. 2576.* Given the authority of the political branches over admission, we held that "when the Executive exercises this [delegated] power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification" against the asserted constitutional interests of U.S. citizens. *Id., at 770, 92 S.Ct. 2576.*

[29]    The principal dissent suggests that *Mandel* has no bearing on this case, *post,* at 2440, and n. 5 (opinion of SOTOMAYOR, J.) (hereinafter the dissent), but our opinions have reaffirmed and applied its deferential standard of review across different contexts and constitutional claims. In *Din,* Justice KENNEDY reiterated that "respect for the political branches' broad power over the creation and administration of the immigration system" meant that the Government need provide only a statutory citation to explain a visa denial. *576 U.S., at ——, 135 S.Ct., at 2141* (opinion concurring in judgment). Likewise in *Fiallo,* we applied *Mandel* to a "broad congressional policy" giving immigration preferences to mothers of illegitimate children. *430 U.S., at 795, 97 S.Ct. 1473.* Even though the statute created a "categorical" entry classification that discriminated on the basis of sex and legitimacy, *post,* at 2440, n. 5, the Court concluded that "it is not the judicial role in cases of this sort to probe and test the justifications" of immigration policies. *430 U.S., at 799, 97 S.Ct. 1473* (citing *Mandel, 408 U.S., at 770, 92 S.Ct. 2576*). Lower courts have similarly applied *Mandel* to broad executive action. See *Rajah v. Mukasey,* 544 F.3d 427, 433, 438–439 (C.A.2 2008) (upholding National Security Entry–Exit Registration System instituted after September 11, 2001).

[30]    *Mandel* 's narrow standard of review "has particular force" in admission and immigration cases that overlap with "the area of national security." *Din,* 576 U.S., at ——, 135 S.Ct., at 2140 (KENNEDY, J., concurring in judgment). For one, "[j]udicial inquiry into the national-security realm raises concerns for the separation of powers" by intruding

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

on the President's constitutional responsibilities in the area of foreign affairs. *Ziglar v. Abbasi,* 582 U.S. ——, ——, 137 S.Ct. 1843, 1861, 198 L.Ed.2d 290 (2017) (internal quotation marks omitted). For another, "when it comes to collecting evidence and drawing inferences" on questions of national security, "the lack of competence on the part of the courts is marked." *Humanitarian Law Project,* 561 U.S., at 34, 130 S.Ct. 2705.

**[31]** **[32]** **[33]** The upshot of our cases in this context is clear: "Any rule of constitutional law that would inhibit the flexibility" of **\*2420** the President "to respond to changing world conditions should be adopted only with the greatest caution," and our inquiry into matters of entry and national security is highly constrained. *Mathews,* 426 U.S., at 81–82, 96 S.Ct. 1883. We need not define the precise contours of that inquiry in this case. A conventional application of *Mandel,* asking only whether the policy is facially legitimate and bona fide, would put an end to our review. But the Government has suggested that it may be appropriate here for the inquiry to extend beyond the facial neutrality of the order. See Tr. of Oral Arg. 16–17, 25–27 (describing *Mandel* as "the starting point" of the analysis). For our purposes today, we assume that we may look behind the face of the Proclamation to the extent of applying rational basis review. That standard of review considers whether the entry policy is plausibly related to the Government's stated objective to protect the country and improve vetting processes. See *Railroad Retirement Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980). As a result, we may consider plaintiffs' extrinsic evidence, but will uphold the policy so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds. [5]

### D

**[34]** Given the standard of review, it should come as no surprise that the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny. On the few occasions where we have done so, a common thread has been that the laws at issue lack any purpose other than a "bare ... desire to harm a politically unpopular group." *Department of Agriculture v. Moreno,* 413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973). In one case, we invalidated a local zoning ordinance that required a special permit for group homes for the intellectually disabled, but not for other facilities such as fraternity houses or hospitals. We did so on the ground that the city's stated concerns about (among other things) "legal responsibility" and "crowded conditions" rested on "an irrational prejudice" against the intellectually disabled.

*Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 448–450, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (internal quotation marks omitted). And in another case, this Court overturned a state constitutional amendment that denied gays and lesbians access to the protection of antidiscrimination laws. The amendment, we held, was "divorced from any factual context from which we could discern a relationship to legitimate state interests," and "its sheer breadth [was] so discontinuous with the reasons offered for it" that the initiative seemed "inexplicable by anything but animus."

*Romer v. Evans,* 517 U.S. 620, 632, 635, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996).

**[35]** The Proclamation does not fit this pattern. It cannot be said that it is impossible to "discern a relationship to legitimate **\*2421** state interests" or that the policy is "inexplicable by anything but animus." Indeed, the dissent can only attempt to argue otherwise by refusing to apply anything resembling rational basis review. But because there is persuasive evidence that the entry suspension has a legitimate grounding in national security concerns, quite apart from any religious hostility, we must accept that independent justification.

**[36]** The Proclamation is expressly premised on legitimate purposes: preventing entry of nationals who cannot be adequately vetted and inducing other nations to improve their practices. The text says nothing about religion. Plaintiffs and the dissent nonetheless emphasize that five of the seven nations currently included in the Proclamation have Muslim-majority populations. Yet that fact alone does not support an inference of religious hostility, given that the policy covers just 8% of the world's Muslim population and is limited to countries that were previously designated by Congress or prior administrations as posing national security risks. See

8 U.S.C. § 1187(a)(12)(A) (identifying Syria and state sponsors of terrorism such as Iran as "countr[ies] or area[s] of concern" for purposes of administering the Visa Waiver Program); Dept. of Homeland Security, DHS Announces Further Travel Restrictions for the Visa Waiver Program (Feb. 18, 2016) (designating Libya, Somalia, and Yemen as additional countries of concern); see also *Rajah,* 544 F.3d, at 433, n. 3 (describing how nonimmigrant aliens from

Trump v. Hawaii, 138 S.Ct. 2392 (2018)

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 38 of 912

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

Iran, Libya, Somalia, Syria, and Yemen were covered by the National Security Entry–Exit Registration System).

The Proclamation, moreover, reflects the results of a worldwide review process undertaken by multiple Cabinet officials and their agencies. Plaintiffs seek to discredit the findings of the review, pointing to deviations from the review's baseline criteria resulting in the inclusion of Somalia and omission of Iraq. But as the Proclamation explains, in each case the determinations were justified by the distinct conditions in each country. Although Somalia generally satisfies the information-sharing component of the baseline criteria, it "stands apart ... in the degree to which [it] lacks command and control of its territory." Proclamation 2 § 2(h)(i). As for Iraq, the Secretary of Homeland Security determined that entry restrictions were not warranted in light of the close cooperative relationship between the U.S. and Iraqi Governments and the country's key role in combating terrorism in the region. § 1(g). It is, in any event, difficult to see how exempting one of the largest predominantly Muslim countries in the region from coverage under the Proclamation can be cited as evidence of animus toward Muslims.

The dissent likewise doubts the thoroughness of the multi-agency review because a recent Freedom of Information Act request shows that the final DHS report "was a mere 17 pages." *Post,* at 2443. Yet a simple page count offers little insight into the actual substance of the final report, much less predecisional materials underlying it. See 5 U.S.C. § 552(b)(5) (exempting deliberative materials from FOIA disclosure).

More fundamentally, plaintiffs and the dissent challenge the entry suspension based on their perception of its effectiveness and wisdom. They suggest that the policy is overbroad and does little to serve national security interests. But we cannot substitute our own assessment for the Executive's predictive judgments on such matters, all of which "are delicate, complex, and involve large elements of prophecy." *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948); see also **\*2422** *Regan v. Wald,* 468 U.S. 222, 242–243, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984) (declining invitation to conduct an "independent foreign policy analysis"). While we of course "do not defer to the Government's reading of the First Amendment," the Executive's evaluation of the underlying facts is entitled to appropriate weight, particularly in the context of litigation involving "sensitive

and weighty interests of national security and foreign affairs." *Humanitarian Law Project,* 561 U.S., at 33–34, 130 S.Ct. 2705. [6]

Three additional features of the entry policy support the Government's claim of a legitimate national security interest. First, since the President introduced entry restrictions in January 2017, three Muslim-majority countries—Iraq, Sudan, and Chad—have been removed from the list of covered countries. The Proclamation emphasizes that its "conditional restrictions" will remain in force only so long as necessary to "address" the identified "inadequacies and risks," Proclamation Preamble, and § 1(h), and establishes an ongoing process to engage covered nations and assess every 180 days whether the entry restrictions should be terminated, §§ 4(a), (b). In fact, in announcing the termination of restrictions on nationals of Chad, the President also described Libya's ongoing engagement with the State Department and the steps Libya is taking "to improve its practices." Proclamation No. 9723, 83 Fed. Reg. 15939.

Second, for those countries that remain subject to entry restrictions, the Proclamation includes significant exceptions for various categories of foreign nationals. The policy permits nationals from nearly every covered country to travel to the United States on a variety of nonimmigrant visas. See, *e.g.,* §§ 2§ 2(b)-(c), (g), (h) (permitting student and exchange visitors from Iran, while restricting only business and tourist nonimmigrant entry for nationals of Libya and Yemen, and imposing no restrictions on nonimmigrant entry for Somali nationals). These carveouts for nonimmigrant visas are substantial: Over the last three fiscal years—before the Proclamation was in effect—the majority of visas issued to nationals from the covered countries were nonimmigrant visas. Brief for Petitioners 57. The Proclamation also exempts permanent residents and individuals who have been granted asylum. §§ 3§§ 3(b)(i), (vi).

Third, the Proclamation creates a waiver program open to all covered foreign nationals seeking entry as immigrants or nonimmigrants. According to the Proclamation, consular officers are to consider in each admissibility determination whether the alien demonstrates that (1) denying entry would cause undue hardship; (2) entry would not pose a threat to public safety; and (3) entry would be in the interest of the United States. § 3§ 3(c)(i); see also § 3§ 3(c)(iv) (listing examples of when a waiver might be appropriate, such as if the foreign national seeks to reside with a close family member, obtain urgent medical care, or pursue significant

business obligations). On its face, this program is similar to the humanitarian exceptions set forth in President Carter's order during the Iran hostage crisis. See Exec. Order No. 12206, 3 C.F.R. 249; Public Papers of **\*2423** the Presidents, Jimmy Carter, Sanctions Against Iran, at 611–612 (1980) (outlining exceptions). The Proclamation also directs DHS and the State Department to issue guidance elaborating upon the circumstances that would justify a waiver. [7]

[37]    Finally, the dissent invokes *Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944). Whatever rhetorical advantage the dissent may see in doing so, *Korematsu* has nothing to do with this case. The forcible relocation of U.S. citizens to concentration camps, solely and explicitly on the basis of race, is objectively unlawful and outside the scope of Presidential authority. But it is wholly inapt to liken that morally repugnant order to a facially neutral policy denying certain foreign nationals the privilege of admission. See *post,* at 2447 – 2448. The entry suspension is an act that is well within executive authority and could have been taken by any other President—the only question is evaluating the actions of this particular President in promulgating an otherwise valid Proclamation.

The dissent's reference to *Korematsu,* however, affords this Court the opportunity to make express what is already obvious: *Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—"has no place in law under the Constitution." 323 U.S., at 248, 65 S.Ct. 193 (Jackson, J., dissenting).

\* \* \*

Under these circumstances, the Government has set forth a sufficient national security justification to survive rational basis review. We express no view on the soundness of the policy. We simply hold today that plaintiffs have not demonstrated a likelihood of success on the merits of their constitutional claim.

## V

Because plaintiffs have not shown that they are likely to succeed on the merits of their claims, we reverse the grant of the preliminary injunction as an abuse of discretion. *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 32,

129 S.Ct. 365, 172 L.Ed.2d 249 (2008). The case now returns to the lower courts for such further proceedings as may be appropriate. Our disposition of the case makes it unnecessary to consider the propriety of the nationwide scope of the injunction issued by the District Court.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice KENNEDY, concurring.
I join the Court's opinion in full.

There may be some common ground between the opinions in this case, in that the Court does acknowledge that in some instances, governmental action may be subject to judicial review to determine whether or not it is "inexplicable by anything but animus," *Romer v. Evans,* 517 U.S. 620, 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996), which in this case would be **\*2424** animosity to a religion. Whether judicial proceedings may properly continue in this case, in light of the substantial deference that is and must be accorded to the Executive in the conduct of foreign affairs, and in light of today's decision, is a matter to be addressed in the first instance on remand. And even if further proceedings are permitted, it would be necessary to determine that any discovery and other preliminary matters would not themselves intrude on the foreign affairs power of the Executive.

In all events, it is appropriate to make this further observation. There are numerous instances in which the statements and actions of Government officials are not subject to judicial scrutiny or intervention. That does not mean those officials are free to disregard the Constitution and the rights it proclaims and protects. The oath that all officials take to adhere to the Constitution is not confined to those spheres in which the Judiciary can correct or even comment upon what those officials say or do. Indeed, the very fact that an official may have broad discretion, discretion free from judicial scrutiny, makes it all the more imperative for him or her to adhere to the Constitution and to its meaning and its promise.

The First Amendment prohibits the establishment of religion and promises the free exercise of religion. From these

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 40 of 912

safeguards, and from the guarantee of freedom of speech, it follows there is freedom of belief and expression. It is an urgent necessity that officials adhere to these constitutional guarantees and mandates in all their actions, even in the sphere of foreign affairs. An anxious world must know that our Government remains committed always to the liberties the Constitution seeks to preserve and protect, so that freedom extends outward, and lasts.

THOMAS, J., concurring.

I join the Court's opinion, which highlights just a few of the many problems with the plaintiffs' claims. There are several more. Section 1182(f) does not set forth any judicially enforceable limits that constrain the President. See

Webster v. Doe, 486 U.S. 592, 600, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988). Nor could it, since the President has *inherent* authority to exclude aliens from the country. See

United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 542–543, 70 S.Ct. 309, 94 L.Ed. 317 (1950); accord,

Sessions v. Dimaya, 584 U.S. ——, —— – ——, 138 S.Ct. 1204, 1248–1249, 200 L.Ed.2d 549 (2018) (THOMAS, J., dissenting). Further, the Establishment Clause does not create an individual right to be free from all laws that a "reasonable observer" views as religious or antireligious. See

Town of Greece v. Galloway, 572 U.S. ——, ——, 134 S.Ct. 1811, 1837–1838, 188 L.Ed.2d 835 (2014) (THOMAS, J., concurring in part and concurring in judgment); Elk Grove Unified School Dist. v. Newdow, 542 U.S. 1, 52–53, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (THOMAS, J., concurring in judgment). The plaintiffs cannot raise any other First Amendment claim, since the alleged religious discrimination in this case is directed at aliens abroad. See United States v. Verdugo–Urquidez, 494 U.S. 259, 265, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990). And, even on its own terms, the plaintiffs' proffered evidence of anti-Muslim discrimination is unpersuasive.

Merits aside, I write separately to address the remedy that the plaintiffs sought and obtained in this case. The District Court imposed an injunction that barred the Government from enforcing the President's Proclamation against anyone, not just the plaintiffs. Injunctions that prohibit the Executive Branch from applying a law or policy against anyone—often called "universal" or "nationwide" injunctions **\*2425** —have become increasingly common.[1] District courts, including the one here, have begun imposing universal

injunctions without considering their authority to grant such sweeping relief. These injunctions are beginning to take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch.

I am skeptical that district courts have the authority to enter universal injunctions. These injunctions did not emerge until a century and a half after the founding. And they appear to be inconsistent with longstanding limits on equitable relief and the power of Article III courts. If their popularity continues, this Court must address their legality.

I

If district courts have any authority to issue universal injunctions, that authority must come from a statute or the Constitution. See Missouri v. Jenkins, 515 U.S. 70, 124, 115 S.Ct. 2038, 515 U.S. 70 (1995) (THOMAS, J., concurring). No statute expressly grants district courts the power to issue universal injunctions.[2] So the only possible bases for these injunctions are a generic statute that authorizes equitable relief or the courts' inherent constitutional authority. Neither of those sources would permit a form of injunctive relief that is "[in]consistent with our history and traditions." *Ibid.*

A

This Court has never treated general statutory grants of equitable authority as giving federal courts a freewheeling power to fashion new forms of equitable remedies. Rather, it has read such statutes as constrained by "the body of law which had been transplanted to this country from the English Court of Chancery" in 1789. Guaranty Trust Co. v. York, 326 U.S. 99, 105, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). As Justice Story explained, this Court's "settled doctrine" under such statutes is that "the remedies in equity are to be administered ... according to the practice of courts of equity in [England]." Boyle v. Zacharie & Turner, 6 Pet. 648, 658, 8 L.Ed. 532 (1832). More recently, this Court reiterated that broad statutory grants of equitable authority give federal courts " 'an authority to administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English

Trump v. Hawaii, 138 S.Ct. 2392 (2018)

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

Court of Chancery at the time of the separation of the two countries.' " *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 318, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999)* (Scalia, J.) (quoting *Atlas Life Ins. Co. v. W.I. Southern, Inc.,* 306 U.S. 563, 568, 59 S.Ct. 657, 83 L.Ed. 987 (1939)).

## B

The same is true of the courts' inherent constitutional authority to grant equitable **\*2426** relief, assuming any such authority exists. See *Jenkins,* 515 U.S., at 124, 115 S.Ct. 2038 (THOMAS, J., concurring). This authority is also limited by the traditional rules of equity that existed at the founding.

The scope of the federal courts' equitable authority under the Constitution was a point of contention at the founding, and the "more limited construction" of that power prevailed. *Id.,* at 126, 115 S.Ct. 2038. The founding generation viewed equity "with suspicion." *Id.,* at 128, 115 S.Ct. 2038. Several anti-Federalists criticized the Constitution's extension of the federal judicial power to "Case[s] in ... Equity," Art. III, § 2, Art. III, § 2, as "giv[ing] the judge a discretionary power." Letters from The Federal Farmer No. XV (Jan. 18, 1788), in 2 The Complete Anti–Federalist 315, 322 (H. Storing ed. 1981). That discretionary power, the anti-Federalists alleged, would allow courts to "explain the constitution according to the reasoning spirit of it, without being confined to the words or letter." Essays of Brutus No. XI (Jan. 31, 1788), in *id.,* at 417, 419–420. The Federalists responded to this concern by emphasizing the limited nature of equity. Hamilton explained that the judiciary would be "bound down by strict rules and precedents which serve to define and point out their duty in every particular case that comes before them." The Federalist No. 78, p. 471 (C. Rossiter ed. 1961) (Federalist). Although the purpose of a court of equity was "to give relief in extraordinary cases, which are exceptions to general rules," "the principles by which that relief is governed are now reduced to a regular system." *Id.* No. 83 at 505 (emphasis deleted).

The Federalists' explanation was consistent with how equity worked in 18th-century England. English courts of equity applied established rules not only when they decided the merits, but also when they fashioned remedies. Like other

aspects of equity, "the system of relief administered by a court of equity" had been reduced "into a regular science." 3 W. Blackstone, Commentaries on the Laws of England 440–441 (1768) (Blackstone). As early as 1768, Blackstone could state that the "remedy a suitor is entitled to expect" could be determined "as readily and with as much precision, in a court of equity as in a court of law." *Id.,* at 441. Although courts of equity exercised remedial "discretion," that discretion allowed them to deny or tailor a remedy despite a demonstrated violation of a right, not to expand a remedy beyond its traditional scope. See G. Keeton, An Introduction to Equity 117–118 (1938).

In short, whether the authority comes from a statute or the Constitution, district courts' authority to provide equitable relief is meaningfully constrained. This authority must comply with longstanding principles of equity that predate this country's founding.

## II

Universal injunctions do not seem to comply with those principles. These injunctions are a recent development, emerging for the first time in the 1960s and dramatically increasing in popularity only very recently. And they appear to conflict with several traditional rules of equity, as well as the original understanding of the judicial role.

Equity originated in England as a means for the Crown to dispense justice by exercising its sovereign authority. See Adams, The Origins of English Equity, 16 Colum. L. Rev. 87, 91 (1916). Petitions for equitable relief were referred to the Chancellor, who oversaw cases in equity. See 1 S. Symon's, Pomeroy's, Equity Jurisprudence § 33 (5th ed. 1941) (Pomeroy); G. **\*2427** McDowell, Equity and the Constitution 24 (1982). The Chancellor's equitable jurisdiction was based on the "reserve of justice in the king." F. Maitland, Equity 3 (2d ed.1936); see also 1 Pomeroy § 33, at 38 (describing the Chancellor's equitable authority as an "extraordinary jurisdiction—that of *Grace*— by delegation" from the King). Equity allowed the sovereign to afford discretionary relief to parties where relief would not have been available under the "rigors of the common law." *Jenkins, supra,* at 127, 115 S.Ct. 2038 (opinion of THOMAS, J.).

The English system of equity did not contemplate universal injunctions. As an agent of the King, the Chancellor had

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Trump v. Hawaii, 138 S.Ct. 2392 (2018)

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

no authority to enjoin him. See Bray, Multiple Chancellors: Reforming the National Injunction, 131 Harv. L. Rev. 417, 425 (2017) (Bray). The Chancellor could not give "any relief against the king, or direct any act to be done by him, or make any decree disposing of or affecting his property; not even in cases where he is a royal trustee." 3 Blackstone 428. The Attorney General could be sued in Chancery, but not in cases that " 'immediately concerned' " the interests of the Crown. Bray 425Bray 425 (citing 1 E. Daniell, The Practice of the High Court of Chancery 138 (2d ed. 1845)). American courts inherited this tradition. See J. Story, Commentaries on Equity Pleadings § 69 (1838) (Story).

Moreover, as a general rule, American courts of equity did not provide relief beyond the parties to the case. If their injunctions advantaged nonparties, that benefit was merely incidental. Injunctions barring public nuisances were an example. While these injunctions benefited third parties, that benefit was merely a consequence of providing relief to the plaintiff. Woolhandler & Nelson, Does History Defeat Standing Doctrine? 102 Mich. L. Rev. 689, 702 (2004) (Woolhandler & Nelson); see Pennsylvania v. Wheeling & Belmont Bridge Co., 13 How. 518, 564, 14 L.Ed. 249 (1852) (explaining that a private "injury makes [a public nuisance] a private nuisance to the injured party").

True, one of the recognized bases for an exercise of equitable power was the avoidance of "multiplicity of suits." Bray 426Bray 426; accord, 1 Pomeroy § 243. Courts would employ "bills of peace" to consider and resolve a number of suits in a single proceeding. Id., § 246. And some authorities stated that these suits could be filed by one plaintiff on behalf of a number of others. Id., § 251. But the "general rule" was that "all persons materially interested ... in the subject-matter of a suit, are to be made *parties* to it ..., however numerous they may be, so that there may be a complete decree, which shall bind them all." Story § 72, at 61 (emphasis added). And, in all events, these "proto-class action[s]" were limited to a small group of similarly situated plaintiffs having some right in common. Bray 426–427Bray 426–427; see also Story § 120, at 100 (explaining that such suits were "always" based on "a common interest or a common right").

American courts' tradition of providing equitable relief only to parties is consistent with our view of the nature of judicial power. For most of our history, courts understood judicial power as "fundamentall[y] the power to render judgments in individual cases." Murphy v. National

Collegiate Athletic Assn., 584 U.S. ——, —— – ——, 138 S.Ct. 1461, 1485, ——L.Ed.2d —— (2018) (THOMAS, J., concurring). They did not believe that courts could make federal policy, and they did not view judicial review in terms of "striking down" laws or regulations. See id., at —— – ——, 138 S.Ct., at 1469–1470. Misuses of judicial power, Hamilton reassured the people of New York, could not threaten "the general liberty of the people" **2428 because courts, at most, adjudicate the rights of "individual[s]." Federalist No. 78, at 466.

The judiciary's limited role was also reflected in this Court's decisions about who could sue to vindicate certain rights. See Spokeo, Inc. v. Robins, 578 U.S. ——, —— – ——, 136 S.Ct. 1540, 1544–1546, 194 L.Ed.2d 635 (2016) (THOMAS, J., concurring). A plaintiff could not bring a suit vindicating public rights—*i.e.,* rights held by the community at large—without a showing of some specific injury to himself. Id., at —— – ——, 136 S.Ct., at 1545–1546. And a plaintiff could not sue to vindicate the private rights of someone else. See Woolhandler & Nelson 715–716. Such claims were considered to be beyond the authority of courts. Id., at 711–717.

This Court has long respected these traditional limits on equity and judicial power. See, *e.g., Scott v. Donald,* 165 U.S. 107, 115, 17 S.Ct. 262, 41 L.Ed. 648 (1897) (rejecting an injunction based on the theory that the plaintiff "so represents [a] class" whose rights were infringed by a statute as "too conjectural to furnish a safe basis upon which a court of equity ought to grant an injunction"). Take, for example, this Court's decision in Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). There, a taxpayer sought to enjoin the enforcement of an appropriation statute. The Court noted that this kind of dispute "is essentially a matter of public and not of individual concern." Id., at 487, 43 S.Ct. 597. A general interest in enjoining implementation of an illegal law, this Court explained, provides "no basis ... for an appeal to the preventive powers of a court of equity." Ibid. Courts can review the constitutionality of an act only when "a justiciable issue" requires it to decide whether to "disregard an unconstitutional enactment." Id., at 488, 43 S.Ct. 597. If the statute is unconstitutional, then courts enjoin "not the execution of the statute, but the acts of the official." Ibid. Courts cannot issue an injunction based on a mere allegation "that officials of the executive department of the government are executing and will execute an act of Congress asserted to

Trump v. Hawaii, 138 S.Ct. 2392 (2018)

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

be unconstitutional." *Ibid.* "To do so would be not to decide a judicial controversy." *Id., at 488–489, 43 S.Ct. 597.*

By the latter half of the 20th century, however, some jurists began to conceive of the judicial role in terms of resolving general questions of legality, instead of addressing those questions only insofar as they are necessary to resolve individual cases and controversies. See Bray 451Bray 451. That is when what appears to be "the first [universal] injunction in the United States" emerged. Bray 438Bray 438.

In *Wirtz v. Baldor Elec. Co.,* 337 F.2d 518 (C.A.D.C.1963), the Court of Appeals for the District of Columbia Circuit addressed a lawsuit challenging the Secretary of Labor's determination of the prevailing minimum wage for a particular industry. *Id., at 520.* The D.C. Circuit concluded that the Secretary's determination was unsupported, but remanded for the District Court to assess whether any of the plaintiffs had standing to challenge it. *Id., at 521–535.* The D.C. Circuit also addressed the question of remedy, explaining that if a plaintiff had standing to sue then "the District Court should enjoin ... the Secretary's determination with respect to the *entire industry*." *Id., at 535* (emphasis added). To justify this broad relief, the D.C. Circuit explained that executive officers should honor judicial decisions "in all cases of essentially the same character." *Id., at 534.* And it noted that, once a court has decided an issue, it "would ordinarily give the same relief to any individual who comes to it with an essentially similar cause of action." *Ibid.* The D.C. Circuit added that the case was "clearly a proceeding **\*2429** in which those who have standing are here to vindicate the public interest in having congressional enactments properly interpreted and applied." *Id., at 534–535.*

Universal injunctions remained rare in the decades following *Wirtz.* See Bray 440–445*Wirtz.* See Bray 440–445. But recently, they have exploded in popularity. See *id., at 457–459.* Some scholars have criticized the trend. See generally *id., at 457–465*; Morley, Nationwide Injunctions, Rule 23(b)(2), and the Remedial Powers of the Lower Courts, 97 B.U.L. Rev. 615, 633–653 (2017); Morley, De Facto Class Actions? Plaintiff- and Defendant–Oriented Injunctions in Voting Rights, Election Law, and Other Constitutional Cases, 39 Harv. J.L. & Pub. Pol'y 487, 521–538 (2016).

No persuasive defense has yet been offered for the practice. Defenders of these injunctions contend that they ensure that individuals who did not challenge a law are treated the same as plaintiffs who did, and that universal injunctions give the judiciary a powerful tool to check the Executive Branch. See Amdur & Hausman, Nationwide Injunctions and Nationwide Harm, 131 Harv. L. Rev. Forum 49, 51, 54 (2017); Malveaux, Class Actions, Civil Rights, and the National Injunction, 131 Harv. L. Rev. Forum 56, 57, 60–62 (2017). But these arguments do not explain how these injunctions are consistent with the historical limits on equity and judicial power. They at best "boi[l] down to a policy judgment" about how powers ought to be allocated among our three branches of government. *Perez v. Mortgage Bankers Assn.,* 575 U.S. ——, ——, 135 S.Ct. 1199, 1225, 191 L.Ed.2d 186 (2015) (THOMAS, J., concurring in judgment). But the people already made that choice when they ratified the Constitution.

\* \* \*

In sum, universal injunctions are legally and historically dubious. If federal courts continue to issue them, this Court is dutybound to adjudicate their authority to do so.

Justice BREYER, with whom Justice KAGAN joins, dissenting.

The question before us is whether Proclamation No. 9645 is lawful. If its promulgation or content was significantly affected by religious animus against Muslims, it would violate the relevant statute or the First Amendment itself. See 8 U.S.C. § 1182(f) (requiring "find[ings]" that persons denied entry "would be detrimental to the interests of the United States"); Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (First Amendment); Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n, 584 U.S. ——, 138 S.Ct. 1719, —— L.Ed.2d —— (2018) (same); *post,* at 2433 – 2435 (SOTOMAYOR, J., dissenting). If, however, its sole *ratio decidendi* was one of national security, then it would be unlikely to violate either the statute or the Constitution. Which is it? Members of the Court principally disagree about the answer to this question, *i.e.,* about whether or the extent to which religious animus played a significant role in the Proclamation's promulgation or content.

Trump v. Hawaii, 138 S.Ct. 2392 (2018)

Case 3:20-cv-07721-SI     Document 58-6     Filed 11/10/20     Page 44 of 912

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

In my view, the Proclamation's elaborate system of exemptions and waivers can and should help us answer this question. That system provides for case-by-case consideration of persons who may qualify for visas despite the Proclamation's general ban. Those persons include lawful permanent residents, asylum seekers, refugees, students, children, and numerous others. There are likely many such persons, perhaps in the thousands. And I believe it appropriate to take account of their Proclamation-granted status when considering the Proclamation's lawfulness. The Solicitor **\*2430** General asked us to consider the Proclamation "as" it is "written" and "as" it is "applied," waivers and exemptions included. Tr. of Oral Arg. 38. He warned us against considering the Proclamation's lawfulness "on the hypothetical situation that [the Proclamation] is what it isn't," *ibid.,* while telling us that its waiver and exemption provisions mean what they say: The Proclamation does not exclude individuals from the United States "if they meet the criteria" for a waiver or exemption. *Id.,* at 33.

On the one hand, if the Government is applying the exemption and waiver provisions as written, then its argument for the Proclamation's lawfulness is strengthened. For one thing, the Proclamation then resembles more closely the two important Presidential precedents on point, President Carter's Iran order and President Reagan's Cuba proclamation, both of which contained similar categories of persons authorized to obtain case-by-case exemptions. *Ante,* at 2422 – 2433; Exec. Order No. 12172, 44 Fed. Reg. 67947 (1979), as amended by Exec. Order No. 12206, 45 Fed. Reg. 24101 (1980); Presidential Proclamation No. 5517, 51 Fed. Reg. 30470 (1986). For another thing, the Proclamation then follows more closely the basic statutory scheme, which provides for strict case-by-case scrutiny of applications. It would deviate from that system, not across the board, but where circumstances may require that deviation.

Further, since the case-by-case exemptions and waivers apply without regard to the individual's religion, application of that system would help make clear that the Proclamation does not deny visas to numerous Muslim individuals (from those countries) who do not pose a security threat. And that fact would help to rebut the First Amendment claim that the Proclamation rests upon anti-Muslim bias rather than security need. Finally, of course, the very fact that Muslims from those countries would enter the United States (under Proclamation-provided exemptions and waivers) would help to show the same thing.

On the other hand, if the Government is *not* applying the system of exemptions and waivers that the Proclamation contains, then its argument for the Proclamation's lawfulness becomes significantly weaker. For one thing, the relevant precedents—those of Presidents Carter and Reagan—would bear far less resemblance to the present Proclamation. Indeed, one might ask, if those two Presidents thought a case-by-case exemption system appropriate, what is different about present circumstances that would justify that system's absence?

For another thing, the relevant statute requires that there be "find[ings]" that the grant of visas to excluded persons would be "detrimental to the interests of the United States." § 1182(f). Yet there would be no such findings in respect to those for whom the Proclamation itself provides case-by-case examination (followed by the grant of a visa in appropriate cases).

And, perhaps most importantly, if the Government is not applying the Proclamation's exemption and waiver system, the claim that the Proclamation is a "Muslim ban," rather than a "security-based" ban, becomes much stronger. How could the Government successfully claim that the Proclamation rests on security needs if it is excluding Muslims who satisfy the Proclamation's own terms? At the same time, denying visas to Muslims who meet the Proclamation's own security terms would support the view that the Government excludes them for reasons based upon their religion.

**\*2431** Unfortunately there is evidence that supports the second possibility, *i.e.,* that the Government is not applying the Proclamation as written. The Proclamation provides that the Secretary of State and the Secretary of Homeland Security "shall coordinate to adopt guidance" for consular officers to follow when deciding whether to grant a waiver. § 3§ 3(c)(ii). Yet, to my knowledge, no guidance has issued. The only potentially relevant document I have found consists of a set of State Department answers to certain Frequently Asked Questions, but this document simply restates the Proclamation in plain language for visa applicants. It does not provide guidance for consular officers as to how they are to exercise their discretion. See Dept. of State, FAQs on the Presidential Proclamation, https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/presidential-proclamation-archive/2017-12-04-Presidential-Proclamation.html (all Internet materials as last visited June 25, 2018).

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

An examination of publicly available statistics also provides cause for concern. The State Department reported that during the Proclamation's first month, two waivers were approved out of 6,555 eligible applicants. Letter from M. Waters, Assistant Secretary Legislative Affairs, to Sen. Van Hollen (Feb. 22, 2018). In its reply brief, the Government claims that number increased from 2 to 430 during the first four months of implementation. Reply Brief 17. That number, 430, however, when compared with the number of pre-Proclamation visitors, accounts for a minuscule percentage of those likely eligible for visas, in such categories as persons requiring medical treatment, academic visitors, students, family members, and others belonging to groups that, when considered as a group (rather than case by case), would not seem to pose security threats.

*Amici* have suggested that there are numerous applicants who could meet the waiver criteria. For instance, the Proclamation anticipates waivers for those with "significant business or professional obligations" in the United States, § 3§ 3(c)(iv)(C), and *amici* identify many scholars who would seem to qualify. Brief for Colleges and Universities as *Amici Curiae* 25–27; Brief for American Council on Education et al. as *Amici Curiae* 20 (identifying more than 2,100 scholars from covered countries); see also Brief for Massachusetts Technology Leadership Council, Inc., as *Amicus Curiae* 14–15 (identifying technology and business leaders from covered countries). The Proclamation also anticipates waivers for those with a "close family member (*e.g.,* a spouse, child, or parent)" in the United States, § 3§ 3(c)(iv)(D), and *amici* identify many such individuals affected by the Proclamation. Brief for Labor Organizations as *Amici Curiae* 15–18 (identifying children and other relatives of U.S. citizens). The Pars Equality Center identified 1,000 individuals—including parents and children of U.S. citizens—who sought and were denied entry under the Proclamation, hundreds of whom seem to meet the waiver criteria. See Brief for Pars Equality Center et al. as *Amici Curiae* 12–28.

Other data suggest the same. The Proclamation does not apply to asylum seekers or refugees. §§ 3§§ 3(b)(vi), 6(e). Yet few refugees have been admitted since the Proclamation took effect. While more than 15,000 Syrian refugees arrived in the United States in 2016, only 13 have arrived since January 2018. Dept. of State, Bureau of Population, Refugees, and Migration, Interactive Reporting, Refugee Processing Center, http://ireports.wrapsnet.org. Similarly few refugees have been admitted since January from Iran (3), Libya (1), Yemen (0), and Somalia (122). *Ibid.*

*2432 The Proclamation also exempts individuals applying for several types of nonimmigrant visas: lawful permanent residents, parolees, those with certain travel documents, dual nationals of noncovered countries, and representatives of governments or international organizations. §§ 3§ 3(b)(i)-(v). It places no restrictions on the vast majority of student and exchange visitors, covering only those from Syria, which provided 8 percent of student and exchange visitors from the five countries in 2016. § 2§§ 2(b)-(h); see Dept. of State, Report of the Visa Office 2016, Table XVII Nonimmigrant Visas Issued Fiscal Year 2016 (Visa Report 2016 Table XVII). Visitors from Somalia are eligible for any type of nonimmigrant visa, subject to "additional scrutiny." § 2§ 2(h)(ii). If nonimmigrant visa applications under the Proclamation resemble those in 2016, 16 percent of visa applicants would be eligible for exemptions. See Visa Report 2016 Table XVII.

In practice, however, only 258 student visas were issued to applicants from Iran (189), Libya (29), Yemen (40), and Somalia (0) in the first three months of 2018. See Dept. of State, Nonimmigrant Visa Issuances by Nationality, Jan., Feb., and Mar. 2018. This is less than a quarter of the volume needed to be on track for 2016 student visa levels. And only 40 nonimmigrant visas have been issued to Somali nationals, a decrease of 65 percent from 2016. *Ibid.*; see Visa Report 2016 Table XVII. While this is but a piece of the picture, it does not provide grounds for confidence.

Anecdotal evidence further heightens these concerns. For example, one *amicus* identified a child with cerebral palsy in Yemen. The war had prevented her from receiving her medication, she could no longer move or speak, and her doctors said she would not survive in Yemen. Her visa application was denied. Her family received a form with a check mark in the box unambiguously confirming that " 'a waiver will not be granted in your case.' " Letter from L. Blatt to S. Harris, Clerk of Court (May 1, 2018). But after the child's case was highlighted in an *amicus* brief before this Court, the family received an update from the consular officer who had initially denied the waiver. It turns out, according to the officer, that she had all along determined that the waiver criteria were met. But, the officer explained, she could not relay that information at the time because the waiver required review from a supervisor, who had since approved it. The officer said that the family's case was now in administrative processing and that she was attaching a " 'revised refusal letter indicating the approval of the waiver.' " *Ibid.* The new form did not actually approve the waiver (in fact, the form contains

Trump v. Hawaii, 138 S.Ct. 2392 (2018)

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

no box saying "granted"). But a different box was now checked, reading: " 'The consular officer is reviewing your eligibility for a waiver under the Proclamation.... This can be a lengthy process, and until the consular officer can make an individualized determination of [the relevant] factors, your visa application will remain refused under Section 212(f) [of the Proclamation].' " *Ibid.* One is left to wonder why this second box, indicating continuing review, had not been checked at the outset if in fact the child's case had remained under consideration all along. Though this is but one incident and the child was admitted after considerable international attention in this case, it provides yet more reason to believe that waivers are not being processed in an ordinary way.

Finally, in a pending case in the Eastern District of New York, a consular official has filed a sworn affidavit asserting that he and other officials do not, in fact, have discretion to grant waivers. According to the affidavit, consular officers "were not allowed to exercise that discretion" and **\*2433** "the waiver [process] is merely 'window dressing.' " See Decl. of Christopher Richardson, *Alharbi v. Miller,* No. 1:18–cv–2435 (June 1, 2018), pp. 3–4. Another report similarly indicates that the U.S. Embassy in Djibouti, which processes visa applications for citizens of Yemen, received instructions to grant waivers "only in rare cases of imminent danger," with one consular officer reportedly telling an applicant that " '[e]ven for infants, we would need to see some evidence of a congenital heart defect or another medical issue of that degree of difficulty that ... would likely lead to the child's developmental harm or death.' " Center for Constitutional Rights and the Rule of Law Clinic, Yale Law School, Window Dressing the Muslim Ban: Reports of Waivers and Mass Denials from Yemeni–American Families Stuck in Limbo 18 (2018).

Declarations, anecdotal evidence, facts, and numbers taken from *amicus* briefs are not judicial factfindings. The Government has not had an opportunity to respond, and a court has not had an opportunity to decide. But, given the importance of the decision in this case, the need for assurance that the Proclamation does not rest upon a "Muslim ban," and the assistance in deciding the issue that answers to the "exemption and waiver" questions may provide, I would send this case back to the District Court for further proceedings. And, I would leave the injunction in effect while the matter is litigated. Regardless, the Court's decision today leaves the District Court free to explore these issues on remand.

If this Court must decide the question without this further litigation, I would, on balance, find the evidence of antireligious bias, including statements on a website taken down only after the President issued the two executive orders preceding the Proclamation, along with the other statements also set forth in Justice SOTOMAYOR's opinion, a sufficient basis to set the Proclamation aside. And for these reasons, I respectfully dissent.

Justice SOTOMAYOR, with whom Justice GINSBURG joins, dissenting.

The United States of America is a Nation built upon the promise of religious liberty. Our Founders honored that core promise by embedding the principle of religious neutrality in the First Amendment. The Court's decision today fails to safeguard that fundamental principle. It leaves undisturbed a policy first advertised openly and unequivocally as a "total and complete shutdown of Muslims entering the United States" because the policy now masquerades behind a facade of national-security concerns. But this repackaging does little to cleanse Presidential Proclamation No. 9645 of the appearance of discrimination that the President's words have created. Based on the evidence in the record, a reasonable observer would conclude that the Proclamation was motivated by anti-Muslim animus. That alone suffices to show that plaintiffs are likely to succeed on the merits of their Establishment Clause claim. The majority holds otherwise by ignoring the facts, misconstruing our legal precedent, and turning a blind eye to the pain and suffering the Proclamation inflicts upon countless families and individuals, many of whom are United States citizens. Because that troubling result runs contrary to the Constitution and our precedent, I dissent.

I

Plaintiffs challenge the Proclamation on various grounds, both statutory and constitutional. Ordinarily, when a case can be decided on purely statutory grounds, we strive to follow a "prudential rule of avoiding constitutional questions." *Zobrest v.* **\*2434** *Catalina Foothills School Dist.,* 509 U.S. 1, 8, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993). But that rule of thumb is far from categorical, and it has limited application where, as here, the constitutional question proves far simpler than the statutory one. Whatever the merits of plaintiffs' complex statutory claims, the Proclamation must be enjoined for a more fundamental reason: It runs afoul of the Establishment Clause's guarantee of religious neutrality.

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

A

The Establishment Clause forbids government policies "respecting an establishment of religion." U.S. Const., Amdt. 1. The "clearest command" of the Establishment Clause is that the Government cannot favor or disfavor one religion over another. *Larson v. Valente,* 456 U.S. 228, 244, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982); *Church of Lukumi Babalu Aye, Inc. v. Hialeah,* 508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) ("[T]he First Amendment forbids an official purpose to disapprove of a particular religion"); *Edwards v. Aguillard,* 482 U.S. 578, 593, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) ("The Establishment Clause ... forbids *alike* the preference of a religious doctrine *or* the prohibition of theory which is deemed antagonistic to a particular dogma" (internal quotation marks omitted));

*Lynch v. Donnelly,* 465 U.S. 668, 673, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (noting that the Establishment Clause "forbids hostility toward any [religion]," because "such hostility would bring us into 'war with our national tradition as embodied in the First Amendmen[t]' "); *Epperson v. Arkansas,* 393 U.S. 97, 106, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) ("[T]he State may not adopt programs or practices ... which aid or oppose any religion. This prohibition is absolute" (citation and internal quotation marks omitted)). Consistent with that clear command, this Court has long acknowledged that governmental actions that favor one religion "inevitabl[y]" foster "the hatred, disrespect and even contempt of those who [hold] contrary beliefs." *Engel v. Vitale,* 370 U.S. 421, 431, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). That is so, this Court has held, because such acts send messages to members of minority faiths " 'that they are outsiders, not full members of the political community.' " *Santa Fe Independent School Dist. v. Doe,* 530 U.S. 290, 309, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000). To guard against this serious harm, the Framers mandated a strict "principle of denominational neutrality." *Larson,* 456 U.S., at 246, 102 S.Ct. 1673; *Board of Ed. of Kiryas Joel Village School Dist. v. Grumet,* 512 U.S. 687, 703, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) (recognizing the role of courts in "safeguarding a principle at the heart of the Establishment Clause, that government should not prefer one religion to another, or religion to irreligion").

"When the government acts with the ostensible and predominant purpose" of disfavoring a particular religion, "it violates that central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides." *McCreary County v. American Civil Liberties Union of Ky.,* 545 U.S. 844, 860, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005). To determine whether plaintiffs have proved an Establishment Clause violation, the Court asks whether a reasonable observer would view the government action as enacted for the purpose of disfavoring a religion. See *id.,* at 862, 866, 125 S.Ct. 2722; accord, *Town of Greece v. Galloway,* 572 U.S. ——, ——, 134 S.Ct. 1811, 1825, 188 L.Ed.2d 835 (2014) (plurality opinion).

In answering that question, this Court has generally considered the text of the government policy, its operation, and any **\*2435** available evidence regarding "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by" the decisionmaker. *Lukumi,* 508 U.S., at 540, 113 S.Ct. 2217 (opinion of KENNEDY, J.); *McCreary,* 545 U.S., at 862, 125 S.Ct. 2722 (courts must evaluate "text, legislative history, and implementation ..., or comparable official act" (internal quotation marks omitted)). At the same time, however, courts must take care not to engage in "any judicial psychoanalysis of a drafter's heart of hearts." *Id.,* at 862, 125 S.Ct. 2722.

B

1

Although the majority briefly recounts a few of the statements and background events that form the basis of plaintiffs' constitutional challenge, *ante,* at 2417 – 2418, that highly abridged account does not tell even half of the story. See Brief for The Roderick & Solange MacArthur Justice Center as *Amicus Curiae* 5–31 (outlining President Trump's public statements expressing animus toward Islam). The full record paints a far more harrowing picture, from which a reasonable observer would readily conclude that the Proclamation was motivated by hostility and animus toward the Muslim faith.

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 48 of 912

**Trump v. Hawaii, 138 S.Ct. 2392 (2018)**

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

During his Presidential campaign, then-candidate Donald Trump pledged that, if elected, he would ban Muslims from entering the United States. Specifically, on December 7, 2015, he issued a formal statement "calling for a total and complete shutdown of Muslims entering the United States." App. 119. That statement, which remained on his campaign website until May 2017 (several months into his Presidency), read in full:

> "Donald J. Trump is calling for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on. According to Pew Research, among others, there is great hatred towards Americans by large segments of the Muslim population. Most recently, a poll from the Center for Security Policy released data showing '25% of those polled agreed that violence against Americans here in the United States is justified as a part of the global jihad' and 51% of those polled 'agreed that Muslims in America should have the choice of being governed according to Shariah.' Shariah authorizes such atrocities as murder against nonbelievers who won't convert, beheadings and more unthinkable acts that pose great harm to Americans, especially women.

> "Mr. Trum[p] stated, 'Without looking at the various polling data, it is obvious to anybody the hatred is beyond comprehension. Where this hatred comes from and why we will have to determine. Until we are able to determine and understand this problem and the dangerous threat it poses, our country cannot be the victims of the horrendous attacks by people that believe only in Jihad, and have no sense of reason or respect of human life. If I win the election for President, we are going to Make America Great Again.'— Donald J. Trump." *Id.,* at 158; see also *id.,* at 130–131.

On December 8, 2015, Trump justified his proposal during a television interview by noting that President Franklin D. Roosevelt "did the same thing" with respect to the internment of Japanese Americans during World War II. *Id.,* at 120. In January 2016, during a Republican primary debate, Trump was asked whether he wanted to "rethink [his] position" on "banning Muslims from entering the country." **\*2436** *Ibid.* He answered, "No." *Ibid.* A month later, at a rally in South Carolina, Trump told an apocryphal story about United States General John J. Pershing killing a large group of Muslim insurgents in the Philippines with bullets dipped in pigs' blood in the early 1900's. *Id.,* at 163–164. In March 2016, he expressed his belief that "Islam hates us. ... [W]e

can't allow people coming into this country who have this hatred of the United States ... [a]nd of people that are not Muslim." *Id.,* at 120–121. That same month, Trump asserted that "[w]e're having problems with the Muslims, and we're having problems with Muslims coming into the country." *Id.,* at 121. He therefore called for surveillance of mosques in the United States, blaming terrorist attacks on Muslims' lack of "assimilation" and their commitment to "sharia law." *Ibid.*; *id.,* at 164. A day later, he opined that Muslims "do not respect us at all" and "don't respect a lot of the things that are happening throughout not only our country, but they don't respect other things." *Ibid.*

As Trump's presidential campaign progressed, he began to describe his policy proposal in slightly different terms. In June 2016, for instance, he characterized the policy proposal as a suspension of immigration from countries "where there's a proven history of terrorism." *Id.,* at 121. He also described the proposal as rooted in the need to stop "importing radical Islamic terrorism to the West through a failed immigration system." *Id.,* at 121–122. Asked in July 2016 whether he was "pull[ing] back from" his pledged Muslim ban, Trump responded, "I actually don't think it's a rollback. In fact, you could say it's an expansion." *Id.,* at 122–123. He then explained that he used different terminology because "[p]eople were so upset when [he] used the word Muslim." *Id.,* at 123.

A month before the 2016 election, Trump reiterated that his proposed "Muslim ban" had "morphed into a[n] extreme vetting from certain areas of the world." *Ibid.* Then, on December 21, 2016, President-elect Trump was asked whether he would "rethink" his previous "plans to create a Muslim registry or ban Muslim immigration." *Ibid.* He replied: "You know my plans. All along, I've proven to be right." *Ibid.*

On January 27, 2017, one week after taking office, President Trump signed [Executive Order No. 13769, 82 Fed. Reg. 8977 (2017)](#) (EO–1), entitled "Protecting the Nation From Foreign Terrorist Entry Into the United States." As he signed it, President Trump read the title, looked up, and said "We all know what that means." App. 124. That same day, President Trump explained to the media that, under EO–1, Christians would be given priority for entry as refugees into the United States. In particular, he bemoaned the fact that in the past, "[i]f you were a Muslim [refugee from Syria] you could come in, but if you were a Christian, it was almost impossible." *Id.,* at 125. Considering that past policy "very unfair," President

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 49 of 912

Trump v. Hawaii, 138 S.Ct. 2392 (2018)

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

Trump explained that EO–1 was designed "to help" the Christians in Syria. *Ibid.* The following day, one of President Trump's key advisers candidly drew the connection between EO–1 and the "Muslim ban" that the President had pledged to implement if elected. *Ibid.* According to that adviser, "[W]hen [Donald Trump] first announced it, he said, 'Muslim ban.' He called me up. He said, 'Put a commission together. Show me the right way to do it legally.' " *Ibid.*

On February 3, 2017, the United States District Court for the Western District of Washington enjoined the enforcement of EO–1. See *Washington v. Trump,* 2017 WL 462040, *3. The Ninth Circuit denied **\*2437** the Government's request to stay that injunction. *Washington v. Trump,* 847 F.3d 1151, 1169 (2017) (*per curiam* ). Rather than appeal the Ninth Circuit's decision, the Government declined to continue defending EO–1 in court and instead announced that the President intended to issue a new executive order to replace EO–1.

On March 6, 2017, President Trump issued that new executive order, which, like its predecessor, imposed temporary entry and refugee bans. See *Exec. Order No. 13,780, 82 Fed. Reg. 13209 (EO–2).* One of the President's senior advisers publicly explained that EO–2 would "have the same basic policy outcome" as EO–1, and that any changes would address "very technical issues that were brought up by the court." App. 127. After EO–2 was issued, the White House Press Secretary told reporters that, by issuing EO–2, President Trump "continue[d] to deliver on ... his most significant campaign promises." *Id.,* at 130. That statement was consistent with President Trump's own declaration that "I keep my campaign promises, and our citizens will be very happy when they see the result." *Id.,* at 127–128.

Before EO–2 took effect, federal District Courts in Hawaii and Maryland enjoined the order's travel and refugee bans. See *Hawaii v. Trump,* 245 F.Supp.3d 1227, 1239 (Haw.2017); *International Refugee Assistance Project* (*IRAP* ) *v. Trump,* 241 F.Supp.3d 539, 566 (Md.2017). The Fourth and Ninth Circuits upheld those injunctions in substantial part. *IRAP v. Trump,* 857 F.3d 554, 606 (C.A.4 2017) (en banc); *Hawaii v. Trump,* 859 F.3d 741, 789 (C.A.9 2017) (*per curiam* ). In June 2017, this Court granted the Government's petition for certiorari and issued a *per curiam* opinion partially staying the District Courts'

injunctions pending further review. In particular, the Court allowed EO–2's travel ban to take effect except as to "foreign nationals who have a credible claim of a bona fide relationship with a person or entity in the United States." *Trump v. IRAP,* 582 U.S. ——, ——, 137 S.Ct. 2080, 2088, 198 L.Ed.2d 643 (2017).

While litigation over EO–2 was ongoing, President Trump repeatedly made statements alluding to a desire to keep Muslims out of the country. For instance, he said at a rally of his supporters that EO–2 was just a "watered down version of the first one" and had been "tailor[ed]" at the behest of "the lawyers." App. 131. He further added that he would prefer "to go back to the first [executive order] and go all the way" and reiterated his belief that it was "very hard" for Muslims to assimilate into Western culture. *Id.,* at 131–132. During a rally in April 2017, President Trump recited the lyrics to a song called "The Snake," a song about a woman who nurses a sick snake back to health but then is attacked by the snake, as a warning about Syrian refugees entering the country. *Id.,* at 132, 163. And in June 2017, the President stated on Twitter that the Justice Department had submitted a "watered down, politically correct version" of the "original Travel Ban" "to S[upreme] C [ourt]."[1] *Id.,* at 132. The President went on to tweet: "People, the lawyers and the courts can call it whatever they want, but I am calling it what we need and what it is, a TRAVEL BAN!" *Id.,* at 132–133. He added: "That's right, we need a TRAVEL BAN for certain DANGEROUS countries, not some politically correct term that won't help us protect our people!" *Id.,* at 133. Then, on August 17, 2017, **\*2438** President Trump issued yet another tweet about Islam, once more referencing the story about General Pershing's massacre of Muslims in the Philippines: "Study what General Pershing ... did to terrorists when caught. There was no more Radical Islamic Terror for 35 years!" *IRAP v. Trump,* 883 F.3d 233, 267 (C.A.4 2018) (*IRAP II* ) (en banc) (alterations in original).

In September 2017, President Trump tweeted that "[t]he travel ban into the United States should be far larger, tougher and more specific—but stupidly, that would not be politically correct!" App. 133. Later that month, on September 24, 2017, President Trump issued Presidential Proclamation No. 9645, *82 Fed. Reg. 45161 (2017)* (Proclamation), which restricts entry of certain nationals from six Muslim-majority countries. On November 29, 2017, President Trump "retweeted" three anti-Muslim videos, entitled "Muslim Destroys a Statue of Virgin Mary!", "Islamist mob pushes teenage boy off roof and beats him to death!", and "Muslim migrant beats up

Dutch boy on crutches!"[2]  *IRAP II*, 883 F.3d, at 267. Those videos were initially tweeted by a British political party whose mission is to oppose "all alien and destructive politic[al] or religious doctrines, including ... Islam." *Ibid.* When asked about these videos, the White House Deputy Press Secretary connected them to the Proclamation, responding that the "President has been talking about these security issues for years now, from the campaign trail to the White House" and "has addressed these issues with the travel order that he issued earlier this year and the companion proclamation." *Ibid.*

2

As the majority correctly notes, "the issue before us is not whether to denounce" these offensive statements. *Ante,* at 2418. Rather, the dispositive and narrow question here is whether a reasonable observer, presented with all "openly available data," the text and "historical context" of the Proclamation, and the "specific sequence of events" leading to it, would conclude that the primary purpose of the Proclamation is to disfavor Islam and its adherents by excluding them from the country. See  *McCreary,* 545 U.S., at 862–863, 125 S.Ct. 2722. The answer is unquestionably yes.

Taking all the relevant evidence together, a reasonable observer would conclude that the Proclamation was driven primarily by anti-Muslim animus, rather than by the Government's asserted national-security justifications. Even before being sworn into office, then-candidate Trump stated that "Islam hates us," App. 399, warned that "[w]e're having problems with the Muslims, and we're having problems with Muslims coming into the country," *id.,* at 121, promised to enact a "total and complete shutdown of Muslims entering the United States," *id.,* at 119, and instructed one of his advisers to find a "lega[l]" way to enact a Muslim ban, *id.,* at 125.[3] The **\*2439** President continued to make similar statements well after his inauguration, as detailed above, see *supra,* at 2436 – 2438.

Moreover, despite several opportunities to do so, President Trump has never disavowed any of his prior statements about Islam.[4] Instead, he has continued to make remarks that a reasonable observer would view as an unrelenting attack on the Muslim religion and its followers. Given President Trump's failure to correct the reasonable perception of his apparent hostility toward the Islamic faith, it is unsurprising that the President's lawyers have, at every step in the lower courts, failed in their attempts to launder the Proclamation of its discriminatory taint. See  *United States v. Fordice,* 505 U.S. 717, 746–747, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992) ("[G]iven an initially tainted policy, it is eminently reasonable to make the [Government] bear the risk of nonpersuasion with respect to intent at some future time, both because the [Government] has created the dispute through its own prior unlawful conduct, and because discriminatory intent does tend to persist through time" (citation omitted)). Notably, the Court recently found less pervasive official expressions of hostility and the failure to disavow them to be constitutionally significant. Cf.  *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n,* 584 U.S. ——, ——, 138 S.Ct. 1719, 1732, —— L.Ed.2d —— (2018) ( "The official expressions of hostility to religion in some of the commissioners' comments —comments that were not disavowed at the Commission or by the State at any point in the proceedings that led to the affirmance of the order—were inconsistent with what the Free Exercise Clause requires"). It should find the same here.

**\*2440** Ultimately, what began as a policy explicitly "calling for a total and complete shutdown of Muslims entering the United States" has since morphed into a "Proclamation" putatively based on national-security concerns. But this new window dressing cannot conceal an unassailable fact: the words of the President and his advisers create the strong perception that the Proclamation is contaminated by impermissible discriminatory animus against Islam and its followers.

II

Rather than defend the President's problematic statements, the Government urges this Court to set them aside and defer to the President on issues related to immigration and national security. The majority accepts that invitation and incorrectly applies a watered-down legal standard in an effort to short circuit plaintiffs' Establishment Clause claim.

The majority begins its constitutional analysis by noting that this Court, at times, "has engaged in a circumscribed judicial inquiry when the denial of a visa allegedly burdens the constitutional rights of a U.S. citizen." *Ante,* at 2419 (citing  *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972)). As the majority notes, *Mandel* held that

Trump v. Hawaii, 138 S.Ct. 2392 (2018)

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

when the Executive Branch provides "a facially legitimate and bona fide reason" for denying a visa, "courts will neither look behind the exercise of that discretion, nor test it by balancing its justification." *Id., at 770, 92 S.Ct. 2576.* In his controlling concurrence in *Kerry v. Din, 576 U.S. ——, 135 S.Ct. 2128, 192 L.Ed.2d 183 (2015),* Justice KENNEDY applied *Mandel* 's holding and elaborated that courts can " 'look behind' the Government's exclusion of" a foreign national if there is "an affirmative showing of bad faith on the part of the consular officer who denied [the] visa." *Din, 576 U.S., at ——, 135 S.Ct., at 2141* (opinion concurring in judgment). The extent to which *Mandel* and *Din* apply at all to this case is unsettled, and there is good reason to think they do not. [5] Indeed, even the Government agreed at oral argument that where the Court confronts a situation involving "all kinds of denigrating comments about" a particular religion and a subsequent policy that is designed with the purpose *2441 of disfavoring that religion but that "dot[s] all the i's and ... cross[es] all the t's," *Mandel* would not "pu[t] an end to judicial review of that set of facts." Tr. of Oral Arg. 16.

In light of the Government's suggestion "that it may be appropriate here for the inquiry to extend beyond the facial neutrality of the order," the majority rightly declines to apply *Mandel* 's "narrow standard of review" and "assume [s] that we may look behind the face of the Proclamation." *Ante,* at 2420. In doing so, however, the Court, without explanation or precedential support, limits its review of the Proclamation to rational-basis scrutiny. *Ibid.* That approach is perplexing, given that in other Establishment Clause cases, including those involving claims of religious animus or discrimination, this Court has applied a more stringent standard of review. See, *e.g., McCreary, 545 U.S., at 860–863, 125 S.Ct. 2722; Larson, 456 U.S., at 246, 102 S.Ct. 1673; Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 449–452, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969);* see also *Colorado Christian Univ. v. Weaver, 534 F.3d 1245, 1266 (C.A.10 2008)* (McConnell, J.) (noting that, under Supreme Court precedent, laws "involving discrimination on the basis of religion, including interdenominational discrimination, are subject to heightened scrutiny whether they arise under the Free Exercise Clause, the Establishment Clause, or the Equal Protection Clause" (citations omitted)). [6] As explained above, the Proclamation is plainly unconstitutional under that heightened standard. See *supra,* at 2438 – 2440.

But even under rational-basis review, the Proclamation must fall. That is so because the Proclamation is " 'divorced from any factual context from which we could discern a relationship to legitimate state interests,' and 'its sheer breadth [is] so discontinuous with the reasons offered for it' " that the policy is " 'inexplicable by anything but animus.' " *Ante,* at 2420 (quoting *2442 *Romer v. Evans, 517 U.S. 620, 632, 635, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996)*); see also *Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 448, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)* (recognizing that classifications predicated on discriminatory animus can never be legitimate because the Government has no legitimate interest in exploiting "mere negative attitudes, or fear" toward a disfavored group). The President's statements, which the majority utterly fails to address in its legal analysis, strongly support the conclusion that the Proclamation was issued to express hostility toward Muslims and exclude them from the country. Given the overwhelming record evidence of anti-Muslim animus, it simply cannot be said that the Proclamation has a legitimate basis. *IRAP II, 883 F.3d, at 352* (Harris, J., concurring) (explaining that the Proclamation contravenes the bedrock principle "that the government may not act on the basis of *animus* toward a disfavored religious minority" (emphasis in original)).

The majority insists that the Proclamation furthers two interrelated national-security interests: "preventing entry of nationals who cannot be adequately vetted and inducing other nations to improve their practices." *Ante,* at 2421. But the Court offers insufficient support for its view "that the entry suspension has a legitimate grounding in [those] national security concerns, quite apart from any religious hostility." *Ibid.*; see also *ante,* at 2420 – 2423, and n. 7. Indeed, even a cursory review of the Government's asserted national-security rationale reveals that the Proclamation is nothing more than a " 'religious gerrymander.' " *Lukumi, 508 U.S., at 535, 113 S.Ct. 2217.*

The majority first emphasizes that the Proclamation "says nothing about religion." *Ante,* at 2421. Even so, the Proclamation, just like its predecessors, overwhelmingly targets Muslim-majority nations. Given the record here, including all the President's statements linking the Proclamation to his apparent hostility toward Muslims, it is of no moment that the Proclamation also includes minor restrictions on two non-Muslim majority countries, North Korea and Venezuela, or that the Government has removed

a few Muslim-majority countries from the list of covered countries since EO–1 was issued. Consideration of the entire record supports the conclusion that the inclusion of North Korea and Venezuela, and the removal of other countries, simply reflect subtle efforts to start "talking territory instead of Muslim," App. 123, precisely so the Executive Branch could evade criticism or legal consequences for the Proclamation's otherwise clear targeting of Muslims. The Proclamation's effect on North Korea and Venezuela, for example, is insubstantial, if not entirely symbolic. A prior sanctions order already restricts entry of North Korean nationals, see Exec. Order No. 13810, 82 Fed. Reg. 44705 (2017), and the Proclamation targets only a handful of Venezuelan government officials and their immediate family members, 82 Fed. Reg. 45166. As such, the President's inclusion of North Korea and Venezuela does little to mitigate the anti-Muslim animus that permeates the Proclamation.

The majority next contends that the Proclamation "reflects the results of a worldwide review process undertaken by multiple Cabinet officials." *Ante,* at 2421. At the outset, there is some evidence that at least one of the individuals involved in that process may have exhibited bias against Muslims. As noted by one group of *amici,* the Trump administration appointed Frank Wuco to help enforce the President's travel bans and lead the multiagency review process. See Brief for Plaintiffs in *International Refugee Assistance Project v. Trump* as *Amici Curiae* **\*2443** 13–14, and n. 10. According to *amici,* Wuco has purportedly made several suspect public statements about Islam: He has "publicly declared that it was a 'great idea' to 'stop the visa application process into this country from Muslim nations in a blanket type of policy,' " "that Muslim populations 'living under other-than-Muslim rule' will 'necessarily' turn to violence, that Islam prescribes 'violence and warfare against unbelievers,' and that Muslims 'by-and-large ... resist assimilation.' " *Id.,* at 14.

But, even setting aside those comments, the worldwide review does little to break the clear connection between the Proclamation and the President's anti-Muslim statements. For "[n]o matter how many officials affix their names to it, the Proclamation rests on a rotten foundation." Brief for Constitutional Law Scholars as *Amici Curiae* 7 (filed Apr. 2, 2018); see *supra,* at 2435 – 2438. The President campaigned on a promise to implement a "total and complete shutdown of Muslims" entering the country, translated that campaign promise into a concrete policy, and made several statements linking that policy (in its various forms) to anti-Muslim animus.

Ignoring all this, the majority empowers the President to hide behind an administrative review process that the Government refuses to disclose to the public. See IRAP II, 883 F.3d, at 268 ("[T]he Government chose not to make the review publicly available" even in redacted form); IRAP v. Trump, No. 17–2231(CA4), Doc. 126 (Letter from S. Swingle, Counsel for Defendants–Appellants, to P. Connor, Clerk of the United States Court of Appeals for the Fourth Circuit (Nov. 24, 2017)) (resisting Fourth Circuit's request that the Government supplement the record with the reports referenced in the Proclamation). Furthermore, evidence of which we can take judicial notice indicates that the multiagency review process could not have been very thorough. Ongoing litigation under the Freedom of Information Act shows that the September 2017 report the Government produced after its review process was a mere 17 pages. See *Brennan Center for Justice v. United States Dept. of State,* No. 17–cv–7520 (SDNY), Doc. No. 31–1, pp. 2– 3. That the Government's analysis of the vetting practices of hundreds of countries boiled down to such a short document raises serious questions about the legitimacy of the President's proclaimed national-security rationale.

Beyond that, Congress has already addressed the national-security concerns supposedly undergirding the Proclamation through an "extensive and complex" framework governing "immigration and alien status." Arizona v. United States, 567 U.S. 387, 395, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012). [7] The Immigration and Nationality Act sets forth, in painstaking detail, a reticulated scheme regulating the admission of individuals to the United States. Generally, admission to the United States requires a valid visa or other travel document. 8 U.S.C. §§ 1181, 1182(a)(7)(A)(i) (I), 1182(a)(7)(B)(i)(II). To obtain a visa, an applicant must produce "certified cop[ies]" of documents proving her identity, background, and criminal history. §§ 1202(b), 1202(d). An applicant also must undergo an in-person interview **\*2444** with a State Department consular officer. §§ 1201(a)(1), 1202(h)(1), 22 CFR §§ 42.62(a)-(b) (2017); see also 8 U.S.C. §§ 1202(h)(2)(D), 1202(h) (2)(F) (requiring in-person interview if the individual "is a national of a country officially designated by the Secretary of State as a state sponsor of terrorism" or is "a member of a group or section that ... poses a security threat to the United States"). "Any alien who ... has engaged in a terrorist

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 53 of 912

**Trump v. Hawaii, 138 S.Ct. 2392 (2018)**

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

activity," "incited terrorist activity," or been a representative, member, or endorser of a terrorist organization, or who "is likely to engage after entry in any terrorist activity," § 1182(a)(3)(B), or who has committed one or more of the many crimes enumerated in the statute is inadmissible and therefore ineligible to receive a visa. See § 1182(a)(2) (A) (crime of moral turpitude or drug offense); § 1182(a) (2)(C) (drug trafficking or benefiting from a relative who recently trafficked drugs); § 1182(a)(2)(D) (prostitution or "unlawful commercialized vice"); § 1182(a)(2)(H) (human trafficking); § 1182(a)(3) ("Security and related grounds").

In addition to vetting rigorously any individuals seeking admission to the United States, the Government also rigorously vets the information-sharing and identity-management systems of other countries, as evidenced by the Visa Waiver Program, which permits certain nationals from a select group of countries to skip the ordinary visa-application process. See § 1187. To determine which countries are eligible for the Visa Waiver Program, the Government considers whether they can satisfy numerous criteria—*e.g.,* using electronic, fraud-resistant passports, § 1187(a)(3)(B), 24–hour reporting of lost or stolen passports, § 1187(c)(2)(D), and not providing a safe haven for terrorists, § 1187(a)(12)(D)(iii). The Secretary of Homeland Security, in consultation with the Secretary of State, also must determine that a country's inclusion in the program will not compromise "the law enforcement and security interests of the United States." § 1187(c)(2)(C). Eligibility for the program is reassessed on an annual basis. See § 1187(a)(12)(D)(iii), 1187(c)(12)(A). As a result of a recent review, for example, the Executive decided in 2016 to remove from the program dual nationals of Iraq, Syria, Iran, and Sudan. See Brief for Former National Security Officials as *Amici Curiae* 27.

Put simply, Congress has already erected a statutory scheme that fulfills the putative national-security interests the Government now puts forth to justify the Proclamation. Tellingly, the Government remains wholly unable to articulate any credible national-security interest that would go unaddressed by the current statutory scheme absent the Proclamation. The Government also offers no evidence that this current vetting scheme, which involves a highly searching consideration of individuals required to obtain visas for entry into the United States and a highly searching consideration of which countries are eligible for inclusion in the Visa Waiver Program, is inadequate to achieve the Proclamation's proclaimed objectives of "preventing entry of nationals who cannot be adequately vetted and inducing other nations to improve their [vetting and information-sharing] practices." *Ante,* at 2421.

For many of these reasons, several former national-security officials from both political parties—including former Secretary of State Madeleine Albright, former State Department Legal Adviser John Bellinger III, former Central Intelligence Agency Director John Brennan, and former Director of National Intelligence James Clapper—have advised that the Proclamation and its predecessor orders "do not advance the national-security or foreign policy interests of the United **\*2445** States, and in fact do serious harm to those interests." Brief for Former National Security Officials as *Amici Curiae* 15 (boldface deleted).

Moreover, the Proclamation purports to mitigate national-security risks by excluding nationals of countries that provide insufficient information to vet their nationals. 82 Fed. Reg. 45164. Yet, as plaintiffs explain, the Proclamation broadly denies immigrant visas to all nationals of those countries, including those whose admission would likely not implicate these information deficiencies (*e.g.,* infants, or nationals of countries included in the Proclamation who are long-term residents of and traveling from a country not covered by the Proclamation). See Brief for Respondents 72. In addition, the Proclamation permits certain nationals from the countries named in the Proclamation to obtain nonimmigrant visas, which undermines the Government's assertion that it does not already have the capacity and sufficient information to vet these individuals adequately. See 82 Fed. Reg. 45165–45169.

Equally unavailing is the majority's reliance on the Proclamation's waiver program. *Ante,* at 2423, and n. 7. As several *amici* thoroughly explain, there is reason to suspect that the Proclamation's waiver program is nothing more than a sham. See Brief for Pars Equality Center et al. as *Amici Curiae* 11, 13–28 (explaining that "waivers under the Proclamation are vanishingly rare" and reporting numerous stories of deserving applicants denied waivers). The remote possibility of obtaining a waiver pursuant to an ad hoc, discretionary, and seemingly arbitrary process scarcely demonstrates that the Proclamation is rooted in a genuine concern for national

security. See *ante,* at 2430 – 2433 (BREYER, J., dissenting) (outlining evidence suggesting "that the Government is not applying the Proclamation as written," that "waivers are not being processed in an ordinary way," and that consular and other officials "do not, in fact, have discretion to grant waivers").

In sum, none of the features of the Proclamation highlighted by the majority supports the Government's claim that the Proclamation is genuinely and primarily rooted in a legitimate national-security interest. What the unrebutted evidence actually shows is that a reasonable observer would conclude, quite easily, that the primary purpose and function of the Proclamation is to disfavor Islam by banning Muslims from entering our country.

### III

As the foregoing analysis makes clear, plaintiffs are likely to succeed on the merits of their Establishment Clause claim. To obtain a preliminary injunction, however, plaintiffs must also show that they are "likely to suffer irreparable harm in the absence of preliminary relief," that "the balance of equities tips in [their] favor," and that "an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). Plaintiffs readily clear those remaining hurdles.

First, plaintiffs have shown a likelihood of irreparable harm in the absence of an injunction. As the District Court found, plaintiffs have adduced substantial evidence showing that the Proclamation will result in "a multitude of harms that are not compensable with monetary damages and that are irreparable —among them, prolonged separation from family members, constraints to recruiting and retaining students and faculty members to foster diversity and quality within the University community, and the diminished membership of the [Muslim] Association." 265 F.Supp.3d 1140, 1159 (Haw.2017).

**\*2446** Second, plaintiffs have demonstrated that the balance of the equities tips in their favor. Against plaintiffs' concrete allegations of serious harm, the Government advances only nebulous national-security concerns. Although national security is unquestionably an issue of paramount public importance, it is not "a talisman" that the Government can use "to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins.' " *Ziglar v. Abbasi,* 582

U.S. ——, ——, 137 S.Ct. 1843, 1862, 198 L.Ed.2d 290 (2017). That is especially true here, because, as noted, the Government's other statutory tools, including the existing rigorous individualized vetting process, already address the Proclamation's purported national-security concerns. See *supra,* at 2443 – 2445.

Finally, plaintiffs and their *amici* have convincingly established that "an injunction is in the public interest." *Winter,* 555 U.S., at 20, 129 S.Ct. 365. As explained by the scores of *amici* who have filed briefs in support of plaintiffs, the Proclamation has deleterious effects on our higher education system;[8] national security;[9] healthcare;[10] artistic culture;[11] and the Nation's technology industry and overall economy.[12] Accordingly, the Court of Appeals correctly affirmed, in part, the District Court's preliminary injunction.[13]

### IV

The First Amendment stands as a bulwark against official religious prejudice and embodies our Nation's deep commitment to religious plurality and tolerance. That constitutional promise is why, "[f]or centuries now, people have come to this country from every corner of the world to share in the blessing of religious freedom." *Town of Greece v. Galloway,* 572 U.S., at ——, 134 S.Ct., at 1841 (KAGAN, J., dissenting). Instead of vindicating those principles, today's decision tosses them aside. In holding that the First Amendment gives way to an executive policy that a reasonable observer would view as motivated by animus against Muslims, the majority opinion upends this Court's precedent, repeats tragic mistakes of the past, and denies countless individuals the fundamental right of religious liberty.

Just weeks ago, the Court rendered its decision in *Masterpiece Cakeshop,* 584 U.S. ——, 138 S.Ct. 1719, —— L.Ed.2d ——, which applied the bedrock principles of religious neutrality and tolerance in considering **\*2447** a First Amendment challenge to government action. See *id.,* at ——, 138 S.Ct., at 1731 ("The Constitution 'commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all

Trump v. Hawaii, 138 S.Ct. 2392 (2018)

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

officials must pause to remember their own high duty to the Constitution and to the rights it secures' " (quoting *Lukumi,* 508 U.S., at 547, 113 S.Ct. 2217)); *Masterpiece,* 584 U.S., at ——, 138 S.Ct., at 1732 (KAGAN, J., concurring) ("[S]tate actors cannot show hostility to religious views; rather, they must give those views 'neutral and respectful consideration' "). Those principles should apply equally here. In both instances, the question is whether a government actor exhibited tolerance and neutrality in reaching a decision that affects individuals' fundamental religious freedom. But unlike in *Masterpiece,* where a state civil rights commission was found to have acted without "the neutrality that the Free Exercise Clause requires," *id., at* ——, 138 S.Ct., at 1731, the government actors in this case will not be held accountable for breaching the First Amendment's guarantee of religious neutrality and tolerance. Unlike in *Masterpiece,* where the majority considered the state commissioners' statements about religion to be persuasive evidence of unconstitutional government action, *id.,* at —— ——, 138 S.Ct., at 1728–1730, the majority here completely sets aside the President's charged statements about Muslims as irrelevant. That holding erodes the foundational principles of religious tolerance that the Court elsewhere has so emphatically protected, and it tells members of minority religions in our country " 'that they are outsiders, not full members of the political community.' " *Santa Fe,* 530 U.S., at 309, 120 S.Ct. 2266.

Today's holding is all the more troubling given the stark parallels between the reasoning of this case and that of *Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944). See Brief for Japanese American Citizens League as *Amicus Curiae.* In *Korematsu,* the Court gave "a pass [to] an odious, gravely injurious racial classification" authorized by an executive order. *Adarand Constructors, Inc. v. Peña,* 515 U.S. 200, 275, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (GINSBURG, J., dissenting). As here, the Government invoked an ill-defined national-security threat to justify an exclusionary policy of sweeping proportion. See Brief for Japanese American Citizens League as *Amicus Curiae* 12–14. As here, the exclusion order was rooted in dangerous stereotypes about, *inter alia,* a particular group's supposed inability to assimilate and desire to harm the United States. See *Korematsu,* 323 U.S., at 236–240, 65 S.Ct. 193 (Murphy, J., dissenting). As here, the Government was unwilling to reveal its own intelligence agencies' views of the alleged security concerns to the very citizens it

purported to protect. Compare *Korematsu v. United States,* 584 F.Supp. 1406, 1418–1419 (N.D.Cal.1984) (discussing information the Government knowingly omitted from report presented to the courts justifying the executive order); Brief for Japanese American Citizens League as *Amicus Curiae* 17–19, with *IRAP II,* 883 F.3d, at 268; Brief for Karen Korematsu et al. as *Amici Curiae* 35–36, and n. 5 (noting that the Government "has gone to great lengths to shield [the Secretary of Homeland Security's] report from view"). And as here, there was strong evidence that impermissible hostility and animus motivated the Government's policy.

Although a majority of the Court in *Korematsu* was willing to uphold the Government's actions based on a barren invocation of national security, dissenting Justices warned of that decision's harm to our **\*2448** constitutional fabric. Justice Murphy recognized that there is a need for great deference to the Executive Branch in the context of national security, but cautioned that "it is essential that there be definite limits to [the government's] discretion," as "[i]ndividuals must not be left impoverished of their constitutional rights on a plea of military necessity that has neither substance nor support." 323 U.S., at 234, 65 S.Ct. 193 (Murphy, J., dissenting). Justice Jackson lamented that the Court's decision upholding the Government's policy would prove to be "a far more subtle blow to liberty than the promulgation of the order itself," for although the executive order was not likely to be long lasting, the Court's willingness to tolerate it would endure. *Id.,* at 245–246, 65 S.Ct. 193.

In the intervening years since *Korematsu,* our Nation has done much to leave its sordid legacy behind. See, *e.g.,* Civil Liberties Act of 1988, 50 U.S.C.App. § 4211 *et seq.* (setting forth remedies to individuals affected by the executive order at issue in *Korematsu* ); Non–Detention Act of 1971, 18 U.S.C. § 4001(a) (forbidding the imprisonment or detention by the United States of any citizen absent an Act of Congress). Today, the Court takes the important step of finally overruling *Korematsu,* denouncing it as "gravely wrong the day it was decided." *Ante,* at 2423 (citing *Korematsu,* 323 U.S., at 248, 65 S.Ct. 193 (Jackson, J., dissenting)). This formal repudiation of a shameful precedent is laudable and long overdue. But it does not make the majority's decision here acceptable or right. By blindly accepting the Government's misguided invitation to sanction a discriminatory policy motivated by animosity toward a disfavored group, all in the name of a superficial claim of national security, the Court

Trump v. Hawaii, 138 S.Ct. 2392 (2018)

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 56 of 912

redeploys the same dangerous logic underlying *Korematsu* and merely replaces one "gravely wrong" decision with another. *Ante,* at 2423.

Our Constitution demands, and our country deserves, a Judiciary willing to hold the coordinate branches to account when they defy our most sacred legal commitments. Because

the Court's decision today has failed in that respect, with profound regret, I dissent.

**All Citations**

138 S.Ct. 2392, 201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354, 2018 Daily Journal D.A.R. 6193, 27 Fla. L. Weekly Fed. S 503

## Footnotes

\*   The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1   The President also invoked his power under 8 U.S.C. § 1185(a)(1), which grants the President authority to adopt "reasonable rules, regulations, and orders" governing entry or removal of aliens, "subject to such limitations and exceptions as [he] may prescribe." Because this provision "substantially overlap[s]" with § 1182(f), we agree with the Government that we "need not resolve ... the precise relationship between the two statutes" in evaluating the validity of the Proclamation. Brief for Petitioners 32–33.

2   The Proclamation states that it does not disclose every ground for the country-specific restrictions because "[d]escribing all of those reasons publicly ... would cause serious damage to the national security of the United States, and many such descriptions are classified." § 1(j).

3   The Act is rife with examples distinguishing between the two concepts. See, *e.g.,* 8 U.S.C. § 1101(a)(4) ("The term 'application for admission' has reference to the application for admission into the United States and not to the application for the issuance of an immigrant or nonimmigrant visa."); § 1182(a) ("ineligible to receive visas and ineligible to be admitted"); § 1182(a)(3)(D)(iii) ("establishes to the satisfaction of the consular officer when applying for a visa ... or to the satisfaction of the Attorney General when applying for admission"); § 1182(h)(1)(A)(i) ("alien's application for a visa, admission, or adjustment of status"); § 1187 (permitting entry without a visa); § 1361 (establishing burden of proof for when a person "makes application for a visa ..., or makes application for admission, or otherwise attempts to enter the United States").

4   The concepts of entry and admission—but not issuance of a visa—are used interchangeably in the INA. See § 1101(a)(13)(A) (defining "admission" as the "lawful entry of the alien into the United States").

5   The dissent finds "perplexing" the application of rational basis review in this context. *Post,* at 2441. But what is far more problematic is the dissent's assumption that courts should review immigration policies, diplomatic sanctions, and military actions under the *de novo* "reasonable observer" inquiry applicable to cases involving holiday displays and graduation ceremonies. The dissent criticizes application of a more constrained standard of review as "throw[ing] the Establishment Clause out the window." *Post,* at 2441, n. 6. But as the numerous precedents cited in this section make clear, such a circumscribed inquiry applies to any constitutional claim concerning the entry of foreign nationals. See Part IV–C, *supra.* The dissent can cite no authority for its proposition that the more free-ranging inquiry it proposes is appropriate in the national security and foreign affairs context.

6   The dissent recycles much of plaintiffs' § 1182(f) argument to assert that "Congress has already erected a statutory scheme that fulfills" the President's stated concern about deficient vetting. *Post,* at 2443 – 2444. But

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

for the reasons set forth earlier, Congress has not in any sense "stepped into the space and solved the exact problem." Tr. of Oral Arg. 53. Neither the existing inadmissibility grounds nor the narrow Visa Waiver Program address the failure of certain high-risk countries to provide a minimum baseline of reliable information. See Part III–B–1, *supra*.

7    Justice BREYER focuses on only one aspect of our consideration—the waiver program and other exemptions in the Proclamation. Citing selective statistics, anecdotal evidence, and a declaration from unrelated litigation, Justice BREYER suggests that not enough individuals are receiving waivers or exemptions. *Post*, at 2431 – 2433 (dissenting opinion). Yet even if such an inquiry were appropriate under rational basis review, the evidence he cites provides "but a piece of the picture," *post*, at 2432, and does not affect our analysis.

1    "Nationwide injunctions" is perhaps the more common term. But I use the term "universal injunctions" in this opinion because it is more precise. These injunctions are distinctive because they prohibit the Government from enforcing a policy with respect to anyone, including nonparties—not because they have wide geographic breadth. An injunction that was properly limited to the plaintiffs in the case would not be invalid simply because it governed the defendant's conduct nationwide.

2    Even if Congress someday enacted a statute that clearly and expressly authorized universal injunctions, courts would need to consider whether that statute complies with the limits that Article III places on the authority of federal courts. See *infra*, at 2427 – 2428.

1    According to the White House, President Trump's statements on Twitter are "official statements." App. 133.

2    The content of these videos is highly inflammatory, and their titles are arguably misleading. For instance, the person depicted in the video entitled "Muslim migrant beats up Dutch boy on crutches!" was reportedly not a "migrant," and his religion is not publicly known. See Brief for Plaintiffs in *International Refugee Assistance Project v. Trump* as *Amici Curiae* 12, n. 4; P. Baker & E. Sullivan, Trump Shares Inflammatory Anti–Muslim Videos, and Britain's Leader Condemns Them, N.Y. Times, Nov. 29, 2017 ("[A]ccording to local officials, both boys are Dutch"), https://www.nytimes.com/2017/11/29/us/politics/trump-anti-muslim-videos-jayda-fransen.html (all Internet materials as last visited June 25, 2018).

3    The Government urges us to disregard the President's campaign statements. Brief for Petitioners 66–67. But nothing in our precedent supports that blinkered approach. To the contrary, courts must consider "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history." 🔖 *Church of Lukumi Babalu Aye, Inc. v. Hialeah,* 508 U.S. 520, 540, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (opinion of KENNEDY, J.). Moreover, President Trump and his advisers have repeatedly acknowledged that the Proclamation and its predecessors are an outgrowth of the President's campaign statements. For example, just last November, the Deputy White House Press Secretary reminded the media that the Proclamation addresses "issues" the President has been talking about "for years," including on "the campaign trail." 🚩 *IRAP II,* 883 F.3d 233, 267 (C.A.4 2018). In any case, as the Fourth Circuit correctly recognized, even without relying on any of the President's campaign statements, a reasonable observer would conclude that the Proclamation was enacted for the impermissible purpose of disfavoring Muslims. 🚩 *Id.,* at 266, 268.

4    At oral argument, the Solicitor General asserted that President Trump "made crystal-clear on September 25 that he had no intention of imposing the Muslim ban" and "has praised Islam as one of the great countries [*sic*] of the world." Tr. of Oral Arg. 81. Because the record contained no evidence of any such statement made on September 25th, however, the Solicitor General clarified after oral argument that he actually intended to refer to President Trump's statement during a television interview on January 25, 2017. Letter from N. Francisco, Solicitor General, to S. Harris, Clerk of Court (May 1, 2018); Reply Brief 28, n. 8. During that interview, the President was asked whether EO–1 was "the Muslim ban," and answered, "no it's not the Muslim ban." See Transcript: ABC News anchor David Muir interviews President Trump, ABC News, Jan. 25, 2017, http://abcnews.go.com/Politics/transcript-abc-news-anchor-david-muir-interviews-president/story?id=45047602. But that lone assertion hardly qualifies as a disavowal of the President's comments about Islam —some of which were spoken after January 25, 2017. Moreover, it strains credulity to say that President

Trump's January 25th statement makes "crystal-clear" that he never intended to impose a Muslim ban given that, until May 2017, the President's website displayed the statement regarding his campaign promise to ban Muslims from entering the country.

5   *Mandel* and *Din* are readily distinguishable from this case for a number of reasons. First, *Mandel* and *Din* each involved a constitutional challenge to an Executive Branch decision to exclude a single foreign national under a specific statutory ground of inadmissibility. *Mandel,* 408 U.S., at 767, 92 S.Ct. 2576; *Din,* 576 U.S., at ——, 135 S.Ct., at ——. Here, by contrast, President Trump is not exercising his discretionary authority to determine the admission or exclusion of a particular foreign national. He promulgated an executive order affecting millions of individuals on a categorical basis. Second, *Mandel* and *Din* did not purport to establish the framework for adjudicating cases (like this one) involving claims that the Executive Branch violated the Establishment Clause by acting pursuant to an unconstitutional purpose. Applying *Mandel*'s narrow standard of review to such a claim would run contrary to this Court's repeated admonition that "[f]acial neutrality is not determinative" in the Establishment Clause context. *Lukumi,* 508 U.S., at 534, 113 S.Ct. 2217. Likewise, the majority's passing invocation of *Fiallo v. Bell,* 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977), is misplaced. *Fiallo,* unlike this case, addressed a constitutional challenge to a statute enacted by Congress, not an order of the President. *Id.,* at 791, 97 S.Ct. 1473. *Fiallo* 's application of *Mandel* says little about whether *Mandel* 's narrow standard of review applies to the unilateral executive proclamation promulgated under the circumstances of this case. Finally, even assuming that *Mandel* and *Din* apply here, they would not preclude us from looking behind the face of the Proclamation because plaintiffs have made "an affirmative showing of bad faith," *Din,* 576 U.S., at ——, 135 S.Ct., at 2141, by the President who, among other things, instructed his subordinates to find a "lega[l]" way to enact a Muslim ban, App. 125; see *supra,* at 2435 – 2438.

6   The majority chides as "problematic" the importation of Establishment Clause jurisprudence "in the national security and foreign affairs context." *Ante,* at 2420, n. 5. As the majority sees it, this Court's Establishment Clause precedents do not apply to cases involving "immigration policies, diplomatic sanctions, and military actions." *Ante,* at 2420, n. 5. But just because the Court has not confronted the precise situation at hand does not render these cases (or the principles they announced) inapplicable. Moreover, the majority's complaint regarding the lack of direct authority is a puzzling charge, given that the majority itself fails to cite any "authority for its proposition" that a more probing review is inappropriate in a case like this one, where United States citizens allege that the Executive has violated the Establishment Clause by issuing a sweeping executive order motivated by animus. *Ante,* at 2420 n. 5; see *supra,* at 2440, and n. 5. In any event, even if there is no prior case directly on point, it is clear from our precedent that "[w]hatever power the United States Constitution envisions for the Executive" in the context of national security and foreign affairs, "it most assuredly envisions a role for all three branches when individual liberties are at stake." *Hamdi v. Rumsfeld,* 542 U.S. 507, 536, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (plurality opinion). This Court's Establishment Clause precedents require that, if a reasonable observer would understand an executive action to be driven by discriminatory animus, the action be invalidated. See *McCreary,* 545 U.S., at 860, 125 S.Ct. 2722. That reasonable-observer inquiry includes consideration of the Government's asserted justifications for its actions. The Government's invocation of a national-security justification, however, does not mean that the Court should close its eyes to other relevant information. Deference is different from unquestioning acceptance. Thus, what is "far more problematic" in this case is the majority's apparent willingness to throw the Establishment Clause out the window and forgo any meaningful constitutional review at the mere mention of a national-security concern. *Ante,* at 2420, n. 5.

7   It is important to note, particularly given the nature of this case, that many consider "using the term 'alien' to refer to other human beings" to be "offensive and demeaning." *Flores v. United States Citizenship & Immigration Servs.,* 718 F.3d 548, 551–552, n. 1 (C.A.6 2013). I use the term here only where necessary "to

201 L.Ed.2d 775, 86 USLW 4602, 18 Cal. Daily Op. Serv. 6354...

be consistent with the statutory language" that Congress has chosen and "to avoid any confusion in replacing a legal term of art with a more appropriate term." *Ibid.*

8    See Brief for American Council on Education et al. as *Amici Curiae* ; Brief for Colleges and Universities as *Amici Curiae* ; Brief for New York University as *Amicus Curiae.*

9    See Brief for Retired Generals and Admirals of the U.S. Armed Forces as *Amici Curiae* ; Brief for Former National Security Officials as *Amici Curiae.*

10    See Brief for Association of American Medical Colleges as *Amicus Curiae.*

11    See Brief for Association of Art Museum Directors et al. as *Amici Curiae.*

12    See Brief for U.S. Companies as *Amici Curiae* ; Brief for Massachusetts Technology Leadership Council, Inc., as *Amicus Curiae.*

13    Because the majority concludes that plaintiffs have failed to show a likelihood of success on the merits, it takes no position on "the propriety of the nationwide scope of the injunction issued by the District Court." *Ante,* at 2423. The District Court did not abuse its discretion by granting nationwide relief. Given the nature of the Establishment Clause violation and the unique circumstances of this case, the imposition of a nationwide injunction was " 'necessary to provide complete relief to the plaintiffs.' " *Madsen v. Women's Health Center, Inc.,* 512 U.S. 753, 765, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994); see *Califano v. Yamasaki,* 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class").

---

**End of Document**                                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

17 Cal. Daily Op. Serv. 8036, 2017 Daily Journal D.A.R. 7996

868 F.3d 830
United States Court of Appeals, Ninth Circuit.

UNITED STATES of America, Plaintiff-Appellee,

v.

Jesus CASTILLO-MENDEZ, Defendant-Appellant.

No. 15-50273
|
Argued and Submitted December
7, 2016 Pasadena, California
|
Filed August 21, 2017

**Synopsis**

**Background:** Defendant was convicted after a jury trial in the United States District Court for the Southern District of California, Larry A. Burns, J., of attempted illegal reentry. Defendant appealed.

**Holdings:** The Court of Appeals, Paez, Circuit Judge, held that:

[1] whether a defendant was actually under official restraint at the time he entered the United States is irrelevant to the crime of attempted illegal reentry;

[2] the critical inquiry in attempted illegal reentry cases is the defendant's mental state: whether he specifically intended to enter free from official restraint; and

[3] district court's legally erroneous and confusing supplemental jury instruction was prejudicial to defendant.

Reversed and remanded with instructions.

West Headnotes (11)

**[1]** **Criminal Law**  Review De Novo

The Court of Appeals reviews de novo whether the district court's response to a jury question correctly states the law.

**[2]** **Criminal Law**  Issues related to jury trial

When a jury demonstrates confusion about a controlling legal principle, the Court of Appeals reviews whether the district court eliminated that confusion.

**[3]** **Criminal Law**  Instructions in general

Even if the Court of Appeals determines a jury instruction was erroneous or failed to clear up confusion, it must still review whether the error was harmless.

1 Cases that cite this headnote

**[4]** **Criminal Law**  Elements and incidents of offense; definitions

A jury instruction that erroneously describes an element of the offense is harmless only if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.

1 Cases that cite this headnote

**[5]** **Aliens, Immigration, and Citizenship**  Reentry after removal

Whether a defendant was actually under official restraint at the time he entered the United States is irrelevant to the crime of attempted illegal reentry; what matters is the defendant's state of mind when attempting to enter the United States, regardless of whether he was, as a matter of fact, under official restraint. Immigration and Nationality Act § 276,  8 U.S.C.A. §§ 1326(a),  1326(b).

**[6]** **Aliens, Immigration, and Citizenship**  Reentry after removal

In illegal reentry cases where the defendant was "found in" the United States, the government must prove that at the time a defendant entered, he was free from official restraint as a matter of fact, irrespective of his knowledge or intent to

avoid that restraint. Immigration and Nationality Act § 276, 📄 8 U.S.C.A. § 1326(a).

1 Cases that cite this headnote

[7]    **Aliens, Immigration, and Citizenship** 🔑 Reentry after removal

Because crime of illegal reentry where a defendant was "found in" the United States is a general intent crime, the government can prove the fact of official restraint in "found in" cases regardless of whether the alien was aware of the surveillance or intended to evade inspection.

Immigration and Nationality Act § 276, 📄 8 U.S.C.A. § 1326(a).

2 Cases that cite this headnote

[8]    **Aliens, Immigration, and Citizenship** 🔑 Reentry after removal

The critical inquiry in attempted illegal reentry cases is the defendant's mental state: whether he specifically intended to enter free from official restraint. Immigration and Nationality Act § 276, 📄 8 U.S.C.A. §§ 1326(a), 📄 1326(b).

1 Cases that cite this headnote

[9]    **Aliens, Immigration, and Citizenship** 🔑 Reentry after removal

Unlike crime of illegal reentry in which defendant is "found in" the United States, attempted illegal reentry is a specific intent crime, and the government must show specific intent to enter free from official restraint as an element of the crime. Immigration and Nationality Act § 276, 📄 8 U.S.C.A. §§ 1326(a), 📄 1326(b).

4 Cases that cite this headnote

[10]   **Criminal Law** 🔑 Conduct and Deliberations of Jury

The Court of Appeals reverses and remands for a new trial where a district court's supplemental instruction failed to clear away jury confusion

with its answer or when the answer was legally incorrect, and when such error or confusion was prejudicial to the defendant.

1 Cases that cite this headnote

[11]   **Criminal Law** 🔑 Elements and incidents of offense; definitions

District court's legally erroneous and confusing supplemental instruction to jury on requirement that a defendant have specific intent to enter the United States free of official restraint in order to be guilty of crime of attempted illegal reentry was prejudicial to defendant, where specific intent to enter free from official restraint was the central and contested issue at trial, nearly all testimony and evidence focused on whether defendant intended to enter from official restraint or if he intended to flee from dangerous smugglers and surrender to border patrol agents, there was evidence supporting both sides, and jury's questions demonstrated that it was likely confused about this issue. Immigration and Nationality Act § 276, 📄 8 U.S.C.A. §§ 1326(a), 📄 1326(b).

3 Cases that cite this headnote

**Attorneys and Law Firms**

*832  Kurt D. Hermansen (argued), Law Office of Kurt David Hermansen, San Diego, California, for Defendant-Appellant.

D. Benjamin Holley (argued), Assistant United States Attorney; Helen H. Hong, Chief, Appellate Section, Criminal Division; United States Attorney's Office, San Diego, California; for Plaintiff-Appellee.

Appeal from the United States District Court for the Southern District of California, Larry A. Burns, District Judge, Presiding, D.C. No. 3:14-cr-03299-LAB-1

Before: Stephen Reinhardt, A. Wallace Tashima, and Richard A. Paez, Circuit Judges.

## OPINION

PAEZ, Circuit Judge:

Jesus Castillo-Mendez appeals his conviction for attempted illegal reentry, a violation of 8 U.S.C. § 1326(a), (b). One of the elements of attempted illegal reentry is that the defendant specifically intend to reenter the United States free from official restraint. At trial, Castillo-Mendez argued that the government failed to prove that he attempted to enter the country with the requisite intent. To the contrary, he argued that when he crossed over the border he did so with the intent to escape smugglers he believed would harm him. During deliberation, the jury, apparently confused with respect to the meaning of specific intent to enter free from official restraint, asked the district court for clarification. In response, the district court provided the jury with a supplemental instruction, which Castillo-Mendez argues was erroneous and prejudicial. We agree. We therefore reverse and remand for a new trial. [1]

## I.

In September 2014, Castillo-Mendez planned to cross the border with two other men, his cousin Nestor Castillo-Ramirez, and a man known only as Teodulo. Teodulo **\*833** had arranged for smugglers to facilitate the group's entry into the United States.

Prior to their journey across the border, the smugglers housed the three men in a dirty, abandoned building near the border for approximately two days. The building was full of trash, fenced with barbed wire, and lacked a bathroom, electricity, and running water. The group had limited or no food during this time. Nonetheless, Castillo-Mendez and his companions did not believe they could leave the house or abandon their plan for fear of reprisal by the smugglers. Eventually, approximately seven smugglers picked up Castillo-Mendez, Castillo-Ramirez, and Teodulo from the house and took them to the border, all ten men in one pick up truck.

Around six pm, three of the seven smugglers walked the group from the truck up to the border fence, instructing the men that they would watch them cross over from atop a nearby hill. In preparing to cross, the three men noticed a border patrol truck on the other side of the fence, and possibly also

a plane flying overhead. The group told the smugglers that they did not want to cross, but the smugglers responded with threatening, aggressive, and frightening comments and told them they had no choice but to cross right then. The group believed that the smugglers might have weapons and feared for their safety. Ultimately, the three men jumped over the fence; Castillo-Ramirez twisted his ankle and Teodulo injured his hand in the process.

Within ten minutes, a border patrol officer encountered and arrested the group. Castillo-Mendez was ultimately charged with attempted illegal reentry under 8 U.S.C. § 1326(a), (b).

At trial, the government sought to prove that Castillo-Mendez specifically intended to enter free from official restraint. As part of the government's affirmative case, Jason LeClaire, a United States Customs and Border Patrol agent, testified that around the time Castillo-Mendez, Castillo-Ramirez, and Teodulo jumped the fence, he noticed a sensor go off suggesting that someone had crossed the border. He further explained that about ten minutes later, he saw a group of three men move from behind a rock pile and head north. He explained that he did not see the men for approximately ten minutes after the sensor alerted. LeClaire alerted another border patrol agent, Kalina Massie, who drove to the location and confronted the men. Massie provided additional testimony, explaining that the men "appeared to be hiding," although she could not recall in what position. Massie testified that when she walked up to the men, Castillo-Mendez stood, raised his hands, and said "you got us." Massie concluded by stating that Castillo-Mendez made no attempt to run or resist arrest and was cooperative in answering her questions.

Castillo-Mendez sought to rebut the government's showing that he specifically intended to enter free from official restraint by showing that he actually intended to flee from the smugglers and enter border patrol custody. [2] To that end, Castillo-Mendez and Castillo-Ramirez testified as to their state of mind at the time they crossed the border. Castillo-Mendez explained that when he jumped the border fence, he intended to "free [him]self from the coyotes" and knew that he would be caught by border patrol agents. He further testified that he intended to surrender to the border patrol agents upon entering the **\*834** United States. Castillo-Ramirez provided similar testimony, explaining that he believed the smugglers would beat them up or kill them if they did not cross over the

border, and that he "felt safer with the immigration officers." Castillo-Ramirez added that he knew they would ultimately be caught by border agents.

Castillo-Mendez also testified that the men walked northward after crossing, instead of immediately turning themselves in, because the smugglers were observing them and they feared for their safety. Similarly, Castillo-Ramirez testified that the men did not immediately turn themselves in because they feared the smugglers had weapons pointed at them. Castillo-Mendez testified that when the border patrol agents caught him, he "felt [he]'d been saved." According to Castillo-Mendez, when border patrol encountered them, the men sat on the ground to show that they "were giving up." According to Castillo-Ramirez, the men wanted to surrender but were seated because of his injured ankle. He explained that the men were resting on the ground because they were "tired,[ ] couldn't walk anymore, [his] ankle was injured, and [they] knew that the Border Patrol was going to get to where [they] were at."

After the defense rested, the district court instructed the jury on the elements of attempted illegal reentry, including, critically, that "[t]he government has to prove that the defendant had the specific intent to enter the United States free of official restraint." [3] After beginning deliberations, the jury submitted two questions to the court: (1) "What does official restraint mean?" and (2) "Does intent to enter start between T.J. [Tijuana] or on the day of the crime? The fence?"

After discussing the first question with the government and defense counsel, the district court instructed the jury that

> For an alien to be under official restraint, that alien must be under continuous governmental observation or surveillance from the moment he attempts to make entry into the United States until the moment he's apprehended. In other words, the person must be under official observation or surveillance at all times during and after he attempts to make physical entry into the United States. Such surveillance can take the form of physical observation by a government official or any kind of electronic surveillance. Additionally, the alien

> must lack the freedom to go at large and mix with the population. But the alien need not be aware that he's under surveillance. Any alien who is under this kind of sustained surveillance has not entered *835 ... the United States freely of official restraint.

Castillo-Mendez does not challenge the supplemental instruction the district court gave in response to the second question and accordingly we do not address it. [4]

After the court gave these supplemental instructions, each side was allotted five minutes to make additional arguments. The jury was then excused, and the district judge acknowledged that the supplemental instruction on official restraint "kind of missed the mark." Defense counsel requested that the district court withdraw the official restraint instruction, but the court responded, "not a chance."

The jury returned a guilty verdict. Castillo-Mendez timely appealed.

## II.

[1]  [2]  We review de novo whether the district court's response to a jury question correctly states the law. *United States v. Verduzco*, 373 F.3d 1022, 1030 n.3 (9th Cir. 2004). When a jury demonstrates confusion about a controlling legal principle, we also review whether the district court "eliminated that confusion." *United States v. Walker*, 575 F.2d 209, 213–14 (9th Cir. 1978); *see also Bollenbach v. United States*, 326 U.S. 607, 612–13, 66 S.Ct. 402, 90 L.Ed. 350 (1946) (instructing district courts to "clear ... away with concrete accuracy" any jury confusion when the jury asks questions); *Verduzco, 373 F.3d at 1031* (requiring district courts to answer jury questions "with particular care and acumen.").

[3]  [4]  Even if we determine an instruction was erroneous or failed to clear up confusion, we must still review whether the error was harmless. A jury instruction that erroneously describes an element of the offense "is harmless only if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *United*

*States v. Liu*, 731 F.3d 982, 992 (9th Cir. 2013) (citation and internal quotation marks omitted).

### III.

### A.

### 1.

At the outset, we briefly review the development of our attempted illegal reentry law. Section 1326(a) makes it a crime to "enter[ ], attempt[ ] to enter or ... at any time [be] found in, the United States" after a previous removal. 8 U.S.C. § 1326(a). We have held that accordingly, the statute consists of three distinct offenses: completed illegal reentry, attempted illegal reentry, and "found in," illegal reentry. *United States v. Pacheco-Medina*, 212 F.3d 1162, 1165 (9th Cir. 2000). Our early illegal reentry case law held that all three types of illegal reentry were general intent *malum prohibitum* regulatory offenses, wherein the government did not have to prove that the defendant acted under any particular mens rea. See 🚩 *Pena-Cabanillas v. United States*, 394 F.2d 785, 788–90 (9th Cir. 1968). Thirty years later in *Gracidas-Ulibarry*, we recognized that the statute used the word "attempt," which at common law **\*836** required the government to show specific intent. *United States v. Gracidas-Ulibarry*, 231 F.3d 1188, 1192–95 (9th Cir. 2000) (en banc). We thus made clear that while "found in" and completed illegal reentry are general intent crimes which require no mens rea, attempted illegal reentry is a specific intent crime which requires the government to show the mens rea that the defendant specifically intended to reenter. *Id.* at 1195.

The separate offenses continued to develop on separate tracks in our case law, and today, each separate offense has a unique set of elements. *Vazquez-Hernandez*, 849 F.3d at 1226 ("[T]he elements that the government is required to prove in 'found in' cases are not directly parallel to those required to prove attempted illegal reentry[.]").

We first outlined the elements of attempted illegal reentry in *Gracidas-Ulibarry*. We explained that "(1) the defendant

had the purpose, i.e., conscious desire, to reenter the United States without the express consent of the Attorney General; (2) the defendant committed an overt act that was a substantial step towards reentering without that consent; (3) the defendant was not a citizen of the United States; (4) the defendant had previously been lawfully denied admission, excluded, deported or removed from the United States; and (5) the Attorney General had not consented to the defendant's attempted reentry." *Id.* at 1196. We held that the first element, conscious desire to reenter, meant that the defendant had the specific intent to reenter. *Id.* Five years later in *Lombera-Valdovinos*, we specified more precisely that conscious desire to reenter meant specific intent to reenter free from official restraint. *429 F.3d at 928.* In doing so, we explained that specific intent to enter free from official restraint meant intent to go "at large within the United States" and "mix with the population." *Id.* at 929 (quoting *United States v. Hernandez-Herrera*, 273 F.3d 1213, 1218 (9th Cir. 2001)).

We then recognized that a defendant charged with attempted illegal reentry can undermine the government's efforts to show specific intent to enter free from official restraint by showing that he entered with the intent to be taken into custody. In *Lombera-Valdovinos*, for example, we held that a defendant who entered intending to be taken into jail did not enter with the specific intent to be free from official restraint because he made "no effort to evade official restraint" and instead "*sought* such restraint." *Id.* at 930 (emphasis in original); *see also United States v. Argueta-Rosales*, 819 F.3d 1149, 1156–57 (9th Cir. 2016) (holding that a defendant who believed he was chased by an armed gunman entered the United States to seek border patrol custody and lacked intent to enter free from official restraint).

We recently described another way that a defendant charged with attempted illegal reentry can undermine the government's showing that he specifically intended to enter free from official restraint: by showing that he entered knowing he was under official restraint. In *Vazquez-Hernandez*, the defendant washed car windows each day in the border crossing pre-inspection area, technically on the *United States side of the border.* 849 F.3d at 1223, 1227. The defendant argued that he did not intend to enter free from official restraint because he knew he was under constant

government surveillance from his daily experience in the area. *Id.* We held that a defendant who knew he was under constant government surveillance did not enter with the intent to be free from official restraint. **\*837** *Id.* at 1227. In other words, another way to show a lack of specific intent to go at large in the United States is through a lack of intent to evade or be free from constant government surveillance. *Id.* (describing the standard as "intent to evade official surveillance"); *see also Lombera-Valdovinos,* 429 F.3d at 930 (suggesting, without clearly holding, that knowledge of constant surveillance is one way to show a lack of intent to go at large).

**2.**

Here, Castillo-Mendez's defense relied on our cases holding that a defendant who intended to enter border patrol custody did not specifically intend to enter free from official restraint. *Argueta-Rosales,* 819 F.3d at 1156–57; *Lombera-Valdovinos,* 429 F.3d at 928. The central issue at trial was whether Castillo-Mendez crossed the border intending to flee from his smugglers and be taken into custody, or rather did so with the specific intent to enter without apprehension and roam freely in the United States.

As previously noted, the jury seemed to struggle with this very question. Initially, the district court had instructed the jury that "specific intent to enter the United States free of official restraint" was an element of the crime. The jury asked what official restraint meant in reference to Castillo-Mendez's requisite intent,[5] and when intent is formed. The jury's questions reveal that they were confused regarding the district court's instruction on specific intent to enter free from official restraint, which was central to Castillo-Mendez's defense. *Walker,* 575 F.2d at 213 ("On appeal, we may infer from questions asked by the jury that it was confused about a controlling legal principle.").

Instead of clearing up the jury's confusion regarding specific intent to be free from official restraint, the district court provided the jury with a misleading supplemental instruction. The district court instructed "For an alien to be under official restraint, that alien must be under continuous governmental observation or surveillance.... But the alien need not be aware that he's under surveillance." The district court drew this supplemental instruction from our "found in" case law. Castillo-Mendez's counsel objected to the supplemental instruction precisely because it derived from "found in," not attempt, cases, but the district court responded "I really don't understand why you contend there would be a distinction between whether it's a found-in or an attempted case."[6] There are, however, as discussed *supra,* significant differences between the separate offenses of "found in" and attempted illegal reentry. By relying on "found in" rather than attempted illegal reentry cases, the district court committed two major errors in its supplemental instruction.

**[5] [6]** First, the district court's instruction erroneously focused on whether Castillo-Mendez **\*838** was, in fact, under official restraint when he entered. The district court began its supplemental instruction with "For an alien to be under official restraint ...," and each subsequent sentence addressed *when* a defendant is under official restraint.[7] Whether a defendant was actually under official restraint at the time he entered, however, is irrelevant to the crime of attempted illegal reentry. In attempted illegal reentry cases, official restraint functions only as a way of elucidating the defendant's requisite mens rea of specific intent to enter free from official restraint. The only element of attempted illegal reentry which makes reference to official restraint is the mens rea element of "specific intent to reenter 'free from official restraint.' " *See Lombera-Valdovinos,* 429 F.3d at 929. What matters therefore in attempted illegal reentry cases is the defendant's state of mind—regardless of whether he was, as a matter of fact, under official restraint. In "found in" cases, on the other hand, the government must prove that at the time a defendant entered, he was free from official restraint as a matter of fact, irrespective of his knowledge or intent to avoid that restraint. *United States v. Bello-Bahena,* 411 F.3d 1083, 1087 (9th Cir. 2005); *see also United States v. Leos-Maldonado,* 302 F.3d 1061, 1063–64 (9th Cir. 2002) (distinguishing between fact of official restraint and intent, and holding that the former is not required for attempted illegal reentry but the latter is).

The supplemental instruction should have instead focused on Castillo-Mendez's specific intent to enter without being apprehended—without making reference to the factual matter of whether he was under official restraint when he attempted to enter. For example, the court could have reminded the jury of its original charge, that the jury must find that the defendant specifically intended to enter free from official restraint, and,

17 Cal. Daily Op. Serv. 8036, 2017 Daily Journal D.A.R. 7996

as used in that context, official restraint means being detected, apprehended, and prevented from going at large within the United States, or mixing with the population. *Lombera-Valdovinos*, 429 F.3d at 929–30.

**[7]** Second, and as a result of the first error, the district court erroneously instructed the jury that the defendant "need not be aware that he's under surveillance" or official restraint. Because "found in" is a general intent crime, *see Gracidas-Ulibarry*, 231 F.3d at 1195; *Matter of Pierre et al.*, 14 I. & N. Dec. 467, 469 (BIA 1973), the government can prove the fact of official restraint in "found in" cases "regardless of whether the alien was aware of the surveillance or intended to evade inspection." *United States v. Ruiz-Lopez*, 234 F.3d 445, 448 (9th Cir. 2000); *see also Pacheco-Medina*, 212 F.3d at 1164 (citing *Matter of Pierre*, 14 I. & N. Dec. at 469) (explaining that official restraint can be "unbeknownst to the alien"). By drawing from "found in" cases, the district court's instruction told the jury that it did not matter whether Castillo-Mendez knew or did not know about official restraint, or in effect, that his mental state was irrelevant.

**[8]** **[9]** This cannot be correct, as the critical inquiry in attempted illegal reentry cases is the defendant's mental state—whether he specifically intended to enter free from official restraint. *Lombera-Valdovinos*, 429 F.3d at 929. Unlike "found in" illegal reentry, attempted illegal reentry is a specific intent crime, and the government must show specific intent to enter **\*839** free from official restraint as an element of the crime. *Id.* at 928; *Gracidas-Ulibarry*, 231 F.3d at 1195. Whether a defendant knew about official restraint may well be relevant to this inquiry. For example, Castillo-Mendez's testimony that he saw a border patrol car and plane before he crossed bolstered his defense that he entered intending to go into custody. Likewise, in *Vazquez-Hernandez* the defendant's argument that he knew he was under surveillance at the border supported his defense that he did not enter intending to go at large in the *United States*. 849 F.3d at 1227. By drawing from "found in" cases, and stating that Castillo-Mendez "need not be aware" of official restraint, the district court suggested that his mental state was irrelevant; a result that is confusing and legally inaccurate. It was error for the district court to have included this sentence.[8]

In sum, instead of clearing up the jury's confusion and responding with legal accuracy, the district court drew from inapposite "found in" illegal reentry cases, which led it to provide a legally incorrect answer that further confused the jury. *Walker*, 575 F.2d at 213 (citing *Powell v. United States*, 347 F.2d 156, 158 (9th Cir. 1965)) (instructing district courts not to "confuse or leave an erroneous impression in the minds of the jurors"). We must decide whether these errors were prejudicial.

**B.**

**[10]** **[11]** We reverse and remand for a new trial where a district court's supplemental instruction failed to clear away jury confusion with its answer or when the answer was legally incorrect, and when such error or confusion was prejudicial to the defendant. *Id.* at 214 (reversing even where the court's statement was legally correct but "when viewed in light of the jury's [ ] question [wa]s confusing"). An erroneous jury instruction that describes an element of the offense "is harmless only if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Liu*, 731 F.3d at 992 (internal quotation marks and citation omitted). Here, the district court's legally erroneous and confusing supplemental instruction was prejudicial.

Specific intent to enter free from official restraint is an element of attempted illegal reentry and here it was the central and contested issue at trial. *Gracidas-Ulibarry*, 231 F.3d at 1190. Nearly all of the testimony and evidence focused on whether Castillo-Mendez intended to enter "free from official restraint" or if instead he intended to flee from dangerous smugglers and surrender to border patrol agents. There was evidence on both sides. For example, evidence in support of the former interpretation included the fact that he arranged to pay the smugglers only if the border crossing was successful, the border patrol agents' testimony that the men were hiding, and Castillo-Mendez's failure to explain his fear of the smugglers when apprehended. On the other hand, there was evidence in support of the latter interpretation, such as Castillo-Mendez's and Castillo-Ramirez's testimony about their intent to flee from the smugglers, their belief **\*840** that the smugglers had weapons, and their reasons for sitting on the ground. With clear and legally correct instructions, the jury could have weighed this conflicting

evidence, assessed the credibility of the witnesses, and come to a proper determination of guilt or innocence.

This was the central element contested at trial and there is evidence to support either outcome. As demonstrated by its questions, the jury was likely confused about this singularly important issue, and the district court's supplemental instruction failed to remove this confusion. *Walker,* 575 F.2d at 213. As a result, it is not clear "beyond a reasonable doubt that a rational jury would have" convicted Castillo-Mendez on this record. *Liu,* 731 F.3d at 992.

IV.

For the foregoing reasons, we reverse Castillo-Mendez's conviction and remand for a new trial. On remand, the district court should instruct the jury that to convict Castillo-Mendez of attempted illegal reentry the government must prove specific intent to enter free from official restraint. Should the jury again ask for the definition of official restraint, the district court should remind the jury that official restraint is relevant only as a part of the defendant's requisite mens rea, and answer with a definition drawn from attempted illegal reentry cases, such as "you must find that the defendant had the specific intent to enter free from official restraint, which means intent to enter without being detected, apprehended, or prevented from going at large within the United States and mixing with the population."

**REVERSED AND REMANDED.**

**All Citations**

868 F.3d 830, 17 Cal. Daily Op. Serv. 8036, 2017 Daily Journal D.A.R. 7996

## Footnotes

1    We have jurisdiction under 28 U.S.C. § 1291.

2    Castillo-Mendez's counsel also requested an instruction on the defense of necessity, which the district court included in its charge. The necessity defense dovetailed with his theory of the case, that he entered intending to escape dangerous smugglers.

3    The district court instructed the jury that attempted illegal reentry had six elements: (1) "[T]he defendant had been removed from the United States." (2) "[T]he defendant had the conscious desire to reenter the United States without consent." (3) "[T]he defendant was an alien." (4) The defendant "did not have consent ... to come back into the United States." (5) "[T]he defendant did something that was a substantial step toward committing the crime of attempted illegal reentry." (6) "[T]he defendant had the specific intent to enter the United States free from official restraint." The court derived the first five elements from the Ninth Circuit Committee on Model Criminal Jury Instructions, Manual of Model Criminal Jury Instruction for the District Courts of the Ninth Circuit, 9.7 (2010), and the sixth element from *United States v. Lombera-Valdovinos,* 429 F.3d 927, 928 (9th Cir. 2005). The Ninth Circuit Committee on Model Criminal Jury Instructions has since amended the model jury instructions to include six elements, much in line with the district court's instructions here. However, it would be more precise to instruct that attempted illegal reentry has five elements because we have interpreted the second element, "conscious desire to reenter," to mean "specific intent to enter free from official restraint." *See id.*; *United States v. Vazquez-Hernandez,* 849 F.3d 1219, 1225 (9th Cir. 2017).

4    As to the jury's second question, the district court instructed:

[Y]ou should consider all of the evidence bearing on the defendant's intentions, whether arising before, during, or after the moment of the attempted physical entry.... However, you may not find that the defendant intended to enter the United States free of official restraint unless ... the defendant had the required intent to enter the U.S. at the moment he attempted to make entry. [T]here must be a concurrence of the actions

**United States v. Castillo-Mendez, 868 F.3d 830 (2017)**

17 Cal. Daily Op. Serv. 8036, 2017 Daily Journal D.A.R. 7996

that amount to the substantial step or the attempt and the frame of mind of I want to get in without being apprehended.

5    The sole place that "official restraint" arose in the district court's charge was in reference to the requisite mens rea, or the specific intent to enter free from official restraint.

6    We are sympathetic to the district court's error as our Model Criminal Jury Instructions are far from a model of clarity on this point. Although the jury instructions recognize the three distinct offenses in the separate instructions for completed (9.6), attempted (9.7), and "found in" (9.8) illegal reentry, the various commentary are less than clear in adhering to these distinctions. Ninth Circuit Committee on Model Criminal Jury Instructions, Manual of Model Criminal Jury Instruction for the District Courts of the Ninth Circuit, 9.6–9.8 (2010, rev'd 2017). For example, the commentary for completed illegal reentry, a crime which has no mens rea element, suggests that the mens rea is specific intent, and cites to attempted illegal reentry cases.

*See id.* at 9.6; *see also* *Gracidas-Ulibarry*, 231 F.3d at 1195.

7    Moreover, in the government's supplemental argument, the prosecutor suggested that the jury should look to the fact of official restraint in determining Castillo-Mendez's intent when he crossed the border.

8    Castillo-Mendez also argued that the district court erred in discussing constant surveillance throughout its supplemental instruction. We agree that given Castillo-Mendez's theory of the case, that he entered intending to be taken into custody, it would have been clearer had the district court focused its supplemental instruction on intent to enter without being apprehended, rather than repeatedly discussing constant surveillance.

By contrast, in a case like *Vazquez-Hernandez* where the defendant's theory relied principally on his knowledge of constant surveillance, an instruction focusing on constant surveillance might be appropriate. 849 F.3d at 1227.

---

**End of Document**                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI     Document 58-6     Filed 11/10/20     Page 69 of 912

204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by United States v. Kayarth, 10th Cir.(Kan.), July 30, 2020

139 S.Ct. 2319
Supreme Court of the United States.

UNITED STATES, Petitioner
v.
Maurice Lamont DAVIS and Andre Levon Glover

No. 18-431
|
Argued April 17, 2019
|
Decided June 24, 2019

**Synopsis**

**Background:** Two defendants were convicted in the United States District Court for the Northern District of Texas, Reed Charles O'Connor, J., 2016 WL 4218056 and 2016 WL 4218078, of Hobbs Act robberies and conspiracy to commit Hobbs Act robbery, and one of the defendants was also convicted of being a felon in possession of a firearm, and their sentences were enhanced based on using, carrying, or possessing a firearm in connection with a federal crime of violence. Defendants appealed. The United States Court of Appeals for the Fifth Circuit, 677 Fed.Appx. 933, affirmed. The Supreme Court granted certiorari, vacated the judgment, and remanded. On remand, the Court of Appeals, 903 F.3d 483, affirmed in part, vacated in part, and remanded. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Gorsuch, held that:

[1] residual clause of definition of violent felony, in federal statute providing mandatory minimum sentences based on using, carrying, or possessing a firearm in connection with a federal crime of violence, was unconstitutionally vague under due process and separation of powers principles, abrogating

United States v. Douglas, 907 F. 3d 1, Ovalles v. United States, 905 F. 3d 1231, and United States v. Barrett, 903 F. 3d 166, and

[2] presumption of constitutionality could not be applied to save the residual clause by deeming a case-specific approach rather than a categorical approach to be applicable.

Affirmed in part, vacated in part, and remanded.

Justice Kavanaugh filed a dissenting opinion, in which Justices Thomas and Alito joined, and Chief Justice joined in part.

**Procedural Posture(s):** Appellate Review.

West Headnotes (16)

**[1]** **Constitutional Law** 🔑 Judicial rewriting or revision

**Constitutional Law** 🔑 Invalidation, annulment, or repeal of statutes

When Congress passes an unconstitutionally vague law, the role of courts under the Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again.

8 Cases that cite this headnote

**[2]** **Constitutional Law** 🔑 Sentencing and punishment

**Constitutional Law** 🔑 Statutory minimum, maximum, or mandatory sentences

**Weapons** 🔑 Violation of other rights or provisions

The residual clause of the definition of violent felony in a federal statute providing mandatory minimum sentences for using or carrying a firearm during and in relation to a federal crime of violence, or possessing a firearm in furtherance of a federal crime of violence, which definition treats as a crime of violence a felony that by its nature involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense, is unconstitutionally vague under due process and separation of powers principles;

abrogating United States v. Douglas, 907 F.

United States v. Davis, 139 S.Ct. 2319 (2019)

Case 3:20-cv-07721-SI   Document 58-6   Filed 11/10/20   Page 70 of 912

204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

3d 1, 🚩 *Ovalles v. United States*, 905 F. 3d 1231, and 🚩 *United States v. Barrett*, 903 F. 3d 166.

U.S. Const. Amend. 5; 🚩 18 U.S.C.A. § 924(c)(3)(B).

1149 Cases that cite this headnote

**[3]**   **Constitutional Law** 🔑 Certainty and definiteness; vagueness

Vague laws contravene the first essential of due process of law that statutes must give people of common intelligence fair notice of what the law demands of them. U.S. Const. Amend. 5.

16 Cases that cite this headnote

**[4]**   **Constitutional Law** 🔑 Criminal Law

**Constitutional Law** 🔑 Encroachment on legislature

Vague criminal laws undermine the Constitution's separation of powers and the democratic self-governance it aims to protect, because only the people's elected representatives in the legislature are authorized to make an act a crime.

6 Cases that cite this headnote

**[5]**   **Constitutional Law** 🔑 Criminal Law

**Constitutional Law** 🔑 Encroachment on legislature

Vague criminal statutes threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide.

11 Cases that cite this headnote

**[6]**   **Constitutional Law** 🔑 Sentencing and punishment

**Constitutional Law** 🔑 Judgment and Sentence

Under due process principles and constitutional separation of powers, the imposition of criminal punishment cannot be made to depend on a judge's estimation of the degree of risk posed by a crime's imagined ordinary case. U.S. Const. Amend. 5.

17 Cases that cite this headnote

**[7]**   **Criminal Law** 🔑 Creation and Definition of Offenses

In ordinary speech, the word "offense" in a criminal statute can carry at least two possible meanings: it can refer to a generic crime, say, the crime of fraud or theft in general, or it can refer to the specific acts in which an offender engaged on a specific occasion.

3 Cases that cite this headnote

**[8]**   **Statutes** 🔑 Similar or related statutes

Courts normally presume that the same language in related statutes carries a consistent meaning.

7 Cases that cite this headnote

**[9]**   **Statutes** 🔑 Other Statutes

Usually when statutory language is obviously transplanted from other legislation, courts have reason to think it brings the old soil with it.

**[10]**   **Constitutional Law** 🔑 Avoidance of constitutional questions

Under the presumption of constitutionality, courts should, if possible, interpret ambiguous statutes to avoid rendering them unconstitutional.

4 Cases that cite this headnote

**[11]**   **Constitutional Law** 🔑 Avoidance of constitutional questions

The constitutional-doubt canon of statutory construction suggests that courts should construe ambiguous statutes to avoid the need even to address serious questions about their constitutionality.

7 Cases that cite this headnote

**[12]** **Constitutional Law** ⚖ Penal statutes

**Constitutional Law** ⚖ Sentencing and punishment

**Constitutional Law** ⚖ Statutory minimum, maximum, or mandatory sentences

**Weapons** ⚖ Violation of other rights or provisions

The presumption of constitutionality, a canon of construction under which courts should, if possible, interpret ambiguous statutes to avoid rendering them unconstitutional, could not be applied to save from unconstitutional vagueness, under due process and separation of powers principles, residual clause of definition of violent felony in federal statute providing mandatory minimum sentences for using, carrying, or possessing a firearm in connection with federal crime of violence, by deeming a case-specific approach rather than a categorical approach to be applicable to residual clause, where such invocation of the canon would expand the reach of the criminal statute in order to save it; case-specific reading would cause the enhanced penalties to apply to conduct they had not previously been understood to reach, i.e., categorically nonviolent felonies committed in violent ways. U.S. Const. Amend. 5; 🚩 18 U.S.C.A. § 924(c)(3)(B).

290 Cases that cite this headnote

**[13]** **Constitutional Law** ⚖ Rewriting to save from unconstitutionality

Respect for due process and constitutional separation of powers suggests a court may not, in order to save Congress the trouble of having to write a new law, construe a criminal statute to penalize conduct it does not clearly proscribe. U.S. Const. Amend. 5.

3 Cases that cite this headnote

**[14]** **Criminal Law** ⚖ Liberal or strict construction; rule of lenity

The rule of lenity teaches that ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor.

9 Cases that cite this headnote

**[15]** **Criminal Law** ⚖ Liberal or strict construction; rule of lenity

The rule of lenity, under which ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor, is founded on the tenderness of the law for the rights of individuals to fair notice of the law, and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department.

13 Cases that cite this headnote

**[16]** **Constitutional Law** ⚖ Criminal Law

**Constitutional Law** ⚖ Certainty and definiteness in general

The constitutional principles of due process and separation of powers, underlying the rule of lenity, counsel caution before invoking constitutional avoidance to construe a criminal statute to punish conduct that it does not unambiguously proscribe. U.S. Const. Amend. 5.

**West Codenotes**

**Held Unconstitutional**

🚩 18 U.S.C.A. § 924(c)(3)(B)

**Recognized as Unconstitutional**

🚩 18 U.S.C.A. §§ 16(b), 🚩 924(e)(2)(B)(ii)

*Syllabus* [*]

Respondents Maurice Davis and Andre Glover were charged with multiple counts of Hobbs Act robbery and one count of conspiracy to commit Hobbs Act robbery. They were also charged under 🚩 18 U.S.C. § 924(c), which authorizes heightened criminal penalties for using, carrying,

Case 3:20-cv-07721-SI Document 58-6 Filed 11/10/20 Page 72 of 912

United States v. Davis, 139 S.Ct. 2319 (2019)
204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

or possessing a firearm in connection with any federal "crime of violence or drug trafficking crime." § 924(c)(1)(A). "Crime of violence" is defined in two subparts: the elements clause, § 924(c)(3)(A), and the residual clause, § 924(c)(3)(B). The residual clause in turn defines a "crime of violence" as a felony "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." *Ibid.* A jury convicted the men on most of the underlying charges and on two separate § 924(c) charges for brandishing a firearm in connection with their crimes. The Fifth Circuit initially rejected their argument that § 924(c)'s residual clause is unconstitutionally vague, but on remand in light of *Sessions v. Dimaya,* 584 U.S. ——, 138 S.Ct. 1204, 200 L.Ed.2d 549 (2018), the court reversed course and held § 924(c)(3)(B) unconstitutional. It then held that Mr. Davis's and Mr. Glover's convictions on the § 924(c) count charging robbery as the predicate crime of violence could be sustained under the elements clause, but that the other count—which charged conspiracy as a predicate crime of violence—could not be upheld because it depended on the residual clause.

*Held*: Section 924(c)(3)(B) is unconstitutionally vague. Pp. 2325 – 2336.

(a) In our constitutional order, a vague law is no law at all. The vagueness doctrine rests on the twin constitutional pillars of due process and separation of powers. This Court has recently applied the doctrine in two cases involving statutes that bear more than a passing resemblance to § 924(c)(3)(B)'s residual clause—*Johnson v. United States,* 576 U.S. ——, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015), which addressed the residual clause of the Armed Career Criminal Act (ACCA), and *Sessions v. Dimaya,* which addressed the residual clause of 18 U.S.C. § 16. The residual clause in each case required judges to use a "categorical approach" to determine whether an offense qualified as a violent felony or crime of violence. Judges had to disregard how the defendant actually committed the offense and instead imagine the degree of risk that would attend the idealized " 'ordinary case' " of the offense. *Johnson,* 576 U.S., at ——, 135 S.Ct., at 2557. The Court held in each case that the imposition

of criminal punishments cannot be made to depend on a judge's estimation of the degree of risk posed by a crime's imagined "ordinary case." The government and lower courts have long understood § 924(c)(3)(B) to require the same categorical approach. Now, the government asks this Court to abandon the traditional categorical approach and hold that the statute commands a case-specific approach that would look at the defendant's actual conduct in the predicate crime. The government's case-specific approach would avoid the vagueness problems that doomed the statutes in *Johnson* and *Dimaya* and would not yield to the same practical and Sixth Amendment complications that a case-specific approach under the ACCA and § 16 would, but this approach finds no support in § 924(c)'s text, context, and history. Pp. 2325 – 2328.

(b) This Court has already read the nearly identical language of § 16(b) to mandate a categorical approach. See *Leocal v. Ashcroft,* 543 U.S. 1, 7, 125 S.Ct. 377, 160 L.Ed.2d 271. And what is true of § 16(b) seems at least as true of § 924(c)(3)(B). The government claims that the singular term "offense" carries the "generic" meaning in connection with the elements clause but a "specific act" meaning in connection with the residual clause, but nothing in § 924(c)(3)(B) rebuts the presumption that the single term "offense" bears a consistent meaning. This reading is reinforced by the language of the residual clause itself, which speaks of an offense that, "by its nature," involves a certain type of risk. Pp. 2327 – 2330.

(c) The categorical reading is also reinforced by § 924(c)(3)(B)'s role in the broader context of the federal criminal code. Dozens of federal statutes use the phrase "crime of violence" to refer to presently charged conduct. Some cross-reference § 924(c)(3)'s definition, while others are governed by the virtually identical definition in § 16. The choice appears completely random. To hold that § 16(b) requires the categorical approach while § 924(c)(3)(B) requires the case-specific approach would make a hash of the federal criminal code. Pp. 2329 – 2330.

(d) Section 924(c)(3)(B)'s history provides still further evidence that it carries the same categorical-approach

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 73 of 912

United States v. Davis, 139 S.Ct. 2319 (2019)

204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

command as 🚩 § 16(b). When Congress enacted the definition of "crime of violence" in 🚩 § 16 in 1984, it also employed the term in numerous places in the Act, including 🚩 § 924(c). The two statutes, thus, were originally designed to be read together. And when Congress added a definition of "crime of violence" to 🚩 § 924(c) in 1986, it copied the definition from 🚩 § 16 without making any material changes to the language of the residual clause, which would have been a bizarre way of suggesting that the two clauses should bear drastically different meanings. Moreover, 🚩 § 924(c) originally prohibited the use of a firearm in connection with *any* federal felony, before Congress narrowed 🚩 § 924(c) in 1984 by limiting its predicate offenses to "crimes of violence." The case-specific reading would go a long way toward nullifying that limitation and restoring the statute's original breadth. Pp. 2330 – 2332.

(e) Relying on the canon of constitutional avoidance, the government insists that if the case-specific approach does not represent the best reading of the statute, it is nevertheless the Court's duty to adopt any "fairly possible" reading to save the statute from being unconstitutional. But it is doubtful the canon could play a proper role in this case even if the government's reading were "possible." This Court has sometimes adopted the *narrower* construction of a criminal statute to avoid having to hold it unconstitutional if it were construed more broadly, but it has not invoked the canon to *expand* the reach of a criminal statute in order to save it. To do so would risk offending the very same due process and separation of powers principles on which the vagueness doctrine itself rests and would sit uneasily with the rule of lenity's teaching that ambiguities about a criminal statute's breadth should be resolved in the defendant's favor. Pp. 2332 – 2333.

🚩 903 F.3d 483, affirmed in part, vacated in part, and remanded.

GORSUCH, J., delivered the opinion of the Court, in which GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. KAVANAUGH, J., filed a dissenting opinion, in which THOMAS and ALITO, JJ., joined, and in which ROBERTS, C.J., joined as to all but Part II–C.

**\*2321** ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

**Attorneys and Law Firms**

Noel J. Francisco, Solicitor General, Department of Justice, Washington, DC, for Petitioner.

Noel J. Francisco, Solicitor General, Brian A. Benczkowski, Assistant Attorney General, Eric J. Feigin, Erica L. Ross, Assistants to the Solicitor, General, Robert A. Parker, John P. Taddei, Attorneys, Department of Justice, Washington, DC, for Petitioner.

Jeffrey T. Green, Tobias S. Loss-Eaton, Chike Croslin, Gabriel Schonfeld, Sidley Austin LLP, Washington, DC, Sarah O'Rourke Schrup, Northwestern Supreme, Court Practicum, Chicago, IL, Brandon E. Beck, J. Matthew Wright, K. Joel Page, Jason Hawkins, Federal Defender for N. District of Texas, Lubbock, TX, J. Joseph Mongaras, Tiffany Talamentez, Udashen & Anton, Dallas, TX, for Respondents.

**Opinion**

Justice GORSUCH delivered the opinion of the Court.

**\*2323** **[1]** In our constitutional order, a vague law is no law at all. Only the people's elected representatives in Congress have the power to write new federal criminal laws. And when Congress exercises that power, it has to write statutes that give ordinary people fair warning about what the law demands of them. Vague laws transgress both of those constitutional requirements. They hand off the legislature's responsibility for defining criminal behavior to unelected prosecutors and judges, and they leave people with no sure way to know what consequences will attach to their conduct. When Congress passes a vague law, the role of courts under our Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again.

**[2]** Today we apply these principles to 🚩 18 U.S.C. § 924(c). That statute threatens long prison sentences for anyone who uses a firearm in connection with certain other federal crimes. But *which* other federal crimes? The statute's residual clause points to those felonies "that by [their] nature, involv[e] a substantial risk that **\*2324** physical force against the person or property of another may be used in the course of committing the offense." 🚩 § 924(c)(3)(B). Even the government admits that this language, read in the way nearly everyone (including the government) has long understood it,

provides no reliable way to determine which offenses qualify as crimes of violence and thus is unconstitutionally vague. So today the government attempts a new and alternative reading designed to save the residual clause. But this reading, it turns out, cannot be squared with the statute's text, context, and history. Were we to adopt it, we would be effectively stepping outside our role as judges and writing a new law rather than applying the one Congress adopted.

I

After Maurice Davis and Andre Glover committed a string of gas station robberies in Texas, a federal prosecutor charged both men with multiple counts of robbery affecting interstate commerce in violation of the Hobbs Act, 18 U.S.C. § 1951(a), and one count of conspiracy to commit Hobbs Act robbery. The prosecutor also charged Mr. Davis with being a felon in possession of a firearm. In the end, a jury acquitted Mr. Davis of one robbery charge and otherwise found the men guilty on all counts. And these convictions, none of which are challenged here, authorized the court to impose prison sentences of up to 70 years for Mr. Davis and up to 100 years for Mr. Glover.

But that was not all. This appeal concerns *additional* charges the government pursued against the men under § 924(c). That statute authorizes heightened criminal penalties for using or carrying a firearm "during and in relation to," or possessing a firearm "in furtherance of," any federal "crime of violence or drug trafficking crime." § 924(c)(1)(A). The statute proceeds to define the term "crime of violence" in two subparts—the first known as the elements clause, and the second the residual clause. According to § 924(c)(3), a crime of violence is "an offense that is a felony" and

> "(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> > "(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

Violators of § 924(c) face a mandatory minimum sentence of five years in prison, over and above any sentence they receive for the underlying crime of violence or drug trafficking crime. The minimum sentence rises to 7 years if the defendant brandishes the firearm and 10 years if he discharges it. Certain types of weapons also trigger enhanced penalties—for example, a defendant who uses a short-barreled shotgun faces a minimum sentence of 10 years. And repeat violations of § 924(c) carry a minimum sentence of 25 years. [1]

At trial, the government argued that Mr. Davis and Mr. Glover had each committed two separate § 924(c) violations by brandishing a short-barreled shotgun in connection with their crimes. Here, too, the jury agreed. These convictions yielded a mandatory minimum sentence for each man of 35 years, which had to run consecutively **\*2325** to their other sentences. Adding the § 924(c) mandatory minimums to its discretionary sentences for their other crimes, the district court ultimately sentenced Mr. Glover to more than 41 years in prison and Mr. Davis to more than 50 years.

On appeal, both defendants argued that § 924(c)'s residual clause is unconstitutionally vague. At first, the Fifth Circuit rejected the argument. *United States v. Davis,* 677 Fed.Appx. 933, 936 (2017) (*per curiam*). But after we vacated its judgment and remanded for further consideration in light of our decision in *Sessions v. Dimaya,* 584 U.S. ——, 138 S.Ct. 1204, 200 L.Ed.2d 549 (2018), striking down a different, almost identically worded statute, the court reversed course and held § 924(c)(3)(B) unconstitutional. 903 F.3d 483, 486 (2018) (*per curiam*). It then held that Mr. Davis's and Mr. Glover's convictions on one of the two § 924(c) counts, the one that charged *robbery* as a predicate crime of violence, could be sustained under the elements clause. But it held that the other count, which charged *conspiracy* as a predicate crime of violence, depended on the residual clause; and so it vacated the men's convictions and sentences on that count.

Because the Fifth Circuit's ruling deepened a dispute among the lower courts about the constitutionality of § 924(c)'s residual clause, we granted certiorari to resolve the question. 586 U.S. ——, 139 S.Ct. 782, 202 L.Ed.2d 511 (2018). [2]

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 75 of 912

United States v. Davis, 139 S.Ct. 2319 (2019)
204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

## II

**[3]** **[4]** **[5]** Our doctrine prohibiting the enforcement of vague laws rests on the twin constitutional pillars of due process and separation of powers. See *Dimaya*, 584 U.S., at —— – ——, 138 S.Ct., at 1212–1213 (plurality opinion); *id.*, at —— – ——, 138 S.Ct., at 1224–1228 (GORSUCH, J., concurring in part and concurring in judgment). Vague laws contravene the "first essential of due process of law" that statutes must give people "of common intelligence" fair notice of what the law demands of them. *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926); see *Collins v. Kentucky*, 234 U.S. 634, 638, 34 S.Ct. 924, 58 L.Ed. 1510 (1914). Vague laws also undermine the Constitution's separation of powers and the democratic self-governance it aims to protect. Only the people's elected representatives in the legislature are authorized to "make an act a crime." *United States v. Hudson*, 7 Cranch 32, 34, 11 U.S. 32, 3 L.Ed. 259 (1812). Vague statutes threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide. See *Kolender v. Lawson*, 461 U.S. 352, 357–358, and n. 7, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89–91, 41 S.Ct. 298, 65 L.Ed. 516 (1921); *United States v. Reese*, 92 U.S. 214, 221, 23 L.Ed. 563 (1876).

In recent years, this Court has applied these principles to two statutes that bear more than a passing resemblance to § 924(c)(3)(B)'s residual clause. In *Johnson v. United States*, 576 U.S. ——, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015), the **\*2326** Court addressed the residual clause of the Armed Career Criminal Act (ACCA), which defined a "violent felony" to include offenses that presented a "serious potential risk of physical injury to another." § 924(e)(2)(B)(ii). The ACCA's residual clause required judges to use a form of what we've called the "categorical approach" to determine whether an offense qualified as a violent felony. Following the categorical approach, judges had to disregard how the defendant actually committed his crime. Instead, they were required to imagine the idealized " 'ordinary case' " of the defendant's crime and then guess whether a " 'serious potential risk of physical injury to another' " would attend its commission. *Id.*, at ——, 135 S.Ct., at 2557. *Johnson* held this judicial inquiry produced "more unpredictability and arbitrariness" when it comes to specifying unlawful conduct than the Constitution allows. *Id.*, at —— – ——, 135 S.Ct., at 2558–2559.

Next, in *Sessions v. Dimaya*, we considered the residual clause of 18 U.S.C. § 16, which defines a "crime of violence" for purposes of many federal statutes. Like § 924(c)(3), § 16 contains an elements clause and a residual clause. The only difference is that § 16's elements clause, unlike § 924(c)(3)'s elements clause, isn't limited to felonies; but there's no material difference in the language or scope of the statutes' residual clauses. [3] As with the ACCA, our precedent under § 16's residual clause required courts to use the categorical approach to determine whether an offense qualified as a crime of violence. *Dimaya*, 584 U.S., at —— – ——, 138 S.Ct., at 1211–1212; see *Leocal v. Ashcroft*, 543 U.S. 1, 7, 10, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004). And, again as with the ACCA, we held that § 16's residual clause was unconstitutionally vague because it required courts "to picture the kind of conduct that the crime involves in the ordinary case, and to judge whether that abstraction presents some not-well-specified-yet-sufficiently-large degree of risk." *Dimaya*, 584 U.S., at ——, 138 S.Ct., at 1216 (internal quotation marks omitted).

**[6]** What do *Johnson* and *Dimaya* have to say about the statute before us? Those decisions teach that the imposition of criminal punishment can't be made to depend on a judge's estimation of the degree of risk posed by a crime's imagined "ordinary case." But does § 924(c)(3)(B) require that sort of inquiry? The government and lower courts have long thought so. For years, almost everyone understood § 924(c)(3)(B) to require exactly the same categorical approach that this Court found problematic in the residual clauses of the ACCA and § 16. [4] Today, the government **\*2327** acknowledges that, if this understanding is correct, then § 924(c)(3)(B) must be held unconstitutional too.

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 76 of 912

United States v. Davis, 139 S.Ct. 2319 (2019)
204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

But the government thinks it has now found a way around the problem. In the aftermath of our decisions holding the residual clauses of the ACCA and § 16(b) unconstitutionally vague, the government "abandon[ed] its longstanding position" that § 924(c)(3)(B) requires a categorical analysis and began urging lower courts to "adopt a new 'case specific' method" that would look to "the 'defendant's actual conduct' in the predicate offense." 903 F.3d at 485. Now, the government tries the same strategy in this Court, asking us to abandon the traditional categorical approach and hold that the statute actually commands the government's new case-specific approach. So, while the consequences in this case may be of constitutional dimension, the real question before us turns out to be one of pure statutory interpretation.

In approaching the parties' dispute over the statute's meaning, we begin by acknowledging that the government is right about at least two things. First, a case-specific approach would avoid the vagueness problems that doomed the statutes in *Johnson* and *Dimaya*. In those cases, we recognized that there would be no vagueness problem with asking a jury to decide whether a defendant's " 'real-world conduct' " created a substantial risk of physical violence. *Dimaya*, 584 U.S., at —— – ——, 138 S.Ct., at 1215–1216; see *Johnson*, 576 U.S., at ——, ——, 135 S.Ct., at 2558, 2561. Second, a case-specific approach wouldn't yield the same practical and Sixth Amendment complications under § 924(c) that it would have under the ACCA or § 16. Those other statutes, in at least some of their applications, required a *judge* to determine whether a defendant's *prior conviction* was for a "crime of violence" or "violent felony." In that context, a case-specific approach would have entailed "reconstruct[ing], long after the original conviction, the conduct underlying that conviction." *Id.*, at ——, 135 S.Ct., at 2652. And having a judge, not a jury, make findings about that underlying conduct would have "raise[d] serious Sixth Amendment concerns." *Descamps v. United States*, 570 U.S. 254, 269–270, 133 S.Ct. 2276, 186 L.Ed.2d 438 (2013). By contrast, a § 924(c) prosecution focuses on the conduct with which the defendant is *currently charged*. The government already has to prove to a jury that the defendant committed all the acts necessary to punish him for the underlying crime of violence or drug trafficking crime. So it wouldn't be that difficult to ask the jury to make an additional finding about whether the defendant's conduct also created a substantial risk that force would be used.

But all this just tells us that it might have been a good idea for Congress to have written a residual clause for § 924(c) using a case-specific approach. It doesn't tell us whether Congress actually wrote such a clause. To answer *that* question, we need to examine the statute's text, context, and history. And when we do that, it becomes clear that the statute simply cannot support the government's newly minted case-specific theory.

III

A

Right out of the gate, the government faces a challenge. This Court, in a unanimous opinion, has already read the nearly identical language of 18 U.S.C. § 16(b) to mandate a categorical approach. And, importantly, the Court did so without so much as mentioning the practical and constitutional **2328** concerns described above. Instead, the Court got there based entirely on the text. In *Leocal*, the Court wrote:

> "In determining whether petitioner's conviction falls within the ambit of § 16, the statute directs our focus to the 'offense' of conviction. See § 16(a) (defining a crime of violence as '*an offense* that has *as an element* the use ... of physical force against the person or property of another' (emphasis added)); § 16(b) (defining the term as '*any other offense* that is a felony and that, *by its nature*, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense' (emphasis added)). This language requires us to look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime." 543 U.S. at 7, 125 S.Ct. 377.

*Leocal* went on to suggest that burglary would always be a crime of violence under § 16(b) "because burglary, *by its nature*, involves a substantial risk that the burglar will use force against a victim in completing the crime," regardless of how any *particular* burglar might act on a specific occasion. *Id.*, at 10, 125 S.Ct. 377 (emphasis added); see also

Case 3:20-cv-07721-SI   Document 58-6   Filed 11/10/20   Page 77 of 912

United States v. Davis, 139 S.Ct. 2319 (2019)
204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

*Dimaya*, 584 U.S., at ——, 138 S.Ct., at 1217 (plurality opinion) (reaffirming that " § 16(b)'s text ... demands a categorical approach"). And what was true of § 16(b) seems to us at least as true of § 924(c)(3)(B): It's not even close; the statutory text commands the categorical approach.

[7] Consider the word "offense." It's true that "in ordinary speech," this word can carry at least two possible meanings. It can refer to "a generic crime, say, the crime of fraud or theft in general," or it can refer to "the specific acts in which an offender engaged on a specific occasion." *Nijhawan v. Holder*, 557 U.S. 29, 33–34, 129 S.Ct. 2294, 174 L.Ed.2d 22 (2009). But the word "offense" appears just once in § 924(c)(3), in the statute's prefatory language. And everyone agrees that, in connection with the elements clause, the term "offense" carries the first, "generic" meaning. Cf. *id.*, at 36, 129 S.Ct. 2294 (similar language of the ACCA's elements clause "refers directly to generic crimes"). So reading this statute most naturally, we would expect "offense" to retain that same meaning in connection with the residual clause. After all, "[i]n all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning." *Cochise Consultancy, Inc.* v. *United States ex rel. Hunt*, 587 U.S. ——, ——, 139 S.Ct. 1507, 1512, —— L.Ed.2d —— (2019).

To prevail, the government admits it must persuade us that the singular term "offense" bears a split personality in § 924(c), carrying the "generic" meaning in connection with the elements clause but then taking on the "specific act" meaning in connection with the residual clause. And, the government suggests, this isn't quite as implausible as it may sound; sometimes the term "offense" *can* carry both meanings simultaneously. To illustrate its point, the government posits a statute defining a "youthful gun crime" as "an offense that has as an element the use of a gun and is committed by someone under the age of 21." Tr. of Oral Arg. 16. This statute, the government suggests, would leave us little choice but to understand the single word "offense" as encompassing both the generic crime and the manner of its commission on a specific occasion. To which we say: Fair enough. It's *possible* for surrounding text to make clear that "offense" carries a double meaning. But absent evidence to the contrary, we presume the term is being used consistently. And nothing in § 924(c)(3)(B) comes close to rebutting that presumption.

**\*2329** Just the opposite. The language of the residual clause itself reinforces the conclusion that the term "offense" carries the same "generic" meaning throughout the statute. Section 924(c)(3)(B), just like § 16(b), speaks of an offense that, "by its nature," involves a certain type of risk. And that would be an exceedingly strange way of referring to the circumstances of a specific offender's conduct. As both sides agree, the "nature" of a thing typically denotes its " 'normal and characteristic quality,' " *Dimaya*, 584 U.S., at ——, 138 S.Ct., at 1217 (quoting Webster's Third New International Dictionary 1507 (2002)), or its " 'basic or inherent features,' " *United States v. Barrett*, 903 F.3d 166, 182 (CA2 2018) (quoting Oxford Dictionary of English 1183 (A. Stevenson ed., 3d ed. 2010)). So in plain English, when we speak of the nature of an offense, we're talking about "what an offense normally—or, as we have repeatedly said, 'ordinarily'—entails, not what happened to occur on one occasion." *Dimaya*, 584 U.S., at ——, 138 S.Ct., at 1217; see *Leocal*, 543 U.S. at 7, 125 S.Ct. 377 (contrasting the "nature of the offense" with "the particular facts [of] petitioner's crime"). [5]

Once again, the government asks us to overlook this obvious reading of the text in favor of a strained one. It suggests that the statute might be referring to the "nature" of the defendant's conduct on a particular occasion. But while this reading may be linguistically feasible, we struggle to see why, if it had intended this meaning, Congress would have used the phrase "by its nature" at all. The government suggests that "by its nature" keeps the focus on the offender's *conduct* and excludes evidence about his *personality*, such as whether he has violent tendencies. But even without the words "by its nature," nothing in the statute remotely suggests that courts are allowed to consider character evidence—a type of evidence usually off-limits during the guilt phase of a criminal trial. Cf. Fed. Rule Evid. 404.

**B**

[8] Things become clearer yet when we consider § 924(c)(3)(B)'s role in the broader context of the federal criminal code. As we've explained, the language of § 924(c)(3)(B) is almost identical to the language of § 16(b), which this Court has read to mandate a categorical approach. And we

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 78 of 912

United States v. Davis, 139 S.Ct. 2319 (2019)
204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

normally presume that the same language in related statutes carries a consistent meaning. See, *e.g.*, *Sullivan v. Stroop*, 496 U.S. 478, 484, 110 S.Ct. 2499, 110 L.Ed.2d 438 (1990).

This case perfectly illustrates why we do that. There are dozens of federal statutes that use the phrase "crime of violence" to refer to presently charged conduct rather than a past conviction. Some of those statutes cross-reference the definition of "crime of violence" in § 924(c)(3), while others are governed by the virtually identical definition in § 16. The choice appears completely random. Reading the similar language in § 924(c)(3)(B) and § 16(b) similarly yields sensibly congruent applications across all these other statutes. But if we accepted the government's invitation to reinterpret § 924(c)(3)(B) as alone endorsing a case-specific approach, we would produce **\*2330** a series of seemingly inexplicable results.

Take just a few examples. If the government were right, Congress would have mandated the case-specific approach in a prosecution for providing explosives to facilitate a crime of violence, 18 U.S.C. § 844(*o*), but the (now-invalidated) categorical approach in a prosecution for providing *information about* explosives to facilitate a crime of violence, § 842(p)(2). It would have mandated the case-specific approach in a prosecution for using false identification documents in connection with a crime of violence, § 1028(b)(3)(B), but the categorical approach in a prosecution for using confidential phone records in connection with a crime of violence, § 1039(e)(1). It would have mandated the case-specific approach in a prosecution for giving someone a firearm to use in a crime of violence, § 924(h), but the categorical approach in a prosecution for giving a minor a handgun to use in a crime of violence, § 924(a)(6)(B)(ii). It would have mandated the case-specific approach in a prosecution for traveling to another State to acquire a firearm for use in a crime of violence, § 924(g), but the categorical approach in a prosecution for traveling to another State to *commit* a crime of violence, § 1952(a)(2). And it would have mandated the case-specific approach in a prosecution for carrying armor-piercing ammunition in connection with a crime of violence, § 924(c)(5), but the categorical approach in a prosecution for carrying a firearm while "in possession of armor piercing ammunition capable

of being fired in that firearm" in connection with a crime of violence, § 929(a)(1).

There would be no rhyme or reason to any of this. Nor does the government offer any plausible account why Congress would have wanted courts to take such dramatically different approaches to classifying offenses as crimes of violence in these various provisions. To hold, as the government urges, that § 16(b) requires the categorical approach while § 924(c)(3)(B) requires the case-specific approach would make a hash of the federal criminal code.

C

Section 924(c)(3)(B)'s history provides still further evidence that it carries the same categorical-approach command as § 16(b). It's no accident that the language of the two laws is almost exactly the same. The statutory term "crime of violence" traces its origins to the Comprehensive Crime Control Act of 1984. There, Congress enacted the definition of "crime of violence" in § 16. § 1001(a), 98 Stat. 2136. It also "employed the term 'crime of violence' in numerous places in the Act," *Leocal*, 543 U.S. at 6, 125 S.Ct. 377, including in § 924(c). § 1005(a), 98 Stat. 2138. At that time, Congress didn't provide a separate definition of "crime of violence" in § 924(c) but relied on § 16's general definition. The two statutes, thus, were originally designed to be read together.

**[9]**  Admittedly, things changed a bit over time. Eventually, Congress expanded § 924(c)'s predicate offenses to include drug trafficking crimes as well as crimes of violence. §§ 104(a)(2)(B)–(C), 100 Stat. 457. When it did so, Congress added a subsection-specific definition of "drug trafficking crime" in § 924(c)(2)—and, perhaps thinking that both terms should be defined in the same place, it also added a subsection-specific definition of "crime of violence" in § 924(c)(3). § 104(a)(2)(F), *id.*, at 457. But even then, Congress didn't write a new definition of that term. Instead, it copied and pasted the definition from § 16 without making any material changes to the language of the residual clause. The government suggests that, in doing so, Congress "intentionally separated" and "decoupled" **\*2331** the two

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 79 of 912

United States v. Davis, 139 S.Ct. 2319 (2019)
204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

definitions. Brief for United States 34, 37. But importing the residual clause from § 16 into § 924(c)(3) almost word for word would have been a bizarre way of suggesting that the two clauses should bear drastically different meanings. Usually when statutory language " 'is obviously transplanted from ... other legislation,' " we have reason to think " 'it brings the old soil with it.' " *Sekhar v. United States,* 570 U.S. 729, 733, 133 S.Ct. 2720, 186 L.Ed.2d 794 (2013).

What's more, when Congress copied § 16(b)'s language into § 924(c) in 1986, it proceeded on the premise that the language *required* a categorical approach. By then courts had, as the government puts it, "beg[u]n to settle" on the view that § 16(b) demanded a categorical analysis. Brief for United States 36–37. Of particular significance, the Second Circuit, along with a number of district courts, had relied on the categorical approach to hold that selling drugs could *never* qualify as a crime of violence because "[w]hile the traffic in drugs is often accompanied by violence," it can also be carried out through consensual sales and thus "does not *by its nature* involve substantial risk that physical violence will be used." *United States v. Diaz,* 778 F.2d 86, 88 (1985). Congress moved quickly to abrogate those decisions. But, notably, it didn't do so by directing a case-specific approach or changing the language courts had read to require the categorical approach. Instead, it accepted the categorical approach as given and simply declared that certain drug trafficking crimes automatically trigger § 924 penalties, regardless of the risk of violence that attends them. §§ 104(a)(2)(B)–(C), 100 Stat. 457.

The government's reply to this development misses the mark. The government argues that § 16(b) had not acquired such a well-settled judicial construction by 1986 that the reenactment of its language in § 924(c)(3)(B) should be presumed to have incorporated the same construction. We agree. See *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, L. P. A.,* 559 U.S. 573, 590, 130 S.Ct. 1605, 176 L.Ed.2d 519 (2010) (interpretations of three courts of appeals "may not have 'settled' the meaning" of a statute for purposes of the reenactment canon). But Congress in 1986 did more than just reenact language that a handful of courts had interpreted to require the categorical approach. It amended § 924(c) specifically to abrogate the *results* of those decisions, without making any attempt to overturn

the categorical *reading* on which they were based. And *that* would have been an odd way of proceeding if Congress had thought the categorical reading erroneous.

There's yet one further and distinct way in which § 924(c)'s history undermines the government's case-specific reading of the residual clause. As originally enacted in 1968, § 924(c) prohibited the use of a firearm in connection with *any* federal felony. § 102, 82 Stat. 1224. The 1984 amendments *narrowed* § 924(c) by limiting its predicate offenses to "crimes of violence." But the case-specific reading would go a long way toward nullifying that limitation and restoring the statute's original breadth. After all, how many felonies don't involve a substantial risk of physical force when they're committed using a firearm—let alone when the defendant brandishes or discharges the firearm?

Recognizing this difficulty, the government assures us that a jury wouldn't be allowed to find a felony to be a crime of violence *solely* because the defendant used a firearm, although it could consider the firearm as a "factor." Tr. of Oral Arg. 8. But the government identifies no textual basis for this rule, and exactly how it would work in practice is anyone's guess. The government says, for example, that **\*2332** "selling counterfeit handbags" while carrying a gun wouldn't be a crime of violence under its approach. *Id.,* at 9. But why not? Because the counterfeit-handbag trade is so inherently peaceful that there's no substantial risk of a violent confrontation with dissatisfied customers, territorial competitors, or dogged police officers? And how are jurors supposed to determine that? The defendant presumably knew the risks of his trade, and he chose to arm himself. See *United States v. Simms,* 914 F.3d 229, 247–248 (CA4 2019) (en banc) (refusing to "condem[n] jurors to such an ill-defined inquiry"). Even granting the government its handbag example, we suspect its approach would result in the vast majority of federal felonies becoming potential predicates for § 924(c) charges, contrary to the limitation Congress deliberately imposed when it restricted the statute's application to crimes of violence.

### D

**[10]    [11]** With all this statutory evidence now arrayed against it, the government answers that it should prevail anyway because of the canon of constitutional avoidance.

United States v. Davis, 139 S.Ct. 2319 (2019)

204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

Maybe the case-specific approach doesn't represent the best reading of the statute—but, the government insists, it is our duty to adopt any " 'fairly possible' " reading of a statute to save it from being held unconstitutional. Brief for United States 45. [6]

**[12]** We doubt, however, the canon could play a proper role in this case even if the government's reading were "possible." True, when presented with two "fair alternatives," this Court has sometimes adopted the *narrower* construction of a criminal statute to avoid having to hold it unconstitutional if it were construed more broadly. *United States v. Rumely,* 345 U.S. 41, 45, 47, 73 S.Ct. 543, 97 L.Ed. 770 (1953); see, *e.g.,* *Skilling v. United States,* 561 U.S. 358, 405–406, and n. 40, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010); *United States v. Lanier,* 520 U.S. 259, 265–267, and n. 6, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). But no one before us has identified a case in which this Court has invoked the canon to *expand* the reach of a criminal statute in order to save it. Yet that is exactly what the government seeks here. Its case-specific reading would cause § 924(c)(3)(B)'s penalties to apply to conduct they have not previously been understood to reach: categorically nonviolent felonies committed in violent ways. See *Simms,* 914 F.3d at 256–257 (Wynn, J., concurring). [7]

**\*2333** **[13]** Employing the avoidance canon to expand a criminal statute's scope would risk offending the very same due process and separation-of-powers principles on which the vagueness doctrine itself rests. See *supra,* at 2325 – 2326. Everyone agrees that Mr. Davis and Mr. Glover did many things that Congress had declared to be crimes; and no matter how we rule today, they will face substantial prison sentences for those offenses. But does § 924(c)(3)(B) require them to suffer additional punishment, on top of everything else? Even if you think it's *possible* to read the statute to impose such additional punishment, it's *impossible* to say that Congress surely intended that result, or that the law gave Mr. Davis and Mr. Glover fair warning that § 924(c)'s mandatory penalties would apply to their conduct. Respect for due process and the separation of powers suggests a court may not, in order to save Congress the trouble of having to write a new law, construe a criminal statute to penalize conduct it does not clearly proscribe.

**[14]** **[15]** **[16]** Employing the canon as the government wishes would also sit uneasily with the rule of lenity's teaching that ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor. That rule is "perhaps not much less old than" the task of statutory "construction itself." *United States v. Wiltberger,* 18 U.S. (5 Wheat.) 76, 95, 5 L.Ed. 37 (1820) (Marshall, C.J.). And much like the vagueness doctrine, it is founded on "the tenderness of the law for the rights of individuals" to fair notice of the law "and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department." *Ibid.*; see *Lanier,* 520 U.S. at 265–266, and n. 5, 117 S.Ct. 1219. Applying constitutional avoidance to narrow a criminal statute, as this Court has historically done, accords with the rule of lenity. By contrast, using the avoidance canon instead to adopt a more expansive reading of a criminal statute would place these traditionally sympathetic doctrines at war with one another. [8]

### IV

What does the dissent have to say about all this? It starts by emphasizing that § 924(c)(3)(B) has been used in "tens of thousands of federal prosecutions" since its enactment 33 years ago. *Post,* at 2337 (opinion of KAVANAUGH, J.). And the dissent finds it "surprising" and "extraordinary" that, after all those prosecutions over all that time, the statute could "suddenly" be deemed unconstitutional. *Post,* at 2337 – 2338. But the government *concedes* that § 924(c)(3)(B) is unconstitutional if it means what everyone has understood it to mean in nearly all of those prosecutions over all those years. So the only way the statute can be saved is if we were "suddenly" to give it a new meaning different from the one it has borne for the last three decades. And if we could do *that,* it would indeed be "surprising" and "extraordinary."

**\*2334** The dissent defends giving this old law a new meaning by appealing to intuition. It suggests that a categorical reading of § 924(c)(3)(B) is "unnatural" because "[i]f you were to ask John Q. Public whether a particular crime posed a substantial risk of violence, surely he would respond, 'Well, tell me how it went down —*what happened*?' " *Post,* at 2343 (some internal quotation marks omitted). Maybe so. But the language in the statute before us isn't the language posited in the dissent's push

poll. 🚩 Section 924(c)(3)(B) doesn't ask about the risk that "a particular crime posed" but about the risk that an "offense ... by its nature, involves." And a categorical reading of this categorical language seemed anything but "unnatural" to the unanimous Court in 📙 *Leocal* or the plurality in *Dimaya*.[9] Nor did the government think the categorical reading of 🚩 § 924(c)(3)(B) "unnatural" when it embraced that reading for decades. The dissent asks us to overlook the government's prior view, explaining that the government only defended a categorical reading of the statute "when it did not matter for constitutional vagueness purposes"—that is, before 📙 *Johnson* and *Dimaya* identified constitutional problems with the categorical approach. *Post*, at 2355. But isn't that exactly the point? Isn't it at least a little revealing that, when the government had no motive to concoct an alternative reading, even it thought the best reading of 🚩 § 924(c)(3)(B) demanded a categorical analysis?

If this line of attack won't work, the dissent tries another by telling us that we have "not fully account[ed] for the long tradition of substantial-risk criminal statutes." *Post*, at 2355. The dissent proceeds to offer a lengthy bill of particulars, citing dozens of state and federal laws that do not use the categorical approach. *Post*, at 2339 – 2342, and nn. 4–17. But what does this prove? Most of the statutes the dissent cites impose penalties on whoever "creates," or "engages in conduct that creates," or acts under "circumstances that create" a substantial risk of harm; others employ similar language. Not a single one imposes penalties for committing certain acts during "an offense ... that by its nature, involves" a substantial risk, or anything similar. Marching through the dissent's own catalog thus only winds up confirming that legislatures know how to write risk-based statutes that require a case-specific analysis—and that 🚩 § 924(c)(3)(B) is not a statute like that.

When the dissent finally turns to address the words Congress actually wrote in 🚩 § 924(c)(3)(B), its main argument seems to be that a categorical reading violates the canon against superfluity. On this account, reading "offense" generically in connection with the residual clause makes the residual clause "duplicate" the elements clause and leaves it with "virtually nothing" to do. *Post*, at 2347. But that is a surprising assertion coming from the dissent, which devotes several pages to describing the "many" offenders who have been convicted under the residual clause using the categorical approach but

who "might not" be prosecutable under the elements clause. *Post*, at 2353 – 2355. It is also wrong. As this Court has long understood, the residual clause, read categorically, "sweeps more broadly" than the elements clause—potentially reaching offenses, like burglary, that do not have violence as an *element* but that arguably present a substantial *risk* of violence. 📙 *Leocal*, 543 U.S. at 10, 125 S.Ct. 377. So even **\*2335** under the categorical reading, the residual clause is far from superfluous.

Without its misplaced reliance on the superfluity canon, there is little left of the dissent's textual analysis. The dissent asserts that the phrase "by its nature" must "focu[s] on the defendant's actual conduct"—but only because this "follows" from the dissent's earlier (and mistaken) superfluity argument. *Post*, at 2347. Next, the dissent claims that "the word 'involves' " and "the phrase 'in the course of committing the offense' " both support a case-specific approach. *Post*, at 2348. But these words do not favor either reading: It is just as natural to ask whether the offense of robbery *ordinarily* "involves" a substantial risk that violence will be used "in the course of committing the offense" as it is to ask whether a *particular* robbery "involved" a substantial risk that violence would be used "in the course of committing the offense." If anything, the statute's use of the present and not the past tense lends further support to the categorical reading.[10] The dissent thinks it significant, too, that the statute before us "does not use the term 'conviction,' " *post*, at 2349; but that word is hardly a prerequisite for the categorical approach, as *Dimaya* makes clear. Remarkably, the dissent has nothing at all to say about 🚩 § 924(c)(3)'s history or its relationship with other criminal statutes; it just ignores those arguments. And when it comes to the constitutional avoidance canon, the dissent does not even try to explain how using that canon to criminalize conduct that *isn't* criminal under the fairest reading of a statute might be reconciled with traditional principles of fair notice and separation of powers. Instead, the dissent seems willing to consign " 'thousands' " of defendants to prison for "years—potentially decades," not because it is certain or even likely that Congress ordained those penalties, but because it is merely "possible" Congress might have done so. *Post*, at 2352, 2354 – 2355. In our republic, a speculative possibility that a man's conduct violated the law should never be enough to justify taking his liberty.

In the end, the dissent is forced to argue that holding 🚩 § 924(c)(3)(B) unconstitutional would invite "bad" social policy consequences. *Post*, at 2355. In fact, the dissent's

United States v. Davis, 139 S.Ct. 2319 (2019)

204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

legal analysis only comes sandwiched between a lengthy paean to laws that impose severe punishments for gun crimes and a rogue's gallery of offenses that may now be punished somewhat less severely. See *post*, at 2336 – 2337, 2352 – 2355. The dissent acknowledges that "the consequences cannot change our understanding of the law." *Post*, at 2355. But what's the point of all this talk of "bad" consequences if not to suggest that judges should be tempted into reading the law to satisfy their policy goals? Even taken on their own terms, too, the dissent's policy concerns are considerably overblown. While the dissent worries that our ruling may elicit challenges to past 🚩 § 924(c) convictions, ***2336** *post*, at 2354, the dissent's preferred approach—saving 🚩 § 924(c)(3)(B) by changing its meaning—would also call into question countless convictions premised on the categorical reading. And defendants whose 🚩 § 924(c) convictions are overturned by virtue of today's ruling will not even necessarily receive lighter sentences: As this Court has noted, when a defendant's 🚩 § 924(c) conviction is invalidated, courts of appeals "routinely" vacate the defendant's entire sentence on all counts "so that the district court may increase the sentences for any remaining counts" if such an increase is warranted. 📙 *Dean* v. *United States*, 581 U.S. ——, ——, 137 S.Ct. 1170, 1176, 197 L.Ed.2d 490 (2017).

Of course, too, Congress always remains free to adopt a case-specific approach to defining crimes of violence for purposes of 🚩 § 924(c)(3)(B) going forward. As Mr. Davis and Mr. Glover point out, one easy way of achieving that goal would be to amend the statute so it covers any felony that, "based on the facts underlying the offense, involved a substantial risk" that physical force against the person or property of another would be used in the course of committing the offense. Brief for Respondents 46 (quoting H. R. 7113, 115th Cong., 2d Sess. (2018); emphasis deleted); see also Tr. of Oral Arg. 19 (government's counsel agreeing that this language would offer "clearer" support for the case-specific approach than the current version of the statute does). The dissent's catalog of case-specific, risk-based criminal statutes supplies plenty of other models Congress could follow. Alternatively still, Congress might choose to retain the categorical approach but avoid vagueness in other ways, such as by defining crimes of violence to include certain enumerated offenses or offenses that carry certain minimum penalties. All these options and more are on the table. But these are options that belong to Congress to consider; no matter how tempting, this Court is

not in the business of writing new statutes to right every social wrong it may perceive.

\*

We agree with the court of appeals' conclusion that 🚩 § 924(c)(3)(B) is unconstitutionally vague. At the same time, exactly what that holding means for Mr. Davis and Mr. Glover remains to be determined. After the Fifth Circuit vacated their convictions and sentences on one of the two 🚩 § 924(c) counts at issue, both men sought rehearing and argued that the court should have vacated their sentences on all counts. In response, the government conceded that, if 🚩 § 924(c)(3)(B) is held to be vague, then the defendants are entitled to a full resentencing, not just the more limited remedy the court had granted them. The Fifth Circuit has deferred ruling on the rehearing petitions pending our decision, so we remand the case to allow the court to address those petitions. The judgment below is affirmed in part and vacated in part, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

Justice KAVANAUGH, with whom Justice THOMAS and Justice ALITO join, and with whom THE CHIEF JUSTICE joins as to all but Part II–C, dissenting.

Crime and firearms form a dangerous mix. From the 1960s through the 1980s, violent gun crime was rampant in America. The wave of violence destroyed lives and devastated communities, particularly in America's cities. Between 1963 and 1968, annual murders with firearms rose by a staggering 87 percent, and annual aggravated assaults with firearms increased by more than 230 percent.

 **\*2337** Faced with an onslaught of violent gun crime and its debilitating effects, the American people demanded action. In 1968, Congress passed and President Lyndon Johnson signed the Gun Control Act. That law made it a separate federal crime to use or carry a firearm during a federal felony. Despite that and other efforts, violent crime with firearms continued at extraordinarily dangerous levels. In 1984 and again in 1986, in legislation signed by President Reagan, Congress reenacted that provision of the 1968 Act, with amendments. The law now prohibits, among other things, using or carrying a firearm

Case 3:20-cv-07721-SI   Document 58-6   Filed 11/10/20   Page 83 of 912

United States v. Davis, 139 S.Ct. 2319 (2019)
204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

during and in relation to a federal "crime of violence." 18 U.S.C. § 924(c)(1)(A). The law mandates substantial prison time for violators.

Over the last 33 years, tens of thousands of § 924(c) cases have been prosecuted in the federal courts. Meanwhile, violent crime with firearms has decreased significantly. Over the last 25 years, the annual rate of murders with firearms has dropped by about 50 percent, and the annual rate of nonfatal violent crimes (robberies, aggravated assaults, and sex crimes) with firearms has decreased by about 75 percent. Violent crime in general (committed with or without a firearm) has also declined. During that same time period, both the annual rate of overall violent crime and the annual rate of murders have dropped by almost 50 percent.

Although the level of violent crime in America is still very high, especially in certain cities, Americans under the age of 40 probably cannot fully appreciate how much safer most American cities and towns are now than they were in the 1960s, 1970s, and 1980s. Many factors have contributed to the decline of violent crime in America. But one cannot dismiss the effects of state and federal laws that impose steep punishments on those who commit violent crimes with firearms.

Yet today, after 33 years and tens of thousands of federal prosecutions, the Court suddenly finds a key provision of § 924(c) to be unconstitutional because it is supposedly too vague. That is a surprising conclusion for the Court to reach about a federal law that has been applied so often for so long with so little problem. The Court's decision today will make it harder to prosecute violent gun crimes in the future. The Court's decision also will likely mean that thousands of inmates who committed violent gun crimes will be released far earlier than Congress specified when enacting § 924(c). The inmates who will be released early are not nonviolent offenders. They are not drug offenders. They are offenders who committed violent crimes with firearms, often brutally violent crimes.

A decision to strike down a 33-year-old, often-prosecuted federal criminal law because it is all of a sudden unconstitutionally vague is an extraordinary event in this Court. The Constitution's separation of powers authorizes this Court to declare Acts of Congress unconstitutional. That is an awesome power. We exercise that power of judicial review in justiciable cases to, among other things, ensure that Congress

acts within constitutional limits and abides by the separation of powers. But when we overstep our role in the name of enforcing limits on Congress, we do not uphold the separation of powers, we transgress the separation of powers.

I fully understand how the Court has arrived at its conclusion given the Court's recent precedents in *Johnson* v. *United States*, 576 U.S. ——, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015), and *Sessions* v. *Dimaya*, 584 U.S. ——, 138 S.Ct. 1204, 200 L.Ed.2d 549 (2018). But this case presents an entirely different question. Those cases **\*2338** involved statutes that imposed additional penalties based on *prior* convictions. This case involves a statute that focuses on the defendant's current conduct during the charged crime. The statute here operates entirely in the present. Under our precedents, this statute therefore is not unconstitutionally vague. It is a serious mistake, in my respectful view, to follow *Johnson* and *Dimaya* off the constitutional cliff in this case. I respectfully dissent. [1]

I

Section 924(c) prohibits using or carrying a firearm during and in relation to a federal "crime of violence," or possessing a firearm in furtherance of a federal "crime of violence." [2]

Section 924(c) is a substantive criminal offense, not a sentence enhancement. The Government therefore charges a § 924(c) offense in the indictment. Ordinarily, when charged under § 924(c), a defendant will be charged with both an underlying federal crime and then also a § 924(c) offense. For example, Davis was charged with both conspiracy to commit robbery and a § 924(c) offense. Glover was likewise charged with both conspiracy to commit robbery and a § 924(c) offense.

By any measure, Davis and Glover's conduct during the conspiracy was violent. Davis and Glover committed multiple armed robberies of convenience stores in the early morning hours. Those armed robberies followed a pattern: Davis and Glover (or Glover and a co-conspirator)—usually covering their faces—would arrive at a convenience store in the early morning hours in a car with no plates. One of them would point a short-barreled shotgun at a female employee and order

Case 3:20-cv-07721-SI   Document 58-6   Filed 11/10/20   Page 84 of 912

United States v. Davis, 139 S.Ct. 2319 (2019)
204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

her around. Sometimes, he would point the short-barreled shotgun in her face. Sometimes, he would put the short-barreled shotgun in her side. While one of them was aiming the short-barreled shotgun at the store employee, another would take cigarettes and demand money. Davis and Glover's crime spree ended with still more dangerous behavior: a high-speed car chase in wet and dangerous driving conditions that culminated in a crash.

Section 924(c)(3) lays out the definition of "crime of violence" for purposes of § 924(c). That definition has two prongs, either of which can bring a defendant within **\*2339** the scope of § 924(c). [3]

The first prong of § 924(c)(3) is the elements prong. That prong, the Government concedes here, asks whether the underlying crime *categorically* fits within § 924(c) because of the elements of the crime. The judge makes that determination. If the answer is yes, then the judge instructs the jury on the § 924(c) offense to simply find whether the defendant used or carried a firearm during and in relation to that underlying crime, or possessed a firearm in furtherance of that underlying crime.

The Fifth Circuit concluded that Davis and Glover's conspiracy offenses did not fit within the elements prong of § 924(c)(3). So the question was whether Davis and Glover were covered by the second prong.

The second prong of § 924(c)(3) is the substantial-risk prong. That prong covers cases beyond those covered by the first prong, the elements prong. Congress sensibly wanted to cover defendants who committed crimes that are not necessarily violent by definition under the elements prong, but who committed crimes with firearms in a way that created a substantial risk that violent force would be used. To that end, the substantial-risk prong, properly read, focuses not on the elements of the underlying crime, but rather on the defendant's conduct during that crime. If a defendant used or carried a firearm during and in relation to the crime, *and* the defendant's conduct during the crime created a substantial risk that physical force may be used, then the defendant may be guilty of a § 924(c) offense. In that instance, the jury makes the finding: Did the defendant's conduct during the

underlying crime create a substantial risk that violent force would be used?

In other words, as relevant here, a defendant can fall within the scope of § 924(c) either (1) because of the elements of the underlying crime or (2) because of the defendant's conduct in committing the underlying crime. Either (1) the judge finds that an element of the underlying crime entails the use of physical force or (2) the jury finds that the defendant's actual conduct involved a substantial risk that physical force may be used. Put another way, the underlying crime itself may automatically bring the defendant within the scope of § 924(c). Or if the underlying crime does not automatically qualify as a crime of violence, then the defendant's conduct during the crime may still bring the defendant within the scope of § 924(c). Sensible enough.

The basic question in this case is whether the substantial-risk prong of § 924(c)(3)'s definition of "crime of violence" is unconstitutionally vague. It is not.

As this Court has explained multiple times, criminal laws that apply a risk standard to a defendant's conduct are not too vague, but instead are perfectly constitutional. Writing for the Court in *Johnson*, for example, Justice Scalia stated that "we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct." 576 U.S., at ——, 135 S.Ct., at 2561. The following year in *Welch v. United States*, Justice Kennedy confirmed that *Johnson* "cast no doubt on the many laws that 'require gauging the riskiness of conduct in which an individual defendant engages *on a particular occasion*.' **\*2340** " 578 U.S. ——, —— – ——, 136 S.Ct. 1257, 1262–1263, 194 L.Ed.2d 387 (2016) (quoting *Johnson*, 576 U.S., at ——, 135 S.Ct., at 2561). Two years later in *Dimaya*, Justice KAGAN wrote for the Court and echoed Justice Scalia and Justice Kennedy: "In *Johnson*'s words, 'we do not doubt' the constitutionality of applying § 16(b)'s 'substantial risk [standard] to real-world conduct.' " 584 U.S., at —— – ——, 138 S.Ct., at 1215–1216 (quoting *Johnson*, 576 U.S., at ——, 135 S.Ct., at 2561).

That kind of risk-based criminal statute is not only constitutional, it is very common. As the Court has recognized, "dozens of federal and state criminal laws use terms like 'substantial risk,' 'grave risk,' and 'unreasonable risk,' " and almost all of those statutes "require gauging the riskiness of conduct in which an individual defendant engages *on a particular occasion*." *Johnson*, 576 U.S., at ——, 135 S.Ct., at 2561. Indeed, the Government's brief in *Johnson* collected more than 200 state and federal statutes that imposed criminal penalties for conduct that created a risk of injury to others. App. to Supp. Brief for United States in *Johnson* v. *United States*, O. T. 2014, No. 13–7120, pp. 1a–99a.

Take a few examples from federal law: It is a federal crime to create "a *substantial risk* of harm to human life" while illegally "manufacturing a controlled substance." 21 U.S.C. § 858 (emphasis added). Under certain circumstances, it is a federal crime to create "a *substantial risk* of serious bodily injury to any other person by destroying or damaging any structure, conveyance, or other real or personal property within the United States or by attempting or conspiring to" do so. 18 U.S.C. § 2332b(a)(1)(B) (emphasis added). And for purposes of the chapter of the federal criminal code dealing with sexual abuse crimes, "serious bodily injury" is defined as "bodily injury that involves a *substantial risk* of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty." § 2246(4) (emphasis added).

The States' criminal codes are similar. Among the crimes that the States define by using qualitative risk standards are resisting arrest,[4] kidnaping,[5] assault,[6] battery,[7] criminal recklessness,[8] endangerment, **\*2341** [9] unlawful restraint,[10] theft,[11] hazing,[12] abuse,[13] neglect,[14] arson,[15] homicide,[16] and weapons offenses.[17]

Consider a few specific examples: In Pennsylvania, a person resists arrest "if, with the intent of preventing a public servant from effecting a lawful arrest or discharging any other duty, the person creates a *substantial risk* of bodily injury to the public servant or anyone else." 18 Pa. Cons. Stat. § 5104 (2015) (emphasis added). In Tennessee, kidnaping is defined as false imprisonment "under circumstances exposing the other person to *substantial risk* of bodily injury." Tenn. Code Ann. § 39–13–303(a) (2018) (emphasis added). In New York, reckless endangerment occurs when a person "recklessly

engages in conduct which creates a *substantial risk* of serious physical injury to another person." N. Y. Penal Law Ann. § 120.20 (emphasis added). And in Maryland, neglect of a **\*2342** minor is defined as "the intentional failure to provide necessary assistance and resources for the physical needs or mental health of a minor that creates a *substantial risk* of harm to the minor's physical health or a *substantial risk* of mental injury to the minor." Md. Crim. Law Code Ann. § 3–602.1(a) (5)(i) (2012) (emphasis added).

The above examples demonstrate that substantial-risk standards like the one in § 924(c)(3)(B) are a traditional and common feature of criminal statutes. As the Eleventh Circuit succinctly stated, there "is nothing remarkable about asking jurors to make that sort of risk determination—and, if necessary, requiring judges to instruct jurors on the meaning of terms like 'substantial' and 'physical force.' " *Ovalles v. United States*, 905 F.3d 1231, 1250, n. 8 (2018) (en banc). That is "exactly how similar questions have been resolved for centuries and are resolved every day in courts throughout the country." *Ibid*.

A statute is unconstitutionally vague only if "it fails to give ordinary people fair notice of the conduct it punishes," or is "so standardless that it invites arbitrary enforcement." *Johnson*, 576 U.S., at ——, 135 S.Ct., at 2556. Section 924(c)(3)(B) is not unconstitutionally vague. To reiterate, § 924(c)(3)(B) defines "crime of violence" as "an offense that is a felony and ... that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." Section 924(c)(3)(B) affords people of ordinary intelligence ample notice that they may be punished if they carry or use a gun while engaging in criminal conduct that presents a risk that physical force may be used. There "is a whole range of conduct that anyone with at least a semblance of common sense would know" is covered by § 924(c) (3)(B). *Chicago v. Morales*, 527 U.S. 41, 114, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (THOMAS, J., dissenting) (internal quotation marks omitted). And prosecutors, defense attorneys, judges, and juries are well equipped to enforce and defend § 924(c)(3)(B) prosecutions in a principled and predictable way—just as they have for decades with many other substantial-risk criminal statutes. As Judge Niemeyer wrote in his separate opinion in the Fourth Circuit, "the parties

Case 3:20-cv-07721-SI     Document 58-6     Filed 11/10/20     Page 86 of 912

United States v. Davis, 139 S.Ct. 2319 (2019)
204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

in those cases had little difficulty understanding, enforcing, or defending the 🚩 § 924(c)(1) charges at issue." *United States v. Simms*, 914 F.3d 229, 264 (2019). [18]

In short, 🚩 § 924(c)(3)(B) is a garden-variety, substantial-risk criminal law. 🚩 Section 924(c)(3)(B) is not unconstitutionally vague.

## II

This case therefore should be straightforward. But the Court complicates things by engaging in a two-step dance that ends with the Court concluding that 🚩 § 924(c)(3)(B) is unconstitutionally vague.

The Court's first step is to construe 🚩 § 924(c)'s substantial-risk prong to require an ordinary-case categorical approach rather than a conduct-specific approach. In other words, the Court says that a defendant's guilt or innocence under 🚩 § 924(c)(3)'s substantial-risk prong hinges on a judge's assessment of how a *hypothetical defendant* would ordinarily commit the underlying crime. In the Court's view, a defendant's guilt or innocence under **\*2343** 🚩 § 924(c)(3)'s substantial-risk prong does not depend on a jury's finding about how the *actual defendant* actually committed the underlying crime.

The Court's second step is based on the Court's decisions in 🚩 *Johnson* and *Dimaya*. The Court says that the ordinary-case categorical approach makes 🚩 § 924(c)(3)(B) unconstitutionally vague.

For purposes of this case, the Court's error is its first step—that is, in construing the substantial-risk prong of 🚩 § 924(c)(3) to require an ordinary-case categorical approach. For three reasons, I disagree with the Court's analysis. First, the Court's justifications in 🚩 *Johnson* and *Dimaya* for adopting the categorical approach do not apply in the context of 🚩 § 924(c). Second, the text of 🚩 § 924(c)(3)(B) is best read to focus on the actual defendant's actual conduct during the underlying crime, not on a hypothetical defendant's imagined conduct during an ordinary case of the underlying crime.

Third, even if the text were ambiguous, the constitutional avoidance canon requires that we interpret the statute to focus on the actual defendant's actual conduct.

I will address those three points in Parts II–A, II–B, and II–C.

## A

According to the Court, if 🚩 § 924(c)(3)(B) focused on the defendant's conduct during the underlying crime, then it would *not* be unconstitutionally vague. But 🚩 § 924(c)(3)(B), as the Court reads it, focuses on a hypothetical defendant's conduct during an ordinary case of the underlying crime. As a result, the Court says that 🚩 § 924(c)(3)(B) *is* unconstitutionally vague.

But it makes little sense, as I see it, to say that 🚩 § 924(c)(3)(B)'s substantial-risk inquiry focuses on whether *a hypothetical defendant's imagined conduct* during an ordinary case of the crime creates a substantial risk that physical force may be used, rather than on whether *the actual defendant's actual conduct* during the actual crime created a substantial risk that physical force may be used. Why would we interpret a federal law that criminalizes current-offense conduct to focus on a hypothetical defendant rather than on the actual defendant? As Judge Newsom cogently wrote for the Eleventh Circuit en banc majority, "If you were to ask John Q. Public whether a particular crime posed a substantial risk of violence, surely he would respond, 'Well, tell me how it went down—*what happened*?' " *Ovalles*, 905 F.3d at 1241. [19]

Why does the Court read the substantial-risk prong in such an unnatural way? The Court explains that 🚩 *Johnson* interpreted similar substantial-risk language to require the ordinary-case categorical approach. See 🚩 576 U.S., at ———— ————, 135 S.Ct., at 2561–2562. A plurality of the Court did the same in 🚩 *Dimaya*. See 🚩 584 U.S., at ——— – ————, 138 S.Ct., at 1216–1218. And the Court today casts this case as the third installment in a trilogy with a predictable ending, one that was supposedly foreordained by 🚩 *Johnson* and *Dimaya*.

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 87 of 912

United States v. Davis, 139 S.Ct. 2319 (2019)
204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

The gaping hole in the Court's analysis, in my view, is that *Johnson* and *Dimaya* addressed statutes that imposed penalties based on a defendant's *prior* criminal convictions.

In *Johnson*, the Court interpreted a definition of "violent felony" that was used in sentencing proceedings to classify prior convictions as predicates for stricter sentences. See §§ 924(e)(1), (e)(2)(B). In **\*2344** *Dimaya*, the Court interpreted a definition of "crime of violence" that was used in immigration proceedings to classify prior convictions as predicates for more severe immigration consequences. See § 16 (defining "crime of violence"); 8 U.S.C. § 1101(a)(43)(F) (incorporating 18 U.S.C. § 16); 8 U.S.C. § 1227(a)(2)(A)(iii) (deportation); §§ 1229b(a)(3), (b)(1)(C) (ineligibility for cancellation of removal and adjustment of status).

In interpreting those statutes, the Court employed the ordinary-case categorical approach to assess an individual's *past* convictions. And application of that categorical approach, the Court then said, rendered the statutes at issue in those cases unconstitutionally vague. See *Dimaya*, 584 U.S., at —— – ——, 138 S.Ct., at 1215–1216; *Johnson*, 576 U.S., at —— – ——, 135 S.Ct., at 2557–2558.[20]

Two important principles drove the Court's adoption of the categorical approach in the *prior*-conviction context in *Johnson* and *Dimaya*.

*First*, in the prior-conviction cases, the Court emphasized that the categorical approach avoids the difficulties and inequities of relitigating "past convictions in minitrials conducted long after the fact." *Moncrieffe v. Holder*, 569 U.S. 184, 200–201, 133 S.Ct. 1678, 185 L.Ed.2d 727 (2013). Without the categorical approach, courts would have to determine the underlying conduct from years-old or even decades-old documents with varying levels of factual detail. See *Taylor v. United States*, 495 U.S. 575, 601–602, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). The factual statements that are contained in those documents are often "prone to error." *Mathis v. United States*, 579 U.S. ——, ——, 136 S.Ct. 2243, 2252, 195 L.Ed.2d 604 (2016). The categorical approach avoids the unfairness of allowing inaccuracies to "come back to haunt the defendant many years down the road." *Id.*, at ——, 136

S.Ct., at 2253. The Court has echoed that reasoning time and again. See, *e.g.*, *Dimaya*, 584 U.S., at ——, 138 S.Ct., at 1218 (plurality opinion); *Johnson*, 576 U.S., at ——, 135 S.Ct., at 2561; *Descamps v. United States*, 570 U.S. 254, 270, 133 S.Ct. 2276, 186 L.Ed.2d 438 (2013); *Chambers v. United States*, 555 U.S. 122, 125, 129 S.Ct. 687, 172 L.Ed.2d 484 (2009).

*Second*, in the prior-conviction cases, the Court insisted on the categorical approach to avoid "Sixth Amendment concerns." *Descamps*, 570 U.S. at 269, 133 S.Ct. 2276. The Sixth Amendment, as interpreted by this Court's precedents, does not allow a judge (rather than a jury) to make factual determinations that increase the maximum penalty. See *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The Court has read its Sixth Amendment precedents to require the categorical approach. Under the categorical approach, the judge looks only to the fact of conviction and the statutory definition of the prior offense. The Court has reiterated those Sixth Amendment concerns in countless categorical-approach cases. See, *e.g.*, *Dimaya*, 584 U.S., at ——, 138 S.Ct., at 1218 (plurality opinion); *Mathis*, 579 U.S., at ——, 136 S.Ct., at 2252; *Shepard v. United States*, 544 U.S. 13, 24–25, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005) (plurality opinion); *Taylor*, 495 U.S. at 601, 110 S.Ct. 2143.

**\*2345** In short, the Court in *Johnson* and *Dimaya* employed something akin to the constitutional avoidance doctrine to read the statutes at issue to avoid practical and Sixth Amendment problems. In the words of Justice THOMAS, the "categorical approach was never really about the best reading of the text." *Dimaya*, 584 U.S., at ——, 138 S.Ct., at 1256 (dissenting opinion). As Judge Raggi has perceptively stated: "[C]onstitutional avoidance informed the original categorical-approach mandate." *United States v. Barrett*, 903 F.3d 166, 179 (CA2 2018).

But neither of the two reasons identified in *Johnson* and *Dimaya* applies to 18 U.S.C. § 924(c)(3)(B)—not even a little.

Case 3:20-cv-07721-SI   Document 58-6   Filed 11/10/20   Page 88 of 912

United States v. Davis, 139 S.Ct. 2319 (2019)
204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

*First*, § 924(c) does not require examination of old conduct underlying a *prior* conviction. Section 924(c) operates entirely in the present. In a § 924(c) prosecution, there are ordinarily two charged crimes: the underlying crime and the § 924(c) offense. Here, for example, the defendants were charged with conspiracy to commit robbery and with the § 924(c) offense. The defendant's conduct during the underlying crime is part of the § 924(c) offense. The conduct charged in the § 924(c) offense is in front of the jury (if the case goes to trial) or accepted by the defendant in the plea agreement (if the defendant pleads guilty). The indictment must allege specific offense conduct, and that conduct must be proved with real-world facts in order to obtain a conviction. There is no need to worry about stale evidence or unavailable witnesses. Nor is there any need to worry about inaccuracies in years-old or decades-old documents coming back to haunt the defendant.

*Second*, § 924(c) likewise raises no Sixth Amendment concerns. A jury will find the facts or, if the case ends in a guilty plea, the defendant will accept the facts in the plea agreement. For the § 924(c) charge, as relevant here, a jury must find that the defendant's conduct "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." The defendant has the opportunity to contest the relevant facts either at the trial or in plea negotiations. No Sixth Amendment issue arises in a § 924(c) prosecution.

No practical or Sixth Amendment problems exist with § 924(c)(3)(B). Indeed, the Court itself acknowledges that "a case-specific approach wouldn't yield the same practical and Sixth Amendment complications" that arose in *Johnson* and *Dimaya*. *Ante*, at 2327.

We should recognize that *Johnson* and *Dimaya* dealt with an entirely different context: *prior* convictions. There is no need to follow *Johnson* and *Dimaya* off the cliff here. We should read § 924(c)(3)(B) like the dozens of other substantial-risk statutes in federal and state criminal law: to focus on the actual defendant's actual conduct during the actual underlying crime, not on a hypothetical defendant's imagined conduct during an ordinary case of that crime.

B

Now to the statutory text of § 924(c)(3)(B). Even though the context here is current-offense conduct, not past convictions, the Court says that the statutory language nonetheless compels a focus on a hypothetical defendant's imagined conduct, not on the actual defendant's actual conduct. I disagree. Criminal defendants are usually punished based on what they actually did, not based on what a hypothetical defendant might have done.

To begin with, the text of § 924(c)(3)(B) must be interpreted against the backdrop of traditional criminal-law practice. As described **\*2346** above, substantial-risk statutes are commonplace in federal and state criminal law. Those statutes ordinarily call for examination of the actual defendant's actual conduct during the actual crime. The Court does not identify a single self-contained federal or state law that defines the *actus reus* of the crime based on the imagination of the judge about a hypothetical defendant, rather than on the evidence before the jury about the actual defendant.

This Court applied an exception in *Johnson* and *Dimaya* for substantial-risk statutes that impose sentencing and other penalties based on *past* convictions. But that is an exception for past convictions, not a rule for current-offense conduct. Section 924(c)(3)(B) must be read in line with the traditional, common practice of focusing on the actual defendant's actual conduct during the underlying crime.

With that background, I turn to the precise text of § 924(c)(3). To repeat, the text of § 924(c)(3) provides: A defendant may not use or carry a firearm during and in relation to, or possess a firearm in furtherance of, "an offense that is a felony and" that either (A) "has as an element the use, attempted use, or threatened use of physical force against the person or property of another," or (B) "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

I will focus on four particular aspects of the statutory text of § 924(c)(3)(B).

Case 3:20-cv-07721-SI   Document 58-6   Filed 11/10/20   Page 89 of 912

United States v. Davis, 139 S.Ct. 2319 (2019)

204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

*First*, start with the term "offense." Section 924(c)(3) has two prongs under which a defendant might qualify for a § 924(c) conviction: first, if the underlying crime automatically qualifies as a crime of violence based on its elements; and, second, if the defendant's conduct during the underlying crime created a substantial risk that physical force may be used, even if the underlying crime by its elements does not constitute a crime of violence.

The term "offense" applies to both prongs. In the elements prong, the term refers to the elements of the underlying crime. In the substantial-risk prong, the term refers to the defendant's conduct during the underlying crime. That is entirely commonplace and sensible.

Reading "offense" in that commonsense way follows from the Court's precedents interpreting the term "offense." As the Court has explained many times, the term "offense" may "sometimes refer to a generic crime" and may "sometimes refer to the specific acts in which an offender engaged on a specific occasion." *Nijhawan v. Holder*, 557 U.S. 29, 33–34, 129 S.Ct. 2294, 174 L.Ed.2d 22 (2009).[21] Indeed, the single term "offense" can refer to both in the same statutory scheme. See, *e.g.*, *id., at 40*, 129 S.Ct. 2294; *id., at 38*, 129 S.Ct. 2294 (listing other examples); *United States v. Hayes*, 555 U.S. 415, 421–422, 129 S.Ct. 1079, 172 L.Ed.2d 816 (2009).

In *United States v. Hayes*, for example, the Court interpreted the term "misdemeanor crime of domestic violence." That term was defined as "an offense" that (1) "has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon," and (2) was "committed by" a person who has a particular relationship with the victim. § 921(a)(33)(A). The Court interpreted the "offense that ... has, as an element" language in that provision to focus on the **\*2347** legal prohibition, and interpreted the "offense ... committed by" language to focus on the defendant's conduct. See *Hayes, 555 U.S. at 421–422, 129 S.Ct. 1079*. In other words, the term "offense" was used once but had two different meanings as applied to the two different parts of the statutory provision.

Another example is the Immigration and Nationality Act. That statute defines "aggravated felony" in part as "an offense" (1) that "involves fraud or deceit" and (2) "in which the loss to the victim or victims exceeds $ 10,000." 8 U.S.C. § 1101(a)(43)(M)(i). The Court interpreted the "offense that ... involves fraud or deceit" language to focus on the legal prohibition. See *Kawashima v. Holder*, 565 U.S. 478, 483, 132 S.Ct. 1166, 182 L.Ed.2d 1 (2012). And the Court interpreted the "offense ... in which the loss" language to focus on the individual's conduct. See *Nijhawan, 557 U.S. at 40*, 129 S.Ct. 2294. Again, the term "offense" was used once, but had two different meanings as applied to the two different parts of the statutory provision.

Section 924(c)(3) is the same kind of statutory provision. It likewise encompasses both the legal prohibition (in subpart (A)) and the defendant's actual conduct (in subpart (B)). The term "offense" was read in *Hayes*, *Kawashima*, and *Nijhawan* to encompass both the legal prohibition and the defendant's conduct. The term should be read that same way here.

Moreover, if the substantial-risk prong of § 924(c)(3) requires assessing a hypothetical defendant's conduct rather than the actual defendant's conduct, then there would be little daylight between the elements prong and the substantial-risk prong. After all, a crime is defined by its elements. The elements tell you what happens in an ordinary case of a crime. To imagine how a hypothetical defendant would have committed an ordinary case of the crime, you would presumably look back to the elements of the crime. But doing that under the substantial-risk prong—as the Court would do—would just duplicate the inquiry that already occurs under the elements prong. That would defeat Congress' purpose in adding the substantial-risk prong to § 924(c)(3)—namely, covering defendants who committed crimes that are not violent by definition but that are committed by particular defendants in ways that create a risk of violence. There is no reason to think that Congress meant to duplicate the elements prong in the substantial-risk prong.[22]

The Court usually tries to avoid an interpretation of a statutory provision that would make the provision redundant and accomplish virtually nothing. See, *e.g.*, *Republic of Sudan v. Harrison*, 587 U.S. ——, ——, 139 S.Ct. 1048, 1061, 203 L.Ed.2d 433 (2019); *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 35, 123 S.Ct. 2041, 156

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 90 of 912

United States v. Davis, 139 S.Ct. 2319 (2019)
204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

L.Ed.2d 18 (2003); *Mackey v. Lanier Collection Agency & Service, Inc.,* 486 U.S. 825, 837, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988); A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 174–179 (2012); W. Eskridge, Interpreting Law: A Primer on How to Read Statutes and the Constitution 112–114 (2016). We should heed that principle here, and recognize that the term "offense" in the substantial-risk prong refers to the actual defendant's conduct during the underlying crime.

In short, the term "offense" in § 924(c)(3), as applied to the substantial-risk **\*2348** prong, focuses on the actual defendant's actual conduct, not on a hypothetical defendant's imagined conduct.

*Second*, § 924(c)(3)(B) asks whether the defendant's offense "by its nature" involves a risk that physical force may be used. In a vacuum, the "nature" of an offense could be either "the metaphysical 'nature' of the offense" or "the underlying facts of the offense." *Dimaya,* 584 U.S., at ––––, 138 S.Ct., at 1254 (THOMAS, J., dissenting). But that is because the term "offense" could refer to a legal prohibition or to the defendant's actual conduct. As explained above, however, the term "offense" as applied to the substantial-risk prong refers to the actual defendant's conduct during the underlying crime. It follows that "by its nature" focuses on the nature of the actual defendant's conduct during the crime. The phrase "by its nature" is linked to the term "offense." If the term "offense" refers to the defendant's actual conduct, then "by its nature" also focuses on the defendant's actual conduct.

Under the conduct-specific approach to the substantial-risk prong, the "by its nature" language simply means that the Government has to show more than a defendant's proclivity for crime and more than the mere fact that the defendant was carrying a gun. The Government has to show that the defendant's conduct by its nature *during the crime* created a substantial risk that physical force may be used.

In short, as Justice THOMAS has pointed out, it "is entirely natural to use words like 'nature' and 'offense' to refer to an offender's actual underlying conduct." *Ibid.* So it is here.

*Third*, § 924(c)(3)(B) asks whether the defendant's conduct "involves" a substantial risk that physical force may be used. In *Taylor v. United States,* a case involving a

prior-conviction statutory provision, the Court pointed to the *absence* of the word "involved" in adopting a categorical approach. 495 U.S. at 600, 110 S.Ct. 2143. And in *Nijhawan v. Holder,* another case involving a prior-conviction statutory provision, the Court explained that the word "involves" did not support a categorical approach. 557 U.S. at 36, 129 S.Ct. 2294. Here, unlike in *Taylor,* the statute does use the word "involves." Under *Taylor*'s reasoning, the inclusion of the word "involves" in § 924(c)(3)(B) supports the conclusion that § 924(c)(3)(B) employs a conduct-specific approach rather than a categorical approach.

*Fourth*, § 924(c)(3)(B)'s use of the phrase "in the course of committing the offense" indicates that the proper focus is on the actual defendant's actual conduct, not on a hypothetical defendant's imagined conduct. After all, the underlying offense was committed by the actual defendant, not by a hypothetical defendant. It strains common sense to think that the "in the course of committing the offense" language in § 924(c)(3)(B) contemplates an inquiry into a hypothetical defendant's conduct during an ordinary case of the crime.

Importantly, the law at issue in *Johnson* did not have the "in the course of committing the offense" language. § 924(e)(2)(B)(ii). That is a major textual difference between the law in *Johnson* on the one hand and § 924(c)(3)(B) on the other hand. And that textual distinction further shows that § 924(c)(3)(B) focuses on the actual defendant's actual conduct.

In short, those four textual indicators, while not all entirely one-sided, together strongly suggest that § 924(c)(3)(B) focuses on the actual defendant's actual conduct during the actual crime, not on a hypothetical defendant's imagined conduct during an ordinary case of the crime.

On top of all the language in the statute, § 924(c)(3)(B) does *not* contain the critical **\*2349** term that ordinarily marks a categorical approach.

Section 924(c)(3)(B) does not use the term "conviction." This Court has historically recognized the term "conviction"

Case 3:20-cv-07721-SI Document 58-6 Filed 11/10/20 Page 91 of 912

United States v. Davis, 139 S.Ct. 2319 (2019)

204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

as a key textual driver of the categorical approach. In cases such as *Taylor* and *Johnson*, the Court zeroed in on the word "convictions." See *Johnson*, 576 U.S., at ——, 135 S.Ct., at 2561; *Taylor*, 495 U.S. at 600, 110 S.Ct. 2143; see also *Mathis*, 579 U.S., at ——, 136 S.Ct., at 2252; *Moncrieffe*, 569 U.S. at 191, 133 S.Ct. 1678; *Ovalle*, 905 F.3d at 1245. So too, the Court in *Leocal* v. *Ashcroft* emphasized that the text of the INA that incorporated § 16(b) used the term "convicted." 543 U.S. 1, 4, 7, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004). [23]

The term "conviction" is nowhere to be found in the text of § 924(c)(3)(B). That should not come as a surprise, given that § 924(c)(3)(B) is a substantive criminal offense concerned with the defendant's current-offense conduct. The absence of the term "conviction" in § 924(c)(3)(B) strongly supports a conduct-specific approach.

Put simply, the textual clues—both the words that are used and the words that are not used—point strongly to the conclusion that § 924(c)(3)(B) requires a jury to assess the actual defendant's actual conduct during the underlying crime. The conclusion becomes overwhelming when considered against the general background of substantial-risk statutes. To be sure, a statute can always be written more clearly. But here, the textual toolkit leads decisively to that conclusion.

C

But after all of that, suppose that you are not convinced. Suppose that you think that this case is still a close call on the text, even with the background of substantial-risk statutes and the Court's precedents. Indeed, suppose you ultimately disagree with the above analysis of the text. Even so, the Government still wins—unless it can be said that § 924(c)(3)(B) *unambiguously* requires a categorical approach. Under the constitutional avoidance canon, the precise question before us is not whether § 924(c)(3)(B) is best read to require a conduct-specific approach, but rather (as the Court's cases say) whether § 924(c)(3)(B) can reasonably, plausibly, or fairly possibly be interpreted

to require a conduct-specific approach. The answer to that question is easy. Yes. See *Hooper v. California*, 155 U.S. 648, 657, 15 S.Ct. 207, 39 L.Ed. 297 (1895) ("reasonable"); *Clark v. Martinez*, 543 U.S. 371, 380, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005) ("plausible"); *Skilling v. United States*, 561 U.S. 358, 406, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010) ("fairly possible" (internal quotation marks omitted)).

The Court says that if § 924(c)(3)(B) requires the categorical approach, then it is unconstitutionally vague. But the Court also says that if § 924(c)(3)(B) focuses on the defendant's actual conduct, then it is constitutionally permissible. As the Court puts it, "a case-specific approach would avoid the vagueness problems that doomed the statutes in *Johnson* and *Dimaya*." *Ante*, at ——. So the entire ball game is **\*2350** whether it is fairly possible to interpret § 924(c)(3)(B) to require a conduct-specific approach. It surely is at least fairly possible.

It is an elementary principle of statutory interpretation that an ambiguous statute must be interpreted, whenever possible, to avoid unconstitutionality. See generally Scalia, Reading Law: The Interpretation of Legal Texts, at 247–251; Eskridge, Interpreting Law: A Primer on How to Read Statutes and the Constitution, at 317–322. That uncontroversial principle of statutory interpretation dates back to the Founding era. See *Mossman v. Higginson*, 4 U.S. (4 Dall.) 12, 14, 1 L.Ed. 720 (1800). As Justice THOMAS has explained, the traditional doctrine of constitutional avoidance commands "courts, when faced with two plausible constructions of a statute—one constitutional and the other unconstitutional—to choose the constitutional reading." *Clark*, 543 U.S. at 395, 125 S.Ct. 716 (dissenting opinion). This Court's duty is "not to destroy the Act if we can, but to construe it, if consistent with the will of Congress, so as to comport with constitutional limitations." *Civil Service Comm'n v. Letter Carriers*, 413 U.S. 548, 571, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). In discharging that duty, "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Hooper*, 155 U.S. at 657, 15 S.Ct. 207.

This Court's longstanding practice of saving ambiguous statutes from unconstitutionality where fairly possible affords proper respect for the representative branches of our Government. The Court has explained that "a presumption

never ought to be indulged, that congress meant to excise or usurp any unconstitutional authority, unless that conclusion is forced upon the Court by language altogether unambiguous." *United States v. Coombs*, 12 Pet. 72, 76, 37 Pet. 72, 9 L.Ed. 1004 (1838).

In countless cases for more than 200 years, this Court has recognized the principle that courts should construe ambiguous laws to be consistent with the Constitution. See, *e.g.*, *McDonnell* v. *United States*, 579 U.S. ——, —— – ——, 136 S.Ct. 2355, 2372–2373, 195 L.Ed.2d 639 (2016); *Skilling*, 561 U.S. at 405–409, 130 S.Ct. 2896; *Clark*, 543 U.S. at 380–382, 125 S.Ct. 716; *Edmond v. United States*, 520 U.S. 651, 658, 117 S.Ct. 1573, 137 L.Ed.2d 917 (1997); *Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal.*, 508 U.S. 602, 628–630, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *New York v. United States*, 505 U.S. 144, 170, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992); *Rust v. Sullivan*, 500 U.S. 173, 190–191, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991); *Public Citizen v. Department of Justice*, 491 U.S. 440, 465–467, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989); *Communications Workers v. Beck*, 487 U.S. 735, 762, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988); *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council*, 485 U.S. 568, 575–578, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988); *St. Martin Evangelical Lutheran Church v. South Dakota*, 451 U.S. 772, 780–781, 101 S.Ct. 2142, 68 L.Ed.2d 612 (1981); *Letter Carriers*, 413 U.S. at 571, 93 S.Ct. 2880; *Machinists v. Street*, 367 U.S. 740, 749–750, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); *Ashwander v. TVA*, 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *ICC v. Oregon-Washington R. & Nav. Co.*, 288 U.S. 14, 40–42, 53 S.Ct. 266, 77 L.Ed. 588 (1933); *Crowell v. Benson*, 285 U.S. 22, 62–63, 52 S.Ct. 285, 76 L.Ed. 598 (1932); *Lucas v. Alexander*, 279 U.S. 573, 577–578, 49 S.Ct. 426, 73 L.Ed. 851 (1929); *Richmond Screw Anchor Co. v. United States*, 275 U.S. 331, 345–346, 48 S.Ct. 194, 72 L.Ed. 303 (1928); **\*2351** *Blodgett v. Holden*, 275 U.S. 142, 148–149, 48 S.Ct. 105, 72 L.Ed. 206 (1927) (opinion of Holmes, J.); *Missouri Pacific R. Co. v. Boone*, 270 U.S. 466, 471–472, 46 S.Ct. 341, 70 L.Ed. 688 (1926);

*Linder v. United States*, 268 U.S. 5, 17–18, 45 S.Ct. 446, 69 L.Ed. 819 (1925); *Panama R. Co. v. Johnson*, 264 U.S. 375, 390, 44 S.Ct. 391, 68 L.Ed. 748 (1924); *Texas v. Eastern Texas R. Co.*, 258 U.S. 204, 217, 42 S.Ct. 281, 66 L.Ed. 566 (1922); *Baender v. Barnett*, 255 U.S. 224, 225–226, 41 S.Ct. 271, 65 L.Ed. 597 (1921); *United States v. Jin Fuey Moy*, 241 U.S. 394, 401, 36 S.Ct. 658, 60 L.Ed. 1061 (1916); *United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366, 407–408, 29 S.Ct. 527, 53 L.Ed. 836 (1909); *Hooper*, 155 U.S. at 657, 15 S.Ct. 207; *Grenada County Supervisors v. Brogden*, 112 U.S. 261, 268–269, 5 S.Ct. 125, 28 L.Ed. 704 (1884); *Coombs*, 12 Pet. at 76; *Parsons v. Bedford*, 3 Pet. 433, 448–449, 28 U.S. 433, 7 L.Ed. 732 (1830); *Mossman*, 4 Dall. at 14.

To be clear, the case before us is not a case of avoiding *possible* unconstitutionality. This is a case of avoiding *actual* unconstitutionality. There is a debate about the former practice. There is no real debate about the latter rule. And it is the latter rule of statutory interpretation at issue here.

Section 924(c)(3)(B) is best read to focus on the defendant's actual conduct. But at a minimum—given the text, the background of substantial-risk laws, and the relevant precedents—it is fairly possible to interpret § 924(c)(3)(B) to focus on the defendant's actual conduct. Because that reasonable interpretation would save § 924(c)(3)(B) from unconstitutionality, this case should be very straightforward, as Judge Newsom explained in his thorough majority opinion in the Eleventh Circuit and as Judge Niemeyer and Judge Richardson explained in their persuasive separate opinions in the Fourth Circuit. *Ovalles*, 905 F.3d at 1251; *Simms*, 914 F.3d at 272 (opinion of Niemeyer, J.); *id.*, at 272–277 (opinion of Richardson, J.). We should prefer the constitutional reading over the unconstitutional reading.

The Court did not apply constitutional avoidance in *Johnson* and *Dimaya*. Why not? In those two cases, the Court explained, the canon of constitutional avoidance was essentially rendered a nullity. That is because, as the Court described the situation, the Court was between a rock and a hard place. The categorical approach would have led to Fifth Amendment vagueness concerns, whereas applying the conduct-specific approach would have led to

Case 3:20-cv-07721-SI   Document 58-6   Filed 11/10/20   Page 93 of 912

United States v. Davis, 139 S.Ct. 2319 (2019)
204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

Sixth Amendment jury-trial concerns. See *Dimaya*, 584 U.S., at ——– ——, 138 S.Ct. 1204, 1217–1218 (plurality opinion).

Here, by contrast, the Court is not between a rock and a hard place. Applying the categorical approach to § 924(c)(3)(B) would lead to vagueness concerns, whereas applying the conduct-specific approach would lead to no constitutional concerns.

Faced with a choice between a rock and constitutionality, the Court chooses the rock. I do not understand that choice.

The Court offers two related reasons for its choice to run the statute into a rock. Neither reason holds up.

*First*, the Court concludes that the constitutional avoidance canon must yield to the rule of lenity. That argument disregards the Court's oft-repeated statements that the rule of lenity is a tool of last resort that applies "only when, after consulting traditional canons of statutory construction," grievous ambiguity remains. *Hayes*, 555 U.S. at 429, 129 S.Ct. 1079 (internal quotation marks omitted); see also, *e.g.*,

**\*2352** *Ocasio* v. *United States*, 578 U.S. ——, ——, n. 8, 136 S.Ct. 1423, 1434 n. 8, 194 L.Ed.2d 520 (2016) ("after seizing everything from which aid can be derived" (internal quotation marks omitted)); *Muscarello v. United States*, 524 U.S. 125, 138, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998) (same); *United States v. Wells*, 519 U.S. 482, 499, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997) (same); *Reno v. Koray*, 515 U.S. 50, 65, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (same); *United States v. Shabani*, 513 U.S. 10, 17, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994) ("after consulting traditional canons of statutory construction"); *Smith v. United States*, 508 U.S. 223, 239, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) ("after seizing every thing from which aid can be derived" (internal quotation marks and alterations omitted)); *Moskal v. United States*, 498 U.S. 103, 108, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) ("*after* resort to the language and structure, legislative history, and motivating policies of the statute" (internal quotation marks omitted)); *Callanan v. United States*, 364 U.S. 587, 596, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961) ("at the end of the process of construing what Congress has expressed").

The constitutional avoidance canon is a traditional canon of statutory interpretation. The constitutional avoidance canon is employed to reach a reasonable interpretation of an ambiguous statute. Where, as here, that canon applies and yields such a reasonable interpretation, no grievous ambiguity remains. The rule of lenity has no role to play. Contrary to the Court's assertion, the canon of constitutional avoidance is not "at war" with the rule of lenity. *Ante*, at 2333. The canon of constitutional avoidance precedes the rule of lenity because the rule of lenity comes into play (this Court has said countless times) only "*after* consulting traditional canons of statutory construction." *Hayes*, 555 U.S. at 429, 129 S.Ct. 1079 (emphasis added; internal quotation marks omitted). The rule of lenity "comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers." *Callanan*, 364 U.S. at 596, 81 S.Ct. 321.

In addition, the rule of lenity is triggered only in the face of "grievous ambiguity." *Muscarello*, 524 U.S. at 139, 118 S.Ct. 1911 (internal quotation marks omitted). To reiterate, § 924(c)(3)(B) is best read to focus on the actual defendant's actual conduct. But to the extent that there is any ambiguity in § 924(c)(3)(B), that ambiguity is far from grievous.

*Second*, and relatedly, the Court claims that the canon of constitutional avoidance, as a general matter, cannot be relied upon to broaden the scope of a criminal statute, as opposed to narrowing the scope of a criminal statute. And the Court says that the canon cannot be used here because, in the Court's view, relying on the constitutional avoidance canon in this case would expand the scope of § 924(c)(3)(B). I disagree for two independent reasons.

To begin with, that theory seems to come out of nowhere. The Court's novel cabining of the constitutional avoidance canon is not reflected in this Court's precedents. On the contrary, it contradicts several precedents. This Court has applied the constitutional avoidance canon even when avoiding the constitutional problems would have broadened the statute's scope. For example, in *United States v. Culbert*, this Court rejected a narrowing construction of the Hobbs Act because that construction would have raised vagueness concerns. 435 U.S. 371, 374, 98 S.Ct. 1112, 55 L.Ed.2d 349 (1978); see also *United States v. Shreveport Grain & Elevator Co.*,

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 94 of 912

United States v. Davis, 139 S.Ct. 2319 (2019)

204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

287 U.S. 77, 82, 53 S.Ct. 42, 77 L.Ed. 175 (1932); cf. *United States v. Grace*, 461 U.S. 171, 176, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983).

**\*2353** Moreover, the premise of this novel broadening/narrowing theory is flawed. A categorical approach to § 924(c)(3)(B) would not be inherently narrower than a conduct-specific approach. Each approach would sweep in some crimes that the other would not. On the one hand, some crimes that might be deemed categorically violent sometimes may be committed in nonviolent ways. Those crimes would be covered by the categorical approach but not by a conduct-specific approach. On the other hand, some categorically nonviolent crimes are committed in violent ways. Those crimes would not be covered by the categorical approach but would be covered by a conduct-specific approach. See *Johnson*, 576 U.S., at ——, 135 S.Ct., at 2579 (ALITO, J., dissenting).

In sum, the constitutional avoidance canon makes this an especially straightforward case. It is at least fairly possible to read § 924(c)(3)(B) to focus on the actual defendant's actual conduct during the actual crime. End of case.

III

The consequences of the Court's decision today will be severe. By invalidating the substantial-risk prong of § 924(c)(3), the Court's decision will thwart Congress' law enforcement policies, destabilize the criminal justice system, and undermine safety in American communities. If the law required those results, we would have to swallow the consequences. But the law, in my respectful view, does no such thing.

The Court's decision means that people who in the future commit violent crimes with firearms may be able to escape conviction under § 924(c). In enacting § 924(c), Congress sought to keep firearms away from violent crime situations. Today, the Court invalidates a critical provision designed to achieve that goal. To be sure, many violent crimes still might fall within § 924(c)(3)'s elements clause. But many others might not. When defendants use firearms during conspiracies to commit robbery, arsons, attempted carjackings, and kidnapings, to name just a few, they might

no longer be subject to prosecution under § 924(c). See, *e.g.*, *Simms*, 914 F.3d at 233–234 (conspiracy to commit robbery); *United States v. Salas*, 889 F.3d 681, 683–684 (CA10 2018) (arson); *United States v. Jenkins*, 849 F.3d 390, 393 (CA7 2017) (kidnaping).

To get a flavor of the offenders who will now potentially avoid conviction under § 924(c), consider a sample of those offenders who have been convicted under § 924(c)(3)'s substantial-risk prong:

- One defendant committed assault with intent to commit murder. The defendant shot his wife multiple times while the couple was camping in Buffalo River National Park. See *United States v. Prickett*, 839 F.3d 697, 698 (CA8 2016).

- One defendant committed arson. The defendant used a molotov cocktail to firebomb the Irish Ink Tattoo Shop. See *Salas*, 889 F.3d at 683; *United States v. Salazar*, 2014 WL 12788997, \*1 (D.N.M., Aug. 14, 2014).

- One defendant and others kidnaped a man who they believed had stolen money and an Xbox from the defendant. They beat the man severely and threatened to kill him. See Pet. for Cert. in *United States v. Jenkins*, O. T. 2017, No. 1797, p. 2.

- One defendant committed conspiracy to commit robbery. The defendant and his co-conspirators planned to steal Percocet and cash from a man they thought was a drug dealer. Armed with a pistol and a crowbar, they broke into the man's home by shattering a sliding glass door and found three men there. One of the **\*2354** defendant's co-conspirators attacked all three men with the crowbar, and the defendant threatened the men with a pistol multiple times. See *United States v. Douglas*, 907 F.3d 1, 4–5 (CA1 2018).

- One defendant committed attempted carjacking. Armed with guns and baseball bats, the defendant and her co-conspirators robbed a grocery store and carjacked two vehicles, pistol whipping the owner of one of the vehicles in the process. They then attempted to carjack a third vehicle. They approached a family getting out of a minivan and demanded the keys. One of the defendant's co-conspirators hit a 13-year-old girl in the mouth with a

Case 3:20-cv-07721-SI   Document 58-6   Filed 11/10/20   Page 95 of 912

United States v. Davis, 139 S.Ct. 2319 (2019)

204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

baseball bat. Another shot an AK–47 at the girl's family. See 🚩 *Ovalles, 905 F.3d at 1235.*

• One defendant operated multiple houses of prostitution in Annapolis. The defendant threatened perceived competitors with violence. He also beat and threatened women, sometimes to compel them to engage in prostitution. See 🏷 *United States v. Fuertes, 805 F.3d 485, 490–492 (CA4 2015).*

• One defendant committed conspiracy to commit robbery. In the middle of the night, the defendant and a co-conspirator crawled into a McDonald's through the drive-through window. The defendant pointed a gun at the restaurant's manager and attempted to hit another employee. The defendant demanded money, and the manager complied. The defendant then removed the money from the cash drawer, pistol whipped the manager, threw the cash drawer at the other employee, and fled the scene along with his co-conspirators and $ 1,100. See 🏷 *Simms, 914 F.3d at 232.*

• One defendant committed conspiracy to commit robbery. The defendant and his co-conspirators committed a string of armed robberies of small businesses. During the robberies, they wore masks and gloves. They were armed with guns, knives, and baseball bats. They injured several people during the course of their robberies, breaking bones, drawing blood, and knocking people out. They also shot and killed one of their victims point blank. See 🚩 *Barrett, 903 F.3d at 170, 184.*

Those real-life stories highlight a second unfortunate consequence of the Court's decision. Many offenders who have already committed violent crimes with firearms—and who have already been convicted under 🚩 § 924(c)—may be released early from prison. The Court's decision will apply to all defendants whose convictions are not yet final on direct review and who preserved the argument. With the benefit of this Court's decision, many dangerous offenders who received lengthy prison sentences as a result of their violent conduct might walk out of prison early. And who knows whether the ruling will be retroactive? Courts will be inundated with collateral-review petitions from some of the most dangerous federal offenders in America. As Judge Niemeyer wrote in his separate opinion in the Fourth Circuit, "thousands of 🚩 § 924(c)(1) convictions will unnecessarily be challenged as premised on what the majority today concludes is an

unconstitutionally vague provision, even though the parties in those cases had little difficulty understanding, enforcing, or defending the 🚩 § 924(c)(1) charges at issue." 🏷 *Simms, 914 F.3d at 264.*

Moreover, defendants who successfully challenge their 🚩 § 924(c) convictions will not merely be resentenced. Rather, their 🚩 § 924(c) convictions will be thrown out altogether.

**\*2355** That is because, to restate an obvious point, 🚩 § 924(c) defines a substantive criminal offense. To be sure, the 🚩 § 924(c) defendants may also be serving other sentences for other convictions (for instance, if they were convicted of and sentenced for the underlying crime of violence). But with the benefit of the Court's decision, they may be able to get their 🚩 § 924(c) convictions tossed and lop off years—potentially decades—from their total prison time.

All because the Court thinks that 🚩 § 924(c)(3)(B) *unambiguously* compels a focus on the imagined conduct of a hypothetical defendant rather than on the actual conduct of the actual defendant. That analysis is not persuasive, especially in light of the constitutional avoidance doctrine. It is true that the Government once advocated for a categorical approach. But in the early years after Congress added a "crime of violence" definition to 🚩 § 924(c), before courts settled on a categorical approach, the Government correctly argued for a conduct-specific approach to the substantial-risk prong. See, e.g., *United States v. Cruz, 805 F.2d 1464, 1469 (CA11 1986).* The Government later changed its tune only after the courts settled on a categorical approach—at a time when it did not matter for constitutional vagueness purposes, before 🏷 *Johnson* and *Dimaya.* In any event, the question is what to do now after 🏷 *Johnson* and *Dimaya.* The answer should not be hard. To quote Judge William Pryor, writing for five judges in the Eleventh Circuit, how "did we ever reach the point where" we "must debate whether a carjacking in which an assailant struck a 13-year-old girl in the mouth with a baseball bat and a cohort fired an AK–47 at her family is a crime of violence? It's nuts." *Ovalles, 905 F.3d at 1253* (concurring opinion).

To be sure, the consequences cannot change our understanding of the law. But when the consequences are this bad, it is useful to double-check the work. And double-

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 96 of 912

United States v. Davis, 139 S.Ct. 2319 (2019)
204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

checking here, in my view, reveals several problems: relying on cases from the prior-conviction context whose rationales do not apply in this current-offense context; not fully accounting for the long tradition of substantial-risk criminal statutes; not reading the words of the statute in context and consistent with precedents such as *Hayes*; and then, perhaps most problematically, misapplying the longstanding constitutional avoidance canon. After double-checking, it should be evident that the law does not compel those serious consequences. I am not persuaded that the Court can blame this decision on Congress. The Court has a way out, if it wants a way out.

\* \* \*

The Court usually reads statutes with a presumption of rationality and a presumption of constitutionality. Instead of reading § 924(c)(3)(B) to ensure that it is constitutional, the Court reads § 924(c)(3)(B) in a way that makes

it unconstitutional. The bedrock principle that the Court interprets ambiguous statutes to avoid unconstitutionality is seemingly transformed into a principle of interpreting ambiguous statutes to lead to unconstitutionality.

I respect and entirely understand how the Court got here. *Johnson* and *Dimaya* were earth-rattling decisions. But we should not follow *Johnson* and *Dimaya* off the constitutional cliff in this different § 924(c) context. Unlike the statutes at issue in *Johnson* and *Dimaya*, this statute is not a prior-conviction statute. This statute operates entirely in the present and is not remotely vague. I respectfully dissent.

**All Citations**

139 S.Ct. 2319, 204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650, 27 Fla. L. Weekly Fed. S 1031

---

## Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1    When this case was tried, a defendant convicted of two § 924(c) violations in a single prosecution faced a 25-year minimum for the second violation. See *Deal v. United States*, 508 U.S. 129, 132, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993); § 1(a)(1), 112 Stat. 3469. In 2018, Congress changed the law so that, going forward, only a second § 924(c) violation committed "after a prior [ § 924(c)] conviction ... has become final" will trigger the 25-year minimum. Pub. L. 115–391, § 403(a), 132 Stat. 5221.

2    Compare *United States v. Simms*, 914 F.3d 229, 236–246 (CA4 2019) (en banc), *United States v. Salas*, 889 F.3d 681, 685–686 (CA10 2018), and *United States v. Eshetu*, 898 F.3d 36, 37–38 (CADC 2018) (holding that § 924(c)(3)(B) is vague), with *United States v. Douglas*, 907 F.3d 1, 11–16 (CA1 2018), *Ovalles v. United States*, 905 F.3d 1231, 1240–1252 (CA11 2018) (en banc), and *United States v. Barrett*, 903 F.3d 166, 178–184 (CA2 2018) (taking the opposite view).

3    Section 16 provides that the term "crime of violence" means "(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

Case 3:20-cv-07721-SI   Document 58-6   Filed 11/10/20   Page 97 of 912

United States v. Davis, 139 S.Ct. 2319 (2019)

204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

4    See, *e.g.*, 🚩 *United States v. Acosta*, 470 F.3d 132, 134–135 (CA2 2006); *United States v. Butler*, 496 Fed.Appx. 158, 161 (CA3 2012); 🚩 *United States v. Fuertes*, 805 F.3d 485, 498 (CA4 2015); 🚩 *United States v. Williams*, 343 F.3d 423, 431 (CA5 2003); 🚩 *Evans v. Zych*, 644 F.3d 447, 453 (CA6 2011); 🚩 *United States v. Jackson*, 865 F.3d 946, 952 (CA7 2017), vacated and remanded, 584 U.S. ——, 138 S.Ct. 1983, 201 L.Ed.2d 240 (2018); 🚩 *United States v. Moore*, 38 F.3d 977, 979–980 (CA8 1994); 🚩 *United States v. Amparo*, 68 F.3d 1222, 1225–1226 (CA9 1995); *United States v. Munro*, 394 F.3d 865, 870 (CA10 2005); 🚩 *United States v. McGuire*, 706 F.3d 1333, 1336–1337 (CA11 2013); 🚩 *United States v. Kennedy*, 133 F.3d 53, 56 (CADC 1998); see also 🚩 *Ovalles v. United States*, 905 F.3d 1231, 1295 (CA11 2018) (en banc) (J. Pryor, J., dissenting) ("For years, and even after 🚩 *Johnson*, the government consistently has urged that we apply a categorical approach to 🚩 § 924(c)").

5    The government's own regulations reflect this understanding of the ordinary meaning of "by its nature." A Department of Justice regulation provides that an inmate is not eligible for early release if he was convicted of an offense "that, by its nature *or conduct*, presents a serious potential risk of physical force." 🚩 28 CFR § 550.55(b)(5)(iii) (2017) (emphasis added); see 🚩 *Bush v. Pitzer*, 133 F.3d 455, 458 (CA7 1997) (denying early release because "[c]onspiracy does not by its 'nature' present a serious risk; but Bush's 'conduct' did so").

6    There are at least two different canons of construction that sometimes go by the name "constitutional avoidance." The one the government invokes here is perhaps better termed the presumption of constitutionality. Of long lineage, it holds that courts should, if possible, interpret ambiguous statutes to avoid rendering them unconstitutional, see, *e.g.*, 🚩 *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 448–449, 7 L.Ed. 732 (1830) (Story, J.), and it is distinct from the more modern (and more debated) constitutional doubt canon, which suggests courts should construe ambiguous statutes to avoid the need even to address serious questions about their constitutionality, see 🚩⚠ *Rust v. Sullivan*, 500 U.S. 173, 190–191, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991).

7    The government claims to have found cases invoking the canon to expand a statute's reach, but none actually stands for that proposition. Each simply remarks in passing that a construction the Court arrived at for other reasons had the additional benefit of avoiding vagueness concerns; none suggests that a narrower construction was available. See 🚩 *United States v. Grace*, 461 U.S. 171, 176, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (accepting government's construction, which was "not contested by appellees"); 🚩 *United States v. Culbert*, 435 U.S. 371, 379, 98 S.Ct. 1112, 55 L.Ed.2d 349 (1978) (finding statute clear and refusing to "manufacture ambiguity where none exists"); *United States v. Shreveport Grain & Elevator Co.*, 287 U.S. 77, 82–83, 53 S.Ct. 42, 77 L.Ed. 175 (1932) (finding statute unambiguous and construing it according to the "natural import of its terms"). And the dissent, despite compiling a page-long list of constitutional avoidance cases spanning "more than 200 years," *post*, at 2349 – 2351, has been unable to find any better examples. See *post*, at 2352 – 2353 (opinion of KAVANAUGH, J.).

8    Admittedly, abandoning the categorical approach in favor of the case-specific approach would also have the effect of excluding from the statute's coverage defendants who commit categorically *violent* felonies in *nonviolent* ways, and in that respect would be more "lenient" for some defendants. Regardless, the constitutional principles underlying the rule of lenity counsel caution before invoking constitutional avoidance to construe the statute to punish conduct that it does not unambiguously proscribe.

9    To be sure, the dissent suggests that 🚩 *Leocal* and *Dimaya* adopted a categorical reading simply to avoid practical and constitutional problems. *Post*, at 2344 – 2345, 2348, and n. 23. But, as we have seen, this

204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

too is mistaken. *Leocal* did not even mention those problems, and *Dimaya* held that the text demanded a categorical approach. See *supra*, at 2348.

10   The dissent claims that *Taylor v. United States*, 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), and *Nijhawan v. Holder*, 557 U.S. 29, 129 S.Ct. 2294, 174 L.Ed.2d 22 (2009), pointed to "the *absence* of the word 'involved' " as one reason to adopt a categorical approach. *Post*, at 2348. Not true. *Taylor* explained that the ACCA's elements clause requires a categorical approach in part because it refers to a crime "that 'has as an element'—not any crime that, in a particular case, involves—the use or threat of force." 495 U.S. at 600, 110 S.Ct. 2143. All the work in that sentence was being done by the phrase "in a particular case," not by the word "involves." And *Nijhawan* noted that the Court had construed the ACCA's residual clause, which refers to crimes "that '*involv[e] conduct* that presents a serious potential risk of physical injury,' " to require the categorical approach. 557 U.S. at 36, 129 S.Ct. 2294.

1    The statistics contained in the introduction are drawn from: Dept. of Justice, Federal Bureau of Investigation, Uniform Crime Reports 6–7, 8–9 (1963) (rise in violent crime with firearms in the 1960s); *id.*, at 1, 6–7, 9 (1968) (same); Pew Research Center, Gun Homicide Rate Down 49% Since 1993 Peak; Public Unaware 6, n. 5, and 36, 50 (2013) (decrease in violent crime with firearms over about the past 25 years); N. James, Congressional Research Service, Recent Violent Crime Trends in the United States 25–26 (Rep. No. R45236) (June 20, 2018) (decrease in violent crime over about the past 25 years).

2    Section 924(c)(1)(A) provides: "Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—(i) be sentenced to a term of imprisonment of not less than 5 years; (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years." Section 924(c)(1)(B) imposes heightened penalties for certain types of firearms and firearm devices, and § 924(c)(1)(C) imposes heightened penalties for subsequent § 924(c) convictions.

3    Section 924(c)(3) provides: "For purposes of this subsection the term 'crime of violence' means an offense that is a felony and—(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

4    See, *e.g.,* Colo. Rev. Stat. § 18–8–103(1)(b) (2018) ("substantial risk of causing bodily injury"); Ind. Code § 35–44.1–3–1(b)(1)(B) (2019) ("substantial risk of bodily injury"); Mo. Rev. Stat. § 575.150 (2016) ("substantial risk of serious physical injury or death"); Neb. Rev. Stat. § 28–904(1)(b) (2016) ("substantial risk of causing physical injury"); Ore. Rev. Stat. § 162.315(2)(c) (2017) ("substantial risk of physical injury").

5    See, *e.g.,* Alaska Stat. § 11.41.300(a)(2)(B) (2018) ("substantial risk of serious physical injury"); Ohio Rev. Code Ann. § 2905.01(B) (Lexis Supp. 2019) ("substantial risk of serious physical harm").

6    See, *e.g.,* Ala. Code § 13A–6–20(a)(3) (2015) ("grave risk of death"); Del. Code Ann., Tit. 11, § 613(a)(3) (2015) ("substantial risk of death"); D. C. Code § 22–404.01(a)(2) (2018 Cum. Supp.) ("grave risk of serious bodily injury"); Mo. Rev. Stat. § 565.056(1)(4) (2016) ("substantial risk of death or serious physical injury"); Utah Code § 76–5–102(1)(b) (2017) ("substantial risk of bodily injury").

204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

7       See, *e.g.*, Ind. Code § 35–42–2–1.5 (Supp. 2018) ("substantial risk of death"); Wis. Stat. § 940.19(6) (2016) ("substantial risk of great bodily harm").

8       See, *e.g.*, Me. Rev. Stat. Ann., Tit. 17–A, § 211(1) (2006) ("substantial risk of serious bodily injury"), § 213(1) (same); Okla. Stat., Tit. 21, § 1289.11 (2011) ("unreasonable risk and probability of death or great bodily harm"); Wis. Stat. Ann. § 939.24(1) (2016) ("unreasonable and substantial risk of death or great bodily harm").

9       See, *e.g.*, Ariz. Rev. Stat. Ann. §§ 13–1201(A), (B) (2010) ("substantial risk of imminent death or physical injury" and "substantial risk of imminent death"); N. D. Cent. Code Ann. § 12.1–17–03 (2012) ("substantial risk of serious bodily injury or death"); Ore. Rev. Stat. § 163.195(1) (2017) ("substantial risk of serious physical injury"); Wash. Rev. Code § 9A.36.050(1) (2018) ("substantial risk of death or serious physical injury").

10      See, *e.g.*, Ark. Code § 5–11–103(a) (2013) ("substantial risk of serious physical injury"); Conn. Gen. Stat. § 53a–95(a) (2017) ("substantial risk of physical injury"); Tex. Penal Code Ann. § 20.02(c)(2)(A) (2019) ("substantial risk of serious bodily injury").

11      See, *e.g.*, Ind. Code § 35–43–4–2(a)(2)(B) (2018) ("substantial risk of bodily injury"); Minn. Stat. § 609.52(3a) (2016) ("reasonably foreseeable risk of bodily harm").

12      See, *e.g.*, Ind. Code § 35–42–2–2.5(a) (2018) ("substantial risk of bodily injury"); Miss. Code. Ann. §§ 97–3–105(1), (3) (2014) ("substantial risk of physical injury"); Mo. Rev. Stat. §§ 578.365(1), (5) (2016) ("probable risk of the loss of life or probable bodily or psychological harm" and "substantial risk to the life of the student or prospective member"); Ohio Rev. Code Ann. § 2903.31(A) (Lexis 2014) ("substantial risk of causing mental or physical harm"); Ore. Rev. Stat. §§ 163.197(4)(a)(B), (C) (2017) ("unreasonable risk of harm").

13      See, *e.g.*, Iowa Code § 709.3(1)(a) (2019) ("substantial risk of death or serious injury"); N. C. Gen. Stat. Ann. § 14–318.2(a) (2017) ("substantial risk of physical injury"); W. Va. Code Ann. §§ 61–8D–3(c), (d)(1) (2014) ("substantial risk of death or serious bodily injury" and "substantial risk of bodily injury"); Wis. Stat. §§ 948.03(1), (4)(a), (b) (2016) ("unreasonable risk of harm," "unreasonable risk of great bodily harm," and "unreasonable risk of bodily harm").

14      See, *e.g.*, Fla. Stat. § 825.102(3)(a) (2018) ("substantial risk of death"), § 827.03(1)(e) (same); W. Va. Code Ann. §§ 61–8D–4(c), (d)(1) (2014) ("substantial risk of death or serious bodily injury" and "substantial risk of bodily injury").

15      See, *e.g.*, Kan. Stat. Ann. §§ 21–5812(c)(2)(A)(i), (ii) (2018 Cum. Supp.) ("substantial risk of bodily harm"); R. I. Gen. Laws § 11–4–2 (2002) ("substantial risk of serious physical harm"); Wis. Stat. §§ 941.11(1), (2) (2016) ("unreasonable risk of death or great bodily harm").

16      See, *e.g.*, Ala. Code § 13A–6–2(a)(2) (2015) ("grave risk of death"); Kan. Stat. Ann. § 21–5406(a) (2018 Cum. Supp.) ("unreasonable risk of injury"); N. Y. Penal Law Ann. § 125.20(4) (West 2009) ("grave risk of serious physical injury"), §§ 125.25(2), (4) ("grave risk of death" and "grave risk of serious physical injury or death").

17      See, *e.g.*, Alaska Stat. § 11.61.190(a)(2) (2018) ("substantial and unjustifiable risk of physical injury"); Ark. Code Ann. § 5–74–107(b)(1) (Supp. 2017) ("substantial risk of physical injury"); Ohio Rev. Code Ann. § 2923.162(C)(2) (Lexis 2014) ("substantial risk of physical harm"); R. I. Gen. Laws § 11–47–61 (2002) ("substantial risk of death or serious injury"); Wash. Rev. Code § 9A.36.045(1) (2018) ("substantial risk of death or serious physical injury"); W. Va. Code Ann. § 61–7–12 (2014) ("substantial risk of death or serious bodily injury").

18      Judge Niemeyer's opinion was joined by Judges Wilkinson, Duncan, Agee, Keenan, and Quattlebaum.

19      Judge Newsom's majority opinion was joined by Chief Judge Ed Carnes and Judges Tjoflat, Marcus, William Pryor, Rosenbaum, Branch, and Hull.

204 L.Ed.2d 757, 19 Cal. Daily Op. Serv. 5908, 2019 Daily Journal D.A.R. 5650...

20    Tellingly, the Government in *Johnson* and *Dimaya* did not dispute that the categorical approach was the proper method of interpreting the statutes at issue. See *Sessions* v. *Dimaya*, 584 U.S. ——, ——, 138 S.Ct. 1204, 1217, 200 L.Ed.2d 549 (2018) (plurality opinion); *Johnson* v. *United States*, 576 U.S. ——, ——, 135 S.Ct. 2551, 2562–2563, 192 L.Ed.2d 569 (2015). In this case, the Government strenuously disputes the applicability of the categorical approach precisely because the inquiry is not about past convictions.

21    More generally, this Court has often said that "identical language may convey varying content" in the same statute, based on context. *Yates* v. *United States*, 574 U.S. 528, 537, 135 S.Ct. 1074, 191 L.Ed.2d 64 (2015) (plurality opinion); see also *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 319–320, 134 S.Ct. 2427, 189 L.Ed.2d 372 (2014).

22    This duplication point is icing on a textual cake already frosted. In other words, our interpretation of the term "offense" is informed by the text and by our precedents. Our interpretation stands with or without the duplication argument.

23    In *Leocal*, the Court interpreted § 16(b) to require a categorical approach. But unlike § 924(c)(3)(B), that statutory provision applied in the context of past convictions. See 8 U.S.C. §§ 1101(a)(43)(F), 1227(a)(2)(A)(iii); Sentencing Reform Act of 1984, § 217(a), 98 Stat. 2021; Comprehensive Crime Control Act of 1984, § 1202, 98 Stat. 2151. To be sure, § 16(b) was once incorporated into § 924(c). But in 1986, Congress severed the two provisions and included a standalone "crime of violence" definition in § 924(c). For those two reasons, § 924(c)(3)(B) need not and should not be interpreted in the same way as § 16(b).

---

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

950 F.3d 567
United States Court of Appeals, Eighth Circuit.

UNITED STATES of America Plaintiff - Appellee

v.

Markell Jay HAMILTON, also known as Poo Defendant - Appellant

No. 18-2436
|
Submitted: October 14, 2019
|
Filed: February 19, 2020

**Synopsis**

**Background:** Defendant pled guilty in the United States District Court for the Northern District of Iowa, Linda R. Reade, Senior District Judge, to possession of heroin with intent to distribute, and he appealed. The Court of Appeals, 709 Fed.Appx. 425, vacated and remanded. On remand, the District Court, Reade, Senior District Judge, resentenced defendant, and he appealed.

**Holdings:** The Court of Appeals, Shepherd, Circuit Judge, held that:

[1] district court properly considered information and order assessing fines, fees, and costs from defendant's Illinois conviction in determining whether to include conviction in calculating defendant's criminal history score, and

[2] district court was not prohibited from considering other issues on remand.

Vacated and remanded.

Loken, Circuit Judge, dissented in part and filed opinion.

**Procedural Posture(s):** Appellate Review; Sentencing or Penalty Phase Motion or Objection.

West Headnotes (12)

**[1]    Criminal Law** 🗝 Review De Novo

**Criminal Law** 🗝 Sentencing

Court of Appeals reviews de novo district court's construction and interpretation of Chapter Four of Sentencing Guidelines, and reviews for clear error district court's application of Chapter Four to facts.  U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

**[2]    Criminal Law** 🗝 Sentencing

Decisions regarding offenses counted in criminal history calculation are factual determinations subject to clear-error review.

**[3]**    **Sentencing and Punishment**    Effect of subsequent circumstances

Where part of statute of conviction was declared unconstitutional, district court must determine which subsection formed basis of conviction before including conviction in calculating criminal history score, and in making such determination, court may refer to terms of charging document, terms of plea agreement or transcript of colloquy between judge and defendant in which factual basis for plea was confirmed by defendant, or to some comparable judicial record of this information in order to determine whether plea necessarily rested on facts equating to qualifying offense.

**[4]**    **Sentencing and Punishment**    Effect of subsequent circumstances

District court properly considered information and order assessing fines, fees, and costs from defendant's Illinois conviction for aggravated unlawful use of weapon in determining whether to include conviction in calculating defendant's criminal history score after one subsection of statute of conviction had been ruled unconstitutional, even though documents did not provide specific facts about how crime was committed, or include any colloquy between defendant and sentencing court, where information cited subsections that defendant was charged with violating. 720 Ill. Comp. Stat. Ann. 5/24-1.6(a)(2).

**[5]**    **Sentencing and Punishment**    Effect of subsequent circumstances

Where charging document already narrows overinclusive statute, *Shepard v. United States*, 125 S.Ct. 1254, does not require government to produce additional documentation of record of factual basis or admissions by defendant at state plea hearing, or record of judicial findings of fact in state court proceeding in order to establish that defendant's state conviction may be considered in calculating defendant's criminal history score.

**[6]**    **Criminal Law**    Review De Novo

Court of Appeals reviews claim that district court erroneously limited scope of remand de novo.

**[7]**    **Criminal Law**    Remand for Determination or Reconsideration of Particular Matters

When district court does not consider argument on remand because it is unaware of its power to do so, remand is appropriate.

**[8]**    **Sentencing and Punishment**    Discretion of court

District court's failure to understand scope of its authority and discretion at sentencing is considered significant procedural error.

**[9]**    **Criminal Law**    Mandate and proceedings in lower court

After Court of Appeals vacated defendant's sentence and remanded for resentencing after part of Illinois statute under which defendant had previously been convicted had been declared unconstitutional, district court was not prohibited from considering other issues on remand in addition to inclusion of Illinois conviction in defendant's criminal history score, where Court of Appeals' decision did not make any mention of other issues raised on appeal,

including challenges to relevant conduct in presentence investigation report (PSR) and reasonableness of upward departure or variance, or place limitations on district court.

**[10]    Criminal Law**  Mandate and proceedings in lower court

On remand for resentencing, district court can hear any relevant evidence that it could have heard at first hearing, but all issues decided by appellate court become law of the case.

1 Cases that cite this headnote

**[11]    Criminal Law** Mandate and proceedings in lower court

Resentencing court may not disregard scope of any limitations imposed by appellate court.

1 Cases that cite this headnote

**[12]    Criminal Law** Mandate and proceedings in lower court

Where remand is limited to resolution of specific issues, those issues outside scope of remand are generally not available for consideration, but where Court of Appeals vacates sentence or reverses finding related to sentencing and remands case for resentencing without placing any limitations on district court, court can hear any relevant evidence on that issue that it could have heard at first hearing.

1 Cases that cite this headnote

**West Codenotes**

**Recognized as Unconstitutional**

720 Ill. Comp. Stat. Ann. 5/24-1.6(a)(3)(A)

**\*569**  Appeal from United States District Court for the Northern District of Iowa - Cedar Rapids

**Attorneys and Law Firms**

Dan Chatham, Assistant U.S. Attorney, U.S. Attorney's Office, Northern District of Iowa, Cedar Rapids, IA, for Plaintiff-Appellee.

Markell Jay Hamilton, U.S. Penitentiary, Marion, IL, pro. se.

John D. Jacobsen, Jacobsen & Johnson, Cedar Rapids, IA, for Defendant-Appellant.

Before LOKEN, SHEPHERD, and STRAS, Circuit Judges.

**Opinion**

SHEPHERD, Circuit Judge.

In 2017, following a guilty plea to possession of heroin with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(c), the district court sentenced Markell Hamilton to 81 months imprisonment. Hamilton's criminal history score in his presentence investigation report (PSR), which was used to calculate his United States Sentencing Guidelines range, included

a previous felony conviction, under Illinois law, for aggravated unlawful use of a weapon. In United States v. Hamilton, 709 F. App'x 425 (8th Cir. 2018) (per curiam), we vacated Hamilton's sentence because part of the Illinois statute of conviction had been declared unconstitutional by the Illinois Supreme Court and the Seventh Circuit. We remanded for resentencing to allow the district court to determine whether the Illinois conviction was appropriately included in his criminal history score. At resentencing, the district court stated that, based on our opinion vacating Hamilton's sentence, the scope of resentencing was limited to the issue involving Hamilton's previous Illinois conviction. The district court ultimately concluded that this conviction was properly accounted for in Hamilton's criminal history score because Hamilton was convicted under a provision of the Illinois statute that remained in effect. The district court then reimposed the same sentence of 81 months. Hamilton again appeals, asserting that the district court erred by considering documents related to this conviction that did not satisfy the standards set out by 🔖 Shepard v. United States, 544 U.S. 13, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005), and by limiting the scope of resentencing to only the issue involving his previous Illinois conviction. Having jurisdiction pursuant to 28 U.S.C. § 1291, we vacate Hamilton's sentence and remand for resentencing.

**[1]  [2]**  Hamilton's first point of error—that, in determining his criminal history score, the district court relied on documents that did not satisfy 🔖 Shepard to determine that Hamilton had a valid conviction for aggravated unlawful use of a weapon—is without merit. "We review de novo the district court's construction and interpretation of Chapter Four of the Guidelines, and we review for clear error the district court's application of Chapter Four to the facts. Decisions regarding offenses counted in a criminal history calculation are factual determinations subject to clear-error review." United States v. Townsend, 408 F.3d 1020, 1022 (8th Cir. 2005) (citation and internal quotation marks omitted).

**[3]**  To sustain a conviction under 720 Ill. Stat. Comp. § 5/24-1.6 for aggravated unlawful use of a weapon, a defendant **\*570** must have violated either subsection (a)(1) or (a)(2), which provide the locational elements of the crime, and one of the enumerated factors contained in subsection (a)(3). Following Hamilton's conviction under this statute, the Illinois Supreme Court held that one of the enumerated factors, subsection (a)(3)(A), was unconstitutional. 🔖 People v. Mosley, 392 Ill.Dec. 588, 33 N.E.3d 137, 150-151 (2015); 🔖 People v. Aguilar, 377 Ill.Dec. 405, 2 N.E.3d 321, 327-28 (2013). Under these circumstances, where part of the statute of conviction was declared unconstitutional, the district court must determine which subsection formed the basis of conviction before including the conviction in calculating the criminal history score. In making such determination, "the court may refer to the 'terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information,' in order to determine whether the plea ' "necessarily" rested' on facts equating to the qualifying offense." 🔖 United States v. Vasquez-Garcia, 449 F.3d 870, 872 (8th Cir. 2006) (quoting 🔖 Shepard, 544 U.S. at 21, 26, 125 S.Ct. 1254) (applying modified categorical approach to sentencing enhancement for previous firearms conviction).

**[4]**  Hamilton argues that the government produced only the Information and the Order Assessing Fines, Fees and Costs from Hamilton's Illinois conviction and that these documents do not satisfy 🔖 Shepard because they do not provide specific facts about how the crime was committed, do not include any colloquy between Hamilton and the sentencing court, and do not include the specific subsection of the statute for which Hamilton was convicted. Hamilton asserts, therefore, that the district court could not ascertain from the documents it considered whether he was convicted of a violation of a subsection that has since been held unconstitutional. We are not persuaded by Hamilton's contentions. The Order Assessing Fines, Fees and Costs shows that Hamilton was convicted of Count 2 of a seven-count Information, the official charging document under Illinois law, see 725 Ill. Comp. Stat. § 5/111-2, for a violation of 🔖 720 Ill. Comp. Stat. § 5/24-1.6(a)(2), and the Information for Count 2 alleges that Hamilton

knowingly carried or possessed on or about his person a firearm, upon any public lands, ... at a time when he was not on his own land or in his own abode or fixed place of business, and he was not an

invitee thereon for the purpose of display of such weapon or the lawful commerce in weapons, and he had not been issued a currently valid firearm owner's identification card, in violation of Chapter 720 Act 5 Section 24-1.6(a)(2)/(3)(C) of the Illinois Compiled Statutes[.]

R. Doc. 61-2, at 3. The language in the Information directly corresponds to the language of 720 Ill. Comp. Stat. § 5/24-1.6(a)(2) and (a)(3)(C). These documents thus conclusively demonstrate that Hamilton was not convicted of an offense under the invalidated subsection (a)(3)(A).

 **[5]**   And as this Court has previously held, "where a charging document already narrows the overinclusive statute, Shepard does not require the government to produce ... additional documentation" of "a record of the factual basis or admissions by [a defendant] at the state plea hearing, or a record of judicial findings of fact in the state court proceeding." Vasquez-Garcia, 449 F.3d at 873. Because the Information identifies subsections (a)(2) and (a)(3)(C), reference to additional records is not required.

The district court thus did  **\*571**  not err in concluding that Hamilton was convicted of a violation of 720 Ill. Comp. Stat. § 5/24-1.6(a)(2)/(a)(3)(C) based on examination of Hamilton's Information and Order Assessing Fines, Fees and Costs or by including this conviction in Hamilton's criminal history score.

 **[6]**    **[7]**    **[8]**   However, Hamilton's second point of error—that the district court was not limited on remand to consideration of only the issue involving his Illinois conviction—requires that his sentence be vacated and the matter remanded for resentencing. We review Hamilton's claim that the district court erroneously limited the scope of remand de novo. See United States v. Moody, 930 F.3d 991, 993 (8th Cir. 2019). "When a district court does not consider an argument because it is unaware of its power to do so ... a remand is appropriate. A district court's failure to understand the scope of its authority and discretion at sentencing is considered a significant procedural error." Id. at 993 (alteration in original) (citations and internal quotation marks omitted).

 **[9]**    **[10]**    **[11]**    **[12]**   At resentencing, in addition to the issue of the criminal history score, Hamilton sought to challenge the PSR's statement of relevant conduct and the government's request at the original sentencing for an upward departure or variance. The district court rejected Hamilton's attempt to address these additional issues, stating, "So in my opinion, the sole issue today is for us to look at any evidence that we have relative to that Illinois conviction and answer the Eighth Circuit Court of Appeals accordingly with a resentencing." R. Doc. 72, at 3. After hearing argument from Hamilton's counsel regarding the issues to be considered, the district court further stated,

> My reading of the remand was for the sole purpose of considering in the first instance, as the opinion says, whether the criminal history was correctly scored as to [the Illinois conviction], so I am going to limit my review today to the scoring of [the Illinois conviction], the issue being under what section of the Illinois Code was he convicted, because that's my reading of what the Circuit wanted me to do.

R. Doc. 72, at 6. We agree with Hamilton that the district court was not prohibited from considering other issues on remand in addition to the inclusion of the Illinois conviction in Hamilton's criminal history score. "On remand for resentencing, a district court can hear any relevant evidence that it could have heard at the first hearing, but all issues decided by the appellate court become the law of the case. Additionally, the resentencing court may not disregard the scope of any limitations imposed by the appellate court." United States v. Behler, 187 F.3d 772, 776 (8th Cir. 1999) (citation and internal quotation marks omitted). "Where a remand is limited to the resolution of specific issues, those issues outside the scope of the remand are generally not available for consideration." United States v. Walterman, 408 F.3d 1084, 1085 (8th Cir. 2005). "But where a court of appeals vacates a sentence or reverses a finding related to sentencing and remands the case for resentencing without

placing any limitations on the district court, the court can hear any relevant evidence on that issue that it could have heard at the first hearing." United States v. Dunlap, 452 F.3d 747, 749-50 (8th Cir. 2006) (internal quotation marks omitted). While our previous decision vacating Hamilton's sentence instructed the district court to consider the Illinois conviction on remand, it did not make any mention of the other issues raised on appeal, including challenges to the relevant conduct in the PSR and the reasonableness of an upward departure or variance. It did not place **\*572** limitations on the district court. There were thus no "issues decided by the appellate court" to "become the law of the case" and no limitations imposed on the scope of resentencing. The district court's statement that it was not permitted by our previous decision to revisit other issues was in error.

Accordingly, we vacate Hamilton's sentence and remand for resentencing consistent with this opinion.

LOKEN, Circuit Judge, dissenting in part.
I would affirm the district court.

**All Citations**

950 F.3d 567

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

948 F.3d 807
United States Court of Appeals, Seventh Circuit.

UNITED STATES of America, Plaintiff-Appellee,
v.
Eleazar HERNANDEZ-
PERDOMO, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Ismael Rangel-Rodriguez Defendant-Appellant.

No. 19-1964, No. 19-2113
|
Argued December 6, 2019
|
Decided January 23, 2020

**Synopsis**
**Background:** In prosecutions of two defendants, who were Mexican citizens, for illegal reentry after removal, the United States District Court for the Northern District of Illinois, Elaine E. Bucklo, Senior District Judge, 367 F.Supp.3d 836 and 2019 WL 1399982, denied defendants' motions to dismiss grand jury indictments, and defendants entered conditional guilty pleas. Defendants appealed.

**Holdings:** The Court of Appeals, St. Eve, Circuit Judge, held that:

[1] defendants failed to exhaust their administrative remedies with respect to underlying removal orders entered in absentia, and

[2] underlying removal orders were not fundamentally unfair.

Affirmed.

**Procedural Posture(s):** Appellate Review; Pre-Trial Hearing Motion.

West Headnotes (5)

**[1]    Criminal Law** 🔑 Review De Novo

The Court of Appeals reviews de novo a district court's denial of a defendant's motion to dismiss an indictment.

1 Cases that cite this headnote

**[2]    Aliens, Immigration, and Citizenship** 🔑 Collateral Attack

An alien collaterally attacking an underlying removal order, in a prosecution for illegal reentry after removal, bears the burden of proving the underlying removal order was defective. Immigration and Nationality Act § 276(a, d), 8 U.S.C.A. § 1326(a, d).

**[3]    Aliens, Immigration, and Citizenship** 🔑 Denial of right to appeal; waiver of right

Aliens failed to exhaust their administrative remedies with respect to underlying removal orders entered in absentia, as a requirement for collaterally attacking those orders in prosecutions for illegal reentry after removal, where aliens failed to move to reopen the underlying removal orders, even if government failed to notify them of option of bringing motions to reopen. Immigration and Nationality Act §§ 240(b)(5)(C)(ii), 276(a, d), 8 U.S.C.A. §§ 1229a(b)(5)(C)(ii), 1326(a, d).

**[4]    Aliens, Immigration, and Citizenship** 🔑 Notice; order to show cause
**Aliens, Immigration, and Citizenship** 🔑 Collateral Attack
**Constitutional Law** 🔑 Admission and exclusion; deportation

Underlying removal orders entered in absentia were not fundamentally unfair under due process principles, as a requirement for collaterally attacking those orders in prosecutions for illegal reentry after removal, though notices to appear (NTA) for removal proceedings had not listed date or time for initial removal hearing, where aliens had not been entitled to non-discretionary

relief from removal; if they had raised prompt objections to notices to appear, new notices that listed date and time for initial removal hearing could have been issued. U.S. Const. Amend. 5; Immigration and Nationality Act § 276(a, d).

8 U.S.C.A. § 1326(a, d).

[5]  **Aliens, Immigration, and Citizenship**  Collateral Attack

**Constitutional Law**  Admission and exclusion; deportation

To establish that an underlying removal order was fundamentally unfair, as a requirement for collaterally attacking the order in prosecution for illegal reentry after removal, an alien must show the removal proceedings: (1) violated the alien's due process rights, and (2) caused the alien to suffer prejudice. U.S. Const. Amend. 5; Immigration and Nationality Act § 276(a, d).

8 U.S.C.A. § 1326(a, d).

1 Cases that cite this headnote

**\*808**  Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 18-cr-744 — Elaine E. Bucklo, *Judge.*

Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 18-cr-581 — Matthew F. Kennelly, *Judge.*

**Attorneys and Law Firms**

Corey B. Rubenstein, Attorney, Melody Lake Wells, Office of the United States Attorney, Chicago, IL, for Plaintiff-Appellee United States.

John F. Murphy, Sergio F. Rodriguez, William Banks Hardwicke, Attorneys, Office of the Federal Defender Program, Chicago, IL, for Defendant-Appellant Eleazar Hernandez-Perdomo.

Melody Lake Wells, Office of the United States Attorney, Chicago, IL, for Plaintiff-Appellee United States.

John F. Murphy, Attorney, Amanda Gabriella Penabad, Attorney, Office of the Federal Defender Program, Chicago, IL, for Defendant-Appellant Ismael Rangel-Rodriguez.

Before Rovner, Brennan, and St. Eve, Circuit Judges.

**Opinion**

St. Eve, Circuit Judge.

Ismael Rangel-Rodriguez and Eleazar Hernandez-Perdomo are both Mexican citizens who have never been lawfully admitted to the United States. Several years ago, immigration authorities served both of them with Notices to Appear ("NTA") for removal proceedings. These NTAs—like many—were defective because they did not list a date or time for an initial removal hearing. For different reasons, Rangel **\*809** and Hernandez were not present at their respective removal hearings, and the immigration judges ordered them removed *in absentia*. United States Immigration and Customs Enforcement ("ICE") eventually enforced these orders and removed both men to Mexico, but they each illegally returned to the United States and were indicted for illegal reentry in violation of 8 U.S.C. § 1326(a). In light of the Supreme Court's decision in *Pereira v. Sessions,* —— U.S. ——, 138 S. Ct. 2105, 201 L.Ed.2d 433 (2018), they moved to dismiss their respective indictments by collaterally attacking their underlying removal orders under 8 U.S.C. § 1326(d) based on the defective NTAs. The district courts denied their motions, and each defendant entered a conditional plea of guilty to the illegal reentry charge and reserved his right to appeal the denial of the motion to dismiss the indictment. We have consolidated the cases for decision.

We conclude that Rangel and Hernandez have failed to demonstrate that they satisfy any of the requirements set out in § 1326(d). We therefore affirm the judgments.

## I. Background

### A. Ismael Rangel-Rodriguez

In November 2010, police arrested Rangel for driving on a suspended license and several other offenses. The government served him that same day with an NTA announcing removal proceedings. This NTA ordered Rangel to appear before an immigration judge on "a date to be set at a time to be set." Rangel ultimately learned the date and time of

his upcoming hearings, though, because he appeared at three hearings via video conference in late winter and early spring of 2011, while he was in ICE custody. Around March of 2011, Rangel was released on bond. In January of 2012, however, Rangel was arrested for driving under the influence and taken into custody. His next hearing took place on February 22, 2012. Because Rangel remained in state custody, he did not attend this hearing and the immigration judge entered an order of removal *in absentia*. The record does not reveal whether Rangel ever knew of this particular hearing date.

On September 5, 2013, following a conviction on his DUI charge and a year in state prison, Rangel was released to ICE custody. The next day, an ICE officer wrote in Rangel's alien-registration file that Rangel did not wish to reopen his case. Although the alien-registration file entry states that Rangel received a "free legal aid list," the record does not reveal the extent to which Rangel was informed of his right to reopen. ICE removed Rangel from the United States on September 24, 2013, and Rangel reentered two days later. On October 2, ICE reinstated Rangel's removal order and removed him from the United States a second time on March 29, 2014.

At some point following his second removal, Rangel reentered the United States a third time. Chicago Police arrested him in August of 2018, and a grand jury then indicted him on one count of illegal reentry under 8 U.S.C. § 1326(a). Rangel filed a motion to dismiss the indictment, which the district court denied. Following Rangel's entry of a conditional plea of guilty, the district court sentenced Rangel to 23 months' imprisonment.

## B. Eleazar Hernandez-Perdomo

Hernandez tells a similar story. In 2010, ICE took him into custody and personally served him with an NTA that, like Rangel's, omitted the date and time of his first hearing before an immigration judge. This NTA correctly reflected Hernandez's address **\*810** at that time—on Sheridan Road in Highwood, Illinois.

Later that same day, Hernandez was released from ICE custody on his own recognizance. His Order of Release directed him to report in person to an immigration officer on September 7, 2010. The Order of Release further instructed: "You must not change your place of residence without first securing written permission from the immigration officer listed above."

On August 6, 2010, the Executive Office for Immigration Review ("EOIR") sent to Hernandez's Sheridan Road address a Notice of Hearing in Removal Proceedings to remedy the lack of date and time information in the initial NTA. This Notice set his hearing for January 3, 2012. Hernandez, however, never received this Notice because he had moved to a new apartment. Consequently, the Notice was returned to EOIR as undeliverable. Hernandez asserts that, on September 7, 2010, he reported to the immigration officer as required, and at that time he completed and returned to the officer a change-of-address form identifying his new address on Onwentsia Avenue in Highland Park, Illinois.

On January 27, 2011, the EOIR sent Hernandez another Notice of Hearing, this one moving up proceedings by ten months, to March 2, 2011. Despite Hernandez's claimed submission of his change-of-address form, the EOIR sent this Notice of Hearing to his outdated, Sheridan Road address. As with the prior Notice, it was returned as undeliverable.

Because he was unaware of the March 2 hearing, Hernandez did not appear. The immigration judge conducted the removal hearing *in absentia* and ordered him removed. Three months later, ICE agents arrested Hernandez at his Onwentsia address. ICE removed him eight days after his arrest.

As with Rangel, Hernandez's alien-registration file entry states that Hernandez received a "free legal aid list," but the record does not reveal the extent to which Hernandez was informed of his right to reopen. Unlike in Rangel's case, the alien-registration file does not comment on Hernandez's desire, or lack thereof, to reopen the proceedings against him.

In 2018, Hernandez was transferred back into ICE custody after being identified during a traffic stop. A grand jury indicted him on one count of illegal reentry. Like Rangel, Hernandez filed a motion to dismiss the indictment, which the district court denied. Hernandez entered a conditional plea of guilty, and the district court sentenced Hernandez to time served plus one year of supervised release.

## II. Discussion

[1] We review de novo a district court's denial of a defendant's motion to dismiss an indictment. *United States v. Arita-Campos*, 607 F.3d 487, 491 (7th Cir. 2010). As Rangel's and Hernandez's appeals raise identical legal issues

challenging the district courts' decisions to deny their motions to dismiss, we analyze the arguments they submit together.

[2] 8 U.S.C. § 1326 makes it a crime for a removed noncitizen to reenter, or attempt to reenter, the United States without the consent of the Attorney General. In *United States v. Mendoza-Lopez*, 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987), the Supreme Court held that a defendant charged under this statute has a due process right to challenge the underlying order of removal. In 1996, Congress amended the statute to codify the holding of *Mendoza-Lopez* by adding subsection (d), which imposes three requirements on an alien seeking to challenge the validity of his or her underlying removal order. The alien must have "exhausted any administrative **\*811** remedies that may have been available to seek relief against the order," the removal proceedings must have "improperly deprived the alien of the opportunity for judicial review," and the entry of the removal order must be "fundamentally unfair." 8 U.S.C. § 1326(d) (1)–(3). The alien bears the burden of proving the underlying removal order was defective. *United States v. Baptist*, 759 F.3d 690, 695 (7th Cir. 2014). Although we have never expressly stated that an alien must satisfy all three elements of § 1326(d) to collaterally attack his or her removal order, we have implied that this is so. *United States v. Alegria-Saldana*, 750 F.3d 638, 641 (7th Cir. 2014). We need not decide this issue today, though, because Rangel and Hernandez have failed to satisfy any of the three elements.

Rangel and Hernandez base their challenges on the Supreme Court's decision in *Pereira v. Sessions*, ––– U.S. ––––, 138 S. Ct. 2105, 201 L.Ed.2d 433 (2018). The *Pereira* Court addressed the "narrow question" whether an NTA that omits the time or place of an alien's removal hearing triggers the stop-time rule of the Illegal Immigration Reform and Immigrant Responsibility Act, thus terminating the period of continuous physical presence in the United States necessary for an alien to be eligible for discretionary cancellation of removal. *Id.* at 2110. The Court ruled that it did not because the missing information prevents an NTA from satisfying the statutory definition in 8 U.S.C. § 1229(a). *Id.* at 2113–14. Like many other litigants, Rangel and Hernandez both argued at the district court that a deficient NTA deprived an immigration court of jurisdiction, and thus their removal enters were void and could not support their respective

convictions for illegal reentry. We rejected this jurisdictional argument, however, in *Ortiz-Santiago v. Barr*, 924 F.3d 956 (7th Cir. 2019), where we held that an NTA's failure to comply with § 1229(a) was a claim-processing rule subject to waiver and forfeiture. *Id.* at 963. Defendants thus abandon their jurisdictional arguments on appeal. Instead, they now argue that, because they received deficient NTAs, they meet the statutory and constitutional requirements for a collateral attack of their prior orders of removal under 8 U.S.C. § 1326(d).

**A. Exhaustion & Judicial Review**

[3] Rangel and Hernandez contend they have exhausted their available administrative remedies, or should be excused from this requirement, because their challenges would have been futile at the time of their removal proceedings, as the Board of Immigration Appeals and every court to consider the question had previously condoned the "two-step procedure" to remedy deficient NTAs. *See, e.g.*, *Dababneh v. Gonzales*, 471 F.3d 806, 809–10 (7th Cir. 2006) (allowing this procedure). Even assuming that a futility exception applies to immigration exhaustion requirements, though, *Pereira* did not change the administrative remedies available to Rangel and Hernandez after the immigration judges ordered them removed *in absentia*. The solution for both defendants was the same: they both could have moved to reopen their removal proceedings as soon as they became aware of their respective removal orders, likely when they were taken into ICE custody for physical removal. Neither did so.

We have held that a motion to reopen is an "available" administrative remedy for purposes of § 1326(d)(1). *Arita-Campos*, 607 F.3d at 492. Ordinarily, an alien must file a motion to reopen within ninety days of the entry of a final decision. 8 U.S.C. § 1229a(c)(7)(C); 8 C.F.R. § 1003.23(b)(1). But if the underlying order was entered *in absentia* because the alien was in custody at the time of his hearing—as in Rangel's **\*812** case—or he did not receive notice of the proceedings—as in Hernandez's—then the alien may instead move to reopen that removal order "at any time." 8 U.S.C. § 1229a(b)(5)(C)(ii); *Arita-Campos*, 607 F.3d at 492. Likewise, if Hernandez and Rangel had filed motions to reopen, they could have obtained judicial review of the denial of those motions or of the final removal orders entered after a proper hearing. They were thus not "improperly deprived"

of judicial review, 8 U.S.C. § 1326(d)(2), they just never sought it. See *United States v. Larios-Buentello*, 807 F.3d 176, 178 (7th Cir. 2015).

Rangel and Hernandez argue that the government failed to notify them of the option of a motion to reopen, but "aliens are presumed capable of researching generally available remedies." *Alegria-Saldana*, 750 F.3d at 641. They attempt to distinguish *Alegria-Saldana* because, there, immigration authorities undisputedly informed the alien of his right to appeal. See *id.* One cannot read our decision in *Alegria-Saldana* as so limited: we also explained the alien had not exhausted his opportunity to file a motion to reopen or to seek habeas relief, with no indication that authorities ever informed the alien of these remedies. *Id.* Defendants also try to cabin the reach of our ruling in *Alegria-Saldana* by arguing that the immigration judge may permissibly forgo providing guidance only about the availability of a separate habeas suit. This attempt, though, does not persuade us. Surely, a lay person would have a far easier time understanding the explicit statutory provision for reopening an *in absentia* order through § 1229a(b)(5) than the habeas corpus remedy under 28 U.S.C. § 2241 and the common law, *INS v. St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). *Alegria-Saldana* does not suggest that an immigration judge has a duty to inform an alien of direct remedies but not more obscure, collateral ones.

Rangel and Hernandez also contend this interpretation of *Alegria-Saldana* contradicts rulings of the Second and Third Circuits, which have held that the government violates the Due Process Clause by misleading an alien into believing he has no opportunity for judicial review. See *United States v. Charleswell*, 456 F.3d 347 (3d Cir. 2006); *United States v. Lopez*, 445 F.3d 90 (2d Cir. 2006) (Sotomayor, J.). As neither defendant presented this argument to the district court or in their opening briefs, they have both waived it. See *United States v. Dehaan*, 896 F.3d 798, 808 n.4 (7th Cir. 2018).

Even if it were not waived, though, these cases are inapposite to the circumstances presented here. In *Charleswell* and *Lopez*, the government did not merely fail to notify the defendants of their opportunities for judicial review, but rather presented affirmative, misleading (albeit technically correct) statements. In *Charleswell*, a reinstatement order read, "You may contest this determination by making a written

or oral statement to an immigration officer. You do not have a right to a hearing before an immigration judge." 456 F.3d at 356. An alien does, however, have a statutory right to direct judicial review in the appropriate court of appeals pursuant to 8 U.S.C. § 1252(a)(5). *Id.* at 357. Similarly, in *Lopez*, the government told an alien he was not eligible for review by the Board of Immigration Appeals under § 212(c) of the Immigration and Naturalization Act, even though that relief was still available through a petition for habeas corpus. 445 F.3d at 92–93. In both these cases, the government informed aliens that certain relief was unavailable, when in fact is was available through a different avenue. These statements excluding forms of relief, the courts reasoned, mislead an alien to believe that he has no opportunity for judicial review. *Charleswell*, 456 F.3d at 357; **\*813** *Lopez*, 445 F.3d at 99–100. Indeed, such "affirmative misstatements" are more problematic than omissions because they "function[ ] as a deterrent to seeking relief." *Charleswell*, 456 F.3d at 357 (quoting *Lopez*, 445 F.3d at 99).

Rangel and Hernandez argue that their NTAs misled them by saying they could seek review "at the conclusion of [their] hearing[s]," without also listing other available options for relief, such as a motion to reopen. Thus, although the statement on their NTAs was factually accurate, the defendants argue that they were misled to believe that they could no longer contest their removal orders because they were not present at their hearings and missed their opportunity. The NTAs, though, did not list any restrictions on an alien's access to relief: they merely failed to state all of the possible options. Neither the Second nor Third Circuit have found the lack of full disclosure sufficient to collaterally attack a removal order, *see Charleswell*, 456 F.3d at 355–56 (reserving question); *Lopez*, 445 F.3d at 96 (rejecting argument), and therefore our interpretation of *Alegria-Saldana* is not inconsistent.

The defendants also argue that their time in ICE custody was so brief—Rangel spent 19 days there after the entry of his removal order, and Hernandez, only 8—that filing a motion to reopen was not feasible. True, in *Arita-Campos*, the Court deemed 39 days in custody, a period significantly longer than the time either defendant spent in this case, sufficient time to file a motion to reopen. 607 F.3d at 492. Other circuits,

though, have held that the short time the defendants spent was enough. *See United States v. Hinojosa-Perez*, 206 F.3d 832, 836 (9th Cir. 2000) (deeming 8 days sufficient time to file a motion to reopen).

In any event, the number of days in custody is irrelevant because an alien may file a motion to reopen "at any time." 8 U.S.C. § 1229a(b)(5)(C)(ii). The parties dispute how far that language goes. The government argues that the language "at any time" in § 1229a(b)(5)(C)(ii) means what it says—"at any time." Under that literal interpretation, the government argues that Rangel and Hernandez could have filed a motion on the day of oral argument. Defendants, on the other hand, argue that they were permitted to file their motions to reopen only until their orders of removal were reinstated, citing to 8 U.S.C. § 1231(a)(5). We need not resolve the precise time when a motion to reopen becomes unavailable, however, because our case law makes clear that Rangel and Hernandez may have moved to reopen at least until the time they reentered the country, including while they were in Mexico after their removals. *See Cordova-Soto v. Holder*, 732 F.3d 789, 794–95 (7th Cir. 2013). Rangel and Hernandez thus had a sufficient amount of time to file a motion to reopen, and the fact that they both were only in ICE custody for a brief time has no bearing on whether the motion to reopen was available to them.

**B. Fundamental Unfairness**

[4]  [5]  Rangel and Hernandez argue that their removal proceedings were fundamentally unfair for purposes of 8 U.S.C. § 1326(d)(3) because of their deficient NTAs. To establish fundamental unfairness, we have required a defendant to show the removal proceedings (1) violated the alien's due process rights, and (2) caused the alien to suffer prejudice. *Arita-Campos*, 607 F.3d at 493. To satisfy both prongs of this analysis, an alien must demonstrate that he or she was entitled to non-discretionary relief from removal.

*See id.* We have held that aliens have no liberty interest in discretionary relief, and there can be no prejudice unless "judicial **\*814** review 'would have yielded him relief from deportation.' " *Id.* (quoting *United States v. De Horta Garcia*, 519 F.3d 658, 661 (7th Cir. 2008)).

Defendants assert that, under this court's decision in *Ortiz-Santiago*, the immigration judge would have been obligated to quash their NTAs, and this qualifies as mandatory relief from removal. In *Ortiz-Santiago*, we did recognize the commonly-utilized "two-step procedure" of sending a deficient NTA and later remedying it "may be grounds for dismissal of the case." *Ortiz-Santiago*, 924 F.3d at 962–63. We also said, though, that this is a "curable lapse." *Id.* at 965. "If Ortiz-Santiago had raised a prompt objection to the Notice ....[a] new, compliant Notice could have issued, and the case could have proceeded." *Id.* Catching the errors in the deficient NTAs would not have led to non-discretionary relief from removal in either Hernandez's or Rangel's respective cases. Rather, if Hernandez or Rodriguez were to have alerted the immigration court of the NTA's omissions, ICE could have proceeded with removal by simply serving a new, compliant NTA. As both of the defendants have failed to identify any other non-discretionary relief for which they would have been eligible had they received a compliant NTA,[1] they have failed to demonstrate that the removal proceedings were fundamentally unfair.

### III. Conclusion

For the foregoing reasons, we **AFFIRM** the district courts' judgments.

**All Citations**

948 F.3d 807

---

### Footnotes

1    Hernandez offers, in a footnote, that he might have been eligible for voluntary departure, but rightly recognizes that denial of this discretionary relief is not enough to prove that removal proceedings were "fundamentally unfair" under § 1326(d)(3). *See Arita-Campos*, 607 F.3d at 493.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification

Petition for Certiorari Docketed by KEITH A. JAMES v. UNITED STATES, U.S., October 13, 2020

950 F.3d 289
United States Court of Appeals, Fifth Circuit.

UNITED STATES of America, Plaintiff – Appellee

v.

Keith A. JAMES, Defendant – Appellant

No. 18-31069
|
FILED February 18, 2020

**Synopsis**

**Background:** Defendant was convicted, upon a guilty plea, in the United States District Court for the Eastern District of Louisiana, Martin L. C. Feldman, J., of being a felon in possession of a firearm, and was sentenced under the Armed Career Criminal Act (ACCA) to a 188-month prison term. Defendant appealed, challenging her sentence.

**[Holding:]** The Court of Appeals, Haynes, Circuit Judge, held that prior Louisiana conviction for armed robbery was "violent felony" under the force clause of the ACCA.

Affirmed.

**Procedural Posture(s):** Appellate Review; Sentencing or Penalty Phase Motion or Objection.

West Headnotes (6)

**[1]**  **Criminal Law**  ⚷ Review De Novo

The Court of Appeals reviews preserved challenges to legal conclusions underlying a district court's application of the Armed Career Criminal Act (ACCA) de novo. 🚩 18 U.S.C.A. § 924(e)(1).

**[2]**  **Sentencing and Punishment**  ⚷ Violent or Nonviolent Character of Offense

To qualify as a violent felony under the Armed Career Criminal Act (ACCA), an offense must either satisfy the ACCA's force clause or be one of the statutorily enumerated offenses. 🚩 18 U.S.C.A. § 924(e)(2)(B).

**[3]**  **Sentencing and Punishment**  ⚷ Violent or Nonviolent Character of Offense

Under the categorical approach for determining whether a prior conviction qualifies as a violent felony under the Armed Career Criminal Act (ACCA), the court analyzes whether the least-culpable conduct set forth in the statute of conviction would constitute a violent felony. 🚩 18 U.S.C.A. § 924(e)(2)(B).

**[4]    Sentencing and Punishment** ⬦ Particular offenses

Defendant's prior Louisiana conviction for armed robbery qualified as a "violent felony" under the force clause of the Armed Career Criminal Act (ACCA); Louisiana armed robbery statute required proof that defendant used force or intimidation against another, while armed with a dangerous weapon. 🚩 18 U.S.C.A. § 924(e)(2)(B); La. Rev. Stat. Ann. § 14:64(A).

**[5]    Courts** ⬦ Number of judges concurring in opinion, and opinion by divided court

The Court of Appeals is bound by its precedent under the rule of orderliness unless the United States Supreme Court or an en banc decision of the Court of Appeals has changed the relevant law.

**[6]    Sentencing and Punishment** ⬦ Violent or Nonviolent Character of Offense

When defining what constitutes a violent felony under the force clause of the Armed Career Criminal Act (ACCA), the phrase "physical force" means force capable of causing physical pain or injury to another person. 🚩 18 U.S.C.A. § 924(e)(2)(B).

**West Codenotes**

**Recognized as Unconstitutional**

🚩 18 U.S.C.A. § 924(e)(2)(B)(ii)

**\*290**  Appeal from the United States District Court for the Eastern District of Louisiana, Martin L.C. Feldman, U.S. District Judge

**Attorneys and Law Firms**

Kevin G. Boitmann, Diane Hollenshead Copes, Esq., Assistant U.S. Attorneys, U.S. Attorney's Office, Eastern District of Louisiana, New Orleans, LA, for Plaintiff-Appellee.

Samantha Jean Kuhn, Assistant Federal Public Defender, Maura Doherty, Federal Public Defender's Office, Eastern District of Louisiana, New Orleans, LA, for Defendant-Appellant.

Before HAYNES and OLDHAM, Circuit Judges, and HANEN, [*] District Judge.

**Opinion**

HAYNES, Circuit Judge:

The disputed question in this case is whether the Louisiana offense of armed robbery is a violent felony under the Armed Career Criminal Act ("ACCA"). Under the ACCA, the ordinary statutory *maximum* sentence of ten years of imprisonment morphs to a statutory *minimum* of fifteen years of imprisonment. *Compare* 🚩 18 U.S.C. § 924(a)(2), *with* 🚩 § 924(e)(1). We conclude that Louisiana armed robbery qualifies as a violent felony and AFFIRM the district court's judgment.

**\*291  I. Background**

Keith A. James pleaded guilty to one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). In addition to admitting that he owned a firearm, James admitted that he had three prior convictions of armed robbery and three prior convictions of purse snatching.

In James's presentence investigation report ("PSR"), the probation officer recommended that James's convictions for armed robbery, purse snatching, [1] and second-degree battery be classified as violent felonies. Because the PSR determined that James was a career offender, it calculated James's adjusted base offense level as 33 pursuant to § 4B1.4(b)(3)(B) of the U.S. Sentencing Guidelines. After applying a three-level reduction for acceptance of responsibility, the PSR calculated his total offense level as 30. Under the usual application of the Guidelines, his range would have been 151 to 188 months. If James was not an armed career criminal, his sentence would have been capped at 120 months due to the statutory maximum. [2] *See* 18 U.S.C. § 924(a)(2). However, because of the ACCA mandatory minimum sentence, James's actual range was 180 to 188 months. James filed a written objection to the PSR's classification of armed robbery as a violent felony. The court overruled his objection and sentenced James to 188 months' imprisonment and five years of supervised release.

**II. Standard of Review**

 **[1]**  We review preserved challenges to "legal conclusions underlying a district court's application of" the ACCA de novo. *United States v. Fuller*, 453 F.3d 274, 278 (5th Cir. 2006).

**III. Discussion**

**A. Existing Precedent**

The ACCA defines "violent felony" as "any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device" that: "has as an element the use, attempted use, or threatened use of physical force against the person of another" (the "force clause"); "is burglary, arson, or extortion, [or] involves use of explosives" (the "enumerated crimes"); or "otherwise involves conduct that presents a serious potential risk of physical injury to another" (the now-stricken "residual clause"). 18 U.S.C. § 924(e)(2)(B).

In Louisiana, armed robbery is "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." LA. REV. STAT. ANN. § 14:64(A). The elements of simple robbery are the same, except that they lack the dangerous-weapon element. *Id.* § 14:65(A).

In *United States v. Brown*, we held that the Louisiana crime of simple robbery qualifies as a violent felony under the ACCA. 437 F.3d 450, 452 (5th Cir. 2006). We rejected Brown's argument that a simple robbery conviction could be achieved "simply with intimidation and,  **\*292**  therefore, without the use or threatened use of force." *Id.* We reasoned that Louisiana law (1) enumerated simple robbery as a crime of violence and (2) defined a crime of violence as "an offense that has, as an element, the use, attempted use, or threatened use of physical force against the person or property of another." *Id.* (emphasis removed). Because Louisiana classified simple robbery as a crime of violence, which "necessarily entails the use or threatened use of force," simple robbery was a violent felony under the ACCA. *Brown*, 437 F.3d at 452–53.

## B. Subsequent Ruling on the ACCA's Residual Clause

In *Johnson v. United States* (*Johnson II*), ––– U.S. ––––, 135 S. Ct. 2551, 192 L.Ed.2d 569 (2015), the Supreme Court struck down the ACCA's residual clause, which defined "violent felony" to include "any crime punishable by imprisonment for a term exceeding one year ... [that] involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B); *Johnson II*, 135 S. Ct. at 2555–56. The residual clause was held void for vagueness because it "produce[d] more unpredictability and arbitrariness than the Due Process Clause tolerates." *Johnson II*, 135 S. Ct. at 2558.

**[2]** **[3]** Post-*Johnson II*, to qualify as a violent felony under the ACCA, an offense must either satisfy the force clause or be one of the statutorily enumerated offenses. *See* 18 U.S.C. § 924(e)(2)(B); *see United States v. Burris*, 920 F.3d 942, 945–46 (5th Cir. 2019) (holding that the Texas robbery statute, which included "intentionally or knowingly threaten[ing] or plac[ing] another in fear of imminent bodily injury or death," was a violent felony under the ACCA), *petition for cert. filed*, No. 19-6186 (U.S. Oct. 3, 2019); *see also United States v. Reyes-Contreras*, 910 F.3d 169, 181–82 (5th Cir. 2018) (en banc) (addressing definition of "physical force" under the Sentencing Guidelines). Because the record in this case does not identify which of the statutory factors supported the relevant convictions, we need not determine whether the statute is divisible. Instead, we analyze whether the least-culpable conduct in the statute would constitute a violent felony under the ACCA. *See Moncrieffe v. Holder*, 569 U.S. 184, 190–91, 133 S.Ct. 1678, 185 L.Ed.2d 727 (2013) (addressing use of the categorical approach where the court must analyze the state court conviction by addressing the least-culpable conduct criminalized by the statute at issue; the underlying facts do not come into play).

**[4]** **[5]** James contends that the *Brown* panel must have relied on the residual clause when it concluded that the use of force needed for robbery was the same as the use of force contemplated in the ACCA. However, the *Brown* panel did not cite or discuss the ACCA's residual clause. *See Brown*, 437 F.3d at 451–53. On its face, the *Brown* panel relied on and discussed only the ACCA's force clause, and it concluded that Louisiana simple robbery satisfied that clause, so it was not overturned by *Johnson II*.[3] *See id.* We are thus bound by that precedent to reject James's argument under the rule of orderliness unless the Supreme Court or our en banc court has changed the relevant law. **\*293** *Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008) (explaining rule of orderliness).

## C. Analysis of the ACCA's Force Clause

**[6]** James alternatively argues that subsequent case law calls *Brown*'s holding into question because of precedent limiting the reach of the force clause. In *Johnson v. United States* (*Johnson I*), the Supreme Court considered whether the Florida felony offense of battery, defined as "actually and intentionally touching" another person, had as an element the use of force. 559 U.S. 133, 135, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010) (brackets omitted). The Florida Supreme Court had held that "*any* intentional physical contact, no matter how slight"—including a tap on the shoulder without consent—could support a battery conviction. *Id.* at 138, 130 S.Ct. 1265 (internal quotation marks omitted). The Supreme Court reasoned that, when defining what constitutes a violent felony, the phrase "physical force" must mean "force capable of causing physical pain or injury to another person." *Id.* at 140, 130 S.Ct. 1265. The Court also noted that, at common law, battery historically "was a misdemeanor, not a felony." *Id.* at 141, 130 S.Ct. 1265. The Florida offense of battery thus did not count as a violent felony for ACCA purposes. *Id.* at 139–140, 130 S.Ct. 1265.

Subsequently, in *Stokeling v. United States*, the Supreme Court held that a Florida robbery offense satisfied the ACCA's force clause when it required force sufficient to "overcome a victim's resistance." —— U.S. ——, 139 S. Ct. 544, 554–55, 202 L.Ed.2d 512 (2019). The Florida statute at issue defined robbery as "the taking of money or other property ... from the person or custody of another, ... when in the course of the taking there is the use of force, violence, assault, or putting in fear," and the Florida Supreme Court had explained that robbery required "resistance by the victim that is overcome by the physical force of the offender." *Id.* at 549 (internal quotation marks omitted). The Court explained that the ACCA should be understood to incorporate the common-law meanings of "force" and "robbery" and held that the amount of force needed to "overcome [the victim's] resistance" would satisfy the force element. *Id.* at 550–52, 555.

Here, the Louisiana Supreme Court has similarly stated that

> the crime of robbery contemplates that some energy or physical effort will be exerted in the "taking" element of the crime and that *some additional "use of force" in overcoming the will or resistance of the victim is necessary* to distinguish the crime of robbery from the less serious crime of theft.

*State v. Leblanc*, 506 So. 2d 1197, 1200 (La. 1987) (emphasis added). Likewise, it explained that the robbery statute "provide[s] a more severe grade of theft for those instances in which a thief uses force or intimidation to accomplish his goals," and thus "the legislature apparently sought to emphasize the increased risk of danger to human life posed when a theft is carried out in face of the victim's opposition." *State v. Mason*, 403 So. 2d 701, 704 (La. 1981).

James highlights Louisiana cases in which no direct threat of force was involved and contends that the amount of force required in Louisiana is less than that in Florida. *See, e.g.*, *State v. Jones*, 767 So. 2d 808, 810–11 (La. Ct. App. 2000); *State v. Robinson*, 713 So. 2d 828, 829, 832 (La. Ct. App. 1998). These cases, however, do not demonstrate that *Brown* has been overruled by subsequent precedent.

*Brown*'s continued validity is demonstrated by our recent analysis of a similar "robbery by intimidation" in the context of **\*294** determining whether a federal bank-robbery conviction qualified as a crime of violence for the purposes of U.S. Sentencing Guidelines § 4B1.2. *United States v. Brewer*, 848 F.3d 711, 713, 715 (5th Cir. 2017). We reasoned that "intimidation in the bank-robbery context is inherently tied to a threatened use of force." *Id.* at 715. In some circumstances, an "implicit threat to use force" can be a threat of physical force even though "no express threat was made." *Id.* at 715–16. For example, if a bank robber demands that a teller give him money, the demand carries at least "an implicit threat of direct physical force." *Id.* at 716. The circumstances in the Louisiana state cases of *Jones* and *Robinson* were ones where defendants made demands of cashiers; the demands carried similar implied threats to those recognized in *Brewer. Compare Brewer*, 848 F.3d at 715–16, *with Jones*, 767 So. 2d at 810–11, *and Robinson*, 713 So. 2d at 829. The intimidation tactics used, though indirect, were threats of physical force. *See generally Reyes-Contreras*, 910 F.3d at 182 (finding "no valid distinction between direct and indirect force").

In sum, we conclude that subsequent precedent buttresses rather than overrules *Brown.* Accordingly, Louisiana armed robbery is a violent felony under the ACCA's force clause. [4]

## IV. Conclusion

For the foregoing reasons, the district court's judgment is AFFIRMED.

**All Citations**

950 F.3d 289

## Footnotes

| | |
|---|---|
| * | District Judge of the Southern District of Texas, sitting by designation. |
| 1 | We agree with the Government that any error in finding the purse-snatching convictions to be violent felonies is harmless because there are three separate armed-robbery convictions. In light of our holding that the armed-robbery convictions qualify, they are sufficient in number to meet the ACCA's threshold. |
| 2 | Moreover, if James had not qualified for the U.S. Sentencing Guidelines § 4B1.4 armed-career-criminal enhancement, his Guidelines range would likely have been below the 120-month cap. |
| 3 | James points to footnote 2 of *Brown*, which discussed the definition of "intimidation" and noted that "by referencing an 'increased risk of danger to human life,' " Louisiana courts had "show[n] that intimidation entails the threat of force." 437 F.3d at 452 n.2. Even if *Brown*'s second rationale was intertwined with the residual clause, its holding about the force clause was not dependent on the residual clause. |
| 4 | James also argues that the district court erred in adding criminal history points to his offense level calculation under the Sentencing Guidelines. Because the argument turns on the same already-rejected analysis of wording, we reject this argument as well. *See United States v. Shepherd*, 848 F.3d 425, 427 (5th Cir. 2017). |

**End of Document**                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

955 F.3d 391
United States Court of Appeals, Fourth Circuit.

UNITED STATES of America, Plaintiff - Appellant,
v.
Tredarius Jameriquan KEENE, a/k/a Bubba,
a/k/a Bubs; Montez Lamar Allen, a/k/
a Doc Milla; Javontay Jacquis Holland, a/
k/a Tay, a/k/a Reckless; Jalen Cormarrius
Terry, a/k/a Fats, Defendants - Appellees.

No. 19-4609
|
Argued: January 31, 2020
|
Decided: April 9, 2020

**Synopsis**
**Background:** In prosecution for violent crimes in aid of racketeering activity (VICAR) and related crimes, the United States District Court for the Western District of Virginia, Michael F. Urbanski, Chief Judge, 401 F.Supp.3d 720, granted defendants' motion to dismiss VICAR counts, and government filed interlocutory appeal.

**[Holding:]** The Court of Appeals, Keenan, Circuit Judge, held that categorical approach did not apply in determining whether defendants' alleged conduct in assaulting victims with dangerous weapon in violation of Virginia's brandishing statute constituted predicate assault with dangerous weapon under VICAR statute.

Reversed and remanded.

**Procedural Posture(s):** Appellate Review; Preliminary Hearing or Grand Jury Proceeding Motion or Objection.

West Headnotes (4)

**[1]** **Racketeer Influenced and Corrupt Organizations** ⚷ Nexus between enterprise and acts

Categorical approach did not apply in determining whether defendants' alleged conduct in assaulting victims with dangerous weapon in violation of Virginia's brandishing statute constituted predicate assault with dangerous weapon under federal violent crimes in aid of racketeering activity (VICAR) statute; rather, Congress intended for individuals to be convicted of VICAR assault with dangerous weapon by engaging in conduct that violated both that enumerated federal offense as well as state law offense, regardless whether offenses were categorical match. 18 U.S.C.A. § 1959; Va. Code Ann. § 18.2-282.

2 Cases that cite this headnote

**[2]** **Criminal Law** ⚷ Review De Novo

Court of Appeals reviews de novo district court's decision dismissing counts in indictment.

**[3]** **Racketeer Influenced and Corrupt Organizations** ⚷ Nexus between enterprise and acts

To establish that defendant violated violent crimes in aid of racketeering activity (VICAR) statute, government must prove: (1) existence of Racketeer Influenced and Corrupt Organizations Act (RICO) enterprise; (2) that enterprise was engaged in racketeering activity; (3) that defendant had position in enterprise; (4) that defendant committed crime specified in VICAR statute; and (5) that defendant's purpose was to maintain or increase his position in enterprise. 18 U.S.C.A. § 1959.

1 Cases that cite this headnote

**[4]** **Sentencing and Punishment** ⚷ Other Offenses, Charges, Misconduct

In general, defendant will not be subject to detrimental legal consequence based on past conviction unless courts can be certain that his prior offense satisfies full contours of federal requirement.

AR.06616

**\*392**  Appeal from the United States District Court for the Western District of Virginia, at Danville. Michael F. Urbanski, Chief District Judge. (4:18-cr-00012-MFU-RSB-3; 4:18-cr-00012-MFU-RSB-4; 4:18-cr-00012-MFU-RSB-5; 4:18-cr-00012-MFU-RSB-8)

**Attorneys and Law Firms**

ARGUED: Michael Andrew Baudinet, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellant. Paul Graham Beers, GLENN, FELDMANN, DARBY & GOODLATTE, Roanoke, Virginia, for Appellees. ON BRIEF: Thomas T. Cullen, United States Attorney, Laura Day Rottenborn, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellant. Mark D. Haugh, HAUGH & PREAS, PLC, Marion, Virginia, for Appellee Tredarius Keene. Thomas J. Bondurant, Jr., Monica Taylor Monday, GENTRY LOCKE RAKES & MOORE, Roanoke, Virginia; Jacqueline M. Reiner, JACQUELINE M. REINER, PLLC, Richmond, Virginia, for Appellee Javontay Holland. Seth C. Weston, LAW OFFICE OF SETH C. WESTON, PLC, Roanoke, Virginia, for Appellee Montez Allen.

Before KEENAN, HARRIS, and QUATTLEBAUM, Circuit Judges.

**Opinion**

Reversed and remanded by published opinion. Judge Keenan wrote the opinion, in which Judge Harris and Judge Quattlebaum joined.

BARBARA MILANO KEENAN, Circuit Judge:

This appeal requires us to interpret the text of 🚩 18 U.S.C. § 1959, which imposes criminal penalties for committing "violent crimes in aid of racketeering activity" (the VICAR statute). The VICAR statute defines prohibited conduct by reference to enumerated federal offenses, but also requires that the conduct be "in violation of the laws of any State or the United States." 🚩 18 U.S.C. § 1959. Relevant to this appeal, the defendants were charged under the VICAR statute in three counts with the enumerated federal offense of committing assault with a dangerous weapon, in violation of the Virginia prohibition against brandishing a firearm set forth in 🟡 Virginia Code § 18.2-282 (Virginia brandishing).

Because the VICAR statute requires the commission of enumerated federal offenses as well as separate state or federal crimes, the defendants assert that we must apply the categorical approach articulated in 🟡 Taylor v. United States, 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), to determine whether Virginia brandishing is a "categorical match" to the enumerated federal offense of assault with a dangerous weapon. According to the defendants, if the Virginia offense "sweeps more broadly" than the enumerated federal offense, the crimes are not a categorical match and the defendants cannot be convicted of VICAR assault with a dangerous weapon based on Virginia brandishing. *See* 🟡 Omargharib v. Holder, 775 F.3d 192, 196-97 (4th Cir. 2014). In the district court, the government agreed with the defendants that a comparison of the federal and state offenses was required without any consideration **\*393** of the defendants' actual conduct. In accord with the parties' agreed view, the district court did not consider the defendants' conduct but instead applied the categorical approach. The court concluded that Virginia brandishing was broader than the enumerated federal offense of assault with a dangerous weapon, and dismissed the three VICAR counts at issue.

**[1]** Upon our review, we conclude that the portion of the VICAR statute before us is not subject to analysis under the categorical approach. Unlike numerous other statutory provisions, nothing in the statutory language at issue suggests that Congress intended an element-by-element comparison of the enumerated federal offense with the specified state offense. Nor do the underlying policy rationales for the categorical approach apply to the relevant text in the VICAR statute. Instead, the statutory language at issue requires only that a defendant's *conduct*, presently before the court, constitute one of the enumerated federal offenses as well as the charged state crime. We therefore reverse the decision of the district court, and remand for the court to reinstate the dismissed VICAR charges alleging Virginia brandishing.

**I.**

The defendants, Montez Allen, Javontay Holland, Tredarius Keene, and Jalen Terry, along with several other co-defendants, were charged in a 15-count indictment with various offenses related to their involvement in the Bloods gang in Danville, Virginia. In Counts 4, 8, and 14 of the indictment, the defendants were charged with committing violent crimes in aid of racketeering activity, in violation

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 122 of 912

of 🚩 18 U.S.C. § 1959 (the VICAR-brandishing counts). [1] Those counts contained allegations that the defendants violated the VICAR statute by assaulting three victims with a dangerous weapon, which acts also violated the Virginia brandishing statute, 🔖 Virginia Code § 18.2-282. The indictment further alleged that the defendants committed these assaults by shooting or shooting at the victims with a firearm.

The defendants moved to dismiss the VICAR-brandishing counts, contending that the crime of Virginia brandishing did not "match" the enumerated federal offense of "assault with a dangerous weapon" in the VICAR statute. Applying the categorical approach, the district court concluded that the crime of Virginia brandishing is broader than the offense of assault with a dangerous weapon under VICAR, because the federal assault crime requires as an element an intent or threat to inflict injury while Virginia brandishing does not. The district court accordingly dismissed the VICAR-brandishing counts, and the government filed this interlocutory appeal.

## II.

**[2]** We review de novo the district court's decision dismissing the three counts in the indictment. 🔖 *United States v. Good*, 326 F.3d 589, 591 (4th Cir. 2003). Encompassed within this de novo review is the question whether the categorical approach must be applied to the VICAR-brandishing counts, which presents an issue of statutory interpretation. 🔖 *United States v. Davis*, ––– U.S. ––––, 139 S. Ct. 2319, 2327, 204 L.Ed.2d 757 (2019) (applicability of categorical approach is question of statutory interpretation); 🔖 *United States v. Weaver*, 659 F.3d 353, 356 (4th Cir. 2011) (de novo review applies when construing a statute's language).

**\*394** The VICAR statute provides in relevant part:

(a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, *assaults with a dangerous weapon*, commits assault resulting in serious bodily injury upon, or threatens to

commit a crime of violence against any individual *in violation of the laws of any State or the United States*, [2] or attempts or conspires so to do, shall be punished ...

(3) for assault with a dangerous weapon or assault resulting in serious bodily injury, by imprisonment for not more than twenty years or a fine under this title, or both.

🚩 18 U.S.C. § 1959 (emphasis added).

**[3]** The VICAR statute complements the Racketeer Influenced and Corrupt Organizations Act (RICO), 🚩 18 U.S.C. §§ 1961 through 🔖 1968, by addressing the "particular danger posed by those ... who are willing to commit violent crimes in order to bolster their positions within [racketeering] enterprises." 🔖 *United States v. Ayala*, 601 F.3d 256, 266 (4th Cir. 2010). Accordingly, to establish that a defendant violated the VICAR statute, the government must prove: (1) the existence of a RICO enterprise; (2) that the enterprise was engaged in racketeering activity; (3) that the defendant "had a position in the enterprise;" (4) that the defendant committed one of the crimes specified in the VICAR statute, here, assault with a dangerous weapon, also constituting Virginia brandishing; and (5) that the defendant's purpose was "to maintain or increase his position in the enterprise." 🔖 *United States v. Zelaya*, 908 F.3d 920, 926-27 (4th Cir. 2018) (citation and internal quotation marks omitted). The only element at issue in this appeal is the fourth element.

In the district court, both the government and the defendants argued that the VICAR statute requires a comparison of the definition of the enumerated federal offense, assault with a dangerous weapon, with the charged state offense, Virginia brandishing, without consideration of the defendants' conduct. The government now has changed course, arguing that the language of the VICAR statute does not indicate any basis for requiring a comparison of the elements of the federal and state offenses. Thus, the government presently maintains that a jury must find that the defendant's actual conduct constituted one of the enumerated federal offenses while also violating the state law charged in the indictment.

In response, the defendants contend that under Supreme Court precedent, whenever a federal statute refers to enumerated federal crimes and state crimes, a defendant violates the statute only if the elements of the state offense are equivalent to or narrower than the federal offense. Therefore, the

defendants urge us to apply the categorical approach to the VICAR statute, and to conclude that Virginia brandishing may not serve as a predicate offense for the crime of assault with a dangerous weapon.

Initially, we observe that we are troubled by the government's failure to advance **\*395** its current argument before the district court. The inconsistency of advocating one position in the district court, and of reversing course on appeal, reflects poorly on the government in this case. Nevertheless, engaging in our required de novo review of the statutory language, we agree that the categorical approach does not apply to the relevant language in the VICAR statute.

A.

[4] Before addressing the parties' arguments, we begin by discussing the principles underlying the categorical approach, an analytical tool used to determine whether a particular state or federal offense falls within a federal statutory definition.

*See generally* *Descamps v. United States*, 570 U.S. 254, 133 S.Ct. 2276, 186 L.Ed.2d 438 (2013). The categorical approach typically is used in considering prior convictions, and reflects the general principle that a defendant will not be subject to a detrimental legal consequence based on a past conviction unless courts can be certain that his prior offense satisfies the full contours of the federal requirement.[3]

*See generally* *id.* at 266-74, 133 S.Ct. 2276. Accordingly, this approach most often is used to evaluate whether a defendant, based on a prior conviction, qualifies for a federal sentencing enhancement or an immigration consequence. *See, e.g.,* *Moncrieffe v. Holder*, 569 U.S. 184, 133 S.Ct. 1678, 185 L.Ed.2d 727 (2013); *Taylor*, 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607.

Under the categorical approach, courts "focus[ ] solely on the elements of the offense of conviction, comparing those to the commonly understood elements of the generic offense identified in the federal statute." *United States v. Price*, 777 F.3d 700, 704 (4th Cir. 2015); *see also* *Moncrieffe*, 569 U.S. at 190, 133 S.Ct. 1678. A state offense is a "categorical match" to the federal crime only if "the elements comprising the statute of conviction [are] the same as, or narrower than, those of the generic offense." *Price*, 777 F.3d at 704.

The categorical approach arose from the Supreme Court's decision in *Taylor v. United States*, 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), which addressed whether a defendant qualified for an enhanced sentence under the Armed Career Criminal Act, 18 U.S.C. § 924(e) (the ACCA), based on his prior state burglary conviction. The ACCA establishes a 15-year mandatory sentence for certain federal firearm offenses if the defendant has "three previous convictions ... for a violent felony or a serious drug offense, or both." 18 U.S.C. § 924(e). Focusing on the text and legislative history of the ACCA, the Supreme Court concluded that "Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions." *Taylor*, 495 U.S. at 600, 110 S.Ct. 2143.

The Court in *Taylor* identified two sources of "practical difficulties and potential unfairness" that would result if courts **\*396** examined a defendant's underlying conduct rather than the elements of the offense of which he was convicted. *Id.* at 601, 110 S.Ct. 2143. Enhancing a defendant's sentence based on a judge's assessment of the defendant's prior criminal conduct would implicate his right to a jury trial and raise "serious Sixth Amendment concerns." *Descamps*, 570 U.S. at 269, 133 S.Ct. 2276; *Taylor*, 495 U.S. at 601, 110 S.Ct. 2143. And such a conduct-based approach ordinarily would require sentencing courts to examine old court documents, which may be inaccurate or incomplete, to determine the factual basis for a defendant's prior conviction. *Descamps*, 570 U.S. at 270-71, 133 S.Ct. 2276; *Taylor*, 495 U.S. at 601-02, 110 S.Ct. 2143.

The Supreme Court has reiterated these rationales and has used the categorical approach in cases addressing a range of federal statutes. *See* *Davis*, ––– U.S. ––––, 139 S. Ct. 2319, 204 L.Ed.2d 757 (addressing 18 U.S.C. § 924(c), which establishes a criminal offense when a person "uses or carries a firearm" "during and in relation to any crime of violence"); *Sessions v. Dimaya*, ––– U.S. ––––, 138 S. Ct. 1204, 200 L.Ed.2d 549 (2018) (addressing 18 U.S.C. § 16, which defines the term "crime of violence" for general use in the federal criminal code); *Esquivel-Quintana v.*

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

*Sessions,* ––– U.S. ––––, 137 S. Ct. 1562, 198 L.Ed.2d 22 (2017) (addressing the aggravated felony of "sexual abuse of a minor" under the Immigration and Nationality Act (INA), 🚩 8 U.S.C. §§ 1101(a)(43)(A), 1227(a)(2)(A)(iii)); *Descamps,* 570 U.S. 254, 133 S.Ct. 2276 (addressing the ACCA); *Moncrieffe,* 569 U.S. 184, 133 S.Ct. 1678, 185 L.Ed.2d 727 (addressing the aggravated felony of "illicit trafficking in a controlled substance" under the INA, 🚩 8 U.S.C. §§ 1101(a)(43)(B), 1227(a)(2)(A)(iii)).

Applying these principles, it is apparent that courts use the categorical approach because of the need to determine whether a state offense is "comparable" to a federal offense that is described generally. *See* *Moncrieffe,* 569 U.S. at 190, 133 S.Ct. 1678. In contrast, the categorical approach is not applicable when statutory language lacks any textual cues demonstrating Congress' intent to examine generally the elements of an offense. *See* *Nijhawan v. Holder,* 557 U.S. 29, 38, 129 S.Ct. 2294, 174 L.Ed.2d 22 (2009) (addressing the monetary loss threshold of the "fraud or deceit" offense in the INA, 🚩 8 U.S.C. §§ 1101(a)(43)(M)(i), 1227(a)(2)(A)(iii)); *Price,* 777 F.3d at 705, 708 (applying conduct-specific approach to provision of the Sex Offender Registration and Notification Act, 34 U.S.C. § 20911(1), (7)(I)).

### B.

Given this precedent, we review the relevant language of the VICAR statute as our "first and foremost guide" in determining whether the categorical approach is applicable to crimes charged under that statute. *United States v. Simms,* 914 F.3d 229, 240 (4th Cir. 2019) (en banc); *see also* *Davis,* 139 S. Ct. at 2327; *cf.* *Shular v. United States,* ––– U.S. ––––, 140 S. Ct. 779, 784-86, ––– L.Ed.2d ––– (2020) (considering "natural" reading of definition of "serious drug offense" under ACCA to determine which method of categorical approach to apply, and concluding that Congress "opt[ed] ... for language suited to conduct"). As an initial matter, we observe that in addition to murder, kidnapping, maiming, and two types of assault, the VICAR statute also prohibits the act of "threaten[ing] to commit a *crime of violence*" in violation of a state or federal

law. 🚩 18 U.S.C. § 1959 (emphasis added). Because the defendants have not been charged under this language of VICAR involving a "crime of violence," we need not, and do not, consider whether the categorical **\*397** approach would apply in an analysis of that statutory term. Instead, we focus on the specific language of VICAR under which the defendants were charged, which provides:

> Whoever ... assaults with a dangerous weapon ... in violation of the laws of any State or the United States ... shall be punished ....

🚩 18 U.S.C. § 1959.

Nothing in this language suggests that the categorical approach should be used to compare the enumerated federal offense of assault with a dangerous weapon with the state offense of Virginia brandishing. In fact, the most natural reading of the statute does not require any comparison whatsoever between the two offenses. By using the verb "assaults" in the present tense, the language requires that a defendant's presently charged conduct constitute an assault under federal law, while simultaneously also violating a state law. [4] The VICAR statute includes no language suggesting that *all* violations of a state law also must qualify as the enumerated federal offense, a result that would be required under the categorical approach.

Notably, the VICAR language under which the defendants were charged contains none of the words or phrases that have triggered use of the categorical approach in other federal statutes. In the clearest example, courts have applied the categorical approach when a statute refers to the "elements" of a state offense. *See, e.g.,* *Taylor,* 495 U.S. at 600, 110 S.Ct. 2143; *Simms,* 914 F.3d at 233. In the context of the INA, the "relevant statutory hook" for the categorical approach is the statute's reference to the alien's "conviction," rather than to the "acts" the person committed. *Moncrieffe,* 569 U.S. at 191, 133 S.Ct. 1678 (citation omitted); *see also* *Dimaya,* 138 S. Ct. at 1217. The justification for applying the categorical approach to the term "conviction" is apparent, because that term necessarily encompasses the elements of the crime at issue covering the full range of prohibited

conduct, without reference to the specific conduct in which the defendant engaged.

As discussed above, the Supreme Court has identified other similar terms, including "felony" and "offense," that also "are read naturally to denote the crime as *generally* committed." *Dimaya*, 138 S. Ct. at 1217 (citation and quotation marks omitted); *see also Davis*, 139 S. Ct. at 2328-29 (reading the term "offense" in Section 924(c) as referring to "a generic crime ... in general" (citation omitted)); *Leocal v. Ashcroft*, 543 U.S. 1, 7, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004) (when a statute refers to the "offense" of conviction, courts "look to the elements and the nature of the offense of conviction, rather than to the particular facts" of a person's crime). And when a statute refers to the "nature" of an "offense," we also consider that offense categorically, by evaluating what the crime "normally ... entails, not what happened to occur on one occasion."[5] **\*398** *Davis*, 139 S. Ct. at 2329 (quoting *Dimaya*, 138 S. Ct. at 1217-18); *see also Simms*, 914 F.3d at 241. Thus, categorical terms such as "offense," "elements," and "conviction" appear in a variety of statutory contexts, and the use of such terms signals Congress' intent to disregard a defendant's actual conduct, and instead to examine the elements of an offense generally.

In contrast, the language of the VICAR provision under which the defendants were charged is entirely devoid of *any* words or phrases arguably signaling such Congressional intent. We decline to apply the categorical approach based only on the charging of a federal offense of assault with a dangerous weapon in combination with a state offense, without any indication that we should conduct an elements-based analysis of either offense. To the contrary, the VICAR statute's use of the present-tense verb "assaults," without additional reference to an "offense," "conviction," "felony," the "elements" of assault, or any other categorical term, indicates that Congress did not intend for us to "disregard how the defendant[s] actually committed [their] crime[s]." *Davis*, 139 S. Ct. at 2326. Rather, under the plain language of the VICAR statute, a defendant may be convicted when, by his conduct, he "assaults" another person with a dangerous weapon "in violation of" the state law charged in the indictment. This unambiguous statutory language precludes application of a formalistic, overinclusive categorical approach, and instead holds defendants accountable for their actual conduct as presented to a jury.

We also observe that the practical and constitutional concerns underlying the categorical approach are not present here. Because the VICAR language under which the defendants were charged refers only to presently charged conduct, courts are not required to reconstruct the facts underlying previous convictions. See *Descamps*, 570 U.S. at 270-71, 133 S.Ct. 2276; *Taylor*, 495 U.S. at 601, 110 S.Ct. 2143. And the jury, not the judge, will determine whether the defendant committed the offenses charged in the indictment, eliminating any Sixth Amendment concerns. See *Alleyne v. United States*, 570 U.S. 99, 103, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013); *see also Descamps*, 570 U.S. at 269, 133 S.Ct. 2276; *Taylor*, 495 U.S. at 601, 110 S.Ct. 2143. Although these considerations are not dispositive of our inquiry, *see Davis*, 139 S. Ct. at 2327; *Simms*, 914 F.3d at 240, in their absence, we are confident that we need not apply the categorical approach to protect the defendants' rights under the VICAR statute.

Despite its seemingly ubiquitous presence, we apply the categorical approach only when the text of a statute signals the need for such an elements-based approach. *See United States v. Pena*, 952 F.3d 503, 508 n.4 (4th Cir. 2020) (explaining that the categorical approach is "not a default rule of statutory construction," and we apply the approach only "when compelled to do so" by the statutory text). We will not employ this approach, a judicially created construct, in a manner contrary to "Congress' manifest purpose." *See United States v. Hayes*, 555 U.S. 415, 427, 129 S.Ct. 1079, 172 L.Ed.2d 816 (2009). Reading the language of the VICAR statute under which the defendants were charged, we conclude that Congress intended for individuals to be convicted of VICAR assault with a dangerous weapon by engaging **\*399** in conduct that violated both that enumerated federal offense as well as a state law offense, regardless whether the two offenses are a categorical "match." Here, before convicting a defendant, a jury must find that he engaged in the conduct alleged in the indictment, namely, assaulting the named victim with a dangerous weapon in violation of the Virginia brandishing statute. We therefore hold that the district court erred in dismissing the VICAR-brandishing counts.

AR.06621

III.

For these reasons, we reverse the district court's decision dismissing Counts 4, 8, and 14 of the indictment. We remand the case for the district court to reinstate these counts and to conduct further proceedings consistent with the principles expressed in this opinion.

*REVERSED AND REMANDED*

**All Citations**

955 F.3d 391

## Footnotes

1    The defendants also were charged with several other VICAR counts arising from murder and attempted murder under Virginia law. Those counts are not at issue in this appeal.

2    Violations of both state and federal laws can serve as bases for a VICAR conviction. 18 U.S.C. § 1959. Because the defendants in the present case were charged with Virginia brandishing, for the sake of simplicity we refer throughout this opinion only to VICAR's requirement that a defendant's conduct violates state law.

3    Recently, the Supreme Court expanded application of the categorical approach beyond the context of prior convictions. In *Davis,* ―― U.S. ――, 139 S. Ct. 2319, the Court applied the categorical approach in interpreting the language of 18 U.S.C. § 924(c), which establishes a criminal offense when a person "uses or carries a firearm" "during and in relation to any crime of violence or drug trafficking crime." In its decision extending the categorical approach to the determination under Section 924(c) whether a currently charged crime constitutes a "crime of violence," the Court largely relied on its analysis of the identical term in *Sessions v. Dimaya,* ―― U.S. ――, 138 S. Ct. 1204, 200 L.Ed.2d 549 (2018). *Davis,* 139 S. Ct. at 2326-29.

4    The Supreme Court in *Davis* briefly noted that the use of the present tense phrase "by its nature *involves* a substantial risk that physical force ... may be used" supported the conclusion that a categorical analysis should apply to Section 924(c). *Davis,* 139 S. Ct. at 2335 (emphasis added). In contrast to this description, the VICAR statute refers to the commission of the prohibited conduct in the present tense, rather than to whether the "nature" of that conduct presently involves substantial risk. Under these circumstances, the present tense verb counsels against application of the categorical approach.

5    We observe that some statutes, including the ACCA and Section 924(c), specify multiple ways a federal definition may be satisfied, such as requiring the use of force as an element of the offense, enumerating "generic" crimes like burglary and arson which must "match" the predicate offense, or by requiring an assessment of the potential risk posed by a predicate offense (a so-called "residual clause"). *See* 18 U.S.C. § 924(c), (e). Regardless of the type of clause, however, courts rely on statutory language signaling that offenses should be treated categorically before applying that approach.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

950 F.3d 51
United States Court of Appeals, Second Circuit.

UNITED STATES of America, Appellee,

v.

Denis NIKOLLA, also known as Deni, also known as Nache, Defendant-Appellant,

Besnik Llakatura, also known as Besi, also known as Nick, Redinel

Dervishaj, also known as Redi, also known as Red, Defendants. [1]

Docket No. 17-2206
|
August Term, 2019
|
Argued: January 28, 2020
|
Decided: February 19, 2020

**Synopsis**
**Background:** Defendant pled guilty in the United States District Court for the Eastern District of New York, Eric N. Vitaliano, J., 2017 WL 9251624, to Hobbs Act extortion conspiracy, threatening physical violence in furtherance of extortion plan, and brandishing firearm during and in relation to, or in furtherance of, crime of violence, and he appealed.

**[Holding:]** The Court of Appeals, Leval, Senior Circuit Judge, held that defendant's conviction for threatening physical violence in furtherance of extortion plan constituted predicate "crime of violence" under elements clause of statute prohibiting brandishing firearm.

Affirmed.

**Procedural Posture(s):** Appellate Review.

West Headnotes (2)

**[1]**    **Weapons** 🔑 Crimes of violence

Defendant's conviction for threatening physical violence in furtherance of extortion plan constituted predicate "crime of violence" under elements clause of statute prohibiting brandishing firearm during and in relation to, or in furtherance of, crime of violence, despite defendant's contention that conviction could be premised on defendant's threat of violence to himself or his own property, not "person or property of another," as required by statute, absent showing that statute had been applied as defendant suggested. 🚩 18 U.S.C.A. §§ 924(c)(1)(A)(ii), 🟨 1951(a).

3 Cases that cite this headnote

**[2]**    **Weapons** 🔑 Crimes of violence

To determine whether offense is predicate "crime of violence" under elements clause of statute prohibiting brandishing firearm during and in relation to, or in furtherance of, crime of violence, courts employ categorical approach, which

requires them to consider whether offense's elements can be satisfied by conduct that would fall outside definition of "crime of violence," looking to statutory definitions of offense, and not to particular underlying facts. 🚩 18 U.S.C.A. § 924(c)(3)(A).

7 Cases that cite this headnote

United States District Court for the Eastern District of New York (Eric N. Vitaliano, J.)

**Attorneys and Law Firms**

Daniel S. Nooter, Washington, D.C., for Defendant-Appellant.

Nadia I. Shihata, Assistant United States Attorney (Samuel P. Nitze and Patrick T. Hein, Assistant United States Attorneys, on the brief), for Richard P. Donoghue, United States Attorney for the Eastern District of New York, Brooklyn, N.Y., for Appellee.

Before: Pierre N. Leval, José A. Cabranes, Robert D. Sack, Circuit Judges.

**Opinion**

LEVAL, Circuit Judge:

**\*52** **[1]** Defendant-Appellant Denis Nikolla ("Nikolla") appeals from a July 13, 2017 judgment of conviction in the United States District Court for the Eastern District of New York (Eric N. Vitaliano, J.) upon his plea of guilty to two counts of Hobbs Act extortion conspiracy in violation of 🟡 18 U.S.C. § 1951(a), one count of threatening physical violence in furtherance of an extortion plan in violation of 🟡 18 U.S.C. § 1951(a), and one count of brandishing a firearm during and in relation to, or in furtherance of, a "crime of violence" under 🚩 18 U.S.C. § 924(c)(1)(A)(ii). Nikolla was sentenced principally to 216 months imprisonment. On appeal, Nikolla challenges his conviction under 🚩 § 924(c)(1)(A)(ii) on the grounds that the predicate offense, threatening physical violence in furtherance of an extortion plan under 🟡 18 U.S.C. § 1951(a), is not a "crime of violence" as defined in 🚩 § 924(c)(3). For the reasons below, we hold that this offense under 🚩 18 U.S.C. § 1951(a) qualifies categorically as a "crime of violence" under the Elements Clause of 🚩 § 924(c)(3), and affirm the judgment of conviction.

A. BACKGROUND

On July 17, 2014, a grand jury in the Eastern District of New York returned a second superseding indictment charging Nikolla and two co-defendants, Besnik Llakatura and Redinel Dervishaj ("Dervishaj"), with three counts of Hobbs Act extortion conspiracy, in violation of 🟡 18 U.S.C. § 1951(a); three counts of attempted Hobbs Act extortion, in violation of 🟡 18 U.S.C. § 1951(a); and three counts of using or carrying a firearm during and in relation to a crime of violence and possessing a firearm in furtherance of a crime of violence, in violation of 🚩 18 U.S.C. § 924(c)(1)(A)(i) & (ii),[2] all in connection with the defendants' efforts to extort the proprietors of restaurants and other businesses in and around Astoria, Queens in 2012 and 2013. On January 27, 2016, Dervishaj moved to dismiss the 🚩 § 924(c) charges on the grounds that none of the Hobbs Act offenses qualified as "crimes of violence" as required by 🚩 § 924(c). Nikolla joined the motion.

On February 24, 2016, while these motions were pending, the government filed a third superseding indictment which, along with the charges contained in the second superseding indictment, charged Nikolla and Dervishaj with three new counts of "knowingly and intentionally threaten[ing] physical violence ... in furtherance of a plan [of Hobbs Act extortion]," in violation of 18 U.S.C. § 1951(a), on the basis of Nikolla and Dervishaj's "plan and purpose to obtain proceeds from [several establishments] located in Queens, New York, from [the victims], with [the victims'] consent, which consent was to be induced by wrongful use of actual and threatened force, violence and fear of physical injury." App'x at 35–36, 38, 40. The third superseding indictment also modified the previously alleged charges of violation of § 924(c), so that they incorporated as predicate crimes of violence the newly-charged offenses under § 1951(a) of threatened physical violence.

On March 3, 2016, the district court heard oral argument on defendants' joint motion to dismiss the § 924(c) charges. During that hearing, counsel for Dervishaj conceded that the newly-charged Hobbs Act counts in the third superseding indictment, **53** charging Dervishaj and Nikolla with threatening or committing physical violence in furtherance of a plan of extortion in violation of 18 U.S.C. § 1951(a), were "valid predicate[ ]" crimes of violence as defined in § 924(c)(3)'s so-called "Elements Clause," and declined to extend the motion to dismiss to those counts. Gov't App'x at 4.[3] Counsel for Nikolla then agreed that the new counts qualified as "crimes of violence" under the Elements Clause of § 924(c). *Id.* at 5. On March 23, 2016, Nikolla pleaded guilty, pursuant to a plea agreement, to two counts of conspiracy to commit Hobbs Act extortion in violation of 18 U.S.C. § 1951(a), one new count of threatening physical violence in furtherance of an extortion plan in violation of 18 U.S.C. § 1951(a), and one count that charged him under § 924(c)(1)(A)(ii) with brandishing a firearm during and in relation to, or in furtherance of, a "crime of violence."

On appeal, Nikolla asks this court to overturn his § 924(c) conviction because the predicate offense for that conviction — Hobbs Act threat of violence in furtherance of extortion under 18 U.S.C. § 1951(a) — does not qualify as a "crime of violence" under the Elements Clause of § 924(c). Because Nikolla conceded in the district court that this offense constituted a "crime of violence" under § 924(c), we review his challenge on appeal for plain error. *United States v. Hendricks*, 921 F.3d 320, 326 (2d Cir. 2019) ("[Where] a defendant challenges his or her sentence on a basis not raised before the District Court, we review for plain error.").

## B. DISCUSSION

**[2]** Section 924(c) requires a mandatory consecutive sentence of five years imprisonment for the use or carrying of a firearm during and in relation to a "crime of violence" or the possession of a firearm in furtherance of a "crime of violence," and imposes an enhanced penalty of seven years imprisonment (rather than five) "if the firearm is brandished." 18 U.S.C. § 924(c)(1)(A). Section 924(c) defines "crime of violence" as "an offense that is a felony and—(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another." *Id.* § 924(c)(3)(A) (the "Elements Clause").[4] To determine whether an offense is a crime of violence under the Elements Clause of § 924(c)(3), we employ the "categorical approach," which requires us to consider whether the elements of the offense can be satisfied by conduct that would fall outside the definition of a "crime of violence" provided by § 924(c)(3)(A), looking to the statutory definitions of the offense, and not to the particular underlying facts. *See United States v. Hill*, 890 F.3d 51, 55–56 (2d Cir. 2018) (citations omitted). To disqualify a particular offense from § 924(c)'s definition of "crime[s] of violence," a defendant

AR.06625

must show "a realistic probability, not a theoretical possibility, that the statute at issue could be applied to conduct that does not constitute a crime of **\*54** violence" by establishing that "courts [have] in fact appl[ied] the statute in the manner for which he argues." *Id.* at 56 (citations, alterations, and internal quotation marks omitted).

The ultimate indictment charged Nikolla with "threatening physical violence in furtherance of a plan to extort [the victim]" in violation of 18 U.S.C. § 1951(a). App'x at 38. Section 1951(a) defines several separate offenses, one of which applies to a defendant who "commits or threatens physical violence to any person or property in furtherance of a plan or purpose to [commit Hobbs Act robbery or extortion]." 18 U.S.C. § 1951(a); *Scheidler v. Nat'l Org. for Women,* 547 U.S. 9, 22, 126 S.Ct. 1264, 164 L.Ed.2d 10 (2006) (recognizing that committing or threatening physical violence in furtherance of Hobbs Act robbery or extortion is a "separate Hobbs Act crime"). The elements of that offense mirror almost exactly the definition of a "crime of violence" in the Elements Clause of § 924(c). *Compare* 18 U.S.C. § 924(c)(3)(A) (defining "crime of violence" as a felony that "has as an element the ... *threatened use of physical force against the person or property of another*") *with id.* § 1951(a) (imposing criminal liability on any person who "commits or *threatens physical violence to any person or property* in furtherance of a plan [of Hobbs Act extortion]").

Nikolla argues that the § 1951(a) offense does not necessarily involve the threat of physical force "against the person or property *of another*," *id.* § 924(c)(3)(A) (emphasis added), because § 1951(a) — which prohibits the use or threat of violence "to *any* person or property" — would impose liability if a defendant's plan of extortion involved a threat of violence to the defendant himself or his property. Br. of Appellant at 11. Nikolla, however, does not cite to any case that applied the Hobbs Act in this way, and we are aware of none. *Gonzales v. Duenas-Alvarez,* 549 U.S. 183, 193, 127 S.Ct. 815, 166 L.Ed.2d 683 (2007) (requiring "cases in which [ ] courts in fact did apply the statute in the ... manner for which [the defendant] argues"); *Hill,* 890 F.3d at 56 (same).

We therefore hold that the offense specified in the clause of 18 U.S.C. § 1951(a) by the language "[w]hoever ... commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of [ § 1951]" is categorically a "crime of violence" under the Elements Clause of 18 U.S.C. § 924(c)(3).

### C. CONCLUSION

For the foregoing reasons, we AFFIRM the July 13, 2017 judgment of the district court.

**All Citations**

950 F.3d 51

**Footnotes**

1        The Clerk is directed to modify the caption as shown above.

AR.06626

2      The indictment charged Nikolla with, and Nikolla pled guilty to, the enhanced offense of "brandish[ing]" the firearm under 18 U.S.C. § 924(c)(1)(A)(ii), App'x at 38–39, 82–83, 106–07, which increases the mandatory penalty from five years to seven years of imprisonment.

3      Dervishaj was convicted of the § 924(c) offense after a jury trial, but subsequently appealed that conviction raising the same argument as here advanced by Nikolla. This court affirmed his § 924(c) conviction in a summary order. *United States v. Dervishaj*, 787 F. App'x 12 (2d Cir. 2019).

4      In *United States v. Davis*, –––– U.S. ––––, 139 S. Ct. 2319, 204 L.Ed.2d 757 (2019), the Supreme Court invalidated the "Residual Clause" of 18 U.S.C. § 924(c)'s definition of "crime[s] of violence" as unconstitutionally vague. *Id.* at 2336; 18 U.S.C. § 924(c)(3)(B). Because we hold that the charged offense of threatening to commit physical violence in furtherance of Hobbs Act extortion qualifies as a "crime of violence" under the Elements Clause, *Davis*'s holding does not affect our analysis.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by    United States v. Flores,    10th Cir.(Colo.),    June 2, 2020

861 F.3d 1010
United States Court of Appeals, Ninth Circuit.

UNITED STATES of America, Plaintiff-Appellee,
v.
Jose OCHOA, Defendant-Appellant.

No. 15-10354
|
Argued and Submitted August 9,
2016, San Francisco, California
|
Filed July 3, 2017

**Synopsis**

**Background:** Defendant was convicted in the United States District Court for the Northern District of California, Richard Seeborg, J., of illegal reentry into United States, and he appealed. Following affirmance of defendant's conviction, 665 Fed.Appx. 635, the Court of Appeals granted defendant's petition for panel rehearing.

**Holdings:** The Court of Appeals held that:

[1] illegal reentry defendant's prior conviction of conspiring to export defense articles without a license, under federal statute that broadly criminalized the unlicensed export of broad range of "munitions," such as "underwater hardware," did not categorically qualify as proper predicate offense, of kind supporting his removal, and

[2] federal statute that illegal reentry defendant was previously convicted of having conspired to violate, by seeking to export defense articles without a license, was not divisible, such that court could not employ "modified categorical" approach in deciding whether alien's conviction qualified as predicate offense, of kind supporting his removal and subsequent prosecution for illegal reentry.

Reversed and remanded.

Graber, Circuit Judge, issued concurring opinion, in which McKeown, Circuit Judge, and Lynn, Chief District Judge sitting by designation, joined.

West Headnotes (16)

**[1]    Aliens, Immigration, and
Citizenship    Collateral Attack**

Defendant charged with illegal reentry has right to bring collateral attack challenging validity of underlying removal order, which serves as predicate element of illegal reentry offense.

Immigration and Nationality Act § 276,    8 U.S.C.A. § 1326.

19 Cases that cite this headnote

**[2]    Aliens, Immigration, and
Citizenship    Collateral Attack**

**Aliens, Immigration, and
Citizenship    Denial of right to appeal;
waiver of right**

To mount a successful collateral attack on validity of underlying removal order, illegal reentry defendant must ordinarily demonstrate that: (1) he has exhausted any administrative remedies that may have been available to seek relief from the order, (2) that removal proceedings at which order was issued improperly deprived him of opportunity for judicial review, and (3) that entry of order was fundamentally unfair; however, if defendant was not convicted of offense that made him removable to begin with, then he is excused from proving first two elements. Immigration and Nationality Act § 276(d),    8 U.S.C.A. § 1326(d).

28 Cases that cite this headnote

**[3]    Aliens, Immigration, and
Citizenship    Crime and Related Grounds**

To determine whether alien's prior conviction of conspiring to export defense articles without a license supported his removal, the Court of

Appeals would engage in three-step process, under which it initially applied "categorical" approach and asked whether elements of crime of conviction sufficiently matched the elements of generic federal crime, then, if statute was overbroad and thus not a categorical match, would inquire whether statute's elements were indivisible set, and finally, if statute was divisible, such that modified categorical approach applied, would look to limited class of documents to determine what crime, with what elements, the alien was convicted of. Immigration and Nationality Act §§ 101(a)(43)(C), 237(a)(2)(C), 🚩 8 U.S.C.A. §§ 1101(a)(43)(C), 🏳 1227(a)(2)(C); 18 U.S.C.A. § 371; 🏳 22 U.S.C.A. § 2778.

1 Cases that cite this headnote

**[4]** **Aliens, Immigration, and Citizenship** 🔑 Crime and Related Grounds

To determine whether criminal statute under which alien was previously convicted categorically qualifies as a predicate offense, that supports alien's removal, the Court of Appeals focuses solely on whether elements of statute of conviction match elements of the identified qualifying federal offense; if elements match, then removal is proper, but if statute of conviction criminalizes conduct that would not qualify as federal predicate offense, then offense does not categorically qualify as proper predicate offense.

1 Cases that cite this headnote

**[5]** **Aliens, Immigration, and Citizenship** 🔑 Crime and Related Grounds

Illegal reentry defendant's prior conviction of conspiring to export defense articles without a license, under federal statute that broadly criminalized the unlicensed export of broad range of "munitions," such as "underwater hardware," did not categorically qualify as proper predicate offense, of kind supporting his removal. Immigration and Nationality Act §§ 101(a)(43)(C), 237(a)(2)(C), 276, 🚩 8 U.S.C.A.

§§ 1101(a)(43)(C), 🏳 1227(a)(2)(C), 🏳 1326; 18 U.S.C.A. § 371; 🏳 22 U.S.C.A. § 2778.

1 Cases that cite this headnote

**[6]** **Aliens, Immigration, and Citizenship** 🔑 Crime and Related Grounds

Only if criminal statute under which alien was previously convicted is divisible may court employ "modified categorical" approach to determine whether conviction qualifies as predicate offense, of kind supporting alien's removal.

**[7]** **Aliens, Immigration, and Citizenship** 🔑 Crime and Related Grounds

To determine whether criminal statute under which alien was previously convicted of conspiring to export defense articles without a license was a divisible statute, such that court could employ "modified categorical" approach to determine whether alien's conviction qualified as predicate offense, of kind supporting his removal, court had to decide whether the many items on the Munitions List, whose unlicensed exportation would support charge under statute, constituted alternative elements or merely alternative means of committing single crime. Immigration and Nationality Act §§ 101(a)(43)(C), 237(a)(2)(C), 🚩 8 U.S.C.A. §§ 1101(a)(43)(C), 🏳 1227(a)(2)(C); 18 U.S.C.A. § 371; 🏳 22 U.S.C.A. § 2778.

**[8]** **Aliens, Immigration, and Citizenship** 🔑 Crime and Related Grounds

To determine whether criminal statute under which alien was previously convicted of conspiring to export defense articles without a license was a divisible statute, such that court could employ "modified categorical" approach to determine whether alien's conviction qualified as predicate offense, of kind supporting his removal, court would begin by considering the statute's text and court decisions interpreting

the statute; however, if these sources were not dispositive, then court could peek at the record documents for sole and limited purpose of determining whether the listed items, whose unlicensed exportation would support charge under statute, were elements of offense. Immigration and Nationality Act §§ 101(a)(43)(C), 237(a)(2)(C), 8 U.S.C.A. §§ 1101(a)(43)(C), 1227(a)(2)(C); 18 U.S.C.A. § 371; 22 U.S.C.A. § 2778.

**[9]    Aliens, Immigration, and Citizenship** 🔑 **Crime and Related Grounds**

If criminal statute under which alien was previously convicted is drafted with alternative elements, effectively creating several different crimes, then statute is divisible, and court may employ "modified categorical" approach to determine whether conviction under this statute qualifies as predicate offense, of kind supporting alien's removal.

**[10]    Indictments and Charging Instruments** 🔑 **Duplicity**

**Indictments and Charging Instruments** 🔑 **Multiple modes or means of committing the same offense**

While a count joining two or more distinct offenses is duplicitous, there is no bar to stating a charge in a single count if statute is read to create a single crime, but merely provides for various ways to commit it.

1 Cases that cite this headnote

**[11]    Aliens, Immigration, and Citizenship** 🔑 **Crime and Related Grounds**

Federal statute that illegal reentry defendant was previously convicted of having conspired to violate, by seeking to export defense articles without a license, was not divisible, but in prohibiting unlicensed exportation of wide range of items on Munitions List, merely provided alternative means of committing single crime; thus, court could not employ "modified

categorical" approach in deciding whether alien's conviction qualified as predicate offense, of kind supporting his removal and subsequent prosecution for illegal reentry after having been validly removed. Immigration and Nationality Act §§ 101(a)(43)(C), 237(a)(2)(C), 276, 🚩 8 U.S.C.A. §§ 1101(a)(43)(C), 🔑 1227(a)(2)(C), 🔑 1326; 18 U.S.C.A. § 371; 🔑 22 U.S.C.A. § 2778.

**[12]    Aliens, Immigration, and Citizenship** 🔑 **Collateral Attack**

**Constitutional Law** 🔑 **Admission and exclusion; deportation**

Removal order is "fundamentally unfair," as required to be subject to collateral attack by illegal reentry defendant, if (1) defendant's due process rights were violated by defects in underlying removal proceeding, and (2) defendant suffered prejudice as result of these defects. (Per Graber, Circuit Judge, for majority of court.) U.S. Const. Amend. 5.

19 Cases that cite this headnote

**[13]    Aliens, Immigration, and Citizenship** 🔑 **Collateral Attack**

Provision of the Immigration and Nationality Act (INA) permitting illegal reentry defendant to collaterally attack prior removal order if certain procedural and substantive conditions are met places burden of demonstrating that each of these conditions is met on illegal reentry defendant. (Per Graber, Circuit Judge, for majority of court.)

Immigration and Nationality Act § 276(d), 🔑 8 U.S.C.A. § 1326(d).

2 Cases that cite this headnote

**[14]    Aliens, Immigration, and Citizenship** 🔑 **Denial of right to appeal; waiver of right**

Provision of the Immigration and Nationality Act (INA) permitting illegal reentry defendant to collaterally attack prior removal order if certain

procedural and substantive conditions are met is designed to allow collateral attack only as a safety valve for those who could not seek judicial review at the time that original removal order was issued. (Per Graber, Circuit Judge, for majority of court.) Immigration and Nationality Act § 276(d), 🚩 8 U.S.C.A. § 1326(d).

3 Cases that cite this headnote

[15] **Criminal Law** 🔑 Waiver or Loss of Right

Challenge to sentence is foreclosed where defendant waived his right to appeal Sentencing Guidelines determination. (Per Graber, Circuit Judge, for majority of court.) 🚩 U.S.S.G. § 1B1.1 et seq.

[16] **Criminal Law** 🔑 Waiver or Loss of Right

Court of Appeals will enforce a valid waiver of appellate rights even if the claims that could have been made on appeal absent that waiver appear meritorious; whole point of waiver is the relinquishment of claims regardless of their merit. (Per Graber, Circuit Judge, for majority of court.)

**Attorneys and Law Firms**

**\*1013** Geoffrey A. Hansen (argued), Chief Assistant Federal Public Defender; Steven G. Kalar, Federal Public Defender; Office of the Federal Public Defender, San Francisco, California; for Defendant-Appellant.

Phillip Kopczynski (argued), Special Assistant United States Attorney; Barbara J. Valliere, Chief, Appellate Division; Brian J. Stretch, United States Attorney; United States Attorney's Office, San Francisco, California; for Plaintiff-Appellee.

Appeal from the United States District Court for the Northern District of California, Richard Seeborg, District Judge, Presiding, D.C. No. 3:14-cr-00525-RS-1

Before: Susan P. Graber and M. Margaret McKeown, Circuit Judges, and Barbara M.G. Lynn, [*] Chief District Judge.

Concurrence by Judge Graber

**ORDER**

Appellant's petition for panel rehearing is **GRANTED**. 🚩 The memorandum disposition previously filed December 14, 2016, and appearing at 665 Fed.Appx. 635, is hereby withdrawn. As the court's memorandum disposition is withdrawn, Appellant's petition for rehearing en banc is **DENIED** as moot. A published opinion will be filed contemporaneously with this order. Further petitions for rehearing and rehearing en banc may be filed.

**OPINION**

PER CURIAM:

Defendant Jose Ochoa, a citizen of Mexico, was convicted of conspiracy to export defense articles without a license, 18 U.S.C. § 371, 🚩 22 U.S.C. § 2778, and was removed from the United States because of that conviction. When he returned to the United States, he was convicted of illegal reentry in violation of 🚩 8 U.S.C. § 1326. In this appeal, he argues that the removal order was invalid because his 18 U.S.C. § 371 conviction for conspiring to violate 🚩 22 U.S.C. § 2778 was not a categorical match to the Immigration and Nationality Act's ("INA") aggravated felony or firearms offense categories. Reviewing de novo, 🚩 *United States v. Alvarado-Pineda*, 774 F.3d 1198, 1201 (9th Cir. 2014), we hold that Defendant was not originally removable as charged, and so could not be convicted of illegal reentry. We therefore reverse the judgment of conviction.

FACTUAL AND PROCEDURAL BACKGROUND

In 1998, Defendant was indicted for violating 18 U.S.C. § 371, the generic conspiracy statute; the object of the conspiracy was a violation of the Arms Export Control Act, 🚩 22 U.S.C. § 2778, exporting defense articles without a license. Defendant pleaded guilty to those charges in 1998 and was sentenced to a term of imprisonment. While in federal prison, he was served with a notice to appear in November

1998, charging him with removability. The notice to appear alleged, among other things, that Defendant was convicted on April 6, 1998, **1014** of conspiracy to export defense articles without a license in violation of 18 U.S.C. § 371 and 22 U.S.C. § 2778(a), and that the " 'defense articles' included firearms and ammunition per criminal indictment #CR-M-97-387." Defendant's purported removability was predicated on conviction of an aggravated felony as set forth in 8 U.S.C. § 1101(a)(43)(C) and on conviction of a firearms offense as set forth in 8 U.S.C. § 1227(a)(2)(C).

At the hearing before an immigration judge ("IJ") on January 21, 1999, Defendant appeared without a lawyer, though he was offered more time to secure one. At the outset, the IJ explained that Defendant could appeal any decision rendered and provided Defendant with a document correctly explaining his appellate rights. With respect to the underlying conviction, the IJ asked if "some of the things [he was] exporting [were] firearms and ammunition," and Defendant answered, "Yes I was." After reviewing the certified indictment and judgment, the IJ explained that those documents "indicate[d] that between December 4th and December 7th of that same year, [Defendant] and others conspired to ship firearms and ammunition from the United States to Mexico," and that the "[vehicle] [Defendant] was in possession of contained 9 firearms and approximately 28,000 rounds of ammunition." The IJ "f[ou]nd that the charge of deportability under section [237(a)(2)(C) ] of the [INA] has been sustained" and allowed the government "to amend by pen and ink the charge under 237 to read 101(a)(43)(U)," clarifying that Defendant's conviction was for conspiracy. The IJ found Defendant removable as charged.

After an exchange with Defendant, the IJ concluded: "I don't see that there is any relief available to you." He continued: "Now, you can accept that decision but if you disagree with it, you would have 30 days to appeal it. Did you want to accept my decision or reserve your right to appeal?" Defendant accepted. He served the remainder of his federal prison sentence and was removed to Mexico following his release on April 13, 2001.

In 2014, federal agents discovered Defendant in California; he was indicted for illegal reentry, under 8 U.S.C. § 1326. Defendant moved to dismiss the indictment, arguing that his 2001 removal proceedings violated due process because his prior conviction constituted neither an aggravated felony nor a firearms offense—an argument known as a "collateral

attack" on the removal order. The district court denied that motion, Defendant was convicted, and the court sentenced Defendant to 16 months in prison. Following his release, Defendant was removed to Mexico once again. Defendant timely appeals.

## DISCUSSION

A. *Availability of Collateral Review*

**[1]**  **[2]**  A defendant charged with illegal reentry pursuant to 8 U.S.C. § 1326 has the right to bring a collateral attack challenging the validity of his underlying removal order, because that order serves as a predicate element of his conviction. *United States v. Aguilera-Rios*, 769 F.3d 626, 629–30 (9th Cir. 2014); *see also United States v. Mendoza-Lopez*, 481 U.S. 828, 838, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987) (holding, before enactment of § 1326(d), that due process requires an opportunity to collaterally challenge a removal proceeding "at the very least where the defects ... foreclose judicial review of that proceeding"). The mechanism for mounting such a challenge is codified in § 1326(d). To succeed, Defendant must demonstrate that: (1) he has exhausted any administrative remedies that may have been available to seek relief from the order; (2) the deportation proceedings at **1015** which the order was issued improperly deprived him of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair. 8 U.S.C. § 1326(d). But under our circuit's law, if Defendant was not convicted of an offense that made him removable under the INA to begin with, he is excused from proving the first two requirements. *See United States v. Camacho-Lopez*, 450 F.3d 928, 930 (9th Cir. 2006) (holding all three requirements satisfied when notice to appear had charged removability solely on the basis of a crime that was not an aggravated felony under intervening case law); *United States v. Pallares-Galan*, 359 F.3d 1088, 1096, 1103–04 (9th Cir. 2004) (analyzing the statute of conviction to determine that the removal order was improper, satisfying first two elements, but remanding for the district court to consider the third element).

As explained below, we conclude that Defendant's statute of conviction was not an aggravated felony. And " § 1326(d) (1) and (d)(2) [a]re satisfied when the IJ improperly

17 Cal. Daily Op. Serv. 6494, 2017 Daily Journal D.A.R. 6659

characterized a prior conviction as an aggravated felony and erroneously informed the alien that he was ineligible for discretionary relief." *United States v. Gonzalez-Villalobos, 724 F.3d 1125, 1131 (9th Cir. 2013)*. With respect to § 1326(d)(3), we have explained that, if Defendant " 'was removed when he should not have been,' his ... removal was fundamentally unfair, and he may not be convicted of reentry after deportation." *Aguilera-Rios, 769 F.3d at 630* (quoting *Camacho-Lopez, 450 F.3d at 930*). In its original briefing, the government conceded that "[Defendant's] appeal turns on the third prong of this test" and that, if the third prong is satisfied, "his appeal should be granted."

When evaluating whether a defendant "would have had the *right* to be in the United States, as a lawful permanent resident, but for the IJ's determination that he was removable," we have adopted the view that "statutory interpretation decisions are fully retroactive." *Id. at 633* (applying intervening Supreme Court precedent retroactively); *see also Pallares-Galan, 359 F.3d at 1103–04* (conducting statutory interpretation and applying it retroactively). As a result, we can identify no bar in 8 U.S.C. § 1326(d) to considering Defendant's challenge on the merits. Here, the § 1326(d) inquiry collapses into a de novo review of Defendant's removability in 1998.

**B.** *Categorical Analysis*

[3] Defendant argues that his prior conviction did not support removal. To analyze that question, we apply the categorical approach announced by the Supreme Court in *Taylor v. United States, 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990)*, and its progeny. The analysis proceeds in three steps:

> [W]e inquire first "whether the elements of the crime of conviction sufficiently match the elements of the generic federal crime." If the statute is overbroad and thus not a categorical match, we next ask whether the statute's elements are also an indivisible set. Finally, if the statute is divisible, then the modified categorical approach applies and "a sentencing court looks to a limited class of documents to determine what crime, with what elements, a defendant was convicted of."

*United States v. Arriaga-Pinon, 852 F.3d 1195, 1198–99 (9th Cir. 2017)* (alterations omitted) (quoting *Mathis v.*

*United States, —— U.S. ——, 136 S.Ct. 2243, 2248–49, 195 L.Ed.2d 604 (2016)*).

**1.** *Overbreadth*

[4] In determining whether the statute of conviction "categorically qualifies as a **\*1016** predicate offense" for immigration purposes, "we focus solely on whether the elements of the statute of conviction match the elements of the identified qualifying federal offense." *Id. at 1199* (citing *Taylor, 495 U.S. at 600–01, 110 S.Ct. 2143*). If the elements match, Defendant's removal order was proper. But if the statute of conviction "criminalizes conduct that would not qualify as a federal predicate offense, then the offense does not categorically qualify as a proper predicate offense." *Id.*

Defendant was convicted of generic federal conspiracy in violation of 18 U.S.C. § 371.[1] The object of that conspiracy was the unlicensed export of defense articles in violation of 22 U.S.C. § 2778(b)(2), which provides:

> [N]o defense articles or defense services designated by the President under [the United States Munitions List] may be exported or imported without a license ....

Willful violation of this provision is a federal crime. *Id. § 2778(c)*. The Munitions List referenced in § 2778 includes both firearms and ammunition, but also a vast array of other items, including "underwater hardware" and various chemicals and biological materials. 22 C.F.R. § 121.1.

The IJ held that Defendant's conviction constituted two generic offenses, each justifying removability under the INA. First, the IJ held that the crime of conviction was an "aggravated felony," which the INA defines as (among other things) a "conspiracy to commit" "illicit trafficking in firearms or destructive devices (as defined in [18 U.S.C. § 921] )." 8 U.S.C. § 1101(a)(43)(U), (C). The referenced provision defines a "firearm" in relevant part as "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of

an explosive." 18 U.S.C. § 921(a)(3). Second, the IJ held that Defendant's prior conviction was a "firearm offense[ ]," which includes conspiring to "purchase[ ], sell[ ], offer[ ] for sale, exchang[e], us[e], own[ ], possess[ ], or carry[ ] ... any weapon, part, or accessory which is a firearm." 8 U.S.C. § 1227(a)(2)(C).

[5] The elements of 22 U.S.C. § 2778 "sweep[ ] more broadly" than the elements of the generic federal aggravated felony or firearms offenses. *Descamps v. United States,* ––– U.S. ––––, 133 S.Ct. 2276, 2283, 186 L.Ed.2d 438 (2013). By incorporating the entire Munitions List, § 2778 criminalizes unlicensed export of a broad range of "munitions," such as "underwater hardware"; neither generic federal definition speaks to most of the items on that list. Thus, Defendant's underlying conviction "does not categorically qualify as a proper predicate offense." *Arriaga-Pinon,* 852 F.3d at 1199; *accord United States v. Guillen-Cruz,* 853 F.3d 768, 773 (5th Cir. 2017).

2. *Divisibility*

[6]    [7] The next step requires determining whether Defendant's underlying statute of conviction "contains a single, indivisible set of elements." *Arriaga-Pinon,* 852 F.3d at 1199. "Only divisible statutes are subject to the modified categorical approach." *Sandoval v. Yates,* 847 F.3d 697, 704 (9th Cir. 2017). Here, we must decide whether the many items on the Munitions List constitute alternative *elements* of 22 U.S.C. § 2778, or merely list alternative **\*1017** *means* of committing a single crime. *See Mathis,* 136 S.Ct. at 2256 (explaining that, when "faced with an alternatively phrased statute," courts must "determine whether its listed items are elements or means"). "[A] single element must be part of the charged offense with which a jury necessarily found the defendant guilty." *Almanza-Arenas v. Lynch,* 815 F.3d 469, 477 (9th Cir. 2016) (en banc) (citing *Taylor,* 495 U.S. at 602, 110 S.Ct. 2143).

[8]    [9] We begin by considering the statute's text. *See id.* We may also consult court decisions interpreting the statute. *Mathis,* 136 S.Ct. at 2256 (discussing "authoritative sources of state law"); *Sandoval,* 847 F.3d at 704 ("[A] court looks first to the statute itself and then to the case law

interpreting it."). But if these sources are not dispositive, we may "peek at the record documents [for] the sole and limited purpose of determining whether the listed items are elements of the offense." *Mathis,* 136 S.Ct. at 2256–57 (brackets omitted) (quoting *Rendon v. Holder,* 782 F.3d 466, 473–74 (9th Cir. 2015) (Kozinski, J., dissenting from denial of reh'g en banc)). If the text is drafted with alternative elements, effectively creating "several different crimes," *Descamps,* 133 S.Ct. at 2285 & n.2 (internal quotation marks and ellipsis omitted), the statute is divisible, *Mathis,* 136 S.Ct. at 2256.

Section 2778(b)(2) provides that "no defense articles or defense services designated by the President [on the Munitions List] may be exported or imported without a license." 22 U.S.C. § 2778(b)(2). Any person who violates § 2778(b)(2), or "any rule or regulation issued under th[at] section," may be fined not more than $1 million or imprisoned for not more than 20 years, or both. *Id.* § 2778(c). We know of no binding caselaw resolving whether a jury must specifically decide *which* defense article a § 2778 defendant exported without a license. In an earlier case, we noted that "the elements of an export control violation under 22 U.S.C. § 2778 are as follows: the (1) willful (2) export or attempted export (3) of articles listed on the [Munitions List] (4) without a license." *United States v. Chi Mak,* 683 F.3d 1126, 1131 (9th Cir. 2012) (citing *Kuhali v. Reno,* 266 F.3d 93, 104 (2d Cir. 2001)); *see also United States v. Covarrubias,* 94 F.3d 172, 175 (5th Cir. 1996) (per curiam) (same); *United States v. Murphy,* 852 F.2d 1, 6 (1st Cir. 1988) (same). Despite our generalized treatment of the "article" element in *Chi Mak,* the jury charge in that case specifically asked the jurors to find that the defendant had exported "technical data." 683 F.3d at 1132. Because of the ambiguity, that case does not resolve the unanimity question before us. *See also United States v. Bishop,* 740 F.3d 927, 931 (4th Cir. 2014) (describing a § 2778 indictment charging the specific ammunition that the defendant attempted to export). [2]

[10]    [11] Faced with a lack of clarity, we may "peek" at the indictment for insight into the element-or-means distinction. **\*1018** *Mathis,* 136 S.Ct. at 2256–57. Discussing the

Iowa burglary statute at issue in *Mathis,* the Supreme Court explained that, if "one count of an indictment and correlative jury instructions charge a defendant with burgling a 'building, structure, or vehicle'—thus reiterating all the terms of Iowa's law," it would be "as clear an indication as any that each alternative is only a possible means of commission, not an element that the prosecutor must prove to a jury beyond a reasonable doubt." *Id.* at 2257 (citing *Descamps,* 133 S.Ct. at 2290). On the other hand, "an indictment and jury instructions could indicate, by referencing one alternative term to the exclusion of all others, that the statute contains a list of elements, each one of which goes toward a separate crime." *Id.* Here, the count to which Defendant pleaded guilty alleged a conspiracy to export "defense articles, that is, firearms and ammunition, which were designated as defense articles on the United States Munitions List." That *both* defense articles were charged in a single count is telling: although a count joining two or more distinct offenses is duplicitous, "there is no bar to stating a charge in a single count if a statute is read to create a single crime but provides for various ways to commit it." 1A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 142 (4th ed.). Taking *Mathis* at its word, the indictment combining more than one Munitions List item into a single count "is as clear an indication as any that each alternative is only a possible means of commission, not an element." 136 S.Ct. at 2257. But to the extent that these materials do not "speak plainly" enough, we cannot "satisfy '*Taylor*'s demand for certainty' when determining whether a defendant was convicted of a generic offense." *Id.* (quoting *Shepard v. United States,* 544 U.S. 13, 21, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005)); *see also Arriaga-Pinon,* 852 F.3d at 1201 (Thomas, C.J., concurring) (noting that the "focus of *Mathis* was the determination of that 'certainty' in deciding whether the statute of conviction was divisible"). This reasoning means that the statute of conviction was not divisible, ending our analysis. Thus, we do not proceed to the modified categorical approach.

CONCLUSION

Because the statute was overbroad and indivisible, Defendant's conviction under 22 U.S.C. § 2778 could not serve as a proper predicate for removal—either as an aggravated felony or a firearms offense. Accordingly, we **REVERSE** and **REMAND** with instructions to dismiss the indictment.

GRABER, Circuit Judge, with whom McKEOWN, Circuit Judge, and LYNN, Chief District Judge, join, concurring:

I concur in the opinion because it faithfully applies the law of our circuit. I write separately to express my view that our law with respect to the scope of collateral challenges under 8 U.S.C. § 1326(d) has strayed increasingly far from the statutory text and that we are out of step with our sister circuits' correct interpretation. For that reason, we should rehear this case en banc to correct our course.

The panel opinion sets forth the background of this case. I emphasize only one aspect of the facts. While incarcerated in 1998 after pleading guilty to a one-count indictment for federal conspiracy, Defendant Jose Ochoa was served with a notice to appear. The notice specifically charged that Defendant's conspiracy conviction constituted both an aggravated felony and a firearms offense under the Immigration and Nationality Act. At his 1999 hearing, the immigration judge ("IJ") repeatedly apprised Defendant of his appellate rights, **\*1019** both orally and in writing. The IJ determined, on the record, that Defendant's conviction matched the two removability categories contained in the notice to appear. And after being offered the opportunity to appeal or, instead, to accept the decision, Defendant chose to accept the decision. After completing his prison sentence for the underlying crime, he was removed from the United States.

It was not until 2014, after he was indicted for illegal reentry, that Defendant first challenged the IJ's conclusion that his conspiracy conviction was a categorical match to the aggravated felony and firearms offense provisions in the immigration statutes.

A. *The Collateral Attack Provision*

 [12]   Defendant challenges his illegal reentry conviction by invoking the "collateral attack" provision of the illegal reentry statute:

> In a criminal proceeding under this section, an alien may not challenge the validity of the deportation order described in subsection (a)(1) or subsection (b) unless the alien demonstrates that—

(1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;

(2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and

(3) the entry of the order was fundamentally unfair.

8 U.S.C. § 1326(d). An order is "fundamentally unfair" under (d)(3) if "(1) [a defendant's] due process rights were violated by defects in [the] underlying deportation proceeding, and (2) [the defendant] suffered prejudice as a result of the defects." *United States v. Garcia-Martinez, 228 F.3d 956, 960 (9th Cir. 2000)* (internal quotation marks omitted). Subsection (d) was "added in direct response to [*United States v. Mendoza-Lopez, 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987)* ]." *United States v. Barajas-Alvarado, 655 F.3d 1077, 1082 n.6 (9th Cir. 2011).* Prior to *Mendoza-Lopez,* it was not clear under what circumstances, if any, an illegal reentry defendant could challenge the underlying "order of deportation" when the "prior deportation is an element of the crime." *481 U.S. at 833, 107 S.Ct. 2148.* That decision made clear that due process requires "*some* meaningful review of the administrative proceeding," *id. at 837–38, 107 S.Ct. 2148,* which the statute now affords.

B. *The Meaning of § 1326(d)(1) and (2)*

**[13]** Section 1326(d) places the burden on the alien to demonstrate three things in order to challenge collaterally the validity of the deportation order underlying a charge of illegal reentry. By using the conjunction "and," Congress signified that the alien must establish that all three conditions are met. *See United States v. Soto-Mateo, 799 F.3d 117, 120 (1st Cir. 2015)* (noting that "[t]he elements of 1326(d) are conjunctive, and an appellant must satisfy all of those elements in order to prevail"), *cert. denied, —— U.S. ——, 136 S.Ct. 1236, 194 L.Ed.2d 230 (2016); United States v. Wilson, 316 F.3d 506, 509 (4th Cir. 2003)* (same); *United States v. Fernandez-Antonia, 278 F.3d 150, 157 (2d Cir. 2002)* (same).

The text of the statute plainly contains two different kinds of provisions. As noted, paragraph (d)(3) is substantive. A deportation order may be challenged if the entry of the order was "fundamentally unfair," that is, if it violated due process and prejudiced the alien. *Garcia-Martinez, 228 F.3d at 960.*

**[14]** But paragraphs (d)(1) and (2) describe purely *procedural* criteria. The alien **\*1020** is required to have exhausted any available administrative remedies, and "the deportation proceedings at which the order was issued improperly deprived the alien of the *opportunity* for judicial review." 8 U.S.C. § 1326(d)(2) (emphasis added). Subsection (d) is designed to allow collateral attack only as a safety valve for those who *could not* seek judicial review at the time the original removal order issued.

Here, it is clear that Defendant cannot fulfill the terms of the statute. He had an opportunity to seek administrative and judicial review. He knew that he had the opportunity, because the IJ explained his appellate rights accurately, both orally and in writing. An appeal would have allowed the agency and the courts to consider on the merits the arguments that he now makes. Whether those arguments would have succeeded at the time is beside the point; the statute disallows a collateral attack if Defendant had the *opportunity* to obtain administrative and judicial review and thus the *opportunity* to challenge the categorization of his conviction as an aggravated felony and a firearms offense. He simply decided to waive his right to appeal.

As I will explain, though, our court—unlike our sister circuits —has ignored the procedural focus of paragraphs (d)(1) and (2) and essentially read them out of the statute. Partly as a consequence of failing to demand adherence to (d)(1) and (2), our court has made a second error: labeling as "fundamentally unfair" a decision that was *correct* under extant precedent but as to which the governing law changed later. The history of how the demise of paragraphs (d)(1) and (2) occurred, step by step like a frog subjected to increasingly hot water, will be recounted below.

C. *Discretionary Relief*

We have long held that, when an IJ erroneously informs an alien that he or she is ineligible for discretionary relief, the first two prongs of § 1326(d) are satisfied and that,

AR.06636

under § 1326(d)(3), the alien's due process rights were violated; the remaining question is whether the alien has demonstrated the prejudice required under § 1326(d)(3). For example, in *United States v. Muro-Inclan*, 249 F.3d 1180, 1181 (9th Cir. 2001), an illegal reentry defendant was not informed of his "possible eligibility for a waiver of deportation" at his removal hearing. On collateral attack of that removal order, we held that "a waiver is not 'considered and intelligent' when 'the record contains an inference that the petitioner is eligible for relief from deportation,' but the Immigration Judge fails to 'advise the alien of this possibility and give him the opportunity to develop the issue.' " *Id.* at 1183 (quoting *United States v. Arrieta*, 224 F.3d 1076, 1079 (9th Cir. 2000)). In that case, despite the lack of a knowing and intelligent appellate waiver, we could not call the order "fundamentally unfair" under § 1326(d)(3). *Id.* at 1185–86.

Even in this analysis, our court is an outlier. Several years ago, we noted that our precedents characterizing "an IJ's failure to inform an alien of possible eligibility for discretionary relief [as] a due process violation" take a minority position. *United States v. Lopez-Velasquez*, 629 F.3d 894, 897 n.2 (9th Cir. 2010) (en banc). Although we and the Second Circuit hold this view, the Third, Fourth, Fifth, Sixth, Seventh, Eighth, and Tenth Circuits do not appear to consider such failures to be due process violations. *Id.*[1] The First Circuit has now **\*1021** adopted the majority position as well. *See* *Soto-Mateo*, 799 F.3d at 123 (joining "a majority of circuits [that] have rejected the proposition that there is a constitutional right to be informed of eligibility for—or to be considered for—discretionary relief" (quoting *United States v. Santiago-Ochoa*, 447 F.3d 1015, 1020 (7th Cir. 2006))); *see also* *United States v. Cordova-Soto*, 804 F.3d 714, 723 (5th Cir. 2015) (describing the "majority of circuits," but not the Ninth, as finding no constitutional right to be informed of eligibility for discretionary relief, *cert. denied*, ––– U.S. ––––, 136 S.Ct. 2507, 195 L.Ed.2d 840 (2016); *United States v. Torres*, 383 F.3d 92, 104 (3d Cir. 2004) (noting that failing to apprise an alien of discretionary relief does not violate due process, just as "mere errors of state law" do not violate due process in habeas cases (internal quotation marks omitted)).

## D. *Plenary Legal Review*

Of greater concern to me, however, are the significant additional steps that we have taken, beyond constitutionalizing the right to be informed of discretionary relief. In particular, we have made two innovative jurisprudential moves. First, our precedents permit the retroactive application of intervening changes in law to an underlying removal proceeding, so that the IJ's then-correct decision is rendered incorrect in hindsight—even when the change in law is announced in our own opinion adjudicating the collateral attack. Second, we also have permitted an illegal reentry defendant to attack collaterally not just the failure of the IJ to explain the potential availability of discretionary relief, but also the very ground on which the alien was removed. In so doing, we characterize a removal order as "fundamentally unfair" under 8 U.S.C. § 1326(d)(3)—finding that the order violates due process and causes prejudice—merely because we have subsequently identified a legal error. Those two innovations combine to compel the result in this case.

Move number one. In *United States v. Pallares-Galan*, 359 F.3d 1088 (9th Cir. 2004), the defendant in an illegal reentry appeal litigated both the exhaustion issue under § 1326(d) and the question whether his underlying conviction actually constituted an aggravated felony under the modified categorical approach. The defendant had been convicted of several state crimes, and the INS initiated removal proceedings. *Id.* at 1092. The IJ ruled that one of the defendant's convictions was an aggravated felony, and the defendant waived his right to appeal. *Id.* at 1093. After his removal, the defendant was arrested and charged with illegal reentry. *Id.* He argued that his conviction for a state misdemeanor charge was not an aggravated felony as the IJ had declared. *Id.*

We held that the defendant's waiver of his right to appeal "was not 'considered and intelligent' because the IJ erroneously informed him that he was not eligible for relief from deportation on account of his 1999 state misdemeanor [conviction]." *Id.* at 1096. We reasoned that, "[w]here 'the record contains an inference that the petitioner is eligible for relief from deportation,' but the IJ fails to 'advise the alien of this possibility and give him the opportunity to

develop the issue,' we do not consider an alien's waiver of his right to appeal his deportation order to be 'considered and intelligent.' " *Id.* (quoting **\*1022** *Muro-Inclan,* 249 F.3d at 1182). That passage applied our circuit's view, described above, that due process requires the IJ to apprise aliens of possible *discretionary* relief. But I wish to emphasize our method for locating such an "inference" in the record: We conducted the modified categorical analysis in the same decision, decided that the defendant's underlying conviction was not a categorical match to an aggravated felony, and only then held that the defendant's waiver was not "considered and intelligent." *Id.* at 1099–1101. In other words, we used our own, retroactively applied view of the categorical analysis, on the merits, to justify classifying the prior appellate waiver as not "considered and intelligent"—a classic "bootstrapping" approach.

In effect, we held that a substantive error in the IJ's legal analysis—raised and discovered only on collateral attack—satisfies the first two prongs of § 1326(d). *Pallares-Galan,* 359 F.3d at 1104. That result is difficult to square with the requirements of § 1326(d)(1) and (2), which are designed to require that merits arguments be presented to the IJ and argued on appeal in the first instance.

In move number two, we have gone further still. When a collateral challenge implicates an alien's removability itself, we subsume the "fundamental unfairness" prong of § 1326(d)(3) entirely within our retroactive, de novo legal analysis. For example, in *United States v. Camacho-Lopez,* 450 F.3d 928, 929 (9th Cir. 2006), a legal permanent resident was convicted of "vehicular manslaughter with gross negligence, in violation of California Penal Code section 191.5(a)," served with a notice to appear alleging removability for an aggravated felony, and ordered removed; he knew about, but waived, his right to appeal. When the defendant was later found in the United States and charged with illegal reentry under § 1326, he moved to dismiss the indictment, arguing that intervening legal developments clarified that his conviction was not for an aggravated felony. *Id.* Citing *Leocal v. Ashcroft,* 543 U.S. 1, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004), and *Lara-Cazares v. Gonzales,* 408 F.3d 1217 (9th Cir. 2005)—decisions rendered six and seven years after the defendant's removal order issued—we agreed. *Camacho-Lopez,* 450 F.3d at 929–30. We

noted the government's concession that those later decisions applied to the 1998 deportation hearing and that the defendant was both "excused from the exhaustion requirement" and "deprived of a meaningful opportunity for judicial review" within the meaning of § 1326(d)(1) and (2). *Id.* at 930. Addressing the final "fundamentally unfair" prong in § 1326(d)(3), we held that, because the defendant was charged with removability "*only* for having committed an aggravated felony," and intervening cases clarified that his crime was not an aggravated felony, he "was removed when he should not have been and clearly suffered prejudice." *Id.* We reversed and remanded with instructions to dismiss the indictment. *Id.* The intervening change in law satisfied the § 1326(d)(3) requirement that the defendant show a due process violation, and we assumed prejudice from the error.

Reading the cases together, the law of our circuit is that an illegal reentry defendant may invoke later-decided cases to attack an IJ's finding of removability.[2] *See* **\*1023** *United States v. Aguilera-Rios,* 769 F.3d 626, 631 (9th Cir. 2014) (so holding). Those later-decided cases might include a categorical analysis conducted in another section of the same opinion adjudicating a collateral attack—just as we do in this case. *Pallares-Galan,* 359 F.3d at 1099–1101. And if we ultimately agree with the illegal reentry defendant on the merits of his collateral attack, we find the removal order fundamentally unfair, assuming that it rested on no other ground. *Camacho-Lopez,* 450 F.3d at 930. In sum, if we conclude, years later in a collateral attack, employing de novo review, that the IJ erred in finding removability, we hold that all three of § 1326(d)'s requirements are met, even if the defendant could have exhausted administrative remedies, could have appealed the removal order, knew that appeal was available, and failed to appeal. Our progress toward this point was incremental, but the result—a cooked frog—is incompatible with the statute.

E. *Other courts' approaches*

Other circuits have not eroded § 1326(d) to such a degree. For example, in *Soto-Mateo,* the First Circuit noted that, "when 'performing the collateral attack analysis under §

1326(d), an inquiring court ordinarily should address the initial [ (d)(1) ] test of exhaustion of administrative remedies before going on to the other two tests.' " 799 F.3d at 120 (brackets omitted) (quoting *United States v. DeLeon*, 444 F.3d 41, 45 (1st Cir. 2006)). The court held that the defendant "did not exhaust available administrative remedies" before the IJ, "waived his right to appeal," and could not avoid that default by "asserting that his waiver was neither knowing nor intelligent." *Id.* He "plainly knew what he was doing" when he waived his appellate rights. *Id.* at 122. Addressing the argument that the defendant would never have waived his appeal "if he had known that he was not removable as an aggravated felon," the court held, first, that the unsettled state of the law on whether his conviction was an aggravated felony did not matter: "A waiver of rights based on a reasonable interpretation of existing law is not rendered faulty by later jurisprudential developments." *Id.* at 123 (citing *Brady v. United States*, 397 U.S. 742, 757, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)). The court denied this challenge without "reach[ing] the question of whether he satisfied either the judicial review requirement of [§] 1326(d)(2) or the fundamental fairness requirement of [§] 1326(d)(3)." *Id.*

Other courts also read the § 1326(d) requirements differently than we do. *See United States v. Gil-Lopez*, 825 F.3d 819, 820 (7th Cir. 2016) (refusing to consider an argument that the conviction was not for an aggravated felony because a § 1326 defendant signed an appellate waiver and thus did not exhaust remedies); ⚠️*United States v. Villanueva-Diaz*, 634 F.3d 844, 851–52 (5th Cir. 2011) (rejecting a collateral attack because, though intervening decision made the conviction not a removable offense, the "deportation proceedings were not 'fundamentally unfair' "); *United States v. Rodriguez*, 420 F.3d 831, 834 (8th Cir. 2005) (refusing to entertain a collateral attack because "[a] subsequent change in the law does not render [the defendant's] waiver of his right to appeal 'not considered or intelligent' "); *United States v. Rivera-Nevarez*, 418 F.3d 1104, 1105–06 (10th Cir. 2005) (agreeing with the defendant that later-decided statutory interpretation cases were "fully retroactive," but holding that the defendant still could not show he was deprived of opportunity for judicial review under § 1326(d)(2), so the IJ's legal error concerning removability **\*1024** was harmless)[3]; *United States v.*

*Martinez-Rocha*, 337 F.3d 566, 569–70 (6th Cir. 2003) (finding the § 1326(d) requirements unsatisfied when defendant signed an appellate waiver, noting that "a waiver need not be the best choice under the circumstances in order for it to be 'considered and intelligent' "). We are apparently alone, on the wrong side of an (at least) 6-to-1 circuit split.

[15]  [16] This state of affairs is especially surprising because, elsewhere, we readily enforce appellate waivers. In criminal appeals, for example, we foreclose challenges to a sentence when the defendant waived the right to appeal the Sentencing Guidelines determination, because that the alternative "would render meaningless the express waiver of the right" to bring such a challenge. *United States v. Medina-Carrasco*, 815 F.3d 457, 462 (9th Cir. 2016). Even if a Guidelines calculation was seemingly incorrect, setting aside an explicit waiver "would nullify the waiver based on the very sort of claim it was intended to waive." *Id.* (quoting *United States v. Smith*, 500 F.3d 1206, 1213 (10th Cir. 2007)). "We will enforce a valid waiver even if the claims that could have been made on appeal absent that waiver appear meritorious, because the whole point of a waiver is the relinquishment of claims regardless of their merit." *Id.* at 462–63 (internal quotation marks and emphasis omitted).

### F. *Conclusion*

By permitting collateral legal challenges to an IJ's removability determination in the way that we do, we retroactively label erroneous-only-in-hindsight (but unappealed) categorical determinations as "fundamentally unfair," and as satisfying all three requirements of § 1326(d). *See, e.g., Camacho-Lopez*, 450 F.3d at 930. Our precedent has the effect of nullifying the *procedural* requirements of § 1326(d)(1) and (2) and creating in their place a new, substantive right to retroactive de novo review, thereby undermining the finality interests the statute was designed to protect. These anomalies call for en banc consideration to bring our jurisprudence in line with the statute and the other circuits.

### All Citations

861 F.3d 1010, 17 Cal. Daily Op. Serv. 6494, 2017 Daily Journal D.A.R. 6659

## Footnotes

\*    The Honorable Barbara M.G. Lynn, Chief United States District Judge for the Northern District of Texas, sitting by designation.

1    In addition to arguing that 22 U.S.C. § 2778 is overbroad and indivisible, Defendant argues, in the alternative, that the generic conspiracy statute itself is indivisible, precluding a "second step" analysis of § 2778, the conspiracy's object offense. Because, as explained below, we hold that § 2778 is overbroad and indivisible, we decline to reach Defendant's argument concerning the conspiracy statute.

2    Before *Mathis*, the Fifth Circuit had held that a conviction under 18 U.S.C. § 554 for violating 22 U.S.C. § 2778 was divisible, *Franco-Casasola v. Holder*, 773 F.3d 33, 37–38 (5th Cir. 2014), but as we pointed out in *Almanza-Arenas*, that court "ha[d] not addressed the elements versus means distinction, but rather seem[ed] to apply the modified approach to all disjunctive subsections." 815 F.3d at 480 n.17. More recently, the Fifth Circuit held that § 2778 was not an aggravated felony under 8 U.S.C. § 1101(a)(43)(C). *Guillen-Cruz*, 853 F.3d at 771. The court reached that holding in the alternative. First, under the modified categorical approach, the defendant did not plead guilty to exporting an item on the munitions list. *Id.* at 772–73. Second, the court held that the conviction was not an aggravated felony under the categorical approach, though it did not reach the divisibility prong. *Id.* at 773. As explained, we employ different reasoning here.

1    The cases we cited as taking the opposite view are *United States v. Santiago-Ochoa*, 447 F.3d 1015, 1020 (7th Cir. 2006) (stating that an alien does not have a constitutional right to be informed of eligibility for discretionary relief); *Bonhometre v. Gonzales*, 414 F.3d 442, 448 n.9 (3d Cir. 2005) (same); *United States v. Aguirre-Tello*, 353 F.3d 1199, 1205 (10th Cir. 2004) (en banc) (same); *United States v. Lopez-Ortiz*, 313 F.3d 225, 231 (5th Cir. 2002) (same); *see also* *Smith v. Ashcroft*, 295 F.3d 425, 430 (4th Cir. 2002) (stating that an alien's eligibility for discretionary relief is not a constitutionally protected interest); *Escudero-Corona v. INS*, 244 F.3d 608, 615 (8th Cir. 2001) (same); *Ashki v. INS*, 233 F.3d 913, 921 (6th Cir. 2000) (same).

2    As we pointed out in *Aguilera-Rios*, 769 F.3d at 632–33, we have apparently carved out a narrow exception to full retroactivity when the only issue is whether the alien was eligible for relief from removal, as distinct from whether the alien was removable at all. *See* *United States v. Gomez*, 757 F.3d 885, 899 (9th Cir. 2014) (considering the law at the time of the defendant's removal order to determine eligibility for *relief* from removal).

3    This conclusion runs directly contrary to our court's decision in *Aguilera-Rios*, which rejected the government's argument that the removal order was valid because it rested on governing law at the time, and only subsequent, intervening decisions invalidated it. We applied the same retroactivity rule that *Rivera-Nevarez* invoked—even citing that case, 769 F.3d at 631—and held that, at least where intervening statutory interpretation law rendered an alien "*not removable*" as of the time of the IJ hearing, that intervening law would be applied retroactively. *Id.* at 632–33. We never mentioned that the Tenth Circuit in *Rivera-Nevarez* ultimately rejected the retroactive legal challenge because § 1326(d) still barred it, rendering the original legal error harmless.

17 Cal. Daily Op. Serv. 6494, 2017 Daily Journal D.A.R. 6659

---

**End of Document**                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Disagreement Recognized by United States v. Florentino-Rosario, D.Puerto Rico, May 8, 2020

849 F.3d 1219
United States Court of Appeals, Ninth Circuit.

UNITED STATES of America, Plaintiff-Appellee,
v.
Rosario VAZQUEZ-HERNANDEZ, AKA Jose Alfredo Jimenez-Valdez, Defendant-Appellant.

No. 15-10009
|
Argued and Submitted September 12, 2016, San Francisco, California
|
Filed March 3, 2017

**Synopsis**

**Background:** Defendant was convicted in the United States District Court for the District of Arizona, Raner C. Collins, Chief District Judge, No. 4:14-cr-00772-RCC-CRP-1, of attempted illegal reentry. Defendant appealed.

**Holdings:** The Court of Appeals, William K. Sessions III, United States District Judge for the District of Vermont, sitting by designation, held that:

[1] lack of jury instruction regarding freedom from official restraint constituted plain error;

[2] lack of jury instruction regarding freedom from official restraint affected defendant's substantial rights;

[3] rational jury could not have concluded beyond reasonable doubt that defendant was free from official restraint in pre-inspection area, or that he intended to be by entering it;

[4] permitting conviction for attempted illegal reentry based only on intent to enter into pre-inspection area would have undermined fairness of nation's inspection procedures and jeopardized integrity of convictions sustained by courts presiding over border inspection areas; and

[5] rational trier of fact could not have found beyond reasonable doubt that defendant intended to enter United

States free from official restraint and without consent of Attorney General.

Reversed and remanded.

West Headnotes (23)

[1]    **Aliens, Immigration, and Citizenship** ⟳ Reentry after removal

Crossing the United States border from Mexico is a substantial step towards the commission of attempted illegal reentry. Immigration and Nationality Act § 276, 8 U.S.C.A. § 1326.

[2]    **Criminal Law** ⟳ Elements of offense and defenses

**Criminal Law** ⟳ Issues related to jury trial

Although the Court of Appeals generally reviews a jury instruction that misstates the elements of a statutory crime de novo, it reviews an instruction for plain error in the absence of a timely objection to it below.

[3]    **Criminal Law** ⟳ Necessity of Objections in General

In order to conclude that plain error exists, an appellate court must find (1) an error that is (2) plain and (3) affects substantial rights.

[4]    **Criminal Law** ⟳ Necessity of Objections in General

Where the conditions for plain error are met, an appellate court may exercise its discretion to correct the error only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings.

3 Cases that cite this headnote

[5]    **Criminal Law** ⟳ Necessity of Objections in General

Although an appellate court typically refrains from addressing issues that neither party properly raised on appeal, it may do so in cases of a plain error that affects substantial rights; the court exercises its discretion to address these types of errors if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

2 Cases that cite this headnote

**[6]     Aliens, Immigration, and Citizenship** 🔑 **Instructions**

**Criminal Law** 🔑 **Failure to instruct in general**

In defendant's trial on charge of attempted illegal reentry, lack of jury instruction regarding freedom from official restraint constituted plain error, as required for relief on plain error review, since it allowed defendant to be convicted based only on intent to enter into pre-inspection area; average juror likely could not correctly understand and apply term "entry" in that context without specific instruction that illegal reentry required intent to enter free from official restraint. Immigration and Nationality Act § 276, 8 U.S.C.A. § 1326.

12 Cases that cite this headnote

**[7]     Constitutional Law** 🔑 **Degree of proof; reasonable doubt**

**Constitutional Law** 🔑 **Necessity; Right to Jury Trial**

**Jury** 🔑 **Weight and sufficiency of evidence**

The Fifth and Sixth Amendments require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged beyond a reasonable doubt. U.S. Const. Amends. 5, 6.

**[8]     Criminal Law** 🔑 **Elements and Incidents of Offense, and Defenses in General**

Jury instructions misstate the essential elements of an offense when they do not adequately link

the intent element of a crime with the required object of that intent.

**[9]     Aliens, Immigration, and Citizenship** 🔑 **Reentry after removal**

**Aliens, Immigration, and Citizenship** 🔑 **Weight and sufficiency**

The crime of attempted illegal reentry is a specific intent crime that requires proof beyond a reasonable doubt that the defendant had the specific intent to reenter without consent. Immigration and Nationality Act § 276, 8 U.S.C.A. § 1326.

1 Cases that cite this headnote

**[10]     Aliens, Immigration, and Citizenship** 🔑 **Reentry after removal**

**Aliens, Immigration, and Citizenship** 🔑 **Weight and sufficiency**

An alien has not entered the United States for the purposes of the crime of attempted illegal reentry unless he does so free from official restraint; accordingly, to convict a defendant of attempted illegal reentry, the government must prove beyond a reasonable doubt that the defendant crossed into the United States with the specific intent to enter the country free from official restraint. Immigration and Nationality Act § 276, 8 U.S.C.A. § 1326.

12 Cases that cite this headnote

**[11]     Criminal Law** 🔑 **Failure to instruct in general**

In defendant's trial on charge of attempted illegal reentry, lack of jury instruction regarding freedom from official restraint affected defendant's substantial rights, as required for relief on plain error review, since it allowed defendant to be convicted based only on intent to enter into pre-inspection area. Immigration and Nationality Act § 276, 8 U.S.C.A. § 1326.

17 Cal. Daily Op. Serv. 1984, 2017 Daily Journal D.A.R. 1965

**[12]**    **Criminal Law**   Necessity of Objections in General

An error affects substantial rights, as required for relief on plain error review, if there is a reasonable probability that the error affected the outcome of the trial.

1 Cases that cite this headnote

**[13]**    **Criminal Law**   Construction and Effect of Charge as a Whole

**Criminal Law**   Plain or fundamental error

In determining on plain error review the likelihood that an erroneous instruction affected the outcome of a trial, the Court of Appeals reviews the jury instructions as a whole, not only the erroneous instructions; the Court also may examine the arguments made by the parties.

**[14]**    **Criminal Law**   Elements of offense and defenses

Where a jury instruction permits a conviction on either of two alternative theories, one of which is later found to be unconstitutional, the error affects the defendant's substantial rights if there is a reasonable probability that the jury convicted the defendant on the invalid theory.

2 Cases that cite this headnote

**[15]**    **Aliens, Immigration, and Citizenship**   Weight and sufficiency

Rational jury could not have concluded beyond reasonable doubt that defendant was free from official restraint in pre-inspection area, or that he intended to be by entering it, since pre-inspection area served function of allowing uninspected foreign nationals to assemble to accomplish lawful entry and pre-inspection area was subject to surveillance by hundreds of cameras, with small blind spots, and it was surrounded on all sides either by walls or law enforcement agents.

Immigration and Nationality Act § 276,  8 U.S.C.A. § 1326.

**[16]**    **Aliens, Immigration, and Citizenship**   Reentry after removal

The freedom from official restraint requirement for a conviction on a charge of attempted illegal reentry addresses the practical concern that failing to require such a finding would lead to the criminalization of individuals who arrive at a port of entry but have not yet had an opportunity to apply for inspection. Immigration and Nationality Act § 276,  8 U.S.C.A. § 1326.

**[17]**    **Aliens, Immigration, and Citizenship**   Reentry after removal

Under the statute prohibiting attempted illegal reentry, an alien is not free from official restraint when he is in an area that is subject to constant government surveillance. Immigration and Nationality Act § 276,  8 U.S.C.A. § 1326.

1 Cases that cite this headnote

**[18]**    **Aliens, Immigration, and Citizenship**   Reentry after removal

Under the statute prohibiting attempted illegal reentry, the touchstone to determining whether a defendant is free from official restraint is whether the defendant was free to go at large and at will within the United States. Immigration and Nationality Act § 276,  8 U.S.C.A. § 1326.

9 Cases that cite this headnote

**[19]**    **Aliens, Immigration, and Citizenship**   Reentry after removal

**Criminal Law**   Criminal liability

Permitting conviction for attempted illegal reentry based only on intent to enter into pre-inspection area would have undermined fairness of nation's inspection procedures and jeopardized integrity of convictions sustained by courts presiding over border inspection areas, and therefore Court of Appeals exercised its discretion on plain error review to overturn

17 Cal. Daily Op. Serv. 1984, 2017 Daily Journal D.A.R. 1965

conviction as miscarriage of justice. Immigration and Nationality Act § 276, 8 U.S.C.A. § 1326.

---

**[20]    Aliens, Immigration, and Citizenship  Weight and sufficiency**

Rational trier of fact could not have found beyond reasonable doubt that defendant intended to enter United States free from official restraint and without consent of Attorney General, as required to be convicted of attempted illegal reentry; among other things, defendant's apparent cautiousness was not sufficiently probative of intent to run past pre-inspection area, he carried with him supplies only necessary to carry out window-washing activities, and he provided plausible explanation for his arrival at pre-inspection area late in day. Immigration and Nationality Act § 276, 8 U.S.C.A. § 1326.

1 Cases that cite this headnote

---

**[21]    Criminal Law  Review De Novo**

Claims of insufficient evidence to support a jury verdict are reviewed de novo.

1 Cases that cite this headnote

---

**[22]    Criminal Law  Construction in favor of government, state, or prosecution**
**Criminal Law  Reasonable doubt**

Evidence supporting a conviction is sufficient if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

1 Cases that cite this headnote

---

**[23]    Criminal Law  Review De Novo**

A claim that a district court erred in denying a motion for judgment of acquittal is reviewed de novo. Fed. R. Crim. P. 29.

---

**Attorneys and Law Firms**

**\*1222** Henry L. Jacobs (argued), Law Offices of Henry Jacobs PLLC, Tucson, Arizona, for Defendant-Appellant.

Erica Anderson McCallum (argued) and Elizabeth Berenguer, Assistant United States Attorneys; Robert L. Miskell, Appellate Chief; John S. Leonardo, United States Attorney, United States Attorney's Office, Tucson, Arizona; for Plaintiff-Appellee.

Appeal from the United States District Court for the District of Arizona, Raner C. Collins, Chief District Judge, Presiding, D.C. No. 4:14-cr-00772-RCC-CRP-1

Before: Ronald M. Gould and Marsha S. Berzon, Circuit Judges, and William K. Sessions, III,[*] District Judge.

---

## OPINION

SESSIONS, District Judge:

Defendant-appellant Rosario Vazquez-Hernandez appeals his conviction for attempted illegal reentry under 8 U.S.C. § 1326 on the ground that there was insufficient evidence to support his conviction. Vazquez-Hernandez also notes that the district court's instruction at trial failed to properly inform the jury of the essential elements of the offense.

The lack of an instruction to the jury that Vazquez-Hernandez had to have a conscious desire to reenter the United States free from official restraint to be found guilty of the crime of attempted illegal reentry was plain error. Moreover, we conclude that even if the jury applied the correct legal standard, the trial record provides insufficient evidence to allow any rational trier of fact to find the essential elements of attempted illegal reentry beyond a reasonable doubt. Therefore, we vacate Vazquez-Hernandez's conviction and remand to the district court to enter a judgment of acquittal.

---

### *1223  I. Background

Prior to his conviction, Vazquez-Hernandez, a citizen of Mexico, frequently earned money washing car windows at the Mariposa port of entry into the United States in Nogales, Arizona. The U.S. inspection station at the Mariposa port of entry lies on U.S. territory, about 100 yards north of the

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

border with Mexico. As a result, the United States invites foreign nationals and U.S. citizens traveling in vehicles to enter U.S. territory prior to their inspection by immigration officials. Pedestrians are invited to enter the pre-inspection area through a separate, designated lane, and are generally not permitted in the vehicle lanes for safety reasons. U.S. Border Patrol agents have on occasion, however, permitted individuals they presume to be U.S. citizens to enter the northbound vehicle lanes on foot. Although also not officially permitted, vendors and window washers commonly enter the pre-inspection area from Mexico on foot, touting their wares and services to stopped vehicles.

The pre-inspection area is walled off on all sides except at the U.S. border with Mexico and at the Mexican and U.S. inspection points, and is monitored by hundreds of U.S. government cameras. United States "outbound operations" officers, armed with automatic rifles, monitor southbound lanes north of the Mexican government's inspection points. Law enforcement agents stationed at the border sometimes screen individuals entering the pre-inspection area for those who could pose a safety threat and prevent them from entering the pre-inspection area.

Subject to this intermittent screening and control, foreign nationals enter the pre-inspection area on U.S. territory on a daily basis, either in vehicles or on foot. Occasionally, U.S. Border Patrol agents attempt to arrest and detain individuals present on foot in the pre-inspection area who the agents believe, based on their behavior and appearance, do not "have legal status" in the United States, without inquiring about their intent to go past the port of entry. When approached by Border Patrol agents, vendors and other individuals who do not intend to enter the United States beyond the pre-inspection area often flee the pre-inspection area and return to the Mexican side of the border. Pedestrians attempting to enter the United States without inspection sometimes run up the southbound lanes, bypassing the U.S. inspection points.

Before his arrest and conviction in 2014, Vazquez-Hernandez was previously removed from the United States three times, and was once previously convicted of illegal reentry. He was first removed in 2005, before he began his window-washing work. Since he began working at the Mariposa port of entry, he has twice been arrested in the pre-inspection area and subsequently deported, in 2010 and 2013. After his 2010 arrest, he was charged with illegal reentry and pled guilty to the offense.

Around the time he was arrested in 2014, Vazquez-Hernandez entered the pre-inspection area at the Mariposa port of entry to wash windows almost every day, including on the weekends and in the afternoons and evenings. On April 5, 2014, two Border Patrol agents, Agent Adam Erfert and Joshua Thomas, saw Vazquez-Hernandez on surveillance cameras. The agents testified at trial that they became suspicious of Vazquez-Hernandez's intentions because he appeared to be looking around and monitoring his environment, and because of his attentiveness and proximity to the southbound vehicle lanes. The two agents approached Vazquez-Hernandez and, despite Vazquez-Hernandez's efforts to evade the agents' grasp, arrested him. Vazquez-Hernandez was eventually charged with attempted illegal reentry in **\*1224** violation of 8 U.S.C. § 1326 in a superseding indictment returned on October 1, 2014. The case proceeded to trial.

At trial, the district court judge instructed the jury on the elements of the offense of illegal reentry in the following manner:

> [T]he government must prove each of the following elements beyond a reasonable doubt: First, the defendant was removed and/or deported from the United States; second, the defendant had the conscious desire to reenter the United States without consent; third, the defendant was an alien at the time of his attempted reentry into the United States; fourth, the defendant had not obtained the consent of the Attorney General or the Secretary of the Department of Homeland Security to reapply for admission into the United States; and fifth, the defendant did something that was a substantial step toward committing the crime.

 **[1]**   During the course of argument for a directed verdict, and outside the presence of the jury, the judge stated to counsel that the only question at issue was the defendant's intent. [1]

After receiving the instruction on the elements of attempted illegal reentry, the jurors expressed confusion about the intent requirement. The jurors asked, "Does, as a matter of [l]aw,

illegal reentry into the United States include the element of intent to stay in the United States? Or is there no mention of such intent in the statute?" In response, the court referred the jurors to the instruction it had already given on the elements of the offense. Vazquez-Hernandez did not object to the instructions at trial.

On October 8, 2014, the jury convicted Vazquez-Hernandez of attempted illegal reentry, the sole count in the superseding indictment. On December 18, 2014, the district court sentenced Vazquez-Hernandez to 40 months of imprisonment followed by three years of supervised release and imposed a $100 special assessment. Vazquez-Hernandez filed this timely appeal.

## II. Discussion

### A. Improper jury instruction

 **[2]   [3]   [4]   [5]**   Although this Court generally reviews a jury instruction that misstates the elements of a statutory crime de novo, we review an instruction for plain error in the absence of a timely objection to it below.[2] *1225 *United States v. Kilbride*, 584 F.3d 1240, 1247 (9th Cir. 2009). In order to conclude that plain error exists, we must find "(1) an error that is (2) plain and (3) affects substantial rights." *Id.* (quoting *United States v. Peterson*, 538 F.3d 1064, 1071 (9th Cir. 2008)). Where these conditions are met, "we may only exercise our discretion to correct the error if it seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (quoting *Peterson*, 538 F.3d at 1072).

#### i. Plain error

 **[6]   [7]   [8]**   The district court's failure to include an instruction on freedom from official restraint at summation constituted plain error. The Fifth and Sixth Amendments require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged beyond a reasonable doubt. *United States v. Gaudin*, 515 U.S. 506, 509–10, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995). Jury instructions misstate the essential elements of an offense when they do not adequately link the intent element of a crime with the required object of that intent. *See United States v. Montoya-Gaxiola*, 796 F.3d 1118, 1122–24 (9th Cir. 2015) (finding plain error because jury instruction did not specify that, where defendant was charged

with possession of an unregistered firearm, the jury must find that the defendant knew of the features of his weapon that brought it within the definition of a firearm under the criminal statute, rather than knowing that he had a weapon which happened to have such features, unbeknown to the defendant); *United States v. Cherer*, 513 F.3d 1150, 1155 (9th Cir. 2008) (finding error in jury instructions regarding the elements of a sex crime committed towards a minor where the instruction failed to appropriately connect the requisite state of mind, knowledge, with the statute's object, a minor victim).

 **[9]   [10]**   The crime of attempted illegal reentry under 8 U.S.C. § 1326 is a specific intent crime that requires proof beyond a reasonable doubt that the defendant had "the specific intent 'to reenter without consent.' " *United States v. Lombera-Valdovinos*, 429 F.3d 927, 929 (9th Cir. 2005) (quoting *United States v. Leos-Maldonado*, 302 F.3d 1061, 1063 (9th Cir. 2002)). For the purposes of § 1326, "entry" has a distinct legal meaning: "[a]n alien has not entered the United States under § 1326 unless he does so 'free from official restraint.' " *Id.* at 928 (quoting *United States v. Gracidas-Ulibarry*, 231 F.3d 1188, 1191 n.3 (9th Cir. 2000) (en banc)). Accordingly, to convict a defendant of attempted illegal reentry, the Government must "prove beyond a reasonable doubt that [the defendant] crossed into the United States with the specific 'intent to enter the country free from official restraint.' " *United States v. Argueta-Rosales*, 819 F.3d 1149, 1156 (9th Cir. 2016) (quoting *Lombera-Valdovinos*, 429 F.3d at 928).

The jury instructions here omitted this element of attempted illegal reentry. The district court instructed the jury only that it must find that Vazquez-Hernandez "had the conscious desire to reenter the United States without consent," making no mention of the intent to be free from official restraint. This was plain error.[3]

 *1226 *Gracidas-Ulibarry* is not to the contrary. There, this Court held that "an explanation of the meaning of specific intent is necessary to give guidance as to the proper jury instruction for" attempted illegal reentry. *Gracidas-Ulibarry*, 231 F.3d at 1195. Although *Gracidas-Ulibarry* did not specifically explain that § 1326 requires proof that

the defendant attempt to enter "free from official restraint," there was no dispute concerning whether the defendant in that case was under official restraint, or whether he intended to proceed past the border checkpoint. *See* id. at 1191. Here, in contrast, greater elaboration on the specific intent requirement was necessary because the conditions of the pre-inspection area at the Mariposa port of entry, combined with Vazquez-Hernandez's assertion that he did not intend to proceed beyond the inspection points, created ambiguity about Vazquez-Hernandez's intent to reenter free from official restraint.

Likewise, our cases finding no error in the omission of a jury instruction on freedom from official restraint when the defendant was "found in" the United States in violation of § 1326 do not govern here. *See e.g.*, *United States v. Castellanos-Garcia*, 270 F.3d 773, 777 (9th Cir. 2001) (declining to require a trial judge to instruct a jury on the "free from official restraint" requirement for entry in a case alleging that the defendant was "found in" the United States in violation of § 1326, where the defendant did not point to evidence that would suggest that his entry was *not* free from official restraint). *But see* *United States v. Bello-Bahena*, 411 F.3d 1083, 1088–91 (9th Cir. 2005) (remanding for new trial where trial judge failed to offer the defendant's jury instruction regarding "free from official restraint" at trial for being "found in" the United States in violation of § 1326, where defendant's theory that he was not free from official restraint because he was subject to constant surveillance had a basis in the evidence). We have long recognized that " § 1326 sets forth three distinct offenses: 'enter,' 'attempt to enter,' and 'found in.' " *United States v. Pacheco-Medina*, 212 F.3d 1162, 1165 (9th Cir. 2000). Although "an entry, as defined legally, is required before a person is 'found in' the United States," id. at 1166, "the Government does not need to charge or prove voluntary entry in a § 1326 'found in' offense." *United States v. Rivera-Sillas*, 417 F.3d 1014, 1018–19 (9th Cir. 2004), *amended* (9th Cir. 2005). Accordingly, because the elements that the government is required to prove in "found in" cases are not directly parallel to those required to prove attempted illegal reentry, our precedents finding no error where jury instructions did not describe the "free from official restraint" requirement in "found in" cases do not bear on the necessary instructions for attempted illegal reentry cases.

**\*1227 ii. The error affected Vazquez-Hernandez's substantial rights**

[11] [12] [13] [14] The lack of a jury instruction regarding freedom from official restraint affected Vazquez-Hernandez's substantial rights. An error affects substantial rights if there is "a reasonable probability that the error affected the outcome of the trial." *United States v. Marcus*, 560 U.S. 258, 262, 130 S.Ct. 2159, 176 L.Ed.2d 1012 (2010). In determining the likelihood that an erroneous instruction affected the outcome of a trial, "[w]e review the jury instructions as a whole, not only the erroneous instructions. We may also examine the arguments made by the parties." *United States v. Garrido*, 713 F.3d 985, 995 (9th Cir. 2013) (internal quotation and citation omitted). Moreover, where a jury instruction permits a conviction on either of two alternative theories, one of which is later found to be unconstitutional, the error affects the defendant's substantial rights if there is a reasonable probability that the jury convicted the defendant on the invalid theory. Id.

[15] Here, the government advanced two theories of guilt at summation. The district court's instructions permitted the jury to convict Vazquez-Hernandez on either of those theories. Specifically, the government argued that the jury could convict Vazquez-Hernandez if it found that "he had the purpose of illegally reentering the United States, whether it was to make a little money from his window washing business or to scout for traffickers or flee north in the southbound lanes." Thus, the prosecution indicated that either entry into the pre-inspection area with the intent to wash windows and then return to Mexico, *or* entry with the intent to move into the United States past the points of inspection, would constitute an "entry" within the meaning of the intent element of the crime.

[16] Our case law clearly does not support the first of those theories. First, the official restraint doctrine was intended to safeguard the presence of uninspected immigrants in precisely the type of area in to which Vazquez-Hernandez entered and where he remained. The freedom from official restraint requirement addresses the practical concern that failing to require such a finding would lead to the criminalization of individuals who arrive at a port of entry but have not yet had an opportunity to apply for inspection. *See* *Argueta-Rosales*, 819 F.3d at 1160 ("[T]he official restraint doctrine is a practical necessity.... We doubt that

Congress intended to make criminals out of persons who, for any number of reasons, approach immigration officials at the border."); *United States v. Vasilatos*, 209 F.2d 195, 197 (3rd Cir. 1954) (explaining that because "in a literal and physical sense a person coming from abroad enters the United States whenever he reaches land, water or air space within the territorial limits of this nation," "freedom from official restraint must be added to physical presence before entry is accomplished") (cited with approval in *Argueta-Rosales*, 819 F.3d at 1160). The pre-inspection area at the Mariposa port of entry thus serves this function of allowing uninspected foreign nationals to assemble to accomplish a lawful entry.

[17]  Second, an alien is not free from official restraint when he is in an area that is subject to constant government surveillance. *Pacheco-Medina*, 212 F.3d at 1165; *United States v. Aguilar*, 883 F.2d 662, 681 (9th Cir. 1989), *superseded by statute on other grounds*, P.L. No. 99-603, 100 Stat. 3359, *as stated in United States v. Gonzalez-Torres*, 309 F.3d 594 (9th Cir. 2002) ("Continuous surveillance by immigration authorities can be sufficient to place an alien under official restraint" for the purposes of applying the definition of entry to **\*1228** the crime of illegally bringing an alien into the United States). Here, the government's witnesses testified that the pre-inspection area was subject to surveillance by hundreds of cameras, with small blind spots, and was surrounded on all sides either by walls or law enforcement agents.

The only time that Vazquez-Hernandez was not under direct camera surveillance was when Border Patrol Agents Erfert and Thomas were approaching him, with knowledge of his location. Such a minor gap in surveillance is not sufficient to break an officer's "continuous observation" necessary to establish official restraint. *United States v. Gonzalez-Torres*, 309 F.3d 594, 599 (9th Cir. 2002) (finding that where Border Patrol agent observed a defendant from the moment he crossed the border, knew the trail on which the defendant and others were walking, and only lost sight of him "for a number of seconds," the defendant was under constant surveillance and therefore not free from official restraint). Moreover, Vazquez-Hernandez's attempt to evade arrest by running from the agents is not sufficient to deem him free from official restraint, because he was either subject to camera surveillance or within the officer's sight, or both, at the time he ran. *See Pacheco-Medina*, 212 F.3d at 1163–65 (finding no

freedom from official restraint, and thus no entry under § 1326, when alien was subject to surveillance from the moment he crossed the border, even though he immediately ran away from an agent and "gave chase" rather than surrender to arrest).

[18]  Finally, the touchstone to determining whether a defendant is free from official restraint is whether the defendant was free to "go at large and at will within the United States." *Id.* at 1164 (quoting *Ex parte Chow Chok*, 161 F. 627, 630 (N.D.N.Y.), *aff'd*, 163 F. 1021 (2d Cir. 1908)); *see Gonzalez-Torres*, 309 F.3d at 598. There is no doubt in this case that Vazquez-Hernandez was not free to travel at will beyond the points of inspection. The area was largely walled off from U.S. territory not subject to such surveillance and monitored by Border Patrol agents who attempted to stop individuals from proceeding into the United States without inspection. Therefore, given this evidence on the conditions of the pre-inspection area, no rational jury could have concluded beyond a reasonable doubt that Vazquez-Hernandez was free from official restraint in this area, or that he intended to be by entering it. Accordingly, the jury could not properly have sustained a conviction on this theory if it had been adequately instructed.

As we explain later, *see* pp. 1229–31, the evidence that Vazquez-Hernandez intended to flee northward rather than stay in the pre-inspection area was exceedingly weak. Also, the jury's question to the judge indicated that its focus was on the first prosecution theory, concerning defendant's simple presence in the pre-inspection area. If the jury was focusing on the second theory, that the defendant intended to jump the fence and run north across the border, it would not have asked about intent to stay in the United States. It is therefore reasonably likely that the jury found that Vazquez-Hernandez only intended to enter the pre-inspection area, and, in reaching its verdict, relied on the alternative theory advanced by the prosecution and permitted by the inadequate jury instruction that Vazquez-Hernandez could be convicted with this more limited intent. In fact, the evidence did not establish that by intending to enter the pre-inspection area, Vazquez-Hernandez intended to enter free from official restraint, as would be required to convict him on that theory. Accordingly, there is a reasonable probability that the erroneous instruction, which permitted the jury to rely on a theory it should have discarded, impacted **\*1229** the outcome of the trial. Thus, the error affected Vazquez-Hernandez's substantial rights.

AR.06649

### iii. Miscarriage of justice

[19]  We exercise our discretion to correct the error in this case because the jury's possible reliance on a legally invalid theory constitutes a miscarriage of justice which would seriously affect "the fairness, integrity or public reputation of judicial proceedings." *Garrido*, 713 F.3d at 998 (finding that upholding a conviction where "the indictment, the jury instructions and the closing arguments at trial were permeated with the prohibited ... theory" and where neither party argued their cases on a legally valid theory would constitute a miscarriage of justice) (internal quotations omitted). Permitting a conviction for attempted illegal reentry based on the intent to enter into only the pre-inspection area would undermine the fairness of our nation's inspection procedures and jeopardize the integrity of convictions sustained by courts presiding over border inspection areas. These pre-inspection areas have been established to facilitate our country's inspection procedures. Allowing law enforcement discretion to initiate a criminal process against some foreign nationals for crossing the border into this area without enunciating the intent to evade official surveillance could undermine the purpose of the illegal reentry statute.

For these reasons, the omission of the freedom from official restraint requirement from the jury instruction constitutes plain error affecting Vazquez-Hernandez's substantial rights. [4]  We reverse.

### B. Insufficient evidence to support the jury's verdict

[20]  [21]  [22]  [23]  Vazquez-Hernandez argues that there is insufficient evidence to support his conviction for attempted illegal reentry, a claim which, "if successful, would entitle him to a judgment of acquittal." *See United States v. Shetler*, 665 F.3d 1150, 1161 (9th Cir. 2011) (citing *United States v. Williams*, 547 F.3d 1187, 1195 (9th Cir. 2008)). Claims of insufficient evidence to support a jury verdict are reviewed de novo. *United States v. Antonakeas*, 255 F.3d 714, 723 (9th Cir. 2001). Evidence supporting a conviction is sufficient if, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). Vazquez-Hernandez's claim that the district court erred in denying

his motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 is also reviewed de novo. *Castellanos-Garcia*, 270 F.3d at 775.

We conclude that no rational trier of fact properly instructed on the elements of the crime could have found that Vazquez-Hernandez possessed the required mens rea for attempted illegal reentry beyond a reasonable doubt. To be guilty, Vazquez-Hernandez must have intended to enter the United States free from official restraint and without the consent of the Attorney General.

As discussed above, if properly instructed on the official restraint doctrine, no rational jury could have concluded beyond a reasonable doubt that Vazquez-Hernandez **\*1230** was free from official restraint in the pre-inspection area, or that he intended to be simply by entering that area.

Likewise, there is insufficient evidence in the record to support Vazquez-Hernandez's guilt on the theory that he intended to go beyond the pre-inspection area so as to be free to go at large and at will within the United States. The testimony of Agents Erfert and Thomas as to their observations and beliefs about Vazquez-Hernandez's intentions is insufficient to prove beyond a reasonable doubt that Vazquez-Hernandez intended to proceed outside the pre-inspection area. In particular, Agent Erfert stated that Vazquez-Hernandez appeared to be "really worried about who was around him and what's going on," and Agent Thomas stated that Vazquez-Hernandez looked over the wall dividing the northbound and southbound lanes once and that he looked distracted while washing windows.

Vazquez-Hernandez could have looked around cautiously to avoid arrest even if he did not intend to dart northward past the pre-inspection area on the southbound lanes. Vazquez-Hernandez had been arrested and convicted for washing windows in the pre-inspection area before, and it would be logical for him to want to avoid the possibility of another conviction.

Consistent with Vazquez-Hernandez's experience, Agents Thomas and Erfert testified that they sometimes attempt to arrest pedestrian vendors and window-washers rather than warning them that they are not authorized in the area. When approached, pedestrian vendors typically try to avoid arrest by running back to the Mexican side of the border. In light of these customary law enforcement practices, Vazquez-Hernandez's apparent cautiousness was

17 Cal. Daily Op. Serv. 1984, 2017 Daily Journal D.A.R. 1965

not sufficiently probative of an intent to run north past the pre-inspection area.

Agent Erfert speculated that Vazquez-Hernandez was attempting to see if there were any Border Patrol Agents in the southbound lanes, and that individuals who attempt to enter the United States past the pre-inspection area often do so by running up the southbound lanes. [5] However, Vazquez-Hernandez did not attempt to run northward past the inspection points after he saw that the southbound lanes were clear of law enforcement officers. Rather, he continued to wash windows after looking over the wall cautiously. Moreover, Agent Erfert testified that he never saw the appellant attempt to jump any of the fences surrounding the pre-inspection area that would lead into contiguous U.S. territory.

Circumstantial evidence also undermines the inference that Vazquez-Hernandez intended to proceed past the inspection points. On the day he was arrested, Vazquez-Hernandez carried with him only the supplies necessary to carry out window-washing activities. He had only a few coins in his possession. Although Vazquez-Hernandez entered the pre-inspection area around 7:30 p.m., when it was starting to get dark, he did not enter under the full cover of darkness. He also provided a plausible explanation for his arrival at the pre-inspection area late in the day: that he came to work after picking up his daughter from school. Although the agents testified that Vazquez-Hernandez was wearing a sweater or jacket, which one believed was unusual given

the warm weather, the inference that he was dressed for a long journey is weak. The inference is similarly weak that, because an agent saw Vazquez-Hernandez set a water bottle down on the **1231** dividing wall on one occasion, Vazquez-Hernandez was not using any water, and was not really there to wash windows. We conclude, therefore, that no rational juror could find beyond a reasonable doubt that Vazquez-Hernandez intended to travel northward beyond the points of inspection.

### III. Conclusion

In light of the foregoing analysis, we conclude that the district court's instruction failed to properly state the essential elements of attempted illegal reentry and permitted the government to advance, and the jury to convict on, an invalid theory of guilt. This was plain error. Because we further hold that no properly instructed, rational trier of fact could find Vazquez-Hernandez guilty of the crime of attempted illegal reentry, we reverse the defendant's conviction and remand to the district court to enter a judgment of acquittal.

**REVERSED and REMANDED.**

### All Citations

849 F.3d 1219, 17 Cal. Daily Op. Serv. 1984, 2017 Daily Journal D.A.R. 1965

### Footnotes

\*    The Honorable William K. Sessions III, United States District Judge for the District of Vermont, sitting by designation.

1    Crossing the United States border from Mexico is a substantial step towards the commission of attempted illegal reentry. *United States v. Leos-Maldonado*, 302 F.3d 1061, 1063–64 (9th Cir. 2002). Because Vazquez-Hernandez acknowledged that he had formally crossed the border to enter into the pre-inspection area, the district court instructed the parties not to focus on the "substantial step" element of the charged offense.

2    Although Vazquez-Hernandez did not independently challenge the jury instruction on appeal, he did maintain that the instruction was erroneous, as part of his argument that no jury could have determined that he entered the United States free from official restraint, as required by law. Whether the validity of the instruction was adequately raised on appeal is debatable. In any event, although we typically refrain from addressing issues that neither party properly raised on appeal, we may do so in cases of a plain error that affects substantial

rights. *See* *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); Fed. R. Crim. P. 52(b). We exercise our discretion to address these types of errors if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736, 113 S.Ct. 1770 (quoting *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936)). Since the standard by which we review this jury instruction on the merits aligns precisely with this preliminary question under Federal Rule of Criminal Procedure 52(b), we conclude that we have the power to review the instructions for the same reasons that we provide for correcting the instructions in this case. *See infra*, 1229 n.4.

3    This case does not involve a failure to define a term that was within the comprehension of the average juror.

*United States v. Tirouda*, 394 F.3d 683, 688–89 (9th Cir. 2005), *as amended on denial of reh'g and reh'g en banc* (July 13, 2005) ("Whether a term in a jury instruction requires definition normally turns on whether it expresses a concept within the jury's ordinary experience. No prejudice results from a district court's failure to define a concept within the comprehension of the average juror.") (internal quotation omitted). The particular definition of the term "entry" in the context of § 1326 evades a "general reading." *See* *United States v. Pacheco-Medina*, 212 F.3d 1162, 1163 (9th Cir. 2000) ("[A] general reading would suggest that Pacheco did commit the crime because he surely left Mexico for the United States, and he just as surely was found on our soil after he came over the border fence. But as a matter of law it is not quite that easy because physical presence is not enough."). It is improbable that an average juror could correctly understand and apply the term "entry" in this context without a specific instruction that illegal reentry requires intent to enter free from official restraint. Nor is this a case in which the judge need not have instructed the jury to determine a particular question regarding an element of the crime because the judge was entitled to determine it himself as a matter of law. *See* *United States v. Mujahid*, 799 F.3d 1228, 1236–37 (9th Cir. 2015).

4    For these same reasons, we exercise our discretion to review the jury instruction, notwithstanding that Vazquez-Hernandez did not directly raise the issue in his opening brief before this court. *See* *Olano,* 507 U.S. at 732, 736, 113 S.Ct. 1770; *see supra*, pp. 1224–25 n. 2.

5    In contrast, Agent Thomas testified that he did not know whether the appellant's intent was to go beyond the port of entry.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

16 Cal. Daily Op. Serv. 3871, 2016 Daily Journal D.A.R. 3492

KeyCite Yellow Flag - Negative Treatment

Distinguished by    United States v. Salomon-Macias,    9th Cir.(Ariz.),
December 13, 2017

819 F.3d 1149
United States Court of Appeals,
Ninth Circuit.

UNITED STATES of America, Plaintiff–Appellee,

v.

Omar ARGUETA–ROSALES, Defendant–Appellant.

Nos. 14–50384, 14–50385.
|
Argued and Submitted June 3, 2015.
|
Filed April 12, 2016.

**Synopsis**

**Background:** Alien was convicted of attempted illegal
reentry into the United States in the United States District
Court for the Southern District of California, Larry A. Burns,
J., and he appealed.

**Holdings:** The Court of Appeals, Fisher, Circuit Judge, held
that:

[1] in order to convict alien of attempted illegal reentry into
the United States, government had to prove that alien crossed
into the United States with specific intent to enter into country
free from official restraint, and

[2] district court's legal error regarding intent required in order
to convict alien of attempted illegal reentry was not harmless
beyond reasonable doubt.

Vacated and remanded.

Bybee, Circuit Judge, filed opinion concurring in judgment
and otherwise dissenting.

West Headnotes (12)

**[1]    Aliens, Immigration, and
Citizenship    Reentry after removal**

Elements of crime of attempted illegal reentry
into the United States are (1) that defendant
had purpose, i.e., the conscious desire, to
reenter the United States without express consent
of the Attorney General, (2) that defendant
committed overt act that was substantial step
towards reentering without that consent, (3)
that defendant was not citizen of the United
States, (4) that defendant had previously been
lawfully denied admission, excluded, deported
or removed from the United States, and (5)
that the Attorney General had not consented to
defendant's attempted reentry. Immigration and
Nationality Act, § 276, 8 U.S.C.A. § 1326.

3 Cases that cite this headnote

**[2]    Criminal Law    Trial de novo**

District court's conclusions of law following
bench trial are reviewed de novo.

1 Cases that cite this headnote

**[3]    Aliens, Immigration, and
Citizenship    Reentry after removal**

In order to convict alien of attempted illegal
reentry into the United States, government had
to prove beyond a reasonable doubt that alien
crossed into the United States with specific intent
to enter into country free from official restraint;
it was not sufficient simply that alien knew that
he was crossing into the United States and that
he did not have permission to do so. Immigration
and Nationality Act, § 276, 8 U.S.C.A. §
1326.

13 Cases that cite this headnote

**[4]    Aliens, Immigration, and
Citizenship    Reentry after removal**

If alien's sole intent in crossing over into the United States is to be taken into custody, then he is not entering the country with specific intent to be free from official restraint, and cannot be found guilty of specific intent crime of attempted illegal reentry. Immigration and Nationality Act, § 276, 8 U.S.C.A. § 1326.

4 Cases that cite this headnote

[5] **Criminal Law** 👈 Harmless error

When district court in bench trial has made legal error regarding elements of offense, that error is reviewed using same harmless error standard that would apply to erroneous jury instruction.

4 Cases that cite this headnote

[6] **Criminal Law** 👈 Elements and incidents of offense; definitions

Error in describing element of offense in jury instruction is harmless only if it is clear beyond reasonable doubt that rational jury would have found defendant guilty absent the error.

2 Cases that cite this headnote

[7] **Aliens, Immigration, and Citizenship** 👈 Questions for jury

When there is contradictory evidence regarding alien's intent in entering into the United States, whether for purpose of being taken into custody or not, it is for trier of fact to determine whether government has proven unlawful intent, of kind required to support alien's conviction for attempted illegal reentry, beyond a reasonable doubt. Immigration and Nationality Act, § 276, 8 U.S.C.A. § 1326.

1 Cases that cite this headnote

[8] **Aliens, Immigration, and Citizenship** 👈 Reentry after removal

In order to convict alien of attempted illegal reentry, government had to prove only that alien had *a* specific intent to enter the United States free from official restraint, not that this was his only purpose. Immigration and Nationality Act, § 276, 8 U.S.C.A. § 1326.

19 Cases that cite this headnote

[9] **Aliens, Immigration, and Citizenship** 👈 Reentry after removal

If alien actually intends to sneak into the United States, and changes his plans and asks to be taken into custody only when he is spotted by the border patrol, he possesses requisite criminal intent, of kind required to be guilty of attempted illegal reentry. Immigration and Nationality Act, § 276, 8 U.S.C.A. § 1326.

[10] **Criminal Law** 👈 Harmless error

In bench-tried case, district court's legal error regarding intent required in order to convict alien of attempted illegal reentry, i.e., that alien only had to have intent to enter the United States with knowledge that he did not have permission to do so and did not need to enter the country free from official restraint, was not harmless beyond reasonable doubt, where there was evidence in record that alien entered into the country with intent to be taken into custody, including testimony of doctor who examined alien and found that he was suffering from drug-induced paranoia at time of entry and was seeking protection from his perceived persecutors, as well as evidence that alien crossed into the United States in broad daylight in heavily patrolled area and declined border patrol agent's offer to permit him to return to Mexico; it was not clear beyond reasonable doubt that district court would have found alien guilty absent its misapprehension of specific intent element.

Immigration and Nationality Act, § 276, 8 U.S.C.A. § 1326.

1 Cases that cite this headnote

[11] **Administrative Law and Procedure** 👈 Reenactment of construed statute; incorporation of construction

**Statutes** 🔑 **Reenactment or incorporation of prior statute**

Congress is presumed to be aware of administrative or judicial interpretation of statute and to adopt that interpretation when it re-enacts statute without change.

2 Cases that cite this headnote

[12]    **Aliens, Immigration, and Citizenship** 🔑 Weight and sufficiency

When alien is spotted by border patrol agents crossing into the United States, away from official port of entry, this alone is compelling evidence that alien intends to achieve not only physical presence in the United States but also freedom from official restraint, as required for alien to be guilty of illegal reentry. Immigration and Nationality Act, § 276, 🔖 8 U.S.C.A. § 1326.

16 Cases that cite this headnote

**Attorneys and Law Firms**

*1151 Doug Keller, Federal Defenders of San Diego, Inc., San Diego, CA, for Defendant–Appellant.

Laura E. Duffy, United States Attorney, Bruce R. Castetter, Assistant United States Attorney, Chief, Appellate Section, Criminal Division, and Francis A. DiGiacco (argued), Assistant United States Attorney, San Diego, CA, for Plaintiff–Appellee.

Appeal from the United States District Court for the Southern District of California, Larry A. Burns, District Judge, Presiding. D.C. Nos. 3:14–cr–00244–LAB–1, 3:10–cr–04572–LAB–1.

Before: RAYMOND C. FISHER and JAY S. BYBEE, Circuit Judges, and ELIZABETH E. FOOTE, District Judge. *

Opinion by Judge FISHER; Partial Concurrence and Partial Dissent by Judge BYBEE.

**OPINION**

FISHER, Circuit Judge:

At trial on the charge of attempted illegal reentry into the United States, Omar Argueta–Rosales presented evidence that he crossed into the United States in a delusional state, believing he was being chased by Mexican gangs, and with the specific intent solely to place himself into the protective custody of United States officials. The district court found this evidence plausible, but nonetheless found Argueta guilty of the charged offense, ruling the mens rea element of attempted illegal reentry under 🔖 8 U.S.C. § 1326 requires the government to prove only that the defendant knew he was crossing into the United States and that he was not privileged to do so. In 🔖 *United States v. Lombera–Valdovinos*, 429 F.3d 927, 928 (9th Cir.2005), however, we held it was "[im]possible to convict a previously deported alien for attempted illegal reentry into the United States under 🔖 8 U.S.C. § 1326 when he crosses the border with the intent only to be imprisoned ..., because attempted illegal reentry is a specific intent crime that requires proof of intent to enter the country free from official restraint." Because the district court found Argueta guilty under an erroneous legal standard, we vacate his conviction and remand for a new trial or other proceedings consistent with this opinion.

I

Omar Argueta–Rosales was born in Mexico in 1981. When he was five, his mother migrated to the United States and he was left to the care of his grandparents in Mexico. He lived with his grandparents for four years before reuniting with his *1152 mother in Los Angeles, California. He lived with his mother in Los Angeles until he was 16 years old. An immigration judge ordered him removed in 2006.

In 2010, Argueta was apprehended at the border while attempting to unlawfully return to the United States. In 2011, he pled guilty to attempting to illegally reenter the United States, in violation of 🔖 8 U.S.C. § 1326, and received a sentence of five years' probation. A standard term of his probation provided he "shall not commit another federal, state, or local crime."

After returning to Mexico, Argueta began to abuse methamphetamine. A few days before the border crossing that is the subject of this appeal, he was beaten by gang members in Mexico. In the days that followed, according to Dr. Bruce Yanofsky, the court-appointed psychologist who testified at trial, Argueta became "increasingly paranoid, he was worried, he started to see people that were following him and was really concerned about his life."

> [H]e was living out on the streets, running around until he got to the point where he felt that his life was in danger and then obviously ... proceeded to try to cross the border with the account that he gave me that he had the cell phone, that it was a land line—well, it was connected to a line in the United States, he was trying to call for help, he was calling 9–1–1 repeatedly because he wanted law enforcement to intervene because he had tried the Mexican law enforcement to help him and they didn't do anything for him. So in this state of panic, paranoia, and just losing control of what was going on in his life, fearing for his life, he ended up in the border.

No cell phone was found on Argueta's person at the time of his arrest, however.

Argueta crossed the United States border from Mexico, about one and one-half miles west of the San Ysidro, California, port of entry, on November 29, 2013. At the border, Argueta climbed over the approximately 10–foot primary fence, which placed him in the United States. He was at that point between the primary fence and the secondary fence, which is approximately 50 yards north of the primary fence and about 20 feet high. Argueta was spotted by Border Patrol Agent Oscar Alvarado when Argueta was approximately 15 yards north of the primary fence. Argueta was walking, at a normal speed, in a north and westbound direction. Agent Alvarado radioed another officer to intercept Argueta.

Border Patrol Agent Jeffrey Schwinn responded. Agent Schwinn approached in his vehicle to approximately 20 feet away, exited his vehicle and shouted "Hey" to try to get

Argueta's attention. When Argueta did not respond, Agent Schwinn approached Argueta. Argueta turned around and looked at Schwinn, at which point Schwinn asked him in Spanish where he was born. Argueta said Mexico City. Schwinn asked Argueta what country he was a citizen of, and he said Mexico, so Schwinn proceeded to ask him if he had any immigration documents allowing him to enter the United States, and he said no. At that point, Argueta began to walk towards Schwinn, and Schwinn told him to head back south and return to Mexico. When Argueta did not take that suggestion, Agent Schwinn told him he was going to place him under arrest, and Argueta said something to the effect of "you do what you got to do."

About two hours after his arrest, two border patrol agents interviewed Argueta at the Imperial Beach Border Patrol Station in San Diego. During the beginning of the interview, which was conducted in English, Argueta appeared calm and rational. Early in the interview, Argueta **\*1153** asked to make a statement, saying "[i]t's important. It relates to what happened at my house." One of the agents told Argueta he would be able to make a statement later. At one point during the interview, one of the agents asked Argueta, "When did you last enter the United States," and this discussion followed:

A. Last was five years ago. Five years ago, almost five and a half.

Q. How did you enter the United States?

A. Trying to go through the line walking.

Q. Through where?

A. I was walking through Calexico, from Mexicali to Calexico.

Q. The port of entry?

A. Exactly.

Q. What is your destination in the United States, city and state?

A. Los Angeles, California.

Q. Do you have any ... fear of persecution or torture should you be removed from the United States?

A. Yes, I do.

The agents did not follow up on Argueta's claim of persecution.

Toward the end of the interview, when the agents asked Argueta whether he wanted to say anything else, Argueta made apparently delusional statements for two minutes, referring to people who were in the cell with him even though the only people there were Argueta and the two border patrol agents:

A. Just that I come—the people who I'm with right now in the tank are the people who were at my house.

Q. In here in the cell?

A. (Inaudible.) And also, I wanted to ask you guys if it's coincidental or (unintelligible). And that's when one of the (unintelligible) started asking me what's up. I told them I noticed I recognize the skinny guy, the one they put at the end. (Unintelligible) the other one with white shorts (unintelligible). He started taking his hand out. Before that I told the skinny dude, hey, I know you, bro. It hurts me, because that's my wife, you know.

But then again, I don't know what's going on. Like I said, I was going nuts over there. I couldn't remember. I had to ask my wife. I mean, there's some pictures I seen. I can't recognize certain people (unintelligible). I was going through it and not only (unintelligible) that's the people that are after me. (Unintelligible.)

In February 2014, Argueta was charged with attempting to reenter the United States, in violation of 8 U.S.C. § 1326(a) and (b). [1] He was separately charged with violating the terms of his 2011 probation. The district court appointed Dr. Yanofsky **1154 to determine whether Argueta was competent to stand trial. After Argueta was found competent, the case proceeded to a bench trial. At trial, Dr. Yanofsky testified that, on the day Argueta climbed over the border fence, he was suffering from a substance-induced psychosis caused by heavy methamphetamine use. According to Dr. Yanofsky, Argueta was operating under a delusion that individuals were chasing him and trying to kill him, prompting him to climb over the border fence. An expert proffered by the government, Dr. Mark Kalish, disagreed with Dr. Yanofsky's conclusion that Argueta was suffering from substance-induced psychosis.

[1]    At the close of evidence, the parties presented closing arguments to the district court. The elements of the crime of attempted illegal reentry under § 1326 are: "(1) the

defendant had the purpose, i.e., conscious desire, to reenter the United States without the express consent of the Attorney General; (2) the defendant committed an overt act that was a substantial step towards reentering without that consent; (3) the defendant was not a citizen of the United States; (4) the defendant had previously been lawfully denied admission, excluded, deported or removed from the United States; and (5) the Attorney General had not consented to the defendant's attempted reentry." United States v. Gracidas–Ulibarry, 231 F.3d 1188, 1196 (9th Cir.2000) (en banc).

Here, only the first element was in dispute. Relying on United States v. Lombera–Valdovinos, 429 F.3d 927 (9th Cir.2005), Argueta's counsel argued "the government cannot prove specific intent beyond a reasonable doubt because the evidence in this case showed that Mr. Argueta entered the United States under the psychotic belief that he was being chased by armed gunmen in Mexico, but he specifically—while that may be the motive, he specifically intended to enter to find protection" by turning himself in to the border patrol. According to Argueta's counsel, Argueta was not guilty of the crime of attempted illegal reentry if the evidence showed that his "specific intent ... was to go into custody." Counsel maintained that, under Lombera–Valdovinos, "if someone specifically intends to enter the United States to go into custody, they're affirmatively not guilty under the attempted reentry charge of [ § ] 1326."

The district court rejected Argueta's argument. In the court's view, the specific intent element of attempted illegal entry would be satisfied so long as Argueta "knew he was vaulting the fence into the United States and he knew that that was wrong." The court rejected the proposition that Argueta could negate the specific intent element merely by showing he intended to enter into custody, disagreeing with Argueta's argument that "the reason of coming over here to turn yourself in is enough to defeat conscious purpose." According to the court, if the defense was "right that the desire to turn yourself in, even if it's based on a delusion, is enough to defeat conscious purpose, the appellate court will tell us. I don't think it is."

Having rejected Argueta's legal argument, the court proceeded to find the specific intent element proven beyond a reasonable doubt because Argueta (1) knew he was crossing into the United States and (2) knew he did not have permission to do so, facts Argueta did not dispute. Accordingly, the court found Argueta guilty of the crime of attempted illegal reentry.

16 Cal. Daily Op. Serv. 3871, 2016 Daily Journal D.A.R. 3492

In addition, solely on the basis of that conviction, the court also found Argueta guilty of violating the terms of his 2011 probation. The court later sentenced Argueta to 21 months in custody on the attempted illegal reentry conviction and an additional 12 **\*1155** months in custody on the probation violation, to be followed by three years of supervised release. Argueta timely appealed both judgments, and the two appeals have been consolidated in this court.

II

**[2]** Conclusions of law following a bench trial are reviewed de novo. *See Oswalt v. Resolute Indus., Inc.,* 642 F.3d 856, 859 (9th Cir.2011); *cf. United States v. Knapp,* 120 F.3d 928, 930 (9th Cir.1997) ("If a jury instruction misstates elements of a statutory crime, the standard of review is ... *de novo.*").

III

A

This case is controlled by *Lombera–Valdovinos,* where we held it was "[im]possible to convict a previously deported alien for attempted illegal reentry into the United States under

8 U.S.C. § 1326 when he crosses the border with the intent only to be imprisoned ..., because attempted illegal reentry is a specific intent crime that requires proof of intent to enter the country free from official restraint." 429 F.3d at 928.

In *Lombera–Valdovinos,* a border patrol agent was patrolling the border between the United States and Mexico, sitting in a marked border patrol vehicle between the primary fence, which marks the actual border, and the secondary fence, located about 100 feet north of the primary fence. *See id.* With binoculars, the agent saw the defendant and four or five others standing on the Mexico side of the border, about 200 yards away from the agent. *See id.* The agent then looked away for about 15 seconds; when he turned back, he saw the defendant, alone and now on the United States side of the primary fence, walking directly toward him. *See id.* When the defendant continued to walk toward the agent, the agent drove toward him. *See id.* When they met, the defendant stated, "I want to see an immigration judge," admitted to being a citizen of Mexico and, when asked if he had any legal basis for being present in the United States, answered "No." *Id.* He also said

he "wished to go back to jail." *Id.* The agent then searched and arrested the defendant. *See id.*

Because the defendant had been deported before, he was charged with attempted illegal reentry, in violation of § 1326. *See id.* After a jury returned a guilty verdict, the defendant moved for judgment of acquittal under Federal Rule of Criminal Procedure 29. *See id. at 927–28.* The district court denied the motion, and the defendant appealed. *See id.* Reviewing the evidence in the light most favorable to the government, we held that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See id. at 930.*

We explained that, "for purposes of § 1326, 'enter' has a narrower meaning than its colloquial usage." *Id.* at 928. "An alien has not entered the United States under § 1326 unless he does so 'free from official restraint.' " *Id.* (quoting *Gracidas–Ulibarry,* 231 F.3d at 1191 n. 3). Attempted illegal reentry, in turn, "requires proof of specific intent, more particularly the specific intent 'to reenter without consent.' " *Id.* at 929 (citation omitted) (quoting *United States v. Leos–Maldonado,* 302 F.3d 1061, 1063 (9th Cir.2002)). Official restraint, we further explained, "encompasses restraint by any government official," not just officials of the Department of Homeland Security. *Id.* [2] Because all of **\*1156** the evidence showed "the defendant's intent was to be taken into custody," *id.* at 930 n. 3, we held that "no rational trier of fact could conclude ... the defendant was guilty of the specific intent crime of attempted illegal reentry," *id.* at 930.

**[3]** **[4]** As the government now concedes, the district court misapplied *Lombera–Valdovinos* here.[3] In order to convict Argueta, the government was required to prove beyond a reasonable doubt that Argueta crossed into the United States with the specific "intent to enter the country free from official restraint." *Id. at 928.* It was not sufficient that Argueta knew he was crossing into the United States and knew he did not have permission to do so. If Argueta's sole "intent was to be taken into custody," then "no rational trier of fact could conclude [he] was guilty of the specific intent crime of attempted illegal reentry." *Id. at 930 & n. 3.* The district court's verdict thus rested on an erroneous legal standard.

### B

**[5]** **[6]** When a district court in a bench trial has made a legal error regarding the elements of an offense, the error is reviewed using the same harmless error standard that would apply to an erroneous jury instruction. *See Wilson v. United States,* 250 F.2d 312, 323–24 (9th Cir.1957). "An error in describing an element of the offense in a jury instruction is harmless only if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *United States v. Liu,* 731 F.3d 982, 992 (9th Cir.2013) (internal quotation marks omitted); *see also United States v. Driggers,* 559 F.3d 1021, 1025–26 (9th Cir.2009). Accordingly, the question here is whether it is clear beyond a reasonable doubt that the district court would have found Argueta guilty absent the error. The government argues the district court's error was harmless on two independent theories. We address them in turn, finding neither persuasive.

### 1

The government argues *Lombera–Valdovinos* applies only when there is *no evidence* of anything other than the intent to be taken into custody. In the government's view, where, as here, there is substantial evidence of the defendant's specific intent to enter the United States free from official restraint, *Lombera–Valdovinos* "is of no import," even if there is also substantial evidence of the intent to enter into custody. We disagree, and take this opportunity to clarify *Lombera–Valdovinos.*

**[7]** It is true that in *Lombera–Valdovinos* we said "this case presents a rare set of factual circumstances where there is *no evidence* of anything other than the intent to be taken into custody." 429 F.3d at 930 n. 3 (emphasis added). We made that **\*1157** statement, however, in the course of reviewing the denial of the defendant's Rule 29 motion for judgment of acquittal. *See id.* at 928, 930. Under that standard, we were required to affirm the defendant's conviction so long as any rational trier of fact could have found he possessed the specific intent to enter free from official restraint. *See id.* Thus, by pointing to the complete absence of contrary evidence, we were simply applying that highly deferential standard of review. We did not hold that any evidence of an unlawful intent would compel a conviction.

We now clarify that where, as here, there is contradictory evidence regarding the defendant's intent, it is for the trier of fact to determine whether the government has proven unlawful intent beyond a reasonable doubt. The government's contention that *Lombera–Valdovinos* is limited to cases in which there is no evidence of a specific intent to enter the United States free from official restraint is without merit. We reject the government's argument the district court's error was harmless on this ground.

**[8]** **[9]** That being said, we also clarify that the government need not prove that entry free from official restraint was the defendant's *sole* intent. The government must prove only that Argueta had *a* specific intent to enter the United States free from official restraint, not that this was his only purpose. *See Lombera–Valdovinos,* 429 F.3d at 928 (noting the defendant "cross[ed] the border with the intent *only* to be imprisoned" (emphasis added)); *cf. United States v. Shabban,* 612 F.3d 693, 696 & n. 1 (D.C.Cir.2010) ("As Shabban concedes, evidence that a defendant had multiple intentions does not mean there was insufficient evidence of the requisite statutory intent."); *United States v. Julian,* 427 F.3d 471, 485 (7th Cir.2005) ("A defendant need not facilitate someone's interstate or foreign travel with the *sole* or *principal* intent that he engage in prostitution in order to be liable under section 2421, so long as prostitution was *a* significant motive."); *United States v. Fairchild,* 122 F.3d 605, 612 (8th Cir.1997) (holding that "only one of the [defendant's] intentions must meet the elements of the offense"); 1 Wayne R. LaFave, *Substantive Criminal Law* § 5.2 (2d ed. 2015) ("It may be said that, so long as the defendant has the intention required by the definition of the crime, it is immaterial that he may also have had some other intention."). Similarly, if Argueta "actually intended to sneak into the country, and changed his plans only when he was spotted" by the border patrol, he again would be guilty. *Lombera–Valdovinos,* 429 F.3d at 930.

### 2

**[10]** In the alternative, the government contends the error was harmless because there was overwhelming evidence of Argueta's intent to enter free from official restraint. We again disagree.

There was, to be sure, evidence that Argueta crossed the border with the specific intent to enter free from official restraint. He scaled a border fence in an area in which, according to one border patrol agent's testimony, there was a 50–50 chance of evading detection. If he had wanted to turn himself in, he could have presented himself at the port of entry located less than two miles away. When he crossed into the United States, Argueta was walking away from Agent Alvarado rather than toward him. When Agent Schwinn first shouted to Argueta, he did not stop. In his initial encounter with Agent Schwinn, Argueta did not say he was seeking protective custody. When asked his destination during his post-arrest interview, Argueta identified Los Angeles.

**\*1158** Evidence also pointed in the other direction, however. Argueta crossed into the United States in broad daylight in a heavily patrolled area. When Agent Alvarado spotted him on the United States side of the primary fence, he was walking normally, not running. When he was confronted by Agent Schwinn, Argueta did not run. When Agent Schwinn offered Argueta the opportunity to climb the fence back into Mexico rather than being arrested, Argueta declined the offer—evidence fully consistent with Argueta's contention that he crossed into the United States to enter protective custody. Dr. Yanofsky testified Argueta was under a drug-induced psychosis, suffering from delusions, and had entered the United States to seek protection, testimony the district court credited. Argueta told Dr. Yanofsky he made numerous calls to 9–1–1 before reaching the United States border in a further attempt to obtain protection from United States authorities (although no phone was found on Argueta's person when he was arrested). In his post-arrest interview, Argueta referred to people chasing him and said he was in fear of persecution and torture; and Argueta's bizarre behavior at the post-arrest interview confirmed his delusional state. Although Argueta did not cross at the port of entry, the district court found this was consistent with Argueta's perceptions of an immediate threat to this life. Although Argueta told the agents his destination was Los Angeles, he could have easily misunderstood this question in context as referring to his earlier crossing into the United States.

For these reasons, it is not clear beyond a reasonable doubt the district court would have found Argueta guilty absent its misapprehension of the specific intent element. The error therefore was not harmless. [4]

## IV

In his concurring opinion, Judge Bybee suggests our court should use this case as a vehicle to reconsider en banc three sets of circuit precedents: (1) our holdings in cases such as *United States v. Oscar,* 496 F.2d 492, 493–94 (9th Cir.1974), and *United States v. Pacheco–Medina,* 212 F.3d 1162, 1163–66 (9th Cir.2000), that, for immigration purposes, "entry" is a term of art that requires not only physical presence in the United States but also freedom from official restraint; (2) our holding in *United States v. Gracidas–Ulibarry,* 231 F.3d 1188, 1193 (9th Cir.2000) (en banc), that attempted illegal reentry under 8 U.S.C. § 1326 is a specific intent crime; and (3) our holding in *United States v. Lombera–Valdovinos,* 429 F.3d 927, 929 (9th Cir.2005), that "official restraint" encompasses restraint by government officials other than those of the Department of Homeland Security (DHS). In our view, each of these precedents rests on a solid footing.

### A

Judge Bybee would have us reconsider our longstanding view that, for immigration purposes, "entry" is a term of art requiring not only physical presence in the United States but also freedom from official restraint. As Judge Bybee recognizes, this principle was established more than a century ago, *see, e.g.,* **\*1159** *Ex parte Chow Chok,* 161 F. 627, 628–31 (N.D.N.Y.), *aff'd* 163 F. 1021 (2d Cir.1908), and has long been recognized not only by this court but also by the Supreme Court, *see* *Kaplan v. Tod,* 267 U.S. 228, 230–31, 45 S.Ct. 257, 69 L.Ed. 585 (1925); *United States v. Ju Toy,* 198 U.S. 253, 263, 25 S.Ct. 644, 49 L.Ed. 1040 (1905), other federal circuits, *see, e.g., Dimova v. Holder,* 783 F.3d 30, 39 (1st Cir.2015); *Correa v. Thornburgh,* 901 F.2d 1166, 1171–72 (2d Cir.1990); *Parra–Rojas v. Att'y Gen. U.S.,* 747 F.3d 164, 170 (3d Cir.2014); *United States v. Angeles–Mascote,* 206 F.3d 529, 531 (5th Cir.2000); *Vitale v. INS,* 463 F.2d 579, 581–82 (7th Cir.1972); *Nyirenda v. INS,* 279 F.3d 620, 623 (8th Cir.2002), and the Board of Immigration Appeals, *see, e.g., Matter of Martinez–Serrano,* 25 I. & N. Dec. 151, 153 (BIA 2009); *Matter of Pierre,* 14 I. &

N. Dec. 467, 468–69 (BIA 1973). Judge Bybee offers no persuasive justification for casting aside this longstanding and widely accepted understanding of what it means to enter the United States.

Judge Bybee perhaps believes this understanding of "entry" should be preserved for immigration purposes generally but should not apply to *criminal* immigration laws such as 8 U.S.C. §§ 1324, 1325 and 1326. Concurrence at 1165–66. Here again, however, Judge Bybee's view conflicts not only with the longstanding law of this court but also with the law of other circuits. *See, e.g., United States v. Macias,* 740 F.3d 96, 100 (2d Cir.2014); *Angeles–Mascote,* 206 F.3d at 531; *United States v. Cardenas–Alvarez,* 987 F.2d 1129, 1133 (5th Cir.1993); *United States v. Kavazanjian,* 623 F.2d 730, 736–37 (1st Cir.1980); *United States v. Vasilatos,* 209 F.2d 195, 197 (3d Cir.1954). We see no reason for adopting one meaning of entry for immigration purposes generally but a different meaning for criminal immigration laws, much less doing so to create a circuit split.

 [11] Indeed, there are at least two persuasive reasons for continuing to adhere to this longstanding and widely accepted doctrine. First, as Judge Bybee recounts, the doctrine has been around for decades, and, although Congress has amended the criminal immigration laws in the interim, it has never called into question or expressly overruled the firmly established judicial gloss on "entry." As the Supreme Court has observed on many occasions, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Forest Grove Sch. Dist. v. T.A.,* 557 U.S. 230, 239–40, 129 S.Ct. 2484, 174 L.Ed.2d 168 (2009) (quoting *Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978)); *see, e.g., Hing Sum v. Holder,* 602 F.3d 1092, 1100–01 & n. 8 (9th Cir.2010) (interpreting the word "admission" in § 1101(a)(13)(A) in light of existing BIA precedent requiring freedom from restraint).[5]

 **\*1160** Second, the official restraint doctrine is a practical necessity. In its absence, mere physical presence in the United States, without permission, would give rise to criminal liability for illegal reentry under § 1326. *See United States v. Barragan–Cepeda,* 29 F.3d 1378, 1381

(9th Cir.1994) (listing the elements of § 1326). We doubt Congress intended to make criminals out of persons who, for any number of innocent reasons, approach immigration officials at the border. Because "in a literal and physical sense a person coming from abroad enters the United States whenever he reaches any land, water or air space within the territorial limits of this nation," "freedom from official restraint must be added to physical presence before entry is accomplished." *Vasilatos,* 209 F.2d at 197.

B

Judge Bybee also questions our holding in *United States v. Gracidas–Ulibarry,* 231 F.3d 1188, 1190, 1196 (9th Cir.2000) (en banc), that attempted illegal reentry is a specific intent crime, citing four circuits that have rejected that proposition — *United States v. Rodriguez,* 416 F.3d 123, 125 (2d Cir.2005); *United States v. Morales–Palacios,* 369 F.3d 442, 445–49 (5th Cir.2004); *United States v. Peralt–Reyes,* 131 F.3d 956, 957 (11th Cir.1997); *United States v. Reyes–Medina,* 53 F.3d 327, 1995 WL 247343, at \*1 (1st Cir.1995) (unpublished). Concurrence at 1168 & n. 5. All four of those cases, however, were decided before the Supreme Court's decision in *United States v. Resendiz–Ponce,* 549 U.S. 102, 106–07, 127 S.Ct. 782, 166 L.Ed.2d 591 (2007), which confirmed that the attempt prong of § 1326 incorporates the common law meaning of attempt, including an element requiring the specific intent to commit the underlying crime. *Resendiz–Ponce* confirms that *Gracidas–Ulibarry* was correctly decided.

C

Finally, Judge Bybee questions our holding in *United States v. Lombera–Valdovinos,* 429 F.3d 927, 929 (9th Cir.2005), that official restraint "encompasses restraint by any government official, not just officials of DHS," the Department of Homeland Security. Concurrence at 1169. He contends official restraint has "always been limited to physical restraint or surveillance of an alien by a government officer operating at or just inside the border." Concurrence at 1169.

AR.06661

Official restraint, however, "need not be by immigration officers," Correa v. Thornburgh, 901 F.2d 1166, 1172 (2d Cir.1990); see, e.g., Zhang v. Slattery, 55 F.3d 732, 753, 755 (2d Cir.1995) (shipwrecked alien restrained by local police upon reaching shore), superseded by statute on other grounds as recognized in City of New York v. Permanent Mission of India to United Nations, 618 F.3d 172, 201 (2d Cir.2010); Edmond v. Nelson, 575 F.Supp. 532, 535 (E.D.La.1983) (aliens seeking entry by sea "restrained" by the master of a rescuing ship, acting pursuant to border regulations); Matter of Yam, 16 I. & N. Dec. 535, 536–37 (BIA 1978) (alien found at the border and taken under guard by local police to a medical facility), and it need not be at the border, see Kaplan v. Tod, 267 U.S. 228, 229, 45 S.Ct. 257 (1925) (holding a girl was under official restraint even though she was "handed over to the **\*1161** Hebrew Sheltering and Immigrant Aid Society," which in turn allowed her to live with her father).

The position Judge Bybee advances in his concurrence is contrary not only to this precedent but also to the position the government itself argued to us in Lombera–Valdovinos, where the government expressly rejected the proposition that "only Department of Homeland Security restraint constitutes official restraint under section 1326." The government argued there that "an alien is not deemed to have entered unless he is free to go at large" within the United States, the very principle we followed in Lombera–Valdovinos. Judge Bybee, therefore, is seeking to relitigate a rule of law the government expressly advocated for in Lombera–Valdovinos—and which it has not asked us to reconsider now.

Nor has Judge Bybee suggested a rationale for criminalizing conduct such as that engaged in by the defendant in Lombera–Valdovinos. Lombera–Valdovinos crossed the border, walked directly up to a border control agent and asked to be taken into custody. He never sought to evade detection. He never sought the freedom to go at large within the United States. He neither sought nor "gained a foothold in the United States." Kaplan, 267 U.S. at 230, 45 S.Ct. 257. We see no reason Congress would have intended § 1326 to reach such conduct.

Judge Bybee alternatively suggests Lombera–Valdovinos should be reconsidered on a practical ground—because it would allow defendants to avoid liability for attempting to reenter the United States by opportunistically asserting, after detection, that they crossed into the country solely to be placed into official custody. Concurrence at 1170–71. He argues requiring the government to prove beyond a reasonable doubt that the defendant had the specific intent to enter the United States free from official restraint imposes too great a burden on prosecutors.

**[12]**    This speculation seems unfounded. When a person is spotted by border patrol agents crossing into the United States, away from an official port of entry, this alone is compelling evidence that the person intends to achieve not only physical presence in the United States but also freedom from official restraint. Cf. United States v. Quintana–Torres, 235 F.3d 1197, 1200 (9th Cir.2000) (noting an alien's presence in the United States would provide convincing proof of the alien's intention to be here unless adequately explained away, "much as a face covered by jam near a jam jar is convincing proof of jam-eating unless otherwise explained"). Certainly there may be unusual cases in which persons could be acquitted of attempted illegal reentry where, as in Lombera–Valdovinos, they cross the border, walk directly up to a border control agent and ask to be taken into custody. But such cases present "a rare set of factual circumstances." Lombera–Valdovinos, 429 F.3d at 930 n. 3. In the more than 10 years Lombera–Valdovinos has been on the books, it has not, to our knowledge, hindered effective prosecution of those who attempt to enter the United States unlawfully. Indeed, we are aware of only a single case—Lombera–Valdovinos itself—in which an individual has been acquitted on this ground.

V

Because the district court applied an incorrect legal standard, we vacate Argueta's conviction and sentence in No. 14–50384 and vacate the revocation of supervised release and sentence in No. 14–50385. We remand for proceedings consistent with this opinion.

**VACATED AND REMANDED.**

**\*1162** BYBEE, Circuit Judge, concurring in the judgment and dissenting as to everything else:

I agree with the majority that the specific-intent standard that governs Argueta–Rosales's case is supplied by *United States v. Lombera–Valdovinos,* 429 F.3d 927, 928–30 (9th Cir.2005). Because the district court failed to apply that standard, and because we are bound by *Lombera–Valdovinos,* I concur in the majority's judgment vacating the conviction and remanding this case for retrial. Maj. Op. at 1158.

In all other respects, however, I dissent. I am convinced that *Lombera–Valdovinos* was wrongly decided and that our understanding of when an alien is "free from official restraint" has reached an absurd position. Under *Lombera–Valdovinos,* an alien is not guilty of attempted illegal reentry even if he crosses into the United States surreptitiously and outside a port of entry, so long as he tells border control that he came in hopes of remaining under restraint by *any* government official —even in a federal prison far from the border—once in the United States. Judge Rymer rightly pointed out in dissent from *Lombera–Valdovinos* that this novel and unduly expansive definition of "official restraint" makes no sense and creates a puzzling loophole in the law of attempted illegal reentry.

*See* *Lombera–Valdovinos,* 429 F.3d at 931–33 (Rymer, J., dissenting). The passage of time has done nothing to blunt the force of her critique. It is time we revisited *Lombera–Valdovinos.*

## I

I begin by tracing the history that led up to *Lombera–Valdovinos,* because it was a case in which "what's past [was] prologue." William Shakespeare, *The Tempest* act 2, sc. 1. Over roughly the last 100 years, the term "entry" has taken on a "narrower meaning than its colloquial usage" in the context of immigration law. *Lombera–Valdovinos,* 429 F.3d at 928. For purposes of 8 U.S.C. §§ 1325–26, an alien is considered not to have effected an "entry" into the United States unless he not only "cross[es] the ... border," but does so "free from official restraint." *United States v. Hernandez–Herrera,* 273 F.3d 1213, 1218 (9th Cir.2001). The provenance of the official restraint doctrine—and the future of the doctrine, as evidenced by *Lombera–Valdovinos* and this case—should make us rethink the concept of what it means to enter the United States.

## A

Courts adopted this peculiar definition of "entry"—freedom from official restraint—because, for many years, immigration law drew a distinction between *exclusion* and *deportation.* Excluded aliens were those who were summarily sent home at the border, in contrast to aliens who were afforded the more elaborate process of deportation because they were "already physically in the United States." *Landon v. Plasencia,* 459 U.S. 21, 25, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982). *See* *Zadvydas v. Davis,* 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) ("The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law."). The distinction was a crucial one. By virtue of their presence in the United States, aliens in deportation proceedings had greater procedural and substantive rights than aliens in exclusion proceedings—an administrative hearing and an appeal, the right to designate the country of deportation, and the right to seek voluntary departure. *Landon,* 459 U.S. at 26, 103 S.Ct. 321. By contrast, an excludable alien is a determination **\*1163** at the border, "usually ... at the port of entry." *Landon,* 459 U.S. at 25, 103 S.Ct. 321. As the Court explained in *Zadvydas,* "certain constitutional protections available to persons inside the United States are unavailable to aliens outside our geographic borders. But once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens." 533 U.S. at 693, 121 S.Ct. 2491. *See generally* David A. Martin, *Graduated Application of Constitutional Protections for Aliens: The Real Meaning of Zadvydas v. Davis,* 2001 Sup.Ct. Rev. 47, 92–100.

The distinction between excludable and deportable aliens required courts to confront a largely metaphysical, but tricky immigration law problem: What was to be done about aliens who physically crossed the United States border but never reached the point of being able to move freely within the country and mix with the general population? The paradigm example for this is an alien who presents himself at a port of entry and is taken to a "secondary inspection" area, technically across the international border, for further investigation into whether he is authorized to enter the United States. Was the alien now entitled to a deportation proceeding because border agents walked him a few feet across the border? The courts responded to this conceptual ambiguity

16 Cal. Daily Op. Serv. 3871, 2016 Daily Journal D.A.R. 3492

about which due process rights apply in the immigration context by developing the "legal fiction that entry is not accomplished until a person is free from official restraint."

*United States v. Parga–Rosas,* 238 F.3d 1209, 1213 (9th Cir.2001). Under this legal fiction, an alien who never made it out of a port of entry, who was held temporarily by the United States, or who crossed the border at some other place but was never outside the control of the border authorities, would be deemed not to have entered the United States despite having done so in a literal sense. *See, e.g.,* *Kaplan v. Tod,* 267 U.S. 228, 230, 45 S.Ct. 257, 69 L.Ed. 585 (1925) ("[W]hile she was at Ellis Island she was to be regarded as stopped at the boundary line and kept there unless and until her right to enter should be declared."); *United States v. Ju Toy,* 198 U.S. 253, 263, 25 S.Ct. 644 (1905) (holding that an alien detained at a port of entry, "although physically within our boundaries, is to be regarded as if he had been stopped at the limit of our jurisdiction, and kept there while his right to enter was under debate").

Although it was relatively easy to determine whether an alien entered the United States when he presented himself for inspection at a port of entry, it was more complicated to determine if an alien had entered the United States when he was interdicted inside the United States, but near the border. The case generally credited with inaugurating the official restraint doctrine in this area is a Chinese exclusion case, *Ex Parte Chow Chok,* 161 F. 627 (N.D.N.Y.), *aff'd,* 163 F. 1021 (2d Cir.1908). *See* *Lombera–Valdovinos,* 429 F.3d at 929; *United States v. Pacheco–Medina,* 212 F.3d 1162, 1163–64 (9th Cir.2000). In that case U.S. inspectors had tracked eight Chinese aliens as they crossed from Canada into the United States. The aliens were "kept ... in sight," stopped a quarter of a mile inside the United States, and taken into custody. *Chow Chok,* 161 F. at 628. The aliens filed for a writ of habeas corpus, contending that, because they had successfully entered the United States, they could only be deported, not excluded. The court found, however, that the aliens had not successfully entered the United States because "from the moment when they crossed the border, they were in the actual, though not formal, custody of the inspectors." *Id.* at 630. Accordingly, they **\*1164** were only entitled to administrative processing and could be excluded.

B

Although the "entry fiction" doctrine began life as a means of excluding aliens at or near the border without affording them deportation proceedings, it soon crossed over into the realm of criminal law. Courts began to interpret the term "enter," in criminal statutes, as a term of art whose meaning roughly corresponded to the contours of the entry fiction doctrine in immigration law.

For example, in *United States v. Vasilatos,* 209 F.2d 195 (3d Cir.1954), a Greek seaman who had previously been deported from the United States falsely represented to an immigration officer at the Port of Philadelphia that he had never been deported and thereby gained temporary admission to the United States. *Id.* at 196–97. The seaman stayed on his ship until it called at Baltimore, where he disembarked and headed inland. When he was apprehended in New York a year later, he was charged with illegal reentry. *Id.* at 197. The government alleged that the seaman had "entered" the United States at Philadelphia, making that city the proper venue for his trial; the seaman argued that his entry had occurred at Baltimore and that Baltimore was thus the proper venue. *Id.*

The then-prevailing illegal reentry statute (8 U.S.C. § 180 (1946)) did not define what constituted an "entry" into the United States, and there was no general definition of the term elsewhere in Title 8, so the Third Circuit—understandably—looked to the "official restraint" cases for guidance as to when an entry occurred. The court observed that "administration of the immigration laws has long proceeded on th[e official-restraint] theory of entry" and saw "no reason to disturb" that theory in the context of the criminal law. *Vasilatos,* 209 F.2d at 197. It therefore held that the seaman had "entered" the United States at Philadelphia, where his fraudulently obtained clearance for temporary admission had first given him freedom from official restraint, rather than at Baltimore, where he had physically landed in the country. *Id.*

After the relevant events in *Vasilatos* occurred, but before the Third Circuit issued its decision, Congress enacted the Immigration and Nationality Act of 1952, which collected and reorganized the various provisions of American immigration law in one place: Title 8. The Act's definitional provision defined the term "entry" very broadly as "any coming of an alien into the United States, from a foreign port or

place or from an outlying possession, whether voluntarily or otherwise." 8 U.S.C. § 1101(a)(13) (1952). But despite the facial breadth of this definition, the courts were unwilling to do away with the traditional requirement of freedom from official restraint. Rather, they simply assumed without much explanation that § 1101(a)(13) had incorporated the preexisting judicial doctrine of official restraint. *See, e.g., In re Dubbiosi,* 191 F.Supp. 65, 66 (E.D.Va.1961) (acknowledging the adoption of 8 U.S.C. § 1101(a)(13) but stating that "[w]e do not believe, however, that this definition removes the requirement of establishing not only physical presence, but also freedom from official restraint, before 'entry' is accomplished").

At our first opportunity, in *United States v. Oscar,* 496 F.2d 492 (9th Cir.1974), we adopted the same view of what constitutes an "entry" for *criminal* purposes. Oscar and an accomplice arranged for two Honduran nationals to be driven to the San Ysidro Point of Entry, where the Hondurans lied to customs officials and said they were United States citizens. The Hondurans were taken to secondary **\*1165** inspection and later arrested. *Id.* at 492–93. Oscar was subsequently convicted under 18 U.S.C. § 2 of aiding and abetting an illegal entry into the United States.

We reversed the conviction, holding that Oscar could not be guilty of aiding and abetting because the two Hondurans had not committed the underlying offense of illegal entry under 8 U.S.C. § 1325. We acknowledged that the two had come into the United States "[i]n a physical sense" when they moved to secondary inspection, which ostensibly was enough to satisfy the broad definition of "entry" in the 1952 Act. *Oscar,* 496 F.2d at 493. But we agreed with *Vasilatos* 's and *Dubbiosi* 's holdings that "entry," for immigration-related purposes, requires freedom from official restraint. *Id.* at 493–94. We reasoned that although *Vasilatos* and *Dubbiosi* were not factually analogous to Oscar's case, it made sense for us to adopt their approach to "entry" because Congress had chosen to define "entry" in § 1101(a)(13), and it was "unlikely that Congress would define a term in § 1101 ... if it intended the term to have different meanings" in different contexts. *Id.* at 493–94.[1] That consideration, along with the rule of lenity, led us to conclude that the Hondurans had not "entered" the United States because they had not left

the Port of Entry and thus never escaped "official restraint." *Id.* at 494.

In subsequent cases interpreting 8 U.S.C. § 1326, the illegal-reentry statute, we adopted the same view of "entry" that *Oscar* applied under § 1325, holding that an illegal reentry required both physical entry into the country and freedom from official restraint.[2] For example, in *United States v. Martin–Plascencia,* 532 F.2d 1316 (9th Cir.1976), the defendant was charged with unlawful entry. He had gone near the port of entry at San Ysidro and crawled through a hole in one chain link fence and under a second. He was caught 50 yards into the United States. We rejected his argument that he was under official restraint because he had not "reach[ed] the streets of San Ysidro":

> while nominally within the confines of the Port of Entry, [defendant] was at no instant up until the moment of his arrest under any type of official restraint, but to the contrary was exercising his free will, youthful enterprise, and physical agility in evading fixed barriers in accomplishing his entry.

*Id.* at 1317. *See also United States v. Aguilar,* 883 F.2d 662 (9th Cir.1989).

C

We substantially broadened our understanding of the official restraint doctrine in *United States v. Pacheco–Medina,* 212 F.3d 1162 (9th Cir.2000). Pacheco was climbing the international fence between the United States and Mexico when he was picked up by a surveillance camera. The monitor signaled a Border Patrol agent on a bicycle, and he arrived just as Pacheco dropped off the fence, "crouched in preparation for escape in the country at large." *Id.* at 1163. Pacheco ran, but was quickly **\*1166** apprehended. We overturned his conviction for unlawful entry because, although he "tried to get into the country" and, in fact, had succeeded in getting on U.S. soil without permission, "he was under official restraint the whole time." *Id.* at 1165. Of course, Pacheco was not under "official restraint" the "whole time," at least not in the sense in which immigration law created the doctrine to distinguish between deportable and excludable aliens.

It is worth pausing here to consider how far our conception of "official restraint" had strayed from the meaning developed in immigration law up until *Pacheco–Medina.* Recall that the "official restraint" distinction developed to explain why we gave different due process rights to aliens who obtained access to the United States (lawfully or unlawfully) than aliens who presented themselves for admission and, technically—but only technically and temporarily—found themselves standing on U.S. soil. *Pacheco–Medina* said that mere surveillance (even mechanical surveillance) by U.S. authorities was the same "official restraint" as aliens experience when they present themselves at a port of entry.[3]

*Pacheco–Medina* quickly led to some very strange "how-many-angels-are-dancing-on-the-head-of-a-pin" inquiries. Consider two cases decided shortly after *Pacheco–Medina.* In *Hernandez–Herrera,* Herrera was part of a group of aliens who scaled the international fence. The "still watch" agent had the group under observation, and they were quickly detained by field agents. Herrera, however, escaped the agents and ran into thick brush where, unfortunately for him, he "was free from **\*1167** official restraint because he was no longer visible to the 'still watch' agent.... [ The field agent] followed Herrera's footprints, and not Herrera." 273 F.3d at 1219. We affirmed Herrera's conviction for illegal reentry. By contrast, in *Gonzalez–Torres,* Border patrol agent Watkins, using binoculars, observed Torres and others enter the United States. Watkins radioed to a second agent, who began pursuit. Although Watkins actually "lost sight of the group 'for a number of seconds,' " we found that this gap in the surveillance was not sufficient to break the officer's "continuous observation." 309 F.3d at 599. We overturned Torres's conviction. The fact that two aliens who commit identical acts and have identical mental states are treated differently based on whether or not a border patrol agent managed to watch them the whole time should give us pause.

As a theoretical matter, moreover, it is far from clear that the concept of official restraint maps onto criminal law particularly well. Official restraint, after all, was designed to answer the question whether an alien in custody could be excluded or must be deported, whether he was to be afforded minimal procedural rights or plenary rights. *See* *Chow Chok,* 161 F. at 628. We must, of course, determine what "entry" means in convictions under §§ 1325–26. But our concern has nothing to do with what process the alien is due. Once an alien has been indicted under either of these sections, the scope of his procedural rights is decided: he is entitled

to a trial by jury, *see* U.S. Const.amend. VI; representation by counsel, *id.;* and the sundry other procedural protections that define our criminal justice system, *id.* amend. V. "Official restraint" thus ends up being used to answer an entirely different question in criminal cases—*i.e.,* when the *actus reus* of illegal entry or reentry has been accomplished—and, like any repurposed concept, produces some odd results. For example, the notion that an alien who hops a border fence and makes it a substantial distance into this country has not committed the *act* of entering the United States because he was under constant surveillance defies common sense. Perhaps this is why neither § 1325 nor § 1326 nor § 1101(a)(13) mentions any such requirement.

The majority provides little reason for adopting the concept of entry which was developed to discern between different due process standards in the immigration context, in the very different context of determining when someone has committed the substantive crime of illegal reentry. It first warns that the crime of reentry, without the official restraint limitation, would unfairly "make criminals out of persons who, for any number of innocent reasons, approach immigration officials at the border." Maj. Op. at 1160. I respectfully disagree that this is a problem.[4] The lawful process to enter the U.S. does not include walking across the border without permission. That is, by definition, an illegal—or *unauthorized*—entry. Whether or not that person happens to be under surveillance at the time does nothing to change her culpability.

The majority also suggests that we should continue to apply the official restraint doctrine in the criminal context because "the doctrine has been around for decades." Maj. Op. at 1159. But the fact that this doctrine was adopted long ago— **\*1168** without any serious thought either at its inception or since—is precisely what should give us pause.

D

There is one final development I must mention. Prior to *Lombera–Valdovinos,* an alien who could not be charged with illegal entry or reentry because he was never free from official restraint could still be charged with *attempted* illegal entry or reentry. *See* *United States v. Leos–Maldonado,* 302 F.3d 1061, 1063, 1065 (9th Cir.2002) (holding that an alien can be guilty of attempted entry even if he is under official restraint throughout his crossing of the U.S. border). We held in

AR.06666

14

*United States v. Gracidas–Ulibarry,* 231 F.3d 1188, 1195–96 (9th Cir.2000) (en banc), that attempted illegal reentry is a specific-intent crime.[5] At the same time we construed the requisite intent broadly, concluding that an alien need only have the "conscious desire[ ] to reenter the United States without the express consent of the Attorney General." *Id.* at 1196; *see also id.* at 1198 (" § 1326 requires a finding that the defendant consciously desired to reenter the United States without consent."). Under this standard, an alien who intentionally crossed the border but did not escape official restraint would usually be guilty of attempted illegal entry or reentry, assuming he could not claim one of the general criminal-law defenses to specific intent. *See, e.g., United States v. Smith–Baltiher,* 424 F.3d 913, 925 (9th Cir.2005) (holding that a § 1326 defendant was entitled to present a mistake-of-fact defense based on his alleged belief that he was a U.S. citizen); *United States v. Blanco–Gallegos,* 188 F.3d 1072, 1076 (9th Cir.1999) (considering and rejecting a § 1326 defendant's voluntary-intoxication defense on the merits).

## II

Against this legal backdrop, we heard *Lombera–Valdovinos.* A Border Patrol agent first saw Lombera standing on the Mexico side of the U.S.–Mexico border. The agent looked away for a brief period, and when he turned back, Lombera was now on the U.S. side of the primary fence, walking directly toward the agent. The agent drove toward the defendant, and when they met, Lombera said, "I want to see an immigration judge," admitted to being a Mexican citizen, and conceded that he had no legal right to enter the United States. He explained that he had crossed the border because he "wished to go back to jail." Lombera, who had previously been deported several times, was arrested, charged with attempted illegal reentry, and convicted of that offense by a jury. *Lombera–Valdovinos,* 429 F.3d at 928.

We reversed the conviction, holding that no rational trier of fact could conclude that the defendant had the specific intent necessary to be guilty of attempted illegal reentry. We reasoned that because attempted illegal reentry requires the specific intent to reenter the United States without consent, and because an "entry" into the United States requires freedom from official restraint, a defendant "must have the specific intent to reenter 'free from official restraint' " in order to be convicted **\*1169** of attempted reentry under § 1326. *Id.* at 929. And then, crucially, we went on to hold that official restraint "encompasses restraint by *any* government official, not just officials of DHS." *Id.* (emphasis added). Thus, the defendant could not be guilty of attempted illegal reentry, because his intention was to go to jail—where he would be subject to "official restraint" by prison officials. *Id.* at 930.

This reasoning rests on an unprecedentedly expansive view of what constitutes "official restraint." Until *Lombera–Valdovinos,* the concept of "official restraint"—in both the immigration and the criminal context—had never been used to refer to all forms of confinement by any official of the U.S. government. Rather, it had always been limited to physical restraint or surveillance of an alien by a government officer operating at or just inside the border. *See id.* at 931 (Rymer, J., dissenting) ("[Official restraint] is a term of art for border control."). And for good reason: "Official restraint," recall, is a legal fiction used to distinguish between aliens who are deemed to have been stopped at the border and those who have reached the interior of the United States. This distinction does not turn on what happens to an alien *after* he gets beyond the border. An alien who ends up incarcerated in a federal prison has reached the interior of the United States no less than an alien who crosses the border undetected and then gads about the country at perfect liberty.

*Lombera–Valdovinos* 's three explanations for its expansive view of "official restraint" were unconvincing. First, it cited *Oscar* for the proposition that official restraint is not limited to "officials of DHS," noting that the official doing the restraining in Oscar was a "customs official[ ]." *Id.* at 929 (majority opinion). But although the relevant official in Oscar was not, strictly speaking, a border patrol officer, he was working at the San Ysidro Port of Entry and clearly functioning as part of the border control system. *See Oscar,* 496 F.2d at 493. *Oscar* thus shows, at most, that the notion of official restraint does not depend on where precisely an officer stands on an organizational chart. It does not imply that restraint by any government officer, even one not charged with any duty relating to the border, is "official restraint."[6]

Second, *Lombera–Valdovinos* quoted several cases suggesting that any alien who cannot "go[ ] at large within the United States" or "mix with the population" is

under official restraint. *See Lombera–Valdovinos, 429 F.3d at 929* (emphasis omitted). But these quotations were misleading. In each of these cases, the court being quoted was discussing an alien who was not at liberty because he was confined *by border control.* These cases do not establish that whenever an alien is not free to "go at large within the United States," he is under "official restraint" as that term is used in immigration law. *Lombera–Valdovinos* 's failure to appreciate that distinction makes clear that although our § 1325 and § 1326 cases initially borrowed the concept of "official restraint" from the immigration context, we have now wrenched it from that context entirely. With each succeeding step, culminating in *Lombera–Valdovinos,* we have gotten further **\*1170** away from what § 1326 plausibly means.

Finally, the *Lombera–Valdovinos* majority suggested that an alien who presents himself to the authorities at the border wanting to go to jail likely perceives no difference between being in the custody of border authorities and being in the custody of "some other United States jailer," given that he is almost certainly unfamiliar with the doctrine of "official restraint." *Id. at 930 n. 2.* Hence, the majority argued, such an alien cannot possess the intent required for attempted illegal reentry because he does not "intend[ ] to avoid or change" his status of being subject to official restraint. *Id. at 930.* But the initial premise of this argument is flawed. An alien who approaches a port of entry and says he wants to go to jail does not want to stay detained at the border forever; he wishes to go to a prison in the interior and become "part of the United States population, albeit that part of the population which is incarcerated." *Id. at 931* (Rymer, J., dissenting). By asking to go to jail, he demonstrates that he does not perceive the two forms of custody to be the same. *See id. at 932–33* ("Lombera–Valdovinos's articulated purpose was to go to a real jail, not to stay in the constructive custody of immigration officials at the border or its functional equivalent.").

In short, none of *Lombera–Valdovinos* 's arguments for construing "official restraint" in the way that it did stands up to scrutiny. The case was wrongly decided, and were it not binding on this panel, I would not follow it.

## III

*Lombera–Valdovinos* assured us that its consequences would be limited, explaining that its holding applied only in the "rare set of factual circumstances where there is no evidence of anything other than the intent to be taken into custody." *Id.* at 930 n. 3 (majority opinion). But I remain concerned about the decision's potential ramifications, which this case demonstrates may be far-reaching. As the majority opinion here recognizes, nothing in *Lombera–Valdovinos* limits that case's holding to situations in which an alien walks directly up to a border patrol agent and asks straightforwardly to be escorted to jail. Maj. Op. at 1156–57. [7] On the contrary, even an alien who—like Argueta–Rosales—acts in ways that strongly suggest his desire to enter the country free from official restraint can assert, if he is apprehended, that he wants to go to jail and thereby claim the protection of *Lombera–Valdovinos.*

The majority here helpfully tries to address these potential concerns by clarifying that in an attempted illegal reentry case, "[t]he government must prove only that [the defendant] had *a* specific intent to enter the United States free from official restraint, not that this was his only purpose." Maj. Op. at 1156–57. It predicts that a defendant who "actually intend[s] to sneak into the country, and change[s] his plans only when he [i]s spotted" will be convicted of attempted illegal reentry. I certainly hope that the majority is right. But as the majority reminds us, it is the government's burden in a § 1326 case to "prove[ ] unlawful intent beyond a reasonable doubt." *Id.* at 1157. **\*1171** There surely will be some § 1326 cases in which defendants' dubious claims that they desired to go to jail are nonetheless plausible enough to give the jury reasonable doubt of their guilt, thereby allowing those defendants to "gut the crime of attempted reentry by a play on words." *See Lombera–Valdovinos, 429 F.3d at 933* (Rymer, J., dissenting). This cannot possibly be how § 1326 is meant to work.

\* \* \*

*Lombera–Valdovinos* has left our law stuck in a catch–22 worthy of Joseph Heller: Aliens who cross the border hoping to enter the United States free of restraint must be restrained, while aliens who cross hoping to be restrained by the United States must be freed. Under the majority's regime, no one gets

what he wants, but some people go to jail, while everyone else goes home. This is a strange state of affairs indeed. And we could and should have avoided it by holding in *Lombera–Valdovinos* that the specific intent required for attempted illegal reentry is the intent to reenter the United States free from restraint *by authorities at the border.*

The *Lombera–Valdovinos* panel didn't choose that course, so I am compelled to concur in the judgment here. But I do so under protest. I would grant Argueta–Rosales his wish and allow him to go to jail.

**All Citations**

819 F.3d 1149, 16 Cal. Daily Op. Serv. 3871, 2016 Daily Journal D.A.R. 3492

# Footnotes

| | |
|---|---|
| * | The Honorable Elizabeth E. Foote, United States District Judge for the Western District of Louisiana, sitting by designation. |
| 1 | Section 1326(a) states: |

    (a) In general

    Subject to subsection (b) of this section, any alien who—

    (1) has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter

    (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act, shall be fined under Title 18, or imprisoned not more than 2 years, or both.

    Section 1326(b) provides enhanced penalties for certain defendants.

| | |
|---|---|
| 2 | At trial in *Lombera–Valdovinos,* the government argued "official restraint" encompassed only restraint by officials of the Department of Homeland Security (DHS), not other forms of official custody. *See* 429 F.3d at 929–30. In the government's view, if the defendant crossed into the United States with the intent to go to jail, then he had the specific intent to enter free from official restraint. *See id.* at 929. We rejected that argument in *Lombera–Valdovinos, see id.* at 929–30, and the government does not reassert it here. Indeed, the government conceded the point on appeal in *Lombera–Valdovinos. See id.* at 929. |
| 3 | Although the government on appeal has conceded the district court misapplied *Lombera–Valdovinos,* government counsel said nothing in the district court while Argueta's counsel and the court debated the proper legal standard. Had the government pointed out *at that time* that Argueta was articulating the correct legal standard for the specific intent element of attempted illegal reentry, the court might have reached a verdict free from legal error. The government's failure to so advise the court at that time is regrettable. |
| 4 | Argueta argues remand is not required because the district court has already found a reasonable doubt as to whether he crossed into the United States with the specific intent to enter the country free from official restraint. Having reviewed the record, we are not persuaded the district court has made such a finding. We therefore reject Argueta's argument. |
| 5 | Judge Bybee suggests the official restraint doctrine may no longer be valid after the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), which he says "eliminated the concept of 'entry' from the INA altogether." Concurrence at 1166 n. 3. This argument is unpersuasive. First, the |

provision Judge Bybee focuses on, 8 U.S.C. § 1101(a)(13)(A), expressly continues to rely on the concept of "entry," by using that term as part of the definition of "admission." Second, as Judge Bybee acknowledges, we have already held, in *Pacheco–Medina,* 212 F.3d at 1166, that IIRIRA's changes to § 1101(a)(13)(A) did not alter the established meaning of "entry" under § 1326. Third, when Congress adopted IIRIRA in 1996, it also retained and even expanded the use of the term "entry" under §§ 1325 and 1326. *See* Pub.L. No. 104–208, Div. C, Title I, § 105, Title III, § 305 (1996). Given that "entry" had a firmly established meaning at that time—freedom from official restraint—we can infer that Congress intended to retain that meaning when it adopted IIRIRA. *Lezama–Garcia v. Holder,* 666 F.3d 518 (9th Cir.2011), upon which Judge Bybee relies, did not address the "official restraint" doctrine or the meaning of entry under §§ 1325 and 1326, and therefore does not cast doubt on our longstanding precedent applying the official restraint doctrine to entry under §§ 1325 and 1326.

1    *Oscar* seems to have assumed in error that *Vasilatos* rested on an interpretation of § 1101(a)(13)'s definition of "entry." *Oscar,* 496 F.2d at 493–94. But *Vasilatos* expressly stated that it did not. The *Vasilatos* opinion issued after § 1101(a)(13) was adopted, but the relevant events occurred before the statute took effect. *Vasilatos,* 209 F.2d at 196–97. Thus, when we considered the import of § 1101(a)(13) in *Oscar,* we were writing on a cleaner slate than we realized.

2    *See, e.g.,* *United States v. Gonzalez–Torres,* 309 F.3d 594, 598–99 (9th Cir.2002); *United States v. Hernandez–Herrera,* 273 F.3d 1213, 1218–19 (9th Cir.2001); *United States v. Castellanos–Garcia,* 270 F.3d 773, 775–77 (9th Cir.2001).

3    In 1996, Congress refined the INA's concept of lawful entry. The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) eliminated the definition of "entry" from the INA altogether, replacing it with the term "admission." *See* Illegal Immigration Reform and Immigrant Responsibility Act, Pub.L. No. 104–208, § 301(a), 110 Stat. 3009 (1996), *codified at* 8 U.S.C. § 1101(a)(13)(A). Under the new definition "admission" was "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." (emphasis added). As we recognized in 2011, "IIRIRA replaced 'entry' with [the] new concept [of] 'admission' " and, in so doing, it replaced the dividing line between excludable and deportable aliens with a new dividing line—one between *lawfully admitted* aliens and all other aliens, with the latter now subject to "more general 'removal' proceedings." *Lezama–Garcia v. Holder,* 666 F.3d 518, 527–28 (9th Cir.2011). *Pacheco* acknowledged, but rejected out of hand, the changes in definitions in IIRIRA. Although Congress had told us that lawful "admission" required "the lawful entry of the alien ... *after inspection and authorization,*" 8 U.S.C. § 1101(a)(13)(A) (emphasis added), *Pacheco–Medina* said that "[j]ust why [the new definition] should matter at all is far from clear." The fact that IIRIRA eliminated the definition of "entry"—and replaced it with something very different—somehow "ha[d] no significance here." Evidently we believed that Congress had no place in defining "entry": "It certainly does not change the preexisting, and still existing, judicial concept of what an entry is." *Pacheco,* 212 F.3d at 1166 & n. 7.
The majority suggests that Congress's change does not matter because: (1) the term "entry" is still used within the definition of "admission," (2) we reached this issue in *Pacheco*, and (3) Congress retained the use of the term "entry" in other statutory sections. Maj. Op. at 1159 n. 5. But this misses the point. The majority urges that the official restraint doctrine should be adhered to because it "has been around for decades" and Congress has never "called into question ... the firmly established judicial gloss on 'entry.' " *Id.* at 1159. But is not that exactly what Congress has done? Congress decided to eliminate that term of art from the face of the statutory section and replace it with something else. For my present purposes, I do not have to determine

what effect IIRIRA might have had on the official restraint doctrine. But, at the least, the question of what changes, if any, IIRIRA worked on the official restraint doctrine deserved more discussion that it received in *Pacheco–Medina.*

4    One doesn't have to look beyond this case, *Lombera–Valdovinos, Gonzalez–Torres,* or *Pacheco* to see that these were not "persons who, for any number of innocent reasons, approach immigrant officials." Whether these persons are scaling the international fence or running through desert brush, they were not persons seeking to "approach immigration officials" for "innocent reasons."

5    I note that every other circuit to consider the question has disagreed with us, holding that § 1326 does *not* require specific intent. *See United States v. Rodriguez,* 416 F.3d 123, 125–26 (2d Cir.2005); *United States v. Morales–Palacios,* 369 F.3d 442, 446–48 (5th Cir.2004); *United States v. Peralt–Reyes,* 131 F.3d 956 (11th Cir.1997) (per curiam); *United States v. Reyes–Medina,* 53 F.3d 327 (1st Cir.1995) (per curiam). As I observe in text, we have given the specific intent requirement a fairly generous reading, which may have effectively narrowed the gap between us.

6    *Lombera–Valdovinos* 's reliance on *Oscar* as evidence that "official restraint" extends beyond confinement by the Department of Homeland Security is especially curious in light of the fact that since *Oscar,* the Customs Service has been combined with the Border Patrol into one agency (U.S. Customs and Border Protection), which in turn is under the umbrella of DHS. *See* 6 U.S.C. § 542 Note. I doubt it ever made sense, in this context, to draw fine-grained distinctions between "customs officials" working at the border and border patrol agents, but it surely does not make sense to do so now.

7    And even in those cases I would be concerned. Both the majority in *Lombera–Valdovinos* and the majority in this case ignore the possibility that some aliens in unfortunate circumstances—like Argueta–Rosales—may indeed elect to come into the U.S. with a specific intent to reside in U.S. prisons. Under *Lombera–Valdovinos,* they may do so without consequence.

---

**End of Document**        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**U.S. v. Barragan-Cepeda, 29 F.3d 1378 (1994)**

39 Fed. R. Evid. Serv. 1189

KeyCite Yellow Flag - Negative Treatment

Distinguished by  U.S. v. Forman,  E.D.Mich.,  December 30, 1997

29 F.3d 1378
United States Court of Appeals,
Ninth Circuit.

UNITED STATES of America, Plaintiff-Appellee,

v.

Jose BARRAGAN-CEPEDA, Defendant-Appellant.

No. 93-50642.
|
Argued and Submitted June 6, 1994.
|
Decided July 12, 1994.

**Synopsis**

Defendant moved to dismiss, on double jeopardy grounds, charge of unlawful reentry into United States following deportation. The United States District Court for the Southern District of California, Earl B. Gilliam, J., denied motion, and defendant appealed. The Court of Appeals, Canby, Circuit Judge, held that defendant established that issue of alienage was necessarily decided in his favor in prior trial in which he was acquitted on charges of unlawful reentry following deportation and, thus, government was collaterally estopped from relitigating alienage issue.

Reversed and remanded.

West Headnotes (8)

**[1]** **Judgment** 🔑 Admissibility in general

Rule governing competency of juror as witness does not limit admissibility of juror affidavits to determine what issues were decided in prior proceeding. Fed.Rules Evid.Rule 606(b), 28 U.S.C.A.

2 Cases that cite this headnote

**[2]** **Judgment** 🔑 Admissibility in general

Rule governing competency of juror as witness did not preclude consideration of affidavits

of jurors in prior trial, in which defendant was acquitted on charges of unlawful reentry following deportation, to determine what issues were decided in prior trial for purposes of inquiry as to whether federal government was barred from relitigating defendant's alienage in subsequent trial on another unlawful reentry charge; rule bars admission of juror testimony only upon inquiry into validity of verdict, and defendant did not seek to impeach verdict, but, rather, sought to rely upon it. Fed.Rules Evid.Rule 606(b), 28 U.S.C.A.

4 Cases that cite this headnote

**[3]** **Double Jeopardy** 🔑 Relation to collateral estoppel or res judicata

Principle of collateral estoppel is embodied in Fifth Amendment's proscription against double jeopardy. U.S.C.A. Const.Amend. 5.

1 Cases that cite this headnote

**[4]** **Judgment** 🔑 Identity of Issues, in General

**Judgment** 🔑 Matters actually litigated and determined

**Judgment** 🔑 Essentials of Adjudication

In determining whether collateral estoppel applies, court must determine whether issues are sufficiently similar, whether issue was fully litigated in first action, and whether issue was necessarily decided in first action.

1 Cases that cite this headnote

**[5]** **Aliens, Immigration, and Citizenship** 🔑 Reentry after removal

Elements of offense of unlawful reentry following deportation are that defendant was alien, that he was deported, and that he thereafter reentered United States without permission.

Immigration and Nationality Act, § 276, 8 U.S.C.A. § 1326.

6 Cases that cite this headnote

**[6]**     **Judgment** ⚷ Criminal prosecutions

Defendant established that issue of alienage was necessarily decided in his favor in prior trial in which he was acquitted on charges of unlawful reentry following deportation, so that government was collaterally estopped from relitigating alienage issue and, thus, defendant was entitled to dismissal, on double jeopardy grounds, of subsequent charge of unlawful reentry; stipulation in prior trial effectively removed deportation and reentry elements of offense, affidavit by defense counsel stated that sole issue in that trial was defendant's alienage, and affidavits of two jurors asserted that basis of acquittal was jury's belief that defendant was United States citizen. Immigration and Nationality Act, § 276, 📄 8 U.S.C.A. § 1326; U.S.C.A. Const.Amend. 5.

6 Cases that cite this headnote

**[7]**     **Judgment** ⚷ Criminal prosecutions

Acquittal of defendant in 1980 on charges of unlawful entry following deportation, in which issue of defendant's alienage was necessarily decided in his favor, collaterally estopped government from relitigating alienage issue in trial on subsequent unlawful reentry charge, even though defendant admitted in 1978 criminal proceedings that he was Mexican citizen and pled guilty to illegal entry; 1980 acquittal was not subject to collateral attack based on 1978 proceedings, and acquittal was arguably more reliable than 1978 guilty plea as it was product of jury trial in which issue was vigorously litigated.

Immigration and Nationality Act, § 276, 📄 8 U.S.C.A. § 1326.

1 Cases that cite this headnote

**[8]**     **Judgment** ⚷ Criminal prosecutions

Acquittal of defendant in 1980 on charges of unlawful entry following deportation, in which issue of defendant's alienage was necessarily decided in his favor, collaterally estopped government from relitigating alienage issue in trial on subsequent unlawful reentry charge,

notwithstanding contention that defendant admitted being Mexican citizen in deportation proceedings both before and after 1980 trial; defendant's admissions prior to 1980 trial were available to jury in that trial, and government provided no evidence of admissions after 1980 trial. Immigration and Nationality Act, § 276, 📄 8 U.S.C.A. § 1326.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1379** Karen Sue Berg, Asst. Federal Public Defender, San Diego, CA, for defendant-appellant.

Thomas W. McNamara, Asst. U.S. Atty., San Diego, CA, for plaintiff-appellee.

Appeal from the United States District Court for the Southern District of California.

Before: FLETCHER, CANBY, and HALL, Circuit Judges.

**Opinion**

CANBY, Circuit Judge:

Jose Barragan-Cepeda was charged as a deported alien who reentered the United States in violation of 📄 8 U.S.C. § 1326. Following the district court's denial of his motion to dismiss on the ground of double jeopardy, Barragan brings an interlocutory appeal. We reverse.

## *I. BACKGROUND*

In April of 1993, the government indicted Barragan alleging that he was an alien who **\*1380** reentered the United States after deportation in violation of 📄 8 U.S.C. § 1326. Barragan moved to dismiss the indictment because it subjected him to double jeopardy. The basis of his motion was as follows: In 1980, Barragan was indicted, tried and acquitted of a violation of 📄 § 1326 and two other offenses. Each of the 1980 offenses required the government to establish that Barragan was an alien. The 1980 acquittals, he alleges, were based on the fact that the jury found him to be an American

citizen. Although the present charge is based on his April 9, 1993 reentry into the United States, Barragan argues that the government is barred from relitigating a key element, i.e., his alienage.

As proof that his alienage was litigated and decided in the 1980 proceeding, Barragan introduced affidavits from two people who served as jurors in the 1980 trial. The district court ruled that the introduction of these affidavits was improper under Fed.R.Evid. 606(b) and apparently declined to consider them. Barragan also introduced an affidavit from his 1980 defense counsel and a stipulation that was filed prior to trial in the 1980 proceeding.

The district court denied Barragan's motion, ruling that Barragan had failed to establish that his alienage was necessarily decided in the 1980 proceeding. Barragan now appeals both the conclusion that the juror affidavits were inadmissible and the finding that he failed to prove that the alienage issue was necessarily decided.

## II. JUROR AFFIDAVITS

As a preliminary matter, we must decide whether the affidavits by jurors in the 1980 proceeding may properly be considered in the collateral estoppel inquiry. The district court ruled, and the government argues, that Rule 606(b) bars the admission of the juror affidavits to determine whether collateral estoppel applies in this case.

[1] [2] The full text of Rule 606(b) is as follows:

*Upon an inquiry into the validity of a verdict or indictment,* a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

(Emphasis added). The opening clause of this rule is clear. Rule 606(b) bars the admission of juror testimony only upon an inquiry into "the validity of a verdict." It does not limit the admissibility of juror affidavits to determine what issues were decided in a prior proceeding. By proffering jury affidavits regarding the 1980 verdict, Barragan has not sought to impeach that verdict. Quite the contrary, he is attempting to rely upon that verdict. Thus, the district court erred in ruling that the juror affidavits were inadmissible under Rule 606(b).

## III. APPLICATION OF COLLATERAL ESTOPPEL

We must now determine whether these affidavits and the additional evidence put forth by Barragan entitle him to collateral estoppel on the alienage issue.

[3] [4] "[W]hen an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970). This principle, collateral estoppel, is embodied in the Fifth Amendment's proscription against double jeopardy. *Id.* at 445, 90 S.Ct. at 1195. In determining whether collateral estoppel applies, we must determine: first, whether the issues are sufficiently similar; second, whether the issue was fully litigated in the first action; and, third, whether the issue was necessarily decided in **\*1381** that action. *United States v. Crooks,* 804 F.2d 1441, 1446 (9th Cir.1986).

[5] Both in this case and in the 1980 prosecution, the government alleged that Barragan was an alien who reentered the United States after a prior deportation in violation of 8 U.S.C. § 1326. The elements of this offense are undisputed. The defendant must be an alien; he must have been deported; and he must have thereafter reentered the United States without permission. *United States v. Meza-Soria,* 935 F.2d 166, 168 (9th Cir.1991). Barragan argues that the government may not relitigate the first element, whether he is an alien.

[6] Two of the *Crooks* requirements for collateral estoppel are met; the issues are identical and they were actually litigated. The only issue is whether alienage was "necessarily

AR.06674

39 Fed. R. Evid. Serv. 1189

decided" in 1980. To decide this question, *Ashe* counsels this court to

> examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration. The inquiry must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.

397 U.S. at 444, 90 S.Ct. at 1194 (citations omitted).

Due to the age of the earlier proceeding, the record is not available. However, Barragan introduced the following evidence: a stipulation in the 1980 case in which Barragan effectively removed from dispute the other two elements of the reentry after deportation offense, an affidavit signed by his 1980 defense counsel who vouches that the sole issue in that proceeding was Barragan's alienage, and the affidavits, discussed previously, by two of the 1980 jurors, asserting that the basis for the 1980 jury's acquittals was the jury's belief that Barragan was a United States citizen.

This evidence establishes that Barragan's citizenship was the basis for the acquittals. In the 1980 stipulation, Barragan admitted, among other things, the following:

> 21. On December 1, 1978, Jose Barragan-Cepeda was formally deported from the United States, at the Port of San Ysidro, to Mexico. Mr. Barragan was personally served with Form I294 which informed Mr. Barragan that following his deportation and before returning to the United States, he was required to obtain permission to reenter the United States;

Barragan's agreement to this stipulation effectively removed from the jury's consideration the fact of a prior deportation, the second of the three elements of unlawful reentry after deportation.

Barragan also stipulated:

> 24. That after a diligent search of the records of the Department of Justice, Immigration and Naturalization Service, no record was found to exist in the records of the Immigration and Naturalization Service evidencing the filing of an application for permission to reapply for admission to the United States after deportation, or the granting of such permission, relating to Jose Barragan-Cepeda, also known as Joseph Chariez-Cepeda, born July 25, 1957, or July 24, 1958, in Ensenada, B.C. Mexico, or in Mexico.

This stipulation does not foreclose any possible inquiry into the third element, i.e., whether Barragan had permission to reenter the country. However, the fact that he was willing to make the stipulation is strong evidence that this element was not disputed. If Barragan was defending on the ground that he had permission to reenter the United States, he would have had no reason to make the stipulation. After all, it is the government's burden to prove the elements of the offense. Barragan could not have been penalized for refusing to make the stipulation because he had no basis for knowing whether the government had taken the actions to which he stipulated.

The circumstantial evidence in the stipulation is supported by the juror affidavits and the defense counsel affidavit. The government has offered no evidence to contradict any of this evidence. In light of the uncontroverted evidence, Barragan has established that the issue was necessarily decided in his *1382 favor by the 1980 acquittal and the district court clearly erred in finding otherwise.

[7] The government argues that, even so, Barragan is not entitled to collateral estoppel. The government cites two 1978 criminal proceedings in which he admitted being a Mexican citizen and pleaded guilty to illegal entry. In fact,

the government argues, the 1978 proceeding should have collaterally estopped Barragan from litigating alienage in 1980. The 1980 proceeding is not subject to collateral attack now, however.[1] And it is arguably more reliable than the 1978 guilty pleas because it was the product of a jury trial in which the issue was vigorously litigated.

[8]  The government also asserts that Barragan admitted being a Mexican citizen in immigration proceedings both before and after the 1980 proceeding. Barragan's admissions in deportation proceedings prior to the 1980 trial, however, were available to the jury in the 1980 case. Indeed, Barragan stipulated to those admissions. Although the government has made assertions about deportation proceedings since 1980 in which Barragan has admitted Mexican citizenship, it has provided no evidence of these admissions.

We recognize that this is an interlocutory appeal and that the government should not be required to prove its case twice. But when a defendant has filed a motion to dismiss supported by sufficient evidence to grant that motion, the government may not defeat the motion with bald assertions. It must provide evidence. Here, the government has not done so.

Because the evidence clearly indicates that the alienage issue was necessarily decided in 1980, the government is collaterally estopped from relitigating the issue. Because alienage is a necessary element of the offense with which Barragan is charged, the indictment must be dismissed. The judgment of the district court is reversed and the district court is instructed to dismiss the indictment.

REVERSED and REMANDED.

**All Citations**

29 F.3d 1378, 39 Fed. R. Evid. Serv. 1189

---

## Footnotes

[1]  After his 1980 acquittal, Barragan was indicted for making false declarations before a court, *see* 18 U.S.C. § 1623(a), (c), because of declarations made at trial that were inconsistent with his declarations made in a prior deportation proceeding. He pleaded guilty to one count of the indictment, charging inconsistent declarations as to the residency of his family members; those declarations did not relate to his own birthplace.

---

End of Document        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Shropshire v. United States, E.D.Tenn., April 10, 2017

437 F.3d 450
United States Court of Appeals,
Fifth Circuit.

UNITED STATES of America, Plaintiff-Appellee,

v.

Roman A. BROWN, Defendant-Appellant.

No. 04-31237.
|
Jan. 19, 2006.

**Synopsis**

**Background:** Defendant pleaded guilty in the United States District Court for the Middle District of Louisiana, Frank J. Polozola, Chief Judge, to possession of a firearm as a convicted felon, and was sentenced under the Armed Career Criminal Act (ACCA). Defendant appealed his sentence.

**[Holding:]** The Court of Appeals, Edith Brown Clement, Circuit Judge, held that the crime of simple robbery under Louisiana law, of which defendant had previously been convicted, qualified as a "violent felony" under the ACCA.

Affirmed.

West Headnotes (3)

**[1]**    **Criminal Law**  👉 Necessity of Objections in General

Court of appeals finds plain error when: (1) there was an error; (2) the error was clear and obvious; and (3) the error affected the defendant's substantial rights; provided all three conditions are met, an appellate court may, in its discretion, review the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings.

2 Cases that cite this headnote

**[2]**    **Sentencing and Punishment**  👉 Violent or Nonviolent Character of Offense

Generally, the sentencing court will look to the statutory definition of a crime to determine if it qualifies as a violent felony under the Armed Career Criminal Act (ACCA). 🚩 18 U.S.C.A. § 924(e)(2)(B).

13 Cases that cite this headnote

**[3]**    **Sentencing and Punishment**  👉 Particular Offenses

Crime of simple robbery under Louisiana law, of which defendant had previously been convicted, qualified as a "violent felony" under the Armed Career Criminal Act (ACCA); Louisiana statute defined simple robbery as the

taking of anything of value belonging to another by use of force or intimidation, and statutory provision defining "crime of violence" included simple robbery among enumerated offenses. 18 U.S.C.A. § 924(e)(2)(B); LSA-R.S. 14:2(13); LSA-R.S. 14:6.

29 Cases that cite this headnote

**Attorneys and Law Firms**

**\*450**  Robert William Piedrahita, Asst. U.S. Atty. (argued), Baton Rouge, LA, for U.S.

Rebecca L. Hudsmith, Fed. Pub. Def. (argued), Lafayette, LA, for Brown.

Appeal from the United States District Court for the Middle District of Louisiana.

Before GARWOOD, CLEMENT and PRADO, Circuit Judges.

**Opinion**

EDITH BROWN CLEMENT, Circuit Judge:

Roman A. Brown pleaded guilty and was sentenced under the Armed Career Criminal Act ("ACCA"). On appeal, he claims that the Louisiana crime of simple robbery does not qualify as a "violent felony" for purposes of the ACCA. For the reasons that follow, we affirm the sentence of the district court.

## I. FACTS AND PROCEEDINGS

Brown pleaded guilty to possession of a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). As part of the plea agreement, Brown stipulated that he had been previously convicted of two counts of  **\*451**  simple robbery and one count of possession of cocaine. The probation office issued a presentence report ("PSR"), which stated Brown had also been convicted of second degree battery and distribution of cocaine. Due to these additional convictions, the probation officer observed that Brown was eligible to be sentenced under the ACCA, pursuant to 18 U.S.C. § 924(e) and U.S.S.G. § 4B1.4. The officer determined Brown's base offense level under the ACCA to be thirty-four and, after reducing three levels for acceptance of responsibility, recalculated the level to thirty-one. The officer set Brown's criminal history category at VI, and, as a result, the guideline range was between 188 and 235 months. The district court followed the recommendations in the PSR and sentenced Brown to 210 months imprisonment.

Brown appeals his sentence, claiming that his conviction for simple robbery does not qualify as a "violent felony" under the ACCA. [1]

## II. DISCUSSION

 **[1]**   Brown did not object to his sentence at the district court. Therefore, we review for plain error. United States v. Villegas, 404 F.3d 355, 358 (5th Cir.2005). This Court finds plain error when: (1) there was an error; (2) the error was clear and obvious; and (3) the error affected the defendant's substantial rights. United States v. Mares, 402 F.3d 511, 520 (5th Cir.2005), cert.

*denied,* 126 S.Ct. 43 (2005). Provided all three conditions are met, an appellate court may, in its discretion, review the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*

[2]    Sentencing under the ACCA requires a defendant to have three prior felony convictions, which qualify as either a "violent felony" or a "serious drug offense." 18 U.S.C. § 924(e)(1). Section 924(e)(2)(B) defines violent felony:

> [T]he term "violent felony" means any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that (i) *has as an element the use, attempted use, or threatened use of physical force against the person of another* ....

18 U.S.C. § 924(e)(2)(B) (emphasis added). Generally, the sentencing court will look to the statutory definition of the crime to determine if it qualifies as a violent felony under the ACCA. *Taylor v. United States,* 495 U.S. 575, 602, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). *See also United States v. Montgomery,* 402 F.3d 482, 486 (5th Cir.2005).

**\*452**    [3]    In 1996, Brown pled guilty to two counts of simple robbery under Louisiana state law. At that time, the Louisiana statute provided: "Simple robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, but not armed with a dangerous weapon." LA. REV. STAT. § 14:65 (1996). Brown argues that the Louisiana statute defines robbery in the disjunctive with the result that the statute can be violated simply with intimidation and, therefore, without the use or threatened use of force. He further argues that, because the record has no competent documentation to support the fact that his robbery convictions were committed with force or threat of force, these convictions do not qualify as violent felonies under the ACCA.

Brown's arguments are without merit. Louisiana law defines "crime of violence" as the "use, or threatened use of physical force" and specifically includes the crime of simple robbery as a crime of violence. The Louisiana statute provides:

> Crime of violence means an offense that has, as an element, *the use, attempted use, or threatened use of physical force against the person or property of another,* and that, by its very nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense or an offense that involves the possession or use of a dangerous weapon.

LA. REV. STAT. § 14:2(13) (emphasis added). The statute enumerates qualifying offenses, and it includes simply robbery among them. LA. REV. STAT. § 14:2(13)(y). Under Louisiana law, simple robbery is a crime of violence, and a crime of violence necessarily entails the use or threatened use of force. Therefore, simple robbery entails the use or threatened use of force. [2]

No case in this circuit has directly addressed whether a conviction for simple robbery under Louisiana law is a predicate felony under the ACCA, but the Fourth and Ninth Circuits have found that a robbery, where the definition includes the words "by violence or intimidation," does qualify as a violent felony under the ACCA. *United States v. Presley,* 52 F.3d 64, 69 (4th Cir.1995); *United States v. Melton,* 344 F.3d 1021, 1025-26 (9th Cir.2003) (citing to and agreeing with *Presley).*

In 🚩 *Presley,* the Fourth Circuit reasoned: "Violence is the use of force. Intimidation is the threat of the use of force. Thus, because robbery ... has as an element the use or threatened use of force, [defendant's] robbery convictions were properly used as predicates under the ACCA." 52 F.3d at 69. *Cf.* *United States v. Tirrell,* 120 F.3d 670, 680 (7th Cir.1997) (finding **\*453** that the Michigan crime of unarmed robbery, the definition of which included the disjunctive phrase "putting in fear," qualified as a violent felony under the ACCA because "putting in fear constitutes threatening the use of physical force.")

### III. CONCLUSION

We hold that the Louisiana crime of simple robbery qualifies as a violent felony under the ACCA as a matter of law. The district court made no error, plain or otherwise, and the district court's sentence is AFFIRMED.

**All Citations**

437 F.3d 450

### Footnotes

1    Brown also claims that 📑 *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and *Shepard v. United States,* 544 U.S. 13, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005), require the additional facts and nature of his prior convictions either be admitted by him or found by a jury. His argument is without merit. In *United States v. Stone,* this circuit held that the Fifth and Sixth Amendments do not require that convictions used as the bases for sentence enhancements under the ACCA be based on a jury finding. 306 F.3d 241, 243 (5th Cir.2002). *See also* ⚠️ *Almendarez-Torres v. United States,* 523 U.S. 224, 228, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (treating the fact of a prior conviction as a permissible sentencing factor that need not be admitted by the defendant or found by the jury beyond a reasonable doubt). This court in *Stone* also held that there is no Sixth Amendment violation under *Apprendi* where a district court considers the nature of a prior conviction rather than submitting it to the jury. *Stone,* 306 F.3d at 243.

2    Moreover, while "intimidation" within the statutory definition of simple robbery is not further defined by Louisiana statute, there is case law that explores the import of the term. In 1981 the Louisiana Supreme Court addressed the interpretation of the "by use of force or intimidation" element by way of comparing simple robbery to theft. The court stated: "By providing a more severe grade of theft for those instances in which a thief uses force or intimidation to accomplish his goals, the legislature apparently sought to emphasize the increased risk of danger to human life posed when a theft is carried out in the face of the victim's opposition." *State v. Mason,* 403 So.2d 701, 703 (La.1981). Louisiana courts often cite to *Mason* when construing the term intimidation. *See, e.g., State v. Jones,* (La.App. 5 Cir. 7/25/00); 767 So.2d 808, 810; *State v. Florant,* 602 So.2d 338, 341-42 (La.App. 4 Cir.1992); *State v. Jackson,* 454 So.2d 1220, 1222 (La.App. 2 Cir.1984). The treatment by Louisiana courts of the "force or intimidation" element of simple robbery, by referencing an "increased risk of danger to human life," shows that intimidation entails the threat of force.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    AR.06680    4

723 F.3d 215
United States Court of Appeals,
District of Columbia Circuit.

UNITED STATES of America, Appellee

v.

Russell James CASO, Jr., Appellant.

No. 12–3015.
|
Argued Dec. 13, 2012.
|
Decided July 19, 2013.

**Synopsis**

**Background:** Defendant convicted of conspiracy to commit honest-services wire fraud moved to vacate. The United States District Court for the District of Columbia denied the motion, and defendant appealed.

**Holdings:** The Court of Appeals, Garland, Chief Judge, held that:

[1] appropriate measure of "seriousness" for purposes of rule, requiring defendant seeking to demonstrate actual innocence to show that he was actually innocent both of the offense of conviction and of any more serious charges that the government forewent in the course of plea negotiations, was determined by reference to the applicable Sentencing Guidelines range for the offenses, and

[2] making a materially false statement to the government was less serious crime than crime of conviction, and thus, defendant was not required to demonstrate actual innocence to that offense.

Reversed.

West Headnotes (6)

**[1]** **Criminal Law** 🔑 Review De Novo

The court of appeals reviews the district court's holdings on legal issues de novo.

1 Cases that cite this headnote

**[2]** **Criminal Law** 🔑 Fundamental or constitutional error; innocence

The appropriate measure of "seriousness" for purposes of rule requiring defendant seeking to demonstrate actual innocence to excuse a procedural default of a claim, in order to permit review of the claim on a motion to vacate, to show that he was actually innocent both of the offense of conviction and of any more serious charges that the government forewent in the course of plea negotiations, was determined by reference to the applicable Sentencing Guidelines range for the offenses, rather than by reference to the statutory maximum penalties for the offenses. 28 U.S.C.A. § 2255; U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

15 Cases that cite this headnote

**[3]** **Sentencing and Punishment** 🔑 Operation and effect of guidelines in general

A district court's failure to calculate the correct Sentencing Guidelines range constitutes procedural error. U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

1 Cases that cite this headnote

**[4]** **Criminal Law** 🔑 Judgment, sentence, and punishment

The court of appeals presumes that a sentence within the Sentencing Guidelines range is reasonable. U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

**[5]** **Criminal Law** 🔑 Fundamental or constitutional error; innocence

Making a materially false statement to the government was less serious crime than offense of conspiracy to commit honest services fraud, to which defendant pled guilty, since the applicable Sentencing Guidelines range for the false

statement offense was lower, and thus, defendant was not required to demonstrate that he was actually innocent of making a materially false statement to the government, in order to excuse the procedural default on motion to vacate of his claim that his admitted conduct could not support his honest services fraud conviction. 18 U.S.C.A. §§ 371, 1001; U.S.S.G. §§ 2B1.1(a)(2), 2C1.1(a)(1) 3E1.1(a, b), 18 U.S.C.A.

2 Cases that cite this headnote

[6]  **Criminal Law**  Fundamental or constitutional error; innocence

A defendant who has procedurally defaulted a claim by failing to raise it on direct review may raise it in habeas if he can demonstrate that he is actually innocent both of the charge for which he was convicted and of more serious charges that the government forwent in the course of plea bargaining.

14 Cases that cite this headnote

**West Codenotes**

**Limitation Recognized**

U.S.S.G. §§ 1A1.3, 2B1.1(a)(2), (b), 2C1.1(b)(2), 3D1.3(a), 3E1.1(a), 5B1.1(a)(1), (b), 18 U.S.C.A.

*217  Appeal from the United States District Court for the District of Columbia (No. 1:07–cr–00332–1).

**Attorneys and Law Firms**

Elizabeth G. Oyer argued the cause for appellant. With her on the briefs was Scott M. Noveck.

Lauren R. Bates, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief was Ronald C. Machen Jr., U.S. Attorney, and Elizabeth Trosman, John P. Mannarino, and Mary Ann Snow, Assistant U.S. Attorneys.

Before: GARLAND, Chief Judge, and ROGERS and GRIFFITH, Circuit Judges.

**Opinion**

GARLAND, Chief Judge:

**194  Russell James Caso, Jr. is innocent of the crime for which he was charged and convicted. The government does not dispute the point. Nonetheless, Caso was denied an opportunity to collaterally attack his conviction and sentence because he could not demonstrate that he is also innocent of a separate and uncharged offense that has a lower sentencing range under the United States Sentencing Guidelines. Because Caso was not required to make such a showing, we reverse the order denying his motion to vacate his conviction and sentence.

I

Caso's conviction arose out of his work for former United States Representative Curt Weldon. Caso initially served as one of Representative Weldon's legislative assistants. In 2005, he was appointed as the Representative's chief of staff. During this time, Representative Weldon was approached by a nonprofit consulting firm ("Firm A") to take legislative action on two proposals implicating relations between the United States and Russia. The same firm retained Caso's wife to edit written drafts of those proposals. Over the course of several months, Firm A paid Caso's wife $19,000 for what appear to be de minimis services. Mem. & Order Denying Mot. Vacate 2, *United States v. Caso*, No. 07–332 (D.D.C. Jan. 12, 2012) ("Dist. Ct. Op.").

Caso, like many officers and employees of the United States Congress, was required to file an annual disclosure statement detailing, among other things, the sources of "income earned by a spouse from any person which exceed $1,000." 5 U.S.C. app. 4 § 102(e)(1)(A); *see generally* 5 U.S.C. app. 4 §§ 101 et seq. ("Ethics in Government Act of 1978"). Despite this requirement, Caso failed to list Firm A's payments to his wife on his 2005 disclosure statement. Nonetheless, Caso signed the statement, certifying that it was true, complete, and correct. Dist. Ct. Op. 2.

On December 4, 2007, the government charged Caso with conspiracy to commit honest-services wire fraud, in violation of 18 U.S.C. §§ 371, 1343, and 1346. *See* 18 U.S.C. § 371 (proscribing conspiracy to defraud the United States);

*id.* § 1343 (proscribing "any scheme or artifice to defraud" that involves the interstate transmission of signals over a wire); *id.* § 1346 (defining "scheme or artifice to defraud" to include "a scheme or artifice to deprive another of the intangible right of honest services"). On the same day, Caso entered into a plea agreement, admitting that he had intentionally failed to disclose Firm A's payments to his wife and that "[a] reason for this non-disclosure was that [he] knew that his wife's financial relationship with Firm A created a personal conflict of interest." Statement of Offense 3–4 (Dec. 7, 2007) (Appellant's App. 14–15); *see* Plea Agreement 2 (Dec. 7, 2007) (Appellant's App. 19).

On July 30, 2009, Caso was sentenced to three years' probation, including a 170–day term of home confinement. Caso's term of **195 *218 probation ended on August 14, 2012, several months before oral argument on this appeal was heard. *See* Appellant's Br. 9. The expiration of Caso's term of probation does not moot Caso's appeal, however, because his conviction has collateral consequences. *See Carafas v. La Vallee,* 391 U.S. 234, 237–38, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968); *Hamdan v. United States,* 696 F.3d 1238, 1244–45 (D.C.Cir.2012); *United States v. Maddox,* 48 F.3d 555, 560 (D.C.Cir.1995).

Shortly after Caso was sentenced, the Supreme Court handed down *Skilling v. United States,* ––– U.S. ––––, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010), a decision that substantially limited the permissible reach of 18 U.S.C. § 1346, the honest-services fraud statute. Prior to *Skilling,* the government had used that statute to prosecute public officials who failed to disclose conflicts of interest, on the theory that such nondisclosure constituted a "scheme or artifice to deprive another of the intangible right of honest services," 18 U.S.C. § 1346. *See Skilling,* 130 S.Ct. at 2932–33. In *Skilling,* however, the Court interpreted § 1346 more narrowly. In an effort to avoid a "vagueness shoal," *id.* at 2907, the Court held that § 1346 "proscribe[s] bribes and kickbacks—and nothing more." *Id.* at 2932.

After the Supreme Court issued its decision, Caso filed a motion under 28 U.S.C. § 2255 to vacate and set aside his conviction and sentence on the ground that "the conduct

to which he admitted in the statement of the offense—which did not stipulate [his] receipt of a bribe or a kickback— does not constitute an offense under § 1346 following *Skilling.*" Dist. Ct. Op. 4; *see* Def.'s Mot. Vacate 1 (Apr. 25, 2011). The government opposed the motion. It did not dispute that Caso was " 'actually innocent' of the honest services wire fraud upon which his conspiracy conviction was based, as that offense now is defined under *Skilling.*" Opp'n to Def.'s Mot. Vacate 16 (Nov. 3, 2011). [1] But it maintained that Caso had procedurally defaulted his *Skilling* challenge by failing to directly appeal his conviction on the ground that the conduct to which he pled did not constitute an offense. *Id.* at 9–10; *see* Dist. Ct. Op. 6.

The district court agreed with the government. It noted that a defendant is ordinarily required to first "raise the basis of his habeas challenge during trial or on appeal in order to assert that claim on collateral review." Dist. Ct. Op. 6 (citing *United States v. Frady,* 456 U.S. 152, 162, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)). Because Caso had failed to do so, the court held that he had presumptively defaulted his claim for collateral relief. Finally, the court agreed with the government that Caso had failed to satisfy the narrow conditions for excusing such a default that the Supreme Court set out in *Bousley v. United States,* 523 U.S. 614, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998).

In *Bousley,* the Court noted that, "[w]here a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate" one of two conditions: (i) "cause" for the default and "actual prejudice" resulting therefrom, or (ii) that the defendant is "actually innocent." *Id.* at 622, 118 S.Ct. 1604 (citing, inter alia, *Murray v. Carrier,* 477 U.S. 478, 485, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)). To satisfy the second condition, the "petitioner must demonstrate that, " 'in light of all the evidence,' " 'it is more likely than not that no **196 *219 reasonable juror would have convicted him.' " *Id.* at 623, 118 S.Ct. 1604 (quoting *Schlup v. Delo,* 513 U.S. 298, 327–28, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (quoting Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments,* 38 U. CHI. L.REV.. 142, 160 (1970))). In addition, and central to this appeal, the *Bousley* court announced the following rule:

406 U.S.App.D.C. 192

In cases where the Government has forgone *more serious charges* in the course of plea bargaining, petitioner's showing of actual innocence must *also* extend to those charges.

*Id.* at 624, 118 S.Ct. 1604 (emphasis added).

Caso has not attempted to satisfy the first condition for overcoming procedural default; he relies solely on the second. To meet that condition, the district court held that Caso had to demonstrate his "actual innocence" not only of the crime for which he was charged and convicted—conspiracy to commit honest-services wire fraud, in violation of 18 U.S.C. § 371—but also of the separate, uncharged offense of making a "materially false ... statement" to the government, in violation of 18 U.S.C. § 1001. The court held that the government had forgone the false statement charge in the course of bargaining, and that this charge was just as serious as the honest-services conspiracy charge of which Caso had been convicted. Concluding that Caso could not show his actual innocence of the false statement charge in light of the admissions he made in his plea agreement, the court denied his motion to vacate his conviction and sentence.

[1] The question at issue on this appeal is whether, in order to fall within the "actual innocence" condition for excusing procedural default, Caso is required to show his actual innocence of the false statement charge. Because that is a legal question, we review the district court's holding de novo. *United States v. Weaver,* 234 F.3d 42, 46 (D.C.Cir.2000).

II

Caso proffers three arguments for why he should not be required to demonstrate his "actual innocence" of the separate, uncharged offense of making a false statement. In this Part, we set out his first two arguments. We do not, however, need to resolve them. As we discuss, even if Caso is wrong about them, his third argument—which we set out in Part III—is sufficient to require a decision in his favor.

A

Caso's first contention is that *Bousley* does not require him to show his "actual innocence" of making a false statement in violation of 18 U.S.C. § 1001 because he was never charged with that crime. Caso notes that *Bousley* states that a habeas petitioner must show his actual innocence of "more serious *charges* " that the government "has forgone." *Bousley,* 523 U.S. at 624, 118 S.Ct. 1604 (emphasis added). In his view, this refers to charges that were actually presented in an indictment or information.

But *Bousley's* use of the word "charges" is not alone sufficient to establish Caso's position. There is nothing strained about concluding that a prosecutor can forgo "charges" either by dropping them after an indictment *or* by never bringing them at all. Notably, *Bousley* referenced charges forgone by the prosecution "in the course of plea bargaining," *id.,* a process that may either follow or precede the issuance of an indictment (or information).

To support his interpretation, Caso points us to *Bousley's* application of its own rule. Kenneth Bousley had pled guilty to "using" a firearm during a drug **\*\*197 \*220** trafficking crime in violation of 18 U.S.C. § 924(c) (1), a provision that makes it unlawful to use *or carry* a firearm during such a crime. Bousley subsequently filed a 28 U.S.C. § 2255 motion collaterally attacking his conviction. After the Supreme Court narrowed the meaning of "using" to "active employment," *see Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), Bousley contended that his guilty plea was neither knowing nor intelligent because the district court had misinformed him about the nature of the charged offense. The Court held that, although Bousley had procedurally defaulted this claim by failing to raise it on direct appeal, he could overcome that default if he could demonstrate he did not "use" a firearm as the term was defined in *Bailey.* The Court rejected the government's argument that Bousley had to demonstrate he was actually innocent not only of "using" a firearm, but also of "carrying" one. *Bousley,* 523 U.S. at 624, 118 S.Ct. 1604. The Court gave the following reasons:

[P]etitioner's indictment charged him only with 'using' firearms in violation of § 924(c)(1). And there is no record evidence that the Government elected not to charge petitioner with 'carrying' a firearm in exchange for his plea of guilty.

*Id.*

Focusing on the first sentence in the above quotation, Caso maintains that he does not have to demonstrate his innocence of the false statement offense because the government never charged him under § 1001. But the Supreme Court did more than merely look to Bousley's indictment to see what the government charged. In addition, it observed that "there is no record evidence that the Government elected not to charge petitioner with 'carrying' a firearm in exchange for his plea of guilty." *Id.* In Caso's case, by contrast, the government contends (and the district court agreed) that it *does* have "record evidence" that it elected not to charge him with making a false statement in violation of 18 U.S.C. § 1001.

In support of this contention, the government points to an affidavit from its lead prosecutor, averring that the government had indeed contemplated charging Caso with violating § 1001, but had consciously forgone doing so as part of the plea agreement. Gov't Br. 27; *see* Decl. of Howard Sklamberg 2 (Supplemental App. at 84). Caso responds that only evidence created contemporaneously with a charging decision should be considered in determining what charges the government elected not to bring. Considering *post hoc* record evidence "would invite abuse," he argues, because the "government can always point to new or additional charges that its prosecutors could have or would have pursued but for the plea agreement." Appellant's Br. 24, 26.

But there is more than just *post hoc* evidence in this case. As part of the plea agreement, the government agreed that Caso would "not be further prosecuted criminally for the conduct set forth in the attached Statement of Offense." Plea Agreement 1. For his part, Caso agreed that the Statement of Offense "fairly and accurately" described his conduct. *Id.* at 2. Although that statement did not specifically cite 18 U.S.C. § 1001, it did include admissions that were sufficient to establish at least a presumptive violation of that section. In particular, Caso stipulated that he had "intentionally failed to disclose that his wife received payments from Firm A" on his financial disclosure form, "even though he knew that he was required to do so." Statement of Offense 3–4. And he conceded that "[a] reason for this non-disclosure was that [he] knew that his wife's financial relationship with Firm A **198 *221 created a personal conflict of interest." *Id.* at 4. The district court noted that these contemporaneous writings made the prosecutor's affidavit "eminently credible." Dist. Ct. Op. 9.

Nonetheless, the relevant language in *Bousley* is ambiguous. The Court's reference to "record evidence" does not clearly resolve whether *post hoc* affidavits of the kind presented by the government should be considered in determining whether the government considered and then dropped a charge. Nor does the Court's reference to "forgone ... charges" resolve whether the government's decision to forgo a charge must have been expressly made or whether it is sufficient that it be implicit in the conduct the defendant acknowledges in his plea. Because Caso wins this appeal even if we assume that the government agreed to forgo the false statement charge, *see infra* Part III, we need not resolve those questions today.

B

Caso's second argument is that *Bousley's* "actual innocence" requirement does not extend to the § 1001 offense because that offense was not "more serious," *Bousley,* 523 U.S. at 624, 118 S.Ct. 1604, than the § 371 charge. In his view, it was at most "equally serious." The parties dispute the appropriate measure of seriousness, an issue we address in Part III. The government insists that the correct measure is the statutory maximum penalty; Caso contends that the correct measure is the Sentencing Guidelines range. But as Caso notes, even if we were to adopt the government's measure, the § 1001 charge of making a false statement and the § 371 charge of conspiring to commit honest-services wire fraud are equally serious: both have the same statutory maximum penalty of 5 years' imprisonment.[2]

The government argues, and the district court held, that *Bousley* requires a habeas petitioner to show not only that he is actually innocent of the charge to which he pled guilty, but also "of any charges of greater *or equal* seriousness" that the government forwent in exchange for the guilty plea. Gov't Br. 13 (emphasis added); *see* Dist. Ct. Op. 10–12. In response, Caso points to *Bousley's* plain language, which only extends the showing-of-innocence requirement to "*more* serious charges." *Bousley,* 523 U.S. at 624, 118 S.Ct. 1604 (emphasis added).

Once again, the *Bousley* Court's application of its own rule generates ambiguity with respect to the meaning of its language. As we noted above, in *Bousley* the Court looked to the indictment and other record evidence to determine whether the habeas petitioner had to show his actual innocence of "carrying" as well as "using" a firearm. Yet, as the government points out, the "carrying" offense bears the same statutory penalty as the "using" offense for which Bousley was convicted. *See* 18 U.S.C. § 924(c)(1). Likewise, the two offenses are assigned the same base offense level under the Sentencing Guidelines. *See* U.S. SENTENCING GUIDELINES MANUAL § 2K2.4 (2008) ( "U.S.S.G."). Hence, if it were unnecessary to show actual innocence of an "equally serious" charge, the Court's analysis would have been superfluous. The fact that the Court nonetheless undertook that analysis suggests that it intended the actual innocence requirement to extend to "equally serious" charges, notwithstanding that its language mentioned only **199 *222 "more serious" ones. Moreover, as we note below, the likely rationale for the *Bousley* rule supports requiring petitioners to show their innocence of equally serious charges. *See infra* note 6.

The few courts of appeals that have considered this issue appear divided with respect to its resolution.[3] And Caso is surely correct that we should hesitate before adding a condition not included in the express language of the Supreme Court's opinion. *See generally* United States v. Oakar, 111 F.3d 146, 153 (D.C.Cir.1997). Once again, because Caso wins this appeal even if we assume that he must demonstrate his innocence of charges both equal to and more serious than the honest-services conspiracy charge, *see infra* Part III, we do not need to pursue this issue further.

III

Even if we assume that the government did forgo the false statement charge, and even if we assume that a habeas petitioner must show his innocence of a forgone charge that is of either equal or greater seriousness than the charge of conviction, Caso contends that we must nonetheless reverse the district court. That is so, he argues, because the § 1001 charge is of neither equal nor greater seriousness than the § 371 charge to which he pled guilty. Rather, a violation of § 1001 is a *less* serious offense than a violation of § 371. It is less serious, Caso maintains, because its Sentencing Guidelines range is lower and because the Guidelines provide the proper measure of the relative seriousness of offenses.

The government disagrees. It maintains, and the district court held, that seriousness can only be measured by comparing the statutory maximum penalties for each offense. As noted above, by that measure violations of § 1001 and § 371 are equally serious.

In Subpart A, we consider whether the Guidelines or the statutory maxima are the appropriate measure of seriousness under *Bousley.* In Subpart B, we apply our conclusion to the facts of Caso's case.

A

[2] *Bousley* did not tell us which measure of seriousness to employ in determining which offenses are "more serious." Nor did it explain the rationale for requiring habeas petitioners to demonstrate their innocence of "more serious" offenses. Although intuiting the Court's unexpressed rationale is a tricky business, we must attempt to do so because determining which measure of seriousness most closely satisfies that rationale is the best way to decide which measure to apply.

1. The parties appear to believe that the rationale for the "more serious offense" requirement rests on the dynamics of plea bargaining—i.e., that it represents an effort to recreate the bargaining outcome that the parties would have reached absent the invalid charge. It is not clear, however, how the "more serious" requirement meshes with those dynamics. The

406 U.S.App.D.C. 192

government suggests that, in a case in which it has forgone a more serious charge, a showing of innocence regarding that charge is required because it would have demanded a plea to the more serious charge had it known the charge of conviction **\*\*200   \*223** was invalid. That may well be true. But surely the government would have made the same demand if the only other charge had been a less serious one, and yet the 🔖 *Bousley* rule does not encompass such a charge. Moreover, even if the government had demanded a plea to the more serious charge, it is by no means clear that the defendant would have acceded to that demand. It is possible that he would have agreed to plead rather than go to trial, in the hope of receiving leniency from the court. But it is also possible that he would have chosen to take his chances at trial rather than plead to a more serious charge carrying the risk of a higher sentence.[4] In short, the dynamics of plea bargaining are complicated—even more complicated if we factor in offenses of equal severity—and it is not at all clear that the "more serious" rule goes very far toward recreating the bargaining outcome the parties would likely have reached had they known the charge of conviction would be invalidated.[5]

Another, possibly more plausible, rationale relates to the equities of plea bargaining rather than to its dynamics. The Court may have regarded it as fair that, if the uncharged offense is more serious than the offense of conviction, the lesser penalty for the latter should stand unless the defendant can show that he is innocent of both offenses. This ensures, the Seventh Circuit has said, that the defendant does not receive an unjustified "windfall." 🔖 *Lewis,* 329 F.3d at 936.[6] But if the only uncharged offense is less serious than the offense of conviction, it would plainly be unfair to force the defendant to suffer the greater penalty associated with a crime of which he can demonstrate his innocence. Whether or not the defendant is guilty of the less serious uncharged offense, there is no justification for making him bear a greater penalty for a crime that he did not commit. To put the point more sharply: we should not require a person to spend 30 years in prison on an erroneous murder conviction because he was guilty of an uncharged theft offense that would carry a sentence of one year.

2. In the end, it does not matter whether the rationale for the 🔖 *Bousley* rule is rooted in the dynamics of the plea bargaining process or in its equities (or in both). Either rationale leads to the conclusion that the appropriate measure of the seriousness of an offense must be derived from the Sentencing Guidelines rather than the statutory maximum penalty.

There is no doubt that, in deciding whether to plead and what to plead to, defendants rely primarily on their expected Guidelines exposure rather than on the statutory maximum for the offense. *See generally* 🔖 *Peugh v. United States,* —— U.S. ——, 133 S.Ct. 2072, 2085, 186 L.Ed.2d 84 (2013) (plurality opinion) (explaining that a defendant who is contemplating a plea "will be aware that the [Guidelines] range **\*\*201   \*224** is intended to, and usually does, exert controlling influence on the sentence that the court will impose.").[7] The United States Attorneys' Manual makes clear that the government makes the same calculation in deciding the charges upon which it will insist. *See* U.S. ATTORNEYS' MANUAL § 9–27.300(A) (instructing United States Attorneys to charge "the most serious offense that is consistent with the nature of the defendant's conduct," and explaining that "[t]he 'most serious' offense is generally that which yields the highest range under the sentencing guidelines").

**[3]   [4]**   This reliance on the Guidelines is plainly logical. Although the government correctly notes that the Guidelines are no longer binding on district courts, *see* 🔖 *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), the Supreme Court reminded us just this Term that they nonetheless remain the "lodestone of sentencing." 🔖 *Peugh,* 133 S.Ct. at 2084 (majority opinion). "Even after 🔖 *Booker* ..., district courts have in the vast majority of cases imposed either within-Guidelines sentences or sentences that depart downward from the Guidelines on the Government's motion. In less than one-fifth of cases since 2007 have district courts imposed above- or below-Guidelines sentences absent a Government motion." 🔖 *Id.* Nor is this mere happenstance. Guidelines calculations are still "the starting point and the initial benchmark" for every sentencing decision, and "district courts *must* begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."

🔖 *Id.* at 2080, 2083 (quoting 🔖 *Gall v. United States,* 552 U.S. 38, 49, 50 n. 6, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007)); *see* 🔖 *United States v. Turner,* 548 F.3d 1094, 1099–1100 (D.C.Cir.2008).[8] "These requirements mean that '[i]n the usual sentencing, ... the judge will use the Guidelines range as the starting point in the analysis and impose a

AR.06687

sentence within the range.' " *Peugh,* 133 S.Ct. at 2083 (quoting *Freeman v. United States,* —— U.S. ——, 131 S.Ct. 2685, 2692, 180 L.Ed.2d 519 (2011)). Accordingly, in deciding what charge to demand or to accept, the parties must necessarily look to the Guidelines.

Looking to the statutory maxima, by contrast, would provide the parties with little useful information. The statutory ranges are far broader than the Guidelines ranges. *Compare* 18 U.S.C. § 1001 (authorizing a sentence between 0 and 5 years absent special circumstances), *with* U.S.S.G. § 2B1.1 (generating Guidelines ranges as narrow as six months). And courts rarely sentence defendants to the statutory maxima. *See* U.S. SENTENCING COMM'N, SPSS DATAFILE FOR FISCAL YEAR 2012, *available at* http://www.ussc. gov/ **202 *225 Research_and_Statistics/Datafiles/index.cfm (data set indicating that approximately 1% of offenders sentenced in fiscal year 2012 received the applicable statutory maximum).

As we discuss below, Caso's Sentencing Guidelines range for both the § 1001 and the § 371 offense are well below the statutory maximum for each offense. Hence, if the rationale of the *Bousley* rule is to recreate the bargaining outcome that the parties would likely have reached absent an invalid charge, we must appraise any forgone charges just as the parties would have—by reference to the Guidelines.

An equity rationale likewise requires resort to the Guidelines. On that rationale, a defendant should not be absolved of his conviction and sentence if he cannot show he is innocent of an uncharged crime that carries an even longer sentence. At the same time, a defendant should not be required to serve a longer sentence associated with a crime he did not commit, just because he cannot demonstrate his innocence of another crime that would have yielded a shorter sentence. Once again, knowing the statutory maxima is largely irrelevant to this analysis. The operative question is how severe a sentence the forgone charge would likely have yielded. Only the Guidelines can generate a reasonable answer to that question.

The sole argument the government makes for using statutory maxima as the measure of seriousness for *Bousley* purposes is that the maxima reflect Congress' judgment regarding the relative seriousness of offenses. It is not even clear that this is correct as a matter of congressional

understanding, as it was Congress that authorized the Sentencing Guidelines and mandated that district courts consider them in imposing sentences. *See* 28 U.S.C. § 994; 18 U.S.C. § 3553(a)(4). [9] But even if the statutory maxima do suggest Congress' view of the relative seriousness of offenses, a focus on *Congress′* perception responds to neither of the possible rationales for the *Bousley* rule: it is irrelevant both to the dynamics of plea bargaining and to its equities. And the government proffers no reason why the *Bousley* Court would have wanted congressional perceptions to govern a defendant's right to have his habeas claim heard if he was convicted of a crime of which he is actually innocent.

In sum, we conclude that the appropriate measure of the relative seriousness of offenses for purposes of the *Bousley* rule must be derived from the Sentencing Guidelines rather than the statutory maxima. *Accord* *United States v. Halter,* 217 F.3d 551, 553 (8th Cir.2000); *United States v. Lloyd,* 188 F.3d 184, 189 n. 13 (3d Cir.1999).

B

[5] Caso was sentenced for conspiracy to commit honest-services wire fraud, an offense with a Guidelines base offense level of 14. Pre–Sentence Report (PSR) ¶ 32; *see* U.S.S.G. § 2C1.1(a)(1) (2008); *id.* § 2X1.1(a). Because the value of the payments his wife received was more than $10,000 but less than $30,000, the base offense level was enhanced by four levels to 18. PSR ¶ 33; *see* U.S.S.G. §§ 2C1.1(b) (2), 2B1.1(b)(1)(C). After a reduction for acceptance of responsibility, Caso's total offense level was 15. PSR ¶¶ 39, 40; *see* U.S.S.G. § 3E1.1(b). For a defendant like Caso, who had no prior criminal history, that total offense level **203 *226 corresponded to a Guidelines range of 18–24 months. PSR ¶ 82; U.S.S.G. ch. 5, pt. A. [10]

By contrast, the offense of making a false statement under 18 U.S.C. § 1001 corresponds to a base offense level of 6. *See* U.S.S.G. § 2B1.1(a)(2). Under the circumstances of this case, there appear to be no relevant enhancements. *See id.* § 2B1.1(b). With the appropriate reduction for acceptance

of responsibility, the total offense level would have been 4. *See id.* § 3E1.1(a). [11] Because Caso had no prior criminal history, his Guidelines range would have been the lowest range possible, 0–6 months, *see id.* ch. 5, pt. A, well short of the 18–24 months range for a violation of § 371. On this basis, the false statement offense was the less serious offense for *Bousley* purposes. [12]

One of the government's arguments against using the Guidelines rather than the statutory maxima as the measure of seriousness is that several Guidelines factors do not relate to the seriousness of the statutory offense, but rather to the circumstances of the particular case. In this case, the enhancement for the value of the payments Caso's wife received is such a factor. In addition, there are other factors that relate to the characteristics of the defendant rather than to those of the offense: here, for example, Caso's acceptance of responsibility and his criminal history. Although we take the government's point, a good argument can be made that all of these factors are relevant to evaluating relative seriousness. All are part of the determination of the defendant's final Guidelines range and hence of his likely sentence, and both possible rationales for the *Bousley* rule depend upon knowing what the defendant's actual sentence likely would be —not what some average or typical sentence might be for the mine run of those who commit the same statutory offense. [13]

But even if we were to consider the Guidelines shorn of any factors particular to the defendant or his conduct, we would reach the same result in this case. The base offense level for all public officials who conspire to commit honest-services fraud is 14; the base offense level for all those who make a false statement is 6. On this measure, the former remains the more serious charge. [14] The same is true if one looks to the resulting Sentencing Guidelines ranges for *any* criminal history category. *See* U.S.S.G. ch. 5, pt. A.

In a footnote, the government contends that, even if we do consider the Guidelines **204 *227 in measuring the seriousness of an offense, our " inquiry should not be limited solely to the applicable guideline range, but to the *actual* penalty prospectively assessed this defendant." Gov't Br. 35 n. 17 (internal quotation marks omitted). In this regard, the government reminds us that Caso was not sentenced to 18–24 months on his § 371 charge. Instead, because the government

filed a section 5K1.1 departure motion advising the court that Caso had provided substantial assistance to its investigation, Caso was sentenced to three years of probation, including 170 days of home confinement. *See* U.S.S.G. § 5B1.1(a)(1). But that suggests that Caso would have received an even lower sentence—most likely, probation *without* confinement —had he instead pled to the false statement charge, since the Guidelines authorize a sentence of probation for such a charge even *before* taking into account a defendant's cooperation. *See id.* §§ 2B1.1(a)(2); 5B1.1(a)(1).

In sum, by any relevant measure, the government did not forgo a more serious charge when it charged Caso with conspiring to commit honest-services wire fraud.

## IV

[6] Under the rule enunciated in *Bousley,* a defendant who has procedurally defaulted a claim by failing to raise it on direct review may raise it in habeas if he can demonstrate that he is actually innocent both of the charge for which he was convicted and of "more serious" charges that the government forwent in the course of plea bargaining. *Bousley,* 523 U.S. at 624, 118 S.Ct. 1604. [15] If no "more serious" charges were waiting in the wings, the defendant need only demonstrate his actual innocence of the charge of conviction.

We hold today that the appropriate measure of "seriousness" for purposes of this rule must be determined by reference to the United States Sentencing Guidelines. This approach reflects the continued relevance of the Guidelines in charging decisions, plea bargaining, and sentencing, and best aligns with any plausible rationale for the *Bousley* rule. Because Russell Caso is actually innocent of his offense of conviction, and because the government did not forgo any more serious charge in the course of plea bargaining, the judgment of the district court is

*Reversed.*

## All Citations

723 F.3d 215, 406 U.S.App.D.C. 192

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 194 of 912

# Footnotes

1    *See* Dist. Ct. Op. 6 ("The defendant and the government both agree that the defendant is actually innocent of the crime of honest services wire fraud as defined post- *Skilling,* since the admitted-to conduct did not include a bribe or a kickback.").

2    The offense of honest-services wire fraud itself, 18 U.S.C. §§ 1343, 1346, is more serious than the false statement offense by any measure because it has a statutory maximum penalty of 20 years. Caso was charged only with conspiracy to commit such fraud under 18 U.S.C. § 371, which has a 5–year maximum.

3    *Compare* Lewis v. Peterson, 329 F.3d 934, 937 (7th Cir.2003) ( "The logic of the *Bousley* opinion does not require that the charge that was dropped or forgone ... be more serious than the charge to which the petitioner pleaded guilty. It is enough that it is as serious."), *with* United States v. Johnson, 260 F.3d 919, 921 (8th Cir.2001) (implying that one charge must be "more serious" than the other).

4    There is similar uncertainty regarding the scenario in which the remaining charge carries a lower sentence. It is possible that a defendant who agreed to plead to a more serious charge would have pled to a less serious charge if he had known that the offense of conviction was invalid. But it is also possible that, with his exposure limited to a lower sentence, the defendant would have preferred to take his chances at trial.

5    *See generally* Stephanos Bibas, *Plea Bargaining Outside the Shadow of Trial,* 117 HARV. L.REV.. 2463, 2464–67 (2004) (noting that a host of structural distortions, including imperfect heuristics, psychological biases, lawyering problems, information deficits, and risk preferences all affect plea bargaining decisions).

6    Similar considerations may suggest that the equity rationale's logic extends to an equal as well as more serious charge. As noted in Part II.B, however, there are contrary considerations. We do not need to resolve the question to resolve Caso's case.

7    Indeed, our cases have made clear that a defense counsel's conduct may be constitutionally deficient if counsel fails to advise his client of the correct Guidelines range he would face upon taking a plea. *See* United States v. Hanson, 339 F.3d 983, 990 (D.C.Cir.2003); United States v. Booze, 293 F.3d 516, 518 (D.C.Cir.2002); United States v. McCoy, 215 F.3d 102, 108 (D.C.Cir.2000); United States v. Gaviria, 116 F.3d 1498, 1512 (D.C.Cir.1997); *cf.* U.S.S.G. § 6B1.2 cmt. ("The Commission encourages the prosecuting attorney prior to the entry of a plea of guilty ... to disclose to the defendant the facts and circumstances ... that are relevant to the application of the sentencing guidelines.").

8    Moreover, a district court's "[f]ailure to calculate the correct Guidelines range constitutes procedural error." *Peugh,* 133 S.Ct. at 2080. And courts of appeals may—and this Circuit does—"presume that a within-Guidelines sentence is reasonable." *Id.* (citing Rita v. United States, 551 U.S. 338, 347, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007)); *see* United States v. Watson, 476 F.3d 1020, 1023 (D.C.Cir.2007); United States v. Dorcely, 454 F.3d 366, 376 (D.C.Cir.2006).

9    *See also* U.S.S.G. § 1A1.3, at 2–3 ("Congress sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity.").

10   *See* Dist. Ct.'s Statement of Reasons 1 (Aug. 13, 2009) (adopting the above calculations); Gov't Sent'g Mem. 3 (July 27, 2009) (recommending the above calculations but urging the court to apply an additional enhancement that would have increased the total offense level by 4 levels to 19).

11   *See also* U.S.S.G. § 3E1.1(b) (limiting the reduction for acceptance of responsibility to 2 levels unless the offense level prior to the reduction is 16 or greater).

12   *See* Appellant's Br. 38 & n. 8. The government neither challenges nor addresses Caso's calculation of what his Guidelines range would have been for making a false statement.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

406 U.S.App.D.C. 192

13    *Cf.* 🚩 *Lloyd,* 188 F.3d at 189 n. 13 ("[I]t is the *actual* penalty prospectively assessed this defendant for each Count—determined in accordance with the refining criteria of the United States Sentencing Guidelines and set forth in the government's Presentencing Report—that is relevant to our comparison of the seriousness of the respective charges at the time of the plea bargain.").

14    *Cf.* 📄 *Halter,* 217 F.3d at 554 ("[T]he Guidelines themselves specifically refer to the 'most serious' count as being the one with the higher offense level. We choose to adopt this understanding of the phrase 'more serious' for the purpose of applying 📄 *Bousley.*") (citing 📄 U.S.S.G. § 3D1.3(a) (1998)).

15    As noted in Part I, a defendant may also raise a procedurally defaulted claim if he can demonstrate "cause" for the default and "actual prejudice" resulting therefrom. 📄 *Bousley,* 523 U.S. at 622, 118 S.Ct. 1604.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

134 S.Ct. 1405, 188 L.Ed.2d 426, 82 USLW 4207, 14 Cal. Daily Op. Serv. 3246...

KeyCite Yellow Flag - Negative Treatment

Disagreement Recognized by United States v. Love, D.Kan., September 18, 2017

134 S.Ct. 1405
Supreme Court of the United States

UNITED STATES, petitioner

v.

James Alvin CASTLEMAN.

No. 12–1371.
|
Argued Jan. 15, 2014.
|
Decided March 26, 2014.

**Synopsis**

**Background:** Defendant moved to dismiss indictment charging him with possession of a firearm after being convicted of a misdemeanor crime of domestic violence. The United States District Court for the Western District of Tennessee, Jon Phipps McCalla, Chief Judge, granted the motion. Government appealed. The United States Court of Appeals for the Sixth Circuit, Clay, Circuit Judge, 695 F.3d 582, affirmed. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Sotomayor, held that:

[1] common-law meaning of force applied to meaning of "force" in definition of "misdemeanor crime of domestic violence," abrogating United States v. Belless, 338 F.3d 1063, and

[2] defendant's state-law conviction qualified as a "misdemeanor crime of domestic violence."

Reversed and remanded.

Justice Scalia filed an opinion concurring in part and concurring in judgment.

Justice Alito filed an opinion concurring in judgment in which Justice Thomas joined.

**Procedural Posture(s):** On Appeal.

West Headnotes (6)

[1]     **Weapons**      **Domestic violence**

Common-law meaning of force, namely, offensive touching, applied to the meaning of "force" in the definition of "misdemeanor crime of domestic violence" under statute forbidding the possession of firearms by anyone convicted of such a crime, and therefore the definition's requirement of "physical force" was satisfied by the degree of force that

U.S. v. Castleman, 572 U.S. 157 (2014)

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 197 of 912

134 S.Ct. 1405, 188 L.Ed.2d 426, 82 USLW 4207, 14 Cal. Daily Op. Serv. 3246...

supported a common-law battery conviction; abrogating *United States v. Belless,* 338 F.3d 1063. 18 U.S.C.A. §§ 921(a)(33)(A), 922(g)(9).

416 Cases that cite this headnote

**[2]    Statutes    Statutory terms with common law meanings**

Absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses.

15 Cases that cite this headnote

**[3]    Weapons    Domestic violence**

Defendant's conviction under Tennessee law for having intentionally or knowingly caused bodily injury to the mother of his child qualified as a "misdemeanor crime of domestic violence," under federal statute forbidding the possession of firearms by anyone convicted of such a crime. 18 U.S.C.A. §§ 921(a)(33)(A), 922(g)(9); West's T.C.A. §§ 39–13–101, 39–13–111(b).

147 Cases that cite this headnote

**[4]    Assault and Battery    Particular Acts or Conduct**

The force used in a common-law battery need not be applied directly to the body of the victim; a battery may be committed by administering a poison or by infecting with a disease, or even by resort to some intangible substance, such as a laser beam.

28 Cases that cite this headnote

**[5]    Weapons    Domestic violence**

The knowing or intentional application of force is a "use" of force under definition of "misdemeanor crime of domestic violence" in statute forbidding the possession of firearms by anyone convicted of such a crime. 18 U.S.C.A. §§ 921(a)(33)(A), 922(g)(9).

451 Cases that cite this headnote

**[6]    Criminal Law    Liberal or strict construction;  rule of lenity**

A court's construction of a criminal statute must be guided by the need for fair warning; but the rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the court must simply guess as to what Congress intended.

26 Cases that cite this headnote

**1406  *Syllabus* [*]**

**U.S. v. Castleman, 572 U.S. 157 (2014)**

Case 3:20-cv-07721-SI     Document 58-6     Filed 11/10/20     Page 198 of 912

134 S.Ct. 1405, 188 L.Ed.2d 426, 82 USLW 4207, 14 Cal. Daily Op. Serv. 3246...

Respondent Castleman moved to dismiss his indictment under 🚩 18 U.S.C. § 922(g)(9), which forbids the possession of firearms by anyone convicted of a "misdemeanor crime of domestic violence." He argued that his previous conviction for "intentionally or knowingly caus[ing] bodily **\*\*1407** injury to" the mother of his child, App. 27, did not qualify as a "misdemeanor crime of domestic violence" because it did not involve "the use or attempted use of physical force," 18 U.S.C. § 921(a)(33)(A)(ii). The District Court agreed, reasoning that "physical force" must entail violent contact and that one can cause bodily injury without violent contact, *e.g.,* by poisoning. The Sixth Circuit affirmed on a different rationale. It held that the degree of physical force required for a conviction to constitute a "misdemeanor crime of domestic violence" is the same as that required for a "violent felony" under the Armed Career Criminal Act (ACCA), § 924(e)(2)(B)(i)—namely, violent force—and that Castleman could have been convicted for causing slight injury by nonviolent conduct.

*Held* : Castleman's conviction qualifies as a "misdemeanor crime of domestic violence." Pp. 1409 – 1416.

(a) 🚩 Section 922(g)(9)'s "physical force" requirement is satisfied by the degree of force that supports a common-law battery conviction—namely, offensive touching. Congress presumably intends to incorporate the common-law meaning of terms that it uses, and nothing here suggests Congress intended otherwise here. The Sixth Circuit relied upon *Johnson v. United States,* 559 U.S. 133, 130 S.Ct. 1265, 176 L.Ed.2d 1, in which the common-law meaning of "force" was found to be a "comical misfit," *id.,* at 145, 130 S.Ct. 1265, when read into ACCA's "violent felony" definition. But *Johnson* resolves this case in the Government's favor: The very reasons for rejecting the common-law meaning in *Johnson* are reasons to embrace it here. First, whereas it was "unlikely" that Congress meant to incorporate in ACCA's "violent felony" definition "a phrase that the common law gave peculiar meaning only in its definition of a misdemeanor," *id.,* at 141, 130 S.Ct. 1265, it is likely that Congress meant to incorporate the misdemeanor-specific meaning of "force" in defining a "misdemeanor crime of domestic violence." Second, whereas the word "violent" or "violence" standing alone "connotes a substantial degree of force," *id.,* at 140, 130 S.Ct. 1265, that is not true of "domestic violence," which is a term of art encompassing acts that one might not characterize as "violent" in a nondomestic context. Third, whereas this Court has hesitated to apply ACCA to "crimes which, though dangerous, are not typically committed by those whom one normally labels 'armed career criminals,' " *Begay v. United States,* 553 U.S. 137, 146, 128 S.Ct. 1581, 170 L.Ed.2d 490, there is no anomaly in grouping domestic abusers convicted of generic assault or battery offenses together with others whom 🚩 § 922(g) disqualifies from gun ownership. In addition, a contrary reading would have made 🚩 § 922(g)(9) inoperative in at least ten States when it was enacted. Pp. 1409 – 1413.

(b) Under this definition of "physical force," Castleman's conviction qualifies as a "misdemeanor crime of domestic violence." The application of the modified categorical approach—consulting Castleman's state indictment to determine whether his conviction entailed the elements necessary to constitute the generic federal offense—is straightforward. Castleman pleaded guilty to "intentionally or knowingly caus[ing] bodily injury to" the mother of his child, and the knowing or intentional causation of bodily injury necessarily involves the use of physical force. First, a "bodily injury" must result from "physical force." The common-law concept of "force" encompasses even its indirect application, making it impossible to cause bodily injury without applying force in the common-law sense. Second, the knowing or intentional application of force is a "use" of force. 🏳️ **\*\*1408** *Leocal v. Ashcroft,* 543 U.S. 1, 125 S.Ct. 377, 160 L.Ed.2d 271, distinguished. Pp. 1413 – 1415.

(c) Castleman claims that legislative history, the rule of lenity, and the canon of constitutional avoidance weigh against this Court's interpretation of 🚩 § 922(g)(9), but his arguments are unpersuasive. Pp. 1415 – 1416.

🚩 695 F.3d 582, reversed and remanded.

U.S. v. Castleman, 572 U.S. 157 (2014)
134 S.Ct. 1405, 188 L.Ed.2d 426, 82 USLW 4207, 14 Cal. Daily Op. Serv. 3246...

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C.J., and KENNEDY, GINSBURG, BREYER, and KAGAN, JJ., joined. SCALIA, J., filed an opinion concurring in part and concurring in the judgment. ALITO, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined.

**Attorneys and Law Firms**

Melissa Arbus Sherry, Washington, DC, for Petitioner.

Charles A. Rothfeld, Washington, DC, for Respondent.

Steven L. West, West & West Attorneys, Huntingdon, TN, Eugene R. Fidell, New Haven, CT, Charles A. Rothfeld, Counsel of Record, Andrew J. Pincus, Paul W. Hughes, Michael B. Kimberly, Mayer Brown LLP, Washington, DC, for Respondent.

Donald B. Verrilli, Jr., Solicitor General, Mythili Raman, Acting Assistant Attorney General, Michael R. Dreeben, Deputy Solicitor General, Melissa Arbus Sherry, Assistant to the Solicitor General, Counsel of Record, Joseph C. Wyderko, Washington, DC, for Petitioner.

**Opinion**

Justice SOTOMAYOR delivered the opinion of the Court.

**\*159** Recognizing that "[f]irearms and domestic strife are a potentially deadly combination," *United States v. Hayes,* 555 U.S. 415, 427, 129 S.Ct. 1079, 172 L.Ed.2d 816 (2009), Congress forbade the possession of firearms by anyone convicted of "a misdemeanor crime of domestic violence." 18 U.S.C. § 922(g)(9). The respondent, James Alvin Castleman, pleaded guilty to the misdemeanor offense of having "intentionally or knowingly cause[d] bodily injury to" the mother of his child. App. 27. The question before us is whether this conviction qualifies as "a misdemeanor crime of domestic violence." We hold that it does.

I

A

This country witnesses more than a million acts of domestic violence, and hundreds of deaths from domestic violence, **\*160** each year.[1] See *Georgia v. Randolph,* 547 U.S. 103, 117–118, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006). Domestic violence often escalates in severity over time, see Brief for Major Cities Chiefs Association et al. as *Amici Curiae* 13–15; Brief for National Network to End Domestic Violence et al. as *Amici Curiae* 9–12, and the presence of a firearm increases the likelihood that it will escalate to homicide, see *id.,* at 14–15; Campbell et al., Assessing **\*\*1409** Risk Factors for Intimate Partner Homicide, DOJ, Nat. Institute of Justice J., No. 250, p. 16 (Nov. 2003) ("When a gun was in the house, an abused woman was 6 times more likely than other abused women to be killed"). "[A]ll too often," as one Senator noted during the debate over § 922(g)(9), "the only difference between a battered woman and a dead woman is the presence of a gun." 142 Cong. Rec. 22986 (1996) (statement of Sen. Wellstone).

Congress enacted § 922(g)(9), in light of these sobering facts, to " 'close [a] dangerous loophole' " in the gun control laws: While felons had long been barred from possessing guns, many perpetrators of domestic violence are convicted only of misdemeanors. *Hayes, 555 U.S., at 418, 426, 129 S.Ct. 1079.* Section 922(g)(9) provides, as relevant, that any person "who has been convicted ... of a misdemeanor crime of domestic violence" may not "possess in or affecting commerc[e] any

134 S.Ct. 1405, 188 L.Ed.2d 426, 82 USLW 4207, 14 Cal. Daily Op. Serv. 3246...

firearm or ammunition." With exceptions that do not apply here, the statute defines a "misdemeanor crime of domestic violence" as

**\*161** "an offense that ... (i) is a misdemeanor under Federal, State, or Tribal law; and (ii) has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim." § 921(a)(33)(A).

This case concerns the meaning of one phrase in this definition: "the use ... of physical force."

B

In 2001, Castleman was charged in a Tennessee court with having "intentionally or knowingly cause[d] bodily injury to" the mother of his child, in violation of Tenn.Code Ann. § 39–13–111(b) (Supp.2002). App. 27. He pleaded guilty. *Id.,* at 29.

In 2008, federal authorities learned that Castleman was selling firearms on the black market. A grand jury in the Western District of Tennessee indicted him on two counts of violating § 922(g)(9) and on other charges not relevant here. *Id.,* at 13–16.

Castleman moved to dismiss the § 922(g)(9) charges, arguing that his Tennessee conviction did not qualify as a "misdemeanor crime of domestic violence" because it did not "ha[ve], as an element, the use ... of physical force," § 921(a)(33)(A)(ii). The District Court agreed, on the theory that "the 'use of physical force' for § 922(g)(9) purposes" must entail "violent contact with the victim." App. to Pet. for Cert. 40a. The court held that a conviction under the relevant Tennessee statute cannot qualify as a "misdemeanor crime of domestic violence" because one can cause bodily injury without "violent contact"—for example, by "deceiving **\*162** [the victim] into drinking a poisoned beverage." *Id.,* at 41a.

A divided panel of the U.S. Court of Appeals for the Sixth Circuit affirmed, by different reasoning. 695 F.3d 582 (2012). The majority held that the degree of physical force required by § 921(a)(33)(A)(ii) is the same as required by § 924(e)(2)(B)(i), which defines "violent felony." *Id.,* at 587. Applying our decision in *Johnson v. United States,* 559 U.S. 133, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010), which held that § 924(e)(2)(B)(i) requires "*violent* force," *id.,* at 140, 130 S.Ct. 1265, the majority held that Castleman's conviction did not qualify as a "misdemeanor crime of domestic violence" because Castleman could have been convicted for "caus[ing] a slight, nonserious **\*\*1410** physical injury with conduct that cannot be described as violent." 695 F.3d, at 590. Judge MCKEAGUE dissented, arguing both that the majority erred in extending *Johnson* 's definition of a "violent felony" to the context of a "misdemeanor crime of domestic violence" and that, in any event, Castleman's conviction satisfied the *Johnson* standard. *Id.,* at 593–597.

The Sixth Circuit's decision deepened a split of authority among the Courts of Appeals. Compare, *e.g., United States v. Nason,* 269 F.3d 10, 18 (C.A.1 2001) (§ 922(g)(9) "encompass[es] crimes characterized by the application of *any* physical force"), with *United States v. Belless,* 338 F.3d 1063, 1068 (C.A.9 2003) (§ 922(g)(9) covers only "the violent use of force"). We granted certiorari to resolve this split, 570 U.S. ——, 134 S.Ct. 49, 186 L.Ed.2d 962 (2013), and now reverse the Sixth Circuit's judgment.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

U.S. v. Castleman, 572 U.S. 157 (2014)

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 201 of 912

134 S.Ct. 1405, 188 L.Ed.2d 426, 82 USLW 4207, 14 Cal. Daily Op. Serv. 3246...

II

A

**[1]**    **[2]**    "It is a settled principle of interpretation that, absent other indication, 'Congress intends to incorporate the well-settled meaning of the common-law terms it uses.' " *Sekhar v. United States,* 570 U.S. ——, ——, 133 S.Ct. 2720, 2724, 186 L.Ed.2d 794 (2013). Seeing no "other indication" here, we hold that Congress incorporated the common-law meaning of "force"—namely, offensive touching **\*163**—in § 921(a)(33)(A)'s definition of a "misdemeanor crime of domestic violence."

*Johnson* resolves this case in the Government's favor—not, as the Sixth Circuit held, in Castleman's. In *Johnson,* we considered whether a battery conviction was a "violent felony" under the Armed Career Criminal Act (ACCA), § 924(e)(1). As here, ACCA defines such a crime as one that "has as an element the use ... of physical force," § 924(e)(2)(B)(i). We began by observing that at common law, the element of force in the crime of battery was "satisfied by even the slightest offensive touching." 559 U.S., at 139, 130 S.Ct. 1265 (citing 3 W. Blackstone, Commentaries on the Laws of England 120 (1768)). [2] And we recognized the general rule that "a common-law term of art should be given its established common-law meaning," except "where that meaning does not fit." 559 U.S., at 139, 130 S.Ct. 1265. We declined to read the common-law meaning of "force" into ACCA's definition of a "violent felony," because we found it a "comical misfit with the defined term." *Id.,* at 145, 130 S.Ct. 1265; see *United States v. Stevens,* 559 U.S. 460, 474, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) ("[A]n unclear definitional phrase may take meaning from the term to be defined"). In defining a " '*violent* felony,' " we held, "the phrase 'physical force' " must "mea[n] *violent* force." *Johnson,* 559 U.S., at 140, 130 S.Ct. 1265. But here, the common-law meaning of "force" fits perfectly: The very reasons we gave for rejecting that meaning in defining a "violent felony" are reasons to embrace it in defining a "misdemeanor crime of domestic violence." [3]

**\*\*1411**    **\*164**    First, because perpetrators of domestic violence are " routinely prosecuted under generally applicable assault or battery laws," *Hayes,* 555 U.S., at 427, 129 S.Ct. 1079, it makes sense for Congress to have classified as a "misdemeanor crime of domestic violence" the type of conduct that supports a common-law battery conviction. Whereas it was "unlikely" that Congress meant to incorporate in the definition of a " 'violent felony' a phrase that the common law gave peculiar meaning only in its definition of a misdemeanor," *Johnson,* 559 U.S., at 141, 130 S.Ct. 1265, it is likely that Congress meant to incorporate that misdemeanor-specific meaning of "force" in defining a "misdemeanor crime of domestic violence."

Second, whereas the word "violent" or "violence" standing alone "connotes a substantial degree of force," *id.,* at 140, 130 S.Ct. 1265, [4]    **\*165**    THAT IS NOT TRUE OF "DOMESTIC VIOLENCE." "DOMESTIC Violence" is not merely a type of "violence"; it is a term of art encompassing acts that one might not characterize as "violent" in a nondomestic context. See Brief for National Network to End Domestic Violence et al. as *Amici Curiae* 4–9; DOJ, Office on Violence Against Women, Domestic Violence (defining physical forms of domestic violence to include "[h]itting, slapping, shoving, grabbing, pinching, biting, [and] hair pulling"), online at http://www.ovw.usdoj.gov/domviolence.htm. [5] Indeed, "most physical **\*\*1412** assaults committed against women and men by intimates are relatively minor and consist of pushing, grabbing, shoving, slapping, and hitting." DOJ, P. Tjaden & N. Thoennes, Extent, Nature and Consequences of Intimate Partner Violence 11 (2000).

Minor uses of force may not constitute "violence" in the generic sense. For example, in an opinion that we cited with approval in *Johnson,* the Seventh Circuit noted that it **\*166** was "hard to describe ... as 'violence' " "a squeeze of the arm [that] causes a bruise." *Flores v. Ashcroft,* 350 F.3d 666, 670 (2003). But an act of this nature is easy to describe as "domestic violence,"

134 S.Ct. 1405, 188 L.Ed.2d 426, 82 USLW 4207, 14 Cal. Daily Op. Serv. 3246...

when the accumulation of such acts over time can subject one intimate partner to the other's control. If a seemingly minor act like this draws the attention of authorities and leads to a successful prosecution for a misdemeanor offense, it does not offend common sense or the English language to characterize the resulting conviction as a "misdemeanor crime of domestic violence."

Justice SCALIA'S concurrence discounts our reference to social-science definitions of "domestic violence," including those used by the organizations most directly engaged with the problem and thus most aware of its dimensions. See *post,* at 1420 – 1422. It is important to keep in mind, however, that the operative phrase we are construing is not "domestic violence"; it is "physical force." § 921(a)(33)(A). "Physical force" has a presumptive common-law meaning, and the question is simply whether that presumptive meaning makes sense in defining a "misdemeanor crime of domestic violence." [6]

A third reason for distinguishing *Johnson* 's definition of "physical force" is that unlike in *Johnson*—where a determination that the defendant's crime was a "violent felony" would have classified him as an "armed career criminal"— the statute here groups those convicted of "misdemeanor crimes of domestic violence" with others whose conduct does not warrant such a designation. Section 922(g) bars gun possession by anyone "addicted to any controlled substance," § 922(g)(3); **167** by most people who have "been admitted to the United States under a nonimmigrant visa," § 922(g)(5)(B); by anyone who has renounced United States citizenship, § 922(g)(7); and by anyone subject to a domestic restraining order, § 922(g)(8). Whereas we have hesitated (as in *Johnson* ) to apply the Armed Career Criminal Act to "crimes which, though dangerous, are not typically committed by those whom one normally labels 'armed career criminals,' " *Begay v. United States,* 553 U.S. 137, 146, 128 S.Ct. 1581, 170 L.Ed.2d 490 (2008), we see no anomaly in grouping domestic abusers convicted of generic assault or battery offenses together with the others whom § 922(g) disqualifies from gun ownership.

**\*\*1413** An additional reason to read the statute as we do is that a contrary reading would have rendered § 922(g)(9) inoperative in many States at the time of its enactment. The "assault or battery laws" under which "domestic abusers were ... routinely prosecuted" when Congress enacted § 922(g)(9), and under which many are still prosecuted today, *Hayes,* 555 U.S., at 427, 129 S.Ct. 1079, fall generally into two categories: those that prohibit both offensive touching and the causation of bodily injury, and those that prohibit only the latter. See Brief for United States 36–38. Whether or not the causation of bodily injury necessarily entails violent force—a question we do not reach—mere offensive touching does not. See *Johnson,* 559 U.S., at 139–140, 130 S.Ct. 1265. So if offensive touching did not constitute "force" under § 921(a)(33)(A), then § 922(g)(9) would have been ineffectual in at least 10 States—home to nearly thirty percent of the Nation's population [7]—at the time of its enactment. See *post,* at 1419, and n. 5 (SCALIA, J., concurring in part and concurring in judgment) (acknowledging that § 922(g)(9) would have been inapplicable in California and nine other States if it did not encompass offensive touching); App. to Brief for United States 10a–16a (listing statutes **\*168** prohibiting both offensive touching and the causation of bodily injury, only some of which are divisible); cf. *Hayes,* 555 U.S., at 427, 129 S.Ct. 1079 (rejecting an interpretation under which " § 922(g)(9) would have been 'a dead letter' in some two-thirds of the States from the very moment of its enactment").

In sum, *Johnson* requires that we attribute the common-law meaning of "force" to § 921(a)(33)(A)'s definition of a "misdemeanor crime of domestic violence" as an offense that "has, as an element, the use or attempted use of physical force." We therefore hold that the requirement of "physical force" is satisfied, for purposes of § 922(g)(9), by the degree of force that supports a common-law battery conviction.

134 S.Ct. 1405, 188 L.Ed.2d 426, 82 USLW 4207, 14 Cal. Daily Op. Serv. 3246...

B

[3]   Applying this definition of "physical force," we conclude that Castleman's conviction qualifies as a "misdemeanor crime of domestic violence." In doing so, we follow the analytic approach of *Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), and *Shepard v. United States,* 544 U.S. 13, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005). We begin with *Taylor's* categorical approach, under which we look to the statute of Castleman's conviction to determine whether that conviction necessarily "ha[d], as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon," § 921(a)(33)(A).

The Tennessee statute under which Castleman was convicted made it a crime to "commi[t] an assault ... against" a "family or household member"—in Castleman's case, the mother of his child. Tenn.Code Ann. § 39–13–111(b). A provision incorporated by reference, § 39–13–101, defined three types of assault: "(1) [i]ntentionally, knowingly or recklessly caus[ing] bodily injury to another; (2) [i]ntentionally or knowingly caus[ing] another to reasonably fear imminent bodily injury; or (3) [i]ntentionally or knowingly caus[ing] physical contact with another" in a manner that a "reasonable person would regard ... as extremely offensive or provocative." § 39–13–101(a).

*169   It does not appear that every type of assault defined by § 39–13–101 necessarily **1414 involves "the use or attempted use of physical force, or the threatened use of a deadly weapon," § 921(a)(33)(A). A threat under § 39–13–101(2) may not necessarily involve a deadly weapon, and the merely reckless causation of bodily injury under § 39–13–101(1) may not be a "use" of force. [8]

But we need not decide whether a domestic assault conviction in Tennessee categorically constitutes a "misdemeanor crime of domestic violence," because the parties do not contest that § 39–13–101 is a " ' divisible statute,' " *Descamps v. United States,* 570 U.S. ——, ——, 133 S.Ct. 2276, 2281, 186 L.Ed.2d 438 (2013). We may accordingly apply the modified categorical approach, consulting the indictment to which Castleman pleaded guilty in order to determine whether his conviction did entail the elements necessary to constitute the generic federal offense. *Id.,* at ——, 133 S.Ct., at 2281–2282; see *Shepard,* 544 U.S., at 26, 125 S.Ct. 1254. Here, that analysis is straightforward: Castleman pleaded guilty to having "intentionally or knowingly cause[d] bodily injury" to the mother of his child, App. 27, and the knowing or intentional causation of bodily injury necessarily involves the use of physical force.

*170   First, a "bodily injury" must result from "physical force." Under Tennessee law, "bodily injury" is a broad term: It "includes a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn.Code Ann. § 39–11–106(a)(2) (1997). Justice SCALIA'S concurrence suggests that these forms of injury necessitate violent force, under *Johnson's* definition of that phrase. *Post,* at 1417. But whether or not that is so—a question we do not decide—these forms of injury do necessitate force in the common-law sense.

[4]   The District Court thought otherwise, reasoning that one can cause bodily injury "without the 'use of physical force' "—for example, by "deceiving [the victim] into drinking a poisoned beverage, without making contact of any kind." App. to Pet. for Cert. 41a. But as we explained in *Johnson,* "physical force" is simply "force exerted by and through concrete bodies," as opposed to "intellectual force or emotional force." 559 U.S., at 138, 130 S.Ct. 1265. And the common-law concept of "force" encompasses even its indirect application. "Force" in this sense "describ[es] one of the elements of the common-law crime of

AR.06699

134 S.Ct. 1405, 188 L.Ed.2d 426, 82 USLW 4207, 14 Cal. Daily Op. Serv. 3246...

battery," *id., at 139, 130 S.Ct. 1265,* and "[t]he force used" in battery "need not be applied directly to the body of the victim." 2 W. LaFave, Substantive Criminal Law § 16.2(b) (2d ed. 2003). "[A] battery may be committed by administering a poison or by infecting with **1415 a disease, or even by resort to some intangible substance," such as a laser beam. *Ibid.* " [p]oison may have 'forceful physical properties' as a matter of organic chemistry, ... no one would say that a poisoner 'employs' force or 'carries out a purpose by means of force' when he or she sprinkles poison in a victim's drink," *ibid.* (footnote omitted) (citing *State v. Monroe,* 121 N.C. 677, 28 S.E. 547 (1897) (poison); *State v. Lankford,* 29 Del. 594, 102 A. 63 (1917) (disease); *Adams v. Commonwealth,* 33 Va.App. 463, 534 S.E.2d 347 (2000) (laser beam)). It is impossible to cause bodily injury without applying force in the common-law sense.

 [5]     Second, the knowing or intentional application of force is a "use" of force. Castleman is correct that under *Leocal v. Ashcroft,* 543 U.S. 1, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004), the word "use" "conveys the idea **171 that the thing used (here, 'physical force') has been made the user's instrument." Brief for Respondent 37. But he errs in arguing that although " [p]oison may have 'forceful physical properties' as a matter of organic chemistry, ... no one would say that a poisoner 'employs' force or 'carries out a purpose by means of force' when he or she sprinkles poison in a victim's drink," *ibid.* The "use of force" in Castleman's example is not the act of "sprinkl[ing]" the poison; it is the act of employing poison knowingly as a device to cause physical harm. That the harm occurs indirectly, rather than directly (as with a kick or punch), does not matter. Under Castleman's logic, after all, one could say that pulling the trigger on a gun is not a "use of force" because it is the bullet, not the trigger, that actually strikes the victim. *Leocal* held that the "use" of force must entail "a higher degree of intent than negligent or merely accidental conduct," 543 U.S., at 9, 125 S.Ct. 377; it did not hold that the word "use" somehow alters the meaning of " force."

Because Castleman's indictment makes clear that the use of physical force was an element of his conviction, that conviction qualifies as a "misdemeanor crime of domestic violence."

## III

We are not persuaded by Castleman's nontextual arguments against our interpretation of § 922(g)(9).

## A

First, Castleman invokes § 922(g)(9)'s legislative history to suggest that Congress could not have intended for the provision to apply to acts involving minimal force. But to the extent that legislative history can aid in the interpretation of this statute, Castleman's reliance on it is unpersuasive.

Castleman begins by observing that during the debate over § 922(g)(9), several Senators argued that the provision would help to prevent gun violence by perpetrators of severe domestic abuse. Senator Lautenberg referred to "serious **172 spousal or child abuse" and to "violent individuals"; Senator Hutchison to " 'people who batter their wives' "; Senator Wellstone to people who "brutalize" their wives or children; and Senator Feinstein to "severe and recurring domestic violence." 142 Cong. Rec. 22985–22986, 22988. But as we noted above, see *supra,* at 1414, the impetus of § 922(g)(9) was that even perpetrators of severe domestic violence are often convicted "under generally applicable assault or battery laws." *Hayes,* 555 U.S., at 427, 129 S.Ct. 1079. So nothing about these Senators' isolated references to severe domestic violence suggests that they would not have wanted § 922(g)(9) to apply to a misdemeanor assault conviction like Castleman's.

Castleman next observes that § 922(g)(9) is the product of a legislative compromise. The provision originally barred gun possession for any "crime of domestic violence," defined as any "felony or misdemeanor crime of violence, regardless of length,

AR.06700

134 S.Ct. 1405, 188 L.Ed.2d 426, 82 USLW 4207, 14 Cal. Daily Op. Serv. 3246...

term, or manner of punishment." **1416** 142 Cong. Rec. 5840. Congress rewrote the provision to require the use of physical force in response to the concern "that the term crime of violence was too broad, and could be interpreted to include an act such as cutting up a credit card with a pair of scissors," *id.,* at 26675. See *Hayes,* 555 U.S., at 428, 129 S.Ct. 1079. Castleman would have us conclude that Congress thus meant "to narrow the scope of the statute to convictions based on especially severe conduct." Brief for Respondent 24. But all Congress meant to do was address the fear that § 922(g)(9) might be triggered by offenses in which no force at all was directed at a person. As Senator Lautenberg noted, the revised text was not only "more precise" than the original but also "probably broader." 142 Cong. Rec. 26675.

B

**[6]** We are similarly unmoved by Castleman's invocation of the rule of lenity. Castleman is correct that our "construction of a criminal statute must be guided by the need for fair warning." *Crandon v. United States,* 494 U.S. 152, 160, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990). But "the rule of lenity only applies if, after considering **\*173** text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas,* 560 U.S. 474, 488, 130 S.Ct. 2499, 177 L.Ed.2d 1 (2010) (citation and internal quotation marks omitted). That is not the case here.

C

Finally, Castleman suggests—in a single paragraph—that we should read § 922(g)(9) narrowly because it implicates his constitutional right to keep and bear arms. But Castleman has not challenged the constitutionality of § 922(g)(9), either on its face or as applied to him, and the meaning of the statute is sufficiently clear that we need not indulge Castleman's cursory nod to constitutional avoidance concerns.

* * *

Castleman's conviction for having "intentionally or knowingly cause[d] bodily injury to" the mother of his child qualifies as a "misdemeanor crime of domestic violence." The judgment of the United States Court of Appeals for the Sixth Circuit is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice SCALIA, concurring in part and concurring in the judgment.
I agree with the Court that intentionally or knowingly causing bodily injury to a family member "has, as an element, the use ... of physical force," 18 U.S.C. § § 921(a)(33)(A)(ii), and thus constitutes a "misdemeanor crime of domestic violence," § 922(g)(9). I write separately, however, because I reach that conclusion on narrower grounds.

I

Our decision in *Johnson v. United States,* 559 U.S. 133, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010), is the natural place to begin. *Johnson* is significant **\*174** here because it concluded that "the phrase 'physical force' means *violent* force—that is, *force*

U.S. v. Castleman, 572 U.S. 157 (2014)

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 206 of 912

134 S.Ct. 1405, 188 L.Ed.2d 426, 82 USLW 4207, 14 Cal. Daily Op. Serv. 3246...

*capable of causing physical pain or injury to another person.*" *Id., at* 140, 130 S.Ct. 1265 (second emphasis added). This is an easy case if the phrase "physical force" has the same meaning in § 921(a)(33)(A)(ii), the provision that defines "misdemeanor crime of domestic violence" for purposes of § 922(g)(9), as it does in § 924(e)(2)(B)(ii), the provision interpreted in *Johnson,* since it is impossible to cause bodily injury without **\*\*1417** using force "capable of" producing that result.

There are good reasons to give the phrase *Johnson* 's interpretation. One is the presumption of consistent usage—the rule of thumb that a term generally means the same thing each time it is used. Although the presumption is most commonly applied to terms appearing in the same enactment, *e.g., IBP, Inc. v. Alvarez,* 546 U.S. 21, 33–34, 126 S.Ct. 514, 163 L.Ed.2d 288 (2005), it is equally relevant "when Congress uses the same language in two statutes having similar purposes," *Smith v. City of Jackson,* 544 U.S. 228, 233, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005) (plurality opinion); see also *Northcross v. Board of Ed. of Memphis City Schools,* 412 U.S. 427, 428, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973) (*per curiam* ). This case is a textbook candidate for application of the *Smith*–*Northcross* branch of the rule. The "physical force" clauses at issue here and in *Johnson* are worded in nearly identical fashion: The former defines a "misdemeanor crime of domestic violence" as an offense that "has, as an element, the use or attempted use of physical force," § 921(a)(33)(A)(ii), while the latter defines a "violent felony" as an offense that "has as an element the use, attempted use, or threatened use of physical force against the person of another," § 924(e)(2)(B)(i). And both statutes are designed to promote public safety by deterring a class of criminals from possessing firearms.

Respondent's arguments fail to overcome the presumption of consistent usage. In respondent's view, "physical force" cannot mean "*any* force that produces *any* pain or bodily injury," Brief for Respondent 25, because § 921(a)(33)(A)(ii) **\*175** defines a *violent* crime and one can inflict all sorts of minor injuries—bruises, paper cuts, etc.—by engaging in *nonviolent* behavior. Respondent therefore reasons that § 921(a)(33)(A)(ii) requires force capable of inflicting "serious" bodily injury. That requirement is more demanding than both of the plausible meanings of "physical force" we identified in *Johnson* : common-law offensive touching (which *Johnson* rejected) and force capable of causing physical pain or injury, serious or otherwise. See 559 U.S., at 138–140, 130 S.Ct. 1265. It would be surpassing strange to read a statute defining a "*misdemeanor* crime of domestic violence" as requiring greater force than the similarly worded statute in *Johnson,* which defined a "violent *felony,*" and respondent does not make a convincing case for taking that extraordinary step.

For these reasons, I would give "physical force" the same meaning in § 921(a)(33)(A)(ii) as in *Johnson.* The rest of the analysis is straightforward. Because "intentionally or knowingly caus[ing] bodily injury," App. 27, categorically involves the use of "force capable of causing physical pain or injury to another person," 559 U.S., at 140, 130 S.Ct. 1265, respondent's 2001 domestic-assault conviction qualifies as a "misdemeanor crime of domestic violence" under § 922(g)(9). [1] I would reverse the judgment below on that basis and remand for further proceedings.


II


Unfortunately, the Court bypasses that narrower interpretation of § 921(a)(33)(A)(ii) in favor of a much broader one that treats any offensive touching, no matter how slight, as sufficient. That expansive common-law definition **\*\*1418** cannot be squared with relevant precedent or statutory text.

134 S.Ct. 1405, 188 L.Ed.2d 426, 82 USLW 4207, 14 Cal. Daily Op. Serv. 3246...

**\*176**  We have twice addressed the meaning of "physical force" in the context of provisions that define a class of violent crimes. Both times, we concluded that "physical force" means violent force. In *Johnson,* we thought it "clear that in the context of a statutory definition of '*violent* felony,' the phrase 'physical force' means *violent* force." *Id.,* at 140, 130 S.Ct. 1265. And we held that common-law offensive touching—the same type of force the Court today holds *does* constitute "physical force"—is *not* sufficiently violent to satisfy the Armed Career Criminal Act's "physical force" requirement. See *id.,* at 140–144, 130 S.Ct. 1265. Our analysis in *Johnson* was premised in large part on our earlier interpretation of the generic federal "crime of violence" statute, 18 U.S.C. § 16. In *Leocal v. Ashcroft,* 543 U.S. 1, 11, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004), we observed that § 16(a)—which defines a "crime of violence" as "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another"—comprehends "a category of violent, active crimes." The textual similarity between § 921(a)(33)(A)(ii)'s "physical force" clause and the clauses at issue in *Johnson* and *Leocal* thus raises the question: Why should the same meaning not apply here?

The Court gives four responses that merit discussion, none of which withstands scrutiny. First, the Court invokes the " 'settled principle of interpretation that, absent other indication, "Congress intends to incorporate the well-settled meaning of the common-law terms it uses." ' " *Ante,* at 1410 (quoting *Sekhar v. United States,* 570 U.S. ——, ——, 133 S.Ct. 2720, 2724, 186 L.Ed.2d 794 (2013)). That principle is of limited relevance, since the presumption of consistent statutory meaning is precisely "other indication" that § 921(a)(33)(A)(ii) does not incorporate the common-law meaning. Anyway, a more accurate formulation of the principle cited by the Court is that when " 'a word is obviously transplanted from another legal source, whether the common law *or other legislation,* it brings the old soil with it.' " **\*177** *Sekhar, supra,* at ——, 133 S.Ct., at 2724 (quoting Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 537 (1947); emphasis added). Section 921(a)(33)(A)(ii) was enacted after the statutes involved in *Johnson* and *Leocal,*[2] and its "physical force" clause is quite obviously modeled on theirs.

Second, the Court asserts that any interpretation of "physical force" that excludes offensive touching "would have rendered § 922(g)(9) inoperative in many States at the time of its enactment." *Ante,* at 1413. But there is no interpretive principle to the effect that statutes must be given their broadest possible application, and § 922(g)(9) without offensive touching would have had application in four-fifths of the States. Although domestic violence was "routinely prosecuted" under misdemeanor assault or battery statutes when Congress enacted § 922(g)(9), *United States v. Hayes,* 555 U.S. 415, 427, 129 S.Ct. 1079, 172 L.Ed.2d 816 (2009), and such statutes generally prohibited "both offensive touching and the causation of bodily injury" or "only the latter," *ante,* at 1412 – 1413, it does not follow that interpreting "physical force" to mean violent force would have rendered § 922(g)(9) a **\*\*1419** practical nullity. To the contrary, § 922(g)(9) would have worked perfectly well in 38 of the 48 States that had misdemeanor assault or battery statutes at the time of § 922(g)(9)'s enactment. At that point, 19 States had statutes that covered infliction of bodily injury but not offensive touching,[3] and 19 more had statutes that prohibited **\*178** both of types of conduct, but did so in a divisible manner—thus making it possible to identify the basis for a conviction by inspecting charging documents and similar materials, see *Descamps v. United States,* 570 U.S. ——, ——, 133 S.Ct. 2276, 2283–2285, 186 L.Ed.2d 438 (2013).[4]  That leaves only 10 States whose misdemeanor assault or battery statutes (1) prohibited offensive touching, and (2) were framed in such a way that offensive touching was indivisible from physical violence.[5] The fact that § 922(g)(9) would not have applied immediately in 10 States is hardly enough to trigger the presumption against ineffectiveness—the idea that Congress presumably does not enact useless laws. Compare *Hayes, supra,* at 427, 129 S.Ct. 1079 (rejecting an interpretation that supposedly would have rendered § 922(g)(9) " 'a dead letter' in some two-thirds of the States"). I think it far more plausible that Congress enacted a statute that covered **\*179** domestic-violence convictions in four-

134 S.Ct. 1405, 188 L.Ed.2d 426, 82 USLW 4207, 14 Cal. Daily Op. Serv. 3246...

fifths of the States, and left it to the handful of nonconforming States to change their laws (as some have), than that Congress adopted a meaning of "domestic violence" that included the slightest unwanted touching.

Third, the Court seizes on the one and only meaningful distinction between § 921(a)(33)(A)(ii) and the other provisions referred to above: that it defines a violent "misdemeanor" rather than a "violent felony" or an undifferentiated "crime of violence." *Ante,* at 1410 – 1411. We properly take account of the term being defined when interpreting "an unclear definitional phrase." *United States v. Stevens,* 559 U.S. 460, 474, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010); but see **1420 *Babbitt v. Sweet Home Chapter, Communities for Great Ore.,* 515 U.S. 687, 717–719, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (SCALIA, J., dissenting). But when we do so, we consider *the entire* term being defined, not just part of it. Here, the term being defined is "*misdemeanor* crime of domestic *violence.*" Applying the term-to-be-defined canon thus yields the unremarkable conclusion that "physical force" in § 921(a)(33)(A)(ii) refers to the type of force involved in violent misdemeanors (such as bodily-injury offenses) rather than nonviolent ones (such as offensive touching).

Fourth, and finally, the Court seeks to evade *Johnson* and *Leocal* on the ground that " 'domestic violence' encompasses a range of force broader than that which constitutes 'violence' *simpliciter.*" *Ante,* at 1411, n. 4. That is to say, an act need not be violent to qualify as "domestic violence." That absurdity is not only at war with the English language, it is flatly inconsistent with definitions of "domestic violence" from the period surrounding § 921(a)(33)(A)(ii)'s enactment. At the time, dictionaries defined "domestic violence" as, for instance, "[v]iolence between members of a household, usu. spouses; an assault or other violent act committed by one member of a household against another," Black's Law Dictionary 1564 (7th ed. 1999), and "[v]iolence toward or physical *180 abuse of one's spouse or domestic partner," American Heritage Dictionary 534 (4th ed. 2000).[6] Those definitions, combined with the absence of "domestic violence" entries in earlier dictionaries, see, *e.g.,* Black's Law Dictionary 484 (6th ed. 1990); American Heritage Dictionary 550 (3d ed. 1992), make it utterly implausible that Congress adopted a "term of art" definition "encompassing acts that one might not characterize as 'violent' in a nondomestic context," *ante,* at 1411.

The Court's inventive, nonviolent definition fares no better when judged against other accepted sources of meaning. Current dictionaries give "domestic violence" the same meaning as above: ordinary violence that occurs in a domestic context. See, *e.g.,* American Heritage Dictionary 533 (5th ed. 2011) ("[p]hysical abuse of a household member, especially one's spouse or domestic partner"). The same goes for definitions of "domestic violence" found in other federal statutes.[7] Indeed, Congress defined "crime of domestic violence" as a "crime of violence" in another section of the same bill that enacted § 921(a)(33)(A)(ii). See § 350(a), 110 Stat. 3009–639, codified at 8 U.S.C. § 1227(a)(2)(E)(i).

The Court ignores these authorities and instead bases its definition on an *amicus* brief filed by the National Network **181 to End Domestic Violence and other private organizations,[8] and two publications issued **1421 by the Department of Justice's Office on Violence Against Women. The *amicus* brief provides a series of definitions—drawn from law-review articles, foreign-government bureaus, and similar sources—that include such a wide range of nonviolent and even *nonphysical* conduct that they cannot possibly be relevant to the meaning of a statute requiring " physical force," or to the legal meaning of "domestic violence" (as opposed to the meaning desired by private and governmental advocacy groups). For example, *amici's* definitions describe as "domestic violence" acts that " humiliate, isolate, frighten, ... [and] blame ... someone"; "acts of omission"; "excessive monitoring of a woman's behavior, repeated accusations of infidelity, and controlling with whom she has contact." Brief for National Network to End Domestic Violence et al. as *Amici Curiae* 5–8, and nn. 7, 11. The offerings of the Department of Justice's Office on Violence Against Women are equally capacious and (to put it mildly) unconventional. Its publications define "domestic violence" as "a pattern of abusive behavior ... used by one partner to gain or maintain power and control over another," including " [u]ndermining an individual's sense of self-worth," "name-calling," and " damaging one's relationship with his or her children." See, *e.g.,* Domestic Violence, online at http://www.ovw.usdoj.gov/domviolence. htm (all Internet materials as visited Mar. 21, 2014, and available in the Clerk of Court's case file).[9]

134 S.Ct. 1405, 188 L.Ed.2d 426, 82 USLW 4207, 14 Cal. Daily Op. Serv. 3246...

**\*182**  Of course these private organizations and the Department of Justice's (nonprosecuting) Office are entitled to define "domestic violence" any way they want for their own purposes—purposes that can include (quite literally) giving all domestic behavior harmful to women a bad name. (What is more abhorrent than *violence* against women?) But when they (and the Court) impose their all-embracing definition on the rest of us, they not only distort the law, they impoverish the language. When everything is domestic violence, nothing is. Congress will have to come up with a new word (I cannot imagine what it would be) to denote actual domestic *violence.*

Although the Justice Department's definitions ought to be deemed unreliable *in toto* on the basis of their extravagant extensions alone (*falsus in uno, falsus in omnibus* ), the Court chooses to focus only upon the physical actions that they include, viz., "[h]itting, slapping, shoving, grabbing, pinching, biting, [and] hair pulling." *Ibid.* None of those actions bears any real resemblance to mere offensive touching, and all of them are capable of causing physical pain or injury. Cf. **\*\*1422** *Johnson,* 559 U.S., at 143, 130 S.Ct. 1265 (identifying "a slap in the face" as conduct that might rise to the level of violent force). And in any event, the Department of Justice thankfully receives no deference in our interpretation of the criminal laws whose claimed violation the Department of Justice prosecutes. See **\*183** *Gonzales v. Oregon,* 546 U.S. 243, 264, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006) (citing *Crandon v. United States,* 494 U.S. 152, 177, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990) (SCALIA, J., concurring in judgment)). The same ought to be said of advocacy organizations, such as *amici,* that (unlike dictionary publishers) have a vested interest in expanding the definition of "domestic violence" in order to broaden the base of individuals eligible for support services. [10]

This is a straightforward statutory-interpretation case that the parties and the Court have needlessly complicated. Precedent, text, and common sense all dictate that the term "physical force," when used to define a "misdemeanor crime of domestic violence," requires force capable of causing physical pain or bodily injury.

Justice ALITO, with whom Justice THOMAS joins, concurring in the judgment.

The decision in this case turns on the meaning of the phrase "has, as an element, the use ... of physical force." 18 U.S.C. § 921(a)(33)(A)(ii). In *Johnson v. United States,* 559 U.S. 133, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010), the Court interpreted the very same language and held that "physical force" means "violent force." *Id.,* at 140, 130 S.Ct. 1265. I disagreed and concluded that the phrase incorporated the well-established meaning of "force" under the common law of battery, which did not require violent force. See *id.,* at 146, 130 S.Ct. 1265 (dissenting opinion).

The Court of Appeals in the present case understandably followed the reasoning of *Johnson,* but now this Court holds that *Johnson* actually dictates that the identical statutory **\*184** language be interpreted in exactly the same way that the *Johnson* majority rejected. See *ante,* at 1410.

In my view, the meaning of the contested statutory language is the same now as it was four years ago in *Johnson,* and therefore, for the reasons set out in my *Johnson* dissent, I would not extend the reasoning of *Johnson* to the question presented here, on which the *Johnson* Court specifically reserved judgment. 559 U.S., at 143–144, 130 S.Ct. 1265.

**All Citations**

572 U.S. 157, 134 S.Ct. 1405, 188 L.Ed.2d 426, 82 USLW 4207, 14 Cal. Daily Op. Serv. 3246, 2014 Daily Journal D.A.R. 3787, 24 Fla. L. Weekly Fed. S 632

U.S. v. Castleman, 572 U.S. 157 (2014)

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 210 of 912

134 S.Ct. 1405, 188 L.Ed.2d 426, 82 USLW 4207, 14 Cal. Daily Op. Serv. 3246...

## Footnotes

\*      The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1      See Dept. of Justice (DOJ), Bureau of Justice Statistics (BJS), J. Truman, L. Langton, & M. Planty, Criminal Victimization 2012 (Oct. 2013) (Table 1) (1,259,390 incidents of domestic violence in 2012), online at http:// www.bjs.gov/content/pub/pdf/cv12.pdf (all Internet materials as visited Mar. 19, 2014, and available in Clerk of Court's case file); DOJ, BJS, C. Rennison, Crime Data Brief, Intimate Partner Violence, 1993–2001, p. 1 (Feb. 2003) (violence among intimate partners caused deaths of 1,247 women and 440 men in 2000), online at http://www.bjs. gov/content/ pub/pdf/ipv01.pdf.

2      We explained that the word "physical" did not add much to the word "force," except to distinguish "force exerted by and through concrete bodies ... from, for example, intellectual force or emotional force." *Johnson,* 559 U.S., at 138, 130 S.Ct. 1265.

3      *Johnson* specifically reserved the question whether our definition of "physical force" would extend to 18 U.S.C. § 922(g)(9). 559 U.S., at 143–144, 130 S.Ct. 1265. And these reasons for declining to extend *Johnson* 's definition to § 922(g)(9) serve equally to rebut the "presumption of consistent usage" on which Justice SCALIA'S concurrence heavily relies, *post,* at 1416 – 1417, 1418.

4      This portion of *Johnson* 's analysis relied heavily on *Leocal v. Ashcroft,* 543 U.S. 1, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004), in which we interpreted the meaning of a "crime of violence" under 18 U.S.C. § 16. As in *Johnson* and here, the statute defines a "crime of violence" in part as one "that has as an element the use ... of physical force," § 16(a). In support of our holding in *Johnson,* we quoted *Leocal* 's observation that " '[t]he ordinary meaning of [a "crime of violence"] ... suggests a category of violent, active crimes.' " 559 U.S., at 140, 130 S.Ct. 1265 (quoting 543 U.S., at 11, 125 S.Ct. 377).

The Courts of Appeals have generally held that mere offensive touching cannot constitute the "physical force" necessary to a "crime of violence," just as we held in *Johnson* that it could not constitute the "physical force" necessary to a "violent felony." See *Karimi v. Holder,* 715 F.3d 561, 566–568 (C.A.4 2013); *Singh v. Ashcroft,* 386 F.3d 1228, 1233 (C.A.9 2004); *Flores v. Ashcroft,* 350 F.3d 666, 672 (C.A.7 2003); *United States v. Venegas–Ornelas,* 348 F.3d 1273, 1275 (C.A.10 2003); *United States v. Landeros–Gonzales,* 262 F.3d 424, 426 (C.A.5 2001); see also *United States v. Rede–Mendez,* 680 F.3d 552, 558 (C.A.6 2012) (commenting generally that "[i]n the crime of violence context, 'the phrase "physical force" means *violent* force' "); *United States v. Haileselassie,* 668 F.3d 1033, 1035 (C.A.8 2012) (dicta). But see *Hernandez v. U.S. Attorney General,* 513 F.3d 1336, 1340, n. 3 (C.A.11 2008) (*per curiam* ). The Board of Immigration Appeals has similarly extended *Johnson* 's requirement of violent force to the context of a "crime of violence" under § 16. *Matter of Velasquez,* 25 I. & N. Dec. 278, 282 (2010). Nothing in today's opinion casts doubt on these holdings, because—as we explain—"domestic violence" encompasses a range of force broader than that which constitutes "violence" *simpliciter.*

We note, as does Justice SCALIA'S concurrence, *post,* at 1420, and n. 7, that federal law elsewhere defines "domestic violence" in more limited terms: For example, a provision of the Immigration and Nationality Act defines a " 'crime

134 S.Ct. 1405, 188 L.Ed.2d 426, 82 USLW 4207, 14 Cal. Daily Op. Serv. 3246...

of domestic violence' " as "any crime of violence (as defined by [ 18 U.S.C. § 16] )" committed against a qualifying relation. 8 U.S.C. § 1227(a)(2)(E)(i). Our view that "domestic violence" encompasses acts that might not constitute "violence" in a nondomestic context does not extend to a provision like this, which specifically defines "domestic violence" by reference to a generic "crime of violence."

5    See also A. Ganley, Understanding Domestic Violence, in Improving the Health Care Response to Domestic Violence: A Resource Manual for Health Care Providers 18 (2d ed. 1996), online at http://www.futureswithoutviolence.org/userfiles/ file/HealthCare/improving_healthcare_manual_ 1.pdf (physical forms of domestic violence "may include spitting, scratching, biting, grabbing, shaking, shoving, pushing, restraining, throwing, twisting, [or] slapping"); M. McCue, Domestic Violence: A Reference Handbook 6 (1995) (noting that physical forms of domestic violence "may begin with relatively minor assaults such as painful pinching or squeezing").

6    The concurrence's reliance on definitions of "domestic violence" in other statutory provisions, see *post,* at 1420, and n. 7, is similarly unpersuasive. These other provisions show that when Congress wished to define "domestic violence" as a type of "violence" *simpliciter,* it knew how to do so. That it did not do so here suggests, if anything, that it did not mean to. See, *e.g., Custis v. United States,* 511 U.S. 485, 492, 114 S.Ct. 1732, 128 L.Ed.2d 517 (1994). This also answers the concurrence's suggestion, *post,* at 1421, that our holding will somehow make it difficult for Congress to define "domestic violence"—where it wants to—as requiring violent force.

7    See U.S. Census Bureau, Time Series of Intercensal State Population Estimates: April 1, 1990 to April 1, 2000, online at http:// www.census.gov/popest/data/intercensal/st-co/files/CO-EST2001-12-00.pdf (estimating state and national populations as of July 1, 1996).

8    We held in *Leocal* that " 'use' requires active employment," rather "than negligent or merely accidental conduct." 543 U.S., at 9, 125 S.Ct. 377. Although *Leocal* reserved the question whether a reckless application of force could constitute a "use" of force, *id., at 13, 125 S.Ct. 377,* the Courts of Appeals have almost uniformly held that recklessness is not sufficient. See *United States v. Palomino Garcia,* 606 F.3d 1317, 1335–1336 (C.A.11 2010); *Jimenez–Gonzalez v. Mukasey,* 548 F.3d 557, 560 (C.A.7 2008); *United States v. Zuniga–Soto,* 527 F.3d 1110, 1124 (C.A.10 2008); *United States v. Torres–Villalobos,* 487 F.3d 607, 615–616 (C.A.8 2007); *United States v. Portela,* 469 F.3d 496, 499 (C.A.6 2006); *Fernandez–Ruiz v. Gonzales,* 466 F.3d 1121, 1127–1132 (C.A.9 2006) (en banc); *Garcia v. Gonzales,* 455 F.3d 465, 468–469 (C.A.4 2006); *Oyebanji v. Gonzales,* 418 F.3d 260, 263–265 (C.A.3 2005) (ALITO, J.); *Jobson v. Ashcroft,* 326 F.3d 367, 373 (C.A.2 2003); *United States v. Chapa–Garza,* 243 F.3d 921, 926 (C.A.5 2001). But see *United States v. Booker,* 644 F.3d 12, 19–20 (C.A.1 2011) (noting that the First Circuit had not resolved the recklessness issue under *Leocal,* but declining to extend *Leocal 's* analysis to § 922(g)(9)).

1    Respondent argues at length that Tenn.Code Ann. § 39–13–111(b) (2013 Supp.) does not require the "use" of physical force, since it is possible to cause bodily injury through deceit or other nonviolent means. Brief for Respondent 30–42. The argument fails for the reasons given by the Court. See *ante,* at 1414 – 1415.

2    Section § 921(a)(33)(A)(ii) was enacted in 1996. See § 658, 110 Stat. 3009–371. The Armed Career Criminal Act provision interpreted in *Johnson* was enacted in 1986, see § 1402, 100 Stat. 3207–39, and the "crime of violence" statute discussed in *Leocal* was enacted in 1984, see § 1001, 98 Stat. 2136.

3    See Ala.Code § 13A–6–22 (1995); Alaska Stat. § 11.41.230 (1996); Ark.Code Ann. § 5–13–203 (1993); Colo.Rev.Stat. Ann. § 18–3–204 (Westlaw 1996); Conn. Gen.Stat. § 53a–61 (1996); Haw.Rev.Stat. Ann. § 707–712 (1994); Ky.Rev.Stat. Ann. § 508.030 (Michie 1990); Minn.Stat. § 609.224 (Westlaw 1995); Miss.Code Ann. § 97–3–7 (Westlaw 1995); Neb.Rev.Stat. § 28–310 (1995); N.J. Stat. Ann. § 2C:12–1 (West 1995); N.Y. Penal Law Ann. § 120.00 (Westlaw 1995); N.D. Cent. Code Ann. § 12.1–17–01 (Westlaw 1995); Ohio Rev.Code Ann. § 2903.13

(Lexis 1993); Ore.Rev.Stat. § 163.160 (1991); 18 Pa. Cons.Stat. Ann. § 2701 (Westlaw 1995); S.D. Codified Laws § 22–18–1 (1988); Vt. Stat. Ann., Tit. 13, § 1023 (1995); Wis. Stat. Ann. § 940.19 (West Cum. Supp. 1995).

4    See Ariz.Rev.Stat. Ann. § 13–1203 (Westlaw 1995); Del.Code Ann., Tit. 11, §§ 601, 611 (1995); Fla. Stat. § 784.03 (Westlaw 1995); Ga.Code Ann. § 16–5–23 (1996); Idaho Code § 18–903 (Westlaw 1996); Ill. Comp. Stat., ch. 720, § 5/12–3 (West 1994); Ind.Code § 35–42–2–1 (Michie 1994); Iowa Code § 708.1 (Westlaw 1996); Kan. Stat. Ann. § 21–3142 (1995); Me.Rev.Stat. Ann., Tit. 17–A, § 207 (Westlaw 1996); Mo.Rev.Stat. § 565.070 (Westlaw 1996); Mont.Code Ann. § 45–5–201 (1995); N.H.Rev.Stat. Ann. § 631:2–a (West 1996); N.M. Stat. Ann. §§ 30–3–4, 30–3–5 (Westlaw 1996); Tenn.Code Ann. § 39–13–101 (1991); Tex. Penal Code Ann. § 22.01 (Westlaw 1996); Utah Code Ann. § 76–5–102 (Lexis 1995); W. Va.Code Ann. § 61–2–9 (Lexis 1992); Wyo. Stat. Ann. § 6–2–501 (1996).

5    See Cal.Penal Code Ann. § 242 (Westlaw 1996); La.Rev.Stat. Ann. § 14:33 (Westlaw 1996); Mass. Gen. Laws, ch. 265, § 13A (West 1994); Mich. Comp. Laws § 750.81 (1991); Nev.Rev.Stat. Ann. § 200.481 (West Cum. Supp. 1995); N.C. Gen.Stat. Ann. § 14–33 (Lexis 1993); Okla. Stat., Tit. 21, § 642 (West 1991); R.I. Gen. Laws § 11–5–3 (Michie 1994); Va.Code Ann. § 18.2–57 (Michie 1996); Wash. Rev.Code Ann. § 9A.36.041 (Michie 1994).

6    Definitions of "physical force" from the same period are also at odds with the Court's nonviolent interpretation of that phrase. See Black's Law Dictionary 656 (7th ed. 1999) ("[f]orce consisting in a physical act, esp. a violent act directed against a robbery victim"); id., at 1147 (6th ed. 1990) ("[f]orce applied to the body; actual violence").

7    See, e.g., 18 U.S.C. § 2261(a)(1) (defining as "[i]nterstate domestic violence" certain "crime[s] of violence"); § 3561(b) (The term 'domestic violence crime' means a crime of violence ... in which the victim or intended victim is the [defendant's] spouse" or other qualifying relation); 25 U.S.C.A. § 1304(a)(2) ("The term 'domestic violence' means violence committed by a current or former spouse or" other qualifying relation); 42 U.S.C.A. § 13925(a)(8) (Sept. 2013 Supp.) ("The term 'domestic violence' includes felony or misdemeanor crimes of violence committed by a current or former spouse" or other qualifying relation).

8    The other organizations on the brief are the National Domestic Violence Hotline, the Domestic Violence Legal Empowerment and Appeals Project, Legal Momentum, and innumerable state organizations against domestic violence.

9    The Court refers in a footnote to two additional social-science definitions, neither of which aids the Court's cause. See ante, at 1411 – 1412, n. 5. The first is drawn from a health-care manual that provides "a behavioral definition of domestic violence ... *rather than a legal definition,* since a behavioral definition is more comprehensive and more relevant to the health care setting." A. Ganley, Understanding Domestic Violence, in Improving the Health Care Response to Domestic Violence: A Resource Manual for Health Care Providers 18 (2d ed. 1996) (emphasis added), online at http://www.futureswithoutviolence. org/userfiles/file/HealthCare/improving_healthcare_manual_1.pdf. Here, of course, we are concerned with the *less* comprehensive legal definition. The second definition referred to in the footnote equates domestic violence with "overt violence," which in its least serious form consists of "*painful* pinching or squeezing." M. McCue, Domestic Violence: A Reference Handbook 6 (1995) (emphasis added). That meaning is consistent with

    *Johnson* 's definition of "physical force," but it plainly does not include harmless offensive touching.

10   See, e.g., National Network to End Domestic Violence, Reauthorize The Family Violence Prevention and Services Act 1 (Sept. 22, 2010) (advocating the expansion of a program assisting victims of domestic violence to include victims of "dating violence" and thereby "ensure that all victims in danger can access services"), online at http://nnedv. org/downloads/Policy/FVPSA_fact_sheet_9-22-10.pdf.

* * *

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                                    AR.06708   17

KeyCite Yellow Flag - Negative Treatment

Distinguished by U.S. v. Chapa-Garza, 5th Cir.(Tex.), March 1, 2001

207 F.3d 261
United States Court of Appeals,
Fifth Circuit.

UNITED STATES of America, Plaintiff-Appellee,

v.

Miguel DeSANTIAGO-
GONZALEZ, Defendant-Appellant.

No. 99-50517.
|
March 20, 2000.
|
Rehearing and Suggestion for Rehearing
En Banc Denied April 18, 2000.

**Synopsis**

Accused was convicted in the United States District Court for the Western District of Texas, David Briones, J., of attempting to unlawfully reenter the United States after deportation, and he appealed from sentence imposed. The Court of Appeals, DeMoss, Circuit Judge, held that misdemeanor offenses of driving while intoxicated (DWI) of which alien had previously been convicted, prior to his deportation, qualified as "crimes of violence," such as would warrant four-level increase in alien's offense level for subsequent illegal reentry offense.

Affirmed.

West Headnotes (4)

[1] **Criminal Law** — **Review De Novo**

Court of Appeals reviews district court's application of the Sentencing Guidelines de novo. U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

3 Cases that cite this headnote

[2] **Criminal Law** — **Questions of Fact and Findings**

Court of Appeals reviews district court's findings of fact for clear error.

1 Cases that cite this headnote

[3] **Sentencing and Punishment** — **Crime of Violence**

Misdemeanor offenses of driving while intoxicated (DWI) of which alien had previously been convicted, prior to his deportation, qualified as "crimes of violence," as offenses which, by their very nature, involved conduct which presented serious potential risk of physical injury to another; accordingly, alien's offense level for subsequent illegal reentry offense had to be increased by four levels, pursuant to sentencing guideline mandating such increase for aliens previously convicted of misdemeanor crimes of violence. U.S.S.G. §§ 2L1.2(b)(1)(B), 4B1.2, 18 U.S.C.A.

29 Cases that cite this headnote

[4] **Sentencing and Punishment** — **Crime of Violence**

In determining whether particular crime is violent "by its nature," so as to qualify as crime of violence under the Sentencing Guidelines, Court of Appeals applies categorical approach, under which crime is either violent by its nature or not, and circumstances of particular case do not control determination of whether crime is violent. U.S.S.G. §§ 2L1.2(b)(1)(B), 4B1.2, 18 U.S.C.A.

12 Cases that cite this headnote

**Attorneys and Law Firms**

**\*262** Joseph H. Gay, Jr., Asst. U.S. Atty., Mark Randolph Stelmach, Asst. U.S. Atty., San Antonio, TX, for Plaintiff-Appellee.

Philip J. Lynch, Lucien B. Campbell, San Antonio, TX, for Defendant-Appellant.

Appeal from the United States District Court for the Western District of Texas.

Before JOLLY and DeMOSS, Circuit Judges, and DOWD [*], District Judge.

**Opinion**

DeMOSS, Circuit Judge:

Miguel DeSantiago-Gonzalez ("DeSantiago") appeals from the sentence imposed by the district court after he pleaded guilty to attempting to unlawfully reenter the United States after deportation in violation of 8 U.S.C. § 1326.

BACKGROUND

The facts of this case are quite simple and are undisputed. Miguel DeSantiago was deported from the United States in January, 1999. He attempted to reenter the United States at the Paso del Norte port of entry in El Paso, Texas on February 14, 1999, and he pleaded guilty to illegal reentry by a deported alien in violation of 8 U.S.C. § 1326. Prior to his original deportation, DeSantiago had thrice been convicted in New Mexico of the misdemeanor offense of driving while intoxicated ("DWI"), and according to the pre-sentence report ("PSR"), for each conviction, he had been given jail time. [1]

In the PSR, the probation officer recommended that DeSantiago's base offense level be increased by four levels, pursuant to U.S.S.G. § 2L1.2(b)(1)(B), because he had previously been convicted of three misdemeanor crimes of violence. DeSantiago objected to the PSR, claiming that the misdemeanor DWI violations were not "crimes of violence." The district court overruled his objections, stating that drunk driving creates a serious risk of physical injury to another and therefore, is a crime of violence making DeSantiago eligible for the § 2L1.2(b)(1)(B) enhancement. The district court sentenced DeSantiago to a 20-month term of imprisonment, followed by a one-year term of supervised release, and DeSantiago has timely appealed.

**\*263** DISCUSSION

[1] [2] [3] DeSantiago's only issue on appeal is whether the district court erred by enhancing his sentence four levels under § 2L1.2 because he had been thrice convicted of

misdemeanor crimes of violence. We review a district court's application of the guidelines *de novo,* and its findings of fact for clear error. *See* United States v. Hornsby, 88 F.3d 336, 338 (5th Cir.1996); *see also* United States v. Reyna-Espinosa, 117 F.3d 826, 828 (5th Cir.1997).

The applicable guidelines offense section for DeSantiago's conviction under 8 U.S.C. § 1326, provides as follows:

*2L1.2. Unlawfully Entering or Remaining in the United States*

(a) Base Offense Level: *8*

(b) Specific Offense Characteristic

(1) If the defendant previously was deported after a criminal conviction, or if the defendant unlawfully remained in the United States following a removal order issued after a criminal conviction, increase as follows (if more than one applies, use the greater):

(A) If the conviction was for an aggravated felony, increase by *16* levels.

(B) If the conviction was for (i) any other felony, or (ii) three or more misdemeanor crimes of violence or misdemeanor controlled substance offenses, increase by *4* levels.

U.S.S.G. § 2L1.2.

According to application note 1 to this guideline section, the term "crime of violence" is defined according to the provisions of U.S.S.G. § 4B1.2, and for purposes of § 2L1.2(b)(1)(B), the term includes offenses punishable by imprisonment for a term of one year or less. The applicable definition of a "crime of violence" for the purposes of DeSantiago's sentence is thus found at § 4B1.2(a), which provides as follows:

(a) The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that-

(1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or

(2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

U.S.S.G. § 4B1.2. The application notes to § 4B1.2 go on to further narrow the definition of a "crime of violence":

1. For purposes of this guideline-

"Crime of violence" includes murder, manslaughter, kidnapping, aggravated assault, forcible sex offenses, robbery, arson, extortion, extortionate extension of credit, and burglary of a dwelling. Other offenses are included as "crimes of violence" if (A) that offense has as an element the use, attempted use, or threatened use of physical force against the person of another, or (B) the conduct set forth (i.e., expressly charged) in the count of which the defendant was convicted involved use of explosives (including any explosive material or destructive device) or, by its nature, presented a serious potential risk of physical injury to another.

U.S.S.G. § 4B1.2, application note 1.

Based upon the foregoing, the central issue in this case becomes, does the misdemeanor offense of driving while intoxicated implicate § 4B1.2 because such an offense, by its very nature, "involves conduct that presents a serious potential risk of physical injury to another"?

We have held that a "substantial risk" requires only a strong probability of occurrence, not certainty. *See United States v. Rodriguez-Guzman,* 56 F.3d 18, 20 (5th Cir.1995). We have also held that the term "by its nature" dictates a categorical approach to determining whether particular conduct is a crime of violence under 18 U.S.C. § 16(b), that is, a crime is either violent by its nature or not-the circumstances **\*264** of a particular case do not control the determination of whether the crime is violent "by its nature." *See United States v. Velazquez-Overa,* 100 F.3d 418, 420 (5th Cir.1996).

The district court relied on the reasoning of a Seventh Circuit case, *United States v. Rutherford,* 54 F.3d 370 (7th Cir.1995), for its holding that the very nature of the act of driving while intoxicated involves "a serious risk of physical injury." *Id.* at 376. DeSantiago argues that the district court's reliance on *Rutherford* is misplaced, because that decision violated rules of statutory construction. He urges a plain meaning analysis of the term "serious potential risk of physical injury."

The government contends that DeSantiago's argument that rules of statutory construction prohibit a finding that DWI can be a crime of violence has been foreclosed by our recent holding in *Camacho-Marroquin v. INS,* 188 F.3d 649, 652 (5th Cir.1999), in which we relied upon *Rutherford*. In *Camacho-Marroquin,* we held that the Texas crime of felony DWI is, by its very nature, a crime of violence. However, we are reluctant to give *Camacho-Marroquin* controlling effect because it was a deportation case wherein the applicable definition of "crime of violence" was found at 18 U.S.C. § 16, which defines the term "crime of violence" in language similar to but not identical with the definition which controls the sentencing issue presented in this appeal found at U.S.S.G. § 4B1.2(a).

**[4]** Consequently, while we agree with DeSantiago that *Camacho-Marroquin* does not control the outcome of this case, we find persuasive the reasoning of *Rutherford,* that the very nature of the crime of DWI presents a "serious risk of physical injury" to others, and makes DWI a crime of violence. In effect, sub-paragraph (2) of § 4B1.2(a) expands the definition of "crime of violence" so as to encompass such reckless and negligent conduct as driving while intoxicated. As noted above, we take a categorical approach in determining whether a particular crime is violent "by its nature." *See Velazquez-Overa,* 100 F.3d at 420. As the *Rutherford* court noted, that drunk driving is inherently dangerous, is "well-known and well documented." *Rutherford,* 54 F.3d at 376. Thus, as a result of the inherent risk of physical injury associated with drunk driving in general and without regard to the circumstances of any particular case, we join the Seventh Circuit in holding that by its very nature, the crime of driving while intoxicated is a crime of violence as that term is defined in U.S.S.G. § 4B1.2(a)(2).

Accordingly, we hold that the district court did not err in finding that the misdemeanor crime of DWI constitutes a "crime of violence" under § 4B1.2(a)(2). And since

DeSantiago had thrice been convicted of a misdemeanor crime of violence at the time of his attempted unlawful reentry into the United States, the four-level enhancement under § 2L1.2(b)(1)(B) was appropriate.

<div align="center">CONCLUSION</div>

For all of the foregoing reasons, the sentence imposed by the district court below is AFFIRMED.

**All Citations**

207 F.3d 261

<div align="center">

**Footnotes**

</div>

*    District Judge of the Northern District of Ohio, sitting by designation.

1    DeSantiago was first convicted for driving while intoxicated on August 11, 1991 in Roswell, New Mexico-he pleaded guilty and was sentenced to 48 days in jail. Next, he was convicted for driving while intoxicated on January 29, 1993 in Roswell-he pleaded guilty and was sentenced to 90 days in jail. Finally, he was convicted of aggravated driving while intoxicated on March 17, 1994 in Roswell-he pleaded guilty and was sentenced to 364 days in jail.

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

769 F.2d 1095
United States Court of Appeals,
Fifth Circuit.

UNITED STATES of America, Plaintiff-Appellee,

v.

Charles Herbert FULLER, Defendant-Appellant.

No. 84-1850
|
Summary Calendar.
|
Sept. 3, 1985.

**Synopsis**

Defendant sought writ of habeas corpus contending that he pled guilty to distributing methamphetamine because of his lawyer's advice that maximum sentence was 15 years when in fact maximum sentence was only five years. The United States District Court for the Northern District of Texas, Eldon B. Mahon, J., denied habeas corpus relief, and defendant appealed. The Court of Appeals, Alvin B. Rubin, Circuit Judge, held that: (1) even proof of defendant's allegations would not suffice or prove that errors of attorney undermined fairness of proceedings; (2) court's failure to observe literal requirements of criminal rule governing guilty pleas did not justify invalidation of plea; and (3) defendant was not entitled to evidentiary hearing to assess allegations that his attorney misled him.

Affirmed.

West Headnotes (5)

**[1]**    **Criminal Law**  **Plea**

Erroneous advice from counsel or court that maximum sentence was greater than that allowed by statute does not necessarily prejudice defendant unless facts demonstrate that error was likely to have altered defendant's decision to plead guilty; under some circumstances, actual penalty may itself be so formidable or overstatement so small that it is improbable that error would have any effect.

47 Cases that cite this headnote

**[2]**    **Habeas Corpus**  **Arraignment and Plea**

Even if defendant could prove that his attorney erroneously advised him that maximum sentence was 15 years when in fact maximum sentence was only five years, defendant was still not entitled to habeas corpus relief, where defendant was not lead to believe guilty plea would reduce his potential maximum sentence, defendant pled guilty in expectation of possible consequences graver than those he actually faced, defendant was faced with overwhelming evidence of guilt, and with his record of Vietnam service, during which he was injured in combat and decorated, and other extenuating circumstances, he had reason to believe that he might receive leniency if he pled guilty.

25 Cases that cite this headnote

**[3]**    **Criminal Law**  **Sentencing**

Postconviction relief on basis of misinformation from counsel concerning possible sentence may be granted only if it constitutes constitutional error, complete miscarriage of justice, is inconsistent with rudimentary demands of fair procedure, or prejudice as result of lack of compliance with Fed.Rules of Cr.Proc., Rule 11, 18 U.S.C.A.

1 Cases that cite this headnote

**[4]**    **Criminal Law**  **Requisites and Proceedings for Entry**

Trial court's failure to observe literal requirements of Fed.Rules of Cr.Proc., Rule 11, 18 U.S.C.A. did not justify invalidation of defendant's guilty plea, where court's failure to observe rule's requirements did not in fact prejudice defendant or undermine fairness of proceeding.

1 Cases that cite this headnote

**[5]**    **Criminal Law**  **Plea**

Defendant was not entitled to evidentiary hearing to assess allegations that his attorney led him to expect lesser sentence in return for his

plea, where those allegations were refuted by defendant's own sworn testimony during plea proceeding, and defendant alleged no support for, or affidavit of, any third party to attest to his claims.

210 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1096** Charles Herbert Fuller, pro se.

Thomas S. Leatherbury, court appointed, Dallas, Tex., for defendant-appellant.

James A. Rolfe, U.S. Atty., J. Michael Worley, Asst. U.S. Atty., Fort Worth, Tex., for plaintiff-appellee.

Appeal from the United States District Court for the Northern District of Texas.

Before RUBIN, JOHNSON, and JONES, Circuit Judges.

**Opinion**

ALVIN B. RUBIN, Circuit Judge:

A defendant in a criminal case pleaded guilty, he contends, because of his lawyer's advice that the maximum sentence was fifteen years when in fact the maximum sentence was only five years. The defendant feared that, if he proceeded to trial and were convicted, he would receive the maximum sentence. He now seeks relief under 28 U.S.C. § 2255 contending that this misinformation invalidates his plea, that his lawyer was ineffective, and that the district court erred in refusing to grant an evidentiary hearing.

Even if the petitioner can establish the facts alleged in this case, we find that they would not be sufficient to demonstrate that the misinformation induced him to enter the plea or that it prejudiced him. We therefore affirm the district court's denial of relief without an evidentiary hearing.

I.

Charles Herbert Fuller was convicted on his plea of guilty of distributing methamphetamine in violation of 21 U.S.C.

§ 841(a)(1). The court advised him that the maximum penalty for the offense was a prison sentence of fifteen years and a fine of $25,000. At the time of his conviction, the maximum sentence was in fact only five years, and the maximum fine only $15,000,[1] although the statute has since been amended to increase the severity of the punishments.[2] Under the earlier law, offenders with a prior drug-related conviction, such as the defendant in this case, were subject to imprisonment for a maximum of ten years and a fine of $30,000.[3]

The court sentenced Fuller to a six-year prison term with four years of special parole, under 18 U.S.C. § 4205(b)(2), making him eligible for parole at the Parole Commission's discretion.

Fuller complained of the misadvice two years later in a motion under 28 U.S.C. § 2255 filed in June 1981. The district court treated his motion as a motion to correct sentence under Fed.R.Crim.P. 35 and, without referring to Fuller's prior conviction, reduced his prison term from six to five years.

Fuller now alleges that his plea was coerced by the district court's exaggeration of the maximum penalty. Fearing that he would receive the maximum sentence because of his prior drug convictions, he pleaded guilty in hope of a lesser sentence.

Fuller filed this § 2255 motion while still incarcerated in April 1984. It appears that he may have completed his sentence and **\*1097** been released while the appeal was pending. Nevertheless, because the conviction may result in adverse consequences, we have considered it on the merits.[4]

Fuller also maintains that his lawyer advised him to plead guilty "in order to avoid the very strong possibility of a maximum (15 year) sentence if [he] 'angered the Court by pleading innocent and going through the motions of a Jury Trial.' " He contends that his lawyer advised him that the prosecutor would do his best to get a maximum sentence upon conviction but that, if Fuller would change his plea, the prosecutor would recommend a lesser sentence.

The district court denied relief without an evidentiary hearing, distinguishing cases that reached a contrary result. In both *Cooks v. United States*[5] and *United States v. Rumery,*[6] the

defendants' counsel had overstated the possible penalties and then obtained guilty pleas on the promise that the exaggerated penalties would be reduced. The court found it significant that, "[b]ecause petitioner was indicted on only one count there could be no plea bargain offer to dismiss other counts in exchange for a guilty plea." The district court found that, when Fuller entered his guilty plea, he stated under oath that it was "made solely because he was guilty and was not the result of coercion or promises." [7] Fuller's attorney stated at the time that he did not know of "any plea agreement or statements made in connection with this plea" and that "[w]e have nothing worked out with [the U.S. Attorney's office] other than the fact that we were not going to go to trial."

Although the record is silent concerning the lawyer's advice to Fuller, it shows that counsel failed to correct the trial judge when he misstated the maximum. The prosecutor made no recommendation concerning sentence and neither Fuller, nor Fuller's lawyer, called attention to the now-asserted promise that the prosecutor would recommend "a lighter sentence."

## II.

*Strickland v. Washington* [8] set out a two-pronged test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance: (1) the defendant must show that counsel's performance was deficient, and (2) the defendant must show that the deficient performance prejudiced the defense. [9] The contention of ineffective assistance may be rejected because of an insufficient showing of prejudice without inquiry into the adequacy of counsel's performance. [10] "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [11] "The ultimate focus of inquiry must be on the fundamental **\*1098** fairness of the proceeding whose result is being challenged." [12]

Although *Strickland* considered counsel's representation at trial, the opinion is also applicable to convictions based on guilty pleas. [13]

[1] Erroneous advice from counsel or the court that the maximum sentence was greater than that allowed by the

statute does not necessarily prejudice a defendant unless the facts demonstrate that the error was likely to have altered the defendant's decision to plead guilty. [14] Under some circumstances, the actual penalty may itself be so formidable or the overstatement so small that it is improbable the error would have had any effect. Thus, in *Allen v. United States*, [15] a case in which the defendant had pleaded guilty to bank robbery charges after being advised of an exaggerated penalty, we stated: "It is inherently incredible that a person would voluntarily submit himself to a possible thirty-five year sentence but would take his chances on getting an acquittal if he faced only [a] twenty-five year sentence." [16]

Given the discrepancy between the alleged advice and the actual maximum sentence in this case, we cannot be so certain. A defendant, faced with the possibility of fifteen years in prison, might well take a desperate gamble for clemency by pleading guilty as charged. Had he been advised that the maximum sentence was only five years, the same defendant might have accepted that risk in the hope of an acquittal at trial. But whether the defendant might have decided to plead differently cannot be determined simply by measuring the degree to which the penalty was overstated. That decision must be based on consideration of all the facts confronting the defendant.

Fuller knew from the factual resume given in court at the time the judge accepted his guilty plea that the DEA agent to whom he sold the methamphetamine face-to-face would testify that the thirteen grams involved were intended as a sample and that Fuller told him that he could supply pound quantities. The agent would also have testified that he saw several pounds of marijuana in Fuller's motel room. Fuller knew that his own credibility at trial would be negligible because he had recently been released from prison after serving federal sentences for marijuana offenses and escape. With his record of Vietnam service, during which he was injured in combat and decorated, and other extenuating circumstances, he had reason to believe that he might receive leniency if he pleaded guilty. Fuller, therefore, faced what appeared to be overwhelming evidence of guilt and could hope for leniency only if he appeared to be repentant.

At times we have granted relief when a guilty plea was entered in reliance on an overstatement of the possible sentence. In each case, however, we have found that the defendant was erroneously induced to believe that he would benefit from pleading guilty. Thus, in *Cooks v. United States*, [17]

counsel advised the defendant to plead guilty on one count in return for dismissal of five other identical counts. As a matter of law, Cooks was liable only under a single count. Cooks' counsel led him to believe that pleading guilty would reduce his exposure from sixty to ten years of imprisonment. Granting relief, we said "the erroneous advice does not involve an exaggeration of the possible *detriments* of the plea. Rather it presented an unfounded **\*1099** overstatement of the potential *benefits* of pleading guilty."[18]

Similarly, in *United States v. Rumery,*[19] the defendant was charged with a single count of conspiracy, although the indictment also recited the crimes in which the defendant had conspired. Rumery's counsel mistakenly advised him that he had been charged with those crimes as well, but that the substantive charges would be dropped if he pleaded guilty to the conspiracy charge. Rumery was consequently led to believe that his guilty plea would reduce his maximum potential sentence by twenty-five years.

 **[2]**    Fuller was not led to believe that a guilty plea would reduce his potential maximum sentence. During his plea proceedings, Fuller swore that no one had coerced him and that no one had made any promises or representations that he would receive a lighter sentence in return for his plea. Even now he makes no such claims. He pleaded guilty in the expectation of possible consequences graver than those he actually faced. Under these circumstances, proof of Fuller's allegations would not suffice to prove that the errors of his attorney undermined the fairness of the proceedings, or would have led to a different outcome.

III.

 **[3]    [4]**    Fuller also contends that his plea was not made knowingly and voluntarily because of the court's misadvice as to the maximum term of imprisonment, which violated Fed.R.Crim.P. 11(c)(1). Not every violation of that rule, however, entitles a defendant to post-conviction relief. Post-conviction relief on the basis of misinformation concerning the possible sentence may be granted only if it constitutes constitutional error, "a complete miscarriage of justice," is inconsistent "with the rudimentary demands of fair procedure,"[20] or if prejudice as a result of the lack of compliance can be shown.[21] The court's failure to observe the literal requirements of Rule 11 do not justify the invalidation of Fuller's guilty plea because it did not in fact prejudice him or undermine the fairness of the proceeding.

IV.

 **[5]**    Finally, Fuller contends that the district court erred in refusing to grant an evidentiary hearing to assess the allegations that his attorney led him to expect a lesser sentence in return for his plea. These factual allegations are refuted by Fuller's own sworn testimony during the plea proceedings. "Ordinarily a defendant will not be heard to refute his testimony given under oath when pleading guilty."[22] If, however, the defendant offers specific factual allegations supported by the affidavit of a reliable third person, then he is entitled to a hearing on his allegations.[23]

Fuller has alleged no support for, or affidavit of, any third party to attest to the claims he now makes. The district court, therefore, did not err in refusing him an evidentiary hearing.

For these reasons, the judgment is AFFIRMED.

**All Citations**

769 F.2d 1095

---

## Footnotes

1    21 U.S.C. § 841(b)(1)(B) (1982) (amended 1984).

2    21 U.S.C. § 841(b)(1)(C) *as amended by* Pub.L. No. 98-473, Title II, § 502, 98 Stat. 2068, 2070 (1984).

3    21 U.S.C. § 841(b)(1)(B) (1982) (amended 1984).

4    *Sibron v. New York,* 392 U.S. 40, 50-58, 88 S.Ct. 1889, 1896-1900, 20 L.Ed.2d 917, 927-932 (1968); *Carafas v. LaValle,* 391 U.S. 234, 237-38, 88 S.Ct. 1556, 1559, 20 L.Ed.2d 554, 558-59 (1968); *Pollard v. United States,* 352 U.S. 354, 358, 77 S.Ct. 481, 484, 1 L.Ed.2d 393, 397 (1957); *Sinclair v. Blackburn,* 599 F.2d 673, 675-76 (5th Cir.1979); *Matthews v. Florida,* 463 F.2d 679, 681 (5th Cir.1972).

5    461 F.2d 530 (5th Cir.1972).

6    698 F.2d 764 (5th Cir.1983).

7    Fuller had also testified in response to court's questions as follows:

> Q. Has any attorney, officer, employee, or agent of any branch of the government made any suggestion or promise or representation to you that you would receive a lighter sentence or probation if you would just plead guilty?
>
> A. No, sir.
>
> Q. Has anyone made any promise or promises, or representations, or statements of any kind to you if you would plead guilty?
>
> A. No, Your Honor.

8    466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

9    *Id.* at ----, 104 S.Ct. at 2064, 80 L.Ed.2d at 692.

10    *Id.* at ----, 104 S.Ct. at 2069-70, 80 L.Ed.2d at 698-700.

11    *Id.* at ----, 104 S.Ct. at 2068, 80 L.Ed.2d at 697.

12    *Id.* at ----, 104 S.Ct. at 2069, 80 L.Ed.2d at 698.

13    *Craker v. Procunier,* 756 F.2d 1212, 1214-15 (5th Cir.1985); *Hobbs v. Blackburn,* 752 F.2d 1079, 1082 (5th Cir.1985); *Green v. McGougan,* 744 F.2d 1189, 1190-91 (5th Cir.1984).

14    *Allen v. United States,* 634 F.2d 316, 317-18 (5th Cir.1981); *United States v. Woodall,* 438 F.2d 1317, 1322, 1328-29 (5th Cir.) (en banc), *cert. denied,* 403 U.S. 933, 91 S.Ct. 2262, 29 L.Ed.2d 712 (1971); *Eakes v. U.S.,* 391 F.2d 287 (5th Cir.1968).

15    634 F.2d 316 (5th Cir.1981).

16    *Id.* at 317.

17    461 F.2d 530 (5th Cir.1972).

18    *Id.,* at 533 n. 3 (emphasis in original).

19    698 F.2d 764 (5th Cir.1983).

20    *United States v. Timmreck,* 441 U.S. 780, 783-84, 99 S.Ct. 2085, 2087, 60 L.Ed.2d 634, 638-39 (1979).

21    *Allen v. United States,* 634 F.2d 316, 317 (5th Cir.1981), *quoting Keel v. United States,* 585 F.2d 110 (5th Cir.1978) (en banc).

22    *United States v. Sanderson,* 595 F.2d 1021, 1022 (5th Cir.1979), *citing United States v. Barrett,* 514 F.2d 1241, 1243 (5th Cir.1975).

23    *Blackledge v. Allison,* 431 U.S. 63, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977); *Matthews v. United States,* 533 F.2d 900, 902 (5th Cir.1976), *cert. denied,* 429 U.S. 1121, 97 S.Ct. 1156, 51 L.Ed.2d 571 (1977). *Accord United States v. Dabdoub-Diaz,* 599 F.2d 96, 100 (5th Cir.), *cert. denied,* 444 U.S. 878, 100 S.Ct. 164, 62 L.Ed.2d 107 (1979); *Frank v. United States,* 501 F.2d 173, 174 (5th Cir.1974).

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

02 Cal. Daily Op. Serv. 10,686, 2002 Daily Journal D.A.R. 12,347

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by United States v. Gaspar-Miguel, 10th Cir.(N.M.), January 16, 2020

309 F.3d 594
United States Court of Appeals,
Ninth Circuit.

UNITED STATES of America, Plaintiff–Appellee,

v.

Juan GONZALEZ–TORRES, Defendant–Appellant.

No. 00–50543.
|
Argued and Submitted July 9, 2001.
|
Filed Oct. 28, 2002.

**Synopsis**

Defendant was convicted in the United States District Court for the Southern District of California, William B. Enright, J., of entering the United States illegally, being a deported alien found in the United States, and smuggling aliens into the United States. Defendant appealed. The Court of Appeals, Rawlinson, Circuit Judge, held that: (1) defendant, who was continuously observed from time of border crossing to apprehension, did not enter free from official restraint, as required to support illegal entry charges; but (2) existence of official restraint did not preclude alien smuggling conviction; (3) alien smuggling conviction was supported by evidence; (4) specific unanimity instruction was not warranted; (5) defendant's motion to sever charges was untimely, and in any event lacked merit; and (6) evidence that defendant's index finger was badly damaged in an attempt to evade Border Patrol's identification system was properly admitted.

Affirmed in part, reversed in part, and remanded.

Supersedes 273 F.3d 1181.

West Headnotes (26)

**[1]** **Criminal Law** 🔑 Review De Novo

Court of Appeals reviews district court's denial of a motion for acquittal de novo. Fed.Rules Cr.Proc.Rule 29, 18 U.S.C.A.

4 Cases that cite this headnote

**[2]** **Criminal Law** 🔑 Nature of Decision Appealed from as Affecting Scope of Review

In reviewing denial of motion for acquittal, Court of Appeals reviews the evidence presented against the defendant in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Fed.Rules Cr.Proc.Rule 29, 18 U.S.C.A.

7 Cases that cite this headnote

02 Cal. Daily Op. Serv. 10,686, 2002 Daily Journal D.A.R. 12,347

**[3]**    **Aliens, Immigration, and Citizenship** 🔑 Unlawful entry or presence

To "enter" the United States illegally, as will support criminal conviction, an alien must cross the United States border free from "official restraint," which exists if after crossing the border without authorization alien is deprived of his liberty and prevented from going at large within the United States. Immigration and Nationality Act, §§ 275, 276, as amended, 🟨 8 U.S.C.A. §§ 1325, 🟨 1326.

11 Cases that cite this headnote

**[4]**    **Aliens, Immigration, and Citizenship** 🔑 Unlawful entry or presence

An alien does not have to be in the physical custody of the authorities to be subject to official restraint, as will preclude a conviction for illegal entry into the United States by the alien; rather, the concept of official restraint is interpreted broadly, and the restraint may take the form of surveillance, unbeknownst to the alien. Immigration and Nationality Act, §§ 275, 276, as amended, 🟨 8 U.S.C.A. §§ 1325, 🟨 1326.

9 Cases that cite this headnote

**[5]**    **Aliens, Immigration, and Citizenship** 🔑 Reentry after removal

When under surveillance, an alien has not made an entry despite having crossed the border with the intention of evading inspection, because he lacks the freedom to go at large and mix with the population. Immigration and Nationality Act, §§ 275, 276, as amended, 🟨 8 U.S.C.A. §§ 1325, 🟨 1326.

2 Cases that cite this headnote

**[6]**    **Aliens, Immigration, and Citizenship** 🔑 Unlawful entry or presence

If an alien is not discovered until some time after exercising his free will within the United States, he has entered free from official restraint, and thus has made an illegal entry which may support criminal conviction. Immigration and Nationality Act, §§ 275, 276, as amended, 🟨 8 U.S.C.A. §§ 1325, 🟨 1326.

9 Cases that cite this headnote

**[7]**    **Aliens, Immigration, and Citizenship** 🔑 Unlawful entry or presence

Alien who was personally observed crossing over United States border by Border Patrol agent, and who was kept in continuous observation by agents until his apprehension, did not enter country free from official restraint, and thus could not be convicted of illegal entry into the United States, even though agents had lost sight of alien and others in his group for a number of seconds. Immigration and Nationality Act, §§ 275, 276, as amended, 🟨 8 U.S.C.A. §§ 1325, 🟨 1326.

9 Cases that cite this headnote

**[8]**    **Aliens, Immigration, and Citizenship** 🔑 Unlawful entry or presence
        **Aliens, Immigration, and Citizenship** 🔑 Participating in, or inducing unlawful entry

Defendant who never entered the United States for purposes of the illegal entry statutes, since he was under constant observation by Border Patrol agents and thus was not free from official restraint, was still subject to criminal liability

for smuggling aliens. Immigration and Nationality Act, §§ 274(a)(2)(B)(iii), 275, 276, as amended, 8 U.S.C.A. §§ 1324(a)(2)(B)(iii), 1325, 1326.

4 Cases that cite this headnote

**[9]    Aliens, Immigration, and Citizenship** 👈 Participating in, encouraging, or inducing unlawful entry

Crime of smuggling aliens to the United States does not require entry. Immigration and Nationality Act, § 274(a)(2)(B)(iii), as amended, 8 U.S.C.A. § 1324(a)(2)(B)(iii).

**[10]    Aliens, Immigration, and Citizenship** 👈 Participating in, encouraging, or inducing unlawful entry

Doctrine of "official restraint" does not apply to prosecution for smuggling aliens to the United States, and a defendant thus can be convicted of smuggling aliens even if the aliens smuggled were never free from governmental restraint. Immigration and Nationality Act, § 274(a)(2)(B)(iii), as amended, 8 U.S.C.A. § 1324(a)(2)(B)(iii).

**[11]    Criminal Law** 👈 Matters appearing otherwise than by record

Letter filed by appellant's counsel which made new contentions not raised in the briefs or in the district court would be stricken by Court of Appeals. F.R.A.P.Rule 28(j), 28 U.S.C.A.

1 Cases that cite this headnote

**[12]    Courts** 👈 Decisions of Same Court or Co-Ordinate Court

Court of Appeals was not bound by its prior decision undermined by subsequent legislation.

2 Cases that cite this headnote

**[13]    Statutes** 👈 Plain language; plain, ordinary, common, or literal meaning

An unambiguous statute should be interpreted in accordance with its plain meaning.

**[14]    Criminal Law** 👈 Elements and incidents of offense; definitions

Error by district court in concluding that doctrine of "official restraint" applies in prosecution for smuggling aliens into the United States, and thus requires showing that aliens smuggled must have been free from official restraint to support conviction, was harmless, as jury could not have unanimously found defendant guilty of bringing aliens "into" the United States without simultaneously finding that he brought them "to" the United States. Immigration and Nationality Act, § 274(a)(2)(B)(iii), as amended, 8 U.S.C.A. § 1324(a)(2)(B)(iii).

7 Cases that cite this headnote

**[15]    Aliens, Immigration, and Citizenship** 👈 Weight and sufficiency

Conviction for smuggling aliens into the United States was supported by testimony of Border Patrol agents that one member of group of five persons that was observed as it crossed United States border was obviously directing actions

02 Cal. Daily Op. Serv. 10,686, 2002 Daily Journal D.A.R. 12,347

of other four members, who were aliens, and by courtroom testimony identifying defendant as person who had been directing others. Immigration and Nationality Act, § 274(a)(2)(B)(iii), as amended, 8 U.S.C.A. § 1324(a)(2)(B)(iii).

---

**[16]    Criminal Law    Review De Novo**

When jury instructions are challenged as misstatements of law, Court of Appeals reviews them de novo.

4 Cases that cite this headnote

---

**[17]    Criminal Law    Instructions in general**

Determination by Court of Appeals that there was an instructional error requires reversal unless there is no reasonable possibility that the error materially affected the verdict or, in other words, that the error was harmless beyond a reasonable doubt.

2 Cases that cite this headnote

---

**[18]    Criminal Law    Unanimity as to facts, conduct, methods, or theories**

A general unanimity instruction is ordinarily sufficient to instruct the jury that its verdict must be unanimous as to each element of an offense, and a specific unanimity instruction is only required where there is a possibility of juror confusion or when a conviction may result from different jurors concluding that the defendant committed different acts.

2 Cases that cite this headnote

---

**[19]    Criminal Law    In general;  unanimity**

Specific unanimity instruction was not warranted in prosecution for smuggling aliens into the United States, where there was no confusion or prejudice, and verdict indicated jurors' unanimous finding that defendant brought aliens to the United States border and entered illegally. Immigration and Nationality Act, § 274(a)(2)(B)(iii), as amended, 8 U.S.C.A. § 1324(a)(2)(B)(iii).

1 Cases that cite this headnote

---

**[20]    Criminal Law    Proceedings;  waiver**

Requests for severance of charges must be raised prior to trial. Fed.Rules Cr.Proc.Rules 12(b)(5), 14, 18 U.S.C.A.

---

**[21]    Criminal Law    Proceedings;  waiver**

Motion to sever charges against defendant which was brought on morning of trial, immediately before jury was called, was untimely. Fed.Rules Cr.Proc.Rules 12(b)(5), 14, 18 U.S.C.A.

1 Cases that cite this headnote

---

**[22]    Criminal Law    Particular cases**

Defendant charged with illegally entering the United States, and smuggling aliens into the United States, failed to show that a joint trial on charges was so manifestly prejudicial as to require separate trials. Immigration and Nationality

02 Cal. Daily Op. Serv. 10,686, 2002 Daily Journal D.A.R. 12,347

Act, §§ 274(a)(2)(B)(iii), 275, 276, as amended, 8 U.S.C.A. §§ 1324(a)(2)(B)(iii), 1325, 1326; Fed.Rules Cr.Proc.Rule 12(b)(5), 18 U.S.C.A.

**[23]    Criminal Law    🔑    Relevance**

Court of Appeals reviews district court's decision to admit or exclude evidence under rule which requires a balancing of its probative value against its prejudicial effect for abuse of discretion. Fed.Rules Evid.Rule 403, 28 U.S.C.A.

12 Cases that cite this headnote

**[24]    Criminal Law    🔑    Evidence calculated to create prejudice against or sympathy for accused**

District court acted within its discretion by determining that potentially probative value of evidence that defendant's index finger was badly defaced, which allegedly tended to prove that defendant sought to evade the Border Patrol's identification system, was not outweighed by possible prejudice to the defendant, and thus that evidence was admissible in prosecution of defendant for illegal entry into the United States, and for smuggling aliens. Immigration and Nationality Act, §§ 274(a)(2)(B)(iii), 275, 276, as amended, 8 U.S.C.A. §§ 1324(a)(2)(B)(iii), 1325, 1326; Fed.Rules Evid.Rule 403, 28 U.S.C.A.

2 Cases that cite this headnote

**[25]    Statutes    🔑    Plain language;  plain, ordinary, common, or literal meaning**

In construing a statute, court begins with the text, and if the text is unambiguous, the statute will be interpreted according to its plain meaning.

**[26]    Aliens, Immigration, and Citizenship    🔑    Sentencing and punishment**

Penalty provisions of statute establishing offense of smuggling aliens into the United States apply to each alien smuggled, rather than to each conviction. Immigration and Nationality Act, § 274(a)(2)(B), as amended, 8 U.S.C.A. § 1324(a)(2)(B).

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*597**  Benjamin L. Coleman, Federal Defenders of San Diego, San Diego, CA, and Shaun Khojayan, San Diego, CA, for the defendant-appellant.

Patrick K. O'Toole, United States Attorney (at time of argument), Carol C. Lam, United States Attorney (when opinion was filed), Roger W. Haines, Assistant United States Attorney, U.S. Attorney's Office, San Diego, CA, for the plaintiff-appellee.

Appeal from the United States District Court for the Southern District of California; William B. Enright, District Judge, Presiding. D.C. No. CR–00–00790–WBE.

Before RYMER and RAWLINSON, Circuit Judges, and POGUE, [*] Judge.

02 Cal. Daily Op. Serv. 10,686, 2002 Daily Journal D.A.R. 12,347

ORDER AND OPINION

RAWLINSON, Circuit Judge.

## ORDER

The Opinion filed on December 11, 2001, appearing at 🚩 273 F.3d 1181, is withdrawn and replaced with the attached opinion.

## OPINION

Juan Gonzalez–Torres ("Torres") was convicted by a jury of entering the United States in violation of 8 U.S.C. § 1325, being a deported alien "found in" the United States in violation of 8 U.S.C. § 1326, and smuggling aliens in violation of 8 U.S.C. § 1324(a)(2)(B)(iii). The district court erred by finding Torres was not under official restraint. Accordingly, we reverse the convictions based on violations of §§ 1325 and 1326.

BACKGROUND AND PROCEEDINGS

On March 1, 2000, Border Patrol Agent Todd Watkins ("Agent Watkins") observed, through his binoculars, a group of suspected aliens enter the United States from the Mexican border. Agent Watkins was not in position to intercept the group, so he sent a radio message to agents in the area. Border Patrol Agent Jari Karttunen ("Agent Karttunen") received the message, saw the suspects, and began pursuing them. Although he lost sight of them for moments at a time, Agent Watkins observed the suspects continuously. He knew the trail well and was able to visually follow them until they were intercepted.

As he watched the suspects, Agent Watkins noticed that one of the individuals appeared to lead the group. Agent Karttunen also observed this. The leader, identified in court by Agent Karttunen as defendant Torres, was making hand gestures and telling the others when to sit and where to walk. As the group of suspects was near apprehension, Torres attempted to escape, but was unsuccessful. When the Immigration and Naturalization Service ("INS") attempted to identify the suspects through their fingerprints, the **\*598** agents discovered that Torres, who used an alias, had also defaced his index finger, apparently in an effort to frustrate attempts to identify him.

Torres was tried before a jury, and at the close of the Government's case, brought a motion for acquittal under Rule 29 as to all counts. The district court denied the motion. After the motion for acquittal was denied, both sides submitted proposed jury instructions on the official restraint doctrine. The district court adopted the Government's proposed instruction over Torres' objection. The jury returned guilty verdicts as to all counts.

At the sentencing hearing, the district court found, over Torres' objection, that Torres was subject to a five year mandatory minimum because each alien constituted a separate violation under the statute. Torres was sentenced accordingly.

DISCUSSION

I. *Motion for Acquittal*

02 Cal. Daily Op. Serv. 10,686, 2002 Daily Journal D.A.R. 12,347

 **[1]**   **[2]**   We review the district court's denial of a Rule 29 motion for acquittal *de novo.* *United States v. Ruiz–Lopez,* 234 F.3d 445, 447–48 (9th Cir.2001). In doing so, we "review the evidence presented against the defendant in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Neill,* 166 F.3d 943, 948 (9th Cir.), *cert. denied,* 526 U.S. 1153, 119 S.Ct. 2037, 143 L.Ed.2d 1046 (1999) (citation and internal quotation omitted).

   A. *The Illegal Entry Counts:* *8 U.S.C. §§ 1325* and *1326*

Torres' motion for acquittal should have been granted because Torres failed to "enter" the United States. 8 U.S.C. § 1325 prohibits an alien from entering the United States without official authorization. 8 U.S.C. § 1326 prohibits the same conduct from an alien who has been previously removed. It is undisputed that Torres traveled from Mexico to the United States without approval.

 **[3]**   **[4]**   **[5]**   **[6]**   Since 1908, federal courts have recognized that "entering" the United States requires more than mere physical presence within the country. *United States v. Pacheco–Medina,* 212 F.3d 1162, 1163–64 (9th Cir.2000). To "enter," an alien must cross the United States border free from official restraint. *Id.* at 1164. An alien is under "official restraint" if, after crossing the border without authorization, he is "deprived of [his] liberty and prevented from going at large within the United States." *Id.* (quoting *Ex parte Chow Chok,* 161 F. 627, 628–29 (N.D.N.Y.), *aff'd,* 163 F. 1021 (2d Cir.1908)). An alien does not have to be in the physical custody of the authorities to be officially restrained; rather, the concept of official restraint is interpreted broadly. *Ruiz–Lopez,* 234 F.3d at 448. "[T]he restraint may take the form of surveillance, unbeknownst to the alien." *Id.* (quoting *Matter of Pierre,* 14 I. & N. Dec. 467 (1973)). When under surveillance, the alien "has still not made an entry despite having crossed the border with the intention of evading inspection, because he lacks the freedom to go at large and mix with the population." *Id.* On the other hand, if an alien is not discovered until some time after exercising his free will within the United States, he has entered free from official restraint. *United States v. Martin–Plascencia,* 532 F.2d 1316, 1317 (9th Cir.1976).

 **[7]**   Agent Watkins, who discovered Torres' group attempting to enter the United States, testified that he personally observed the group cross from Mexico into the United States. Agent Watkins relayed **\*599** the information to agents in the area. Agent Karttunen followed the group through the brush while Agent Watkins maintained continuous observation until the group was apprehended. Agent Watkins testified that although he lost sight of the group "for a number of seconds" he knew the trail and was able to follow them "up to close to where they were actually apprehended." Between the agents, Torres' group was under continuous observation. Therefore, Torres was never free from official restraint.

   B. *The Smuggling Count:* *8 U.S.C. § 1324(a)(2)(B)(iii)*

 **[8]**   **[9]**   **[10]**   Although Torres never entered the United States for purposes of the illegal entry statutes, he is still subject to criminal liability for smuggling aliens to this country in violation of 8 U.S.C. § 1324(a)(2)(B)(iii). Smuggling aliens to the United States does not require entry. Citing *United States v. Aguilar,* 883 F.2d 662, 681 (9th Cir.1989), Torres' counsel argued in the district court that the official restraint doctrine applied to the smuggling counts. The Assistant United States Attorney agreed, and advised the district court that if the jury found the aliens were never free from official restraint, Torres could not be convicted of bringing them to the United States. Both parties erred in their interpretation of the statute, and we are not bound by their error.

While *Aguilar* does state that the "official restraint" doctrine applies to smuggling cases brought pursuant to § 1324, neither party seemed to realize that *Aguilar* was not decided under the present version of 8 U.S.C. § 1324. *Aguilar* was decided under a predecessor statute which read:

> Any person, including the owner, operator, pilot, master, commanding officer, agent or consignee of any means of transportation who—(1) brings into or lands in the United States, by any means of transportation or otherwise, or attempts, by himself or through another, to bring into or land in the United States, by any means of transportation or otherwise.

883 F.2d at 672 n. 2.

[11]    [12]    This section was substantially revised in 1986. Public Law 99–603, Title I, Part B, § 112–100 Stat. 3381. The legislative history indicates that Congress was particularly concerned with "shortcomings and ambiguities in existing law." H.R.Rep. No. 682(I), 99th Cong., 2d Sess. 65 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5669. Particularly, Congress was concerned with smuggling cases that equated "bring into" with "entering." H.R.Rep. No. 682(I), 99th Cong., 2d Sess. 65 (1986), reprinted in 1986 U.S.C.C.A.N. 5649, 5670. Deliberately overruling case law requiring entry to sustain a smuggling conviction, Congress replaced the words "brings into" with the words "brings to." H.R.Rep. No. 682(I), 99th Cong., 2d Sess. 65 (1986), reprinted in 1986 U.S.C.C.A.N. 5649, 5670. Thus, we are not bound by our decision in *Aguilar*. *United States v. Washington,* 872 F.2d 874, 880 (9th Cir.1989) ("We are not bound by decisions of prior panels if subsequent legislation undermines those decisions"). [1]

[13]    [14]    Since the current statute is unambiguous, it should have been interpreted in accordance with its plain meaning. *See Royal Foods Co. Inc. v. RJR Holdings,*  \*600  *Inc.,* 252 F.3d 1102, 1106 (9th Cir.2001). The district court, led by both parties, committed a mistake of law in finding the official restraint doctrine applicable to cases where a smuggler brings aliens to the United States. Nonetheless, we find the error harmless. The jury could not have unanimously found Torres guilty of bringing aliens "into" the United States without simultaneously finding he brought aliens "to" the United States. *See United States v. Asher,* 854 F.2d 1483, 1496 (3d Cir.1988) (finding the jury could not have found defendant guilty of mail fraud without simultaneously finding the state was deprived of money, a fact not found by the jury, but required by law). The jury's verdict, therefore, remains sound.

[15]    Torres contends there is insufficient evidence to support his conviction for smuggling. However, Agent Watkins testified that as he watched Torres' group cross the border from Mexico into the United States, "four individuals[were] obviously being directed by one." This individual, according to Agent Watkins, directed the group by "hands, arms, gestures. For instance, motion to stop, sit down. He was this one individual obviously leading, pointing in directions, the trail and route that was selected." Although he could not make out the individual's face, Agent Watkins said he thought the individual was wearing a dark jacket.

Agent Karttunen, who assisted in Torres' apprehension, testified that he also recognized the man in a black coat as the leader of the group. Unlike Agent Watkins, Agent Karttunen actually recognized Torres' face and identified him as the individual who was guiding the group. On this record, we find that a rational trier of fact could have found that Torres was guiding the other individuals to the United States in violation of 8 U.S.C. § 1324.

II. *The Jury Instructions*

**[16]** **[17]** When jury instructions are challenged as misstatements of law, we review them *de novo*. *Voohries–Larson v. Cessna Aircraft Co.,* 241 F.3d 707, 713 (9th Cir.2001). "When we determine that there is an instructional error, that requires reversal unless there is no reasonable possibility that the error materially affected the verdict or, in other words, that the error was harmless beyond a reasonable doubt." *United States v. Romo–Romo,* 246 F.3d 1272, 1274 (9th Cir.2001) (internal quotations omitted); *see also* *United States v. Pierre,* 254 F.3d 872, 877 (9th Cir.2001) (applying harmless error analysis).

Since we find Torres was not free from official restraint, *see supra* p. 598, we do not reach Torres' challenge to the district court's official restraint instruction. We must, however, determine whether the district court committed error by failing to give a specific unanimity instruction for the smuggling counts. Torres asserts there is a possibility that some jurors found he merely attempted to bring aliens to the United States, while others found he completed the crime. [2]

**[18]** **[19]** Ordinarily, a general unanimity instruction is sufficient to instruct the jury that its verdict must be unanimous as to each element of an offense. *Jeffries v. Blodgett,* 5 F.3d 1180, 1195 (9th Cir.1993) (citations omitted). A specific unanimity instruction is only required where there is a possibility of juror confusion or when a "conviction may result from different jurors **\*601** concluding that the defendant committed different acts." *Id* (citations omitted). [3] The district court did not err in failing to, *sua sponte,* give a specific unanimity instruction, because the verdict indicates there was no confusion or prejudice. Torres' convictions on counts one and six indicates the jurors unanimously found that Torres brought aliens to the United States border and entered illegally.

III. *The Motion to Sever*

**[20]** **[21]** Torres alleges the district court committed error by denying his motion to sever the counts brought under § 1325 and § 1326 from the counts brought under § 1324. We need not address this issue. Torres' counsel failed to bring the motion for severance until the morning of trial, immediately before the jury was called. When the district court inquired into the reasons for the delay, Torres' counsel asserted, "There is no rule saying that we have to bring [it] pre-trial." Torres' counsel was mistaken. Rule 12(b)(5) of the Federal Rules of Criminal Procedure specifically provides that requests for severance of charges under Rule 14 must be raised prior to trial. Thus, the motion to sever was untimely. [4] *See* *United States v. Castro,* 972 F.2d 1107, 1109 (9th Cir.1992) (recognizing that motions made on day of trial are untimely).

**[22]** Moreover, Torres' motion was properly denied on the merits. There was no showing that a joint trial was so manifestly prejudicial as to require the court to order separate trials. *United States v. Nelson,* 137 F.3d 1094, 1108 (9th Cir.1998).

IV. *Evidence Regarding the Condition of Torres' Finger*

**[23]** **[24]** Torres alleges that the district court erred by allowing the government to introduce evidence that Torres' finger was "scratched up." We review the district court's decision to admit or exclude evidence under Rule 403 for abuse of discretion. *United States v. Crosby,* 75 F.3d 1343, 1346 (9th Cir.1996). The Government introduced evidence that only Torres's index finger was badly defaced. According to the Government, this evidence tended to prove that Torres sought to evade the Border Patrol's identification system. [5] The potentially probative value of this evidence was not outweighed by possible prejudice to the defendant. The district court acted within its discretion in admitting the evidence.

V. *Sentencing*

**[25]** **[26]** The district court found that it was required to impose a five year mandatory minimum sentence on the basis that each alien smuggled constituted a separate violation of 8 U.S.C. § 1324(a)(2)(B). Torres contends that the district

court misconstrued this provision. In construing a statute, we begin with the text. If the text is unambiguous, the statute will be interpreted according to its plain meaning. *Royal Foods v. RJR Holdings Inc.,* 252 F.3d at 1106 (finding that there is no further inquiry if congressional intent is clear from the plain and unambiguous meaning of the language). The text of the statute unequivocally provides that penalties are to be assessed for "each alien in respect to whom a violation of this paragraph occurs." 8 U.S.C. § 1324(a)(2)(B). Nonetheless, **\*602** Torres alleges that the penalty provision was not intended to apply to "each alien," but rather, was intended to apply to "each conviction." This position is directly contrary to the plain language of the statute and its legislative history. Public Law 104–208, 110 Stat. 3009–566 added the penalty section at issue through a provision entitled, "APPLYING CERTAIN PENALTIES ON A PER ALIEN BASIS." *Id.* Torres' sentence was calculated in accordance with the governing statute.

CONCLUSION

We reverse Torres' conviction on counts one and six ( §§ 1325, 1326) and remand for judgment of acquittal. We affirm Torres' conviction and sentence as to counts two through five ( § 1324).

AFFIRMED IN PART, REVERSED and REMANDED IN PART.

**All Citations**

309 F.3d 594, 02 Cal. Daily Op. Serv. 10,686, 2002 Daily Journal D.A.R. 12,347

**Footnotes**

| | |
|---|---|
| \* | The Honorable Donald C. Pogue, Judge, Court of International Trade, sitting by designation. plaintiff-appellee. |
| 1 | Once Torres' counsel realized that *Aguilar* was not controlling, he filed a letter with this Court pursuant to Federal Rule of Appellate Procedure 28(j) for the purpose of making additional arguments. We grant the government's Motion to strike the 28(j) letter because it makes new contentions not raised in the briefs or in the district court. |
| 2 | Torres raises this unanimity argument only in the context of an asserted instructional error. He does not challenge the indictment as duplicitous, so we have no occasion to reach the issue decided in *United States v. Ramirez–Martinez,* 273 F.3d 903 (9th Cir.2001). |
| 3 | Although Torres refers to juror confusion in his briefs, his focus is on the "genuine possibility that different jurors could have convicted him of committing different acts." |
| 4 | It is unclear whether the district court denied the motion because it was untimely or because it was not meritorious. |
| 5 | The Border Patrol's identification system is based on fingerprints of index fingers only. |

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

00 Cal. Daily Op. Serv. 8956

KeyCite Yellow Flag - Negative Treatment

Disagreed With by    U.S. v. Rodriguez,    2nd Cir.(N.Y.),    July 20, 2005

231 F.3d 1188
United States Court of Appeals,
Ninth Circuit.

UNITED STATES of America, Plaintiff–Appellee,
v.
Alfredo GRACIDAS–ULIBARRY,
Defendant–Appellant.

No. 98–50610.
|
Argued and Submitted En Banc June 20, 2000
|
Filed Nov. 7, 2000

**Synopsis**

Defendant was convicted of attempted reentry into United States following deportation, following jury trial in the United States District Court for the Southern District of California, Howard B. Turrentine, J. The Court of Appeals, Rymer, Circuit Judge, 192 F.3d 926, affirmed. On rehearing en banc, the Court of Appeals, Fisher, Circuit Judge, held that: (1) offense of attempted illegal reentry was specific intent crime, but (2) District Court's failure to instruct jury on specific intent element was harmless error.

Affirmed in part, reversed in part, and remanded.

Fernandez, Circuit Judge, concurred in result and filed statement.

West Headnotes (17)

**[1]**    **Aliens, Immigration, and Citizenship**    �070 Reentry after removal

An alien does not reenter, and cannot be considered found in, the United States, for purposes of the statute prohibiting a previously deported alien from entering or being found in the United States, until he or she is physically present in the country and free from official restraint. Immigration and Nationality Act, § 276, 8 U.S.C.A. § 1326.

6 Cases that cite this headnote

**[2]**    **Criminal Law**    �070 Review De Novo

Court of Appeals would review de novo whether jury instruction misstated element of statutory crime.

3 Cases that cite this headnote

**[3]**    **Aliens, Immigration, and Citizenship**    �070 Reentry after removal

The offense of attempting to enter the United States after deportation incorporates the common law meaning of "attempt" and requires proof of a specific intent to enter illegally. Immigration and Nationality Act, § 276, 8 U.S.C.A. § 1326.

23 Cases that cite this headnote

**[4]**    **Criminal Law**    �070 Attempts

The common law meaning of "attempt" is the specific intent to engage in criminal conduct and an overt act which is a substantial step towards committing the crime.

23 Cases that cite this headnote

**[5]**    **Criminal Law**    �070 Acts prohibited by statute

Even when Congress has not used a common law term having an implicit level of intent, a court will read into a statute at least a level of intent or scienter necessary to separate wrongful from innocent conduct, mala prohibita regulatory offenses being an exception.

**[6]**    **Criminal Law**    �070 Acts prohibited by statute

In determining the level of mental culpability required for a particular statutory offense, the Court of Appeals must first look to the intent of Congress.

1 Cases that cite this headnote

**[7]**    **Statutes**    Legislative Construction

When Congress has used a term that has a settled common law meaning, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of that term.

1 Cases that cite this headnote

**[8]**    **Criminal Law**    Attempts

Congress' use of the term "attempts" in a criminal statute does not reflect silence as to intent but is consistent with a purpose to adopt the cluster of ideas that were attached to the borrowed word in the body of learning from which it was taken, that is, the common law; this principle applies regardless of whether the mental culpability requirement of the crime attempted is general intent or mala prohibita strict liability.

2 Cases that cite this headnote

**[9]**    **Criminal Law**    Criminal Intent and Malice

The practical difference between specific and general intent is that certain defenses, such as voluntary intoxication and subjective mistake of fact, can negate culpability only for specific intent crimes.

8 Cases that cite this headnote

**[10]**    **Criminal Law**    Criminal Intent and Malice

Even in a crime requiring no specific intent, a defendant may defend upon the ground that he or she was asleep or unconscious at the time an act occurred and thus did no voluntary act.

**[11]**    **Criminal Law**    Criminal Intent and Malice
**Criminal Law**    Negligence; recklessness

In general, "purpose," for purposes of the hierarchy of culpable states of mind of purpose, knowledge, recklessness, and negligence, corresponds to the concept of "specific intent," while "knowledge" corresponds to "general intent."

16 Cases that cite this headnote

**[12]**    **Criminal Law**    Criminal Intent and Malice
**Criminal Law**    Negligence; recklessness

A person who causes a result prohibited by common law or statute has acted "purposely," for purposes of the hierarchy of culpable states of mind of purpose, knowledge, recklessness, and negligence, if he or she consciously desired that result, whatever the likelihood of that result ensuing from his or her actions.

5 Cases that cite this headnote

**[13]**    **Aliens, Immigration, and Citizenship**    Reentry after removal

The elements of the crime of attempted illegal reentry into the United States are: (1) the defendant had the purpose, that is, conscious desire, to reenter the United States without the express consent of the Attorney General; (2) the defendant committed an overt act that was a substantial step towards reentering without that consent; (3) the defendant was not a citizen of the United States; (4) the defendant had previously been lawfully denied admission, excluded, deported or removed from the United States; and (5) the Attorney General had not consented to the defendant's attempted reentry.

Immigration and Nationality Act, § 276, 8 U.S.C.A. § 1326.

29 Cases that cite this headnote

**[14]**    **Aliens, Immigration, and Citizenship**    Instructions

District court failed to instruct jury on specific intent element of offense of attempted illegal reentry into United States, and thus committed constitutional error, when court merely required jury to find that defendant "attempted to reenter the United States" without defining "attempted" and without instructing jury to make any finding as to intent. Immigration and Nationality Act, § 276, 8 U.S.C.A. § 1326.

29 Cases that cite this headnote

**[15]** **Aliens, Immigration, and Citizenship** 🔑 Instructions

An appropriate jury instruction on the specific intent element of the offense of attempted illegal reentry into the United States would require the jury to find beyond a reasonable doubt that the defendant satisfied each of the five elements of the offense. Immigration and Nationality Act, § 276, 🔖 8 U.S.C.A. § 1326.

15 Cases that cite this headnote

**[16]** **Criminal Law** 🔑 Elements and incidents of offense

A failure to instruct a jury on an element of an offense is harmless error if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.

37 Cases that cite this headnote

**[17]** **Criminal Law** 🔑 Elements and incidents of offense

District court's failure to instruct jury on specific intent element of offense of attempted illegal reentry into United States was harmless error in light of undisputed testimony of three Immigration and Naturalization Service (INS) inspectors that defendant demonstrated conscious desire to enter United States without first obtaining consent, and defendant's failure to support with evidence his defense that he was asleep when automobile in which he was passenger was drive to port of entry. Immigration and Nationality Act, § 276, 🔖 8 U.S.C.A. § 1326.

27 Cases that cite this headnote

## Attorneys and Law Firms

**\*1190** Steven F. Hubachek, Julie A. Blair, Federal Defenders of San Diego, Inc., San Diego, California, for the defendant-appellant.

Roger W. Haines, Jr., Assistant United States Attorney, Larry A. Sebastian, Special Assistant United States Attorney, Criminal Division, San Diego, California, for the plaintiff-appellee.

Appeal from the United States District Court for the Southern District of California; Howard B. Turrentine, Senior District Judge, Presiding. D.C. No. CR–98–00254–HBT.

Before: HUG, CHIEF JUDGE, PREGERSON, REINHARDT, FERNANDEZ, T.G. NELSON, KLEINFELD, THOMAS, GRABER, W. FLETCHER, FISHER and PAEZ, Circuit Judges.

## Opinion

Opinion by Judge FISHER; Concurrence by Judge FERNANDEZ.

FISHER, Circuit Judge:

Under 🔖 8 U.S.C. § 1326, a previously deported alien who "enters, attempts to enter, or is at any time found in" the United States without the express consent of the Attorney General is subject to a fine and imprisonment for up to two years.[1] In 🚩 *Pena–Cabanillas v. United States,* 394 F.2d 785, 788–90 (9th Cir.1968), we held that illegal reentry into the United States under 🔖 *§ 1326* required only a showing of general intent because it was a *malum prohibitum* regulatory offense and the statute did not otherwise specify an intent requirement for that crime.[2] The question posed by this case, however, is what level of intent must the government prove to convict an alien of *attempted* illegal reentry under 🔖 *§ 1326?* The statutory language for the crime of attempted illegal reentry differs from the language used for an accomplished illegal reentry, because "attempt" is a term that at common law requires proof that the defendant had the specific intent to commit the underlying crime and took some overt act that was a substantial step toward committing that crime. *See, e.g.,* 🔖 *United States v. Arbelaez,* 812 F.2d 530, 534 (9th Cir.1987). Because we must assume Congress intended to incorporate the well-established common law meaning

of "attempt" into ⚖ § 1326 absent a contrary statutory command, we conclude the crime of attempted illegal reentry into the United States includes the common law element of specific intent.

## FACTUAL and PROCEDURAL BACKGROUND

[1] On the morning after he was deported from the Calexico, California, port **\*1191** of entry, Alfredo Gracidas–Ulibarry ("Gracidas") was discovered riding as a passenger in the back seat of a car being driven through the border checkpoint at the San Ysidro, California, port of entry.[3] At primary inspection, an immigration inspector asked Gracidas about his citizenship, to which he replied that he was a United States citizen. When, upon further questioning, Gracidas failed to produce identification or to explain how he became a citizen, the inspector became suspicious and referred the car and its occupants to secondary inspection.

At secondary inspection, Gracidas again claimed he was a United States citizen, born in Texas, and gave his name as "Arturo Cabral–Rodriguez." Gracidas said he did not have any identification because his wallet had been stolen two weeks earlier. After an inspector ran several computer checks and informed Gracidas that the computer listed several possible convictions for "Arturo Cabral–Rodriguez," Gracidas admitted he was a Mexican citizen and had been previously deported. The inspectors referred Gracidas to an Immigration and Naturalization Service ("INS") prosecution unit, which ran further computer checks and fingerprint comparisons revealing Gracidas' true identity and that he had been deported just the previous day after having served two years in prison for a felony conviction for sale of a controlled substance.

After being advised of his *Miranda* rights and deciding to answer questions without the assistance of counsel, Gracidas admitted to the inspectors his true name and that he had given a false name at secondary inspection. Gracidas further confirmed his Mexican citizenship, his deportation the previous day and his prison record. He also admitted knowing that he needed to ask the U.S. government for permission to apply to reenter the United States, but claimed he did not do so because he urgently wanted to see his child, who resides in the United States.

Gracidas was charged with attempted illegal reentry in violation of ⚖ 8 U.S.C. § 1326, and with falsely and willfully representing himself as a citizen of the United States in violation of 18 U.S.C. § 911.[4] At trial, Gracidas contended he was asleep when he was driven to the port of entry and thus he never formed the specific intent to reenter the United States illegally. Accordingly, he requested a jury instruction that would have allowed the jury to find him guilty only if it concluded beyond a reasonable doubt that Gracidas "intended to reenter the United States without the consent of the Immigration and Naturalization Service."[5] The district court rejected the requested instruction and instead instructed the jury that it should convict Gracidas if it found that he "attempted to reenter the United States on or about December 5, 1997," and did not have the requisite permission of the Attorney General. The jury convicted Gracidas on both counts and, on appeal, a majority of a three-member panel of this court upheld the district court's instruction, holding that illegal attempt to reenter under ⚖ § 1326 requires proof only of general intent. *See* 📕 *United States v. Gracidas–Ulibarry, 192 F.3d 926, 929–30 (9th Cir.1999).*

[2] [3] Having reheard this case en banc, and reviewing *de novo* whether the jury instruction misstated an element of the statutory crime, *see United States v. Gergen, 172 F.3d 719, 724 (9th Cir.1999),* we now conclude that the district court's instruction was erroneous. We hold that the attempt prong of ⚖ § 1326 incorporates **\*1192** the well-established common law meaning of "attempt" and requires proof of a specific intent to enter illegally. We further conclude, however, that the erroneous instruction was harmless because uncontradicted and overwhelming evidence demonstrated that Gracidas intended to enter the United States without the express consent of the Attorney General.[6]

## DISCUSSION

### I. Whether Attempted Illegal Reentry Under ⚖ 8 U.S.C. § 1326 is a General or Specific Intent Crime

*A. The Common Law Background of the Term "Attempt"*

[4] The common law meaning of "attempt" is the specific intent to "engage in criminal conduct and ... an overt act which is a substantial step towards committing the crime."

*Arbelaez,* 812 F.2d at 534 (9th Cir.1987); *accord United States v. Bailey,* 444 U.S. 394, 405, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980); *Wooldridge v. United States,* 237 F. 775, 778–79 (9th Cir.1916) (collecting common law sources "holding that, to constitute an attempt, there must be the intent to commit a crime and some act done toward its consummation, and that the term 'attempt' signifies both an act and the intent with which it is done"); *Model Penal Code & Commentaries* § 5.01 cmt. at 305 (1985) (noting that Code's definition of attempt "retains the common law requirement of purposive conduct [the Code's term for specific intent] as a prerequisite for attempt liability"); *Black's Law Dictionary* 123–24 (7th ed. 1999) (" 'Every attempt is an act done with intent to commit the offence so attempted.' " (quoting John Salmond, *Jurisprudence* 387 (Glanville L. Williams ed., 10th ed.1947)); 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 6.2, at 18 (1986) ("The crime of attempt ... [at] common law ... consists of: (1) an intent to do an act or to bring about certain consequences which would in law amount to a crime; and (2) an act in furtherance of that intent which ... goes beyond mere preparation."); Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* § 3.A.7, at 637 (3d ed. 1982) ("[A]n attempt to commit any crime requires a specific intent to commit that particular offense."); 4 Charles E. Torcia, *Wharton's Criminal Law* § 693, at 580 (15th ed. 1996) ("At common law, a person commits an attempt when, with intent to commit a particular crime, he performs an act which tends toward but falls short of consummation of such crime."). This accepted common law definition is the basis for the doctrine that the crime of attempt requires a showing of " 'specific intent even if the crime attempted does not.' "

*United States v. Hadley,* 918 F.2d 848, 853 (9th Cir.1990) (quoting *United States v. Sneezer,* 900 F.2d 177, 179 (9th Cir.1990)); *accord* 4 Torcia, *supra,* § 695, at 591–97.

Accordingly, we have held that Congress' use of the term "attempts" in a criminal statute manifested a requirement of specific intent to commit the crime attempted, even when the statute did not contain an explicit intent requirement. For example, we held in *Sneezer* that a conviction for attempted sexual abuse under 18 U.S.C. § 2242—which imposes a prison sentence of up to 20 years upon one who knowingly causes another to engage in a sexual act against his or her will "or attempts to do so"—required a finding of specific intent to commit the crime even though the statute "itself d[id] not appear to include any element of specific intent." 900 F.2d at 179; *accord Hadley,* 918 F.2d at 853

(holding that attempted aggravated sexual abuse under 18 U.S.C. § 2241, which imposes a penalty upon one who uses force or threat to cause another to engage in a sexual act "or attempts to do **\*1193** so," required a showing of specific intent even though the statute contained no express intent requirement); *Wooldridge,* 237 F. at 776, 778–79 (construing statute imposing a criminal penalty if any person "*attempts* to commit any crime, ... when no other provision is made by law for the punishment of such attempt," to require specific intent) (emphasis added) (internal quotation marks and citation omitted). Similarly, in *United States v. Darby,* 857 F.2d 623 (9th Cir.1988), we held that attempted bank robbery requires the specific intent to rob a bank within the meaning of 18 U.S.C. § 2113(a), which provides that one who by force "takes, or attempts to take" money from a bank may be imprisoned up to 20 years, even though bank robbery itself is a general intent crime. *See* 857 F.2d at 626.

**[5]** The reason for requiring specific intent for attempt crimes is to resolve the uncertainty whether the defendant's purpose was indeed to engage in criminal, rather than innocent, conduct. *See Bailey,* 444 U.S. at 405, 100 S.Ct. 624; *United States v. Sayetsitty,* 107 F.3d 1405, 1412 (9th Cir.1997). This uncertainty is not present when the defendant has completed the underlying crime, because the completed act is itself culpable conduct. When the defendant's conduct does not constitute a completed criminal act, however, a heightened intent requirement is necessary to ensure that the conduct is truly culpable. [7] *See Sneezer,* 900 F.2d at 180.

*B. Whether Congress Intended to Incorporate the Common Law Meaning of "Attempt" into Attempted Illegal Reentry Under 8 U.S.C. § 1326*

**[6]** **[7]** In determining the level of mental culpability required for a particular statutory offense, we must first look to the intent of Congress. *See Bailey,* 444 U.S. at 406, 100 S.Ct. 624. Although Congress did not include an explicit intent requirement for the crime of illegal attempt to reenter in § 1326, the term "attempts" implies the common law meaning that includes specific intent. When Congress has used a term that has a settled common law meaning, " 'a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning' " of that term. *Neder v. United States,* 527 U.S. 1, 21, 119 S.Ct. 1827, 144

L.Ed.2d 35 (1999) (quoting *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 322, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992)); *accord Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952); *Standard Oil Co. v. United States,* 221 U.S. 1, 59, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

Neither the text of § 1326 nor its legislative history gives any indication that Congress intended not to incorporate the common law meaning of the term "attempts" into the crime of attempted illegal reentry. *See* 8 U.S.C. § 1326; H.R.Rep. No. 82–1365 (1952), *reprinted in* 1952 U.S.C.C.A.N. 1653, 1723–24; *see also Pena–Cabanillas,* 394 F.2d at 788–89 (noting that the legislative history of § 1326 is "barren" on the issue of intent). Accordingly, we conclude Congress intended an attempted reentry under § 1326 to be a crime of specific intent. *Cf. Neder,* 527 U.S. at 22, 119 S.Ct. 1827 (holding that use of term "defraud" in 18 U.S.C. §§ 1341, 1343 and 1344 demonstrated congressional intent to incorporate the requirement of materiality from common law meaning of fraud); *Evans v. United States,* 504 U.S. 255, 268–69, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992) (holding that Congress' use of term "extortion" in 18 U.S.C. § 1951 incorporated **\*1194** common law meaning of the term into the statute).

Congress may have had good reason to incorporate the common law meaning of attempt into the crime of attempted illegal reentry under § 1326. On the face of it, the common law justification for requiring specific intent for an attempt crime appears applicable to attempted illegal reentry; otherwise, lawful conduct could be swept within the proscription of the statute. For example, a person who has been deported from the United States is authorized, within a specified period after deportation, to request permission at a port of entry to reapply for admission into the United States. *See* 8 C.F.R. § 212.2(f). Moreover, certain forms for waivers from the Attorney General to allow deported persons to return lawfully to the United States are located and processed at ports of entry. *See, e.g.,* 8 C.F.R. §§ 210.2(c), 210.3(e)(2), 211.1(b)(3), 212.1(g), 212.4(b), 212.10; 22 C.F.R. § 41.2(j). If attempted illegal reentry were a general intent crime, a previously deported alien intercepted on the way to, or even at, the port of entry to make such a request or to pick up the forms could be prosecuted under § 1326. True, the alien could try to explain that his or her intent was to comply with the law, not violate it; but the government would not have to prove beyond a reasonable doubt that the alien's true purpose was to break the law.

These concerns are not merely hypothetical. In *United States v. Morales–Tovar,* 37 F.Supp.2d 846 (W.D.Tex.1999), the defendant entered a port of entry, presented his Mexican birth certificate and asked to reapply for a resident alien card. There was no evidence that he actually applied for admission into the United States. *See id.* at 849. Nevertheless, the government arrested him under § 1326, and argued at trial his actions constituted an attempt to reenter illegally because he had lost his permanent resident status when he was deported two years earlier and was told he needed to obtain permission from the Attorney General to reenter within the next 20 years. The defendant argued he was merely following the legal procedure for applying for a waiver to obtain a new resident alien card so he could reenter lawfully. The *Morales–Tovar* court, finding the explanations equally plausible, held the government failed to demonstrate beyond a reasonable doubt that the defendant had the specific intent to reenter illegally. *See id.* at 852–53. The court concluded that a showing of specific intent was required because, otherwise, "any proactive attempt to follow th[e] legally sanctioned procedure" for seeking permission to reapply to reenter the United States would "actually be [an] illegal 'attempt' to reenter." *Id.* at 851.

**[8]** The government, however, argues that the common law doctrine of attempt does not apply to this statutory crime. Instead, it relies on our conclusion in *Pena–Cabanillas* that actual, illegal reentry is a crime of general intent. It also invokes our reasoning in *Pena–Cabanillas* that § 1326 provides for a *malum prohibitum* offense, and includes no explicit language as to intent whereas Congress included explicit intent requirements in other sections of the Immigration and Nationality Act of 1952 that enacted § 1326. [8] Unlike its use of the term "enters" in § 1326 for the crime of illegal reentry, however, Congress' use of the term "attempts" does not reflect silence as to intent but is consistent with a purpose to "adopt[ ] the cluster of ideas that

were attached to [the] borrowed word in the body of learning from which it was taken." *Morissette,* 342 U.S. at 263, 72 S.Ct. 240. This principle applies regardless of whether the mental culpability requirement of the crime attempted is general intent or **\*1195** *mala prohibita* strict liability. *See* 2 LaFave & Scott, *supra,* § 6.2(c)(3), at 28 ("[T]here is no such thing as strict liability attempt.... An attempt to commit a strict liability offense is ... possible only if it is shown that the defendant acted with an intent to bring about the proscribed result."). Thus, *Pena–Cabanillas* and the decisions by this court and other circuits holding that only general intent is required for the crime of illegal reentry into or being found in the United States under 8 U.S.C. § 1326 are inapposite.[9]

The only other circuit to address, in a published opinion binding in its own courts, the level of intent required for the crime of attempted illegal reentry is the Eleventh Circuit, which held in *United States v. Peralt–Reyes,* 131 F.3d 956 (11th Cir.1997), that attempted illegal reentry is a general intent crime.[10] However, the *Peralt–Reyes* opinion provides no analysis other than the court's adoption of the holding of an unpublished First Circuit decision which has no precedential value. *See id.* at 957 (citing and adopting the holding of *United States v. Reyes–Medina,* No. 94–1923, 1995 WL 247343 (1st Cir. Apr.25, 1995)). The unpublished First Circuit decision, in turn, did not analyze attempted illegal reentry in § 1326 as a separate crime, but rather relied solely on cases holding that illegal reentry is a general intent crime and assumed they apply to attempted illegal reentry. *See Reyes–Medina,* 1995 WL 247343, at \*1 (relying on cases cited above in note 5).

We find these decisions unpersuasive. They do not consider the common law meaning of the term "attempt." Nor do they provide any reason for concluding Congress intended not to incorporate the common law meaning of the term into 8 U.S.C. § 1326.

Our conclusion is consistent with our recent decision in *Blanco–Gallegos.* In *Blanco–Gallegos,* the defendant argued he did not have the requisite intent for attempted illegal reentry under 8 U.S.C. § 1326 because he had become voluntarily intoxicated and accidentally walked into the port of entry. *See* 188 F.3d at 1074. Significantly, we considered this defense on its merits and concluded the jury properly rejected it as unsubstantiated. *See id.* at 1076. In so doing,

we implicitly recognized that attempted illegal reentry is a specific intent crime, because voluntary intoxication is a defense only for such crimes. *See United States v. Burdeau,* 168 F.3d 352, 356 (9th Cir.1999); *Sayetsitty,* 107 F.3d at 1411.

*C. The Meaning of "Specific" Intent As an Element of Attempt to Reenter Illegally Under 8 U.S.C. § 1326*

[9] [10] Having concluded that attempted illegal reentry is a crime of specific intent, an explanation of the meaning of specific intent is necessary to give guidance as to the proper jury instruction for this crime. As the Supreme Court has noted, the distinction between specific intent **\*1196** and general intent "has been the source of a good deal of confusion." *Bailey,* 444 U.S. at 403, 100 S.Ct. 624. The practical difference between these two levels of mental culpability is that certain defenses, such as voluntary intoxication and subjective mistake of fact, can negate culpability only for specific intent crimes. *See, e.g., Burdeau,* 168 F.3d at 358 (voluntary intoxication); *United States v. Leon–Leon,* 35 F.3d 1428, 1432–33 (9th Cir.1994) (holding that mistake of fact as to permission to reenter the United States is not a defense to general intent crime of illegal reentry under 8 U.S.C. § 1326); 1 LaFave & Scott, *supra,* §§ 3.5(e), 4.10(a), 5.1(b), at 315, 552–53, 577–79.[11]

[11] [12] The confusion between general and specific intent has been the catalyst for a movement to replace these categories with a hierarchy of four levels of culpable states of mind, defined with greater clarity: purpose, knowledge, recklessness and negligence. *See Bailey,* 444 U.S. at 404, 100 S.Ct. 624; *Model Penal Code & Commentaries, supra,* § 2.02, at 225–26; *see also* 1 LaFave & Scott, *supra,* § 3.4(c), at 299–300. This movement is best exemplified in the Model Penal Code, which the Supreme Court has relied upon as a "source of guidance ... to illuminate" the meaning of and distinctions between intent requirements. *United States v. United States Gypsum Co.,* 438 U.S. 422, 444, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). In general, "purpose" corresponds to the concept of specific intent, while "knowledge" corresponds to general intent. *See Bailey,* 444 U.S. at 405, 100 S.Ct. 624; *Model Penal Code & Commentaries, supra,* § 2.02 cmt. at 233–34. A person who causes a result prohibited

by common law or statute is said to have acted purposely if he or she consciously desired that result, whatever the likelihood of that result ensuing from his or her actions. *See* *Bailey,* 444 U.S. at 404, 100 S.Ct. 624; *United States Gypsum,* 438 U.S. at 444, 98 S.Ct. 2864; *Model Penal Code & Commentaries, supra,* § 2.02, at 225.

[13]    Applying these principles to the present case, we hold the elements of the crime of attempted illegal reentry into the United States under 8 U.S.C. § 1326 are: (1) the defendant had the purpose, i.e., conscious desire, to reenter the United States without the express consent of the Attorney General; (2) the defendant committed an overt act that was a substantial step towards reentering without that consent; (3) the defendant was not a citizen of the United States; (4) the defendant had previously been lawfully denied admission, excluded, deported or removed from the United States; and (5) the Attorney General had not consented to the defendant's attempted reentry. *See* *United States v. Davis,* 960 F.2d 820, 826–27 (9th Cir.1992) (enumerating the elements of attempt); *Arbelaez,* 812 F.2d at 534 (same); *Model Penal Code & Commentaries, supra,* § 5.01 cmt. at 301 ("The general principle is thus that the actor must affirmatively desire to engage in the conduct or to cause the result that will constitute the principal offense."); *see also* *United States v. Sotelo,* 109 F.3d 1446, 1447 (9th Cir.1997) (concluding that a lawful prior deportation is element of crime of illegal reentry under 8 U.S.C. § 1326).

[14]    [15]    We conclude the district court committed constitutional error by failing to instruct the jury on the specific intent element of the crime. *See* *United States v. Fei Lin,* 139 F.3d 1303, 1309 (9th Cir.1998) (holding that failure to instruct as to specific intent is constitutional error); *Martinez v. Borg,* 937 F.2d 422, 423 (9th Cir.1991); *see also* *United States v. Gaudin,* 515 U.S. 506, 510, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) (concluding that Due Process Clause and Sixth Amendment require **\*1197** criminal convictions to rest upon a jury determination that a defendant is guilty of every element of the crime beyond a reasonable doubt). The district court merely required the jury to find that Gracidas "attempted to reenter the United States" without defining "attempted" and without instructing the jury to make any finding as to intent. [12] An appropriate instruction would have required the jury to find beyond a reasonable

doubt that Gracidas satisfied each of the five elements enumerated above. Accordingly, Gracidas' conviction for attempted illegal reentry must be reversed unless the error was harmless beyond a reasonable doubt. *See* *Neder,* 527 U.S. at 15, 119 S.Ct. 1827.

## II. Harmless Error

[16]    [17]    The district court's failure to instruct the jury on the intent element of the offense was harmless error if we conclude that it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder,* 527 U.S. at 18, 119 S.Ct. 1827; *see also* *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (concluding an error is harmless when it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained"). In *Neder,* the Supreme Court held that the omission of an element of a crime from a jury instruction was harmless error when the omitted element was uncontested and supported by overwhelming evidence. *See* 527 U.S. at 17, 119 S.Ct. 1827. Similarly, in this case the government offered undisputed testimony by three INS inspectors who dealt with Gracidas at the San Ysidro port of entry that demonstrated his conscious desire to enter the United States without first obtaining express consent.

The INS inspectors testified that Gracidas admitted that he had lied about being a U.S. citizen, that he gave INS inspectors a false name and that he had recently been deported after serving a sentence in the United States for a felony. Significantly, Gracidas admitted he had not asked the U.S. government for permission to reenter because he wanted to see his child, who was living in the United States, as soon as possible. The government also produced a certificate of nonexistence of record based on Gracidas' INS A-file to demonstrate that Gracidas was deported the day before he attempted to reenter and had not applied for permission to reenter. *See Blanco–Gallegos,* 188 F.3d at 1075 (holding that certificate of nonexistence of record from INS A-file is sufficient evidence to demonstrate the defendant did not seek permission to reapply to reenter the U.S.). Gracidas did not call any witnesses to contradict any of the government's evidence. In the absence of any evidence to the contrary, the government's evidence is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on

the erroneous instruction would have been the same in the absence of the error. *See* ⚑ *Yates v. Evatt,* 500 U.S. 391, 405, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991); 🔺 *United States v. Manuel,* 706 F.2d 908, 915 (9th Cir.1983) (holding that district court's erroneous jury instruction was harmless because uncontradicted evidence supported the conviction).

Gracidas' defense, that he did not have specific intent because he was asleep when the car was driven to the port of entry, does not undermine this conclusion. Gracidas did not support this defense with any evidence, and the INS inspector at primary inspection testified that Gracidas was **\*1198** awake when the inspector questioned him. *See* ▯ *Neder,* 527 U.S. at 19, 119 S.Ct. 1827 (concluding that error would not be harmless if "the defendant contested the omitted element *and* raised evidence sufficient to support a contrary finding") (emphasis added). Gracidas' defense is contradicted by overwhelming evidence, including his own admission that he purposely declined to ask for permission to reapply for entry because he wanted to see his child in the United States without delay. More importantly, Gracidas certainly was awake when he admittedly misrepresented his name and citizenship to the INS inspectors. We therefore conclude that the district court's failure to instruct the jury as to specific intent was harmless beyond a reasonable doubt.

## CONCLUSION

We hold that a conviction for attempt to reenter the United States without the consent of the Attorney General under 8 U.S.C. § 1326 requires a finding that the defendant consciously desired to reenter the United States without consent. Thus, we conclude the district court committed constitutional error when it failed to instruct the jury as to specific intent. However, we hold this error was harmless beyond a reasonable doubt because the overwhelming and uncontested evidence demonstrated that Gracidas did consciously desire to reenter the United States without consent. Finally, we adopt the original panel's conclusions that the evidence was sufficient to support Gracidas' ▯ § 1326 conviction, that the district court erred by failing to decrease Gracidas' offense level by a third point for acceptance of responsibility under ▯ U.S.S.G. § 3E1.1(b)(1) and that the district court did not err by applying ▯ U.S.S.G. § 2L1.2 to Gracidas' sentence under ▯ § 1326.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED for further proceedings consistent with this opinion.

FERNANDEZ, Circuit Judge, concurring:

Because I agree with the persuasive reasoning of the majority opinion in ⚑ *United States v. Gracidas–Ulibarry,* 192 F.3d 926 (9th Cir.1999), which I now adopt, I concur in the result.

**All Citations**

231 F.3d 1188, 00 Cal. Daily Op. Serv. 8956

## Footnotes

1   ▯ 8 U.S.C. § 1326(a) provides, as relevant here:

[A]ny alien who—

(1) has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter

(2) enters, attempts to enter, or is at any time found in, the United States, unless

(A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplication for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act,

shall be fined under Title 18, or imprisoned not more than 2 years, or both.

**WESTLAW** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2 A malum prohibitum act is defined as one "that is a crime merely because it is prohibited by statute, although the act itself is not necessarily immoral." *Black's Law Dictionary* 971 (7th ed.1999).

3 Even though the port of entry was located in the United States, Gracidas had not yet reentered. An alien does not reenter, and cannot be considered found in, the United States until he or she is physically present in the country and free from official restraint. *See United States v. Pacheco–Medina,* 212 F.3d 1162, 1166 (9th Cir.2000).

4 Gracidas does not appeal his conviction under 18 U.S.C. § 911.

5 The INS has delegated authority under 8 C.F.R. § 2.1.

6 We adopt and thus reinstate the panel's conclusions that the evidence was sufficient to support Gracidas' § 1326 conviction, that the district court erred by failing to decrease Gracidas' offense level by a third point for acceptance of responsibility under U.S. Sentencing Guidelines Manual § 3E1.1(b)(1), and that the district court did not err in applying U.S.S.G. § 2L1.2 to Gracidas' sentence under § 1326. *See Gracidas–Ulibarry,* 192 F.3d at 928, 931.

7 Even when Congress has not used a common law term having an implicit level of intent, a court will read into a statute at least a level of intent or scienter necessary to separate wrongful from innocent conduct, *see Carter v. United States,* 530 U.S. 255, 120 S.Ct. 2159, 2169, 147 L.Ed.2d 203 (2000), *mala prohibita* regulatory offenses being an exception. *See Staples v. United States,* 511 U.S. 600, 606, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994); *Bailey,* 444 U.S. at 404 n. 4, 100 S.Ct. 624; *Pena–Cabanillas,* 394 F.2d at 788. Here, of course, § 1326 does use the well-established common law term, "attempts."

8 We noted in *Pena–Cabanillas* that 8 U.S.C. §§ 1287, 1306, 1324, 1325 and 1328 each used terms such as "knowingly," "wilfully," "unlawful intent" and "purpose," which explicitly indicated specific intent was required, while 8 U.S.C. §§ 1306(b), 1306(c), 1321, 1322, 1323 and 1326 did not. 394 F.2d at 789 n. 4. *Pena–Cabanillas* did not, however, address the intent requirement for § 1326 attempts.

9 *See, e.g., United States v. Martus,* 138 F.3d 95, 97 (2d Cir.1998) (illegal reentry); *United States v. Martinez–Morel,* 118 F.3d 710, 713 (10th Cir.1997) (same); *United States v. Henry,* 111 F.3d 111, 113–14 (11th Cir.1997) (same); *United States v. Trevino–Martinez,* 86 F.3d 65, 68 (5th Cir.1996) (same); *United States v. Leon–Leon,* 35 F.3d 1428, 1432–33 (9th Cir.1994) (same); *United States v. Ayala,* 35 F.3d 423, 426 (9th Cir.1994) (found in the United States); *United States v. Espinoza–Leon,* 873 F.2d 743, 746 (4th Cir.1989) (same); *United States v. Hernandez,* 693 F.2d 996, 1000 (10th Cir.1982) (illegal reentry); *United States v. Newton,* 677 F.2d 16, 16–17 (2d Cir.1982) (found in the United States); *United States v. Hussein,* 675 F.2d 114, 115–16 (6th Cir.1982) (illegal reentry); *but cf. United States v. Anton,* 683 F.2d 1011, 1017 (7th Cir.1982) (holding that specific intent is required for illegal reentry under 8 U.S.C. § 1326).

10 In *United States v. Cardenas–Alvarez,* 987 F.2d 1129, 1131–33 (5th Cir.1993), the Fifth Circuit reviewed for sufficiency of the evidence a conviction for attempted illegal reentry. The court concluded there was sufficient evidence to sustain the jury's conclusion that the defendant intended to reenter illegally. *See id.* at 1132. However, the court did not specifically address the issue whether attempted reentry requires general or specific intent.

11 As we recognized in *Pena–Cabanillas,* however, "[e]ven in a crime requiring no specific intent, a defendant may defend upon the ground that he did no voluntary act: that he was asleep or unconscious at the time an

act occurred." 🚩 394 F.2d at 788 n. 2; *see also* 📁 *Carter,* 530 U.S. at ——, 120 S.Ct. at 2169 (noting that sleepwalking would be a defense to 📁 18 U.S.C. § 2113(a) even if it were a general intent crime).

12   Gracidas requested the following jury instruction:

> First, the defendant intended to reenter the United States without the consent of the Immigration and Nationalization Service; Second, the defendant did something which was a substantial step towards committing the crime; Third, the defendant is not a citizen or national of the United States; Fourth, the defendant was lawfully deported from the United States; Fifth, the defendant attempted to reenter the United States without the consent of the Immigration and Naturalization Service.

---

**End of Document** 

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

762 F.3d 1300
United States Court of Appeals,
Eleventh Circuit.

UNITED STATES of America, Plaintiff–Appellant,

v.

James Winston HAYES, Defendant–Appellee.

No. 11–13678.
|
Aug. 12, 2014.

**Synopsis**

**Background:** Defendant pleaded guilty, in the United States District Court for the Northern District of Alabama, No. 7:07–cr–00507–VEH–TMP–1, to bribery, conspiring to commit money laundering, and criminal forfeiture, all arising out of a scheme to rig the competitive bid processes for educational software sold to the Alabama Department of Postsecondary Education (ADPE) and the two-year colleges it regulated. Government appealed sentence imposed.

**[Holding:]** The Court of Appeals, Jordan, Circuit Judge, held that sentences imposed were substantively unreasonable.

Vacated and remanded for resentencing.

Tjoflat, Circuit Judge, filed dissenting opinion.

West Headnotes (7)

**[1]**    **Sentencing and Punishment** 🔑 Remorse, cooperation, assistance

Government has discretion in recommending a methodology to be used in determining extent of a substantial assistance departure at sentencing, and sentencing court has discretion in deciding what methodology to use once it grants a motion for departure. 🔖 U.S.S.G. § 5K1.1, p.s., 18 U.S.C.A.

2 Cases that cite this headnote

**[2]**    **Bribery** 🔑 Sentence and punishment

**Conspiracy** 🔑 Money laundering

**Sentencing and Punishment** 🔑 Comparison with dispositions in other cases

**Sentencing and Punishment** 🔑 Nature, grade or seriousness of offense in general

Concurrent three-year probationary sentences, imposed upon conviction for bribery and conspiring to commit money laundering, arising out of a scheme to rig competitive bid processes for sales of educational software to a State agency, were substantively unreasonable in light of the statutory sentencing factors; sentences conveyed message that would-be white-collar criminals stood to lose little more than a portion of their ill-gotten gains and practically none of their liberty, and thus did not constitute just punishment or promote respect for the law, sentences did not provide for general deterrence, and there was no sentencing disparity among similarly situated offenders to be eliminated. 18 U.S.C.A. §§ 666(a)(2), 🔖 1956(h), 🚩 3553(a).

3 Cases that cite this headnote

**[3]**    **Sentencing and Punishment** 🔑 Factors or Purposes in General

**Sentencing and Punishment** 🔑 Operation and effect of guidelines in general

In imposing sentence, district court may not presume that the range produced by application of the Sentencing Guidelines is reasonable, and must consider the statutory sentencing factors. 🚩 18 U.S.C.A. § 3553(a).

8 Cases that cite this headnote

**[4]**    **Criminal Law** 🔑 Sentencing

Court of Appeals reviews the substantive reasonableness of a sentence for abuse of discretion.

10 Cases that cite this headnote

**[5]**    **Criminal Law** 🔑 Sentencing

**Criminal Law**  👉  Application of guidelines

**Criminal Law**  👉  Judgment, sentence, and punishment

In reviewing the substantive reasonableness of a sentence, Court of Appeals examines the totality of the circumstances, including extent of any variance from the Sentencing Guidelines range, but it may not presume that a sentence outside of that range is unreasonable and must give due deference to sentencing court's decision that the statutory sentencing factors, on the whole, justify extent of the variance. 🚩 18 U.S.C.A. § 3553(a).

12 Cases that cite this headnote

[6]     **Criminal Law**  👉  Sentencing

Fact that Court of Appeals might have reasonably concluded that a different sentence was appropriate is insufficient to justify reversal.

2 Cases that cite this headnote

[7]     **Sentencing and Punishment**  👉  Comparison with dispositions in other cases

The need to avoid unwarranted sentencing disparity requires sentencing court to consider other similarly situated defendants who were convicted of similar crimes.

**Attorneys and Law Firms**

***1301** Praveen S. Krishna, Ramona Albin, James Dennis Ingram, George A. Martin, Jr., Joyce White Vance, U.S. Attorney's Office, Birmingham, AL, for Plaintiff–Appellant.

James Derek Drennan, Jaffe & Drennan, PC, Birmingham, AL, for Defendant–Appellee.

Appeal from the United States District Court for the Northern District of Alabama. D.C. Docket No. 7:07–cr–00507–VEH–TMP–1.

Before ED CARNES, Chief Judge, TJOFLAT, and JORDAN, Circuit Judges.

**Opinion**

JORDAN, Circuit Judge:

"Corruption," Edward Gibbon wrote more than two centuries ago, is "the most infallible symptom of constitutional liberty." EDWARD GIBBON, THE HISTORY OF THE DECLINE AND FALL OF THE ROMAN EMPIRE, Vol. II, Ch. XXI, at 805 (David Womersley ed., Penguin Classics 1995) [1781]. And so, although unfortunate, it is perhaps not surprising that, even today, people continue to pay bribes to government officials with the expectation that they will make decisions based on how much their palms have been greased, and not what they think is best for the constituents they serve.

***1302** In this criminal appeal involving corruption in Alabama's higher education system, we consider whether the district court abused its discretion by imposing a sentence of three years of probation (with a special condition of six to twelve months of home confinement) on a 67–year–old business owner who—over a period of four years—doled out over $600,000 in bribes to a state official in order to ensure that his company would continue to receive government contracts, and whose company reaped over $5 million in profits as a result of the corrupt payments. For the reasons which follow, we hold that such a sentence was indeed unreasonable.

**I**

We begin with the facts, and then discuss what transpired in the district court at sentencing. Along the way, and in response to our colleague's dissent, we add a bit of background on the relationship between departures under 🏳 U.S.S.G. § 5K1.1 and variances after 🏳 *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

**A**

For years, James Winston Hayes ran ACCESS Group Software, LLC, a successful computer software company in Alabama. ACCESS sold educational software to the Alabama Department of Postsecondary Education ("ADPE"), and the two-year colleges it regulates. ACCESS did business with more than 25 two-year colleges and technical schools in Alabama.

Starting in 2002, when he was 59, Mr. Hayes decided to increase his company's chances of being profitable by rigging the competitive bid processes through which the ADPE awards contracts to vendors. Over the course of four years, Mr. Hayes paid over $600,000 in bribes to Roy Johnson—the then-Chancellor of the ADPE—his family, and his friends. The payments, to list a few, included $124,400 towards the construction costs of Mr. Johnson's home; $23,850 for a sound system in that home; and $55,000—as directed by Mr. Johnson—to Mr. Johnson's son-in-law, an attorney, for legal services that were never provided to Mr. Hayes or ACCESS. In order to conceal the nature of the payments, Mr. Hayes and others reimbursed third parties and created false invoices, contracts, and mortgages.

The bribes proved successful. From 2002 to 2006, ACCESS received more than $14 million in gross income from the ADPE, from which it realized a profit of approximately $5 million.

At some point, the federal government began investigating corruption at the ADPE. During the early stages of that investigation, the government contacted Mr. Hayes and subpoenaed his bank records. Perhaps realizing that the jig was up, Mr. Hayes obtained counsel and began cooperating with the government. Among other things, Mr. Hayes permitted his office and vehicle to be wired for audio and video and personally wore a recording device to tape meetings with several targets of the investigation. He also provided the government with documentation verifying his illicit financial dealings with a number of Alabama officials.

In 2007, the government charged Mr. Hayes by information with bribing Mr. Johnson, the former Chancellor of the ADPE—an agency receiving federal funds—in violation of 18 U.S.C. § 666(a)(2) (Count 1), and conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count 2). The information also sought criminal forfeiture based on the charges in Counts 1 and 2. In February of 2008, Mr. Hayes pled guilty to Counts 1 and 2, and consented to forfeiture.

**\*1303** The probation office prepared a presentence investigation report to be used at Mr. Hayes' sentencing. The report indicated that, under the 2010 version of the Sentencing Guidelines Manual, Mr. Hayes scored out to a total offense level of 33 and had a criminal history category of I, resulting in an advisory guidelines range of 135 to 168

months' imprisonment. Neither party voiced objections to the report's calculation of the advisory guidelines, and as a result the district court adopted that range at the initial sentencing hearing. [1]

### B

The Sentencing Guidelines contain a number of departure provisions. Among them is § 5K1.1, which allows a departure from the advisory guidelines range "[u]pon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another[.]"

[1] Because § 5K1.1 is silent as to the methodology to be used in determining the extent of a substantial assistance departure, the government has discretion in recommending a methodology, and the district court has discretion in deciding what methodology to use once it grants a motion for departure. *See United States v. Lindsey,* 556 F.3d 238, 245–46 (4th Cir.2009); *United States v. Floyd,* 499 F.3d 308, 312 n. 6 (3d Cir.2007). As the Seventh Circuit has explained:

> Once the sentencing court decides to depart downward, it in turn may quantify the assistance the defendant provided by a simple numerical reduction in the offense level or by a percentage reduction of the total sentence; both methods (and perhaps others we do not consider here) are tools that appropriately recognize the rationale of the guidelines—that the reduction should reflect accurately the assistance that the defendant has rendered to the government.

*United States v. Senn,* 102 F.3d 327, 332 (7th Cir.1996).

*See also United States v. Vazquez–Lebron,* 582 F.3d 443, 445 (3d Cir.2009) ("A [d]istrict [c]ourt need not follow a particular formula in calculating a § 5K1.1 departure—it may be appropriate to depart by a certain number of months or guideline ranges below the initial sentencing range."); *United*

*States v. Hargrett,* 156 F.3d 447, 450 n. 1 (2d Cir.1998) ("A downward departure based on [ § ] 5K1.1 does not require the district [court] to pick a new offense level and a particular sentence within the range set for that level; rather the court may simply pick a sentence of so many months without mention of an offense level.").

Not surprisingly, therefore, reported cases illustrate a variety of approaches to § 5K1.1 departures. Sometimes, as was the case here, the departure is based on offense levels deducted from the defendant's total offense level.

*See, e.g., United States v. Livesay,* 525 F.3d 1081, 1087 (11th Cir.2008) (government recommendation of three-level downward departure from defendant's total offense level); *United States v. Martin,* 455 F.3d 1227, 1233 & n. 4 (11th Cir.2006) (government recommendation of nine-level downward departure from defendant's total offense level); *United States v. Knapp,* 955 F.2d 566, 568 (8th Cir.1992) (district court's seven-level downward departure from defendant's total offense level). Sometimes the departure is based on a percentage deduction from the bottom, midpoint, or top of the defendant's advisory guidelines range. **\*1304**

*See, e.g., United States v. Burns,* 577 F.3d 887, 889 (8th Cir.2009) (en banc) (government recommendation of 15% downward departure); *United States v. Senn,* 102 F.3d 327, 332 (7th Cir.1996) (government recommendation of 50% downward departure). And sometimes the departure is based on a reduction of a specific number of months from the defendant's advisory guidelines range. *See, e.g., United States v. Koufos,* 666 F.3d 1243, 1254 (10th Cir.2011) (government recommendation of 20–month reduction from bottom and top of applicable range).

Regardless of the methodology used, once the district court grants a motion for downward departure under § 5K1.1, it will be left with a new number (or range of numbers) insofar as the Sentencing Guidelines are concerned. *See United States v. Hippolyte,* 712 F.3d 535, 541 (11th Cir.2013) ("A departure provision is a change to a sentencing guideline range based on, e.g., substantial assistance to authorities."); U.S.S.G. § 1B1.1, n.1(E) (" 'Downward departure' means [a] departure that effects a sentence less than a sentence that could be imposed under the applicable guideline range or a sentence that is otherwise less than the guideline sentence."). The "calculation of the initial advisory [g]uidelines range,

along with any applicable departures, results in a 'final advisory [g]uidelines sentencing range.' " *United States v. Lozoya,* 623 F.3d 624, 626 (8th Cir.2010).

A concrete example helps put these principles into focus. Assume that a defendant has an advisory guidelines range of 70–87 months' imprisonment. If the district court grants a government § 5K1.1 motion which recommends a 50% departure from the bottom of that range, the new bottom number for guidelines purposes will be 35 months of imprisonment (50% of 70 = 35). The district court will then have to determine whether, under the factors set forth in 18 U.S.C. § 3553(a), it should sentence the defendant to 35 months, something less, or something more. That is the approach dictated by the Sentencing Guidelines and our cases. *See* U.S.S.G. § 1B1.1(a)- (c) ("Application Instructions") (district court must first (a) determine the guidelines range, and then (b) consider departures, including those under Chapter 5K, before (c) taking into account the § 3553(a) factors); *United States v. McVay,* 447 F.3d 1348, 1356 (11th Cir.2006) ("[A]fter it has decided the length of departure warranted by the substantial assistance motion, the district court is obliged to take into account the advisory [g]uidelines *and* the sentencing factors set forth in ... § 3553(a) in fashioning a reasonable sentence."); *Martin,* 455 F.3d at 1236 (same). [2]

## C

In this case, the government filed a motion for downward departure pursuant to § 5K1.1 based on Mr. Hayes' substantial assistance, as well as a separate sentencing memorandum. In its motion, which discussed only matters related to Mr. Hayes' cooperation and assistance, the government recommended that the district court depart from an offense level of 33 to an offense level of 25, with a corresponding advisory guidelines range of 57–71 months' imprisonment. Then, apparently traveling under the unstated assumption that the district court would grant its motion for **\*1305** departure, the government advocated that the district court sentence Mr. Hayes to 60 months in custody. In its separate memorandum, the government again recommended a final sentence of 60 months' imprisonment, based in large part on its § 5K1.1 motion for a downward departure. In

so doing, the government at times conflated the factors to be considered under 🚩 § 5K1.1 with the factors to be considered under 🚩 § 3553(a). Although the government's separate bases for the ultimate 60–month recommendation may not have been artfully stated, at the initial and second sentencing hearings the district court and the parties understood that the government was moving for a downward departure (to 57–71 months in custody) under 🚩 § 5K1.1 based solely on Mr. Hayes' substantial assistance, and that the government's bottom-line recommendation of a 60–month prison sentence corresponded to the point within the recommended post-departure range where the government thought the district court should sentence Mr. Hayes after considering the totality of the circumstances and the 🚩 § 3553(a) factors. [3]

The district court pointed out, and the government agreed, that consistent with 🚩 *McVay*, 447 F.3d at 1356, it had to rule on the motion for downward departure before hearing from the parties on what would constitute a reasonable sentence under 🚩 § 3553(a). At the first sentencing hearing, the district court granted the government's 🚩 § 5K1.1 motion, but departed more than the government had recommended. Considering only "[Mr. Hayes'] substantial assistance to the government[,]" the district court found that the "appropriate ... guideline[s] level for consideration ... [was] [l]evel 22, which when combined with the criminal history category of I[,] create[d] an advisory guideline[s] range of 41 to 51 months."

After granting the government's 🚩 § 5K1.1 motion, the district court heard from the parties (mainly at the second sentencing hearing) with respect to the sentence it should impose. Mr. Hayes requested a downward variance to a sentence of probation or a relatively short term of imprisonment based on a number of factors, including his culpability relative to Mr. Johnson, his otherwise lawabiding life, his role as his father's former caretaker, his age and deteriorating physical health, and his not posing a risk to society. The government responded that a total sentence of 60 months' imprisonment was appropriate because Mr. Hayes' crimes were serious and involved the corruption of high-ranking public officials, obstructive behavior, and significant amounts of state funds. The government emphasized that the sentence imposed on Mr. Hayes should be one that not just punished him for his conduct, but also deterred others from engaging in similar conduct.

The district court stated that it had sufficient information on all of the 🚩 § 3553(a) factors, except for the need to avoid unwarranted sentence disparity, and proceeded to read summaries of the dispositions in 14 related cases from a chart provided by the probation office. The district court then noted that Mr. Hayes' "offense was serious" and that the "sentence should promote respect for the law and provide just punishment for the offense." Additionally, the district court remarked "that just because a crime is a white collar crime, it does not mean that it does not need to be deterred," and "agree[d] with the government that prison sentences are probably the best deterrence ... [for] other people who might consider similar conduct." The district court found **\*1306** that Mr. Hayes "seem[ed] genuinely remorseful," was unlikely to commit further crimes, and was not a risk to the public. In response to Mr. Hayes' contentions regarding his age and health, the district court noted that it was "aware of the ability of the government to provide almost any medical care that's needed[ ] [and that although] ... age is something [it] can consider, ... [it did not] consider it to be overwhelming or a large factor in this case."

Returning to the disparity issue, the district court said the following: "And I've spoken at length about the need to avoid unwarranted sentencing disparit [y] among similarly situated defendants. And in having gone through all of that, I don't want anybody to think that [it] was like the overwhelming factor. It's just I had a lot of information about that ... that I hadn't focused on and that I wanted to go through." The district court did not explain what disparity, if any, would result if it sentenced Mr. Hayes to some term of imprisonment.

The district court, noting its authority to impose a non-guidelines sentence under 🚩 *Booker*, 543 U.S. at 259–60, 125 S.Ct. 738, sentenced Mr. Hayes to concurrent terms of three years' probation, with six to twelve months of home confinement. It also ordered Mr. Hayes to pay $628,454.28 in restitution, to forfeit $5 million, and to pay a $1,000 fine and $200 in special assessments. The district court stated that the sentence was "sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing and is reasonable when considering the sentencing factors found at 🚩 § ] 3553(a)." The government objected to the procedural and substantive reasonableness of the sentence, including the extent of the downward departure pursuant to 🚩 § 5K1.1 and the reasonableness of the probationary terms the district court imposed.

25 Fla. L. Weekly Fed. C 281

**[2]**    On appeal, the government does not challenge the extent of the district court's § 5K1.1 departure. The only argument the government makes is that the concurrent three-year terms of probation are substantively unreasonable. As a result, that is the only argument we address.

## II

**[3]**    In imposing sentence, a district court may not presume that the range produced by application of the Sentencing Guidelines is reasonable, *see Rita v. United States,* 551 U.S. 338, 351, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007), and must consider the factors set out in 18 U.S.C. § 3553(a). These are "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most efficient manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range [as set forth in the Sentencing Guidelines] ...; (5) any pertinent policy statement ... issued by the Sentencing Commission....; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a).

## *1307 A

**[4]    [5]    [6]**    We review the substantive reasonableness of a sentence for abuse of discretion. *See Gall v. United States,* 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). In conducting that review, we examine the "totality of the circumstances, including the extent of any variance from the [g]uidelines range," but we cannot presume that a sentence outside of that range is unreasonable. *Id.* We must give "due deference" to the district court's "decision that the § 3553(a) factors, on a whole, justify the extent of the [variance]. The fact that [we] might have reasonably

concluded that a different sentence was appropriate is insufficient to justify reversal[.]" *Id. See also United States v. Langston,* 590 F.3d 1226, 1237 (11th Cir.2009) ( "The weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court, and we will not substitute our judgment in weighing the relevant factors.") (citation and internal quotation marks omitted). Nevertheless, as we said several years ago,

> [a] district court abuses its discretion when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors. As for the third way that discretion can be abused, a district court commits a clear error of judgment when it considers the proper factors but balances them unreasonably [,] ... arriving at a sentence that does not achieve the purposes of sentencing as stated in § 3553(a).

*United States v. Irey,* 612 F.3d 1160, 1189 (11th Cir.2010) (en banc) (citations and internal quotation marks omitted).

We acknowledge the institutional superiority that district courts possess with regards to sentencing, and are mindful that appellate review for reasonableness is not a license to substitute our views for those of the district court. We are nevertheless convinced, under the deferential abuse of discretion standard, that the district court here committed a clear error of judgment in balancing the § 3553(a) factors, and that its downward variance to probation produced a sentence that was outside of the range of reasonable sentences permitted by the record. *See Gall,* 552 U.S. at 51, 128 S.Ct. 586; *Irey,* 612 F.3d at 1190.

In at least one other case involving both an initial § 5K1.1 departure and a subsequent variance, we analyzed

the substantive reasonableness of the variance employing the post-departure range/number as the reference point. *See* United States v. Crisp, 454 F.3d 1285, 1289–90 (11th Cir.2006) ("Even if the district court had not based the extent of the § 5K1.1 departure on improper considerations, its improper leap from the post-departure guideline range of 6–12 months to 5 hours would still have to be corrected."). We do the same here, and use the 41–51 month range produced by the § 5K1.1 departure as the reference point for the variance.

The district court recognized that Mr. Hayes' crimes (bribes of $600,000 paid out over four years, resulting in approximately $5 million in profits) were serious, that white-collar offenses need to be deterred, and that prison sentences are probably the best deterrent for those who might think about engaging in similar conduct. It never explained, however, how concurrent probationary terms with a period of home confinement would constitute just punishment for Mr. Hayes' multi-year bribery scheme, provide general deterrence for others, or promote respect for the law. *See generally* United States v. Shaw, 560 F.3d 1230, 1238 (11th Cir.2009) (explaining that the "justification must be compelling **\*1308** enough to support the degree of the variance and complete enough to allow for meaningful appellate review").

As Mr. Hayes points out, the district court found that he was genuinely remorseful, was not likely to commit further crimes, and was not a risk to the public, but these factors—which are usually present in most white-collar cases resulting in a guilty plea—cannot be seen in a vacuum and must be balanced against the other applicable § 3553(a) factors. In any event, the district court did not explain why they called for a variance down to probation.

[7] We recognize that the district court took into account the possibility of unwarranted sentencing disparity, but that factor, on this record, did not justify sentencing Mr. Hayes to probation. "[T]he need to avoid unwarranted sentencing disparity ... requires the [district] court to consider other similarly situated defendants ... who were convicted of similar crimes." United States v. McQueen, 727 F.3d 1144, 1160 (11th Cir.2013). First, the district court never explained what unwarranted sentencing disparity would result if Mr. Hayes were sentenced to some term of imprisonment, and our review of the chart prepared by the probation office does not reveal any such unwarranted sentencing disparity among similarly situated individuals. The one person who could be said to

be most closely situated to Mr. Hayes was Mr. Johnson, the former Chancellor of the ADPE and the recipient of Mr. Hayes' bribes. Mr. Johnson, who like Mr. Hayes received a downward departure based on a government § 5K1.1 motion, was sentenced to 78 months in prison after pleading guilty to conspiracy to commit bribery, bribery, conspiracy to commit money laundering, obstruction of justice, and tampering with a witness. Second, even if the loss resulting from crimes involving corruption can be seen as a rough proxy for similarity, four of the five related defendants who were responsible for losses over $250,000 received prison terms. And the one who was sentenced to probation was responsible for just over $300,000 in losses, less than half of the amount of money that Mr. Hayes was ordered to pay in restitution.

The district court also considered Mr. Hayes' age and health, but it did not think they were overwhelming factors. They, too, do not support Mr. Hayes' sentence of probation.

**B**

In a number of opinions—some involving defendants who provided substantial assistance to the government—we have explained that general deterrence is an important factor in white-collar cases, where the motivation is greed. In those same opinions, we have set aside sentences of little or no imprisonment because they do not constitute just punishment for the offense, do not promote respect for the law, and will not do much to deter similar criminal activity by others. *See, e.g.,* United States v. Kuhlman, 711 F.3d 1321, 1328–29 (11th Cir.2013) (vacating, as substantively unreasonable, sentence of probation (for "time served" while on pretrial release) for defendant responsible for $3 million health care fraud scheme); United States v. Livesay, 587 F.3d 1274, 1278–79 (11th Cir.2009) (vacating, as substantively unreasonable, sentence of probation for defendant involved in a fraud scheme resulting in loss of over $80 million); Martin, 455 F.3d at 1239–41 (vacating, as substantively unreasonable, sentence of seven days in custody for defendant involved in fraud scheme resulting in loss of over $80 million); Crisp, 454 F.3d at 1290–92 (vacating, as substantively unreasonable, sentence of probation for defendant who participated in bank fraud scheme resulting in loss of **\*1309** about $484,000). We come to the same conclusion here.

AR.06745

Bribery cannot properly be seen as a victimless crime, for in a sense it threatens the foundation of democratic government. Putting aside the financial havoc it can cause, bribery tears at the general belief of the citizenry that government officials will carry out their duties honestly, if not always competently. And that harm, though it may at times appear intangible, is real. [4]

### C

We do not mean to suggest that a downward variance can never be granted in white-collar cases, or that a sentence of probation is never permissible for defendants convicted of bribery or corruption offenses. Indeed, we have upheld, as reasonable, downward variances in several fraud cases where the government has appealed. *See United States v. Vawter,* 167 Fed.Appx. 101, 103 (11th Cir.2006); *United States v. Montgomery,* 165 Fed.Appx. 840, 842–43 (11th Cir.2006).

But there are bribes, and then there are bribes. Mr. Hayes did not just give a one-time gratuity to a local zoning inspector to expedite a building permit for a pool. He paid over half a million dollars in bribes, over a four-year period, to a high-ranking Alabama official so that his company could continue to receive lucrative government contracts—efforts which were rewarded by a corporate bottom line that got fatter by $5 million—and for that he received probation. As corruption cases go, this was bribery writ large, and on this record the district court's significant variance down to probation cannot stand.

### D

In closing, we respond to some of the issues raised by our colleague in dissent. As we explain, we disagree with his view of the case.

First, our colleague says that the government led the district court into committing procedural error by recommending that Mr. Hayes' offense level be reduced by a certain number of levels for substantial assistance. We do not believe that assessment is correct. The numerous cases cited earlier in this opinion indicate that one of the permissible ways to compute a departure under § 5K1.1 is to reduce a defendant's offense level. *See Lindsey,* 556 F.3d at 245–46; *Livesay,* 525

F.3d at 1087; *Floyd,* 499 F.3d at 312 n. 6; *Martin,* 455 F.3d at 1233 & n. 4; *Senn,* 102 F.3d at 332. Although § 5K1.1 has been around for decades, we know of no cases which have suggested, much less held, that a substantial assistance departure cannot be accomplished in this manner. Tellingly, our colleague does not cite to any. [5]

**\*1310** Second, according to our colleague we are sanctioning a procedural error committed by the district court at the behest of the government. That, however, is not so, for there was no procedural error. As we have already explained, nothing in the text of § 5K1.1 prohibits a district court from effecting a substantial assistance departure through a reduction of the defendant's total offense level. "Accordingly, the district court's reference to offense levels [here] in making its discretionary decision of how far to depart did not amount to the application of a 'sentencing range' authorized and made applicable by the Sentencing Guidelines[.]" *Lindsey,* 556 F.3d at 246. [6]

It may be that our colleague thinks that the § 5K1.1 motion did not justify the substantial departure the government was recommending, and/or that the district court departed too far when it granted that motion. Whatever the validity of those concerns, we do not comment on them because no one has raised them on appeal. The government could have tried to argue that the district court erred in departing beyond its § 5K1.1 recommendation, or committed another type of procedural error, but it chose not to make those arguments in its brief, and our general practice is to not address issues that are not properly raised by the parties.

We recognize that, normally, we ensure that there is no procedural error before addressing a claim of substantive unreasonableness, *see Gall,* 552 U.S. at 51, 128 S.Ct. 586, but we will not reach out to address a possible procedural error when neither the defendant nor the government have complained about it. Our cases, in fact, are replete with the rule that we do not have a duty to raise and decide issues—even constitutional ones—not mentioned by the parties. *See, e.g., United States v. Curtis,* 380 F.3d 1308, 1310 (11th Cir.2004); *United States v. Rodriguez,* 279 F.3d 947, 950 n. 3 (11th Cir.2002); *United States v. Nealy,* 232 F.3d 825, 830 (11th Cir.2000).

The cases our colleague cites are consistent with our general approach. In those cases either the defendant or the government asserted procedural error in contesting the sentence, and the panels in those cases understandably ruled on the procedural challenges before addressing substantive reasonableness. *See* United States v. Barner, 572 F.3d 1239, 1247–52 (11th Cir.2009) (defendant raised claim of procedural error); United States v. Carter, 564 F.3d 325, 326 (4th Cir.2009) (government raised claim of procedural error); United States v. Stephens, 549 F.3d 459, 466 (6th Cir.2008) (defendant raised claim of procedural error); United States v. Langford, 516 F.3d 205, 207 (3d Cir.2008) (defendant raised claim of procedural error). Here there are no procedural challenges by either side.

### III

The concurrent three-year probationary sentences in this case are substantively unreasonable given the factors set forth in § 3553(a). First, the sentences convey the message "that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically **\*1311** none of their liberty," Martin, 455 F.3d at 1240, and accordingly do not constitute just punishment for Mr. Hayes' offenses or promote respect for the law. Second, the sentences do not provide for general deterrence because "[t]he threat of spending time on probation simply does not, and cannot, provide the same level of deterrence as can the threat of incarceration in a federal penitentiary for a meaningful period of time." Livesay, 587 F.3d at 1279. Third, the sentences were not required to eliminate any sentencing disparity among similarly situated offenders because no such disparity existed. The sentences imposed on Mr. Hayes are therefore vacated, and the case is remanded for resentencing.

**VACATED AND REMANDED FOR RESENTENCING.**

TJOFLAT, Circuit Judge, dissenting:

I fully agree with the court that the sentence of probation Hayes received in this case of massive public corruption is shockingly low and should not have been imposed. In appealing the sentence, the Government treats the District Court as the scapegoat, as if placing Hayes on probation was all the court's doing. The truth is that it was the Government's doing. To ensure that Hayes was given adequate credit for cooperating in its investigation, the Government deliberately led the District Court to abandon the Sentencing Guidelines, which called for a prison sentence of 135 to 168 months, [1] and then to ignore the Supreme Court's explicit instructions, in Gall v. United States, 552 U.S. 38, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007), on the procedure to use in fashioning an appropriate sentence. This set the stage for the court's adoption of a fictitious Guideline range of 41 to 51 months and its creation of a downward variance to a sentence of probation.

In appealing Hayes's sentence to this court, the Government deliberately avoids any discussion of the District Court's procedural error. [2] To the contrary, it accepts the fictitious Guideline range the court adopted. All it complains of is the variance from that fictitious range to a sentence of probation, arguing that it is substantively unreasonable. Because it invited the procedural error, which, in turn, led to the complained-of substantive error, the "invited error doctrine" precludes the Government from prevailing in this appeal. Yet the court fails to acknowledge that a procedural error has occurred. Instead, it assesses the substantive reasonableness of Hayes's procedurally flawed sentence—something the Supreme Court prohibits—and thereby avoids the need to grapple with the Government's invited error. [3] I dissent from the court's failure to invoke the doctrine and to send the Government hence without day.

In part I of this opinion, I briefly recount the facts giving rise to Hayes's conviction and sentencing. In part II, I describe how the Guidelines are supposed to **\*1312** operate and will show how the Government and the District Court misapplied the Guidelines and set the stage for the sentence at issue. Part III outlines the role the courts of appeals play in reviewing a defendant's sentence, pinpoints the procedural errors in this case, and explains why the invited error doctrine precludes the Government from capitalizing on its induced error and obtaining relief. Part IV concludes.

### I.

From 2002 until 2006, James Hayes paid over $600,000 in bribes to Roy Johnson, the Chancellor of the Alabama Department of Postsecondary Education (the "ADPE"), which included: (1) a $124,000 payment to Johnson for expenses Johnson incurred in constructing his home,

disguised as a payment to Johnson's driver, Lanier Anderson Higgins, for work Higgins never performed; (2) a $23,850 payment to Johnson to fund a sound system in Johnson's home, which Hayes disguised by using a third-party business to pay for the sound system and then reimbursing the business; (3) a $55,000 payment to Johnson's son-in-law Greg Morgan, an attorney, for legal services he never provided; and (4) a $24,418.93 payment to the Retirement Systems of Alabama on behalf of the Dean of Nursing at Southern Union State Community College.

In exchange, Johnson ensured that Access Group Software, LLC, of which Hayes was founder and owner, would win contracts to provide software services and associated services. Most of the time Access was the low bidder. On the few occasions when it was not, Johnson instructed the college president to award Access the contract anyway. Johnson's influence was such that the colleges bought from Access even when its products were inferior to those of other bidders. In total, Access' gross revenue increased to over $14 million and its profits to $5 million.

Hayes's involvement in the corruption at the ADPE began to unravel after a federal grand jury subpoenaed his bank records. Hayes immediately took steps to disguise the true nature of his relationship with Johnson, but his attempts to conceal his criminal activity failed, and he was arrested for bribery, in violation of 18 U.S.C. § 666(a)(2). After he realized the strength of the Government's case against him, Hayes agreed to cooperate and assisted federal agents in their investigation of others involved in Johnson's scheme.

On December 26, 2007, the Government filed in the United States District Court for the Northern District of Alabama an information charging Hayes in Count One with federal-funds bribery, in violation of 18 U.S.C. § 666(a)(2), and in Count Two with conspiring to launder money under 18 U.S.C. § 1956(a)(1)(B)(i), in violation of § 1956(h). The information also included a forfeiture count, Count Three. It alleged that Hayes's interests in the proceeds of the crimes charged in Counts One and Two amounted to at least $5 million and that such interests were subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). The Government filed the information pursuant to a plea agreement it had reached with Hayes. Pursuant to that agreement, Hayes, on February 21, 2008, pled guilty to Counts One and Two and agreed to forfeit $5 million to the United States, representing his interest in the proceeds

of the crimes alleged in those Counts.[4] The **\*1313** plea agreement contained a cooperation provision in which Hayes promised to provide truthful and complete information about Johnson's bribery scheme to the Government's investigators and at the Government's request to testify before the grand jury and at the trial of anyone indicted for participating in the scheme. In return, the Government promised to recommend to the District Court at Hayes's sentencing that the court depart downward from the applicable Guidelines range pursuant to U.S. Sentencing Guidelines Manual § 5K1.1, if Hayes's cooperation rose to the level of substantial assistance for the reasons stated in § 5K1.1.[5]

## II.

The Supreme Court has clearly prescribed the procedure a district court must follow in sentencing a defendant. It is a three-step process. First, the district court "begin[s] ... by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall, 552 U.S. at 49, 128 S.Ct. at 596 (citation omitted). Second, after arriving at the proper Guidelines range, the court must "giv[e] both parties an opportunity to argue for whatever sentence they deem appropriate." Id. Third, the court must "consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party."[6] Id. at 49–50, 128 S.Ct. at 596. In doing that, the court will bear in mind that "[t]he Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate," Rita v. United States, 551 U.S. 338, 349, 127 S.Ct. 2456, 2464, 168 L.Ed.2d 203 (2007), to "assure the meeting of the purposes of sentencing as set forth in [18 U.S.C. § ] 3553(a)(2)," 28 U.S.C. § 991(b). "[W]hen the [court's] discretionary decision accords with the Commission's view of the appropriate application of § 3553(a) in the mine run of cases, it is **\*1314** probable that the sentence is reasonable." Rita, 551 U.S. at 351, 127 S.Ct. at 2465. "If [the court] decides that an outside-Guidelines sentence is warranted, [it] must consider the extent of the deviation and ensure that the justification is sufficiently

compelling to support the degree of the variance." *Gall, 552 U.S. at 50, 128 S.Ct. at 597.* The court must "adequately explain" the reasons for arriving at the chosen sentence, and "a major departure should be supported by a more significant justification than a minor one." *Id.* As the Supreme Court explained in *Peugh v. United States,* ––– U.S. ––––, ––––, 133 S.Ct. 2072, 2083, 186 L.Ed.2d 84 (2013), "sentencing decisions are anchored by the Guidelines."

A.

Federal sentencing is an adversarial process, *Rita, 551 U.S. at 351, 127 S.Ct. at 2465,* with the Government and the defendant engaged in "a confrontation ... similar to that which occurs at a civil bench trial," *United States v. Scroggins,* 880 F.2d 1204, 1209 (11th Cir.1989). The presentence report (the "PSI") serves as the starting point for arriving at an appropriate sentence in the same way that a pretrial stipulation serves as the starting point for arriving at a judgment in a civil case. The PSI identifies all applicable Guidelines and Sentencing Commission policy statements, calculates the defendant's total offense level [7] and criminal history, [8] states the resulting Guidelines sentencing range [9] and types of sentences available, and identifies any factor relevant to the appropriate type or length of sentence and any basis for departing from the Guidelines range. Fed.R.Crim.P. 32(d)(1). It also includes additional information such as a defendant's history and characteristics, as well as assessments of any financial, social, psychological, and medical impact the defendant's crimes had on the victims. Fed.R.Crim.P. 32(d)(2). The parties have an opportunity to object to the PSI. If objections are made, the Probation Office takes them into account and revises the PSI to the extent it deems necessary. Fed.R.Crim.P. 32(f). At least seven days prior to the commencement of the sentencing proceeding, the Probation Office submits to the parties and the court the final PSI, accompanied by an addendum listing the factual issues, and thus the correct Guidelines calculation, to be resolved at sentencing. Fed.R.Crim.P. 32(g).

In this case, the Probation Office prepared and submitted to the parties and the District Court a PSI reciting the facts underpinning the offenses described in Counts One and Two and setting out the appropriate sentencing options under the **\*1315** Guidelines for those counts. The PSI calculated a total offense level of 33 and a criminal history category of I

and determined that the Guidelines prescribed prison terms for Counts One and Two of the information ranging from 135 to 168 months, [10] supervised release terms of two to three years, a fine of $17,500 to $175,000, restitution to ADPE of $2.4 million, and forfeiture as indicated in the plea agreement. Neither party objected to any of the PSI's factual statements describing the criminal activity or to the proceeds of that activity as depicted in the information. Nor did either party object to the PSI's sentencing options, including its calculation of the range of imprisonment, 135 to 168 months. Nor did Hayes object to the PSI's requirement that he make restitution to the ADPE in the sum of $2.4 million.

Also prior to the sentencing hearing, the Government filed a Motion for Downward Departure Pursuant to U.S.S.G. § 5K1.1, [11] which sought to have Hayes's sentence reduced based on his substantial assistance to the Government during its investigation of the bribery scheme. In its motion, [12] the Government urged the District Court, "[b]ased upon the defendant's substantial assistance," to "depart from total offense level 33 to level 25, which results in an advisory guideline range of 57–71 months, [[[ [13] ] and impose a sentence of imprisonment of 60 months." Doc. 22, at 1. The motion did not explain how Hayes's substantial assistance could appropriately serve as the basis for lowering the total offense level or Guidelines range of 135 to 168 months. It provided no explanation because a legitimate explanation was not possible.

Substantial assistance is wholly irrelevant in determining a total offense level. [14] **\*1316** And although the factors in § 5K1.1 are "not an exhaustive list," courts are "prohibited from considering sentencing factors unrelated to the nature and extent of a defendant's assistance in making § 5K1.1 departures." *United States v. Martin,* 455 F.3d 1227, 1235–36 (11th Cir.2006). As such, a finding that the defendant provided substantial assistance cannot change the calculation of the total offense level or the "applicable Guidelines range" under *Gall,* because substantial assistance is unrelated to the determination of that range. *See* 28 U.S.C. § 991(b); 28 U.S.C. § 994(c)-(d) (listing factors the U.S. Sentencing Commission must take into account when creating offense levels—including "the grade of the offense," "the deterrent effect a particular sentence may have on the commission of the offense by others," and "the current incidence of the offense in the community and in

the Nation as a whole"—and the factors to be considered in creating criminal history categories—including age, vocation and skills, community ties—but not mentioning substantial assistance as a basis for either).

In urging the court to create an arbitrary Guidelines range based on the § 5K1.1 factors, the Government invited the court to commit "procedural error." *See Gall,* 552 U.S. at 51, 128 S.Ct. at 597 (describing significant procedural errors, including "failing to calculate (or improperly calculating) the Guidelines range"). This type of procedural error would normally be a ground for vacating the sentence and remanding the case for resentencing. *See, e.g., United States v. Gupta,* 572 F.3d 878, 890–92 (11th Cir.2009) (vacating and remanding a defendant's sentence after the district court improperly calculated the total offense level).

Along with its motion, the Government filed a memorandum recommending that Hayes be sentenced to 60 months' imprisonment. The memorandum stated:

> In accordance with the written plea agreement, the Government must recommend a sentence that departs below the low end of the Guidelines range determined by the Court at sentencing if Defendant provided substantial assistance. As explained below, the Government believes the Guidelines range is correctly calculated in the [PSI] as 135–168 months. Based on the Defendant's substantial assistance, and in light of the sentencing factors set for the in 18 U.S.C. § 3553(a), the Government believes a sentence of 60 months is reasonable.

Doc. 24, at 2. After reiterating that "the correct Guidelines range is 135–168 months," the Government stated that it "believe[d Hayes's] assistance warrants a downward departure from this Guidelines range to a sentence of 60 months." Doc. 24, at 3. The memorandum proceeded to describe the § 3553(a) sentencing factors in general terms, and assured the court that a 60–month sentence was consistent

with those factors. The Government did not reference the Guidelines range again, nor did it explain why a sentence that was more than 50 percent lower than the low end of that range comported with the § 3553(a) factors. The Government's memorandum made no reference to creating a substitute offense level or Guidelines range based on Hayes's substantial assistance. [15]

**\*1317** The Government's § 5K1.1 motion and its Sentencing Memorandum presented the District Court with two contradictory propositions. A 75–month departure from the Guideline range of 135 to 168 months to a sentence of 60 months *would not be* substantively unreasonable because it would not impermissibly frustrate the sentencing goals of § 3553(a)(2)(A) and (B). At the same time, a 75–month departure from that range *would be* substantively unreasonable (which is why the § 5K1.1 motion asked the court to establish a new Guidelines range of 57 to 71 months).

To avoid this dilemma, the Government recommended in its § 5K1.1 motion that, based on the defendant's substantial assistance, the District Court find a substitute offense level and Guidelines range—level 25 with a Guidelines range of 57 to 71 months—within which a sentence of 60 months could be imposed. But, as I have already explained, the court could not give effect to this Guidelines range recommendation because the law precluded it from doing so.

B.

1.

Hayes's sentencing proceeding commenced on June 8, 2011. The District Court began the proceeding, as *Gall* instructs, by determining the applicable Guidelines range. After hearing no objections, adopted the PSI's statements of fact and sentencing options. The court made specific findings that "the guidelines offense level is 33. The criminal history category is I. And the advisory guideline imprisonment range is from 135 months to 168 months." Doc. 28, at 4. The 135– to 168–month range of imprisonment then became **\*1318** the "applicable Guidelines range," *Gall,* 552 U.S. at 49, 128 S.Ct. at 596, which "anchor[s] ... the district court's discretion" in imposing

a final sentence, *Peugh,* —— U.S. at ——, 133 S.Ct. at 2087.

## 2.

After fixing the applicable Guidelines range at 135 to 168 months, the court proceeded to *Gall* 's second step: "giving both parties an opportunity to argue for whatever sentence they deem appropriate." 552 U.S. at 49, 128 S.Ct. at 596. The court began by taking up the Government's § 5K1.1 motion. When the court asked the Government's attorney, George Martin, to speak about his § 5K1.1 motion, he responded, "Judge, I have set out the defendant's cooperation in the motion. I won't belabor those points....

[W]e would ask the Court to grant [the § 5K1.1] motion and sentence the defendant *below* the guideline range to a term of imprisonment of 60 months." Doc. 28, at 7 (emphasis added). In so requesting, Martin appears to have recognized that 135 to 168 months remained the applicable Guidelines range. At this point, he made no reference to the fact that his § 5K1.1 motion urged the court to create a new Guidelines range of 57 to 71 months.

After a brief discussion regarding restitution, the court returned to the § 5K1.1 motion:

> THE COURT: The advisory guideline imprisonment range, as I previously stated, is between 135 months and 168 months. And the government is asking me based on substantial assistance to impose a sentence of 60 months. Correct; Mr. Martin?
>
> MR. MARTIN: Based both on his substantial assistance and the [18 U.S.C. § ] 3553(a) [sentencing] factors.
>
> THE COURT: I'm not supposed to mix those, am I, Mr. Martin?
>
> MR. MARTIN: My recommendation of 60 months is based both on substantial assistance and a consideration of those factors, from my perspective. That is, considering the crimes that he committed on one hand and the other factors and, on the other hand, the assistance he gave to the government, we recommend and we think a reasonable sentence is 60 months under the totality of the circumstances.

> THE COURT: Well, appropriately in your motion, ... you don't list any [§ ] 3553(a) factors. You only list [§ ] 5K1.1 factors. And it is my belief that it is inappropriate for me to consider an amount by which to downwardly depart based on substantial assistance any factors other than substantial assistance, including the government's evaluation of the value of that substantial assistance.... I'm certain there's binding Eleventh Circuit case law to that effect.
>
> MR. MARTIN: Your honor—
>
> THE COURT: I understand that your [§ 5K1.1] motion is different from your sentencing memorandum. You're just asking me in your sentencing memorandum not to vary below what you asked me to do on your 5K.
>
> MR. MARTIN: *What I did is instead of filing one thing that asked the Court to sentence him to the low end of the guidelines* and on the other hand filing a document *at the same time asking that you sentence him way below the bottom end of the guidelines, I filed documents as a complete package setting forth our recommendation* ... and our reasoning for that recommendation, including both the [§ ] 3553(a) factors and the defendant's substantial assistance. In the sentencing memorandum, I make it clear that our 60–month recommendation is based on both of those things.
>
> **\*1319**  THE COURT: You do in your memorandum. I totally agree. Do you agree with me that the binding case law in the Eleventh Circuit is that in ruling on a motion for downward departure pursuant to [§ ] 5K1.1, it is error for a district court to consider anything other than the substantial assistance?
>
> MR. MARTIN: Yes, Your Honor, I do.

Doc. 28, at 16–18 (emphasis added).

Although this colloquy between the court and Martin is somewhat convoluted, it is clear that in filing what he called "a complete package," Martin was providing the District Court with two alternative ways in which to give Hayes appropriate credit for his cooperation with the Government. The court could sentence Hayes "to the low end of the guidelines" or it could sentence him "way below the bottom end of the guidelines." The first alternative would require

the court to lower the Guidelines range to 57 to 71 months and sentence Hayes to the low end of that range, 60 months. The second alternative would require the court to adhere to the applicable Guidelines range, 135 to 168 months, and sentence Hayes "way below the bottom end of the guidelines" to 60 months. The colloquy also demonstrates that the court and Martin both recognized that a defendant's substantial assistance is not relevant in deciding the need for a sentence to satisfy 🚩 § 3553(a)(2)'s sentencing objectives, i.e., the defendant's substantial assistance cannot influence the offense level and the applicable Guidelines range. Rather, the nature and circumstances of the offense and the need for the sentence to attain 🚩 § 3553(a)(2)'s objectives determine the offense level and Guidelines range. *See* 🚩 28 U.S.C. § 994(a). Thus, in asking Hayes's attorney, Derek Drennan, to comment on the Government's 🔖 5K1.1 motion, the court instructed him "to speak only to the issue of substantial assistance because it would be error for [the court] to consider any other factor" in ruling on the motion. Doc. 28, at 18.

Drennan asked the court to grant the Government's motion for the reasons stated in his Sentencing Memorandum. The court granted the motion, then asked Drennan, "[a]re you asking for a level of departure, or you just asking that it be granted? Because it asks me to depart to 60 months." *Id.* at 18–19. Drennan replied, "Yes. That is correct." *Id.* at 19. Next, the court asked Drennan whether he thought 60 months' imprisonment reflected the value of Hayes's assistance. He responded, "[C]ertainly not. I don't know that I have—can take a position as to the government's motion." *Id.*

The court, referring to the second of the two alternative ways Martin proposed for granting a 🔖 § 5K1.1 departure, informed Drennan that "for the government to request a departure that's greater than 50 percent is unusual, to say the least, in my experience. As a percentage, they've asked me to depart down a lot more than I'm accustomed to seeing." Doc. 28, at 19–20. [16] As it turned out, the court did not depart from the applicable Guidelines range, 135 to 168 months. Instead, it adopted to Martin's first alternative and created a brand-new offense level and arbitrary Guidelines range. In granting the Government's 🔖 § 5K1.1 motion, the court explained:

> [I]t comes down to my opinion as to the appropriate amount of a departure. And I have the government's recommendation. And they do it by months or **\*1320**

range when they—although they come up with an offense level. That's certainly not required. What they do is they come up with a number of months, which 60 months is actually five years, but it's all done in months. But that's helpful because it also may impact the fine. To have an offense level is helpful.

> All right. Backing up, *the Court finds that the government's motion for a downward departure pursuant to* [ 🔖 *§ ] 5K1.1 based on the defendant's substantial assistance to the government should be granted. The Court finds that the appropriate ... guideline level for consideration should be Level 22, which when combined with the criminal history category of I creates an advisory guideline range of 41 to 51 months and a fine range from \$7,500 to \$75,000.* [ [[ [17] ] And the supervised release term remains from two to three years.

In departing based on the government's 5K motion, I discussed with and evaluated the significance and usefulness of the defendant's assistance. And I discussed this both with the government and the defendant. And I considered both their writings and their statements here in court. And I specifically considered the government's evaluation of the assistance rendered.

> And I've talked about giving more weight versus less weight and how I agree with the government in giving more weight. It's just that I am giving even more weight than the government gave on all these factors. And I've already said that a request for a departure that's below 50 percent is unusual in my experience—my seven years['] experience.

I considered the truthfulness, the completeness and the reliability of the information and testimony provided by the defendant. I considered the nature and extent of the defendant's assistance and this includes the fact that he identified a totally new target, Mr. Phillip Grace. He testified at least twice. The number of people who were convicted or pled guilty at least in part because of his testimony or willingness to testify and the number of hours he participated in meetings. The number of times he met with the government. His willingness to testify against targets of a state prosecution.

Doc. 28, at 24–26 (emphasis added).
As is apparent, the District Court's creation of a new offense level and applicable Guideline range was based solely on

Hayes's substantial assistance, but the court did not explain how that assistance warranted the new range, a new "starting point and ... initial benchmark" for fashioning Hayes's sentence. *See* Gall, 552 U.S. at 49, 128 S.Ct. at 596. The Government did not object to the District Court's creating a new offense level and applicable Guidelines range because its § 5K1.1 motion had induced the court to do precisely that. With a new Guidelines range, 41 to 51 months, the court, at the Government's behest, abandoned the "applicable Guidelines range," *id.,* which was supposed to "anchor ... the district court's discretion" in selecting a final sentence, Peugh, —— U.S. at ——, 133 S.Ct. at 2087.

3.

The third and final step of the sentencing process prescribed by Gall required the District Court to "consider all of the § 3553(a) factors to determine whether **\*1321** they support the sentence requested by a party." [18] Gall, 552 U.S. at 49–50, 128 S.Ct. at 596. "[D]istrict courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." Id. at 50 n. 6, 128 S.Ct. at 597 n. 6. In considering these § 3553(a) factors, the court may conclude that there are other characteristics of the crime, the defendant, or the victims that are not accounted for by the Guidelines—that take the case out of the "heartland" of cases the Sentencing Commission drew on in prescribing the applicable Guidelines range. [19] In that situation, the court can impose a sentence outside of the Guidelines framework —in Guidelines parlance, a "variance." U.S.S.G. § 1B1.1, background.

However, if the court wishes to sentence the defendant outside the applicable advisory Guidelines range, whether via departure or variance, it "must consider the extent of the deviation [from the Guidelines range] and ensure that the justification is sufficiently compelling to support the degree of the variance.... [A] major departure should be supported by a more significant justification than a minor one." Gall, 552 U.S. at 50, 128 S.Ct. at 597. [20] "Even if the sentencing judge sees a reason to vary from the Guidelines, if the judge uses the sentencing range as the beginning point to explain the decision to deviate from it, then the *Guidelines are in a*

*real sense the basis for the sentence.*" Peugh, —— U.S. at ——, 133 S.Ct. at 2083 (emphasis added) (internal quotation marks omitted).

In this case, the District Court should have begun with the admittedly correct Guidelines range, 135 to 168 months, and then, with that range in mind, considered whether the § 3553(a)(2)(A) and (B) sentencing objectives could accommodate the parties' requested sentences. Instead, the court adopted the Government's first alternative suggestion; it used an arbitrary Guidelines range and considered the parties' sentencing recommendations against that range. When the sentencing hearing resumed on July 13, 2011, [21] the court adhered to that approach, but, as the hearing unfolded, it did not adopt the Government's recommendation to impose a sentence within the 57– to 71–month range.

The court began by reminding the parties that in granting the motion for a downward departure pursuant to [ § ] 5K1.1 based on the defendant's substantial assistance to the government, I found that *the appropriate guideline level for consideration should be Level 22, which when combined with a criminal history category I creates an advisory guideline range of 41 months to 51 months* and a fine range from $7,500 to $75,000 and a supervised release term of two to three years.

**\*1322** Doc. 29, at 10 (emphasis added). This statement confirmed that the court's factual basis for creating the new Guidelines range was limited to Hayes's substantial assistance. The Government did not object to the court's adoption of the 41– to 51–month range, even though it had no legal foundation, because the Government had urged the court to adopt a new Guidelines range in the first place.

Having established 41 to 51 months as the "starting point and the initial benchmark" for determining the defendant's sentence, *see* Gall, 552 U.S. at 49, 128 S.Ct. at 596, the court invited Drennan to discuss whether it should vary downward from that range. Drennan began by discussing the § 3553(a)(2)(A) factor, urging the court to consider that the colleges that bought Access's software were still using it, and thus had sustained no loss, and the relative culpability of Hayes and Johnson, who instigated the criminal conduct. He then turned to the § 3553(a)(2)(C)–(D) factors, highlighting that Hayes had been the main caretaker of his elderly father and mentally disabled brother, both since deceased, after the prior caretaker, Hayes's sister, was killed

in a tornado that struck their residence; that Hayes was in poor health and nearly seventy; and that Hayes was not a risk to society and thus did not need rehabilitation. Hayes followed Drennan, apologized for participating in the bribery scheme, promised to satisfy his restitution and forfeiture obligations, and vowed to rehabilitate himself. These factors, which were unrelated to Hayes's substantial assistance, were appropriate for the court to consider when determining whether to grant a variance.

Martin spoke next and argued that "[t]he Court's sentence should be one that punishes the defendant for this conduct. And it should be a sentence that deters others from engaging in such conduct." Doc. 29, at 17–18. He concluded his argument by stating,

> [A]s I stated at the first part of this sentencing hearing held last month, the government, based on all the factors, believed that a sentence of 60 months was a reasonable sentence. That is over 50 percent below the low end of the guideline range. And nothing has changed that since then to warrant a different recommendation. It was reasonable then. It's reasonable now.

*Id.* at 21.

Turning to Martin's argument that the defendant's sentence should reflect the need for punishment and deterrence, the court said,

> I don't have any issues with your arguments that the defendant needs to be punished. And I don't have any issues with the government's arguments that people need to be deterred from committing white collar crimes and that sending them to jail is a strong deterrent to others and punishment to the person being sentenced.

> What I don't have and I didn't ask for it, but maybe probation has, is because I do think one of the very, very significant things to consider in sentencing—all the [ § ] 3553(a) factors are important. And I feel like I have good information on all of the factors except the one about unwarranted sentence disparities among defendants.

*Id.* at 23.

The court then asked the probation officer, who was attending the hearing, about the sentences imposed on others member of the bribery scheme who had been convicted and sentenced. After she directed the court to the relevant portion of the PSI, which listed the sentences these other participants received, the court read into the record the sentence imposed in twelve of the cases, noting that five were probation **\*1323** and three were greater than 60 months' imprisonment. The probation officer then directed the judge to a chart, which was not included in the PSI and which provided more information about those sentences. The chart listed two additional participants in the scheme, both of whom were sentenced to probation, as well as information for all fourteen participants regarding the crimes with which they were charged, the amount of loss attributed to each, the advisory Guidelines range in each case, and whether they pled guilty or were convicted.

After stating that the sentences the other participants received were relevant to § 3553(a)(6)'s command to avoid unwarranted sentence disparity, the court turned to the § 3553(a)(1) and (2)(A) and (B) factors: "the nature and circumstances of the offense," "this defendant's history and characteristics," the need for "a sentence [that] promote[s] respect for the law and provide[s] just punishment for the offense," "the need to afford adequate deterrence to criminal conduct by others," and the need for "punishment that would deter other people who might consider similar conduct from committing that conduct." Doc. 29, at 29–30. Regarding the § 3553(a)(2)(C) factor, the need for a sentence to deter the defendant from committing further crime, the court found that "this defendant does not pose any risk of further crimes to the public." Doc. 29, at 30. After commenting on these § 3553(a) factors, the court returned to "the need to avoid unwarranted sentence disparities among similarly situated defendant" but said, "I don't want anybody to think that that was ... the overwhelming factor." Doc. 29, at 31–32.

Having considered the § 3553(a) factors, the court granted Hayes a downward variance from the 41– to 51–month Guidelines range and sentenced him to probation for a term of 36 months, with not less than 6 nor more than 12 months home supervision.[22] The court found that "the sentence imposed is sufficient, but not greater than necessary to comply with

the statutory purposes of sentencing and is reasonable when considering the sentencing factors found at 🚩 18 U.S.C. Section 3553(a)." Doc. 29, at 33.

### C.

To summarize, the parties began the sentencing process by stipulating to the PSI's finding that the appropriate offense level in this case was 33 and that the criminal history category was I. They agreed that the correct and therefore applicable Guidelines range was 135 to 168 months. The District Court accepted the PSI factual findings and Guidelines applications. In doing so, the court adhered to the Supreme Court's instructions in *Gall*—that the first step in sentencing is to determine the applicable Guidelines range.

Then, the Government presented the court with two alternative approaches to use in determining Hayes's sentence, both based on his substantial assistance. First, it could lower the offense level from 33 to 25, adopt a new Guidelines range of 57 to 71 months, and impose a sentence within that range, 60 months. Or it could depart from the applicable Guidelines range, 135 to 168 months, and impose a sentence of 60 months. The court adopted the Government's first approach but lowered the offense level to 22 and the applicable Guidelines range to 41 to 51 months. In doing this, the court committed procedural error. *See* 📑 *Gall*, 552 U.S. at 51, 128 S.Ct. at 597. The court then compounded the error by **\*1324** treating the 41 to 51 months range as if it were based on the facts of the case and, after considering 📑 § 3553(a)(2) (C) and (D)'s sentencing factors, concluding that a downward variance to a sentence of probation was warranted.

### III.

After the District Court pronounced sentence, the Government objected "to the procedural reasonableness of the sentence and to the substantive reasonableness of the sentence, including the extent of [the] Court's downward departure pursuant to 5K and the reasonableness of the Court's final sentence." Doc. 29, at 35. On appeal, however, the Government reframes its objection. It abandons the procedural-reasonableness objection and "does not challenge the district court's 📑 § 5K1.1 downward departure to a Guidelines range of 41–51 months." Appellant's Br. at 11

n. 3. It does so even though that Guidelines range is purely arbitrary and therefore erroneous. The Government then limits it challenge to the substantive reasonableness of the sentence on the ground that the downward variance from the 41– to 51–month range to a sentence of probation fails to reflect the seriousness of Hayes's crime, does not adequately deter the general public from engaging in such crime, and is not justified by the need to avoid unwarranted sentencing disparities. [23]

As it did in the District Court, the Government invites us to disregard the Supreme Court's instructions on the sequential steps a district court is to take in imposing a sentence under the Guidelines and the sequential steps a court of appeals is to take in reviewing the sentence. By framing its appeal as a challenge solely to the substantive reasonableness of Hayes's sentence, the Government asks that we disregard *Gall* 's instruction that a court of appeals may not assess the substantive **\*1325** reasonableness of a sentence unless it first concludes that the sentence is procedurally reasonable. See 📑 552 U.S. at 51, 128 S.Ct. at 597. The Government ignores the fact that even though it does not challenge the procedure by which Hayes was sentenced, the Supreme Court requires that we must satisfy ourselves that no procedural error occurred.

It is obvious to me that procedural error did occur. The District Court used an arbitrary Guidelines range as its *Gall* "starting point and ... initial benchmark" in arriving at Hayes's sentence. *See* 📑 *id.* at 49, 128 S.Ct. at 596. Therefore, we may not review the substantive reasonableness of his sentence. Instead, we must vacate the sentence and remand the case for resentencing under the applicable Guidelines range, 135 to 168 months. The invited error doctrine precludes us from doing this, however, because the Government induced the error the District Court committed.

### A.

As the Supreme Court has instructed, a court of appeals' review of a criminal sentence is a two-step process. First it must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the 🚩 § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 260 of 912

failing to adequately explain the chosen sentence." *Gall,* 552 U.S. at 51, 128 S.Ct. at 597. [24] Only then, after the court of appeals is certain that no significant procedural error has occurred, can it turn to the substantive reasonableness of the sentence. *Id.* That is, the substantive reasonableness inquiry "[a]ssum[es] that the district court's sentencing decision is procedurally sound." *Id.* If the sentencing decision is not procedurally sound, it cannot be reviewed for substantive unreasonableness. [25]

We have recognized as much. For instance, in *United States v. Barner,* 572 F.3d 1239 (11th Cir.2009), we declined to discuss the substantive reasonableness of a sentence "because such an exercise cannot be undertaken until [the procedural] errors we have identified are addressed by the district court." *Id.* at 1253 (citing *Gall,* 552 U.S. at 51, 128 S.Ct. at 597). *Cf. Gupta,* 572 F.3d at 888 ("Because we conclude that a remand is necessary to correct procedural errors, we decline to evaluate the substantive reasonableness of Gupta's sentence. We do not know what sentence the district court will impose on remand. Thus, we would be rendering an advisory **\*1326** opinion if we were to pick a sentence and declare it to be reasonable." (citation omitted) (internal quotation marks omitted). [26] Other circuits follow a similar approach. *See, e.g., United States v. Carter,* 564 F.3d 325, 330 n. 4 (4th Cir.2009) ("Having found the sentence procedurally unreasonable ... we cannot review the sentence for substantive reasonableness."); *United States v. Stephens,* 549 F.3d 459, 465 (6th Cir.2008) ("If, and only if, the district court's sentencing decision is procedurally sound, we will then consider the substantive reasonableness of the sentence imposed....") (internal quotation mark omitted)); *United States v. Langford,* 516 F.3d 205, 218 (3d Cir.2008) ("[T]he failure to start with the correct Guideline range is legal error that thwarts reasonableness review—that is, it cuts off our review process before we even reach the issue of reasonableness."). [27]

It is only after the court of appeals is satisfied the district court correctly calculated the Guidelines range and did not otherwise commit procedural error that it can "consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Gall,* 552 U.S. at 51, 128 S.Ct. at 597. The court of appeals needs an accurate Guidelines range because "[w]hen conducting this review,

the court will, of course, take into account the totality of the circumstances, *including the extent of any variance from the Guidelines range.*" *Id.* (emphasis added). If the district court imposes a sentence below the applicable Guidelines range, the reviewing court "must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Id.* When evaluating the district court's weighing of the § 3553(a) factors, the reviewing court is "obliged to remand for resentencing if [it is] left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *United States v. Pugh,* 515 F.3d 1179, 1191 (11th Cir.2008) (internal quotation marks omitted); *see also United States v. Irey,* 612 F.3d 1160, 1189 (11th Cir.2010) (en banc).

B.

The District Court in this case committed clear procedural error by lowering the Guidelines range to 41 to 51 months based on Hayes's cooperation with the Government. Congress precluded the Sentencing Commission—in prescribing, in conformance with 28 U.S.C. § 994, the offense level for Hayes's offenses—and the District Court—in determining, in conformance with § 3553(a)(2)(A) and (B), the need for Hayes's sentence to satisfy the sentencing objectives of punishment and general deterrence—from considering substantial assistance provided to the Government. Because the District Court lowered Hayes's offense level based on substantial assistance alone, it created a Guidelines range, 41 to 51 months, that lacked a legal foundation and was therefore arbitrary. The Government did not object because it encouraged the court to do this; after all, the Guidelines range it wanted the court to adopt, 57 to 71 months, was just as lacking **\*1327** in a legal foundation as the one court ultimately chose. In asking this court to assess the substantive reasonableness of Hayes's sentence, the Government is asking this court to review a sentence imposed without reference to the Guidelines. Reference to the applicable Guidelines range is unnecessary, the Government implies, because anyone with a conscience would know that a sentence of probation for the widespread bribery that occurred in this case in would be preposterous.

We cannot accept the Government's request and at the same time obey the Supreme Court's mandate in *Gall*. *Gall* precludes us from reviewing the substantive reasonableness of a sentence imposed without reference to the applicable Guidelines range. A sentence imposed without reference to that range is procedurally unreasonable. And a finding of procedural reasonableness is a necessary antecedent to substantive reasonableness. *See Gall* 552 U.S. at 51, 128 S.Ct. at 597; *Barner, 572 F.3d at 1253.*

This, of course, makes sense. If a district court imposes sentence without reference to a properly calculated Guidelines range, we lack an accurate benchmark from which to evaluate its substantive reasonableness. "[S]entencing decisions are anchored by the Guidelines and ... they remain a meaningful benchmark through the process of appellate review." *Peugh,* ——U.S. at ——, 133 S.Ct. at 2083; *see also Gall,* 552 U.S. at 50 n. 6, 128 S.Ct. at 597 n. 6 ("The fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."). As *Gall* directs, the substantive-reasonableness analysis must "take into account the totality of the circumstances, *including the extent of any variance from the Guidelines range.*" *Gall,* 552 U.S. at 51, 128 S.Ct. at 597 (emphasis added). As such, we should consider the substantive reasonableness of a sentence only "*after* [we have] determined that the district court's sentencing decision is procedurally sound." *Pugh,* 515 F.3d at 1190 (internal quotation marks omitted) (emphasis added). It is for this reason that this court and other courts of appeals will not evaluate the substantive reasonableness of a sentence in the face of significant procedural error. *See, e.g., Barner,* 572 F.3d at 1253; *United States v. Carter,* 564 F.3d 325, 330 n. 4 (4th Cir.2009); *United States v. Stephens,* 549 F.3d 459, 465 (6th Cir.2008); *United States v. Langford,* 516 F.3d 205, 218 (3d Cir.2008).

In the face of "significant procedural error," *Gall,* 552 U.S. at 51, 128 S.Ct. at 597, such as occurred here in the District Court's use of an arbitrary Guidelines range, our normal response would be to vacate the sentence and remand the case for further proceedings. However, the invited error doctrine precludes us from doing that.

## C.

In moving the District Court to decrease Hayes's offense level from 33 to 25 and to adopt a Guidelines range of 57 to 71 months based solely on an irrelevant criterion, substantial assistance, the Government brought the District Court's procedural error on itself. To be sure, the range the court eventually chose wasn't the one the Government proposed, but it was just as inappropriate as the Government's. Both ranges reflected an intuitive reaction to Hayes's cooperation; the District Court simply thought his cooperation was deserving of a bit more grace than the Government recommended. In the end, the Government accepts the court's range without qualification. Appellant's Br. at **1328** 11 n. 3 ("The government calculates the size of the variance as 41 months because it does not challenge the district court's § 5K1.1 downward departure to a Guidelines range of 41 to 51 months."). And today, this court does as well.

In inviting the District Court to accept 41 to 51 months as the applicable Guidelines range, the Government also invited the District Court to depart or vary downward from that range for reasons unrelated to § 5K1.1 substantial assistance. The court could do this based on evidence indicating that a sentence in the 41 to 51 months range was not needed to satisfy § 3553(a)(2)(A) and (B)'s purposes of punishment and general deterrence.[28] At the end of the day, the court accepted the Government's invitation and imposed a sentence of probation.

Although Hayes's sentence is the product of procedural error that is plain on its face, we are not at liberty to correct the error. As we have explained countless times before, "[i]t is a cardinal rule of appellate review that a party may not challenge as error a ruling ... invited by that party. The doctrine of invited error is implicated when a party induces or invites the district court into making an error." *United States v. Love,* 449 F.3d 1154, 1157 (11th Cir.2006) (citations omitted) (internal quotation marks omitted); *see also United States v. Silvestri,* 409 F.3d 1311, 1327 (11th Cir.2005); *Ford ex rel. Estate of Ford v. Garcia,* 289 F.3d 1283, 1294 (11th Cir.2002). The doctrine of invited error "stems from the common sense view that where a party invites the trial court

to commit error, he cannot later cry foul on appeal." *United States v. Brannan,* 562 F.3d 1300, 1306 (11th Cir.2009).

In the mine-run appeal, we would vacate the sentence and remand the case to the district court for resentencing. Here, we would instruct the court to follow *Gall*'s instruction and, in determining the extent of the 🔖 § 5K1.1 departure from the applicable Guidelines range, 135 to 168 months, "consider all of the 🚩 § 3553(a) factors to determine whether they support the sentence requested." 552 U.S. at 49–50, 128 S.Ct. at 596. [29] In this case, however, we cannot remedy the procedural error because it was invited by the party seeking to challenge the sentence, the Government.

I say that the invited error doctrine applies even in a case where the defendant's sentence is as absurd as the one here. The majority vacates the sentence in this case because the facts and circumstances surrounding the commission of Hayes's crime demand a sentence far more serious than the one he received. Over a period of four years, Hayes's bribes netted him over $5 million in profits and caused the victims to suffer losses of $2.4 million. To the citizens of Alabama aware of the magnitude of Hayes's crime, a sentence of **\*1329** probation is outlandish, a mere slap on the wrist.

Applying the invited error doctrine and allowing Hayes's sentence of probation to stand would breed disrespect for the rule of law in many quarters. Disrespect for the rule of law and the damage to the body politic that portends weigh heavily on one side of the scales of justice. However, the policies the invited error doctrine reflects weigh just as heavily on the other side of the scales. And they are several. I have already mentioned one: the doctrine vindicates respect for the courts by preventing "sandbagging" and "gamesmanship," where a party gets a second bite of the apple at his adversary's expense, and at the public's expense as well. The public suffers because, without the doctrine, the courts' dockets would become overcrowded, the cases of those standing in the queue waiting to be heard would be delayed, and the public's respect for the courts would wane. Justice delayed is justice denied.

In seeking the vacation of Hayes's sentence, the Government is gaming the system. But in a larger sense, it is obstructing the administration of justice in the Eleventh Circuit. Therefore, invoking the invited error doctrine, I would affirm Hayes's sentence.

## IV.

The court entertained this appeal as the Government's brief requested. That is, it sidestepped the issue of whether the Hayes's sentence is procedurally unreasonable and went straight to the issue of whether the sentence is substantively unreasonable. In doing so, the court purports to accept the statement in the Government's brief, that it "does not challenge the district court's 🔖 § 5K1.1 downward departure to a Guidelines range of 41–51 months." Appellant Br. 11 n. 3. I say that the court purports to do this because it is apparent to me that it finds Hayes's sentence of probation substantively unreasonable not because it constitutes an unreasonable variance from a Guideline range of 41 to 51 months, but because it is an unreasonable departure from the applicable Guidelines range of 135 to 168 months. The court reveals this in the following passage of its opinion, which describes the criminal activity the 135– to 158–month range reflects.

> But there are bribes, and then there are bribes. Mr. Hayes did not just give a one-time gratuity to a local zoning inspector to expedite a building permit for a pool. He paid over half a million dollars in bribes, over a four-year period, to a high-ranking Alabama official so that his company could continue to receive lucrative government contracts—efforts which were rewarded by a corporate bottom line that got fatter by $5 million— and for that he received probation. As corruption cases go, this was bribery writ large, and on this record the district court's significant variance of 41–51 months cannot stand.

Ante at 1309.

In short, the court should have focused on *Gall*'s third step, which required the District Court to "consider all of the 🚩 § 3553(a) factors" in light of the correct Guidelines range, 135 to 168 months, "to determine whether they support[ed] the sentence requested by" Hayes—specifically, the sentence

it ultimately imposed, probation. *See* *Gall,* 552 U.S. at 49–50, 128 S.Ct. at 596. After this, the court should have asked whether the District Court "adequately explain[ed]" how a sentence of probation squared with the need for Hayes's sentence to provide just punishment and to deter others from emulating his criminal conduct. Id. at 50, 128 S.Ct. at 597.

***1330** Putting this aside, I am concerned about the court's mandate. What instruction does it give the District Court? Section 3742 of Title 18 of the U.S.Code states, in pertinent part, that

If the court of appeals determines that—

...

(2) the sentence is outside the applicable guideline range and ... the departure is ... plainly unreasonable, it shall state specific reasons for its conclusions and—

...

(B) if it determines that the sentence is too low ..., it shall set aside the sentence and remand the case for further sentencing proceedings with such instructions as the court considers appropriate, subject to subsection (g).

18 U.S.C. § 3742(f)(2). Subsection (g) states that "[a] district court to which a case is remanded pursuant to subsection ... (f)(2) shall resentence a defendant in accordance with section 3553 and with such instructions as may have been given by the court of appeals." § 3742(g).

I suggest that the court's mandate tells the District Court that a sentence of probation on the facts stated in the PSI is substantively unreasonable as a matter of law. The court's reliance on those facts, as opposed to hypothetical facts that would support a Guidelines range of 41 to 51 months,[30] indicates that the applicable Guidelines range is 135 to 168 months.

I return to what I state in the introduction to this opinion: the invited error doctrine requires that the judgment of the District Court be affirmed.

**All Citations**

762 F.3d 1300, 25 Fla. L. Weekly Fed. C 281

## Footnotes

1 The district court held a second sentencing hearing because it thought it might need testimony from witnesses concerning restitution. The parties ended up stipulating as to restitution, and the district court adopted their stipulation.

2 If the district court sentences a defendant to a term different than the one produced by a § 5K1.1 downward departure, such a sentence is "considered a 'variance' " in guidelines parlance. *See* U.S.S.G. § 1B1.1, background. *See also* *United States v. Lee,* 725 F.3d 1159, 1165 n. 5 (9th Cir.2013) ("a 'variance' [is] the third step of the [g]uidelines procedure").

3 This was the same methodology employed in *Martin,* 455 F.3d at 1233 n. 4.

4 "[A]mong a people generally corrupt liberty cannot long exist." EDMUND BURKE, *Letter to the Sheriffs of Bristol* (April 3, 1777), *in* HENRY ROGERS, THE WORKS OF THE RIGHT HON. EDMUND BURKE, VOL. 1, at 221 (London 1837).

5 In the context of departures under § 5K2.0, we have written that, if the district court chooses to depart, "it has 'wide discretion' in determining [the defendant's] base offense level." *United States v. Gibson,* 434 F.3d 1234, 1253 (11th Cir.2006). What we said in *Gibson* is consistent with our decision in this case.
Additionally, to the extent our colleague's dissent might be read as suggesting that the district court could only have "departed" downward within Mr. Hayes' original sentencing range of 135–168 months, such a suggestion

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 264 of 912

would run counter to [§ 5K1.1.](#) The Third and Fifth Circuits have reversed [§ 5K1.1](#) "departures" within the original sentencing range, holding that they are not "departures" at all. *See* [*Vazquez–Lebron,* 582 F.3d at 445–46](#); [*United States v. Hashimoto,* 193 F.3d 840, 843–44 (5th Cir.1999)](#).

6      Even if we assume that the district court committed procedural error, the government did not unambiguously invite the alleged error, a point our colleague seemingly acknowledges by conceding that the colloquy between the district court and the government "is somewhat convoluted." Under our precedent, the invited error doctrine is not triggered by ambiguous statements or representations. *See* [*United States v. Dortch,* 696 F.3d 1104, 1112 (11th Cir.2012)](#) ("In the light of Dortch's ambiguous statement to the district court, the doctrine of invited error does not apply.").

1      Although Hayes was to receive two sentences—one on Count One of the information, the other on Count Two—the parties and the court refer to the sentences as one sentence. For ease of discussion, I do the same.

2      In doing so, the Government invites this court to disregard the Supreme Court's instruction in [*Gall v. United States,* 552 U.S. 38, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007)](#).

3      In ignoring the procedural error, the court effectively adopts the approach the Government takes in its brief—that this court should entertain its substantive unreasonableness argument straightway without first determining whether the District Court committed procedural error. *See infra* part III.

4      On October 27, 2008, the District Court entered a Final Order of Forfeiture. The order recited that, pursuant to the plea agreement, Hayes agreed to forfeit to the United States $5 million "as proceeds of the illegal acts charged in Counts One and Two of the Information," that Hayes had "consented to the entry of a money judgment against him as part of his sentencing in [the case]," and that "based ... [on] the terms of [the] Plea Agreement, the Attorney General is now entitled to possession of said property." Doc. 16, at 1–2. The order then provided that Hayes forfeited "the sum of $5,000,000.00 to the United States," that the Attorney General was "authorized to seize the property forfeited," and that the "Order of Forfeiture operates as a money judgment against ... Hayes, thereby eliminating the requirement for ancillary proceedings." Doc. 16, at 2–3.

5      *See infra* part II.A.

6      [18 U.S.C. § 3553(a)](#) lists seven factors district courts are to consider when sentencing. The first is "the nature and circumstances of the offense and the history and characteristics of the defendant." [§ 3553(a)(1)](#). The second looks to the general purposes of sentencing,

the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

[§ 3553(a)(2)](#). The third is "the kinds of sentences available," the fourth is "the kinds of sentence and the sentencing range" under the Guidelines, the fifth is "any pertinent policy statement ... issued by the Sentencing Commission," the sixth is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," and, finally, the seventh is "the need to provide restitution to any victims of the offense." [§ 3553(a)(3)-(7)](#).

7      The total offense level serves as a proxy for the need for a sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," [§ 3553(a)(2)(A)](#), as well as the need to "afford adequate deterrence to criminal conduct," [§ 3553(a)(2)(B)](#), and the adjustments, which are not necessarily related to the [§ 3553(a)(2)(A)-(B)](#) purposes.

25 Fla. L. Weekly Fed. C 281

8    The criminal history category serves as proxy for the need "to protect the public from further crimes of the defendant." § 3553(a)(2)(C). In other words, it is a proxy for recidivism. Thus, a defendant with a criminal history category of I does not need to be incarcerated to protect the public.

9    Based on a defendant's offense level and criminal history category, the court calculates a Guidelines range from the sentencing table. See U.S.S.G. Ch. 5, Pt. A. Each cell in the table has a range of numbers, which corresponds to the upper and lower end of the recommended term of imprisonment for the defendant, based on the total offense level and criminal history category.

10   The maximum term of imprisonment provided by statute was ten years for Count One, 18 U.S.C. § 666(a)(2), and twenty years for Count Two, 18 U.S.C. § 1956(a)(1)(B), (h). "Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range [as it was for Count One], the statutorily authorized maximum sentence [is] the guideline sentence." U.S. Sentencing Guidelines Manual § 5G1.1(a). The guideline range for Count One thus became 120 months. Because the maximum sentence for Count Two exceeded the 135 to 168 months range, the Count Two sentence could exceed the Count One sentence and create a total prison term of ranging from 135 to 168 months.

11   Section 5K1.1 of the U.S. Sentencing Guidelines provides:

Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines.

(a) The appropriate reduction shall be determined by the court for reasons stated that may include, but are not limited to, consideration of the following:

(1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

(2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

(3) the nature and extent of the defendant's assistance;

(4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;

(5) the timeliness of the defendant's assistance.

12   The Government filed the motion on May 9, 2011. It filed its Sentencing Memorandum the same day and its Amended Sentencing Memorandum on May 10, 2011.

13   The Guidelines sentencing table indicates that an offense level of 33 and a criminal history category of I (Hayes's criminal history category) creates a sentence range of 135 to 168 months; an offense level of 25 and a criminal history category of I creates a sentence range of 57 to 71 months. U.S.S.G. Ch. 5, Pt. A.

14   The total offense level considers "the seriousness of the average offense sentenced under that particular guideline," "various factors considered relevant to the defendant's offense conduct," and "certain factors considered generally relevant for sentencing purposes." Scroggins, 880 F.2d at 1210.

15   A close reading of the Government's § 5K1.1 motion and its Sentencing Memorandum together presents contradictory propositions that are difficult, if not impossible, to reconcile and applies § 5K1.1 in an unlawful manner. I start with the Memorandum because its service was to support the motion.

The Memorandum does not explain how a sentence of 60 months would accomplish the purposes set out in § 3553(a)(1)(A) and (B), to provide just punishment and deter others from committing the public corruption crimes Hayes committed. Were the Government now to explain how sentences of 60 months would satisfy these (A) and (B) purposes, I suppose that it would point to our precedent which requires a court to take the Guidelines range (135 to 168 months) *and the* § 3553(a)(A) and (B) factors (that created that range) into account *after* it tentatively decides the credit it will give the defendant for his § 5K1.1 assistance. *See, e.g., United States v. McVay,* 447 F.3d 1348, 1356 (11th Cir.2006) ("[A]fter it has decided the length of

departure warranted by the substantial assistance motion, the district court is then obliged to take into account the advisory Guidelines range *and* the sentencing factors set forth in 18 U.S.C. § 3553(a) in fashioning a reasonable sentence."). Then, having taken the Guidelines range and the § 3553(a) factors into account, the Government would say that a § 5K1.1 departure of 75 months from the low end of the Guidelines range to a sentence of 60 months would not frustrate the sentencing goals reflected in the 135– to 168–month range. Those goals would still be met.

However, the position the Government took in its § 5K1.1 motion suggested that a 75–month departure from the Guidelines range of 135 to 168 months would frustrate those goals. The Government apparently thought that this frustration could be avoided if the District Court lowered the Guidelines range—and thus reconsidered the sentencing goals of the 135– to 168–month range—so that a sentence of 60 months would be an inside-Guidelines sentence. An inside-Guidelines sentence would not likely engender the public criticism a 75–month departure would produce. The Government's motion therefore recommended that, "based on the defendant's substantial assistance," the District Court depart from the Guidelines range of 135 to 168 months to a Guidelines range of 57 to 71 months, then impose a sentence of 60 months imprisonment—a sentence within the Guidelines range.

16  Sixty months would be greater than a 50–percent departure from the applicable Guidelines range, 135 to 168 months, but not a departure at all from the 57– to 71–month range.

17  The District Court was incorrect to state that the new offense level would help with the fine. The fine remained tied to the original Guidelines range of 135 to 168 months and could not be reduced to the $7,500 to $75,000 range based on substantial assistance.

18  In practice, this step requires the parties to justify their proposed sentences in light of § 3553(a). When it comes time to impose a final sentence, however, the judge is required to show how the sentence is consistent with the § 3553(a) factors.

19  "The [Sentencing] Commission intends sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes." U.S.S.G. Ch. 1 Pt. A, introductory cmt. 4(b).

20  In *Gall,* the Supreme Court did not distinguish between variances and departures, which leads me to believe it was using the terms as synonyms. *See* Thomas W. Hutchison, *et al., Federal Sentencing Law and Practice* § 11.5 (2014 ed.) (reaching the same conclusion).

21  The June 8 hearing was continued until an issue regarding restitution could be resolved. At the July hearing, Martin announced that he and Drennan agreed that Hayes would pay restitution in the sum of $628,454.28.

22  The court ordered Hayes to pay $628,454.28 with interest in restitution to the ADPE, payable immediately, and criminal forfeiture as to Count Three.

23  The Government's appeal is authorized by 18 U.S.C. § 3742(b). That section provides as follows:
   (b) Appeal by the Government.—The Government may file a notice of appeal in the district court for review of an otherwise final sentence *if the sentence*—
   (1) was imposed in violation of law;
   (2) was imposed as a result of an incorrect application of the sentencing guidelines;
   (3) *is less than the sentence specified in the applicable guideline range to the extent that the sentence includes a lesser* fine or *term of imprisonment,* probation, or supervised release *than the minimum established in the guideline range,* or includes a less limiting condition of probation or supervised release under section 3563(b)(6) or (b)(11) than the minimum established in the guideline range; or
   (4) was imposed for an offense for which there is no sentencing guideline and is plainly unreasonable.
   The Government may not further prosecute such appeal without the personal approval of the Attorney General, the Solicitor General, or a deputy solicitor general designated by the Solicitor General.

§ 3742(b) (emphasis added). The Government's brief does not indicate which of the four grounds for appeal it is relying on here. The objection the Government voiced following the District Court's imposition of sentence implied that it would appeal Hayes's sentence on ground (2), because, as I explain, procedural error is manifestly present. Ground (4) is clearly inapplicable, and from a reading of its brief, I conclude that it is not relying on ground (1). That leaves ground (3).

Ground (3) implies that the district court properly applied the Guidelines, and thus arrived at the appropriate applicable Guidelines range. The Government's position is that the District Court properly applied the Guidelines and correctly arrived at the applicable Guidelines range. So, to maintain this appeal, the Government must establish that Hayes's sentence of probation is a "lesser term of imprisonment ... than the minimum established by the guideline range." Hayes has not raised the question of whether a sentence of probation is a term of imprisonment; neither has this panel. Consequently, I do not address it.

24      We assume that the *Gall* Court, in using the term "significant procedural error," meant error that materially affected the defendant's sentence. The procedural error I refer to in this opinion is significant and thus material.

25      The majority justifies its decision not to assess the procedural reasonableness of Hayes's sentence—and to limit its review to the substantive reasonableness of the sentence—based in part on settled Eleventh Circuit precedent that "we do not have a duty to raise and decide issues—even constitutional ones—not mentioned by the parties." Maj. Op. at 22. If this were an ordinary appeal, I would agree that the court should invoke that doctrine. But this is not an ordinary appeal.

Just as a sentencing court is not bound by the parties' framing of the Guidelines range in a plea bargain or at sentencing because the court "has an independent obligation to calculate *correctly* the sentencing range prescribed by the Guidelines," *United States v. Aguilar–Ibarra*, 740 F.3d 587, 591 (11th Cir.2014) (internal quotation marks omitted), a court of appeals cannot—consistent with *Gall*—engage in substantive review without first ensuring the sentence is procedurally reasonable.

26      Declaring that a sentence is substantively unreasonable after finding significant procedural error is to render an advisory opinion because the district court, on remand will be resentencing the defendant under a new Guidelines range, a new benchmark.

27      That the cases cited above included challenges to both the procedural and substantive reasonableness of the sentence does not undermine the broader logic in each case that substantive-reasonableness analysis is impossible without procedural reasonableness.

28      The problem the court would face, though, is that the 41 to 51 months range does not represent the facts and circumstances surrounding Hayes's commission of the bribery in this case. Offense level 22, which drives the 41 to 51 months range, assumes that Hayes's profits and the victims' losses were between $10,000 and $30,000. *See* U.S.S.G. § 2B1.1(b)(1)(C). It is a false assumption, however, because the facts are that Hayes's profits were $5 million and the victims lost $2.4 million. According to the Sentencing Commission, these facts, which the parties and the District Court accepted as true, revealed that a sentence in the range of 135 to 168 months, based on an offense level of 33, was necessary in order to satisfy § 3553(a)(2)(A) and (B)'s sentencing objectives.

29      The same instruction would govern the court's consideration of a party's request for a variance from the applicable Guidelines range.

30      By conceding that the District Court's use of the 41– to 51–month range was correct, the Government implicitly takes the position that the facts of Hayes's case support the 41 to 51 months range.

---

**End of Document**                                  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by U.S. v. Zavala-Mendez, 9th Cir.(Alaska), June 15, 2005

532 F.2d 1316
United States Court of Appeals,
Ninth Circuit.

UNITED STATES of America, Plaintiff-Appellee,

v.

Agustin MARTIN-PLASCENCIA, aka Ernesto Rico Hernandez, Defendant-Appellant.

No. 75-3305.
|
March 25, 1976.

**Synopsis**

Alien appealed from adjudication of juvenile delinquency entered by the United States District Court for the Southern District of California, William B. Enright, J., for illegal entry. The Court of Appeals, East, Senior District Judge, held that juvenile alien's conduct that constituted "illegal entry" though he was still nominally within confines of port of entry at time of arrest; and that he did not have a statutory right to jury trial.

Affirmed.

**Procedural Posture(s):** On Appeal.

West Headnotes (2)

[1]    **Aliens, Immigration, and Citizenship**  🔑  Unlawful Entry or Presence

Alien was guilty of "illegal entry" though at the time of his arrest he was still nominally within the confines of a port of entry, where, prior to that time, he was under no official restraint, and at time of arrest was 50 yards into the United States and attempting to scale a concrete wall, after having crawled through or under two chain link fences.

Immigration and Nationality Act, §§ 275, 275(1), 8 U.S.C.A. §§ 1325, 1325(1).

24 Cases that cite this headnote

[2]    **Jury**  🔑  Dependent, Neglected, or Delinquent Children, Proceedings Involving

Statutes relating to proceedings against juvenile delinquent, as amended, do not grant a juvenile being processed thereunder a right to jury trial. 18 U.S.C.A. §§ 5032, 5033.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1317**  Glorene Franco, Federal Defender of San Diego (argued), San Diego, Cal., for defendant-appellant.

Terry J. Knoepp, U. S. Atty. (argued), San Diego, Cal., for plaintiff-appellee.

OPINION

Before CHAMBERS and WRIGHT, Circuit Judges, and EAST, [*] Senior District Judge.

**Opinion**

EAST, Senior District Judge:

Agustin Martin-Plascencia (Appellant) appeals from an adjudication of juvenile delinquency under 18 U.S.C. s 5032 for knowingly and willfully entering the United States from Mexico in violation of 8 U.S.C. s 1325. We affirm.

The juvenile proceedings were conducted by the District Court sitting without a jury pursuant to 18 U.S.C. ss 5032 and 5033, as amended on September 7, 1974. We note our jurisdiction under 28 U.S.C. ss 1291 and 1294.

Appellant, a 14 or 15 years of age citizen of Mexico, was arrested within the United States near the Port of Entry at San Ysidro, California on August 31, 1975 on the charge of illegal entry. The instant arrest was the young Appellant's 51st arrest upon charges of immigration law violations.

On this August 31 occasion, the Appellant did not present himself to the officials at the Port of Entry, but rather he surreptitiously by-passed the questioning and inspection areas and, out of the view of the immigration officials, crawled through an opening in a six foot chain link fence and then under a second eight foot chain link fence. Appellant was attempting to scale a concrete wall onto a San Ysidro street when apprehended. At this point of the entry, Appellant was no less than 50 yards into the United States.

We deem the pertinent issues on appeal to be:

(1) Did the District Court err in concluding that Appellant entered the United States illegally?

(2) Did the District Court properly deny Appellant's motion for a jury trial?

A third assignment of error involving the insufficiency of the allegations in the information charging the Appellant is wholly without merit.

ISSUE 1:

[1]    The Appellant urges that as a matter of law his entry was not illegal under the rationale of United States v. Oscar, 496 F.2d 492 (9th Cir. 1974). We reject this contention because the facts in Oscar are manifestly distinguishable. The defendants in Oscar presented themselves to the immigration officials for inspection at the Port of Entry and deceitfully represented themselves to be United States citizens. The immigration officials were suspicious and directed them to drive their automobile into the inspection area, which was located within the United States, where they were revealed as aliens. The defendants were immediately arrested.

This court held under those circumstances that the aliens had not illegally entered the United States in violation of 8 U.S.C. s 1325 "because they were never free from the official restraint of the customs officials at the San Ysidro Port of Entry." United States v. Vasilatos, 209 F.2d 195 (3rd Cir. 1954); and In re Dubbiosi, 191 F.Supp. 65 (E.D.Va.1961).

The Appellant here while nominally within the confines of the Port of Entry, was at no instant up until the moment of his arrest under any type of official restraint, but to the contrary was exercising his free will, youthful enterprise, and physical agility in

evading fixed physical barriers in accomplishing his entry. Whether or not he was **\*1318** ultimately able to run the obstacle course and reach the streets of San Ysidro is beside the point.

We conclude that the Appellant's surreptitious free will entry into the United States at a "place other than as designated by immigration officers" ( s 1325(1), supra ) was an illegal entry as charged.

ISSUE 2:

 **[2]**    We disagree with the Appellant's contention that the District Court erred in denying the motion for a jury trial.


This court has held prior to the 1974 amendment that a juvenile being processed under the preferential and protective treatment scheme of the Federal Juvenile Delinquency Act, particularly ss 5032 and 5033, had no constitutional right to a jury trial on the charges. United States v. Salcido-Medina, 483 F.2d 162, 164 (9th Cir. 1973); and United States v. James, 464 F.2d 1228 (9th Cir. 1972). We now hold that ss 5032 and 5033, as amended, do not grant unto a juvenile being processed thereunder a statutory right to a jury trial. United States v. Doe, 385 F.Supp. 902, 905-07 (D.Ariz.1974).

The District Court's adjudication of juvenile delinquency and the Appellant's sentence to custody for treatment is affirmed.

AFFIRMED.

**All Citations**

532 F.2d 1316


**Footnotes**

\*        Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

620 Fed.Appx. 886 (Mem)
This case was not selected for publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See also U.S. Ct. of App. 11th Cir. Rule 36-2.
United States Court of Appeals,
Eleventh Circuit.

UNITED STATES of America, Plaintiff–Appellee,

v.

Jermaine MATHIS, Defendant–Appellant.

No. 15–10562
|
Non–Argument Calendar.
|
Oct. 16, 2015.

**Attorneys and Law Firms**

Andrea G. Hoffman, Nancy L. Langston, Kathleen Mary Salyer, William C. Healy, Wifredo A. Ferrer, U.S. Attorney's Office, Miami, FL, Harry C. Wallace, Jr., U.S. Attorney's Office, Fort Lauderdale, FL, for Plaintiff–Appellee.

Jermaine Mathis, Pensacola, FL, pro se.

Appeal from the United States District Court for the Southern District of Florida. D.C. Docket No. 4:99–cr–10035–KMM–3.

Before TJOFLAT, WILSON, and EDMONDSON, Circuit Judges.

**Opinion**

PER CURIAM:

Jermaine Mathis, proceeding *pro se,* appeals the district court's determination that Mathis was ineligible for a sentence reduction under 18 U.S.C. § 3582(c)(2), and Amendment 782: he was sentenced as a career offender. No reversible error has been shown; we affirm. [*]

We review *de novo* the district court's legal conclusions about the scope of its authority under section 3582(c)(2). *United States v. Lawson,* 686 F.3d 1317, 1319 (11th Cir.2012). We construe liberally *pro se* pleadings. *Tannenbaum v. United States,* 148 F.3d 1262, 1263 (11th Cir.1998).

A district court may not reduce a defendant's term of imprisonment unless (1) the defendant's sentence was based upon a guideline range that the Sentencing Commission later lowered and (2) a reduction is consistent with the Sentencing Commission's applicable policy statements. 18 U.S.C. § 3582(c)(2). A reduction is inconsistent with the guidelines' policy statements if the guidelines amendment does not lower the defendant's "applicable guideline range." U.S.S.G. § 1B1.10(a)(2)(B). A defendant's "applicable guideline range" is the guideline range determined based on a defendant's offense **\*887** level and criminal history category *before* the application of departures or variances. U.S.S.G. § 1B1.10, comment. (n.1(A)).

The district court lacked the authority to reduce Mathis's sentence, pursuant to section 3582(c)(2), because Mathis's applicable guideline range was not lowered by Amendment 782. Although retroactive application of Amendment 782 would reduce Mathis's base offense level from 24 to 22, Mathis's adjusted offense level would still be 34 based on the operation of the career-offender guideline in section 4B1.1. Thus, Mathis's applicable guideline range remains unchanged. The district court committed no error in concluding that Mathis is ineligible for a sentence reduction. *See United States v. Hamilton,* 715 F.3d 328, 337 (11th Cir.2013) ("Where a retroactively applicable guideline amendment reduces a defendant's base offense level, but does not alter the sentencing range upon which his or her sentence was based, § 3582(c)(2) does not authorize a reduction in sentence.").

On appeal, Mathis argues, for the first time, that the commentary to section 1B1.10 (defining the term "applicable guideline range") violates the Equal Protection Clause and is inconsistent with section 1B1.10 and with the Sentencing Commission's statutory authority. Arguments raised for the first time on appeal are reviewed only for plain error. *See United States v. Moriarty,* 429 F.3d 1012, 1018–19 (11th Cir.2005). Because Mathis has identified no controlling precedent from the Supreme Court or from this Court establishing that the commentary violates the Constitution or a federal statute, or is otherwise inconsistent with the guidelines, his argument fails: error, if any, is not plain. *See Stinson v. United States,* 508 U.S. 36, 113 S.Ct. 1913, 1917–18, 123 L.Ed.2d 598 (1993); *United States v. Ramirez–Flores,* 743 F.3d 816, 822 (11th Cir.2014).

AFFIRMED.

**All Citations**

620 Fed.Appx. 886 (Mem)

## Footnotes

\*   Mathis also argues on appeal that the district court erred in classifying him as a career offender under U.S.S.G. § 4B1.1. We lack jurisdiction to consider this argument in this section 3582(c)(2) appeal. *See United States v. Bravo,* 203 F.3d 778, 782 (11th Cir.2000) (in section 3582(c) proceedings, this Court lacks jurisdiction to consider collateral attacks on a sentence).

**End of Document**                                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

499 F.3d 1243
United States Court of Appeals,
Eleventh Circuit.

UNITED STATES of America, Plaintiff–Appellee,

v.

Moris MATURIN, Defendant–Appellant.

No. 07–10481.
|
Sept. 11, 2007.

**Synopsis**

**Background:** Defendant was convicted by guilty plea in the United States District Court for the Southern District of Florida, No. 06-20489-CR-JEM, Jose E. Martinez, J., of illegally reentering the United States after having previously been deported, and defendant appealed.

**[Holding:]** The Court of Appeals held that only foreign, not domestic, offenses were subject to the limitation that that term of imprisonment was completed within the previous 15 years, in order to be considered aggravated felonies for purposes of sentencing.

Affirmed.

West Headnotes (2)

**[1]**  **Criminal Law**  ⚬→  Review De Novo

An appellate court reviews questions of statutory interpretation *de novo*.

4 Cases that cite this headnote

**[2]**  **Sentencing and Punishment**  ⚬→  Time

Temporal restriction, limiting offenses to be considered for 17-level statutory enhancement to those aggravated felonies for which the term of imprisonment was completed within the previous 15 years, applied only to violations of foreign law, not domestic offenses, for purposes of sentencing defendant for illegal reentry after

previously having been deported following his conviction of an aggravated felony. Immigration and Nationality Act, §§ 101(a)(43), 276(b)(2), 8 U.S.C.A. §§ 1101(a)(43), 1326(b)(2).

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1243**  Paul M. Rashkin and Kathleen M. Williams, Fed. Pub. Defenders, Michael David Spivack, Asst. Fed. Pub. Def., Miami, FL, for Maturin.

Carol E. Herman and Anne R. Schultz and Harriett R. Galvin, Asst. U.S. Attys., Miami, FL, for U.S.

Appeal from the United States District Court for the Southern District of Florida.

Before ANDERSON and PRYOR, Circuit Judges, and ALBRITTON,[*] District Judge.

**Opinion**

**\*1244**  PER CURIAM:

Moris Maturin, a native and citizen of Haiti, who pleaded guilty to illegally reentering the United States after having previously been deported, appeals the enhancement of his sentence by 17 months for having committed an aggravated felony before his deportation. 8 U.S.C. § 1326(a). Maturin was deported in December 1994, approximately six years after he completed a term of imprisonment for possession and sale of crack cocaine. The district court enhanced Maturin's sentence by 17 months because he had committed an "aggravated felony" before he had been deported. *Id.* §§ 1101(a)(43), 1326(b)(2). Maturin argues that he is not subject to the enhancement because the term of imprisonment for his offense ended more than 15 years before his reentry. Because the text of section 1101(a)(43) makes clear that the temporal restriction upon which Maturin relies applies only to violations of foreign law, not domestic law, we affirm.

I. BACKGROUND

At age 16, Maturin was convicted and sentenced to 30 months of imprisonment for possession and sale of crack cocaine and was released from prison on April 21, 1988. Maturin was deported in December 1994. In May 2006, Maturin reentered the United States at Miami International Airport where he presented a passport in the name of "Willie James Silvers." Maturin was fingerprinted, and an identity check revealed that both Maturin and Silvers had extensive criminal records and Maturin had previously used the alias "Theodore Irlain," which was the name of an alien who had become naturalized in 1998.

After he was advised of and waived his rights to remain silent and have counsel under the Fifth and Sixth Amendments, Maturin was interviewed by law enforcement. Maturin admitted to obtaining and using Silvers's birth certificate and social security card to obtain a passport in Silvers's name; being an illegal alien; applying for a United States visa from the United States consulate in Haiti under the name "Theodore Irlain," and obtaining a social security card and resident alien card under that name; being arrested in 2005 in Sebring, Florida, for providing false identification to law enforcement; and being convicted in 1987 of possession and sale of cocaine. Later investigation revealed that Maturin had not applied for permission to reenter the United States and had no authority to use Silvers's name or passport.

A federal grand jury returned a four-count indictment that charged Maturin with attempting to reenter the United States without permission after being deported, 8 U.S.C. §§ 1326(a), (b)(2) (count 1); attempting to use a fraudulent passport, 18 U.S.C. § 1544 (count 2); falsely representing that he was a U.S. citizen in order to gain entry, *id.* § 911 (count 3); and possessing and using the identification of another in relation to a felony violation of section 1326, *id.* § 1028A (count 4). Maturin pleaded guilty to counts 1 and 4 with the understanding that the government would ask that counts 2 and 3 be dismissed. The district court accepted Maturin's guilty plea.

The presentence investigation report suggested that Maturin's sentence for count 1 be enhanced because he had committed an aggravated felony before he was deported in 1994. Maturin's counsel objected that the enhancement of Maturin's sentence was barred because he had completed his prison term for the offense more than 15 years earlier. The court overruled the objection on the ground that the restriction excluded from the definition of "aggravated felony" crimes in violation of

foreign law, not domestic law. The court sentenced Maturin to 41 months of imprisonment **\*1245** on count 1 and 24 months of imprisonment on count 4, to be served consecutively. The 41–month sentence for count 1 consisted of the 24–month statutory maximum, 8 U.S.C. § 1326(a), and a 17–month statutory enhancement, *id.* § 1326(b)(2). Maturin now appeals that enhancement.

## II. STANDARD OF REVIEW

**[1]** We review questions of statutory interpretation *de novo*. *United States v. Grigsby,* 111 F.3d 806, 816 (11th Cir.1997).

## III. DISCUSSION

The relevant portion of section 1101(a)(43) distinguishes between offenses under domestic law and foreign law as follows:

> The term [aggravated felony] applies to an offense described in this paragraph whether in violation of Federal or State law and applies to such an offense in violation of the law of a foreign country for which the term of imprisonment was completed within the previous 15 years.

8 U.S.C. § 1101(a)(43). Relying on the text of the statute, legislative history, and the rule of lenity, Maturin argues that section 1101(a)(43) applies a 15–year temporal restriction to both domestic and foreign offenses. We disagree.

**[2]** The phrase "for which the term of imprisonment was completed within the previous 15 years," in section 1101(a)(43), modifies the phrase "an offense in violation of the law of a foreign country," not the earlier phrase about domestic offenses. *See United States v. Camacho–Ibarquen,* 410 F.3d 1307, 1314 n. 2 (11th Cir.2005) (stating in dicta that "the time limitation in INA § 101(a)(43) only

applies to convictions for violations of foreign law"); *United States v. Gitten,* 231 F.3d 77, 80 (2d Cir.2000) (same); *United States v. Gonzalez,* 112 F.3d 1325, 1329–31 (7th Cir.1997) (same); *United States v. Maul–Valverde,* 10 F.3d 544, 546 (8th Cir.1993) (same). The repetition of the phrase "applies to ... an offense" in the middle of section 1101(a)(43) establishes that the provision consists of two parallel halves, each of which satisfies "[t]he term [aggravated felony]." As the Second Circuit has observed, if the 15–year limitation were intended to qualify both the first and second halves of the provision, the provision could have been written in one part. *See Gitten,* 231 F.3d at 80. Congress could have stated that an aggravated felony is an offense "in violation of federal, state, or foreign law for which the term of imprisonment was completed within the previous 15 years." We cannot discount the repetition of the phrase "applies to ... an offense" or the meaning that repetition conveys in ordinary speech. *See United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 520, 99 L.Ed. 615 (1955) (courts must give effect to every word in a statute where possible).

Maturin argues that the temporal restriction applies to both halves of section 1101(a)(43) because the word "and" is used to join the first and second halves of the provision and there is no punctuation separating the two halves. He cites in support a passage from a well-known treatise that states the uncontroversial proposition that, "[w]here two or more requirements are provided in a section and it is the legislative intent that all the requirements be fulfilled in order to comply with the statute, the conjunctive 'and' shall be used." 1A Norman J. Singer, *Sutherland Statutory Construction* § 21:14 (6th ed.2006). Maturin's argument fails.

Treating "and" as a word that connects "two or more requirements" that must be satisfied for an offense to constitute an aggravated felony leads to a bizarre interpretation that not even Maturin intends. This reading would require us to define an **\*1246** aggravated felony as an act that is both (1) a violation of either federal or state law, *and* (2) a violation of foreign law. This reading is absurd. The use of "and" to connect the two halves of the provision means that "[t]he term [aggravated felony]" is satisfied by either half of what follows, as opposed to one of the halves, but the use of "and" has no bearing of whether the temporal restriction qualifies both halves.

The plain meaning of section 1101(a)(43) controls the outcome of this appeal. Because section 1101(a)(43) is clear, we need discuss neither legislative history nor the rule of lenity. *See United States v. Veal,* 153 F.3d 1233, 1245 (11th Cir.1998) ("Review of legislative history is unnecessary 'unless a statute is inescapably ambiguous.' " (quoting *Solis–Ramirez v. United States Dep't of Justice,* 758 F.2d 1426, 1430 (11th Cir.1985))); *Salinas v. United States,* 522 U.S. 52, 66, 118 S.Ct. 469, 478, 139 L.Ed.2d 352 (1997) ("The rule [of lenity] does not apply when a statute is unambiguous ....").

### IV. CONCLUSION

Maturin's sentence is AFFIRMED.

**All Citations**

499 F.3d 1243, 20 Fla. L. Weekly Fed. C 1078

## Footnotes

\*     Honorable W. Harold Albritton, III, United States District Judge for the Middle District of Alabama, sitting by designation.

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

484 F.3d 1111
United States Court of Appeals,
Ninth Circuit.

UNITED STATES of America, Plaintiff–Appellee,

v.

Leobardo OLMOS–ESPARZA,
Defendant–Appellant.

No. 06–50276.
|
Submitted Feb. 7, 2007. *
|
Filed April 24, 2007.

**Synopsis**

**Background:** Mexican defendant was convicted in the United States District Court for the Southern District of California, John A. Houston, J., of illegal reentry following deportation and was initially sentenced to 70 months in custody. The Court of Appeals, 149 Fed.Appx. 596, affirmed defendant's conviction but remanded his sentence. The District Court, Houston, J., re-sentenced defendant to 60 months. Defendant appealed.

**[Holding:]** The Court of Appeals, Michael Daly Hawkins, Circuit Judge, held that as a matter of first impression, there was no time restriction on the use of prior convictions for sentence enhancement purposes under Sentencing Guideline regarding an alien unlawfully entering or remaining in the United States.

Affirmed.

West Headnotes (3)

**[1]** **Criminal Law** 🔑 Review De Novo

Court of Appeals reviews a district court's interpretation of the Sentencing Guidelines de novo.

1 Cases that cite this headnote

**[2]** **Sentencing and Punishment** 🔑 Time

There was no time restriction on the use of prior convictions for sentence enhancement purposes under Sentencing Guideline regarding an alien unlawfully entering or remaining in the United States; notwithstanding that some guidelines had explicit time restrictions and others did not, application of expressio unius doctrine would have lead to strange results, "without regard to the date of conviction" language with regard to aggravated felonies was added to cancel out a time limitation contained in another context and not to implicitly create time limits in instant provision, and definitions or application notes under guideline regarding the computation of criminal history did not automatically apply to create time limits within instant guideline. U.S.S.G. §§ 2L1.2(b), 4A1.2(e), 18 U.S.C.A.

11 Cases that cite this headnote

**[3]** **Statutes** 🔑 Express mention and implied exclusion; expressio unius est exclusio alterius

Statutory construction maxim of "expressio unius," which requires that when some statutory provisions expressly mention a requirement, the omission of that requirement from other statutory provisions implies that the drafter intended the inclusion of the requirement in some instances but not others, is a product of logic and common sense, and is properly applied only when it makes sense as a matter of legislative purpose.

1 Cases that cite this headnote

**Attorneys and Law Firms**

*1112 James Fife, Federal Defenders of San Diego, Inc., San Diego, CA, for the defendant-appellant.

Michelle P. Jennings, Assistant U.S. Attorney, San Diego, CA, for the plaintiff-appellee.

Appeal from the United States District Court for the Southern District of California; John A. Houston, District Judge, Presiding. D.C. No. CR–04–00637–JAH.

Before T.G. NELSON, EUGENE E. SILER, JR.,** and HAWKINS, Circuit Judges.

**Opinion**

MICHAEL DALY HAWKINS, Circuit Judge.

Leobardo Olmos–Esparza ("Olmos–Esparza"), convicted of illegal reentry following deportation, appeals his sentence on remand following a full post-*Booker* [1] resentencing. In an issue of first impression in this circuit, he contends that the district court erred by considering his convictions from 1972 and 1976 in calculating sentencing enhancements under § 2L1.2 of the 2003 Sentencing Guidelines. We join the Tenth and Eleventh Circuits in holding that this section contains no time limitation on the age of convictions for purposes of calculating sentencing enhancements.

**FACTS AND PROCEDURAL HISTORY**

Olmos–Esparza was found in the United States in December 2003. He eventually **\*1113** admitted he was a Mexican citizen who had previously been deported and that he lacked authority to be in the United States. He was convicted following a trial of illegal reentry following deportation in violation of 8 U.S.C. § 1326 and was initially sentenced to 70 months in custody. He appealed his conviction and sentence to this court, which affirmed the conviction but remanded his sentence pursuant to *United States v. Ameline,* 409 F.3d 1073 (9th Cir.2005) (en banc).

The district court determined that it would have sentenced Olmos–Esparza differently if it had known the Guidelines were not mandatory and would have ordered a full resentencing. The Probation Office calculated the sentence in the same manner as before: a base offense level of eight, a sixteen-level enhancement for prior alien smuggling and drug trafficking convictions, and a two-level downward adjustment for acceptance of responsibility. This resulted again in a Guideline range of 63–78 months. On remand, Olmos–Esparza challenged the use of his two prior convictions—sustained in 1972 and 1976—for the sixteen-level enhancement, arguing that they should be subject

to the fifteen-year time limit set forth in § 4A1.2 for calculating criminal history points. The district court rejected this argument, but reviewed all the factors under 18 U.S.C. § 3553 and sentenced Olmos–Esparza to 60 months, 10 months shorter than his previous sentence.

**STANDARD OF REVIEW**

[1]    We review a district court's interpretation of the Guidelines de novo. *United States v. Kimbrew,* 406 F.3d 1149, 1151 (9th Cir.2005).

**DISCUSSION**

U.S.S.G. § 2L1.2(a) establishes a base offense level of eight for unlawfully entering or remaining in the United States. If the defendant was previously deported or unlawfully remained in the United States following certain types of convictions, U.S.S.G. § 2L1.2(b)(1) provides for an increase in sentence based on the type of prior offense:

If the defendant previously was deported, or unlawfully remained in the United States, after—

(A) a conviction for a felony that is (i) a drug trafficking offense for which the sentence imposed exceeded 13 months; (ii) a crime of violence; (iii) a firearms offense; (iv) a child pornography offense; (v) a national security or terrorism offense; (vi) a human trafficking offense; or (vii) an alien smuggling offense, increase by 16 levels;

(B) a conviction for a felony drug trafficking offense for which the sentence imposed was 13 months or less, increase by 12 levels;

(C) a conviction for an aggravated felony, increase by 8 levels;

(D) a conviction for any other felony, increase by 4 levels; or

(E) three or more convictions for misdemeanors that are crimes of violence or drug trafficking offenses, increase by 4 levels.

Neither the text nor the application notes states that a conviction, as used in this section, must have occurred

within a particular time period for the enhancement to apply. One application note, however, explicitly states that an "aggravated felony" has the meaning given that term in the immigration statute—8 U.S.C. § 1101(a)(43)—but "without regard to the date" of the underlying conviction. § 2L1.2, application n. 3(A). [2]

*1114 Olmos–Esparza argues that the application notes are therefore ambiguous, since one portion of the commentary expressly qualifies the temporal scope of prior convictions for aggravated felonies, but says nothing about age limitations as to other predicate convictions. He urges us to use the statutory interpretation maxim *expressio unius est exclusio alterius*—that is, when some statutory provisions expressly mention a requirement, the omission of that requirement from other statutory provisions implies that the drafter intended the inclusion of the requirement in some instances but not others. *See* Longview Fibre Co. v. Rasmussen, 980 F.2d 1307, 1312–13 (9th Cir.1992). Thus, Olmos–Esparza argues that, because the application note expressly indicates that convictions for aggravated felonies are to be considered without regard to the date of conviction, the other crimes enumerated in § 2L1.2(b)(1) *do* have a restriction on the conviction's age, which Olmos–Esparza contends should be imported from U.S.S.G. § 4A1.2 (the Guideline dictating which convictions are to be counted for criminal history purposes). [3]

This precise argument, however, has been considered and rejected by two circuits. United States v. Torres–Duenas, 461 F.3d 1178, 1181–82 (10th Cir.2006), *petition for cert. filed* November 22, 2006 (No. 06–7990); United States v. Camacho–Ibarquen, 410 F.3d 1307, 1312–13 (11th Cir.), *cert. denied,* 546 U.S. 951, 126 S.Ct. 457, 163 L.Ed.2d 347 (2005). We join them today and hold that U.S.S.G. § 2L1.2 does not contain a time limitation on the age of prior convictions.

**[2]  [3]**  There is certainly no time restriction on the use of prior convictions within the plain language of § 2L1.2. An ambiguity is created, if at all, by Olmos–Esparza's urged application of the *expressio unius* principle. But that maxim is "a product of logic and common sense," and is properly applied only when it makes sense as a matter of legislative purpose. Longview Fibre, 980 F.2d at 1313 (quoting

Alcaraz v. Block, 746 F.2d 593, 607–08 (9th Cir.1984)). The interpretation Olmos–Esparza advocates would lead to strange results: a conviction of any age could be considered for "ordinary" aggravated felonies—a mid-level eight point enhancement under § 2L1.2—but there would be a staleness limit with respect to other crimes, including ones the Commission has considered to be *more* serious, including human smuggling, child pornography, and terrorism.

Moreover, Olmos–Esparza's *expressio unius* argument actually cuts both ways, because in other Guideline provisions, the Commission *explicitly* limited the use of prior convictions, but did not expressly do so in § 2L1.2(b). For example, in § 2L1.2 itself, the Commission explicitly limited the use of crimes committed before a defendant was eighteen as a predicate for an enhancement. U.S.S.G. § 2L1.2, application n. 1(A)(iv). As noted above, § 4A1.2(e) also includes explicit time restrictions on the use of prior convictions when computing criminal history points. *1115 These provisions contributed to the Eleventh Circuit's decision to reject the defendant's argument for implicit limitations: "If the Sentencing Commission had intended § 2L1.2(b) to mean what [the defendant] argues, there is no reason the Commission would not have written an explicit time restriction into that guideline," just as it did with other Guidelines. Camacho–Ibarquen, 410 F.3d at 1313. "We are more inclined to find that, because other guidelines sections have explicit time restrictions on the application of convictions, the omission of such a restriction in § 2L1.2 means that none was intended for that section." *Id.*

Further, the definition of "aggravated felony," as used in § 2L1.2 (b)(1)(C) is imported from 8 U.S.C. § 1101(1)(43). The definition in the immigration context includes foreign convictions only if the term of imprisonment was completed within the last fifteen years. We agree with the common sense reading of the Tenth and Eleventh Circuits—that the Sentencing Commission wished to import into § 2L1.2 the substantive definition of aggravated felony from the immigration statute, but not its time limitation on foreign convictions. Camacho–Ibarquen, 410 F.3d at 1313; *see also* Torres–Duenas, 461 F.3d at 1182. In other words, the "without regard to the date of conviction" language was added

AR.06774

to expressly cancel out a time limitation contained in another context, and not to implicitly create one in 🚩 § 2L1.2. [4]

Olmos–Esparza argues that the time limitation on prior convictions from 🚩 § 4A1.2 (criminal history calculation) should be imported into 🚩 § 2L1.2, because, in other situations, this circuit has looked to 🚩 § 4A1.2 for guidance in interpreting 🚩 § 2L1.2. See 🚩 United States v. Moreno–Cisneros, 319 F.3d 456, 458–59 (9th Cir.2003) (looking to 🚩 § 4A1.2's treatment of the sentence imposed following revocation of probation); 🚩 United States v. Ortiz–Gutierrez, 36 F.3d 80, 82 (9th Cir.1994) (looking to 🚩 § 4A1.2's definition of the term "related cases"). But this circuit has also specifically noted that 🚩 § 2L1.2(b) and 🚩 § 4A1.2 intentionally treat prior convictions differently in the calculation of illegal reentry offense level and criminal history:

> Although both [provisions] determine the impact of past crimes on a current sentence, each section does so for a different reason. Thus, the 15–year limit on criminal history calculations does not signal an intent to similarly limit the aggravated felony enhancement under 🚩 § 2L1.2(b)(2).... In other words, we find it particularly troublesome to have illegal aliens returning who are not just illegal aliens, but also criminals. The criminal history category, however, serves the different purpose of evaluating the likelihood that any defendant will commit another crime in the future.

🚩 United States v. Lara–Aceves, 183 F.3d 1007, 1013–14 (9th Cir.1999) (quoting **1116 United States v. Gonzalez, 112 F.3d 1325, 1329 (7th Cir.1997)), overruled on other grounds by 🚩 United States v. Rivera–Sanchez, 247 F.3d 905 (9th Cir.2001) (en banc). [5]

We look to 🚩 § 4A1.2's definitions or application notes if it makes sense in the context of the appeal to interpret language in another Guideline provision, but the substantive provisions of 🚩 § 4A1.2 do not automatically apply outside of that Guideline. In fact, after this court looked to 🚩 § 4A1.2's definition of "related cases" in Ortiz–Gutierrez and "sentence imposed" in Moreno–Cisneros, the Commission amended the application notes to 🚩 § 2L1.2 in 2003 to specifically include cross-references to 🚩 § 4A1.2 (undercutting any argument that the 🚩 § 4A1.2 provisions automatically apply, as Olmos–Esparza essentially argues), yet the Commission did not include any cross-reference to the time limitations on convictions contained in the same section (reinforcing our conclusion that the Commission did not intend to expressly or implicitly import these restrictions into 🚩 § 2L1.2).

In sum, it is apparent that 🚩 § 2L1.2 on its face contains no temporal limitation on the prior conviction used to enhance sentences for illegal reentry. When viewed in context, it is also clear the Commission did not implicitly mean to create such a limitation on prior convictions in 🚩 § 2L1.2, but was instead expressly eliminating any time limitations contained in the borrowed definition for "aggravated felony." The district court therefore did not err by enhancing Olmos–Esparza's sentence for his prior convictions.

**AFFIRMED.**

**All Citations**

484 F.3d 1111, 07 Cal. Daily Op. Serv. 4369, 2007 Daily Journal D.A.R. 5597

## Footnotes

\*       This panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R.App. P. 34(a)(2).

\*\*     The Honorable Eugene E. Siler, Jr., Senior United States Circuit Judge for the Sixth Circuit, sitting by designation.

1       *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

2       The application notes to § 2L1.2 also use the phrase "without regard to the date of the conviction" when cross-referencing the term "sentence of imprisonment" in Guideline § 4A1.2, but do not include that language when cross-referencing the term "related cases" as defined in the same section. § 2L1.2 application nn. 1(B)(vii) & 4(B). Because the determination of whether cases are related and what constitutes a sentence of imprisonment have nothing to do with whether there is a time restriction on some but not other categories of convictions set forth in Section 2L1.2(b)(1), we do not consider either of these ancillary application notes to be probative of the issue we must decide today.

3       Under § 4A1.2(e), if the sentence imposed for a conviction was over one year and one month, then the conviction is counted for criminal history purposes if it occurred within fifteen years; all other convictions are counted if they occurred within ten years.

4       Olmos–Esparza suggests this rationale is unpersuasive because the other crimes listed in § 2L1.2(b)(1)(A) & (B) are also listed as types of aggravated felonies within 8 U.S.C. § 1101(a)(43), and thus would also have the potential for an erroneous incorporation of the fifteen-year limit on foreign convictions contained in that section. However, the other crimes listed in subsections (A) and (B) are not *defined* by cross-reference to § 1101(a)(43); the application notes to § 2L1.2 contain definitions for these specific offenses. The only one of those that refers back to § 1101(a)(43) is "alien smuggling offense," § 2L1.2 app. n. (1)(B)(I), which cannot be a violation of the law of a foreign country. *See* 8 U.S.C. § 1101(a)(43)(N) (cross-referencing 8 U.S.C. § 1324(a), which defines crime as bringing an alien *to the United States* ) (emphasis added); *see also* Camacho–Ibarquen, 410 F.3d at 1314 n. 2.

5       *Lara–Aceves* was interpreting a prior version of § 2L1.2, which had only a one-stage enhancement for aggravated felonies and an application note which mirrored the language of 1101(a)(43) regarding the age of foreign convictions. We held that the "commission intended an aggravated felony to enhance the base offense level regardless of when it was committed" and that it was not inconsistent for § 2L1.2 to thus treat prior convictions differently than in § 4A1.2. 183 F.3d at 1013–14. Because the Guidelines were subsequently amended, it is not directly controlling in this case.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

481 Fed.Appx. 218
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See
also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.
(Find CTA5 Rule 28 and Find CTA5 Rule 47)
United States Court of Appeals,
Fifth Circuit.

UNITED STATES of America, Plaintiff–Appellee
v.
Roberto Alvarez SANDOVAL, also known
as Roberto Sandoval Alvarez, also known
as Roberto Alvarez, also known as Roberto
Alvarez–Sandoval, Defendant–Appellant.

No. 11–20644
|
Summary Calendar.
|
July 25, 2012.

**Synopsis**

**Background:** Defendant was convicted and sentenced in the United States District Court for the Southern District of Texas of illegal reentry following deportation, and he appealed his sentence.

**Holding:** The Court of Appeals held that defendant's misdemeanor Texas conviction for displaying fictitious or counterfeit inspection for vehicle was properly counted in determining criminal history.

Affirmed.

West Headnotes (1)

**[1]**    **Sentencing and Punishment** 🔑 **Offense or adjudication in other jurisdiction**

Defendant's misdemeanor Texas conviction for displaying fictitious or counterfeit inspection certificate for vehicle was properly counted in determining criminal history in sentencing defendant for illegal reentry following deportation; display of certificate required affirmative and knowing activity, and so involved greater level of culpability than offenses of omission listed in statute as offenses that should not be counted in criminal history score such as driving without a license or with invalid license and giving false information to police officer. 🔖 U.S.S.G. § 4A1.2(c)(1), 18 U.S.C.A.; V.T.C.A., Transportation Code § 548.603(a)(1).

**Attorneys and Law Firms**

**\*219** Renata Ann Gowie, Assistant U.S. Attorney, U.S. Attorney's Office, Houston, TX, for Plaintiff–Appellee.

Marjorie A. Meyers, Federal Public Defender, Margaret Christina Ling, Assistant Federal Public Defender, Federal Public Defender's Office, Houston, TX, for Defendant–Appellant.

Appeal from the United States District Court for the Southern District of Texas, USDC No. 4:11–CR–305–1.

Before HIGGINBOTHAM, OWEN, and, SOUTHWICK, Circuit Judges.

**Opinion**

PER CURIAM: [*]

**\*\*1** Roberto Alvarez Sandoval (Alvarez) appeals his sentence for illegal reentry following deportation in violation of 8 U.S.C. § 1326(a), (b)(2). He argues that the district court erred in assessing criminal history points based on his prior misdemeanor conviction for displaying a fictitious or counterfeit inspection certificate in violation of TEX. TRANSP. CODE ANN. § 548.603(a)(1). Under that section, a person commits an offense if he "displays or causes or permits to be displayed an inspection certificate ... knowing that the certificate is counterfeit, tampered with, altered, fictitious, issued for another vehicle, issued for a vehicle failing to meet all emissions inspection requirements, or [otherwise issued in violation of law]." § 548.603(a)(1). Alvarez was convicted of

the offense after being stopped for speeding while driving a car with an inspection sticker issued for a different vehicle.

In determining a defendant's criminal history score, "[s]entences for misdemeanor and petty offenses are counted," except for offenses listed under U.S.S.G. § 4A1.2(c)(1) and "offenses similar to them." *See* § 4A1.2(c)(1). In determining whether a prior offense is "similar" to a listed offense in § 4A1.2(c)(1), this court employs a "common sense approach which relies on all possible factors of similarity." *United States v. Hardeman,* 933 F.2d 278, 281 (5th Cir.1991).

Alvarez argues that the fictitious inspection certificate offense is similar to the offenses of driving without a license or with an invalid license and giving false information to a police officer, which are listed offenses excludable from a defendant's criminal history under § 4A1.2(c)(1). He acknowledges that we have held that a misdemeanor conviction for violating § 548.603 counts as a conviction for

criminal history purposes. *See* **\*220** *United States v. Guajardo,* 218 Fed.Appx. 294 (5th Cir.2007). [1]

To commit the offense of displaying a fictitious or counterfeit inspection certificate, Alvarez had to knowingly display a fictitious or counterfeit certificate or cause or permit such certificate to be displayed. *See* § 548.603(a)(1). The district court did not err in determining that the conviction should be counted in determining his criminal history because displaying a counterfeit inspection certificate requires affirmative and knowing activity and, thus, involves a greater level of culpability than the offenses of omission listed in § 4A1.2(c)(1). *See Hardeman,* 933 F.2d at 281. Accordingly, the district court did not err in assessing criminal history points based on Alvarez's conviction for displaying a fictitious or counterfeit inspection certificate. *Id.*

AFFIRMED.

**All Citations**

481 Fed.Appx. 218, 2012 WL 3030310

## Footnotes

\*      Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1      Although *Guajardo* is not precedential, it is persuasive authority. *See* 5TH CIR. R. 47.5.4.

**End of Document**                                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by U.S. v. Munoz-Flores, 9th Cir.(Cal.), December 12, 1988

818 F.2d 687
United States Court of Appeals,
Ninth Circuit.

UNITED STATES of America, Plaintiff-Appellee,
v.
Douglas D. SMITH, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
J. David Leeper MOSS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert V. SIEBER, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Daniel R. DELANEY, Defendant-Appellant.

Nos. 86-1191 to 86-1194.
|
Argued and Submitted Jan. 12, 1987.
|
Decided May 27, 1987.

**Synopsis**

Demonstrators were convicted of willfully damaging government property, and fine of $50 plus $25 flat assessment for misdemeanants was imposed by magistrate, whose decision was affirmed by the United States District Court for the Eastern District of California, Lawrence K. Karlton, Chief Judge, and defendants appealed. The Court of Appeals, Wallace, Circuit Judge, held that: (1) assessment of $25 flat fee for misdemeanants was punishment, and its imposition on demonstrators without resort to jury trial could not violate their rights under Seventh Amendment; (2) demonstrators lacked standing to litigate issue of constitutionality of $25 flat assessment for misdemeanants which demonstrators alleged could mandate disproportionate penalty to other individuals not party to appeal; and (3) imposition of $25 flat assessment for misdemeanants did not violate due process or equal protection clauses.

Affirmed.

**West Headnotes (8)**

**[1]    Jury** 👈 **Particular Cases in General**

Imposition of $25 fine on person convicted of misdemeanor offense against United States was a punishment, so that its imposition on demonstrators for damaging government property without resort to jury trial did not violate their rights under the Seventh Amendment; declining to follow *U.S. v. Donaldson*, 797 F.2d 125 (3d Cir.); *U.S. v. Dobbins*, 807 F.2d 130 (8th Cir.). Federal Property and Administrative Services Act of 1949, § 205(c), 40 U.S.C.A. § 486(c); 18 U.S.C.A. § 3013; U.S.C.A. Const.Amend. 7.

**[2]    Sentencing and Punishment** 👈 **Other Particular Offenses**

Demonstrators convicted of misdemeanor damage to government property and assessed $25 flat assessment for misdemeanors, who conceded that their own sentence, taken as a whole, was not disproportionate and did not violate Eighth Amendment, lacked standing to challenge constitutionality of statute under Eighth Amendment based on fact that statute could conceivably lead to disproportionate results as applied to individuals not party to appeal. 18 U.S.C.A. § 3013; U.S.C.A. Const.Amend. 8.

6 Cases that cite this headnote

**[3]    Sentencing and Punishment** 👈 **Excessiveness and Proportionality of Sentence**

Where separate elements of punishment, none of which are unconstitutional by their nature, are combined to form defendant's sentence for single crime, whether one of elements is excessively severe can have no practical significance if entire sentence is not excessively severe.

**[4]**  **Sentencing and Punishment** ⚷ Proportionality

**Sentencing and Punishment** ⚷ Other Deprivations

Demonstrators convicted of willfully damaging government property and fined $50, plus $25 flat assessment for misdemeanants, who did not argue that nature of $25 assessment portion of their punishment was unconstitutional per se, as something inherently cruel, like torture, but who attacked ostensibly disproportionate severity of portion of their punishment, failed to state claim that application of $25 flat fee to them yielded Eighth Amendment violation. 18 U.S.C.A. § 3013; U.S.C.A. Const.Amend. 8.

**[5]**  **Constitutional Law** ⚷ Sentencing and Punishment

Demonstrators who were charged with destruction of government property had standing to attack mandatory imposition of $25 flat fee on misdemeanants on substantive due process grounds under Fifth Amendment. 18 U.S.C.A. § 3013; U.S.C.A. Const.Amend. 5.

3 Cases that cite this headnote

**[6]**  **Constitutional Law** ⚷ Penalties and Fines

Mandatory $25 flat assessment for misdemeanants imposed on demonstrators charged with willfully damaging government property did not deprive demonstrators of substantive due process. 18 U.S.C.A. § 3013; U.S.C.A. Const.Amend. 5.

4 Cases that cite this headnote

**[7]**  **Constitutional Law** ⚷ Prisoners, and Those Charged with or Convicted of Crimes

Persons convicted of crime are not suspect class for purpose of equal protection analysis. U.S.C.A. Const.Amend. 14.

6 Cases that cite this headnote

**[8]**  **Constitutional Law** ⚷ Extent of Punishment

Imposition of $25 fixed assessment on misdemeanants was rationally related to legitimate government interest of raising revenue, and thus assessment did not violate equal protection clause; assessment was not intended to compensate actual victim of particular misdemeanant's crime, so that there was no reason why assessment was required to be proportional to damages sustained by individual victim in order to be rationally related to Government's goal. 18 U.S.C.A. § 3013; U.S.C.A. Const.Amend. 14.

6 Cases that cite this headnote

**Attorneys and Law Firms**

**\*688** Thomas J. Hopkins, Sacramento, Cal., for plaintiff-appellee.

Larry Barlly, Sacramento, Cal., for defendants-appellants.

**\*689** Appeal from the United States District Court for the Eastern District of California.

Before WALLACE, SKOPIL and CANBY, Circuit Judges.

**Opinion**

WALLACE, Circuit Judge:

Smith, Delaney, Sieber, and Moss (the demonstrators) appeal from the district court's imposition of a $25 assessment on each of them pursuant to 18 U.S.C. § 3013. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

I

On December 27, 1985, a demonstration occurred on the grounds of the Federal Building in Sacramento, California to protest United States policy in Central America. As a symbol of the protest, the participants bore a casket which they avowedly intended to bury in the Federal Building grounds. As certain of the participants, including the demonstrators, attempted to dig up a portion of the Federal Building lawn, they were arrested.

The demonstrators were charged with willfully damaging government property in violation of 40 U.S.C. § 486(c) and 41 C.F.R. § 101-20.303 (1985). The demonstrators were tried before a magistrate, who found them guilty and imposed a $50 fine, plus the $25 flat assessment for misdemeanants mandated by 18 U.S.C. § 3013. They appealed to the district court, which affirmed the magistrate's decision. The demonstrators then appealed the ruling of the district court.

On appeal, the demonstrators attack only the imposition of the mandatory $25 assessment, not the fine itself. They assert that the assessment is a punishment that violates the eighth amendment and the due process and equal protection clauses of the fifth amendment. They argue in the alternative that, if the assessment is not a punishment, its imposition on them without resort to a jury trial violates their rights under the seventh amendment.

## II

The statute involved in this appeal directs that "[t]he court shall assess on any person convicted of an offense against the United States-in the case of a misdemeanor-the amount of $25 if the defendant is an individual." 18 U.S.C. § 3013(a)(1)(A).

We consider first the threshold question of whether this $25 assessment imposed on the demonstrators pursuant to section 3013 is a punishment. Unfortunately, the circuit courts are divided on this issue. While the demonstrators cite the holding of the Tenth Circuit in *United States v. Mayberry,* 774 F.2d 1018 (10th Cir.1985) (*Mayberry* ), to support their contention that the assessment is a punishment, the government relies on the Third Circuit's opinion in *United States v. Donaldson,* 797 F.2d 125 (3d Cir.1986) (*Donaldson* ), to support its contention that it is not.

*Donaldson* offers little help. The court, in rejecting Donaldson's contention that the rule of lenity applies, held that the statute did not define a substantive crime or set a sentence to be imposed for a criminal offense, but instead merely levied a nominal assessment against convicted defendants as a revenue-raising measure. The court emphasized that Donaldson conceded that section 3013 was not a punishment. Based on this concession, the court concluded that section 3013 was not a criminal statute. *Id.* at 127. *Donaldson* provides no analysis of congressional intent on the issue

presented here. The Eighth Circuit recently adopted the conclusion that section 3013 is not punitive in nature because it "f[ound] the *Donaldson* decision persuasive," but provided no further analysis. *United States v. Dobbins,* 807 F.2d 130, 131 (8th Cir.1986).

*Mayberry,* in contrast, looks at both the practical impact of section 3013 and its legislative history to determine that the assessment is a punishment. The opinion points out that the assessment places an additional burden on the defendant; that it can be imposed only following conviction for a crime against the United States; that it can be collected in the same way as a criminal fine; that the statute imposes a **\*690** higher assessment against defendants convicted of more serious crimes; that the relevant Senate Report acknowledged that the provision would raise little revenue, thus rendering problematic the assumption that its sole purpose was pecuniary; that the Senate Report attributed the same purpose of raising revenue to the manifestly punitive enhanced fines provision of the bill; and that the Senate Report consistently refers to the assessments as "penalties." *Mayberry,* 774 F.2d at 1021.

**[1]** We find *Mayberry*'s analysis of section 3013 the more compelling, and we adopt it. As *Donaldson* indicates, Congress undeniably intended section 3013 assessments to produce revenue. But as *Mayberry* points out, the section 3013 assessment bears many, if not all, of the earmarks of a punitive measure. Thus, while the legislative history of section 3013 is sparse and not completely clear on the issue, we conclude that Congress intended section 3013 to be a punitive measure designed to raise some revenue. A punitive measure designed to raise revenue is still a punitive measure. Therefore, we hold that the section 3013 assessment is a punishment.

Since the assessment is a punishment, its imposition on the demonstrators cannot violate their seventh amendment rights, as they concede. The assessment merely represents a portion of their sentence, and requires no jury determination independent of their adjudication of guilt.

## III

The demonstrators also claim that the section 3013 assessment violates the eighth amendment and the substantive due process clause of the fifth amendment because section

3013 imposes the same punishment on all misdemeanants, and thus fails to ensure that the punishment will be proportional to the gravity of the offense and the culpability of the individual. The demonstrators, however, have conceded that their own sentence taken as a whole (the $50 fine plus the $25 assessment) is not disproportionate and therefore does not violate the eighth amendment. The government argues that the demonstrators have conceded that they have no eighth amendment claim.

 [2]    While their brief is far from clear, the demonstrators apparently make two arguments in response. First, the demonstrators evidently argue that the statute is facially unconstitutional under the eighth amendment because, even if it did not lead to a disproportionate result in their case, it could mandate a disproportionate penalty in some other cases. The demonstrators, however, do not have standing to litigate the putative rights of individuals not party to this appeal. "[O]ne to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional."

*United States v. Raines,* 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960).

 [3]    [4]    Second, the demonstrators appear to argue that, even though their punishment as a whole does not present a constitutional violation, the $25 assessment portion of their punishment does because it was imposed without consideration of their individual circumstances or culpability and is disproportionate as applied to them. The demonstrators do not argue that the *nature* of this $25 assessment portion of their punishment is unconstitutional per se, as something inherently cruel, like torture, would be. *See* *Gregg v. Georgia,* 428 U.S. 153, 169-71, 96 S.Ct. 2909, 2923-24, 49 L.Ed.2d 859 (1976) (plurality opinion), *citing* *Wilkerson v. Utah,* 99 U.S. (9 Otto) 130, 136, 25 L.Ed. 345 (1879). Rather, they attack the ostensibly disproportionate *severity* of this portion of their punishment. But they have admitted that their punishment taken as a whole is not unconstitutionally severe. Their argument is, therefore, that they can state an eighth amendment claim by asserting that one portion of their punishment is disproportionately severe even if the whole is not. This, we hold, they cannot do. Where separate elements of a punishment, none of which are **\*691** unconstitutional by their nature, are combined to form a defendant's sentence for a *single* crime, whether one of these elements is excessively severe can have no practical significance if the entire sentence

is not excessively severe. The demonstrators, therefore, fail to state a claim that the application of section 3013 to them has yielded an eighth amendment violation in this case.

 [5]    Although the demonstrators fail to assert an eighth amendment claim, that does not necessarily mean they have no standing to assert a substantive due process claim under the fifth amendment. The demonstrators were assessed $25 pursuant to section 3013. This injury is "distinct and palpable," *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), and not "abstract," "conjectural," or "hypothetical," *City of Los Angeles v. Lyons,* 461 U.S. 95, 101-02, 103 S.Ct. 1660, 1664-65, 75 L.Ed.2d 675 (1983). To the extent that the demonstrators' due process claim differs from their eighth amendment claim, they have standing. In this argument, they are, in essence, attacking mandatory sentencing on fifth amendment grounds.

 [6]    "[T]he prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative" in non-death penalty cases. *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). The Supreme Court has repeatedly upheld recidivist mandatory sentencing statutes against attacks on a wide variety of constitutional grounds, including due process. *See* *Spencer v. Texas,* 385 U.S. 554, 559-60, 87 S.Ct. 648, 651-52, 17 L.Ed.2d 606 (1967). Those other courts which have been faced with due process challenges to mandatory sentences have also uniformly rejected them. *See, e.g., Virgin Islands v. Grant,* No. 83-87 (D.V.I. May 31, 1984), *aff'd on other grounds,* 775 F.2d 508 (3d Cir.1985); *City of Junction City v. Griffin,* 227 Kan. 332, 607 P.2d 459 (1980); *People v. Hall,* 396 Mich. 650, 242 N.W.2d 377 (1976); *Commonwealth v. Ehrsam,* 355 Pa.Super. 40, 512 A.2d 1199 (1986); *cf.* Annotation, *Validity of State Statute Imposing Mandatory Sentence or Prohibiting Granting of Probation or Suspension of Sentence for Narcotics Offenses,* 81 A.L.R.3d 1192, 1200-02 (1977) (citing cases upholding state mandatory sentencing laws against due process attacks). We conclude that the mandatory assessments imposed here did not of themselves deprive the demonstrators of due process.

IV

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

The demonstrators also challenge section 3013 on equal protection grounds. They present two arguments. The first is that the statute fosters an impermissible and arbitrary distinction between those misdemeanants who are required to appear in court, who thereby become subject to the required section 3013 payment, and those who are initially permitted to post forfeitable collateral, who escape its purview. They did not raise this argument in the trial court, however, and we will not reach it on appeal. *See* United States v. Moody, 778 F.2d 1380, 1383 (9th Cir.1985).

[7] The demonstrators' second equal protection argument is based on the premise that the purpose of section 3013 is to provide restitution to individual crime victims. From this assumption, they argue that the provision provides restitution in an arbitrary manner because the amount of the assessment is not dependent upon a determination of actual damages. We begin our review of this challenge by holding that persons convicted of crimes are not a suspect class. *Upshaw v. McNamara*, 435 F.2d 1188, 1190 (1st Cir.1970); *McGarvey v. District of Columbia*, 468 F.Supp. 687, 690 (D.D.C.1979); *cf. Doe v. Edgar*, 721 F.2d 619, 622 (7th Cir.1983) (offenders twice convicted of driving under the influence not suspect class). To be successful in their equal protection challenge, the demonstrators must show that the imposition of a fixed assessment on misdemeanants in section 3013 is not rationally related to a legitimate government interest. *Lyng v. Castillo*, 477 U.S. 635, 106 S.Ct. 2727, 2729-30, 91 L.Ed.2d 527 (1986).

**\*692** [8] The demonstrators' argument that section 3013 is not rationally related to a legitimate government interest is based on their faulty premise that the purpose of section 3013 is to provide restitution to individual crime victims. As we held earlier, the section 3013 assessment is a punishment designed to raise some revenue. This revenue is intended to enable the government to "provide limited Federal funding to the States ... for direct compensation and service *programs* to assist victims of crime, *including* victims of Federal crime." S.Rep. No. 497, 98th Cong., 2d Sess. 1, *reprinted in* 1984 U.S. Code Cong. & Admin. News 3182, 3607 (emphasis added). It is not intended, as the demonstrators imply, to compensate the actual victim of a particular misdemeanant's

crime. Therefore, there is no reason why the assessment need be proportional to the damages sustained by an individual victim in order to be rationally related to the government's goal in enacting section 3013. Assessing a flat sum will serve the government's goal of accumulating some limited funding that can be funneled to state crime victims' assistance programs, and it will do so without incurring the added administrative costs that determining a scaled assessment for each misdemeanant would entail.

The demonstrators argue that we should nevertheless reach a different result on the basis of the Supreme Court's holding in *James v. Strange*, 407 U.S. 128, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972), but in so doing, they miss the point of *Strange*. The Kansas recoupment statute discussed in *Strange* denied indigent defendants who had used state-appointed counsel all of the basic property exclusions, except "homestead," that were available to normal civil judgment debtors. The court struck down the law because it found the "requirement of some rationality in the nature of the class singled out" not to have been met. *Id.* at 140, 92 S.Ct. at 2034. In contrast, we have determined that requiring the class of persons convicted of misdemeanors against the United States to pay the section 3013 assessment is rationally related to the government's goal of providing revenue for the federal program at issue.

V

The demonstrators finally challenge, also on equal protection grounds, the "harsher" collection methods to which, they claim, section 3013 assessments are subject. Since we have determined that section 3013 assessments are penal in nature, and these assessments are subject to the same collection methods as criminal fines, 18 U.S.C. § 3013(b), there is in fact no difference in collection methods. The assessments are collected like any other criminal fine.

AFFIRMED.

**All Citations**

818 F.2d 687

**WESTLAW**   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag - Negative Treatment
Distinguished by United States v. Wright, 3rd Cir.(Pa.), November 27, 2019

122 S.Ct. 1043
Supreme Court of the United States

UNITED STATES, Petitioner,

v.

Alphonso VONN.

No. 00–973.
|
Argued Nov. 6, 2001.
|
Decided March 4, 2002.

**Synopsis**

Defendant was convicted of armed bank robbery, conspiracy to commit bank robbery, and carrying firearm during crime of violence, following entry of guilty pleas in the United States District Court for the Central District of California, James M. Ideman, J. Defendant appealed. The United States Court of Appeals for the Ninth Circuit,  224 F.3d 1152, vacated and remanded. Certiorari was granted. The Supreme Court, Justice Souter, held that: (1) unobjected-to error in trial court's guilty plea colloquy was reversible only upon showing that such error was plain and that it affected defendant's substantial rights, and (2) appellate court could look to entire record when determining whether defendant's substantial rights had been affected.

Vacated and remanded.

Justice Stevens concurred in part, dissented in part, and filed opinion.

West Headnotes (6)

**[1]**    **Criminal Law**    Presentation of questions in general

Issue not raised below is nevertheless preserved for appellate review if made by current litigant in recent proceeding upon which lower court relied for its resolution of issue, and litigant did not concede correctness of that precedent in current case.

40 Cases that cite this headnote

**[2]**    **Criminal Law**    Arraignment and plea

Defendant who lets error in trial court's guilty plea colloquy pass without objection may only obtain appellate reversal because of such error upon showing that error was plain and that it affected his substantial rights. Fed.Rules Cr.Proc.Rules 11(h), 52(b), 18 U.S.C.A.

1164 Cases that cite this headnote

**[3]**    **Courts**    Construction and application of particular rules

In absence of a clear legislative mandate, Advisory Committee Notes provide reliable source of insight into meaning of Rule of Criminal Procedure. Fed.Rules Cr.Proc.Rule 1 et seq., 18 U.S.C.A.

123 Cases that cite this headnote

**[4]**    **Courts**    Construction and application of rules in general
    **Statutes**    Express mention and implied exclusion; expressio unius est exclusio alterius

Statutory construction canon, that expressing one item of commonly associated group or series excludes another left unmentioned, is only guide, whose fallibility can be shown by contrary indications that adopting particular rule or statute was probably not meant to signal any exclusion of its common relatives.

80 Cases that cite this headnote

**[5]**    **Courts**    Rescission of rules

Repeal of criminal procedural rule by implication is disfavored.

13 Cases that cite this headnote

**[6]**    **Criminal Law**    Arraignment and plea

Appellate court may consult entire record when considering whether unobjected-to error in trial court's guilty plea colloquy affected defendant's

122 S.Ct. 1043, 152 L.Ed.2d 90, 70 USLW 4181, 02 Cal. Daily Op. Serv. 2007...

substantial rights. Fed.Rules Cr.Proc.Rule 11(h), 18 U.S.C.A.

856 Cases that cite this headnote

**1044    *55    *Syllabus** [*]

Federal Rule of Criminal Procedure 11 lays out steps that a judge must take to ensure that a guilty plea is knowing and voluntary. Rule 11(h)'s requirement that any variance from those procedures "which does not affect substantial rights shall be disregarded" is similar to the general "harmless-error" rule in Rule 52(a). However, Rule 11(h) does not include a plain-error provision comparable to Rule 52(b), which provides that a defendant who fails to object to trial error may nonetheless have a conviction reversed by showing among other things that plain error affected his substantial rights. After respondent Vonn was charged with federal bank robbery and firearm crimes, the Magistrate Judge twice advised him of his constitutional rights, including the right to be represented by counsel at every stage of the proceedings; Vonn signed a statement saying that he had read and understood his rights; and he answered yes to the court's questions whether he had understood the court's explanation of his rights and whether he had read and signed the statement. When Vonn later pleaded guilty to robbery, the court advised him of the constitutional rights he was relinquishing, but skipped the advice required by Rule (11)(c)(3) that he would have the right to assistance of counsel at trial. Subsequently, Vonn pleaded guilty to the firearm charge and to a later-charged conspiracy count. Again, the court advised him of the rights he was waiving, but did not mention the right to counsel. Eight months later, Vonn moved to withdraw his guilty plea on the firearm charge but did not cite Rule 11 error. The court denied the motion and sentenced him. On appeal, he sought to set aside all of his convictions, for the first time raising Rule 11. The Ninth Circuit agreed that there had been error and held that Vonn's failure to object before the District Court to the Rule 11 omission was of no import because Rule 11(h) subjects all Rule 11 violations to harmless-error review. Declining to go beyond the plea proceeding in considering whether Vonn was aware of his rights, the court held that the Government had not met its burden, under harmless-error review, of showing no effect on substantial rights, and vacated the convictions.

*Held:*

1. A defendant who lets Rule 11 error pass without objection in the trial court must satisfy Rule 52(b)'s plain-error rule. Pp. 1048–1054.

*56 a) Relying on the canon that expressing one item of a commonly associated group or series excludes another left unmentioned, Vonn claims that Rule 11(h)'s specification of harmless-error review shows an intent to exclude the plain-error standard with which harmless error is paired in Rule 52. However, this canon is only a guide, whose fallibility can be shown by contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion of its common relatives. Here, the harmless— and plain-error alternatives are associated together in Rule 52, having apparently equal dignity with Rule 11(h), and applying by its terms to error in the application of any other Rule of Criminal Procedure. To hold that Rule 11(h)'s terms imply that the latter half of Rule 52 has no application to Rule 11 errors would amount to finding a partial repeal of Rule 52(b) by implication, a result sufficiently disfavored, *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1017, 104 S.Ct. 2862, 81 L.Ed.2d 815, as to require strong support. Support, however, is not readily found, for Vonn has merely selected one possible interpretation of the supposedly intentional omission of a Rule 52(b) counterpart while logic would equally allow a reading that, without a plain-error **1045 rule, a silent defendant has no right of review on direct appeal. Pp. 1049–1050.

(b) Vonn attempts to find support for his reading by pointing beyond the Rule's text to *McCarthy v. United States,* 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418—which was decided when Rule 11 was relatively primitive—and the developments in that case's wake culminating in Rule 11(h)'s enactment. One clearly expressed Rule 11(h) objective was to end the practice of reversing automatically for any Rule 11 error, a practice stemming from reading *McCarthy* expansively to require that Rule 52(a)'s harmless-error provision could not be applied in Rule 11 cases. However, *McCarthy* had nothing to do with the choice between harmless-error and plain-error review. Nor is there any persuasive reason to think that when the Advisory Committee and Congress considered Rule 11(h) they accepted the view Vonn erroneously attributes to this Court in *McCarthy.* The Advisory Committee focused on the disarray, after *McCarthy,* among Courts of Appeals in treating trivial

122 S.Ct. 1043, 152 L.Ed.2d 90, 70 USLW 4181, 02 Cal. Daily Op. Serv. 2007...

errors. The cases cited in the Committee's Notes cannot reliably be read to suggest that plain-error review should never apply to Rule 11 errors, when the Notes never made such an assertion and the cases never mentioned the plain-error/harmless-error distinction. Rather, the Committee should be taken at its word that the harmless-error provision was added because some courts read ⚑ *McCarthy* to require that Rule 52(a)'s general harmless-error provision did not apply to Rule 11 proceedings. The Committee implied nothing more than it said, and it certainly did not implicitly repeal Rule 52(b) so far as it might cover a Rule 11 case. Pp. 1050–1053.

**\*57** c) Vonn's position would also have a tendency to undercut the object of Rule 32(e), which governs guilty plea withdrawal by creating an incentive to file withdrawal motions before sentence, not afterward. This tends to separate meritorious second thoughts and mere sour grapes over a sentence once pronounced. But the incentive to think and act early when Rule 11 is at stake would prove less substantial if a defendant could be silent until direct appeal, when the Government would always have the burden to prove harmlessness. Pp. 1053–1054.

2. A reviewing court may consult the whole record when considering the effect of any Rule 11 error on substantial rights. The Advisory Committee intended the error's effect to be assessed on an existing record, but it did not mean to limit that record strictly to the plea proceeding, as the Ninth Circuit did here. ⚑ *McCarthy* ostensibly supports that court's position; but it was decided before Rule 11(h) was enacted, and it was not a case with a record on point. Here, in addition to the transcript of the plea hearing and Rule 11 colloquy, the record shows that Vonn was advised of his right to trial counsel during his initial appearance and twice at his first arraignment, and that four times either he or his counsel affirmed that he had heard or read a statement of his rights and understood them. Because there are circumstances in which defendants may be presumed to recall information provided to them prior to the plea proceeding, cf. ⚑ *Bousley v. United States,* 523 U.S. 614, 618, 118 S.Ct. 1604, 140 L.Ed.2d 828, the record of Vonn's initial appearance and arraignments is relevant in fact and well within the Advisory Committee's understanding of the record that should be open to consideration. Since the transcripts of Vonn's first appearance and arraignment were not presented to the Ninth Circuit, this Court should not resolve their bearing on his claim before the Ninth Circuit has done so. Pp. 1054–1055.

⚑ 224 F.3d 1152, vacated and remanded.

SOUTER, J., delivered the opinion of the Court, Part III of which was unanimous, and Parts I and II of which were joined by REHNQUIST, C. J., and O'CONNOR, SCALIA, KENNEDY, THOMAS, GINSBURG, and BREYER, **\*\*1046** JJ. STEVENS, J., filed an opinion concurring in part and dissenting in part, *post,* p. 1055.

### Attorneys and Law Firms

Michael R. Dreeben, Washington, DC, for the petitioner.

**\*58** Monica Knox, Los Angeles, CA, for the respondent.

### Opinion

Justice SOUTER delivered the opinion of the Court.

The Government avoids reversal of a criminal conviction by showing that trial error, albeit raised by a timely objection, affected no substantial right of the defendant and was thus harmless. Fed. Rule Crim. Proc. 52(a). A defendant who failed to object to trial error may nonetheless obtain reversal of a conviction by carrying the converse burden, showing among other things that plain error did affect his substantial rights. Fed. Rule Crim. Proc. 52(b).

Rule 11(h) of the Federal Rules of Criminal Procedure is a separate harmless-error rule applying only to errors committed under Rule 11, the rule meant to ensure that a guilty plea is knowing and voluntary, by laying out the steps a trial judge must take before accepting such a plea. Like Rule 52(a), it provides that a failure to comply with Rule 11 that "does not affect substantial rights shall be disregarded." Rule 11(h) does not include a plain-error provision comparable to Rule 52(b).

[1] The first question here is whether a defendant who lets Rule 11 error pass without objection in the trial court must carry the burdens of Rule 52(b) or whether even the silent defendant can put the Government to the burden of proving the Rule 11 error harmless.[1] The second question is **\*59** whether a court reviewing Rule 11 error under either standard is limited to examining the record of the colloquy between court and defendant when the guilty plea was entered, or may look to the entire record begun at the defendant's first appearance in the matter leading to his eventual plea.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

U.S. v. Vonn, 535 U.S. 55 (2002)

122 S.Ct. 1043, 152 L.Ed.2d 90, 70 USLW 4181, 02 Cal. Daily Op. Serv. 2007...

**[2]** We hold that a silent defendant has the burden to satisfy the plain-error rule and that a reviewing court may consult the whole record when considering the effect of any error on substantial rights.

I

On February 28, 1997, respondent Alphonso Vonn was charged with armed bank robbery, under 18 U.S.C. §§ 2113(a) and (d), and using and carrying a firearm during and in relation to a crime of violence, under 18 U.S.C. § 924(c). Vonn appeared that day before a Magistrate Judge, who advised him of his constitutional rights, including "the right to retain and to be represented by an attorney of [his] own choosing at each and every sta[g]e of **1047 the proceedings." App. 15. Vonn said that he had heard and understood his rights, and the judge appointed counsel to represent him.

On March 17, 1997, three days after being indicted, Vonn, along with his appointed counsel, appeared in court for his arraignment. Again, the Magistrate Judge told Vonn about his rights, including the right to counsel at all stages of the proceedings. Vonn's counsel gave the court a form entitled "Statement of Defendant's Constitutional Rights," on which **60 Vonn said he understood his rights, including the right to counsel. His counsel signed a separate statement that he was satisfied that Vonn had read and understood the statement of his rights. The Clerk of Court then asked Vonn whether he had heard and understood the court's explanation of his rights, and whether he had read and signed the statement, and Vonn said yes to each question.

On May 12, 1997, Vonn came before the court and indicated that he would plead guilty to armed bank robbery but would go to trial on the firearm charge. The court then addressed him and, up to a point, followed Rule 11(c)(3) of the Federal Rules of Criminal Procedure. The judge advised Vonn of the constitutional rights he would relinquish by pleading guilty, but skipped the required advice that if Vonn were tried he would have "the right to the assistance of counsel."

Several months later, the stakes went up when the grand jury returned a superseding indictment, charging Vonn under an additional count of conspiracy to commit bank robbery. Although he first pleaded not guilty to this charge as well as

the firearm count, at a hearing on September 3, 1997, Vonn said he intended to change both pleas to guilty. Again, the court advised Vonn of rights waived by guilty pleas, but failed to mention the right to counsel if he went to trial. This time, the prosecutor tried to draw the court's attention to its error, saying that she did not "remember hearing the Court inform the defendant of his right to assistance of counsel." *Id.,* at 61. The court, however, may have mistaken the remark as going to Rule 11(c)(2), and answered simply that Vonn was represented by counsel.[2]

Eight months later, Vonn moved to withdraw his guilty plea on the firearm charge. He did not, however, cite Rule 11 error but instead based his request on his own mistake **61 about facts relevant to the charge. The court denied this motion, and on June 22, 1998, sentenced Vonn to 97 months in prison.

On appeal, Vonn sought to set aside not only the firearm conviction but the other two as well, for the first time making an issue of the District Judge's failure to advise him of his right to counsel at trial, as required by the Rule. The Court of Appeals agreed there had been error, and held that Vonn's failure to object before the District Court to its Rule 11 omission was of no import, since Rule 11(h) "supersedes the normal waiver rule," and subjects all Rule 11 violations to harmless-error review, 224 F.3d 1152, 1155 (C.A.9 2000) (citing *United States v. Odedo,* 154 F.3d 937 (C.A.9 1998)). The consequence was to put the Government to the burden of showing no effect on substantial rights.[3] The court declined to "go beyond the plea proceeding in considering whether the defendant was aware of his rights," and did not accept the record of Vonn's plea colloquies as evidence that Vonn was aware of **1048 his continuing right to counsel at trial. 224 F.3d, at 1155. It held the Government had failed to shoulder its burden to show the error harmless and vacated Vonn's convictions.

We granted certiorari, 531 U.S. 1189, 121 S.Ct. 1185, 149 L.Ed.2d 102 (2001), to resolve conflicts among the Circuits on the legitimacy of (1) placing the burden of plain error on a defendant appealing on the basis of Rule 11 error raised for the first time on appeal,[4] and (2) looking beyond the plea colloquy to other parts of the **62 official record to see whether a defendant's substantial rights were affected by a deviation from Rule 11.[5] We think the Court of Appeals was mistaken on each issue, and vacate and remand.

122 S.Ct. 1043, 152 L.Ed.2d 90, 70 USLW 4181, 02 Cal. Daily Op. Serv. 2007...

II

Rule 11 of the Federal Rules of Criminal Procedure requires a judge to address a defendant about to enter a plea of guilty, to ensure that he understands the nature of his crime in relation to the facts of his case, as well as his rights as a criminal defendant. The Rule has evolved over the course of 30 years from general scheme to detailed plan, which now includes a provision for dealing with a slip-up by the judge in applying the Rule itself. Subsection (h) reads that "[a]ny variance from the procedures required by this rule which does not affect substantial rights shall be disregarded." The language comes close to tracking the text of Rule 52(a), providing generally for "harmless-error" review, that is, consideration of error raised by a defendant's timely objection, but subject to an opportunity on the Government's part to carry the burden of showing that any error was harmless, as having no effect on the defendant's substantial rights. See Fed. Rule Crim. Proc. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded"); United States v. Olano, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

Rule 52(a), however, has a companion in Rule 52(b), a "plain-error" rule covering issues not raised before the district court in a timely way: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." When an appellate court considers error that qualifies as plain, the tables are turned on demonstrating the substantiality of any effect on *63 a defendant's rights: the defendant who sat silent at trial has the burden to show that his "substantial rights" were affected. Id., at 734–735, 113 S.Ct. 1770. And because relief on plain-error review is in the discretion of the reviewing court, a defendant has the further burden to persuade the court that the error " 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.' " Id., at 736, 113 S.Ct. 1770 (quoting United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936)).

The question here is whether Congress's importation of the harmless-error standard into Rule 11(h) without its companion plain-error rule was meant to eliminate a silent defendant's burdens under the Rule 52(b) plain-error review, and instead give him a right to subject the Government to the burden of demonstrating harmlessness. If the answer is yes, the

defendant loses nothing by failing to object to obvious Rule 11 error when it occurs. We think the answer is no.

**1049 A

Vonn's most obvious recourse is to argue from the text itself: Rule 11(h) unequivocally provides that a trial judge's "variance" from the letter of the Rule 11 scheme shall be disregarded if it does not affect substantial rights, the classic shorthand formulation of the harmless–error standard. It includes no exception for nonobjecting defendants.

[3]    Despite this unqualified simplicity, however, Vonn does not argue that Rule 11 error must always be reviewed on the 11(h) standard, with its burden on the Government to show an error harmless. Even though Rule 11(h) makes no distinction between direct and collateral review, Vonn does not claim even that the variant of harmless-error review applicable on collateral attack, see Brecht v. Abrahamson, 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), would apply when evaluating Rule 11 error on habeas review. Rather, he concedes that the adoption of 11(h) had no effect on the stringent standard for collateral review of Rule 11 error under 28 U.S.C. § 2255 (1994 ed.), as established by our holding in *64 United States v. Timmreck, 441 U.S. 780, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979), that a defendant cannot overturn a guilty plea on collateral review absent a showing that the Rule 11 proceeding was " 'inconsistent with the rudimentary demands of fair procedure' " or constituted a " 'complete miscarriage of justice,' " id., at 783, 99 S.Ct. 2085 (quoting Hill v. United States, 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962)). The concession is prudent, for the Advisory Committee Notes explaining the adoption of Rule 11(h) speak to a clear intent to leave Timmreck undisturbed, [6] and there is no question of Timmreck's validity in the aftermath of the 1983 amendments.

Whatever may be the significance of the text of Rule 11(h) for our issue, then, it cannot be as simple as the face of the provision itself. Indeed, the closest Vonn gets to a persuasive argument that Rule 11 excuses a silent defendant from the burdens of plain-error review is his invocation of the common interpretive canon for dealing with a salient omission from statutory text. He claims that the specification of harmless-error review in 11(h) shows an intent to exclude the standard

U.S. v. Vonn, 535 U.S. 55 (2002) | Case 3:20-cv-07721-SI | Document 58-6 | Filed 11/10/20 | Page 293 of 912

122 S.Ct. 1043, 152 L.Ed.2d 90, 70 USLW 4181, 02 Cal. Daily Op. Serv. 2007...

with which harmless error is paired in Rule 52, the plain-error standard with its burdens on silent defendants. The congressional choice to express the one standard of review without its customary companion does not, however, speak with any clarity in Vonn's favor.

[4] [5] *65 At best, as we have said before, the canon that expressing one item of a commonly associated group or series excludes another left unmentioned is only a guide, whose fallibility can be shown by contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion of its common relatives. See *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 703, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991); cf. *Burns v. United States,* 501 U.S. 129, 136, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991) ("An inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual **1050 evidence of congressional intent"). Here, the plausibility of an expression-exclusion reading of Rule 11(h) is subject to one strike without even considering what such a reading would mean in practice, or examining the circumstances of adopting 11(h). For here the harmless— and plain-error alternatives are associated together in the formally enacted Rule 52, having apparently equal dignity with Rule 11(h), and applying by its terms to error in the application of any other Rule of criminal procedure. To hold that the terms of Rule 11(h) imply that the latter half of Rule 52 has no application to Rule 11 errors would consequently amount to finding a partial repeal of Rule 52(b) by implication, a result sufficiently disfavored, *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1017, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984), as to require strong support.

Support, however, is not readily found. In the first place, even if we indulge Vonn with the assumption that Congress meant to imply something by failing to pair a plain-error provision with the harmless-error statement in Rule 11(h), just what it would have meant is subject to argument. Vonn thinks the implication is that defendants who let Rule 11 error pass without objection are relieved of the burden on silent defendants generally under the plain-error rule, to show the error plain, prejudicial, and disreputable to the judicial system. But, of course, this is not the only "implication" consistent with Congress's choice to say nothing about Rule 11 plain error. It would be equally possible, as a matter *66 of logic, to argue that if Rule 52(b) were implicitly made inapplicable to Rule 11 errors, a defendant who failed to object to Rule 11 errors would have no right of review

on direct appeal whatever. A defendant's right to review of error he let pass in silence depends upon the plain-error rule; no plain-error rule, no direct review. Vonn has, then, merely selected one possible interpretation of the supposedly intentional omission of a Rule 52(b) counterpart, even though logic would equally allow another one, not to Vonn's liking.

B

Recognition of the equivocal character of any claimed implication of speaking solely in terms of harmless error forces Vonn to look beyond the text in hope of finding confirmation for his reading as opposed to the one less hospitable to silent defendants. And this effort leads him to claim support in *McCarthy v. United States,* 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969), and the developments in the wake of that case culminating in the enactment of Rule 11(h). This approach, at least, gets us on the right track, for the one clearly expressed objective of Rule 11(h) was to end the practice, then commonly followed, of reversing automatically for any Rule 11 error, and that practice stemmed from an expansive reading of *McCarthy.* What that case did, and did not, hold is therefore significant.

When *McCarthy* was decided, Rule 11 was relatively primitive, requiring without much detail that the trial court personally address a defendant proposing to plead guilty and establish on the record that he was acting voluntarily, with an understanding of the charge and upon a factual basis supporting conviction. *Id.,* at 462, 89 S.Ct. 1166. [7] When McCarthy stood before *67 the District Court to plead guilty to tax evasion, however, the judge's colloquy with him went no further than McCarthy's understanding of his right to a jury trial, the particular sentencing possibilities, **1051 and the absence of any threats or promises. There was no discussion of the elements of the crime charged, or the facts that might support it. Indeed, despite the allegation that McCarthy had acted "willfully and knowingly," his lawyer consistently argued at the sentencing hearing that his client had merely been neglectful, *ibid.* Although defense counsel raised no objection to the trial court's deficient practice under Rule 11, this Court reversed the conviction on direct review. The Court rested the result solely on the trial judge's obvious failure to conform to the Rule, *id.,* at 464, 89 S.Ct. 1166, and emphasized that the Rule's procedural safeguards served important constitutional interests in guarding against

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

122 S.Ct. 1043, 152 L.Ed.2d 90, 70 USLW 4181, 02 Cal. Daily Op. Serv. 2007...

inadvertent and ignorant waivers of constitutional rights, *id.,* at 465, 89 S.Ct. 1166. Although the Government asked to have the case remanded for further evidentiary hearing and an opportunity to show that McCarthy's plea had been made knowingly and voluntarily, the Court said no and ordered the plea and resulting conviction vacated.

Vonn does not, of course, claim that *McCarthy* held that a silent defendant had no plain-error burden, but he says that this must have been the Court's understanding, or it would have taken McCarthy's failure to object to the trial judge's Rule 11 failings, combined with his failure to meet the requirements of the plain-error rule, as a bar to relief. This reasoning is unsound, however, for two reasons, the first being that not a word was said in *McCarthy* about the plain-error rule, or for that matter about harmless error. The opinion said nothing about Rule 52 or either of the rules by name. The parties' briefs said nothing. The only serious issue was raised by the Government's request to remand the case for a new evidentiary hearing on McCarthy's state of mind when he entered the plea, and not even this had anything *68 to do with either the harmless— or plain-error rule. Under the former, the Government's opportunity and burden is to show the error harmless based on the entire record before the reviewing court, see *United States v. Hasting,* 461 U.S. 499, 509, n. 7, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); under the plain-error rule the Government likewise points to parts of the record to counter any ostensible showing of prejudice the defendant may make, see *United States v. Young,* 470 U.S. 1, 16, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). Under either rule, the Government's opportunity is to persuade with what it has, not to initiate further litigation. Yet further litigation is what the Government wanted in *McCarthy.* It argued that if the Court did not think that the existing record demonstrated that McCarthy's plea had been knowing and voluntary, the Court should remand for a further hearing with new evidence affirmatively making this showing, *394 U.S., at 469, 89 S.Ct. 1166.* When the Court said no, it made no reference to harmless or plain error, but cited the object of Rule 11 to eliminate time-wasting litigation after the fact about how knowing and voluntary a defendant really had been at an earlier hearing. *Id.,* at 469–470, 89 S.Ct. 1166. And it expressed intense skepticism that any defendant would succeed, no matter how little he understood, once the evidence at a subsequent hearing

showed that he had desired to plead. *Id.,* at 469, 89 S.Ct. 1166. In sum, *McCarthy* had nothing to do with the choice between harmless-error and plain-error review; the issue was simply whether the Government could extend the litigation for additional evidence.

Vonn's attempt to read the *McCarthy* Court's mind is therefore purely speculative. What is worse, however, his speculation is less plausible than the view that the Court would probably have held that McCarthy satisfied the plain-error burdens if that had mattered. There was no question that the trial judge had failed to observe Rule 11, and the failing was obvious. So was the prejudice to McCarthy. Having had no explanation from the judge of the knowing and willful state of mind charged as of the time of the tax **1052 *69 violation, he pleaded guilty and was later sentenced at a hearing in which his lawyer repeatedly represented that McCarthy had been guilty of nothing but sloppiness.[8] The contradiction between the plea and the denial of the mental state alleged bespoke the prejudice of an unknowing plea, to which the judge's indifference was an affront to the integrity of the judicial system. While we need not relitigate or rewrite *McCarthy* at this point, it is safe to say that the actual opinion is not even speculative authority that the plain-error rule stops short of Rule 11 errors.

Nor is there any persuasive reason to think that when the Advisory Committee and Congress later came to consider Rule 11(h) they accepted the view Vonn erroneously attributes to this Court in *McCarthy.* The attention of the Advisory Committee to the problem of Rule 11 error was not drawn by *McCarthy* so much as by events that subsequently invested that case with a significance beyond its holding. In 1975, a few years after *McCarthy* came down, Congress transformed Rule 11 into a detailed formula for testing a defendant's readiness to proceed to enter a plea of guilty, obliging the judge to give specified advice about the charge, the applicable criminal statute, and even collateral law. The Court in *McCarthy* had, for example, been content to say that a defendant would need to know of the right against self-incrimination and rights to jury trial and confrontation before he could knowingly plead. But the 1975 revision of Rule 11 required instruction on such further matters as cross-examination in addition to confrontation, see Fed. Rule Crim. Proc. 11(c)(3); the right to counsel "at ... trial" even when the defendant stood in court with a lawyer next to him (as in this

U.S. v. Vonn, 535 U.S. 55 (2002)

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 295 of 912

122 S.Ct. 1043, 152 L.Ed.2d 90, 70 USLW 4181, 02 Cal. Daily Op. Serv. 2007...

case), see ☐ *ibid.;* and even the consequences of any **\*70** perjury the defendant might commit at the plea hearing, see Rule 11(c)(5).

Although the details newly required in Rule 11 colloquies did not necessarily equate to the importance of the overarching issues of knowledge and voluntariness already addressed in the earlier versions of the Rule, some Courts of Appeals felt bound to treat all Rule 11 lapses as equal and to read ☐ *McCarthy* as mandating automatic reversal for any one of them. See Advisory Committee's Notes on 1983 Amendments to Fed. Rule Crim. Proc. 11, 18 U.S.C.App., p. 1568 (hereinafter Advisory Committee's Notes) (citing ☐ *United States v. Boone,* 543 F.2d 1090 (C.A.4 1976); ☐ *United States v. Journet,* 544 F.2d 633 (C.A.2 1976)). This approach imposed a cost on Rule 11 mistakes that ☐ *McCarthy* neither required nor justified, and by 1983 the practice of automatic reversal for error threatening little prejudice to a defendant or disgrace to the legal system prompted further revision of Rule 11. Advisory Committee's Notes 1568.

The Advisory Committee reasoned that, although a rule of *per se* reversal might have been justified at the time ☐ *McCarthy* was decided, "[a]n inevitable consequence of the 1975 amendments was some increase in the risk that a trial judge, in a particular case, might inadvertently deviate to some degree from the procedure which a very literal reading of Rule 11 would appear to require." Advisory Committee's Notes 1568. After the amendments, "it became more apparent than ever that Rule 11 should not be given such a crabbed interpretation that ceremony was exalted over substance." ☐ *Ibid.*

Vonn thinks the Advisory Committee's report also includes a signal that it meant to dispense with a silent defendant's plain-error burdens. He stresses that the report cited Courts of Appeals cases of "crabbed interpretation" that had given **\*\*1053** relief to nonobjecting defendants. By proposing only a harmless-error amendment to correct the mistakes made **\*71** in these cases, he says, the Committee must have thought that the Government's only answer to nonobjecting defendants should be to prove error harmless, if it could. But this argument ignores the fact that these cases were not merely instances of automatic reversal, but were cited along with harmless-error cases as illustrations of the "considerable disagreement" that arose after ☐ *McCarthy* among Courts of

Appeals in treating errors of trivial significance. See Advisory Committee's Notes 1568. Given the Advisory Committee's apparent focus on the disarray among courts, the citations Vonn points to cannot reliably be read to suggest that plain-error review should never apply to Rule 11 errors, when the Advisory Committee Notes never made such an assertion and the reported cases cited by the Committee never mentioned the plain-error/harmless-error distinction.

We think, rather, that the significance of Congress's choice to adopt a harmless-error rule is best understood by taking the Advisory Committee at its word. "It must ... be emphasized that a harmless error provision has been added to Rule 11 because some courts have read ☐ *McCarthy* as meaning that the general harmless error provision in Rule 52(a) cannot be utilized with respect to Rule 11 proceedings." *Id.,* at 1569. The Committee said it was responding simply to a claim that the harmless-error rule did not apply. Having pinpointed that problem, it gave a pinpoint answer. If instead the Committee had taken note of claims that "Rule 52" did not apply, or that "neither harmless-error nor plain-error rule applied," one could infer that enacting a harmless-error rule and nothing more was meant to rule out anything but harmless-error treatment. But by providing for harmless-error review in response to nothing more than the claim that harmless-error review would itself be erroneous, the Advisory Committee implied nothing more than it said, and it certainly did not implicitly repeal Rule 52(b) so far as it might cover a Rule 11 case.

### **\*72** C

A further reason to doubt that Congress could have intended Vonn's position is the tendency it would have to undercut the object of Rule 32(e), which governs withdrawing a plea of guilty by creating an incentive to file withdrawal motions before sentence, not afterward. A trial judge is authorized to grant such a presentence motion if the defendant carries the burden of showing a "fair and just reason" for withdrawal, and a defendant who fails to move for withdrawal before sentencing has no further recourse except "direct appeal or ... motion under ☐ 28 U.S.C. 2255," subject to the rules covering those later stages. Fed. Rule Crim. Proc. 32(e). Whatever the "fair and just" standard may require on presentence motions,[9] the Advisory Committee Notes confirm the textual suggestion that the Rule creates a " 'near-presumption' " against granting motions filed

122 S.Ct. 1043, 152 L.Ed.2d 90, 70 USLW 4181, 02 Cal. Daily Op. Serv. 2007...

after sentencing, Advisory Committee's Notes on 1983 Amendment to Fed. Rule Crim. Proc. 32, 18 U.S.C.App., p. 1621 (quoting United States v. Barker, 514 F.2d 208, 219 (C.A.D.C.1975)). This is only good sense; in acting as an incentive to think through a guilty plea before sentence is imposed, the Rule tends to separate meritorious second thoughts (say, a defendant's doubts about his understanding) and mere sour grapes over a sentence once pronounced. The "near-presumption" concentrates plea litigation in the **\*\*1054** trial courts, where genuine mistakes can be corrected easily, and promotes the finality required in a system as heavily dependent on guilty pleas as ours.

**\*73** But the incentive to think and act early when Rule 11 is at stake would prove less substantial if Vonn's position were law; a defendant could choose to say nothing about a judge's plain lapse under Rule 11 until the moment of taking a direct appeal, at which time the burden would always fall on the Government to prove harmlessness. A defendant could simply relax and wait to see if the sentence later struck him as satisfactory; if not, his Rule 11 silence would have left him with clear but uncorrected Rule 11 error to place on the Government's shoulders. This result might, perhaps, be sufferable if there were merit in Vonn's objection that applying the plain-error standard to a defendant who stays mum on Rule 11 error invites the judge to relax. The plain-error rule, he says, would discount the judge's duty to advise the defendant by obliging the defendant to advise the judge. But, rhetoric aside, that is always the point of the plain-error rule: the value of finality requires defense counsel to be on his toes, not just the judge, and the defendant who just sits there when a mistake can be fixed cannot just sit there when he speaks up later on. [10]

**\*74** In sum, there are good reasons to doubt that expressing a harmless-error standard in Rule 11(h) was meant to carry any implication beyond its terms. At the very least, there is no reason persuasive enough to think 11(h) was intended to repeal Rule 52(b) for every Rule 11 case.

### III

**[6]** The final question goes to the scope of an appellate court's enquiry into the effect of a Rule 11 violation, whatever the review, plain error or harmless. The Court of Appeals confined itself to considering the record of "the plea proceeding," 224 F.3d, at 1156, applying Circuit precedent recognizing that the best evidence of a defendant's understanding when pleading guilty is the colloquy closest to the moment he enters the plea. While there is no doubt that this position serves the object of Rule 11 to eliminate wasteful *post hoc* probes into a defendant's psyche, McCarthy, 394 U.S., at 470, 89 S.Ct. 1166, the Court of Appeals was more zealous than the policy behind the Rule demands. The Advisory Committee intended the effect of error to be assessed on an existing record, no question, but it did not mean to limit that record strictly to the plea proceedings: the enquiry " 'must be resolved solely on the basis of the Rule 11 transcript' and the other portions (*e.g.,* sentencing hearing) of the limited record **\*\*1055** made in such cases." Advisory Committee's Notes 1569 (quoting United States v. Coronado, 554 F.2d 166, 170, n. 5 (C.A.5 1977)).

True, language in McCarthy ostensibly supports the position taken by the Court of Appeals (which did not, however, rest on it); we admonished that "[t]here is no adequate substitute **\*75** for demonstrating *in the record at the time the plea is entered* the defendant's understanding of the nature of the charge against him," 394 U.S., at 470, 89 S.Ct. 1166 (emphasis in original). But McCarthy was decided before the enactment of Rule 11(h), which came with the commentary just quoted, and McCarthy in any event was not a case with a record of anything on point, even outside the Rule 11 hearing. The Government responded to the laconic plea colloquy not by referring to anything illuminating in the record; instead it brought up the indictment, tried to draw speculative inferences from conversations McCarthy probably had with his lawyer, and sought to present new evidence. The only serious alternative to "the record at the time the plea [was] entered" was an evidentiary hearing for further factfinding by the trial court.

Here, however, there is a third source of information, outside the four corners of the transcript of the plea hearing and Rule 11 colloquy, but still part of the record. Transcripts brought to our attention show that Vonn was advised of his right to trial counsel during his initial appearance before the Magistrate Judge and twice at his first arraignment. The record shows that four times either Vonn or his counsel affirmed that Vonn had heard or read a statement of his rights and understood what they were. Because there are circumstances in which defendants may be presumed to recall information provided to them prior to the plea proceeding, cf. Bousley v. United States, 523 U.S. 614, 618, 118 S.Ct. 1604, 140 L.Ed.2d 828

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 297 of 912

122 S.Ct. 1043, 152 L.Ed.2d 90, 70 USLW 4181, 02 Cal. Daily Op. Serv. 2007...

(1998) (a defendant with a copy of his indictment before pleading guilty is presumed to know the nature of the charge against him), the record of Vonn's initial appearance and arraignment is relevant in fact, and well within the Advisory Committee's understanding of "other portions ... of the limited record" that should be open to consideration. It may be considered here.

The transcripts covering Vonn's first appearance and arraignment were not, however, presented to the Court of Appeals. Probably owing to that court's self-confinement to a **\*76** narrower record, it made no express ruling on the part of the Government's rehearing motion requesting to make the first-appearance and arraignment transcripts part of the appellate record. For that reason, even with the transcripts now in the parties' joint appendix filed with us, we should not resolve their bearing on Vonn's claim before the Court of Appeals has done so. *Adarand Constructors, Inc. v. Mineta, 534 U.S. 103, 122 S.Ct. 511, 151 L.Ed.2d 489 (2001).*

We therefore vacate the Court of Appeals's judgment and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

Justice STEVENS, concurring in part and dissenting in part. For the reasons stated in Part III of the Court's opinion, I agree that the effect of a violation of Rule 11 of the Federal Rules of Criminal Procedure should be evaluated on the basis of the entire record, rather than just the record of the plea colloquy, and that a remand is therefore required. Contrary to the Court's analysis in Part II of its opinion, however, I am firmly convinced that the history, the text of Rule 11, and the special office of the Rule all support the conclusion, "urged by the Government" in *McCarthy v. United States, 394 U.S. 459, 469, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969),* that the burden of demonstrating that a violation of that Rule is harmless is "place[d] upon the Government," *ibid.*

**\*\*1056** In *McCarthy,* after deciding that the trial judge had not complied with Rule 11, the Court had to "determine the effect of that noncompliance, an issue that ha[d] engendered a sharp difference ... among the courts of appeals." *Id. at 468, 89 S.Ct. 1166.* The two alternatives considered by those courts were the automatic reversal rule

that we ultimately unanimously endorsed in *McCarthy* and the harmless-error rule urged by **\*77** the Government.[1] No one even argued that the defendant should have the burden of proving prejudice.[2] The Court's conclusion that "prejudice inheres in a failure to comply with Rule 11" was uncontroversial.[3] *Id., at 471, 89 S.Ct. 1166.*

During the years preceding the 1983 amendment to Rule 11, it was generally understood that noncompliance with Rule 11 in direct appeal cases required automatic reversal. See Advisory Committee's Notes on 1983 Amendments to Fed. Rule Crim. Proc. 11, 18 U.S.C.App., p. 1568 (hereinafter Advisory Committee's Notes) (citing *United States v. Boone, 543 F.2d 1090 (C.A.4 1976); United States v. Journet, 544 F.2d 633 (C.A.2 1976)).* Thus, prior to the addition of Rule 11(h), *neither* plain-error[4] nor harmless-error review applied to Rule 11 violations. Rejecting *McCarthy's* "extreme **\*78** sanction of automatic reversal" for technical violations, Congress added subsection 11(h), which closely tracks the harmless-error language of Rule 52(a).[5] Advisory Committee's Notes 1569. As the Advisory Committee's Notes make clear, "Subdivision (h) makes no change in the responsibilities of the judge at Rule 11 proceedings, but instead *merely* rejects the extreme sanction of automatic reversal." *Ibid.* (emphasis deleted and added). The plain text thus embodies Congress' choice of incorporating the standard found in Rule 52(a), while omitting that of Rule 52(b).[6] Because the pre-existing background of Rule 11 was that Rule 52(b) did not apply, and because the **\*\*1057** amendment adding Rule 52(a) via subsection (h) did not also add Rule 52(b), the straightforward conclusion is that plain-error review does not apply to Rule 11 errors.

Congress' decision to apply *only* Rule 52(a)'s harmless-error standard to Rule 11 errors is tailored to the purpose of the Rule. The very premise of the required Rule 11 colloquy is that, even if counsel is present, the defendant may not adequately understand the rights set forth in the Rule unless the judge explains them. It is thus perverse to place the burden on the uninformed defendant to object to deviations from Rule 11 or to establish prejudice arising out of the judge's failure to mention a right that he does not know he **\*79** has.[7] Under the Court's approach, the Government bears the burden of establishing no harm only when the defendant objects to the district court's failure to inform him. In other words, the

U.S. v. Vonn, 535 U.S. 55 (2002)

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 298 of 912

122 S.Ct. 1043, 152 L.Ed.2d 90, 70 USLW 4181, 02 Cal. Daily Op. Serv. 2007...

Government must show prejudice only when the defendant asks the judge to advise him of a right of which the Rule 11 colloquy assumes he is unaware. To see the implausibility of this, imagine what such an objection would sound like: "Your Honor, I object to your failure to inform me of my right to assistance of counsel if I proceed to trial."

Despite this implausible scenario, and to support the result that it reaches, the Court's analysis relies upon an image of a cunning defendant, who is fully knowledgeable of his rights, and who games the system by sitting silently as the district court, apparently less knowledgeable than the defendant, slips up in following the dictates of Rule 11. See, *e.g., ante,* at 1048 ("[A] defendant loses nothing by failing to **\*80** object to obvious Rule 11 error when it occurs"); *ante,* at 1054 ("[A] defendant could choose to say nothing about a judge's plain lapse under Rule 11 until the moment of taking a direct appeal, at which time the burden would always fall on the Government to prove harmlessness. A defendant could simply relax and wait to see if the sentence later struck him as satisfactory"). My analysis is based on a fundamentally different understanding of the considerations that motivated the Rule 11 colloquy requirements in the first place. Namely, in light of the gravity of a plea, the court will assume no knowledge on the part of the defendant, even if represented by counsel, and the court must inform him of a base level of information before accepting his plea. [8]

**\*\*1058** The express inclusion in Rule 11 of a counterpart to Rule 52(a) and the omission of a counterpart to Rule 52(b) is best understood as a reflection of the fact that it is only fair to place the burden of proving the impact of the judge's error on the party who is aware of it rather than the party who is unaware of it. This burden allocation gives incentive to the judge to follow meticulously the Rule 11 requirements and to the prosecutor to correct Rule 11 errors at the time of the colloquy. The Court's approach undermines those incentives.

I would remand to the Court of Appeals to determine whether, taking account of the entire record, the Government has met its burden of establishing that the District Court's failure to inform the respondent of his right to counsel at trial was harmless.

## All Citations

535 U.S. 55, 122 S.Ct. 1043, 152 L.Ed.2d 90, 70 USLW 4181, 02 Cal. Daily Op. Serv. 2007, 2002 Daily Journal D.A.R. 2447, 15 Fla. L. Weekly Fed. S 145

## Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1    This question is rightly before us even though the Government did not urge the Court of Appeals to adopt a plain-error standard. As the Court of Appeals recognized, 224 F.3d 1152, 1155 (C.A.9 2000), this position was squarely barred by Circuit precedent holding that any Rule 11 error is subject to harmless-error review. *United States v. Odedo,* 154 F.3d 937, 940 (C.A.9 1998). Although the Government did not challenge *Odedo* as controlling precedent, we have previously held that such a claim is preserved if made by the current litigant in "the recent proceeding upon which the lower courts relied for their resolution of the issue, and [the litigant] did not concede in the current case the correctness of that precedent." *United States v. Williams,* 504 U.S. 36, 44–45, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992). Although there evidently was some confusion as to the Government's precise position in *Odedo,* presumably because the Government argued there, as here, that failure to raise a Rule 11 objection constitutes "waiver," the Court of Appeals understood the Government to contend that "forfeited error" is subject to plain-error review. That, coupled with the fact that the Government did not concede below that *Odedo* was correctly decided, is enough for us to take up this question.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

122 S.Ct. 1043, 152 L.Ed.2d 90, 70 USLW 4181, 02 Cal. Daily Op. Serv. 2007...

2   Rule 11(c)(2) provides that "if the defendant is not represented by an attorney," the court must inform the defendant that he "has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent [him]."

3   As already noted, n. 1, *supra,* the Government in this case did not specifically argue that the plain-error rule, Rule 52(b), governs this case; that was its position in Odedo, 154 F.3d, at 939, on which the Court of Appeals relied for authority here. Hence, the Court of Appeals in this case went no further than to reject the Government's waiver argument.

4   Compare, *e.g.,* 224 F.3d, at 1155 (case below); *United States v. Lyons,* 53 F.3d 1321, 1322, n. 1 (C.A.D.C.1995), with *United States v. Gandia–Maysonet,* 227 F.3d 1, 5–6 (C.A.1 2000); *United States v. Bashara,* 27 F.3d 1174, 1178 (C.A.6 1994); *United States v. Cross,* 57 F.3d 588, 590 (C.A.7 1995); and *United States v. Quinones,* 97 F.3d 473, 475 (C.A.11 1996).

5   Compare, *e.g.,* 224 F.3d, at 1155, with *United States v. Parkins,* 25 F.3d 114, 118 (C.A.2 1994); *United States v. Johnson,* 1 F.3d 296, 302 (C.A.5 1993); *United States v. Lovett,* 844 F.2d 487, 492 (C.A.7 1988); *United States v. Jones,* 143 F.3d 1417, 1420 (C.A.11 1998); and *Lyons, supra,* at 1322–1323.

6   In the absence of a clear legislative mandate, the Advisory Committee Notes provide a reliable source of insight into the meaning of a rule, especially when, as here, the rule was enacted precisely as the Advisory Committee proposed. See *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 165–166, n. 9, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988) (where "Congress did not amend the Advisory Committee's draft in any way ... the Committee's commentary is particularly relevant in determining the meaning of the document Congress enacted"). Although the Notes are the product of the Advisory Committee, and not Congress, they are transmitted to Congress before the rule is enacted into law. See Amendments to Rules of Criminal Procedure, H.R. Doc. No. 98–55 (1983) (submitting to Congress amendments to the Federal Rules of Criminal Procedure, including the addition of Rule 11(h), accompanied by the report of the Judicial Conference containing the Advisory Committee Notes to the amendment).

7   Prior to its amendment in 1975, Rule 11 provided, in relevant part:

> "The court may refuse to accept a plea of guilty, and shall not accept such plea or a plea of *nolo contendere* without first addressing the defendant personally and determining that the plea is made voluntarily with understanding of the nature of the charge and the consequences of the plea. ... The court shall not enter a judgment upon a plea of guilty unless it is satisfied that there is a factual basis for the plea."

8   Nor did McCarthy claim that the guilty plea should be accepted on the *Alford* theory that a defendant may plead guilty while protesting innocence when he makes a conscious choice to plead simply to avoid the expenses or vicissitudes of trial. *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

9   The Courts of Appeals have held that a Rule 11(h) violation that is harmless under Rule 11(h) does not rise to the level of a "fair and just reason" for withdrawing a guilty plea. See *United States v. Driver,* 242 F.3d 767, 769 (C.A.7 2001) ("Even an established violation of Rule 11 can be harmless error ... and thus not a 'fair and just reason' to return to Square One"); *United States v. Siegel,* 102 F.3d 477, 481 (C.A.11 1996); *United States v. Martinez–Molina,* 64 F.3d 719, 734 (C.A.1 1995).

10   Contrary to Justice STEVENS's suggestion, *post,* at 1057–1058 (opinion concurring in part and dissenting in part), there is nothing "perverse" about conditioning the Government's harmless-error burden on an objection when the judge commits Rule 11 error. A defendant's right to counsel on entering a guilty plea is expressly

122 S.Ct. 1043, 152 L.Ed.2d 90, 70 USLW 4181, 02 Cal. Daily Op. Serv. 2007...

recognized in Rule 11(c)(2), and counsel is obliged to understand the Rule 11 requirements. It is fair to burden the defendant with his lawyer's obligation to do what is reasonably necessary to render the guilty plea effectual and to refrain from trifling with the court. It therefore makes sense to require counsel to call a Rule 11 failing to the court's attention. It is perfectly true that an uncounseled defendant may not, in fact, know enough to spot a Rule 11 error, but when a defendant chooses self-representation after a warning from the court of the perils this entails, see 🚩⚠️ *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), Rule 11 silence is one of the perils he assumes. Any other approach is at odds with Congress's object in adopting Rule 11, recognized in 🚩 *McCarthy v. United States,* 394 U.S. 459, 465, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969), to combat defendants' "often frivolous" attacks on the validity of their guilty pleas, by aiding the district judge in determining whether the defendant's plea was knowing and voluntary and creating a record at the time of the plea supporting that decision.

Vonn's final retort that application of the plain-error rule would tend to leave some "unconstitutional pleas" uncorrected obviates the question in this case, which is who bears the burden of proving that Rule 11 error did or did not prejudice the defendant: the Government or the defendant?

1    🚩 *McCarthy* was decided 15 years after the adoption of Rule 52, and yet neither the parties nor the Court discussed the application of that Rule despite the fact that the defendant had failed to object to the Rule 11 error.

2    Nor did the Government make such an argument in the Court of Appeals in this case. That should be a sufficient reason for refusing to consider the argument here, see 🚩 *United States v. Williams,* 504 U.S. 36, 55–61, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) (STEVENS, J., dissenting), but, as in *Williams,* the Court finds it appropriate to accord "a special privilege for the Federal Government," *id., at 59, 112 S.Ct. 1735.*

3    "We thus conclude that prejudice inheres in a failure to comply with Rule 11, for noncompliance deprives the defendant of the Rule's procedural safeguards that are designed to facilitate a more accurate determination of the voluntariness of his plea." 🚩 *McCarthy, 394 U.S., at 471–472, 89 S.Ct. 1166.* Not a word in the proceedings that led to the amendment rejecting the automatic reversal remedy questioned the validity of the proposition that every violation of the Rule is presumptively prejudicial. The amendment merely gives the Government the opportunity to overcome that presumption.

4    Rule 52(b) states: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." When a court reviews for plain error, the burden is on the defendant to show that the error affected his substantial rights. 🚩 *United States v. Olano,* 507 U.S. 725, 734–735, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

5    Rule 52(a) states: "Harmless error. Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Rule 11(h) states: "Harmless error. Any variance from the procedures required by this rule which does not affect substantial rights shall be disregarded."

6    The Court incorrectly asserts that this is an argument for repeal by implication of Rule 52(b). *Ante,* at 1050 ("To hold that the terms of Rule 11(h) imply that the latter half of Rule 52 has no application to Rule 11 errors would consequently amount to finding a partial repeal of Rule 52(b) by implication, a result sufficiently disfavored"). This ignores the fact that prior to the enactment of Rule 11(h), courts applied neither Rule 52(a) nor (b) to Rule 11 violations.

7    The Court states that this is like any other application of the plain-error rule as it is applied to all trial errors. *Ante,* at 1054 ("The plain-error rule, [Vonn] says, would discount the judge's duty to advise the defendant by obliging the defendant to advise the judge. But, rhetoric aside, that is always the point of the plain-error rule ..."). Unlike most rules that apply to a trial, however, the special purpose of the Rule 11 colloquy is to provide information to a defendant prior to accepting his plea. Given this purpose, it is inconceivable that Congress intended the same rules for review of noncompliance to apply. A parallel example from the self-representation context illustrates this point. Pursuant to 🚩⚠️ *Faretta v. California,* 422 U.S. 806, 95 S.Ct.

122 S.Ct. 1043, 152 L.Ed.2d 90, 70 USLW 4181, 02 Cal. Daily Op. Serv. 2007...

2525, 45 L.Ed.2d 562 (1975), a defendant who wishes to represent himself must "be made aware of the dangers and disadvantages of self-representation," *id., at 835, 95 S.Ct. 2525.* Assume a defendant states that he wishes to proceed *pro se,* and the trial judge makes no attempt to warn the defendant of the dangers and disadvantages of self-representation. If the defendant makes no objection to the trial court's failure to warn, surely we would not impose a plain-error review standard upon this nonobjecting defendant.

This is so because the assumption of *Faretta's* warning requirement is that the defendant is unaware of the dangers. It is illogical in this context, as in the Rule 11 context, to require the presumptively unknowing defendant to object to the court's failure to adequately inform. Congress' decision to apply the harmless-error standard to all Rule 11 errors surely reflects this logic.

8  See *Kercheval v. United States,* 274 U.S. 220, 223, 47 S.Ct. 582, 71 L.Ed. 1009 (1927) ("A plea of guilty differs in purpose and effect from a mere admission or an extra-judicial confession; it is itself a conviction.... Out of just consideration for persons accused of crime, courts are careful that a plea of guilty shall not be accepted unless made voluntarily after proper advice and with full understanding of the consequences").

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

130 S.Ct. 10
Supreme Court of the United States

VIRGINIA, Petitioner,
v.
Joseph A. Moses HARRIS, Jr., Respondent.

No. 08–1385.
|
Oct. 20, 2009.

**Opinion**

The petition for a writ of certiorari is denied.

Chief Justice ROBERTS, with whom Justice SCALIA joins, dissenting.

Every year, close to 13,000 people die in alcohol-related car crashes—roughly one death every 40 minutes. See Dept. of Transp., Nat. Hwy. Traffic Safety Admin., Traffic Safety Facts, 2007 Traffic Safety Annual Assessment—Alcohol–Impaired Driving Fatalities 1 (No. 811016, Aug. 2008). Ordinary citizens are well aware of the dangers posed by drunk driving, and they frequently report such conduct to the police. A number of States have adopted programs specifically designed to encourage such tips—programs such as the "Drunkbuster Hotline" in New Mexico and the REDDI program (Report Every Drunk Driver Immediately) in force in several States. See Dept. of Transp., Nat. Hwy. Traffic Safety Admin., Programs Across the United States That Aid Motorists in the Reporting of Impaired Drivers to Law Enforcement (2007).

By a 4-to-3 vote, the Virginia Supreme Court below adopted a rule that will undermine such efforts to get drunk drivers off the road. The decision below commands that police officers following a driver reported to be drunk *do nothing* until they see the driver actually do something unsafe on the road—by which time it may be too late.

Here, a Richmond police officer pulled Joseph Harris over after receiving an anonymous tip that Harris was driving while intoxicated. The tip described Harris, his car, and the direction he was traveling in considerable detail. The officer did not personally witness Harris violate any traffic laws. When Harris was pulled over, however, he reeked of alcohol, his speech was slurred, he almost fell over in attempting to exit his car, and he failed the sobriety tests the officer

administered on the scene. Harris was convicted of driving while intoxicated, but the Virginia Supreme Court overturned the conviction. It concluded that because the officer had failed to independently verify that Harris was driving dangerously, the stop violated the Fourth Amendment's prohibition on unreasonable searches and seizures. 276 Va. 689, 696–698, 668 S.E.2d 141, 146–147 (2008); see Pet. for Cert. 4 (citing record).

I am not sure that the Fourth Amendment requires such independent corroboration before the police can act, at least in the special context of anonymous tips reporting drunk driving. This is an important question that is not answered by our past decisions, and that has deeply divided federal and state courts. The Court should grant the petition for certiorari to answer the question and resolve the conflict.

On the one hand, our cases allow police to conduct investigative stops based on reasonable suspicion, viewed under the totality of the circumstances. *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Alabama v. White,* 496 U.S. 325, 328–331, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). In *Florida v. J.L.,* 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), however, we explained that anonymous tips, in the absence of additional corroboration, typically lack the "indicia of reliability" needed to justify a stop under the reasonable suspicion standard. In *J.L.,* the Court suppressed evidence seized by police after receiving an anonymous tip **\*11** alleging that a young man, wearing a plaid shirt and waiting at a particular bus stop, was carrying a gun. The majority below relied extensively on *J.L.* in reversing Harris's conviction.

But it is not clear that *J.L.* applies to anonymous tips reporting drunk or erratic driving. *J.L.* itself suggested that the Fourth Amendment analysis might be different in other situations. The Court declined "to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability." *Id.,* at 273, 120 S.Ct. 1375. It also hinted that "in quarters where the reasonable expectation of Fourth Amendment privacy is diminished," it might be constitutionally permissible to "conduct protective searches on the basis of information insufficient to justify searches elsewhere." *Id.,* at 274, 120 S.Ct. 1375.

AR.06798

Virginia v. Harris, 558 U.S. 978 (2009)

130 S.Ct. 10, 175 L.Ed.2d 322, 78 USLW 3234, 78 USLW 3236...

There is no question that drunk driving is a serious and potentially deadly crime, as our cases have repeatedly emphasized. See, *e.g.,* *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 451, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) ("No one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it. Media reports of alcohol-related death and mutilation on the Nation's roads are legion"). The imminence of the danger posed by drunk drivers exceeds that at issue in other types of cases. In a case like *J.L.,* the police can often observe the subject of a tip and step in before actual harm occurs; with drunk driving, such a wait-and-see approach may prove fatal. Drunk driving is always dangerous, as it is occurring. This Court has in fact recognized that the dangers posed by drunk drivers are unique, frequently upholding anti-drunk-driving policies that might be constitutionally problematic in other, less exigent circumstances. [1]

In the absence of controlling precedent on point, a sharp disagreement has emerged among federal and state courts over how to apply the Fourth Amendment in this context. The majority of courts examining the question have upheld investigative stops of allegedly drunk or erratic drivers, even when the police did not personally witness any traffic violations before conducting the stops. [2] These courts have typically distinguished *J.L.*'s general rule based on some combination of (1) the especially grave and imminent dangers posed by drunk driving; (2) the enhanced reliability **12** of tips alleging illegal activity in public, to which the tipster was presumably an eyewitness; (3) the fact that traffic

stops are typically less invasive than searches or seizures of individuals on foot; and (4) the diminished expectation of privacy enjoyed by individuals driving their cars on public roads. A minority of jurisdictions, meanwhile, take the same position as the Virginia Supreme Court, requiring that officers first confirm an anonymous tip of drunk or erratic driving through their own independent observation. [3] This conflict has been expressly noted by the lower courts. [4]

The conflict is clear and the stakes are high. The effect of the rule below will be to grant drunk drivers "one free swerve" before they can legally be pulled over by police. It will be difficult for an officer to explain to the family of a motorist killed by that swerve that the police had a tip that the driver of the other car was drunk, but that they were powerless to pull him over, even for a quick check.

Maybe the decision of the Virginia Supreme Court below was correct, and the Fourth Amendment bars police from acting on anonymous tips of drunk driving unless they can verify each tip. If so, then the dangerous consequences of this rule are unavoidable. But the police should have every legitimate tool at their disposal for getting drunk drivers off the road. I would grant certiorari to determine if this is one of them.

**All Citations**

558 U.S. 978, 130 S.Ct. 10 (Mem), 175 L.Ed.2d 322, 78 USLW 3234, 78 USLW 3236, 2009 Daily Journal D.A.R. 14,921

## Footnotes

1    See, *e.g.,* *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 455, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (approving use of field-sobriety checkpoints of all approaching drivers, despite fact that over 98 percent of such drivers were innocent); *South Dakota v. Neville,* 459 U.S. 553, 554, 560, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983) (upholding state law allowing a defendant's refusal to take a blood-alcohol test to be introduced as evidence against him at trial); *Mackey v. Montrym,* 443 U.S. 1, 17–19, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979) (upholding state law requiring mandatory suspension of a driver's license upon a drunk-driving suspect's refusal to submit to a breath-analysis test); see also *Indianapolis v. Edmond,* 531 U.S. 32, 37–38, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) (noting that in the Fourth Amendment context the Court has upheld government measures "aimed at removing drunk drivers from the road," distinguishing such measures from those with the primary purpose of "detect [ing] evidence of ordinary criminal wrongdoing").

2    See, *e.g.,* *United States v. Wheat,* 278 F.3d 722 (C.A.8 2001); *People v. Wells,* 38 Cal.4th 1078, 45 Cal.Rptr.3d 8, 136 P.3d 810 (2006); *State v. Prendergast,* 103 Hawai'i 451, 83 P.3d 714 (2004); *State v. Walshire,* 634 N.W.2d 625 (Iowa 2001); *State v. Crawford,* 275 Kan. 492, 67 P.3d 115 (2003); *Bloomingdale v. State,* 842 A.2d 1212 (Del.2004); *State v. Golotta,* 178 N.J. 205, 837 A.2d 359 (2003); *State v. Scholl,* 2004 S.D. 85, 684 N.W.2d 83; *State v. Boyea,* 171 Vt. 401, 765 A.2d 862 (2000); *State v. Rutzinski,* 2001 WI 22, 241 Wis.2d 729, 623 N.W.2d 516.

3    See, *e.g.,* *McChesney v. State,* 988 P.2d 1071 (Wyo.1999); *Commonwealth v. Lubiejewski,* 49 Mass.App. 212, 729 N.E.2d 288 (2000); *State v. Sparen,* No. CR00258199S, 2001 WL 206078 (Conn.Super.Ct., Feb. 9, 2001) (unpublished).

4    See, *e.g., Wheat, supra,* at 729–730 (reviewing cases upholding stops, then noting that some courts "have reached a different conclusion"); *Wells, supra,* at 1084, 45 Cal.Rptr.3d 8, 136 P.3d, at 814 ("split of authority").

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

96 S.Ct. 2040, 12 Fair Empl.Prac.Cas. (BNA) 1415, 11 Empl. Prac. Dec. P 10,958...

KeyCite Yellow Flag - Negative Treatment

Superseded by Statute as Stated in *Veasey v. Perry*, S.D.Tex., July 2, 2014

96 S.Ct. 2040
Supreme Court of the United States

Walter E. WASHINGTON, etc., et al., Petitioners,

v.

Alfred E. DAVIS et al.

No. 74-1492.
|
Argued March 1, 1976.
|
Decided June 7, 1976.

**Synopsis**

Unsuccessful black applicants for employment as police officers by the District of Columbia brought class action claiming that recruiting procedures, including a written personnel test administered to determine whether applicants have acquired a particular level of verbal skill, were racially discriminatory. The United States District Court for the District of Columbia, 348 F.Supp. 15, granted defendants' motions for summary judgment and plaintiffs appealed. The Court of Appeals, 168 U.S.App.D.C. 42, 512 F.2d 956, reversed and directed summary judgment for plaintiff and certiorari was granted. The Supreme Court, Mr. Justice White, held that standards applicable to equal employment opportunity cases should not have been applied in resolving issue whether the test violated due process clause of the Fifth Amendment; that a law is not unconstitutional solely because it has a racially disproportionate impact regardless of whether it reflects a racially discriminatory purpose; that the disproportionate impact of the test, which was neutral on its face, did not warrant conclusion that test was a purposely discriminatory device; and that a positive relationship between the test and training school performance was sufficient to validate the test, wholly aside from its possible relationship to actual performance as a police officer.

Judgment of Court of Appeals reversed.

Mr. Justice Stewart joined in parts of the opinion.

Mr. Justice Stevens filed concurring opinion.

Mr. Justice Brennan, with whom Mr. Justice Marshall joined, filed dissenting opinion.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (16)

**[1]    Federal Courts**    Presentation of Questions Below or on Review; Record; Waiver

Although petition for certiorari to United States Court of Appeals did not present as ground for reversal the Court of Appeals' erroneous application of statutory standards in resolving constitutional issue before it, occasion was appropriate for the Supreme Court to invoke plain error rule. Supreme Court Rules, rule 40, subd. 1(d)(2), 28 U.S.C.A.

30 Cases that cite this headnote

**[2]    Constitutional Law**    Discrimination and Classification

The standard for adjudicating claims of invidious racial discrimination under the due process clause of the Fifth Amendment is not identical to the standards applicable under the Equal Employment Opportunity Act. Civil Rights Act of 1964, § 701 et seq. as amended 42 U.S.C.A. § 2000e et seq.; U.S.C.A.Const. Amends. 5, 14.

168 Cases that cite this headnote

**[3]    Constitutional Law**    Race, National Origin, or Ethnicity

The central purpose of the equal protection clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race. U.S.C.A.Const. Amend. 14.

603 Cases that cite this headnote

**[4]    Constitutional Law**    Race, National Origin, or Ethnicity

**Constitutional Law**    Relationship to equal protection guarantee

Washington v. Davis, 426 U.S. 229 (1976)

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 306 of 912

96 S.Ct. 2040, 12 Fair Empl.Prac.Cas. (BNA) 1415, 11 Empl. Prac. Dec. P 10,958...

Though the due process clause of the Fifth Amendment contains an equal protection component prohibiting the government from invidious discrimination, it does not follow that a law or other official act is unconstitutional solely because it has a racially disproportionate impact regardless of whether it reflects a racially discriminatory purpose. U.S.C.A.Const. Amend. 5.

1036 Cases that cite this headnote

**[5]**    **Constitutional Law** ⚖ Race, National Origin, or Ethnicity

A statute, otherwise neutral on its face, must not be applied so as invidiously to discriminate on basis of race. U.S.C.A.Const. Amends. 5, 14.

76 Cases that cite this headnote

**[6]**    **Constitutional Law** ⚖ Race, National Origin, or Ethnicity

An invidious discriminatory purpose in application of a statute may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another. U.S.C.A.Const. Amends. 5, 14.

301 Cases that cite this headnote

**[7]**    **Constitutional Law** ⚖ Race, national origin, or ethnicity

**Constitutional Law** ⚖ Intentional or purposeful action

Disproportionate impact of a statute is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution and, standing alone, does not trigger the rule that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations. U.S.C.A.Const. Amends. 5, 14.

261 Cases that cite this headnote

**[8]**    **Constitutional Law** ⚖ Intentional or purposeful action

In proper circumstances, the racial impact of a law, rather than its discriminatory purpose, is the critical factor in determining a constitutional violation. U.S.C.A.Const. Amends. 5, 14.

475 Cases that cite this headnote

**[9]**    **Public Employment** ⚖ Examination

The Constitution does not prevent the government from seeking through a written test of verbal skill modestly to upgrade the communicative abilities of its employees rather than to be satisfied with some lower level of competence, particularly where the job requires special ability to communicate orally and in writing. U.S.C.A.Const. Amends. 5, 14.

17 Cases that cite this headnote

**[10]**    **Constitutional Law** ⚖ Public employees and officials

Negro applicants for employment as police officers could no more successfully claim that written test of verbal skill denied them equal protection than could white applicants who also failed the test. U.S.C.A.Const. Amend. 5; D.C.C.E. §§ 1–320, 4–103; 5 U.S.C.A. § 3304(a).

58 Cases that cite this headnote

**[11]**    **Civil Rights** ⚖ Educational requirements; ability tests

The disproportionate impact on Negroes of written test of verbal skill administered to applicants for employment as police officers did not warrant the conclusion that test, which was neutral on its face, was a purposely discriminatory device. U.S.C.A.Const. Amend. 5; 5 U.S.C.A. § 3304(a); 42 U.S.C.A. § 1981; D.C.C.E. §§ 1–320, 4–103.

115 Cases that cite this headnote

Washington v. Davis, 426 U.S. 229 (1976)

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 307 of 912

96 S.Ct. 2040, 12 Fair Empl.Prac.Cas. (BNA) 1415, 11 Empl. Prac. Dec. P 10,958...

[12]    Civil Rights 🔗 Admissibility of evidence;
statistical evidence

The affirmative efforts of police department to recruit black officers, the changing racial composition of the recruit classes and of the force in general, and the relationship of written test of verbal skill to the training program negated any inference that the department discriminated on the basis of race notwithstanding the disproportionate impact of the test on Negro applicants. U.S.C.A.Const. Amend. 5; 5 U.S.C.A. § 3304(a); 42 U.S.C.A. § 1981; D.C.C.E. §§ 1–320, 4–103.

245 Cases that cite this headnote

[13]    Civil Rights 🔗 Judicial review and
enforcement of administrative decisions

The statutory standard of review of the Equal Employment Opportunity Act involves a more probing judicial review of, and less deference to, the seemingly reasonable acts of administrators and executives than is appropriate under the Constitution where special racial impact of written personnel test is claimed. Civil Rights Act of 1964, § 701 et seq. as amended 42 U.S.C.A. § 2000e et seq.; U.S.C.A.Const. Amends. 5, 14.

20 Cases that cite this headnote

[14]    Constitutional Law 🔗 Civil rights

Extension of a rule that a statute designed to serve neutral ends is nevertheless invalid, absent compelling justification, if in practice it benefits or burdens one race more than another, beyond those areas where the rule is already applicable by reason of statute, such as in the field of public employment, should await legislative prescription. Civil Rights Act of 1964, § 701 et seq. as amended 42 U.S.C.A. § 2000e et seq.

26 Cases that cite this headnote

[15]    Civil Rights 🔗 Educational requirements;
ability tests

Positive relationship between test of verbal skill administered applicants for employment as police officers to training course performance was sufficient to validate the test, wholly aside from its possible relationship to actual performance as a police officer. U.S.C.A.Const. Amend. 5; D.C.C.E. §§ 1–320, 4–103; 5 U.S.C.A. § 3304(a).

38 Cases that cite this headnote

[16]    Civil Rights 🔗 Educational requirements;
ability tests

District court's conclusion that test of verbal skill administered to applicants for employment as police officers was directly related to the requirements of the police training program was supported by a validation study as well as by other evidence of record. U.S.C.A.Const. Amend. 5; D.C.C.E. §§ 1–320, 4–103; 5 U.S.C.A. § 3304(a).

68 Cases that cite this headnote

**2042  Syllabus [*]

*229  Respondents Harley and Sellers, both Negroes (hereinafter respondents), whose applications to become police officers in the District of Columbia had been rejected, in an action against District of Columbia officials (petitioners) and others, claimed that the Police Department's recruiting procedures, including a written personnel test (Test 21), were racially discriminatory and violated the Due Process Clause of the Fifth Amendment, 42 U.S.C. s 1981, and D.C.Code s 1-320. Test 21 is administered generally to prospective Government employees to determine whether applicants have acquired a particular level of verbal skill. Respondents contended that the test bore no relationship to job performance and excluded a disproportionately high number of Negro applicants. Focusing solely on Test 21, the parties filed cross-motions for **2043 summary judgment. The District Court, noting the absence of any claim of

96 S.Ct. 2040, 12 Fair Empl.Prac.Cas. (BNA) 1415, 11 Empl. Prac. Dec. P 10,958...

intentional discrimination, found that respondents' evidence supporting their motion warranted the conclusions that (a) the number of black police officers, while substantial, is not proportionate to the city's population mix; (b) a higher percentage of blacks fail the test than whites; and (c) the test has not been validated to establish its reliability for measuring subsequent job performance. While that showing sufficed to shift the burden of proof to the defendants in the action, the court concluded that respondents were not entitled to relief, and granted petitioners' motion for summary judgment, in view of the facts that 44% Of new police recruits were black, a figure proportionate to the blacks on the total force and equal to the number of 20- to 29-year-old blacks in the recruiting area; that the Police Department had affirmatively sought to recruit blacks, many of whom passed the test but failed to report for duty; and that the test was a useful indicator of training school performance (precluding the need to show validation in terms of job performance) and was not designed to, and did not, discriminate against otherwise qualified blacks. Respondents on **\*230** appeal contended that their summary judgment motion (which was based solely on the contention that Test 21 invidiously discriminated against Negroes in violation of the Fifth Amendment) should have been granted. The Court of Appeals reversed, and directed summary judgment in favor of respondents, having applied to the constitutional issue the statutory standards enunciated in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158, which held that Title VII of the Civil Rights Act of 1964, as amended, prohibits the use ofests that operate to exclude members of minority groups, unless the employer demonstrates that the procedures are substantially related to job performance. The court held that the lack of discriminatory intent in the enactment and administration of Test 21 was irrelevant; that the critical fact was that four times as many blacks as whites failed the test; and that such disproportionate impact sufficed to establish a constitutional violation, absent any proof by petitioners that the test adequately measured job performance. Held:

1. The Court of Appeals erred in resolving the Fifth Amendment issue by applying standards applicable to Title VII cases. Pp. 2046-2052.

(a) Though the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the Government from invidious discrimination, it does not follow that a law or other official act is unconstitutional Solely because it has a racially disproportionate impact regardless of whether it reflects a racially discriminatory purpose. Pp. 2047-2050.

(b) The Constitution does not prevent the Government from seeking through Test 21 modestly to upgrade the communicative abilities of its employees rather than to be satisfied with some lower level of competence, particularly where the job requires special abilities to communicate orally and in writing; and respondents, as Negroes, could no more ascribe their failure to pass the test to denial of equal protection than could whites who also failed. P. 2050.

(c) The disproportionate impact of Test 21, which is neutral on its face, does not warrant the conclusion that the test was a purposely discriminatory device, and on the facts before it the District Court properly held that any inference of discrimination was unwarranted. Pp. 2050-2051.

(d) The rigorous statutory standard of Title VII involves a more probing judicial review of, and less deference to, the seemingly reasonable acts of administrators and executives than is **\*231** appropriate under the Constitution where, as in this case, special racial impact but no discriminatory purpose is claimed. Any extension of that statutory standard should await legislative prescription. Pp. 2051-2052.

2. Statutory standards similar to those obtaining under Title VII were also satisfied here. The District Court's conclusion **\*\*2044** that Test 21 was directly related to the requirements of the police training program and that a positive relationship between the test and that program was sufficient to validate the test (wholly aside from its possible relationship to actual performance as a police officer) is fully supported on the record in this case, and no remand to establish further validation is appropriate. Pp. 2052-2054.

168 U.S.App.D.C. 42, 512 F.2d 956, reversed.

## Attorneys and Law Firms

David P. Sutton, Washington, D. C., for petitioners.

Mark L. Evans, Washington, D. C., for the federal respondents.

Richard B. Sobol, Washington, D. C., for respondents Davis et al.

96 S.Ct. 2040, 12 Fair Empl.Prac.Cas. (BNA) 1415, 11 Empl. Prac. Dec. P 10,958...

**Opinion**

**\*232**  Mr. Justice WHITE delivered the opinion of the Court.

This case involves the validity of a qualifying test administered to applicants for positions as police officers in the District of Columbia Metropolitan Police Department. The test was sustained by the District Court but invalidated by the Court of Appeals. We are in agreement with the District Court and hence reverse the judgment of the Court of Appeals.

I

This action began on April 10, 1970, when two Negro police officers filed suit against the then Commissioner of the District of Columbia, the Chief of the District's Metropolitan Police Department, and the Commissioners of the United States Civil Service Commission.[1] An amended complaint, filed December 10, alleged that the promotion policies of the Department were racially discriminatory and sought a declaratory judgment and an injunction. The respondents Harley and Sellers were permitted to intervene, their amended complaint asserting **\*233** that their applications to become officers in the Department had been rejected, and that the Department's recruiting procedures discriminated on the basis of race against black applicants by a series of practices including, but not limited to, a written personnel test which excluded a disproportionately high number of Negro applicants. These practices were asserted to violate respondents' rights "under the due process clause of the Fifth Amendment to the United States Constitution, under 42 U.S.C. s 1981 and under D.C.Code s 1-320."[2] Defendants answered, and discovery **\*\*2045** and **\*234** various other proceedings followed.[3] Respondents then filed a motion for partial summary judgment with respect to the recruiting phase of the case, seeking a declaration that the test administered to those applying to become police officers is "unlawfully discriminatory and thereby in violation of the due process clause of the Fifth Amendment . . . ." No issue under any statute or regulation was raised by the motion. The District of Columbia defendants, petitioners here, and the federal parties also filed motions for summary judgment with respect to the recruiting aspects of the case, asserting that respondents were entitled to relief on neither constitutional nor statutory grounds.[4] The District Court granted petitioners' and denied respondents' motions. 348 F.Supp. 15 (DC1972).

According to the findings and conclusions of the District Court, to be accepted by the Department and to enter an intensive 17-week training program, the police recruit was required to satisfy certain physical and character standards, to be a high school graduate or its equivalent, and to receive a grade of at least 40 out of 80 on "Test 21," which is "an examination that is used generally throughout the federal service," which "was developed by the Civil Service Commission, not the Police Department," **\*235** and which was "designed to test verbal ability, vocabulary, reading and comprehension." *Id.,* at 16.

The validity of Test 21 was the sole issue before the court on the motions for summary judgment. The District Court noted that there was no claim of "an intentional discrimination or purposeful discriminatory acts" but only a claim that Test 21 bore no relationship to job performance and "has a highly discriminatory impact in screening out black candidates." Ibid. Respondents' evidence, the District Court said, warranted three conclusions: "(a) The number of black police officers, while substantial, is not proportionate to the population mix of the city. (b) A higher percentage of blacks fail the Test than whites. (c) The Test has not been validated to establish its reliability for measuring subsequent job performance." Ibid. This showing was deemed sufficient to shift the burden of proof to the defendants in the action, petitioners here; but the court nevertheless concluded that on the undisputed facts respondents were not entitled to relief. The District Court relied on several factors. Since August 1969, 44% Of new police force recruits had been black; that figure also represented the proportion of blacks on the total force and was roughly equivalent to 20- to 29-year-old blacks in the 50-mile radius in which the recruiting efforts of the Police Department had been concentrated. It was undisputed that the Department had systematically and affirmatively sought to enroll black officers many of whom passed the test but failed to report for duty. The District Court rejected the assertion that Test 21 was culturally slanted to favor whites and was "satisfied that the undisputable facts prove the test to be reasonably and directly related to the requirements of the police recruit training program and that it is neither so designed nor operates (Sic ) to discriminate **\*236** against otherwise qualified blacks' Id., at 17. It was thus not necessary to show that Test 21 was not only a useful indicator of training school performance but also been validated in terms of job performance "The lack of job performance validation does not defeat the Test, given its direct relationship **\*\*2046** to recruiting and the valid part it plays in this process." Ibid. The District Court ultimately concluded that "(t)he proof is

AR.06805

96 S.Ct. 2040, 12 Fair Empl.Prac.Cas. (BNA) 1415, 11 Empl. Prac. Dec. P 10,958...

wholly lacking that a police officer qualifies on the color of his skin rather than ability" and that the Department "should not be required on this showing to lower standards or to abandon efforts to achieve excellence."[5] Id., at 18.

Having lost on both constitutional and statutory issues in the District Court, respondents brought the case to the Court of Appeals claiming that their summary judgment motion, which rested on purely constitutional grounds, should have been granted. The tendered constitutional issue was whether the use of Test 21 invidiously discriminated against Negroes and hence denied them due process of law contrary to the commands of the Fifth Amendment. The Court of Appeals, addressing that issue, announced that it would be guided by Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), a case involving the interpretation and application of Title VII of the Civil Rights Act of 1964, and held that the statutory standards elucidated in that case were to govern the due process question tendered in this one.[6] 168 U.S.App.D.C. 42, 512 F.2d 956 (1975). *237 The court went on to declare that lack of discriminatory intent in designing and administering Test 21 was irrelevant; the critical fact was rather that a far greater proportion of blacks four times as many failed the test than did whites. This disproportionate impact, standing alone and without regard to whether it indicated a discriminatory purpose, was held sufficient to establish a constitutional violation, absent proof by petitioners that the test was an adequate measure of job performance in addition to being an indicator of probable success in the training program, a burden which the court ruled petitioners had failed to discharge. That the Department had made substantial efforts to recruit blacks was held beside the point and the fact that the racial distribution of recent hirings and of the Department itself might be roughly equivalent to the racial makeup of the surrounding community, broadly conceived, was put aside as a "comparison (not) material to this appeal." Id., at 46 n. 24, 512 F.2d, at 960 n. 24. The Court of Appeals, over a dissent, accordingly reversed the judgment of the District Court and directed that respondents' motion for partial summary judgment be granted. We granted the petition for certiorari, 423 U.S. 820, 96 S.Ct. 33, 46 L.Ed.2d 37 (1975), filed by the District of Columbia officials.[7]

**\*238** II

[1]    Because the Court of Appeals erroneously applied the legal standards applicable to Title VII cases in resolving the constitutional issue before it, we reverse its judgment in respondents' favor. Although the petition for certiorari did not present this ground for reversal,[8] our Rule 40(1)(d)(2) provides that we "may notice a **\*\*2047** plain error not presented";[9] and this is an appropriate occasion to invoke the Rule.

[2]    As the Court of Appeals understood Title VII,[10] employees or applicants proceeding under it need not concern themselves with the employer's possibly discriminatory purpose but instead may focus solely on the racially differential impact of the challenged hiring or promotion *239 practices. This is not the constitutional rule. We have never held that the constitutional standard for adjudicating claims of invidious racial discrimination is identical to the standards applicable under Title VII, and we decline to do so today.

[3]    [4]    The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race. It is also true that the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). But our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional Solely because it has a racially disproportionate impact.

Almost 100 years ago, Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1880), established that the exclusion of Negroes from grand and petit juries in criminal proceedings violated the Equal Protection Clause, but the fact that a particular jury or a series of juries does not statistically reflect the racial composition of the community does not in itself make out an invidious discrimination forbidden by the Clause. "A purpose to discriminate must be present which may be proven by systematic exclusion of eligible jurymen of the proscribed race or by unequal application of the law to such an extent as to show intentional discrimination." Akins v. Texas, 325 U.S. 398, 403-404, 65 S.Ct. 1276, 1279, 89 L.Ed. 1692, 1696 (1945). A defendant in a criminal case is entitled "to require that the State not deliberately and systematically deny to members of his race the right to participate as jurors

96 S.Ct. 2040, 12 Fair Empl.Prac.Cas. (BNA) 1415, 11 Empl. Prac. Dec. P 10,958...

in the administration of justice." Alexander v. Louisiana, 405 U.S. 625, 628-629, 92 S.Ct. 1221, 1224, 31 L.Ed.2d 536 (1972). See also Carter v. Jury Comm'n, 396 U.S. 320, 335-337, 339, 90 S.Ct. 5, 526-528, 529, 24 L.Ed.2d 549, 560-561, 562 (1970); Cassell v. Texas, 339 U.S. 282, 287-290, 70 S.Ct. 629, 631-633, 94 L.Ed. 839, 847-849 (1950); Patton v. Mississippi, 332 U.S. 463, 468-469, 68 S.Ct. 184, 187, 92 L.Ed. 76, 80 (1947).

**\*240** The rule is the same in other contexts. Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964), upheld a New York congressional apportionment statute against claims that district lines had been racially gerrymandered. The challenged districts were made up predominantly of whites or of minority races, and their **\*\*2048** boundaries were irregularly drawn. The challengers did not prevail because they failed to prove that the New York Legislature "was either motivated by racial considerations or in fact drew the districts on racial lines"; the plaintiffs had not shown that the statute "was the product of a state contrivance to segregate on the basis of race or place of origin." Id., at 56, 58, 84 S.Ct., at 605, 11 L.Ed.2d, at 515. The dissenters were in agreement that the issue was whether the "boundaries . . . were purposefully drawn on racial lines." Id., at 67, 84 S.Ct., at 611, 11 L.Ed.2d, at 522.

The school desegregation cases have also adhered to the basic equal protection principle that the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose. That there are both predominantly black and predominantly white schools in a community is not alone violative of the Equal Protection Clause. The essential element of De jure segregation is "a current condition of segregation resulting from intentional state action. Keyes v. School Dist. No. 1, 413 U.S. 189, 205, 93 S.Ct. 2686, 2696, 37 L.Ed.2d 548 (1973). The differentiating factor between De jure segregation and so-called De facto segregation . . . is Purpose or Intent to segregate." Id., at 208, 93 S.Ct., at 2696, 37 L.Ed.2d, at 561. See also Id., at 199, 211, 213, 93 S.Ct. at 2692, 2698, 2699, 37 L.Ed.2d, at 558, 564, 566. The Court has also recently rejected allegations of racial discrimination based solely on the statistically disproportionate racial impact of various provisions of the Social Security Act because "(t)he acceptance of appellants' **\*241** constitutional theory would render suspect each difference in treatment among the grant classes, however lacking in racial motivation and however otherwise rational the treatment might be." *Jefferson v. Hackney,* 406 U.S. 535, 548, 92 S.Ct. 1724, 1732, 32 L.Ed.2d 285, 297 (1972). And compare Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), with James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971).

**[5]** This is not to say that the necessary discriminatory racial purpose must be express or appear on the face of the statute, or that a law's disproportionate impact is irrelevant in cases involving Constitution-based claims of racial discrimination. A statute, otherwise neutral on its face, must not be applied so as invidiously to discriminate on the basis of race. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). It is also clear from the cases dealing with racial discrimination in the selection of juries that the systematic exclusion of Negroes is itself such an "unequal application of the law . . . as to show intentional discrimination." Akins v. Texas, supra, 325 U.S., at 404, 65 S.Ct., at 1279, 89 L.Ed., at 1696. Smith v. Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940); Pierre v. Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757 (1939); Neal v. Delaware, 103 U.S. 370, 26 L.Ed. 567 (1881). A prima facie case of discriminatory purpose may be proved as well by the absence of Negroes on a particular jury combined with the failure of the jury commissioners to be informed of eligible Negro jurors in a community, Hill v. Texas, 316 U.S. 400, 404, 62 S.Ct. 1159, 1161, 86 L.Ed. 1559, 1562 (1942), or with racially non-neutral selection procedures, Alexander v. Louisiana, supra ; Avery v. Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953); Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967). With a prima facie case made out, "the burden of proof shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result." Alexander, supra, 405 U.S., at 632, 92 S.Ct., at 1226, 31 L.Ed.2d, at 542. See also Turner v. Fouche, 396 U.S. 346, 361, 90 S.Ct. 532, 540, 24 L.Ed.2d 567, 579 (1970); Eubanks v. Louisiana, 356 U.S. 584, 587, 78 S.Ct. 970, 973, 2 L.Ed.2d 991, 994 (1958).

Washington v. Davis, 426 U.S. 229 (1976)

Case 3:20-cv-07721-SI   Document 58-6   Filed 11/10/20   Page 312 of 912

96 S.Ct. 2040, 12 Fair Empl.Prac.Cas. (BNA) 1415, 11 Empl. Prac. Dec. P 10,958...

**[6]** **[7]** **\*242** Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including **\*\*2049** the fact, if it is true, that the law bears more heavily on one race than another. It is also not infrequently true that the discriminatory impact in the jury cases for example, the total or seriously disproportionate exclusion of Negroes from jury venires may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds. Nevertheless, we have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution.

Standing alone, it does not trigger the rule, McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964), that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations.

There are some indications to the contrary in our cases. In Palmer v. Thompson, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), the city of Jackson, Miss., following a court decree to this effect, desegregated all of its public facilities save five swimming pools which had been operated by the city and which, following the decree, were closed by ordinance pursuant to a determination by the city council that closure was necessary to preserve peace and order and that integrated pools could not be economically operated. Accepting the finding that the pools were closed to avoid violence and economic loss, this Court rejected the argument that the abandonment of this service was inconsistent with the outstanding desegregation decree and that the otherwise seemingly permissible ends served by the ordinance could be impeached by demonstrating that **\*243** racially invidious motivations had prompted the city council's action. The holding was that the city was not overtly or covertly operating segregated pools and was extending identical treatment to both whites and Negroes. The opinion warned against grounding decision on legislative purpose or motivation, thereby lending support for the proposition that the operative effect of the law rather than its purpose is the paramount factor. But the holding of the case was that the legitimate purposes of the ordinance to preserve peace and avoid deficits were not open to impeachment by evidence that the councilmen were actually motivated by racial considerations.

Whatever dicta the opinion may contain, the decision did not involve, much less invalidate, a statute or ordinance having neutral purposes but disproportionate racial consequences.

**[8]** Wright v. Council of City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972), also indicates that in proper circumstances, the racial impact of a law, rather than its discriminatory purpose, is the critical factor. That case involved the division of a school district. The issue was whether the division was consistent with an outstanding order of a federal court to desegregate the dual school system found to have existed in the area. The constitutional predicate for the District Court's invalidation of the divided district was "the enforcement until 1969 of racial segregation in a public school system of which Emporia had always been a part." Id., at 459, 92 S.Ct., at 2202, 33 L.Ed.2d, at 60. There was thus no need to find "an independent constitutional violation." Ibid. Citing Palmer v. Thompson, we agreed with the District Court that the division of the district had the effect of interfering with the federal decree and should be set aside.

That neither Palmer Nor Wright was understood to have changed the prevailing rule is apparent from Keyes v. School Dist. No. 1, supra, where the principal issue **\*244** in litigation was whether to what extent there had been purposeful discrimination resulting in a partially or wholly segregated school system. Nor did other later cases, Alexander v. Louisiana, supra, and Jefferson v. Hackney, supra, indicate that either **\*\*2050** Palmer or Wright had worked a fundamental change in equal protection law. [11]

Both before and after Palmer v. Thompson, however, various Courts of Appeals have held in several contexts, including public employment, that the substantially disproportionate racial impact of a statute or official practice standing alone and without regard to discriminatory purpose, suffices to prove racial discrimination violating the Equal Protection Clause absent some justification going substantially beyond what would be necessary to validate most other legislative classifications. [12] The **\*245** cases impressively demonstrate that there is another side to the issue; but, with all due respect, to the extent that those cases rested on or expressed the view that proof of discriminatory racial purpose is unnecessary in making out an equal protection violation, we are in disagreement.

**[9]** **[10]** As an initial matter, we have difficulty understanding how a law establishing a racially neutral qualification for employment is nevertheless racially discriminatory and denies "any person . . . equal protection

96 S.Ct. 2040, 12 Fair Empl.Prac.Cas. (BNA) 1415, 11 Empl. Prac. Dec. P 10,958...

of the laws" simply because a greater proportion of Negroes fail to qualify than members of other racial or ethnic groups. Had respondents, along with all others who had failed Test 21, whether white or black, brought an action claiming that the test denied each of them equal protection of the laws as compared with those who had passed with high enough scores to qualify them as police recruits, it is most unlikely that their challenge would have been sustained. Test 21, which is administered generally to prospective Government employees, concededly seeks to ascertain whether those who take it have acquired a particular level of verbal skill; and it is untenable that *246 the Constitution prevents the Government from seeking modestly to upgrade the communicative abilities of its employees rather than to be satisfied with some lower level of competence, particularly where the job requires special ability to communicate orally and in writing. Respondents, as Negroes, could no more successfully claim that the test denied them equal protection than could white applicants who also failed. The conclusion would not be different in the face of proof that more Negroes than whites had been **2051 disqualified by Test 21. That other Negroes also failed to score well would, alone, not demonstrate that respondents individually were being denied equal protection of the laws by the application of an otherwise valid qualifying test being administered to prospective police recruits.

 [11]  [12]  Nor on the facts of the case before us would the disproportionate impact of Test 21 warrant the conclusion that it is a purposeful device to discriminate against Negroes and hence an infringement of the constitutional rights of respondents as well as other black applicants. As we have said, the test is neutral on its face and rationally may be said to serve a purpose the Government is constitutionally empowered to pursue. Even agreeing with the District Court that the differential racial effect of Test 21 called for further inquiry, we think the District Court correctly held that the affirmative efforts of the Metropolitan Police Department to recruit black officers, the changing racial composition of the recruit classes and of the force in general, and the relationship of the test to the training program negated any inference that the Department discriminated on the basis of race or that "a police officer qualifies on the color of his skin rather than ability." 🚩 348 F.Supp., at 18.

 [13]  Under Title VII, Congress provided that when hiring *247 and promotion practices disqualifying substantially disproportionate numbers of blacks are challenged, discriminatory purpose need not be proved, and that it is

an insufficient response to demonstrate some rational basis for the challenged practices. It is necessary, in addition, that they be "validated" in terms of job performance in any one of several ways, perhaps by ascertaining the minimum skill, ability, or potential necessary for the position at issue and determining whether the qualifying tests are appropriate for the selection of qualified applicants for the job in question. [13]  However this process proceeds, it involves a more probing judicial review of, and less deference to, the seemingly reasonable acts of administrators and executives than is appropriate under the Constitution where special racial impact, without discriminatory purpose, is claimed. We are not disposed to adopt this more rigorous standard for the purposes *248 of applying the Fifth and the Fourteenth Amendments in cases such as this

A rule that a statute designed to serve neutral ends is nevertheless invalid, absent compelling justification, if in practice it benefits or burdens one race more than another would be far-reaching and would raise serious questions about, and perhaps invalidate, a whole range of tax, welfare, public service, regulatory, and licensing statutes that may be more burdensome to the poor and to the average black than to the more affluent white. [14]

**2052 [14]  Given that rule, such consequences would perhaps be likely to follow. However, in our view, extension of the rule beyond those areas where it is already applicable by reason of statute, such as in the field of public employment, should await legislative prescription.

As we have indicated, it was error to direct summary judgment for respondents based on the Fifth Amendment.

III

We also hold that the Court of Appeals should have affirmed the judgment of the District Court granting the motions for summary judgment filed by petitioners and the federal parties. Respondents were entitled to relief on neither constitutional nor statutory grounds.

 *249  The submission of the defendants in the District Court was that Test 21 complied with all applicable statutory as well as constitutional requirements; and they appear not to have disputed that under the statutes and regulations governing their conduct standards similar to those obtaining under Title VII had to be satisfied. [15]  The District Court also assumed

96 S.Ct. 2040, 12 Fair Empl.Prac.Cas. (BNA) 1415, 11 Empl. Prac. Dec. P 10,958...

that Title VII standards were to control the case identified the determinative issue as whether Test 21 was sufficiently job related and proceeded to uphold use of the test because it was "directly related to a determination of whether the applicant possesses sufficient skills requisite to the demands of the curriculum a recruit must master at the police academy."

🚩 348 F.Supp., at 17. The Court of Appeals reversed because the relationship between Test 21 and training school success, if demonstrated at all, did not satisfy what it deemed to be the crucial requirement **\*250** of a direct relationship between performance on Test 21 and performance on the policeman's job.

 **[15]**   We agree with petitioners and the federal parties that this was error. The advisability of the police recruit training course informing the recruit about his upcoming job, acquainting him with its demands, and attempting to impart a modicum of required skills seems conceded. It is also apparent to us, as it was to the District Judge, that some minimum verbal and communicative skill would be very useful, if not essential, to satisfactory progress in the training regimen. Based on the evidence before him, the District Judge concluded that Test 21 was directly related to the requirements of the police training program and that a positive relationship between the test and training-course performance was sufficient to validate the former, wholly aside from its possible relationship to actual performance as a police officer. This conclusion of the District Judge that training-program validation may itself be sufficient is supported by regulations of the Civil Service Commission, by the opinion evidence **\*\*2053** placed before the District Judge, and by the current views of the Civil Service Commissioners who were parties to the case. [16] Nor is the **\*251** conclusion closed by either Griggs or 📙 Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); and it seems to us the much more sensible construction of the job-relatedness requirement.

 **[16]**   The District Court's accompanying conclusion that Test 21 was in fact directly related to the requirements of the police training program was supported by a validation study, as well as by other evidence of record; [17] **\*252** and we are not convinced that this conclusion was erroneous.

The federal parties, whose views have somewhat changed since the decision of the Court of Appeals and who still insist that training-program validation is sufficient, now urge a remand to the District Court for the purpose of further

inquiry into whether the training-program test scores, which were found to correlate with Test 21 scores, are themselves an appropriate measure of the trainee's mastership of the material taught in the course and whether the training program itself is sufficiently related to actual performance of the police officer's task. We think a remand is inappropriate. The District Court's judgment was warranted by the record before it, and we perceive no good reason to reopen it, particularly since we were informed at oral argument that although Test 21 is still being administered, the training program itself has undergone substantial modification in the course of this litigation. If there are now deficiencies in the recruiting practices under prevailing Title VII standards, those deficiencies are to be directly addressed in accordance with appropriate procedures mandated under that Title.

The judgment of the Court of Appeals accordingly is reversed.

So ordered.

Mr. Justice STEWART joins Parts I and II of the Court's opinion.

 **\*\*2054**  Mr. Justice STEVENS, concurring.

While I agree with the Court's disposition of this case, I add these comments on the constitutional issue discussed **\*253** in Part II and the statutory issue discussed in Part III of the Court's opinion.

The requirement of purposeful discrimination is a common thread running through the cases summarized in Part II. These cases include criminal convictions which were set aside because blacks were excluded from the grand jury, a reapportionment case in which political boundaries were obviously influenced to some extent by racial considerations, a school desegregation case, and a case involving the unequal administration of an ordinance purporting to prohibit the operation of laundries in frame buildings. Although it may be proper to use the same language to describe the constitutional claim in each of these contexts, the burden of proving a prima facie case may well involve differing evidentiary considerations. The extent of deference that one pays to the trial court's determination of the factual issue, and indeed, the extent to which one characterizes the intent issue as a question of fact or a question of law, will vary in different contexts.

Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor.

Washington v. Davis, 426 U.S. 229 (1976)

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 315 of 912

96 S.Ct. 2040, 12 Fair Empl.Prac.Cas. (BNA) 1415, 11 Empl. Prac. Dec. P 10,958...

For normally the actor is presumed to have intended the natural consequences of his deeds. This is particularly true in the case of governmental action which is frequently the product of compromise, of collective decisionmaking, and of mixed motivation. It is unrealistic, on the one hand, to require the victim of alleged discrimination to uncover the actual subjective intent of the decisionmaker or, conversely, to invalidate otherwise legitimate action simply because an improper motive affected the deliberation of a participant in the decisional process. A law conscripting clerics should not be invalidated because an atheist voted for it.

 *254  My point in making this observation is to suggest that the line between discriminatory purpose and discriminatory impact is not nearly as bright, and perhaps not quite as critical, as the reader of the Court's opinion might assume. I agree, of course, that a constitutional issue does not arise every time some disproportionate impact is shown. On the other hand, when the disproportion is as dramatic as in Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 or Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), it really does not matter whether the standard is phrased in terms of purpose or effect. Therefore, although I accept the statement of the general rule in the Court's opinion, I am not yet prepared to indicate how that standard should be applied in the many cases which have formulated the governing standard in different language. *

My agreement with the conclusion reached in Part II of the Court's opinion rests on a ground narrower than the Court describes. I do not rely at all on the evidence of good-faith efforts to recruit black police officers. In my judgment, neither those efforts nor the subjective good faith of the District administration, would save Test 21 if it were otherwise invalid.

There are two reasons why I am convinced that the challenge to Test 21 is insufficient. First, the test serves the neutral and legitimate purpose of requiring all applicants to meet a uniform minimum standard of literacy. Reading ability is manifestly relevant to the police function, there is no evidence that the required passing grade was set at an arbitrarily high level, and there is sufficient disparity among high schools and high school graduates to justify the use of a separate uniform test. Second,  *255  the same test is used throughout the federal service. The applicants for employment in the District of  **2055  Columbia Police Department represent such a small fraction of the total number of persons who have taken the test that their experience is of minimal probative

value in assessing the neutrality of the test itself. That evidence, without more, is not sufficient to overcome the presumption that a test which is this widely used by the Federal Government is in fact neutral in its effect as well as its "purposes" that term is used in constitutional adjudication.

My study of the statutory issue leads me to the same conclusion reached by the Court in Part III of its opinion. Since the Court of Appeals set aside the portion of the District Court's summary judgment granting the defendants' motion, I agree that we cannot ignore the statutory claims even though as the Court makes clear, Ante, at 238 n.10, there is no Title VII question in this case. The actual statutory holdings are limited to 42 U.S.C. s 1981 and s 1-320 of the District of Columbia Code, to which regulations of the Equal Employment Opportunity Commission have no direct application.

The parties argued the case as though Title VII standards were applicable. In a general way those standards shed light on the issues, but there is sufficient individuality and complexity to that statute, and to the regulations promulgated under it, to make it inappropriate simply to transplant those standards in their entirety into a different statutory scheme having a different history. Moreover, the subject matter of this case the validity of qualifications for the law enforcement profession is one in which federal district judges have a greater expertise than in many others. I therefore do not regard this as a case in which the District Court was required to apply Title VII standards as strictly as would  *256  be necessary either in other contexts or in litigation actually arising under that statute.

The Court's specific holding on the job-relatedness question contains, I believe, two components. First, as a matter of law, it is permissible for the police department to use a test for the purpose of predicting ability to master a training program even if the test does not otherwise predict ability to perform on the job. I regard this as a reasonable proposition and not inconsistent with the Court's prior holdings, although some of its prior language obviously did not contemplate this precise problem. Second, as a matter of fact, the District Court's finding that there was a correlation between success on the test and success in the training program has sufficient evidentiary support to withstand attack under the "clearly erroneous" standard mandated by Fed.Rule Civ.Proc. 52(a). Whether or not we would have made the same finding of fact, the opinion evidence identified in n. 17 of the Court's opinion and indeed the assumption made by the Court of Appeals quoted therein

96 S.Ct. 2040, 12 Fair Empl.Prac.Cas. (BNA) 1415, 11 Empl. Prac. Dec. P 10,958...

is surely adequate to support the finding under the proper standard of appellate review.

On the understanding that nothing which I have said is inconsistent with the Court's reasoning, I join the opinion of the Court except to the extent that it expresses an opinion on the merits of the cases cited Ante, at 2050, n. 12.

Mr. Justice BRENNAN, with whom Mr. Justice MARSHALL joins, dissenting.

The Court holds that the job qualification examination (Test 21) given by the District of Columbia Metropolitan Police Department does not unlawfully discriminate on the basis of race under either constitutional or statutory standards.

 **\*257**  Initially, it seems to me that the Court should not pass on the statutory questions, because they are not presented by this case. The Court says that respondents' summary judgment motion "rested on purely constitutional grounds," Ante, at 2046, and that "the Court of Appeals erroneously applied the legal standards applicable to Title VII cases in resolving the constitutional issue before it," Ante, at 2046. There is a suggestion, however, that petitioners are entitled to prevail because they met the burden of proof imposed by 5 U.S.C. s 3304. Ante, at 2052 n. 15. As I understand the opinion, **\*\*2056**  the Court therefore holds that Test 21 is job-related under s 3304, but not necessarily under Title VII. But that provision, by the Court's own analysis, is no more in the case than Title VII; respondents' "complaint asserted no claim under s 3304." Ante, at 2045 n. 2. Cf. Ante, at 2046-2047 n. 10. If it was "plain error" for the Court of Appeals to apply a statutory standard to this case, as the Court asserts, Ante, at 2046-2047, then it is unfortunate that the Court does not recognize that it is also plain error to address the statutory issues in Part III of its opinion.

Nevertheless, although it appears unnecessary to reach the statutory questions, I will accept the Court's conclusion that respondents were entitled to summary judgment if they were correct in their statutory arguments, and I would affirm the Court of Appeals because petitioners have failed to prove that Test 21 satisfies the applicable statutory standards. [1]  All parties' arguments and **\*258**  both lower court decisions were based on Title VII standards. In this context, I think it wrong to focus on s 3304 to the exclusion of the Title VII standards, particularly because the Civil Service Commission views the

job-relatedness standards of Title VII and s 3304 as identical. [2]  See also Infra, at 2058-2059.

In applying a Title VII test, [3]  both the District Court and the Court of Appeals held that respondents had offered sufficient evidence of discriminatory impact to shift to petitioners the burden of proving job relatedness. 348 F.Supp. 15, 16; 168 U.S.App.D.C. 42, 45-47, 512 F.2d 956, 959-961. The Court does not question these rulings, and the only issue before us is what petitioners were required to show and whether they carried their burden. The Court agrees with the District Court's conclusion that Test 21 was validated by a positive relationship between Test 21 scores and performance in police training courses. This result is based upon the Court's reading of the record, its interpretation of instructions **\*259**  governing testing practices issued by the Civil Service Commission (CSC), and "the current views of the Civil Service Commissioners who were parties to the case." We are also assured that today's result is not foreclosed by *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Finally, the Court asserts that its conclusion is "the much more sensible construction of the job relatedness requirement." *Ante,* at 2053.

But the CSC instructions cited by the Court do not support the District Court's conclusion. More importantly, the brief filed in this Court by the CSC takes the position that petitioners did not satisfy the burden of proof imposed by the CSC guidelines. It also appears that longstanding regulations of the Equal Employment Opportunity Commission (EEOC) previously **\*\*2057**  endorsed by this Court require a result contrary to that reached by the Court. Furthermore, the Court's conclusion is inconsistent with my understanding of the interpretation of Title VII in Griggs and Albemarle. I do not find this conclusion "much more sensible" and with all respect I suggest that today's decision has the potential of significantly weakening statutory safeguards against discrimination in employment.

I

On October 12, 1972, the CSC issued a supplement to the Federal Personnel Manual containing instructions for compliance with its general regulations concerning

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Washington v. Davis, 426 U.S. 229 (1976)

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 317 of 912

96 S.Ct. 2040, 12 Fair Empl.Prac.Cas. (BNA) 1415, 11 Empl. Prac. Dec. P 10,958...

employment practices.[4] The provision cited by the Court *260 requires that Test 21 "have a demonstrable and rational relationship to important job-related performance objectives identified by management." "Success in training" is one example of a possible objective. The statistical correlation established by the Futransky validity study, Ante, at 2053 n. 17, was between applicants' scores on Test 21 and recruits' average scores on final examinations given during the police training course.

It is hornbook law that the Court accord deference to the construction of an administrative regulation when that construction is made by the administrative authority responsible for the regulation. E. g., Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965). It is worthy of note, therefore, that the brief filed by the CSC in this case interprets the instructions in a manner directly contrary to the Court, despite the Court's claim that its result is supported by the Commissioners' "current views."

"Under Civil Service Commission regulations and current professional standards governing criterion-related test validation procedures, the job-relatedness of an entrance examination may be demonstrated by proof that scores on the examination predict properly measured success in job-relevant training (regardless of whether they predict success on the job itself).

"The documentary evidence submitted in the district court demonstrates that scores on Test 21 are predictive of Recruit School Final Averages. There *262 is little evidence, however, concerning the relationship between the Recruit School tests and the substance of the training program, and between the substance of the training program and the post-training job of a police officer. It cannot be determined, therefore, whether the Recruit School Final Averages are a proper measure of success in training and whether the training program is job-relevant." Brief for CSC 14-15 (emphasis added).

The CSC maintains that a positive correlation between scores on entrance examinations and the criterion of success in training may establish the job relatedness of an entrance test thus relieving an employer from the burden of providing a relationship to job performance after training but only subject to certain limitations.

"Proof that scores on an entrance examination predict scores on training school achievement tests, however, does not, by itself, satisfy the burden of demonstrating the job-relatedness

of the entrance examination. There must also be evidence the nature of which will depend on the particular circumstances of the case showing that the achievement test scores are an appropriate measure of **2058 the trainee's mastery of the material taught in the training program and that the training program imparts to a new employee knowledge, skills, or abilities required for performance of the post-training job." Id., at 24-25.

Applying its standards[5] the CSC concludes that none of the evidence presented in the District Court established "the appropriateness of using Recruit School Final Averages as the measure of training performance or the relationship of the Recruit School program to the job of a police officer." Id., at 30.[6]

The CSC's standards thus recognize that Test 21 can be validated by a correlation between Test 21 scores and recruits' averages on training examinations only if (1) the training averages predict job performance or (2) the averages are proved to measure performance in job-related training. There is no proof that the recruits' average is correlated with job performance after completion of training. See n. 10, Infra. And although a positive relationship to the recruits' average might be sufficient to validate Test 21 if the average were proved to reflect mastery of material on the training curriculum that was in turn demonstrated to be relevant to job performance, the record is devoid of proof in this regard. First, there is no demonstration by petitioners that the training-course examinations measure comprehension of the training curriculum; indeed, these examinations do not even appear in the record. Furthermore, the Futransky study simply designated an average of 85 on the *263 examination as a "good" performance and assumed that a recruit with such an average learned the material taught in the training course.[7] Without any further proof of the significance of a score of 85, and there is none in the record, I cannot agree that Test 21 is predictive of "success in training."

II

Today's decision is also at odds with EEOC regulations issued pursuant to explicit authorization in Title VII, 42 U.S.C. s 2000e-12(a). Although the dispute in this case is not within the EEOC's jurisdiction, as I noted above, the proper construction of Title VII nevertheless is relevant. Moreover, the 1972 extension of Title VII to public

96 S.Ct. 2040, 12 Fair Empl.Prac.Cas. (BNA) 1415, 11 Empl. Prac. Dec. P 10,958...

employees gave the same substantive protection to those employees as had previously been accorded in the private sector, Morton v. Mancari, 417 U.S. 535, 546-547, 94 S.Ct. 2474, 2480-2481, 41 L.Ed.2d 290, 298-299 (1974), and it is therefore improper to maintain different standards in the public and private sectors. Chandler v. Roudebush, 425 U.S. 840, 864, 96 S.Ct. 1949, 1961, 48 L.Ed.2d 416, 433 (1976). See n. 2, Supra.

As with an agency's regulations, the construction of a statute by the agency charged with its administration is entitled **\*\*2059** to great deference. Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 210, 93 S.Ct. 364, 367, 34 L.Ed.2d 415, 419 (1972); Udall v. Tallman, 380 U.S., at 16, 85 S.Ct., at 801, 13 L.Ed.2d, at 625; Power Reactor Co. v. Electricians, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924, 932 (1961). The deference **\*264** due the pertinent EEOC regulations is enhanced by the fact that they were neither altered nor disapproved when Congress extensively amended Title VII in 1972. [8] Chemehuevi Tribe of Indians v. FPC, 420 U.S. 395, 410, 95 S.Ct. 1066, 1075, 43 L.Ed.2d 279, 290 (1975); Cammarano v. United States, 358 U.S. 498, 510, 79 S.Ct. 524, 531, 3 L.Ed.2d 462, 470 (1959); Allen v. Grand Central Aircraft Co., 347 U.S. 535, 547, 74 S.Ct. 745, 752, 98 L.Ed. 933, 943 (1954); Massachusetts Mut. Life Ins. Co. v. United States, 288 U.S. 269, 273, 53 S.Ct. 337, 339, 77 L.Ed. 739, 742 (1933). These principles were followed in Albemarle where the Court explicitly endorsed various regulations no fewer than eight times in its opinion, 422 U.S., at 431-436, 95 S.Ct., at 2378-2381, 45 L.Ed.2d, at 304-307 [9] and Griggs, 401 U.S., at 433-434, 91 S.Ct., at 854-855, 28 L.Ed.2d, at 165-166.

The EEOC regulations require that the validity of a job qualification test be proved by "empirical data demonstrating that the test is predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated." 29 CFR s 1607.4(c) (1975). This construction of Title VII was approved in Albemarle, where we quoted this provision and remarked that "(t)he message of these Guidelines is the same as that of the Griggs case." 422 U.S., at 431, 95 S.Ct., at 2378, 45 L.Ed.2d, at 304. The regulations also set forth minimum standards for **\*265**

validation and delineate the criteria that may be used for this purpose.

"The work behaviors or other criteria of employee adequacy which the test is intended to predict or identify must be fully described; and, additionally, in the case of rating techniques, the appraisal form(s) and instructions to the rater(s) must be included as a part of the validation evidence. Such criteria may include measures other than actual work proficiency, such as training time, supervisory ratings, regularity of attendance and other work behaviors. Whatever criteria are used they must represent major or critical work behaviors as revealed by careful job analyses." 29 CFR s 1607.5(b)(3) (1975).

This provision was also approved in Albemarle, 422 U.S., at 432, 95 S.Ct., at 2379, 45 L.Ed.2d, at 304, and n. 30.

If we measure the validity of Test 21 by this standard, which I submit we are bound to do, petitioners' proof is deficient in a number of ways similar to those noted above. First, the criterion of final training examination averages does not appear to be "fully described." Although the record contains some general discussion of the training curriculum, the examinations are not in the record, and there is no other evidence completely elucidating the subject matter tested by the training examinations. Without this required description we cannot determine whether the correlation with training examination averages is sufficiently related to petitioners' need to ascertain "job-specific ability." See Albemarle, 422 U.S., at 433, 95 S.Ct., at 2379, 45 L.Ed.2d, at 305. Second, the EEOC regulations do not expressly permit validation by correlation to training performance, unlike the CSC instructions. **\*\*2060** Among the specified criteria the closest to training performance is "training time." All recruits to the Metropolitan Police Department, however, go through the **\*266** same training course in the same amount of time, including those who experience some difficulty. See n. 7, *supra*. Third, the final requirement of s 1607.5(b)(3) has not been met. There has been no job analysis establishing the significance of scores on training examinations, nor is there any other type of evidence showing that these scores are of 'major or critical " importance.

Accordingly, EEOC regulations that have previously been approved by the Court set forth a construction of Title VII that is distinctly opposed to today's statutory result.

III

Washington v. Davis, 426 U.S. 229 (1976)

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 319 of 912

96 S.Ct. 2040, 12 Fair Empl.Prac.Cas. (BNA) 1415, 11 Empl. Prac. Dec. P 10,958...

The Court also says that its conclusion is not foreclosed by Griggs and Albemarle, but today's result plainly conflicts with those cases. Griggs held that "(i)f an employment practice which operates to exclude Negroes cannot be shown to be Related to job performance, the practice is prohibited." 401 U.S., at 431, 91 S.Ct., at 853, 28 L.Ed.2d, at 164 (emphasis added). Once a discriminatory impact is shown, the employer carries the burden of proving that the challenged practice "bear(s) a Demonstrable relationship to successful performance of the jobs for which it was used." Ibid. (emphasis added). We observed further:

"Nothing in the Act precludes the use of testing or measuring procedures; obviously they are useful. What Congress has forbidden is giving these devices and mechanisms controlling force unless they are demonstrably a reasonable measure of job performance. . . . What Congress has commanded is that any tests used must measure the person for the job and not the person in the abstract." Id., at 436, 91 S.Ct., at 856, 28 L.Ed.2d, at 167.

Albemarle read Griggs to require that a discriminatory test be validated through proof "by professionally acceptable methods" that it is " 'predictive of or significantly *267 correlated with *important* elements of work behavior *which comprise or are relevant to the job or jobs* for which candidates are being evaluated.' " 422 U.S., at 431, 95 S.Ct., at 2378, 45 L.Ed.2d, at 304 (emphasis added), quoting 29 CFR s 1607.4(c) (1975). Further, we rejected the employer's attempt to validate a written test by proving that it was related to supervisors' job performance ratings, because there was no demonstration that the ratings accurately reflected job performance. We were unable "to determine whether the criteria Actually considered were sufficiently related to the (employer's) legitimate interest in job-specific ability to justify a testing system with a racially discriminatory impact." 422 U.S., at 433, 95 S.Ct., at 2379, 45 L.Ed.2d, at 305 (emphasis in original). To me, therefore, these cases read Title VII as requiring proof of a significant relationship to job performance to establish the validity of a discriminatory test. See also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 678 and n. 14 (1973). Petitioners do not maintain that there is a demonstrated correlation between Test 21 scores and job performance. Moreover, their validity study was unable to discern a significant positive relationship between training

averages and job performance. [10] Thus, there is no proof of a correlation either direct or indirect between Test 21 and performance of the job of being a police officer.

It may well be that in some circumstances, proof of a relationship between a discriminatory qualification test and training **2061 performance is an acceptable substitute for establishing a relationship to job performance. But this question is not settled, and it should not be resolved *268 by the minimal analysis in the Court's opinion. [11] Moreover, it is particularly inappropriate to decide the question on this record. "Professionally acceptable methods" apparently recognize validation by proof of a correlation with training performance, rather than of performance, if (1) the training curriculum includes information proved to be important to job performance and (2) the standard used as a measure of training performance is shown to reflect the trainees' mastery of the material included in the training curriculum. See Brief for CSC 24-29; Brief for the Executive Committee of Division 14 of the American Psychological Assn. as Amicus Curiae 37-43. But no authority, whether professional, administrative, or judicial, has accepted the sufficiency of a correlation with training performance in the absence of such proof. For reasons that I have stated above, the record does not adequately establish either factor. As a result, the Court's conclusion cannot be squared with the focus on job performance in Griggs and Albemarle, even if this substitute showing is reconcilable with the holdings in those cases.

Today's reduced emphasis on a relationship to job performance is also inconsistent with clearly expressed congressional intent. A section-by-section analysis of the 1972 amendments to Title VII states as follows:

"In any area where the new law does not address itself, or in any areas where a specific contrary intention is not indicated, it was assumed that the present case law as developed by the courts would *269 continue to govern the applicability and construction of Title VII." 118 Cong.Rec. 7166 (1972).

The pre-1972 judicial decisions dealing with standardized tests used as job qualification requirements uniformly follow the EEOC regulations discussed above and insist upon proof of a relationship to job performance to prove that a test is job related. [12] Furthermore, the Court ignores Congress' explicit hostility toward the use of written tests as job-qualification requirement; Congress disapproved the CSC's "use of general ability tests which are not aimed at any direct relationship to specific jobs." H.R.Rep. No. 92-238, at 24

96 S.Ct. 2040, 12 Fair Empl.Prac.Cas. (BNA) 1415, 11 Empl. Prac. Dec. P 10,958...

(1971). See S.Rep. No. 92-415, pp. 14-15 (1971)S.Rep. No. 92-415, pp. 14-15 (1971). Petitioners concede that Test 21 was devised by the CSC for general use and was not designed to be used by police departments.

Finally, it should be observed that every federal court, except the District Court in this case, presented with proof identical to that offered to validate Test 21 has reached a conclusion directly opposite to that of the **\*270** Court today. [13] Sound policy considerations **\*\*2062** support the view that, at a minimum, petitioners should have been required to prove that the police training examinations either measure job-related skills or predict job performance. Where employers try to validate written qualification tests by proving a correlation with written examinations in a training course, there is a substantial danger that people who have good verbal skills will achieve high scores on both tests due to verbal ability, rather than "job-specific ability." As a result, employers could validate any entrance examination that measures only verbal ability by giving another written test that measures verbal ability at the end of a training course. Any contention that the resulting correlation between examination scores would be evidence that the initial test is "job related" is plainly erroneous. It seems to me, however, that the Court's holding in this case can be read as endorsing this dubious proposition. Today's result will prove particularly unfortunate if it is extended to govern Title VII cases.

Accordingly, accepting the Court's assertion that it is necessary to reach the statutory issue, I would hold that petitioners have not met their burden of proof and affirm the judgment of the Court of Appeals.

**All Citations**

426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597, 12 Fair Empl.Prac.Cas. (BNA) 1415, 11 Empl. Prac. Dec. P 10,958

# Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499, 505.

1    Under s 4-103 of the District of Columbia Code, appointments to the Metropolitan Police force were to be made by the Commissioner subject to the provisions of Title 5 of the United States Code relating to the classified civil service. The District of Columbia Council and the Office of Commissioner of the District of Columbia, established by Reorganization Plan No. 37 of 1967, were abolished as of January 2, 1975, and replaced by the Council of the District of Columbia and the Office of Mayor of the District of Columbia.

2    Title 42 U.S.C. s 1981 provides:

     "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

     Section 1-320 of the District of Columbia Code (1973) provides:

     "In any program of recruitment or hiring of individuals to fill positions in the government of the District of Columbia, no officer or employee of the government of the District of Columbia shall exclude or give preference to the residents of the District of Columbia or any State of the United States on the basis of residence, religion, race, color, or national origin."

     One of the provisions expressly made applicable to the Metropolitan Police force by s 4-103 is 5 U.S.C. s 3304(a), which provides:

     "s 3304. Competitive service; examinations.

     "(a) The President may prescribe rules which shall provide, as nearly as conditions of good administration warrant, for

96 S.Ct. 2040, 12 Fair Empl.Prac.Cas. (BNA) 1415, 11 Empl. Prac. Dec. P 10,958...

"(1) open, competitive examinations for testing applicants for appointment in the competitive service which are practical in character and as far as practical relate to matters that fairly test the relative capacity and fitness of the applicants for the appointment sought; and

"(2) noncompetitive examinations when competent applicants do not compete after notice has been given of the existence of the vacancy."

The complaint asserted no claim under 📑 s 3304.

3    Those proceedings included a hearing on respondents' motion for an order designating the case as a class action. A ruling on the motion was held in abeyance and was never granted insofar as the record before us reveals.

4    In support of the motion, petitioners and the federal parties urged that they were in compliance with all applicable constitutional, statutory, and regulatory provisions, including the provisions of the Civil Service Act which since 1883 were said to have established a "job relatedness" standard for employment.

5    When summary judgment was granted, the case with respect to discriminatory promotions was still pending. The District Court, however, made the determination and direction authorized by Fed.Rule Civ.Proc. 54(b). The promotion issue was subsequently decided adversely to the original plaintiffs. Davis v. Washington, 352 F.Supp. 187 (DC 1972).

6    "Although appellants' complaint did not allege a violation of Title VII of the Civil Rights Act of 1964, which then was inapplicable to the Federal Government, decisions applying Title VII furnish additional instruction as to the legal standard governing the issues raised in this case. . . . The many decisions disposing of employment discrimination claims on constitutional grounds have made no distinction between the constitutional standard

and the statutory standard under Title VII." 🚩 168 U.S.App.D.C. 42, 44 n. 2, 512 F.2d 956, 958 n. 2 (1975).

7    The Civil Service Commissioners, defendants in the District Court, did not petition for writ of certiorari but have filed a brief as respondents. See our Rule 21(4). We shall at times refer to them as the "federal parties."

8    Apparently not disputing the applicability of the Griggs and Title VII standards in resolving this case, petitioners presented issues going only to whether 📑 Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), had been misapplied by the Court of Appeals.

9    See, E. g., 📑 Silber v. United States, 370 U.S. 717, 82 S.Ct. 1287, 8 L.Ed.2d 798 (1962); Carpenters v. United States, 330 U.S. 395, 412, 67 S.Ct. 775, 784, 91 L.Ed. 973, 987 (1947); 📑 Sibbach v. Wilson & Co., 312 U.S. 1, 16, 61 S.Ct. 422, 427, 85 L.Ed. 479, 486 (1941); 📑 Mahler v. Eby, 264 U.S. 32, 45, 44 S.Ct. 283, 288, 68 L.Ed. 549, 557 (1924); Weems v. United States, 217 U.S. 349, 362, 30 S.Ct. 544, 547, 54 L.Ed. 793, 796 (1910).

10    Although Title VII standards have dominated this case, the statute was not applicable to federal employees when the complaint was filed; and although the 1972 amendments extending the Title to reach Government employees were adopted prior to the District Court's judgment, the complaint was not amended to state a claim under that Title, nor did the case thereafter proceed as a Title VII case. Respondents' motion for partial summary judgment, filed after the 1972 amendments, rested solely on constitutional grounds; and the Court of Appeals ruled that the motion should have been granted.

At the oral argument before this Court, when respondents' counsel was asked whether "this is just a purely Title VII case as it comes to us from the Court of Appeals without any constitutional overtones," counsel responded: "My trouble honestly with that proposition is the procedural requirements to get into court under Title VII, and this case has not met them." Tr. of Oral Arg. 66.

11    To the extent that Palmer suggests a generally applicable proposition that legislative purpose is irrelevant in constitutional adjudication, our prior cases as indicated in the text are to the contrary; and very shortly after

Palmer, all Members of the Court majority in that case joined the Court's opinion in 📑 Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), which dealt with the issue of public financing for private

96 S.Ct. 2040, 12 Fair Empl.Prac.Cas. (BNA) 1415, 11 Empl. Prac. Dec. P 10,958...

schools and which announced, as the Court had several times before, that the validity of public aid to church-related schools includes close inquiry into the purpose of the challenged statute.

12      Cases dealing with public employment include: 🚩 Chance v. Board of Examiners, 458 F.2d 1167, 1176-1177 (CA2 1972); 🔖 Castro v. Beecher, 459 F.2d 725, 732-733 (CA1 1972); 🚩 Bridgeport Guardians v. Bridgeport Civil Service Comm'n, 482 F.2d 1333, 1337 (CA2 1973); 🚩 Harper v. Mayor of Baltimore, 359 F.Supp. 1187, 1200 (D.Md.), aff'd in pertinent part Sub nom. 🚩 Harper v. Kloster, 486 F.2d 1134 (CA4 1973); 🚩 Douglas v. Hampton, 168 U.S.App.D.C. 62, 67, 512 F.2d 976, 981 (1975); but cf. 🚩 Tyler v. Vickery, 517 F.2d 1089, 1096-1097 (CA5 1975), cert. pending, No. 75-1026. There are also District Court cases: 🚩 Wade v. Mississippi Cooperative Extension Serv., 372 F.Supp. 126, 143 (ND Miss. 1974); 🚩 Arnold v. Ballard, 390 F.Supp. 723, 736, 737 (N.D. Ohio 1975); 🚩 United States v. City of Chicago, 385 F.Supp. 543, 553 (N.D. Ill. 1974); Fowler v. Schwarzwalder, 351 F.Supp. 721, 724 (D.Minn. 1972), rev'd on other grounds, 498 F.2d 143 (CA8 1974).

In other contexts there are 🔖 Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (CA2 1968) (urban renewal); 🔖 Kennedy Park Homes Assn. v. City of Lackawanna, 436 F.2d 108, 114 (CA2 1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971) (zoning); 🔖 Southern Alameda Spanish Speaking Organization v. Union City, 424 F.2d 291 (CA9 1970) (dictum) (zoning); 🚩 Metropolitan H. D. Corp. v. Village of Arlington Heights, 517 F.2d 409 (CA7), cert. granted, December 15, 1975, 423 U.S. 1030, 96 S.Ct. 560, 46 L.Ed.2d 404 (1975) (zoning); 🚩 Gautreaux v. Romney, 448 F.2d 731, 738 (CA7 1971) (dictum) (public housing); Crow v. Brown, 332 F.Supp. 382, 391 (N.D. Ga. 1971), aff'd, 457 F.2d 788 (CA5 1972) (public housing); 🔖 Hawkins v. Town of Shaw, 437 F.2d 1286 (CA5 1971), aff'd on rehearing en banc, 🔖 461 F.2d 1171 (1972) (municipal services).

13      It appears beyond doubt by now that there is no single method for appropriately validating employment tests for their relationship to job performance. Professional standards developed by the American Psychological Association in its Standards for Educational and Psychological Tests and Manuals (1966), accept three basic methods of validation: "empirical" or "criterion" validity (demonstrated by identifying criteria that indicate successful job performance and then correlating test scores and the criteria so identified); "construct" validity (demonstrated by examinations structured to measure the degree to which job applicants have identifiable characteristics that have been determined to be important in successful job performance); and "content" validity (demonstrated by tests whose content closely approximates tasks to be performed on the job by the applicant). These standards have been relied upon by the Equal Employment Opportunity Commission in fashioning its Guidelines on Employee Selection Procedures, 29 CFR pt. 1607 (1975), and have been judicially noted in cases where validation of employment tests has been in issue. See, E.g., Albemarle Paper Co. v. Moody, 422 U.S. 405, 431, 95 S.Ct. 2362, 2378, 45 L.Ed.2d 280, 304 (1975); Douglas v. Hampton, 168 U.S.App.D.C., at 70, 512 F.2d, at 984; 🔖 Vulcan Society v. Civil Service Comm'n, 490 F.2d 387, 394 (CA2 1973).

14      Goodman, De Facto School Segregation: A Constitutional and Empirical Analysis, 60 Calif.L.Rev. 275, 300 (1972), suggests that disproportionate-impact analysis might invalidate "tests and qualifications for voting, draft deferment, public employment, jury service, and other government-conferred benefits and opportunities . . .; (s)ales taxes, bail schedules, utility rates, bridge tolls, license fees, and other state-imposed charges." It has also been argued that minimum wage and usury laws as well as professional licensing requirements would require major modifications in light of the unequal-impact rule. Silverman, Equal

96 S.Ct. 2040, 12 Fair Empl.Prac.Cas. (BNA) 1415, 11 Empl. Prac. Dec. P 10,958...

Protection, Economic Legislation, and Racial Discrimination, 25 Vand.L.Rev. 1183 (1972). See also Demsetz, Minorities in the Market Place, 43 N.C.L.Rev. 271 (1965).

15    In their memorandum supporting their motion for summary judgment, the federal parties argued:

"In Griggs, supra, the Supreme Court set a job-relationship standard for the private sector employers which has been a standard for federal employment since the passage of the Civil Service Act in 1883. In that act Congress has mandated that the federal government must use '. . . examinations for testing applicants for appointment . . . which . . . as far as possible relate to matters that fairly test the relative capacity and fitness of the applicants for the appointments sought.' 5 U.S.C. s 3304(a)(1). Defendants contend that they have been following the job-related standards of Griggs, supra, for the past eighty-eight years by virtue of the enactment of the Civil Service Act which guaranteed open and fair competition for jobs."

They went on to argue that the Griggs standard had been satisfied. In granting the motions for summary judgment filed by petitioners and the federal parties, the District Court necessarily decided adversely to respondents the statutory issues expressly or tacitly tendered by the parties.

16    See n. 17, Infra. Current instructions of the Civil Service Commission on "Examining, Testing, Standards, and Employment Practices" provide in pertinent part:

"S2-2 Use of applicant appraisal procedures

a. Policy. The Commission's staff develops and uses applicant appraisal procedures to assess the knowledges, skills, and abilities of persons for jobs and not persons in the abstract.

"(1) Appraisal procedures are designed to reflect real, reasonable, and necessary qualifications for effective job behavior.

"(2) An appraisal procedure must, among other requirements, have a demonstrable and rational relationship to important job-related performance objectives identified by management, such as:

"(a) Effective job performance;

"(b) Capability;

"(c) Success in training;

"(d) Reduced turnover; or

"(e) Job satisfaction." 37 Fed.Reg. 21557 (1972).

See also Equal Employment Opportunity Commission Guidelines on Employee Selection Procedures, 29 CFR s 1607.5(b)(3) (1975), discussed in Albemarle Paper Co. v. Moody, 422 U.S., at 430-435, 95 S.Ct. 2362, 2378-2380, 45 L.Ed.2d 280, 304-307.

17    The record includes a validation study of Test 21's relationship to performance in the recruit training program. The study was made by D. L. Futransky of the Standards Division, Bureau of Policies and Standards, United States Civil Service Commission. App., at 99-109. Findings of the study included data "support(ing) the conclusion that T(est) 21 is effective in selecting trainees who can learn the material that is taught at the Recruit School." Id., at 103. Opinion evidence, submitted by qualified experts examining the Futransky study and/or conducting their own research, affirmed the correlation between scores on Test 21 and success in the training program. E. g., Affidavit of Dr. Donald J. Schwartz (personnel research psychologist, United States Civil Service Commission), App. 178, 183 ("It is my opinion . . . that Test 21 has a significant positive correlation with success in the MPD Recruit School for both Blacks and whites and is therefore shown to be job related . . ."); affidavit of Diane E. Wilson (personnel research psychologist, United States Civil Service Commission), App. 185, 186 ("It is my opinion that there is a direct and rational relationship between the content and difficulty of Test 21 and successful completion of recruit school training").

The Court of Appeals was "willing to assume for purposes of this appeal that appellees have shown that Test 21 is predictive of further progress in Recruit School." 168 U.S.App.D.C., at 48, 512 F.2d, at 962.

*    Specifically, I express no opinion on the merits of the cases listed in n. 12 of the Court's opinion.

1    Although I do not intend to address the constitutional questions considered by the Court in Part II of its opinion, I feel constrained to comment upon the propriety of footnote 12, Ante, at 2049-2050. One of the cases "disapproved" therein is presently scheduled for plenary consideration by the Court in the 1976

96 S.Ct. 2040, 12 Fair Empl.Prac.Cas. (BNA) 1415, 11 Empl. Prac. Dec. P 10,958...

Term, Metropolitan Housing Development Corp. v. Village of Arlington Heights, 517 F.2d 409 (CA7), cert. granted, 423 U.S. 1030, 96 S.Ct. 560, 46 L.Ed.2d 404 (1975). If the Court regarded this case only a few months ago as worthy of full briefing and argument, it ought not be effectively reversed merely by its inclusion in a laundry list of lower court decisions.

2    The only administrative authority relied on by the Court in support of its result is a regulation of the Civil Service Commission construing the civil service employment standards in Title 5 of the United States Code.

Ante, at 2052-2053 n. 16. I note, however, that 5 U.S.C. s 3304 was brought into this case by the CSC, not by respondents, and the CSC's only reason for referring to that provision was to establish that petitioners had been "following the job-related standards of Griggs (V. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971),) for the past eighty-eight years." Ante, at 2052 n. 15.

3    The provision in Title VII on which petitioners place principal reliance is 42 U.S.C. s 2000e-2(h). See Griggs v. Duke Power Co., supra, 401 U.S., at 433-436, 91 S.Ct., at 854-856, 28 L.Ed.2d, at 165-167.

4    See 5 CFR s 300.101 Et seq. (1976). These instructions contain the "regulations" that the Court finds supportive of the District Court's conclusion, which was reached under Title VII, but neither the instructions nor the general regulations are an interpretation of Title VII. The instructions were issued "under authority of sections 3301 and 3302 of title 5, United States Code, and E.O. 10577, 3E.O. 10577, 3 CFR 1954-58 Comp., p. 218." 37 Fed.Reg. 21552 (1972). The pertinent regulations of the CSC in 5 CFR s 300.101 Et seq. were promulgated pursuant to the same authorities, as well as 5 U.S.C. ss 7151, 7154 and Exec.Order No. 11478, 3Exec.Order No. 11478, 3 CFR (1966-1970 Comp.) 803.

5    The CSC asserts that certain of its guidelines have some bearing on Test 21's job relatedness. Under the CSC instructions, " 'criterion-related' validity," see Douglas v. Hampton, 168 U.S.App.D.C. 62, 70 n. 60, 512 F.2d 976, 984 n. 60 (1975), can be established by demonstrating a correlation between entrance examination scores and "a criterion which is legitimately based on the needs of the Federal Government." P S3-2(a)(2), 37 Fed.Reg. 21558 (1972). Further, to prove validity, statistical studies must demonstrate that Test 21, "to a significant degree, measures performance or qualifications requirements which are relevant to the job or jobs for which candidates are being evaluated." P S3-3(a), 37 Fed.Reg. 21558 (1972). These provisions are ignored in the Court's opinion.

6    On this basis, the CSC argues that the case ought to be remanded to enable petitioners to try to make such a demonstration, but this resolution seems to me inappropriate. Both lower courts recognized that petitioners had the burden of proof, and as this burden is yet unsatisfied, respondents are entitled to prevail.

7    The finding in the Futransky study on which the Court relies, Ante, at 2053 n. 17, was that Test 21 "is effective in selecting trainees who can learn the material that is taught at the Recruit School," because it predicts averages over 85. On its face, this would appear to be an important finding, but the fact is that Everyone learns the material included in the training course. The study noted that all recruits pass the training examinations; if a particular recruit has any difficulty, he is given assistance until he passes.

8    Still another factor mandates deference to the EEOC regulations. The House and Senate committees considering the 1972 amendments to Title VII recognized that discrimination in employment, including the use of testing devices, is a "complex and pervasive phenomenon." S.Rep. No. 92-415, p. 5 (1971)S.Rep. No. 92-415, p. 5 (1971); H.R.Rep. No. 92-238, p. 8 (1971); U.S.Code Cong. & Admin.News 1972, p. 2137. As a result, both committees noted the need to obtain "expert assistance" in this area. S.Rep. No. 92-415S.Rep. No. 92-415, Supra, at 5; H.R.Rep. No. 92-238, Supra, at 8.

9    Indeed, two Justices asserted that the Court relied too heavily on the EEOC guidelines. 422 U.S. 449, 95 S.Ct. 2389, 45 L.Ed.2d 316 (Blackmun, J., concurring in judgment); Id., at 451, 95 S.Ct., at 2387, 45 L.Ed.2d, at 317 (Burger, C. J., concurring in part and dissenting in part).

96 S.Ct. 2040, 12 Fair Empl.Prac.Cas. (BNA) 1415, 11 Empl. Prac. Dec. P 10,958...

10  Although the validity study found that Test 21 predicted job performance for white officers, but see Albemarle, 422 U.S., at 433, 95 S.Ct., at 2379, 45 L.Ed.2d, at 305, no similar relationship existed for black officers. The same finding was made as to the relationship between training examination averages and job performance. See Id., at 435, 95 S.Ct., at 2380, 45 L.Ed.2d, at 306.

11  The Court of Appeals recognized that deciding whether 42 U.S.C. s 2000e-2(h) permitted such proof "is not a simple or insignificant endeavor." 168 U.S.App.D.C. 42, 50 n. 59, 512 F.2d 956, 964 n. 59. The court declined to express any view on this issue on the ground that petitioners had not satisfied this standard even if it were acceptable, which seems to me the proper treatment of the question.

12  Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); United States v. Jacksonville Terminal Co., 451 F.2d 418, 456-457 (CA5 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972); Hicks v. Crown Zellerbach Corp., 319 F.Supp. 314, 319-321 (E.D.La.1970) (issuing preliminary injunction), 321 F.Supp. 1241, 1244 (1971) (issuing permanent injunction). See also Castro v. Beecher, 334 F.Supp. 930 (D.Mass.1971), aff'd in part and rev'd in part on other grounds, 459 F.2d 725 (CA1 1972); Western Addition Community Org. v. Alioto, 330 F.Supp. 536, 539-540 (N.D.Cal.1971), 340 F.Supp. 1351, 1354-1356 (1972) (issuing preliminary injunction), 360 F.Supp. 733 (1973) (issuing permanent injunction); Chance v. Board of Examiners, 330 F.Supp. 203 (S.D.N.Y.1971), aff'd, 458 F.2d 1167 (CA2 1972); Baker v. Columbus Mun. Sep. School Dist., 329 F.Supp. 706, 721-722 (N.D.Miss.1971), aff'd, 462 F.2d 1112 (CA5 1972); Arrington v. Massachusetts Bay Transp. Auth., 306 F.Supp. 1355 (D.Mass.1969).

13  United States v. City of Chicago, 385 F.Supp. 543, 555-556 (N.D.Ill.1974) (police department); Officers for Justice v. CSC, 371 F.Supp. 1328, 1337 (N.D.Cal.1973) (police department); Smith v. City of East Cleveland, 363 F.Supp. 1131, 1148-1149 (N.D.Ohio 1973) (police department), aff'd in part and rev'd in part on other grounds, 520 F.2d 492 (CA6 1975); Harper v. Mayor of Baltimore, 359 F.Supp. 1187, 1202-1203 (D.Md.) (fire department), modified and aff'd, 486 F.2d 1134 (CA4 1973); Pennsylvania v. O'Neill, 348 F.Supp. 1084, 1090-1091 (E.D.Pa.1972) (police department), aff'd in pertinent part and vacated in part, 473 F.2d 1029 (CA3 1973).

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 11501870
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Tampa Division.

Curtis Lee WILLIAMS,

v.

UNITED STATES of America.

Case No. 8:17-cv-1915-T-17AEP,
Case No. 8:16-cr-359-T-17AEP
|
Signed 12/08/2017

**Attorneys and Law Firms**

Curtis Lee Williams, Marianna, FL, pro se.

Michael M. Gordon, US Attorney's Office, Tampa, FL, for
United States of America.

ORDER

ELIZABETH A. KOVACHEVICH, UNITED STATES
DISTRICT JUDGE

**\*1** This cause is before the Court on Curtis Lee Williams,
Jr.'s 28 U.S.C. § 2255 motion to vacate, set aside or correct
an illegal sentence. (Doc. cv-1; cr-80). The Government
responded to the motion and Williams replied to the response.

After review, the motion to vacate must be **denied.**

**PROCEDURAL HISTORY**

In August 2016, a grand jury returned an eight-count
indictment charging Williams and his codefendant with drug
and firearms offenses. Williams pled guilty to one count of
conspiracy to distribute and possess with intent to distribute
28 grams or more of crack cocaine, in violation of 21 U.S.C.
§§ 846 and 841(b)(1)(B)(iii). The Government dismissed
his remaining charges.

Williams' Presentence Investigation Report (PSR), detailed
his significant criminal history. (PSR ¶¶ 39–56). Based on
prior convictions for robbery and possession of cocaine with

intent to distribute, the Probation Office recommended that
this Court sentence Williams as a career offender under the
United States Sentencing Guidelines (USSG) § 4B1.1.
(PSR ¶ 28). In advance of sentencing, Williams' counsel
filed a sentencing memorandum and motion for downward
departure and downward variance. (Doc. cr-60). Counsel
pointed out that, "Williams was within approximately ninety
days of the robbery conviction not being scored at all." (Id. 4).
Without his prior robbery conviction qualifying as a predicate,
Williams would not have been a career offender.

The Government also filed a motion for downward departure
in advance of Williams' sentencing. (Doc. cr-63). Williams
provided information to law enforcement that helped secure
his codefendant's timely guilty plea and conviction. (Id.). In
turn, the Government submitted that he deserved a two-level
reduction in his offense level.

Williams faced a total offense level of 31, criminal history
category of VI, and an advisory guidelines range of 188
to 235 months imprisonment. (PSR ¶¶ 38, 58, 59, 110). At
sentencing, this Court granted the Government's request for
a two-level departure and granted an additional two levels for
a total departure of four levels. (Doc. cr-64). The amended
guidelines range, after departures, totaled 130 to 162 months.
This Court sentenced Williams to 130 months imprisonment.
(Docs. 64, 67).

He did not appeal from his conviction or sentence. Instead,
Williams timely filed the instant 28 U.S.C. § 2255 motion
alleging four grounds of ineffective assistance of counsel, all
centered on his representation at sentencing.

**STATEMENT OF FACTS**

Working out of the home that he shared with his wife and
children, Williams supplied crack cocaine to his codefendant,
Brian Allen. (Doc. cr-34 at 16–17; PSR ¶¶ 17, 87). Allen
flipped the cocaine and sold it on the streets. Law enforcement
completed the first of many controlled purchases from the pair
on January 13, 2016. (Id. at 16; Doc. cr-81 at 27–29). Over
the course of the next seven months, an undercover officer
purchased nearly 130 grams of crack cocaine and a short-
barreled shotgun. (Doc. cr-34 at 1618, PSR ¶¶ 16–23). Law
enforcement found two loaded firearms, loose ammunition,
and $2,800 ($300 of which was determined to be funds used

during a previous controlled purchase) in Williams' master bedroom. (PSR ¶ 22).

### Burden of Proof

**\*2** In general, on collateral review the petitioner bears the burden of proof and persuasion on each and every aspect of his claim, *see In re Moore*, 830 F.3d 1268, 1272 (11th Cir. 2016) (collecting cases), which is "a significantly higher hurdle than would exist on direct appeal" under plain error review, *see United States v. Frady*, 456 U.S. 152, 164–66 (1982). Accordingly, if this Court "cannot tell one way or the other" whether the claim is valid, then the defendant has failed to carry his burden. *Moore*, 830 F.3d at 1273; *cf. United States v. Rodriguez*, 398 F.3d 1291, 1300 (11th Cir. 2005) (in plain error review, "the burden truly is on the defendant to show that the error actually did make a difference ... Where errors could have cut either way and uncertainty exists, the burden is the decisive factor in the third prong of the plain error test, and the burden is on the defendant"). Williams cannot meet this burden.

### Timeliness

Williams' judgment of conviction became final on April 14, 2017, when the time for filing a direct appeal had passed. Therefore, he had until April 14, 2018, to file his 28 U.S.C. § 2255 motion. *see Adams v. United States*, 173 F.3d 1339, 1342 n.2 (11th Cir. 1999) (if defendant does not pursue direct appeal, conviction becomes final when time for filing direct appeal expires). Williams timely filed his 28 U.S.C. § 2255 motion on August 11, 2017.

### Cognizability

Williams' claims are cognizable. Section 2255 authorizes an attack on a sentence on four grounds: (1) it was imposed in violation of the Constitution or laws of the United States; (2) it was imposed without jurisdiction; (3) it exceeds the maximum authorized by law; or (4) it is otherwise subject to collateral attack. 28 U.S.C. § 2255. Williams claims that his counsel was ineffective at sentencing are grounded in the

Sixth Amendment and are cognizable under 28 U.S.C. § 2255. *See, e.g., Lynn v. United States*, 365 F.3d 1225, 1234 n.17 (11th Cir. 2004) (ineffective assistance claims should be decided in section 2255 proceedings).

### STANDARD OF REVIEW

To succeed on an ineffective assistance of counsel claim, a petitioner must show that (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced his defense. *see Strickland v. Washington*, 466 U.S. 668, 687 (1984). When evaluating performance, this Court must apply a "strong presumption" that counsel has "rendered adequate assistance and [has] made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.... We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately. *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (*en banc*); quoting *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992)).

To establish deficient performance, a petitioner must show that "no competent counsel would have taken the action that his counsel did take." *see Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (*en banc*). A petitioner demonstrates prejudice only when he establishes "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* If the petitioner fails to establish either of the *Strickland* prongs, his claim fails. *see Maharaj v. Sec'y, Dep't of Corr.*, 432 F.3d 1292, 1319 (11th Cir. 2005).

### DISCUSSION

**CLAIM ONE: CAREER OFFENDER DESIGNATION**

**\*3**  Williams claims counsel was ineffective for failing to challenge his career offender designation. His argument centers on his mistaken belief that his prior robbery conviction should not have qualified as a career offender predicate because of its age.

A defendant qualifies as a career offender if, among other things, he "has at least two prior felony convictions of either a crime of violence or a controlled substance offense." USSG § 4B1.1(a)(3). "Prior felony convictions under section 4B1.1 are counted using the definitions and instructions for computing criminal history in section 4A1.2." *United States v. Shannon,* 449 F.3d 1146, 1148 (11th Cir. 2006) (*per curiam*); USSG § 4B1.2, comment. (n.3). A prior sentence can count towards a career offender enhancement if it resulted in "imprisonment exceeding one year and one month" and "was imposed within fifteen years of the defendant's commencement of the instant offense." U.S.S.G. § 4A1.2(e)(1). A sentence also counts if it was imposed more than 15 years before the current offense, but the incarceration extended into the applicable 15-year period. *Id.*; *Shannon,* 449 F.3d at 1148.

A revocation of probation can impact the time period in which sentences are counted under section 4A1.2(e)(1). *Shannon,* 449 F.3d at 1148. In the case of a prior revocation, the original imprisonment term is added to any additional imprisonment term imposed upon revocation. USSG § 4A1.2(k)(1); *Shannon,* 449 F.3d at 1148. Consequently, a court "ordinarily should count a conviction that is imposed, and on which the defendant is paroled, outside the [15-year] window, when the defendant later -- within the window -- is incarcerated for breaching the conditions of his parole." *Id.* (internal quotation marks omitted).

Convicted in 1997, Williams was sentenced to serve six years imprisonment and four years probation for robbery. (PSR ¶ 43; Attachment A). He violated probation twice in 1999, served additional time, and was ultimately released from custody on April 21, 2001. The current conspiracy commenced as early as January 13, 2016 -- 14 years, 8 months, and 20 days after his release from the robbery conviction. (Doc. 16 at 16; Doc. 81 at 27; PSR ¶ 16). Williams' robbery conviction falls within the applicable 15-year window and properly counts as a career-offender predicate. *United States v. Thornton,* 522 F. App'x 854, 858 (11th Cir. 2013) (prior conviction resulting in incarceration within the 15-year window meets age-of-predicate requirement). Counsel noted the 15-year window at sentencing and reminded this Court that the robbery conviction was approximately 90 days shy of the 15-year deadline.

Accordingly, Williams cannot support his allegation that counsel was ineffective by failing to challenge the applicability of his prior robbery conviction based on its age. *Maharaj,* 432 F.3d at 1319.

**CLAIM TWO: CRIMINAL HISTORY CALCULATION**

Williams' claim that counsel was ineffective for failing to object to other convictions receiving criminal history points is equally unavailing.

A prior conviction receives criminal history points if its sentence "was imposed within ten years of the defendant's commencement of the instant offense," USSG § 4 A1.2(e)(2), or resulted in "imprisonment exceeding one year and one month" and "was imposed within fifteen years of the defendant's commencement of the instant offense," USSG § 4A1.2(e)(1). Again, if a sentence were imposed more than 15 years before the current offense, but the incarceration extended into the applicable 15-year period, the sentence counts. USSG § 4A1.2(e)(1), (k)(1).

**\*4**  Williams suggests his counsel was ineffective for failing to challenge the applicability of his prior 2001 and 2002 drug convictions because they fall outside of the 10-year time frame. Although Williams is correct that the convictions are more than 10 years old, his argument has a fatal flaw: both convictions meet the 15-year requirement because the sentences imposed exceeded one year and one month. *See* USSG § 4A1.2(e)(1).

In November 2001, Williams was arrested by state authorities and charged with possession of cocaine and soliciting another to commit prostitution. (PSR ¶ 45). This arrest came seven months after his release from the robbery conviction.

Ten months later, a September 2002 traffic stop resulted in an information charging Williams with possession of cocaine with intent to distribute it and a variety of traffic-based offenses. (PSR ¶ 46). In December 2002, Williams was convicted in both cases and sentenced to 21 months imprisonment. These offenses count as separate sentences even though the sentences were imposed on the same day. USSG § 4A1.2(a)(2). He was released from custody on May 8, 2004 --11 years, 8 months, and 5 days before the commencement of the instant offense. (PSR ¶¶ 45-46; Attachments B, C to document 6). As with his first claim, Williams's allegation that counsel was ineffective for failing to object to these convictions does not meet the strict standards governing deficient performance and resulting prejudice. Strickland, 466 U.S. at 687. Accordingly, this claim fails.

**CLAIM THREE: SHEPARD DOCUMENTS**

Next, Williams raises a challenge under Shepard v. United States, 544 U.S. 13 (2005). He argues that counsel was ineffective for failing to challenge prior convictions used to determine his criminal history category and qualify him as a career offender.

The Supreme Court held in Shepard that, to determine whether a particular conviction qualifies as a violent felony, a court is "limited to examining the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." Id. at 16. Sentencing courts "may also rely on facts contained in a presentence investigation report (PSR), so long as those facts are undisputed." United States v. Rosales-Bruno, 676 F.3d 1017, 1020 (11th Cir. 2012); see United States v. Beckles, 565 F.3d 832, 843 (11th Cir. 2009) ("For purposes of sentencing, the district court also may base its factual findings on undisputed statements found in the PS[R], because they are factual findings to which the defendant has assented.").

The issue of whether counsel performed unreasonably by not objecting to the PSR and its inclusion of Williams' prior convictions is of no moment. This is because Williams, stuck within the confines of Strickland, cannot prove resulting prejudice from his counsel's purportedly deficient performance. The decision not to assert such a challenge was reasonable given that Williams never disputed the fact of any

of his prior convictions. (See generally Doc. 81.) Counsel made a strategic decision to request a downward departure. ("[W]e admit he is technically scored correctly as a career offender, ... [but the] standard that's set forth in 4A1.3(b)(1), it doesn't correctly categorize Mr. Williams' criminal history.") McNeal v. Wainwright, 722 F.2d 674, 676 (11th Cir. 1984) ("Counsel will not be deemed unconstitutionally deficient because of tactical decisions.") (citations omitted).

**\*5** Moreover, Shepard-approved documents would have sufficed had counsel objected to the PSR as Williams suggests. (See Attachments A–C to document 6; see also Gonzalez v. United States, No. 8:07-cr-134-T-17EAJ, 2012 WL 279451, at \*9–11 (M.D. Fla., Jan. 31, 2012) (rejecting claim that defense counsel was ineffective "for failing to object to ... the government's failure to produce Shepard-type documents" because § 2255 movant "has not shown that his sentence or guidelines calculation would have been different had his counsel done anything differently"); United States v. Alexander, No. 4:05-CR-034-SPM, 2007 WL 4218988, at \*3 (N.D. Fla., Nov. 27, 2007) ("[W]hile ... Defendant charges that counsel was ineffective for not securing additional information beyond that stated in the PSR to advise the Court of the underlying facts of the convictions, he does not even now contest the summary of the offenses in the PSR or offer anything to refute the pertinent paragraphs.").

**CLAIM FOUR: FIREARMS ENHANCEMENT**

Williams argues in his final claim that counsel provided ineffective assistance for failing to object to the application of a two-level guidelines enhancement for a firearm. (PSR ¶ 29; USSG § 2D1.1(b)(1)).

The offense level for a drug offense is increased by two levels if "a dangerous weapon (including a firearm) was possessed." (USSG § 2D1.1(b)(1)); United States v. Pham, 463 F.3d 1239, 1245-46 (11th Cir. 2006). The enhancement applies when a "weapon was present, unless it is clearly improbable that the weapon was connected with the offense." (USSG § 2D1.1, comment. n.3). If the firearm were found in a place -- such as Williams's residence -- where acts in furtherance of the conspiracy took place, the enhancement is also applicable. United States v. Cook, 593 F. App'x. 878, 882 (11th Cir. 2014) (enhancement properly applied where the defendant possessed the firearm at his

residence and also engaged in conspiratorial conversations at the residence); *see also United States v. Whitt*, 470 F. App'x. 820, 821–22 (11th Cir. 2012) (enhancement properly applied to firearm found on premises but not in the same room as drugs, even though transactions were completed outside);

*United States v. Trujillo*, 146 F.3d 838, 847 (11th Cir. 1998) (concluding the firearm was present where defendant's loaded gun was found in an office adjacent to the area where the cocaine was discovered).

To support the enhancement, the government must show that "the firearm was present at the site of the charged conduct" or that "the defendant possessed a firearm during conduct associated with the offense of conviction." *United States v. Stallings*, 463 F.3d 1218, 1220 (11th Cir. 2006). However, the firearm does not have to facilitate the distribution of drugs for the enhancement to apply. *United States v. Audain*, 254 F.3d 1286, 1289-90 (11th Cir. 2001). Once the government meets its burden, then the evidentiary burden shifts to the defendant to demonstrate that a connection between the weapon and the offense was "clearly improbable." *Stallings*, 463 F.3d at 1220 (citation omitted); *Whitt*, 470 F. App'x. at 821.

The enhancement may also apply if a co-conspirator possessed the firearm. *United States v. Fields*, 408 F.3d 1356, 1359 (11th Cir. 2005). There, the government must establish by a preponderance of the evidence that "(1) the possessor of the firearm was a co-conspirator, (2) the possession was in furtherance of the conspiracy, (3) the defendant was a member of the conspiracy at the time of possession, and (4) the co-conspirator possession was reasonably foreseeable by the defendant." *Pham,* 463 F.3d at 1245 (quoting *Fields*, 408 at 1359).

The facts support Williams' receiving a two-level firearms enhancement. On June 28, 2016, Allen and the undercover officer traveled to Williams' residence where they met with Williams and exchanged $1,400 for 28 grams of crack cocaine. (PSR ¶ 20). Later that same day, Allen sold the officer a short-barreled shotgun. (*Id.*). Fifteen days later, law enforcement executed a search warrant at Williams's residence. (PSR ¶ 22). In Williams' master bedroom, officers found a loaded pistol and proceeds from previous drug transactions. (*Id.*). Narcotics transactions had previously taken place at this residence. The sale of the short-barreled shotgun, along with the firearm found in Williams' bedroom,

are both "acts which were reasonably foreseeable to Williams as he and Allen were co-conspirators in this offense[.]" (*Id.*); *Pham,* 463 F.3d at 1245; *Audain,* 254 F.3d at 1289-90.

**\*6** Williams' wife, Jessica, now claims that she possessed the gun found in their home and asserts that her husband did not have access to the gun. Her affidavit does not absolve Williams, however. First, the truth of her affidavit is questionable because the ammunition was located inside an unlocked small dresser inside the master bedroom of the home they shared. (PSR ¶ 22). Second, her affidavit does not demonstrate a "clearly improbable" connection between the firearm and the offense. *Stallings,* 463 F.3d at 1220. Finally, Jessica Williams' affidavit does not address the gun sold by Williams' co-conspirator -- an act reasonably foreseeable to Williams.

Even if the Court fully credited Jessica Williams' affidavit, Williams cannot prove that he was prejudiced by his counsel's lack of objection. This is because Williams' offense level (34) was the product of his statutory maximum penalty combined with his career offender status. (PSR ¶¶ 34, 35). Williams faced the same advisory guidelines range with or without the two-level enhancement at the crux of this allegation. Consequently, there is not "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.

Nothing in Williams' reply convinces the Court that he is entitled to § 2255 relief.

Accordingly, the Court orders:

That Williams' § 2255 motion to vacate (Doc. cv-1; cr-80) is denied. The Clerk is directed to enter judgment for the Government and to close this case.

## CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

The Court declines to issue a certificate of appealability because Defendant has failed to make a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c)(2). Nor will the Court authorize the Defendant to proceed on appeal in forma pauperis because such an appeal

would not be taken in good faith. See 📄 28 U.S.C. § 1915(a)(3). Defendant shall be required to pay the full amount of the appellate filing fee pursuant to 📄 § 1915(b)(1) and (2).

ORDERED at Tampa, Florida, on December 8, 2017.

**All Citations**

Slip Copy, 2017 WL 11501870

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

696 F.3d 121
United States Court of Appeals,
First Circuit.

XIAN TONG DONG, Petitioner,

v.

Eric H. HOLDER, Jr.,
Attorney General, Respondent.

No. 12–1091.
|
Submitted Sept. 5, 2012.
|
Decided Oct. 3, 2012.

**Synopsis**

**Background:** Alien, a Chinese national, petitioned for review of an order of the Board of Immigration Appeals (BIA) that denied alien's application for asylum based on his wife's forced abortion and his fear of religious persecution.

**Holdings:** The Court of Appeals, Selya, Circuit Judge, held that:

[1] in a matter of first impression in the circuit, alien was not entitled to per se refugee status, pursuant to statute providing for such status for "a person who has been forced to abort a pregnancy," based only on his wife's forced abortion by Chinese authorities, and

[2] BIA's determination that alien did not have well-founded fear of religious persecution sufficient to warrant asylum was supported by substantial evidence.

Petition denied.

West Headnotes (10)

[1] **Aliens, Immigration, and Citizenship** 🔑 Review of initial decision or administrative review

In the ordinary course, judicial review in immigration matters focuses on the final order of the Board of Immigration Appeals (BIA), but

where the BIA accepts the immigration judge's (IJ's) findings and reasoning yet adds its own gloss, court reviews the two decisions as a unit.

7 Cases that cite this headnote

[2] **Aliens, Immigration, and Citizenship** 🔑 Law questions

**Statutes** 🔑 Attorney General

On petition for review of Board of Immigration Appeals' (BIA's) denial of asylum, Court of Appeals would review de novo Chinese alien's claim for per se refugee status as "a person who [was] forced to abort a pregnancy" based on his wife's forced abortion by Chinese authorities, albeit with some deference to Attorney General's reasonable interpretation of the statutes and regulations that fell within his purview; alien's claim raised a question of statutory interpretation. Immigration and Nationality Act, § 101(a)(42)(B), 🚩 8 U.S.C.A. § 1101(a)(42)(B).

1 Cases that cite this headnote

[3] **Aliens, Immigration, and Citizenship** 🔑 Forced abortion or coerced sterilization

Alien, a Chinese national, was not entitled to per se refugee status, pursuant to statute providing for such status for "a person who has been forced to abort a pregnancy," based only on his wife's forced abortion by Chinese authorities. Immigration and Nationality Act, § 101(a)(42) (B), 🚩 8 U.S.C.A. § 1101(a)(42)(B); 🚩 8 C.F.R. § 1003.1(h)(1)(i).

[4] **Aliens, Immigration, and Citizenship** 🔑 Law questions

**Statutes** 🔑 Attorney General

Given the Attorney General's unfettered grant of authority to usurp the Board of Immigration Appeals (BIA) in an immigration case, the Attorney General's interpretation of an immigration statute is entitled to *Chevron* deference, and thus, if the statute in question is

AR.06828

ambiguous, an inquiring court must defer to the Attorney General's reasonable construction of it.

🚩 8 C.F.R. § 1003.1(h)(1)(i).

1 Cases that cite this headnote

**[5]** **Aliens, Immigration, and Citizenship** 🔑 **Forced abortion or coerced sterilization**

Alien is not entitled to per se refugee status solely on the basis that his wife was compelled to undergo a forced abortion. Immigration and Nationality Act, § 101(a)(42)(B), 🚩 8 U.S.C.A. § 1101(a)(42)(B); 🚩 8 C.F.R. § 1003.1(h)(1)(i).

**[6]** **Aliens, Immigration, and Citizenship** 🔑 **Country conditions; official reports**

Board of Immigration Appeals' (BIA's) determination, that alien, a Chinese national, did not have well-founded fear of religious persecution sufficient to warrant asylum, was supported by substantial evidence, including Department of State Human Rights Report indicating that religious persecution in China was subsiding and that, in some regions, unregistered groups or house churches with hundreds of members met openly, with full knowledge of the authorities. Immigration and Nationality Act, §§ 101(a)(42)(A), 242(b)(4)(B), 🚩 8 U.S.C.A. §§ 1101(a)(42)(A), 1252(b)(4)(B); 🚩 8 C.F.R. § 1208.13(b)(2)(iii)(A).

5 Cases that cite this headnote

**[7]** **Aliens, Immigration, and Citizenship** 🔑 **Presumptions and Burden of Proof**

An asylum-seeker bears the burden of proving that he is a refugee within the meaning of the immigration laws. Immigration and Nationality Act, § 101(a)(42), 🚩 8 U.S.C.A. § 1101(a)(42).

**[8]** **Aliens, Immigration, and Citizenship** 🔑 **Well Founded Fear of Future Persecution**

A specific link with the alien's own circumstances and the region of the alien's country of nationality from which the alien hails is normally a necessary element of an asylum claim based on a fear of future persecution. Immigration and Nationality Act, § 101(a)(42)(A), 🚩 8 U.S.C.A. § 1101(a)(42)(A).

2 Cases that cite this headnote

**[9]** **Aliens, Immigration, and Citizenship** 🔑 **Country conditions; official reports**

Overview reports about instances of persecution do very little to substantiate an asylum-seeking alien's claims of persecution as overview reports do not ordinarily either directly or by reasonable implication connect these foibles with the alien's particular situation. Immigration and Nationality Act, § 101(a)(42)(A), 🚩 8 U.S.C.A. § 1101(a)(42)(A).

1 Cases that cite this headnote

**[10]** **Aliens, Immigration, and Citizenship** 🔑 **Weight and Sufficiency**

When the evidence in an asylum proceeding, taken as a whole, comprises a mixed bag, the Board of Immigration Appeals (BIA) and the immigration judge (IJ) are free to attach substantial weight to those portions of the evidence that undercut the alien's claim. Immigration and Nationality Act, § 101(a)(42), 🚩 8 U.S.C.A. § 1101(a)(42).

5 Cases that cite this headnote

**Attorneys and Law Firms**

**\*122** Nathan Weill and Law Office of Nathan Weill on brief for petitioner.

Stuart F. Delery, Acting Assistant Attorney General, Civil Division, Terri J. Scadron, Assistant Director, and Shahrzad Baghai, Trial Attorney, Office of Immigration Litigation, Civil Division, on brief for respondent.

Before THOMPSON, SELYA and LIPEZ, Circuit Judges.

**Opinion**

SELYA, Circuit Judge.

This case requires us to decide, for the first time, whether 8 U.S.C. § 1101(a)(42)(B), a statute enacted to pave the way for asylum for victims of China's coercive population control policies, extends automatically to a spouse of a person forced to undergo an abortion. We join several of our sister circuits in holding that it does not.

The issue arises in connection with the asylum application of Xian Tong Dong, a Chinese national, who seeks to remain in the United States because of, among other things, his wife's forced abortion. Before **\*123** us, he solicits judicial review of a final order of the Board of Immigration Appeals (BIA) denying him asylum and decreeing his removal to his homeland. After careful consideration, we reject his petition.

The record reflects that the petitioner entered the United States without inspection in March of 2006. The Chinese government previously had forced his wife to undergo an abortion, and he hoped to send for her and their son after gaining permission to remain.

The petitioner applied for asylum on October 10, 2006. Federal authorities responded by instituting removal proceedings and referring his case to the immigration court. The case was heard on the merits by an immigration judge (IJ) on December 2, 2009. In the interim, the petitioner became involved with the Chinese Evangelical Church in Boston, Massachusetts. He was baptized there in April of 2009. He expanded the grounds on which he sought asylum to include a fear of religious persecution.

In the immigration court, the petitioner testified that, consonant with the Chinese government's repressive population control policies, his wife was fitted with an intrauterine device (IUD) after the birth of their first child. [1] Flouting government policy, she had the IUD removed by a privately retained physician. The couple thereafter conceived a second child. When Chinese authorities became aware of

the pregnancy, they subjected the petitioner's wife to a forced abortion in 2005. This event, according to the petitioner, prompted him to leave China and come to the United States.

The Attorney General has discretion to grant asylum to any alien who establishes that he is a refugee. 8 U.S.C. § 1158(b)(1). At the end of the petitioner's hearing, he argued that he was entitled to per se refugee status under 8 U.S.C. § 1101(a)(42)(B) as "a person who has been forced to abort a pregnancy." The IJ rejected this argument, holding that the spouse of a person who has been physically subjected to a forced abortion is not entitled to refugee status per se.

Alternatively, the petitioner argued that he was entitled to asylum on a different ground; he posited that repatriation would subject him to persecution because his new found Evangelical Christian beliefs would compel him to attend an unsanctioned church (which, in turn, would leave him open to arrest). The IJ rejected this argument as well. She concluded that the evidence in the record indicated that the Chinese government's handling of unsanctioned churches varied widely in different regions of the country, and that the petitioner had not introduced evidence sufficient to show that he was likely to be targeted by the government. Thus, the petitioner had failed to carry his burden of showing a well-founded fear of persecution on account of his religion. *See Jiang v. Gonzales,* 474 F.3d 25, 30 (1st Cir.2007).

After the IJ denied the petitioner's application for asylum and ordered his removal, the petitioner appealed. The BIA affirmed. This timely petition for judicial review followed.

[1] In the ordinary course, judicial review in immigration matters focuses on the final order of the BIA. *See Amouri v. Holder,* 572 F.3d 29, 33 (1st Cir.2009). But where, as here, the BIA accepts the IJ's findings and reasoning yet adds its own gloss, we review the two decisions as a unit. *See Gilca v. Holder,* 680 F.3d 109, 114 (1st Cir.2012).

**\*124** [2] The main event in this case is the petitioner's claim for per se refugee status under 8 U.S.C. § 1101(a)(42)(B). Because this claim raises a question of statutory interpretation, it engenders de novo review, "albeit with some deference to the [agency's] reasonable interpretation of the statutes and regulations that fall within its purview." *Carvalho–Frois v. Holder,* 667 F.3d 69, 72 (1st Cir.2012).

AR.06830

**[3]** Section 1101(a)(42)(B) states in pertinent part that the term "refugee" shall include "a person who has been forced to abort a pregnancy or to undergo involuntary sterilization." The petitioner argues that a man whose wife is forced to abort a child loses the child in the same way as the mother and, thus, has been forced to abort a pregnancy. Based on this reasoning, the petitioner asserts that the plain language of the statute encompasses a person—like himself—whose spouse experienced a forced abortion at the hands of the government.

The petitioner's assertion has a certain superficial appeal. But in rebuffing this assertion, both the BIA and the IJ relied on the Attorney General's contrary interpretation of the statute. *See* Matter of J–S–, 24 I. & N. Dec. 520, 536 (BIA 2008) (opinion of Attorney General). We turn, therefore, to this quandary.

The relevant statute speaks only of "a person who has been forced to abort a pregnancy," 8 U.S.C. § 1101(a)(42)(B). Under a natural reading, the focus is on persons targeted for a procedure, not upon the results of the procedure. Put another way, the statutory language appears unambiguously to refer only to the person who actually undergoes the procedure, not to the spouse of that person. Two courts of appeals have unreservedly embraced this plain-language construction. *See* Lin–Zheng v. Att'y Gen., 557 F.3d 147, 157 (3d Cir.2009); Shi Liang Lin v. U.S. Dep't of Justice, 494 F.3d 296, 309 (2d Cir.2007). Two others have agreed with the plain-language interpretation, but in an abundance of caution have gone on to discuss the Attorney General's interpretation. *See* Yi Ni v. Holder, 613 F.3d 415, 425–26 (4th Cir.2010); Yu v. U.S. Att'y Gen., 568 F.3d 1328, 1332–33 (11th Cir.2009).

We too hold that the plain language of the statute defeats the petitioner's claim. But even if we assume—favorably to the petitioner—that the statutory text, read charitably, might admit of some conceivable ambiguity, the Attorney General's interpretation would demand the same result.

**[4]** To begin, 8 C.F.R. § 1003.1(h)(1)(i) authorizes the Attorney General to direct the BIA to refer specific cases to him for review and determination. Given this unfettered grant of authority to usurp the BIA—an authority that the Attorney General exercised in Matter of J–S—the Attorney General's interpretation of the statute is entitled to Chevron deference. *See* INS v. Aguirre–Aguirre, 526

U.S. 415, 424–25, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999); Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see also* Naeem v. Gonzales, 469 F.3d 33, 36 (1st Cir.2006) (explaining that judicial review of the Attorney General's formal interpretation of an immigration statute is entitled to Chevron deference). This means, in effect, that if the statute in question is ambiguous, an inquiring court must defer to the Attorney General's reasonable construction of it. *See* Chevron, 467 U.S. at 843, 104 S.Ct. 2778; Naeem, 469 F.3d at 36.

In Matter of J–S–, the Attorney General, relying heavily on a textual analysis of section 1101(a)(42)(B), rejected an expansive interpretation of the statute that **\*125** would have dictated spousal eligibility. Matter of J–S–, 24 I. & N. Dec. at 528. The Attorney General's interpretation hewed to the letter of the statute. To cinch matters, he fortified this plain-language construction with convincing comparisons to other provisions of the Immigration and Nationality Act. One such provision limns particular circumstances under which a spouse may be eligible for asylum. Id. at 529–30 (citing 8 U.S.C. § 1158(b)(3)). Another requires every applicant for asylum establish "*his or her own* eligibility." Id. at 530 (emphasis in original) (citing 8 U.S.C. § 1158(b)(1)(B)).

Four of our sister circuits (including two that held the plain language of the statute to be controlling) have addressed the Chevron question that faces us today. They have, without exception, concluded that the Attorney General's interpretation of section 1101(a)(42)(B) is both reasonable and worthy of deference. *See* Yi Ni, 613 F.3d at 425; Nai Yuan Jiang v. Holder, 611 F.3d 1086, 1097 (9th Cir.2010); Shou Wei Jin v. Holder, 572 F.3d 392, 397 (7th Cir.2009); Yu, 568 F.3d at 1332–33. No court has either rejected the Attorney General's interpretation of the statute or thereafter given its imprimatur to the strained reading that the petitioner espouses.

To be sure, the Attorney General took great care to make certain that his interpretation of section 1101(a)(42)(B) "does not explicitly exclude spouses from its purview."

AR.06831

*Matter of J–S–,* 24 I. & N. Dec. at 530. But a spouse must show some special circumstance—that is, something more than his relationship to the recipient of a forced abortion—in order to avail himself of this caveat. Here, however, the petitioner has made no such showing. Indeed, the agency in this case considered (and found inapplicable) other provisions of section 1101(a)(42)(B) that might have allowed the petitioner to qualify as a per se refugee. Along these lines, the petitioner could have adduced evidence to show that he had a well-founded fear of, say, forced sterilization or persecution for resisting a coercive population control program. *See* 8 U.S.C. § 1101(a)(42)(B). But the petitioner did not offer any such evidence, nor has he made any such argument.

[5]    That ends this aspect of the matter. We agree with the other courts of appeals that have mulled the question: given the language of the relevant statute and the Attorney General's reasonable interpretation of it, we hold that the agency did not err in refusing to grant the petitioner per se refugee status on the basis that the Chinese government had compelled his wife to undergo a forced abortion.

[6]    We proceed next to the agency's determination that the petitioner did not carry his burden of proving a well-founded fear of religious persecution sufficient to warrant asylum. We review such determinations under the familiar substantial evidence rule. *See Ruiz v. Mukasey,* 526 F.3d 31, 35 (1st Cir.2008). "This standard requires us to accept all findings of fact so long as they are supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Gilca,* 680 F.3d at 114 (internal quotation marks omitted); *see* 8 U.S.C. § 1252(b)(4)(B). "This is not a petitioner-friendly standard of review; a reversal is appropriate only when the record evidence points unerringly to a conclusion different from that reached by the BIA." *Ruiz,* 526 F.3d at 35 (internal quotation marks omitted); *see INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992).

[7]    "An asylum-seeker bears the burden of proving that he is a refugee within the meaning of the immigration laws." *Jiang,* 474 F.3d at 30. Pursuant to *126 8 U.S.C. § 1101(a)(42)(A), an alien may achieve refugee status based on a well-founded fear of persecution if "there is a pattern or practice in his or her country of nationality ... of persecution of a group of persons similarly situated to the applicant on account of ... religion." 8 C.F.R. § 1208.13(b)(2)(iii)(A).

In this case, the petitioner's evidence suggests that there are important differences between sanctioned and unsanctioned Protestant churches in China. For example, the Chinese government requires sanctioned churches to exalt the Communist Party over God, to instruct members to uphold Marxism, Leninism and Mao Zedong thought, and to withhold baptism for those under the age of 18.[2] The petitioner, who became an Evangelical Christian after he fled from China, maintains in his brief that he regarded these restrictions as inconsistent with the principles of his faith—a circumstance that, upon repatriation, would impel him to join an unsanctioned church.

[8]    Here, however, the petitioner's evidence of potential persecution based on this religious choice is neither specific to his own circumstances nor localized to the region in China from which he hails. Such a specific link is normally a necessary element of a claim based on a fear of future persecution. *See, e.g., Lopez Perez v. Holder,* 587 F.3d 456, 461–62 (1st Cir.2009); *Seng v. Holder,* 584 F.3d 13, 19–20 (1st Cir.2009); *Raza v. Gonzales,* 484 F.3d 125, 129 (1st Cir.2007).

At any rate, the petitioner's attempt to establish a pattern and practice of persecution of Evangelical Christians is unpersuasive. His evidence in this respect consists primarily of information about some generalized trends in China, gleaned from a variety of reports published by the State Department and the United States Commission on International Freedom. One of these reports estimates that between fifty and seventy million Chinese Christians practice in unsanctioned churches, even though varying degrees of government-instigated or government-tolerated harassment exist. Another report mentions sporadic incidents of members of unsanctioned churches being incarcerated for "re-education through labor" for engaging in illegal religious activities.

[9]    Although these carefully selected evidentiary excerpts hint at a multitude of problems, they are not enough to compel a finding that the petitioner harbors a well-founded fear of religious persecution. The reports to which the petitioner alludes tell us very little about the prevalence or severity of harassment; they tell us even less about the likelihood that the petitioner, if repatriated, would be exposed to harassment that rises to the level of persecution. *Cf. Bocova v. Gonzales,* 412 F.3d 257, 263 (1st Cir.2005)

AR.06832

(holding that mistreatment rises to the level of persecution when it is "systematic rather than reflective of a series of isolated incidents" and concluding that two instances of police brutality and one threat did not amount to persecution under this standard). We have said before, and today reaffirm, that overview reports, such as the ones upon which the petitioner relies, "do very little to substantiate" claims of persecution as they do not ordinarily "either directly or by reasonable implication, connect these foibles with the petitioner's particular situation." *Lopez Perez,* 587 F.3d at 461. "Without some specific, direct, and credible evidence relative to [the petitioner's] own situation," the nexus between the petitioner and the reports' generalized depictions **\*127** are too speculative to compel a finding of persecution. *Seng,* 584 F.3d at 19–20.

In all events, the 2008 Department of State Human Rights Report makes manifest that "[l]ocal authorities' handling of unregistered Protestant groups varie[s] in different regions of the country." Relatedly, the report notes that "freedom to participate in religious activities [has] continued to increase in many areas" of China. Thus, the report explains, persecution on this ground is subsiding. The report goes on to explain that "in some regions unregistered groups or house churches with hundreds of members me[e]t openly, with full knowledge of [the] authorities." The documentary evidence relied on by the petitioner concedes the existence of these trends.

 **[10]**    To sum up, the evidence, taken as a whole, comprises a mixed bag. The BIA and the IJ were, therefore, free to attach substantial weight to those portions of the evidence that undercut the petitioner's claim. *See Negeya v. Gonzales,* 417 F.3d 78, 84 (1st Cir.2005).

The short of it is that the evidence in the record did not compel the agency to find that the petitioner had carried his burden of proving an objectively reasonable and well-founded fear of religious persecution. After all, the petitioner offered no "specific, direct, and credible evidence relative to [his] own situation," *Seng,* 584 F.3d at 19, as required by our precedents. Given the chiaroscuro nature of the record, the agency's determination that the petitioner failed to carry his burden of establishing that he, in particular, would likely be subject to religious persecution should he be repatriated, is supported by substantial evidence. *See, e.g., Chen v. Holder,* 675 F.3d 100, 107–08 (1st Cir.2012).

We add a coda. The petitioner's claim of religious persecution has a peculiar twist: he did not convert to Evangelical Christianity until *after* his arrival in the United States. Other courts have considered the implications of this cart-before-the-horse scenario and have indicated that it carries with it a need for the alien to prove certain additional facts. *See, e.g., Hongsheng Leng v. Mukasey,* 528 F.3d 135, 138 (2d Cir.2008) ("[T]o establish eligibility for relief based exclusively on activities undertaken after his arrival in the United States, an alien must make some showing that authorities in his country of nationality are (1) aware of his activities or (2) likely to become aware of his activities."); *Sui Jing Zhang v. Att'y Gen.,* ——Fed.Appx. ——, ——, 2012 WL 3632222 (3d Cir.2012) [No. 12–1510, slip op. at 3] (similar). We take no view on this issue because, in all events, the petitioner's claim of religious persecution fails on other grounds.

We need go no further. [3]  For the reasons elucidated above, we deny the petition for judicial review.

***So Ordered.***

**All Citations**

696 F.3d 121

---

### Footnotes

1    We note that the IJ found the petitioner's testimony to be generally credible.

2    These directives apparently are anathema to Evangelical Christian churches, and those churches apparently operate in China only as unsanctioned churches.

3    The petitioner's argument that the BIA gave insufficient consideration to the distinction between sanctioned and unsanctioned churches does not alter this conclusion. This distinction is irrelevant to the question of whether the petitioner forged a nexus between whatever generalized problems existed and his own situation.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

96 Cal. Daily Op. Serv. 2042, 96 Daily Journal D.A.R. 3456

KeyCite Yellow Flag - Negative Treatment

Distinguished by Arrey v. Barr, 9th Cir., February 26, 2019

79 F.3d 932
United States Court of Appeals,
Ninth Circuit.

Pao YANG; Ying Yang; Jimmy Yang; Bao Yang;
Seyar Yang; Phonesavanne Yang, Petitioners,

v.

IMMIGRATION AND NATURALIZATION
SERVICE, Respondent.

No. 94–70439.
|
Argued and Submitted Dec. 7, 1995.
|
Decided March 27, 1996.

**Synopsis**

Aliens petitioned for review of Board of Immigration Appeals' (BIA) denial of asylum under regulation categorically precluding asylum for refugees who have firmly resettled in another country. The Court of Appeals, Cynthia Holcomb Hall, Circuit Judge, held that: (1) regulation did not exceed authority of Attorney General under its mandate to exercise discretion in granting asylum to eligible aliens, and (2) regulation reflected permissible construction of asylum statute.

Petition denied.

West Headnotes (8)

**[1]** **Aliens, Immigration, and
Citizenship** ⚬ Validity

**Aliens, Immigration, and
Citizenship** ⚬ Aliens firmly resettled in third
country

Regulation categorically barring asylum if alien has "firmly resettled" in third country before arriving in United States did not exceed authority of Attorney General under its mandate to exercise discretion in granting asylum to eligible aliens; discretion did not require individualized accounting for every equity bearing on particular

application and it did not supplant general grant of permission for rule making over ad hoc adjudication. Immigration and Nationality Act, § 208(a), as amended, 8 U.S.C.A. § 1158(a); 8 C.F.R. § 208.14(c)(2) (1994).

14 Cases that cite this headnote

**[2]** **Aliens, Immigration, and
Citizenship** ⚬ Eligibility;  Refugee Status

Finding of eligibility for asylum merely entitles alien to submit application for asylum; it does not guarantee that asylum will be granted. Immigration and Nationality Act, §§ 101(a)(42)(A), 208(a), as amended, 8 U.S.C.A. §§ 1101(a)(42)(A), 1158(a).

**[3]** **Administrative Law and
Procedure** ⚬ Permissible or reasonable
construction

In face of ambiguity or congressional silence on precise question at issue, court should defer to agency's considered judgment if based on permissible construction of statute.

6 Cases that cite this headnote

**[4]** **Administrative Law and
Procedure** ⚬ Rulemaking, adjudication, or
other mechanism

Agency to whom Congress grants discretion may elect between rule making and ad hoc adjudication to carry out its mandate.

5 Cases that cite this headnote

**[5]** **Administrative Law and
Procedure** ⚬ Rulemaking, adjudication, or
other mechanism

Even if statutory scheme requires individualized determinations, decision maker has authority to rely on rule making to resolve certain issues of general applicability unless Congress clearly expresses intent to withhold that authority.

3 Cases that cite this headnote

**[6]    Aliens, Immigration, and
Citizenship**    Discretionary or mandatory

Discretion may be exercised under asylum
statute by rules giving fixed weight to particular
factor. Immigration and Nationality Act, §
208(a), as amended,    8 U.S.C.A. § 1158(a).

**[7]    Aliens, Immigration, and
Citizenship**    Aliens firmly resettled in third
country

Explicit statutory bar to refugee applications
from firmly resettled aliens outside United States
did not support presumption that absence of
similar bar in asylum statute showed specific
intent that no similar bar be applied to asylum
applications; read together, two sections provide
that Attorney General may not admit firmly
resettled refugees if they apply from abroad, but
may choose whether to grant them asylum if
they manage to apply from within United States,
so that regulation barring asylum for firmly
resettled aliens represents just such a choice and
is consistent with grant of discretion in statute.
Immigration and Nationality Act, §§ 207(c)(1),
208(a), as amended,    8 U.S.C.A. §§ 1157(c)
(1),    1158(a);    8 C.F.R. § 208.14(c)(2) (1994).

13 Cases that cite this headnote

**[8]    Aliens, Immigration, and
Citizenship**    Validity

**Aliens, Immigration, and
Citizenship**    Aliens firmly resettled in third
country

Regulation categorically barring asylum if
alien has "firmly resettled" in third country
before arriving in United States reflected
permissible construction of asylum statute;
Congress intended to give relief to individuals
subject to persecution in their homelands and
firmly resettled aliens are by definition no
longer subject to persecution. Immigration and

Nationality Act, § 208(a), as amended,    8
U.S.C.A. § 1158(a);    8 C.F.R. § 208.14(c)(2)
(1994).

14 Cases that cite this headnote

**Attorneys and Law Firms**

**\*933**    Donald L. Ungar, Simmons, Ungar, Helbush,
Steinberg & Bright, San Francisco, California, for petitioners.

Alison R. Drucker and Patricia Connally, Office of
Immigration Litigation, United States Department of Justice,
Washington, DC, for respondent.

Petition to Review a Decision of the Immigration and
Naturalization Service.

Before: BROWNING, CANBY and HALL, Circuit Judges.

**Opinion**

CYNTHIA HOLCOMB HALL, Circuit Judge:

The petitioners were denied asylum in the United States
under a regulation which categorically precludes asylum for
refugees who have "firmly resettled" in another country.
*See* 8 C.F.R. § 208.14(c)(2) (1994). [1] They argue that the
regulation is ultra vires, and ask us to remand their cause
to the Immigration and Naturalization Service ("INS") for
consideration on the merits. We have jurisdiction over this
timely appeal pursuant to    8 U.S.C. § 1105a(a). Finding that
the regulation does not violate its enabling statute, we deny
the petition.

**I**

The petitioners are a Hmong family from Laos. They claim
that during the Vietnam War, members of their family
cooperated with the American military and CIA against the
communists. In return, they say, they received promises of
asylum in the United States.

When the Pathet Lao came to power in Laos in 1975,
petitioner Pao Yang, his wife Ying, and others of their
extended family fled to Thailand. They claim that they
immediately sought passage to the United States, but that the

96 Cal. Daily Op. Serv. 2042, 96 Daily Journal D.A.R. 3456

American government denied their request for asylum. For three years the family remained in a Thai refugee camp, until the French government offered them admission to France as refugees. The Yangs accepted the French offer, they say, because Thai authorities threatened them with deportation to Laos if they refused.

Pao and Ying Yang thus took refuge in France, where they remained for fourteen years and had four children, who are also petitioners in this case. In spite of this long period of residence in France, the BIA determined that under French law the family remained foreign refugees rather than French citizens or permanent residents. It is unclear whether the Yangs either applied or became eligible for permanent residence in France. In any event, they maintain that they never intended to remain in France. Pao Yang attests that the family considered **\*934** France merely a stopping point on their way to the United States, but that the French government refused them travel documentation until 1991. Once they obtained their documents, the parents came to the United States as visitors. The children followed.

The Yangs overstayed their visas, and the INS ordered them to show cause. On January 28, 1994, an immigration judge ("IJ") found them deportable under section 241(a)(1)(B) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1251(a)(1)(B). In reviewing their application for asylum under section 208 of the INA, 8 U.S.C. §§ 1158(a), (c), the IJ determined that the Yangs were ineligible for relief under the accompanying regulations, which deny asylum to applicants who have "firmly resettled" in a third country. *See* 8 C.F.R. §§ 208.14(c)(2) (denying asylum to applicants firmly resettled), 208.15 (defining "firmly resettled").

The Yangs conceded arguendo that they were at one time firmly resettled in France, but denied that they necessarily retained the right under French law to return to France. Furthermore, returning to Laos was not an option. According to an INS report, the Yangs faced continuing threats to "life or freedom" in Laos. On the basis of this advice, the IJ withheld the family's deportation to Laos under section 243(h) of the INA, 8 U.S.C. § 1253(h), and designated France as the family's destination of deportation or, in the alternative, voluntary departure.

The Yangs appealed to the Board of Immigration Appeals ("BIA") solely on the basis that regulation 208.14(c)(2) was ultra vires. The BIA summarily dismissed the appeal on June 28, 1994. The Yangs renew the claim on appeal to this court. We review de novo the BIA's determination of this purely legal question regarding the requirements of the Immigration and Nationality Act. *Ghaly v. INS,* 58 F.3d 1425, 1429 (9th Cir.1995).

## II

**[1]** Under INS regulation 208.14(c)(2), the finding that an alien has "firmly resettled" in a third country prior to his or her arrival in the United States bars that alien's eligibility for asylum. 8 C.F.R. § 208.14(c)(2). The question presented in this case is whether this regulation violates its enabling statute, section 208 of the INA, 8 U.S.C. § 1158(a), [2] which permits the Attorney General to grant asylum as a matter of discretion.

**[2]** Section 208 gives the Attorney General discretion to grant asylum to aliens who meet a statutory definition of eligibility. In practice this decision is delegated to the INS, *see* *Patel v. INS,* 638 F.2d 1199, 1201 n. 1 (9th Cir.1980), which considers asylum applications in two stages. *See* *Kazlauskas v. INS,* 46 F.3d 902, 905 (9th Cir.1995) (describing two-stage procedure). At the first stage, the INS inquires into eligibility. An alien is eligible if he or she is determined to be a "refugee" within the meaning of INA section 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). [3] A **\*935** finding of eligibility merely entitles the alien to submit an application for asylum; it does not guarantee that asylum will be granted.

At the second stage, the INS makes a discretionary decision on the application. Section 208 does not explicitly limit or structure this exercise of discretion, except to disqualify any alien "convicted of an aggravated felony." 8 U.S.C. § 1158(d). [4] It states only that "an [eligible] alien *may* be granted asylum *in the discretion of* the Attorney General." 8 U.S.C. § 1158(a) (emphasis added). As we have previously noted, this language amounts to a "broad delegation of power" to the Attorney General. *Komarenko v. INS,* 35 F.3d 432, 436 (9th Cir.1994).

The question before us is whether the INS may exercise this discretion by creating a rule that automatically excludes a

96 Cal. Daily Op. Serv. 2042, 96 Daily Journal D.A.R. 3456

particular class of applicants. Under the INS regulations in effect until October 1, 1990, the INS was to evaluate an asylum application by weighing against each other a number of equitable factors. *Matter of Pula,* 19 I. & N. Dec. 467, 473–74 (BIA 1987) (listing the factors to be considered for grant of asylum); *Kazlauskas,* 46 F.3d at 906 (approving and applying the *Pula* standards). These factors had no fixed weight, but were to be taken together and viewed in the "totality of the circumstances." *Pula,* 19 I. & N. Dec. at 474. The October 1990 regulations, at issue in this appeal, follow the *Pula* approach, but add to the calculus categorical bars to asylum for aliens in three categories, [5] one of which covers aliens "firmly resettled" in a third country. 8 C.F.R. § 208.14(c)(2). Under the new regulation, a finding of firm resettlement trumps any other equities in the applicant's favor. The Yangs argue that this rule contravenes the INA by precluding the INS from exercising its discretion in individual cases.

[3] We must reject the argument that regulation 208.14(c)(2) exceeds the authority of the Attorney General if we find that the regulation has a "reasonable foundation ... that is, if it rationally pursues a purpose that it is lawful for the INS to seek." *Reno v. Flores,* 507 U.S. 292, 309, 113 S.Ct. 1439, 1451, 123 L.Ed.2d 1 (1993) (citing *Carlson v. Landon,* 342 U.S. 524, 541, 72 S.Ct. 525, 534–35, 96 L.Ed. 547 (1952)) (internal quotations omitted). Following the doctrine announced in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we must first consider "whether Congress has directly spoken to the precise question at issue." *Id.* at 842–43, 104 S.Ct. at 2781. Thus we begin with traditional methods of statutory interpretation. If it then appears that Congress has been silent with respect to the specific issue, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782. In the face of ambiguity or Congressional silence, we should defer to the agency's considered judgment. *Id.*; *Van Blaricom v. Burlington N. Ry. Co.,* 17 F.3d 1224, 1225 (9th Cir.1994).

The language of section 208 is silent as to firm resettlement. As discussed above, it simply grants the Attorney General "discretion" to grant asylum to eligible aliens, subject only to an exception for aliens convicted of aggravated felonies.

8 U.S.C. § 1158(d). The Yangs contend, first, that this mandate to exercise discretion precludes the agency's giving conclusive weight to a single factor, such as firm resettlement. In their view, Congress envisaged this "discretion" as something like an individualized accounting of every equity that bears on a particular application. We reject this argument for two reasons.

**\*936** First, the Yangs mistakenly presume that the equitable factors announced in *Pula* are themselves statutorily mandatory, and reflect a Congressional determination that *these* factors must be considered in any exercise of "discretion" under section 208. This is false. The *Pula* factors were not dictated by the INA, but were created judicially by the BIA. The INS is, presumably, free to alter or amend them, provided it does so in a manner consistent with the text and purposes of the INA, and without otherwise running afoul of the "arbitrary and capricious" standard set out in section 706(2)(A) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Regulation 208.14(c)(2) may or may not conflict with *Pula;* [6] this is irrelevant because both are instruments of delegated discretion.

[4] [5] Second, it is a well-established principle of administrative law that an agency to whom Congress grants discretion may elect between rulemaking and ad hoc adjudication to carry out its mandate. *American Hosp. Ass'n v. NLRB,* 499 U.S. 606, 611–13, 111 S.Ct. 1539, 1543, 113 L.Ed.2d 675 (1991); *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 294, 94 S.Ct. 1757, 1771–72, 40 L.Ed.2d 134 (1974). As the Supreme Court has stated, "even if a statutory scheme requires individualized determinations, the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority." *American Hosp.,* 499 U.S. at 612, 111 S.Ct. at 1543. Thus, in *American Hospital,* the Court permitted the NLRB to promulgate a rule even though the underlying statute, which instructed the agency to make a particularized decision "in each case," suggested a Congressional preference for ad hoc adjudication over rulemaking. *Id.* at 609–11, 111 S.Ct. at 1542.

Under the INA, the term "discretion" does not supplant this general grant of permission for rulemaking. In *Reno,* the Supreme Court upheld an INS regulation in circumstances

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

96 Cal. Daily Op. Serv. 2042, 96 Daily Journal D.A.R. 3456

similar to those before us. The respondents were a class of alien juveniles who had been taken into INS custody pending their deportation hearings. 507 U.S. at 293–95, 113 S.Ct. at 1443. Custody was intended to secure their appearance before the INS, and to ensure their safety. *Id.* at 295–97, 113 S.Ct. at 1444. The governing statute, however, permitted the Attorney General "in [her] discretion" to release such aliens into the custody of responsible citizens. *Id.* at 293–95, 113 S.Ct. at 1443; 8 U.S.C. § 1252(a)(1) (1993). The contested regulation was promulgated as an exercise of this discretion. It set out a rule which, in essence, allowed juvenile detainees to be released only to members of their families. *Id.* at 295–97, 113 S.Ct. at 1444. The respondents argued, among other things, that this regulation exceeded the authority of the Attorney General; they contended that under the INA, juveniles should also have the option to be released to other "responsible adults" unrelated to them. *Id.*

The Supreme Court rejected this argument and upheld the regulation. It held that a " 'blanket' presumption of the unsuitability of [unrelated] custodians" was not inconsistent with an exercise of discretion under section 1252(a)(1). *Id.* at 312–14, 113 S.Ct. at 1453. Although discretion under the statute required "some level of individualized determination ... this [did] not mean that the Service must forswear use of reasonable presumptions and generic rules." *Id.* (quoting *INS v. National Center for Immigrants' Rights,* 502 U.S. 183, 193–96, 112 S.Ct. 551, 558–59, 116 L.Ed.2d 546 (1991)) (quotation marks omitted). Under this analysis, an exercise of discretion would be sufficiently "individualized" if the INS applied its regulation fairly in individual cases, by individually determining whether each alien would be eligible for the prescribed relief. *Id.* In the present case, this standard is clearly met. The Yangs appeared before an IJ and conceded **\*937** their firm resettlement in France. There can be no question that the regulation determined the outcome of the Yangs' application.

**[6]** Recently this court considered and upheld a companion provision to the regulation now at issue. In *Komarenko,* 35 F.3d 432, we held that regulation 208.14(c)(1) did not exceed the authority of the Attorney General under section 1158(a). The regulation categorically barred asylum for any alien convicted of a "particularly serious crime." *Id.* at 436. We found the regulatory bar to be consistent with the

discretionary mandate of the statute, both because the statute did not explicitly address the specific issue, and because the INS would be required under the regulation "to exercise individualized discretion in determining whether a particular offense would be counted as 'particularly serious.' " *Id. Komarenko* thus stands for the proposition that "discretion" under section 1158(a) may be exercised by rules giving fixed weight to a particular factor.

**[7]** This, however, does not conclude our inquiry under *Chevron* 's first prong. The Yangs offer an independent textualist argument to support their conclusion that the regulation is ultra vires. They read INA section 208 together with sections 207 and 209, all three of which were added to the INA enacted by the Refugee Act of 1980. Refugee Act of 1980, Pub.L. No. 96–212, § 201(b), 94 Stat. 102 (1980), *codified as amended at* 8 U.S.C. §§ 1157–1159. [7] They note that while all three of these sections establish procedures relating to refuge and asylum, sections 207 and 209 explicitly bar applications from firmly resettled aliens where section 208 does not. As the Supreme Court has said elsewhere in the course of interpreting provisions of the Refugee Act, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 432, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987) (citing *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300–01, 78 L.Ed.2d 17 (1983)) (internal quotation marks omitted).

However, we find important differences between the present statutory provisions and those discussed in *Cardoza–Fonseca.* In that case the Supreme Court compared the standards of proof in INA sections 243(h) and 208. Section 243(h) required the Attorney General to withhold deportation for an alien whose "life or freedom would be threatened" in his or her native country. Section 208 gave the attorney discretion to grant asylum to an alien who showed a "well-founded fear" of persecution. The two statutes clearly deployed different and incompatible language to describe their standards of proof. However, the government wished to avoid certain "anomalous" results of having two separate standards of proof in asylum cases. It therefore advised the Court to hold that the same standard of proof applied under both sections. 480 U.S. at 430, 107 S.Ct. at 1212. The Court disagreed. It reasoned that whereas section 208

AR.06839

96 Cal. Daily Op. Serv. 2042, 96 Daily Journal D.A.R. 3456

expressed both subjective ("fear") and objective ("well-founded") components, section 243(h) described a purely **\*938** objective inquiry. 480 U.S. at 430–31, 107 S.Ct. at 1212–13. The Court concluded that by omitting the word fear from the language of section 243(h), and including it in section 208, Congress meant to express its intention that the two standards of proof should differ. Id. at 432, 107 S.Ct. at 1213.

The present case is not governed by *Cardoza–Fonseca* because the statutory provisions before us present no comparable inconsistency. Section 207 establishes the procedure by which an alien *not* present in the United States may apply for entry as a refugee. 8 U.S.C. 1157(c)(1). It gives the Attorney General discretion to admit any refugee who is "not firmly resettled in any foreign country" and who is "determined to be of special humanitarian concern." *Id.* Unlike section 208, it does not exclude serious felons. Section 208, on the other hand, sets up procedures for granting asylum to refugees *within* the United States. As discussed above, it grants the Attorney General discretion without mentioning firm resettlement or special humanitarian concern, but with an explicit exclusion for certain felons. The plain meaning of these two sections read together is that the Attorney General *may not* admit firmly resettled refugees if they apply from abroad, but *may choose* whether to grant them asylum if they manage to apply from within the United States. Because regulation 208.14(c)(2) represents just such a choice, it appears to be consistent with the grant of discretion described in section 208.

To hold otherwise would improperly constrain the statutory discretion of the Attorney General. The Yangs' "deliberate exclusion" argument clearly justifies too much; their reasoning suggests that the mention of felons in section 208 precludes an INS rule barring felons under section 207. Likewise, section 207 directs the Attorney General to admit refugees of "special humanitarian concern;" surely this does not prohibit humanitarian concerns from underpinning the regulations written under the authority of section 208.

Against this conclusion, the Yangs argue that firm resettlement appeared in section 207 but not in 208 because Congress intended to favor applicants already present in the United States. They contend that this policy is evident in other provisions of the INA, which, for example, allow aliens illegally present in the United States to win suspension of deportation, registry, or amnesty—privileges unavailable

to aliens who remain in their homelands. *See* 8 U.S.C. §§ 1160, 1254, 1255a and 1259. This argument is plausible. But like the Supreme Court in *Reno,* 507 U.S. at 312 n. 8, 113 S.Ct. at 1453 n. 8, we think it preferable to divine Congressional intent from the statute in issue before we look elsewhere for indications of the applicable policy. According to section 208, Congress intended to permit the Attorney General to decide how best to address the question what weight to attribute to firm resettlement in the asylum process with respect to aliens present in the United States. Furthermore, we think the regulation makes reasonable sense, for reasons we discuss below.

The second half of the Yangs' textualist attack upon the regulation focuses on the relationship between sections 208 and 209. Here again, the analogy with *Cardoza–Fonseca* is inapt. Section 209 permits a section 208 asylee to become a "permanent resident" after one year of physical presence in the United States, *provided* the alien is not firmly resettled in another country. 8 U.S.C. § 1159(b); 8 C.F.R. § 209.2(a)(iv) (1994). As the Yangs rightly point out, section 209 thus contemplates that an alien may have been granted asylum under section 208 even though he or she had firmly resettled elsewhere. Yet under the regulation a firmly resettled alien would never have been granted asylum. Therefore, they argue, regulation 208.14(c)(2) renders the firm resettlement provision of section 209 superfluous. Be this as it may, we again find no inconsistency. Section 209 clearly allows for the *possibility* that the Attorney General might grant asylum to a firmly resettled alien. However, it does not demand that she do so. Section 209 is pointedly silent with respect to how the Attorney General should exercise her discretionary power under section 208.

**[8]** Thus we conclude our inquiry under *Chevron* 's first prong: Congress has been **\*939** silent on the relevance of firm resettlement to asylum applications under section 208. Moving on to *Chevron* 's second prong, we must now ask whether regulation 208.14(c)(2) reflects a permissible construction of the statute. There can be no question that it does. In *Rosenberg v. Yee Chien Woo,* 402 U.S. 49, 91 S.Ct. 1312, 28 L.Ed.2d 592 (1971), the Supreme Court held that the INS *must* take firm resettlement into account in determining whether an applicant met the statutory definition of a refugee. *Id.* at 54–55, 91 S.Ct. at 1316 (citing "the central theme of all 23 years of refugee legislation-the creation of a haven for the world's homeless people"). Firm resettlement has long

been a decisive factor in asylum policy. Even before the regulation was promulgated in 1990, firm resettlement seems to have precluded a grant of asylum in practice. *See* 🚩 *Matter of Soleimani,* Int. Dec. 3118 (observing that "a finding that an alien has firmly resettled in a third country would normally preclude a grant of asylum as a matter of discretion").

Nothing in the Refugee Act or its legislative history alters the long-standing significance of firm resettlement to the asylum process. The stated purpose of the Act

declares that it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands.... The Congress further declares that it is the policy of the United States to encourage all nations to provide assistance and resettlement opportunities to refugees to the fullest extent possible.

... The objectives of this Act are to provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted.

Refugee Act of 1980, § 101. Regulation 208.14(c)(2) is fully consistent with these aims. Congress intended to give relief to individuals "subject to persecution in their homelands." Because firmly resettled aliens are by definition no longer subject to persecution, the regulation creates no conflict with this aim. Moreover, the regulation seems directly to "encourage" other nations "to provide assistance and resettlement." Finally, to the extent that the Act's purposes are procedural, the regulation does not impede them. [8]

Furthermore, we cannot say that regulation 208.14(c)(2) represents an unreasonable exercise of the Attorney General's discretion. Without this regulation, a firmly resettled alien living abroad might circumvent section 207 by coming illegally to the United States and applying under section 208. Congress need not have foreseen the "bootstrapping" problem for this rationale to support the regulation; it is precisely to cope with the unexpected that Congress deferred to the experience and expertise of the Attorney General in fashioning section 208. Regulation 208.14(c)(2) effectively *harmonizes* sections 207 and 208 by closing a loophole incentive to illegal immigration. *See also* 🔖 *Abdalla v. INS,* 43 F.3d 1397, 1400 (10th Cir.1994) (Regulation 208.14(c)(2) "preclude[s] a deportable alien from bootstrapping an asylum claim simply by unilaterally severing his existing ties to a third country....").

### III

Because we find that regulation 208.14(c)(2) contravenes neither the letter nor the spirit of its enabling statute, the petition is DENIED.

### All Citations

79 F.3d 932, 96 Cal. Daily Op. Serv. 2042, 96 Daily Journal D.A.R. 3456

---

### Footnotes

1    The regulation is now found at 8 C.F.R. § 208.14(d)(2) (1995).

2    Section 208 of the INA, 🔖 8 U.S.C. § 1158 states, in pertinent part:
   **Asylum procedure**
   **(a) Establishment by Attorney General; coverage**
   The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of 🚩 section 1101(a)(42)(A) of this title....
   **(c) Status of spouse or child of alien granted asylum**
   A spouse or child ... of an alien who is granted asylum under subsection (a) may ... be granted the same status....

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

96 Cal. Daily Op. Serv. 2042, 96 Daily Journal D.A.R. 3456

3    🚩 Title 8, section 1101 states, in pertinent part:

**Definitions (a) As used in this chapter—**

...

(42) The term "refugee" means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion....

4    This provision was enacted in 1990 as an amendment to the INA. Immigration Act of 1990, Pub.L. No. 101–649, § 501(a)(2), 104 Stat. 4978, 5048 (1990). Before 1990, section 208 placed no explicit limits on the Attorney General's discretion.

5    The regulation states, in pertinent part:

**(c) Mandatory denials.** An application for asylum shall be denied if:

(1) The alien, having been convicted ... of a particularly serious crime in the United States, constitutes a danger to the community;

(2) The applicant has been firmly resettled within the meaning of § 208.15; or

(3) There are reasonable grounds for regarding the alien as a danger to the security of the United States. 8 C.F.R. 208.14.

6    We note that the BIA itself addressed the relationship between the *Pula* factors and section 208 in a case which arose before the promulgation of regulation 208.14(c)(2). In *Matter of Soleimani,* 20 I. & N. Dec. ——, Int. Dec. 3118 (BIA 1989), the BIA stated that only "in the absence of any regulatory bar" would firm resettlement be treated as one factor of relevance to be weighed against others. This dictum implies that the BIA regarded *Pula* only as an attempt to fill a gap left in INS regulations. We think that the regulation at issue represents the agency's effort to fill this gap.

7    Section 207 states, in pertinent part:

**Annual admission of refugees and admission of emergency situation refugees**

...

**(c) Admission by Attorney General of refugees; criteria; admission status of spouse or child; applicability of other statutory requirements; termination of refugee status ...**

(1) Subject to the numerical limitations [above], the Attorney General may, in [her] discretion and pursuant to such regulations as [she] may prescribe, admit any refugee *who is not firmly resettled* in any foreign country ...

🏳 8 U.S.C. § 1157 (emphasis added).

Section 209 states, in pertinent part:

**Adjustment of status of refugees**

...

**(b) Maximum number of adjustments; recordkeeping**

Not more than 10,000 of the refugee admissions authorized under 🏳 section 1157(a) of this title in any fiscal year may be made available ... to adjust the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum who—

...

(2) has been physically present in the United States for at least one year ...

(3) continues to be a refugee ...

(4) *is not firmly resettled* in any foreign country ...

🏳 8 U.S.C. § 1159 (emphasis added).

8    The legislative history contains no discussion as to why Congress chose not to mention firm resettlement in section 208. *See* S.Rep. No. 256, 96th Cong., 2d Sess., *reprinted in* 1980 U.S.C.C.A.N. 141; H.R. Conf. Rep. No. 781, 96th Cong., 2d Sess., *reprinted in* 1980 U.S.C.C.A.N. 160. We also note that the INS offered

**Yang v. I.N.S., 79 F.3d 932 (1996)**

96 Cal. Daily Op. Serv. 2042, 96 Daily Journal D.A.R. 3456

no explanation for the firm resettlement bar in promulgating the regulations, nor did outside commentators appear to bring the issue to their attention. *See* 55 Fed.Reg. 30,674–79 (1990); 53 Fed.Reg. 11,300, 11,306 (1988); *see also* 52 Fed.Reg. 32,552 (1987); 45 Fed.Reg. 37,392 (1980).

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Bamidele v. I.N.S., 3rd Cir., November 1, 1996

68 F.3d 1540
United States Court of Appeals,
Third Circuit.

You Yi YANG; Bong Won Yee; Guang Feng Li; Chu–Su Chen; Pin Lin; Yong Zhong Pan, a/k/a Pu Wing Chun; So Gee Dong; Chang Chun Lu; Xin–Fei Zhang, a/k/a Xin–Fuei Zarang; Tong Wai Zhang; Dai Min Lu; Shi Chun Zheng; Chun Hua Lin; Xing Chen; Shuidi Zheng; Guo Zhen Xie; Li Yun–You; Ming Long Lin; Dek Fun Lin; Zhong Chen; Wang Chao Lin; Nan Ren Lin; Yeng Ming Lin; Chan Bin Jong; Zeng Hua Zheng; Yung Kwon Cheng; Rui Qui Huang; Shimu Chen; Gui Lin Cheng; Ren Yan Yang; Yong Zheng; Kwai Sung Cheng; Xue Kian Chen; Yi Hong Lin; Gou Zhi Lee; Jian Le Shi; Wu Chao; Xing–Kwong Zheng, a/k/a Xing–Ke Zheng; Xue Yao Lin; Jian Bin Lin; Wing Jong Jung; Bin Hua Zheng; Xiang Gui Cao; Zuoxun Lee; Chai Kan Cheng; Ai Ming Wang; Sing Chou Chung; Jar Jian Wang; He Ping Cao; Zeng–Ping Lui; Kou Zhang Cheng; Gong Shi; Cai Wan Chen; Yue Feng Lee; Zhao Shan Zhao; Fen–Hou Chen; Chong Sheng Qu; Xue–Dee Chen; Mao–Jiang Lin; Wen–Hao Chen; Jian Fu Chai; De Hui Chen; Ji Li Zheng; Fu Sing Zheng; Ye Zing Chai; Fa Yu Zhuang; Shi J Zheng; Zhong Zhou; Lian Bing Zheng; Zhai Young Zhu; Xue Can Zou; Xye Rong Zhan; Au Zia Zhao; Yue Feng Zhang; Da He Zheng; Shan Cien Zhang; Nan Wei Zhang; Hua Yi Zhon; Ye Song; Gin Guan Wu; Yee Jan Wong; Xin Chang Shang; Zhong Wu Luo; Huseh Ta Tang; Wang Wu Dong; You Shui Wang; Zim Sheng Whang; Si Ou; Li Tun Cheng; Pan Shao Min; You Quan Lin; Bi Sheng Liu; Xu Yong Lu; Lu Tian Hao; Ghuan Li Liu; Rui Kan Lin; Xiang Keng Lin; Kong Zhi Li; Duan Sheng Kin; Zhon Guan Li; Jin Lim Fu; Zhe Shung Jain; Hyei Gwor; Wing–Hon Cheng; Dai Zi He; Zhi Ping Gao; Xiang Nmu Gao; Yi Cheng Dong; Ei Young Giang; Son Shing Dong; Jia Reng Dong; Chi Chi Chung; Wor Oi Chin; Zhu F. Cheng; Son Ching Cheng; Gin Sen Cheng; Tia Sian Chen; Kan Guan Chen; Kai Q. Zeng; Guo Cheng Lin; Xiang Guan Cai; Xin Sing Zhou; Yong Qui Chi; Yong Ging Wu; Cian Gluan Yong; Cheng Ye Wu; Ming Guang Liu; Chun Lin Jin; Jan Yon Chung; Zhen Huan Weng; Kang Di Weng; Cheng Xiao Dai; Guo Ping Ye; Chang Qing Zhou; Mei Xi Chen; Jian Biao Weng; Dar Hua Wang; Fui Lin; Zhe Shung Jan; Zhong Ming Tian; Guan Jun Wang; Jian Yun Wan; Jia Wen Liu; Bao Jin Lui; Zhang Song Xhong; Xin Bin Zheng, Appellees,
v.
George MAUGANS, District Counsel of the United States Immigration and Naturalization Service—Baltimore District; David L. Milhollen, Director of the Executive Office for Immigration Review and Chairman of the Board of Immigration Appeals; Richard J. Sharkey, District Counsel of the US Immigration and Naturalization Service—Philadelphia District; J. Scott Blackman, District Director of the US Immigration and Naturalization Service—Philadelphia District; United States Immigration & Naturalization Service; Executive Office For Immigration Review; Janet Reno, Attorney General of the United States; Doris Meissner, Commissioner of the US Immigration and Naturalization Service; Mary Maguire Dunne, Acting Director of the Executive Office for Immigration Review and Acting Chairman of the Board of Immigration Appeals; Janet Reno, Attorney General of the United States; Doris Meissner, Commissioner of the U.S. Immigration and Naturalization Service; George Maugans, District Counsel of the U.S. Immigration and Naturalization Service, Baltimore District; David L. Milhollen, Director of the Executive Office for Immigration Review and Chairman of the Board of Immigration Appeals; Richard J. Sharkey, District Counsel of the U.S. Immigration and Naturalization Service, Philadelphia District; J. Scott Blackman, District Director of the U.S. Immigration and Naturalization Service, Philadelphia District; Mary Maguire

Dunne, Acting Director of the Executive Office for Immigration Review and Acting Chairman of the Board of Immigration Appeals, Appellants, in 95–7316, 95–7317, 95–7318, 95–7319, 95–7320 and 95–7321.

Nos. 95–7316, 95–7317, 95–7318, 95–7319, 95–7320 and 95–7321.

|

Argued Aug. 25, 1995.

|

Decided Oct. 24, 1995.

|

Sur Petition for Rehearing Dec. 27, 1995.

**Synopsis**

Aliens who were ordered excluded after denial of their applications for asylum filed habeas corpus petitions. The United States District Court for the Middle District of Pennsylvania, Sylvia H. Rambo, Chief Judge, granted partial summary judgment, holding that alien had entered the United States within meaning of Immigration and Nationality Act (INA). Government's motion for reconsideration was denied, and District Court ordered deportation as to petitioner and five other petitioners. On appeal, the Court of Appeals, Cowen, Circuit Judge, held that: (1) entry is not effected under INA merely by encroaching upon United States territorial waters without being detected or pursued by authorities, and (2) under INA, aliens have burden of proving that they have satisfied all three elements of entry test before they are eligible for deportation proceedings.

Reversed and remanded.

Sarokin, Circuit Judge, filed a dissenting opinion.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (14)

**[1]     Aliens, Immigration, and Citizenship** 🔑 Substantial evidence in general

Board of Immigration Appeals' (BIA) findings of fact are conclusive and must be upheld if supported by reasonable, substantial and probative evidence on the record considered as a whole. Immigration and Nationality Act, § 106(a)(4), as amended, 🔖 8 U.S.C.A. § 1105a(a)(4).

1 Cases that cite this headnote

**[2]     Administrative Law and Procedure** 🔑 Aliens, Immigration, and Citizenship

**Aliens, Immigration, and Citizenship** 🔑 Law questions

Board of Immigration Appeals' (BIA) interpretation of Immigration and Nationality Act (INA) is entitled to deference under the 🔖 *Chevron* standard governing deference applicable to statutory interpretation by agency charged with administering statute. Immigration and Nationality Act, § 106(a)(4), as amended, 🔖 8 U.S.C.A. § 1105a(a)(4).

1 Cases that cite this headnote

**[3]     Administrative Law and Procedure** 🔑 Permissible or reasonable construction

Where Congress has not spoken directly on the issue, reviewing court asks only whether agency's answer is based on permissible construction of statute.

**[4]**   **Administrative Law and Procedure**   ☞ Aliens, Immigration, and Citizenship

**Aliens, Immigration, and Citizenship**   ☞ Law questions

Board of Immigration Appeals' (BIA) interpretation of burden of proof provisions of Immigration and Nationality Act (INA) as placing upon aliens the burden to prove that they had established all three elements of "entry" test was entitled to deference under ⧉ *Chevron* standards, where that interpretation was not unreasonable. Immigration and Nationality Act, § 291, as amended, 8 U.S.C.A. § 1361.

1 Cases that cite this headnote

**[5]**   **Aliens, Immigration, and Citizenship**   ☞ Distinction between admissibility and removal proceedings

**Aliens, Immigration, and Citizenship**   ☞ Presumptions and burden of proof

Under the Immigration and Nationality Act (INA), aliens have the burden of proving that they have set aside all three elements of entry test before they are eligible for deportation proceedings. Immigration and Nationality Act, § 291, as amended, 8 U.S.C.A. § 1361.

**[6]**   **Aliens, Immigration, and Citizenship**   ☞ Status and classification of aliens in general

Aliens who have "entered" the United States, regardless of whether such entry was legal, enjoy more rights and privileges than those who are still "on the threshold of initial entry."

**[7]**   **Aliens, Immigration, and Citizenship**   ☞ Distinction between admissibility and removal proceedings

Immigration and Naturalization Service (INS) may deport an alien who has effected an "entry" only pursuant to deportation proceeding, whereas it may exclude an alien who has not "entered" through an exclusion hearing.

**[8]**   **Aliens, Immigration, and Citizenship**   ☞ Distinction between admissibility and removal proceedings

In deportation proceedings, aliens receive many advantages that they are not entitled to in exclusion proceedings, including advance notice of the charges against them, direct appeal to the Court of Appeals, and a right to designate the country of destination.

**[9]**   **Aliens, Immigration, and Citizenship**   ☞ Mode and effect of entry or reentry

Under the Immigration and Nationality Act (INA), merely crossing into the territorial waters of United States is insufficient to constitute "physical presence" for purpose of determining whether alien has entered the United States; physical presence requirement of entry test can be satisfied only when alien reaches dry land. Immigration and Nationality Act, § 101(a)(38), as amended, ⚑ 8 U.S.C.A. § 1101(a)(38).

7 Cases that cite this headnote

**[10]**   **Aliens, Immigration, and Citizenship**   ☞ Mode and effect of entry or reentry

In determining whether alien has "entered" United States second element of test, that is, actual or intentional evasion of inspection at nearest inspection point, must be satisfied on dry land, since first element of entry, physical presence, can only be satisfied on dry land. Immigration and Nationality Act, § 101, as amended, 🚩 8 U.S.C.A. § 1101.

5 Cases that cite this headnote

[11] **Aliens, Immigration, and Citizenship** 🔑 Mode and effect of entry or reentry

Under "freedom from official restraint" element of entry test, freedom from official restraint means that alien is no longer under constraint emanating from the government that would otherwise prevent her from physically passing on. Immigration and Nationality Act, § 101, as amended, 🚩 8 U.S.C.A. § 1101.

4 Cases that cite this headnote

[12] **Aliens, Immigration, and Citizenship** 🔑 Mode and effect of entry or reentry

Freedom from official restraint element of entry test can be satisfied only after finding of physical presence in the United States, as freedom from official restraint outside the United States is irrelevant. Immigration and Nationality Act, § 101, as amended, 🚩 8 U.S.C.A. § 1101.

4 Cases that cite this headnote

[13] **Aliens, Immigration, and Citizenship** 🔑 Mode and effect of entry or reentry

When alien attempts to enter the United States, the mere fact that he or she may have eluded the gaze of law enforcement for brief period of time after having come upon United States territory is insufficient, in and of itself, to establish freedom from official restraint required for finding of entry making alien eligible for deportation rather than exclusion. Immigration and Nationality Act, § 101, as amended, 🚩 8 U.S.C.A. § 1101.

3 Cases that cite this headnote

[14] **Aliens, Immigration, and Citizenship** 🔑 Weight and Sufficiency

Aliens who swam ashore from vessel grounded in United States territorial waters failed to satisfy burden that they were "free from official restraint" as required to find that they had "entered" United States; none of aliens ever left beach area, which was teeming with law enforcement activity soon after ship ran aground, and none of the aliens were free to go at large and mix with general population, but instead all were either apprehended shortly after coming ashore or brought into custody as result of immediate and intense law enforcement efforts. Immigration and Nationality Act, § 101, as amended, 🚩 8 U.S.C.A. § 1101.

2 Cases that cite this headnote

## Attorneys and Law Firms

**\*1542** Craig T. Trebilcock, Stock & Leader, York, PA, Frances P. Rayer, Pepper, Hamilton & Scheetz, Philadelphia, PA, Beverly J. Points, York, PA, Ann Carr, Lancaster, PA, Robert S. Kitchenoff, David H. Weinstein (argued), Weinstein, Kitchenoff, Scarlato and Goldman, Philadelphia, PA, Kathleen Blanchard, Astra Merck, Inc., Wayne, PA, Sharon J. Phillips, New York

City, Kurt A. Blake, Katherman & Heim, York, PA, for appellees Dek Fun Lin, Shimu Chen, Chao Wu, Sing Chou Chung, Dar Hwa Wang, Zhao Shan Zhao.

Philemina M. Jones, David M. McConnell, Gary G. Grindler (argued), **\*1543** United States Department of Justice, Office of Immigration Litigation, Washington, DC, for appellants George Maugans, District Counsel of the United States Immigration and Naturalization Service—Baltimore District, David L. Milhollen, Director of the Executive Office for Immigration Review and Chairman of the Board of Immigration Appeals, Richard J. Sharkey, District Counsel of the United States Immigration and Naturalization Service—Philadelphia District, J. Scott Blackman, District Director of the United States Immigration and Naturalization Service—Philadelphia District, Immigration & Naturalization Service, Executive Office for Immigration Review, Janet Reno, United States Attorney General, Doris Meissner, Commissioner of the United States Immigration and Naturalization Service, Mary Maguire Dunne, Acting Director of the Executive Office for Immigration Review and Acting Chairman of the Board of Immigration Appeals.

Before: GREENBERG, COWEN and SAROKIN, Circuit Judges.

## OPINION OF THE COURT

COWEN, Circuit Judge.

This case involves the issue of whether an "entry" may be effected pursuant to section 101 of the Immigration and Nationality Act of 1952 ("INA"), 8 U.S.C. § 1101, merely by encroaching upon United States territorial waters without being detected or pursued by authorities. Also at issue is whether the district court accorded the Board of Immigration Appeals' ("BIA") construction of section 291 of the INA, 8 U.S.C. § 1361, which is the statute's burden of proof provision, the deference to which it was entitled under the standard the Supreme Court set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The related appeals before us arise from the *habeas corpus* petitions of six citizens of the People's Republic of China who are currently being held for deportation by the Immigration and Naturalization Service ("INS"). Petitioners Sing Chou Chung ("Chung"), Dek Fun Lin ("Lin"), Shimu Chen ("Chen"), Wu Chao ("Chao"), Shan Zhao ("Zhao") and Dar Hwa Wang ("Wang") set foot upon a Rockaway, Queens beach on June 6, 1993, after having traveled for three months in the cargo hold of the "Golden Venture," an alien smuggling ship carrying over 300 passengers. None of the petitioners ever left the beach area and all of them admittedly were arrested within thirty minutes of their arrival.

Chung, Lin, Chen, Chao, Zhao and Wang all had their legal claims adjudicated in exclusion proceedings. At their respective exclusion proceedings, the six petitioners' applications for asylum were denied and they were ordered excluded from the United States. They then filed *habeas corpus* petitions in the United States District Court for the Middle District of Pennsylvania, pursuant to section 106(b) of the INA, 8 U.S.C. § 1105a(b). All six petitioners proceeded to file motions in the district court for partial summary judgment on the issue of whether they had "entered" the United States within the meaning of the INA. [1]

On May 16, 1995, the district court held that petitioner Chung had "entered" the United States as a matter of law before he had reached dry land. *Chung v. Reno,* 886 F.Supp. 1172, 1184 (M.D.Pa.1995). As to the allocation of the burden of proof under section 291 of the INA, the district court further held that it was unreasonable for the BIA to place the burden upon illegal aliens to establish **\*1544** that they were "free from official restraint." *Id.* at 1185. On June 6, 1995, the district court denied the government's motion for reconsideration and ordered deportation proceedings to commence against Chung within ten days. The government was ordered to release Chung if deportation proceedings were not commenced within that time period. On June 9, 1995, based upon its decision in *Chung,* the district court ordered the government to initiate deportation proceedings against petitioners Lin, Chen, Chao, Zhao and Wang.

The government appeals the district court's orders granting partial summary judgment on the issue of entry in the six petitioners' *habeas corpus* actions. As the district court interpreted our decision in   *United States v. Vasilatos,* 209 F.2d 195 (3d Cir.1954) too broadly and failed to accord the BIA's interpretation of the INA the required level of deference, we reverse.

## I.

### A.

These cases arise from the following series of events, as described in the BIA's decision in   *Matter of G–,* Int.Dec. 3215, at 5–7 (BIA 1993). In the early morning hours of June 6, 1993, the "Golden Venture" struck a sandbar 100 to 200 yards offshore of Fort Tilden Military Reservation, which is located on the Rockaway Peninsula in the Gateway National Recreation Area in Queens, New York. The plight of "Golden Venture" first came to the attention of law enforcement officers at approximately 1:45 a.m. At that time, two United States Department of the Interior Park Police officers saw the ship, some of its passengers running on the beach and others attempting to swim ashore. At 1:58 a.m., the officers contacted the New York City Police Department ("NYPD") and other law enforcement agencies for assistance.

A formidable array of law enforcement officers soon arrived upon the scene. NYPD officers responded to the emergency call at 2:19 a.m. Soon thereafter a police cordon was set up to secure the beach area. Also involved in the rescue operation were police canine units, New York State Police helicopters equipped with searchlights, Coast Guard boats and helicopters and personnel from the New York Park Police, the Jacob Riis Park Police, the New York City Fire Department and the Emergency Medical Service. INS officials arrived at approximately 3:30 a.m.

Over 100 "Golden Venture" passengers remained on the ship to await the arrival of rescue personnel. Approximately 200 of the passengers, however, decided to hazard the fifty-three-degree waters and high waves by attempting to swim ashore. Although it appears that most of the people who ultimately reached the beach were too exhausted to go farther, about thirty passengers fled into the surrounding community before the perimeter of the beach had been sealed off. Others were arrested on the beach and held in a building on Fort Tilden Military Reservation. The police escorted passengers who needed medical attention to local hospitals where, after they received appropriate medical treatment, were placed in the custody of the INS.

At York County Prison, exclusion hearings were brought against the "Golden Venture" detainees, including the six petitioners. At their respective exclusion proceedings, the petitioners provided the following accounts of their arrivals: Chung, Lin and Chen said that they jumped from the ship, swam ashore and lay down in exhaustion until they were approached by an officer. Chao also said that he jumped from the ship and swam ashore. He came up on the beach near a fence, walked about thirty steps, changed his clothes and waited until some officers took him away. Zhao averred that he "almost walked to the street" before a police officer approached him approximately thirty minutes after his arrival on the beach. Wang stated that he jumped into the ocean, swam ashore, changed clothes and sat on the beach. While on the beach he was taken away by the officers after being given emergency care.

The BIA entered a final exclusion order in each of petitioners' cases after concluding that the aliens had not proven that they made an "entry" into the United States within the meaning of section 101 of the INA. All six petitioners and many of their "Golden Venture" co-passengers also applied for political **\*1545** asylum in their exclusion hearings, alleging that they were being persecuted by China's one-child-to-a-family policy. Their applications for asylum were all rejected. Presently the petitioners, along with nearly half the "Golden Venture" passengers, are being detained at York County Prison in Pennsylvania.

### B.

The BIA addressed the issue of entry in *Matter of G–,* which involved the case of petitioner Sing Chou Chung, one of the "Golden Venture" passengers. Applying well-established law, the BIA defined "entry" as requiring satisfaction of the following three elements: "(1) a crossing into the territorial limits of the United States, i.e., physical presence; (2)(a) inspection and admission by an immigration officer, or (b) actual and intentional evasion of inspection at the nearest entry point; and (3) freedom from official restraint." *Id.* at 8 (citing *Correa v. Thornburgh,* 901 F.2d 1166, 1171 (2d Cir.1990); *Matter of Patel,* Int.Dec. 3157 (BIA 1991), 1991 WL 353524).

Since Chung landed on the beach, the BIA found that he had satisfied the "physical presence" requirement. The BIA also found that the second element of the entry test had been met because "the circumstances under which the *Golden Venture* landed, [Chung's] payment of money to a smuggling operation for passage to the United States, his lack of travel documents entitling him to enter this country, and his conduct once he came ashore" suggested that Chung intended to evade inspection at the nearest entry point. *Matter of G–,* Int.Dec. 135, at 13 *Matter of G–,* Int.Dec. 135, at 13.

The determinative factor was whether Chung had satisfied the third element of the entry test, i.e., whether he was ever "free from official restraint." The BIA interpreted section 291 of the INA as placing the burden upon the "Golden Venture" aliens to establish that they were free from official restraint. The BIA recognized that "in cases where there is no clear evidence of the facts determinative of the entry issue, those cases ultimately must be resolved on where the burden of proof lies." *Id.* at 11. The BIA held that Chung did not "enter" the United States because he had failed to meet this burden. *Id.* at 14–15.

## C.

Over 100 of the detainees, including the petitioners, filed *habeas corpus* petitions in the United States District Court for the Middle District of Pennsylvania, pursuant to section 106(b) of the INA, 8 U.S.C. § 1105a(b). As these petitions presented similar issues, the district court consolidated them under the caption *Yang You Yi v. Maugans,* No. 93–1702. The consolidation order, entered on November 15, 1993, consolidated "for all purposes" current and future *habeas corpus* petitions from the "Golden Venture" passengers detained at York County Prison.

After the district court's consolidation order had been entered, the six petitioners filed individual motions for partial summary judgment on the issue of whether they had effected an "entry" into the United States. On May 16, 1995, the district court granted petitioner Chung's motion for partial summary judgment, holding that he had entered the United States within the meaning of the INA. *Chung v. Reno,* 886 F.Supp. at 1185. The district court concluded that the BIA had applied the governing immigration law incorrectly in two areas. First, the court rejected the BIA's conclusion that all three elements necessary to establish that an entry into the United States has occurred must be satisfied while the alien is on "dry land." *Id.* at 1179. The district court interpreted our decision in *United States v. Vasilatos,* 209 F.2d 195 (3d Cir.1954), as binding authority, which led it to conclude that Chung had satisfied all three elements of the entry test before he reached dry land. *Chung,* 886 F.Supp. at 1184.

The district court further held that the burden of proof had not been properly allocated by the BIA. The district court held that the INA's burden provision required Chung to establish only that had he made a physical entry into the United States at a point distant from an inspection station. *Id.* at 1185. Accordingly, the district court granted Chung's motion for partial summary judgment, concluding that he had entered **\*1546** the United States as provided by the INA. *Id.*

The government sought reconsideration under Fed.R.Civ.P. 59(e). On June 6, 1995, the district court denied the government's motion and ordered deportation proceedings to commence against Chung within ten days. In separate one-page orders issued on June 9, 1995, the district court ordered deportation proceedings to begin within ten days for petitioners Lin, Chen, Chao,

Zhao and Wang. On June 20, 1995, the district court denied the government's motion for a stay pending appeal. These appeals followed.

## II.

We must decide whether the petitioners were entitled to have their cases adjudicated in a deportation hearing, as opposed to the more summary exclusion proceedings which they did in fact receive. We also must decide, as between the alien and the government, who has the burden of proving that an alien was "free from official restraint" under section 291 of the INA, 8 U.S.C. § 1361. The district court had jurisdiction under section 106(b) of the INA, 8 U.S.C. § 1105a(b). We have jurisdiction pursuant to 28 U.S.C §§ 1291 and 2253. We review *de novo* the district court's grant of the *habeas corpus* petitions. *United States v. Cleary,* 46 F.3d 307, 309–10 (3d Cir.1995).

**[1]** **[2]** **[3]** As the district court recognized, the BIA's findings of fact are conclusive and must be upheld "if supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4). The BIA's interpretation of the INA is also entitled to deference pursuant to the Supreme Court's decision in *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82. *See Fatin v. INS,* 12 F.3d 1233, 1239 (3d Cir.1993) (applying *Chevron* standard to the BIA's interpretation of the Refugee Act of 1980). Where Congress has not spoken directly on the issue, we ask only "whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782.

## III.

Section 291 of the INA places the burden of proving entry as follows: "Whenever any person ... makes application for admission, or otherwise attempts to enter the United States, the burden of proof shall be upon such person to establish that he ... is not subject to exclusion under any provision of this chapter...." 8 U.S.C. § 1361. The BIA interprets this section as placing upon aliens the burden to prove that they have established all three elements of the aforementioned "entry" test. The district court, however, shifted the burden of proof to the government to establish that the petitioners were not free from official restraint. It held that section 291 requires aliens to prove only that they have "physically entered the United States at a point distant from an inspection station." *Chung,* 886 F.Supp. at 1185. In so holding, the court relied upon the Eastern District of New York's decision in *In re Application of Phelisna,* 551 F.Supp. 960 (E.D.N.Y.1982).

Three days after the district court's decision in *Chung,* the Court of Appeals for the Second Circuit expressly overruled *Phelisna* 's holding concerning the proper allocation of the burden under section 291. *Xin–Chang Zhang v. Slattery,* 55 F.3d 732 (2d Cir.1995). The *Zhang* court held that the INA was ambiguous on the allocation of the burden of proving entry, but deferred to the BIA's interpretation of section 291 because it was not unreasonable. *Id.* at 756. On reconsideration, the district court in this matter rejected the Second Circuit's reasoning. The district court placed the burden upon the government to establish lack of freedom from official restraint, concluding that the government is in the better position to know when and how it placed the alien into custody or under surveillance. *Chung v. Reno,* No. 94–1702, slip op. at 9 (M.D.Pa. June 6, 1995).

**[4]** **[5]** The BIA's interpretation of the burden of proof provisions of the INA is entitled to deference under the standards set forth in *Chevron.* As this court indicated in *Fatin v. INS,* 12 F.3d at 1233, *Chevron* requires the following principles to be applied when we review the BIA's interpretation of INA:

**\*1547** [I]n considering an interpretation adopted by the Board, we must ask whether Congress has directly spoken to the precise question at issue. If it has not, we may not simply impose [our] own construction on the statute. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 1239 (citations and internal quotation marks omitted). We do not believe that the BIA's interpretation of section 291 is unreasonable. *See Zhang,* 55 F.3d at 756. We therefore hold that under the INA, aliens have the burden of proving that they have satisfied all three elements of the entry test before they are eligible for deportation proceedings.

## IV.

**[6]** **[7]** **[8]** The United States' immigration laws prescribe two types of proceedings in which aliens may be expelled from the country—deportation hearings and exclusion hearings. *Landon v. Plasencia,* 459 U.S. 21, 25, 103 S.Ct. 321, 325, 74 L.Ed.2d 21 (1982). Our immigration laws also distinguish between aliens who have "entered" the United States, regardless of whether such "entry" was legal, and aliens who come to our borders seeking admission. *Leng May Ma v. Barber,* 357 U.S. 185, 187, 78 S.Ct. 1072, 1073, 2 L.Ed.2d 1246 (1958). Aliens who have "entered" enjoy more rights and privileges than those who are still "on the threshold of initial entry." *Id.* (quoting *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956 (1953)). The INS may deport an alien who has effected an "entry" only pursuant to a deportation proceeding, whereas it may exclude an alien who has not "entered" through to an exclusion hearing. *Landon,* 459 U.S. at 25, 103 S.Ct. at 325. In deportation proceedings, aliens receive many advantages that they are not entitled to in exclusion proceedings, including advance notice of the charges against them, direct appeal to the Court of Appeals and a right to designate the country of destination. *Correa,* 901 F.2d at 1171 n. 4.

### A.

**[9]** The first element of the entry test requires aliens to establish that they were physically present within the territorial limits of the United States. The district court's finding that the "physical presence" requirement of the entry test was satisfied while the "Golden Venture" passengers were still aboard the ship expressly rejected the reasoning of both the Second and the Fourth Circuits in other *habeas corpus* cases arising from the same incident. [2] *See Zhang,* 55 F.3d at 732; *Chen Zhou Chai v. Carroll,* 48 F.3d 1331 (4th Cir.1995). In *Chen,* the Court of Appeals for the Fourth Circuit held that "mere presence in the territorial waters of the United States does not constitute an entry into the United States." *Id.* at 1343. Similarly, as the Court of Appeals for the Second Circuit reasoned in *Zhang,* "United States immigration law is designed to regulate the travel of human beings, whose habitat is land, not the comings and goings of fish or birds." *Zhang,* 55 F.3d at 754. Interpreting the same provision of the INA, the Second Circuit held that "an alien attempting to enter the United States by sea has not satisfied the physical presence element ... at least until he has landed." *Id.*

The district court rejected the Second and Fourth Circuits' *terra firma* rule in part because it concluded that our decision in *Vasilatos* was binding. *Vasilatos* involved a Greek seaman who was convicted of entering the United States after having been

deported. Vasilatos was a crew member aboard a Greek ship that arrived in Philadelphia as its first port of call. *Vasilatos,* 209 F.2d at 196. In Philadelphia an immigration officer asked Vasilatos if he had ever been deported. Vasilatos lied and was granted admission for a twenty-nine-day stay in the United States. *Id.* at 196–97. Vasilatos did not leave the ship in Philadelphia. The ship sailed on to Baltimore, where Vasilatos jumped ship. He was arrested in New York the following year. *Id.* at 197.

**\*1548**  Vasilatos was tried and convicted in the Eastern District of Pennsylvania for feloniously attempting to enter the United States after having been deported. Vasilatos challenged the court's venue, claiming that he had not entered the United States in Philadelphia. The *Vasilatos* court rejected this argument, reasoning that the "presence in the United States which is essential to entry existed when, and even before, the ship arrived in Philadelphia." *Id.* Moreover, "[t]he other essential factor, freedom from restraint, came into existence when an immigration officer in Philadelphia cleared Vasilatos for a temporary stay in the United States." *Id.* Since Vasilatos had "entered" the United States in Philadelphia, we held that the venue of Vasilatos' trial was properly in the Eastern District of Pennsylvania. *Id.* at 198.

The district court concluded that *Vasilatos* mandates a departure from the Second and Fourth Circuits' decisions in *Zhang* and *Chen.* We disagree. The district court failed to consider the changes that Congress made in the immigration laws in 1952. As the Senate Report discussing the INA observed, "[t]he purpose of the bill is to repeal all immigration and nationality laws and to enact a completely revised immigration and nationality code." S.REP. No. 1137, 82d Cong., 2d Sess. 1 (1952). Although *dictum* from *Vasilatos* supports the district court's decision, [3] the *Vasilatos* court made plain that its decision was governed by the immigration laws in existence before Congress enacted the INA. *Vasilatos,* 209 F.2d at 196.

Before the INA was enacted in 1952, Congress had not provided a statutory definition of "entry." *Id.* at 197. "As a result, courts struggled to define what constitutes an entry for immigration purposes." Mitchell Scott Bloom, Note, *The Disproportionate Effect of the Entry Fiction on Excludable Aliens,* 9 B.C. Third World L.J. 271, 275 (1989). "Entry" is now statutorily defined as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession," excepting certain situations not applicable here. 8 U.S.C. § 1101(a)(13).

The definition of "United States" that the *Vasilatos* court interpreted is to be found in section one of the Immigration Act of 1917, 8 U.S.C. § 173 (repealed). This section stated that "[t]he term 'United States' shall be construed to mean the United States, and *any waters,* territory, or other place subject to the jurisdiction thereof, except the Isthmian Canal Zone...." *United States v. Maisel,* 183 F.2d 724, 726 (3d Cir.1950) (quoting statute) (emphasis added). Section 101 of the INA provides the current definition of "United States":

> The term "United States," except as otherwise specifically herein provided, when used in a geographical sense, means the continental United States, Alaska, Hawaii, Puerto Rico, Guam, and the Virgin Islands of the United States.

8 U.S.C. § 1101(a)(38). Significantly, the current version does not include waters or airspace subject to the jurisdiction of the United States. Nor can it be said that the current definition implicitly includes territorial waters. As the language of section 101 suggests, the INA provides expressly to the contrary. In the provision regulating travel of citizens and aliens during time of war or national emergency, the definition of the term United States "includes the Canal Zone, and *all territory and waters, continental or insular,* subject to the jurisdiction of the United States." *Id.* at § 1185(c) (emphasis added). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed

that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 432, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987) (citations omitted).

Furthermore, the United States Code contains a variety of definitions for the term **\*1549** "United States" for use in various contexts. [4] Given the multitude of definitions Congress provided for "United States" in different contexts, we think it behooves a court to adhere strictly to the statutory definition applicable to the situation at bar. We therefore conclude that under the Immigration and Nationality Act of 1952, merely crossing into the territorial waters of the United States is insufficient to constitute physical presence for the purpose of determining whether an alien has entered the United States. The "physical presence" requirement of the entry test can be satisfied only when an alien reaches dry land. *See Zhang,* 55 F.3d at 754 (Zhang "was not physically present until he came to the beach"); *Chen,* 48 F.3d at 1343 (Chen never entered the United States because he was apprehended "before he reached the shore"). [5]

## B.

**[10]**   The second prong of the entry test requires "(a) an inspection and admission by an immigration officer or (b) actual or intentional evasion of inspection at the nearest inspection point." *Correa,* 901 F.2d at 1171 (citations omitted). Since the petitioners were not inspected and admitted by an immigration officer, we focus upon the latter requirement. Neither the district court in its decision nor the government on appeal has challenged the BIA's finding that Chung actually and intentionally evaded inspection. The district court nonetheless concluded that this requirement was satisfied before the petitioners reached dry land. *Chung,* 886 F.Supp. at 1184. Because the government has not challenged the BIA's findings as to whether the petitioners actually and intentionally evaded inspection at the nearest place of inspection, and since the district court did not pass on these findings as to five of the petitioners, we decline to reach that issue on appeal. We do observe, however, that since the first element of the entry test (physical presence) can only be satisfied on dry land, it follows that the second element (actual or intentional evasion of inspection at the nearest inspection point) must also be satisfied on dry land. By definition it would appear that such evasion also must occur within the "United States," as defined by the INA.

## C.

**[11]**   **[12]**   The Court of Appeals for the Second Circuit has defined the third element of the entry test, freedom from official restraint, as "mean [ing] that the alien is no longer under constraint emanating from the government that would otherwise prevent her from physically passing on." *Correa,* 901 F.2d at 1172. This requirement can be satisfied only after a finding of physical presence in the United States, because such freedom while outside the United States is irrelevant. The authority that best supports the petitioners' contention that they were "free from official restraint" on June 6, 1993, is the Court of Appeals for the Ninth Circuit's decision in *United States v. Martin–Plascencia,* 532 F.2d 1316 (9th Cir.), *cert. denied,* 429 U.S. 894, 97 S.Ct. 255, 50 L.Ed.2d 177 (1976). *Martin–Plascencia* involved a Mexican juvenile who sought to bypass immigration authorities in and around the port of entry at San Ysidro, California. *Id.* at 1317. He did so by avoiding

> **\*1550** the questioning and inspection areas and, out of the view of the immigration officials, crawled through an opening in a six foot chain link fence and then under a second eight foot chain link fence. [Martin–Plascencia] was attempting to scale a concrete wall onto a San Ysidro street when apprehended. At this point of the entry, [Martin–Plascencia] was no less than 50 yards into the United States.

*Id.*

[13]  Notwithstanding the fact that Martin–Plascencia failed to escape the confines of the port of entry before he was arrested, the *Martin–Plascencia* court held that he had effected an entry into the United States pursuant to the INA. We expressly reject and depart from the Ninth Circuit's reasoning and analysis. When an alien attempts to enter the United States, the mere fact that he or she may have eluded the gaze of law enforcement for a brief period of time after having come upon United States territory is insufficient, in and of itself, to establish freedom from official restraint. *Cf. Bertrand v. Sava,* 684 F.2d 204 (2d Cir.1982) (fifty-three Haitians who were apprehended shortly after they came ashore on a Florida beach all processed in exclusion proceedings), *cited in Matter of G–,* Int.Dec. 3215, at 10 n. 5.

[14]  Based upon the administrative record before us, it is clear that none of the petitioners have satisfied their burden that they were free from official restraint. None of the petitioners ever left the beach area, which was teeming with law enforcement activity soon after the "Golden Venture" ran aground. Nor were any of the petitioners "free to ... go at large and mix with the general population." *Correa,* 901 F.2d at 1172; *Matter of Pierre,* 14 I & N Dec. 467, 469 (BIA 1973). Far from indistinguishably mixing with the general population, petitioners either were apprehended shortly after coming ashore, or were brought into custody as a result of immediate and intense law enforcement efforts. We therefore conclude that the petitioners were never free from official restraint.

## V. CONCLUSION

For the foregoing reasons, we hold that the petitioners could not have effected an "entry" into the United States until they reached dry land. We also hold that the petitioners have the burden of proving that they meet all the requirements of "entry" in order to be entitled to a deportation hearing. We therefore will reverse the district court's orders and remand the cases for further proceedings consistent with this opinion.

SAROKIN, Circuit Judge, dissenting:

The issue presented here is not whether petitioners shall be excluded or deported, but rather what due process rights shall be accorded to them in connection with that determination. Although the inroads which these petitioners made into this country were brief both in distance and time, they were sufficient under existing precedent to satisfy the requirements entitling them to a deportation hearing with its enhanced protections. Whether they will be permitted to stay will be determined in those hearings; all that we decide today is whether those hearings will be full and fair or brief and limited. That petitioners arrived in this country illegally, intending to do so, is not disputed and reflects upon them and the conditions in their own country which forced them to undertake such a hazardous journey. The process by which we deal with them, however, reflects upon our nation and our basic traditions; it is this process that makes such a journey worthwhile to so many.

I.

As the ship "Golden Venture" headed within sight of New York in the early morning hours of June 6, 1993, the approximately 300 Chinese nationals aboard were in the final stages of a long escape from the People's Republic of China (PRC). As described by this court in an earlier decision in this litigation, they endured much hardship in the course of their journey. First they traveled overland, through the mountains of the PRC and Burma to the jungles of Thailand. *See Yi v. Maugans,* 24 F.3d 500, 502 (3d Cir.1994) (denying class certification for the "Golden Venture" passengers). There they **\*1551** climbed into the cargo hold of the smuggling ship "Golden Venture," settling in for a long journey that they hoped would successfully, though illegally,

bring them to the United States. *Id.* The ship sailed for over 100 days—days during which the passengers sat in the bowels of the ship. The culmination of this arduous journey was the grounding of the vessel a mere 100 to 200 yards off the shore of the Gateway National Recreation Area in Queens, New York. *Id.*

As set forth in 🔖 *Matter of G–,* Int.Dec. 3215, at 5–7 (BIA 1993), the passengers on the ship were in desperate straits once it ran aground:

> According to newspaper accounts of several passengers interviewed, pandemonium erupted on board when the ship was grounded. Passengers began spewing out of the cargo hold of their ship, where they had been forced to stay during their 3–month–long voyage. They crowded the ship's deck, only to be told by the ship's crew to jump overboard.

*Id.* at 6.

By the time the ship was first spotted by two park police officers at 1:45 a.m., its passengers were well into an evacuation from the distressed ship. Some of the passengers were already running on the shore, others were in the water, swimming and wading towards the beach, and still others were on board the ship awaiting rescue. At some unspecified time after the arrival of the first rescue personnel at 2:19 a.m., a cordon was established on a portion of the beach, about ¼ to ½ mile long, extending 600 yards inland from the water line.

All six of the petitioners in the instant appeal had reached the beach prior to being encountered by rescue personnel. I recount their individual stories here as they presented them below to the BIA.

Petitioner Dek Fun Lin jumped off the ship after it ran aground. Appendix ("App.") at 144. With difficulty, he swam to shore. When he arrived, he was too exhausted to move and rested on the beach with other passengers from the boat. *Id.* About a half an hour after he arrived, someone in a uniform came up and wrapped him in a blanket, and then others came and offered him medical help. *Id.*

Petitioner Shimu Chen climbed to the deck of the ship when it ran aground and spotted a helicopter. *Id.* at 158. He then followed other passengers and jumped into the water. He struggled to shore where he lay, too exhausted to "continue [his] escape." *Id.* at 159. A man approached him after an unspecified amount of time and carried Chen to a group of other Chinese people where he rested and was looked after until he could be brought to the Red Cross. *Id.*

Petitioner Wu Chao swam for about half an hour in the water before arriving on the beach. *Id.* at 175. When he made it to shore, Chao noticed about ten or fifteen other Chinese nationals on the beach with him, as well as some fences nearby. Then he lay down to rest because he was too exhausted from his swim to leave the beach. *Id.* at 181–82. He was on the beach for a "pretty long time" before he was taken by people wearing blue and white to a place where he received medical attention. *Id.* at 176–77.

Petitioner Sing Chou Chung dove into the water from the "Golden Venture" and swam to shore. Being a weak swimmer, he was exhausted upon arriving there and rested. About a half-hour after he arrived on the beach, Chung was approached by someone in a uniform whom he believes to be a policeman. This person offered him a blanket. He was also given medical care by people wearing white uniforms. Then Chung was handcuffed by police and brought to the hospital. *Id.* at 206.

Petitioner Shan Zhao also arrived on shore on his own. Once on land, he claims that he "almost walked to the street," *id.* at 213, prior to being approached by an official about 30 minutes after he arrived on the beach. *Id.* at 216.

Petitioner Dar Hwa Wang arrived on the beach and noticed that the only other people around were other passengers from the vessel. *Id.* at 235. After "some time," the length of which was unspecified in the record, Wang was given a blanket by "some people," and then about a half an hour later, **\*1552** was taken to an immigration office and then incarcerated. *Id.* at 236.

The first immigration officials arrived on the scene at about 3:30 a.m., some time after the rescue operation was well underway.

In *Matter of G–,* Int.Dec. 3215, at 7. No effort was made to differentiate or keep track of which passengers were found on the shore, which were rescued from the water, which were rescued from the boat, or which were taken to medical facilities. Rather, "[i]mmigration officials processed all detainees as one large group." *Id.* The captain of "Golden Venture" and his crew were arrested pending criminal prosecution for smuggling by the evening of the grounding.

The six petitioners in the instant case, along with about half of their compatriots from the doomed smuggling ship, were taken to York County Prison on June 7, 1993, the day after their tumultuous arrival. They have been detained there ever since—a period of twenty-seven months to date, which followed 100 harrowing days at sea.

II.

In the instant habeas corpus action petitioners claim that they are entitled to deportation hearings rather than exclusion proceedings because they "entered" the United States within the meaning of the Immigration and Nationality Act ("INA"). The type of proceeding to which they are entitled is significant to the petitioners. The procedural protections provided to applicants in deportation hearings are significantly greater than those available to asylum seekers in exclusion proceedings. As the Second Circuit has noted:

> Deportation proceedings are generally more favorable to the alien than exclusion proceedings. Rights available in deportation but not exclusion include advance notice of the charges, a burden of proof placed on the government, direct appeal to the Court of Appeals, the right to seek suspension of the order, and the right to designate the country of destination....

> Other than protection against gross physical abuse, the alien seeking initial entry appears to have little or no constitutional due process protection.

*Correa v. Thornburgh,* 901 F.2d 1166, 1171 n. 5 (2d Cir.1990) (citation omitted).

I respectfully dissent because I believe that the district court was correct in determining that the petitioners here are entitled to adjudicate their asylum claims in deportation hearings with their attendant due process protections. The district court properly concluded that the "Golden Venture" passengers were both physically present and free from official restraint from the time they crossed into the territorial waters of the United States. I also concur with the district court determination that the six petitioners actually and intentionally evaded inspection, although as explained herein, this test ordinarily would not be met by merely crossing into United States territorial waters.

A.

The territorial waters of the United States extend twelve miles from its shores. [1] Petitioners contend, and the district court held, that they were physically present in the United States the moment they crossed into its territorial waters.

I do not contest either the Fourth Circuit's statement, or the majority's reliance upon it, that "mere presence in the territorial waters of the United States does not constitute entry into the United States." *Chen Zhou Chai v. Carroll,* 48 F.3d 1331, 1343 (4th Cir.1995); Majority Opinion, at 1547. The issue is not whether physical presence *alone* constitutes entry, but rather

whether the first prong of the three-prong entry analysis is met by crossing into the territorial waters of the United States. I believe that it is.

I base my conclusion on case law, statutory construction, and clear logic. Like the district court, I am convinced that **\*1553** *United States v. Vasilatos,* 209 F.2d 195 (3d Cir.1954), mandates this conclusion. In *Vasilatos,* the court made very clear that Vasilatos was physically present in the United States prior to arriving on land: "[T]hat presence in the United States which is essential to entry existed when, *and even before,* the ship arrived in Philadelphia. *No landing was necessary* to supply that prerequisite." *Id.* at 197 (emphasis added).

The majority finds *Vasilatos* inapplicable here, making much of the fact that, at the time Vasilatos entered the United States, the INA as it exists today was not yet enacted. Specifically, the majority discredits *Vasilatos* because "[t]he definition of 'United States' that the *Vasilatos* court interpreted" was repealed and replaced by different language when Congress enacted the INA in 1952. *See* Majority Opinion, at 1548. Yet there is no discussion in the *Vasilatos* opinion at all about interpreting the phrase "United States."

Rather, the court looked to the definition of "entry," the word at the heart of this case. *Vasilatos,* 209 F.2d at 197. The court noted that the word "entry," defined in section 101(a)(13) of the INA of 1952 as "any coming of an alien into the United States from a foreign port or place," 8 U.S.C. § 1101(a)(13), was not defined in the immigration laws applicable at the time the *Vasilatos* case arose. However, it concluded:

> It must have been apparent, long before the fact was *emphasized in the 1952 definition* [of entry], that in a literal and *physical* sense a person coming from abroad enters the United States whenever he reaches any land, water or air space within the territorial limits of this nation.

*Id.* at 197 (emphasis added). Thus, the court in *Vasilatos* believed that the 1952 definition of "entry" actually "*emphasized*" its conclusion that a person is physically present in the United States upon crossing into territorial waters. Clearly, then, the *Vasilatos* court thought that the phrase "United States" appearing in the 1952 definition of "entry" included territorial waters.

Even if the majority were correct that *Vasilatos* was based on a now repealed definition of "United States," I think the majority misreads the current statute when it concludes that the term "United States" for purposes of entry does not include territorial waters for three reasons. First, I read the definition of the "United States" supplied in section 101(a)(38) of the INA to include territorial waters. Second, section 215 of the INA and its more specific definition of the "United States", which the majority cites in an effort to show that the general definition of "United States" does not include territorial waters, demonstrates that Congress explicitly *did* anticipate that aliens may have achieved entry by coming into the territorial waters. Third, I am convinced that the majority's conclusion that physical presence can only be accomplished on dry land is too vague and would lead to absurd results in its application. I will address each of these points in turn.

1.

Section 101 of the INA, the definitions section, provides that "United States" is defined as "the *continental* United States, Alaska, Hawaii, Puerto Rico, Guam, and the Virgin Islands of the United States." 8 U.S.C. § 1101(a)(38) (emphasis added). The government asserts, and apparently the majority agrees, that the word "continental" means that this definition encompasses only dry land. The word "continental," however, is used merely to distinguish offshore states and territories from the lower

AR.06858

64 USLW 2302

forty-eight states. This conclusion finds support in 8 C.F.R. § 215.1(f) which reads, "The term *continental United States* means the District of Columbia and the several States, except Alaska and Hawaii." (emphasis in original). [2]

**\*1554**  2.

The majority argues that the definition of "United States" in section 101(a)(38) of the INA cannot mean more than dry land because another section of the Act, section 215(c), presents a more specific definition of "United States" for the purposes of that provision, which includes "all territory and waters, continental or insular." 8 U.S.C. § 1185(c). The majority contends that this definition would be meaningless if territorial waters were already part of the general definition of "United States" in section 101(a)(38) of the Act. Majority Opinion, at 1548–49.

Yet, the section 215(c) definition of "United States," along with its inclusion of territorial waters, applies to a provision of the INA that is *about entry,* and even specifically, the illegal transport of aliens. Thus section 215 and its definition of "United States" actually disproves the majority's point. Section 215(a)(1) provides:

> [I]t shall be unlawful for any alien to depart from or *enter* or attempt to depart from or *enter the United States* except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.

8 U.S.C. § 1185(a)(1) (emphasis added). Section 215(a)(2) provides:

> [I]t shall be unlawful for any person to transport or attempt to transport from *or into the United States* by another person with the knowledge or reasonable cause to believe that the departure or *entry* of such other person is forbidden by this section.

8 U.S.C. § 1185(a)(2) (emphasis added).

Section 215 actually demonstrates that Congress *did* envision that an alien could be physically present in the United States for purposes of entry by crossing into the territorial waters. Indeed, it seems apparent that Congress included the more specific definition of "United States" in this section to emphasize this point, thus ensuring that the President has adequate authority to regulate the entry and departure of aliens into and from the United States.

3.

Finally, I believe it would be impossible to base a determination of physical presence in the United States on arrival on land because it is unclear precisely what "dry land" means. Does this mean touching shore that is not covered by any water at all? What is the effect of high and low tides? Has an alien reached dry land upon standing on a beach that is moist with ocean water, or does the sand need to be perfectly dry? These questions may seem absurd, but they demonstrate how difficult it would be to premise these determinations on such a vague standard which changes as constantly as the tides.

Accordingly, I agree with earlier precedent that, for the purposes of determining physical presence, crossing into the territorial waters of the United States is sufficient. This of course does not mean that crossing into the territorial waters alone is sufficient

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

to constitute entry. Indeed, as long established by the U.S. Supreme Court, an alien can be physically present in the United States and still not have entered the U.S. within the meaning of the INA. *Leng May Ma v. Barber,* 357 U.S. 185, 188, 78 S.Ct. 1072, 1074, 2 L.Ed.2d 1246 (1958). For that, an alien must satisfy the other two prongs of the test.

B.

The second prong of the "entry" test requires that an alien be either inspected and admitted by an immigration officer, or that he or she actually and intentionally evade inspection at the nearest inspection point. The BIA found in the cases of three petitioners, Chao, Chung and Wang, that they had affirmatively met this standard, App. 163, 203, 222, and it made no specific finding on this issue one way or the other for petitioners Lin, Chen and Zhao. App. at 141, 146–47, 211. The majority declined to resolve this issue directly, but implied that an alien must first reach dry land prior to actually and intentionally evading inspection. I agree that this issue need not be expressly resolved on appeal because the government never contested that the six petitioners, all of whom arrived on dry land prior to being approached **\*1555** by any government officials, had actually and intentionally evaded inspection. However, because I consider this prong of the entry analysis to be an important piece of the entire entry puzzle, I will explore this issue in some detail.

In finding that petitioners Chao, Chung and Wang had actually and intentionally evaded inspection, the BIA looked to the conclusion in *Matter of G–,* Int.Dec. 3215 (BIA 1993). In *Matter of G–,* the BIA determined that another passenger from "Golden Venture" demonstrated intent to evade inspection:

> [N]owhere in the record is there evidence suggesting that the applicant deliberately surrendered himself to the authorities for immigration processing, or that, once ashore, he sought them out, voluntarily awaited their arrival, or otherwise acted consistently with a desire to submit himself for immigration inspection. In fact, given the circumstances under which the *Golden Venture* landed, the applicant's payment of money to a smuggling operation for passage to the United States, his lack of travel documents entitling him to enter this country, and his conduct once he came ashore, we find that the requisite intent to evade can be sufficiently gleaned from the record.

*Matter of G–,* Int.Dec. 3215, at 13 (BIA 1993).

This analysis, when applied to the stories of each of the six petitioners in this appeal, makes clear that all of them satisfied the actual and intentional evasion prong: all of them paid money to be smuggled to the United States; none of them carried travel documents; and none of them sought out immigration inspectors once ashore. However, it leaves open the question of whether "Golden Venture" passengers who were either rescued while in the water or while still aboard the ship met this prong.

In its briefs before the court, the government argues that inspection stations are always on land, and thus, in order to have actually evaded inspection, an alien would necessarily have to be on land. While I agree that in most circumstances this would be true, I also am aware that there are at least some circumstances in which inspections take place at sea. The Coast Guard commonly engages in activity related to enforcing immigration laws. For example, during the exodus of thousands of Haitians from Haiti in the early 1990's, the Coast Guard interdicted aliens on the high seas to prevent their illegal entry into the United States. *See* Exec.Ord. No. 12,807, 57 Fed.Reg. 23,133 (1992) (ordering issuance of instructions "to the Coast Guard in order to enforce the suspension of the entry of undocumented aliens by sea").

64 USLW 2302

I thus once again decline to accept a bright line rule that an alien must, unequivocally, be on dry land in order to meet a prong of the entry test. Rather, I think an analysis of numerous facts must be considered in determining whether an alien has actually and intentionally evaded inspection while still at sea. Such facts should include, but are not limited to: (1) whether an incoming vessel is heading toward an inspection site or is intending to avoid any; (2) the proximity of the vessel to an inspection site; (3) the distance traveled within the boundaries of the United States without encountering an inspection site or an inspecting officer; (4) whether the vessel has reached a harbor or other protected area as opposed to being in the open sea; and (5) the presence or absence of government ships or airplanes that could interdict or observe incoming vessels.

In this case, I find the facts tend to support a conclusion that all passengers aboard "Golden Venture" actually and intentionally evaded inspection, regardless of whether they arrived on land. I find that all the detail in the record about the nature of the smuggling operation demonstrated *intent* to evade inspection. Given that "Golden Venture" (1) was not heading toward an ordinary inspection site; (2) was not, as far as the record reveals, in the vicinity of an inspection site; (3) had traveled virtually twelve miles into United States territory; (4) was apparently not in the open ocean but rather in a harbor or other kind of protected area; and (5) had successfully evaded Coast Guard vessels that were allegedly in the area looking  **\*1556**  for it,[3]  I would be inclined to conclude that all of its passengers *actually* evaded inspection. However, given the lack of evidence on the record as to the distance of the vessel from the nearest inspection station and the geographical nature of the harbor or bay where it ran aground, I would remand this determination to the district court for further fact-finding before making an entry determination.


C.

The BIA based its determination that the petitioners in this case never achieved entry on the grounds that they were never free from official restraint. The majority agrees with the BIA's determination, dismissing Ninth Circuit case law as nonbinding on the Third Circuit and concluding that the petitioners had failed to meet their burden of proving they were free from official restraint. As I discuss, *infra,* I disagree with the court's analysis of the burden of proof question. I also disagree with the majority's conclusion that the petitioners were not free from official restraint because I am persuaded that statutory authority and case law cannot support such a conclusion.

"Freedom from restraint" means an alien attempting entry is not under governmental constraint that would "otherwise prevent her from physically passing on." *Correa,* 901 F.2d at 1172, (citing *Vasilatos,* 209 F.2d at 197). This restraint can be effected by someone other than an immigration official. *See* *Vasilatos,* 209 F.2d at 197 (finding restraint of plaintiff was effected by the master of the ship); *Correa,* 901 F.2d at 1172 ("restraint need not be by immigration officers"). Furthermore, official restraint can be accomplished through mere observation; actual physical restraint is not required. *See* *United States v. Aguilar,* 883 F.2d 662, 682 (9th Cir.1989), *cert. denied,* 498 U.S. 1046, 111 S.Ct. 751, 112 L.Ed.2d 771 (1991); *In re Pierre,* 14 Int.Dec. 467, 469 (BIA 1973) ("restraint may take the form of surveillance").

It is not, however, necessary that an alien act upon this freedom. *See* *Aguilar,* 883 F.2d at 683 ("where an alien is able to exercise his free will subsequent to physical entry, he is not under official restraint"); *Matter of Patel,* Int.Dec. 3157 (BIA 1991), 1991 WL 353524 at \*5 ("The critical point ... is that freedom from official restraint exists, not that such freedom has been exercised."). The majority includes no discussion in its analysis regarding whether the aliens aboard "Golden Venture" were free from official restraint prior to arriving on land. Unlike the majority, I have concluded, *supra,* that the petitioners were physically present in the United States prior to arriving on land. Accordingly, I consider whether freedom from official restraint was accomplished at the point of the petitioners' physical arrival in the United States—presence in our territorial waters.

Section 271(a) of the INA, 8 U.S.C. § 1321(a), and the case law that interprets it clearly indicate that an alien *could* be free from official restraint while still in the water. The statute reads in part:

> It shall be the duty of every person, including the owners, masters, officers, and agents of vessels, aircraft [or] transportation lines ... bringing an alien to, or providing a means for an alien to come to, the United States ... to prevent the landing of such alien in the United States at a port of entry other than as designated by the Attorney General or at any time or place other than as designated by the immigration officers.

8 U.S.C. § 1321(a).

This statute has been interpreted to mean that aliens who are physically present in the United States are nonetheless under official restraint by virtue of the duty placed on the owner, master, officer, or agent of the vessel. In *Vasilatos,* the court explained that aliens have not achieved entry merely by crossing into territorial waters "so long as they are detained there pending formal disposition of their requests." *Vasilatos,* 209 F.2d at 197. In support of this proposition, the Third Circuit cited to 8 U.S.C. (1946 ed.) § 146, *reenacted as* 8 U.S.C. § 1321, and noted "[t]he reasonableness of this concept is emphasized by the fact that the master of an incoming vessel is under a legal duty to restrict passengers and crew members to the ship pending immigration clearance." *Id.*

 **\*1557** Similarly, in *Edmond v. Nelson,* 575 F.Supp. 532 (E.D.La.1983), the court determined that Haitian aliens were not free from restraint when they were aboard a ship in U.S. territorial waters because they were under restraint of the ship's captain who was following his section 271 duty:

> While the petitioners were not under 'official restraint,' in that they were not under arrest or in the custody of the INS, it is clear that they were under a restraint required by the statute that governs entry of aliens, a statute that contemplates that law-abiding ship's masters will act as did this ship's master. *For this reason,* entry was never effected.

*Id.* at 535 (emphasis added). [4] It can be inferred from *Edmond* that if the ship's captain had *not* acted according to the statute, but instead released the petitioners, or even told them to dive overboard upon approaching land, they would *not* have been under restraint any longer.

But for ship personnel's duty and authority under section 271 of the INA, then, passengers on board ships in U.S. territorial waters would be free from official restraint. In the instant case, the petitioners were carried into the territorial waters of the United States aboard a smuggling ship. Obviously, captains of smuggling ships are not officially restraining their passengers under section 271. Indeed, in this case, the master of the "Golden Venture" told the passengers to jump ship, *see* *Matter of G–,* Int.Dec. 3215 at 6, clearly indicating he was evading his duty under section 271 and defying the laws of the United States. Thus, I conclude that the passengers aboard "Golden Venture" were free from official restraint from the moment they crossed into the territorial waters of the United States.

However, I do *not* conclude that entry is achieved by merely crossing into U.S. territorial waters without being spotted by U.S. government officials. While I assert that passengers aboard a smuggling ship can be both physically present and free from official restraint the moment they cross into U.S. territorial waters, passengers on board the ship have not entered within the meaning of the INA unless they have also actually and intentionally evaded inspection. As noted in my discussion of evasion of inspection above, only rarely will an alien be found to have actually evaded inspection prior to reaching land.

64 USLW 2302

Furthermore, smuggling ships can still be spotted outside territorial waters and therefore be under official restraint by observation the moment they cross into territorial waters. Indeed, in the case of "Golden Venture," the ship was under surveillance by the Coast Guard prior to its entry into U.S. territorial waters; it was only after the ship disappeared from tracking devices that it was able to slip into the U.S. territorial waters.

<center>III.</center>

While my analysis would preclude the need to address the burden of proof issue, I feel I must do so here because I cannot agree with the majority that the BIA's interpretation of section 291 of the INA is reasonable. Section 291 provides:

> Whenever any person ... makes application for admission, or otherwise attempts to enter the United States, the burden of proof shall be upon such person to establish that he ... is not subject to exclusion under any provision of this chapter....

8 U.S.C. § 1361.

The district court concluded that section 291 does not place the burden of proving freedom from official restraint on the petitioners. Rather, the court originally relied upon *In re Application of Phelisna,* 551 F.Supp. 960 (E.D.N.Y.1982), and concluded that section 291 required nothing more than that petitioners bear the burden of proving they " 'came physically into the United States at some point not in the vicinity of an inspection station.' " *Chung v. Reno,* 886 F.Supp. 1172, 1185 (M.D.Pa.1995) (citing *Phelisna,* 551 F.Supp. at 963). As noted by **\*1558** the majority, the Second Circuit subsequently overruled *Phelisna* 's holding in *Zhang v. Slattery,* 55 F.3d 732, 756 (2d Cir.1995). The district court in this matter then revisited the issue and reached the same conclusion based on a finding that the BIA's interpretation of section 291 was not reasonable. *Chung v. Reno,* No. 94–1702, slip op. at 9 (M.D.Pa. June 6, 1995).

While I agree that the Second Circuit did overrule *Phelisna* 's holding regarding the burden of proof in *Zhang,* I feel it important to note that it did so only on the grounds of deference to administrative interpretation, not because it found the district court's statutory analysis in *Phelisna* to be inherently flawed. Indeed, the *Zhang v. Slattery* opinion explicitly agrees with the conclusion in *Phelisna* that there is " 'no express statutory provision allocating the burden of proving "entry." ' " *Zhang v. Slattery,* 55 F.3d at 756 (citation omitted). The Second Circuit overruled *Phelisna* 's ultimate conclusion only on the grounds that the agency's interpretation of the statute was "reasonable" and thus entitled to deference under *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 845, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984). *Zhang v. Slattery,* 55 F.3d at 756. The majority follows the Second Circuit's reasoning to reach the same conclusion.

I disagree with the majority because I do not find the BIA's statutory interpretation reasonable and thus determine it need not be accorded deference. *Id.* at 845, 104 S.Ct. at 2783 (explaining deference accorded to agency only if the interpretation "reasonable").

The BIA's interpretation of section 291 would require the petitioners to bear the burden of proving that they were not being observed by the government, observation being a form of official restraint. *See In re Pierre,* 14 I & N Dec. at 469. Because observation can "take the form of surveillance, *unbeknownst to the alien,*" *id.,* the alien would be required to prove something she does not know. Indeed, in this case, the ship *was* originally under Coast Guard surveillance prior to being lost again, and it

is inconceivable that any of its passengers were aware of this at the time. I think it is unreasonable, impossible and inequitable to call upon the passengers aboard "Golden Venture" to prove they had not been under such surveillance and therefore conclude that the BIA erred in determining that the burden of proof regarding freedom from official restraint lies with the aliens.

IV.

For the foregoing reasons, I would affirm the district court's decision.

Before: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS, McKEE, and SAROKIN, Circuit Judges.

SUR PETITION FOR REHEARING

Dec. 27, 1995

The petition for rehearing filed by appellees having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied. Judge Sarokin would have granted rehearing in banc for the reasons set forth in his dissenting opinion.

**All Citations**

68 F.3d 1540, 64 USLW 2302

**Footnotes**

1    The question whether the petitioners had "entered" the United States is not merely a matter of semantics. Under the law, once an alien has "entered" the United States, that individual has certain rights that can be adjudicated only pursuant to a full deportation hearing. However, if the individual is found in the United States but never "entered" within the meaning of section 101 of the INA, the alien can be excluded through the summary process of an exclusion hearing.

2    Only about half the "Golden Venture" passengers are being detained at York County Prison. Passengers detained in other jurisdictions have initiated similar cases in other courts.

3    The *Vasilatos* court noted that "[i]t must have been apparent, long before the fact was emphasized in the 1952 definition, that in a literal and physical sense a person coming from abroad enters the United States whenever he reaches any land, water or air space within the territorial limits of this nation." *Vasilatos,* 209 F.2d at 197.

4    For example, Chapter 47, Consumer Product Safety, of Title 15, Commerce and Trade, defines the "United States" to "mean[ ] all of the States." 15 U.S.C. § 2052(a)(14). Under the Federal Unemployment Tax Act, "[t]he term 'United States' ... includes the States, the District of Columbia, the Commonwealth of Puerto Rico, and the Virgin Islands." 26 U.S.C. § 3306(j)(2). Under the Longshore and Harbor Workers' Compensation Act, "[t]he term 'United States' ...

Case 3:20-cv-07721-SI   Document 58-6   Filed 11/10/20   Page 368 of 912

means the several States and Territories and the District of Columbia, including the territorial waters thereof." 33 U.S.C. § 902(9). Finally, under Title 18 of the United States Code, Crimes and Criminal Procedure, "[t]he term 'United States' ... includes all places and waters, continental or insular, subject to the jurisdiction of the United States, except the Canal Zone." 18 U.S.C. § 5.

5    The dissent argues that the majority's standard is vague and can lead to absurd results because it is unclear what "dry land" means. Dissent at 1554–55. The dry land standard requires that the alien reach the shore and be out of water. This is the logical import of the Second and Fourth Circuits' reasoning and analysis and is consistent with our interpretation of the entry test today. We see no ambiguity here.

1    Until recently, the territorial seas of the United States were limited to within three miles from the coast. President Reagan extended this to twelve miles by Presidential Proclamation in 1988. Exec. Order No. 5928, 54 Fed.Reg. 777 (1989). *See* 8 C.F.R. § 287.1(a)(1) (defining "external boundaries" of the United States as "the land and boundaries and the territorial sea of the United States extending 12 nautical miles from the baseline of the United States....").

2    While I recognize that 8 C.F.R. § 215 is a codification of section 215 of the INA, the statutory section the majority posits has an expanded definition of "United States," I find the definition in the regulation instructive for purposes of the general meaning of "continental United States." I further note that the phrase "continental United States" does not exist in the definition of "United States" presented in section 215(c) of the INA, and conclude that the phrase at it appears in 8 C.F.R. § 215 was borrowed from the general definition of "United States" for the whole INA.

3    The record reveals that Coast Guard vessels had tracked "Golden Venture" but lost track of the vessel prior to its crossing into territorial waters.

4    It is notable that the court in *Edmond,* a decision rendered *after* the enactment of the INA in 1952, did *not* rule that petitioners failed to achieve entry because they had not stepped on dry land. Rather, the court recognized they had "entered United States waters," noting "*[h]owever* ... petitioners were ... under lock and key detention by the ship's master," thus implicitly accepting that physical presence for purposes of entry was achieved by crossing into the waters. *Id.* (emphasis added).

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

950 F.3d 147
United States Court of Appeals, First Circuit.

YONG GAO, Petitioner,

v.

William P. BARR, Attorney General, Respondent.

No. 19-1694
|
February 20, 2020

**Synopsis**

**Background:** Alien, a native and citizen of the People's Republic of China, petitioned for review of Board of Immigration Appeals (BIA) order affirming an immigration judge's (IJ) denial of his applications for asylum, withholding of removal, and protection under Convention Against Torture (CAT).

**Holdings:** The Court of Appeals, Stahl, Senior Circuit Judge, held that:

[1] substantial evidence supported finding of that alien's 23-hour detention by police did not constitute past persecution;

[2] alien failed to exhaust his administrative remedies with respect to IJ's finding that he could safely relocate in China upon his return; and

[3] alien waived his claim that he qualified for CAT relief.

Petition denied.

**Procedural Posture(s):** Review of Administrative Decision.

West Headnotes (14)

**[1]    Aliens, Immigration, and Citizenship** 👈 Review of initial decision or administrative review

Where the Board of Immigration Appeals (BIA) adopts and affirms the ruling of an immigration judge (IJ) but also examines some of the IJ's conclusions, the Court of Appeals reviews both the BIA's and IJ's opinions.

**[2]    Administrative Law and Procedure** 👈 Aliens, Immigration, and Citizenship

**Aliens, Immigration, and Citizenship** 👈 Law questions

Court of Appeals reviews de novo legal conclusions in immigration proceedings, with appropriate deference to the agency's interpretation of the underlying statute in accordance with administrative law principles. Immigration and Nationality Act § 242, 🚩 8 U.S.C.A. § 1252(b)(4)(B).

**[3]**     **Aliens, Immigration, and Citizenship** 🔑 Substantial evidence in general

Court of Appeals reviews administrative factual findings in immigration proceedings under the deferential substantial evidence standard, meaning that Court will not disturb such findings if they are supported by reasonable, substantial, and probative evidence on the record considered as a whole. Immigration and Nationality Act § 242, 🚩 8 U.S.C.A. § 1252(b)(4)(B).

**[4]**     **Aliens, Immigration, and Citizenship** 🔑 Acts Constituting Persecution

Persecution, as would support application for asylum, is not defined by statute, and what constitutes persecution is resolved on a case-by-case basis. Immigration and Nationality Act § 101, 🚩 8 U.S.C.A. § 1101(a)(42)(A).

**[5]**     **Aliens, Immigration, and Citizenship** 🔑 Acts Constituting Persecution
        **Aliens, Immigration, and Citizenship** 🔑 Government action or acquiescence

"Persecution," as would support grant of asylum, generally involves a discriminatory harm caused by government action or allowed by government acquiescence that surpasses unpleasantness, harassment, and even basic suffering. Immigration and Nationality Act § 101, 🚩 8 U.S.C.A. § 1101(a)(42)(A).

**[6]**     **Aliens, Immigration, and Citizenship** 🔑 Well Founded Fear of Future Persecution

Severity, duration, and frequency of physical abuse are factors relevant to determination as to whether an alien seeking asylum has well-founded fear of future persecution, as is whether harm is systematic rather than reflective of a series of isolated incidents. Immigration and Nationality Act § 101, 🚩 8 U.S.C.A. § 1101(a)(42)(A).

**[7]**     **Aliens, Immigration, and Citizenship** 🔑 Well Founded Fear of Future Persecution

In determining whether an applicant has well-founded fear of future persecution, as would support grant of asylum, reviewing court considers severity and frequency of the applicant's alleged harassment in light of the nature and extent of the applicant's injuries. Immigration and Nationality Act § 101, 🚩 8 U.S.C.A. § 1101(a)(42)(A).

**[8]**     **Aliens, Immigration, and Citizenship** 🔑 Detention or imprisonment

Substantial evidence supported finding of Board of Immigration Appeals (BIA) and immigration judge (IJ) that Chinese alien's single 23-hour detention by police for reading Bible at work did not constitute past persecution, as would support his application for asylum; alien's detention was neither systematic nor frequent, alien did not establish that duration of his detention was persecutory, and alien's argument that he suffered post-detention economic persecution was undermined by his continued, uneventful residence in China for approximately nine months until his departure on his own passport to the United States. Immigration and Nationality Act § 101, 🚩 8 U.S.C.A. § 1101(a)(42)(A); 🚩 8 C.F.R. § 1208.13(b)(1).

**[9]**     **Aliens, Immigration, and Citizenship** 🔑 Threats, Harassment, and Acts of Violence
        **Aliens, Immigration, and Citizenship** 🔑 Detention or imprisonment

Single detention, even one accompanied by beatings and threats, does not necessarily rise to the level of persecution, as would support asylum application. Immigration and Nationality Act § 101, 8 U.S.C.A. § 1101(a)(42)(A); 8 C.F.R. § 1208.13(b)(1).

**[10]    Aliens, Immigration, and Citizenship** ☞ Economic deprivation

Economic disadvantage must be severe and deliberate to rise to the level of persecution, as would support asylum application. Immigration and Nationality Act § 101, 8 U.S.C.A. § 1101(a)(42)(A); 8 C.F.R. § 1208.13(b)(1).

**[11]    Aliens, Immigration, and Citizenship** ☞ Presentation and preservation of questions at administrative level

Chinese alien failed to exhaust his administrative remedies with respect to finding of immigration judge (IJ) that alien could safely relocate in China upon his return to avoid persecution for his religious beliefs, and thus that he could not establish well-founded fear of future persecution, as required to qualify for asylum, and thus Court of Appeals was precluded from reviewing relocation finding, where alien did not present any argumentation regarding relocation finding before Board of Immigration Appeals (BIA). Immigration and Nationality Act §§ 101, 242, 8 U.S.C.A. §§ 1101(a)(42)(A), 1252(d)(1); 8 C.F.R. §§ 1208.13(b)(1), 1208.13(b)(2)(ii).

**[12]    Aliens, Immigration, and Citizenship** ☞ Presentation and preservation of questions at administrative level

An alien's failure to present developed argumentation to the Board of Immigration Appeals (BIA) on a particular theory amounts to a failure to exhaust administrative remedies as to that theory. Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(d)(1).

**[13]    Aliens, Immigration, and Citizenship** ☞ Reasonable fear of persecution or clear probability standard

Standard for withholding of removal is more stringent than that of asylum. Immigration and Nationality Act § 241, 8 U.S.C.A. § 1231(b)(3)(A); 8 C.F.R. §§ 1208.16(b), 1208.16(b)(2).

1 Cases that cite this headnote

**[14]    Aliens, Immigration, and Citizenship** ☞ Presentation of questions in brief or petition

Chinese alien waived on judicial review his argument that he qualified for relief under Convention Against Torture (CAT), where he merely cited to CAT provision governing eligibility for CAT protection, and recited relevant definition of torture, but failed to offer any developed argumentation relating to claim. 8 C.F.R. §§ 208.16(c)(2)-(3), 208.18(a)(1).

**\*149**  PETITION FOR REVIEW OF AN ORDER OF THE BOARD OF IMMIGRATION APPEALS

**Attorneys and Law Firms**

Adedayo O. Idowu, Silver Spring, MD, for petitioner.

Elizabeth K. Fitzgerald-Sambou, Trial Attorney, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, with whom Joseph H. Hunt, Assistant Attorney General, Civil Division, and Bernard A. Joseph, Senior Litigation Counsel, Office of Immigration Litigation, were on brief, for respondent.

Before Kayatta, Selya, and Stahl, Circuit Judges.

**Opinion**

STAHL, Circuit Judge.

Yong Gao, a native and citizen of the People's Republic of China ("China"), petitions this court for review of a Board of Immigration Appeals ("BIA") order affirming an Immigration Judge ("IJ")'s denial of his applications for asylum, withholding of removal, and protection under Article III of the United Nations Convention Against Torture ("CAT"). After careful consideration of Gao's claims, the BIA's order, and the underlying findings of the IJ, we deny Gao's petition for review.

## I. Factual Background and Procedural History

In China, Gao worked for a construction supply house, where he oversaw deliveries and dispatches. In 2011, a customer named Auntie Li gave Gao a Bible from a church of so-called "Shouters," which China considers to be a cult. Subsequently, Gao attended church meetings at Auntie Li's **\*150** house. Gao also brought the Bible to his place of work and read it during his breaks.

In June or July of 2011, Gao's supervisor caught him reading the Bible at work. The supervisor confiscated the Bible and called the police, who arrested Gao at the supply house. The police took Gao to the public security bureau and questioned him from about 8 or 9 p.m. until midnight. The police then placed Gao in a separate room overnight. The next day, a different officer questioned Gao, pushed his head against the top of a desk, and threatened to beat him. Gao ultimately admitted to the police that Auntie Li had given him the Bible. During his approximately twenty-three hours of detention, Gao was denied food and water. He was released around 7 p.m. on the second day of detention, after his family had paid a 5000-yuan fine to the police. Gao subsequently attempted to return to his place of employment but was informed that he had been terminated because of his alleged cult affiliation. He later visited Auntie Li's house and saw that the door had been barred, leading him to conclude she had also been arrested.

In March 2012, Gao acquired a visa to travel to the United States. Obtained through a private agency in China, the visa falsely stated that Gao would attend the Juilliard School in New York.[1] On March 27, 2012, he was admitted to the United States as a nonimmigrant and was authorized to remain in the country until September 26 of that year. On August 21, 2012, Gao applied for asylum, withholding of removal, and protection under the CAT. On September 29, 2014, the United States Department of Homeland Security issued Gao a Notice to Appear and placed him in removal proceedings because he had overstayed his visa. Gao conceded removability.

On January 18, 2018, an IJ denied Gao's applications and ordered his removal. Regarding Gao's asylum application, the IJ determined that he failed to demonstrate past persecution and a well-founded fear of future persecution in China. Specifically, the IJ reasoned that the harm Gao suffered did not constitute persecution because he did not experience more than ordinary harassment, mistreatment, or suffering. In coming to that conclusion, the IJ considered the severity, duration, and frequency of Gao's physical abuse and whether his harm was systematic. The IJ found that Gao was arrested once in China and detained for approximately twenty-three hours. The IJ noted Gao's testimony that he was interrogated twice, beaten once, and denied food

and water. The IJ also observed that Gao did not indicate he required professional medical treatment or sustained any lasting injuries as a result of his encounter with police.

The IJ determined that because Gao did not demonstrate past persecution, he was not entitled to a presumption that he would face future persecution. *See* 8 C.F.R. § 1208.13(b)(1). The IJ did state that Gao could nevertheless prevail on his asylum claim by proving a well-founded fear of future persecution on account of a protected ground that was both subjectively and objectively reasonable. The IJ added that Gao needed to demonstrate that he could not safely relocate in China to avoid **\*151** future persecution. *See* 8 C.F.R. § 1208.13(b)(2)-(3). The IJ then found that Gao had remained in China without police encounters for nine months following his arrest and that he was then given a visa to leave China and go to the United States. [2]

After reviewing the United States Department of State 2016 International Religious Freedom Report for China, which Gao had submitted into evidence, the IJ found that Gao could nevertheless "relocate somewhere safely in China." Accordingly, the IJ determined that Gao had not established a well-founded fear of future persecution and denied his asylum application.

As to Gao's withholding of removal application, the IJ determined that Gao did not meet the requisite clear probability of persecution standard because he failed to meet the less stringent standard for asylum. The IJ also denied Gao CAT protection because Gao did not establish that Chinese officials would more likely than not torture him upon his repatriation.

Gao appealed to the BIA on February 12, 2018, arguing that the IJ erred in concluding that his experience did not constitute past persecution and that he did not have a well-founded fear of future persecution. On June 28, 2019, the BIA affirmed the IJ's decision, agreeing that Gao's single instance of harm did not constitute past persecution. The BIA also determined that Gao "ha[d] not challenged the Immigration Judge's determination that he could avoid future harm by relocating" in China. The BIA further determined that Gao could not satisfy the more stringent standard for withholding of removal and that he did not raise specific arguments relating to the IJ's denial of CAT protection. Gao timely petitioned this court for review of the BIA's order.

## II. Discussion

[1]  [2]  [3]  Where, as here, "the BIA adopts and affirms the IJ's ruling but also examines some of the IJ's conclusions, this Court reviews both the BIA's and IJ's opinions." *Loja-Paguay v. Barr,* 939 F.3d 11, 15 (1st Cir. 2019) (quoting *Perlera-Sola v. Holder,* 699 F.3d 572, 576 (1st Cir. 2012)). We review legal conclusions de novo, "with appropriate deference to the agency's interpretation of the underlying statute in accordance with administrative law principles." *Ramírez-Pérez v. Barr,* 934 F.3d 47, 50 (1st Cir. 2019) (quoting *Rivas-Durán v. Barr,* 927 F.3d 26, 30 (1st Cir. 2019)). We review administrative factual findings "under the deferential 'substantial evidence standard,' meaning that we will not disturb such findings if they are 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.' " *Id.* (quoting *Rivas-Durán,* 927 F.3d at 30). Under this standard, "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

Gao now contends that the IJ and the BIA erred in concluding that he did not suffer past persecution and was not entitled to asylum, withholding of removal, or protection under the CAT. We address each argument in turn, and conclude that none has merit.

## A. Asylum

Under our immigration laws, the Attorney General may grant asylum to an applicant if the applicant demonstrates that he is a "refugee." **\*152** 8 U.S.C. § 1158(b)(1)(A), (B)(i); *see* 8 C.F.R. § 1240.8. A refugee is defined as a person who is unable

or unwilling to return to the country of his nationality because of past persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A). A showing of past persecution creates a rebuttable presumption that the applicant's fear of future persecution is well-founded. 8 C.F.R. § 1208.13(b)(1).

[4]  [5]  [6]  [7]  "Persecution" is not defined by statute, and "what constitutes persecution is resolved on a case-by-case basis." Panoto v. Holder, 770 F.3d 43, 46 (1st Cir. 2014). Generally, it involves a discriminatory harm caused by government action or allowed by government acquiescence that "surpasses 'unpleasantness, harassment, and even basic suffering.' " Id. (quoting Sombah v. Mukasey, 529 F.3d 49, 51 (1st Cir. 2008)). "The severity, duration, and frequency of physical abuse are factors relevant to this determination, as is whether harm is systematic rather than reflective of a series of isolated incidents." Thapaliya v. Holder, 750 F.3d 56, 59 (1st Cir. 2014) (quoting Barsoum v. Holder, 617 F.3d 73, 79 (1st Cir. 2010)). We also consider the severity and frequency of the applicant's alleged harassment in light of "the nature and extent of an applicant's injuries." Martínez-Pérez v. Sessions, 897 F.3d 33, 40 (1st Cir. 2018) (quoting Vasili v. Holder, 732 F.3d 83, 89 (1st Cir. 2013)).

## 1. Past Persecution

[8]  [9]  Substantial evidence supported the IJ's and BIA's conclusions that Gao's harm did not constitute past persecution. Gao's sole detention was neither systematic nor frequent, and "a single detention, even one accompanied by beatings and threats ... does not necessarily rise to the level of persecution." Jinan Chen v. Lynch, 814 F.3d 40, 45 (1st Cir. 2016); see Anacassus v. Holder, 602 F.3d 14, 19-20 (1st Cir. 2010) ("[I]solated beatings, even when rather severe, do not establish systematic mistreatment needed to show persecution." (quoting Wiratama v. Mukasey, 538 F.3d 1, 7 (1st Cir. 2008))). Gao also fails to establish that the twenty-three-hour duration of his detention was persecutory. See Jinan Chen, 814 F.3d at 45-46 (finding no persecution where petitioner was detained for nine days, beaten, and threatened by Chinese police; Topalli v. Gonzales, 417 F.3d 128, 132 (1st Cir. 2005) (finding no persecution where petitioner's multiple detentions coupled with beatings "never exceeded 24 hours").

Gao also does not demonstrate that his ordeal was sufficiently severe to constitute persecution under this court's precedent. The record does not show that Gao sustained any injuries during his twenty-three-hour detention. See Jinan Chen, 814 F.3d at 45-46 (finding no persecution where petitioner's injuries following nine-day detention with beatings "did not exceed bruising"); Thapaliya, 750 F.3d at 58-60 (finding no persecution where petitioner was beaten "fairly severely" and "suffered injuries to his head and chin, as well as bruising all over his body"). Moreover, Gao did not indicate that he sought or required medical treatment following his release. See Jinan Chen, 814 F.3d at 46 (citing Topalli, 417 F.3d at 132; Vasili, 732 F.3d at 89) (recognizing as relevant that petitioner "did not require hospitalization or conventional, allopathic medical care" following detention); Cabas v. Holder, 695 F.3d 169, 174 (1st Cir. 2012) (finding no persecution where petitioner's "single incident of physical harm was an isolated event and the resulting injuries were not sufficiently severe to require medical attention").

[10]  Gao additionally contends that the IJ and the BIA failed to consider the 5000-yuan  **153**  fine his family paid to obtain his release from detention.[3] This argument is unpersuasive. "[E]conomic disadvantage must be severe and deliberate to rise to the level of persecution." Yong Xiu Lin v. Holder, 754 F.3d 9, 16 (1st Cir. 2014) (alteration in original) (quoting Wu v. Holder, 741 F.3d 211, 215 (1st Cir. 2013)). Gao has not demonstrated that these harms caused him severe financial difficulty or prevented him from obtaining other employment.[4] See Jinan Chen, 814 F.3d at 43-46 (finding no persecution where petitioner's father paid "a lot of money" to Chinese police to secure petitioner's release from detention); Alexandrescu v. Mukasey, 537 F.3d 22, 25 (1st Cir. 2008) (finding no economic persecution where petitioner "lost his job, not his ability to make a living"). Gao's argument that he suffered post-detention persecution is further undermined by his continued, uneventful residence in China for approximately nine months until his departure on his own passport to the United States. See Jinan Chen, 814 F.3d at 43-46 (finding no persecution where petitioner remained in China without police mistreatment

for approximately three months following detention until departing on his own passport); Topalli, 417 F.3d at 132 (finding no persecution where petitioner remained in Albania without police mistreatment for approximately three years following arrest). In sum, the IJ's and BIA's conclusions that Gao's harm did not constitute past persecution, even when looking at all the evidence in aggregate, were supported by substantial record evidence.

### 2. Future Persecution

[11]   Because he did not establish past persecution, Gao is not presumed to have a well-founded fear of future persecution. See 8 C.F.R. § 1208.13(b)(1). In addition, Gao "does not have a well-founded fear of persecution if [he] could avoid persecution by relocating to another part of [his] country of nationality ... if under all the circumstances it would be reasonable to expect [him] to do so." Id. § 1208.13(b)(2)(ii); see Chen Qin v. Lynch, 833 F.3d 40, 45 (1st Cir. 2016) (finding no well-founded fear of future persecution where petitioner could safely relocate to her brother's home in her native country). The IJ found that Gao could safely relocate in China upon his return to avoid persecution. Gao did not dispute that finding in his brief to the BIA, and in its order, the BIA determined that Gao had "not challenged the Immigration Judge's determination that he could avoid future harm by relocating."

[12]   This court "may review a final order of removal only if ... the alien has exhausted all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1). A petitioner's "failure to present developed argumentation to the BIA on a particular theory amounts to a failure to exhaust administrative remedies as to that theory." Avelar Gonzalez v. Whitaker, 908 F.3d 820, 828 (1st Cir. 2018) (quoting Ramirez-Matias v. Holder, 778 F.3d 322, 327 (1st Cir. 2015)). Before the BIA, Gao **154 failed to present any argumentation regarding the relocation finding. Accordingly, as Gao failed to exhaust his administrative remedies regarding that finding, we may not now review it. Consequently, Gao cannot demonstrate a well-founded fear of future persecution upon return to China. See 8 C.F.R. § 1208.13(b)(2)(ii); Chen Qin, 833 F.3d at 45.

Overall, Gao has not demonstrated past persecution or a well-founded fear of future persecution, and the denial of his asylum application was supported by substantial record evidence. See 8 U.S.C. §§ 1101(a)(42)(A), 1252(b)(4)(B).

### B. Withholding of Removal

[13]   To be entitled to withholding of removal, Gao must establish that his "life or freedom would be threatened in [China] because of [his] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); see 8 C.F.R. § 1208.16(b). To carry this burden without having demonstrated past persecution, Gao must show that it is "more likely than not" that he would be persecuted on account of a protected ground if repatriated. 8 C.F.R. § 1208.16(b)(2); see Olmos-Colaj v. Sessions, 886 F.3d 168, 176 (1st Cir. 2018) (describing the standard as "a clear probability of future persecution" (quoting López-Castro v. Holder, 577 F.3d 49, 54 (1st Cir. 2009))). This standard is more stringent than that of asylum. Villalta-Martinez v. Sessions, 882 F.3d 20, 23 (1st Cir. 2018). Thus, because Gao cannot succeed on his asylum claim, we also affirm the denial of his claim for withholding of removal.[5] See id. at 26.

### C. CAT

[14]  In his brief to this court, Gao included a section titled "Petitioner's application for protection under Article 3 of the UN Convention Against Torture should also be granted." Thereafter, Gao merely cites to Article 3 of the CAT, provides the standard governing eligibility for CAT protection, see 8 C.F.R. § 208.16(c)(2)-(3), and recites the relevant definition of torture, see id. § 208.18(a)(1). Because Gao has not offered any developed argumentation relating to his claim, we deem it waived. See Olmos-Colaj, 886 F.3d at 176 (citing Jiang v. Gonzales, 474 F.3d 25, 32 (1st Cir. 2007) ("[T]heories advanced in skeletal form, unaccompanied by developed argumentation, are deemed abandoned.")); Sok v. Mukasey, 526 F.3d 48, 52 (1st Cir. 2008) (deeming CAT claim waived where petitioner only presented introductory assertion of entitlement to CAT protection).

## III. Conclusion

We deny the petition for review and affirm the decision of the BIA upholding the IJ's denial of Gao's applications for asylum, withholding of removal, and protection under the CAT.

## All Citations

950 F.3d 147

## Footnotes

1    Though the IJ stated that Gao had testified that he obtained a "business visa .... to attend Julliard [sic] School in New York," it is unclear whether the visa was intended for study, work, or both. The issued visa was a nonimmigrant B-2 visa that was good until September 26, 2012. Gao testified before the IJ that the "business visa" was obtained on the pretense of "[i]nterview[ing] for the school." He also testified that the visa application falsely stated that he had both studied and worked at the Shanghai Conservatory of Music.

2    Though the IJ stated that Gao "was given a visa to leave China," the record does not describe any visa other than the nonimmigrant B-2 entry visa that Gao obtained from the United States.

3    In his petition for review, Gao asserts for the first time that he was required to report to Chinese police on a weekly basis after his detention. We will not consider this assertion because it was not raised below. See 8 U.S.C. § 1252(b)(4)(A) ("[T]he court of appeals shall decide the petition only on the administrative record on which the order of removal is based ....").

4    In an affidavit accompanying his initial applications for asylum, withholding of removal, and CAT protection, Gao stated that he "gave up a steady job in China" around the time he departed for the United States. The record does not otherwise describe Gao's employment in China beyond the position that he lost following his detention.

5    We note that an applicant for withholding of removal who has not demonstrated past persecution cannot satisfy the relevant standard if he "could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so." 8 C.F.R. § 1208.16(b)(2). Therefore, Gao cannot succeed in his claim for withholding of removal because of the IJ's unchallenged relocation finding, which we cannot now review. See 8 U.S.C. § 1252(d)(1).

End of Document    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

538 F.3d 143
United States Court of Appeals,
Second Circuit.

YUEN JIN, Petitioner,

v.

Michael B. MUKASEY, * Attorney
General of the United States, Respondent;
Shan Hu Zheng, Petitioner,

v.

Bureau of Citizenship and
Immigration Services, Respondent;
Jiao Fang Chen, Petitioner,

v.

United States Department of Justice, Attorney
General Michael B. Mukasey, * Respondents.
Hua Zeng, Petitioner,

v.

Bureau of Citizenship and
Immigration Services, Respondent.

Docket Nos. 05–5485–ag, 05–6367–
ag, 06–0004–ag, 06–2998–ag.

|

Argued: Dec. 12, 2007.

|

Decided: Aug. 15, 2008.

**Synopsis**
**Background:** Aliens, citizens of China, petitioned for judicial review of the decisions of the Board of Immigration Appeals (BIA), denying their motions to reopen and to file successive asylum applications on account of changed personal circumstances, namely, the birth of additional children in the United States.

**Holdings:** The Court of Appeals, John M. Walker, Jr., Circuit Judge, held that:

[1] aliens were required to show changed country conditions, rather than changed personal circumstances;

[2] aliens lacked due process liberty or property interest in discretionary grant of asylum;

[3] aliens were not deprived of due process;

[4] requirement that aliens show changed country conditions did not violate equal protection; and

[5] aliens were not entitled to grant of motions to reopen for consideration of successive asylum applications.

Petitions denied.

Sack, Circuit Judge, filed opinion concurring in part.

West Headnotes (18)

[1]    **Administrative Law and
       Procedure** 🔑 Aliens, Immigration, and
       Citizenship

       **Aliens, Immigration, and
       Citizenship** 🔑 Review of discretion

       **Aliens, Immigration, and
       Citizenship** 🔑 Law questions

       The Court of Appeals reviews the denial
       of a motion to reopen by the Board of
       Immigration Appeals (BIA) for abuse of
       discretion, and reviews its legal conclusions
       de novo, with the caveat that the BIA's
       interpretations of ambiguous provisions of the
       Immigration and Nationality Act (INA) are owed
       substantial deference unless arbitrary, capricious,
       or manifestly contrary to the statute.

       2 Cases that cite this headnote

[2]    **Administrative Law and
       Procedure** 🔑 Aliens, Immigration, and
       Citizenship

       **Aliens, Immigration, and
       Citizenship** 🔑 Law questions

       Precedential Board of Immigration Appeals
       (BIA) decisions are eligible for strong deference,
       pursuant to *Chevron*, insofar as they represent the
       agency's authoritative interpretations of statutes.

       6 Cases that cite this headnote

**[3]    Aliens, Immigration, and Citizenship 🔑 Law questions**

The interpretation by the Board of Immigration Appeals (BIA) of its own regulation is entitled to controlling weight unless it is plainly erroneous or inconsistent with the regulation.

5 Cases that cite this headnote

**[4]    Aliens, Immigration, and Citizenship 🔑 Time Limitations**

Unlike in the case of a successive asylum application, changed personal circumstances are insufficient to excuse an alien from the 90–day filing requirement for a motion to reopen removal proceedings. Immigration and Nationality Act, § 208(a)(2)(D), 8 U.S.C.A. § 1158(a)(2)(D); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 304(a)(3), 8 U.S.C.A. § 1229a(c)(7)(A), (c)(7)(C)(i, ii); 8 C.F.R. § 1208.4(a)(4)(i)(A, B).

10 Cases that cite this headnote

**[5]    Aliens, Immigration, and Citizenship 🔑 Time Limitations**

Alien under a final order of removal, who wished to file a new asylum application, was required to do so in conjunction with a motion to reopen those proceedings, and if such a motion was filed more than 90 days after entry of the final order, the motion was required to be denied unless the alien could establish changed country conditions, rather than changed personal circumstances. Immigration and Nationality Act, § 208(a)(2)(D), 8 U.S.C.A. § 1158(a)(2)(D); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 304(a)(3), 8 U.S.C.A. § 1229a(c)(7)(A), (c)(7)(C)(i); 8 C.F.R. § 1208.4(a)(4)(i)(A, B), (b)(3)(ii).

79 Cases that cite this headnote

**[6]    Aliens, Immigration, and Citizenship 🔑 Time limitations for filing**

An alien may file a successive asylum application based on changed personal circumstances or changed country conditions at any time during immigration proceedings before the entry of a final order of removal or within the 90–day deadline for a motion to reopen. Immigration and Nationality Act, § 208(a)(2)(D), 8 U.S.C.A. § 1158(a)(2)(D); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 304(a)(3), 8 U.S.C.A. § 1229a(c)(7)(C).

39 Cases that cite this headnote

**[7]    Statutes 🔑 Superfluousness**

It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.

**[8]    Aliens, Immigration, and Citizenship 🔑 Reopening, Reconsideration, or Remand**

As a procedural matter, a motion to reopen must be filed with a successive asylum petition after the completion of removal proceedings because the Board of Immigration Appeals (BIA) could not otherwise consider the new issue raised by the alien. Immigration and Nationality Act, § 208(a)(2)(D), 8 U.S.C.A. § 1158(a)(2)(D); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 304(a)(3), 8 U.S.C.A. § 1229a(c)(7)(C).

2 Cases that cite this headnote

**[9]    Aliens, Immigration, and Citizenship 🔑 Time Limitations**

Only with the government's consent, or pursuant to the sua sponte discretion of the Board of Immigration Appeals (BIA), an alien

subject to a final removal order alleging only changed personal circumstances could reopen his proceedings after the 90-day period for filing a motion to reopen and file a successive asylum petition. Immigration and Nationality Act, § 208(a)(2)(D), 8 U.S.C.A. § 1158(a)(2)(D); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 304(a)(3), 8 U.S.C.A. § 1229a(c)(7)(C); 8 C.F.R. § 1003.2(a), (c)(3)(iii).

5 Cases that cite this headnote

**[10]    Constitutional Law**    Asylum, refugees, and withholding of removal

An alien who has already filed one asylum application, been adjudicated removable and ordered deported, and who has nevertheless remained in the United States illegally for several years, does not have a due process liberty or property interest in a discretionary grant of asylum upon the filing of a successive asylum application. U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, § 208(a)(2)(D), 8 U.S.C.A. § 1158(a)(2)(D); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 304(a)(3), 8 U.S.C.A. § 1229a(c)(7)(C); 8 C.F.R. § 1003.2(c)(3)(iii).

17 Cases that cite this headnote

**[11]    Aliens, Immigration, and Citizenship**    Time Limitations

**Constitutional Law**    Asylum, refugees, and withholding of removal

Even assuming that an alien who had already filed one asylum application, was subject to final removal order, and had nevertheless remained in the United States illegally for several years, had a protected liberty or property interest in a discretionary grant of asylum upon the filing of a successive asylum application, alien was afforded due process by the opportunity to file a motion to reopen in conjunction with the

successive asylum application within the 90-day period following the final removal order. U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, § 208(a)(2)(D), 8 U.S.C.A. § 1158(a)(2)(D); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 304(a)(3), 8 U.S.C.A. § 1229a(c)(7)(C); 8 C.F.R. §§ 1003.2(c)(3)(iii), 1208.4(b)(3)(ii).

29 Cases that cite this headnote

**[12]    Aliens, Immigration, and Citizenship**    Time Limitations

**Constitutional Law**    Discrimination Between Classes of Aliens

Board of Immigration Appeals (BIA) requirement that aliens subject to final order of removal, who wished to file successive asylum applications, had to do so in conjunction with motion to reopen those proceedings, and had to establish changed country conditions, rather than changed personal circumstances, if motion to reopen was filed more than 90 days after final removal order, did not violate equal protection; although aliens who complied with final removal orders by leaving could apply for withholding of removal upon reentry without showing changed country conditions, such aliens were not similarly situated to aliens who refused to comply with removal orders, and even if such aliens were similarly situated, they were not a protected class, and it was rational to treat aliens who refused to comply with removal orders differently, in order to prevent abuse of the asylum process and create incentive for aliens to comply with removal orders. U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, § 208(a)(2)(D), 8 U.S.C.A. § 1158(a)(2)(D); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 304(a)(3), 8 U.S.C.A. § 1229a(c)(7)(C)(ii); 8 C.F.R. § 1003.2(c)(3)(ii).

85 Cases that cite this headnote

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**[13]    Constitutional Law** ⚷ **Similarly situated persons; like circumstances**

The government can treat persons differently without violating the equal protection clause if they are not similarly situated. U.S.C.A. Const.Amend. 5.

7 Cases that cite this headnote

**[14]    Constitutional Law** ⚷ **Rational Basis Standard; Reasonableness**

A classification subject to rational basis review must be upheld against an equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. U.S.C.A. Const.Amend. 5.

13 Cases that cite this headnote

**[15]    Aliens, Immigration, and Citizenship** ⚷ **Relief Under Treaties Against Torture**

**International Law** ⚷ **Self-executing agreements; implementing legislation**

Neither the United Nations Protocol Relating to the Status of Refugees nor the Convention Against Torture (CAT) are self-executing treaties.

3 Cases that cite this headnote

**[16]    Aliens, Immigration, and Citizenship** ⚷ **Relief Under Treaties Against Torture**

**International Law** ⚷ **Self-executing agreements; implementing legislation**

**International Law** ⚷ **Private parties; privately enforceable rights**

The United Nations Protocol Relating to the Status of Refugees and the Convention Against Torture (CAT) do not create private rights that aliens can enforce in immigration proceedings beyond those rights contained in their implementing statutes and regulations.

5 Cases that cite this headnote

**[17]    International Law** ⚷ **Domestic statutes and regulations**

**International Law** ⚷ **Legislation; statutes, regulations, and ordinances**

United States immigration law is not subordinate to customary international law or necessarily subordinate to treaty-based international law and, in fact, may permissibly conflict with both.

1 Cases that cite this headnote

**[18]    Aliens, Immigration, and Citizenship** ⚷ **Time Limitations**

Aliens, citizens of China, who were subject to final orders of removal after their initial asylum applications were denied, were not entitled to grant of motions to reopen for consideration of successive asylum applications, based on changed personal circumstances, namely, the birth of additional children in the United States, where aliens filed their requests for relief several years after the entry of their final removal orders. Immigration and Nationality Act, § 208(a)(2)(D), 🔖 8 U.S.C.A. § 1158(a)(2)(D); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 304(a)(3), 🔖 8 U.S.C.A. § 1229a(c)(7)(C)(ii); 🚩 8 C.F.R. § 1003.2(c)(3)(ii).

75 Cases that cite this headnote

**Attorneys and Law Firms**

**\*146** Steven A. Mundie, Baron, Mundie & Shelkin, P.C., New York, N.Y., for Petitioner Jin, No. 05–5485–ag.

Joshua Bardavid (Theodore N. Cox, on the brief), New York, N.Y., for Petitioner Zheng, No. 06–6367–ag.

Yee Ling Poon (Robert Duk–Hwan Kim, the brief), New York, N.Y., for Petitioner Chen, No. 06–0004–ag.

Lorance Hockert, New York, N.Y., for Petitioner Zeng, No. 06–2998–ag.

Mark R. Von Sternberg, C. Mario Russell, Catholic Charities Community Services, New York, N.Y., for Amicus Curiae in Support of Petitioner Zeng in No. 06–26 2998–ag.

Kirti Vaidya Reddy, Assistant United States Attorney, of counsel (Kathy S. Marks, Assistant United States Attorney, of counsel, on the brief), for Michael J. Garcia, United States Attorney for the Southern District of New York, New York, N.Y., for Respondents United States Department of Justice and Attorney General Mukasey in Nos. 05–5485–ag, 06–0004–ag.

**\*147** Nancy L. Miller, Assistant United States Attorney (Craig Oswald, Assistant United States Attorney, on the brief), for Patrick J. Fitzgerald, United States Attorney for the Northern District of Illinois, Chicago, Ill., for Respondent Bureau of Citizenship and Immigration Services in No. 05–6367–ag.

Marvin J. Caughman, Assistant United States Attorney, for Reginald I. Lloyd, United States Attorney for the District of South Carolina, Columbia, S.C., for Respondent Bureau of Citizenship and Immigration Services in No. 06–2998–ag.

Before: WALKER, CABRANES, and SACK, Circuit Judges.

**Opinion**

Judge SACK concurs in a separate opinion.

JOHN M. WALKER, JR., Circuit Judge:

These cases, argued in tandem, require us to decide whether an alien subject to a final order of removal who files a successive asylum application based only on changed personal circumstances must also file a motion to reopen based on changed country conditions pursuant to 8 C.F.R. § 1003.2(c)(3)(ii), when the ninety-day deadline has passed for such a motion. Petitioners Yuen Jin, Shan Hu Zheng, Jiao Fang Chen, and Hua Zeng, all Chinese citizens, sought to advance successive asylum claims years after their initial asylum applications were denied and they were ordered removed. Petitioners moved to reopen their proceedings and requested permission to file successive asylum applications, arguing that they were newly eligible for asylum based on the birth of additional U.S.-born children after the entry of their final removal orders.

The Board of Immigration Appeals (BIA) denied the motions and refused leave to file successive asylum petitions because petitioners had alleged only changed personal circumstances and not changed country conditions. [1] The latter, the agency concluded, was required for consideration of an untimely motion to reopen, and petitioners could not assert successive asylum claims in the absence of an accompanying motion to reopen pursuant to 8 C.F.R. § 1003.2(c)(3)(ii). The BIA subsequently adopted this conclusion as the holding of its published, precedential opinion, In re C–W–L, 24 I. & N. Dec. 346 (B.I.A.2007). Because we have determined that the agency's interpretation of the relevant statutory provisions is not arbitrary, capricious, or manifestly contrary to the statute, we defer to the BIA's decision in In re C–W–L and accordingly deny the petitions for review.

**BACKGROUND**

**I. Yuen Jin**

In December 1998, Petitioner Yuen Jin arrived in the United States from Fujian Province, China, and was detained after presenting a fraudulent passport. In January 1999, the INS served her with a Notice to Appear and placed her in removal proceedings. In May 1999, Jin sought asylum, withholding of removal, and relief under the Convention Against Torture (CAT) on the grounds that Chinese authorities forced her to undergo an abortion and that she feared future persecution for illegally departing China.

**\*148** In September 1999, Jin married Jian Geng Zheng, and in October of that year, she appeared at a hearing before an Immigration Judge (IJ). Finding the petitioner not credible, the IJ issued a decision in December 1999 denying Jin's applications for relief and ordering her removed. In April 2000, while her appeal was pending before the BIA, Jin had her first child. Jin's removal order became final in September 2002 when the BIA affirmed the IJ's decision; Jin did not file a petition for review in this court.

In January 2005, Jin gave birth to her second child, and in July 2005, nearly three years after the BIA issued a final order of removal, Jin filed a motion to reopen her proceedings, claiming that, in light of China's family planning policies, the birth of her second child constituted changed personal circumstances that affected her eligibility for asylum. She also submitted a second asylum application accompanied by supporting documents.

In September 2005, the BIA denied Jin's untimely motion, finding that she had not demonstrated changed *country* conditions as required for the Board to consider a motion to reopen filed more than ninety days after the entry of a final removal order. The BIA did not address Jin's successive asylum petition but construed Jin's motion only as a motion to reopen. Jin filed a timely petition for review of the Board's decision in this court.

## II. Shan Hu Zheng

In December 1994, Petitioner Shan Hu Zheng left Fujian Province, China, for the United States, where she arrived without inspection. She filed an initial asylum application, alleging religious persecution. In November 1995, the IJ denied Zheng's application and ordered her deported, finding that the evidence of harassment that she had presented did not rise to the level of persecution. The BIA affirmed in May 1996.

In October 2000, Zheng married Hong Tao Lin, a naturalized U.S. citizen, and later gave birth to two children—one in February 2002, and another in May 2003. After filing unsuccessful motions to reopen in 1999 and 2002, Zheng filed a third motion to reopen in June 2005, claiming that the birth of her second child constituted changed circumstances that warranted the granting of an untimely motion to reopen and made her newly eligible for asylum. Based on her changed personal circumstances, Zheng argued that she could file a successive asylum application.

In July 2005, the BIA denied the motion as both number-barred and time-barred. The BIA found that Zheng's motion did not fall within an exception to those procedural limitations because the birth of children in the United States did not amount to changed country conditions. Four months later, the BIA reopened Zheng's proceedings *sua sponte* based on an ineffective assistance of counsel claim. The BIA then reissued its July 2005 decision to enable Zheng to timely file the instant petition for review in this court.

## III. Jiao Fang Chen

Petitioner Jiao Fang Chen entered the United States in August 1999 as a non-immigrant visitor without a valid entry document. She was subsequently placed in removal proceedings. In June 2000, she filed applications for asylum, withholding of deportation, and CAT relief, claiming that family planning authorities in China forcibly inserted an IUD after the birth of her first child in 1995, that she had secretly

removed it, and that she left China to avoid reinsertion of the device. In June 2000, Chen gave birth to her second child, and at her asylum hearing, Chen claimed that she would be forcibly sterilized if returned **\*149** to China, because she now had more than one child.

The IJ denied Chen's claims and ordered her removed after making an adverse credibility determination and finding that Chen had not adduced sufficient persuasive evidence of systematic forced sterilization under China's one-child policy. In April 2002, the BIA summarily affirmed. Chen did not file a petition for review of that decision.

In August 2005, Chen filed a motion to reopen and a new asylum application with the BIA, arguing that her untimely filing should be excused because (1) she was now pregnant with her third child and "would definitely be unable to avoid sterilization," and (2) the enforcement of China's family planning laws had become harsher and more widespread since 2002. The BIA denied the motion as untimely, noting that Chen's third pregnancy was not a change arising in China, that changed personal circumstances did not excuse her late filing, and that no change in China's enforcement policy had occurred. The BIA did not address Chen's new asylum application. Chen now petitions for review of that decision.

## IV. Hua Zeng

Petitioner Hua Zeng, born in Fujian Province, arrived in the United States without inspection in March 1999. He applied for asylum, withholding of removal, and relief under the CAT in July of that year. In his asylum application, Zeng stated that he left China because local officials harassed, attacked, and arrested him after he spoke out against the government. In September 1999, he was placed in removal proceedings, and in February 2000, the IJ ordered Zeng removed in absentia when he failed to attend his removal hearing. The February 23, 2000 removal order became final after Zeng failed to appeal the IJ's order.

In June 2000, Zeng filed a motion to reopen his proceedings, alleging that he had missed his master calendar hearing because of circumstances beyond his control. The IJ granted him two weeks to file a detailed affidavit and supporting documentation, but Zeng did not file anything more and did not appeal the IJ's denial of the motion.

After the removal order became final, Zeng remained in the United States, married, and fathered two children—one born in December 2002 and the other in October 2005. In January

2006, more than five years after he was ordered removed, Zeng filed with the immigration court a motion to reopen based on his changed personal circumstances. He argued that the birth of his two sons made him newly eligible for asylum relief because he would be forcibly sterilized if removed to China. Zeng also requested permission to file an untimely successive asylum application based on his changed personal circumstances, despite his concession that country conditions had not changed.

The IJ denied the motion, noting that a previous motion to reopen filed by Zeng had been denied on July 14, 2000, and that his current motion to reopen thus violated both the time and numerical restrictions set forth in the applicable regulations. The IJ did not act upon Zeng's request for permission to file a second asylum application.

In April 2006, Zeng appealed the IJ's decision to the BIA, arguing that no motion to reopen was required in order to file a successive asylum application. The BIA rejected this argument and dismissed Zeng's appeal. The Board agreed with the IJ that Zeng's motion to reopen was both time-barred and number-barred and, in addition, found the motion to be **\*150** ineligible for an exception based on changed country conditions because it was based only on a change in personal circumstances. Zeng then filed a timely petition for review in this court.

### DISCUSSION

Petitioners' cases present the common question of whether an alien subject to a final removal order may file a successive asylum petition based solely on changed personal circumstances, unaccompanied by a motion to reopen based on changed country conditions. Consistent with its ruling in each of the cases at bar, the BIA recently answered this question in the negative in *In re C–W–L,* 24 I. & N. Dec. 346, holding that when a petitioner is subject to a final order of removal, his successive asylum application is subject to the same procedural requirements as a motion to reopen and must therefore allege changed country conditions if it is filed more than ninety days after the entry of the final order. *Cf.* 8 U.S.C. § 1101(a)(47)(B) (providing that a removal order becomes final "upon the earlier of—(i) a determination by the Board of Immigration appeals affirming such order; or (ii) the expiration of the period in which the alien is permitted to seek review of such order by the Board of Immigration Appeals").

**[1]** **[2]** **[3]** We review the BIA's denial of a motion to reopen for abuse of discretion, *Kaur v. BIA,* 413 F.3d 232, 233 (2d Cir.2005) (per curiam), and its legal conclusions de novo, "with the caveat that the BIA's interpretations of ambiguous provisions of the INA are owed substantial deference unless 'arbitrary, capricious, or manifestly contrary to the statute,' " *Perez Suriel de Batista v. Gonzales,* 494 F.3d 67, 69 (2d Cir.2007) (per curiam) (internal quotation marks and citation omitted) (quoting *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Precedential BIA decisions (i.e., those that have been published), such as *In re C–W–L,* "are eligible for *Chevron* deference insofar as they represent the agency's authoritative interpretations of statutes." *Maiwand v. Gonzales,* 501 F.3d 101, 104 (2d Cir.2007). And the BIA's interpretation of its own regulation is entitled to "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); *see also Jigme Wangchuck v. Dep't of Homeland Sec.,* 448 F.3d 524, 528 (2d Cir.2006) (according "substantial deference" to the BIA's interpretations of immigration regulations).

### I. The Statutory and Regulatory Scheme

As a general rule, an alien who has filed a previous asylum application that has been denied may not apply again for asylum. 8 U.S.C. § 1158(a)(2)(C). There is, however, an exception "if the alien demonstrates to the satisfaction of the Attorney General ... the existence of *changed circumstances* which materially affect the applicant's eligibility for asylum." *Id.* § 1158(a)(2)(D) (emphasis added). Pursuant to its expressly delegated authority to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this chapter," *id.* § 1158(d)(5)(B), the agency promulgated 8 C.F.R. § 1208.4. Subsection (a)(4)(i) of that regulation provides that the term "changed circumstances" can refer to *either* changed country conditions or changed personal circumstances, which include "activities the applicant becomes involved in outside the country of feared persecution that place the applicant at risk." 8 C.F.R. § 1208.4(a)(4)(i)(A)–(B). **\*151** Petitioners argue, based on these statutory and regulatory provisions, that § 1158(a)(2)(D) permits an alien under a final removal order to file a successive asylum petition on the basis of

changed personal circumstances, such as the birth of a second or third child in the United States. *See Wei Guang Wang v. BIA,* 437 F.3d 270, 273–74 (2d Cir.2006).

**[4]** Petitioners' argument is complicated, however, by additional provisions of the Immigration and Nationality Act (INA) and their implementing regulations. Under 8 C.F.R. § 1208.4(b)(3)(ii), "[a]fter completion of ... removal proceedings, and in *conjunction with a motion to reopen* pursuant to 8 CFR part 1003 where applicable," an asylum application must be filed with the immigration court having jurisdiction over the prior proceeding. *Id.* § 1208.4(b)(3)(ii) (emphasis added). An alien who is subject to a final removal order and who wishes to reopen his proceedings generally may file only one motion to reopen and must file that motion within ninety days of the date of entry of the final order. 8 U.S.C. § 1229a(c)(7)(A), (C)(i); *see also* 8 C.F.R. § 1003.2(c)(2). These numerical and time limitations do not apply, however, if the motion is based on changed country conditions and the relevant evidence was unavailable during the prior proceeding. 8 U.S.C. § 1229a(c)(7)(C)(ii);[2] *see also* 8 C.F.R. § 1003.2(c)(3)(ii).[3] Unlike in the case of a successive asylum application filed under 8 U.S.C. § 1158(a)(2)(D), changed personal circumstances are insufficient to excuse an alien from the procedural requirements of a motion to reopen. *See, e.g., Wang,* 437 F.3d at 274 ("The law is clear that a petitioner must show changed country conditions in order to exceed the 90–day filing requirement for seeking to reopen removal proceedings. A self-induced change in personal circumstances cannot suffice." (citation omitted)); *Jian Huan Guan v. BIA,* 345 F.3d 47, 49 (2d Cir.2003) (per curiam) (holding that an alien was not entitled to relief from the ninety-day motion to reopen deadline because she had established only changed personal circumstances, "which does not fit under the exception set forth in 8 C.F.R. [§ 1003.2](c)(3)(ii)").

Reading all of these provisions together, the BIA has interpreted them to provide that: (1) an alien who has completed removal proceedings and is under a final order of removal, and who wishes to file a new asylum application, must do so in conjunction with a motion to reopen those proceedings; and (2) if such a motion is filed more than ninety days after entry of the final order, the motion must be denied unless the alien can establish changed *country* conditions. *See*

*In re C–W–L,* 24 I. & N. Dec. at 351 ("[T]he regulations require that *all* asylum applications filed **\*152** with the Immigration Court after the close of removal, deportation, or exclusion proceedings be accompanied by a properly filed motion to reopen."); *id.* at 350 ("[8 U.S.C. § 1158(a)(2)(D)], on which the respondent relies for his premise that changes in *personal* circumstances justify the new asylum application, simply does not apply to a situation where an asylum applicant has already been ordered removed.").

**[5]** For the reasons expressed below, we hold that the BIA's interpretation of the relevant INA provisions is not arbitrary, capricious, or manifestly contrary to the statute, and that its regulatory interpretation—in particular, its reading of 8 C.F.R. § 1208.4(b)(3)(ii)—is not plainly erroneous or inconsistent with the regulations. We therefore accord those interpretations deference under *Chevron,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694.

The Board's determination that a properly filed motion to reopen is a prerequisite to the filing of a new asylum petition when the petitioner is under a final removal order has recently been affirmed by four other circuits and is based on sound reasoning. *See Qing Li Chen v. Mukasey,* 524 F.3d 1028, 1030 (9th Cir.2008) ("We conclude that the BIA's interpretation of [8 U.S.C. §§ 1158 and 1229a(c)(7)], as they affect each other, is a reasonable one, and we defer to that interpretation."); *Wen Ying Zheng v. Mukasey,* 509 F.3d 869, 872 (8th Cir.2007) ("[T]he BIA reasonably harmonized the relevant statutes and regulations in concluding that an alien under a final order of removal must successfully reopen under 8 U.S.C. § 1229a(c)(7)(C)(ii) in order to pursue an untimely or successive asylum application under 8 U.S.C. § 1158(a)(2)(D)."); *Hai Fan Huang v. Attorney Gen. of the U.S.,* 249 Fed.Appx. 293, 298 (3d Cir.2007) (unpublished opinion) ("[W]e cannot say the BIA's requirement that an alien under a final administrative order of exclusion or removal must file a motion to reopen is an arbitrary or capricious interpretation of the immigration laws."); *Cheng Chen v. Gonzales,* 498 F.3d 758, 760 (7th Cir.2007) (agreeing with the BIA that 8 U.S.C. § 1229a(c)(7)(C)(ii)'s requirements govern the successive asylum application of a petitioner subject to a final removal order).

The Board's treatment and application of 8 U.S.C. § 1229a (c)(7)(C)(ii) under the facts presented is not inconsistent with 8 U.S.C. § 1158(a)(2)(D). Any potential tension between 8 U.S.C. § 1208.4(a)(4)'s broad provision that changed country conditions or changed circumstances can support a new asylum application under § 1158(a)(2)(D) and the BIA's determination that *only* changed country conditions can support a new asylum application filed by an alien under a final removal order is easily resolved. As the Seventh Circuit noted in *Cheng Chen*, § 1158(a)(2)(D) "says nothing about the situation in which the applicant has already been ordered removed, the order has been made final, and the time for reopening the removal proceeding has expired." 498 F.3d at 760. Thus, 8 C.F.R. § 1208.4(b)(3)(ii), which discusses the filing of an asylum application "in conjunction with a motion to reopen" when removal proceedings have been completed,[4] and **\*153** 8 U.S.C. § 1229a(c)(7)(C), which delineates the requirements for such a motion when a final order has issued, can properly be read as filling that gap by setting forth the mechanism by which an alien may file a successive asylum petition when the alien has already been ordered removed.

[6] The BIA's interpretation of the INA gives meaning to *both* 8 U.S.C. § 1229a(c)(7)(C) and 8 U.S.C. § 1158(a)(2)(D). Under that interpretation, an alien may file a successive asylum application based on changed personal circumstances or changed country conditions, pursuant to 8 U.S.C. § 1158(a)(2)(D), "at any time during proceedings before the entry of a final order of removal or within the 90–day deadline for a motion to reopen. Outside of those circumstances, changed country conditions [under § 1229a(c)(7)(C) ] must be shown." *In re C–W–L*, 24 I. & N. Dec. at 353. The statutory provisions each play a role and apply at different points in the immigration proceeding, with § 1158(a)(2)(D) "apply[ing] principally at an earlier stage of proceedings than[ ] the 90–day reopening provisions in [ § 1229a(c)(7)(C) ]." *Id.*

[7] It is "a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Alaska Dep't of Envtl.*

*Conservation v. EPA,* 540 U.S. 461, 489 n. 13, 124 S.Ct. 983, 157 L.Ed.2d 967 (2004) (internal quotation marks and citation omitted). But, as the BIA reasoned, petitioners' proposed interpretation that an alien may file a new asylum application at *any* time—even when subject to a final removal order—without a motion to reopen, and by showing either changed personal circumstances or changed country conditions, would render § 1229a(c)(7)(C) superfluous. *See In re C–W–L,* 24 I. & N. Dec. at 351. An alien could completely bypass the more stringent procedural requirements for a motion to reopen by filing a successive asylum application; neither § 1229a(c)(7)(C)'s ninety-day deadline nor its exception in the case of changed country conditions would ever apply, even after the entry of a final order of removal.

[8] The Board's determination is also consistent with its general administrative procedures. As the BIA acknowledged in *In re C–W–L,* as a procedural matter a motion to reopen must be filed with a successive asylum petition after the completion of removal proceedings because the agency could not otherwise consider the new issue raised by the petitioner. 24 I. & N. Dec. at 350 (noting that, in the case presented, the applicant "filed no motion to reopen proceedings, a prerequisite to our taking up any issue arising in his case, given the entry of the removal order against him"); *see also id.* at 351 (stating that "[t]he only way for us to acquire jurisdiction over a petition for further relief (such as a 'successive asylum application')" when a final order of removal is in place "is through a properly filed motion to reconsider or reopen"); *id.* at 354. Nor could the petitioner benefit from a grant of asylum on his successive application unless he first provided the agency with a means of reopening his proceedings to vacate the **\*154** removal order. *See* 8 C.F.R. § 209.2(a)(1)(v) (providing that an alien who has been granted asylum may not adjust his status unless he is admissible to the United States).

[9] Petitioners contend that the BIA's interpretation of the INA is contrary to the statutory scheme and to Congress's intent because it would leave without any avenue of relief aliens whose personal circumstances have genuinely changed more than ninety days after a final agency decision in a removal proceeding. We disagree. Notwithstanding the fact that any such aliens would likely have remained in the country in violation of the immigration laws, *see* 8 U.S.C. § 1253(a) (1)(A) (setting forth penalties for an alien who "willfully fails

or refuses to depart from the United States within a period of 90 days from the date of the final order of removal under administrative processes"), 8 C.F.R. § 1003.2(c)(3)(iii) provides that the time and numerical limitations for a motion to reopen "shall not apply to a motion to reopen proceedings ... [a]greed upon by all parties and jointly filed." Thus, with the government's consent, an alien alleging only changed personal circumstances could reopen his proceedings and file a successive asylum petition. Furthermore, it is within the BIA's discretion to reopen proceedings *sua sponte* if it determines, based on a petitioner's particular circumstances, that reopening is warranted. *See* 8 C.F.R. § 1003.2(a) ("The Board may at any time reopen or reconsider on its own motion any case in which it has rendered a decision.").

Petitioners also claim that the regulatory history of 8 C.F.R. § 1208.4 "unambiguously establishes" that they are not required to file a motion to reopen with their successive asylum applications. They point, in particular, to the Department of Justice's explicit decision not to include such a requirement in the final version of the regulation:

> Because of inconsistency between the formulation of changed circumstances in [ 8 U.S.C. § 1158(a)(2)(D) ] and the formulation in [ 8 U.S.C. § 1229(c)(7)(C)(ii) ], which permits an alien to file a motion to reopen beyond the time limit normally applicable to such a motion, the Department has decided to drop the requirement that, for purposes of the prohibition in [ 8 U.S.C. § 1158(a)(2)(C) ], [the changed circumstances] exception may only be raised through a motion to reopen.

62 Fed.Reg. 10,312, 10,316 (Mar. 6, 1997); *cf.* 62 Fed.Reg. 444, 463 (proposed Jan. 3, 1997) ("Changed circumstances arising after the denial of the application but before the alien's departure or removal from the United States shall only be considered as part of a motion to reopen...."). 

This argument was considered and rejected by the Third, Seventh, Eighth, and Ninth Circuits and by the BIA in *In*

*re C–W–L,* and we reject it as well. We find persuasive the BIA's reasoning that

> [t]he cited regulatory history nowhere states that an alien may file unlimited "successive asylum applications" after the entry of a final administrative order of removal without filing a motion to reopen. At best, the cited regulatory provisions implementing [ 8 U.S.C. § 1158(a)(2)(D)] are silent on the issue of reopening, most likely because the requirement of an accompanying motion to reopen once a final order of removal has been entered is clearly set forth in other parts of the statutory and regulatory scheme.

*In re C–W–L,* 24 I. & N. Dec. at 352. Thus, the regulation's history does not unambiguously support petitioners' argument. As we have discussed, the current regulation can be read, consistent with **\*155** 8 U.S.C. § 1158(a)(2)(D), 8 U.S.C. § 1229(c)(7)(C), and 8 C.F.R. § 1003.2, to provide that a successive asylum application may be filed without a motion to reopen *before* a final removal order has entered. *See Zheng,* 509 F.3d at 872 ("[C]hanging the regulations ... does not reflect a clear intent to *weaken* the requirements of a motion to reopen when an alien under a final order of removal seeks to file a[ ] ... successive asylum application."). Petitioners' regulatory history argument therefore does not undermine the reasonableness of the BIA's statutory and regulatory interpretations.

The BIA's determination is further supported by policy considerations that several courts of appeals have recognized as important. The decisions of the Third, Seventh, and Eighth Circuits were influenced by principles that we articulated in *Wei Guang Wang v. BIA,* 437 F.3d 270. *See Zheng,* 509 F.3d at 871 (stating that "practical realities support [the BIA's] interpretation," and discussing *Wang*); *Huang,* 249 Fed.Appx. at 298; *Cheng Chen,* 498 F.3d at 760. In *Wang,* we discussed the policy behind extending the ninety-day deadline for a motion to reopen based on changed country

conditions, but not on changed personal circumstances. We noted that it would be "ironic" to allow aliens to reopen their cases following a final order of deportation simply because they were able to change their own personal circumstances (e.g., by giving birth to additional children) while remaining in the United States illegally:

> It is quite a different situation ... where a petitioner is seeking to reopen his asylum case due to circumstances entirely of his own making after being ordered to leave the United States. In such a situation, it would be ironic, indeed, if petitioners ... were permitted to have a second and third bite at the apple simply because they managed to marry and have children while evading authorities. This apparent gaming of the system in an effort to avoid deportation is not tolerated by the existing regulatory scheme. The law is clear that a petitioner must show changed country conditions in order to exceed the 90–day filing requirement for seeking to reopen removal proceedings. A self-induced change in personal circumstances cannot suffice.

*Wang,* 437 F.3d at 274 (citations omitted).

We find this logic equally applicable to successive asylum petitions filed after the BIA has issued a final removal order. Were we to accept petitioners' argument that an alien subject to such an order may file, more than ninety days after its entry, a second asylum application without a motion to reopen, and on the basis of *only* changed personal circumstances, we would be permitting extensive "gaming of the system" because those circumstances could be "entirely of [the alien's] own making." *Id.* Aliens would have every incentive to disregard their removal orders and remain in the United States long enough to change their personal circumstances (e.g., by having children or practicing a persecuted religion) and initiate new proceedings via a new asylum application.[5]

As the Seventh Circuit suggested in *Cheng Chen,* some restriction that cannot be manipulated by petitioners must be in **\*156** place, lest petitioners take advantage of the system by "manufacturing" a new case for asylum. *See* 498 F.3d at 760 ("It makes no sense to allow an alien who manages to elude capture ... for years after he has been ordered to leave the country, and has exhausted all his legal remedies against removal, to use this interval of unauthorized presence in the United States to manufacture a case for asylum."). Requiring a petitioner to file a motion to reopen in order to file a new asylum application, and therefore to show *country* conditions if the motion is untimely, provides one such restriction against manufacturing a case for asylum.

Such a requirement also promotes the agency's interest in finality. The Supreme Court has recognized this interest as important in the immigration context. *See INS v. Doherty,* 502 U.S. 314, 323, 112 S.Ct. 719, 116 L.Ed.2d 823 (1992) (noting that "[m]otions for reopening of immigration proceedings are disfavored" because "as a general matter, every delay works to the advantage of the deportable alien who wishes merely to remain in the United States"); INS v. Abudu, 485 U.S. 94, 107–08, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988) (noting the "strong public interest" in finality, and endorsing the view that the INS should have the right to be restrictive in granting motions to reopen because "[g]ranting such motions too freely will permit endless delay of deportation by aliens creative and fertile enough to continuously produce new and material facts"). Accepting petitioners' argument would permit aliens to file a new asylum application at any time, virtually without restriction, undermining significantly the finality of immigration proceedings.

We conclude that the BIA's interpretation of the INA and its implementing regulations are reasonable, fully consistent with the relevant statutory and regulatory provisions, and comport with sound and well-established policy considerations. We therefore affirm its holding that an alien under a final removal order must file a successive asylum application in conjunction with a motion to reopen and in accordance with those procedural requirements. We also note that we are not bound by our comment in *Jian Huan Guan v. BIA,* 345 F.3d 47 (2d Cir.2003) (per curiam), that such an alien may request permission to file a successive, untimely asylum application based only on changed personal circumstances, because that comment was contained in dicta.

*See id. at 49; see also Zheng,* 509 F.3d at 872 (stating that the language in *Guan* was dictum); *Cheng Chen,* 498 F.3d at 760 (same); *In re C–W–L,* 24 I. & N. Dec. at 353 (same); *cf. Chang Hua He v. Gonzales,* 501 F.3d 1128, 1133 n. 9 (9th Cir.2007) (suggesting, in dicta, that the petitioner could file a successive asylum application without a motion to reopen); *Haddad v. Gonzales,* 437 F.3d 515, 518 (6th Cir.2006) (same); *cf. also Qing Li Chen,* 524 F.3d at 1033 ("[W]e are not bound by He's offhand observation."); *Xiao Xing Ni v. Gonzales,* 494 F.3d 260, 272–73 (2d Cir.2007) (Calabresi, J., concurring).

## II. Constitutional Challenges

Petitioners raise two constitutional challenges to the BIA's determination, both of which we reject as meritless.

### A. Due Process

[10] Petitioners contend that the BIA's interpretation of the INA violates aliens' due process rights by depriving them of a hearing when they have experienced only changed personal circumstances. But petitioners have not established any liberty or property interest in asylum that warrants Fifth Amendment protection. We agree with the views of other circuits that **\*157** have addressed similar due process claims in the context of discretionary relief. *See, e.g., Smith v. Ashcroft,* 295 F.3d 425, 430 (4th Cir.2002) (noting that aliens have no protected liberty or property interest in a waiver of deportation under former INA § 212(c) because such relief is discretionary, "a circumstance fatal to [a] due process claim"); *Oguejiofor v. Attorney Gen. of the U.S.,* 277 F.3d 1305, 1309 (11th Cir.2002) ("[A]n alien has no constitutionally-protected right to discretionary relief or *to be eligible for discretionary relief.*" (emphasis added)). We hold that an alien who has already filed one asylum application, been adjudicated removable and ordered deported, and who has nevertheless remained in the country illegally for several years, does not have a liberty or property interest in a discretionary grant of asylum. In other contexts, we have suggested in dicta that an alien's interest "in not being returned [to a country where he fears persecution] may well enjoy some due process protection not available to an alien claiming only admission." *Yiu Sing Chun v. Sava,* 708 F.2d 869, 877 (2d Cir.1983); *see also Augustin v. Sava,* 735 F.2d 32, 37 (2d Cir.1984) (noting that the INA "prohibits the Attorney

General from deporting or returning an alien to a country in which his life or freedom would be jeopardized," but leaving open the question of "whether or not due process protections apply to an application for a discretionary grant of asylum"). We do not consider those situations here, nor do we address whether an applicant for withholding of removal or relief under the CAT would have a protectable interest in those mandatory forms of relief.

[11] In any event, assuming arguendo that petitioners had a protectable interest in relief under § 1158(a)(2)(D), they have not been denied due process. We stated in *Augustin v. Sava*:

> The requirements of the due process clause are flexible and dependent on the circumstances of the particular situation examined. Without attempting precisely to map the contours of due process in the immigration area, we think that the protected right to avoid deportation or return to a country where the alien will be persecuted warrants a hearing where the likelihood of persecution can be fairly evaluated.

735 F.2d at 37 (citation omitted). Any alien to whom the BIA's determination would apply would have already had a full and fair removal hearing (which resulted in a final removal order) as well as the adjudication of their initial asylum application. The alien is afforded additional process by the opportunity to submit and offer evidence on a motion to reopen her earlier proceedings; if the motion is granted, a hearing will be held. 8 U.S.C. § 1229a(c)(7)(B). Thus, petitioners cannot succeed on their due process challenge.[6]

### *158 B. Equal Protection

[12] Petitioners also argue that the BIA's interpretation results in an equal protection violation in that it treats aliens under a final removal order who nevertheless remain illegally in the United States differently than aliens under a final removal order who comply with the order by leaving, but who later reenter the United States illegally. The latter class may apply for withholding of removal and is not required to

present evidence of changed country conditions to support a determination of reasonable fear. *See* 8 C.F.R. § 1241.8(e); *id.* § 1208.31. Under the BIA's rulings, however, the former class may not reopen proceedings or submit a new asylum application without showing changed country conditions.

[13] To successfully assert an equal protection challenge, petitioners must first establish that the two classes at issue are similarly situated. "[T]he government can treat persons differently if they are not 'similarly situated.'" *Jankowski–Burczyk v. INS,* 291 F.3d 172, 176 (2d Cir.2002) (internal quotation marks and citation omitted). Petitioners have failed to do so here. Aliens who disregard a final removal order and remain in the country illegally are not similarly situated to aliens who have complied with a final order but subsequently reenter the United States and try to seek relief. *Cf. id.* at 178 (concluding that legal permanent residents and non-legal permanent residents are not similarly situated for purposes of equal protection analysis).

[14] Assuming arguendo that the two classes of aliens were similarly situated, petitioners' equal protection claim would fail on other grounds. The challenged classification is not protected, and there is no fundamental right at stake, *see supra* Part II.A; thus, the proper standard of review is rational basis. *See Heller v. Doe,* 509 U.S. 312, 319–20, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) ("[A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity. Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." (citations omitted)). Furthermore, "[a] sufficient reason need not be one actually considered by Congress." *Jankowski–Burczyk,* 291 F.3d at 178. A classification subject to rational basis review "must be upheld against [an] equal protection challenge if there is *any reasonably conceivable* state of facts that could provide a rational basis for the classification. Where there are plausible reasons for Congress' action, our inquiry is at an end." *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313–14, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (emphasis added) (internal quotation marks and citations omitted).

There is a rational basis for distinguishing between aliens who comply with their final removal orders and those who do not, and for giving the former greater legal protection

than the latter. As the government has argued, "[i]t is surely rational for Congress to treat scofflaws who disobey orders of removal less favorably than aliens who obey such orders." Supplemental Br. for Resp't in No. 06–2998–ag at 48. Congress may well have wanted to prevent abuse of the asylum process and to create an incentive for aliens to comply *159 with final orders of removal. Furthermore, Congress could have determined that aliens who complied with their removal orders were less likely upon return to "game the system" by changing their personal circumstances, compared to aliens who deliberately disobeyed their orders and chose to remain in the country. Because any distinction drawn between aliens who comply with their final removal orders and those who do not is rationally related to a legitimate governmental purpose, we conclude that there is no equal protection violation.

### III. Treaty and Customary International Law–Based Challenges

Finally, petitioners argue that under the United Nations Protocol Relating to the Status of Refugees ("Protocol"), Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. No. 6557, and the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (CAT), Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), the agency has an obligation to ensure that aliens will not be returned to a country in which they are likely to face persecution or torture. On that basis, petitioners claim that the BIA's actions violated their rights under international law because, if removed, they will be persecuted for violating China's family planning policies. Petitioners also argue that the BIA's interpretation violates customary international law in general and the principles of non-refoulement and protection of refugees "sur place" in particular.

[15] [16] But neither the Protocol nor the CAT are self-executing treaties. *See Pierre v. Gonzales,* 502 F.3d 109, 119 (2d Cir.2007) (CAT); *Bertrand v. Sava,* 684 F.2d 204, 218–19 (2d Cir.1982) (Protocol); *see also Purwantono v. Gonzales,* 498 F.3d 822, 824 (8th Cir.2007) (Protocol); *Sukwanputra v. Gonzales,* 434 F.3d 627, 632 (3d Cir.2006) (same); *Singh v. Ashcroft,* 398 F.3d 396, 404 n. 3 (6th Cir.2005) (CAT); *Auguste v. Ridge,* 395 F.3d 123, 132 (3d Cir.2005) (same); *cf. Medellin v. Texas,* 552 U.S. 491, 128 S.Ct. 1346, 1365, 170 L.Ed.2d 190 (2008) (CAT). They therefore do not create private rights that petitioners

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

can enforce in this court beyond those contained in their implementing statutes and regulations (i.e., the INA). *See* Dreyfus v. Von Finck, 534 F.2d 24, 30 (2d Cir.1976) ("It is only when a treaty is self-executing, when it prescribes rules by which private rights may be determined, that it may be relied upon for the enforcement of such rights."). And we have determined that the BIA's rulings are fully consistent with the framework of the INA and its relevant regulations. Furthermore, even if the treaties were self-executing, "there is a strong presumption against inferring individual rights from international treaties." *United States v. De La Pava,* 268 F.3d 157, 164 (2d Cir.2001); *see also* *Medellin,* 128 S.Ct. at 1357 n. 3 (collecting cases in the courts of appeals acknowledging such a presumption). Accordingly, we reject petitioners' treaty-based argument.

**[17]** Petitioners have also presented no evidence that the BIA's interpretation of the statutory provisions conflicts with principles of customary international law. And even if there were a conflict, "United States law is not subordinate to customary international law or necessarily subordinate to treaty-based international law and, in fact, may conflict with both." *United States v. Yousef,* 327 F.3d 56, 91 (2d Cir.2003); *see also* *Sosa v. Alvarez–Machain,* 542 U.S. 692, 731, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (noting that Congress may "shut the door to the law of nations entirely [ ] ... at any time (explicitly, or implicitly by treaties or statutes that **\*160** occupy the field), just as it may modify or cancel any judicial decision so far as it rests on recognizing an international norm as such"). We have said repeatedly that when there is a conflict between a statute and customary international law, the statute controls. *See* Pierre, 502 F.3d at 119 ("An act of Congress will govern in domestic courts in derogation of previous treaties and customary international law."); *Oliva v. U.S. Dep't of Justice,* 433 F.3d 229, 236 (2d Cir.2005) ("[C]lear congressional action trumps customary international law. This rule, of course, applies in immigration matters." (internal quotation marks and citations omitted)). Thus, petitioners' argument based on customary international law also fails.

**IV. Disposition of the Instant Cases**

**[18]** Applying the agency's statutory interpretation, which we affirm, to petitioners' cases, we conclude that the BIA did not abuse its discretion in denying petitioners' motions to reopen. Petitioners were all subject to final orders of removal

after their initial asylum applications were denied. They were therefore required to properly file a motion to reopen to pursue a new asylum application. Because petitioners filed their requests for relief more than ninety days, indeed several years, after the entry of their final removal orders, their motions to reopen were untimely and, pursuant to 8 U.S.C. § 1229a(c)(7)(C)(ii) and 8 C.F.R. 1003.2(c)(3)(ii), they were required to demonstrate that conditions in China had changed.

Petitioners requested reopening and asylum based on the birth of a second or third child in the United States. But it is well settled in this circuit that the birth of additional children in the United States is evidence of changed personal circumstances, not changed country conditions within the meaning of 8 C.F.R. § 1003.2(c)(3)(ii). *See, e.g.,* Wang, 437 F.3d at 273–74; *Guan,* 345 F.3d at 49 ("Guan's evidence is essentially of changed personal circumstances in the United States based on the birth of her two sons...."). Because petitioners failed to satisfy the requirements for a motion to reopen, the BIA did not err in denying their motions or failing to consider their successive asylum applications.

Petitioners raise some additional arguments that pertain to their individual cases. We have considered those arguments and find all of them to be without merit.

**CONCLUSION**

For the foregoing reasons, the petitions for review are DENIED. Having completed our review, any stay of removal that the court previously granted in these proceedings is VACATED, and any pending motion for a stay of removal is DISMISSED as moot.

SACK, Circuit Judge, concurring in part:
I concur in the judgment of the majority. I also join in Judge Walker's opinion for the majority, with one exception.

The majority resolves the petitioners' due process challenge by concluding, first, that "an alien who has already filed one asylum application, been adjudicated removable and ordered deported, and who has nevertheless remained in the country illegally for several years, does not have a liberty or property interest in a discretionary grant of asylum," *ante* at 156;

and second, that "[i]n any event, assuming arguendo that petitioners had a protectable interest in relief [they sought], they have **\*161** not been denied due process," *ante* at 157. As to the first point—the existence of a liberty or property interest—the majority may well be right. [1] But I would prefer not to purport to decide categorically here this issue of first impression. The same result obtains independently under the majority's alternative rationale, with which I agree—that due process has, in fact, afforded to the petitioners.

Evaluating a due process claim involves a two-part inquiry in which we ask: "1) whether plaintiffs possess a liberty or property interest protected by the Due Process Clause; and, if so, 2) whether existing ... procedures are constitutionally adequate." *Kapps v. Wing,* 404 F.3d 105, 112 (2d Cir.2005). When the first question is unsettled and the second question is easily answered in the affirmative, we have not hesitated to dispose of the claim on the second question alone. *See, e.g., Gaston v. Coughlin,* 249 F.3d 156, 162 (2d Cir.2001); *Rojas–Reyes v. INS,* 235 F.3d 115, 124 (2d Cir.2000). [2]

I think we should do so here.

**All Citations**

538 F.3d 143

---

# Footnotes

\*    Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Michael B. Mukasey is automatically substituted for former Attorney General Alberto R. Gonzales as the respondent in these cases.

1    Jin's motion to reopen was *See In re Jin,* No. A 77 107 473 denied Zheng's motion to reopen *Zheng,* No. A 73 605 767 (B.I.A. reopen was denied on December 22 777 126 (B.I.A. Dec. 22, 2005). of Zeng's motion on June 21, 200 277 (B.I.A. June 21, 2006), *aff'* N.Y. City Jan. 24, 2006).

2    The statute provides:
     There is no time limit on the filing of a motion to reopen if the basis of the motion is to apply for relief under sections 1158 or 1231(b)(3) of this title and is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding.

     8 U.S.C. § 1229a(c)(7)(C)(ii).

3    The regulation provides:
     The time and numerical limitations set forth in paragraph (c)(2) of this section shall not apply to a motion to reopen proceedings:
     To apply or reapply for asylum or withholding of deportation based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous hearing[.]

     8 C.F.R. § 1003.2(c)(3)(ii).

4    In relevant part, 8 C.F.R. § 1208.4(b)(3)(ii) states:
     Asylum applications shall be filed directly with the Immigration Court having jurisdiction over the case in the following circumstances:
     ....
     After completion of exclusion, deportation, or removal proceedings, and in conjunction with a motion to reopen pursuant to 8 CFR part 1003 where applicable, with the Immigration Court having jurisdiction over the prior proceeding. Any such motion must reasonably explain the failure to request asylum prior to the completion of the proceedings.

The regulation does not explicitly require that a motion to reopen accompany an asylum application. Nevertheless, for the reasons stated below, we agree with the BIA that the regulatory scheme as a whole makes "clear that an asylum application may only be filed with the Immigration Court in conjunction with a motion to reopen." *In re C–W–L,* 24 I. & N. Dec. at 350 (internal quotation marks and citation omitted).

5    Catholic Charities Community Services, as amicus, suggests that an alien's intentions (whether "good-faith" or not) are irrelevant if the changed personal circumstances place the alien at risk of persecution upon return to his country of origin. Of course, there is no indication that the petitioner in *Wang,* or the petitioners in the instant cases, have engaged in bad-faith gamesmanship of the immigration process. We note, however, that the rules governing successive asylum petitions are designed to avoid such manipulation.

6    In his concurrence, Judge evaluation of petitioners' due inquiry, but he disagrees with Sack acknowledges that our process claim involves a two-part the approach that we adopt—namely, addressing the first part of the inquiry first. While he notes that "we have not hesitated to dispose of the claim on the second question alone," Concurrence at 161, it is also true that we have not hesitated to rest our analysis on the first question alone, *see, e.g., Connolly v. McCall,* 254 F.3d 36, 42 (2d Cir.2001) (per curiam) (rejecting a due process claim on the ground that the plaintiff could not establish a property interest in his continued participation in a pension scheme). Indeed, we have often found it prudent, as we have here, to rest our analysis on the first question but nevertheless to address the second. *See, e.g., McMenemy v. City of Rochester,* 241 F.3d 279, 286–88 (2d Cir.2001) (Sack, J.) (concluding that the plaintiff lacked a cognizable property interest, "[b]ut even if he did have a property interest, he was not deprived of it without due process of law").

Nor is it at all clear, as the concurring opinion contends, that the issue of petitioners' interests in asylum relief is "unsettled" or less "easily answered" than whether the procedures afforded were constitutionally adequate. Concurrence at 161. Furthermore, any "complications" in due process analysis arising from interests in withholding of removal or relief under the CAT are not at issue here.

1    Because I think we ought not reach this issue, I arrive at no conclusion with respect to it. I point out, nonetheless, that the issue may not be as simple as the majority makes it appear. Although asylum is a discretionary form of relief, *INS v. Aguirre–Aguirre,* 526 U.S. 415, 420, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999), and the Due Process Clause does not protect benefits that "government officials may grant or deny ... in their discretion," *Town of Castle Rock, Colo. v. Gonzales,* 545 U.S. 748, 756, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005), every asylum applicant is nonetheless entitled to due process in establishing her eligibility for that form of relief, *see, e.g., Ali v. Mukasey,* 529 F.3d 478, 490 (2d Cir.2008); *Burger v. Gonzales,* 498 F.3d 131, 134 (2d Cir.2007); *see also Zadvydas v. Davis,* 533 U.S. 678, 693–94, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) ("[T]his Court has held that the Due Process Clause protects an alien subject to a final order of deportation, though the nature of that protection may vary depending upon status and circumstance." (citations omitted)).

The due process issue is also complicated because, unlike asylum, withholding of removal under 8 U.S.C. § 1231(b)(3) and the Convention Against Torture is mandatory. *Delgado v. Mukasey,* 508 F.3d 702, 705 (2d Cir.2007); *Yang v. Gonzales,* 478 F.3d 133, 141 (2d Cir.2007); 8 U.S.C. § 1231(b)(3)(A). We have said that "some due process protection surrounds the determination of whether an alien has sufficiently shown that return to a particular country will jeopardize his life or freedom so as to invoke the mandatory prohibition against his return to that country." *Augustin v. Sava,* 735 F.2d 32, 37 (2d Cir.1984). Furthermore, the INA's implementing regulations provide that "[a]n asylum application shall be deemed to constitute at the same time an application for withholding of removal." 8 C.F.R. § 208.3(b). Any BIA policy restricting the ability to apply for asylum will therefore also implicate withholding of removal, a form of relief that carries due process protection.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

I think we should refrain from addressing these and related issues until we are required to do so.

2    I do not think the majority's citations to  *Connolly v. McCall,* 254 F.3d 36 (2d Cir.2001) (per curiam), where the second question was not easily answered in the affirmative, or  *McMenemy v. City of Rochester,* 241 F.3d 279 (2d Cir.2001), where the narrow first question—whether the plaintiff had the property interests he claimed—was answered largely by reference to well-settled Supreme Court, Second Circuit and New York law, affect this conclusion.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Zadvydas v. Davis, 533 U.S. 678 (2001)
Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 395 of 912

121 S.Ct. 2491, 150 L.Ed.2d 653, 69 USLW 4626, 69 USLW 4581...

KeyCite Yellow Flag - Negative Treatment

Superseded by Regulation as Stated in Hernandez-Carrera v. Carlson, 10th Cir.(Kan.), November 12, 2008

121 S.Ct. 2491
Supreme Court of the United States

Kestutis ZADVYDAS, Petitioner,

v.

Christine G. DAVIS and Immigration and Naturalization Service.

John D. Ashcroft, Attorney General, et al., Petitioners,

v.

Kim Ho Ma.

Nos. 99–7791 and 00–38.
|
Argued Feb. 21, 2001.
|
Decided June 28, 2001.

### Synopsis

Resident aliens who had been ordered removed and who were held in custody by Immigration and Naturalization Service (INS) beyond 90–day removal period, due to government's inability to remove them, brought separate habeas petitions seeking release. The United States District Court for the Eastern District of Louisiana, Fallon, J., 986 F.Supp. 1011, granted one petition. The United States Court of Appeals for the Fifth Circuit reversed, 185 F.3d 279. The United States District Court for the Western District of Washington, Lasnik, J., 56 F.Supp.2d 1165, granted other petition. The United States Court of Appeals for the Ninth Circuit affirmed, 208 F.3d 815. Certiorari was granted, and cases were consolidated. The Supreme Court, Justice Breyer, held that: (1) Immigration and Naturalization Act's (INA) post-removal-period detention provision contains implicit reasonableness limitation; (2) federal habeas statute grants federal courts authority to decide whether given post-removal-period detention is statutorily authorized; and (3) presumptive limit to reasonable duration of post-removal-period detention is six months.

Vacated and remanded.

Justice Scalia filed dissenting opinion joined by Justice Thomas.

Justice Kennedy filed dissenting opinion joined by the Chief Justice and joined by Justices Scalia and Thomas in part.

West Headnotes (7)

**[1]** **Habeas Corpus** ⚖ Aliens

Federal habeas corpus proceedings are available as forum for statutory and constitutional challenges to post-removal-period detention of alien. Immigration and Nationality Act, § 241(a)(6), as amended, 8 U.S.C.A. § 1231(a)(6); 28 U.S.C.A. § 2241(c)(3).

1216 Cases that cite this headnote

**[2]** **Constitutional Law** ⚖ Avoidance of doubt

When act of Congress raises serious doubt as to its constitutionality, Supreme Court first ascertains whether construction of statute is fairly possible by which question may be avoided.

68 Cases that cite this headnote

**[3]** **Aliens, Immigration, and Citizenship** ⚖ Time limitations; indefinite detention

Immigration and Nationality Act's (INA) post-removal-period detention provision does not permit indefinite detention of alien beyond 90–day removal period in event government is unable to remove, but rather contains implicit limitation of detention period to that reasonably necessary to bring about removal; provision that Attorney General "may" continue to detain alien who is "risk to the community or unlikely to comply with the order of removal" is not grant of unlimited discretion, and once removal is no longer reasonably foreseeable, continued detention is no longer authorized under Act. U.S.C.A. Const.Amend. 5; Immigration and Nationality, § 241(a)(6), as amended, 8 U.S.C.A. § 1231(a)(6).

2820 Cases that cite this headnote

**[4]** **Constitutional Law** Restraint, commitment, and detention

**Constitutional Law** Commitment and proceedings therefor

Government detention violates Due Process Clause unless detention is ordered in criminal proceeding with adequate procedural protections, or there is special justification, such as harm-threatening mental illness, which outweighs individual's constitutionally protected interest in avoiding physical restraint. U.S.C.A. Const.Amend. 5.

384 Cases that cite this headnote

**[5]** **Constitutional Law** Admission and exclusion; deportation

Due Process Clause protects alien subject to final order of deportation. U.S.C.A. Const.Amend. 5.

253 Cases that cite this headnote

**[6]** **Habeas Corpus** Aliens

**Statutes** Particular Departments and Officers, Construction by

Primary federal habeas corpus statute grants federal courts authority to decide whether given post-removal-period detention of alien is statutorily authorized; courts are not required to defer to executive branch's view as to whether implicit reasonableness limitation of post-removal-period statute is satisfied, although executive view must be taken into account. Immigration and Nationality Act, § 241(a)(6), as amended, 8 U.S.C.A. § 1231(a)(6); 28 U.S.C.A. § 2241(c)(3).

1141 Cases that cite this headnote

**[7]** **Aliens, Immigration, and Citizenship** Time limitations; indefinite detention

**Habeas Corpus** Particular persons and proceedings

Presumptive limit to reasonable duration of detention under post-removal-period provision of Immigration and Nationality Act (INA) is six months; after six months, once alien provides good reason to believe that there is no significant likelihood of removal in reasonably foreseeable future, government must respond with evidence sufficient to rebut that showing in order to warrant further detention. Immigration and Nationality Act, § 241(a)(6), as amended, 8 U.S.C.A. § 1231(a)(6).

2491 Cases that cite this headnote

**\*\*2492** *Syllabus* [*]

**\*678** After a final removal order is entered, an alien ordered removed is held in custody during a 90–day removal period. If the alien is not removed in those 90 days, the post-removal-period detention statute authorizes further detention or supervised release, subject to administrative review. Kestutis Zadvydas, petitioner in No. 99–7791—a resident alien born, apparently of Lithuanian parents, in a German displaced persons camp—was ordered deported based on his criminal record. Germany and Lithuania refused to accept him because he was not a citizen of their countries; efforts to send him to his wife's native country also failed. When he remained in custody after the removal period expired, he filed a habeas action under 28 U.S.C. § 2241. The District Court granted the writ, reasoning that, because the Government would never remove him, his confinement would be permanent, in violation of the Constitution. In reversing, the Fifth Circuit concluded that Zadvydas' detention did not violate the Constitution because eventual deportation was not impossible, good-faith efforts to remove him continued, and his detention was subject to administrative review. Kim Ho Ma, respondent in No. 00–38, is a resident alien born in Cambodia who was ordered removed based on his aggravated felony conviction. When he remained in custody after the removal period expired, he filed a § 2241 habeas petition. In ordering his release, the District Court held that the Constitution forbids post-removal-period detention unless there is a realistic chance that an alien will be removed, and that no such chance existed here because Cambodia has no repatriation treaty with the United States.

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 397 of 912

Zadvydas v. Davis, 533 U.S. 678 (2001)
121 S.Ct. 2491, 150 L.Ed.2d 653, 69 USLW 4626, 69 USLW 4581...

The Ninth Circuit affirmed, concluding that detention was not authorized for more than a reasonable time beyond the 90–day period, and that, given the lack of a repatriation agreement, that time had expired.

*Held:*

1. 🚩 Section 2241 habeas proceedings are available as a forum for statutory and constitutional challenges to post-removal-period detention. Statutory changes in the immigration law left habeas untouched as the **\*679** basic method for obtaining review of continued custody after a deportation **\*\*2493** order becomes final, and none of the statutory provisions limiting judicial review of removal decisions applies here. Pp. 2497–2498.

2. The post-removal-period detention statute, read in light of the Constitution's demands, implicitly limits an alien's detention to a period reasonably necessary to bring about that alien's removal from the United States, and does not permit indefinite detention. Pp. 2498–2503.

(a) A statute permitting indefinite detention would raise serious constitutional questions. Freedom from imprisonment lies at the heart of the liberty protected by the Due Process Clause. Government detention violates the Clause unless it is ordered in a criminal proceeding with adequate procedural safeguards or a special justification outweighs the individual's liberty interest. The instant proceedings are civil and assumed to be nonpunitive, and the Government proffers no sufficiently strong justification for indefinite civil detention under this statute. The first justification—preventing flight—is weak or nonexistent where removal seems a remote possibility. Preventive detention based on the second justification—protecting the community—has been upheld only when limited to specially dangerous individuals and subject to strong procedural protections. When preventive detention is potentially indefinite, this dangerousness rationale must also be accompanied by some other special circumstance, such as mental illness, that helps to create the danger. The civil confinement here is potentially permanent, and once the flight risk justification evaporates, the only special circumstance is the alien's removable status, which bears no relation to dangerousness. Moreover, the sole procedural protections here are found in administrative proceedings, where the alien bears the burden of proving he is not dangerous, without (according to the Government) significant later judicial review. The Constitution may well preclude granting an administrative body unreviewable

authority to make determinations implicating fundamental rights. Pp. 2498–2500.

(b) 🚩 *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956—in which an alien was indefinitely detained as he attempted to reenter the country —does not support the Government's argument that alien status itself can justify indefinite detention. Once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all persons within the United States, including aliens, whether their presence is lawful, unlawful, temporary, or permanent. Nor do cases holding that, because Congress has plenary power to create immigration law, the Judicial Branch must defer to Executive and Legislative Branch decisionmaking in that area help the Government, because that power is subject to constitutional limits. Finally, the aliens' liberty interest is not diminished by their lack of a legal right to live at large, for the choice at issue here is between imprisonment and supervision under **\*680** release conditions that may not be violated and their liberty interest is strong enough to raise a serious constitutional problem with indefinite detention. Pp. 2500–2502.

(c) Despite the constitutional problem here, if this Court were to find a clear congressional intent to grant the Attorney General the power to indefinitely detain an alien ordered removed, the Court would be required to give it effect. But this Court finds no clear indication of such intent. The statute's use of "may" is ambiguous and does not necessarily suggest unlimited discretion. Similar related statutes requiring detention of criminal aliens during removal proceedings and the removal period do not show that Congress authorized indefinite detention here. Finally, nothing in the statute's legislative history clearly demonstrates a congressional intent to authorize indefinite, perhaps permanent, detention. Pp. 2502–2503.

3. The application of the "reasonable time" limitation is subject to federal-court **\*\*2494** review. The basic federal habeas statute grants the federal courts authority to determine whether post-removal-period detention is pursuant to statutory authority. In answering that question, the court must ask whether the detention exceeds a period reasonably necessary to secure removal. It should measure reasonableness primarily in terms of the statute's purpose of assuring the alien's presence at the moment of removal. Thus, if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized. If it is foreseeable, the court should consider the risk of

the alien's committing further crimes as a factor potentially justifying continued confinement. Without abdicating their responsibility to review the detention's lawfulness, the courts can take appropriate account of such matters as the Executive Branch's greater immigration-related expertise, the Immigration and Naturalization Service's administrative needs and concerns, and the Nation's need to speak with one voice on immigration. In order to limit the occasions when courts will need to make the difficult judgments called for by the recognition of this necessary Executive leeway, it is practically necessary to recognize a presumptively reasonable period of detention. It is unlikely that Congress believed that all reasonably foreseeable removals could be accomplished in 90 days, but there is reason to believe that it doubted the constitutionality of more than six months' detention. Thus, for the sake of uniform administration in the federal courts, six months is the appropriate period. After the 6–month period, once an alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must furnish evidence sufficient to rebut that showing. Pp. 2503–2505.

**\*681** 4. The standard that the Fifth Circuit applied in holding Zadvydas' continued detention lawful seems to require an alien seeking release to show the absence of *any* prospect of removal—no matter how unlikely or unforeseeable—and thus demands more than the statute can bear. The Ninth Circuit's conclusion that Ma should be released may have rested solely upon the absence of a repatriation agreement without giving due weight to the likelihood of successful future negotiations. P. 2505.

🚩 185 F.3d 279 and 🚩 208 F.3d 815, vacated and remanded.

BREYER, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, SOUTER, and GINSBURG, JJ., joined. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined, *post,* p. 2505. KENNEDY, J., filed a dissenting opinion, in which REHNQUIST, C.J., joined, and in which SCALIA and THOMAS, JJ., joined as to Part I, *post,* p. 2507.

**Attorneys and Law Firms**

Jay W. Stansell, Seattle, WA, for respondent in No. 00–38. With him on the brief were Thomas W. Hillier II and Jennifer E. Wellman.

Robert F. Barnard, New Orleans, LA, for petitioner in No. 99–7791.

Edwin S. Kneedler, Washington, DC, for respondents in No. 99–7791 and for petitioners in No. 00–38.

**Opinion**

**\*682** Justice BREYER delivered the opinion of the Court.

When an alien has been found to be unlawfully present in the United States and a final order of removal has been entered, the Government ordinarily secures the alien's removal during a subsequent 90–day statutory "removal period," during which time the alien normally is held in custody.

**\*\*2495** A special statute authorizes further detention if the Government fails to remove the alien during those 90 days. It says:

"An alien ordered removed [1] who is inadmissible ... [2] [or] removable [as a result of violations of status requirements or entry conditions, violations of criminal law, or reasons of security or foreign policy] or [3] who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to [certain] terms of supervision ...." 📄 8 U.S.C. § 1231(a)(6) (1994 ed., Supp. V).

In these cases, we must decide whether this post-removal-period statute authorizes the Attorney General to detain a removable alien *indefinitely* beyond the removal period or only for a period *reasonably necessary* to secure the alien's removal. We deal here with aliens who were admitted to the United States but subsequently ordered removed. Aliens who have not yet gained initial admission to this country present a very different question. See *infra,* at 2500–2501. Based on our conclusion that indefinite detention of aliens in the former category would raise serious constitutional concerns, we construe the statute to contain an implicit "reasonable time" limitation, the application of which is subject to federal-court review.

**\*683** I

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 399 of 912

Zadvydas v. Davis, 533 U.S. 678 (2001)

121 S.Ct. 2491, 150 L.Ed.2d 653, 69 USLW 4626, 69 USLW 4581...

## A

The post-removal-period detention statute is one of a related set of statutes and regulations that govern detention during and after removal proceedings. While removal proceedings are in progress, most aliens may be released on bond or paroled. 66 Stat. 204, as added and amended, 110 Stat. 3009–585, 8 U.S.C. §§ 1226(a)(2), (c) (1994 ed., Supp. V). After entry of a final removal order and during the 90–day removal period, however, aliens must be held in custody. § 1231(a)(2). Subsequently, as the post-removal-period statute provides, the Government "may" continue to detain an alien who still remains here or release that alien under supervision. § 1231(a)(6).

Related Immigration and Naturalization Service (INS) regulations add that the INS District Director will initially review the alien's records to decide whether further detention or release under supervision is warranted after the 90–day removal period expires. 8 C.F.R. § 241.4(c)(1), (h), (k)(1)(i) (2001). If the decision is to detain, then an INS panel will review the matter further, at the expiration of a 3–month period or soon thereafter. § 241.4(k)(2)(ii). And the panel will decide, on the basis of records and a possible personal interview, between still further detention or release under supervision. § 241.4(i). In making this decision, the panel will consider, for example, the alien's disciplinary record, criminal record, mental health reports, evidence of rehabilitation, history of flight, prior immigration history, and favorable factors such as family ties. § 241.4(f). To authorize release, the panel must find that the alien is not likely to be violent, to pose a threat to the community, to flee if released, or to violate the conditions of release. § 241.4(e). And the alien must demonstrate "to the satisfaction of the Attorney General" that he will pose no danger or risk of flight. **684 § 241.4(d)(1). If the panel decides against release, it must review the matter again within a year, and can review it earlier if conditions change. §§ 241.4(k)(2)(iii), (v).

## B

### 1

We consider two separate instances of detention. The first concerns Kestutis Zadvydas, a resident alien who was born,

apparently of Lithuanian parents, in a displaced persons camp in Germany in 1948. When he was eight years old, Zadvydas immigrated to the United States with his **2496 parents and other family members, and he has lived here ever since.

Zadvydas has a long criminal record, involving drug crimes, attempted robbery, attempted burglary, and theft. He has a history of flight, from both criminal and deportation proceedings. Most recently, he was convicted of possessing, with intent to distribute, cocaine; sentenced to 16 years' imprisonment; released on parole after two years; taken into INS custody; and, in 1994, ordered deported to Germany. See 8 U.S.C. § 1251(a)(2) (1988 ed., Supp. V) (delineating crimes that make alien deportable).

In 1994, Germany told the INS that it would not accept Zadvydas because he was not a German citizen. Shortly thereafter, Lithuania refused to accept Zadvydas because he was neither a Lithuanian citizen nor a permanent resident. In 1996, the INS asked the Dominican Republic (Zadvydas' wife's country) to accept him, but this effort proved unsuccessful. In 1998, Lithuania rejected, as inadequately documented, Zadvydas' effort to obtain Lithuanian citizenship based on his parents' citizenship; Zadvydas' reapplication is apparently still pending.

The INS kept Zadvydas in custody after expiration of the removal period. In September 1995, Zadvydas filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241 challenging **685 his continued detention. In October 1997, a Federal District Court granted that writ and ordered him released under supervision. Zadvydas v. Caplinger, 986 F.Supp. 1011, 1027–1028 (E.D.La.). In its view, the Government would never succeed in its efforts to remove Zadvydas from the United States, leading to his permanent confinement, contrary to the Constitution. Id., at 1027.

The Fifth Circuit reversed this decision. Zadvydas v. Underdown, 185 F.3d 279 (1999). It concluded that Zadvydas' detention did not violate the Constitution because eventual deportation was not "impossible," good-faith efforts to remove him from the United States continued, and his detention was subject to periodic administrative review. Id., at 294, 297. The Fifth Circuit stayed its mandate pending potential review in this Court.

Zadvydas v. Davis, 533 U.S. 678 (2001)

121 S.Ct. 2491, 150 L.Ed.2d 653, 69 USLW 4626, 69 USLW 4581...

2

The second case is that of Kim Ho Ma. Ma was born in Cambodia in 1977. When he was two, his family fled, taking him to refugee camps in Thailand and the Philippines and eventually to the United States, where he has lived as a resident alien since the age of seven. In 1995, at age 17, Ma was involved in a gang-related shooting, convicted of manslaughter, and sentenced to 38 months' imprisonment. He served two years, after which he was released into INS custody.

In light of his conviction of an "aggravated felony," Ma was ordered removed. See 8 U.S.C. §§ 1101(a)(43)(F) (defining certain violent crimes as aggravated felonies), 1227(a)(2)(A)(iii) (1994 ed., Supp. IV) (aliens convicted of aggravated felonies are deportable). The 90–day removal period expired in early 1999, but the INS continued to keep Ma in custody, because, in light of his former gang membership, the nature of his crime, and his planned participation in a prison hunger strike, it was "unable to conclude that *686 Mr. Ma would remain nonviolent and not violate the conditions of release." App. to Pet. for Cert. in No. 00–38, p. 87a.

In 1999, Ma filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241. A panel of five judges in the Federal District Court for the Western District of Washington, considering Ma's and about 100 similar cases together, issued a joint order holding that the Constitution forbids post-removal-period detention unless there is "a realistic chance that [the] alien will be deported" (thereby permitting classification of the detention as "in aid of deportation"). *Binh Phan v. Reno,* 56 F.Supp.2d 1149, 1156 (1999). The District Court then held an evidentiary hearing, decided that there was no "realistic chance" that Cambodia **2497 (which has no repatriation treaty with the United States) would accept Ma, and ordered Ma released. App. to Pet. for Cert. in No. 00–38, at 60a–61a.

The Ninth Circuit affirmed Ma's release. *Kim Ho Ma v. Reno,* 208 F.3d 815 (2000). It concluded, based in part on constitutional concerns, that the statute did not authorize detention for more than a "reasonable time" beyond the 90–day period authorized for removal. *Id., at 818.* And, given the lack of a repatriation agreement with Cambodia, that time had expired upon passage of the 90 days. *Id., at 830–831.*

3

Zadvydas asked us to review the decision of the Fifth Circuit authorizing his continued detention. The Government asked us to review the decision of the Ninth Circuit forbidding Ma's continued detention. We granted writs in both cases, agreeing to consider both statutory and related constitutional questions. See also *Duy Dac Ho v. Greene,* 204 F.3d 1045, 1060 (C.A.10 2000) (upholding Attorney General's statutory and constitutional authority to detain alien indefinitely). We consolidated the two cases for argument; and we now decide them together.

*687 II

[1] We note at the outset that the primary federal habeas corpus statute, 28 U.S.C. § 2241, confers jurisdiction upon the federal courts to hear these cases. See § 2241(c)(3) (authorizing any person to claim in federal court that he or she is being held "in custody in violation of the Constitution or laws ... of the United States"). Before 1952, the federal courts considered challenges to the lawfulness of immigration-related detention, including challenges to the validity of a deportation order, in habeas proceedings. See *Heikkila v. Barber,* 345 U.S. 229, 230, 235–236, 73 S.Ct. 603, 97 L.Ed. 972 (1953). Beginning in 1952, an alternative method for review of *deportation orders,* namely, actions brought in federal district court under the Administrative Procedure Act (APA), became available. See *Shaughnessy v. Pedreiro,* 349 U.S. 48, 51–52, 75 S.Ct. 591, 99 L.Ed. 868 (1955). And in 1961 Congress replaced district court APA review with initial *deportation order* review in courts of appeals. See Act of Sept. 26, 1961, § 5, 75 Stat. 651 (formerly codified at 8 U.S.C. § 1105a(a)) (repealed 1996). The 1961 Act specified that federal habeas courts were also available to hear statutory and constitutional challenges to *deportation* (and exclusion) *orders.* See 8 U.S.C. § 1105a(a)(10), (b) (repealed 1996). These statutory changes left habeas untouched as the basic method for obtaining review of continued *custody after* a deportation order had become final. See *Cheng Fan

Zadvydas v. Davis, 533 U.S. 678 (2001)

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 401 of 912

121 S.Ct. 2491, 150 L.Ed.2d 653, 69 USLW 4626, 69 USLW 4581...

*Kwok v. INS,* 392 U.S. 206, 212, 215–216, 88 S.Ct. 1970, 20 L.Ed.2d 1037 (1968) (holding that § 1105a(a) applied only to challenges to determinations made during deportation proceedings and motions to reopen those proceedings).

More recently, Congress has enacted several statutory provisions that limit the circumstances in which judicial review of deportation decisions is available. But none applies here. One provision, 8 U.S.C. § 1231(h) (1994 ed., Supp. V), simply forbids courts to construe *that section* "to create any ... procedural right or benefit that is legally enforceable" **\*688** ; it does not deprive an alien of the right to rely on 28 U.S.C. § 2241 to challenge detention that is without statutory authority.

Another provision, 8 U.S.C. § 1252(a)(2)(B)(ii) (1994 ed., Supp. V), says that "no court shall have jurisdiction to review" decisions "specified ... to be in the discretion of the Attorney General." The aliens here, however, do not seek review of the Attorney General's exercise of discretion; rather, they challenge the extent of the Attorney General's authority under the post-removal-period detention statute. And the extent of that authority is not a matter of discretion. See also, *e.g.,* § 1226(e) (applicable to certain detention-related decisions *in period preceding* **\*\*2498** *entry* of final removal order); § 1231(a)(4)(D) (applicable to assertion of causes or claims *under* *§ 1231(a)(4),* which is not at issue here); § 1252(a)(1), (a)(2)(C) (applicable to judicial review of "final order[s] of removal"); § 1252(g) (applicable to decisions "to commence proceedings, adjudicate cases, or execute removal orders").

We conclude that § 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention. And we turn to the merits of the aliens' claims.

### III

The post-removal-period detention statute applies to certain categories of aliens who have been ordered removed, namely, inadmissible aliens, criminal aliens, aliens who have violated their nonimmigrant status conditions, and aliens removable for certain national security or foreign relations reasons, as well as any alien "who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal." 8 U.S.C. § 1231(a)(6) (1994 ed., Supp. V); see also 8 C.F.R. § 241.4(a) (2001). It says that an alien who falls into one of these categories **\*689** "may be detained beyond the removal period and, if released, shall be subject to [certain] terms of supervision." 8 U.S.C. § 1231(a)(6) (1994 ed., Supp. V).

The Government argues that the statute means what it literally says. It sets no "limit on the length of time beyond the removal period that an alien who falls within one of the Section 1231(a)(6) categories may be detained." Brief for Petitioners in No. 00–38, p. 22. Hence, "whether to continue to detain such an alien and, if so, in what circumstances and for how long" is up to the Attorney General, not up to the courts. *Ibid.*

**[2]** "[I]t is a cardinal principle" of statutory interpretation, however, that when an Act of Congress raises "a serious doubt" as to its constitutionality, "this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932); see also *United States v. X–Citement Video, Inc.,* 513 U.S. 64, 78, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994); *United States v. Jin Fuey Moy,* 241 U.S. 394, 401, 36 S.Ct. 658, 60 L.Ed. 1061 (1916); cf. *Almendarez–Torres v. United States,* 523 U.S. 224, 238, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (construction of statute that avoids invalidation best reflects congressional will). We have read significant limitations into other immigration statutes in order to avoid their constitutional invalidation. See *United States v. Witkovich,* 353 U.S. 194, 195, 202, 77 S.Ct. 779, 1 L.Ed.2d 765 (1957) (construing a grant of authority to the Attorney General to ask aliens whatever questions he "deem [s] fit and proper" as limited to questions "reasonably calculated to keep the Attorney General advised regarding the continued availability for departure of aliens whose deportation is overdue"). For similar reasons, we read an implicit limitation into the statute before us. In our view, the statute, read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States. It does not permit indefinite detention.

121 S.Ct. 2491, 150 L.Ed.2d 653, 69 USLW 4626, 69 USLW 4581...

*690 A

[3] [4] A statute permitting indefinite detention of an alien would raise a serious constitutional problem. The Fifth Amendment's Due Process Clause forbids the Government to "depriv[e]" any "person ... of ... liberty ... without due process of law." Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects.

See Foucha v. Louisiana, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). And this Court has said that government **2499 detention violates that Clause unless the detention is ordered in a *criminal* proceeding with adequate procedural protections, see United States v. Salerno, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), or, in certain special and "narrow" nonpunitive "circumstances," Foucha, supra, at 80, 112 S.Ct. 1780, where a special justification, such as harm-threatening mental illness, outweighs the "individual's constitutionally protected interest in avoiding physical restraint." Kansas v. Hendricks, 521 U.S. 346, 356, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997).

The proceedings at issue here are civil, not criminal, and we assume that they are nonpunitive in purpose and effect. There is no sufficiently strong special justification here for indefinite civil detention—at least as administered under this statute. The statute, says the Government, has two regulatory goals: "ensuring the appearance of aliens at future immigration proceedings" and "[p]reventing danger to the community." Brief for Respondents in No. 99–7791, p. 24. But by definition the first justification—preventing flight—is weak or nonexistent where removal seems a remote possibility at best. As this Court said in Jackson v. Indiana, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), where detention's goal is no longer practically attainable, detention no longer "bear[s][a] reasonable relation to the purpose for which the individual [was] committed." Id., at 738, 92 S.Ct. 1845.

The second justification—protecting the community—does not necessarily diminish in force over time. But we have *691 upheld preventive detention based on dangerousness only when limited to specially dangerous individuals and subject to strong procedural protections. Compare Hendricks, supra, at 368, 117 S.Ct. 2072 (upholding scheme that imposes detention upon "a small segment of particularly dangerous individuals" and provides "strict procedural safeguards"), and Salerno, supra, at 747, 750–752, 107 S.Ct. 2095 (in upholding pretrial detention, stressing "stringent time limitations," the fact that detention is reserved for the "most serious of crimes," the requirement of proof of dangerousness by clear and convincing evidence, and the presence of judicial safeguards), with Foucha, supra, at 81–83, 112 S.Ct. 1780 (striking down insanity-related detention system that placed burden on detainee to prove nondangerousness). In cases in which preventive detention is of potentially *indefinite* duration, we have also demanded that the dangerousness rationale be accompanied by some other special circumstance, such as mental illness, that helps to create the danger. See Hendricks, supra, at 358, 368, 117 S.Ct. 2072.

The civil confinement here at issue is not limited, but potentially permanent. Cf. Salerno, supra, at 747, 107 S.Ct. 2095 (noting that "maximum length of pretrial detention is limited" by "stringent" requirements); Carlson v. Landon, 342 U.S. 524, 545–546, 72 S.Ct. 525, 96 L.Ed. 547 (1952) (upholding temporary detention of alien during deportation proceeding while noting that "problem of ... unusual delay" was not present). The provision authorizing detention does not apply narrowly to "a small segment of particularly dangerous individuals," Hendricks, supra, at 368, 117 S.Ct. 2072, say, suspected terrorists, but broadly to aliens ordered removed for many and various reasons, including tourist visa violations. See 8 U.S.C. § 1231(a) (6) (1994 ed., Supp. V) (referencing § 1227(a)(1)(C)); cf. Hendricks, 521 U.S., at 357–358, 117 S.Ct. 2072 (only individuals with "past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future" may be detained). And, once the flight risk justification evaporates, the only special circumstance present *692 is the alien's removable status itself, which bears no relation to a detainee's dangerousness. Cf. id., at 358, 117 S.Ct. 2072; Foucha, supra, at 82, 112 S.Ct. 1780.

Moreover, the sole procedural protections available to the alien are found in **2500 administrative proceedings, where the alien bears the burden of proving he is not dangerous, without (in the Government's view) significant

Zadvydas v. Davis, 533 U.S. 678 (2001)

121 S.Ct. 2491, 150 L.Ed.2d 653, 69 USLW 4626, 69 USLW 4581...

later judicial review. Compare 8 C.F.R. § 241.4(d)(1) (2001) (imposing burden of proving nondangerousness upon alien) with *Foucha, supra,* at 82, 112 S.Ct. 1780 (striking down insanity-related detention for that very reason). This Court has suggested, however, that the Constitution may well preclude granting "an administrative body the unreviewable authority to make determinations implicating fundamental rights." *Superintendent, Mass. Correctional Institution at Walpole v. Hill,* 472 U.S. 445, 450, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (O'CONNOR, J.); see also *Crowell,* 285 U.S., at 87, 52 S.Ct. 285 (Brandeis, J., dissenting) ("[U]nder certain circumstances, the constitutional requirement of due process is a requirement of judicial process"). The Constitution demands greater procedural protection even for property. See *South Carolina v. Regan,* 465 U.S. 367, 393, 104 S.Ct. 1107, 79 L.Ed.2d 372 (1984) (O'CONNOR, J., concurring in judgment); *Phillips v. Commissioner,* 283 U.S. 589, 595–597, 51 S.Ct. 608, 75 L.Ed. 1289 (1931) (Brandeis, J.). The serious constitutional problem arising out of a statute that, in these circumstances, permits an indefinite, perhaps permanent, deprivation of human liberty without any such protection is obvious.

The Government argues that, from a constitutional perspective, alien status itself can justify indefinite detention, and points to *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953), as support. That case involved a once lawfully admitted alien who left the United States, returned after a trip abroad, was refused admission, and was left on Ellis Island, indefinitely detained there because the Government could not find another country to accept him. The Court held that Mezei's detention did not violate the Constitution. *Id.,* at 215–216, 73 S.Ct. 625.

**\*693** Although *Mezei,* like the present cases, involves indefinite detention, it differs from the present cases in a critical respect. As the Court emphasized, the alien's extended departure from the United States required him to seek entry into this country once again. His presence on Ellis Island did not count as entry into the United States. Hence, he was "treated," for constitutional purposes, "as if stopped at the border." *Id.,* at 213, 215, 73 S.Ct. 625. And that made all the difference.

**[5]** The distinction between an alien who has effected an entry into the United States and one who has never entered

runs throughout immigration law. See *Kaplan v. Tod,* 267 U.S. 228, 230, 45 S.Ct. 257, 69 L.Ed. 585 (1925) (despite nine years' presence in the United States, an "excluded" alien "was still in theory of law at the boundary line and had gained no foothold in the United States"); *Leng May Ma v. Barber,* 357 U.S. 185, 188–190, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958) (alien "paroled" into the United States pending admissibility had not effected an "entry"). It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders. See *United States v. Verdugo–Urquidez,* 494 U.S. 259, 269, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (Fifth Amendment's protections do not extend to aliens outside the territorial boundaries); *Johnson v. Eisentrager,* 339 U.S. 763, 784, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) (same). But once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all "persons" within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent. See *Plyler v. Doe,* 457 U.S. 202, 210, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *Mathews v. Diaz,* 426 U.S. 67, 77, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976); *Kwong Hai Chew v. Colding,* 344 U.S. 590, 596–598, and n. 5, 73 S.Ct. 472, 97 L.Ed. 576 (1953); **\*\*2501** *Yick Wo v. Hopkins,* 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); cf. *Mezei, supra,* at 212, 73 S.Ct. 625 ("[A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law"). Indeed, this Court has held that the Due Process **\*694** Clause protects an alien subject to a final order of deportation, see *Wong Wing v. United States,* 163 U.S. 228, 238, 16 S.Ct. 977, 41 L.Ed. 140 (1896), though the nature of that protection may vary depending upon status and circumstance, see *Landon v. Plasencia,* 459 U.S. 21, 32–34, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982); *Johnson, supra,* at 770, 70 S.Ct. 936.

In *Wong Wing, supra,* the Court held unconstitutional a statute that imposed a year of hard labor upon aliens subject to a final deportation order. That case concerned substantive protections for aliens who had been ordered removed, not procedural protections for aliens whose removability was being determined. Cf. *post,* at 2505 (SCALIA, J., dissenting).

Zadvydas v. Davis, 533 U.S. 678 (2001)
121 S.Ct. 2491, 150 L.Ed.2d 653, 69 USLW 4626, 69 USLW 4581...

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 404 of 912

The Court held that punitive measures could not be imposed upon aliens ordered removed because "all persons within the territory of the United States are entitled to the protection" of the Constitution. 163 U.S., at 238, 16 S.Ct. 977 (citing Yick Wo, supra, at 369, 6 S.Ct. 1064 (holding that equal protection guarantee applies to Chinese aliens)); see also Witkovich, 353 U.S., at 199, 201, 77 S.Ct. 779 (construing statute which applied to aliens ordered deported in order to avoid substantive constitutional problems). And contrary to Justice SCALIA's characterization, see *post*, at 2505–2507, in *Mezei* itself, both this Court's rejection of Mezei's challenge to the procedures by which he was deemed excludable and its rejection of his challenge to continued detention rested upon a basic territorial distinction. See Mezei, supra, at 215, 73 S.Ct. 625 (holding that Mezei's presence on Ellis Island was not "considered a landing" and did "not affec[t]" his legal or constitutional status (internal quotation marks omitted)).

In light of this critical distinction between *Mezei* and the present cases, *Mezei* does not offer the Government significant support, and we need not consider the aliens' claim that subsequent developments have undermined *Mezei's* legal authority. See Brief for Petitioner in No. 99–7791, p. 23; Brief for Respondent in No. 00–38, pp. 16–17; Brief for Lawyers' Committee for Human Rights as *Amicus Curiae* in No. 00–38, pp. 15–20. Nor are we aware of any other authority that would support Justice KENNEDY's limitation of *695 due process protection for removable aliens to freedom from detention that is arbitrary or capricious. See *post*, at 2513–2515 (dissenting opinion).

The Government also looks for support to cases holding that Congress has "plenary power" to create immigration law, and that the Judicial Branch must defer to Executive and Legislative Branch decisionmaking in that area. Brief for Respondents in No. 99–7791, at 17, 20 (citing Harisiades v. Shaughnessy, 342 U.S. 580, 588–589, 72 S.Ct. 512, 96 L.Ed. 586 (1952)). But that power is subject to important constitutional limitations. See INS v. Chadha, 462 U.S. 919, 941–942, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (Congress must choose "a constitutionally permissible means of implementing" that power); The Chinese Exclusion Case, 130 U.S. 581, 604, 9 S.Ct. 623, 32 L.Ed. 1068 (1889) (congressional authority limited "by the Constitution itself and considerations of public policy and justice which control, more or less, the conduct of all civilized nations"). In these

cases, we focus upon those limitations. In doing so, we nowhere deny the right of Congress to remove aliens, to subject them to supervision with conditions when released from detention, or to incarcerate them where appropriate for violations of those conditions. See 8 U.S.C. § 1231(a)(3) (1994 ed., Supp. V) (granting authority to Attorney General to prescribe regulations governing supervision of aliens not removed within 90 days); § 1253 (imposing penalties for failure to comply with **2502 release conditions). The question before us is not one of " 'confer[ring] on those admitted the right to remain against the national will' " or " 'sufferance of aliens' " who should be removed. *Post*, at 2506 (SCALIA, J., dissenting) (emphasis deleted) (quoting Mezei, 345 U.S., at 222–223, 73 S.Ct. 625 (Jackson, J., dissenting)). Rather, the issue we address is whether aliens that the Government finds itself unable to remove are to be condemned to an indefinite term of imprisonment within the United States.

Nor do the cases before us require us to consider the political branches' authority to control entry into the United States. Hence we leave no "unprotected spot in the Nation's *696 armor." Kwong Hai Chew, 344 U.S., at 602, 73 S.Ct. 472. Neither do we consider terrorism or other special circumstances where special arguments might be made for forms of preventive detention and for heightened deference to the judgments of the political branches with respect to matters of national security. The sole foreign policy consideration the Government mentions here is the concern lest courts interfere with "sensitive" repatriation negotiations. Brief for Respondents in No. 99–7791, at 21. But neither the Government nor the dissents explain how a habeas court's efforts to determine the likelihood of repatriation, if handled with appropriate sensitivity, could make a significant difference in this respect. See *infra*, at 2503–2504.

Finally, the Government argues that, whatever liberty interest the aliens possess, it is "greatly diminished" by their lack of a legal right to "liv[e] at large in this country." Brief for Respondents in No. 99–7791, at 47; see also *post*, at 2506 (SCALIA, J., dissenting) (characterizing right at issue as "right to release into this country"). The choice, however, is not between imprisonment and the alien "living at large." Brief for Respondents in No. 99–7791, at 47. It is between imprisonment and supervision under release conditions that may not be violated. See *supra*, at 2501 (citing 8 U.S.C. §§ 1231(a)(3), 1253 (1994 ed., Supp. V)); 8 C.F.R. § 241.5 (2001) (establishing conditions of release after

Zadvydas v. Davis, 533 U.S. 678 (2001)

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 405 of 912

121 S.Ct. 2491, 150 L.Ed.2d 653, 69 USLW 4626, 69 USLW 4581...

removal period). And, for the reasons we have set forth, we believe that an alien's liberty interest is, at least, strong enough to raise a serious question as to whether, irrespective of the procedures used, cf. *post,* at 2515–2517 (KENNEDY, J., dissenting), the Constitution permits detention that is indefinite and potentially permanent.

B

Despite this constitutional problem, if "Congress has made its intent" in the statute "clear, 'we must give effect to that intent.' " *Miller v. French,* 530 U.S. 327, 336, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000) (quoting *Sinclair Refining Co. v. Atkinson,* 370 U.S. 195, 215, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962)). **\*697** We cannot find here, however, any clear indication of congressional intent to grant the Attorney General the power to hold indefinitely in confinement an alien ordered removed. And that is so whether protecting the community from dangerous aliens is a primary or (as we believe) secondary statutory purpose. Cf. *post,* at 2507, 2508–2509 (KENNEDY, J., dissenting). After all, the provision is part of a statute that has as its basic purpose effectuating an alien's removal. Why should we assume that Congress saw the alien's dangerousness as unrelated to this purpose?

The Government points to the statute's word "may." But while "may" suggests discretion, it does not necessarily suggest unlimited discretion. In that respect the word "may" is ambiguous. Indeed, if Congress had meant to authorize long-term detention of unremovable aliens, it certainly could have spoken in clearer terms. Cf. 8 U.S.C. § 1537(b)(2)(C) (1994 ed., Supp. V) ("If no country is willing to receive" a terrorist alien ordered removed, "the Attorney General may, notwithstanding any other provision of law, retain the alien in **\*\*2503** custody" and must review the detention determination every six months).

The Government points to similar related statutes that *require* detention of criminal aliens during removal proceedings and the removal period, and argues that these show that mandatory detention is the rule while discretionary release is the narrow exception. See Brief for Petitioners in No. 00–38, at 26–28 (citing 8 U.S.C. §§ 1226(c), 1231(a)(2)). But the statute before us applies not only to terrorists and criminals, but also to ordinary visa violators, see *supra,* at 2499; and, more importantly, post-removal-period detention, unlike detention pending a determination of removability or

during the subsequent 90–day removal period, has no obvious termination point.

The Government also points to the statute's history. That history catalogs a series of changes, from an initial period (before 1952) when lower courts had interpreted statutory **\*698** silence, Immigration Act of 1917, ch. 29, §§ 19, 20, 39 Stat. 889, 890, to mean that deportation-related detention must end within a reasonable time, *Spector v. Landon,* 209 F.2d 481, 482 (C.A.9 1954) (collecting cases); *United States ex rel. Doukas v. Wiley,* 160 F.2d 92, 95 (C.A.7 1947); *United States ex rel. Ross v. Wallis,* 279 F. 401, 403–404 (C.A.2 1922), to a period (from the early 1950's through the late 1980's) when the statutes permitted, but did not require, post-deportation-order detention for up to six months, Immigration and Nationality Act of 1952, § 242(c), 66 Stat. 210, 8 U.S.C. § 1252(c), (d) (1982 ed.); *Witkovich,* 353 U.S., at 198, 77 S.Ct. 779, to more recent statutes that have at times mandated and at other times permitted the post-deportation-order detention of aliens falling into certain categories such as aggravated felons, Anti–Drug Abuse Act of 1988, § 7343(a), 102 Stat. 4470, 8 U.S.C. § 1252(a)(2) (mandating detention); Immigration Act of 1990, § 504(a), 104 Stat. 5049–5050, 8 U.S.C. §§ 1252(a)(2) (A), (B) (permitting release under certain circumstances); Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, § 306(a)(4), 105 Stat. 1751, 8 U.S.C. § 1252(a)(2)(B) (same).

In early 1996, Congress explicitly expanded the group of aliens subject to mandatory detention, eliminating provisions that permitted release of criminal aliens who had at one time been lawfully admitted to the United States. Antiterrorism and Effective Death Penalty Act of 1996, § 439(c), 110 Stat. 1277. And later that year Congress enacted the present law, which liberalizes pre-existing law by shortening the removal period from six months to 90 days, mandates detention of certain criminal aliens during the removal proceedings and for the subsequent 90–day removal period, and adds the post-removal-period provision here at issue. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Div. C, §§ 303, 305, 110 Stat. 3009–585, 3009–598 to 3009–599; 8 U.S.C. §§ 1226(c), 1231(a) (1994 ed., Supp. V).

**\*699** We have found nothing in the history of these statutes that clearly demonstrates a congressional intent to authorize indefinite, perhaps permanent, detention. Consequently,

interpreting the statute to avoid a serious constitutional threat, we conclude that, once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute. See 1 E. Coke, Institutes *70b *("Cessante ratione legis cessat ipse lex")* (the rationale of a legal rule no longer being applicable, that rule itself no longer applies).

## IV

[6]    The Government seems to argue that, even under our interpretation of the statute, a federal habeas court would have to accept the Government's view about whether the implicit statutory limitation is satisfied in a particular case, conducting little or no independent review of the matter. In our view, that is not so. Whether **\*\*2504** a set of particular circumstances amounts to detention within, or beyond, a period reasonably necessary to secure removal is determinative of whether the detention is, or is not, pursuant to statutory authority. The basic federal habeas corpus statute grants the federal courts authority to answer that question. See 28 U.S.C. § 2241(c)(3) (granting courts authority to determine whether detention is "in violation of the ... laws ... of the United States"). In doing so the courts carry out what this Court has described as the "historic purpose of the writ," namely, "to relieve detention by executive authorities without judicial trial." *Brown v. Allen,* 344 U.S. 443, 533, 73 S.Ct. 397, 97 L.Ed. 469 (1953) (Jackson, J., concurring in result).

In answering that basic question, the habeas court must ask whether the detention in question exceeds a period reasonably necessary to secure removal. It should measure reasonableness primarily in terms of the statute's basic purpose, namely, assuring the alien's presence at the moment of removal. Thus, if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no **\*700** longer authorized by statute. In that case, of course, the alien's release may and should be conditioned on any of the various forms of supervised release that are appropriate in the circumstances, and the alien may no doubt be returned to custody upon a violation of those conditions. See *supra,* at 2501 (citing 8 U.S.C. §§ 1231(a)(3), 1253 (1994 ed., Supp. V); 8 C.F.R. § 241.5 (2001)). And if removal is reasonably foreseeable, the habeas court should consider the risk of the alien's committing further crimes as a factor potentially justifying confinement within that reasonable removal period. See *supra,* at 2499.

We recognize, as the Government points out, that review must take appropriate account of the greater immigration-related expertise of the Executive Branch, of the serious administrative needs and concerns inherent in the necessarily extensive INS efforts to enforce this complex statute, and the Nation's need to "speak with one voice" in immigration matters. Brief for Respondents in No. 99–7791, at 19. But we believe that courts can take appropriate account of such matters without abdicating their legal responsibility to review the lawfulness of an alien's continued detention.

Ordinary principles of judicial review in this area recognize primary Executive Branch responsibility. They counsel judges to give expert agencies decisionmaking leeway in matters that invoke their expertise. See *Pension Benefit Guaranty Corporation v. LTV Corp.,* 496 U.S. 633, 651–652, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990). They recognize Executive Branch primacy in foreign policy matters. See *Container Corp. of America v. Franchise Tax Bd.,* 463 U.S. 159, 196, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983). And they consequently require courts to listen with care when the Government's foreign policy judgments, including, for example, the status of repatriation negotiations, are at issue, and to grant the Government appropriate leeway when its judgments rest upon foreign policy expertise.

[7]    We realize that recognizing this necessary Executive leeway will often call for difficult judgments. In order to limit **\*701** the occasions when courts will need to make them, we think it practically necessary to recognize some presumptively reasonable period of detention. We have adopted similar presumptions in other contexts to guide lower court determinations. See *Cheff v. Schnackenberg,* 384 U.S. 373, 379–380, 86 S.Ct. 1523, 16 L.Ed.2d 629 (1966) (plurality opinion) (adopting rule, based on definition of "petty offense" in United States Code, that right to jury trial extends to all cases in which sentence of six months or greater is imposed); *County of Riverside v. McLaughlin,* 500 U.S. 44, 56–58, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) (O'CONNOR, J.) (adopting presumption, **\*\*2505** based on lower court estimate of time needed to process arrestee, that 48–hour delay in probable-cause hearing after arrest is reasonable, hence constitutionally permissible).

While an argument can be made for confining any presumption to 90 days, we doubt that when Congress shortened the removal period to 90 days in 1996 it believed that all reasonably foreseeable removals could

Case 3:20-cv-07721-SI Document 58-6 Filed 11/10/20 Page 407 of 912

**Zadvydas v. Davis, 533 U.S. 678 (2001)**
121 S.Ct. 2491, 150 L.Ed.2d 653, 69 USLW 4626, 69 USLW 4581...

be accomplished in that time. We do have reason to believe, however, that Congress previously doubted the constitutionality of detention for more than six months. See Juris. Statement in *United States v. Witkovich*, O.T.1956, No. 295, pp. 8–9. Consequently, for the sake of uniform administration in the federal courts, we recognize that period. After this 6–month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing. And for detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the "reasonably foreseeable future" conversely would have to shrink. This 6–month presumption, of course, does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future.

## *702 V

The Fifth Circuit held Zadvydas' continued detention lawful as long as "good faith efforts to effectuate ... deportation continue" and Zadvydas failed to show that deportation will prove "impossible." 185 F.3d, at 294, 297. But this standard would seem to require an alien seeking release to show the absence of *any* prospect of removal—no matter how unlikely or unforeseeable—which demands more than our reading of the statute can bear. The Ninth Circuit held that the Government was required to release Ma from detention because there was no reasonable likelihood of his removal in the foreseeable future. 208 F.3d, at 831. But its conclusion may have rested solely upon the "absence" of an "extant or pending" repatriation agreement without giving due weight to the likelihood of successful future negotiations. See id., at 831, and n. 30. Consequently, we vacate the judgments below and remand both cases for further proceedings consistent with this opinion.

*It is so ordered.*

Justice SCALIA, with whom Justice THOMAS joins, dissenting.
I join Part I of Justice KENNEDY's dissent, which establishes the Attorney General's clear statutory authority to detain

criminal aliens with no specified time limit. I write separately because I do not believe that, as Justice KENNEDY suggests in Part II of his opinion, there may be some situations in which the courts can order release. I believe that in both *Zadvydas v. Davis,* No. 99–7791, and *Ashcroft v. Ma,* No. 00–38, a "careful description" of the substantive right claimed,

Reno v. Flores, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993), suffices categorically to refute its existence. A criminal alien under final order of removal who allegedly will not be accepted by any other country in the reasonably foreseeable future claims a constitutional right of supervised release into the United States. This claim can be repackaged as freedom *703 from "physical restraint" or freedom from "indefinite detention," *ante,* at 2498, but it is at bottom a claimed right of release into this country by an individual who *concededly* has no legal right to be here. There is no such constitutional right.

Like a criminal alien under final order of removal, an inadmissible alien at the border has no right to be in the United States. The Chinese Exclusion Case, 130 U.S. 581, 603, 9 S.Ct. 623, 32 L.Ed. 1068 (1889). In Shaughnessy v. United States ex rel. Mezei, **2506 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953), we upheld potentially indefinite detention of such an inadmissible alien whom the Government was unable to return anywhere else. We said that "we [did] not think that respondent's continued exclusion deprives him of any statutory or constitutional right." Id., at 215, 73 S.Ct. 625. While four Members of the Court thought that Mezei deserved greater procedural protections (the Attorney General had refused to divulge any information as to why Mezei was being detained, id., at 209, 73 S.Ct. 625), no Justice asserted that Mezei had a substantive constitutional right to release into this country. And Justice Jackson's dissent, joined by Justice Frankfurter, affirmatively asserted the opposite, with no contradiction from the Court: "Due process does not invest any alien with a right to enter the United States, *nor confer on those admitted the right to remain against the national will.* Nothing in the Constitution requires admission *or sufferance* of aliens hostile to our scheme of government." Id., at 222–223, 73 S.Ct. 625 (emphasis added). Insofar as a claimed legal right to release into this country is concerned, an alien under final order of removal stands on an equal footing with an inadmissible alien at the threshold of entry: He has no such right.

The Court expressly declines to apply or overrule *Mezei, ante,* at 2501, but attempts to distinguish it—or, I should rather say, to obscure it in a legal fog. First, the Court claims that "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Ante,* at 2500. True enough, but only where that distinction makes perfect **\*704** sense: with regard to the question of what *procedures* are necessary to prevent entry, as opposed to what *procedures* are necessary to eject

a person already in the United States. See, *e.g.,* 📑 *Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) ( "Our cases have frequently suggested that a continuously present resident alien is entitled to a fair hearing *when threatened with deportation*" (emphasis added)). The

Court's citation of 📑 *Wong Wing v. United States,* 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896), for the proposition that we have "held that the Due Process Clause protects an alien subject to a final order of deportation," *ante,* at 2501, is arguably relevant. That case at least involved aliens under final order of deportation. \* But all it held is that they could not be subjected to the punishment of hard labor without a judicial trial. I am sure they cannot be tortured, as well— but neither prohibition has anything to do with their right to be released into the United States. Nor does *Wong Wing* show that the rights of detained aliens subject to final order of deportation are different from the rights of aliens arrested and detained at the border—unless the Court believes that the detained alien in *Mezei could* have been set to hard labor.

*Mezei* thus stands unexplained and undistinguished by the Court's opinion. We are offered no justification why an alien under a valid and final order of removal—which has *totally extinguished* whatever right to presence in this country he possessed—has any greater due process right to be released into the country than an alien at the border seeking entry. **\*705** Congress undoubtedly thought that both groups of aliens—inadmissible aliens at the threshold and criminal aliens under final order of removal—could be constitutionally **\*\*2507** detained on the same terms, since it provided the authority to detain both groups in the very same statutory provision, see 📑 8 U.S.C. § 1231(a)(6). Because I believe *Mezei* controls these cases, and, like the Court, I also see no reason to reconsider *Mezei,* I find no constitutional impediment to the discretion Congress gave to the Attorney General. Justice KENNEDY's dissent explains the clarity of the detention provision, and I see no obstacle to following the statute's plain meaning.

Justice KENNEDY, with whom THE CHIEF JUSTICE joins, and with whom Justice SCALIA and Justice THOMAS join as to Part I, dissenting.

The Court says its duty is to avoid a constitutional question. It deems the duty performed by interpreting a statute in obvious disregard of congressional intent; curing the resulting gap by writing a statutory amendment of its own; committing its own grave constitutional error by arrogating to the Judicial Branch the power to summon high officers of the Executive to assess their progress in conducting some of the Nation's most sensitive negotiations with foreign powers; and then likely releasing into our general population at least hundreds of removable or inadmissible aliens who have been found by fair procedures to be flight risks, dangers to the community, or both. Far from avoiding a constitutional question, the Court's ruling causes systemic dislocation in the balance of powers, thus raising serious constitutional concerns not just for the cases at hand but for the Court's own view of its proper authority. Any supposed respect the Court seeks in not reaching the constitutional question is outweighed by the intrusive and erroneous exercise of its own powers. In the guise of judicial restraint the Court ought not to intrude upon the other branches. The constitutional question the statute presents, it must be acknowledged, may **\*706** be a significant one in some later case; but it ought not to drive us to an incorrect interpretation of the statute. The Court having reached the wrong result for the wrong reason, this respectful dissent is required.

I

The Immigration and Nationality Act (INA), 📕 8 U.S.C. § 1101 *et seq.* (1994 ed. and Supp. V), is straightforward enough. It provides:

"An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a) (1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3)." 📑 8 U.S.C. § 1231(a)(6) (1994 ed., Supp. V).

By this statute, Congress confers upon the Attorney General discretion to detain an alien ordered removed. It gives express

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 409 of 912

Zadvydas v. Davis, 533 U.S. 678 (2001)

121 S.Ct. 2491, 150 L.Ed.2d 653, 69 USLW 4626, 69 USLW 4581...

authorization to detain "beyond the removal period." *Ibid.* The class of removed aliens detainable under the section includes aliens who were inadmissible and aliens subject to final orders of removal, provided they are a risk to the community or likely to flee. The issue to be determined is whether the authorization to detain beyond the removal period is subject to the implied, nontextual limitation that the detention be no longer than reasonably necessary to effect removal to another country. The majority invokes the canon of constitutional doubt to read that implied term into the statute. One can accept the premise that a substantial constitutional question is presented by the prospect of lengthy, even unending, detention in some instances; but the statutory construction the Court adopts should be rejected in any event. The interpretation has no basis in the language **\*707** or structure of the INA and in fact contradicts and defeats the purpose set forth in the express terms of the statutory text.

**\*\*2508**  The Court, it is submitted, misunderstands the principle of constitutional avoidance which it seeks to invoke. The majority gives a brief bow to the rule that courts must respect the intention of Congress, *ante,* at 2502, but then waltzes away from any analysis of the language, structure, or purpose of the statute. Its analysis is not consistent with our precedents explaining the limits of the constitutional doubt rule. The rule allows courts to choose among constructions which are "fairly possible," *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932), not to " 'press statutory construction to the point of disingenuous evasion even to avoid a constitutional question,' " *Salinas v. United States,* 522 U.S. 52, 60, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) (quoting *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 57, n. 9, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)). Were a court to find two interpretations of equal plausibility, it should choose the construction that avoids confronting a constitutional question. The majority's reading of the statutory authorization to "detai[n] beyond the removal period," however, is not plausible. An interpretation which defeats the stated congressional purpose does not suffice to invoke the constitutional doubt rule, for it is "plainly contrary to the intent of Congress." *United States v. X–Citement Video, Inc.,* 513 U.S. 64, 78, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994). The majority announces it will reject the Government's argument "that the statute means what it literally says," *ante,* at 2498, but then declines to offer any other acceptable textual interpretation. The majority does not demonstrate an ambiguity in the delegation of the detention power to the Attorney General. It simply amends the statute

to impose a time limit tied to the progress of negotiations to effect the aliens' removal. The statute cannot be so construed. The requirement the majority reads into the law simply bears no relation to the text; and in fact it defeats the statutory purpose and design.

**\*708**  Other provisions in § 1231 itself do link the requirement of a reasonable time period to the removal process. See, *e.g.,* § 1231(c)(1)(A) (providing that an alien who arrives at a port of entry "shall be removed immediately on a vessel or aircraft" unless "it is impracticable" to do so "within a *reasonable* time" (emphasis added)); § 1231(c)(3)(A)(ii)(II) (requiring the "owner of a vessel or aircraft bringing an alien to the United States [to] pay the costs of detaining and maintaining the alien ... for the period of time *reasonably necessary* for the owner to arrange for repatriation" (emphasis added)). That Congress chose to impose the limitation in these sections and not in § 1231(a)(6) is evidence of its intent to measure the detention period by other standards. When Congress has made express provisions for the contingency that repatriation might be difficult or prolonged in other portions of the statute, it should be presumed that its omission of the same contingency in the detention section was purposeful. Indeed, the reasonable time limits in the provisions just mentioned simply excuse the duty of early removal. They do not mandate release. An alien within one of these categories, say, a ship stowaway, would be subject as well to detention beyond the removal period under § 1231(a)(6), if the statute is read as written. Under the majority's view, however, it appears the alien must be released in six months even if presenting a real danger to the community.

The 6–month period invented by the Court, even when modified by its sliding standard of reasonableness for certain repatriation negotiations, see *ante,* at 2504–2505, makes the statutory purpose to protect the community ineffective. The risk to the community exists whether or not the repatriation negotiations have some end in sight; in fact, when the negotiations end, the risk may be greater. The authority to detain beyond the removal period is to protect the community, not to negotiate the aliens' return. The risk to the community **\*\*2509** survives repatriation negotiations. To a more limited, but still significant, extent, so does the concern with flight. It **\*709** is a fact of international diplomacy that governments and their policies change; and if repatriation efforts can be revived, the Attorney General has an interest

in ensuring the alien can report so the removal process can begin again.

Congress, moreover, was well aware of the difficulties confronting aliens who are removable but who cannot be repatriated. It made special provisions allowing them to be employed, a privilege denied to other deportable aliens. See § 1231(a)(7) (providing an "alien [who] cannot be removed due to the refusal of all countries designated by the alien or under this section to receive the alien" still remains eligible for employment in the United States). Congress' decision to ameliorate the condition of aliens subject to a final order of removal who cannot be repatriated, but who need not be detained, illustrates a balance in the statutory design. Yet the Court renders the other side of the balance meaningless. The risk to the community posed by a removable alien is a function of a variety of circumstances, circumstances that do not diminish just because the alien cannot be deported within some foreseeable time. Those circumstances include the seriousness of the alien's past offenses, his or her efforts at rehabilitation, and some indication from the alien that, given the real prospect of detention, the alien will conform his or her conduct. This is the purpose for the periodic review of detention status provided for by the regulations. See 8 C.F.R. § 241.4 (2001). The Court's amendment of the statute reads out of the provision the congressional decision that dangerousness alone is a sufficient basis for detention, see *ante*, at 2503 (citing 1 E. Coke, Institutes *70b), and reads out as well any meaningful structure for supervised release.

The majority is correct to observe that in *United States v. Witkovich,* 353 U.S. 194, 77 S.Ct. 779, 1 L.Ed.2d 765 (1957), the Court "read significant limitations into" a statute, *ante,* at 2498, but that does not permit us to avoid the proper reading of the enactment now before us. In *Witkovich,* the Court construed former § 1252(d), which required an alien under a final order of deportation **\*710** "to give information under oath ... as the Attorney General may deem fit and proper." 353 U.S., at 195, 77 S.Ct. 779. The Court held that although the plain language "appears to confer upon the Attorney General unbounded authority to require whatever information he deems desirable of aliens whose deportation has not been effected within six months," *id., at 199, 77 S.Ct. 779,* the constitutional doubt this interpretation would raise meant the language would be construed as limited to the provision of information "reasonably calculated to keep the Attorney General advised regarding the continued availability

for departure of aliens whose deportation is overdue," *id., at 202, 77 S.Ct. 779.* In *Witkovich* the interpretation of the text was in aid of the statutory purpose; in the instant cases the interpretation nullifies the statutory purpose. Here the statute by its own terms permits the Attorney General to consider factors the Court now makes irrelevant.

The majority's unanchored interpretation ignores another indication that the Attorney General's detention discretion was not limited to this truncated period. Section 1231(a)(6) permits continued detention not only of removable aliens but also of inadmissible aliens, for instance those stopped at the border before entry. Congress provides for detention of both categories within the same statutory grant of authority. Accepting the majority's interpretation, then, there are two possibilities, neither of which is sustainable. On the one hand, it may be that the majority's rule applies to both categories of aliens, in which case we are asked to assume that Congress intended to restrict the discretion it could confer upon the Attorney General so that all inadmissible aliens **\*\*2510** must be allowed into our community within six months. On the other hand, the majority's logic might be that inadmissible and removable aliens can be treated differently. Yet it is not a plausible construction of § 1231(a)(6) to imply a time limit as to one class but not to another. The text does not admit of this possibility. As a result, it is difficult to see why "[a]liens who have not yet gained initial admission **\*711** to this country would present a very different question." *Ante,* at 2495.

Congress' power to detain aliens in connection with removal or exclusion, the Court has said, is part of the Legislature's considerable authority over immigration matters. See, *e.g., Wong Wing v. United States,* 163 U.S. 228, 235, 16 S.Ct. 977, 41 L.Ed. 140 (1896) ("Proceedings to exclude or expel would be vain if those accused could not be held in custody pending the inquiry into their true character and while arrangements were being made for their deportation"). It is reasonable to assume, then, and it is the proper interpretation of the INA and § 1231(a)(6), that when Congress provided for detention "beyond the removal period," it exercised its considerable power over immigration and delegated to the Attorney General the discretion to detain inadmissible and other removable aliens for as long as they are determined to be either a flight risk or a danger to the Nation.

121 S.Ct. 2491, 150 L.Ed.2d 653, 69 USLW 4626, 69 USLW 4581...

The majority's interpretation, moreover, defeats the very repatriation goal in which it professes such interest. The Court rushes to substitute a judicial judgment for the Executive's discretion and authority. As the Government represents to us, judicial orders requiring release of removable aliens, even on a temporary basis, have the potential to undermine the obvious necessity that the Nation speak with one voice on immigration and foreign affairs matters. Brief for Respondents in No. 99–7791, p. 49. The result of the Court's rule is that, by refusing to accept repatriation of their own nationals, other countries can effect the release of these individuals back into the American community. *Ibid.* If their own nationals are now at large in the United States, the nation of origin may ignore or disclaim responsibility to accept their return. *Ibid.* The interference with sensitive foreign relations becomes even more acute where hostility or tension characterizes the relationship, for other countries can use the fact of judicially mandated release to their strategic advantage, refusing the return of their nationals **\*712** to force dangerous aliens upon us. One of the more alarming aspects of the Court's new venture into foreign affairs management is the suggestion that the district court can expand or contract the reasonable period of detention based on its own assessment of the course of negotiations with foreign powers. The Court says it will allow the Executive to perform its duties on its own for six months; after that, foreign relations go into judicially supervised receivership.

The cases which the Court relies upon to support the imposition of presumptions are inapposite. The rule announced in *Cheff v. Schnackenberg,* 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629 (1966)—"that sentences exceeding six months for criminal contempt may not be imposed by federal courts absent a jury trial"—was based on the definition of a "petty offense" that was still operable in the United States Code, and was proper "under the peculiar power of the federal courts to revise sentences in contempt cases." *Id.,* at 380, 86 S.Ct. 1523. The majority can point to no similar statutory or judicial source for its authority to create its own time-based rule in these cases. It cites only an observation in a brief filed by the Government in *United States v. Witkovich,* O.T.1956, No. 295, pp. 8–9, see *ante,* at 2505, relying, in turn, on doubts expressed in a 1952 Senate Report concerning detention for longer than six months under an Act with standards different from, and far less precise than those applicable here. In *County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), our **\*\*2511** reasonableness presumption for delays

of less than 48 hours between an arrest and a probable-cause hearing was, as the majority recognizes, *ante,* at 2504–2505, based on the "Court of Appeals' determination of the time required to complete those procedures." 500 U.S., at 57, 111 S.Ct. 1661. Here, as far as we know, the 6–month period bears no particular relationship to how long it now takes to deport any group of aliens, or, for that matter, how long it took in the past to remove. Zadvydas' case itself demonstrates that the repatriation process may often take years to **\*713** negotiate, involving difficult issues of establishing citizenship and the like. See Brief for Petitioner in No. 99–7791, pp. 17–20.

It is to be expected that from time to time a foreign power will adopt a truculent stance with respect to the United States and other nations. Yet the Court by its time limit, or presumptive time limit, goes far to undercut the position of the Executive in repatriation negotiations, thus ill serving the interest of all foreign nationals of the country concerned. Law-abiding aliens might wish to return to their home country, for instance, but the strained relationship caused by the difficult repatriation talks might prove to be a substantial obstacle for these aliens as well.

In addition to weakening the hand of our Government, court ordered release cannot help but encourage dilatory and obstructive tactics by aliens who, emboldened by the Court's new rule, have good reason not to cooperate by making their own repatriation or transfer seem foreseeable. An alien ordered deported also has less incentive to cooperate or to facilitate expeditious removal when he has been released, even on a supervised basis, than does an alien held at an Immigration and Naturalization Service (INS) detention facility. Neither the alien nor his family would find any urgency in assisting with a petition to other countries to accept the alien back if the alien could simply remain in the United States indefinitely.

The risk to the community posed by the mandatory release of aliens who are dangerous or a flight risk is far from insubstantial; the motivation to protect the citizenry from aliens determined to be dangerous is central to the immigration power itself. The Government cites statistical studies showing high recidivism rates for released aliens. One Government Accounting Office study cited by Congress in floor debates on the Antiterrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214, put the figure as high as 77 percent. 142 Cong. Rec. 7972 (1996); Brief for Respondents in **\*714** No. 99–7791, at 27, n. 13. It seems

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 412 of 912

**Zadvydas v. Davis, 533 U.S. 678 (2001)**

121 S.Ct. 2491, 150 L.Ed.2d 653, 69 USLW 4626, 69 USLW 4581...

evident a criminal record accumulated by an admitted alien during his or her time in the United States is likely to be a better indicator of risk than factors relied upon during the INS's initial decision to admit or exclude. Aliens ordered deported as the result of having committed a felony have proved to be dangerous.

Any suggestion that aliens who have completed prison terms no longer present a danger simply does not accord with the reality that a significant risk may still exist, as determined by the many factors set forth in the regulations. See 8 C.F.R. § 241.4(f) (2001). Underworld and terrorist links are subtle and may be overseas, beyond our jurisdiction to impose felony charges. Furthermore, the majority's rationale seems to apply to an alien who flees prosecution or escapes from custody in some other country. The fact an alien can be deemed inadmissible because of fraud at the time of entry does not necessarily distinguish his or her case from an alien whose entry was legal. Consider, for example, a fugitive alien who enters by fraud or stealth and resides here for five years with significant ties to the community, though still presenting a danger; contrast him with an alien who entered lawfully but a month later committed an act making him removable. Why the Court's rationale should apply to the second alien but not the first is not apparent.

**\*\*2512** The majority cannot come to terms with these distinctions under its own rationale. The rule the majority creates permits consideration of nothing more than the reasonable foreseeability of removal. See *ante,* at 2504. That standard is not only without sound basis in the statutory structure, but also is not susceptible to customary judicial inquiry. Cf. *INS v. Aguirre–Aguirre,* 526 U.S. 415, 425, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) ("The judiciary is not well positioned to shoulder primary responsibility for assessing the likelihood and importance of such diplomatic repercussions"). The majority does say that the release of terrorists or other "special circumstances" might justify "heightened deference to the judgments of the political **\*715** branches with respect to matters of national security." *Ante,* at 2502. Here the Court appears to rely on an assessment of risk, but this is the very premise it finds inadequate to sustain the natural reading of the statute. The Court ought not to reject a rationale in order to deny power to the Attorney General and then invoke the same rationale to save its own analysis.

This rule of startling breadth invites potentially perverse results. Because other nations may refuse to admit aliens who have committed certain crimes—see, *e.g.,* Brief for Petitioner

in No. 99–7791, at 19 ("Lithuanian law precludes granting of citizenship to persons who, before coming to Lithuania, have been sentenced in another state to imprisonment for a deliberate crime for which criminal liability is imposed by the laws of the Republic of Lithuania" (citations and internal quotation marks omitted))—often the aliens who have committed the most serious crimes will be those who may be released immediately under the majority's rule. An example is presented in the case of Saroeut Ourk, a Cambodian alien determined to be removable and held pending deportation. See *Ourk v. INS,* No. 00–35645 (CA9, Sept. 18, 2000), cert. pending, No. 00–987. Ourk was convicted of rape by use of drugs in conjunction with the kidnaping of a 13–year–old girl; after serving 18 months of his prison term, he was released on parole but was returned to custody twice more for parole violations. Pet. for Cert. in No. 00–987, pp. 4–5. When he was ordered deported and transferred to the custody of the INS, it is no surprise the INS determined he was both a flight risk and a danger to the community. Yet the Court of Appeals for the Ninth Circuit concluded, based on its earlier decision in *Kim Ho Ma v. Reno,* 208 F.3d 815 (C.A.9 2000), that Ourk could no longer be held pending deportation, since removal to Cambodia was not reasonably foreseeable. App. to Pet. for Cert. in No. 00–987, pp. 3a–4a. See also *Phetsany v. INS,* No. 00–16286 (C.A.9, Sept. 18, 2000), cert. pending, No. 00–986 (requiring release of a native and **\*716** citizen of Laos convicted of attempted, premeditated murder); *Mounsaveng v. INS,* No. 00–15309 (C.A.9, Aug. 11, 2000), cert. pending, No. 00–751 [*] (releasing a citizen of Laos convicted of rape of a 15–year–old girl and reckless endangerment for involvement in a fight in which gunshots were fired); *Lim v. Reno,* No. 99–36191 (C.A.9, Aug. 14, 2000), cert. pending, No. 00–777 (releasing a Cambodian convicted of rape and robbery); *Phuong Phuc Le v. INS,* No. 00–16095 (C.A.9, Sept. 18, 2000), cert. pending, No. 00–1001 (releasing a Vietnamese citizen convicted of voluntary manslaughter in a crime involving the attempted murder of two other persons). Today's result will ensure these dangerous individuals, and hundreds more like them, will remain free while the Executive Branch tries to secure their removal. By contrast, aliens who violate mere tourist visa requirements, *ante,* at 2499, can in the typical case be held pending deportation on grounds that a minor offender is more likely to be removed. There is no reason to suppose Congress intended this odd result.

The majority's rule is not limited to aliens once lawfully admitted. Today's result may well mandate the release of those **\*\*2513** aliens who first gained entry illegally or by fraud,

AR.06908

Case 3:20-cv-07721-SI   Document 58-6   Filed 11/10/20   Page 413 of 912

Zadvydas v. Davis, 533 U.S. 678 (2001)

121 S.Ct. 2491, 150 L.Ed.2d 653, 69 USLW 4626, 69 USLW 4581...

and, indeed, is broad enough to require even that inadmissible and excludable aliens detained at the border be set free in our community. In *Rosales–Garcia v. Holland,* 238 F.3d 704, 725 (C.A.6 2001), for example, Rosales, a Cuban citizen, arrived in this country during the 1980 Mariel boatlift. *Id.,* at 707. Upon arrival in the United States, Rosales was released into the custody of a relative under the Attorney General's authority to parole illegal aliens, see 8 U.S.C. § 1182(d)(5)(A), and there he committed multiple crimes for which he was convicted and imprisoned. 238 F.3d, at 707–708. While serving a sentence for burglary and grand larceny, Rosales escaped from prison, another of the offenses **\*717** for which he ultimately served time. *Id.,* at 708. The INS eventually revoked Rosales' immigration parole, ordered him deported, and held him pending deportation, subject to periodic consideration under the Cuban Review Plan. See 8 C.F.R. § 212.12(g)(2) (2001). In reasoning remarkably similar to the majority's, the Court of Appeals for the Sixth Circuit held that the indefinite detention of Rosales violated Fifth Amendment due process rights, because "the government has offered ... no credible reason that there is any possibility that Cuba may accept Rosales's return anytime in the foreseeable future." 238 F.3d, at 725. This result— that Mariel Cubans and other illegal, inadmissible aliens will be released notwithstanding their criminal history and obvious flight risk—would seem a necessary consequence of the majority's construction of the statute.

The majority's confidence that the Judiciary will handle these matters "with appropriate sensitivity," *ante,* at 2502, 2504, allows no meaningful category to confine or explain its own sweeping rule, provides no justification for wresting this sovereign power away from the political branches in the first place, and has no support in judicially manageable standards for deciding the foreseeability of removal.

It is curious that the majority would approve of continued detention beyond the 90–day period, or, for that matter, during the 90–day period, where deportation is not reasonably foreseeable. If the INS cannot detain an alien because he is dangerous, it would seem irrelevant to the Constitution or to the majority's presumption that the INS has detained the alien for only a little while. The reason detention is permitted at all is that a removable alien does not have the same liberty interest as a citizen does. The Court cannot bring itself to acknowledge this established proposition. Likewise, it is far from evident under the majority's theory why the INS can

condition and supervise the release of aliens who are not removable in the reasonably foreseeable future, or why "the alien may no doubt be returned to custody upon **\*718** a violation of those conditions." *Ante,* at 2504. It is true that threat of revocation of supervised release is necessary to make the supervised release itself effective, a fact even counsel for Zadvydas acknowledged. Brief for Petitioner in No. 99–7791, at 20–21. If that is so, however, the whole foundation for the Court's position collapses.

The Court today assumes a role in foreign relations which is unprecedented, unfortunate, and unwise. Its misstep results in part from a misunderstanding of the liberty interests these aliens retain, an issue next to be discussed.

II

The aliens' claims are substantial; their plight is real. They face continued detention, perhaps for life, unless it is shown they no longer present a flight risk or a danger to the community. In a later case the specific circumstances of a detention may present a substantial constitutional question. That is not a reason, however, for framing a rule which ignores the law governing alien status.

**\*\*2514** As persons within our jurisdiction, the aliens are entitled to the protection of the Due Process Clause. Liberty under the Due Process Clause includes protection against unlawful or arbitrary personal restraint or detention. The liberty rights of the aliens before us here are subject to limitations and conditions not applicable to citizens, however. See, *e.g., Mathews v. Diaz,* 426 U.S. 67, 79–80, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976) ( "In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens"). No party to this proceeding contests the initial premise that the aliens have been determined to be removable after a fair hearing under lawful and proper procedures. Section 1229a sets forth the proceedings required for deciding the inadmissibility or removability of an alien, including a hearing before an immigration judge, at which the INS carries "the burden of establishing by clear and convincing evidence that ... the alien is deportable." **\*719** 8 U.S.C. § 1229a(c)(3)(A); see also *Berenyi v. District Director, INS,* 385 U.S. 630, 636, 87 S.Ct. 666, 17 L.Ed.2d 656 (1967) ("When the Government seeks to ... deport a resident alien and send him from our shores, it carries the heavy burden of proving its case

121 S.Ct. 2491, 150 L.Ed.2d 653, 69 USLW 4626, 69 USLW 4581...

by clear, unequivocal, and convincing evidence" (internal quotation marks and footnotes omitted)). Aliens ordered removed pursuant to these procedures are given notice of their right to appeal the decision, 8 U.S.C. § 1229a(c)(4), may move the immigration judge to reconsider, § 1229a(c)(5), can seek discretionary cancellation of removal, § 1229b, and can obtain habeas review of the Attorney General's decision not to consider waiver of deportation. See INS v. St. Cyr, ante, 533 U.S., at 314, 121 S.Ct. 2271. As a result, aliens like Zadvydas and Ma do not arrive at their removable status without thorough, substantial procedural safeguards.

The majority likely is correct to say that the distinction between an alien who entered the United States, as these aliens did, and one who has not, "runs throughout immigration law." Ante, at 2500. The distinction is not as clear as it might seem, however, and I doubt it will suffice to confine the rationale adopted by the majority. The case which often comes to mind when one tests the distinction is Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953), where the Court considered the situation of an alien denied entry and detained on Ellis Island. The detention had no foreseeable end, for though Mezei was inadmissible to the United States it seemed no other country would have him. Id., at 209, 73 S.Ct. 625. The case presented a line-drawing problem, asking whether the alien was in our country; or whether his situation was the same as if he were still on foreign shores; or whether he fell in a legal category somewhere in between, though if this were true, it still would not be clear how to resolve the case. The Court held the alien had no right to a hearing to secure his release. Id., at 212–213, 73 S.Ct. 625. (Approximately 17 months after this Court denied Mezei relief, the Attorney General released him on parole. It appears Mezei **\*720** never returned to INS custody, though he was not admitted to the United States as a citizen or lawful permanent resident. See Weisselberg, The Exclusion and Detention of Aliens: Lessons From the Lives of Ellen Knauff and Ignatz Mezei, 143 U. Pa. L.Rev. 933, 979–984 (1995).)

Here the majority says the earlier presence of these aliens in the United States distinguishes the cases from Mezei. For reasons given here it is submitted the majority is incorrect in its major conclusions in all events, so even if it were assumed these aliens are in a class with more rights than Mezei, it makes no difference. For purposes of this dissent it is not necessary to rely upon Mezei.

That said, it must be made clear these aliens are in a position far different from aliens with a lawful right to remain here. **\*2515** They are removable, and their rights must be defined in accordance with that status. The due process analysis must begin with a "careful description of the asserted right." Reno v. Flores, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). We have "long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." Landon v. Plasencia, 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982). The same is true for those aliens like Zadvydas and Ma, who face a final order of removal. When an alien is removable, he or she has no right under the basic immigration laws to remain in this country. The removal orders reflect the determination that the aliens' ties to this community are insufficient to justify their continued presence in the United States. An alien's admission to this country is conditioned upon compliance with our laws, and removal is the consequence of a breach of that understanding.

It is true the Court has accorded more procedural protections to those aliens admitted to the country than those stopped at the border, observing that "a continuously present alien is entitled to a fair hearing when threatened with **\*721** deportation." Ibid.; Mezei, supra, at 212, 73 S.Ct. 625 ("[A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law .... But an alien on the threshold of initial entry stands on a different footing: 'Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned' " (quoting United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 544, 70 S.Ct. 309, 94 L.Ed. 317 (1950))). Removable and excludable aliens are situated differently before an order of removal is entered; the removable alien, by virtue of his continued presence here, possesses an interest in remaining, while the excludable alien seeks only the privilege of entry.

Still, both removable and inadmissible aliens are entitled to be free from detention that is arbitrary or capricious. Where detention is incident to removal, the detention cannot be justified as punishment nor can the confinement or its conditions be designed in order to punish. See Wong Wing v. United States, 163 U.S. 228, 16 S.Ct. 977, 41

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 415 of 912

Zadvydas v. Davis, 533 U.S. 678 (2001)

121 S.Ct. 2491, 150 L.Ed.2d 653, 69 USLW 4626, 69 USLW 4581...

L.Ed. 140 (1896). This accords with international views on detention of refugees and asylum seekers. See Report of the United Nations Working Group on Arbitrary Detention, U.N. Doc. E/CN.4/2000/4 (Dec. 28, 1999); United Nations High Commissioner for Refugees, Guidelines on Applicable Criteria and Standards Relating to the Detention on Asylum–Seekers (Feb. 10, 1999). It is neither arbitrary nor capricious to detain the aliens when necessary to avoid the risk of flight or danger to the community.

Whether a due process right is denied when removable aliens who are flight risks or dangers to the community are detained turns, then, not on the substantive right to be free, but on whether there are adequate procedures to review their cases, allowing persons once subject to detention to show that through rehabilitation, new appreciation of their responsibilities, or under other standards, they no longer present special risks or danger if put at large. The procedures **\*722** to determine and to review the status-required detention go far toward this objective.

By regulations, promulgated after notice and comment, the Attorney General has given structure to the discretion delegated by the INA in order to ensure fairness and regularity in INS detention decisions. First, the INS provides for an initial postcustody review, before the expiration of the 90–day removal period, at which a district director conducts a record review. 8 C.F.R. § 241.4 (2001). The alien is entitled to present any relevant information in **\*\*2516** support of release, and the district director has the discretion to interview the alien for a personal evaluation. § 241.4(h)(1). At the end of the 90–day period, the alien, if held in custody, is transferred to a postorder detention unit at INS headquarters, which in the ordinary course will conduct an initial custody review within three months of the transfer. § 241.4(k)(2)(ii). If the INS determines the alien should remain in detention, a two-member panel of INS officers interviews the alien and makes a recommendation to INS headquarters. § 241.4(i)(1)–(3). The regulations provide an extensive, nonexhaustive list of factors that should be considered in the recommendation to release or further detain. Those include: "[t]he nature and number of disciplinary infractions"; "the detainee's criminal conduct and criminal convictions, including consideration of the nature and severity of the alien's convictions, sentences imposed and time actually served, probation and criminal parole history, evidence of recidivism, and other criminal history"; "psychiatric and psychological reports pertaining to the detainee's mental health"; "[e]vidence of rehabilitation"; "[f]avorable factors, including ties to the United States

such as the number of close relatives"; "[p]rior immigration violations and history"; "[t]he likelihood that the alien is a significant flight risk or may abscond to avoid removal, including history of escapes"; and any other probative information. § 241.4(f). Another review must occur within one year, with mandatory evaluations each year thereafter; if the alien requests, **\*723** the INS has the discretion to grant more frequent reviews. § 241.4(k)(2)(iii). The INS must provide the alien 30–days advance, written notice of custody reviews; and it must afford the alien an opportunity to submit any relevant materials for consideration. § 241.4(i)(3)(ii). The alien may be assisted by a representative of his choice during the review, § 241.4(i)(3)(i), (ii), and the INS must provide the alien with a copy of its decision, including a brief statement of the reasons for any continued detention, § 241.4(d).

In this context the proper analysis can be informed by our cases involving parole-eligibility or parole-revocation determinations. In *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), for example, we held some amount of process was due an individual whose parole was revoked, for "the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty." *Id.,* at 482, 92 S.Ct. 2593; see also *Board of Pardons v. Allen,* 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987). We rejected in *Morrissey* the suggestion that the State could justify parole revocation "without some informal procedural guarantees," 408 U.S., at 483, 92 S.Ct. 2593, but "[g]iven the previous conviction and the proper imposition of conditions," we recognized that "the State has an overwhelming interest in being able to return the individual to imprisonment without the burden of a new adversary criminal trial," *ibid.* We held the review process need not include a judicial officer or formal court proceeding, but could be conducted by a neutral administrative official. *Id.,* at 486, 92 S.Ct. 2593.

While the majority expresses some concern that the regulations place the burden on the alien to show he is no longer dangerous, that question could be adjudicated in a later case raising the issue. It should be noted the procedural protection here is real, not illusory; and the criteria for obtaining release are far from insurmountable. Statistics show that between February 1999 and mid-November 2000 some 6,200 aliens were provided custody reviews before expiration of the 90–day removal period, and of those aliens about 3,380 **\*724** were released. 65 Fed.Reg. 80285 (2000); Reply Brief

Case 3:20-cv-07721-SI     Document 58-6     Filed 11/10/20     Page 416 of 912

Zadvydas v. Davis, 533 U.S. 678 (2001)

121 S.Ct. 2491, 150 L.Ed.2d 653, 69 USLW 4626, 69 USLW 4581...

for Petitioners in No. 00–38, p. 15. As a result, although the alien carries the burden to prove detention is no longer justified, there is no showing this is an unreasonable burden.

 **2517  Like the parolee in *Morrissey,* who was aware of the conditions of his release, the aliens in the instant cases have notice, constructive or actual, that the INA imposes as a consequence of the commission of certain crimes not only deportation but also the possibility of continued detention in cases where deportation is not immediately feasible. And like the prisoner in *Board of Pardons v. Allen,* who sought federal-court review of the discretionary decision denying him parole eligibility, removable aliens held pending deportation have a due process liberty right to have the INS conduct the review procedures in place. See 482 U.S., at 381, 107 S.Ct. 2415. Were the INS, in an arbitrary or categorical manner, to deny an alien access to the administrative processes in place to review continued detention, habeas jurisdiction would lie to redress the due process violation caused by the denial of the mandated procedures under 8 C.F.R. § 241.4 (2001).

This is not the posture of the instant cases, however. Neither Zadvydas nor Ma argues that the Attorney General has applied the procedures in an improper manner; they challenge only the Attorney General's authority to detain at all where removal is no longer foreseeable. The Government has conceded that habeas jurisdiction is available under 28 U.S.C. § 2241 to review an alien's challenge to detention following entry of a final order of deportation, Brief for Respondents in No. 99–7791, at 9–10, n. 7; Tr. of Oral Arg. 59, although it does not detail what the nature of the habeas review would be. As a result, we need not decide today whether, and to what extent, a habeas court could review the Attorney General's determination that a detained alien continues to be dangerous or a flight risk. Given the undeniable deprivation of liberty caused by the detention, there might be substantial questions concerning the severity necessary  *725  for there to be a community risk; the adequacy of judicial review in specific cases where it is alleged there is no justification for concluding an alien is

dangerous or a flight risk; and other issues. These matters are not presented to us here.

In all events, if judicial review is to be available, the inquiry required by the majority focuses on the wrong factors. Concepts of flight risk or future dangerousness are manageable legal categories. See, *e.g.,* *Kansas v. Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997); *Foucha v. Louisiana,* 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). The majority instead would have the Judiciary review the status of repatriation negotiations, which, one would have thought, are the paradigmatic examples of nonjusticiable inquiry. See *INS v. Aguirre–Aguirre,* 526 U.S., at 425, 119 S.Ct. 1439. The inquiry would require the Executive Branch to surrender its primacy in foreign affairs and submit reports to the courts respecting its ongoing negotiations in the international sphere. High officials of the Department of State could be called on to testify as to the status of these negotiations. The Court finds this to be a more manageable, more appropriate role for the Judiciary than to review a single, discrete case deciding whether there were fair procedures and adequate judicial safeguards to determine whether an alien is dangerous to the community so that long-term detention is justified. The Court's rule is a serious misconception of the proper judicial function, and it is not what Congress enacted.

For these reasons, the Court should reverse the judgment of the Court of Appeals for the Ninth Circuit and affirm the judgment of the Court of Appeals for the Fifth Circuit. I dissent.

**All Citations**

533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653, 69 USLW 4626, 69 USLW 4581, 01 Cal. Daily Op. Serv. 5455, 2001 Daily Journal D.A.R. 6671, 14 Fla. L. Weekly Fed. S 442, 2001 DJCAR 3494

**Footnotes**

121 S.Ct. 2491, 150 L.Ed.2d 653, 69 USLW 4626, 69 USLW 4581...

\*     The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

\*     The Court also cites *Landon v. Plasencia,* 459 U.S. 21, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982), as oblique support for the claim that the due process protection afforded aliens under final order of removal "may vary depending upon status and circumstance." *Ante,* at 2501. But that case is entirely inapt because it did not involve an alien subject to a final order of deportation. The Court also cites *Johnson v. Eisentrager,* 339 U.S. 763, 770, 70 S.Ct. 936, 94 L.Ed. 1255 (1950), *ante,* at 2501, but that case is doubly irrelevant: because it dealt not with deportation but with the military's detention of enemy aliens outside the territorial jurisdiction of the United States, and because it rejected habeas corpus jurisdiction anyway.

\*     [Reporter's Note: See *post,* 533 U.S. 943, 121 S.Ct. p. 2582.]

---

**End of Document**                                                                 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

917 F.2d 1308
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing
in the Federal Reporter. Use FI CTA9 Rule 36-3 for
rules regarding the citation of unpublished opinions.)
United States Court of Appeals, Ninth Circuit.

Clifton W. ZANG, Petitioner–Appellant,

v.

R.S. PETERSON, Superintendent, Oregon
State Correctional Inst., Respondent–Appellee.

No. 89–35646.
|
Argued and Submitted Oct. 1, 1990.
|
Decided Nov. 9, 1990.

Appeal from the United States District Court for the District
of Oregon; Malcolm F. Marsh, District Judge, Presiding.

**Synopsis**
D.Or.

AFFIRMED.

**Procedural Posture(s):** On Appeal.

MEMORANDUM [**]

Before HUG and NELSON, Circuit Judges, and WALKER, [*]
District Judge.

**Opinion**
 **\*1** After his conviction for two counts of aggravated murder,
petitioner Clifton W. Zang filed a *pro se* petition for writ
of habeas corpus under 28 U.S.C. § 2254. He claimed
deprivation of his constitutional right to a fair trial because
the state trial court accepted his guilty plea when he lacked the
capacity to make a reasoned choice and ineffective assistance
of counsel. The district court granted summary judgment
against petitioner. We affirm the district court's ruling in all
aspects.

I. BACKGROUND.

Petitioner was charged with two counts of aggravated murder
in Washington County Circuit Court for the shooting deaths
of his former girlfriend, Donna Stewart, and her friend, Erik
Buehner.

Prior to their murders, the victims had obtained restraining
orders against petitioner. Shortly thereafter, on March 23,
1983, petitioner unsuccessfully attempted to see Ms. Stewart
on her break at work. While waiting, petitioner fell asleep
in his car in the parking lot at Ms. Stewart's place of
employment. Upon awakening the next morning, petitioner
discovered that his car would not start. Petitioner hitched a
ride to Ms. Stewart's apartment. That morning, Ms. Stewart's
apartment was ransacked and Ms. Stewart and Mr. Buehner
were shot to death upon returning to her apartment. Petitioner
drove Mr. Buehner's car from Ms. Stewart's apartment to the
parking lot where he had left his car. He then broke into his
car to obtain shells for a .22 gun, returned to Mr. Buehner's
car and shot himself in the head. Petitioner was taken to
a hospital, where he remained unconscious for eight days.
When petitioner regained consciousness, he was completely
blinded from the gunshot wound and was unable to remember
the events surrounding the deaths of Ms. Stewart and Mr.
Buehner.

On or about April 5, 1983, John Ray was appointed to
represent petitioner. Dr. Edward Colbach was appointed to
evaluate Mr. Zang's psychiatric health and wrote two reports,
dated May 20, 1983 and June 10, 1983.

Petitioner's trial for aggravated murder began on June 9, 1983.
On June 10, 1983, Dr. Colbach interviewed petitioner and
found him emotionally distraught and tearful as he attempted
to recall the events on the day of the shooting incident. On
June 14, 1983, Mr. Zang appeared hysterical in court, and
the trial was postponed until June 16, 1983. The state trial
judge refused to entertain a change of plea at that time due to
petitioner's extreme emotional state.

On June 16, 1983, petitioner appeared before the state trial
court and entered a plea of guilty to two counts of intentional
murder. At this proceeding, the court spent over an hour
explaining to petitioner the possible sentences which could
be imposed and determining whether petitioner was mentally
capable of deciding to change his plea. The court relied
on petitioner's demeanor and conduct, his apparent ability
to understand the potential sentences which he would face,
and the rational reasons for his change of plea. During the

colloquy, petitioner asserted repeatedly that he understood the court's statements and responded appropriately to the court's questions. When asked about his reasons for changing his plea, petitioner answered that his ambition was to become the first blind professional bowler and his guilty plea might result in a shorter term of imprisonment. In response to the court's question whether petitioner would admit to the lesser included offense of murdering Erik Buehner, petitioner stated:

**\*2** I had no desire to kill him, either. But, apparently I did. That is why—that is something that doesn't seem to clarify to me, manslaughter, murder, aggravated murder, it's all life. You take someone's life and that's not right. I don't care if you have been on drugs or whatever, you have killed someone. That is wrong.

After reviewing the psychiatric reports and Dr. Colbach's qualifications, the state trial court found that petitioner was competent to plead guilty and waive his constitutional rights. Petitioner was then sentenced to two concurrent life sentences.

After imprisonment, petitioner filed for state post-conviction relief, alleging that his guilty plea was not the result of a knowing and voluntary waiver of rights because he was mentally incompetent at the time. Petitioner testified that he had no recollection of shooting anyone and only pled guilty because everyone kept telling him that he had committed the murders. Petitioner also testified to several instances of his lawyer's failure to investigate. After a hearing on petitioner's competency, the post-conviction trial court denied relief. The Oregon Court of Appeals affirmed, and the Oregon Supreme Court denied review. Petitioner then sought federal habeas corpus relief. United States District Judge Marsh adopted Magistrate Hogan's findings of fact and recommendations and granted a motion for summary judgment against petitioner.

## II. ANALYSIS.

A. *Whether the state trial court erred in finding that Zang was competent to plead guilty.*

A federal court considering habeas proceedings must presume the correctness of the state court's findings of fact. 28 U.S.C. § 2254(d); *Sumner v. Mata,* 449 U.S. 539 (1981). An exception to this presumption of correctness arises when a federal court concludes that the state court finding was not "fairly supported by the record." 28 U.S.C. § 2254(d)(8);

see also Sumner, 449 U.S. at 597; *Maggio v. Fulford,* 462 U.S. 111 (1983) (per curiam). In such circumstances, a federal court must explain the reasoning which led it to conclude that at least one of the first seven factors under 28 U.S.C. § 2254(d) was present and that the state court finding was not fairly supported by the record. *Sumner,* 449 U.S. at 593. A state court's determination of an accused's competency to plead guilty is accordingly granted a high degree of deference. *Marshall v. Lonberger,* 459 U.S. 422, 432 (1982).

An accused's competence to stand trial is established if the he has "sufficient present ability to consult with his or her lawyer with a reasonable degree of rational understanding and have a rational as well as factual understanding of the proceedings." *Chavez,* 656 F.2d at 518. The competency standard for entering a guilty plea is more stringent. In order to waive his constitutional rights, a defendant must be able to understand the nature and consequences of his waiver and plea and make a rational choice among the alternatives presented. *Chavez,* 656 F.2d at 518; *Sailer v. Gunn,* 548 F.2d 271 (9th Cir.1977); *Sieling v. Eyman,* 478 F.2d 211 (9th Cir.1973); *De Kaplany v. Enomoto,* 540 F.2d 975 (9th Cir.1976) (en banc), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 815, 50 L.Ed.2d 793 (1977).

**\*3** The following evidence was before the state trial court when it accepted petitioner's guilty plea on June 16, 1983:

(1) Dr. Weisert's April 14, 1983 report stating that "Mr. Zang is able to understand the nature of the proceedings against him, can assist and cooperate with his counsel and can participate in his defense, and also, that opinion is corroborated by the hospital staff disposition board;"

(2) Two reports from Dr. Colbach, dated May 20, 1983 and June 10, 1983, which noted that petitioner demonstrated no signs of any serious organic brain damage nor any serious mental illness, but that he was distraught, depressed, and suffered from a lapse of memory regarding the shooting incident. The reports stated that petitioner might be able to claim extreme emotional distress at the time of the shooting, which might constitute a mitigating circumstance;

(3) Petitioner's general demeanor and conduct in court, which revealed that he could understand the alternative sentences which could be imposed and that he was able to respond coherently to the court's questions;

(4) Petitioner's attempted suicide shortly after the shooting incident which resulted in permanent blindness; and

(5) Petitioner's hysterical conduct in court just a few days earlier on June 14, 1983.

In reviewing the record, we find that the state court's conclusion that petitioner was competent for purposes of entering a guilty plea was fairly supported by the record. The state trial judge expressly applied the competency standard of petitioner's "ability to make a reasonable choice among the alternatives that are presented and the ability to understand the nature of the consequences of the waiver and also the consequences of entering a plea to some other charge." Excerpt of Record 10. The only arguable manifestation of petitioner's claimed incompetence at the hearing was his explanation for wanting to change his plea to guilty: that he hoped to spread a message of love to the public by becoming the first blind professional bowler and that his guilty plea might result in an earlier release from prison. However unusual such an ambition may be, it nevertheless states a rational basis for petitioner's change of plea. Although petitioner was in a state of depression and emotional turbulence earlier, which resulted in the discontinuance of his trial, his mien at the June 16, 1983 proceedings and the records of petitioner's psychiatric evaluations led the court to determine that he was competent to enter a guilty plea. The transcript of the proceedings reveals that petitioner understood and responded appropriately and coherently to the court's questions. Furthermore, § 2254(d) does not permit federal habeas courts to reevaluate the credibility and demeanor of witnesses before the state trial court. *Marshall v. Lonberger,* 459 U.S. at 434. Thus, we affirm the district court's finding that petitioner was competent to plead guilty.

B. *Whether the state trial court erred in failing to hold a hearing regarding Zang's competency to plead guilty.*

**\*4** Whenever there is "substantial evidence" that a defendant may be mentally incompetent to stand trial, due process requires an evidentiary hearing regarding competency. *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). The Ninth Circuit in *Moore v. United States,* 464 F.2d 663 (9th Cir.1972), concluded that the trial court's failure to hold a *Pate* evidentiary hearing, in light of substantial evidence of the defendant's long-standing mental incompetency, required that the defendant's guilty plea and conviction be vacated and the defendant be rearraigned. In *De Kaplany,* 540 F.2d 975, the court concluded that where the district court conducted a thorough, retroactive hearing on petitioner's competency to plead guilty, the petitioner was not deprived of his due process right to a fair trial. Thus, the court upheld the validity of the petitioner's guilty plea.

In both *Pate v. Robinson* and *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), the Supreme Court reversed petitioners' convictions for the trial court's failure to hold an evidentiary hearing regarding petitioner's competence to stand trial. In *Pate,* the petitioner had a long history of mental illness resulting from a severe childhood head injury, had been convicted of killing his infant son, had attempted suicide, and four defense witnesses testified that in their opinion, Robinson was insane. In *Drope,* the petitioner had a history of pronounced irrational behavior: on the Sunday before trial he attempted to choke his wife, and shortly after trial commenced, he shot himself in a suicide attempt. In the present case, Zang had no prior history of mental illness. Despite having shot himself in the head in a suicide attempt and experiencing selective loss of memory thereafter, Zang appeared competent at the guilty plea hearing, and the state court was careful to elicit responses from Zang to determine his mental competency to enter a guilty plea.

However, where a substantial question regarding a criminal defendant's mental competency has arisen in a criminal proceeding, an evidentiary hearing is required. Evidence of an accused's incompetency encompasses "all information properly before the court, whether it is in the form of testimony or exhibits formally admitted or ... in the form of medical reports of other kinds of reports that have been filed with the court." *Moore,* 464 F.2d 666. Although evidence of Zang's incompetence does not rise to the level of the indicia of incompetence involved in *Pate* or *Drope,* it nevertheless creates a reasonable doubt regarding Zang's competence to waive his constitutional rights. *See Chavez,* 656 F.2d at 519; *Tillery v. Eyman,* 492 F.2d 1056, 1059 (9th Cir.1974). Therefore, an evidentiary hearing on Zang's competency to waive his constitutional rights and to plead guilty was required, and both the state trial court and the state held such hearings. The question is whether those hearings satisfied the requirement of a *Pate* evidentiary hearing.

**\*5** In *Pate,* the Supreme Court did not expressly describe the nature of the required evidentiary hearing. However, in

*Chavez,* the Ninth Circuit found that a hearing in which the district court did not expressly ask the petitioner if he had evidence concerning his competence that he wished to present, but did inquire into petitioner's understanding of the proceedings, his rights, his reasoning process, and his ability to cooperate with counsel, was sufficient to establish petitioner's competency.

Similarly, we hold that the state trial court's proceeding in which Zang pled guilty satisfied the requirement of a *Pate* evidentiary hearing, in light of the state trial court's thorough questioning, review of the psychiatric reports, and application of the correct standard for determining competence to waive constitutional rights. Since the state court hearing sufficed to establish Zang's competence to plead guilty, we hold that petitioner was not entitled to another evidentiary hearing on competence in the federal district court.

C. *Whether the federal district court erred in failing to hold an evidentiary hearing before granting the government's summary judgment motion.*

Petitioner contends that a habeas petitioner is entitled to an evidentiary hearing in federal court pursuant to *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). However, petitioner's reliance on *Townsend* is misplaced. An evidentiary hearing in federal district court is only required where the state trial court's findings of fact cannot be reconstructed from the record. In *Townsend,* the state trial judge did not render an opinion, findings of fact, nor conclusions of law. Because the record did not reveal the state trial court's basis for its findings, the district court's refusal to hold an evidentiary hearing regarding the voluntariness of the defendant's confession was reversible error. In the instant case, the record provided the district court with a full explanation of the state court's reasons for its determination of competency. Hence, the district court did not err in declining to hold another evidentiary hearing on petitioner's competency to plead guilty.

D. *Ineffective assistance of counsel.*

In a federal habeas challenge to a state criminal judgment, a state court finding that counsel rendered effective assistance is not binding on a federal court. *Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Both the inadequate performance and prejudice components

of the ineffectiveness inquiry are mixed questions of law and fact. *Id.*

A habeas petitioner who challenges his conviction claiming actual ineffective assistance of counsel must demonstrate both that his lawyer's representation was deficient and that the deficient legal representation prejudiced his defense. *Id.* at 687. To determine whether legal assistance was deficient, the court must inquire "whether counsel's assistance was reasonable considering all the circumstances at the time of the assistance." *Id.* at 688. Furthermore, judicial scrutiny of legal assistance must be highly deferential; there is a strong presumption that counsel rendered adequate assistance. *Id.* at 690.

 **\*6** To establish prejudice, a petitioner must show there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Alternatively, a petitioner must establish that a reasonable probability exists that, absent counsel's errors, the finder of fact would have had a reasonable doubt regarding guilt. *Id.* at 695.

Petitioner claims that he was denied effective assistance of counsel because his lawyer, Mr. Ray, failed to investigate his case properly and allowed him to plead guilty when he was clearly incompetent and there was insufficient evidence to convict petitioner of intentional murder.

1. *Failure to investigate thoroughly.*

Petitioner contends that his trial lawyer did not investigate the following aspects of his case:

(1) Whether Ms. Stewart's apartment door locks had been changed since petitioner moved out;

(2) Whether petitioner's vehicle contained any forensic evidence;

(3) The existence of any impeachment evidence regarding witnesses who testified to petitioner threatening Ms. Stewart;

(4) The presence of any broken glass on petitioner's clothes at the time of arrest;

(5) Whether a handwriting analysis comparing petitioner's handwriting with the writings at the scene of the shooting

and at the scene of petitioner's own shooting would reveal exculpatory evidence; and

(6) The financial backgrounds of petitioner and Ms. Stewart to rebut inaccurate evidence regarding the cause of their separation.

Petitioner argues that an investigation of the above matters might have indicated that another person was responsible for the shooting deaths of Ms. Stewart and Mr. Buehner, and therefore, his attorney's failure to investigate constituted ineffective assistance of counsel.

The record reveals that Mr. Ray testified that occasionally petitioner would suggest other possible perpetrators of the murders. Each time, Mr. Ray discussed these possibilities with petitioner and the private investigator. On such occasions, Mr. Ray either investigated the matters or concluded that the suggestions were not worthy of investigation.

Mr. Ray's failure to investigate the above aspects of petitioner's case did not render his assistance deficient because these issues were not necessary to the preparation of a defense. The burden of proving guilt was upon the prosecution, and defense counsel's failure to investigate the possibility that another person was responsible for the killings was not unreasonable under the circumstances. Mr. Ray expressed his opinion there was sufficient evidence to convict petitioner of first degree manslaughter, murder or aggravated murder. Any factual investigations may well have revealed incriminating evidence which might have refreshed petitioner's memory of the events surrounding the shootings. Petitioner told Dr. Colbach that he remembered hitching a ride to Ms. Stewart's apartment, throwing some things around her apartment, seeing the dead bodies of the victims, and running to Mr. Buehner's pickup truck. In light of the circumstances at the time of trial, it does not appear that Mr. Ray's failure to investigate the questions raised by petitioner constituted deficient assistance of counsel.

**\*7** 2. *Failure to prepare adequate psychiatric evidence.*

Relying on 📖 *Andrews v. United States,* 403 F.2d 341 (9th Cir.1968), petitioner argues that his lawyer's failure to request a psychiatric evaluation immediately before the guilty plea constituted ineffective assistance of counsel. However, *Andrews* is distinguishable in that Andrews had a long history of mental illness of which his attorney was aware and yet

his attorney did not request any psychiatric investigation regarding his client's competency to stand trial. In the present case, petitioner's attorney expressly requested at least two psychiatric evaluations, one of which was requested just prior to the trial, indicating that Mr. Ray intended to determine petitioner's competency to stand trial.

Allowing petitioner to enter a guilty plea when petitioner appeared in all respects to be competent does not constitute ineffective assistance of counsel.

3. *Sufficiency of evidence to convict for intentional murder.*

Petitioner asserts that his attorney rendered deficient legal representation when he allowed petitioner to plead guilty to intentional murder when there was insufficient evidence to support such a conviction.

Dr. Colbach's May 20, 1983 report concluded that petitioner satisfied the major elements for a manslaughter defense based on extreme emotional disturbance and that petitioner's marijuana and alcohol use were not major causes of petitioner's loss of control. Dr. Colbach's June 10, 1983 report stated that petitioner had a very high blood alcohol level of .102 approximately one hour after the shooting and that the ultimate question was whether a jury would find that petitioner would have an affirmative defense based on extreme emotional disturbance. [1] At the guilty plea hearing, the state trial judge explained to petitioner that the burden of proving the affirmative defense of extreme emotional disturbance would be on the petitioner and that extreme emotional disturbance not resulting from a person's own reckless acts would constitute an affirmative defense to aggravated murder, but not to manslaughter.

Furthermore, Mr. Ray later testified that he believed that there was sufficient evidence to convict petitioner of first-degree manslaughter, murder or aggravated murder.

Reviewing the record, it does not appear that allowing petitioner to plead guilty to two counts of murder constituted deficient legal representation. Petitioner did not have a strong case for an affirmative defense of extreme emotional disturbance, as conceded in Dr. Colbach's June 10, 1983 report. Hence, he could well have been convicted of two counts of aggravated murder and faced a harsher sentence. Petitioner was competent at the time of the entry of his guilty plea and appeared to understand the state trial court's lengthy explanation of the possible sentences he might face

if convicted by a jury. Thus, he chose to face a certain sentence rather than risking a longer sentence which might have resulted if he had chosen to continue with his trial. Mr. Ray's representation of petitioner is not rendered deficient by allowing his client to choose to forego a painful trial and plead guilty to a lesser included offense.

**\*8** Therefore, because we hold that counsel's assistance in this case did not constitute deficient legal representation, we need not address the issue whether petitioner was prejudiced by counsel's professional errors. The district court's conclusion that petitioner was not deprived of effective assistance of counsel is AFFIRMED.

**All Citations**

917 F.2d 1308 (Table), 1990 WL 173753

## Footnotes

\*       The Honorable Vaughn R. Walker, United States District Judge for the Northern District of California, sitting by designation.

\*\*     This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 21.

1       Under Oregon law, it is an affirmative defense to aggravated murder that the homicide was committed under the influence of extreme emotional disturbance when such disturbance is not the result of a person's own intentional, reckless, or criminally negligent act and for which disturbance there is a reasonable explanation.

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Bolieiro v. Holder,   1st Cir.,   September 27, 2013

617 F.3d 650
United States Court of Appeals,
Second Circuit.

Xue Yong ZHANG, Petitioner,

v.

Eric H. HOLDER, Jr., Attorney General
of the United States, Respondent.

Docket No. 09–2628–ag.
|
Argued: June 24, 2010.
|
Decided: Aug. 12, 2010.

**Synopsis**

**Background:** Alien, a native and citizen of China, petitioned for review of a decision by the Board of Immigration Appeals (BIA), dismissing his appeal of an order of the immigration judge (IJ), which terminated his reopened removal proceedings on the basis that he had already been removed from the United States.

**Holdings:** The Court of Appeals, Wesley, Circuit Judge, held that:

[1] departure bar deprived BIA of jurisdiction to consider alien's untimely motion to reopen pursuant to the BIA's sua sponte authority, and

[2] alien was not entitled to grant of motion to reopen, nunc pro tunc, as of date that BIA denied his request for stay of removal.

Petition denied.

West Headnotes (8)

[1]     **Aliens, Immigration, and Citizenship** 🔑 **Law questions**

The Court of Appeals reviews de novo legal questions decided by the Board of Immigration Appeals (BIA).

[2]     **Aliens, Immigration, and Citizenship** 🔑 **Law questions**

The Court of Appeals owes substantial deference to the interpretation by the Board of Immigration Appeals (BIA) of an immigration regulation unless the court finds that interpretation to be plainly erroneous or inconsistent with the regulation.

3 Cases that cite this headnote

[3]     **Aliens, Immigration, and Citizenship** 🔑 **Reopening, Reconsideration, or Remand**

The departure bar regulation, barring motions to reopen on behalf of aliens who were subsequently removed, deprived the Board of Immigration Appeals (BIA) of jurisdiction to consider alien's untimely motion to reopen invoking the BIA's sua sponte authority after the alien had already been removed from the United States. Immigration and Nationality Act, § 240(c)(7), 8 U.S.C.A. § 1229a(c)(7); 8 C.F.R. § 1003.2(a, d).

19 Cases that cite this headnote

[4]     **Federal Civil Procedure** 🔑 **Nunc pro tunc orders**

When a matter is adjudicated "nunc pro tunc," it is as if it were done as of the time that it should have been done.

3 Cases that cite this headnote

[5]     **Aliens, Immigration, and Citizenship** 🔑 **Determination**

An award of nunc pro tunc may, in an appropriate circumstance, be granted as a means of rectifying error in immigration proceedings.

4 Cases that cite this headnote

[6]    **Federal Civil Procedure** 🔑 Nunc pro tunc
orders

The doctrine of nunc pro tunc is a far-reaching
equitable remedy applied in certain exceptional
cases, typically aimed at rectifying any injustice
to the parties suffered by them on account of
judicial or agency delay.

3 Cases that cite this headnote

[7]    **Aliens, Immigration, and
Citizenship** 🔑 Findings, statement of reasons,
and determination

Assuming arguendo that nunc pro tunc would
available as a means of providing equitable
relief when the Board of Immigration Appeals
(BIA) was divested of its jurisdiction by the
departure bar regulation to consider sua sponte
alien's untimely motion to reopen, alien was
not entitled to grant of motion to reopen,
nunc pro tunc, as of date that BIA denied his
request for stay of removal, on basis that the
stay would have prevented alien's removal and
avoided application of departure bar; motion to
reopen relied on BIA's discretionary sua sponte
authority, so that denial of stay did not result in
significant error, there was no allegation of undue
delay or misconduct by BIA in resolving motion
to reopen, alien did not act diligently in pursuing
relief, and nunc pro tunc order was unlikely to
lead to relief from removal order. 🚩 8 C.F.R. §
1003.2(d).

24 Cases that cite this headnote

[8]    **Aliens, Immigration, and
Citizenship** 🔑 Jurisdiction and venue

Questions relating to the manner in which the
Board of Immigration Appeals (BIA) exercises
its sua sponte authority, which the Court
of Appeals lacks jurisdiction to review, are
distinct from questions relating to the BIA's
understanding of a regulation governing the
scope of its authority, which present interpretive
issues that are squarely within the province of the
Court of Appeals.

7 Cases that cite this headnote

**Attorneys and Law Firms**

**\*651** Matthew L. Guadagno (Jules E. Coven and Kerry W.
Bretz, on the brief), Bretz & Coven, LLP, New York, NY, for
Petitioner.

**\*652** Steven F. Day, Trial Attorney (Tony West, Assistant
Attorney General; and Francis W. Fraser, Senior Litigation
Counsel, on the brief), Office of Immigration Litigation, Civil
Division, U.S. Department of Justice, Washington, DC, for
Respondent.

Before MINER, CABRANES, and WESLEY, Circuit Judges.

**Opinion**

WESLEY, Circuit Judge:

Petitioner Xue Yong Zhang ("petitioner" or "Zhang") seeks
review of a May 22, 2009 decision by the Board of
Immigration Appeals ("BIA" or "Board"), which dismissed
his appeal of an Immigration Judge's January 22, 2009
decision for want of jurisdiction. In 2003, the order calling
for petitioner to be removed, as well as a finding by the
Immigration Judge ("IJ") that petitioner had submitted a
frivolous asylum application, became final. Five years later,
in July 2008, petitioner filed a motion to reopen those
proceedings and a request for a stay of removal. The
motion was procedurally defective under the Immigration and
Nationality Act ("INA"), *see* 🔖 8 U.S.C. § 1229a(c)(7), but
petitioner asked the BIA to invoke its "*sua sponte* authority,"
*see* 🚩 8 C.F.R. § 1003.2(a).

The BIA declined to issue the stay, but it later granted
the motion to reopen and remanded the proceedings to
the IJ. However, by the time the BIA granted the motion,
petitioner had already been removed. On remand, the IJ
terminated the proceedings when she learned that petitioner
was no longer physically present in the United States. In
the decision challenged by petitioner here, the BIA vacated
its prior order reopening the removal proceedings, reasoning
that it lacked jurisdiction to consider petitioner's motion at
that time because he had already been removed. In support
of that conclusion, the Board cited the "departure bar"

regulation, 🚩 8 C.F.R. § 1003.2(d), and its decision in *In re* 🚩 *Armendarez–Mendez,* 24 I. & N. Dec. 646 (BIA 2008).

In his petition for review, petitioner contends that the departure bar, as applied by the BIA in this case, is invalid because it conflicts with the language of the regulation governing the BIA's *sua sponte* authority. Petitioner also asserts, in the alternative, that the BIA should have granted his motion to reopen, *nunc pro tunc,* as of the date that it denied his request for a stay of removal. This equitable relief, petitioner argues, would have avoided the application of the departure bar.

Although we are sympathetic to petitioner's plight, we are not persuaded, as a legal matter, by either contention. The BIA has taken the position in a precedential decision that the departure bar, where applicable, deprives it of jurisdiction to consider a motion to reopen that asks the Board to invoke its *sua sponte* authority. *See In re* 🚩 *Armendarez–Mendez,* 24 I. & N. Dec. at 660. We conclude that the BIA's construction of this regulation is not plainly erroneous and is therefore entitled to deference. Consequently, the BIA did not err in relying on 🚩 *In re Armendarez–Mendez* and deciding that it lacked jurisdiction to reopen petitioner's removal proceedings after he had been removed from the country.

We decline to resolve, however, whether the departure bar also precludes relief under the doctrine of *nunc pro tunc.* We need not take that additional step because, assuming, *arguendo,* that *nunc pro tunc* relief is not jurisdictionally foreclosed, petitioner is not entitled to that equitable remedy in this case. Accordingly, the petition is denied.

## I. BACKGROUND

Zhang was born in China in 1978 and first came to the United States in October **\*653** 1999. Because Zhang lacked valid entry documents when he arrived, the agency formerly known as the Immigration and Naturalization Service ("INS")[1] detained him and commenced removal proceedings. Petitioner conceded that he was subject to removal, and subsequently filed an application for withholding of removal, asylum, and relief under the Convention Against Torture. In his application, Zhang expressed "fear that [he would] be fined and sentenced to jail for at least a year" if he returned to China because he "violated the family planning policy and also left the country illegally without an exit permit."

After accepting briefing relating to the applications, IJ Noel Ferris conducted a merits hearing on April 4, 2001 in New York City. Before petitioner began his testimony, the IJ warned him that knowingly filing a frivolous asylum application would lead him to be "barred forever from receiving any benefits under the Immigration and Nationality Act." The IJ also defined in clear terms the meaning of the word "frivolous." Following these warnings, Zhang indicated that he understood the IJ's admonition and that he wished to proceed with the adjudication of his asylum application.

During his testimony at the merits hearing, petitioner asserted that he left China to escape political persecution based on China's family planning policies. Early in his testimony, the IJ warned petitioner that "vague" answers to questions from his attorney "impair[ed][his] believability." Petitioner went on to explain that he married a woman in accordance with his cultural traditions, but that when she became pregnant the government informed them that both the marriage and the pregnancy were "illegal." Government officials then forced his wife to have an abortion and imposed a fine on the couple. Petitioner testified that he was incarcerated after he failed to pay the fine, but that he escaped custody and fled to the United States. The only documentary evidence petitioner produced in support of this testimony was a photograph that he described as depicting himself and his wife on their wedding day. The IJ did not allow petitioner to introduce the picture as evidence of the marriage, but she accepted petitioner's testimony describing the photo. Later, during the government's cross-examination of petitioner relating to statements during his credible fear interview, the IJ made an express finding that his testimony was not "credible, believable or factually accurate."

After petitioner's testimony was complete, the IJ issued an oral decision:

> [N]ot only have I denied your applications[,] I have found your filing is entirely frivolous and therefore you will be barred for life from ever becoming legally resident in this country....
>
> ....
>
> I believe the lies you have told to the [c]ourt are material and I believe they were told to the [c]ourt purely to secure an [i]mmigration benefit.

In a decision issued on the same day, the IJ reviewed petitioner's testimony, characterized it as "absurd" and "just plain made ... up from beginning to end," and concluded that petitioner had submitted "a frivolous application for asylum ... supported entirely by ... perjurious testimony." Petitioner filed an appeal, but the BIA affirmed the IJ's decision without an opinion on January 15, 2003. Petitioner did not seek review of that decision in this Court.

 **\*654** On July 15, 2008, Zhang filed a motion with the BIA seeking: (1) a stay of removal; and (2) to reopen his removal proceedings. Petitioner argued that "the BIA should exercise its *sua sponte* jurisdiction" to reopen the removal proceedings, *see* 8 C.F.R. § 1003.2(a), because the IJ's conclusion that his asylum application was frivolous was "invalid" based on the BIA's intervening decision in *In re Y–L–*, 24 I. & N. Dec. 151 (BIA 2007).

The BIA denied petitioner's motion for a stay of removal two days later, on July 17, 2008, based on its conclusion that "there [was] little likelihood that the motion [to reopen would] be granted." Petitioner was removed to China by the Department of Homeland Security ("DHS") on July 22, 2008. On September 10, 2008, apparently unaware of this fact, the BIA relied on its *sua sponte* authority to grant petitioner's motion to reopen. In that decision, the Board indicated that it did "not necessarily disagree with the [IJ's] ultimate finding[ ]" that petitioner had knowingly submitted a frivolous asylum application, but it remanded for "clarification" based on *In re Y–L–*.

On remand, on January 22, 2009, the IJ terminated the proceedings once she ascertained that petitioner was no longer physically present in the United States. Zhang's counsel appealed to the BIA. Counsel argued that the BIA had previously erred by denying his request for a stay, and that it should have granted his motion to reopen *nunc pro tunc* to a date prior to his removal to avoid the application of the departure bar. He also "preserve[d] for federal review" the argument that the departure bar conflicts with the provisions of the INA relating to motions to reopen.

On May 22, 2009, the BIA dismissed the appeal and vacated its September 10, 2008 order reopening petitioner's removal proceedings, reasoning that it "did not have jurisdiction" to grant that motion because petitioner had already been removed. In support of its jurisdictional holding, the BIA

cited the departure bar, 8 C.F.R. § 1003.2(d), and *In re Armendarez–Mendez*, 24 I. & N. Dec. 646 (BIA 2008). Following that decision, Zhang's counsel filed the instant petition for review.

## II. DISCUSSION

This case requires us to consider the scope of the BIA's jurisdiction to reopen otherwise-final removal proceedings in response to a party's motion, where the motion to reopen is deficient under the INA and instead asks the Board to invoke its *sua sponte* authority. Specifically, we must decide whether the departure bar, 8 C.F.R. § 1003.2(d), divests the BIA of jurisdiction to grant an alien's motion to reopen based on the Board's *sua sponte* authority, *id.* § 1003.2(a), where the movant has already been removed from the country. [2]

 **\*655** In *In re Armendarez–Mendez,* the BIA interpreted 8 C.F.R. § 1003.2 and answered that question in the affirmative. 24 I. & N. Dec. at 653, 660. Although the BIA's construction is not without flaws, we conclude that its view is entitled to deference under the circumstances of this case, and that the Board did not err when it vacated its September 10, 2008 order on jurisdictional grounds. We further hold that petitioner has not demonstrated that he is entitled to relief under the equitable doctrine of *nunc pro tunc.* Accordingly, for the reasons set forth below, the petition for review is denied.

### A. The Development of the BIA's *Sua Sponte* Authority and the Departure Bar

The BIA was established through regulations promulgated by the Attorney General in 1940. *See Regulations Governing Departmental Organization and Authority, 5 Fed.Reg. 3502, 3503, § 90.2 (Sept. 4, 1940).* [3] These regulations authorized the Board to "issue orders of deportation"; "consider and determine appeals"; and resolve motions for "reconsideration, reargument or reopening of a case after the issuance of a final decision." *Id.* at 3503–04, §§ 90.3(a)-(b), 90.10.

In 1952, Congress enacted the INA, also known as the McCarran–Walter Act. Pub.L. No. 82–414, ch. 414, 66 Stat. 163 (June 27, 1952). The INA charged the Attorney General "with the administration and enforcement" of the

Act, and authorized him to "establish such regulations ... as he deem[ed] necessary for carrying out [that] authority." *Id.* § 103(a), 66 Stat. at 173. Pursuant to that congressional delegation, the Attorney General promulgated a series of regulations defining the "[a]ppellate jurisdiction" of the BIA and the "[p]owers of the Board." Immigration and Nationality Regulations, 17 Fed.Reg. 11,469, 11,475, § 6.1(b), (d) (Dec. 19, 1952) (final rule codified at 8 C.F.R. § 6.1(b), (d) **656** (1952)). Section 6.1(d)(1) of those regulations defined the "General[ ]" "[p]owers of the Board":

> Subject to any specific limitation prescribed by this chapter, in considering and determining cases before it as provided in this part the Board shall exercise such discretion and authority conferred upon the Attorney General by law as is appropriate and necessary for the disposition of the case....

8 C.F.R. § 6.1(d)(1) (1952). The 1952 regulations also allowed for motions to reopen and for reconsideration of Board decisions, and these regulations included the first version of the departure bar. *See id.* § 6.2. [4] Two years after these regulations were promulgated, the BIA concluded that the departure bar was a jurisdictional limitation on its authority to consider a motion to reopen when "the alien is outside the United States." *In re G–Y B–,* 6 I. & N. Dec. 159, 160 (BIA 1954).

In 1958, the Attorney General revised the regulations relating to the BIA's authority to consider motions to reopen. *See* Miscellaneous Amendments to Chapter, 23 Fed.Reg. 9115, 9118–19 (Nov. 26, 1958). The revised regulations established what is now referred to as the BIA's *sua sponte* authority by providing the Board with the power to reopen proceedings and reconsider its decisions "on its own motion." *Id.* at 9118, § 3.2. This BIA authority remained a creature of Attorney General regulations—not restricted or modified by congressional enactments—for more than thirty years.

Congress amended the INA in 1961 in order to add, *inter alia,* provisions relating to judicial review of the BIA's decisions. *See* Act of Sept. 26, 1961, Pub.L. No. 87–301, 75 Stat. 650. Relevant here is § 5(a) of the Act, which established the "sole and exclusive procedure for [ ] the judicial review of all final orders of deportation heretofore or hereafter made against aliens within the United States." *Id.* § 5(a), 75 Stat. at 651 (codified at 8 U.S.C. § 1105a(a) (1964) (repealed 1996)). Among the judicial review procedures adopted by Congress was a provision similar to the departure bar regulation, which stated that "[a]n order of deportation or of exclusion shall not be reviewed *by any court* if the alien ... has departed from the United States after the issuance of the order." 8 U.S.C. § 1105a(c) (1964) (emphasis added); *see also In re Armendarez–Mendez,* 24 I. & N. Dec. at 649 ("[N]early a decade after the departure bar rule went into effect, Congress imposed a similar statutory restriction prohibiting the United States courts of appeals from reviewing deportation orders if the alien 'has departed from the United States after issuance of the order.' " (quoting 8 U.S.C. § 1105a(c) (1964))).

Until 1990, this procedural scheme remained intact, and the substance of the Attorney General's regulations regarding motions to reopen went unchanged. However, in the Immigration Act of 1990, Pub.L. No. 101–649, 104 Stat. 4978 (Nov. 29, 1990), Congress directed the Attorney General to "issue regulations with respect to ... the period of time in which motions to reopen and to reconsider may be offered in deportation proceedings, which regulations [should] include a limitation on the number of such motions that may be filed and a maximum time period for the filing of such motions." *Id.* § 545(d)(1), 104 **657** Stat. at 5066. Congress issued this directive in order to "reduce or eliminate ... abuses" of regulations that, at that time, permitted aliens to file an unlimited number of motions to reopen without any limitations period. *Stone v. INS,* 514 U.S. 386, 400, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995).

Although the Attorney General expressed doubt about the need to impose such limitations because there was "little evidence of abuse," she ultimately promulgated regulations that, subject to certain exceptions, permitted an alien to "file one motion to reopen within 90 days." *Dada v. Mukasey,* 554 U.S. 1, 128 S.Ct. 2307, 2315, 171 L.Ed.2d 178 (2008) (citing Executive Office for Immigration Review; Motions and Appeals in Immigration Proceedings, 61 Fed.Reg. 18,900, 18,901, 18,905 (Apr. 29, 1996) (final rule codified at 8 C.F.R. § 3.2(c) (effective July 1, 1996))); *see also Iavorski v. INS,* 232 F.3d 124, 129, 131 (2d Cir.2000). However, the revised regulations retained additional "mechanisms whereby

otherwise untimely motions could still be considered when the circumstances so required." *Iavorski,* 232 F.3d at 131. Chief among these mechanisms were the regulations providing authority to both an IJ and the BIA to reopen, *sua sponte,* a proceeding. *Id.* (citing 8 C.F.R. §§ 3.2(a), 3.23(b)(1) (2000)). [5]

Approximately three months later, Congress codified some—but not all—of the Attorney General's 1996 regulations regarding motions to reopen. *See Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"),* Pub.L. No. 104–208, div. C, § 304, 110 Stat. 3009–546, 3009–587 (Sept. 30, 1996). Neither the departure bar nor the regulation granting the BIA *sua sponte* authority was mentioned in the statute in any fashion. *See In re Armendarez–Mendez,* 24 I. & N. Dec. at 654. But the IIRIRA repealed the INA's judicial review provisions—including the provision precluding post-departure judicial review of BIA orders—and enacted new rules for that process. *See* Pub.L. No. 104–208, div. C, § 306, 110 Stat. at 3009–607 to –612. Under these revisions to the INA, an alien is no longer foreclosed from seeking *judicial* review of a BIA order after he or she departs from the country. *See Dada,* 128 S.Ct. at 2320.

The Attorney General promulgated new regulations based on the IIRIRA on March 6, 1997. *See Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures,* 62 Fed.Reg. 10,312 (Mar. 6, 1997). Although some commenters on the proposed regulations had opined that the IIRIRA impliedly invalidated the departure bar, the Attorney General rejected that view: "No provision of the [IIRIRA] supports reversing the long established rule that a motion to reopen or reconsider cannot be made in immigration proceedings by or on behalf of a person after that person's departure from the United States." *Id.* at 10,321. Consequently, the Attorney General retained in her regulations both the departure bar and the BIA's authority to consider a motion to reopen *sua sponte. See* **\*658** *id.* at 10,330–31 (final rule codified at 8 C.F.R. § 3.2(a), (d) (1997)). [6]

## B. The BIA's Application of the Departure Bar
In the present case, the BIA concluded that it "did not have jurisdiction" to enter its September 10, 2008 order reopening petitioner's removal proceedings because petitioner had

already been removed from the United States. The Board vacated the order and dismissed the appeal, citing the departure bar and *In re Armendarez–Mendez.* Petitioner now argues that the departure bar regulation "goes against the plain language" of the portion of the regulation governing the BIA's *sua sponte* authority. However, the BIA rejected a similar contention in *In re Armendarez–Mendez.* We hold that the BIA's interpretation is entitled to deference and that it requires us to reject petitioner's argument.

Under the current version of the INA, an alien who is to be removed pursuant to an order of the BIA typically has ninety days after the Board's decision becomes final to file a motion to reopen. *See* 8 U.S.C. § 1229a(c)(7)(A), (c)(7)(C)(i); *see also Ali v. Gonzales,* 448 F.3d 515, 517 (2d Cir.2006) (per curiam). [7] Petitioner's motion to reopen was untimely in this regard, as it was filed approximately five years after the removal order became final.

The INA also enumerates statutory exceptions that allow this ninety-day time limit to be excused or extended. For example, an otherwise-untimely motion to reopen may be permitted if the alien seeks asylum based on "changed country conditions arising in the country of nationality or the country to which removal has been ordered." 8 U.S.C. § 1229a(c)(7)(C)(ii). We have also held that the ninety-day deadline for filing a motion to reopen is subject to equitable tolling under appropriate circumstances. *See Iavorski,* 232 F.3d at 134 (holding that the limitations period for untimely motions to reopen can be equitably tolled to accommodate claims of ineffective assistance of counsel). However, petitioner's motion to reopen did not rely on any of the INA's statutory exceptions to the ninety-day time limit, and he did not argue that he is entitled to equitable tolling.

Instead, petitioner asked the BIA to invoke its *sua sponte* authority to reopen his removal proceedings. The wellspring of this authority resides, as it always has, in a regulation promulgated by the Attorney General: "The Board may at any time reopen or reconsider *on its own motion* any case in which it has rendered a decision.... The decision to grant or deny a **\*659** motion to reopen or reconsider is within the discretion of the Board, *subject to the restrictions of this section.*" 8 C.F.R. § 1003.2(a) (emphases added). [8] However, after the Board realized that petitioner had been removed, it took the view that it was divested of jurisdiction to consider his motion

based on the departure bar, which states that "[a]ny departure from the United States, including the ... removal of a person who is the subject of ... removal proceedings, occurring after the filing of a motion to reopen or a motion to reconsider, shall constitute a withdrawal of such motion." 8 C.F.R. § 1003.2(d). [9]

The basis for the BIA's interpretation of the departure bar as a jurisdictional limitation on its *sua sponte* authority is *In re Armendarez–Mendez.* In that case, the BIA noted that it has had "regulatory power to entertain motions, subject to such limitations as the Attorney General may prescribe," since 1940, but that "there was no statute delineating the scope or limits of that power" until Congress passed the Immigration Act of 1990. 24 I. & N. Dec. at 647, 654. Moreover, the Board reasoned, "[a]s early as 1954" and "in an unbroken string of precedents extending over 50 years," it has "construed the departure bar rule as imposing a limitation on [its] jurisdiction to entertain motions filed by aliens who had departed the United States." *Id.* at 648 (citing, *inter alia,* *In re G–Y B–,* 6 I. & N. Dec. at 159–60). Based on those first principles, the BIA "reaffirm[ed]" its "established understanding" of the departure bar as a jurisdictional limitation on its *sua sponte* authority, and it rejected the Ninth Circuit's construction of the departure bar in *Zi–Xing Lin v. Gonnzales,* 473 F.3d 979, 981–82 (9th Cir.2007) (relying on the rule of lenity to hold that 8 C.F.R. § 1003.23(b)(1) does not deprive an IJ of jurisdiction to consider a motion to reopen filed by a removed alien). *In re Armendarez–Mendez,* 24 I. & N. Dec. at 650–53, 660. [10]

**\*660** **[1]**   **[2]**   We review *de novo* legal questions decided by the BIA. *See* *Phong Thanh Nguyen v. Chertoff,* 501 F.3d 107, 111 (2d Cir.2007). However, we owe "substantial deference" to the BIA's interpretation of the applicable regulation in *In re Armendarez–Mendez,* unless we find that interpretation to be "plainly erroneous or inconsistent with the regulation." *Padmore v. Holder,* 609 F.3d 62, 67 (2d Cir.2010) (internal quotation marks omitted); *see also* *Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997).

To be sure, the BIA's construction is anything but airtight. With respect to the departure bar, it is linguistically awkward

to consider the forcible removal of an alien as "constitut[ing] a withdrawal" of any pending motions filed by the alien, 8 C.F.R. § 1003.2(d). *See* *Marin–Rodriguez v. Holder,* 612 F.3d 591, 592–93 (7th Cir.2010) (reasoning that the departure bar regulation "amounts to saying that, by putting an alien on a bus, the agency may 'withdraw' its adversary's motion"); *cf.* *Madrigal v. Holder,* 572 F.3d 239, 245–46 (6th Cir.2009) (Kethledge, J., concurring). And, when the departure bar is read in isolation, it is not readily apparent why the "withdrawal" that it effects is jurisdictional in nature. *See* *Marin–Rodriguez,* at 593–94. Moreover, the portion of the regulation governing the BIA's *sua sponte* authority permits the Board to exercise that power "at any time." 8 C.F.R. § 1003.2(a). But the BIA apparently understands the phrase "at any time" to mean "at any time that the alien in question is physically present in the United States." Finally, although *In re Armendarez–Mendez* is couched in jurisdictional terms without qualification, it is unclear why a "withdrawal" under the departure bar would deprive the BIA of authority to either: (1) act in a purely *sua sponte* fashion, unprompted by a person who has been removed; or (2) consider a motion to reopen filed by DHS rather than a person who is being, or has been, removed. For example, in *Marin–Rodriguez* the BIA appears to have resolved a motion for reconsideration filed by DHS pursuant to the INA, despite knowing full well that the departure bar was in play because the petitioner had already been removed. *See* *Marin–Rodriguez,* at 591–92.

**[3]**   Though we do not intend to create an exhaustive list of our concerns through these examples, the point is clear: Were we writing on a blank slate, we might reach a different conclusion than that of the BIA regarding the relationship between these portions of 8 C.F.R. § 1003.2. But, in light of *In re Armendarez–Mendez,* we are not presented with a blank slate. The BIA tells us that the departure bar serves as a jurisdictional limitation on its *sua sponte* authority. Under the circumstances of this case—where petitioner filed an otherwise-barred motion to reopen and asked the BIA to invoke its *sua sponte* authority—we cannot say that the Board's construction is plainly erroneous.

First, even before the BIA offered its precedential interpretation, we indicated, in dicta, that an alien's voluntary departure from the country would result in a "forfeiture of the right to file a motion to reopen." *Singh v. Gonzales,* 468

F.3d 135, 140 (2d Cir.2006) (citing 8 C.F.R. § 1003.2(d)). And we were not alone in this regard. *See Mansour v. Gonzales,* 470 F.3d 1194, 1198 (6th Cir.2006); *Navarro–Miranda v. Ashcroft,* 330 F.3d 672, 676 (5th Cir.2003). *But see Zi–Xing Lin,* 473 F.3d at 981–82. Moreover, following *In re Armendarez–Mendez,* two Circuits have reached conclusions similar to that of the **\*661** BIA and held that the departure bar deprives the Board of authority to consider a motion to reopen that would otherwise be defective under the INA. *See Toora v. Holder,* 603 F.3d 282, 288 (5th Cir.2010); *Mendiola v. Holder,* 585 F.3d 1303, 1310 (10th Cir.2009); *Rosillo–Puga v. Holder,* 580 F.3d 1147, 1159–60 (10th Cir.2009); *Ovalles v. Holder,* 577 F.3d 288, 296–97 (5th Cir.2009). That our Court and others have interpreted 8 C.F.R. § 1003.2 in a fashion similar to the BIA supports the conclusion that the Board's view in *In re Armendarez–Mendez* is not plainly erroneous.

Second, although certain language from *In re Armendarez–Mendez* cuts broadly, we need only examine the merits of the Board's position with respect to the situation presented here. Approximately five years after petitioner's removal proceedings became final, he filed a motion to reopen that asked the BIA to invoke its *sua sponte* authority. There is no dispute here that the Attorney General's decision to provide the BIA with such authority was a valid use of his rulemaking power under the INA. And petitioner has not argued that the *sua sponte* power itself is inconsistent with the statute. This comes as no surprise, as there was no statutory basis for his motion. Be that as it may, the BIA's position in *In re Armendarez–Mendez* has more force in the context of a motion to reopen in which an alien asks the BIA to rely on jurisdiction that comes from a regulation rather than a statute. If the Attorney General possesses the authority to vest *sua sponte* jurisdiction in the BIA—and it is undisputed here that he does—then it stands to reason that he would also have the authority to limit that jurisdiction and define its contours through, among other things, the departure bar.

Third, when the text of § 1003.2 is viewed as a whole, it is not unreasonable to interpret the departure bar as a limitation on the BIA's *sua sponte* authority. *Cf. In re Ames Dep't Stores, Inc.,* 582 F.3d 422, 427 (2d Cir.2009) (noting that statutory interpretation calls for an examination of "the specific context in which [the] language is used, and the broader context of the statute as a whole" (internal quotation marks omitted)). Paragraph (a) of § 1003.2, which is titled "General," refers to the Board's authority to not only reopen a proceeding *sua sponte,* but also to resolve motions to reopen or reconsider filed by either DHS or "the party affected by the decision." 8 C.F.R. § 1003.2(a). However, the "[g]eneral" authority conferred upon the BIA by the Attorney General in § 1003.2(a), which may be exercised "at any time," is not absolute. *Id.* Rather, paragraph (a) makes clear that the BIA's *sua sponte* authority is "subject to the restrictions of ... section [1003.2]." *Id.* The more-specific departure bar, codified within "this section" at paragraph (d), may reasonably be interpreted as a "restriction [ ]" on the "[g]eneral" *sua sponte* provision in paragraph (a). *Id.; see also Navarro–Miranda,* 330 F.3d at 676. Therefore, at least insofar as the BIA's *sua sponte* authority is concerned—and we need not go any further in this case—the Board's interpretation of the departure bar as a jurisdictional limitation is not plainly inconsistent with the terms of 8 C.F.R. § 1003.2 when the regulation is read as a whole.

Finally, the BIA's construction is supported by the historical evolution of this regulation. At least since the Alien Registration Act of 1940, Congress has delegated to the Attorney General broad authority to establish rules and regulations to enforce the nation's immigration laws. *See* Pub.L. No. 670, § 37(a), ch. 339, 54 Stat. at 675. Relying on that congressional delegation, the Attorney General established the departure bar in 1952 and later empowered the BIA to reopen immigration **\*662** proceedings *sua sponte.* Since 1954, the Board has taken the position that the departure bar operates as a limitation on its jurisdiction to consider motions to reopen. *See In re G–Y B–,* 6 I. & N. Dec. at 160. This limitation must be understood in connection with the BIA's position "within the larger immigration bureaucracy." *In re Armendarez–Mendez,* 24 I. & N. Dec. at 656. By divesting the BIA of authority over persons removed from the country, the Attorney General preserved the jurisdictional primacy of DHS and the State Department over "the inspection and admission of aliens from abroad." *Id.*

Congress, through decades of silence on this subject despite repeated amendments to the INA, [11] has acquiesced in the BIA's understanding of the authority granted to it by the Attorney General. *See Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 846, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986); United Airlines, Inc. v. Brien, 588 F.3d 158, 172–73 (2d Cir.2009); see also William, 499 F.3d at 344* (Williams, C.J., dissenting) ("Given the INA's silence with respect to the departure bar, I understand Congress's failure to explicitly repeal 8 C.F.R. § 1003.2(d) as acquiescence to its continued operation."). Although the INA was enacted in 1952, *see* Pub.L. No. 82–414, 66 Stat. at 163, Congress provided no limitations on the scope of the BIA's authority to consider motions to reopen until the Immigration Act of 1990, Pub.L. No. 101–649, § 545(d) (1), 104 Stat. at 5066. Even then, Congress left it to the Attorney General to consider in the first instance the policy decisions regarding appropriate limitations to be imposed on these motions. *See id.* When the Attorney General responded to that legislative mandate in 1996, she saw fit to retain the departure bar. *See* 8 C.F.R. § 3.2 (1996).

In the same year, 1996, Congress revised the INA by passing the IIRIRA. *See* Pub.L. No. 104–208, div. C, 110 Stat. at 3009–546. Although the IIRIRA repealed the portion of the INA that precluded *judicial* review of a BIA decision after an alien leaves the country, *see id.* § 306, 110 Stat. at 3009–607, the Act was silent as to both the departure bar and the BIA's *sua sponte* authority. There is nothing incongruous about retaining the latter but excising the former, for "judicial review of an alien's petition for review with respect to a *final order of removal* is not the same as BIA review of a *motion to reopen.*" William, 499 F.3d at 343 (Williams, C.J., dissenting) (emphases in original). By allowing courts to review BIA decisions even after the alien leaves the United States, Congress empowered us to oversee, *inter alia,* the manner in which the BIA polices its jurisdictional boundaries. In any event, the congressional silence in the IIRIRA regarding § 1003.2 is not inconsistent with the BIA's position. Therefore, for all of these reasons, we cannot conclude that *In re Armendarez–Mendez,* as it applies to the facts of this case, is plainly erroneous.

There is some superficial tension between our conclusion and a recent decision of the Seventh Circuit. *See Marin–*

*Rodriguez, at 593–95.* In *Marin–Rodriguez,* the petitioner filed a motion for reconsideration approximately one month after the BIA dismissed his appeal. *See id. at 591.* Thus, unlike in this case, the motion was timely under the INA. *See* 8 U.S.C. § 1229a(c)(7)(C)(i). The Board granted the motion and remanded to the IJ, apparently **\*663** unaware at the time that the petitioner had been removed from the country while the motion was pending. *See Marin–Rodriguez, at 591–92.* The DHS then filed a motion for reconsideration of its own, which the BIA granted based on the departure bar. *Id.*

Because the petitioner's only motion for reconsideration was timely under the INA, the facts of *Marin–Rodriguez* resemble those considered by the Fourth Circuit in *William. See* 499 F.3d at 334 n. 5. But the Seventh Circuit rejected the Fourth Circuit's "understanding" of the INA. *Marin–Rodriguez, at 593.* Referring to the Supreme Court's analysis in *Dada v. Mukasey,* the *Marin–Rodriguez* court reasoned as follows:

> If the Supreme Court sees no incompatibility between a statutory right to apply for [voluntary departure] and an implied-withdrawal approach [to situations where an alien seeks to reopen his removal proceedings after agreeing to voluntarily depart], it is hard to fault the Board for adopting a similar view. Thus an alien with a right to move for reconsideration [under the INA] may give up that right by a specified act [such as departing from the country].

*Id.* [12] Nevertheless, the court went on to reason that the "validity" of "the particular condition the Board has attached" on motions to reopen—*i.e.,* physical presence in the United States—"must be ascertained on other grounds." *Id.*

With the issue thus framed, the court went on to hold that, "[a]s a rule about subject-matter jurisdiction, § 1003.2(d)

is untenable." *Id.* at 593–94. It reasoned that, although the INA authorizes the Board to reconsider or reopen its own decisions, the statute "does not make that step depend on the alien's presence in the United States." *Id.* "[S]ince [the IIRIRA was passed in] 1996 nothing in the statute undergirds a conclusion that the Board lacks 'jurisdiction'—which is to say, adjudicatory competence—to issue decisions that affect the legal rights of departed aliens." *Id.* (internal citation omitted). The Seventh Circuit then cited *Union Pacific Railroad v. Brotherhood of Locomotive Engineers,* 558 U.S. 67, 130 S.Ct. 584, 175 L.Ed.2d 428 (2009), for the proposition that "an administrative agency is not entitled to contract its own jurisdiction by regulations or by decisions in litigated proceedings." *Marin–Rodriguez,* at 593–94. In the court's view, *Union Pacific* was "dispositive in favor of the holding in *William*—though on a rationale distinct from the [F]ourth [C]ircuit's." *Id.* at 593–94.

Properly understood, the analysis in *Marin–Rodriguez* does not conflict with ours. The point is made clear by reference to the source of BIA jurisdiction that was invoked by the petitioner in each case. In *Marin–Rodriguez,* the petitioner's motion for reconsideration was authorized by the INA; Congress, by enacting **\*664** the IIRIRA, gave the BIA jurisdiction to consider one such motion if it is filed within ninety days after the removal decision becomes final. *See* 8 U.S.C. § 1229a(c)(7)(C)(i). In this case, however, petitioner was not eligible to avail himself of this statutory entitlement under the INA. Instead, in support of his motion, he invoked the regulation in which the Attorney General authorized the BIA to consider motions to reopen *sua sponte. See* 8 C.F.R. § 1003.2(a).

Consequently, we need not decide if the Attorney General, by promulgating § 1003.2, has improperly "contract[ed]" the jurisdiction given to the BIA by Congress pursuant to the IIRIRA. *Marin–Rodriguez,* at 593–94. We leave that question for another day. *See supra* note 2. The *sua sponte* power that is at issue here is—and always has been—a creature of regulations promulgated by the Attorney General pursuant to a valid delegation from Congress. *See* 8 U.S.C. § 1103(g)(2). The Attorney General's power to limit this aspect of the BIA's jurisdiction is subsumed within

his more expansive power to create it. Therefore, the BIA's understanding of the departure bar as a limitation on its *sua sponte* jurisdiction, as opposed to its jurisdiction to consider timely motions to reopen under the INA, cannot be said to be "untenable."

In reaching this conclusion, we are mindful of the admonition from *Union Pacific* that "the word 'jurisdiction' has been used by courts ... to convey 'many, too many, meanings,'" and that "profligate use of the term" is to be avoided. 130 S.Ct. at 596 (quoting *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 90, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)). In *Union Pacific,* the Supreme Court considered the nature of provisions in the Railway Labor Act ("RLA") that required parties to labor disputes to attempt to reach a settlement "in conference" before submitting the matter to arbitration before the National Railroad Adjustment Board ("NRAB"). *See id.* at 591–92 n. 3 (citing 45 U.S.C. § 152 Second, Sixth). The NRAB had characterized the "in conference" requirement as a limitation on its jurisdiction, and the Supreme Court disagreed.

Congress vested the NRAB with jurisdiction over "*all disputes* between carriers and their employees 'growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions.'" *Slocum v. Delaware, Lackawanna & W. R.R. Co.,* 339 U.S. 239, 240, 70 S.Ct. 577, 94 L.Ed. 795 (1950) (emphasis added) (quoting 45 U.S.C. § 153 First (i)). Moreover, "Congress gave the [NRAB] no authority to adopt rules of jurisdictional dimension." *Union Pac.,* 130 S.Ct. at 597 (citing 45 U.S.C. § 153 First (v)). Based largely on the absence of such a delegation, the Court held that the RLA's "in conference" requirement did not limit the NRAB's statutory jurisdiction and the NRAB lacked authority to characterize it in that fashion. *See id.* at 598. As such, the requirement is merely a claim-processing rule, and any defenses based on non-compliance with it are forfeitable.

Unlike in *Union Pacific,* this is not an instance where a statute vests an agency with broad authority that the agency has declined to exercise. Whereas the NRAB's jurisdiction is established in the statute that created it and the NRAB's rulemaking authority is rather limited, Congress delegated the authority to define some aspects of the BIA's

jurisdiction to the Attorney General. *Compare* 45 U.S.C. § 153 First (v) (authorizing the NRAB to "adopt such rules as it deems necessary to control proceedings before the respective divisions and not in conflict with the provisions of this section"), *with* 8 U.S.C. § 1103(g)(2) (authorizing the Attorney General to "establish such regulations, **\*665** prescribe such forms of bond, reports, entries, and other papers, issue such instructions, *review such administrative determinations in immigration proceedings, delegate such authority,* and perform such other acts as the Attorney General determines to be necessary for carrying out this section" (emphasis added)). It is undisputed in this case that the delegation to the Attorney General includes the authority to promulgate regulations defining—indeed, expanding—the BIA's jurisdiction to consider motions to reopen otherwise-final removal proceedings. And petitioner has not argued that the manner in which the Attorney General has chosen to define the BIA's jurisdiction conflicts with the INA or leads to some sort of interpretive problem under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Thus, we are mindful of the analytical approach taken by the Supreme Court in *Union Pacific,* as well as that of the Seventh Circuit in *Marin–Rodriguez,* but the holdings in those cases are inapposite.

Therefore, we hold that the BIA is not plainly erroneous in its position, expressed in *In re Armendarez–Mendez,* that the departure bar limits its *sua sponte* jurisdiction. Accordingly, because the Board is entitled to deference with respect to that view, it did not err in concluding that § 1003.2(d) deprived it of authority to consider petitioner's motion to reopen after he was removed from the country.

## C. *Nunc Pro Tunc* Relief

 **[4]**   Petitioner also argues that, as a matter of equity, he is entitled to *nunc pro tunc* relief in order to avoid the application of the departure bar. [13] He asserts that this relief is warranted because the BIA erred by denying his motion for a stay of removal on July 17, 2008. Had the stay been granted, petitioner contends, he would not have been removed from the country prior to the Board's order granting his motion to reopen. Therefore, in petitioner's view, the appropriate remedy is that the BIA's September 10, 2008 order, which reopened his removal proceedings and remanded the case for "clarification" of the IJ's finding that his asylum application

was frivolous, "should have been granted *nunc pro tunc* to the date of the erroneous denial of his motion for a stay of removal." (Pet'r Br. 22.)

 **[5]**   **[6]**   "It is ... beyond question that an award of *nunc pro tunc* may, *in an appropriate circumstance,* be granted as a means of rectifying error in immigration proceedings." *Edwards v. INS,* 393 F.3d 299, 309 (2d Cir.2004) (emphasis added, footnote omitted). However, the doctrine of *nunc pro tunc* "is a 'far-reaching equitable remedy' applied in 'certain exceptional cases,' typically aimed at 'rectif[ing] any injustice [to the parties] suffered by them on account of judicial [or agency] delay.' " *Iouri v. Ashcroft,* 464 F.3d 172, 182 (2d Cir.2006) (quoting *Iavorski,* 232 F.3d at 130 n. 4 and *Weil v. Markowitz,* 829 F.2d 166, 175 (D.C.Cir.1987)). We have not previously decided whether the doctrine of *nunc pro tunc* is available as a means of providing equitable relief where the BIA is divested of jurisdiction by the departure bar to consider an alien's motion to reopen. To our knowledge, the BIA has not expressed a view on this question, either. [14]  **\*666** Nevertheless, we need not resolve that issue in this case. Even assuming, *arguendo,* that the departure bar does not foreclose equitable relief, petitioner has not demonstrated that a *nunc pro tunc* remedy is warranted.

Petitioner relies principally on *Edwards v. INS.* There, the BIA denied three aliens an opportunity to apply for " § 212(c) relief," *i.e.,* a waiver of deportation, [15] based on an interpretation of the INA that we later deemed to be legally erroneous, *see St. Cyr v. INS,* 229 F.3d 406, 418 (2d Cir.2000), *aff'd* 533 U.S. 289, 326, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001); *Henderson v. INS,* 157 F.3d 106, 130 (2d Cir.1998). *See Edwards,* 393 F.3d at 303–06. After the BIA erroneously denied the § 212(c) relief, each petitioner accrued more than five years' imprisonment, which rendered them independently ineligible for the waiver under the INA as it existed at the time. *See id.* at 307 (citing 8 U.S.C. § 1182(c) (1994) (repealed 1996)). Following the decisions in *Henderson* and *St. Cyr,* the *Edwards* petitioners asked the BIA to reopen their immigration proceedings and to reconsider whether they were eligible for § 212(c) relief. *See id.* at 303. These applications were denied, however, on

the alternative basis that each petitioner had been incarcerated for more than five years. *See* 📄 *id.* at 303–06.

In 📄 *Edwards,* we rejected the application of the INA's five-year bar and concluded that, under the doctrine of *nunc pro tunc,* the petitioners were entitled to apply for § 212(c) relief based on the facts as they existed at the time of their initial, erroneously denied applications. *See* 📄 *id.* at 312. We held that "an award of *nunc pro tunc* relief [should] ordinarily be available where agency error would otherwise result in an alien being deprived of the opportunity to seek a particular form of deportation relief." 📄 *Id.* at 310–11. On the other hand, "agency error would not 'result' in an alien being deprived of the opportunity to seek deportation relief where the alien would have independently been barred *at the time* of the error from applying for the form of relief at issue." 📄 *Id.* at 311 n. 15 (emphasis in original).

**[7]**    Petitioner seeks to attribute error to the BIA's denial of his request for a stay of removal. In denying that aspect of his motion, the Board reasoned that it "ha[d] concluded that there [was] little likelihood that the motion [to reopen would] be granted." Petitioner asserts that there is "no question" that the BIA erred in issuing this decision because the Board ultimately granted the motion to reopen, notwithstanding its initial characterization of the submission as having "little likelihood" of success. (Pet'r Br. 24.)

**[8]**    This contention, though flawed as a matter of formal logic, is not without intuitive appeal. *Cf.* 📄 *Dada,* 128 S.Ct. at 2320 (suggesting that "it may constitute an abuse of discretion for the BIA to" deny a **\*667** motion for a stay of removal "where the motion states nonfrivolous grounds for reopening"). However, in 📄 *Edwards* we concluded that principles of equity favored a *nunc pro tunc* remedy in response to a "significant error" by the BIA. 📄 393 F.3d at 309. There, the "significan[ce]" of the error had a constitutional dimension: We noted that "an erroneous denial of the opportunity to apply for § 212(c) relief may constitute a due process violation." *Id.* at 308–09 (citing 📄 *United States v. Copeland,* 376 F.3d 61, 70–71 (2d Cir.2004) and 📄 *United States v. Sosa,* 387 F.3d 131, 138 (2d Cir.2004)). By contrast, in assessing the BIA's denial of petitioner's application for a stay of removal, it must be remembered that: (1) petitioner's motion to reopen relied on the Board's

"entirely discretionary" *sua sponte* authority, 📄 *Ali,* 448 F.3d at 518;[16] and (2) because the motion was based on a 2007 BIA decision, 📄 *In re Y–L–,* that was issued after petitioner's 2001 merits hearing, the motion did not, strictly speaking, call into question the merits or procedure underlying the IJ's findings, *cf.* 📄 *NLRB v. Coca–Cola Bottling Co.,* 55 F.3d 74, 78 (2d Cir.1995) ("Appellate courts ordinarily apply the law in effect at the time of the appellate decision...."). Viewed in that light, the BIA's denial of petitioner's motion for a stay of removal due to its belief that the motion was unlikely to succeed was not, as petitioner suggests, necessarily an abuse of discretion.

Moreover, there is no allegation of undue dely or misconduct by the BIA in resolving petitioner's motion to reopen. If anyone can be faulted for "delay," 🚩 *Iouri,* 464 F.3d at 182, it is petitioner. He did not appeal the IJ's original findings to this Court after the BIA affirmed her decision in 2003, and he did not file his motion to reopen and the application for a stay of removal until after he was placed in detention and his removal was imminent. The motion was also filed almost fifteen months after the issuance of the BIA decision upon which it relied, 📄 *In re Y–L–.* It was for these reasons that the BIA properly characterized petitioner's 2008 submission as "opportunistic."[17] *Cf.* 📄 *Azize v. Bureau of Citizenship & Immigration Servs.,* 594 F.3d 86, 93 (2d Cir.2010) (Jacobs, C.J., dissenting) (reasoning that the petitioner's delay in seeking relief militated against granting a *nunc pro tunc* remedy); 📄 *Edwards,* 393 F.3d at 311 n. 15 (noting that *nunc pro tunc* relief may be "rendered inappropriate by the existence of unclean hands, or other equitable factors" (emphasis in original)). This timing takes on added significance due to petitioner's argument that, because his father was granted asylum in 2006, he would be eligible for asylum as a derivative beneficiary under the Child Status Protection Act ("CSPA"), *see* 📄 8 U.S.C. § 1158(b)(3), if the IJ were to vacate her finding that his prior application was frivolous. Because petitioner has offered almost no documentation to support this contention, we are unable to assess its merits. However, potential eligibility for asylum under the CSPA gave petitioner and his counsel every reason to **\*668** pursue challenges to the IJ's frivolousness finding both zealously and expeditiously. Petitioner did not do so and instead waited until the eleventh hour to file his motion for a stay of removal.

Finally, in *Edwards* it was crucial to our analysis that the relief for which those petitioners sought to apply was granted "in a significant percentage of cases." 393 F.3d at 311. In fact, we remanded one of the cases with specific instructions to grant the petitioner § 212(c) relief without any further proceedings. *See* id. at 312. But that cannot be said in this case. Petitioner has asked us to direct that the BIA's September 10, 2008 order be entered, *nunc pro tunc,* as of the date the Board denied his motion for a stay of removal. However, that order did not vacate the IJ's frivolousness finding. Instead, the BIA reopened and remanded the removal proceedings "for *clarification,*" and the Board specifically noted that it did "not necessarily disagree with the [IJ's] ultimate findings." (JA 19–20 (emphasis added).)

As such, the link between the relief petitioner wishes to pursue and the mechanism by which he hopes to obtain it is far more attenuated than in *Edwards.* The procedural mechanism to which petitioner seeks access through the doctrine of *nunc pro tunc* is a remand to the IJ for compliance with *In re Y–L–.* But he does not simply seek a more thorough explanation, he hopes to have the frivolousness finding vacated. Petitioner offers nothing but speculation as to how, in the context of such a remand, he would obtain that relief.

Balanced against this conjecture, we find little reason in the record to think that the IJ would abandon her frivolousness finding. At the outset of the April 4, 2001 merits hearing regarding petitioner's applications for relief from removal, the IJ issued warnings about the consequences of filing a frivolous application for asylum. (JA 178.) The BIA recently clarified the guidance it offered in *In re Y–L–* by noting that "[s]ufficient notice [of the possibility of a frivolousness finding] is afforded when the [IJ] explains the consequences of filing a frivolous asylum application, either at the time the asylum application is filed or prior to commencement of the merits hearing." *In re B–Y–,* 25 I. & N. Dec. 236, 242 (BIA 2010). After receiving this notice, petitioner indicated that he understood the IJ's warnings and elected to proceed with his application. (JA 179, 182–83.) Early in his testimony, the IJ indicated to petitioner that the manner in which he was answering questions was adversely affecting her assessment of his credibility. (*See* JA 197–98 ("The law provides that if you only give vague answers you may well be denied [asylum] for that reason alone because it may impair your believability."); *see also* id. at 198.) Subsequently, while petitioner was being cross-examined, the IJ made a finding on the record that one of his responses was not "credible, believable or factually accurate." (JA 224.)

Immediately following petitioner's testimony, the IJ ruled on the record that his asylum application was "entirely frivolous." (JA 229.) The IJ reasoned as follows: "I believe the lies you have told to the [c]ourt are *material* and I believe they were told to the [c]ourt *purely to secure an [i]mmigration benefit." (Id.* (emphases added).) After the hearing, the IJ issued a nineteen-page decision that reviewed petitioner's testimony, nearly line by line; identified numerous statements that she viewed as misrepresentations; and characterized his testimony, on the whole, as "absurd." (JA 88; *see also* id. at 76 ("It is the [c]ourt's opinion that [Zhang] just plain made this up."); id. at 77 ("[T]his is the vaguest testimony I have heard in a long time and ... [Zhang] gave the [c]ourt the impression repeatedly during this hearing that he had memorized a story and was **\*669** afraid he would miss a bit ...").) In the conclusion of the decision, the IJ found that petitioner had submitted "a frivolous application for asylum ... supported entirely by ... perjurious testimony." (JA 90.) On direct appeal, the BIA affirmed and adopted the IJ's decision as its own. Petitioner did not seek judicial review of that conclusion.

Thus, although it is largely undisputed that the IJ's frivolousness finding ran afoul of the intervening procedural protections articulated by the BIA in *In re Y–L–,* petitioner has done little to challenge the IJ's findings that: (1) his testimony was "perjurious" as to "material" elements of his asylum application; and (2) he committed such perjury "purely to secure an [i]mmigration benefit." *See* 8 C.F.R. § 1208.20 ("[A]n asylum application is frivolous if any of its material elements is deliberately fabricated."). Therefore, petitioner's speculation that he could obtain vacatur of the IJ's frivolousness finding in a remand pursuant to *In re Y–L–* runs headlong into a record that strongly suggests that the IJ would not abandon that conclusion.

\* \* \*

In sum, the putative error that petitioner has identified is different in kind than the "significant error" that we remedied in *Edwards* by applying the doctrine of *nunc pro tunc.* Moreover, there is no allegation that the government engaged in misconduct or undue delay when resolving petitioner's

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

motion to reopen. Petitioner's own delay in filing the motion was at least partially to blame for the fact that the Board did not resolve it before he was removed. Finally, the remand that petitioner seeks is exceedingly unlikely to result in the relief that he ultimately hopes to obtain. Therefore, under the circumstances of this case, we are not persuaded that principles of equity warrant *nunc pro tunc* relief.

### III. CONCLUSION

For the foregoing reasons, the petition for review is denied.

**All Citations**

617 F.3d 650

## Footnotes

1    The INS ceased to exist on March 1, 2003, and its functions were transferred to the Department of Homeland Security ("DHS") pursuant to the Homeland Security Act of 2002, Pub.L. No. 107–296, § 402, 116 Stat. 2135, 2178 (Nov. 25, 2002). *See Dobrova v. Holder,* 607 F.3d 297, 299 n. 1 (2d Cir.2010).

2    Petitioner concedes that he did not advance this contention during his appeal to the BIA. (*See* Pet'r Br. 27 n. 5.) However, the government has not raised a failure-to-exhaust defense, thereby waiving it. *See Lin Zhong v. U.S. Dep't of Justice,* 480 F.3d 104, 120 (2d Cir.2007). We may therefore reach the merits of petitioner's argument relating to the relationship between the BIA's *sua sponte* authority and the departure bar. We also note that petitioner has abandoned the argument that he presented to the BIA, based on *William v. Gonzales,* 499 F.3d 329 (4th Cir.2007), that the departure bar conflicts with the provisions of the INA relating to motions to reopen, *see* 8 U.S.C. § 1229a(c)(7). (*See* Pet'r Br. 27 n. 5.) In *In re Armendarez–Mendez,* 24 I. & N. Dec. at 653–60, the BIA rejected the reasoning of the *William* majority. This issue is presently the subject of a Circuit split. *Compare Rosillo–Puga v. Holder,* 580 F.3d 1147, 1159–60 (10th Cir.2009) (rejecting the analysis of the *William* majority), *Pena–Muriel v. Gonzales,* 489 F.3d 438 441–43 (1st Cir.2007) (rejecting the argument that the departure bar was impliedly repealed by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, div. C, 110 Stat. 3009–546 (Sept. 30, 1996)), *and Mendiola v. Holder,* 585 F.3d 1303, 1310 (10th Cir.2009) (following *Rosillo–Puga), with Coyt v. Holder,* 593 F.3d 902, 907 (9th Cir.2010) (holding that the departure bar "cannot apply to cause the withdrawal of an administrative petition filed by a petitioner who has been involuntarily removed"). However, because petitioner has abandoned the argument, we do not reach it.

3    Congress created the first federal agency focused on immigration—the Office of the Superintendent of Immigration—in § 7 of the Act of March 3, 1891, ch. 551, 26 Stat. 1084, 1085. The Office was part of the Treasury Department until 1903, when it was transferred to the Department of Commerce and Labor. *See* An Act To establish the Department of Commerce and Labor, Pub.L. No. 87, § 4, ch. 552, 32 Stat. 825, 826 (Feb. 14, 1903). In 1913, the agency was transferred to the newly created Department of Labor and divided into the Bureau of Immigration and the Bureau of Naturalization. *See* An Act To create a Department of Labor, Pub.L. No. 426, § 3, ch. 141, 37 Stat. 736, 737 (Mar. 4, 1913). The two Bureaus were combined in 1933 by President Roosevelt, and the consolidated entity was named the Immigration and Naturalization Service ("INS"). Exec. Order No. 6166Exec. Order No. 6166, § 14 (June 10, 1933), *reprinted following* 5 U.S.C. § 901. In 1940, the INS was transferred to the Department of Justice. *See* Reorganization Plan No. V, 54 Stat. 1238 (effective June 14, 1940); *see also* Alien Registration Act of 1940, Pub.L. No. 670, § 37(a), ch. 439, 54 Stat. 670, 675 (June 28, 1940). In September 1940, the Attorney General changed the name of the "Board of Review" of the INS to the Board of Immigration Appeals. *See* Regulations Governing Departmental

Organization and Authority, 5 Fed.Reg. 3502, 3503, § 90.2 (Sept. 4, 1940). *See generally A Historical Guide to the U.S. Government* 305–08 (George Thomas Kurian *et al.,* eds., 1998). Lastly, effective March 2003, the functions of the INS were transferred to DHS. *See supra* note 1.

4    Section 6.2 of the 1952 regulations provided, in pertinent part:

> A motion to reopen or a motion to reconsider shall not be made by or in behalf of a person who is the subject of deportation proceedings subsequent to his departure from the United States. Any departure of such person from the United States occurring after the making of a motion to reopen or a motion to reconsider shall constitute a withdrawal of such motion.

> 8 C.F.R. § 6.2 (1952).

5    In addition to the BIA's *sua sponte* authority and the departure bar, 8 C.F.R. § 1003.2(a), (d), the Attorney General's regulations vest in IJs similar authority with analogous departure limitations, *id.* § 1003.23(b)(1) ("An [IJ] may upon his or her own motion at any time ... reopen or reconsider any case in which he or she has made a decision.... Any departure from the United States ... occurring after the filing of a motion to reopen or a motion to reconsider shall constitute a withdrawal of such motion."). These regulations are "substantively identical" in terms of the authority they provide to IJs and the BIA to consider motions to reopen. *In re* Armendarez–Mendez, 24 I. & N. Dec. at 650.

6    In response to the Homeland Security Act of 2002, *see supra* note 1, the Attorney General reorganized title 8 of the Code of Federal Regulations to reflect the transfer of the functions of the INS from the Department of Justice to the DHS. *See* Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed.Reg. 9824 (Feb. 28, 2003). As a result, the regulation governing the BIA's *sua sponte* authority and the applicable departure bar was moved—without changes—from 8 C.F.R. § 3.2 (2002), to 8 C.F.R. § 1003.2 (2009).

7    Section 1229a(c)(7)(A)—titled "Motions to Reopen," "In general"—provides:

> An alien may file one motion to reopen [removal] proceedings under this section, except that this limitation shall not apply so as to prevent the filing of one motion to reopen described in subparagraph (C)(iv).

8 U.S.C. § 1229a(c)(7)(A). Section 1229a(c)(7)(C)(i) sets forth the "general" deadline for such a motion:

> Except as provided in this subparagraph, the motion to reopen shall be filed within 90 days of the date of entry of a final administrative order of removal.

*Id.* § 1229a(c)(7)(C)(i).

8    Section 1003.2(a) provides:

> General. The Board may at any time reopen or reconsider on its own motion any case in which it has rendered a decision. A request to reopen or reconsider any case in which a decision has been made by the Board, which request is made by the Service, or by the party affected by the decision, must be in the form of a written motion to the Board. The decision to grant or deny a motion to reopen or reconsider is within the discretion of the Board, subject to the restrictions of this section. The Board has discretion to deny a motion to reopen even if the party moving has made out a prima facie case for relief.

8 C.F.R. § 1003.2(a).

9    Section 1003.2(d) provides:

> Departure, deportation, or removal. A motion to reopen or a motion to reconsider shall not be made by or on behalf of a person who is the subject of exclusion, deportation, or removal proceedings subsequent to his or her departure from the United States. Any departure from the United States, including the deportation or removal of a person who is the subject of exclusion, deportation, or removal proceedings, occurring after the filing of a motion to reopen or a motion to reconsider, shall constitute a withdrawal of such motion.

8 C.F.R. § 1003.2(d).

10   More recently, the BIA has placed a caveat on its conclusion that the departure bar deprives it of jurisdiction to consider motions to reopen. In *In re* Bulnes–Nolasco, 25 I. & N. Dec. 57 (BIA 2009), the BIA took the position that an IJ's application of a different departure bar regulation, 8 C.F.R. § 1003.23(b)(1), "in a case involving an inoperative *in absentia* deportation order would give that order greater force than it is entitled to by law." 25 I. & N. Dec. at 59–60 (citing 8 C.F.R. § 1003.23(b)(4)(iii)(A)(2)). Therefore, in the BIA's view, "an alien's departure from the United States while under an outstanding order of deportation or removal issued *in absentia* does not deprive the [IJ] of jurisdiction to entertain a motion to reopen to rescind the order if the motion is premised on lack of notice." Id. at 60. The removal order in this case was not entered with petitioner *in absentia,* and petitioner does not argue that he lacked notice of the proceedings (at which he was present and represented by counsel). Therefore, any limitation on *In re Armendarez–Mendez* resulting from the BIA's subsequent decision in *In re Bulnes–Nolasco* is not material to our analysis.

11   *See, e.g.,* IIRIRA, Pub.L. No. 104–208, 110 Stat. at 3009–546 (Sept. 30, 1996); Immigration Act of 1990, Pub.L. No. 101–649, 104 Stat. at 4978 (Nov. 29, 1990); Immigration Reform and Control Act of 1986, Pub.L. No. 99–603, 100 Stat. 3359 (Nov. 6, 1986); Immigration and Nationality Act Amendments of 1976, Pub.L. No. 94–571, 90 Stat. 2703 (Oct. 20, 1976); Act of Oct. 3, 1965, Pub.L. No. 89–236, 79 Stat. 911.

12   In *Dada,* the Supreme Court confronted the tension between: (1) the time period that an alien is afforded to leave the country if he agrees to depart voluntarily, which may be as short as sixty days, *see* 8 U.S.C. § 1229c(b)(2); and (2) the ninety-day time period that an alien is afforded to file a motion to reopen his removal proceedings, *see* 8 U.S.C. § 1229a(c)(7)(C)(i). The Court held that "to safeguard the right to pursue a motion to reopen for voluntary departure recipients, the alien must be permitted to withdraw, unilaterally, a voluntary departure request before expiration of the departure period, without regard to the underlying merits of the motion to reopen." Dada, 128 S.Ct. at 2319. The Court also suggested that "[a] more expeditious solution" to the issue in that case "might be to permit an alien who has departed the United States to pursue a motion to reopen postdeparture." Id. at 2320. However, the departure bar was not placed in issue by the parties in *Dada,* and the Court expressly declined to consider it. See id.

13   The phrase *nunc pro tunc* means, literally, "now for then." *Iouri v. Ashcroft,* 464 F.3d 172, 182 (2d Cir.2006) (internal quotation marks omitted). "When a matter is adjudicated *nunc pro tunc,* it is as if it were done as of the time that it should have been done." *Edwards v. INS,* 393 F.3d 299, 308 (2d Cir.2004); *accord Blake v. Carbone,* 489 F.3d 88, 94 n. 5 (2d Cir.2007).

14   The availability of *nunc pro tunc* relief to a removed alien, at least under certain circumstances, would be consistent with some aspects of the BIA's analysis in *In re* Bulnes–Nolasco, 25 I. & N. Dec. at 59–60.

15   The phrase " § 212(c) relief," as used in *Edwards,* referred to waivers of deportation under the INA, 8 U.S.C. § 1182(c) (1994) (repealed 1996). Aliens were required to demonstrate three criteria in order to be eligible for § 212(c) relief:

   1) that they possessed lawful permanent resident status; 2) that they had been lawfully domiciled in the United States for seven or more years; and 3) if they had been convicted of an aggravated felony or felonies, that they had served less than five years in prison on those aggravated felony offenses.

   *Edwards,* 393 F.3d at 307. In the IIRIRA, Congress "replaced § 212(c) relief with a new form of discretionary relief known as 'cancellation of removal.' " *Edwards,* 393 F.3d at 302 & n. 4 (citing 8 U.S.C. § 1229b).

16    We note that questions relating to the manner in which the BIA *exercises* its *sua sponte* authority, which we lack jurisdiction to review, are distinct from questions relating to the BIA's understanding of the regulation governing the scope of this authority, which present interpretive issues that are squarely within our province.

17    In its September 10, 2008 order, the BIA took the view that petitioner's motion was "opportunistic" because he "did not file [the] motion at the time [the Board] issued [ *In re Y–L–*]" and instead "filed the motion only after he was placed in detention and his removal became imminent." The BIA's characterization is consistent with the fact that petitioner filed the motion on July 15, 2008 but was removed just seven days later, on July 22.

---

**End of Document**                                     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Petition granted in part and denied in part.

🚩 KeyCite Yellow Flag - Negative Treatment

Disagreed With by Momin v. Gonzales, 5th Cir., April 24, 2006

422 F.3d 98
United States Court of Appeals,
Third Circuit.

Zheng ZHENG, Petitioner

v.

Alberto GONZALES, [*] Attorney General
of the United States, Respondent.

No. 03–3634.
|
Argued Feb. 7, 2005.
|
Filed: Sept. 8, 2005.

**Synopsis**

**Background:** Board of Immigration Appeals (BIA) denied motion of alien, a Chinese native, to reopen removal proceedings. Alien petitioned for review.

**Holdings:** The Court of Appeals, Becker, Circuit Judge, held that:

[1] procedural requirements were met for BIA to grant motion of alien to reopen removal proceedings due to ineffective assistance of counsel;

[2] alien had not been prejudiced by his former counsel's alleged ineffective assistance;

[3] alien was paroled "arriving alien";

[4] Court of Appeals had authority to review challenge to regulation;

[5] statute left some ambiguity about whether Attorney General could determine by regulation what classes of aliens were eligible to apply for adjustment of status;

[6] regulation was impermissible and unreasonable construction of governing statute; and

[7] alien was eligible to apply for adjustment of status.

West Headnotes (20)

[1]    **Aliens, Immigration, and
       Citizenship** 🔑 **Ineffectiveness of counsel**

       Procedural requirements were met for Board of Immigration Appeals (BIA) to grant motion of alien, a native of China, to reopen removal proceedings due to ineffective assistance of counsel, due to failure of former attorney to file appellate brief, where alien submitted reasonably detailed affidavit explaining that his former attorney had agreed to file appellate brief, former attorney claimed that he did not do so because he never received briefing schedule, and alien's later attorneys diligently investigated issue and stated that they did not file disciplinary complaint against former attorney because of their uncertainty as to whether former attorney ever received briefing schedule. U.S.C.A. Const.Amend. 5.

       14 Cases that cite this headnote

[2]    **Aliens, Immigration, and
       Citizenship** 🔑 **Review of discretion**

       The decision of the Board of Immigration Appeals (BIA) to deny reopening is reviewed for abuse of discretion.

       9 Cases that cite this headnote

[3]    **Constitutional Law** 🔑 **Admission and
       exclusion; deportation**

       Aliens in removal proceedings have a Fifth Amendment right to due process, which entails a right to be represented by counsel. U.S.C.A. Const.Amend. 5.

       2 Cases that cite this headnote

[4]    **Constitutional Law** 🔑 **Admission and
       exclusion; deportation**

       Ineffective assistance of counsel in a removal proceeding may constitute a denial of due

process if the alien was prevented from reasonably presenting his case. U.S.C.A. Const.Amend. 5.

4 Cases that cite this headnote

**[5]**    **Aliens, Immigration, and Citizenship** 🔑 Assistance of counsel

Fact that Immigration and Naturalization Service (INS) did not submit appellate brief to Board of Immigration Appeals (BIA) did not establish that neither alien's attorney nor INS received briefing notice or schedule, for purpose of alien's ineffective assistance of counsel claim that was based on counsel's failure to file appellate brief, since alien's failure to file brief was in itself sufficient cause for BIA to dismiss appeal and thus INS would not have had reason to file brief without brief from alien. U.S.C.A. Const.Amend. 5; 🚩 8 C.F.R. § 1003.1(d)(2)(i)(E).

**[6]**    **Aliens, Immigration, and Citizenship** 🔑 Ineffectiveness of counsel

Board of Immigration Appeals (BIA) did not abuse its discretion by determining, on motion of alien, a native of China, to reopen removal proceedings, that alien had not been prejudiced by his former counsel's alleged ineffective assistance, since motion did not explain why alien would have been eligible for relief from removal beyond general statement that he would have had opportunity to "make his claim for asylum again to the BIA," and alien otherwise failed to exhaust his other claim before BIA. U.S.C.A. Const.Amend. 5.

25 Cases that cite this headnote

**[7]**    **Aliens, Immigration, and Citizenship** 🔑 Adjustment of status

Application to adjust status made by alien, a native of China, in removal proceeding under Chinese Student Protection Act (CSPA) was subject to statute that governed adjustment of status of non-immigrant to that of person admitted for permanent residence. Immigration

and Nationality Act, § 245(a), 🟨 8 U.S.C.A. § 1255(a); 🚩 8 C.F.R. § 1245.1(c)(8).

1 Cases that cite this headnote

**[8]**    **Aliens, Immigration, and Citizenship** 🔑 Law questions

The legal conclusions of the Board of Immigration Appeals (BIA) are subject to de novo review, with appropriate deference to the agency's interpretation of the underlying statute.

2 Cases that cite this headnote

**[9]**    **Aliens, Immigration, and Citizenship** 🔑 Effect of parole; rights of paroled aliens

Alien, a native of China, who received advance parole, could not be summarily removed by immigration officer under statute that governed screening of arriving aliens by immigration officers. Immigration and Nationality Act, §§ 212(d)(5), 235(b)(1)(A)(i), 🟨 8 U.S.C.A. §§ 1182(d)(5), 🚩 1225(b)(1)(A)(i).

**[10]**    **Aliens, Immigration, and Citizenship** 🔑 Adjustment of status

**Aliens, Immigration, and Citizenship** 🔑 Effect of parole; rights of paroled aliens

Alien, a native of China, was paroled "arriving alien," for purpose of regulation that categorically prohibited arriving aliens from adjusting status, despite moratorium in enforcement of immigration laws under Chinese Student Protection Act (CSPA), where alien arrived in United States without inspection, left pursuant to advance parole, and re-entered with no legal status greater than that of parole. 🚩 8 C.F.R. § 1245.1(c)(8).

6 Cases that cite this headnote

**[11]    Aliens, Immigration, and Citizenship** 🔑 Jurisdiction and venue

Court of Appeals had authority to review challenge made by alien, a native of China, to interpretation of legal standards made by Board of Immigration Appeals (BIA) for eligibility for adjustment, although Court could not review Attorney General's exercise of discretion in granting adjustment of status in individual case.

Immigration and Nationality Act, § 245, 🚩 8 U.S.C.A. § 1255; 🚩 8 C.F.R. § 1245.1.

16 Cases that cite this headnote

**[12]    Administrative Law and Procedure** 🔑 Erroneous or unreasonable construction; conflict with statute

Where Congress has not merely failed to address a precise question, but has given an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation, then the agency's legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.

5 Cases that cite this headnote

**[13]    Administrative Law and Procedure** 🔑 Permissible or reasonable construction

When a court reviews an agency's construction of the statute which it administers, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

3 Cases that cite this headnote

**[14]    Administrative Law and Procedure** 🔑 Plain, literal, or clear meaning; ambiguity or silence

When a court reviews an agency's construction of the statute which it administers, courts may employ traditional tools of statutory construction to ascertain that Congress had an intention on the precise question at issue; deference to an agency's statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent.

3 Cases that cite this headnote

**[15]    Aliens, Immigration, and Citizenship** 🔑 Judicial Review or Intervention

To extent that immigration statute granted discretion to Attorney General to create categorical eligibility rules for adjustment of status, rules were subject to review for reasonableness. Immigration and Nationality Act, §§ 242(a)(2)(B)(i), 245, 🚩 8 U.S.C.A. §§ 1252(a)(2)(B)(i), 🚩 1255(a); 🚩 8 C.F.R. § 1245.1(c)(8).

4 Cases that cite this headnote

**[16]    Aliens, Immigration, and Citizenship** 🔑 Validity

Statutory structure and language that left some ambiguity about whether Attorney General could determine by regulation what classes of aliens were eligible to apply for adjustment of status did not so totally abdicate authority to Attorney General as to allow regulation that essentially reversed eligibility structure set out by Congress.

Immigration and Nationality Act, § 245(a), 🚩 8 U.S.C.A. § 1255(a); 🚩 8 C.F.R. § 1245.1(c)(8).

9 Cases that cite this headnote

**[17]    Aliens, Immigration, and Citizenship** 🔑 Validity

Regulation that rendered most aliens paroled into United States ineligible to apply for adjustment of status was impermissible and unreasonable construction of somewhat ambiguous governing statute, and was invalid, since Congress' intent indicating otherwise was apparent both from language of underlying statute, which allowed

aliens "paroled into the United States" to apply for adjustment, and from its structure, which allowed such applications as general matter and excluded only few narrow classes from eligibility. Immigration and Nationality Act, §§ 101(a)(13)(B), 212, 245(a), 8 U.S.C.A. §§ 1101(a)(13)(B), 1182(d)(5)(A), 1225, 1255(a); 8 C.F.R. §§ 1.1(q), 212.5(b)(5), 1245.1(c)(8).

18 Cases that cite this headnote

[18]    **Administrative Law and Procedure**    Permissible or reasonable construction

Broad deference to a regulation that an administrative agency implemented in interpreting a statute which it was charged with enforcing will be merited so long as the regulation bears a fair relationship to the language of the statute, reflects the views of those who sought its enactment, and matches the purpose they articulated.

7 Cases that cite this headnote

[19]    **Aliens, Immigration, and Citizenship**    Adjustment of status

**Aliens, Immigration, and Citizenship**    Effect of parole; rights of paroled aliens

Alien, a native of China, qualified as "alien paroled into the United States," and was eligible to apply for adjustment of status, despite receiving Notice to Appear before immigration judge, since Notice to Appear merely commenced removal proceedings, rather than executing removal order, and alien remained free on parole throughout pendency of removal

proceedings and was currently free on parole. Immigration and Nationality Act, § 245, 8 U.S.C.A. § 1255; 8 C.F.R. § 212.5.

3 Cases that cite this headnote

[20]    **Administrative Law and Procedure**    Theory or grounds not provided or relied upon by agency

Review of an agency's decision is based solely on the stated grounds for that decision.

1 Cases that cite this headnote

**West Codenotes**

**Held Invalid**

8 C.F.R. § 1245.1(c)(8).

**Attorneys and Law Firms**

*101 Joseph C. Hohenstein (Argued), Philadelphia, PA, for Petitioner.

Peter D. Keisler, Assistant Attorney General, Linda S. Wernery, Senior Litigation Counsel, Thankful T. Vanderstar (Argued), Trial Attorney, Office of Immigration Litigation, Civil Division, United States Department of Justice, Ben Franklin Station, Washington, DC, for Respondent.

Mary A. Kenney, Nadine K. Wettstein, American Immigration Law Foundation, Washington, DC, for Amicus Curiae American Immigration Law Foundation.

Before BARRY, FUENTES, and BECKER, Circuit Judges.

OPINION OF THE COURT

BECKER, Circuit Judge.

## Table of Contents

I. Introduction.................................................................... ........ 102

II. Facts and Procedural History................................................... ......... 103

A. Background Facts.................................................................... ....... 103

B. Zheng's Adjustment Application................................................ ....... 103

C. Removal Proceedings................................................................ ....... 104

D. Appellate Proceedings............................................................. ....... 105

III. The Motion To Reopen Asylum Proceedings.............................. ....... 105

A. The *Lozada* Requirements...................................................... 106

B. Prejudice.................................................................................. 107

IV. Adjustment of Status....................................................................... ....... 108

A. The Statutory and Regulatory Framework................................ 108

   1. Statutory Authority To Adjust Status.................................................. 108

   2. The Eligibility Regulation.................................................................. 109

B. The "Arriving Alien" Category................................................. ....... 110

V. The Validity of the Regulation........................................................... ....... 111

A. The *Chevron* Analysis............................................................ 112

B. Discretion and the *Chevron* Analysis..................................... 113

C. *Chevron* Step One: Eligibility and Discretion....................... 114

D. Restrictions.............................................................................. 116

   1. Parole and Removal Proceedings....................................................... 116

   2. Arriving Aliens and Adjustment of Status.......................................... 118

   3. Is the Regulation a Permissible Interpretation of the Statute?............ 119

VI. Application to Zheng......................................................................... ....... 120

A. Zheng's Parole Status and the Effect of the Notice to Appear............... 120

B. Zheng's Adjustment Applications............................................ ....... 121

C. Who Has Jurisdiction Over Zheng's Application?.................... 122

VII.  Conclusion..................................................................................................................... ........ 124

### *102  I. Introduction

Zheng Zheng petitions this Court to review a decision by the Board of Immigration Appeals (BIA) denying his motion to reopen removal proceedings. Zheng raises two claims. First, he argues that the BIA should have granted his motion to reopen because of ineffective assistance of counsel. Zheng argues that his previous attorney was ineffective because he failed to file an appellate brief with the BIA after an Immigration Judge (IJ) denied his application for asylum. Because we find that the prejudice requirement of the ineffective assistance claim has not been met, we reject Zheng's argument on this point.

Second, Zheng argues that the BIA should have granted his request to remand his case so that an IJ might consider his petitions for adjustment of status. Zheng presses two applications to adjust status. First, he has an employment-based application. Second, he alleges that he is covered by the Chinese Student Protection Act of 1992, Pub. L. No. 102–404, 106 Stat. 1969 (CSPA), which allows certain Chinese nationals to adjust their status to that of lawful permanent residents. The government responds that Zheng is an "arriving alien" and, as such, forbidden by regulation from adjusting his status under 🚩 8 C.F.R. § 1245.1(c)(8). Zheng and the *amicus curiae* argue that this regulation is inconsistent with the governing statute, and therefore invalid, relying on the First Circuit's recent decision in 🔖 *Succar v. Ashcroft,* 394 F.3d 8 (1st Cir.2005).

**\*103**  While our reasoning differs somewhat from that of the First Circuit, we agree with that court's conclusion that 🚩 8 C.F.R. § 1245.1(c)(8) is not a valid exercise of the Attorney General's authority under the Immigration and Nationality Act (INA). We concur with the government that the statute grants the Attorney General broad discretion to issue regulations, and that this discretion may include some power to regulate eligibility to adjust status. But the Attorney General's power is not unlimited, and must be exercised consistently with the intent of the statute. Because the statute allows paroled aliens to apply for adjustment of status, whereas the regulation forecloses this statutory eligibility, the regulation is not based on a permissible statutory reading. We will therefore grant the petition for review and remand to allow the immigration authorities to consider Zheng's applications for adjustment of status.

### II. Facts and Procedural History

#### A. Background Facts

Zheng Zheng was born on May 25, 1960, in Fuzhou, People's Republic of China. He claims that in 1989, when he was a middle school teacher in Fuzhou, he was involved in student uprisings. He apparently disseminated information from the BBC and Voice of America to the teachers and students of his school, passed out pamphlets, and organized rallies. The Chinese government cracked down on the student demonstrators authorities June 1989. As part of this crackdown, government authorities came looking for Zheng. He hid from security officers for a time, staying with friends and relatives, and eventually left China through Hong Kong and came to the United States. Zheng apparently arrived in California at some point in or after 1990, and entered the country without inspection by immigration officials.

Zheng eventually moved to Woodlyn, Pennsylvania, where he lived until 1993, when he returned to China briefly to visit his sick father. Before leaving for China, Zheng obtained a permission to re-enter (or "advance parole"), dated July 28, 1993, which allowed him to return to the United States under the status that he had when he left. Although Zheng was an uninspected illegal alien, he was not deportable at that time because then-President Bush had instituted a Deferred Enforced Departure (DED) program for certain Chinese nationals in the wake of the Tiananmen Square massacre. *See* Exec. Order No. 12,711, 55 Fed. Reg. 13897 (Apr. 11, 1990). Zheng was eligible for DED, so his permission to reenter was issued. This allowed him to travel to China and return to the United States without being detained at the border as an illegal alien. He did in fact re-enter the United States on September 27, 1993, using his advance parole authorization. [1]

#### B. Zheng's Adjustment Application

On October 20, 1993, Zheng filed an application to adjust status with the Immigration and Naturalization Service

(INS). [2]  In this application, he claimed that he was entitled to lawful permanent residence status under the Chinese Student Protection **\*104**  Act, because he had arrived in the United States before April 11, 1990, and met the other requirements of the CSPA. He submitted a sworn statement saying that he entered California on February 1, 1990, as well as various materials that tended to show that he was in New York prior to that date. The INS ultimately ruled on the application on May 5, 1999—almost six years after it was filed—finding that Zheng had failed to "present authentic and convincing evidence" to show that he had entered the United States prior to April 1990. It noted that many of the materials Zheng had submitted were proven to be fraudulent, and Zheng admitted as much, saying that he bought one of the documents on the street in Chinatown. The INS therefore denied Zheng's application to adjust his status.

### C. Removal Proceedings

That decision left Zheng as an unadmitted illegal alien. On October 29, 1999, the INS began removal proceedings by serving on Zheng a Notice to Appear alleging that he was an "alien present in the United States without being admitted or paroled" under  8 U.S.C. § 1182(a)(6)(A)(i). On January 7, 2000, the INS amended the Notice to Appear, withdrawing the  § 1182(a)(6)(A)(i) charge and adding a charge under  § 1182(a)(7)(A)(i)(I), which allows deportation of an alien who "is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by [the INA]." The new Notice to Appear also revised the factual allegations against Zheng, alleging that he was, "on September 27, 1993, paroled into the United States pursuant to Executive Order 12711," and that he was removable under the  § 1182(a)(7)(A)(i)(I) standard.

Zheng retained an attorney, Sigang Li, who filed an asylum application on his behalf on August 9, 2000. A merits hearing was conducted before an Immigration Judge in Philadelphia on September 17, 2001. Zheng testified during a brief direct examination in which he contradicted his asylum application in several important respects. Most notably, he stated that he was depressed because he had just learned that his father had died on August 27, 2001—but his August 2000 asylum application listed his father as deceased. He also told a story about his interactions with the Chinese security agencies that differed several particulars from the account in his application. In a lengthy cross-examination, counsel for the INS pointed out these inconsistencies.

At the end of the September 17, 2001, hearing, the IJ issued an oral decision. Before reaching Zheng's asylum claims, he considered his CSPA application to adjust status, which had been submitted as an exhibit. He noted that Zheng "initially had indicated an intent to renew that application before this Court," but determined that Zheng, as a parolee, was an "arriving alien" under  8 C.F.R. § 1245.1(c)(8). The IJ thus decided that Zheng was ineligible for adjustment of status.

The IJ then turned to Zheng's claims for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). Based on inconsistencies between Zheng's testimony and his application, the IJ made an adverse credibility finding. He thus denied asylum, withholding, and CAT relief. As for the asylum claim, he also found that Zheng should be barred from asylum because he filed his claim too late, see generally 8 C.F.R. § 208.4(a), although he noted that he would not have exercised his discretion **\*105**  adversely if Zheng had been credible and eligible for asylum.

### D. Appellate Proceedings

Zheng then engaged attorney Sigang Li to file an appeal before the BIA. Li filed a Notice of Appeal with the BIA, and checked the box indicating that he would file a brief. He never filed a brief, and now claims that this was because he did not receive a briefing schedule from the BIA. Without a brief from the petitioner, the INS also did not file a brief, and the BIA dismissed the appeal in a short per curiam order dated August 20, 2002. The dismissal was predicated mainly on Zheng's counsel's failure to file a brief, which can support a summary dismissal under  8 C.F.R. § 1003.1(d)(2)(i) (E) (formerly § 3.1(d)(2)(i)(D)). The BIA also considered the merits, however, noting that "upon review of the record, we are not persuaded that the Immigration Judge's ultimate resolution of this case was in error." Zheng never petitioned this Court to review the BIA's August 2002 decision.

Zheng retained new counsel, who filed a timely motion to reopen with the BIA on November 18, 2002, alleging ineffective assistance of counsel. The motion argued that Li's failure to file a brief constituted ineffective assistance and thus warranted reopening. It further argued that Zheng was entitled to review of his application for adjustment of status.

The motion to reopen also pressed Zheng's application to adjust status pursuant to the CSPA, and included a further application for adjustment of status based on an approved Petition for Alien Worker. [3]

In a March 5, 2003, decision, the BIA denied the motion to reopen, finding that Zheng had not complied with the procedural requirements of an ineffective assistance claim, and that even if he had, he did not demonstrate that any prejudice resulted from Li's failure to file a brief. The BIA also rejected Zheng's applications for CSPA and work-related adjustment of status, agreeing with the IJ that Zheng was an arriving alien in removal proceedings and therefore ineligible to apply for adjustment of status. Zheng retained a third attorney, who timely filed the present petition for review with this Court. [4] We have jurisdiction to review the final order of the BIA under 🚩 8 U.S.C. § 1252.

### III. The Motion To Reopen Asylum Proceedings

**[1]** We deal first with Zheng's argument that the BIA should have granted his motion to reopen proceedings because of ineffective assistance of counsel. Zheng initially applied for asylum, withholding of removal, and CAT protection. Those applications were denied by the IJ, and Zheng's first attorney failed to file an appellate brief with the BIA, which affirmed the IJ's order. Zheng submits that this failure constituted ineffective assistance **\*106** and required the BIA to reopen proceedings.

**[2]** Motions to reopen immigration proceedings are viewed with strong disfavor, and "we review the BIA's decision to deny reopening for abuse of discretion, mindful of the 'broad' deference that the Supreme Court would have us afford."

🟨 *Xu Yong Lu v. Ashcroft,* 259 F.3d 127, 131 (3d Cir.2001).

#### A. The *Lozada* Requirements

**[3]** **[4]** Aliens in removal proceedings have a Fifth Amendment right to due process, which entails a right to be represented by counsel. 🟨 *Lu,* 259 F.3d at 131. Ineffective assistance of counsel may "constitute a denial of due process if 'the alien was prevented from reasonably presenting his case.' " *Id.* (quoting 🟨 *Lozada v. INS,* 857 F.2d 10, 13–14 (1st Cir.1988)).

The BIA has set forth three requirements for motions to reopen based on claims of ineffective assistance: (1) the alien's motion must be supported by an "affidavit of the allegedly aggrieved [alien] attesting to the relevant facts"; (2) "former counsel must be informed of the allegations and allowed the opportunity to respond," and this response should be submitted with the motion; and (3) "if it is asserted that prior counsel's handling of the case involved a violation of ethical or legal responsibilities, the motion should reflect whether a complaint has been filed with appropriate disciplinary authorities regarding such representation, and if not, why not." 🚩 *Matter of Lozada,* 1988 WL 235454, 19 I. & N. Dec. 637, 639 (BIA 1988).

We have "generally agree[d] that the BIA's three-prong test is not an abuse of the Board's wide-ranging discretion." 🟨 *Lu,* 259 F.3d at 133. The *Lu* panel, however, was not willing to "apply[ ] a strict, formulaic interpretation of *Lozada,"* and noted that "only in rare circumstances have courts refused to reopen immigration proceedings *solely* because a petitioner failed to file a bar complaint." 🟨 *Id.* at 133, 134 (emphasis in original). In *Lu* we denied a petition for review where the alien had neither set forth the relevant facts in sufficient detail, as required by the first prong of *Lozada,* nor filed a disciplinary complaint.

**[5]** Zheng, however, seems to have satisfied the *Lozada* requirements as we interpreted them in *Lu.* Unlike Lu, Zheng submitted a reasonably detailed affidavit explaining that his former attorney, Sigang Li, had agreed to file an appellate brief but never did. Second, Li was afforded an opportunity to respond, and did so in a statement in which he admitted that he had agreed to file a brief, but claimed that he did not do so because he never received a briefing schedule. Finally, although Zheng's later attorneys have not filed a disciplinary complaint against Li, *Lozada* does not mandate that they do so, so long as they explain why they did not. Zheng's attorneys have explained, in accordance with the third prong of *Lozada,* that they did not file a complaint because of their uncertainty as to whether or not Li ever received a briefing schedule. Zheng's present attorneys have been diligent in investigating this issue and have submitted a request under the Freedom of Information Act (FOIA) to determine whether such a briefing schedule was issued. [5] Zheng thus appears to have met **\*107** the procedural requirements of *Matter of Lozada.*

### B. Prejudice

[6]    Nonetheless, Zheng's ineffective assistance claim fails because he has not demonstrated that prejudice resulted from the ineffective assistance of his BIA appellate counsel. Under *Lozada,* to prevail on an ineffective assistance claim, an alien must demonstrate not only that counsel's assistance was ineffective, but also that he was prejudiced by counsel's poor performance. 19 I. & N. Dec. at 638.

When the BIA dismissed Zheng's appeal for failure to submit a brief, it also stated that it was satisfied that the IJ's decision was not erroneous. Similarly, in denying the motion to reopen, the BIA noted that the motion did not allege that any prejudice resulted from the ineffective assistance. A review of Zheng's motion to reopen confirms the BIA's conclusion: the motion states that Li's failure to file a brief "has irreparably prejudiced [Zheng's] eligibility for relief from removal," but it does not explain why Zheng would have been eligible for relief from removal in the first place. Indeed, in this petition for review, Zheng does not even argue that he could have prevailed on the asylum appeal if Li had filed a brief, beyond a general statement that he would have had the opportunity to "make his claim for asylum again to the BIA." Our limited review of the merits of Zheng's asylum claim satisfies us that no prejudice resulted from Li's failure to file an appellate brief, as explained in the margin. [6]

Instead, Zheng alleges two other kinds of prejudice. First, he argues that an effective appellate counsel would have been able to present his adjustment of status claims. Because the substance of those claims is currently before us, *see infra* Parts IV–V, no prejudice seems to have resulted from Li's failure to argue those issues before the BIA, and we consider those claims in connection with the merits rather than as part of an ineffective assistance argument.

Second, Zheng contends that "counsel's review of the hearing transcripts before the IJ ... identifies serious concerns about the quality of the representation at that hearing." He asserts that Li was unwilling to meet with him to prepare his testimony, had trouble finding Zheng's file, and conducted only a brief and unprepared direct examination. Li's incompetence before the IJ, Zheng argues, prejudiced his ability to present his asylum claims.

This argument was not presented to the BIA in the motion to reopen, which focused solely on ineffective assistance at the appellate level. The failure to exhaust this claim before the BIA "bars consideration **\*108** of particular questions not raised in an appeal to the Board." *Alleyne v. INS,* 879 F.2d 1177, 1182 (3d Cir.1989); *see also Awad v. Ashcroft,* 328 F.3d 336, 340 (7th Cir.2003); *Prado v. Reno,* 198 F.3d 286, 292 (1st Cir.1999). Furthermore, Zheng has not satisfied the *Lozada* requirements as to this claim: Li, his attorney, has had no opportunity to dispute Zheng's characterization of his performance before the IJ, and Zheng has not explained why no disciplinary complaint was filed regarding these allegations.

We reiterate that our review of the Board's decision turns on abuse of discretion. Based on the arguments presented to it, the BIA seems to have been well within its discretion to find that no prejudice resulted from Li's ineffective appellate assistance.

### IV. Adjustment of Status

[7]    [8]    A far more difficult question is presented by Zheng's attempts to renew his application to adjust status under the CSPA, and to adjust his status based on his employment-based immigrant visa petition. The BIA held that Zheng is ineligible for this relief because its regulations prohibit "arriving aliens" from adjusting status. This claim was raised as part of Zheng's motion to reopen, and the BIA's ultimate decision on the motion is subject to review for abuse of discretion. *Lu,* 259 F.3d at 131. The Board's legal conclusions, however, are subject to de novo review, "with appropriate deference to the agency's interpretation of the underlying statute." *Barrios v. Attorney General,* 399 F.3d 272, 274 (3d Cir.2005) (citing *Abdulai v. Ashcroft,* 239 F.3d 542, 551–52 (3d Cir.2001)).

### A. The Statutory and Regulatory Framework

While Zheng appears to be eligible to apply for adjustment of status under the plain terms of the Immigration and Nationality Act, a regulation promulgated pursuant to the Act renders him ineligible to do so. Zheng argues that the regulation is therefore invalid, a claim we take up in Part V, *infra.* In this Part, we explain why Zheng is ineligible for adjustment under the terms of the relevant regulation.

### 1. Statutory Authority To Adjust Status

Zheng claims that he may adjust his status under INA section 245(a), 8 U.S.C. § 1255(a), which provides:

> The status of an alien who was inspected and admitted or paroled into the United States or the status of any other alien having an approved petition for classification under subparagraph (A)(iii), (A)(iv), (B)(ii), or (B)(iii) of section 204(a)(1) [8 U.S.C. § 1154(a)(1)] [or] [7] may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

Zheng argues that he was "admitted or paroled into the United States" by virtue of (1) his prior Deferred Enforced Departure status (which Zheng contends was an "admission") and (2) his re-entry to the United States pursuant to a grant of advance **\*109** parole on September 27, 1993. If this contention is correct, then the statutory text would appear to render Zheng eligible for adjustment of status, although the final decision to adjust status is left to the discretion of the Attorney General.

Zheng applied to adjust status pursuant to the Chinese Student Protection Act of 1992, § 2, Pub. L. No. 102–404, 106 Stat. 1969 (CSPA). In relevant part, the CSPA provides that an alien who (1) is a national of the People's Republic of China, (2) has resided continuously in the United States since April 11, 1990 (other than "brief, casual, and innocent absences"), and (3) was not in China for more than 90 days between April 11, 1990, and October 9, 1992, may adjust status to that of a lawful permanent resident without regard to availability of immigrant visas. Id. § 2(a) & (b). In addition, Zheng asks to adjust status pursuant to an employment-based application.

### 2. The Eligibility Regulation

The government responds that Zheng is ineligible to adjust status because he is an "arriving alien who is in removal proceedings." The government's theory is based on a regulation promulgated pursuant to the INA, which provides that "[a]ny arriving alien who is in removal proceedings pursuant to section 235(b)(1) or section 240 of the Act [8 U.S.C. § 1225(b)(1) or § 1229a]" is categorically "ineligible to apply for adjustment of status to that of a lawful permanent resident alien under section 245 of the Act [8 U.S.C. § 1255]." 8 C.F.R. § 1245.1(c)(8). We deal with the question whether Zheng is an "arriving alien" later. *See infra* Part IV.B. For now, we note that it is clear that Zheng is currently in removal proceedings under section 240 of the INA, 8 U.S.C. § 1229a, and therefore falls under the regulation if he is in fact an "arriving alien."

It is less clear that Zheng's application to adjust his status falls under section 245 of the INA, 8 U.S.C. § 1255. Zheng argues instead that it falls under the CSPA, which is a separate statute. [8] This argument is based on the BIA's decision in *Matter of Artigas*, 2001 WL 534298, 23 I. & N. Dec. 99 (BIA 2001), in which the Board allowed an arriving alien to adjust status pursuant to the Cuban Refugee Adjustment Act, Pub. L. No. 89–732, 80 Stat. 1161 (1966). The INS had argued that Artigas's application was barred by 8 C.F.R. § 1245.1(c)(8), but the BIA disagreed, finding that the regulation only covers section 245 applications, and "does not state that arriving aliens in removal proceedings are ineligible to apply for adjustment of status under the Cuban Adjustment Act." *Artigas*, 23 I. & N. Dec. at 104. Zheng argues that the CSPA, like the Cuban Refugee Adjustment Act, is an independent means of adjusting status, and that it is therefore not covered by § 1245.1(c)(8). The BIA disagreed, noting cursorily that it "[saw] no reason to extend [its] holding in *Matter of Artigas* ... to the instant case."

Zheng's analogy has intuitive appeal, in that the CSPA and the Cuban Refugee Adjustment Act serve similar

purposes, and there is therefore some logic to treating them similarly. Nonetheless, the two statutes work via different mechanisms, and this difference dooms Zheng's argument. The Cuban Refugee Adjustment Act specifically created a new mechanism for adjustment of status, in language that to some extent parallels section 245 but does not rely on it. (Indeed, that Act **110** operates "[n]otwithstanding the provisions of section 245(c) of the Immigration and Nationality Act." Cuban Refugee Adjustment Act § 1, Pub. L. No. 89–732, 80 Stat. 1161.)

The CSPA, on the other hand, applies specifically "whenever [a covered] alien ... applies for adjustment of status *under section 245* of the Immigration and Nationality Act." CSPA § 2(a)(1), Pub. L. No. 102–404, 106 Stat. 1969 (emphasis added). Thus the CSPA modifies some of the rules for Chinese aliens' applications for adjustment of status under section 245, but those applications are still made under that section. By its terms, then, the eligibility regulation applies to Zheng's case, even though it did not apply in *Artigas*.

We therefore find that Zheng's applications to adjust status were made pursuant to INA section 245, 8 U.S.C. § 1255. Thus, if Zheng is an "arriving alien," and if 8 C.F.R. § 1245.1(c)(8) is valid, then the regulation renders him ineligible for such relief.

## B. The "Arriving Alien" Category

 **[9]** **[10]** The next question facing us is whether Zheng is an "arriving alien" within the meaning of § 1245.1(c)(8). This phrase is defined by regulation:

> The term arriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. An arriving alien remains such even if paroled pursuant to

section 212(d)(5) of the Act, except that an alien who was paroled before April 1, 1997, or an alien who was granted advance parole which the alien applied for and obtained in the United States prior to the alien's departure from and return to the United States, shall not be considered an arriving alien for purposes of section 235(b)(1) (A)(i) of the Act.

8 C.F.R. § 1.1(q). [9]

While the first portion of this definition at first seems to support an intuitive reading of the term "arriving alien"—viz., that it means "an alien who is physically arriving at the border of the United States"—in fact the term has a much broader meaning. It encompasses not only aliens who are actually at the border, but also aliens who were paroled after their arrival. [10] It is therefore clear that Zheng is an "arriving **111** alien." He arrived in the United States without inspection, but then left pursuant to an advance parole. Because he re-entered with no legal status greater than that of a parolee, he is simply a paroled arriving alien.

Zheng objects to this characterization on two grounds, both of them erroneous. First, he maintains that, because he was subject to Deferred Enforced Departure after April 1990, he was admitted to the United States and so is not an arriving alien. There is no support for this contention. DED is not an admission status. Rather, the President simply ordered the Attorney General to defer deporting Chinese nationals between April 1990 and January 1994, because of worries about the effects of the Tiananmen Square crackdown. *See* Exec. Order No. 12,711, § 1, 55 Fed. Reg. 13897 (Apr. 11, 1990). This moratorium in enforcement of immigration laws against some aliens did not transform them into lawfully admitted immigrants.

Second, Zheng argues that application of the "arriving alien" classification to him is impermissibly retroactive, because the term entered the statute with the passage of the Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104–208, 110 Stat. 3009 (1996) (IIRIRA), whereas he has been in the United States since 1990. Zheng has cited no support for the proposition that this change in immigration

terminology and procedure is impermissibly retroactive, and we reject it. [11]

We therefore conclude that Zheng is an "arriving alien" within the meaning of the regulations. Because he is an arriving alien in removal proceedings, and because he is attempting to apply for adjustment of status, he meets all of the criteria of 8 C.F.R. § 1245.1(c)(8), and is therefore ineligible to adjust status under the plain terms of that regulation. It remains for us to decide whether the regulation is valid.

### V. The Validity of the Regulation

[11] Zheng contends that 8 C.F.R. § 1245.1(c)(8), the regulation that renders him ineligible to adjust status, is invalid. He argues that the regulation is inconsistent with the text of INA section 245, 8 U.S.C. § 1255(a), and therefore exceeds the Attorney General's regulatory authority.

We note that 8 U.S.C. § 1252(a)(2)(B)(i) strips courts of jurisdiction to review "any judgment regarding the granting of relief under" 8 U.S.C. § 1255. This provision plainly forecloses review of the Attorney General's exercise of discretion in granting adjustment of status in individual cases, but we are satisfied that it does not foreclose review of the BIA's interpretation of the legal standards for eligibility for such adjustment. *See* *Succar v. Ashcroft,* 394 F.3d 8, 19–20 (1st Cir.2005). The government does not now dispute that we have jurisdiction to consider Zheng's challenge to its regulations.

It appears that *amicus curiae* American Immigration Law Foundation (AILF) has made a concerted effort to bring and argue this claim in many of the Courts of Appeals. The result of this effort, for our purposes, is that we have two recent well-reasoned opinions from other Courts of Appeals to consult in ruling on the validity **\*112** of the regulation. The first is *Succar v. Ashcroft, supra* (Lynch, J.), in which a unanimous panel of the First Circuit struck down the regulation. A short companion opinion, *Rodriguez de Rivera v. Ashcroft,* 394 F.3d 37 (1st Cir.2005), further explained *Succar.*

In contrast, in *Mouelle v. Gonzales,* 416 F.3d 923 (8th Cir.2005) (Beam, J.), the Eighth Circuit rejected *Succar's* conclusion and found that the regulation was within the scope of the Attorney General's authority. Judge Bye dissented, stating that he would follow the reasoning of *Succar.* [12]

### A. The *Chevron* Analysis

[12] [13] A court's review of a regulation interpreting a statute is normally subject to *Chevron* deference. This standard of judicial review requires a two-step inquiry:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (footnotes omitted). However, where Congress has not merely failed to address a precise question, but has given an "express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," then the agency's "legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843–44, 104 S.Ct. 2778.

[14] In the first step of the *Chevron* analysis, courts may "employ [ ] traditional tools of statutory construction [to]

ascertain[ ] that Congress had an intention on the precise question at issue." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 448, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (quoting *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. 2778). "Even for an agency able to claim all the authority possible under *Chevron,* deference to its statutory interpretation is called for only when the devices of judicial construction have been tried and found to **\*113** yield no clear sense of congressional intent." *Gen. Dynamics Land Sys., Inc. v. Cline,* 540 U.S. 581, 600, 124 S.Ct. 1236, 157 L.Ed.2d 1094 (2004).

### B. Discretion and the Chevron Analysis

**[15]**  The government first argues that we owe § 1245.1(c)(8) even greater deference than the two-step *Chevron* structure would provide. Specifically, the government contends that § 1245.1(c)(8) is a mere exercise of the discretion that the statute explicitly entrusts to the Attorney General, and therefore cannot be overruled by a court. We could not second-guess the Attorney General's decision to deny adjustment in a specific instance, *see* 8 U.S.C. § 1252(a)(2)(B)(i), and the government contends that we have no more authority to question the Attorney General's decision to exercise this discretion by across-the-board regulation rather than by case-by-case decisionmaking.

In support of this argument, the government points to Attorney General Janet Reno's explanation of § 1245.1(c)(8) at the time of its promulgation. Although the regulation governs eligibility, the explanation was specifically phrased in terms of the Attorney General's discretion:

> Consistent with Congress' intent that arriving aliens ... be removed in an expedited manner through the procedures provided in section 235(b)(1) of the Act [ 8 U.S.C. § 1225(b)(1) ], the Attorney General has determined that she will not favorably exercise her discretion to adjust the status of arriving aliens who are ordered removed pursuant to section 235(b)(1) of the Act or who are placed

> in removal proceedings under section 240 of the Act [ 8 U.S.C. § 1229a].... If the Service decides as a matter of prosecutorial discretion, not to initiate removal proceedings but to parole the arriving alien, the alien will be able to apply for adjustment of status before the district director.

62 Fed. Reg. 444, 452 (1997).

As further support for its position, the government cites *Lopez v. Davis,* 531 U.S. 230, 121 S.Ct. 714, 148 L.Ed.2d 635 (2001). In *Lopez,* the Court considered a Bureau of Prisons (BOP) regulation denying early release to prisoners whose offense involved a firearm. Lopez, a prisoner, argued that this regulation was inconsistent with the governing statute, which provides that the BOP "may" grant early release to any prisoner convicted of a "nonviolent offense" who successfully completed a substance abuse treatment program. *See* 18 U.S.C. § 3621(e)(2)(B). The Court determined that the BOP was entitled to exercise its discretionary authority by categorical regulation, and was not confined to case-by-case assessments. 531 U.S. at 244, 121 S.Ct. 714.

*Lopez* supports the government's argument that the Attorney General may use regulation to define the contours of his discretion. But *Lopez* is a double-edged sword, for it does *not* stand for the proposition that the statutory grant of discretion to the Attorney General renders his exercise of that discretion functionally unreviewable. Instead, *Lopez* puts this discretionary authority squarely within the second step of the *Chevron* framework:

> Beyond instructing that the Bureau has discretion to reduce the period of imprisonment for a nonviolent offender who successfully completes drug treatment, Congress has not identified any further circumstance in which the Bureau either must grant the reduction, or is forbidden to do so. In this familiar situation, where Congress has enacted a law that does not answer "the precise question at issue," all we must decide is whether the Bureau, the agency empowered to administer the early release program, **\*114** has filled the statutory gap "in a way that is reasonable in light of the legislature's revealed design."

*Lopez,* 531 U.S. at 242, 121 S.Ct. 714 (quoting *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 257, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995) (citing *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778)); *see also Mouelle,* 416 F.3d at 929–30.

Thus, we find that, to the extent that the statute grants the Attorney General the discretion to create categorical eligibility rules for adjustment of status, those rules are nonetheless subject to review for reasonableness under the second prong of the *Chevron* test.

### C. Chevron *Step One: Eligibility and Discretion*

**[16]**  We turn to the first prong of the *Chevron* analysis. We do so because Zheng and *amicus* argue that the statute does *not* grant the Attorney General any discretion to determine eligibility for adjustment of status. They argue instead that, while the Attorney General may issue regulations regarding the adjustment process, and while he certainly has discretion over the final decision to grant adjustment, Congress has explicitly spoken on the issue of *eligibility* for adjustment, and the Attorney General thus has no power to modify the statutory eligibility requirements. This argument was endorsed by the First Circuit in *Succar,* which found the statute unambiguous and struck down the regulation under the first prong of the *Chevron* test. *See* 394 F.3d at 24, 30.

This argument begins from the text of INA section 245(a), which, to repeat, provides:

> The status of an alien who was inspected and admitted or paroled into the United States ... may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

8 U.S.C. § 1255(a). Zheng and *amicus* argue that the plain text of this provision allows any alien "inspected and admitted or paroled into the United States" to make an *application* to adjust status, although it leaves the ultimate discretion to *grant* adjustment in the hands of the Attorney General.

Zheng's argument draws further support from the structure of the adjustment provisions in the INA. Section 245 does not stop with the general adjustment provision quoted above; rather, it goes on to exclude several categories of aliens from eligibility for adjustment. Section 245(c), 8 U.S.C. § 1255(c), provides that subsection (a) shall not apply to alien crewmen, aliens who accept unauthorized employment or are in unlawful immigration status, aliens deportable for engaging in terrorist activities, and certain aliens with visa defects or other problems with their immigration status. [13] And subsection (e) provides that the Attorney General may not adjust the status of an alien who marries during removal proceedings and who seeks adjustment based on that marriage.

The First Circuit found this long list of statutory exclusions to be compelling evidence **\*115** that "Congress unambiguously reserved to itself the determination of who is eligible to apply for adjustment of status relief." *Succar,* 394 F.3d at 24. That court noted that "when Congress desired to limit the ability of a non-citizen who might otherwise have been eligible to apply for adjustment of status under 1255(a), it has done so explicitly by defining several categories of aliens as not eligible to apply." *Id.* at 25. From the statutory text and structure, the court discerned "two themes":

> First, Congress explicitly rendered ineligible a certain category of aliens to apply. Second, that category of excluded aliens included some in removal proceedings, but Congress chose not to disqualify from eligibility all of those aliens "inspected and admitted or paroled" in removal or other judicial proceedings. In those limited circumstances when the

involvement in proceedings works to hamper an individual's ability to adjust status, Congress has explicitly said so.

*Id.* These themes gave the First Circuit a "clear sense of congressional intent," *id.* at 22 (quoting *Gen. Dynamics Land Sys.,* 540 U.S. at 600, 124 S.Ct. 1236), and led it to conclude that the statute unambiguously precluded the Attorney General from imposing further restrictions on eligibility to apply for adjustment of status.

The First Circuit conceded that the statute grants the Attorney General broad discretion to grant or deny adjustment of status. But it found an important distinction between eligibility to apply for adjustment and the substantive relief of a grant of adjustment. In drawing this distinction, the court relied on *INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). In that case, the Supreme Court considered the asylum standard of "well-founded fear of persecution," which the Attorney General had interpreted as incorporating the withholding of removal standard that the alien be "more likely than not" to be persecuted. The Court noted that the Attorney General has discretion to grant asylum to eligible refugees, but nonetheless rejected his interpretation of the standards for eligibility. *See id.* at 443–44, 449, 107 S.Ct. 1207. The First Circuit took this to mean that "[t]he Supreme Court ... has ruled that the two questions of discretion as to the ultimate relief and discretion as to eligibility exclusions are distinct." *Succar,* 394 F.3d at 23; *see also INS v. Yang,* 519 U.S. 26, 30, 117 S.Ct. 350, 136 L.Ed.2d 288 (1996) ("While [ 8 U.S.C. § 1251(a)(1)(H) ] establishes certain prerequisites to eligibility for a waiver of deportation, it imposes no limitations on the factors that the Attorney General ... may consider in determining who, among the class of eligible aliens, should be granted relief.").

The Eighth Circuit, disagreeing with *Succar,* pointed out that *Cardoza–Fonseca* need not be read for the proposition that discretion to grant substantive relief and discretion to restrict eligibility are unrelated. *Cardoza–Fonseca* concerned the Attorney General's interpretation of a statutory standard, while the regulation at issue here "does not purport to interpret statutory eligibility standards, but rather rests on the discretionary authority that Congress explicitly gave the Attorney General to grant adjustment-of-status relief."

*Mouelle,* 416 F.3d at 929–30. The court asked rhetorically, "[W]hy should the Attorney General be forced to exercise his discretion through rules that speak only to the ultimate relief rather than eligibility?" *Id.* at 928–29. Relying on *Lopez,* which allowed an agency to exercise its discretion via general rulemaking rather than by individual determinations, the Eighth Circuit concluded that "it makes little sense to invalidate this regulation simply because it speaks in terms of eligibility." *Id.*

**\*116** While the question is close, we cannot agree with the First Circuit that the statutory text and structure indicate a clear intent to preempt the field of eligibility. The fact that Congress declared some categories of aliens ineligible for adjustment by statute does not in itself conclusively prove that the Attorney General cannot declare other categories ineligible by regulation. Indeed, in *Lopez,* the prisoner argued "that, by identifying a class of inmates ineligible for sentence reductions under § 3621(e)(2)(B), *i.e.,* those convicted of a violent offense, Congress has barred the Bureau from identifying further categories of ineligible inmates." 531 U.S. at 239, 121 S.Ct. 714. This argument is essentially identical to that adopted by *Succar:* that statutory eligibility standards "cover the field" and prevent an agency from further regulating eligibility. But the Supreme Court rejected this argument in *Lopez,* and we are unwilling to follow it here. [14] *See also Mourning v. Family Publ'ns Serv., Inc.,* 411 U.S. 356, 372, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973) ("Respondent argues that, in requiring disclosure as to some transactions, Congress intended to preclude the [agency] from imposing similar requirements as to any other transactions. To accept respondent's argument would undermine the flexibility sought in vesting broad rulemaking authority in an administrative agency.").

We therefore find that, under the first step of the *Chevron* analysis, INA section 245 is ambiguous as to whether the Attorney General may regulate eligibility to apply for adjustment of status.

### *D.* Chevron *Step Two: Congressional Meaning Versus Regulatory Restrictions*

**[17]** Even if the statute is ambiguous, and even if the Attorney General is empowered to issue regulations to fill in gaps in the statute, those regulations must be "reasonable in

light of the legislature's revealed design." *NationsBank, 513 U.S. at 257, 115 S.Ct. 810.* The fact that the Attorney General may regulate eligibility does not give him free rein to issue any eligibility regulations that he chooses; under the second step of *Chevron,* those regulations must still be "based on a permissible construction of the statute." *467 U.S. at 843, 104 S.Ct. 2778.*

### 1. Parole and Removal Proceedings

To deal with the second *Chevron* prong, we must examine the statute in more depth. We begin with the fact that section 245(a) allows the Attorney General to grant adjustment to any alien "who was inspected and admitted or paroled into the United States." *8 U.S.C. § 1255(a).* Importantly, the statute grants eligibility to adjust status not only to those aliens who have been lawfully admitted into the United States, but also to those who have merely been paroled.

> The Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant **\*117** public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

*8 U.S.C. § 1182(d)(5)(A).* Regulations prescribe in more detail who may be paroled; it appears that the broadest class of parolees comprises those "whose continued detention is not in the public interest." *8 C.F.R. § 212.5(b)(5).*

Paroled aliens are not admitted to the United States. *8 U.S.C. § 1101(a)(13)(B).* Instead, they are treated by the statute as "applicants for admission." *Id.* § 1225(a)(1) ("An alien present in the United States who has not been admitted ... shall be deemed for the purposes of this chapter an applicant for admission."). The statute provides that an applicant for admission "shall be detained for a [removal] proceeding" if an immigration officer determines that he or she is "not clearly and beyond a doubt entitled to be admitted." *Id.* § 1225(b)(2)(A). Parole is a form of relief from immigration *detention;* it is not a form of relief from *removal proceedings,* and when the purposes of parole have been served the parolee must be returned to custody and removal proceedings must continue. *Id. § 1182(d)(5)(A).* Thus, the statutory structure seems to indicate that virtually all parolees will be in removal proceedings.

Parole is authorized by section 212 of the INA:

The parties to this case have not provided us with any statistics to test our supposition that most parolees are in removal proceedings. However, the First Circuit noted in *Succar* that "it was represented in the briefs before this court that the 'majority of the intended beneficiaries of parolee adjustment of status are in removal proceedings,' " and that the Attorney General did not dispute that statistic. *394 F.3d at 21.*

More compelling than any statistic, however, is the statutory structure that indicates that parolees will, by default, be in removal proceedings: any alien "not clearly and beyond a doubt entitled to be admitted" will be placed in removal proceedings, *8 U.S.C. § 1225(b)(2)(A),* so any parolee— that is, any alien who has been inspected but not admitted— will *necessarily* be in removal proceedings. We thus do not rely exclusively upon the statistics provided in the *Succar* court; our conclusion is informed by the plain indication of congressional intent. It is clear from the statutory text that Congress intended for virtually all parolees to be in removal proceedings. [15]

**\*118** It is equally clear, of course, that Congress intended that parolees, as a general class, be eligible for adjustment of status: the statute provides explicitly that the Attorney General may grant adjustment to "an alien who was inspected

and admitted or paroled into the United States." 8 U.S.C. § 1255(a). The statute further provides that the Attorney General may grant the adjustment "if the alien makes an application for such adjustment," *id.* § 1255(a)(1), which plainly contemplates that paroled aliens may make such an application (though of course the Attorney General need not grant it). Because the large majority of aliens paroled into the United States will be in removal proceedings, it is difficult to avoid the conclusion that Congress intended that the mere fact of removal proceedings would not render an alien ineligible to apply for adjustment of status. *See also* *Succar,* 394 F.3d at 25 ("Congress chose not to disqualify from eligibility all of those aliens 'inspected and admitted or paroled' in removal or other judicial proceedings.").

### 2. Arriving Aliens and Adjustment of Status

The regulation under which the government wants to exclude Zheng provides as follows:

(c) Ineligible aliens. The following categories of aliens are ineligible to apply for adjustment of status to that of a lawful permanent resident alien under section 245 of the Act:

...

(8) Any arriving alien who is in removal proceedings pursuant to section 235(b)(1) or section 240 of the Act [8 U.S.C. § 1225(b)(1) or § 1229a]....

8 C.F.R. § 1245.1. While the statute renders parolees eligible, as a general rule, for adjustment of status, the regulation appears to have the opposite effect. The regulation is phrased in terms of "arriving aliens," as defined by 8 C.F.R. § 1.1(q), but this term seems to be essentially synonymous with "applicants for admission" as defined by 8 U.S.C. § 1225(a)(1). *See supra* Part V.D.1. In particular, although the term "arriving alien" might sound like it refers only to those aliens physically in the process of arriving in the United States, it also extends to those who arrive and are paroled into the United States. *See* 8 C.F.R. § 1.1(q); *Succar,* 394 F.3d at 17; Part IV.B, *supra.* Thus "arriving aliens" appears to encompass most or all of those aliens who are paroled into the United States, as well as many of those aliens who are detained by DHS. Indeed, in its supplemental briefing, the

government states that "[a] parolee is an 'arriving alien' who has been permitted temporary entry into the United States, as opposed to a non-parolee 'arriving alien' who has been detained for removal proceedings."

Similarly, the regulation limits its scope to arriving aliens who are "in removal proceedings," but as we have seen this is no real limitation. At least the majority of aliens paroled into the United States are in removal proceedings, yet, as explained above, Congress's clear intent is that virtually all parolees should be in such proceedings. *See supra* Part V.D.1. We are thus faced with a regulation that renders most aliens paroled into the United States ineligible to apply for adjustment of status.

The government points out that, under its regulations, some parolees may be eligible for adjustment of status. Specifically, **\*119** the government notes that an arriving alien may *renew* an adjustment application that was denied by a district director, if the alien had filed the denied application pursuant to an earlier admission into the United States and then renewed the application after returning to the United States under the terms of an advance parole granted in order to pursue the adjustment application. *See* 8 C.F.R. § 1245.2(a)(1)(i) & (ii). This is, however, a very narrow exception. [16] Moreover, it does not comport with Congress's stated intent that parolees should be eligible to apply for adjustment of status. The parolees allowed to adjust status under § 1245.2(a)(1) are only those who are *renewing* applications that they made as "admitted" aliens; the regulation makes no provision for aliens making a first-time application while in removal proceedings. Thus, under the government's reading, paroled aliens may not really *apply* to adjust status; they may only *renew* applications that they made when they were not "paroled" but "admitted."

In short, while there may be paroled aliens who are eligible to apply for adjustment of status under the regulations promulgated by the Attorney General, the government has not pointed to any significant category of paroled aliens who would in fact be eligible to make such an application. For all practical purposes, then, it appears that § 1245.1(c)(8) renders paroled aliens ineligible to apply for adjustment of status.

### 3. Is the Regulation a Permissible Interpretation of the Statute?

**[18]**    We are thus faced with a statute providing that, in general, aliens paroled into the United States may apply to adjust their status, and a regulation providing that, in general, they may not. The conflict between regulation and statute is clear and unmistakable. Under the second step of the *Chevron* test, "we must determine 'whether the regulation harmonizes with the plain language of the statute, its origin, and purpose. So long as the regulation bears a fair relationship to the language of the statute, reflects the views of those who sought its enactment, and matches the purpose they articulated, it will merit deference.' " *Appalachian States Low–Level Radioactive Waste Comm'n v. O'Leary,* 93 F.3d 103, 110 (3d Cir.1996) (quoting *Sekula v. FDIC,* 39 F.3d 448, 452 (3d Cir.1994)).

While this is a deferential standard, we think it plain that § 1245.1(c)(8) fails to meet it. As we have explained above in some detail, Congress's clearly expressed intent was to allow most paroled aliens to apply for adjustment of status; the regulation's effect is to bar almost all such aliens from adjustment. Congress's intent is apparent both from the language of the statute, allowing aliens "paroled into the United States" to apply for adjustment, and **\*120** from its structure, allowing such applications as a general matter and excluding only a few narrow classes from eligibility. This conclusion is supported by the legislative history. The First Circuit in *Succar* examined the history of INA section 245 in some detail, and came to the conclusion that Congress's intent in enacting that section was to spare admitted and paroled aliens the hardship and expense of having to leave the United States in order to apply for an adjustment of status to which they were entitled. *See Succar,* 394 F.3d at 32–34.

We have found that the text of INA section 245 leaves some ambiguity about whether the Attorney General may determine by regulation what classes of aliens are eligible to apply for adjustment of status, thus precluding reliance on the first prong of the *Chevron* test. *See supra* Part V.C. But, as we noted there, the decision is a close one: the statutory structure and language noted by the *Succar* court, while not unambiguous, certainly suggest that Congress intended to regulate eligibility by statute rather than to leave it in the Attorney General's hands. The closeness of the step one

question has some bearing on our step two decision. While the statute may be ambiguous enough to allow for some regulatory eligibility standards, it does not so totally abdicate authority to the Attorney General as to allow a regulation, like § 1245.1(c)(8), that essentially reverses the eligibility structure set out by Congress.

*Chevron,* of course, stands for the proposition that administrative agencies receive broad deference in interpreting the statutes which they are charged with enforcing. We are mindful of our obligation to respect the decisions of the immigration agencies, which are informed by long experience and deep specialization in matters of great national importance. But we have an even higher obligation to respect the clearly expressed will of Congress, which in promulgating and amending the INA made its own considered decisions, balancing the need to swiftly remove undeserving aliens against the desire to afford every applicant a fair chance to request any immigration benefits that he or she may deserve.

Given Congress's intent as expressed in the language, structure, and legislative history of INA section 245, the regulation's effect of precluding almost all paroled aliens from applying to adjust their status does not "harmonize[ ] with the plain language of the statute, its origin, and purpose." *Sekula,* 39 F.3d at 452. Because 8 C.F.R. § 1245.1(c)(8) is not based on a permissible reading of INA section 245(a), 8 U.S.C. § 1255(a), we hold that the regulation is invalid insofar as it renders parolees ineligible to apply for adjustment of status. As explained in the following Part, we will therefore remand Zheng's case to the immigration authorities for further consideration.

### VI. Application to Zheng

**[19]**    Having held that § 1245.1(c)(8) is invalid, we now turn to several miscellaneous issues, specific to Zheng's case, that the government contends prevent him from applying for adjustment of status.

### A. Zheng's Parole Status and the Effect of the Notice to Appear

Zheng meets 🚩 section 245's requirement that he be an alien "admitted or paroled into the United States," 🚩 8 U.S.C. § 1255(a), because he was granted advance parole to return to the country in 1993. *See supra* Part II.A. The government argues, however, that his parole was revoked when the INS served him with a Notice to Appear. The regulations provide that, "[w]hen a charging document is served on **\*121** the alien, the charging document will constitute written notice of termination of parole, unless otherwise specified." 🚩 8 C.F.R. § 212.5(e)(2)(i). Thus, because Zheng's parole was revoked when a Notice to Appear was served on him, he is said to no longer be "paroled into the United States" under the terms of 🚩 section 245.

While this argument is facially plausible, it seems to conflict with the statutory and regulatory scheme. The Notice to Appear institutes removal proceedings, but it does not normally revoke parole in any literal, physical sense. Thus the Notice to Appear in our record ordered Zheng to appear before an Immigration Judge; it did not commit him to INS custody. The regulation quoted above also provides that "[i]f the exclusion, deportation, or removal order cannot be executed within a reasonable time, the alien shall again be released on parole unless in the opinion of [a DHS] official ... the public interest requires that the alien be continued in custody." 🚩 8 C.F.R. § 212.5(e)(2)(i). Because Zheng does not seem to have been taken into custody, and because the Notice to Appear merely commenced removal proceedings rather than executing a removal order, we are forced to conclude that this exception applied to Zheng, and that he was free on parole during his removal proceedings. [17] Perhaps the Notice to Appear revoked his parole, but, if so, he was immediately reparoled.

Because Zheng appears to have remained free on parole throughout the pendency of removal proceedings, and is free on parole now, we hold that he qualifies as an "alien paroled into the United States" under the terms of 🚩 section 245. We leave to another day a determination of whether DHS may prevent a paroled alien from applying for adjustment of status by serving a Notice to Appear and committing the alien to custody. Zheng argues, with some force, that the statute uses a past participle, speaking in terms of aliens "admitted or paroled into the United States," not merely aliens *currently* free on parole. While this word choice is not conclusive evidence, it does suggest that DHS might be

unable to terminate adjustment eligibility simply by revoking parole.

We also note *amicus's* argument that the revised Notice to Appear charged Zheng only with lack of possession of a valid unexpired immigrant visa under INA section 212(a)(7)(A)(i)(I), 🚩 8 U.S.C. § 1182(a)(7)(A)(i)(I), and that the CSPA specifically excludes this charge as a basis for denying adjustment of status, CSPA § 2(a)(3)(A), 106 Stat. at 1969. We agree with *amicus* that it seems anomalous to allow DHS to revoke Zheng's eligibility to adjust status by charging him under a section of the INA that the CSPA renders inapplicable.

### *B. Zheng's Adjustment Applications*

Zheng presses two adjustment applications. One is based on his approved employment-based immigrant visa petition. Zheng's employment-based adjustment application was first raised in his motion to reopen before the BIA. As far as we can determine, neither the DHS, the IJ, nor the BIA has considered this application. Because we have found that Zheng is eligible to apply for adjustment, we will remand this application for further consideration by the proper authorities. *See infra* Part VI.C.

Zheng's second adjustment claim is a renewal of his application to adjust status pursuant to the CSPA, which was previously denied because Zheng had submitted **\*122** fraudulent documents in support of his claim. Indeed, the 1999 denial of Zheng's adjustment petition is what precipitated these removal proceedings.

**[20]** We are sympathetic to the government's position that "the statute does not mandate that Zheng, or any other alien, be given a second chance to apply for adjustment of status." But the BIA explicitly rejected Zheng's CSPA adjustment application, not because it was duplicative, but because the Board found that Zheng, as an arriving alien in removal proceedings, is ineligible for adjustment of status. We are bound to review the agency's decision based solely on the stated grounds for that decision. *See* 🚩 *SEC v. Chenery Corp.,* 318 U.S. 80, 95, 63 S.Ct. 454, 87 L.Ed. 626 (1943); 🚩 *Li v. Attorney General,* 400 F.3d 157, 163 (3d Cir.2005). Here, the BIA's stated basis for denying relief was the 🚩 § 1245.1(c)(8) eligibility regulation, which we have found invalid.

As the First Circuit put it in the companion case to *Succar:*

> Since the agency action ... cannot be sustained on the stated grounds, the appropriate remedy is to remand to the BIA for further proceedings consistent with the holding [on the eligibility issue]. We do not address any other issues.

> We do not, for example, address the issue of whether Rivera's application for adjustment of status is somehow number-barred because she already filed one earlier application, which was denied. None of the IJ, the BIA, or the government in its brief to this court have suggested that any such number bar exists.

*Rodriguez de Rivera,* 394 F.3d at 40. Similarly, here, although the government has in its brief argued the unfairness of giving Zheng multiple chances to submit credible evidence of his CSPA claim, it has not pointed to any provision of the statute or regulations that would bar Zheng from renewing his application for adjustment of status. We must therefore remand that application to the immigration authorities.

### C. Who Has Jurisdiction Over Zheng's Application?

In order to remand this case, we must determine who has jurisdiction to hear Zheng's applications for adjustment of status. Jurisdiction over applications to adjust status is allocated by regulation:

> An alien who believes he or she meets the eligibility requirements of section 245 of the Act [ 8 U.S.C. § 1255] or section 1 of the Act of November 2, 1966 [viz., the Cuban Refugee Adjustment Act], and [ 8 C.F.R.] § 1245.1 shall apply to the director having jurisdiction over his or her place of residence unless otherwise instructed in 8 CFR part 1245, or by the instruction on the application form. After an alien, other than an arriving alien, is in deportation or removal proceedings, his or her application for adjustment of status under section 245 of the Act ... shall be made and considered only in those proceedings.

> An arriving alien, other than an alien in removal proceedings, who believes he or she meets the eligibility requirements of section 245 of the Act ... and § 1245.1 shall apply to the director having jurisdiction over his or her place of arrival.

8 C.F.R. § 1245.2(a)(1).

This regulation appears to create three categories of applicants. First, there is a broad catch-all category of aliens who believe they are eligible. These aliens may apply for adjustment to the district director [18] with jurisdiction over their residence. **\*123** Second, aliens who are not arriving aliens, but who are in removal proceedings, may apply for adjustment in those proceedings—ordinarily, we expect, to the IJ with jurisdiction over the removal proceedings. Third, arriving aliens who are *not* in removal proceedings may apply for adjustment to the district director with jurisdiction over their place of arrival.

This list seems to omit a fourth category, arriving aliens who are in removal proceedings. Such an omission is, of course, perfectly consistent with § 1245.1(c)(8), which renders that class of aliens ineligible to apply for adjustment of status. Because we have found the eligibility regulation invalid, however, we must consider the impact of our decision on the jurisdictional regulation: if arriving aliens in removal proceedings are eligible to adjust status, then someone must have jurisdiction to consider their applications.

In a letter dated February 4, 2005, we asked counsel to address the question of who should have jurisdiction to hear adjustment petitions of arriving aliens in removal proceedings if we were to find that such aliens were eligible to adjust status. Following oral argument, the parties submitted supplemental briefing on this and other questions. Zheng's position is that the Immigration Judge responsible for removal proceedings should have jurisdiction over his adjustment applications. The government's position is less clear, but it appears to ask us to "leave to the Attorney General the determination of who has jurisdiction over such applications."

The simplest reading of § 1245.2(a)(1) in light of our eligibility holding is that aliens in Zheng's position fall into the catch-all category of aliens who may apply to the USCIS

district director responsible for their place of residence. This reading is bolstered by the fact that, prior to the enactment of the eligibility regulation that we have invalidated today, an arriving alien in removal proceedings was required to file his or her adjustment applications with the INS district director rather than the IJ hearing the removal proceedings.

See *Matter of Castro–Padron, 1996 WL 379828, 21 I. & N. Dec. 379, 380 (BIA 1996)* ("The applicants can file their adjustment applications with the district director of the Immigration and Naturalization Service, who has sole jurisdiction over the application and can act on the application independently of [the removal] proceedings."); *see also supra* note 16.

In *Succar* and *Rodriguez de Rivera,* the First Circuit invalidated § 1245.1(c)(8) and remanded to the BIA without explaining who had jurisdiction to hear petitioners' adjustment applications. See *Succar,* 394 F.3d at 36; *Rodriguez de Rivera,* 394 F.3d at 40. Consistent with our reading above, commentators seem to have assumed that the district director will have exclusive jurisdiction to hear adjustment applications from arriving aliens in removal proceedings. But other conclusions are possible:

> **\*124** As a consequence [of *Succar*], parolees in proceedings are currently eligible to adjust status before USCIS notwithstanding the fact that the individual is in proceedings. Moreover, it is reported that at least some of the immigration judges in the Boston immigration court are also accepting adjustment applications from "arriving alien" parolees and adjudicating them.

Sarah Ignatius & Elisabeth S. Stickney, *Immigration Law & the Family* § 8:35 (database updated 2005).

Because the plain text of § 1245.2(a)(1) appears to grant the district director the jurisdiction to hear adjustment of status applications from arriving aliens in removal proceedings, and because neither party has provided any convincing argument for granting jurisdiction to any other official, we tentatively conclude that the USCIS district director for Philadelphia should have jurisdiction over Zheng's adjustment application. Nonetheless, we will remand to the BIA for further consideration; if the parties agree, or the BIA is convinced, that the IJ has jurisdiction to hear Zheng's application, then the Board may remand it to the IJ rather than to the district director.

## VII. Conclusion

For the reasons set forth in Part II, we will deny Zheng's petition for review insofar as it relates to his motion to reopen asylum proceedings. But because 8 C.F.R. § 1245.1(c)(8) contradicts the clear language and expressed intent of INA section 245(a), 8 U.S.C. § 1255(a), we find that the regulation is not a permissible exercise of the Attorney General's discretion. Therefore, as an alien paroled into the United States, Zheng is eligible to apply for adjustment of status, which the Attorney General may grant or deny in his discretion, and we will grant the petition for review on that basis. We will remand this case to the BIA for further proceedings consistent with this opinion. On remand, the BIA must determine who has jurisdiction over Zheng's adjustment applications.

**All Citations**

422 F.3d 98

## Footnotes

\*    Substituted pursuant to Fed. R.App. P. 43(c).

1    The DED program expired by its terms on January 1, 1994. Exec. Order No. 12,711, § 1, 55 Fed. Reg. 13897 (Apr. 11, 1990).

2    On March 1, 2003, the INS's functions were transferred to the Bureau of Immigration and Customs Enforcement (ICE) and the U.S. Customs and Immigration Service (USCIS) of the United States Department of Homeland Security (DHS). *See* *Knapik v. Ashcroft,* 384 F.3d 84, 86 n. 2 (3d Cir.2004) (citing Homeland Security Act of 2002, Pub. L. No. 107–296, §§ 441, 451 & 471, 116 Stat. 2135, *codified at* 6 U.S.C. §§ 251, 271 & 291).

3    Zheng's Immigrant Petition for Alien Worker was approved by the INS with a priority date of February 14, 2001. The petition was granted under INA section 203(b)(3)(A)(i), 8 U.S.C. § 1153(b)(3)(A)(i), which allows skilled workers (Zheng is a Chinese chef) to receive immigrant visas. An alien with such an approved petition may, in the discretion of the Attorney General, have his status adjusted to that of a lawful permanent resident. *See* 8 U.S.C. §§ 1153(b)(3) & 1229(a); *see generally* U.S. Citizenship and Immigration Services, How Do I Become a Lawful Permanent Resident While in the United States?, http:// uscis.gov/graphics/howdoi/ legpermres.htm (last visited August 8, 2005).

4    Due to a mailing mishap, the March 2003 decision was reissued on August 4, 2003. The petition for review, dated September 2, 2003, was therefore timely filed within 30 days of the final order of removal. *See* 8 U.S.C. § 1252(b)(1).

5    The FOIA documents revealed that the INS also did not submit a brief to the BIA, although the administrative record indicates that there was a briefing notice issued to Zheng's lawyer and to the INS. Zheng interprets the lack of an INS brief to mean that neither party actually *received* the briefing notice or schedule. The government, however, points out that the lack of an INS brief proves nothing, as the INS is not required to submit an appellate brief before the BIA. Without a brief from the alien, the INS would have no reason to file a brief: the alien's failure to file a brief is in itself sufficient cause for the BIA to dismiss the appeal. *See* 8 C.F.R. § 1003.1(d)(2)(i)(E).

6    The IJ denied asylum on the basis of an adverse credibility finding, listing numerous discrepancies between Zheng's testimony and his asylum application and finding that Zheng's explanation of these problems on cross-examination was unconvincing. Furthermore, even if Zheng were credible, he does not seem to have alleged any past persecution: he was questioned by security officers, and was demoted at work. He does not, however, allege that he was ever detained (beyond a brief house arrest), tortured, or even threatened. He returned to China in 1993, and does not appear to have encountered any trouble during that visit. Zheng has given us no reason to believe that, if Li had filed an appellate brief with the BIA, the Board might have reversed the IJ's reasonable asylum decision.

7    Subparagraphs (A)(iii), (A)(iv), (B)(ii), and (B)(iii) of 8 U.S.C. § 1154(a)(1) all refer to aliens who are the spouses or children of citizens or lawful permanent residents, and are not applicable here. The "or" in the statutory text of § 1255 appears to be a mistake, and is noted as such in the United States Code Annotated.

8    Zheng's application to adjust status based on his employment visa application falls squarely under section 245.

9    Section 212(d)(5) of the INA, 8 U.S.C. § 1182(d)(5), authorizes the Attorney General to parole into the United States "temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien" and the parole must be terminated when its purposes have been served. Section 235(b)(1)(A)(i) of the INA, 8 U.S.C. § 1225(b)(1)(A)(i), governs screening of arriving aliens by immigration officers. As Zheng received advance parole in 1993, he is not an arriving alien for section 235(b)(1)(A)(i) purposes, and so cannot be summarily removed by an immigration officer.

10    More broadly, courts and commentators seem to take "arriving alien" as a catch-all category containing all aliens who have not been "inspected and admitted" to the United States. *See, e.g., Succar v. Ashcroft,* 394

F.3d 8, 16 (1st Cir.2005) ("Parolees, although they are physically present in the United States, are treated as if they were at the border seeking admission."); Stanley Mailman & Stephen Yale–Loehr, *Adjustment of Status for Paroled Persons: An Endangered Species?,* N.Y. L.J., Feb. 28, 2005, at 3 (equating the term "arriving alien" with "unadmitted alien").

11   Zheng cites *INS v. St. Cyr,* 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), for the proposition that some of IIRIRA's changes are impermissibly retroactive. But *St. Cyr* dealt with a section of IIRIRA that "attache[d] new legal consequences to events completed before its enactment." *Id.* at 321, 121 S.Ct. 2271 (quoting *Martin v. Hadix,* 527 U.S. 343, 357–58, 119 S.Ct. 1998, 144 L.Ed.2d 347 (1999)). The definition of "arriving alien" does no such thing, and, apart from the effects of § 1245.1(c)(8), Zheng has not identified any substantive consequence of application of the new term to him.

12   The Fifth Circuit, in an unpublished decision, has rejected an arriving alien's request to adjust status despite an *amicus* brief filed by the AILF. *See Diarra v. Gonzales,* 137 Fed.Appx. 627 (5th Cir.2005) (unpublished per curiam opinion). The *Diarra* panel merely found that the petitioner was an arriving alien under § 1245.1(c)(8), without addressing the validity of that regulation. It is unclear whether the question of validity was briefed. Other pending cases in which the AILF has requested or been granted *amicus curiae* status include *Ramos Bona v. Ashcroft,* Nos. 03–71596 & 03–72488, 2005 WL 924230 (9th Cir.2005); *Hong v. Gonzales,* No. 04–74034, 2005 WL 1773109 (9th Cir.2005); *Roozeky v. Ashcroft,* No. 04–71540, 2005 WL 780482 (9th Cir.2005); and *Shah v. Gonzales,* No. 05–10587, 2001 WL 951547 (11th Cir.2001). *See* American Immigration Law Foundation, *Succar*–Related Cases, http://www.ailf.org/lac/lac_arrivingalien.htm (last visited August 19, 2005). None of these cases had been decided as of the date of this opinion.

13   The government does not contend that any of the § 1255(c) exclusions bar Zheng's application.

14   The First Circuit distinguished *Lopez* by noting that in section 245, 8 U.S.C. § 1255, "Congress made numerous and explicit policy choices about who is eligible for adjustment of status relief, who is ineligible, and of those ineligible, who is nonetheless eligible with certain application restrictions." *Succar,* 394 F.3d at 29. In the *Lopez* statute, on the other hand, Congress had identified only a single class of ineligible inmates: those who had committed violent felonies. While this distinction is plausible, and section 245 and § 3621(e)(2)(B) certainly differ in specificity, we respectfully conclude that *Succar's* distinction comes perilously close to rejecting the Supreme Court's holding in *Lopez.*

15   The Attorney General, in promulgating § 1245.1(c)(8), suggested that the then-INS might "decide[ ] as a matter of prosecutorial discretion, not to initiate removal proceedings but to parole the arriving alien," which would then render the alien eligible to adjust status before the district director. 62 Fed. Reg. 444, 452 (1997). But of course, as outlined above, the decision to parole an alien is not synonymous with the decision not to initiate removal proceedings. Instead, as we have explained, parolees will by default—and by clear congressional intent—be in removal proceedings. Thus, under the text of the regulation, DHS's discretionary decision to parole an alien would not render the alien eligible for adjustment of status, because the alien would still be an arriving alien in removal proceedings.

Even assuming, however, that DHS does have the prosecutorial discretion to dismiss removal proceedings —an assumption that is questionable given the statutory requirement that parolees *"shall* be detained for a [removal] proceeding," 8 U.S.C. § 1225(b)(2)(A) (emphasis added)—Congress clearly intended for most parolees to be in removal proceedings. We thus doubt that DHS's prosecutorial discretion will result in many paroled aliens being eligible for adjustment under the regulation.

16   The government points out that this exception existed prior to the passage of IIRIRA and the 1997 adoption of § 1245.1(c)(8). In *Matter of Castro–Padron,* 1996 WL 379828, 21 I. & N. Dec. 379 (BIA 1996), the BIA held that an IJ had no jurisdiction to entertain an application for adjustment of status made by an alien

in removal proceedings, except in the narrow circumstances described in the text. The government cites *Castro–Padron* for the theory that the § 1245.1(c)(8) exception "is not a new rule that the INS is imposing." But prior to 1997, while IJs lacked jurisdiction to consider applications like Zheng's, INS district directors had such jurisdiction. *See Castro–Padron,* 21 I. & N. Dec. at 380 ("The applicants can file their adjustment applications with the district director of the Immigration and Naturalization Service, who has sole jurisdiction over the application and can act on the application independently of [the removal] proceedings."). After 1997, the regulations prevent aliens in Zheng's position from applying for adjustment in *any* forum.

17    The government has never contended that the public interest requires that Zheng be held in custody, nor is there any evidence in the record to support such a contention.

18    At the time this regulation was enacted, the district director was a local official of the INS. With the enactment of the Homeland Security Act of 2002, the term's meaning has become inscrutable. *See* 8 C.F.R. § 1.1(o) ("On or after March 1, 2003, pursuant to delegation from the Secretary of Homeland Security or any successive re-delegation, the terms ['director' or 'district director'] mean, to the extent that authority has been delegated to such official: service center director; special agent in charge; field office director; district director for services; district director for interior enforcement; or director, field operations."). We use "district director" to designate whatever DHS official is now responsible for reviewing applications to adjust status, probably a USCIS District Director. It appears that adjustment of status applications are now made at district offices of the USCIS. *See, e.g.,* USCIS Philadelphia Field Office, About Us, http:// uscis.gov/graphics/fieldoffices/ philadelphia/aboutus.htm (last visited August 6, 2005).

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Shantu v. Lynch, 4th Cir., July 13, 2016

547 F.3d 504
United States Court of Appeals,
Fourth Circuit.

Chi Alfred ZUH, a/k/a Chi A. Zuh, Petitioner,

v.

Michael B. MUKASEY,
Attorney General, Respondent.

No. 06-2050.
|
Argued: Sept. 25, 2008.
|
Decided: Nov. 25, 2008.

**Synopsis**

**Background:** Alien petitioned for review of order of Board
of Immigration Appeals (BIA) denying his application for
asylum.

**[Holding:]** The Court of Appeals, Diana Gribbon Motz,
Circuit Judge, held that immigration judge (IJ) erred in
failing to consider totality of circumstances in denying asylum as a
matter of discretion.

Vacated and remanded.

West Headnotes (3)

**[1]**    **Aliens, Immigration, and
Citizenship**    Review of Discretion

The Court of Appeals reviews the discretionary
denial of asylum by an immigration judge (IJ) for
abuse of discretion. Immigration and Nationality
Act, § 208(b), 8 U.S.C.A. § 1158(b); 8 C.F.R.
§ 208.14(a).

19 Cases that cite this headnote

**[2]**    **Aliens, Immigration, and
Citizenship**    Findings or Statement of
Reasons

**Aliens, Immigration, and
Citizenship**    Credibility

In ruling that an asylum applicant is not
credible, an immigration judge (IJ) must offer a
specific, cogent reason for his or her disbelief
of the applicant, and the Court of Appeals
will not defer to adverse credibility findings
based on speculation, conjecture, or an otherwise
unsupported personal opinion.

14 Cases that cite this headnote

**[3]**    **Aliens, Immigration, and
Citizenship**    Findings or Statement of
Reasons

In denying alien's asylum application as a
matter of discretion after finding that he was
eligible for asylum and granting withholding
of removal, immigration judge (IJ) erred in
failing to consider totality of circumstances in
exercising her discretion; IJ stated she based
denial of asylum solely on alien's testimony and
"incredible" documentation, without discussing
other corroborating evidence he presented, and
IJ apparently failed to consider the credible
evidence of alien's severe past persecution, or
that he had a fiancée and two young children
still in Cameroon, who continued to be harassed
by the government, or that after entering United
States, alien obtained work permit, attended
tractor-trailer training school, and befriended
someone who testified to his good character.
Immigration and Nationality Act, § 208(b), 8
U.S.C.A. § 1158(b); 8 C.F.R. § 208.14(a).

24 Cases that cite this headnote

**Attorneys and Law Firms**

**\*505** **ARGUED:** Sarah M. Brackney, Arnold & Porter,
L.L.P., Washington, D.C., for Petitioner. Thomas Henderson
Dupree, Jr., United States Department of Justice, Washington,
D.C., for Respondent. **ON BRIEF:** Rod J. Rosenstein, United

States Attorney, Alex S. Gordon, Assistant United States Attorney, Office of the United States Attorney, Baltimore, Maryland, for Respondent.

Before MOTZ, KING, and DUNCAN, Circuit Judges.

Vacated and remanded by published opinion. Judge MOTZ wrote the opinion, in which Judge KING and Judge DUNCAN joined.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

An Immigration Judge (IJ) found Chi Alfred Zuh eligible for asylum and granted him withholding of removal and protection under Article 3 of the United Nations Convention Against Torture. Despite Zuh's eligibility, the IJ denied asylum as a matter of discretion. The Board of Immigration Appeals (BIA) affirmed without opinion. Zuh petitions for review of this final order. Finding that the IJ failed to consider the totality of the circumstances in denying Zuh asylum, we vacate and remand for further proceedings consistent with this opinion.

### I.

Zuh, a native of Cameroon, came to this country in 2001 and soon thereafter sought asylum. He claims to have been subject to severe torture and beatings in Cameroon due to his political activities in two opposition parties, the Social Democratic Front (SDF) and the Southern Cameroon National Council (SCNC).

Specifically, Zuh testified that the Cameroonian government arrested and tortured him on four separate occasions: in February 1995, in January 1997, in May 1997, and finally in September 2001. On all four occasions, Zuh was stripped naked, severely beaten, confined for extended periods in inhumane quarters, and given little food, water, or medicine. He had to be hospitalized after being released and suffered permanent injuries, which he documented through medical certificates from a Cameroonian doctor and a letter from an American doctor.

Fearing for his life after the fourth imprisonment, Zuh escaped from prison and immediately thereafter, with the help of his uncle, borrowed a French passport. He then flew to the United States and took up residence with his uncle's friend, Peter Clarkson Fon. Zuh belongs to the American chapters of both the SDF and the SCNC. He believes that the Cameroonian government will arrest, torture, and possibly **\*506** kill him if the United States returns him to Cameroon. [1]

At Zuh's first hearing, the IJ denied him all relief. The IJ found Zuh's supporting documentation to be of limited probative value and faulted him for presenting insufficient corroborating evidence, such as other witnesses or letters from family members in Cameroon. As a result, the IJ found that although Zuh carried his burden of proof as to general conditions in Cameroon, he did not present sufficient evidence of danger specific to himself. Significantly, however, the IJ did not fault Zuh's veracity or find him incredible.

On appeal, the BIA remanded the case to the IJ in light of new evidence Zuh presented to the Board. At the second hearing before the IJ, Zuh testified that at the first hearing he had been reluctant to involve his family for fear of endangering them. But, in what he described as an agonizing decision, he decided to provide new documentary evidence from his family. Two witnesses also testified on Zuh's behalf: a friend of his fiancée's, Henrietta Bettah, and the man with whom he lives in the United States, Peter Clarkson Fon.

After the conclusion of the second hearing, the IJ granted Zuh withholding of removal and protection under the Convention Against Torture. The IJ reasoned that Zuh-ostensibly through the testimony of his two witnesses-had shown a "clear probability that someone in [Zuh's] position ... would face the prospect of torture." But "in the exercise of [her] discretion" the IJ denied Zuh asylum because of Zuh's assertedly "incredible documentation" and "not completely truthful" testimony. In reaching this conclusion, the IJ entered what she characterized as a "split credibility finding," stating that although Zuh's witnesses were credible, he was not. She also based this "split credibility finding" on her conclusion that Zuh's documents had "little or no probative value" either because they did not constitute affidavits or because they contained alleged irregularities.

The BIA, through a single member, affirmed without opinion. Zuh then filed this petition for review.

II.

A.

We have jurisdiction over final orders of removal under 8 U.S.C. § 1252(a)(1) (2006). When the BIA summarily affirms the IJ's decision, we review the correctness of the BIA's final order but review the reasoning of the IJ's opinion, "recognizing that the Board has concluded that any error in reasoning is 'harmless or nonmaterial.' " *Camara v. Ashcroft,* 378 F.3d 361, 366 (4th Cir.2004) (*quoting* 8 C.F.R. § 1003.1(e)(4)).

**[1]** **[2]**  We review an IJ's discretionary denial of asylum for abuse of discretion. *Dankam v. Gonzales,* 495 F.3d 113, 119 n. 2 (4th Cir.2007). Although this standard of review is deferential, it does not offer an IJ a blank check. *See Huang v. INS,* 436 F.3d 89, 97 (2d Cir.2006) (noting that the courts and the BIA have established "extensive limitations on an IJ's exercise of discretion in the context of asylum-eligible **\*507** refugees"). Rather, an IJ must weigh all relevant evidence under the totality of the circumstances. *Dankam,* 495 F.3d at 119 n. 2; *Kalubi v. Ashcroft,* 364 F.3d 1134, 1139 (9th Cir.2004); *Shahandeh-Pey v. INS,* 831 F.2d 1384, 1387 (7th Cir.1987). Moreover, as we have long recognized, an IJ must " ' offer a specific, cogent reason for [his or her] disbelief' " of the applicant, *Figeroa v. INS,* 886 F.2d 76, 78 (4th Cir.1989) (*quoting* *Turcios v. INS,* 821 F.2d 1396, 1399 (9th Cir.1987)), and we will not defer to adverse credibility findings based on " ' speculation, conjecture, or an otherwise unsupported personal opinion.' " *Tewabe v. Gonzales,* 446 F.3d 533, 538 (4th Cir.2006) (*quoting* *Dia v. Ashcroft,* 353 F.3d 228, 250 (3d Cir.2003) (en banc)).

B.

Zuh applied for three different protections: asylum under 8 U.S.C. § 1158(b) (2006), withholding of removal under 8 U.S.C. § 1231(b)(3) (2006), and protection under Article 3 of the United Nations Convention Against Torture (CAT). The IJ, the BIA, and the Government do *not* contend that Zuh failed to meet the standards for the last two-withholding of removal and CAT protection-both of which entail a greater burden of proof than the first-asylum eligibility.[2] Nor do they contend that any statutory factors bar Zuh from asylum. *See* 8 U.S.C. § 1158(b)(2) (2006). Thus, indisputably Zuh has established asylum eligibility. The question before us is whether the IJ appropriately exercised her discretion in denying Zuh this relief.

An asylum applicant who meets the legal standard for asylum is only "*eligible* for asylum," which the Attorney General (or his or her designee) "in his [or her] discretion" may grant. *INS v. Cardoza-Fonseca,* 480 U.S. 421, 443, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Although discretionary denials of asylum do occur, such denials are "exceedingly rare," *Huang,* 436 F.3d at 92, and are generally based on egregious conduct by the applicant. *See, e.g.,* *Aioub v. Mukasey,* 540 F.3d 609, 612 (7th Cir.2008) (applicant's fraudulent marriage); *Kouljinski v. Keisler,* 505 F.3d 534, 543 (6th Cir.2007) (applicant's three drunk-driving convictions).

A discretionary denial of asylum is even more rare when the IJ or BIA has found the applicant entitled to withholding of removal or protection under the CAT. Although applicable regulations permit an IJ to grant withholding of removal while denying discretionary asylum, *see* 8 C.F.R. § 208.16 (2008), the Board has affirmed such a disposition in very few cases and only when the Government has demonstrated egregious negative activity by the applicant. *See, e.g.,* *Matter of Shirdel,* 19 I. & N. Dec. 33, 37-38 (B.I.A.1984) (applicant circumvented orderly refugee procedures by using a smuggler to gain entry into the United States). Furthermore, we know of only one (unpublished) Court of Appeals decision upholding such a disposition. **\*508** *Aden v. Ashcroft,* 112 Fed.Appx. 852, 854 (3d Cir.2004) (applicant repeatedly failed to disclose his prior grant of asylum in a third country). On the other hand, two other Courts of Appeals, addressing similar situations, have soundly rejected this course. *See* *Huang,* 436 F.3d at 97-102; *Kalubi,* 364 F.3d at 1138-39. Indeed, the Attorney General himself acknowledges in a motion filed in this court that the IJ's holding in this case is "internally inconsistent."

We agree with the Second Circuit that this sort of resolution places an applicant in an "unusual legal status," in which he is ineligible to become a lawful permanent resident here, unable to reunite his family as derivative asylees, and subject to deportation to a willing third country. *Huang,* 436 F.3d at 95. We bear this in mind as we turn to the rationale offered by the IJ in this case.

### III.

Based on her "split credibility finding," the IJ exercised her discretion to deny Zuh asylum. Zuh contends that no substantial evidence supports this finding. He notes that at his first hearing, the IJ did not enter an adverse credibility determination and that at his second hearing the IJ refused to allow him to testify at length, stating that she did not want to cover "old ground." Thus, he contends that although the IJ did not make an adverse credibility finding at the first hearing, her subsequent "split credibility finding" effectively invalidated the bulk of his testimony from that first hearing.

### A.

The IJ appears to rest her determination that Zuh was not "particularly credible" on what she characterized as an inconsistency between his testimony at the first and second hearings. This asserted inconsistency concerned the failure of the person with whom Zuh lives in the United States, Peter Clarkson Fon, to testify at Zuh's first hearing.

A straightforward reading of the record reveals there simply is no inconsistency. The IJ suggested that at the first hearing Zuh represented that Clarkson was unwilling to testify, whereas at the second hearing Clarkson not only testified but also stated that he would have testified at the first hearing if asked. But the record reveals that at the first hearing Zuh apparently thought that an affidavit from Clarkson (a busy cab driver) would suffice, while at the second hearing, given the IJ's initial dismissal of his claim, Zuh concluded that he needed Clarkson's testimony to bolster his case. In short, Zuh *never* asserted that Clarkson had been unwilling to testify at the first hearing.

Even if this did constitute an inconsistency, it provides a thin reed on which to rest the conclusion that Zuh does not constitute a "particularly credible witness." [3] We have

previously faulted an IJ for "attach[ing] the bare label 'implausible' to [a petitioner's] testimony without providing specific and cogent reasons for doing so." *Tewabe,* 446 F.3d at 539. Given that Zuh's testimony was "not inherently implausible," we likewise find "unsustainable" this IJ's "unexplained characterization" of Zuh. *Id.*

### B.

The IJ dismissed letters from Zuh's family because they lacked sworn affidavits, even though Zuh authenticated the **\*509** letters through his testimony and the Government never objected to the lack of affidavits.

We recognize that sworn affidavits may often deserve greater weight than simple letters. But no statute or case law suggests that documents at immigration hearings must be sworn. Rather, without so much as pausing to note the unsworn nature of a document, numerous courts-including this one-have relied on such documents when considering claims of asylum applicants. *See, e.g., Tewabe,* 446 F.3d at 537; *Camara,* 378 F.3d at 369; *Shahandeh-Pey,* 831 F.2d at 1386; *In re Casillas,* 22 I. & N. Dec. 154, 157 n. 3 (B.I.A.1998) (noting that an applicant can demonstrate marriage through "letters or affidavits from family, friends, or acquaintances"). Moreover, it seems untenable to require a sworn statement from a person harassed because of a relationship with an asylum applicant and potentially endangered by helping that applicant in a country with conditions that the IJ herself described as "deplorable." *See Hor v. Gonzales,* 421 F.3d 497, 501 (7th Cir.2005) ("It seems unlikely that Hor's coworkers, who surely have a healthy respect for the murderous potential of [a radical Islamic group in Algeria], would submit affidavits to the U.S. immigration authorities.").

The unsworn nature of the many documents relied on by Zuh thus provides no basis for the IJ's refusal to credit them.

### C.

The IJ also found fault with two aspects of medical certificates submitted by Zuh to corroborate the injuries he suffered from torture.

First, the IJ found it significant that the handwriting on a letter from Zuh's Cameroonian doctor does not seem to

match the handwriting on the text of medical certificates that the doctor prepared. We note, however, that in addition to the letter, the doctor submitted an affidavit certifying the authenticity of both medical certificates, and the signature and seal on the affidavit match the signature and seal on both certificates. Thus, whatever the differences between the two sets of documents, clearly the Cameroonian doctor signed and affixed his seal attesting to the accuracy of both the affidavit and the certificates. Zuh also testified to the authenticity of the certificates, and no witness contradicted either the doctor's affidavit or Zuh's testimony. For these reasons the IJ's apparent reliance on the handwriting in the letters does not seem well founded.

The IJ also found it implausible that the medical certificates, although assertedly prepared months apart, contain serial numbers separated by only four digits. The Government did not comment on this issue until its closing argument at the first hearing, when it suggested that "perhaps more than just four certificates would've been issued during that period of time." The IJ dismissed out of hand Zuh's response that Cameroonians rarely request these "medico-legal" certificates because they are expensive and because most injury claims in Cameroon are settled.

Zuh has consistently maintained this explanation throughout his testimony at both hearings and it certainly is not inherently implausible. *See Tewabe,* 446 F.3d at 539. Moreover, his Cameroonian doctor offered the same explanation. As the Seventh Circuit has noted, "The notion that documentation is as regular, multicopied, and ubiquitous in disordered nations as in the United States, a notion that crops up frequently in decisions by immigration judges, is unrealistic concerning conditions actually prevailing in the Third World." *Hor,* 421 F.3d at 501 (citations omitted).

 **\*510** For these reasons, the IJ's brief analysis of these serial numbers seems to us mere speculation or conjecture. *Tewabe,* 446 F.3d at 538.

### D.

Finally, the IJ found a newspaper article discussing Zuh and his uncle incredible because it contained non-consecutive page numbers and was set forth on seemingly mismatched paper. Like the medical certificate issue, the Government lawyer did not raise this contention until closing argument (this time at the second hearing), when he asserted that it was

"interesting" that the page numbers were not consecutive and that "I'm not an expert, but it does appear as though the paper used for that insert is slightly different than the paper on the rest of the newspaper."

Essentially, the IJ, adopting the Government's contention, concluded that Zuh fabricated the newspaper article out of whole cloth, complete with consistent page headers, advertisements, pictures, and other articles. Once again, we question the appropriateness of speculating about foreign documents, *see Ayi v. Gonzales,* 460 F.3d 876, 883 (7th Cir.2006), and holding a Cameroonian dissident newspaper to the same standard as the *New York Times* or even the *Baltimore Sun.*

### E.

Having exhausted our analysis of the possible reasons for the IJ's negative credibility finding, the standard of review requires us also to consider the cumulative effect of those reasons. *See, e.g., Dankam,* 495 F.3d at 122-23. In this case each of the IJ's stated problems gains no stature when considered in combination with the others. We thus have serious misgivings with the IJ's "split credibility finding." Nevertheless, we will assume, without deciding, that substantial evidence supported this credibility determination because we conclude below that the IJ did not-as she must-consider the totality of the circumstances in exercising her discretion.

### IV.

### A.

 **[3]**    Zuh's central contention is that the IJ abused her discretion in denying him asylum given the record in this case and the IJ's findings as to his eligibility for withholding of removal and protection under the CAT.

To date we have not outlined the relevant factors to be considered when determining whether to grant or deny discretionary asylum relief. Relevant regulations, decisions of other courts, and administrative opinions, however, provide substantial assistance in this regard. *See, e.g., 8 C.F.R. § 208.14(a)* (2008) (general provision granting IJs discretionary power to grant or deny asylum); *id. §*

208.16(e) (mandating reconsideration of a discretionary denial of asylum where the applicant will be separated from his spouse and minor children by virtue of a grant only of withholding of removal); *Shahandeh-Pey,* 831 F.2d at 1387-88; *In re H-,* 21 I. & N. Dec. 337, 347-48 (B.I.A.1996); *Matter of Burbano,* 20 I. & N. Dec. 872, 874-79 (B.I.A.1994); *Matter of Chen,* 20 I. & N. Dec. 16, 18-22 (B.I.A.1989); *Matter of Pula,* 19 I. & N. Dec. 467, 472-75 (B.I.A.1987); *Matter of Marin,* 16 I. & N. Dec. 581, 584-87 (B.I.A.1978).

In light of these authorities, we believe that courts and IJs should consider, when relevant, the following non-exhaustive list of factors as part of the totality of the circumstances. *See* **\*511** *Dankam,* 495 F.3d at 119 n. 2. On the positive side, an IJ should consider:

1) Family, business, community, and employment ties to the United States, and length of residence and property ownership in this country;

2) Evidence of hardship to the alien and his family if deported to any country, or if denied asylum such that the alien cannot be reunited with family members (as derivative asylees) in this country;

3) Evidence of good character, value, or service to the community, including proof of genuine rehabilitation if a criminal record is present;

4) General humanitarian reasons, such as age or health;

5) Evidence of severe past persecution and/or well-founded fear of future persecution, including consideration of other relief granted or denied the applicant (e.g., withholding of removal or CAT protection).

On the negative side, relevant factors include the:

1) Nature and underlying circumstances of the exclusion ground;

2) Presence of significant violations of immigration laws;[4]

3) Presence of a criminal record and the nature, recency, and seriousness of that record, including evidence of recidivism;

4) Lack of candor with immigration officials, including an actual adverse credibility finding by the IJ;

5) Other evidence that indicates bad character or undesirability for permanent residence in the United States.

We emphasize that an IJ need not analyze or even list every factor. *See Casalena v. INS,* 984 F.2d 105, 107 (4th Cir.1993). To the contrary, we explicitly reject such an "inflexible test" and recognize the "undesirability and 'difficulty, if not impossibility, of defining any standard in discretionary matters of this character.' " *Marin,* 16 I. & N. Dec. at 584 (*quoting Matter of L-,* 3 I. & N. Dec. 767, 770 (B.I.A.1949)). But at the very least, an IJ must demonstrate that he or she reviewed the record and balanced the *relevant* factors and must discuss the positive or adverse factors that support his or her decision. *Casalena,* 984 F.2d at 107; *Marin,* 16 I. & N. Dec. at 585 ("The basis for the immigration judge's decision must be enunciated in his opinion.").

B.

In the case at hand, the IJ offered only the following explanation as the basis for her decision to deny asylum:

> The application for asylum is denied in the exercise of discretion because under the Board's decision in *Matter of O-D-,* the Court finds that the respondent is responsible for some of the incredible documentation that he has provided. The Court holds him also accountable for testimony, which the Court believes was not completely truthful.

**\*512** The IJ thus stated that she based her decision to deny asylum solely on Zuh's testimony and "incredible" documentation without discussing the wealth of other corroborating evidence he presented. This, at the very least, suggests that she did not consider all relevant factors. *See Huang,* 436 F.3d at 99.

Besides the IJ's dubious "split credibility finding," we can find only one factor-never mentioned by the IJ-that lends any support to her decision to deny asylum: Zuh entered the United States on a borrowed passport. But the record makes it clear that Zuh obtained this passport immediately after escaping from detention and torture in Cameroon and so reasonably believed the passport necessary to escape further imminent persecution.

Not a single other factor appears to support the IJ's conclusion. Zuh has no criminal record and has never participated in torture or persecution. Furthermore, after entering this country, Zuh obtained a work permit, attended tractor-trailer training school, and befriended someone who testified to his good character. The IJ apparently failed to consider these factors or that Zuh has a fiancée and two young children still in Cameroon, who continue to be harassed by the government. Because withholding of removal, unlike asylum, does not allow the applicant to bring his family to this country, *Huang,* 436 F.3d at 100–01, the IJ should certainly have considered this factor.

Perhaps most troubling, the IJ does not appear to have factored evidence of either Zuh's past persecution or his well-founded fear of future persecution into her determination to deny him asylum relief. This factor "outweigh[s] all but the most egregious adverse factors ... [and][t]he actual experience of past persecution should also weigh in favor of a grant of asylum." *Huang,* 436 F.3d at 98 (citations and emphasis omitted); *see also Dankam,* 495 F.3d at 119 n. 2 (*quoting Huang,* 436 F.3d at 98); *Shahandeh-Pey,* 831 F.2d at 1388 (noting that it was "[r]emarkabl[e]" that the IJ failed to weigh the applicant's well-founded fear of persecution). [5]

Indisputably, Zuh has advanced consistent, credible evidence in support of his contention that he has suffered severe persecution and faces a danger of persecution if returned. First, as even the IJ acknowledged, Zuh provided an avalanche of country condition documentation, which convinced the IJ that "the human rights situation in ... Cameroon today is deplorable."

Second, Zuh provided various details about his arrests that remained remarkably consistent throughout both hearings. Not only did Zuh's direct testimony accord with his own cross-examination and with his father's letter, but also-although unmentioned by the IJ-a letter from an American

doctor corroborated Zuh's description of the injuries torture caused him. Indeed, this doctor expressly stated, "I thus conclude that Chi Alfred Zuh did **\*513** suffer the torture and abuse that he claims."

Third, although in her first decision the IJ faulted Zuh for not having letters from his family corroborating his testimony, she apparently failed to consider that at the second hearing Zuh presented three letters from his fiancée and letters from his father, his sister, his mother, his uncle, and one of his uncle's employees. Moreover, Zuh's explanation for not offering this evidence at the first hearing-that he feared endangering his family-seems entirely plausible.

Finally, we must note a particular tension in the IJ's opinion. Her adverse credibility finding rested on her disbelief of Zuh and his documents. But she found Zuh's witnesses, Bettah and Clarkson, credible and explicitly rested Zuh's eligibility for withholding of removal and CAT protection on their testimony. An honest reading of the record renders this conclusion untenable given that the testimony of these two witnesses provides little more than ancillary detail. [6] Therefore, in granting withholding of removal and CAT protection, the IJ must have relied on the very documents and testimony she found incredible in denying discretionary asylum.

An IJ cannot have it both ways, finding an applicant and his documents incredible for one purpose and yet relying on them for another. *Kalubi,* 364 F.3d at 1138–39 ("[I]f an applicant's testimony on a particular issue is not found incredible for purposes of determining whether he is eligible for asylum, it must be taken as true-and cannot be found incredible-on the same issue for purposes of determining whether he is entitled to asylum."). This sort of judicial sleight of hand constitutes the very definition of an abuse of discretion.

For all of these reasons, we cannot uphold the IJ's decision based on the stated rationale. We recognize, however, that our role is *not* to weigh the evidence and "determine which of the competing views is more compelling." *Gonahasa v. INS,* 181 F.3d 538, 542 (4th Cir.1999). Accordingly, we must remand the case so that an IJ may consider the totality of the relevant evidence in determining whether Zuh merits discretionary asylum relief.

V.

Before concluding, we note that academic literature and court decisions have grown increasingly strident in their criticism of the immigration review process. Our finding today adds to this rising tide of criticism.

Academic literature critical of the current state of immigration law abounds. Perhaps the most prominent is a recent empirical study that criticizes immigration judges, the BIA, and the federal courts for failing to adjudicate asylum cases consistently. Jaya Ramji-Nogales et al., *Refugee Roulette: Disparities in Asylum Adjudication*, 60 Stan. L.Rev. 295 (2007). But this is by no means the only academic commentary to take issue with the administration of immigration law and to emphasize the importance of appropriate judicial review. *See, e.g.*, Eric M. Fink, *Liars and Terrorists and Judges, Oh My: Moral Panic and the Symbolic Politics of Appellate* **\*514** *Review in Asylum Cases*, 83 Notre Dame L.Rev.2019 (2008).

At a broad level of generality, we note that the Supreme Court has emphasized the importance of judicial review in the immigration context. *See* 🔖 *INS v. St. Cyr*, 533 U.S. 289, 298-99, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). Moreover, courts have grown increasingly skeptical of the high error rate within the immigration system. In a remarkable opinion, Judge Posner recently noted that the Seventh Circuit had "reversed the Board of Immigration Appeals in whole or part in a staggering 40 percent of the 136 petitions to review ... on the merits" over the prior year. 🔖 *Benslimane v. Gonzales*, 430 F.3d 828, 829 (7th Cir.2005). He concluded that "the adjudication of [immigration] cases at the administrative level has fallen below the minimum standards of legal justice." 🔖 *Id.* at 830. Similar judicial criticism of immigration adjudications appears in a variety of other contexts. *See, e.g.*, 🔖 *Wang v. Att'y Gen.*, 423 F.3d 260, 269 (3d Cir.2005) ("The tone, the tenor, the disparagement, and the sarcasm of the IJ seem more appropriate to a court television show than a federal court proceeding."); 🔖 *Lopez-Umanzor v. Gonzales*, 405 F.3d 1049, 1054 (9th Cir.2005) ("[T]he IJ's assessment of [p]etitioner's credibility was skewed by prejudgment, personal speculation, bias, and conjecture...."); Adam Liptak, *Courts Criticize Judges' Handling of Asylum Cases*, N.Y. Times, Dec. 26, 2005, at A1.

This circuit, too, has criticized immigration judges' decisions. *See, e.g.*, 🔖 *Dankam*, 495 F.3d at 124-25 (Shedd, J., concurring) (questioning portions of the IJ's credibility determination); 🔖 *Tewabe*, 446 F.3d at 540 (faulting the IJ for giving "no cogent explanation based on common sense, the record, or any other relevant factor for disbelieving [the petitioner]"); 🔖 *Camara*, 378 F.3d at 370, 372 (criticizing the IJ for "completely ignor[ing]" independent evidence and for "fail[ing] to follow the [agency]'s own regulations").

We note, however, that like most issues, the weight of opinion does not fall entirely on one side. For example, Judge Kozinski has excoriated his colleagues for "a systemic effort to dismantle the reasons immigration judges give for their decisions." *Abovian v. INS*, 257 F.3d 971, 980 (9th Cir.2001) (Kozinski, J., dissenting from denial of rehearing en banc); *see also* 🔖 *Fiadjoe v. Att'y Gen.*, 411 F.3d 135, 169 (3d Cir.2005) (Smith, J., dissenting) ("In my view, the majority's approach is effectively one of *de novo* review. The law forbids us from substituting our judgment for that of the BIA...."); Stephen H. Legomsky, *Learning To Live with Unequal Justice: Asylum and the Limits to Consistency*, 60 Stan. L.Rev. 413 (2007). Therefore, at this juncture we are not prepared to join Judge Posner or others in their wholesale critique of IJs.

But we must perform our statutory duty. Although the legislature has constricted our review of immigration decisions like this one, it certainly has not eliminated our role. Rather, Congress has established a multi-layered system for adjudication of immigrant claims. *See, e.g.*, 🔖 8 U.S.C. §§ 1158, 🔖 1229a, 🔖 1252 (2006); 🔖 8 C.F.R. §§ 1003.1, 🔖 1003.10 (2008). The administration of that system lies in the first instance with hardworking immigration judges and the Board of Immigration Appeals, but the Courts of Appeals ensure that the system works properly. We do so not by substituting our judgment for that of the IJs, but rather by ensuring adherence to law, proper support of findings in the record, and the considered and proper exercise of discretion.

For these reasons, we grant the petition for review, vacate the BIA's order affirming **\*515** the IJ's decision, and remand the case for further consideration consistent with this opinion. In addition, we urge the BIA to "recommend that the Chief Immigration Judge schedule this case on remand before a different IJ." 🔖 *Camara*, 378 F.3d at 372. [7]

*VACATED AND REMANDED.*

**All Citations**

547 F.3d 504

## Footnotes

1    Zuh is not the only member of his family to suffer oppression. He testified that the Cameroonian government also subjected his brother to political persecution, imprisoning him in 1997; Zuh has not heard from his brother since that date. In addition, in the course of their efforts to find Zuh after his departure from Cameroon, government security forces have harassed and beaten his parents, fiancée, and children. The government has also threatened to kidnap Zuh's children. And because his uncle helped Zuh escape Cameroon, the Cameroonian government harassed and then imprisoned the uncle.

2    The preponderance of the evidence standard applies to withholding of removal. *INS v. Stevic,* 467 U.S. 407, 429-30, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). The applicable burden of proof for protection under Article 3 of the Convention Against Torture is similar, requiring a showing that it is "more likely than not that [the applicant] would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2) (2008). In contrast, asylum eligibility involves a lower burden of proof. The applicant need only prove that he is "unable or unwilling to return" to his country of nationality or the country in which he last habitually resided "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1158(b)(1)(A), 1101(a)(42) (2006); *Anim v. Mukasey,* 535 F.3d 243, 252 (4th Cir.2008).

3    We note that the IJ did preface her discussion of this "inconsistency" with the phrase "[f]or example," implying that additional factors contributed to her credibility finding. But we can only evaluate a credibility determination on the grounds actually articulated.

4    Some elaboration is necessary concerning the presence of immigration law violations. Although this factor "is a proper and relevant discretionary factor," the BIA has cautioned against affording it too much weight. *Pula,* 19 I. & N. Dec. at 473 (noting that overly weighting this factor would have the "practical effect [of] deny[ing] relief in virtually all cases"). Instead, this factor itself involves a totality of the circumstances inquiry, such that the IJ must examine the "actions of an alien in his flight from the country where he fears persecution." *Id.* When an alien uses fraudulent documents to escape imminent capture or further persecution, courts and IJs may give this factor little to no weight.

5    At oral argument, the Government asserted that an IJ need only weigh an applicant's well-founded fear of persecution when the IJ has denied all other types of relief. This argument seems premised on the notion that because the grant of withholding of removal prevents the Government from returning the applicant to his native country, it renders the danger of persecution in that country irrelevant. Certainly, an IJ must give an applicant's fear of persecution greater weight when she denies the applicant all other relief. *See Pula,* 19 I. & N. Dec. at 474. But we reject the categorical approach urged by the Government. As the Second Circuit noted, "if one accepted this position, those very asylum-seekers who met the higher standard of proof of persecution required for withholding of removal (and thus those persons most in need of this nation's asylum relief) would be the ones who received less protection." *Huang,* 436 F.3d at 98 n. 11.

6    The testimony of Bettah and Clarkson, standing alone, does not appear sufficient to meet the burden of proof for withholding of removal. Bettah, who herself has been granted asylum, testified only that she rode in a car with Zuh for ten minutes on the way to an SDF meeting, thus verifying his membership in the SDF and

corroborating a very minor part of his testimony. Clarkson testified only about the circumstances of Zuh's arrival in the United States and about a trip to Cameroon during which he verified that the Cameroonian government continues to harass Zuh's family.

7    We note Zuh's argument that the BIA erred in not assigning his appeal to a three-member panel. *See* 8 C.F.R. § 1003.1(e)(4) (2008). Although we agree that this case warranted review by such a panel, our disposition moots this point.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

378 F.3d 173
United States Court of Appeals,
Second Circuit.

Rafiu Ajadi ABIMBOLA, Petitioner–Appellant,

v.

John ASHCROFT, United States Attorney General; James W. Ziglar, Commissioner of Immigration and
Naturalization Service; Edward J. McElroy, INS District Director for New York; Christine G. Davis, INS
District Director for Louisiana; John P. Weiss, The Office in charge, INS Connecticut, Respondents–Appellees.

Docket No. 02–2632.
|
Argued: June 17, 2004.
|
Decided: Aug. 5, 2004.

**Synopsis**
**Background:** Alien who was lawful permanent resident (LPR) petitioned for writ of habeas corpus, challenging final order of

removal and detention based on aggravated felony conviction. The United States District Court for the Eastern 📙🔺District

of New York, 2002 WL 2003186, Gershon, J., denied petition, and alien appealed.

**Holdings:** The Court of Appeals, Wesley, Circuit Judge, held that:

Connecticut third-degree larceny offense constituted a theft offense, and was therefore an "aggravated felony" under the
Immigration and Nationality Act (INA); and

alien's *Alford* plea to third-degree larceny constituted a "conviction" under the INA.

Affirmed.

**Procedural Posture(s):** On Appeal.

**Attorneys and Law Firms**

**\*173** Anil Kalhan, Cleary, Gottlieb, Steen & Hamilton, New York, New York (Wesley Kelman, Lewis J. Liman, MaryAnn
J. Sung, of counsel), for Petitioner–Appellant.

Kristen Chapman, Assistant United States Attorney, Brooklyn, New York (Roslynn R. Mauskopf, United States Attorney for the
Eastern District of New York, on the brief; Varuni Nelson, Assistant **\*174** United States Attorney, of counsel), for Respondents–
Appellees.

Before: B.D. PARKER and WESLEY, Circuit Judges, and IRENAS, Senior District Judge. [*]

WESLEY, Circuit Judge:

## Background

Petitioner Rafiu Ajadi Abimbola, a citizen of Nigeria, entered the United States in 1991 and was granted lawful permanent resident status on September 8, 1994. In the latter half of the 1990s, Abimbola was charged with several federal and state crimes. On February 24, 1997, Abimbola pleaded guilty in the United States District Court for the Eastern District of New York to bank fraud in violation of 18 U.S.C. § 1344. Moreover, on November 7, 1997, he entered an *Alford* plea to larceny in the third degree in violation of Connecticut General Statutes § 53a–124. [1]

In June 1999, based on the federal conviction, the Immigration and Naturalization Service ("INS") served Abimbola with a notice to appear. The INS sought Abimbola's removal pursuant to § 237(a)(2)(A)(iii) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1227(a)(2)(A)(iii), for an aggravated felony conviction as defined under INA § 101(a)(43)(G). 8 U.S.C. § 1101(a)(43)(G), that subsection defines "aggravated felony" as "a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment [is] at least one year." *Id.* Although the original charge only included the federal conviction, the INS amended the notice to appear by adding the Connecticut larceny conviction. The INS asserted that Connecticut third-degree larceny is a theft offense and therefore also an aggravated felony.

Abimbola responded *pro se,* arguing that the Connecticut third-degree larceny conviction is not an aggravated felony as defined by the INA. He also moved for a change of venue from Oakdale, Louisiana to New York City—a request the immigration judge ("IJ") denied. Finally, Abimbola applied for asylum, asserting that he would be killed by Muslim extremists if he returned to Nigeria because of his family's prominent position in their Christian church.

In December 2000, at a removal hearing in Oakdale, Louisiana, the INS withdrew the charge of removability based on the federal conviction as that conviction was still on direct appeal. [2] Abimbola contested the charge of removability, arguing that the conduct underlying the state larceny conviction constituted fraud and deceit rather than theft. He argued that the conviction should not be construed as an aggravated felony. On June 22, 2001, the IJ found Abimbola removable as an aggravated felon and ordered him removed to Nigeria. The IJ also denied Abimbola's **\*175** application for asylum and his petition for withholding of removal under INA § 241(b)(3) and the United Nations Convention Against Torture ("CAT"). The IJ reasoned that Abimbola did not provide credible testimony concerning his alleged fear of persecution and torture in Nigeria.

Abimbola appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). He added several arguments that had not been presented to the IJ. First, he argued that his *Alford* plea did not constitute a conviction pursuant to 8 U.S.C. § 1101(a) (48)(A). Second, he argued that he was entitled to discretionary relief under former § 212(c) of the INA. *See* 8 U.S.C. § 1182(c), *repealed by* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, § 304(b), 110 Stat. 3009–597 (Sept. 30, 1996). With regard to the denial of withholding of removal under § 241(b)(3) and CAT, Abimbola only challenged the credibility determination of the IJ. On February 12, 2002, the BIA dismissed Abimbola's appeal, finding that Abimbola had been convicted of an aggravated felony and was not eligible for any other form of relief from removal, including relief under the former § 212(c). The BIA did not address Abimbola's *Alford* plea argument.

On August 16, 2001, Abimbola filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of New York, challenging his detention, the removal proceedings, and his order of removal. He presented to the district court the same arguments he previously made before the BIA. The district court denied the habeas corpus petition and lifted the stay of removal it had imposed pending the outcome of the § 2241 petition. *Abimbola v. Ashcroft,* No. 01–CV–5568(NG), 2002 WL 2003186, 2002 U.S. Dist. LEXIS 16219 (E.D.N.Y. Aug.28, 2002). The district court reasoned that Abimbola's *Alford* plea was a conviction for purposes of the immigration laws and that Connecticut third-degree larceny qualifies as an aggravated felony. The court also concluded that the IJ had not abused its discretion in denying the motion to change venue. Finally, the district court held that the claim under former § 212(c) was unexhausted because it was never presented to the IJ and that the

claims under § 241(b)(3) and the CAT were nonreviewable because Abimbola only challenged the IJ's credibility findings. Judgment was entered on September 5, 2002.

Abimbola appeals the district court's decision.

### Discussion

Is third-degree larceny under Connecticut law, *see* Conn. Gen.Stat. § 53a–124, an aggravated felony under the INA? More specifically, was petitioner convicted of a "theft offense" under section 101(a)(43)(G) of the INA when he entered an *Alford* plea to the state crime? We agree with the BIA as well as the district court that petitioner committed an aggravated felony and is deportable. We also find that petitioner's other claims are either without merit or that we lack jurisdiction to hear them. Thus, we affirm the district court's order denying the habeas petition and dismiss the appeal.

*Connecticut Third–Degree Larceny:*

When this Court is called upon to construe a provision of the INA, we must give "substantial deference" to the BIA's interpretation of the statutes it is charged with administering. *Evangelista v. Ashcroft,* 359 F.3d 145, 150 (2d Cir.2004). Since the term "theft offense" is not cross-referenced to any other federal criminal statute, the BIA's interpretation is "given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Natural* **\*176** *Res. Def. Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see also Evangelista,* 359 F.3d at 150.

The BIA interprets "theft offense" to include the taking of property "whenever there is a criminal intent to deprive the owner of the rights and benefits of ownership, even if such deprivation is less than total or permanent." *In re V–Z–S–,* 22 I. & N. Dec. 1338, 1346 (BIA 2000). This definition is similar to definitions adopted by three of our sister circuits. For example, the Ninth Circuit defines "theft offense" as "a taking of property or an exercise of control over property without consent with the criminal intent to deprive the owner of rights and benefits of ownership, even if such deprivation is less than total or permanent." *United States v. Corona–Sanchez,* 291 F.3d 1201, 1205 (9th Cir.2002) (en banc); *Hernandez–Mancilla v. INS,* 246 F.3d 1002, 1009 (7th Cir.2001) (same); *United States v. Vasquez–Flores,* 265 F.3d 1122, 1125 (10th Cir.2001) (same).

"Congress used the words 'theft offense' rather than just 'theft,' thus indicating that the phrase ought to be read to incorporate different but closely related constructions in *modern state statutes.*" *Corona–Sanchez,* 291 F.3d at 1205 (emphasis added). The BIA's broader, more generic definition recognizes that "the contemporary crime of theft stems from the common law crime of larceny" but is not confined by the common-law definition. *Id.* at 1204 (alterations and quotation marks omitted). In *Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), the Supreme Court defined "burglary" within the meaning of the Anti–Drug Abuse Act of 1986, 18 U.S.C. § 924(e). That statute provides a sentence enhancement for a defendant who is convicted for unlawful possession of a firearm. *Id.* at 577–78, 110 S.Ct. 2143. The Court noted that Congress intended to use a "generic" view of "burglary" in order to prevent "offenders from invoking the arcane technicalities of the common-law definition of burglary to evade the sentence-enhancement provision, and protected offenders from the unfairness of having enhancement depend upon the label employed by the State of conviction." *Id.* at 589, 110 S.Ct. 2143. As several courts and the BIA have recognized, the *Taylor* analysis is analogous to the INA and weighs heavily in favor of a broad understanding of "theft offense." *See, e.g.,* *Corona–Sanchez,* 291 F.3d at 1205. In our view, the BIA's interpretation of "theft offense" is reasonable.

We do not defer, however, to the BIA's interpretation of state criminal laws as "the BIA is not charged with the administration of these laws." *Ming Lam Sui v. INS,* 250 F.3d 105, 112 (2d Cir.2001). Thus, we review *de novo* the BIA's determination that Connecticut third-degree larceny is a theft offense and therefore an aggravated felony. *See Chrzanoski v. Ashcroft,* 327 F.3d 188, 191 (2d Cir.2003).

To determine whether a particular state offense constitutes an aggravated felony under federal law, this Court employs the "categorical approach." Under this analysis, removability does not rest on the "particular set of facts underlying an alien's criminal conviction." *Dickson v. Ashcroft,* 346 F.3d 44, 48 (2d Cir.2003). "The categorical approach focuses on the intrinsic nature of the offense rather than on the factual circumstances surrounding any particular violation." *Id.* at 48 (internal quotation marks omitted). We must ask whether "every set of facts violating a statute ... satisf[ies] the criteria for removability," *Dickson,* 346 F.3d at 48, keeping in mind that "only the minimum criminal conduct necessary to sustain a conviction under a given statute is relevant[.]" **\*177** *Dalton v. Ashcroft,* 257 F.3d 200, 204 (2d Cir.2001) (citation omitted). When the criminal statute at issue encompasses some classes of criminal acts that fall within the federal definition of aggravated felony and some classes that do not fall within the definition, the statute is considered "divisible." *Id.* If a statute is divisible, a court may then look "to the record of conviction for the limited purpose of determining whether the alien's conviction was under the branch of the statute that permits removal." *Id.* at 48–49. Under section 240(c)(3)(B) of the INA, the record of conviction includes the charging document, plea agreement, a verdict or judgment of conviction, and a record of the sentence or plea transcript. 8 U.S.C. § 1229a(c)(3)(B); *see Dickson,* 346 F.3d at 53.

Abimbola contends that even if we adopt the BIA's definition of theft offense, portions of Connecticut's third-degree larceny statute, Conn. Gen.Stat. § 53a–124, are broader than this definition. He makes two arguments to support finding section 53a–124 divisible. First, he argues that while section 53a–124 clearly criminalizes theft of services, "theft offense" only encompasses the theft of tangible property. Second, he argues that portions of Connecticut's statute do not incorporate the necessary intent requirement present in a theft offense. If we agree with him that the state statute is divisible, he asserts that the case must be remanded as the record does not reflect the section of the statute for which he was convicted. We reject his arguments, finding instead that Connecticut third-degree larceny is not divisible and is a theft offense.

Section 53a–124 provides:

> A person is guilty of larceny in the third degree when he commits larceny, as defined in section 53a–119, and: (1) the property consists of a motor vehicle, the value of which is five thousand dollars or less; (2) the value of the property or service exceeds one thousand dollars; (3) the property consists of a public record, writing or instrument kept, held or deposited according to law with or in the keeping of any public office or public servant; or (4) the property consists of a sample, culture, microorganism, specimen, record, recording, document, drawing or any other article, material, device or substance which constitutes, represents, evidences, reflects or records a secret scientific or technical process, invention or formula or any phase or part thereof.

Conn. Gen.Stat. § 53a–124(a). Section 53a–119, in turn, provides: "A person commits larceny when, with *intent to deprive another of property or to appropriate the same to himself or a third person,* he wrongfully takes, obtains or withholds such property from an owner." *Id.* at § 53a–119 (emphasis added). The statute then lists different fact scenarios which constitute larceny. [3] The statute is careful **\*178** to note however that this list is not exclusive. *Id.*

With respect to Abimbola's first argument, it is clear that section 53a–124 includes theft of services. "A person is guilty of larceny in the third degree when he commits larceny, ... and ... (2) the value of the property or *service* exceeds one thousand dollars." Conn. Gen.Stat. § 53a–124(a) (emphasis added). Thus, the question turns on whether the federal definition of "theft offense" is limited to tangible, movable property.

In *V–Z–S–*, the BIA articulated a general definition of "theft offense," but did not decide whether theft of services fell within that definition. [4] Abimbola argues that *V–Z–S–* relied on the Model Penal Code definition in determining whether theft of services constitutes "theft." Since the Code recognizes that theft involves the taking of property, which traditionally included only "movable property," Abimbola contends that "theft offense" should be limited in a similar way.

Abimbola finds support for his view in the Ninth Circuit's majority opinion in *Corona–Sanchez.* After adopting a broad and generic definition of theft offense, the majority ruled that the definition does not include theft of services or labor. *Corona–Sanchez,* 291 F.3d at 1208. The majority reasoned that theft of services or labor are not within the definition of "theft offense" because traditionally "one's labor is not one's 'property.' " *Id.* (quoting MPC § 223.7, cmt. 1 (1980)). The majority noted that many states have enacted theft-of-service provisions, but indicated that this fact suggests that "if labor were property, there would be no need for separate provisions criminalizing the theft of labor or services." *Id.*

We respectfully disagree with this conclusion. As noted above, the statutory crimes of theft—"theft offenses"—have evolved from the common law. While traditional common-law definitions may not have included services as "property" within the definition of theft, many state statutes had criminalized such conduct prior to the enactment of § 1101(a)(43)(G). The BIA did look to the Model Penal Code in *V–S–Z–*, but it also correctly reasoned that "theft offense" incorporates modern state theft statutes. Furthermore, as the dissent in *Corona–Sanchez* noted, "The [Model Penal Code] itself *includes* theft of services in § 223.7 .... The Commentary indicates that labor or professional service, though arguably viewed as a species of property, had not been included in the traditional scope of that term in ordinary theft statutes but that since promulgation of the Code in 1962, more than half of the states have enacted theft of service provisions." *Corona–Sanchez,* 291 F.3d at 1216 n. 6 (citing American Law Institute, Modern Penal Code and Commentaries II § 223.7, cmt. 1 (1980)) (emphasis in original). Congress clearly intended to incorporate **\*179** a modern understanding of theft. It therefore would make little sense to exclude theft of services from the definition. Finally, as the district court noted, this Circuit has already concluded that the legislative history of this statute and its plain language indicate a clear congressional intent to expand the definition of aggravated felony as applied to *theft offenses* to bring more convictions within its ambit. *See United States v. Pacheco,* 225 F.3d 148 (2d Cir.2000) (holding that misdemeanor larceny is a theft offense under 8 U.S.C. § 1101(a)(43)(G) if the punishment is for at least one year). In our view, inclusion of theft of services in section 53a–124 does not broaden the state statute beyond the definition of theft offense.

Second, Abimbola argues that section 53a–124, by incorporating section 53a–119, does not mandate the "intent" element required in the BIA's definition. We agree with the district court that section 53a–124's intent requirement is no broader than the requirements of § 1101(a)(43)(G). First, the preamble to 53a–119 specifically states that to be convicted of larceny, a person must have the "*intent to deprive* another of property or to appropriate the same to himself or a third person." Conn. Gen.Stat. § 53a–119 (emphasis added). Since section 53a–124 encompasses this definition of larceny, the plain reading of the statute includes the necessary intent requirement. There is no reason to believe that the Connecticut courts consider this preamble meaningless verbiage. Connecticut adheres to the basic canon of statutory construction "that the legislature had a purpose for each sentence, clause or phrase in a legislative enactment, and that it did not intend to enact meaningless provisions." *Hall v. Gilbert & Bennett Mfg. Co.,* 241 Conn. 282, 303, 695 A.2d 1051 (1997). Furthermore, the Connecticut Supreme Court recently noted that "[i]n order to sustain a conviction under Connecticut's larceny provisions, ... we require proof of the existence of a felonious *intent to deprive* the owner of the property permanently" and that "a specific intent to deprive" is an "essential

element of larceny," which "must be proved beyond a reasonable doubt." *State v. Calonico,* 256 Conn. 135, 160, 770 A.2d 454 (2001) (emphasis added and alterations omitted).

Finally, first- and second-degree larceny both define larceny by reference to the definition in section 53a–119. *See* Conn. Gen.Stat. §§ 53a–122, 53a–123. The difference in severity depends on factors such as the value of property involved or whether extortion was used in commission of the crime. *Id.* Accepting Abimbola's position would require a conclusion that intent to deprive is not a requirement of first- and second-degree larceny in Connecticut.

Abimbola presses that some of the subsections in § 53a–119 do not require intent to deprive. In particular, he points to two cases involving the receipt of stolen property: *State v. Gabriel,* 192 Conn. 405, 473 A.2d 300 (1984), and *State v. Perez,* 181 Conn. 299, 435 A.2d 334 (1980). The plain language of section 53a–119(8) states that "[a] person is guilty of larceny by receiving stolen property if he receives, retains, or disposes of stolen property knowing that it has probably been stolen or believing that it has probably been stolen." Conn. Gen. State § 53(a)–119(8). The Connecticut Supreme Court has noted that this crime does not involve "specific intent" but has recognized that knowingly receiving, retaining, or disposing of stolen goods involves "guilty knowledge or criminal intent." *Gabriel,* 192 Conn. at 414, 473 A.2d 300. By definition, the victim has already suffered a deprivation of property *before* the defendant has done anything. Thus, it was logical for the Connecticut Supreme **\*180** Court not to read the preamble's "intent to deprive" into this particular subsection—the deprivation has already occurred. Instead, Connecticut criminalizes a person *knowingly* receiving stolen goods. One who possesses stolen property under Connecticut law does so knowing or having reason to know that the property is stolen. It would seem self-evident that under Connecticut law, the possession of stolen property therefore plays a role in the continued deprivation of a rightful owner's use of his or her property. To our mind, that fits squarely within the concept of a deprivation of property. In any event, Congress specifically designated this type of crime in its definition of aggravated felony. *See* 8 U.S.C. § 1101(a)(43)(G). Section 53a–119(8) therefore does not broaden third-degree larceny beyond the federal definition of an aggravated felony.

We disagree that *Gabriel* and *Perez* support the argument that section 53a–119's "intent to deprive" requirement is not mandatory throughout the other subsections of that statute. Unlike subsection eight, the conduct described in the other subsections of 53a–119 involves situations where the defendant has directly deprived the victim of the rights and benefits of ownership. The most reasonable construction of section 53a–119 includes reading the intent to deprive requirement into all of the subsections except in the case of receipt of stolen goods—a theft related crime. Thus, we find that section 53a–124 is not divisible because it is no broader than "theft offense" as defined by § 1101(a)(43)(G). We therefore agree with the district court that Connecticut third-degree larceny is an aggravated felony.

*Alford* Plea:

 Abimbola also argues that his *Alford* plea is not a conviction pursuant to 8 U.S.C. § 1101(a)(48)(A). We agree with the district court that Abimbola's argument is meritless. We note that Abimbola did not make this argument before the IJ and raised it for the first time before the BIA, which did not address the issue in its ruling. This presents an open question as to whether we have jurisdiction over this claim since Abimbola may not have properly exhausted his administrative remedies as required by 8 U.S.C. § 1252(d). *Cf.* *Restrepo v. McElroy,* 369 F.3d 627, 633 n. 10 (2d Cir.2004). The government, however, has not offered a jurisdictional objection based on an exhaustion argument for this claim.

The jurisdictional issue presents a particularly difficult and complex problem. In our view, it would be unwise to reach a conclusion in this case without the benefit of argument from both sides. Furthermore, as the jurisdictional issue goes to statutory and not constitutional jurisdiction, we may exercise hypothetical jurisdiction. *See* *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 816 n. 11 (2d Cir.2000). Since it is clear that Abimbola's claim concerning his *Alford* plea is meritless, we assume jurisdiction to decide the issue but take no position as to whether Abimbola met the exhaustion requirement in § 1252(d).

Under the INA, "conviction" is defined as:

> a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where—(i) a judge or jury has found the alien guilty *or the alien has entered a plea of guilty* or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

**\*181** 8 U.S.C. § 1101(a)(48)(A) (emphasis added). As the plain language indicates, "conviction" includes a guilty plea. An *Alford* plea *is* a guilty plea.[5] *See North Carolina v. Alford,* 400 U.S. 25, 37, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

In *Alford,* the Supreme Court was confronted with a defendant who pleaded guilty to first-degree murder but continued to profess his innocence. The Court reasoned that Alford's guilty plea was analogous to a plea of nolo contendere. *Id.* at 35, 91 S.Ct. 160. Under a plea of nolo contendere, "a defendant does not expressly admit his guilt, but nonetheless waives his right to a trial and authorizes the court for purposes of the case to treat him as if he were guilty." *Id.* The Court concluded there is no "material difference between a plea that refuses to admit commission of the criminal act and a plea containing a protestation of innocence when, as in the instant case, a defendant intelligently concludes that his interests require entry of a guilty plea and the record before the judge contains strong evidence of actual guilt." *Id.* at 37, 91 S.Ct. 160. Thus, an *Alford* plea is still a guilty plea and fits within the plain language of § 1101(a)(48)(A). "[A]n *Alford* plea is simply a guilty plea, with evidence in the record of guilt, typically accompanied by the defendant's protestation of innocence and his or her unequivocal desire to enter the plea." *United States v. Mackins,* 218 F.3d 263, 268 (3d Cir.2000).

Abimbola argues that Congress' failure specifically to include an *Alford* plea within the definition of "conviction" bespeaks of congressional intent to exclude this type of plea. He notes that a plea of nolo contendere is explicitly included and argues that if Congress intended to incorporate an *Alford* plea within the definition of "conviction," it would have been equally specific. The inclusion of nolo contendere pleas in the statute supports our holding here. It reflects that Congress focused the sanction of removal on a criminal conviction as opposed to an admission of guilt. Abimbola does not contest that he was convicted of third-degree larceny. The fact that his conviction was the result of an *Alford* plea is immaterial under the INA.

Finally, to the extent that Abimbola argues there was no factual basis in his case to have allowed an *Alford* plea, Abimbola's contention is nothing more than a collateral attack on his state conviction. Collateral attacks are not available in a habeas petition challenging the BIA's removal decision. *See* 28 U.S.C. § 2241; *Broomes v. Ashcroft,* 358 F.3d 1251, 1255 (10th Cir.2004).

*Other Claims:*

We have reviewed all of Abimbola's claims and find that they are either without merit or that we lack jurisdiction to review them. With respect to relief under former § 212(c) of the INA, the record clearly shows that Abimbola's plea was entered after this statute was repealed.[6] Furthermore, Abimbola contests the IJ credibility determinations with respect to relief under § 241(b)(3) and the CAT. We do not have jurisdiction to hear these claims. *See Sol v. INS,* 274 F.3d 648, 651 (2d Cir.2001).

## **\*182 Conclusion**

The district court's order of August 30, 2002, denying the habeas corpus petition, is hereby AFFIRMED.

**All Citations**

378 F.3d 173

# Footnotes

\*       The Honorable Joseph E. Irenas, United States Senior District Judge for the District of New Jersey, sitting by designation.

1       Although it is clear that Abimbola entered his plea on November 7, 1997, it is unclear why the case was not resolved until May 7, 1999. The record appears to show that the larceny charge would have been resolved on December 2, 1997 but for Abimbola's failure to appear. Thus, on May 7, 1999, the larceny charge was finally resolved and Abimbola also entered an *Alford* plea to the charge of failure to appear in violation of Connecticut General Statutes § 53a–172.

2       This Court granted the government's motion to dismiss Abimbola's direct appeal in an order dated September 10, 2003. *United States v. Ajadi,* No. 97-135 (2d Cir.2003). On February 20, 2004, the Court denied Abimbola's motion for a rehearing. *United States v. Ajadi,* No. 97-1325 (2d Cir.2004).

3       According to the statute,

[l]arceny includes, but is not limited to:

(1) Embezzlement....

(2) Obtaining property by false pretenses....

(3) Obtaining property by false promise....

(4) Acquiring property lost, mislaid or delivered by mistake....

(5) Extortion....

(6) Defrauding of public community....

(7) Theft of services....

(8) Receiving stolen property. A person is guilty of larceny by receiving stolen property if he receives, retains, or disposes of stolen property knowing that it has probably been stolen or believing that it has probably been stolen ....

(9) Shoplifting....

(10) Conversion of a motor vehicle. A person is guilty of conversion of a motor vehicle who, after renting or leasing a motor vehicle under an agreement in writing which provides for the return of such vehicle to a particular place at a particular time, fails to return the vehicle to such place within the time specified, and who thereafter fails to return such vehicle to the agreed place or to any other place of business of the lessor within one hundred twenty hours after the lessor shall have sent a written demand to him for the return of the vehicle by registered mail ....

(11) Obtaining property through fraudulent use of an automated teller machine...

(12) Library theft....

(13) Conversion of leased property....

(14) Failure to pay prevailing rate of wages....

(15) Theft of utility service....

(16) Air bag fraud....

Conn. Gen.Stat. § 53a–119.

4       Of course, the BIA did precisely that here but in an unpublished opinion on which other BIA panels cannot rely. *See* *Abimbola,* 2002 WL 2003186, at \*3, 2002 U.S. Dist. LEXIS 16219, at \*9.

5       In *Gousse v. Ashcroft,* 339 F.3d 91, 95–96 (2d Cir.2003), this Court assumed that a Connecticut *Alford* plea is a conviction for immigration purposes. *Gousse* is not binding because the issue of whether a plea could be a "conviction" was not raised.

6       Like the argument regarding his *Alford* plea, we exert hypothetical jurisdiction over this claim.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

58 S.Ct. 454
Supreme Court of the United States.

ADAM

v.

SAENGER et al. *

No. 197.

|

Argued Jan. 6, 1938.

|

Decided Jan. 31, 1938.

**Synopsis**

On Writ of Certiorari to the Court of Civil Appeals for the Ninth Supreme Judicial District of the State of Texas.

Action by Estaban Adam against William Saenger and others founded upon a judgment of the Supreme Court of California. To review a judgment of the Texas Court of Civil Appeal,  101 S.W.2d 1046, affirming a judgment of dismissal, plaintiff brings certiorari.

Reversed and remanded.

**Attorneys and Law Firms**

**\*\*455  \*60** Mr. M. G. Adams, of Beaumont, Tex., for petitioner.

Mr. Oliver J. Todd, of Beaumont, Tex., for respondents.

**Opinion**

Mr. Justice STONE delivered the opinion of the Court.

The question for decision is whether the action, in this case, of the Texas state courts, in dismissing a suit founded upon a judgment of the Supreme Court of California, denied to the judgment the faith and credit which the Constitution, article 4, s 1, commands.

Petitioner, as assignee of a California judgment against the Beaumont Export & Import Company, a Texas corporation, brought the present suit in the Texas state district court against respondents, directors of the corporation acting as its trustees in dissolution, and against its stockholders as transferees of corporate assets, to collect the judgment. His petition sets out in detail the circumstances attending the rendition of the California judgment **\*61** and incorporates by reference a duly attested copy of the judgment roll.

It appears that the corporation brought suit in the superior court of California, a court of general jurisdiction, against Montes, petitioner's predecessor in interest, to recover a money judgment for goods sold and delivered. Thereupon Montes, following what is alleged to be the California practice, with leave of the court brought a cross-action against the corporation, by service of a cross-complaint upon the corporation's attorney of record in the pending suit, to recover for the conversion of chattels. Judgment in the cross-action, taken by default, was followed by dismissal of the corporation's suit and is the judgment which is the subject of the present suit. A motion to open the default and to be allowed to defend, made later on behalf of the corporation, was contested and was denied by the court, the issue being whether the cross-complaint was in fact served on the plaintiff's attorney.

Adam v. Saenger, 303 U.S. 59 (1938)

58 S.Ct. 454, 82 L.Ed. 649

The trial court sustained a general demurrer to the complaint and gave judgment dismissing the cause, which the Texas Court of Civil Appeals affirmed, 101 S.W.2d 1046. Petition to the Texas Supreme Court for a writ of error was denied for want of jurisdiction. We granted certiorari, 302 U.S. 668, 58 S.Ct. 28, 82 L.Ed. 515; cf. Bain Peanut Co. v. Pinson, 282 U,s,. 499, 51 S.Ct. 228, 75 L.Ed. 482, the question being an important one of constitutional law. Our writ is properly directed to the Texas Court of Civil Appeals, it being the highest court of the state in which a judgment could be had. Bacon v. Texas, 163 U.S. 207, 215, 16 S.Ct. 1023, 41 L.Ed. 132;  **456  Sullivan v. Texas, 207 U.S. 416, 28 S.Ct. 215, 52 L.Ed. 274; San Antonio Railway Co. v. Wagner, 241 U.S. 476, 36 S.Ct. 626, 60 L.Ed. 1110;  American Railway Express Co. v. Levee, 263 U.S. 19, 44 S.Ct. 11, 68 L.Ed. 140.

The Texas Court of Civil Appeals rested its decision on a single ground, want of jurisdiction of the California court over the corporation in the cross-action in which the judgment was rendered. Construing the California statutes  *62  and decisions which the complaint set out, it concluded that they did not authorize service of the complaint in the cross-action upon the plaintiff's attorney of record. It held further that in any case as the corporation was not present within the state no jurisdiction could be acquired over it by the substituted service, and the California judgment was consequently without due process and a nullity beyond the protection of the full faith and credit clause. To review these rulings we brought the case here. Cf.  Ward v. Love County, 253 U.S. 17, 25, 40 S.Ct. 419, 422, 64 L.Ed. 751;  Indiana ex rel. Anderson v. Brand, 303 U.S. 95, 58 S.Ct. 443, 82 L.Ed. 685, decided this day.

By R.S. s 905, 28 U.S.C. s 687, 28 U.S.C.A. s 687, enacted under authority of the full faith and credit clause, article 4, section 1, of the Constitution, the duly attested record of the judgment of a state is entitled to such faith and credit in every court within the United States as it has by law or usage in the state from which it is taken. If it appears on its face to be a record of a court of general jurisdiction, such jurisdiction over the cause and the parties is to be presumed unless disproved by extrinsic evidence, or by the record itself.  Hanley v. Donoghue, 116 U.S. 1, 6 S.Ct. 242, 29 L.Ed. 535;  Knowles v. Logansport Gaslight & Coke Co., 19 Wall. 58, 22 L.Ed. 70;  Settlemier v. Sullivan, 97 U.S. 444, 24 L.Ed. 1110. But in a suit upon the judgment of another state the jurisdiction of the court which rendered it is open to judicial inquiry,  Chicago Life Insurance Co. v. Cherry, 244 U.S. 25, 37 S.Ct. 492, 61 L.Ed. 966, and when the matter of fact or law on which jurisdiction depends was not litigated in the original suit it is a matter to be adjudicated in the suit founded upon the judgment.  Thompson v. Whitman, 18 Wall. 457, 21 L.Ed. 897. Here the fact of the service of the complaint upon the attorney is alleged by the petitioner and admitted by the demurrer, but the court's conclusion that the California court was without jurisdiction, resting in part upon its construction of the California statutes, presents an issue not litigated in the California suit which must be determined in the present one.

*63  Congress has not prescribed the manner in which the legal effect of the judgment and the proceedings on which it is founded in the state where rendered are to be ascertained by the courts of another state. It has left that to the applicable procedure of the courts in which they are drawn in question. Where they are in issue this Court, in the exercise of its appellate jurisdiction to review cases coming to it from state courts, takes judicial notice of the law of the several states to the same extent that such notice is taken by the court from which the appeal is taken. 'Whatever was matter of law in the court appealed from is matter of law here, and whatever was matter of fact in the court appealed from is matter of fact here.'  Hanley v. Donoghue, supra, 116 U.S. 1, at page 6, 6 S.Ct. 242, 245, 29 L.Ed. 535.

According to Texas law the legal effect of the judgment of another state, on which suit is brought is to be determined by the court, not the jury. But a suitor who asserts that the force and effect of the judgment is different from that of a similar judgment of the courts of the state is required to allege specifically and prove as matter of fact the particular laws or usage on which he relies to establish the difference, and on demurrer only the law or usage specifically alleged will be considered in determining whether the law of another state differs from that of Texas. Porcheler v. Bronson, 50 Tex. 555;  Gill v. Everman, 94 Tex. 209, 59 S.W. 531; National Bank of Commerce v. Kenney, 98 Tex. 293, 83 S.W. 368.

Adam v. Saenger, 303 U.S. 59 (1938)

58 S.Ct. 454, 82 L.Ed. 649

In the present suit petitioner, in conformity to the state procedure, has set out in his complaint the California statutes and the citations of the decisions of California courts which he contends establish the law of that state that a cross-action in a pending suit may be begun by service of a cross-complaint upon the plaintiff's attorney. The question thus raised upon demurrer for decision by the court is the legal effect in California of the service, and hence of the judgment founded upon **457 it. *64 Whether the question be regarded as one of fact or more precisely and accurately as a question of law to be determined as are other questions of law, although procedural exigencies require it to be presented by the pleading and proof, as are issues of fact, it is one arising under the Constitution and a statute of the United States which commands that such faith and credit shall be given by every court to the California proceedings 'as they have by law or usage' of that state. And since the existence of the federal right turns on the meaning and effect of the California statute, the decision of the Texas court on that point, whether of law or of fact, is reviewable here. Stanley v. Schwalby, 162 U.S. 255, 274, 277—279, 16 S.Ct. 754, 40 L.Ed. 960; Southern Pacific Co. v. Schuyler, 227 U.S. 601, 611, 33 S.Ct. 277, 57 L.Ed. 662, 43 L.R.A., N.S., 901; Creswill v. Knights of Pythias, 225 U.S. 246, 261, 32 S.Ct. 822, 56 L.Ed. 1074; Ancient Egyptian Order v. Michaux, 279 U.S. 737, 744—746, 49 S.Ct. 485, 488, 73 L.Ed. 931; Norris v. Alabama, 294 U.S. 587, 590, 55 S.Ct. 579, 580, 79 L.Ed. 1074; see Northern Pacific R. Co. v. North Dakota, 236 U.S. 585, 593, 35 S.Ct. 429, 59 L.Ed. 735, L.R.A.1917F, 1148, Ann.Cas.1916A, 1; cf. Union Pacific R. Co. v. Public Service Comm., 248 U.S. 67, 69, 39 S.Ct. 24, 63 L.Ed. 131; Ward v. Love County, supra, 253 U.S. 17, 22, 40 S.Ct. 419, 421, 64 L.Ed. 751; Truax v. Corrigan, 257 U.S. 312, 324, 42 S.Ct. 124, 126, 66 L.Ed. 254, 27 A.L.R. 375; Davis v. Wechsler, 263 U.S. 22, 24, 44 S.Ct. 13, 14, 68 L.Ed. 143; Patterson v. Alabama, 294 U.S. 600, 602, 55 S.Ct. 575, 576, 79 L.Ed. 1082.

While this Court re-examines such an issue with deference after its determination by a state court, it cannot, if the laws and Constitution of the United States are to be observed, accept as final the decision of the state tribunal as to matters alleged to give rise to the asserted federal right. This is especially the case where the decision is rested, not on local law or matters of fact of the usual type, which are peculiarly within the cognizance of the local courts, but upon the law of another state, as readily determined here as in a state court. Huntington v. Attrill, 146 U.S. 657, 684, 13 S.Ct. 224, 36 L.Ed. 1123; Yarborough v. Yarborough, 168 S.C. 46, 166 S.E. 877; Id., 290 U.S. 202, 54 S.Ct. 181, 78 L.Ed. 269, 90 A.L.R. 924.


In ruling that the service in the California suit was unauthorized, the Texas Court of Civil Appeals said: *65 'The cross-action was not an ancillary proceeding, but an independent suit in which a final judgment could be rendered without awaiting a decision in the original suit. Farar v. Steenbergh, 173 Cal. 94, 159 P. 707. It is well settled in this state that a cross-action occupies the attitude of an independent suit and requires service of the cross-action upon the cross-defendant. Harris v. Schlinke, 95 Tex. 88, 65 S.W. 172. This being so, in the absence of a waiver of service, or an appearance by the cross-defendant, personal service on the cross-defendant must be had to confer jurisdiction upon the court to determine the matter and render judgment in the case.'

But the question presented by the pleadings is the status of a cross-action under the California statutes, not under those of Texas. We think its status is adequately disclosed by the California statutes and decisions pleaded by petitioner, and is that for which he contends.

Section 442 of the California Code of Civil Procedure specifically provides that a defendant may secure affirmative relief upon 'cross-complaint' which 'must be served upon the parties affected thereby,' and requires service of 'summons upon the cross-complaint' only upon such parties as 'have not appeared in the action.'[1] **458 Arguing that 'action' means only 'cross-action' and not the original action brought by the plaintiff, the Texas court concluded *66 that a plaintiff who has not appeared in the cross-action must be served with summons 'as upon the commencement of an original action.' But the word 'action,' even if susceptible of such meaning, cannot be so interpreted in the face of the pleaded California decisions which hold that a cross-

58 S.Ct. 454, 82 L.Ed. 649

complaint may be served on the attorney of one who is already a party to the original action. Farrar v. Steenbergh, 173 Cal. 94, 159 P. 707; Wood v. Johnston, 8 Cal.App. 258, 96 P. 508; Ritter v. Braash, 11 Cal.App. 258, 104 P. 592.

Section 1015, as amended by St.Cal.1933, p. 1899, provides that in all cases where a party, whether resident or nonresident, has an attorney in an action, 'the service of papers, when required, must be upon the attorney instead of the party, except service of subpenas, of writs, and other process issued in the suit, and of papers to bring him into contempt.'[2] The Texas Court of Civil Appeals construed this section as requiring 'service of subpenas, of writs, and other process issued in the suit' upon the party rather than the attorney, and as including the cross-complaint in the terms 'writ' and 'process.' But assuming that a cross-complaint served without summons may be so characterized, it is clear that the section does not by its terms preclude valid service  *67  of the cross-complaint upon the attorney for a party which, as we have seen, section 442 permits. Section 1015 directs service upon the attorney of all but the three types of papers excepted, but says nothing as to the effectiveness of service of those papers upon him. Section 1011, as amended by St.Cal.1933, p. 1898, set out in the pleading though not referred to in the court's opinion, reads, 'Notices and papers, when and how served. The service may be personal, by delivery to the party or attorney on whom the service is required to be made.'

The question whether section 1015 does forbid service of a cross-complaint on the attorney has been definitely answered in the negative by the Supreme Court of California, which, in Farrar v. Steenbergh, supra, 173 Cal. 94, 97, 159 P. 707, 708, held, 'Service of a cross-complaint upon a plaintiff who appears by an attorney is not made by a summons to the plaintiff, but by delivery of a copy of the cross-complaint to the attorney.' Upon this ground the California District Court of Appeals, in cases, on which petitioner relies, has sustained judgments taken upon default in a cross-action begun by service of the cross-complaint on the plaintiff's attorney. Ritter v. Braash, supra; Wood v. Johnston, supra. Upon all the pleaded evidence of the California law, to the consideration of which we are restricted by the present state of the record, we think the only inference to be drawn is that the service in the California suit was authorized by California law.

 There is nothing in the Fourteenth Amendment to prevent a state from adopting a procedure by which a judgment in personam may be rendered in a cross-action against a plaintiff in its courts, upon service of process or of appropriate pleading upon his attorney of record. The plaintiff having, by his voluntary act in demanding justice from the defendant, submitted himself to the jurisdiction of the court, there is nothing arbitrary or unreasonable in treating him as being there for all purposes  *68  for which justice to the defendant requires his presence. It is the price which the state may exact as the condition of opening its courts to the plaintiff. Young Company v. McNeal-Edwards Co., 283 U.S. 398, 400, 51 S.Ct. 538, 539, 75 L.Ed. 1140; compare Chicago & Northwestern Railway Co. v. Lindell, 281 U.S. 14, 17, 50 S.Ct. 200, 201, 74 L.Ed. 670.

 **459  The judgment is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed.

Mr. Justice CARDOZO took no part in the consideration or decision of this case.

Mr. Justice BLACK concurs in the result.

**All Citations**

303 U.S. 59, 58 S.Ct. 454, 82 L.Ed. 649

**Footnotes**

**Adam v. Saenger, 303 U.S. 59 (1938)**

58 S.Ct. 454, 82 L.Ed. 649

\*    Rehearing denied 303 U.S. 666, 58 S.Ct. 640, 82 L.Ed. 1123; Mandate conformed to 119 S.W.2d 687.

1    'Whenever the defendant seeks affirmative relief against any party, relating to or depending upon the contract, transaction, matter, happening or accident upon which the action is brought, or affecting the property to which the action relates, he may, in addition to his answer, file at the same time, or by permission of the court subsequently, a cross-complaint. The cross-complaint must be served upon the parties affected thereby, and such parties may demur or answer thereto as to the original complaint. If any of the parties affected by the cross-complaint have not appeared in the action, a summons upon the cross-complaint must be issued and served upon them in the same manner as upon the commencement of an original action.'

2    'When a plaintiff or a defendant, who has appeared, resides out of the State, and has no attorney in the action or proceeding, the service may be made on the clerk or on the justice where there is no clerk, for him. But in all cases where a party has an attorney in the action or proceeding, the service of papers, when required, must be upon the attorney instead of the party, except service of subpenas, of writs, and other process issued in the suit, and of papers to bring him into contempt. If the sole attorney for a party is removed or suspended from practice, then the party has no attorney within the meaning of this section. If his sole attorney has no known office in this State, notices and papers may be served by leaving a copy thereof with the clerk of the court or with the justice where there is no clerk, unless such attorney shall have filed in the cause an address of a place at which notices and papers may be served on him, in which event they may be served at such place.'

---

End of Document    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

468 F.3d 462
United States Court of Appeals,
Seventh Circuit.

Ahmed ALI, Petitioner–Appellant,

v.

Deborah ACHIM, Michael Chertoff, and Alberto Gonzales, Respondents–Appellees.
Ahmed Ali, Petitioner,

v.

Alberto Gonzales, Respondent.

Nos. 05–1194, 05–2028, 05–3009.
|
Argued Jan. 9, 2006.
|
Decided Nov. 6, 2006.
|
Rehearing and Rehearing En Banc Denied Jan. 5, 2007.

**Synopsis**
**Background:** Alien petitioned for review of removal order of Board of Immigration Appeals (BIA), and appealed order of the United States District Court for the Northern District of Illinois, Amy J. St. Eve, J., 342 F.Supp.2d 769, denying his habeas corpus petition.

**Holdings:** The Court of Appeals, Sykes, Circuit Judge, held that:

Attorney General (AG) acted within statutory authority in establishing heightened waiver of inadmissibility standard for aliens convicted of violent or dangerous crimes, and

substantial evidence did not support determination that alien failed to show he was more likely than not to face torture if he returned to Somalia.

Affirmed in part, reversed in part, and remanded.

**Procedural Posture(s):** On Appeal.

**Attorneys and Law Firms**

**\*463**  M.C. Georgina Fabian, Mayer, Brown, Rowe & Maw, Chicago, IL, Charles Roth (argued), Midwest Immigrant and Human Rights Center, Travelers and Immigrants Aid, Chicago, IL, Christine Poulon, Mayer, Brown, Rowe & Maw, Washington, DC, for Petitioner–Appellant.

Sheila M. McNulty, Office of the United States Attorney, Chicago, IL, Leslie M. McKay (argued), Department of Justice, Civil Division, Immigration Litigation, Washington, DC, for Respondents–Appellees.

Brian J. Murray, Jones Day, Chicago, IL, Mirna Adjami, Charles Roth (argued), Midwest Immigrant and Human Rights Center, Travelers and Immigrants Aid, Chicago, IL, for Amicus Curiae.

Karen Lundgren, Department of Homeland Security, Office of the Chief Counsel, Chicago, IL, Robbin K. Blaya (argued), Department of Justice, Civil Division, Immigration Litigation, Washington, DC, for Respondent.

Before POSNER, EVANS, and SYKES, Circuit Judges.

**Opinion**

SYKES, Circuit Judge.

Ahmed Ali petitions for review from the Board of Immigration Appeals' ("BIA") final decision ordering him removed to his native Somalia. He also appeals from an order of the United States District Court for the Northern District of Illinois denying his habeas corpus petition in which he challenged his prolonged preremoval detention. The government released Ali from custody shortly before this case was argued, so the habeas detention challenge is moot and we review only the decision of the BIA ordering his removal to Somalia. For the reasons that follow, we deny the petition for review with respect to the BIA's denial of waiver of inadmissibility, asylum, and withholding of removal. We grant the petition with respect to the BIA's denial of deferral of removal under the Convention Against Torture ("CAT") and remand that claim for further proceedings.

### I. Background

Ali was born in 1980 in Baidoa, Somalia, to a family belonging to the minority Rahanweyn clan and the Digil subclan. Since the collapse of its central government in 1991, Somalia has been afflicted by interclan and intraclan warfare. U.S. STATE DEP'T COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES (SOMALIA) 2 (Mar.2006). The State Department Country Report specifically highlights deadly infighting among subfactions of the Rahanweyn Resistance Army in the southern regions of Bay and Bakool. Ali's hometown of Baidoa is located in the Bay region.

According to the uncontradicted testimony of Dr. Said Samatar, a professor of African History at Rutgers University who gave his expert opinion at Ali's immigration hearing, if Ali were returned to the areas of Somalia controlled by his Rahanweyn clan, "he would face immediate and present danger" because the region "is in dispute by two factions of the Rahanweyn." By "immediate and present danger" **\*464** he meant Ali was likely to be beaten and robbed and, "in many places," would also be targeted for death. Dr. Samatar indicated Ali would likely be singled out to be beaten, robbed, or killed because he would be perceived as wealthy after spending time in the United States and "because of the intricacy of [his] lineage." Regarding this latter point, he described persistent feuds between subfactions of the Rahanweyn based on lineage, and testified that the infighting among the Rahanweyn "depends on ... your clan lineage." Dr. Samatar testified that Ali would fare no better in another part of Somalia not controlled by the Rahanweyn. In non-Rahanweyn-controlled regions, he said, Ali would be targeted by members of the local dominant clan because of his status as a Rahanweyn.

Shortly after the outbreak of clan-based violence in 1991, two of Ali's brothers were killed—one by a stray bullet, the other by street gangs. In 1994 warlords from the dominant Hawiye clan who were affiliated with the United Somali Congress ("USC") invaded Baidoa. USC soldiers shot at Ali on two or three occasions, and he describes "constantly running from the USC military" as a teenager. Hawiye militiamen subjected him to several beatings. In 1996, when Ali was sixteen years old, USC soldiers raided the Ali family's home in Baidoa and attempted to rape Ali's older sister. When she resisted, they killed her. Both the attempted rape and murder happened in front of Ali.

Soon after his sister's murder, Ali and the rest of his family fled to a town near the Somali–Kenyan border. There they again experienced clan-based persecution, this time at the hands of the Darod clan. The Rahanweyn were easily identified by the Darods because they spoke a different dialect. In one incident, a member of the Darod militia demanded that Ali put his penis into an exhaust pipe; Ali refused and was beaten. He understood this kind of abuse as an attempt to humiliate the members of minority clans like the Rahanweyn.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

In 1998 Ali and his family fled to Kenya, and in 1999 the United States admitted them as refugees. Ali settled in Madison, Wisconsin, with one of his sisters; his parents moved to Minnesota. He worked a variety of jobs in Madison and attended the Madison Area Technical College. Even after moving to Madison, however, Ali suffered nightmares about the atrocities he witnessed and experienced in Somalia, especially his sister's murder. He says the nightmares caused him to develop a drinking problem and to struggle with depression and insomnia.

Ali was involved in a string of altercations in Madison, starting with an incident in April 2000 where he accepted a ride in a car from three men and a woman. They drove him to a park in Madison, beat him up, and hit him with a beer bottle. His lip was cut and he received medical treatment at a hospital. Two months later Ali crossed paths with one of the men from the April 2000 incident. They started to fight, the police responded, and both Ali and the other man were cited for disorderly conduct.

Then, on June 30, 2000, Ali got into yet another fight with the same man when he spotted him on State Street in downtown Madison. Ali gave the following statement to police officers investigating the incident: "If someone does something to you, you don't forget. I knew it was a mistake and I went after him and I punched him first and he put me on the ground and that's when I got the knot on my head and it was an eye for an eye yesterday." During this altercation, Ali produced a box-cutting instrument and cut the other man about the face, chest, hand, shoulder, and back, saying, "I'm gonna kill you all."

 **\*465**  Ali was arrested and charged in Dane County Circuit Court with substantial battery with intent to cause substantial bodily harm by using a dangerous weapon in violation of sections 940.19(3) and 939.63 of the Wisconsin Statutes. He was released on his own recognizance on condition that he not return to the vicinity of State Street where the June 30 fight occurred. Ali violated this condition by going to State Street—he says he was there to catch a bus to school—and he was again arrested and released. During this period of release, Ali was diagnosed with posttraumatic stress disorder caused by his experiences in Somalia.

Ali pleaded no contest to the felony charge of substantial battery with a dangerous weapon and was placed on probation for seven years and ordered to serve an eleven-month term of incarceration in the local work release facility. Ali completed his eleven-month term in June 2002 and was turned over to federal immigration authorities who initiated removal proceedings against him because of his felony battery conviction.

Ali conceded removability on account of his conviction, but sought relief from removal in the form of a waiver of inadmissibility, asylum, withholding of removal, and deferral of removal under the CAT. After two-and-a-half years of administrative proceedings, the BIA ultimately denied all of Ali's claims for relief. The BIA applied the standard set forth in Matter of Jean, 23 I. & N. Dec. 373, 2002 WL 968631 (2002), to deny Ali a waiver of inadmissibility because he committed a violent crime and had not shown an "exceptional and extremely unusual hardship." Citing Ali's conviction for substantial battery with a dangerous weapon, the BIA also found him ineligible for asylum and withholding of removal because he had committed a "particularly serious crime." Finally, the BIA refused to grant Ali deferral of removal under the CAT because it concluded he had not shown he would more likely than not suffer torture if returned to Somalia. Ali petitioned this court for review.

## II. Discussion

### A. Jurisdiction to review discretionary decisions

The government first challenges our jurisdiction to consider the BIA's discretionary decisions denying waiver of inadmissibility and finding Ali ineligible for asylum and withholding of removal. Section 1252(a)(2)(B) generally deprives courts of jurisdiction to review discretionary denials of immigration relief, and § 1252(a)(2)(C) strips courts of jurisdiction to review final removal orders against aliens who are removable by reason of having committed certain crimes. 8 U.S.C. § 1252(a)(2)(B), (C). But there is an exception for constitutional claims and questions of law: the statute provides that neither

subparagraph (B) or (C) of § 1252(a)(2) precludes judicial "review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals." 8 U.S.C. § 1252(a)(2)(D); *Sokolov v. Gonzales,* 442 F.3d 566, 569 (7th Cir.2006).

So while we lack jurisdiction to review the Attorney General's exercise of discretion to grant or deny relief to an alien (or, more commonly, the discretionary decision of the BIA acting on the Attorney General's behalf), we retain jurisdiction to examine whether the correct legal standard was applied to the alien's claim for relief. *See Jean v. Gonzales,* 452 F.3d 392, 396 (5th Cir.2006). Accordingly, we proceed to Ali's argument that the BIA evaluated his claims using improper legal standards.

**\*466  B. *Matter of Jean* standard**

An alien who commits a "crime of moral turpitude" generally may not be admitted to the United States. [1] 8 U.S.C. § 1182(a)(2)(A)(i)(I). But Congress has given the Attorney General and the Secretary of Homeland Security permissive discretion to waive a refugee's inadmissibility "for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest." 8 U.S.C. § 1159(c). In *Matter of Jean,* 23 I. & N. Dec. 373, 2002 WL 968631 (2002), the Attorney General declined to waive inadmissibility for a Haitian refugee who pleaded guilty to second-degree manslaughter after beating and shaking a nineteen-month old child to death. *Matter of Jean,* 23 I. & N. Dec. at 374–75. The Attorney General articulated a heightened standard for waiving the inadmissibility of refugees who have been convicted of violent or dangerous crimes. Under the *Matter of Jean* standard, aliens convicted of "violent or dangerous" criminal acts will not be allowed to adjust their status under § 1159(c) "except in extraordinary circumstances, such as those involving national security or foreign policy considerations, or cases in which an alien clearly demonstrates that the denial of status adjustment would result in exceptional and extremely unusual hardship." *Matter of Jean,* 23 I. & N. Dec. at 383.

Ali argues that the heightened standard established in *Matter of Jean* for waiving the inadmissibility of refugees who commit violent crimes is inconsistent with and unauthorized by § 1159(c). He contends the BIA should have evaluated his request for a waiver of inadmissibility by looking at the totality of the circumstances in his case, including his family's experiences in Somalia, his posttraumatic stress disorder, his victim's previous attack against him, and his ties to family in the United States. He asserts that § 1159(c) spells out a "three-part test" for inadmissibility waivers that the BIA was required to follow.

We think Ali reads too much into the statute and overstates the scope of the *Matter of Jean* standard. First, § 1159(c) does not contain a "three-part test," nor does it direct the Attorney General to conduct a "totality of the circumstances" analysis when deciding whether to grant an inadmissibility waiver. The statute says the Attorney General or Secretary of Homeland Security "*may* waive" a refugee's inadmissibility for "humanitarian purposes, to assure family unity, or when it is otherwise in the public interest." 8 U.S.C. § 1159(c) (emphasis added). Nowhere does the statute require the Attorney General to waive any refugee's inadmissibility; the language is completely permissive, giving the Attorney General the discretion to decide on a case-by-case basis whether to grant relief for any of the three listed reasons.

After we heard oral argument in this case, two other federal courts of appeals considered similar challenges to the *Matter of Jean* standard and rejected them in published opinions. In the first of these decisions, *Rivas–Gomez v. Gonzales,* 441 F.3d 1072 (9th Cir.2006), the Ninth Circuit observed that the Attorney General possesses "broad discretion to grant or deny waivers and may establish general standards governing the exercise of such discretion 'as long as these standards are rationally related to the statutory scheme.'" *Id.* at 1078 (quoting *Ayala–Chavez v. INS,* 944 F.2d 638, 641 (9th Cir.1991)). The court approved *Matter of*  **\*467**  *Jean's* heightened waiver standard for refugees who commit violent crimes because it found the standard was

rationally related to the "national immigration policy of not admitting aliens who would be a danger to society." *Rivas–Gomez,* 441 F.3d at 1078.

The Fifth Circuit reached the same conclusion in *Jean v. Gonzales,* 452 F.3d at 396–98. This was petitioner Jean's appeal from the Attorney General's decision in *Matter of Jean.* Jean argued, as Ali does here, that the Attorney General's heightened standard for refugees who commit violent crimes was not authorized by 8 U.S.C. § 1159(c). The Fifth Circuit disagreed because "the Attorney General did not add a class of aliens to those who are statutorily inadmissible for waiver, nor did he instruct the BIA to ignore statutory considerations of family unity, humanitarian concerns, and public interest." *Jean,* 452 F.3d at 397 (citing *Togbah v. Ashcroft,* 104 Fed.Appx. 788, 794 (3d Cir.2004) (unpublished)). Because *Matter of Jean's* heightened waiver standard for violent criminal refugees was "rational and connected to the statutory scheme," the Fifth Circuit held the Attorney General permissibly exercised the broad discretion conferred upon him by § 1159(c). *Id.*

We agree with our sister circuits that the Attorney General did not exceed his statutory authority when he articulated the heightened waiver standard in *Matter of Jean.* The *Matter of Jean* standard is not like the regulation successfully challenged in *Succar v. Ashcroft,* 394 F.3d 8 (1st Cir.2005), a case on which Ali relies. *Succar* held that where 8 U.S.C. § 1255(a) lists categories of aliens who may apply to the Attorney General for a discretionary adjustment of immigration status, the Attorney General—in the exercise of that discretion—may not promulgate a regulation that effectively amends the statute by completely barring subcategories of aliens from applying for adjustment. *Succar,* 394 F.3d at 21. The court found such a regulation would contradict the statute because § 1255(a) did not give the Attorney General the discretion to decide who could *apply* for adjustment, it only gave him the discretion to decide who should be *granted* adjustment. *Id.* at 28.

But in *Matter of Jean* the Attorney General did not categorically exclude violent or dangerous criminal refugees from applying for an inadmissibility waiver, nor from being granted such a waiver. *Matter of Jean* simply says the Attorney General will, in the exercise of his statutorily conferred discretion, require a more compelling showing of hardship from refugees who make themselves inadmissible by committing violent crimes. *Jean,* 23 I. & N. Dec. at 383. *Succar* itself spells out this distinction: "Congress's eligibility determinations do not limit the considerations that may guide the Attorney General in exercising his discretion to determine who, among those eligible, will be accorded grace." *Succar,* 394 F.3d at 29 n. 28 (quotation marks and citations omitted). *See also Jean,* 452 F.3d at 397 ("[T]he Attorney General did not add a class of aliens to those who are statutorily inadmissible for waiver.... He left open the possibility that even the most violent and dangerous immigrants could be granted relief in an appropriate case."). The Attorney General acted within the discretion conferred by § 1159(c) when he established the heightened waiver standard for violent or dangerous criminal refugees in *Matter of Jean.*

## C. A "particularly serious crime"

Ali next argues that the BIA erred when it found he committed a "particularly serious crime," a finding that made him ineligible for asylum and withholding of **\*468** removal. The immigration statutes give the Attorney General—by extension, the BIA—discretion to determine whether aliens are eligible to receive asylum and withholding of removal. 8 U.S.C. §§ 1158(b)(2)(A)(ii) and 1231(b)(3)(B)(ii). [2] As we have noted, courts generally lack jurisdiction to review the Attorney General's discretionary immigration decisions, but § 1252(a)(2)(D) authorizes us to address the questions of law raised by Ali's challenge to the BIA's finding that he committed a particularly serious crime.

Ali's appeal presents questions of law because he challenges the BIA's interpretation of the term "particularly serious crime" in the asylum and withholding statutes. He argues that the plain language of those statutes should have precluded the BIA from holding that his conviction for substantial battery with a dangerous weapon constituted a "particularly serious crime." Where,

as here, we are asked to review " 'an agency's construction of the statute which it administers,' " we apply "the principles of deference described in 🔖 *Chevron U.S.A. v. Natural Resources, Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)." 🔖 *INS v. Aguirre–Aguirre,* 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) (quoting 🔖 *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778).

If the statute at issue speaks clearly and directly to the question at hand, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 🔖 *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778. But when "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." 🔖 *Id.* at 843, 104 S.Ct. 2778. An agency's interpretation of an ambiguous statute may be permissible even if it differs from the construction the reviewing court would have given the statute "if the question initially had arisen in a judicial proceeding." 🔖 *Id.* at 843 n. 11, 104 S.Ct. 2778. We give "considerable weight ... to an executive department's construction of a statutory scheme it is entrusted to administer," 🔖 *id.* at 844, 104 S.Ct. 2778, and deference to the executive "is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.' " 🔖 *Aguirre–Aguirre,* 526 U.S. at 425, 119 S.Ct. 1439 (quoting 🔖 *INS v. Abudu,* 485 U.S. 94, 110, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988)).

Ali urges us to hold that the asylum and withholding statutes are unambiguous, that his crime of conviction is not a "particularly serious crime" within the meaning of 🔖 §§ 1158(b)(2) and 🔖 1231(b)(3), and that the BIA's interpretation of these statutes is not entitled to judicial deference. The asylum statute says that an alien is ineligible for asylum "if the Attorney General determines that ... (ii) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States." 🔖 8 U.S.C. § 1158(b)(2)(A)(ii). Neither 🔖 § 1158 nor any other section of the immigration code offers a definition of the statutory phrase "particularly serious crime," but 🔖 § 1158 does list two categories of crimes that are per se "particularly serious": (1) "aggravated felon[ies]" and (2) other crimes that the Attorney General "designate[s] by regulation." 🔖 8 U.S.C. §§ 1158(b)(2)(B). Ali would have us read **\*469** subparagraph (b)(2)(B) to mean that *only* aggravated felonies and other crimes specifically designated by regulation may be considered "particularly serious." [3]

We do not think 🔖 § 1158 so cabins the Attorney General's discretion to determine whether an alien has been convicted of a "particularly serious crime" for purposes of ineligibility for asylum. Congress named two categories of per se "particularly serious" crimes, but it did not say these were the *only* categories of crimes that would bring an alien's case within the statutory bar. Nowhere does 🔖 § 1158 purport to prohibit the Attorney General from determining in a given case that an alien's nonaggravated felony is "particularly serious" unless he had the foresight to explicitly itemize that particular crime by regulation. The statutory language simply is not susceptible to such a limited interpretation. We therefore reject Ali's argument that the BIA misinterpreted an unambiguous statute. Alternatively, to the extent there is any ambiguity, the BIA's interpretation is entitled to considerable deference. 🔖 *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778.

In this regard, the BIA's construction of 🔖 § 1158(b)(2) is entirely permissible, particularly considering the vast array of crimes defined by each of the fifty states' criminal codes. An interpretation that requires the Attorney General and his agents to sift through each state's code and prospectively identify by regulation every single crime that would qualify as "particularly serious" would impose an onerous task. Nothing in the statute's text suggests a requirement that the Attorney General must engage in such an anticipatory task. 🔖 Section 1158(b)(2) does not prohibit the Attorney General from determining on a case-by-case

basis that an asylum applicant has committed a "particularly serious" crime, even though the crime is neither an aggravated felony nor a crime expressly designated by regulation as "particularly serious."

We reach the same conclusion with respect to the withholding of removal statute, 8 U.S.C. § 1231(b)(3)(B). That statute says an alien is ineligible for withholding of removal if "the Attorney General decides that ... (ii) the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States." Subparagraph (b)(3)(B) adds the following about the "particularly serious crime" exclusion:

> For purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.

8 U.S.C. § 1231(b)(3)(B).

Ali reads this language to mean that only aggravated felonies count as particularly serious crimes for purposes of withholding of removal ineligibility. He notes that the statute makes aggravated felonies resulting in prison terms of at least five years per se "particularly serious." The next sentence gives the Attorney General discretion to decide that a crime is particularly serious even if the alien was not sentenced to at least five years in prison. But, Ali observes, that same sentence says **\*470** nothing about giving the Attorney General discretion to call a crime particularly serious when it is not an "aggravated felony." Ali invokes the canon of construction that says the expression of one thing is the exclusion of the other. *See, e.g.,* *Dersch Energies, Inc. v. Shell Oil Co.,* 314 F.3d 846, 861 n. 15 (*expressio unius est exclusio alterius*). He reasons that because the statute expressly grants the Attorney General discretion to find aggravated felonies "particularly serious" regardless of the length of an alien's sentence but does not explicitly provide any similar discretion for crimes that are not aggravated felonies, § 1231(b)(3)(B) precludes the Attorney General from finding any crimes "particularly serious" other than aggravated felonies.

The problem with this argument is that § 1231 does not state a general rule that only aggravated felonies can be considered "particularly serious" crimes. The designation of aggravated felonies producing sentences of at least five years' imprisonment as per se "particularly serious" creates no presumption that the Attorney General may not exercise discretion on a case-by-case basis to decide that other nonaggravated-felony crimes are also "particularly serious." Congress specified that the Attorney General may extend the "particularly serious" designation to aggravated felonies producing prison terms of less than five years. But the absence of a similar provision for nonaggravated-felony crimes does not imply that only aggravated felonies can qualify as "particularly serious" crimes. Again, to the extent that § 1231(b)(3)(B) is ambiguous on this point, the BIA's reasonable interpretation is entitled to deference. *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778.

The BIA acted in accordance with §§ 1158 and 1231 and did not apply an incorrect legal standard when it determined that Ali committed a "particularly serious" crime for purposes of ineligibility for asylum and withholding of removal. We lack jurisdiction to review the BIA's exercise of discretion when the agency operates under the proper legal standard. 8 U.S.C. § 1252(a)(2)(B) and (C). We therefore do not address Ali's argument that the BIA misapplied its own precedent—*Matter of Frentescu,* 18 I. & N. Dec. 244, 1982 WL 190682 (1982) [4]—in its analysis of Ali's offense of conviction. Reviewing the BIA's determination in this regard would require an improper assertion of jurisdiction over the BIA's exercise of its statutorily

conferred discretion. *But see* 🚩 *Afridi v. Gonzales,* 442 F.3d 1212, 1218–20 (9th Cir.2006) (asserting jurisdiction then granting petition for review and remanding alien's withholding of removal claim because BIA did not fully engage the *Frentescu* factors when deciding alien's crime was "particularly serious").

## D. International law

Ali spends two sentences in his opening brief arguing that the BIA's decision violates international standards for denying relief to criminal refugees, but his cursory argument provides no basis for granting his petition. The only authority he cites is the *Office of the High Commissioner for Human Refugees, Handbook on Procedures and Criteria for Determining Refugee* **\*471** *Status,* ¶ 154, which "is not binding on the Attorney General, the BIA, or United States courts." 📒 *Aguirre–Aguirre,* 526 U.S. at 427, 119 S.Ct. 1439.

## E. Deferral of removal under the Convention Against Torture

Finally, we address Ali's contention that the BIA should have granted him deferral of removal under the CAT, implemented at 📒 8 C.F.R. §§ 1208.16– 📒 18. [5] The BIA denied Ali relief under the CAT because it determined that he had not shown he would more likely than not face torture if removed to Somalia. We review the BIA's factual findings for substantial evidence; this means we will reverse the BIA's decision only if the evidence in the record compels a contrary conclusion. *Jun Ying Wang v. Gonzales,* 445 F.3d 993, 997 (7th Cir.2006).

Ali is entitled to deferral of removal—the relief is mandatory, not discretionary—if he can prove that it is more likely than not he would be tortured if removed to Somalia. 📒 8 C.F.R. § 1208.16(c)(2) and (4). The BIA was required to consider "all evidence relevant to the possibility of future torture ... including, but not limited to" evidence that Ali suffered past torture, evidence that he could relocate to a part of Somalia where he is not likely to be tortured, evidence of "gross, flagrant or mass violations of human rights" in Somalia, and other relevant information about Somalia's country conditions. 📒 8 C.F.R. § 1208.16(c)(3). For purposes of the CAT, torture has the following definition:

> [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

📒 8 C.F.R. § 1208.18(a)(1). Mental pain or suffering constitutes torture if it results from, among other things, the "intentional infliction or threatened infliction of severe physical pain or suffering," the "threat of imminent death," and the "threat that another person will imminently be subjected to death, severe physical pain or suffering." 📒 8 C.F.R. § 1208.18(a)(4). The requirement that torture be inflicted by or with the acquiescence of a public official is met if "prior to the activity constituting torture," a public official is aware of the activity and then "breach[es] his or her legal responsibility to intervene to prevent such activity." 📒 8 C.F.R. § 1208.18(a)(7).

The BIA acknowledged that Ali "would probably face [clan-based] harm and possibly torture if returned to live for prolonged periods in certain areas" of Somalia that are not controlled by the Rahanweyn. But the Board concluded the only risks to which Ali would be exposed in the Rahanweyn-controlled areas would be based on his perceived wealth for having lived in the United

States or because of the random **\*472** violence and looting that plagues the Bay and Bakool regions. In the BIA's view, violence would not be inflicted for the purpose of causing severe mental or physical pain or suffering, and would not be motivated by the desire to obtain from Ali a confession or information, to punish or coerce him, or to discriminate against him. *See* 8 C.F.R. § 1208.18(a)(1) (requiring "torture" to be attributable to these motives). Accordingly, the BIA found Ali had not shown he was more likely than not to face torture if removed to Somalia and denied relief under the CAT.

The BIA reached these conclusions by ignoring key evidence, overlooking Dr. Samatar's testimony that Ali would be targeted for violence in the Rahanweyn-controlled areas because of his particular lineage within his clan, not just for being perceived as wealthy for having lived in the United States. The BIA failed to take into account Dr. Samatar's testimony that the Rahanweyn infighting "depends on ... your clan lineage" and that violence and torture are perpetrated with the intent to punish clan members.

We also find remarkable the BIA's overall conclusion that Ali did "not present [ ] evidence of past harm which is necessarily linked to his clan membership and which bolsters the belief he will be tortured in the future." The BIA reached this conclusion only by omitting any mention of the attempted rape and murder of Ali's sister and the violence Ali endured personally. Soldiers from the invading Hawiye clan attempted to rape Ali's sister, then killed her when she resisted. This atrocity took place in the context of the interclan warfare between the dominant Hawiye and the Rayanweyn, and it was carried out in the Ali family home with Ali—who was then sixteen years old—looking on. Ali himself was shot at and beaten by militiamen affiliated with the Hawiye. The BIA also made no mention of the clan-based violence Ali suffered at the hands of the Darod militia on the Somali–Kenyan border after fleeing from the Hawiye. The record reflects that the violence Ali witnessed and experienced had a profound psychological effect on him, precipitating post-traumatic stress disorder.

By focusing narrowly on the deaths of Ali's two brothers—both of which could plausibly be attributed to the generally unsafe, lawless conditions in Somalia-the BIA sidestepped critical evidence it was required to consider. 8 C.F.R. § 1208.16(c)(3). When all the relevant evidence is properly considered, the record compels the conclusion that Ali would more likely than not face torture if removed to Somalia. [6]

Because the BIA found Ali was not likely to face torture in Somalia, it left open the question whether he would face torture "at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." **\*473** 8 C.F.R. § 1208.18(a)(1). The parties have not fully briefed this issue on appeal—each only briefly mentioning the matter—so the prudent course is to remand the case for the BIA to consider whether Ali established the official capacity element of his CAT claim.

### III. Conclusion

Ali's petition for review is DENIED with respect to his claims for waiver of inadmissibility, asylum, and withholding of removal. His petition is GRANTED as to his claim for deferral of removal under the CAT, and that claim is REMANDED to the BIA for further proceedings consistent with this opinion.

AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.

**All Citations**

468 F.3d 462

# Footnotes

1    Ali concedes that his conviction for substantial battery with a dangerous weapon was a crime of moral turpitude.

2    Withholding of removal is a mandatory form of relief to which eligible applicants are entitled, 8 U.S.C. § 1231(b)(3)(A), but the Attorney General has discretion to determine who is eligible. 8 U.S.C. § 1231(b)(3)(B).

3    The parties agree that Ali's crime of conviction was neither an aggravated felony (as that term is defined for immigration purposes) nor a crime the Attorney General has by regulation designated as "particularly serious."

4    "While there are crimes which, on their face, are 'particularly serious crimes' or clearly are not 'particularly serious crimes,' the record in most proceedings will have to be analyzed on a case-by-case basis. In judging the seriousness of a crime, we look to such factors as the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a danger to the community." *Matter of Frentescu,* 18 I. & N. Dec. 244, 247, 1982 WL 190682 (1982).

5    Deferral of removal under the CAT is a limited form of protection available only to aliens who are barred from receiving withholding of removal. 8 C.F.R. § 1208.17(a). Deferral of removal does not confer permanent immigration status on an alien, and an alien who has been granted this form of relief may be removed to another country where there is no likelihood of torture. 8 C.F.R. § 1208.17(b)(2). Also, deferral of removal is subject to termination if an immigration judge determines that there is no longer a likelihood of torture in the country to which removal has been deferred. 8 C.F.R. § 1208.17(b)(1).

6    Ali's case is not like *Pelinkovic v. Ashcroft,* 366 F.3d 532 (7th Cir.2004), a case on which the government relies. *Pelinkovic* upheld the denial of a claim for relief under the CAT because the petitioners failed "to make a particularized showing that any of them would more likely than not be subject to torture upon their return, as differentiated from the general risk shared by all ethnic Albanians in Montenegro." We explained it was impossible for the petitioners to show a likelihood of torture because "the events they feared were prospective—*possible* civil war with Serbia, *possibly* resulting in the same ethnic cleansing directed at ethnic Albanians as in other Milosevic campaigns. Thankfully, those possibilities did not come to pass." *Id.* at 542. Here, Ali's fears are not premised on merely prospective possibilities; they are rooted in the reality of Somalian interclan and intraclan warfare that devastated his own family and continues to plague much of his homeland.

---

**End of Document**                                                  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Azim v. U.S. Atty. Gen., 314 Fed.Appx. 193 (2008)

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 499 of 912

314 Fed.Appx. 193
This case was not selected for publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See also U.S. Ct. of App. 11th Cir. Rule 36-2.
United States Court of Appeals,
Eleventh Circuit.

Roy AZIM, Petitioner,

v.

U.S. ATTORNEY GENERAL, Respondent.

Nos. 07–12390, 07–14171.
|
Sept. 3, 2008.

#### Synopsis

**Background:** Alien, a native of Kyrgyzstan, petitioned for review of decision of the Board of Immigration Appeals (BIA) affirming immigration judge's determination that alien was removable.

**Holdings:** The Court of Appeals held that

alien's misrepresentations on his visa application were willful, but

questions of fact as to whether the misrepresentations were material required vacatur of BIA's decision and remand for further findings.

Petition granted; vacated and remanded.

#### Attorneys and Law Firms

**\*194** Ira J. Kurzban, Geoffrey A. Hoffman, Kurzban, Kurzban, Weinger & Tetzeli, P.A., Miami, FL, for Petitioner.

David V. Bernal, Anthony Cardozo Payne, Justice Dept. Civil Division Consumer Litigation Off., Jesse M. Bless, Andrew C. MacLachlan, Ernesto H. Molina, Jr., Washington, DC, for Respondent.

Petitions for Review of a Decision of the Board of Immigration Appeals. Agency No. AXX–XXX–957.

Before BIRCH, MARCUS and FORRESTER [*], Circuit Judges.

#### Opinion

PER CURIAM:

**\*\*1** Roy Azim petitions for review of a final order of the Board of Immigration Appeals ("BIA") which (1) affirmed the Immigration Judge's ("IJ") decision that Azim was removable because he was inadmissible at the time of entry due to a willful misrepresentation of a material fact, 8 U.S.C. §§ 1182(a)(6)(C)(i), 1227(a)(1), Immigration and Nationality Act ("INA") §§ 212(a)(6)(C)(i), 237(a)(1); and (2) reversed the IJ's decision that Azim was eligible for a statutory waiver of removal because

he was otherwise admissible at the time of admission, 8 U.S.C. § 1227(a)(1)(H)(II); INA § 237(a)(1)(H)(II). After review, we grant the petition and VACATE and REMAND for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Vacatur of Azim's Convictions

In 1981, Azim, a native of Kyrgyzstan, was convicted in the former Kyrgyz Soviet Socialist Republic of various crimes, including *inter alia* illegally acquiring, possessing and storing unregistered firearms; obtaining gold nuggets and sable skins by fraud and deception and trading them in violation of the rules of monetary operations; inflicting serious physical harm; **\*195** and obtaining and using narcotic substances. With regard to the narcotic substances, Azim was found to have "illegally obtained and retained for personal use the narcotic 'Omnopon.' " Azim served a seven-year sentence.

In 1991, Azim's convictions were vacated based on his rehabilitation. In 1998, the Plenum of the Supreme Court of the new post-Soviet Kyrgyz Republic completely vacated Azim's convictions due to lack of evidence that he committed the crimes and gross procedural errors in the prosecution.

### B. Visa Application

In May 1997, after the 1991 rehabilitative vacatur, but before the 1998 vacatur, Azim applied for a visa to enter the United States as an immigrant. On his application, Azim answered "no" to the questions whether he had ever been convicted of: (1) a crime involving moral turpitude; (2) two or more offenses with an aggregate sentence of five years or more; or (3) a crime involving narcotics. Azim also answered "no" to the question whether he had ever been arrested or convicted of a crime or had served a jail sentence.

The IJ and the BIA concluded that the government had proven that Azim was removable under 8 U.S.C. § 1227(a)(1)(A) as an alien who was inadmissible at the time he entered the United States because, pursuant to 8 U.S.C. § 1182(a)(6)(C)(i), because he had made a material misrepresentation on his visa application. [1]

An alien who is inadmissible under the law at the time of entry is removable. 8 U.S.C. § 1227(a)(1)(A). At the time of Azim's June 1997 admission into the United States, an alien was excludable "who, by fraud or *willfully* misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or entry into the United States or other benefit provided under this chapter." 8 U.S.C. § 1182(a)(6)(C)(i) (1996) (emphasis added). [2] An alien's misrepresentation is willful if the statement was deliberate and the alien had knowledge of the statement's falsity. *See In re Healy & Goodchild,* 17 I. & N. Dec. 22, 28 (BIA 1979); *In re S & B–C–,* 9 I. & N. Dec. 436, 445 (BIA 1960, A.G.1961). The government bears the burden of proving the facts showing removability by clear, unequivocal and convincing evidence, including whether a material misrepresentation was made to procure a visa. *See Woodby v. INS,* 385 U.S. 276, 277, 87 S.Ct. 483, 484, 17 L.Ed.2d 362 (1966); *In re Bosuego,* 17 I. & N. Dec. 125, 131 (BIA 1980).

**\*\*2** Azim does not contest that he made misrepresentations on his visa application, only whether those misrepresentations were willful and material. Substantial evidence **\*196** supports the finding that Azim's misrepresentations on his visa application were willful. Azim was arrested, convicted and imprisoned, and Azim was aware that he had been arrested, convicted and imprisoned. Because Azim's statements in his visa application to the contrary were knowingly factually inaccurate and deliberately made, they were willful. The fact that Azim made the statements in good faith based on advice from his attorneys is unavailing as there is no requirement that Azim's misrepresentations have been made with an intent to deceive. *See Mwongera v. INS,* 187 F.3d 323, 330 (3d Cir.1999) (stating that the government "does not need to show intent to deceive; rather, knowledge of the

falsity of the representation will suffice"); *Witter v. INS,* 113 F.3d 549, 554 (5th Cir.1997) (same); *Forbes v. INS,* 48 F.3d 439, 442 (9th Cir.1995) (same).

We therefore turn to the question of whether Azim's misrepresentations were material. An alien's misrepresentation is material if it "had a natural tendency to influence the decisions of" an immigration official. *Kungys,* 485 U.S. at 772, 108 S.Ct. at 1547. An alien's misrepresentation as to an application for a visa or for entry in to the United States is material if: (1) the alien is inadmissible on the true facts; or (2) "the misrepresentation tends to shut off a line of inquiry which is relevant to the alien's eligibility and which might well have resulted in a proper determination that he" was inadmissible. *In re Bosuego,* 17 I. & N. Dec. at 127–28; *see also In re S & B–C–,* 9 I. & N. Dec. at 447. "The important factor is how the case would have appeared to the consul had he been in possession of all the facts at the time application was made. If having been in possession of all the facts, it would have appeared probable to the consul that respondent was inadmissible, then concealment of those facts was a material matter." *In re Bosuego,* 17 I. & N. Dec. at 128 (brackets and quotation marks omitted).

In Azim's case, the IJ found that Azim "denied having been arrested, convicted, and serving a sentence of seven years in the Kyrgyz Republic for crimes involving the infliction of serious harm, narcotics violations, firearms violations, currency violations, and theft by deceit. [Azim] would have been inadmissible based on these facts and therefore the misrepresentation was material." The IJ concluded that these convictions were "not nullified by" the 1998 vacatur, but made no reference to the 1991 rehabilitative vacatur in its determination that Azim was removable.

In a 4 May 2007 order, the BIA reinstated its earlier April 2005 order and agreed with the IJ's finding that the misrepresentations were material. However, the BIA made no analysis of the effect of Azim's 1991 rehabilitative vacatur. Under the law in effect in 1997 when Azim's visa application was under consideration by consular officials, a rehabilitative vacatur was effective to remove non-controlled substance convictions from an alien's record for immigration purposes. *See In re Marroquin–Garcia,* 23 I. & N. Dec. 705, 706–09 (A.G.2005); *In re Luviano–Rodriguez,* 21 I. & N. Dec. 235, 237–38 (BIA 1996), *rev'd,* 23 I. & N. Dec. 718 (A.G.2005). Neither the IJ nor the BIA appear to have considered whether Azim's Omnopon conviction was in fact a controlled substance offense under 21 U.S.C. § 802 barring Azim's admission in 1997.[3] Furthermore, Omnopon **197** is not listed in any of the federal drug schedules or referenced anywhere else in the United States Code or the Code of Federal Regulations. Nor did the government present any evidence as to the drug class, chemical composition or nature of Omnopon. Thus, it appears the IJ (and the BIA) did not consider whether it would have appeared probable to a consular official in 1997 that the 1991 vacatur was effective as to Azim's Omnopon conviction.[4]

**3** Accordingly, we grant Azim's petition, vacate the BIA's decision dated 4 May 2007, and remand this case to the BIA for further findings of fact by the IJ as to whether Omnopon is a controlled substance under 21 U.S.C. § 802 and whether the inquiry foreclosed by Azim's misrepresentations might well have resulted in the proper determination that his Omnopon conviction rendered him inadmissible.[5]

**PETITION GRANTED; VACATED and REMANDED.**

**All Citations**

314 Fed.Appx. 193, 2008 WL 4090645

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

AR.06997

# Footnotes

* Honorable J. Owen Forrester, United States District Judge for the Northern District of Georgia, sitting by designation.

1 The BIA's opinion adopted the IJ's determination that Azim was removable because he had made a willful, material misrepresentation in his visa application. Thus, we review both the BIA's opinion and the IJ's determination. *See Al Najjar v. Ashcroft,* 257 F.3d 1262, 1284 (11th Cir.2001) (explaining that we review the orders of both the IJ and the BIA where the BIA adopts the IJ's reasoning).

 We review legal determinations *de novo, Mohammed v. Ashcroft,* 261 F.3d 1244, 1247–48 (11th Cir.2001), and factual determinations under the substantial evidence test, *Forgue v. U.S. Att'y Gen.,* 401 F.3d 1282, 1286 (11th Cir.2005). Although the materiality of a statement "rests upon a factual evidentiary showing," whether a misrepresentation is material is a question of law we review *de novo. See Kungys v. United States,* 485 U.S. 759, 772, 108 S.Ct. 1537, 1547, 99 L.Ed.2d 839 (1988) (quotation marks omitted).

2 The current version of 8 U.S.C. § 1182(a)(6)(C)(i) is identical except that it substitutes the word "admission" for "entry" and uses the more recently implemented term "inadmissible" rather than "excludable."

3 The BIA's May 4, 2007 order reinstating its prior decision stated in its recitation of the facts that Azim's narcotics conviction was for "possession and use of the narcotic opium...." To the extent the BIA made a factual finding that Azim's Omnopon conviction was one for possessing and using opium, it is not supported by any record evidence and, in any event, was outside the scope of its authority. *See* 8 C.F.R. § 1003.1(d)(3)(iv) (providing that the BIA "will not engage in factfinding in the course of deciding appeals").

4 For purposes of determining materiality, we look at the circumstances as they existed at the time the visa application was made. *Bosuego,* 17 I. & N. Dec. at 128. Although Azim urges us to consider his 1998 vacatur, developments or happenings occurring afterwards cannot vitiate a material misrepresentation committed at the time an immigration benefit was obtained. *See Matter of G–R–,* 7 I & N Dec. 508, 510 (BIA 1957). Thus, we must disregard Azim's 1998 vacatur for purposes of evaluating the materiality of his misrepresentations.

5 Because we vacate and remand for further findings as to Azim's removability, we do not address the BIA's determination that Azim was alternatively ineligible for a discretionary waiver or the BIA's denial of Azim's motion for reconsideration.

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

934 F.3d 255
United States Court of Appeals, Third Circuit.

Carlos Eduardo BASTARDO-VALE, Petitioner

v.

ATTORNEY GENERAL UNITED STATES of America, Respondent

No. 17-2017
|
Argued on May 24, 2018 before Merits Panel
|
Argued En Banc on May 15, 2019
|
(Filed: August 12, 2019)

**Synopsis**
**Background:** Alien, a native and citizen of Venezuela, sought review of decision of the Board of Immigration Appeals (BIA), concluding that alien's conviction for second-degree unlawful imprisonment under Delaware law constituted a "particularly serious crime," rendering him ineligible for both asylum and withholding of removal.

**Holdings:** The Court of Appeals, en banc, Shwartz, Circuit Judge, held that:

Immigration Judge (IJ) and BIA's blatant disregard of binding regional precedent on definition of the phrase "particularly serious crime" in the context of withholding of removal was ultra vires;

phrase "particularly serious crime" in asylum statute includes, but is not limited to, aggravated felonies;

grant of regulatory authority to designate classes of offenses as "particularly serious crimes" within the meaning of the asylum statute did not displace the Attorney General's authority to also make case-specific determinations concerning whether an alien's offense should be deemed "particularly serious";

phrase "particularly serious crime" in the withholding of removal statute includes, but is not limited to, aggravated felonies, overruling *Alaka v. Attorney General of U.S.*, 456 F.3d 88; and

alien waived any challenges to the BIA's assessment of whether his Delaware conviction constituted a "particularly serious crime" under the asylum and withholding of removal statutes.

Petition denied.

McKee, Circuit Judge, filed dissenting opinion.

Ambro, Circuit Judge, filed dissenting opinion.

**Procedural Posture(s):** Review of Administrative Decision; Other.

**\*257** On Petition for Review of an Order of The Board of Immigration Appeals

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(Agency No. AXXX-XX7-703)

Immigration Judge: Quynh Vu Bain

**Attorneys and Law Firms**

Rosa Barreca, 1308 South 8th Street, Philadelphia, PA 19147, Cherylle C. Corpuz [ARGUED], Morais Law, 101 West Main Street, Suite 101 Moorestown, NJ 08057, Counsel for Petitioner

Benjamin M. Moss [ARGUED], Judith R. O'Sullivan, United States Department of Justice, Office of Immigration Litigation, P.O. Box 878, Ben Franklin Station, Washington, DC 20044, Counsel for Respondent

Joseph C. Hohenstein [ARGUED], Landau Hess Simon & Choi, 190 North Independence Mall West, Suite 602, Philadelphia, PA 19106, Counsel for Amicus Curiae American Immigration Lawyers Association

Before: SMITH, Chief Judge, McKEE, AMBRO, CHAGARES, JORDAN, HARDIMAN, GREENAWAY, JR., SHWARTZ, KRAUSE, RESTREPO, BIBAS, PORTER, and MATEY, Circuit Judges.

OPINION OF THE COURT

SHWARTZ, Circuit Judge.

**\*258**  Today we decide whether the phrase "particularly serious crime" as used in both the asylum and withholding of removal statutes, 8 U.S.C. §§ 1158(b)(2), 1231(b)(3), includes, but is not limited to, aggravated felonies. We hold that it does. The phrase "particularly serious crime" means the same thing in both statutes, and the language of those statutes shows that aggravated felonies are a subset of particularly serious crimes.

In reaching this conclusion, we overrule Alaka v. Attorney General, 456 F.3d 88 (3d Cir. 2006), where we defined the phrase "particularly serious crime" in the context of withholding of removal to include only aggravated felonies. Because we revisit this precedent and agree with the Board of Immigration Appeals' ("BIA") decision that Petitioner Carlos Eduardo Bastardo-Vale committed a particularly serious crime that barred him from obtaining asylum and withholding of removal relief, we will deny the petition for review.

I

Bastardo-Vale petitions for review of the BIA decision that his conviction for second-degree unlawful imprisonment under Delaware law constitutes a "particularly serious crime," rendering him ineligible for both asylum and withholding of removal relief. 8 U.S.C. §§ 1158(b)(2), 1231(b)(3). His state conviction arose from a forcible sexual encounter with a college freshman ("victim"). At the time of the incident, Bastardo-Vale, a native and citizen of Venezuela who entered the United States on a nonimmigrant student visa, was a graduate resident assistant at Goldey-Beacom College.

In the early morning of November 10, 2013, Bastardo-Vale returned to his apartment. There, by the victim's account, Bastardo-Vale invited her to his apartment where he forcibly pulled her into his room and began raping her, or by Bastardo-Vale's account, they began to have consensual sex. According to the police report, the victim told Bastardo-Vale to " 'stop' numerous times but he refused." A.R. 2187. She "freed herself by using her knee to strike [Bastardo-Vale] in the rib cage and push him off of her body." Id. The victim and Bastardo-Vale both left the apartment. About forty-five minutes later, Bastardo-Vale encountered security guards elsewhere on campus, who told him that they were looking for him because he had been accused of rape and

instructed him to "stay." A.R. 260. Bastardo-Vale ignored their direction, returned to his apartment to retrieve a used condom, and tossed it into a dumpster. He claimed that he discarded the evidence because, as a graduate resident assistant, he risked losing his scholarship by having sexual relations with a freshman.

Bastardo-Vale pleaded no contest to second-degree unlawful imprisonment in violation of Del. Code Ann. tit. 11, § 781 and was sentenced to the maximum term of one year's imprisonment, which was suspended for eleven months of time served.

The Department of Homeland Security ("DHS") then charged Bastardo-Vale with removability under **\*259** 8 U.S.C. § 1227(a)(2)(A)(i), for being convicted of a crime involving moral turpitude, and under 8 U.S.C. § 1227(a)(1)(C)(i), for failing to comply with the conditions of his nonimmigrant status. The Immigration Judge ("IJ") found Bastardo-Vale was removable because he had stopped attending college and thus failed to comply with the "conditions of his admission to nonimmigrant student status." A.R. 197. Bastardo-Vale applied for asylum, withholding of removal, and Convention Against Torture ("CAT") relief based primarily on his claim that he was harmed in his country of origin on account of an imputed political opinion stemming from his mother's political activities. DHS argued that Bastardo-Vale was not entitled to asylum and withholding of removal because he had been convicted of a particularly serious crime and was a "danger to the community of the United States." 8 U.S.C. §§ 1158(b)(2)(A)(ii), 1231(3)(B)(ii). The IJ rejected that argument and instead of applying Alaka, which limited the phrase "particularly serious crime" to aggravated felonies, it relied on In re N-A-M-, 24 I. & N. Dec. 336 (BIA 2007), aff'd per curiam, 587 F.3d 1052 (10th Cir. 2009). Applying N-A-M-, the IJ determined that Bastardo-Vale's conviction was not for a particularly serious crime because (1) it "was based on a plea agreement pursuant to which [he] pled no contest," A.R. 203; (2) there was no evidence suggesting he used "physical force to confine the victim in his apartment," A.R. 204, and (3) he "received a sentence of one year, all of which was suspended for time served ... [which] suggest[s] that the criminal court did not consider him a danger to the community," A.R. 204. The IJ noted that Bastardo-Vale's attempt to dispose of evidence was "very troubling" but insufficient to make his crime a particularly serious offense. A.R. 204. The IJ therefore found that he was eligible for asylum and had no need to consider his request for withholding of removal or CAT relief. DHS appealed the IJ's finding that Bastardo-Vale's conviction was not for a particularly serious crime.

The BIA agreed with DHS, disregarded our precedent in Alaka, and held that Bastardo-Vale had "been convicted of a particularly serious crime under [the BIA's] case-by-case approach set forth in," among other cases, N-A-M-. A.R. 6. The BIA concluded that the Delaware unlawful imprisonment statute encompasses conduct involving physical force and intimidation, as well as that which "places at risk a particularly vulnerable segment of society ... [so the] conviction falls within the potential ambit of a particularly serious crime." A.R. 6. The BIA concluded the circumstances of Bastardo-Vale's offense demonstrated its seriousness because "[t]he use of physical force to overcome another's desire to terminate a sexual encounter, whether originally consented to or not, is an inherently violent act that places a victim in fear for their safety." A.R. 6-7. The BIA held that Bastardo-Vale's conviction for a particularly serious crime barred him from receiving asylum and withholding of removal but remanded the matter to the IJ to address whether he was entitled to CAT relief. [1]

 **\*260**  On remand, Bastardo-Vale withdrew his CAT claim, and the IJ ordered Bastardo-Vale removed. Bastardo-Vale appealed the IJ's decision to the BIA for it to certify the ruling as final and petitioned our Court for review. [2]  The BIA determined that "there [was] nothing left for [it] to decide regarding" Bastardo-Vale's asylum or withholding of removal applications, Supp. App. 10, but again remanded the matter for the IJ to determine his country of removal. The IJ subsequently ordered Bastardo-Vale removed to Venezuela.

Bastardo-Vale seeks review of the BIA's determination that his conviction for second-degree  **\*261**  unlawful imprisonment qualifies as a particularly serious crime and asserts that he is entitled to asylum and withholding of removal. He claims that the BIA erred in disregarding Alaka and holding that his nonaggravated offense was a "particularly serious crime" that bars him from relief.

AR.07001

After oral argument before a panel of our Court, we elected sua sponte to hear the case en banc to determine whether Alaka remains good law. We now examine the phrase "particularly serious crime" under both the asylum and withholding of removal statutes as well as the rulings of our sister circuits who have concluded that the phrase "particularly serious crime" is not limited to aggravated felonies in either the asylum or withholding of removal context.

II [3]

A

The IJ granted Bastardo-Vale asylum but the BIA overturned that ruling because it found that Bastardo-Vale was convicted of an offense it deemed to be a particularly serious crime, even though it was not an aggravated felony. To determine whether this is correct, we will first review the statutory framework for asylum.

The Secretary of Homeland Security or the Attorney General may grant an asylum application if the alien shows that he is a "refugee" who is persecuted due to his race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1158(b)(1)(B)(i). Asylum, however, is unavailable to an alien, "convicted by a final judgment of a particularly serious crime," whom the Attorney General determines "constitutes a danger to the community of the United States." Id. § 1158(b)(2)(A)(ii).

The phrase "particularly serious crime" is not defined in § 1158, but Congress included two "Special Rules" within the asylum statute addressing the subject. Id.

§ 1158(b)(2)(B). The Special Rules provide:

(i) Conviction of aggravated felony

For purposes of clause (ii) of subparagraph (A) [which bars an alien convicted of a particularly serious crime from asylum relief], an alien who has been convicted of an aggravated felony shall be considered to have been convicted of a particularly serious crime.

(ii) Offenses

The Attorney General may designate by regulation offenses that will be considered to be a crime described in clause (ii) ... of subparagraph (A).

Id. While the language in subsection (i) automatically designates aggravated felonies as particularly serious crimes, subsection (ii) shows that Congress did not limit the definition of particularly serious crimes to aggravated felonies. Indeed, the asylum statute authorizes the Attorney General to designate by regulation other offenses as particularly serious crimes. Id. § 1158(b)(2)(B)(ii). To say that the statute limits the types of offenses that could be considered particularly serious to aggravated felonies would render superfluous the Attorney General's power to designate offenses as particularly serious crimes by regulation. Gao v. Holder, 595 F.3d 549, 556 (4th Cir. 2010). Our reading ensures that we "give effect to every word" of the **\*262** statute. Leocal v. Ashcroft, 543 U.S. 1, 12, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004) (citation omitted).

Moreover, reading "particularly serious crime" to include only aggravated felonies would improperly render the phrase meaningless as it would just be an alternate phrase for "aggravated felony." See TRW Inc. v. Andrews, 534 U.S. 19, 31, 122

S.Ct. 441, 151 L.Ed.2d 339 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation marks and citation omitted)). Reading the plain language of the asylum statute to provide that aggravated felonies are just one category of crimes that are deemed particularly serious would give the phrases "particularly serious crime" and "aggravated felony" independent meaning.

Such a reading would also render meaningless the Attorney General's power to designate other crimes as serious. See Delgado v. Holder, 648 F.3d 1095, 1106 (9th Cir. 2011) (en banc) ("There is little question that this latter provision permits the Attorney General, by regulation, to make particular crimes categorically particularly serious even though they are not aggravated felonies." (emphasis omitted)); Gao, 595 F.3d at 556 ("Given that the statute makes all aggravated felonies per se particularly serious, the Attorney General's power to designate offenses as such by regulation would be 'wholly redundant' if it were limited to aggravated felonies." (citation omitted)); Nethagani v. Mukasey, 532 F.3d 150, 156 (2d Cir. 2008) ("The Attorney General (or his agents) may determine that a crime is particularly serious for purposes of the asylum statute, 8 U.S.C. § 1158(b)(2)(B)(i), even though it is not an aggravated felony."); Ali v. Achim, 468 F.3d 462, 469 (7th Cir. 2006) ("Nowhere does § 1158 purport to prohibit the Attorney General from determining in a given case that an alien's nonaggravated felony is 'particularly serious' unless he had the foresight to explicitly itemize that particular crime by regulation.").

Congress's grant of authority to the Attorney General to promulgate regulations to identify other offenses as particularly serious crimes further demonstrates that offenses other than aggravated felonies could be designated as per se particularly serious crimes. Through rulemaking, the Attorney General gives notice to the public of offenses, in addition to aggravated felonies, that may be designated as per se "particularly serious crimes" and receives comments. This authorization, however, is permissive and does not preclude the Attorney General from evaluating, on a case-by-case basis, whether the facts and circumstances of a conviction also support concluding that an individual alien committed a particularly serious crime. Immigration officials have proceeded via case-by-case adjudication since the early 1980s. See Delgado, 648 F.3d at 1106 (citing In re Frentescu, 18 I. & N. Dec. 244, 247 (1982)). We presume that Congress was aware of this procedure in 1996 when it granted the Attorney General the authority to identify by regulation categories of crimes that may be deemed per se particularly serious crimes. See id. ("Although Congress has amended the asylum statute's particularly serious crime bar over time, none of its actions have called into question the BIA's authority to designate offenses as particularly serious crimes through case-by-case adjudication."); see also Lorillard v. Pons, 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."). Thus, the grant of regulatory **\*263** authority to designate classes of offenses as particularly serious crimes did not displace the Attorney General's authority to also make case-specific determinations concerning whether an alien's offense should be deemed "particularly serious." [4] See Delgado, 648 F.3d at 1106 (holding that § 1158(b)(2)(B) "does not require the **\*264** Attorney General to anticipate every adjudication by promulgating a regulation covering each particular crime"); Gao, 595 F.3d at 556 (rejecting the view that "regulation is the exclusive means by which the Attorney General can determine that a non-aggravated felony is a particularly serious crime" because, among other things, "requiring an agency to proceed by rulemaking alone could stultify the administrative process by rendering it inflexible and incapable of dealing with many of the specialized problems which arise" (internal citation and quotation marks omitted)); Ali, 468 F.3d at 469 (noting that "[a]n interpretation that requires the Attorney General and his agents to sift through each state's code and prospectively identify by regulation every single crime that would qualify as 'particularly serious' would impose an onerous burden," and that "[n]othing in the statute's text suggests a requirement that the Attorney General must engage in such an anticipatory task"). [5]

For these reasons, we hold that under the asylum statute, (1) aggravated felonies **\*265** are a subset of offenses that constitute particularly serious crimes; (2) the Attorney General has the authority to designate other offenses as per se particularly serious;

AR.07003

and (3) the Attorney General retains the authority, through a case-by-case evaluation of the facts surrounding an individual alien's specific offense, to deem that alien to have committed a particularly serious crime.

B

We next examine the phrase "particularly serious crime" in the withholding of removal statute to determine whether it also includes, but is not limited to, aggravated felonies. The "particularly serious crime" bar in that statute provides:

Subparagraph (A) [providing for withholding of removal] does not apply to an alien deportable under section 1227(a)(4)(D) of this title or if the Attorney General decides that—

...

(ii) the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States;

...

For the purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.

8 U.S.C. § 1231(b)(3)(B).

In Alaka, we interpreted the phrase "particularly serious crime" as used in the withholding statute to be limited to aggravated felonies. 456 F.3d at 104-05. The Alaka court examined only the withholding statute, and no party presented the Alaka court with the identical phrase from the asylum statute. Thus, the Alaka court was not required to consider whether the use of the phrase in the asylum statute should influence its interpretation of the identical phrase in the withholding statute. Unlike our colleagues in Alaka, we must interpret the phrase as used in both statutes because Bastardo-Vale seeks both asylum and withholding of removal relief. We must therefore proceed in this case mindful that "[i]n all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning." Cochise Consultancy, Inc. v. United States ex rel. Hunt, –– U.S. ––––, 139 S. Ct. 1507, 1512, 203 L.Ed.2d 791 (2019) (citation omitted); Smith v. City of Jackson, 544 U.S. 228, 233, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005) ("[W]hen Congress uses the same language in two statutes having similar purposes ... it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."). As a result, we will reexamine our earlier interpretation of the phrase "particularly serious crime" as it is used in the withholding of removal statute.

**\*266** As we already stated, the phrase "particularly serious crime" as used in the asylum statute includes but is not limited to aggravated felonies. Examining the identical phrase in the withholding of removal statute, we reach the same conclusion. The withholding of removal statute specifically lists a subset of aggravated felonies deemed per se "particularly serious crimes." The statute provides that "an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime." 8 U.S.C. § 1231(b)(3)(B). Through this language, Congress designated a category of aggravated felonies based upon the punishment imposed to be a particularly serious crime. In the very next sentence, Congress expressly stated that its directive concerning aliens convicted of aggravated felonies and sentenced to five or more years' imprisonment did not "preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted

of a particularly serious crime." Id. The language embodies Congress's explicit statement that the Attorney General had the continuing authority to determine whether a crime is particularly serious. This demonstrates that Congress did not disturb the Attorney General's prior practice of deciding, on a case-by-case basis, whether an alien's crime was particularly serious. See N-A-M v. Holder, 587 F.3d 1052, 1056 (10th Cir. 2009) (observing that the "long history of case-by-case determination" of particularly serious crimes "counsels against ... a bright-line rule" for determining which crimes are particularly serious (citations omitted)). Indeed, the language of § 1231(b)(3)(B) is permissive, not restrictive, in that it does not explicitly dictate that the only offenses that constitute particularly serious crimes are aggravated felonies. See Delgado, 648 F.3d at 1104; Gao, 595 F.3d at 555; N-A-M, 587 F.3d at 1056.

Moreover, Congress used both "aggravated felony" and "particularly serious crimes" in the statute and, as stated earlier, we are obligated to give each word meaning. See N-A-M, 587 F.3d at 1056 (holding that "Congress's use of two different terms—'particularly serious' crime and 'aggravated' felony—is additionally indicative of substantively different meanings"). To say that only aggravated felonies are "particularly serious crimes" would render the words "particularly serious crime" surplusage. Put differently, if Congress did not intend for crimes other than aggravated felonies to disqualify aliens from withholding of removal, then it would have simply said that (1) an alien convicted of an aggravated felony and sentenced to at least five years of imprisonment is barred from relief and that (2) the Attorney General may, in his discretion, bar those who are convicted of an aggravated felony and who received sentences of less than five years from relief. Congress's inclusion of the words "particularly serious crime" in addition to the words "aggravated felony" conveys that the bar may apply to those who are convicted of crimes other than aggravated felonies too when the Attorney General determines the offense is a particularly serious crime.

In sum, the language of the withholding of removal statute shows that aggravated felonies are a subset of particularly serious crimes and that Congress has deemed one subset of aggravated felonies, namely those for which the alien was sentenced to at least five years, particularly serious per se. Our sister circuits have also embraced the view that the phrase "particularly serious crime" as used in the withholding of removal statute includes but is not limited to aggravated felonies. See **\*267** Delgado, 648 F.3d at 1102-04; Gao, 595 F.3d at 554-55; N-A-M, 587 F.3d at 1056; Nethagani, 532 F.3d at 156-57; see also Valerio-Ramirez v. Sessions, 882 F.3d 289, 296 (1st Cir. 2018) (adopting a case-by-case approach for determining "whether a non-aggravated felony qualifies as a particularly serious crime rendering an alien ineligible for withholding of deportation" (internal quotation marks omitted)). Thus, under the language of both the asylum and withholding statutes, the phrase "particularly serious crime" means the same thing: both aggravated felonies and other offenses can be particularly serious crimes. [6]

In reaching this conclusion, we depart from our precedent in Alaka. In our Court, precedent is binding on later panels, 3d Cir. I.O.P. 9.1, and "[w]e do not overturn our precedents lightly," Al-Sharif v. U.S. Citizenship & Immigration Servs., 734 F.3d 207, 212 (3d Cir. 2013) (en banc). Indeed, this practice shows our Court's respect for the role of stare decisis and the predictability it affords. See Payne v. Tennessee, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (noting that stare decisis "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process" (citation omitted)). This case, however, presents a "rare occasion" where departure is required for four reasons. See In re Grossman's Inc., 607 F.3d 114, 117 (3d Cir. 2010) (en banc). First, in the twelve years since Alaka, no other appellate court tasked with interpreting the phrase "particularly serious crime" has concluded that it only includes aggravated felonies. While we generally "decide cases before us based on our own examination of the issue, not on the views of other jurisdictions," these more recent decisions suggest that we should "consider whether the reasoning applied by our colleagues elsewhere is persuasive." Id. at 121; Joyce v. Maersk Line Ltd, 876 F.3d 502, 512 (3d Cir. 2017) (en banc) ("[W]hen our Court is in disagreement with every other circuit to consider a question, it can be wise to reconsider our prior reasoning."). Second, the phrase "particularly serious crime" is used in both the asylum and withholding of removal statutes and should be interpreted to mean the same thing. See, e.g., City of Jackson, 544 U.S. at 233, 125 S.Ct. 1536. Third, by interpreting the phrase consistently across similar statutes, and similar to our sister circuits, we

ensure that aliens in different circuits with identical convictions are treated similarly. Finally, as explained above, limiting the phrase "particularly serious crimes" to encompass only aggravated felonies "cannot easily be reconciled with the text" of the asylum and withholding of removal statutes. See Al-Sharif, 734 F.3d at 212. Therefore, we now overrule Alaka's definition of particularly serious crime as being limited to aggravated felonies and hold that the phrase "particularly serious crime" includes —but is not limited to—aggravated felonies.

## III

Having determined that the phrase "particularly serious crime" can include offenses other than aggravated felonies, we now address the Government's argument that Bastardo-Vale waived his right to challenge the BIA's application of N-A-M- to his conviction.

**\*268**   "[A]n appellant's opening brief must set forth and address each argument the appellant wishes to pursue in an appeal." Barna v. Bd. of Sch. Directors of Panther Valley Sch. Dist., 877 F.3d 136, 145 (3d Cir. 2017). If an argument on appeal is not "supported specifically by 'the reasons for [it], with citations to the authorities and parts of the record on which the appellant relies,' " it is not properly preserved. Id. (quoting Fed. R. App. P. 28(a)(8)(A)). We typically decline to address arguments not properly preserved in the "original briefs" to us. See Daggett v. Kimmelman, 811 F.2d 793, 795 n.1 (3d Cir. 1987).

Bastardo-Vale failed to argue in his opening brief to us that the BIA improperly applied N-A-M- in concluding that his conviction for second-degree unlawful imprisonment was a particularly serious crime. Instead, Bastardo-Vale argued only that, because he was not convicted of an aggravated felony, the particularly serious crime bar did not apply to his claims for asylum and withholding of removal. Bastardo-Vale's clear focus on Alaka in his brief to our Court and his omission of any argument regarding the BIA's application of N-A-M- and its analysis of the circumstances of his offense constitutes a waiver of any challenges to the BIA's assessment of whether his offense of conviction constitutes a particularly serious crime. Thus, we will leave the BIA's conclusion undisturbed. [7]

## IV

For the foregoing reasons, we will deny the petition.

McKEE, Circuit Judge, dissenting

Today we hold that the panel in Alaka v. Attorney General[1] erred in concluding that "particularly serious crime," as that term is used in 8 U.S.C. § 1231(b)(3)(B), is not limited to aggravated felonies. Although I concede that the question is a close call, I agree with Judge Ambro that the category is limited to aggravated felonies. Accordingly, I join Judge Ambro's dissent from the Majority's analysis of that issue. For the reasons he explains in his dissent, I agree that Congress intended to limit particularly serious crimes in 8 U.S.C. § 1231(b)(3)(B) to aggravated felonies. However, like Judge Ambro, I also commend Judge Shwartz for her analytical approach in explaining the Majority's conclusion that Alaka was wrongly decided. I share the concern expressed in the Majority Opinion regarding the "IJ and BIA's blatant disregard of the binding regional precedent" of this Article III Court. [2]  The Majority's approach of avoiding a discussion of In re M-H-,[3] and Chevron deference,[4] is in the best tradition of Article III jurisprudence.

Nevertheless, I cannot agree that the Majority has appropriately dealt with the unambiguous phrase "by regulation" in 8 U.S.C. § 1158(b)(2)(B); therefore, I must also respectfully dissent from the Majority's interpretation of that provision. As I **\*269** explain below, my colleagues' analysis and discussion of that phrase simply reads it out of the statute. Although I appreciate the difficulties that can result from interpreting the statute as Congress wrote it, I am not convinced by the Majority Opinion that those difficulties justify simply ignoring the express limitation that Congress placed upon the Attorney General's authority to define crimes as being "particularly serious."

## I.

Congress unambiguously stated that "[t]he Attorney General may designate *by regulation* offenses that will be considered to be a [particularly serious] crime."[5] My colleagues argue that the fact that the statute says the Attorney General "*may*" designate offenses as particularly serious crimes by regulation does not mean the Attorney General may *only* do so by regulation. They believe that Congress did not intend to preclude the Attorney General from also so designating offenses by agency adjudication.[6] They proclaim: "the grant of regulatory authority to designate classes of offenses as particularly serious crimes did not displace the Attorney General's authority to also make case-specific determinations concerning whether an alien's offense should be deemed 'particularly serious.' "[7] However, that proclamation ignores that Congress *did* expressly limit that grant of regulatory authority. It stated that the Attorney General could designate additional crimes "by regulation."

My colleagues suggest that Congress would have stated that "the Attorney General *shall* designate by regulation," if Congress intended to require the Attorney General to act by regulation only. However, inserting a command such as "shall" instead of "may" would almost certainly obligate the Attorney General to designate additional particularly serious crimes, whether or not the Attorney General would otherwise have done so. Surely Congress did not intend to require the Attorney General to designate additional crimes as being "particularly serious" within the meaning of the statute. Rather, Congress left that decision to the discretion of the Attorney General. Had Congress intended to allow the Attorney General to designate other crimes as particularly serious in any way that s/he chose, rather than relying on "may" in drafting § 1158(b)(2)(B), Congress would have said something like: "[t]he Attorney General may designate by regulation, *or otherwise*, offenses that will be considered to be a crime described in clause (ii) ... of subparagraph (A)." Or, Congress could have omitted the limiting phrase completely and just said: "[t]he Attorney General may designate offenses that will be considered to be a crime described in clause (ii) ... of subparagraph (A)." It chose not to do that, so the limiting phrase that was inserted must mean something.

My colleagues gloss over the fact that they are reading "by regulation" out of the statute by explaining "[t]his authorization ... *is permissive* and does not preclude the Attorney General from evaluating, on a case-by-case basis, whether the facts and circumstances of a conviction also support concluding that an individual alien committed a particularly serious crime."[8] But simply saying the authority that Congress granted is "permissive" surely cannot negate **\*270** the express limitation Congress placed on that permission or the resulting limitation on how the Attorney General may exercise that authority. The statute is permissive, but the permission is not absolute.

A simple and practical hypothetical is illustrative here. Assume that a child living in Newark, New Jersey asks her mother for permission to travel to New York City for the weekend, and the mother responds, "you may go to New York for the weekend." Now, imagine the mother's horror when the daughter calls from Los Angeles and tells the mother that she had permission to travel there because the mother simply said the daughter *may* go to New York, but did not say that the daughter may not go to Los Angeles or that she must go to New York. The daughter's claim of parental permission would be no less valid than the grant of congressional permission which my colleagues rely upon here. Yet, I think it is safe to assume that the daughter's explanation would be met with something less than enthusiastic approval. It is an argument that no parent would accept, and this Court should not accept it either.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

The analogy is not as far afield as the very different context may suggest. Such "permission by omission" (or more precisely, license by omission) is exactly what the Majority is authorizing.

My colleagues explain that "[i]mmigration officials have proceeded via case-by-case adjudication since the early 1980s." [9] They argue that "[w]e presume that Congress was aware of this procedure in 1996 when it granted the Attorney General the authority to identify by regulation categories of crimes that may be deemed per se particularly serious crimes." [10] But therein lies the proverbial rub. Congress did not have to include the limitation "by regulation" when the statute was amended in 1996. It is much more logical to conclude that Congress included that limitation because it was concerned about what immigration officials had been doing "since the early 1980s," and wanted to limit the Attorney General's exercise of discretion. Why else include the limitation – "by regulation?" The fact that Congress was aware of what immigration officials had been doing for 16 years before adding "by regulation" to the statute is perhaps the strongest argument against the Majority's position.

The Majority Opinion attempts to rescue the jettisoning of this limiting phrase in part by citing to *Rossman v. Fleet Bank (R.I.) National Association,* [11] and arguing that we there relied upon the " 'permissive sense' of the word 'may.' " [12] However, *Rossman* is totally irrelevant to our inquiry here. There, a borrower sued Fleet Bank arguing that a fee imposed that was not disclosed in the credit card solicitation violated the Truth in Lending Act. The bank claimed that the credit solicitation only had to accurately disclose fees which were contemplated when it issued the solicitation agreement. The Act required disclosure of "[a]ny annual fee ... imposed for the issuance or availability of a credit card." [13]  A controlling regulation required disclosure of "[a]ny ... periodic fee ... that *may be imposed* for the issuance ...  **\*271**  of a credit or charge card." [14]  The borrower claimed that this meant that Fleet had to disclose any fee that may ever be imposed for the credit card. However, applicable provisions of the Truth in Lending Act allowed the bank to make subsequent changes to fees as long as they did not "affect the accuracy of a previous disclosure." [15]  We agreed with the District Court's conclusion that "*in this context*" the "use of the word 'may' does not compel adoption of plaintiff's interpretation." [16]  Context matters; and the context in which "may" was used in the statute and regulation at issue in *Rossman* is wholly unhelpful to our inquiry into what that word means in the context of 8 U.S.C. § 1158(b)(2)(B)(ii).

My colleagues' allusion to a second problem with my interpretation of the asylum statute is not helpful either. They cite *Lorillard v. Pons* [17] to argue that we presume Congress was aware that the Attorney General had been defining new crimes as serious crimes on a case-by-case basis and that Congress therefore accepted the practice by subsequently re-enacting the statute "without change." [18]  However, as I explain in more detail below, Congress did not reenact the statute "without change," it amended it by adding the limitation "by regulation," thereby limiting the authority of the Attorney General.

In order to justify reading "by regulation" out of the statute, the Majority Opinion also partially relies upon a discussion of some of the regulatory history and agency and judicial decisions that preceded the 1996 amendments. [19]  That analysis may have some relevance to an inquiry into the meaning of an ambiguous statute. However, there is nothing ambiguous about the phrase "by regulation" or any other part of the statute that we are discussing, and my colleagues do not suggest that there is any ambiguity. Accordingly, much of the discussion in footnote five of the Majority Opinion should simply be irrelevant to our inquiry here. It is the cardinal canon of statutory interpretation that a court must begin with the statutory language. "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." [20]

The Majority's analysis is also contrary to our obligation to give effect to each word of a statute "so that no part will be inoperative or superfluous, void or insignificant." [21]  Ironically, the Majority Opinion stresses that its reading "give[s] effect to every word of the statute." [22]  But simply saying so does not make it so. It completely ignores the limiting phrase: "by regulation."

**\*272**  I realize, of course, that the Supreme Court has long held that courts must presume Congress intended "a sensible construction" of statutes and that any interpretation that produces an absurd result suggests that Congress did not intend that which the text of a statute would otherwise require. [23] However, neither the Majority here, nor the decisions of our sister courts of appeals that are relied upon, make any serious attempt to show that limiting the Attorney General to the regulatory process would create such an absurdity and therefore counsel against a literal interpretation of "by regulation." Merely saying that such a limitation "would impose an onerous burden," [24] does not mean that it would create an absurdity. Many restrictions on government action may be viewed by some as onerous or burdensome. That is particularly true of restrictions on governmental exercise of power. Indeed, the entire regimen established under the Immigration and Nationality Act and related treaties impose burdens on the Executive's exercise of authority. But burdensome limitations do not automatically rise to the level of an absurdity for purposes of statutory construction.

Nevertheless, my colleagues do insist that limiting the Attorney General to the regulatory process "would impose an onerous burden." [25] However, the "burdens" imposed by requiring the Attorney General to engage in rulemaking to supplement the list of crimes that are particularly serious are not so onerous or impossible as to make the resulting scheme absurd. To the extent that requiring the Attorney General to invoke the regulatory process before allowing the Attorney General to exclude an entire category of persons from eligibility for a favorable exercise of discretion imposes an undue burden, it is a burden that Congress, and not the courts, must mitigate.

## II.

My colleagues also rely on decisions of our sister appellate courts for their conclusion that "by regulation" includes case-by-case adjudication, but those decisions are devoid of the kind of analysis that should be required before ignoring an unambiguous statutory limitation on the authority of the Attorney General. Most of the cases relied upon by the Majority contain precious little (if any) analysis of the limiting phrase "by regulation" in § 1158(b)(2)(B). They merely recite the statutory text, don jurisprudential blinders, and blithely conclude that the statute doesn't say what it says. For example, in *Ali v. Achim*, relied on by the Majority, the Court of Appeals for the Seventh Circuit actually stated: "[n]owhere does [the statute] purport to prohibit the Attorney General from determining in a given case that an alien's nonaggravated felony is 'particularly serious' unless he had the foresight to explicitly itemize that particular crime by regulation. The statutory language simply is not susceptible to such a limited interpretation." [26] But of course, the statute is not only susceptible to that interpretation; it says exactly that in unmistakable language. By its very terms it does "purport to prohibit the **\*273**  Attorney General from determining in a given case that an alien's nonaggravated felony is 'particularly serious' unless" the determination is done "by regulation." The court's declaration to the contrary is nothing more than *ipse dixit*, and my colleagues' citation to it is also an *ipse dixit*; it could not more clearly conflict with the statutory text.

Similarly, in *Delgado*, the Court of Appeals for the Ninth Circuit relied on *Ali*'s analysis to conclude that, even though the statute "is silent on case-by-case adjudication," it "does not require the Attorney General to anticipate every adjudication by promulgating a regulation covering each particular crime." [27] But the statute is not silent on case-by-case adjudication. Moreover, the *Delgado* court was affording *Chevron* deference to the BIA.

Two issues relevant to our discussion were before the court in *Delgado*. First, whether the withholding statute limited particularly serious crimes to aggravated felonies; and second, whether, under the asylum statute, the Attorney General was limited to the regulatory process in order to declare other crimes particularly serious. On the first question, because there was no controlling judicial precedent to guide its analysis, the court relied upon *Chevron* and deferred to the BIA's interpretation

of the statute. The court's analysis can be summed up in its statement: "[u]nder 🔖 *Chevron,* we owe deference to the BIA's interpretation." [28]

The court then decided that "by regulation" also included case-by-case adjudication, in part by deferring to the BIA. It stated: "[b]ecause the history of the withholding and asylum statutes are similar, our conclusion as to the withholding statute is instructive." [29] The court then cited the BIA's history of case-by-case adjudication and concluded that "the Attorney General has the authority to designate offenses as particularly serious crimes through case-by-case adjudication." [30] Since the court failed to provide any in-depth analysis of why it could ignore the clear limitation in the statute, it does not provide much guidance for our inquiry into the meaning of this unambiguous statute.

The other case that the Majority relies upon for the proposition that "by regulation" includes case-by-case adjudication is *Gao v. Holder.* [31] *Gao* suffers from similar flaws. There, the Court of Appeals for the Fourth Circuit cited to the decision in 🔖 *Ali.* It, too, read the explicit limitation, "by regulation," out of the statute, concluding that "nothing in the statute says that the Attorney General must use regulation to designate crimes as particularly serious." [32] Thus, as in 🔖 *Ali* and *Delgado,* the court put on blinders and concluded that the statute does not say what it says. And, as in *Delgado,* the court then proceeded to defer to the BIA's decision to determine particularly serious crimes on a case-by-case basis. [33] It concluded "the choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency." [34] However, that is clearly not true where, as here, Congress **\*274** has imposed limits on the exercise of that informed discretion. These decisions simply do not provide sufficient support for us to ignore the text of this unambiguous statute.

Moreover, as my colleagues note, and as I have noted above, Congress specifically amended the asylum statute to add the limiting phrase: "by regulation." [35] I have already mentioned this, but I think it is worth reiterating that the limitation was not included in the asylum statute before 1996. [36] The statute simply barred asylum where the alien committed any aggravated felony. The Attorney General did not have any authority to deny asylum based on the commission of any other category of crime. [37] If we are to give each word in the statute meaning, [38] we must conclude that Congress specifically added "by regulation" to give the Attorney General a power which he did not already possess. "When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." [39] Congress clearly thought that the Attorney General needed authority to designate other offenses as particularly serious crimes "by regulation." If my colleagues are correct and adding "by regulation" does not limit the Attorney General to the regulatory process, then that phrase in the 1996 amendment is absolutely meaningless. However, that conclusion violates our obligation to give meaning to every word of a statute. If a congressional grant of authority was necessary to allow the Attorney General to designate offenses as particularly serious "by regulation," then the Attorney General should need a congressional grant of authority to designate offenses as particularly serious by BIA adjudication.

### III.

Accordingly, for all the reasons I have set forth above, I must respectfully dissent.

**AMBRO**, Circuit Judge, dissenting

I join in full Judge McKee's dissent relating to the interpretation of "by regulation" in 🔖 8 U.S.C. § 1158(b)(2)(B), which deals with asylum. Thus, I write only with respect to whether a "particularly seriously crime" in the withholding-of-removal provision of 🔖 8 U.S.C. § 1231(b)(3)(B) covers more than an aggravated felony. It reads in part as follows:

[Withholding of removal] does not apply... if the Attorney General decides that—

(ii) the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States;

...

For the purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed,  **\*275**  an alien has been convicted of a particularly serious crime.

Judge Shwartz, writing for the majority, holds that a "particularly serious crime" is not limited to an aggravated felony. This overrules the contrary reading of *Alaka v. Attorney General*, 456 F.3d 88, 104-05 (3rd Cir. 2006), a decision I authored as a matter of statutory interpretation. Though I disagree with our new interpretation, I commend Judge Shwartz for construing the withholding-of-removal provision in that analytical framework instead of focusing on whether the BIA's decision, rendered after *Alaka*, in *In re: M-H-*, 26 I & N Dec. 46 (BIA 2012), is entitled to *Chevron* deference, an issue neither briefed nor decided in *Alaka*.

I do, however, continue to believe that *Alaka* got this right, and that the majority misreads the language of the withholding-of-removal statute. The first sentence of the clarifying paragraph makes all aggravated felonies carrying a sentence of more than five years particularly serious; the second, which expressly refers back to "[t]he previous sentence," authorizes the Attorney General to declare certain other crimes as particularly serious "notwithstanding the length of sentence imposed." On its face this appears to mean that the Attorney General's discretion qualifies only aggravated felonies that resulted in a prison sentence of less than five years, and it does not extend to other crimes. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 154 (2012) ("A proviso conditions the principal matter that it qualifies—almost always the matter immediately preceding.").

Thus the provision creates a three-tiered system: (1) certain aggravated felonies automatically are particularly serious (those with actual, aggregated prison sentences of at least five years); (2) other aggravated felonies with lesser prison sentences can be considered particularly serious on a case-by-case basis free of the need to do so by regulation; and (3) all other crimes are not particularly serious. [1]

The majority holds to the contrary that the Attorney General's power conferred by the second sentence is effectively unlimited, but this does not fit the language of the statute. If that had been Congress's intent, it would have worded the provision differently, either adding "for any crime" after "notwithstanding the length of sentence imposed" or simply stating that "the previous sentence shall not preclude the Attorney General from determining in any other case that an alien has been convicted of a particularly serious crime." Yet Congress did not enact any such addition. Neither should a court.

I respectfully dissent.

**All Citations**

934 F.3d 255

# Footnotes

[1]      In reaching this conclusion, the BIA did not cite and in fact did not follow Alaka. Rather, it relied upon its own decision in In re M-H-, 26 I. & N. Dec. 46 (BIA 2012), where it held that, under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and National Cable & Telecommunications Ass'n v. Brand X Internet Services, 545 U.S. 967, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005), it had the authority to apply its own interpretation. The BIA in M-H-, in turn, reasoned that (1) Alaka did not hold that 8 U.S.C. § 1231(b)(3)(B) was unambiguous, M-H-, 26 I. & N. Dec. at 49, (2) applying its own precedent to matters arising in the Third Circuit would "promote national uniformity in the application of the particularly serious crime bar for withholding of removal," id., and (3) using its own precedent would "provide consistency in the treatment of the particularly serious crime bars for [both] asylum and withholding of removal" cases, id. at 49-50.

The IJ and BIA's blatant disregard of the binding regional precedent is ultra vires. See Abdulai v. Ashcroft, 239 F.3d 542, 553 (3d Cir. 2001) ("The BIA is required to follow court of appeals precedent within the geographical confines of the relevant circuit." (citation omitted)). While we understand the value of uniform treatment of similarly situated aliens and acknowledge that, until now, our circuit precedent differed from that of other circuits, Brand X did not provide the IJ or BIA the authority to ignore the applicable regional circuit's precedent. See Abdulai, 239 F.3d at 553; Saravia v. Att'y Gen., 905 F.3d 729, 731 (3d Cir. 2018) (holding that an IJ must follow circuit precedent despite the BIA's "subsequent contrary decision" (citation omitted)). To the contrary, Brand X provides that "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to Chevron deference ... if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." 545 U.S. at 982, 125 S.Ct. 2688.

In Alaka, we did not hold that the phrase "particularly serious crime" in the withholding of removal statute was ambiguous. Thus, the case on which the BIA and IJ relied, M-H-, misunderstood Alaka's view of the statutory phrase. M-H-reasoned that since Alaka did not expressly state that the withholding statute was "unambiguous," the agency was free to disregard our interpretation of the statute and impose its own. 26 I. & N. Dec. at 49. There are two related problems with this view. First, Alaka stated that the "plain language and structure" of the withholding statute "indicate[d] that an offense must be an aggravated felony" to be particularly serious. 456 F.3d at 104. This demonstrated that the Alaka court did not view the withholding statute as ambiguous. Second, the absence of Chevron-type language from Alaka, such as an explicit statement that the statute was unambiguous, is understandable because the BIA had not interpreted the clause at issue when the Alaka court ruled. Thus, the Alaka court had no reason to use language relevant to deciding whether we are obligated to defer to an agency's interpretation. The lack of magic words like "unambiguous" and use of words like "suggest" or "implies," when viewed in context of Alaka's focus on the statute's language and structure, conveys that it viewed the statute as clear. See Texas v. Alabama-Coushatta Tribe of Texas, 918 F.3d 440, 447 (5th Cir. 2019) (holding that a "prior judicial decision need not say in so many magic words that its holding is the only permissible interpretation of the statute in order for that holding to be binding on an agency" (internal quotation marks and citations omitted)). Because the BIA's interpretation of Alaka is predicated on

an erroneous view that Alaka did not hold that the statute was unambiguous, we need not defer to its interpretation.

Compare M-H-, 26 I. & N. Dec. at 49, with Alabama-Coushatta Tribe, 918 F.3d at 449 (holding that "a court should not defer to an agency's interpretation of a statute if a 'judicial precedent hold[s] that the statute unambiguously forecloses the agency's interpretation' " (quoting Brand X, 545 U.S. at 982-83, 125 S.Ct. 2688)).

2      Although Bastardo-Vale prematurely filed his petition for review before a final order of removal was entered, such an order has since been entered, and thus we now have jurisdiction under 8 U.S.C. § 1252(a)(1). See Khan v. Att'y Gen., 691 F.3d 488, 494 (3d Cir. 2012). The Government recognizes that we have jurisdiction and has moved to withdraw its motion to dismiss for lack of jurisdiction, which we will grant.

3      The IJ had jurisdiction under 8 C.F.R. § 1208.2 and the BIA had jurisdiction under 8 C.F.R. § 1003.1(b). When, as here, the BIA issues its own opinion on the merits, we review the BIA's decision, not that of the IJ. Mahn v. Att'y Gen., 767 F.3d 170, 173 (3d Cir. 2014) (citation omitted).

4      In his dissent, Judge McKee contends that the phrase "by regulation" in the asylum statute, 8 U.S.C. § 1158(b)(2)(B)(ii), operates as a limitation that precludes the use of case-by-case adjudication to determine whether certain crimes are particularly serious. There are several problems with this interpretation.

First, this reading overlooks the word "may" that precedes the phrase "by regulation." Id. The word "may" conveys permission for the agency to act in a particular way but does not mandate that the agency act only in that one fashion. May, Merriam-Webster, https://www.merriamwebster.com/dictionary/may (last visited July 26, 2019) (defining "may" as "have permission to" or "be free to"); May, Black's Law Dictionary (11th ed. 2019) (defining "may" as "[t]o be permitted to"); see Rossman v. Fleet Bank (R.I.) Nat'l Ass'n, 280 F.3d 384, 393 (3d Cir. 2002) (noting the "permissive sense" of the word "may").

Second, Congress knows how to limit an agency to rulemaking or to adjudication. For example, the Attorney General can parole aliens "for urgent humanitarian reasons or significant public benefit," but can do so "only on a case-by-case basis," not by using prospective rulemaking. 8 U.S.C. § 1182(d)(5)(A). Moreover, Congress has at times distinguished between mandatory and permissive uses of rulemaking. Compare 42 U.S.C. § 1395m(a)(1)(G) ("The Secretary [of Health and Human Services] shall specify by regulation the methodology to be used" for rendering certain kinds of payments) with id. § 1395m(a)(12) ("The Secretary may designate, by regulation ... one carrier for one or more entire regions to process all claims within the region for covered items under this section."). Similarly, Congress has at times required agencies to use rulemaking to achieve a certain result. See, e.g., 42 U.S.C. § 6924(a) (providing that if some conditions are met, "the Administrator [of the Environmental Protection Agency] shall promulgate regulations establishing ... performance standards"); id. § 7409(a)(1)(A) (providing that the Administrator of the Environmental Protection Agency "shall publish proposed regulations prescribing a national primary ambient air quality standard"). In short, Congress could have written the asylum statute so that the agency could proceed only by rulemaking or only by adjudication. Congress, however, has not done so here. The absence of such language makes clear that Congress did not displace the Attorney General's longstanding discretion to choose between rulemaking and adjudication. See PBW Stock Exch., Inc. v. SEC, 485 F.2d 718, 732 (3d Cir. 1973) (noting that "[t]he courts have consistently held that where an agency, as in this case, is given an option to proceed by rulemaking or by individual adjudication the choice is one that lies in the informed discretion of the administrative agency").

Third, as stated previously, Congress added the "by regulation" language within the context of the agency's regular use of case-by-case adjudication. Because Congress was aware of the agency's practice of adjudication, see Lorillard, 434 U.S. at 580, 98 S.Ct. 866, its inclusion of the "by regulation" language added another means by which the agency could categorize crimes as particularly serious: rulemaking. This interpretation of the "by regulation" clause accords with principles of administrative law. See SEC v. Chenery Corp., 332 U.S. 194, 202, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947) (observing that "there is ... a very definite place for the case-by-case evolution of statutory standards" because

"problems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule").

Finally, to the extent that Judge McKee asserts that Congress must confer adjudicatory powers upon the agency to determine which crimes are particularly serious, it has already done so. An IJ "conduct[s] proceedings for deciding the inadmissibility or deportability of an alien." 8 U.S.C. § 1229a(a)(1). The IJ, among other things, "receive[s] evidence, and interrogate[s], examine[s], and cross-examine[s] the alien and any witnesses." Id. § 1229a(b)(1). Afterwards, the IJ "shall decide whether an alien is removable ... based only on the evidence produced in the hearing." Id. § 1229a(c)(1)(A). Congress has therefore authorized IJs to decide whether an alien is removable.

This decision, in turn, requires that an IJ consider whether there are grounds to order or not order an alien's removal. An IJ, for example, may consider a request for asylum, which includes evaluating whether there are legal impediments to receiving this relief, such as certain prior convictions. Thus, the authority to decide whether an alien is removable or eligible for relief from removal through asylum includes the authority to decide whether the alien committed a "particularly serious crime" that precludes asylum relief. See id. § 1158(b)(2)(A)(ii). As a result, Congress has delegated the power to adjudicate on a case-by-case basis to the agency.

5    The congressional enactments during this period also show that the regulatory authority did not displace the Attorney General's authority to also consider whether an alien committed a particularly serious crime on a case-by-case basis.

Congress amended the immigration laws in the 1990s to limit the availability of asylum and other relief, St. Cyr v. I.N.S., 229 F.3d 406, 411 n.3 (2d Cir. 2000); Garcia v. I.N.S., 7 F.3d 1320, 1322 (7th Cir. 1993), and to "expedite" the removal of criminal aliens, Patel v. Zemski, 275 F.3d 299, 304 (3d Cir. 2001), overruled on other grounds by Demore v. Kim, 538 U.S. 510, 516, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003); DeSousa v. Reno, 190 F.3d 175, 185 (3d Cir. 1999). To this end, Congress expanded the Attorney General's authority by adding the "particularly serious crime" bar to the asylum statute in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. Congress also gave the Attorney General the authority to designate categories of offenses as particularly serious crimes that would bar asylum relief. Before this regulatory authority was granted, the Attorney General had evaluated whether an offense was a particularly serious crime on a case-by-case basis. Delgado, 648 F.3d at 1106; Frentescu, 18 I. & N. Dec. at 247. Because Congress added this regulatory authority in the context of other legislation that increased the grounds to remove aliens, it would be inconsistent with this goal to believe that Congress replaced a case-by-case adjudicatory process with a regulation-only process, which would slow the identification of qualifying offenses and remove consideration of facts that reveal whether the specific alien is a danger to the community. See 8 U.S.C. § 1158(b)(2)(A)(ii); Gao, 595 F.3d at 557 ("It would be a Herculean task to sift through each state's code and prospectively identify by regulation every single crime that would qualify as particularly serious." (internal quotation marks omitted)). In addition, the caselaw landscape before 1996 and Congress's reaction to it also show that inclusion of the "by regulation" language was a reaffirmation of regulatory authority. Since In re Frentescu, the Attorney General could proceed by adjudication. In other words, the adjudication door was open. By the time Congress added this language in 1996, however, the Court of Appeals for the Ninth Circuit had closed the other door by holding that the agency could not use rulemaking. Komarenko v. INS, 35 F.3d 432, 436 (9th Cir. 1994). Aliens in other circuits also attacked agency rules designating crimes as particularly serious as ultra vires, arguing that crimes could be particularly serious only if deemed so by adjudication. See, e.g., Ahmetovic v. INS, 62 F.3d 48, 52 (2d Cir. 1995) (alien "contend[ed] that the BIA should have conducted a broad inquiry into the facts underlying her conviction in order to determine whether the crime was 'particularly serious.' "). By adding "by regulation," therefore, Congress ended this debate: it rejected Komarenko and allowed the agency to proceed by rulemaking. Contrary to Judge McKee's contention that the phrase is meaningless, it clarifies that both the adjudication and rulemaking doors are open to the agency, leaving the agency discretion to choose between them.

For these additional reasons, we conclude that the Attorney General has authority both to designate categories of offenses as particularly serious crimes and to decide whether an alien's offense constitutes a particularly serious crime on a case-by-case basis.

6       The differences in the statutes do not mean that the phrase "particularly serious crime" should be given a different meaning. While asylum is discretionary and withholding of removal is mandatory, and entitlement to asylum is met by a lower standard of proof than that required for withholding of removal, each statute reflects Congress's view that a "particularly serious crime" bars aliens from obtaining certain immigration relief.

7       Even if Bastardo-Vale did not waive this argument, there is likely enough evidence to uphold the BIA's determination that he committed a particularly serious crime.

1       456 F.3d 88 (3d Cir. 2006).

2       Maj. Op. at 259–60 n.1.

3       26 I. & N. Dec. 46 (BIA 2012).

4       *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See also* *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) (explaining when an Article III court owes deference to the administrative agency's interpretation of a statute).

5       8 U.S.C. § 1158(b)(2)(B)(ii) (emphasis added).

6       Maj. Op. at 262–63.

7       *Id.* at 262–63.

8       *Id.* at 262–63 (emphasis added).

9       *Id.* (citing *Delgado v. Holder*, 648 F.3d 1095, 1106 (9th Cir. 2011) (en banc)).

10      *Id.*

11      280 F.3d 384, 393 (3d Cir. 2002).

12      Maj. Op. at 263–64 n.4.

13      *Rossman*, 280 F.3d at 392 (quoting 15 U.S.C. § 1637 (c)(1)(A)(ii)(I)).

14      *Id.* (quoting 12 C.F.R. § 226.5a(b)(2)) (emphasis in original).

15      *Id.*

16      *Id.* at 393 (emphasis added).

17      434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978).

18      Maj. Op. at 262–63.

19      *Id.* at 262–64.

20      *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (internal citations and quotations omitted).

21      *Corley v. United States*, 556 U.S. 303, 314, 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004)).

22      Maj. Op. at 261–62 (citing *Leocal v. Ashcroft*, 543 U.S. 1, 12, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004)) (internal quotation marks omitted).

23      *United States v. Kirby*, 74 U.S. (7 Wall.) 482, 486–87, 19 L.Ed. 278 (1868). *See also* *Encompass Ins. Co. v. Stone Mansion Rest. Inc.*, 902 F.3d 147, 152 (3d Cir. 2018), *reh'g denied* (Sept. 17, 2018) ("Nevertheless, it is also a 'basic tenet of statutory construction ... that courts should interpret a law to avoid absurd or bizarre results.' ") (quoting *In re Kaiser Aluminum Corp.*, 456 F.3d 328, 338 (3d Cir. 2006)).

24      Maj. Op. at 264 (quoting *Ali v. Achim*, 468 F.3d 462, 469 (7th Cir. 2006)).

25      *Id.*

26   468 F.3d at 469.

27   648 F.3d at 1106.

28   *Id.* at 1102.

29   *Id.* at 1106.

30   *Id.* (citing *Ali,* 468 F.3d at 469).

31   595 F.3d 549 (4th Cir. 2010).

32   *Id.* at 556.

33   *Id.* at 556–57.

34   *Id.* at 556 (citing *SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947)).

35   *See* Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104–208, div. C., tit. VI, § 604(a), 110 Stat. 3009.

36   *See, e.g.,* 8 U.S.C. § 1158 (1996); 8 U.S.C. § 1158 (1994).

37   *See* 8 U.S.C. § 1158(d) (1996).

38   *Leocal,* 543 U.S. at 12, 125 S.Ct. 377 ("[W]e must give effect to every word of a statute wherever possible.").

39   *Stone v. I.N.S.,* 514 U.S. 386, 397, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995).

1    This is different from the asylum statute, which creates only two tiers: aggravated felonies, all of which are particularly serious, and all other crimes, which may "by regulation" be designated as particularly serious. 8 U.S.C. § 1158(b)(2)(B)(ii).

---

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 1590945
Only the Westlaw citation is currently available.
United States District Court, E.D. Arkansas, Western Division.

Matthew BOIVIN ADC #110905, Plaintiff

v.

Asa HUTCHINSON, et al., Defendants

No: 4:18-cv-00888 BRW-PSH
|
Signed 03/07/2019

**Attorneys and Law Firms**

R. Theodor Stricker, Stricker Law Firm, PLLC, Jonesboro, AR, for Plaintiff.

Amanda J. Jegley, Arkansas Attorney General's Office, Little Rock, AR, for Defendants.

### FINDINGS AND RECOMMENDATION

Patricia S. Harris, UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS

**\*1**  The following proposed Findings and Recommendation have been sent to United States District Judge Billy Roy Wilson. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection, and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

### DISPOSITION

### I. Introduction

Plaintiff Matthew Boivin, an inmate at the Arkansas Department of Correction's North Central Unit, filed this action pursuant to 42 U.S.C. § 1983, alleging defendants violated his civil rights (Doc. No. 1). Specifically, Boivin alleges Governor Asa Hutchinson, Board of Correction Chairman Benny Magness, and Arkansas Department of Correction Director Wendy Kelley require him to perform prison labor without compensation or the award of meritorious good time. Boivin claims that requiring him to work violates the Universal Declaration of Human Rights and the United Nations Charter, the Eighth, Thirteenth, and Fourteenth Amendments of the United States Constitution, the Fair Labor Standards Act, and the Arkansas Constitution.

Defendants move to dismiss Boivin's claims for failure to state a claim upon which relief may be granted (Doc. No. 5). Boivin did not respond to defendants' motion. Boivin moved to amend his complaint and filed a proposed amended complaint (Doc. Nos. 10-11). However, those amendments do not cure the deficiencies asserted by defendants. As explained herein, the undersigned recommends that defendants' motion be granted.

## II. Legal Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a court to dismiss a claim on the basis of a dispositive issue of law. *Neitzke v. Williams*, 490 U.S. 319, 326 (1989). If, as a matter of law, "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations," a claim must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one. *Id.* at 327 (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984) ); *see also O'Neal v. State Farm Fire & Cas. Co.*, 630 F.3d 1075, 1077 (8th Cir. 2011).

When considering a motion to dismiss under Rule 12(b)(6), the court must accept as true all of the factual allegations contained in the complaint, and all reasonable inferences from the complaint must be drawn in favor of the nonmoving party. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Young v. City of St. Charles, Mo.*, 244 F.3d 623, 627 (8th Cir. 2001). The court reads the complaint as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). In addition to the complaint, the court may consider matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint. *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

**\*2** To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts sufficient to state a claim as a matter of law and not merely legal conclusions. *Young*, 244 F.3d at 627. The factual allegations in the complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* (quoting *Bell Atlantic*, 550 U.S. at 556). Where a complaint pleads facts that are "merely consistent" with a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* (quoting *Bell Atlantic*, 550 U.S. at 557). In *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), the Supreme Court emphasized that when ruling upon a motion to dismiss in a § 1983 action, a *pro se* complaint must be liberally construed and held to less stringent standards than formal pleadings drafted by lawyers. However, such liberal pleading standards apply only to a plaintiff's factual allegations. *Neitzke v. Williams*, 490 U.S. 319, 330 n. 9 (1989).

## III. Analysis

### The Universal Declaration of Human Rights, the United Nations Charter, and the Thirteenth Amendment

Boivin claims that the use of his labor without compensation under threat of punishment violates Articles 4 and 5 of the Universal Declaration of Human Rights (prohibiting slavery, servitude, torture, and cruel, inhuman or degrading treatment or punishment) and Articles 55 and 56 of the United Nations Charter (promoting "universal respect for, and observance of, human rights and fundamental freedoms for all"). [1] Doc. No. 1 at ¶¶ 16, 19 & 20. However, neither the declaration nor the U.N. Charter provide a basis for a private cause of action. *See United States v. Chatman*, 351 F. App'x 740, 741 (3d Cir. 2009) ("... the Universal Declaration of Human Rights is a non-binding declaration that provides no private rights of action.") (citing *Sosa v. Alvarez–Machain*, 542 U.S. 692, 734 (2004) [2] ); *United States v. Khatallah*, 160 F. Supp. 3d 144, 148 (D.D.C. 2016) ("the U.N. Charter ... form parts of international agreements that impose general obligations on countries; they confer no rights on individuals or private rights of action enforceable in U.S. courts.").

Furthermore, Boivin's claim that he is subjected to slavery or involuntary servitude must be analyzed under the U.S. Constitution as opposed to international treaties or agreements. *See* *Reid v. Covert,* 354 U.S. 1, 17 (1957) ("This Court has regularly and uniformly recognized the supremacy of the Constitution over a treaty."). The Thirteenth Amendment to the U.S. Constitution provides, in relevant part, "[n]either slavery nor involuntary servitude, *except as a punishment for crime whereof the party shall have been duly convicted,* shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, § 1 (emphasis added). It is well-settled that requiring convicted inmates to work with no pay does not violate the Thirteenth Amendment. *See* *Ray v. Mabry,* 556 F.2d 881, 882 (8th Cir. 1977) (citing *Draper v. Rhay,* 315 F.2d 193, 197 (9th Cir. 1963); *Howerton v. Mississippi County,* Ark., 361 F. Supp. 356, 364 (E.D. Ark. 1973); *Holt v. Sarver,* 309 F. Supp. 362, 369-72 (E.D. Ark. 1970), *aff'd,* 442 F.2d 304 (8th Cir. 1971) ).

**\*3** Boivin maintains in his brief[3] that the Thirteenth Amendment's prohibition on slavery and servitude applies to him because he was only sentenced to a term of imprisonment, and was not sentenced to "hard labor." That argument fails. Arkansas law requires all inmates sentenced to the Department of Correction to participate in the work programs to which they are assigned. *See* Ark. Code Ann. § 12-30-401(a) (West); *Wendt v. Lynaugh,* 841 F.2d 619, 620 (5th Cir. 1988) (" 'Appellant also makes a convoluted argument that under Texas law a prison sentence consists only of confinement and does not compel labor. This latter argument is quickly disposed of because Tex. Rev. Civ. Stat. Ann. art. 6166x [requires prisoners to be kept at work] ...' "); *Ali v. Johnson,* 259 F.3d 317, 318 (5th Cir. 2001) (distinguishing *Watson v. Graves,* 909 F.2d 1549 (5th Cir. 1990), and holding that the precise terms of state law are irrelevant because the Thirteenth Amendment does not forbid an inmate being required to work.). *See also* *Loving v. Johnson,* 455 F.3d 562, 563 (5th Cir. 2006) ("The failure of a state specifically to sentence an inmate to hard labor does not change this rule.").

For these reasons, Boivin's claims based on the Universal Declaration of Human Rights and U.N. Charter should be dismissed without prejudice for failure to state a claim upon which relief may be granted. Additionally, to the extent Boivin claims his Thirteenth Amendment rights have been violated, those claims should also be dismissed without prejudice.

### Eighth Amendment

Boivin claims the use of his labor without compensation under threat of punishment violates the Eighth and Fourteenth Amendments' prohibition on cruel and unusual punishment.[4] Doc. No. 1 at ¶¶ 17 & 19. Boivin alleges that the use of his labor without compensation is unusual because 45 states pay their prisoners to work. Doc. No. 1 at ¶ 17. Boivin also claims the ADC's use of his labor without compensation in out-of-state prisons is punishment.[5] Doc. No. 1 at ¶ 19.

Certainly, "there are circumstances in which prison work requirements can constitute cruel and unusual punishment." *See* *Ray v. Mabry,* 556 F.2d at 882 (citing *Jackson v. Bishop,* 268 F. Supp. 804, 816 (E.D. Ark. 1967), *vacated on other grounds,* 404 F.2d 571 (8th Cir. 1968); *Talley v. Stephens,* 247 F. Supp. 683, 687 (E.D. Ark. 1965) ). The court in *Talley* explained that requiring inmates

> ... to perform physical labor which is beyond their strength, or which constitutes a danger to their lives or health, or which is unduly painful constitutes an infliction of cruel and unusual punishment prohibited by the Eighth Amendment to the Constitution of the United States as included in the 14th Amendment.

**\*4** 247 F. Supp. at 687. In *McMaster v. State of Minnesota*, inmates brought Eighth and Thirteenth Amendment claims based on being required to work without fair pay. 819 F. Supp. 1429, 1442 (D. Minn. 1993), *aff'd,* 30 F.3d 976 (8th Cir. 1994). The Minnesota district court dismissed those claims "[b]ecause the Thirteenth Amendment specifically countenances forced labor during incarceration, and because plaintiffs have alleged no facts indicating that the circumstances under which they performed their labor constitute cruel and unusual punishment, ...". *Id.*

Boivin does not assert an Eighth Amendment claim based on the nature of the work he is required to do, and he does not assert that such work is beyond his physical strength, dangerous to his health, or otherwise painful. Rather, he argues that the Eighth Amendment requires courts to apply "evolving standards of decency" when evaluating whether a punishment is cruel and unusual. *See* Doc. No. 2 at ¶ 10 (quoting *Thompson v. Oklahoma*, 487 U.S. 815 (1988) ). He further argues that 45 [6] of 50 states have elected to pay wages or grant good time to inmates as compensation for work, reflecting a recognition of evolving standards of decency. Thus, Boivin implies, the states that pay money or grant good time to inmates for work have applied current standards of decency, and Arkansas's failure to do so constitutes cruel and unusual punishment. Boivin also argues that to determine whether a punishment is cruel and unusual, the Court must review relevant state statutes, human rights treaties and declarations prohibiting slavery, and the Standard Minimum Rules for the Treatment of Prisoners prohibiting slavery or servitude. *Id.* at ¶¶ 8 & 9. Defendants do not address this argument.

Boivin is correct that what constitutes cruel and unusual punishment may be revisited based on evolving standards of decency, and the fact that most states provide their prisoners with some pay or good time is evidence of such evolution. [7] However, the Thirteenth Amendment specifically allows forced labor during incarceration. The Court cannot nullify the express language of the Thirteenth Amendment by extending the Eighth Amendment's ban on cruel and unusual punishment to forced prison labor. Accordingly, Boivin's Eighth Amendment claims should be denied without prejudice for failure to state a claim upon which relief may be granted.

### *Fair Labor Standards Act*

**\*5** Boivin claims that the ADC's profit from his labor without compensation under threat of punishment violates the Fair Labor Standards Act ("FLSA"). Doc. No. 1 at ¶ 18. Inmates are not "employees" of the state entitled to protection under the FLSA. *See* *McMaster v. State of Minn.*, 30 F.3d 976, 980 (8th Cir. 1994) ("We hold that inmates such as the present plaintiffs, who are required to work as part of their sentences and perform labor within a correctional facility as part of a state-run prison industries program are not 'employees' of the state or prison within the meaning of the Fair Labor Standards Act."). Accordingly, Boivin's claims for violations of the FLSA should be dismissed without prejudice for failure to state a claim upon which relief may be granted.

### *Arkansas Constitution*

Because Boivin fails to state a federal claim for relief, the Court should not exercise supplemental jurisdiction over Boivin's state law constitutional claim(s). Those claims should be dismissed without prejudice.

### IV. Conclusion

The undersigned recommends that defendants' motion to dismiss (Doc. No. 5) be granted and that Boivin's motion for leave to amend his complaint (Doc. No. 10) be denied as moot.

**All Citations**

Slip Copy, 2019 WL 1590945

## Footnotes

1    "The Universal Declaration of Human Rights is a resolution of the General Assembly of the United Nations. As such,
     it is a powerful and authoritative statement of the customary international law of human rights." *Siderman de
     Blake v. Republic of Argentina*, 965 F.2d 699, 719-720 (9th Cir. 1992) (citing *Filartiga v. Pena–Irala*, 630 F.2d 876,
     882–84 (2d Cir. 1980) ). "The United Nations Charter, in contrast to the Universal Declaration, is a treaty of the United
     States." *Id.*

2    In *Sosa*, Justice Souter explained:
         ... the Declaration does not of its own force impose obligations as a matter of international law. See Humphrey, The
         UN Charter and the Universal Declaration of Human Rights, in The International Protection of Human Rights 39,
         50 (E. Luard ed.1967) (quoting Eleanor Roosevelt calling the Declaration " 'a statement of principles ... setting up a
         common standard of achievement for all peoples and all nations' " and " 'not a treaty or international agreement ...
         impos[ing] legal obligations' ").
     542 U.S. at 734-735.

3    Boivin makes no thirteenth amendment argument claim in his complaint or proposed amended complaint. However, in
     a brief in support of his complaint, he argues that he was sentenced to time and not hard labor. *See* Doc. No. 2 at 1-2 & 7.

4    The Eighth Amendment's ban on cruel and unusual punishment applies to the states via the Fourteenth Amendment.
     *See Graham v. Fla.*, 560 U.S. 48, 98 (2010). Boivin's complaint does not describe a separate fourteenth amendment
     due process or equal protection claim. However, a liberal reading of Boivin's brief in support of his complaint reveals
     a potential equal protection claim. Boivin alleges that all inmates must work, and while some earn good time, he does
     not. Doc. No. 2 at ¶ 2. Boivin states that he, who was convicted of first degree murder, must serve 70% of his sentence
     with no credit for good time pursuant to Ark. Code Ann. § 16-93-618, while inmates convicted of the manufacture of
     methamphetamine may receive credit for good time. *Id.* This allegation does not support an equal protection claim – as
     a person convicted of first degree murder (*see* Doc. No. 1 at ¶ 8), Boivin is not similarly situated to persons convicted
     of manufacturing methamphetamine.

5    Boivin does not allege that he has been incarcerated at the private prison in Bowie County, Texas where some ADC
     inmates are incarcerated pursuant to a contract between the ADC and Lasalle Corrections. *See* Doc. No. 1 at 5, ¶ 13.

6    Recent news articles indicate that Arkansas and Alabama are now the only two states that make prisoners work
     without any pay. *See e.g.*, https://www.ualrpublicradio.org/post/proposal-would-require-arkansas-pay-inmates-labor;
     https://katv.com/news/local/lawmakers-seek-constitutional-amendment-to-ban-forced-inmate-labor.

7    The Court notes that prisoners in other states do not earn very much. *See* Josh Halladay, The Thirteenth Amendment,
     Prison Labor Wages, and Interrupting the Intergenerational Cycle of Subjugation, 42 Seattle U. L. Rev. 937, 963 (2019)
     ("Compensation for labor is either meager or nonexistent. On average, state prisoners earn $ 0.20 per hour and federal
     prisoners earn $ 0.31 per hour. Throughout the fifty states and the federal prison system, the average minimum wage
     prisoners earn for regular, non-industry jobs, which 94% of prison laborers work, is $ 0.14 per hour. The average
     maximum is $ 0.64 per hour.") (citing Wendy Sawyer, *How Much Do Incarcerated People Earn In Each State?*, Prison
     Pol'y Initiative (Apr. 10, 2017), https://www.prisonpolicy.org/blog/2017/04/10/wages/).

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 3436501
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

CAPITAL AREA IMMIGRANTS' RIGHTS COALITION, et al., Plaintiffs,

v.

Donald J. TRUMP, et al., Defendants.

CV No. 1:19-cv-02117-TJK
|
Filed July 24, 2019

TRANSCRIPT OF ORAL RULING HELD BEFORE THE HONORABLE TIMOTHY J. KELLY UNITED STATES
DISTRICT JUDGE

**Attorneys and Law Firms**

For the Plaintiffs: Mitchell P. Reich, Esq., Justin Bernick, Esq., HOGAN LOVELLS US LLP, 555 Thirteenth Street, NW,
Washington, DC 20004, (202) 637-5833.

For the Defendants: Lauren C. Bingham, Esq., U.S. DEPARTMENT OF JUSTICE, Civil Division, P.O. Box 868, Ben Franklin
Station, Washington, DC 20044, (202) 616-4458.

Court Reporter: Timothy R. Miller, RPR, CRR, NJ-CCR, Official Court Reporter, U.S. Courthouse, Room 6722, 333
Constitution Avenue, NW, Washington, DC 20001, (202) 354-3111.

For the Plaintiffs: Elizabeth Hagerty, Esq., T. Clark Weymouth, Esq., Kaitlin Welborn, Esq., HOGAN LOVELLS US LLP, 555
Thirteenth Street, NW, Washington, DC 20004, (202) 637-3231, Manoj Govindaiah, Esq., REFUGEE AND IMMIGRANT
CENTER FOR EDUCATION AND LEGAL SERVICES, 802 Kentucky Avenue, San Antonio, TX 78201, (210) 787-3745.

For the Defendants: Erez Reuveni, Esq., Scott G. Stewart, Esq., UNITED STATES DEPARTMENT OF JUSTICE, P.O. Box
868, Ben Franklin Station, Washington, DC 20044, (202) 307-4293.

## PROCEEDINGS

The Honorable Timothy J. Kelly, United States District Judge

 **\*1** THE DEPUTY CLERK: Your Honor, this is civil matter 19-2117, Capital Area Immigrants' Rights Coalition, et al., v.
Donald J. Trump, et al.

Will counsel please approach the podium and state your appearance for the record.

MR. REICH: Good morning, Your Honor. Mitchell Reich for the plaintiffs, and I'm joined here by Justin Bernick.

THE COURT: Good morning to both of you.

MS. BINGHAM: Good morning, Your Honor. Lauren Bingham from the Department of Justice on behalf of the defendants.
I am joined by counsel on the phone.

AR.07022

THE COURT: All right. Good morning to everyone here.

Good morning to counsel on the phone.

The parties are present for an oral ruling on the plaintiffs' motion for a temporary restraining order.

Emergency injunctive relief is an extraordinary remedy never awarded as of right. It may only be awarded upon a clear showing that the movant is entitled to it.

A plaintiff seeking such relief must establish, one, that he is likely to succeed on the merits; two, that he is likely to suffer irreparable harm in the absence of preliminary relief; three, that the balance of equities -- a balance of the equities tips in his favor; and, four, that an injunction is in the public interest.

The basis of preliminary relief, however, has always been irreparable harm, and so I will start there.

The party seeking a preliminary injunction must make two showings to demonstrate irreparable harm. First, the harm must be certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm. And, second, the harm must itself be irreparable; that is, it must be beyond remediation.

Plaintiffs claim harm to their organizational missions. They allege that the Interim Rule will burden their ability to ensure that immigrants subject to the removal process are provided assistance and representation to the fullest extent possible.

As a threshold matter, I do find that it is likely that these allegations are sufficient for standing purposes. Under the law of this Circuit, an organization may challenge an agency action on its own behalf if it alleges a concrete and demonstrable injury to its activities. The organization must first show that the challenged action either perceptibly impaired its ability to provide services or inhibited its daily operations and then, further, that the organization's mission is in direct conflict with the action that it challenges.

Here, both organizations have alleged that the new rule will disrupt their day-to-day ability to provide legal representation and other services for recent migrants. And for purposes of making the minimum showing necessary for standing, that is likely sufficient. I also find that plaintiffs likely fall within the zone of interests of the asylum statute.

But for purposes of meeting the irreparable harm requirement, that harm must nevertheless be certain and great. It must be actual. And it must be so imminent that there is a clear and present need for a temporary restraining order enjoining the implementation of the Interim Rule for the next two weeks. And for the reasons I'll walk through, I do not find that the plaintiffs have met that high standard.

 **\*2**  Both organizations highlight a series of harms to their respective activities that they contend will result from the implementation of the Interim Rule. They describe the efforts needed to develop new intake procedures and training materials, the additional time needed to prepare applicants for interviews with asylum officers, and the general burden of appealing more credible fear determinations.

To the extent that they seek to rely on their projected additional expenditures, that cannot suffice. Indeed, that would effectively eliminate the irreparable harm requirement when suing under the APA. Nor does their assertion that this situation will lead to a drop in their funding rise beyond their speculation about the effects.

Plaintiffs' most salient claim of irreparable harm is their assertion that, due to the various burdens imposed by this new rule overall, they will have fewer resources to go around and, therefore, will be able to assist fewer asylum applicants. Each client they are unable to reach because of this rule, they claim is an irreparable harm.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

At the outset, I have some skepticism as to whether this type of injury to the organization is the type of irreparable harm that can warrant emergency relief. It is the mission of both organizations to ensure representation to as many immigrants in the removal process that they can, but it is not clear to me that a temporary burden on those missions will call the -- will cause the organizations to suffer irremediable harm when a later order or judgment vacating the rule could relieve the burden and allow the organizations to provide the services the way they did beforehand.

Now, I recognize the Circuit may have suggested else -- otherwise in the League of Women Voters case, but the plaintiffs' efforts there were tied to a single impending election, and the organizations' efforts here to provide asylum to -- to provide assistance to asylum applicants are fluid and ongoing.

But even if I were to accept that the inability to represent an individual at some point during the removal process could contribute to irreparable harm to the organizations, I do not find, on this limited record, that plaintiffs have provided sufficient evidence of a certain, great and immediate harm to meet this high burden on a TRO.

The most concrete evidence plaintiffs provide are their predictions that the Interim Rule will double or triple the amount of time it takes them to conduct intake interviews and to prepare for credible fear interviews. And plaintiffs have argued that the Interim Rule will greatly increase the amount of time their organizations must spend to represent children through the credible and reasonable fear interviews.

But although the plaintiffs have -- provide -- provided some data, they have not provided enough information for me to find that they have met their burden here. They have not specified how many of their clients will be newly eligible under the Interim Rule; how many intake interviews or credible fear interviews will take place over the next few weeks; and, ultimately, how many potential clients they will be unable to reach in that time frame.

In addition, and crucially, plaintiffs have not specified the alleged harm that will become irremediable over the next few weeks; that is, on the theory that their harm becomes truly irreparable when a potential client that they could not reach gets deported prior to any potential preliminary or even permanent vacatur of the rule. There's just nothing in the record to suggest how many individuals, if any, may fall into that category, again, within the time frame of a TRO.

 **3** Finally, in League of Women Voters, on which plaintiffs chiefly rely, it was relatively easy to measure the organizations' success, and thus their corresponding harm, the drop in the number of voters registered. Here, the success of the organizations in pursuing the goal of representation depends, in part, on how they decide to allocate their resources, to whom and when. I do not question their judgments, but that reality does introduce more speculation into the degree and the extent of harm to them that is actually caused by the Interim Rule. So again, and I emphasize, at least on this limited record, this situation here is not comparable, in my view, to the certain and great effects the organizations were able to demonstrate in League of Women Voters.

Now, to be sure, the effect of this Interim Rule is far-reaching and significant, and I want to be clear on this point. I'm not concluding that this rule, if deemed unlawful, would cause no irreparable harm to those asylum applicants subject to it, but the plaintiffs before me here are not asylum seekers affected by this rule. They are two -- only two organizations, one of which operates in the D.C. area far from the southern border. And I find that those -- these two plaintiffs have not shown on this record that they, as organizations, will be irreparably harmed absent a temporary restraining order.

The Supreme Court in the Winter case made clear that a party must demonstrate a likelihood of irreparable harm to be entitled to preliminary injunctive relief, and that is consistent with the case law in this Circuit denying requests for such relief on the basis of a failure to show irreparable harm alone. Thus, I am denying the TRO on that basis alone.

With that said, I'd like to offer some preliminary thoughts on the other relevant factors that may be useful to the parties as we move forward on a potential preliminary injunction as to why, even if these plaintiffs are subsequently able to meet the

minimum showing of irreparable harm on a different record, I don't think it's obvious that they would be entitled to preliminary relief, although, of course, I don't rule that out.

As to the merits, I have strong doubts that the plaintiffs will be able to successfully show that the Interim Rule exceeds the Attorney General's authority under Section 1158(b) (2) (C).

At least at this point, I think that the plaintiffs are reading too strict a limitation on to the Attorney General's authority. In other words, they seek to have the phrase "consistent with" do too much. According to plaintiffs, anytime the Attorney General enacts a limitation that covers the same concern as one of those addressed by the statutory bars, it's necessarily inconsistent; that is, it's completely off limits, almost a form of congressional preemption.

But there is little in the text to suggest to me that Congress intended its eligibility criteria to be the limit or that additional limitations addressing similar concerns were not consistent with the statute. And even if plaintiffs' argument is that it's a matter of degree -- that is, that a new limitation issued by the Attorney General cannot overlap with a limitation already imposed by Congress so much that it becomes too, quote, inconsistent with the policy goals gleaned from the rest of the statute -- that is a remarkable contention, particularly in the context of immigration and when the Attorney General has long exercised broad discretion to determine which applicants should be granted asylum.

For all these same reasons, I have strong doubt as to plaintiffs' claims relating to the TVPRA.

Turning to plaintiffs' procedural claim, I have some doubt there as well, although to me it's a much closer call. The Government has invoked good cause exception to dispense with the notice and comment requirement for the Interim Rule. And even though I must narrowly construe and reluctantly countenance the exception under Circuit precedent, I'm required to give deference to the agency's factual findings and expert judgments that underlie the good cause determination, unless they are arbitrary and capricious.

 **\*4**  The record here contains some evidence in the form of newspaper articles suggesting that migrants respond, at least to some degree, to changes to our immigration policies and to those of the Mexican government, and that proposition has a certain logic to it. On the other hand, the record on this point is thin, and it is a necessary step in the Government's reasoning as to why the exception is justified. And while one court has relied on a similar record to conclude that the agency's judgment about the effect of an immigration rule supported good cause, in that case the judge deferred to the agency's ultimate good cause conclusion, whereas under this Circuit's precedent, I'm required to review that conclusion de novo.

There is more evidence in the record concerning what the effect of a dramatic increase in a -- in migrants at our southern border would be, especially now against the backdrop of a significant uptick -- of the significant uptick in migrant encounters and apprehensions at the border over the last few months. The record suggests that our immigration system at the border is being severely strained and that such an increase, if it occurred, would, at a minimum, have negative repercussions throughout that system.

Finally, in consideration of the equities and the public interest, I note that these factors merge when the government is the party opposing the request for preliminary relief.

Here, the public interest is served by the government being able to conduct its administration of its immigration laws in the lawful ways it sees fit. And at least as I see things now, that public interest weighs heavily against the type of organizational harm alleged here.

But I want to emphasize that these are my preliminary thoughts on these other factors at this point, and I'm certainly open to further development of the factual record and additional legal argument on those points as we move forward.

But as for today's ruling, because plaintiffs have not shown a likelihood of irreparable harm entitling them to a temporary restraining order, their motion for a TRO is denied.

With that, let me turn to a few housekeeping matters.

I -- obviously, we've acknowledged before that this same issue was being considered by another judge, I think, at a hearing today. My suggestion would be for both parties to confer, come up with a briefing schedule for -- a briefing schedule and a proposed date for hearing on the PI, and give me a joint status report, let's say, on Friday. I don't know whether the plaintiffs -- well, whether either side are -- will be impacted by whatever happens out in California, but that will allow you time to gather, consult with your clients, look at your schedule, and jointly -- hopefully, jointly propose a schedule going forward.

Let me ask the plaintiffs. Does that seem reasonable?

MR. REICH: Yes, Your Honor. We'd be amenable to that.

THE COURT: All right. From the Government's perspective, either folks on the phone or here, does that seem a reasonable way forward?

MS. BINGHAM: I'll defer to my colleagues on the phone, but it sounds reasonable to me.

(Brief pause.)

THE COURT: I heard the beep just a second ago. So I --

MR. STEWART: That does, Your Honor. That seems reasonable to the Government. Thank you.

THE COURT: All right. Maybe that was a mute button issue.

All right. So that's what we'll do.

The other little bit of housekeeping I have is, Mr. Stewart, if you're on the phone, I think you had indicated that you're -- the Government was opposing, at least to some degree, the amicus brief -- the motion for leave to file an amicus brief that's on the docket. Is there any reason why the Government can't respond to that, let's say, by Monday?

MR. STEWART: Sure, Your Honor. File an opposition to that by Monday? We can do that, Your Honor.

 **\*5**  THE COURT: All right. And then I will resolve that promptly.

All right. Any other further housekeeping matters from either side?

MR. REICH: No, Your Honor.

THE COURT: All right.

MS. BINGHAM: Nothing from us, Your Honor.

MR. STEWART: One request from the Government, Your Honor. Would it be possible to expedite the issuance of the transcript from Your Honor's oral ruling today?

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

THE COURT: You know, I honestly don't know my ability to do that. I think, obviously, that would be productive -- let me put it this way. I will look into that. And, certainly, I understand why that would be productive for all the parties. And if it can be expedited, it will be expedited. At a -- as I -- off the top of my head, there might be an issue of payment, and I don't know if either party wants to represent that they'll step up and pay for that transcript to be expedited. I just don't know, as I sit here, the answer to that question. I'm certainly not against it. To the extent that it can be done -- to the extent that my -- I have an influence over that, I will certainly encourage that to occur. Let me put it that way.

All right.

MR. STEWART: Thank you, Your Honor.

THE COURT: All right. With all that said, then, I will hear from the parties on Friday, and we'll see where we go from here.

Counsel are dismissed.

THE DEPUTY CLERK: All rise. This Honorable Court stands in recess.

(Proceedings concluded at 10:22 a.m.)

**All Citations**

Slip Copy, 2019 WL 3436501

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

476 F.3d 158
United States Court of Appeals,
Third Circuit.

Salvatore CAROLEO, Petitioner,

v.

Alberto R. GONZALES, Attorney General of the United States, Respondent.

No. 05-3762.
|
Submitted Under Third Circuit
L.A.R. 34.1(a) Sept. 15, 2006.
|
Opinion Filed Feb. 7, 2007.

**Synopsis**
**Background:** Alien, a native of Italy, petitioned for review of an order of the Board of Immigration Appeals (BIA) denying his motion for a discretionary waiver of removal.

The Court of Appeals, Garth, Circuit Judge, held that alien was not entitled to discretionary waiver of removal.

Petition denied.

Weis, Circuit Judge, filed concurring opinion.

**Attorneys and Law Firms**

*159 Mario Apuzzo, Esq., Jamesburg, NJ, for Petitioner.

Peter D. Kiesler, Michael P. Lindemann, Ethan B. Kanter, U.S. Department of Justice Office of Immigration Litigation, Washington, DC, for Respondent.

Before: SLOVITER, WEIS and GARTH, Circuit Judges.

OPINION

GARTH, Circuit Judge.

Petitioner Salvatore Caroleo seeks our review of a decision of the Board of Immigration Appeals ("BIA") denying his motion for a discretionary waiver of removal pursuant to § 212(c) of the Immigration and Nationality Act ("INA"). Because we agree with the BIA's determination that an aggravated felony/crime of violence-for which Caroleo has been found removable on the basis of his state court conviction for attempted murder-has no statutory counterpart in § 212(a) of the INA, we will deny Caroleo's petition.

**\*160**  I.

Petitioner Salvatore Caroleo, a 35 year-old native and citizen of Italy, entered the United States as a lawful permanent resident on an Immigrant Visa on April 23, 1978. In December 1993, Caroleo was indicted in New Jersey Superior Court on a number of charges related to an attack he committed on a woman in Middlesex County. By letter dated March 14, 1996, New Jersey State Assistant Prosecutor Robert J. Brass offered Caroleo a plea agreement. The terms of the proposal required Caroleo to plead guilty to three counts: attempted murder, second-degree burglary, and possession of a weapon for unlawful purposes. Under the terms of the plea offer, Caroleo's maximum custodial sentence would be twelve years, with a four-year period of parole ineligibility.

On November 1, 1996, Caroleo appeared in court with his attorney, Louis C. Esposito, and formally accepted Brass's March 14, 1996 plea offer. On January 6, 1997, Caroleo was sentenced, in accordance with the plea agreement, to a total of twelve years imprisonment. The sentence provided that Caroleo would not be eligible for parole prior to serving four years.

II.

On June 12, 2000, while still incarcerated, Caroleo was served by the INS with a Notice to Appear, charging him with being removable under INA § 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii), as an alien convicted of an "aggravated felony," as that term is defined in INA § 101(a)(43), 8 U.S.C. § 1101(a)(43). In particular, the Notice to Appear contained two charges relating to two separate aggravated felonies. The first charge alleged that Caroleo had been convicted of an aggravated felony consisting of "a crime of violence [attempted murder] ... for which the term of imprisonment [is] at least one year." INA § 101(a)(43)(F), 8 U.S.C. 1101(a)(43)(F). The second charge alleged that Caroleo was convicted of the aggravated felony of "a theft offense ... or burglary offense for which the term of imprisonment [is] at least one year." INA § 101(a)(43)(G), 8 U.S.C. § 1101(a)(43)(G).

A hearing was held before an immigration judge ("IJ") on April 19, 2001. At the hearing, Caroleo, who was represented by counsel, conceded the removal charges, and sought to apply for a discretionary waiver of deportation under INA § 212(c). Counsel for Caroleo acknowledged that the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which took effect in 1996, foreclosed § 212(c) relief to individuals such as Caroleo who had been convicted of aggravated felonies. He argued, however, that Caroleo might still be entitled to relief under the Second Circuit's decision in *St. Cyr v. INS,* 229 F.3d 406 (2d Cir.2000), which held that AEDPA's restriction on § 212(c) relief to aggravated felons could not be applied retroactively to aliens who pled guilty prior to AEDPA's effective date of April 24, 1996. Caroleo conceded that he had pled guilty *after* that date, but asserted that, because his *crime* had been committed in 1993-prior to the enactment of AEDPA-the principles of St. *Cyr* should be extended to render AEDPA inapplicable to him.

On April 19, 2001, the IJ issued an oral decision ordering that Caroleo be removed. The IJ rejected Caroleo's argument that the holding of *St. Cyr* should be extended to aliens like Caroleo whose crime had been committed prior to-but had pled guilty after-AEDPA's effective date. The IJ therefore held that *St. Cyr* was inapplicable to Caroleo because Caroleo "has conceded that he *pled guilty* on November 1, 1996," which was after the April 24, 1996 effective date of AEDPA.

**\*161**  Caroleo filed his appeal to the BIA shortly after the Supreme Court affirmed *St. Cyr* on June 25, 2001. On appeal, Caroleo again argued that he was not subject to AEDPA's limitations on § 212(c) relief because his offense was committed in 1993, prior to the enactment of AEDPA. On July 30, 2001, the BIA dismissed the appeal. In its order, the BIA stated that

Caroleo "acknowledges that he pled guilty to attempted murder and burglary on or about November 1, 1996," a date after AEDPA had taken effect, and that ⬛ *St. Cyr* only applies to aliens who pled guilty prior to AEDPA's effective date regardless of when their crimes were committed.

III.

On April 25, 2005, Caroleo filed a special motion with the BIA seeking § 212(c) relief. Caroleo specifically relied upon regulations then recently adopted by the Department of Justice to implement ⬛ *St. Cyr.* Those regulations provide that an alien need only have agreed with the prosecutor *informally* to plead guilty prior to AEDPA's effective date to avoid the limitations imposed by AEDPA. In his motion, Caroleo asserted, for the first time, that although his guilty plea was not formally entered in court until November 1, 1996, he had in fact *informally* accepted the prosecution's March 14, 1996 plea offer prior to AEDPA's April 24, 1996 effective date, and that he was therefore eligible to be considered for § 212(c) relief under pre-AEDPA standards. To support this assertion, Caroleo submitted an affidavit from Louis C. Esposito, the attorney who had represented him in his criminal case. In the affidavit, Esposito stated:

3. Due to the quantity and quality of the evidence the State had against Mr. Caroleo, he and I never seriously considered a trial. We therefore immediately opened plea negotiations with Assistant Prosecutor Robert J. Brass.

4. On March 14, 1996, Mr. Brass made a plea offer. The offer was transmitted in a letter to me dated March 14, 1996 ... This offer was accepted by Mr. Caroleo and me shortly after I received the letter.

5. Due to my busy trial calendar and the mental health problems and several mental health hospitalizations experienced by Mr. Caroleo, the offer was not formally acted upon until November 1, 1996, the day Mr. Caroleo entered his guilty plea on the record in the Superior Court of New Jersey ...

6. The initial offer which we received in writing in Mr. Brass's letter dated March 14, 1996 was never rejected and *accepted as presented almost immediately....*

7. I have a clear recollection of the facts of the case, the plea negotiations with the State, the time that the State made the offer, the time that Mr. Caroleo and I accepted that offer, and would, if required, be willing to testify in open court to this knowledge. *I can state with certainty that we accepted the State's plea offer dated March 14, 1996 before April 24, 1996.*

Caroleo acknowledged that, under amendments to the INA that were in place since 1990, § 212(c) relief was unavailable to any alien who had served a term of imprisonment of at least five years for an aggravated felony. At the time his special motion seeking § 212(c) relief was filed in April 2005, Caroleo was still incarcerated, and had, to that point, served more than eight years in prison.

Caroleo presented two main arguments that he was nevertheless entitled to relief. First, as a matter of statutory interpretation, Caroleo argued that the time at which to evaluate whether an alien has "served a **\*162** term of imprisonment of at least five years," thus rendering him ineligible for consideration under § 212(c), is when the alien first seeks to apply for such relief-or at the latest, upon entry of a final order of removal. In the present case, Caroleo had sought to apply for a § 212(c) waiver at the hearing before the IJ on April 19, 2001, at which time he had served fewer than five years. Moreover, Caroleo had still not served five years at the time when the BIA issued its July 30, 2001 order affirming the IJ's decision.

Second, Caroleo argued that, even if he was found to be statutorily barred from relief under § 212(c), the BIA should nevertheless consider his application on equitable grounds. Caroleo asserted that it would be unjust to deny him § 212(c) relief on the basis of his now having served more than five years' incarceration, when he had, in fact, sought such relief prior to having served five years, but had been wrongly denied the opportunity to do so. Caroleo therefore asked the BIA to employ the equitable remedy of nunc *pro* tunc to consider his § 212(c) application as though he had properly filed it before serving five years.

In an order dated July 7, 2005, the BIA denied Caroleo's motion. First, the BIA ruled that Caroleo was ineligible for a § 212(c) waiver because the aggravated felony convictions on the basis of which Caroleo was found removable-i.e., "crime of violence" and "theft or burglary offense," "do not have a statutory counterpart in section 212(a) of the Act." As a second ground for denying his motion, the order stated: "it appears that the respondent has served more than 5 years of incarceration for his aggravated felony convictions. If this is true, it would also render him ineligible for a section 212(c) waiver." Caroleo then filed this timely petition.

IV.

We have jurisdiction to review constitutional claims or questions of law raised upon a petition for review from a final order of the BIA pursuant to INA § 242(a), 8 U.S.C. § 1252(a) as amended by section 106 of the REAL ID Act of 2005, Pub.L. No. 109-13, Div. B, 119 Stat. 231, 310 (2005). We review such constitutional claims and questions of law de novo. Kamara v. Att'y Gen., 420 F.3d 202, 211 (3d Cir.2005).

In order for Caroleo to establish his eligibility for § 212(c) relief, he must demonstrate (i) that he agreed to plead guilty prior to AEDPA's effective date, and is therefore not subject to AEDPA's absolute bar on § 212(c) relief to aggravated felons; [1] (ii) that he is entitled to invoke § 212(c) despite having now served more than five years in prison; and (iii) that the basis for his removal has a "statutory counterpart" ground for exclusion in INA § 212(a). Caroleo must prevail on all three grounds to succeed in his petition-i.e., to establish his eligibility for relief under INA § 212(c).

Were we to reach the first two issues, we would hold that Caroleo should be permitted, on equitable grounds, to apply for § 212(c) relief despite having now served more than five years in prison, and that Caroleo's application should be remanded for a determination of when Caroleo agreed to plead guilty. These issues are mooted, however, by our conclusion that Caroleo is ineligible for § 212(c) relief as a result of his failure to satisfy the "statutory counterpart" requirement under § 212(c) because at least one of the **163 grounds upon which the government seeks his removal-the aggravated felony of "crime of violence" (attempted murder)-does not have a statutory counterpart INA § 212(a). Thus, even if we held for Caroleo on the first two issues listed above, his petition must nevertheless be denied.

1.

The principle that § 212(c) is available in removal proceedings only where the ground for removal has a "statutory counterpart" ground for exclusion has been firmly in place and consistently applied since at least 1991. [2] This requirement has also recently been codified in the INS regulations:

(f) Limitations on discretion to grant an application under section 212(c) of the Act. An application for relief under former section 212(c) of the Act shall be denied if:

....

(5) *The alien is deportable under former section 241 of the Act or removable under section 237 of the Act on a ground which does not have a statutory counterpart in section 212 of the Act.*

8 C.F.R. § 1212.3(f) (emphasis added). [3] *See also* *Farquharson v. United States* **164 *AG,* 246 F.3d 1317, 1324 (11th Cir.2001); *Cato v. INS,* 84 F.3d 597 (2d Cir.1996); *Gjonaj v. INS,* 47 F.3d 824, 827 (6th Cir.1995); *Komarenko v. INS,*

35 F.3d 432, 435 (9th Cir.1994); *Chow v. INS,* 12 F.3d 34, 38 (5th Cir.1993); *Leal-Rodriguez v. INS,* 990 F.2d 939, 948-52 (7th Cir.1993); *Campos v. INS,* 961 F.2d 309, 316-17 (1st Cir.1992). Caroleo argues he should not be removed because he satisfies the "statutory counterpart" requirement in that his criminal convictions-for attempted murder, burglary, and unlawful possession of a weapon for an unlawful purpose-constitute "crime[s] involving moral turpitude," one of the grounds for exclusion under INA § 212(a). *See* 8 U.S.C. § 1182(a)(2)(A)(i). Our analysis, however, leads to a different conclusion.

2.

Section 237 of the INA, entitled "Deportable Aliens," lists the grounds upon which the Attorney General may order an alien removed. It is in this context that courts look to an alien's *underlying criminal conviction* to determine whether it falls within one of § 237's statutory grounds for removal. For example, an alien will only be subject to removal under INA § 237(a)(2)(A)(iii) if it is determined that the crime for which he was convicted is indeed an aggravated felony as that term is defined in the INA. Likewise, before an alien can be removed for a "crime involving moral turpitude," INA § 237(a)(2)(A)(i), the government must establish that the alien's *underlying conviction* does indeed constitute a crime involving moral turpitude. It is in this context-i.e., determining whether an alien's *underlying conviction* qualifies as moral turpitude thereby establishing *removability*-that some cases have held that crimes like those for which Caroleo was convicted are crimes involving moral turpitude. [4]

The statutory counterpart requirement under § 212(c), on the other hand, presents an entirely different question. In an application for § 212(c) *relief-i.e. a discretionary waiver of removal,* the alien's removability has already been established-i.e., it has already been determined that the underlying crime for which he has been convicted falls within one of INA § 237's grounds for removal. The relevant statutory counterpart inquiry then looks-not to the underlying criminal conviction-but rather to the *statutory ground for removal contained in INA § 237* and whether it has a counterpart in the *statutory ground for exclusion provisions of INA § 212(a).* Under this categorical analysis, we compare the removal and exclusion provisions *of the INA* to determine whether they are "substantially equivalent" *See Bedoya-Valencia v. INS,* 6 F.3d 891, 894 (2d Cir.1993); *Campos v. INS,* 961 F.2d 309, 313 n. 6 (1st Cir.1992). If they are, a statutory counterpart has been established.

This distinction between the preliminary question of *removability* under INA § 237 and the statutory counterpart requirement for *relief from removal* under INA § 212(c) leads us to conclude that Caroleo has not satisfied the statutory counterpart requirement. Because while it is true that the *underlying crime* of **\*165** attempted murder can be characterized as a crime involving moral turpitude for the purposes of determining *removability, see, e.g., Yousefi v. United States INS,* 260 F.3d 318, 326 (4th Cir.2001), the statutory counterpart prerequisite for *§ 212(c) relief from removal* focuses, quite differently, upon the *statutory ground for removal*-here an aggravated felony "crime of violence." *Komarenko v. INS,* 35 F.3d 432 (9th Cir.1994). And, there is no authority challenging the BIA's direct holding in *Matter of Brieva,* 23 I. & N. Dec. 766 (BIA 2005) that the aggravated felony "crime of violence" ground for removal is *not* a statutory counterpart of INA § 212(a)'s "crime involving moral turpitude."

In *Komarenko,* the court rejected an analysis very similar to the one proposed by Caroleo. Komarenko was convicted of assault with a deadly weapon in violation of California law and sentenced to four years imprisonment. The INS commenced removal proceedings against him for being an alien convicted of the aggravated felony of a "firearms charge," 8 U.S.C. § 1227(a)(2)(C). Komarenko conceded removability but sought a waiver under § 212(c), arguing that his conviction for assault with a deadly weapon had a statutory counterpart in INA § 212(a)'s "crime involving moral turpitude" ground for exclusion.

The court specifically rejected Komarenko's claim that the court must look to the particular facts of his crime, which, he claimed, could be deemed a crime of moral turpitude. *The court held that it is the statutory ground for removal that must have a "substantially identical" counterpart in the statutory grounds for exclusion in order to qualify for section 212(c); the factual basis of the underlying criminal activity is irrelevant.* The court explained that this conclusion follows directly from the equal protection concerns that are the basis for the whole idea of a "statutory counterpart":

> Generally, when courts have found an equal protection violation, the excludability and deportation provisions have been substantially identical. That way, the only distinction between the two classes of persons the statute created was that one class of individuals had traveled abroad and returned, and the other had not. It is this arbitrary distinction that violates equal protection. In the instant case, the provisions are entirely dissimilar, and the distinction between the two classes is not arbitrary or unreasonable.... For this reason, the linchpin of the equal protection analysis in this context is that the two provisions be "substantially identical."

*Komarenko,* 35 F.3d at 435.

The court also addressed Komarenko's argument that, because his conviction for assault with a deadly weapon would also have qualified him for exclusion under INA § 212(a)'s crime involving moral turpitude ground, it would violate equal protection to deny him § 212(c) relief from removal proceedings predicated on the same underlying criminal activity. The court rejected this argument, holding that the underlying criminal activity was not relevant; what was important was the statutory ground in the INA under which removal was sought. Whether the underlying crime could also have been the basis for a different ground for removal-one which *does* have a statutory counterpart ground for exclusion-is entirely irrelevant.

Komarenko claims we must focus on the facts of his individual case and conclude that because he could have been excluded under the moral turpitude provision, he has been denied equal protection. *We decline to speculate whether the I.N.S. would have applied this broad* **\*166** *excludability provision to an alien in Komarenko's position. Were we to do so, we would extend discretionary review to every ground for deportation that could constitute "the essential elements of a crime involving moral turpitude."* 8 U.S.C. § 1182(a)(2)(A)(i)(II). Such judicial legislating would vastly overstep our "limited scope of judicial inquiry into immigration legislation," *Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977); *Francis,* 532 F.2d at 272, and would interfere with the broad enforcement powers Congress has delegated to the Attorney General, see 8 U.S.C. § 1103(a). We decline to adopt a factual approach to our equal protection analysis in the context of the deportation and excludability provisions of the INA.

*Komarenko,* 35 F.3d at 435 (emphasis added).

Thus, it was irrelevant to the *Komarenko* court whether the alien could have been removed under the moral turpitude statutory ground for removal. The government had ordered Komarenko removed for a firearms charge and the court therefore was required to restrict its inquiry to the question whether the removal category "firearms charge" is a statutory counterpart of the moral turpitude ground for exclusion. The court held that it was not.

The same analysis was more recently applied in two cases before the BIA, whose interpretation of the INA is entitled to deference. *See Chevron, U.S.A., Inc. v. NRDC, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), *Francois v. Gonzales,* 448 F.3d 645, 648 (3d Cir.2006). In *Matter of Brieva,* 23 I. & N. Dec. 766 (BIA 2005), an alien was ordered removed under the "crime of violence" aggravated felony provision after having been convicted under state law for unauthorized

use of a motor vehicle. The alien appealed to the BIA on two grounds. First, the alien asserted that unauthorized use of a motor vehicle was not a "crime of violence" aggravated felony for which he could be removed. Second, the alien argued that even if removable for committing a crime of violence, he was entitled to § 212(c) relief because "crime of violence" is a statutory counterpart of INA § 212(a)'s "crime involving moral turpitude." The BIA rejected both of these arguments. The BIA first held that unauthorized use of a motor vehicle qualifies as a crime of violence under the INA, thereby making the alien removable as a result of his conviction for that "aggravated felony." Removability having been established, the BIA then turned to the alien's request for relief under § 212(c). The BIA denied relief, holding that the crime of violence ground for removal is not a statutory counterpart of INA § 212(a)'s "crime involving moral turpitude" ground for exclusion.

The BIA held that, in deciding the question, the court should look not to the underlying crime-i.e., unauthorized use of a motor vehicle, but rather to the *statutory ground* for removal:

> In making the comparison in this case, the relevant question is whether the "crime of violence" aggravated felony ground, as defined in section 101(a)(43)(F) of the Act, is substantially equivalent to a ground of inadmissibility in section 212(a) of the Act.

<p style="text-align:center">....</p>

> Although there need not be perfect symmetry in order to find that a ground of removal has a statutory counterpart in section 212(a), there must be a closer match than that exhibited by the incidental overlap between section 101(a)(43)(F) (crime of violence) and section 212(a)(2)(A)(i)(I) (crime involving moral turpitude). The distinctly different **\*167** terminology used to describe the two categories of offenses and the significant variance in the types of offenses covered by these two provisions lead us to conclude that they are not "statutory counterparts" for purposes of section 212(c) eligibility.

*Matter of Brieva,* 23 I. & N. Dec. 766, 773.

The alien in *Brieva* also argued that, because he *could have* been removed under the "theft offense" provision of the INA, *see* 8 U.S.C. § 1101(a)(43)(G)(stating that the INA's definition of "aggravated felony" includes "a theft offense ... for which the term of imprisonment [is] at least one year"), the BIA should look to that ground as a basis for comparison to INA § 212(a)'s moral turpitude provision. The BIA rejected this argument:

> The respondent argues that his crime is a "theft offense" for purposes of comparing the moral turpitude ground of inadmissibility. However, the respondent has not been charged with an aggravated felony "theft offense." The comparable ground test for section 212(c) requires that the offense charged, i.e., "crime of violence," have an analogous ground of inadmissibility. *Whether the respondent could be found inadmissible for a "theft offense" amounting to a crime of moral turpitude is not relevant to the critical question whether the "crime of violence" removal ground has a comparable ground of inadmissibility.*

*Id.* at 772 n. 4 (emphasis added).

In *Brieva,* the BIA relied on *In re Blake,* 23 I. & N. Dec. 722 (BIA 2005), in which the BIA had held that the "sexual abuse of a minor" aggravated felony ground for removal, *see* INA § 101(a)(43)(A), is not a statutory counterpart of INA § 212(a)'s "crime involving moral turpitude" ground for exclusion. In reaching this conclusion, the *Blake* Court noted that, although some crimes constituting "sexual abuse of a minor" may well constitute moral turpitude, this fact was not determinative under the categorical approach:

As indicated by the approach taken in our decisions in the firearms cases discussed above, whether a ground of deportation or removal has a statutory counterpart in the provisions for exclusion or inadmissibility turns on whether Congress has employed similar language to describe substantially equivalent categories of offenses. Although many firearms offenses may also be crimes of moral turpitude, the category of firearms offenses is not a statutory counterpart to crimes of moral turpitude. Similarly, although there may be considerable overlap between offenses categorized as sexual abuse of a minor and those considered crimes of moral turpitude, these two categories of offenses are not statutory counterparts.

*In re Blake,* 23 I. & N. Dec. 722, 728.

## V.

In the present case, Caroleo was convicted in state court of attempted murder, burglary, and unlawful possession of a weapon for an unlawful purpose. Based upon the attempted murder conviction, the government charged Caroleo with being subject to removal under the "crime of violence" aggravated felony ground contained in INA § 237.[5] Caroleo does not **\*168** dispute that his attempted murder conviction is a crime of violence under the INA; indeed, he concedes that he is removable on that basis.

 Caroleo's application for section 212(c) relief was properly denied. Under *Matter of Silva,* 16 I. & N. Dec. 26 (BIA 1976) and subsequent authority, Caroleo is not entitled to relief under § 212(c) unless the statutory basis for his removal-i.e., crime of violence, has a statutory counterpart ground for exclusion in INA § 212(a). As *Komarenko, Brieva,* and *Blake* make clear, the underlying crime for which Caroleo was convicted plays no role in this inquiry. It is therefore irrelevant that Caroleo's conviction for attempted murder could have subjected him to removal as an alien convicted of a crime of moral turpitude under INA § 237(a)(2)(A)(i). *See, e.g., Yousefi,* 260 F.3d at 326. Once the government has categorized his offense as a "crime of violence" in removal proceedings, and that categorization has been upheld, our § 212(c) inquiry focuses on whether *this statutory ground* for removal is substantially equivalent to any of the statutory grounds for exclusion contained in INA § 212(a).

The BIA has held that the "crime of violence" aggravated felony ground for *removal* under INA § 237 is not "substantially equivalent" to INA § 212(a)'s "crime involving moral turpitude" *ground for exclusion* such that the two can be considered statutory counterparts. *Brieva,* 23 I. & N. Dec. at 773.

We recognize the seeming illogic of a scheme under which the crime of attempted murder may constitute a crime involving moral turpitude rendering the alien removable, while the same alien, if charged with being removable under INA § 237's aggravated felony "crime of violence" ground, is ineligible for § 212(c) relief because a "crime of violence" is not a statutory counterpart of a "crime involving moral turpitude." However, this is the result of an administratively engrafted "statutory counterpart" requirement and its interpretation by the BIA in *Brieva* and the Ninth Circuit in *Komarenko,* and we find these authorities persuasive. Because we hold that Caroleo's conviction of attempted murder is an aggravated felony "crime of violence" that has no statutory counterpart in a crime involving moral turpitude we will deny Caroleo's request for § 212(c) relief and thus his petition.

WEIS, Circuit Judge, concurring.

I concur in the denial of the petition of review. Although I do not accept some portions of the majority opinion of my distinguished colleagues, I agree that the dispositive issue is the application of the comparability test, a policy adopted by the immigration authorities.

Although the test has been used for some decades, it has only recently been codified in a regulation. *See* 8 C.F.R. § 1003.44, 1212.3(f)(5) (effective Oct. 28, 2004). Briefly stated, in order to qualify for a waiver under section 212(c) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(c), the ground of deportation must have a counterpart in section 212(a).

The substance of the inquiry has been expressed in a variety of ways, but the term "ground" has not been clearly defined by the courts. In my view, the comparability should be that between the grounds specified in INA section 237(a), 8 U.S.C. § 1227(a), and the grounds listed in section 212(a). Therefore, the alien must first show that the underlying conviction constitutes a deportable offense under section **\*169** 237(a) and then demonstrate the comparability of that ground with one in section 212(a).

I agree with the majority that an aggravated felony crime of violence has no statutory counterpart in section 212(a). However, as we noted in *Park v. Attorney General,* 472 F.3d 66, 73 (3d Cir.2006), a conviction may be categorized as both an aggravated felony and one of moral turpitude as those terms are used in the immigration law. Where a conviction does so qualify, the counterpart test should be applied to both the aggravated felony and moral turpitude grounds for deportation in section 237(a).

Petitioner argues that his conviction was one of moral turpitude that has an explicit counterpart in section 212(a). Therefore, he contends that he is eligible for a discretionary waiver under section 212(c). He thus would have the comparability exist between the underlying conviction and section 212(a).

The petitioner's argument is flawed. Assuming that the conviction was for a crime of moral turpitude, the next and crucial question is whether it was a ground of deportation under section 237(a). I believe this case presents a situation where the petitioner's underlying conviction for attempted murder can be both a crime of violence and moral turpitude. [6]

Although crimes of moral turpitude are often not ones that allow for easy and specific definitions, attempted murder fits neatly within the tests we formulated in *DeLeon-Reynoso v. Ashcroft,* 293 F.3d 633 (3d Cir.2002) and *Partyka v. Attorney General,* 417 F.3d 408 (3d Cir.2005). There we cited vileness, depravity, and reprehensible acts deliberately committed as characteristic of moral turpitude. *See, e.g., Asencio v. INS,* 37 F.3d 614 (11th Cir.1994) (BIA categorized attempted murder as crime of moral turpitude).

That said, however, petitioner's crimes do not constitute deportation grounds for moral turpitude. INA § 237(a)(2)(A)(i)(I) specifically states that "any alien who is convicted of a crime involving moral turpitude committed within five years ... after the date of admission ... is deportable." [7] *See* 8 U.S.C. § 1227(a)(2)(A)(i)(I). Because petitioner committed the crimes here on a day more than five years after originally being admitted to this country and has not left the country and been readmitted during that time, his convictions do not satisfy this provision.

Therefore, although petitioner committed crimes of moral turpitude, the government had no authority to deport him on that basis. His moral turpitude conviction could not be a "ground" for deportation, and therefore the issue of comparability with section 212(a) is simply not applicable.

Moreover, because he could not be deported on the ground of moral turpitude, there is no need for petitioner to obtain a waiver on that basis under section 212(c). In effect, he has already received the substance of that benefit because the moral turpitude deportation provision no longer applies to him since five years had elapsed following his admission. In short, he could not receive a waiver of deportation for a **\*170** moral turpitude conviction when the passage of time had already prevented deportation.

AR.07036

I agree with the majority that, although petitioner has asserted other substantial defenses, in the end the comparability issue trumps those contentions.

Accordingly, I join in the denial of the petition for review.

**All Citations**

476 F.3d 158

## Footnotes

1   We consider all three of Caroleo's claims even though the BIA's July 7, 2005 decision deals only with the "five year" and "statutory counterpart" grounds.

2   Section 212(c) was repealed in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104-208 § 304, 110 Stat. 3009-597 (1996). Relief under § 212(c) remains available, however, pursuant to *St. Cyr,* for aliens who have been found removable pursuant to guilty pleas entered *prior* to § 212(c)'s repeal.

3   The statutory counterpart requirement has somewhat tortuous origins. Under its literal terms, § 212(c) offers relief only to aliens who leave the United States and are faced with *exclusion* under the provisions of INA § 212(a). *See* INA § 212(c), 8 U.S.C. § 1182(c)( "Aliens lawfully admitted for permanent residence *who temporarily proceed abroad ... may be admitted* in the discretion of the Attorney General [despite being faced with exclusion under the provisions of INA § 212(a) ]")(emphasis added).

The INS, however, extended § 212(c) relief to a subclass of aliens in *removal or deportation* proceedings: aliens who had left the United States and then were permitted to reenter *despite being excludable.* This practice yielded an inequitable result by treating differently, removable aliens who had left and reentered the United States and those who had never left. Under the INS's policy, by the simple expedient of taking a trip abroad, the former class of aliens became eligible for discretionary relief while the latter were not. (We use the term "removal" instead of "deportation" because the statutory term used in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") is "removal"). Finding this distinction "not rationally related to any legitimate purpose of the statute," the Second Circuit in 1976 struck it down as a violation of the equal protection component of the Due Process Clause of the Fifth Amendment. *Francis v. INS,* 532 F.2d 268, 272 (2d Cir.1976). The BIA subsequently adopted this reasoning in *Matter of Silva,* 16 I. & N. Dec. 26 (BIA 1976), and extended § 212(c) relief to removable aliens regardless of whether they had departed the United States since the commission of the act rendering them removable.

Under the rationale of *Francis* and Silva, certain aliens removable under INA § 237 may receive § 212(c) relief as if they were subject to *exclusion* rather than *removal.* However, the equal protection rationale underlying the extension of § 212(c) relief to removable aliens only requires that such relief be made available to removable aliens who would be *excludable* for the same reasons that render them *removable*-a situation not true for all aliens facing removal. *Accordingly, § 212(c) relief was not extended to aliens whose removability is based upon a ground for which a comparable ground of exclusion-i.e. a statutory counterpart-does not exist. See* Matter of Wadud, 19 I. & N. Dec. 182, 184 (BIA 1984); *Matter of Granados,* 16 I. & N. Dec. 726 (BIA 1979).

As we have recognized in note 2, *supra,* § 212(c) was repealed in 1996, and relief under that statute is now available only to aliens who entered guilty pleas prior to that date.

4    We have recognized that "it is not uncommon for the DHS to conceive of a single crime as qualifying both as a crime involving moral turpitude and as an aggravated felony." *Park v. Attorney General,* 472 F.3d 66, 73 (3d Cir.2006). However, Park involved only the preliminary question of the alien's *removability* under INA § 237; § 212(c) *relief from removal,* and the statutory counterpart requirement thereunder, were not in issue. The analyses are different for each of these provisions.

5    Because we find that the crime of violence ground for Caroleo's removal has no statutory counterpart in INA § 212(a), thus rendering him ineligible for relief under § 212(c), we do not reach the question whether the second ground upon which the government seeks to remove Caroleo-a "theft offense ... or burglary offense for which the term of imprisonment [is] at least one year," 8 U.S.C. § 1101(a)(43)(G)-has a statutory counterpart in INA § 212(a).

6    The majority did not reach the question whether the petitioner's second ground of removal for a theft offense has a statutory counterpart in INA section 212(a), but using the categorical approach it would appear that the petitioner's theft offense would also constitute a crime of moral turpitude.

7    Subsection (iii) provides that an alien who is convicted of two or more crimes involving moral turpitude not arising out of a single scheme of criminal misconduct ... is deportable. Because both convictions in this case resulted from a single incident, that provision is not applicable to this case.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

96 Cal. Daily Op. Serv. 4634, 96 Daily Journal D.A.R. 7460

86 F.3d 949
United States Court of Appeals,
Ninth Circuit.

Neal Andrew CARR, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 94–70373.
|
Argued and Submitted Feb. 8, 1996.
|
Decided June 25, 1996.

**Synopsis**

Alien petitioned for review of decision of Board of Immigration Appeals (BIA) to refuse his request for delay of deportation proceedings so that he could seek expungement of his conviction. The Court of Appeals, Wallace, Circuit Judge, held that: (1) alien's firearms offense was not expungeable, and (2) distinction between expungeable and nonexpungeable offenses did not violate his due process right to equal protection.

Petition denied.

**Attorneys and Law Firms**

**\*950** Jan Joseph Bejar, San Diego, California, for the petitioner.

Bryan S. Beier and Charles E. Pazar, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the respondent.

Petition to Review a Decision of the Immigration and Naturalization Service.

Before: WALLACE and T.G. NELSON, Circuit Judges, and BROWNING, * District Judge.

**Opinion**

WALLACE, Circuit Judge:

Carr petitions us to review the decision of the Board of Immigration Appeals (Board), holding him deportable under section 241(a)(2)(C) of the Immigration and Nationality Act (Act), 8 U.S.C. § 1251(a)(2)(C). We have jurisdiction over this timely petition pursuant to 8 U.S.C. § 1105a(a). We deny the petition.

I

Carr is a native of Canada who entered the United States at Blaine, Washington, on March 12, 1967. At that time, he was two years old, and he entered as a legal permanent resident.

96 Cal. Daily Op. Serv. 4634, 96 Daily Journal D.A.R. 7460

On November 7, 1991, Carr was convicted of assault with a deadly weapon in violation of California Penal Code § 245(a)(2) (prohibiting "[a]ny person [from] commit[ting] an assault upon the person of another with a firearm"). The Act subjects aliens convicted of firearms offenses to deportation. *See* 8 U.S.C. § 1251(a)(2)(C). On March 8, 1993, the Immigration and Naturalization Service (Service) issued Carr an order to show cause charging his deportability.

Carr challenged his deportation by moving the immigration judge (IJ) to terminate deportation proceedings so that he could receive an expungement of his conviction under California Penal Code § 1203.4. An expungement, Carr argued, would make his conviction nonrecognizable for deportation purposes. *See generally Matter of Ozkok,* 19 I. & N.Dec. 546 (BIA 1988) (a conviction for a crime of moral turpitude, if expunged, may not support deportation). The IJ and subsequently the Board denied this motion, ruling that the Service only recognizes expungements for certain specific classes of crimes. Carr's firearms offense did not fall within any of these classes, and, therefore, there would be no purpose in delaying deportation **\*951** to allow Carr to seek expungement. In his petition to us, Carr argues that the Service's policy of recognizing expungement for some crimes, but not the weapons offense for which he was convicted, violates his right to equal protection under the Constitution's Due Process Clause. Although Carr did not raise this constitutional objection in his administrative hearings, we conclude we should hear it. *Garberding v. INS,* 30 F.3d 1187, 1188 n. 1 (9th Cir.1994) (*Garberding* ) (issues not raised with the Board are usually waived, but an equal protection issue may be brought for the first time before us if it does not involve procedural errors).

## II

We review the Board's determination of questions of law de novo, but give deference to the Board's interpretation of the Act. *Ghaly v. INS,* 58 F.3d 1425, 1429 (9th Cir.1995). Whether a deportation proceeding violated an alien's due process rights is reviewed de novo. *Burgos–Abril v. INS,* 58 F.3d 475, 476 (9th Cir.1995).

Aliens against whom courts have rendered a "final conviction" are generally deportable. *See Gutierrez v. INS,* 323 F.2d 593, 596–97 (9th Cir.1963), *cert. denied,* 377 U.S. 910, 84 S.Ct. 1171, 12 L.Ed.2d 179 (1964); *see generally* 8 U.S.C. § 1251. However, the Service has made certain, limited exceptions to this rule. First, it will recognize the expungement, pursuant to a state statute, of crimes of moral turpitude. Thus, aliens convicted of such crimes, which otherwise would provide grounds for deportation, may avoid deportation if they receive an expungement. *See, e.g., Matter of Ibarra–Obando,* 12 I. & N. 576 (BIA 1966, AG 1967).

Second, the Service also recognizes the expungement of certain drug offenses. *See Garberding,* 30 F.3d at 1189–90. While it had been a long standing Service policy to deny recognition of expungement of drug crimes, *see Matter of A—F—,* 8 I. & N. Dec. 429, 432 (AG 1959), the Federal First Offender Act (recodified at 18 U.S.C. § 3607) altered this policy. This statute expunges the convictions of certain classes of federal drug offenders. *See* 18 U.S.C. § 3607(c) (a first time drug offender who is under 21 years of age shall receive an expungement of his crime which shall "restore such person, in the contemplation of the law, to the status he occupied before such arrest or institution of criminal proceedings"). As a result of this statute, the Attorney General will not deport an alien if the alien's federal conviction has been expunged under section 3607. *See, e.g., Matter of Seda,* 17 I. & N. Dec. 550, 553 (BIA 1980). In addition, if a state enacts a statutory counterpart to section 3607, the Service will recognize the state expungement of state drug offenses. *See In re Deris,* Int. Dec. 3102 at 12 (BIA 1989) (*Deris* ) (denying relief from deportation because the Maryland drug offense expungement statute did not "qualify as a state counterpart to the federal first offender statute"), *modified by, In re Manrique,* Int. Dec. 3250 (BIA 1995) (*Manrique* ).

Carr's weapons offense does not fall within these limited exceptions. It is not a crime of moral turpitude. *See* 🚩 *Komarenko v. INS,* 35 F.3d 432, 435 (9th Cir.1994) (precluding an alien convicted of violating California Penal Code § 245(a)(2)—the same statute pursuant to which Carr was convicted—from seeking a discretionary deportation waiver available to those convicted of crimes of moral turpitude); 🟡 *Gonzalez–Alvarado v. INS,* 39 F.3d 245, 246 (9th Cir.1994) ("[t]ypically, crimes of moral turpitude involve fraud" as well as "acts of baseness or depravity contrary to accepted moral standards" (quotations omitted)). Nor is Carr's crime an expungeable drug offense. The Board properly refused to delay deportation until Carr could receive an expungement because the Service would not recognize the expungement for deportation purposes.

Against this obvious application of the Act and its explanatory precedent, Carr makes an equal protection claim. He argues that the Service's distinction between expungeable and nonexpungeable crimes has no rational basis and thus violates his due process right of equal protection. *See* 🚩 *Garberding,* 30 F.3d at 1190 ("[C]itizens and aliens alike [ ] are protected by the Due Process Clause of the Constitution. It is equally well established that the Due Process **\*952** Clause incorporates the guarantees of equal protection." (citations omitted)). We test Carr's assertion recognizing that federal classifications of aliens "are valid unless wholly irrational." *Id.* (quotations omitted).

First, Carr points to *Garberding* as support for his claim, but this case gives him no help. It dealt with a problem resulting from the Service's practice of recognizing expungement of state convictions only if the state statute which expunged the alien's conviction substantially resembled 🟡 section 3607. *Id.* at 1188–91; *see also* 🔵 *Deris,* Int. Dec. 3102. Deportation, therefore, depended upon which state's laws the alien happened to violate. We struck down this Service practice on equal protection grounds. 🚩 *Garberding,* 30 F.3d at 1191 ("distinguishing *Garberding* for deportation because of the breadth of Montana's expungement statute, not because of what she did, has no logical relation to the fair administration of the immigration laws").

Following *Garberding,* the Service abandoned the approach, exemplified in *Deris,* of recognizing state expungements only when the state expungement statute is a "counterpart" to the federal first offender statute. Instead, under current practice, the Service will not deport an alien convicted under state law if the alien can "establish[ ] that he would have been eligible for federal first offender treatment." 🔵 *Manrique,* Int. Dec. 3250 at 11. The Service declared that *Deris* and similar cases are thereby "modified" to reflect this new understanding of the law. *Id.*

Carr asserts that *Garberding* somehow requires us to hold that the Service's distinction between firearms on the one hand, and moral turpitude and drug crimes on the other, is irrational and violative of due process. *Garberding,* however, ruled only on the constitutionality of treating aliens differently on the basis of which state laws they violated. It concluded only that treating aliens differently on the basis of their state expungement statute is irrational; it did not speak to the issue of treating aliens differently on the basis of the crimes they had committed. Because the holding of *Garberding* is so limited, it cannot serve Carr's purpose of showing that the Service's distinctions based on the crimes aliens commit violate due process.

As a second argument, Carr asserts that it is irrational to allow expungement for crimes of moral turpitude, but not for weapons offenses, where many crimes of moral turpitude would seem greatly more egregious than firearms offenses. 🚩🔶 *Cabasug v. INS,* 847 F.2d 1321 (9th Cir.1988) (*Cabasug* ), prevents our adoption of this argument.

*Cabasug* dealt with a slightly different issue: whether the Service can rationally deny discretionary deportation or exclusion relief under section 212(c) of the Act, 🟡 8 U.S.C. § 1182(c), to aliens convicted of firearms offenses, but not to aliens convicted of more serious crimes. The principle adopted in *Cabasug* is clear: the Service can craft different policies for firearms offenses even though some would view them as out of line with its policy towards other crimes. *See* 🚩🔶 *Cabasug,* 847 F.2d at 1327 ("We do not agree that all crimes of moral turpitude are necessarily more serious than possession of a sawed-off shotgun or machine gun. We also do not agree with the implicit proposition that the Constitution requires Congress to lay out crimes on a

96 Cal. Daily Op. Serv. 4634, 96 Daily Journal D.A.R. 7460

spectrum...."). Therefore, considering that *Cabasug* allowed the Service to treat firearms violations differently in the context of eligibility for discretionary deportation or exclusion relief under section 212(c) of the Act, the Service may do so in the context of expungement recognition as well.

PETITION DENIED.

**All Citations**

86 F.3d 949, 96 Cal. Daily Op. Serv. 4634, 96 Daily Journal D.A.R. 7460

## Footnotes

\*    Honorable William D. Browning, United States District Judge, District of Arizona, sitting by designation.

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

129 F.3d 29
United States Court of Appeals,
First Circuit.

Ran CHOEUM, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

Nos. 96–1446, 97–1552.
|
Heard May 9, 1997.
|
Decided Nov. 5, 1997.

**Synopsis**

Alien who had pleaded guilty to burglary and kidnapping in state court petitioned for review of final orders of the Board of Immigration Appeals (BIA) denying alien's applications for asylum and withholding and for discretionary waiver, and denying alien's motions to reopen. The Court of Appeals initially upheld BIA's decisions, and, on rehearing, the Court of Appeals, Lynch, Circuit Judge, held that: (1) alien's motion to reopen, but not judicial review of BIA decisions, was "action taken" within meaning of Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), for purpose of review under Antiterrorism and Effective Death Penalty Act (AEDPA); (2) alien was not entitled to separate determination of dangerousness to community in connection with denial of withholding of deportation; (3) regulation supporting denial of asylum did not exceed authority delegated by Congress; and (4) BIA did not abuse its discretion in denying waiver of deportation.

Affirmed in part and dismissed in part.

Opinion, 118 F.3d 17, withdrawn.

**Attorneys and Law Firms**

**\*31**  Richelle S. Kennedy, Boston, MA, with whom Steven W. Hansen and Bingham, Dana & Gould LLP, were on brief, for petitioner.

David V. Bernal, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, Department of Justice, Washington,  **\*32**  DC, with whom Philemina McNeill Jones, Assistant Director, and Frank Hunger, Assistant Attorney General, Civil Division, Department of Justice, were on brief, for respondent.

Before TORRUELLA, Chief Judge, BOWNES, Senior Circuit Judge, and LYNCH, Circuit Judge.

**Opinion**

LYNCH, Circuit Judge.

The difficulty of wending through this country's immigration laws—for the immigrants involved, for the courts, and even for the federal agencies charged with enforcing the laws—is illustrated by this case. For the courts, what is involved is properly ascertaining congressional intent in light of constitutional guarantees in decision of cases. For this Cambodian immigrant, Ran Choeum, what is involved is whether she will be deported, possibly back to that war-torn land she left when she was a child. She petitions for review of two decisions of the Board of Immigration Appeals ("BIA"), one dated February 9, 1996, denying

her applications for asylum and withholding and for discretionary waiver, and one dated April 22, 1997, denying her motions to reopen.

In the interim, the complexity of the immigration laws was enhanced by two new statutes. On April 24, 1996, the Antiterrorism and Effective Death Penalty Act, Pub.L. 104–132, 110 Stat. 1214 (1996) ("AEDPA"), was signed into law. On September 30, 1996, (the same day Choeum moved to reopen before the BIA) the Illegal Immigration Reform and Immigrant Responsibility Act, Pub.L. 104–208, 110 Stat. 3009 (1996) ("IIRIRA"), was signed into law. Both statutes contain jurisdiction-stripping provisions removing from the federal circuit courts of appeals their previous jurisdiction over certain categories of final orders of deportation.

This case was originally argued on May 9, 1997. In a decision dated July 2, 1997, we upheld the decisions of the BIA on reasoning which rejected particular arguments by both sides. Each party filed petitions for rehearing. The Immigration and Naturalization Service (INS), in its rehearing petition, for the first time raised a new argument that this court lacked jurisdiction to review both of the BIA orders because AEDPA § 440(a) precludes jurisdiction over deportations for "aggravated felonies" under IIRIRA § 321.

It would have been vastly preferable, of course, for the INS to have asserted this jurisdictional argument initially, and we have some concern about the government's burdening of immigrants with the obligation to respond to new-found statutory interpretations by the INS after a case has been heard and decided.[1] Nonetheless, because rehearing was timely sought and parties may not waive issues of subject matter jurisdiction,[2] we granted rehearing on particular issues. We withdraw our earlier opinion and restate in this opinion those of our earlier conclusions which remain pertinent. We conclude that we have jurisdiction to review the first decision of the BIA, which requires deportation, and sustain that decision on its merits. We conclude that we lack jurisdiction over the second BIA decision, denying Choeum's petition to reopen.

## I.

Ran Choeum, an immigrant from Cambodia, pleaded guilty in New York state court to charges of burglary and kidnapping. The charges stemmed from a crime in which Choeum's boyfriend, seeking to settle a family grievance, murdered two elderly relatives of his sister's fiancé. Choeum, who left the scene before the murders took place, pleaded guilty to burglary and kidnapping in order to avoid a possible murder conviction under the felony murder rule. While Choeum was in **\*33** prison, deportation proceedings against her commenced.

Choeum seeks review of the BIA order of deportation of April 24, 1996. She argues that AEDPA changes the standard for determining whether an alien is eligible for withholding of deportation. She also argues that the Attorney General's regulation under which her application for asylum was denied exceeds the authority delegated to the Attorney General by Congress. Finally, she contends that the BIA abused its discretion in failing to grant her discretionary relief from deportation. She also petitions for review of the BIA's decision of April 22, 1997, denying her motion to reopen.

The INS, for its part, argues that, under AEDPA, this court lacks jurisdiction to review Choeum's petitions. The jurisdictional argument comes in two parts. First, the INS argues that this court has no jurisdiction over either petition for review because AEDPA § 440(a), 8 U.S.C. § 1105a(a)(10), removes jurisdiction over deportations for "aggravated felonies" as that term is more broadly defined in IIRIRA § 321(a), 8 U.S.C. § 1101(a)(43). In light of the effective date provided in IIRIRA § 321(c), we agree that there is no jurisdiction over the second petition on this ground, but the first petition survives this attack. Second, the INS argues there is still no jurisdiction over the first petition for review because she is an alien who has committed a firearms offense under 8 U.S.C. § 1251(a)(2)(C), in this case, burglary, and AEDPA § 440(a) does not permit review of deportations based on such grounds. We hold that judicial review remains available because in the agency deportation proceedings, Choeum

was charged with deportability based only on her kidnapping offense, which is a crime of moral turpitude under 8 U.S.C. § 1251(a)(2)(A)(i), and not with a firearms offense.

We further hold that the INS may not substitute alternative grounds for deportation at this stage in the proceedings, and that its argument fails both as a matter of statutory construction and because it raises due process concerns under the Constitution. Therefore, AEDPA does not deprive this court of jurisdiction to hear Choeum's first petition. Choeum's legal arguments, however, while ably made, do not convince us that the BIA erred in denying Choeum the various forms of relief sought. Accordingly, the BIA's decision is affirmed.

## II.

Ran Choeum was born in a small Cambodian village in 1969. She was one of twelve children; her father was a soldier and her mother supported the family by rice farming. In 1973, her father was killed. The Khmer Rouge came to power in the area in 1975, and Choeum's mother, fearing retaliation for her husband's military activities, fled with her children to another village. Choeum's mother died in 1978 of starvation and illness. In 1979, Choeum's oldest sister brought Choeum and two other sisters, the only surviving members of the family, to a refugee camp in Thailand; they lived in various camps for the next five years.

On March 27, 1985, Choeum and her sisters were admitted to the United States as refugees; Choeum was later granted permanent resident status, retroactive to that date. The Choeums' sponsors helped them to obtain welfare and housing. Choeum, who was fifteen at the time, had never been to school in Cambodia and spoke no English. Choeum briefly attended high school in Brooklyn, but dropped out when she became pregnant by her boyfriend, a Cambodian immigrant named Lak Ling. Choeum's son Wicky was born on January 2, 1987. At Lak Ling's request, Choeum and her son moved to Philadelphia to live with his relatives.

In June 1988, Lak Ling, Choeum and the baby travelled to New York for Ling's sister's engagement party. When they arrived at Ling's parents' house, they learned that the sister, who was only fourteen, and her fiancé, a twenty-eight year old Cambodian man, had disappeared and that the fiancé's family had not paid the $2,000 dowry owed Ling's family.

The next night, June 5, Choeum went outside to buy ice cream for her son. She saw Ling in a car with three Chinese men she did not know. Ling told her to get in the car, and told her that they were going to get his **\*34** sister. When they arrived at a large apartment house on Ocean Avenue, Brooklyn, they all went upstairs and Ling told Choeum to knock on the door of the apartment where Ling's sister's fiancé's parents lived. No one answered. After driving around, they returned to the house and the Chinese men knocked on the door. One of the men was carrying a paper bag.

This time, the door was opened. The men went in, and Choeum followed. The Chinese men began searching the apartment, while Ling talked to his sister's fiancé's parents. The Chinese men began piling up money and jewelry on the floor in front of the parents. One of the Chinese men brought two young children into the room. Ling instructed them to tie the children up. Ling assured Choeum that he was just trying to scare the parents into revealing where his sister was. The men brought the children into another room, took out a knife, cut the telephone cord, and bound the children with it. One of the children says that Choeum helped tie up the children and put tape on their mouths. According to Choeum, she merely watched, and then she noticed that her boyfriend was holding a gun. Choeum asserts that she became scared, went back into the other room, and untied the children; the Immigration Judge, however, did not credit this testimony. One of the men yelled at her to get out when he saw her near the children. All four men then screamed at Choeum to leave and wait in the car. She went outside and waited. When the men returned to the car fifteen minutes later, she asked if anything had happened; Ling assured her that everything was fine. Choeum returned to Ling's parents' house.

The next morning, Choeum was arrested. It was then that she learned that the two adults at the Ocean Avenue apartment had been murdered. She was charged with a variety of crimes, but agreed to cooperate with the police and to help them find Ling.

Facing a possible murder conviction, Choeum pleaded guilty to kidnapping in the third degree and burglary in the first degree, with a three to nine year sentence.

While in prison, Choeum received favorable performance assessments, particularly from her teachers. She made rapid progress in English, and came close to achieving a GED despite her complete lack of formal education. Choeum was released in September 1991. She moved to Lowell, Massachusetts to live with her sisters and their children. She enrolled in job training programs, eventually finding a manufacturing job. The social services professionals who worked with her were impressed by her eagerness to work and to improve herself.

In 1993, Choeum gave birth to a second son, David. David's father left her after she became pregnant and has no contact with his son. Choeum quit her job when she became pregnant with David, and receives welfare and food stamps. Choeum still resides near her sisters in Lowell, and helps them, as none of the others are proficient in English. Choeum's older son, Wicky, lives in Philadelphia with Lak Ling's parents, who gained custody of him during Choeum's imprisonment. Choeum does not see Wicky often, but speaks to him monthly on the phone. Choeum asserts in her most recent affidavit that she is pregnant with a third child. She also asserts that, because she fears for their safety, she would leave Wicky and David in this country were she to be deported to Cambodia.

III.

Deportation proceedings were initiated against Choeum with the issuance of an Order to Show Cause ("OSC") on September 18, 1990. The OSC charged Choeum with deportability pursuant to the then-current version of Section 241(a)(4) [3] of the Immigration and Nationality Act ("INA"), in that she had been convicted of a crime of moral turpitude committed within five years after entry and sentenced to imprisonment for a year or more. The OSC stated that the crime of moral turpitude was kidnapping. The OSC did not refer to Choeum's burglary conviction either in the factual allegations or in the grounds for deportability.

**\*35** In her responsive pleadings, filed March 31, 1992, Choeum admitted the factual allegations in the OSC and conceded deportability as charged. She also sought the opportunity to apply for asylum, withholding of deportation, and waiver of deportability pursuant to INA § 212(c), 🔖 8 U.S.C. § 1182(c).

A hearing was held before an Immigration Judge on August 7, 1992. The facts and circumstances of Choeum's crime were fully explored, including through testimony by Choeum's defense attorney. The Immigration Judge denied her applications for asylum under INA § 208(a), 🔖 8 U.S.C. § 1158(a), and for withholding of deportation under INA § 243(h), 8 U.S.C. § 1253(h), on the grounds that such applications must be denied if the alien, having been convicted of a particularly serious crime in the United States, constitutes a danger to the community. The Immigration Judge found that, based on all the evidence concerning Choeum's burglary and kidnapping convictions, she had "in fact been convicted of a particularly serious crime." He noted that the BIA has interpreted the statutory language to mean that an alien convicted of a particularly serious crime necessarily constitutes a danger to the community. Therefore, he ruled, Choeum was not eligible for asylum or withholding of deportation.

Regarding Choeum's application for a discretionary waiver under INA § 212(c), the Immigration Judge engaged in a careful balancing of the equities. Going through factors identified as significant by the BIA, the Immigration Judge found that Choeum's separation from Wicky and her sisters and the conditions in Cambodia were significant factors, but those facts did not overcome the egregious and horrible nature of her crime. On this ground, the Judge denied Choeum's application for discretionary waiver as well.

Choeum appealed the decision to the BIA, arguing that the equities, including the birth of her second child after the hearing, warranted an exercise of favorable discretion under INA § 212(c), and that the Immigration Judge should have made a separate

determination that Choeum posed a danger to the community before denying her applications for asylum and withholding of deportation. In a decision dated February 9, 1996, the BIA dismissed Choeum's appeal, reaffirming its view that an alien who has been convicted of a particularly serious crime necessarily constitutes a danger to the community and is ineligible for withholding of deportation and asylum. The BIA further found that the Immigration Judge gave proper consideration to the discretionary factors in denying Choeum's request for Section 212(c) relief.

AEDPA was signed into law on April 24, 1996. Choeum's petition for review was filed with this court on May 9, 1996. On September 30, 1996, Choeum filed a motion to reopen with the BIA, based on new evidence, particularly the birth of David and the expectation of a third child, and on the argument that AEDPA § 413(f), 8 U.S.C. § 1253(h), removed the bar to withholding of deportation for aliens convicted of particularly serious crimes. The BIA denied Choeum's motion to reopen on April 22, 1997, finding that under AEDPA § 440(d), Choeum was now statutorily ineligible for INA § 212(c) relief, and rejecting her interpretation of AEDPA § 413(f). Choeum has asked this court to review this decision as well.

## IV.

A. *Jurisdiction: The Effective Date of IIRIRA § 321(c)*

 Correctly pointing out that Congress in the IIRIRA expanded the definition of "aggravated felonies" and precluded judicial review over deportations for aggravated felonies, the INS argues this court lacks jurisdiction over both petitions. Because we agree that kidnapping, the basis for the order deporting Choeum is an "aggravated felony,"[4] the decisive question has to do with **\*36** when this new definition became effective and the application of that effective date to the facts of this case.

IIRIRA § 321(c) establishes the "effective date" after which these definitions of "aggravated felony" are binding:

> The amendments made by this section shall apply to *actions taken* on or after the date of the enactment of this Act, regardless of when the conviction occurred....

IIRIRA § 321(c) (emphasis added). The IIRIRA was enacted on September 30, 1996, so federal courts may not hear appeals from "actions taken" regarding final orders for deportation occurring after September 30, 1996 where the basis for deportation is commission (at any time) of an "aggravated felony."

IIRIRA § 321(c) does not itself define "actions taken." Neither of the interpretations offered by the parties appear appropriate. Choeum argues that the most sensible interpretation of "actions taken" is that it refers to immigration proceedings brought against the immigrant. Choeum thus characterizes "actions" in the immigration context as analogous to a *civil* action. Choeum cites Black's Law Dictionary in support of this proposition, that "action" should be defined in its "usual sense" as a "lawsuit brought in court"—*i.e.,* the filing of the complaint. Under this definition, "actions taken" would refer only to removal proceedings *begin* after September 30, 1996, with no retroactive application to pending proceedings. The INS began removal proceedings against Choeum in 1990.

The INS argues that "actions taken" means *any* action taken regarding the case constitutes an "action taken." The INS argues that judicial review is such an action. Thus, this court's exercising of jurisdiction over the matter (by hearing the case in May, 1997), the INS argues, causes the court to be divested of jurisdiction. The INS relies for support on a two page, per curiam opinion in Mendez–Morales v. INS, 119 F.3d 738 (8th Cir.1997), which decides that "[b]ecause judicial review by this court would be an 'action taken' for purposes of IIRIRA § 321(c), we have no jurisdiction to hear [petitioner's] appeal." *Id.* at 739. That court did not explain this statement nor cite to authority. As to the second petition, the INS says that this court has no

jurisdiction because, in any event, the BIA's denial of Choeum's motion to reopen her case constitutes an "action taken" after the September 30, 1996 date. We agree only with the latter argument.

Both sides present untenable definitions in their arguments. It is not obvious that "action" in the immigration context does or should have the same meaning as an "action" in the civil context. The court of appeals review actions by the administrative agency in deportation cases and Choeum attacks four different actions on review. Choeum's position assumes there can be only one action, and that is the initial filing in a matter. The INS's position is also flawed: it is unlikely Congress intended the very act of exercising jurisdiction to trigger the destruction of that jurisdiction. If Congress had intended to affect every petition pending in a court, there was much clearer language available to express such an intent. Neither does it make sense that federal jurisdiction should be dependent on when a court schedules a hearing on a particular petition. For example, it seems irrational that a federal court would have jurisdiction over a matter if it heard argument on September 29, 1996, but would *not have* jurisdiction if it postponed the argument until October 1, 1996.

*Valderrama–Fonseca v. INS,* 116 F.3d 853 (9th Cir.1997) is the only other opinion we have found that considers the definition of "actions taken" under IIRIRA § 321(c). The facts are similar to this case. The INS sought to deport an alien because he had committed burglary, a crime of "moral turpitude;" the INS then argued that AEDPA § 440(a) precluded judicial review of the final order of deportation because the crime was also an "aggravated felony" under 8 U.S.C. § 1101(a)(43). There was no question that the alien's offense would constitute an "aggravated felony" if the revised definition **\*37** were applicable under IIRIRA § 321(c); hence the precise issue upon which jurisdiction depended was whether an "action" had been "taken" after September 30, 1996.

The court offered three potential definitions of "actions taken." "Actions taken" could refer to: (*l* ) orders and decisions issued against an alien by the Attorney General acting through the BIA or Immigration Judge, (2) steps taken by the alien, such as applying for discretionary relief, (3) to any action by anyone, including a circuit court. *Id.* at 856. The court did not consider Choeum's proposed definition: that "actions taken" refers exclusively to the commencement of deportation proceedings against the alien.

We largely agree with the holding of *Valderrama–Fonseca.* The third reading is improbable: it makes no sense that federal jurisdiction should be based on the oral argument calendar. The second definition is plausible, as IIRIRA § 309(c)(4)(A) refers to an "action for judicial review," which would be initiated by the client herself. But we need not decide the issue on the facts of this case. Choeum filed her first petition for review on May 9, 1996 well before the effective date. The first definition is the strongest and most sensible: that "actions taken" refers to actions and decisions of the Attorney General. "This makes logical and practical sense, as 'actions taken' is easily understood to encompass things done by an agency to an alien." *Id.* This interpretation is also consistent with how the word "actions" is used in another section of the INA limiting federal court jurisdictional section of the INA, 8 U.S.C. § 1252(g):

> Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

We conclude that jurisdiction over Choeum's first petition is not removed by virtue of AEDPA § 440(a). The decision of the immigration judge and the BIA's affirmance all occurred prior to October 1, 1996, so the revised "aggravated felony" rules in IIRIRA § 321(a) do not apply. By the same reasoning, this court does *not* have jurisdiction over Choeum's second petition,

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

because the BIA's denial of Choeum's motion to reopen occurred on April 22, 1997, which is *after* the October 1, 1996 triggering date for applicability of the "aggravated felony" rules. We dismiss the second petition.

B. *Jurisdiction: AEDPA and Basis for BIA's Deportation Order*

The INS also filed a motion to dismiss with this court, arguing that Section 440(a) of AEDPA, apart from IIRIRA, deprives this court of jurisdiction to hear this case. That section ousts the jurisdiction of the federal courts to review the deportation petitions of, among other classes of aliens, aliens deportable by reason of firearms offenses under 📑 8 U.S.C. § 1251(a)(2)(C). The INS contends that Choeum's burglary conviction was such an offense. However, at the deportation proceedings, the INS did not assert the burglary offense as a basis for deportation. Instead, the INS rested on the kidnapping offense, although the INS did not argue that the kidnapping was also a firearms offense. The INS's argument seems to be that because it *might* have sought to deport Choeum based on her burglary-firearms conviction, even though it chose *not* to do so, this court lacks jurisdiction to review Choeum's deportation based upon her kidnapping non-firearms offense because this court lacks jurisdiction over a burglary-firearms based deportation, even though this was not the basis for deportation.

Section 440(a) of AEDPA amended Section 106(a)(10) of the INA, 📑 8 U.S.C. § 1105a(a)(10), [5] to provide that final orders **\*38** of deportation against aliens who are "deportable by reason of having committed" certain types of criminal offenses, including firearms offenses, "shall not be subject to review by any court." AEDPA § 440(a), 110 Stat. at 1276–77. This provision of AEDPA applies to pending cases. 📑 *Kolster v. INS,* 101 F.3d 785, 790 (1st Cir.1996). Under AEDPA, judicial review remains available to aliens who have committed other types of offenses, including aliens who have been convicted of only one crime of moral turpitude. *See* AEDPA § 440(a); 📑 8 U.S.C. § 1251(a)(2)(A).

The INS contends that the first degree burglary charge to which Choeum pleaded guilty was a firearms offense as defined by Section 241(a)(2)(C) of the INA, which renders deportable any alien who "is convicted under any law of ... using ... any weapon ... which is a firearm ... in violation of any law." 📑 8 U.S.C. § 1251(a)(2)(C). Therefore, the INS contends, Choeum is "deportable by reason of having committed" a firearms offense and Section 440(a) of AEDPA deprives this court of jurisdiction to hear her petition.

Choeum makes two responses to the INS's argument. First, Choeum argues that she was not, in fact, convicted of a firearms offense, as her plea colloquy reveals that she herself did not "use" a handgun. [6] Second, Choeum points out, correctly, that the OSC only referenced the kidnapping conviction.

It is undisputed that the burglary conviction was not charged as a basis for deportation in the OSC, and that Choeum's concession of deportability only encompassed the grounds charged in the OSC, *i.e.* that she was in fact deportable because the kidnapping conviction was a crime of moral turpitude. The Immigration Judge did, as the INS points out, hear extensive testimony on the nature of Choeum's crime. Notably, however, he did not attempt to determine whether Choeum had used a firearm, because that was not an issue in the proceedings before him.

The INS's argument is essentially a linguistic one. According to the INS, for purposes of jurisdiction, aliens "deport*able by reason of*" having committed firearms offenses are not only those aliens who *have been ordered deported* for firearms offenses, but also those aliens who *could be* deported for that reason. As a matter of statutory construction, that argument is somewhat illogical: The contested phrase comes from Section 440(a) of AEDPA, a statutory section solely concerned with final orders of deportation. The section therefore applies, by its very terms, only to aliens who have actually been adjudged deportable. It is therefore highly doubtful that, in that context, Congress meant "deportable by reason of" to mean, as the INS would have it, "potentially susceptible to being deported by reason of ..."

The reading of the statute that the INS proposes also raises due process concerns. "It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Reno v. Flores,* 507 U.S. 292, 306, 113 S.Ct. 1439, 1449, 123 L.Ed.2d 1 (1993). At the core of these due process rights is the right to notice of the nature of the charges and a meaningful opportunity to be heard. *See, e.g.,* *Kwong Hai Chew v. Colding,* 344 U.S. 590, 596–98, 73 S.Ct. 472, 477–78, 97 L.Ed. 576 (1953); *Kaczmarczyk v. INS,* 933 F.2d 588, 596 (7th Cir.1991)(citing cases).

**\*39** We do not need to determine what form of notice would be constitutionally required, because the statutory and regulatory scheme under which deportation proceedings are conducted mandate specific procedures. The INA itself provides that, in deportation proceedings, written notice—referred to as an order to show cause—shall be given to the alien specifying, among other things, "[t]he charges against the alien and the statutory provisions alleged to be have been violated." 8 U.S.C. § 1252b(a)(1)(D). INS regulations permit the INS to lodge additional charges of deportability "at any time during a hearing" before an Immigration Judge, but specifically state that these charges must be submitted in writing for service on the alien and for entry into the record, that the Immigration Judge shall read the additional charges to the alien and explain them to her, and that the alien may have a reasonable time, including requesting a continuance, to respond to additional charges. 8 C.F.R. § 242.16(d). It is undisputed that the INS did not, at any time, reopen deportation proceedings to comply with these statutory and regulatory formalities.

In *Hirsch v. I.N.S.,* 308 F.2d 562 (9th Cir.1962), the BIA had ordered petitioner deported on the basis of crimes which were admitted into evidence at his deportation hearing, but which were never added to the INS's charge against him. The court found that this procedure not only violated INS regulations similar to the ones discussed above, but also contravened basic notions of procedural due process:

[A]t all pertinent times, petitioner was entitled to a statement of the charges against him, to a hearing of those charges, and to answer them.

Procedural due process requires no less, and such due process is required in such a hearing. We have frequently commented upon the severity of the remedy of deportation, with the consequent requirement that prescribed procedures must be followed for the protection of the alien. Surely being advised of the charges upon which the proceeding is based is fundamental to due process.

*Id.* at 566–67 (internal citations omitted).

Here the INS is not actually attempting to deport the petitioner on uncharged grounds, but rather using uncharged grounds to cut off judicial review. However, this court has found that even arguably lesser deprivations of notice and the opportunity to be heard "ran afoul of petitioner's procedural rights." *Gebremichael v. INS,* 10 F.3d 28, 39 (1st Cir.1993) (holding that BIA could not rely on extra-record facts concerning human rights in Ethiopia without affording petitioner an opportunity to respond). In these circumstances, where the word "deportable" has a meaning that the context makes plain, and the INS asks us to choose a different interpretation, we are influenced by the maxim of statutory construction that tells us to interpret statutes so as to avoid constitutional concerns. *See, e.g.,* *Frisby v. Schultz,* 487 U.S. 474, 483, 108 S.Ct. 2495, 2501, 101 L.Ed.2d 420 (1988); *United States v. Three Juveniles,* 61 F.3d 86, 90 (1st Cir.1995). We therefore reject the INS's suggested interpretation of Section 440(a)'s use of "deportable by reason of."

The INS suggests that this court can make the necessary determination that Choeum's offense was a firearms offense, implying that briefing and argument before this court provide sufficient notice. The INS points out that in *Kolster,* we termed deportability "a largely mechanical determination based on facts that can often be objectively ascertained." 101 F.3d at 789. That description, of course, assumes that the necessary facts will be before the decision maker. Use of a firearm not being an issue in the proceedings below, the record before this court cannot be considered complete and the INS argument fails on pragmatic

grounds. [7] More importantly, **\*40** it is not the institutional role of this court to serve as a factfinding body on issues of first impression.

We hold that the INS cannot, consistent with due process and the statutory and regulatory requirements governing its own proceedings, substitute new grounds for deportation at this stage in the proceedings, solely for the purposes of depriving the federal courts of jurisdiction. [8] We therefore need not determine whether or not Choeum's conviction for burglary in the first degree constitutes a firearms offense. We turn to Choeum's claims of legal error, based on the grounds on which the INS actually proceeded.

<div align="center">V.</div>

Choeum appeals the February 9, 1996 denial of her applications for three separate types of relief from deportation: (1) withholding of deportation under Section 243(h) of the INA, 8 U.S.C. § 1253(h); (2) asylum under 8 U.S.C. § 1158; [9] and (3) discretionary waiver of deportability under Section 212(c) of the INA, 8 U.S.C. § 1182(c). [10] We address each of these claims in turn.

*A. Withholding of Deportation*

Choeum's argument with regard to withholding of deportation again requires us to consider the effect of AEDPA's amendments to the immigration laws. Section 243(h)(1) of the INA, 8 U.S.C. § 1253(h)(1), provides that:

> The Attorney General shall not deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

An alien who meets this standard of eligibility, and who does not fall under a statutory exception, is *entitled* to withholding of deportation; the Attorney General does not have discretion in Section 243(h) proceedings. *Cardoza–Fonseca,* 480 U.S. at 429, 107 S.Ct. at 1212. However, Section 243(h)(2) does enumerate several classes of aliens to whom Section 243(h)(1) does not apply. 8 U.S.C. § 1253(h)(2). One such exception is where "the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States." 8 U.S.C. § 1253(h)(2)(B)( "the Particularly Serious Crime Exception").

The BIA has interpreted this exception to require only a determination of whether an alien's crime is "particularly serious"; according to the BIA, an alien convicted of a particularly serious crime necessarily constitutes a danger to the community. *See, e.g.,* **\*41** *Matter of K-,* 20 I. & N. Dec. 418, 1991 WL 353530, \*3 (BIA Nov. 5, 1991); *Matter of Carballe,* 19 I. & N. Dec. 357, 360 (BIA 1986)("The phrase 'danger to the community' is an aid to defining 'particularly serious crime,' not a mandate that administrative agencies or the courts determine whether an alien will become a recidivist."). This court, while acknowledging that there is "considerable logical force" to the argument that the Particularly Serious Crime Exception requires a separate determination of dangerousness to the community, has upheld the agency's interpretation under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Mosquera–Perez v. INS,* 3 F.3d 553 (1st Cir.1993).

The Immigration Judge here made a specific finding that Choeum's crime was a particularly serious one, and then, applying the BIA interpretation of the Exception, determined that Choeum was ineligible for withholding of deportation. The BIA similarly rejected Choeum's argument that she was entitled to a separate determination of whether she poses a danger to the community. Were it not for AEDPA, that, under *Mosquera–Perez,* would be the end of it.

However, in Section 413(f) of AEDPA, Congress amended Section 243(h) of the INA to include a new subsection (h)(3). The new provision states, in relevant part:

> Notwithstanding any other provision of law, paragraph (1) [the withholding provision] shall apply to any alien if the Attorney General determines, in the discretion of the Attorney General, that
>
> ...
>
> (B) the application of paragraph (1) to such alien is necessary to ensure compliance with the 1967 United Nations Protocol Relating to the Status of Refugees.

8 U.S.C. § 1253(h)(3).

Choeum argues that, by directing that the withholding provisions be applied so as to "ensure compliance" with the 1967 United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577 (the "Protocol"), "not withstanding any other provision of law," Congress incorporated the Protocol into United States statutory law. The Protocol, Choeum argues, requires a separate, individualized determination that the alien is *currently* a danger to the community. Thus, according to Choeum, Section 413(f) of AEDPA expressed a congressional intent to reject the BIA's rulings that Section 243(h)(2) requires only a determination that the alien has been convicted of a particularly serious crime. [11]

The Protocol binds its signatories to compliance with the substantive provisions of the 1951 United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150, 176 (1954)189 U.N.T.S. 150, 176 (1954), 19 U.S.T. 6259, 6278, T.I.A.S. No. 6577 (1968) (the "Convention"). Article 33.1 of the Convention prohibits the "refoulement"—the forced return or expulsion—of a refugee to territories where his life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group, or political opinion. Art. 33.1, 19 U.S.T. at 6276. Article 33.2 of the Convention provides an exception to this principle of "nonrefoulement":

> The benefit of the present provision may not, however, be claimed by a refugee for whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or *who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country.*

Art. 33.2, 19 U.S.T. at 6276(emphasis added).

The United States statutory law on withholding, including the Particularly Serious Crime Exception, thus closely mirrors the language of the Convention. (This is not **\*42** surprising, as Congress, when it enacted the relevant provisions of Section 243(h) in 1980, specifically intended to bring United States refugee law into conformance with the Protocol. *See* Cardoza–Fonseca, 480 U.S. at 436–37, 107 S.Ct. at 1215–16; *Mosquera–Perez,* 3 F.3d at 556.) As the express terms of the Convention do not differ from those of the United States' Particularly Serious Crime Exception, the explicit reference to the Protocol in AEDPA's Section 413(f) would not appear to modify that Exception.

Choeum argues, however, that Section 413(f) expresses a congressional intent to incorporate the United Nations' interpretation of the Protocol's withholding provisions into United States immigration law. She refers this court to an advisory opinion on AEDPA issued by Representative Anne Willem Bijleveld of the United Nations High Commissioner for Refugees ("UNHCR") to the American Immigration Lawyers Association, and to the UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status* (1979)("UNHCR Handbook").

Mr. Bijleveld's opinion takes the position that the Protocol requires a signatory state to make a separate determination that the refugee it seeks to expel is a danger to the community. The UNHCR Handbook, for its part, does not unambiguously support Choeum's position. The UNHCR Handbook, while requiring an individualized determination of the applicability of Article 33.2's exclusion clause, focusses on the definition of "serious non-political crime" and does not explicitly require a separate dangerousness determination. *See* UNHCR Handbook, *supra*, ¶¶ 154–57, at 36–37.

The INS, in contrast, points this court to *Matter of Q–T–M–T–,* Interim Dec. 3300, 1996 WL 784581, *16 (BIA Dec. 21, 1996). In *Matter of Q–T–M–T–,* the BIA held that Section 413(f) of AEDPA did not require a separate dangerousness determination:

> [W]e have consistently held that neither the Convention and Protocol nor section 243(h)(2)(B) of the Act requires a separate "dangerousness" determination "focusing on the likelihood of future misconduct on the part of the alien." ... [E]very reviewing court reaching this issue has sustained our prior holding in this regard. Indeed, in 1995, the Attorney General issued a regulation adopting this construction of section 243(h)(2)(B). 8 C.F.R. § 208.16(c)(2)(ii)(1995). Moreover, there is nothing in the legislative history of either the AEDPA or the IIRIRA suggesting that Congress had any intent to override this well-settled construction of the law. And, particularly in enacting the IIRIRA, Congress reflected its ability to clearly address and override Board and judicial constructions of the law which it deemed erroneous. Thus, we do not find our ruling on this issue [to be] affected by section 243(h)(3) of the Act.

*Id.*

The INS further argues that the reason for enacting Section 413(f) was that AEDPA expanded the definition of "aggravated felony" to include crimes that might be considered less serious than those the Protocol intended to cover in its exclusion clause. Section 243(h)(2) of the INA, 8 U.S.C. § 1253(h)(2), expressly states that, for withholding purposes, "an alien convicted of an aggravated felony shall be considered to have committed a particularly serious crime." The INS contends that AEDPA Section 413(f) was thus intended to preserve the Attorney General's flexibility in assessing whether crimes now defined as aggravated felonies were, in fact, "particularly serious" within the meaning of the Protocol.

In interpreting Section 413(f) of AEDPA, we must first determine if the statutory language makes the intent of Congress clear and unambiguous; if the statute is ambiguous, we give deference to the BIA's interpretation of the immigration laws, unless that interpretation is arbitrary, capricious, or contrary to the statute. *Chevron,* 467 U.S. at 842–45, 104 S.Ct. at 2781–83 (1984); *Mosquera–Perez,* 3 F.3d at 554.

The plain language of Section 413(f) is not very illuminating. It directs the Attorney General to ensure compliance with the Protocol, yet as noted, the language of the Protocol's withholding provisions has already been codified as United States statutory law. Section 413(f) thus appears, at first glance, to be **\*43** surplusage. The legislative history of AEDPA is similarly unhelpful.

The import of Section 413(f) is thus ambiguous, and we turn to the agency interpretation. The reasoning behind the BIA's interpretation is fairly persuasive. Congress is presumed to be aware of the BIA's longstanding construction of the Particularly Serious Crime Exception. *See Mosquera–Perez,* 3 F.3d at 559. If Section 413(f) of AEDPA were meant to correct that construction, Congress certainly would have done so in a less oblique fashion. We also note that Section 413 of AEDPA, as a whole, is entitled "Denial of Other Relief to Alien Terrorists," and that the legislation shows few, if any, indications of having

intended to *expand* the rights of criminal aliens. In this context, the INS's explanation of why Section 413(f) was enacted is certainly a reasonable one.

In turn, Choeum's arguments are unpersuasive. As noted, the UNHCR Handbook does not unambiguously support her interpretation of the Protocol. Moreover, the Supreme Court, while acknowledging that the UNHCR Handbook is "useful in giving content to the obligations that the Protocol establishes," expressly disclaimed the suggestion that the Handbook had "the force of law or in any way binds the INS." *Cardoza–Fonseca,* 480 U.S. at 439 n. 22, 107 S.Ct. at 1217 n. 22.

In this context, where the statute is ambiguous, and the BIA has offered a reasonable interpretation of its provisions, it would be improper for this court to substitute the advisory opinion of an international body for the reasoned judgment of the domestic administrative agency with primary responsibility for administering the statute. Accordingly, we find that the interpretation of Section 243(h)(2)(B) and Section 243(h)(3) adopted by the BIA is not unreasonable, arbitrary, or capricious. Consequently, a separate inquiry into Choeum's dangerousness to the community was not required. *See Mosquera–Perez,* 3 F.3d at 559. Choeum was not eligible for withholding of deportation.

*B. Asylum*

 Choeum next argues that the regulation under which she was deemed ineligible for asylum exceeds the authority delegated to the Attorney General by Congress.

An INS regulation provides that: "An application for asylum shall be denied if ... [t]he alien, having been convicted by a final judgment of a particularly serious crime in the United States, constitutes a danger to the community...." 8 C.F.R. § 208.14(d)(1). [12] This regulation was promulgated pursuant to then-current Section 208(a) of the INA, 8 U.S.C. § 1158(a), [13] which provided:

> The Attorney General shall establish a procedure for an alien ... to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of ... this title.

Choeum points out that, in 1990, the same year that the challenged regulation was adopted, Congress enacted what was then 8 U.S.C. § 1158(d), which provided that "[a]n alien who has been convicted of an aggravated felony ... may not apply for or be granted asylum." 8 U.S.C. § 1158(d). Choeum argues that, by negative implication, Congress did not intend a similar *per se* bar for aliens convicted of particularly serious crimes, and that the Attorney General exceeded the authority delegated by Congress in barring a larger class of aliens than that barred by statute.

 The statute expressly conferred broad authority on the Attorney General to "establish a procedure" for asylum applications, and the granting of asylum is explicitly **\*44** left to the Attorney General's discretion. Under *Chevron,* where Congress "explicitly left a gap for the agency to fill," and where there is thus "an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," we should uphold a gap-filling regulation unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron,* 467 U.S. at 843–44, 104 S.Ct. at 2781–83.

The Attorney General's determination that aliens convicted of particularly serious crimes should be ineligible for asylum is not unreasonable. Applying *Chevron,* we do not find that the regulation exceeds the broad grant of authority conferred by the enabling statute. Accordingly, Choeum's application for asylum was properly denied. We note that the two other circuits to have considered the argument made here by Choeum have also upheld the regulation. *See Ahmetovic v. INS,* 62 F.3d 48, 51 (2d Cir.1995)(finding that Congress did not intend to limit agency's power to impose a higher standard on asylum seekers);

🚩 *Komarenko v. INS,* 35 F.3d 432, 436 (9th Cir.1994)(noting similarity of asylum regulation to statutory withholding provisions for aliens who have committed particularly serious crimes). [14]

*C. 212(c) Waiver*

Choeum also argues that the BIA abused its discretion in denying her application for a waiver of deportation under Section 212(c) of the INA, 🔖 8 U.S.C. § 1182(c).

The BIA denied Choeum's application for Section 212(c) relief twice, first when affirming the Immigration Judge's decision and again when denying Choeum's motion to reopen. We consider only the first of these denials. *See* 🔖 8 U.S.C. § 1105a(a)(6)("[W]henever a petitioner seeks review of an order under this section, any review sought with respect to a motion to reopen or reconsider such an order shall be consolidated with the review of the order."). [15]

We only have jurisdiction to review the BIA's initial denial of Section 212(c) relief. Relief under Section 212(c) is discretionary, and review by this court is for abuse of discretion. *See, e.g.,* 🔖 *Hazzard v. INS,* 951 F.2d 435, 438 (1st Cir.1991). We will uphold such a denial unless it was made "without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." *Id.*

Here, the BIA found that the Immigration Judge "gave proper consideration to the discretionary factors." We agree, and can find no abuse of discretion. Choeum's crime was, as the Immigration Judge found, profoundly disturbing. Choeum argues that the Immigration Judge improperly determined that she showed little remorse. However, the Immigration Judge observed her demeanor and heard her testimony. This finding essentially turns on Choeum's credibility and does not provide a basis to overrule the BIA. Choeum also argues that the Immigration Judge improperly emphasized her reliance on welfare, by failing to consider the circumstances that have made it difficult for her to work. Many of these circumstances are of Choeum's own making. Moreover, many, if not most immigrants, face language and educational barriers that make finding employment challenging.

Choeum's only argument of substance is that, by affirming the decision of the Immigration Judge "based upon and for the reasons set forth in that decision," the BIA apparently did not consider the new evidence of the post-hearing birth of her son David. The INS replies that the BIA is an appellate body and that Choeum failed to comply with the proper procedure for presenting new evidence, which is to move to reopen proceedings  **\*45**  before the Immigration Judge, *see* 8 C.F.R. § 3.2.

While the BIA may, in its discretion, consider new evidence presented for the first time on appeal, it is certainly appropriate for the BIA to insist on compliance with the proper procedures. Fair proceedings are best assured through proper entry into the record of all relevant evidence, and through the ability of the factfinder to sift that evidence. The BIA has given notice, in earlier decisions, that it may refuse to consider new evidence that is not part of the record before the Immigration Judge. *See, e.g., Matter of C-,* 20 I. & N. Dec. 529, 1992 WL 200361, *6 (BIA May 28, 1992). In these circumstances, the BIA's insistence that the procedural formalities be observed cannot be considered an abuse of discretion. [16]

Accordingly, the decisions of the BIA challenged in the first petition are *affirmed.* The second petition is dismissed.

**All Citations**

129 F.3d 29

# Footnotes

1   In another sense, however, Choeum is the beneficiary of the government's shifting position. Because mandate has never issued, and because Choeum has not been deported during the pendency of this appeal, the effect of the government's delay in making its new jurisdictional argument has been to delay Choeum's deportation.

2   *See* *United States v. Baucum,* 80 F.3d 539, 541 (D.C.Cir.1996); *Michigan Employment Security Comm'n v. Wolverine Radio Co., Inc.,* 930 F.2d 1132, 1137–38 (6th Cir.1991); *Escobar Ruiz v. INS,* 813 F.2d 283, 286 n. 3 (9th Cir.1987).

3   The section has been amended several times since then; the current version of the provision is Section 241(a)(2)(A)(i), 8 U.S.C. § 1251(a)(2)(A)(i).

4   Under IIRIRA § 321(a), an "aggravated felony" is "a crime of violence (as defined in section 16 of Title 18, but not including a purely political offense) for which the term of imprisonment at least one year." 8 U.S.C. § 1101(a)(43)(F). A "crime of violence" is defined as "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 16(a). Because kidnapping satisfies the terms of 8 U.S.C. § 16(a) and Choeum's term of imprisonment exceeded one year, Choeum committed an aggravated felony under IIRIRA § 321(a).

5   Section 106 of the INA, 8 U.S.C. § 1105a was repealed by § 306(b) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. 104–208, 110 Stat. 3009–546 ("IIRIRA"); IIRIRA substitutes new judicial review provisions. *See* IIRIRA § 306(a), 8 U.S.C. § 1252. However, this repeal applies only to final orders of deportation and motions to reopen filed on or after April 1, 1997. *See* IIRIRA §§ 306(c), 309, 110 Stat. at 3009–612, 625, *as amended by* Pub.L. 104–302, 110 Stat. 3656 (Oct. 11, 1996)(technical amendment clarifying that judicial review provisions of IIRIRA are not effective upon enactment). IIRIRA also provides transitional rules for certain classes of cases, *see infra.*

6   Under New York law, a person is guilty of burglary in the first degree "when he knowingly enters or remains unlawfully in a dwelling with intent to commit a crime therein, and when in effecting entry or while in the dwelling or in immediate flight therefrom, he or *another participant in the crime:*

    1. Is armed with explosives or a deadly weapon; or

    2. Causes physical injury to any person who is not a participant in the crime; or

    3. Uses or threatens the immediate use of a dangerous instrument; or

    4. Display what appears to be a pistol, revolver, rifle, shotgun, machine gun, or other firearm...."

N.Y. Penal Law § 140.30 (emphasis added).

Thus, under New York law, Choeum could be convicted of burglary in the first degree simply by virtue of Ling's use of the gun.

7   The INS draws our attention to *Yang v. INS,* 109 F.3d 1185 (7th Cir.1997). In that case, petitioner contested the administrative finding that he was deportable by reason of having committed certain crimes, crimes which would render him ineligible, under AEDPA, for judicial review of his deportation order. The Seventh Circuit asserted that "a court has jurisdiction to determine whether it has jurisdiction" and reviewed the record to see if the law had been properly applied to petitioner's case. *Id.* at 1192. That situation, where the court reviews the administrative record to determine if the law has been correctly applied to petitioner's case, is not analogous to the situation here, where the question to be answered was not addressed in the proceedings below.

8   To the extent that *Abdel–Razek v. INS,* 114 F.3d 831 (9th Cir.1997), takes a different position on this issue, we find it unpersuasive. But we do not believe that *Abdel–Razek* really conflicts with our conclusion. *Abdel–Razek,* and

*Mendez–Morales v. INS,* 119 F.3d 738 (8th Cir.1997), which the INS also cites, both involve aliens who had committed a single crime which was the sole basis for their respective deportations, and the issue was whether the INS could substitute one ground for deportation, *i.e.,* commission of a crime of moral turpitude, for another, *i.e.,* an aggravated felony. This a different situation than we have in the present case, where Choeum had committed two different crimes, and the INS wishes to use one crime as the basis for deportation but then the *other* crime as the basis for denying this court jurisdiction. By citing *Abdel–Razek* as authority that opposes this conclusion, the INS confuses the legal grounds for deportation with its underlying factual basis.

9   Withholding of deportation and asylum are similar in that both offer relief from deportation based on the likelihood of persecution in the alien's home country. Asylum requires a greater showing than withholding, and carries with it the entitlement to become a lawful permanent resident, and eventually a citizen. Withholding, on the other hand, does not give the alien the automatic right to remain in the United States; the alien may still be deported to a third country in which she would not face persecution. *See* *INS v. Cardoza–Fonseca,* 480 U.S. 421, 428 n. 6, 107 S.Ct. 1207, 1211 n. 6, 94 L.Ed.2d 434 (1987).

10   Section 212(c), by its express terms, permits the Attorney General to waive the exclusion of otherwise excludable aliens; a longstanding interpretation extends this discretionary authority to the waiver of deportation. *Kolster,* 101 F.3d at 787.

11   The INS initially argued that Section 413(f) of AEDPA did not apply to Choeum's case, as AEDPA Section 413(g) instructed that the amendments made by Section 413(f) should apply only to those applications on which final action had not been taken before the date of AEDPA's enactment, *i.e.* April 30, 1996. *See* AEDPA § 413(g), 110 Stat. 1269–70. The BIA denied Choeum's application for withholding on February 9, 1996; the INS argued that this—not judicial review—constituted "final action" on Choeum's application, and that Section 413(f) was therefore inapplicable to Choeum's case. We need not decide whether the INS's interpretation of "final action" is the correct one.

12   8 C.F.R. § 208.14(d) previously appeared at 8 C.F.R. § 208.14(c), and is referred to by its former designation in the administrative proceedings in this case, and in the cases discussed herein.

13   Section 604 of IIRIRA, "Asylum Reform," substantially amends Section 208 of the INA, 8 U.S.C. § 1158. However, Section 604 of IIRIRA applies only to applications for asylum filed on or after April 1, 1997. *See* IIRIRA § 604(c), 110 Stat. 3009–694. References in this opinion are to the earlier version of 8 U.S.C. § 1158, which may be found at 8 U.S.C.A. § 1158 (West 1996).

14   We also note that, in the asylum provisions of IIRIRA, Congress has made aliens who have been convicted of particularly serious crimes ineligible for asylum, and *explicitly* stated that the Attorney General may provide, by regulation, additional limitations and conditions on the consideration of an application for asylum. *See* 8 U.S.C. § 1158(b)(2)(A)(ii); 1158(d)(5)(B) (1997 version).

15   As noted, IIRIRA repealed 8 U.S.C. § 1105a. *See supra* note 2. IIRIRA does adopt a consolidation provision that is substantially similar to the old provision. *See* IIRIRA § 306(a)(2) (current 8 U.S.C. § 1252(b)(6)).

16   We also note that the birth of a second child was unlikely to substantially shift the equities of petitioner's case. While it is true that Choeum has a second child, he is very young, allegedly has no relationship with his father, and presumably does not yet have significant ties to the United States. Additionally, the BIA, by relying on the record before the Immigration Judge, did not consider the other post-hearing events in Choeum's life, including quitting her job, returning to reliance on welfare, and failing to pursue further her GED or other educational avenues.

---

**End of Document**                                                            © 2020 Thomson Reuters. No claim to original U.S. Government Works.

126 S.Ct. 1854
Supreme Court of the United States

DAIMLERCHRYSLER CORP. et al., Petitioners,

v.

Charlotte CUNO et al.

William W. Wilkins, Tax Commissioner for the State of Ohio, et al., Petitioners,

v.

Charlotte Cuno et al.

Nos. 04–1704, 04–1724.
|
Argued March 1, 2006.
|
Decided May 15, 2006. Rehearing Denied June 26, 2006. See 548 U.S. 920, 126 S.Ct. 2961.

**Synopsis**

**Background:** City and State taxpayers brought state court action challenging local property tax abatements and investment tax credits granted to automobile manufacturer to induce it to remain in city. Following removal, the United States District Court for the Northern District of Ohio, David A. Katz, J., 154 F.Supp.2d 1196, dismissed complaint for failure to state claim. Appeal was taken. The United States Court of Appeals for the Sixth Circuit, 386 F.3d 738, found that the state franchise tax credit violated the Commerce Clause. Certiorari was granted.


**Holdings:** The United States Supreme Court, Chief Justice Roberts, held that:

state taxpayers did not have Article III standing to challenge award of Ohio franchise tax credit to manufacturer;

there was no exception to the general prohibition on taxpayer standing for a Commerce Clause challenge to state tax decisions; and

city taxpayers did not have Article III standing to challenge award of franchise tax credit.


Vacated in part and remanded.

Justice Ginsburg filed opinion concurring in part and concurring in the judgment.

**Procedural Posture(s):** Motion to Dismiss.


**\*\*1855  \*332** *Syllabus* [*]

The city of Toledo and State of Ohio sought to encourage DaimlerChrysler Corp. to expand its Toledo operations by offering it local property tax exemptions and a state franchise tax credit. A group of plaintiffs including Toledo residents who pay state and local taxes sued in state court, alleging that the tax breaks violated the Commerce Clause. The taxpayer plaintiffs claimed injury because the tax breaks depleted the state and local treasuries to which they contributed. Defendants removed the action to District Court. Plaintiffs moved to remand to state court because, *inter alia,* they doubted whether they satisfied either the

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

126 S.Ct. 1854, 164 L.Ed.2d 589, 74 USLW 4233, 06 Cal. Daily Op. Serv. 3931...

constitutional or prudential limitations on standing in federal court. The District Court declined to remand the case, concluding that plaintiffs had standing under the "municipal taxpayer standing" rule articulated in *Massachusetts v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078. On the merits, the court found that neither tax benefit violated the Commerce Clause. Without addressing standing, the Sixth Circuit agreed as to the municipal tax exemption, but held that the state franchise tax credit violated the Commerce Clause. Defendants sought certiorari to review the invalidation of the franchise tax credit, and plaintiffs sought certiorari to review the upholding of the property tax exemption. This Court granted review to consider whether the franchise tax credit violates the Commerce Clause, and directed the parties to address the issue of standing.

*Held:* Plaintiffs have not established their standing to challenge the state franchise tax credit. Because they have no standing to challenge that credit, the lower courts erred by considering their claims on the merits. Pp. 1860 – 1868.

1. State taxpayers have no standing under Article III to challenge state tax or **\*\*1856** spending decisions simply by virtue of their status as taxpayers. Pp. 1860 – 1865.

(a) Before this Court can address the merits of plaintiffs' challenge, it has an obligation to assure itself that the merits question is presented in a proper Article III "case" or "controversy." *Lujan v. Defenders of* **\*333** *Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351. The case-or-controversy limitation is crucial in maintaining the " 'tripartite allocation of power' " set forth in the Constitution. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 474, 102 S.Ct. 752, 70 L.Ed.2d 700. "Article III standing ... enforces the ... case-or-controversy requirement." *Elk Grove Unified School Dist. v. Newdow,* 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d 98. The requisite elements of standing are familiar: "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556. Plaintiffs, as the parties now asserting federal jurisdiction, must carry the burden of establishing their standing. Pp. 1860 – 1861.

(b) Plaintiffs' principal claim that the franchise tax credit depletes state funds to which they contribute through their taxes, and thus diminishes the total funds available for lawful uses and imposes disproportionate burdens on them, is insufficient to establish standing under Article III. This Court has denied *federal* taxpayers standing under Article III to object to a particular expenditure of federal funds simply because they are taxpayers. See, *e.g., Valley Forge Christian College, supra,* at 476–482, 102 S.Ct. 752. The animating principle behind cases such as *Valley Forge* was announced in *Frothingham v. Mellon,* decided with *Massachusetts v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078, in which the Court observed that a federal taxpayer's "interest in the moneys of the Treasury ... is shared with millions of others; is comparatively minute and indeterminable; and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity," *id., at* 487, 43 S.Ct. 597. This rationale applies with undiminished force to state taxpayers who allege simply that a state fiscal decision will deplete the fisc and "impose disproportionate burdens on them." See *Doremus v. Board of Ed. of Hawthorne,* 342 U.S. 429, 433–434, 72 S.Ct. 394, 96 L.Ed. 475. Because state budgets frequently have an array of tax and spending provisions that may be challenged on a variety of bases, affording state taxpayers standing to press such challenges simply because their tax burden gives them an interest in the state treasury would interpose the federal courts as " 'virtually continuing monitors of the wisdom and soundness' " of state fiscal administration, contrary to the more modest role Article III envisions for federal courts. See *Allen, supra,* at 760–761, 104 S.Ct. 3315. Pp. 1862 – 1864.

(c) Also rejected is plaintiffs' argument that they have state taxpayer standing on the ground that their Commerce Clause challenge is just like the Establishment Clause challenge this Court permitted in *Flast v. Cohen,* 392 U.S. 83, 105–106, 88 S.Ct. 1942, 20 L.Ed.2d 947. *Flast* allowed an Establishment Clause challenge by federal taxpayers to a congressional action

Case 3:20-cv-07721-SI   Document 58-6   Filed 11/10/20   Page 564 of 912

DaimlerChrysler Corp. v. Cuno, 547 U.S. 332 (2006)
126 S.Ct. 1854, 164 L.Ed.2d 589, 74 USLW 4233, 06 Cal. Daily Op. Serv. 3931...

under Art. I, § 8. Although *Flast* held out the possibility that "specific [constitutional] **\*334** limitations" other than the Establishment Clause might support federal taxpayer standing, 392 U.S., at 105, 85, 88 S.Ct. 1942, only the Establishment Clause has been held to do so since **\*\*1857** *Flast,* see, *e.g., Bowen v. Kendrick,* 487 U.S. 589, 618, 108 S.Ct. 2562, 101 L.Ed.2d 520. Plaintiffs' reliance on *Flast* is misguided: Whatever rights plaintiffs have under the Commerce Clause, they are fundamentally unlike the right not to contribute even " 'three pence' " to support a religious establishment that was upheld in *Flast,* 392 U.S., at 103, 88 S.Ct. 1942. Indeed, plaintiffs compare the two Clauses at such a high level of generality that almost any constitutional constraint on government power could be likened to the Establishment Clause as interpreted in *Flast. Id.,* at 105, 88 S.Ct. 1942. And a finding that the Commerce Clause satisfies the *Flast* test because it often implicates governments' fiscal decisions would leave no principled way of distinguishing other constitutional provisions that also constrain governments' taxing and spending decisions. See, *e.g., Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209. Yet such a broad application of *Flast's* exception to the general prohibition on taxpayer standing would be at odds with *Flast's* own promise that it would not transform federal courts into forums for taxpayers' "generalized grievances." 392 U.S., at 106, 88 S.Ct. 1942. Pp. 1864 – 1865.

2. Plaintiffs' status as *municipal* taxpayers does not give them standing to challenge the *state* franchise tax credit at issue.

This Court has noted with approval the standing of municipal taxpayers to enjoin the illegal use of a municipal corporation's funds. See, *e.g., Frothingham, supra,* at 486–487, 43 S.Ct. 597. But plaintiffs' attempts to leverage the notion of municipal taxpayer standing into standing to challenge the state tax credit are unavailing. Pp. 1865 – 1868.

(a) Plaintiffs argue that because state law requires revenues from the franchise tax to be distributed to local governments, the award of a credit to DaimlerChrysler reduced such distributions and thus depleted the funds of local governments to which plaintiffs pay taxes. But plaintiffs' challenge is still to the state law and state decision, not those of plaintiffs' municipality. Their argument thus suffers from the same defects that the claim of state taxpayer standing exhibits. P. 1866.

(b) Also rejected is plaintiffs' claim that their standing to challenge the municipal property tax exemption supports jurisdiction over their challenge to the franchise tax credit under the "supplemental jurisdiction" recognized in *Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218. *Gibbs* held that federal-question jurisdiction over a claim may authorize a federal court to exercise jurisdiction over state-law claims that may be viewed as part of the same case because they "derive from a common nucleus of operative fact" as the federal claim. *Id.,* at 725, 86 S.Ct. 1130. Plaintiffs assume that *Gibbs* stands for the proposition that federal jurisdiction extends to all claims sufficiently related to a claim within Article III to be part **\*335** of the same case, regardless of the deficiency that would keep the former claims out of federal court if presented on their own. This Court's general approach to the application of *Gibbs* has been markedly more cautious. See, *e.g., Exxon Mobil Corp. v. Allapattah Services, Inc.,* 545 U.S. 546, 553, 125 S.Ct. 2611, 162 L.Ed.2d 502. The Court has never applied *Gibbs* ' rationale to permit a federal court to exercise supplemental jurisdiction over a claim that does not itself satisfy those elements of the Article III inquiry, such as constitutional standing, that "serv[e] to identify those disputes which are appropriately resolved through the judicial process." **\*\*1858** *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135. There is no reason to read *Gibbs'* language as broadly as plaintiffs urge, particularly since the Court's standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press, see, *e.g., Allen, supra,* at 752, 104 S.Ct. 3315. If standing were commutative, as plaintiffs claim, the Court's insistence that a plaintiff must demonstrate standing separately for each form of relief sought, see, *e.g., Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167,

126 S.Ct. 1854, 164 L.Ed.2d 589, 74 USLW 4233, 06 Cal. Daily Op. Serv. 3931...

185, 120 S.Ct. 693, 145 L.Ed.2d 610, would make little sense when all claims for relief derive from a "common nucleus of operative fact," as they appear to have in cases like 🔖 *Laidlaw.*

Such a reading of 🔖 *Gibbs* would have remarkable implications. The doctrines of mootness, ripeness, and political question all originate in Article III' s "case" or "controversy" language, no less than standing does. See, *e.g.,* 🔖 *National Park Hospitality Assn. v. Department of Interior,* 538 U.S. 803, 808, 123 S.Ct. 2026, 155 L.Ed.2d 1017. Yet if 🔖 *Gibbs* ' "common nucleus" formulation announced a new definition of "case" or "controversy" for all Article III purposes, a federal court would be free to entertain moot or unripe claims, or claims presenting a political question, if they "derived from" the same "operative fact[s]" as another federal claim suffering from none of these defects. Plaintiffs' reading of 🔖 *Gibbs,* therefore, would amount to a significant revision of the Court's precedent interpreting Article III. With federal courts thus deciding issues they would not otherwise be authorized to decide, the " 'tripartite allocation of power' " that Article III is designed to maintain, 🔖 *Valley Forge, supra,* at 474, 102 S.Ct. 752, would quickly erode, and the Court's emphasis on the standing requirement's role in maintaining this separation would be rendered hollow rhetoric, see 🔖 *Lewis v. Casey,* 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606. Pp. 1866 – 1868.

🚩 386 F.3d 738, vacated in part and remanded.

ROBERTS, C.J., delivered the opinion of the Court, in which STEVENS, SCALIA, KENNEDY, SOUTER, THOMAS, BREYER, and ALITO, JJ., joined. GINSBURG, J., filed an opinion concurring in part and concurring in the judgment, *post,* p. 1868.

**Attorneys and Law Firms**

Charles A. Rothfeld, Erika Z. Jones, Miriam R. Nemetz, Mayer, Brown, Rowe & Maw LLP, Washington, D.C., Theodore B. Olson, Counsel of Record, Theodore J. Boutrous, Jr., David Debold, Matthew D. McGill, Michael S. Diamant, Gibson, Dunn & Crutcher LLP, Washington, D.C., for Petitioner in No. 04–1704.

Peter D. Enrich, Boston, MA, Alan Morrison, Stanford, CA, Terry J. Lodge, Counsel of Record, Toledo, OH, for respondents.

Adam W. Loukx, Samuel J. Nugent, Senior Attorneys, City of Toledo Law Dept., Toledo, Ohio, for Municipal Petitioners, Lisa E. Pizza, Spengler Nathanson P.L.L., Toledo, OH, for School Board Petitioners, Jim Petro, Attorney General of Ohio, Douglas R. Cole, Counsel of Record, State Solicitor, Stephen P. Carney, Senior Deputy Solicitor, Erik J. Clark, Deputy Solicitor, Sharon A. Jennings, Robert C. Maier, Assistant Attorneys General, Columbus, **\*\*1859** Ohio, for Petitioners in No. 04–1724.

**Opinion**

Chief Justice ROBERTS delivered the opinion of the Court.

 **\*337** Jeeps were first mass-produced in 1941 for the U.S. Army by the Willys–Overland Motor Company in Toledo, Ohio. Nearly 60 years later, the city of Toledo and State of Ohio sought to encourage the current manufacturer of Jeeps— DaimlerChrysler—to expand its Jeep operation in Toledo, by offering local and state tax benefits for new investment. **\*338** Taxpayers in Toledo sued, alleging that their local and state tax burdens were increased by the tax breaks for DaimlerChrysler, tax breaks that they asserted violated the Commerce Clause. The Court of Appeals agreed that a state tax credit offered under Ohio law violated the Commerce Clause, and state and local officials and DaimlerChrysler sought review in this Court. We are obligated before reaching this Commerce Clause question to determine whether the taxpayers who objected to the credit have standing to press their complaint in federal court. We conclude that they do not, and we therefore can proceed no further.

I

Ohio levies a franchise tax "upon corporations for the privilege of doing business in the state, owning or using a part or all of its capital or property in [the] state, or holding a certificate of compliance authorizing it to do business in [the] state." *Wesnovtek Corp. v. Wilkins,* 105 Ohio St.3d 312, 313, 2005–Ohio–1826, ¶ 2, 825 N.E.2d 1099, 1100; see Ohio Rev.Code Ann. § 5733.01 (Lexis 2005). A taxpayer that purchases "new manufacturing machinery and equipment" and installs it at sites in the State receives a credit against the franchise tax. See § 5733.33(B)(1) (Lexis 1999). [1] Municipalities in Ohio may also offer partial property tax waivers to businesses that agree to invest in qualifying areas. See § 5709.62(C)(1)(a) (Lexis 2005). With consent from local school districts, the partial property tax waiver can be increased to a complete exemption. See § 5709.62(D)(1).

In 1998, DaimlerChrysler entered into a contract with the city of Toledo. Under the contract, DaimlerChrysler agreed to expand its Jeep assembly plant at Stickney Avenue in **\*339** Toledo. In exchange, the city agreed to waive the property tax for the plant, with the consent of the two school districts in which the plant is located. Because DaimlerChrysler undertook to purchase and install "new manufacturing machinery and equipment," it was also entitled to a credit against the state franchise tax. See § 5733.33(B)(1) (Lexis 1999).

 Plaintiffs filed suit against various state and local officials and DaimlerChrysler in state court, alleging that these tax benefits violated the Commerce Clause. Most of the plaintiffs were residents of Toledo, who paid taxes to both the city of Toledo and State of Ohio. They claimed that they were injured because the tax breaks for DaimlerChrysler diminished the funds available to the city and State, imposing a "disproportionate burden" on plaintiffs. App. 18a, 23a, 28a. [2]

 **\*\*1860**  Defendants removed the action to the United States District Court for the Northern District of Ohio. See 28 U.S.C. § 1441. Plaintiffs filed motions to remand the case to state court. See § 1447(c). One of the grounds on which they sought remand concerned their standing. They professed "substantial doubts about their ability to satisfy either the constitutional or the prudential limitations on standing in the federal court," and urged the District Court to avoid the issue entirely by remanding. Plaintiffs' Supplemental Motion for Remand to State Court in No. 3:00cv7247, p. 13, Record, Doc. 17 (footnote omitted).

The District Court declined to remand the case, concluding that, "[a]t the bare minimum, the Plaintiffs who are taxpayers have standing to object to the property tax exemption   **\*340**  and franchise tax credit statutes under the 'municipal taxpayer standing' rule articulated in *Massachusetts v. Mellon,* 262 U.S. 447[, 43 S.Ct. 597, 67 L.Ed. 1078] (1923)." App. 78a (citations omitted).

On the merits, the District Court found that neither tax benefit violated the Commerce Clause. See 154 F.Supp.2d 1196 (2001). The Court of Appeals for the Sixth Circuit agreed with the District Court as to the municipal property tax exemption, but held that the state franchise tax credit violated the Commerce Clause. See 386 F.3d 738 (2004). The Court of Appeals did not address the issue of standing.

Defendants sought certiorari to review the Sixth Circuit's invalidation of the franchise tax credit and plaintiffs sought certiorari to review the upholding of the property tax exemption. We granted certiorari to consider whether the franchise tax credit violates the Commerce Clause, 545 U.S. 1165, 126 S.Ct. 36, 162 L.Ed.2d 933 (2005); the Michigan Supreme Court had decided a similar question contrary to the Sixth Circuit's analysis here. See *Caterpillar, Inc. v. Department of Treasury,* 440 Mich. 400, 488 N.W.2d 182 (1992). We also asked the parties to address whether plaintiffs have standing to challenge the franchise tax credit in this litigation.

II

DaimlerChrysler Corp. v. Cuno, 547 U.S. 332 (2006)

126 S.Ct. 1854, 164 L.Ed.2d 589, 74 USLW 4233, 06 Cal. Daily Op. Serv. 3931...

We have "an obligation to assure ourselves" of litigants' standing under Article III. *Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). We therefore begin by addressing plaintiffs' claims that they have standing as taxpayers to challenge the franchise tax credit.

A

Chief Justice Marshall, in *Marbury v. Madison,* 1 Cranch 137, 2 L.Ed. 60 (1803), grounded the Federal Judiciary's authority to exercise judicial review and interpret the Constitution on the necessity to do so in the course of carrying out the judicial function of deciding cases. As Marshall explained, "[t]hose who apply the rule to particular cases, must of necessity expound

**\*341** and interpret that rule." *Id.,* at 177. Determining that a matter before the federal courts is a proper case or controversy under Article III therefore assumes particular importance in ensuring that the Federal Judiciary respects " 'the proper—and properly limited—role of the courts in a democratic society,' " *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). If a dispute is not a **\*\*1861** proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so.

This Court has recognized that the case-or-controversy limitation is crucial in maintaining the " 'tripartite allocation of power' " set forth in the Constitution. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 474, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (quoting *Flast v. Cohen,* 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968)). Marshall again made the point early on, this time in a speech in the House of Representatives. "A case in law or equity," Marshall remarked,

"was a term ... of limited signification. It was a controversy between parties which had taken a shape for judicial decision. If the judicial power extended to every *question* under the constitution it would involve almost every subject proper for legislative discussion and decision; if to every *question* under the laws and treaties of the United States it would involve almost every subject on which the executive could act. The division of power [among the branches of government] could exist no longer, and the other departments would be swallowed up by the judiciary." 4 Papers of John Marshall 95 (C. Cullen ed.1984).

As this Court has explained, " '[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.' " **\*342** *Raines v. Byrd,* 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (quoting *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 37, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)).

The case-or-controversy requirement thus plays a critical role, and "Article III standing ... enforces the Constitution's case-or-controversy requirement." *Elk Grove Unified School Dist. v. Newdow,* 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004). The "core component" of the requirement that a litigant have standing to invoke the authority of a federal court "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The requisite elements of this "core component derived directly from the Constitution" are familiar: "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen, supra,* at 751, 104 S.Ct. 3315. We have been asked to decide an important question of constitutional law concerning the Commerce Clause. But before we do so, we must find that the question is presented in a "case" or "controversy" that is, in James Madison's words, "of a Judiciary Nature." 2 Records of the Federal Convention of 1787, p. 430 (M. Farrand ed.1966). That requires plaintiffs, as the parties now asserting federal jurisdiction, to carry the burden of establishing their standing under Article III.[3]

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 568 of 912

DaimlerChrysler Corp. v. Cuno, 547 U.S. 332 (2006)
126 S.Ct. 1854, 164 L.Ed.2d 589, 74 USLW 4233, 06 Cal. Daily Op. Serv. 3931...

**\*\*1862** B

Plaintiffs principally claim standing by virtue of their status as Ohio taxpayers, alleging that the franchise tax credit **\*343** "depletes the funds of the State of Ohio to which the Plaintiffs contribute through their tax payments" and thus "diminish[es] the total funds available for lawful uses and impos[es] disproportionate burdens on" them. App. 28a; see also Brief for Respondents 24. On several occasions, this Court has denied *federal* taxpayers standing under Article III to object to a particular expenditure of federal funds simply because they are taxpayers. Thus the alleged "deprivation of the fair and constitutional use of [a federal taxpayer's] tax dollar" cannot support a challenge to the conveyance of Government land to a private religious college, *Valley Forge, supra,* at 476, 482, 102 S.Ct. 752 (internal quotation marks and some brackets omitted), and "the interest of a taxpayer in the moneys of the federal treasury furnishes no basis" to argue that a federal agency's loan practices are unconstitutional, *Alabama Power Co. v. Ickes,* 302 U.S. 464, 478, 58 S.Ct. 300, 82 L.Ed. 374 (1938); see also *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974).

The animating principle behind these cases was announced in their progenitor, *Frothingham v. Mellon,* decided with *Massachusetts v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). In rejecting a claim that improper federal appropriations would "increase the burden of future taxation and thereby take [the plaintiff's] property without due process of law," the Court observed that a federal taxpayer's

> "interest in the moneys of the Treasury ... is shared with millions of others; is comparatively minute and indeterminable; and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity." *Id.,* at 486, 487, 43 S.Ct. 597.

This logic is equally applicable to taxpayer challenges to expenditures that deplete the treasury, and to taxpayer challenges to so-called "tax expenditures," which reduce amounts available to the treasury by granting tax credits or **\*344** exemptions. In either case, the alleged injury is based on the asserted effect of the allegedly illegal activity on public revenues, to which the taxpayer contributes.

Standing has been rejected in such cases because the alleged injury is not "concrete and particularized," *Defenders of Wildlife, supra,* at 560, 112 S.Ct. 2130, but instead a grievance the taxpayer "suffers in some indefinite way in common with people generally," *Frothingham, supra,* at 488, 43 S.Ct. 597. In addition, the injury is not "actual or imminent," but instead "conjectural or hypothetical." *Defenders of Wildlife, supra,* at 560, 112 S.Ct. 2130 (internal quotation marks omitted). As an initial matter, it is unclear that tax breaks of the sort at issue here do in fact deplete the treasury: The very point of the tax benefits is to spur economic activity, which in turn *increases* government revenues. In this very action, the Michigan plaintiffs claimed that they were injured because they lost out on the added revenues that would have accompanied DaimlerChrysler's decision to expand facilities in Michigan. See n. 2, *supra.*

Plaintiffs' alleged injury is also "conjectural or hypothetical" in that it depends on how legislators respond to a reduction in revenue, if that is the consequence of the credit. Establishing injury requires speculating that elected officials will increase a **\*\*1863** taxpayer-plaintiff's tax bill to make up a deficit; establishing redressability requires speculating that abolishing the challenged credit will redound to the benefit of the taxpayer because legislators will pass along the supposed increased revenue in the form of tax reductions. Neither sort of speculation suffices to support standing. See *ASARCO Inc. v. Kadish,* 490 U.S. 605, 614, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989) (opinion of KENNEDY, J.) ("[I]t is pure speculation whether the lawsuit

Case 3:20-cv-07721-SI   Document 58-6   Filed 11/10/20   Page 569 of 912

DaimlerChrysler Corp. v. Cuno, 547 U.S. 332 (2006)
126 S.Ct. 1854, 164 L.Ed.2d 589, 74 USLW 4233, 06 Cal. Daily Op. Serv. 3931...

would result in any actual tax relief for respondents"); *Warth,* 422 U.S., at 509, 95 S.Ct. 2197 (criticizing a taxpayer standing claim for the "conjectural nature of the asserted injury").

A taxpayer plaintiff has no right to insist that the government dispose of any increased revenue it might experience **\*345** as a result of his suit by decreasing his tax liability or bolstering programs that benefit him. To the contrary, the decision of how to allocate any such savings is the very epitome of a policy judgment committed to the "broad and legitimate discretion" of lawmakers, which "the courts cannot presume either to control or to predict." *ASARCO, supra,* at 615, 109 S.Ct. 2037 (opinion of KENNEDY, J.). Under such circumstances, we have no assurance that the asserted injury is "imminent"—that it is "certainly impending." *Whitmore v. Arkansas,* 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (internal quotation marks omitted); see *Defenders of Wildlife,* 504 U.S., at 564–565, n. 2, 112 S.Ct. 2130.

The foregoing rationale for rejecting federal taxpayer standing applies with undiminished force to state taxpayers. We indicated as much in *Doremus v. Board of Ed. of Hawthorne,* 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952). In that case, we noted our earlier holdings that "the interests of a taxpayer in the moneys of the federal treasury are too indeterminable, remote, uncertain and indirect" to support standing to challenge "their manner of expenditure." *Id.,* at 433, 72 S.Ct. 394. We then "reiterate[d]" what we had said in rejecting a federal taxpayer challenge to a federal statute "as equally true when a state Act is assailed: 'The [taxpayer] must be able to show ... that he has sustained ... some direct injury ... and not merely that he suffers in some indefinite way in common with people generally.' " *Id.,* at 433–434, 72 S.Ct. 394 (quoting *Frothingham, supra,* at 488, 43 S.Ct. 597); see *ASARCO, supra,* at 613–614, 109 S.Ct. 2037 (opinion of KENNEDY, J.) ("[W]e have likened state taxpayers to federal taxpayers" for purposes of taxpayer standing (citing *Doremus, supra,* at 434, 72 S.Ct. 394)).

The allegations of injury that plaintiffs make in their complaint furnish no better basis for finding standing than those made in the cases where federal taxpayer standing was denied. Plaintiffs claim that DaimlerChrysler's tax credit depletes the Ohio fisc and "impos[es] disproportionate burdens on [them]." App. 28a. This is no different from similar claims by federal taxpayers we have already rejected under **\*346** Article III as insufficient to establish standing. See, *e.g., Frothingham,* 262 U.S., at 486, 43 S.Ct. 597 (allegation of injury that the effect of government spending "will be to increase the burden of future taxation and thereby take [plaintiff's] property without due process of law").

 State policymakers, no less than their federal counterparts, retain broad discretion to make "policy decisions" concerning state spending "in different ways ... depending on their perceptions of wise state fiscal policy and myriad other circumstances." *ASARCO, supra,* at 615, 109 S.Ct. 2037 (opinion of KENNEDY, J.). **\*\*1864** Federal courts may not assume a particular exercise of this state fiscal discretion in establishing standing; a party seeking federal jurisdiction cannot rely on such "[s]peculative inferences ... to connect [his] injury to the challenged actions of [the defendant]," *Simon,* 426 U.S., at 45, 96 S.Ct. 1917; see also *Allen,* 468 U.S., at 759, 104 S.Ct. 3315. Indeed, because state budgets frequently contain an array of tax and spending provisions, any number of which may be challenged on a variety of bases, affording state taxpayers standing to press such challenges simply because their tax burden gives them an interest in the state treasury would interpose the federal courts as " 'virtually continuing monitors of the wisdom and soundness' " of state fiscal administration, contrary to the more modest role Article III envisions for federal courts. See *id.,* at 760–761, 104 S.Ct. 3315 (quoting *Laird v. Tatum,* 408 U.S. 1, 15, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972)).

For the foregoing reasons, we hold that state taxpayers have no standing under Article III to challenge state tax or spending decisions simply by virtue of their status as taxpayers.[4]

126 S.Ct. 1854, 164 L.Ed.2d 589, 74 USLW 4233, 06 Cal. Daily Op. Serv. 3931...

*347  C

 Plaintiffs argue that an exception to the general prohibition on taxpayer standing should exist for Commerce Clause challenges to state tax or spending decisions, analogizing their Commerce Clause claim to the Establishment Clause challenge we permitted in *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947. *Flast* held that because "the Establishment Clause ... specifically limit[s] the taxing and spending power conferred by Article I, § 8," "a taxpayer will have standing consistent with Article III to invoke federal judicial power when he alleges that congressional action under the taxing and spending clause is in derogation of" the Establishment Clause. *Id.,* at 105–106, 88 S.Ct. 1942. *Flast* held out the possibility that "other specific [constitutional] limitations" on Article I, § 8, might surmount the "barrier to suits against Acts of Congress brought by individuals who can assert only the interest of federal taxpayers." 392 U.S., at 105, 85, 88 S.Ct. 1942. But as plaintiffs candidly concede, "only the Establishment Clause" has supported federal taxpayer suits since *Flast.* Brief for Respondents 12; see *Bowen v. Kendrick,* 487 U.S. 589, 618, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988) ("Although we have considered the problem of standing and Article III limitations on federal jurisdiction many times since *[Flast],* we have consistently adhered to *Flast* and the narrow exception it created to the general rule against taxpayer standing").

Quite apart from whether the franchise tax credit is analogous to an exercise of congressional power under Article I, § 8, plaintiffs' reliance on *Flast* is misguided: Whatever rights plaintiffs have under the Commerce Clause, they are fundamentally unlike the right not to " 'contribute three pence ... for the support of any one [religious] establishment.' "  **348  **1865 392 U.S., at 103, 88 S.Ct. 1942 (quoting 2 Writings of James Madison 186 (G. Hunt ed.1901)). Indeed, plaintiffs compare the Establishment Clause to the Commerce Clause at such a high level of generality that almost any constitutional constraint on government power would "specifically limit" a State's taxing and spending power for *Flast* purposes. 392 U.S., at 105, 88 S.Ct. 1942; see Brief for Respondents 14 ("In each case, the harm to be avoided by [the two Clauses] is the loss of governmental neutrality"). And even if the two Clauses are similar in that they often implicate governments' fiscal decisions, see *id.,* at 13–14, a finding that the Commerce Clause satisfies the *Flast* test would leave no principled way of distinguishing those other constitutional provisions that we have recognized constrain governments' taxing and spending decisions, see, *e.g., Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987) (invalidating state sales tax under the Free Press Clause). Yet such a broad application of *Flast's* exception to the general prohibition on taxpayer standing would be quite at odds with its narrow application in our precedent and *Flast's* own promise that it would not transform federal courts into forums for taxpayers' "generalized grievances." 392 U.S., at 106, 88 S.Ct. 1942.

 *Flast* is consistent with the principle, underlying the Article III prohibition on taxpayer suits, that a litigant may not assume a particular disposition of government funds in establishing standing. The *Flast* Court discerned in the history of the Establishment Clause "the specific evils feared by [its drafters] that the taxing and spending power would be used to favor one religion over another or to support religion in general." *Id.,* at 103, 88 S.Ct. 1942. The Court therefore understood the "injury" alleged in Establishment Clause challenges to federal spending to be the very "extract [ion] and spen[ding]" of "tax money" in aid of religion alleged by a plaintiff. *Id.,* at 106, 88 S.Ct. 1942. And an injunction against the spending would of course redress *that* injury, regardless of whether lawmakers would dispose of the savings in a way  *349  that would benefit the taxpayer-plaintiffs personally. See *Valley Forge,* 454 U.S., at 514, 102 S.Ct. 752 (STEVENS, J., dissenting) ("[T]he plaintiffs' invocation of the Establishment Clause was of decisive importance in resolving the standing issue in *[Flast]* ").

DaimlerChrysler Corp. v. Cuno, 547 U.S. 332 (2006)

126 S.Ct. 1854, 164 L.Ed.2d 589, 74 USLW 4233, 06 Cal. Daily Op. Serv. 3931...

Plaintiffs thus do not have state taxpayer standing on the ground that their Commerce Clause challenge is just like the Establishment Clause challenge in *Flast.*

### III

Plaintiffs also claim that their status as *municipal* taxpayers gives them standing to challenge the *state* franchise tax credit at issue here. The *Frothingham* Court noted with approval the standing of municipal residents to enjoin the "illegal use of the moneys of a municipal corporation," relying on "the peculiar relation of the corporate taxpayer to the corporation" to distinguish such a case from the general bar on taxpayer suits. 262 U.S., at 486, 487, 43 S.Ct. 597; see *ASARCO,* 490 U.S., at 613–614, 109 S.Ct. 2037 (opinion of KENNEDY, J.) (reiterating distinction). Plaintiffs here challenged the municipal property tax exemption as municipal taxpayers. That challenge was rejected by the Court of Appeals on the merits, and no issue regarding plaintiffs' standing to bring it has been raised. In plaintiffs' challenge to the state franchise tax credit, however, they identify no municipal action contributing to any claimed injury. Instead, they try to leverage the notion of municipal taxpayer standing beyond challenges to municipal action, in two ways.

#### **1866 A

First, plaintiffs claim that because state law requires revenues from the franchise tax to be distributed to local governments, Ohio Rev.Code Ann. § 5733.12 (Lexis 2005), the award of a credit to DaimlerChrysler reduced such distributions and thus depleted the funds of "local governments to which Respondents pay taxes." Brief for Respondents 16. But plaintiffs' challenge is still to the state law and state *350 decision, not those of their municipality. We have already explained why a state taxpayer lacks standing to challenge a state fiscal decision on the grounds that it might affect his tax liability. All plaintiffs have done in recasting their claims as ones brought by municipal taxpayers whose municipalities receive funding from the State—the level of which might be affected by the same state fiscal decision—is introduce yet another level of conjecture to their already hypothetical claim of injury.

And in fact events have highlighted the peril of assuming that any revenue increase resulting from a taxpayer suit will be put to a particular use. Ohio's General Assembly suspended the statutory budget mechanism that distributes franchise tax revenues to local governments in 2001 and again in its subsequent biennial budgets. See Amended Substitute H.B. 94, 124th General Assembly § 140 (2001), available at http://www.legislature. state. oh.us/BillText124/ 124_HB_94_ENR.pdf (all Internet materials as visited May 12, 2006, and available in Clerk of Court's case file); Amended Substitute H. B. 95, 125th General Assembly § 139 (2003), available at http:// www.legislature. state. oh.us/BillText125/ 125_HB_95_EN2_N.pdf; Amended Substitute H. B. 66, 126th General Assembly § 557.12 (2005), available at http://www. legislature.state.oh.us/ BillText126/126_HB_66_EN2d.pdf. Any effect that enjoining DaimlerChrysler's credit will have on municipal funds, therefore, will not result from automatic operation of a statutory formula, but from a hypothesis that the state government will choose to direct the supposed revenue from the restored franchise tax to municipalities. This is precisely the sort of conjecture we may not entertain in assessing standing. See *ASARCO, supra,* at 614, 109 S.Ct. 2037 (opinion of KENNEDY, J.).

#### B

The second way plaintiffs seek to leverage their standing to challenge the municipal property tax exemption into a *351 challenge to the franchise tax credit is by relying on *Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 572 of 912

DaimlerChrysler Corp. v. Cuno, 547 U.S. 332 (2006)
126 S.Ct. 1854, 164 L.Ed.2d 589, 74 USLW 4233, 06 Cal. Daily Op. Serv. 3931...

(1966). According to plaintiffs, the "supplemental jurisdiction" recognized in that case supports jurisdiction over all their claims, once the District Court determined they had standing to challenge the property tax exemption. Brief for Respondents 17–18.

*Gibbs* held that federal-question jurisdiction over a claim may authorize a federal court to exercise jurisdiction over state-law claims that may be viewed as part of the same case because they "derive from a common nucleus of operative fact" as the federal claim. 383 U.S., at 725, 86 S.Ct. 1130. Plaintiffs assume that *Gibbs* stands for the proposition that federal jurisdiction extends to all claims sufficiently related to a claim within Article III to be part of the same case, regardless of the nature of the deficiency that would keep the former claims out of federal court if presented on their own.

Our general approach to the application of *Gibbs,* however, has been markedly more cautious. For example, as a matter of statutory construction of the pertinent jurisdictional provisions, we refused to extend **1867 *Gibbs* to allow claims to be asserted against nondiverse parties when jurisdiction was based on diversity, see *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978), and we refused to extend *Gibbs* to authorize supplemental jurisdiction over claims that do not satisfy statutory amount-in-controversy requirements, see *Finley v. United States,* 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989). As the Court explained just last Term, "[w]e have not ... applied *Gibbs* ' expansive interpretive approach to other aspects of the jurisdictional statutes." *Exxon Mobil Corp. v. Allapattah Services, Inc.,* 545 U.S. 546, 553, 125 S.Ct. 2611, 2617, 162 L.Ed.2d 502 (2005) (applying 28 U.S.C. § 1367, enacted in 1990, to allow a federal court in a diversity action to exercise supplemental jurisdiction over additional diverse plaintiffs whose claims failed to meet the amount-in-controversy threshold).

What we have never done is apply the rationale of *Gibbs* to permit a federal court to exercise supplemental jurisdiction *352 over a claim that does not itself satisfy those elements of the Article III inquiry, such as constitutional standing, that "serv[e] to identify those disputes which are appropriately resolved through the judicial process." *Whitmore,* 495 U.S., at 155, 110 S.Ct. 1717. We see no reason to read the language of *Gibbs* so broadly, particularly since our standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press. See *Allen,* 468 U.S., at 752, 104 S.Ct. 3315 ("[T]he standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the *particular claims* asserted" (emphasis added)). We have insisted, for instance, that "a plaintiff must demonstrate standing separately for each form of relief sought." *Laidlaw,* 528 U.S., at 185, 120 S.Ct. 693; see *Los Angeles v. Lyons,* 461 U.S. 95, 109, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). But if standing were commutative, as plaintiffs claim, this insistence would make little sense when all claims for relief derive from a "common nucleus of operative fact," as they certainly appear to have in both *Laidlaw, supra,* at 175–179, 120 S.Ct. 693, and *Lyons, supra,* at 97–98, 103 S.Ct. 1660.

Plaintiffs' reading of *Gibbs* to allow standing as to one claim to suffice for all claims arising from the same "nucleus of operative fact" would have remarkable implications. The doctrines of mootness, ripeness, and political question all originate in Article III's "case" or "controversy" language, no less than standing does. See, *e.g., National Park Hospitality Assn. v. Department of Interior,* 538 U.S. 803, 808, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003) (ripeness); *Arizonans for Official English v. Arizona,* 520 U.S. 43, 67, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (mootness); *Reservists Comm. to Stop the War,* 418 U.S., at 215, 94 S.Ct. 2925 (political question). Yet if *Gibbs* ' "common nucleus" formulation announced a new definition of "case" or "controversy" for all Article III purposes, a federal court would be free to entertain moot or unripe claims, or claims

DaimlerChrysler Corp. v. Cuno, 547 U.S. 332 (2006)
126 S.Ct. 1854, 164 L.Ed.2d 589, 74 USLW 4233, 06 Cal. Daily Op. Serv. 3931...

presenting a political question, if they "derived from" the same "operative fact[s]" as another federal claim suffering **\*353** from none of these defects. Plaintiffs' reading of *Gibbs,* therefore, would amount to a significant revision of our precedent interpreting Article III. With federal courts thus deciding issues they would not otherwise be authorized to decide, the " 'tripartite allocation of power' " that Article III is designed to maintain, *Valley Forge,* 454 U.S., at 474, 102 S.Ct. 752, would quickly erode; our emphasis on the standing requirement's role in maintaining this separation would be rendered hollow rhetoric. As we have explained, **\*\*1868** "[t]he actual-injury requirement would hardly serve the purpose ... of preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy *all* inadequacies in that administration." *Lewis v. Casey,* 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).

*Lewis* emphasized that "[t]he remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Ibid.* Plaintiffs' theory of ancillary standing would contravene this principle. Plaintiffs failed to establish Article III injury with respect to their *state* taxes, and even if they did so with respect to their *municipal* taxes, that injury does not entitle them to seek a remedy as to the state taxes. As the Court summed up the point in *Lewis,* "standing is not dispensed in gross." *Id.,* at 358, n. 6, 116 S.Ct. 2174. [5]

**\*354**   \* \* \*

All the theories plaintiffs have offered to support their standing to challenge the franchise tax credit are unavailing. Because plaintiffs have no standing to challenge that credit, the lower courts erred by considering their claims against it on the merits. The judgment of the Sixth Circuit is therefore vacated in part, and the cases are remanded for dismissal of plaintiffs' challenge to the franchise tax credit.

*It is so ordered.*

Justice GINSBURG, concurring in part and concurring in the judgment.

Today's decision, the Court rightly points out, is solidly grounded in longstanding precedent, *Frothingham v. Mellon,* decided with *Massachusetts v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), and *Doremus v. Board of Ed. of Hawthorne,* 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952), decisions that antedate current jurisprudence on standing to sue. See *ante,* at 1862, 1863. *Frothingham* held nonjusticiable a federal taxpayer's suit challenging a federal-spending program. See 262 U.S., at 487, 43 S.Ct. 597 (describing taxpayer's interest as "minute and indeterminable"). *Doremus* applied *Frothingham's* reasoning to a state taxpayer's suit. 342 U.S., at 434, 72 S.Ct. 394. These decisions exclude from federal-court cognizance claims, not delineated by Congress, presenting generalized grievances. An exception to *Frothingham's* rule, recognized post-*Doremus* in *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), covers certain alleged violations of the Establishment Clause. The *Flast* exception has not been extended to other areas. See **\*355** *Bowen v. Kendrick,* 487 U.S. 589, 618, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988); cf. Enrich, **\*\*1869** Saving the States from Themselves: Commerce Clause Constraints on State Tax Incentives for Business, 110 Harv. L.Rev. 377, 417–418 (1996).

One can accept, as I do, the nonjusticiability of *Frothingham*-type federal and state taxpayer suits in federal court without endorsing as well the limitations on standing later declared in *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S.

AR.07069

**DaimlerChrysler Corp. v. Cuno, 547 U.S. 332 (2006)**

Case 3:20-cv-07721-SI   Document 58-6   Filed 11/10/20   Page 574 of 912

126 S.Ct. 1854, 164 L.Ed.2d 589, 74 USLW 4233, 06 Cal. Daily Op. Serv. 3931...

26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) 🔖 *(EKWRO)*; 🔖 *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); 🚩 *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); and 🔖 *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). See 🔖 *EKWRO,* 426 U.S., at 54–66, 96 S.Ct. 1917 (Brennan, J., concurring in judgment); 🔖 *Valley Forge,* 454 U.S., at 513–515, 102 S.Ct. 752 (STEVENS, J., dissenting); 🚩 *Allen,* 468 U.S., at 783–795, 104 S.Ct. 3315 (same), and the overturned Court of Appeals opinion, 🚩 *Wright v. Regan,* 656 F.2d 820, 828–832 (C.A.D.C.1981) (Ginsburg, J.); 🔖 *Defenders of Wildlife,* 504 U.S., at 582–585, 112 S.Ct. 2130 (STEVENS, J., concurring in judgment); Sunstein, What's Standing after 🔖 *Lujan?* Of Citizen Suits, "Injuries," and Article III, 91 Mich. L.Rev. 163, 203–205, 228–229 (1992) (contrasting 🔖 *Lujan,* 🚩 *Allen,* and 🔖 *EKWRO* with ⚠ *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978)); Fletcher, The Structure of Standing, 98 Yale L.J. 221, 267–270 (1988) (commenting on 🔖 *Flast* and 🔖 *Valley Forge* ). Noting this large reservation, I concur in the judgment, and in the balance of the Court's opinion.

**All Citations**

547 U.S. 332, 126 S.Ct. 1854, 164 L.Ed.2d 589, 74 USLW 4233, 06 Cal. Daily Op. Serv. 3931, 2006 Daily Journal D.A.R. 5770, 19 Fla. L. Weekly Fed. S 185

## Footnotes

* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See 🔖 *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1 Ohio has begun phasing out the franchise tax and has discontinued offering new credits against the tax like the one DaimlerChrysler received. See §§ 5733.01(G), 🔖 5733.33(B)(1) (Lexis 2005). Where relevant, therefore, the citations in this opinion are to the statutes in effect at the time DaimlerChrysler made its investment.

2 Other plaintiffs were residents of Toledo who claimed they were injured because they were displaced by the DaimlerChrysler expansion and Michigan residents who claimed injury because DaimlerChrysler would have expanded its operations in Michigan but for the Ohio investment tax credit. Plaintiffs neither identified these allegations as a basis for standing in their merits brief before this Court nor referred to them at oral argument. Any argument based on these allegations is therefore abandoned. See, *e.g.,* 🔖 *United States v. International Business Machines Corp.,* 517 U.S. 843, 855, and n. 3, 116 S.Ct. 1793, 135 L.Ed.2d 124 (1996).

3 Because defendants removed the case from state court to District Court, plaintiffs were not initially the parties that invoked federal jurisdiction. Indeed, plaintiffs initially expressed doubts as to their standing. Nonetheless, because "[w]e presume that federal courts lack jurisdiction unless the contrary appears affirmatively from the record," 🔖 *Renne v. Geary,* 501 U.S. 312, 316, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991) (internal quotation marks omitted), the party asserting federal jurisdiction when it is challenged has the burden of establishing it. Whatever the parties' previous positions on the propriety of a federal forum, plaintiffs, as the parties seeking to establish federal jurisdiction, must make the showings required for standing.

4 The majority of the Courts of Appeals to have considered the issue have reached a similar conclusion. See, *e.g., Booth v. Hvass,* 302 F.3d 849 (C.A.8 2002); 🔖 *Board of Ed. of Mt. Sinai Union Free School Dist. v. New York State Teachers*

126 S.Ct. 1854, 164 L.Ed.2d 589, 74 USLW 4233, 06 Cal. Daily Op. Serv. 3931...

*Retirement System,* 60 F.3d 106 (C.A.2 1995); *Colorado Taxpayers Union, Inc. v. Romer,* 963 F.2d 1394 (C.A.10 1992); *Taub v. Kentucky,* 842 F.2d 912 (C.A.6 1988); *Korioth v. Briscoe,* 523 F.2d 1271 (C.A.5 1975); but cf. *Arakaki v. Lingle,* 423 F.3d 954, 967–969 (C.A.9 2005) (finding state taxpayer standing in light of *Hoohuli v. Ariyoshi,* 741 F.2d 1169 (C.A.9 1984), but noting that Justice KENNEDY's opinion in *ASARCO Inc. v. Kadish,* 490 U.S. 605, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989), would "carry persuasive value" absent *Hoohuli*).

5    In defending the contrary position, plaintiffs rely on three cases from the Courts of Appeals. But two of those cases hold only that, once a litigant has standing to request invalidation of a particular agency action, it may do so by identifying all grounds on which the agency may have " 'failed to comply with its statutory mandate.' " *Sierra Club v. Adams,* 578 F.2d 389, 392 (C.A.D.C.1978) (quoting *Sierra Club v. Morton,* 405 U.S. 727, 737, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)); see also *Iowa Independent Bankers v. Board of Governors of Fed. Reserve,* 511 F.2d 1288, 1293–1294 (C.A.D.C.1975). They do not establish that the litigant can, by virtue of his standing to challenge one government action, challenge other governmental actions that did not injure him. In the third case, the Court of Appeals relied substantially on the fact that "all courts possess an inherent power to prevent unprofessional conduct by those attorneys who are practicing before them" in allowing the Government to contest the division of a damages award it was ordered to pay between a plaintiff and his attorney. *Jackson v. United States,* 881 F.2d 707, 710, 711 (C.A.9 1989). That situation is rather far afield from the question before us.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Descamps v. U.S., 570 U.S. 254 (2013)

133 S.Ct. 2276, 186 L.Ed.2d 438, 81 USLW 4490, 13 Cal. Daily Op. Serv. 6313...

133 S.Ct. 2276
Supreme Court of the United States

Matthew Robert DESCAMPS, Petitioner

v.

UNITED STATES.

No. 11–9540.
|
Argued Jan. 7, 2013.
|
Decided June 20, 2013.

**Synopsis**

**Background:** Defendant was convicted in the United States District Court for the Eastern District of Washington, Fred L. Van Sickle, Senior Judge, of possession of firearm by convicted felon and sentenced under the Armed Career Criminal Act (ACCA).

Defendant appealed. The United States Court of Appeals for the Ninth Circuit, 466 Fed.Appx. 563, affirmed. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Kagan, held that:

courts may not apply the modified categorical approach to sentencing under ACCA when the crime of which the defendant was convicted has a single, indivisible set of elements, abrogating U.S. v. Aguila–Montes de Oca, 655 F.3d 915, U.S. v. Armstead, 467 F.3d 943, and

defendant's prior burglary conviction under California law was not for a violent felony within the meaning of ACCA.

Reversed.

Justice Kennedy filed a concurring opinion.

Justice Thomas filed an opinion concurring in the judgment.

Justice Alito filed a dissenting opinion.

**\*\*2278** *Syllabus* [*]

**\*254** The Armed Career Criminal Act (ACCA) increases the sentences of certain **\*\*2279** federal defendants who have three prior convictions "for a violent felony," including "burglary, arson, or extortion." 18 U.S.C. § 924(e). To determine whether a past conviction is for one of those crimes, courts use a "categorical approach": They compare the statutory elements of a prior conviction with the elements of the "generic" crime—*i.e.,* the offense as commonly understood. If the statute's elements are the same as, or narrower than, those of the generic offense, the prior conviction qualifies as an ACCA predicate. When a prior conviction is for violating a "divisible statute"—one that sets out one or more of the elements of the offense in the alternative, *e.g.,* burglary involving entry into a building *or* an automobile—a "modified categorical approach" is used. That approach permits sentencing

133 S.Ct. 2276, 186 L.Ed.2d 438, 81 USLW 4490, 13 Cal. Daily Op. Serv. 6313...

courts to consult a limited class of documents, such as indictments and jury instructions, to determine which alternative element formed the basis of the defendant's prior conviction.

Petitioner Descamps was convicted of being a felon in possession of a firearm. The Government sought an ACCA sentence enhancement, pointing to Descamps' three prior convictions, including one for burglary under California Penal Code Ann. § 459, which provides that a "person who enters" certain locations "with intent to commit grand or petit larceny or any felony is guilty of burglary." In imposing an enhanced sentence, the District Court rejected Descamps' argument that his § 459 conviction cannot serve as an ACCA predicate because § 459 goes beyond the "generic" definition of burglary. The Ninth Circuit affirmed, holding that its decision in *United States v. Aguila–Montes de Oca,* 655 F.3d 915, permits the application of the modified categorical approach to a prior conviction under a statute that is "categorically broader than the generic offense." It found that Descamps' § 459 conviction, as revealed in the plea colloquy, rested on facts satisfying the elements of generic burglary.

*Held* : The modified categorical approach does not apply to statutes like § 459 that contain a single, indivisible set of elements. Pp. 2281 – 2293.

(a) This Court's caselaw all but resolves this case. In *Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607, and *Shepard v. United States,* 544 U.S. 13, 125 S.Ct. 1254, 161 L.Ed.2d 205, the Court approved the use of a modified categorical approach in a "narrow **\*255** range of cases" in which a divisible statute, listing potential offense elements in the alternative, renders opaque which element played a part in the defendant's conviction. Because a sentencing court cannot tell, simply by looking at a divisible statute, which version of the offense a defendant was convicted of, the court is permitted to consult extra-statutory documents—but only to assess whether the defendant was convicted of the particular "statutory definition" that corresponds to the generic offense. *Nijhawan v. Holder,* 557 U.S. 29, 129 S.Ct. 2294, 174 L.Ed.2d 22, and *Johnson v. United States,* 559 U.S. 133, 130 S.Ct. 1265, 176 L.Ed.2d 1, also emphasized this elements-based rationale for the modified categorical approach. That approach plays no role here, where the dispute does not concern alternative elements but a simple discrepancy between generic burglary and § 459. Pp. 2281 – 2286.

(b) The Ninth Circuit's *Aguila–Montes* approach turns an elements-based inquiry into an evidence-based one, asking not whether "statutory definitions" necessarily require an adjudicator to find the **\*\*2280** generic offense, but whether the prosecutor's case realistically led the adjudicator to find certain facts. *Aguila–Montes* has no roots in this Court's precedents. In fact, it subverts those decisions, conflicting with each of the rationales supporting the categorical approach and threatening to undo all its benefits. Pp. 2286 – 2291.

(1) *Taylor* 's elements-centric categorical approach comports with ACCA's text and history, avoids Sixth Amendment concerns that would arise from sentencing courts' making factual findings that properly belong to juries, and averts "the practical difficulties and potential unfairness of a factual approach." 495 U.S., at 601, 110 S.Ct. 2143.

ACCA's language shows that Congress intended sentencing courts "to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions." *Id.,* at 600, 110 S.Ct. 2143. The Ninth Circuit's approach runs headlong into that congressional choice. Instead of reviewing extra-statutory documents only to determine which alternative element was the basis for the conviction, the Circuit looks to those materials to discover what the defendant actually did.

Under ACCA, the sentencing court's finding of a predicate offense indisputably increases the maximum penalty. Accordingly, that finding would (at least) raise serious Sixth Amendment concerns if it went beyond merely identifying a prior conviction. That is why *Shepard* refused to permit sentencing courts to make a disputed determination about what facts must have supported

133 S.Ct. 2276, 186 L.Ed.2d 438, 81 USLW 4490, 13 Cal. Daily Op. Serv. 6313...

a defendant's conviction. 544 U.S., at 25, 125 S.Ct. 1254 (plurality opinion). Yet the Ninth Circuit flouts this Court's reasoning by authorizing judicial factfinding that goes far beyond the recognition of a prior conviction.

**\*256** The Ninth Circuit's decision also creates the same "daunting" difficulties and inequities that first encouraged the adoption of the categorical approach. Sentencing courts following *Aguila–Montes* would have to expend resources examining (often aged) documents for evidence that a defendant admitted, or a prosecutor showed, facts that, although unnecessary to the crime of conviction, satisfied an element of the relevant generic offense. And the *Aguila–Montes* approach would also deprive many defendants of the benefits of their negotiated plea deals. Pp. 2287 – 2290.

(2) In defending *Aguila–Montes,* the Ninth Circuit denied any real distinction between divisible and indivisible statutes extending further than the generic offense. But the Circuit's efforts to imaginatively reconceive all indivisible statutes as divisible ones are unavailing. Only divisible statutes enable a sentencing court to conclude that a jury (or judge at a plea hearing) has convicted the defendant of every element of the generic crime. Pp. 2289 – 2291.

(c) The Government offers a slightly different argument: It contends that the modified categorical approach should apply where, as here, the mismatch of elements between the crime of conviction and the generic offense results not from a missing element but from an element's overbreadth. But that distinction is malleable and manipulable. And in any event, it is a distinction without a difference. Whether the statute of conviction has an overbroad or missing element, the problem is the same: Because of the mismatch in elements, a person convicted under that statute is never convicted of the generic crime. Pp. 2291 – 2293.

(d) Because generic unlawful entry is not an element, or an alternative element of, § 459, a conviction under that statute is **\*\*2281** never for generic burglary. Descamps' ACCA enhancement was therefore improper. Pp. 2292 – 2293.

466 Fed.Appx. 563, reversed.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C.J., and SCALIA, KENNEDY, GINSBURG, BREYER, and SOTOMAYOR, JJ., joined. KENNEDY, J., filed a concurring opinion. THOMAS, J., filed an opinion concurring in the judgment. ALITO, J., filed a dissenting opinion.

**Attorneys and Law Firms**

Dan B. Johnson, Spokane, WA, for Petitioner.

Benjamin J. Horwich, Washington, DC, for Respondent.

Matthew Campbell, Assistant Federal Defender, Federal Defenders of Eastern Washington and Idaho, Spokane, WA, Dan B. Johnson, Counsel of Record, Spokane, WA, for Petitioner.

Donald B. Verrilli, Jr., Solicitor General, Counsel of Record, Lanny A. Breuer, Assistant Attorney General, Michael R. Dreeben, Deputy Solicitor General, Benjamin J. Horwich, Assistant to the Solicitor General, Daniel S. Goodman, Attorney, Department of Justice, Washington, DC, for Respondent.

**Opinion**

Justice KAGAN delivered the opinion of the Court.

**\*257** The Armed Career Criminal Act (ACCA or Act), 18 U.S.C. § 924(e), increases the sentences of certain federal defendants who have three prior convictions "for a violent felony," including "burglary, arson, or extortion." To determine whether a past conviction is for one of those crimes, courts use what has become known as the "categorical approach": They

133 S.Ct. 2276, 186 L.Ed.2d 438, 81 USLW 4490, 13 Cal. Daily Op. Serv. 6313...

compare the elements of the statute forming the basis of the defendant's conviction with the elements of the "generic" crime—*i.e.,* the offense as commonly understood. The prior conviction qualifies as an ACCA predicate only if the statute's elements are the same as, or narrower than, those of the generic offense.

We have previously approved a variant of this method—labeled (not very inventively) the "modified categorical approach"—when a prior conviction is for violating a so-called "divisible statute." That kind of statute sets out one or more elements of the offense in the alternative—for example, stating that burglary involves entry into a building *or* an automobile. If one alternative (say, a building) matches an element in the generic offense, but the other (say, an automobile) does not, the modified categorical approach permits sentencing courts to consult a limited class of documents, such as indictments and jury instructions, to determine which alternative formed the basis of the defendant's prior conviction. The court can then do what the categorical approach demands: compare the elements of the crime of conviction (including the alternative element used in the case) with the elements of the generic crime.

**\*258**  This case presents the question whether sentencing courts may also consult those additional documents when a defendant was convicted under an "indivisible" statute—*i.e.,* one not containing alternative elements—that criminalizes a broader swath of conduct than the relevant generic offense. That would enable a court to decide, based on information about a case's underlying facts, that the defendant's prior conviction qualifies as an ACCA predicate even though the elements **\*\*2282**  of the crime fail to satisfy our categorical test. Because that result would contravene our prior decisions and the principles underlying them, we hold that sentencing courts may not apply the modified categorical approach when the crime of which the defendant was convicted has a single, indivisible set of elements.


I


Petitioner Michael Descamps was convicted of being a felon in possession of a firearm, in violation of 🚩 18 U.S.C. § 922(g). That unadorned offense carries a maximum penalty of 10 years in prison. The Government, however, sought an enhanced sentence under ACCA, based on Descamps' prior state convictions for burglary, robbery, and felony harassment.

ACCA prescribes a mandatory minimum sentence of 15 years for a person who violates 🚩 § 922(g) and "has three previous convictions ... for a violent felony or a serious drug offense." 🚩 § 924(e)(1). The Act defines a "violent felony" to mean any felony, whether state or federal, that "has as an element the use, attempted use, or threatened use of physical force against the person of another," or that "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 🚩 § 924(e)(2)(B).

Descamps argued that his prior burglary conviction could not count as an ACCA predicate offense under our categorical approach. He had pleaded guilty to violating California Penal Code Ann. § 459 (West 2010), which provides that a "person **\*259**  who enters" certain locations "with intent to commit grand or petit larceny or any felony is guilty of burglary." That statute does not require the entry to have been unlawful in the way most burglary laws do. Whereas burglary statutes generally demand breaking and entering or similar conduct, California's does not: It covers, for example, a shoplifter who enters a store, like any customer, during normal business hours. See 📘 *People v. Barry,* 94 Cal. 481, 483–484, 29 P. 1026, 1026–1027 (1892). In sweeping so widely, the state law goes beyond the normal, "generic" definition of burglary. According to Descamps, that asymmetry of offense elements precluded his conviction under § 459 from serving as an ACCA predicate, whether or not his own burglary involved an unlawful entry that could have satisfied the requirements of the generic crime.

The District Court disagreed. According to the court, our modified categorical approach permitted it to examine certain documents, including the record of the plea colloquy, to discover whether Descamps had "admitted the elements of a generic burglary" when entering his plea. App. 50a. And that transcript, the court ruled, showed that Descamps had done so. At the plea

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 580 of 912

Descamps v. U.S., 570 U.S. 254 (2013)
133 S.Ct. 2276, 186 L.Ed.2d 438, 81 USLW 4490, 13 Cal. Daily Op. Serv. 6313...

hearing, the prosecutor proffered that the crime " ' involve[d] the breaking and entering of a grocery store,' " and Descamps failed to object to that statement. *Ibid.* The plea proceedings, the District Court thought, thus established that Descamps' prior conviction qualified as a generic burglary (and so as a "violent felony") under ACCA. Applying the requisite penalty enhancement, the court sentenced Descamps to 262 months in prison—more than twice the term he would otherwise have received.

The Court of Appeals for the Ninth Circuit affirmed, relying on its recently issued decision in *United States v. Aguila–Montes de Oca,* 655 F.3d 915 (2011) (en banc) (*per curiam* ). There, a divided en banc court took much the same view of the modified categorical approach as had the District Court in this case. The en banc court held that when a sentencing **\*260** court considers a conviction under § 459—or **\*\*2283** any other statute that is "categorically broader than the generic offense"—the court may scrutinize certain documents to determine the factual basis of the conviction. See *id.,* at 940. Applying that approach, the Court of Appeals here found that Descamps' plea, as revealed in the colloquy, "rested on facts that satisfy the elements of the generic definition of burglary." 466 Fed.Appx. 563, 565 (2012).

We granted certiorari, 567 U.S. ——, 133 S.Ct. 90, 183 L.Ed.2d 730 (2012), to resolve a Circuit split on whether the modified categorical approach applies to statutes like § 459 that contain a single, "indivisible" set of elements sweeping more broadly than the corresponding generic offense. [1] We hold that it does not, and so reverse.

II

 Our caselaw explaining the categorical approach and its "modified" counterpart all but resolves this case. In those decisions, as shown below, the modified approach serves a limited function: It helps effectuate the categorical analysis when a divisible statute, listing potential offense elements in the alternative, renders opaque which element played a part in the defendant's conviction. So understood, the modified approach cannot convert Descamps' conviction under § 459 into an ACCA predicate, because that state law defines burglary not alternatively, but only more broadly than the generic offense.

 We begin with *Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), which established the rule for determining when a defendant's prior conviction counts as one of ACCA's enumerated **\*261** predicate offenses (*e.g.,* burglary). *Taylor* adopted a "formal categorical approach": Sentencing courts may "look only to the statutory definitions"—*i.e.,* the elements—of a defendant's prior offenses, and *not* "to the particular facts underlying those convictions." *Id.,* at 600, 110 S.Ct. 2143. If the relevant statute has the same elements as the "generic" ACCA crime, then the prior conviction can serve as an ACCA predicate; so too if the statute defines the crime more narrowly, because anyone convicted under that law is "necessarily ... guilty of all the [generic crime's] elements." *Id.,* at 599, 110 S.Ct. 2143. But if the statute sweeps more broadly than the generic crime, a conviction under that law cannot count as an ACCA predicate, even if the defendant actually committed the offense in its generic form. The key, we emphasized, is elements, not facts. So, for example, we held that a defendant can receive an ACCA enhancement for burglary only if he was convicted of a crime having "the basic elements" of generic burglary—*i.e.,* "unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." *Ibid.* And indeed, we indicated that the very statute at issue here, § 459, does not fit that bill because "California defines 'burglary' so broadly as to include shoplifting." *Id.,* at 591, 110 S.Ct. 2143.

At the same time, *Taylor* recognized a "narrow range of cases" in which sentencing courts—applying what we would later dub the "modified categorical approach"— **\*\*2284** may look beyond the statutory elements to "the charging paper and jury instructions" used in a case. *Id.,* at 602, 110 S.Ct. 2143. To explain when courts should resort to that approach, we hypothesized a statute with alternative elements—more particularly, a burglary statute (otherwise conforming to the generic

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 581 of 912

**Descamps v. U.S., 570 U.S. 254 (2013)**
133 S.Ct. 2276, 186 L.Ed.2d 438, 81 USLW 4490, 13 Cal. Daily Op. Serv. 6313...

crime) that prohibits "entry of an automobile as well as a building." *Ibid.* One of those alternatives (a building) corresponds to an element in generic burglary, whereas the other (an automobile) does not. In a typical case brought under the statute, the prosecutor charges one of those two alternatives, **\*262** and the judge instructs the jury accordingly. So if the case involves entry into a building, the jury is "actually required to find all the elements of generic burglary," as the categorical approach demands. *Ibid.* But the statute alone does not disclose whether that has occurred. Because the statute is "divisible"—*i.e.,* comprises multiple, alternative versions of the crime—a later sentencing court cannot tell, without reviewing something more, if the defendant's conviction was for the generic (building) or non-generic (automobile) form of burglary. Hence *Taylor* permitted sentencing courts, as a tool for implementing the categorical approach, to examine a limited class of documents to determine which of a statute's alternative elements formed the basis of the defendant's prior conviction.

In *Shepard v. United States,* 544 U.S. 13, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005), the hypothetical we posited in *Taylor* became real: We confronted a Massachusetts burglary statute covering entries into "boats and cars" as well as buildings. 544 U.S., at 17, 125 S.Ct. 1254. The defendant there pleaded guilty to violating the statute, and we first confirmed that *Taylor* 's categorical approach applies not just to jury verdicts, but also to plea agreements. That meant, we held, that a conviction based on a guilty plea can qualify as an ACCA predicate only if the defendant "necessarily admitted [the] elements of the generic offense." *Id.,* at 26, 125 S.Ct. 1254. But as we had anticipated in *Taylor,* the divisible nature of the Massachusetts burglary statute confounded that inquiry: No one could know, just from looking at the statute, which version of the offense Shepard was convicted of. Accordingly, we again authorized sentencing courts to scrutinize a restricted set of materials—here, "the terms of a plea agreement or transcript of colloquy between judge and defendant"—to determine if the defendant had pleaded guilty to entering a building or, alternatively, a car or boat. *Ibid.* Yet we again underscored the narrow scope of that review: It was not to determine "what the defendant and state judge must have understood as the factual basis of the **\*263** prior plea," but only to assess whether the plea was to the version of the crime in the Massachusetts statute (burglary of a building) corresponding to the generic offense. *Id.,* at 25–26, 125 S.Ct. 1254 (plurality opinion).

Two more recent decisions have further emphasized the elements-based rationale—applicable only to divisible statutes—for examining documents like an indictment or plea agreement. In *Nijhawan v. Holder,* 557 U.S. 29, 129 S.Ct. 2294, 174 L.Ed.2d 22 (2009), we discussed another Massachusetts statute, this one prohibiting " 'Breaking and Entering at Night' " in any of four alternative places: a "building, ship, vessel, or vehicle." *Id.,* at 35, 129 S.Ct. 2294. We recognized that when a statute so "refer[s] to several different crimes," not all of which qualify as an ACCA predicate, a court must determine which crime formed the basis of the defendant's conviction. *Ibid.* That is why, we explained, *Taylor* and *Shepard* developed the modified categorical **\*\*2285** approach. By reviewing the extra-statutory materials approved in those cases, courts could discover "which statutory phrase," contained in a statute listing "several different" crimes, "covered a prior conviction." 557 U.S., at 41, 129 S.Ct. 2294. And a year later, we repeated that understanding of when and why courts can resort to those documents: "[T]he 'modified categorical approach' that we have approved permits a court to determine which statutory phrase was the basis for the conviction." *Johnson v. United States,* 559 U.S. 133, 144, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010) (citation omitted).

Applied in that way—which is the only way we have ever allowed—the modified approach merely helps implement the categorical approach when a defendant was convicted of violating a divisible statute. The modified approach thus acts not as an exception, but instead as a tool. It retains the categorical approach's central feature: a focus on the elements, rather than the facts, of a crime. And it preserves the categorical approach's basic method: comparing those elements with the generic offense's. All the modified approach adds is a mechanism for making that comparison **\*264** when a statute lists multiple, alternative elements, and so effectively creates "several different ... crimes." *Nijhawan,* 557 U.S., at 41, 129 S.Ct. 2294. If at least one, but not all of those crimes matches the generic version, a court needs a way to find out which the defendant was convicted of.

That is the job, as we have always understood it, of the modified approach: to identify, from among several alternatives, the crime of conviction so that the court can compare it to the generic offense. [2]

 The modified approach thus has no role to play in this case. The dispute here does not concern any list of alternative elements. Rather, it involves a simple discrepancy between generic burglary and the crime established in § 459. The former requires an unlawful entry along the lines of breaking and entering. See 3 W. LaFave, Substantive Criminal Law § 21.1(a) (2d ed. 2003) (hereinafter LaFave). The latter does not, and indeed covers simple shoplifting, as even the Government *265 acknowledges. See Brief for United States 38; Barry, 94 Cal., at 483–484, 29 P., at 1026–1027. In Taylor 's words, then, § 459 "define[s] burglary more broadly" than the generic offense. 495 U.S., at 599, 110 S.Ct. 2143. And because that is true—because California, **2286 to get a conviction, need not prove that Descamps broke and entered—a § 459 violation cannot serve as an ACCA predicate. Whether Descamps *did* break and enter makes no difference. And likewise, whether he ever admitted to breaking and entering is irrelevant. Our decisions authorize review of the plea colloquy or other approved extra-statutory documents only when a statute defines burglary not (as here) overbroadly, but instead alternatively, with one statutory phrase corresponding to the generic crime and another not. In that circumstance, a court may look to the additional documents to determine which of the statutory offenses (generic or non-generic) formed the basis of the defendant's conviction. But here no uncertainty of that kind exists, and so the categorical approach needs no help from its modified partner. We know Descamps' crime of conviction, and it does not correspond to the relevant generic offense. Under our prior decisions, the inquiry is over.

### III

The Court of Appeals took a different view. Dismissing everything we have said on the subject as "lack[ing] conclusive weight," the Ninth Circuit held in *Aguila–Montes* that the modified categorical approach could turn a conviction under *any* statute into an ACCA predicate offense. 655 F.3d, at 931. The statute, like § 459, could contain a single, indivisible set of elements covering far more conduct than the generic crime—and still, a sentencing court could "conside[r] to some degree the factual basis for the defendant's conviction" or, otherwise stated, "the particular acts the defendant committed." Id., at 935–936. More specifically, the court could look to reliable materials (the charging document, jury instructions, plea colloquy, and so forth) to determine *266 "what facts" can "confident[ly]" be thought to underlie the defendant's conviction in light of the " prosecutorial theory of the case" and the "facts put forward by the government." Id., at 936–937. It makes no difference, in the Ninth Circuit's view, whether "specific words in the statute" of conviction " ' actually required' " the jury (or judge accepting a plea) "to find a particular generic element." Id., at 936 (quoting Taylor, 495 U.S., at 602, 110 S.Ct. 2143; internal quotation marks omitted). [3]

 **2287 That approach—which an objecting judge aptly called "modified factual," 655 F.3d, at 948 (Berzon, J., concurring in judgment)—turns an elements-based inquiry into an *267 evidence-based one. It asks not whether "statutory definitions" necessarily require an adjudicator to find the generic offense, but instead whether the prosecutor's case realistically led the adjudicator to make that determination. And it makes examination of extra-statutory documents not a tool used in a "narrow range of cases" to identify the relevant element from a statute with multiple alternatives, but rather a device employed in every case to evaluate the facts that the judge or jury found. By this point, it should be clear that the Ninth Circuit's new way of identifying ACCA predicates has no roots in our precedents. But more: *Aguila–Montes* subverts those decisions, conflicting with each of the rationales supporting the categorical approach and threatening to undo all its benefits.

### A

This Court offered three grounds for establishing our elements-centric, "formal categorical approach." *Taylor,* 495 U.S., at 600, 110 S.Ct. 2143. First, it comports with ACCA's text and history. Second, it avoids the Sixth Amendment concerns that would arise from sentencing courts' making findings of fact that properly belong to juries. And third, it averts "the practical difficulties and potential unfairness of a factual approach." *Id.,* at 601, 110 S.Ct. 2143. When assessed in light of those three reasons, the Ninth Circuit's ruling strikes out swinging.

Start with the statutory text and history. As we have long recognized, ACCA increases the sentence of a defendant who has three "previous convictions" for a violent felony—not a defendant who has thrice committed such a crime. 18 U.S.C. § 924(e)(1); see *Taylor,* 495 U.S., at 600, 110 S.Ct. 2143. That language shows, as *Taylor* explained, that "Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions." *Ibid.*; see *Shepard,* 544 U.S., at 19, 125 S.Ct. 1254. If Congress had wanted to increase a sentence based on the facts of a prior offense, it presumably would have said so; other statutes, in other **\*268** contexts, speak in just that way. See *Nijhawan,* 557 U.S., at 36, 129 S.Ct. 2294 (construing an immigration statute as requiring a " 'circumstance-specific,' not a 'categorical,' " approach). But in ACCA, *Taylor* found, Congress made a deliberate decision to treat every conviction of a crime in the same manner: During the lengthy debate preceding the statute's enactment, "no one suggested that a particular crime might sometimes count towards enhancement and sometimes not, depending on the facts of the case." 495 U.S., at 601, 110 S.Ct. 2143. Congress instead meant ACCA to function as an on-off switch, directing that a prior crime would qualify as a predicate offense in all cases or in none.

The Ninth Circuit's approach runs headlong into that congressional choice. Instead of reviewing documents like an indictment or a plea colloquy only to determine "which statutory phrase was the basis for the conviction," the Ninth Circuit looks to those materials to discover what the defendant actually did. *Johnson,* 559 U.S., at 144, 130 S.Ct. 1265. This case demonstrates the point. Descamps was not *convicted of* generic burglary, because (as the Government agrees) § 459 does not contain that crime's required unlawful- **\*\*2288** entry element. See Brief for United States 38, 43–44. At most, the colloquy showed that Descamps *committed* generic burglary, and so hypothetically *could have been* convicted under a law criminalizing that conduct. But that is just what we said, in *Taylor* and elsewhere, is not enough. See 495 U.S., at 600, 110 S.Ct. 2143; *Carachuri–Rosendo v. Holder,* 560 U.S. ——, ——, 130 S.Ct. 2577, 2586, 177 L.Ed.2d 68 (2010) (rejecting such a " 'hypothetical approach' " given a similar statute's directive to "look to the conviction itself," rather than "to what might have or could have been charged"). And the necessary result of the Ninth Circuit's method is exactly the differential treatment we thought Congress, in enacting ACCA, took care to prevent. In the two years since *Aguila–Montes,* the Ninth Circuit has treated some, but not other, convictions under § 459 as ACCA predicates, based on minor variations in the cases' plea documents. Compare, **\*269** *e.g.,* 466 Fed.Appx., at 565 (Descamps' § 459 conviction counts as generic burglary), with 655 F.3d at 946 (Aguila–Montes' does not).

Similarly, consider (though *Aguila–Montes* did not) the categorical approach's Sixth Amendment underpinnings. We have held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Under ACCA, the court's finding of a predicate offense indisputably increases the maximum penalty. Accordingly, that finding would (at the least) raise serious Sixth Amendment concerns if it went beyond merely identifying a prior conviction. Those concerns, we recognized in *Shepard,* counsel against allowing a sentencing court to "make a disputed" determination "about what the defendant and state judge must have understood as the factual basis of the prior plea," or what the jury in a prior trial must have accepted as the theory of the crime. 544 U.S., at 25, 125 S.Ct. 1254 (plurality opinion); see *id.,* at 28, 125 S.Ct. 1254 (THOMAS, J., concurring in part and concurring in judgment) (stating that such a finding would "giv[e] rise to constitutional error, not doubt"). Hence our insistence on the categorical approach.

133 S.Ct. 2276, 186 L.Ed.2d 438, 81 USLW 4490, 13 Cal. Daily Op. Serv. 6313...

Yet again, the Ninth Circuit's ruling flouts our reasoning—here, by extending judicial factfinding beyond the recognition of a prior conviction. Our modified categorical approach merely assists the sentencing court in identifying the defendant's crime of conviction, as we have held the Sixth Amendment permits. But the Ninth Circuit's reworking authorizes the court to try to discern what a trial showed, or a plea proceeding revealed, about the defendant's underlying conduct. See *Aguila–Montes,* 655 F.3d, at 937. And there's the constitutional rub. The Sixth Amendment contemplates that a jury—not a sentencing court—will find such facts, unanimously and beyond a reasonable doubt. And the only facts the court can be sure the jury so found are those  **\*270**  constituting elements of the offense—as distinct from amplifying but legally extraneous circumstances. See, *e.g.,* *Richardson v. United States,* 526 U.S. 813, 817, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999). Similarly, as *Shepard* indicated, when a defendant pleads guilty to a crime, he waives his right to a jury determination of only that offense's elements; whatever he says, or fails to say, about superfluous facts cannot license a later sentencing court to impose extra punishment. See 544 U.S., at 24–26, 125 S.Ct. 1254 (plurality opinion). So when the District Court here enhanced Descamps' sentence, based on  **\*\*2289**  his supposed acquiescence to a prosecutorial statement (that he "broke and entered") irrelevant to the crime charged, the court did just what we have said it cannot: rely on its own finding about a non-elemental fact to increase a defendant's maximum sentence.

Finally, the Ninth Circuit's decision creates the same "daunting" difficulties and inequities that first encouraged us to adopt the categorical approach. *Taylor,* 495 U.S., at 601–602, 110 S.Ct. 2143. In case after case, sentencing courts following *Aguila–Montes* would have to expend resources examining (often aged) documents for evidence that a defendant admitted in a plea colloquy, or a prosecutor showed at trial, facts that, although unnecessary to the crime of conviction, satisfy an element of the relevant generic offense. The meaning of those documents will often be uncertain. And the statements of fact in them may be downright wrong. A defendant, after all, often has little incentive to contest facts that are not elements of the charged offense—and may have good reason not to. At trial, extraneous facts and arguments may confuse the jury. (Indeed, the court may prohibit them for that reason.) And during plea hearings, the defendant may not wish to irk the prosecutor or court by squabbling about superfluous factual allegations. In this case, for example, Descamps may have let the prosecutor's statement go because it was irrelevant to the proceedings. He likely was not thinking about the possibility that his silence could come  **\*271**  back to haunt him in an ACCA sentencing 30 years in the future. (Actually, he could not have been thinking that thought: ACCA was not even on the books at the time of Descamps' burglary conviction.)

Still worse, the *Aguila–Montes* approach will deprive some defendants of the benefits of their negotiated plea deals. Assume (as happens every day) that a defendant surrenders his right to trial in exchange for the government's agreement that he plead guilty to a less serious crime, whose elements do not match an ACCA offense. Under the Ninth Circuit's view, a later sentencing court could still treat the defendant as though he had pleaded to an ACCA predicate, based on legally extraneous statements found in the old record. *Taylor* recognized the problem: "[I]f a guilty plea to a lesser, nonburglary offense was the result of a plea bargain," the Court stated, "it would seem unfair to impose a sentence enhancement as if the defendant had pleaded guilty to generic burglary. 495 U.S., at 601–602, 110 S.Ct. 2143. That way of proceeding, on top of everything else, would allow a later sentencing court to rewrite the parties' bargain.

B

The Ninth Circuit defended its (excessively) modified approach by denying any real distinction between divisible and indivisible statutes extending further than the generic offense. "The only conceptual difference," the court reasoned, "is that [a divisible statute] creates an *explicitly* finite list of possible means of commission, while [an indivisible one] creates an *implied* list of every means of commission that otherwise fits the definition of a given crime." *Aguila–Montes,* 655 F.3d, at 927. For example, an indivisible statute "requir[ing] use of a 'weapon' is not meaningfully different"—or so says the Ninth Circuit—"from a statute that simply lists every kind of weapon in existence ... ('gun, axe, sword, baton, slingshot, knife, machete, bat,' and so on)." *Ibid.*

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 585 of 912

133 S.Ct. 2276, 186 L.Ed.2d 438, 81 USLW 4490, 13 Cal. Daily Op. Serv. 6313...

In a similar way, *every* indivisible statute can be imaginatively **\*272** reconstructed as a divisible one. And if that is true, the Ninth Circuit asks, why limit the modified categorical **\*\*2290** approach only to explicitly divisible statutes?

The simple answer is: Because only divisible statutes enable a sentencing court to conclude that a jury (or judge at a plea hearing) has convicted the defendant of every element of the generic crime. A prosecutor charging a violation of a divisible statute must generally select the relevant element from its list of alternatives. See, *e.g.,* *The Confiscation Cases,* 20 Wall. 92, 104, 22 L.Ed. 320 (1874) ("[A]n indictment or a criminal information which charges the person accused, in the disjunctive, with being guilty of one or of another of several offences, would be destitute of the necessary certainty, and would be wholly insufficient"). [4] And the jury, as instructions in the case will make clear, must then find that element, unanimously and beyond a reasonable doubt. So assume, along the lines of the Ninth Circuit's example, that a statute criminalizes assault with any of eight specified weapons; and suppose further, as the Ninth Circuit did, that only assault with a *gun* counts as an ACCA offense. A later sentencing court need only check the charging documents and instructions ("Do they refer to a gun or something else?") to determine whether in convicting a defendant under that divisible statute, the jury necessarily found that he committed the ACCA-qualifying crime.

None of that is true of an overbroad, indivisible statute. A sentencing court, to be sure, can hypothetically reconceive such a statute in divisible terms. So, as *Aguila–Montes* reveals, **\*273** a court blessed with sufficient time and imagination could devise a laundry list of potential "weapons"—not just the eight the Ninth Circuit mentioned, but also (for starters) grenades, pipe bombs, spears, tire irons, BB guns, nunchucks, and crossbows. But the thing about hypothetical lists is that they are, well, hypothetical. As long as the statute itself requires only an indeterminate "weapon," that is all the indictment must (or is likely to) allege and all the jury instructions must (or are likely to) mention. And most important, that is all the jury must find to convict the defendant. The jurors need not all agree on whether the defendant used a gun or a knife or a tire iron (or any other particular weapon that might appear in an imagined divisible statute), because the actual statute requires the jury to find only a "weapon." And even if in many cases, the jury could have readily reached consensus on the weapon used, a later sentencing court cannot supply that missing judgment. Whatever the underlying facts or the evidence presented, the defendant still would not have been convicted, in the deliberate and considered way the Constitution guarantees, of an offense with the same (or narrower) elements as the supposed generic crime (assault with a gun).

Indeed, accepting the Ninth Circuit's contrary reasoning would altogether collapse the distinction between a categorical and a fact-specific approach. After all, the Ninth Circuit's "weapons" example is just the tip of the iceberg: Courts can go much further in reconceiving indivisible statutes as impliedly divisible ones. In fact, every element of every statute can be imaginatively transformed as the Ninth **\*\*2291** Circuit suggests—so that every crime is seen as containing an infinite number of sub-crimes corresponding to "all the possible ways an individual can commit" it. *Aguila–Montes,* 655 F.3d, at 927. (Think: Professor Plum, in the ballroom, with the candlestick?; Colonel Mustard, in the conservatory, with the rope, on a snowy day, to cover up his affair with Mrs. Peacock?) If a sentencing court, as the Ninth Circuit **\*274** holds, can compare each of those "implied ... means of commission" to the generic ACCA offense, *ibid.* (emphasis deleted), then the categorical approach is at an end. At that point, the court is merely asking whether a particular set of facts leading to a conviction conforms to a generic ACCA offense. And that is what we have expressly and repeatedly forbidden. Courts may *modify* the categorical approach to accommodate alternative "statutory definitions." *Ibid.;* cf. *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.,* 512 U.S. 218, 225, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994) (" ' [T]o modify' means to change moderately or in minor fashion").

They may not, by pretending that every fact pattern is an "implied" statutory definition, *Aguila–Montes,* 655 F.3d, at 927, convert that approach into its opposite.

IV

The Government tries to distance itself from the Ninth Circuit by offering a purportedly narrower theory—that although an indivisible statute that is "truly missing" an element of the generic offense cannot give rise to an ACCA conviction, California's

133 S.Ct. 2276, 186 L.Ed.2d 438, 81 USLW 4490, 13 Cal. Daily Op. Serv. 6313...

burglary law can do so because it merely "contains a broader version of the [generic] element of unlawfulness of entry." Brief for United States 11–12. The Government's argument proceeds in three steps. It begins from the premise that sentencing courts applying ACCA should consider not only the statute defining a prior crime but also any judicial interpretations of it. Next, the Government points to a California decision holding (not surprisingly) that a defendant cannot "burglariz[e] his own home"; the case's reasoning, the Government notes, is that § 459 (though not saying so explicitly) requires "an entry which invades a possessory right." *People v. Gauze,* 15 Cal.3d 709, 713–716, 125 Cal.Rptr. 773, 542 P.2d 1365, 1367–1368 (1975). Given that precedent, the Government contends, § 459 includes a kind of "unlawful entry," although it is broader than the generic crime's analogous requirement. Finally,  **\*275**  the Government asserts that sentencing courts may use the modified approach "to determine whether a particular defendant's conviction under" such an overbroad statute actually "was for [the] generic" crime. Brief for United States 11.

 Although elaborately developed in the Government's brief, this argument's first two steps turn out to be sideshows. We may reserve the question whether, in determining a crime's elements, a sentencing court should take account not only of the relevant statute's text, but of judicial rulings interpreting it. And we may assume, as the Government insists, that California caselaw treats § 459 as including an element of entry "invading a possessory right"—although, truth be told, we find the state decisions on that score contradictory and confusing.[5] Even on those assumptions,  **\*\*2292**  § 459's elements do not come into line with generic burglary's. As the Government concedes, almost every entry onto another's property with intent to steal—including, for example, a shoplifter's walking into an open store—"invades a possessory right" under § 459. See Brief for United States 38; *Gauze,* 15 Cal.3d, at 714, 125 Cal.Rptr. 773, 542 P.2d, at 1367. By contrast, generic burglary's unlawful-entry element excludes any case in which a person enters premises open to the public, no matter his intent; the generic crime requires breaking and entering or similar unlawful activity. See Brief for United States 38; LaFave § 21.1(a). So everything rests on the Government's  **\*276**  third point: that this mismatch does not preclude applying the modified categorical approach, because it results not from a missing element but instead from an element's overbreadth.

But for starters, we see no principled way to make that distinction. Most overbroad statutes can also be characterized as missing an element; and most statutes missing an element can also be labeled overbroad. Here is the only conclusion in *Aguila–Montes* we agree with: "[I]t is difficult, if not impossible" to determine which is which. 655 F.3d, at 925. The example that court gave was as follows: A statute of conviction punishes possession of pornography, but a federal law carries a sentence enhancement for possession of child pornography. Is the statute of conviction overbroad because it includes both adult and child pornography; or is that law instead missing the element of involvement of minors? The same name game can be played with § 459. The Government labors mightily to turn what it fears looks like a missing-element statute into an overbroad statute through the incorporation of judicial decisions. But even putting those decisions aside, the Government might have described § 459 as merely having an overbroad element because "entry" includes both the lawful and the unlawful kind. And conversely, Descamps could claim that even as judicially interpreted, § 459 is entirely missing generic burglary's element of breaking and entering or similar unlawful conduct. All is in the eye of the beholder, and prone to endless manipulation.

In any event, and more fundamentally, we see no reason why the Government's distinction should matter. Whether the statute of conviction has an overbroad or missing element, the problem is the same: Because of the mismatch in elements, a person convicted under that statute is never convicted of the generic crime. In this case, for example, Descamps was not convicted of generic burglary because § 459, whether viewed as missing an element or containing an overbroad  **\*277**  one, does not require breaking and entering. So every reason we have given—textual, constitutional, and practical—for rejecting the Ninth Circuit's proposed approach applies to the Government's as well. See *supra,* at 2287 – 2290. At bottom, the Government wants the same thing as the Ninth Circuit (if nominally in a few fewer cases): It too wishes a sentencing court to look beyond the elements to the evidence or, otherwise said, to explore whether a person convicted of one crime could also have been convicted of another, more serious offense. But that circumstance-specific review is just what the categorical approach precludes. And as we have explained, we adopted the modified approach to help implement  **\*\*2293**  the categorical inquiry, not to undermine it.

**WESTLAW**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

133 S.Ct. 2276, 186 L.Ed.2d 438, 81 USLW 4490, 13 Cal. Daily Op. Serv. 6313...

<div align="center">V</div>

Descamps may (or may not) have broken and entered, and so committed generic burglary. But § 459—the crime of which he was convicted—does not require the factfinder (whether jury or judge) to make that determination. Because generic unlawful entry is not an element, or an alternative element, of § 459, a conviction under that statute is never for generic burglary. And that decides this case in Descamps' favor; the District Court should not have enhanced his sentence under ACCA. [6] That court and the Ninth Circuit erred in invoking the modified categorical approach to look behind Descamps' conviction in search of *278 record evidence that he actually committed the generic offense. The modified approach does not authorize a sentencing court to substitute such a facts-based inquiry for an elements-based one. A court may use the modified approach only to determine which alternative element in a divisible statute formed the basis of the defendant's conviction. Accordingly, we reverse the judgment of the Court of Appeals.

*It is so ordered.*

Justice KENNEDY, concurring.

As the Court explains, this case concerns earlier convictions under state statutes classified by cases in the Courts of Appeals, and now in today's opinion for the Court, as "indivisible." See, *e.g., United States v. Aguila–Montes de Oca,* 655 F.3d 915 (C.A.9 2011) (en banc) (*per curiam* ); *United States v. Beardsley,* 691 F.3d 252 (C.A.2 2012). This category is used to describe a class of criminal statutes that are drafted with a single set of elements that are broader than those of the generic definition of the corresponding crime enumerated in the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(2)(B)(ii).

Just one of the substantial concerns that the Court is correct to consider is that, in the regular course of the criminal process, convictions may be entered, often by guilty pleas, when either the attorney or the client, or both, have given no consideration to possible later consequences under ACCA. See *ante,* at 2289 – 2290. As a result, certain facts in the documents approved for judicial examination in *Shepard v. United States,* 544 U.S. 13, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005), may go uncontested because they do not alter the sentencing consequences of the crime, even though their effect is to require a later enhancement under ACCA. This significant risk of failing to consider the full consequences of the plea and conviction is troubling.

*279 Balanced against this, as Justice ALITO indicates, is that the dichotomy between divisible and indivisible state criminal statutes is not all that clear. See *post,* at 2301 – 2302 (dissenting opinion). The effect of today's decision, moreover, is that an unspecified number, but likely a large number, of state criminal statutes that are indivisible but that often do reach serious crimes otherwise subject to ACCA's provisions, **2294 now must be amended by state legislatures. Otherwise, they will not meet federal requirements even though they would have come within ACCA's terms had the state statute been drafted in a different way. This is an intrusive demand on the States.

On due consideration, the concerns well expressed by the Court persuade me that it reaches the correct result. The disruption to the federal policy underlying ACCA, nevertheless, is troubling and substantial. See *post,* at 2301 – 2302 (ALITO, J., dissenting). If Congress wishes to pursue its policy in a proper and efficient way without mandating uniformity among the States with respect to their criminal statutes for scores of serious offenses, and without requiring the amendment of any number of federal criminal statutes as well, Congress should act at once. It may then determine whether ACCA's design and structure should be modified to meet the concerns expressed both by the Court and the dissenting opinion.

With these observations, I join the opinion of the Court.

Justice THOMAS, concurring in the judgment.

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 588 of 912

Descamps v. U.S., 570 U.S. 254 (2013)
133 S.Ct. 2276, 186 L.Ed.2d 438, 81 USLW 4490, 13 Cal. Daily Op. Serv. 6313...

Petitioner Matthew Descamps was convicted of being a felon in possession of a firearm, 🚩 18 U.S.C. § 922(g), which subjected him to a maximum sentence of 10 years' imprisonment. The District Court, however, applied an Armed Career Criminal Act (ACCA) enhancement with a mandatory *minimum* of 15 years based in part on Descamps' earlier California conviction for burglary. See 🚩 § 924(e). The California **\*280** law says that any "person who enters" any of a number of structures "with intent to commit grand or petit larceny or any felony is guilty of burglary." California Penal Code Ann. § 459 (West 2010). That law does not, on its face, require the jury to determine whether the entry itself was unlawful, a required element of the so-called "generic" offense of burglary that qualifies as an ACCA predicate. See *Taylor v. United States,* 495 U.S. 575, 599, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). The majority holds that a court may not review the underlying facts of Descamps' state crime to determine whether he entered the building unlawfully and, thus, that his burglary conviction may not be used as a predicate offense under ACCA. While I agree with the Court's conclusion, I disagree with its reasoning.

I have previously explained that ACCA runs afoul of 🟡 *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), because it allows the judge to "mak[e] a finding that raises [a defendant's] sentence beyond the sentence that could have lawfully been imposed by reference to facts found by the jury or admitted by the defendant." 🚩 *James v. United States,* 550 U.S. 192, 231, 127 S.Ct. 1586, 167 L.Ed.2d 532 (2007) (dissenting opinion) (internal quotation marks omitted). Under the logic of *Apprendi,* a court may not find facts about a prior conviction when such findings increase the statutory maximum. This is so whether a court is determining whether a prior conviction was entered, see 530 U.S., at 520–521, 120 S.Ct. 2348 (THOMAS, J., concurring), or attempting to discern what facts were necessary to a prior conviction. See 🚩 *James, supra,* at 231–232, 127 S.Ct. 1586 (THOMAS, J., dissenting). In either case, the court is inappropriately finding a fact that must be submitted to the jury because it "increases the penalty for a crime beyond the prescribed statutory maximum." *Apprendi, supra,* at 490, 120 S.Ct. 2348

In light of the foregoing, it does not matter whether a statute is "divisible" or "indivisible," see *ante,* at 2278 – 2280, and courts should not have to struggle with the **\*\*2295** contours of the so-called "modified categorical" approach. *Ibid.* **\*281** The only reason Descamps' ACCA enhancement is before us is "because this Court has not yet reconsidered 🟡🔶 *Almendarez–Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), which draws an exception to the *Apprendi* line of cases for judicial factfinding that concerns a defendant's prior convictions." 🟡 *Shepard v. United States,* 544 U.S. 13, 27, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005) (THOMAS, J., concurring in part and concurring in judgment). Regardless of the framework adopted, judicial factfinding increases the statutory maximum in violation of the Sixth Amendment. However, because today's opinion at least limits the situations in which courts make factual determinations about prior convictions, I concur in the judgment.


Justice ALITO, dissenting.

The Court holds, on highly technical grounds, that no California burglary conviction qualifies as a burglary conviction under the Armed Career Criminal Act (ACCA), 🚩 18 U.S.C. § 924(c). This is so, according to the Court, because (1) burglary under California law is broader than so-called "generic burglary"—unlawfully entering or remaining in a building with the intent to commit a crime; (2) the California burglary statute is not "divisible"; and (3) our "modified categorical approach" cannot be used in a case involving an indivisible statute. Even when it is apparent that a California burglary conviction was based on what everyone imagines when the term "burglary" is mentioned—*e.g.,* breaking into a home to steal valuables—that conviction, the Court holds, must be ignored.

I would give ACCA a more practical reading. When it is clear that a defendant necessarily admitted or the jury necessarily found that the defendant committed the elements of generic burglary, the conviction should qualify. Petitioner's burglary conviction meets that requirement, and I would therefore affirm the decision of the Court of Appeals.

I

Before petitioner was charged in the case now before us, he had already compiled a criminal record that included convictions **\*282** in Washington State for assault and threatening to kill a judge, and convictions in California for robbery and burglary. See App. 11a–12a; 466 Fed.Appx. 563, 565 (C.A.9 2012). After his release from custody for these earlier crimes, petitioner fired a gun in the direction of a man who supposedly owed him money for methamphetamine, and as a result, he was charged in federal court with possession of a firearm by a convicted felon, in violation of § 922(g)(1). A jury found him guilty, and the District Court imposed an enhanced sentence under ACCA because he had the requisite number of previous convictions for "a violent felony or a serious drug offense." § 924(e). ACCA defines a "violent felony" to include a "burglary" that is "punishable by imprisonment for a term exceeding one year," § 924(e)(2)(B), and both the District Court and the Court of Appeals found that petitioner's California burglary conviction fit this definition.

While the concept of a conviction for burglary might seem simple, things have not worked out that way under our case law. In *Taylor v. United States,* 495 U.S. 575, 599, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), we held that "burglary" under ACCA means what we called "generic burglary," that is, the "unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." Determining whether a burglary conviction qualifies under this definition is **\*\*2296** easy if the elements set out in the state statute are the same as or narrower than the elements of generic burglary, see *ibid.,* but what if the state offense is broader? In that event, we have held, a federal court may sometimes apply what we have termed the "modified categorical approach," that is, it may examine some items in the state-court record, including charging documents, jury instructions, and statements made at guilty plea proceedings, to determine if the defendant was actually found to have committed the elements of the generic offense. See *Shepard v. United States,* 544 U.S. 13, 20, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005); *Taylor, supra,* at 602, 110 S.Ct. 2143.

**\*283** Petitioner argues that his 1978 conviction for burglary under California Penal Code § 459 does not qualify as a burglary conviction for ACCA purposes because of the particular way in which this provision is worded. Section 459 provides that a "person who enters" certain locations " with intent to commit grand or petit larceny or any felony is guilty of burglary." Cal.Penal Code Ann. § 459 (West 2010). This provision is broader than generic burglary in two respects.

The first, which does not preclude application of the modified categorical approach, concerns the place burglarized. While generic burglary applies only to offenses involving the entry of a building, the California provision also reaches offenses involving the entry of some other locations, see *ibid.* Under our cases, however, a federal court considering whether to apply ACCA may determine, based on an examination of certain relevant documents, whether the conviction was actually based on the entry of a building and, if it was, may impose an increased sentence. See *Johnson v. United States,* 559 U.S. 133, 144, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010); *Nijhawan v. Holder,* 557 U.S. 29, 35, 129 S.Ct. 2294, 174 L.Ed.2d 22 (2009); *Shepard, supra,* at 26, 125 S.Ct. 1254.

The second variation is more consequential. Whereas generic burglary requires an entry that is unlawful or unprivileged, the California statute refers without qualification to "[e]very person who enters." § 459. Petitioner argues, and the Court agrees, that this discrepancy renders the modified categorical approach inapplicable to his California burglary conviction.

II

133 S.Ct. 2276, 186 L.Ed.2d 438, 81 USLW 4490, 13 Cal. Daily Op. Serv. 6313...

The Court holds that "sentencing courts may not apply the modified categorical approach when the crime of which the defendant was convicted has a single, indivisible set of elements." *Ante,* at 2282. Because the Court's holding is based on the distinction between "divisible" and "indivisible" statutes, it is important to identify precisely what this taxonomy means.

**\*284** My understanding is that a statute is divisible, in the sense used by the Court, only if the offense in question includes as separate elements all of the elements of the generic offense. By an element, I understand the Court to mean something on which a jury must agree by the vote required to convict under the law of the applicable jurisdiction. See *ante,* at 2288 (citing *Richardson v. United States,* 526 U.S. 813, 817, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999)). And although the Court reserves decision on the question whether a sentencing court may take authoritative judicial decisions into account in identifying the elements of a statute, see *ante,* at 2291 – 2292 I will assume that a sentencing court may do so. While the elements of a criminal offense are generally set out in the statutory text, courts sometimes find that unmentioned elements are implicit. See, *e.g., Neder v. United States,* 527 U.S. 1, 20, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (holding that federal mail fraud, wire **\*\*2297** fraud, and bank fraud statutes require proof of materiality even though that element is not mentioned in the statutory text). I cannot think of any reason why an authoritative decision of this sort should be ignored, and the Court has certainly not provided any. I therefore proceed on the assumption that a statute is divisible if the offense, *as properly construed,* has the requisite elements.

The Court's holding that the modified categorical approach may be used only when a statute is divisible in this sense is not required by ACCA or by our prior cases and will cause serious practical problems.

A

Nothing in the text of ACCA mandates the Court's exclusive focus on the elements of an offense. ACCA increases the sentence of a defendant who has "three previous *convictions ...* for a violent felony," 18 U.S.C. § 924(e)(1) (emphasis added), and the Court claims that the word "convictions" mandates a narrow, elements-based inquiry, see *ante,* at 2287 – 2288. But "[i]n ordinary speech, when it is said that a person was convicted of or for doing something, the 'something' may include facts that go beyond the bare elements of the relevant **\*285** criminal offense." *Moncrieffe v. Holder,* 569 U.S. ——, ——, 133 S.Ct. 1678, 1701, 185 L.Ed.2d 727 (2013) (ALITO, J., dissenting).

Nor is an exclusively elements-based inquiry mandated by ACCA's definition of a "violent felony" as "any crime ... that ... is burglary," § 924(e)(2)(B)(ii). In drafting that provision, Congress did not say "any crime that has *the elements* of burglary." Indeed, the fact that Congress referred to "elements" elsewhere in the same subparagraph, see § 924(e)(2)(B)(i) (defining "violent felony" to mean any crime that "has *as an element* the use, attempted use, or threatened use of physical force against the person of another" (emphasis added)), but omitted any reference to elements from § 924(e)(2)(B)(ii) suggests, if anything, that it did not intend to focus exclusively on elements. Cf. *Caraco Pharmaceutical Laboratories, Ltd. v. Novo Nordisk A/S,* 566 U.S. ——, ——, 132 S.Ct. 1670, 1682–83, 182 L.Ed.2d 678 (2012).

B

The Court says that our precedents require an elements-based approach and accuses the Court of Appeals of "flout[ing] our reasoning" in *Taylor, Shepard, Nijhawan,* and *Johnson,* see *ante,* at 2283 – 2285, 2288, but that charge is unfounded. In at least three of those cases, the Court thought that the modified categorical approach could be used in relation to statutes that may not have been divisible.

133 S.Ct. 2276, 186 L.Ed.2d 438, 81 USLW 4490, 13 Cal. Daily Op. Serv. 6313...

*Shepard* concerned prior convictions under two Massachusetts burglary statutes that applied not only to the entry of a "building" (as is the case with generic burglary) but also to the entry of a "ship, vessel, or vehicle." Mass. Gen. Laws Ann., ch. 266, § 16 (West 2000). See also § 18; 544 U.S., at 17, 125 S.Ct. 1254. And the *Shepard* Court did not think that this feature of the Massachusetts statutes precluded the application of the modified categorical approach. See *id.,* at 25–26, 125 S.Ct. 1254; *ante,* at 2283 – 2284. See also *Nijhawan,* 557 U.S., at 35, 129 S.Ct. 2294 (discussing *Shepard* ).

In today's decision, the Court assumes that "building" and the other locations enumerated in the Massachusetts **\*286** statutes, such as "vessel," were alternative elements, but that is questionable. It is quite likely that the entry of a building and the entry of a vessel were simply alternative means of satisfying an element. See **\*\*2298** *Commonwealth v. Cabrera,* 449 Mass. 825, 827, 874 N.E.2d 654, 657 (2007) ("The elements of breaking and entering in the nighttime with intent to commit a felony are (1) breaking and (2) entering a building, ship, vessel or vehicle belonging to another (3) at night, (4) with the intent to commit a felony"). "[L]egislatures frequently enumerate alternative means of committing a crime without intending to define separate elements or separate crimes." *Schad v. Arizona,* 501 U.S. 624, 636, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) (plurality). The feature that distinguishes elements and means is the need for juror agreement, see *Richardson, supra,* at 817, 119 S.Ct. 1707, and therefore in determining whether the entry of a building and the entry of a vessel are elements or means, the critical question is whether a jury would have to agree on the nature of the place that a defendant entered.

A case that we decided earlier this Term illustrates why "building" and "vessel" may have been means and not separate elements. In *Lozman v. Riviera Beach,* 568 U.S. ——, 133 S.Ct. 735, 184 L.Ed.2d 604 (2013), we were required to determine whether a "floating home" (a buoyant but not very sea-worthy dwelling) was a "vessel." Seven of us thought it was not; two of us thought it might be. Compare *id.,* at ——, 133 S.Ct., at 739, with *id.,* at ——, 133 S.Ct., at 744–45. (SOTOMAYOR, J., dissenting). Suppose that a defendant in Massachusetts was charged with breaking into a structure like the *Lozman* floating home. In order to convict, would it be necessary for the jury to agree whether this structure was a "building" or a "vessel"? If some jurors insisted it was a building and others were convinced it was a vessel, would the jury be hung? The Court's answer is "yes." According to the Court, if a defendant had been charged with burglarizing the *Lozman* floating home and this Court had been sitting as the jury, the defendant would have escaped conviction **\*287** for burglary, no matter how strong the evidence, because the "jury" could not agree on whether he burglarized a building or a vessel.

I have not found a Massachusetts decision squarely on point, but there is surely an argument that the Massachusetts Legislature did not want to demand juror agreement on this question. In other words, there is a strong argument that entry of a "building" and entry of a "vessel" are merely alternative means, not alternative elements. And if that is so, the reasoning in *Shepard* undermines the Court's argument that the modified categorical approach focuses solely on elements and not on conduct.

*Johnson,* like *Shepard,* involved a statute that may have set out alternative means, rather than alternative elements. Under the Florida statute involved in that case, a battery occurs when a person either "1. [a]ctually and intentionally touches or strikes another person against the will of the other; or 2. [i]ntentionally causes bodily harm to another person." Fla. Stat. § 784.03(1)(a) (2010). It is a distinct possibility (one not foreclosed by any Florida decision of which I am aware) that a conviction under this provision does not require juror agreement as to whether a defendant firmly touched or lightly struck the victim. Nevertheless, in *Johnson,* we had no difficulty concluding that the modified categorical approach could be applied.[1] See 559 U.S., at 137, 130 S.Ct. 1265.[2]

**\*\*2299 \*288** Far from mandating the Court's approach, these decisions support a practical understanding of the modified categorical approach. Thus, in *Shepard,* we observed that the factual circumstances of a defendant's prior conviction may be relevant to determining whether it qualifies as a violent felony under ACCA. See 544 U.S., at 20–21, 125 S.Ct. 1254 ("With

AR.07087

133 S.Ct. 2276, 186 L.Ed.2d 438, 81 USLW 4490, 13 Cal. Daily Op. Serv. 6313...

such material in a pleaded case, a later court could generally tell whether the plea had 'necessarily' rested on the *fact* identifying the burglary as generic, just as the details of instructions could support that conclusion in the jury case, or the details of a generically limited charging document would do in any sort of case" (emphasis added; citation omitted)); 📄 *id.,* at 24, 125 S.Ct. 1254 (plurality opinion) ("Developments in the law since *Taylor* ... provide a further reason to adhere to the demanding requirement that ... a prior conviction 'necessarily' involved (and a prior plea necessarily admitted) *facts equating to* generic burglary" (emphasis added)); 📄 *id.,* at 25, 125 S.Ct. 1254 (noting that, in the context of a nongeneric burglary statute, unless the charging documents "narro[w] the charge to generic limits, the only certainty of a generic finding lies in jury instructions, or bench-trial findings and rulings, or (in a pleaded case) in the defendant's own admissions or accepted *findings of fact* confirming the *factual basis* for a **\*289** valid plea" (emphasis added)). And in *Nijhawan,* we departed from the categorical approach altogether and instead applied a "circumstance-specific" approach. See 📄 557 U.S., at 36, 38, 129 S.Ct. 2294. If anything, then, *Nijhawan* undermines the majority's position that rigid adherence to elements is always required.

C

The Court fears that application of the modified categorical approach to statutes such as § 459 would be unfair to defendants, who "often ha[ve] little incentive to contest facts that are not elements of the charged offense" and "may not wish to irk the prosecutor or court by squabbling about superfluous factual allegations." *Ante,* at 2289. This argument attributes to criminal defendants and their attorneys a degree of timidity that may not be realistic. But in any event, even if a defendant does not think it worthwhile to "squabbl[e]" about insignificant factual allegations, a defendant clearly has an incentive to dispute allegations that may have a bearing on his sentence. And that will **\*\*2300** often be the case when alternative elements or means suggest different degrees of culpability. Cf. Cal.Penal Code Ann. § 460 (providing that burglary of certain inhabited locations enumerated in § 459 is punishable in the first degree, and that burglary of all other locations is punishable in the second degree).

D

The Court's approach, I must concede, does have one benefit: It provides an extra measure of assurance that a burglary conviction will not be counted as an ACCA predicate unless the defendant, if he went to trial, was actually found by a jury to have committed the elements of the generic offense. But this extra bit of assurance will generally be quite modest at best.

To see why this is so, compare what would happen under an indivisible burglary statute that simply requires entry invading **\*290** a possessory right, and a divisible statute that has the following two alternative elements: (1) entry by trespass and (2) entry by invitation but with an undisclosed criminal intent. Under the former statute, the jury would be required to agree only that the defendant invaded a possessory right when entering the place in question, and therefore it would be possible for the jury to convict even if some jurors thought that the defendant entered by trespassing while others thought that he entered by invitation but with an undisclosed criminal intent. Under the latter statute, by contrast, the jury would have to agree either that he trespassed or that he entered by invitation but with an undisclosed criminal intent.

This requirement of unanimity would be of some practical value only if the evidence in a case pointed to both possibilities, and in a great many cases that will not be so. In cases prosecuted under the California burglary statute, I suspect, the evidence generally points either to a trespassory entry, typically involving breaking into a building or other covered place, or to an entry by invitation but with an undisclosed criminal intent (in many cases, shoplifting). Cases in which the evidence suggests that the defendant might have done either are probably not common. And in cases where there is evidence supporting both theories, the presence of a divisible statute containing alternative elements will not solve the problem: A guilty verdict will not reveal the alternative on which the jury agreed unless the jury is asked to return a special verdict, something that is not generally favored in criminal cases. See 6 LaFave § 24.10(a), at 543–544.

133 S.Ct. 2276, 186 L.Ed.2d 438, 81 USLW 4490, 13 Cal. Daily Op. Serv. 6313...

In cases that end with a guilty plea—and most do—the benefit of divisibility is even less. A judge who accepts a guilty plea is typically required to confirm that there is a factual basis for the plea, see 5 *id.,* § 21.4(f), at 835–840 (3d ed. 2007 and Supp. 2011–2012), and the proffer of a factual basis will generally focus exclusively on one of the alternative elements.

**\*291**  The Court nevertheless suggests that the extra modicum of assurance provided in cases involving divisible statutes is needed to prevent violations of the Sixth Amendment jury trial right, *ante,* at 2287 – 2289, but I disagree. So long as a judge applying ACCA is determining, not what the defendant did when the burglary in question was committed, but what the jury in that case necessarily found or what the defendant, in pleading guilty, necessarily admitted, the jury trial right is not infringed. See *Almendarez–Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). When the modified categorical approach is used to decide whether " a jury was actually required to find all the elements of [a] generic [offense]," the defendant has already enjoyed his Sixth Amendment right to a jury determination  **\*\*2301**  of those elements. *Taylor,* 495 U.S., at 602, 110 S.Ct. 2143.


### III

While producing very modest benefits at most, the Court's holding will create several serious problems.


### A

Determining whether a statute is divisible will often be harder than the Court acknowledges. What I have said about the statutes involved in *Shepard* and *Johnson* illustrates this point. The Court assumes that those statutes were divisible, but as I have explained, it is possible that they were not. See *supra,* at 2297 – 2298.

To determine whether a statute contains alternative elements, as opposed to merely alternative means of satisfying an element, a court called upon to apply ACCA will be required to look beyond the text of the statute, which may be deceptive. Take, for example, Michigan Compiled Laws Annotated § 750.82(1) (West 2004), which criminalizes assault with "a gun, revolver, pistol, knife, iron bar, club, brass knuckles, or other dangerous weapon." The Court seems to assume that a statute like this enumerates alternative elements, *ante,* at 2290 – 2291, but the Michigan courts have held otherwise.  **\*292**  Under Michigan law, the elements of § 750.82(1) are "(1) an assault, (2) with a dangerous weapon, and (3) with the intent to injure or place the victim in reasonable apprehension of an immediate battery." *People v. Avant,* 235 Mich.App. 499, 505, 597 N.W.2d 864, 869 (1999). Although the statute lists numerous types of weapons, the particular type of weapon is not itself an element that the prosecution must prove beyond a reasonable doubt. Instead, the list of weapons in the statute merely enumerates alternative means of committing the crime. [3]

Even if a federal court applying ACCA discovers a state-court decision holding that a particular fact must be alleged in a charging document, its research is not at an end. Charging documents must generally include factual allegations that go beyond the bare elements of the crime—specifically, at least enough detail to permit the defendant to mount a defense. See 5 LaFave § 19.3(b), at 276. And some jurisdictions require fairly specific factual allegations. See, *e.g.,* N.Y. Crim. Proc. Law Ann. § 200.50 (West 2007) (enumerating detailed requirements for indictment); *People v. Swanson,* 308 Ill.App.3d 708, 712, 242 Ill.Dec. 351, 721 N.E.2d 630, 633 (1999) (vacating conviction for disorderly conduct for submitting a false police report because information "d [id] not describe with particularity the time, date, or location of the alleged domestic battery and the acts comprising the battery ... [or] the statement that was falsely reported"); *Edwards v. State,* 379 So.2d 336, 338 (Ala.Crim.App.1979) (it is insufficient for an indictment for robbery to allege the amount of money taken; it "must aver the denomination of the money taken or that the particular denomination is  **\*293**  unknown to the grand jury"). Thus, the mere fact that state law requires a particular fact to be alleged in a charging document does not mean that this fact must be found by a jury or admitted by the defendant.

133 S.Ct. 2276, 186 L.Ed.2d 438, 81 USLW 4490, 13 Cal. Daily Op. Serv. 6313...

The only way to be sure whether particular items are alternative elements or simply alternative means of satisfying an element **\*\*2302** may be to find cases concerning the correctness of jury instructions that treat the items one way or the other. And such cases may not arise frequently. One of the Court's reasons for adopting the modified categorical approach was to simplify the work of ACCA courts, see 📄 *Shepard,* 544 U.S., at 20, 125 S.Ct. 1254; 📄 *Taylor,* 495 U.S., at 601, 110 S.Ct. 2143, but the Court's holding today will not serve that end.

### B

The Court's holding will also frustrate fundamental ACCA objectives. We have repeatedly recognized that Congress enacted ACCA to ensure (1) that violent, dangerous recidivists would be subject to enhanced penalties and (2) that those enhanced penalties would be applied uniformly, regardless of state-law variations. See, *e.g.,* 📄 *id.,* at 587–589, 110 S.Ct. 2143. See also 📄 *id.,* at 582, 110 S.Ct. 2143 (" '[I]n terms of fundamental fairness, the Act should ensure, to the extent that it is consistent with the prerogatives of the States in defining their own offenses, that the same type of conduct is punishable on the Federal level in all cases' " (quoting S.Rep. No. 98–190, p. 20 (1983)S.Rep. No. 98–190, p. 20 (1983))); 📄 495 U.S., at 591, 110 S.Ct. 2143 (rejecting disparate results across states based on label given by State to a particular crime).

The Court's holding will hamper the achievement of these objectives by artificially limiting ACCA's reach and treating similar convictions differently based solely on the vagaries of state law. Defendants convicted of the elements of generic burglary in California will not be subject to ACCA, but defendants who engage in exactly the same behavior in, say, Virginia, will fall within ACCA's reach. See Va.Code Ann. § 18.2–90 (Lexis 2009).

 **\*294** I would avoid these problems by applying the modified categorical approach to § 459—and any other similar burglary statute from another State—and would ask whether the relevant portions of the state record clearly show that the jury necessarily found, or the defendant necessarily admitted, the elements of generic burglary. If the state-court record is inconclusive, then the conviction should not count. But where the record is clear, I see no reason for granting a special dispensation.

### IV

When the modified categorical approach is applied to petitioner's conviction, it is clear that he "necessarily admitted"—and therefore was convicted for committing—the elements of generic burglary: the unlawful or unprivileged entry of a building with the intent to commit a crime.

Both the complaint and information alleged that petitioner "unlawfully and feloniously enter[ed]" a building (the "CentroMart") "with the intent to commit theft therein." App. 14a–17a. When the trial court inquired into the factual basis for petitioner's plea, the prosecutor stated that petitioner's crime involved "the breaking and entering of a grocery store." *Id.,* at 25a. Neither petitioner nor his attorney voiced any objection.[4] *Ibid.* In order to accept petitioner's plea, the trial court was required under California law to ensure that the plea had a factual basis, see **\*\*2303** Cal.Penal Code Ann. § 1192.5 (1978); App. 26a, and we must presume that the plea proceedings were conducted in a regular manner, see 📄 **\*295** *Parke v. Raley,* 506 U.S. 20, 29–30, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992). The unmistakable inference arising from the plea transcript is that the trial judge—quite reasonably—understood petitioner and his attorney to assent to the factual basis provided by the prosecutor. Both the District Court and the Court of Appeals concluded that petitioner had admitted and, as a practical matter, was convicted for having committed the elements of generic burglary, and we did not agree to review that fact-bound determination, see 567 U.S. ——, 133 S.Ct. 90, 183 L.Ed.2d 730 (2012) (granting certiorari "limited to Question 1 presented by the petition").

**Descamps v. U.S., 570 U.S. 254 (2013)**

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 595 of 912

133 S.Ct. 2276, 186 L.Ed.2d 438, 81 USLW 4490, 13 Cal. Daily Op. Serv. 6313...

Even if that determination is reviewed, the lower courts' conclusion should be sustained. Under the California burglary statute, as interpreted by the State Supreme Court, a defendant must either (a) commit a trespass in entering the location in question or (b) enter in violation of some other possessory right. See *People v. Gauze,* 15 Cal.3d 709, 713–714, 125 Cal.Rptr. 773, 542 P.2d 1365, 1367 (1975).[5]

In this case, the judge who accepted petitioner's guilty plea must have relied on petitioner's implicit admission that he "broke" into the store, for if petitioner had admitted only that he entered the store, the judge would not have been able to assess whether he had invaded a possessory right. Nor would a admission to merely "entering" the store have permitted the judge to assess whether petitioner entered with the intent to commit a crime; petitioner's admission to "breaking" was therefore critical to that element, as well. Cf. Black's Law Dictionary 236 (rev. 4th ed. 1968) ("Breaking" denotes the "tearing away or removal of any part of a house or of the locks, latches, or other fastenings intended to **\*296** secure it, or otherwise exerting force to gain an entrance, with the intent to commit a felony").

We have explained that burglary under § 924(e) means "an unlawful or unprivileged entry into, or remaining in, a building or other structure, with intent to commit a crime." *Taylor,* 495 U.S., at 598, 110 S.Ct. 2143. Based on petitioner's guilty plea and the *Shepard* documents, it is clear that petitioner necessarily admitted the elements of generic burglary. He unlawfully entered a building with the intent to commit a crime. Accordingly, I would hold that petitioner's conviction under § 459 qualifies as a conviction for "burglary" under § 924(e).

For these reasons, I would affirm the decision of the Court of Appeals, and I therefore respectfully dissent.

### All Citations

570 U.S. 254, 133 S.Ct. 2276, 186 L.Ed.2d 438, 81 USLW 4490, 13 Cal. Daily Op. Serv. 6313, 2013 Daily Journal D.A.R. 7929, 24 Fla. L. Weekly Fed. S 343

### Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1    Compare, *e.g.,* 466 Fed.Appx. 563, 565 (C.A.9 2012) (case below) (applying the modified categorical approach to § 459); *United States v. Armstead,* 467 F.3d 943, 947–950 (C.A.6 2006) (applying that approach to a similar, indivisible statute), with, *e.g., United States v. Beardsley,* 691 F.3d 252, 268–274 (C.A.2 2012) (holding that the modified categorical approach applies only to divisible statutes); *United States v. Giggey,* 551 F.3d 27, 40 (C.A.1 2008) (en banc) (same).

2    The dissent delves into the nuances of various States' laws in an effort to cast doubt on this understanding of our prior holdings, arguing that we used the modified categorical approach in cases like *Taylor, Shepard,* and *Johnson* "in relation to statutes that may not have been divisible" in the way that we have just described. *Post,* at 2297 (ALITO, J.). But if, as the dissent claims, the state laws at issue in those cases set out "merely alternative means, not alternative elements" of an offense, *post,* at 2298, that is news to us. And more important, it would have been news to the *Taylor,*

133 S.Ct. 2276, 186 L.Ed.2d 438, 81 USLW 4490, 13 Cal. Daily Op. Serv. 6313...

*Shepard*, and *Johnson* Courts: All those decisions rested on the explicit premise that the laws "contain [ed] statutory phrases that cover several different ... crimes," not several different methods of committing one offense. *Johnson, 559 U.S., at 144, 130 S.Ct. 1265* (citing *Nijhawan, 557 U.S., at 41, 129 S.Ct. 2294*). And if the dissent's real point is that distinguishing between "alternative elements" and "alternative means" is difficult, we can see no real-world reason to worry. Whatever a statute lists (whether elements or means), the documents we approved in *Taylor* and *Shepard*—i.e., indictment, jury instructions, plea colloquy, and plea agreement—would reflect the crime's elements. So a court need not parse state law in the way the dissent suggests: When a state law is drafted in the alternative, the court merely resorts to the approved documents and compares the elements revealed there to those of the generic offense.

3     The dissent, as we understand it, takes the same view as the Ninth Circuit; accordingly, each of the reasons—statutory, constitutional, and practical—that leads us to reject *Aguila–Montes* proves fatal to the dissent's position as well. The dissent several times obscures its call to explore facts with language from our categorical cases, asking whether "the relevant portions of the state record clearly show that the jury necessarily found, or the defendant necessarily admitted, the elements of [the] generic [offense]." *Post,* at 2302; see *Shepard, 544 U.S., at 24, 125 S.Ct. 1254* (plurality opinion) (reiterating *Taylor*'s "demanding requirement that ... a prior conviction '*necessarily*' involve[ ]" a jury finding on each element of the generic offense) (emphasis added). But the dissent nowhere explains how a factfinder can have "necessarily found" a non-element—that is, a fact that by definition is *not* necessary to support a conviction. The dissent's fundamental view is that a sentencing court should be able to make reasonable "inference[s]" about what the factfinder really (even though not necessarily) found. See *post,* at 2302 – 2303. That position accords with our dissenting colleague's previously expressed skepticism about the categorical approach. See *Moncrieffe v. Holder, 569 U.S. ——, ——, 133 S.Ct. 1678, 1701, 185 L.Ed.2d 727 (2013)* (ALITO, J., dissenting) ("I would hold that the categorical approach is not controlling where the state conviction at issue was based on a state statute that encompasses both a substantial number of cases that qualify under the federal standard and a substantial number that do not. In such situations, it is appropriate to look beyond the elements of the state offense and to rely as well on facts that were admitted in state court or that, taking a realistic view, were clearly proved"). But there are several decades of water over that dam, and the dissent offers no newly persuasive reasons for revisiting our precedents.

4     See also 1 C. Wright & A. Leipold, Federal Practice and Procedure: Criminal § 125, pp. 550–551 (4th ed. 2008) ("If a single statute sets forth several different offenses, [a] pleading ... that does not indicate which crime [the] defendant allegedly committed is insufficient"); 5 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure § 19.3(a), p. 263 (3d ed. 2007) ("[W]here a statute specifies several different ways in which the crime can be committed, [courts often] hold that the pleading must refer to the particular alternative presented in the individual case").

5     Several decisions treat "invasion of a possessory right" as an aspect of § 459's entry element, see, *e.g.,* *People v. Waidla,* 22 Cal.4th 690, 723, 94 Cal.Rptr.2d 396, 996 P.2d 46, 65 (2000); *Fortes v. Sacramento Munic. Ct. Dist.,* 113 Cal.App.3d 704, 712–714, 170 Cal.Rptr. 292, 296–297 (1980), but others view the issue of possessory right as bearing only on the affirmative defense of consent, see, *e.g.,* *People v. Sherow,* 196 Cal.App.4th 1296, 1303–1305, 1311, and n. 9, 128 Cal.Rptr.3d 255, 260–261, 266, and n. 9 (2011); *People v. Felix,* 23 Cal.App.4th 1385, 1397, 28 Cal.Rptr.2d 860, 867 (1994). And California's pattern jury instructions do *not* require the jury to find invasion of a possessory right before convicting a defendant of burglary. See 1 Cal. Jury Instr., Crim., No. 1700 (2012).

6     The Government here forfeited an alternative argument that § 459 qualifies as a predicate offense under ACCA's "residual clause," which covers statutes "involv[ing] conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). We express no view on that argument's merits. Compare *United States v. Mayer,* 560 F.3d 948, 960–963 (C.A.9 2009) (holding that Oregon's burglary statute falls within the residual clause, even though it does not include all of generic burglary's elements), with *id., at 951* (Kozinski, C.J., dissenting from denial of rehearing en banc) (arguing that the panel opinion "is a train wreck in the making").

133 S.Ct. 2276, 186 L.Ed.2d 438, 81 USLW 4490, 13 Cal. Daily Op. Serv. 6313...

1    However, because the *Shepard* documents did not reveal whether Johnson had been found to have touched or struck, we had to determine whether the relatively innocuous phrase—"[a]ctually and intentionally touch[ing]" another person

—constituted physical force for purposes of § 924(e)(2)(B)(i). See *Johnson,* 559 U.S., at 137, 130 S.Ct. 1265.

2    The remaining case, *Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), may also have involved a statute that was not divisible, but the situation is less clear. There, the defendant had several Missouri burglary

convictions, and Missouri had several different burglary provisions in effect at the time in question. See *id.,* at 578, n. 1, 110 S.Ct. 2143. The particular provision involved in each of those cases was not certain. *Ibid.* At least one of those provisions, however, may not have been divisible. That provision, Mo.Rev.Stat. § 560.070 (1969) (repealed), applied not only to buildings but also to "any booth or tent," "any boat or vessel," or a "railroad car." It is not entirely clear whether a Missouri court would have required jurors to agree on a particular choice from this list. In *State v. Vandergriff,* 403 S.W.2d 579, 581 (Mo.1966), the Missouri Supreme Court held that an information was deficient because it "omitted a description of the type of building that might be burglarized as defined by § 560.070, and thereby omitted an essential element of the offense of burglary in the second degree." Because an information must generally include factual details that go beyond the elements of an offense, see 5 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure § 19.3(b), p. 276 (3d ed. 2007) (hereinafter LaFave), it is possible that the Missouri court did not mean to say that the type of building was an element in the sense in which I understand the Court to use the term here.

3    The board game Clue, to which the Court refers, see *ante,* at 2290 – 2291, does not provide sound legal guidance. In that game, it matters whether Colonel Mustard bashed in the victim's head with a candlestick, wrench, or lead pipe. But in real life, the colonel would almost certainly not escape conviction simply because the jury was unable to agree on the particular type of blunt instrument that he used to commit the murder.

4    The Ninth Circuit has held that a court applying the modified categorical approach may rely on a prosecutor's statement as to the factual basis for a guilty plea when that statement is offered on the record in the defendant's presence and the

defendant does not object. *United States v. Hernandez–Hernandez,* 431 F.3d 1212, 1219 (2005). Petitioner has not challenged the Ninth Circuit's rule, and that issue is not within the scope of the question on which we granted certiorari. Accordingly, I would apply it for purposes of this case.

5    The majority suggests that California law is ambiguous as to this requirement, see *ante,* at 2291 – 2292, n. 5, but any confusion appears to have arisen after petitioner's 1978 conviction and is therefore irrelevant for purposes of this case.

Cf. *McNeill v. United States,* 563 U.S. ——, ——, 131 S.Ct. 2218, 2219, 180 L.Ed.2d 35 (2011) ("The only way to answer [ACCA's] backward-looking question [whether a previous conviction was for a serious drug offense] is to consult the law that applied at the time of that conviction").

---

**End of Document**                     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

595 F.3d 549
United States Court of Appeals,
Fourth Circuit.

Zhan GAO, Petitioner,

v.

Eric H. HOLDER, Jr., Attorney General, Respondent.

No. 07–2070.
|
Argued Dec. 1, 2009.
|
Decided Feb. 23, 2010.

**Synopsis**
**Background:** Lawful permanent resident (LPR) alien, a native and citizen of China, petitioned for review of an order of the Board of Immigration Appeals (BIA), denying her applications for asylum and withholding of removal.

**Holdings:** The Court of Appeals, Wilkinson, Circuit Judge, held that:

BIA had the authority to determine whether alien's prior conviction for unlawful export was a particularly serious crime, as would render alien ineligible for withholding of removal;

BIA could determine on case-by-case basis if alien's crime was particularly serious; and

unlawful export of military technology was a particularly serious crime, rendering alien ineligible for withholding of removal.

Petition denied.

**Attorneys and Law Firms**

**\*551  ARGUED:** Amy Louise Howe, Howe & Russell, PC, Bethesda, Maryland, for Petitioner. Zoe Jaye Heller, United States Department of Justice, Washington, DC, for Respondent. **ON BRIEF:** Tony West, Assistant Attorney General, Douglas E. Ginsburg, Senior Litigation Counsel, United States Department of Justice, Washington, D.C., for Respondent.

Before TRAXLER, Chief Judge, and WILKINSON and MICHAEL, Circuit Judges.

Petition denied by published opinion. Judge WILKINSON wrote the opinion, in which Chief Judge TRAXLER and Judge MICHAEL joined.

## OPINION

WILKINSON, Circuit Judge:

Zhan Gao petitions for review of a final decision by the Board of Immigration Appeals ("BIA") denying her applications for withholding of removal and asylum. The BIA determined through adjudication that she was ineligible for these forms of relief because her conviction for unlawful export of military technology was a "particularly serious crime," even though it was not classified as an aggravated felony.

In her petition for review, Gao makes two principal arguments. For purposes of withholding of removal, she argues that only aggravated felonies can qualify as particularly serious crimes. For purposes of asylum, she contends that a non-aggravated felony can qualify as a particularly serious crime only if the Attorney General first designates it as such through regulation.

After careful consideration, we reject both arguments. We defer to the BIA's reasoned view that an offense need not be an aggravated felony to qualify as a particularly serious crime for purposes of withholding. Furthermore, we conclude that the BIA may determine that a non-aggravated felony is a particularly serious crime for purposes of asylum through the process of case-by-case adjudication. We likewise reject Gao's additional arguments and deny her petition.

I.

A.

Zhan Gao was born in the People's Republic of China. She entered the United **\*552** States in 1989 on a student visa and became a lawful permanent resident in 1993. Sometime thereafter, she began exporting controlled technology without a license to what the BIA described as "quasi-governmental entities in China" that focused on military research. Between October 2000 and January 2001, for example, she exported eighty microprocessors designed for use in military aircraft and missiles at a total sales price of $539,296. She and her husband did not, however, report any of this income in their 2001 federal tax return.

On January 20, 2001, Gao travelled to China with her husband and oldest child on a family visit. Shortly before she was scheduled to return to the United States, she was detained by Chinese authorities and separated from her husband and child. The authorities held her in solitary confinement, interrogated her for long hours, and accused her of taking "internal" documents out of China. On July 24, 2001, she was convicted of spying on behalf of Taiwan and sentenced to ten years in prison. Due at least in part to criticism from the United States, China released Gao on "medical parole" on July 26, 2001, and she returned to the United States.

After returning, Gao gained attention by speaking and publishing articles about her treatment in China. But around the same time, she resumed her business of exporting technology to China. She did so without obtaining or even inquiring about the proper licenses. Between November 2001 and January 2002, she made seven shipments, one of which was unlawful.

Unbeknownst to her at that time, the federal government had been investigating her exporting activities since the fall of 2000. The investigation culminated on February 25, 2002 when government agents executed a search warrant at her residence and discovered several items which are illegal to export without a license.

Following the search, Gao began cooperating with the government in an effort to obtain a lighter sentence. On November 26, 2003, she pled guilty to one count of unlawful export of Commerce Control List items in violation of 50 U.S.C. § 1702 and § 1705(b) and to one count of tax fraud in violation of 26 U.S.C. § 7206(1). Based on her cooperation, the district court granted her a downward departure and sentenced her to seven months of imprisonment, eight months of community confinement, and three years of supervised release. It also ordered her to pay an assessment of $200, a fine of $2,500, forfeiture of $505,521, and taxes, interest, and penalties of $88,885.

B.

Following Gao's release from prison, the Department of Homeland Security ("DHS") detained her and initiated removal proceedings. It charged that Gao was inadmissible and thus removable on two independent grounds: (1) her convictions for unlawful export and tax fraud were "crime[s] involving moral turpitude" under 8 U.S.C. § 1182(a)(2)(A)(i)(I) and (2) the Attorney General had reasonable grounds to believe that she sought "to enter the United States to engage solely, principally, or incidentally in" an activity "to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information" under 8 U.S.C. § 1182(a)(3)(A)(i)(II).

The immigration judge ruled that Gao's convictions for tax fraud and unlawful export were crimes involving moral turpitude, rendering her removable under Section 1182(a)(2)(A)(i)(I). But he found that she was not removable under Section 1182(a)(3)(A)(i)(II) because a "reasonable  *553  person" would not expect her to engage in future unlawful activity.

Turning to the question of relief, the immigration judge found that Gao was entitled to asylum, withholding of removal, and deferral of removal under the Convention Against Torture (CAT). He rejected DHS's contention that she was ineligible for asylum and withholding because her conviction for unlawful export was a "particularly serious crime" under 8 U.S.C. § 1158(b)(2)(A)(ii) and § 1231(b)(3)(B)(ii). While acknowledging that Gao's crime created a risk of future harm, he concluded that it was not particularly serious because it did not involve "a direct link to violent crime" or "directly affect the health of individuals in the United States."

DHS appealed, arguing among other things that Gao was removable under Section 1182(a)(3)(A)(i)(II) and that her conviction was a particularly serious crime. The BIA found no error on the first point, but it reversed on the second. While acknowledging that Gao's crime of unlawful export was not an aggravated felony, the BIA reasoned that its "national security implications" rendered it a particularly serious crime. It was "impossible," the BIA explained, "to quantify the number of lives [Gao] potentially imperiled by exporting military technology that is still presumably extant." Accordingly, it held that Gao was ineligible for asylum and withholding of removal. It did, however, uphold the immigration judge's conclusion that she was eligible for protection under the CAT.

Both parties filed motions to reconsider, and the BIA issued a second decision. This time, it reversed the immigration judge's ruling that Gao was not removable under Section 1182(a)(3)(A)(i)(II), finding he applied the wrong standard of proof. But the BIA reaffirmed its previous conclusion that Gao's offense was a particularly serious crime, even though it was not an aggravated felony.

Gao filed a pro se petition for review of the BIA's decision, and this court subsequently appointed counsel to represent her. In this appeal, we note that Gao's removability under Section 1182(a)(2)(A)(i)(I) for crimes involving moral turpitude and her eligibility for protection under the CAT are not before us. Instead, Gao challenges the BIA's decisions that she is ineligible for withholding of removal and asylum and that she is removable under Section 1182(a)(3)(A)(i)(II) as an alien who seeks to enter the United States to violate its export laws.

II.

We first turn to Gao's eligibility for withholding of removal and asylum. Because the statutes governing these forms of relief differ somewhat, we address them separately.

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 601 of 912

A.

We begin by setting out the relevant statutory provisions governing withholding of removal. Under the Immigration and Nationality Act ("INA"), an alien facing deportation is ineligible for withholding of removal if "the Attorney General decides," among other things, that "the alien, having been convicted by a final judgment of a particularly serious crime, is a danger to the community of the United States." 8 U.S.C. § 1231(b)(3)(B)(ii). For purposes of this provision:

> an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the **\*554** Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.

§ 1231(b)(3)(B). The INA defines "aggravated felony" at 8 U.S.C. § 1101(a)(43). The parties agree that Gao's unlawful export offense falls outside that definition.

Gao urges us to read this paragraph to imply that *only* aggravated felonies can qualify as particularly serious crimes. She notes that the first sentence creates a per se rule that aggravated felonies accompanied by prison terms of at least five years are particularly serious. She then contends that the second sentence modifies the one before it by granting the Attorney General discretion to find that other aggravated felonies are particularly serious on a case-by-case basis. But because the second sentence does not mention non-aggravated felonies, she argues that the Attorney General is implicitly precluded from considering those offenses as particularly serious crimes.

We have jurisdiction to review this question of law under 8 U.S.C. § 1252(a)(2)(D), but we do not approach it with a blank slate. The BIA has held that "a particularly serious crime need not be an aggravated felony" for purposes of withholding of removal. *In re N–A–M–,* 24 I. & N. Dec. 336, 337 (BIA 2007). In its view, the statute "creates no presumption that the Attorney General may not exercise discretion on a case-by-case basis to decide that ... nonaggravated-felony crimes are also 'particularly serious.' " *Id.* at 338 (quoting *Ali v. Achim,* 468 F.3d 462, 470 (7th Cir.2006)). The second sentence, it explained, "means only that aggravated felonies for which sentences of less than 5 years' imprisonment were imposed may be found to be 'particularly serious crimes,' not that *only* aggravated felonies may be found to be such crimes." *Id.* at 341.

When it interprets ambiguous provisions of the INA, the BIA is entitled to deference under the familiar principles of principles of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *INS v. Aguirre–Aguirre,* 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999). Moreover, we note that "judicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.' " *Id.* at 425, 119 S.Ct. 1439 (quoting *INS v. Abudu,* 485 U.S. 94, 110, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988)).

Applying the principles of *Chevron* here, we conclude that Congress has not "directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. The term "particularly serious crime" is open-ended, and the statute does not

define it. And prior to the BIA's decision in 🚩 *N–A–M–,* the courts of appeal were divided over whether only aggravated felonies could be particularly serious crimes for purposes of withholding of removal. *Compare* 🚩 *Alaka v. Attorney Gen. of the United States,* 456 F.3d 88, 105 (3d Cir.2006) (holding that particularly serious crimes must be aggravated felonies), *with* 🚩 *Ali,* 468 F.3d at 470 (rejecting that view). Accordingly, we defer to the BIA's interpretation so long as it "is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778.

For the reasons below, we conclude that the BIA's interpretation was plainly permissible. In doing so, we join the other circuits that have had occasion to consider the BIA's 🚩 *N–A–M–* decision. *See N–A–M v. Holder,* 587 F.3d 1052, 1055–56 (10th Cir.2009); 🚩 *Delgado v. Holder,* 563 F.3d 863, 867–69 (9th Cir.2009); *Nethagani* **\*555** *v. Mukasey,* 532 F.3d 150, 156–57 (2d Cir.2008).

The reasons for this consensus are straightforward. The statute does not declare that some categories of crimes may not be considered particularly serious. Instead, it creates a per se rule that some aggravated felonies must be considered particularly serious and then leaves it up to the Attorney General to "decide[ ]" whether other crimes are as well. 8 U.S.C. § 1231(b)(3)(B). Petitioner would read the second sentence of the quoted paragraph to impose a major limitation on the Attorney General's discretion by implication. But the language of that provision is not restrictive, but permissive. In our view, the BIA quite naturally reads that sentence not as implicitly limiting the Attorney General's discretion to aggravated felonies but instead as reinforcing the scope of that discretion. That is, the second sentence clarifies that the previous sentence simply creates a *per se* category of particularly serious crimes, rather than the *exclusive* category. As the Second Circuit explained, the BIA "naturally and reasonably reads the second sentence of § 1231(b)(3)(B) as a caution against drawing an available inference from the prior sentence." *Nethagani,* 532 F.3d at 157.

The BIA has also noted two other factors that support its interpretation. First, the "history and background" of the particularly serious crime provision suggest that it is not limited to the universe of aggravated felonies. 🚩 *N–A–M–,* 24 I. & N. Dec. at 339. Since Congress first enacted the provision in 1980, the BIA's "consistent practice" has "reflected an understanding" that particularly serious crimes need not be aggravated felonies. 🚩 *Id.* at 338–39. And despite the fact that Congress has amended the statute several times, it has never limited the concept of particularly serious crimes to aggravated felonies. 🚩 *Id.* at 339–41 (tracing the history of the provision).

Second, the BIA noted that its reading was consistent with the purpose of the statute, which is to protect the public from dangerous individuals. 🚩 *Id.* at 341. As it observed, some crimes, such as possessing biological weapons or tampering with consumer products, are potentially quite serious yet do not meet the technical requirements of being aggravated felonies. 🚩 *Id.* at 341 & n. 6. Limiting particularly serious crimes to aggravated felonies would therefore "create[ ] a gap or loophole" whereby individuals committing very serious crimes would remain eligible for withholding of removal, unless some other statutory exception happened to apply to them. 🚩 *Id.* at 341.

For these reasons, we shall respect the BIA's interpretation. Accordingly, we hold that the Attorney General and, by extension, the BIA had the authority to determine whether Gao's conviction was a particularly serious crime under Section 1231(b)(3)(B)(ii) even though it was not an aggravated felony.[1]

B.

We now turn to Gao's eligibility for asylum. Much like in the context of withholding of removal, an alien is ineligible for asylum "if the Attorney General determines that," among other things, "the alien, having been convicted by a final judgment of a particularly serious crime,  **\*556**  constitutes a danger to the community of the United States." 8 U.S.C. § 1158(b)(2)(A)(ii). The statute then provides two "Special rules" for applying the particularly serious crime provision in the context of asylum. § 1158(b)(2)(B). First, "an alien who has been convicted of an aggravated felony shall be considered to have been convicted of a particularly serious crime," regardless of the length of sentence imposed. § 1158(b)(2)(B)(i). Second, "[t]he Attorney General may designate by regulation offenses that will be considered" particularly serious crimes. § 1158(b)(2)(B)(ii).

Gao does not dispute that non-aggravated felonies can qualify as particularly serious crimes for purposes of asylum and for good reason. Given that the statute makes all aggravated felonies per se particularly serious, the Attorney General's power to designate offenses as such by regulation would be "wholly redundant" if it were limited to aggravated felonies. *Delgado v. Holder,* 563 F.3d 863, 870 (9th Cir.2009).

Instead, Gao contends that regulation is the exclusive means by which the Attorney General can determine that a non-aggravated felony is a particularly serious crime. The BIA, she argues, is thus precluded from making these determinations through case-by-case adjudication. We have jurisdiction over this legal question under 8 U.S.C. § 1252(a)(2)(D), and we reject Gao's claim for the reasons below.[2]

 First of all, nothing in the statute says that the Attorney General must use regulation to designate crimes as particularly serious. Instead, the statute empowers the Attorney General to "determine[ ]" whether an alien has been convicted of a particularly serious crime, 8 U.S.C. § 1158(b)(2)(A), and then provides that he "*may* designate by regulation offenses that will be considered" as such. § 1158(b)(2)(B)(ii) (emphasis added). Like our sister circuits, we think that Section 1158(b)(2)(B)(ii) simply empowers the Attorney General to designate offenses which, like aggravated felonies, will be considered per se particularly serious. *Delgado,* 563 F.3d at 870; *Ali v. Achim,* 468 F.3d 462, 468–69 (7th Cir.2006). Its nature is again permissive, and it does not preclude him and, by extension, the BIA from determining whether an individual alien's crime was particularly serious by looking at the underlying facts in the course of adjudication.

 Second, it is a basic principle of administrative law that "the choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency." *SEC v. Chenery Corp.* (*Chenery II* ), 332 U.S. 194, 203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *see also NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 294, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). This principle exists for good reason. Rulemaking, by its very nature, is categorical, whereas adjudication is sensitive to the facts of particular cases. While rulemaking has certain advantages, requiring an agency to proceed by rulemaking alone could "stultify the administrative process" by rendering it "inflexible and incapable of dealing with many of the specialized problems which arise." *Chenery II,* 332 U.S. at 202, 67 S.Ct. 1575.

 **\*557**  Here, for example, it is not difficult to discern why the BIA has chosen the flexibility that adjudication affords. The underlying circumstances of an alien's crime may make that crime particularly serious, "even though the same offense committed by other persons in other circumstances would not necessarily be particularly serious." *Delgado,* 563 F.3d at 870. Recognizing this, the BIA examines crimes on a case-by-case basis to identify dangerous individuals and protect the public

from them. Absent statutory language to the contrary, we are reluctant to push the BIA to a categorical approach that would be insensitive to individual circumstances.

Third, the Attorney General would also face immense practical difficulties if he were required to act through rulemaking alone. It would be a Herculean task to "sift through each state's code and prospectively identify by regulation every single crime that would qualify as 'particularly serious.' " *Ali*, 468 F.3d at 469. Courts should not casually impose such burdens on administrative agencies, especially where, as here, there is no indication that Congress intended to do so.

For these reasons, we conclude that the BIA was permitted under Section 1158(b)(2) to determine that Gao's offense was particularly serious through adjudication.

C.

Next Gao argues that, even if we reject her legal challenges, we should nonetheless find that the BIA abused its discretion in determining that her crime was particularly serious. The INA provides that we may not review determinations of the Attorney General "the authority for which is specified under this subchapter to be in the discretion of the Attorney General ..., other than granting of [asylum]." 8 U.S.C. § 1252(a)(2)(B)(ii). While there is some question as to how explicit the statutory language conferring discretion on the Attorney General must be to invoke this provision, *compare, e.g., Nethagani v. Mukasey*, 532 F.3d 150, 155 (2d Cir.2008), with *Ali v. Achim*, 468 F.3d 462, 470 (7th Cir.2006), the resolution of that issue is not necessary in the case before us because the BIA plainly acted with the bounds of its discretion.

The BIA determines whether crimes are particularly serious on a case-by-case basis, considering factors such as "the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a danger to the community." *Matter of Frentescu*, 18 I. & N. Dec. 244, 247 (BIA 1982). Appellate courts should not lightly reverse for abuse of discretion in cases where, as here, lower tribunals weigh various factors under a totality-of-the-circumstances test. The weighing of such factors is the very essence of a discretionary judgment.

Considering such factors, the BIA determined that Gao's conviction for unlawfully exporting military technology was particularly serious. The BIA acknowledged that Gao's sentence had been relatively light, but it discounted this factor because her sentence was "based largely on the fact that [she] had cooperated with law enforcement officials," rather than on the nature of her offense. It also acknowledged that unlawful export is not a particularly serious crime on its face, but it concluded that the "national security implications" of Gao's conduct elevated it to that status. By selling "sophisticated microprocessors with well-known military applications" to "quasi-governmental entities in China" that were known to do military **\*558** research, Gao "placed her desire for financial gain ahead of the security interests of the United States." It was "impossible," the BIA explained, "to quantify the number of lives [Gao] potentially imperiled by exporting military technology that is still presumably extant."

In her petition, Gao criticizes the BIA's decision on a number of grounds, but her main contention appears to be that her crime cannot be considered particularly serious because there is no evidence that it actually harmed anyone. The BIA soundly rejected this argument, however, reasoning that it was "the very potential of risk that [made] [Gao's] offense so serious." There is no question that this did not represent an abuse of discretion.

III.

Lastly, Gao challenges the BIA's finding that she was inadmissible and thus removable under 8 U.S.C. § 1182(a)(3)(A)(i)(II), as one whom the Attorney General "knows, or has reasonable ground to believe, seeks to enter the United States to engage solely, principally, or incidentally in" any activity "to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information." We need not reach this issue either because it too is not relevant to the outcome of this case.

The immigration judge found and Gao concedes that she was removable for another, independent reason: her convictions for unlawful export and tax fraud were crimes "involving moral turpitude" under 8 U.S.C. § 1182(a)(2)(A)(i)(I). Thus, Gao is removable regardless of whether Section 1182(a)(3)(A)(i)(II) also applies to her.

Gao points out that if we deemed her eligible for asylum and withholding of removal, a finding of inadmissibility under Section 1182(a)(3)(A)(i)(II) would have certain collateral effects on her ability to seek additional relief in the future. But having affirmed the BIA's conclusion that she is not eligible for asylum and withholding, we see no reason to express an opinion on the applicability of Section 1182(a)(3)(A)(i)(II).

<div align="center">IV.</div>

For the reasons above, Gao's petition is

*DENIED.*

**All Citations**

595 F.3d 549

<div align="center">

**Footnotes**

</div>

1    Gao also faults the BIA for not making separate findings on the seriousness of her crime and her dangerousness to the community. But it is well settled in this circuit that "once the particularly serious crime determination is made, the alien is ineligible for withholding without a separate finding on dangerousness." *Kofa v. INS,* 60 F.3d 1084, 1088 (4th Cir.1995) (en banc).

2    The Attorney General argues that Gao failed to exhaust her administrative remedies as required by 8 U.S.C. § 1252(d)(1) with respect to her asylum claim, but on balance we agree with Gao that her filings before the BIA repeatedly challenged the BIA's statutory authority to determine that her conviction was a "particularly serious crime" for purposes of asylum and withholding of removal.

End of Document    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

72 F.3d 135
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in
the Federal Reporter. Use FI CTA9 Rule 36-3 for rules regarding the citation of unpublished opinions.)
United States Court of Appeals, Ninth Circuit.

Jerzy GATALSKI, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 94–70493.
|
Submitted Nov. 17, 1995. [*]
|
Decided Dec. 8, 1995.

Petition for Review of Decision of the Board of Immigration Appeals, No. A–XX–XXX–335.

**Synopsis**
BIA

PETITION DENIED.

**Procedural Posture(s):** On Appeal.

Before: WRIGHT, FERNANDEZ, and KLEINFELD, Circuit Judges.


MEMORANDUM [**]

**\*1**  Jerzy Gatalski petitions for review of the Board of Immigration Appeals' (BIA) final order of deportation to Poland. We deny the petition.


*1. Ineffective Assistance of Counsel*
Gatalski raises on appeal, for the first time, a claim of ineffective assistance of counsel. An alien must exhaust administrative remedies before seeking judicial review. Failure to do so deprives this court of jurisdiction to hear the matter. *Rashtabadi v. INS,* 23 F.3d 1562, 1567 (9th Cir.1994). The proper procedure is to file a motion to reopen with the BIA and present the board with the opportunity to pass upon the claim. *See id.* [1]


*2. Commission of a Particularly Serious Crime*
*Matter of Frentescu,* 18 I. & N.Dec. 244, 247 (BIA 1982), declared that some crimes are particularly serious on their face; most crimes, however, must be analyzed on a case-by-case basis. Relevant factors are: (1) the nature of the conviction; (2) the circumstances and underlying facts of the conviction; (3) the type of sentence imposed; and, "most importantly," (4) whether the type and circumstances of the crime indicate that the alien is a danger to the community. *Id.* Crimes against persons are more likely than property crimes to be found particularly serious. *Id.*

The BIA correctly determined that the crime of attempted rape is both "inherently" a particularly serious crime and that the facts of Gatalski's crime justified a determination of particular seriousness. In addition, Gatalski's commission of another violent crime against a second woman illustrates that he is a danger to the community. Moreover, contrary to Gatalski's claim, once the BIA determined that he had committed a particularly serious crime it did not have to make a separate determination that he was a danger to the community. *See Komarenko v. Immigration and Naturalization Serv.,* 35 F.3d 432, 436 (9th Cir.1994); *cf. Urbina–Mauricio v. INS,* 989 F.2d 1085, 1087 (9th Cir.1993). [2]

### 3. Asylum—Fear of Persecution

The BIA may take administrative notice of the democratization of Poland. *Acewicz v. United States Immigration and Naturalization Serv.,* 984 F.2d 1056, 1060 (9th Cir.1993). Assuming that the INS's 1982 grant of asylum to Gatalski gave rise to a rebuttable presumption of a reasonable fear of future persecution, that presumption was rebutted by the changed conditions in Poland. Gatalski's speculation that he faced future persecution did not suffice to establish that his fear was well-founded. In fact, his testimony focused on the anticipated economic hardships he faced if deported to Poland and on an isolated visit from "government officials" to his mother's residence inquiring about his whereabouts. Economic hardship does not establish political persecution. *Raass v. Immigration and Naturalization Serv.,* 692 F.2d 596, 596 (9th Cir.1982).

Similarly, Gatalski's past persecution in Poland was not so "atrocious" that the BIA abused its discretion when it denied him asylum for humanitarian reasons. *See Acewicz,* 984 F.2d at 1062. Gatalski established that he endured beatings resulting in hospitalization, other physical abuse, threats of prosecution, politically motivated confinement, and forced membership in the Communist party. While this establishes that Gatalski suffered from political persecution before fleeing Poland, it does not rise to the level of atrociousness found to suffice in *Matter of Chen,* Int.Dec. 3104 (BIA 1989). *See Acewicz,* 984 F.2d at 1062.

**\*2** In any event, the BIA indicated that it would not exercise its discretion to grant Gatalski asylum because his atrocious crimes outweighed any equities. In that it did not err. Moreover, the regulation governing discretionary denial of applications for asylum mandates denial if "[t]he alien, having been convicted by a final judgment of a particularly serious crime in the United States, constitutes a danger to the community." 8 C.F.R. § 208.14(d)(1); *Komarenko,* 35 F.3d at 436. Since the BIA correctly held Gatalski committed a particularly serious crime which made him a danger to the community, denial of asylum was mandatory.

Petition DENIED.

KLEINFELD, Circuit Judge, concurring:

I would not reach the question of whether the particular attempted rape and unlawful imprisonment of which Gatalski was convicted amounted to "particularly serious crime [which] constitutes a danger to the community." 8 U.S.C. § 1253(h). Though these crimes are, as a category, plainly serious and dangerous, Gatalski raises a serious issue regarding whether *Beltran–Zavala v. INS,* 912 F.2d 1027 (9th Cir.1990), would require a remand on the ground that the BIA "leapt directly from the fact of conviction to the determination." *Id.* at 1032. We need not determine whether the BIA erred under *Frentescu* and *Beltran–Zavala,* requiring particularized as opposed to categorical analysis of the crimes, because Gatalski did not establish a well founded fear of persecution, or otherwise establish that he should have been granted asylum or relief from deportation.

The BIA was persuaded by the INS evidence that "little likelihood of present persecution exists because of changed circumstances in Poland." It said that Gatalski's past persecution, though serious, did not rise to the level warranting asylum for humanitarian reasons, as in *Matter of Chen,* Int.Dec. 3104 (BIA 1989), and it could not ignore his criminal behavior in exercising its discretion. That was a permissible exercise of discretion, based on substantial evidence, regardless of whether the

BIA was correct in characterizing Gatalski's crime as "particularly serious and a danger to the community." *See* *Acewicz v. INS,* 984 F.2d 1056, 1061 (9th Cir.1993). Though he was seriously persecuted by the Communist regime, the change of regimes has vitiated the well-foundedness of any fear of future persecution on account of Gatalski's political opinions.

**All Citations**

72 F.3d 135 (Table), 1995 WL 732611

## Footnotes

*      The panel finds this case appropriate for submission without oral argument pursuant to 9th Cir.R. 34–4 and Fed.R.App.P. 34(a).

**      This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36–3.

1      We note, however, that Gatalski's assertion that his conviction for false imprisonment was set aside is otiose. *State v. Harris,* 849 P.2d 1216, 1220–21 (Wash.1993) did no such thing. At any rate, that did not affect the attempted rape conviction upon which the BIA put its greatest reliance. It is doubtful that Gatalski can show prejudice. *See* *Mohsseni Behbahani v. INS,* 796 F.2d 249, 251 (9th Cir.1986).

2      This determination made Gatalski ineligible for withholding of deportation. *See* 8 U.S.C. § 1253(h)(2)(B).

---

**End of Document**                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

127 S.Ct. 815
Supreme Court of the United States

Alberto R. GONZALES, Attorney General, Petitioner,

v.

Luis Alexander DUENAS–ALVAREZ.

No. 05–1629.
|
Argued Dec. 5, 2006.
|
Decided Jan. 17, 2007.

**Synopsis**

**Background:** Following conviction of permanent resident alien for taking a vehicle without consent, the Board of Immigration Appeals (BIA) found alien removable. Alien petitioned for review. The United States Court of Appeals for the Ninth Circuit, 176 Fed.Appx. 820, summarily remanded. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Breyer, held that:

"theft offense," for which alien may be removed, includes crime of "aiding and abetting" a theft offense, and

violation of California statute prohibiting taking vehicle without consent was "theft offense."

Vacated and remanded.

Justice Stevens concurred in part and dissented in part, and filed opinion.

**816   *183 *Syllabus* ***

Respondent, a permanent resident alien, was convicted of violating Cal. Veh.Code Ann. § 10851(a), under which "[a]ny person who drives or takes a vehicle not his or her own, without the consent of the owner ..., or *any person who is a party or an accessory to or an accomplice in* the driving or unauthorized taking or stealing, *is guilty* of a public offense." (Emphasis added.) The Federal Government then sought to remove respondent from the United States as an alien convicted of "a theft offense ... for which the term of imprisonment [is] at least one year," 8 U.S.C. § 1101(a)(43)(G); § 1227(a)(2)(A). The Government claimed that the California conviction qualified as such a "theft offense" under the framework set forth in *Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607. In *Taylor,* the Court considered whether a prior conviction for violating a state statute criminalizing certain burglary-like behavior fell within the term "burglary" for sentence-enhancement purposes under 18 U.S.C. § 924(e). This Court held that Congress meant that term to refer to "burglary" in "the generic sense in which the term is now used in the criminal codes of most States," 495 U.S., at 598, 110 S.Ct. 2143; and that a sentencing court seeking to determine whether a particular prior conviction was for generic burglary should normally look to the state statute defining the crime of conviction, not to the facts of the particular prior case, *id.,* at 599–600, 110 S.Ct. 2143; but that where state law

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

127 S.Ct. 815, 166 L.Ed.2d 683, 75 USLW 4053, 07 Cal. Daily Op. Serv. 637...

defines burglary broadly to include crimes falling outside generic "burglary," the sentencer should "go beyond the mere fact of conviction" and examine, *e.g.,* the charging document and jury instructions to determine whether the earlier "jury was actually required to find all the elements of generic burglary," *id., at 602, 110 S.Ct. 2143.* The Federal Immigration Judge and the Board of Immigration Appeals (BIA) found respondent removable, but the Ninth Circuit summarily remanded in light of its earlier *Penuliar* decision holding that "aiding and abetting" a theft is not itself a crime under the generic definition of theft.

*Held:* The term "theft offense" in 8 U.S.C. § 1101(a)(43)(G) includes the crime of "aiding and abetting" a theft offense. Pp. 820 – 823.

(a) One who aids or abets a theft, like a principal who actually participates, commits a crime that falls within the scope of the generic theft **\*184** definition accepted by the BIA and the Ninth and other Circuits: the "taking of property or an exercise of control over property without consent with the criminal intent to deprive the owner of rights and benefits of ownership, even if such deprivation is less than total or permanent." *Penuliar v. Gonzales,* 435 F.3d 961, 969. Since, as the record shows, state and federal criminal law now uniformly treats principals and aiders and abettors alike, "the generic sense in which" the term "theft" "is now used in the criminal codes of most States," **\*\*817** *Taylor, supra,* at 598, 110 S.Ct. 2143, covers such "aiders and abettors" as well as principals. And the criminal activities of these aiders and abettors of a generic theft thus fall within the scope of the term "theft" in the federal statute. Pp. 820 – 821.

(b) The Court rejects respondent's argument that Cal. Veh.Code Ann. § 10851, through the California courts' application of a "natural and probable consequences" doctrine, creates a subspecies of the crime falling outside the generic "theft" definition. The fact that, under California law, an aider and abettor is criminally responsible not only for the crime he intends, but also for any crime that naturally and probably results from his intended crime, does not in itself show that the state statute covers a nongeneric theft crime. Relatively few jurisdictions have expressly rejected the "natural and probable consequences" doctrine, and many States and the Federal Government apply some form or variation of that doctrine or permit jury inferences of intent in circumstances similar to those in which California has applied the doctrine. To succeed, respondent must show something *special* about California's version of the doctrine. His attempt to show that, unlike most other States, California makes a defendant criminally liable for conduct he did not intend, not even as a known or almost certain byproduct of his intentional acts, fails because the California cases respondent cites do not show that California's law is applied in such a way that is somehow broader in scope than other States' laws. Moreover, to find that state law creates a crime outside the generic definition of a listed crime in a federal statute requires a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct falling outside the generic definition. To make that showing, an offender must at least point to his own case or other cases in which the state courts in fact did apply the statute in the special (nongeneric) manner for which he argues. Respondent makes no such showing. Pp. 820 – 823.

(c) Respondent's additional claims—that § 10851(1) holds liable accessories after the fact, who need not be shown to have committed a theft, and (2) applies to joyriding, which falls outside the generic "theft" definition—are not considered here because they do not fall within the terms of the question presented, the lower court did not consider them, and this Court declines to reach them in the first instance. Pp. 822 – 823.

176 Fed.Appx. 820, vacated and remanded.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C.J., and SCALIA, KENNEDY, SOUTER, THOMAS, GINSBURG, and ALITO, JJ., joined, and in which STEVENS, J., joined, as to Parts I, II, and III–B. STEVENS, J., filed an opinion concurring in part and dissenting in part, *post,* p. 825.

127 S.Ct. 815, 166 L.Ed.2d 683, 75 USLW 4053, 07 Cal. Daily Op. Serv. 637...

**Attorneys and Law Firms**

Dan Himmelfarb, Washington, D.C., for petitioner.

Christopher J. Meade, New York, NY, for respondent.

Paul D. Clement, Solicitor General, Counsel of Record, Department of Justice, Washington, D.C., for petitioner.

Christopher J. Meade, Counsel of Record, Anne K. Small, Janet R. Carter, Wilmer, Cutler, Pickering, Hale and Dorr LLP, New York, NY, for respondent.

Paul D. Clement, Solicitor General, Counsel of Record, Peter D. Keisler, Assistant Attorney General, Edwin S. Kneedler, Deputy Solicitor General, Dan Himmelfarb, Assistant to the Solicitor General, Donald E. Keener, Jennifer Paisner, Department of Justice Washington, D.C., for petitioner.

**Opinion**

Justice BREYER delivered the opinion of the Court.

**\*185** Immigration law provides for removal from the United States of an alien convicted of "a *theft offense* (including receipt of stolen property) ... for which the term of imprisonment [is] at least one year." 8 U.S.C. § 1101(a)(43)(G) (emphasis added; footnote omitted); § 1227(a)(2)(A). The question here is whether the term "theft offense" in this federal statute includes the crime of "*aiding and abetting*" a theft offense. We hold that it does. And we vacate a Ninth Circuit determination to the contrary.

I

The Immigration and Nationality Act, 66 Stat. 163, as amended, 8 U.S.C. § 1101 *et seq.,* (2000 ed. and Supp.IV), lists a set of offenses, conviction for any one of which subjects certain aliens to removal from the United States, § 1227(a). In determining whether a conviction (say, a conviction for violating a state criminal law that forbids the taking of property without permission) falls within the scope of **\*186** a listed offense (*e.g.,* "theft offense"), the lower courts uniformly have applied the approach this Court set forth in *Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). *E.g., Soliman v. Gonzales,* 419 F.3d 276, 284 (C.A.4 2005); *Abimbola v. Ashcroft,* 378 F.3d 173, 176–177 (C.A.2 2004); *Huerta–Guevara v. Ashcroft,* 321 F.3d 883, 886–888 (C.A.9 2003); *Hernandez–Mancilla v. INS,* 246 F.3d 1002, 1008–1009 (C.A.7 2001).

*Taylor* concerned offenses listed in the federal Armed Career Criminal Act, 18 U.S.C. § 924(e) (2000 ed. and Supp. IV). That Act mandates a lengthy prison sentence for offenders with previous convictions for, *e.g.,* a "violent felony"; and the Act sets forth certain specific crimes, *e.g.,* "burglary," included in this category. The Court, in *Taylor,* considered whether a conviction for violating a state statute criminalizing certain burglary-like behavior fell within the listed federal term "burglary." 495 U.S., at 589, 598, 110 S.Ct. 2143.

The Court held that Congress meant its listed term "burglary" to refer to a specific crime, *i.e.,* " 'burglary' " in "*the generic sense in which the term is now used in the criminal codes of most States*." *Id.,* at 598, 110 S.Ct. 2143 (emphasis added). The Court also held that a state conviction qualifies as a burglary conviction, "regardless of" the "exact [state] definition or label" as long as it has the "basic elements" of "generic" burglary, namely, "unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." *Id.,* at 599, 110 S.Ct. 2143. The Court added that, when a sentencing court seeks

127 S.Ct. 815, 166 L.Ed.2d 683, 75 USLW 4053, 07 Cal. Daily Op. Serv. 637...

to determine whether a particular prior conviction was for a generic burglary offense, it should normally look not to the facts of the particular prior case, but rather to the state statute defining the crime of conviction. *Id.,* at 599–600, 110 S.Ct. 2143.

The Court further noted that a "few States' burglary statutes" "define burglary more broadly" to include both a (generically defined) listed crime and also one or more nonlisted crimes. *Id.,* at 599, 110 S.Ct. 2143. For example, Massachusetts defines "burglary" as including not only breaking into " 'a building' "  **187**  but also breaking into a "vehicle" (which falls outside the generic definition of "burglary," for a car is not a " 'building or structure' "). See *Shepard v. United States,* 544 U.S. 13, 16, 17, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005); see also *Taylor,* 495 U.S., at 599, 110 S.Ct. 2143 (discussing  **\*\*819** Missouri burglary statutes). In such cases the Court's "categorical approach" permits the sentencing court "to go beyond the mere fact of conviction" in order to determine whether the earlier "jury was actually required to find all the elements of generic burglary." *Id.,* at 602, 110 S.Ct. 2143; see also *Conteh v. Gonzales,* 461 F.3d 45, 54 (C.A.1 2006) (observing that some courts refer to this step of the *Taylor* inquiry as a "modified categorical approach"). "For example," the sentencing court might examine "the indictment or information and jury instructions" in the earlier case. 495 U.S., at 602, 110 S.Ct. 2143. In *Shepard,* we added that, in a nonjury case, the sentencing court might examine not only the "charging document" but also "the terms of a plea agreement," the "transcript of colloquy between judge and defendant," or "some comparable judicial record" of information about the "factual basis for the plea." 544 U.S., at 26, 125 S.Ct. 1254.

## II

The case before us concerns the application of the framework just set forth to Luis Duenas–Alvarez, the respondent here, a permanent resident alien of the United States. In 2002, Duenas–Alvarez was convicted of violating Cal. Veh.Code Ann. § 10851(a) (West 2000). That section states:

> "Any person who drives or takes a vehicle not his or her own, without the consent of the owner thereof, and with intent either to permanently or temporarily deprive the owner thereof of his or her title to or possession of the vehicle, whether with or without intent to steal the vehicle, or *any person who is a party or an accessory to or an accomplice in* the driving or unauthorized taking or stealing, *is guilty* of a public offense." (Emphasis added.)

 **188**  After Duenas–Alvarez was convicted, the Federal Government, claiming that the conviction was for a generic theft offense, began removal proceedings. A Federal Immigration Judge, agreeing with the Government that the California offense is "a theft offense ... for which the term of imprisonment [is] at least one year," found Duenas–Alvarez removable. 8 U.S.C. § 1101(a)(43)(G) (footnote omitted); § 1227(a)(2)(A). The Board of Immigration Appeals (BIA) affirmed. Duenas–Alvarez sought review of the BIA's decision in the Court of Appeals for the Ninth Circuit.

While respondent's petition for court review was pending, the Ninth Circuit, in *Penuliar v. Ashcroft,* 395 F.3d 1037 (2005), held that the relevant California Vehicle Code provision, § 10851(a), sweeps more broadly than generic theft. See *id.,* at 1044–1045. In particular, the court said that generic theft has as an element the taking or control of others' property. But, the court added, the California statutory phrase " '[who] is a party or an accessory ... or an accomplice' " would permit conviction "for aiding and abetting a theft." *Id.,* at 1044 (emphasis deleted). And the court believed that one might "aid" or "abet" a theft without taking or controlling property. *Id.,* at 1044–1045 (citing *Martinez–Perez v. Ashcroft,* 393 F.3d 1018 (C.A.9 2004), withdrawn and amended, 417 F.3d 1022 (2005)). Hence, in the Court of Appeals' view, the provision must cover some

127 S.Ct. 815, 166 L.Ed.2d 683, 75 USLW 4053, 07 Cal. Daily Op. Serv. 637...

generically defined "theft" crimes and also some other crimes (aiding and abetting crimes) that, because they are not generically defined "theft" crimes, fall outside the scope of the term "theft" in the immigration statute. 395 F.3d, at 1044–1045.

The Ninth Circuit subsequently heard Duenas–Alvarez's petition for review and summarily remanded the case to the agency **820 for further proceedings in light of *Penuliar.* 176 Fed.Appx. 820 (2006). We granted the Government's petition for certiorari in order to consider the legal validity of the Ninth Circuit's holding set forth in *Penuliar* and applied *189 here, namely, the holding that "aiding and abetting" a theft is not itself a crime that falls within the generic definition of theft. We conclude that the Ninth Circuit erred.

### III

The Ninth Circuit, like other Circuits and the BIA, accepted as a generic definition of theft, the "taking of property or an exercise of control over property without consent with the criminal intent to deprive the owner of rights and benefits of ownership, even if such deprivation is less than total or permanent." *Penuliar v. Gonzales,* 435 F.3d 961, 969 (2006) (internal quotation marks omitted). See *Abimbola,* 378 F.3d, at 176 (analyzing the BIA's definition and citing cases from three other Circuits, including the Ninth Circuit, approving that definition). The question before us is whether one who aids or abets a theft falls, like a principal, within the scope of this generic definition. We conclude that he does.

The common law divided participants in a felony into four basic categories: (1) *first-degree principals,* those who actually committed the crime in question; (2) *second-degree principals,* aiders and abettors present at the scene of the crime; (3) *accessories before the fact,* aiders and abettors who helped the principal before the basic criminal event took place; and (4) *accessories after the fact,* persons who helped the principal after the basic criminal event took place. See *Standefer v. United States,* 447 U.S. 10, 15, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980). In the course of the 20th century, however, American jurisdictions eliminated the distinction among the first three categories. *Id.,* at 16–19, 100 S.Ct. 1999; *Nye & Nissen v. United States,* 336 U.S. 613, 618, 69 S.Ct. 766, 93 L.Ed. 919 (1949).

Indeed, every jurisdiction—all States and the Federal Government—has "expressly abrogated the distinction" among principals and aiders and abettors who fall into the second and third categories. 2 W. LaFave, Substantive *190 Criminal Law § 13.1(e), p. 333 (2d ed.2003) (LaFave). The Solicitor General has presented us with a comprehensive account of the law of all States and federal jurisdictions as well. And we have verified that these jurisdictions treat similarly principals and aiders and abettors who fall into the second or third common-law category. See Appendix A, *infra.* Since criminal law now uniformly treats those who fall into the first three categories alike, "the generic sense in which" the term "theft" "is now used in the criminal codes of most States," *Taylor,* 495 U.S., at 598, 110 S.Ct. 2143, covers such "aiders and abettors" as well as principals. And the criminal activities of these aiders and abettors of a generic theft must themselves fall within the scope of the term "theft" in the federal statute.

### A

Duenas–Alvarez does not defend the Ninth Circuit's position. He agrees with the Government that generically speaking the law treats aiders and abettors during and before the crime the same way it treats principals; and that the immigration statute must then treat them similarly as well. Instead, Duenas–Alvarez argues that the California Vehicle Code provision in other ways reaches beyond generic theft to cover certain nongeneric crimes.

127 S.Ct. 815, 166 L.Ed.2d 683, 75 USLW 4053, 07 Cal. Daily Op. Serv. 637...

Duenas-Alvarez points out that California defines "aiding and abetting" such that an aider and abettor is criminally responsible **821 not only for the crime he intends, but also for any crime that "naturally and probably" results from his intended crime.

*People v. Durham,* 70 Cal.2d 171, 181, 74 Cal.Rptr. 262, 449 P.2d 198, 204 (1969) (" 'aider and abettor ... liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged' " (quoting *People v. Villa,* 156 Cal.App.2d 128, 134, 318 P.2d 828 (1957); emphasis deleted)). This fact alone does not show that the statute covers a nongeneric theft crime, for relatively few jurisdictions (only 10 in Duenas–Alvarez's own view) have expressly rejected the *191 "natural and probable consequences" doctrine. See Brief for Respondent 21–22; Appendix B, *infra.* Moreover, many States and the Federal Government apply some form or variation of that doctrine, or permit jury inferences of intent in circumstances similar to those in which California has applied the doctrine, as explained below. See Appendix C, *infra.* To succeed, Duenas–Alvarez must show something *special* about California's version of the doctrine—for example, that California in applying it criminalizes conduct that most other States would not consider "theft."

Duenas–Alvarez attempts to make just such a showing. In particular, he says that California's doctrine, unlike that of most other States, makes a defendant criminally liable for conduct that the defendant did not intend, not even as a known or almost certain byproduct of the defendant's intentional acts. See 1 LaFave § 5.2(a), at 341 (person intends that which he knows "is practically certain to follow from his conduct"). At oral argument, Duenas–Alvarez's counsel suggested that California's doctrine, for example, might hold an individual who wrongly bought liquor for an underage drinker criminally responsible for that young drinker's later (unforeseen) reckless driving. See Tr. of Oral Arg. 44. And Duenas–Alvarez refers to several California cases in order to prove his point. See Brief for Respondent 19.

We have reviewed those cases, however, and we cannot agree that they show that California's law is somehow special. In the first case, *People v. Nguyen,* 21 Cal.App.4th 518, 26 Cal.Rptr.2d 323 (1993), the Third Appellate District in California upheld the jury conviction of individuals who had aided several robberies at houses of prostitution, for aiding and abetting a sexual assault used by one of the individuals to convince a proprietor, by frightening her, to give up property. *Id.,* at 528, 533– 534, 26 Cal.Rptr.2d, at 329, 333. The court, in upholding the verdict, wrote that "knowledge of another's criminal purpose is not sufficient for aiding *192 abetting; the defendant *must also share that purpose or intend to commit, encourage, or facilitate the commission of the crime.*" *Id.,* at 530, 26 Cal.Rptr.2d, at 330 (emphasis added). The court added that "[w]hile the defendants participated in the criminal endeavor the foreseeability of sexual assault went from possible or likely *to certain,* yet *defendants continued to lend their aid and assistance* to the endeavor." *Id.,* at 534, 26 Cal.Rptr.2d, at 333 (emphasis added). The court said that the jury could find that the defendants'

> "continuing participation in the criminal endeavor aided the perpetrators by providing the control and security they needed to tarry long enough to commit the sexual offense, by helping to convince the victim that resistance would be useless, and by dissuading the victim's employee from any notion she may have formed of going to the victim's assistance."

And the court concluded:

> "Under these circumstances it will not do for defendants to assert that they **822 were concerned only with robbery and bear no responsibility for the sexual assault." *Id.,* at 533–534, 26 Cal.Rptr.2d, at 333.

*People v. Simpson,* 66 Cal.App.2d 319, 152 P.2d 339 (1944), affirmed a kidnaping and robbery conviction on an aiding and abetting theory. *Id.,* at 322, 152 P.2d 339. Although the defendant argued to the appeals court that she and her compatriots

127 S.Ct. 815, 166 L.Ed.2d 683, 75 USLW 4053, 07 Cal. Daily Op. Serv. 637...

had not planned to kidnap the robbery victim, the record showed that she had brought the gun used to intimidate the victim while he was tied up and placed in a car, in which she and her corobbers rode with the victim to another location while they robbed him. *Id., at 322–323, 152 P.2d 339.* As in *Nguyen,* the court, noting that kidnaping was the *means* by which the robbery was committed, found that the defendant had the requisite "motive," or intent to commit the kidnaping. *66 Cal.App.2d, at 326, 152 P.2d 339.*

**\*193** *People v. Montes,* 74 Cal.App.4th 1050, 88 Cal.Rptr.2d 482 (1999), affirmed an attempted murder conviction where a confederate of the defendant shot the victim after the defendant committed armed assault, simple assault, and breach of the peace. *Id., at 1055, 88 Cal.Rptr.2d, at 485.* The court found that the conduct for which the appellant was charged with assault and breach of the peace was a "confrontation ... punctuated by threats and weaponry" "in the context of an ongoing rivalry between ... two gangs [that] acted violently toward each other." *Ibid.* The court reasoned that the escalating violence, resulting in someone being shot, was a foreseeable consequence of the defendant's intended act of participating in the gang confrontation. *Ibid.*

Although the court in *Montes* applied a more expansive concept of "motive" or "intent" than did the courts in *Nguyen* and *Simpson,* we cannot say that those concepts as used in any of these cases extend significantly beyond the concept as set forth in the cases of other States. See Appendix C, *infra.*

Moreover, in our view, to find that a state statute creates a crime outside the generic definition of a listed crime in a federal statute requires more than the application of legal imagination to a state statute's language. It requires a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime. To show that realistic probability, an offender, of course, may show that the statute was so applied in his own case. But he must at least point to his own case or other cases in which the state courts in fact did apply the statute in the special (nongeneric) manner for which he argues.

Because Duenas–Alvarez makes no such showing here, we cannot find that California's statute, through the California courts' application of a "natural and probable consequences" **\*194** doctrine, creates a subspecies of the Vehicle Code section crime that falls outside the generic definition of "theft."

## B

Duenas–Alvarez makes two additional claims. First, he argues that § 10851 holds liable accessories after the fact; and to prove that an individual was an accessory after the fact does not require the Government to show that the individual committed a theft. Second, Duenas–Alvarez argues that § 10851 applies, not only to auto theft, but also to joyriding, which he argues involves so limited a deprivation of the use of a car that it falls outside the generic "theft" definition. See *Van Vechten v. American Eagle Fire Ins. Co.,* 239 N.Y. 303, 146 N.E. 432 (1925) (Cardozo, J.) (citing cases for proposition that a very temporary use is not theft).

**\*\*823** We shall not consider these claims. The question that we agreed to decide is whether " 'theft offense' " in the federal statute "includes aiding and abetting the commission of the offense." See Brief for Petitioner I. Context makes clear that "aiding and abetting" in this question referred to the use of that term in *Penuliar, i.e.,* to the second and third common-law categories (principal in the second degree, accessory before the fact), see *supra,* at 820, see also Brief for Petitioner 13, and not to "accessory after the fact." Thus neither this claim nor the "joyriding" claim falls within the terms of the question presented. Regardless, the lower court did not consider the claims, and we decline to reach them in the first instance. See *National Collegiate Athletic*

*Assn. v. Smith,* 525 U.S. 459, 469–470, 119 S.Ct. 924, 142 L.Ed.2d 929 (1999); *Roberts v. Galen of Va., Inc.,* 525 U.S. 249, 253–254, 119 S.Ct. 685, 142 L.Ed.2d 648 (1999) *(per curiam); United States v. Bestfoods,* 524 U.S. 51, 72–73, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998).

For these reasons we vacate the Ninth Circuit's judgment and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

**\*195** APPENDIXES TO OPINION OF THE COURT

A

Ala.Code §§ 13A–2–20, 13A–2–23 (2006); Alaska Stat. §§ 11.16.100, 11.16.110 (2004); Ariz.Rev.Stat. Ann. §§ 13–301, 13–302, 13–303(A) (West 2001); Ark.Code Ann. §§ 5–2–402, 5–2–403(a) (2006); Colo.Rev.Stat. Ann. §§ 18–1–601, 18–1–603 (2006); Conn. Gen.Stat. § 53a–8(a) (2005); Del.Code Ann., Tit. 11, § 271 (1995); D.C.Code § 22–1805 (2001); Fla. Stat. § 777.011 (2006); Ga.Code Ann. § 16–2–20 (2003); Haw.Rev.Stat. §§ 702–221, 702–222 (1993); Idaho Code § 19–1430 (Lexis 2004); Ill. Comp. Stat., ch. 720, §§ 5/5–1, 5/5–2 (West 2004); Ind.Code § 35–41–2–4 (West 2004); Iowa Code § 703.1 (2005); Kan. Stat. Ann. § 21–3205(1) (1995); Ky.Rev.Stat. Ann. § 502.020(1) (West 2006); La. Stat. Ann. § 14:24 (West 1997); Me.Rev.Stat. Ann., Tit. 17–A, § 57(1) (2006); Md.Crim. Proc.Code Ann. § 4–204(b) (Lexis Supp.2006); Mass. Gen. Laws, ch. 274, § 2 (West 2004); Mich. Comp. Laws Ann. § 767.39 (West 2000); Minn.Stat. § 609.05, subd. 1 (2004); Miss.Code Ann. § 97–1–3 (2006); Mo.Rev.Stat. §§ 562.036, 562.041(1) (2000); Mont.Code Ann. §§ 45–2–301, 45–2–302 (2005); Neb.Rev.Stat. § 28–206 (1995); Nev.Rev.Stat. § 195.020 (2003); N.H.Rev.Stat. Ann. § 626:8 (Supp.2006); N.J. Stat. Ann. § 2C:2–6 (West 2005); N.M. Stat. Ann. § 30–1–13 (2004); N.Y. Penal Law Ann. § 20.00 (West 2004); N.C. Gen.Stat. Ann. § 14–5.2 (Lexis 2005); N.D. Cent.Code Ann. § 12.1–03–01(1) (Lexis 1997); Ohio Rev.Code Ann. §§ 2923.03(A), (F) ( Lexis 2006); Okla. Stat., Tit. 21, § 172 (West 2001); Ore.Rev.Stat. §§ 161.150, 161.155 (2003); 18 Pa. Cons.Stat. § 306 (2002); R.I. Gen. Laws § 11–1–3 (2002); S.C.Code Ann. § 16–1–40 (2003); S.D. Codified Laws §§ 22–3–3, 22–3–3.1 (1998); Tenn.Code Ann. §§ 39–11–401(a), 39–11–402 (2006); Tex. Penal Code Ann. §§ 7.01, 7.02(a) (West 2003); Utah Code Ann. § 76–2–202 (Lexis 2003); Vt. Stat. Ann., Tit. 13, §§ 3–4 (1998); Va.Code Ann. § 18.2–18 (Lexis 2004); Wash. Rev.Code § 9A.08.020 **\*196** 2006); W. Va.Code Ann. § 61–11–6 (Lexis 2005); Wis. Stat. § 939.05 (2003–2004); Wyo. Stat. Ann. § 6–1–201 (2005).

B

Alaska Stat. § 11.16.110; *Riley v. State,* 60 P.3d 204, 214, 219–221 (Alaska App.2002); **\*\*824** *Tarnef v. State,* 512 P.2d 923, 928 (Alaska 1973); *State v. Phillips,* 202 Ariz. 427, 435–437, 46 P.3d 1048, 1056–1058 (2002); *State v. Wall,* 212 Ariz. 1, 4–5, 126 P.3d 148, 151–152 (2006); Colo.Rev.Stat. § 18–1–603; *Bogdanov v. People,* 941 P.2d 247, 250–252, and n. 8, as amended by 955 P.2d 997 (Colo.1997), disapproved of on other grounds by *Griego v. People,* 19 P.3d 1, 7–8 (Colo.2001); *Wilson–Bey v. United States,* 903 A.2d 818, 821–822 (D.C.2006); *Kitt v. United States,* 904 A.2d 348, 354–356 (D.C.2006); *Commonwealth v. Richards,* 363 Mass. 299, 305–308, 293 N.E.2d 854, 859–860 (1973); *Commonwealth v. Daughtry,* 417 Mass. 136, 137–140, 627 N.E.2d 928, 930–931 (1994); Mont.Code Ann. § 45–2–302; *State ex rel. Keyes v. Montana 13th Jud. Dist. Ct.,* 288 Mont. 27, 32–35, 955 P.2d 639, 642–643 (1998); *Sharma v. State,* 118 Nev. 648, 653–657, 56 P.3d 868, 871–873 (2002) *(per curiam);* cf. *Bolden v. State,* 121 Nev. 908, 921–922, 124 P.3d 191, 200

Gonzales v. Duenas-Alvarez, 549 U.S. 183 (2007)

Case 3:20-cv-07721-SI   Document 58-6   Filed 11/10/20   Page 617 of 912

127 S.Ct. 815, 166 L.Ed.2d 683, 75 USLW 4053, 07 Cal. Daily Op. Serv. 637...

(2005); *State v. Carrasco,* 1997–NMSC–047, ¶¶ 5–13, 124 N.M. 64, 946 P.2d 1075, 1079–1080; *State v. Bacon,* 163 Vt. 279, 286–292, 658 A.2d 54, 60–63 (1995); *State v. Pitts,* 174 Vt. 21, 23–27, 800 A.2d 481, 483–485 (2002).

## C

See, *e.g.,* 2 LaFave § 13.3(b), at 361–362, nn. 27–29 (2d ed.2003 and Supp.2007) (identifying cases applying the doctrine in California, Delaware, Illinois, Indiana, Iowa, Kansas, Maine, Minnesota, Tennessee, and Wisconsin, as well as in other States where the continued viability of the doctrine is unclear); *State v. Medeiros,* 599 A.2d 723, 726 (R.I.1991) (aider and abettor intends natural and probable consequences of his acts). See also *Beasley v. State,* 360 So.2d 1275, 1278 (Fla.App.1978); Ga.Code Ann. § 16–2–20; *Jackson* **\*197** *v. State,* 278 Ga. 235, 235–237, 599 S.E.2d 129, 131–132 (2004); *Jordan v. State,* 272 Ga. 395, 395–397, 530 S.E.2d 192, 193–194 (2000); *Crawford v. State,* 210 Ga.App. 36, 36–37, 435 S.E.2d 64, 65 (1993); *State v. Ehrmantrout,* 100 Idaho 202, 595 P.2d 1097 (1979) *(per curiam); State v. Meyers,* 95–750, pp. 5–7 (La.App.11/26/96), 683 So.2d 1378, 1382; *State v. Holmes,* 388 So.2d 722, 725–727 (La.1980); *People v. Robinson,* 475 Mich. 1, 8–9, 715 N.W.2d 44, 49 (2006); *Welch v. State,* 566 So.2d 680, 684–685 (Miss.1990); *State v. Roberts,* 709 S.W.2d 857, 863, and n. 6 (Mo.1986); *State v. Ferguson,* 20 S.W.3d 485, 497 (Mo.2000); *State v. Logan,* 645 S.W.2d 60, 64–65 (Mo.App.1982); *State v. Leonor,* 263 Neb. 86, 95–97, 638 N.W.2d 798, 807 (2002); N.J. Stat. Ann. § 2C:2–6; *State v. Torres,* 183 N.J. 554, 566–567, 874 A.2d 1084, 1092 (2005); *State v. Weeks,* 107 N.J. 396, 401–406, 526 A.2d 1077, 1080–1082 (1987); Ohio Rev.Code Ann. § 2923.03; *State v. Johnson,* 93 Ohio St.3d 240, 242–246, 754 N.E.2d 796, 799–801 (2001); *State v. Herring,* 94 Ohio St.3d 246, 248–251, 762 N.E.2d 940, 947–948 (2002); Ore.Rev.Stat. § 161.155; *State v. Pine,* 336 Ore. 194, 203–205, 206–208, and n. 6, 82 P.3d 130, 135, 137, and n. 6 (2003); *State v. Anlauf,* 164 Ore.App. 672, 674–677, and n. 1, 995 P.2d 547, 548–549, and n. 1 (2000); *Hudgins v. Moore,* 337 S.C. 333, 339, n. 5, 524 S.E.2d 105, 108, n. 5 (1999); S.D. Codified Laws § 22–3–3; *State v. Tofani,* 2006 SD 63, ¶¶ 31–48, 719 N.W.2d 391, 400–405; *State v. Richmond,* 90 S.W.3d 648, 654–656 (Tenn.2002); Tex. Penal Code Ann. § 7.02; *Ex parte Thompson,* 179 S.W.3d 549, 552 (Tex.Crim.App.2005); *Gordon v. State,* 640 S.W.2d 743, 758 (Tex.App.1982); Utah Code Ann. § 76–2–202; *State v. Alvarez,* 872 P.2d 450, 461 (Utah 1994); *State v. Crick,* 675 P.2d 527, 534 (Utah 1983); *State* **\*\*825** *v. Rodoussakis,* 204 W.Va. 58, 77, 511 S.E.2d 469, 488 (1998); *Jahnke v. State,* 692 P.2d 911, 921–922 (Wyo.1984); *Fales v. State,* 908 P.2d 404, 408 (Wyo.1995); *United States v. Edwards,* 303 F.3d 606, 637 (C.A.5 2002), cert. denied, 537 U.S. 1192, 123 S.Ct. 1272, 154 L.Ed.2d 1025 (2003); *United States v. Walker,* 99 F.3d 439, 443 (C.A.D.C.1996); *United States v.* **\*198** *Miller,* 22 F.3d 1075, 1078–1079 (C.A.11 1994); *United States v. Moore,* 936 F.2d 1508, 1527(CA7), cert. denied, 502 U.S. 991, 112 S.Ct. 607, 116 L.Ed.2d 630 (1991); *United States v. Graewe,* 774 F.2d 106, 108, n. 1 (C.A.6 1985), cert. denied, 474 U.S. 1068 and 1069, 106 S.Ct. 826, 88 L.Ed.2d 798 (1986); *United States v. Barnett,* 667 F.2d 835, 841 (C.A.9 1982); *United States v. DeLaMotte,* 434 F.2d 289, 293 (C.A.2 1970), cert. denied, 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971).

Justice STEVENS, concurring in part and dissenting in part.

While I join Parts I, II, and III–B of the Court's opinion, as well as its judgment, I do not join Part III–A. I am not prepared to disagree with anything said in Part III–A, but I believe we would be well advised to withhold comment on issues of California law until after they have been addressed by the Court of Appeals in the first instance. Limiting our decision to the question we granted certiorari to answer, though not a rigid rule, is generally prudent. Doing so seems particularly wise whenever reaching beyond the question presented requires analysis of disputed issues of state law. Because circuit judges are generally more familiar with the law of the States within their respective jurisdictions than we are, we have often followed the sound practice of deferring to the courts of appeals on such matters even when we did not necessarily share their views. See, *e.g., Haring v.*

*Prosise,* 462 U.S. 306, 314, 103 S.Ct. 2368, 76 L.Ed.2d 595 (1983); *Bishop v. Wood,* 426 U.S. 341, 345–346, and n. 10, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (collecting cases); see also *Elk Grove Unified School Dist. v. Newdow,* 542 U.S. 1, 16, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004). I would adhere to that settled practice in this case.

**All Citations**

549 U.S. 183, 127 S.Ct. 815, 166 L.Ed.2d 683, 75 USLW 4053, 07 Cal. Daily Op. Serv. 637, 2007 Daily Journal D.A.R. 707, 20 Fla. L. Weekly Fed. S 47

## Footnotes

| | |
|---|---|
| * | The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499. |

                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.    AR.07114    10

208 F.3d 299
United States Court of Appeals,
First Circuit.

Luis Aquiles HERRERA–INIRIO, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 99–1852.
|
Heard March 9, 2000.
|
Decided April 5, 2000.

**Synopsis**

Alien petitioned for review of order of Board of Immigration Appeals (BIA) ordering him removed based on fact he was found guilty in Puerto Rico court of abuse. The Court of Appeals, Selya, Circuit Judge, held that: (1) Puerto Rico court's issuance of formal judgment of exoneration did not preclude finding that alien was "convicted" for removal purposes; (2) statute defining "conviction" for purposes of federal immigration law did not violate full faith and credit clause; (3) statute did not violate Tenth Amendment; and (4) statute did not violate substantive due process guarantees.

Petition denied; order affirmed.

**Attorneys and Law Firms**

 **\*302**  Peter J. Zatz–Hanley, with whom Ramon M. Gonzalez was on brief, for petitioner.

Terri J. Scadron, Senior Litigation Counsel, Office of Immigration Litigation, United States Department of Justice, with whom David W. Ogden, Acting Assistant Attorney General, Civil Division, and Lyle D. Jentzer, Trial Attorney, Office of Immigration Litigation, were on brief, for respondent.

Before TORRUELLA, Chief Judge, COFFIN, Senior Circuit Judge, and SELYA, Circuit Judge.

**Opinion**

SELYA, Circuit Judge.

In this case, the petitioner, Luis Aquiles Herrera–Inirio, hoists the red flag of federalism and seeks to overturn an order calling for his deportation entered by the Board of Immigration Appeals (the Board). The Board's removal order rests upon its interpretation of  8 U.S.C. § 1101(a)(48)(A), the provision in the Immigration and Nationality Act (the I & N Act) that defines the term "conviction" for immigration-related purposes. The petitioner charges that the Board misread the law, failed to give full faith and credit to  **\*303**  the Puerto Rico courts' construction of a Puerto Rico domestic violence statute, overstepped the bounds set by the Tenth Amendment, and transgressed the Due Process Clause of the Fifth Amendment. Finding that the petitioner's arguments lack force, we deny the petition for review.

## I. BACKGROUND

The petitioner is a Dominican national who was admitted to the United States as an immigrant in 1994. He made his home in Puerto Rico, married an American citizen, and became a lawful permanent resident on April 16, 1997. Approximately

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

two months later, his wife filed a complaint with the police, in which she claimed that the petitioner had used physical and psychological violence against her (*e.g.,* striking her in the face with his fist, biting her breast, and forcing her into a car against her will). The police charged the petitioner with the criminal offense of aggravated abuse. *See* P.R. Laws Ann. tit. 8, § 632. On December 4, 1997, he pled guilty to a lesser charge of simple abuse. *See id.* § 631.

On January 30, 1998, the Puerto Rico Superior Court issued a resolution which commemorated that the petitioner had been "found guilty" on December 4 of a crime involving spousal abuse, but suspended further proceedings and ordered the petitioner to comply with a series of conditions for one year. *See id.* § 636 (stating in pertinent part that after an accused pleads guilty to certain specified crimes, "the court may ... suspend all procedures and submit the convicted person to probation, provided he/she participates in a reeducation and retraining program for persons who incur abusive conduct in a relationship with another"). The resolution also stated:

> If during this trial period the defendant does not violate any of the conditions, the Court will, at its sole discretion ... be able to exonerate the defendant and dismiss the case against him.... The exonerated person will have the right to, once the case has been dismissed, have the Puerto Rico Police Superintendent return any records of fingerprints or photographies [sic] in their possession, taken in relation to the violation which gave origin to this accusation.

A federal statute, 8 U.S.C. § 1227(a)(2)(E)(i), provides that an alien who is convicted of a crime of domestic violence at any time after his entry into the United States is subject to deportation. A companion statute, 8 U.S.C. § 1227(a)(2)(A)(i), provides that an alien who, having acquired lawful permanent resident status, is convicted within ten years after admission to the United States of a crime of moral turpitude (for which a sentence of one year or longer may be imposed) is likewise subject to deportation. On July 24, 1998, the Immigration and Naturalization Service (the INS) invoked these statutes and instituted removal proceedings against the petitioner.

At his deportation hearing, the petitioner argued that he had merely been placed in a pretrial diversion program and thus had neither been "convicted" of the offense of spousal abuse nor "sentenced" to one year of probation. On January 15, 1999, the immigration judge (the IJ) ruled that the petitioner had been convicted of the crime for immigration purposes; that the crime was potentially punishable by a prison term of one year and involved moral turpitude; and that the petitioner had been sentenced to probation. Consequently, she ordered the petitioner removed from the United States.

The petitioner appealed this order to the Board. *See* 8 C.F.R. §§ 3.1(b)(3), 240.15 (1999). Shortly thereafter, the one-year probationary period expired. Accordingly, on February 12, 1999, the Superior Court dismissed the indictment in accordance with its earlier resolution and directed the police superintendent to purge the records. The petitioner then asked the Board to terminate the removal proceedings or, in the alternative, to remand the case to the IJ for action "according with the dismissal **\*304** of the criminal charges." The Board demurred, instead dismissing the petitioner's appeal. In its decision, the Board held that the petitioner had been convicted for immigration purposes pursuant to 8 U.S.C. § 1101(a)(48)(A) because he had entered a guilty plea and a judge had decreed a form of punishment (the one-year probationary period). The Board also agreed with the IJ's determination that the petitioner had been convicted of a crime involving both spousal abuse and moral turpitude.

This timely petition for judicial review followed. In it, the petitioner challenges the finding that what transpired amounted to a "conviction" for immigration purposes (and, concomitantly, the constitutionality of section 1101(a)(48)(A)). He does not seek review of the Board's determination that the subject offense was a crime that involved both domestic violence and moral turpitude, and we therefore eschew any further reference to that aspect of the matter.

## II. ANALYSIS

We bifurcate our analysis, first considering the propriety of the Board's construction of section 1101(a)(48)(A), and then addressing the petitioner's constitutional challenges.

### A. Was Petitioner "Convicted"?

We review de novo an agency's construction of a statute that it administers, subject, however, to established principles of deference. *See INS v. Aguirre–Aguirre,* 526 U.S. 415, 424–25, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999); *Strickland v. Commissioner, Me. Dep't of Human Servs.,* 96 F.3d 542, 545 (1st Cir.1996). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. Because agency officials acting in the immigration context "exercise especially sensitive political functions that implicate questions of foreign relations," *INS v. Abudu,* 485 U.S. 94, 110, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988), deference to administrative expertise is particularly appropriate.

The statute *sub judice* provides that:

The term "conviction" means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where—

(i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt; and (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

8 U.S.C. § 1101(a)(48)(A). This language leaves nothing to the imagination. The text unambiguously encompasses within the definition of "conviction" situations in which adjudications of guilt have been withheld, as long as the defendant's guilt has been established by a trial, plea, or admission, and a judicial officer orders some form of punishment, penalty, or restraint on the defendant's liberty.

The petitioner does not contest—nor could he—that he pled guilty or that the conditions imposed upon him during the one-year probationary period constituted a form of punishment, penalty, or restraint. Instead, he posits that his particular situation eludes the statute's sweep because the local court eventually issued a formal judgment of exoneration that wiped the slate clean.[1] This means, he says, that **\*305** there was neither a "withheld adjudication of guilt" nor a "formal judgment of guilt" in his case.

This construct is unsound. Passing the fact that at the time of the IJ's determination the Puerto Rico Superior Court had not yet dismissed the indictment (and, thus, an adjudication of the petitioner's guilt was indeed "withheld"), no provision in the I & N Act gives controlling effect to state law or requires the INS to do an about-face if a state, pursuant to a diversionary disposition scheme, retroactively erases a conviction. To the exact contrary, state rehabilitative programs that have the effect of vacating a conviction other than on the merits or on a basis tied to the violation of a statutory or constitutional right in the underlying criminal case have no bearing in determining whether an alien is to be considered "convicted" under section 1101(a)(48)(A). *See United States v. Campbell,* 167 F.3d 94, 98 (2d Cir.1999); *In re Roldan–Santoyo,* Int. Dec. 3377, at 19, 1999 WL 126433 (BIA 1999); *see also Dickerson v. New Banner Institute, Inc.,* 460 U.S. 103, 119, 103 S.Ct. 986, 74 L.Ed.2d 845 (1983); *United States v. Cuevas,* 75 F.3d 778, 782 (1st Cir.1996).

If more were needed—and we do not think it is—the legislative history makes it crystal clear that the definition of "conviction" limned in 🚩 section 1101(a)(48)(A) applies to the petitioner's situation. Frustrated by the crazy quilt of anomalous results that flowed from widely disparate state rehabilitative and diversionary arrangements, the Board attempted over a decade ago to ensure uniformity by adopting a multi-part definition of "conviction." *See In re Ozkok,* 19 I. & N. Dec. 546, 551–52 (BIA 1988). This paradigm obligated the INS to show that the alien had entered a guilty plea (or otherwise been found guilty); that the judge had ordered some form of punishment, penalty, or restraint on the alien's liberty; and that, if not entered contemporaneously with the order for punishment, a judgment or adjudication of guilt could be entered (without the need for any further proceedings regarding the alien's guilt or innocence on the original charge) if the alien violated the terms or conditions of the court's order. *See id.*

This effort failed to produce the desired uniformity and Congress stepped in to fill the void. It enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.L. No. 104–208, Div. C, 110 Stat. 3009–546, which, among other things, added 🚩 section 1101(a)(48) (and its uniform definition of "conviction") to the I & N Act. The Conference Committee Report that accompanied the IIRIRA dwelt at length on Congress's intent in enacting 🚩 section 1101(a)(48)(A):

> This section deliberately broadens the scope of the definition of "conviction" beyond that adopted by the Board of Immigration Appeals in *Matter of Ozkok* .... As the Board noted in *Ozkok,* there exist[s] in the various States a myriad of provisions for ameliorating the effects of a conviction. As a result, aliens who have clearly been guilty of criminal behavior and whom Congress intended to be considered "convicted" have escaped the immigration consequences normally attendant upon a conviction. *Ozkok,* while making it more difficult for alien criminals to escape such consequences, does not go far enough to address situations where a judgment of guilt or imposition of sentence is suspended, conditioned upon the alien's future good behavior. For example, the third prong of *Ozkok* requires that a judgment or adjudication of guilt may be entered if the alien violates a term or condition of probation, without **\*306** the need for any further proceedings regarding guilt or innocence on the original charge. In some States, adjudication may be "deferred" upon a finding or confession of guilt, and a final judgment of guilt may not be imposed if the alien violates probation until there is an additional proceeding regarding the alien's guilt or innocence. In such cases, the third prong of the *Ozkok* definition prevents the original finding or confession of guilt to be considered a "conviction" for deportation purposes. This new provision, by removing the third prong of *Ozkok,* clarifies Congressional intent that even in cases where adjudication is "deferred," the original finding or confession of guilt is sufficient to establish a "conviction" for purposes of the immigration laws.

H.R. Conf. Rep. No. 104–828, at 224 (1996), *quoted in* 🏳️ *Moosa v. INS,* 171 F.3d 994, 1002 (5th Cir.1999) (alterations omitted). The emphasis that Congress placed on the *original* admission of guilt plainly indicates that a subsequent dismissal of charges, based solely on rehabilitative goals and not on the merits of the charge or on a defect in the underlying criminal proceedings, does not vitiate that original admission. *See 🏳️ Moosa,* 171 F.3d at 1009 (observing that Congress deliberately included deferred adjudications within the definition of "conviction" for purposes of 🚩 section 1101(a)(48)(A)).

To say more on this topic would be supererogatory. The nature of the petitioner's offense, his guilty plea, and the Superior Court's imposition of a one-year term of probation combine to bring his case squarely within the ambit of the statutory definition of "conviction" now contained in the I & N Act, notwithstanding the Superior Court's subsequent dismissal of the indictment.

*See* *id.* at 1010; *In re Punu,* Int. Dec. 3364, 1998 WL 546634 (BIA 1998). Consequently, the Board did not misconstrue the Act when it concluded that the petitioner had been "convicted" for immigration purposes.

## B. Is Section 1101(a)(48)(A) Constitutional?

An alien who has become a lawful permanent resident enjoys the full protection of the United States Constitution. *See* *Kwong Hai Chew v. Colding,* 344 U.S. 590, 596 n. 5, 73 S.Ct. 472, 97 L.Ed. 576 (1953); *Campos v. INS,* 961 F.2d 309, 316 (1st Cir.1992); *see also* *Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) (explaining that "once an alien gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly"). Taking due advantage of this protection, the petitioner launches a volley of challenges to the constitutionality of section 1101(a)(48)(A). We examine them seriatim.

**1. *Full Faith and Credit.*** In enacting section 1101(a)(48)(A), Congress defined the term "conviction" for purposes of federal immigration law. That definition applies even if both the predicate offense and the penalty therefor are creatures of state law. *See* *White v. INS,* 17 F.3d 475, 479 (1st Cir.1994). The petitioner claims that this hybridization risks distorting the meaning of local law. He sees this case as a paradigmatic example of a situation in which that risk has come home to roost, frustrating the purpose of Puerto Rico's chosen scheme for diversionary dispositions and denying Puerto Rico (and the petitioner) the benefit of full faith and credit. We do not agree.

Congress long ago passed a statute implementing the Full Faith and Credit Clause, U.S. Const. art. IV, § 1. *See* 28 U.S.C. § 1738 (providing, inter alia, that the "Acts, records and judicial proceedings" of each of the states, territories, and possessions "shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of [the originating] State, Territory or Possession"). Under this regime, **\*307** "a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). The "[a]cts, records and judicial proceedings" of Puerto Rico's courts fall within this prescription.

Neither the Full Faith and Credit Clause nor the statutory overlay

> purports to prevent federal legislative authorities from writing federal statutes that differ from state statutes or from attaching, to words in a federal statute, a meaning that differs from the meaning attached to the same word when used in a statute enacted by a state. A federal Union in which this were not so —a Union in which states possessed the constitutional power to control federal courts' interpretation of federal statutes—would not resemble our *post*-Civil War United States.

*Molina v. INS,* 981 F.2d 14, 19 (1st Cir.1992) (Breyer, J.); *cf.* *Cuevas,* 75 F.3d at 782 (noting that the immigration laws contain no indication that they are to be interpreted in accordance with state law). On the basis of this reasoning—which we deem sound— section 1101(a)(48)(A) does not infract applicable principles of full faith and credit. *See* *Yanez–Popp v. INS,* 998 F.2d 231, 237 (4th Cir.1993).

**2.** *The Tenth Amendment.* The petitioner contends that Congress, in enacting section 1101(a)(48)(A), offended the Tenth Amendment because it disregarded Puerto Rico's public policy anent the handling of domestic violence cases. This contention is devoid of merit.

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. This language "confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." *New York v. United States,* 505 U.S. 144, 157, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). Thus, for example, Congress may not command states to administer federal regulatory programs, conscript state officers directly, or otherwise treat state governments as federal handmaidens. *See New York v. United States,* 179 F.3d 29, 33–34 (2d Cir.1999), *cert. denied,* 528 U.S. 1115, 120 S.Ct. 932, 145 L.Ed.2d 811 (2000).

This limitation on federal authority is inapposite here. As the Supreme Court declared almost a half-century ago, the proposition "that the formulation of ... policies [pertaining to the entry of aliens and their right to remain here] is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government." *Galvan v. Press,* 347 U.S. 522, 531, 74 S.Ct. 737, 98 L.Ed. 911 (1954). Since then, the Court repeatedly has reiterated that Congress's legislative power in enacting immigration-related laws is at least as pervasive and encompassing as in any conceivable field. *See, e.g., Reno v. Flores,* 507 U.S. 292, 305, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); *Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977); *see also Amanullah v. Nelson,* 811 F.2d 1, 4 (1st Cir.1987) (collecting cases). In short, immigration is uniquely a matter of federal, not local, concern. *See* U.S. Const. art. I, § 9, cl. 1.

This gets the grease from the goose. Because Congress possesses plenary authority over immigration-related matters, it may freely displace or preempt state laws in respect to such matters. *See New York,* 179 F.3d at 34–35; *Lopez v. INS,* 758 F.2d 1390, 1392 (10th Cir.1985). After all, in areas in which plenary federal power exists, "the Supremacy Clause permits **\*308** no other result," notwithstanding that Congress may enact laws that "curtail or prohibit the States' prerogatives to make legislative choices respecting subjects the States may consider important." *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 290, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). So it is here.

**3.** *Substantive Due Process.* We turn now to the final item in the petitioner's asseverational array: his claim that both section 1101(a)(48)(A) and the specific action taken against him violate his right to substantive due process. In connection with this claim, he says that section 1101(a)(48)(A) unconstitutionally forecloses the application and enforcement of a valid and final state court judgment, and that the INS's removal order, in light of the Superior Court's dismissal of the indictment, works a comparable deprivation.

### a. The Legislation

Because Congress has plenary power to make policies and rules concerning the exclusion of aliens, *see* U.S. Const. art. I, § 8, cl. 4; *see also Plyler v. Doe,* 457 U.S. 202, 225, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1992), the immigration process is, in the last analysis, frankly political in character. The courts' authority to scrutinize legislation in this field is correspondingly narrow. *See Fiallo,* 430 U.S. at 792, 97 S.Ct. 1473; *Hampton v. Mow Sun Wong,* 426 U.S. 88, 101 n. 21, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976). As a result, the principal indicium of whether immigration legislation offends substantive due process is whether the law is based upon a "facially legitimate and bona fide reason." *Fiallo,* 430 U.S. at 794–95, 97 S.Ct. 1473;

*accord* Kleindienst v. Mandel, 408 U.S. 753, 770, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). If so, "courts will neither look behind the exercise of discretion, nor test it by balancing its justification against the constitutional interest asserted by those challenging the statute." Campos, 961 F.2d at 316.

Viewed against this jurisprudential backdrop, section 1101(a)(48)(A) easily passes constitutional muster. As previously discussed, *see supra* Part II(A), the statute grew out of a perceived need for a nationally uniform definition of the term "conviction" for immigration purposes. Indeed, Congress enacted section 1101(a)(48)(A) for the express purpose of counteracting (and, thus, correcting) disparities caused by varying state rehabilitative procedures. *See* Moosa, 171 F.3d at 1001–02 (synthesizing legislative history). By any standard, this is a plausible basis for federal legislative intervention and, thus, a "facially legitimate and bona fide reason" for congressional action.

As a fallback, the petitioner asserts that section 1101(a)(48)(A) fails the due process test because there is a fundamental "right" to have a state law definition of "conviction" applied in removal proceedings. This is wishful thinking. There is simply no purchase in the Supreme Court's precedents for elevating so narrowly focused a "right" to the status of one of "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." Washington v. Glucksberg, 521 U.S. 702, 720–21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (citations and internal quotation marks omitted). Indeed, we agree with the Fourth Circuit that when, as now, "narrow compass and special circumstances" attend a claimed right, the odds are very great that the right is not fundamental. Hawkins v. Freeman, 195 F.3d 732, 747 (4th Cir.1999) (en banc). Here, moreover, two other factors—the Court's announced reluctance to expand the boundaries of substantive due process, *see* Glucksberg, 521 U.S. at 720, 117 S.Ct. 2258; Vega–Rodriguez v. Puerto Rico Tel. Co., 110 F.3d 174, 183 (1st Cir.1997), and the plenary power that Congress enjoys over the field of immigration—make the proposition unarguable. We conclude, therefore, that the liberty **\*309** interest asserted by the petitioner does not implicate a fundamental right.

That determination undercuts the petitioner's argument. Because the right asserted is not a fundamental one, section 1101(a)(48)(A) need only be rationally related to a legitimate governmental interest in order to survive judicial perscrutation. *See* Flores, 507 U.S. at 306, 113 S.Ct. 1439. This is pretty much the same as saying that there must have been a "facially legitimate and bona fide reason" underlying the enactment of the statute. *See* United States v. Ahumada–Aguilar, 189 F.3d 1121, 1125 (9th Cir.1999); Turkhan v. Perryman, 188 F.3d 814, 828–29 (7th Cir.1999); Azizi v. Thornburgh, 908 F.2d 1130, 1133 n. 2 (2d Cir.1990); *see also* Collin O'Connor Udell, Miller v. Albright: *Plenary Power, Equal Protection, and the Rights of an Alien Love Child,* 12 Geo. Immigr. L.J. 621, 628 & n.67, 652 (1998) (noting that "the [facially legitimate bona fide reason] test has been cast as the equivalent of rational basis scrutiny by some courts"); Stephen H. Legomsky, Ten More Years of Plenary Power, 22 Hastings Const. L.Q. 925, 931 (1995) (similar). As discussed above, a sufficient reason—the government's need for a nationally uniform definition of the term "conviction" for immigration purposes—exists here. Section 1101(a)(48)(A) rationally advances that goal.

### b. The Executive Action

The second branch of the petitioner's substantive due process thesis is no more persuasive. In it, he assails the actions taken by the INS in this case. But those actions were precisely aligned with the purpose of the statute and well within its fair intendment.

Executive actions that do no more than comport with valid statutory commands simply are not the stuff from which substantive due process violations can be fashioned. *See* *Kleindienst,* 408 U.S. at 770, 92 S.Ct. 2576.

Of course, the same result would obtain even if, contrary to precedent, we yielded to the petitioner's importuning and analyzed the situation under the type of substantive due process analysis that characteristically attaches to executive action outside the immigration context. The removal order in this case, while strong medicine, in no way sinks to the level of "outrageous, uncivilized, and intolerable" conduct, *Hasenfus v. LaJeunesse,* 175 F.3d 68, 72 (1st Cir.1999), nor does it "shock the conscience," *Evans v. Avery,* 100 F.3d 1033, 1038 (1st Cir.1996).

### III. CONCLUSION

We need go no further. For the reasons stated, we conclude that the Board correctly determined that the petitioner was convicted for immigration purposes, and that section 1101(a)(48)(a)—which compelled that determination—does not violate the Constitution. Consequently, the removal order was lawful.

***The order of the Board of Immigration Appeals is affirmed, and the petition for review is denied and dismissed.***

### All Citations

208 F.3d 299

## Footnotes

1    For purposes of this case, we treat Puerto Rico as the functional equivalent of a state, according the same effect to its judicial decrees as we would to the orders of a state court and according the same effect to its legislative enactments as we would to state statutes. *See* 28 U.S.C. § 1738 (extending full faith and credit doctrine to Puerto Rico); 48 U.S.C. § 734 (providing that, unless otherwise specified, federal statutes applicable to states apply to Puerto Rico); *see also* *Cruz v. Melecio,* 204 F.3d 14 (1st Cir.2000).

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

23 I. & N. Dec. 718 (U.S.Atty.Gen.), Interim Decision 3508, 2005 WL 731413

U.S. Department of Justice

Executive Office for Immigration Review

Board of Immigration Appeals

IN RE FRUCTOSO LUVIANO-RODRIGUEZ, RESPONDENT

File A92 569 244 - Los Angeles

Decided by Attorney General January 18, 2005

Decided by Board February 29, 1996

**\*\*1  \*718**  An alien whose firearms conviction was expunged pursuant to section 1203.4 of the California Penal Code has been "convicted" for immigration purposes. *Matter of Marroquin*, 23 I&N Dec. 705 (A.G. 2005), followed.

**FOR RESPONDENT:**
Enrique Arevalo, Esquire,
South Pasadena, California

**FOR DEPARTMENT OF HOMELAND SECURITY:**
Joe D. Whitley,
General Counsel

BEFORE THE ATTORNEY GENERAL

(January 18, 2005)

In 1996, the Commissioner of the Immigration and Naturalization Service requested that the decision of the Board of Immigration Appeals in *In re Luviano*, 21 I&N Dec. 235 (BIA 1996), be certified for review pursuant to the provision now codified at 8 C.F.R. § 1003.1(h)(1)(iii) (2004). The request for certification is granted and, for the reasons set forth in the accompanying opinion, the decision of the BIA is reversed and remanded for further proceedings.

OPINION

In *In re Luviano*, 21 I&N Dec. 235 (BIA 1996) ("*Luviano*"), the Board of Immigration Appeals ("BIA") held that a defendant whose conviction for a state firearms offense had been "expunged" pursuant to section 1203.4(a) of the California Penal Code had not been "convicted" within the meaning of section 241(a)(2)(C) of the Immigration and Nationality Act ("INA"), codified as 8 U.S.C. § 1251(a)(2)(C) (1994).[1]  The Commissioner of the Immigration  **\*719**  and Naturalization Service referred the BIA's decision in this matter for my review pursuant to 8 C.F.R. § 3.1(h)(1)(iii) (1996).[2]

For the reasons provided below, which I have set forth at greater length in my decision issued today in *In re Marroquin*, 23 I&N Dec. 705 (A.G. 2005), the BIA's decision is reversed and remanded.

I.

The BIA based its holding in *Luviano* on its interpretation of prior Attorney General opinions, which had held that aliens whose convictions for, respectively, petty theft and forgery, had been expunged pursuant to section 1203.4(a) of the California Penal

Code, were not convicted of a crime for purposes of what was then section 241(a)(4) of the INA, the provision that subjected to deportation aliens who had been convicted of what the INA terms crimes of moral turpitude. *See Luviano*, 21 I&N Dec. at 237 (citing *In re Ibarra-Obando*, 12 I&N Dec. 576 (BIA 1966; A.G. 1967); *In re G-*, 9 I&N Dec. 159 (BIA 1960; A.G. 1961)). The Attorney General decisions on which the BIA relied had distinguished the Attorney General's earlier decision in *In re A-F-*, 8 I&N Dec. 429 (BIA, A.G. 1959). There, the Attorney General had held that Congress's progressive strengthening of the deportation laws with respect to aliens who had committed narcotics offenses, which would subject them to deportation under what was then section 241(a)(11) of the INA, revealed that Congress intended that aliens convicted of such narcotics offenses be subject to deportation under section 241(a)(11) even if their convictions had been "expunged" pursuant to section 1203.4(a) of the California Penal Code. *See In re A-F-.*

**\*\*2** The BIA concluded in *Luviano* that, taken together, the Attorney General's expungement decisions established the following legal rule. Convictions for narcotics offenses that had been expunged pursuant to section 1203.4(a) of the California Penal Code could serve as the basis for an order of deportation under section 241(a)(11) of the INA, but convictions for other offenses that had been expunged pursuant to that provision of California law could not serve as the basis for an order of deportation. *See Luviano*, 21 I&N Dec. at 238. Accordingly, the BIA held that Luviano-Rodriguez had not been convicted for purposes of section 241(a)(2)(C) of the INA because his conviction for a state firearms offense had been expunged pursuant to section 1203.4(a) of the California Penal Code. *See id.*

**\*720** During the pendency of my review of this matter, three events occurred that bear on the merits of the BIA's decision. First, Congress enacted section 322 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-628. That provision set forth, for the first time, an express statutory definition of "conviction" for the INA. *See* INA § 101(a)(48), 8 U.S.C. § 1101(a)(48) (2000). Second, the BIA issued its decision in *In re Marroquin*, A90 509 015 (BIA Feb. 21, 1997) ("*Marroquin*"), which addressed whether the new federal statutory definition of "conviction" precluded the rule regarding expunged convictions that the BIA had set forth in *Luviano*. The BIA concluded in *Marroquin* that the new federal statutory definition did not preclude the BIA's decision in *Luviano*, and therefore it held that the alien in that case was not subject to deportation because his state firearms conviction had been expunged pursuant to section 1203.4(a) of the California Penal Code. *See Marroquin*, A90 509 015, slip op. at 1. The BIA referred its decision in *Marroquin* for review by the Attorney General. *Id.* at 6. Third, in a subsequent case the BIA reversed itself and concluded that the new federal definition of "conviction" meant that an alien remains convicted notwithstanding a subsequent state action to expunge the conviction. *See In re Roldan*, 22 I&N Dec. 512, 523 (BIA 1999).

II.

**\*\*3** I have issued today an opinion that addresses the BIA's decisions in *Marroquin* and *In re Roldan*. I held that the new federal statutory definition of "conviction" means that aliens whose firearms convictions have been expunged pursuant to section 1203.4(a) of the California Penal Code generally are subject to deportation under what is now section 237 of the INA. [3] My opinion in *Marroquin* concludes that the federal statutory definition of "conviction" encompasses convictions for firearms offenses that have been expunged pursuant to section 1203.4(a) of the California Penal Code. It concludes that an expungement pursuant to section 1203.4(a) constitutes a procedure that serves to ameliorate some of the punitive consequences of a legally valid finding of guilt but in no way undermines the original judgment. For these reasons, I reversed the BIA's decision in *Marroquin*.

My holding in *Marroquin* necessitates the reversal of the BIA's decision in this matter as well. Luviano-Rodriguez's firearms conviction was also expunged pursuant to section 1203.4(a) of the California Penal Code, and the BIA concluded on that basis alone in *Luviano* that he was not subject to **\*721** deportation because he had not been "convicted" within the meaning of the relevant provision of the INA. *See Luviano*, 21 I&N Dec. at 238. For the reasons set forth more fully in my opinion in *Marroquin*, that determination cannot be reconciled with the new federal statutory definition of "conviction." *See* INA § 101(a)(48), 8 U.S.C. § 1101(a)(48).

**Footnotes**

1    After the initial deportation order was entered in this matter, former section 241 of the Immigration and Nationality Act was redesignated as section 237 by section 305(a)(2) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-598. The redesignated provision has been codified with modifications that are not relevant here as section 1227 of title 8, United States Code.

2    Now 8 C.F.R. § 1003.1(h)(1)(iii) (2004).

3    Because Congress passed the new federal statutory definition during the pendency of respondent's appeal, the new statutory definition of "conviction" applies here. *See* IIRIRA § 322(c), 110 Stat. at 3009-629 (explaining that the new statutory definition shall apply "to convictions … entered before, on, or after the date of the enactment of [IIRIRA].").

23 I. & N. Dec. 718 (U.S.Atty.Gen.), Interim Decision 3508, 2005 WL 731413

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   AR.07125   3

23 I. & N. Dec. 621 (BIA), Interim Decision 3493, 2003 WL 21358480

U.S. Department of Justice

Executive Office for Immigration Review

Board of Immigration Appeals

IN RE CHRISTOPHER PICKERING, RESPONDENT

File A70 539 319 - Detroit

Decided June 11, 2003

**1  *621  (1) If a court vacates an alien's conviction for reasons solely related to rehabilitation or immigration hardships, rather than on the basis of a procedural or substantive defect in the underlying criminal proceedings, the conviction is not eliminated for immigration purposes.

(2) Where the record indicated that the respondent's conviction for possession of a controlled substance was quashed by a Canadian court for the sole purpose of avoiding the bar to his acquisition of permanent residence, the court's action was not effective to eliminate the conviction for immigration purposes.

**FOR RESPONDENT:**
Marshal E. Hyman, Esquire,
Troy, Michigan

**FOR THE DEPARTMENT OF HOMELAND SECURITY:** [1]
Marsha K. Nettles,
Assistant District Counsel

BEFORE: Board Panel: FILPPU, GUENDELSBERGER, and PAULEY, Board Members.
PAULEY, Board Member:

In a decision dated September 21, 1999, an Immigration Judge found the respondent removable as an alien convicted of a controlled substance violation and ordered him removed from the United States. The respondent has appealed, arguing that he has not been convicted for immigration purposes because a Canadian court with jurisdiction over the matter issued an order quashing his conviction. The appeal will be dismissed.

I. FACTUAL AND PROCEDURAL HISTORY

The respondent is a native and citizen of Canada. On November 6, 1980, he was convicted in Chatham, Ontario, Canada, of unlawful possession of a restricted drug, namely, Lysergic Acid Diethylamide ("LSD"), contrary to Section 41(1) of the Food & Drugs Act. The respondent was sentenced to  *622  pay a fine of $300.00 (Canadian) or, in default of payment, to 30 days in custody.

In March 1993, the respondent filed an application for adjustment of status. Aware that his controlled substance conviction rendered him ineligible for adjustment, the respondent subsequently requested that the Ontario Court of Justice (General Division) quash the conviction. In a judgment dated June 20, 1997, the court quashed the respondent's 1980 conviction for unlawful possession of LSD. On August 21, 1998, the respondent's application for adjustment of status was denied and removal proceedings were initiated.

The Immigration Judge found the respondent removable on the basis of his conviction and ordered him removed. In his decision, the Immigration Judge declined to give effect to the Canadian court's order quashing the conviction, finding that the court's action was for rehabilitative purposes to allow the respondent to live permanently in the United States.

## II. ISSUE

The question presented in this appeal is whether the Canadian court's order quashing the respondent's conviction vitiates the conviction for immigration purposes. On the facts of this case, we find that it does not.

## III. ANALYSIS

**\*\*2**  Section 101(a)(48)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(48)(A) (2000), defines the term "conviction" as follows:

The term "conviction" means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication has been withheld, where—

(i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and

(ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

Although the definition of a conviction in section 101(a)(48)(A) does not directly address "quashing" of convictions, we have considered the issue of vacated convictions in two recent decisions. We held in *Matter of Roldan*, 22 I&N Dec. 512 (BIA 1999), that under the definition in section 101(a)(48)(A), no effect is to be given in immigration proceedings to a state action which purports to expunge, dismiss, cancel, vacate, discharge, or otherwise remove a guilty plea or other record of guilt or conviction by operation of a state rehabilitative statute. In *Matter of Rodriguez-Ruiz*, 22 I&N Dec. 1378 (BIA 2000), we determined that a conviction that had been  **\*623**  vacated on the merits pursuant to Article 440 of the New York Criminal Procedure Law did not constitute a conviction for immigration purposes within the meaning of the statute.

The issue presented in this case is not directly controlled by either *Matter of Roldan* or *Matter of Rodriguez-Ruiz*. We limited our holding in *Roldan* to "those circumstances where an alien has been the beneficiary of a state rehabilitative statute which purports to erase the record of guilt." *Matter of Roldan*, *supra*, at 523. *Rodriguez-Ruiz* involved a statute authorizing vacation of a conviction based on the legal merits of the underlying proceedings. The Government argued that because the New York conviction had been vacated "for purposes of avoiding removal, and not for reasons relating to a constitutional or legal defect in the criminal proceedings," the respondent's conviction should remain a "conviction" under the Act. *Matter of Rodriguez-Ruiz*, *supra*, at 1379. We rejected that contention, finding that the court's order was not within the parameters of *Roldan* because the law under which the conviction was vacated was not an expungement or rehabilitative statute. We further held that we would not look behind the state court judgment to ascertain whether the court acted in accordance with its own law in vacating the conviction.

**\*\*3**  The federal courts have also considered whether section 101(a)(42)(A) of the Act provides an exception for a vacated conviction from the definition of a "conviction." In *Herrera-Inirio v. INS*, 208 F.3d 299, 306 (1st Cir. 2000), the United States Court of Appeals for the First Circuit noted that the "emphasis that Congress placed on the *original* admission of guilt plainly indicates that a subsequent dismissal of the charges, based solely on rehabilitative goals and not on the merits of the charge or on a defect in the underlying criminal proceedings, does not vitiate that original admission." Thus, the court concluded that state rehabilitative programs that have the effect of vacating a conviction other than on the merits or on a basis tied to the violation of a statutory or constitutional right in the underlying criminal case have no bearing in determining whether an alien is to be considered "convicted" under section 1101(a)(48)(A).

*Id.* at 306. In reaching this conclusion, the court relied on *United States v. Campbell*, 167 F.3d 94, 98 (2d Cir. 1999), where the Second Circuit observed that "no provision [in the immigration laws] excepts from this definition a conviction that has been vacated" and found that a state order setting aside a conviction was invalid for immigration purposes where it "was not based on any showing of innocence or on any suggestion that the conviction had been improperly obtained."

In *Zaitona v. INS*, 9 F.3d 432, 436-37 (6th Cir. 1993), the Sixth Circuit, in whose jurisdiction this case arises, held that a district court order vacating a federal conviction would not be recognized for immigration purposes where **\*624** the sole reason for the order was to enter an otherwise untimely judicial recommendation against deportation in order to prevent the alien's deportation. In this regard, the Sixth Circuit stated that the sentencing court should not subsequently be permitted "to vacate a judgment for reasons that have nothing to do with the underlying validity of the guilty plea and original conviction themselves." *Id.* at 436.

The Sixth Circuit's approach is also consistent with other relevant federal court decisions. *See, e.g.*, *Renteria-Gonzalez v. INS*, 322 F.3d 804, 812 (5th Cir. 2002) (stating that "the text, structure, and history of the INA suggest that a vacated federal conviction does remain valid for purposes of the immigration laws");[2] *Beltran-Leon v. INS*, 134 F.3d 1379, 1380-81 (9th Cir. 1998) (finding that a vacated conviction remained a conviction for deportation purposes where the state court's action, pursuant to a writ of audita querela, was undertaken "solely in order to prevent deportation and the subsequent hardship to [the alien] and his family"); *cf. United States v. Bravo- Diaz*, 312 F.3d 995 (9th Cir. 2002) (finding that audita querela and the All Writs Act are unavailable to undo a conviction in order to avoid deportation on equitable grounds where there is no legal defect in the conviction); *United States v. Tablie*, 166 F.3d 505 (2d Cir. 1999) (same); *Doe v. INS*, 120 F.3d 200 (9th Cir. 1997) (same).

**\*\*4**  In accord with the federal court opinions applying the definition of a conviction at section 101(a)(48)(A) of the Act, we find that there is a significant distinction between convictions vacated on the basis of a procedural or substantive defect in the underlying proceedings and those vacated because of post-conviction events, such as rehabilitation or immigration hardships. Thus, if a court with jurisdiction vacates a conviction based on a defect in the underlying criminal proceedings, the respondent no longer has a "conviction" within the meaning of section 101(a)(48)(A). If, however, a court vacates a conviction for reasons unrelated to the merits of the underlying criminal proceedings, the respondent remains "convicted" for immigration purposes.[3] The fact that the case at bar involves a foreign conviction does not alter our analysis with respect to the purpose of the subsequent vacation of that conviction.

**\*625**  The resolution of this case therefore turns on whether the conviction was quashed on the basis of a defect in the underlying criminal proceedings.[4]  In making this determination, we look to the law under which the Canadian court issued its order and the terms of the order itself, as well as the reasons presented by the respondent in requesting that the court vacate the conviction.

The order quashing the conviction in this case does not reference law pursuant to which the conviction was vacated. Although the respondent noted in his affidavit that he sought the relief pursuant to Section 24(1) of the Canadian Charter of Rights and Freedoms and has argued that the purpose of this section is to provide appropriate and just remedies for violation of Charter rights, we are unable to discern such a purpose from the official documentation submitted in support of the claim.

Turning to the wording of the order and the respondent's request for post-conviction relief, we note that the judgment only refers, as the grounds for ordering the conviction quashed, to the respondent's request and his supporting affidavit. Significantly, neither document identifies a basis to question the integrity of the underlying criminal proceeding or conviction. The affidavit alleges that the respondent's controlled substance conviction is a bar to his permanent residence in the United States and indicates that the sole purpose for the order is to eliminate that bar.[5]  Under these circumstances, we find that the quashing of the conviction was not based on a defect in the conviction or in the proceedings underlying the conviction, but instead appears to have been entered solely for immigration purposes. For these reasons, we agree with the Immigration Judge that the respondent has a "conviction" for possession of a controlled substance within the meaning of section 101(a)(48)(A) of the Act. Accordingly, the respondent's appeal will be dismissed.

**ORDER:** The appeal is dismissed.

## Footnotes

1    We note that the functions of the Immigration and Naturalization Service have been transferred to the Department of Homeland Security pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-116 Stat. 2135.

2    The majority opinion in *Renteria-Gonzalez v. INS*, *supra*, indicates that a vacated federal conviction remains valid for purposes of the immigration laws irrespective of the reasons why the conviction was vacated. *See id.* at 822-23 (Benavides, J., specially concurring). This approach appears contrary to *Matter of Rodriguez-Ruiz*, *supra*, and we decline at this time to adopt it outside the jurisdiction of the Fifth Circuit.

3    *But cf. Matter of Sirhan*, 13 I&N Dec. 592 (BIA 1970); *Matter of O'Sullivan*, 10 I&N Dec. 320 (BIA 1963) (declining to find that a conviction was vacated for the sole purpose of avoiding deportation).

4    There is no contention that the Canadian court has inaccurately stated the basis for its ruling.

5    The affidavit recites that the respondent had been granted a pardon in 1996 for his 1980 LSD offense (as well as for convictions in 1977 for taking a vehicle without consent and in 1979 for assault causing bodily harm), but that he had been advised that only the 1980 crime stood as a "bar to gaining permanent residency in the United States." We note that the foreign pardon the respondent received would not serve to eliminate his convictions for immigration purposes. *See Matter of B-*, 7 I&N Dec. 166 (BIA 1956); *cf.* section 237(a)(2)(A)(v) of the Act, 8 U.S.C. § 1227(a)(2)(A)(v) (2000).

23 I. & N. Dec. 621 (BIA), Interim Decision 3493, 2003 WL 21358480

---

**End of Document**                                © 2020 Thomson Reuters. No claim to original U.S. Government Works.

5 U.S. 137, 2 L.Ed. 60

1 Cranch 137
Supreme Court of the United States

William MARBURY

v.

James MADISON, Secretary of State of the United States.

Feb. 1803.

**Opinion**

MARSHALL.

**\*\*1  \*138**  The supreme court of the U. States has not power to issue a mandamus to a secretary of state of the U. States, it being an exercise of *original* jurisdiction not warranted by the constitution. Congress have not power to give original jurisdiction to the supreme court in other cases than those described in the constitution. An act of congress repugnant to the constitution cannot become a law. The courts of the U. States are bound to take notice of the constitution. A commission is not necessary to the appointment of an officer by the executive—Semb. A commission is only *evidence* of an appointment.

Delivery is not necessary to the validity of letters patent. The President cannot authorize a secretary of state to omit the performance  **\*139**  of those duties which are enjoined by law.

A justice of peace in the district of Columbia is not removable at the will of the President. When a commission for an officer not holding his office at the will of the President, is by him signed and transmitted to the secretary of state to be sealed and recorded, it is irrevocable; the appointment is complete. A mandamus is the proper remedy to compel a secretary of state to deliver a commission to which the party is entitled.

**\*137**  At the last term, viz. December term, 1801, William Marbury, Dennis Ramsay, Robert Townsend Hooe, and William Harper, by their counsel, Charles Lee, esq. late attorney general of the United States, severally moved the court for a rule to James Madison, secretary of state of the United States, to shew cause why a mandamus should not issue commanding him to cause to be delivered to them respectively their several commissions as justices of the peace in the district of Columbia. This motion was supported by affidavits of the following facts; that notice of this motion had been given to Mr. Madison; that Mr. Adams, the late president of the United States, nominated the applicants to the senate for their advice and consent to be appointed justices of the peace of the district of Columbia; that the senate advised and consented to the appointments; that commissions in due form were signed by the said president appointing them justices, &c. and that the seal of the United States was in due form affixed to the said commissions by the secretary of state; that the applicants have requested Mr. Madison to deliver them their said commissions, who has not complied with that request; and that their said commissions are withheld from them; that the applicants have made application to Mr. Madison as secretary of state of the United States at his office, for information whether the commissions were signed and sealed as aforesaid; that explicit and satisfactory information has not been given in answer to that inquiry, either by the secretary of state or any officer in the department of state; that application has been made to the secretary of the Senate for a certificate of the nomination of the applicants, and of the advice and consent of the senate, who has declined giving such a certificate; whereupon a rule was laid to shew cause on the 4th day of this term. This rule having been duly served,

Mr. Lee, in support of the rule, observed that it was important to know on what ground a justice of peace in the district of Columbia holds his office, and what proceedings are necessary to constitute an appointment to an office not held at the will of the president. However notorious the facts are, upon the suggestion of which this rule has been laid, yet the applicants have been much embarrassed in obtaining evidence of them. Reasonable information has been denied at the office of the department

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

of state. Although a respectful memorial has been made to the senate praying them to suffer their secretary to give extracts from their executive journals respecting the nomination of the applicants to the senate, and of their advice and consent to the appointments, yet their request has been denied, and their petition rejected. They have therefore been compelled to summon witnesses to attend in court, whose voluntary affidavits they could not obtain. Mr. Lee here read the affidavit of Dennis Ramsay, and the printed journals of the senate of 31 January, 1803, respecting the refusal of the senate to suffer their secretary to give the information requested. He then called Jacob Wagner and Daniel Brent, who had been summoned to attend the court, and who had, as it is understood, declined giving a voluntary affidavit. They objected to being sworn, alleging that they were clerks in the department of state and not bound to disclose any facts relating to the business or transactions in the office.

 **\*\*2** Mr. Lee observed, that to shew the propriety of examining these witnesses, he would make a few remarks on the nature of the office of secretary of state. His duties are of two kinds, and he exercises his functions in two distinct capacities; as a public ministerial officer of the United States, and as agent of the President. In the first his duty is to the United States or its citizens; in the other his duty is to the President; in the one he is an independent, and an accountable officer; in the other he is dependent upon the President, is his agent, and accountable to him alone. In the former capacity he is compellable by mandamus to do his duty; in the latter he is not. This distinction is clearly pointed out by the two acts of congress upon this subject. The first was passed 27th July, 1789, vol. 1. p. 359, entitled "an act for establishing an executive department, to be denominated the department of foreign affairs." The first section ascertains the duties of the secretary so far as he is considered as a mere executive agent. It is in these words, "Be it enacted, &c. that there shall be an executive department, to be denominated the department of foreign affairs, and that there shall be a principal officer therein, to be called the secretary of the department of foreign affairs, who shall perform and execute such duties as shall from time to time be enjoined on, or intrusted to him by the President of the United States, agreeable to the constitution, relative to correspondencies, commissions **\*140** or instructions to or with public ministers or consuls from the United States; or to negotiations with public ministers from foreign states or princes, or to memorials or other applications from foreign public ministers, or other foreigners, or to such other matters respecting foreign affairs as the President of the United States shall assign to the said department; and furthermore, that the said principal officer shall conduct the business of the said department in such manner as the President of the United States shall from time to time order or instruct."

The second section provides for the appointment of a chief clerk; the third section prescribes the oath to be taken which is simply, "well and faithfully to execute the trust committed to him;" and the fourth and last section gives him the custody of the books and papers of the department of foreign affairs under the old congress. Respecting the powers given and the duties imposed by this act, no mandamus will lie. The secretary is responsible only to the President. The other act of congress respecting this department was passed at the same session on the 15th September 1789, vol. 1, p. 41, c. 14, and is entitled "An act to provide for the safe keeping of the acts, records, and seal of the United States, and for other purposes." The first section changes the name of the department and of the secretary, calling the one the department and the other the secretary of state. The second section assigns new duties to the secretary, in the performance of which it is evident, from their nature, he cannot be lawfully controlled by the president, and for the non-performance of which he is not more responsible to the president than to any other citizen of the United States. It provides that he shall receive from the president all bills, orders, resolutions and votes of the senate and house of representatives, which shall have been approved and signed by him; and shall cause them to be published, and printed copies to be delivered to the senators and representatives and to the executives of the several states; and makes it his duty carefully to preserve the originals; and to cause them to be recorded in books to be provided for that purpose. The third section provides a seal of the United States. The fourth makes it his duty to keep the said seal, and to make out and record, and to affix the seal of the United States to all civil commissions, after they **\*141** shall have been signed by the President. The fifth section provides for a seal of office, and that all copies of records and papers in his office, authenticated under that seal, shall be as good evidence as the originals. The sixth section establishes fees for copies, &c. The seventh and last section gives him the custody of the papers of the office of the secretary of the old congress. Most of the duties assigned by this act are of a public nature, and the secretary is bound to perform them, without the control of any person. The President has no right to prevent him from receiving the bills, orders, resolutions and votes of the legislature, or from publishing and distributing them, or from preserving or recording them. While the secretary remains in office the President cannot take from his custody the seal of the United States, nor prevent him from recording, and affixing the seal to civil commissions of such officers as hold not their offices at the will of the President, after he has signed them and delivered them to the secretary for that purpose. By other laws he is to make out

**WESTLAW**   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

5 U.S. 137, 2 L.Ed. 60

and record in his office patents for useful discoveries, and patents of lands granted under the authority of the United States. In the performance of all these duties he is a public ministerial officer of the United States. And the duties being enjoined upon him by law, he is, in executing them, uncontrollable by the President; and if he neglects or refuses to perform them, he may be compelled by mandamus, in the same manner as other persons holding offices under the authority of the United States. The President is no party to this case. The secretary is called upon to perform a duty over which the President has no control, and in regard to which he has no dispensing power, and for the neglect of which he is in no manner responsible. The secretary alone is the person to whom they are entrusted, and he alone is answerable for their due performance. The secretary of state, therefore, being in the same situation, as to these duties, as every other ministerial officer of the United States, and equally liable to be compelled to perform them, is also bound by the same rules of evidence. These duties are not of a confidential nature, but are of a public kind, and his clerks can have no exclusive privileges. There are undoubtedly facts, which may come to their knowledge by means of their connection with the secretary of state, respecting which  **142**  they cannot be bound to answer. Such are the facts concerning foreign correspondencies, and confidential communications between the head of the department and the President. This, however, can be no objection to their being sworn, but may be a ground of objection to any particular question. Suppose I claim title to land under a patent from the United States. I demand a copy of it from the secretary of state. He refuses. Surely he may be compelled by mandamus to give it. But in order to obtain a mandamus, I must shew that the patent is recorded in his office. My case would be hard indeed if I could not call upon the clerks in the office to give evidence of that fact. Again, suppose a private act of congress had passed for my benefit. It becomes necessary for me to have the use of that act in a court of law. I apply for it. I am refused. Shall I not be permitted, on a motion for a mandamus, to call upon the clerks in the office to prove that such an act is among the rolls of the office, or that it is duly recorded? Surely it cannot be contended that although the laws are to be recorded, yet no access is to be had to the records, and no benefit to result therefrom.

 **3**  The court ordered the witnesses to be sworn and their answers taken in writing, but informed them that when the questions were asked they might state their objections to answering each particular question, if they had any.

 **4**  Mr. Wagner being examined upon interrogatories, testified, that at this distance of time he could not recollect whether he had seen any commission in the office, constituting the applicants, or either of them justices of the peace. That Mr. Marbury and Mr. Ramsay called on the secretary of state respecting their commissions. That the secretary referred them to him; he took them into another room and mentioned to them, that two of the commissions had been signed, but the other had not. That he did not know that fact of his own knowledge, but by the information of others. Mr. Wagner declined answering the question "who gave him that information;" and the court decided that he was not bound to answer it, because it was not pertinent to this cause. He further testified that some of the commissions of the justices, but he believed not all, were recorded. He did not know whether the commissions of the applicants were  **143**  recorded, as he had not had recourse to the book for more than twelve months past.

Mr. Daniel Brent testified, that he did not remember certainly the names of any of the persons in the commissions of justices of the peace signed by Mr. Adams; but believed, and was almost certain, that Mr. Marbury's and col. Hooe's commissions were made out, and that Mr. Ramsay's was not; that he made out the list of names by which the clerk who filled up the commissions was guided; he believed that the name of Mr. Ramsay was pretermitted by mistake, but to the best of his knowledge it contained the names of the other two; he believed none of the commissions for justices of the peace signed by Mr. Adams, were recorded. After the commissions for justices of the peace were made out, he carried them to Mr. Adams for his signature. After being signed he carried them back to the secretary's office, where the seal of the United States was affixed to them. That commissions are not usually delivered out of the office before they are recorded; but sometimes they are, and a note of them only is taken, and they are recorded afterwards. He believed none of those commissions of justices were ever sent out, or delivered to the persons for whom they were intended; he did not know what became of them, nor did he know that they are now in the office of the secretary of state.

Mr. Lincoln, attorney general, having been summoned, and now called, objected to answering. He requested that the questions might be put in writing, and that he might afterwards have time to determine whether he would answer. On the one hand he respected the jurisdiction of this court, and on the other he felt himself bound to maintain the rights of the executive. He was acting as secretary of state at the time when this transaction happened. He was of opinion, and his opinion was supported by

that of others whom he highly respected, that he was not bound, and ought not to answer, as to any facts which came officially to his knowledge while acting as secretary of state.

The questions being written were then read and handed to him. He repeated the ideas he had before suggested, and said his objections were of two kinds.

**5   *144   1st. He did not think himself bound to disclose his official transactions while acting as secretary of state; and

2d. He ought not to be compelled to answer any thing which might tend to criminate himself.

Mr. Lee, in reply, repeated the substance of the observations he had before made in answer to the objection of Mr. Wagner and Mr. Brent. He stated that the duties of a secretary of state were two-fold. In discharging one part of those duties he acted as a public ministerial officer of the United States, totally independent of the President, and that as to any facts which came officially to his knowledge, while acting in this capacity, he was as much bound to answer as a marshal, a collector, or any other ministerial officer. But that in the discharge of the other part of his duties, he did not act as a public ministerial officer, but in the capacity of an agent of the President, bound to obey his orders, and accountable to him for his conduct. And that as to any facts which came officially to his knowledge in the discharge of this part of his duties, he was not bound to answer. He agreed that Mr. Lincoln was not bound to disclose any thing which might tend to criminate himself.

Mr. Lincoln thought it was going a great way to say that every secretary of state should at all times be liable to be called upon to appear as a witness in a court of justice, and testify to facts which came to his knowledge officially. He felt himself delicately situated between his duty to this court, and the duty he conceived he owed to an executive department; and hoped the court would give him time to consider of the subject.

The court said, that if Mr. Lincoln wished time to consider what answers he should make, they would give him time; but they had no doubt he ought to answer. There was nothing confidential required to be disclosed. If there had been he was not obliged to answer it; and if he thought that any thing was communicated to him in confidence he was not bound to disclose it; nor was he obliged to state any thing which would criminate himself; but that the fact whether such commissions had been in the office or not, could not be a confidential fact; it   *145   is a fact which all the world have a right to know. If he thought any of the questions improper, he might state his objections.

Mr. Lincoln then prayed time till the next day to consider of his answers under this opinion of the court.

The court granted it and postponed further consideration of the cause till the next day.

At the opening of the court on the next morning, Mr. Lincoln said he had no objection to answering the questions proposed, excepting the last which he did not think himself obliged to answer fully. The question was, what had been done with the commissions. He had no hesitation in saying that he did not know that they ever came to the possession of Mr. Madison, nor did he know that they were in the office when Mr. Madison took possession of it. He prayed the opinion of the court whether he was obliged to disclose what had been done with the commissions.

The court were of opinion that he was not bound to say what had become of them; if they never came to the possession of Mr. Madison, it was immaterial to the present cause, what had been done with them by others.

**6   To the other questions he answered that he had seen commissions of justices of the peace of the district of Columbia, signed by Mr. Adams, and sealed with the seal of the United States. He did not recollect whether any of them constituted Mr. Marbury, col. Hooe, or col. Ramsay, justices of the peace; there were when he went into the office several commissions for justices of peace of the district made out; but he was furnished with a list of names to be put into a general commission, which was done, and was considered as superseding the particular commissions; and the individuals whose names were contained in

5 U.S. 137, 2 L.Ed. 60

this general commission were informed of their being thus appointed. He did not know that any one of the commissions was ever sent to the person for whom it was made out, and did not believe that any one had been sent.

 *146  Mr. Lee then read the affidavit of James Marshall, who had been also summoned as a witness. It stated that on the 4th of March 1801, having been informed by some person from Alexandria that there was reason to apprehend riotous proceedings in that town on that night, he was induced to return immediately home, and to call at the office of the secretary of state, for the commissions of the justices of the peace; that as many as 12, as he believed, commissions of justices for that county were delivered to him for which he gave a receipt, which he left in the office. That finding he could not conveniently carry the whole, he returned several of them, and struck a pen through the names of those, in the receipt, which he returned. Among the commissions so returned, according to the best of his knowledge and belief, was one for colonel Hooe, and one for William Harper.

Mr. Lee then observed, that having proved the existence of the commissions, he should confine such further remarks as he had to make in support of the rule to three questions;

1st. Whether the supreme court can award the writ of mandamus in any case.

2d. Whether it will lie to a secretary of state in any case whatever.

3d. Whether in the present case the court may award a mandamus to James Madison, secretary of state.

The argument upon the 1st question is derived not only from the principles and practice of that country, from whence we derive many of the principles of our political institutions, but from the constitution and laws of the United States.

This is the *supreme* court, and by reason of its supremacy must have the superintendance of the inferior tribunals and officers, whether judicial or ministerial. In this respect there is no difference between a judicial and a ministerial officer. From this principle alone the court of king's bench in England derives the power of issuing the writs of mandamus and prohibition. 3. Inst. 70, 71.  *147  Shall it be said that the court of king's bench has this power in consequence of its being the supreme court of judicature, and shall we deny it to this court which the constitution makes the *supreme* court? It is a beneficial, and a necessary power; and it can never be applied where there is another *adequate, specific, legal remedy.*

The second section of the third article of the constitution gives this court appellate jurisdiction in all cases in law and equity arising under the constitution and laws of the United States (except the cases in which it has original jurisdiction) with such exceptions, and under such regulations as congress shall make. The term "appellate jurisdiction" is to be taken in its largest sense, and implies in its nature the right of superintending the inferior tribunals.

 **7  Proceedings in nature of appeals are of various kinds, according to the subject matter. 3 Bl. com. 402. It is a settled and invariable principle, that every right, when withheld, must have a remedy, and every injury its proper redress. 3 Bl. com. 109. There are some injuries which can only be redressed by a writ of mandamus, and others by a writ of prohibition. There must then be a jurisdiction some where competent to issue that kind of process. Where are we to look for it but in that court which the constitution and laws have made supreme, and to which they have given appellate jurisdiction? Blackstone, vol. 3, p. 110, says that a writ of mandamus is "a command issuing in the king's name from the court of king's bench, and directed to any *person,* corporation or inferior court, requiring them to do some particular thing therein specified, *which appertains to their office and duty,* and which the court has previously determined, or at least supposes, to be consonant to right and justice. It is a writ of a most extensively remedial nature, and issues in all cases where the party has a right to have any thing done, *and has no other specific means of compelling its performance."*

In the Federalist, vol. 2, p. 239, it is said, that the word "appellate" is not to be taken in its technical sense, as used in reference to appeals in the course of the *civil* law, but in its broadest sense, in which it denotes nothing more than the power of one tribunal

5 U.S. 137, 2 L.Ed. 60

to review the proceedings **\*148** of another, either as to law or fact, or both. The writ of mandamus is in the nature of an appeal as to fact as well as law. It is competent for congress to prescribe the forms of process by which the supreme court shall exercise its appellate jurisdiction, and they may well declare a mandamus to be one. But the power does not depend upon implication alone. It has been recognized by legislative provision as well as in judicial decisions in this court.

Congress, by a law passed at the very first session after the adoption of the constitution, vol. 1, p. 58, sec. 13, have expressly given the supreme court the power of issuing writs of mandamus. The words are, "The supreme court shall also have appellate jurisdiction from the circuit courts, and courts of the several states, in the cases herein after specially provided for; and shall have power to issue writs of prohibition to the district courts, when proceeding as courts of admiralty and maritime jurisdiction; and writs of *mandamus,* in cases warranted by the principles and usages of law, to any courts appointed, or *persons holding office,* under the authority of the United States."

Congress is not restrained from conferring original jurisdiction in other cases than those mentioned in the constitution. 2 Dal. Rep. 298.

**\*\*8** This court has entertained jurisdiction on a mandamus in one case, and on a prohibition in another. In the case of the United States v. judge Lawrence, 3. Dal. Rep. 42, a mandamus was moved for by the attorney general at the instance of the French minister, to compel judge Lawrence to issue a warrant against captain Barre, commander of the French ship of war Le Perdrix, grounded on an article of the consular convention with France. In this case the power of the court to issue writs of mandamus, was taken for granted in the arguments of counsel on both sides, and seems to have been so considered by the court. The mandamus was refused, because the case in which it was required, was not a proper one to support the motion. In the case of the United States v. judge Peters a writ of prohibition was granted, 3. Dal. Rep. 121, 129. This was the celebrated case of the French **\*149** corvette the Cassius, which afterwards became a subject of diplomatic controversy between the two nations. On the 5th Feb. 1794, a motion was made to the supreme court in behalf of one John Chandler, a citizen of Connecticut, for a mandamus to the *secretary at war,* commanding him to place Chandler on the invalid pension list. After argument, the court refused the mandamus, because the two acts of congress respecting invalids, did not support the case on which the applicant grounded his motion. The case of the United States v. Hopkins, at February term, 1794, was a motion for a mandamus to Hopkins, loan officer for the district of Virginia, to command him to admit a person to subscribe to the United States loan. Upon argument the mandamus was refused because the applicant had not sufficiently established his title. In none of these cases, nor in any other, was the power of this court to issue a mandamus ever denied. Hence it appears there has been a legislative construction of the constitution upon this point, and a judicial practice under it, for the whole time since the formation of the government.

2d. The second point is, can a mandamus go to a secretary of state in any case? It certainly cannot in *all* cases; nor to the President in *any* case. It may not be proper to mention this position; but I am compelled to do it. An idea has gone forth, that a mandamus to a secretary of state is equivalent to a mandamus to the President of the United States. I declare it to be my opinion, grounded on a comprehensive view of the subject, that the President is not amenable to any court of judicature for the exercise of his high functions, but is responsible only in the mode pointed out in the constitution. The secretary of state acts, as before observed, in two capacities. As the agent of the President, he is not liable to a mandamus; but as a recorder of the laws of the United States; as keeper of the great seal, as recorder of deeds of land, of letters patent, and of commissions, &c. he is a ministerial officer of the people of the United States. As such he has duties assigned him by law, in the execution of which he is independent of all control, but that of the laws. It is true he is a high officer, but he is not above law. It is not consistent with the policy of our political institutions, or the manners of the citizens of the United States, that any ministerial officer having public duties to perform, **\*150** should be above the compulsion of law in the exercise of those duties. As a ministerial officer he is compellable to do his duty, and if he refuses, is liable to indictment. A prosecution of this kind might be the means of punishing the officer, but a specific civil remedy to the injured party can only be obtained by a writ of mandamus. If a mandamus can be awarded by this court in any case, it may issue to a secretary of state; for the act of congress expressly gives the power to award it, "in cases warranted by the principles and usages of law, *to any person holding offices under the authority of the United States."*

Many cases may be supposed, in which a secretary of state ought to be compelled to perform his duty specifically. By the 5th and 6th sections of the act of congress, vol. 1, p. 43, copies under seal of the office of the department of state are made evidence in courts of law, and fees are given for making them out. The intention of the law must have been, that every person needing a copy should be entitled to it. Suppose the secretary refuses to give a copy, ought he not to be compelled? Suppose I am entitled to a patent for lands purchased of the United States; it is made out and signed by the President who gives a warrant to the secretary to affix the great seal to the patent; he refuses to do it; shall I not have a mandamus to compel him? Suppose the seal is affixed, but the secretary refuses to record it; shall he not be compelled? Suppose it recorded, and he refuses to deliver it; shall I have no remedy?

**\*\*9**  In this respect there is no difference between a patent for lands, and the commission of a judicial officer. The duty of the secretary is precisely the same.

Judge Patterson inquired of Mr. Lee whether he understood it to be the duty of the secretary to deliver a commission, unless ordered so to do by the President.

Mr. Lee replied, that after the President has signed a commission for an office not held at his will, and it comes to the secretary to be sealed, the President has done with it, and nothing remains, but that the secretary perform those ministerial acts which the law imposes upon him. It immediately becomes his duty to seal, record, and deliver **\*151** it on demand. In such a case the appointment becomes complete by the signing and sealing; and the secretary does wrong if he withholds the commission.

3d. The third point is, whether in the present case a writ of mandamus ought to be awarded to James Madison, secretary of state.

The justices of the peace in the district of Columbia are judicial officers, and hold their office for five years. The office is established by the act of Congress passed the 27th of Feb. 1801, entitled "An act concerning the district of Columbia," ch. 86, sec. 11 and 14; page 271, 273. They are authorized to hold courts and have cognizance of personal demands of the value of 20 dollars. The act of May 3d, 1802, ch. 52, sec. 4, considers them as judicial officers, and provides the mode in which execution shall issue upon their judgments. They hold their offices independent of the will of the President. The appointment of such an officer is complete when the President has nominated him to the senate, and the senate have advised and consented, and the President has signed the commission and delivered it to the secretary to be sealed. The President has then done with it; it becomes irrevocable. An appointment of a judge once completed, is made forever. He holds under the constitution. The requisites to be performed by the secretary are ministerial, ascertained by law, and he has no discretion, but must perform them; there is no dispensing power. In contemplation of law they are as if done.

These justices exercise part of the judicial power of the United States. They ought therefore to be independent. Mr. Lee begged leave again to refer to the Federalist, vol. 2, Nos. 78 and 79, as containing a correct view of this subject. They contained observations and ideas which he wished might be generally read and understood. They contained the principles upon which this branch of our constitution was constructed. It is important to the citizens of this district that the justices should be independent; almost all the authority immediately exercised over them is that of the justices. They wish to know whether the justices of this district are to hold their commissions at the will of a secretary of state. **\*152**  This cause may seem trivial at first view, but it is important in principle. It is for this reason that this court is now troubled with it. The emoluments or the dignity of the office, are no objects with the applicants. They conceive themselves to be duly appointed justices of the peace, and they believe it to be their duty to maintain the rights of their office, and not to suffer them to be violated by the hand of power. The citizens of this district have their fears excited by every stretch of power by a person so high in office as the secretary of state.

**\*\*10**  It only remains now to consider whether a mandamus to compel the delivery of a commission by a public ministerial officer, is one of "the cases warranted by the principles and usages of law."

It is the general principle of law that a mandamus lies, if there be no other *adequate, specific, legal* remedy; 3 *Burrow,* 1067, *King v. Barker, and al.* This seems to be the result of a view of all the cases on the subject.

5 U.S. 137, 2 L.Ed. 60

The case of Rex.v. Borough of Midhurst, 1. Wils. 283, was a mandamus to compel the presentment of certain conveyances to purchasers of burgage tenements, whereby they would be entitled to vote for members of parliament. In the case of Rex v. Dr. Hay, 1. W.Bl.Rep. 640, a mandamus issued to admit one to administer an estate.

A mandamus gives no right, but only puts the party in a way to try his right. Sid. 286.

It lies to compel a ministerial act which concerns the public. 1. Wilson, 283, 1. Bl.Rep. 640—although there be a more tedious remedy, Str. 1082, 4 Bur. 2188, 2 Bur. 1045; So if there be a legal right, and a remedy in equity, 3. Term Rep. 652. A mandamus lies to obtain admission into a trading company. Rex v. Turkey Company, 2 Bur. 1000. Carthew 448. 5 Mod. 402; So it lies to put the corporate seal to an instrument. 4. Term.Rep. 699; to commissioners of the excise to grant a permit, 2 Term.Rep. 381; to admit to an office, 3 Term.Rep. 575; to deliver papers which concern the public, 2 Sid. 31. A mandamus will sometimes lie in a  *153  doubtful case, 1 Levinz 123, to be further considered on the return, 2 Levinz, 14. 1 Sidersin, 169.

It lies to be admitted a member of a church, 3. Bur. 1265, 1043.

 **11  The process is as ancient as the time of Ed.2d. 1 Levinz 23.

The first writ of mandamus is not peremptory, it only commands the officer to do the thing or shew cause why he should not do it. If the cause returned be sufficient, there is an end of the proceeding, if not, a peremptory mandamus is then awarded.

It is said to be a writ of discretion. But the discretion of a court always means a found, legal discretion, not an arbitrary will. If the applicant makes out a proper case, the court are bound to grant it. They can refuse justice to no man.

On a subsequent day, and before the court had given an opinion, Mr. Lee read the affidavit of Hazen Kimball, who had been a clerk in the office of the Secretary of State, and had been to a distant part of the United States, but whose return was not known to the applicant till after the argument of the case.

It stated that on the third of March, 1801, he was a clerk in the department of state. That there were in the office, on that day, commissions made out and signed by the president, appointing William Marbury a justice of peace for the county of Washington; and Robert T. Hooe a justice of the peace for the county of Alexandria, in the district of Columbia.

Afterwards, on the 24th of February the following opinion of the court was delivered by the chief justice.

*Opinion of the court.*

At the last term on the affidavits then read and filed with the clerk, a rule was granted in this case, requiring the secretary of state to shew cause why a mandamus  *154  should not issue, directing him to deliver to William Marbury his commission as a justice of the peace for the county of Washington, in the district of Columbia.

No cause has been shewn, and the present motion is for a mandamus. The peculiar delicacy of this case, the novelty of some of its circumstances, and the real difficulty attending the points which occur in it, require a complete exposition of the principles, on which the opinion to be given by the court, is founded.

These principles have been, on the side of the applicant, very ably argued at the bar. In rendering the opinion of the court, there will be some departure in form, though not in substance, from the points stated in that argument.

In the order in which the court has viewed this subject, the following questions have been considered and decided.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

AR.07137

5 U.S. 137, 2 L.Ed. 60

1st. Has the applicant a right to the commission he demands?

2dly. If he has a right, and that right has been violated, do the laws of his country afford him a remedy?

3dly. If they do afford him a remedy, is it a *mandamus* issuing from this court?

The first object of inquiry is,

1st. Has the applicant a right to the commission he demands?

His right originates in an act of congress passed in February 1801, concerning the district of Columbia.

After dividing the district into two counties, the 11th section of this law, enacts, "that there shall be appointed in and for each of the said counties, such number of discreet persons to be justices of the peace as the president of the United States shall, from time to time, think expedient, to continue in office for five years.

 **\*155**  It appears, from the affidavits, that in compliance with this law, a commission for William Marbury as a justice of peace for the county of Washington, was signed by John Adams, then president of the United States; after which the seal of the United States was affixed to it; but the commission has never reached the person for whom it was made out.

 **\*\*12**  In order to determine whether he is entitled to this commission, it becomes necessary to enquire whether he has been appointed to the office. For if he has been appointed, the law continues him in office for five years, and he is entitled to the possession of those evidences of office, which, being completed, became his property.

The 2d section of the 2d article of the constitution, declares, that, "the president shall nominate, and, by and with the advice and consent of the senate, shall appoint ambassadors, other public ministers and consuls, and all other officers of the United States, whose appointments are not otherwise provided for."

The third section declares, that "he shall commission all the officers of the United States."

An act of congress directs the secretary of state to keep the seal of the United States, "to make out and record, and affix the said seal to all civil commissions to officers of the United States, to be appointed by the President, by and with the consent of the senate, or by the President alone; provided that the said seal shall not be affixed to any commission before the same shall have been signed by the President of the United States."

These are the clauses of the constitution and laws of the United States, which affect this part of the case. They seem to contemplate three distinct operations:

1st. The nomination. This is the sole act of the President, and is completely voluntary.

2d. The appointment. This is also the act of the President, and is also a voluntary act, though it can only be performed by and with the advice and consent of the senate.

 **\*156**  3d. The commission. To grant a commission to a person appointed, might perhaps be deemed a duty enjoined by the constitution. "He shall," says that instrument, "commission all the officers of the United States."

The acts of appointing to office, and commissioning the person appointed, can scarcely be considered as one and the same; since the power to perform them is given in two separate and distinct sections of the constitution. The distinction between the appointment and the commission will be rendered more apparent, by adverting to that provision in the second section of the

second article of the constitution, which authorizes congress "to vest, by law, the appointment of such inferior officers, as they think proper, in the President alone, in the courts of law, or in the heads of departments;" thus contemplating cases where the law may direct the President to commission an officer appointed by the courts, or by the heads of departments. In such a case, to issue a commission would be apparently a duty distinct from the appointment, the performance of which, perhaps, could not legally be refused.

Although that clause of the constitution which requires the President to commission all the officers of the United States, may never have been applied to officers appointed otherwise than by himself, yet it would be difficult to deny the legislative power to apply it to such cases. Of consequence the constitutional distinction between the appointment to an office and the commission of an officer, who has been appointed, remains the same as if in practice the President had commissioned officers appointed by an authority other than his own.

**13  It follows too, from the existence of this distinction, that, if an appointment was to be evidenced by any public act, other than the commission, the performance of such public act would create the officer; and if he was not removable at the will of the President, would either give him a right to his commission, or enable him to perform the duties without it.

These observations are premised solely for the purpose of rendering more intelligible those which apply more directly to the particular case under consideration.

*157  This is an appointment made by the President, by and with the advice and consent of the senate, and is evidenced by no act but the commission itself. In such a case therefore the commission and the appointment seem inseparable; it being almost impossible to shew an appointment otherwise than by proving the existence of a commission; still the commission is not necessarily the appointment; though conclusive evidence of it.

But at what stage does it amount to this conclusive evidence?

The answer to this question seems an obvious one. The appointment being the sole act of the President, must be completely evidenced, when it is shewn that he has done everything to be performed by him.

Should the commission, instead of being evidence of an appointment, even be considered as constituting the appointment itself; still it would be made when the last act to be done by the President was performed, or, at furthest, when the commission was complete.

The last act to be done by the President, is the signature of the commission. He has then acted on the advice and consent of the senate to his own nomination. The time for deliberation has then passed. He has decided. His judgment, on the advice and consent of the senate concurring with his nomination, has been made, and the officer is appointed. This appointment is evidenced by an open, unequivocal act; and being the last act required from the person making it, necessarily excludes the idea of its being, so far as respects the appointment, an inchoate and incomplete transaction.

Some point of time must be taken when the power of the executive over an officer, not removable at his will, must cease. That point of time must be when the constitutional power of appointment has been exercised. And this power has been exercised when the last act, required from the person possessing the power, has been performed. This last act is the signature of the commission. This idea seems to have prevailed with the legislature, when the act passed, converting the department *158 of foreign affairs into the department of state. By that act it is enacted, that the secretary of state shall keep the seal of the United States, "and shall make out and record, and shall affix the said seal to all civil commissions to officers of the United States, to be appointed by the President:" "Provided that the said seal shall not be affixed to any commission, before the same shall have been signed by the President of the United States; nor to any other instrument or act, without the special warrant of the President therefore."

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

5 U.S. 137, 2 L.Ed. 60

The signature is a warrant for affixing the great seal to the commission; and the great seal is only to be affixed to an instrument which is complete. It attests, by an act supposed to be of public notoriety, the verity of the Presidential signature.

 **14  It is never to be affixed till the commission is signed, because the signature, which gives force and effect to the commission, is conclusive evidence that the appointment is made.

The commission being signed, the subsequent duty of the secretary of state is prescribed by law, and not to be guided by the will of the President. He is to affix the seal of the United States to the commission, and is to record it.

This is not a proceeding which may be varied, if the judgment of the executive shall suggest one more eligible; but is a precise course accurately marked out by law, and is to be strictly pursued. It is the duty of the secretary of state to conform to the law, and in this he is an officer of the United States, bound to obey the laws. He acts, in this respect, as has been very properly stated at the bar, under the authority of law, and not by the instructions of the President. It is a ministerial act which the law enjoins on a particular officer for a particular purpose.

If it should be supposed, that the solemnity of affixing the seal, is necessary not only to the validity of the commission, but even to the completion of an appointment, still when the seal is affixed the appointment is made, and  *159  the commission is valid. No other solemnity is required by law; no other act is to be performed on the part of government. All that the executive can do to invest the person with his office, is done; and unless the appointment be then made, the executive cannot make one without the co-operation of others.

After searching anxiously for the principles on which a contrary opinion may be supported, none have been found which appear of sufficient force to maintain the opposite doctrine.

Such as the imagination of the court could suggest, have been very deliberately examined, and after allowing them all the weight which it appears possible to give them, they do not shake the opinion which has been formed.

In considering this question, it has been conjectured that the commission may have been assimilated to a deed, to the validity of which, delivery is essential.

This idea is founded on the supposition that the commission is not merely *evidence* of an appointment, but is itself the actual appointment; a supposition by no means unquestionable. But for the purpose of examining this objection fairly, let it be conceded, that the principle, claimed for its support, is established.

The appointment being, under the constitution, to be made by the President *personally,* the delivery of the deed of appointment, if necessary to its completion, must be made by the President also. It is not necessary that the livery should be made personally to the grantee of the office: It never is so made. The law would seem to contemplate that it should be made to the secretary of state, since it directs the secretary to affix the seal to the commission *after* it shall have been signed by the President. If then the act of livery be necessary to give validity to the commission, it has been delivered when executed and given to the secretary for the purpose of being sealed, recorded, and transmitted to the party.

But in all cases of letters patent, certain solemnities are required by law, which solemnities are the evidences  *160  of the validity of the instrument. A formal delivery to the person is not among them. In cases of commissions, the sign manual of the President, and the seal of the United States, are those solemnities. This objection therefore does not touch the case.

 **15  It has also occurred as possible, and barely possible, that the transmission of the commission, and the acceptance thereof, might be deemed necessary to complete the right of the plaintiff.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**Marbury v. Madison, 1 Cranch 137 (1803)**

5 U.S. 137, 2 L.Ed. 60

The transmission of the commission, is a practice directed by convenience, but not by law. It cannot therefore be necessary to constitute the appointment which must precede it, and which is the mere act of the President. If the executive required that every person appointed to an office, should himself take means to procure his commission, the appointment would not be the less valid on that account. The appointment is the sole act of the President; the transmission of the commission is the sole act of the officer to whom that duty is assigned, and may be accelerated or retarded by circumstances which can have no influence on the appointment. A commission is transmitted to a person already appointed; not to a person to be appointed or not, as the letter enclosing the commission should happen to get into the post-office and reach him in safety, or to miscarry.

It may have some tendency to elucidate this point, to enquire, whether the possession of the original commission be indispensably necessary to authorize a person, appointed to any office, to perform the duties of that office. If it was necessary, then a loss of the commission would lose the office. Not only negligence, but accident or fraud, fire or theft, might deprive an individual of his office. In such a case, I presume it could not be doubted, but that a copy from the record of the office of the secretary of state, would be, to every intent and purpose, equal to the original. The act of congress has expressly made it so. To give that copy validity, it would not be necessary to prove that the original had been transmitted and afterwards lost. The copy would be complete evidence that the original had existed, and that the appointment had been made, but, not that the original had been transmitted. If indeed it should appear that **\*161** the original had been mislaid in the office of state, that circumstance would not affect the operation of the copy. When all the requisites have been performed which authorize a recording officer to record any instrument whatever, and the order for that purpose has been given, the instrument is, in law, considered as recorded, although the manual labour of inserting it in a book kept for that purpose may not have been performed.

In the case of commissions, the law orders the secretary of state to record them. When therefore they are signed and sealed, the order for their being recorded is given; and whether inserted in the book or not, they are in law recorded.

A copy of this record is declared equal to the original, and the fees, to be paid by a person requiring a copy, are ascertained by law. Can a keeper of a public record, erase therefrom a commission which has been recorded? Or can he refuse a copy thereof to a person demanding it on the terms prescribed by law?

**\*\*16** Such a copy would, equally with the original, authorize the justice of peace to proceed in the performance of his duty, because it would, equally with the original, attest his appointment.

If the transmission of a commission be not considered as necessary to give validity to an appointment; still less is its acceptance. The appointment is the sole act of the President; the acceptance is the sole act of the officer, and is, in plain common sense, posterior to the appointment. As he may resign, so may he refuse to accept: but neither the one, nor the other, is capable of rendering the appointment a non-entity.

That this is the understanding of the government, is apparent from the whole tenor of its conduct.

A commission bears date, and the salary of the officer commences from his appointment; not from the transmission or acceptance of his commission. When a person, appointed to any office, refuses to accept that office, the successor is nominated in the place of the person who **\*162** has declined to accept, and not in the place of the person who had been previously in office, and had created the original vacancy.

It is therefore decidedly the opinion of the court, that when a commission has been signed by the President, the appointment is made; and that the commission is complete, when the seal of the United States has been affixed to it by the secretary of state.

Where an officer is removable at the will of the executive, the circumstance which completes his appointment is of no concern; because the act is at any time revocable; and the commission may be arrested, if still in the office. But when the officer is not removable at the will of the executive, the appointment is not revocable, and cannot be annulled. It has conferred legal rights which cannot be resumed.

5 U.S. 137, 2 L.Ed. 60

The discretion of the executive is to be exercised until the appointment has been made. But having once made the appointment, his power over the office is terminated in all cases, where, by law, the officer is not removable by him. The right to the office is *then* in the person appointed, and he has the absolute, unconditional, power of accepting or rejecting it.

Mr. Marbury, then, since his commission was signed by the President, and sealed by the secretary of state, was appointed; and as the law creating the office, gave the officer a right to hold for five years, independent of the executive, the appointment was not revocable; but vested in the officer legal rights, which are protected by the laws of this country.

To withhold his commission, therefore, is an act deemed by the court not warranted by law, but violative of a vested legal right.

This brings us to the second inquiry; which is,

2dly. If he has a right, and that right has been violated, do the laws of this country afford him a remedy?

 **17   *163  The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection. In Great Britain the king himself is sued in the respectful form of a petition, and he never fails to comply with the judgment of his court.

In the 3d vol. of his commentaries, p. 23, Blackstone states two cases in which a remedy is afforded by mere operation of law.

"In all other cases," he says, "it is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded."

And afterwards, p. 109, of the same vol. he says, "I am next to consider such injuries as are cognizable by the courts of the common law. And herein I shall for the present only remark, that all possible injuries whatsoever, that did not fall within the exclusive cognizance of either the ecclesiastical, military, or maritime tribunals, are for that very reason, within the cognizance of the common law courts of justice; for it is a settled and invariable principle in the laws of England, that every right, when withheld, must have a remedy, and every injury its proper redress."

The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right.

If this obloquy is to be cast on the jurisprudence of our country, it must arise from the peculiar character of the case.

It behoves us then to enquire whether there be in its composition any ingredient which shall exempt it from legal investigation, or exclude the injured party from legal redress. In pursuing this inquiry the first question which presents itself, is, whether this can be arranged  *164  with that class of cases which come under the description of *damnum absque injuria* —a loss without an injury.

This description of cases never has been considered, and it is believed never can be considered, as comprehending offices of trust, of honor or of profit. The office of justice of peace in the district of Columbia is such an office; it is therefore worthy of the attention and guardianship of the laws. It has received that attention and guardianship. It has been created by special act of congress, and has been secured, so far as the laws can give security to the person appointed to fill it, for five years. It is not then on account of the worthlessness of the thing pursued, that the injured party can be alleged to be without remedy.

Is it in the nature of the transaction? Is the act of delivering or withholding a commission to be considered as a mere political act, belonging to the executive department alone, for the performance of which, entire confidence is placed by our constitution in the supreme executive; and for any misconduct respecting which, the injured individual has no remedy.

That there may be such cases is not to be questioned; but that every act of duty, to be performed in any of the great departments of government, constitutes such a case, is not to be admitted.

 **\*\*18**  By the act concerning invalids, passed in June, 1794, vol. 3. p. 112, the secretary at war is ordered to place on the pension list, all persons whose names are contained in a report previously made by him to congress. If he should refuse to do so, would the wounded veteran be without remedy? Is it to be contended that where the law in precise terms, directs the performance of an act, in which an individual is interested, the law is incapable of securing obedience to its mandate? Is it on account of the character of the person against whom the complaint is made? Is it to be contended that the heads of departments are not amenable to the laws of their country?

Whatever the practice on particular occasions may be, the theory of this principle will certainly never be maintained.  **\*165**  No act of the legislature confers so extraordinary a privilege, nor can it derive countenance from the doctrines of the common law. After stating that personal injury from the king to a subject is presumed to be impossible, Blackstone, vol. 3. p. 255, says, " but injuries to the rights of property can scarcely be committed by the crown without the intervention of its officers; for whom, the law, in matters of right, entertains no respect or delicacy; but furnishes various methods of detecting the errors and misconduct of those agents, by whom the king has been deceived and induced to do a temporary injustice."

By the act passed in 1796, authorizing the sale of the lands above the mouth of Kentucky river (vol.3d. p. 299) the purchaser, on paying his purchase money, becomes completely entitled to the property purchased; and on producing to the secretary of state, the receipt of the treasurer upon a certificate required by the law, the president of the United States is authorized to grant him a patent. It is further enacted that all patents shall be countersigned by the secretary of state, and recorded in his office. If the secretary of state should choose to withhold this patent; or the patent being lost, should refuse a copy of it; can it be imagined that the law furnishes to the injured person no remedy?

It is not believed that any person whatever would attempt to maintain such a proposition.

It follows then that the question, whether the legality of an act of the head of a department be examinable in a court of justice or not, must always depend on the nature of that act.

If some acts be examinable, and others not, there must be some rule of law to guide the court in the exercise of its jurisdiction.

In some instances there may be difficulty in applying the rule to particular cases; but there cannot, it is believed, be much difficulty in laying down the rule.

By the constitution of the United States, the President is invested with certain important political powers, in the  **\*166**  exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience. To aid him in the performance of these duties, he is authorized to appoint certain officers, who act by his authority and in conformity with his orders.

In such cases, their acts are his acts; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion. The subjects are political. They respect the nation, not individual rights, and being entrusted to the executive, the decision of the executive is conclusive. The application of this remark will be perceived by adverting to the act of congress for establishing the department of foreign affairs. This officer, as his duties were prescribed by that act, is to conform precisely to the will of the President. He is the mere organ by whom that will is communicated. The acts of such an officer, as an officer, can never be examinable by the courts.

 **\*\*19**  But when the legislature proceeds to impose on that officer other duties; when he is directed peremptorily to perform certain acts; when the rights of individuals are dependent on the performance of those acts; he is so far the officer of the law; is amenable to the laws for his conduct; and cannot at his discretion sport away the vested rights of others.

The conclusion from this reasoning is, that where the heads of departments are the political or confidential agents of the executive, merely to execute the will of the President, or rather to act in cases in which the executive possesses a constitutional or legal discretion, nothing can be more perfectly clear than that their acts are only politically examinable. But where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured, has a right to resort to the laws of his country for a remedy.

If this be the rule, let us enquire how it applies to the case under the consideration of the court.

 **\*167**  The power of nominating to the senate, and the power of appointing the person nominated, are political powers, to be exercised by the President according to his own discretion. When he has made an appointment, he has exercised his whole power, and his discretion has been completely applied to the case. If, by law, the officer be removable at the will of the President, then a new appointment may be immediately made, and the rights of the officer are terminated. But as a fact which has existed cannot be made never to have existed, the appointment cannot be annihilated; and consequently if the officer is by law not removable at the will of the President; the rights he has acquired are protected by the law, and are not resumable by the President. They cannot be extinguished by executive authority, and he has the privilege of asserting them in like manner as if they had been derived from any other source.

The question whether a right has vested or not, is, in its nature, judicial, and must be tried by the judicial authority. If, for example, Mr. Marbury had taken the oaths of a magistrate, and proceeded to act as one; in consequence of which a suit had been instituted against him, in which his defense had depended on his being a magistrate; the validity of his appointment must have been determined by judicial authority.

So, if he conceives that, by virtue of his appointment, he has a legal right, either to the commission which has been made out for him, or to a copy of that commission, it is equally a question examinable in a court, and the decision of the court upon it must depend on the opinion entertained of his appointment.

 **\*\*20**  That question has been discussed, and the opinion is, that the latest point of time which can be taken as that at which the appointment was complete, and evidenced, was when, after the signature of the president, the seal of the United States was affixed to the commission.

It is then the opinion of the court,

1st. That by signing the commission of Mr. Marbury, the president of the United States appointed him a justice  **\*168**  of peace, for the county of Washington in the district of Columbia; and that the seal of the United States, affixed thereto by the secretary of state, is conclusive testimony of the verity of the signature, and of the completion of the appointment; and that the appointment conferred on him a legal right to the office for the space of five years.

2dly. That, having this legal title to the office, he has a consequent right to the commission; a refusal to deliver which, is a plain violation of that right, for which the laws of his country afford him a remedy.

It remains to be inquired whether,

3dly. He is entitled to the remedy for which he applies. This depends on,

1st. The nature of the writ applied for, and,

5 U.S. 137, 2 L.Ed. 60

2dly. The power of this court.

1st. The nature of the writ.

Blackstone, in the 3d volume of his commentaries, page 110, defines a mandamus to be, "a command issuing in the king's name from the court of king's bench, and directed to any person, corporation, or inferior court of judicature within the king's dominions, requiring them to do some particular thing therein specified, which appertains to their office and duty, and which the court of king's bench has previously determined, or at least supposes, to be consonant to right and justice."

Lord Mansfield, in 3d Burrows 1266, in the case of the *King v. Baker, et al.* states with much precision and explicitness the cases in which this writ may be used.

"Whenever," says that very able judge, "there is a right to execute an office, perform a service, or exercise a franchise (more especially if it be in a matter of public concern, or attended with profit) and a person is kept out of possession, or dispossessed of such right, and  **\*169**  has no other specific legal remedy, this court ought to assist by mandamus, upon reasons of justice, as the writ expresses, and upon reasons of public policy, to preserve peace, order and good government." In the same case he says, "this writ ought to be used upon all occasions where the law has established no specific remedy, and where in justice and good government there ought to be one."

In addition to the authorities now particularly cited, many others were relied on at the bar, which show how far the practice has conformed to the general doctrines that have been just quoted.

This writ, if awarded, would be directed to an officer of government, and its mandate to him would be, to use the words of Blackstone, "to do a particular thing therein specified, which appertains to his office and duty and which the court has previously determined, or at least supposes, to be consonant to right and justice." Or, in the words of Lord Mansfield, the applicant, in this case, has a right to execute an office of public concern, and is kept out of possession of that right.

 **\*\*21**  These circumstances certainly concur in this case.

Still, to render the mandamus a proper remedy, the officer to whom it is to be directed, must be one to whom, on legal principles, such writ may be directed; and the person applying for it must be without any other specific and legal remedy.

1st. With respect to the officer to whom it would be directed. The intimate political relation, subsisting between the president of the United States and the heads of departments, necessarily renders any legal investigation of the acts of one of those high officers peculiarly irksome, as well as delicate; and excites some hesitation with respect to the propriety of entering into such investigation. Impressions are often received without much reflection or examination, and it is not wonderful that in such a case as this, the assertion, by an individual, of his legal claims in a court of justice; to which claims it is the duty of that court to attend; should at first view be considered  **\*170**  by some, as an attempt to intrude into the cabinet, and to intermeddle with the prerogatives of the executive.

It is scarcely necessary for the court to disclaim all pretensions to such a jurisdiction. An extravagance, so absurd and excessive, could not have been entertained for a moment. The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court.

But, if this be not such a question; if so far from being an intrusion into the secrets of the cabinet, it respects a paper, which, according to law, is upon record, and to a copy of which the law gives a right, on the payment of ten cents; if it be no intermeddling with a subject, over which the executive can be considered as having exercised any control; what is there in the exalted station

of the officer, which shall bar a citizen from asserting, in a court of justice, his legal rights, or shall forbid a court to listen to the claim; or to issue a mandamus, directing the performance of a duty, not depending on executive discretion, but on particular acts of congress and the general principles of law?

If one of the heads of departments commits any illegal act, under color of his office, by which an individual sustains an injury, it cannot be pretended that his office alone exempts him from being sued in the ordinary mode of proceeding, and being compelled to obey the judgment of the law. How then can his office exempt him from this particular mode of deciding on the legality of his conduct, if the case be such a case as would, were any other individual the party complained of, authorize the process?

It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done that the propriety or impropriety of issuing a mandamus, is to be determined. Where the head of a department acts in a case, in which executive discretion is to be exercised; in which he is the mere organ of executive will; it is **\*171** again repeated, that any application to a court to control, in any respect, his conduct, would be rejected without hesitation.

**\*\*22** But where he is the head of a good department is directed by law to do a certain act affecting the absolute rights of individuals, in the performance of which he is not placed under the particular direction of the President, and the performance of which, the President cannot lawfully forbid, and therefore is never presumed to have forbidden; as for example, to record a commission, or a patent for land, which has received all the legal solemnities; or to give a copy of such record; in such cases, it is not perceived on what ground the courts of the country are further excused from the duty of giving judgment, that right be done to an injured individual, than if the same services were to be performed by a person not the head of a department.

This opinion seems not now, for the first time, to be taken up in this country.

It must be well recollected that in 1792, an act passed, directing the secretary at war to place on the pension list such disabled officers and soldiers as should be reported to him, by the circuit courts, which act, so far as the duty was imposed on the courts, was deemed unconstitutional; but some of the judges, thinking that the law might be executed by them in the character of commissioners, proceeded to act and to report in that character.

This law being deemed unconstitutional at the circuits, was repealed, and a different system was established; but the question whether those persons, who had been reported by the judges, as commissioners, were entitled, in consequence of that report, to be placed on the pension list, was a legal question, properly determinable in the courts, although the act of placing such persons on the list was to be performed by the head of a department.

That this question might be properly settled, congress passed an act in February, 1793, making it the duty of the secretary of war, in conjunction with the attorney general, to take such measures, as might be necessary to obtain an adjudication of the supreme court of the United **\*172** States on the validity of any such rights, claimed under the act aforesaid.

After the passage of this act, a mandamus was moved for, to be directed to the secretary at war, commanding him to place on the pension list, a person stating himself to be on the report of the judges.

There is, therefore, much reason to believe, that this mode of trying the legal right of the complainant, was deemed by the head of a department, and by the highest law officer of the United States, the most proper which could be selected for the purpose.

When the subject was brought before the court the decision was, not that a mandamus would not lie to the head of a department, directing him to perform an act, enjoined by law, in the performance of which an individual had a vested interest; but that a mandamus ought not to issue in that case—the decision necessarily to be made if the report of the commissioners did not confer on the applicant a legal right.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**\*\*23**  The judgment in that case, is understood to have decided the merits of all claims of that description; and the persons on the report of the commissioners found it necessary to pursue the mode prescribed by the law subsequent to that which had been deemed unconstitutional, in order to place themselves on the pension list.

The doctrine, therefore, now advanced, is by no means a novel one.

It is true that the mandamus, now moved for, is not for the performance of an act expressly enjoined by statute.

It is to deliver a commission; on which subject the acts of Congress are silent. This difference is not considered as affecting the case. It has already been stated that the applicant has, to that commission, a vested legal right, of which the executive cannot deprive him. He has been appointed to an office, from which he is not removable, at the will of the executive; and being so **\*173**  appointed, he has a right to the commission which the secretary has received from the president for his use. The act of congress does not indeed order the secretary of state to send it to him, but it is placed in his hands for the person entitled to it; and cannot be more lawfully withheld by him, than by any other person.

It was at first doubted whether the action of *detinue* was not a specific legal remedy for the commission which has been withheld from Mr. Marbury; in which case a mandamus would be improper. But this doubt has yielded to the consideration that the judgment in *detinue* is for the thing itself, *or* its value. The value of a public office not to be sold, is incapable of being ascertained; and the applicant has a right to the office itself, or to nothing. He will obtain the office by obtaining the commission, or a copy of it from the record.

This, then, is a plain case for a mandamus, either to deliver the commission, or a copy of it from the record; and it only remains to be inquired,

Whether it can issue from this court.

The act to establish the judicial courts of the United States authorizes the supreme court "to issue writs of mandamus, in cases warranted by the principles and usages of law, to any courts appointed, or persons holding office, under the authority of the United States."

The secretary of state, being a person holding an office under the authority of the United States, is precisely within the letter of the description; and if this court is not authorized to issue a writ of mandamus to such an officer, it must be because the law is unconstitutional, and therefore absolutely incapable of conferring the authority, and assigning the duties which its words purport to confer and assign.

The constitution vests the whole judicial power of the United States in one supreme court, and such inferior courts as congress shall, from time to time, ordain and establish. This power is expressly extended to all cases arising under the laws of the United States; and consequently, in some form, may be exercised over the present **\*174**  case; because the right claimed is given by a law of the United States.

**\*\*24**  In the distribution of this power it is declared that "the supreme court shall have original jurisdiction in all cases affecting ambassadors, other public ministers and consuls, and those in which a state shall be a party. In all other cases, the supreme court shall have appellate jurisdiction."

It has been insisted, at the bar, that as the original grant of jurisdiction, to the supreme and inferior courts, is general, and the clause, assigning original jurisdiction to the supreme court, contains no negative or restrictive words; the power remains to the legislature, to assign original jurisdiction to that court in other cases than those specified in the article which has been recited; provided those cases belong to the judicial power of the United States.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

If it had been intended to leave it in the discretion of the legislature to apportion the judicial power between the supreme and inferior courts according to the will of that body, it would certainly have been useless to have proceeded further than to have defined the judicial power, and the tribunals in which it should be vested. The subsequent part of the section is mere surplusage, is entirely without meaning, if such is to be the construction. If congress remains at liberty to give this court appellate jurisdiction, where the constitution has declared their jurisdiction shall be original; and original jurisdiction where the constitution has declared it shall be appellate; the distribution of jurisdiction, made in the constitution, is form without substance.

Affirmative words are often, in their operation, negative of other objects than those affirmed; and in this case, a negative or exclusive sense must be given to them or they have no operation at all.

It cannot be presumed that any clause in the constitution is intended to be without effect; and therefore such a construction is inadmissible, unless the words require it.

 **\*175**  If the solicitude of the convention, respecting our peace with foreign powers, induced a provision that the supreme court should take original jurisdiction in cases which might be supposed to affect them; yet the clause would have proceeded no further than to provide for such cases, if no further restriction on the powers of congress had been intended. That they should have appellate jurisdiction in all other cases, with such exceptions as congress might make, is no restriction; unless the words be deemed exclusive of original jurisdiction.

When an instrument organizing fundamentally a judicial system, divides it into one supreme, and so many inferior courts as the legislature may ordain and establish; then enumerates its powers, and proceeds so far to distribute them, as to define the jurisdiction of the supreme court by declaring the cases in which it shall take original jurisdiction, and that in others it shall take appellate jurisdiction; the plain import of the words seems to be, that in one class of cases its jurisdiction is original, and not appellate; in the other it is appellate, and not original. If any other construction would render the clause inoperative, that is an additional reason for rejecting such other construction, and for adhering to their obvious meaning.

To enable this court then to issue a mandamus, it must be shewn to be an exercise of appellate jurisdiction, or to be necessary to enable them to exercise appellate jurisdiction.

 **\*\*25**  It has been stated at the bar that the appellate jurisdiction may be exercised in a variety of forms, and that if it be the will of the legislature that a mandamus should be used for that purpose, that will must be obeyed. This is true, yet the jurisdiction must be appellate, not original.

It is the essential criterion of appellate jurisdiction, that it revises and corrects the proceedings in a cause already instituted, and does not create that cause. Although, therefore, a mandamus may be directed to courts, yet to issue such a writ to an officer for the delivery of a paper, is in effect the same as to sustain an original action for that paper, and therefore seems not to belong to  **\*176**  appellate, but to original jurisdiction. Neither is it necessary in such a case as this, to enable the court to exercise its appellate jurisdiction.

The authority, therefore, given to the supreme court, by the act establishing the judicial courts of the United States, to issue writs of mandamus to public officers, appears not to be warranted by the constitution; and it becomes necessary to enquire whether a jurisdiction, so conferred, can be exercised.

The question, whether an act, repugnant to the constitution, can become the law of the land, is a question deeply interesting to the United States; but, happily, not of an intricacy proportioned to its interest. It seems only necessary to recognize certain principles, supposed to have been long and well established, to decide it.

That the people have an original right to establish, for their future government, such principles as, in their opinion, shall most conduce to their own happiness, is the basis, on which the whole American fabric has been erected. The exercise of this original

right is a very great exertion; nor can it, nor ought it to be frequently repeated. The principles, therefore, so established, are deemed fundamental. And as the authority, from which they proceed, is supreme, and can seldom act, they are designed to be permanent.

This original and supreme will organizes the government, and assigns, to different departments, their respective powers. It may either stop here; or establish certain limits not to be transcended by those departments.

The government of the United States is of the latter description. The powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? The distinction, between a government with limited and unlimited powers, is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited **\*177** and acts allowed, are of equal obligation. It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it; or, that the legislature may alter the constitution by an ordinary act.

Between these alternatives there is no middle ground. The constitution is either a superior, paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and like other acts, is alterable when the legislature shall please to alter it.

**\*\*26** If the former part of the alternative be true, then a legislative act contrary to the constitution is not law: if the latter part be true, then written constitutions are absurd attempts, on the part of the people, to limit a power, in its own nature illimitable.

Certainly all those who have framed written constitutions contemplate them as forming the fundamental and paramount law of the nation, and consequently the theory of every such government must be, that an act of the legislature, repugnant to the constitution, is void.

This theory is essentially attached to a written constitution, and is consequently to be considered, by this court, as one of the fundamental principles of our society. It is not therefore to be lost sight of in the further consideration of this subject.

If an act of the legislature, repugnant to the constitution, is void, does it, notwithstanding its invalidity, bind the courts, and oblige them to give it effect? Or, in other words, though it be not law, does it constitute a rule as operative as if it was a law? This would be to overthrow in fact what was established in theory; and would seem, at first view, an absurdity too gross to be insisted on. It shall, however, receive a more attentive consideration.

It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each.

**\*178** So if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty.

If then the courts are to regard the constitution; and the constitution is superior to any ordinary act of the legislature; the constitution, and not such ordinary act, must govern the case to which they both apply.

Those then who controvert the principle that the constitution is to be considered, in court, as a paramount law, are reduced to the necessity of maintaining that courts must close their eyes on the constitution, and see only the law.

5 U.S. 137, 2 L.Ed. 60

This doctrine would subvert the very foundation of all written constitutions. It would declare that an act, which, according to the principles and theory of our government, is entirely void; is yet, in practice, completely obligatory. It would declare, that if the legislature shall do what is expressly forbidden, such act, notwithstanding the express prohibition, is in reality effectual. It would be giving to the legislature a practical and real omnipotence, with the same breath which professes to restrict their powers within narrow limits. It is prescribing limits, and declaring that those limits may be passed as pleasure.

That it thus reduces to nothing what we have deemed the greatest improvement on political institutions—a written constitution—would of itself be sufficient, in America, where written constitutions have been viewed with so much reverence, for rejecting the construction. But the peculiar expressions of the constitution of the United States furnish additional arguments in favour of its rejection.

**27  The judicial power of the United States is extended to all cases arising under the constitution.

*179  Could it be the intention of those who gave this power, to say that, in using it, the constitution should not be looked into? That a case arising under the constitution should be decided without examining the instrument under which it arises?

This is too extravagant to be maintained.

In some cases then, the constitution must be looked into by the judges. And if they can open it at all, what part of it are they forbidden to read, or to obey?

There are many other parts of the constitution which serve to illustrate this subject.

It is declared that "no tax or duty shall be laid on articles exported from any state." Suppose a duty on the export of cotton, of tobacco, or of flour; and a suit instituted to recover it. Ought judgment to be rendered in such a case? ought the judges to close their eyes on the constitution, and only see the law.

The constitution declares that "no bill of attainder or *ex post facto* law shall be passed."

If, however, such a bill should be passed and a person should be prosecuted under it; must the court condemn to death those victims whom the constitution endeavors to preserve?

"No person," says the constitution, "shall be convicted of treason unless on the testimony of two witnesses to the same overt act, or on confession in open court."

Here the language of the constitution is addressed especially to the courts. It prescribes, directly for them, a rule of evidence not to be departed from. If the legislature should change that rule, and declare *one* witness, or a confession *out of* court, sufficient for conviction, must the constitutional principle yield to the legislative act?

From these, and many other selections which might be made, it is apparent, that the framers of the constitution *180 contemplated that instrument, as a rule for the government of *courts,* as well as of the legislature.

Why otherwise does it direct the judges to take an oath to support it? This oath certainly applies, in an especial manner, to their conduct in their official character. How immoral to impose it on them, if they were to be used as the instruments, and the knowing instruments, for violating what they swear to support?

The oath of office, too, imposed by the legislature, is completely demonstrative of the legislative opinion on this subject. It is in these words, "I do solemnly swear that I will administer justice without respect to persons, and do equal right to the poor and

to the rich; and that I will faithfully and impartially discharge all the duties incumbent on me as according to the best of my abilities and understanding, agreeably to *the constitution,* and laws of the United States."

Why does a judge swear to discharge his duties agreeably to the constitution of the United States, if that constitution forms no rule for his government? if it is closed upon him, and cannot be inspected by him?

 **\*\*28**  If such be the real state of things, this is worse than solemn mockery. To prescribe, or to take this oath, becomes equally a crime.

It is also not entirely unworthy of observation, that in declaring what shall be the *supreme* law of the land, the *constitution* itself is first mentioned; and not the laws of the United States generally, but those only which shall be made in *pursuance* of the constitution, have that rank.

Thus, the particular phraseology of the constitution of the United States confirms and strengthens the principle, supposed to be essential to all written constitutions, that a law repugnant to the constitution is void; and that *courts,* as well as other departments, are bound by that instrument.

The rule must be discharged.

**All Citations**

1 Cranch 137, 5 U.S. 137, 1803 WL 893, 2 L.Ed. 60

**End of Document**                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

8 I. & N. Dec. 429 (BIA), Interim Decision 1024, 1959 WL 11595

United States Department of Justice

Board of Immigration Appeals

MATTER OF A-----F-----

In DEPORTATION Proceedings

A-2904545

*Board Decision of September 1, 1959*

*Decided by Attorney General October 12, 1959*

**1   *429  **Deportability–Narcotics offenses, section 241(a)(11) of 1952 act–Finality of conviction–Effect of State expungement law.**

(1) Judgment of State court, after finding of guilt, that proceedings be suspended and probation granted upon condition that defendant serve one year in the county jail constitutes a "conviction" within the meaning of section 241(a)(11) of the 1952 act.

(2) Finding of deportability under section 241(a)(11) of the 1952 act based upon conviction of State narcotics offense is not affected by a technical "expungement" or erasure of conviction record, as authorized by some State statutes, upon fulfillment of conditions of probation, such as section 1203.4 of the California Penal Code or section 1772 of the Welfare and Institutions Code. (Overrules *Matter of D-----, 7 I. & N. Dec. 670.*)

**CHARGE:**

Order: Act of 1952–Section 241(a)(11) [8 U.S.C. 1251(a)(11)]–Convicted of narcotic violation.

**BEFORE THE BOARD**

(September 1, 1959)

**Discussion:** On September 14, 1956, we dismissed an appeal from a decision of a special inquiry officer directing the respondent's deportation. Thereafter, a suit was instituted for judicial review of the order of deportation which resulted in decisions adverse to the respondent in the United States District Court for the Southern District of California (Central Division) and in the United States Court of Appeals for the Ninth Circuit (*Arrellano-Flores* v. *Hoy*, 262 F.2d 667 (1958)). Counsel then filed a petition for certiorari in the Supreme Court of the United States which is now pending. [a1]  On May 6, 1959, he filed a motion addressed to this Board seeking reconsideration of our decision of September 14, 1956. In our order of June 24, 1959, we denied this motion and affirmed our previous order. On July 14, 1959, the Service requested that the case be  *430  referred to the Attorney General for review of the Board's decision pursuant to 8 CFR 3.1(h)(1)(iii).

The respondent is a 55-year-old married male, native and citizen of Mexico, who last entered the United States about June 13, 1954, as a returning resident. He has resided in the United States since 1925 when he was admitted for permanent residence. On March 9, 1956, a judge of the Superior Court of California found the respondent guilty of a violation of section 11500 of the Health and Safety Code of that State in that he did "sell, furnish and give away flowering tops and leaves of Indian Hemp" also known as *cannabis sativa* or marihuana. On April 6, 1956, the court directed that proceedings be suspended and that probation be granted for five years, one of the conditions of probation being that the respondent serve one year in the county jail. It was

on the basis of this conviction that the special inquiry officer and this Board held that the respondent was deportable under 8 U.S.C. 1251(a)(11).

**\*\*2** The respondent's counsel stated in his motion of May 6, 1959, that it was predicated on *Matter of D-----, 7 I. & N. Dec. 670*, formerly Int. Dec. No. 916, decided March 6, 1958. His position was, in effect, that *Matter of D-----* required termination of this deportation proceeding, and he also contended that there had been no final judgment of conviction in the respondent's case. In our decision of June 24, 1959, we explained why the facts in *Matter of D-----, supra*, were not analogous to those relating to the respondent, and we affirmed our previous order in which we had held this respondent deportable. The sole contention raised in the Service motion of July 14, 1959, is that there is a conflict between the decision in the respondent's case and the decision in *Matter of D-----, supra*. While not specifically stated in the motion of July 14, 1959, it is apparent that the Service agrees with our *decision* that this respondent is deportable and agrees with the statements which we made in our order of June 24, 1959, that there was a final judgment of conviction in the respondent's case. The motion contains the statement that it is the view of the Service that *Matter of D-----, supra*, erroneously states the law, and the Service obviously urges the overruling of that decision.

*Matter of D-----, supra*, involved an alien who was approximately 17 years old at the time of his conviction, and he was treated as a youthful offender. About one year after the conviction, and pursuant to section 1772 of the Welfare and Institutions Code of California, the court entered an order setting aside the alien's plea of guilty and dismissing the information. We did not, as asserted by the Service in its motion, state in our previous order that the conviction was expunged under section 1203.4 of the California Penal Code. We did state that, although the present respondent was 51 **\*431** years old when the narcotic violation was committed, we did not regard this factor as distinguishing the case from *Matter of D-----* because of the possibility that this respondent might at some future date have his conviction set aside under section 1203.4 of the California Penal Code. Section 1772 of the Welfare and Institutions Code and section 1203.4 of the California Penal Code were quoted in footnotes 1 and 2 of the decision in *Matter of D-----*. They are substantially similar in their provisions that, under specified conditions, the court may set aside the verdict of guilty and dismiss the accusation or information. Section 1772 is limited to youthful offenders. Since only section 1203.4 would have any relevance in this respondent's case, we will discuss the question under that statutory provision although our statements would be equally applicable to section 1772.

Section 1203.4 of the California Penal Code provides, in part, as follows:

Every defendant who has fulfilled the conditions of his probation for the entire period thereof, or who shall have been discharged from probation prior to the termination of the period thereof, shall at any time thereafter be permitted by the court to withdraw his plea of guilty and enter a plea of not guilty; or if he has been convicted after a plea of not guilty, the court shall set aside the verdict of guilty; and in either case the court shall thereupon dismiss the accusations or information against such defendant, who shall thereafter be released from all penalties and disabilities resulting from the offense or crime of which he has been convicted. \* \* \* provided, that in any subsequent prosecution of such defendant for any other offense, such prior conviction may be pleaded and proved and shall have the same effect as if probation had not been granted or the accusation or information dismissed.

**\*\*3** The proposition urged by the Service in its motion of July 14, 1959, is that an alien convicted of a crime which rendered him deportable continues to be deportable on the basis of that conviction even after the court has set aside the conviction under section 1203.4 of the California Penal Code. While the motion discusses only this statutory provision of California, acceptance of the proposition advanced by the Service would logically require a conclusion that the setting aside of a conviction, in accordance with similar statutory provisions of other States, likewise would be ineffective to prevent deportation.

*Matter of P-----, 5 I. & N. Dec. 392 (1953),* involved the question of whether there had been a conviction for immigration purposes under the following circumstances. The alien, in a Massachusetts criminal proceeding, had been sentenced to imprisonment for one year and the sentence was suspended. After the expiration of one year the sentence was revoked and the case was placed "on file." We held that there was a conviction rendering him deportable. The lower courts agreed that this alien was deportable but the Supreme Court reversed, stating that it was unable to say that the conviction **\*432** had attained such finality as to support an order of deportation (*Pino* v. *Landon*, 349 U.S. 901 (1955)). Thereafter, we held in another Massachusetts

**WESTLAW** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

case that the conviction was insufficient for deportation purposes where, after completion of probation, the sentence was revoked and the complaint was dismissed (*Matter of G-----*, 7 I. & N. Dec. 171 (1956)).

In a case where the conviction is expunged under section 1203.4 of the California Penal Code, the plea of guilty is withdrawn or the verdict of guilty is set aside and thereupon the accusation or information against the defendant is dismissed. If the Supreme Court was unable to find finality of conviction in *Pino* v. *Landon, supra*, where only the *sentence* was revoked, we do not understand how the Service can maintain that there is finality of conviction in a case under section 1203.4 where the verdict of guilty is set aside and the accusation is dismissed. In such a case, not only is there no finality of conviction, but there is in contemplation of law no conviction whatever.

*In re Ringnalda*, 48 F. Supp. 975 (S.D. Cal., 1943), related to the question of whether an alien was qualified for naturalization, and the particular point discussed was the effect of the expungement of a conviction under section 1203.4 of the California Penal Code. It was stated (p. 976) that, through these proceedings, the defendant stands cleared of guilt, and the court cited with approval a California decision which had held that the intention of the legislature was to wipe out absolutely the entire proceedings and to place the defendant in the position which he would have occupied if no accusation or information had ever been presented against him.

It might be assumed from the motion of the Service that *Matter of D-----, supra*, formulated some new policy of terminating deportation proceedings where the record of conviction had been expunged. Actually, that is not the case. On the contrary, it has been the established and accepted view of the Service and of this Board for many years that in cases where a court has expunged the record of an alien's conviction, the conviction cannot thereafter serve as the basis for deporting the alien or excluding him. In its request of July 14, 1959, the Service urges only that *Matter of D-----, supra*, be overruled. However, in reality, it is seeking to overthrow the long-standing practice we have mentioned without even commenting on its existence. The cases next cited confirm the existence of this rule.

**\*\*4**  In *Matter of G-----*, 1 I. & N. Dec. 96, a decision approved by the Attorney General on January 14, 1942, there was involved article 780 of the Texas Code of Criminal Procedure which permits certain defendants to move for a new trial and dismissal of the case after the expiration of time assessed as punishment by the jury.  **\*433**  There, following the conclusion of the deportation hearing and pursuant to this statutory provision, the court entered an order granting a new trial to the alien and dismissing the cause. We said (at p. 97) that deportation could not be ordered on the basis of the *conviction* of crime because "today there is not outstanding a conviction of the respondent for this crime." Since there was in that case no further discussion of this matter, it seems obvious that the proposition that the expungement of a conviction rendered the conviction ineffective to support an order of deportation was believed no longer open to question at the time of our decision in that case in 1941. The only question which it was considered necessary to discuss there was whether the alien's original plea of guilty to the offense constituted an *admission* of the crime for immigration purposes.

Article 780 of the Texas Code of Criminal Procedure was also pertinent to the decision in *Matter of L-----R-----*, 7 I. & N. Dec. 318. In that case, sentence was suspended on recommendation of the jury. On February 18, 1957, the Attorney General ordered termination of the deportation proceeding and held that the conviction lacked finality. There, the period of punishment assessed had not expired and the conviction had not been expunged when the case was considered by the Attorney General, but the decision turned on the specific language of article 778 of the Texas law, relating to suspended sentences, which is to the effect that neither a verdict of conviction nor the judgment thereon becomes final unless there has been a final conviction for another felony during the period of suspension of the sentence. Similar language is not contained in the California statute under discussion. However, if the conviction lacked finality under the circumstances present in *Matter of L----- R----, supra*, the Service can hardly be correct in its view that there was a final conviction in *Matter of D-----, supra*, since in that case the conviction had already been expunged at the time the case was considered.

In *Matter of O-----T-----*, 4 I. & N. Dec. 265, which was a decision by the Central Office of the Service in 1951, it was stated at page 266, "The Service and the Board of Immigration Appeals have held in numerous cases that the proceedings under

section 1203.4 [of the California Penal Code] expunge the record of conviction and that *thereafter* it may not serve as the basis for an order of deportation" (emphasis supplied). The cases cited in that decision show that this had been the rule concerning section 1203.4 since at least 1943, and the matter was so well settled that the only reported cases are those dealing with possible exceptions to the rule. In addition to *Matter of O----- T-----, supra*, the existence of the rule is illustrated by *Matter of E-----V-----*, 5 I. & N. Dec. 194 (1953); *Matter of H-----*, 6 I. & N. Dec. 619 (1955); and **\*434** *Matter of S-----R-----*, 7 I. & N. Dec. 495 (1957), in all of which section 1203.4 of the California Penal Code was involved.

**\*\*5** In *Matter of D-----, supra*, which the Service says is in conflict with the decision in the respondent's case, the special inquiry officer, in terminating the deportation proceeding, also referred to the well-settled rule mentioned above and stated that section 1203.4 of the California Penal Code had "uniformly been held to expunge and remove the conviction as a basis for deportation." In our decision of March 6, 1958, in that case, we stated (p. 674) that the action taken by the California court removed the alien's conviction as a basis for deportation, and we affirmed the special inquiry officer's order terminating the proceeding. If this Board erroneously stated the law in *Matter of D-----, supra*, as contended in the present motion, we do not understand why the Service did not even file a motion for reconsideration of that decision at the time it was rendered.

When the Service urged, in *Matter of D-----, supra*, that the special inquiry officer had erred in terminating the deportation proceeding, this was based on the fact that the alien was charged with being deportable under 8 U.S.C. 1251(a)(11) and that 8 U.S.C. 1251(b), as amended July 18, 1956 (1958 ed.), provided, in effect, that a *pardon* would not relieve from deportation an alien deportable under 8 U.S.C. 1251(a)(11). It was contended by the Service that an expungement of the record of conviction in California was the equivalent of a pardon and that, therefore, expungement of the conviction did not relieve the alien from liability to deportation. That was the sole argument advanced by the Service in that case. The Service made no attempt there to contradict the special inquiry officer's statement that the expungement of a conviction in California had uniformly been held to remove the conviction as a basis for deportation, nor did it request repudiation of the rule. On the contrary, *Matter of D-----, supra*, would seem to indicate acquiescence of the Service in the rule as to deportation under 8 U.S.C. 1251(a)(4) for convictions involving moral turpitude with a request for an exception to the rule in the cases of deportations under 8 U.S.C. 1251(a)(11) relating to narcotic convictions.

On page 2 of its motion, the Service quoted a statement from *Arellano-Flores* v. *Hoy, supra*, at page 668, which is to the effect that the court could not ignore what transpired in the criminal proceedings but that possibly Congress intended to do its own defining (of "convicted") rather than leaving the matter of what constituted a conviction for determination under the statute of the particular state. Actually, the word "convicted" is not one of the terms which was defined in 8 U.S.C. 1101, but the decision in *Pino* v. *Landon, supra*, must be considered, of course, an interpretation of "convicted" limiting it to convictions which have sufficient finality.

**\*435** The opinion of the Court of Appeals in this respondent's case shows that the statement quoted by the Service related to a contention of the respondent based on a decision of the Seventh Circuit that one Freislinger had not been convicted under Illinois law because a final judgment of conviction had not been entered. In holding that this respondent had been "convicted," the Court of Appeals did not base its decision upon the proposition that the provisions of the California statute or what transpired in the criminal proceedings should be disregarded. On the contrary, in the next paragraph following the one quoted by the Service, the Court of Appeals stated that California would consider that on this record there was a conviction. Parenthetically, we observe that the court had also stated at page 667 of the opinion that under California law such a sentence as was prescribed with respect to this respondent does not constitute a final judgment from which an appeal may be taken, citing *In re Marquez*, 45 P. 2d 342. That case was decided in 1935. However, section 1237 of the California Penal Code, as amended in 1951, relating to cases in which the defendant may appeal, contains the specific statement, "an order granting probation [which is what occurred in the respondent's case] shall be deemed to be a final judgment within the meaning of this section."

**\*\*6** With reference to the above-mentioned quotation by the Service from the opinion of the Court of Appeals, it is followed by this statement in the motion of July 14, 1959: "It is the Service view that this statement correctly reflects the Congressional intent, and that a conviction has occurred within the meaning of the immigration laws, notwithstanding subsequent legal process

under the California statutes whereby this record of conviction ceases to exist for some purposes." On page 3 of the motion it is stated that, "in asserting that an alien is properly held not deportable where the conviction has been expunged, the Board has asserted a legal principle contrary to that set forth in the Ninth Circuit in the instant case." We consider it appropriate to comment on two matters raised by these statements of the Service.

In the first place, we understand from the two statements mentioned above that it is the view of the Service that *Arrellano-Flores* v. *Hoy, supra*, holds that this respondent will continue to remain deportable even if his conviction should hereafter be expunged under section 1203.4 of the California Penal Code. However, the decision of the Court of Appeals shows that it did not even consider the effect of a possible expungement of the record of conviction.

The Court of Appeals stated in its opinion (p. 667) that the principal issue was whether the alien had been "convicted"; that the judgment of the State court was that the proceedings be suspended and that probation be granted upon the condition that the **\*436** alien serve one year in the county jail; and that, because of this "rubbery end" to the trial, the alien says he has not been "convicted" but just found guilty. In other words, the respondent's contention before the Court of Appeals had nothing to do with section 1203.4 but only with his claim that he had not been convicted because, although he was required to serve one year's imprisonment, the State court had actually suspended the imposition of sentence. (We had previously held in *Matter of O-----*, 7 I. & N. Dec. 539 (1957), that there was finality of conviction where imposition of sentence was suspended.) Since counsel, before the Court of Appeals, did not even raise his contention that the respondent should not be deported because of the possibility that he might be able to have the record of conviction expunged at some future date and inasmuch as that question was not considered by the Court of Appeals, we believe it is clear that the decision in *Arrellanos-Flores* v. *Hoy, supra*, cannot be considered as offering any support for the contention of the Service that an alien remains deportable after his conviction has been expunged.

Our second comment concerning the two statements of the Service mentioned above is with respect to that part which is to the effect that, when a conviction has been expunged under section 1203.4 of the California Penal Code, it "ceases to exist *for some purposes.*" Section 1203.4 specifically provides that upon the court's dismissal of the accusations or information against the defendant, he "shall thereafter be released from all penalties and disabilities resulting from the offense or crime of which he has been convicted." The comprehensive language which was used does not indicate that the conviction ceases to exist only for some purposes. The one statutory exception is contained in the proviso quoted above, which is part of section 1203.4, to the effect that in any subsequent prosecution the prior conviction may be pleaded and proved and shall have the same effect as if the information had not been dismissed.

**\*\*7**  The Service also stated that this Board has recognized that the expunging of the record of conviction in California does not completely obliterate the fact that the unlawful acts occurred, citing *Matter of H-----*, 6 I. & N. Dec. 619; *Matter of S-----R-----*, 7 I. & N. Dec. 495; and *In re Paoli*, 49 F. Supp. 128 (N.D. Cal., 1943). The statement itself is correct and we agree that we have said this.

The statement mentioned in the preceding paragraph appears to have been first discussed in *Matter of O-----T-----*, 4 I. & N. Dec. 265 (1951). There an alien was convicted of petty theft in 1940 and in 1949 deportation proceedings were instituted on the basis of this conviction. Thereafter, the conviction was expunged under section 1203.4 of the California Penal Code. After commenting upon the fact that it had been held in numerous cases that following such **\*437** expungement the record of conviction could not serve as the basis for deportation, it was stated that reconsideration of the question had been requested by a reviewing officer because of the decision of the Supreme Court of California in *Meyer* v. *Board of Medical Examiners*, 206 P. 2d 1085 (1949). The *Meyer* case involved suspension of a physician's license and the court had said that the expungement of a conviction does not obliterate the fact that there has been a final adjudication of guilt of the crime. *Matter of O----- T-----, supra*, was a decision of the Central Office of the Service and, after reviewing a number of California cases, the final conclusion was that no change was warranted in the view that the deportation charge is not sustained where the record of conviction has been expunged. Since the Service itself considered the issue raised by the *Meyer* case when it decided in 1951 to adhere to the

previous practice, there is an incongruity connected with the Service now bringing up the same factor in urging reversal of the well-settled rule that an alien is not deportable on the basis of a conviction which has been expunged.

Although we said in *Matter of H-----, supra,* and *Matter of S----- R-----, supra,* that the expunging of the record of conviction does not completely obliterate the fact that the unlawful acts occurred, it is significant that each case clearly shows that no change was being made in the rule which had been in effect since at least 1943 that a deportation charge is not supported by a record of conviction which has been expunged. *Matter of H-----, supra,* even went a step beyond this. There the alien had been convicted of two offenses involving moral turpitude during the preceding five years and the records of conviction had been expunged under section 1203.4 of the California Penal Code. In that case there was no attempt to predicate a deportation charge on the expunged convictions, and the question involved was whether, under section 101(f)(3) of the Immigration and Nationality Act [8 U.S.C. 1101(f)(3)], the alien was precluded from establishing good moral character because of the two offenses which he had committed during the five-year period. We held that the expungement of the convictions removed the statutory bar to proving good moral character and we found the alien eligible for voluntary departure. Our decision was approved bv the Attorney General on October 18, 1955.

 **\*\*8** We do not consider that *In re Paoli, supra,* is of any value in supporting the present position of the Service. That case involved an applicant for naturalization. The court held that an expunged conviction could be considered on the question of whether the applicant had established good moral character but a principal reason for the conclusion was that the court, in naturalization cases, could find lack of good moral character merely on the basis of unlawful acts committed **\*438** by the applicant regardless of whether the applicant had ever been prosecuted therefor.

On pages 2 and 3 of its motion, the Service refers to the fact that an offense which has been expunged may be pleaded and proved during the prosecution of a second offense and, as we have indicated above, this is a specific provision of section 1203.4 of the California Penal Code. The Service then says: "If so pleaded and proved, it would, in the Board view, have the incidental effect of resurrecting deportability." There is also a reference to the "vacillating rule" of the Board. We believe the Service is well aware that we have not held, nor have we said, that an alien who was not deportable on the basis of an expunged conviction, becomes deportable on the same conviction if that first conviction was pleaded and proved in a second prosecution. Actually, in *Matter of S-----R-----, 7 I. & N. Dec. 495,* it was the Service which argued that, in accordance with the proviso to section 1203.4, a subsequent prosecution automatically revived an expunged conviction. We declined there to follow that view. Under the circumstances, these remarks of the Service are unwarranted.

The Service also referred to our interpretation of a Federal statute "in which the Congress saw fit to state that an alien who had committed the particular crime or crimes, and as to whom the judicial process has acted with sufficient finality to adjudicate the issue that he was in fact guilty of that crime, was not a proper person to continue to reside in this country." The statutory provision on which this deportation is predicated is section 241(a)(11) of the Immigration and Nationality Act [8 U.S.C. 1251(a)(11)] and the part which is pertinent to this case is that requiring the deportation of an alien "\* \* \* who has been convicted of a violation of \* \* \* any law \* \* \* controlling the \* \* \* sale \* \* \* of \* \* \* marihuana \* \* \*." The Congress did not define "convicted" nor does the statute contain any of the language which the Service seeks to ascribe to the Congress. The question under 8 U.S.C. 1251(a)(11) is simply whether an alien has been "convicted" of any of the narcotic offenses mentioned therein and whether there is finality of conviction in accordance with *Pino* v. *Landon, supra.* We have held that this respondent was convicted and that he is deportable. Where the record of conviction has been expunged, as in *Matter of D-----, supra,* it is our considered opinion that the expunged conviction cannot support an order of deportation. We hold, therefore, that *Matter of D-----, supra,* was correctly decided and that no change is warranted in that decision.

 **\*\*9** We turn now to the contention of the Service that there is a conflict between our decision concerning this respondent and the decision in *Matter of D-----, supra.* Our position is (1) that an alien may be **\*439** deported even though there is a possibility that at some future date he might be able to secure the expungement of his conviction under the law of the state where the conviction occurred, and (2) that an alien is not deportable on the basis of a conviction which has been expunged. This is the distinction between the two cases. In the respondent's case, the conviction has not been expunged, and there is no assurance

that it ever will be expunged. Accordingly, we hold that he is deportable. In *Matter of D-----, supra*, the conviction had been expunged and we held, therefore, that he was not deportable. The Service understands that we had made this distinction in our previous order. However, its motion of July 14, 1959, seems to indicate that the Service believes there is something anomalous about the fact that an alien can be deported before his conviction is expunged but the same alien for the same crime cannot be deported after the conviction has been expunged. Apparently this is advanced as an argument why there is a conflict between the two decisions. However, in view of the distinction between the two cases which we have pointed out, we do not consider that there is a conflict nor that the argument is a valid one.

A situation similar to the foregoing is present in every deportation under 8 U.S.C. 1251(a)(4) predicated on conviction for a crime involving moral turpitude. There, deportation is lawful if the alien is deported before he can secure a pardon for the crime, but, if a deportation proceeding is instituted and the alien then obtains a pardon during the pendency of the proceeding, he cannot thereafter be deported on the basis of the pardoned crime. As we stated in our previous order, there have been many cases in which aliens have been found deportable under 8 U.S.C. 1251(a)(4) and subsequently obtained pardons after which the deportation proceedings were terminated. In *Houvardas v. Wixon*, 169 F.2d 980 (C.A. 9, 1949), cert. den. 336 U.S. 913, it was held that the alien was deportable although he was eligible for a pardon and the court apparently believed that the delay in securing a pardon was not the fault of the alien. In *Matter of R-----R-----*, 7 I. & N. Dec. 478 (1957), we held, with respect to a Texas statutory provision similar to section 1203.4 of the California Penal Code, that the fact that the conviction may be expunged upon satisfactory fulfillment of the conditions of probation does not affect the finality of the conviction during the period of probation. Hence, these cases illustrate the invalidity of the Service view that there is something repugnant about the fact that an alien can be deported prior to the expungement of the conviction and cannot be deported if it has been expunged before deportation takes place.

**\*\*10**  As we have indicated above, our position that an alien cannot be deported after the conviction has been expunged is not something  **\*440**  which originated in *Matter of D-----, supra*, but was acknowledged by the Service as being well settled when it decided in 1951 in *Matter of O-----T-----, supra*, that no change was warranted in that rule. On the other hand, the fact that there is a possibility that an alien's conviction may be expunged at some future date has not heretofore deterred the Service from instituting deportation proceedings. For example, that is the situation in this respondent's case; in *Matter of O-----T-----, supra*, the decision shows that, after the deportation proceeding had been instituted, the record of conviction was expunged and the proceeding was then terminated; and that was true also with respect to *Matter of D-----, supra*, in which the record of conviction was expunged on August 31, 1957, and the special inquiry officer's decision in that case shows that the order to show cause instituting the proceeding was served prior thereto–on March 12, 1957.

In disagreeing with the proposition that an alien's deportability may depend upon whether he succeeds in having his conviction expunged before deportation takes place, the Service speaks of the "procedural requirements" of the California statute coming into play as though every defendant who has completed his probation is entitled to have the conviction expunged. It is clear from section 1203.4 of the Californial Penal Code that such is not the case because it is specifically limited to a defendant "who has fulfilled the conditions of his probation *for the entire period thereof*, or who shall have been discharged from probation prior to the termination of the period thereof." Hence, if a defendant is not within either of these categories, he is not entitled to have his conviction expunged.

The present respondent was on April 6, 1956, placed on probation for five years. We do not know whether he has thus far fulfilled the conditions of his probation or whether he will continue to do so until the expiration of five years on April 6, 1961. For that reason, we said in our order of June 24, 1959, that section 1203.4 of the California Penal Code does not assure the respondent that his conviction will be set aside, and the mere fact that such a possibility exists does not seem to us a proper basis for terminating this deportation proceeding as counsel for the respondent requested.

For the reasons stated above, we hold that there is no conflict between the rule which has been in effect since 1943 concerning section 1203.4 of the California Penal Code (or *Matter of D-----, supra*) and the decision which was rendered in the respondent's case. We adhere to the 1943 rule that a conviction which has been expunged will not support an order of deportation. While

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

counsel for the respondent had also claimed that there was a conflict between the decision in the respondent's case and the decision in *Matter of D-----, supra*, his position was the opposite of that urged by the Service, that is, counsel contended that *Matter of D-----, supra*, had been **\*441** correctly decided and that it required termination of the proceedings against this respondent. Our reasons for rejecting his contentions are set forth fully in our order of June 24, 1959, and need not be further discussed. The Service has not expressed disagreement with any of the statements which we made in our previous order in connection with our rejection of counsel's contentions except regarding the question of whether there was a conflict between *Matter of D-----, supra*, and the decision in the respondent's case. That point was discussed in the decision of June 24, 1959, as well as in the present order. As requested by the Service, this case will be certified to the Attorney General.

 **\*\*11  Order:** It is ordered that our orders of September 14, 1956, and June 24, 1959, be affirmed.

*It is further ordered* that this case be referred to the Attorney General for review under 8 CFR 3.1(h)(1)(iii) in accordance with the request of the Service.


# BEFORE THE ATTORNEY GENERAL

(October 12, 1959)
The Board of Immigration Appeals, at the request of the Commissioner of Immigration and Naturalization, has referred to me for review, as provided by 8 CFR 3.1(h) its order of September 14, 1956, dismissing the respondent's appeal from the order of a special inquiry officer directing his deportation and its order of June 24, 1959, denying respondent's motion for reconsideration.

The special inquiry officer directed the respondent's deportation on the ground that he was an alien who had been convicted of a narcotic offense. Section 241(a)(11) of the Immigration and Nationality Act, 66 Stat. 204, as amended, 8 U.S.C. 1251(a)(11), provides in pertinent part for the deportation of any alien:

* * * who at any time has been convicted of a violation of, or a conspiracy to violate, any law or regulation relating to the illicit possession of or traffic in narcotic drugs, or who has been convicted of a violation of, or a conspiracy to violate, any law or regulation governing or controlling the taxing, manufacture, production, compounding, transportation, sale, exchange, dispensing, giving away, importation, exportation, or the possession for the purpose of the manufacture, production, compounding, transportation, sale, exchange, dispensing, giving away, importation, or exportation of (specified narcotic drugs) * * *.

On November 14, 1955, an accusation was filed against respondent in a Superior Court of the State of California charging him with having unlawfully sold, furnished, and given away, flowering tops and leaves of Indian hemp (*cannabis sativa*) (marihuana) in violation of section 11500 of the California Health and Safety Code. After trial respondent was found guilty of the offense, and on April 6, 1956, the court entered the following order:

 **\*442**  Proceedings suspended, Probation granted for five years, condition, one year County Jail; residence and employment to be approved by Probation Officer; no narcotics; stay away from persons and places where narcotics are used; obey all laws and rules of Probation Department. [1]

The respondent has served one year in the county jail; his term of probation will not expire until April 6, 1961. The Board of Immigration Appeals dismissed respondent's appeal from the order of deportation without opinion.

Respondent thereupon instituted an action in the United States District Court for the Southern District of California challenging the validity of the deportation order. The district court upheld the order. The judgment of the district court was affirmed by the Court of Appeals for the Ninth Circuit (*Arrellano-Flores* v. *Hoy*, 262 F.2d 667 (1958)). The Court of Appeals stated that the respondent's principal contention was that he had not been "convicted" within the meaning of section 241(a)(11) of the

Immigration and Nationality Act since "(t)he judgment of the state court, after the finding of guilt, was that the proceedings be suspended and that probation be granted upon the condition that appellant serve one year in the county jail." The court rejected this contention, holding that whatever might be the state law as to whether there had been a conviction Congress intended the question to be determined by reference to federal law. The court stated (p. 668):

**12** While one cannot close one's eyes to the state's statutes and what transpired in the state's proceedings, we are inclined to the belief that perhaps here Congress intended to do its own defining rather than leave the matter to the variable state statutes. Credence for this view can be found in the fact the present statute reads "convicted" while its predecessor, 46 Stat. 1171 (Chap. 224), read "convicted and sentenced." [2] It would appear that federal **443** courts have generally taken the view that a plea of guilty or a finding of guilty, which is in repose and remains undisturbed, amounts to a conviction. See *Kercheval* v. *United States*, 274 U.S. 220.

But if our question is whether California would consider on this record there was a conviction, then it is clear that California has answered in the affirmative. *In re Morehead*, 107 Cal. App. 2d 346, 237 P. 2d 335; *People* v. *Christman*, 41 Cal. App. 2d 158, 106 P. 2d 32. [3]

The respondent thereupon filed a petition in the Supreme Court for a writ of certiorari. That petition is now pending. [a1] In May 1959, the Solicitor advised the Court that after the petition had been filed, "it was discovered that the Board of Immigration Appeals had rendered a decision (*Matter of D-----*, 7 I. & N. Dec. 670 (March 6, 1958)), subsequent to the decision in this case, which may be inconsistent therewith since it expressed the view that a person who is "released from all penalties and disabilities pursuant to section 1203.4 of the California Penal Code, after a period of probation, [4] is not a person 'convicted' for the purposes of deportation." It was further stated that on the basis of the latter decision the petitioner (the respondent herein) had moved the Board for reconsideration; and in view of the fact that "the administrative position as to the effect of a California judgment of probation is thus presently under reexamination," the court was requested to defer action on the petition until after the ultimate determination of petitioner's motion for reconsideration.

On June 24, 1959, the Board denied respondent's motion for reconsideration. The Board held that its decision in *Matter of D-----, supra*, did not require a different determination in respondent's case, stating that while the cases were similar in both involved like statutes, namely § 1772 of the California Welfare and Institutions Code and § 1203.4 of the Penal Code, [5] –

**444** * * * we are convinced that there is no statutory authorization for complying with counsel's request that the deportation proceeding be terminated in the respondent's case on the basis of the possibility that at some future date he might have his narcotic conviction set aside. The situation is different when a record of conviction *has already been expunged* in California because, in such a case, there is *no conviction whatever* to support an order of deportation. (Emphasis by the Board.)

**13** Referring to respondent's contention that the state court conviction lacked finality because the imposition of sentence had been suspended, the Board said:

* * * The opinion of the Court of Appeals for the Ninth Circuit shows that it was fully aware of the judgment of the state court inasmuch as there is a recital of the fact that the state court had ordered that the proceedings be suspended and that probation be granted upon the condition that the respondent serve one year. It was this exact question which was considered by the United States Court of Appeals and it concluded that the respondent had been "convicted" within the meaning of 8 U.S.C. 1251(a) (11). * * *

On July 14, 1959, the Commissioner of Immigration and Naturalization requested the Board to refer the case to the Attorney General for review. The Commissioner, stating that "administrative reconsideration" had been sought so that the Board might have "an opportunity to consider an apparent conflict in its decisions, and to clarify the Attorney General's position with respect to the issue involved," asserted that the factual distinction relied upon by the Board to support its holding in *Matter of D-----,*

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

*supra*, had no legal significance. The Commissioner argued that a correct interpretation of § 241(a)(11), reflected in the opinion of the Court of **\*445** Appeals, was that "a conviction has occurred within the meaning of the immigration laws, notwithstanding subsequent legal process under the California Statutes whereby this record of conviction ceases to exist for some purposes." And he continued:

It is, therefore, the Service view that *Matter of D-----* erroneously states the law. It is further the Service view that the order entered by the Board on June 24, 1959, in no way resolves a conflict of law between that case and the instant case, since in asserting that an alien is properly held not deportable where the conviction has been expunged, the Board has asserted a legal principle contrary to that set forth in the Ninth Circuit in the instant case. Accordingly, since the issue is one which must be resolved in order that appropriate action may be taken in connection with the petition for certiorari to the Supreme Court (sic), it is requested that the case be certified to the Attorney General.

In referring the case to me for review, the Board has adhered to its view that the distinction between *Matter of D-----, supra*, and this case is a valid one, and is consistent with the opinion of the Court of Appeals. The Board also states that acceptance of the Commissioner's view "would logically require a conclusion that the setting aside of a conviction, in accordance with similar statutory provisions of other States, likewise would be ineffective to prevent deportation," thus overturning a long-established administrative practice.

The special inquiry officer, the Commissioner of Immigration and Naturalization, the Board of Immigration Appeals, the District Court, and the Court of Appeals are in agreement that the respondent was convicted of a narcotic violation within the meaning of § 241(a)(11) of the Immigration and Nationality Act. I am in accord. I, therefore, affirm the order of the Board dismissing the respondent's appeal and denying his petition for reconsideration. However, it is my view that for the purpose of § 241(a) (11) it is immaterial that pursuant to a state statute like § 1203.4 of the California Penal Code or § 1772 of the Welfare and Institutions Code the verdict of guilty has been set aside and the criminal charge dismissed. I, therefore, disagree with the Board that in such cases "there is no conviction whatever to support an order of deportation." I limit my disagreement to the precise issue presented–namely, a deportation proceeding brought under § 241(a)(11), as it may be affected by state laws of the nature of the California statutes considered herein.

 **\*\*14** The history of § 241(a)(11) convinces me that Congress did not intend that aliens convicted of narcotic violations should escape deportation because, as in California, the State affords a procedure authorizing a technical erasure of the conviction. Traffic in narcotics has been a continuing and serious Federal concern. Congress has progressively strengthened the deportation laws dealing **\*446** with aliens involved in such traffic. Thus, as indicated above (footnote 2), in 1940 the deportation statute was amended to eliminate the requirement that in addition to a conviction there must be a sentence. At the same time the statute was extended to convictions for violation of State as well as Federal statutes. And, since the 1956 amendment an alien may no longer escape deportability by proffering a pardon. In the face of this clear national policy, I do not believe that the term "convicted" may be regarded as flexible enough to permit an alien to take advantage of a technical "expungent" which is the product of a state procedure wherein the merits of the conviction and its validity have no place. I believe that Congress intended the inquiry to stop at the point at which it is ascertained that there has been a conviction in the normal sense in which the term is used in Federal law. See *Berman v. United States*, 302 U.S. 211 (A defendant is convicted even though the trial court, after imposing sentence, has placed the defendant on probation.). Of course, if the conviction is still subject to reversal by the usual processes of appellate scrutiny, the statute is not satisfied. But beyond this I do not think the inquiry can extend, consonant with the Congressional purpose and policy. I, therefore, regard it as immaterial for the purposes of § 241(a)(11) that the record of conviction has been cancelled by a state process such as is provided by § 1203.4 of the California Penal Code and by § 1772 of its Welfare and Institutions Code.

Moreover, to follow the Board's view would make the deportability of the alien depend upon the vagaries of state law. It has been said that only in California and a few other States is provision made for the cancellation of a record of conviction or for the withdrawal of a plea of guilty, upon the termination of probation. *Probation and Related Measures* (U.N. Publication No. 1951, IV, 2) 106. And § 1203.4 of the California Penal Code (and presumably § 1772 of the California Welfare and Institutions Code)

has been characterized as "without parallel in the legislation of any other state" in providing for a release of the probationer from all penalties and disabilities resulting from conviction. 2 Stan. Law Rev. 221, 222 (1949). It is hardly to be supposed that Congress intended, in providing for the deportation of aliens convicted of narcotic violations, to extend preferential treatment to those convicted in the few jurisdictions, which, like California, provide for the expungement of a record of conviction upon the termination of probation.

## Footnotes

a1    Cert. den. 362 U.S. 921 (1960).

1    Section 1203.1 of the California Penal Code provides that the Court, in ordering probation, may suspend the imposing or the execution of the sentence and may direct that such suspension shall continue for a period not exceeding the maximum possible term of the sentence, and that as a condition of probation may imprison the defendant in the county jail for a period not exceeding the maximum time fixed by law "in the instant case."

2    The reference to the predecessor statute is to the Act of February 18, 1931, 46 Stat. 1171. The words "and sentenced" were eliminated in 1940, 54 Stat. 673. That act also extended deportability to aliens convicted of a violation of state as well as federal narcotic laws. These changes were carried forward into the 1952 act. The legislative history of the 1940 amendments does not disclose any specific discussion as to the change from "convicted and sentenced" to "convicted." See Hearings before a Subcommittee of the Senate Judiciary Committee, 76 Cong., 3d Sess., on H.R. 5138, 76th Cong., H.R. Rept. Nos. 994, 2683, S. Rept. No. 1796, 86 Cong. Rec. 8340-49, 9029-36.

A further amendment was made by the Narcotic Control Act of 1956, 70 Stat. 575, to provide that a pardon was not to relieve from deportability an alien otherwise deportable because of conviction of a narcotic offense. See Gordon and Rosenfield, *Immigration Law and Procedure*, § 4.17.

3    The Court of Appeals stated (p. 667), citing *In re Marquez*, 3 Cal.2d 625, 45 P. 2d 342 (1935), that under California law "such a sentence as was prescribed here does not constitute a final judgment from which an appeal may be taken." The court apparently overlooked the 1951 amendment of § 1237 of the California Penal Code, which now expressly provides that an order granting probation "shall be deemed to be a final judgment" for purposes of appeal. See *People v. Hedderly*, 43 C.2d 476, 274 P. 2d 857 (1954).

a1    Cert. den. 362 U.S. 921 (1960).

4    Section 1203.4 provides that a defendant who has fulfilled the conditions of his probation may be permitted by the court "to withdraw his plea of guilty and enter a plea of not guilty; or if he has been convicted after a plea of not guilty, the court shall set aside the verdict of guilty; and in either case the court shall thereupon dismiss the accusations or information against such defendant, who shall thereafter be released from all penalties and disabilities resulting from the offense or crime of which he has been convicted."

5    In *Matter of D-----*, 7 I. & N. Dec. 670, the respondent, as in this case, was charged with being deportable pursuant to § 241(a)(11) of the Immigration and Nationality Act in that he had been convicted in California for unlawfully selling marihuana. By order dated June 20, 1956, the court committed the respondent to the Youth Authority of California for the term prescribed by law. Section 1772 of the Welfare and Institutions Code provides that in the case of a person honorably discharged from control by the Youth Authority, the court which committed him may set aside the verdict of guilty and dismiss the accusation or information and he "shall thereafter be released from all penalties and disabilities resulting from the offense or crime for which he was committed." During the pendency of the deportation proceeding the court entered an order pursuant to § 1772, setting aside the respondent's plea of guilty and dismissing the information. The special inquiry officer terminated the deportation proceeding on the ground that as a consequence of the proceedings under § 1772 the respondent no longer stood convicted of the crime upon which the deportation proceeding was based. The Immigration and Naturalization Service contended before the Board of Immigration Appeals that a § 1772 "expungement of the conviction" is equivalent to a pardon and, accordingly, that the respondent remained deportable since the 1956 amendment to § 241(a)(11) (see Footnote 2, *supra*) removed a pardon as the basis for relief from deportation thereunder.

The Board rejected this contention, stating that the question was not one of a pardon but rather of conviction and that the respondent had not been convicted within the meaning of § 241 (a)(11).

*Matter of D-----, supra,* was not referred to the Attorney General for review of the Board's decision.

8 I. & N. Dec. 429 (BIA), Interim Decision 1024, 1959 WL 11595

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

MATTER OF J-D-E-C- APPEAL OF HOUSTON, TEXAS..., 2018 WL 1990537...

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 668 of 912

2018 WL 1990537 (DHS)

**Non-Precedent Decision of the Administrative Appeals Office**

U.S. Department of Homeland Security

U.S. Citizenship and Immigration Services

Administrative Appeals Office (AAO)

Houston, Texas

MATTER OF J-D-E-C-

APPEAL OF HOUSTON, TEXAS FIELD OFFICE DECISION

PETITION: FORM I-360, PETITION FOR AMERASIAN, WIDOW(ER), OR SPECIAL IMMIGRANT

April 10, 2018

**\*1** The Petitioner was born in Honduras and entered the United States when he was 17 years old. When the Petitioner was 18 years old, a Texas family court entered an order with parental reunification and best-interest determinations. Based on this order, the Petitioner seeks classification as a special immigrant juvenile (SIJ). *See* Immigration and Nationality Act (the Act) sections 101(a)(27)(J) and 204(a)(1)(G), 8 U.S.C. §§ 1101(a)(27)(J) and 1154(a)(1)(G). SIJ classification may be granted to foreign-born children in the United States who cannot reunify with one or both parents because of abuse, neglect, abandonment, or a similar basis under state law.

The Houston, Texas, Acting Field Office Director (the Director) denied the Petitioners Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant (SIJ petition) on the basis that the Petitioner was not the subject of a qualifying juvenile order, and the request for SIJ classification did not warrant U.S. Citizenship and Immigration Services' (USCIS) consent.

On appeal, the Petitioner submits a brief and supplemental evidence, including the transcript of the [IDENTIFYING INFORMATION REDACTED BY AGENCY] 2015 state court hearing (hearing transcript). The Petitioner claims that he is eligible for SIJ classification because the family court had jurisdiction over his care and custody, and there is a reasonable factual basis for the determinations in the order. Upon *de novo* review of the entire record, we will dismiss the appeal.

I. LAW

To establish eligibility for SIJ classification, a petitioner must show that he or she is unmarried, under 21 years of age, and has been subject to a slate juvenile court order determining that the petitioner cannot reunify with one or both parents due to abuse, neglect, abandonment, or a similar basis under state law. Section 101(a)(27)(J) of the Act; 8 C.F.R. § 204.11(c). A petitioner must have been declared dependent upon the juvenile court, or the juvenile court must have placed the petitioner in the custody of a state agency or a guardian appointed by the state or the juvenile court. Section 101(a)(27)(J)(i) of the Act. The record must also contain a judicial or administrative determination that it is not in the petitioner's best interest to return to his or her or his or her parents' country of nationality or last habitual residence. *Id.* at section 101(a)(27)(J)(ii). SIJ classification may only be granted upon the consent of the Department of Homeland Security (DHS), through USCIS, when a petitioner meets all other eligibility criteria. Section 101(a)(27)(J)(i)-(iii) of the Act. A petitioner must demonstrate, by a preponderance of the evidence, that he merits SIJ classification. *Matter of Chawathe*, 25 I&N Dec. 369, 375 (AAO 2010).

II. ANALYSIS

AR.07164

**\*2**  The Petitioner was born in Honduras in [IDENTIFYING INFORMATION REDACTED BY AGENCY] 1997 and entered the United States in November 2014 without inspection, admission, or parole. In [IDENTIFYING INFORMATION REDACTED BY AGENCY] 2015, when the Petitioner was 18 years old, the District Court of the [IDENTIFYING INFORMATION REDACTED BY AGENCY], Texas (family court), issued an *Order of Dependency and Findings* (findings order), declaring that it had "subject matter jurisdiction to enter Declaratory Judgments to declare rights, status, and other legal relations regarding those persons over whom [the] court has personal jurisdiction." The family court found that "family reunification with one or both of the parents of the Child is not viable due to abuse, neglect or abandonment, or a similar basis found under Texas State law. Chapters 261.001 and 152.102 of the Texas Family Code." The family court also found that "it is not in [the Petitioner's] best interest to be returned to his or his parent's previous country of nationality or country of last habitual residence because of abuse, neglect, or abandonment, or [*sic*] similar basis under State law." Pursuant to those findings, the family court ordered that the Petitioner. "is dependent upon this juvenile court in accordance with the laws of the State of Texas while such Child is residing in the State of Texas."

We do not question the family court's factual findings regarding the Petitioner's best-interests, or parental reunification; however, for the reasons discussed below, the findings order does not establish the Petitioner's eligibility for SIJ classification under the Act.

A. The Family Court Did Not Act as a "Juvenile Court" for SIJ Purposes.

The record does not establish that the findings order was issued pursuant to the court's jurisdiction over the Petitioner as a juvenile, because Texas law defines a child as under the age of 18 and the Petitioner was over 18 years of age when the court issued its order. For SIJ classification, a petitioner must have been subject to an order containing the requisite determinations issued by a "juvenile court." Section 101(a)(27)(J)(i) of the Act; *see* 8 C.F.R. §§ 204.11(c)-(d) (stating the eligibility and evidentiary requirements of an order and findings issued by a juvenile court). A "juvenile court" is defined as a court "having jurisdiction under State law to make judicial determinations about the custody and care of juveniles." 8 C.F.R. § 204.11(a). While the specific title and type of court may vary from state to state, the record must establish that the court had competent jurisdiction under state law to make the required determinations about the care and custody of the petitioner as a juvenile, including whether parental reunification is viable. *Id* at § 204.11(a), (d)(2): 6 USCIS Policy Manual J.2(D)(4), J.3(A)(1), https://www.uscis.gov/policymanual. The required determinations are meant to be judicial conclusions made in accordance with the appropriate state law. *See* 6 USCIS Policy Manual, *supra*, at J.3(A)(2) (requiring that the juvenile court order (or orders) use language establishing that the specific findings were made under state law). Additionally, a state court order that relies on federal immigration law and regulations, including the definition of a child, instead of state law, to support its jurisdiction and conclusions will not be considered qualifying for SIJ purposes. *See id* at J.2 (D)(4) (requiring that juvenile courts follow their state laws on jurisdiction). State law is, therefore, controlling on the definition of a juvenile or child within the states' child welfare provisions. *Id.* at J.2 (D)(4), J.3(A)(1)-(2).

**\*3**  Although Texas district courts are those of general jurisdiction under article V. section 8 of the Texas constitution, a dependency or custody order issued by a court with jurisdiction over both adults and juveniles will only suffice if the record shows that the court exercised jurisdiction over a petitioner as a juvenile under state law. *See* section 101(a)(27)(J)(i) of the Act; USCIS Policy Manual, *supra*, at J.2(D)(4), J.3(A)(1) (explaining that SO classification requires that the juvenile court order be properly issued under state law, including state jurisdictional statutes concerning the custody and care of children); Tex. Const. art V, § 8.

Texas law breaks down the definition of a child in various ways, but almost uniformly as being under 18 years of age. *See* Tex. Fam. Code Ann. §§ 101.003, 51.02.[1] The family court, as a family district court, has "primary responsibility for cases involving family law matters [including] . . . child welfare, custody, support and reciprocal support, dependency, neglect, and delinquency." *See* Tex. Gov't Code Ann. § 24.601. Therefore, the findings order correctly declares that the family court has "jurisdiction under State law to make judicial determinations about the custody and care of juveniles, as such term is defined in 8 C.F.R. § 204.11." Although the family court has jurisdiction to act as a juvenile court under Texas law, it was not acting as a

MATTER OF J-D-E-C- APPEAL OF HOUSTON, TEXAS..., 2018 WL 1990537...

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 670 of 912

juvenile court under Texas law, or for SIJ purposes, when it issued the findings order because the Petitioner was not a ""child" under Texas law when the proceeding occurred. *See* Tex. Fam. Code Ann. §§ 101.003,51.02.

Despite the Petitioner's contention on appeal that the only definition of ""child" that should apply is the definition that appears within the Act. *see* section 101(b)(1) of the Act, a juvenile court order must have been properly issued under state law to be valid for purposes of SIJ classification, and different states may have different jurisdictional requirements for dependency. *See* section 101(a)(27)(J)(i) of the Act (requiring that the parental-reunification determination be made "under State law"); 8 C.F.R. §§ 204.11(a), (c)(3) (requiring that a juvenile court exercise jurisdiction ""under State law" and that a dependency declaration be made "in accordance with state law governing such declarations of dependency, while the alien was in the United States and under the jurisdiction of the court"); *see also* Special Immigrant Status, Final Rule, 58 Fed. Reg. 42,839, 42,846 (Aug. 12, 1993) (recognizing "that certain inequities caused by variations in state law are unavoidable in determining eligibility . . ." and adding that "Juvenile court issues are under the jurisdiction of the states and therefore dependent upon slate statutes."); 6 USCIS Policy Manual, *supra*, at J.2(D)(4); *Perez-Olano v. Holder*, Case No. CV 05-3604, ¶ 8 (C.D. Cal. 2005) (Settlement Agreement) (defining juvenile as "any alien who is eligible to apply for a dependency order or SIJ predicate order in a State court *as determined by the law of the State* in which the alien is domiciled" (emphasis added)). While we acknowledge that the requirement that a juvenile court order have been properly issued under slate law may result in "certain inequities" for Petitioners from states that only allow jurisdiction over the care and custody of individuals up to 18 years of age (as with Texas) versus states that allow jurisdiction over the care and custody of individuals up to 21 years of age (as with Maryland), the plain language of the Act requires the application of state law. *See* section 101(a)(27)(J)(i) of the Act (requiring that the parental-reunification determination be made "under State law").

 **\*4** Further, although the Petitioner argues on appeal that the application of a state-law definition to the term "child" for purposes of a juvenile court's jurisdiction while allowing requests for SIJ classification to be filed until 21 years of age leads to an "absurd conclusion" and "disrupts the constitutional mandate of uniformity." [2] the extension of the eligibility to petition for SIJ classification beyond 18 years of age until 21 years of age was directly an attempt "to minimize confusion caused by dissimilar state laws" by "establish[ing] a consistent countrywide definition of the age at which an alien [would] no longer be eligible for special immigrant juvenile status." 58 Fed. Reg. at 42,846. In fact, the regulation was amended in response to, in part, concerns about individuals who, although no longer considered children or juveniles under state law, are still considered dependent children under state law. *See id.* ("The revised standard allows students and other young persons who continue to be dependent upon the juvenile court after reaching the age of eighteen to qualify for special immigrant juvenile status."). Thus, affording petitioners an opportunity to submit requests for SIJ classification until 21 years of age, even if they are no longer considered children under state law, but as long as a juvenile court properly exercised jurisdiction over their care and custody while they were under the juvenile court's jurisdiction to do so, is an ameliorative measure that ensures uniformity in the ability to petition for SIJ classification, not an "absurd conclusion."

The Petitioner also asserts that "USCIS exceeded its authorization under the INA by applying a state law definition of 'child' to its evaluation of the [IDENTIFYING INFORMATION REDACTED BY AGENCY] subject matter jurisdiction.'" In support of that argument, the Petitioner applies the *Chevron* doctrine as recited in *Texas v. United States*, 497 F.3d 491, 500-01 (5th Cir. 2007) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council. Inc.*, 467 U.S. 837, 842-43 (1984)). While we acknowledge this argument, *Budhathoki v. Department of Homeland Security*, which the Director cited in the denial, undertook a similar analysis and found that, in that case, USCIS' denial of a petitioner's request for SIJ classification "was within its statutory authority and was not arbitrary and capricious." 220 F.Supp.3d 778, 788 (W.D. Tex. 2016) (stating that USCIS engaged in an appropriate analysis of the record to determine whether the record "contains 'a reasonable factual basis . . . for the . . . court's rulings'" (internal citation omitted) and did not act arbitrarily and capriciously by analyzing "the . . . orders to determine whether the Texas courts had a rational basis for their findings" when "the INA authorized" such an analysis). As the Act references "State law," *see* section 101(a)(27)(J)(i) of the Act, it does not explicitly contradict 'clear congressional intent' to analyze the state-law basis for a court's determinations regarding the requirements for SIJ classification in a given case. *See Texas v. U.S.*, 497 F.3d 491, 506 (5th Cir. 2007) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.").

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 671 of 912

MATTER OF J-D-E-C- APPEAL OF HOUSTON, TEXAS..., 2018 WL 1990537...

**\*5**  The Petitioner attempts to distinguish *Budhathoki* because the order in that case did not include "a conclusion of law regarding dependency" and was a different type of proceeding. *See* 220 F.Supp.3d at 787. The Petitioner correctly notes those distinctions, but they are insufficient to distinguish the holding of that case as that holding ultimately turned on the court order's failure to include "a reasonable basis for the findings that the Texas courts were 'juvenile court[s]' and Plaintiffs were dependent on those courts." *Id.* As in *Budhathoki*, the Petitioner's findings order does not provide a state-law basis for the court's jurisdiction and dependency determinations over the Petitioner as a "child," and the record that was before the family court does not provide sufficient evidence of that basis. *See* 6 USCIS Policy Manual, *supra*, at J.3(A)(3).

Although the family court had general jurisdiction over the Petitioner, the record does not show that the family court had jurisdiction over the Petitioners custody and care as a "juvenile court" for SIJ purposes. *See* 8 C.F.R. § 204.11(a). Therefore, the family court did not act as a "juvenile court" for SIJ purposes.

B. The Findings Order Does Not Contain a Qualifying Parental Reunification Determination.

Although not addressed by the Director, the Petitioner's findings order does not contain a qualifying parental reunification determination, The Act requires that a juvenile court determine that an SIJ petitioner's "reunification with one or both . . . parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law." Section 101(a)(27)(J)(i) of the Act. The juvenile court order should specify with which parent(s) the petitioner cannot reunify, and which ground applies: abuse, neglect, abandonment, or a similar basis under state law. 6 USCIS Policy Manual, *supra*, at J.3(A)(4). The plain language of the statute indicates that the reunification finding is a legal conclusion made under state law and must encompass both a determination of abuse, neglect, abandonment, or similar mistreatment, and a corresponding determination that the petitioner could not be returned to the custody of the unfit parent(s). Section 101(a)(27)(J)(i) of the Act; 6 USCIS Policy Manual, *supra*, at J.3(A)(4). Consequently, to establish SIJ eligibility, the record must show that the juvenile court had competent jurisdiction to determine whether a parent could regain custody and to order reunification, if warranted, and actually made such a legal determination under the applicable state Jaw. *See* 8 CFR § 204.11(a), (d)(2)(i)-(ii) (requiring an order issued by a court of competent jurisdiction with a determination that family reunification is no longer viable); *see also* 6 USCIS Policy Manual, *supra*, at J.2(D)(4) (explaining that a juvenile court order must have been properly issued under state law to establish SIJ eligibility). Where a juvenile court loses the capacity to order reunification with a parent when a child turns 18 years old, that juvenile court necessarily cannot make a juridical determination that reunification between that child and one or both of his or her parents is not viable. Accordingly, a juvenile court order finding that parental reunification is not viable will not be considered qualifying for the purpose of establishing SIJ eligibility if the evidence submitted by the petitioner does not establish the courts' jurisdiction under state law to place the child under the custody of the allegedly unfit parent.

**\*6**  The Petitioner's findings order, in its parental reunification determination, does not specify with which parent and on what basis reunification is not viable. *See* 6 USCIS Policy Manual, *supra*, at J.3(A)(4) (requiring that the determination be specific as to the parent(s) and the basis). While the determination does find and order that "[f]amily reunification with one or both of the parents of the Child is not viable due to abuse, neglect or abandonment, or a similar basis found under Texas State law. Chapters 261.001 and 152.102 of the Texas Family Code[,]" that finding and order does not amount to a qualifying parental reunification determination for SIJ purposes because it does not specify with which parent and on what basis reunification would not be viable. *See* 6 USCIS Policy Manual, *supra*, at J.3(A)(4) (requiring that the determination be specific as to the parent(s) and the basis). As part of the Petitioner's SIJ petition, he submitted the Original Petition for Declaratory Judgment (declaratory judgment petition), which includes his own affidavit and his mother's affidavit. On appeal, he provides the hearing transcript. All of those documents allege that the Petitioner's father abandoned and neglected him; however, those documents are insufficient to establish that the family court came to a specific legal conclusion that reunification would not be viable with the Petitioner's father due to abandonment and/or neglect. As the findings order does not specify with which parent and on what basis reunification is not viable, the findings order does not contain a qualifying parental reunification determination.

Moreover, as the Petitioner was 18 years of age or older at the time the orders were issued, he has not established the family court's jurisdiction under state law to determine his custody. [3] *See Ngo v. Ngo*, 133 S.W.3d 688, 691 (Tex. Ct. App. 2003) (finding custody issue moot once child reached the age of 18); *In re N.J.D.* No. 04-13-00293-CV, 2014 WL 555915 (Tex. Ct. App. Feb. 12, 2014) (dismissing as moot an appeal of order awarding Department of Family and Protective Services permanent managing conservatorship of a child because the child had turned 18 years old); *In re E.H.*, No. 2-07-343-CV, 2008 WL 2404490 (Tex. Ct. App. June 12, 2008) (same)." Where a court lacks jurisdiction over a juvenile's custody, it cannot make a judicial determination that parental reunification is not viable for SIJ purposes. Here, the family court could not have ordered that the Petitioner be placed in anyone's custody, including his parents' custody had the family court determined that doing so was appropriate. As the Petitioner was beyond the scope of the Texas child welfare statutes when the family court issued the findings order, the parental reunification determination was a factual, rather than legal, conclusion on the viability of parental reunification. Therefore, the family court necessarily did not have jurisdiction to make a parental reunification determination and the findings orders do not contain a qualifying parental reunification determination.

C. The Findings Order Does Not Contain a Qualifying Dependency Determination.

**\*7** Even if the findings order had been issued by a juvenile court, it lacks a qualifying determination of juvenile dependency or child custody. A Petitioner must be declared dependent upon a juvenile court, or be legally committed to, or placed under the custody of a state agency or department, or of an individual or entity appointed by a state or juvenile court. 8 U.S.C. § 1 101(a)(27)(J)(i). *See also* 8 C.F.R. § 204.11(c)(3); 6 USCIS Policy Manual, *supra*, at J.2(D). A juvenile court's dependency declaration must be made in accordance with state law governing such declarations of dependency, 8 C.F.R. § 204.11(c)(3). To be eligible for SIJ classification, a Petitioner must also "continue[] to be dependent upon the juvenile court" without that "dependency . . . having been vacated, terminated, or otherwise ended." 8 C.F.R. § 204.11(c)(5). Court-ordered dependency or custodial placements that are intended to be temporary generally do not qualify for the purpose of establishing eligibility for SIJ classification. 6 USCIS Policy Manual, *supra*, at J.2(D)(1).

Texas courts' authority to issue declaratory judgments is limited to those issues within their subject matter jurisdiction. Tex. Civ. Prac. and Rem. Code § 37.003. The Petitioner does not cite any provision of Texas law regarding juvenile dependency or child custody under which the district court could retain jurisdiction over a young adult such as the Petitioner. There is no indication that the court declared the Petitioner dependent or made any determination regarding his custody under any provision of Texas law governing juvenile dependency or custody such as, for example, the child welfare or custody provisions of the Texas Family Code. *See e.g.* Tex. Fam. Code Ann. §§ 261 et. seq. (regarding proceedings for "Protection of the Child") and 152.102(4) (defining "child custody proceeding" to include proceedings for neglect, abuse, dependency, guardianship, or termination of parental rights under the Uniform Child Custody Jurisdiction and Enforcement Act). Here, the findings order states that the Petitioner "is dependent upon this juvenile court in accordance with the laws of the State of Texas while such child is residing in the State of Texas and is under the jurisdiction of this Court." While the findings orders generally refer to "the laws of the State of Texas," it does not cite to or reference any specific state law on juvenile dependency. Consequently, the findings order does not contain a qualifying dependency determination.

D. The Full Faith and Credit Clause of the U.S. Constitution Does Not Compel USCIS to Deem the Findings Order Sufficient for SIJ Classification.

The Petitioner further asserts that we are required to give the findings order "full faith and credit;" however, the full faith-and-credit provisions of 28 U.S.C. § 1738 apply to courts, not federal administrative agencies such as USCIS. *See NLRB v. Yellow Freight Systems, Inc.*, 930 F.2d 316, 320 (3d Cir. 1991), *cert. denied*, 502 U.S. 820 (1991) ("federal administrative agencies are not bound by section 1738 because they are not 'courts'"); *American Airlines v. Dept. of Transportation*, 202 F.3d 788, 799 (5th Cir. 2000) *cert. denied*, 530 U.S. 1284 (2000) (finding that 28 U.S.C. § 1738 did not apply to the Department of Transportation because it is "an agency, not a 'court'").

AR.07168

Case 3:20-cv-07721-SI   Document 58-6   Filed 11/10/20   Page 673 of 912

MATTER OF J-D-E-C- APPEAL OF HOUSTON, TEXAS..., 2018 WL 1990537...

**\*8**  The Petitioner cites *Matter of F-*, 8 I&N Dec. 251 (BIA 1959), for the holding that a divorce decree would not be "open to collateral attack on jurisdictional grounds to inquire into questions of residence and domicile, provided one of the parties to the divorce was actually present within the court's jurisdiction." The Board in that case added that "[n]ot only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face." *Matter of F-*, 8 I&N Dec. 251, 253 (BIA 1959). The Petitioner also cites *Thornton v. Dobbs*, 355 S.W.3d 312, 316 (Tex. App. 2011), for the proposition that "conclusions of law 'may not be reversed unless they are erroneous as a matter of law.'" While we acknowledge those cases, USCIS, by denying a request for SIJ classification, does not apply state law, or reverse the validity of a juvenile court order for purposes under state law, but, rather, assesses whether a "juvenile court" applied state law in making the required SIJ determinations. *See* 6 USCIS Policy Manual, *supra*, at J.2(D)(4). Although the Petitioner's findings order may be valid under Texas law and for purposes within Texas, we find that it does not contain the qualifying determinations under federal law for SIJ purposes.

Despite the non-applicability of 28 U.S.C. § 1738 to USCIS as a federal administrative agency, we generally defer to state courts on matters of state child welfare law, 6 USCIS Policy Manual, *supra*, at J.2(A); however, the Petitioner's findings order is insufficient for SIJ purposes under federal law as the family court was not acting as a "juvenile court" under state law, and the parental reunification and dependency determinations are insufficient, *See* 6 USCIS Policy Manual, *supra*, at J.2(D)(4).

E. The Equal Protection Requirement of the Due Process Clause of the Fifth Amendment to the U.S. Constitution Does Not Compel USCIS to Deem the Findings Order Qualifying under Federal Law.

While the Petitioner claims a due process violation, there are no due process rights implicated in the adjudication of an immigrant petition. *See Azizi v. Thornburgh*, 908 F.2d 1130, 1134 (2d Cir. 1990) (explaining that the Fifth Amendment protects against the deprivation of property rights granted to immigrants without due process, however, petitioners do not have an inherent property right in an immigrant visa). In addition, even where due process rights are implicated, an individual must show prejudice to establish a violation. *See generally, Garcia-Villeda v. Mukasey*, 531 F.3d 141, 149 (2d Cir. 2008) (stating that "[p]arties claiming denial of due process in immigration cases [involving removal proceedings] must, in order to prevail, allege some cognizable prejudice fairly attributable to the challenged process") (citations omitted).

**\*9**  The Petitioner cites *Francis v. Immigration & Naturalization Serv.*, 532 F.2d 268 (2d Cir. 1976), as support for the applicability of the equal protection clause to the Petitioner's request for SIJ classification; however, *Francis* is inapplicable because that case involved a lawful permanent resident who was in removal proceedings and was seeking a waiver. *See Francis v. immigration & Naturalization Serv.*, 532 F.2d 268 (2d Cir. 1976). As the Petitioner correctly notes, *Francis* applies the minimal scrutiny test to determine the validity of "distinctions between different classes of persons," *see id.* at 272; however, *Francis* also acknowledges "the power of Congress to create different standards of admission and deportation for different groups of aliens." *See id.* at 273.

SIJ classification requires that an immigrant be the subject of "administrative or judicial proceedings" before "a juvenile court located in the United States." and that those proceedings apply "State law." *See* sections 101(a)(27)(J)(i)-(ii) of the Act. As the Act does not provide the means by which a petitioner would submit evidence of satisfaction of that requirement, we turn to the regulation for guidance. *See id.*; 8 C.F.R. § 204.11(d). The applicable regulation requires that a petitioner submit "a juvenile court order" from a "juvenile court," which is "a court located in the United States having jurisdiction under State law to make judicial determinations about the custody and care of juveniles" *See* 8 C.F.R. §§ 204.11(a), (d)(2). The USCIS Policy Manual provides additional guidance as it reflects USCIS' interpretation of the changes to the eligibility requirements for SIJ classification, which were modified by the Trafficking' Victims Protection and Reauthorization Act of 2008 (TVPRA 2008), Pub. L. No. 110-457, 122 Stat. 5044 (Dec. 23 2008) (removing the requirement of eligibility for long-term foster care, and expanding the parental-reunification finding to "1 or both the immigrant's parents"). USCIS relies on the expertise of the juvenile court in making child welfare decisions and does not reweigh evidence to determine if the child was subjected to abuse, neglect, abandonment, or a similar basis under state law; however, record evidence must contain, or provide, a reasonable factual basis for each of the requisite determinations, and must demonstrate that the juvenile court order was properly issued under state

law. *See* 6 USCIS Policy Manual, *supra*, at J.2(D)(4)-(5). As eligibility for SIJ classification requires that a petitioner submit a "juvenile court order," 8 C.F.R. § 204.11(d)(2), resulting from "administrative or judicial proceedings"D' under "State law," section 101(a)(27)(J) of the Act, USCIS "reasonabl[y], not arbitrar[ily]." and "rest[ing] upon some ground of difference having a fair and substantia] relation to the object of the legislation," *see Francis*, 532 F.2d at 272, defers to the applicable, unique state law in adjudicating a request for SIJ classification, *see supra* note 1. in doing so, USCIS does not apply state law, but, rather, assesses whether a "juvenile court" applied state law in making the required SIJ determinations. *See* 6 USCIS Policy Manual, *supra*, at J.2(D)(4). Therefore, the equal protection requirement of the Due Process Clause of the Fifth Amendment to the U.S. Constitution does not compel USCIS to deem the findings order qualifying under federal law.

F. The Petitioner Does Not Warrant USCIS' Consent to His Request for SIJ Classification.

 **\*10**  A grant of SIJ classification requires USCIS' consent. Section 101(a)(27)(J)(iii) of the Act; 6 USCIS Policy Manual, *supra*, at J.2(D)(5). In determining whether consent is warranted, USCIS reviews juvenile court orders and the relevant record to determine whether the family court's parental reunification and best-interest determinations are supported by a reasonable factual basis. *See* 6 USCIS Policy Manual, *supra*, at J.2(D)(5). In consenting to a grant of SIJ classification, USCIS also acknowledges that the request for SIJ classification is *bona fide*. Section 101(a)(27)(J)(iii) of the Act; H.R. Rep. No. 105-405, at 130 (1997) (explaining the *bona fide* requirement); 6 USCIS Policy Manual, *supra*, at J.2(D)(5). USCIS relies on the expertise of the juvenile court in making child welfare decisions and does not reweigh the evidence to determine if the child was subjected to abuse, neglect, abandonment, or a similar basis under state law; USCIS reviews the juvenile court order only to ensure that it contains the requisite dependency or custodial placement and includes, or is supplemented by, the factual basis for the order. *Id.* While template orders that merely recite the Act and regulations will not suffice, juvenile court orders that contain or are supplemented by judicial findings of fact are generally sufficient to establish a reasonable factual basis for the juvenile court's order and the judicial or administrative best-interest determination. *Id.* Where the juvenile court order does not contain such findings of fact, USCIS may consider, for example, the underlying petition for dependency or custody, records from the juvenile court proceedings, any supporting documents submitted to the juvenile court, affidavits summarizing such evidence, or affidavits and records consistent with the court's findings. *Id.* The evidence must confirm that the juvenile court made an informed decision. *Id.* at J.2(D)(5).

1. There Was a Reasonable Factual Basis for the Parental Reunification and Best-Interest Determinations.

As part of the Petitioner's SIJ petition, he submitted the declaratory judgment petition, which includes his own affidavit and his mother's affidavit. On appeal, he provides the hearing transcript. All of those documents contain facts showing that the Petitioner's father abandoned and neglected him. Specifically, the Petitioner's affidavit says that he only ever had contact with his father two times in 2014 during which times they "exchanged pleasantries" and his father gave him "one hundred (100) pesos (about $5.00 US Dollars)." The Petitioner's mother's affidavit explains the circumstances surrounding the Petitioner's conception and confirms that the Petitioner's father "did not provide or offer to provide any financial or any other support for [the Petitioner]." Although the findings order does not contain a qualifying parental reunification finding because it does not specify with which parent and on what basis reunification is not viable, the above-listed documents provide sufficient evidence of the reasonable factual basis for the family court's finding. *See* 6 USCIS Policy Manual, *supra*, at J.2(D)(5).

 **\*11**  The language in the findings order, by itself, does not provide a reasonable factual basis for the best-interest determination because it does not establish that the family court considered a placement for the Petitioner in Honduras, *see* 6 USCIS Policy Manual, *supra*, at J.2(D)(3): however, the hearing transcript provides the Petitioner's testimony that the Petitioner would not have a place in Honduras where he could safely return because his only possible caregivers are deceased, in prison, or living in the location from which the Petitioner fled. Based on the details included in the findings order, as well as the hearing transcript, the Petitioner has provided sufficient evidence of the reasonable factual basis for the best-interest determination. For the foregoing reasons, there was a reasonable factual basis for the family court's parental reunification and best-interest determinations.

2. The Petitioner's Request for SIJ Classification Is Not *Bona Fide*.

MATTER OF J-D-E-C- APPEAL OF HOUSTON, TEXAS..., 2018 WL 1990537...

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 675 of 912

The Director found that the Petitioner had not met his burden of establishing that his request for SIJ classification was *bona fide*, which requires that neither the juvenile court order, nor the best-interest determination, have been "sought primarily for the purpose of obtaining the status of an alien lawfully admitted for permanent residence, rather than for the purpose of obtaining relief from abuse or neglect." *See* H.R. Rep. No. 105-405, at 130 (1997). While USCIS recognizes that there may be some immigration motive for seeking a juvenile court order. SIJ status cannot be the primary purpose of obtaining the juvenile court order. *See* section 101(a)(27)(J)(i)-(ii) of the Act (discussing dependency-, parental reunification-, and best-interest determinations); 8 C.F.R. §§ 204.11(c)(3)--(6) (discussing dependency-, parental reunification-, and best-interest determinations); 6 USCIS Policy Manual, *supra*, at J.2(D)(5).

The Petitioner obtained the findings order through the declarator;' judgment petition that was filed by the Petitioner's mother when the Petitioner was 17 years old. That petition premised the request for relief on the Texas Uniform Declaratory Judgments Act (DJA), Chapter 37 of the Texas Civil Practice and Remedies Code, which allows a person "whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise" to "have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder." *See Tex. Civ. Prac. & Rem. Code Ann. § 37.004.* [4] On that basis, the Petitioner requested that the family court issue a declaratory judgment making the requisite determinations for SIJ classification. The record reflects that the only resulting order of that proceeding was the findings order. While the findings order does find "that the child is in need of an order from the court to prevent further harm to the child by virtue of the child's circumstance," the findings order does not compel any individual or state actor to act under state law to accomplish the stated goal of "prevent[ing] further harm to the child." Instead, the "*Orders*" section restates the "*Findings*" section, states that the Petitioner "is dependent upon this juvenile court in accordance with the laws of the State of Texas while such Child is residing in the State of Texas," and concludes with "IT IS FURTHER ORDERED that this Order may be disclosed and used in other jurisdictions and further to support a petition for [SIJ] status to the Department of Homeland Security, [USCIS], pursuant to 8 U.S.C. § 1101(a)(27)(J)."

*12* Although the family court, as a family district court, has "primary responsibility for cases involving family law matters [including] . . . child welfare, custody, support and reciprocal support, dependency, neglect, and delinquency." *see* Tex. Gov't Code Ann. § 24.601, and the family court stated that the Petitioner was "dependent upon" the family court, the findings order does not compel any action that provides "relief from abuse or neglect." H.R. Rep. No. 105-405, at 130 (1997); 6 USCIS Policy Manual, *supra*, at J.2(D)(5) (explaining that the court-ordered dependency or custodial placement of the child is the relief being sought from the juvenile court). *See also* 58 Fed. Reg. at 42,846 (expanding the definition of "long-term foster care" to "allow[] juveniles to qualify for special immigrant status when guardianship or adoption is deemed to be in the juvenile's best interest after the alien is found to be dependent upon the juvenile court"). Other than issuing SIJ-related determinations, the family court, by entering the Petitioner's findings order, did not "declar[e] . . . rights, status, or other legal relations" under a Texas statute, *see* Tex. Civ. Prac. & Rem. Code Ann. §37.004, that provided ""relief from abuse or neglect," *see H.R.* Rep. No. 105-405, at 130 (1997). given that the Petitioner had already aged-out of the family court's jurisdiction at the time that the findings order was issued. The record also does not contain any evidence that the findings order was issued concurrently with a child custody, guardianship, or dependency proceeding. Despite the language in the findings order, record evidence is insufficient to establish that the proceeding was initiated other than for the purpose of obtaining an immigration benefit. Consequently, the Petitioner has not established that his request for SIJ classification is *bona fide* and merits USCIS' consent.

III. CONCLUSION

The Petitioner has not established that the findings order was issued by a juvenile court, or that the order contains a qualifying parental reunification or dependency determination. The Petitioner is also ineligible for SIJ classification because he has not established that his request for SIJ classification is *bona fide*. Consequently, USCIS' consent is not warranted.

**ORDER:** The appeal is dismissed.

AR.07171

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 676 of 912

MATTER OF J-D-E-C- APPEAL OF HOUSTON, TEXAS..., 2018 WL 1990537...

Cite as *Matter of J-D-E-C-*, ID# 1078686 (AAO Apr. 10, 2018)

## Footnotes

1    The Petitioner correctly notes that the definition of "child" can include "a person over 18 years of age," but that particular language only applies to child support proceedings, not to the proceeding at hand. *See* Tex. Fam. Code Ann. § 101.003(b). The Petitioner further argues that Texas law allows for extension of jurisdiction beyond a person's eighteenth birthday in certain causes of action; however, the Petitioner has not shown that any of these exceptions are applicable to his case. *See Tex. Fam. Code Ann. §§ 51.0412* (describing "incomplete proceedings" in the criminal context). 263.602 (discussing the extended foster care context).

2    The Petitioner relies on language from the U.S. Supreme Court in *Arizona v. United States*, which discusses Congress' power "'to establish a uniform Rule of Naturalization.'" 567 U.S. 387, 418 (2012) (internal citations omitted) (explaining that Congress was given the naturalization power to "vindicate" the power of states "to exclude those they did not want" by ensuring that one state's "particularly tax citizenship standards" would not provide "a gateway for the entry of 'obnoxious aliens' into other States'D'). We note that the Court's dicta regarding the naturalization power discusses the importance of uniformity; however, the eligibility requirements to petition for SIJ classification are uniform for all petitioners and across all U.S. jurisdictions, and the requirement that juvenile courts exercise their own state laws in taking jurisdiction over the care and custody of juveniles does not detract from the uniform age limit of 21 years of age for filing requests for SIJ classification.

3    Section 152.102 of the Texas Family Code defines *child* "as an individual who has not attained 18 years of age" and *child custody proceeding* as "a proceeding in which legal custody, physical custody, or visitation with respect to a child is an issue. The term includes a proceeding for divorce, separation, neglect, abuse, dependency, guardianship, paternity, termination of parental rights, and protection from domestic violence in which the issue may appear."

4    On appeal, the Petitioner asserts that, in light of a "plain language" interpretation, the use of "under the . . . statute" and "thereunder" in the DJA "must refer to [the Act] in this declaratory judgment action because that was the statute under which [the Petitioner] requested SIJ-related findings." *See* Tex. Civ. Prac. & Rem. Code Ann. § 37,004. Although it is correct that the DJA uses "under the . . . statute" and "thereunder," the Civil Practice and Remedies Code (CPRC), under which the DJA falls, was enacted in an attempt to make Texas law "more accessible and understandable" as it underwent revision. *See id.* at § 1.001 (explaining the purpose of the CPRC). Therefore, the DJA, as a remedy by which individuals can seek "relief from uncertainty and insecurity with respect to rights, status, and other legal relations[,]" *id.* at § 37.002, refers to "question[s] of construction or validity" of Texas statutes, *id* at § 37.004, not of federal provisions. Even if the DJA could be interpreted to refer to section 101(a)(27)(J) of the Act, as the statute establishing SIJ classification, that statute specifically requires that SIJ determinations be made "under Slate law." *See* section 101(a)(27)(J)(i) (discussing dependency and parental reunification determinations). Therefore, the definition of "child" under Texas law would still be applicable in this case.

2018 WL 1990537 (DHS)

**End of Document**                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

17 I. & N. Dec. 550 (BIA), Interim Decision 2832, 1980 WL 121936

United States Department of Justice

Board of Immigration Appeals

MATTER OF SEDA

In Deportation Proceedings

A-20879583

Decided by Board October 10, 1980

**\*\*1  \*550**  (1) Section 101(f)(3) of the Immigration and Nationality Act, 8 U.S.C. 1101(f)(3), precludes a person from establishing good moral character if he has been convicted of or admits the commission of a crime involving moral turpitude during the period for which good moral character is required to be established.

(2) The crime of forgery, to which the respondent pleaded guilty, is a crime involving moral turpitude.

(3) A conviction exists for immigration purposes when there is a judicial finding of guilt, the court takes action which removes the case from a pending status, and the action of the court is considered a conviction by the state for at least some purposes.

(4) The Georgia Act for Probation of First Offenders provides that upon a verdict or a plea of guilty or nolo contendere, but before an adjudication of guilt, the court may, without entering a judgment of guilt, defer proceedings, place the defendant on probation, and subsequently discharge the defendant without court adjudication of guilt so that he is not considered to have a criminal conviction. Ga.Code Ann. sections 27–2727, 27–2728.

(5) A person sentenced under a first offender statute which provides for withholding of adjudication of guilt by the court and discharge without conviction upon successful completion of probation is not considered to be convicted for immigration purposes. Matter of Kaneda, 16 I & N. Dec. 677 (BIA 1979); Matter of Haddad, 16 I & N Dec. 253 (BIA 1977); and Matter of Werk, 16 I & N. Dec. 234 (BIA 1977), modified.

(6) Where a plea of guilty results in something less than a conviction, the plea, without more, is not tantamount to an admission of commission of crime for immigration purposes, so the respondent, who was not convicted, is not statutorily ineligible for voluntary departure as a person precluded from establishing good moral character.

(7) Notwithstanding the absence of a conviction by reason of the Georgia Act for Probation of First Offenders, a plea of guilty to the crime of forgery is a significant adverse factor in determining whether a favorable exercise of discretion is warranted.

(8) The respondent, who has no family ties or other equities to offset the adverse factors of his guilty plea to the crime of forgery and the withdrawal of church sponsorship on the basis of his objectionable behavior, is denied voluntary departure as a matter of discretion.

**CHARGES:**

Order: Act of 1952—Sec. 241(a)(9) [8 U.S.C. 1251(a)(9) ]—Nonimmigrant student—failed to comply with conditions of status

**\*551**  Lodged: Act of 1952—Sec. 241(a)(2) [8 U.S.C. 1251(a)(2) ]—Nonimmigrant student—remained longer than permitted

**ON BEHALF OF RESPONDENT:**

Dale M. Schwartz, Esquire

1400 Candler Building

Atlanta, Georgia 30303

BY: Milhollan, Chairman; Maniatis, and Farb, Board Members. Concurring Opinion: Maguire, Board Member. Concurring in Part, Dissenting in Part: Appleman, Board Member

 **\*\*2**  In a decision dated February 15, 1979, the immigration judge found the respondent deportable on his own admission on the lodged charge, under section 241(a)(2) of the Immigration and Nationality Act, 8 U.S.C. 1251(a)(2), as a nonimmigrant who remained longer than authorized. He further denied the respondent's request for voluntary departure. The respondent has appealed from the immigration judge's denial of voluntary departure. The appeal will be dismissed.

The respondent is a 34–year–old native and citizen of Kenya who entered the United States on September 12, 1973, as a nonimmigrant student. His status was subsequently changed to that of an exchange visitor, and his stay was extended to March 22, 1978. At deportation proceedings, he conceded deportability as an overstay, but denied that he had failed to maintain his student status as charged in the Order to Show Cause. The respondent's wife and four children, all natives and citizens of Kenya, reside in the United States with him.

At deportation proceedings, the trial attorney introduced evidence that the respondent had pleaded guilty on January 27, 1978, to the offense of forgery in the first degree in the Superior Court of the State of Georgia for Fulton County. The record indicates that the respondent was placed on probation for 5 years under the provisions of the Georgia Act for Probation of First Offenders and was ordered to make restitution in the amount of $3,585.00. The immigration judge determined on the basis of that court order that the respondent was statutorily ineligible for voluntary departure under section 101(f)(3) of the Act, 8 U.S.C. 1101(f)(3), as a person who had been convicted of a crime involving moral turpitude.

On appeal, the respondent argues that he has not been "convicted" of the forgery offense because under the Georgia statute relating to first offenders under which he was sentenced, proceedings are deferred while the defendant is on probation, and upon fulfillment of probation, the defendant is discharged without court adjudication of guilt. Ga.Code Ann. sections 27–2727 and 27–2728. He further cites as applicable our decisions recognizing that first offender statutes may eliminate the effect of a conviction for immigration purposes. See  **\*552**  Matter of Kaneda, 16 I & N. Dec. 677 (BIA 1979); Matter of Haddad, 16 I & N Dec. 253 (BIA 1977); Matter of Werk, 16 I & N. Dec. 234 (BIA 1977).

In order to be eligible for voluntary departure, an alien must establish, inter alia, that he is, and has been, a person of good moral character for at least 5 years immediately preceding his application for such relief. Section 244(e) of the Act, 8 U.S.C. 1254(e). Under section 101(f)(3) of the Act, a person is precluded from establishing good moral character if he has been convicted of or admits the commission of a crime involving moral turpitude during the statutory period.

The record indicates that the respondent pleaded guilty to forgery, which is a crime involving moral turpitude. See Matter of Jimenez, 14 I & N. Dec. 442 (BIA 1973); Matter of A--, 5 I & N Dec. 52 (BIA 1953). We, therefore, must determine whether for immigration purposes the respondent can be considered to have been "convicted" of that offense under Georgia law or to have admitted commission of the crime.

 **\*\*3**  This Board has repeatedly held that a conviction exists for immigration purposes when the following elements are present: (1) there has been a judicial finding of guilt, (2) the court takes action which removes the case from the category of those which are (actually or in theory) pending for consideration by the court—the court orders the defendant fined or incarcerated, or the court suspends sentence, (3) the action of the court is considered a conviction by the state for at least some purpose. Matter of Robinson, 16 I & N. Dec. 762 (BIA 1979); Matter of Varagianis, 16 I & N Dec. 48 (BIA 1976); Matter of Pikkarainen, 10 I & N. Dec. 401 (BIA 1963); Matter of L--R--, 8 I & N. Dec. 269 (BIA 1959).

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

The pertinent sections of the Georgia statute relating to first offenders provide as follows:

Probation for first offenders; when applicable; violation of terms of probation—

Upon a verdict or plea of guilty or a plea of nolo contendere by [sic] before an adjudication of guilt, the court may, in the case of a defendant who has not been previously convicted of a felony, without entering a judgment of guilt and with the consent of the defendant, defer further proceeding and place the defendant on probation as provided by the Statewide Probation Act [sections 27–2702 through 27–2726.1]. Upon violation of the terms of probation, or upon a conviction for another crime, the court may enter an adjudication of guilt and proceed as otherwise provided. No person may avail himself of the provisions of this law [sections 27–2727 through 27–2732] on more than one occasion.

Same; discharged probationer not to be considered to have criminal conviction; records of probation—

Upon fulfillment of the terms of probation, or upon release by the court prior to the termination of the period thereof, the defendant shall be discharged without court adjudication of guilt. Such discharge shall completely exonerate the defendant of any criminal purpose, shall not affect any civil right or liberties, and he shall not be considered to have a criminal conviction. Should a person be placed under probation under this law [sections 27–2727 through 27–2732], a record of the same shall be forwarded to the office of the State Probation System and to the Identification  **\*553**  Division of the Federal Bureau of Investigation. Ga.Code Ann. sections 27–2727, 27–2728 (emphasis added).

In interpreting these provisions, the Supreme Court of Georgia has stated that during the probationary period imposed, the defendant's trial has, in effect, been suspended, and if he successfully completes the probationary sentence without violations, no formal act of conviction is rendered. See Favors v. State, 214 S.E.2d 645 (Ga.1975); State v. Wiley, 210 S.E.2d 790 (Ga.1974). Thus, the clear language of the statute and the judicial interpretation thereof indicate that a defendant sentenced under the Georgia Act for Probation of First Offenders is not convicted unless and until he violates the terms of his probation or is convicted of another crime, at which time an adjudication of guilt may be entered by the court. Therefore, under the standards previously set forth, the probationary sentence imposed on a defendant under that Act should not be considered to be a "conviction" for immigration purposes. See Pino v. Landon, 349 U.S. 901 (1955); cf. Matter of Winter, 12 I & N. Dec. 638 (BIA 1967, 1968); Matter of G--, 9 I & N Dec. 159 (BIA 1960; A.G.1961).

 **\*\*4**  In previous decisions, this Board has treated other first offender statutes, the language of which is nearly identical to the Georgia Act, as expungement statutes. See Matter of Kaneda, supra; Matter of Haddad, supra; Matter of Werk, supra. In Werk we accepted the Service policy that the federal first offender statute, 21 U.S.C. 844(b)(1), which dealt only with narcotics convictions, was comparable to the Federal Youth Corrections Act, 18 U.S.C. 5005, et seq. That Act, as well as its state counterparts, had been held to expunge narcotics convictions of youth offenders for deportation purposes. See Matter of Andrade, 14 I & N. Dec. 651 (BIA 1974); Matter of Zingis, 14 I & N. Dec. 621 (BIA 1974). We, therefore, held that convictions under the federal first offender statute could be considered expunged for deportation purposes.

Our subsequent inquiry in Haddad and Kaneda, which dealt with state first offender statutes, was limited to determining whether the statute involved was the state counterpart of the federal statute. Thus, the threshold question of whether there was a conviction in existence which could be expunged was never addressed. Although in Werk we quoted a Service memorandum stating that the "legislative history indicates that discharge and dismissal under [21 U.S.C. 844(b)(1) ] shall not be deemed conviction of a crime," we have continued to refer to the federal first offender statute and its state counterparts as having the effect of expunging a conviction.

We now hold that a person sentenced under a first offender statute, which provides for withholding of adjudication of guilt by the court and discharge without conviction upon successful completion of probation,  **\*554**  shall not be considered to be

"convicted" for immigration purposes. Our decisions in Matter of Werk, supra, Matter of Haddad, supra, and Matter of Kaneda, supra, are modified to comport with this view.

We must next determine whether the respondent's plea of guilty constitutes an admission of commission of the crime, which also would render him ineligible for voluntary departure. Ordinarily, a plea of guilty in a criminal prosecution is regarded as an "admission" within the meaning of the immigration laws. Blumen v. Haff, 78 F.2d 833 (9 Cir.), cert. denied, 296 U.S. 644 (1935); Matter of K--, 9 I & N. Dec. 143 (S.I.O.1959, BIA 1959, A.G.1961); Matter of P--, 4 I & N. Dec. 373 (BIA 1951). However, where a plea of guilty results in something less than a conviction, it has been held that the plea, without more, is not tantamount to an admission of commission of the crime for immigration purposes. Matter of Winter, supra. Since we have found that the respondent's guilty plea does not amount to a conviction, it also cannot be considered to be an admission of commission of the crime. Accordingly, we find that the respondent is not statutorily ineligible for voluntary departure as a person precluded by section 101(f)(3) from establishing good moral character.

 **5  A grant of voluntary departure is a matter of discretion, however, and an alien must not only establish that he is statutorily eligible, but also that he is worthy of discretionary relief. See Matter of Turcotte, 12 I & N. Dec. 206 (BIA 1967); Matter of Mariani, 11 I & N. Dec. 210 (BIA 1965). Consideration of an application for voluntary departure involves many factors, including the alien's prior immigration history, the nature of his entry, and his violations of the immigration and other laws, as well as the length of residence in this country, close family ties, and humanitarian needs. See Matter of Gamboa, 14 I & N. Dec. 244 (BIA 1972).

In the instant case, the respondent pleaded guilty to the crime of forgery. Although we have determined that such a plea does not render him statutorily ineligible for voluntary departure, we believe it is a significant adverse factor to be considered in deciding whether a favorable exercise of discretion is warranted. Cf. Matter of Turcotte, supra; Matter of Pitzoff, 10 I & N. Dec. 35 (BIA 1962).

In addition, the church sponsor who took the respondent into his home upon his arrival in the United States testified at deportation proceedings that he asked the respondent to leave his house and that the church withdrew its sponsorship of the respondent due to his behavior. Although the respondent attempted to rebut the accusations made against him, we believe that the witness's testimony and the fact that church sponsorship was withdrawn must be viewed as negative factors in our determination on discretion.

 *555  The respondent's wife and children are citizens of Kenya whose status in this country is dependent on that of the respondent. Therefore, he cannot be considered to have close family ties in the United States. No other equities have been presented by the respondent to offset the adverse factors in this case. Accordingly, we conclude that voluntary departure should be denied as a matter of discretion. The appeal will be dismissed.

ORDER: The appeal is dismissed.


DISSENTING IN PART AND CONCURRING IN PART: Irving A. Appleman, Board Member

I concur in that portion of the decision which finds there was no conviction in view of the Georgia first offender statute under which the respondent was sentenced, and in the denial of voluntary departure as a matter of discretion.

However, I am disturbed by the remainder of the majority opinion. The purpose of the comments regarding Matter of Werk, 16 I & N. Dec. 234 (BIA 1977), Matter of Haddad, 16 I & N. Dec. 253 (BIA 1977), However, I am disturbed by the remainder of the majority opinion. The purpose of the comments regarding Matter of Werk, 16 I & N. Dec. 234 (BIA 1977), Matter of Haddad, 16 I & N. Dec. 253 (BIA 1977), and Matter of Kaneda, 16 I & N. Dec. 677 (BIA 1979), is not clear. Those holdings are not necessarily germane to an inquiry into the language and meaning of the Georgia statute we are concerned with here, and if the intent is to impeach them, it is done in a singularly imprecise and unscholarly way. Thus the majority notes: "In previous

decisions this Board has treated other first offender statutes, the language of which is nearly identical (emphasis supplied) to the Georgia Act, as expungement statutes." No analysis or comparison is made of the statutes in question, but the decisions in Matter of Werk, supra, Matter of Haddad, supra, and Matter of Kaneda, supra, are "modified" to comport with the present decision even though it is not shown what, or why, "modification" is needed.

**6   The decision in Matter of Werk was premised on a Wisconsin first offender statute which, according to representations made by the Immigration and Naturalization Service, was a counterpart to 21 U.S.C. 844(b)(1), which, in turn, was the equivalent, in the narcotics field, of the Federal Youth Corrections Act, 18 U.S.C. 5010, et seq. Since both 21 U.S.C. 844(b)(1) and 18 U.S.C. 5010 are statutes which suspend the imposition or execution of sentence after a finding of guilt, it is clear that the Service motion to terminate in Werk rested on an assumption there was a conviction in that case. Whether the Service **556  would agree that termination was warranted in Werk on an assumption there was no conviction is not known, nor has the Service been given a chance to brief or argue the point. Nor is it clear whether, in casting doubt on the interpretations of state first offender statutes such as that in Werk, the majority also questions the reasoning in decisions involving the application of 21 U.S.C. 844(b)(1) to narcotics convictions, or the Federal Youth Corrections Act to other "convictions" (see e.g., Matter of Zingis, 14 I & N. Dec. 621 (BIA 1974)).

In point of fact there is a very significant difference between (a) the Georgia statute, and (b) the Wisconsin statute in Werk, the Michigan statute in Haddad, and the Virginia statute in Kaneda. That difference has been completely overlooked or ignored by the majority, and makes any "modification" very questionable.

In Matter of O--, 7 I & N. Dec. 539 (BIA 1957), in defining a "conviction" for deportation purposes, this Board attempted to explain the difference between a statute suspending the imposition or execution of sentence, and one which specifically postponed any consideration of a case. Only in the latter instance does the criminal proceeding fail to achieve the finality necessary to support an order of deportation. Id. at 543. All of the statutes involved (i.e., in Werk, Haddad, and Kaneda, as well as here), speak of the non-entry of a judgment of guilt. Only one, however, the Georgia statute, specifically stipulates deferment of proceedings "before an adjudication of guilt ..." Ga.Code Ann. section 27–2727 (emphasis supplied). The entry of formal judgment of guilt in a criminal proceeding is a quite different matter from an adjudication of guilt. See generally Matter of O--, id. at 542. Hence, even though under the Georgia statute the "prior finding of guilt may be pleaded and proven as if an adjudication of guilt had been entered ..." in the event of a subsequent prosecution for another offense (Ga.Code Ann. section 27–2730), and the respondent is still on "probation" (Ex. 5), I nevertheless agree that there was no conviction here, but rather a complete deferment of the criminal proceeding without any finding of guilt. Cf. de Lara v. U.S., 439 F.2d 1316 (5 Cir.1971); Pino v. Landon, 349 U.S. 901 (1955).

On the other hand, a conviction acquires sufficient finality to sustain deportability when no further consideration is required as to innocence or guilt. Matter of Johnson, 11 I & N. Dec. 401 (BIA 1965). This was the case in Matter of Haddad, Matter of Werk and Matter of Kaneda, supra. Under the statutes in those cases the defendants were clearly adjudged guilty, although no formal entry was made in the criminal record, or, if made, it was subsequently eradicated. All that was involved was a suspension of imposition of judgment and sentence, with subsequent expungement, and this is a conviction for deportation purposes. Matter of Cruzado, 14 I & N. Dec. 513 (BIA 1973). Significantly,  **557  if there were no "convictions" in the Werk-type cases, as the majority now appears to find, notwithstanding adjudications of guilt, then deportation for hard narcotics "convictions," after expungement under statutes such as section 1772 of the Welfare and Institutions Code of California, arguably is now open to challenge. [1]

**7   I see no reason for disturbing the earlier decisions at this time. They appear to be correct and, in any event, their consideration is not necessary to the determination in this case. If the majority thought them relevant, one would have hoped for, and expected, a more satisfactory and lucid justification for "modification" than that the statutes involved are "nearly identical." Since the relief is being denied as a matter of discretion in any event, it is hard to understand the need for a rash venture into this particular legal thicket. Bagamasbad v. INS, 429 U.S. 24 (1976). I expressly dissent from the attack on those precedents.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

CONCURRING OPINION: Mary P. Maguire, Board Member

Contrary to the suggestion in the dissent, the intent of the majority opinion is not to impeach, but to clarify the Board's former decisions which were decided on a theory which the majority now finds to be incorrect. Therefore, in order to be legally precise and consistent in our rulings, the majority believes that they should be amended to reflect the Board's current opinion. In my view, it would indeed be unscholarly to leave unrevised a decision which the majority believed to be founded on legally erroneous conclusions.

The dissent correctly points out that the Board's decision in Matter of Werk, 16 I & N. Dec. 234 (BIA 1977), was premised on a Service memo which referred to the federal first offender statute, 21 U.S.C. 844, as the "equivalent" in the narcotics field of the Federal Youth Corrections Act. However, the dissent states further that these statutes are similar in that both suspend the imposition or execution of sentencing after a finding of guilt. Examination of the statutes reveals the fallacy of that statement.

Under the Federal Youth Corrections Act, the court may suspend the imposition or execution of sentence of a youth offender and place him on probation. It may then discharge him from probation, which  *558  effectively sets aside the conviction. We have found that this statute provides for a total expungement which eliminates the conviction as a basis for deportation. See Matter of Berker, Interim Decision 2511 (BIA 1976); Matter of Zingis, 14 I & N Dec. 621 (BIA 1974); see also Matter of Andrade, 14 I & N. Dec. 651 (BIA 1974).

The federal first offender statute, on the other hand, provides that there is no conviction if the court defers proceedings without entering a judgment of guilt and later discharges the defendant and dismisses the proceedings against him after successful completion of probation. This statute, as well as each of the state statutes we have considered, specifies that such discharge and dismissal shall be without court adjudication of guilt and shall not be deemed a conviction. The Service, in fact, notes in its memorandum that the legislative history of the statute supports the conclusion that no conviction exists upon discharge and dismissal.

Thus, it is clear that these two statutes are by no means procedurally equivalent to one another. They are comparable, however, in that they provide a means to ameliorate the stigma of conviction for a certain class of offenders to whom Congress sought to extend leniency. I believe that the Service's use of the term "equivalent" was intended to equate the effect rather than the legal function of the two statutes and to reflect its conclusion that an alien sentenced under either statute should not be subject to deportation. Inasmuch as the Service recognized that no conviction resulted under the first offender statute, and advocated that it be treated in the same manner as the Federal Youth Corrections Act, I have no doubt that it would approve of the conclusion reached in the majority opinion.

 **8  I would note, however, my confusion with the dissent's question regarding the application of the Board's reasoning to cases involving 21 U.S.C. 844(b)(1) in narcotics convictions or the Federal Youth Corrections Act in other convictions. The federal first offender statute, by its very language, is limited to narcotics offenses, so it can only be applied in such cases. Furthermore, as we have distinguished the procedure used in first offender statutes from that in the Federal Youth Corrections Act and its state counterparts, I do not see how it could logically be inferred that the majority's decision in this case affects our decisions regarding the Federal Youth Corrections Act in either narcotics or non-narcotics cases. See Matter of Zingis, supra; Matter of Nagy, 12 I & N. Dec. 623 (BIA 1968). Moreover, if the majority had believed that such decisions were altered by its opinion in this case, the majority would have so stated.

I also wish to note my disagreement with the conclusion in the dissent that there are significant differences between the Georgia statute and the other first offender statutes which this Board has  *559  examined. The difference claimed is that the Georgia statute specifies that the proceedings may be deferred before an adjudication of guilt, whereas the others speak only of the nonentry of a judgment of guilt. It is also stated in the dissent that the entry of a formal judgment of guilt is different from an adjudication of guilt, with citation being made to Matter of O--, 7 I & N. Dec. 539, 542 (BIA 1957).

I would first point out that 21 U.S.C. 844(b)(1), on which our rulings regarding the state first offender statutes rely, states that if a person is found guilty, after trial or upon a plea of guilty, the court may, without entering a judgment of guilt, defer proceedings and place him on probation and, upon violation of the conditions of probation, may enter an adjudication of guilt and proceed to sentencing. Furthermore, each of the state statutes also provides for deferment of proceedings following a plea or finding of guilty without a judgment of guilt being entered by the court. Inasmuch as proceedings are deferred under each of the statutes and no judgment of guilt is entered by the judge, I am unable to determine what, if any, are distinguishing factors.

In regard to the contention that a judgment of guilt differs from an adjudication of guilt, I maintain that these terms are synonymous. See Black's Law Dictionary, 63 (5th ed. 1979); Webster's New Collegiate Dictionary, 15 (1977). I believe that the dissent has confused the situation where the court, upon a guilty plea or jury verdict, finds the defendant guilty and enters a judgment of guilt but declines to impose a sentence, and that where the court, also following a plea or verdict, decides to defer proceedings and refrains from entering a judgment of guilt. These two circumstances were discussed in Matter of O--, supra, where it was concluded that the former case resulted in a conviction while the latter did not. I would agree and cite the Federal Youth Corrections Act as an example of a case where judgment may be entered but imposition of sentence suspended, and the first offender statutes as a situation where no adjudication of guilt is made by the court. Under either set of circumstances, a guilty plea or finding of guilt by a jury may be present, but the subsequent act of the judge determines whether a conviction exists for immigration purposes. If proceedings are deferred, there is no conviction, but a conviction results if the court enters a judgment, regardless of whether sentence is actually imposed or either the imposition or execution of sentence is suspended. See Pino v. Landon, 349 U.S. 901 (1955); Matter of Robinson, 16 I & N. Dec. 762 (BIA 1979); Matter of O--, supra.

**9  It is also argued by the dissent that this case is distinguishable from our previous decisions in that the defendants there were adjudged to be guilty by the court and were sentenced to fine or imprisonment or both. This is true. However, in each case, the conviction was later set aside, placing the defendant back in the position of one whose guilt had *560 not yet been adjudicated. Imposition of the sentence was not merely suspended, as the dissent suggests, but the conviction, including the adjudication of guilt, was totally eradicated. See Matter of Kaneda, 16 I & N. Dec. 677 (BIA 1979); Matter of Sirhan, 13 I & N. Dec. 592 (BIA 1970); Matter of O'Sullivan, 10 I & N. Dec. 320 (BIA 1963). The court then resentenced the defendant under the first offender statute and discharged him by dismissing the proceedings pursuant to the statute. I, therefore, remain convinced that such discharge and dismissal under each of the first offender statutes does not amount to a conviction, as is manifest from language of each statute, and believe that our decision correctly so states.

## Footnotes

1    Attorney General, of course, and the Ninth Circuit have consistently upheld deportability in such cases despite expungement. Matter of A--F--, 8 I & N. Dec. 429 (A.G.1959), aff'd, Arrellano–Flores v. Hoy, 262 F.2d 667, cert. denied, 362 U.S. 721 (1960); cf. Matter of Andrade, 14 I & N. Dec. 651 (BIA 1974); see also Matter of G--, 9 I & N. Dec. 159 (A.G.1961); Kelly v. INS, 349 F.2d 473 (9 Cir.1965), cert. denied, 382 U.S. 932 (1965); Garcia Gonzales v. INS, 344 F.2d 804 (9 Cir.1965). The dicta as to Werk, etc., would seem to fly in the face of these holdings.

17 I. & N. Dec. 550 (BIA), Interim Decision 2832, 1980 WL 121936

End of Document    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

19 I. & N. Dec. 33 (BIA), Interim Decision 2958, 1984 WL 48579

United States Department of Justice

Board of Immigration Appeals

MATTER OF SHIRDEL, et al.

In Exclusion Proceedings

A-26166161

A-26166163

A-26166164

A-26166165

Decided by Board February 21, 1984

**\*\*1**  **\*33**  (1) Afghan nationals who arrived in the United States with fraudulent Turkish passports as transit without visa (TRWOV) aliens in order to submit applications for asylum are excludable under the second clause of section 212(a)(19) of the Immigration and Nationality Act, 8 U.S.C. 1182(a)(19), for attempting to enter the United States by fraud or material misrepresentation.

(2) The use of fraudulent Turkish passports by Afghan nationals in order to avail themselves of the TRWOV privilege was an integral part of their material misrepresentation in attempting to enter the United States. See 8 C.F.R. 212.1(e)(3).

(3) Afghan nationals who came here from a foreign port in order to submit applications for asylum attempted an 'entry' into the United States within the meaning of section 101(a)(13) of the Act, 8 U.S.C. 1101(a)(13).

(4) An alien who circumvents the orderly procedures for obtaining refugee status abroad will be denied the discretionary relief of asylum in the absence of strong countervailing equities to overcome this serious adverse factor.

(5) Whether or not an applicant in exclusion proceedings is excludable under section 212(a)(19) of the Act, is not determinative a as to the issue of the discretionary relief of asylum. Matter of Salim, Interim Decision 2922 (BIA 1982), clarified.

**EXCLUDABLE:**

Act of 1952—Sec. 212(a)(19) 8 U.S.C. 1182(a)(19)]—Procured visa by fraud or willful misrepresentation of a material fact

Sec. 212(a)(20) [8 U.S.C. 1182(a)(20)]—No valid immigrant visa

**ON BEHALF OF APPLICANT:**

Stephen M. Perlitsh, Esquire

Cohen & Tucker

1501 Broadway

New York, New York 10036

**ON BEHALF OF SERVICE:**

Guadalupe Gonzalez

Appellate Trial Attorney

BY: Milhollan, Chairman; Maniatis, Dunne, Morris, and Vacca, Board Members

**\*34**  The applicants appeal from the May 17, 1983, decision of the immigration judge finding them excludable under section 212(a)(19) of the Immigration and Nationality Act, 8 U.S.C. 1182(a)(19), denying their application for asylum pursuant to section 208 of the Act, 8 U.S.C. 1158, and granting them temporary withholding of deportation pursuant to section 243(h) of the Act, 8 U.S.C. 1253(h), to Afghanistan. The appeal will be dismissed.

The applicants' additional excludability under section 212(a)(20) of the Act, 8 U.S.C. 1182(a)(20), for lack of a valid immigrant or nonimmigrant visa is not at issue and was conceded at the exclusion hearing (Tr. p. 2). They are natives and citizens of Afghanistan who arrived in the United States without documentation and submitted applications for asylum and 243(h) relief. They contend that the immigration judge erred in denying their applications for asylum as a matter of discretion. They also contend that the immigration judge erred in finding them excludable under section 212(a)(19), merely because they arrived in the United States posing as transit without visa (TRWOV) aliens using fraudulently obtained Turkish passports and airplane tickets issued in others' names (Exs. 17–19). See Matter of Salim, Interim Decision 2922 (BIA 1982). We disagree with both of the applicants' contentions.

**\*\*2**  The burden in exclusion proceedings is upon the applicant for admission to establish that he is not inadmissible under any provision of the Immigration and Nationality Act. See section 291 of the Act, 8 U.S.C. 1361; Matter of Healy and Goodchild, 17 I&N Dec. 22 (BIA 1979); Matter of Doural, Interim Decision 2861 (BIA 1981); Matter of Martinez—Rivero, Interim Decision 2884 (BIA 1981). Section 212(a)(19) renders excludable from admission:
Any alien who seeks to procure, or has sought to procure, or has procured a visa or other documentation, or seeks to enter the United States, by fraud, or by willfully misrepresenting a material fact.

The Attorney General has held that the first clause of section 212(a)(19), relating to documents, is both prospective and retrospective, but the second clause of the statute, relating to seeking entry into the United States, is prospective only. Matter of M—, 6 I&N Dec. 149 (A.G. 1954); Matter of M—, 6 I&N Dec. 752 (BIA 1955). Consequently, an alien whose fraud or material misrepresentations relate to the procurement of documents is forever barred from admission, unless he obtains a waiver. [1]  On the other hand, a fraud or misrepresentation in connection with an entry not related to the  **\*35**  procurement of documents will invalidate only that entry and will not preclude a subsequent entry otherwise regular. We must examine the facts of this case for excludability under both clauses of the statute, since the immigration judge did not specify under which clause of section 212(a)(19) his finding was based.

The applicants contend that they are not excludable under section 212(a)(19) because they did not commit any fraud or willful misrepresentation to a United States official to cause the issuance of a visa or documentation. See Matter of Box, 10 I&N Dec. 87 (BIA 1962); Matter of L—L—, 9 I&N Dec. 324 (BIA 1961); Matter of Sarkissian, 10 I&N Dec. 109 (BIA 1962); Matter of Kai Hing Hui, 15 I&N Dec. 288 (BIA 1975). We closely scrutinize the factual basis for a possible finding of excludability under the first clause of section 212(a)(19) for fraud in the procurement of entry documents since such a finding perpetually bars an alien from admission. Matter of Healy and Goodchild, supra; compare Matter of M—, 6 I&N Dec. 752 (BIA 1955).

We conclude that a finding of excludability under the first clause of section 212(a)(19) of the Act cannot be sustained. The applicants' intentional misstatements to airline officials concerning their intent to proceed through the United States to Canada and their fraudulent use of Turkish passports procured to obtain passage to this country as TRWOV aliens were material misrepresentations within the meaning of section 212(a)(19) of the Act. See Matter of S—B— and C—, 9 I&N Dec. 436 (BIA 1960; A.G. 1961); cf. Suite v. INS, 594 F.2d 972 (3 Cir. 1979). Yet, their use of the passport and statements to airline officials were not made in connection with the procurement of a visa or their documentation and did not involve misrepresentation before officials of the United States government. See Matter of Kai Hing Hui, supra; Matter of Sarkissian, supra; Matter of Box, supra; Matter of L—L—, supra. Similarly, there is no evidence that the applicants made material misrepresentations or committed fraud in connection with their applications for refugee status. See United States v. Fedorenko, 449 U.S. 490 (1981). Consequently, we find that the applicants are not excludable under the first clause of section 212(a)(19) of the Act as aliens who sought to procure or who have procured a visa or other documentation by fraud or by willful misrepresentation of a material fact.

**\*3**  However, we find the applicants excludable under the second clause of section 212(a)(19) for seeking to enter the United States by fraud or a material misrepresentation. See Matter of M—, supra. Our decisions in Matter of Box, supra; Matter of L—L—, supra; Matter of Sarkissian, supra; and Matter of Kai Hing Hui, supra,  **\*36**  are inapplicable since they dealt with cases in which excludability was charged based on the procurement of documents by fraud or material misrepresentation. Such is not the case here, where the fraud was their flying to the United States posing as TRWOV aliens in order to submit applications for asylum. TRWOV aliens are admitted under agreements with the transportation lines, which guarantee their immediate and continuous passage to a foreign country, and do not encounter United States officials until they arrive at a port of entry. See generally Matter of PAA 'Flight 896/10', 8 I&N Dec. 498 (BIA 1959); C. Gordon & H. Rosenfield, Immigration Law and Procedure §§ 2.9a, 9.20c (1982). Until May of 1979 neither immigration judges nor this Board addressed asylum claims in exclusion proceedings. Matter of Lam, Interim Decision 2857 (BIA 1981); Matter of Salim, supra. Consequently, the question of what constitutes fraud or material misrepresentation in seeking to enter the United States as an applicant for asylum is an issue of first impression before this Board. [2]

In United States v. Kavazanjian, 623 F.2d 730 (1 Cir. 1980), the court held that if an alien adopts the TRWOV device solely for the purpose of reaching the United States and submitting an asylum application without any intention of pursuing the remainder of the journey, it constitutes a fraud on the United States. The TRWOV device is designed to facilitate international travel by permitting aliens travelling between foreign countries to make a stopover in the United States without presenting a passport or visa. See section 212(d)(4)(C), 8 U.S.C. 1182(d)(4)(C). To avail himself of the TRWOV privilege an alien must establish that he is admissible under the immigration laws; that he has confirmed and onward reservations to at least the next country beyond the United States; and that he will continue his journey and depart this country within 8 hours after his arrival or on the next available transport. See 8 C.F.R. 214.2(c); 22 C.F.R. 41.30.

Pursuant to section 101(a)(15)(C) of the Act, 8 U.S.C. 1101(a)(15)(C), and 8 C.F.R. 212.1(e), TRWOV aliens are exempt from the passport and visa requirements if they are in possession of travel documents establishing their identity, nationality, and ability to enter some other country. However, 8 C.F.R. 212.1(e)(3) specifies that the TRWOV privilege is unavailable to citizens or nationals of Afghanistan, Cuba, Iraq, or Iran. The basis for that restriction imposed on Afghans is their abuse of  **\*37**  the TRWOV device in order to submit applications for asylum as refugees. See 47 Fed. Reg. 5990 (Feb. 9, 1982); 47 Fed. Reg. 8005 (Feb. 24, 1982). It is clear that the applicants committed fraud upon the United States in order to arrive in this country by posing as Turkish citizens.

**\*4**  The applicants clearly intended to enter the United States. This was their ultimate goal. They chose not to wait abroad for a refugee visa. Instead, their first step for eventually entering this country as refugees was to apply for asylum when they arrived in the United States on February 5, 1983. They needed to be physically present in this country in order to submit such an application. Yet, they could not fly here legally because they did not have visas and were precluded from obtaining TRWOV status as Afghan nationals. They avoided the 8 C.F.R. 212.1(e)(3) restriction on TRWOV status for Afghans by fraud. The four Turkish passports they fraudulently purchased for $8,000 included airline tickets issued to the same names listed in the passports (Tr. pp. 14–17) (Exs. 17–19). [3]  Turkish nationals are not precluded from obtaining TRWOV status pursuant to 8 C.F.R. 212.1(e)(3). Posing as Turkish nationals the applicants were able to apply for asylum in New York, circumventing the orderly procedures for applying for refugee status abroad.

Section 101(a)(13) of the Act, 8 U.S.C. 1101(a)(13), states, in part, that 'the term 'entry' means any coming of an alien into the United States from a foreign port or place.' The applicants came here from such a foreign port in order to submit an application for asylum. Consequently, the immigration judge properly found the applicants excludable under section 212(a)(19) for attempting to enter the United States by fraud. The fraud was an integral step in their scheme to eventually enter as refugees. [4]

We also agree with the immigration judge's denial of their application for asylum as a matter of discretion, even though he found that they had a well-founded fear of persecution in their native Afghanistan  **\*38**  for purposes of 243(h) relief. The applicants erroneously contend that the immigration judge's discretionary denial was an abuse of discretion. They also erroneously assume

that the finding of excludability under section 212(a)(19) is determinative in their case. Even if they had not been found excludable under that section, it does not follow that asylum would have been granted.

An asylum applicant seeks the favorable exercise of discretion. Consequently, as with all such discretionary applications, an applicant has the burden to establish that the favorable exercise of discretion is warranted. Matter of Salmon, 16 I&N Dec. 734 (BIA 1978); Matter of Seda, 17 I&N Dec. 550 (BIA 1980); Matter of Rojas, 15 I&N Dec. 492 (BIA 1976); Matter of Arai, 13 I&N Dec. 494 (BIA 1970); Matter of Salim, supra. The critical factor for denying the applications for asylum is that by using fraudulent passports they improperly bypassed the orderly procedures prescribed for obtaining refugee status abroad. The record reflects that the applicants were sold the airplane tickets and documents which they used to board an airplane bound for the United States by an organized ring of smugglers (Tr. pp. 13–17). We have in the past considered it a strong negative factor to enter the United States with the aid of a professional smuggler because of the threat it presents to the enforcement of our immigration laws. Matter of Rojas, supra.

 **5  The number of Afghan refugees admitted into the United States must fall within the ceiling of 5,000 allocated by the President to Middle East refugees. Therefore, the State Department, Bureau of Human Rights and Humanitarian Affairs, recommended in its advisory letter that the asylum applications be denied for policy considerations since the applicants misused our immigration laws to gain an advantage over all other similarly situated Afghan refugees who are following the established procedures for legally immigrating to the United States (Exs. 11–14).

We have weighed all the equities and conclude that the applications for asylum were properly denied in the exercise of discretion. Matter of Salim, supra; Walai v. INS, 552 F. Supp. 998 (S.D.N.Y. 1982). To grant asylum to someone who reaches our shores aided by a ring of smugglers, after he had already escaped from the country where he reasonably feared persecution, would only encourage others to likewise bypass the orderly procedures prescribed for immigrating as a refugee. The applicants should not be placed ahead of all the other similarly situated Afghan refugees. Their only relatives in this country are other applicants for asylum. Their contention that being denied asylum could result in an unjust result because the mother and daughter are not in detention and are also applicants for asylum is illogical. If the mother and daughter  *39  obtain asylum on their own in their separate applications, then the applicants could still receive derivative refugee status pursuant to 8 C.F.R. 207.1(e), and subsequent adjustment of status pursuant to 8 C.F.R. 209.2(a)(3). Consequently, the applicants would not be unduly prejudiced by their asylum application having been denied. [5]

Finally, the applicants erroneously contend that they cannot be deported to Pakistan unless Pakistan agrees to their resettlement there. See Walai v. INS, supra. Under section 7 of the Immigration and Nationality Act Amendments of 1981, Pub. L. 97–116, Stat. 1611 (Dec. 29, 1981), the applicants can ultimately be deported to any country which will accept them. See Matter of Salim, supra, note 1; Walai v. INS, supra.

ORDER: The appeal is dismissed.

# Footnotes

[1]     See section 241(f)(1) of the Act, 8 U.S.C. 1251(f)(1), as amended by section 8 of the Immigration and Nationality Act Amendments of 1981, Pub. L. 97–116, 95 Stat. 1611 (December 29, 1981).

[2]     We did not need to address this question in Salim because there excludability under section 212(a)(19) was conceded at the exclusion hearing.

[3]     Only the sons' passports and airline tickets were made part of the record since the father's passport included his wife and daughter who proceeded to Colorado without being detained. The father had a similar Turkish passport and airline ticket (Tr. pp. 6–7, 13, 16–17).

4    The dictum in United States v. Kavazanjian, supra, at 738, states that a TRWOV is not attempting to enter because he is precluded from adjustment of status by section 245(c)(3) of the Act, 8 U.S.C. 1255(c)(3), and therefore, his status is similar to that of a parolee. However, section 209 of the Act, 8 U.S.C. 1159, is the applicable adjustment provision for asylees, not section 245. Section 245(c)(3) is applicable only to adjustment applications pursuant to section 245. Moreover, unlike a parolee, an asylee is not subject to certain grounds of excludability and has available more waivers of excludability than a mere parolee. See section 209(c). Pursuant to section 101(a)(13) of the Act, any coming from abroad, with limited exceptions, constitutes an 'entry.'

5    Since their excludability derives from the second clause of section 212(a)(19), it would not preclude a subsequent entry otherwise regular in an adjustment application as derivative refugees. See Matter of M—, supra. See also note 4, infra.

19 I. & N. Dec. 33 (BIA), Interim Decision 2958, 1984 WL 48579

---

**End of Document**                                           © 2020 Thomson Reuters. No claim to original U.S. Government Works.

776 F.3d 1152
United States Court of Appeals,
Tenth Circuit.

Gustavo MENA–FLORES, Petitioner,

v.

Eric H. HOLDER, Jr., United States Attorney General, Respondent.

Nos. 13–9532, 13–9584, 13–9605.
|
Jan. 23, 2015.

**Synopsis**

**Background:** Alien petitioned for review of decision of the Board of Immigration Appeals (BIA), 2013 WL 4041225, denying his request for adjustment in status on ground that there was "reason to believe" that he participated in drug trafficking, and of subsequent denial of motion to reconsider, 2013 WL 6269327.

**Holdings:** The Court of Appeals, Bacharach, Circuit Judge, held that:

jurisdiction-stripping provisions of the Immigration and Nationality Act (INA) did not apply to deprive the Court of Appeals of jurisdiction over alien's petition;

substantial evidence supported determination by the BIA that alien was ineligible for status adjustment because there was "reason to believe" that he had participated in his brother's drug trafficking conspiracy;

the BIA did not abuse its discretion in declining to reopen removal proceedings based on alleged ineffectiveness of alien's counsel in not presenting certain evidence; and

the BIA did not abuse its discretion by denying alien's motion to reconsider.

Petition denied.

**Attorneys and Law Firms**

**\*1155** Mark R. Barr, Lichter Immigration, Denver, CO, for Petitioner.

Robert Michael Stalzer, United States Department of Justice, Washington, D.C. (Stuart F. Delery, Assistant Attorney General, Civil Division, Anh–Thu Mai–Windle, Senior Litigation Counsel, and Julie M. Iversen, Trial Attorney, Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C., on the briefs) for Respondent.

Before HOLMES, BACHARACH, and McHUGH, Circuit Judges.

**Opinion**

BACHARACH, Circuit Judge.

The Department of Homeland Security initiated proceedings to remove Mr. Gustavo Mena Flores from the United States on the ground that he was in the country illegally. Mr. Mena Flores conceded removability, but applied to adjust his status to permanent residency based on his marriage to a U.S. citizen. The immigration judge eventually denied the request, stating that Mr. Mena Flores was ineligible for permanent residency because of a "reasonable belief" that he had participated in drug trafficking. On appeal the Board of Immigration Appeals affirmed, concluding that the immigration judge had sufficient evidence to find a reason to believe that Mr. Mena Flores had participated in drug trafficking.

Mr. Mena Flores petitioned this court to review the Board's denial of his request for adjustment in status. While the petition was pending, the Board denied Mr. Mena Flores's subsequent motions to reopen the case and reconsider the denial of his motion to reopen. Mr. Mena Flores then filed petitions seeking review of these denials.

We deny Mr. Mena Flores's petitions to review the Board's three orders, which affirmed the denial of his application to adjust his status and denied his requests to reopen the proceedings and to reconsider  **\*1156**  the refusal to reopen. The Board of Immigration Appeals did not err when it held that Mr. Mena Flores had failed to

- prove eligibility for an adjustment in status or

- justify reopening or reconsideration.

## I. Removal Proceedings and Request for an Adjustment in Status

Mr. Mena Flores entered the United States unlawfully in 1990. Sixteen years later, the Department of Homeland Security initiated removal proceedings on the ground that he was present in the United States without admission or parole. Mr. Mena Flores admitted that he was removable because he was "undocumented." But, Mr. Mena Flores tried to change this status, seeking permanent residency based on his marriage to a U.S. citizen. If he had succeeded, he would have avoided removal.

 The Department of Homeland Security contended that Mr. Mena Flores could not become a permanent resident based on his criminal activity. This contention stemmed from an arrest of Mr. Mena Flores on drug charges.[1] Though Mr. Mena Flores was acquitted, an immigration judge cannot adjust an alien's status if the evidence creates even a "reason to believe" that the applicant participated in drug trafficking. 8 U.S.C. §§ 1182(a)(2)(C)(i), 1255(i)(2)(A). This standard is lower than the "beyond a reasonable doubt" standard, so the acquittal did not guarantee eligibility to become a permanent resident. *See, e.g., Cuevas v. Holder,* 737 F.3d 972, 975 (5th Cir.2013) (holding "that an alien can be inadmissible under § 1182(a)(2)(C) even when not convicted of a crime"); *Lopez–Umanzor v. Gonzales,* 405 F.3d 1049, 1053 (9th Cir.2005) (" Section 1182(a)(2)(C) does not require a conviction, but only a 'reason to believe' that the alien is or has been involved in drug trafficking."); *Garces v. U.S. Att'y Gen.,* 611 F.3d 1337, 1345 (11th Cir.2010) (stating that § 1182(a)(2)(C) renders an alien inadmissible based on a "reason to believe" standard, which does not require a conviction).

Both parties submitted evidence on the allegations of drug trafficking, relying on some of the records from the state criminal trial. At a hearing, the immigration judge granted Mr. Mena Flores's request for adjustment in status. The immigration judge found that Mr. Mena Flores had shown there was no reason to believe he was a participant in drug trafficking. R. (Case No. 13–9532) at 261–62.

The Department of Homeland Security appealed, urging that the agency had a reason to believe Mr. Mena Flores had trafficked in drugs. The Board of Immigration Appeals remanded to the immigration judge to address all of the evidence.

On remand, the immigration judge denied Mr. Mena Flores's application. On essentially the same record, the judge found that there was reasonable, substantial, and probative evidence creating a reason to believe that Mr. Mena Flores had been involved in drug trafficking. *Id.* at 30. For these findings, the immigration judge relied on

AR.07186

• the statements from "[a]t least five witnesses" involved in the drug operation,

• an affidavit by a special agent identifying two other witnesses to Mr. Mena Flores's trafficking activities, and

**\*1157** • a determination that Mr. Mena Flores was not credible because of his demeanor while testifying.

*Id.* at 28–30.

Mr. Mena Flores appealed to the Board of Immigration Appeals, which affirmed and adopted the immigration judge's decision. *Id.* at 3.

## II. Mr. Mena Flores's Administrative Motions for Reopening and Reconsideration

After the Board's decision, Mr. Mena Flores hired new counsel, who moved for the Board to reopen the removal proceedings to consider transcripts from the criminal trial and additional character references. *See* R. (Case No. 13–9605) at 122–23. Mr. Mena Flores argued that his prior attorney had been ineffective by failing to present this evidence earlier. The Board denied the motion to reopen, holding that prior counsel's failure to introduce the evidence did not amount to "egregious circumstances" or result in prejudice. *Id.* at 123.

Following the denial of his motion to reopen, Mr. Mena Flores moved for the Board to reconsider the denial of his motion to reopen, arguing that the Department of Homeland Security had misrepresented critical evidence by splitting one witness's statements, correctly attributing one part and misattributing the other part to another witness. Mr. Mena Flores argues that this error caused the immigration judge to mistakenly believe that there was an additional witness. The Board denied the motion, reasoning that Mr. Mena Flores could not establish prejudice because the misattributed statements were merely "cumulative [of] other consistent and corroborative evidence relied upon by the Immigration Judge." *Id.* at 4.

## III. Denial of Adjustment in Status

When the immigration judge disallowed an adjustment in status, he reasoned that Mr. Mena Flores had not satisfied his burden of proof on eligibility because of the evidence of drug trafficking. The Board of Immigration Appeals dismissed the appeal, and we conclude that this dismissal did not constitute error.

### A. Subject Matter Jurisdiction

This court generally has subject matter jurisdiction to review final orders of removal, such as the order against Mr. Mena Flores. 8 U.S.C. § 1252(a)(1), (5). But, exceptions exist, and the Department of Homeland Security invokes three of them:

1. 8 U.S.C. § 1252(a)(2)(C), which bars review of orders against aliens who are removable because they have participated in drug trafficking;

2. 8 U.S.C. § 1252(a)(2)(B)(i), which bars review of orders involving discretionary relief, including adjustment in status; and

3. 8 U.S.C. § 1252(d)(1), which bars review of unexhausted arguments.

These provisions do not preclude jurisdiction.[2]

### 1. Criminal Aliens, 8 U.S.C. § 1252(a)(2)(C)

In 8 U.S.C. § 1252(a)(2)(C), federal law precludes jurisdiction to review an order of removal of an alien who "is removable" based on commission of certain crimes, including drug trafficking. 8 U.S.C. § 1252(a)(2)(C). We must decide if this provision applies when the agency ordered **\*1158** removal based on illegal presence in the country and relied on criminality only to decline an adjustment in status. We conclude that § 1252(a)(2)(C) does not apply in these circumstances.

The Department of Homeland Security argues that Mr. Mena Flores is removable because the government could have ordered him removed based on drug trafficking. We disagree with this logic. The agency did not find Mr. Mena Flores removable for drug trafficking, so application of this jurisdictional bar would require us to make new factual findings. Because such fact finding would be inappropriate, we hold that § 1252(a)(2)(C) does not preclude jurisdiction in situations like ours, when there is no conviction and the alien was not ordered removed for a covered crime (such as drug trafficking). [3]

Section 1252(a)(2)(C) precludes jurisdiction when an alien "is removable" based on participation in drug trafficking. But, the phrase "is removable" can be interpreted in two ways:

1. as requiring a finding by the immigration judge that the alien was removable for drug trafficking, or

2. as capturing all instances in which the agency could have removed the alien for criminal activity, even when no immigration judge had found criminal activity and the alien had not been convicted of a covered crime.

*See* *Calcano–Martinez v. INS,* 533 U.S. 348, 350 n. 2, 121 S.Ct. 2268, 150 L.Ed.2d 392 (2001) (stating that § 1252(a)(2)(C) "is not without its ambiguities").

Our resolution of this ambiguity determines whether we have jurisdiction. We retain jurisdiction if we adopt the first definition because Mr. Mena Flores was not removed based on drug trafficking. (He was ordered removed based on his "undocumented" status.) We might lack jurisdiction if we adopt the second definition because there is evidence that Mr. Mena Flores trafficked in drugs. [4]

We adopt the first definition based on

• the "strong presumption in favor of judicial review of administrative action," [5]

• the "longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien," [6] and

• definitions of the term "removable" in other sections of the Immigration and Nationality Act.

Applying these factors, we conclude that § 1252(a)(2)(C) does not strip us of jurisdiction.

Because the phrase "is removable" is ambiguous, we find guidance in principles of statutory interpretation. *See* *Calcano–Martinez v. INS,* 533 U.S. 348, 350 n. 2, 121 S.Ct. 2268, 150 L.Ed.2d 392 (2001) (explaining that because § 1252(a)(2)(C) is ambiguous, "[the] background principles of statutory construction and constitutional concerns must be considered"). These principles include a strong presumption favoring **\*1159** judicial review of administration action. *See* *INS v. St. Cyr,* 533 U.S. 289, 298, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (explaining that the agency had to overcome this presumption by showing that statutes "stripped the courts of jurisdiction to decide the question of law presented by" a habeas corpus application).

As noted above, the phrase "is removable" can be interpreted in two ways. One would apply whenever the court could ultimately deem the alien removable; the other would apply only when the immigration judge found the alien removable for covered

crimes. Interpreting the phrase to require a finding by the immigration judge, we adopt a definition that facilitates judicial review of administrative action.

In doing so, we also follow the established principle of construing ambiguities in removal statutes in favor of the alien. *See United States v. Quintana,* 914 F.2d 1409, 1410 (10th Cir.1990) ("Statutes relating to deportation of aliens are liberally construed in favor of the alien concerned as the deportation penalty can be harsh."). This principle applies here because § 1252(a)(2)(C) contains a lingering ambiguity ("is removable") and relates to removability by governing the appealability of orders of removal.

We interpret "is removable" in favor of aliens by defining it to require that the agency actually removed aliens on the ground of drug trafficking (rather than ineligibility for an adjustment in status because of evidence involving drug trafficking). The statute strips us of jurisdiction to review orders of removal only when an alien is actually removed for trafficking. This interpretation expands aliens' opportunities to seek judicial review. As a result, our interpretation favors aliens.

We rely not only on canons of construction, but also on other parts of the Immigration and Nationality Act. To do so, we examine the statute to see how it uses the terms "removal" and "removable."

We start with the section we are interpreting: § 1252(a)(2)(C). This section refers to an alien who "is removable." Elsewhere in the statute, Congress provided that removal proceedings must take place before an immigration judge. 8 U.S.C. § 1229a(a)(1). Under 8 U.S.C. § 1229a, the immigration judge must "decide whether [the] alien is removable." 8 U.S.C. § 1229a(c)(1)(A). "Section 1229a's use of the term 'removable' suggests ... that a person is not 'removable' on a particular basis unless or until the [immigration judge] determines that he is." *Alvarez–Santos v. INS,* 332 F.3d 1245, 1251 (9th Cir.2003); *see also Choeum v. INS,* 129 F.3d 29, 38 (1st Cir.1997) (concluding that a statute—stripping courts of jurisdiction " 'by reason of [an alien] having committed' certain types of criminal offenses"—applies only to "aliens who have actually been adjudged deportable" for the specified crimes). Therefore, the phrase "is removable" can be satisfied only when an immigration judge concludes that the alien is removable for committing a covered crime.

The government relies on *Shepherd v. Holder,* 678 F.3d 1171 (10th Cir.2012), arguing that we lack jurisdiction because of evidence that could have allowed removal of Mr. Mena Flores based on drug trafficking. *Shepherd* involved removal of an individual based on forgery after she had been convicted of forgery. *See Shepherd,* 678 F.3d at 1175. The immigration judge initially denied removal, concluding that the individual was a citizen under the Child Citizenship Act. *See id.* Subsequently, the government again sought removal, arguing that the alien was removable based on the forgery conviction because she was too old to qualify for citizenship under the Child Citizenship **\*1160** Act. *See id.* at 1175–76. The immigration judge agreed and ordered removal. *See id.* at 1176.

On appeal we determined that we had jurisdiction to consider the threshold jurisdictional question of whether the individual was a citizen, but lacked jurisdiction to determine whether the individual was removable because of her forgery conviction. *Id.* at 1179. For this holding, we quoted *Garcia v. INS,* 237 F.3d 1216 (10th Cir.2001), where we had said:

The [statute] divests courts of jurisdiction only if an alien "*is removable by reason of having committed a criminal offense.*" 8 U.S.C. § 1252(a)(2)(C) (emphasis added). It does not say that courts lack jurisdiction if the ... alien is *found* deportable for commission of certain criminal offenses by the [Immigration Judge/Board of Immigration Appeals]. Thus, the statutory language clearly requires that we determine whether [the triggering statutory] conditions exist before dismissing the appeal.

AR.07189

*Id.* at 1180 (quoting *Garcia v. INS,* 237 F.3d 1216, 1220 (10th Cir.2001)). We quoted this language only for the proposition that we can consider the jurisdictional facts, not to indicate that we can make new factual findings triggering the jurisdictional bar in § 1252(a)(2)(C). *Id.* There was no need for the court to make a new factual finding on removability for commission of a covered crime; the agency had already made that finding. *Id.* at 1176.[7] Thus, *Shepherd* does not suggest that a court can lose jurisdiction by making new factual findings of criminality.

Because *Shepherd* does not apply, we conclude that we have jurisdiction over the petition. Mr. Mena Flores was not removed for trafficking in drugs; he was removed because he was undocumented and unable to satisfy his burden for an adjustment in status. The evidence of criminality was relevant not to prove Mr. Mena Flores was removable as a criminal, but to rebut his argument that he was eligible for an adjustment in status.

Ultimately, Mr. Mena Flores bore an obligation to dispel any reason to believe the drug trafficking allegation. But, the immigration judge could deny an adjustment in status even if he had not regarded Mr. Mena Flores as a drug trafficker. Because Mr. Mena Flores was removed on noncriminal grounds, we retain jurisdiction notwithstanding § 1252(a)(2)(C). *See Syblis v. Att'y Gen.,* 763 F.3d 348, 351 n. 5 (3d Cir.2014) (stating that § 1252(a)(2)(C) does not bar jurisdiction when the agency found the alien removable based on the overstay statute rather than his criminal conviction).

### 2. Discretionary Relief, 8 U.S.C. § 1252(a)(2)(B)(i)

Section 1252(a)(2)(B)(i) strips the federal courts of jurisdiction to review decisions "regarding the granting of [discretionary] relief" under § 1229b. 8 U.S.C. § 1252(a)(2)(B)(i). Because adjustment in status involves a form of discretionary relief under § 1229b, the Department of Homeland Security argues that we lack jurisdiction. We disagree.

Even when an alien seeks a discretionary form of relief, the jurisdictional bar in § 1252(a)(2)(B)(i) does not apply to nondiscretionary aspects of that relief. **\*1161** *Sabido Valdivia v. Gonzales,* 423 F.3d 1144, 1148–49 (10th Cir.2005). In evaluating an application for adjustment in status, an immigration judge must make both discretionary and nondiscretionary determinations. The judge must determine if the alien

- satisfies the eligibility requirements and

- merits the favorable exercise of discretion by the court.

8 U.S.C. 1229a(c)(4)(A). The second element involves a discretionary determination, but the first one does not.

The immigration judge declined relief based on the first determination, concluding that Mr. Mena Flores could not become a permanent resident because of the evidence of drug trafficking. R. (Case No. 13–9532) at 63–65. With this conclusion, the immigration judge noted that he had not reached the discretionary determination. *Id.* at 65 n. 1. Therefore, our review is limited to the nondiscretionary aspects of the immigration judge's determination that Mr. Mena Flores is ineligible for relief. In these circumstances, § 1252(a)(2)(B)(i) does not preclude jurisdiction.

### 3. Exhaustion of Arguments, 8 U.S.C. § 1252(d)(1)

We can review an order of removal only if the alien has exhausted available administrative remedies. 8 U.S.C. § 1252(d)(1). The government argues that Mr. Mena Flores makes two unexhausted arguments on appeal:

1. The statements by trafficker-informants were not credible because of internal inconsistencies.

2. The government misattributed Mr. Kenneth Fuqua's statements to Mr. Gary Smith, making it appear that an additional person had identified Mr. Mena Flores as a part of the drug trafficking organization.

We disagree, concluding that both arguments are exhausted because the Board of Immigration Appeals has addressed these arguments on the merits.

The two arguments were presented in the motions to reopen and reconsider, and the Board rejected both arguments on the merits. R. (Case No. 13–9605) at 4, 25–26, 123, 159–64. "If the [Board of Immigration Appeals] deems an issue sufficiently presented to consider it on the merits, such action by the BIA exhausts the issue as far as the agency is concerned and that is all § 1252(d)(1) requires to confer our jurisdiction." *Sidabutar v. Gonzales,* 503 F.3d 1116, 1120 (10th Cir.2007).

By submitting both arguments to the Board and obtaining decisions on the merits, Mr. Mena Flores has exhausted his arguments on internal inconsistency and misattribution of statements to Gary Smith. *See Molina v. Holder,* 763 F.3d 1259, 1262–63 (10th Cir.2014); *cf. Sidabutar,* 503 F.3d at 1122 (stating that two claims were unexhausted because they "should have been brought before the BIA in the first instance through a motion to reconsider or reopen").

### B. Merits

The Board denied Mr. Mena Flores's request for adjustment in status, concluding that his participation in drug trafficking made him ineligible to become a permanent resident. On review, we evaluate if the Board's conclusion was supported by substantial evidence. Based on that review, we conclude the agency did not err in denying Mr. Mena Flores's application for an adjustment in status.

#### 1. Burden of Proof

Like any alien applying for relief from removal, Mr. Mena Flores bears the burden to prove his eligibility. 8 U.S.C. § 1229a(c)(4). Thus, Mr. Mena Flores **\*1162** must prove that he is eligible to become a permanent resident.

The Department of Homeland Security denies eligibility based on evidence of drug trafficking. To rebut that position,[8] Mr. Mena Flores must prove that there is not a reason to believe that he had participated in drug trafficking. *See* 8 U.S.C. §§ 1182(a)(2)(C), 1229a(c)(2)(A), 1255(i)(2)(A); 8 C.F.R. § 1240.8(d).

#### 2. Standard of Review

The Board determined that the evidence supported a belief that Mr. Mena Flores had participated in drug trafficking. In reviewing the Board's decision, we engage in de novo review of constitutional and other legal questions. *Lorenzo v. Mukasey,* 508 F.3d 1278, 1282 (10th Cir.2007). Factual determinations, including credibility determinations, are reviewed only for substantial evidence. *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992); *see Elzour v. Ashcroft,* 378 F.3d 1143, 1150 (10th Cir.2004) (holding that credibility determinations are reviewed under the substantial evidence test in the asylum context). Under this standard, we uphold the Board's finding only if the evidence was "reasonable, substantial and probative." *Elzour,* 378 F.3d at 1150.[9] Applying this standard, we can reverse the Board's findings of fact only if "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

Although we are reviewing the decision of the Board, we can consult the immigration judge's opinion to the extent that it was relied upon by the Board. 📄 *Sarr v. Gonzales,* 474 F.3d 783, 790 (10th Cir.2007). In this case, the Board adopted all of the immigration judge's findings, so we will refer to opinions of both the Board and the immigration judge when evaluating the sufficiency of the evidence. R. (Case No. 13–9532) at 3.

### 3. The Evidence of Trafficking

Authorities suspected that Mr. Mena Flores had participated in a drug trafficking organization led by his brother, Santiago. This suspicion led to drug charges against Mr. Mena Flores. Though Mr. Mena Flores was acquitted, the Department of Homeland Security used the trial evidence to prevent Mr. Mena Flores from adjusting his status to permanent residency.

In denying Mr. Mena Flores's request for adjustment in status, the immigration judge and the Board relied on three types of evidence:

    1. witness statements,

    2. an affidavit from a special agent, and

    3. Mr. Mena Flores's testimony.

### *1163  a. The Witness Statements

In police reports and sworn statements, four participants in the drug trafficking organization (Mr. Donald Skinner, Mr. Kenneth Fuqua, Mr. Richard Lee Clark, and Mr. Benito Garcia) said that Mr. Mena Flores had been involved in the drug operation. Mr. Mena Flores questions their credibility based on their criminal records, content of their testimony, and bias resulting from their incentives to provide incriminating information.

The first witness was Mr. Donald Skinner, who identified Mr. Mena Flores from a picture, stating that he was Santiago's "brother and one of his runners." R. (Case No. 13–9532) at 2003 ("I called [Santiago] and tell [sic] him what I needed and [Santiago] called me back telling me that I'm going to meet [Mr. Mena Flores]."). Mr. Skinner testified inconsistently regarding the number [10] and locations [11] of these transactions.

Mr. Skinner was subject to impeachment in three ways:

    1. He admitted that his memory was poor because of "a lot of stuff in [his] head." [12]

    2. He had prior arrests for making false reports. [13]

    3. He admitted that he could not distinguish between Mr. Mena Flores and one of his brothers (Martin), who was also involved in drug activity. [14]

The second witness was Mr. Kenneth Fuqua, who identified Mr. Mena Flores as one of Santiago's brothers involved in the drug business. *Id.* at 1051 (Incident Rep., Dec. 16, 2005), 2234 (Statement of Kenneth Fuqua, Feb. 7, 2006). Mr. Fuqua could not provide details about dates or the amount of drugs provided by Mr. Mena Flores. *Id.* at 2260–67.

The third witness was Mr. Richard Lee Clark. When shown a picture of Mr. Mena Flores, Mr. Clark said that he recognized the individual from a drug transaction. *Id.* at 394 (Incident Rep., Dec. 7, 2005). This account had two problems:

    1. Mr. Clark said the individual's name was "Chico," and Mr. Mena Flores's nickname was "Tavo." [15]

2. Mr. Clark elsewhere confused Mr. Mena Flores with one of his brothers (Martin). [16]

The fourth witness was Mr. Benito Garcia, who said that Mr. Mena Flores had been the "main person" helping Santiago. *Id.* at 4340 (Incident Rep., March 25, 2007). But, Mr. Garcia admitted that he had never conducted any deliveries with Mr. Mena Flores or seen him at any deliveries. *Id.*

### b. Special Agent McVey's Affidavit

Special Agent Jeffrey McVey submitted an affidavit stating that two more participants in the drug operation had identified Mr. Mena Flores: Ms. Kyla Weisberg and Ms. Lucinda Allen.

According to the affidavit, Ms. Weisberg said "that she had gone with [Mr. Skinner] **\*1164** to pick up [drugs] from [Santiago] Mena Flores and his brothers." *Id.* at 1325. But, in a related interview, Ms. Weisberg acknowledged that she "did not know the brothers['] names" and that she believed that the men were Santiago's brothers because Mr. Skinner had told her they were. *Id.* at 942. Ms. Weisberg was also unable to identify Mr. Mena Flores when shown his picture. *Id.*

In the affidavit, Special Agent McVey also referred to a statement by Ms. Lucinda Allen. Ms. Allen said that on one occasion, she had "met [with Santiago Mena Flores] at his brother's residence located at 372 North 18th Ct., Brighton, Colorado." *Id.* at 1326. But, this address was not Mr. Mena Flores's address; it was his brother Martin's. *Id.* at 1033. On a separate occasion, Ms. Allen was unable to identify a photograph of Mr. Mena Flores. *Id.* at 2551–52.

### c. Mr. Mena Flores's Testimony

Mr. Mena Flores testified, denying any involvement in drug crimes or knowledge of his brother's participation in drug crimes. The immigration judge found that Mr. Mena Flores was not credible "regarding his lack of knowledge of [sic] brother's criminal activity," finding instead that the evidence against Mr. Mena Flores was "internally consistent and probative." *Id.* at 30. [17]

### 4. Reason to Believe

Mr. Mena Flores could not obtain permanent residency if there was "reason to believe" that he had participated in drug trafficking. 8 U.S.C. § 1182(a)(2)(C). [18] Thus, we ask: Did the Board err by concluding that Mr. Mena Flores had failed to disprove a reason to believe he had engaged in drug trafficking? Keeping in mind that Mr. Mena Flores bears the burden of proof for adjustment in status, we conclude the Board did not err.

### a. Credibility Issues

The immigration judge was entitled to give credence to the testimony of Mr. Skinner, Mr. Fuqua, and Mr. Garcia [19] despite the credibility challenges made by Mr. Mena Flores.

Though Mr. Skinner identified Mr. Mena Flores as a participant in the drug ring, there were credibility issues. For the agency's determinations on these credibility issues, we apply the abuse-of-discretion standard. *See Elzour v. Ashcroft,* 378 F.3d 1143, 1150 n. 9 (10th Cir.2004). Under this standard, the agency had the discretion to credit Mr. Skinner's testimony. The agency could have downplayed the inconsistencies in light of Mr. Skinner's consistent testimony that he had met Mr. Mena Flores at least twenty times. Similarly, the agency could have downplayed the problems in distinguishing Mr. Mena **\*1165** Flores from his brother Martin because Mr. Skinner said that he knew that both Mr. Mena Flores and Martin were active in the drug organization.

The fact-finder could also give weight to Mr. Fuqua's testimony. Mr. Fuqua remembered seeing Mr. Mena Flores's car and a particular transaction. Though Mr. Mena Flores attacks Mr. Fuqua's credibility, a rational adjudicator could determine that Mr. Fuqua was credible.

The agency could also have relied on testimony by Mr. Garcia, who identified Mr. Mena Flores as a participant in the organization. Though Mr. Garcia never saw Mr. Mena Flores at a transaction, an adjudicator could rely on hearsay testimony. *N–A–M v. Holder,* 587 F.3d 1052, 1057–58 (10th Cir.2009) (explaining that the rules of evidence are relaxed in the immigration setting and the judge may rely on hearsay evidence as long as it is "probative and its use is fundamentally fair").

Through the accounts of Mr. Fuqua, Mr. Skinner, and Mr. Garcia, the immigration judge could reasonably find that the evidence supported a finding of ineligibility based on Mr. Mena Flores's criminal activity. *See* *United States v. Aguayo–Delgado,* 220 F.3d 926, 934–35 (8th Cir.2000) (holding that the evidence was sufficient to convict beyond a reasonable doubt when the evidence consisted mainly of testimony by other participants in drug transactions, even though there were questions about the reliability and consistency of the accounts).

Mr. Mena Flores points to questions surrounding the government's remaining witnesses. We need not consider these questions because a reasonable adjudicator could have relied on the statements by Mr. Skinner, Mr. Fuqua, and Mr. Garcia to find that Mr. Mena Flores had not satisfied his burden of persuasion. With credibility findings lying in the province of the immigration judge, he could reasonably find that the evidence showed ineligibility for permanent residency because of criminal activity.

### b. Mr. Mena Flores's Arguments

Mr. Mena Flores makes six arguments in challenging the Board's finding of ineligibility for permanent residency:

1. The denial of the application to adjust status was a close call.

2. The evidence tainted by governmental misrepresentations was not reasonable, substantial, or probative.

3. Law enforcement officers never saw Mr. Mena Flores commit a crime despite months of surveillance.

4. His personal characteristics were inconsistent with criminal behavior.

5. Most members of the drug operation were unable to identify Mr. Mena Flores as a participant.

6. The government's witnesses were unreliable.

His arguments do not affect our conclusion that there was sufficient evidence for a reasonable adjudicator to conclude that Mr. Mena Flores had trafficked in drugs. [20]

### *1166  i. Close Call

Mr. Mena Flores asserts that we should consider the closeness of the issue. We assume, for the sake of argument, that the underlying factual issue involves a close call. But, we must uphold the Board's decision if there is sufficient evidence for a reasonable adjudicator to conclude that Mr. Mena Flores was involved in drug trafficking. 8 U.S.C. § 1252(b)(4)(B). Thus, even if we determine that the immigration judge or the Board had inappropriately relied on certain evidence, we must uphold the findings if the remaining evidence would permit a reasonable fact-finder to conclude that Mr. Mena Flores had trafficked in drugs. Because the evidence is sufficient, we reject Mr. Mena Flores's argument.

In evaluating the evidence, we find little guidance from existing case law. The case law involves a spectrum of facts on which circuit courts have affirmed or reversed an agency's finding regarding a reason to believe that an alien had engaged in drug crimes. Mr. Mena Flores does not fall neatly on either side of the spectrum.

On one side of the spectrum, there are cases in which courts have found a "reason to believe" the alien was engaged in criminality. Circuit courts have routinely upheld "reason-to-believe" findings when the alien

• admits to the relevant crime,

• is directly observed with drugs by police, immigration, or government officials, or

• has a conviction for possession of a controlled substance or another nontrafficking offense.

*See, e.g.,* ⚑⚠ *Fernandez–Bernal v. Att'y Gen.,* 257 F.3d 1304, 1310–11 (11th Cir.2001) (alien admitted to possessing cocaine, even though the underlying conviction was expunged); *Cuevas v. Holder,* 737 F.3d 972, 973 (5th Cir.2013) (car search revealed cocaine hidden in the rear panel); ⚑ *Nunez–Payan v. INS,* 811 F.2d 264, 265–66 (5th Cir.1987) (pleaded guilty to narcotics charge and received a probationary sentence of 32 months under a deferred adjudication statute); *see also* Appellant's Opening Br. (Case No. 13–9532) at 27–34 (listing cases in which the Board of Immigration Appeals or a court has upheld reason-to-believe findings).

On the other side of the spectrum are cases in which courts have reversed the agency's "reason to believe" findings. These cases involve the Board's reliance on

• the fact that an arrest had been made without analyzing the underlying circumstances, or

• the presence of conclusory police reports that lack any indication of criminality.

*See, e.g.,* ⚑ *Garces v. Att'y Gen.,* 611 F.3d 1337, 1350 (11th Cir.2010) (reversing a finding of reason to believe based only on a vacated plea and some hearsay in police reports); ⚑ *Igwebuike v. Caterisano,* 230 Fed.Appx. 278, 283–85 (4th Cir.2007) (reversing a finding of reason to believe that had been based solely on insubstantial, non-probative evidence).

Our facts fall somewhere in the middle of this spectrum. Mr. Mena Flores has not admitted trafficking, has never been observed by law enforcement with drugs, and has no criminal record. On the other hand, the evidence against him is stronger than other cases in which a court has reversed the Board's "reason to believe" findings. For example, the evidence here includes the statements of at least three participants in the trafficking organization. On balance, we conclude that the agency could reasonably determine that the facts create a reason to believe criminality despite the absence of circumstances frequently found in other cases. Thus, the agency did not err in concluding that Mr.  **\*1167**  Mena Flores had failed to meet his burden.

### ii. The Government's Erroneous Statement

Mr. Mena Flores argues that the agency's decision is tainted by a governmental misrepresentation. In its evidence, the Department of Homeland Security mistakenly attributed part of Mr. Fuqua's account to Mr. Gary Smith. Based on this mistake, it appeared that Mr. Smith had implicated Mr. Mena Flores when Mr. Smith had not. [21] Mr. Mena Flores argues this error is significant because of Mr. Smith's role in the drug trafficking organization.

The Board addresses this argument in Mr. Mena Flores's subsequent motion to reconsider, concluding that the error was harmless because the evidence was cumulative. *See* p. 1171–72, below. We agree with the Board's conclusion expressed in its denial of the motion to reconsider. As we have stated, the remaining evidence permits the conclusion that Mr. Mena Flores trafficked in drugs. Therefore, this mistake does not require reversal of the Board's denial of Mr. Mena Flores's request for an adjustment in status.

### iii. No Eyewitness Testimony by Law Enforcement Officers

Mr. Mena Flores points out that no law enforcement officer ever saw him commit a crime despite months of surveillance. But, eyewitness testimony by law enforcement officers is not necessary to preclude eligibility for an adjustment in status. *See* ⚑ 8 U.S.C. § 1182(a)(2)(C) (requiring only a "reason to believe"). The evidence need only be reasonable, substantial, and probative

for the Board to have a reason to believe that Mr. Mena Flores was involved in drug-trafficking. *See* *Matter of Rico,* 16 I. & N. Dec. 181, 185 (1977) (requiring reasonable, substantial, and probative evidence when the burden was on the government). Because that evidence exists, we reject Mr. Mena Flores's argument. [22]

### iv. Personal Characteristics

Mr. Mena Flores emphasizes that the circumstances of his personal life do not suggest criminality: He has no prior criminal record, did not have multiple telephone numbers, and kept a steady job.

But, a reasonable adjudicator could find criminality notwithstanding this evidence. Our question is whether the evidence supports the agency's determination that Mr. Mena Flores is ineligible for an adjustment in status based on involvement in drug-trafficking. The commendable aspects of his personal life do not preclude an agency from finding that Mr. Mena Flores failed to satisfy his burden of persuasion on the evidence of drug trafficking.

### v. Not Identified by Most Members of the Drug Operation

Mr. Mena Flores notes that most members of the drug operation did not identify him as a participant. But, some did, and their testimony provides sufficient evidence for the immigration judge to conclude that Mr. Mena Flores is not eligible to become a permanent resident.

### *1168  vi. Unreliability of Witnesses

Mr. Mena Flores also argues that the government's witnesses are unreliable. By relying on the witnesses, the immigration judge implicitly found that the testimony of the governmental witnesses was reliable. *See* *United States v. Toro–Pelaez,* 107 F.3d 819, 825 (10th Cir.1997) (recognizing the district court's implicit "resolution of credibility issues").

We have already addressed the reliability of the statements made by Mr. Fuqua, Mr. Skinner, and Mr. Garcia. For the sake of argument, we can assume that solid reasons exist to question the credibility of the three men. Despite these credibility issues, a reasonable fact-finder could rely on the witnesses' statements. As a result, these statements require us to uphold the Board's determination.

### 5. Summary

In summary, substantial evidence supports the Board's determination that Mr. Mena Flores was inadmissible based on involvement in a drug-trafficking crime.

## IV. Review of the Motion to Reopen and Reconsider

We deny the petitions on the Board's decisions to deny reopening and reconsideration.

### A. Jurisdiction

We have subject matter jurisdiction to review the Board's denial of Mr. Mena Flores's motion to reopen and reconsider because both are final orders. *Infanzon v. Ashcroft,* 386 F.3d 1359, 1361–62 (10th Cir.2004); *see also* *Khan v. Gonzales,* 495 F.3d 31, 36 (2d Cir.2007) (reviewing a motion to reconsider). [23]

### B. Motion to Reopen

Through a motion to reopen, an alien can request the Board to reopen his appeal in light of newly available evidence. Typically, "[a] motion to reopen seeks to present evidence that 'is material and was not available and could not have been discovered or

presented at the former hearing.' " *Mahamat v. Gonzales,* 430 F.3d 1281, 1283 n. 3 (10th Cir.2005) (quoting 8 C.F.R. § 1003.2(c)(1)). But, an alien can also base a motion to reopen on available documents that had not been submitted because of counsel's ineffectiveness. *See Akinwunmi v. INS,* 194 F.3d 1340, 1341 & n. 2 (10th Cir.1999) (per curiam).

Mr. Mena Flores bases his motion to reopen on evidence that was not presented because of ineffective representation. The Board denied the motion to reopen, and we conclude that the decision fell within the Board's discretion.

### 1. Burden to Show Ineffective Representation

The Board of Immigration Appeals could reopen the proceedings only if Mr. Mena Flores showed that counsel was ineffective and the circumstances were egregious. *Matter of Lozada,* 19 I. & N. Dec. 637, 638–39 (BIA 1988), *overruled, Matter of Compean,* 24 I. & N. Dec. 710 (BIA 2009), *vacated,* 25 I. & N. Dec. 1 (BIA 2009). The legal representation was ineffective only if the attorney's deficiencies were so prejudicial that the proceedings **\*1169** became fundamentally unfair. *Akinwunmi,* 194 F.3d at 1341 n. 2.

### 2. Abuse of Discretion

In rejecting Mr. Mena Flores's claim of ineffective representation, we consider whether the agency abused its discretion. *Pineda v. Gonzales,* 427 F.3d 833, 838 (10th Cir.2005). The agency abused its discretion if it failed to give a rational explanation, inexplicably deviated from past policies, failed to supply any reasoning, or rested on summary or conclusory statements. *Infanzon v. Ashcroft,* 386 F.3d 1359, 1362 (10th Cir.2004).

### 3. Mr. Mena Flores's Arguments

Mr. Mena Flores urges an abuse of discretion based on four aspects of the Board's decision:

1. summary dismissal of the argument involving the omission of part of the criminal trial transcripts,

2. failure to explain why Mr. Mena Flores's character references could not rebut specific evidence considered by the immigration judge,

3. a misstatement regarding the number of witnesses identifying Mr. Mena Flores as a participant in the drug trafficking organization, and

4. failure to address Mr. Mena Flores's contention that the particular circumstances should lessen his burden of proving actual prejudice.

Under the abuse-of-the-discretion standard, our inquiry is whether the Board provided a rational explanation or rested on conclusory statements. We conclude the explanation was rational.

### a. Trial Transcripts

Mr. Mena Flores bears the burden to prove that

• his counsel's failure to introduce the trial transcripts rendered the legal representation ineffective, and

• the ineffectiveness caused enough prejudice to make the proceedings fundamentally unfair.

*Tang v. Ashcroft,* 354 F.3d 1192, 1196 (10th Cir.2003). The ineffectiveness prong requires "egregious circumstances,"[24] and the prejudice prong requires a "reasonable likelihood" that the outcome would have been different but for counsel's deficient performance.[25]

 The Board concluded that it was not egregious for Mr. Mena Flores's prior counsel to withhold the trial transcripts. Because the transcripts include evidence damaging to Mr. Mena Flores, the Board determined that Mr. Mena Flores's prior counsel probably made a strategic decision on which parts to offer. An attorney's objectively reasonable tactical decisions do not qualify as ineffective assistance. *Hooper v. Mullin,* 314 F.3d 1162, 1169–70 (10th Cir.2002). So, the Board determined that Mr. Mena Flores's attorney was not ineffective by failing to submit the transcripts.

Mr. Mena Flores argues that the Board abused its discretion, claiming that his attorney could not have made a strategic decision because he had not even read the transcripts. But, Mr. Mena Flores provides no evidence that the attorney failed to read the transcripts.

In addition to concluding that Mr. Mena Flores's attorney did not fail to provide effective representation, the Board concluded that the failure to submit the transcripts was not prejudicial. Mr. Mena Flores claims the Board failed to analyze how the transcripts could have damaged  **\*1170**  the credibility of the government's witnesses. For example, Mr. Mena Flores's trial counsel testified that

- jurors stated after the trial that they had not believed the prosecution's witnesses because they testified inconsistently and had strong reasons to lie,

- some witnesses had provided substantial help to the prosecution and agreed to cooperate in exchange for reductions in their sentences,

- an employer had testified that Mr. Mena Flores was a good employee,

- Mr. Mena Flores's brother (Santiago) had admittedly made the telephone calls from Mr. Mena Flores's telephone, and

- none of the surveillance showed activity by Mr. Mena Flores.

R. (Case No. 13–9605) at 1224–30, 1233.

Mr. Mena Flores overstates the significance of the trial transcripts. The Board and the immigration judge already knew about the prosecution's difficulty in obtaining the conviction and the impeachment of the government's witnesses.

The transcripts contain at least some information that could have proven damaging to Mr. Mena Flores. At the criminal trial, the prosecution presented testimony by Mr. Skinner and Mr. Fuqua. After hearing their testimony on direct examination and cross examination, Mr. Mena Flores's attorney moved for a judgment of acquittal. R. (Case No. 13–9605) at 706–07. The trial judge denied the motion, concluding that "a reasonable juror could conclude that Mr. Mena Flores [was] guilty." *Id.* at 708.

In the removal proceedings, the agency had not only the accounts by Mr. Skinner and Mr. Fuqua, but also the account of Mr. Benito Garcia. Unlike the district court, the agency did not have to decide whether someone could find beyond a reasonable doubt that Mr. Mena Flores was guilty of distribution of a controlled substance, conspiracy, or possession of a controlled substance. The question before the agency was merely whether there was "reason to believe" Mr. Mena Flores had trafficked in drugs.

The full transcripts might have allowed the agency to rely on the trial judge's assessment of the evidence. After hearing that evidence, the trial judge stated that a reasonable jury could conclude beyond a reasonable doubt that Mr. Mena Flores had committed the crimes. And, he drew that conclusion with less evidence than the immigration judge had. Under these

circumstances, a full copy of the trial transcript might have strengthened the immigration judge's resolve to find a "reason to believe" that Mr. Mena Flores was a drug trafficker.

The Board's decision was supported by a clear rationale, did not depart from established policies, and applied a correct interpretation of the law. Thus, we hold that the Board did not abuse its discretion in declining to reopen the proceedings based on counsel's alleged failure to use the full trial transcript.

### b. Character References

Mr. Mena Flores claims that his attorney acted egregiously in failing to present letters attesting to good character. In his brief to the Board, Mr. Mena Flores claimed that the statements of his friends, family, and co-workers would have rebutted the statements of the adverse witnesses. The desired letters would have depicted Mr. Mena Flores as an honest, hardworking man, whose family is his first priority.

The Board dedicated less than one sentence to the letters. But, in that sentence, the Board concluded that the character references failed to rebut the information considered by the immigration judge. The brevity of this explanation does not establish  **\*1171** an abuse of discretion. *Infanzon v. Ashcroft,* 386 F.3d 1359, 1362 (10th Cir.2004).

The Board could reasonably conclude that the character evidence did not rebut the evidence relied on by the immigration judge. [26] As a result, the attorney's failure to present character evidence did not require the Board to grant the motion to reopen.

### c. Statement of Gary Smith

As discussed previously, the Department of Homeland Security misattributed a statement made by Mr. Fuqua to both Mr. Fuqua and Mr. Smith. This error suggested that five witnesses had implicated Mr. Mena Flores when only four witnesses had done so. [27] In ruling on Mr. Mena Flores's motion to reopen, the Board stated: "There were at least five informants or witnesses who stated that [Mr. Mena Flores] served as a 'runner' for [Santiago], and the statements were consistent and corroborative." R. (Case No. 13–9605) at 123. Mr. Mena Flores argues that the Board's factual mistake entails an abuse of discretion. We disagree.

When Mr. Mena Flores subsequently asked the Board to reconsider its denial of the motion to reopen, he also argued that the Board's factual mistake was fatal. In denying the motion to reconsider, the Board determined that the mistake was harmless because the erroneous evidence was cumulative of other evidence. R. (Case No. 13–9605) at 4.

The Board was ideally suited to say how it would have decided if it had known there were only four witnesses rather than five. After all, the Board would have known how it would have ruled with the correct information. Thus, the Board had the discretion to decline to reopen the proceedings based on its earlier mistake.

### d. Unaddressed Evidentiary Burden

In his motion to reopen, Mr. Mena Flores argued his case should be reopened even if he disputed only a few pieces of evidence relied on by the immigration judge. He explained that his case contained less direct evidence than others in which the Board had sustained "reason to believe" findings. The Board did not address this argument, and Mr. Mena Flores claims that the Board had a duty to explain why the typical evidentiary burden would apply.

We disagree. The Board's obligation is to " 'consider the issues raised ... and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted.' " *Becerra–Jimenez v. INS,* 829 F.2d 996, 1000 (10th Cir.1987) (quoting *Osuchukwu v. INS,* 744 F.2d 1136, 1142–43 (5th Cir.1984)). This obligation does not require the Board to " 'expressly parse or refute on the record' each individual argument ... offered by the petitioner." *Wang v. BIA,*

437 F.3d 270, 275 (2d Cir.2006) (quoting *Xian Ji Chen v. Dep't of Justice,* 434 F.3d 144, 160 n. 13 (2d Cir.2006)). Thus, the Board had no obligation to say why the typical standard applied and we decline to reverse the Board's decision on this ground.

**\*1172  C. Motion to Reconsider**

"A motion to reconsider ... is available to raise errors of fact or law committed by the [Board] in its prior decision." *Mahamat v. Gonzales,* 430 F.3d 1281, 1283 n. 3 (10th Cir.2005); *see* 8 C.F.R. § 1003.2(b)(1). Mr. Mena Flores asked the Board to reconsider its denial of his motion to reconsider, arguing that the Board had affirmed the immigration judge's findings based in part on a factual error.

The Board relied on the immigration judge's statements that "[t]here were at least five informants or witnesses" who implicated Mr. Mena Flores in the trafficking organization. R. (Case No. 13–9605) at 3. In fact, there were only four witnesses. The Board denied the motion to reconsider, deciding that the evidence in error "was cumulative to other consistent and corroborative evidence." *Id.* at 4; *see* pp. 1167, 1171, above. The Board then listed the other evidence, concluding that it was sufficient.

 Mr. Mena Flores argues that the Board abused its discretion by making new factual mistakes and by making impermissible factual findings. We conclude that the Board did not abuse its discretion in denying the motion to reconsider.

**1. Factual Errors**

In denying the motion to reconsider, the Board made two statements that Mr. Mena Flores characterizes as inaccurate:

1. There had been four witnesses to Mr. Mena Flores's criminality.

2. Mr. Richard Clark had identified a picture of Mr. Mena Flores.

Mr. Mena Flores argues the first statement constitutes error because there were not four "*eye-witnesses* to his criminality." Appellant's Opening Br. (Case Nos. 13–9584 & 13–9605) at 50 (emphasis added). This argument is based on the fact that Mr. Garcia, one of the witnesses, never saw Mr. Mena Flores participate in trafficking. But, the Board did not say there were four eye-witnesses; it said merely that there were four witnesses implicating Mr. Mena Flores in drug crimes. Mr. Garcia was a witness because he had made statements indicating that he was aware of Mr. Mena Flores's participation in the drug trafficking organization. Thus, there were four witnesses, even if not all of them were eye-witnesses, and the Board did not err in saying there were four witnesses.

In addition, Mr. Mena Flores argues that he was never identified by Mr. Clark. But, Mr. Clark identified Mr. Mena Flores through a photograph as an individual who had been present at a drug transaction. R. (Case No. 13–9532) at 394.

As Mr. Mena Flores argues, Mr. Clark gave the wrong nickname for Mr. Mena Flores. *Id.* But, Mr. Clark's mistake goes to the reliability of the identification; it does not change the fact that Mr. Clark identified Mr. Mena Flores (through a photograph) as someone involved in the drug organization. Thus, the Board's characterization of Mr. Clark's account was accurate.

Even if the Board had made factual errors, the record contains sufficient evidence for a reasonable adjudicator to conclude that Mr. Mena Flores participated in drug trafficking. Therefore, the alleged errors would not have compelled the Board to grant the motion to reconsider.

**2. Impermissible Fact–Finding**

Mr. Mena Flores adds that the Board should have granted the motion to reconsider and ordered a remand to the immigration judge once the Board determined that there were not five witnesses. In Mr. Mena Flores's view, the Board's analysis entailed impermissible fact-finding. *See* 8 C.F.R. § 1003.1(d)(3)(iv).

 **\*1173**  The Board did not err. It merely determined that the remaining facts would have led to the same result even without the mistake over the number of witnesses. Thus, we reject Mr. Mena Flores's argument that the Board engaged in impermissible fact-finding.

We conclude that the Board did not abuse its discretion in denying Mr. Mena Flores's motion to reconsider.

### V. Conclusion

Mr. Mena Flores bears the burden to establish that there was no reason to believe that he had been a drug trafficker and that the Board abused its discretion by denying his motions to reopen and reconsider. He has failed to satisfy his burdens. Thus, we deny the petitions for review.

### All Citations

776 F.3d 1152

### Footnotes

1    The charges included (1) one count of distribution of a controlled substance, cocaine, (2) one count of distribution of a controlled substance, methamphetamine, (3) one count of conspiracy to distribute a controlled substance, cocaine and methamphetamine, (4) one count of possession of a controlled substance, methamphetamine, and (5) one count of possession of a controlled substance, cocaine. R. (Case No. 13–9532) at 590–92.

2    The Department of Homeland Security argues that if § 1252 applies, our jurisdiction would be limited to considering constitutional claims. But, we conclude that § 1252 does not foreclose jurisdiction. Thus, we need not consider the Department's argument that our jurisdiction is limited to constitutional claims.

3    Under federal law, an alien is considered inadmissible when convicted of certain crimes. 8 U.S.C. § 1182(a)(2)(A)-(B). Thus, fact-finding may be unnecessary when the alien was convicted of a crime. But, our case does not involve a conviction.

4    Under the second definition, we would need to decide in the first instance whether the government had proven by clear and convincing evidence that there was a reason to believe the allegations of drug trafficking. 8 U.S.C. § 1229a(c)(3); 8 C.F.R. § 1240.8(a). We are not making this assessment in the first instance because we adopt the first definition and reject the second.

5    *INS v. St. Cyr,* 533 U.S. 289, 298, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001).

6    *INS v. Cardoza–Fonseca,* 480 U.S. 421, 449, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987).

7    The same was true in *Garcia v. INS.* There, we addressed 8 U.S.C. § 1227(A)(2)(A)(iii), which provides for removal of aliens convicted of aggravated felonies. *Garcia v. INS,* 237 F.3d 1216, 1217 (10th Cir.2001). There was no question about whether the alien was guilty. The statute authorized removal based on a conviction, and the alien had been

convicted of driving under the influence. *Id.* The sole jurisdictional issue was whether the crime involved an aggravated felony. 📙 *Id.* at 1221.

8   After the immigration judge found that Mr. Mena Flores deserved discretionary relief, the Department of Homeland Security appealed to the Board. In deciding that appeal, the Board stated that the burden of proof shifted to the government to establish that there was a reason to believe that Mr. Mena Flores had been involved in drug trafficking. R. (Case No. 13–9584) at 932. That statement conflicts with our precedent, which puts the burden on the alien to prove that a mandatory ground for denial of relief does not apply. *Garcia v. Holder,* 584 F.3d 1288, 1289–90 (10th Cir.2009).

9   The requirement of "reasonable, substantial, and probative" evidence applies in two contexts. We define "substantial evidence" as evidence that is "reasonable, substantial, and probative." 📙 *Elzour v. Ashcroft,* 378 F.3d at 1150. And, in applying 📙 8 U.S.C. § 1182(a)(2)(C), the Board of Immigration Appeals interprets the phrase "reason to believe" to require proof by "reasonable, substantial, and probative evidence." 📙 *Matter of Rico,* 16 I. & N. Dec. 181, 185 (BIA 1977).

10   R. (Case No. 13–9532) at 926 (over 30); *id.* at 929–30 (approximately 24); *id.* at 1034 (at least 20).

11   R. (Case No. 13–9532) at 930 (stating that the deals occurred only in public places); *id.* at 2003–04 (stating that he sometimes picked up drugs at Mr. Mena Flores's house).

12   R. (Case No. 13–9532) at 2086; *see also id.* at 2073 (stating that he had "a lot in [his] head").

13   R. (Case No. 13–9532) at 1176.

14   R. (Case No. 13–9532) at 2012.

15   R. (Case No. 13–9532) at 394.

16   R. (Case No. 13–9532) at 2353–55.

17   Mr. Mena Flores has not challenged the finding on his own credibility.

18   The parties disagree on what this burden entails. Mr. Mena Flores admits that the evidence need not have proven drug trafficking beyond a reasonable doubt. But, what would suffice? The Board of Immigration Appeals has stated that the "reason to believe" standard is met only if the evidence is "reasonable, substantial and probative." *In re El–Abed,* 2006 WL 1558763, at *2 (BIA 2006); *see* note 9, above. The Department of Homeland Security concedes that the government had reason to believe the drug-trafficking allegations only if the evidence was reasonable, substantial, and probative. And, as discussed above, our standard of review requires us to decide whether the evidence was reasonable, substantial, and probative. *See* p. 1162 & note 9, above.

19   As discussed above, Mr. Richard Lee Clark also stated that he had recognized Mr. Mena Flores from a drug transaction. But, Mr. Clark had elsewhere confused Mr. Mena Flores with his brother Martin. We may assume, for the sake of argument, that Mr. Clark's account added little to the government's proof. *See* p. 1165, below.

20   Mr. Mena Flores argues that in the absence of a conviction, the Board of Immigration Appeals has upheld findings of inadmissibility only when there were other non-trafficking or controlled substance possession convictions, trafficking-related arrests, admissions to authorities, detection of drugs on the person, or observation by government officials. In support, Mr. Mena Flores cites a number of cases upholding findings of inadmissibility under these circumstances. But, Mr. Mena Flores does not cite any cases in which the Board of Immigration Appeals has invalidated a finding of inadmissibility without these kinds of proof. From Mr. Mena Flores's listing of cases, we might infer that the present case is unique. But, the listing of cases does not help us in deciding how to adjudicate this unique case.

21   The Department of Homeland Security notified the immigration judge of the mistake, but the judge still relied on the error. *See* R. (Case No. 13–9605) at 1219.

22   Mr. Mena Flores argues that despite the lengthy investigation, he was referenced in only a single set of surveillance notes and less than 0.02% of all calls. This argument bears on credibility of the witnesses linking Mr. Mena Flores to the drug ring. But, as discussed above, the agency could credit the witness testimony despite the infrequent references to Mr. Mena Flores.

23   The Department of Homeland Security argues that we lack subject matter jurisdiction over these motions because we lack jurisdiction over the petition addressing adjustment in status. But, as discussed above, we conclude we have jurisdiction over the agency's decision to deny an adjustment in status. Because we conclude that we have jurisdiction over the

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 707 of 912

petition addressing adjustment in status, we need not address the Department's related jurisdictional challenge to the petitions involving reopening and reconsideration.

24    *Osei v. INS,* 305 F.3d 1205, 1208 (10th Cir.2002) (quoting *Stroe v. INS,* 256 F.3d 498, 501 (7th Cir.2001)).

25    *United States v. Aguirre–Tello,* 353 F.3d 1199, 1208–09 (10th Cir.2004).

26    Mr. Mena Flores argues that the evidence relied on by the immigration judge was just as general as the evidence of good character. We may assume, for the sake of argument, that he is correct. Nonetheless, the Board of Immigration Appeals could reasonably conclude that the character references did not rebut the evidence relied on by the immigration judge.

27    Mr. Mena Flores also argues that Mr. Garcia never saw any alleged acts of criminality by Mr. Mena Flores. But, as will be discussed below, the Board did not say there were four eye-witnesses; the Board merely said that there were four witnesses implicating Mr. Mena Flores in drug crimes.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

770 F.3d 1071
United States Court of Appeals,
Second Circuit.

SUZHEN MENG, Petitioner,

v.

Eric H. HOLDER, Jr., United States Attorney General, Respondent.

Docket No. 12–2258–ag.
|
Argued: Aug. 26, **2014**.
|
Decided: Nov. 3, **2014**.

**Synopsis**

**Background:** Alien, a native of China, petitioned for review of a Board of Immigration Appeals decision, which upheld an Immigration Judge's order of removal, denial of an application for asylum and withholding of removal, and denial of relief pursuant to the Convention Against Torture (CAT).

**Holdings:** The Court of Appeals, Reena Raggi, Circuit Judge, held that:

[1] the statutory "persecutor bar" precluded the alien's application for asylum and withholding of removal, and

[2] the alien failed to establish that it was more likely than not that she would be tortured if removed to her home country.

Petition denied

West Headnotes (3)

[1]    **Aliens, Immigration, and Citizenship**  ⚷  Review of initial decision or administrative review

Where the Board of Immigration Appeals (BIA) upholds an Immigration Judge's (IJ) decision and closely tracks the IJ's reasoning, the Court of Appeals may consider both the IJ's and the BIA's opinions for the sake of completeness.

1 Cases that cite this headnote

[2]    **Aliens, Immigration, and Citizenship**  ⚷  Participants in persecution

Substantial evidence supported an Immigration Judge's determination that an alien, a native of China, assisted in the persecution of women who became pregnant in violation of China's family planning policy, and thus the alien was ineligible for either asylum or withholding of removal under the statutory "persecutor bar," where the alien, in her role as a public security officer, registered and reported unauthorized pregnancies to Chinese authorities for more than two decades with knowledge that forced abortions and sterilizations were the typical punishment meted out to women she reported for unauthorized pregnancies. Immigration and Nationality Act, §§ 208(b)(2)(A)(i), 241(b)(3)(B)(i), 8 U.S.C.A. §§ 1158(b)(2)(A)(i), 1231(b)(3)(B)(i); 8 C.F.R. § 208.13(c).

2 Cases that cite this headnote

**[3]**  **Aliens, Immigration, and Citizenship** 🔑 Standard for relief

The prior 14-day detention and beating of an alien, a native of China, did not demonstrate that it was more likely than not that the alien would be tortured if removed to her home country, as required for relief under the Convention against Torture (CAT), where, after the alien was released from her detention, she remained in China for more than ten months without experiencing any further harm, the Chinese authorities returned her passport, thereby allowing her to travel outside China, and the alien's husband and children have remained in China unharmed. 📕 8 C.F.R. §§ 208.16(c)(2), 📕 1208.16(c)(3).

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1072** Gary J. Yerman, The Yerman Group, LLC, New York, NY, for Petitioner.

Alison Marie Igoe, Senior Counsel (Stuart F. Delery, Principal Deputy Assistant Attorney General; Lyle Jentzer, Senior Counsel, on the brief), Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for Respondent.

Before: WINTER, RAGGI, CARNEY, Circuit Judges.

**Opinion**

REENA RAGGI, Circuit Judge:

Petitioner Suzhen Meng is a native and citizen of the People's Republic of China who seeks asylum, withholding of removal, and relief pursuant to the Convention Against Torture ("CAT") based on past political persecution in China, which she claims to have experienced because, as a local public security officer, she refused to collect security fees and reported police corruption. Meng now petitions this court for review of the May 9, 2012 decision of the Board of Immigration Appeals ("BIA") upholding the April 22, 2010 decision of Immigration Judge ("IJ") Javier E. Balasquide, which denied Meng such relief and ordered her removal from the United States. *See In re Suzhen Meng,* No. A089 224 906 (B.I.A. May 9, 2012), *aff'g* No. A089 224 906 (Immig.Ct.N.Y.C. Apr. 22, 2010).

Meng contends that the agency erred in concluding that the statutory "persecutor bar" rendered her ineligible for asylum and withholding of removal. *See* 📕 8 U.S.C. §§ 1158(b)(2)(A)(i), 📕 1231(b)(3)(B)(i). She maintains that her actions as a public security officer, specifically, her reporting women pregnant in violation of China's family planning limitations to local authorities, were insufficient as a matter of law to constitute "assistance" in persecution. Meng also challenges the agency's finding that she failed to carry her burden for CAT relief.

For the reasons explained in this opinion, we identify no error in the agency's rulings and, accordingly, we deny the petition for review.

**I. *Background***

A. *Meng's Application for Relief*

AR.07205

On February 25, 2008, Meng was admitted to the United States as a nonimmigrant visitor with authorization to remain for six months. Five months later, on July 24, 2008, Meng filed for asylum, withholding of removal, and CAT relief, stating that she had suffered past political persecution when, as a public security officer in her local community, she refused to collect a security fee from residents and wrote a letter to the local public security bureau alleging that the police chief was corrupt. Meng asserted that, as a result of these actions, her passport was confiscated and **\*1073** she was arrested and held in custody for 14 days, during which time a guard slapped her in the face several times and fellow prisoners beat her on instruction of the guards. Ten months later, Meng's passport was returned when she promised not to engage in any further anti-government activities, whereupon she left China.

### B. *Meng's Immigration Hearing*

On September 16, 2008, Meng was charged as subject to removal for having overstayed her visa. *See* 8 U.S.C. § 1182(a)(7)(A)(i)(I). At an October 1, 2009 hearing before the IJ, Meng pursued her claim for relief from removal by testifying to the persecution alleged in her application. She also testified to her job responsibilities as a public security officer, a position she had held for 22 years. Meng stated that, in that capacity, she oversaw approximately 1,100 households, and that her duties included reporting all pregnant women to China's family planning office, including women pregnant in violation of state limitations. Meng understood that when she reported a policy-violating woman to authorities, that woman would be punished, typically by being forced to undergo an abortion or sterilization. Indeed, she testified to having seen such women dragged away forcibly by the police. Nevertheless, Meng voluntarily continued to serve as a security officer and to make her reports, although she sometimes advised women whom she would report as being pregnant in violation of family planning policy to go into hiding or to flee.

### C. *Denial of Relief*

On April 22, 2010, the IJ denied Meng's application for relief and ordered her removed. Although the IJ found Meng credible, he ruled that her active assistance in the persecution of women pregnant in violation of China's family planning policy barred her from receiving asylum or withholding of removal. The IJ further denied Meng CAT relief, concluding that she had failed to show that it was more likely than not that she would be tortured if returned to China.

The BIA essentially agreed with the IJ and dismissed Meng's appeal, prompting this petition for review.

## II. *Discussion*

### A. *Standard of Review*

On a petition for review of a BIA decision, we apply the deferential substantial-evidence standard to the agency's findings of fact, treating them as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see Shunfu Li v. Mukasey,* 529 **F**.**3d** 141, 146 (**2d Cir**.2008). We apply *de novo* review, however, to questions of law, including whether an alien's conduct could render her a "persecutor" as that term is statutorily defined. *See* 8 U.S.C. §§ 1158(b)(2)(A)(i), 1231(b)(3)(B)(i); *Yanqin Weng v. Holder,* 562 **F**.**3d** 510, 513 (**2d Cir**.2009).

**[1]**    Where, as here, the BIA upholds the IJ's decision and "closely tracks the IJ's reasoning, this Court may consider both the IJ's and the BIA's opinions for the sake of completeness." *Maldonado v. Holder,* 763 **F**.**3d** 155, 158–59 (**2d Cir**.**2014**).

### B. *Asylum and Withholding of Removal: The "Persecutor Bar"*

Asylum is a form of discretionary relief that allows an otherwise removable alien to remain and work in the United States if she demonstrates that she is a "refugee," *i.e.,* an alien who "is unable or unwilling to return to, and is unable or unwilling to avail ... herself of the protection of, [her native] country because of [past] persecution **\*1074** or a well founded fear of [future]

persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *See* 8 U.S.C. §§ 1101(a), 1158(b)(1)(A), (b)(3), (c)(1); 8 C.F.R. §§ 1208.13(b), 1208.21; *Mei Fun Wong v. Holder,* 633 F.3d 64, 68 (**2d Cir**.2011). Withholding of removal, meanwhile, is a form of mandatory relief that prevents the removal of an alien to a country where "the alien's life or freedom would be threatened ... because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3).

Both forms of relief are subject to a statutory "persecutor bar," which renders an alien ineligible for either asylum or withholding if she has "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* §§ 1158(b)(2)(A)(i), 1231(b)(3)(B)(i); *see* *Xu Sheng Gao v. U.S. Att'y Gen.,* 500 F.3d 93, 97–98 (**2d Cir**.2007). This court has identified four factors relevant to determining when this persecutor bar applies: (1) "the alien must have been involved in acts of persecution"; (2) a "nexus must be shown between the persecution and the victim's race, religion, nationality, membership in a particular social group, or political opinion"; (3) if the alien "did not [herself] incite, order, or actively carry out" the persecution, her conduct "must have assisted the persecution"; and (4) the alien must have had "sufficient knowledge that ... her actions may assist in persecution to make those actions culpable." *Balachova v. Mukasey,* 547 F.3d 374, 384–85 (**2d Cir**.2008) (internal quotation marks omitted). Where evidence indicates that an alien assisted in persecution, the alien seeking relief from removal bears "the burden of proving by a preponderance of the evidence" that she "did not so act." 8 C.F.R. § 208.13(c); *see* *Zhang Jian Xie v. INS,* 434 F.3d 136, 139 (**2d Cir**.2006).

 **[2]**    Here, the IJ and BIA concluded that Meng had assisted in the persecution of women who became pregnant in violation of China's family planning policy because, in her role as a public security officer, she had reported such women to Chinese authorities for more than two decades knowing that, as a result, any number of these women would be subjected to forced abortions or sterilizations. Meng does not—and cannot—dispute that forced abortions and involuntarily sterilizations constitute persecution on a protected ground; they are statutorily defined as such. *See* 8 U.S.C. § 1101(a)(42); *Yan Yan Lin v. Holder,* 584 F.3d 75, 80 (**2d Cir**.2009) ("It is settled law that forced abortion is persecution on account of political opinion."). Nor does she dispute that women in her community who became pregnant in violation of family planning policy were subjected to such persecution. Instead, Meng contends that the record evidence was insufficient as a matter of law to admit a finding that she "assisted" in such persecution. She maintains that her actions in registering and reporting unauthorized pregnancies were merely tangential, passive accommodations of the persecutory conduct of Chinese family planning authorities, which *Zhang Jian Xie v. INS,* 434 F.3d at 143, holds is not enough to constitute assistance in persecution. *See also* *Xu Sheng Gao v. U.S. Att'y Gen.,* 500 F.3d at 99–100 (holding mere association with persecutory enterprise insufficient to trigger persecutor bar). Indeed, Meng argues that *Xu Sheng Gao* requires evidence that one of her reports led to a specific forced abortion or involuntary sterilization to admit a finding of assistance. *See id.* In fact, the cited precedents do not support Meng's arguments.

 **\*1075**  In *Zhang Jian Xie,* at the same time that this court observed that conduct "passive in nature" and "tangential" to third-party acts of oppression is insufficient to manifest "assistance," we stated that "active" conduct, having "direct consequences for the victims," can constitute "assistance in persecution." 434 F.3d at 143. Here, Meng's conduct was clearly active and not passive. She affirmatively identified pregnant women in her community, including those pregnant in violation of China's family planning policy, and she deliberately reported these women to authorities. Nor was she merely associated with a persecutory enterprise. She was integral to the effectuation of persecution. Meng's reporting of policy-violating women was no "minor" action, but the critical step that set in motion the entire persecutory scheme of enforcement. *Cf. id.* (upholding agency's imposition of persecutor bar even though petitioner's assistance was "arguably minor"). Indeed, without Meng's reports, authorities would not have known which women had violated family planning policy. Moreover, Meng's actions had direct consequences for the victims insofar as her reports were the basis for women being subjected to forced abortions and sterilizations. Meng not only admitted knowing that her conduct had this effect; she testified that it was the reason she sometimes

urged the women whom she reported to hide or flee. Nevertheless, with knowledge that her conduct triggered persecution, Meng voluntarily continued to serve for more than two decades as a public security officer and to report women for unauthorized pregnancies. This record was sufficient to admit the agency finding that Meng assisted in persecution. *See In re Suzhen Meng,* No. 089 224 906, at 2 (finding that "as a result of [Meng's] actions, the Family Planning officials went to women's homes who had illegal pregnancies, seized them, and subjected them to forced abortions and sterilizations").

*Xu Sheng Gao v. U.S. Attorney General* compels no different conclusion. In that case, the alien who reported offending booksellers to Chinese authorities knew only that there was a possibility that the booksellers "*could* " be arrested and imprisoned, but nothing indicated that any bookseller had, in fact, been subjected to such treatment. 500 F.3d at 100 (emphasis in original). Rather, the most serious sanction that petitioner knew ever to have been imposed on a reported bookseller was revocation of a business license. *See id.* It was in these circumstances—with no evidence of persecution *ever* resulting from the alien's conduct —that we were "unable to conclude" that the alien had "the requisite level of knowledge that his acts assisted in persecution to sustain a finding that he was a 'persecutor' under the statute." *Id.* at 102. By contrast, here, Meng admitted knowing that forced abortions and sterilizations were the typical punishment meted out to women she reported for unauthorized pregnancies. Where, as in this case, the occurrence of the persecution is undisputed, and there is such evidence of "culpable knowledge that the consequences of one's actions would assist in acts of persecution," *Xu Sheng Gao* specifically states that "the evidence need not [further] show that the alleged persecutor had specific actual knowledge that his actions assisted in a particular act of persecution." *Id.* at 103. [1]

**\*1076** *Yanqin Weng v. Holder* also affords Meng no support in challenging the application of the persecutor bar to this case. 562 F.3d at 515. In *Yanqin Weng,* the petitioning alien, a nurse's assistant, provided post-surgical medical care to women in China who had undergone forced abortions and, on one occasion, sat outside the locked door of a room where women awaiting forced abortions were being held until delayed doctors arrived to perform the procedures. *See id.* at 512, 515. In concluding that the persecutor bar did not apply to these circumstances, this court observed that the petitioner's provision of *post*-surgical care did not contribute to the abortions. *See id.* at 515. As for petitioner's guarding women facing forced abortions, that one-time occurrence was deemed to have "deviated markedly from her routine duties" and lasted only ten minutes before petitioner, in fact, helped one of the women escape, which resulted in petitioner losing her job. *Id.* Here, as already noted, Meng's reporting of women pregnant in violation of China's family planning policy did contribute directly to the forced abortion and sterilization of these women. Further, Meng engaged in such reporting over a period of two decades. In short, her assistance in persecution was not a single, marked departure from her duties, but a regular, and important, aspect of her duties. While Meng may have encouraged some women to hide or flee to avoid the persecution that she knew would follow from her conduct, the record indicates that Meng nevertheless persisted in reporting women with unauthorized pregnancies as long as she served as a public security official.

Accordingly, because the record evidence was sufficient to support a finding that Meng assisted in persecution, we identify no legal error in the agency's determination that the persecutor bar rendered Meng ineligible for asylum or withholding of removal.

### D. *CAT Relief*

**[3]**    A petitioner seeking CAT relief must demonstrate that it is "more likely than not" that she will be tortured if removed to her home country. *See* 8 C.F.R. § 208.16(c)(2); *Yan Yan Lin v. Holder,* 584 F.3d at 82. Here, we identify no error in the agency's denial of CAT relief for failure to satisfy this requirement.

Meng essentially relies on evidence of her past 14–day detention and beatings to argue likely future persecution. We need not here decide if this experience rose to the level of "torture," *but see* 8 C.F.R. § 1208.18(a)(2) (defining torture as "extreme form of cruel and inhuman treatment"); *Kyaw Zwar Tun v. INS,* 445 F.3d 554, 567 (2d Cir.2006) ("[T]orture requires proof

of something more severe than the kind of treatment that would suffice to prove persecution."), because even assuming that the issue were resolved in Meng's favor, she would not have demonstrated agency error.

Past torture does not give rise to a presumption of future torture. Rather, it serves as evidence of the *possibility* of future torture. *See* 8 C.F.R. § 1208.16(c)(3). Here, the following facts demonstrate why such a possibility cannot be converted into the requisite likelihood: (1) after Meng's release from detention, she remained in China for more than 10 months without experiencing any further harm; (2) Chinese authorities returned her passport, thereby allowing her to travel outside China; and (3) Meng's husband and children remain in China unharmed. *See Melgar de Torres v. Reno,* 191 F.3d 307, 313 (2d Cir.1999) (holding that where **\*1077** family members remain unharmed in petitioner's native country, objective fear of future harm is undermined); *see also Mu Xiang Lin v. U.S. Dep't of Justice,* 432 F.3d 156, 160 (2d Cir.2005) (upholding denial of CAT relief where petitioner offered no "particularized evidence" that she would be tortured in her country of removal). We therefore conclude that substantial evidence supports the agency's determination that Meng has not demonstrated that it is "more likely than not" that she will be tortured if returned to China.

### III. *Conclusion*

To summarize, we conclude:

1. The statutory persecutor bar rendered Meng ineligible for asylum and withholding of removal because, for over 20 years, she reported the identities of women with unauthorized pregnancies, knowing that, as a result, many of these women would be subjected to forced abortions and sterilizations. This showing was legally sufficient to demonstrate her assistance in persecution.

2. Meng is not entitled to CAT relief because she has not established that it is more likely than not that she will be tortured if removed to China.

Accordingly, the petition for review is DENIED.

### All Citations

770 F.3d 1071

### Footnotes

1    *Xu Sheng Gao* also concluded that the reporting petitioner did not assist in persecution that reflected the discretionary decision of others at the end of an attenuated chain of authority. *See* 500 F.3d at 101–02. But where, as here, Meng's reports regularly resulted in persecution, she knew that, and she nevertheless continued to report, we conclude that the agency has a substantial basis for finding assistance and applying the persecutor bar.

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 464001
Only the Westlaw citation is currently available.
United States District Court, N.D. California,
Oakland Division.

Hicham MESNAOUI, Plaintiff,

v.

Jamie BERLOWITZ, et al., Defendants.

No. C 11–03165 LB.
|
Feb. 13, 2012.

**Attorneys and Law Firms**

Hicham Mesnaoui, Emeryville, CA, pro se.

Joann M. Swanson, United States Attorney's Office, San Francisco, CA, for Defendant.

## ORDER GRANTING (1) DEFENDANT'S MOTION TO SUBSTITUTE AND (2) DEFENDANT'S MOTION TO DISMISS

LAUREL BEELER, United States Magistrate Judge.

### I. INTRODUCTION

**\*1** *Pro se* plaintiff Hicham Mesnaoui filed suit against two employees of the United States Department of State for violations of multiple international and domestic laws. The United States moved to substitute itself as the proper defendant in the case and also to dismiss Mr. Mesnaoui's complaint with prejudice. Pursuant to Civil Local Rule 7–1(b), the court finds that these matters are suitable for determination without oral argument and vacates the February 16, 2012 hearing. For the reasons stated below, the court GRANTS the United States's motions.

### II. BACKGROUND

On June 27, 2011, Mr. Mesnaoui filed suit against Jamie Berlowitz and Christopher Bergaust, both of whom are or were federal employees. Complaint, ECF No. 1.[1] In his complaint, Mr. Mesnaoui alleges that he is a Moroccan citizen; that his ex-wife (Maryam Bint Abrahman) fraudulently secured a passport for their minor child, Selma, from Mr. Bergaust, an employee of the U.S. State Department in Casablanca, Morocco; and that his ex-wife used this fraudulently obtained passport to kidnap Selma and bring her to the United States. *See id.* at 1–3. It appears from the complaint and attached documents that these events occurred sometime in or before August 2009. *See id.* at 4–16. Mr. Mesnaoui also alleges that in August 2009 Mr. Berlowitz, an employee of the U.S. State Department in San Francisco, California, took possession of the allegedly fraudulent passport. *Id.* at 2.

In so doing, Mr. Mesnaoui alleges that Mr. Berlowitz and Mr. Bergaust violated the "Moroccan nationality code," the United States–Morocco Free Trade Agreement, "international human rights," 18 U.S.C. § 241, and 8 U.S.C. § 1433, and otherwise abused their power. *Id.* In his prayer for relief, Mr. Mesnaoui seeks $20,000,000 in compensation for the "personal injury of me and my child and my senior parents" as well as various forms of non-monetary relief, including, that the fraudulently

obtained passport be returned to him; that he be granted full custody of Selma and be allowed to take her home to Morocco; that the government investigate the forging of the passport; and that the government enforce various criminal, immigration and/or civil rights statutes. *Id.* at 3.

On December 20, 2011, the United States filed a motion to be substituted as the proper defendant in this action and to dismiss Mr. Mesnaoui's complaint. Motion, ECF No. 15. Mr. Mesnaoui opposed the motion. Opposition, ECF No. 24.

## III. DISCUSSION

### A. The United States's Motion to Substitute Party

Under the Federal Employees Liability Reform and Tort Compensation Act, otherwise known as the Westfall Act, a federal employee is immune from suit upon certification of the Attorney General that the employee was acting within the scope of his employment. *See* 28 U.S.C. § 2679(d)(1). As to the events alleged in Mr. Mesnaoui's complaint, the United States Attorney, pursuant to 28 U.S.C. § 2679(d) and 28 C.F.R. § 15.3, has certified that Mr. Berlowitz and Mr. Bergaust were acting within the course and scope of their federal employment. Certification, ECF No. 21. Such a certification is *"prima facie* evidence that a federal employee was acting in the scope of her employment at the time of the incident." Billings v. United States, 57 F.3d 797, 800 (9th Cir.1995). Mr. Mesnaoui, as plaintiff, bears the burden of disproving the certification by a preponderance of the evidence. *Id.*

**\*2** Pauly v. U.S. Dep't of Agric., 348 F.3d 1143, 1150–51 (9th Cir.2003).

While Mr. Mesnaoui ostensibly opposes the United States's motion to substitute, he provides no evidence, let alone a preponderance of evidence, to disprove the United States Attorney's certification. *See* Opposition, ECF No. 24 at 3. Accordingly, the court grants the United States's motion. The United States is the only proper defendant, and Mr. Berlowitz and Mr. Bergaust are dismissed from this case.

### B. The United States's Motion to Dismiss

"The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress." Block v. North Dakota, 461 U.S. 273, 287, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983) (citations omitted). Thus, "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." FDIC v. Meyer, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) (citing Loeffler v. Frank, 486 U.S. 549, 554, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988); Fed. Housing Admin. v. Burr, 309 U.S. 242, 244, 60 S.Ct. 488, 84 L.Ed. 724 (1940)). "Sovereign immunity is jurisdictional in nature. Indeed, the 'terms of [the United States'] consent to be sued in any court define that court's jurisdiction to entertain the suit.' " *Id.* (quoting United States v. Sherwood, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941), and citing United States v. Mitchell, 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.")).

Thus, in order for Mr. Mesnaoui's claims to be actionable, the claims must be ones for which the United States has waived sovereign immunity. As described above, Mr. Mesnaoui alleges a variety of claims, but none of them are ones for which sovereign immunity has been waived. They are barred for this reason.[2]

It would not be inconceivable, however, that Mr. Mesnaoui's claims for damages might be construed as ones brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), which "provides a limited waiver of the sovereign immunity of the United States for torts committed by federal employees acting within the scope of their employment." Nurse v. United

*States,* 226 F.3d 996, 1000 (9th Cir.2000) (citing *Valdez v. United States,* 56 F.3d 1177, 1179 (9th Cir.1995)). [3] "Under the FTCA, the United States may be held civilly liable for the torts of its employees 'in the same manner and to the same extent as a private individual under like circumstances.'" *Id.* (quoting 28 U.S.C. § 2674). A claim under the FTCA must be:

> [1] against the United States, [2] for money damages, ... [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b).

**\*3** *Meyer,* 510 U.S. at 477. "A claim comes within this jurisdictional grant—and thus is 'cognizable' under § 1346(b)—if it is actionable under § 1346(b). And a claim is actionable under § 1346(b) if it alleges the six elements outlined above." *Id.* (citing *Loeffler,* 486 U.S., at 562).

Here, though, as the United States points out, Mr. Mesnaoui's potential FTCA claim is not one for which a private person could be liable. Under this "private party analog" element, a plaintiff must show that the claim asserted is analogous to a "comparable cause of action against a private individual." *C.P. Chemical v. United States,* 810 F.2d 34, 37 (2d Cir.1987). "When considering whether a private analog exists, the issue is not whether a state or other governmental entity would be liable for the conduct alleged, but whether a private individual would be liable under analogous circumstances." *Figueroa v. United States,* 739 F.Supp.2d 138, 140 (citing *United States v. Olson,* 546 U.S. 43, 45–46, 126 S.Ct. 510, 163 L.Ed.2d 306 (2005)). "A comparable claim is stated where an analogy can be drawn between the conduct forming the basis of the claim against the federal government, and that which could form the basis of a cause of action against a private individual." *Id.* at 141 (citing *C.P. Chemical,* 810 F.2d at 37).

Determining whether a private analog exists is not as simple as it may seem. As the District Court in *Figueroa v. United States,* 739 F.Supp.2d 138 (E.D.N.Y.2010) recently explained:

> For example, a comparable private analog is stated where a government employee fails to maintain a safe path of travel at a federal facility. In such a case, the tortious conduct of an individual who fails to maintain his property is analogous to the conduct of the government employee who similarly fails in his duty to maintain safety on government property. *See, e.g., Silverman v. United States,* 2008 WL 1827920 \*11–12 (E.D.N.Y.2008). On the other hand, no private analog is necessarily stated, for example, where the FTCA claim is based only upon an alleged failure to enforce a Federal statute or government regulation. *Chen [v. United States],* 854 F.2d [622,] 626 [ ( 2d. Cir.1988) ]. In such a case, no private conduct analogy can be drawn, and the FTCA claim is properly dismissed. *See, e.g., Dorking Genetics v. United States,* 76 F.3d 1261, 1266 (2d Cir.1996); *Chen,* 854 F.2d at 626. No FTCA claim is stated in the latter example because the action forming the basis of the claim, "is action of the type that private persons could not engage in and hence could not be liable for under local law." *Chen,* 854 F.2d at 626, quoting, *Jayvee Brand v. United States,* 721 F.2d 385, 390 (D.C.Cir.1983).

*Id.* at 141. In discussing Figueroa, a court in the Southern District of Ohio also explained that:

> The *Figueroa* court was quick to recognize that the "private party analog" question is fairly nuanced, and that it is not always fatal to an FTCA claim to find that the function performed by the governmental employee is "uniquely governmental." Some activities, such as operating a lighthouse or inspecting a mine for compliance with federal safety regulations, are performed only by governmental officials, but private persons can engage in similar functions such as warning people of dangers or inspecting mines for other purposes. *Figueroa,* 2010 WL 3704187, \*3, citing **United States v. Olson,** 546 U.S. 43, 126 S.Ct. 510, 163 L.Ed.2d 306 (2005). Indeed, as early as its decision in *Indian Towing Co. v. United States,* 350 U.S. 61, 64, 76 S.Ct. 122, 100 L.Ed. 48 (1955), the Supreme Court had rejected the notion that the FTCA "must be read as excluding

liability in the performance of activities which private persons do not perform." The Court directed the lower courts to look beyond the exact circumstances under which the government employee had acted and to determine if there were "like" circumstances in the private sector where such actions could legitimately form the basis for tort liability.

**\*4** *Howard v. U.S. Dist. Court for the Southern Dist. of Ohio,* No. 2:10–cv–757, 2011 WL 1043961, at \*4 (S.D.Ohio Mar.17, 2011).

Here, even looking beyond the exact circumstances at hand, the court has been unable to divine a suitable private party analog to Mr. Mesnaoui's claims. As summarized above, he alleges that his ex-wife fraudulently secured a passport for their minor child, Selma, from Mr. Bergaust, in Casablanca, Morocco; and then used this fraudulently obtained passport to kidnap Selma and bring her to the United States. *See* Complaint, ECF No. 1 at 1–3. Later, Mr. Berlowitz took possession of the allegedly fraudulent passport. *Id.* at 2. Issuing and confiscating passports, however, are not activities that private persons can engage in. Only the federal government may perform these tasks. *See* 22 U.S.C. § 211a ("The Secretary of State may grant and issue passports, and cause passports to be granted, issued, and verified in foreign countries by diplomatic and consular officers of the United States and by such other employees of the Department of State who are citizens of the United States as the Secretary of State may designate ...."); 22 C.F.R. §§ 51.7(a) ("A passport at all times remains the property of the United States and must be returned to the U.S. Government upon demand."), 51.62(a)(2) ("The Department may revoke or limit a passport when ... [t]he passport has been obtained illegally, fraudulently or erroneously; was created through illegality or fraud practiced upon the Department; or has been fraudulently altered or misused."). Unlike the more difficult cases discussed in *Figueroa* and *Howard,* there are no circumstances in the private sector that are "like" those of the State Department in relation to the issuance of passports, and the court is unaware of any case law holding differently. In fact, in the only case the court found involving passport-related FTCA claims, the court concluded that no private party analog existed. *See Figueroa,* 739 F.Supp.2d at 142 (holding that the conduct forming the basis of Plaintiff's complaint—the allegedly negligent issuance of a passport—lacks a private analog and therefore cannot form the basis of a claim pursuant to the FTCA). Thus, even if the court construed Mr. Mesnaoui's claims as ones brought under the FTCA, they would still fail for this reason.

If that were not enough, "a tort claim [under the FTCA] 'shall be forever barred' unless it is presented 'within two years after such claim accrues.' " *Hensley v. United States,* 531 F.3d 1052, 1056 (9th Cir.2008) (quoting 28 U.S.C. § 2401(b)). "As a general rule, a claim accrues 'when a plaintiff knows or has reason to know of the injury which is the basis of his action.' " *Id.* (quoting *Gibson v. United States,* 781 F.2d 1334, 1344 (9th Cir.1986) (internal quotation marks omitted)). Importantly, "the statute of limitations in 28 U.S.C. § 2401(b) is jurisdictional and, consequently, ... equitable doctrines that otherwise could excuse a claimant's untimely filing do not apply." *Marley v. United States,* 567 F.3d 1030, 1032 (9th Cir.2009). Here, all of the conduct alleged by Mr. Mesnaoui occurred in or before August 2009, and there is no allegation or evidence suggesting that Mr. Mesnaoui presented his claim to the State Department by August 2011. In fact, the United States submitted along with its motion a declaration from a State Department employee noting that no administrative claim has even been received from Mr. Mesnaoui. Dantzler Declaration, ECF No. 20 at 1. Without such an allegation or evidence, Mr. Mesnaoui's potential FTCA claim is barred. [4]

## IV. CONCLUSION

**\*5** Based on the foregoing, the United States' motion to dismiss Mr. Mesnaoui's complaint is GRANTED. Mr. Mesnaoui's complaint is DISMISSED WITH PREJUDICE. [5]

This disposes of ECF No. 19.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 464001

## Footnotes

1       Citations are to the Electronic Case File ("ECF") with pin cites to the electronic page number at the top of the document, not the pages at the bottom.

2       Even if sovereign immunity had been waived, his claims would fail for other reasons as well. First, Mr. Mesnaoui alleges a violation of the Moroccan Nationality Code, but this court's jurisdiction is limited to civil actions arising under the Constitution, laws, or treaties of the United States and does not encompass actions arising under the laws of foreign nations. 28 U.S .C. § 1331. Second, Mr. Mesnaoui alleges a violation of the United States—Morocco Free Trade Agreement, but he has no private right of action with respect to this agreement. *See* United States—Morocco Free Trade Agreement Implementation Act, Pub.L. No. 108–302, § 102(c) 118 Stat. 1103, 1105 (2004) ("No person other than the United States—(1) shall have any cause of action or defense under the Agreement or by virtue of congressional approval thereof; or (2) may challenge, in any action brought under any provision of law, any action or inaction by any department, agency, or other instrumentality of the United States, any State, or any political subdivision of a State, on the ground that such action or inaction is inconsistent with the Agreement."). Third, Mr. Mesnaoui alleges a violation of "international human rights, article 15." This allegation clearly is insufficient, but to the extent Mr. Mesnaoui's is attempting to allege a violation of Article 15 of the University Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810 (1948), which states that "(1) Everyone has the right to a nationality [and] (2) No one shall be arbitrarily deprived of his nationality nor denied the right to change his nationality," the United States Supreme Court has made clear that "the Declaration does not of its own force impose obligations as a matter of international law." *Sosa v. Alvarez–Machain,* 542 U.S. 692, 734–35, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (citing Humphrey, "The U.N. Charter and the Universal Declaration of Human Rights," THE INTERNATIONAL PROTECTION OF HUMAN RIGHTS 39, 50 (E. Luard ed.1967)) (footnote omitted). Fourth, Mr. Mesnaoui alleges a violation of 8 U.S.C. § 1433(a)(3), which allows a parent who is a citizen of the United States (or, if the citizen parent has died during the preceding 5 years, a citizen grandparent or citizen legal guardian) to apply for naturalization on behalf of a child born outside of the United States if the child is under the age of eighteen. *See* 8 U.S.C. § 1433(a)(3). Nowhere in his complaint, though, does he allege that anyone has applied for naturalization for any child. And, fifth, to the extent that Mr. Mesnaoui attempts to bring a claim for violation of 18 U.S.C. § 241, "[this law] provide[s] for criminal prosecution by the government and do[es] not provide a private right of action to individual litigants" like Mr. Mesnaoui. *Buza v. California Dept. of Corrections and Rehabilitation,* No. 10–CV–00326–LHK, 2010 WL 4316919, at *2 (N.D.Cal. Oct.27, 2010) (citing *Cok v. Cosentino,* 876 F.2d 1 (10th Cir.1989) ("Only the United States as prosecutor can bring a complaint under 18 U.S.C. §§ 241– 242."); *Haile v. Sawyer,* No. C 02–5723 MJJ, 2003 WL 1907661, at *3 (N.D.Cal. Apr.14, 2003) (dismissing all of Plaintiffs claims under Title 18 because Plaintiff is not authorized to bring claims under criminal statutes)).

3       Indeed, the United States did exactly that in its motion to dismiss. *See generally,* Motion, ECF No. 19.

4       Mr. Mesnaoui's potential FTCA claim arguably fails because of the "foreign country exception" as well. "The FTCA's foreign country exception provides that the United States may not be held liable in tort for acts or omissions 'arising in a foreign country.' " *Nurse v. United States,* 226 F.3d 996, 1003 (9th Cir.2000) (quoting 28 U.S.C. § 2680(k); and citing *Donahue v. U.S. Dept. of Justice,* 751 F.Supp. 45 (S.D.N.Y.1990)). "The purpose of the exception is to ensure that the United States is not exposed to excessive liability under the laws of a foreign country over which it has

no control." *Id.* (citing 🚩 *Sami v. United States,* 617 F.2d 755, 762–63 (D.C.Cir.1979). "For the purposes of the FTCA, an act 'arises' 'where the negligent act or omission occurs,' 🚩 *Cominotto v. United States,* 802 F.2d 1127, 1130 (9th Cir.1986),* or 'where the act necessary to avoid neg-ligence should have occurred.' " *Id.* (quoting *Grunnet v. United States,* 730 F.2d 573, 575 (9th Cir.1984). "The place where the loss or injury is actually felt is not necessarily controlling." *Id.* (citing 🚩 *Leaf v. United States,* 588 F.2d 733, 735 (9th Cir.1978)). As the acts alleged against Mr. Bergaust appear to have taken place in Morocco, the FTCA's "foreign country exception" would appear to bar his claim in that respect.

5    In light of Mr. Mesnaoui's complaint being dismissed with prejudice, the court also DENIES his motion for appointment of counsel. Motion for Appointment of Counsel, ECF No. 15. While the court acknowledges Mr. Mesnaoui's difficulties with proceeding pro se, the record indicates that he has been notified that Family Court for the Santa Clara County Superior Court has jurisdiction over his child custody issues. Mesnaoui Declaration, ECF No. 25 at 9.

---

**End of Document**                                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

532 F.3d 150
United States Court of Appeals,
Second Circuit.

Khalid NETHAGANI, Petitioner,

v.

Michael B. MUKASEY, Attorney General of The United States of America, [*] William Cleary, Field
Director, Buffalo Detention and Removal Office, Department of Homeland Security, Respondents.

Docket No. 05–3249–ag.
|
Argued: June 16, 2008.
|
Decided: July 9, 2008.

**Synopsis**

**Background:** Alien, who was native and citizen of India, sought asylum and withholding of removal. After the Board of Immigration Appeals dismissed final appeal from Immigration Judge's order of removal, alien sought writ of habeas corpus in federal district court. The United States District Court for the Western District of New York, Charles J. Siragusa, J., transferred case as petition for review to the Court of Appeals.

**Holdings:** The Court of Appeals, Dennis Jacobs, Chief Judge, held that:

court of appeals had jurisdiction to review BIA determination, and

BIA's determination that alien's first degree reckless endangerment conviction was "particularly serious crime" for purposes of asylum and withholding of removal was proper.

Petition denied.

**Attorneys and Law Firms**

**\*152** Gerald P. Seipp, Clearwater, FL for Petitioner.

Zoe J. Heller, Trial Attorney, Office of Immigration Litigation (Gail Y. Mitchell, Assistant United States Attorney, for Terrance P. Flynn, United States Attorney, Western District of New York, Buffalo, NY, on the brief) for Respondents.

Before: JACOBS, Chief Judge, STRAUB, Circuit Judge, and JONES, District Judge. [**]

**Opinion**

DENNIS JACOBS, Chief Judge:

The Immigration and Nationality Act bars the grant of asylum or withholding of removal to an alien whom the Attorney General "determines" or "decides" has "been convicted by a final judgment of a particularly serious crime." 8 U.S.C. §§ 1158(b)(2)(A)(ii) (asylum); 1231(b)(3)(B)(ii) (withholding). Petitioner argues that only aggravated felonies qualify as "particularly

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

serious crime[s]" within the meaning of those subsections. A preliminary question is whether we retain appellate jurisdiction to decide that question.

## BACKGROUND

In 1993, Khalid Nethagani, a native and citizen of India, was convicted in New York State Court of reckless endangerment in the first degree, having shot into the air a gun that he possessed illegally. He was placed in removal proceedings (on unrelated grounds) in 1994. Nearly a decade later, on May 30, 2003, the Board of Immigration Appeals ("BIA") dismissed Nethagani's final appeal from an order of removal entered by Immigration Judge Phillip J. Montante, Jr. (Nethagani had appealed to the BIA on two previous occasions, and had won remand to an Immigration Judge both times.) In disposing of the appeal, the BIA determined that Nethagani was ineligible for asylum, *see* 8 U.S.C. § 1158, and for withholding of removal, *see* 8 U.S.C. § 1231(b)(3), because he had been convicted of a "particularly serious crime," *see* 8 U.S.C. §§ 1158(b)(2)(A)(ii); 1231(b)(3) (B)(ii). *In re Nethagani,* No. A28 999 892 (B.I.A. May 30, 2003), *aff'g* No. A 28 999 892 (Immig. Ct. Buffalo Mar. 29, 2001).

**\*153** In April 2004, Nethagani sought a writ of habeas corpus in the Western District of New York. Pursuant to section 106(c) of the REAL ID Act of 2005, Pub.L. No. 109–13, 119 Stat. 231, 310–11, which took effect on May 11, 2005, the petition was transferred to this Court, where it was docketed as a petition for review.

## DISCUSSION

Nethagani argues that the BIA failed to consider the proper factors in determining whether he had been convicted of a particularly serious crime, and that only an aggravated felony may constitute a particularly serious crime for purposes of either 8 U.S.C. §§ 1158(b)(2)(A)(ii) (asylum) or 1231(b)(3)(B)(ii) (withholding).

We first decide whether we have subject-matter jurisdiction.

### I

Because this case was initiated before April 1, 1997, and because the BIA decision was issued after October 30, 1996, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") transitional jurisdictional rules apply. *See* IIRIRA § 309(c)(4), Pub.L. No. 104–208, 110 Stat. 3009–546, 3009–626 to 627 (transitional jurisdictional rules); *id.* § 309(a) and (c) (1) (transitional jurisdictional rules apply to deportation proceedings pending on April 1, 1997); *id.* § 309(c)(4) (transitional rules apply to cases in which final order of deportation is entered after October 30, 1996). Those "transitional" jurisdictional rules were modified by the REAL ID Act:

> A petition for review filed under former section 106(a) of the Immigration and Nationality Act (as in effect before its repeal by section 306(b) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ...) shall be treated as if it had been filed as a petition for review under section 242 of the Immigration and Nationality Act ( 8 U.S.C. § 1252), as amended by this section.

REAL ID Act § 106(d), 119 Stat. 311. Since IIRIRA instructed that petitions for review in "transitional rules" cases be filed under § 106 of the pre-IIRIRA version of the Immigration and Nationality Act, 8 U.S.C. § 1105a (1994), *see* IIRIRA § 309(c)(1), the REAL ID Act applies our current (*i.e.,* REAL ID-era) jurisdictional rules to "transitional rules" cases. *See Iouri v. Ashcroft,* 487 F.3d 76, 83–84 (2d Cir.2007) (applying the REAL ID Act's jurisdictional rules to a "transitional rules" IIRIRA case when the REAL ID Act was enacted during the pendency of appeal). Our jurisdiction to decide this petition for review is therefore governed by 8 U.S.C. § 1252, which contains jurisdiction stripping provisions.

Does § 1252 relieve us of jurisdiction to review the agency's determination that Nethagani committed a "particularly serious crime" for purposes of 8 U.S.C. §§ 1158(b)(2)(A)(ii) and 1231(b)(3)(B)(ii)?

The government reminds us that we lack jurisdiction to review any "decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is *specified under this subchapter* to be in the *discretion* of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title [authority to apply for asylum]." 8 U.S.C. § 1252(a)(2)(B)(ii) (emphases added). Both statutory provisions at issue here fall within "this subchapter" for purposes of § 1252. *See Guyadin v. Gonzales,* 449 F.3d 465, 468 (2d Cir.2006) (explaining that the subchapter referred to in § 1252 encompasses 8 U.S.C. §§ 1151–1381).

**\*154** As to *asylum,* the provision limiting an alien's eligibility reads, in relevant part:

Paragraph (1)[which establishes eligibility for asylum] shall not apply to an alien if the Attorney General *determines* that—

...

(ii) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States[.]

8 U.S.C. § 1158(b)(2)(A) (emphasis added). And the provision limiting the grant of *withholding* reads, in relevant part:

Subparagraph (A) [which establishes an alien's entitlement to withholding of removal] does not apply to an alien ... if the Attorney General *decides* that—

...

(ii) the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States[.]

8 U.S.C. § 1231(b)(3)(B) (emphasis added).

Thus the two provisions authorize the Attorney General (respectively) to "determine[ ]" or "decide[ ]" that the alien was convicted of a particularly serious crime. [1] The question is not whether these inquiries require an exercise of discretion. They probably do. We must also determine whether the text of the subchapter in which they appear "specifie[s]" that the "decision" is "in the discretion of the Attorney General." *See* 8 U.S.C. § 1252(a)(2)(B)(ii). We hold that it does not.

This Court has concluded that § 1252(a)(2)(B)(ii) strips us of jurisdiction to review certain discretionary decisions. [2] In each such instance, the relevant provision authorizing the Attorney General to act explicitly characterized the act as discretionary.

*Cf.* *Sanusi v. Gonzales,* 445 F.3d 193, 199 (2d Cir.2006) (per curiam) (holding that § 1252(a)(2)(B)(ii) does not strip our jurisdiction to review decisions to grant or deny continuance motions because "continuances are not even mentioned in the subchapter"). So the government is now asking us to do something we have not done before.

Given the "strong presumption in favor of judicial review of administrative action," *see* *INS v. St. Cyr,* 533 U.S. 289, 298, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), we hold that, when a statute authorizes the Attorney General to make a determination, but lacks additional language specifically rendering that determination to be within his discretion (*e.g.,* "in the discretion of the Attorney General," "to the satisfaction of the Attorney General," **\*155** etc.), the decision is not one that is "specified ... to be in the discretion of the Attorney General" for purposes of § 1252(a)(2)(B)(ii).

Because neither § 1158(b)(2)(A) nor § 1231(b)(3)(B) expressly places the determination within the discretion of the Attorney General, we conclude that neither provision "specifie[s]" that the decision is within his "discretion." We therefore determine that § 1252(a)(2)(B)(ii) does not abate our power to review the decision that Nethagani was convicted of a particularly serious crime. *Accord* *Alaka v. Att'y Gen.,* 456 F.3d 88, 98, 101–02 (3d Cir.2006).

## II

Nethagani argues that the BIA failed to follow its own precedents in determining that his first degree reckless endangerment conviction was a particularly serious crime. We disagree.

The Immigration and Nationality Act does not define a "particularly serious crime," though it does state parameters, set out in the margin,[3] for crimes that are particularly serious *per se.* Nethagani's offense—first degree reckless endangerment—is not *per se* particularly serious. In such a case as this, the BIA exercises the Attorney General's discretion to determine whether the crime was particularly serious using the guideposts set out in *In re Frentescu,* 18 I. & N. Dec. 244, 247 (B.I.A.1982), *modified, In re C-,* 20 I. & N. Dec. 529 (B.I.A.1992):(1) "the nature of the conviction," (2) "the circumstances and underlying facts of the conviction," (3) "the type of sentence imposed" and (4) "whether the type and circumstances of the crime indicate that the alien will be a danger to the community[,]" *id.* at 247. And crimes against persons are more likely to be particularly serious than are crimes against property. *Id.*

Here, the BIA addressed each *Frentescu* factor. The Board properly took into consideration: (1) that reckless endangerment "involves behavior which could end a human life"; (2) Nethagani's version of the events underlying his reckless endangerment conviction; (3) the sentence ("[A]lthough the respondent could have received a much longer sentence, he was sentenced to several months of incarceration, which was followed by 5 years of probation. This is not insignificant."); and (4) that firing a pistol into the air presents "a high potential for serious or fatal harm to the victim or an innocent bystander." The BIA properly applied its own precedent in determining that Nethagani had been convicted of a particularly serious crime for purposes of 8 U.S.C. §§ 1158(b)(2)(A)(ii) and 1231(b)(3)(B)(ii).

## III

Nethagani next contends that particularly serious crimes constitute a subset of aggravated felonies, *i.e.,* that only aggravated felonies may qualify as particularly serious crimes. Nethagani relies on two statutory provisions that respectively create *per se* categories for purposes of the asylum provision and for purposes of the withholding provision.

AR.07219

**Asylum.** The asylum provision states that "an alien who has been convicted of an aggravated felony shall be considered to have been convicted of a particularly serious  **\*156**  crime." 8 U.S.C. § 1158(b)(2)(B)(i). Every aggravated felony is therefore a *per se* particularly serious crime for purposes of asylum. Nethagani asks us to infer that every particularly serious crime must be an aggravated felony for purposes of asylum.

 The wording of § 1158(b)(2)(B)(i), [4]  which is in issue here, is nearly identical to the wording of the former withholding statute, 8 U.S.C. § 1253(h)(2) (1995), [5]  which we construed to permit the Attorney General (or immigration officials exercising their delegated authority on the Attorney General's behalf) to determine that a nonaggravated felony crime is a particularly serious crime. *See Ahmetovic v. INS,* 62 F.3d 48, 52 (2d Cir.1995). Our reasoning in *Ahmetovic* with respect to the old version of the withholding statute remains persuasive for the purpose of interpreting the current version of the asylum statute. We therefore reject Nethagani's proposed statutory construction. *See also Ali v. Achim,* 468 F.3d 462, 468–69 (7th Cir.2006). The Attorney General (or his agents) may determine that a crime is particularly serious for purposes of the asylum statute, 8 U.S.C. § 1158(b)(2)(B)(i), even though it is not an aggravated felony.

 **Withholding of Removal.** Under the provisions governing withholding of removal,

> an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.

 8 U.S.C. § 1231(b)(3)(B). Nethagani urges us to read this provision to mean that *only* aggravated felonies can qualify as particularly serious crimes, as the Third Circuit has done. *See Alaka v. Att'y Gen.,* 456 F.3d 88, 105 (3d Cir.2006).

However, the BIA has recently rejected Nethagani's—and the Third Circuit's—interpretation in a precedential opinion. *See In re N–A–M–,* 24 I. & N. Dec. 336, 337–41 (B.I.A.2007) *appeal docketed.* Nos. 08–9527, 07–9580 (10th Cir. Nov. 11, 2007). Relying on the text, history, and background of § 1231(b)(3)(B), the BIA concluded that the second sentence of § 1231(b)(3)(B) "means only that aggravated felonies for which sentences of less than 5 years' imprisonment were imposed may be found to be 'particularly serious crimes,' not that *only* aggravated felonies may be found to be such crimes." *Id.* at 341.

 We will defer to the BIA's construction of ambiguous statutory language so long as its interpretation is reasonable. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Khouzam v. Ashcroft,* 361 F.3d 161, 164 (2d Cir.2004). (The Third Circuit, in deciding *Alaka,* had no occasion to consider whether the statute was ambiguous because there was not yet a BIA opinion on point.) We cannot find that the portion of § 1231(b)(3)(B) laid out in the block quotation, *supra,* speaks clearly to the question raised in this petition because its second sentence admits of at least two readings: either (1) it contributes to the first sentence's  **\*157**  definition of "particularly serious crime," *see Alaka,* 456 F.3d at 104–05, or (2) it clarifies that an aggravated felony may be a particularly serious crime regardless of sentence length, *see N–A–M–,* 24 I. & N. Dec. 336. We accept the BIA's interpretation as permissible because

it naturally and reasonably reads the second sentence of § 1231(b)(3)(B) as a caution against drawing an available inference from the prior sentence.

## CONCLUSION

We have considered Nethagani's remaining arguments and find them meritless. For the foregoing reasons, we deny the petition for review.

## All Citations

532 F.3d 150

## Footnotes

\*      Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Michael B. Mukasey is automatically substituted for former Attorney General John Ashcroft as respondent in this case.

\*\*     The Honorable Barbara S. Jones, of the United States District Court for the Southern District of New York, sitting by designation.

1       If so, the BIA has held that the alien necessarily constitutes "a danger to the community of the United States." We have accepted the BIA's interpretation of the statute. *See* *Ahmetovic v. INS,* 62 F.3d 48, 52–53 (2d Cir.1995).

2       We have concluded that § 1252(a)(2)(B)(ii) strips our jurisdiction to review grants or denials of the following:

   • Relief under former section 212(c) of the Immigration and Nationality Act, *see* 8 U.S.C. § 1182(c) (repealed 1996) ("... may be admitted in the discretion of the Attorney General"). *See* *Blake v. Carbone,* 489 F.3d 88, 98 n. 7 (2d Cir.2007); *Avendano–Espejo v. DHS,* 448 F.3d 503 (2d Cir.2006);

   • Hardship waivers under 8 U.S.C. § 1186a(c)(4) ("The Attorney General, in the Attorney General's discretion, may...."). *See* *Atsilov v. Gonzales,* 468 F.3d 112, 116–17 (2d Cir.2006);

   • Hardship waivers under 8 U.S.C. § 1182(i) ("The Attorney General may, in the discretion of the Attorney General...."). *See* *Jun Min Zhang v. Gonzales,* 457 F.3d 172, 175–76 (2d Cir.2006);

   • Waivers of inadmissibility under 8 U.S.C. § 1182(d)(11) ("The Attorney General may, in his discretion...."). *See* *Saloum v. U.S. Citizenship & Immig. Servs.,* 437 F.3d 238, 242–44 (2d Cir.2006).

3       For purposes of the withholding of removal provision: if an alien has been convicted of one or more aggravated felonies that results in an aggregate prison sentence of at least five years, then he has *per se* been convicted of a particularly serious crime. *See* 8 U.S.C. § 1231(b)(3)(B). For purposes of the asylum provision: all aggravated felonies are *per se* particularly serious crimes, *see* 8 U.S.C. § 1158(b)(2)(B)(i), as are all crimes the Attorney General so designates by regulation, *see* *id.* § 1158(b)(2)(B)(ii).

4       "[A]n alien who has been convicted of an aggravated felony shall be considered to have been convicted of a particularly serious crime." 8 U.S.C. § 1158(b)(2)(B)(i).

5      "[A]n alien who has been convicted of an aggravated felony shall be considered to have committed a particularly serious crime." 8 U.S.C. § 1253(h)(2) (1995).

---

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

12 Cal. Daily Op. Serv. 7278, 2012 Daily Journal D.A.R. 8895

683 F.3d 1164
United States Court of Appeals,
Ninth Circuit.

Rene Lopez RODRIGUEZ, Petitioner,
v.
Eric H. HOLDER, Jr., Attorney General, Respondent.
Rene Lopez Rodriguez, Petitioner,
v.
Eric H. Holder, Jr., Attorney General, Respondent.

Nos. 08–71481, 08–73353.
|
Argued and Submitted Feb. 17, 2012.
|
Filed June 27, 2012.

**Synopsis**
**Background:** Alien, a native and citizen of Mexico, petitioned for review of a decision of the Board of Immigration Appeals (BIA), which reversed the determination of an Immigration Judge (IJ) that the alien was admissible.

The Court of Appeals, Paez, Circuit Judge, held that the BIA committed legal error by making its own factual determination and engaging in de novo review of the IJ's factual findings.

Petition granted, and remanded.

**Attorneys and Law Firms**

**\*1166** Daniel M. Kowalski, The Fowler Law Firm, PC, Austin, TX, for petitioner Rene Lopez–Rodriguez.

Tracey N. McDonald (argued), Gregory G. Katsas, Assistant Attorney General, Blair T. O'Connor, Assistant Director, Edward C. Durant, United States Department of Justice, Washington, D.C., for respondent Eric H. Holder, Jr., Attorney General.

On Petition for Review of an Order of the Board of Immigration Appeals. Agency No. AXXX–XX8–197.

Before: PROCTER HUG, JR., BETTY B. FLETCHER, and RICHARD A. PAEZ, Circuit Judges.

## OPINION

PAEZ, Circuit Judge:

The Board of Immigration Appeals' (BIA or Board) governing regulations limit its scope of review of an immigration judge's (IJ) factual findings. Under 🚩 8 C.F.R. § 1003.1(d)(3)(i), (iv), the BIA may only review findings of fact for clear error, and is prohibited from making its own factual determinations. In this petition for review, which arises in the context of allegations of drug smuggling, we consider whether the Board exceeded these limitations when it reversed the IJ's determination that

petitioner Rene Lopez–Rodriguez was admissible and concluded instead that Lopez–Rodriguez was inadmissible under 8 U.S.C. § 1182(a)(2)(C). Because we conclude that the Board committed legal error by making its own factual determination and engaging in de novo review of the IJ's factual findings, we grant the petition and remand for further proceedings.

## I.

Rene Lopez–Rodriguez is a native and citizen of Mexico. In 2006, he was working as a "runner" or supplier for ships in Puerto Peñasco, Sonora, a fishing and resort town located on the Gulf of California.[1] He had been working for the same employer for two years. His employer would regularly send him to a particular store in Phoenix, Arizona to pick up various parts for ships. According to Lopez–Rodriguez's testimony, he had been using his employer's 2000 Dodge Ram 1500 series pickup truck to make these trips for approximately three months prior to the incident at issue in this case.

On July 22, 2006, Lopez–Rodriguez picked up the Dodge truck from his employer in the morning, and drove to the border crossing at Lukeville, Arizona. His destination was Phoenix, where he planned to exchange old ship motor pistons for new ones and to have the tires on the truck replaced. The truck's gas gauge indicated that the gas tank was full when Lopez–Rodriguez picked up the truck. Lopez–Rodriguez testified that he did not refill the tank during the approximately 60–mile drive from Puerto Peñasco to the Lukeville port of entry.

Upon arrival at the port of entry, Lopez–Rodriguez and his truck were inspected by Customs and Border Protection (CBP) officers Sergio Ballesteros, Jr. and **\*1167** Ivan Gonzalez. Lopez–Rodriguez told the officers that he was going to Phoenix to pick up pistons, that the truck belonged to his boss, and that he had nothing to declare for customs. The officers then inspected the truck by tapping the gas tank with a brass rod and found that the tank "tapped abnormally hard," which is often a signal that something solid is inside the tank. After being questioned a second time, Lopez–Rodriguez again stated that he had no items to declare. At that point, the officers escorted Lopez–Rodriguez from his truck to a nearby office, where he was detained while Officer Gonzalez conducted a secondary inspection of the truck. According to the officers, Lopez–Rodriguez was "calm" during this entire period.

Officer Gonzalez drove the Dodge truck from the primary inspection lanes to the secondary inspection area. He testified that the gas gauge needle indicated that the tank was full. After using a fiber optic scope to determine that there were packages inside the gas tank, Officer Gonzalez put Lopez Rodriguez into a detention cell. At that point, Lopez–Rodriguez asked why he was being detained and Officer Gonzalez told him that he had found drugs inside the truck. Lopez–Rodriguez testified that he was not aware of the presence of drugs in the truck until that moment, and that he "couldn't believe it." He remained calm and was silent upon hearing this news, because he "didn't know what to say" and "couldn't think of anything."

Officer Gonzalez then removed the gas tank from the truck and removed the sending unit from the tank to gain access to the tank's interior, where he found 46 vacuum-sealed packages of marijuana. They weighed, in total, approximately 46 kilograms or 101 pounds. According to Officer Gonzalez, the gas tank was "very full" of gas and "fuel was spilling out" when he removed the sending unit.

At Lopez–Rodriguez's merits hearing, Officer Gonzalez testified that, based upon his experience, the truck's gas tank had a capacity of approximately 30 gallons. He also testified that he estimated that the marijuana took up "[p]robably 25 gallons, leaving about 5 gallons of fluid that can be inside the gas tank with—along with the contraband." Officer Gonzalez opined that "[i]f the gas tank was reading properly and if it was full, by the time he got from [Puerto Peñasco] to [Lukeville], [the gas gauge] would have read empty," and Lopez–Rodriguez "would have had to refuel again."

Upon further questioning by the IJ, Officer Gonzalez clarified that his statement that there was room for five gallons of fuel in the gas tank was "a rough estimate" and that there might have been room for between four and six gallons. He stated that

he based the estimate on "how much I have to syphon out, [and] how long it takes me." The amount of fuel in the truck's gas tank was never actually measured. When the IJ asked Lopez–Rodriguez to respond to Officer Gonzalez's conclusions, Lopez–Rodriguez said, "But, it is the truth. I didn't fill up with gas."

## II.

Lopez–Rodriguez was paroled into the United States to face immigration and criminal charges following his initial detention at the Lukeville port of entry. However, no criminal charges were ever filed against Lopez–Rodriguez in connection with this incident. Subsequently, he was charged with being ineligible for admission because there was "reason to believe" that he was or had been an illicit trafficker of a controlled substance, or because he was or had been "a knowing assister, abettor, conspirator, or colluder with others in the illicit trafficking [of a] controlled substance"  **1168**  in violation of INA § 212(a)(2)(C), 8 U.S.C. § 1182(a)(2)(C).

Lopez–Rodriguez proceeded pro se in his hearings before the IJ. [2]  At his second master calendar hearing, Lopez–Rodriguez admitted the charges against him, but at his removal hearing he explained that he had done so in order "to go faster to Mexico" where his children were in school and needed his salary to pay their educational expenses. At all of his appearances before the IJ, Lopez–Rodriguez expressed a desire to have a hearing immediately so that he could return to Mexico as quickly as possible.

Three witnesses—Lopez-Rodriguez, Officer Ballesteros, and Officer Gonzalez—testified at the removal hearing, and the IJ found all three to be credible. In fact, the IJ ended his oral decision by noting that Lopez–Rodriguez "has maintained steadfastly that he had no knowledge that there was marijuana in the vehicle at any time," and then stated, "I believe him."

The IJ summarized the case by explaining that it "all comes down to whether [Lopez–Rodriguez] is stating falsely that he refueled between Puerto Peñasco and the Port of Entry at Lukeville, Arizona." Concluding that "it may very well be true that the applicant did not put gas in the vehicle prior to getting to the Port of Inspection in Lukeville," and that Lopez–Rodriguez "was used by his employer or by somebody unbeknownst to his employer" to transport the marijuana, the IJ found that there was no "reason to believe" that Lopez–Rodriguez "is an elicit [sic] trafficker in a controlled substance or knowingly aided, abetted, colluded, et cetera." Lopez–Rodriguez was admitted into the United States as a visitor until September 18, 2006, four days after the date of the hearing and decision. Lopez–Rodriguez remained detained during the appeals process, however, and was removed to Mexico at some point following the BIA's first decision reversing the IJ.

The government appealed the IJ's ruling to the BIA, challenging the IJ's finding that there was "no reason to believe" that Lopez–Rodriguez had trafficked in a controlled substance. The BIA reversed the IJ twice. In its first decision, dated February 17, 2007, the BIA reversed the IJ because Lopez–Rodriguez's "credibility is undermined by the fact that such a large amount of marijuana—over 100 pounds—was found concealed in the truck and his implausible story that he traveled from Puerto Peñasco to the Arizona border on only 5 gallons of gas and arrived at the port of entry with a full tank." Lopez–Rodriguez petitioned for review of that decision with this court. Subsequently, the government filed a motion to remand the case to the BIA, explaining that "notwithstanding its reference to the 'clear error' standard, the Board may have engaged in *de novo* review of the [IJ]'s fact-findings, something that 8 C.F.R. § 1003.1(d)(3)(i) prohibits." We granted  **1169**  the motion and remanded the case to the BIA.

On remand, the BIA again reversed the IJ in a decision dated March 17, 2008. In its order, the BIA specifically stated that it had been directed to re-evaluate its earlier decision under the clear error standard, and further wrote that it was "mindful that [it is] not to engage in *de novo* review of facts determined by the [IJ]." Noting that the IJ had found Officer Gonzalez credible and that Officer Gonzalez had "significant experience inspecting cars at the border," and asserting that Lopez–Rodriguez had contradicted himself in his testimony, the BIA, "upon consideration of the evidence and testimony of record," concluded that

12 Cal. Daily Op. Serv. 7278, 2012 Daily Journal D.A.R. 8895

it was "left with the definite and firm conviction" that the IJ's decision to admit him was "clearly erroneous." In particular, the Board "f[ou]nd it impossible to accept the [IJ]'s conclusion that the applicant testified credibly."

The BIA explained its decision by discussing in detail Officer Gonzalez's testimony, in particular the estimates that Officer Gonzalez provided of the space available in the gas tank and the amount of gas removed from the tank during his inspection of the truck. The BIA also noted that Officer Gonzalez had "concluded that [Lopez–Rodriguez] could not have driven the distance from Puerto Peñasco to the border without refueling and still have 4 to 6 gallons of gas filling up the tank."

As to Lopez–Rodriguez's credibility, the BIA concluded that the IJ ignored a contradiction in his testimony. According to the BIA, "the applicant first testified that his employer had never asked him to drive the employer's truck into the United States to pick up supplies before. Yet, he later testified that he had driven his employer's truck to the United States very often, as much as every week, in the 3 months before he was arrested at the border."

The BIA also concluded that the IJ erred by finding no "reason to believe" that Lopez–Rodriguez was an illicit trafficker because the standard for inadmissibility under INA § 212(a)(2)(C), 8 U.S.C. § 1182(a)(2)(C) is "quite low" and is analogous to the probable cause standard.

Lopez–Rodriguez timely petitioned for review, arguing primarily that the BIA violated 8 C.F.R. § 1003.1(d)(3) by engaging in prohibited de novo review, and arguing in passing that the Board improperly equated the regulation's "reason to believe" standard to the probable cause standard. Although we grant the petition, we do not address the latter issue.

## III.

Where the BIA conducts its own review of the evidence and law, rather than adopting the IJ's decision, our "review 'is limited to the BIA's decision, except to the extent the IJ's opinion is expressly adopted.' " *Hosseini v. Gonzales,* 471 F.3d 953, 957 (9th Cir.2006) (quoting *Cordon–Garcia v. INS,* 204 F.3d 985, 990 (9th Cir.2000)).

We have jurisdiction over questions of law pursuant to 8 U.S.C. § 1252(a)(2)(D), and we review de novo the BIA's determinations of questions of law and its legal conclusions. *Tamang v. Holder,* 598 F.3d 1083, 1088 (9th Cir.2010). Whether the BIA has applied the correct standard of review is a question of law. *Arteaga v. I.N.S.,* 836 F.2d 1227, 1228 (9th Cir.1988), *abrogated on other grounds by I.N.S. v. Elias–Zacarias,* 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992); *see also Afridi v. Gonzales,* 442 F.3d 1212, 1218 (9th Cir.2006) (holding that the court "can determine whether the BIA applied the correct legal standard in making its determination" **\*1170** ), *overruled on other grounds by Estrada–Espinoza v. Mukasey,* 546 F.3d 1147, 1160 n. 15 (9th Cir.2008) (en banc).

BIA regulations prohibit the Board from "engag[ing] in de novo review of findings of fact determined by an [IJ]." 8 C.F.R. § 1003.1(d)(3)(i); *see also Brezilien v. Holder,* 569 F.3d 403, 413 (9th Cir.2009) (noting that "where the IJ has made a factual finding, the BIA has very limited authority to revisit that finding"). Instead, "[f]acts determined by the [IJ], *including findings as to the credibility of testimony,* shall be reviewed only to determine whether the findings of the [IJ] are clearly erroneous." § 1003.1(d)(3)(i) (emphasis added). Where the BIA engages in de novo review of an IJ's factual findings instead of limiting its review to clear error, it has committed an error of law, as our sister circuits have recognized, and we have no difficulty in agreeing with that conclusion. *See, e.g., Turkson v. Holder,* 667 F.3d 523, 528 (4th Cir.2012) (holding that "the BIA committed

error as a matter of law because it failed to apply the appropriate standard of review"); *Chen v. Bureau of Citizenship and Immigration Serv.*, 470 F.3d 509, 515 (2d Cir.2006) (holding that the BIA's independent credibility assessment amounted to "de novo review and constitutes legal error by the BIA requiring remand"). We do not rely on the Board's invocation of the clear error standard; rather, when the issue is raised, our task is to determine whether the BIA faithfully employed the clear error standard or engaged in improper de novo review of the IJ's factual findings. [3]

 Where the IJ has not made a finding of fact on a disputed matter, and such a finding is necessary to resolution of the case, the BIA must remand to the IJ to make the required finding; it may not conduct its own fact-finding. 8 C.F.R. § 1003.1(d)(3)(iv); *Brezilien,* 569 F.3d at 413 (concluding that the regulation unambiguously "requires the BIA to remand the factual inquiry to the IJ rather than making its own factual finding on the matter"); *see also* *Padmore v. Holder,* 609 F.3d 62, 69 (2d Cir.2010) ("The IJ did not find facts with respect to this incident. If the BIA continues to believe that factfinding on these issues is necessary for an appropriate exercise of discretion, it should remand to the IJ for that purpose."). Where the BIA fails to follow its own regulations and makes factual findings, "it commits an error of law, which we have jurisdiction to correct." *Padmore,* 609 F.3d at 67.

## IV.

### A.

 The BIA may find an IJ's factual finding to be clearly erroneous if it is "illogical or implausible," or without "support in inferences that may be drawn from the facts in the record." *Anderson v. Bessemer City,* 470 U.S. 564, 577, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *see also* **\*1171** *United States v. Hinkson,* 585 F.3d 1247, 1262 (9th Cir.2009) (en banc). [4]

The Supreme Court's opinion in *Anderson* is extremely helpful to our understanding of the limits on the BIA when it reviews the IJ's factual findings for clear error. In fact, the Department of Justice cited *Anderson* in the explanatory comments that it issued to accompany the new regulations adopting the clear error standard of review, and concluded that "[a] factfinding may not be overturned simply because the Board would have weighed the evidence differently or decided the facts differently had it been the factfinder." Board of Immigration Appeals: Procedural Reforms to Improve Case Management, 67 Fed.Reg. 54,878, 54,889 (Aug. 26, 2002) (citing *Anderson,* 470 U.S. at 573, 105 S.Ct. 1504).

*Anderson* provides important guidance on the purpose and limits of the clear error standard:

> Th[e clear error] standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty ... if it undertakes to duplicate the role of the lower court.... If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.*

12 Cal. Daily Op. Serv. 7278, 2012 Daily Journal D.A.R. 8895

470 U.S. at 573–74, 105 S.Ct. 1504 (emphasis added); *see also* Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 857–58, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) ("An appellate court cannot substitute its interpretation of the evidence for that of the trial court simply because the reviewing court 'might give the facts another construction, resolve the ambiguities differently, and find a more sinister cast to actions which the District Court apparently deemed innocent.' " (quoting United States v. Real Estate Boards, 339 U.S. 485, 495, 70 S.Ct. 711, 94 L.Ed. 1007 (1950))).

In particular, where credibility determinations are at issue, *Anderson* counsels that "even greater deference" must be afforded to the IJ's factual findings, "for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Id. at 575, 105 S.Ct. 1504 (citing Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)). Similarly, the Fourth Circuit very recently noted that "IJs hear witnesses and determine the credibility of evidence. The BIA reviews a paper record, devoid of the nuances of weighing evidence first hand. The IJ is thus in a better position to make factual determinations than the BIA acting in an **\*1172** appellate capacity." Turkson, 667 F.3d at 527.

Of course, as the *Anderson* Court rightly pointed out, "[t]his is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness." 470 U.S. at 575, 105 S.Ct. 1504. In certain circumstances, *Anderson* explains, the weight of the record may overcome a positive credibility determination:

> Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination.

Id. (citing United States v. U.S. Gypsum Co., 333 U.S. 364, 396, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). However, the *Anderson* court concluded by explaining that

> when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, *that finding, if not internally inconsistent, can virtually never be clear error.*

Id. (emphasis added).

In the context of this case, it would be error for the BIA to hold that the IJ's findings of fact and credibility determinations were clearly erroneous if those findings and determinations were not illogical or implausible and had support in inferences that may be drawn from the record, and if Lopez–Rodriguez's testimony is uncontradicted by objective evidence and internally consistent.

**B.**

The BIA relied on two aspects of the testimony in this case to vacate the IJ's decision and to find that certain factual findings were "clearly erroneous": Officer Gonzalez's estimates and opinions regarding the amount of gas in the gas tank, and a supposed contradiction in Lopez–Rodriguez's testimony. The testimony regarding these issues, according to the BIA, made it "impossible to accept" that Lopez–Rodriguez testified credibly. However, by characterizing Officer Gonzalez's estimates and opinions as factual, the BIA engaged in impermissible fact-finding. In addition, the BIA engaged in further fact-finding and in de novo review of the IJ's factual findings by concluding that Lopez–Rodriguez contradicted himself. Finally, the BIA applied de novo review to the IJ's credibility determination by independently assessing Lopez–Rodriguez's credibility without deference to the IJ's findings.

*Officer Gonzalez's Testimony*

The IJ made certain findings of fact in his oral decision. He found that both the CBP officers and Lopez–Rodriguez testified credibly. He also found that Lopez–Rodriguez worked as a runner for fishing boats, providing supplies as directed by his employer, and that the truck in question belonged to Lopez–Rodriguez's employer. Further, the IJ found that Lopez–Rodriguez was calm throughout his interactions with the CBP officers at the port of entry.

The IJ made no factual findings, however, as to the quantity of gas in the Dodge truck either when Lopez–Rodriguez left Puerto Peñasco or when he arrived at the Lukeville port of entry, or as to the amount of gas that the truck used per mile from Puerto Peñasco to Lukeville on July 22, 2006. [5] Further-more, the IJ made no factual determination of whether Lopez– **\*1173** Rodriguez refueled during his drive north. Although the IJ did note that both Officer Gonzalez and Lopez–Rodriguez testified that the gas gauge indicated that the tank was full upon arrival at the Lukeville port of entry, he did not make a specific finding on the issue.

The BIA may not make its own factual findings to resolve these issues; if the BIA believes that it cannot decide the case without resolution of these facts, then it must remand to the IJ for further factual findings. 8 C.F.R. § 1003.1(d)(3)(iv); *Brezilien,* 569 F.3d at 413; *Padmore,* 609 F.3d at 69. Here, however, the BIA accepted as true Officer Gonzalez's estimates and opinions regarding these unresolved factual issues. The BIA also stated conclusively that the truck's gas gauge reflected that the tank was full upon arrival at the Lukeville port of entry. [6] This is fact-finding prohibited by § 1003.1(d)(3)(iv).

In its decision the Board cited "Officer Gonzalez's credible testimony" as one reason why it is "impossible to accept the [IJ]'s conclusion that [Lopez–Rodriguez] testified credibly." Noting Officer Gonzalez's "significant experience inspecting cars at the border," the BIA listed a number of the estimates that Gonzalez made about the gas tank and the amount of gas it contained when Lopez–Rodriguez reached the border, and mentioned Gonzalez's opinion that Lopez–Rodriguez "could not have driven the distance from Puerto Peñasco to the border without refueling and still have 4 to 6 gallons of gas filling up the tank." The BIA does not explain further how Officer Gonzalez's testimony undermines the IJ's finding that Lopez–Rodriguez testified credibly; we are left to draw our own conclusions from the Board's recitation of the officer's testimony.

Our review of the BIA's decision leads us to conclude that the Board accepted as true Officer Gonzalez's estimates and opinions, although the BIA was careful to note that it was simply quoting from Officer **\*1174** Gonzalez's testimony ("As Officer Gonzalez testified," "He stated," "he estimated," and "he concluded"). If the Board had not accepted these statements as true, there would be no basis—other than the supposed contradiction in Lopez–Rodriguez's testimony, discussed *infra*—to reverse the IJ's credibility determination as "clearly erroneous." That the IJ found Officer Gonzalez to have testified *credibly,* however, does not give the Board license to accept as *true* Officer Gonzalez's estimates and opinions about historical factual details when the IJ clearly decided not to make factual findings regarding these disputed issues. The IJ stated that he did not "doubt Officer Gonzalez' [sic] assessment as being made in good faith," but stated twice in his oral decision that whether Lopez–Rodriguez refueled between Puerto Peñasco and Lukeville was unresolved due to insufficient evidence. [7] The IJ concluded that Officer Gonzalez did not lie, but also concluded that Officer Gonzalez's estimates alone were insufficient to resolve the issue of whether

12 Cal. Daily Op. Serv. 7278, 2012 Daily Journal D.A.R. 8895

or not Lopez–Rodriguez refueled between Puerto Peñasco and Lukeville. The BIA may not take it upon itself to resolve the issue. 🚩 8 C.F.R. § 1003.1(d)(3)(iv).

By accepting Officer Gonzalez's estimates and opinions as true, and by stating conclusively that the Dodge truck's gas gauge read full at the Lukeville inspection station, the BIA engaged in impermissible fact-finding in violation of 🚩 8 C.F.R. § 1003.1(d)(3)(iv). As noted above, these issues were left unresolved by the IJ, as was the issue of whether the gas gauge accurately reflected the true quantity of gas in the tank. If the BIA wanted specific factual findings on these issues, then the governing regulations required it to remand the case to the IJ instead of making its own factual determinations. *See* 🔖 *Brezilien,* 569 F.3d at 413; 🔖 *Padmore,* 609 F.3d at 69.

*Contradiction in Lopez–Rodriguez's Testimony*

The IJ did not identify any contradictions in Lopez–Rodriguez's testimony. The claimed contradiction noted by the BIA in its decision following remand relates to whether or not Lopez–Rodriguez had previously driven his employer's truck into the United States to pick up boat supplies before his trip on July 22, 2006, and if so, how often. The IJ found specifically that Lopez–Rodriguez "has come into the United States on numerous occasions and is basically directed each time by his employer to go to a specific place in Phoenix to pick up supplies for the boat, turn around and come back to his work in Mexico." The IJ did not make any findings as to what specific vehicle or vehicles Lopez–Rodriguez used to drive to the United States on these trips.

The BIA, without specifically referring to this factual determination by the IJ or concluding that the IJ's determination was illogical, implausible, or without support in the record, found that the IJ "ignored a contradiction" in Lopez–Rodriguez's testimony. The Board stated that Lopez–Rodriguez "first testified that his employer had never asked him to drive the employer's truck into the United States to pick up supplies before. Yet, he later testified that he had driven his employer's truck to the United States very often, as much as **\*1175** every week, in the 3 months before he was arrested at the border." Without further explanation, the BIA used this claimed contradiction as a second basis for finding that the IJ's credibility determination was "clearly erroneous."

The first exchange between the IJ and Lopez–Rodriguez to which the BIA referred in its decision occurred at Lopez–Rodriguez's second master calendar hearing on August 24, 2006, after the government's attorney had finished asking a series of questions about the white Dodge Ram pickup truck that Lopez–Rodriguez was driving on the day in question, and what Lopez–Rodriguez had planned on doing with it that day:

IJ: How long have you been working for this person [the employer], sir?

L–R: Two years.

IJ: Did he ever ask you to do this before?

L–R: No.

IJ: Have you ever taken a vehicle into the United States before?

L–R: How so? I mean, I, I didn't hear?

IJ: Have you ever taken a vehicle into the United States before?

L–R: No, just with that and my vehicle, that's it.

The IJ did not find that the above exchange contradicted Lopez–Rodriguez's testimony at his removal hearing on September 14, 2006, in which he answered the IJ as follows:

12 Cal. Daily Op. Serv. 7278, 2012 Daily Journal D.A.R. 8895

IJ: How long had you worked for him [the employer]?

L–R: Two years.

IJ: You had gone to Phoenix before?

L–R: Yes.

IJ: Have you driven that truck before?

L–R: I had—I had started driving that truck three months prior to my being stopped, arrested.

IJ: Ever take it to Phoenix before?

L–R: Yes, I was, I was going very often. Every 15 days, every week, once a month.

IJ: In that truck?

L–R: In that truck.

The BIA found that the second exchange contradicted the first.

The BIA could not conclude, however, that Lopez–Rodriguez contradicted himself in these two exchanges without drawing factual inferences from Lopez–Rodriguez's answers to the IJ's questions, and without making findings as to the vehicle or vehicles that Lopez–Rodriguez regularly used to drive into the United States for his employer.

In the first exchange that the BIA referenced, the IJ asked, "Have you ever taken *a vehicle* into the United States before?," and Lopez–Rodriguez responded, "No, just with *that and my vehicle,* that's it." (Emphasis added.) As noted above, just before this exchange the government's attorney had asked Lopez–Rodriguez a series of questions about his employer's white Dodge Ram truck. In the second exchange, Lopez–Rodriguez testified that he had been driving the Dodge truck to Phoenix for work regularly for approximately three months prior to July 22, 2006. For the BIA to have found a contradiction in these two exchanges, it would have had to read Lopez–Rodriguez's answer, "No, just with that and my vehicle, that's it," to mean that he had only ever driven his own vehicle and some other vehicle that was not the Dodge truck ("*that* ") into the United States.[8] However, both the **\*1176** Board's interpretation of what Lopez–Rodriguez meant when he said "No, just with that and my vehicle, that's it," and its conclusion regarding the vehicle or vehicles Lopez–Rodriguez regularly drove into the United States for his employer, required the Board to make prohibited findings of fact. If this factual determination was essential to the Board's review of the IJ's decision, it should have remanded to the IJ for additional factual findings. *See* 🚩 8 C.F.R. § 1003.1(d)(3)(iv); 🚩 *Padmore,* 609 F.3d at 69; 🚩 *Brezilien,* 569 F.3d at 413.

That the Board engaged in de novo review of the IJ's factual findings is evident in its selective review of Lopez–Rodriguez's testimony. Specifically, the BIA ignored a third exchange that explained Lopez–Rodriguez's other responses to the IJ and supported his testimony that he had driven the Dodge truck to the United States for work previously. Towards the end of the second master calendar hearing, the IJ and Lopez–Rodriguez engaged in the following exchange:

IJ: You've never done this [drug smuggling] before?

L–R: No.

IJ: When did you get your border crossing card? What year?

L–R: I don't recall exactly what year.

12 Cal. Daily Op. Serv. 7278, 2012 Daily Journal D.A.R. 8895

IJ: Approximately? How long have you had it?

L–R: Since six year [sic], seven years.

IJ: You never had a problem before?

L–R: No.

IJ: And, do you come into the United States?

L–R: Well, I would just go on business, that's it.

IJ: And, what business is that?

L–R: Shipping business. It would be every 15 days, you know, every month or every, every week.

IJ: For this boss also?

L–R: Yes.

IJ: *Were you driving other vehicles for this boss into the United States?*

L–R: *No, that was the only one. Sometimes I would go in my vehicle.*

(Emphases added). Although Lopez–Rodriguez does not mention the length of time that he had been using the Dodge Ram truck to run errands for his boss, this exchange undermines the BIA's assertion that Lopez–Rodriguez contradicted himself in his testimony. As the Tenth Circuit concluded in *Kabba,* "when rejecting the IJ's credibility findings under a review purportedly targeted only at clear error, the BIA cannot selectively examine some evidence while ignoring other evidence presented to it." 530 F.3d at 1247. In so doing, the BIA substituted its own reading of the evidence for that of the IJ without applying the deference required by the clear error standard of review. That is an error of law under the BIA's own regulations. 8 C.F.R. § 1003.1(d)(3)(i).


*Credibility Determination*

 Finally, the BIA found the IJ's decision to be "clearly erroneous" on the basis of its own determination of Lopez–Rodriguez's credibility. As the Supreme Court noted in *Anderson,* a credibility determination is based, at least in part, on "variations in demeanor and tone of voice" that only the factfinder witnesses. 470 U.S. at 575, 105 S.Ct. 1504. Although an appellate court or other reviewing body may find clear error in a fact-finder's credibility determination if a witness's story is contradicted by the evidence or is internally inconsistent or implausible, a factfinder may nevertheless credit one witness's testimony over another's if both have related coherent and facially plausible stories that are not contradicted by extrinsic evidence. **\*1177** *See id.* Such a decision "can virtually never be clear error." *Id.*

Here, both Lopez–Rodriguez and Officer Gonzalez told coherent and facially plausible stories. The IJ believed both and concluded that there was not enough evidence to show that Lopez–Rodriguez was lying. Although the IJ found that both Officer Gonzalez and Lopez–Rodriguez testified credibly, the BIA decided instead, on the basis of the paper record, that only the testimony of Officer Gonzalez was truthful. The BIA has not identified sufficient evidence, however, to show that the IJ's credibility determination with respect to Lopez–Rodriguez was "clearly erroneous" under the deferential clear error standard of review. Instead, it relied upon its own factual findings and de novo review of the evidence. The BIA's independent credibility determination, therefore, constitutes improper de novo review. *See Anderson,* 470 U.S. at 575, 105 S.Ct. 1504; *Hinkson,* 585 F.3d at 1262.

*Conclusion*

Although the BIA invoked the clear error standard, it failed to apply this deferential standard of review. This is an error of law that requires that we grant Lopez–Rodriguez's petition and remand the case to the agency. 🚩 8 C.F.R. § 1003.1(d)(3)(i); 🏷 *Brezilien,* 569 F.3d at 413; *see also Kabba,* 530 F.3d at 1245–46; 🏷 *Chen,* 470 F.3d at 515.

The BIA made its own findings as to the accuracy of the historical facts discussed in Officer Gonzalez's testimony and the supposed contradiction in Lopez–Rodriguez's testimony. The Board further engaged in prohibited de novo review in finding a contradiction in Lopez–Rodriguez's testimony and in making its own finding regarding Lopez–Rodriguez's credibility. Both are disallowed by the agency's own regulations. 🚩 8 C.F.R. § 1003.1(d)(3)(i), (iv).

## V.

This case clearly lacks a robust factual basis on which to determine whether Lopez–Rodriguez drove to the border knowing that there were drugs in his employer's truck's gas tank. It is not up to the BIA, however, to create one on its own. The BIA improperly found facts and applied de novo review to the IJ's decision, and we therefore remand this case to the agency so that the BIA may apply the correct "clear error" standard of review. If the BIA concludes that it cannot properly review the IJ's decision without further factual development of the record, then the Board must remand the case to the IJ so that he may make the requisite factual findings.

Because we conclude that the BIA erred in its application of the clear error standard of review and erred by making factual findings, and remand on that basis, we need not resolve whether a "reason to believe" under INA § 212(a)(2)(C), 🏷 8 U.S.C. § 1182(a)(2)(C) is the equivalent of the probable cause standard under the Fourth Amendment.

**GRANTED AND REMANDED.**

**All Citations**

683 F.3d 1164, 12 Cal. Daily Op. Serv. 7278, 2012 Daily Journal D.A.R. 8895

## Footnotes

1    This factual summary is drawn from testimony by Lopez–Rodriguez and two Customs and Border Protection officers at his inadmissibility hearings, and from factual findings made by the IJ.

2    Lopez–Rodriguez appeared a total of three times before the IJ. His first master calendar hearing was a group advisement of rights on August 17, 2006. The IJ continued Lopez–Rodriguez's case after Lopez–Rodriguez stated that he wanted to seek counsel, although he also said that if his case were to be postponed then he would waive his right to counsel. His next appearance before the IJ was at a second master calendar hearing on August 24, 2006, at which Lopez–Rodriguez testified that he did not know that there was marijuana in the truck's gas tank until CBP officers told him as much at the Lukeville port of entry. The IJ continued the case to allow the government to call other witnesses and to ask Lopez–Rodriguez more extensive questions. Lopez–Rodriguez's final appearance before the IJ occurred at his removal hearing

on September 14, 2006. At the removal hearing, the IJ heard further testimony from Lopez–Rodriguez and testimony from CBP officers Ballesteros and Gonzalez.

3    Several of our sister circuits have remanded cases to the agency where the BIA, although invoking the "clear error" standard of review, actually engaged in prohibited de novo review or fact-finding. *See, e.g.,* *Alvarado de Rodriguez v. Holder,* 585 F.3d 227, 235 (5th Cir.2009) ( "Quite simply, the BIA is not entitled to state the correct legal standard but actually apply an incorrect standard."); *Kabba v. Mukasey,* 530 F.3d 1239, 1246 (10th Cir.2008) ("Although the BIA's opinion set forth the correct standard of review and recited a conclusion that the IJ's credibility findings were clearly erroneous, the BIA did not apply this deferential standard in substance."); *Chen,* 470 F.3d at 515 ("Although the BIA used the phrase 'clearly erroneous' in its opinion, the review it conducted in fact was to independently assess Chen's credibility without giving deference to the findings of the IJ. This is de novo review...."). We apply the same scrutiny here to the BIA's assertions that it reviewed the IJ's decision for clear error.

4    We relied heavily on *Anderson* in our discussion of abuse of discretion in *Hinkson,* quoting directly from the opinion in our formulation of this circuit's abuse of discretion test. 585 F.3d at 1262. Although *Hinkson* specifically addressed the abuse of discretion standard, the opinion noted that the Supreme Court "defined abuse of discretion review of factual findings in terms of 'clearly erroneous' review, holding that '[w]hen an appellate court reviews a district court's factual findings, the abuse-of-discretion and clearly erroneous standards are indistinguishable....' " *Id.* at 1259 (quoting *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 401, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990)) (alteration in original). We subsequently quoted *Hinkson's* formulation of the abuse of discretion test as a statement of the standard for clear error review. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles,* 660 F.3d 384, 395 (9th Cir.2011).

5    The IJ noted Officer Gonzalez's estimates on these factual questions, but subsequently stated that "there is no statement of expertise in measurement of Officer Gonzalez. And, in questioning by the Court, he acknowledges that there might have been four gallons, maybe five, maybe six. He is not sure of the exact amount.... There was no actual measurement of the amount of gas that was in there. This was all by basically, for lack of a better term, eyeballing it." The IJ further concluded that the government's printout of a Dodge Ram 1500 series pickup truck's likely fuel usage from the web site www.fueleconomy.gov "does not answer the question of actually how much gas was in the vehicle when the applicant started from Puerto Peñasco versus how much was in the vehicle when it was syphoned out and not put into any measurement."

6    There is nothing in the record to establish that the gas gauge accurately reflected the quantity of gas in the tank. Indeed, Officer Gonzalez qualified his testimony regarding the gas gauge by stating that "*If* the gas tank was reading properly and *if* it was full, by the time [Lopez–Rodriguez] got from [Puerto Peñasco] to [Lukeville], it would have read empty." Officer Gonzalez's testimony is also somewhat contradictory on the issue of the gas gauge. The government's attorney initially asked him if the flotation device that measures the quantity of gas in the tank was "unobstructed by these packages [of marijuana]," and Officer Gonzalez responded that "[i]t was obstructed." However, shortly thereafter, Officer Gonzalez testified that "[t]he sending unit was reading correctly." Leaving Officer Gonzalez's testimony aside, the IJ noted in his oral decision that "[f]requently, from common experience, when a gas gauge reads full, it reads full for a while before dropping. And, how much gas may be consumed by the time that gauge starts dropping, I do not know and I am not going to venture a guess at." In its opinion, the Board presumed that the gas gauge was working properly and accurately reflected the quantity of gas in the tank, but there is no evidence to support such a conclusion. If this unresolved factual issue were key to the Board's review of the IJ's decision in this case, it should have remanded to the IJ for further factual findings. 8 C.F.R. § 1003.1(d)(3)(iv).

7    Immediately after citing Officer Gonzalez's good faith, the IJ noted that "in fairness, it may very well be true that the applicant did not put gas in the vehicle prior to getting to the Port of Inspection in Lukeville." Later in his oral decision, he concluded that the case "comes down to whether it was five gallons of gas that were used, thereby necessitating a refilling of the tank. And, I do not think that there is sufficient evidence to show that this applicant has lied and refilled the tank prior to getting to the Port of Inspection in Lukeville."

8    This interpretation seems to ignore both the context of the exchange between the IJ and Lopez–Rodriguez and the normal vagaries of human speech, especially when that speech is translated into English. Prior to this exchange, the government's

attorney had just asked Lopez–Rodriguez about the Dodge Ram truck. The most logical interpretation of "just with that and my vehicle" is that "that" referred to the Dodge truck, given that Lopez–Rodriguez had just been discussing it.

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2020 Thomson Reuters. No claim to original U.S. Government Works.    AR.07235   13

422 Fed.Appx. 530
This case was not selected for publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See also U.S.Ct. of App. 7th Cir. Rule 32.1.
United States Court of Appeals,
Seventh Circuit.

William E. RUHAAK, Petitioner–Appellant,

v.

COMMISSIONER of INTERNAL REVENUE, Respondent–Appellee.

No. 10–3877.
|
Submitted May 19, 2011.
|
Decided May 20, 2011.

**Synopsis**

**Background:** Taxpayer brought action against Commissioner of Internal Revenue, alleging he was exempt from paying taxes that supported military as a "victim of freedom of conscience" under the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights (ICCPR). The United States Tax Court, Richard T. Morrison, J., granted Commissioner's motion for summary judgment, and taxpayer appealed.

**Holdings:** The Court of Appeals held that:

burden, if any, placed on taxpayer's First Amendment rights was justified by government's interest in maintaining sound and efficient tax system, and

ICCPR did not provide for private right of action.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**\*531** Appeal from the United States Tax Court. No. 27423–08L. Richard T. Morrison, Judge.

**Attorneys and Law Firms**

William E. Ruhaak, Joliet, IL, pro se.

Sara Ann Ketchum, Gilbert S. Rothenberg, Deputy Assistant Attorney General, Department of Justice, Office of the Attorney General, Washington, DC, for Respondent–Appellee.

Before WILLIAM J. BAUER, Circuit Judge, MICHAEL S. KANNE, Circuit Judge, ANN CLAIRE WILLIAMS, Circuit Judge.

**ORDER**

 **\*\*1**  William E. Ruhaak appeals from the Tax Court's decision ordering him to pay federal income taxes for 2007. He argues that the Internal Revenue Service should have considered his argument that a conscience-based objection to military spending is a valid basis for refusing to pay taxes. We affirm.

Ruhaak refuses to pay federal taxes that would fund the military. Instead he wants to either donate this portion of his taxes to organizations fostering peace or have his taxes earmarked for nonmilitary purposes. When Ruhaak failed to pay a balance from his 2007 taxes, the IRS sent him a notice  **\*532**  of intent to levy, warning him that his failure to pay $2,399 in taxes, interest, and penalties would result in seizure of his property to satisfy the overdue tax obligations. The IRS Appeals Office scheduled a conference with Ruhaak and explained that Treasury regulations did not permit it to consider challenges on moral, religious, political, constitutional, or conscientious grounds. Ruhaak appealed to the Tax Court, arguing that the IRS should have allowed him to show that he is exempt from paying taxes that support the military because he is a "victim of freedom of conscience" as defined by Article 18 of the Universal Declaration of Human Rights. The Tax Court found this claim frivolous,

*see* I.R.C. §§ 6330(c)(4)(B), 6702(b)(2)(A)(i); I.R.S. Notice 08–14, 2008–4 I.R.B. 310, at (1)(h), and granted summary judgment to the commissioner.

On appeal, Ruhaak reiterates that the IRS and the Tax Court should have considered his conscience-based objection and argues that federal regulations barring appeals from tax liability on conscientious grounds, *see* Treas. Reg. § 601.106(b), violate Article 18 of the International Covenant on Civil and Political Rights ("ICCPR"), which provides for the right to freedom of conscience. Ruhaak argues that the United States, as a party to the covenant, must bring its regulations into compliance with the ICCPR and give him an opportunity to make his freedom-of-conscience argument.

 The Tax Court properly granted summary judgment for the commissioner. Taxpayers have no constitutional or statutory right to withhold taxes based on moral or religious objections to government expenditures. *See Jenkins v. Comm'r,* 483 F.3d 90, 91–93 (2d Cir.2007); *Browne v. United States,* 176 F.3d 25, 26 (2d Cir.1999); *First v. Comm'r,* 547 F.2d 45, 45–46 (7th Cir.1976). The tax system could not function if taxpayers could avoid taxes based on religious, moral, or conscientious objections, so any burden placed on Ruhaak's First Amendment rights is justified by the government's interest in maintaining a sound and efficient tax system. *See Hernandez v. Comm'r,* 490 U.S. 680, 699–700, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989); *United States v. Indianapolis Baptist Temple,* 224 F.3d 627, 630 (7th Cir.2000); *McLaughlin v. Comm'r,* 832 F.2d 986, 987–88 (7th Cir.1987). Nor do the ICCPR or the Universal Declaration of Human Rights help Ruhaak's claim. The United States has ratified the ICCPR, but the substantive provisions are not self-executing and do not create enforceable obligations. *See Sosa v. Alvarez–Machain,* 542 U.S. 692, 728, 734–35, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004); *Clancy v. Office of Foreign Assets Control,* 559 F.3d 595, 604 (7th Cir.2009). And the Universal Declaration of Human Rights is a statement of principles and not a treaty or international agreement imposing legal obligations. *See Sosa,* 542 U.S. 692 at 734–35, 124 S.Ct. 2739.

 **\*\*2**  Because the arguments Ruhaak pursues on appeal are frivolous, we affirm the decision of the Tax Court. We also direct Ruhaak to show cause within 14 days why we should not impose a sanction of $4,000, the presumptive sanction for filing a frivolous appeal in a tax case. See *Szopa v. United States,* 460 F.3d 884, 887 (7th Cir.2006).

## All Citations

422 Fed.Appx. 530, 2011 WL 1936132, 107 A.F.T.R.2d 2011-2117, 2011-1 USTC P 50,403

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Sebelius v. Auburn Regional Medical Center, 568 U.S. 145 (2013)

133 S.Ct. 817, 184 L.Ed.2d 627, 81 USLW 4053, Med & Med GD (CCH) P 304,293...

133 S.Ct. 817
Supreme Court of the United States

Kathleen SEBELIUS, Secretary of Health and Human Services, Petitioner

v.

AUBURN REGIONAL MEDICAL CENTER et al.

No. 11–1231.
|
Argued Dec. 4, 2012.
|
Decided Jan. 22, 2013.

**Synopsis**

**Background:** Medicare providers brought action against the Secretary of the Department of Health and Human Services, challenging their adjustments for serving a disproportionate share of low-income patients. The United States District Court for the District of Columbia, 686 F.Supp.2d 55, granted the Secretary's motion to dismiss. Providers appealed. The United States Court of Appeals for the District of Columbia Circuit, Griffith, Circuit Judge, 642 F.3d 1145, reversed. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Ginsburg, held that:

provision of Medicare statute setting 180-day limit for filing appeals to Provider Reimbursement Review Board (PRRB) was not jurisdictional, abrogating *Alacare Home Health Servs., Inc. v. Sullivan*, 891 F.2d 850, and *St. Joseph's Hospital of Kansas City v. Heckler*, 786 F.2d 848, and

provision of Medicare statute setting 180-day limit was not subject to equitable tolling.

Reversed and remanded.

Justice Sotomayor filed a concurring opinion.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

**West Codenotes**

**Negative Treatment Reconsidered**

42 CFR § 405.1841(b)

**818** *Syllabus* *

The reimbursement amount health care providers receive for inpatient services rendered to Medicare beneficiaries is adjusted upward for hospitals that serve a disproportionate share of low-income patients. The adjustment amount is determined in part by the percentage of a hospital's patients who are eligible for Supplemental Security Income (SSI), called the SSI fraction. Each year, the Centers for Medicare & Medicaid Services (CMS) calculates the SSI fraction for an eligible hospital and submits that number to the hospital's "fiscal intermediary," a Department of Health and Human Services (HHS) contractor. The intermediary

133 S.Ct. 817, 184 L.Ed.2d 627, 81 USLW 4053, Med & Med GD (CCH) P 304,293...

computes the reimbursement amount due and then sends the hospital a Notice of Program Reimbursement (NPR). A provider dissatisfied with the determination has a right to appeal to the Provider Reimbursement Review Board (PRRB or Board) within 180 days of receiving the NPR. 42 U.S.C. § 1395oo(a)(3). By regulation, the Secretary of HHS authorized the PRRB to extend the 180–day limit, for good cause, up to three years. See 42 CFR 405.1841(b) (2007).

The Baystate Medical Center—not a party here—timely appealed its SSI fraction calculation for each year from 1993 through 1996. The PRRB found that errors in CMS's methodology resulted in a **819 systematic undercalculation of the disproportionate share adjustment and corresponding underpayments to providers. In March 2006, the Board's *Baystate* decision was made public. Within 180 days, respondent hospitals filed a complaint with the Board, challenging their adjustments for 1987 through 1994. Acknowledging that their challenges were more than a decade out of time, they urged that equitable tolling of the limitations period was in order due to CMS's failure to tell them about the computation error. The PRRB held that it lacked jurisdiction, reasoning that it had no equitable powers save those legislation or regulation might confer. On judicial review, the District Court dismissed the hospitals' claims. The D.C. Circuit reversed. The presumption that statutory limitations periods are generally subject to equitable tolling, the court concluded, applied to the 180–day time limit because nothing in § 1395oo(a)(3) indicated that Congress intended to disallow such tolling.

*Held* :

1. The 180–day limitation in § 1395oo(a)(3) is not "jurisdictional." Pp. 823 – 826.

(a) Unless Congress has "clearly state[d]" that a statutory limitation is jurisdictional, the restriction should be treated "as nonjurisdictional." *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 515–516, 126 S.Ct. 1235, 163 L.Ed.2d 1097. "[C]ontext, including this Court's interpretations of similar provisions in many years past," is probative of whether Congress intended a particular provision to rank as jurisdictional. *Reed Elsevier, Inc. v. Muchnick,* 559 U.S. 154, ——, 130 S.Ct. 1237, 1248, 176 L.Ed.2d 18. If § 1395oo(a)(3) were jurisdictional, the 180–day time limit could not be enlarged by agency or court.

Section 1395oo(a)(3) hardly reveals a design to preclude any regulatory extension. The provision instructs that a provider "may obtain a hearing" by filing "a request ... within 180 days after notice of the intermediary's final determination." It "does not speak in jurisdictional terms." *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 394, 102 S.Ct. 1127, 71 L.Ed.2d 234. This Court has repeatedly held that filing deadlines ordinarily are not jurisdictional; indeed, they have been described as "quintessential claim-processing rules." *Henderson v. Shinseki,* 562 U.S. ——, ——, 131 S.Ct. 1197, 1203, 179 L.Ed.2d 159. Pp. 823 – 825.

(b) Court-appointed *amicus* urges that § 1395oo(a)(3) should be classified as a jurisdictional requirement based on its proximity to §§ 1395oo(a)(1) and (a)(2), both jurisdictional requirements, *amicus* asserts. But a requirement that would otherwise be nonjurisdictional does not become jurisdictional simply because it is in a section of a statute that also contains jurisdictional provisions. *Gonzalez v. Thaler,* 565 U.S. ——, ——, 132 S.Ct. 641, ——, 181 L.Ed.2d 619. *Amicus* also urges that the Medicare Act's express grant of authority for the Secretary to extend the time for beneficiary appeals implies the absence of such leeway for § 1395oo(a)(3)'s provider appeals. In support, *amicus* relies on the general rule that Congress's use of "certain language in one part of the statute and different language in another" can indicate that "different meanings were intended," *Sosa v. Alvarez–Machain,* 542 U.S. 692, 711, n. 9, 124 S.Ct. 2739, 159 L.Ed.2d 718. But that interpretive guide, like other canons of construction, is "no more than [a] rul[e] of thumb" that can tip the scales when a statute could be read in multiple ways. *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391. Here, § 1395oo(a)'s limitation is most sensibly **820 characterized as nonjurisdictional. Pp. 825 – 826.

2. The Secretary's regulation is a permissible interpretation of § 1395oo(a)(3). Pp. 826 – 828.

AR.07239

133 S.Ct. 817, 184 L.Ed.2d 627, 81 USLW 4053, Med & Med GD (CCH) P 304,293...

(a) Congress vested in the Secretary large rulemaking authority to administer Medicare. A court lacks authority to undermine

the Secretary's regime unless her regulation is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A.
Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694. Here, the regulation
survives inspection under that deferential standard. The Secretary brought to bear practical experience in superintending the
huge program generally, and the PRRB in particular, in maintaining a three-year outer limit for intermediary determination
challenges. A court must uphold her judgment as long as it is a permissible construction of the statute, even if the court would
have interpreted the statute differently absent agency regulation. Pp. 826 – 827.

(b) A presumption of equitable tolling generally applies to suits against the United States, *Irwin v. Department of Veterans
Affairs,* 498 U.S. 89, 95–96, 111 S.Ct. 453, 112 L.Ed.2d 435, but application of this presumption is not in order for § 1395*oo*(a)
(3). This Court has never applied *Irwin* 's presumption to an agency's internal appeal deadline. The presumption was adopted
in part on the premise that "[s]uch a principle is likely to be a realistic assessment of legislative intent." *Irwin,* 498 U.S., at
95, 111 S.Ct. 453. That premise is inapt in the context of providers' administrative appeals under the Medicare Act. For nearly
40 years the Secretary has prohibited the Board from extending the 180–day deadline, except as provided by regulation. In
the six times § 1395*oo* has been amended since 1974, Congress has left untouched the 180–day provision and the Secretary's
rulemaking authority. Furthermore, the statutory scheme, which applies to sophisticated institutional providers, is not designed

to be " 'unusually protective' of claimants." *Bowen v. City of New York,* 476 U.S. 467, 480, 106 S.Ct. 2022, 90 L.Ed.2d
462. Nor is the scheme one "in which laymen, unassisted by trained lawyers, initiate the process." *Zipes,* 455 U.S., at 397,
102 S.Ct. 1127.

The hospitals ultimately argue that the Secretary's regulations fail to adhere to "fundamentals of fair play." *FCC v. Pottsville
Broadcasting Co.,* 309 U.S. 134, 143, 60 S.Ct. 437, 84 L.Ed. 656. They point to 42 CFR § 405.1885(b)(3), which permits
reopening of an intermediary's reimbursement determination "at any time" if the determination was procured by fraud or fault
of the provider. But this Court has explained that giving intermediaries more time to discover overpayments than providers have
to discover underpayments may be justified by the "administrative realities" of the system: a few dozen fiscal intermediaries

are charged with issuing tens of thousands of NPRs, while each provider can concentrate on a single NPR, its own. *Your
Home Visiting Nurse Services, Inc. v. Shalala,* 525 U.S. 449, 455, 456, 119 S.Ct. 930, 142 L.Ed.2d 919. Pp. 827 – 828.

🚩 642 F.3d 1145, reversed and remanded.

GINSBURG, J., delivered the opinion for a unanimous Court. SOTOMAYOR, J., filed a concurring opinion.

**Attorneys and Law Firms**

Edwin S. Kneedler, Washington, DC, for Petitioner.

John F. Manning, Cambridge, MA, appointed by this Court as amicus curiae.

**821 Robert L. Roth, Washington, DC, for Respondents.

Patricia A. Millett, Ruthanne M. Deutsch, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, Hyland Hunt, John B.
Capehart, Akin Gump Strauss Hauer & Feld LLP, Dallas, TX, Robert L. Roth, Counsel of Record, John R. Hellow, Hooper,
Lundy & Bookman, P.C., Washington, DC, Counsel for Respondents.

William B. Schultz, Acting General Counsel, Kenneth Y. Choe, Deputy General Counsel, Janice L. Hoffman, Associate General
Counsel, Lawrence J. Harder, Acting Deputy Associate General Counsel for Litigation, Robert W. Balderston, Jocelyn Beer,

Sebelius v. Auburn Regional Medical Center, 568 U.S. 145 (2013)

133 S.Ct. 817, 184 L.Ed.2d 627, 81 USLW 4053, Med & Med GD (CCH) P 304,293...

Gerard Keating, Attorneys, Department of Health and Human Services, Washington, DC, Donald B. Verrilli, Jr., Solicitor General, Counsel of Record, Stuart F. Delery, Acting Assistant Attorney General, Edwin S. Kneedler, Deputy Solicitor General, Melissa Arbus Sherry, Assistant to the Solicitor General, Mark B. Stern, Stephanie R. Marcus, Attorneys, Department of Justice, Washington, DC, for Petitioner.

**Opinion**

Justice GINSBURG delivered the opinion of the Court.

 **\*148**  This case concerns the time within which health care providers may file an administrative appeal from the initial determination of the reimbursement due them for inpatient services rendered to Medicare beneficiaries. Government contractors, called fiscal intermediaries, receive cost reports annually from care providers and notify them of the reimbursement amount for which they qualify. A provider dissatisfied with the fiscal intermediary's determination may appeal to an administrative body named the Provider Reimbursement Review Board (PRRB or Board). The governing statute, § 602(h)(*l*)(D), 97 Stat. 165, 42 U.S.C. § 1395*oo*(a)(3), sets a 180–day limit for filing appeals from the fiscal intermediary to the PRRB. By a regulation promulgated in 1974, the Secretary of the Department of Health and Human **\*149**  Services (HHS) authorized the Board to extend the 180–day limitation, for good cause, up to three years. [1]

The providers in this case are hospitals who appealed to the PRRB more than ten years after expiration of the 180–day statutory deadline. They assert that the Secretary's failure to disclose information that made the fiscal intermediary's reimbursement calculation incorrect prevented them from earlier appealing to the Board. Three positions have been briefed and argued regarding the time for providers' appeals to the PRRB. First, a Court-appointed *amicus curiae* has urged that the 180–day limitation is "jurisdictional," and therefore cannot be enlarged at all by agency or court. Second, the Government maintains that the Secretary has the prerogative to set an outer limit of three years for appeals to the Board. And third, the hospitals argue that the doctrine of equitable tolling applies, stopping the 180–day clock during the time the Secretary concealed the information that made the fiscal intermediary's reimbursement determinations incorrect.

We hold that the statutory 180–day limitation is not "jurisdictional," and that the Secretary reasonably construed the statute to permit a regulation extending the time for a provider's appeal to the PRRB to **\*\*822**  three years. We further hold that the presumption in favor of equitable tolling does not apply to administrative appeals of the kind here at issue.

I

The Medicare program covers certain inpatient services that hospitals provide to Medicare beneficiaries. Providers are reimbursed at a fixed amount per patient, regardless of the actual operating costs they incur in rendering these services. But the total reimbursement amount is adjusted upward **\*150**  for hospitals that serve a disproportionate share of low-income patients. This adjustment is made because hospitals with an unusually high percentage of low-income patients generally have higher per-patient costs; such hospitals, Congress therefore found, should receive higher reimbursement rates. See H.R.Rep. No. 99–241, pt. 1, p. 16 (1985). The amount of the disproportionate share adjustment is determined in part by the percentage of the patients served by the hospital who are eligible for Supplemental Security Income (SSI) payments, a percentage commonly called the SSI fraction. 42 U.S.C. § 1395ww(d) (2006 ed. and Supp. V).

At the end of each year, providers participating in Medicare submit cost reports to contractors acting on behalf of HHS known as fiscal intermediaries. Also at year end, the Centers for Medicare & Medicaid Services (CMS) calculates the SSI fraction for each eligible hospital and submits that number to the intermediary for that hospital. Using these numbers to determine the total payment due, the intermediary issues a Notice of Program Reimbursement (NPR) informing the provider how much it will be paid for the year.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**Sebelius v. Auburn Regional Medical Center, 568 U.S. 145 (2013)**

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 746 of 912

133 S.Ct. 817, 184 L.Ed.2d 627, 81 USLW 4053, Med & Med GD (CCH) P 304,293...

If a provider is dissatisfied with the intermediary's reimbursement determination, the statute gives it the right to file a request for a hearing before the PRRB within 180 days of receiving the NPR. § 1395*oo*(a)(3) (2006 ed.) In 1974, the Secretary promulgated a regulation, after notice and comment rulemaking, permitting the Board to extend the 180–day time limit upon a showing of good cause; the regulation further provides that "no such extension shall be granted by the Board if such request is filed more than 3 years after the date the notice of the intermediary's determination is mailed to the provider." 39 Fed.Reg. 34517 (1974) (codified in 42 CFR § 405.1841(b) (2007)). [2]

**\*151**  For many years, CMS released only the results of its SSI fraction calculations and not the underlying data. [3]  The Baystate Medical Center—a hospital not party to this case—timely appealed the calculation of its SSI fraction for each year from 1993 through 1996. Eventually, the PRRB determined that CMS had omitted several categories of SSI data from its calculations **\*\*823**  and was using a flawed process to determine the number of low-income beneficiaries treated by hospitals. These errors caused a systematic undercalculation of the disproportionate share adjustment, resulting in underpayments to the providers. *Baystate Medical Center v. Leavitt,* 545 F.Supp.2d 20, 26–30 (D.D.C.2008); see *id., at 57–58* (concluding that CMS failed to use "the best available data").

The methodological errors revealed by the Board's *Baystate* decision would have yielded similarly reduced payments to all providers for which CMS had calculated an SSI fraction. In March 2006, the Board's decision in the *Baystate* case was made public. Within 180 days, the hospitals in this case filed a complaint with the Board seeking to challenge their disproportionate share adjustments for the years 1987 through 1994. The hospitals acknowledged that their challenges, unlike Baystate's timely contest, were more than a decade out of time. But equitable tolling of the limitations period was in order, they urged, due to CMS's failure to inform the hospitals that their SSI fractions had been based on faulty data.

The PRRB held that it lacked jurisdiction over the hospitals' complaint, reasoning that it had no equitable powers save those legislation or regulation might confer, and that  **\*152**  the Secretary's regulation permitted it to excuse late appeals only for good cause, with three years as the outer limit. On judicial review, the District Court dismissed the hospitals' claims for relief, holding that nothing in the statute suggests that "Congress intended to authorize equitable tolling." 686 F.Supp.2d 55, 70 (D.D.C.2010).

The Court of Appeals reversed. 642 F.3d 1145 (C.A.D.C.2011). It relied on the presumption that statutory limitations periods are generally subject to equitable tolling and reasoned that " 'the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States.' " *Id., at 1148* (quoting *Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 95–96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990)). The presumption applies to the 180–day time limit for provider appeals from reimbursement determinations, the Court of Appeals held, finding nothing in the statutory provision for PRRB review indicating that Congress intended to disallow equitable tolling. 642 F.3d, at 1149–1151.

We granted the Secretary's petition for certiorari, 567 U.S. ——, 133 S.Ct. 30, 183 L.Ed.2d 674 (2012), to resolve a conflict among the Courts of Appeals over whether the 180–day time limit in 42 U.S.C. § 1395*oo* (a)(3) constricts the Board's jurisdiction. Compare 642 F.3d 1145 (case below); *Western Medical Enterprises, Inc. v. Heckler,* 783 F.2d 1376, 1379–1380 (C.A.9 1986) (180–day limit is not jurisdictional and the Secretary may extend it for good cause), with *Alacare Home Health Servs., Inc. v. Sullivan,* 891 F.2d 850, 855–856 (C.A.11 1990) (statute of limitations is jurisdictional and the Secretary lacked authority to promulgate good-cause exception); *St. Joseph's Hospital of Kansas City v. Heckler,* 786 F.2d 848, 852–853 (C.A.8 1986) (same). Beyond the jurisdictional inquiry, [4]  the Secretary  **\*153**  asked us to determine whether the Court of Appeals erred in concluding that equitable tolling applies to providers' Medicare reimbursement appeals to the PRRB, notwithstanding the  **\*\*824**  Secretary's regulation barring such appeals after three years.

**Sebelius v. Auburn Regional Medical Center, 568 U.S. 145 (2013)**
Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 747 of 912

133 S.Ct. 817, 184 L.Ed.2d 627, 81 USLW 4053, Med & Med GD (CCH) P 304,293...

## II

### A

 Characterizing a rule as jurisdictional renders it unique in our adversarial system. Objections to a tribunal's jurisdiction can be raised at any time, even by a party that once conceded the tribunal's subject-matter jurisdiction over the controversy. Tardy jurisdictional objections can therefore result in a waste of adjudicatory resources and can disturbingly disarm litigants. See *Henderson v. Shinseki,* 562 U.S. ——, ——, 131 S.Ct. 1197, 1202–1203, 179 L.Ed.2d 159 (2011); *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006). With these untoward consequences in mind, "we have tried in recent cases to bring some discipline to the use" of the term "jurisdiction." *Henderson,* 562 U.S., at ——, 131 S.Ct., at 1202; see also *Steel Co. v. Citizens for Better Environment,* 523 U.S. 83, 90, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (jurisdiction has been a "word of many, too many, meanings" (internal quotation marks omitted)).

 To ward off profligate use of the term "jurisdiction," we have adopted a "readily administrable bright line" for determining whether to classify a statutory limitation as jurisdictional. *Arbaugh,* 546 U.S., at 516, 126 S.Ct. 1235. We inquire whether Congress has "clearly state[d]" that the rule is jurisdictional; absent such a clear statement, we have cautioned, "courts should treat the restriction as nonjurisdictional in character." *Id.,* at 515–516, 126 S.Ct. 1235; see also *Gonzalez v. Thaler,* 565 U.S. ——, ——, 132 S.Ct. 641, 648–649, 181 L.Ed.2d 619 (2012); *Henderson,* 562 U.S., at ——, 131 S.Ct., at 1203. This is not to say that Congress must incant magic words in order to speak clearly. We consider "context, including this Court's **\*154** interpretations of similar provisions in many years past," as probative of whether Congress intended a particular provision to rank as jurisdictional. *Reed Elsevier, Inc. v. Muchnick,* 559 U.S. 154, 168, 130 S.Ct. 1237, 176 L.Ed.2d 18 (2010); see also *John R. Sand & Gravel Co. v. United States,* 552 U.S. 130, 133–134, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008).

 We reiterate what it would mean were we to type the governing statute, 42 U.S.C. § 1395*oo*(a)(3), "jurisdictional." Under no circumstance could providers engage PRRB review more than 180 days after notice of the fiscal intermediary's final determination. Not only could there be no equitable tolling. The Secretary's regulation providing for a good-cause extension, see *supra,* at 822, would fall as well.

The language Congress used hardly reveals a design to preclude any regulatory extension. Section 1395*oo*(a)(3) instructs that a provider of services "may obtain a hearing" by the Board regarding its reimbursement amount if "such provider files a request for a hearing within 180 days after notice of the intermediary's final determination." This provision "does not speak in jurisdictional terms." *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 394, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). Indeed, it is less "jurisdictional" in tone than the provision we held to be nonjurisdictional in *Henderson.* There, the statute provided that a veteran seeking Veterans Court review of the Department of Veterans Affairs' determination of disability benefits "*shall* file a notice of appeal ... within 120 days." 562 U.S., at ——, 131 S.Ct., at 1204 (quoting 38 U.S.C. § 7266(a) (emphasis added)). Section 1395*oo*(a)(3), by contrast, contains neither the mandatory word "shall" nor the appellation "notice of appeal," **\*\*825** words with jurisdictional import in the context of 28 U.S.C. § 2107's limitations on the time for appeal from a district court to a court of appeals. See *Bowles v. Russell,* 551 U.S. 205, 214, 127 S.Ct. 2360, 168 L.Ed.2d 96 (2007).

Key to our decision, we have repeatedly held that filing deadlines ordinarily are not jurisdictional; indeed, we have described them as "quintessential claim-processing rules." *Henderson,* 562 U.S., at ——, 131 S.Ct., at 1203; see also *Scarborough v. Principi,* **\*155** 541 U.S. 401, 414, 124 S.Ct. 1856, 158 L.Ed.2d 674 (2004) (filing deadline for fee applications under Equal

Sebelius v. Auburn Regional Medical Center, 568 U.S. 145 (2013)

133 S.Ct. 817, 184 L.Ed.2d 627, 81 USLW 4053, Med & Med GD (CCH) P 304,293...

Access to Justice Act); *Kontrick v. Ryan,* 540 U.S. 443, 454, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004) (filing deadlines for objecting to debtor's discharge in bankruptcy); *Honda v. Clark,* 386 U.S. 484, 498, 87 S.Ct. 1188, 18 L.Ed.2d 244 (1967) (filing deadline for claims under the Trading with the Enemy Act). This case is scarcely the exceptional one in which a " century's worth of precedent and practice in American courts" rank a time limit as jurisdictional. *Bowles,* 551 U.S., at 209, n. 2, 127 S.Ct. 2360; cf. *Kontrick,* 540 U.S., at 454, 124 S.Ct. 906 (a time limitation may be emphatic, yet not jurisdictional).

### B

*Amicus* urges that the three requirements in § 1395oo(a) are specifications that together define the limits of the PRRB's jurisdiction. Subsection (a)(1) specifies the claims providers may bring to the Board, and subsection (a)(2) sets forth an amount-in-controversy requirement. These are jurisdictional requirements, *amicus* asserts, so we should read the third specification, subsection (a)(3)'s 180–day limitation, as also setting a jurisdictional requirement.

Last Term, we rejected a similar proximity-based argument. A requirement we would otherwise classify as nonjurisdictional, we held, does not become jurisdictional simply because it is placed in a section of a statute that also contains jurisdictional provisions. *Gonzalez,* 565 U.S., at ——, 132 S.Ct., at 651–652; see *Weinberger v. Salfi,* 422 U.S. 749, 763–764, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) (statutory provision at issue contained three requirements for judicial review, only one of which was jurisdictional).

*Amicus* also argues that the 180–day time limit for provider appeals to the PRRB should be viewed as jurisdictional because Congress could have expressly made the provision nonjurisdictional, and indeed did so for other time limits in the Medicare Act. *Amicus* notes particularly that when Medicare beneficiaries request the Secretary to reconsider a benefits determination, the statute gives them a time limit of 180 days or "such additional time as the Secretary may allow." 42 U.S.C. § 1395ff(b)(1)(D)(i); see also § 1395ff(b)(1)(D)(ii) **\*156** (permitting Medicare beneficiary to request a hearing by the Secretary within "time limits" the Secretary "shall establish in regulations"). We have recognized, as a general rule, that Congress's use of "certain language in one part of the statute and different language in another" can indicate that "different meanings were intended." *Sosa v. Alvarez–Machain,* 542 U.S. 692, 711, n. 9, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (internal quotation marks omitted). *Amicus* notes this general rule in urging that an express grant of authority for the Secretary to extend the time for beneficiary appeals implies the absence of such leeway for provider appeals.

But the interpretive guide just identified, like other canons of construction, is "no more than [a] rul[e] of thumb" that can tip the scales when a statute could be read in multiple ways. *Connecticut* **\*\*826** *Nat. Bank v. Germain,* 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). For the reasons earlier stated, see *supra,* at 823 – 825, we are persuaded that the time limitation in § 1395oo(a) is most sensibly characterized as a nonjurisdictional prescription. The limitation therefore does not bar the modest extension contained in the Secretary's regulation.

### III

We turn now to the question whether § 1395oo(a)(3)'s 180–day time limit for a provider to appeal to the PRRB is subject to equitable tolling.

**Sebelius v. Auburn Regional Medical Center, 568 U.S. 145 (2013)**

133 S.Ct. 817, 184 L.Ed.2d 627, 81 USLW 4053, Med & Med GD (CCH) P 304,293...

A

Congress vested in the Secretary large rulemaking authority to administer the Medicare program. The PRRB may adopt rules and procedures only if "not inconsistent" with the Medicare Act or "regulations of the Secretary." 42 U.S.C. § 1395*oo*(e). Concerning the 180–day period for an appeal to the Board from an intermediary's reimbursement determination, the Secretary's regulation implementing § 1395*oo,* adopted after notice and comment, speaks in no uncertain terms:

**\*157** "A request for a Board hearing filed after [the 180–day time limit] shall be dismissed by the Board, except that for good cause shown, the time limit may be extended. However, no such extension shall be granted by the Board if such request is filed more than 3 years after the date the notice of the intermediary's determination is mailed to the provider." 42 CFR § 405.1841(b) (2007).

The Secretary allowed only a distinctly limited extension of time to appeal to the PRRB, cognizant that "the Board is burdened by an immense caseload," and that "procedural rules requiring timely filings are indispensable devices for keeping the machinery of the reimbursement appeals process running smoothly." *High Country Home Health, Inc. v. Thompson,* 359 F.3d 1307, 1310 (C.A.10 2004). Imposing equitable tolling to permit appeals barred by the Secretary's regulation would essentially gut the Secretary's requirement that an appeal to the Board "shall be dismissed" if filed more than 180 days after the NPR, unless the provider shows "good cause" and requests an extension *no later than* three years after the NPR. A court lacks authority to undermine the regime established by the Secretary unless her regulation is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The Secretary's regulation, we are satisfied, survives inspection under that deferential standard. As HHS has explained, "[i]t is in the interest of providers and the program that, at some point, intermediary determinations and the resulting amount of program payment due the provider or the program become no longer open to correction." CMS, Medicare: Provider Reimbursement Manual, pt. 1, ch. 29, § 2930, p. 29–73 (rev. no. 372, 2011); cf. *Taylor v. Freeland & Kronz,* 503 U.S. 638, 644, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992) ( "Deadlines may lead to unwelcome results, but they prompt parties to act and produce finality."). The Secretary brought to bear practical experience in superintending the huge program generally, and the **\*158** PRRB in particular, in maintaining three years as the outer limit. A court must uphold the Secretary's judgment as long as it is a permissible construction of the statute, even if it differs from how the court would have interpreted the statute in the absence of an agency regulation. **\*\*827** *National Cable & Telecommunications Assn. v. Brand X Internet Services,* 545 U.S. 967, 980, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005); see also *Chevron,* 467 U.S., at 843, n. 11, 104 S.Ct. 2778.

B

Rejecting the Secretary's position, the Court of Appeals relied principally on this Court's decision in *Irwin,* 498 U.S., at 95–96, 111 S.Ct. 453. *Irwin* concerned the then 30–day time period for filing suit against a federal agency under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16(c) (1988 ed.). We held in *Irwin* that "the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States." 498 U.S., at 95–96, 111 S.Ct. 453. *Irwin* itself, and equitable-tolling cases we have considered both pre- and post-*Irwin,* have generally involved time limits for filing suit in federal court. See, *e.g.,* *Holland v. Florida,* 560 U.S. 631, 130 S.Ct. 2549, 177 L.Ed.2d 130 (2010) (one-year limitation for filing application for writ of habeas corpus); *Rotella v. Wood,* 528 U.S. 549, 120 S.Ct.

1075, 145 L.Ed.2d 1047 (2000) (four-year period for filing civil RICO suit); *United States v. Beggerly,* 524 U.S. 38, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998) (12–year period to bring suit under Quiet Title Act); *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (one- and three-year periods for commencing civil action under § 10(b) of the Securities Exchange Act of 1934); *Honda v. Clark,* 386 U.S. 484, 87 S.Ct. 1188, 18 L.Ed.2d 244 (1967) (60–day period for filing suit under Trading with the Enemy Act); *Kendall v. United States,* 107 U.S. 123, 2 S.Ct. 277, 27 L.Ed. 437 (1883) (six-year period for filing suit in Court of Claims). Courts in those cases rendered in the first instance the decision whether equity required tolling.

This case is of a different order. We have never applied the *Irwin* presumption to an agency's internal appeal deadline, **\*159** here the time a provider has to appeal an intermediary's reimbursement determination to the PRRB. Cf. *United States v. Brockamp,* 519 U.S. 347, 350, 117 S.Ct. 849, 136 L.Ed.2d 818 (1997) (assuming, *arguendo,* that *Irwin* presumption applied to time limit for filing an administrative claim for a tax refund, but concluding based on statutory text, structure, and purpose that there was "good reason to believe that Congress did *not* want the equitable tolling doctrine to apply").

The presumption of equitable tolling was adopted in part on the premise that "[s]uch a principle is likely to be a realistic assessment of legislative intent." *Irwin,* 498 U.S., at 95, 111 S.Ct. 453. But that premise is inapt in the context of providers' administrative appeals under the Medicare Act. The Act, until 1972, provided no avenue for providers to obtain administrative or judicial review. When Congress first directed the Secretary to establish the PRRB, Congress simultaneously imposed the 180–day deadline, with no statutory exceptions. For nearly 40 years the Secretary has prohibited the Board from extending that deadline, except as provided by regulation. And until the D.C. Circuit's decision in this case, no court had ever read equitable tolling into § 1395oo(a)(3) or the Secretary's implementation of that provision. Congress amended § 1395oo six times since 1974, each time leaving untouched the 180–day administrative appeal provision and the Secretary's rulemaking authority. At no time did Congress express disapproval of the three-year outer time limit set by the Secretary for an extension upon a showing of good cause. See *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 846, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) ("[W]hen Congress revisits a statute giving rise to a longstanding administrative interpretation **\*\*828** without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." (internal quotation marks omitted)).

We note, furthermore, that unlike the remedial statutes at issue in many of this Court's equitable-tolling decisions, see **\*160** *Irwin,* 498 U.S., at 91, 111 S.Ct. 453; *Bowen v. City of New York,* 476 U.S. 467, 480, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986); *Zipes,* 455 U.S., at 398, 102 S.Ct. 1127, the statutory scheme before us is not designed to be " 'unusually protective' of claimants." *Bowen,* 476 U.S., at 480, 106 S.Ct. 2022. Nor is it one "in which laymen, unassisted by trained lawyers, initiate the process." *Zipes,* 455 U.S., at 397, 102 S.Ct. 1127 (internal quotation marks omitted). The Medicare payment system in question applies to " sophisticated" institutional providers assisted by legal counsel, and " generally capable of identifying an underpayment in [their] own NPR within the 180–day time period specified in 42 U.S.C. § 1395oo (a)(3)." *Your Home Visiting Nurse Services, Inc. v. Shalala,* 525 U.S. 449, 456, 119 S.Ct. 930, 142 L.Ed.2d 919 (1999). As repeat players who elect to participate in the Medicare system, providers can hardly claim lack of notice of the Secretary's regulations.

The hospitals ultimately argue that the Secretary's regulations fail to adhere to the "fundamentals of fair play." *FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134, 143, 60 S.Ct. 437, 84 L.Ed. 656 (1940). They point, particularly, to 42 CFR § 405.1885(b)(3) (2012), which permits reopening of an intermediary's reimbursement determination "at any time if it is established that such determination ... was procured by fraud or similar fault of any party to the determination." [5]

133 S.Ct. 817, 184 L.Ed.2d 627, 81 USLW 4053, Med & Med GD (CCH) P 304,293...

We considered a similar alleged inequity in *Your Home* and explained that it was justified by the "administrative realities" of the provider reimbursement appeal system. 525 U.S., at 455, 119 S.Ct. 930. There are only a few dozen fiscal intermediaries and they are charged with issuing tens of thousands of NPRs, while each provider can concentrate on a single NPR, its own. *Id.,* at 456, 119 S.Ct. 930. The Secretary, *Your Home* concluded, could reasonably believe that this asymmetry justifies giving the intermediaries more time to discover overpayments **\*161** than the providers have to discover underpayments. Moreover, the fraud exception allowing indefinite reopening does apply to an intermediary if it "procured" a Board decision by "fraud or similar fault." Although an intermediary is not a party to its own determination, it does rank as a party in proceedings before the Board. 42 CFR § 405.1843(a). [6]

We hold, in sum, that the 180–day statutory deadline for administrative appeals to the PRRB, contained in 42 U.S.C. § 1395*oo*(a)(3), is not "jurisdictional." Therefore the Secretary lawfully exercised her rulemaking authority in providing for a three-year "good cause" extension. We further hold that the equitable tolling presumption our *Irwin* decision approved for **\*\*829** suits brought in court does not similarly apply to administrative appeals of the kind here considered, and that the Secretary's regulation, 42 CFR § 405.1841(b), is a permissible interpretation of the statute.

The judgment of the United States Court of Appeals for the District of Columbia Circuit is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*


Justice SOTOMAYOR, concurring.

The Court holds that the presumption in favor of equitable tolling that we adopted in *Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 95–96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990), does not apply to 42 U.S.C. § 1395*oo*(a)(3)'s nonjurisdictional 180–day deadline for health care providers to file administrative appeals with the Provider Reimbursement Review Board (PRRB), and that **\*162** the Secretary's regulation limiting "good cause" extensions of that deadline to three years is a permissible interpretation of the statute. I agree with those holdings and join the Court's opinion in full. I write separately to note that the Court's decision in this case does not establish that equitable tolling principles are irrelevant to internal administrative deadlines in all, or even most, contexts.

The Court is correct that our equitable tolling cases have typically involved deadlines to bring suit in federal court. *Ante,* at 827. But we have never suggested that the presumption in favor of equitable tolling is generally inapplicable to administrative deadlines. Cf. *Henderson v. Shinseki,* 562 U.S. ——, ——, n. 4, 131 S.Ct. 1197, 1206, n. 4, 179 L.Ed.2d 159 (2011) (noting that the Government did not dispute whether the statutory filing deadline in the Article I Veterans Court was subject to equitable tolling if the deadline was nonjurisdictional); *United States v. Brockamp,* 519 U.S. 347, 350–353, 117 S.Ct. 849, 136 L.Ed.2d 818 (1997) (assuming without deciding that the *Irwin* presumption applied to administrative tax refund claims but finding based on statutory text, structure, and the underlying subject matter that tolling was unavailable); see also *ante,* at 827 (discussing *Brockamp*). And we have previously applied the *Irwin* presumption outside the context of filing deadlines in Article III courts. See *Young v. United States,* 535 U.S. 43, 49–53, 122 S.Ct. 1036, 152 L.Ed.2d 79 (2002) (applying the presumption to a limitations period in bankruptcy proceedings); cf. *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 392–398, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982) (holding that the statutory time limit for filing charges with the Equal Employment Opportunity Commission was "not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling").

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 752 of 912

Sebelius v. Auburn Regional Medical Center, 568 U.S. 145 (2013)

133 S.Ct. 817, 184 L.Ed.2d 627, 81 USLW 4053, Med & Med GD (CCH) P 304,293...

In administrative settings other than the one presented here, I believe the "background principle" that limitations periods "are customarily subject to equitable tolling," *Young, 535 U.S., at 49–50, 122 S.Ct. 1036* (internal quotation marks omitted), may limit an agency's discretion to make filing deadlines absolute **\*163** . The Court quite properly observes that the question whether equitable tolling is available turns on congressional intent. See *ante,* at 827. "[A] realistic assessment" of that intent, *Irwin, 498 U.S., at 95, 111 S.Ct. 453,* may vary by context.

In this case, given the nature of the statutory scheme, which "applies to 'sophisticated' institutional providers" who are "repeat players" in the Medicare system, and the statute's history, I agree that it would distort congressional intent to presume that the PRRB's administrative deadline should be subject to equitable tolling. *Ante,* at 827 – 828 (quoting *Your* **\*\*830** *Home Visiting Nurse Services, Inc. v. Shalala,* 525 U.S. 449, 456, 119 S.Ct. 930, 142 L.Ed.2d 919 (1999)). By contrast, with respect to remedial statutes designed to protect the rights of unsophisticated claimants, see *ante,* at 827, agencies (and reviewing courts) may best honor congressional intent by presuming that statutory deadlines for administrative appeals are subject to equitable tolling, just as courts presume comparable judicial deadlines under such statutes may be tolled. Because claimants must generally pursue administrative relief before seeking judicial review, see *Woodford v. Ngo,* 548 U.S. 81, 88–91, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), a contrary approach could have odd practical consequences and would attribute a strange intent to Congress: to protect a claimant's ability to seek judicial review of an agency's decision by making equitable tolling available, while leaving to the agency's discretion whether the same claimant may invoke equitable tolling in order to seek an administrative remedy in the first place.

Even in cases where the governing statute clearly delegates to an agency the discretion to adopt rules that limit the scope of equitable exceptions to administrative deadlines, I believe "cases may arise where the equities in favor of tolling the limitations period are 'so great that deference to the agency's judgment is inappropriate.' " *Bowen v. City of New York,* 476 U.S. 467, 480, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986) (quoting *Mathews v. Eldridge,* 424 U.S. 319, 330, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). In particular, efforts by an agency to enforce tight filing deadlines in cases where **\*164** there are credible allegations that filing delay was due to the agency's own misfeasance may not survive deferential review. While equitable tolling extends to circumstances outside both parties' control, the related doctrines of equitable estoppel and fraudulent concealment may bar a defendant from enforcing a statute of limitation when its own deception prevented a reasonably diligent plaintiff from bringing a timely claim. See *United States v. Beggerly,* 524 U.S. 38, 49–50, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998) (Stevens, J., concurring) (noting that these doctrines are distinct); see generally 2 C. Corman, Limitation of Actions §§ 9.1, 9.7 (1991) (describing the doctrines). In *Bowen,* we applied the basic principle underlying these doctrines to an agency's conduct, as we concluded that a 60–day deadline to seek judicial review of the administrative denial of disability benefits should be tolled because the Social Security Administration's " 'secretive conduct prevent[ed] plaintiffs from knowing of a violation of rights.' " *476 U.S., at 481, 106 S.Ct. 2022* (quoting *New York v. Heckler,* 742 F.2d 729, 738 (C.A.2 1984)).

While the providers in this case allege that the agency's failure to disclose information about how it calculated the Supplemental Security Income fraction prevented them from bringing timely challenges to reimbursement determinations, I am satisfied that the Secretary's 3–year good-cause exception is a reasonable accommodation of the competing interests in administrative efficiency and fairness. We would face a different case if the Secretary's regulation did not recognize an exception for good cause or defined good cause so narrowly as to exclude cases of fraudulent concealment and equitable estoppel. See *ante,* at 822, n. 2 (explaining that the Secretary's amended regulation limiting the scope of " 'good cause,' " 73 Fed.Reg. 30250 (2008) (codified in 42 CFR § 405.1836(b) (2012)), is not before us).

With these observations, I join the Court's opinion in full.

Sebelius v. Auburn Regional Medical Center, 568 U.S. 145 (2013)

133 S.Ct. 817, 184 L.Ed.2d 627, 81 USLW 4053, Med & Med GD (CCH) P 304,293...

**All Citations**

568 U.S. 145, 133 S.Ct. 817, 184 L.Ed.2d 627, 81 USLW 4053, Med & Med GD (CCH) P 304,293, 13 Cal. Daily Op. Serv. 773, 2013 Daily Journal D.A.R. 936, 23 Fla. L. Weekly Fed. S 565

## Footnotes

*   The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1   The agency was called the Department of Health, Education, and Welfare until 1979, but for simplicity's sake we refer to it as HHS throughout this opinion.

2   In 2008, after this case commenced, the Secretary replaced the 1974 regulation with a new prescription limiting "good cause" to "extraordinary circumstances beyond [the provider's] control (such as a natural or other catastrophe, fire, or strike)." 73 Fed.Reg. 30250 (2008) (codified in 42 CFR § 405.1836(b) (2012)). The new regulation retains the strict three-year cutoff for all claims. § 405.1836(c)(2). The parties agree that this case is governed by the 1974 regulation, and our opinion today addresses only that regulation.

3   In § 951 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, 117 Stat. 2427, Congress required the Secretary to furnish hospitals with the data necessary to compute their own disproportionate share adjustment. Pursuant to this congressional mandate, the Secretary has adopted procedures for turning over the SSI data to hospitals upon request. 70 Fed.Reg. 47438 (2005).

4   Because no party takes the view that the statutory 180–day time limit is jurisdictional, we appointed John F. Manning to brief and argue this position as *amicus curiae.* 567 U.S. ——, 133 S.Ct. 30, 183 L.Ed.2d 674 (2012). *Amicus* Manning has ably discharged his assigned responsibilities and the Court thanks him for his well-stated arguments.

5   Because neither the Secretary nor the intermediary counts as a party to the intermediary's determination, 42 CFR § 405.1805, providers alone are subject to this exception to the time limitation.

6   The fraud exception apart, reopening time is limited to three years. § 405.1885(a). Within that time, reopening may be sought by the intermediary, the Board, the Secretary, or the provider. Thus an intermediary determination or Board decision could not be reopened if, outside the three-year window, the Secretary discovered errors in calculating the SSI fraction that resulted in overpayments to providers.

* * *

---

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

24 F.3d 249
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA9 Rule 36-3 for rules regarding the citation of unpublished opinions.)
United States Court of Appeals, Ninth Circuit.

Kaivan SHARIFZADEH–FAHRAJI, Petitioner,

v.

IMMIGRATION & NATURALIZATION SERVICE, Respondent.

No. 92–70695.
|
Argued and Submitted March 15, 1994.
|
Decided April 15, 1994.

Petition to Review a Decision of the Immigration and Naturalization Service, No. A41–162–546.

**Synopsis**
BIA

PETITION DENIED.

**Procedural Posture(s):** On Appeal.

Before: POOLE, CANBY, and RYMER, Circuit Judges.


MEMORANDUM *

**\*1**  Kaivan Sharifzadeh–Fahraji petitions for review of the Board of Immigration Appeals' decision dismissing his appeal from a deportation order under section 241(a)(1) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1251(a)(1), as an alien excludable at entry under section 212(a)(14) and (a)(20) of the INA, 8 U.S.C. § 1182(a)(14) and (a)(20). Fahraji's immigrant visa was based on a second marriage (to a United States citizen) although at the time of entry he was still legally married to his first wife. His principal argument is that the BIA erred in failing to give an annulment of the first marriage, obtained after entry, retroactive effect. We have jurisdiction, 8 U.S.C. § 1105a(a), and we deny the petition for review.


I

Although he articulates the argument in a number of ways, Fahraji's appeal turns on his contention that the BIA erred by failing to give retroactive effect to the annulment. He claims that because the annulment had the effect of making his first marriage void from the outset, the BIA must disregard the first marriage altogether. We disagree. The Board does not have to give retroactive effect to annulments. *Hendrix v. INS*, 583 F.2d 1102 (9th Cir.1978). "Unless unusual circumstances dictate that in the interest of justice retroactive effect should be given an annulment, it is the marital status at the time of entry that should serve as the basis for one alien's preferment over others under the quota system." *Id.* at 1103 (citation omitted). When Fahraji applied for his

AR.07250

immigrant visa, he did not acknowledge his participation in a prior marriage ceremony. Nor did he file for the annulment until after the INS issued an order to show cause. Moreover, Fahraji presented nothing to indicate his circumstances are sufficiently unusual that justice demands his annulment be given retroactive effect.

Whether or not his annulment "relates back" for other purposes, the question here is whether it relates back for immigration purposes. *Matter of Wong,* 16 I & N Dec. 87, 89 (BIA 1977). It is not fatal to the BIA's position in this case that in others it has given an annulment retroactive effect. [1] As we cannot say the BIA erred in not finding special circumstances in this case, we affirm the Board.

## II

Fahraji makes two additional, related arguments. First, he submits that the immigration court lacked jurisdiction to challenge his second marriage and that collateral estoppel precludes relitigating his marriage. However, neither the IJ nor the BIA adjudicated Fahraji's marriage to Baltazar. Rather, they determined whether Fahraji, as a matter of immigration law, had been admitted properly to the United States as the spouse of an American citizen. A finding by an immigration agency that Fahraji was excludable at entry is not an adjudication of his marital status.

Fahraji also argues that the Hawaii state court annulment decree is entitled to full faith and credit by federal courts and agencies and that the BIA's failure to give the annulment retroactive effect violates the Tenth Amendment of the United States Constitution. Deciding that Fahraji was excludable at entry does not undermine the annulment decree, or have any bearing on the validity of the annulment or Hawaii's authority to grant the decree. The Full Faith and Credit Clause is therefore not implicated.

## III

**\*2** Finally, Fahraji argues that the IJ erred in admitting an unauthenticated copy of a marriage contract between Fahraji and his first wife because an uncertified official record is not evidence and should not have been considered. However, administrative proceedings are not controlled by strict rules of evidence; the law requires only that an alien be afforded due process. *Cunanan v. INS,* 856 F.2d 1373, 1374 (9th Cir.1988); *Matter of Magana,* 17 I & N Dec. 111, 115 (BIA 1979) ("Suffice it to say that the Federal Rules of Civil Procedure are not applicable in deportation proceedings."). Even if receiving the contract were error, Fahraji was not denied due process since he has shown no prejudice. *Garcia–Jaramillo v. INS,* 604 F.2d 1236, 1239 (9th Cir.1979), *cert. denied,* 449 U.S. 828 (1980); *see also Matter of Santos,* 19 I & N Dec. 105 (BIA 1986) (alien must demonstrate prejudice by violation of procedural rule or regulation before deportation proceeding will be invalidated). As Fahraji admitted that he had participated in the first marriage ceremony and that he was party to a contract of marriage, the document itself was cumulative and thus not prejudicial.

PETITION DENIED.

## All Citations

24 F.3d 249 (Table), 1994 WL 140652

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## Footnotes

\*      This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36–3.

1      Five of the BIA decisions Fahraji cites in which an annulment was given retroactive effect pre-date *Hendrix. See* *Matter of Samedi,* 14 I & N Dec. 625 (BIA 1974); *Matter of Kwan,* 11 I & N Dec. 205 (BIA 1965); *Matter of F–,* 8 I & N Dec. 251 (BIA 1959); *Matter of V–,* 6 I & N Dec. 153 (BIA 1954); *Matter of T–,* 3 I & N Dec. 528 (BIA 1949). The only post-*Hendrix* BIA decision upon which he relies, *Matter of Astorga,* 17 I & N Dec. 1 (BIA 1979), involves an alien whose immigrant status was dependent upon the marriage which was annulled, a situation factually different from this case.

---

**End of Document**      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

419 F.3d 276
United States Court of Appeals,
Fourth Circuit.

Omima Ibrahim SOLIMAN, Petitioner,

v.

Alberto R. GONZALES, Attorney General, Respondent.

No. 04–1990.
|
Argued May 24, 2005.
|
Decided Aug. 22, 2005.

**Synopsis**

**Background:** Alien petitioned for review of order of Board of Immigration Appeals (BIA) ordering her removal.

The Court of Appeals, King, Circuit Judge, held that alien's Virginia conviction for credit card fraud was not for an aggravated felony rendering her removable under Immigration and Nationality Act.

Petition granted.

**Attorneys and Law Firms**

**\*277 ARGUED:** Thomas Kirk Ragland, Elliot & Mayock, Washington, D.C., for Petitioner. Daniel Eric Goldman, United States Department of Justice, Office of Immigration Litigation, Washington, D.C., for Respondent. **ON BRIEF:** Thomas A. Elliot, Fabienne Chatain, Elliot & Mayock, Washington, D.C., for Petitioner. Peter D. Keisler, Assistant Attorney General, Civil Division, James A. Hunolt, Senior Litigation, Michele Y.F. Sarko, Civil Division, Office of Immigration Litigation, Washington, D.C., for Respondent.

Before WILLIAMS, KING, and GREGORY, Circuit Judges.

Petition for review granted and order of removal vacated by published opinion. Judge KING wrote the opinion, in which Judge WILLIAMS and Judge GREGORY joined.

**OPINION**

KING, Circuit Judge.

Petitioner Omima Ibrahim Soliman has filed a petition seeking review by this **\*278** Court of the July 13, 2004, 🚩 2004 WL 1739198 decision of the Board of Immigration Appeals ("BIA") ordering her removal to Egypt. By our Order of June 21, 2005, we have granted the petition for review and vacated the BIA's order of removal, in that the BIA's order was premised on the erroneous determination that Soliman had been previously convicted of an "aggravated felony," as that term is defined in 🚩 8

U.S.C. § 1101(a)(43)(A)–(U). [1] This opinion further explains the rulings embodied in our June 21, 2005 Order, and it is filed pursuant thereto.

## I.

Soliman is a native of Egypt, and she immigrated to this country on May 31, 1996. On May 20, 2002, Soliman was indicted in Fairfax County, Virginia, for the offense of "Fraudulent Use of a Credit Card," in violation of Virginia Code § 18.2–195, for having represented that she was the holder of a credit card belonging to someone else, without the card holder's consent, to obtain property in excess of $200. [2] Soliman was convicted on June 10, 2002 and, on October 21, 2002, the court sentenced her to two years of incarceration, all suspended, plus two years of probation.

On December 16, 2003, the Immigration and Naturalization Service (the "INS") issued Soliman a Notice to Appear and initiated removal proceedings against her. The Notice to Appear classified Soliman as removable from this country pursuant to the provisions of 8 U.S.C. § 1227(a)(2)(A)(iii), which gives the Attorney General the authority to deport "[a]ny alien who is convicted of an aggravated felony at any time after admission." The aggravated felonies subject to this statutory provision are enumerated in 8 U.S.C. § 1101(a)(43)(A)–(U). [3] Of importance here, these aggravated felonies include "a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment [is] at least one year," § 1101(a)(43)(G) ("Subsection (G)"), and "an offense that ... involves fraud or deceit in which the loss to the victim or victims exceeds $10,000," § 1101(a)(43)(M)(i) ("Subsection (M)(i)").

The INS's Notice to Appear alleged that Soliman's Virginia conviction for credit card fraud constituted a "theft offense" under Subsection (G). Soliman maintained otherwise, however, asserting that her offense was not a "theft offense" under Subsection (G), but rather a fraud offense, covered by Subsection (M)(i). According **\*279** to Soliman, the offense for which she was convicted involved less than the $10,000 specified in Subsection (M)(i), and thus is not an aggravated felony and a proper basis for deportation. [4]

By decision of January 29, 2004, the Immigration Judge (the "IJ") rejected each of Soliman's contentions, agreeing with the INS and concluding that her conviction was for a theft offense under Subsection (G). In so ruling, the IJ defined a "theft offense" as a criminal offense where there is "a criminal intent to deprive the owner of the rights and benefits of ownership." The IJ reasoned that, because Soliman "was not entitled to obtain the property that she did under the statute under which she was convicted," her crime involved theft within the meaning of Subsection (G).

The BIA affirmed the IJ's ruling by its Order of July 13, 2004 (the "BIA Order"), from which Soliman's petition for review emanates. [5] Although the BIA agreed with Soliman that her offense "by its terms, involves fraud," it nonetheless concluded that the theft and fraud subsections of § 1101(a)(43), spelled out in Subsections (G) and (M)(i), "are not mutually exclusive," and ruled that "a crime which involves fraud may also involve theft." BIA Order at 1. "Indeed," the BIA observed, "the common definition of the term 'theft' includes fraud." *Id.* (citing *Black's Law Dictionary,* defining theft as a "popular name for larceny ... [t]he fraudulent taking of personal property belonging to another ... without his consent, with the intent to deprive the owner of the value of the same"). The BIA then defined a "theft offense" as "the unlawful taking of property, whenever there is a criminal intent to deprive the owner of the rights or benefits of ownership, either permanently or less so." *Id.* at 2.

In assessing whether Soliman's conviction was for a theft offense, the BIA applied the "categorical approach" set forth and explained by the Supreme Court in *Taylor v. United States,* 495 U.S. 575, 598–600, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990) (explaining that court analyzing prior conviction must first look to categorical nature of statute of prior conviction, and then, if

necessary, look to certain facts underlying conviction). In so doing, the BIA first concluded that ⬛ Virginia Code § 18.2–195, under which Soliman was convicted, is not a "categorical" theft statute—in other words, its elements are not the same as the elements of a theft offense under federal law. Looking then to Soliman's indictment to determine the particular facts underlying her conviction, the BIA found that the actual conduct underlying her offense was the functional equivalent of a theft offense as the BIA had defined it: "the unlawful taking of property, whenever there is a criminal intent to deprive the owner of the rights of benefits of ownership, either permanently or less so." BIA Order at 2. Specifically, the BIA concluded that, in Soliman's prosecution in Fairfax County, there had been an "unlawful taking of property" from *the merchant* because "[t]he fraud renders the taking unlawful"; further, it found there was "criminal intent to deprive the owner of the rights and benefits of ownership" because **\*280** Soliman had deprived "*the card's true owner* of his or her benefits or rights of ownership." *Id.* (emphasis added).

By her petition for review, Soliman has raised a single issue: whether the BIA erred in determining that she was deportable because her Virginia conviction constituted an aggravated felony, *i.e.,* a "theft offense" pursuant to Subsection(G).

## II.

As an initial matter, we recognize that our jurisdiction to consider and resolve petitions for review from the decisions of the BIA is limited. 🚩 Section 1252(a)(2)(C) of Title 8, United States Code, provides that no court has jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense. We have recognized, however, that we possess limited "jurisdiction to review factual determinations that trigger the jurisdiction-stripping provision"—specifically, (1) whether Soliman is an alien, and (2) whether she has been convicted of an aggravated felony. *See* *Ramtulla v. Ashcroft,* 301 F.3d 202, 203 (4th Cir.2002) (citing ⬛ Calcano–Martinez v. INS, 533 U.S. 348, 350 n. 2, 121 S.Ct. 2268, 150 L.Ed.2d 392 (2001)). If either of these two factual determinations is found to be erroneous, we possess jurisdiction over Soliman's petition for review; otherwise, we are obliged to dismiss her petition. *See* 🚩 Lewis v. INS, 194 F.3d 539, 542 (4th Cir.1999) (explaining that "jurisdiction turns on presence, or lack thereof, of these two facts" and court therefore has "jurisdiction to review them").

By her petition for review, Soliman admits the fact that she is an alien. The only jurisdictional fact she contests is whether she was convicted in Virginia state court of an "aggravated felony" within the meaning of 🚩 8 U.S.C. § 1101(a)(43).

## III.

In support of her position in this proceeding, Soliman makes two contentions. First, she maintains that her conviction in Virginia was for an offense that involves fraud or deceit, that she was not convicted of a theft offense, and that the BIA erred in improperly characterizing her conviction as a theft offense under Subsection (G). In support of this contention, she points to the definitions of "theft offense" adopted in similar proceedings by our sister circuits. *See* 🚩 Nugent v. Ashcroft, 367 F.3d 162, 174 (3d Cir.2004) (defining theft offense as "a taking of property or an exercise of control over property *without consent* ") (emphasis added); 🚩 United States v. Corona–Sanchez, 291 F.3d 1201, 1205 (9th Cir.2002) (same); ⬛ United States v. Vasquez–Flores, 265 F.3d 1122, 1125 (10th Cir.2001) (same); ⬛ Hernandez–Mancilla v. INS, 246 F.3d 1002, 1009 (7th Cir.2001) (same). Second, and alternatively, Soliman maintains that if her Virginia conviction included both theft and fraud, we should adhere to the reasoning of the Third Circuit in *Nugent,* and apply the $10,000 minimum threshold of Subsection (M)(i) to any such hybrid offense. 🚩 367 F.3d at 176. The Attorney General contends in response, first, that the BIA properly categorized Soliman's conviction as a "theft offense," and thus as an aggravated felony, and second, that the BIA's interpretation of 🚩 8 U.S.C. § 1101(a)(43) is

entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Because we are able to resolve Soliman's petition for review by finding that Soliman's conviction was not for a theft offense under Subsection (G), we need not reach and address her alternative contention with respect to imputing Subsection (M)(i)'s minimum threshold to Subsection (G).

*\*281* A.

1.

 The Supreme Court has determined that the special deference rules of *Chevron* apply to BIA interpretations of the statutes it administers. *See INS v. Aguirre–Aguirre,* 526 U.S. 415, 424–25, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999); *see also Blanco de Belbruno v. Ashcroft,* 362 F.3d 272, 278 (4th Cir.2004) (applying *Chevron* to BIA interpretations of INS regulations). As the Court has explained, such deference is premised on the proposition that " 'the power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.' " *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778 (quoting *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974)). When *Chevron* deference applies, a court in reviewing an agency action "is confronted with two questions":

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43, 104 S.Ct. 2778. More specifically, *Chevron* deference applies to the BIA's interpretations of the Immigration and Nationality Act, the statute at issue here. *See Aguirre–Aguirre,* 526 U.S. at 424, 119 S.Ct. 1439; *see also Blanco de Belbruno,* 362 F.3d at 278.

Pursuant to the foregoing, we are obliged to apply the principles of *Chevron* to the BIA's determination of the underlying issue in this case—the meaning of Subsection (G). However, we need not accord deference to the BIA's ultimate finding that Soliman's particular offense was an aggravated felony, which involves an issue of our appellate jurisdiction and an interpretation of Virginia criminal law, neither of which lies within the BIA's authority or expertise. *See Aguirre–Aguirre,* 526 U.S. at 424–25, 119 S.Ct. 1439 (deferring to BIA interpretation of statute it administers); *Lopez–Elias v. Reno,* 209 F.3d 788, 791 (5th Cir.2000) (declining to apply *Chevron* deference to enforcement of federal jurisdiction limitations).

2.

Under *Chevron,* we are first obliged to consider whether Congress has spoken on the precise question at issue—here, whether a "theft offense" includes fraud. *See Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. If Congress's intention is clear, the inquiry ends

there, as "pure questions of statutory construction [are] for the courts to decide." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). The BIA Order determined that "the common definition of the term 'theft' includes fraud" and applied the definition of "theft offense" to encompass fraud. As explained below, however, that determination was contrary to the intention of Congress.

In assessing Congress's intent, we are obliged to look to and apply the "traditional tools of statutory construction." *Cardoza–Fonseca,* 480 U.S. at 446, 107 S.Ct. 1207. And under settled rules, the plain **\*282** language of the statute in question is deemed the most reliable indicator of Congressional intent. We are obliged to look to the statutory language as a whole, construing each section in harmony with every other part or section, because "Act[s] of Congress ... should not be read as a series of unrelated and isolated provisions." *Gustafson v. Alloyd Corp.,* 513 U.S. 561, 570, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995).

The plain text of § 1101(a)(43) shows that Congress specifically distinguished fraud from theft, and that it meant for the two offenses to be treated differently. Subsection (G) provides that an aggravated felony is "a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment [is] at least one year." Subsection (M)(i), on the other hand, provides for an aggravated felony classification for "an offense that involves fraud or deceit in which the loss to the victim or victims exceeds $10,000." Congress thus decided to treat fraud as a distinct offense from theft within § 1101(a)(43), and it prescribed a $10,000 threshold before a fraud offense can qualify as an "aggravated felony."

The classic definitions of "theft" and "fraud," as those terms were commonly used at the time of the Act's adoption in 1952, appear to have key differences. For example, the crime of theft was then generally described as

> [a] fraudulent taking of corporeal personal property belonging to another, from his possession, or from the possession of some person holding the same for him, *without his consent,* with the intent to deprive the owner of the value of the same, and to appropriate it to the use or benefit of the person taking.

*Black's Law Dictionary* 1647–48 (4th ed.1951) (emphasis added); *see also Black's Law Dictionary* 1477 (6th ed.1990) (defining theft as "[t]he act of taking property without the owner's consent"). Under this definition, a theft involved five elements: (1) a taking; (2) of property; (3) from its owner or his representative; (4) without that person's consent; (5) with intent to deprive the owner to the benefit of the thief. [6]

On the other hand, the crime of fraud was then generally described as:

> An intentional perversion of truth for the purpose of *inducing another in reliance* upon it to part with some valuable thing belonging to him or *to surrender* a legal right; a false representation of a matter of fact, whether by words or by conduct, by false or misleading allegations, or by concealment of that which should have been disclosed, which deceives and is intended to deceive another so that he shall act upon it to his injury.

*Id.* at 788 (emphasis added). When a theft offense has occurred, property has been obtained from its owner "without consent"; in a fraud scheme, the owner has voluntarily "surrendered" his property, because of an "intentional perversion of truth," or otherwise "act[ed] upon" a false representation to his injury. The key and controlling distinction between these two crimes

is therefore the "consent" element—theft occurs without consent, while fraud occurs with consent that has been unlawfully obtained.

**\*283** Where Congress has utilized distinct terms within the same statute, the applicable canons of statutory construction require that we endeavor to give different meanings to those different terms—here "fraud" and "theft." *See, e.g.,* *United States v. Nordic Village,* 503 U.S. 30, 36, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). Similarly, statutory provisions are to be construed as a whole, and we are not to give one word of a statute a meaning "so broad that it is inconsistent" with its accompanying words. *Gustafson,* 513 U.S. at 575, 115 S.Ct. 1061. Further, "where Congress includes particular language in one section of a statute but omits it in another provision of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion." *Cardoza–Fonseca,* 480 U.S. at 432, 107 S.Ct. 1207 (internal quotation marks omitted). Finally, we are "loath" to read one statutory provision so as to render another provision of the same statute superfluous. *Cooper Indus. v. Aviall Serv., Inc.,* 543 U.S. 157, 125 S.Ct. 577, 583, 160 L.Ed.2d 548 (2004); *see also* Norman J. Singer, Statutes and Statutory Construction § 46.06 (6th ed.2000).

In order to give proper effect to the intention of Congress that theft and fraud offenses are to be treated differently for purposes of an "aggravated felony" issue, a proper definition of the term "theft offense" must distinguish between such an offense and a fraud scheme. And the key distinction on that point is the "without consent" element, present in the classic definition of a theft offense. This key distinction was eliminated by the definition of "theft offense" used by the BIA in this proceeding, substituting the term "unlawful" for "without consent" of the property owner. BIA Order at 2. In so doing, the BIA authorized a fraud offense to satisfy the "unlawful taking" requirement of a theft, and thus be subsumed within the term "theft offense." Such a result is contrary to the intention of Congress, as evidenced by its separate and different treatment of fraud. *See* *Cardoza–Fonseca,* 480 U.S. at 432, 107 S.Ct. 1207. Indeed, the BIA's definition of "theft offense" makes the fraud provision of Subsection (M)(i) superfluous, and it results in an outcome that is contrary to Congress's explicit inclusion of a $10,000 threshold for fraud offenses into Subsection (M)(i)—transforming all fraud offenses into theft offenses, and thus also into aggravated felonies under § 1101(a)(43). *See* *Cooper Indus.,* 125 S.Ct. at 583 (cautioning against reading statute so as to make portions superfluous).

 Our conclusion that a taking of property "without consent" is an essential element of a theft offense is also consistent with the theft offense definitions adopted and utilized by the courts of appeals to previously consider this issue. These courts have concluded that a "theft offense" is "a taking of property or an exercise of control over property without consent with the criminal intent to deprive the owner of rights and benefits of ownership, even if such deprivation is less than total or permanent." *Hernandez–Mancilla,* 246 F.3d at 1009; *see also* *Nugent,* 367 F.3d at 174; *Vasquez–Flores,* 265 F.3d at 1125; *Corona-Sanchez,* 291 F.3d at 1205. *But cf.* *Abimbola v. Ashcroft,* 378 F.3d 173 (2d Cir.2004) (describing BIA definition of theft as "similar" to definition adopted by Third, Seventh, Ninth, and Tenth Circuits, and distinguishing *Corona–Sanchez* ).

As a result, we must conclude that the BIA's definition of a theft offense in the aggravated felony context, as including a fraud scheme, is contrary to congressional intent. That alone, however, is not dispositive **\*284** of our resolution of Soliman's petition for review. In order to complete that determination, we must also assess whether, applying the proper "without consent" element of theft, Soliman has been previously convicted of an "aggravated felony."

### B.

In assessing whether Soliman's Virginia state court conviction was for a theft offense, we are obliged to utilize the categorical analysis approach spelled out in *Taylor v. United States,* 495 U.S. 575, 598–600, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990).

This analysis requires that we first examine whether the statutory elements of credit card fraud in Virginia, under Virginia Code § 18.2–195, include the elements of an aggravated felony theft offense, under Subsection (G), "regardless of [the] exact definition or label" of the Virginia crime. *Taylor,* 495 U.S. at 599, 110 S.Ct. 2143. If the statute of conviction may, but does not necessarily, include all the elements of "theft" under Subsection (G), we are then obliged to look to the indictment (or information) and similar documents for the state law offense, and assess whether the state court, in adjudging guilt, was required to find the elements of theft required by federal law. *Shepard v. United States,* 544 U.S. 13, 125 S.Ct. 1254, 1263, 161 L.Ed.2d 205 (2005); *Taylor,* 495 U.S. at 602, 110 S.Ct. 2143.

1.

Importantly for this analysis, the Commonwealth of Virginia has created separate statutory provisions for "credit card theft," on the one hand, and "credit card fraud," on the other. In Virginia Code § 18.2–192, entitled "Credit card theft," an offender's unauthorized taking of money from a credit card owner is criminalized. This provision specifies that a person is guilty of credit card theft when, *inter alia,* the offender takes

> a credit card or credit card number from the person, possession, custody or control of another without the cardholder's consent ... with intent to use it or sell it, or to transfer it to a person other than the issuer or the cardholder.

§ 18.2–192(a). A separate provision of the Virginia Code, § 18.2–195, entitled "Credit card fraud," creates the distinct crime of credit card fraud and specifies, *inter alia,* that:

(1) A person is guilty of *credit card fraud* when, with intent to defraud any person, he:

(a) Uses for the purpose of obtaining money, goods, services or anything else of value a credit card or credit card number obtained or retained in violation of § 18.2–192 or a credit card or credit card number which he knows is expired or revoked; [or]

(b) Obtains money, goods, services or anything else of value by representing (i) without the consent of the cardholder that he is the holder of a specified card or credit card number or (ii) that he is the holder of a card or credit card number and such card or credit card number has not in fact been issued....

Va. Stat. § 18.2–195 (emphasis added). The credit card fraud provision of the Virginia Code thus criminalizes the *utilization* of another's credit card number to obtain something of value from a third person or institution, whether money, goods, or services, or security for a debt; and this provision also criminalizes the use of an offender's own credit card number or a fictional number under certain circumstances. And, the Virginia Court of Appeals has ruled that, in order to prove the offense of "credit card fraud," in violation of § 18.2–195, the prosecution is obliged to demonstrate a specific intent to defraud, **\*285** which is characterized as the " 'intent to deceive or trick.' " *Harrison v. Commonwealth,* 32 Va.App. 525, 529 S.E.2d 330, 333 (2000) (quoting *Campbell v. Commonwealth,* 14 Va.App. 988, 421 S.E.2d 652, 654 (1992)).

2.

Soliman was convicted in Virginia state court in 2002 of violating § 18.2–195, the "credit card fraud" provision of the Virginia Code. In ruling that this offense was an aggravated felony and that Soliman was deportable because of it, the BIA correctly concluded that her offense was not categorically a theft offense, because the credit card fraud statute criminalizes a wide range of conduct. As evident from the many activities which it criminalizes, however, a person could be convicted under the credit card fraud statute for: "[o]btain[ing] control over a credit card number as security for debt," or "[r]emit[ting] to an issuer or acquirer a record of a credit card or credit card number transaction which is in excess of the monetary amount authorized by the cardholder." § 18.2–195(1)(c), (2)(a). Neither of these activities involves the "taking of property." As a result, Virginia's "credit card fraud" offense does not "substantially correspond" to a theft offense under Subsection (G), and the Virginia offense for which Soliman was convicted is thus not a "categorical" match for a Subsection (G) offense, as required by *Taylor,* 495 U.S. at 602, 110 S.Ct. 2143.

Although the bare offense of Soliman's conviction is not a categorical match for a Subsection (G) theft offense, we are also obliged to apply a "modified" categorical approach, looking beyond the mere fact of her state conviction, to examine the charging papers and similar documents in the state court, to assess what Soliman's conviction "necessarily rested on." *Shepard,* 125 S.Ct. at 1259–61 (describing limitations of such inquiry in plea context); *Randhawa v. Ashcroft,* 298 F.3d 1148, 1152 (9th Cir.2002) (discussing applicability of modified categorical approach to assessment of whether petitioner had committed theft offense). In this regard, the indictment specifies that Soliman "did feloniously and with the intent to defraud obtain property valued in excess of $200.00, by representing, without the consent of the cardholder, that she was the holder of a Visa check card, issued to Helen Best." Va.Code § 18.2–195." For multiple reasons, this indictment allegation does not show that Soliman was convicted of all the elements of a "theft offense" under Subsection (G).

First, the indictment does not charge Soliman with taking goods without the consent of the merchant, and thus she was not convicted of a theft offense against the merchant. Second, although the indictment does allege, as part of the fraud charge, that Soliman used the credit card itself without consent of its owner, the allegations of the indictment for her fraud conviction, fail to demonstrate that she was convicted of each element of credit card theft. In particular, the indictment tracks the provisions of § 18.2–195(1)(b)(i) of Virginia's credit card fraud statute, which makes it unlawful for any person, with the intent to defraud, to "obtain[ ] money, goods, services or anything else of value by representing ... without the consent of the cardholder that he is the holder of a specified card or credit card number." Importantly, the indictment does *not* track § 18.2–195(1)(a) of the statute, which deals with the situation where a fraud scheme arises from an underlying credit card theft—where the card used to obtain property has been obtained "in violation of 18.2–192," the credit card theft statute. Nor is it conclusive, from the indictment, that Soliman actually obtained any property **\*286** from the cardholder—the indictment merely alleges that she "represented" that the card was hers in order to obtain property from a merchant, whereas § 18.2–195(1)(a), by way of example, requires that the card be "used" to obtain such property. Thus, it is not conclusive from the indictment that Soliman's Virginia conviction required proof of the elements of credit card theft. *See Shepard,* 125 S.Ct. at 1263; *Taylor,* 495 U.S. at 602, 110 S.Ct. 2143. As a result, we must reject the BIA's contention that Soliman was convicted of a "theft offense" within the meaning of Subsection (G). She therefore has not been convicted of an "aggravated felony" within the meaning of § 1101(a)(43), and our Order of June 21, 2005, must be sustained.

IV.

Because the BIA erred in determining that Soliman had been previously convicted in the Virginia state court of an aggravated felony, her petition for review must be granted and the BIA's order for her removal must be vacated.

*PETITION FOR REVIEW GRANTED AND ORDER OF REMOVAL VACATED.*


**All Citations**

419 F.3d 276


# Footnotes

1       More specifically, our Order of June 21, 2005 provided: "The Court grants petitioner's motion for an expedited decision, grants her petition for review and vacates the order of removal. An opinion will follow in due course."

2       The state court indictment returned against Soliman in Virginia specifically alleged that she "did feloniously and with the intent to defraud obtain property valued in excess of $200.00, by representing, without the consent of the cardholder, that she was the holder of a Visa check card, issued to Helen Best. Va.Code § 18.2–195."

3       Section 1101(a)(43) of Title 8, United States Code, spells out the specific "aggravated felonies" which may result in deportation. Two of those aggravated felonies are relevant to our discussion today, § 1101(a)(43)(G) and (M)(i). These subsections provide:

         (43) The term "aggravated felony" means—

         ...

         (G) a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment [is] at least one year;

         ...

         (M) an offense that—

         (i) involves fraud or deceit in which the loss to the victim or victims exceeds $10,000....

         8 U.S.C. § 1101(a)(43)(G), (M)(i).

4       The Virginia indictment specified only that Soliman's offense involved "more than $200." The parties agree that the actual amount involved in the offense was $ 1,427.38.

5       The BIA Order was issued by a single member of the BIA only. Soliman objected to this procedure as contrary to the BIA's regulations for the first time in her reply brief, but her objection is not properly before us and is not resolved here. *See United States v. Lewis,* 235 F.3d 215, 218 n. 3 (4th Cir.2000) ("[A]n issue first argued in a reply brief is not properly before a court of appeals.").

6       The line between the crimes of theft and fraud seems to be less clearly drawn in the most recent edition of *Black's Law Dictionary.* That edition provides two definitions of theft: first, "the felonious taking and removing of another's personal property with the intent of depriving the true owner of it; larceny"; and second, "[b]roadly, any act or instance of stealing, including larceny ... and false pretenses." *Black's Law Dictionary* 1516 (8th Ed.2004).

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

110 S.Ct. 2143
Supreme Court of the United States

Arthur Lajuane TAYLOR, Petitioner

v.

UNITED STATES.

No. 88–7194.
|
Argued Feb. 28, 1990.
|
Decided May 29, 1990.

**Synopsis**

Defendant conditionally pleaded guilty to possession of firearm by convicted felon. The United States District Court for the Eastern District of Missouri, John F. Nangle, Chief Judge, enhanced defendant's sentence on basis of his previous felony convictions, including second-degree burglary. Defendant appealed. The Court of Appeals for the Eighth Circuit, 864 F.2d 625, affirmed. Defendant petitioned for writ of certiorari. The Supreme Court, Justice Blackmun, held that: (1) "burglary," within meaning of sentence enhancement statute, refers to conviction of any crime, regardless of its exact definition or label, having basic elements of unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime; (2) sentencing court may find that defendant was convicted of "burglary" if charging papers and jury instructions actually required jury to find all elements of generic burglary in order to convict defendant; and (3) remand was necessary to determine whether defendant's prior Missouri conviction for second-degree burglary constituted "burglary," for sentence enhancement purposes.

Court of Appeals vacated and remanded.

Justice Scalia filed opinion concurring in part and concurring in the judgment.

Opinion on remand, 932 F.2d 703.

**\*\*2145  \*575** *Syllabus* [*]

When respondent Taylor pleaded guilty to possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1), he had four prior convictions, including two **\*\*2146** second-degree burglary under Missouri law. The Government sought to apply § 924(e), which, *inter alia*, (1) provides a sentence enhancement for a "person" convicted under § 922(g) who "has three previous convictions ... for a violent felony," and (2) defines "violent felony" as "(B) ... any crime punishable by imprisonment for a term exceeding one year" that "(i) has as an element the use, attempted use, or threatened use of physical force against [another's] person," or "(ii) is burglary [or other specified offenses] or otherwise involves conduct that presents a serious potential risk of physical injury to another." In imposing an enhanced sentence upon Taylor, the District Court rejected his contention that, because his burglary convictions did not present a risk of physical injury under § 924(e)(2)(B)(ii), they should not count. The Court of Appeals affirmed, ruling that the word "burglary" in § 924(e)(2)(B)(ii) "means 'burglary' however a state chooses to define it."

110 S.Ct. 2143, 109 L.Ed.2d 607, 58 USLW 4616

*Held:* An offense constitutes "burglary" under 🚩 § 924(e) if, regardless of its exact definition or label, it has the basic elements of a "generic" burglary—*i.e.,* an unlawful or unprivileged entry into, or remaining in, a building or other structure, with intent to commit a crime—or if the charging paper and jury instructions actually required the jury to find all the elements of generic burglary in order to convict the defendant. Pp. 2149–2160.

(a) The convicting State's definition of "burglary" cannot control the word's meaning under 🚩 § 924(e), since that would allow sentence enhancement for identical conduct in different States to turn upon whether the particular States happened to call the conduct "burglary." That result is not required by 🚩 § 924(e)'s omission of a "burglary" definition contained in a prior version of the statute absent a clear indication that Congress intended by the deletion to abandon its general approach of using uniform categorical definitions for predicate offenses. "Burglary" in 🚩 § 924(e) must have some uniform definition independent of the labels used by the various States' criminal codes. Cf. 🟨 *United States v. Nardello,* 393 U.S. 286, 293–294, 89 S.Ct. 534, 538–539, 21 L.Ed.2d 487. Pp. 2154–2155.

 ***576** b) Nor is 🚩 § 924(e) limited to the common-law definition of "burglary"—*i.e.,* a breaking and entering of a dwelling at night with intent to commit a felony. Since that definition has been expanded in most States to include entry without a "breaking," structures other than dwellings, daytime offenses, intent to commit crimes other than felonies, etc., the modern crime has little in common with its common-law ancestor. Moreover, absent a specific indication of congressional intent, a definition so obviously ill suited to the statutory purpose of controlling violent crimes by career offenders cannot be read into 🚩 § 924(e). The definition's arcane distinctions have little relevance to modern law enforcement concerns, and, because few of the crimes now recognized as burglaries would fall within the definition, its adoption would come close to nullifying the effect of the statutory term "burglary." Under these circumstances, the general rule of lenity does not require adoption of the common-law definition. Pp. 2155–2157.

(c) 🚩 Section 924(e) is not limited to those burglaries that involve especially dangerous conduct, such as first-degree or aggravated burglaries. If that were Congress' intent, there would have been no reason to add the word "burglary" to 🚩 § 924(e)(2)(B)(ii), since that provision already includes *any* crime that "involves conduct that presents a serious potential risk" of harm to persons. It is more likely that Congress thought that burglary and the other specified offenses so often presented a risk of personal injury or were committed by career criminals that they should be included even though, considered solely in terms of their statutory elements, they do not necessarily involve the use or threat of force against a person. Moreover, the choice of the unqualified language "*is* burglary ... or otherwise involves" **\*\*2147** dangerous conduct indicates that Congress thought that ordinary burglaries, as well as those involving especially dangerous elements, should be included. Pp. 2157–2158.

(d) There thus being no plausible alternative, Congress meant by "burglary" the generic sense in which the term is now used in most States' criminal codes. The fact that this meaning is practically identical to the omitted statutory definition is irrelevant. That definition was not explicitly replaced with a different or narrower one, and the legislative history discloses that no alternative was ever discussed. The omission therefore implies, at most, that Congress simply did not wish to specify an exact formulation. P. 2158.

(e) The sentencing court must generally adopt a formal categorical approach in applying the enhancement provision, looking only to the fact of conviction and the statutory definition of the predicate offense, rather than to the particular underlying facts. That approach is required, since, when read in context, 🚩 § 924(e)(2)(B)(ii)'s "is burglary" phrase most likely refers to the statutory elements of the offense rather than to the **\*577** facts of the defendant's conduct; since the legislative history reveals a general categorical approach to predicate offenses; and since an elaborate factfinding process regarding the defendant's prior offenses would be impracticable and unfair. The categorical approach, however, would still permit the sentencing court to go beyond the mere fact of conviction in the narrow range of cases in which the indictment or information and the jury instructions

AR.07263

actually required the jury to find all of the elements of generic burglary even though the defendant was convicted under a statute defining burglary in broader terms. Pp. 2158–2160.

(f) The judgment must be vacated and the case remanded for further proceedings, since, at the time of Taylor's convictions, most but not all of the Missouri second-degree burglary statutes included all the elements of generic burglary, and it is not apparent from the sparse record which of those statutes were the bases for the convictions. P. 2160.

864 F.2d 625, (CA 8 1989) vacated and remanded.

BLACKMUN, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and BRENNAN, WHITE, MARSHALL, STEVENS, O'CONNOR, and KENNEDY, JJ., joined, and in all but Part II of which SCALIA, J., joined. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, *post,* p. 2160.

**Attorneys and Law Firms**

*Bruce Dayton Livingston,* by appointment of the Court, 493 U.S. 952, argued the cause for petitioner. With him on the briefs was *J. Bennett Clark.*

*Michael R. Lazerwitz* argued the cause for the United States. With him on the brief were *Solicitor General Starr, Deputy Solicitor General Bryson, Assistant Attorney General Dennis,* and *Andrew Levchuk.**

* *Burton H. Shostak* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae* urging reversal.

**Opinion**

Justice BLACKMUN delivered the opinion of the Court.

In this case we are called upon to determine the meaning of the word "burglary" as it is used in § 1402 of Subtitle I (the Career Criminals Amendment Act of 1986) of the Anti–Drug Abuse Act of 1986, 18 U.S.C. § 924(e). This statute provides a sentence enhancement for a defendant who is convicted under 18 U.S.C. § 922(g) (unlawful possession of a  **\*578**  firearm) and who has three prior convictions for specified types of offenses, including "burglary."

I

Under 18 U.S.C. § 922(g)(1), it is unlawful for a person who has been convicted previously for a felony to possess a firearm. A defendant convicted for a violation of § 922(g)(1) is subject to the sentence-enhancement provision at issue, § 924(e):

"(1) In the case of a person who violates section 922(g) of this title and has three previous convictions by any court ... for  **\*\*2148**  a violent felony or a serious drug offense, or both ... such person shall be fined not more than $25,000 and imprisoned not less than fifteen years....

"(2) As used in this subsection—

".....

"(B) the term 'violent felony' means any crime punishable by imprisonment for a term exceeding one year ... that—

"(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

"(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another."

In January 1988, in the United States District Court for the Eastern District of Missouri, petitioner Arthur Lajuane Taylor pleaded guilty to one count of possession of a firearm by a convicted felon, in violation of § 922(g)(1). At the time of his plea, Taylor had four prior convictions. One was for robbery, one was for assault, and the other two were for second-degree burglary under Missouri law. [1]

**\*579** The Government sought sentence enhancement under § 924(e). Taylor conceded that his robbery and assault convictions properly could be counted as two of the three prior convictions required for enhancement, because they involved the use of physical force against persons, under § 924(e)(2)(B)(i). Taylor contended, however, that his burglary convictions should not count for enhancement, because they did not involve "conduct that presents a serious potential risk of physical injury to another," under § 924(e)(2)(B)(ii). His guilty plea was conditioned on the right to appeal this issue. The District Court, pursuant to § 924(e)(1), sentenced Taylor to 15 years' imprisonment without possibility of parole.

The United States Court of Appeals for the Eighth Circuit, by a divided vote, affirmed Taylor's sentence. It ruled that, because the word "burglary" in § 924(e)(2)(B)(ii) "means 'burglary' however a state chooses to define it," the District Court did not err in using Taylor's Missouri convictions for second-degree burglary to enhance his sentence. 864 F.2d 625, 627 (1989). The majority relied on their court's earlier decision in *United States v. Portwood,* 857 F.2d 1221 (1988), cert. denied, 490 U.S. 1069, 109 S.Ct. 2073, 104 L.Ed.2d 638 (1989). We granted certiorari, 493 U.S. 889, 110 S.Ct. 231, 107 L.Ed.2d 183 (1989), to resolve a conflict among the Courts of **\*580** Appeals concerning the definition of burglary for purposes of § 924(e). [2]

**\*\*2149** The word "burglary" has not been given a single accepted meaning by the state courts; the criminal codes of the States define burglary in many different ways. See *United States v. Hill,* 863 F.2d 1575, 1582, and n. 5 (CA11 1989) (surveying a number of burglary statutes). On the face of the federal enhancement provision, it is not readily apparent whether Congress intended "burglary" to mean whatever the State of the defendant's prior conviction defines as burglary, or whether it intended that some uniform definition of burglary be applied to all cases in which the Government seeks a § 924(e) enhancement. And if Congress intended that a uniform definition of burglary be applied, was that definition to be the traditional common-law definition, [3] or one of the broader "generic" definitions articulated in the Model Penal Code and in a predecessor statute to § 924(e), or some other definition specifically tailored to the purposes of the enhancement statute?

**\*581** II

Before examining these possibilities, we think it helpful to review the background of § 924(e). Six years ago, Congress enacted the first version of the sentence-enhancement provision. Under the Armed Career Criminal Act of 1984, Pub.L. 98–473, ch. 18, 98 Stat. 2185, 18 U.S.C.App. § 1202(a) (1982 ed., Supp. III) (repealed in 1986 by Pub.L. 99–308, § 104(b), 100 Stat. 459), any convicted felon found guilty of possession of a firearm, who had three previous convictions "for robbery or burglary," was to receive a mandatory minimum sentence of imprisonment for 15 years. Burglary was defined in the statute itself as "any felony consisting of entering or remaining surreptitiously within a building that is property of another with intent to engage in conduct constituting a Federal or State offense." § 1202(c)(9).

The Act was intended to supplement the States' law enforcement efforts against "career" criminals. The House Report accompanying the Act explained that a "large percentage" of crimes of theft and violence "are committed by a very small percentage of repeat offenders," and that robbery and burglary are the crimes most frequently committed by these career criminals. H.R.Rep. No. 98–1073, pp. 1, 3 (1984) (H.Rep.); see also S.Rep. No. 98–190, p. 5 (1983)S.Rep. No. 98–190, p. 5 (1983) (S.Rep.), U.S.Code Cong. & Admin.News 1984, p. 3182. The House Report quoted the sponsor of the legislation, Senator Specter, who found burglary one of the "most damaging crimes to society" because it involves "invasion of [victims'] homes or workplaces, violation of their privacy, and loss of their most personal and valued possessions." H.Rep., at 3, U.S.Code Cong. & Admin.News 1984, p. 3663. Similarly, the Senate Report stated that burglary was included because it is one of "the most common violent street crimes," and "[w]hile burglary is sometimes viewed as a non-violent crime, its character can change rapidly, depending on the fortuitous presence of the occupants of the home when the burglar enters, or their arrival while he is still on the premises." S.Rep., at 4–5.

 **\*582** The only explanation of why Congress chose the specific definition of burglary included in § 1202 appears in the Senate Report:

"Because of the wide variation among states and localities in the ways that offenses are labeled, the absence of definitions raised the possibility that culpable offenders might escape punishment on a technicality. For instance, the common law definition of burglary includes a requirement  **\*\*2150** that the offense be committed during the nighttime and with respect to a dwelling. However, for purposes of this Act, such limitations are not appropriate. Furthermore, in terms of fundamental fairness, the Act should ensure, to the extent that it is consistent with the prerogatives of the States in defining their own offenses, that the same type of conduct is punishable on the Federal level in all cases." S.Rep., at 20.

In 1986, § 1202 was recodified as 18 U.S.C. § 924(e) by the Firearms Owners' Protection Act, Pub.L. 99–308, § 104, 100 Stat. 458. The definition of burglary was amended slightly, by replacing the words "any felony" with "any crime punishable by a term of imprisonment exceeding one year and...."

Only five months later, § 924(e) again was amended, into its present form, by § 1402 of Subtitle I (the Career Criminals Amendment Act of 1986) of the Anti–Drug Abuse Act of 1986, 100 Stat. 3207–39. This amendment effected three changes that, taken together, give rise to the problem presented in this case. It expanded the predicate offenses triggering the sentence enhancement from "robbery or burglary" to "a violent felony or a serious drug offense"; it defined the term "violent felony" to include "burglary"; and it deleted the pre-existing definition of burglary.

The legislative history is silent as to Congress' reason for deleting the definition of burglary. It does reveal, however, the general purpose and approach of the Career Criminals Amendment Act of 1986. Two bills were proposed; from  **\*583** these the current statutory language emerged as a compromise. The first bill, introduced in the Senate by Senator Specter and in the House by Representative Wyden, provided that any "crime of violence" would count toward the three prior convictions required for a sentence enhancement, and defined "crime of violence" as "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another," or any felony "that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." S. 2312, 99th Cong., 2d Sess. (1986); H.R. 4639, 99th Cong., 2d Sess. (1986). The second bill, introduced in the House by Representatives Hughes and McCollum, took a narrower approach, restricting the crimes that would count toward enhancement to "any State or Federal felony that has as an element the use, attempted use, or threatened use of physical force against the person of another." H.R. 4768, 99th Cong., 2d Sess. (1986).

When Senator Specter introduced S. 2312 in the Senate, he stated that since the enhancement provision had been in effect for a year and a half, and "has been successful with the basic classification of robberies and burglaries as the definition for 'career criminal,' the time has come to broaden that definition so that we may have a greater sweep and more effective use of this important statute." 132 Cong.Rec. 7697 (1986). Similarly, during the House and Senate hearings on the bills, the witnesses reiterated the concerns that prompted the original enactment of the enhancement provision in 1984: the large proportion of

crimes committed by a small number of career offenders, and the inadequacy of state prosecutorial resources to address this problem. See Armed Career Criminal Legislation: Hearing on H.R. 4639 and H.R. 4768 before the Subcommittee on Crime of the House Committee on the Judiciary, 99th Cong., 2d Sess. (1986) (House Hearing); Armed Career Criminal Act Amendments: **\*584** Hearing on S. 2312 before the Subcommittee on Criminal Law of the Senate Committee on the Judiciary, 99th Cong., 2d Sess. (1986) (Senate Hearing). The issue under consideration was uniformly referred to as "expanding" the range of predicate offenses. House Hearing, at 8 ("[A]ll of us want to see the legislation expanded to other violent offenders and career drug dealers") (statement of Representative Wyden); *id.,* at 11 ("I think we can all agree that we should expand the predicate offenses") (statement of Representative Hughes); *id.,* at 14 (statement of Deputy Assistant Attorney **\*\*2151** General James Knapp); *id.,* at 32–33 (statement of Bruce Lyons, President-elect of National Association of Criminal Defense Lawyers); *id.,* at 44 (statement of Senator Specter); Senate Hearing, at 1 ("The time seems ripe in many quarters, including the Department of Justice, to expand the armed career criminal bill to include other offenses") (statement of Senator Specter); *id.,* at 15 (statement of United States Attorney Edward S. G. Dennis, Jr.); *id.,* at 20 (statement of David Dart Queen of the Department of the Treasury); *id.,* at 49 and 55 (statement of Ronald D. Castille, District Attorney, Philadelphia).

Witnesses criticized the narrower bill, H.R. 4768, for excluding property crimes, pointing out that some such crimes present a serious risk of harm to persons, and that the career offenders at whom the enhancement provision is aimed often specialize in property crimes, especially burglary. See House Hearing, at 9 and 12 ("I would hope ... that at least some violent felonies against property could be included"; "people ... make a full-time career and commit hundreds of burglaries") (statements of Representative Wyden); *id.,* at 49–53 (statement of Mr. Castille). The testimony of Mr. Knapp focused specifically on whether the enhancement provision should include burglary as a predicate offense. He criticized H.R. 4768 for excluding "such serious felonies against property as most burglary offenses" and thus "inadvertently narrow[ing] the scope of the present Armed Career Criminal Act," and went on to say:

 **\*585** "Now the question has been raised, well, what crimes against property should be included? We think, burglary, of course; arson; extortion; and various explosives offenses....

"The one problem I see in using a specific generic term like burglary or arson—that's fine for those statutes—but a lot of these newer explosive offenses don't have a single generic term that covers them, and that is something that the committee may want to be very careful about in coming up with the final statutory language.

"It is these crimes against property—which are inherently dangerous—that we think should be considered as predicate offenses." House Hearing, at 15.

In response to a question by Representative Hughes as to the justification for retaining burglary as a predicate offense, Mr. Knapp explained that "your typical career criminal is most likely to be a burglar," and that "even though injury is not an element of the offense, it is a potentially very dangerous offense, because when you take your very typical residential burglary or even your professional commercial burglary, there is a very serious danger to people who might be inadvertently found on the premises." *Id.,* at 26. He qualified his remarks, however, by saying: "Obviously, we would not consider, as prior convictions, what I would call misdemeanor burglaries, or your technical burglaries, or anything like that." *Ibid.*

Representative Hughes put the same question to the next witness, Mr. Lyons. The witness replied:

"When you use burglary, burglary is going back to really what the original legislative history and intent was, to get a hold of the profit motive and to the recidivist armed career criminal. The NACDL really has no problem with burglary as a predicate offense." *Id.,* at 38.

In his prepared statement for the Subcommittee, the witness had noted that H.R. 4768 "would not appear to encompass **\*586** ... burglary," and that "[i]f the Subcommittee concludes that it can accept no retreat from current law, we would suggest that the preservation of burglary as a prior offense be accomplished simply by retaining 'burglary' ... rather than by substituting for it the all-inclusive 'crime of violence' definition proposed in H.R. 4639." House Hearing, at 34.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

110 S.Ct. 2143, 109 L.Ed.2d 607, 58 USLW 4616

H.R. 4639, on the other hand, was seen as too broad. See *id.,* at 11 ("[I]t is important  **2152 to prioritize offenses") (statement of Representative Hughes); *id.,* at 16 ("[T]he answer probably lies somewhere between the two bills") (statement of Mr. Knapp). The hearing concluded with a statement by Representative Hughes, a sponsor of the narrower bill, H.R. 4768:

"Frankly, I think on the question of burglaries, I can see the arguments both ways. We have already included burglaries.

"My leanings would be to leave it alone; it is in the existing law; it was the existing statute. We can still be specific enough. We are talking about burglaries that probably are being carried out by an armed criminal, because the triggering mechanism is that they possess a weapon.... So we are not talking about the average run-of-the-mill burglar necessarily, we are talking about somebody who also illegally possesses or has been transferred a firearm." House Hearing, at 41.

After the House hearing, the Subcommittee drafted a compromise bill, H.R. 4885. This bill included "violent felony" as a predicate offense, and provided that

"the term 'violent felony' means any crime punishable by imprisonment for a term exceeding one year that—

"(i) has as an element the use, attempted use, or threatened use of force against the person of another; or

"(ii) involves conduct that presents a serious potential risk of physical injury to another."

 **587  H.R. 4885 was favorably reported by the House Committee on the Judiciary. H.R.Rep. No. 99–849 (1986)H.R.Rep. No. 99–849 (1986). The Report explained:

"The Subcommittee on Crime held a hearing ... to consider whether it should expand the predicate offenses (robbery and burglary) in existing law in order to add to its effectiveness. At this hearing a consensus developed in support of an expansion of the predicate offenses to include serious drug trafficking offenses ... and violent felonies, generally. This concept was encompassed in H.R. 4885 by deleting the specific predicate offenses for robbery and burglary and adding as predicate offenses [certain drug offenses] and violent felonies....

"The other major question involved in these hearings was as to what violent felonies involving physical force against *property* should be included in the definition of 'violent' felony. The Subcommittee agreed to add the crimes punishable for a term exceeding one year that involve conduct that presents a serious potential risk of physical injury to others. This will add State and Federal crimes against property such as burglary, arson, extortion, use of explosives and similar crimes as predicate offenses where the conduct involved presents a serious risk of injury to a person" (emphasis in original). *Id.,* at 3.

The provision as finally enacted, however, added to the above-quoted subsection (ii) the phrase that is critical in this case: "... *is burglary, arson, or extortion, involves use of explosives, or otherwise* involves conduct that presents a serious potential risk of physical injury to another."  18 U.S.C. § 924(e)(2)(B)(ii) (emphasis added).

Some useful observations may be drawn. First, throughout the history of the enhancement provision, Congress focused its efforts on career offenders—those who commit a large number of fairly serious crimes as their means of livelihood, and who, because they possess weapons, present at  *588  least a potential threat of harm to persons. This concern was not limited to offenders who had actually been convicted of crimes of violence against persons. (Only H.R. 4768, rejected by the House Subcommittee, would have restricted the predicate offenses to crimes actually involving violence against persons.)

The legislative history also indicates that Congress singled out burglary (as opposed to other frequently committed property crimes such as larceny and auto theft) for inclusion as a predicate offense, both in 1984 and in  **2153  1986, because of its inherent potential for harm to persons. The fact that an offender enters a building to commit a crime often creates the possibility of a violent confrontation between the offender and an occupant, caretaker, or some other person who comes to investigate. And the offender's own awareness of this possibility may mean that he is prepared to use violence if necessary to carry out his plans or to escape. Congress apparently thought that all burglaries serious enough to be punishable by imprisonment for

more than a year constituted a category of crimes that shared this potential for violence and that were likely to be committed by career criminals. There never was any proposal to limit the predicate offense to some special subclass of burglaries that might be especially dangerous, such as those where the offender is armed, or the building is occupied, or the crime occurs at night. [4]

Second, the enhancement provision always has embodied a categorical approach to the designation of predicate offenses. In the 1984 statute, "robbery" and "burglary" were defined in the statute itself, not left to the vagaries of state law. See 18 U.S.C.App. §§ 1202(c)(8) and (9) (1982, ed. Supp. III). Thus, Congress intended that the enhancement provision be triggered by crimes having certain specified elements, not by crimes that happened to be labeled "robbery" or "burglary" **\*589** by the laws of the State of conviction. Each of the proposed versions of the 1986 amendment carried forward this categorical approach, extending the range of predicate offenses to all crimes having certain common characteristics—the use or threatened use of force, or the risk that force would be used—regardless of how they were labeled by state law.

Third, the 1984 definition of burglary shows that Congress, at least at that time, had in mind a modern "generic" view of burglary, roughly corresponding to the definitions of burglary in a majority of the States' criminal codes. See *United States v. Hill,* 863 F.2d, at 1582, n. 5. In adopting this definition, Congress both prevented offenders from invoking the arcane technicalities of the common-law definition of burglary to evade the sentence-enhancement provision, and protected offenders from the unfairness of having enhancement depend upon the label employed by the State of conviction. See S.Rep., at 20.

Nothing in the legislative history of the 1986 amendment shows that Congress was dissatisfied with the 1984 definition. All the testimony and reports read as if the meaning of burglary was undisputed. The debate at the 1986 hearings centered upon whether any property crimes should be included as predicate offenses, and if so, which ones. At the House hearing, the Subcommittee reached a consensus that at least some property crimes, including burglary, should be included, but again there was no debate over the proper definition of burglary. The compromise bill, H.R. 4885, apparently was intended to include burglary, among other serious property offenses, by implication, as a crime that "involves conduct that presents a serious potential risk of physical injury to another." The language added to H.R. 4885 before its enactment seemingly was meant simply to make explicit the provision's implied coverage of crimes such as burglary.

The legislative history as a whole suggests that the deletion of the 1984 definition of burglary may have been an inadvertent **\*590** casualty of a complex drafting process. [5] In any event, there is nothing **\*\*2154** in the history to show that Congress intended in 1986 to replace the 1984 "generic" definition of burglary with something entirely different. Although the omission of a pre-existing definition of a term often indicates Congress' intent to reject that definition, see *INS v. Cardoza–Fonseca,* 480 U.S. 421, 432, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987); *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983), we draw no such inference here.

Nor is there any indication that Congress ever abandoned its general approach, in designating predicate offenses, of using uniform, categorical definitions to capture all offenses of a certain level of seriousness that involve violence or an inherent risk thereof, and that are likely to be committed by career offenders, regardless of technical definitions and labels under state law.

III

These observations about the purpose and general approach of the enhancement provision enable us to narrow the range of possible meanings of the term "burglary."

A

First, we are led to reject the view of the Court of Appeals in this case. It seems to us to be implausible that Congress intended the meaning of "burglary" for purposes of § 924(e) to depend on the definition adopted by the State of conviction. That would mean that a person convicted of unlawful possession of a firearm would, or would not, receive a sentence enhancement **\*591** based on exactly the same conduct, depending on whether the State of his prior conviction happened to call that conduct "burglary."

For example, Michigan has no offense formally labeled "burglary." It classifies burglaries into several grades of "breaking and entering." See Mich.Comp.Laws § 750.110 (1979). In contrast, California defines "burglary" so broadly as to include shoplifting and theft of goods from a "locked" but unoccupied automobile. See Cal.Penal Code Ann. § 459 (West Supp.1990); United States v. Chatman, 869 F.2d 525, 528–529, and n. 2 (CA9 1989) (entry through unsecured window of an unoccupied auto, and entry of a store open to the public with intent to commit theft, are "burglary" under California law); see also Tex.Penal Code Ann. §§ 30.01–30.05 (1989 and Supp.1990) (defining burglary to include theft from coin-operated vending machine or automobile); United States v. Leonard, 868 F.2d 1393, 1395, n. 2 (CA5 1989), cert. pending, No. 88–1885.

Thus, a person imprudent enough to shoplift or steal from an automobile in California would be found, under the Ninth Circuit's view, to have committed a burglary constituting a "violent felony" for enhancement purposes—yet a person who did so in Michigan might not. Without a clear indication that with the 1986 amendment Congress intended to abandon its general approach of using uniform categorical definitions to identify predicate offenses, we do not interpret Congress' omission of a definition of "burglary" in a way that leads to odd results of this kind. See Dickerson v. New Banner Institute, Inc., 460 U.S. 103, 119–120, 103 S.Ct. 986, 995–996, 74 L.Ed.2d 845 (1983) (absent plain indication to the contrary, federal laws are not to be construed so that their application is dependent on state law, "because the application of federal legislation is nationwide and at times the federal program would be impaired if state law were to control"); United States v. Turley, 352 U.S. 407, 411, 77 S.Ct. 397, 399, 1 L.Ed.2d 430 (1957) ("[I]n the absence of a plain indication of an intent to incorporate diverse state laws into a federal criminal statute, **\*592** the meaning of the federal statute should not be dependent on state law").

**\*\*2155** This Court's response to the similar problem of interpreting the term "extortion" in the Travel Act, 18 U.S.C. § 1952, is instructive:

"Appellees argue that Congress' decision not to define extortion combined with its decision to prohibit only extortion in violation of state law compels the conclusion that peculiar versions of state terminology are controlling.... The fallacy of this contention lies in its assumption that, by defining extortion with reference to state law, Congress also incorporated state labels for particular offenses. Congress' intent was to aid local law enforcement officials, not to eradicate only those extortionate activities which any given State denominated extortion.... Giving controlling effect to state classifications would result in coverage under § 1952 if appellees' activities were centered in Massachusetts, Michigan, or Oregon, but would deny coverage in Indiana, Kansas, Minnesota, or Wisconsin although each of these States prohibits identical criminal activities."

United States v. Nardello, 393 U.S. 286, 293–294, 89 S.Ct. 534, 538–539, 21 L.Ed.2d 487 (1969).

We think that "burglary" in § 924(e) must have some uniform definition independent of the labels employed by the various States' criminal codes.

B

Some Courts of Appeals, see n. 2, *supra,* have ruled that 🚩 § 924(e) incorporates the common-law definition of burglary, relying on the maxim that a statutory term is generally presumed to have its common-law meaning. See *Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 249, 96 L.Ed. 288 (1952). This view has some appeal, in that common-law burglary is the core, or common denominator, of the contemporary usage of the term. Almost all States include a breaking and entering of a dwelling at night, with intent to commit a felony, among their **\*593** definitions of burglary. Whatever else the Members of Congress might have been thinking of, they presumably had in mind at least the "classic" common-law definition when they considered the inclusion of burglary as a predicate offense.

The problem with this view is that the contemporary understanding of "burglary" has diverged a long way from its commonlaw roots. Only a few States retain the common-law definition, or something closely resembling it. [6] Most other States have expanded this definition to include entry without a "breaking," structures other than dwellings, offenses committed in the daytime, entry with intent to commit a crime other than a felony, etc. See LaFave & Scott, *supra,* n. 3, §§ 8.13(a) through (f), pp. 464–475. This statutory development, "when viewed in totality, has resulted in a modern crime which has little in common with its common-law ancestor except for the title of burglary." *Id.,* at § 8.13(g), p. 476.

Also, interpreting "burglary" in 🚩 § 924(e) to mean common-law burglary would not comport with the purposes of the enhancement statute. The arcane distinctions embedded in the common-law definition have little relevance to modern law enforcement concerns. [7] It seems unlikely that the **\*\*2156 \*594** Members of Congress, immersed in the intensely practical concerns of controlling violent crime, would have decided to abandon their modern, generic 1984 definition of burglary and revert to a definition developed in the ancient English law—a definition mentioned nowhere in the legislative history. Moreover, construing "burglary" to mean common-law burglary would come close to nullifying that term's effect in the statute, because few of the crimes now generally recognized as burglaries would fall within the common-law definition.

It could be argued, of course, that common-law burglary, by and large, involves a greater "potential risk of physical injury to another." 🚩 § 924(e)(2)(B)(ii). But, even assuming that Congress intended to restrict the predicate offense to some especially dangerous subclass of burglaries, restricting it to common-law burglary would not be a rational way of doing so. The common-law definition does not require that the offender be armed or that the dwelling be occupied at the time of the crime. An armed burglary of an occupied commercial building, in the daytime, would seem to pose a far greater risk of harm to persons than an unarmed nocturnal breaking and entering of an unoccupied house. It seems unlikely that Congress would have considered the latter, but not the former, to be a "violent felony" counting towards a sentence enhancement. In the absence of any specific indication that Congress meant to incorporate the common-law meaning of burglary, we shall not read into the statute a definition of "burglary" so obviously ill suited to its purposes.

This Court has declined to follow any rule that a statutory term is to be given its common-law meaning, when that meaning is obsolete or inconsistent with the statute's purpose. **\*595** In *Perrin v. United States,* 444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979), this Court rejected the argument that the Travel Act incorporated the common-law definition of "bribery" because, by 1961 when the Act was passed,

"the common understanding and meaning of 'bribery' had extended beyond its early common-law definitions. In 42 States and in federal legislation, 'bribery' included the bribery of individuals acting in a private capacity. It was against this background that the Travel Act was passed.

. . . . .

"... The record of the hearings and floor debates discloses that Congress made no attempt to define the statutory term 'bribery,' but relied on the accepted contemporary meaning" (footnote omitted). *Id.,* at 45, 100 S.Ct., at 315–316.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For this reason, the Court concluded that "the generic definition of bribery, rather than a narrow common-law definition, was intended by Congress." *Id.,* at 49, 100 S.Ct., at 317. Similarly, in *United States v. Nardello,* 393 U.S. 286, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969), this Court held that the Travel Act did not incorporate the common-law definition of "extortion," because that definition had been expanded in many States by the time the Act was passed, *id.,* at 289, 89 S.Ct., at 536, and because such an interpretation would conflict with the Act's purpose to curb the activities of organized crime. *Id.,* at 293, 89 S.Ct., at 538. The Court therefore declined the give the term an "unnaturally narrow reading," and concluded that the defendants' acts fell within "the generic term extortion as used in the Travel Act." *Id.,* at 296, 89 S.Ct., at 539. See also *Bell v. United States,* 462 U.S. 356, 362, 103 S.Ct. 2398, 2402, 76 L.Ed.2d 638 (1983) (common-law limitation on meaning of "larceny" not incorporated in Bank Robbery Act because "[t]he congressional goal of protecting bank assets **2157** is entirely independent of the traditional distinction on which [the defendant] relies"); *United States v. Turley,* 352 U.S., at 416–417, 77 S.Ct., at 402–403 (application of National Motor Vehicle Theft Act not limited to "situations which at common law would be considered larceny" because "[p]rofessional thieves resort to innumerable **596** forms of theft and Congress presumably sought to meet the need for federal action effectively rather than to leave loopholes for wholesale evasion").

Petitioner argues that the narrow common-law definition of burglary would comport with the rule of lenity—that criminal statutes, including sentencing provisions, are to be construed in favor of the accused. See *Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980); *Simpson v. United States,* 435 U.S. 6, 14–15, 98 S.Ct. 909, 913–914, 55 L.Ed.2d 70 (1978). This maxim of statutory construction, however, cannot dictate an implausible interpretation of a statute, nor one at odds with the generally accepted contemporary meaning of a term. See *Perrin v. United States,* 444 U.S., at 49, n. 13, 100 S.Ct., at 317, n. 13.

### C

Petitioner suggests another narrowing construction of the term "burglary," more suited to the purpose of the enhancement statute:

"Burglary is any crime punishable by a term of imprisonment exceeding one year and consisting of entering or remaining within a building that is the property of another with intent to engage in conduct constituting a Federal or State offense that has as an element necessary for conviction conduct that presents a serious risk of physical injury to another." Brief for Petitioner 29.

As examples of burglary statutes that would fit this definition, petitioner points to first-degree or aggravated-burglary statutes having elements such as entering an occupied building; being armed with a deadly weapon; or causing or threatening physical injury to a person. See n. 4, *supra.* This definition has some appeal, because it avoids the arbitrariness of the state-law approach, by restricting the predicate offense in a manner congruent with the general purpose of the enhancement statute.

We do not accept petitioner's proposal, however, for two reasons. First, it is not supported by the language of the **597** statute or the legislative history. Petitioner essentially asserts that Congress meant to include as predicate offenses only a subclass of burglaries whose elements include "conduct that presents a serious risk of physical injury to another," over and above the risk inherent in ordinary burglaries. But if this were Congress' intent, there would have been no reason to add the word "burglary" to § 924(e)(2)(B)(ii), since that provision already includes *any* crime that "involves conduct that presents a serious potential risk of physical injury to another." We must assume that Congress had a purpose in adding the word "burglary" to H.R. 4885 before enacting it into law. The most likely explanation, in view of the legislative history, is that Congress thought that certain general categories of property crimes—namely burglary, arson, extortion, and the use of explosives—so often presented a risk of injury

to persons, or were so often committed by career criminals, that they should be included in the enhancement statute even though, considered solely in terms of their statutory elements, they do not necessarily involve the use or threat of force against a person.

Second, if Congress had meant to include only an especially dangerous subclass of burglaries as predicate offenses, it is unlikely that it would have used the unqualified language "*is* burglary ... or otherwise involves conduct that presents a serious potential risk" in § 924(e)(2)(B)(ii) (emphasis added). Congress presumably realized that the word "burglary" is commonly understood to include not only aggravated burglaries, but also run-of-the-mill burglaries **2158 involving an unarmed offender, an unoccupied building, and no use or threat of force. This choice of language indicates that Congress thought ordinary burglaries, as well as burglaries involving some element making them especially dangerous, presented a sufficiently "serious potential risk" to count toward enhancement.

## *598  D

 We therefore reject petitioner's view that Congress meant to include only a special subclass of burglaries, either those that would have been burglaries at common law, or those that involve especially dangerous conduct. These limiting constructions are not dictated by the rule of lenity. See *supra,* at 2157. We believe that Congress meant by "burglary" the generic sense in which the term is now used in the criminal codes of most States. See *Perrin,* 444 U.S., at 45, 100 S.Ct., at 315; *Nardello,* 393 U.S., at 289, 89 S.Ct., at 536.

Although the exact formulations vary, the generic, contemporary meaning of burglary contains at least the following elements: an unlawful or unprivileged entry into, or remaining in, a building or other structure, with intent to commit a crime. [8]  See LaFave & Scott *supra,* n. 3, § 8.13(a), p. 466 (modern statutes "generally require that the entry be unprivileged"); *id.,* § 8.13(c), p. 471 (modern statutes "typically describe the place as a 'building' or 'structure' "); *id.,* § 8.13(e), p. 474 ("[T]he prevailing view in the modern codes is that an intent to commit any offense will do").

This generic meaning, of course, is practically identical to the 1984 definition that, in 1986, was omitted from the enhancement provision. The 1984 definition, however, was not explicitly replaced with a different or narrower one; the legislative history discloses that no alternative definition of burglary was ever discussed. As we have seen, there simply is no plausible alternative that Congress could have had in mind. The omission of a definition of burglary in the 1986 *599 Act therefore implies, at most, that Congress did not wish to specify an exact formulation that an offense must meet in order to count as "burglary" for enhancement purposes.

We conclude that a person has been convicted of burglary for purposes of a § 924(e) enhancement if he is convicted of any crime, regardless of its exact definition or label, having the basic elements of unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime.

## IV

 There remains the problem of applying this conclusion to cases in which the state statute under which a defendant is convicted varies from the generic definition of "burglary." If the state statute is narrower than the generic view, *e.g.,* in cases of burglary convictions in common-law States or convictions of first-degree or aggravated burglary, there is no problem, because the conviction necessarily implies that the defendant has been found guilty of all the elements of generic burglary. And if the defendant was convicted of burglary in a State where the generic definition has been adopted, with minor variations in terminology, then the trial court need find only that the state statute corresponds in substance to the generic meaning of burglary.

A few States' burglary statutes, however, as has been noted above, define burglary more broadly, *e.g.,* by eliminating the requirement that the entry be unlawful, or by including places, such as automobiles and vending machines, other than buildings. **\*\*2159**  One of Missouri's second-degree burglary statutes in effect at the times of petitioner Taylor's convictions included breaking and entering "any booth or tent, or any boat or vessel, or railroad car." Mo.Rev.Stat. § 560.070 (1969) (repealed). Also, there may be offenses under some States' laws that, while not called "burglary," correspond in substantial part to generic burglary. We therefore must address the question whether, in the case of a defendant who has been convicted under a nongeneric-burglary  **\*600**  statute, the Government may seek enhancement on the ground that he actually committed a generic burglary. [9]

This question requires us to address a more general issue—whether the sentencing court in applying § 924(e) must look only to the statutory definitions of the prior offenses, or whether the court may consider other evidence concerning the defendant's prior crimes. The Courts of Appeals uniformly have held that § 924(e) mandates a formal categorical approach, looking only to the statutory definitions of the prior offenses, and not to the particular facts underlying those convictions. See *United States v. Chatman,* 869 F.2d at 529; *United States v. Headspeth,* 852 F.2d 753, 758–759 (CA4 1988); *United States v. Vidaure,* 861 F.2d 1337, 1340 (CA5 1988), cert. denied, 489 U.S. 1088, 109 S.Ct. 1551, 103 L.Ed.2d 854 (1989); *United States v. Sherbondy,* 865 F.2d 996, 1006–1010 (CA9 1988). We find the reasoning of these cases persuasive.

First, the language of § 924(e) generally supports the inference that Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions. Section 924(e)(1) refers to "a person who ... has three previous convictions" for—not a person who has committed—three previous violent felonies or drug offenses. Section 924(e)(2)(B)(i) defines "violent felony" as any crime punishable by imprisonment for more than a year that "has as an element"—not any crime that, in a particular case, involves—the use or threat of force. Read in this context, the phrase "is burglary" in § 924(e)(2)(B)(ii)  **\*601**  most likely refers to the elements of the statute of conviction, not to the facts of each defendant's conduct.

Second, as we have said, the legislative history of the enhancement statute shows that Congress generally took a categorical approach to predicate offenses. There was considerable debate over what kinds of offenses to include and how to define them, but no one suggested that a particular crime might sometimes count towards enhancement and sometimes not, depending on the facts of the case. If Congress had meant to adopt an approach that would require the sentencing court to engage in an elaborate factfinding process regarding the defendant's prior offenses, surely this would have been mentioned somewhere in the legislative history.

Third, the practical difficulties and potential unfairness of a factual approach are daunting. In all cases where the Government alleges that the defendant's actual conduct would fit the generic definition of burglary, the trial court would have to determine what that conduct was. In some cases, the indictment or other charging paper might reveal the theory or theories of the case presented to the jury. In other cases, however, only the Government's actual proof at trial would indicate whether the defendant's conduct constituted generic burglary. Would the Government be permitted to introduce the trial transcript before the sentencing court, or if no transcript is available, present the testimony of witnesses? Could the defense present witnesses of its own and argue  **\*\*2160**  that the jury might have returned a guilty verdict on some theory that did not require a finding that the defendant committed generic burglary? If the sentencing court were to conclude, from its own review of the record, that the defendant actually committed a generic burglary, could the defendant challenge this conclusion as abridging his right to a jury trial? Also, in cases where the defendant pleaded guilty, there often is no record of the underlying facts. Even if the Government were able to prove those facts, if a guilty plea to a lesser, nonburglary offense was the result of a plea bargain,  **\*602**  it would seem unfair to impose a sentence enhancement as if the defendant had pleaded guilty to burglary.

Taylor v. U.S., 495 U.S. 575 (1990)
110 S.Ct. 2143, 109 L.Ed.2d 607, 58 USLW 4616

We think the only plausible interpretation of 🚩 § 924(e)(2)(B)(ii) is that, like the rest of the enhancement statute, it generally requires the trial court to look only to the fact of conviction and the statutory definition of the prior offense. [10] This categorical approach, however, may permit the sentencing court to go beyond the mere fact of conviction in a narrow range of cases where a jury was actually required to find all the elements of generic burglary. For example, in a State whose burglary statutes include entry of an automobile as well as a building, if the indictment or information and jury instructions show that the defendant was charged only with a burglary of a building, and that the jury necessarily had to find an entry of a building to convict, then the Government should be allowed to use the conviction for enhancement.

We therefore hold that an offense constitutes "burglary" for purposes of a 🚩 § 924(e) sentence enhancement if either its statutory definition substantially corresponds to "generic" burglary, or the charging paper and jury instructions actually required the jury to find all the elements of generic burglary in order to convict the defendant.

In Taylor's case, most but not all the former Missouri statutes defining second-degree burglary include all the elements of generic burglary. See n. 1, *supra.* Despite the Government's argument to the contrary, it is not apparent to us from the sparse record before us which of those statutes were the bases for Taylor's prior convictions. We therefore vacate the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

**\*603** Justice SCALIA, concurring in part and concurring in the judgment.
I join in the Court's opinion except for Part II, which examines in great detail the statute's legislative history. The examination does not uncover anything useful (*i.e.,* anything that tempts us to alter the meaning we deduce from the text anyway), but that is the usual consequence of these inquiries (and a good thing, too). What is noteworthy, however, is that in this case it is hard to understand what we would have done if we *had* found anything useful. The Court says, correctly, that the statutory term "burglary" has a "generally accepted contemporary meaning" which must be given effect and which may not be modified by the rule of lenity. *Ante,* at 2157, 2158. But if the meaning is so clear that it cannot be constricted by that venerable canon of construction, surely it is not so ambiguous that it can be constricted by the sundry floor statements, witness testimony, and other legislative incunabula that the Court discusses. Is it conceivable that we look to the legislative history only to determine whether it displays, not a *less* extensive punitive intent than the plain meaning (the domain of the rule of lenity), but a *more* extensive one? If we found a more extensive one, I assume we would then have to apply the rule of lenity, bringing us **\*\*2161** back once again to the ordinary meaning of the statute. It seems like a lot of trouble.

I can discern no reason for devoting 10 pages of today's opinion to legislative history, except to show that we have given this case close and careful consideration. We must find some better way of demonstrating our conscientiousness.

**All Citations**

495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607, 58 USLW 4616

**Footnotes**

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1  Taylor's burglary convictions were in Missouri state courts in 1963 and 1971. In those years, Missouri had seven different statutes under which one could be charged with second-degree burglary. All seven offenses required entry into a structure, but they varied as to the type of structure and the means of entry involved. See Mo.Rev.Stat. § 560.045 (1969) (breaking and entering a dwelling house); § 560.050 (having entered a dwelling house, breaking out of it); § 560.055 and 560.060 (breaking an inner door); § 560.070 (breaking and entering a building, booth, tent, boat, or railroad car); § 560.075 (breaking and entering a bank); and § 560.080 (breaking and entering a vacant building).

In 1979, all these statutes were replaced with Mo.Rev.Stat. § 569.170 (1986), which provides that a person commits second-degree burglary "when he knowingly enters unlawfully or knowingly remains unlawfully in a building or inhabitable structure for the purpose of committing a crime therein."

The formal Notice of Punishment Enhancement submitted to the District Court in this case did not reveal which of the seven earlier Missouri statutes were the bases for Taylor's convictions; it stated only that he was convicted of burglary in the second degree. App. 6–7.

2  See, e.g., United States v. Leonard, 868 F.2d 1393 (CA5 1989) (burglary defined according to state law); 864 F.2d 625 (CA8 1989) (this case—same); United States v. Chatman, 869 F.2d 525 (CA9 1989) (common-law definition of burglary); United States v. Headspeth, 852 F.2d 753 (CA4 1988) (same); United States v. Palmer, 871 F.2d 1202 (CA3), cert. denied, 493 U.S. 890, 110 S.Ct. 233, 107 L.Ed.2d 185 (1989) (burglary means any offense that would have met the definition of burglary under a predecessor statute to § 924(e)); United States v. Taylor, 882 F.2d 1018 (CA6 1989) (same); United States v. Dombrowski, 877 F.2d 520 (CA7 1989) (same); United States v. Hill, 863 F.2d 1575 (CA11 1989) (same); and United States v. Patterson, 882 F.2d 595 (CA1 1989) (case-by-case inquiry whether the crime defined by state statute involves conduct that presents a serious potential risk of injury to another).

3  "Burglary was defined by the common law to be the breaking and entering of the dwelling house of another in the nighttime with the intent to commit a felony." W. LaFave & A. Scott, Substantive Criminal Law § 8.13, p. 464 (1986) (LaFave & Scott). See 4 W. Blackstone, Commentaries *224.

4  Some States have first-degree or aggravated-burglary statutes that single out such especially dangerous forms of burglary. See LaFave & Scott, §§ 8.13(f), (g), pp. 475–478.

5  The Senate, on October 5, 1989, passed a bill, S. 1711, 101st Cong., 1st Sess., that would add to § 924(e)(2) a definition of burglary identical to the one deleted in 1986. See 135 Cong.Rec. 23613 (1989). In introducing the bill, Senator Biden explained that the amendment

"corrects an error that occurred inadvertently when the definition of burglary was deleted from the Armed Career Criminal statute in 1986. The amendment reenacts the original definition which was intended to be broader than common law burglary." Id., at 23519.

This bill is pending in the House.

6  See, e.g., Md.Ann.Code, Art. 27, § 30 (1987); Mass.Gen.Laws, ch. 266, § 15 (1988); Miss.Code Ann. § 97–17–19 (1972); W.Va.Code § 61–3–11 (1990).

7  Consider Blackstone's exposition of one of the elements of burglary:

"The time must be by night, and not by day: for in the day time there is no burglary. We have seen, in the case of justifiable homicide, how much more heinous all laws made an attack by night, rather than by day; allowing the party attacked by night to kill the assailant with impunity. As to what is reckoned night, and what day, for this purpose: anciently the day was accounted to begin only at sun-rising, and to end immediately upon sun-set; but the better opinion seems to be, that if there be daylight or crepusculum enough, begun or left, to discern a man's face withal, it is no burglary. But this does not extend to moonlight; for then many midnight burglaries would go unpunished: and besides, the malignity of the offence does not so properly arise from its being done in the dark, as at the dead of night; when all the creation, except beasts of prey, are at rest; when sleep has disarmed the owner, and rendered his castle defenceless." 4 W. Blackstone, Commentaries *224.

See also *id.,* at \*224—\*228 (burglary must be of a "*mansion* -house," must involve a breaking and entering, and must be with intent to commit a felony).

8    This usage approximates that adopted by the drafters of the Model Penal Code:

"A person is guilty of burglary if he enters a building or occupied structure, or separately secured or occupied portion thereof, with purpose to commit a crime therein, unless the premises are at the time open to the public or the actor is licensed or privileged to enter." American Law Institute, Model Penal Code § 221.1 (1980).

9    Our present concern is only to determine what offenses should count as "burglaries" for enhancement purposes. The Government remains free to argue that any offense—including offenses similar to generic burglary—should count towards enhancement as one that "otherwise involves conduct that presents a serious potential risk of physical injury to another" under 🚩 § 924(e)(2)(B)(ii).

10    Even if an enhancement is not available under 🚩 § 924(e), the Government may still present evidence of the defendant's actual prior criminal conduct, to increase his sentence for the 🚩 § 922(g)(1) violation under the Federal Sentencing Guidelines.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

U. S. v. Caceres, 440 U.S. 741 (1979)

99 S.Ct. 1465, 59 L.Ed.2d 733, 43 A.F.T.R.2d 79-872, 79-1 USTC P 9294...

99 S.Ct. 1465
Supreme Court of the United States

UNITED STATES, Petitioner,

v.

Alfredo L. CACERES.

No. 76–1309.
|
Argued Jan. 8, 9, 1979.
|
Decided April 2, 1979.

**Synopsis**

Defendant who was charged with bribing an Internal Revenue Service agent, moved to suppress tape recordings of conversations with agent on the ground that authorizations required by IRS regulations had not been secured. The United States District Court for the Northern District of California, granted the motion, and the Court of Appeals for the Ninth Circuit, 545 F.2d 1182, affirmed. On certiorari, the Supreme Court, Mr. Justice Stevens, held that failure of IRS agent to follow IRS electronic surveillance regulations before recording conversations between taxpayer and agent did not require suppression of tape recordings in prosecution of taxpayer accused of bribing IRS agent.

Reversed.

Mr. Justice Marshall filed dissenting opinion in which Mr. Justice Brennan joined.

**\*\*1465**  **\*741**  *Syllabus*[*]

Regulations in the Internal Revenue Service Manual prohibit "consensual electronic  **\*\*1466**  surveillance" between taxpayers and IRS agents unless certain specified prior authorization is obtained. With respect to the monitoring of face-to-face (nontelephone) conversations, the Director of the Internal Security Division or the Assistant Commissioner (Inspection) of the IRS may authorize the recording of such conversations in emergency situations, but if there is at least 48 hours in which to obtain approval, a signed request must also be submitted to the Attorney General or a designated Assistant Attorney General. In connection with the audit of the income tax returns of respondent and his wife, an IRS agent met with respondent on, among other dates, January 31 and February 6, 1975. Emergency approval for the use of electronic equipment at both meetings was obtained, pending a request to the Justice Department for authority to monitor conversations with respondent for a 30-day period, but such authority was never obtained for the January 31 and February 6 meetings. At these meetings, respondent, unaware of the surveillance, paid or offered money to the agent for a favorable resolution of the audit. The agent at both meetings wore a concealed radio transmitter which allowed other agents to monitor and record the conversations. Subsequently, respondent was prosecuted for bribing the IRS agent. At his trial he moved to suppress tape recordings of the conversations on the ground that the authorizations required by the IRS regulations had not been secured. The District Court granted the motion, and the Court of Appeals affirmed. Both courts held that the meetings had not been monitored in accordance with the IRS regulations, concluding that neither meeting fell within the emergency provision of the regulations because the exigencies were the product of "government-created scheduling problems." *Held:* The tape recordings, and the testimony of the agents who monitored the meetings in question, were not required to be excluded from evidence because of the conceded violation of the IRS regulations. Pp. 1470–1474.

99 S.Ct. 1465, 59 L.Ed.2d 733, 43 A.F.T.R.2d 79-872, 79-1 USTC P 9294...

(a) While a court has a duty to enforce an agency regulation when compliance with the regulation is mandated by the Constitution or federal law, here the agency was not required either by the Constitution, *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462; **\*742** *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453, or by statute, *Bridges v. Wixon*, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103, distinguished, to adopt any particular procedures or rules before engaging in consensual monitoring and recording. Pp. 1470–1471.

(b) None of respondent's constitutional rights was violated either by the actual recording or by the agency's violation of its own regulations. That respondent's conversations were monitored without Justice Department approval, whereas conversations of others similarly situated would, assuming the IRS generally follows its own regulations, be recorded only with such approval, does not amount to a denial of equal protection. Nor does the IRS officials' construction of the situation as an emergency, even if erroneous, raise any constitutional questions. And this is not a case in which the Due Process Clause is implicated, since respondent cannot reasonably contend that he relied on the regulations or that their breach had any effect on his conduct. Finally, the Administrative Procedure Act provides no grounds for judicial enforcement of the violated regulations, since the remedy sought is not invalidation of the agency action but rather judicial enforcement of the regulations by means of the exclusionary rule. Pp. 1471–1473.

(c) This Court declines to adopt any rigid exclusionary rule, such as is urged by respondent, whereby all evidence obtained in violation of regulations concerning electronic eavesdropping would be excluded. Nor can this Court accept respondent's further argument that even without a rigid rule of exclusion, his is a case in which evidence secured in violation of agency regulations should be excluded under a more limited, individualized approach, since, to the contrary, this case exemplifies those situations in which evidence would *not* be **\*\*1467** excluded under a case-by-case approach, it appearing that the agency action, though later found to violate the regulations, nonetheless reflected a reasonable, good-faith attempt to comply in a situation in which monitoring was appropriate and would have received Justice Department approval if the request had been received more promptly. Pp. 1473–1474.

545 F.2d 1182, reversed.

**Attorneys and Law Firms**

**\*743** James J. Brosnahan, San Francisco, Cal., for respondent.

Kenneth S. Geller, Dept. of Justice, Washington, D.C., for petitioner.

**Opinion**

Mr. Justice STEVENS delivered the opinion of the Court.

The question we granted certiorari to decide is whether evidence obtained in violation of Internal Revenue Service (IRS) regulations may be admitted at the criminal trial of a taxpayer accused of bribing an IRS agent. 436 U.S. 943, 98 S.Ct. 2843, 56 L.Ed.2d 784 (1978).

Unbeknown to respondent, three of his face-to-face conversations with IRS Agent Yee were monitored by means of a radio transmitter concealed on Yee's person. Respondent moved to suppress tape recordings of the three conversations on the ground that the authorizations required by IRS regulations had not been secured. The District Court granted the motion. The Court of Appeals for the Ninth Circuit reversed as to the third tape; it concluded that adequate authorization had been obtained.[1] As to the first two tapes, however, the Court of Appeals agreed with the District Court both that the IRS regulations had not been followed and that exclusion of the recordings was therefore required. It is the latter conclusion that is at issue here.

AR.07279

The Government argues that exclusion of probative evidence in a criminal trial is an inappropriate sanction for violation of an executive department's regulations. In this case, moreover, it argues that suppression is especially inappropriate because the violation of the regulation was neither deliberate nor prejudicial, and did not affect any constitutional **\*744** or statutory rights. We agree that suppression should not have been ordered in this case, and therefore reverse the judgment of the Court of Appeals.

## I

Neither the Constitution nor any Act of Congress requires that official approval be secured before conversations are overheard or recorded by Government agents with the consent of one of the conversants. [2] Such "consensual electronic surveillance" between taxpayers and IRS agents is, however, prohibited by IRS regulations unless appropriate prior authorization is obtained. [3]

The IRS Manual sets forth in detail the procedures to be followed in obtaining such **\*\*1468** approvals. [4] For all types of requests the **\*745** regulations require an explanation of the reasons for the proposal, the type of equipment to be used, the names of the persons involved, and the duration of the proposed monitoring.

Approval by as many as three different levels of authority may be required, depending on the kind of surveillance that is contemplated and the circumstances of the request. Telephone conversations may be monitored with the approval of an Assistant Regional Inspector of the Internal Security Division. Such advance approval may be requested and given verbally, although the authorization must subsequently be **\*746** confirmed in writing. The monitoring of nontelephone conversations requires approval at the national as well as the regional level. In emergency situations, the Director, or Acting Director, Internal Security Division, or the Assistant Commissioner (Inspection) may authorize the recording. If there is at least 48 hours in which to obtain approval, a signed request must also be submitted to the Attorney General of the United States, or a designated Assistant Attorney General, by the Director or Acting Director of the Internal Security Division.

## II

On March 14, 1974, Agent Yee met with respondent and his wife in connection with an audit of their 1971 income tax returns. After Mrs. Caceres left the meeting, respondent offered Yee a "personal settlement" of $500 in exchange for a favorable resolution of the audit. When he returned to the IRS office, Yee reported the offer to his superiors and prepared an affidavit describing it. [5]

The record reflects no further discussion of the offer until January 1975. It does indicate, however, that one telephone conversation between Yee and respondent, on March 21, 1974, was recorded with authorization, [6] and that authority was also obtained to monitor face-to-face conversations with respondent from time to time **\*\*1469** during the period between March and September 1974. [7] Yee continued to work on the **\*747** audit of respondent's records throughout this period, but his meetings, until January 1975, were with Mrs. Caceres and the Caceres' accountant. [8]

On January 27, 1975, Yee had a meeting with respondent that was not recorded. According to Yee's affidavit, [9] the meeting proceeded in two stages. First, he discussed his calculations with respondent, Mrs. Caceres, and their accountant. When respondent and his wife asked for an additional week to check their records, Yee told them it would be necessary to sign an extension because the statute of limitations would otherwise expire soon. Respondent stated that he would have to consult his attorney before signing any extension, and would call Yee with his decision later that day.

Yee then left the office to return to his car. He was followed by respondent, who revived the subject of a "personal settlement." This time, respondent indicated that he had $500 that he would give Yee immediately, with an additional $500 to be paid when the matter was finally settled. Yee refused the offer, but at respondent's insistence, eventually stated that he might consider it.

99 S.Ct. 1465, 59 L.Ed.2d 733, 43 A.F.T.R.2d 79-872, 79-1 USTC P 9294...

In subsequent conversations initiated by Agent Yee, all of which were monitored, [10] respondent indicated that he was not prepared for another meeting with Yee. Finally, in a conversation on January 30 at 5:15 p. m., respondent agreed to a meeting the following day at 2 p. m. At 8:15 a. m. on the **\*748** 31st, the Regional Inspector in San Francisco telephoned the Director of Internal Security in Washington and obtained emergency approval for the use of electronic equipment to monitor the meeting that afternoon. On the same day, a written request for authority to monitor face-to-face conversations for a period of 30 days was initiated and, in due course, forwarded to Washington for submission to the Department of Justice.

At the meeting on the 31st, respondent gave Yee $500 and promised to give him an additional $500 when he received a notice from IRS showing his deficiency at an amount upon which he and Yee had agreed. As in all his future meetings with respondent, Yee wore a concealed radio transmitter which allowed other agents to monitor and record their conversation.

Yee next called respondent on February 5 and arranged a meeting for the next day to review the audit agreement. Because the Department of Justice had not yet acted on, or perhaps even received, the request for a 30-day authorization, the Regional Inspector again requested and obtained emergency approval to monitor the meeting with respondent. At the February 6 meeting, respondent renewed his promise to pay an additional $500 in connection with the 1971 return, and also offered Yee another $2,000 for help in settling his 1973 and 1974 returns.

**\*\*1470** On February 11, a Deputy Assistant Attorney General approved the request for authority to monitor Yee's conversations with respondent for 30 days. The approval was received in time to cover a meeting held that day at which Yee was paid the additional $500. Because the 30-day period did not commence until February 11, however, no approval from the Department of Justice was ever obtained for the earlier monitorings of January 31 and February 6.

The District Court and the Court of Appeals both held that the two earlier meetings had not been monitored in accordance with IRS regulations, since Justice Department approval had **\*749** not been secured. The courts recognized that such approval is not required, by the terms of the regulations, in "emergency situations" when less than 48 hours is available to secure authorization. They recognized, too, that in each instance, less than 48 hours did exist between the time the IRS initiated its request for monitoring approval and the time of the scheduled meeting with Yee. But the courts concluded that neither meeting fell within the emergency provision of the regulations because the exigencies were the product of "government-created scheduling problems." [11]

The Government does not challenge that conclusion. We are therefore presented with the question whether the tape recordings, and the testimony of the agents who monitored the January 31 and February 6 conversations, should be excluded because of the violation of the IRS regulations.

### III

A court's duty to enforce an agency regulation is most evident when compliance with the regulation is mandated by the Constitution or federal law. In *Bridges v. Wixon,* 326 U.S. 135, 152–153, 65 S.Ct. 1443, 1451–1452, 89 L.Ed. 2103, for example, this Court held invalid a deportation ordered on the basis of statements which did not comply with the Immigration Service's rules requiring signatures and oaths, finding that the rules were designed "to afford [the alien] due process of law" by providing "safeguards against essentially unfair procedures." [12]

In this case, however, unlike *Bridges v. Wixon,* the agency was not required by the Constitution or by statute to adopt any particular procedures or rules before engaging in consensual **\*750** monitoring and recording. While Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.,* regulates electronic surveillance conducted without the consent of either party to a conversation, federal statutes impose no restrictions on recording a conversation with the consent of one of the conversants.

99 S.Ct. 1465, 59 L.Ed.2d 733, 43 A.F.T.R.2d 79-872, 79-1 USTC P 9294...

Nor does the Constitution protect the privacy of individuals in respondent's position. In *Lopez v. United States*, 373 U.S. 427, 439, 83 S.Ct. 1381, 1388, 10 L.Ed.2d 462, we held that the Fourth Amendment provided no protection to an individual against the recording of his statements by the IRS agent to whom he was speaking. In doing so, we repudiated any suggestion that the defendant had a "constitutional right to rely on possible flaws in the agent's memory, or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible of impeachment," concluding instead that "the risk that petitioner took in offering a bribe to [the IRS agent] fairly included the risk that the offer would be accurately reproduced in

court, whether by faultless memory or mechanical recording." The same analysis was applied in *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453, to consensual monitoring and recording by means of a **\*\*1471** transmitter concealed on an informant's person, even though the defendant did not know that he was speaking with a Government agent:

"Concededly a police agent who conceals his police connections may write down for official use his conversations with a defendant and testify concerning them, without a warrant authorizing his encounters with the defendant and without otherwise

violating the latter's Fourth Amendment rights. *Hoffa v. United States*, 385 U.S. [293], at 300–303, [ 87 S.Ct. 408, 17 L.Ed.2d 374.] For constitutional purposes, no different result is required if the agent instead of immediately reporting and transcribing his conversations with defendant, either (1) simultaneously records them with electronic equipment which he is carrying on his person, **\*751** *Lopez v. United States, supra* ; (2) or carries radio equipment which simultaneously transmits the conversations either to recording equipment located elsewhere or to other agents monitoring the transmitting frequency.

*On Lee v. United States* [343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270.] If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent

to whom the defendant is talking and whose trustworthiness the defendant necessarily risks." *United States v. White, supra*, at 751, 91 S.Ct., at 1125 (opinion of WHITE, J.). [13]

Our decisions in *Lopez* and *White* demonstrate that the IRS was not required by the Constitution to adopt these regulations. [14] It is equally clear that the violations of agency regulations **\*752** disclosed by this record do not raise any constitutional questions.

It is true, of course, that respondent's conversations were monitored without the approval of the Department of Justice, whereas the conversations of others in a similar position would, assuming the IRS generally follows its regulations, be recorded only with Justice Department approval. But this difference does not even arguably amount to a denial of equal protection. No claim is, or reasonably could be, made that if the IRS had more promptly addressed **\*\*1472** this request to the Department of Justice, it would have been denied. As a result, any inconsistency of which respondent might complain is purely one of form, with no discernible effect in this case on the action taken by the agency and its treatment of respondent.

Moreover, the failure to secure Justice Department authorization, while conceded here to be a violation of the IRS regulations, was attributable to the fact that the IRS officials responsible for administration of the relevant regulations, both in San Francisco and Washington, construed the situation as an emergency within the meaning of those regulations. Their construction of their own regulations, even if erroneous, was not obviously so. That kind of error by an executive agency in interpreting its own regulations surely does not raise any constitutional questions.

Nor is this a case in which the Due Process Clause is implicated because an individual has reasonably relied on agency **\*753** regulations promulgated for his guidance or benefit and has suffered substantially because of their violation by the agency. [15] Respondent cannot reasonably contend that he relied on the regulation, or that its breach had any effect on his conduct. He did not know that his conversations with Yee were being recorded without proper authority. He was, of course, prejudiced in the sense that he would be better off if all monitoring had been postponed until after the Deputy Assistant Attorney General's approval was obtained on February 11, 1975, but precisely the same prejudice would have ensued if the approval had been

issued more promptly. For the record makes it perfectly clear that a delay in processing the request, rather than any doubt about its propriety or sufficiency, was the sole reason why advance authorization was not obtained before February 11.

Finally, the Administrative Procedure Act [16] provides no grounds for judicial enforcement of the regulation violated in this case. The APA authorizes judicial review and invalidation of agency action that is arbitrary, capricious, an abuse of discretion, or not in accordance with law, as well as action *754 taken "without observance of procedure required by law." [17] Agency violations of their own regulations, whether or not also in violation of the Constitution, may well be inconsistent with the standards of agency action which the APA directs the courts to enforce. [18] Indeed, some of our **1473 most important decisions holding agencies bound by their regulations have been in cases originally brought under the APA. [19]

But this is not an APA case, and the remedy sought is not invalidation of the agency action. Rather, we are dealing with a criminal prosecution in which respondent seeks judicial enforcement of the agency regulations by means of the exclusionary rule. That rule has primarily rested on the judgment that the importance of deterring police conduct that may invade the constitutional rights of individuals throughout the community outweighs the importance of securing the conviction of the specific defendant on trial. [20] In view of our *755 conclusion that none of respondent's constitutional rights has been violated here, either by the actual recording or by the agency violation of its own regulations, our precedents enforcing the exclusionary rule to deter constitutional violations provide no support for the rule's application in this case. [21]

IV

Respondent argues that the regulations concerning electronic eavesdropping, even though not required by the Constitution or by statute, are of such importance in safeguarding the privacy of the citizenry that a rigid exclusionary rule should be applied to all evidence obtained in violation of any of their provisions. We do not doubt the importance of these rules. Nevertheless, without pausing to evaluate the Government's challenge to our power to do so, [22] we decline to adopt any rigid rule requiring federal courts to exclude any evidence obtained as a result of a violation of these rules.

Regulations governing the conduct of criminal investigations are generally considered desirable, and may well provide more valuable protection to the public at large than the deterrence flowing from the occasional exclusion of items of evidence in criminal trials. [23] Although we do not suggest that a suppression order in this case would cause the IRS to abandon or modify its electronic surveillance regulations, we cannot ignore the possibility that a rigid application of an exclusionary rule to every regulatory violation could have a serious *756 deterrent impact on the formulation of additional standards to govern prosecutorial and police procedures. [24] Here, the Executive itself has provided for internal sanctions **1474 in cases of knowing violations of the electronic-surveillance regulations. [25] To go beyond that, and require exclusion in every case, would take away from the Executive Department the primary responsibility for fashioning the appropriate remedy for the violation of its regulations. But since the content, and indeed the existence, of the regulations would remain within the Executive's sole authority, the result might well be fewer and less protective regulations. In the long run, it is far better to have rules like those contained in the IRS Manual, and to tolerate occasional erroneous administration of the kind displayed by this record, than either to have no rules except those mandated by statute, or to have them framed in a mere precatory form.

Nor can we accept respondent's further argument that even without a rigid rule of exclusion, his is a case in which evidence secured in violation of the agency regulation should be excluded on the basis of a more limited, individualized approach. Quite the contrary, this case exemplifies those situations in which evidence would *not* be excluded if a case-by-case approach were applied. The two conversations at issue here were recorded with the approval of the IRS officials in San Francisco and Washington. In an emergency situation, *757 which the agents thought was present, this approval would have been sufficient. The agency action, while later found to be in violation of the regulations, nonetheless reflected a reasonable, good-faith attempt to comply in a situation in which no one questions that monitoring was appropriate and would have certainly received Justice

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

99 S.Ct. 1465, 59 L.Ed.2d 733, 43 A.F.T.R.2d 79-872, 79-1 USTC P 9294...

Department authorization, had the request been received more promptly. In these circumstances, there is simply no reason why a court should exercise whatever discretion it may have to exclude evidence obtained in violation of the regulations.

The judgment of the Court of Appeals is

*Reversed.*

Mr. Justice MARSHALL, with whom Mr. Justice BRENNAN joins, dissenting.

The Court today holds that evidence obtained in patent violation of agency procedures is admissible in a criminal prosecution. In so ruling, the majority determines both that the Internal Revenue Service's failure to comply with its own mandatory regulations implicates no due process interest, and that the exclusionary rule is an inappropriate sanction for such noncompliance. Because I can subscribe to neither proposition, and because the Court's decision must inevitably erode respect for law among those charged with its administration, I respectfully dissent.

I

In a long line of cases beginning with *Bridges v. Wixon,* 326 U.S. 135, 152–153, 65 S.Ct. 1443, 1451–1452, 89 L.Ed. 2103 (1945), this Court has held that "one under investigation . . . is legally entitled to insist upon the observance of rules" promulgated by an executive or legislative body for his protection. See *United States v. Nixon,* 418 U.S. 683, 695–696, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974); *Yellin v. United States,* 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963); *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *United States ex rel. Accardi v.* **\*758** *Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). Underlying these decisions is a judgment, central to our concept of due process, that government officials no less than private citizens are bound by rules of law. [1] Where individual **\*\*1475** interests are implicated, the Due Process Clause requires that an executive agency adhere to the standards by which it professes its action to be judged. See *Vitarelli v. Seaton, supra,* 359 U.S. at 547, 79 S.Ct. at 976 (Frankfurter, J., concurring in part and dissenting in part).

Despite these well-established precedents and the IRS's conceded failure to abide by mandatory investigative regulations, the Court finds no due process violation on the facts of this case. In reaching its conclusion, the majority relies on the absence of constitutional or statutory underpinnings for **\*759** the regulations and on respondent's inability to establish prejudice from their circumvention. This approach draws support neither from our prior holdings nor from the principles on which the Due Process Clause is founded.

This Court has consistently demanded governmental compliance with regulations designed to safeguard individual interests even when the rules were not mandated by the Constitution or federal statute. In *United States ex rel. Accardi v. Shaughnessy, supra,* the Court granted a writ of habeas corpus where the Attorney General had disregarded applicable procedures for the Board of Immigration Appeals' suspension of deportation orders. Although the Attorney General had final power to deport the petitioner and had no statutory or constitutional obligation to provide for intermediate action by the Board, this Court held that while suspension procedures were in effect, "the Attorney General denies himself the right to sidestep the Board or dictate its decision." 347 U.S., at 267, 74 S.Ct., at 503. On similar reasoning, the Court in *Service v. Dulles,* vacated a Foreign Service officer's national security discharge. While acknowledging that the Secretary of State was not obligated to adopt "rigorous substantive and procedural safeguards," the Court nonetheless held that "having done so he could not, so long as the Regulations remain unchanged, proceed without regard to them." 354 U.S., at 388, 77 S.Ct., at 1165. Similarly, in *Vitarelli v. Seaton*, 1012, we demanded adherence to Department of Interior employee-discharge procedures that were "generous beyond the requirements

99 S.Ct. 1465, 59 L.Ed.2d 733, 43 A.F.T.R.2d 79-872, 79-1 USTC P 9294...

that bind [the] agency." 359 U.S., at 547, 79 S.Ct., at 976 (Frankfurter, J., concurring in part and dissenting in part). And most recently, in *Morton v. Ruiz*, we declined to permit the Bureau of Indian Affairs to depart from internal rules for establishing assistance-eligibility requirements although the procedures were "more rigorous than otherwise would be required." 415 U.S., at 235, 94 S.Ct., at 1074. See also *United States v. Nixon, supra; Yellin v. United States, supra; Bridges v. *760 Wixon*, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945). [2] Thus, where internal regulations **1476 do not merely facilitate internal agency housekeeping, cf. *American Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 538, 90 S.Ct. 1288, 1292, 25 L.Ed.2d 547 (1970), [3] but rather afford significant procedural protections, we have insisted on compliance.

That the IRS regulations at issue here extend such protections is beyond dispute. As this Court recognized in *Berger v. New York*, 388 U.S. 41, 63, 87 S.Ct. 1873, 1885, 18 L.Ed.2d 1040 (1967), "[f]ew threats to liberty exist which are greater than that posed by the use of eavesdropping devices." An agency's self-imposed constraints on the use of these devices, no less than limitations mandated by statute or by the Fourth Amendment, operate to preserve a "measure of privacy and a sense of personal security" for individuals potentially subject to surveillance. See *United States v. White*, 401 U.S. 745, 790, 91 S.Ct. 1122, 1145, 28 L.Ed.2d 453 (1971) (Harlan, J., dissenting).

Moreover, the history of the IRS authorization requirements clearly establishes that they were intended to protect privacy interests. The regulations were an outgrowth of investigations in 1965 and 1966 by a Subcommittee of the Senate Judiciary Committee concerning surveillance techniques of federal agencies. Testimony at Subcommittee hearings revealed that IRS agents had made extensive unauthorized use of a wide variety of eavesdropping techniques. *761 Hearings on S.Res. 39 before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, 89th Cong., 1st and 2d Sess., 1206–1208, 1762–1763, 1774–1777, 1828–1830, 1923–1935, 1999–2003 (1965–1966) (hereinafter S.Res. 39 Hearings). [4] Among the agency practices that the Subcommittee found offensive was the monitoring of certain conversations between taxpayers and IRS agents wired for sound. See, *e. g., id.*, at 2017, 2078. Of more general concern was the agency's total failure to detect or disapprove violations of its own internal rules. Evidence before the Subcommittee indicated that supervisory personnel had condoned the use of illegal wiretaps, see *id.*, 1517, 1546–1548, while upper level officials had remained ignorant of widespread departures from prescribed policies. See *id.*, 1118, 1124–1128, 2005.

In response to that congressional investigation, the IRS convened a special Board of Inquiry to review agency surveillance practices and to recommend new procedures. Both the scope of the new regulations and the IRS Commissioner's representations to the Senate Subcommittee demonstrate that the agency was concerned not only with preventing "violation[s] of a person's constitutional or statutory rights," but also with "carefully control[ling]" certain investigatory techniques which, "although legal, nevertheless tend to be offensive to the public conscience." *Id.*, at 1122 (testimony of Commissioner Cohen). The Commissioner further assured the Subcommittee that detailed regulations adopted by the agency in 1967 would guarantee such control. *Id.*, at 1122–1126; CCH [1967] Stand.Fed. Tax **1477 Rep. ¶ 6711, p. 71,756. Those regulations, recodified without substantial modification, are *762 the basis of the instant proceedings. Compare Internal Revenue Service Manual ¶ 652.22 (Sept. 1975) with Internal Revenue Service Manual Supplement, Wiretapping and Electronic Eavesdropping, No. 93G–70 (July 10, 1967).

Against this historical backdrop, it is inarguable that these IRS regulations affect substantial individual interests. Indeed the Court does not suggest otherwise. Rather, it places weight on respondent's failure to establish prejudice from agency illegality. Because Caceres cannot demonstrate that he "reasonably relied" on the regulations, *ante*, at 1472, or that the failure to obtain proper authorization had any "discernible effect" on the IRS's decision to monitor his conversations with Agent Yee, *ibid.*, the Court concludes that the agency's action implicates no due process interest. Such an approach is fundamentally misconceived. By assessing respondent's claim in terms of prejudice, the Court disregards not only its prior holdings, but also the principles of governmental regularity on which they rest.

99 S.Ct. 1465, 59 L.Ed.2d 733, 43 A.F.T.R.2d 79-872, 79-1 USTC P 9294...

To make subjective reliance controlling in due process analysis deflects inquiry from the relevant constitutional issue, the legitimacy of government conduct. If an individual is entitled only to the process that he subjectively believes is due, an agency could disregard its investigative rules with impunity provided it did so with consistency. For no person could "reasonably rely," *ante*, at 1472, on rules that were generally ignored. And to the extent that the majority views reliance as critical in an investigative context, it effectively reduces mandatory regulations to hortatory policies. Presumably the only persons with occasion to discover breaches of investigative rules will be those facing criminal prosecution. Such individuals will rarely, if ever, be able to establish that they planned their conduct with internal agency regulations in view. [5]

 **\*763** Moreover, the Court's focus on subjective reliance is inconsistent with our prior decisions enforcing due process guarantees. In *Bridges v. Wixon*, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945), we vacated a deportation order because the Immigration and Naturalization Service had failed to observe regulations requiring that witness statements be made under oath, even though the petitioner's statements were not involved and he had not invoked the regulations at his deportation hearing.

So too, in *Yellin v. United States*, 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963), this Court overturned the defendant's contempt conviction for refusal to testify before Congress where the House Committee on Un-American Activities had ignored rules requiring it to consider formally the injuries to a witness' reputation that might attend public hearings. Yet as the dissent in *Yellin* pointed out, the defendant had predicated his refusal to testify on First Amendment grounds, not on the public nature of the proceedings, and had in "no way indicated that an executive session would have made any difference in his willingness to answer questions." *Id.*, at 141, 83 S.Ct., at 1846 (WHITE, J., dissenting).

Nor has this Court required, as it does today, that procedural irregularity affect the outcome of the governmental action at issue. For example, there was no suggestion in *Yellin* that, had the Committee formally considered the injury to the defendant's reputation, it would have convened an executive session. Indeed, the Committee Chairman had testified that this was precisely the kind of case where a public hearing was appropriate. **\*\*1478** 374 U.S., at 117–118, n. 6, 83 S.Ct., at 1833–1834. Nonetheless, the Court, even as it expressed doubt that procedural compliance **\*764** would have made a difference, insisted that the defendant was entitled to no less. *Id.*, at 121, 83 S.Ct., at 1835. [6]

Similarly, the petitioner in *Vitarelli v. Seaton*, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959), was in no meaningful sense prejudiced by the Department of the Interior's departure from regulations governing employee discharges for national security reasons. After the petitioner filed suit, he received a revised notice of dismissal which complied with all applicable regulations. Despite the petitioner's inability to demonstrate that adherence to agency regulations would have affected the decision to discharge him, this Court ordered reinstatement.

Implicit in these decisions, [7] and in the Due Process Clause itself, is the premise that regulations bind with equal force whether or not they are outcome determinative. As its very terms make manifest, the Due Process Clause is first and foremost a guarantor of *process*. It embodies a commitment to procedural regularity independent of result. To focus on the conduct of individual defendants rather than on that of the government necessarily qualifies this commitment. If prejudice becomes critical in measuring due process obligations, individual officials may simply dispense with whatever procedures are unlikely to prove dispositive in a given case. Thus, the majority's analysis invites the very kind of capricious and unfettered decisionmaking that the Due Process Clause in general and these regulations in particular were designed to prevent.

 **\*765** Any fair application of our prior holdings mandates a different result. When the Government engages to protect individual interests, it may not constitutionally abrogate that commitment at its own convenience. I would hold the IRS to its surveillance-authorization procedures regardless of whether a litigant can establish prejudice from their circumvention.

II

U. S. v. Caceres, 440 U.S. 741 (1979)

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 791 of 912

99 S.Ct. 1465, 59 L.Ed.2d 733, 43 A.F.T.R.2d 79-872, 79-1 USTC P 9294...

Having found a due process violation, I would require that the fruits of that illegality be suppressed in respondent's criminal prosecution. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Accordingly, under my analysis, it would be unnecessary to consider the scope of our supervisory powers, discussed in Part IV of the Court's opinion. Because, however, the Court addresses that issue, I must register my profound disagreement with both its reasoning and ultimate conclusion.

In determining that the exclusionary rule is an unwarranted sanction for the agency misconduct here, the Court attaches great significance to the agents' ostensible "good faith" in construing their own regulations to permit "emergency" surveillance of respondent in January and February 1975. *Ante*, at 1474. The record does not admit of such a charitable characterization. IRS Agent Yee alleged that respondent first attempted to bribe him in March 1974. The IRS recorded a conversation between Caceres and Yee that same month. No further contact with Caceres concerning the bribe occurred until January 1975, and no reasons have been offered for Agent Yee's failure to initiate surveillance during that 10-month hiatus. Nor does the record reflect any justification for the agency's failure **1479 to obtain approval for monitoring between the January 27 and January 31 meetings, to schedule meetings so as to permit timely authorization requests, or to process the January 31 authorization request expeditiously. In positing that the agents had a colorable basis for believing that the January 31 and February 6 meetings *766 constituted "emergency situation[s]," see *ante*, at 1474, the Court simply ignores the findings below that Agent Yee had absolute control over the scheduling of those conversations, and that any exigency was solely of the Government's own making. [8] This is plainly not an instance in which law enforcement officers have failed to grasp the nuances of constitutional doctrine in an area where the Court itself is sharply divided. Cf. *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 417, 91 S.Ct. 1999, 2015, 29 L.Ed.2d 619 (1971) (BURGER, C. J., dissenting); *Stone v. Powell*, 428 U.S. 465, 538–540, 96 S.Ct. 3037, 3072–3073, 49 L.Ed.2d 1067 (1976) (WHITE, J., dissenting). Rather, the record demonstrates a breach of unambiguous and unquestionably applicable procedures.

Moreover, even assuming the good faith which the agency has failed to demonstrate, that consideration should not figure in our present analysis. Restricting application of the exclusionary rule to instances of bad faith would invite law enforcement officials to gamble that courts would grant absolution for all but the most egregious conduct. Since judges do not lightly cast aspersions on the motives of government officials, the suppression doctrine would be relegated to those rare circumstances where a litigant can prove insolent or calculated indifference to agency regulations. As we have noted in the context of Fourth Amendment violations, "[i]f subjective good faith alone were the test, . . . the people would be 'secure . . .' only in the discretion of the police." *Beck v. Ohio*, 379 U.S. 89, 97, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964). Just as intent has not been determinative in Fourth Amendment cases, see, *e. g. Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), it should not be material here.

The Court next suggests that suppression is unnecessary in this case because "the Executive itself has provided for *767 internal sanctions in cases of knowing violations of the electronic-surveillance regulations." *Ante*, at 1474 (footnote omitted). Significantly, however, the Court does not assert that the sanctions which exist in theory are effectively employed in practice. While "[s]elf-scrutiny is a lofty ideal," *Wolf v. Colorado*, 338 U.S. 25, 42, 69 S.Ct. 1359, 1369, 93 L.Ed. 1782 (1949) (Murphy, J., dissenting), nothing in the record before us indicates why IRS disciplinary procedures should enjoy the Court's special confidence. Quite the contrary, the circumstances surrounding the conception and continued operation of IRS authorization requirements illustrate a persistent indifference toward enforcement. [9] And abdication by the **1480 courts is unlikely to increase the agency's vigilance in disciplining or even discovering *768 violations. To remove a defendant's incentive for exposing evasions or disingenuous constructions of applicable rules will inevitably diminish the agency's interest in self-monitoring. [10]

Finally, the Court declines to order suppression because "a rigid application of an exclusionary rule to every regulatory violation could have a serious deterrent impact on the formulation of additional standards to govern prosecutorial and police procedures."

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

*Ante* at 1474. No support is offered for that speculation. In fact, all available evidence is to the contrary. Since 1967, the IRS has retained regulations requiring agents to give *Miranda* warnings in noncustodial settings despite Court of Appeals decisions suppressing statements taken in violation of those rules. *United States v. Sourapas*, 515 F.2d 295, 298 (CA9 1975); *United States v. Leahey*, 434 F.2d 7 (CA1 1970); *United States v. Heffner*, 420 F.2d 809 (CA4 1969). Significantly the Court points to no instance in which an agency has withdrawn the procedural protections made meaningful by decisions such as *Bridges v. Wixon*, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945), *United States Ex rel., Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681, (1954), *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957), and *Vitarelli v. Seaton*, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959).

Even if the majority's concern about inhibiting agency self-regulation were more solidly grounded, it could not justify the result in this case. Under today's decision, regulations **\*769** largely unenforced by the IRS will be unenforceable by the courts.[11] I cannot share the Court's apparent conviction that much would be lost if the agency were to withdraw such rules in protest against judicial enforcement. Presumably Congress, which has been repeatedly dissuaded by the IRS from legislating in the area,[12] would then step into the breach. In the event of congressional action, this Court could not so cavalierly tolerate unauthorized electronic surveillance. See *Miller v. United States*, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).[13] Particularly where, **\*\*1481** as here, agency regulations were designed to stand in the place of legislative action, we should not hesitate to give them similar force and effect.

In my judgment, the Court has utterly failed to demonstrate why the exclusionary rule is inappropriate under the circumstances presented here. Equally disturbing is the majority's refusal even to acknowledge countervailing considerations. Quite apart from specific deterrence, there are significant values served by a rule that excludes evidence secured by lawless enforcement of the law. Denying an agency the fruits of noncompliance gives credibility to the due **\*770** process and privacy interests implicated by its conduct.[14] Also, and perhaps more significantly, exclusion reaffirms the Judiciary's commitment to those values. Preservation of judicial integrity demands that unlawful intrusions on privacy should "find no sanction in the judgments of the courts." *Weeks v. United States*, 232 U.S. 383, 392, 34 S.Ct. 341, 344, 58 L.Ed. 652 (1914). See *Elkins v. United States*, 364 U.S. 206, 222–223, 80 S.Ct. 1437, 1446–1447, 4 L.Ed.2d 1669 (1960). Today's holding necessarily confers upon the Judiciary a "taint of partnership in official lawlessness." *United States v. Calandra*, 414 U.S. 338, 357, 94 S.Ct. 613, 624, 38 L.Ed.2d 561 (1974) (Brennan J., dissenting). I decline to participate in that venture.

I would affirm the judgment of the court below.

**All Citations**

440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733, 43 A.F.T.R.2d 79-872, 79-1 USTC P 9294, 1979-1 C.B. 465

## Footnotes

\*      The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1       545 F.2d 1182 (9 Cir. 1976). The District Court suppressed evidence relating to the third conversation as well on the ground that the approval of a *Deputy* Assistant Attorney General was not sufficient to comply with the regulations. The Court of Appeals disagreed, concluding that the Attorney General's authority to approve such monitoring could be

U. S. v. Caceres, 440 U.S. 741 (1979)

Case 3:20-cv-07721-SI    Document 58-6    Filed 11/10/20    Page 793 of 912

99 S.Ct. 1465, 59 L.Ed.2d 733, 43 A.F.T.R.2d 79-872, 79-1 USTC P 9294...

delegated not only to Assistant Attorneys General, as provided specifically in the regulation, but also to their deputies. That conclusion is not at issue here.

2    See United States v. White, 401 U.S. 745, 752, 91 S.Ct. 1122, 1126, 28 L.Ed.2d 453 (plurality opinion); Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462; 18 U.S.C. § 2511(2)(c); infra, at 1470–1471.

3    The IRS regulations were drafted to conform to the requirements of the Attorney General's October 16, 1972, Memorandum to the Heads of Executive Departments and Agencies. The memorandum mandates Justice Department approval for all consensual monitoring of nontelephone conversations by federal departments and agencies. The only exceptions are if less than 48 hours is available to secure approval or if exigent circumstances preclude requests for advance authorization from the Justice Department; in such cases, monitoring may be instituted under the authorization of the head of the department or agency, or other officials designated by him.

4    Paragraph 652.22 of the IRS Manual (in effect Sept. 1975) provides in pertinent part:

"(1) The monitoring of non-telephone conversations with the consent of one party requires the advance authorization of the Attorney General or any designated Assistant Attorney General. Requests for such authority may be signed by the Director, Internal Security Division, or, in his/her absence, the Acting Director. This authority cannot be redelegated. These same officials may authorize temporary emergency monitoring when exigent circumstances preclude requesting the authorization of the Attorney General in advance. If the Director, Internal Security Division, cannot be reached the Assistant Commissioner (Inspection) may grant emergency approval. This authority cannot be redelegated.

"(2) Written approval of the Attorney General must be requested 48 hours prior to the use of mechanical, electronic or other devices to overhear, transmit or record a non-telephone private conversation with the permission of one party to the conversation. . . . Any requests being telefaxed into the National Office should be submitted four days prior to the anticipated equipment use. . . . .

"(3) [A request] must be signed and submitted by the Regional Inspector or Chief, Investigations Branch, to the Director, Internal Security Division. Such requests will contain [reason for such proposed use; type of equipment to be used; names of persons involved; proposed location of equipment; duration of proposed use (limited to 30 days from proposed beginning date); and manner or method of installation] . . . .

_____

"(6) When emergency situations occur, the Director or Acting Director, Internal Security Division, or the Assistant Commissioner (Inspection) will be contacted to grant emergency approval to monitor. This emergency approval authority cannot be redelegated. . . . Emergency authorization pursuant to this exception will not be given where the requesting official has in excess of 48 hours to obtain written advance approval from the Attorney General.

"(7) If, at the time the emergency approval request is submitted, it is desired that approval for use of electronic equipment be given for an extended period, this should be indicated on the [appropriate form]. The Director, in addition to reporting his authorization for emergency use to the Attorney General, will also request approval for the Use of Electronic Equipment for the duration of that period specified by the requestor."

5    App. 20, 23–24, 46.

6    Id., at 25–27, 46.

7    Requests for authorization to use electronic equipment to monitor nontelephone conversations are made on a form (No. 5177) that requires disclosure of the dates of previous authorizations. The form dated January 31, 1975, App. 63, is termed an extension, and reports prior authorizations dated March 25, April 24, May 24, June 27, July 23, and August 29, 1974. Under the regulations, a single authorization may cover a period of up to 30 days; the intervals between the dates of prior authorizations in this case are consistent with successive 30-day authorizations, although this has not been established by any evidence called to our attention.

8    Yee had one follow-up conversation with respondent later in March, which was not monitored. From that point until January 1975, he had no further contact with respondent. App. to Pet. for Cert. 16a (opinion and order of the District Court); App. 21–22.

9    Id., at 65–67.

10   In the District Court, respondent moved to suppress evidence relating to these telephone conversations on the grounds that the monitoring had not been properly authorized. The District Court rejected that challenge, concluding that the

applicable IRS regulations had been followed with respect to these conversations. App. to Pet. for Cert. 16a–17a. That ruling is not at issue here.

11    545 F.2d, at 1187. See also App. to Pet. for Cert. 20a (opinion of District Court) ("the only 'emergency' was created wholly by the I.R.S.").

12    See also United States ex rel. *Bilokumsky v. Tod*, 263 U.S. 149, 155, 44 S.Ct. 54, 56, 68 L.Ed. 221 (Court assumed that "one under investigation with a view to deportation is legally entitled to insist upon the observance of rules promulgated by the Secretary pursuant to law").

13    Mr. Justice WHITE further stated:
"Nor should we be too ready to erect constitutional barriers to relevant and probative evidence which is also accurate and reliable. An electronic recording will many times produce a more reliable rendition of what a defendant has said than will the unaided memory of a police agent. It may also be that with the recording in existence it is less likely that the informant will change his mind, less chance that threat or injury will suppress unfavorable evidence and less chance that cross-examination will confound the testimony. Considerations like these obviously do not favor the defendant, but we are not prepared to hold that a defendant who has no constitutional right to exclude the informer's unaided testimony nevertheless has a Fourth Amendment privilege against a more accurate version of the events in question." 401 U.S., at 753, 91 S.Ct., at 1126.

14    It does not necessarily follow, however, as a matter of either logic or law, that the agency had no duty to obey them. "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required." *Morton v. Ruiz*, 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270. See, *e. g., United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (holding habeas corpus relief proper where Government regulations "with the force and effect of law" governing the procedure to be followed in processing and passing upon an alien's application for suspension of deportation were not followed); *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (invalidating Secretary of State's dismissal of an employee where regulations requiring approval of the Deputy Undersecretary and consultation of full record were not satisfied); *Vitarelli v. Seaton*, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (invalidating dismissal of Interior Department employee where regulations governing hearing procedures for national security dismissals were not followed). See also *Yellin v. United States*, 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (reversing contempt conviction where congressional committee had not complied with its rules requiring it to consider a witness' request to be heard in executive session).

15    In *Raley v. Ohio*, 360 U.S. 423, 437–438, 79 S.Ct. 1257, 1265–1266, 3 L.Ed.2d 1344, we held that due process precluded the conviction of individuals for refusing to answer questions asked by a state investigating commission which itself had erroneously provided assurances, express or implied, that the defendants had a privilege under state law to refuse to answer. And in *Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487, the Court held that an individual could not be punished for demonstrating "near" a courthouse where the highest police officials of the city had advised the demonstrators that they could meet where they did without violating the statutory proscription against demonstrations "near" the courthouse. Cf. *Arizona Grocery Co. v. Atchison, T. & S. F. R. Co.,* 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (holding invalid Interstate Commerce Commission's retroactive application of new rate); *Columbia Broadcasting System, Inc. v. United States,* 316 U.S. 407, 422, 62 S.Ct. 1194, 1202, 86 L.Ed. 1563 (agency regulations on which individuals are "entitled to rely" bind agency and are therefore ripe for judicial review). The underlying rationale of the foregoing cases is plainly inapplicable here.

16    The Act was originally passed in 1946, 60 Stat. 237, and is codified at 5 U.S.C. § 551 *et seq.* and § 701 *et seq.*.

17    5 U.S.C. § 706.

18    Cf. *Board of Curators Univ. of Mo. v. Horowitz,* 435 U.S. 78, 92 n. 8, 98 S.Ct. 948, 956, 55 L.Ed.2d 124; *Vitarelli v. Seaton, supra,* 359 U.S., at 547, 79 S.Ct., at 976 (Frankfurter, J., concurring in part and dissenting in part) ("This judicially evolved rule of administrative law is now firmly established and, if I may add, rightly so. He that takes the procedural sword shall perish with that sword").

Even as a matter of administrative law, however, it seems clear that agencies are not required, at the risk of invalidation of their action, to follow all of their rules, even those properly classified as "internal." In *American Farm Lines v. Black Ball Freight Service,* 397 U.S. 532, 538, 90 S.Ct. 1288, 1292, 25 L.Ed.2d 547, for example, ICC rules requiring certain information to be included in applications had not been followed. This Court rejected the argument that the agency action was therefore invalid, concluding that the Commission was "entitled to a measure of discretion in administering its own procedural rules in such a manner as it deems necessary to resolve quickly and correctly urgent transportation problems."

19    See App. in *Service v. Dulles, App. in O.T. 1956, No. 407, p. 40;* Vitarelli v. Seaton, O.T. 1958, No. 101, p. 7. The complaints in both of these cases invoked 5 U.S.C. § 1009 (1964 ed.), the then-applicable APA judicial-review provision.

20    See *Linkletter v. Walker,* 381 U.S. 618, 633, 636–637, 85 S.Ct. 1731, 1741, 14 L.Ed.2d 601; *Mapp v. Ohio,* 367 U.S. 643, 656, 81 S.Ct. 1684, 1692, 6 L.Ed.2d 1081; *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669.

21    Since no statute was violated by the recording of respondent's conversations, this Court's decision in *Miller v. United States,* 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332, is likewise inapplicable.

22    The Government argues that Fed. Rule Evid. 402 and 18 U.S.C. § 3501 prohibited the Court of Appeals from exercising whatever supervisory power it otherwise have to suppress evidence of respondent's statements to Yee. Brief for United States 42.

23    See Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L.Rev. 349, 416–428 (1974); McGowan, Rule-Making and the Police, 70 Mich.L.Rev. 659 (1972).

24    See F. Cooper, Administrative Agencies and the Courts 289–290 (1951) ("[T]oo rigid an application of the doctrine prohibiting disregard of procedural rules would encourage the tendency of some agencies to proceed almost without rules. The doctrine should not be pressed so far as to induce agencies to adopt the protective device of promulgating procedural rules so vague in nature as to make it impossible to show a violation of the rules").

25    See IRS Manual ¶ 652.1(3) (in effect Sept. 1975) ("Any employee who knowingly violates or in any way knowingly countenances violation of this policy will be subject to disciplinary action and may be removed from the Service").

1    Although not always expressly predicated on the Due Process Clause, these decisions are explicable in no other terms.

The complaints in only two of the cases, *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959), and *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957), invoked the Administrative Procedure Act, see *ante,* at 1473 n. 19. In neither of these cases was the Act even mentioned in the Court's opinions. Rather, *Vitarelli* followed *Service,* see 359 U.S., at 539–540, 79 S.Ct., at 972–973, which in turn had relied on *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). See 354 U.S., at 373, 386–387, 77 S.Ct. 1152. Both *Accardi* and its predecessor, *Bridges v. Wixon,* 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945), were habeas corpus cases. And *Yellin v. United States,* 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963), which involved criminal contempt sanctions, followed *Accardi.* Thus, it is clear that this line of precedent cannot be dismissed as federal administrative law. Cf. *Board of Curators, Univ. of Mo. v. Horowitz,* 435 U.S. 78, 92 n. 8, 98 S.Ct. 948, 956, 55 L.Ed.2d 124 (1978) (dictum). To the contrary, these decisions have been uniformly, and I believe properly, interpreted as resting on due process foundations. See *United States v. Sourapas,* 515 F.2d 295, 298 (CA9 1975); *Konn v. Laird,* 460 F.2d 1318 (CA7 1972); *Antonuk v. United States,* 445 F.2d 592, 595 (CA6 1971); *Hollingsworth v. Balcom,* 441 F.2d 419, 421 (CA6 1971); *United States v. Leahey,* 434 F.2d 7, 9 (CA1 1970); *United States v. Lloyd,* 431 F.2d

U. S. v. Caceres, 440 U.S. 741 (1979)

99 S.Ct. 1465, 59 L.Ed.2d 733, 43 A.F.T.R.2d 79-872, 79-1 USTC P 9294...

160, 171 (CA9 1970); *Government of Canal Zone v. Brooks,* 427 F.2d 346, 347 (CA5 1970); *United States v. Heffner,* 420 F.2d 809, 811–812 (CA4 1969); cf. *Schatten v. United States,* 419 F.2d 187, 191 (CA6 1969). See generally Berger, Do Regulations Really Bind Regulators, 62 Nw.U.L. Rev. 137 (1967).

2     At issue in *Bridges*, were regulations requiring that witness statements be made under oath and signed in order to be admissible in deportation hearings. As the Court correctly points out, *ante*, at 1470, those rules were designed as safeguards "against essentially unfair procedures." 326 U.S., at 153, 65 S.Ct., at 1452. However, there is no basis in precedent or in the language of *Bridges* itself for the majority's further intimation that the Due Process Clause "mandated" such protective regulations. *Ante*, at 1470.

3     *American Farm Lines v. Black Ball Freight Service*, involved rules promulgated to assist an agency in compiling information for internal decisionmaking. As the *American Farm* Court noted in distinguishing *Vitarelli v. Seaton*, *supra*, these rules were not "intended primarily to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion . . . ." 397 U.S., at 538–539, 90 S.Ct., at 1292.

4     As summarized by Senator Morse: "The record reveals that illegal wiretapping by the Internal Revenue Service is not an occasional action of an overzealous agent, but is the logical and reasonable consequence of a well-defined program . . .." Hearings on S.Res. 928 before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, 90th Cong., 1st Sess., 29 (1967).

5     Just as we do not expect defendants in Fourth Amendment cases to demonstrate that but for the warrant requirement they would have acted otherwise, we should not demand that those in respondent's position establish that they predicated their action on the existence of internal regulations. In both contexts, the rationale for mandating government compliance with procedural safeguards is the same: to prevent law enforcement officials from exercising unchecked discretion where substantial privacy interests are involved. And in neither case is a requirement of subjective reliance consistent with that objective.

6     The *Yellin* Court, 374 U.S., at 121, 83 S.Ct., at 1835, was equally dubious that agency adherence to its regulations would have affected the Attorney General's ultimate decision to deport in *United States ex rel. Accardi v. Shaughnessy,* 347 U.S., at 267, 74 S.Ct. at 503.

7     In part, these decisions also reflect a prudent reluctance to speculate how another branch of government would have acted under different circumstances. Because the Court has so little apparent difficulty in hypothesizing that compliance would not have mattered in this case, see *ante*, at 1472, 1474, it has adopted an approach that may well prove problematic in the next. Not all circumstances affecting agency decisions will so readily lend themselves to counterfactual analysis.

8     See 545 F.2d 1182, 1187 (CA9 1976). For example, when Agent Yee proposed a meeting for the following day, Caceres responded: "I'll arrange my schedule to your convenience." App. 15.

9     With respect to IRS officials' enthusiasm for self-discipline before and during the Senate investigation, Senator Long stated that, "generally speaking, they have found wrongdoing only when the subcommittee has pointed directly and explicitly to it." S.Res. 39 Hearings 1118.

Since that investigation, the agency's performance has remained less than exemplary. In 1974, an internal audit of electronic surveillance within the IRS Intelligence Division revealed that 18 agents had engaged in 35 to 40 "instances" of improper monitoring within the previous year, with an "instance" defined to include as many as 15 different phone calls. Oversight Hearings into the Operations of the IRS before a Subcommittee of the House Committee on Government Operations, 94th Cong., 1st Sess., 426–431, 450 (1975) (hereinafter Oversight Hearings). None of these employees were dismissed or demoted. In only one case did violations even actuate suspension. There, an employee who monitored his home telephone for "personal reasons completely unrelated to his official duties" was suspended for five days. *Id.*, at 451; Reply Brief for United States 17, and n. 9. Four other employees received written reprimands. Eight received oral admonitions, three of which were confirmed in writing and none of which became part of the agents' personnel folders. Oversight Hearings 451, 453. The Service took no action in five cases. *Id.*, at 451.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

99 S.Ct. 1465, 59 L.Ed.2d 733, 43 A.F.T.R.2d 79-872, 79-1 USTC P 9294...

Such nominal sanctions hardly justify the Court's faith in agency self-restraint, particularly given the Government's failure to identify a single instance of internal disciplinary action by the IRS since 1974. See Reply Brief for the United States 16–17.

10 Professor Amsterdam, whom the majority cites for the proposition that regulations governing investigatory conduct "may well provide more valuable protection to the public at large than the deterrence flowing from the occasional exclusion of items of evidence," *ante*, at 1473, and n. 23, submits in the same article that federal review of compliance with such regulations through the exclusionary rule "remains essential." Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L.Rev. 349, 429 (1974). As he maintains, the suppression doctrine provides the "necessary occasions" for review of administrative problems and circumventions, and affords the "only available incentive" for law enforcement officials to make internal rules clear and incorporate them in personnel training. *Ibid.*

11 See n. 9, *supra*. Significantly, the Court does not suggest APA litigation as a plausible alternative means of enforcing investigative regulations. Unless a criminal prosecution is initiated, an individual is unlikely to discover that he was subject to unauthorized surveillance. And it strains credulity to suppose that an individual under criminal indictment would assume the expense, not to mention the risks of antagonizing government officials, that would attend APA proceedings. Cf. Amsterdam, The Supreme Court and the Rights of Suspects in Criminal Cases, 45 N.Y.U.L.Rev. 785, 787 (1970).

12 See S.Res. 39 Hearings 1122–1124, 1144 (testimony of Commissioner Cohen); Oversight Hearings 401 (testimony of Commissioner Alexander); *id.*, at 448 (testimony of Assistant Commissioner for Compliance Wolfe).

13 In *Miller*, the Court suppressed evidence obtained after District of Columbia police forcibly entered an apartment without announcing their authority and purpose as required by a federal statute made applicable in the District by a ruling.

14 See Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U.Chi.L.Rev. 665, 756 (1970) (by demonstrating that society attaches serious consequences to unlawful infringement of privacy interests "the exclusionary rule invokes and magnifies the moral and educative force of the law. Over the long term this may integrate some fourth amendment ideals into the value system or norms of behavior of law enforcement agencies").

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

837 F.3d 668
United States Court of Appeals, Sixth Circuit.

UNITED STATES of America, Plaintiff–Appellee,

v.

Wilmer CANELAS–AMADOR, Defendant–Appellant.

No. 15-6035
|
Decided and Filed: September 14, 2016

Synopsis

**Background:** Defendant was convicted in the United States District Court for the Eastern District of Tennessee, Thomas W. Phillips, J., of illegal reentry offense. He appealed from sentence imposed.

The Court of Appeals, Alice M. Batchelder, Circuit Judge, held that term "conviction," as used in Sentencing Guideline mandating a sixteen-point enhancement of base offense level for defendant convicted of illegal reentry if he has prior conviction of crime of violence, was not broad enough to include defendant's prior guilty plea to charge of assault.

Reversed and remanded.

**\*669** Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville. No. 3:15-cr-00053-1 —Thomas W. Phillips, District Judge.

**Attorneys and Law Firms**

ON BRIEF: Laura E. Davis, Federal Defender Services of Eastern Tennessee, Inc., Knoxville, Tennessee, for Appellant. Brooklyn Sawyers, United States Attorney's Office, Knoxville, Tennessee, for Appellee.

**\*670** Before: SILER, BATCHELDER, and GIBBONS, Circuit Judges.

**OPINION**

ALICE M. BATCHELDER, Circuit Judge.

As anyone who watches detective shows on television can tell you, it is rarely good news when "the feds" take over on a case —they are generally portrayed as likely to bungle the whole thing, permitting the guilty party to get off scot-free. This trope is certainly a gross exaggeration. But at least in this case there may be a grain of truth to it, albeit in circumstances involving the less-than-thrilling minutiae of immigration law and the federal sentencing guidelines.

Six years ago Tennessee law enforcement officials arrested illegal immigrant Wilmer Canelas–Amador and charged him in Tennessee state court with felony aggravated assault and a few related misdemeanors. The record before us does not contain any findings of fact by the Tennessee court or any hearing transcripts, but it does include a document entitled "Waiver of Trial by Jury and Acceptance of Plea of Guilty," which Canelas–Amador signed and the Tennessee trial court approved in a form order.

Before the trial court could enter judgment or pronounce a sentence, however, federal immigration authorities took Canelas–Amador into custody, moving him out of Tennessee and eventually deporting him back to Honduras. When Canelas–Amador failed to appear for a presentence interview, the Tennessee trial court (which was, apparently, unaware that Canelas–Amador had been taken out of state by immigration authorities) issued a capias (*i.e.*, a bench warrant) ordering law enforcement to bring him into custody, presumably to sit for the interview. Not surprisingly, nothing came of the capias, and the matter appears to have lain dormant ever since.

Soon after being deported, Canelas–Amador reentered the U.S. illegally and was promptly arrested. He pled guilty to illegal reentry in federal court in Texas and was sentenced to one year of imprisonment. Then, in 2015, he was again arrested, this time in Tennessee, and was charged in federal court in Tennessee with illegal reentry, to which he pled guilty. This time, however, the district court gave him a much longer sentence: 57 months' imprisonment, basing that sentence in large part on its 57–81 month guideline-range calculation. At the heart of that calculation was the district court's determination, over Canelas–Amador's objection, that the state court order accepting his "Waiver of Trial by Jury and Acceptance of Plea of Guilty" constituted a "conviction for a felony that is ... a crime of violence," mandating a sixteen-point enhancement under the guideline provision applicable to Illegal Reentry. U.S.S.G. § 2L1.2(b)(1)(A)(ii). [1]

As the district court noted, § 2L1.2(b)(1)(A)(ii) of the guidelines does not define "conviction," nor have we supplied any controlling interpretation of that **\*671** term. The district court therefore looked to cases from outside of this circuit, concluding that the Immigration and Naturalization Act (INA), specifically 8 U.S.C. § 1101(a)(48)(A), provided the proper definition of "conviction," since the crime of illegal reentry is codified in the INA at 8 U.S.C. § 1326.

Under § 1101(a),

> The term "conviction" means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where—
>
> > (i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and
> >
> > (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

8 U.S.C. § 1101(a)(48)(A).

The district court concluded that the state court order accepting the guilty plea was "a formal judgment of guilt and is therefore a conviction for purpose of Sentencing Guideline § 2L1.2(b)(1)(A)." This calculation, together with that court's criminal-history determination, resulted in the aforementioned guideline range of 57–81 months' imprisonment. Sans enhancements, Canelas–Amador would have been facing a guideline range of two to eight months' imprisonment.

This appeal presents us with a single question: was the district court right that the state court order accepting the guilty plea was a conviction for the purposes of § 2L1.2(b)(1)(A)(ii)? On the district court's own reasoning—which, tellingly, the government does not defend in this appeal—the answer is straightforward: no, a plea agreement approved in a form order falls well short of "a formal judgment of guilt" under § 1101(a)(48)(A).

True, we give words "their ordinary, contemporary, common meaning" unless there's a good reason not to, *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979), and the word "judgment" is often understood to mean any formal judicial decision, *see, e.g.*, *Random House Webster's Unabridged Dictionary* 1036 (1987) (defining "judgment" as "a judicial decision given by a judge or court"); *Webster's Third International Dictionary* 1223 (1986) (defining "judgment" as "a

formal decision or determination given in a cause by court of law or other tribunal"). Legal dictionaries define the term more narrowly, emphasizing the finality of the decision, *see, e.g.*, *Black's Law Dictionary* 970 (10th Ed. 2014) (defining "judgment" as a "court's *final* determination of the rights and obligations of the parties in a case [including] any order from which an appeal lies" (emphasis added)), but this is not without exceptions, *see Ballantine's Law Dictionary* 680 (3d ed. 1969) (emphasizing finality, but also noting that "judgment" is "[s]ometimes synonymous with decision").

The initial plausibility of the district court's construction does not bear up under close scrutiny, however. The sort of judgment spoken of in § 1101(a)(48) is a *criminal* judgment. When used in this setting, the term refers to something much more definite that simply any ruling by a court. As the Supreme Court has put it: "Final judgment in a criminal case means sentence. The sentence is the judgment." *Berman v. United States*, 302 U.S. 211, 212, 58 S.Ct. 164, 82 L.Ed. 204 (1937). Indeed, the phrase "judgment of guilt" bears a striking resemblance to the technical legal phrase "judgment of conviction"—which, according to both **\*672** Federal Rule of Criminal Procedure 32(k) and *Black's Law Dictionary*, is a written record setting "forth the plea, the jury verdict or the court's findings, the adjudication, and sentence." Fed. R. Crim. P. 32(k); *accord Black's Law Dictionary* 972 (10th Ed. 2014).

This similarity has prompted our colleagues on the Second, Third, Fifth, and Eleventh Circuits to conclude that Rule 32(k) sets forth the correct definition of "formal judgment of guilt." *See Mejia Rodriguez v. U.S. Dep't of Homeland Sec.*, 629 F.3d 1223, 1226–27 (11th Cir. 2011); *Singh v. Holder*, 568 F.3d 525, 530 (5th Cir. 2009); *Puello v. Bureau of Citizenship & Immigration Servs.*, 511 F.3d 324, 328–29 (2d Cir. 2007); *Perez v. Elwood*, 294 F.3d 552, 562 (3d Cir. 2002). We agree. The only difference between the two phrases—the substitution of "guilt" for "conviction"—strikes us as immaterial. Indeed, Rule 32(k) sets "conviction" in opposition to "not guilty." *See* Fed. R. Crim. P. 32(k). And the key point, as the Second Circuit noted in *Puello*, is that "both terms center on the action the court must take to formalize the judgment," 511 F.3d at 329, a point underscored by § 1101(a)(48)(A)'s inclusion of the word "formal."

Further, if "formal judgment of guilt" just means a court order of some sort, why did Congress bother to include the alternative definition? Under the district court's broad reading, a mere finding of guilt or entry of "a plea of guilty" would be sufficient in all circumstances, regardless of whether formal "adjudication of guilt ha[d] been withheld" or the court had imposed any "punishment, penalty, or restraint on the alien's liberty." Such a construction is dubious, to say the least. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) ("Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise."); *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988) (presumption against redundancy). We therefore conclude that there was no "formal judgment of guilt" on the aggravated assault charge because the Tennessee court never sentenced Canelas–Amador for the aggravated assault and those truncated proceedings do not constitute an adjudication under Rule 32(k). *See Mejia Rodriguez*, 629 F.3d at 1227.[2]

The government contends that this court is nevertheless bound to affirm the district court's guideline calculation based on our decision in *United States v. Pritchett*, 749 F.3d 417, 425–26 (6th Cir. 2014). That case held, in relevant part, that a defendant's prior guilty plea to a state-law offense was a "prior conviction" under 21 U.S.C. § 841, despite the defendant's "successful completion of [a] probationary sentence and the expungement of [the defendant's] record." *Id.* It based this conclusion, in part, on the fact that, "in some circumstances, a guilty plea alone [is] enough to constitute a conviction." *Id.* at 424 (brackets in original; internal quotation marks omitted). And while we have stated, in an unpublished (and thus nonbinding) opinion, that a guilty plea is *always* enough, *United States v. Hamad*, 575 Fed.Appx. 660, 661 (6th Cir. 2014) (unpublished) (per curiam) (quoting *Pritchett*, 749 F.3d at 424), this **\*673** is not, as our discussion of § 1101(a)(48)(A) makes clear, an accurate

summary of federal law. Contrary to the government's contentions, *Pritchett* thus does not decide this case. But it does raise an important question: is this one of those circumstances where a guilty plea alone is sufficient? Put another way, was the district court right in concluding that § 1101(a)(48)(A) provides the proper definition?

The government says "no"—the proper definition of "conviction" is found, not in § 1101, but in the guidelines themselves, specifically in § 4A1.2(a)(4), which governs criminal history computation. That section provides that " 'Convicted of an offense,' for the purposes of this provision, means that the guilt of the defendant has been established, whether by guilty plea, trial, or plea of *nolo contendere*." U.S.S.G. § 4A1.2(a)(4). Under *this* approach, there is no question that a guilty plea alone is sufficient.

So, which definition applies? As it turns out, there is an (apparently unacknowledged) circuit split on this question. The Fourth, Fifth, Tenth, and Eleventh Circuits have looked to § 1101. *See United States v. Medina*, 718 F.3d 364, 368 (4th Cir. 2013) ("Given that § 2L1.2—unlike § 4A1.2—relates specifically to an immigration offense, we conclude ... that the definition of conviction in § 1101 must control."); *United States v. Ramirez*, 367 F.3d 274, 277 (5th Cir. 2004); *United States v. Anderson*, 328 F.3d 1326, 1328 (11th Cir. 2003); *United States v. Zamudio*, 314 F.3d 517, 521 (10th Cir. 2002). But the First, Second, and Ninth Circuits have applied the definition set forth in § 4A1.2(a)(4). *See United States v. Mendez–Sosa*, 782 F.3d 1061, 1063 (9th Cir. 2015) ("Chapter Four of the sentencing guidelines, and not the Immigration and Nationality Act, provides the proper definition of 'conviction.' "); *United States v. Campbell*, 167 F.3d 94, 98 (2d Cir. 1999); *United States v. Cuevas*, 75 F.3d 778, 782 (1st Cir. 1996).

The reasoning in these cases is very thin. And it is not surprising that the split has gone unnoticed since, in most circumstances, the disagreement is irrelevant. All of the cases cited above analyzed whether diversionary sentences or expungements count as convictions for the purposes of § 2L1.2. The answer to that question is that they do, regardless of which definition applies. In the unusual circumstances of this case, however, the difference matters a great deal.

The guidelines are designed to ensure that the penalties provided for in federal criminal statutes are applied in a just, uniform, and predictable way. Thus, while § 1101(a) defines terms only insofar "[a]s used in this chapter," we believe that Canelas–Amador is correct in saying that, all things being equal, it makes sense to interpret a term used in both a criminal statute and in the guidelines provisions applicable to that statute consistently and with reference to the statutory definition. On the other hand, if the guidelines themselves provide a specific definition, it makes sense to follow that, even in the face of a conflicting statutory definition. *See United States v. Pimentel–Flores*, 339 F.3d 959, 963–64 (9th Cir. 2003).

What makes this case difficult is that it falls somewhere in between these two situations. Section 4A1.2(a)(4) is part of the guidelines of course, but it does not purport to provide a comprehensive definition for *all* guidelines provisions. *See* U.S.S.G. § 4A1.2(a)(4) (" 'Convicted of an offense,' for the purposes of *this provision* means...." (emphasis added)). Nevertheless, the government has a point in saying that it would be odd to define "conviction" one way for computation of criminal history—§ 4A1.2—and another way for computation **\*674** of the impact criminal history has on the offense level—§ 2L1.2. Similarly, though the comments to § 2L1.2 do define some terms by making explicit reference to § 4A1.2(a)(4), they at other points look to § 1101(a) for definitions. The comments for the two sections, moreover, include slightly different definitions of "crime of violence."

The circumstantial evidence is thus far from decisive. And while we think that, without a clear statement in the guidelines to the contrary, the statutory definition is generally preferable, there remains a not insignificant doubt as to which definition should apply here. When, in criminal cases, the tools of statutory interpretation do not resolve a question, where significant doubt or uncertainty lingers, we must construe the provision in favor of the defendant. *See Chapman v. United States*, 500 U.S. 453, 463, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991). This principle—the rule of lenity—has roots deep within the Anglo–American legal tradition, and it "embodies the instinctive distastes against men languishing in prison unless the lawmaker has clearly said they should." *United States v. Bass*, 404 U.S. 336, 348, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) (internal quotation marks omitted). As Chief Justice John Marshall explained nearly two centuries ago,

> The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment.

*United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95, 5 L.Ed. 37 (1820).

The guidelines are not statutes, of course, but they are promulgated by the United States Sentencing Commission pursuant to federal statute, and they play an important, often central, role in determining how long someone will languish in prison. Thus, as we have previously stated, we may "apply the rule of lenity to matters relating to the Sentencing Guidelines." *United States v. Boucha*, 236 F.3d 768, 776 (6th Cir. 2001). Applying that rule here, we hold that the more restrictive definition set forth in § 1101(a)(48)(A) applies. Under that definition, Canelas–Amador was never convicted of aggravated assault by the Tennessee state court, and we therefore hold that that the district court erred in calculating the guidelines range.

It might be argued that this conclusion elevates form above substance—*he pled guilty to the crime after all*! And, in a sense, our decision today does just that. But it does so for the very good reason that form is of paramount importance in the criminal law. As with the vagueness doctrine, the rule of lenity sets an outer limit, checking the tremendous power of the state by requiring it to act with a minimum level of clarity and transparency when it wishes to deprive people of their liberty. It reflects our nation's solemn commitment to the principle that it is better to not punish those who have done wrong—or, in cases like this one, to punish them more lightly—than to countenance legal provisions so foggy that they fail to provide fair notice and thus, ultimately, leave the rights of the innocent unprotected. *See The Federalist No. 62*, at 323–24 (James Madison) (The Gideon ed., George W. Carey & James McClellan eds., Liberty Fund 2001) ("It will be of little avail to the people, that the laws are made by men of their own choice, if the laws be so voluminous that they cannot be read, or *so incoherent that they cannot be understood....* **\*675** Law is defined to be a rule of action; but how can that be a rule, which is little known and less fixed." (emphasis added)).

Finally, the government's contention that Canelas–Amador "seems to argue that because he did not comply with his duty to appear in state court for a presentence interview, he must now be relieved of the burdens of that criminal conduct to which he pleaded guilty," gets things exactly backwards. As we noted at the outset, it was the action of the federal government, not Canelas–Amador, that resulted in his removal from the state before a formal judgment of conviction could be entered. Its desire to see the immigration laws executed promptly is understandable—even quite commendable—but it has no one to blame but itself for the consequences of having in this instance acted too quickly.

The district court's incorrect guidelines-range calculation was a significant procedural error. *See United States v. Bolds*, 511 F.3d 568, 579 (6th Cir. 2007). And we therefore reverse and remand to the district court for resentencing consistent with this opinion.

**All Citations**

837 F.3d 668

# Footnotes

1     Relatedly, the district court found—again, over Canelas–Amador's objection—that the Presentence Report appropriately concluded that three criminal history points were warranted because Canelas–Amador had been sentenced by the Tennessee state court and had illegally reentered the U.S. "while under a criminal justice sentence." These conclusions were incorrect. As mentioned above, the Tennessee trial court never sentenced Canelas–Amador, nor was the capias issued for a "probation violation," as the district court seems to have concluded. *Compare* *Moore v. State,* 578 S.W.2d 78, 81 (Tenn. 1979) ("Under [Tennessee] criminal procedure, a capias is [an] intermediate process having the sole purpose of securing the presence of the defendant."), *with* U.S.S.G. § 4A1.1(c), (d).

2     This is not, as the district court rightly concluded, a circumstance where "adjudication has been withheld"—the adjudication simply never happened. And even if it *had* been withheld, there is nothing in the record suggesting that the Tennessee trial court "ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed." 8 U.S.C. § 1101(a)(48)(A).

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

228 F.Supp.3d 128
United States District Court, D. Maine.

UNITED STATES of America,
v.
Marcos HERNANDEZ, et al., Defendants.

Docket No. 2:16–cr–37–NT
|
Signed 01/11/2017

**Synopsis**
**Background:** After grand jury returned indictment charging defendants with conspiracy to commit a Hobbs Act robbery, Hobbs Act robbery, and brandishing a firearm in furtherance of a crime of violence, defendants move to dismiss firearm count on grounds that conspiracy to commit Hobbs Act robbery and Hobbs Act robbery did not constitute crimes of violence that could support firearms offense.

**Holdings:** The District Court, Nancy Torresen, J., held that:

Hobbs Act robbery was a "crime of violence";

conspiracy to commit Hobbs Act robbery was not a "crime of violence" under force clause of statute prohibiting use of or carrying a firearm during a crime of violence;

residual clause of statute prohibiting use of or carrying a firearm during a crime of violence was not unconstitutionally vague; and

conspiracy to commit Hobbs Act robbery was a "crime of violence" under residual clause.

Motion denied.

**West Codenotes**

**Recognized as Unconstitutional**
 18 U.S.C.A. § 924(e)(2)(B)(ii)

**Attorneys and Law Firms**

**\*129**  Benjamin M. Block, U.S. Attorney's Office, Portland, ME, for United States of America.

**\*130**  Joseph Stanley Mekonis, Law Office of Joseph Mekonis, Saco, ME, for Defendants.

### ORDER ON DEFENDANTS' MOTION TO DISMISS

Nancy Torresen, United States Chief District Judge

The Grand Jury returned an indictment charging the Defendants with conspiracy to commit a Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) (Count One); Hobbs Act robbery in violation of 18 U.S.C. §§ 2, 1951(a) (Count Two); and brandishing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. §§ 2, 924(c)(1)(A)(ii) (Count Three). (ECF No. 1). The Defendants move to dismiss Count Three on the grounds that conspiracy to commit Hobbs Act robbery and Hobbs Act robbery do not constitute crimes of violence as defined in § 924(c)(3). (ECF No. 121). For the following reasons, the motion is **DENIED**.

## METHOD OF ANALYSIS

In the parties' initial briefing, both sides assumed that a categorical analysis of the Hobbs Act was required. To perform a categorical analysis, I am required to identify the minimum criminal conduct necessary for conviction under the predicate offense's statutory elements without regard to the underlying facts in the case. *United States v. Acosta*, 470 F.3d 132, 135 (2d Cir. 2006). [1] If a Hobbs Act robbery could be committed without "the use, attempted use, or threatened use of physical force against the person or property of another," then the crime categorically is not a crime of violence for purposes of § 924(c)(3)(A).

At oral argument, I invited the parties to address whether it made sense to use a categorical approach in the context of a motion to dismiss a § 924(c) count of an indictment. It seemed strange to perform the categorical analysis for a count that is heading to trial. Both parties pointed me to a First Circuit opinion holding that it was not error to instruct a jury that the predicate crimes of tampering with and retaliating against an informant were, as a matter of law, crimes of violence for purposes of § 924(c). See *United States v. Weston*, 960 F.2d 212, 217 (1st Cir. 1992) *abrogated on other grounds by* *Stinson v. United States*, 508 U.S. 36, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993). While the First Circuit did not use the term "categorical" in *Weston*, the parties nonetheless believe that categorical analysis is required.

The Third Circuit recently addressed this precise question. Despite the defendant and government's agreement that categorical analysis was appropriate, the Third Circuit resisted:

> **\*131** We do not agree that the categorical approach applies here. When the predicate offense, Hobbs Act robbery, and the § 924(c) offense are contemporaneous and tried to the same jury, the record of all necessary facts [are] before the district court. The jury's determination of the facts of the charged offenses unmistakably shed[s] light on whether the predicate offense was committed with "the use, attempted use, or threatened use of physical force against the person or property of another."

*United States v. Robinson*, 844 F.3d 137, 141–42 (3rd Cir. 2016). In addition to *Robinson*, a number of lower courts have pointed out that categorical analysis does not make much sense in the case of a contemporaneously charged § 924(c) count. [2]

This growing consensus is based on the origins and purposes behind categorical analysis. The categorical approach was designed to guide courts in determining whether a predicate offense constitutes a crime of violence for the purposes of fashioning an appropriate sentence under the Armed Career Criminal Act, 18 U.S.C. § 924(e) ("ACCA"). *Taylor v. United States*, 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). At issue in *Taylor* was whether the defendant's two prior state burglary convictions should be considered violent felonies under ACCA. The Supreme Court unanimously held that to determine whether the burglaries qualified, the sentencing court could look only to the conviction and the statutory definition of the offense, not to the underlying facts involved in the particular offense.

In reaching this conclusion, the 🚩 *Taylor* Court focused on three factors. First, the Court noted that "[s]ection 924(e)(1) refers to 'a person who ... has three previous convictions' for—not a person who has committed—three previous violent felonies or drug offenses." 🚩 *Id.* at 600, 110 S.Ct. 2143. The Court interpreted this text as congressional intent to focus on the category of the conviction, not the underlying facts. *See* 🚩 *id.* Second, the legislative history of ACCA suggested that a categorical approach was intended. "If Congress had meant to adopt an approach that would require the sentencing court to engage in an elaborate factfinding process regarding the defendant's prior offenses, surely this would have been mentioned somewhere in the legislative history." 🚩 *Id.* at 601, 110 S.Ct. 2143. Third, the Court pointed out "the practical difficulties and potential unfairness of a factual approach." 🚩 *Id.* The Court was concerned that facts not found by a jury would be used to enhance the Defendant's sentence and envisioned the practical difficulties of determining the factual basis for a defendant's past, potentially old, [3] convictions. 🚩 *Id.*

The Supreme Court has repeatedly restated the rationale for using categorical analysis under ACCA. *See* 🚩 *Mathis v. United States,* ––– U.S. ––––, 136 S.Ct. 2243, 2252–53, 195 L.Ed.2d 604 (2016); 🚩 *Descamps v. United States,* ––– U.S. ––––, 133 S.Ct. 2276, 2287, 186 L.Ed.2d 438 (2013). **\*132** The categorical approach has been refined, 🚩 *Shepard v. United States,* 544 U.S. 13, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005) (applying categorical analysis to a defendant entering a plea instead of having a trial) and extended to other statutes and guidelines. *See* 🚩 *Moncrieffe v. Holder,* 569 U.S. 184, 133 S.Ct. 1678, 1684, 185 L.Ed.2d 727 (2013) (using categorical analysis to determine whether a crime is an aggravated felony under the Immigration and Nationality Act); 🚩 *Leocal v. Ashcroft,* 543 U.S. 1, 9–11, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004) (applying categorical analysis under definition of crime of violence in 🚩 18 U.S.C. § 16); 🚩 *Stinson,* 508 U.S. at 39, 113 S.Ct. 1913 (applying categorical analysis under the career offender guideline, 🚩 U.S.S.G. § 4B1.1). All these applications involve a backward look at a prior conviction.

The reasons used to support categorical analysis in 🚩 *Taylor* do not fit the 🚩 § 924(c) context. First, the text of 🚩 § 924(c), which uses the term "offense," is different than that of 🚩 § 924(e), which speaks in terms of "previous convictions." Second, the elaborate fact-finding process that 🚩 *Taylor* was concerned about is not going to pose the same problems in a contemporaneously charged 🚩 § 924(c) offense. The government must plead and prove the 🚩 § 924(c) count beyond a reasonable doubt to a jury, or the defendant must admit a factual basis for a plea, so there are no fairness or Sixth Amendment concerns. [4] Finally, there are no concerns about having to relitigate the factual basis for old convictions or rely on old, possibly inaccurate recitations of fact. Rather, there will either be "a live case where fresh evidence will be presented to a jury," 🚩 *United States v. Woodley,* No. 15–cr–20007, 2015 WL 7770859, at \*4 (E.D. Mich. Dec. 3, 2015), or a guilty plea that will be based on an adequate factual basis to demonstrate whether the way in which the crime was committed had the requisite use of physical force. Despite the agreement of the parties to the contrary, I conclude that categorical analysis is not appropriate here and would deny the motion to dismiss on that basis alone. But, out of an abundance of caution and because it does not affect the outcome, I will conduct the categorical analysis.

## DISCUSSION

### I. Statutory Background

The categorical analysis requires a close look at the language of both 🚩 § 924(c) and the Hobbs Act.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**A. Using or Carrying a Firearm During a Crime of Violence,** 18 U.S.C. § 924(c)

Under § 924(c),

> any person who, during and in relation to any crime of violence ... uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence ... if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years....

18 U.S.C. § 924(c)(i)(A), (ii). The term "crime of violence" as used in § 924(c) means:

> an offense that is a felony and—
>
> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> **\*133**  (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3)(A)–(B). Section 924(c)(3)(A) is commonly referred to as the "force clause," and § 924(c)(3)(B) as the "residual clause."

The parties have not pointed to a Supreme Court or First Circuit case defining the term "physical force" under § 924(c)(3). In *Johnson v. United States*, the Supreme Court defined the term "physical force" for purposes of ACCA as "violent force ... capable of causing physical pain or injury to another person." 559 U.S. 133, 140, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010) ("*Johnson I*"). Here, the parties agree that the *Johnson I* definition of physical force applies. It is not clear to me that § 924(c)(3) requires violent force,[5] but I will accept the Government's concession, at least as it is applied to the portion of § 924(c)(3) that deals with physical force against the person of another.

Whether the residual clause under § 924(c)(3) is still valid is an open question in this Circuit. In *Johnson v. United States*, the Supreme Court held that a similar, but not identical, residual clause of ACCA was unconstitutionally vague. —— U.S. ——, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015) ("*Johnson II*").

**B. The Hobbs Act,** 18 U.S.C. § 1951

The Hobbs Act provides that:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so, or commits or

Case 3:20-cv-07721-SI   Document 58-6   Filed 11/10/20   Page 808 of 912

threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

 18 U.S.C. § 1951(a).

The Hobbs Act defines "robbery" as:

> The unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of *actual or threatened force, or violence, or fear of injury, immediate or future*, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his **\*134** company at the time of the taking or obtaining.

18 U.S.C. § 1951(b)(1) (emphasis added).

## II. The Defendants' Arguments

The Defendants make essentially three arguments in support of their motion to dismiss the § 924(c) charge: (i) a Hobbs Act robbery is not a crime of violence because it does not have as an element the use, attempted use or threatened use of physical force as required under the § 924(c) force clause; (ii) a conspiracy to commit Hobbs Act robbery is similarly not a crime of violence; and (iii) the § 924(c) residual clause is unconstitutional in the wake of *Johnson II*.

### A. Hobbs Act Robbery and the Force Clause

The First Circuit has not yet addressed whether Hobbs Act robbery categorically constitutes a crime of violence post-*Johnson II*. Before *Johnson II*, the First Circuit concluded that Hobbs Act robbery was categorically a crime of violence, but it did not specifically do so under the force clause. *See United States v. Morales–Machuca*, 546 F.3d 13, 21 (1st Cir. 2008) (not specifying whether Hobbs Act robbery was a crime of violence under the force or residual clause); *United States v. Turner*, 501 F.3d 59, 67–68 (1st Cir. 2007) (finding conspiracy to commit Hobbs Act robbery was a crime of violence under the residual clause).

At least two Circuits have addressed the question post-*Johnson II* and concluded that the Hobbs Act categorically qualifies as a crime of violence under § 924(c)(3)(A). *United States v. Hill*, 832 F.3d 135, 141–44 (2d Cir. 2016) (rejecting claim that "fear of injury" under Hobbs Act can be accomplished without the "use, attempted use or threatened use of physical force"); *United States v. Howard*, 650 Fed.Appx. 466, 468 (9th Cir. 2016) ("Hobbs Act robbery by means of 'fear of injury' ... qualifies as crime of violence.").

Three judges within this District have also recently concluded that Hobbs Act robbery constitutes a crime of violence under § 924(c)(3)(A). *United States v. Williams*, 179 F.Supp.3d 141, 154–55 (D. Me. 2016); *Craig v. United States*, No. 16-303, 2016 WL 5874965, at \*5 (D. Me. Oct. 7, 2016); *United States v. Pomerleau*, No. 7-115, 2016 WL 6471202, at \*2 (D. Me. Nov.

1, 2016). Numerous district courts outside this Circuit have likewise concluded that Hobbs Act robbery categorically is a crime of violence under the § 924(c) force clause. [6]

**\*135** The Defendants argue that Hobbs Act robbery categorically fails to qualify as a crime of violence under the force clause for three reasons. First, Defendants contend that the minimum criminal conduct required for a Hobbs Act robbery conviction would be a threat of damage to property, which could be accomplished without violent force. Second, they claim that putting a victim in fear of injury to her *person* could also be accomplished without violent force. Third, and this argument is buried within the Defendants' fear of injury argument, the Defendants contend that Hobbs Act robbery by "actual or threatened force" could be accomplished by force not amounting to violent force. [7]

Interestingly, the issue of whether a Hobbs Act robbery is a crime of violence under § 924(c) is tearing through the district courts. New opinions are being filed on this topic practically every week. So far, all the courts have rejected the argument that the force required to generate "fear of injury to person or property" is less than the force required by § 924(c). [8] But the Defendants' third argument—that the quantum of force needed for a Hobbs Act robbery committed with "actual or threatened force" is less than violent force—appears to have been squarely presented only to one court. *See United States v. Johnson, No. 16-29, 2016 WL 7223264, at \*3–4 (C.D. Cal. Dec. 12, 2016)* (holding that Hobbs Act robbery is categorically a crime of violence). I address each of the Defendants' arguments in turn.

### 1. Whether Fear of Injury to Property Requires Violent Physical Force

In support of their first argument, the Defendants posit a number of hypotheticals that they claim demonstrate the minimal culpable conduct required for a Hobbs Act robbery. A perpetrator could commit a Hobbs Act robbery by putting someone in fear of injury to his property, for example, by merely threatening to pour out an expensive bottle of wine, flush drugs down the toilet, delete computer records, contaminate food, or deface art. Defs.' Reply 2 (ECF No. 137). Since these actions do not involve physical force capable of causing injury, they conclude, Hobbs Act robbery categorically fails as a predicate for a § 924(c) charge.

There are two problems with this argument. First, under the categorical analysis, judges are directed to determine not whether there is a "theoretical possibility" that the minimum criminal conduct would require the use of physical force, but rather whether there is a "realistic probability." *Gonzales v. Duenas–Alvarez*, 549 U.S. 183, 193, 127 S.Ct. 815, 166 L.Ed.2d 683 (2007); *see also United States v. Fish*, 758 F.3d 1, 6 (1st Cir. 2014) ("[i]n assessing whether the elements of the candidate proposed as a predicate crime are overbroad, we need not consider fanciful, hypothetical scenarios."). To show a "realistic probability," the defendant must point to a case where "courts in fact did apply the statute" in the manner he claims they **\*136** would. *Duenas–Alvarez*, 549 U.S. at 193, 127 S.Ct. 815. Here, the Defendants have not pointed to any cases with similar factual scenarios that were actually prosecuted. The Defendants examples are theoretically possible, but not realistically probable, and under *Duenas–Alvarez*, I am not required to consider them.

Second, the Defendants' argument assumes that the *Johnson I* definition of "physical force against the person of another" under ACCA extends to the meaning of physical force against property under § 924(c)(3). [9] *Johnson I* interprets the ACCA force clause as requiring violent force or force "capable of causing physical pain or injury to another person." 559 U.S. at 140, 130 S.Ct. 1265. Applying the logic of *Johnson I* to the context of force against property, it would seem reasonable to focus on the effect of the force on the property and to require force capable of causing damage to property. Therefore, a Hobbs Act robbery involving the fear of injury to property is logically a threat of force capable of causing damage to property.

Accordingly, I am unpersuaded by the Defendants' arguments that their Hobbs Act robbery hypotheticals—which all involve a fear of damage or destruction of property—would not have as an element the threatened use of physical force against property required by 🚩 § 924(c)(3)(A).

## 2. Whether Fear of Injury to Person Requires Use of Violent Physical Force

Defendants' second argument is that a Hobbs Act robbery committed by placing a victim in fear of injury to their person could be committed without violent force if, for example, they had an intimidating style of dress or demeanor or simply told a victim to "give me your wallet." Defs.' Mot. to Dismiss 9. The Government responds that a Hobbs Act robbery by means of fear of injury is designed to reach conduct where the defendant did not make a threat, but "intentionally instilled or exploited the victim's fear of injury from the use of force." Gov.'s Opp'n 12 (ECF No. 128) (quoting *United States v. Pena*, 161 F.Supp.3d 268, 280 (S.D.N.Y. 2016)).

The Defendants have offered nothing new here. Their hypotheticals are farfetched, not backed up by real-life cases, and have been rejected by numerous other courts. For the reasons set forth in 🚩 *Hill* and echoed in 🚩 *Williams* and every other court that has considered it, I agree that the "fear of injury" prong of the Hobbs Act should be interpreted as a fear of injury from the use of force capable of causing injury to a person or property. *See* 🚩 *Hill*, 832 F.3d at 141–44; 🚩 *Williams*, 179 F.Supp.3d at 151; 🚩 *Howard*, 650 Fed.Appx. at 468; cases collected *supra*, note 5.

## 3. Whether Actual or Threatened Force Requires Use of Violent Physical Force

In their third argument—that the means of "actual or threatened force" itself does not necessarily involve the type of violent force required by 🚩 *Johnson I*—the Defendants are breaking new ground. The cases cited by the parties have mostly assumed or the defendants have conceded that the "actual or threatened force" clause has as an element the use, attempted use, or threatened use of physical force. *See, e.g.,* 🚩 *Hill*, 832 F.3d at 141–44; 🚩 *Williams*, 179 F.Supp.3d at 152. But here, the Defendants boldly go where few have **\*137** gone before, taking issue with the statement in 🚩 *Williams* that it is "self-evident that a Hobbs Act robbery committed by means of 'actual or threatened force' or violence meets the required 'physical force' element." Defs.' Mot. to Dismiss 8 (quoting 🚩 *Williams*, 179 F.Supp.3d at 152). The Defendants argue "[a]ll force is not violent force" and provide as an example a purse snatching, which they claim "meets the 'actual force' requirement of a Hobbs Act robbery, yet does not amount to the level of force required for a crime of violence post- 🚩 *Johnson [I]*." Mot. to Dismiss 8.

The Government assumes that a Hobbs Act robbery requires "violent force" as defined in 🚩 *Johnson I* and points to 🚩 *Williams* and 🚩 *Hill*. But, as discussed, those cases addressed arguments made under the "fear of injury" clause. The Government does not address the argument that the term "actual force" could require less force than "violent force" under 🚩 *Johnson I*. I do not blame the Government for not discerning the Defendants' argument, however, because it is poorly developed and hidden within the Defendants' section on "fear of injury."

At issue is the level of force required for a Hobbs Act robbery conviction under the "actual or threatened force" clause. The Defendants rely on 🚩 *Jackson v. United States* for their argument that actual force could be less than violent force. 🚩 No. 06–94, 2016 WL 3167073 (D. Me. June 6, 2016). In 🚩 *Jackson*, Judge Singal concluded that a conviction for robbery under the Maine robbery statute, 17–A M.R.S.A. § 651(1)(C), did not categorically qualify as a violent felony under ACCA's force

clause. The 📑 *Jackson* decision relied on a Law Court opinion in a purse snatching case that interpreted the Maine robbery "physical force" requirement as "*any* physical force." 📑 2016 WL 3167073, at *2 (quoting 📑 *Raymond v. State,* 467 A.2d 161, 164–65 (Me. 1983)).

I agree with the Government that 📑 *Jackson* is distinguishable. Under Maine law any degree of physical force is sufficient to elevate theft to a robbery, and that categorically removes Maine robbery as a violent felony predicate under ACCA. 📑 *Jackson* would be persuasive in this case only if I were to interpret Hobbs Act robbery as committable by *any* degree of force.

To interpret the "actual or threatened force" clause of the Hobbs Act for the amount of force required, I follow the roadmap for statutory construction set down in 📑 *United States v. Nason,* 269 F.3d 10 (1st Cir. 2001). First, I examine the text of the Hobbs Act, which, as stated above, defines "robbery" as:

> the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of *actual or threatened force, or violence, or fear of injury, immediate or future,* to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

📑 18 U.S.C. § 1951(b)(1) (emphasis added). In interpreting the term "actual force," I assume "absent evidence to the contrary, that Congress knew and adopted the widely accepted legal definitions of meanings associated with the specific words enshrined in the statute." 📑 *Nason,* 269 F.3d at 16. As the First Circuit did in 📑 *Nason,* I consult Black's Law Dictionary, which defines "actual force" as "[f]orce consisting in a physical act, esp. a violent act directed against a robbery victim."[10] *Black's Law Dict.* (10th ed. 2014).

**\*138** "Ultimately, context determines meaning." 📑 *Johnson I,* 559 U.S. at 139, 130 S.Ct. 1265; *see also* 📑 *United States v. Castleman,* ––– U.S. ––––, 134 S.Ct. 1405, 1410–12, 188 L.Ed.2d 426 (2014) (defining "physical force" differently in the context of domestic violence than in the ACCA context of a violent felony). Here the context for the term "actual force" is the Hobbs Act robbery statute, which requires an "unlawful taking or obtaining of personal property from the person or in the presence of another, against his will" that "obstructs, delays, or affects commerce." 📑 18 U.S.C. § 1951(a)- (b)(1). Black's Law Dictionary's definition of "actual force" and its reference to a *violent* act against a *robbery* victim, suggests to me that the ordinary meaning of "actual force" in the robbery context involves something more than any physical force. It is reasonable, therefore, that the meaning of Hobbs Act "actual force" is force "capable of causing pain or injury" or force "capable of damaging property."

In 📑 *Nason,* the First Circuit went on to consider whether the wording of adjacent statutory provisions or the legislative history suggested a meaning other than the ordinary meaning of the term used there. The Defendants here offer no statutory comparisons and make no legislative history arguments that would suggest a different definition. In fact, other than to suggest that a purse snatching has the requisite force to constitute a violation of the Hobbs Act, the Defendants offer no exegesis of what level of force is required by the term "actual force" in the Hobbs Act.

This brings me back to the purse snatching scenario. In my opinion, a purse snatching is capable of causing pain or injury to person and/or property. Thus, if it met the commerce element, it could be the basis for a Hobbs Act robbery and could be considered a crime of violence under 🚩 § 924(c)(3). The Defendants have not met their burden under 📑 *Duenas–Alvarez* of

providing examples of real Hobbs Act robbery prosecutions involving actual or threatened force *not capable* of causing injury. *See* 549 U.S. at 193, 127 S.Ct. 815.

To summarize, I conclude that all the means of committing a Hobbs Act robbery—actual or threatened force, violence, and placing a person in fear of injury to person or property—have as an element the use, attempted use or threatened use of physical force as defined by *Johnson I.*

### B. Hobbs Act Conspiracy and the Force Clause

The Defendants argue that conspiracy to commit Hobbs Act robbery does not "have as an element the use, attempted use, or threatened use of physical force against the person or property of another." Defs.' Mot. to Dismiss 9. Because conspiracy requires as little as a "tacit understanding" with no overt act, the Defendants argue, there is no conduct element that would satisfy § 924(c)(3)(A). Defs.' Reply 3 (quoting *United States v. Palmer*, 203 F.3d 55, 63 (1st Cir. 2000)).

The First Circuit has previously held that conspiracy to commit a crime of violence is itself a crime of violence under § 924(c). *Turner*, 501 F.3d at 68. However, this conclusion was made in the context of the residual clause's "substantial risk" of physical force requirement. It seems plain to me that the "use, attempted use, or threatened use of physical force against the person or property of another" is not an element of conspiracy, which requires simply the intent to enter into an agreement and the intent to achieve the criminal objective of that agreement. *See United States v. Gore*, 636 F.3d 728, 731 (5th Cir. 2011); *United States v. White*, 571 F.3d 365, 368–69 (4th Cir. 2009), *abrogated on other grounds by* **\*139** *Johnson II*, ––– U.S. ––––, 135 S.Ct. 2551, 192 L.Ed.2d 569; *United States v. King*, 979 F.2d 801, 801–03 (10th Cir. 1992); *United States v. Baires–Reyes*, 191 F.Supp.3d 1046, 1049–50 (N.D. Cal. 2016); *United States v. Edmundson*, 153 F.Supp.3d 857, 859–60 (D. Md. 2015). I therefore conclude that conspiracy to commit Hobbs Act robbery is categorically not a crime of violence under the force clause of § 924(c)(3)(A).

### C. The Residual Clause

My conclusion that conspiracy is not categorically a crime of violence under § 924(c)(3)(A) raises the issue of whether conspiracy to commit Hobbs Act robbery constitutes a crime of violence under § 924(c)(3)(B). As introduced above, § 924(c)'s definition of "crime of violence" has a residual clause in addition to a force clause, which covers any felony "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." § 924(c)(3)(B).

In *Johnson II*, the Supreme Court addressed the constitutionality of the residual clause found in ACCA. The ACCA residual clause defines a violent felony as "any crime punishable by imprisonment for a term exceeding one year ... that ... is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." § 924(e)(2)(B)(ii). The Supreme Court held:

> Two features of [ACCA's] residual clause conspire to make it unconstitutionally vague. In the first place, the residual clause leaves grave uncertainty about how to estimate the risk posed by a crime. It ties the judicial assessment of risk to a judicially imagined "ordinary case" of a crime, not to real-world facts or statutory elements....

> At the same time, the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony. It is one thing to apply an imprecise "serious potential risk" standard to real-world facts; it is quite another to apply it

to a judge-imagined abstraction. By asking whether the crime "otherwise involves conduct that presents a serious potential risk," moreover, the residual clause forces courts to interpret "serious potential risk" in light of the four enumerated crimes—burglary, arson, extortion, and crimes involving the use of explosives.... By combining indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony, the residual clause produces more unpredictability and arbitrariness than the Due Process Clause tolerates.

*Johnson II*, 135 S.Ct. at 2557–58. In reaching its conclusion, the Supreme Court noted that *Johnson II* marked the fifth time it had dealt with whether a crime fell under ACCA's residual clause. *Id.* at 2558–60.

The Defendants argue that § 924(c)'s residual clause, like ACCA's, is unconstitutionally vague. [11] Defs.' Mot. to Dismiss 11–13. Both statutes, the Defendants argue, call for categorical analysis to determine whether conduct in the "ordinary case" of an offense poses a "substantial risk." *See* Defs.' Mot. to Dismiss 11–13; *see also Johnson II*, 135 S.Ct. at 2557–58.

The Government argues that § 924(c)'s residual clause remains viable after *Johnson II* because it is distinguishable from ACCA's residual clause in five material **\*140** aspects. For its first two arguments, the Government focuses on the differences in the language in the statutes. It claims that § 924(c)'s residual clause is "more targeted and straightforward" because it "confines the risk assessment to only those risks that arise during the commission of the offense" and speaks in terms of "force" rather than "injury." Gov.'s Opp'n 15–16. Third, the Government contends that the enumerated list in ACCA's residual clause introduces a level of confusion not found in § 924(c)(3)(B). Gov.'s Opp'n 16–17. Fourth, the Government argues that § 924(c), which sets forth a new offense only if perpetrated with a firearm, functions differently and more narrowly than ACCA, which identifies offenses for a recidivist enhancement. Gov.'s Opp'n at 17. Finally, the Government points out that "[i]n contrast to its ACCA jurisprudence, the Court has never had occasion to resolve a disputed question about the meaning" of § 924(c)'s residual clause. Gov.'s Opp'n 17. And, when the Court addressed the 18 U.S.C. § 16(b) residual clause, which is worded identically to § 924(c)(3)(B), its interpretation of what conduct constitutes an "ordinary case" was unanimous. Gov.'s Opp'n 17 (citing *Leocal*, 543 U.S. at 10, 125 S.Ct. 377).

I acknowledge that if a categorical approach is mandated, [12] § 924(c)'s residual clause requires an assessment of risk as applied to an "ordinary case" abstraction. Whether § 924(c)'s residual clause survives depends on whether one reads *Johnson II* broadly or narrowly. *See, e.g., United States v. Gonzalez–Longoria*, 831 F.3d 670, 675–76 (5th Cir. 2016) (en banc) (upholding the constitutionality of § 16(b)'s residual clause and suggesting that *Johnson II* should be read narrowly "as a long-considered ill-ease and eventual repudiation of the categorical approach in the specific context of the Armed Career Criminal Act's residual clause."). I see little point in getting out ahead of the Supreme Court in this complicated area.

I agree with the Second, Sixth, and Eighth Circuits that § 924(c)'s residual clause is distinct enough from ACCA's residual clause to uphold its constitutionality. *Hill*, 832 F.3d at 146–50; *United States v. Taylor*, 814 F.3d 340, 375–79 (6th Cir. 2016); *United States v. Prickett*, 839 F.3d 697, 698–700 (8th Cir. 2016); *cf. Gonzalez–Longoria*, 831 F.3d at 675–77 (finding *Johnson II* does not render § 16(b) unconstitutional). *But cf. Golicov v. Lynch*, 837 F.3d 1065, 1072 (10th Cir. 2016) (*Johnson II* renders § 16(b) void for vagueness); *Shuti v. Lynch*, 828 F.3d 440 (6th Cir. 2016); *United States v. Vivas–Ceja*, 808 F.3d 719, 723 (7th Cir. 2015); *Dimaya v. Lynch*, 803 F.3d 1110, 1120 (9th Cir. 2015), *cert. granted*

AR.07309

*Lynch v. Dimaya*, —— U.S. ——, 137 S.Ct. 31, 195 L.Ed.2d 902 (2016). [13] The Sixth Circuit succinctly summarized the differences:

> **\*141** [S]everal factors distinguish the ACCA residual clause from § 924(c)(3)(B). First, the statutory language of § 924(c)(3)(B) is distinctly narrower, especially in that it deals with physical force rather than physical injury. Second, the ACCA residual clause is linked to a confusing set of examples that plagued the Supreme Court in coming up with a coherent way to apply the clause, whereas there is no such weakness in § 924(c)(3)(B). Third, the Supreme Court reached its void-for-vagueness conclusion only after struggling mightily for nine years to come up with a coherent interpretation of the clause, whereas no such history has occurred with respect to § 924(c)(3)(B). Finally, the Supreme Court was clear in limiting its holding to the particular set of circumstances applying to the ACCA residual clause, and only some of those circumstances apply to § 924(c)(3)(B).

*Taylor*, 814 F.3d at 376.

Because I hold that the residual clause under § 924(c) is constitutional after *Johnson II*, I easily conclude that the Hobbs Act conspiracy count is a crime of violence under the residual clause. *Turner*, 501 F.3d at 68 ("[c]onspiracy under the Hobbs Act constitutes a 'crime of violence' for purposes of 18 U.S.C. § 924(c)).

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Defendants' motion.

SO ORDERED.

**All Citations**

228 F.Supp.3d 128

## Footnotes

1    If a statute is divisible and an offense can be committed in alternate ways, I may peek at a limited number of documents (charging instrument, jury instructions, plea colloquy, plea agreement) to see if I can determine which of the alternate offenses supported the conviction. *Descamps v. United States*, —— U.S. ——, 133 S.Ct. 2276, 2281–85, 186 L.Ed.2d 438 (2013). Once that is done, I return to a fact-blind analysis of whether the minimum criminal conduct necessary for conviction under the alternative of the offense involved, has as an element, the use, attempted use or threatened use of physical force against the person or property of another.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

The parties agree on the question of divisibility, and I will go along with their conclusions: (i) that the Hobbs Act is divisible; (ii) that the dividing line is between Hobbs Act extortion and Hobbs Act robbery; and (iii) that the robbery portion of the Hobbs Act is not divisible. Defs.' Mot. to Dismiss 6 (ECF No. 121) (citing *United States v. Williams*, 179 F.Supp.3d 141, 149 (D. Me. 2016)); Gov.'s Opp'n 8–9 (ECF No. 128). Because the Defendants do not contest that they are being charged with Hobbs Act robbery, there is no need to do any further modified categorical analysis.

2    *See, e.g., United States v. Jimenez–Segura,* No. 07-146, 206 F.Supp.3d 1115, 1127–32, 2016 WL 4718949, at \*9–11 (E.D. Va. Sept. 8, 2016); *United States v. McCallister,* No. 15-171, 2016 WL 3072237, at \*2–7 (D.D.C. May 31, 2016); *United States v. Wells,* No. 14-280, 2015 WL 10352877, at \*4 (D. Nev. Dec. 30, 2015); *United States v. Morgan,* No. 14-20610, 2015 WL 9463975, at \*2–5 (E.D. Mich. Dec. 18, 2015); *United States v. Standberry,* 139 F.Supp.3d 734, 739 (E.D. Va. 2015); *United States v. McDaniels,* 147 F.Supp.3d 427, 430–33 (E.D. Va. 2015).

3    As the Third Circuit pointed out in *Robinson,* the most recent of Taylor's prior burglary convictions occurred seventeen years before the proposed application of ACCA enhancements. *Robinson,* 844 F.3d at 141–42.

4    Although *Weston* indicates that the determination of whether a predicate felony constitutes a crime of violence is a matter of law, this does not preclude a jury from doing the fact-finding regarding how a predicate act was committed. I can envision either staged deliberations or questions on a special verdict form that would allow the jury to determine the means of committing the offense before going on to decide a § 924(c) count.

5    In *United States v. Nason,* the First Circuit interpreted the term "physical force" as it is used in the definition of a misdemeanor crime of domestic violence in 18 U.S.C. § 921(a)(33)(A). 269 F.3d 10 (1st Cir. 2001). After consulting Black's Law Dictionary and other dictionaries, the First Circuit determined that the "widely accepted" meaning of "physical force" was "characterized as power, violence, or pressure directed against another person's body." *Id.* at 16. " 'Violence' is essentially a subset of physical force involving injury or risk of harm." *Id.* at 17. The parties do not analyze whether Congress intended the term "physical force" to have a more demanding standard under § 924(c), and I do not undertake to do that research myself. I would note that two district courts within the Second Circuit have refused to apply the "violent force" definition from *Johnson I* to § 924(c). *United States v. Pena,* 161 F.Supp.3d 268, 272 (S.D.N.Y. 2016) ("*Pena I*"); *United States v. Pena,* 190 F.Supp.3d 317 (E.D.N.Y. 2016) ("*Pena II*"). Instead, the courts in *Pena* cases used the "power, violence, or pressure directed against a person or thing" standard that the Second Circuit had used under 18 U.S.C. § 16's definition of "crime of violence," which has an identical force clause as § 924(c). *Pena II,* 190 F.Supp.3d at 320–21 (quoting *Santana v. Holder,* 714 F.3d 140, 144 (2d Cir. 2013)). "Although the *Johnson [I]* definition may be the law of the land in the context of the ACCA—which uses a force clause that lacks reference to the use of force against property—the *Santana* definition remains 'forceful' in the context of 18 U.S.C. § 16, and, in this Court's view, § 924(c)(3)." *Id.*

6    *Blackstone v. United States,* No. 99-257, 2016 WL 7469579, at \*5 (C.D. Cal. Dec. 27, 2016); *United States v. Barrows,* No. 13-185, 2016 WL 4010023, at \*2–4 (D. Nev. July 25, 2016); *United States v. Bailey,* No. 14-328, 2016 WL 3381218, at \*2–6 (C.D. Cal. June 8, 2016); *Pena,* 190 F.Supp.3d at 318–22; *McCallister,* 2016 WL 3072237, at \*7–8; *United States v. Smith,* No. 11-58, 2016 WL 2901661, at \*4–5 (D. Nev. May 18, 2016); *United States v. Reed,* 187 F.Supp.3d at 747–49 (W.D. La. 2016); *United States v. Coleman,* No. 14-664, 2016 WL 1435696, at \*1–3 (N.D. Ill. Apr. 12, 2016); *United States v. Clarke,* 171 F.Supp.3d 449, 453 (D. Md. 2016); *United States v. Hancock,* 168 F.Supp.3d 817, 824 (D. Md. 2016); *Pena,* 161 F.Supp.3d at 284; *United States v. Lenzy,* No. 14-25, 2016 WL 1019712, at \*3 (N.D. Ga. Feb. 4, 2016); *United States v. Bennett,* No. 15-134, 2016 WL 354753, at \*4 (E.D. Va. Jan. 27, 2016); *United States v. Crawford,* No. 15-70, 2016 WL 320116 (N.D. Ind. Jan. 27, 2016); *United States v. Walker,* No. 15-49, 2016 WL 153088, at \*5–6

(E.D. Va. Jan. 12, 2016); *McDaniels*, 147 F.Supp.3d at 430–33; *United States v. Anglin*, No. 14-3, 2015 WL 6828070, at *6 (E.D. Wis. Nov. 6, 2015); *United States v. Redmond*, No. 14-226, 2015 WL 5999317, at *4 (W.D.N.C. Oct. 13, 2015); *Standberry*, 139 F.Supp.3d at 740; *United States v. Hunter*, No. 12-124, 2015 WL 6443084, at *2 (E.D. Va. Oct. 23, 2015); *United States v. Brownlow*, No. 15-34, 2015 WL 6452620, at *5 (N.D. Ala. Oct. 26, 2015); *United States v. Merinord*, No. 15-136, 2015 WL 6457166, at *5 (E.D.N.C. Oct. 26, 2015).

7    The Defendants also suggest that Hobbs Act robbery could be accomplished without the "*intentional* threat of physical force" and therefore categorically fail to satisfy an implied intent requirement under § 924(c)(3)(A). Defs.' Mot. to Dismiss 2, 7. The Defendants do not develop this argument, however, and I will not make it for them. *Díaz–Colón v. Fuentes–Agostini*, 786 F.3d 144, 149 (1st Cir. 2015) ("[w]e deem waived claims not made or claims adverted to in a cursory fashion, unaccompanied by developed argument."). I note, however, that other courts who have considered this argument have rejected it. *See, e.g.*, *United States v. Hill*, 832 F.3d 135, 143 n.10 (2d Cir. 2016); *Williams*, 179 F.Supp.3d at 153–54; *Barrows*, 2016 WL 4010023, at *3–4; *Bailey*, 2016 WL 3381218, at *5–6; *Pena*, 161 F.Supp.3d at 283–84.

8    *See supra* note 5.

9    Section 924(c)(3)'s force clause reads "has as an element the use, attempted use, or threatened use of physical force against the person *or property* of another...." 18 U.S.C. § 924(c)(3)(A) (emphasis added). ACCA's force clause requires that the predicate offense "has as an element the use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i).

10   Interestingly, Black's Law Dictionary's definition of "actual force" cross references the term "physical force."

11   Under the Fifth Amendment, a criminal statute is impermissibly vague where it "fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, ––– U.S. ––––, 135 S.Ct. 2551, 2556, 192 L.Ed.2d 569 (2015) ("*Johnson II*").

12   Again, I am reminded how this whole controversy could be avoided if we jettisoned the categorical approach for contemporaneously charged § 924(c) counts. To me it makes little sense to imagine the "ordinary case" when we will have real-world facts that can be tried to a jury.

13   The majority of district courts to consider this issue have also distinguished § 924(c)(3)(B) from ACCA's residual clause. *See United States v. Moreno–Aguilar*, No. 13-496, 198 F.Supp.3d 548, 554–58 (D. Md. 2016); *Kundo v. United States*, No. 16-436, 2016 WL 3079755, at *2–3 (D. Utah May 31, 2016); *United States v. Green*, No. 15-526, 2016 WL 277982, at *3–5 (D. Md. Jan. 22, 2016); *United States v. Tsarnaev*, 157 F.Supp.3d 57, 71–74 (D. Mass. 2016); *United States v. Checora*, 155 F.Supp.3d 1192, 1201–03 (D. Utah 2015); *McDaniels*, 147 F.Supp.3d at 436–37; *United States v. Lusenhop*, No. 14-122, 2015 WL 5016514, at *3 (S.D. Ohio Aug. 25, 2015). *But see United States v. Herr*, No. 16-10038, 2016 WL 6090714, at *2 (D. Mass. Oct. 18, 2016); *United States v. Baires–Reyes*, 191 F.Supp.3d 1046, 1052–53 (N.D. Cal. 2016) (relying on *Dimaya v. Lynch*, 803 F.3d 1110, 1120 (9th Cir. 2015)).

---

**End of Document**                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

291 F.3d 1201
United States Court of Appeals,
Ninth Circuit.

UNITED STATES of America, Plaintiff–Appellee,

v.

Moses CORONA–SANCHEZ, a/k/a Enrique Sanchez–Corona, Defendant–Appellant.

No. 98–50452.
|
Argued and Submitted Dec. 11, 2001.
|
Filed June 6, 2002.

**Synopsis**

Defendant pleaded guilty in the United States District Court for the Southern District of California, William B. Enright, J., to being a deported alien found in the United States. Defendant appealed his sentence. The Court of Appeals initially affirmed in part and remanded in part, 234 F.3d 449, but on rehearing en banc, the Court of Appeals, Thomas, Circuit Judge, held that alien's sentence could not be enhanced on basis of California theft conviction.

Reversed and remanded.

Rymer, Circuit Judge, filed opinion concurring in part and dissenting in part, in which Kozinski, T.G. Nelson, and Kleinfeld, Circuit Judges, joined.

Kozinski, Circuit Judge, filed dissenting opinion.


**Attorneys and Law Firms**

**\*1202** Wendy S. Gerboth, Hulett Harper LLP, San Diego, CA, for the defendant-appellant.

Patrick K. O'Toole, United States Attorney, Roger W. Haines, Jr., Assistant United States Attorney, U.S. Attorney's Office, San Diego, CA, for the plaintiff-appellee.

Appeal from the United States District Court for the Southern District of California; William B. Enright, District Judge, Presiding. D.C. No. CR–98–00025–WBE.

Before: SCHROEDER, Chief Judge, REINHARDT, KOZINSKI, RYMER, T.G. NELSON, KLEINFELD, THOMAS, McKEOWN, W. FLETCHER, FISHER, and BERZON, Circuit Judges.

**Opinion**


Opinion by Judge THOMAS; Partial Concurrence and Partial Dissent by Judge RYMER; Dissent by Judge KOZINSKI.

THOMAS, Circuit Judge.

This appeal presents the question of whether a California state conviction for the petty theft of cigarettes and beer constitutes an aggravated felony under 8 U.S.C. § 1101(a)(43)(G) and therefore justifies increasing a sentence for unlawful reentry

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

02 Cal. Daily Op. Serv. 4915, 2002 Daily Journal D.A.R. 6263

pursuant to 8 U.S.C. § 1326(b)(2). Under the circumstances of this case, we conclude that it does not, and reverse and remand for resentencing.

## I

Moses Corona–Sanchez was born in Guadalajara, Mexico and lived there until 1987 or 1988, when, at the age of 13, he came to the United States to live with his aunt. He attended junior high and high school in San Clemente, California. His exposure to law enforcement began in 1993, when he was charged with being a minor in possession of alcohol. Since that time, he has been convicted of various offenses, deported 16 times, and excluded twice.

Relevant to the case at hand, Corona–Sanchez was apprehended in 1994 while attempting to spirit away a 12–pack of beer and a pack of cigarettes from a grocery store. [1] This was a reprise of his previous unsuccessful petty larceny of a liquor store, so he was sentenced for petty theft with a prior conviction.

In 1997, Corona–Sanchez pled guilty to the instant charge: being a deported alien found in the United States in violation of 8 U.S.C. § 1326(a). Because the district court deemed the 1994 petty theft conviction to be an aggravated felony, it increased Corona–Sanchez's base offense level from 8 to 24 pursuant to United States Sentencing Guideline § 2L1.2(b)(1)(A). [2] After subtracting 3 levels **1203** for acceptance of responsibility and determining that Corona–Sanchez's criminal history category is VI, the court then committed Corona–Sanchez to the custody of the Bureau of Prisons for 77 months. From this sentence, he appeals. We reconsider the case en banc.

## II

We adopt the portion of the panel opinion in this case that addresses an error in the indictment under which Corona–Sanchez was charged. *See United States v. Corona–Sanchez,* 234 F.3d 449, 451 (9th Cir.2000) [hereinafter *Corona–Sanchez I* ]. For ease of reference, we reprint the relevant portion of the panel opinion in full here:

As an initial matter, we note that in February 1998, Corona–Sanchez pled guilty to a one-count indictment which charged him with a violation of both 8 U.S.C. [§ ]1326(a) (being an alien found in the United States after deportation) and 8 U.S.C. § 1326(b)(2) (reentry after deportation and the commission of an aggravated felony). At that time, we considered § 1326(b)(2) to be a separate offense. *See United States v. Gonzalez–Medina,* 976 F.2d 570, 572 (9th Cir.1992). Shortly after Corona–Sanchez's plea, the Supreme Court held that the fact of a prior aggravated felony conviction is not an element of the offense, but a sentencing factor to be applied by the court. *See Almendarez–Torres v. United States,* 523 U.S. 224, 226, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998).

We recently confronted this precise factual situation in *United States v. Rivera–Sanchez,* 222 F.3d 1057, 1061–62 (9th Cir.2000). There we held that where an indictment charges a defendant with a violation of both § 1326(a) and § 1326(b)(2) in the same count, and the judgment reflects conviction under both provisions, "the proper procedure under these circumstances is to direct the district court to enter a corrected judgment striking the reference to § 1326(b)(2) so that the judgment will unambiguously reflect that the defendant was convicted of only one punishable offense pursuant to § 1326(a)." *Id.; see also United States v. Herrera–Blanco,* 232 F.3d 715 (9th Cir.2000) (*sua sponte* remanding to the district

AR.07314

2

U.S. v. Corona-Sanchez, 291 F.3d 1201 (2002)
02 Cal. Daily Op. Serv. 4915, 2002 Daily Journal D.A.R. 6263

court with directions to correct the judgment of conviction to exclude a reference to 8 U.S.C. § 1326(b)(2)). We shall do so here. We are left with Corona–Sanchez's challenge to his sentence.

*Id.*

III

The primary question on this appeal is whether Corona–Sanchez's prior conviction qualifies as an aggravated felony for federal sentencing purposes. In making this determination, we return to the familiar analytical model constructed by the Supreme Court in *Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). Under *Taylor,* federal courts do not examine the facts underlying the prior offense, but "look only to the fact of conviction and the statutory definition of the prior offense." *Id.* at 602, 110 S.Ct. 2143. If the statute criminalizes conduct that would not constitute an aggravated felony under federal sentencing law, then the conviction may not be used for sentence enhancement unless the record includes " 'documentation or judicially noticeable facts that clearly establish that the conviction is a predicate conviction for enhancement purposes.' " *United States v. Rivera–Sanchez,* 247 F.3d 905, 908 (9th Cir.2001) (en banc) (quoting *United States v. Casarez–Bravo,* 181 F.3d 1074, 1077 (9th Cir.1999)). " '[I]f the statute and the judicially noticeable facts would allow the defendant to be convicted of an offense other than that defined as a qualifying offense by the guidelines, then the conviction does **\*1204** not qualify as a predicate offense.' " *Id.* (quoting *Casarez–Bravo,* 181 F.3d at 1077).

A

Corona–Sanchez's prior conviction is considered an aggravated felony for federal sentencing purposes if it is a "theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment[is] at least one year." 8 U.S.C. § 1101(a)(43)(G).[3] As with many other subsections in the same statute, Congress did not define the term "theft offense." Thus, under *Taylor,* our first task is to construe and define the meaning of this phrase.

In construing other subsections of the same statute in the past, we have employed two methodologies, depending on the nature of the described offense. *United States v. Trinidad–Aquino,* 259 F.3d 1140, 1143 (9th Cir.2001). If the qualifying offense is described in terms of a traditional common law crime, then we have defined the offense in terms of its generic, core meaning. *Id.* at 1144; *see also* *Ye v. INS,* 214 F.3d 1128, 1131–32 (9th Cir.2000) (construing "burglary offense"). This approach is consistent with the principles of construction that the Supreme Court has long employed for federal criminal statutes. *See, e.g., Neder v. United States,* 527 U.S. 1, 21, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) ("[W]here Congress uses terms that have accumulated settled meaning under the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.") (internal quotation marks and modifications omitted).

If, on the other hand, the qualifying offense is described in terms that do not embrace a traditional common law crime, we have "employed the ordinary, contemporary, and common meaning" of the statutory words. *Trinidad–Aquino,* 259 F.3d at 1143; *see also* *United States v. Baron–Medina,* 187 F.3d 1144, 1146 (9th Cir.1999) (construing "sexual abuse of a minor").

In this instance, our choice of methodology is clear because "[t]he contemporary crime of 'theft' stems from the common law crime of larceny." *Corona–Sanchez I,* 234 F.3d at 454 (citing 2 Wayne R. LaFave, *Criminal Law,* § 8.1 (3d ed.2000)). Indeed,

Blackstone describes the offense as "larceny or theft." 4 William Blackstone, *Commentaries on the Law of England* 229 (Univ. of Chicago ed.1979).

Initially, common law larceny was confined to a "trespassory taking," or one in which the thief "took and carried away" personal property that was in the owner's possession. *Bell v. United States,* 462 U.S. 356, 358, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). "The elements of common law larceny are (1) a wrongful taking and carrying away (asportation), (2) of the personal property of another, (3) with the fraudulent intent to deprive the owner of his property without his consent." *United States v. Thordarson,* 646 F.2d 1323, 1335 n. 22 (9th Cir.1981) (citing *United States v. Barlow,* 470 F.2d 1245, 1251 (D.C.Cir.1972)); *see also* 4 Blackstone, *supra,* at 229–33. As it evolved, the common law definition expanded "to include cases where the owner merely was deemed to be in possession." *Bell,* 462 U.S. at 359, 103 S.Ct. 2398. However, "[b]y the late 18th century, courts were less willing to expand common-law definitions." *Id.* Thus, criminal statutes "such as embezzlement and obtaining property by false pretenses" were enacted to "fill this gap." *Id.* At present, "[m]ost modern codes have abolished the separate crimes of larceny, embezzlement, **\*1205** and false pretenses in favor of the comprehensive crime of 'theft.' " *Corona–Sanchez I,* 234 F.3d at 454 (citing 2 LaFave, *supra,* §§ 8.2 n. 1, 8.8).

Corona–Sanchez argues that we ought to limit the concept of "theft offense" to its common law definition in our formulation of a core, generic concept of the term. Although the common law definition informs us and is the starting point of our analysis, it is not the end point. Indeed, such an approach was rejected by the Supreme Court in *Taylor,* 495 U.S. at 592–96, 110 S.Ct. 2143 (holding that "burglary" should not be limited to its common law meaning, given the statutory history).

*Taylor* also precludes the use of the specific definition used by the state of conviction. *Id.* at 590–91, 110 S.Ct. 2143. Rather, *Taylor* instructs that when Congress described predicate offenses, it meant to incorporate "the generic sense in which the term is now used in the criminal codes of most States." *Id.* at 598, 110 S.Ct. 2143. This guidance is particularly apt in the present context, because Congress used the words "theft offense" rather than just "theft," thus indicating that the phrase ought be read to incorporate different but closely related constructions in modern state statutes.

After undertaking an examination, pursuant to *Taylor,* of existing approaches, the Seventh Circuit concluded that the "modern, generic definition" of the phrase "theft offense (including receipt of stolen property)" is:

> a taking of property or an exercise of control over property without consent with the criminal intent to deprive the owner of rights and benefits of ownership, even if such deprivation is less than total or permanent.

*Hernandez–Mancilla v. INS,* 246 F.3d 1002, 1009 (7th Cir.2001). This definition has also been adopted by the Tenth Circuit. *United States v. Vasquez–Flores,* 265 F.3d 1122, 1125 (10th Cir.2001).

Prior to issuance of *Hernandez–Mancilla,* the panel in this case adopted the definition of theft as contained in the Model Penal Code ("MPC") §§ 223.2–223.9. *Corona–Sanchez I,* 234 F.3d at 454–55. Although use of the MPC is certainly a plausible approach, adoption of the standard established by the two other circuits that have construed the phrase makes more sense in a national context. In addition, the Seventh Circuit's definition is closer to "the generic sense in which the term is now used in the criminal codes of most States," *Taylor,* 495 U.S. at 598, 110 S.Ct. 2143, than is the MPC's. Although common law larceny has been consolidated with other previously distinct crimes in most states, "[o]rdinarily ... the substantive elements of the offenses have not changed." 3 Charles E. Torcia, *Wharton's Criminal Law* § 382 (15th ed.1995). In contrast, "[t]he Model

Penal Code provides for an ambitious plan of consolidation of smaller separate crimes into one larger crime called 'theft.' " 2 LaFave, *supra*, § 8.8.

The Seventh Circuit's analysis is persuasive. It is also closer to the "generic sense" of the crime, as envisioned by the Supreme Court. We are also mindful of the desirability of a uniform, national definition. *Taylor,* 495 U.S. at 590–92, 110 S.Ct. 2143. Thus, we adopt the Seventh Circuit's construction.

## B

Having joined the Seventh and Tenth Circuits in their construction of "theft offense," we next must determine whether the state statute that formed the basis of the sentence enhancement qualifies as a theft offense. To accomplish this, we obviously must identify the statute upon which the predicate conviction was based. *Cf.* **\*1206** *United States v. Potter,* 895 F.2d 1231, 1238 (9th Cir.1990) (holding that in order to count a prior conviction as a predicate violent felony under 18 U.S.C. § 924(e), "the sentencing court and the appellate court [must] be certain of the specific statutory sections under which the defendant previously was convicted"). Otherwise, it is impossible to determine the statutory definition of the prior offense. *See id.; see also* *Taylor,* 495 U.S. at 602, 110 S.Ct. 2143. Normally, this would not be an operose task. Unfortunately, the record in this case is not particularly pellucid on this point. All the known information about the conviction comes from the rendition of criminal history contained in the presentence report prepared for Corona–Sanchez's sentencing in this case. This report indicates that the probation officer gathered information from local law enforcement agencies and courts as well as the FBI, CII, and DMV information systems. No other court documents—or any other evidence for that matter—were presented to the district court concerning the offense.

The presentence report describes the qualifying offense as "666/488 PC, Petty Theft with Prior Jail Term for a Specific Offense." However, neither § 666 nor § 488 of the California Penal Code describes crimes. Section 488 simply states: "Theft in other cases is petty theft." Section 666 is a pure sentencing statute, which provides:

> Every person who, having been convicted of petty theft, grand theft, auto theft under Section 10851 of the Vehicle Code, burglary, carjacking, robbery, or a felony violation of Section 496 and having served a term therefor in any penal institution or having been imprisoned therein as a condition of probation for that offense, is subsequently convicted of petty theft, then the person convicted of that subsequent offense is punishable by imprisonment in the county jail not exceeding one year, or in the state prison. [4]

*See* *People v. Bouzas,* 53 Cal.3d 467, 279 Cal.Rptr. 847, 807 P.2d 1076, 1084 (1991) ("[T]he legislature has long intended that section 666 establishes a penalty, not a substantive 'offense.' "). Thus, by their plain language neither statute cited in the presentence report, and relied upon by the district court, even comes close to approximating the generic, core elements of a § 1101(a)(43)(G) "theft offense" pursuant to *Hernandez–Mancilla.* [5]

Assuming that Corona–Sanchez was, in fact, convicted of "Petty Theft with Prior Jail Term for a Specific Offense," as stated in the presentence report, that conviction would necessarily have been founded on California Penal Code § 484(a), which is the general California theft statute. There is no other statute that is applicable to the described crime, and the structure of the California theft provisions compels that conclusion. Section 484(a) [6] defines **\*1207** theft in general. Sections 486 through 488

divide theft into categories. Section 486 states, "Theft is divided into two degrees, the first of which is termed grand theft; the second, petty theft." Section 487 then describes certain circumstances in which theft will constitute grand theft, such as when the value of the stolen item exceeds $400. Section 488 explains that "[t]heft in other cases is petty theft."

Sections 490 and 666 of the Penal Code govern the sentencing of petty thefts. Section 490 provides, "Petty theft is punishable by fine not exceeding one thousand dollars ($1,000), or by imprisonment in the county jail not exceeding six months, or both." Section 666, as we have discussed, permits the imposition of a higher sentence if the defendant was previously convicted of a theft.

Thus, to meet the presentence report's description of "Petty Theft with Prior Jail Term for a Specific Offense," Corona–Sanchez would had to have been convicted of general theft under § 484(a), with the offense categorized as a petty theft under § 488, with the sentence enhanced under § 666.

The general California theft statute, § 484(a), provides:

> Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft. In determining the value of property obtained, for the purposes of this section, the reasonable and fair market value shall be the test, and in determining the value of services received the contract price shall be the test. If there be no contract price, the reasonable and going wage for the service rendered shall govern. For the purposes of this section, any false or fraudulent representation or pretense made shall be treated as continuing, so as to cover any money, property or service received as a result thereof, and the complaint, information or indictment may charge that the crime was committed on any date during the particular period in question. The hiring of any additional employee or employees without advising each of them of every labor claim due and unpaid and every judgment that the employer has been unable to meet shall be prima facie evidence of intent to defraud. [7]

The language of the California theft statute is unique among the states. It is not derived from the Model Penal Code. The language of § 484(a) has remained unchanged since its adoption in 1927. *See* 1927 Cal. Stat. 619, § 1. In comparing the *Hernandez–Mancilla* definition of "theft offense" with § 484(a), it becomes apparent that § 484(a) is broader than the generically defined offense. Significantly, it allows a conviction for theft when the defendant has neither taken, nor exercised control over, the property. *See, e.g., People v. Coffelt*, 140 Cal.App. 444, 35 P.2d 374, 376 (1934). A defendant can be convicted of the substantive offense of violation of § 484 for aiding and abetting a theft, even if that theory is not specifically **\*1208** charged. *See* Cal.Penal Code §§ 31, 971; *People v. Rose*, 56 Cal.App.4th 990, 992, 65 Cal.Rptr.2d 887 (1997); *People v. Guzman*, 45 Cal.App.4th 1023, 53 Cal.Rptr.2d 67, 69 (1996); *see also* 18 Cal. Jur.3d (Rev), *Criminal Law* § 1132 (1985). Under California law, aiding and abetting liability is quite broad, extending even to promotion and instigation. *See People v. Beeman*, 35 Cal.3d 547, 199 Cal.Rptr. 60, 674 P.2d 1318, 1325–26 (1984). Thus, it would not be apparent from reference to the statute of conviction alone to discern whether or not the criminal act was embraced within the federal sentencing definition. Therefore, a conviction under § 484(a) cannot serve as a qualifying offense. *See Rivera–Sanchez*, 247 F.3d at 909.

Further, there are offenses that are included in § 484(a) that are not included in the generic definition. For example, § 484(a) criminalizes theft of labor and solicitation of false credit reporting. Not only is the theft of labor not a part of the *Hernandez–Mancilla* definition, but it generally has not been included within the scope of ordinary theft statutes because one's labor is not one's "property." MPC § 223.7, cmt. 1. It may be that many states have now enacted separate theft-of-services provisions, but that fact does not mean that most states consider labor or services to be "property." In fact, it suggests the contrary is true: if labor were property, there would be no need for separate provisions criminalizing the theft of labor or services. In addition, the Supreme Court has carefully maintained the distinction between "property" and other rights when construing criminal statutes.

*See, e.g.,* McNally v. United States, 483 U.S. 350, 356, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), *superseded on other grounds by statute as recognized in* Cleveland v. United States, 531 U.S. 12, 19–20, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000).

It is also significant that the sentence enhancement in this case was not sought purely on the basis of a petty theft conviction under § 484(a). Rather, the qualifying conviction is described as "Petty Theft with Prior Jail Term for a Specific Offense." However, the inclusion of a prior theft conviction—whether or not it is treated as a substantive element of the crime—does not narrow the broad scope of § 484(a) in a way that conforms it to the generic, *Hernandez–Mancilla* definition.

Thus, neither a first-time conviction for theft under § 484(a), nor a conviction for "Petty Theft with Prior Jail Term for a Specific Offense," facially qualifies as an aggravated felony under 8 U.S.C. § 1101(a)(43)(G) because the state statutes at issue criminalize conduct that would not constitute a theft offense under federal sentencing law.

A conviction under § 484(a) for petty theft also does not facially qualify as an aggravated felony for federal sentencing purposes under *Taylor* because it is not a theft offense "for which the term of imprisonment [is] at least one year" as required by 8 U.S.C. § 1101(a)(43)(G). Under California law, the maximum possible sentence for petty theft is six months. *See* Cal.Penal Code § 490. Thus, on its face, a conviction for petty theft under California Penal Code §§ 484(a) and 488 does not qualify as an aggravated felony under federal sentencing law.

However, Corona–Sanchez actually received a two-year sentence for the crime due to the application of California Penal Code § 666, which provides a sentence enhancement for recidivists. Thus, the government argues, his conviction qualifies for treatment as an aggravated felony. However, *Taylor* requires us to examine the prior crimes by considering the statutory definition of the crimes categorically, **\*1209** without reference "to the particular facts underlying those convictions." 495 U.S. at 600, 110 S.Ct. 2143. Thus, under the categorical approach, we must consider the sentence available for the crime itself, without considering separate recidivist sentencing enhancements.

This approach is consistent with the Supreme Court's historic separation of recidivism and substantive crimes. As the Court bluntly put it, "recidivism does not relate to the commission of the offense." *Apprendi v. New Jersey,* 530 U.S. 466, 488, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (internal quotation marks and citation omitted); *see also* *Almendarez–Torres v. United States,* 523 U.S. 224, 230, 239–47, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (concluding that a penalty provision that authorizes a court to increase the sentence for a recidivist does not define a separate crime). Following this lead, we have drawn a similar distinction between substantive offenses and recidivist sentencing enhancement statutes. *See Montiel–Barraza v. INS,* 275 F.3d 1178, 1180 (9th Cir.2002) (holding that California Vehicle Code § 23175, now numbered 23550, which functions similarly to Penal Code § 666 but in the context of successive convictions for driving under the influence of alcohol, "is an enhancement statute; it does not alter the elements of the underlying offense"). California draws the same distinction for

02 Cal. Daily Op. Serv. 4915, 2002 Daily Journal D.A.R. 6263

§§ 484 and 666. *See Bouzas,* 279 Cal.Rptr. 847, 807 P.2d at 1080 (approving of cases holding that under § 666, the prior "is a sentencing factor for the court and not a matter for the jury to consider in relation to the present offense on which the defendant is being tried").

The Sentencing Guidelines take a similar approach, describing felonies with reference to the offense, rather than separate sentencing enhancements. When Corona–Sanchez was sentenced, application note 1 to United States Sentencing Guideline § 2L1.2, the guideline at issue here, stated in part: " 'Felony offense' means any federal, state, or local offense punishable by imprisonment for a term exceeding one year." U.S.S.G. § 2L1.2 application note 1 (1997). This construction is also in accord with Congress's historical distinction between the crimes it chooses to categorize as felonies and those it designates as misdemeanors. *See United States v. Robles–Rodriguez,* 281 F.3d 900, 904 (9th Cir.2002).

Examining the crime itself, rather than any sentencing enhancements, is also consistent with the legislative history of defining aggravated felonies under 8 U.S.C. § 1101(a)(43). In defining "aggravated felony," Congress was addressing serious crimes. *See* H.R.Rep. No. 104–22, at 5 (1995) ( "[These amendments] address the problems of aliens who commit serious crimes while they are in the United States and ... give Federal law enforcement officials additional means with which to combat organized immigration crime."); *cf. Kofa v. INS,* 60 F.3d 1084, 1090–91 (4th Cir.1995) ( "Speaking through the amendment [to 8 U.S.C. § 1253(h)(2) ], Congress tells us that aliens who are convicted of an aggravated felony have committed a particularly serious crime."). The immigration consequences to an alien convicted of an "aggravated felony" are significant. [8] Given the profound consequences of the designation **\*1210** and the declared purpose of Congress to target "serious crimes," it is doubtful that Congress intended to include crimes such as petty theft within the ambit of the definition by virtue of state sentencing enhancements imposed for acts that themselves are not aggravated felonies. [9]

Therefore, under the categorical approach, we must separate the recidivist enhancement from the underlying offense. The maximum possible sentence for petty theft in violation of California Penal Code §§ 484(a) and 488, considered without reference to § 666, is six months. *See* Cal.Penal Code § 490. Thus, a conviction for petty theft in California is not an "aggravated felony" under 8 U.S.C. § 1101(a)(43)(G).

*Alberto–Gonzalez v. INS,* 215 F.3d 906 (9th Cir.2000), is not to the contrary. In that case, we considered 8 U.S.C. § 1101(a)(43)(G) in the context of a petition for review of a deportation decision. We held that the phrase "for which the term of imprisonment [is] at least one year" in § 1101(a)(43)(G) "refer[s] to the actual sentence imposed by the trial judge." 215 F.3d at 910. However, the question we addressed in *Alberto–Gonzalez* was whether to consider the actual sentence imposed or, as urged by the government in that case, *only* the potential sentence that the judge could have imposed. *Id.* at 909. Under the position the government urged in *Alberto–Gonzalez,* all convictions for crimes with indeterminate sentences would have to be treated as aggravated felonies under federal sentencing law, even if only a one-day sentence were imposed. The question of a sentence imposed in excess of the stated statutory maximum was not at issue in *Alberto–Gonzalez.* Under the categorical approach, we must first look at the maximum sentence for the crime that conforms to the generic definition. Then, if the maximum sentence is over one year, we look to the actual sentence imposed pursuant to *Alberto–Gonzalez* to see whether it also satisfies the one-year requirement.

It is irrelevant that California defines crimes enhanced and sentenced as felonies under § 666 as, in fact, felonies. *See People v. Stevens,* 48 Cal.App.4th 982, 56 Cal.Rptr.2d 13, 15–16 (1996). Indeed, the parties do not dispute that a crime may be classified as an "aggravated felony" under 8 U.S.C. § 1101(a)(43)(G) without regard to whether, under state law, the crime is *labeled* a felony or a misdemeanor. This rule is an almost-compelled natural outgrowth of *Taylor's* holding that a crime

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

may be a "burglary" regardless of whether the state gives the crime that label. *Taylor,* 495 U.S. at 590–92, 110 S.Ct. 2143. Other circuits have held that it is irrelevant whether the state labels the underlying crime "misdemeanor" or "felony." *See, e.g.,* *United States v. Christopher,* 239 F.3d 1191, 1193 (11th Cir.) (collecting cases), *cert. denied,* 534 U.S. 877, 122 S.Ct. 178, 151 L.Ed.2d 123 (2001). We agree with our sister circuits. The relevant question is whether the crime meets the definition of an "aggravated felony" under federal sentencing law. [10]

**\*1211** In this case, the maximum possible sentence for petty theft in violation of California Penal Code §§ 484(a) and 488, considered without reference to California Penal Code § 666, is six months. *See* Cal.Penal Code § 490. Thus, Corona–Sanchez's prior conviction cannot be considered a "theft offense ... for which the term of imprisonment[is] at least one year" under 8 U.S.C. § 1101(a)(43)(G).

### D

In sum, considered categorically, California Penal Code § 484(a) is too broad to constitute a "theft offense" in all circumstances. Thus, a conviction under § 484(a) does not facially qualify as an aggravated felony under 8 U.S.C. § 1101(a)(43)(G). Neither, of course, would a conviction under California Penal Code §§ 488 and 666 qualify because those sections do not describe substantive criminal offenses, much less qualify as "generic" theft offenses under federal law. Finally, the statutes at issue do not qualify as aggravated felonies for federal sentencing purposes because the maximum sentence for petty theft without statutory recidivist enhancements is less than one year. For these reasons, Corona–Sanchez's conviction under "666/488" for "Petty Theft with Prior Jail Term for a Specific Offense" does not facially qualify as an aggravated felony under federal sentencing law.

### IV

When the statute of conviction does not facially qualify as an aggravated felony under federal sentencing law, *Taylor* allows "the sentencing court to go beyond the mere fact of conviction in a narrow range of cases where a jury was actually required to find all the elements of [the generic offense]." 495 U.S. at 602, 110 S.Ct. 2143. To that end, courts may examine the record for "documentation or judicially noticeable facts that clearly establish that the conviction is a predicate conviction for enhancement purposes." *Rivera–Sanchez,* 247 F.3d at 908 (citation and internal quotation marks omitted). We have labeled this the "modified categorical approach." *Ye,* 214 F.3d at 1133. The idea of the modified categorical approach is to determine if the record unequivocally establishes that the defendant was convicted of the generically defined crime, even if the statute defining the crime is overly inclusive. For example, in the case of a jury trial, the charging document and jury instructions from the prior offense may demonstrate that the "jury was actually required to find all the elements" of the generic crime. *Taylor,* 495 U.S. at 602, 110 S.Ct. 2143. Similarly, if a defendant enters a guilty plea, the sentencing court may consider the charging documents in conjunction with the plea agreement, the transcript of a plea proceeding, or the judgment to determine whether the defendant pled guilty to the elements of the generic crime. *See* *United States v. Bonat,* 106 F.3d 1472, 1476–78 (9th Cir.1997). Charging papers alone are never sufficient. *United States v. Parker,* 5 F.3d 1322, 1327 (9th Cir.1993). [11] However, charging papers may be considered in combination with a signed plea agreement. *United States v. Sweeten,* 933 F.2d 765, 767, 769–70 (9th Cir.1991).

A

In the present case, none of these documents are part of the record. The only document presented to the district court **\*1212** was the presentence report. When the presentence report identifies the statute of conviction and the defendant does not controvert it, the presentence report is sufficient evidence to establish that the prior conviction was for the statute listed in the report. *United States v. Romero–Rendon,* 220 F.3d 1159, 1162–65 (9th Cir.2000). However, we have not extended this rule from the relevant inquiry under *Taylor's* true categorical approach—i.e., what is the statute of conviction?—to the relevant inquiry under the modified categorical approach—i.e., of what elements was the defendant convicted? Instead, we have held that a presentence report reciting the facts of the crime is insufficient evidence to establish that the defendant pled guilty to the elements of the generic definition of a crime when the statute of conviction is broader than the generic definition. *See United States v. Franklin,* 235 F.3d 1165, 1172 (9th Cir.2000); *see also United States v. Potter,* 895 F.2d 1231, 1237–38 (9th Cir.1990).

The *Franklin* case is quite similar to the present case. In *Franklin,* the presentence report did not recite the statute of conviction, but, as here, there was no dispute about what the statute of conviction was. 235 F.3d at 1169–70 & n. 4 (noting that Franklin's predicate offenses "were charged pursuant to" California Penal Code § 459; also noting that the charging papers for the predicate offenses were in evidence). The statute of conviction was too broad to meet the generic definition. *Id.* at 1169. Thus, the issue addressed in *Franklin* was identical to the issue we address here: whether there is sufficient evidence to show that the defendant was convicted of the elements of the generic offense when the statute of conviction is too broad. In *Franklin,* as in this case, the presentence report contained a short description of the facts underlying the prior convictions. *Id.* at 1171. Further, unlike this case, the court saw the factual allegations contained in the charging papers, which had been produced. *Id.* at 1170. The facts as given in the charging papers and the presentence report suggested that the crimes at issue could have fallen within the generic definition. *Id.* However, applying *Taylor,* we held that this evidence was not enough, "uncontested or contested, [to] establish that a jury actually found beyond a reasonable doubt, or that Franklin plead guilty to, all of the requisite facts necessary" to bring the predicate offenses within the applicable generic definition. *Id.* at 1172. This was so because the documents did not allow the court to "know[ ] what a jury actually found or what Franklin actually admitted in a plea." *Id.*

Thus, Corona–Sanchez's presentence report is insufficient evidence because all it does is recite the facts of the crimes as alleged in the charging papers. That it also notes that he "P/G as charged" does not remedy the situation, because it does not indicate the source of this information. It is unclear if this information came from a source that we have previously deemed acceptable, such as a signed plea agreement, a transcript of the plea hearing, or a judgment of conviction, *see Bonat,* 106 F.3d at 1476–78, or merely from one of the electronic criminal history databases consulted by the probation officer who prepared the report. We need not decide in this case whether information contained in a presentence report from an identified, acceptable source can constitute evidence under *Taylor's* modified categorical approach. Such a case is not before us. When the presentence report itself does not contain the information necessary under the modified categorical approach, it cannot constitute sufficient evidence.

In this case, the presentence report alone is not sufficient to establish that Corona–Sanchez was convicted of a qualifying **\*1213** offense. It provides only the facts as alleged in the charging documents for the prior conviction, but "the Supreme Court in *Taylor* and this circuit in our precedents have foreclosed any approach that considers the underlying facts of prior convictions to determine whether a defendant was convicted by a jury or pleaded guilty to a predicate offense" for federal sentencing purposes. *Franklin,* 235 F.3d at 1171. Thus, a remand for resentencing would be required for this reason alone.

B

In this case, the parties have agreed that Corona–Sanchez was convicted under the §§ 484/488/666 scheme. As we have explained, a conviction for petty theft under California Penal Code § 484(a), even under the §§ 484/488/666 scheme, cannot qualify as an aggravated felony under 8 U.S.C. § 1101(a)(43)(G) because the maximum possible sentence for a violation of § 484(a) is six months. Therefore, in this case, even if the relevant documents were to establish the substantive elements of the generic crime, the offense of which Corona–Sanchez was convicted would still not constitute an aggravated felony because it fails to meet the one-year sentence requirement of § 1101(a)(43)(G). However, there may well be other sentencing issues that remain. *See* United States v. Matthews, 278 F.3d 880, 885–86 (9th Cir.2002) (en banc) (holding that in the normal case, resentencing after remand is open and is not limited to issues or evidence previously presented). This case is remanded to the district court for resentencing consistent with this opinion.

**REVERSED AND REMANDED FOR RESENTENCING.**

RYMER, Circuit Judge, with whom KOZINSKI, T.G. NELSON, and KLEINFELD, Circuit Judges, join, concurring in part [1] and dissenting in part.

To me, stealing property from a grocery store with a prior conviction for doing the same thing—to which Corona–Sanchez pled guilty and for which he was sentenced to two years in custody pursuant to California Penal Code §§ 488 and 666, is plainly a "theft offense ... for which the term of imprisonment is at least one year." 8 U.S.C. § 1101(a)(43)(G). If so, the conviction was for an "aggravated felony" and enhancement of Corona–Sanchez's federal sentence for illegally reentering the United States after being deported was required by U.S.S.G. § 2L1.2(b)(1)(A). This is true regardless of which generic definition of "theft" we adopt. While I do not believe that the full range of conduct proscribed by California's statutory definition of "theft," Cal.Penal Code § 484(a), falls outside the modern, categorical meaning of "theft offense," even if it does, we are not required to play ostrich to the record which reflects that the elements of a theft offense, however defined, exist in this case and that Corona–Sanchez was convicted of a felony. Therefore, I would affirm.

It is undisputed that on January 11, 1994 Corona–Sanchez entered a guilty plea to a California complaint in Orange County Superior Court Case No. 94SF0169 charging that on or about March 14, 1994, he attempted to steal/take and carry away the property of Albertsons Grocery Store. His plea was to petty theft with a prior jail term for a specific offense—again, petty theft —pursuant to California Penal Code §§ 666 and 488. He was sentenced to two years in custody. [2] This information, together **\*1214** with the fact that Corona–Sanchez had previously been charged with, and pled guilty to, entering Dad's Liquor Store in San Clemente, California, with the intent to commit larceny, is set out in the Presentence Report filed in connection with Corona–Sanchez's sentencing in this case. He objected to the enhancement recommended by the PSR on the basis that the prior conviction relied upon by the probation officer (petty theft with a prior) is not an aggravated felony because it includes theft of services; it includes theft of real property; and it can be punishable by less than one year of imprisonment. But Corona–Sanchez did not object to the PSR's recitation of what the charging document averred, what he pled guilty to, or the statutes of conviction.

U.S.S.G. § 2L1.2(b)(1)(A) mandates enhancement of an alien's sentence for unlawfully reentering the United States when he was previously deported after a conviction for an "aggravated felony." Section 2L1.2(b)(1)(A) relies on 8 U.S.C. § 1101(a)(43) for its definition of "aggravated felony." An "aggravated felony" under § 1101(a)(43)(G) means "a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment [is] at least one year." Congress failed to say what it meant by "theft offense." In these circumstances, the Supreme Court has indicated that we should craft a definition that is modern, uniform, and categorical, and that does not depend upon the definition adopted by the state of conviction. *Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990).

02 Cal. Daily Op. Serv. 4915, 2002 Daily Journal D.A.R. 6263

In *Taylor,* the Court had to determine the meaning of "burglary" as the term was used for enhancing sentences under the Career Criminals Amendment Act of 1986 (Subtitle I of the Anti–Drug Abuse Act of 1986), 18 U.S.C. § 924(e). In doing so, the Court recognized that the contemporary understanding of "burglary" has diverged from its common law roots, and it concluded that Congress meant the generic sense in which the term is now used in the criminal codes of most states. Accordingly, the Court settled upon the minimum basic elements of burglary by considering what commentators had to say, the prevailing view in modern codes, and its treatment in the Model Penal Code. *Id.* at 598, 110 S.Ct. 2143.

Corona–Sanchez argues that in the absence of a Congressional definition the courts should turn to the common law, because theft is a common law crime. However, as the majority concludes, *Taylor* makes it clear that common law definitions are not controlling. *Id.* at 598, 110 S.Ct. 2143. Thus, our task is to discern a contemporary, generic definition for "theft offense."

As the panel opinion explains, the same concerns animating *Taylor's* approach are present here. *United States v. Corona–Sanchez (Corona–Sanchez I),* 234 F.3d 449, 454–55 (9th Cir.2000). Congress expanded the immigration consequences of past criminal conduct when it passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). Further, it used the term "theft offense" in § 1101(a)(43)(G), not just the word "theft." This manifests Congressional intent to paint with a broad brush. *Id.* at 455. Other circuits agree. *See Hernandez–Mancilla v. I.N.S.,* 246 F.3d 1002, 1008 (7th Cir.2001); *United States v. Vasquez–Flores,* 265 F.3d 1122, 1124 (10th Cir.2001).

Given this intent, the panel thought that the definition of "theft offense" should derive from the Model Penal Code (MPC). **\*1215** *Corona–Sanchez I,* 234 F.3d at 454–55. The MPC reflects a common understanding of the crime of "theft" and captures the sentiment of Congress because it employs an expansive definition. The Model Penal Code sets forth eight types of theft offenses, and consolidates the three common law crimes of larceny, embezzlement and false pretenses into "theft." [3]

At the time of the panel opinion in *Corona–Sanchez I,* the Fifth Circuit was the only court of appeals that had considered the question of what "theft offense" in § 1101(a)(43)(G) meant. Without reference to other sources, it used the definition in *Black's Law Dictionary,* which defines "theft" as "the act of stealing." [4] *United States v. Dabeit,* 231 F.3d 979, 983 (5th Cir.2000). The panel believed that the MPC's formulation was preferable to *Black's,* although consistent with it. Since the panel decision was rendered, the Seventh and Tenth Circuits have also had occasion to define "theft offense." In addition to the MPC, they examined *Black's* as well as the approach of the Board of Immigration Appeals (BIA). [5] Both courts agree that " 'Congress signaled that it was not presenting an exhaustive list of offenses (i.e., just theft and receipt); rather with its word choices, Congress indicated that the phrase ought to be given a broad read.' " *Vasquez–Flores,* 265 F.3d at 1124 (quoting with approval *Hernandez–Mancilla,* 246 F.3d at 1008). Having considered **\*1216** the MPC, *Black's Law Dictionary* and the definition developed by the BIA, both courts held that the "modern, generic, and broad definition of the entire phrase 'theft offense (including receipt of stolen property)' is a taking of property or an exercise of control over property without consent with the criminal intent to deprive the owner of rights and benefits of ownership, even if such deprivation is less than total or permanent." *Hernandez–Mancilla,* 246 F.3d at 1009; *Vasquez–Flores,* 265 F.3d at 1125.

The majority opts for the *Hernandez–Mancilla* test, which has the merit of making the generic definition more uniform. However, I do not agree with its implicit assumption that the *Hernandez–Mancilla* definition is necessarily narrower than the MPC's—or California's statutory definition—of "theft." Certainly nothing in the Seventh Circuit's opinion suggests that it thought so. Rather, it read "theft offense" as an "umbrella label," and came up with a formulation which it thought "distilled [the offense] to its essence" by combining definitions developed by the BIA in *V–Z–S* and *Bahta*—which, in turn, had been crafted from the MPC, *Black's,* and federal as well as state statutes. *Hernandez–Mancilla,* 246 F.3d at 1008.

The majority holds that § 484(a) is broader than the Seventh Circuit's definition because § 484(a) criminalizes theft of services and solicitation of false credit reporting. However, "property" can include services;[6] and it isn't just solicitation of false credit reporting that California penalizes, but the fraudulent obtaining of money or property, labor or service that is the theft. Neither example causes Corona–Sanchez's conviction to fall outside *Hernandez–Mancilla*. Nor does *People v. Coffelt*, 140 Cal.App. 444, 35 P.2d 374, 376 (1934), indicate that § 484(a) allows a conviction for theft when the defendant has not taken or exercised control over the stolen property; certainly in *Coffelt* itself, the defendant *did* exercise control by directing property taken by false pretenses to a third party. California is no different from any other jurisdiction in recognizing that theft is theft whether the property is taken for someone else or for oneself. Finally, and curiously, the majority suggests that § 484 is broader than its preferred generic definition of theft because a defendant can be convicted of the substantive offense of violation of § 484 for aiding and abetting a theft. It cannot be that the possibility of being liable as an aider or abettor takes an offense out of the running, for this is true of any crime in California, where principals include those who aid or abet the commission of a crime. Cal.Penal Code § 31. In any event, "[t]o be liable as an aider and abettor, the defendant must have instigated or advised the commission of the offense or have been present for the purpose of assisting." 1 Witkin & Epstein, *California Criminal Law* (3d ed.), § 78, p. 124 (2000). This is unremarkable, and well within the bounds of whichever generic formulation is adopted.

But even if § 484(a) were broader, stealing property from a grocery store is a **\*1217** "theft"—never mind a "*theft offense.*" An offense constitutes a "theft offense" for purposes of an aggravated felony enhancement if its statutory definition substantially corresponds to the generic definition *or* the charging paper sets out all the elements of the generic offense. *Taylor*, 495 U.S. at 602, 110 S.Ct. 2143. Here, the PSR recites what Corona–Sanchez was charged with, and what he pled guilty to, and what he was sentenced for—and he contests none of it.

The majority accepts the PSR's identification of the statute of conviction, but nothing more. I do not believe that either *United States v. Franklin,* 235 F.3d 1165, 1172 (9th Cir.2000), or *United States v. Potter,* 895 F.2d 1231, 1237–38 (9th Cir.1990), constrains us to ignore the PSR's recitation of what the charging document specifically charged in this case. The presentence report in *Potter* simply described the defendant's prior conviction without mentioning the specific statutory section under which he had been convicted; the PSR in *Franklin* described the facts (which the categorical approach precludes a court from resorting to), but not the statute of conviction. Thus, the information in both PSRs was thought unreliable for purposes of enhancing a sentence under the Armed Career Criminal Act, 18 U.S.C. § 924(e). But the same is not true here. Both the charge and the statutes of conviction are set out, and were relied upon by the district court, properly I believe, in the absence of any objection calling the accuracy of the account into question.

In these circumstances I do not see how *United States v. Rivera–Sanchez,* 247 F.3d 905 (9th Cir.2001), is implicated. There, the question was whether a conviction under a statute that criminalized conduct we had previously held did not qualify as an aggravated felony (solicitation of drug offenses) could be an aggravated felony under 8 U.S.C. § 1101(a)(43)(B). We held that the conviction facially does not qualify, because the full range of conduct encompassed by the statute does not constitute an aggravated felony. No such question is raised in this case because we have never held that any part of the California theft statute is not an aggravated felony under § 1101(a)(43)(G), and there is no basis for doing so now no matter which formulation of the generic definition is preferred. Given the charge to which Corona–Sanchez pled guilty, there is no possibility that he was convicted for an act that is not a "theft offense."

Corona-Sanchez also argues that the rule of lenity should cause us to interpret § 1101(a)(43)(G) without consideration of the penalties imposed by state law. Yet this is precisely what § 1101(a)(43)(G) directs us to do. Once it is determined that a theft offense has been committed, the only other condition is that the term of imprisonment be at least one year. In this case, it was two years.

The majority holds that the categorical approach requires us to separate the recidivist enhancement from the underlying offense, leaving a maximum possible sentence for petty theft of six months under Cal.Penal Code § 490. But nothing in *Taylor* suggests that we must do this. Instead, up until now, we—and other circuits as well—have held that the determinative sentence is the *actual sentence imposed. See, e.g.,* Alberto–Gonzalez v. INS, 215 F.3d 906, 909 (9th Cir.2000); United States v. Pacheco, 225 F.3d 148, 154 (2d Cir.2000); United States v. Graham, 169 F.3d 787, 790 (3d Cir.1999). The majority's attempt to distinguish *Alberto–Gonzalez* is not persuasive to me. There, we construed 8 U.S.C. § 1101(a)(48)(B), which provides for purposes of IIRIRA that "[a]ny reference to a term of imprisonment or a sentence with respect to an offense is **\*1218** deemed to include the period of incarceration or confinement ordered by a court of law," as meaning the sentence actually imposed. It is hard to read the word "ordered" any other way, no matter what arguments were made (or not made) in *Alberto–Gonzalez.* In any event, if the statutory maximum is what matters, I do not agree that the relevant maximum is for a single crime of petty theft because that ignores the reality that Corona–Sanchez was a recidivist who pled guilty to petty theft with a prior pursuant to §§ 488 *and* 666. There is no getting around the fact that "[p]etty theft becomes a more serious offense when the defendant was previously convicted of this crime," 2 Witkin & Epstein, *California Criminal Law* (3d ed.), § 7, p. 27, as Corona–Sanchez was here, and § 666—not § 490—prescribes punishment for that offense.

In sum, it is evident to me that a conviction for petty theft with a prior, on charges of stealing beer from a grocery store, for which the sentence imposed was two years, constitutes an "aggravated felony" for purposes of U.S.S.G. § 2L1.2(b)(1)(A). I would affirm.

KOZINSKI, Circuit Judge, dissenting.

I join Judge Rymer's dissent without reservation but write to elaborate on a single point. In section III.C of its opinion, the majority holds that the maximum term of imprisonment for the crime of which Corona–Sanchez was convicted is six months. The longer sentence he received, the majority argues, is based on a sentencing enhancement, which is not an element of the crime of petty theft. The majority relies on People v. Bouzas, 53 Cal.3d 467, 279 Cal.Rptr. 847, 807 P.2d 1076, 1080 (1991), which holds that "the prior conviction under ... section 666[is] a sentencing factor for the court, and not ... an 'element' of an offense to be determined by a jury." If *Bouzas* were good law, the majority's argument would be plausible, but it is not. The procedure approved by the California Supreme Court in *Bouzas* doesn't survive *Apprendi;* the recidivist enhancement is an element of the crime that must be determined by a jury.

Three of the justices in the Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), majority apparently were of the view that the Court's prior opinions in Almendarez–Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), and McMillan v. Pennsylvania, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), survived its ruling; the remaining two majority justices suggested strongly that they did not survive. *See* Apprendi, 530 U.S. at 517–18, 120 S.Ct. 2348 (concurrence of Justice Thomas, joined by Justice Scalia). It is, at the very least, doubtful that the distinction our majority purports to draw between the base offense and a sentencing enhancement continues to be valid. But whatever the fate of *Almendarez–Torres* and *McMillan,* there is no doubt that what we have here is not the normal case of a basic crime (petty theft) coupled with a sentencing enhancement (recidivism). Rather, California has created a wholly new crime, petty theft with a prior, all the elements of which must be determined by a jury.

*Almendarez–Torres* and *McMillan* dealt with situations where recidivism had a single effect: It enlarged the term of imprisonment the court could impose. Section 666 is quite different because it does much more than lengthen the potential

02 Cal. Daily Op. Serv. 4915, 2002 Daily Journal D.A.R. 6263

sentence; it changes the nature of the crime. Petty theft, as defined by section 488 of the California Penal Code, is a misdemeanor. Cal.Penal Code § 490. However, if a defendant has previously been convicted of a qualifying offense, the crime becomes a felony. Cal.Penal Code § 666; *see* Cal.Penal Code § 17 (defining "felony"). Felonies and misdemeanors connote different

**\*1219** levels of culpability and carry very different stigma. As the Court noted in *Apprendi,* cases such as *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), and *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), are "concerned as much with the category of substantive offense as 'with the degree of criminal culpability' assessed." 530 U.S. at 494–95, 120 S.Ct. 2348 (quoting *Mullaney,* 421 U.S. at 698, 95 S.Ct. 1881). The Court continued:

> The degree of criminal culpability the legislature chooses to associate with particular, factually distinct conduct has significant implications both for a defendant's very liberty, *and for the heightened stigma associated with an offense the legislature has selected as worthy of greater punishment.*

*Id.* at 495, 120 S.Ct. 2348 (emphasis added).

Raising an offense from a misdemeanor to a felony has effects far beyond the extra time defendant might serve. While employers may be willing to overlook a misdemeanor in potential employees, they are much less likely to hire convicted felons, especially for positions of trust and responsibility. Suffering a felony conviction, rather than a misdemeanor, can also have serious effects on personal relationships and reputation in the community. Moreover, under state law, felons suffer a variety of limitations and disabilities that misdemeanants do not. Misdemeanor sentences are served in local jails, while felony time is spent in state prison. Cal.Penal Code § 12. For the rest of their lives, felons (but not misdemeanants) are denied the right to vote, *see, e.g.,* Cal. Elec.Code § 2212, and the right to bear arms. *See, e.g.,* Cal.Penal Code § 12021.

Raising the level of crime from a misdemeanor to a felony adds such grave consequences for the individual charged with a crime that it seems wholly inconceivable that the element which causes this escalation can be deemed merely a sentencing factor that can be determined by the judge alone. That element—here the fact of prior conviction—is part of the definition of the very offense, and must be determined by a jury. *Bouzas,* decided nine years before *Apprendi,* is no longer good law.

The crime of which Corona–Sanchez was convicted therefore is not, as the majority would have it, petty theft. Rather, it is the distinct crime of theft by one who has previously been convicted of a predicate offense. This is a different, and more serious, crime, one that may be punished by imprisonment in the state prison rather than in a county jail. Moreover, it is clearly a "theft offense" and does not, by virtue of this additional element, fall outside the generic definition of "theft." Nor, as persuasively explained by Judge Rymer, does the California theft statute sweep more broadly than the generic definition, whether one adopts the Model Penal Code definition, the Seventh Circuit's definition or any other rational definition. I would affirm.

**All Citations**

291 F.3d 1201, 02 Cal. Daily Op. Serv. 4915, 2002 Daily Journal D.A.R. 6263

**Footnotes**

1. No documents from this conviction are a part of the record in this case, as is discussed more fully later, but Corona–Sanchez's attorney in the present case explained to the district court that these are the facts of the prior conviction according to Corona–Sanchez's recollection. The government does not dispute this account.

2. The district court used the 1997 version of the guidelines manual. As relevant here, the current version of the guidelines does not differ.

3. This circuit, along with all others to consider the problem, has held that the verb "is" is missing from the statute and should be read into it. *See Alberto–Gonzalez v. INS*, 215 F.3d 906, 909 n. 6 (9th Cir.2000).

4. The version of this statute in effect in 1994 when Corona–Sanchez committed the crime at issue used the spelling "petit" rather than "petty" but is otherwise the same.

5. Thus, contrary to the dissent's argument, the presentence report does not recite the statute "of conviction." It only recites statutes setting forth a sentencing scheme, from which the statute of conviction can be inferred.

6. In 1994, when Corona–Sanchez committed the crime at issue, all other subsections of § 484 discussed fact patterns that would lead to a presumption of intent to commit theft by fraud. *See* Cal.Penal Code § 484(b)-(e) (West Suppl.1994). In addition, the Penal Code then also defined as theft giving false information about the ownership of an item when selling it to a pawnbroker. *Id.* § 484.1. Section 485 criminalized appropriating lost property with knowledge or means of inquiry of the identity of the true owner. Thus, the other Penal Code sections dealing with theft are plainly not applicable to Corona–Sanchez's crime.

7. The version of this statute in effect in 1994 when Corona–Sanchez committed the crime at issue did not contain the gender-inclusive "or her" references but is otherwise the same.

8. For example, an alien convicted of an aggravated felony is: (1) subject to deportation, 8 U.S.C. § 1227(a)(2)(A)(iii), and presumed deportable, *id.* § 1228(c); (2) ineligible to seek judicial review of a removal order, *id.* § 1252(a)(2)(C); (3) barred from eligibility for asylum, *id.* § 1158(b)(2)(A)(ii), (B)(i); (4) barred from receiving voluntary departure, *id.* § 1229c(a)(1); (5) disqualified from cancellation of removal, *id.* § 1229b(a)(3); and (6) subject to being taken into custody upon release from confinement, regardless of whether the release is on parole or supervised release, *id.* § 1226(c)(1).

9. The parties have not pointed to any authority suggesting that § 666 is not a unique sentencing scheme or indicating that other states give judges the power to impose either a sentence of up to six months in the county jail or a sentence of up to three years in prison for a petty theft offense. This uniqueness reinforces our conclusion that when it enacted the aggravated felony provisions, Congress did not have in mind a petty theft offense enhanced pursuant to § 666.

10. Because of our resolution of this case, we need not decide whether the crime first must be considered a felony under the traditional common law definition or under general provisions of federal law *before* qualifying as an "aggravated felony" under 8 U.S.C. § 1101(a)(43)(G). *Cf. United States v. Pacheco*, 225 F.3d 148, 154–55 (2d Cir.2000).

11. *Taylor* and *Parker* thus foreclose the dissent's suggestion that the modified categorical approach is satisfied merely when "the charging paper sets out all the elements of the generic offense." *See* dissent at 1217.

1. I concur in Parts I and II of the majority opinion, and in that portion of Part III(C) where we join other circuits in holding that misdemeanors can qualify as an "aggravated felony" under 8 U.S.C. § 1101(a)(43)(G).

2. Section 666 provides that a person convicted of a subsequent offense (having been convicted previously of petit theft) is punishable by imprisonment in the county jail not exceeding one year, or in the state prison. In turn, Cal.Penal Code § 18 provides that any offense punishable by imprisonment in a state prison is punishable by imprisonment for 16 months, or two or three years.

3. Under the MPC, "theft" comprises theft by unlawful taking or disposition; theft by deception; theft by extortion; theft of property lost, mislaid, or delivered by mistake; receiving stolen property; theft of services; theft by failure to make required disposition of funds received; and unauthorized use of automobiles and other vehicles. Model Penal Code §§ 223.2–223.9.

4. *Black's Law Dictionary* (6th ed.1990) defines "theft" as:

A popular name for larceny. The act of stealing.... The fraudulent taking of personal property belonging to another, from his possession, or from the possession of some person holding the same for him, without his consent, with intent to deprive the owner of the value of the same, and to appropriate it to the use or benefit of the person taking.

It is also said that theft is a wider term than larceny and that it includes swindling and embezzlement and that generally, one who obtains possession of property by lawful means and thereafter appropriates the property to the taker's own use is guilty of a "theft"....

Theft is any of the following acts done with intent to deprive the owner permanently of the possession, use or benefit of his property: (a) Obtaining or exerting unauthorized control over property; or (b) Obtaining by deception control over property; or (c) Obtaining by threat control over property; or (d) Obtaining control over stolen property knowing the property to have been stolen by another.

*Black's Law Dictionary* 1477 (6th ed.1990) (citations omitted). "Larceny" is defined as:

Felonious stealing, taking and carrying, leading, riding, or driving away another's personal property, with intent to convert it or to deprive owner thereof.... The essential elements of a "larceny" are an actual or constructive taking away of the goods or property of another without the consent and against the will of the owner or possessor and with a felonious intent to convert the property to the use of someone other than the owner.

*Id.* at 881 (citations omitted).

5    The BIA crafted a definition for "theft offense" by reference to the Model Penal Code, *Black's Law Dictionary,* and federal as well as state statutes in *In re V–Z–S,* Interim Dec. No. 3434, 2000 WL 1058931 (BIA Aug. 1, 2000). It concluded that a taking of property "constitutes a 'theft' whenever there is criminal intent to deprive the owner of rights and benefits of ownership, even if such deprivation is less than total or permanent." Later, in *In re Bahta,* Interim Dec. 3437, 2000 WL 1470462 (BIA Oct. 4, 2000), the BIA construed use of the parenthetical "(including receipt of stolen property)," and held that it was intended to clarify that the term "theft offense" did not require proof that the offender was involved in the actual taking of property.

6    The majority states that theft of services has generally not been included within the scope of ordinary theft statutes because "services" were not considered to be "property," citing to the MPC commentary to § 223.7. Maj. op. *supra* at 1208. I don't read it this way. The MPC itself *includes* theft of services in § 223.7, and the Commentary does not exclude them. The Commentary indicates that labor or professional service, though arguably viewed as a species of property, had not been included in the traditional scope of that term in ordinary theft statutes but that since promulgation of the Code in 1962, more than half of the states have enacted theft-of-service provisions. *See* American Law Institute, Modern Penal Code and Commentaries II § 223.7, cmt. 1 (1980).

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

75 F.3d 778
United States Court of Appeals,
First Circuit.

UNITED STATES of America, Appellee,

v.

Rafael Antonio CUEVAS, Defendant, Appellant.

No. 95-1730.
|
Heard Jan. 9, 1996.
|
Decided Feb. 7, 1996.

**Synopsis**

Defendant was convicted in the United States District Court for the District of Rhode Island, Ernest C. Torres, J., of being illegally present in the United States after being deported, and he appealed sentencing enhancement for being deported after aggravated felony conviction. The Court of Appeals, Lynch, Circuit Judge, held that: (1) state's acceptance of defendant's plea of nolo contendere on drug charge followed by imposition of probationary sentence was conviction for purposes of prior offense enhancement; (2) drug offense was aggravated felony; and (3) defendant was subject to additional two points of criminal history for committing offense of conviction while under sentence of probation, though it was imposed after his illegal reentry in 1990, since he was indicted for offense of being "found" in United States in 1995.

Affirmed.

**Attorneys and Law Firms**

 **\*779** Louis B. Abilheira, Warren, RI, for appellant.

Margaret E. Curran, Assistant United States Attorney, Providence, RI, with whom Sheldon Whitehouse, United States Attorney, and Edwin J. Gale, Assistant United States Attorney, were on brief, for the United States.

Before TORRUELLA, Chief Judge, ROSENN, Senior Circuit Judge,[*] and LYNCH, Circuit Judge.

**Opinion**

LYNCH, Circuit Judge.

Before he was convicted for being illegally present in the United States in violation of 8 U.S.C. § 1326, Rafael Antonio Cuevas, a citizen of the Dominican Republic, had three separate encounters with the Rhode Island criminal justice system. The primary question in this sentencing appeal is whether the disposition of at least one of Cuevas' state offenses was a "conviction" for an "aggravated felony" under the prior offense enhancement of U.S.S.G. § 2L1.2(b)(2) (Nov.1994). Cuevas says that the enhancement does not apply to him, arguing that one of the offenses was not a "conviction" under state law, and that the others were not "aggravated felonies." We hold otherwise, on the grounds that the definition of "conviction" is a matter of federal, not state, law and that Cuevas' reading of the term "aggravated felony" is foreclosed by a recent decision of this court. Cuevas falls within the group as to whom Congress and the Sentencing Commission intended longer prison terms-illegal aliens previously deported after aggravated felony convictions-and so we affirm his sentence.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

*Facts*

Each of the three times that Cuevas faced charges under the criminal law in Rhode Island, he submitted a plea of *nolo contendere,* his plea was accepted, he was judged guilty of the crime charged, and he was sentenced. In 1983 he received three years probation for breaking and entering into a building in the nighttime with intent to commit larceny; in 1984 he was sentenced to a year in prison plus probation for possession of cocaine; and in 1986 he was sentenced to two years probation for possession of cocaine.

Cuevas was deported in 1989. He returned illegally in 1990, then was arrested again in 1994 on another Rhode Island charge of cocaine possession. Once again, he pleaded *nolo* and was sentenced to probation. While serving that term of probation, he was found in the United States by federal authorities. He was subsequently indicted in federal court on a charge of having been found in the United States without obtaining the consent of the Attorney General, in violation of 8 U.S.C. § 1326. He pleaded guilty and was sentenced to fifty-seven months in prison under U.S.S.G. § 2L1.2. His appeal raises two challenges to his sentence.

*The "Aggravated Felony" Enhancement*

As in many sentencing appeals, the consequences of this appeal to the defendant are not negligible. The district court imposed a sentence of fifty-seven months. [1] Cuevas **\*780** says that he should serve no more than twenty-one months. [2] He argues that the 16-level enhancement he received under § 2L1.2(b)(2) of the Guidelines [3] for having previously been "deported after a conviction for an aggravated felony" cannot stand, because neither of the two cocaine possession offenses he committed prior to his deportation was a "conviction for an aggravated felony." [4] He contends that his first violation was not itself an "aggravated felony," and that the disposition of his second drug offense, to which he pleaded *nolo* and for which he received a sentence of probation, was not a "conviction" under Rhode Island law. We reject both prongs of Cuevas' challenge.

*A. Whether the 1986 Disposition Was a "Conviction"*

Cuevas assumes that whether the disposition in 1986 of his second cocaine possession offense is to be considered a "conviction" for purposes of the Guidelines is a matter of Rhode Island law. He posits that he was not "convicted" of that offense under Rhode Island law and so it cannot be a conviction for purposes of Guidelines § 2L1.2. [5] This assumption is unfounded. In this Circuit and others, courts have consistently held that whether a particular disposition counts as a "conviction" in the context of a federal statute is a matter of federal determination. [6] Under applicable federal standards, Cuevas was clearly "convicted" with respect to his 1986 cocaine possession offense. As that offense was an "aggravated felony," his 1989 deportation was "after a conviction" for at least one aggravated felony, and the enhancement of § 2L1.2(b)(2) was properly applied.

In *Molina v. INS,* 981 F.2d 14 (1st Cir.1992), this court addressed the meaning of a statute limiting the availability of amnesty from deportation to illegal aliens who have "not been convicted of any felony" while in the United States. 8 U.S.C. § 1255a(a)(4)(B). The petitioner in that case, an illegal alien, admitted that he had twice pleaded *nolo contendere* and been sentenced to probation on felony drug charges under **\*781** Rhode Island law. Citing the same provision of Rhode Island law upon which Cuevas relies here, *see* R.I.Gen.Laws § 12-18-3, the petitioner argued that a *nolo* plea to a drug charge followed by a sentence of straight probation was not treated as a "conviction" under state law and, therefore, should not be considered so for purposes of federal law. *Molina,* 981 F.2d at 19. For the court, Judge (now Justice) Breyer rejected this argument. The court specifically held that the term "conviction" is a matter of federal, not state, definition. *Molina,* 981 F.2d at 19-20; *see also White v. INS,* 17 F.3d 475, 479 (1st Cir.1994) ( "As we have held before, federal law defines the term 'conviction' as it is used in the immigration context." (citing *Molina,* 981 F.2d at 19)). The court noted that this Circuit, forty years earlier, had held that "the meaning of

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

the word 'convicted' in the federal immigration law is a federal question." *Id.* at 19-20 (quoting *Pino v. Nicolls,* 215 F.2d 237, 243 (1st Cir.1954) (Magruder, J.) (internal quotation marks omitted), *rev'd on other grounds,* 349 U.S. 901, 75 S.Ct. 576, 99 L.Ed. 1239 (1955) (per curiam)). [7]

We follow *Molina* and *Pino* and hold that the meaning of the word "conviction" in § 2L1.2(b)(2) of the Sentencing Guidelines, which implements 8 U.S.C. § 1326(b), a provision found within the immigration laws, is to be determined in accordance with federal law. *See also White,* 17 F.3d at 479; *Chong v. INS,* 890 F.2d 284 (11th Cir.1989) (per curiam); *accord Wilson v. INS,* 43 F.3d 211, 215 (5th Cir.) (per curiam), *cert. denied,* 516 U.S. 811, 116 S.Ct. 59, 133 L.Ed.2d 23 (1995); *Ruis-Rubio v. INS,* 380 F.2d 29 (9th Cir.) (per curiam), *cert. denied,* 389 U.S. 944, 88 S.Ct. 302, 19 L.Ed.2d 302 (1967).

Support for this conclusion comes from outside the context of immigration statutes as well. For example, the Seventh Circuit has recently held, in applying the penalty enhancement provisions of the Controlled Substances Act, 21 U.S.C. § 841(b)(1)(B), that a plea of guilty to a state felony offense followed by a sentence of probation [8] constitutes a "prior conviction," even though that disposition would not be so deemed under the law of the convicting state. *See United States v. McAllister,* 29 F.3d 1180, 1184 (7th Cir.1994). [9] Similarly, in 1983 this court held that a defendant who had entered a *nolo contendere* plea and was sentenced to probation under Rhode Island law had been "convicted" of a crime for purposes of the federal felon-in-possession-of-a-firearm statute, 18 U.S.C. § 922(h)(1), even though the event did not amount to a "conviction" under state law. *United States v. Bustamante,* 706 F.2d 13, 14-15 (1st Cir.) (Breyer, J.), *cert. denied,* 464 U.S. 856, 104 S.Ct. 175, 78 L.Ed.2d 157 (1983).

The decisions in *Bustamante* and, to a lesser degree, in *McAllister* both were based in part on the Supreme Court's decision in *Dickerson v. New Banner Institute, Inc.,* 460 U.S. 103, 103 S.Ct. 986, 74 L.Ed.2d 845 (1983). In *Dickerson,* a defendant who had pleaded guilty to a state offense, served a term of probation, and received an expungement of his record argued that he had not been "convicted" of that offense. The Court did not agree. Observing that a defendant "cannot be placed on probation if the court does not deem him to be guilty of a crime," **\*782** *id.* at 113-14, 103 S.Ct. at 992, the Court held that the meaning of "conviction" for purposes of the federal gun control statutes is a federal matter:

> Whether one has been "convicted within the language of [a federal] statute [ ] is necessarily ... a question of federal, not state, law, despite the fact that the predicate offense and its punishment are defined by the law of the State.

*Id.* at 111-12, 103 S.Ct. at 991.

It is true, of course, that the particular outcome reached in *Dickerson* under the federal gun control laws was effectively abrogated by Congress in May 1986, when it amended 18 U.S.C. § 921(a)(20) to read as it currently does. That congressional action, however, reflects not a disagreement with the Court's reasoning, but merely that Congress determined that its legislative objectives would be better served by defining "conviction" by reference to state law. *See McAllister,* 29 F.3d at 1184-85 ("[W]hile interpreting federal statutes is a question of federal law, Congress can make the meaning of a statute dependent on state law."). The decisions in *Dickerson* and *Bustamante* still stand for the proposition that, absent legislative indication to the contrary, the meaning of "conviction" for purposes of a federal statutory scheme is to be determined under prevailing federal law. *See Yanez-Popp v. INS,* 998 F.2d 231, 236 (4th Cir.1993) ("[*Dickerson* ] still stands for the general proposition that federal law governs the application of Congressional statutes in the absence of a plain language to the contrary."); *cf. McAllister,* 29 F.3d at 1185 (treating *Dickerson* as still authoritative, outside context of gun laws, for principle that guilty plea plus probation equals conviction under federal law). Congress' decision to overrule the particular result reached in *Dickerson* simply reflects a deliberate choice to define "conviction" as used in a federal gun statute by reference to state law.

Congress has not made the same choice with respect to the immigration laws. *See Wilson,* 43 F.3d at 215; *Yanez-Popp,* 998 F.2d at 235; *see also Molina,* 981 F.2d at 22 ("Of course, federal gun control law is not federal immigration law."). Since the May 1986 enactment of the statutory amendment to the gun control laws that effectively abrogated *Dickerson,* the courts-including this one, *see White,* 17 F.3d at 479; *Molina,* 981 F.2d at 19-have continued to define "conviction" according to uniform federal standards for purposes of the laws governing immigration offenses. If Congress had disapproved of these cases, it surely could have amended the immigration laws in the same fashion it did the firearms statute. That Congress has chosen not to do so reinforces our conclusion that "conviction" in the context of the laws governing immigration offenses, including federal sentencing for those offenses, remains a matter of federal definition.

The disposition of Cuevas' 1986 state cocaine possession offense clearly falls within the scope of the term "conviction," federally understood. This is true both as a matter of Guidelines interpretation and, more broadly, under the law governing immigration offenses. Although the particular guideline at issue here ( § 2L1.2) does not define "conviction," the guideline that contains the general instructions for assessing a defendant's criminal history does provide clear guidance. *See* U.S.S.G. § 4A1.2. That guideline specifically provides that the phrase " '[c]onvicted of an offense' ... means that the guilt of the defendant has been established, whether by guilty plea, trial, or plea of *nolo contendere.*" U.S.S.G. § 4A1.2(a)(4) (Nov.1994). [10]

Relying in part on § 4A1.2, this court held in *United States v. Pierce,* 60 F.3d 886 (1st Cir.1995), *petition for cert. filed* (Oct. 19, 1995) (No. 95-6474), that a prior state "conviction" is established for Guidelines purposes by "a guilt-establishing event (such as a plea where a defendant states that he does not wish to contest the charges)." *Id.* at 892 (plea of *nolo,* even if followed by a withheld adjudication, constitutes a "conviction" for **\*783** federal sentencing purposes); *see also United States v. Jones,* 910 F.2d 760, 761 (11th Cir.1990) (per curiam) (same). Here, there is no dispute that whether or not Cuevas' second cocaine offense could be considered a "conviction" under Rhode Island law, he was indeed adjudged guilty of that crime following his *nolo* plea and was sentenced to probation based on that plea. *Cf. Dickerson,* 460 U.S. at 113-14, 103 S.Ct. at 992 ("[O]ne cannot be placed on probation if the court does not deem him to be guilty of a crime."). It seems clear under the Guidelines, then, that Cuevas was "convicted" of the 1986 cocaine offense.

Furthermore, even outside the specific context of the Guidelines, the law is plain that a state's acceptance of a defendant's plea of *nolo contendere* on a drug charge followed by imposition of a probationary sentence counts as a "conviction" for purposes of the statutes relating to immigration offenses. *White,* 17 F.3d at 479; [11] *Molina,* 981 F.2d at 18; *Ruis-Rubio,* 380 F.2d at 29-30. We conclude that Cuevas was "convicted" in 1986 of his second cocaine offense, both within the meaning of the Guidelines and within the broader context of the laws governing immigration offenses.

Once the disposition of Cuevas' second cocaine offense is recognized to be a conviction, it clearly constitutes an "aggravated felony" under U.S.S.G. § 2L1.2(b)(2). An "aggravated felony" includes any "drug trafficking crime" within the meaning of 18 U.S.C. § 924(c)(2). U.S.S.G. § 2L1.2, comment. (n. 7). A "drug trafficking crime" in turn encompasses, *inter alia,* any offense that is both (1) a felony and (2) punishable under the Controlled Substances Act (21 U.S.C. § 801 *et seq.*). *See* 18 U.S.C. § 924(c)(2); *United States v. Restrepo-Aguilar,* 74 F.3d 361, 365 (1st Cir.1996); *United States v. Forbes,* 16 F.3d 1294, 1301 (1st Cir.1994). Here, the defendant's second offense of simple possession of cocaine undoubtedly qualifies as a felony in the requisite sense. *Forbes,* 16 F.3d at 1301 (explaining that a second drug possession offense is punishable as a felony under federal law.) [12] And cocaine possession is, of course, punishable under the Controlled Substances Act. *See* 21 U.S.C. § 844(a). Thus, the offense falls within the definition of "drug trafficking crime" under 18 U.S.C. § 924(c)(2), and is

an "aggravated felony" within the meaning of U.S.S.G. § 2L1.2(b)(2) and application note 7. The district court, therefore, properly increased the defendant's base offense level by 16 levels.

*B. Whether the 1984 Offense Was a "Felony"*

Even were one to assume that the disposition of Cuevas' 1986 cocaine offense was not a "conviction," his challenge to the application of § 2L1.2(b)(2) would fail, because his 1984 conviction for cocaine possession was itself for an "aggravated felony." As to his 1984 cocaine offense, Cuevas does not dispute that he was "convicted." Rather, he argues that, while the offense was a felony under Rhode Island law, it would have been **\*784** punishable only as a misdemeanor if prosecuted under federal law, and therefore could not be a "felony," nor a "drug trafficking crime," nor an "aggravated felony" for purposes of § 2L1.2(b)(2). We recently rejected precisely this argument, however, in *United States v. Restrepo-Aguilar,* 74 F.3d 361 (1st Cir.1996). Thus, even apart from Cuevas' 1986 cocaine possession offense, the district court properly enhanced defendant's sentence by 16 levels in view of his 1984 offense, which was itself an "aggravated felony" under § 2L1.2(b)(2).

*Criminal History Category Computation*

Cuevas argues that the district court erroneously added two points to his Guidelines criminal history computation based on a finding that defendant had committed his federal offense of conviction while under a sentence of probation imposed by the Rhode Island state court for a 1994 state drug offense. *See* U.S.S.G. § 4A1.1(d) (Nov.1994) ("Add 2 points if the defendant committed the instant offense while under any criminal justice sentence, including probation...."). Defendant contends that because he illegally reentered the United States in 1990, he could not have committed that offense while under his 1994 state probationary sentence. This argument has no more than superficial appeal.

The unambiguous terms of the statute under which Cuevas was convicted establish that a deported alien who illegally reenters and remains in the United States can violate the statute at three different points in time: when he "enters," "attempts to enter," or when he "is at any time found in" this country. 8 U.S.C. § 1326(a). As was said in *United States v. Rodriguez,* 26 F.3d 4 (1st Cir.1994), "we think it plain that 'enters,' 'attempts to enter' and 'is at any time found in' describe three distinct occasions on which a deported alien can violate Section 1326." *Id.* at 8.

Cuevas was indicted specifically for the offense of being "found" in the United States in violation of § 1326(a). That was the charge to which he pleaded guilty. Thus, even though defendant illegally reentered the United States in 1990, he committed his § 1326(a) offense in 1995, when he was "found." *Rodriguez,* 26 F.3d at 8. He was unquestionably serving a criminal probatory sentence for his 1994 state drug conviction at that time. There was no error in the district court's application of U.S.S.G. § 4A1.1(d).

*Affirmed.*

**All Citations**

75 F.3d 778

# Footnotes

\*   Of the Third Circuit, sitting by designation.

1   Section 2L1.2 of the Guidelines, which governs defendant's offense of conviction, sets a base offense level of 8. The district court then added sixteen levels under subsection (b)(2) and subtracted three levels for acceptance of responsibility under § 3E1.1, producing a total offense level of 21. Charted against a criminal history category of IV, that offense level yielded a sentencing range of 57-71 months; the district court imposed sentence at the bottom of the range.

2   While Cuevas asserts that § 2L1.2(b)(2) does not apply to him, he concedes that his BOL of 8 was subject at least to a 4-level increase under § 2L1.2(b)(1). Subtracting two levels for acceptance of responsibility under § 3E1.1(a), he would calculate his total offense level to be 10, corresponding to a sentencing range of 15-21 months, given a criminal history category of IV.

3   Under that guideline, defendants convicted under 8 U.S.C. § 1326 who previously have been "deported after a conviction for an aggravated felony" are subject to a substantial increase in their sentences:

     If the defendant previously was deported after a conviction for an aggravated felony, increase by 16 levels.

     U.S.S.G. § 2L1.2(b)(2) (Nov.1994). Application note 7 to § 2L1.2 provides in relevant part:

     "Aggravated felony," as used in subsection (b)(2), means ... any illicit trafficking in any controlled substance (as defined in 21 U.S.C. § 802), including any drug trafficking crime as defined in 18 U.S.C. § 924(c)(2); ... or any attempt or conspiracy to commit any such act. The term "aggravated felony" applies to offenses described in the previous sentence whether in violation of federal or state law....

     U.S.S.G. § 2L1.2, comment. (n. 7) (Nov.1994).

4   Defendant also asserts that his 1983 offense of breaking and entering cannot be characterized as an "aggravated felony." As the government does not contest this point, we treat it as conceded.

5   He relies on R.I.Gen.Laws § 12-18-3(a) (1994), which provides:

     Whenever any person shall be arraigned before the district court or superior court, and shall plead nolo contendere, and the court places the person on probation ..., then upon the completion of the probationary period, and absent a violation of the terms of the probation, the plea and probation shall not constitute a conviction for any purpose. Evidence of a plea of nolo contendere followed by a period of probation, completed without violation of the terms of said probation, may not be introduced in any court proceeding, except that records may be furnished to a sentencing court following the conviction of an individual for a crime committed subsequent to the successful completion of probation on the prior offense.

6   The particular guideline at issue here, § 2L1.2, implements a statutory penalty enhancement found within the immigration laws. *See* 8 U.S.C. § 1326(b); *United States v. Restrepo-Aguilar,* 74 F.3d 361, 363 n. 2 (1st Cir.1996). Thus, our understanding of the term "conviction" is informed both by the law governing immigration offenses as well as the law under the Guidelines governing the federal sentencing of those offenses.

7   The Supreme Court in its *Pino* decision expressed no disagreement with Judge Magruder's statement that the meaning of "conviction" is a federal question, but found that the conviction at issue had not attained "finality." *See Pino,* 349 U.S. at 901; *Wilson v. INS,* 43 F.3d 211, 215 (5th Cir.) (per curiam), *cert. denied,* 516 U.S. 811, 116 S.Ct. 59, 133 L.Ed.2d 23 (1995); *Molina,* 981 F.2d at 20.

8   For purposes of determining whether a state disposition is a "conviction" as a matter of federal law, there is no meaningful distinction between a plea of guilty followed by probation and a plea of *nolo contendere* followed by probation. *United States v. Bustamante,* 706 F.2d 13, 15 (1st Cir.), *cert. denied,* 464 U.S. 856, 104 S.Ct. 175, 78 L.Ed.2d 157 (1983);

*cf.* 🔖 *Sokoloff v. Saxbe,* 501 F.2d 571, 574-75 (2d Cir.1974) (stating principle in context of 🔖 21 U.S.C. § 824(a)(2) license revocation case).

9    Other Circuits are in agreement with *McAllister* that federal law governs the meaning of "conviction" in the federal drug laws. *See* 🔖 *United States v. Mejias,* 47 F.3d 401, 403-04 (11th Cir.1995) (plea of *nolo* in state court, even with adjudication withheld, is conviction for federal purposes); 🔖 *United States v. Meraz,* 998 F.2d 182, 183 (3d Cir.1993); 🔖 *United States v. Campbell,* 980 F.2d 245, 250 n. 6 (4th Cir.1992), *cert. denied,* 508 U.S. 952, 113 S.Ct. 2446, 124 L.Ed.2d 663 (1993).

10    Although the direct applicability of this definition is limited to the "purposes of [ 🔖 § 4A1.2]" itself, the *purposes* underlying the Guidelines' criminal history computation provisions are the same as the purpose behind the prior offense enhancement contained in 🔖 § 2L1.2(b)(2)-*i.e.,* to provide increased sentences for defendants who have demonstrated recidivist tendencies. The guidance given in 🔖 § 4A1.2 is instructive, if not dispositive.

11    In *White,* we said that a disposition meets the federal definition of "conviction" for purposes of the laws governing immigration offenses if:

> (1) a judge or jury has found the alien guilty or he [or she] has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilty;
>
> (2) the judge has ordered some form of punishment, penalty, or restraint on the person's liberty to be imposed ...; and
>
> (3) a judgment of adjudication of guilt may be entered if the person violates the terms of his [or her] probation or fails to comply with the requirements of the court's order, without availability of further proceedings regarding the person's guilt or innocence of the original charge.

🔖 *White,* 17 F.3d at 479 (quoting 🚩 *Matter of Ozkok,* Interim Decision 3044, 19 I. & N. Dec. 546, 551-52 (B.I.A.1988)); *see also* 🔖 *Wilson,* 43 F.3d at 213-14 (adopting *Ozkok* ); 🔖 *Molina,* 981 F.2d at 18 (quoting *Ozkok* ). All of these factors are satisfied by the disposition of Cuevas' 1986 cocaine possession offense.

12    The possession offense, which was punishable under Rhode Island law by a maximum of three years imprisonment, *see* 🔖 R.I.Gen.Laws § 21-28-4.01(C)(1)(a), is also a felony under state law, *see* 🔖 R.I.Gen.Laws § 11-1-2 (defining "felony" as an offense punishable by a term of imprisonment exceeding one year). Thus, regardless whether the offense would have been punishable as a felony under federal law, the offense qualifies as a felony for purposes of the definition of "drug trafficking crime." *See* 🚩 *Restrepo-Aguilar,* 74 F.3d at 366.

---

**End of Document**　　　　　　　　　　　　　　　　© 2020 Thomson Reuters. No claim to original U.S. Government Works.

222 F.3d 1
United States Court of Appeals,
First Circuit.

UNITED STATES of America, Appellant,

v.

Julio César LUNA–DÍAZ, a/k/a Federico Antonio Soto–Pena Defendant, Appellee.

No. 99–2125.
|
Heard April 7, 2000.
|
Decided July 27, 2000.

### Synopsis

Defendant was convicted of reentry after deportation by the United States District Court for the District of Rhode Island, Ernest C. Torres, Chief Judge. Government appealed sentence. The Court of Appeals, Bownes, Senior Circuit Judge, held that defendant who, at time of deportation, had been convicted of aggravated felony, was subject upon his subsequent conviction for reentry after deportation to 16-level increase based on conviction having been for aggravated felony, notwithstanding that his aggravated felony conviction had been vacated subsequent to deportation.

Reversed and remanded.

### Attorneys and Law Firms

**\*1** Donald C. Lockhart, Assistant United States Attorney, Mary E. Rogers, Assistant United States Attorney, with whom Margaret E. Curran, United States Attorney, were on brief, for appellant.

**\*2** Steven A. Lagana, with whom Lagana & Associates was on brief, for appellee.

Before TORRUELLA, Chief Circuit Judge, BOWNES, Senior Circuit Judge, and LIPEZ, Circuit Judge.

### Opinion

BOWNES, Senior Circuit Judge.

This appeal by the government challenges a sentence imposed by the United States District Court for the District of Rhode Island (Torres, J.). Defendant–Appellee Julio Cesar Luna–Díaz (hereafter "Luna") was convicted of the offense of reentry after deportation. At sentencing, the district court refused to apply a 16–level enhancement for reentry by an alien who had previously been deported following conviction of an aggravated felony. Finding the district court's decision contrary to the language of the guidelines, we reverse and remand for new sentencing.

### I. Offense Facts

Although the law in this case is complex, the facts are simple and undisputed. The events that occasioned this appeal began in October of 1992, when Luna first entered the United States illegally. In December of 1993, Luna pled guilty in Massachusetts state court to four felony drug offenses related to the manufacture and distribution of cocaine (hereafter "the 1993 conviction"). The state court imposed a two-year suspended sentence. In May of 1995, Luna was deported. Luna again entered the country illegally in September of 1997, but was almost immediately apprehended and deported. In December of 1997, Luna again entered the country without permission from the Attorney General. On March 26, 1998, he was arrested. Shortly after his arrest,

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Luna was indicted, and he pled guilty on September 11, 1998 to a violation of 8 U.S.C. § 1326(a) (1994), which bars deported aliens from returning without the express permission of the Attorney General. The district court sentenced him to eighteen months imprisonment.

### II. Procedural Facts and Relevant Statutes

This case is governed by a somewhat complex web of federal and state statutes. Section 1326(a), the statute under which Luna was indicted, states in pertinent part:

Subject to subsection (b) of this section, any alien who—

(1) has been denied admission, excluded, deported, or removed ... and thereafter

(2) enters ... the United States, unless ... the Attorney General has expressly consented ...

shall be fined under Title 18, or imprisoned not more than 2 years, or both.

Section 1326(b) provides that:

Notwithstanding subsection (a) of this section, in the case of any alien described in such subsection—...

(2) whose removal was subsequent to a conviction for commission of an aggravated felony, such alien shall be fined under [Title 18], imprisoned not more than 20 years, or both....

United States Sentencing Guidelines Manual (U.S.S.G.) § 2L1.2 is the relevant guideline provision for violations of § 1326. Section 2L1.2 sets a base offense level of 8. Subsection (b) of § 2L1.2 provides for enhancements based on specific offense characteristics. It states:

(b) Specific Offense Characteristic

(1) If the defendant previously was deported after a criminal conviction ... increase as follows....:

(A) If the conviction was for an aggravated felony, increase by 16 levels.

U.S.S.G. § 2L1.2(b).

After pleading guilty, Luna obtained a continuance of his sentencing hearing in order to challenge his earlier 1993 conviction in a Massachusetts state court. Luna then moved in state court to vacate his previous conviction. As support for this **\*3** motion, Luna cited Mass. Gen. Laws ch. 278 § 29D (1998). This law, which applies in all criminal cases in Massachusetts, mandates a warning to defendants pleading guilty, that a guilty plea may have adverse immigration consequences. Chapter 278, § 29D states:

The court shall not accept a plea of guilty ... from any defendant in any criminal proceeding unless the court advises such defendant of the following: "If you are not a citizen of the United States, you are hereby advised that conviction of the offense for which you have been charged may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization, pursuant to the laws of the United States." The defendant shall not be required at the time of the plea to disclose to the court his legal status in the United States....

If the court fails so to advise the defendant, and he later at any time shows that his plea and conviction may have one of the enumerated consequences, the court, on the defendant's motion, shall vacate the judgment, and permit the defendant to withdraw the plea of guilty.... Absent a record that the court provided the advisement required by this section, the defendant shall be presumed not to have received the required advisement.

In a proceeding before the state court, the judge who had accepted the original plea examined the docket and record from the 1993 conviction. The court noted that the box marked "Advised of Alien Rights" had not been checked. [1] In keeping with § 29D's presumption, the court vacated the plea.

After vacating the 1993 conviction, Luna moved in federal district court to advance his sentencing. At sentencing, Luna claimed that § 2L1.2(b) no longer applied to him, because he had vacated his conviction. The government disagreed, arguing instead that the relevant time for determination of felon status is the time of deportation, not the time of sentencing on the reentry offense. The district court accepted the defendant's view and declined to apply the 16–level enhancement. The government objected to the resulting sentence of eighteen months, and this appeal ensued.

### III. Standard of Review

We review the legal determination of the guideline's meaning and scope de novo. *See* *United States v. Talladino,* 38 F.3d 1255, 1263 (1st Cir.1994) ("[Q]uestions of law—including interpretive questions concerning the meaning and scope of the sentencing guidelines—engender de novo review.").

### IV. Guideline Interpretation

We begin, as with other questions of statutory and regulatory interpretation, with the plain language of the disputed guideline. *See* *United States v. McMinn,* 103 F.3d 216, 221 (1st Cir.1997) ("Our construction is guided by conventional interpretive principles."); *see also* *United States v. Butler,* 207 F.3d 839, 847 (6th Cir.2000) ("It was proper for the district court to take a plain language approach in its interpretation of § 3B1.4, because courts must treat the sentencing guidelines as if they were a statute, and follow the clear, unambiguous language if there is no manifestation of a contrary intent.") (opinion of Clay, J.) (internal quotation marks omitted); *United States v. Lewis,* 93 F.3d 1075, 1080 (2d Cir.1996) ( "Interpretation of the Guidelines is similar to statutory construction."). [2]

**\*4**   The guideline at issue in this case states: "If the defendant previously was deported after a ... conviction ... for an aggravated felony increase 16 levels." The guideline's plain language militates in favor of the government's position. The language suggests that the relevant time is the time of deportation: "deported after a ... conviction," and not the time of sentencing. The guideline speaks of time, not possession or status. In other words, the guideline (and statute) might have dealt with aliens who *have* a previous aggravated felony conviction or *are* convicted felons, and then are convicted of reentry. The guideline, however, is in the past tense, which suggests that the present status of the aggravated felony conviction is irrelevant. It is impossible to alter the historical fact that the defendant was convicted, and then deported.

The same is true of the statute itself, which speaks of an alien "whose removal was subsequent to a conviction for commission of an aggravated felony." 8 U.S.C. § 1326(b). By all indications, the relevant time under the statute is the moment of removal, not of sentencing.

This conclusion is in accord with that of the Tenth Circuit in the only reported decision to address this problem. [3] In *United States v. Cisneros–Cabrera,* 110 F.3d 746 (10th Cir.1997), the court ruled that subsequent vacatur of the previous aggravated felony was irrelevant to the application of § 2L1.2(b). The court did so exclusively by resort to the plain language of § 2L1.2(b) and § 1326(b). It stated:

Given the clarity of 8 U.S.C. § 1326(b)(2) and U.S.S.G. § 2L1.2(b)(2), the district court's consideration of [defendant's] vacated state conviction to enhance his sentence was appropriate. [Defendant] does not deny he was deported after a conviction for an aggravated felony, and under § 2L1.2(b)(2), no more is required. Thus, while true most other sentence enhancement provisions consider only those convictions valid at the time of sentencing, in this case, the relevant time frame for determining whether the sentence enhancement should apply is specifically provided by statute.

*Cisneros–Cabrera,* 110 F.3d at 748.

Review of other statutes that depend on prior convictions supports our conclusion with respect to the language of the statute. The guidelines concerning calculation of a defendant's criminal history score contain an explicit exception for convictions subsequently vacated. Application Note 6 to U.S.S.G. § 4A1.2 states: "Sentences resulting from convictions that (A) have been **\*5** reversed or vacated because of errors of law or because of subsequently discovered evidence exonerating the defendant, or (B) have been ruled constitutionally invalid ... are not to be counted." Other guidelines that provide sentence enhancements based on prior convictions explicitly incorporate by reference the above limitations. For example, Application Note 5 to U.S.S.G. § 2K2.1, dictates that, when considering enhancement under the guideline for possession of a firearm, " 'prior felony conviction(s),' are defined in § 4B1.2."

More importantly, the Armed Career Criminal Act, 18 U.S.C. § 924 (1994) (ACCA), bars the use of "[a]ny conviction which has been expunged, or set aside ....," *see* § 921(a)(20) (providing definitions for § 924), as does the guideline that pertains to the Act. *See* U.S.S.G. § 4B1.2, Application Note 3 (cross-referencing definition of convictions set out in § 4A1.2).

The absence of an explicit exception for vacated convictions in § 2L1.2(b) and the statute compels a result here that is different from the result that would obtain under the ACCA or § 4A1.2. Congress (in the ACCA) and the Sentencing Commission (in § 4A1.2) have both manifested an ability to state unambiguously when vacated convictions are to be disregarded for purposes of punishment. Because the guidelines elsewhere make such an exception explicit, we are unable to read one implicitly into § 2L1.2(b).

Our interpretation of the statute is in accord with the interpretive method used by the Supreme Court in the analogous *Custis v. United States,* 511 U.S. 485, 114 S.Ct. 1732, 128 L.Ed.2d 517(1994). In that case the Supreme Court considered whether the ACCA "should be read to permit defendants to challenge the constitutionality of convictions used for sentencing purposes." *Id.* at 490, 114 S.Ct. 1732. The Court answered this question in the negative, noting that related statutes explicitly permitted such challenges, but the ACCA did not. The Court found this omission deliberate and dispositive, stating: "The language of [the Drug Act] shows that when Congress intended to authorize collateral attacks on prior convictions ... it knew how to do so. Congress' omission of similar language in [the ACCA] indicates that it did not intend to give defendants the right to challenge the validity of prior convictions under this statute." *Id.* at 492, 114 S.Ct. 1732. *Cf. Gozlon–Peretz v. United States,* 498 U.S. 395, 404, 111 S.Ct. 840, 112 L.Ed.2d 919 (1991) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoted in *Custis,* 511 U.S. at 492, 114 S.Ct. 1732).

The First Circuit faced an similar interpretive question in *United States v. Josleyn,* 99 F.3d 1182, 1198–99 (1st Cir.1996). In that case, the defendant argued that a guideline enhancement for "abuse of a position of trust" should not apply to commercial bribery cases. As support for his position, he noted that because the guidelines mandated that the enhancement could not apply to public bribery cases, they should not apply to private bribery. We rejected this position, stating:

The absence of an explicit provision restricting the application of the abuse-of-trust enhancement in commercial bribery cases severely undercuts the analogy urged by [the defendant]. *See United States v. Newman,* 982 F.2d 665, 673–74 (1st Cir.1992) (applying *expressio unius est exclusio alterius* principle in this sentencing context). Furthermore, the Sentencing Commission took pains throughout the Guidelines to specify the circumstances in which courts should not impose enhancements for abuse of trust.

*Josleyn,* 99 F.3d at 1198–99. For similar reasons, we refuse to adopt Luna's view of the instant guideline.

In addition, the commentary to § 2L1.2(b) implies that Luna's now-vacated conviction should still be considered. **\*6** Application Note 4 states: "An adjustment under subsection (b) for a prior felony conviction applies in addition to any criminal history points added for such conviction in Chapter Four, Part A...." Application Note 4 makes clear that under § 2L1.2(b), prior convictions are distinct from convictions considered under § 4A1.2. Convictions that the court may consider pursuant to § 4A1.2 are limited to those that have not been vacated; those that the court may consider under § 2L1.2(b) carry no such limitation, and are to be considered "in addition."

Diaz argues that the instant case is controlled by our decision in *United States v. Cuevas,* 75 F.3d 778 (1st Cir.1996). In *Cuevas* we considered the question of whether a plea of *nolo contendere* constituted a conviction for purposes of § 2L1.2. According to a state statute, such pleas could not be introduced in any later proceeding, provided that the defendant had successfully completed probation on the *nolo* plea. *See id.* at 780 & n. 5. We held that "conviction" under § 2L1.2 was a matter of federal law, and that the state law did not control. *See id.* at 781.

Contrary to Luna's assertions on appeal, we did not hold that § 4A1.1–2 provides the definition for the term "conviction" in the reentry guideline. We did not go that far. *See Cuevas,* 75 F.3d at 780–81. We described the criminal history guideline as "provid[ing] ... guidance," *id.* at 782, and "instructive, if not dispositive," *id.* at 782 n. 10. Even if we were to agree, which we do not, that *Cuevas* turned on application of § 4A1.1–2 to § 2L1.2, that still would not bind us in the instant case. *Cuevas* defined "conviction" but did not deal with the *exclusions* from the definition that are at issue in the instant case. [4]

### V. Conclusion

For the reasons stated, we find that the district court abused its discretion in refusing to impose the enhancement. Accordingly, we *vacate* the sentence imposed by the district court and *remand* for resentencing. [5]

### All Citations

222 F.3d 1

### Footnotes

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

1    We note that there are, on the docket sheet, five boxes to check for colloquy warning. They are: "Advised of right to counsel;" "Advised of right to drug exam;" "Advised of right to bail review;" "Advised of right to F.I. Jury Trial;" and "Advised of alien rights." The New Bedford District Court checked only one of these boxes: the one for the right to a jury trial.

2    There is one crucial difference between interpreting criminal statutes and all other statutes. In interpreting a criminal statute, including the guidelines, the rule of lenity applies. *See* *United States v. Werlinger,* 894 F.2d 1015, 1017–18 (8th Cir.1990) (invoking rule of lenity to find that Guidelines shall not be readily construed to multiply punishment for conduct already punished through the application of another guideline). The rule of lenity requires that ambiguities in the scope of a criminal statute must be resolved in favor of the criminal defendant. *See* *United States v. Lanier,* 520 U.S. 259, 266, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997); *see also* *United States v. Bowen,* 127 F.3d 9, 13 (1st Cir.1997) (invoking the rule of lenity to resolve Sentencing Guidelines' ambiguity in favor of criminal defendant). The rule comes into operation, though, only when the language of the statute is ambiguous. *See* *United States v. Campbell,* 167 F.3d 94, 98 (2d Cir.1999).

3    In our decision in *United States v. Smith,* 36 F.3d 128 (1st Cir.1994), we considered a facially similar claim. The defendant in that case alleged that his indictment under § 1326, which referred specifically to § 1326(b)(2), should have been dismissed because he succeeded in vacating his prior state conviction. We rejected that contention, based on our view that § 1326(b) does not establish a separate offense, but instead provides a sentencing enhancement. That view has since been affirmed by the Supreme Court. *See* *Almendarez–Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). Despite the factual similarity, *Smith* bears no resemblance to the instant case as a legal matter; it dealt with dismissal of the indictment based on a ground since rejected by the Supreme Court, and not with sentencing on an issue not yet considered by the Supreme Court.

4    We are aware of the decision of the Second Circuit in *United States v. Campbell,* 167 F.3d 94 (2d Cir.1999). In that case, the Second Circuit held that convictions that had been vacated could still form the basis for the § 2L1.2 enhancement where the reason for the vacatur (or reversal) was "for reasons unrelated to innocence or errors of law." *Id.* at 98. In doing so, the court, like the *Cuevas* court, relied on § 4A1.2 as instructive, although not controlling, for purposes of § 2L1.2. Were we to adopt the view of the Second Circuit, our result might be the same; the vacatur in Diaz's case is arguably technical. We do not reach the issue, however, because of our holding above that the plain language of the guideline requires use of Luna's prior conviction.

5    One caveat is appropriate. The instant case does not require us to decide whether allowing § 2L1.2(b)'s enhancement to rest on a prior conviction vacated as a result of a constitutional infirmity, egregious error of law, or determination of innocence, might in some limited circumstances raise constitutional due process concerns.

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

773 F.3d 774
United States Court of Appeals,
Seventh Circuit.

Alberto VELASCO–GIRON, Petitioner,

v.

Eric H. HOLDER, Jr., Attorney General of the United States, Respondent.

No. 12–2353.
|
Argued Nov. 29, 2012.
|
Decided Sept. 26, 2014.

**Synopsis**

**Background:** Alien, a citizen of Mexico who was admitted to the United States for permanent residence, petitioned for review of an order of the Board of Immigration Appeals (BIA) finding him removable, and ineligible for cancellation of removal, for having committed an aggravated felony.

The Court of Appeals, Easterbrook, Circuit Judge, held that *Chevron* deference applied to prior administrative adjudication defining term sexual abuse of a minor, on which BIA relied to find alien ineligible for cancellation of removal.

Petition denied.

Posner, Circuit Judge, filed dissenting opinion.

**Attorneys and Law Firms**

**\*775** Brian J. Murray, Jones Day, Chicago, IL, Rajeev Muttreja, Jones Day, New York, NY, for Petitioner.

Jennifer Jeanette Keeney, Oil, Department of Justice, Washington, DC, for Respondent.

Before POSNER, EASTERBROOK, and MANION, Circuit Judges.

**Opinion**

EASTERBROOK, Circuit Judge.

A removable alien who has lived in the United States for seven years (including five as a permanent resident) is entitled to seek cancellation of removal unless he has committed an "aggravated felony." 8 U.S.C. § 1229b(a)(3). Alberto Velasco–Giron, a citizen of Mexico who was admitted to the United States for permanent residence, became removable after multiple criminal convictions. An immigration judge, seconded by the Board of Immigration Appeals, concluded that one of these convictions is for "sexual abuse of a minor", which 8 U.S.C. § 1101(a)(43)(A) classifies as an aggravated felony, and that Velasco–Giron therefore is ineligible even to be considered for cancellation of removal. In reaching that conclusion, the agency used as a guide the definition of "sexual abuse" in 18 U.S.C. § 3509(a)(8) rather than the one in 18 U.S.C. § 2243(a). See *Matter of Rodriguez–Rodriguez,* 22 I. & N. Dec. 991 (BIA 1999) (en banc); *Matter of V–F–D,* 23 I. & N. Dec. 859 (BIA 2006).

The conviction in question is for violating Cal.Penal Code § 261.5(c), which makes it a crime to engage in sexual intercourse with a person under the age of 18, if the defendant is at least three years older. The Board has held that this offense constitutes "sexual abuse of a minor". Velasco–Giron was 18 at the time; the girl was 15; but the Board makes nothing of these ages, and it asks (so we too must ask) whether the crime is categorically "sexual abuse of a minor." The Board's affirmative answer stems from § 3509(a)(8), which defines "sexual abuse" as "the employment, use, persuasion, inducement, enticement, or coercion of a child to engage in, or assist another person to engage in, sexually explicit conduct or the rape, molestation, prostitution, or other form of sexual exploitation of children, or incest with children". Elsewhere the Criminal Code defines a "minor" as a person under 18. See 18 U.S.C. §§ 2256(1), 2423(a).

The Board equates "child" with "minor"; Velasco–Giron does not argue otherwise. Instead he contends that the Board should use § 2243(a), which defines "sexual abuse of a minor" as engaging in a "sexual act" (a phrase that includes fondling as well as intercourse) with a person between the ages of 12 and 15, if the offender is at least four years older. The offense under Cal.Penal Code § 261.5(c) does not satisfy that definition categorically—and Velasco–Giron's acts don't satisfy it specifically (the age gap of 18 to 15 is three years).

**\*776** If the Immigration and Nationality Act supplied its own definition of "sexual abuse of a minor," ours would be an easy case. But it does not. That's why the Board had to choose, and the possibilities include § 3509(a)(8), § 2243(a), a few other sections in the Criminal Code, and a definition of the Board's invention. Section 1101(a)(43)(A) specifies that the category "aggravated felony" includes "murder, rape, or sexual abuse of a minor". The Board noted in *Rodriguez–Rodriguez* that Congress could have written something like "murder, rape, or sexual abuse of a minor (as defined in section 2243 of title 18)" but did not do so—though other sections do designate specific federal statutes. See, e.g., 8 U.S.C. § 1101(a)(43)(B): "illicit trafficking in a controlled substance (as defined in section 802 of title 21), including a drug trafficking crime (as defined in section 924(c) of title 18)". The Board stated that, because Congress chose to use a standard rather than a cross-reference, it would be inappropriate for the Board to adopt § 2243(a) as the sole definition; § 3509(a)(8) is more open-ended, which the Board saw as a better match given the legislative decision not to limit the definition by cross-reference.

A case such as Velasco–Giron's shows one reason why. The offense under Cal.Penal Code § 261.5(c) is a member of a set that used to be called "statutory rape"; it fits comfortably next to "rape" in § 1101(a)(43)(A); but adopting § 2243(a) as an exclusive definition would make that impossible. What's more, to adopt § 2243(a) as the only definition would be to eliminate the possibility that crimes against persons aged 11 and under, or 16 or 17, could be "sexual abuse of a minor." (Recall that § 2243(a) deals only with victims aged 12 to 15.)

 When resolving ambiguities in the Immigration and Nationality Act—and "sexual abuse of a minor" deserves the label "ambiguous"—the Board has the benefit of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), under which the judiciary must respect an agency's reasonable resolution. See, e.g., *Scialabba v. Cuellar de Osorio,* ─── U.S. ───, 134 S.Ct. 2191, 2203, 189 L.Ed.2d 98 (2014); *INS v. Aguirre–Aguirre,* 526 U.S. 415, 424–25, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999). We have considered the Board's approach to "sexual abuse of a minor" five times, and each time we have held that *Rodriguez–Rodriguez* takes a reasonable approach to the issue. See *Lara–Ruiz v. INS,* 241 F.3d 934, 939–42 (7th Cir.2001); *Guerrero–Perez v. INS,* 242 F.3d 727, 735 n. 3 (7th Cir.2001) (also accepting the Board's conclusion that a crime that a state classifies as a misdemeanor may be an "aggravated felony" for

federal purposes); *Espinoza–Franco v. Ashcroft,* 394 F.3d 461 (7th Cir.2004); *Gattem v. Gonzales,* 412 F.3d 758, 762–66 (7th Cir.2005); *Gaiskov v. Holder,* 567 F.3d 832, 838 (7th Cir.2009).

 Velasco–Giron maintains that sexual intercourse with a person under 18, by someone else at least three years older, is not "sexual abuse of a minor." We could reach that conclusion, however, only if the Board exceeded its authority in *Rodriguez–Rodriguez* by looking to 18 U.S.C. § 3509(a)(8) as the starting point for understanding "sexual abuse" and to 18 U.S.C. §§ 2256(1), 2423(a) for the definition of a "minor" as a person under 18. Our five decisions holding that the approach of *Rodriguez–Rodriguez* is within the Board's discretion foreclose Velasco-Giron's arguments, unless we are prepared to overrule them all—which he asks us to do.

He relies principally on **\*777** *Estrada–Espinoza v. Mukasey,* 546 F.3d 1147 (9th Cir.2008) (en banc), which held that the Board erred in treating a violation of Cal.Penal Code § 261.5(c) as "sexual abuse of a minor." *Estrada–Espinoza* reached this conclusion because § 261.5(c) does not satisfy the definition in 18 U.S.C. § 2243(a), which requires a victim under the age of 16 and a four-year age difference. To justify adopting the definition in § 2243(a), the Ninth Circuit rejected the Board's approach in *Rodriguez–Rodriguez,* holding, 546 F.3d at 1157 n. 7, that it flunks Step One of *Chevron*—that is to say, an agency lacks discretion if Congress has made the decision and left no ambiguity for the agency to resolve. That's circular, however. If the court has already decided that the only proper definition comes from § 2243(a), then of course there's no discretion for the Board to exercise. But the phrase "sexual abuse of a minor" that the Board must administer appears in 8 U.S.C. § 1101(a)(43)(A), not 18 U.S.C. § 2243(a), and § 1101(a)(43)(A) is open-ended. Precision is vital in a criminal statute; it is less important in a civil statute such as § 1101(a)(43)(A), and the Board was entitled to find that Congress omitted a statutory reference from § 1101(a)(43)(A) precisely in order to leave discretion for the agency.

The Ninth Circuit also concluded that *Chevron* is inapplicable to *Rodriguez–Rodriguez* because the Board adopted a standard rather than a rule. We'll come back to this, but for now two points stand out. First, the Ninth Circuit did not identify any authority for its view that *Chevron* is limited to rules. It did cite *Christensen v. Harris County,* 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), which holds that an opinion letter from an agency does not come within *Chevron,* but that's a different point. *Christensen* is a precursor of *United States v. Mead Corp.,* 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), which concluded that only regulations and administrative adjudications come within *Chevron. Rodriguez–Rodriguez* is an administrative adjudication with precedential effect; it is part of *Chevron's* domain. Second, the Ninth Circuit's view that *Rodriguez–Rodriguez* did not adopt a "rule" misunderstands what the Board did. It decided to take the definition in § 3509(a)(8) as its guide. The agency could have issued a regulation pointing to § 3509(a)(8) or repeating its language verbatim, and it is hard to imagine that a court then would have said "not precise enough." True, § 3509(a)(8) itself is open-ended; the Board needs to classify one state statute at a time, and the statutory language leaves room for debate about whether a particular state crime is in or out. Yet many statutes and regulations adopt criteria that leave lots of cases uncertain. If § 3509(a)(8) is good enough to be part of the United States Code, why would an agency be forbidden to adopt its approach?

At all events, it would not be possible for us to follow *Estrada–Espinoza* without overruling *Lara–Ruiz* and its four successors, for they hold that *Rodriguez–Rodriguez* is indeed entitled to respect under *Chevron* and is a permissible exercise of the Board's discretion. Nor are we the only circuit to reach that conclusion. *Oouch v. Department of Homeland Security,* 633 F.3d 119, 122 (2d Cir.2011); *Mugalli v. Ashcroft,* 258 F.3d 52, 60 (2d Cir.2001); and *Restrepo v. Attorney General,* 617 F.3d

787, 796 (3d Cir.2010), all hold that *Rodriguez–Rodriguez* is entitled to *Chevron* deference. *Bahar v. Ashcroft,* 264 F.3d 1309, 1312 (11th Cir.2001), also accepts *Rodriguez–Rodriguez,* though without explicit reliance on *Chevron.* Meanwhile the Fifth Circuit has held that, as a matter of federal law under the Sentencing Guidelines, a "minor" in the phrase "sexual abuse of a minor" is a person **\*778** under the age of 18. *United States v. Rodriguez,* 711 F.3d 541 (5th Cir.2013) (en banc). If that's so, then it would be hard to see a problem in using the same age line to identify "sexual abuse of a minor" for immigration purposes.

Our dissenting colleague observes (see page 782) that most states treat persons 16 and older as adults for the purpose of defining sex offenses. Yet 18 U.S.C. § 2256(1) and § 2423(a) define 18 as adulthood. A federal court may set aside administrative decisions that are contrary to law, but nothing permits us to reject agency decisions that follow the United States Code, no matter how many states use a different age demarcation. Our colleague's view that "[t]he question the Board should be addressing is the gravity of particular sexual offenses involving minors" (page 782) amounts to a conclusion that the Board's approach in *Rodriguez–Rodriguez* is a substantively bad policy. As we have observed, however, *Chevron* permits the Board to establish its own doctrines when implementing ambiguous statutes.

The dissent also maintains that the Board has departed from its own precedent by supposing that *Rodriguez–Rodriguez* adopted § 3509(a)(8) as an exclusive test, rather than (as the Board put it in *Rodriguez–Rodriguez* ) as a "guide." Yet the Board's decision in this case states that § 3509(a)(8) is being used "*as a guide* in identifying the types of crimes that we would consider to constitute sexual abuse of a minor" (emphasis added). If the Board in some other case had classified Cal.Penal Code § 261.5(c) (or another materially similar law) as *not* constituting "sexual abuse of a minor," then there would be a genuine concern about administrative inconsistency, but our dissenting colleague does not identify any such divergence.

Nor does Velasco–Giron, who (unlike the dissent) does not contend that the Board has been self-contradictory or that it erred by choosing 18 as the age of majority. Quite the contrary, Velasco–Giron writes that the Board's disposition here "flowed ... from" *Rodriguez–Rodriguez*. He acknowledges that the Board has followed its own precedent, which it established years before (in a decision enforced by *Afridi v. Gonzales,* 442 F.3d 1212 (9th Cir.2006)), that a violation of Cal.Penal Code § 261.5(c) entails "sexual abuse of a minor." That's why Velasco–Giron asks us to reject *Rodriguez–Rodriguez* and all of its sequels, as the Ninth Circuit did in *Estrada–Espinoza* (which overruled *Afridi* ).

We promised to return to the question whether, as the Ninth Circuit believes, *Chevron* is inapplicable to standards. We cannot locate any such doctrine in the Supreme Court's decisions. Just this year, for example, the Court held that the EPA's implementation of a statute requiring each state to take account of how its emissions affect other states is covered by *Chevron,* even though the EPA's approach calls for the balancing of multiple factors, including cost. *EPA v. EME Homer City Generation, L.P.,* ––– U.S. ––––, 134 S.Ct. 1584, 188 L.Ed.2d 775 (2014). Many similar examples could be given, including the National Labor Relation Board's vague (and shifting) specification of "unfair labor practices," which the Board has tried vainly since its creation in 1935 to reduce to a rule. The Board's definition of an "unfair labor practice" remains a standard, and ambulatory even by the standard of standards, but for all that one to which the Supreme Court consistently defers.

If more support were needed, *Aguirre–Aguirre* provides it. That decision reversed the Ninth Circuit for failing to accord *Chevron* deference to one of the **\*779** Board's interpretive standards. An alien who committed a "serious nonpolitical crime" before entering the United States is ineligible for asylum. 8 U.S.C. § 1231(b)(3)(B)(iii) (formerly § 1253(h)(2)(C)). The Board has approached "serious nonpolitical crime" in common-law fashion, ruling one crime at a time that an offense does, or doesn't, meet this standard. It has not attempted to formulate a rule that would dictate the classification of all crimes. The Ninth Circuit was dissatisfied with the Board's approach, but the Supreme Court held it entitled to respect under *Chevron.* If the Board can define "serious nonpolitical crime" one case at a time, why can't it define "sexual abuse of a minor" one case at a time? Actually *Rodriguez–Rodriguez* does better than that, by drawing a precise age line at 18 and using § 3509(a)(8) as a guide.

If what the Board did in *Aguirre–Aguirre* was enough, what it did in *Rodriguez–Rodriguez* was enough. When an agency chooses to address topics through adjudication, it may proceed incrementally; it need not resolve every variant (or even several variants) in order to resolve one variant. See, e.g., *SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *Heckler v. Ringer,* 466 U.S. 602, 617, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984). This is "one of the earliest principles developed in American administrative law". *Almy v. Sebelius,* 679 F.3d 297, 303 (4th Cir.2012).

Many judges dislike administrative adjudication because they think standards generated in common-law fashion are poorly theorized and too uncertain to give adequate notice to persons subject to regulation. Judge Friendly once held, for these reasons and others, that the NLRB must replace adjudication with rulemaking when it wants to announce rules of general application. *Bell Aerospace Co. v. NLRB,* 475 F.2d 485 (2d Cir.1973). But the Supreme Court was not persuaded and unanimously concluded that an agency can choose freely between rules and standards, between rulemaking and adjudication. *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). Since *Bell Aerospace* "[t]he Court has not even suggested that a court can constrain an agency's choice between rulemaking and adjudication". Richard J. Pierce, Jr., I *Administrative Law Treatise* § 6.9 at 510 (5th ed.2010).

Velasco–Giron proposes a more ambitious doctrine than the one Judge Friendly favored. He wants the Board not only to replace standards with rules but also to adopt rules that are complete and self-contained. In Velasco–Giron's view, until the Board has solved *every* interpretive problem in the phrase "sexual abuse of a minor," and shown how *every* possible state crime must be classified, it cannot decide how *any* state conviction can be classified. That requirement would be inconsistent with *Aguirre–Aguirre* and would send the Board on an impossible quest.

Immigration statutes are full of vague words, such as "persecution," and vague phrases such as "crime of moral turpitude." The Board has not found a way to solve every interpretive problem in these phrases and has chosen the common-law approach. Judges have failed to turn tort law into a set of rules; Holmes declared in *The Common Law* that they were bound to do so eventually, but more than 130 years have passed without the goal being nearer. Perhaps "sexual abuse of a minor" will prove equally intractable. Judges are not entitled to require the impossible, or even the answer they think best. Like the NLRB, the FTC, the SEC, and many another agency, the BIA is a policy-making institution as well as a judicial **\*780** one. It may choose standards as the best achievable policies. Just as judges do every day, the Board is entitled to muddle through.

The petition for review is denied.

POSNER, Circuit Judge, dissenting.

The ground on which the petitioner was denied cancellation of removal (he does not deny that he was removable, because of a conviction for harassment and for violating an order of protection, see 8 U.S.C. §§ 1227(a)(2)(E)(i), (ii)) was that he had been convicted in California in 2005 of engaging in sexual intercourse with a girl who was not yet 18 and was more than three years younger than he. *Cal.Penal Code § 261.5(c).* She was in fact 15 and he 18, but the Board of Immigration Appeals did not consider the ages of either party to the sexual relationship. It relied entirely on the fact that the girl was under 18 and he more than three years older. She could have been one day short of her eighteenth birthday on the day when the relationship began and that day could have been his twenty-first birthday. The crime was punished as a misdemeanor under California law and according to his uncontradicted affidavit his only punishment was unsupervised probation. The crime was reported by the girl's father and the defendant pleaded guilty on his nineteenth birthday; the sexual relationship had been brief and consensual; that is another fact the Board ignored.

Now 28 years old, the petitioner has lived in the United States since the age of 14 and is a lawful permanent resident. The immigration judge said that "there are some extremely strong equities in this case." But the immigration statute precludes

cancellation of removal of an alien who has been convicted of an "aggravated felony," defined (for this purpose) as including "murder, rape, or sexual abuse of a minor," 8 U.S.C. § 1101(a)(43)(A), and the immigration judge ruled that the California misdemeanor was "sexual abuse of a minor" and therefore a categorical bar to cancellation of removal. The Board of Immigration Appeals affirmed.

So what is "sexual abuse of a minor"? We are obliged to give some deference to the Board's definition of a term appearing in the immigration statutes. *INS v. Aguirre–Aguirre,* 526 U.S. 415, 424–25, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999); *Arobelidze v. Holder,* 653 F.3d 513, 519–20 (7th Cir.2011). But the Board has not defined "sexual abuse of a minor." True, it said in this case, quoting *In re Rodriguez–Rodriguez,* 22 I & N Dec. 991, 995 (BIA 1999) (en banc), that it *has* defined the term—defined it "as encompassing any offense that involves 'the employment, use, persuasion, inducement, enticement, or coercion of a child to engage in, or assist another person to engage in, sexually explicit conduct or the rape, molestation, prostitution, or other form of sexual exploitation of children, or incest with children.' "

Rejecting a very narrow definition (advocated by Rodriguez–Rodriguez) of "sexual abuse of a minor" elsewhere in the federal criminal code, see 18 U.S.C. § 2243, the Board in his case had taken the definition verbatim from a provision of the federal criminal code that defines the rights of child victims as witnesses, 18 U.S.C. § 3509(a)(8); see also 18 U.S.C. § 3509(a)(9), defining "sexually explicit conduct" very broadly. Read literally, the definition would encompass the petitioner's misdemeanor, because obviously he induced the girl to have sex with him. So if *Rodriguez–Rodriguez* had adopted the definition in section 3509(a)(8), as the Board in the present case said it had done (while also saying, as we'll see, that it hadn't), as the definition of "sexual abuse of a minor" **781** in the immigration statute, that would be the end of this case. But *Rodriguez–Rodriguez* had gone on to say that "in defining the term 'sexual abuse of a minor,' we are not obliged to adopt a federal or state statutory provision" and "we are not adopting this statute as a definitive standard or definition but invoke it as a guide in identifying the types of crimes we would consider to be sexual abuse of a minor." 22 I & N Dec. at 994, 996. In other words, the Board found the definition useful given the facts of the *Rodriguez–Rodriguez* case (which are very different from the facts of the present case), but did not adopt it as the canonical definition of "sexual abuse of a minor."

The Board in this case added that to derive the meaning of the words "sexual," "minor," and "abuse" in the aggravated-felony provision of the immigration statute it would look to the "ordinary, contemporary, and common meaning of the words" (and for this it cited our decision in *Espinoza–Franco v. Ashcroft,* 394 F.3d 461, 464–65 (7th Cir.2005), quoting *United States v. Martinez–Carillo,* 250 F.3d 1101, 1104 (7th Cir.2001)). So neither in this case nor in *Rodriguez–Rodriguez* did the Board adopt either the definition in the federal criminal code or an alternative definition.

In *Rodriguez–Rodriguez* the specific offense of which the petitioner had been convicted was "indecency with a child by exposure" in violation of Texas law, and the Board pointed to "the severity of the penalty" that the petitioner had received —10 years' imprisonment, the statutory maximum—as "demonstrat [ing] that Texas considers the crime to be serious.... In consideration of these factors, [the Board found] that indecent exposure in the presence of a child by one intent on sexual arousal is clearly sexual abuse of a minor within the meaning of" the immigration statute. 22 I & N Dec. at 996.

So *Rodriguez–Rodriguez* did not define "sexual abuse of a minor" in the immigration statute to encompass *every* criminal sexual activity involving a minor, as section 3509(a)(8) of the federal criminal code seems to do. Instead it gave reasons pertinent to the case before it, in particular the severity of the punishment meted out by the state court, for concluding that the petitioner's particular criminal offense had been serious enough to merit designation as sexual abuse of a minor for purposes of immigration law. In the present case the Board gave no reason for its similar, but less plausible, conclusion. Given the language it quoted in this case from the earlier decision, it couldn't have thought that *Rodriguez–Rodriguez* had adopted the text of section 3509(a) (8) as the definition of "sexual abuse of a minor" in the immigration statute. But if it did think *Rodriguez–Rodriguez* had done

that, it was wrong, was therefore misapplying Board precedent, and for that reason (among others) its decision could not stand.

*Huang v. Mukasey,* 534 F.3d 618, 620 (7th Cir.2008); *Ssali v. Gonzales,* 424 F.3d 556, 564–66 (7th Cir.2005); *Hernandez v. Ashcroft,* 345 F.3d 824, 846–47 (9th Cir.2003). Treating the federal statute as merely a guide obliged the Board in this case to go beyond the definition of sexual abuse in the federal criminal code, and it failed to do that, the critical omission being a failure to consider the gravity of the peti-tioner's crime and punishment in relation to the crime and punishment in *Rodriguez–Rodriguez.*

Characteristically (see, e.g., *Benitez Ramos v. Holder,* 589 F.3d 426, 430 (7th Cir.2009); *Miljkovic v. Ashcroft,* 376 F.3d 754, 756–57 (7th Cir.2004)), the Justice Department tries to remedy the deficiencies of the Board's analysis by supplying reasons **\*782** (including references to social science data) for why the petitioner's offense should be regarded as grave; in doing so the Department flouts *SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

The inadequacy of the Board's analysis would not be fatal if the correctness of the conclusion could not be questioned (for then the Board's error would be harmless). It could not be questioned if, for example, the petitioner had been convicted of a violent rape. But voluntary sexual intercourse between a just-turned 21 year old and an about-to-turn 18 year old (the premise of the Board's opinion, for it declined to consider the actual facts of the petitioner's misdemeanor) is illegal in only eight states. The petitioner's sentence to unsupervised probation should tell us what California, though one of the eight, thinks of the gravity of his offense. The age of consent is 16 in a majority (34) of the states (including the District of Columbia) as well as in the Model Penal Code, § 213.3(1)(a). (The source of my statistics is Legal Age of Consent for Marriage and Sex for the 50 United States, http://globaljusticeinitiative.files.wordpress.com/2011/12/united-states-age-of-consent-table11.pdf (visited Sept. 24, 2014), as were the other websites cited in this opinion.) By age 17, 40 percent of American girls have had sexual intercourse. Guttmacher Institute, Fact Sheet, "American Teens' Sexual and Reproductive Health" (May 2014), www.guttmacher.org/pubs/FB-ATSRH. html.

The question the Board should be addressing is the gravity of particular sexual offenses involving minors, rather than assuming that any of them, however trivial, makes the perpetrator unfit to be allowed to live in the United States. Some are serious, some are trivial. Apparently California didn't think the petitioner's offense serious, classifying it as a misdemeanor and giving him a nominal sentence of unsupervised probation. Although the girl was 15, the Board of Immigration Appeals, averse to making distinctions, treats the offense as if it involved a barely 21 year old man having sex with an almost 18 year old girl. It's difficult to imagine a more trivial sexual offense. California thinks it trivial. Why does the Board think it serious? How can the Board believe that for a 21–year–old man to have consensual sex with a girl one day shy of her 18th birthday renders the 21–year–old unfit to remain in the United States? Could we not at least ask the Board to explain why it thinks a minor misdemeanor sex offense is grounds for deportation? If a 10–year prison sentence informs the Board's judgment of whether a sexual offense involving a minor should be deemed an aggravated felony, as we learn from *Rodriguez–Rodriguez* that it does, then a sentence of unsupervised probation should inform the Board's judgment as well, yet it is not mentioned in the Board's opinion in this case.

Nor is this a case in which the immigration judge provided the analysis and the Board relied on it. The immigration judge provided no analysis but said merely that she was bound by *Rodriguez–Rodriguez* and that the petitioner's conviction "constitutes sexual abuse of a minor and although treated as a misdemeanor, under state law and in [Velasco–Giron's] case by its terms constitutes an aggravated felony under" the immigration statute. The passage I've just quoted is garbled, but implies that the Board has laid down a rule that any unlawful sexual activity involving a minor, however trivial, is an aggravated felony. It has never laid down such a rule.

The majority opinion misreads *Rodriguez–Rodriguez* as having adopted a rule that governs this case. The same misreading **\*783** invalidates the Board's decision in this case.

### All Citations

773 F.3d 774

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

514 F.3d 679
United States Court of Appeals,
Seventh Circuit.

Ernesto ZAMORA–MALLARI, Gerardo Medina–Munoz, and Jose L. Barraza–Ibarra, Petitioners,

v.

Michael B. MUKASEY, Attorney General of the United States, Respondent.

Nos. 06–3717, 06–3841, 06–3979, 07–1199, 07–1670.

|

Argued Sept. 6, 2007.

|

Decided Jan. 24, 2008.

|

Rehearing En Banc Denied April 14, 2008.

**Synopsis**
**Background:** Aliens petitioned for review of order of Board of Immigration Appeals (BIA) denying waivers of removability.

**Holdings:** The Court of Appeals, Manion, Circuit Judge, held that:

aliens did not qualify for waivers of removability, and

denial of aliens' requests for waivers of removability did not violate equal protection clause.

Petitions denied.

**Attorneys and Law Firms**

**\*681** Richard Hanus (argued), Mark S. Kocol (argued), Royal F. Berg (argued), Chicago, IL, for Petitioners.

Joshua E. Braunstein, Brianne Whelan (argued), Gladys M. Steffens-Guzman (argued), Richard Zanfardino (argued), Department of Justice Civil Division, Immigration Litigation, Washington, DC, for Respondent.

Before FLAUM, MANION, and KANNE, Circuit Judges.

**Opinion**

MANION, Circuit Judge.

This opinion resolves three separate appeals challenging orders of the Board of Immigration Appeals ("Board"). The petitioners, Ernesto Zamora–Mallari ("Mallari"), Gerardo Medina–Munoz ("Munoz"), and Jose Luis Barraza–Ibarra ("Ibarra"), all sought waivers of removability under § 212(c) of the Immigration and Nationality Act ("INA"). The Board denied their requests for § 212(c) waivers, as well as other motions brought by the petitioners. The petitioners appeal. We deny the petitions for review.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## I.

### A. Petitioner Mallari

In 1991, Mallari, a citizen of the Philippines, entered the United States on an immigrant visa as an unmarried son of a United States citizen. Less than three years later, Mallari was indicted in Illinois state court on charges of criminal sexual abuse, aggravated criminal sexual abuse, and sexual exploitation of a child. In 1995, Mallari pleaded guilty to criminal sexual abuse and was sentenced to one year probation and community service.

In September 1999, the government served Mallari with a Notice to Appear ("NTA") in immigration court, charging him with removal as an alien convicted of criminal sexual abuse, an aggravated felony. Mallari requested a waiver from removal under § 212(c). An Immigration Judge ("IJ") denied Mallari's request and ordered him removed to the Philippines; the IJ concluded that Mallari was not eligible for a § 212(c) waiver because at the time of his guilty plea he lacked seven years of lawful domicile, as required by statute. Mallari appealed to the Board, arguing that he should have been permitted to present his application for § 212(c) relief. The government moved to remand Mallari's case to allow him to apply for § 212(c) relief. The Board agreed that remand was appropriate, noting that Mallari now possessed the seven years residency required for a § 212(c) waiver. Accordingly, the Board remanded the case to the IJ "for further proceedings consistent with this opinion."

On remand to the IJ, Mallari submitted numerous documents in support of his § 212(c) waiver application. The government, however, responded that Mallari was not eligible for the requested relief based on the Board's recent decision in *Matter of Blake*, 23 I & N Dec. 722 (BIA 2005). In *Blake,* the Board held that aliens charged **\*682** with deportability for having committed the aggravated felony of sexual abuse of a minor are ineligible for relief under § 212(c) because there is no ground of inadmissibility corresponding to that ground of deportability. The IJ denied Mallari's request for § 212(c) relief and Mallari again appealed to the Board.

On July 20, 2006, in lieu of a brief, Mallari filed a motion to remand, seeking to pursue adjustment of status on the basis of an approved relative visa petition filed by his adult son who is a citizen of the United States. The government opposed Mallari's motion to remand. On September 21, 2006, the Board dismissed Mallari's appeal, concluding that Mallari was ineligible for a waiver under § 212(c). The Board further concluded that while Mallari might be eligible for an adjustment of status on the basis of a relative visa petition, he had failed to establish any discretionary considerations favoring remand and therefore he had not met his heavy burden of proving that reopening the proceedings was warranted. Mallari appeals.

### B. Petitioner Munoz

Munoz, a citizen of Mexico, was admitted into the United States as a lawful permanent resident on October 27, 1989. In 1990, Munoz pleaded guilty in Illinois state court to the crime of aggravated criminal sexual abuse of a minor. Munoz was sentenced to probation for four years, but he violated his probation order by returning to Mexico. Following Munoz's probation violation, the Illinois state court sentenced him to three years of imprisonment.

Based on his conviction, the government served Munoz with an NTA in immigration court, charging him with removal as an alien convicted of sexual abuse of a minor, an aggravated felony. In May 2005, an IJ determined that Munoz was removable, and that he was not entitled to a § 212(c) waiver of removability. Munoz appealed to the Board. In September 2006, the Board dismissed his appeal, holding that Munoz was not entitled to a § 212(c) waiver. Munoz filed an appeal with this court.

The day before oral argument, Munoz filed an Emergency Motion to Hold Petition for Review in Abeyance to allow the Board to adjudicate a motion to reopen he had filed one week earlier with the Board. The motion to hold in abeyance is now also before this court. In support of his motion, Munoz attested that on August 28, 2007, he filed a Motion to Reopen his immigration case with the Board, seeking adjustment of status as the spouse of a United States citizen. The government objected to Munoz's request to hold this appeal in abeyance, noting that proceeding with Munoz's appeal would have no effect on Munoz's motion

to reopen. Given that Munoz's appeal was fully briefed and argued, and that we are considering a purely legal question, there is no reason to further delay adjudication of the issue presented on appeal. Accordingly, we deny Munoz's Motion to Hold Petition for Review in Abeyance.

## C. Petitioner Ibarra

In 1981, Ibarra, a citizen of Mexico, "entered the United States at or near El Paso, Texas ... without being admitted or paroled into the United States." IJ Decision at 2. However, he later became a lawful permanent resident on May 18, 1990. Less than one month later, Ibarra pleaded guilty in Illinois state court to two counts of aggravated criminal sexual assault "based on his sexual penetration of a child under the age of 13."

On May 4, 1999, the Immigration and Naturalization Service "INS" (now the Department of Homeland Security, "DHS") served Ibarra with an NTA. The NTA **\*683** charged Ibarra with removability from the United States as an alien convicted of criminal sexual assault, an aggravated felony. An IJ ordered Ibarra deported to Mexico, determining that he was statutorily ineligible for a § 212(c) waiver. Ibarra appealed to the Board. While his appeal was pending, the Supreme Court decided *INS v. St. Cyr,* 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). In *St. Cyr,* the Supreme Court held that aliens whose criminal convictions were obtained through plea agreements, and who would have been eligible for § 212(c) relief at the time of their pleas, remained eligible for § 212(c) relief notwithstanding the fact that § 212(c) had been repealed prior to the initiation of their removal proceedings. *Id.* at 326, 121 S.Ct. 2271. Based on *St. Cyr,* the Board remanded Ibarra's case to the INS to allow Ibarra to apply for § 212(c) relief. On remand, an IJ determined that Ibarra was not eligible for a § 212(c) waiver based on the offense for which he was found removable. Ibarra appealed to the Board. The Board dismissed Ibarra's appeal, agreeing with the IJ that Ibarra was not entitled to § 212(c) relief. Ibarra appealed to this court.

While his appeal was pending before this court, Ibarra filed a motion to reopen his case to present an application for adjustment of status based on his marriage to a United States citizen and his wife's approved visa petition. The Board denied Ibarra's motion to reopen and Ibarra appealed that decision to this court. He also filed a motion to reconsider both the Board's denial of his request for § 212(c) relief and its denial of his motion to reopen. The Board denied Ibarra's motion to reconsider and Ibarra appeals from that denial as well.

## II.

On appeal, all three petitioners argue that they are entitled to seek a waiver from removability pursuant to § 212(c). Mallari and Ibarra also present other issues related solely to their individual cases. We address the § 212(c) issue first, as to all petitioners, and then consider the additional issues on appeal.

## A. Section 212(c)

Historically, the government could remove a lawful permanent resident from the United States by either deporting them after entry under § 241 (now § 237) of the INA, 8 U.S.C. § 1227, or by excluding them upon reentry under § 212 of the INA, 8 U.S.C. § 1182(a). Currently, there are forty-six grounds of exclusion, 8 U.S.C. § 1182, and thirty-three grounds of deportation, 8 U.S.C. § 1227. *Blake v. Carbone,* 489 F.3d 88, 94 (2d Cir.2007). While there is some overlap, not every act that renders someone deportable makes him excludable, and vice versa. *Id.*

Until 1996, § 244 of the INA authorized the Attorney General, in his discretion, to suspend the deportation of a person who 1) maintained at least seven years of continuous physical presence in the United States (ten for certain deportable offenses) following the commission of the deportable offense, 2) possessed "good moral character," and 3) whose deportation would

result in "extreme hardship" ("exceptional and extremely unusual hardship" for certain deportable offenses) "to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." 8 U.S.C. § 1254(a)(1) & (2) (repealed 1996). Similarly, § 212(c) of the INA contained a waiver provision for those subject to exclusion, providing the Attorney General with discretion to waive exclusion (now known as inadmissibility) for "[a]liens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and **\*684** not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years...." 8 U.S.C. § 1182(c) (repealed 1996).

By its terms, § 244 applied only to those in deportation (now called removal) proceedings and § 212(c) applied only to those in exclusion proceedings. See 8 U.S.C. § 1254(a); 8 U.S.C. § 1182(c). The disparity between the statutes could lead to some strange outcomes. For instance, if a lawful permanent resident left the country and upon returning to the United States was placed in exclusion proceedings, a § 212(c) waiver would be available. However, if the border officials failed to place the lawful permanent resident in exclusion proceedings and instead allowed reentry, and later the government instituted deportation proceedings, a § 212(c) waiver would not be available under the plain language of that statute. While the latter individual could seek a § 244 waiver from deportation, the requirements for a waiver under that section were more stringent. Thus, a § 212(c) waiver was more desirable. But because the returning lawful permanent resident had been allowed reentry and was not placed in removal proceedings, the text of § 212(c) limited such an individual to a § 244 waiver.

To address this quirk in the system, the Board for over sixty years considered § 212(c) waiver applications from "lawful permanent residents who commit[ed] an excludable offense in the United States, depart[ed] and return [ed] to the United States after commission of the offense, [and who] ha[d] not been put in exclusion proceedings upon return, but later end[ed] up in deportation proceedings." See Blake, 489 F.3d at 94. See Matter of G–A–, 7 I & N Dec. 274 (BIA 1956). In other words, since the Board's decision in Matter of G–A, the Board allowed certain individuals in deportation proceedings to obtain a waiver under a statutory provision, namely § 212(c), that by its terms did not apply.

Following the Board's decision in Matter of G–A–, a lawful permanent resident who had never left the United States sought a § 212(c) waiver from the Board. See Matter of Arias–Uribe, 13 I & N Dec. 696 (BIA 1971), aff'd sub nom. Arias–Uribe v. INS, 466 F.2d 1198 (9th Cir.1972). The Board, while recognizing that it had already expanded the scope of § 212(c) beyond that authorized by Congress, refused to broaden § 212(c) even further so as to allow a waiver for those who never left the country. Arias–Uribe, 13 I & N Dec. at 698.

However, in 1976, the Second Circuit rejected the Board's position that a § 212(c) waiver was only available to those individuals who had actually departed and reentered the country. Francis v. INS, 532 F.2d 268 (2d Cir.1976). In Francis, the INS charged the petitioner with deportability under § 241 of the INA based on his conviction for a narcotics offense. Francis sought a § 212(c) waiver, but the Board held that because Francis had never left the United States and was being deported under § 241, and not being excluded under § 212(a), § 212(c) did not apply. Francis appealed to the Second Circuit, arguing that treating him differently than lawful permanent residents who had departed and returned to the United States violated the Equal Protection Clause of the Constitution. The Second Circuit agreed, holding that Congress lacked a rational justification for treating lawful permanent residents who had traveled abroad and then returned differently than those who had never left the country. Id. at 273. Rather than strike the statute, though, the Second Circuit held that the petitioner and others who "differed from excludable lawful permanent residents only in terms of a **\*685** recent departure from the country" were entitled to seek a § 212(c) waiver. See Blake, 489 F.2d at 95 (explaining Francis).

The Solicitor General decided not to seek certiorari in *Francis,* and the Board then acquiesced to the Second Circuit's decision in *Francis* by following the mandate of *Francis* throughout the country, *see Matter of Silva,* 16 I & N. Dec. 26 (BIA 1976), even though the Board was "not required to accept an adverse determination by one circuit court of appeals as binding throughout the United States." *State of Ga. Dep't. of Med. Assis. v. Bowen,* 846 F.2d 708, 710 (11th Cir.1988). *See Valere v. Gonzales,* 473 F.3d 757, 760 (7th Cir.2007) ("In *In Matter of Silva,* 16 I & N. Dec. 26 (B.I.A.1976), the B.I.A. adopted the Second Circuit's position."). Based on *Francis,* immigration courts throughout the country considered § 212(c) waiver requests from lawful permanent residents in deportation proceedings where the permanent resident aliens were similarly situated to those in exclusion proceedings. *See, e.g., Matter of Silva,* 16 I & N. Dec. 26. This court followed suit. *Leal–Rodriguez v. INS,* 990 F.2d 939, 948–49 (7th Cir.1993) (holding that based on *Francis*'s rationale a deportable alien may seek § 212(c) relief if the ground for deportation had a comparable ground of exclusion, but rejecting the petitioner's argument that all deportable aliens qualified for a § 212(c) waiver).

The Board, as early as the 1970's, began to apply a "comparable grounds" analysis to determine if a lawful permanent resident subject to deportation was similarly situated to someone in exclusion proceedings. *Valere,* 473 F.3d at 761. The Board adopted the "comparable grounds" test to account for the fact that a § 212(c) waiver was only available to aliens who were "excludable" under § 212(a). Thus, an alien deportable under § 241 would be similarly situated to an excludable alien only if the statutory ground for removal had a statutory counterpart, i.e., a "comparable ground," in the enumerated grounds for excludability under § 212(a). *See id.* at 760. In other words, the Board concluded that an individual subject to removal is only allowed to seek a § 212(c) waiver if the ground for removal is also a statutory ground for exclusion. The Attorney General approved the "comparable grounds" analysis in 1991. *Matter of Hernandez–Casillas,* 20 I & N. Dec. 262 (BIA 1990, A.G.1991) (holding that § 212(c) is not available for a ground of deportability that is not also a waivable ground of excludability under § 212(a)). [1]

The Board's adoption of the "comparable grounds" test, however, did not end the difficulties caused by applying a statutory standard beyond the text's scope. Rather, it created an entirely new issue, namely how to determine what was a "comparable" ground of excludability. One of the next significant issues the Board confronted concerned the handling of § 212(c) waiver requests made by individuals subject to deportation for being convicted of an aggravated felony. Section 241(a)(4)(B) of the INA provided for deportation for those convicted of aggravated felonies, whereas § 212(a) does not provide for exclusion of those convicted of aggravated felonies. The Board concluded that, rather than adopt an absolute bar to § 212(c) waivers for aggravated felons subject to **\*686** deportation, it would look to the provision of the INA that defined the offense as an "aggravated felony" to determine if there was a comparable ground of excludability. *In re Meza,* 20 I & N. Dec. 257 (BIA 1991). Accordingly, in *Meza,* the Board first looked to the INA to determine the underlying category of aggravated felony charged, which, in that case, was "any illicit trafficking in any controlled substance ... including any drug trafficking crime." *Id.* The Board then looked to § 212(a) to determine if it provided a ground of excludability that compared to the underlying aggravated felony. The Board concluded that § 212(a)(23), which provided as a basis for exclusion that the conviction was for "a violation of, or conspiracy to violate, any law or regulation relating to the illicit possession or traffic in narcotic drugs ...." *see* 8 U.S.C. § 1182(a)(23), provided a comparable ground of excludability. Accordingly, the Board concluded that Meza could seek a § 212(c) waiver. *Id.*

The Board's decision in *Meza* left other questions unanswered—most significantly whether the Board (and courts) should look to the grounds for deportation stated in the NTA, as opposed to what the INS *could* have charged the alien with as a basis for excludability had the alien sought admission. The Ninth Circuit in *Komarenko v. INS,* 35 F.3d 432 (9th Cir.1994), explored this question. In *Komarenko,* the petitioner was convicted of assault with a deadly weapon. Following his conviction, the INS began deportation proceedings, charging Komarenko with deportability based on being an alien convicted of a firearms charge.

🚩 *Id.* at 434. After the Board held that Komarenko did not qualify for a § 212(c) waiver because there was no comparable ground for excludability, Komarenko filed a petition for review in the Ninth Circuit. Komarenko argued that the Board's ruling violated his equal protection and due process rights and that he was entitled to a § 212(c) waiver because "the factual basis for his conviction, assault with a deadly weapon, could have rendered him excludable as an alien convicted of a crime involving moral turpitude under § 212(a)(2) of the INA." 🚩 *Id.* at 435. In other words, Komarenko argued that the court "must focus on the facts of his individual case and conclude that because he *could have been* excluded under the moral turpitude provision, he has been denied equal protection." 🚩 *Id.* (emphasis in original). The Ninth Circuit rejected Komarenko's argument for several reasons. First, it refused "to speculate whether the I.N.S. would have applied this broad [moral turpitude] excludability provision to an alien in Komarenko's position." 🚩 *Id.* Second, the court believed that looking to what an alien could have been charged with as a basis for excludability, as opposed to what he was charged with, "would extend discretionary review to every ground for deportation that could constitute the essential elements of a crime involving moral turpitude." 🚩 *Id.* The Ninth Circuit believed that "[s]uch judicial legislating would vastly overstep our limited scope of judicial inquiry into immigration legislation, and would interfere with the broad enforcement powers Congress has delegated to the Attorney General, *see* 📙 8 U.S.C. § 1103(a)." 🚩 *Id.* (internal quotations omitted). Third, the Ninth Circuit believed that Komarenko's proposed approach "would create an arbitrary distinction between aliens whose firearms convictions rise to the level of a crime of moral turpitude and those whose convictions do not, and then extend discretionary review only to those with the more serious convictions." 🚩 *Id.* at 435 n. 2. Accordingly, the Ninth Circuit held that the appropriate focus was on the charged ground for deportation and not on whether an alien **\*687** could have been excluded under the moral turpitude provision. *See* 🚩 *id.* 435. The Ninth Circuit then concluded that Komarenko did not qualify for a § 212(c) waiver, holding "that the deportation provision for aliens convicted for firearms charges and the exclusion provision for moral turpitude" are not substantially identical. 🚩 *Id.* at 434.

While the circuits attempted to navigate the torrents of § 212(c), Congress began a series of amendments to the immigrations laws. First, in 1990, Congress amended § 212(c) so as to prevent the Attorney General from granting waivers to aggravated felons who had served five or more years in prison. *See* Immigration Act of 1990, Pub.L. No. 101–649, § 511(a), 104 Stat. 4978, 5052 (1990). Then in 1996, Congress eliminated § 212(c) waivers entirely for lawful permanent residents convicted of an aggravated felony, *see* Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104–132, § 440(d), 110 Stat. 1214, 1277 (1996), and later that same year repealed § 212(c) entirely. *See* Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009–597 (1996). [2]

However, in 🚩 *INS v. St. Cyr* the Supreme Court held there is

> nothing in IIRIRA unmistakably indicating that Congress considered the question whether to apply its repeal of § 212(c) retroactively to such aliens. We therefore hold that § 212(c) relief remains available for aliens, like respondent, whose convictions were obtained through plea agreements and who, notwithstanding those convictions, would have been eligible for § 212(c) relief at the time of their plea under the law then in effect.

🚩 533 U.S. 289, 326, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001).

Following 🚩 *St. Cyr,* the DHS promulgated a rule to implement 🚩 *St. Cyr,* and at the same to time clarify the comparable grounds test. The DHS codified the comparable grounds test in 8 C.F.R. § 1212.3(f)(5), providing that "[a]n application for

relief under former section 212(c) of the Act shall be denied if ... [t]he alien is deportable under former section 241 of the Act or removable under section 237 of the Act on a ground which does not have a statutory counterpart in section 212 of the Act."

In 2005, the Board in *Blake,* 23 I & N Dec. 722, again applied the comparable grounds test, as recently codified in 8 C.F.R. § 1212.3(f)(5). In that case, the DHS charged Blake with deportability for having an aggravated felony conviction for sexual abuse of a minor. Blake sought a waiver of deportability under § 212(c). The Board held that Blake did not qualify for a § 212(c) waiver because there was no comparable ground of inadmissibility (i.e., excludability) under § 212(a). The Board in *Blake* also specifically rejected the petitioner's **\*688** claim that the "crime of moral turpitude" ground for exclusion was the statutory counterpart. *Id.* at 729.

Numerous circuits, including this one, have followed the Board's approach in *Blake. See Valere v. Gonzales,* 473 F.3d 757, 762 (7th Cir.2007) (holding that Board's decision denying Valere § 212(c) relief under the reasoning of *Blake* did not violate the Equal Protection clause because "there is no statutory counterpart in § 212(a) for his crime of indecent assault of a minor," and therefore "Valere is not similarly situated to an inadmissible, returning alien who is eligible to apply for § 212(c) relief"); *Soriano v. Gonzales,* 489 F.3d 909, 909 (8th Cir.2006) (holding that Soriano "was ineligible for a waiver of removability under Immigration and Nationality Act (INA) § 212(c) ... because the ground for which he was found removable—the aggravated felony of sexual abuse of minor—does not have a statutory counterpart in the grounds of inadmissibility listed in INA § 212(a)...."); *Caroleo v. Gonzales,* 476 F.3d 158, 167–68 (3d Cir.2007) (holding that Caroleo was not entitled to a § 212(c) waiver because Caroleo was charged with removability for a crime of violence and there is no statutory counterpart in § 212(a), and rejecting Caroleo's claim that the Board should look to the underlying crime of attempted murder and treat that as being a counterpart to § 212(a)'s crime of moral turpitude).

Recently, however, the Second Circuit overruled the Board's *Blake* decision. In *Blake v. Carbone,* 489 F.3d 88 (2d Cir.2007), the four petitioners had all been charged with removability for various criminal offenses. Specifically, two of the petitioners had been convicted of murder, rape, and sexual abuse of a minor; one had a federal racketeering conviction; and the fourth was convicted of first degree manslaughter. The Board concluded that they were not eligible for § 212(c) waivers because there were no statutory counterparts to the grounds of removability. The petitioners appealed to the Second Circuit, arguing that the moral turpitude ground of excludability was the statutory counterpart because all aggravated felonies involved crimes of moral turpitude. Conversely, the government argued that the only question was whether the ground for deportability *relied upon* by the DHS had a comparable ground for exclusion. The Second Circuit rejected both approaches, holding instead that the Board must determine whether each petitioner's "particular aggravated felony offense *could* form the basis of exclusion under § 212(a) as a crime of moral turpitude." *Id.* at 104 (emphasis added). In reaching this conclusion, *Blake* expressly "recognize [d][its] holding [was] at odds with that reached by several other circuits." *Id.* at 103. The *Blake* court then explained its reason for rejecting these decisions, stating:

> Were we to approve of these other courts' formulaic approach—limiting ourselves only to the language in the relevant grounds of deportation and exclusion—we would be ignoring our precedent that requires us to examine the circumstances of the deportable alien, rather than the language Congress used to classify his or her status.

*Id.* at 104.

Since the Second Circuit's decision in *Blake*, two circuits have rejected *Blake*'s approach in published opinions, specifically, the Ninth Circuit in 🚩 *Abebe v. Gonzales,* 493 F.3d 1092 (9th Cir.2007), and most recently the Eighth Circuit in *Vue v. Gonzales,* 496 F.3d 858 (8th Cir.2007). [3]  In  **\*689** 🚩 *Abebe,* the government commenced deportation proceedings against Abebe, charging that he was deportable because he had been convicted of sexual abuse of a minor, an aggravated felony. The Ninth Circuit, after explaining the history of the § 212(c) issue, reaffirmed its holding in 🚩 *Komarenko,* that § 212(c) relief is only available in "cases involving aliens facing deportation on a basis which '*is identical to a statutory ground for exclusion* for which discretionary relief would be available.' " 🚩 *Abebe,* 493 F.3d at 1104 (emphasis in original) (quoting 🚩 *Komarenko* ). In other words, the Ninth Circuit looked to the actual grounds on which an alien is found to be removable—not the possible grounds. 🚩 *Id.*

Most recently, the Eighth Circuit in *Vue v. Gonzales,* 496 F.3d 858 (8th Cir.2007), addressed the § 212(c) issue. After summarizing the history of the § 212(c) issue, the court ruled that since there was no statutory counterpart to Vue's aggravated felony (first degree assault), Vue was not entitled to a § 212(c) waiver. The *Vue* court also rejected the Second Circuit's decision in *Blake* as contrary to its own Eighth Circuit precedent and held that Vue was not entitled to a § 212(c) waiver even if his aggravated felony was also a crime of moral turpitude. *Id.* at 861.

 Against this backdrop, we consider the petitioners' argument that they were entitled to seek § 212(c) waivers. Initially, the petitioners all argue that the Board impermissibly applied 8 C.F.R. § 1212.3(f)(5) and the Board's decision in *Blake* retroactively so as to deny them relief under § 212(c). Specifically, the petitioners argue that the Board erred in relying on *Blake* and 8 C.F.R. § 1212.3(f)(5) in holding that they were not eligible for § 212(c) waivers because *Blake* was decided after they pleaded guilty to sexual abuse of a minor and 8 C.F.R. § 1212.3(f)(5) was promulgated after their guilty pleas. However, neither *Blake* nor 8 C.F.R. § 1212.3(f)(5) established a new rule. Rather, since the 1970's, the Board has held that § 212(c) waivers for deportation cases were limited to situations where there was a comparable ground of excludability. *See Valere,* 473 F.3d at 762. Section 1212.3(f)(5) of the regulations also did not create a new rule of law, but merely codified the Board's case law. Similarly, the Board in *Blake* did not establish a new rule of law, but rather applied the previously well-established comparability standard in a different factual context. [4]  Therefore, *Blake* and  **\*690**  8 C.F.R. § 1212.3(f)(5) did not retroactively apply a new rule of law to the petitioners. *See Valere,* 473 F.3d at 761 (rejecting the argument that § 1212.3(f)(5) impaired petitioner's right to a § 212(c) waiver because he "never had any right to § 212(c) eligibility.... Section 1212.3(f)(5) is simply the agency's codification of this preexisting, judicially created rule"); *Vue,* 496 F.3d at 863 (stating that "8 C.F.R 1212.3(f)(5) merely codifies established law"); *see also 🟡 Blake,* 489 F.3d at 98–99 (noting that "[t]he statutory counterpart rule does nothing more than crystallize the agency's preexisting body of law and therefore cannot have an impermissible retroactive effect").

 In a somewhat related argument, the petitioners also claim that the government impermissibly retroactively denied them § 212(c) waivers for having committed an "aggravated felony" because at the time they pleaded guilty to sexual abuse, sexual abuse did not constitute an "aggravated felony." The petitioners point out that it was only after Congress passed IIRIRA that sexual abuse was defined as an "aggravated felony." However, in passing IIRIRA, Congress expressly provided "that the amended definition of 'aggravated felony' should be applied to any and all criminal violations committed by an alien after entry into the United States, regardless of whether they were committed before or after the amended definition went into affect." 🟡 *Flores–Leon v. INS,* 272 F.3d 433, 439 (7th Cir.2001).

Moreover, as the Second Circuit explained in *Blake*, such claims of impermissible

retroactivity by petitioners Blake and Singh are curious. Each pleaded guilty to a crime that was not a deportable offense when they entered their pleas. Blake pleaded guilty to sexual abuse of a minor in 1992 but did not become deportable until 1996, when IIRIRA amended the definition of an aggravated felony

to include sexual abuse of a minor. *See* 8 U.S.C. § 1101(a)(43). Singh similarly pleaded guilty to murder in 1986 but did not become deportable until the passage of the AEDPA. To say Blake and Singh relied on the law in effect at the time of their guilty plea is illogical; neither would have been deportable at the time of their plea, making it impossible for them to even think they would need a § 212(c) waiver to stay in the country.

*Blake,* 489 F.3d at 99 n. 8.

Similarly, in this case, because at the time the petitioners pleaded guilty to sexual abuse it was not a deportable offense, they could not have pleaded guilty in reliance on the availability of a § 212(c) waiver since they had no need for a waiver. The petitioners' real complaint is that they pleaded guilty to offenses that were not deportable at the time of their pleas. However, because Congress expressly made the new definition of "aggravated felony" retroactive, the petitioners cannot challenge the retroactivity of that definition. *See Flores–Leon,* 272 F.3d at 438–39 (holding that "Congress has clearly manifested an intent to apply the amended definition of 'aggravated felony' retroactively").

Next, the petitioners claim that the Board's decisions holding them ineligible for § 212(c) waivers violate the Supreme Court's holding in *St. Cyr.* As explained above, in *St. Cyr* the Supreme Court held that § 212(c) relief remains available to **\*691** aliens whose convictions were obtained through plea agreements and who, notwithstanding those convictions, would have been eligible for § 212(c) waivers at the time of their pleas under the law then in effect. *St. Cyr,* 533 U.S. at 326, 121 S.Ct. 2271. However, for *St. Cyr* to benefit the petitioners, the petitioners must show that at the time of their pleas they were entitled to § 212(c) relief. As explained above, since at least 1979 the government has denied § 212(c) waivers to those subject to deportability, absent a comparable ground in § 212(c). Thus, unless there is a comparable ground of inadmissibility under § 212(a), *St. Cyr* is inapplicable.

 That then leads to petitioners' argument that because their convictions for sexual abuse of a minor are crimes of moral turpitude, they qualify for § 212(c) waivers, and therefore denying them the right to apply for such waivers violates *St. Cyr* and their equal protection rights. In support of their position, the petitioners rely on the Second Circuit's decision in *Blake,* overturning the Board's *Blake* decision. This court, however, rejected that argument in *Valere,* and we need a compelling reason to overturn circuit precedent, such as a Supreme Court mandate or a new statute. *Santos v. United States,* 461 F.3d 886, 891 (7th Cir.2006).

The petitioners initially contend that *Valere* is not controlling because the petitioner in that case did "not directly challenge the [Board's] conclusion in *Blake* that the crime of sexual abuse of a minor has no statutory counterpart in § 212(a)." *See Valere,* 473 F.3d at 761. That argument, however, ignores the fact that *Valere* presented an equal protection argument that required this court to consider the validity of *Blake* and the statutory counterpart test. Specifically, in *Valere,* the petitioner claimed "that application of the statutory counterpart requirement of § 1212.3(f)(5) violates his equal protection rights." *Id.* To address Valere's equal protection argument, this court needed to first determine if Valere was similarly situated to an inadmissible alien, and that determination rested on the validity of the statutory counterpart test and *Blake.* In *Valere,* this court held that § 1212.3(f)(5) was "simply the agency's codification of this preexisting judicially created [statutory counterpart] rule." *Id.* at 761. We further held that "[a]lthough the *Blake* decision marked the first time the [Board] applied the rule to the crime of sexual assault of a minor, the rule itself is not new." *Id.* This court then concluded that "Valere's crime of indecent assault of a minor—like Blake's crime of sexual abuse of a minor—had no statutory counterpart in § 212(a) at the time Valere pleaded guilty." *Id.* We further held that because there was "no statutory counterpart in § 212(a) for his crime of indecent assault of a minor, Valere is not similarly situated to an inadmissible, returning alien who is eligible to apply for § 212(c) relief." *Id.* at 762. Therefore Valere's equal protection challenge failed. *Id.* Thus, contrary to the petitioners' argument, *Valere* did consider the validity of the

statutory counterpart test, as well as *Blake*'s holding that the crime of moral turpitude category did not qualify as a counterpart, and *Valere* controls.

The petitioners also claim that we should overturn our decision in *Valere* because it was based on the Board's decision in *Blake,* which the Second Circuit recently overturned. However, as the Second Circuit recognized in *Blake,* its holding conflicts with every other circuit that has confronted the issue. *See Blake,* 489 F.3d at 103. *See, e.g., Avilez–Granados v. Gonzales,* **\*692** 481 F.3d 869, 872 (5th Cir.2007) [5] ; *Caroleo v. Gonzales,* 476 F.3d 158, 168 (3d Cir.2007); *Kim v. Gonzales,* 468 F.3d 58, 62 (1st Cir.2006); *Komarenko v. INS,* 35 F.3d 432 (9th Cir.1994). Since *Blake,* in published opinions, two circuits have reaffirmed their earlier holdings and rejected the Second Circuit's approach in *Blake. See Abebe v. Gonzales,* 493 F.3d 1092 (9th Cir.2007); *Vue v. Gonzales,* 496 F.3d 858 (8th Cir.2007). A third circuit has rejected *Blake* in an unpublished order. *See Birkett v. Attorney General of U.S.,* 2007 WL 3193530 (3d Cir.2007). Thus, the weight of precedent supports our holding in *Valere.*

Additionally, we find the reasoning of the Ninth Circuit in *Komarenko,* as recently reaffirmed in *Abebe,* particularly persuasive. As the Ninth Circuit explained, if courts were to look beyond the charged grounds of deportation to the underlying criminal offense to determine whether the criminal offense *could* have been treated as a crime of moral turpitude, that would greatly expand the role Congress assigned the judiciary in immigration cases. That is especially true given that the precise meaning of the term "moral turpitude" is not clearly established. We also find the Fifth Circuit's reasoning in *Avilez–Granados,* 481 F.3d 869, persuasive. In that case, the alien was charged with removability for sexual abuse of a child. The petitioner argued that there was a statutory counterpart in the crime of moral turpitude ground of inadmissibility. The Fifth Circuit rejected that argument, reasoning that "it is not enough that a crime could be reclassified. There is no textual link between sexual abuse of a child and crimes involving moral turpitude to indicate that Congress had the same class of offenses in mind when it enacted the two provisions that must be compared." *Id.* at 872.

 Further, we reject the Second Circuit's reasoning in *Blake* that it is inappropriate to take a "formulaic approach" that limits the court "to the language in the relevant grounds of deportation and exclusion." *Id.* Rather, an approach that focuses on the ground that forms the actual basis for deportation is most appropriate given that the courts have already expanded the scope of § 212(c) beyond its expressed coverage. As the First Circuit observed, § 212(c) has already been "stretched beyond its language" in response to "equal protection concerns." *See Campos v. INS,* 961 F.2d 309, 316 (1st Cir.1992). Additional "judicial redrafting would serve only to pull the statute further from its moorings in the legislative will." *Farquharson,* 246 F.3d at 1325. Moreover, "further speculative tinkering by courts with a statute that says one thing but is supposed to mean another will likely as not result in even more confusion." *Campos,* 961 F.2d at 315. While it has been firmly established since *Francis* that those subject to deportation may seek § 212(c) waivers, even though by its own terms § 212(c) is inapplicable to deportation proceedings, we decline to further expand § 212(c) to look beyond the actual charges of removability for purposes of determining comparability. Accordingly, we reject the petitioners' argument that they qualify for § 212(a) waivers. We further affirm our holding in *Valere* that there is no equal protection violation because there is no "statutory counterpart in § 212(a) for his crime of indecent assault of a minor, [and thus petitioner] is not similarly situated to an inadmissible, returning alien who is eligible to apply for § 212(c) relief." *Valere,* 473 F.3d at 762. **\*693**  Similarly, in this case, because there is no "comparable ground" of exclusion for sexual abuse of a minor, petitioners are not similarly situated to inadmissible aliens and therefore they also cannot establish an equal protection violation. Likewise, because at the time of their pleas the petitioners did not qualify for § 212(c) relief, *St. Cyr* does not apply.

Finally, we note that the Board continues to believe that its approach in *Blake* is appropriate, notwithstanding the Second Circuit's decision, as demonstrated by the Board's recent decision in *In re Jacques,* 2007 WL 2463895 (2007). In *Jacques,* the

respondent had sought a § 212(c) waiver. The Board held that Jacques was ineligible for such a waiver because the ground for removal, namely knowingly receiving stolen property, did not have a comparable ground of inadmissibility. The Board also held that "whether the offense in question might also have come under a different ground of removability, i.e., convicted of a crime involving moral turpitude, ... is not relevant to the inquiry." *Id.* Further, the Board declined to follow the Second Circuit's decision in *Blake*, noting that it was bound to follow precedent from the jurisdiction in which the appeal arises. *Id.* The Board added that its approach has been followed by the Third, Fifth, Seventh and Ninth Circuit, citing *Caroleo v. Gonzales,* 476 F.3d 158 (3d Cir.2007); *Vo v. Gonzales,* 482 F.3d 363 (5th Cir.2007); *Valere v. Gonzales,* 473 F.3d 757 (7th Cir.2007); *Abebe v. Gonzales,* 493 F.3d 1092 (9th Cir.2007).

## B. Individual Claims

Other than his motion to hold this appeal in abeyance and his arguments related to § 212(c), Munoz did not present any additional arguments on appeal. Conversely, Ibarra and Mallari present several additional arguments on appeal. We consider their claims individually below.

### 1. Ibarra

As noted above, after the Board denied Ibarra's request for a § 212(c) waiver, Ibarra filed a motion to reopen his case, arguing that he was eligible to adjust his status to that of lawful permanent resident given his marriage to a United States citizen. The Board denied Ibarra's motion to reopen and Ibarra filed a notice of appeal of that decision to this court. He also filed a motion to reconsider both the Board's denial of his request for § 212(c) relief and its denial of his motion to reopen. The Board denied Ibarra's motion to reconsider and Ibarra appeals from that denial as well. On appeal, Ibarra argues that the Board erred in denying his motion to reopen and his subsequent motion for reconsideration. The government maintains that we lack jurisdiction to consider Ibarra's appeal, as it relates to the denial of his motion to reopen and the denial of his motion for reconsideration.[6]

We begin with the jurisdictional question. Because Ibarra's conviction for sexual abuse of a minor constitutes an aggravated felony under the INA, this court retains only limited jurisdiction to review a final order of removal. *See* 8 U.S.C. § 1252(a)(2)(C) (providing that no court shall have jurisdiction to review any final order of removal against an alien who is removable for having committed an aggravated **\*694** felony). Specifically, this court may consider only constitutional claims and questions of law raised in proper petitions for review. *See* 8 U.S.C. § 1252(a)(2)(D); *Hernandez–Alvarez v. Gonzales,* 432 F.3d 763, 765 (7th Cir.2005). Moreover, "where Congress explicitly withdraws our jurisdiction to review a final order of deportation, our authority to review motions to reconsider or to reopen deportation proceedings is thereby likewise withdrawn." *Sarmadi v. INS,* 121 F.3d 1319, 1322 (9th Cir.1997); *see also Assaad v. Ashcroft,* 378 F.3d 471, 474 (5th Cir.2004) (explaining that "just as our power to review a final [removal] order is circumscribed by § 1252(a)(2)'s various jurisdiction-stripping provisions, our 'jurisdiction to entertain an attack on that order mounted through filing ... a motion to reopen' is equally curtailed") (quoting *Patel v. U.S. Att'y Gen.,* 334 F.3d 1259, 1261 (11th Cir.2003)); *Emile v. INS,* 244 F.3d 183, 189 (1st Cir.2001) (noting that "[b]ecause [defendant] was convicted of an aggravated felony, we have no authority to consider on direct review any other claim once we conclude that he was legitimately so classified"); *Sousa v. INS,* 226 F.3d 28, 34 (1st Cir.2000) (holding that "having determined that [the petitioner] is removable as an aggravated felon, our authority to act in this case with respect to the removal proceeding, including incidental rulings on discretionary relief, is at an end"). Thus, we generally lack jurisdiction to consider Ibarra's challenges to the Board's denial of his motions to reopen and for reconsideration.

In response, Ibarra claims that this court has jurisdiction because the Board's denials of his motion to reopen and motion for reconsideration were based on an incorrect interpretation of the law. Ibarra also argues that by denying him a hearing of his application for adjustment of status based on his wife's visa petition, the Board violated his right to due process.

AR.07361

A "petitioner may not create the jurisdiction that Congress chose to remove simply by cloaking an ... argument in constitutional garb...." *Torres–Aguilar v. INS,* 246 F.3d 1267, 1271 (9th Cir.2001). Yet that is exactly what Ibarra seeks to do, by reformulating his arguments as presenting legal and constitutional questions. Ibarra fails to cite any case law that would support his position that the denial of his motion to reopen or for reconsideration implicates legal or constitutional principles. Rather, the decision to grant or deny a motion to reopen is a discretionary decision, even if the alien demonstrates that he is entitled to relief. *See* 8 C.F.R. § 1003.2(a). In this case, the Board denied Ibarra's motion to reopen, finding that Ibarra should have presented his request for adjustment of status much earlier. This conclusion did not involve a question of law. Nor does Ibarra present a valid constitutional claim, as the due process clause does not require the Board to reopen or reconsider cases previously decided or otherwise provide for discretionary relief. *See Dave v. Ashcroft,* 363 F.3d 649, 653 (7th Cir.2004) (holding that "in immigration proceedings, a petitioner has no liberty or property interest in obtaining purely discretionary relief ... and the denial of such relief therefore cannot implicate due process"); *Garcia v. Att'y Gen. of U.S.,* 329 F.3d 1217, 1224 (11th Cir.2003) (holding that "aliens do not enjoy a constitutionally protected liberty interest in a purely discretionary form of relief"). Accordingly, this court lacks jurisdiction to consider Ibarra's challenges to the Board's denial of his motion to reopen and motion for reconsideration. *Id.*[7]

**\*695** Ibarra also argues that the Board's order stripping him forever of his lawful permanent residence was "an excessive fine" in violation of the Eighth Amendment. The Board's removal order, however, is not a "fine," and thus the Excessive Fine Clause of the Eighth Amendment does not apply. The Cruel and Unusual Punishment Clause is likewise inapplicable because "deportation proceedings are not criminal and do not constitute punishment" and thus do not "constitute 'cruel and unusual punishment' under the Eighth Amendment." *Flores–Leon,* 272 F.3d at 440. Accordingly, Ibarra's attempt to invoke the Eighth Amendment fails.

### 2. Mallari

On appeal, in addition to the arguments raised by the other petitioners in relation to the § 212(c) waiver issue, Mallari contends that the law of the case doctrine required the IJ to consider his request for a § 212(c) waiver.[8] As noted above, the IJ originally denied Mallari § 212(c) relief because he lacked the requisite seven years of residency then required for such a waiver. On appeal to the Board, the Board remanded his case to the IJ for consideration of Mallari's request for a § 212(c) waiver. Mallari argues that because the Board previously remanded the case to the IJ to allow him to apply for a § 212(c) waiver, the law of the case doctrine bars the Board from now ruling that he is not entitled to a § 212(c) waiver.

The law of the case doctrine generally provides that "once an appellate court either expressly or by necessary implication decides an issue, the decision will be binding upon all subsequent proceedings in the same case." *Key v. Sullivan,* 925 F.2d 1056, 1060 (7th Cir.1991). The law of the case doctrine has been applied to agency proceedings. *Id. See also Zhang v. Gonzales,* 434 F.3d 993, 998 (7th Cir.2006). However, the law of the case doctrine is inapplicable in this case because the Board never ruled that Mallari was entitled to a § 212(c) waiver. Rather, the Board remanded the case to allow Mallari to seek a § 212(c) waiver, noting that he now met the required seven years of residency. The Board never addressed the merits of Mallari's petition for § 212(c) relief. Nor did the Board address the question of whether Mallari's basis for removal had a comparable ground in § 212(a). Accordingly, the law of the case doctrine does not **\*696** apply. *See Key,* 925 F.2d at 1061 (holding that "the law of the case doctrine comes into play only with respect to issues previously determined").

Mallari also seeks to challenge on appeal the Board's denial of his motion to remand. As noted above, while Mallari's appeal from the IJ's denial of his request for a § 212(c) waiver was pending before the Board, Mallari requested a remand to pursue adjustment of status on the basis of an approved relative visa petition filed by his adult son who is a United States citizen. The

government opposed Mallari's motion to remand. On September 21, 2006, the Board dismissed Mallari's appeal, concluding that Mallari was ineligible for a waiver under § 212(c). The Board further held that while he might be eligible for an adjustment of status on the basis of a relative visa petition, Mallari had failed to establish any discretionary considerations favoring remand and therefore failed to meet his heavy burden of proving that reopening the proceedings was warranted. Mallari challenges the Board's denial of his motion to remand.

As with Ibarra's motion to reopen, we lack jurisdiction to consider Mallari's challenge to the Board's denial of his motion to remand. Mallari was charged with removability as an aggravated felon and § 1252(a)(2)(C) precludes all judicial review, other than for constitutional and legal claims. 8 U.S.C. § 1252(a)(2)(C). *See supra* at 51–52.

Mallari argues alternatively that if § 1252(a)(2)(C) acts to bar this court from having jurisdiction over the Board's decision to deny his remand request, the issue is still properly before this court pursuant to § 1252(a)(2)(D), as an issue involving constitutional dimensions. Mallari then posits that "[g]iven the utter lack of attention to Mr. Mallari's life circumstances along with the significant error of facts contained in the Board's decision, it appears Mr. Mallari's constitutional right to due process was violated as the Board's decision is truly void of any discretion." Petitioner Mallari's Reply Brief at 10.

Again, we stress that "petitioner may not create the jurisdiction that Congress chose to remove simply by cloaking an ... argument in constitutional garb...." *Torres–Aguilar v. INS,* 246 F.3d at 1271. Rather, a constitutional claim "would at least have to be colorable" before a court will exercise jurisdiction to review such a claim or question. *Id.* "To be colorable in this context ... the claim must have some possible validity." *Id.* (internal quotation omitted). In this case, Mallari failed to present even a colorable due process claim. While a permanent resident alien is entitled to due process, such process is provided in the form of notice of the charges against him and a meaningful opportunity to be heard at a deportation hearing. *Kwong Hai Chew v. Colding,* 344 U.S. 590, 596–98, 73 S.Ct. 472, 97 L.Ed. 576 (1953). In this case, Mallari received both notice and a meaningful opportunity to be heard during the removal proceedings. Due process does not require the Board to provide for additional hearings on remand, and an alien does not have a constitutionally protected interest in receiving discretionary relief. Therefore, Mallari's claim that the Board erred in denying his request for remand fails to state a colorable constitutional claim. We accordingly lack jurisdiction to review that issue on appeal.

## III.

In sum, we reaffirm our holding in *Valere* and hold that aliens, such as those petitioning this court, charged with removability for an aggravated felony involving sexual abuse of a minor do not qualify for **\*697** a § 212(c) waiver under the comparable grounds test. Moreover, because there is no comparable ground for inadmissibility, petitioners are not similarly situated to those found inadmissible under § 212(a) and therefore there is no equal protection violation. The law of the case doctrine is also inapplicable to Mallari's case because the Board never reached the merits of his § 212(c) petition. Finally, we lack jurisdiction to review the petitioners' challenges to the Board's denials of their subsequent motions. We DENY the petitions for review.

**All Citations**

514 F.3d 679

# Footnotes

1    The Attorney General's approval was pursuant to the authority "Congress has vested in the Attorney General ... to decide legal questions arising under the immigration laws. *See* 8 U.S.C. § 1103(a). The Attorney General has delegated this function to the Board; however, the Attorney General retains the authority to review final decisions of the BIA, either upon the Attorney General's initiative or by request. *See* 8 C.F.R. § 3.1(h)." *Farquharson v. U.S. Att'y Gen.,* 246 F.3d 1317, 1323 n. 7 (11th Cir.2001).

2    As part of the broad structural changes to the IIRIRA, Congress "dropped the concept of 'excludability' and now uses the defined term of 'inadmissibility.' " *Xi v. U.S. I.N.S.,* 298 F.3d 832, 838 (9th Cir.2002). The IIRIRA also eliminated some of the distinctions that had existed between "deportation" and "exclusion" proceedings and created a unified proceeding under § 240 called "removal proceedings." 8 U.S.C. § 1229a. Section 240(e)(2) of the INA then defines the term "removable" to mean an alien who is "deportable" or an alien who is "inadmissible." Congress also adopted § 240A(a), Cancellation of Removal, creating a waiver from removal whether the permanent resident was inadmissible under § 212(a) or deportable under § 237 (which replaced the predecessor deportation provision, § 241), but only for certain classes of aliens, excluding those convicted of aggravated felonies. 8 U.S.C. § 1229B.

3    The Third Circuit has also rejected the Second Circuit's approach in *Blake,* albeit in an unpublished decision. *See Birkett v. Att'y Gen. of U.S.,* 2007 WL 3193530 (3d Cir.2007). Also in an unpublished decision the Eleventh Circuit in *Palomino–Abad v. U.S. Att'y Gen.,* 229 Fed.Appx. 891 (11th Cir.2007), remanded the case to the Board to allow the Board to reconsider its ruling in light of the Second Circuit's decision in *Blake.* In doing so, the Eleventh Circuit stated that it was not expressing any opinion about the petitioner's eligibility for a § 212 waiver. In *Gutierrez–Almazan v. Gonzales,* 491 F.3d 341 (7th Cir.2007), the petitioner sought reversal of the Board's decision denying him § 212(c) relief because he had failed to file a timely petition. The Board had also ruled that even if Almazan's petition was timely, he was not entitled to relief under § 212(c) because he was convicted of sexual assault of a minor and there was no comparable ground for inadmissibility. This court did not reach the merits of the § 212(c) issue, even though *Valere* would control, and instead remanded, directing the Board to consider the petition. This court then added that on remand the Board "may wish to reconsider its prejudice ruling in light of the Second Circuit's decision in *Blake v. Carbone,* 489 F.3d 88 (2d Cir.2007)." *Gutierrez–Almazan,* 491 F.3d at 344 n. 1. *Gutierrez–Almazan,* however, did not take a position on the propriety of the Second Circuit's decision in *Blake. Id.*

4    The petitioners all maintain on appeal that if their case had been heard before *Blake* they would have qualified for § 212(c) relief. However, as just noted, *Blake* merely applied the comparable basis test to a new factual scenario. If one of these petitioners' cases had come before *Blake,* that case would be the "*Blake* " case that stood for the proposition that an alien convicted of sexual abuse of a minor does not qualify for a § 212(c) waiver because there is no comparable ground of excludability.

5    The Fifth Circuit in *Avilez–Granados* "note[d] that two companion cases, *Vo v. Gonzales,* 482 F.3d 363, and *Brieva–Perez v. Gonzales,* 482 F.3d 356 (5th Cir.2007), were heard on the same day and contain related issues and overlapping reasoning."

6    The government properly acknowledges that this court has jurisdiction over the § 212(c) waiver issue because that issue presents both a question of law and a constitutional question. Under § 106(a) of the REAL Act of 2005, circuit courts have jurisdiction to review questions of law and constitutional claims notwithstanding other jurisdictional bars. 8 U.S.C. § 1251(a)(2)(C).

7    In addition to arguing that the Board violated his due process rights by denying his motion to reopen and for reconsideration, throughout his appellate briefs Ibarra makes general claims of due process violations. *See, e.g.,* Ibarra Brief at 16 ("Immigration Judge Cuevas violated the Petitioner's rights to due process in denying the request for a continuance."); *id.* ("He further erred and violated the Petitioner's right to due process ... in denying him a waiver under Section 212(c) of the INA."); *id.* ("The Board erred in concluding that the Petitioner was not eligible for a § 212(c) waiver [and][i]n so doing, the Board also violated the Petitioner's right to ... due process of the law."); *id.* at 17 ("Denying the Petitioner a hearing on his application for adjustment of status was a further violation of his right to due process ...."); *id.* at 20–21 (The IJ "further violated his right to due process, by allowing the government to file its 95 pages of documents the day before the May 14, 2004 hearing."); *id.* at 22 ("The Board has further violated the Petitioner's right to due process by not following its own precedent."). But other than citing the general due process requirement that a petitioner be provided a meaningful opportunity to be heard, Ibarra does not develop these other due process arguments or cite any applicable case law. Therefore, these claims have been forfeited. *See United States v. Boyle,* 484 F.3d 943, 946 (7th Cir.2007).

8    In his appellate brief, Ibarra states in passing: "The law of this case therefore is that the Petitioner is statutorially eligible under ▢ *St. Cyr.*" *See* Ibarra Petitioner Brief at 21. Ibarra, however, did not further develop this argument and has thus forfeited it. *See Boyle,* 484 F.3d at 946.

---

**End of Document**                                       © 2020 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Supplemented by   Improving Regulation and Regulatory Review,   Pres.Exec.Order,   January 18, 2011

58 FR 51735, Exec. Order No. 12866, 1993 WL 13149641(Pres.)

Executive Order 12866

Regulatory Planning and Review

September 30, 1993

The American people deserve a regulatory system that works for them, not against them: a regulatory system that protects and improves their health, safety, environment, and well-being and improves the performance of the economy without imposing unacceptable or unreasonable costs on society; regulatory policies that recognize that the private sector and private markets are the best engine for economic growth; regulatory approaches that respect the role of State, local, and tribal governments; and regulations that are effective, consistent, sensible, and understandable. We do not have such a regulatory system today.

With this Executive order, the Federal Government begins a program to reform and make more efficient the regulatory process. The objectives of this Executive order are to enhance planning and coordination with respect to both new and existing regulations; to reaffirm the primacy of Federal agencies in the regulatory decision-making process; to restore the integrity and legitimacy of regulatory review and oversight; and to make the process more accessible and open to the public. In pursuing these objectives, the regulatory process shall be conducted so as to meet applicable statutory requirements and with due regard to the discretion that has been entrusted to the Federal agencies.

Accordingly, by the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1.** *Statement of Regulatory Philosophy and Principles.* (a) *The Regulatory Philosophy.* Federal agencies should promulgate only such regulations as are required by law, are necessary to interpret the law, or are made necessary by compelling public need, such as material failures of private markets to protect or improve the health and safety of the public, the environment, or the well-being of the American p eople. In deciding whether and how to regulate, agencies should assess all costs and benefits of available regulatory alternatives, including the alternative of not regulating. Costs and benefits shall be understood to include both quantifiable measures (to the fullest extent that these can be usefully estimated) and qualitative measures of costs and benefits that are difficult to quantify, but nevertheless essential to consider. Further, in choosing among alternative regulatory approaches, agencies should select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity), unless a statute requires another regulatory approach.

(b) *The Principles of Regulation.* To ensure that the agencies' regulatory programs are consistent with the philosophy set forth above, agencies should adhere to the following principles, to the extent permitted by law and where applicable:
(1) Each agency shall identify the problem that it intends to address (including, where applicable, the failures of private markets or public institutions that warrant new agency action) as well as assess the significance of that problem.

(2) Each agency shall examine whether existing regulations (or other law) have created, or contributed to, the problem that a new regulation is intended to correct and whether those regulations (or other law) should be modified to achieve the intended goal of regulation more effectively.

(3) Each agency shall identify and assess available alternatives to direct regulation, including providing economic incentives to encourage the desired behavior, such as user fees or marketable permits, or providing information upon which choices can be made by the public.

(4) In setting regulatory priorities, each agency shall consider, to the extent reasonable, the degree and nature of the risks posed by various substances or activities within its jurisdiction.

(5) When an agency determines that a regulation is the best available method of achieving the regulatory objective, it shall design its regulations in the most cost-effective manner to achieve the regulatory objective. In doing so, each agency shall consider incentives for innovation, consistency, predictability, the costs of enforcement and compliance (to the government, regulated entities, and the public), flexibility, distributive impacts, and equity.

(6) Each agency shall assess both the costs and the benefits of the intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs.

(7) Each agency shall base its decisions on the best reasonably obtainable scientific, technical, economic, and other information concerning the need for, and consequences of, the intended regulation.

(8) Each agency shall identify and assess alternative forms of regulation and shall, to the extent feasible, specify performance objectives, rather than specifying the behavior or manner of compliance that regulated entities must adopt.

(9) Wherever feasible, agencies shall seek views of appropriate State, local, and tribal officials before imposing regulatory requirements that might significantly or uniquely affect those governmental entities. Each agency shall assess the effects of Federal regulations on State, local, and tribal governments, including specifically the availability of resources to carry out those mandates, and seek to minimize those burdens that uniquely or significantly affect such governmental entities, consistent with achieving regulatory objectives. In addition, as appropriate, agencies shall seek to harmonize Federal regulatory actions with related State, local, and tribal regulatory and other governmental functions.

(10) Each agency shall avoid regulations that are inconsistent, incompatible, or duplicative with its other regulations or those of other Federal agencies.

(11) Each agency shall tailor its regulations to impose the least burden on society, including individuals, businesses of differing sizes, and other entities (including small communities and governmental entities), consistent with obtaining the regulatory objectives, taking into account, among other things, and to the extent practicable, the costs of cumulative regulations.

(12) Each agency shall draft its regulations to be simple and easy to understand, with the goal of minimizing the potential for uncertainty and litigation arising from such uncertainty.

**Sec. 2.** *Organization.* An efficient regulatory planning and review process is vital to ensure that the Federal Government's regulatory system best serves the American people.

(a) *The Agencies.* Because Federal agencies are the repositories of significant substantive expertise and experience, they are responsible for developing regulations and assuring that the regulations are consistent with applicable law, the President's priorities, and the principles set forth in this Executive order.

(b) *The Office of Management and Budget.* Coordinated review of agency rulemaking is necessary to ensure that regulations are consistent with applicable law, the President's priorities, and the principles set forth in this Executive order, and that decisions made by one agency do not conflict with the policies or actions taken or planned by another agency. The Office of Management

and Budget (OMB) shall carry out that review function. Within OMB, the Office of Information and Regulatory Affairs (OIRA) is the repository of expertise concerning regulatory issues, including methodologies and procedures that affect more than one agency, this Executive order, and the President's regulatory policies. To the extent permitted by law, OMB shall provide guidance to agencies and assist the President, the Vice President, and other regulatory policy advisors to the President in regulatory planning and shall be the entity that reviews individual regulations, as provided by this Executive order.

(c) *The Vice President.* The Vice President is the principal advisor to the President on, and shall coordinate the development and presentation of recommendations concerning, regulatory policy, planning, and review, as set forth in this Executive order. In fulfilling their responsibilities under this Executive order, the President and the Vice President shall be assisted by the regulatory policy advisors within the Executive Office of the President and by such agency officials and personnel as the President and the Vice President may, from time to time, consult.

**Sec. 3.** *Definitions.* For purposes of this Executive order: (a) "Advisors" refers to such regulatory policy advisors to the President as the President and Vice President may from time to time consult, including, among others: (1) the Director of OMB; (2) the Chair (or another member) of the Council of Economic Advisers; (3) the Assistant to the President for Economic Policy; (4) the Assistant to the President for Domestic Policy; (5) the Assistant to the President for National Security Affairs; (6) the Assistant to the President for Science and Technology; (7) the Assistant to the President for Intergovernmental Affairs; (8) the Assistant to the President and Staff Secretary; (9) the Assistant to the President and Chief of Staff to the Vice President; (10) the Assistant to the President and Counsel to the President; (11) the Deputy Assistant to the President and Director of the White House Office on Environmental Policy; and (12) the Administrator of OIRA, who also shall coordinate communications relating to this Executive order among the agencies, OMB, the other Advisors, and the Office of the Vice President.
(b) "Agency," unless otherwise indicated, means any authority of the United States that is an "agency" under 44 U.S.C. 3502(1), other than those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(10).

(c) "Director" means the Director of OMB.

(d) "Regulation" or "rule" means an agency statement of general applicability and future effect, which the agency intends to have the force and effect of law, that is designed to implement, interpret, or prescribe law or policy or to describe the procedure or practice requirements of an agency. It does not, however, include:

(1) Regulations or rules issued in accordance with the formal rulemaking provisions of 5 U.S.C. 556, 557;

(2) Regulations or rules that pertain to a military or foreign affairs function of the United States, other than procurement regulations and regulations involving the import or export of non-defense articles and services;

(3) Regulations or rules that are limited to agency organization, management, or personnel matters; or

(4) Any other category of regulations exempted by the Administrator of OIRA.

(e) "Regulatory action" means any substantive action by an agency (normally published in the **Federal Register**) that promulgates or is expected to lead to the promulgation of a final rule or regulation, including notices of inquiry, advance notices of proposed rulemaking, and notices of proposed rulemaking.

(f) "Significant regulatory action" means any regulatory action that is likely to result in a rule that may:

(1) Have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities;

(2) Create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in this Executive order.

**Sec. 4.** *Planning Mechanism.* In order to have an effective regulatory program, to provide for coordination of regulations, to maximize consultation and the resolution of potential conflicts at an early stage, to involve the public and its State, local, and tribal officials in regulatory planning, and to ensure that new or revised regulations promote the President's priorities and the principles set forth in this Executive order, these procedures shall be followed, to the extent permitted by law: (a) *Agencies' Policy Meeting.* Early in each year's planning cycle, the Vice President shall convene a meeting of the Advisors and the heads of agencies to seek a common understanding of priorities and to coordinate regulatory efforts to be accomplished in the upcoming year.

(b) *Unified Regulatory Agenda.* For purposes of this subsection, the term "agency" or "agencies" shall also include those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(10). Each agency shall prepare an agenda of all regulations under development or review, at a time and in a manner specified by the Administrator of OIRA. The description of each regulatory action shall contain, at a minimum, a regulation identifier number, a brief summary of the action, the legal authority for the action, any legal deadline for the action, and the name and telephone number of a knowledgeable agency official. Agencies may incorporate the information required under 5 U.S.C. 602 and 41 U.S.C. 402 into these agendas.

(c) *The Regulatory Plan.* For purposes of this subsection, the term "agency" or "agencies" shall also include those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(10). (1) As part of the Unified Regulatory Agenda, beginning in 1994, each agency shall prepare a Regulatory Plan (Plan) of the most important significant regulatory actions that the agency reasonably expects to issue in proposed or final form in that fiscal year or thereafter. The Plan shall be approved personally by the agency head and shall contain at a minimum:

(A) A statement of the agency's regulatory objectives and priorities and how they relate to the President's priorities;

(B) A summary of each planned significant regulatory action including, to the extent possible, alternatives to be considered and preliminary estimates of the anticipated costs and benefits;

(C) A summary of the legal basis for each such action, including whether any aspect of the action is required by statute or court order;

(D) A statement of the need for each such action and, if applicable, how the action will reduce risks to public health, safety, or the environment, as well as how the magnitude of the risk addressed by the action relates to other risks within the jurisdiction of the agency;

(E) The agency's schedule for action, including a statement of any applicable statutory or judicial deadlines; and

(F) The name, address, and telephone number of a person the public may contact for additional information about the planned regulatory action.

(2) Each agency shall forward its Plan to OIRA by June 1st of each year.

(3) Within 10 calendar days after OIRA has received an agency's Plan, OIRA shall circulate it to other affected agencies, the Advisors, and the Vice President.

(4) An agency head who believes that a planned regulatory action of another agency may conflict with its own policy or action taken or planned shall promptly notify, in writing, the Administrator of OIRA, who shall forward that communication to the issuing agency, the Advisors, and the Vice President.

(5) If the Administrator of OIRA believes that a planned regulatory action of an agency may be inconsistent with the President's priorities or the principles set forth in this Executive order or may be in conflict with any policy or action taken or planned by another agency, the Administrator of OIRA shall promptly notify, in writing, the affected agencies, the Advisors, and the Vice President.

(6) The Vice President, with the Advisors' assistance, may consult with the heads of agencies with respect to their Plans and, in appropriate instances, request further consideration or inter-agency coordination.

(7) The Plans developed by the issuing agency shall be published annually in the October publication of the Unified Regulatory Agenda. This publication shall be made available to the Congress; State, local, and tribal governments; and the public. Any views on any aspect of any agency Plan, including whether any planned regulatory action might conflict with any other planned or existing regulation, impose any unintended consequences on the public, or confer any unclaimed benefits on the public, should be directed to the issuing agency, with a copy to OIRA.

(d) *Regulatory Working Group.* Within 30 days of the date of this Executive order, the Administrator of OIRA shall convene a Regulatory Working Group ("Working Group"), which shall consist of representatives of the heads of each agency that the Administrator determines to have significant domestic regulatory responsibility, the Advisors, and the Vice President. The Administrator of OIRA shall chair the Working Group and shall periodically advise the Vice President on the activities of the Working Group. The Working Group shall serve as a forum to assist agencies in identifying and analyzing important regulatory issues (including, among others (1) the development of innovative regulatory techniques, (2) the methods, efficacy, and utility of comparative risk assessment in regulatory decision-making, and (3) the development of short forms and other streamlined regulatory approaches for small businesses and other entities). The Working Group shall meet at least quarterly and may meet as a whole or in subgroups of agencies with an interest in particular issues or subject areas. To inform its discussions, the Working Group may commission analytical studies and reports by OIRA, the Administrative Conference of the United States, or any other agency.

(e) *Conferences*. The Administrator of OIRA shall meet quarterly with representatives of State, local, and tribal governments to identify both existing and proposed regulations that may uniquely or significantly affect those governmental entities. The Administrator of OIRA shall also convene, from time to time, conferences with representatives of businesses, nongovernmental organizations, and the public to discuss regulatory issues of common concern.

**Sec. 5.** *Existing Regulations*. In order to reduce the regulatory burden on the American people, their families, their communities, their State, local, and tribal governments, and their industries; to determine whether regulations promulgated by the executive branch of the Federal Government have become unjustified or unnecessary as a result of changed circumstances; to confirm that regulations are both compatible with each other and not duplicative or inappropriately burdensome in the aggregate; to ensure that all regulations are consistent with the President's priorities and the principles set forth in this Executive order, within applicable law; and to otherwise improve the effectiveness of existing regulations: (a) Within 90 days of the date of this Executive order, each agency shall submit to OIRA a program, consistent with its resources and regulatory priorities, under which the agency will periodically review its existing significant regulations to determine whether any such regulations should be modified or eliminated so as to make the agency's regulatory program more effective in achieving the regulatory objectives, less burdensome, or in greater alignment with the President's priorities and the principles set forth in this Executive order. Any significant regulations selected for review shall be included in the agency's annual Plan. The agency shall also identify

any legislative mandates that require the agency to promulgate or continue to impose regulations that the agency believes are unnecessary or outdated by reason of changed circumstances.

(b) The Administrator of OIRA shall work with the Regulatory Working Group and other interested entities to pursue the objectives of this section. State, local, and tribal governments are specifically encouraged to assist in the identification of regulations that impose significant or unique burdens on those governmental entities and that appear to have outlived their justification or be otherwise inconsistent with the public interest.

(c) The Vice President, in consultation with the Advisors, may identify for review by the appropriate agency or agencies other existing regulations of an agency or groups of regulations of more than one agency that affect a particular group, industry, or sector of the economy, or may identify legislative mandates that may be appropriate for reconsideration by the Congress.

**Sec. 6.** *Centralized Review of Regulations.* The guidelines set forth below shall apply to all regulatory actions, for both new and existing regulations, by agencies other than those agencies specifically exempted by the Administrator of OIRA:

(a) *Agency Responsibilities.* (1) Each agency shall (consistent with its own rules, regulations, or procedures) provide the public with meaningful participation in the regulatory process. In particular, before issuing a notice of proposed rulemaking, each agency should, where appropriate, seek the involvement of those who are intended to benefit from and those expected to be burdened by any regulation (including, specifically, State, local, and tribal officials). In addition, each agency should afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of not less than 60 days. Each agency also is directed to explore and, where appropriate, use consensual mechanisms for developing regulations, including negotiated rulemaking.

(2) Within 60 days of the date of this Executive order, each agency head shall designate a Regulatory Policy Officer who shall report to the agency head. The Regulatory Policy Officer shall be involved at each stage of the regulatory process to foster the development of effective, innovative, and least burdensome regulations and to further the principles set forth in this Executive order.

(3) In addition to adhering to its own rules and procedures and to the requirements of the Administrative Procedure Act, the Regulatory Flexibility Act, the Paperwork Reduction Act, and other applicable law, each agency shall develop its regulatory actions in a timely fashion and adhere to the following procedures with respect to a regulatory action:

(A) Each agency shall provide OIRA, at such times and in the manner specified by the Administrator of OIRA, with a list of its planned regulatory actions, indicating those which the agency believes are significant regulatory actions within the meaning of this Executive order. Absent a material change in the development of the planned regulatory action, those not designated as significant will not be subject to review under this section unless, within 10 working days of receipt of the list, the Administrator of OIRA notifies the agency that OIRA has determined that a planned regulation is a significant regulatory action within the meaning of this Executive order. The Administrator of OIRA may waive review of any planned regulatory action designated by the agency as significant, in which case the agency need not further comply with subsection (a)(3)(B) or subsection (a)(3)(C) of this section.

(B) For each matter identified as, or determined by the Administrator of OIRA to be, a significant regulatory action, the issuing agency shall provide to OIRA:

(i) The text of the draft regulatory action, together with a reasonably detailed description of the need for the regulatory action and an explanation of how the regulatory action will meet that need; and

(ii) An assessment of the potential costs and benefits of the regulatory action, including an explanation of the manner in which the regulatory action is consistent with a statutory mandate and, to the extent permitted by law, promotes the President's priorities and avoids undue interference with State, local, and tribal governments in the exercise of their governmental functions.

(C) For those matters identified as, or determined by the Administrator of OIRA to be, a significant regulatory action within the scope of section 3(f)(1), the agency shall also provide to OIRA the following additional information developed as part of the agency's decision-making process (unless prohibited by law):

(i) An assessment, including the underlying analysis, of benefits anticipated from the regulatory action (such as, but not limited to, the promotion of the efficient functioning of the economy and private markets, the enhancement of health and safety, the protection of the natural environment, and the elimination or reduction of discrimination or bias) together with, to the extent feasible, a quantification of those benefits;

(ii) An assessment, including the underlying analysis, of costs anticipated from the regulatory action (such as, but not limited to, the direct cost both to the government in administering the regulation and to businesses and others in complying with the regulation, and any adverse effects on the efficient functioning of the economy, private markets (including productivity, employment, and competitiveness), health, safety, and the natural environment), together with, to the extent feasible, a quantification of those costs; and

(iii) An assessment, including the underlying analysis, of costs and benefits of potentially effective and reasonably feasible alternatives to the planned regulation, identified by the agencies or the public (including improving the current regulation and reasonably viable nonregulatory actions), and an explanation why the planned regulatory action is preferable to the identified potential alternatives.

(D) In emergency situations or when an agency is obligated by law to act more quickly than normal review procedures allow, the agency shall notify OIRA as soon as possible and, to the extent practicable, comply with subsections (a)(3)(B) and (C) of this section. For those regulatory actions that are governed by a statutory or court-imposed deadline, the agency shall, to the extent practicable, schedule rulemaking proceedings so as to permit sufficient time for OIRA to conduct its review, as set forth below in subsection (b)(2) through (4) of this section.

(E) After the regulatory action has been published in the **Federal Register** or otherwise issued to the public, the agency shall:

(i) Make available to the public the information set forth in subsections (a)(3)(B) and (C);

(ii) Identify for the public, in a complete, clear, and simple manner, the substantive changes between the draft submitted to OIRA for review and the action subsequently announced; and

(iii) Identify for the public those changes in the regulatory action that were made at the suggestion or recommendation of OIRA.

(F) All information provided to the public by the agency shall be in plain, understandable language.

(b) *OIRA Responsibilities.* The Administrator of OIRA shall provide meaningful guidance and oversight so that each agency's regulatory actions are consistent with applicable law, the President's priorities, and the principles set forth in this Executive order and do not conflict with the policies or actions of another agency. OIRA shall, to the extent permitted by law, adhere to the following guidelines:

(1) OIRA may review only actions identified by the agency or by OIRA as significant regulatory actions under subsection (a)(3)(A) of this section.

(2) OIRA shall waive review or notify the agency in writing of the results of its review within the following time periods:

(A) For any notices of inquiry, advance notices of proposed rulemaking, or other preliminary regulatory actions prior to a Notice of Proposed Rulemaking, within 10 working days after the date of submission of the draft action to OIRA;

(B) For all other regulatory actions, within 90 calendar days after the date of submission of the information set forth in subsections (a)(3)(B) and (C) of this section, unless OIRA has previously reviewed this information and, since that review, there has been no material change in the facts and circumstances upon which the regulatory action is based, in which case, OIRA shall complete its review within 45 days; and

(C) The review process may be extended (1) once by no more than 30 calendar days upon the written approval of the Director and (2) at the request of the agency head.

(3) For each regulatory action that the Administrator of OIRA returns to an agency for further consideration of some or all of its provisions, the Administrator of OIRA shall provide the issuing agency a written explanation for such return, setting forth the pertinent provision of this Executive order on which OIRA is relying. If the agency head disagrees with some or all of the bases for the return, the agency head shall so inform the Administrator of OIRA in writing.

(4) Except as otherwise provided by law or required by a Court, in order to ensure greater openness, accessibility, and accountability in the regulatory review process, OIRA shall be governed by the following disclosure requirements:

(A) Only the Administrator of OIRA (or a particular designee) shall receive oral communications initiated by persons not employed by the executive branch of the Federal Government regarding the substance of a regulatory action under OIRA review;

(B) All substantive communications between OIRA personnel and persons not employed by the executive branch of the Federal Government regarding a regulatory action under review shall be governed by the following guidelines: (i) A representative from the issuing agency shall be invited to any meeting between OIRA personnel and such person(s);

(ii) OIRA shall forward to the issuing agency, within 10 working days of receipt of the communication(s), all written communications, regardless of format, between OIRA personnel and any person who is not employed by the executive branch of the Federal Government, and the dates and names of individuals involved in all substantive oral communications (including meetings to which an agency representative was invited, but did not attend, and telephone conversations between OIRA personnel and any such persons); and

(iii) OIRA shall publicly disclose relevant information about such communication(s), as set forth below in subsection (b)(4)(C) of this section.

(C) OIRA shall maintain a publicly available log that shall contain, at a minimum, the following information pertinent to regulatory actions under review:

(i) The status of all regulatory actions, including if (and if so, when and by whom) Vice Presidential and Presidential consideration was requested;

(ii) A notation of all written communications forwarded to an issuing agency under subsection (b)(4)(B)(ii) of this section; and

(iii) The dates and names of individuals involved in all substantive oral communications, including meetings and telephone conversations, between OIRA personnel and any person not employed by the executive branch of the Federal Government, and the subject matter discussed during such communications.

(D) After the regulatory action has been published in the **Federal Register** or otherwise issued to the public, or after the agency has announced its decision not to publish or issue the regulatory action, OIRA shall make available to the public all documents exchanged between OIRA and the agency during the review by OIRA under this section.

(5) All information provided to the public by OIRA shall be in plain, understandable language.

**Sec. 7.** *Resolution of Conflicts.* To the extent permitted by law, disagreements or conflicts between or among agency heads or between OMB and any agency that cannot be resolved by the Administrator of OIRA shall be resolved by the President, or by the Vice President acting at the request of the President, with the relevant agency head (and, as appropriate, other interested government officials). Vice Presidential and Presidential consideration of such disagreements may be initiated only by the Director, by the head of the issuing agency, or by the head of an agency that has a significant interest in the regulatory action at issue. Such review will not be undertaken at the request of other persons, entities, or their agents.

Resolution of such conflicts shall be informed by recommendations developed by the Vice President, after consultation with the Advisors (and other executive branch officials or personnel whose responsibilities to the President include the subject matter at issue). The development of these recommendations shall be concluded within 60 days after review has been requested.

During the Vice Presidential and Presidential review period, communications with any person not employed by the Federal Government relating to the substance of the regulatory action under review and directed to the Advisors or their staffs or to the staff of the Vice President shall be in writing and shall be forwarded by the recipient to the affected agency(ies) for inclusion in the public docket(s). When the communication is not in writing, such Advisors or staff members shall inform the outside party that the matter is under review and that any comments should be submitted in writing.

At the end of this review process, the President, or the Vice President acting at the request of the President, shall notify the affected agency and the Administrator of OIRA of the President's decision with respect to the matter.

**Sec. 8.** *Publication.* Except to the extent required by law, an agency shall not publish in the **Federal Register** or otherwise issue to the public any regulatory action that is subject to review under section 6 of this Executive order until (1) the Administrator of OIRA notifies the agency that OIRA has waived its review of the action or has completed its review without any requests for further consideration, or (2) the applicable time period in section 6(b)(2) expires without OIRA having notified the agency that it is returning the regulatory action for further consideration under section 6(b)(3), whichever occurs first. If the terms of the preceding sentence have not been satisfied and an agency wants to publish or otherwise issue a regulatory action, the head of that agency may request Presidential consideration through the Vice President, as provided under section 7 of this order. Upon receipt of this request, the Vice President shall notify OIRA and the Advisors. The guidelines and time period set forth in section 7 shall apply to the publication of regulatory actions for which Presidential consideration has been sought.

**Sec. 9.** *Agency Authority.* Nothing in this order shall be construed as displacing the agencies' authority or responsibilities, as authorized by law.

**Sec. 10.** *Judicial Review.* Nothing in this Executive order shall affect any otherwise available judicial review of agency action. This Executive order is intended only to improve the internal management of the Federal Government and does not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

**Sec. 11.** *Revocations.* Executive Orders Nos. 12291 and 12498; all amendments to those Executive orders; all guidelines issued under those orders; and any exemptions from those orders heretofore granted for any category of rule are revoked.

WILLIAM CLINTON

THE WHITE HOUSE,September 30, 1993.

**Editorial Note:** For the President's remarks on signing this Executive order, see issue 39 of the Weekly Compilation of Presidential Documents.

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Supplemented by   Improving Regulation and Regulatory Review,   Pres.Exec.Order,   January 18, 2011

58 FR 51735, Exec. Order No. 12866, 1993 WL 13149641(Pres.)

Executive Order 12866

Regulatory Planning and Review

September 30, 1993

The American people deserve a regulatory system that works for them, not against them: a regulatory system that protects and improves their health, safety, environment, and well-being and improves the performance of the economy without imposing unacceptable or unreasonable costs on society; regulatory policies that recognize that the private sector and private markets are the best engine for economic growth; regulatory approaches that respect the role of State, local, and tribal governments; and regulations that are effective, consistent, sensible, and understandable. We do not have such a regulatory system today.

With this Executive order, the Federal Government begins a program to reform and make more efficient the regulatory process. The objectives of this Executive order are to enhance planning and coordination with respect to both new and existing regulations; to reaffirm the primacy of Federal agencies in the regulatory decision-making process; to restore the integrity and legitimacy of regulatory review and oversight; and to make the process more accessible and open to the public. In pursuing these objectives, the regulatory process shall be conducted so as to meet applicable statutory requirements and with due regard to the discretion that has been entrusted to the Federal agencies.

Accordingly, by the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1.** *Statement of Regulatory Philosophy and Principles.* (a) *The Regulatory Philosophy.* Federal agencies should promulgate only such regulations as are required by law, are necessary to interpret the law, or are made necessary by compelling public need, such as material failures of private markets to protect or improve the health and safety of the public, the environment, or the well-being of the American p eople. In deciding whether and how to regulate, agencies should assess all costs and benefits of available regulatory alternatives, including the alternative of not regulating. Costs and benefits shall be understood to include both quantifiable measures (to the fullest extent that these can be usefully estimated) and qualitative measures of costs and benefits that are difficult to quantify, but nevertheless essential to consider. Further, in choosing among alternative regulatory approaches, agencies should select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity), unless a statute requires another regulatory approach.

(b) *The Principles of Regulation.* To ensure that the agencies' regulatory programs are consistent with the philosophy set forth above, agencies should adhere to the following principles, to the extent permitted by law and where applicable:

(1) Each agency shall identify the problem that it intends to address (including, where applicable, the failures of private markets or public institutions that warrant new agency action) as well as assess the significance of that problem.

(2) Each agency shall examine whether existing regulations (or other law) have created, or contributed to, the problem that a new regulation is intended to correct and whether those regulations (or other law) should be modified to achieve the intended goal of regulation more effectively.

(3) Each agency shall identify and assess available alternatives to direct regulation, including providing economic incentives to encourage the desired behavior, such as user fees or marketable permits, or providing information upon which choices can be made by the public.

(4) In setting regulatory priorities, each agency shall consider, to the extent reasonable, the degree and nature of the risks posed by various substances or activities within its jurisdiction.

(5) When an agency determines that a regulation is the best available method of achieving the regulatory objective, it shall design its regulations in the most cost-effective manner to achieve the regulatory objective. In doing so, each agency shall consider incentives for innovation, consistency, predictability, the costs of enforcement and compliance (to the government, regulated entities, and the public), flexibility, distributive impacts, and equity.

(6) Each agency shall assess both the costs and the benefits of the intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs.

(7) Each agency shall base its decisions on the best reasonably obtainable scientific, technical, economic, and other information concerning the need for, and consequences of, the intended regulation.

(8) Each agency shall identify and assess alternative forms of regulation and shall, to the extent feasible, specify performance objectives, rather than specifying the behavior or manner of compliance that regulated entities must adopt.

(9) Wherever feasible, agencies shall seek views of appropriate State, local, and tribal officials before imposing regulatory requirements that might significantly or uniquely affect those governmental entities. Each agency shall assess the effects of Federal regulations on State, local, and tribal governments, including specifically the availability of resources to carry out those mandates, and seek to minimize those burdens that uniquely or significantly affect such governmental entities, consistent with achieving regulatory objectives. In addition, as appropriate, agencies shall seek to harmonize Federal regulatory actions with related State, local, and tribal regulatory and other governmental functions.

(10) Each agency shall avoid regulations that are inconsistent, incompatible, or duplicative with its other regulations or those of other Federal agencies.

(11) Each agency shall tailor its regulations to impose the least burden on society, including individuals, businesses of differing sizes, and other entities (including small communities and governmental entities), consistent with obtaining the regulatory objectives, taking into account, among other things, and to the extent practicable, the costs of cumulative regulations.

(12) Each agency shall draft its regulations to be simple and easy to understand, with the goal of minimizing the potential for uncertainty and litigation arising from such uncertainty.

**Sec. 2.** *Organization.* An efficient regulatory planning and review process is vital to ensure that the Federal Government's regulatory system best serves the American people.

(a) *The Agencies.*Because Federal agencies are the repositories of significant substantive expertise and experience, they are responsible for developing regulations and assuring that the regulations are consistent with applicable law, the President's priorities, and the principles set forth in this Executive order.

(b) *The Office of Management and Budget.* Coordinated review of agency rulemaking is necessary to ensure that regulations are consistent with applicable law, the President's priorities, and the principles set forth in this Executive order, and that decisions made by one agency do not conflict with the policies or actions taken or planned by another agency. The Office of Management

and Budget (OMB) shall carry out that review function. Within OMB, the Office of Information and Regulatory Affairs (OIRA) is the repository of expertise concerning regulatory issues, including methodologies and procedures that affect more than one agency, this Executive order, and the President's regulatory policies. To the extent permitted by law, OMB shall provide guidance to agencies and assist the President, the Vice President, and other regulatory policy advisors to the President in regulatory planning and shall be the entity that reviews individual regulations, as provided by this Executive order.

(c) *The Vice President.* The Vice President is the principal advisor to the President on, and shall coordinate the development and presentation of recommendations concerning, regulatory policy, planning, and review, as set forth in this Executive order. In fulfilling their responsibilities under this Executive order, the President and the Vice President shall be assisted by the regulatory policy advisors within the Executive Office of the President and by such agency officials and personnel as the President and the Vice President may, from time to time, consult.

**Sec. 3.** *Definitions.* For purposes of this Executive order: (a) "Advisors" refers to such regulatory policy advisors to the President as the President and Vice President may from time to time consult, including, among others: (1) the Director of OMB; (2) the Chair (or another member) of the Council of Economic Advisers; (3) the Assistant to the President for Economic Policy; (4) the Assistant to the President for Domestic Policy; (5) the Assistant to the President for National Security Affairs; (6) the Assistant to the President for Science and Technology; (7) the Assistant to the President for Intergovernmental Affairs; (8) the Assistant to the President and Staff Secretary; (9) the Assistant to the President and Chief of Staff to the Vice President; (10) the Assistant to the President and Counsel to the President; (11) the Deputy Assistant to the President and Director of the White House Office on Environmental Policy; and (12) the Administrator of OIRA, who also shall coordinate communications relating to this Executive order among the agencies, OMB, the other Advisors, and the Office of the Vice President.
(b) "Agency," unless otherwise indicated, means any authority of the United States that is an "agency" under 44 U.S.C. 3502(1), other than those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(10).

(c) "Director" means the Director of OMB.

(d) "Regulation" or "rule" means an agency statement of general applicability and future effect, which the agency intends to have the force and effect of law, that is designed to implement, interpret, or prescribe law or policy or to describe the procedure or practice requirements of an agency. It does not, however, include:

(1) Regulations or rules issued in accordance with the formal rulemaking provisions of 5 U.S.C. 556, 557;

(2) Regulations or rules that pertain to a military or foreign affairs function of the United States, other than procurement regulations and regulations involving the import or export of non-defense articles and services;

(3) Regulations or rules that are limited to agency organization, management, or personnel matters; or

(4) Any other category of regulations exempted by the Administrator of OIRA.

(e) "Regulatory action" means any substantive action by an agency (normally published in the **Federal Register**) that promulgates or is expected to lead to the promulgation of a final rule or regulation, including notices of inquiry, advance notices of proposed rulemaking, and notices of proposed rulemaking.

(f) "Significant regulatory action" means any regulatory action that is likely to result in a rule that may:

(1) Have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities;

(2) Create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in this Executive order.


**Sec. 4.** *Planning Mechanism.* In order to have an effective regulatory program, to provide for coordination of regulations, to maximize consultation and the resolution of potential conflicts at an early stage, to involve the public and its State, local, and tribal officials in regulatory planning, and to ensure that new or revised regulations promote the President's priorities and the principles set forth in this Executive order, these procedures shall be followed, to the extent permitted by law: (a) *Agencies' Policy Meeting.* Early in each year's planning cycle, the Vice President shall convene a meeting of the Advisors and the heads of agencies to seek a common understanding of priorities and to coordinate regulatory efforts to be accomplished in the upcoming year.

(b) *Unified Regulatory Agenda.* For purposes of this subsection, the term "agency" or "agencies" shall also include those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(10). Each agency shall prepare an agenda of all regulations under development or review, at a time and in a manner specified by the Administrator of OIRA. The description of each regulatory action shall contain, at a minimum, a regulation identifier number, a brief summary of the action, the legal authority for the action, any legal deadline for the action, and the name and telephone number of a knowledgeable agency official. Agencies may incorporate the information required under 5 U.S.C. 602 and 41 U.S.C. 402 into these agendas.

(c) *The Regulatory Plan.* For purposes of this subsection, the term "agency" or "agencies" shall also include those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(10). (1) As part of the Unified Regulatory Agenda, beginning in 1994, each agency shall prepare a Regulatory Plan (Plan) of the most important significant regulatory actions that the agency reasonably expects to issue in proposed or final form in that fiscal year or thereafter. The Plan shall be approved personally by the agency head and shall contain at a minimum:

(A) A statement of the agency's regulatory objectives and priorities and how they relate to the President's priorities;

(B) A summary of each planned significant regulatory action including, to the extent possible, alternatives to be considered and preliminary estimates of the anticipated costs and benefits;

(C) A summary of the legal basis for each such action, including whether any aspect of the action is required by statute or court order;

(D) A statement of the need for each such action and, if applicable, how the action will reduce risks to public health, safety, or the environment, as well as how the magnitude of the risk addressed by the action relates to other risks within the jurisdiction of the agency;

(E) The agency's schedule for action, including a statement of any applicable statutory or judicial deadlines; and

(F) The name, address, and telephone number of a person the public may contact for additional information about the planned regulatory action.

(2) Each agency shall forward its Plan to OIRA by June 1st of each year.

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(3) Within 10 calendar days after OIRA has received an agency's Plan, OIRA shall circulate it to other affected agencies, the Advisors, and the Vice President.

(4) An agency head who believes that a planned regulatory action of another agency may conflict with its own policy or action taken or planned shall promptly notify, in writing, the Administrator of OIRA, who shall forward that communication to the issuing agency, the Advisors, and the Vice President.

(5) If the Administrator of OIRA believes that a planned regulatory action of an agency may be inconsistent with the President's priorities or the principles set forth in this Executive order or may be in conflict with any policy or action taken or planned by another agency, the Administrator of OIRA shall promptly notify, in writing, the affected agencies, the Advisors, and the Vice President.

(6) The Vice President, with the Advisors' assistance, may consult with the heads of agencies with respect to their Plans and, in appropriate instances, request further consideration or inter-agency coordination.

(7) The Plans developed by the issuing agency shall be published annually in the October publication of the Unified Regulatory Agenda. This publication shall be made available to the Congress; State, local, and tribal governments; and the public. Any views on any aspect of any agency Plan, including whether any planned regulatory action might conflict with any other planned or existing regulation, impose any unintended consequences on the public, or confer any unclaimed benefits on the public, should be directed to the issuing agency, with a copy to OIRA.

(d) *Regulatory Working Group.* Within 30 days of the date of this Executive order, the Administrator of OIRA shall convene a Regulatory Working Group ("Working Group"), which shall consist of representatives of the heads of each agency that the Administrator determines to have significant domestic regulatory responsibility, the Advisors, and the Vice President. The Administrator of OIRA shall chair the Working Group and shall periodically advise the Vice President on the activities of the Working Group. The Working Group shall serve as a forum to assist agencies in identifying and analyzing important regulatory issues (including, among others (1) the development of innovative regulatory techniques, (2) the methods, efficacy, and utility of comparative risk assessment in regulatory decision-making, and (3) the development of short forms and other streamlined regulatory approaches for small businesses and other entities). The Working Group shall meet at least quarterly and may meet as a whole or in subgroups of agencies with an interest in particular issues or subject areas. To inform its discussions, the Working Group may commission analytical studies and reports by OIRA, the Administrative Conference of the United States, or any other agency.

(e) *Conferences*. The Administrator of OIRA shall meet quarterly with representatives of State, local, and tribal governments to identify both existing and proposed regulations that may uniquely or significantly affect those governmental entities. The Administrator of OIRA shall also convene, from time to time, conferences with representatives of businesses, nongovernmental organizations, and the public to discuss regulatory issues of common concern.

**Sec. 5.** *Existing Regulations*. In order to reduce the regulatory burden on the American people, their families, their communities, their State, local, and tribal governments, and their industries; to determine whether regulations promulgated by the executive branch of the Federal Government have become unjustified or unnecessary as a result of changed circumstances; to confirm that regulations are both compatible with each other and not duplicative or inappropriately burdensome in the aggregate; to ensure that all regulations are consistent with the President's priorities and the principles set forth in this Executive order, within applicable law; and to otherwise improve the effectiveness of existing regulations: (a) Within 90 days of the date of this Executive order, each agency shall submit to OIRA a program, consistent with its resources and regulatory priorities, under which the agency will periodically review its existing significant regulations to determine whether any such regulations should be modified or eliminated so as to make the agency's regulatory program more effective in achieving the regulatory objectives, less burdensome, or in greater alignment with the President's priorities and the principles set forth in this Executive order. Any significant regulations selected for review shall be included in the agency's annual Plan. The agency shall also identify

any legislative mandates that require the agency to promulgate or continue to impose regulations that the agency believes are unnecessary or outdated by reason of changed circumstances.

(b) The Administrator of OIRA shall work with the Regulatory Working Group and other interested entities to pursue the objectives of this section. State, local, and tribal governments are specifically encouraged to assist in the identification of regulations that impose significant or unique burdens on those governmental entities and that appear to have outlived their justification or be otherwise inconsistent with the public interest.

(c) The Vice President, in consultation with the Advisors, may identify for review by the appropriate agency or agencies other existing regulations of an agency or groups of regulations of more than one agency that affect a particular group, industry, or sector of the economy, or may identify legislative mandates that may be appropriate for reconsideration by the Congress.

**Sec. 6.** *Centralized Review of Regulations.* The guidelines set forth below shall apply to all regulatory actions, for both new and existing regulations, by agencies other than those agencies specifically exempted by the Administrator of OIRA:

(a) *Agency Responsibilities.* (1) Each agency shall (consistent with its own rules, regulations, or procedures) provide the public with meaningful participation in the regulatory process. In particular, before issuing a notice of proposed rulemaking, each agency should, where appropriate, seek the involvement of those who are intended to benefit from and those expected to be burdened by any regulation (including, specifically, State, local, and tribal officials). In addition, each agency should afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of not less than 60 days. Each agency also is directed to explore and, where appropriate, use consensual mechanisms for developing regulations, including negotiated rulemaking.

(2) Within 60 days of the date of this Executive order, each agency head shall designate a Regulatory Policy Officer who shall report to the agency head. The Regulatory Policy Officer shall be involved at each stage of the regulatory process to foster the development of effective, innovative, and least burdensome regulations and to further the principles set forth in this Executive order.

(3) In addition to adhering to its own rules and procedures and to the requirements of the Administrative Procedure Act, the Regulatory Flexibility Act, the Paperwork Reduction Act, and other applicable law, each agency shall develop its regulatory actions in a timely fashion and adhere to the following procedures with respect to a regulatory action:

(A) Each agency shall provide OIRA, at such times and in the manner specified by the Administrator of OIRA, with a list of its planned regulatory actions, indicating those which the agency believes are significant regulatory actions within the meaning of this Executive order. Absent a material change in the development of the planned regulatory action, those not designated as significant will not be subject to review under this section unless, within 10 working days of receipt of the list, the Administrator of OIRA notifies the agency that OIRA has determined that a planned regulation is a significant regulatory action within the meaning of this Executive order. The Administrator of OIRA may waive review of any planned regulatory action designated by the agency as significant, in which case the agency need not further comply with subsection (a)(3)(B) or subsection (a)(3) (C) of this section.

(B) For each matter identified as, or determined by the Administrator of OIRA to be, a significant regulatory action, the issuing agency shall provide to OIRA:

(i) The text of the draft regulatory action, together with a reasonably detailed description of the need for the regulatory action and an explanation of how the regulatory action will meet that need; and

(ii) An assessment of the potential costs and benefits of the regulatory action, including an explanation of the manner in which the regulatory action is consistent with a statutory mandate and, to the extent permitted by law, promotes the President's priorities and avoids undue interference with State, local, and tribal governments in the exercise of their governmental functions.

(C) For those matters identified as, or determined by the Administrator of OIRA to be, a significant regulatory action within the scope of section 3(f)(1), the agency shall also provide to OIRA the following additional information developed as part of the agency's decision-making process (unless prohibited by law):

(i) An assessment, including the underlying analysis, of benefits anticipated from the regulatory action (such as, but not limited to, the promotion of the efficient functioning of the economy and private markets, the enhancement of health and safety, the protection of the natural environment, and the elimination or reduction of discrimination or bias) together with, to the extent feasible, a quantification of those benefits;

(ii) An assessment, including the underlying analysis, of costs anticipated from the regulatory action (such as, but not limited to, the direct cost both to the government in administering the regulation and to businesses and others in complying with the regulation, and any adverse effects on the efficient functioning of the economy, private markets (including productivity, employment, and competitiveness), health, safety, and the natural environment), together with, to the extent feasible, a quantification of those costs; and

(iii) An assessment, including the underlying analysis, of costs and benefits of potentially effective and reasonably feasible alternatives to the planned regulation, identified by the agencies or the public (including improving the current regulation and reasonably viable nonregulatory actions), and an explanation why the planned regulatory action is preferable to the identified potential alternatives.

(D) In emergency situations or when an agency is obligated by law to act more quickly than normal review procedures allow, the agency shall notify OIRA as soon as possible and, to the extent practicable, comply with subsections (a)(3)(B) and (C) of this section. For those regulatory actions that are governed by a statutory or court-imposed deadline, the agency shall, to the extent practicable, schedule rulemaking proceedings so as to permit sufficient time for OIRA to conduct its review, as set forth below in subsection (b)(2) through (4) of this section.

(E) After the regulatory action has been published in the **Federal Register** or otherwise issued to the public, the agency shall:

(i) Make available to the public the information set forth in subsections (a)(3)(B) and (C);

(ii) Identify for the public, in a complete, clear, and simple manner, the substantive changes between the draft submitted to OIRA for review and the action subsequently announced; and

(iii) Identify for the public those changes in the regulatory action that were made at the suggestion or recommendation of OIRA.

(F) All information provided to the public by the agency shall be in plain, understandable language.

(b) *OIRA Responsibilities*. The Administrator of OIRA shall provide meaningful guidance and oversight so that each agency's regulatory actions are consistent with applicable law, the President's priorities, and the principles set forth in this Executive order and do not conflict with the policies or actions of another agency. OIRA shall, to the extent permitted by law, adhere to the following guidelines:

(1) OIRA may review only actions identified by the agency or by OIRA as significant regulatory actions under subsection (a)(3)(A) of this section.

(2) OIRA shall waive review or notify the agency in writing of the results of its review within the following time periods:

(A) For any notices of inquiry, advance notices of proposed rulemaking, or other preliminary regulatory actions prior to a Notice of Proposed Rulemaking, within 10 working days after the date of submission of the draft action to OIRA;

(B) For all other regulatory actions, within 90 calendar days after the date of submission of the information set forth in subsections (a)(3)(B) and (C) of this section, unless OIRA has previously reviewed this information and, since that review, there has been no material change in the facts and circumstances upon which the regulatory action is based, in which case, OIRA shall complete its review within 45 days; and

(C) The review process may be extended (1) once by no more than 30 calendar days upon the written approval of the Director and (2) at the request of the agency head.

(3) For each regulatory action that the Administrator of OIRA returns to an agency for further consideration of some or all of its provisions, the Administrator of OIRA shall provide the issuing agency a written explanation for such return, setting forth the pertinent provision of this Executive order on which OIRA is relying. If the agency head disagrees with some or all of the bases for the return, the agency head shall so inform the Administrator of OIRA in writing.

(4) Except as otherwise provided by law or required by a Court, in order to ensure greater openness, accessibility, and accountability in the regulatory review process, OIRA shall be governed by the following disclosure requirements:

(A) Only the Administrator of OIRA (or a particular designee) shall receive oral communications initiated by persons not employed by the executive branch of the Federal Government regarding the substance of a regulatory action under OIRA review;

(B) All substantive communications between OIRA personnel and persons not employed by the executive branch of the Federal Government regarding a regulatory action under review shall be governed by the following guidelines: (i) A representative from the issuing agency shall be invited to any meeting between OIRA personnel and such person(s);

(ii) OIRA shall forward to the issuing agency, within 10 working days of receipt of the communication(s), all written communications, regardless of format, between OIRA personnel and any person who is not employed by the executive branch of the Federal Government, and the dates and names of individuals involved in all substantive oral communications (including meetings to which an agency representative was invited, but did not attend, and telephone conversations between OIRA personnel and any such persons); and

(iii) OIRA shall publicly disclose relevant information about such communication(s), as set forth below in subsection (b)(4) (C) of this section.

(C) OIRA shall maintain a publicly available log that shall contain, at a minimum, the following information pertinent to regulatory actions under review:

(i) The status of all regulatory actions, including if (and if so, when and by whom) Vice Presidential and Presidential consideration was requested;

(ii) A notation of all written communications forwarded to an issuing agency under subsection (b)(4)(B)(ii) of this section; and

(iii) The dates and names of individuals involved in all substantive oral communications, including meetings and telephone conversations, between OIRA personnel and any person not employed by the executive branch of the Federal Government, and the subject matter discussed during such communications.

(D) After the regulatory action has been published in the **Federal Register** or otherwise issued to the public, or after the agency has announced its decision not to publish or issue the regulatory action, OIRA shall make available to the public all documents exchanged between OIRA and the agency during the review by OIRA under this section.

(5) All information provided to the public by OIRA shall be in plain, understandable language.

**Sec. 7.** *Resolution of Conflicts.* To the extent permitted by law, disagreements or conflicts between or among agency heads or between OMB and any agency that cannot be resolved by the Administrator of OIRA shall be resolved by the President, or by the Vice President acting at the request of the President, with the relevant agency head (and, as appropriate, other interested government officials). Vice Presidential and Presidential consideration of such disagreements may be initiated only by the Director, by the head of the issuing agency, or by the head of an agency that has a significant interest in the regulatory action at issue. Such review will not be undertaken at the request of other persons, entities, or their agents.

Resolution of such conflicts shall be informed by recommendations developed by the Vice President, after consultation with the Advisors (and other executive branch officials or personnel whose responsibilities to the President include the subject matter at issue). The development of these recommendations shall be concluded within 60 days after review has been requested.

During the Vice Presidential and Presidential review period, communications with any person not employed by the Federal Government relating to the substance of the regulatory action under review and directed to the Advisors or their staffs or to the staff of the Vice President shall be in writing and shall be forwarded by the recipient to the affected agency(ies) for inclusion in the public docket(s). When the communication is not in writing, such Advisors or staff members shall inform the outside party that the matter is under review and that any comments should be submitted in writing.

At the end of this review process, the President, or the Vice President acting at the request of the President, shall notify the affected agency and the Administrator of OIRA of the President's decision with respect to the matter.

**Sec. 8.** *Publication.* Except to the extent required by law, an agency shall not publish in the **Federal Register** or otherwise issue to the public any regulatory action that is subject to review under section 6 of this Executive order until (1) the Administrator of OIRA notifies the agency that OIRA has waived its review of the action or has completed its review without any requests for further consideration, or (2) the applicable time period in section 6(b)(2) expires without OIRA having notified the agency that it is returning the regulatory action for further consideration under section 6(b)(3), whichever occurs first. If the terms of the preceding sentence have not been satisfied and an agency wants to publish or otherwise issue a regulatory action, the head of that agency may request Presidential consideration through the Vice President, as provided under section 7 of this order. Upon receipt of this request, the Vice President shall notify OIRA and the Advisors. The guidelines and time period set forth in section 7 shall apply to the publication of regulatory actions for which Presidential consideration has been sought.

**Sec. 9.** *Agency Authority.* Nothing in this order shall be construed as displacing the agencies' authority or responsibilities, as authorized by law.

**Sec. 10.** *Judicial Review.* Nothing in this Executive order shall affect any otherwise available judicial review of agency action. This Executive order is intended only to improve the internal management of the Federal Government and does not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

**Sec. 11.** *Revocations.* Executive Orders Nos. 12291 and 12498; all amendments to those Executive orders; all guidelines issued under those orders; and any exemptions from those orders heretofore granted for any category of rule are revoked.

WILLIAM CLINTON

THE WHITE HOUSE,September 30, 1993.

**Editorial Note:** For the President's remarks on signing this Executive order, see issue 39 of the Weekly Compilation of Presidential Documents.

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Supplemented by    Consultation and Coordination With Indian Tribal Governments,    Pres.Exec.Order,    November 6, 2000

61 FR 4729, Exec. Order No. 12988, 1996 WL 33673667(Pres.)

Executive Order 12988

Civil Justice Reform

February 5, 1996

 **\*4729**   **\*4729**  By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 301 of title 3, United States Code, and in order to improve access to justice for all persons who wish to avail themselves of court and administrative adjudicatory tribunals to resolve disputes, to facilitate the just and efficient resolution of civil claims involving the United States Government, to encourage the filing of only meritorious civil claims, to improve legislative and regulatory drafting to reduce needless litigation, to promote fair and prompt adjudication before administrative tribunals, and to provide a model for similar reforms of litigation practices in the private sector and in various states, it is hereby ordered as follows:

**Section 1.** *Guidelines to Promote Just and Efficient Government Civil Litigation.* To promote the just and efficient resolution of civil claims, those Federal agencies and litigation counsel that conduct or otherwise participate in civil litigation on behalf of the United States Government in Federal court shall respect and adhere to the following guidelines during the conduct of such litigation:

(a) *Pre-filing Notice of a Complaint.* No litigation counsel shall file a complaint initiating civil litigation without first making a reasonable effort to notify all disputants about the nature of the dispute and to attempt to achieve a settlement, or confirming that the referring agency that previously handled the dispute has made a reasonable effort to notify the disputants and to achieve a settlement or has used its conciliation processes.

(b) *Settlement Conferences.* As soon as practicable after ascertaining the nature of a dispute in litigation, and throughout the litigation, litigation counsel shall evaluate settlement possibilities and make reasonable efforts to settle the litigation. Such efforts shall include offering to participate in a settlement conference or moving the court for a conference pursuant to Rule 16 of the Federal Rules of Civil Procedure in an attempt to resolve the dispute without additional civil litigation.

(c) *Alternative Methods of Resolving the Dispute in Litigation.* Litigation counsel shall make reasonable attempts to resolve a dispute expeditiously and properly before proceeding to trial.

(1) Whenever feasible, claims should be resolved through informal discussions, negotiations, and settlements rather than through utilization of any formal court proceeding. Where the benefits of Alternative Dispute Resolution ("ADR") may be derived, and after consultation with the agency referring the matter, litigation counsel should suggest the use of an appropriate ADR technique to the parties.

(2) It is appropriate to use ADR techniques or processes to resolve claims of or against the United States or its agencies, after litigation counsel determines that the use of a particular technique is warranted in the context of a particular claim or claims, and that such use will materially contribute to the prompt, fair, and efficient resolution of the claims.

(3) To facilitate broader and effective use of informal and formal ADR methods, litigation counsel should be trained in ADR techniques.

**\*4730   \*4730**   (d) *Discovery*. To the extent practical, litigation counsel shall make every reasonable effort to streamline and expedite discovery in cases under counsel's supervision and control.

(1) *Review of Proposed Document Requests*. Each agency within the executive branch shall establish a coordinated procedure for the conduct and review of document discovery undertaken in litigation directly by that agency when that agency is litigation counsel. The procedure shall include, but is not necessarily limited to, review by a senior lawyer prior to service or filing of the request in litigation to determine that the request is not cumulative or duplicative, unreasonable, oppressive, unduly burdensome or expensive, taking into account the requirements of the litigation, the amount in controversy, the importance of the issues at stake in the litigation, and whether the documents can be obtained from some other source that is more convenient, less burdensome, or less expensive.

(2) *Discovery Motions*. Before petitioning a court to resolve a discovery motion or petitioning a court to impose sanctions for discovery abuses, litigation counsel shall attempt to resolve the dispute with opposing counsel. If litigation counsel makes a discovery motion concerning the dispute, he or she shall represent in that motion that any attempt at resolution was unsuccessful or impracticable under the circumstances.

(e) *Sanctions*. Litigation counsel shall take steps to seek sanctions against opposing counsel and opposing parties where appropriate.

(1) Litigation counsel shall evaluate filings made by opposing parties and, where appropriate, shall petition the court to impose sanctions against those responsible for abusive practices.

(2) Prior to filing a motion for sanctions, litigation counsel shall submit the motion for review to the sanctions officer, or his or her designee, within the litigation counsel's agency. Such officer or designee shall be a senior supervising attorney within the agency, and shall be licensed to practice law before a State court, courts of the District of Columbia, or courts of any territory or Commonwealth of the United States. The sanctions officer or designee shall also review motions for sanctions that are filed against litigation counsel, the United States, its agencies, or its officers.

(f) *Improved Use of Litigation Resources*. Litigation counsel shall employ efficient case management techniques and shall make reasonable efforts to expedite civil litigation in cases under that counsel's supervision and control. This includes but is not limited to:

(1) making reasonable efforts to negotiate with other parties s about, and stipulate to, facts that are not in dispute;

(2) reviewing and revising pleadings and other filings to ensure that they are accurate and that they reflect a narrowing of issues, if any, that has resulted from discovery;

(3) requesting early trial dates where practicable;

(4) moving for summary judgment in every case where the movant would be likely to prevail, or where the motion is likely to narrow the issues to be tried; and

(5) reviewing and revising pleadings and other filings to ensure that unmeritorious threshold defenses and jurisdictional arguments, resulting in unnecessary delay, are not raised.

**WESTLAW**   © 2020 Thomson Reuters. No claim to original U.S. Government Works.    AR.07387    2

**Sec. 2.** *Government Pro Bono and Volunteer Service.* All Federal agencies should develop appropriate programs to encourage and facilitate pro bono legal and other volunteer service by government employees to be performed on their own time, including attorneys, as permitted by statute, regulation, or other rule or guideline.

**Sec. 3.** *Principles to Enact Legislation and Promulgate Regulations Which Do Not Unduly Burden the Federal Court System.*
 **\*4731   \*4731** (a)  *General Duty to Review Legislation and Regulations.*  Within current budgetary constraints and existing executive branch coordination mechanisms and procedures established in OMB Circular A-19 and Executive Order No. 12866, each agency promulgating new regulations, reviewing existing regulations, developing legislative proposals concerning regulations, and developing new legislation shall adhere to the following requirements:

(1) The agency's proposed legislation and regulations shall be reviewed by the agency to eliminate drafting errors and ambiguity;

(2) The agency's proposed legislation and regulations shall be written to minimize litigation; and

(3) The agency's proposed legislation and regulations shall provide a clear legal standard for affected conduct rather than a general standard, and shall promote simplification and burden reduction.

(b) *Specific Issues for Review.* In conducting the reviews required by subsection (a), each agency formulating proposed legislation and regulations shall make every reasonable effort to ensure:

(1) that the legislation, as appropriate—

(A) specifies whether all causes of action arising under the law are subject to statutes of limitations;

(B) specifies in clear language the preemptive effect, if any, to be given to the law;

(C) specifies in clear language the effect on existing Federal law, if any, including all provisions repealed, circumscribed, displaced, impaired, or modified;

(D) provides a clear legal standard for affected conduct;

(E) specifies whether private arbitration and other forms of private dispute resolution are appropriate under enforcement and relief provisions; subject to constitutional requirements;

(F) specifies whether the provisions of the law are severable e if one or more of them is found to be unconstitutional;

(G) specifies in clear language the retroactive effect, if any, to be given to the law;

(H) specifies in clear language the applicable burdens of proof;

(I) specifies in clear language whether it grants private parties a right to sue and, if so, the relief available and the conditions and terms for authorized awards of attorney's fees, if any;

(J) specifies whether State courts have jurisdiction under the law and, if so, whether and under what conditions an action would be removable to Federal court;

(K) specifies whether administrative proceedings are to be required before parties may file suit in court and, if so, describes those proceedings and requires the exhaustion of administrative remedies;

(L) sets forth the standards governing the assertion of personal jurisdiction, if any;

(M) defines key statutory terms, either explicitly or by reference to other statutes that explicitly define those terms;

(N) specifies whether the legislation applies to the Federal Government or its agencies;

(O) specifies whether the legislation applies to States, territories, the District of Columbia, and the Commonwealths of Puerto Rico and of the Northern Mariana Islands;

(P) specifies what remedies are available such as money damages, civil penalties, injunctive relief, and attorney's fees; and

 *4732   *4732  (Q) addresses other important issues affecting clarity and general draftsmanship of legislation set forth by the Attorney General, with the concurrence of the Director of the Office of Management and Budget ("OMB") and after consultation with affected agencies, that are determined to be in accordance with the purposes of this order.

(2) that the regulation, as appropriate—

(A) specifies in clear language the preemptive effect, if any, to be given to the regulation;

(B) specifies in clear language the effect on existing Federal law or regulation, if any, including all provisions repealed, circumscribed, displaced, impaired, or modified;

(C) provides a clear legal standard for affected conduct rather than a general standard, while promoting simplification and burden reduction;

(D) specifies in clear language the retroactive effect, if any, to be given to the regulation;

(E) specifies whether administrative proceedings are to be required before parties may file suit in court and, if so, describes those proceedings and requires the exhaustion of administrative remedies;

(F) defines key terms, either explicitly or by reference to other regulations or statutes that explicitly define those items; and

(G) addresses other important issues affecting clarity and general draftsmanship of regulations set forth by the Attorney General, with the concurrence of the Director of OMB and after consultation with affected agencies, that are determined to be in accordance with the purposes of this order.

(c) *Agency Review.* The agencies shall review such draft legislation or regulation to determine that either the draft legislation or regulation meets the applicable standards provided in subsections (a) and (b) of this section, or it is unreasonable to require the particular piece of draft legislation or regulation to meet one or more of those standards.


**Sec. 4.** *Principles to Promote Just and Efficient Administrative Adjudications.*
(a) *Implementation of Administrative Conference Recommendations.* In order to promote just and efficient resolution of disputes, an agency that adjudicates administrative claims shall, to the extent reasonable and practicable, and when not in conflict with other sections of this order, implement the recommendations of the Administrative Conference of the United States, entitled "Case Management as a Tool for Improving Agency Adjudication," as contained in 1 C.F.R. 305.86-7 (1991).

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(b) *Improvements in Administrative Adjudication.* All Federal agencies should review their administrative adjudicatory processes and develop specific procedures to reduce delay in decision-making, to facilitate self-representation where appropriate, to expand non-lawyer counseling and representation where appropriate, and to invest maximum discretion in fact-finding officers to encourage appropriate settlement of claims as early as possible.

(c) *Bias.* All Federal agencies should review their administrative adjudicatory processes to identify any type of bias on the part of the decision-makers that results in an injustice to persons who appear before administrative adjudicatory tribunals; regularly train all fact-finders, administrative law judges, and other decision-makers to eliminate such bias; and establish appropriate mechanisms to receive and resolve complaints of such bias from persons who appear before administrative adjudicatory tribunals.

(d) *Public Education.* All Federal agencies should develop effective and simple methods, including the use of electronic technology, to educate the public about its claims/benefits policies and procedures.

**Sec. 5.** *Coordination by the Department of Justice.*
(a) The Attorney General shall coordinate efforts by Federal agencies to implement sections 1, 2 and 4 of this order.

 **\*4733    \*4733**  (b) To implement the principles and purposes announced by this order, the Attorney General is authorized to issue guidelines implementing sections 1 and 4 of this order for the Department of Justice. Such guidelines shall serve as models for internal guidelines that may be issued by other agencies pursuant to this order.

**Sec. 6.** *Definitions.* For purposes of this order:
(a) The term "agency" shall be defined as that term is defined in section 105 of title 5, United States Code.

(b) The term "litigation counsel" shall be defined as the trial counsel or the office in which such trial counsel is employed, such as the United States Attorney's Office for the district in which the litigation is pending or a litigating division of the Department of Justice. Special Assistant United States Attorneys are included within this definition. Those agencies authorized by law to represent themselves in court without assistance from the Department of Justice are also included in this definition, as are private counsel hired by any Federal agency to conduct litigation on behalf of the agency or the United States.

**Sec. 7.** *No Private Rights Created.* This order is intended only to improve the internal management of the executive branch in resolving disputes, conducting litigation in a reasonable and just manner, and reviewing legislation and regulations. This order shall not be construed as creating any right or benefit, substantive or procedural, enforceable at law or in equity by a party against the United States, its agencies, its officers, or any other person. This order shall not be construed to create any right to judicial review involving the compliance or noncompliance of the United States, its agencies, its officers, or any other person with this order. Nothing in this order shall be construed to obligate the United States to accept a particular settlement or resolution of a dispute, to alter its standards for accepting settlements, to forego seeking a consent decree or other relief, or to alter any existing delegation of settlement or litigating authority.

**Sec. 8.** *Scope.*
(a) *No Applicability to Criminal Matters or Proceedings in Foreign Courts.* This order is applicable to civil matters only. It is not intended to affect criminal matters, including enforcement of criminal fines or judgments of criminal forfeiture. This order does not apply to litigation brought by or against the United States in foreign courts or tribunals.

(b) *Application of Notice Provision.* Notice pursuant to subsection (a) of section 1 is not required (1) in any action to seize or forfeit assets subject to forfeiture or in any action to seize property; (2) in any bankruptcy, insolvency, conservatorship, receivership, or liquidation proceeding; (3) when the assets that are the subject of the action or that would satisfy the judgment are subject to flight, dissipation, or destruction; (4) when the defendant is subject to flight; (5) when, as determined by litigation counsel, exigent circumstances make providing such notice impracticable or such notice would otherwise defeat the purpose of the litigation, such as in actions seeking temporary restraining orders or preliminary injunctive relief; or (6) in those limited classes of cases where the Attorney General determines that providing such notice would defeat the purpose of the litigation.

(c) *Additional Guidance as to Scope.* The Attorney General shall have the authority to issue further guidance as to the scope of this order, except section 3, consistent with the purposes of this order.

**Sec. 9.** *Conflicts with Other Rules.*Nothing in this order shall be construed to require litigation counsel or any agency to act in a manner contrary to the Federal Rules of Civil Procedure, Tax Court Rules of Practice and Procedure, State or Federal law, other applicable rules of practice or procedure, or court order.

**Sec. 10.** *Privileged Information.* Nothing in this order shall compel or authorize the disclosure of privileged information, sensitive law enforcement infor **\*4734** mation, **\*4734** information affecting national security, or information the disclosure of which is prohibited by law.

**Sec. 11.** *Effective Date.* This order shall become effective 90 days after the date of signature. This order shall not apply to litigation commenced prior to the effective date.

**Sec. 12.** *Revocation.* Executive Order No. 12778 is hereby revoked.

WILLIAM J. CLINTON

THE WHITE HOUSE,February 5, 1996.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

64 FR 43255, Exec. Order No. 13132, 1999 WL 33943706(Pres.)

Executive Order 13132

Federalism

August 4, 1999

**\*43255**  By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to guarantee the division of governmental responsibilities between the national government and the States that was intended by the Framers of the Constitution, to ensure that the principles of federalism established by the Framers guide the executive departments and agencies in the formulation and implementation of policies, and to further the policies of the Unfunded Mandates Reform Act, it is hereby ordered as follows:

**Section 1.** *Definitions.* For purposes of this order:

(a) "Policies that have federalism implications" refers to regulations, legislative comments or proposed legislation, and other policy statements or actions that have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government.

(b) "State" or "States" refer to the States of the United States of America, individually or collectively, and, where relevant, to State governments, including units of local government and other political subdivisions established by the States.

(c) "Agency" means any authority of the United States that is an "agency" under 44 U.S.C. 3502(1), other than those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(5).

(d) "State and local officials" means elected officials of State and local governments or their representative national organizations.

**Sec. 2.** *Fundamental Federalism Principles.* In formulating and implementing policies that have federalism implications, agencies shall be guided by the following fundamental federalism principles:

(a) Federalism is rooted in the belief that issues that are not national in scope or significance are most appropriately addressed by the level of government closest to the people.

(b) The people of the States created the national government and delegated to it enumerated governmental powers. All other sovereign powers, save those expressly prohibited the States by the Constitution, are reserved to the States or to the people.

(c) The constitutional relationship among sovereign governments, State and national, is inherent in the very structure of the Constitution and is formalized in and protected by the Tenth Amendment to the Constitution.

(d) The people of the States are free, subject only to restrictions in the Constitution itself or in constitutionally authorized Acts of Congress, to define the moral, political, and legal character of their lives.

(e) The Framers recognized that the States possess unique authorities, qualities, and abilities to meet the needs of the people and should function as laboratories of democracy.

**\*43256**  (f) The nature of our constitutional system encourages a healthy diversity in the public policies adopted by the people of the several States according to their own conditions, needs, and desires. In the search for enlightened public policy, individual

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

States and communities are free to experiment with a variety of approaches to public issues. One-size-fits-all approaches to public policy problems can inhibit the creation of effective solutions to those problems.

(g) Acts of the national government—whether legislative, executive, or judicial in nature—that exceed the enumerated powers of that government under the Constitution violate the principle of federalism established by the Framers.

(h) Policies of the national government should recognize the responsibility of—and should encourage opportunities for—individuals, families, neighborhoods, local governments, and private associations to achieve their personal, social, and economic objectives through cooperative effort.

(i) The national government should be deferential to the States when taking action that affects the policymaking discretion of the States and should act only with the greatest caution where State or local governments have identified uncertainties regarding the constitutional or statutory authority of the national government.

**Sec. 3.** *Federalism Policymaking Criteria.* In addition to adhering to the fundamental federalism principles set forth in section 2, agencies shall adhere, to the extent permitted by law, to the following criteria when formulating and implementing policies that have federalism implications:
(a) There shall be strict adherence to constitutional principles. Agencies shall closely examine the constitutional and statutory authority supporting any action that would limit the policymaking discretion of the States and shall carefully assess the necessity for such action. To the extent practicable, State and local officials shall be consulted before any such action is implemented. Executive Order 12372 of July 14, 1982 ("Intergovernmental Review of Federal Programs") remains in effect for the programs and activities to which it is applicable.

(b) National action limiting the policymaking discretion of the States shall be taken only where there is constitutional and statutory authority for the action and the national activity is appropriate in light of the presence of a problem of national significance. Where there are significant uncertainties as to whether national action is authorized or appropriate, agencies shall consult with appropriate State and local officials to determine whether Federal objectives can be attained by other means.

(c) With respect to Federal statutes and regulations administered by the States, the national government shall grant the States the maximum administrative discretion possible. Intrusive Federal oversight of State administration is neither necessary nor desirable.

(d) When undertaking to formulate and implement policies that have federalism implications, agencies shall:

(1) encourage States to develop their own policies to achieve program objectives and to work with appropriate officials in other States;

(2) where possible, defer to the States to establish standards;

(3) in determining whether to establish uniform national standards, consult with appropriate State and local officials as to the need for national standards and any alternatives that would limit the scope of national standards or otherwise preserve State prerogatives and authority; and

(4) where national standards are required by Federal statutes, consult with appropriate State and local officials in developing those standards.

**\*43257  Sec. 4.** *Special Requirements for Preemption.* Agencies, in taking action that preempts State law, shall act in strict accordance with governing law.

(a) Agencies shall construe, in regulations and otherwise, a Federal statute to preempt State law only where the statute contains an express preemption provision or there is some other clear evidence that the Congress intended preemption of State law, or where the exercise of State authority conflicts with the exercise of Federal authority under the Federal statute.

(b) Where a Federal statute does not preempt State law (as addressed in subsection (a) of this section), agencies shall construe any authorization in the statute for the issuance of regulations as authorizing preemption of State law by rulemaking only when the exercise of State authority directly conflicts with the exercise of Federal authority under the Federal statute or there is clear evidence to conclude that the Congress intended the agency to have the authority to preempt State law.

(c) Any regulatory preemption of State law shall be restricted to the minimum level necessary to achieve the objectives of the statute pursuant to which the regulations are promulgated.

(d) When an agency foresees the possibility of a conflict between State law and Federally protected interests within its area of regulatory responsibility, the agency shall consult, to the extent practicable, with appropriate State and local officials in an effort to avoid such a conflict.

(e) When an agency proposes to act through adjudication or rulemaking to preempt State law, the agency shall provide all affected State and local officials notice and an opportunity for appropriate participation in the proceedings.

**Sec. 5.** *Special Requirements for Legislative Proposals.* Agencies shall not submit to the Congress legislation that would:

(a) directly regulate the States in ways that would either interfere with functions essential to the States' separate and independent existence or be inconsistent with the fundamental federalism principles in section 2;

(b) attach to Federal grants conditions that are not reasonably related to the purpose of the grant; or

(c) preempt State law, unless preemption is consistent with the fundamental federalism principles set forth in section 2, and unless a clearly legitimate national purpose, consistent with the federalism policymaking criteria set forth in section 3, cannot otherwise be met.

**Sec. 6.** *Consultation.*

(a) Each agency shall have an accountable process to ensure meaningful and timely input by State and local officials in the development of regulatory policies that have federalism implications. Within 90 days after the effective date of this order, the head of each agency shall designate an official with principal responsibility for the agency's implementation of this order and that designated official shall submit to the Office of Management and Budget a description of the agency's consultation process.

(b) To the extent practicable and permitted by law, no agency shall promulgate any regulation that has federalism implications, that imposes substantial direct compliance costs on State and local governments, and that is not required by statute, unless:

(1) funds necessary to pay the direct costs incurred by the State and local governments in complying with the regulation are provided by the Federal Government; or

(2) the agency, prior to the formal promulgation of the regulation,

(A) consulted with State and local officials early in the process of developing the proposed regulation;

 **\*43258** ' (B) in a separately identified portion of the preamble to the regulation as it is to be issued in the **Federal Register**, provides to the Director of the Office of Management and Budget a federalism summary impact statement, which consists of a description of the extent of the agency's prior consultation with State and local officials, a summary of the nature of their concerns and the agency's position supporting the need to issue the regulation, and a statement of the extent to which the concerns of State and local officials have been met; and

(C) makes available to the Director of the Office of Management and Budget any written communications submitted to the agency by State and local officials.

(c) To the extent practicable and permitted by law, no agency shall promulgate any regulation that has federalism implications and that preempts State law, unless the agency, prior to the formal promulgation of the regulation,

(1) consulted with State and local officials early in the process of developing the proposed regulation;

(2) in a separately identified portion of the preamble to the regulation as it is to be issued in the **Federal Register**, provides to the Director of the Office of Management and Budget a federalism summary impact statement, which consists of a description of the extent of the agency's prior consultation with State and local officials, a summary of the nature of their concerns and the agency's position supporting the need to issue the regulation, and a statement of the extent to which the concerns of State and local officials have been met; and

(3) makes available to the Director of the Office of Management and Budget any written communications submitted to the agency by State and local officials.

**Sec. 7.** *Increasing Flexibility for State and Local Waivers.*

(a) Agencies shall review the processes under which State and local governments apply for waivers of statutory and regulatory requirements and take appropriate steps to streamline those processes.

(b) Each agency shall, to the extent practicable and permitted by law, consider any application by a State for a waiver of statutory or regulatory requirements in connection with any program administered by that agency with a general view toward increasing opportunities for utilizing flexible policy approaches at the State or local level in cases in which the proposed waiver is consistent with applicable Federal policy objectives and is otherwise appropriate.

(c) Each agency shall, to the extent practicable and permitted by law, render a decision upon a complete application for a waiver within 120 days of receipt of such application by the agency. If the application for a waiver is not granted, the agency shall provide the applicant with timely written notice of the decision and the reasons therefor.

(d) This section applies only to statutory or regulatory requirements that are discretionary and subject to waiver by the agency.

**Sec. 8.** *Accountability.*

(a) In transmitting any draft final regulation that has federalism implications to the Office of Management and Budget pursuant to Executive Order 12866 of September 30, 1993, each agency shall include a certification from the official designated to ensure compliance with this order stating that the requirements of this order have been met in a meaningful and timely manner.

(b) In transmitting proposed legislation that has federalism implications to the Office of Management and Budget, each agency shall include a certification from the official designated to ensure compliance with this order that all relevant requirements of this order have been met.

 **\*43259**  (c) Within 180 days after the effective date of this order, the Director of the Office of Management and Budget and the Assistant to the President for Intergovernmental Affairs shall confer with State and local officials to ensure that this order is being properly and effectively implemented.

**Sec. 9.** *Independent Agencies.* Independent regulatory agencies are encouraged to comply with the provisions of this order.

**Sec. 10.** *General Provisions.*
(a) This order shall supplement but not supersede the requirements contained in Executive Order 12372 ("Intergovernmental Review of Federal Programs"), Executive Order 12866 ("Regulatory Planning and Review"), Executive Order 12988 ("Civil Justice Reform"), and OMB Circular A-19.

(b) Executive Order 12612 ("Federalism"), Executive Order 12875 ("Enhancing the Intergovernmental Partnership"), Executive Order 13083 ("Federalism"), and Executive Order 13095 ("Suspension of Executive Order 13083") are revoked.

(c) This order shall be effective 90 days after the date of this order.

**Sec. 11.** *Judicial Review.* This order is intended only to improve the internal management of the executive branch, and is not intended to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, or any person.

WILLIAM J. CLINTON

THE WHITE HOUSE,August 4, 1999.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

Exec. Order No. 13563, 76 FR 3821, 2011 WL 176023(Pres.)

Executive Order 13563

Improving Regulation and Regulatory Review

January 18, 2011

**\*3821**  By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to improve regulation and regulatory review, it is hereby ordered as follows:

Section 1. General Principles of Regulation. (a) Our regulatory system must protect public health, welfare, safety, and our environment while promoting economic growth, innovation, competitiveness, and job creation. It must be based on the best available science. It must allow for public participation and an open exchange of ideas. It must promote predictability and reduce uncertainty. It must identify and use the best, most innovative, and least burdensome tools for achieving regulatory ends. It must take into account benefits and costs, both quantitative and qualitative. It must ensure that regulations are accessible, consistent, written in plain language, and easy to understand. It must measure, and seek to improve, the actual results of regulatory requirements.

(b) This order is supplemental to and reaffirms the principles, structures, and definitions governing contemporary regulatory review that were established in Executive Order 12866 of September 30, 1993. As stated in that Executive Order and to the extent permitted by law, each agency must, among other things: (1) propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs (recognizing that some benefits and costs are difficult to quantify); (2) tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives, taking into account, among other things, and to the extent practicable, the costs of cumulative regulations; (3) select, in choosing among alternative regulatory approaches, those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity); (4) to the extent feasible, specify performance objectives, rather than specifying the behavior or manner of compliance that regulated entities must adopt; and (5) identify and assess available alternatives to direct regulation, including providing economic incentives to encourage the desired behavior, such as user fees or marketable permits, or providing information upon which choices can be made by the public.

(c) In applying these principles, each agency is directed to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible. Where appropriate and permitted by law, each agency may consider (and discuss qualitatively) values that are difficult or impossible to quantify, including equity, human dignity, fairness, and distributive impacts.

Sec. 2. Public Participation. (a) Regulations shall be adopted through a process that involves public participation. To that end, regulations shall be based, to the extent feasible and consistent with law, on the open exchange of information and perspectives among State, local, and tribal officials, experts in relevant disciplines, affected stakeholders in the private sector, and the public as a whole.

(b) To promote that open exchange, each agency, consistent with Executive Order 12866 and other applicable legal requirements, shall endeavor to provide the public with an opportunity to participate in the regulatory process. To the extent feasible and permitted by law, each agency shall afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that should generally y3822be at least 60 days. To the extent feasible and permitted by law, each agency shall also provide, for both proposed and final rules, timely online access to the rulemaking docket on regulations.gov, including relevant scientific and technical findings, in an open format that can be easily searched and downloaded. For proposed rules, such access shall include, to the extent feasible and permitted by law, an opportunity for public comment on all pertinent parts of the rulemaking docket, including relevant scientific and technical findings.

(c) Before issuing a notice of proposed rulemaking, each agency, where feasible and appropriate, shall seek the views of those who are likely to be affected, including those who are likely to benefit from and those who are potentially subject to such rulemaking.

Sec. 3. Integration and Innovation. Some sectors and industries face a significant number of regulatory requirements, some of which may be redundant, inconsistent, or overlapping. Greater coordination across agencies could reduce these requirements, thus reducing costs and simplifying and harmonizing rules. In developing regulatory actions and identifying appropriate approaches, each agency shall attempt to promote such coordination, simplification, and harmonization. Each agency shall also seek to identify, as appropriate, means to achieve regulatory goals that are designed to promote innovation.

Sec. 4. Flexible Approaches. Where relevant, feasible, and consistent with regulatory objectives, and to the extent permitted by law, each agency shall identify and consider regulatory approaches that reduce burdens and maintain flexibility and freedom of choice for the public. These approaches include warnings, appropriate default rules, and disclosure requirements as well as provision of information to the public in a form that is clear and intelligible.

Sec. 5. Science. Consistent with the President's Memorandum for the Heads of Executive Departments and Agencies, "Scientific Integrity" (March 9, 2009), and its implementing guidance, each agency shall ensure the objectivity of any scientific and technological information and processes used to support the agency's regulatory actions.

Sec. 6. Retrospective Analyses of Existing Rules. (a) To facilitate the periodic review of existing significant regulations, agencies shall consider how best to promote retrospective analysis of rules that may be outmoded, ineffective, insufficient, or excessively burdensome, and to modify, streamline, expand, or repeal them in accordance with what has been learned. Such retrospective analyses, including supporting data, should be released online whenever possible.

(b) Within 120 days of the date of this order, each agency shall develop and submit to the Office of Information and Regulatory Affairs a preliminary plan, consistent with law and its resources and regulatory priorities, under which the agency will periodically review its existing significant regulations to determine whether any such regulations should be modified, streamlined, expanded, or repealed so as to make the agency's regulatory program more effective or less burdensome in achieving the regulatory objectives.

Sec. 7. General Provisions. (a) For purposes of this order, "agency" shall have the meaning set forth in section 3(b) of Executive Order 12866.

(b) Nothing in this order shall be construed to impair or otherwise affect:

(i) authority granted by law to a department or agency, or the head thereof; or

(ii) functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(c) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**The President**

 *3823  (d) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

BARACK OBAMA

THE WHITE HOUSE,January 18, 2011.

Exec. Order No. 1356376 FR 38212011 WL 176023(Pres.)

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Exec. Order No. 13771, 82 FR 9339, 2017 WL 446312(Pres.)

Executive Order 13771

Reducing Regulation and Controlling Regulatory Costs

January 30, 2017

**\*9339**  By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Budget and Accounting Act of 1921, as amended (31 U.S.C. 1101 et seq.), section 1105 of title 31, United States Code, and section 301 of title 3, United States Code, it is hereby ordered as follows:

Section 1. Purpose. It is the policy of the executive branch to be prudent and financially responsible in the expenditure of funds, from both public and private sources. In addition to the management of the direct expenditure of taxpayer dollars through the budgeting process, it is essential to manage the costs associated with the governmental imposition of private expenditures required to comply with Federal regulations. Toward that end, it is important that for every one new regulation issued, at least two prior regulations be identified for elimination, and that the cost of planned regulations be prudently managed and controlled through a budgeting process.

Sec. 2. Regulatory Cap for Fiscal Year 2017. (a) Unless prohibited by law, whenever an executive department or agency (agency) publicly proposes for notice and comment or otherwise promulgates a new regulation, it shall identify at least two existing regulations to be repealed.

(b) For fiscal year 2017, which is in progress, the heads of all agencies are directed that the total incremental cost of all new regulations, including repealed regulations, to be finalized this year shall be no greater than zero, unless otherwise required by law or consistent with advice provided in writing by the Director of the Office of Management and Budget (Director).

(c) In furtherance of the requirement of subsection (a) of this section, any new incremental costs associated with new regulations shall, to the extent permitted by law, be offset by the elimination of existing costs associated with at least two prior regulations. Any agency eliminating existing costs associated with prior regulations under this subsection shall do so in accordance with the Administrative Procedure Act and other applicable law.

(d) The Director shall provide the heads of agencies with guidance on the implementation of this section. Such guidance shall address, among other things, processes for standardizing the measurement and estimation of regulatory costs; standards for determining what qualifies as new and offsetting regulations; standards for determining the costs of existing regulations that are considered for elimination; processes for accounting for costs in different fiscal years; methods to oversee the issuance of rules with costs offset by savings at different times or different agencies; and emergencies and other circumstances that might justify individual waivers of the requirements of this section. The Director shall consider phasing in and updating these requirements.

Sec. 3. Annual Regulatory Cost Submissions to the Office of Management and Budget. (a) Beginning with the Regulatory Plans (required under Executive Order 12866 of September 30, 1993, as amended, or any successor order) for fiscal year 2018, and for each fiscal year thereafter, the head of each agency shall identify, for each regulation that increases incremental cost, the offsetting regulations described in section 2(c) of this order, and provide the agency's best approximation of the total costs or savings associated with each new regulation or repealed regulation.  **\*9340**

(b) Each regulation approved by the Director during the Presidential budget process shall be included in the Unified Regulatory Agenda required under Executive Order 12866, as amended, or any successor order.

(c) Unless otherwise required by law, no regulation shall be issued by an agency if it was not included on the most recent version or update of the published Unified Regulatory Agenda as required under Executive Order 12866, as amended, or any successor order, unless the issuance of such regulation was approved in advance in writing by the Director.

(d) During the Presidential budget process, the Director shall identify to agencies a total amount of incremental costs that will be allowed for each agency in issuing new regulations and repealing regulations for the next fiscal year. No regulations exceeding the agency's total incremental cost allowance will be permitted in that fiscal year, unless required by law or approved in writing by the Director. The total incremental cost allowance may allow an increase or require a reduction in total regulatory cost.

(e) The Director shall provide the heads of agencies with guidance on the implementation of the requirements in this section.

Sec. 4. Definition. For purposes of this order the term "regulation" or "rule" means an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or to describe the procedure or practice requirements of an agency, but does not include:
(a) regulations issued with respect to a military, national security, or foreign affairs function of the United States;

(b) regulations related to agency organization, management, or personnel; or

(c) any other category of regulations exempted by the Director.

Sec. 5. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director relating to budgetary, administrative, or legislative proposals.
(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.  **\*9341**

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

 THE WHITE HOUSE,January 30, 2017.

Exec. Order No. 1377182 FR 93392017 WL 446312(Pres.)

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Office of Legal Access Programs

List of Pro Bono Legal Service Providers | Recognition & Accreditation Roster Reports | Self Help Materials

The Office of Legal Access Programs is part of EOIR's Office of Policy. Since April 2000, the Office of Legal Access Programs (OLAP) has worked to improve the efficiency of immigration court hearings by increasing access to information and raising the level of representation for individuals appearing before the immigration courts and Board of Immigration Appeals (BIA). OLAP programs and initiatives include the:

- Recognition & Accreditation (R&A) Program
- List of Pro Bono Legal Service Providers
- Legal Orientation Program (LOP)
- Legal Orientation Program for Custodians of Unaccompanied Alien Children (LOPC)
- Self-Help Legal Centers
- Model Hearing Program
- BIA Pro Bono Project
- National Qualified Representative Program (NQRP) and other congressionally mandated "pilot innovation programs"

The Assistant Director, Office of Policy, works through OLAP to administer the Recognition & Accreditation (R&A) Program. The purpose of the R&A program is to authorize qualified non-attorneys to provide representation in immigration matters through approved organizations.

Individuals in removal proceedings are provided the List of Pro Bono Legal Service Providers (List). The List contains information on non-profit organizations, referral services, and attorneys who may be able to assist in providing pro bono (free) legal services in immigration proceedings. The Office of Policy maintains the List, oversees the application process, and monitors the providers' adherence to the regulatory requirements.

The Office of Policy administers the legal orientation and helpdesk programs to provide detained adults (LOP) or the adult caregivers of children (LOPC) in immigration removal proceedings with information about the immigration court process and their obligations. Where available, these programs also facilitate access to pro bono representation.

The Office of Policy also provides written materials and technical assistance for Self-Help Legal Centers within immigration courts. These centers assist individuals in immigration removal proceedings to learn about the immigration court process and their responsibilities.

The Model Hearing Program offers court-facilitated mock trial sessions with hands-on training in immigration court with a goal of increasing the number of pro bono representatives available for individuals in immigration removal proceedings.

AR.07402

The Office of Policy administers the BIA Pro Bono Project to facilitate timely pro bono representation for select individuals with appeals before the Board of Immigration Appeals (BIA), and oversees the National Qualified Representative Program (NQRP), a nationwide program to provide qualified representatives to certain unrepresented individuals whom the Department of Homeland Security's Immigration and Customs Enforcement detains and whom an immigration judge or the BIA have determined to be mentally incompetent to represent themselves in immigration removal proceedings.

---

For more information on EOIR's programs and initiatives, please send an email to: PAO.EOIR@usdoj.gov

Updated February 19, 2020

# Was this page helpful?

Was this page helpful?
Yes No

AR.07403



OOD
PM 19-05

Effective: November 19, 2018

To:       All of EOIR
From:   James R. McHenry III, Director *KHRfor JRM*
Date:    November 19, 2018

# GUIDANCE REGARDING THE ADJUDICATION OF ASYLUM APPLICATIONS CONSISTENT WITH INA § 208(d)(5)(A)(iii)

| | |
|---|---|
| PURPOSE: | Provides guidance regarding the adjudication of asylum applications consistent with INA 208(d)(5)(A)(iii) |
| OWNER: | Office of the Director |
| AUTHORITY: | 8 U.S.C. § 1158; 8 C.F.R. §§ 1003.0(b), 1208.7 |
| CANCELLATION: | None |

     This Policy Memorandum establishes the policy of EOIR—consistent with INA § 208(d)(5)(A)(iii)—to complete adjudications of asylum applications within 180 days to the maximum extent practicable.

     Asylum applications received by EOIR have more than tripled since FY 2014, and there are currently over 350,000 cases in immigration proceedings with an asylum application pending. Consequently, it is imperative that EOIR adopt sound strategies for handling asylum cases in a timely manner consistent with the intent of the Immigration and Nationality Act (INA). Doing so will ensure that aliens with meritorious claims will not have to wait any longer than necessary to receive benefits associated with asylee status while aliens with unmeritorious claims will be allowed to depart voluntarily or removed as expeditiously as possible.

     The INA contains two separate provisions relating to a 180-day time frame in the context of an asylum application.

     The first, INA § 208(d)(5)(A)(iii), directs the Attorney General to set procedures for processing asylum applications so that such applications should be adjudicated within 180 days:

     In the absence of exceptional circumstances, final administrative adjudication of the asylum application, not including administrative appeal, shall be completed within 180 days after the date an application is filed.

AR.07404

Implementing regulations clarify that the "time periods within which . . . the asylum application must be adjudicated pursuant to section 208(d)(5)(A)(iii) of the Act shall begin when the alien has filed a complete asylum application in accordance with" applicable procedures. 8 C.F.R. § 1208.7(a)(2).

The second, INA § 208(d)(2), addresses when an asylum applicant may be granted employment authorization based on an asylum application:

> An applicant for asylum is not entitled to employment authorization, but such authorization may be provided under regulation by the Attorney General. An applicant who is not otherwise eligible for employment authorization shall not be granted such authorization prior to 180 days after the date of filing of the application for asylum.

Implementing regulations relevant to employment authorization provide that aliens (1) cannot apply for employment authorization until at least 150 days after they file their application for asylum and (2) "no employment authorization shall be issued to an asylum applicant prior to the expiration of the 180-day period following the filing of the asylum application." 8 C.F.R. § 1208.7(a)(1). Furthermore, "[t]he time periods within which the alien may not apply for employment authorization . . . shall begin when the alien has filed a complete asylum application in accordance with" applicable regulations. *Id.* § 1208.7(a)(2).

Although neither provision is subject to private enforcement against the Government, INA § 208(d)(7), both statutory provisions express Congress's strong expectation that asylum applications would be adjudicated within 180 days of the date of filing. INA § 208(d)(5)(A)(iii) does so expressly, by indicating that asylum applications should be adjudicated within 180 days absent "exceptional circumstances." And INA § 208(d)(2) does so implicitly, by providing that employment authorization shall not be granted prior to 180 days after an alien files an asylum application, i.e., after the claim is supposed to have been adjudicated.

Although both of these provisions reflect an expectation that asylum applications should be adjudicated within 180 days of filing, the provisions themselves are not identical. For example, the adjudication deadline for the asylum application itself is subject to tolling for "exceptional circumstances." INA § 208(d)(5)(A)(iii). In contrast, the period during which an alien is barred from filing an application for employment authorization based on an asylum application, as implemented by DHS in concert with EOIR, may be tolled solely for an alien-caused continuance, 8 C.F.R. § 1208.7(a)(1), and continuances are subject to a "good cause" standard, *see infra*.

Aliens in removal proceedings sometimes request continuances pursuant to 8 C.F.R. § 1003.29 that, if granted, would delay adjudication of their asylum applications past the 180-day deadline. Section 1003.29 imposes a "good cause" standard for granting continuances. But if granting a continuance would result in missing the 180-day deadline, the Immigration Judge may only grant the continuance if the respondent satisfies both the good-cause standard of 8 C.F.R. § 1003.29 and also shows the "exceptional circumstances" required by INA § 208(d)(5)(A)(iii). Under 8 C.F.R. § 1208.7(a)(2), "[a]ny delay requested or caused by the applicant shall not be counted as part of" the 180-day adjudication deadline described in INA § 208(d)(5)(A)(iii). This means that an alien who causes delays in the adjudication process is not entitled to such a prompt adjudication of his asylum claim. But, absent delays that qualify as exceptional circumstances, 8

C.F.R. § 1208.7(a)(2) does not relieve Immigration Judges of their obligation to adjudicate asylum claims within 180 days.

"Good cause" remains the appropriate standard for granting continuances in Immigration Court. *See Matter of L-A-B-R-*, 27 I&N Dec. 405 (A.G. 2018). A continuance does not automatically justify exceeding the 180-day timeline in INA § 208(d)(5)(A)(iii), however, because the statute's "exceptional circumstances" standard is higher than the "good cause" standard for continuances. INA § 208(d)(5)(A)(iii) does not define the "exceptional circumstances" that would warrant extending asylum adjudications beyond 180 days. But Congress defined the term "exceptional circumstances" elsewhere in the INA in ways that suggest it represents a higher standard than "good cause." In INA § 240, Congress defined "exceptional circumstances" to mean "exceptional circumstances . . . beyond the control of the alien," such as "battery or extreme cruelty" or "serious illness" suffered by the alien or his child or parent. INA § 240(e)(1); *see also Matter of J-P-*, 22 I&N Dec. 33, 34 (BIA 1998) (describing "exceptional circumstances" in former INA § 242B as a "high standard"). Definitions of "extraordinary circumstances" in immigration-related regulations are similarly demanding. *E.g.*, 8 C.F.R. § 1212.7(d) (examples involve "national security or foreign policy considerations, or . . . exceptional and extremely unusual hardship").

By contrast, the Attorney General recently explained that the "good cause" standard for continuances is an open-ended term that requires a balancing of all relevant factors, a standard that would allow a broader set of reasons for delay. *Matter of L-A-B-R-*, 27 I&N Dec. 405 (A.G. 2018). Although the Attorney General described continuances in *Matter of Castro-Tum* as an "appropriate way to deal with exceptional circumstances," 27 I&N Dec. 271, 293 (2018), continuances may be justified in certain commonplace, unexceptional scenarios as well, *see, e.g.*, *Matter of L-A-B-R-*, 27 I&N Dec. at 417 (alien is the subject of a viable visa petition and prospective application for adjustment of status); *Matter of Sibrun*, 18 I&N Dec. 354, 356–57 (BIA 1983) (despite a diligent good faith effort to prepare, alien needs additional time to obtain probative, noncumulative and significantly favorable evidence). That is consistent with the way "good cause" is defined elsewhere in the INA. *See, e.g.*, 8 U.S.C. § 1253(a)(3) (setting forth numerous factors relevant to "good cause" for suspending an alien's sentence for failure to depart); *cf. Matter of S-A-*, 21 I&N Dec. 1050, 1053 (BIA 1997) ("reasonable cause" standard is "far less demanding" than "exceptional circumstances" standard).

In short, good cause that warrants a continuance in general does not necessarily—and in every case—constitute exceptional circumstances that justify missing the 180-day deadline in INA § 208(d)(5)(A)(iii).

EOIR has not always clearly and carefully distinguished between INA § 208(d)(5)(A)(iii) and INA § 208(d)(2) in its operational guidance. For instance, EOIR currently maintains a single "asylum clock" that purports to capture the running of both 180-day periods, even though, as discussed above, the standards for tolling those periods differ. [1]    Nevertheless, the statutory

---

[1] This PM does not replace Operating Policies and Procedures Memorandum (OPPM) 13-03, *Guidelines for Implementation of the ABT Settlement Agreement*. EOIR remains subject to the terms of the settlement of *B.H., et al. v. U.S. Citizenship and Immigration Services, et al.*, No. CV11-2108-RAJ (W.D. Wash.) (ABT Settlement Agreement), and nothing in this PM is intended to abrogate any extant obligation under that settlement. Further, EOIR will continue to maintain its current "asylum clock" underpinning the "180-day Asylum EAD Clock" for purposes of the ABT Settlement Agreement. Except as clarified herein, EOIR will also maintain its current guidance in OPPM

distinction between these periods is clear, as is the difference between "good cause" and "exceptional circumstances." Thus, EOIR must also be more precise in how it considers these related, but distinct, provisions.

Accordingly, it is the policy of EOIR, as a matter of sound case management, to complete adjudications of asylum applications within 180 days consistent with INA § 208(d)(5)(A)(iii) to the maximum extent practicable. [2] To that end, it is expected that once an asylum application is filed—and regardless of whether the application is filed by mail, at the window, or at a hearing— the Immigration Court will adjudicate it within 180 days, absent exceptional circumstances, consistent with INA § 208(d)(5)(A)(iii).[3] Further, good cause that warrants a continuance in general does not necessarily—and in every case—constitute exceptional circumstances that justify exceeding the 180-day deadline in INA § 208(d)(5)(A)(iii).[4]

This PM is intended to provide guidance to assist adjudicators in the timely adjudication of asylum applications consistent with principles of sound case management and the clear expectations of Congress codified in the INA. It is not intended to limit the discretion of an Immigration Judge, and nothing herein should be construed as mandating a particular outcome in any specific case. Rather, its purpose is to provide clear policy direction regarding the importance of adhering to statutory responsibilities in adjudicating asylum cases in order to ensure that both

---

13-02, *The Asylum Clock*. In the future, however, EOIR may develop a more precise mechanism for differentiating and tracking the 180-day period prescribed by INA § 208(d)(5)(A)(iii) independently of the 180-day period prescribed by INA § 208(d)(2) and will update its guidance accordingly at that time. Additionally, as in all cases, when an Immigration Judge continues an asylum case or gives a call-up date, the Judge is responsible for making the reason(s) for the adjournment or call-up date clear on the record. In all cases, including asylum cases, the Judge should annotate the case worksheet on the left side of the Record of Proceedings with the corresponding adjournment code or call-up code. The Court Administrator and court staff are responsible for ensuring that each adjournment code and call-up code is accurately entered into CASE or any successor database. The Immigration Judge and Court Administrator are also responsible for ensuring that a correct case identification code, if any, is accurately noted and entered into CASE or its successor. The Immigration Judge must be careful to use the adjournment code that most accurately reflects the basis for the continuance and must ensure that, if applicable, the party requesting a continuance is the same as the party to whom the continuance is credited. For example, in cases in which an alien requests a continuance to await the adjudication of an application by U.S. Citizenship and Immigration Services, the adjournment code should be credited to the alien unless DHS joins the request. Intentional or repeated negligent use of an incorrect code or assignment of a continuance to an incorrect party not only affects the integrity of EOIR's data but may also result in corrective action.

[2] Pursuant to the ABT Settlement Agreement, when setting a case from a master calendar hearing to an individual calendar hearing, a minimum of 45 days for a non-detained case and 14 days for a detained case must be allowed, even if the 180-day adjudications deadline is imminent. The instant PM does not alter that requirement.

[3] This policy should be read as being incorporated into the January 17, 2018 memorandum entitled "Case Priorities and Immigration Court Performance Measures" and Appendix A to that memorandum. As with the other goals outlined in that memorandum, EOIR recognizes that it may take time to effectuate this policy fully due to current operational constraints. Nevertheless, the agency remains wholly committed to fulfilling the expectations enshrined in the INA regarding the adjudication of asylum applications to the maximum extent practicable.

[4] Any suggestion in any prior guidance that "good cause" and "exceptional circumstances" are coterminous in every case is now expressly clarified to state that they are not.

AR.07407

meritorious and unmeritorious claims are addressed as efficiently as possible consistent with the law.[5]

This PM is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

Please contact your supervisor if you have any questions. Further guidance on this subject may be forthcoming.

––––––––

[5] Although administrative appeals are excluded from the provisions of INA § 208(d)(5)(A)(iii), the Board of Immigration Appeals (Board) is subject to general regulatory requirements regarding the timely adjudication of appeals. *See* 8 C.F.R. § 1003.1(e)(8). Those provisions, while not enforceable by parties against the Government, reflect an internal management directive in favor of timely dispositions. *Id.* § 1003.1(e)(8)(vi). Accordingly, except in exigent circumstances determined by the Chairman of the Board, appeals assigned to a single Board member shall be adjudicated within 90 days of the completion of the record on appeal and appeals assigned to a three-member panel shall be adjudicated within 180 days of the completion of the record. *Id.* § 1003.1(e)(8)(i). The Board is expected to adhere to those regulations for all appeals, including appeals of asylum cases.